UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                    :    18-cv-2949-ARR-RER
SUSANNA MIRKIN and BORIS MIRKIN,                                    :
Individually and on behalf of all others similarly situated,        :    OPINION AND ORDER
                                                                    :
                            Plaintiffs,                             :
                                                                    :
         -against-                                                  :
                                                                    X
XOOM ENERGY, LLC and
XOOM ENERGY NEW YORK, LLC,

                            Defendants.
-------------------------------------------------------------------

ROSS, United States District Judge:

Plaintiffs Susanna Mirkin and Boris Mirkin, a married couple residing together in Brooklyn, bring this putative class action against defendants XOOM Energy, LLC and XOOM Energy New York, LLC (collectively, "XOOM"). They assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment arising out of their March 2013 agreement to obtain residential electricity services from XOOM, an independent energy service company ("ESCO"). Defendants moved to dismiss the complaint on the ground that plaintiffs have failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).[1] Although I conclude that plaintiffs were not obligated to exhaust XOOM's dispute-resolution

---

[1] In their motion to dismiss, defendants also argue that "XOOM Energy[,] LLC is not a proper[] party to the action because it is not a party to the underlying contract, nor is it licensed to do business in New York." Br. in Supp. of XOOM Energy, LLC and XOOM Energy New York, LLC's Mot. to Dismiss Pls.' Class Action Compl. 1 n.1, ECF No. 19-1 ("Defs.' Mot. to Dismiss"). In response, plaintiffs argue that XOOM Energy, LLC can be held liable under both agency principles and a veil-piercing theory. Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Pls.' Class Action Compl. 4 n.2, ECF No. 20 ("Pls.' Opp'n"). Because I find that plaintiffs have failed to state a claim against either party, I do not evaluate these arguments.

1

remedies before bringing their claims in federal court, I grant defendants' motion to dismiss in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are drawn from plaintiffs' April 2018 complaint and are presumed to be true for the purpose of this motion to dismiss. *See Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).

In March 2013, Boris Mirkin created an application on XOOM's website to begin receiving residential electricity services through the company's SimpleFlex Variable Rate Plan. Compl. ¶ 41, ECF No. 1-2; Compl, Ex. 1, at 1 ("ESA"). Shortly thereafter, XOOM sent plaintiffs an Electricity Sales Agreement ("the agreement") which described the company's pricing policies and services. Compl. ¶ 41; *see* ESA. Plaintiffs began receiving electricity supplied by XOOM two months later, in May 2013. Compl. ¶ 42. For the first month of the agreement, XOOM charged plaintiffs a teaser rate of 8.99¢/kWh. Compl. ¶ 41.[2] During the months that followed, XOOM increased its rates to "exorbitant" levels—a tactic that plaintiffs allege is part of a "classic bait and switch deception scheme." Compl. ¶¶ 40, 43. Plaintiffs do not object to the fact that their rates increased *per se*, but they allege that the extent of the increase and the subsequent rates they were charged did not comply with their reasonable expectations under the agreement.

Pursuant to the agreement, XOOM stated that it would provide energy services to plaintiffs at "a variable rate, per kWH, that may change on a monthly basis." ESA 1. The agreement further explained that the monthly variable rate will be "based on XOOM's *actual and estimated supply costs*[,] which may include but not be limited to prior period adjustments, inventory and balancing

---

[2] Plaintiffs allege that they were charged 9.39¢/kWh during the first month of services, *see* Compl. ¶ 43, but they acknowledge in their opposition to defendants' motion to dismiss that this rate includes New York State tax. *See* Pls.' Opp'n 7 n.6; *see also* Defs.' Mot. to Dismiss 6 n.4 (noting that the 9.39¢/kWh figure included tax).

costs." *Id.* (emphasis added). Separately, the agreement stated that "[t]here are no guaranteed savings in this [a]greement at this time." *Id.* Plaintiffs allege that this representation led them—as it would have led any reasonable consumer—to believe that their variable rate "would reflect XOOM's costs for purchasing electricity at wholesale prices." Compl. ¶ 45. Yet instead of reflecting the price of electricity on the wholesale market, XOOM's monthly variable rates "were not commensurate with XOOM's supply costs." Compl. ¶ 46.

As support for their contentions that XOOM failed to comply with the rate-setting methodology outlined in the agreement, plaintiffs compare XOOM's rates to an estimated "Market Supply Cost." Compl. ¶ 47. The term "Market Supply Cost" does not appear anywhere in the agreement, but plaintiffs allege that it "corresponds to a rate that reflects [the] 'actual and estimated supply costs'" referenced as the basis for XOOM's variable rates. *Id.* To arrive at the "Market Supply Cost," plaintiffs developed an undisclosed formula that takes into account a variety of factors relevant to the electricity market: "(load-weighted) Zone J day-ahead prices, ancillary services costs, capacity costs, renewable portfolio standards (RPS) costs, and various charges and taxes related to New York's Independent Systems Operator." *Id.* Plaintiffs increased the resulting figure by an unspecified "substantial margin" in an effort to approximate the likely "retailer fixed costs" of an ESCO like XOOM. *Id.* Though plaintiffs do not disclose the formula or the raw data they used, they allege that the resulting "Market Supply Rate" was "estimated based on the costs of a retailer supplying a residential customer for each period," *id.* In their opposition to XOOM's motion to dismiss, they further explain that the figure was "calculated by [p]laintiffs' consulting expert, an experienced energy consultant at a top consulting firm." Pls.' Opp'n 6 n.5.

Plaintiffs' complaint includes a table that compares XOOM's rates to the "Market Supply Cost" during the same billing cycle, demonstrating that XOOM charged plaintiffs up to 58.55%

3

more than the "Market Supply Cost."[3] Compl. ¶ 47. Though XOOM's rate was lower than the "Market Supply Cost" during the first month of service (the "teaser" month), XOOM's rate was higher than the comparable "Market Supply Cost" during all other months. *Id.* XOOM's variable rate steadily increased for the first four months of service, decreased in September 2013, and rose again during the billing period from October 8 to November 7—plaintiffs' last month of service with XOOM. *Id.* Plaintiffs allege that this table demonstrates that "XOOM's rate was consistently and substantially higher than the rate based on [d]efendants' supply costs, which demonstrates that XOOM's rate is not set in accordance with XOOM's customer contract." Compl. ¶ 49. They argue that plaintiffs were "charged rates that are substantially higher and untethered to the supply costs," and that XOOM's failure to charge a rate that approximates the "Market Supply Rate" "caused injury to [p]laintiffs because . . . their rate should have been based on XOOM's supply costs, which it was not." Compl. ¶ 54, 56. Plaintiffs situate XOOM's behavior within the broader energy-deregulation movement across New York, arguing that XOOM, like other ESCOs operating with limited governmental oversight, "exploits deregulated markets with false promises that its energy rates are based on its actual and estimated supply costs." Compl. ¶ 27.

After growing increasingly dissatisfied with XOOM's rates, plaintiffs cancelled their service with the company in November 2013. Compl. ¶ 47. In April 2018, they filed this complaint in New York State Supreme Court in Kings County. *See* Notice of Removal ¶ 1, ECF No. 1. A month later, defendants removed the case to this court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), *et seq. Id.* ¶ 2. XOOM's motion to dismiss argues that plaintiffs have failed

---

[3] The table that appears in plaintiffs' complaint adds New York sales tax to XOOM's rates. In their opposition to defendants' motion to dismiss, plaintiffs provide an adjusted table without sales tax that demonstrates that the variance between the Market Supply Cost and XOOM's rate was, at its highest point, 51.73%. Pls.' Opp'n 7 n.6.

to state a claim upon which relief can be granted. Specifically, defendants argue that the agreement gave them the authority to set variable rates based on a non-exhaustive set of factors, "and not, as [p]laintiffs have invented, an unknown yet somehow hyper-specific 'Market Supply Rate' that is nowhere to be found in the four corners of the parties' contract." Defs.' Mot. to Dismiss 1.[4]

## LEGAL STANDARD

To survive a motion to dismiss under 12(b)(6), a complaint "must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Though plaintiffs do not need to include "detailed factual allegations" in the complaint, "[t]hreadbare recitals of the elements of cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In considering a motion to dismiss made pursuant to Rule 12(b)(6), the court must construe a complaint liberally, "accepting all factual allegations . . . as true, and drawing all reasonable inferences in the plaintiff's favor." *Lundy*, 711 F.3d at 113 (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A well-pleaded complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hamlen v. Gateway Energy Servs. Corp.*, No. 16 Civ. 3526 (VB), 2017 WL 892399, at *2 (S.D.N.Y. Mar. 6, 2017) (citation omitted).

## DISCUSSION

---

[4] XOOM's motion to dismiss also includes a request for oral argument. Because I find that the motion can be resolved on the briefs provided by the parties, I did not hear oral argument on this motion.

XOOM argues that all three of plaintiffs' causes of action—breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment—fail to state a claim upon which relief can be granted. Defs.' Mot. to Dismiss 2–3. Because the agreement between the parties specifies that it will be "governed by the laws of the state of North Carolina," ESA 3, I analyze plaintiffs' claims using the law of that state.[5] *See, e.g. Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.").

## I. The agreement's dispute-resolution clause does not impose a mandatory exhaustion requirement.

As an initial matter, XOOM argues that the court should dismiss the complaint because plaintiffs have failed to take advantage of the dispute-resolution provisions outlined in the agreement. Defs.' Mot. to Dismiss 22–23. The agreement states that, "[i]n the event of a billing dispute or a disagreement involving XOOM's service," a party "should contact XOOM's Customer Care Center" either by phone or in writing. ESA 3. It also notes that "[a] dispute or complaint relating to a residential customer may be submitted by either party at any time to the [New York State Department of Public Service]." *Id.* Before the dispute is settled, parties "must pay [their] bill in full, except for the specific disputed amount." *Id.* Finally, it provides that, in the event that the parties are unable to resolve their disagreement within forty-five days, either party "may avail itself of all remedies available under law or equity." *Id.*

---

[5] Further, as a federal court sitting in diversity, I use New York's rules regarding the treatment of a choice-of-law provision in a contract. *See Radioactive, J.V. v. Manson*, 153 F. Supp. 2d 462, 469–70 (S.D.N.Y. 2001).

Read in the light most favorable to plaintiffs, I find that the dispute-resolution clause of the agreement does not impose a mandatory exhaustion requirement upon XOOM's customers. Instead, I agree with plaintiffs that the language used in the clause is permissive, "set[ting] forth a voluntary pre-suit procedure that a customer may invoke at her discretion." Pls.' Opp'n 17. The provision uses the permissive terms "should" and "may" to describe the opportunities available to a dissatisfied customer under the agreement. *See Atla-Medine v. Crompton Corp.*, No. 00 CIV 5901(HB), 2001 WL 1382592, at *5 (S.D.N.Y. Nov. 7, 2001) ("Used in this context, 'should' is permissive, not mandatory."); *Vance v. Warren Cty. Fiscal Court*, No. 2005-CA-001331-MR, 2006 WL 3231362, at *2 (Ky. Ct. App. Nov. 9, 2006) ("The word 'should[]' . . . is not mandatory. Instead, it denotes discretion."). In contrast, when describing customers' billing obligations, the agreement uses the mandatory term "must," "demonstrat[ing] that if the contract's drafters intended the dispute resolution provision to be mandatory, they could easily have done so." Pls.' Opp'n 18 (citing *Int'l Fid. Ins. Co. v. County of Rockland*, 98 F. Supp. 2d 400, 412–13 (S.D.N.Y. 2000)).

Furthermore, it is not even entirely clear that the dispute resolution provision would apply to plaintiffs' complaints, which allege systemic violations rather than a discrete "billing dispute," ESA 3. XOOM's arguments to the contrary are unconvincing, as they rely in large part on cases involving arbitration clauses, which are analyzed under the Federal Arbitration Act and are not at issue here. *See Benihana of Tokyo, LLC v. Benihana Inc.*, 73 F. Supp. 3d 238, 249 (S.D.N.Y. 2014) ("The overwhelming balance of authority in this circuit and elsewhere indicates that, absent some separate suggestion that an *[a]rbitration [p]rovision* is intended to trigger permissive arbitration, provisions with the word 'may' trigger mandatory arbitration." (emphasis added) (citations omitted)). I am similarly not persuaded by XOOM's argument that the provision mandating that a

7

customer wait forty-five days before she "may avail [herself] of all remedies available under law or equity" would be meaningless if this court were to find the dispute-resolution provisions voluntary. Reply Br. in Further Supp. of XOOM Energy, LLC and XOOM Energy New York, LLC's Mot. to Dismiss Pls.' Class Action Compl. 14, ECF No. 22 ("Defs.' Reply"). Instead, I find that the forty-five-day waiting period applies only to those customers who *choose* to use the dispute-resolution mechanisms available to them under the agreement; those who do not use these mechanisms, like plaintiffs here, may file a case in federal or state court without exhausting other resolution channels.

For these reasons, I do not agree with XOOM that plaintiffs' failure to use the dispute-resolution provisions compels dismissal of their claims. As a result, I analyze each of plaintiffs' three causes of action separately to determine whether the complaint alleges sufficient facts to support each claim.

## II. Plaintiffs fail to state a claim for breach of contract.

Plaintiffs allege that XOOM "failed to perform its obligations under the contract because [it] charged variable rates for electricity and gas that were not based on '[its] actual and estimated supply costs." Compl. ¶ 71. Under North Carolina law, a plaintiff can state a claim for breach of contract if she establishes that (1) a valid contract exists, and (2) the defendant breached the terms of that contract. *See Crosby v. City of Gastonia*, 635 F.3d 634, 645 (4th Cir. 2011). The parties both agree that the Electricity Sales Agreement constitutes a valid contract,[6] but they disagree about whether XOOM's pricing constitutes a breach of its terms.

---

[6] In arguing that they can assert a claim for unjust enrichment as an alternative to the breach of contract claim, plaintiffs suggest that there is some disagreement between the parties about the validity of the contract. *See* Pls.' Opp'n 16–17. As I discuss in Part IV, *infra*, I find that any disagreement between the parties regarding the scope of the dispute-resolution clause does not constitute a disagreement about the validity of the underlying contract itself.

8

When analyzing the terms of a contract, I must "resolve all ambiguities in the contract in [p]laintiffs' favor." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010). A contract's terms are ambiguous if "the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 658 S.E.2d 918, 921 (N.C. 2008) (citation omitted). However, the mere fact that the parties urge different interpretations of the same language does not mean that the contract is ambiguous. *See Johnson v. Levy*, 812 F. Supp. 2d 167, 182–83 (E.D.N.Y. 2011). The court should not declare a contract ambiguous "on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Id.* (quoting *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 568 (2d Cir. 2011)). I must "examine the language of the contract itself for indications of the parties' intent at the moment of execution," *State v. Philip Morris USA*, 685 S.E.2d 85, 90 (N.C. 2009) (quoting *State v. Philip Morris USA*, 618 S.E.2d 219, 225 (N.C. 2005)), focusing only on the "four corners" of the "written instrument," *Carolina Power & Light Co. v. Bowman*, 51 S.E.2d 191, 199 (N.C. 1949).

Plaintiffs argue that a reasonable customer would have interpreted XOOM's reference to its "actual and estimated supply costs" as a promise that its variable rates would bear some relationship to "wholesale prices." Compl. ¶¶ 44–45 (emphasis omitted). In making this argument, plaintiffs rely upon cases from a variety of federal courts around the country that have had the occasion to consider the prices charged by deregulated ESCOs on the residential electricity market. "While analogous, these cases . . . address contractual provisions, legal theories, and factual allegations that are similar, but not identical, to those in the present case." *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 405 n.1 (E.D. Pa. 2016). However, the differences between

the contractual terms are revealing, as they help to demonstrate the deficiencies in plaintiffs' complaint.

Plaintiffs attempt to equate XOOM's "actual and estimated supply costs" to a verifiable, external rate of electricity costs, which can be ascertained by customers and easily compared to the rate they were actually charged. *See* Compl. ¶¶ 51–54. The problem with this position is that it belies the plain terms of the contract. The agreement says nothing about the "wholesale" rate of electricity, the market rate, or any of the factors that plaintiffs use to calculate their "Market Supply Cost"—"(load-weighted) Zone J day-ahead prices, ancillary services costs, capacity costs, renewable portfolio standard (RPS) costs, and various charges and taxes," Compl. ¶ 48. XOOM does not claim in the agreement or elsewhere that it purchases its electricity on the wholesale market, and plaintiffs make no specific allegations about the mechanism by which "XOOM fill[s] its supply needs," Defs.' Reply 4.

Instead, plaintiffs "transpose allegations from other complaints and provisions from other agreements" into XOOM's agreement with its customers. Defs.' Reply 6. Yet unlike the agreement here, the contracts used by other electricity companies in cases that have survived motions to dismiss *directly* reference the "wholesale market," "wholesale prices," or "market-related" circumstances, making it eminently reasonable for a customer to believe that her rates would be based on those external factors. *See, e.g. Basile v. Stream Energy Pa, LLC*, No. 1:15-cv-01518, 2016 WL 4611443, at *4 (M.D. Pa. Sept. 6, 2016) (contract stated that prices would be "based upon the fluctuation of *wholesale* natural gas prices or other inputs to *wholesale* electric prices" (emphasis added)); *Mirkin v. Viridian Energy, Inc.*, No. 3:15-cv-1057 (SRU), 2016 WL 3661106, at *3 (D. Conn. July 5, 2016) (defendant stated that "price may fluctuate from month-to-month based on *wholesale market conditions* applicable to the LDU's [Local Distribution Utility] service

territory" (alteration in original) (emphasis added)); *Yang Chen v. Hiko Energy, LLC*, No. 14 CV 1771(VB), 2014 WL 7389011, at *1 (S.D.N.Y. Dec. 29, 2014) (contracts stated that the rate would "reflect the *wholesale* cost of electricity . . . and other *market-related* factors" (emphasis added)).

In contrast, plaintiffs' agreement with XOOM does not incorporate any references to external rates or market prices. The agreement references a handful of factors that *may* help determine XOOM's "actual and estimated supply costs,"[7] but it provides customers with no clear formula for the calculation of its costs. By referencing XOOM's individual costs—as opposed to the circumstances of the broader market or the experiences of other, comparable ESCOs—the agreement makes XOOM's rate-setting decisions an internal activity. Customers—at least those without any background in the electricity market or the numerous factors that may determine the costs of an individual electricity provider—would have no basis for predicting XOOM's actual or estimated costs. As a result, customers have no mechanism for comparing their actual rates to the costs of the utility, since the agreement provides them with limited information about the factors used to determine XOOM's costs.

As XOOM notes, the court's decision in *Hamlen v. Gateway Energy Services Corp.* is particularly instructive. In that case, the plaintiff's contract with Gateway noted that the electricity provider's variable rates would be based on an "evaluation of a number of factors that affect the

---

[7] At various points in the briefing, defendants appear to misinterpret or misrepresent plaintiffs' arguments, suggesting that plaintiffs do not recognize that the list of terms are "non-exhaustive" or that the contract "expressly provides that the rate will be variable, [and] that it may change on a monthly basis." Defs.' Mot. to Dismiss 1, 11; *see also id.* at 2 (noting that the agreement "expressly advised [p]laintiffs that they would be receiving a monthly variable price"). As I read plaintiffs' argument, they do not complain about the variability itself or the fact that XOOM did not necessarily comply with all of the non-exhaustive terms. Rather, they allege that XOOM failed to base its rates on its "actual and estimated supply costs," however those are measured, and that the agreement—despite including a list of non-exhaustive factors that may be used to *define* those costs—commits XOOM to using its costs as the foundation for its rate-setting. *See, e.g.*, Pls.' Opp'n 13 ("Plaintiffs have amply pleaded that they reasonably expected that XOOM's rates would be commensurate with its actual and estimated supply costs . . . .").

11

total price of electricity or natural gas to a customer." 2017 WL 892399, at *1. The contract provided a description of some of the considerations that the company might use to determine costs, but noted that those considerations are "not exhaustive of all factors that may influence our pricing decision each month." *Id.* Based on this representation—which gave the electricity provider considerable, even if not total, discretion to determine the rates charged based on an evaluation of its costs each month—the court found that plaintiffs were wrong to "conflate[] wholesale rates with defendant's natural gas costs." *Id.* at *4. Even if were accurate that the defendant "charged more than competitors or the wholesale rate," that does not mean that it "failed to consider its *own* natural gas costs or market conditions." *Id.* (emphasis added); *see also Daniyan v. Viridian Energy LLC*, No. GLR-14-2715, 2015 WL 4031752, at *3 (D. Md. June 30, 2015) (holding that a contract that stated that electricity prices "will vary on a month-to-month basis" did not commit the service provider to set its prices based on the wholesale market).

At the same time, plaintiffs are correct that XOOM's promises are distinguishable from the contracts in *Hamlen* and *Daniyan* in one respect. Unlike the contracts in both cases, XOOM's agreement *does* commit the electricity provider to set prices that are based on a specific variable: XOOM's costs. Nevertheless, plaintiffs are wrong to suggest that the reference to XOOM's costs invokes a stable, fixed, or easily determined rate that customers can use as a benchmark for their own variable rates. To the contrary, the multiple factors plaintiffs use to calculate their fabricated "Market Supply Rate" demonstrate just how little resemblance this figure bears to the expectations of a reasonable customer. While a reasonable customer may plausibly expect that XOOM will set rates based on its costs, a reasonable customer would likely *not* assume that XOOM's costs will be based, for example, on "(load-weighted) Zone J day-ahead prices," Compl. ¶ 48.

Plaintiffs' allegations fail because they conflate XOOM's internal costs with complicated factors that appear nowhere on the face of the agreement. Defs.' Mot. to Dismiss 2. Ultimately, the agreement's reference to XOOM's costs "amount[s] to [little] more than vague generalities." *Daniyan*, 2015 WL 4031752, at *2. This may lead to a lack of clarity, but it does not plausibly provide plaintiffs with a reasonable expectation that XOOM's costs are equivalent to the wholesale market rate or any of the variables that plaintiffs include in their calculations. *Cf. Claridge v. No. Am. Power & Gas, LLC*, No. 15-cv-1261(PKC), 2015 WL 5155934, at *5 (S.D.N.Y. Sept. 2, 2015) (comparing a legitimately ambiguous contractual provision to one where the defendant "simply publish[ed] truthful information and allow[ed] consumers to make their own assumptions about the nature of the information" (alterations in original) (quoting *Gomez-Jimenez v. N. Y. Law Sch.*, 956 N.Y.S.2d 54, 59 (N.Y. App. Div. 2012))). Thus, the reference to XOOM's costs does not make the agreement "ambiguous," as plaintiffs' preferred interpretation would "strain the contract language beyond its reasonable and ordinary meaning." *Johnson*, 812 F. Supp. 2d at 183 (quoting *Fed. Ins. Co.*, 639 F.3d at 568).

A comparison between plaintiffs' complaint and the complaints filed in similar cases further demonstrates these distinctions. In *Mirkin v. Viridian Energy*—a case involving the same named plaintiffs as the instant case—the court found that plaintiffs had adequately pleaded that Viridian Energy failed to comply with its contractual promise to set variable rates "from month-to-month based on wholesale market conditions." 2016 WL 3661106, at *6. Plaintiffs' amended complaint in that case not only reasonably alleged that a customer would expect that her variable rates would bear some relationship to wholesale rates—rising and falling in relationship to changes in the wholesale rate—but it also provided a side-by-side comparison between Viridian's rates and the "Average Wholesale Market LBPM Rate for the NYC Region." First Amended Class Action

Complaint ¶ 47, *Mirkin v. Viridian Energy, Inc.*, No. 3:15-cv-01057(SRU) (D. Conn. Dec. 18, 2015), ECF No. 47. This comparison demonstrated that Viridian's rates were as much as 384.43% higher than the comparable wholesale market rate.[8] *Id.* Likewise, plaintiffs in *Yang Chen v. Hiko Energy* provided a comparison between their rates and the rates charged by PSE&G, the local utility, demonstrating that Hiko Energy failed to meet its explicit promise to set rates that were "1–7% lower than the utility's price for the first six months of service." Consolidated Class Action Complaint ¶¶ 16–22, *Yang Chen*, No. 14-cv-01771-VB (S.D.N.Y. July 9, 2014), ECF No. 21.

These comparable complaints began with reasonable allegations about a customer's expectations under the contract, and then compared the actual rates charged by the energy company defendant to the rate that should have been charged based on plaintiffs' reasonable expectations. Here, the plaintiffs have failed to do both of these things: (1) they do not plausibly allege that XOOM's reference to "actual and estimated supply costs" could have led a reasonable customer to believe that prices would be based on wholesale or market rates, and (2) their manufactured "Market Supply Cost" is far too attenuated from XOOM's "actual or estimated supply costs" to demonstrate a breach. As a result, plaintiffs' breach of contract claim is dismissed.

### III. Plaintiffs fail to state a claim for a breach of the implied covenant of good faith and fair dealing.

Plaintiffs' second cause of action is for a breach of the implied covenant of good faith and fair dealing. As XOOM acknowledges, every contract in North Carolina "carries with it an implied covenant by the parties to act fairly and in good faith in carrying out the agreement." Defs.' Mot. to Dismiss 15 (citing *Bicycle Transit Auth. v. Bell*, 333 S.E.2d 299, 305 (N.C. 1985)). However,

---

[8] As XOOM points out, it is notable that the disparity between plaintiffs' rate and the manufactured "Market Supply Cost" is, at its highest, around 50%, while the cases that have survived motions to dismiss allege much more significant disparities in the triple digits. *Cf.* Defs.' Reply 9 n.3. Though this would not, on its own, be a basis for dismissing the claim at this stage of the litigation, it demonstrates some of the material differences between this complaint and those that have survived similar motions.

courts in North Carolina generally hold that this claim rises and falls with a claim for breach of contract; where, as here, the court has already determined that the defendants' behavior did not constitute a breach of an express contractual term, "it would be illogical . . . to conclude that [the defendants] somehow breached implied terms of the same contract[]" with the same behavior. *Suntrust Bank v. Bryant/Sutphin Props., LLC*, 732 S.E.2d 594, 603 (N.C. Ct. App. 2012); *see also Rezapour v. Earthlog Equity Grp., Inc.*, No. 5:12CV105-RLV, 2013 WL 3326026, at *4 (W.D. N.C. July 1, 2013) ("Where the claim for breach of good faith is 'part and parcel' of a similar claim for breach of an express term of the contract claim, that claim will rise and fall with the other breach of contract claim.").

Plaintiffs argue that they can sustain this claim as a separate cause of action because the claims "are based on different (although to some degree overlapping) facts." Pls.' Opp'n 11. They cite several cases that interpreted similar claims under the law of other states, including New York. *See, e.g. Hamlen*, 2017 WL 892399, at *4–5 (allowing the claim for breach of the implied covenant of good faith and fair dealing to proceed even after dismissing the breach of contract claim where the defendants' rates were "substantially higher than its competitors'"); *E*Trade Fin. Corp. v. Deutsche Bank AG*, No. 05 Civ. 0902, 2008 WL 2428225, at *26 (S.D.N.Y. June 13, 2008) (allowing both claims to go forward because it was "too soon to address whether the plaintiffs' claim for breach of the covenant of good faith and fair dealing is duplicative" of the breach of contract claim). These cases, however, have limited value for plaintiffs' argument, since courts interpreting North Carolina law have held that the claims are analyzed together even if they are based on "*similar*," and not identical, facts. *Rezapour*, 2013 WL 3326026, at *4 (emphasis added).

Moreover, I agree with defendants that plaintiffs have not actually based their claims on different facts. Though plaintiffs add a few buzzwords to their second cause of action, alleging

15

that XOOM engaged in "price gouging" and acted "arbitrarily and unreasonably," Compl. ¶¶ 77, 78, these terms do not change the reality that their claims are derived from the same underlying behavior. *See* Defs.' Reply 7 (noting that plaintiffs have added certain "conclusory buzzwords" but "fail to plead any facts to support these allegations"). Plaintiffs allege that XOOM breached the implied covenant by "frustrat[ing] [p]laintiffs['] and other [c]lass members' reasonable expectations that the variable rates for electricity would be based on 'XOOM's actual and estimated supply costs.'" Compl. ¶ 78. Just as in *Melville v. Spark Energy*, "[t]hese allegations are ones that arise from the contract itself—they center on what the [agreement] promised and whether [XOOM] fulfilled that promise." No. 15-8706 (RBK/JS), 2016 WL 6775635, at *5 (D.N.J. Nov. 15, 2016).

Furthermore, plaintiffs are incorrect that XOOM's variable rates deprived them of their reasonable expectations under the agreement, since I have already found that they failed to adequately plead that XOOM was obligated to set its prices in accordance with wholesale prices or plaintiffs' own "Market Supply Cost." *See, e.g.*, *Cole v. Wells Fargo Bank, N.A.*, No. 1:15-cv-00039-MR, 2016 WL 737943, at *7 (W.D.N.C. Feb. 23, 2016) ("[N]o obligation may be implied that would be inconsistent with the other terms of the contractual relationship"). Thus, having already found that XOOM did not fail to comply with customers' reasonable expectations under the agreement, I find that this claim also fails as a matter of law. *See B. Lewis Prods., Inc. v. Angelou*, No. 01Civ.0530MBM, 2005 WL 1138474, at *11 (S.D.N.Y. May 12, 2005) ("[T]he weight of North Carolina authority holds also that a claim for breach of the covenant of good faith and fair dealing based on facts identical to those supporting a breach of contract claim should not be pursued separately.").

**IV.    Plaintiffs fail to state a claim for unjust enrichment.**

16

As an alternative to their claims based on the contract, plaintiffs assert a claim for unjust enrichment. They allege that XOOM "unjustly enriched itself and received a benefit beyond what was contemplated in XOOM's customer contract." Compl. ¶ 82. North Carolina law recognizes a claim for unjust enrichment as a "quasi-contract" claim, where a "contract [is] implied in law." *Carty v. Westport Homes of N.C., Inc.*, 472 F. App'x 255, 258 (4th Cir. 2012) (internal quotation marks omitted) (quoting *Atl. & E. Carolina Ry. Co. v. Wheatly Oil Co.*, 594 S.E.2d 425, 429 (N.C. Ct. App. 2004)). As a result, "[i]f there is a contract between the parties the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988) (citing *Vetco Concrete Co. v. Troy Lumber Co.*, 124 S.E.2d 905 (N.C. 1962)). Though plaintiffs acknowledge that this claim can only be brought in the absence of a governing contract, they argue that they can sustain this claim as an alternative pleading under Federal Rule of Civil Procedure 8. Pls.' Opp'n 15.

XOOM makes several arguments in response. While I am not convinced by all of XOOM's arguments, I ultimately agree that the unjust enrichment claim can only be sustained in the alternative if there is a genuine dispute about the validity of the underlying contract. To the extent that XOOM argues that plaintiffs' claim fails because it is not *explicitly* pleaded in the complaint "as an alternative," Defs.' Mot. to Dismiss 21, I am not persuaded that this is a fatal defect. *Cf. Pres. Prof'l Servs., LLC v. M2 Pictures, LLC*, No. 3:14-CV-589-RJC-DCK, 2015 WL 3659506, at *7 (W.D. N.C. May 5, 2015) (noting that the claims were not pleaded in the alternative, but ultimately dismissing on different grounds), *adopted by* 2015 WL 3657463 (W.D.N.C. June 12, 2015). XOOM also argues that plaintiffs' claim for unjust enrichment is time-barred, as New York courts[9] apply a three-year statute of limitations to these claims where, as here, the plaintiff seeks

---

[9] Though I interpret the contract according to North Carolina law, I apply the statute of limitations of the forum state, New York. *See, e.g.*, *Schermerhorn v. Metro.Transp. Auth.*, 156 F.3d 351, 354 (2d Cir. 1998)

money damages. *See* Defs.' Mot. to Dismiss 18–19. However, as plaintiffs point out, the law regarding the statute of limitations is less clear than XOOM suggests—particularly because plaintiffs bring claims for *both* monetary and equitable relief. *See, e.g.*, *Ross v. Thomas*, No. 09 Civ. 5631 (SAS), 2010 WL 3952903, at *7 n.96 (S.D.N.Y. Oct. 7, 2010) ("The vast majority of courts have applied a six-year statute of limitations to unjust enrichment claims regardless of whether plaintiffs are seeking legal or monetary relief."), *aff'd*, 460 F. App'x 16 (2d Cir. 2012); *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 263 (S.D.N.Y. 2008) ("New York's statute of limitations for unjust enrichment is six years . . . .").

However, I agree that the weight of authority demonstrates that an unjust enrichment claim can only be sustained as an alternative to a claim based on a contract if the existence of that contract is in doubt. *See, e.g.*, *Melville*, 2016 WL 6775635, at *5 ("Where a valid contract governs the parties' rights and obligations, a party cannot bring a claim for unjust enrichment."); *Karski v. Brazilian Res., Inc.*, No. 3:08CV608-RJC-DSC, 2009 WL 1255545, at *6 (W.D. N.C. May 4, 2009) (applying both North Carolina and New Hampshire law and holding that under either, "an unjust enrichment claim lies only in the *absence* of a valid express contract"), *adopted by* 2009 WL 2045869 (W.D.N.C. July 9, 2009). Plaintiffs argue for the first time in their opposition to XOOM's motion to dismiss that the validity of the underlying agreement between the parties *is* disputed, "because XOOM's reading of the contract's dispute resolution provision may render the

---

("In diversity cases, state statutes of limitations govern the timeliness of state law claims . . . .") (citations omitted); *see also Mohsen v. Morgan Stanley & Co.*, No. 11 Civ. 6751(PGG), 2014 WL 4593919, at *5 (S.D.N.Y. Sept. 15, 2014) ("[T]he choice of law provision governing the Client Account Agreement does not mandate that New York's statute of limitations be applied to Mohsen's claims."); *Portfolio Recovery Assocs., LLC v. King*, 927 N.E.2d 1059, 1061 (N.Y. 2010) (finding that the court below correctly applied New York's statute of limitations rules even though the contract between the parties specified that Delaware law governed the contract, because "[c]hoice of law provisions typically apply to only substantive issues");. Furthermore, neither party argues that North Carolina's statute of limitations rules should be applied here, and both parties discuss only New York's statute of limitations rules as they pertain to the "unjust enrichment" claim.

contract void and unenforceable." Pls.' Opp'n 16. I am not persuaded. First, as already stated, I disagree with XOOM that the dispute-resolution provision imposed a mandatory exhaustion requirement. Second, and more importantly, even if plaintiffs continued to argue that this provision was invalid, they would be arguing for the invalidity of a particular clause of the contract, not the contract as a whole. *See, e.g. Int'l Paper Co. v. Corporex Constructors, Inc.*, 385 S.E.2d 553, 555 (N.C. Ct. App. 1989) (noting that a provision of a contract that is severable from an invalid provision can still be enforced).

Furthermore, plaintiffs' claim for unjust enrichment directly invokes the underlying contract, demonstrating that the unjust enrichment claim "simply duplicates, or replaces, a conventional contract or tort claim." *Yang Chen*, 2014 WL 7389011, at *7 (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)); *see* Compl. ¶ 82 (arguing that XOOM unjustly enriched itself because it "received a benefit beyond what was contemplated in XOOM's *customer contract*" (emphasis added)). I agree with the court in *Madison River Management Co. v. Business Management Software Corp.* that plaintiffs "cannot now claim the existence of an implied contract" when all of the facts pleaded in their complaint "allege there is an express contract between the parties." 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005).

As a result, plaintiffs' claim for unjust enrichment is dismissed.

## CONCLUSION

For the foregoing reasons, XOOM's motion to dismiss is granted in its entirety. The clerk of court is directed to enter judgment accordingly and close the case.

So ordered.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated: September 21, 2018
Brooklyn, New York