## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSANNA MIRKIN AND BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | No: 18 Civ. 2949 (ARR) (RER) |
| v. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| XOOM ENERGY, LLC, and XOOM ENERGY NEW YORK, LLC, | |
| Defendants. | Jury Trial Demanded |

## CLASS ACTION COMPLAINT

Plaintiffs Susanna Mirkin and Boris Mirkin, by their attorneys Wittels Law, P.C., Hymowitz Law Group, PLLC, and Kheyfits Belenky LLP bring this action in their individual capacity, and on behalf of a class of persons defined below, against Defendants XOOM Energy, LLC ("XOOM-Energy") and XOOM Energy New York, LLC ("XOOM-NY") (collectively "XOOM" or "Defendants") and hereby allege upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation made by their attorneys, as follows:

### NATURE OF THE ACTION

1.      This action seeks to redress the improper pricing practices of Defendants that have caused thousands of New York consumers to pay many millions of dollars more for their residential gas and electricity than they should otherwise have paid.

2.      Traditionally, residential energy was supplied by regulated utilities like Con Edison.  The rates utilities could charge were strictly controlled.  In the 1990s, however, Enron's

unprecedented lobbying campaign resulted in deregulation of state energy markets in New York and elsewhere such that consumers were permitted to choose from a variety of companies selling residential energy.  Seizing on deregulation, independent energy service companies ("ESCOs") like XOOM have grown rapidly.

3.     Price is the most important consideration for energy consumers.  Given that there is no difference at all in the commodity that XOOM supplies as opposed to the consumer's utility, the only reason a consumer switches to an ESCO like XOOM is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility.  That is, after all, the entire point of energy deregulation.

4.     Defendants take advantage of deregulation by offering a teaser rate that is lower than the local utility's rate.  When the teaser rate expires after a brief period, sometimes as short as a month, Defendants charge a variable rate, which under their customer contract must be based on Defendants' supply cost (the wholesale cost of energy makes up over 90% of Defendants' supply costs).  Yet the rate Defendants charge is ***not*** based on supply costs as required by the contract but is instead a substantially higher rate based on Defendants' price gouging.

5.     Defendants' conduct injures New York consumers and is unlawful.  In fact, XOOM's variable rates are significantly higher than what XOOM's contract requires.  XOOM's business model is simple:  after the teaser rate expires, it charges exorbitant rates that are not based on Defendants' supply costs.  As a result, New York consumers are being fleeced millions of dollars in exorbitant residential energy charges.  Residential energy costs are a significant portion of most New York families' budgets.  To prey on consumers as Defendants have done here is unconscionable.

6.      This suit is brought pursuant to the common law of New York on behalf of a class of consumers who purchased residential electricity or gas from XOOM at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment.  It seeks, *inter alia*, injunctive relief, actual damages and refunds, interest, attorneys' fees and the costs of this suit.

7.      Only through a class action can XOOM's customers remedy Defendants' ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge XOOM's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, many customers don't realize they are victims of XOOM's conduct.  With this class action, Plaintiffs and the Class seek to level the playing field and ensure that companies like XOOM engage in fair and upright business practices.

## PARTIES

8.      Plaintiffs Susanna Mirkin and Boris Mirkin are married and reside in Brooklyn, New York.

9.      Defendant XOOM-NY is a limited liability company that was formed under the laws of the State of New York, with its principal place of business located in Huntersville, North Carolina.  XOOM-NY is the wholly owned subsidiary of Defendant XOOM-Energy. XOOM-NY is XOOM-Energy's agent in New York and has apparent authority to act on XOOM-Energy's behalf.  XOOM-NY and XOOM-Energy use the same corporate logo and share the same principal place of business.   On information and belief, XOOM-NY has no separate offices or letterhead.  On information and belief, XOOM-NY does not have its own management or employees.  When Defendants issue new releases about New York, they do so under the XOOM-Energy's brand.  On information and belief, the XOOM-Energy management

and employees conduct the affairs of XOOM-NY.  On information and belief, XOOM-NY does not have its own payroll.  On information and belief, to the extent XOOM-NY maintains any corporate policies, those policies were developed and implemented by XOOM-Energy's management and employees.  On information and belief, XOOM-NY does not advertise or have a website.  Rather XOOM-NY procures and enrolls customers through co-Defendant XOOM-Energy's advertisements and website.  On information and belief, XOOM-Energy authorized XOOM-NY to procure and enroll customers through co-Defendant XOOM-Energy's website.  On information and belief, all XOOM marketing directed at New York consumers was created by or at the request of XOOM-Energy.  On information and belief, XOOM-Energy is fully aware that XOOM-NY has apparent authority to act on XOOM-Energy's behalf.

10.     On information and belief, XOOM-NY possesses actual authority to act on XOOM-Energy's behalf in New York.  On information and belief, XOOM-Energy's management, employees, or other individuals contracted by XOOM-Energy drafted the customer contract at issue in this litigation.  On information and belief, XOOM-Energy caused Defendants to breach their contracts with Plaintiffs and the Class.

11.     On information and belief, XOOM-NY is entirely dominated by XOOM-Energy. On information and belief, XOOM-NY observes no corporate formalities.  On information and belief, XOOM-NY keeps no corporate records or minutes and has no officers or directors elected in accordance with its by-laws.  On information and belief, XOOM-Energy commingles assets with XOOM-NY.  On information and belief, XOOM-Energy pays all of XOOM-NY's bills.  On information and belief, XOOM-NY's revenues are not recorded independently, but are treated as part of XOOM-Energy's revenues.  On information and belief, XOOM-NY has no assets and passes all revenues to XOOM-Energy.  On information and belief, XOOM-NY does not own real

property.  On information and belief, any real property owned by Defendants is owned by XOOM-Energy or other entities controlled by XOOM-Energy.  On information and belief, XOOM-NY's marketing and sales data are not recorded independently but are treated as part of XOOM-Energy's marketing and sales data.  On information and belief, XOOM-NY does not have an independent marketing and sales department and does not utilize marketing and sales software for its sole benefit.  Instead, on information and belief, XOOM-NY uses XOOM-Energy's marketing and sale channels and software.

12.     In sum, XOOM-NY is a shell company through which XOOM-Energy operates in New York.  XOOM-NY is XOOM-Energy's agent in New York with authority to bind New York consumers to XOOM's customer contract.

13.     Defendant XOOM-Energy is a limited liability company that was formed under the laws of the State of Delaware, with its principal place of business located in Huntersville, North Carolina.  On information and belief, XOOM-NY is XOOM-Energy's alter ego because XOOM-Energy exercises complete domination and control of XOOM-NY so that XOOM-NY has no independent identity.  XOOM-Energy supplies electricity, natural gas, and renewable energy through its wholly-owned subsidiaries, which in New York is XOOM-NY.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants.

15.     This Court has general personal jurisdiction over Defendants. Defendants do business in New York through continuous, permanent, and substantial activity in New York.

16.     This Court has personal jurisdiction over Defendant XOOM-NY because it is a

limited liability company organized under the laws of the State of New York.

17.     This Court has personal jurisdiction over Defendant XOOM-Energy because it

transacts business in New York.  On its website, XOOM-Energy states as follows:

> Based in Huntersville, North Carolina, XOOM Energy, is a progressive,
> independent energy retailer. Through its wholly-owned subsidiaries, XOOM
> Energy supplies natural gas, electricity and renewable energy to residential, small
> business, mid-market and large commercial customers in deregulated energy
> markets in 18 states, plus the District of Columbia, and Canadian provinces of
> Alberta and Ontario, in 100+ utility markets across North America.

Additionally, on its website, www.xoomenergy.com, that is registered and administered

by XOOM-Energy (not XOOM-NY), XOOM-Energy advertises various energy plans to New

York residential and commercial customers and enables New York consumers to enroll as

XOOM customers:

> How do I enroll? It's simple. If you are the account holder or legally authorized
> person on the account, you may enroll right here online.  It only takes a few minutes
> – all you need is your utility bill to get started.

18.     Venue is proper in the Eastern District of New York because Plaintiffs Susanna

Mirkin and Boris Mirkin reside in Brooklyn, NY.

## SUBSTANTIVE ALLEGATIONS

### Energy Deregulation and Resulting Wide-Spread Consumer Harm

19.     In 1996, New York deregulated the sale of retail gas and electricity.  As a result of

deregulation, New York consumers can purchase natural gas and electricity through third-party

suppliers while continuing to receive delivery of the energy from their existing public utilities.

These third-party energy suppliers are known as energy service companies, or "ESCOs."  Since

New York opened its retail gas and electric markets to competition, approximately two million

New York consumers have switched to an ESCO.

20.     ESCOs are subject to minimal regulation by New York's utility regulator, the

New York State Public Service Commission (the "PSC"). ESCOs like XOOM do not have to

file their rates with the PSC, or the method by which those rates are set. The PSC also does not

limit in any way the prices ESCOs charge.

21.     ESCOs play a middleman role: they purchase energy directly or indirectly from

companies that produce energy and sell that energy to end-user consumers. However, ESCOs do

not **deliver** energy to consumers. Rather, the companies that produce energy deliver it to

consumers' utilities, which in turn deliver it to the consumer. ESCOs merely buy gas and

electricity and then sell that energy to end-users with a mark-up. Thus, ESCOs are essentially

brokers and traders: they neither make nor deliver gas or electricity, but merely buy energy from

a producer and re-sell it to consumers.

22.     ESCOs like XOOM also bear minimal credit risk (i.e., risk their customers will

not pay) because of New York's purchase of receivables program. In its *Statement of Policy on

Further Steps Toward Competition in Retail Energy Market*, issued August 25, 2004, the PSC

authorized utilities to purchase the ESCO accounts receivable, in order to, *inter alia*: reduce

ESCO operating costs. Purchase of Receivables ("POR") was rolled out by each of the utilities.

Under POR, the utility purchases the ESCO receivables when they accrue, at a discount. The

discount amount varies by utility but is generally based on the uncollectable accounts incurred by

the ESCOs in that utility's service area. Relatively few accounts become uncollectible, however,

because the utility can turn off the consumer's gas or electricity. The ESCO receives the full

discounted payment from the utility regardless of whether a customer pays its bill. Upon

information and belief, XOOM participates in all New York utilities POR programs where it

serves New York consumers.

23.     If a customer switches to an ESCO, the customer's existing utility continues to

bill the customer for both the energy supply and delivery costs.  The only difference to the customer is which company sets the price for the customer's energy supply.  For the ESCO, however, this is a significant cost savings because it does not have to bill (and collect from) its customers.  Because the utility remains the primary billing contact ESCOs like XOOM can service relatively large customer bases with far fewer customer service costs than would be possible if XOOM billed its customers directly.

24.     After a customer switches to an ESCO, the customer's energy supply charge (based either on a customer's kilowatt hour [electricity] or therm [gas] usage) is calculated using the supply rate charged by the ESCO and not the regulated rate charged by the customer's former utility.  The supply rate charged is itemized on the customer's bill as the number of kilowatt hours ("kWh") or therms multiplied by the rate.  For example, if a customer uses 145 kWh at a rate of 10.0¢ per kWh, the customer will be billed $14.50 (145 x $.10) for their energy supply.

25.     Responding to shocking energy prices, many key players that supported retail deregulation now regret the role they played.  For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented:

> Deregulation has failed.  We are not going to give up on re-regulation till it is done.[1]

26.     A Connecticut leader who participated in that state's foray into retail energy deregulation was similarly regretful:

> Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex. . . .  If somebody says, no, we didn't screw up, then I don't know what world we are living in.  We

---

[1] David Hill, *State Legislators Say Utility Deregulation Has Failed in its Goals*, The Washington Times, May 4, 2011.

did.[2]

27.     XOOM takes advantage of deregulation and the lack of regulatory oversight to charge New York consumers exorbitant rates for residential electricity and gas.  In theory, energy deregulation allows consumers to shop around for the best energy rates, and it allows consumers to take advantage of market-based rates that decline when wholesale costs decline.  However, XOOM exploits deregulated markets with false promises that its energy rates are based on its actual and estimated supply costs.  In fact, XOOM's rates are not reflective of Defendants' supply costs.

28.     One of deregulation's main unintended consequences has been the proliferation of ESCOs like XOOM whose business model is primarily based on taking advantage of consumers.  As a result of this widespread misconduct, states like New York began enacting post-deregulation remedial legislation meant to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers."[3]  As the sponsoring memorandum notes, the ESCO Consumers Bill of Rights, codified as G.B.L. Section 349-d, in 2010 sought to end the exact type of deceptive conduct Plaintiffs challenge here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity and natural gas.  Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.

* * *

---

[2] Christopher Keating, *"Eight Years Later . . . 'Deregulation Failed,'"* Hartford Courant, Jan. 21, 2007.

[3] ESCO Consumers Bill of Rights, New York Sponsors Memorandum, 2009 A.B. 1558, at 1 (2009) attached as Exhibit 2.

> High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, *short-term "teaser" rates followed by skyrocketing variable prices*—many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas. The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.

*Id*. at 3–4 (emphasis added).

29.     New York regulators have also begun to call out the high levels of misconduct that pervade the state's deregulated energy markets. For example, in 2014 the PSC concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion."[4]  The PSC further noted "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[5]  The PSC concluded as follows:

> [A]s currently structured, the retail energy commodity markets for residential and small nonresidential customers cannot be considered to be workably competitive. Although there are a large number of suppliers and buyers, and suppliers can readily enter and exit the market, the general absence of information on market conditions, particularly the price charged by competitors, is an impediment to effective competition . . . .[6]

30.     The PSC's complaint data confirms its conclusions. A large percentage of consumer complaints to the PSC concern variable rate pricing like Defendants' where

---

[4] CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 4 (Feb. 25, 2014).

[5] *Id*. at 11.

[6] *Id*. at 10.

consumers' bills are more or less as advertised during the teaser or fixed rate period, but after this initial period expires, instead of switching the consumer back to the utility the ESCO uses the consumers' inaction to substantially increase the price without further notice or explanation as to how the new rate is determined.

31.     Statistics from the New York Attorney General's ("NYAG") office confirm the pattern of activity this consumer class action seeks to combat.  From at least the year 2000 to the present, the NYAG has investigated numerous ESCOs' deceptive and illegal business practices. These investigations have resulted in at least eight settlements providing for extensive injunctive relief and millions in restitution and penalties.

32.     In the last four years, the NYAG has also directly received more than 600 complaints against ESCOs.  These complaints demonstrate that the ESCO practices that were the subject of the NYAG's previous settlements continue, and that industry participants like XOOM view regulatory enforcement actions as simply the cost of continuing their fraudulent business practices.

33.     The unlawful conduct of ESCOs like XOOM has been devastating to New York consumers.  For example, "[a]ccording to the data provided by [New York's] utilities, the approximately two million New York State residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have paid if they purchased commodity from their distribution utility during the 36-months ending December 31, 2016."[7]  "Additionally, small commercial customers paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for

_____

[7] CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 2 (Mar. 30, 2018).

the same 36-month period."[8]  Combining these two groups, New York consumers have been

"'overcharged' by over $1.3 billion dollars over this time period."[9]

34.     New York's low-income consumers have also been hit hard.  The utilities

reported that low-income ESCO customers (a subset of the residential customers mentioned

above) "collectively paid in excess of $146 million more than they would have paid if they took

commodity supply from their utility."[10]

35.     Based on the flood of consumer complaints, negative media reports, and data

demonstrating massive overcharges, the PSC announced in December 2016 an evidentiary

hearing to consider primarily whether ESCOs should be "completely prohibited from serving

their current products" to New York residential consumers.[11]  In other words, to reassess whether

New York's deregulation experiment has failed everyday consumers.

36.     Then, on December 16, 2016, the PSC permanently prohibited ESCOs from

serving low-income customers, because of "the persistent ESCO failure to address (or even

apparently to acknowledge) the problem of overcharges to [low income] customers . . . ."[12]

37.     Following the first part of the evidentiary hearing announced in December 2016,

on March 30, 2018, PSC staff reached the following conclusions about ESCOs in New York:

> [M]ass market ESCO customers have become the victims of a failed market
> structure that results in customers being fooled by advertising and

---

[8] *Id.* at 3.

[9] *Id*.

[10] *Id*.

[11] CASE 12-M-0476, Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits, at 3 (Dec. 2, 2016).

[12] CASE 12-M-0476, Order Adopting A Prohibition On Service To Low-Income Customers By Energy Services Companies, at 3 (Dec. 16, 2016).

marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.  Rather than fierce ESCO against ESCO price competition working to protect customers from excessive charges, ESCOs have deliberately obfuscated prices and resisted market reforms such that the Commission's decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable. [13]

\* \* \*

[T]he Commission must direct that mass market ESCO customer bills disclose a relative bill comparison showing the current bill charges and what the customer would have paid had they taken delivery and commodity from their utility.[14]

\* \* \*

The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.  Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.

Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers.  For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[15]

\* \* \*

---

[13] CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 1 (Mar. 30, 2018).

[14] *Id.* at 4.

[15] *Id.* at 41–42 (citations omitted).

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[16]

38.     As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, PSC staff found that these costs do "not justify the significant overcharges" ESCOs levied on New York consumers.[17] Likewise, when the ESCOs claimed that their provision to consumers of so-called value-added products such as light bulbs and thermostats contributed to their excessive rates, PSC staff found that "these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[18] Instead, PSC staff reached the following conclusion:

The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers. These overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market. These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[19]

---

[16] *Id.* at 86 (citations omitted).

[17] *Id.* at 37.

[18] *Id.* at 87.

[19] *Id.*

39.     This class action, which seeks damages, restitution, penalties, and equitable relief is further proof that residential energy deregulation has been an abject failure.

## XOOM Charges Improperly High Electricity Rates

40.     XOOM engages in a classic bait and switch deception scheme.  XOOM lures consumers into switching to its electricity supply service by offering teaser rates that are much lower than its regular rates.

41.     In or around March 2013, Plaintiff Boris Mirkin enrolled (in his wife Susanna Mirkin's name) through the XOOM-Energy website into the SimpleFlex Plan with the advertised rate of 8.99¢/kWh.  Plaintiff Boris Mirkin believed he was enrolling with the entity that controls the "Xoom" brand, to wit XOOM-Energy.  Shortly after the enrollment, Plaintiffs received Defendants' "XOOM Energy: New Customer Enrollment" e-mail attaching the "Electricity Sales Agreement," (referred to as "XOOM's customer contract") and attached hereto as Exhibit 1.

42.     In May 2013, Plaintiffs' electricity account was switched to XOOM for electricity supply.  Thereafter, Plaintiffs paid the rate that they were charged.

43.     Plaintiffs were initially placed on an introductory teaser rate of 8.99¢ per kWh for electricity for the first month of service.  After the first month on the teaser rate, XOOM charged Plaintiffs exorbitant variable month-to-month rates for electricity.

44.     XOOM's customer contract represents that "[customer's] monthly variable rate is based on XOOM's ***actual and estimated supply costs*** which may include but not be limited to prior period adjustments, inventory and balancing costs."

45.     But the rates XOOM charged Plaintiffs were not commensurate with XOOM's supply costs.

46.     The other cost factors XOOM identifies in its customer contract are "inventory,"

which only applies to gas,[20] and normal system "balancing costs," are already incorporated in the wholesale market rate of electricity in New York.  As for "prior period adjustments" those should balance out over time, as adjustments are both positive and negative.  Therefore, and consistent with the PSC's staff's findings regarding the ESCO industry mentioned in Paragraphs 37–38 *supra*, these other cost factors cannot explain the drastic increases in XOOM's variable rate or the reason its rates are disconnected from the wholesale supply cost.

47.     Upon information and belief, XOOM purchases its energy either directly from the New York Independent System Operator ("NYISO") or pursuant to an agreement(s) that ties XOOM's supply costs to prices in the NYISO wholesale market.  During the year Plaintiffs were XOOM customers (2013) the NYISO listed both Defendants in its Annual Report as NYISO "Market Participants."  Both the 2016 NYISO Annual Report and the NYISO market participant list as of September 26, 2018 also list both defendants as NYISO "Market Participants."

48.     The "What is Energy Deregulation" page on XOOM's website states "[y]our retail supplier buys natural gas and electric power from wholesale markets.  XOOM Energy is strategically aligned with one of the world's largest energy wholesalers, enabling us to buy energy on a competitive basis."[21]

49.     The "FAQs" on XOOM's website until at least October 19, 2018 described XOOM's variable plan as allowing consumers to purchase energy "at market-based prices . . . ."  At some point after October 19, 2018 and after this lawsuit was first filed on April 18, 2018,

---

[20] Electricity unlike gas is not storable, and thus cannot become "inventory."

[21] *What is Energy Deregulation*, XOOM ENERGY, https://xoomenergy.com/en/what-is-deregulation (last visited Aug. 21, 2019).

XOOM removed the reference to "market-based prices" from the "FAQs on its website. [22]  In the New York specific FAQs on its website XOOM still describes its variable plan as providing consumers the "flexibility of market-based rates" and that this is a way XOOM can "reduce my energy costs."[23]

50.      In the New York specific FAQs on its website XOOM describes third-party energy suppliers like itself as a "company that acquires its electricity, renewable energy or natural gas supplies from the wholesale market and is licensed to sell it retail to homes and business."[24]

51.      A video on bottom of XOOM's website until at least October 19, 2018 stated that XOOM's variable prices are based on market prices when it describes "the reward" that comes from "twists or turns of the market[.]"[25] At some point after October 19, 2018 and after this lawsuit was first filed on April 18, 2018, XOOM took this video off of its website.

52.      The below image from a XOOM marketing presentation states that XOOM's rates fluctuate "with wholesale market[.]"

---

[22] *Frequently Asked Questions*, XOOM ENERGY, https://xoomenergy.com/en/faq (last visited Aug. 21, 2019).

[23] *Frequently Asked Questions*, *New York* (FAQ: "How does XOOM Energy reduce my energy costs?"), XOOM ENERGY, https://xoomenergy.com/en/faq/new-york (last visited Aug. 21, 2019).

[24] *Frequently Asked Questions*, *New York* (FAQ: "What is an energy supplier?"), XOOM ENERGY, https://xoomenergy.com/en/faq/new-york (last visited Aug. 21, 2019).

[25] XOOM ENERGY, Fixed vs. Variable Rate Energy from XOOM Energy video at 1:00, https://xoomenergy.com/en (last visited Oct. 19, 2018).

XOOM Energy Residential and Small Business Plan Options
Variable Rate Plan
•Rate fluctuates with wholesale market
•Lowest possible cost that current market allows
•Pricing each month can vary
•Month-to-Month: no term commitment
ACN

53. New York's wholesale electricity market is administered by the NYISO. The NYISO is regulated by the Federal Energy Regulatory Commission (FERC). The NYISO publishes hourly electric energy prices by location, referred to as locational marginal prices (LMPs).[26] LMPs form the majority portion of the wholesale electricity price. The other wholesale electricity components besides LMPs are ancillary services costs, capacity costs, renewable portfolio standard (RPS) costs, and various relatively-small charges related to the NYISO. The remaining components of the wholesale supply cost are set by the NYISO or are otherwise set in the wholesale electricity market. In other words, all components of the wholesale cost of electricity are objectively determinable and mandated by regulation. In New York City, a 4.5% gross receipt tax is charged on electricity sales.

---

[26] *See Pricing Data*, NEW YORK INDEPENDENT SYSTEM OPERATOR, https://www.nyiso.com/public/markets_operations/market_data/pricing_data/index.jsp (last visited Oct. 19, 2018).

54.     Plaintiffs paid XOOM's variable rate through November 2013.  In November

2013, Plaintiffs cancelled their service with XOOM.  The following table identifies the billing

periods during this time, the variable rates XOOM charged Plaintiffs, and the "Market Supply

Cost," which corresponds to a rate that reflects "actual and estimated supply costs," as required

by the XOOM customer contract:

| Period | XOOM Rate | Market Supply Cost | Difference in % | XOOM Total Margin (Markup) on Wholesale Cost[27] |
|---|---|---|---|---|
| 5/10/2013–6/11/2013 | 8.99 (*teaser*) | 11.08 | -23.25% | N/A |
| 6/11/2013–7/11/2013 | 11.96 | 11.80 | -1.34% | 11.04% |
| 7/11/2013–8/9/2013 | 14.40 | 12.35 | 16.60% | 28.36% |
| 8/9/2013–9/10/2013 | 14.88 | 10.18 | 46.17% | 60.81% |
| 9/10/2013–10/8/2013 | 14.15 | 10.13 | 39.68% | 54.40% |
| 10/8/2013–11/7/2013 | 14.90 | 9.85 | 51.27% | 66.47% |

55.     In the above table, the column "Market Supply Costs" were estimated based on

the costs of a retailer supplying a residential customer for each period.  The supply costs

included (load-weighted) Zone J day-ahead NYISO prices (the wholesale cost of electricity for

Brooklyn, where Plaintiffs reside), ancillary services costs, capacity costs, renewable portfolio

standard (RPS) costs, and various relatively-small charges related to the NYISO.  These charges

are tracked by NYISO's Market Monitor, the external consultant that independently evaluates

the New York wholesale electricity market.  NYISO's Market Monitor is appointed pursuant to

---

[27] This figure adds percent margin associated with the 1.3¢ per kWh margin in Plaintiff's "Market Supply Cost" to the "Difference in %" increase in XOOM's rates over the already generous 1.3¢ per kWh margin.

NYISO's FERC regulation and tariff.  The monthly values used to construct the table came from the Market Monitor's monthly reports.  A substantial margin of 1.3¢ per kWh sold to cover retailer fixed costs has also been included.  During Plaintiffs' billing cycles this represents an average 13.67% markup (margin) over XOOM's actual supply costs.  Attached hereto as Exhibit 3 is a table of components and values that were used to compile the "Market Supply Cost" for each month in the above table.[28]

56.     XOOM's rate was consistently and substantially higher than the rate based on Defendants' supply costs, which demonstrates that XOOM's rate is not set in accordance with XOOM's customer contract.

57.     Notably, setting aside the teaser rate there was only one month when XOOM's rate was lower than the rate based on Defendants' supply costs.  In addition, XOOM's rates went up when the underlying wholesale market rates went up (compare XOOM's rates and the Market Supply Cost for the 6/11/2013–7/11/2013 and 7/11/2013–8/9/2013 billing periods) but *continued to climb* when the wholesale market rate declined (compare XOOM's rates and the Market Supply Cost for the 9/10/2013–10/8/2013 and 10/8/2013–11/7/2013 billing periods).  Further, XOOM's total markup compared to its wholesale costs is exceedingly high (as much as 66.47%), especially considering its low operating costs and its contractual pledge to base consumers rates on XOOM's supply costs.

58.     With discovery of XOOM's actual costs and profits, Plaintiffs will be able to create an even more precise model showing what XOOM's prices should have been under the

---

[28] The calculated market supply costs have changed slightly from the previous analysis due to a slightly different method for allocating NYISO costs (which are calculated in some cases on a monthly basis) across the customer billing periods, which overlap months.

terms of its customer contract.  This model will also further demonstrate XOOM's exorbitant and unconscionable energy charges.

59.     As established above, XOOM's breaches its customer contract as consumers do not receive a price based on the specified factors, i.e., "XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments."  Instead, consumers are charged rates that are substantially higher and untethered to the supply costs.

60.     In addition, in the electricity market, the rates New York utilities like Con Edison (Plaintiffs' utility) charge generally reflect the NYISO wholesale rate because Con Edison purchases electricity for its customers directly from the NYISO.  Thus, the purchases made by Con Edison from the NYISO serve as a good indicator of XOOM's supply costs, which also purchases energy at the wholesale market rate.

61.     As demonstrated in the table below, that XOOM's rate does not rise and fall with Con Edison's rate shows that XOOM's rate is not in fact based on its supply costs.  While the Con Edison rates are not a perfect reflection of the wholesale cost of electricity (utilities have true-ups and other adjustments in their rates) if XOOM's rates were based on its supply costs those rates would move with Con Edison's rates.  Notably, when Con Edison's rates rise XOOM's rates go up, but when Con Edison's rates fall, XOOM's rates *rise*.

| Period | XOOM Rate[29] | Con Edison Supply Charge | Difference in % |
|---|---|---|---|
| 5/10/2013–6/11/2013 | 9.39 (*teaser*) | 10.06 | -6.66% |
| 6/11/2013–7/11/2013 | 12.50 | 11.20 | -10.40% |
| 7/11/2013–8/9/2013 | 15.05 | 12.36 | 21.76% |
| 8/9/2013–9/10/2013 | 15.55 | 9.78 | 60.00% |
| 9/10/2013–10/8/2013 | 14.79 | 10.12 | 46.15% |
| 10/8/2013–11/7/2013 | 15.57 | 9.82 | 58.55% |

---

[29] Because the Con Edison Supply Charge includes New York City's 4.5% gross receipts tax, that amount was added to the XOOM rate to allow an "apples to apples" comparison.

62.     XOOM knows full well that it charges a rate that is unconscionably high, and that it reaps outrageous profits to the direct detriment of New York consumers without regard to the consequences high utility bills cause such consumers.  Instead, just as uncovered by the PSC's staff regarding the industry as a whole, XOOM's rates are not based on Defendants' supply costs.  They are based on Defendants' greed and the lack of adequate price transparency in the ESCO market.  As such, XOOM's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

63.     XOOM's conduct caused injury to Plaintiffs because under the XOOM customer contract, their rate should have been based on XOOM's supply costs, which it was not.

64.     Had XOOM charged Plaintiffs a rate that was actually based on Defendants' supply costs, Plaintiffs would have been charged a substantially lower rate and they were injured accordingly when they paid their residential energy bills.

## CLASS ACTION ALLEGATIONS

65.     Plaintiffs sue on their own behalf and on behalf of a Class for damages and injunctive relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

66.     The Class is preliminarily defined as all XOOM customers in the State of New York who were charged a variable rate for electricity or gas at any time from April 18, 2012 through and including the date of judgment.

67.     Excluded from the Class are the officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.  Also excluded are all federal, state and local government entities; and any judge, justice or judicial officer presiding over this action and the members of their immediate

families and judicial staff.

68.     Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Defendants.  Plaintiffs believe, however, that based on the number of XOOM customers, the Class encompasses thousands of individuals whose identities can be readily ascertained from Defendants' records.  Accordingly, the members of the Class are so numerous that the joinder of all such persons is impracticable.

69.     Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct. Further, Plaintiffs and the Class sustained substantially the same injuries and damages arising out of Defendants' conduct.

70.     Plaintiffs will fairly and adequately protect the interests of all Class members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

71.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.  Whether XOOM breached its contract with New York customers by charging variable rates not based on the factors specified in the customer agreements;

      b.  Whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

      c.  Whether XOOM should be enjoined from continuing to charge variable

rates not based on the factors specified in the customer agreements.

72.     A class action is superior to all other available methods for resolving this controversy because i) the prosecution of separate actions by Class members will create a risk of adjudications with respect to individual Class members that will, as a practical matter, be dispositive of the interests of the other Class members not parties to this action, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by Class members will create a risk of inconsistent or varying adjudications with respect to individual Class members, which will establish incompatible standards for Defendants' conduct; iii) Defendants have acted or refused to act on grounds generally applicable to all Class members; and iv) questions of law and fact common to the Class predominate over any questions affecting only individual Class members.

73.     Further, the following issues are also appropriately resolved on a class-wide basis under Fed. R. Civ. P. 23(c)(4):

      a. Whether XOOM breached its contract with New York customers by charging variable rates not based on the factors specified in the customer agreements;

      b. Whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

      c. Whether XOOM should be enjoined from continuing to charge variable rates not based on the factors specified in the customer agreements.

74.     Accordingly, this action satisfies the requirements set forth under Fed. R. Civ. P. 23(a), 23(b), and 23(c)(4).

## FIRST CAUSE OF ACTION
### (Breach of Contract)

75.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein, and further allege as follows:

76.     Plaintiffs and the Class entered into a valid contract with Defendant XOOM for the provision of electricity.

77.     Pursuant to the XOOM's customer contract, XOOM agreed to charge a variable rate for electricity based on "XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs."

78.     Pursuant to the contract, Plaintiffs and the Class paid the variable rates charged by XOOM for electricity.

79.     However, XOOM failed to perform its obligations under the contract because XOOM charged variable rates for electricity and gas that were not based on "XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs."

80.     Plaintiffs and the Class were damaged as a result because they were billed, and they paid energy rates that were substantially higher than they would have been had XOOM based its rates the criteria set forth in XOOM's customer contract.

81.     By reason of the foregoing, XOOM-Energy and XOOM-NY are jointly and severally liable to Plaintiffs and the other members of the Class for the damages that they have suffered as a result of XOOM's actions, the amount of such damages to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Susanna Mirkin and Boris Mirkin respectfully request that this

Court:

A.   Issue an order certifying the Class defined above, appointing the Plaintiffs as
Class Representatives and designating their attorneys as Class Counsel;

B.   Determine that XOOM breached the customer contract with the Class and enter
an appropriate order awarding monetary and injunctive relief;

C.   Enter an order granting all appropriate relief on behalf of the Class under
applicable law;

D.   Render an award of compensatory damages, the amount of which is to be
determined at trial;

E.   Enter a judgment of damages in an amount of at least $50,000,000, including
interest, costs, reasonable attorneys' fees, costs and expenses; and

(h)   Grant all such other relief as the Court deems appropriate.

Dated: Armonk, New York
August 21, 2019

By:   /s/ Steven L. Wittels
Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic

WITTELS LAW, P.C.
18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
tpalikovic@wittelslaw.com

*Lead Counsel for Plaintiffs and the Class*

Daniel Hymowitz
HYMOWITZ LAW GROUP, PLLC
1629 Sheepshead Bay Road
Brooklyn, NY 11235
Telephone: (718) 807-9900
Facsimile: (866) 521-6040
daniel@hymowitzlaw.com

Andrey Belenky
Dmitry Kheyfits
KHEYFITS BELENKY LLP
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Phone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

*Co-Counsel for Plaintiffs and the Class*