# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

$\qquad$ Plaintiffs,

v.

XOOM ENERGY, LLC and
XOOM ENERGY NEW YORK, LLC

$\qquad$ Defendants.

Case No. 18 Civ. 2949 (ARR) (RER)

**ORAL ARGUMENT REQUESTED**

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

---

**WITTELS MCINTURFF PALIKOVIC**
Steven L. Wittels
J. Burkett McInturff
Steven D. Cohen
Ethan D. Roman
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
sdc@wittelslaw.com
edr@wittelslaw.com

**HYMOWITZ LAW GROUP, PLLC**
Daniel Hymowitz
1629 Sheepshead Bay Road
Brooklyn, NY 11235
Telephone: (718) 807-9900
Facsimile: (866) 521-6040
daniel@hymowitzlaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
Dmitry Kheyfits
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

Dated:   December 16, 2022

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

I.    OVERVIEW AS TO WHY CLASS CERTIFICATION IS WARRANTED ................... 1

II.   OVERVIEW OF THE COMMON PROOF FOR TRIAL ................................. 4

FACTUAL BACKGROUND ............................................................................................ 7

I.    XOOM'S NEW YORK CONSUMERS HAVE SEEN ABSOLUTELY NO
BENEFIT FROM XOOM'S SALE OF RETAIL ELECTRICITY AND
NATURAL GAS ....................................................................................... 7

II.   ALL XOOM NEW YORK VARIABLE RATE CUSTOMERS ENROLLED
BEFORE FEBRUARY 11, 2016 OR ROLLED OVER FROM FIXED TO
VARIABLE RATE PRODUCTS BEFORE 2021 WERE SUBJECT TO THE
SAME 2013 CONTRACT LANGUAGE ........................................................ 10

III.  XOOM USED A COMMON SALES AND PRICING SCHEME TO SELL
ENERGY TO ITS CUSTOMERS AT VARIABLE RATES ........................... 15

IV.  XOOM PRODUCED DATA THAT IDENTIFIES CLASS MEMBERS
AND ENABLES PLAINTIFFS TO ESTABLISH INDIVIDUAL AND
CLASS DAMAGES ................................................................................. 19

V.   PLAINTIFFS WERE INJURED BY XOOM'S UNIFORM PRICING SCHEME ........ 19

VI.  PLAINTIFFS' EXPERTS DETERMINED CLASS DAMAGES USING
COMMON PROOF .................................................................................. 21

ARGUMENT .................................................................................................................... 23

I.    LEGAL STANDARD ................................................................................ 23

      A.  Class Certification ................................................................................. 23

II.   PLAINTIFFS HAVE SATISFIED RULE 23**(a)** ............................................ 24

      A.    The Class Is Sufficiently Numerous ..................................................... 24

      B.    This Action Raises Questions Common to All Potential Class Members
with Common Answers ........................................................................... 25

      C.    Plaintiffs' Claims are Typical of the Class's Claims ............................. 27

      D.    Plaintiffs and Class Counsel Will Fairly and Adequately Protect the
Interests of the Class............................................................................... 28

E.     The Class Is Ascertainable ........................................................................ 31

III.   PLAINTIFFS AND THE PROPOSED CLASS SATISFY RULE 23(b)(3)'s
       REQUIREMENTS ................................................................................................ 32

       A.     Common Questions of Law and Fact Predominate ................................. 32

              1.   Common Questions Predominate in Establishing Defendants' Liability ....... 32

              2.   Common Questions of Classwide Damages Predominate Over Those
                   of Individual Class Members ........................................................ 35

              3.   Class Treatment is Superior to Other Methods of Adjudication.................... 36

IV.    NOTICE SHOULD BE PROVIDED TO THE CLASS .................................................... 38

CONCLUSION ................................................................................................................ 38

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591, 617 (1997) ........................................................................... 23, 24, 32

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
 568 U.S. 455 (2013) ............................................................................................ 24, 32

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*,
 222 F.3d 52 (2d Cir. 2000) ............................................................................................ 28

*Bayne v. NAPW, Inc.*,
 No. 18 Civ. 3591, 2021 WL 4822426 (MKB) (RER) (E.D.N.Y. Aug. 10, 2021) .................... 29

*Bell v. Gateway Energy Services Corp.*,
 No. 31168/2018 (Rockland Cnty. Super. Ct. Jan. 8, 2021), NYSCEF No. 152 ............... *passim*

*BLT Steak LLC v. Liberty Power Corp., LLC*,
 No. 151293/2013 (N.Y. Cnty., Super. Ct. Aug. 14, 2020), NYSCEF No. 376 ..................... 3, 6

*Caridad v. Metro-North Commuter R.R.*,
 191 F.3d 283 (2d Cir. 1999) ............................................................................................ 24

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*,
 504 F.3d 229 (2d Cir. 2007) ............................................................................................ 27

*Chen v. Hiko Energy, LLC*,
 No. 14 Civ. 1771 (S.D.N.Y. May 9, 2016), ECF No. 93 ........................................................... 6

*Claridge v. N. Am. Power & Gas, LLC*,
 No. 15 Civ. 1261 (PKC), 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) ........................ *passim*

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ............................................................................................ 35, 36

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
 502 F.3d 91 (2d Cir. 2007) ............................................................................................ 28

*Cromer Fin. Ltd. v. Berger*,
 205 F.R.D. 113 (S.D.N.Y. 2001) ............................................................................................ 37

*Dial Corp. v. News Corp.*,
    No. 13 Civ. 6802 (WHP), 2015 WL 4104624 (S.D.N.Y. June 18, 2015) ............................... 27

*Edwards v. N. Am. Power & Gas, LLC*,
    No. 14 Civ. 1714, 2018 WL 3715273 (D. Conn. Aug. 3, 2018)................................................ 6

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................................................................. 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ................................................................................................................. 24

*Fox v. Cheminova, Inc.*,
    213 F.R.D. 113 (E.D.N.Y. 2003) ............................................................................................. 37

*Gen. Tel. Co. of S.W. v. Falcon*,
    457 U.S. 147 (1982) ................................................................................................................. 24

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) ................................................................................................................... 23

*Hamlen v. Gateway Energy Services Corp.*,
    No. 16 Civ. 3526 (S.D.N.Y. Sept. 13, 2019), ECF No. 141 ...................................................... 6

*Hines v. Equifax Info. Svcs., LLC*,
    No. 19 Civ. 6701 (RPK) (RER), 2022 WL 2841909 (July 16, 2022)................................. 29, 31

*Hoeffner v. D'Amato*,
    No. 09 Civ. 3160 (PKC) (CLP), 2019 WL 1428367 (E.D.N.Y. Mar. 29, 2019)..................... 25

*Iglesias-Mendoza v. La Belle Farm, Inc.*,
    239 F.R.D. 363 (S.D.N.Y. 2007)) ............................................................................................ 27

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)..................................................................................................... 23

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)..................................................................................................... 31

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................................................... 29

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ............................................................................................. 31

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013)................................................................................. 33, 34, 35, 36

*Jianmin Jin v. Shanghai Original, Inc.*,
No. 16 Civ. 5633 (ARR) (JO), 2018 WL 1597389 (E.D.N.Y. Apr. 2, 2018)........................... 27

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015)................................................................................. 25

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
897 F.3d 88 (2d Cir. 2018)................................................................................. 30

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997)................................................................................. 23

*Martinez v. Agway*,
No. 18 Civ. 235 (MAD) (ATB), 2022 WL 1091607 (N.D.N.Y. Apr. 12, 2022)...................... 37

*Mazzei v. Money Store*,
829 F.3d 260 (2d Cir. 2016)................................................................................. 33

*Mirkin v. XOOM Energy, LLC*,
931 F.3d 173 (2d Cir. 2019)................................................................................. 8, 33, 37

*Morris v. Alle Processing Corp.*,
No. 08 Civ. 4874 (JMA), 2013 WL 1880919 (E.D.N.Y. May 6, 2013) ................................ 23

*Mosely v. Vitalize Labs, LLC*,
No. 13 Civ. 2470 (RJD) (RLM), 2015 WL 5022635 (E.D.N.Y. Aug. 24, 2015) .................... 30

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
392 F.3d 520 (2d Cir. 2004)................................................................................. 33

*Richards v. Direct Energy Svcs., LLC*,
915 F.3d 88 (2d Cir. 2019)................................................................................. 37

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015)................................................................................. 32

*Roberts v. Verde Energy, USA, Inc.*,
No. X07-HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017),
*aff'd*, 2019 WL 1276501 (Conn. Super. Ct. Feb. 1, 2019) .................................... 3, 25

*Robinson* v. *Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001) ..................................................................................... 28

*Shahriar v. Smith & Wollensky Rest. Grp.*,
    659 F.3d 234 (2d Cir. 2011) ..................................................................................... 24

*Silvis v. Ambit Energy L.P.*,
    326 F.R.D. 419 (E.D. Pa. 2018) ................................................................................. 6

*Stanley v. Direct Energy Servs., LLC*,
    466 F. Supp. 3d 415 (S.D.N.Y. 2020) ...................................................................... 29

*Steinberg v. Nationwide Mut. Ins. Co.*,
    224 F.R.D. 67 (E.D.N.Y. 2004) ................................................................... 3, 25, 34

*Stinson v. City of N.Y.*,
    282 F.R.D. 360 (S.D.N.Y. 2012) ............................................................................. 29

*Sykes v. Mel S. Harris and Associates LLC*,
    780 F.3d 70 (2d Cir. 2015) ................................................................................. 25, 32

*Todd v. XOOM Energy Maryland, LLC*,
    No. 15 Civ. 154 (GJH), 2020 WL 4784767 (D. Md. Aug. 18, 2020) .................................. 3, 11

*Vergara v. Apple REIT Nine, Inc.*,
    No. 19 Civ. 2027 (DLI) (RML), 2021 WL 1103348 (E.D.N.Y. Feb. 5, 2021) ....................... 29

*Vu v. Diversified Collection Servs., Inc.*,
    293 F.R.D. 343 (E.D.N.Y. 2013) ............................................................................. 28

*Wal-Mart Stores v. Dukes*,
    564 U.S. 338 (2011) .................................................................................... *passim*

*Wise v. Energy Plus Holdings, LLC*,
    No. 11 Civ. 7345 (S.D.N.Y. Sept. 17, 2013), ECF No. 75 ............................................... 6

*Zhang v. Ichiban Grp., LLC*,
    No. 17 Civ. 148 (MAD/TWD), 2021 WL 3030052 (N.D.N.Y. May 21, 2021) ............... 26, 37

**Statutes**

G.B.L. § 349-d ............................................................................................................. 9

**Other Authorities**

Cases 15-M-0127, et al.,
   Dep't of Pub. Serv. Staff Redacted Initial Br., (Mar. 30, 2018) ........................................... 9, 10

Cases 15-M-0127, et al.,
   Ord. Adopting Changes to the Retail Access Energy Market and Establishing Further
   Process, Dec. 12, 2019 .......................................................................................................... 10

Cases 94-E-0952, et al.,
   *In the Matter of Competitive Opportunities Regarding Elec. Serv.*, Op. and Ord. Regarding
   Competitive Opportunities for Elect. Serv., Op. No. 96-12 (May 20, 1996)............................. 7

ESCO Consumers Bill of Rights, New York Sponsors Memorandum, 2009 A.B. 1558 (2009)...... 9

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................... *passim*

Plaintiffs Susanna and Boris Mirkin and the proposed Class (together, "Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion for Class Certification against Defendants XOOM Energy, LLC and XOOM Energy New York, LLC (together, "Defendants" or "XOOM").[1]

## INTRODUCTION

## I.   OVERVIEW AS TO WHY CLASS CERTIFICATION IS WARRANTED

This is precisely the type of case for which the class action device under Rule 23 was created.  After years of extensive discovery and motion practice, Plaintiffs obtained XOOM's underlying pricing data which confirms that the company failed to charge electricity and gas rates to Plaintiffs and the proposed Class of XOOM customers pursuant to XOOM's standard form 2013 energy sales contract.  Under the operative 2013 contract (hereafter the "2013 Contract" or "2013 Sales Agreement"), XOOM was bound to charge customers as follows:

> Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs.

But in violation of this requirement, XOOM never charged rates based on its actual or estimated supply costs.  Instead, despite producing data detailing its total actual supply costs—which Plaintiffs' energy economists analyzed and tallied—XOOM based its rates on a slew of non-supply cost criteria nowhere mentioned or even suggested by the 2013 Contract.

The documents, data, and deposition testimony—including testimony from Defendants' own expert—all show that XOOM set its rates however it pleased, admitting that in setting rates it used such non-supply cost criteria as "pricing strategies," "margin goals," "customer attrition rates," and "competitors rates."  While such a rate-setting process might have been permissible

---

[1] Accompanying this memorandum is the Declaration of Steven L. Wittels, dated December 16, 2022 ("Wittels Decl.").  References in this memorandum to "Ex." refer to the Wittels Decl. exhibits.

under the subsequent February 11, 2016 contract that XOOM later used for non-class members, the 2013 Contract allowed no such discretion.  Under the 2016 amended contract, XOOM told new customers that their rates would be calculated as follows:

> Your rate may be based upon a number of factors, which may include or be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Tellingly, all of the XOOM witnesses and its expert concede that these non-supply costs are the exact same criteria the company used to set rates for the Plaintiffs and the proposed Class under the 2013 Contract.  At the risk of an old cliché, the proof is in the pudding.  The proof shows that XOOM completely ignored its own technical definition of "supply costs" when setting rates for Plaintiffs and the Class.

After gaining permission from the Second Circuit to proceed with this class action on their First Amended Complaint, Plaintiffs worked aggressively to obtain the discovery and expert testimony that shows this proposed class action meets all the prerequisites for class certification. Indeed, this case is one in a line of prior successful energy cases brought by consumers against energy services companies ("ESCOs") in New York and other states who were similarly victimized by energy deregulation and unconscionable price gouging.  As far as undersigned counsel is aware, four courts have addressed contested motions to certify classes of ESCO customers like XOOM's who were overcharged under the terms of their written customer

2

agreements; each court held that class certification was warranted.[2]  This case should be no exception.[3]

      This is a classic breach of contract case with one cause of action that has all the hallmarks of commonality that one would expect from a discrete contract claim.  *See Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." (quotation omitted)).  The sole core issues on this motion are (1) can Plaintiffs offer sufficient commonality and typicality of proof such that, without a decision on the merits, they can nonetheless demonstrate common questions of fact as to whether XOOM charged Plaintiffs more than its "actual and estimated supply costs," and (2) can Plaintiffs show through common proof what the potential overcharge damages are to Plaintiffs and the proposed Class of consumers governed by the 2013 Contract?  The short answer to both questions is yes, and in so finding the Court should grant class certification.

---

[2] *See Bell v. Gateway Energy Services Corp.*, No. 31168/2018 (Rockland Cnty. Super. Ct. Jan. 8, 2021), NYSCEF No. 152 (the "*Bell* Op."; Ex. 6); *BLT Steak LLC v. Liberty Power Corp., L.L.C.*, No. 151293/2013 (N.Y. Cnty., Super. Ct. Aug. 14, 2020), NYSCEF No. 376; *Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261 (PKC), 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016); and *Roberts v. Verde Energy, USA, Inc.*, No. X07-HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017), *aff'd*, 2019 WL 1276501 (Conn. Super. Ct. Feb. 1, 2019).

[3] Defendants may point to the district court's denial of class certification in a consumer fraud class action against XOOM by energy customers in Maryland and elsewhere alleging statutory and common law fraud by third-party salesman promising savings to customers.  *Compare Todd v. XOOM Energy Maryland, LLC*, No. 15 Civ. 154 (GJH), 2020 WL 4784767 (D. Md. Aug. 18, 2020).  But even a cursory reading of that decision reveals why it is inapposite, as the Maryland court never addressed uniform breach of contract claims by New York customers like the Mirkins, instead ruling on a factual record where "[t]here is a substantial variation in the language of the promises or guarantees that the customers claim were made to them," *id.* at *7; and the court further determining that individual issues of, inter alia, reliance, causation, and predominance made consumer fraud certifiability unworkable, *id.* at *15-16.  Our straightforward breach of contract claim case faces none of these hurdles.

## II.    OVERVIEW OF THE COMMON PROOF FOR TRIAL

Plaintiffs' First Amended Class Action Complaint ("FAC") ¶ 59 alleges that XOOM customers were charged prices that were "substantially higher and untethered to [XOOM's] supply costs."  The FAC further alleges that "[w]ith discovery of XOOM's actual costs and profits, Plaintiffs will be able to create [a] precise model showing what XOOM's prices should have been under the terms of its customer contract.  This model will also further demonstrate XOOM's exorbitant and unconscionable energy charges."  FAC ¶ 58.  Because "'supply costs' are very technical terms in the industry," Ex. 1, Dep. Tr. of Plaintiffs' energy economist Dr. Derya Eryilmaz, dated Nov. 15, 2022 ("Eryilmaz Tr.") 35:8–9, Plaintiffs retained experienced energy economists Derya Eryilmaz, Ph.D. and Seabron Adamson of Charles River Associates to (i) analyze first whether XOOM set rates consistent with the technical "supply cost" verbiage in its contract, and (ii) if not, to then determine an appropriate measure of damages.  *See also* Ex. 2, Dep. Tr. of defense expert David C. Coleman dated November 16, 2022 ("Coleman Tr.") at 26:20–29:8 (acknowledging that his understanding of the meaning of the term "supply costs" came with 20 years of experience working in the energy industry).

Even though a class-wide damages model is not required at this stage, Plaintiffs' experts have now built models showing what XOOM's rates should have been under the 2013 Contract and detail how XOOM's rates were untethered to its supply costs.  Plaintiffs' experts' first damages model calculates the amount that XOOM overcharged its New York variable rate customers compared to what it should have charged customers had the variable rates been set using XOOM's reported supply costs.  Ex. 3, Expert Report of Derya Eryilmaz, Ph.D. and Seabron Adamson, dated Oct. 3, 2022 ("Pls.' Expert Rep.") at ¶¶ 62–72.  Model 1 calculates class-wide damages at ███████████████████ for more than 80,000 Class members.  *Id.* at ¶¶ 23(b), 65.  This figure has

escalated given Defendants' belated production of more class data last week which may add an additional 30,000 customers to the proposed Class.  Wittels Decl. ¶ 13.

Under a second damages model, Plaintiffs' experts adjusted their overcharge formula in the event the factfinder were to determine that the applicable contract allows XOOM to charge a profit margin above its actual costs despite the absence of any such "margin" provision in the 2013 Contract.  This Model 2 calculates class-wide damages using the ████████████████████ margins that XOOM imposed on its New York fixed-rate customers.  Pls. Expert Rep. at ¶¶ 73–77.  Model 2 calculates class-wide damages at ████████████████ for more than 80,000 class members—numbers that will escalate further due to Defendants' late production of additional class-wide data.  *Id.* at ¶ 77; Wittels Decl. ¶ 13.  Plaintiffs' experts can readily adjust the second model if the factfinder determines that a different margin is appropriate.  Pls. Expert Rep. at ¶ 73 n.51.

As we detail below, all modes of discovery – XOOM witness testimony, data, documents, and discovery responses – make quite clear that XOOM considered many factors other than its supply costs when setting rates for New York variable rate customers, none of which were specified or permitted under the customer contract.  *See, e.g.*, Ex. 4, Defs.' Supp. Responses to Pls.' First Set of Reqs. For Admis. at 3–5 (Nos. 31–36) (admitting that XOOM's pricing group would review XOOM's "profit margin," the "prior month's rate," "local utility rates," "customer attrition rates," "sales trends," and "competitive intelligence," including but not limited to the energy rates set by XOOM's competitors in the New York market, as part of its monthly rate-setting process).  Defendants concede that it was solely the contract language change in February 2016 that allowed XOOM to base rates prospectively on "pricing strategies" (among other factors).  The company further admits that "XOOM's method for setting rates . . . [did] not change[]" from

2013 onwards.  Ex. 5, Defs.' Supp. Response to Interrog. No. 23, dated Apr. 29, 2022.  This reaffirms that XOOM never bound itself to its own 2013 Contract terms.

As mentioned above, the four courts that addressed contested class certification motions on facts like those here, where energy customers claimed overcharges under the terms of their customer agreements, all sided with plaintiffs and the class.  *See* Ex. 6, *Bell* Op.; *BLT Steak*, No. 151293/2013, NYSCEF No. 376; *Claridge*, 2016 WL 7009062; *Roberts*, 2017 WL 6601993.

Many other courts have followed suit in the settlement context.  *See, e.g.*, *Hamlen v. Gateway Energy Services Corp.*, No. 16 Civ. 3526 (S.D.N.Y. Sept. 13, 2019), ECF No. 141 (granting final approval of settlement class; finding the requirements for class certification satisfied); *Edwards v. N. Am. Power & Gas, LLC*, No. 14 Civ. 1714, 2018 WL 3715273, at *6–8 (D. Conn. Aug. 3, 2018) (same); *Silvis v. Ambit Energy L.P.*, 326 F.R.D. 419, 428–29 (E.D. Pa. 2018) (same); *Chen v. Hiko Energy, LLC*, No. 14 Civ. 1771 (S.D.N.Y. May 9, 2016), ECF No. 93 (same); *Wise v. Energy Plus Holdings, LLC*, No. 11 Civ. 7345 (S.D.N.Y. Sept. 17, 2013), ECF No. 75 (same).  There is no basis to depart from such precedent here.

All relevant factors in this case likewise favor class certification.  As discussed in more detail below, the applicable 2013 Contracts all contain the same rate setting provision.  Plaintiffs and all Class Members have allegedly been damaged by XOOM's "pricing strategies" in violation of the uniform contract language.  Further, Plaintiffs will offer common proof that XOOM actually charged its New York variable rate customers in excess of the contract-limiting "actual and estimated supply costs."  None of the core legal or factual questions in this case are individualized: the same contract language applies to all members of the proposed Class, and the alleged breach also affected all Class members.

Accordingly, on behalf of more than 110,000 similarly-situated customers, as verified by Defendants' records, Plaintiffs seek class certification pursuant to Fed. R. Civ. P. 23(b)(3) of the following Class:

> **All New York XOOM residential or small commercial customers who were charged a variable rate for electricity or natural gas under the operative 2013 XOOM New York variable rate contract or its equivalent language at any time from January 1, 2013 through and including the date of judgment.[4]**

Without such class certification, tens of thousands of XOOM consumers who were wrongly overcharged by XOOM will be left remediless.  For these and the following reasons, the Court should certify the proposed Class.

## FACTUAL BACKGROUND

I.   **XOOM'S NEW YORK CONSUMERS HAVE SEEN ABSOLUTELY NO BENEFIT FROM XOOM'S SALE OF RETAIL ELECTRICITY AND NATURAL GAS**

In 1996, New York's Public Service Commission ("PSC") deregulated the market for retail energy supply after Enron's unprecedented lobbying campaign.  As a result of deregulation, consumers in New York (and other states) were permitted to choose from a variety of companies selling energy.  *See* FAC, ECF No. 42 ¶¶ 2, 19; *see also* Defs.' Answer to FAC ("Ans."), ECF No. 44 ¶¶ 2, 19.  The PSC's "general goals" for deregulation included lowering rates for consumers and increasing consumer choice.  Ex. 7, Cases 94-E-0952, *et al.*, *In the Matter of Competitive Opportunities Regarding Elec. Serv.*, Op. and Ord. Regarding Competitive Opportunities for Elect. Serv., Op. No. 96-12 (May 20, 1996) ("1996 Ord."), at 28.  As a result, the New York retail electricity and natural gas industries opened to competition and consumers were able to choose

---

[4] Excluded from the Class are the officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.  Also excluded are all federal, state, and local government entities and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

their energy supplier.  *Id.*; FAC ¶ 19.  The hope was that greater competition in energy markets would result in energy suppliers being more aggressive and creative than utilities in reducing wholesale purchasing costs and thereby lowering prices for retail customers, particularly when wholesale costs decline.  Ex. 7, 1996 Ord. at 28; FAC ¶ 27.

Unfortunately for consumers in New York and elsewhere, deregulation has proven to be disastrous in practice.  Energy suppliers like XOOM that offer an alternative to consumers' local utilities are known as energy service companies or "ESCOs."  Ans. ¶ 19; Ex. 3, Pls.' Expert Rep. at ¶¶ 23(a), 25.  Yet even when consumers select an ESCO to supply their electricity and/or natural gas, local utilities continue to deliver electricity and/or natural gas to consumers' homes or places of business.  Ans. ¶ 21; FAC ¶¶ 19, 21; *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 175 (2d Cir. 2019).  ESCOs do not generate, transmit, or distribute electricity or gas to retail consumers, but instead arrange supply from the wholesale energy market.  *Mirkin*, 931 F.3d at 175; Ex. 3, Pls.' Expert Rep. ¶ 25.  ESCOs are essentially middlemen: they neither make nor deliver electricity or gas, but instead buy energy from a producer and resell it to consumers.  *Mirkin*, 931 F.3d at 175. The local utility remains responsible for billing the consumer for both energy supply and delivery costs and manages customer payment risks.  Ans. ¶ 23; Ex. 3, Pls.' Expert Rep. ¶ 25.  Because the utility handles billing, an ESCO like XOOM can service large customer bases with far lower customer service costs than would be necessary if ESCOs billed consumers directly.  FAC ¶ 23. There would be no reason for a consumer to switch from a local utility to an ESCO like XOOM if the consumer did not believe that the ESCO offered rates that were at least competitive with the utility's rates.

Deregulation's main consequence has been the proliferation of ESCOs like XOOM whose business model is primarily based on taking advantage of energy consumers.  FAC ¶ 28.  The 2009

sponsoring memo of the ESCO Consumer Bill of Rights, codified as G.B.L. § 349-d, recognized that problems in the ESCO industry included "onerous contracts" and "short-term 'teaser' rates followed by skyrocketing variable prices." Ex. 8, ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 1 (2009).   Indeed, in 2018, PSC staff concluded that their own organization's prior "decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable because "ESCOs have deliberately obfuscated prices and resisted market reforms." Ex. 9, Cases 15-M-0127, et al., Dep't of Pub. Serv. Staff Redacted Initial Br., at 1 (Mar. 30, 2018).   PSC staff further concluded at that time:

> The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.   Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.

> Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers.   For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated. . . .

> ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires.   In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully

informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices. . . .

The massive . . . overcharges [are] the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers. These overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market. These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.

*Id.* at 41–42, 86–87.

In recognition of the rampant problems with ESCOs and after conducting extensive hearings and further investigation, in December 2019 the PSC essentially banned the sale of energy under variable rate plans like the one offered by XOOM here. *See* Ex. 3, Pls.' Expert Rep. at ¶¶ 23(g), 34–35. The PSC specifically took note of "the lack of easily accessible and comprehensible product and pricing information and [] the number of complaints alleging that bad-acting ESCOs were misleading and exploiting customers." Ex. 10, Cases 15-M-0127, et al., Ord. Adopting Changes to the Retail Access Energy Market and Establishing Further Process, Dec. 12, 2019 at 12.

## II. ALL XOOM NEW YORK VARIABLE RATE CUSTOMERS ENROLLED BEFORE FEBRUARY 11, 2016 OR ROLLED OVER FROM FIXED TO VARIABLE RATE PRODUCTS BEFORE 2021 WERE SUBJECT TO THE SAME 2013 CONTRACT LANGUAGE

Plaintiffs' and the proposed Class Members' claims arise from XOOM's uniform breach of contract to its New York variable rate customers regarding its variable rate pricing. FAC at ¶¶ 75–81. In its standard Sales Agreement used from 2013 through February 10, 2016 (the 2013 Contract), XOOM uniformly told New York residential and small business customers that its variable price product would have a rate set "based on XOOM's actual and estimated supply costs

which may include but not be limited to prior period adjustments, inventory and balancing costs." Ex. 11, XOOM SimpleFlex Electricity Sales Agreement; Ex. 12, XOOM SimpleFlex Natural Gas Sales Agreement; Ex. 13, XOOM BizChoice Sales Agreement; Ex. 14, XOOM SimpleClean Sales Agreement; Ex. 15, XOOM BizSimpleClean Sales Agreement. *See also* Ex. 3, Pls.' Expert Rep. at ¶¶ 6, 28. "Supply costs" is a term of art used in the energy industry that ordinary energy customers are likely unfamiliar with. *See* Ex. 1, Eryilmaz Tr., 34:7–21, 51:8–52:9, 53:21–54:20.

In addition to consumers who began their relationship with XOOM on its variable rate product, there are two other groups of consumers to whom the same contract term applied. The first consists of XOOM New York customers who were on expiring fixed rate contracts[5] who did not elect another fixed rate contract. These consumers were uniformly notified by XOOM that if they did not elect to enter into another fixed rate contract, they would be rolled over into a variable rate plan that XOOM called the Basic Plan, which is XOOM's standard variable rate plan.[6] The second group consists of former customers of Planet Energy, another energy supplier; when XOOM first entered the New York market in 2013, it did so by acquiring customers from Planet Energy. Ex. 17, Dep. Tr. of Director of Pricing and Structuring Jason Loehde in his individual capacity, dated July 27, 2022 ("Loehde Tr.") 39:25–40:8. Those former Planet Energy variable rate customers also received notices from XOOM informing them that their variable rates would

---

[5] "XOOM [] offer[s] both fixed rate plans, the monthly rates for which remain constant during the term of the plan, and variable rate energy plans, in which rates may vary each month." *Todd v. XOOM Energy Maryland, LLC*, No. 15 Civ. 154 (GJH), 2020 WL 4784767, at *1 (D. Md. Aug., 18, 2020).

[6] Ex. 31, XOOM Basic Plan Renewal Notice; Ex. 32, Dep. Tr. of former XOOM Compliance Officer Patricia Kulesa, dated June 29, 2022, 39:20–41:8, 55:15–58:8, 137:13–138:3, 142:12–143:3 (describing XOOM's renewal notice process and what happened when customers did not respond to a renewal notice); Ex. 16, Dep. Tr. of XOOM's 30(b)(6) corporate witness, Director of Pricing and Structuring Jason Loehde dated July 28, 2022 ("XOOM 30(b)(6) Tr.") 137:13–138:22, 141:14–142:1 (describing how XOOM fixed rate customers who did not respond to a renewal notice were switched to a variable rate plan). The 2013 Contract language was included in renewal notices until sometime in 2021. *Id.* at 135:16–136:8 █████████

be determined going forward based on XOOM's actual and estimated supply costs.  Ex. 3, Pls.'
Expert Rep. ¶ 28.

In summary, three categories of residential and small commercial electricity and natural
gas customers are subject to this exact same 2013 Contract language: (1) XOOM New York
variable rate customers who originally signed up as variable rate customers between 2013 and
February 10, 2016; (2) XOOM New York variable rate customers who originally signed up as
XOOM fixed rate customers and who were rolled into a variable rate contract prior to 2021; and
(3) Planet Energy New York customers who became XOOM variable rate customers in or around
2013.  *See* Ex. 18, Feb. 3, 2022 Tr. of Conference Before M.J. Reyes ("2/3/22 Tr.") 5:12–18 (Judge
Reyes: "If once they were a variable rate customer, they're being treated exactly as the Mirkins
were, why does it matter how they became a variable rate customer?"), 10:11–18 (Judge Reyes:
"If in fact these other potential class members once they became variable rate customers were
subject to the same treatment as the Mirkins were, then they are similarly situated and are truly
class members.  I don't know that it's relevant how they became members of the class coming
from a fixed rate plan, coming from another provider, supplier.").  These three categories of
consumers were subject to the same variable rate contract language regardless of whether they
purchased electricity or natural gas, were residential versus small business customers,[7] or enrolled
in variable rate plans that were identified as including a clean energy component.

In total, there are more than 80,000 New York variable rate customers in the proposed
Class who enrolled and were supplied electricity or natural gas by XOOM according to the data
XOOM produced in discovery.  *See* Ex. 3, Pls.' Expert Rep. at ¶ 23(b).  In fact, a preliminary

---

[7] *See* Ex. 19, *Todd v. XOOM Energy Maryland, LLC*, Dep. Tr. of Jason Loehde, dated Oct. 11, 2018, 28:5–
15 ███████████████████████████████████████████████

review of additional data produced by Defendants on December 6, 2022 (just ten days before this filing), suggests that size of the proposed Class will rise by more than 37 percent, to more than 110,000 persons.[8]

On and after February 11, 2016, XOOM substantially modified the pricing term in its New York variable rate standard contract to try and give itself discretion to set rates based upon a broad range of criteria.  The 2016 contract states:

> Your rate may be based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Ex. 20, 2/11/16 Sales Agreement; *see also* Ex. 21, Defs.' Responses to Pls.' Second Set of Interrogs., dated Sept. 30, 2020 ("Defs.' Interrog. Resps."), at 6 (No. 24) ("[T]he February 11, 2016 contract language applied to New York customers that [first] enrolled in a variable rate plan on or after February 11, 2016.").  The criteria laid out in the 2016 contract are utterly absent from the 2013 Contract.  But, despite this dramatic shift in contractual language, the inclusion of these criteria in the 2016 contract did not change or affect XOOM's policies or methodology for setting variable rate prices in any way, throwing into sharp relief the fact that XOOM was not adhering to the language of the 2013 Contract when setting rates for Plaintiffs and the Class.[9]  To fully

---

[8] The "more than 80,000" figure does not include the number of New York customers who were rolled over from fixed rate plans to variable rate plans between January 25, 2013 and January 1, 2020 because Plaintiffs' experts did not have that data available at the time they prepared their report.  Ex. 3, Pls.' Expert Rep. at ¶ 6 n.7.  XOOM produced this additional data a mere 10 days ago, and a preliminary review shows that there may be approximately 30,000 additional "roll-over" New York customers.  Wittels Decl. ¶ 13.  XOOM withheld this data until December 6, 2022, even though disclosure should have occurred (at the latest) in or around April 2022 as part of the Class data production ordered by Judge Reyes on February 3, 2022.  *Id.*; Ex. 18, 2/3/22 Tr. 10:11–21.

[9] Ex. 5, Defs.' Supp. Response to Interrog. No. 23, dated Apr. 29, 2022 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Footnote continued on next page.*

appreciate the marked differences between the 2013 Contract and the post-2016 contract, it bears repeating the term in the 2013 Contract that XOOM was required to comply with when setting Plaintiffs' and the Class's rates:

> Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs.

Ex. 11, 2013 Sales Agreement.

Indeed, in critical admissions against interest, both the company's corporate witness and Director of Pricing and Structuring Jason Loehde and former XOOM Senior Vice President of Energy Supply and Pricing Andrew Coppola admitted that XOOM had "always" based its New York variable rate prices on "XOOM's pricing strategies" and on "fluctuations in energy supply and demand" even though none of those price setting criteria appeared in the 2013 Sales Agreement.  Ex. 16, XOOM 30(b)(6) Tr., 20:5–10, 134:2–135:15; Ex. 22, Coppola Tr. 98:11–18. XOOM's 30(b)(6) representative, Mr. Loehde, also testified that ███████████████████ ████████████████████████████████████████████████ thus conceding that the 2013 Contract at issue in this litigation did not properly describe XOOM's processes for setting rates for proposed Class Members.  Ex. 16, XOOM 30(b)(6) Tr. 134:2–135:15 (emphasis added).

In sum, ████████████████████████████████████████████ ███████████████████████████████████████████.  *See* Ex. 3, Pls.' Expert Rep. at ¶ 30.  From day one, XOOM consistently incorporated its pricing strategies into

---

████████████████████████████████████; Ex. 16, XOOM 30(b)(6) Tr. 20:5–10 ████████████████████████████████████████████████████████████ Ex. 22, Dep. Tr. of Andrew Coppola, XOOM's former Senior Vice President of Energy Supply and Pricing, dated May 11, 2022 ("Coppola Tr.") 97:22–98:6, 277:16–20████████████████████████████

setting its variable rates even though the 2013 Contract did not allow XOOM to use "pricing strategies" to set rates.  Indeed, XOOM's defense expert witness David Coleman agreed, testifying at his deposition that with respect to the 2013 Contract, XOOM took into account its "pricing strategies" when setting rates—even though the 2013 Contract made no mention of such criteria. Ex. 2, Coleman Tr. 66:11–15.

## III.   XOOM USED A COMMON SALES AND PRICING SCHEME TO SELL ENERGY TO ITS CUSTOMERS AT VARIABLE RATES

XOOM offers its energy customers like Plaintiffs an introductory rate (or teaser rate) that subsequently converts to a monthly variable rate which is invariably higher than the initial teaser rate.  FAC ¶¶ 4, 40.  While the monthly variable rate was supposed to be based on XOOM's actual and estimated supply costs, the rate Defendants charged was in fact substantially higher than those costs.  *Id.* ¶¶ 4–5, 27, 56, 59; Ex. 3, Pls.' Expert Rep. ¶¶ 23(c), 50.  As a result of XOOM's practices, its New York energy customers have been collectively overcharged in violation of the 2013 Contract by likely ▮▮▮▮▮▮▮▮▮▮.  FAC ¶ 5; Ex. 3, Pls.' Expert Rep. ¶¶ 23(j), 65, 78.[10]



Ex. 3, Pls.' Expert Rep. at ¶¶ 23(f), 53; Ex. 2, Coleman Tr. 71:3–6.  ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[10] The additional Class data provided by XOOM described in footnote 8 above was not produced in time for Plaintiffs' experts to incorporate it into their report or rebuttal report.  Wittels Decl. ¶ 13.  However, a preliminary review of damages based on these additional Class Members shows that total damages would increase by around ▮▮▮▮▮▮▮ under Plaintiffs' experts' methods.  *Id.*



█████████████████████.[11]   Indeed, the record evidence demonstrates that ███████

████.   *See* Ex. 22, Coppola Tr. 88:10–14; Ex. 17, Loehde Tr. 61:11–19 ████████

██████; Ex. 23, Dep. Tr. of former Director of Product Management for XOOM's Supply Team

Ryan Park, dated July 22, 2022 ("Park Tr.") 32:10–19

████████████████. Ex. 24, Chidester Tr. 50:3–10; Ex. 23, Park Tr. 98:10–15

█████; Ex. 2, Coleman Tr. 49:24–50:2 ████. Ex. 17, Loehde

Tr. 150:16–152:4; Ex. 24, Chidester Tr. 85:10–86:2.

[11] Ex. 21, Defs.' Interrog. Resps. at 3 (No. 22)████████ Ex. 17, Loehde Tr. 63:23–65:2; Ex. 24, Dep. Tr. of XOOM's Product Portfolio Manager Troy Chidester, dated June 24, 2022 ("Chidester Tr.") 18:6–12.

███████████████████████████████████████████████████████████████

███████████████████████████. [12]   Additionally, ███████████████████████████████

███████████████████████████████████████████████████████████████

███. [13]

XOOM employees would prepare a number of reports to be distributed before or during

the pricing meeting, ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████. [14]  ███████████████████████

---

[12] *See* Ex. 4, Defs.' Supp. Responses to Pls.' First Set of Reqs. For Admis. at 3–5 (Nos. 31–36) ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ Ex. 16, XOOM 30(b)(6) Tr. 83:10–23 ████████████████████████
█████████████████████████████ ; Ex. 22, Coppola Tr. at 37:11–38:4, 38:18–39:19, 84:12–19
██████████████████████ *id.* at 50:8–51:2, 84:20–85:7 █████████████████
██████████████ ; *id.* at 107:6–108:1 ██████████████████████████████
█████████████████████ *id.* at 233:17–234:19 ██████████████████
████████████ *id.* at 237:22–239:3
█████████████████ ; Ex. 24, Chidester Tr. 99:8–14 █████████████████
█████████████████████ ; Ex. 23, Park Tr. 33:10–22, 98:10–15, 99:20–100:22
████████████████████████████████████████ ; Ex. 25, *Todd v. XOOM Energy Maryland, LLC* Dep. Tr. of former XOOM Chief Executive Officer Thomas Ulry, dated Mar. 20, 2019 101:10–22
█████████ ; Ex. 2, Coleman Tr. 54:5–55:17 █████████████████████████
████████████████████████████████████████████████

[13] Ex. 23, Park Tr. 34:20–36:16 ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
Ex. 24, Chidester Tr. 130:5–131:5 ████████████████████████████████████████
█████████████████ .

[14] Ex. 17, Loehde Tr. 48:17–25 ████████████████████████████████████████████
████████████████████████████████████ Ex. 24, Chidester Tr. 18:13–19:9 ██████

*Footnote continued on next page.*

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████. Ex. 24, Chidester Tr.

105:16–23; Ex. 17, Loehde Tr. 182:6–21; Ex. 23, Park Tr. 90:5–92:5.

In the rate-setting workbooks, XOOM identifies the various supply costs associated with

its electricity and natural gas products and reports those costs on a per kilowatt hour or per therm

basis. *See* Ex. 26, XOOM_INIT_001118 (example of a rate-setting workbook); Ex. 3, Pls.' Expert

Rep. at ¶¶ 43–45. However, the rate-setting workbooks do not anywhere identify any prior period

adjustments or balancing costs, both of which were supply cost categories identified in the contract

at issue here.[15]

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████. *See*

Ex. 3, Pls.' Expert Rep. at ¶¶ 55, 59, 75.█████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

Ex. 24, Chidester Tr. 133:25–134:19. ██████████████████████████████

███████████████████. *See* Ex. 22, Coppola Tr. 198:4–8.



─────────────────────

██████████████████████████; *id.* at 46:21–47:3, 129:23–130:4
█████████████████████████████; *id.* at 104:13–20; Ex. 22, Coppola Tr. 86:24–88:3
███████ Ex. 23, Park Tr. 32:20–34:19, 120:18–121:6.

[15] *See* Ex. 3, Pls.' Expert Rep. at ¶¶ 23(d)██████████████████████
██████████████████████████████████████ ¶ 47
██████████████████████████████████████ ¶ 51
████████████████████████████████████████████████
██████████████████████████████████████, ¶ 63; Ex. 2, Coleman Tr. 95:17–
96:4
███████████████████████████████████████████.

IV.   **XOOM PRODUCED DATA THAT IDENTIFIES CLASS MEMBERS AND ENABLES PLAINTIFFS TO ESTABLISH INDIVIDUAL AND CLASS DAMAGES**

For each New York variable rate customer who is part of the proposed Class, XOOM produced customer data in discovery that includes data items for each month the customer was enrolled in a XOOM variable rate plan:

1)   the customer's enrollment number;

2)   the date they became a XOOM customer;

3)   the date upon which XOOM began charging the customer a variable rate;

4)   the date upon which XOOM ceased charging the customer a variable rate;

5)   the commodity sold (electricity or natural gas);

6)   the name of the utility that distributes energy to the customer;

7)   the XOOM variable rate for the month;

8)   the energy usage by the customer for that month;

9)   the date the individual ceased being a XOOM customer;

10)   the name of the XOOM variable rate product (*e.g.*, SimpleFlex, SimpleClean, BizChoice, Basic Plan);

11)   the service period begin date;

12)   the service period end date; and

13)   whether the customer was residential or commercial.

*See* Wittels Decl. ¶¶ 12; Ex. 3, Pls.' Expert Rep. at ¶ 42.  Plaintiffs' experts used this customer data to develop class-wide damages models.  *See id.* at ¶¶ 40, 42.

V.   **PLAINTIFFS WERE INJURED BY XOOM'S UNIFORM PRICING SCHEME**

Plaintiffs Susanna and Boris Mirkin signed up for XOOM's electricity variable rate in or around March 2013 based on their belief that they could save money by switching their energy

supplier to XOOM.  *See* Ex. 27, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022, 25:6–24.  While Boris was the primary decision-maker regarding the couple's energy supply, Susanna's name was listed on the electricity account for their home.  *Id.* at 27:12–18; Ex. 28, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022, 37:11–20, 60:3–11.

After enrollment, the Mirkins received the 2013 Sales Agreement at issue in this case via email.  Ans. ¶ 41.  For their first month of service in May 2013, the Mirkins received a one-month teaser rate of 8.99 cents per kWh.  Ans. ¶ 43; FAC ¶¶ 41–43; Ex. 3, Pls.' Expert Rep. at ¶ 3.  But as shown in the following chart, once the teaser rate ended and the Mirkins moved to XOOM's variable rate, the Mirkins were charged much higher rates:

| Billing Period | XOOM Rate |
|---|---|
| 5/10/2013–6/11/2013 | 8.99 (*teaser*) |
| 6/11/2013–7/11/2013 | 11.96 |
| 7/11/2013–8/9/2013 | 14.40 |
| 8/9/2013–9/10/2013 | 14.88 |
| 9/10/2013–10/8/2013 | 14.15 |
| 10/8/2013–11/7/2013 | 14.90 |

FAC ¶¶ 43, 54.

During the five months that the Mirkins paid XOOM variable rates, they were dramatically overcharged as compared to XOOM's supply costs.  *See* FAC ¶¶ 45, 61; Ex. 29, Expert Rebuttal Report of Derya Eryilmaz and Seabron Adamson, dated Nov. 4, 2022 ("Pls.' Rebuttal Rep.") at ¶¶ 29–32 (showing that in a mere 5 months, the Mirkins were overcharged for their electricity usage by approximately ███ when compared to XOOM's supply costs).  The Mirkins stopped using XOOM as their energy supplier in November 2013.  Ans. ¶¶ 54, 78; Ex. 30, Con Edison

Energy Supply Account Statement at Mirkins_00061 (showing that the Mirkins switched from XOOM to a different energy supplier as of November 2013).

## VI.   PLAINTIFFS' EXPERTS DETERMINED CLASS DAMAGES USING COMMON PROOF

Plaintiffs' experts Dr. Derya Eryilmaz and Seabron Adamson, who have a combined 35+ years of experience in the field of energy economics, have furnished two detailed reports, as well as deposition testimony, describing how they (i) calculated each Class Member's damages using common evidence and standardized damages models, and (2) determined the Class's total damages.  As described in their expert reports, Dr. Eryilmaz and Mr. Adamson prepared two different damages models to compute class damages.  Ex. 3, Pls.' Expert Rep. at ¶¶ 23(h), 60–77.

The experts' first damages model calculates the amount that XOOM overcharged its variable rate customers relative to what the company should have charged customers had XOOM based the rates on its actual reported supply costs, as required by the 2013 Contract.  *Id.* at ¶¶ 62–72.  This method determines the overcharges for each month by taking the difference between the rate XOOM charged and XOOM's reported supply costs and multiplying that difference by the customer's energy usage.  *Id.*  In order to perform these calculations, the experts thoroughly analyzed customer data and reports prepared and maintained by XOOM in the ordinary course of its business.  *Id.* at ¶¶ 38–49.

For their second damages model, Plaintiffs' experts adjusted the overcharge formula in the event that the ultimate factfinder determines that, even though not specified, the contract would still contain an implied term allowing XOOM to charge customers a reasonable "margin" in excess of its supply costs.  This alternative model applies the much lower (but still profitable) margins XOOM used for its New York fixed rate customers.  *See* Ex. 3, Pls.' Expert Rep. at ¶¶ 73–77.

Plaintiffs' experts determined that the resulting damages to the Class are approximately ▮▮▮▮▮▮ under the first method, and approximately ▮▮▮▮▮▮ under the second.  Ex. 3, Pls.' Expert Rep. at ¶¶ 23(j), 65, 77–78.[16]  Dr. Eryilmaz and Mr. Adamson can readily update this model to account for different profit margins and can use either method to generate damages for each Class Member using the same data and without individualized inquiries, including updating the second model to account for different profit margins (if needed).  *Id.* at ¶ 73 n.51 ("If the Court or factfinder determines that a different margin was appropriate here (*e.g.,* 10%), we would easily be able to update our calculations to reflect a different margin assumption.").[17]

Plaintiffs' experts have further noted that based on their review of XOOM's data, workbooks, and reports, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ notwithstanding the fact that XOOM's rates are supposed to be based on its supply costs.  Ex. 29, Pls.' Rebuttal Rep. at ¶ 10.  Defendants' expert Mr. Coleman also conceded this fact during his deposition.  Ex. 2, Coleman Tr. 105:4–8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Meanwhile, Mr. Coleman did not undertake *any* damages analysis because he believes that no damages are warranted at all.  *Id.* at 92:23–93:6.  In reaching his conclusion, Defendants' expert relied primarily on various correlation theories, even though the contract at issue says nothing about rates being correlated to XOOM's costs.  *Id.* at 49:18–23.  The lack of basic and sound

---

[16] As discussed above in footnotes 8 and 10, these figures would have been ▮▮▮▮▮▮▮▮▮▮▮▮ had Plaintiffs' experts timely received the additional Class data many months ago.

[17] For the same reasons, Plaintiffs' experts can easily update their models to include—and generate individual damages accounting for—the additional Class data first provided by XOOM on December 6, 2022.

energy economics principles in the Coleman report is underscored by Plaintiffs' experts, who note that under Coleman's correlation theory XOOM would have free reign under the contract to charge whatever margin it pleased—*i.e.*, even a 100% margin, which reveals the absurdity of the theory. *See* Ex. 29, Pls.' Rebuttal Rep. at ¶¶ 14–15 (noting that "[c]orrelation is simply not a meaningful measure to determine if the rates are appropriate under the contract"). Accordingly, the Coleman report and its opinion (to the extent Defendants try to rely on it), should be given no credence here.

## ARGUMENT

### I. LEGAL STANDARD

#### A. Class Certification

"[C]lass actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981). Indeed, the "very core" of class actions is to afford relief that otherwise would be too "paltry" for an individual suit. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Because a class action provides a single forum in which to litigate similar claims, a class action is an indispensable mechanism for conserving judicial resources. *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006). Any doubt as to the propriety of certification should be resolved in favor of certifying the class because denying class certification will almost certainly terminate the action and be detrimental to class members. *See Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (Rule 23 should be "given liberal rather than restrictive construction"). Indeed, "[c]ourts in this Circuit have displayed a preference for granting rather than denying class certification." *Morris v. Alle Processing Corp.*, No. 08 Civ. 4874 (JMA), 2013 WL 1880919, at *5 (E.D.N.Y. May 6, 2013) (internal quotation omitted).

Class certification is warranted once a court determines that the requirements of Rule 23 are met. *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348 (2011). In determining whether a class should be certified, the question is not whether the plaintiffs will prevail on the merits, but whether

the requirements of Rule 23 have been established.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011).  While "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160 (1982) (cleaned up), merits questions are considered "only to the extent [] that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).  "[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision."  *Id.* (internal citations omitted).

It is also well settled that at this stage of litigation Plaintiffs' allegations should be taken as true.  *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291, 293 (2d Cir. 1999) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)).  As discussed above, Plaintiffs have amassed substantial evidence demonstrating that XOOM did not base its electricity and natural gas prices on its actual and estimated supply costs despite the requirement under the 2013 Contract to do so.

To obtain class certification, a plaintiff must meet the four criteria set forth in Rule 23(a) and show that at least one of the requirements of Rule 23(b) are satisfied.  *Amchem*, 521 U.S. at 613.  Plaintiffs here seek certification under Rule 23(b)(3).

## II.   PLAINTIFFS HAVE SATISFIED RULE 23(A)

### A.   <u>The Class Is Sufficiently Numerous</u>

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The Second Circuit has held that a prospective class of forty or more raises a presumption of numerosity.  *Shahriar v. Smith & Wollensky Rest. Grp.*, 659 F.3d 234, 252 (2d Cir. 2011).  The numerosity requirement is easily met because XOOM's records show that there are tens of thousands of XOOM New York customers in the class.  Ex. 3, Pls.' Expert Rep. at ¶ 23(b).

**B.**   **This Action Raises Questions Common to All Potential Class Members with Common Answers**

Rule 23(a)(2)'s commonality requirement is met when "there are questions of law or fact common to the class." *Dukes*, 564 U.S. at 349.   To establish commonality, a plaintiff must demonstrate "that the class members have suffered the same injury" and that the claims they allege "depend upon a common contention." *Id.*   The common contention "must be of such a nature that is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Consideration of this requirement obligates a district court to determine whether plaintiffs have 'suffered the same injury.'" *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 84 (2d Cir. 2015) (affirming order granting motion for class certification and quoting *Dukes*, 564 U.S. at 350). However, not "all questions of law or fact raised" need be "common." *Dukes*, 564 U.S. at 368. *See also Hoeffner v. D'Amato*, No. 09 Civ. 3160 (PKC) (CLP), 2019 WL 1428367, at *7 (E.D.N.Y. Mar. 29, 2019) ("Even a single common legal or factual question will suffice to prove commonality." (internal quotation omitted)).

"Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137–38 (2d Cir. 2015); *see also* Ex. 6, *Bell* Op. at 4 (finding commonality because each contract contained the same pricing language); *Roberts v. Verde Energy, USA, Inc.*, No. X07-HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017), *aff'd*, 2019 WL 1276501 (Conn. Super. Ct. Feb. 1, 2019) ("There are common questions of law or fact to the class and they clearly predominate over any individual issues.   A common contract is at issue."); *cf. Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("[C]laims arising from

interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." (quotation omitted)).

Commonality is easily satisfied here.  Class members were all subject to the same contract language.  XOOM thus made uniform representations to all Class members regarding its variable rate pricing methodology but set its variable rates without basing them on its underlying supply costs (instead using a legion of criteria, many of which XOOM admits are not supply costs). Accordingly, the common question is whether XOOM failed to set rates in accord with the 2013 Contract.

"The claims of the proposed class turn on the 'common contention' that [defendants] misleadingly described [their] method for calculating variable monthly rates, a claim that 'is capable of classwide resolution . . . .'  Plaintiffs have therefore shown common questions of law and fact under Rule 23(a)(2)."  *Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261 (PKC), 2016 WL 7009062, at *4 (quoting *Dukes*, 564 U.S. at 350).  *See also Zhang v. Ichiban Grp., LLC*, No. 17 Civ. 148 (MAD/TWD), 2021 WL 3030052, at *4 (N.D.N.Y. May 21, 2021) (explaining that because defendants' allegedly unlawful practices "would likely be common to all employees," the "[p]laintiffs have demonstrated commonality by a preponderance of the evidence").

Determinations regarding the proper measure of damages are likewise common to the Class because damages can be calculated by applying a common formula that takes the difference between the rate XOOM charged and XOOM's reported supply costs (whether without or with a margin) and multiplies that difference by the customer's energy usage.  *See Claridge*, 2016 WL 7009062, at *3 (holding that the plaintiffs satisfied commonality where "Plaintiffs also point to common questions on damages, including whether damages should be calculated according to the difference between [the defendants'] rates and those of other market participants, or whether

26

damages should instead reflect the difference between [the] actual charged rate and a hypothetical rate calculated pursuant to the factors described in the Sales Agreement."); Ex. 6, *Bell* Op. at 4 (holding that because damages could be adjudicated using common proof of the defendant's business records and utility rates, the damages model supported commonality).

### C.     <u>Plaintiffs' Claims are Typical of the Class's Claims</u>

This case easily hurdles Rule 23(a)(3)'s typicality requirement, which is "not highly demanding." *Dial Corp. v. News Corp.*, No. 13 Civ. 6802 (WHP), 2015 WL 4104624, at *4 (S.D.N.Y. June 18, 2015) (citation omitted).  Rule 23(a)(3) "requires that the claims of the class representatives be typical of those of the class[.]  [It] is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 245 (2d Cir. 2007).  "[I]f 'plaintiffs assert . . . that defendants committed the same wrongful acts in the same manner against all members of the class, they establish necessary typicality.'" *Jianmin Jin v. Shanghai Original, Inc.*, No. 16 Civ. 5633 (ARR) (JO), 2018 WL 1597389, at *12 (E.D.N.Y. Apr. 2, 2018) (Ross, J.) (quoting *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 371 (S.D.N.Y. 2007)) (*decertified*, 2019 WL 11816612, but because of class counsel's failure to prosecute).

Typicality is readily satisfied where the plaintiffs and the Class were injured under the same contract.  *See, e.g.*, *Claridge*, 2016 WL 7009062, at *4 (finding plaintiffs' claims typical where they were "directed toward [defendant's] statements made in a widely dispersed document and a uniform contract"); Ex. 6, *Bell* Op. at 6 (finding defendants' contractual representations to plaintiff arose out of same course of conduct directed at the class, rendering plaintiff's claims typical).  A finding of typicality is especially appropriate where, as here, the communications alleged to be improper are made in uniform written notices which were received by Plaintiffs and

the proposed Class.  *See Vu v. Diversified Collection Servs., Inc.*, 293 F.R.D. 343, 354 (E.D.N.Y. 2013) (certifying class and finding typicality satisfied where "[p]laintiff's claims could not be more similar to those of the class because both are based on near identical language in the notice letters.").

Here, Plaintiffs' and Class Members' claims arise from the same documents and course of events, and each Class Member would make the same legal arguments to prove Defendants' liability.  Plaintiffs and Class Members were commonly bound by a Sales Agreement (and for some, a renewal notice) that XOOM distributed to Class Members.  Each Sales Agreement contained the same language describing XOOM's pricing of its variable rate products.  *See Claridge*, 2016 WL 7009062, at *4; Ex. 6, *Bell* Op. at 6 (holding that typicality was satisfied because the plaintiff's claims arose out of the same course of conduct, *i.e.*, uniform contractual language, as others in the class).  Plaintiffs and Class Members would proffer the same evidence and arguments in their claims against XOOM.  Accordingly, Plaintiffs' claims are typical of those of the Class.

### D.    Plaintiffs and Class Counsel Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4)'s adequacy requirement encompasses two inquiries: (1) whether substantial conflicts of interest exist between plaintiffs and class members, and (2) whether plaintiffs' counsel are experienced and capable of adequately prosecuting the action.  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).  "Two factors generally inform whether class representatives satisfy the Rule 23(a)(4) requirement: '(1) absence of conflict[s of interest] and (2) assurance of vigorous prosecution."  *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001) (citations omitted), *abrogated on other grounds by Dukes*, 564 U.S.

28

338.  Only a conflict "that goes to the very subject matter of the litigation will defeat a party's claim of representative status."  *Stinson v. City of N.Y.*, 282 F.R.D. 360, 371 (S.D.N.Y. 2012).

Additionally, "[c]ourts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case."  *Bayne v. NAPW, Inc.*, No. 18 Civ. 3591, 2021 WL 4822426 (MKB) (RER), at *7 (E.D.N.Y. Aug. 10, 2021) (quoting *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012)).  "Indeed, 'the requirement that the class representative have knowledge of the facts of the case is a 'modest one.'" *Hines v. Equifax Info. Svcs., LLC*, No. 19 Civ. 6701 (RPK) (RER), 2022 WL 2841909, at *19 (July 16, 2022) (Reyes, M.J.) (quoting *Vergara v. Apple REIT Nine, Inc.*, No. 19 Civ. 2027 (DLI) (RML), 2021 WL 1103348, at *3 (E.D.N.Y. Feb. 5, 2021)).

Here, the Mirkin Plaintiffs and the proposed Class have interests that are perfectly aligned. They allege the same wrong and seek the same relief.  Plaintiffs have the same contract claim that all other Class members have based on the contract language at issue.  Indeed, the Mirkins' contract claim is identical to all XOOM variable rate natural gas and electric customers covered by the 2013 Supply Agreement, which includes clean energy customers, small commercial customers, former customers of Planet Energy who were on a XOOM variable rate plan, and fixed rate customers rolled over into a XOOM variable rate plan.

Indeed, it is well settled that class action plaintiffs can represent all class members that suffered sufficiently similar injuries.  *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 438 (S.D.N.Y. 2020) (in a case involving another independent energy supplier, noting that "[t]he Second Circuit has explicitly instructed that 'non-identical injuries *of the same general character*

can support standing' for a class action") (quoting *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 94 (2d Cir. 2018)).   The fact that a New York variable rate customer was a natural gas customer, a "clean energy" customer, originally a Planet Energy customer, or initially a fixed-rate customer is not a barrier to the Mirkin Plaintiffs bringing claims on these consumers' behalf.   "[C]ourts in this Circuit have held that, subject to further inquiry at the class certification stage, a named plaintiff has standing to bring class action claims . . . for products that he did not purchase, so long as those products . . . are 'sufficiently similar' to the products that the named plaintiff *did* purchase."   *Mosely v. Vitalize Labs, LLC*, No. 13 Civ. 2470 (RJD) (RLM), 2015 WL 5022635, at *7 (E.D.N.Y. Aug. 24, 2015) (emphasis in original).   Here, variable rate customers that originally contracted with Planet Energy or started out on a fixed rate plan are still variable rate customers with the same contract language at issue, as are the company's natural gas customers, small commercial customers, and "clean energy" customers.   Magistrate Judge Reyes so found earlier in the proceedings.   *See* Ex. 18, 2/3/22 Tr. 5:12–18 ("If once they were a variable rate customer, they're being treated exactly as the Mirkins were, why does it matter how they became a variable rate customer?"), 10:11–18 ("If in fact these other potential class members once they became variable rate customers were subject to the same treatment as the Mirkins were, then they are similarly situated and are truly class members.   I don't know that it's relevant how they became members of the class coming from a fixed rate plan, coming from another provider, supplier.").

Plaintiffs will fairly and adequately protect the interests of the Class.   The Mirkin Plaintiffs have "demonstrated [their] commitment to pursuing these claims" by sitting for depositions, collecting and providing relevant documents and information, reviewing the complaint, and

"responding to extensive written discovery requests[.]" *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 406–07 (S.D.N.Y 2015) ; Wittels Decl. ¶ 14.[18]

Likewise, Plaintiffs' counsel are especially well-qualified and experienced in prosecuting complex class actions, including customer class actions against ESCOs.  Wittels Decl. ¶¶ 6–9 (detailing other litigation against ESCOs).  Plaintiffs' counsel have demonstrated an unflagging willingness to pursue this litigation.  *Id.* ¶ 10.  Undersigned counsel should be appointed class counsel under Rule 23(g).

### E.    The Class Is Ascertainable

The "implied requirement of ascertainability" is a "fifth pre-condition to class certification." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 407.  Ascertainability "demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017).  The party seeking certification is not "require[d] [to make] a showing of administrative feasibility at the class certification stage." *Id.* at 265.  Here, the ascertainability requirement is easily established because class membership can be objectively determined using XOOM's business records, which identify the XOOM New York variable rate customers during the relevant period subject to the contract language at issue here.  XOOM has produced such data to the Plaintiffs, which identifies the members of the proposed Class.  *See* Ex. 3, Pls.' Expert Rep. at ¶ 42; Wittels Decl. ¶ 12.  *See also Hines*, 2022 WL 2841909, at *16 (finding ascertainability met where "proposed class . . . definitions use clear, objective criteria and establish class membership with definite temporal and geospatial boundaries such that class membership can be readily determined").

---

[18] Any attempt by Defendants to impugn Plaintiffs' honesty and credibility based on Plaintiffs' entirely unrelated tax dispute with the IRS, *see generally* ECF Nos. 112–114, should not be credited by this Court.

### III.   PLAINTIFFS AND THE PROPOSED CLASS SATISFY RULE 23(B)(3)'S REQUIREMENTS

#### A.   Common Questions of Law and Fact Predominate

##### 1.   *Common Questions Predominate in Establishing Defendants' Liability*

Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) .

A court must "bear[] firmly in mind that the focus of Rule 23(b)(3) is on the predominance of common questions . . . ."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).  It "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof," but instead to prove that "common questions predominate over any questions affecting only individual class members."  *Id.* at 469 (emphasis in original; alterations and quotation marks omitted); *accord Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 87 (2d Cir. 2015) ("The mere existence of individual issues will not be sufficient to defeat certification.  Rather, the balance must tip such that these individual issues predominate.").  "Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Claridge*, 2016 WL 7009062, at *5 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)).   The purpose of the predominance element is to ensure that certification "would achieve economies of time, effort and expense, and promote uniformity of decisions as to persons

similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)).

Plaintiffs' breach of contract claim presents straightforward common questions that will be answered through common proof, precluding the predominance of individual issues. To establish a breach of contract claim, a plaintiff need only demonstrate "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

"Contract claims satisfy Rule 23(b)(3) when the claims of the proposed class 'focus predominantly on common evidence[.]'" *Claridge*, 2016 WL 7009062, at *6 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)). Plaintiffs' breach of contract claim arises out of XOOM's standardized Sales Agreements and its variable rate pricing decisions for its New York customers. The standardized customer contracts represent that XOOM's variable rates would be based on its own actual (or estimated) supply costs to procure electricity and natural gas. XOOM produced their actual supply costs in discovery, and Plaintiffs' energy experts calculated and analyzed their supply costs. From this analysis, it is clear from Defendants' own data that XOOM utterly ignored its contractual obligation and grossly overcharged Plaintiffs and the proposed Class. Plaintiffs and the proposed Class allege that XOOM breached its 2013 Sales Agreement by implementing pricing practices that set variable rates using undisclosed pricing factors and outrageously large profit margins. *See also Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177 (2d Cir. 2019) ("The Mirkins have alleged . . . that XOOM's rates showed significant upward deviations from [XOOM's supply costs]. . . . These allegations are sufficient to state a claim for breach of contract, as XOOM promised to base its rates on its supply costs and the Mirkins' allegations and calculations plausibly allege that this did not occur."). Plaintiffs' and the

proposed Class's contract claim hinges on the common question of whether XOOM breached those contracts.  Because these questions entail generalized evidence and will predominate over any individual questions, class certification is undoubtedly appropriate here.

"[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) (quotation omitted); *see also In re U.S. Foodservice*, 729 F.3d at 124–25 (finding predominance requirement met in case where contracts at issue "essentially all say the same thing" (cleaned up)).  XOOM's customer contracts and retention notices at issue here have identical language requiring that XOOM base its variable rates on its actual and estimated supply costs.  Plaintiffs will show using common evidence that XOOM's variable rate pricing established during its regularly-held pricing meetings consistently overcharged members of the proposed Class well in excess of XOOM's actual and estimated supply costs.

Plaintiffs will also demonstrate XOOM's breach of contract using extensive common evidence.  Plaintiffs' experts Dr. Eryilmaz and Mr. Adamson will demonstrate through common proof furnished by XOOM which applies equally to all Class Members that Defendants failed to comply with their contractual pricing obligations.  Ex. 3, Pls.' Expert Rep. ¶¶ 23(c)–(f), 38–59. Plaintiffs' experts detail what XOOM's actual supply costs are, and clearly demonstrate that XOOM's variable rates were consistently and significantly higher than rates calculated based on the actual contract terms.  Dr. Eryilmaz and Mr. Adamson will establish that XOOM's variable rates were dramatically higher than rates truly based on its supply costs, and that XOOM actually set its rates in order to achieve certain profit goals and to execute XOOM's "pricing strategies." Dr. Eryilmaz and Mr. Adamson will also show that XOOM's New York variable rate margins

were set significantly higher than the margins for its New York fixed rate customers even though both types of products were profitable for XOOM.  Proof of Plaintiffs' claims will be common to all members of the proposed Class and will rely on XOOM's standard and uniform 2013 Sales Agreements and related communications, XOOM's discovery responses, XOOM's business records, and XOOM witness testimony.

Accordingly, Plaintiffs easily satisfy the predominance element because they show that XOOM's New York 2013 Contract language applies to all members of the proposed Class.  *In re U.S. Foodservice*, 729 F.3d at 126 (affirming district court's conclusion that common issues predominate where "the record does not indicate the existence of material differences in contract language or other significant individualized evidence").

2.    *Common Questions of Classwide Damages Predominate Over Those of Individual Class Members*

Damages are also provable on a classwide basis.  Plaintiffs will establish the proposed Class damages in a way that is consistent with their theories of liability and using common evidence in accordance with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  As the Second Circuit has explained, "[i]n *Comcast*, the Supreme Court held that courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis."  *In re U.S. Foodservice*, 729 F.3d at 123 n.8 (citing *Comcast*, 569 U.S. at 35–38).  None of the Plaintiffs' damages calculations require individualized inquiries.  Plaintiffs' experts have prepared standardized formulas for each measure of damages that will automatically generate the amount of damages applicable to each member of the proposed Class using XOOM's own data.  Ex. 3, Pls.' Expert Rep. at ¶¶ 62–77.  Thus, no individualized inquiry will be necessary.

Plaintiffs' proposed damages calculations take the difference between the variable rates XOOM charged the Class and the rates XOOM would have charged had it complied with its 2013 Contract. In their report, Dr. Eryilmaz and Mr. Adamson prepared a damages model that calculates the difference between the XOOM New York variable rate and XOOM's stated supply costs for each month in each New York utility market. *Id.* at ¶¶ 62–72. Dr. Eryilmaz and Mr. Adamson further show that if the factfinder determines that a margin is appropriate, the experts can calculate damages applying such a margin. The approach they illustrate in their report is to take the difference between the XOOM New York variable rate margins that XOOM charged versus the XOOM New York fixed rate margins that XOOM applied to its otherwise similarly-situated fixed rate customers. *Id.* at ¶¶ 73–77.

Accordingly, Plaintiffs' damages model satisfies *Comcast* and the predominance standard. *See, e.g.*, *In re U.S. Foodservice*, 729 F.3d at 123 & n.8 (holding that a measure of damages based upon the amount of overcharges—*i.e.*, "the difference between the amount they paid on fraudulently inflated cost-plus invoices and the amount they should have been billed"—"is thus directly linked with their underlying theory of classwide liability (that the misrepresentations on the invoices caused overpayments) and is therefore in accord with . . . *Comcast*[.]").

### 3.    *Class Treatment is Superior to Other Methods of Adjudication*

Under Rule 23(b)(3), the Court must consider (1) proposed Class members' interest in controlling individual actions; (2) any litigation already commenced by proposed Class members; (3) the merits of concentrating the litigation in this Court; and (4) any difficulties in managing a class action. Here, these factors strongly weigh in favor of class certification. XOOM has wildly boosted its profits at its New York variable rate customers' expense and, in doing so, it has failed to honor the terms of its 2013 Contract. Defendants will not be properly held accountable for their breach of their consumer contract absent class certification.

36

The proposed Class's interest in aggregating these claims outweighs any individual's interest in controlling her own case, especially where, as here, significant barriers to individual recovery are present.  Adjudicating separate actions all arising from the same operative facts would pose a significant burden on the courts.  "[T]he more similar the claims of the potential class members, the less sense it makes to litigate repetitious individual actions."  *Fox v. Cheminova, Inc.*, 213 F.R.D. 113, 130 (E.D.N.Y. 2003); *see also Roberts*, 2017 WL 6601993, at *2 ("Piecemeal litigation would be less workable.  Given that much of the case depends on the central common legal issues surrounding the contract[,] class members would have little interest in separately controlling the litigation . . . .").  Additionally, prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual Class Members that could establish incompatible standards of conduct for Defendants.  *See Zhang v. Ichiban Grp., LLC*, No. 17 Civ. 148 (MAD/TWD), 2021 WL 3030052, at *8 (N.D.N.Y. May 21, 2021) ("Forcing the proposed class members to litigate nearly identical grievances in individual actions 'would risk disparate results among those seeking redress, . . . would exponentially increase the costs of litigation for all, and would be a particularly inefficient use of judicial resources.'" (quoting *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 134 (S.D.N.Y. 2001))).  Individualized actions "would simply entail repeated adjudications of identical provisions" of the contract.  *Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261 (PKC), 2016 WL 7009062, at *6 (S.D.N.Y. Nov. 30, 2016).[19]

---

[19] A few ESCO cases denied class certification as moot because the plaintiffs' claims had been dismissed. *See Martinez v. Agway*, No. 18 Civ. 235, 2022 WL 1091607, at *6 (N.D.N.Y. Apr. 12, 2022); *Richards v. Direct Energy Svcs., LLC*, 915 F.3d 88, 96 (2d Cir. 2019) (noting that the district court dismissed plaintiff's "motion for class certification as moot because it had dismissed or granted summary judgment on all of [plaintiff's] claims").  *See also Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 178 n.3 (2d Cir. 2019) (distinguishing *Richards*' applicability to this case because "the relevant contractual provisions are critically different"); Ex. 2, Coleman Tr. 107:19–109:21 (Defendants' expert conceding that the contractual language is "certainly different" here than in the *Richards* case).

Additionally, the claims of Plaintiffs and the proposed Class would not be economical to litigate on an individual basis and thus members of the proposed Class are unlikely to prosecute individual actions.  *See Roberts*, 2017 WL 6601993, at *2 ("Consumer contracts affecting thousands of people but not necessarily yielding thousands of dollars to each class member are well suited for class certification.  Without the class action method[,] most claims like this wouldn't be brought, including claims with great social utility."

Additionally, through more than four years of litigation and the entire discovery period, no difficulties have occurred in managing this action and, accordingly, it can be readily tried as a class action.  Fed. R. Civ. P. 23(b)(3)(D).

Thus, all relevant considerations weigh in favor of class certification.

## IV.    NOTICE SHOULD BE PROVIDED TO THE CLASS

In addition to certifying the class, Plaintiffs request that the Court also direct that notification of class action certification be made to the Class by mail, email, and/or any other means that is the best practicable notice, with such notice to be paid by Defendants.  *See* Rule 23(c)(2).

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs respectfully request that the Court certify the Class described herein under Federal Rule of Civil Procedure 23(a) and (b)(3), appoint Plaintiffs Susanna Mirkin and Boris Mirkin as Class Representatives, and appoint Wittels McInturff Palikovic as Class Counsel.

Dated: December 16, 2022

Respectfully submitted,

 /s/ Steven L. Wittels
 Steven L. Wittels

**WITTELS MCINTURFF PALIKOVIC**
Steven L. Wittels
J. Burkett McInturff
Steven D. Cohen
Ethan D. Roman
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
sdc@wittelslaw.com
edr@wittelslaw.com

Daniel Hymowitz
**HYMOWITZ LAW GROUP, PLLC**
1629 Sheepshead Bay Road
Brooklyn, NY 11235
Telephone: (718) 807-9900
Facsimile: (866) 521-6040
daniel@hymowitzlaw.com

Andrey Belenky
Dmitry Kheyfits
**KHEYFITS BELENKY LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

*Co-Counsel for Plaintiffs and the Proposed Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 16, 2022, the foregoing was served via email on all counsel of record.

By:  <u>/s/ Steven L. Wittels</u>
Steven L. Wittels