# Exhibit 9

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

Case 15-M-0127   –   In the Matter of Eligibility Criteria for Energy Service Companies.

Case 12-M-0476   –   Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State.

Case 98-M-1343   –   In the Matter of Retail Access Business Rules.

DEPARTMENT OF PUBLIC SERVICE
STAFF REDACTED INITIAL BRIEF

F. THOMAS DWYER
STEVEN J. KRAMER

Staff Counsel

DATED:  March 30, 2018

JOINT TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ................................................................................................. 1

II. BACKGROUND ...................................................................................................................... 6

   A. PROCEDURAL HISTORY ............................................................................................... 6

   B. THE RETAIL MARKETS TODAY ................................................................................ 16

      1. Overview of the Retail Energy Markets Serving Mass Market Customers ............................ 16

      2. ESCO Registration and Eligibility .............................................................................. 17

      3. ESCO Business Practices ........................................................................................... 17

      4. Billing and Purchase of Receivables ........................................................................... 17

      5. Current Status of the UBP .......................................................................................... 17

      6. Monitoring and Enforcement ..................................................................................... 18

III. ANALYSIS .......................................................................................................................... 20

   A. REGULATORY REGIME .............................................................................................. 20

      1. Commission's Vision in Opening the Competitive Markets ............................................. 20

      2. Application of Public Service Law to ESCOs ............................................................... 20

         a) Scope of Commission Jurisdiction Under the PSL .................................................... 20

         b) Should ESCOs Be Required To File Tariffs? .......................................................... 24

         c) Financial Oversight ............................................................................................. 25

      3. Enforcement Powers Over ESCOs .............................................................................. 26

         a) Commission's Enforcement Mechanisms and Efforts ............................................... 26

         b) Attorney General's Enforcement Mechanisms and Efforts ......................................... 27

      4. Other State and Federal Laws Applicable to ESCOs ...................................................... 27

   B. USEFULNESS & ACCURACY OF COMPARING ESCO AND UTILITY RATES ................ 27

      1. Utility Bill Comparison Methodologies ....................................................................... 27

      2. Utility Delivery and Supply Cost Allocations ............................................................... 40

   C. RESPONSE TO COMMISSION'S INQUIRIES ON THE FUTURE OF
ESCOs IN THE MASS MARKET .................................................................................... 41

      1. Should Retail Choice Continue In New York? .............................................................. 41

a) ESCOs' Role in Residential Markets ................................................................ 42

    (i) Defining Residential ................................................................................ 44

b) ESCOs' Role in Non-Residential Markets ..................................................... 45

    (i) Defining Small Commercial ................................................................... 45

    (ii) Whether Small Commercial should be included in Mass Market? .......... 45

    (iii) Whether Certain UBP Provisions Should Apply to Small Commercial? .......... 48

2. ESCOs' Place in the Competitive Market ....................................................... 49

    a) Whether ESCOs have "Market Power" ..................................................... 49

    b) The Functionality of Competitive Markets for Retail Commodity Services .................. 54

    c) ESCOs' Impact on Commodity Prices:  Rates in the Fully Regulated Market ................ 59

3. Future Product Offerings ............................................................................... 62

    a) Variable-Rate, Commodity-Only Products ................................................ 63

    b) Fixed-Price Products ............................................................................... 64

    c) Renewable Energy Products .................................................................... 67

    d) Value-Added or Bundled Products ........................................................... 71

    e) CCA Products ........................................................................................ 72

    f) Other Products ....................................................................................... 74

4. ESCOs' Role in the Commission's Energy Policies, Including REV and CES .......... 75

5. ESCO Eligibility Requirements ...................................................................... 77

    a) New Applicants ...................................................................................... 77

    b) Current ESCOs ...................................................................................... 77

6. ESCO Reporting and Collateral Posting Requirements .................................... 77

7. ESCO Marketing Practices ............................................................................ 79

    a) ESCO Practices; Materials; Contracts; Scripts & Training Materials .......... 79

    b) Door-to-Door Marketing ........................................................................ 79

    c) Telemarketing ........................................................................................ 79

    d) Other ..................................................................................................... 79

8. Customer Information and Cyber Security ...................................................... 79

9. Purchase of Receivables and Billing Process .................................................. 80

    a) Purchase of Receivables ......................................................................... 80

b) Billing Methodologies.................................................................................82

    (1) Utility Consolidated Billing .............................................................82

    (2) Dual Billing .....................................................................................83

    (3) Supplier Consolidated Billing .........................................................83

10. Customer Complaints...................................................................................83

    a) Historical Complaints................................................................................83

    (1) Prices ...............................................................................................83

    (2) Sales and Marketing ........................................................................83

    b) ESCO Complaint Rates v. Utility Complaint Rates...................................83

    c) Impact of Enforcement on Complaint Rates ..............................................83

    d) Complaint-Rate Trends and Implications ..................................................83

11. Transparency.................................................................................................85

    a) Transparency in Utility Pricing .................................................................85

    b) Transparency in ESCO Pricing & Products ..............................................85

    c) Mechanisms for Creating or Improving Transparency ..............................85

12. Customer Renewal Process...........................................................................90

13. Customer Shopping Tools.............................................................................90

14. Customer Choice...........................................................................................90

    a) Default Service .........................................................................................90

    b) ESCO Products .........................................................................................90

15. Examples of Competitive Market Frameworks in Other States....................90

16. State Agency & Consumer Advocacy Group Actions ..................................90

    a) Investigations ...........................................................................................90

    b) Actions to Monitor the Market..................................................................90

17. Energy Brokers .............................................................................................90

    a) Proposed Energy Broker Role in the Mass Market ...................................90

    b) Registration of Energy Brokers in the Mass Market .................................90

IV. CONCLUSION.......................................................................................................91

# I.   PRELIMINARY STATEMENT

The prices charged to residential and small commercial (mass market) customers by energy service companies (ESCOs) for electric and gas commodity service are substantially higher than the prices charged by the utilities.  Additionally, the large gulf between ESCO and utility charges is not justified by the offering of energy-related value-added services.  Instead, mass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.  Rather than fierce ESCO against ESCO price competition working to protect customers from excessive charges, ESCOs have deliberately obfuscated prices and resisted market reforms such that the Commission's decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable.  The Commission has an obligation under the Public Service Law (PSL) to rectify this situation, which can only be done through either a full revocation of retail access for mass market customers, or a fundamental reset in the retail access rules in the manner proposed by Staff in this brief.

To satisfy its ongoing obligation to ensure that retail markets are providing their commodity offerings at just and reasonable rates, the Commission initiated this ESCO Track I proceeding by notice issued December 2, 2016.[1]  That notice directed the parties to submit testimony and exhibits addressing, to the extent relevant to their positions, 20 questions.[2]  The overarching question among those 20 is whether ESCOs should be prohibited, in whole or in part, from serving mass market customers, and how the Commission should regulate the ESCOs and their product offerings.[3]

---

[1]   Case 15-M-0127 et al., In the Matter of Eligibility Criteria for Energy Service Companies, Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits (December 2, 2016) (December 2016 Notice).

[2]   Id. at 5-8.

[3]   Id. at 5-6, questions 1-6.

CASE 15-M-0127, et al.

In order to analyze the retail markets to determine whether they are or are not providing commodity products at just and reasonable rates, the Commission also directed that the record for Track I contain data for the years 2014 through 2016 including the number of customers served by the ESCOs, volume of sales in dollars and in kilowatt hours (kWh).[4]  This, and other data, were to be used to analyze the prices that ESCOs have charged for electric or gas commodity on an annual basis during the period 2014-2016 compared to the incumbent utilities, including whether the ESCOs were profitable or not, and whether under the current mass markets structure, ESCOs can profitably offer lower prices on an annual basis compared to the incumbent utility.[5]  Other questions sought information regarding the marketing practices of the ESCOs, whether customers were able to obtain information about the relative prices and offerings of the ESCOs and utilities and their likely ability to understand this information, including evidence regarding the transparency of the retail markets and customer complaints about ESCO service and practices.[6]

As we explain in this initial brief, the retail energy markets for the mass market customers are not functioning as the Commission originally intended for those customers.  The Commission's intention in opening the retail markets to competition was for customers to realize the benefits of competition – lower prices for customers.  Evidence proves that, on an aggregated basis, ESCOs are charging mass market customers significantly more than those customers would have been charged if they instead remained as full service utility customers.  According to the data provided by the utilities, the approximately two million New York State residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have paid if they purchased commodity from their distribution utility during the 36-months ending December 31, 2016.  Additionally, small commercial customers

---

[4]   Id. at 6-7, questions 9-11.

[5]   Id. at 7, questions 12-13.

[6]   Id. at 6, 7-8, questions 7, 14-20.

CASE 15-M-0127, et al.

paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for the same 36-month period. Combining the residential and small commercial customer classes, mass market customers were "overcharged" by over $1.3 billion dollars over this time period. Finally, the data also shows that low-income customers (a subset of the residential customer mentioned above) who took commodity service from an ESCO collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility. Staff has shown that the lack of transparency in the mass markets for commodity service does not allow customers to make rational price comparisons among all competitors in the market (the ESCOs and the incumbent utility). Additionally, the evidence developed by Staff proves that the marketing and enrollment practices of many of the ESCOs are not in accord with the Commission's Uniform Business Practices (UBP) for ESCOs and that their marketing practices rely on pressure tactics and unfulfilled promises that the customer will save money on commodity. In contrast, the evidence clearly demonstrates that, overall, mass market customers paid $1.3 billion more than they would have if they simply remained with their default utility provider during the 2014-2016 period that the Commission directed be analyzed in this Track I proceeding.

Most customers are receiving no material energy-related value-added products or services to account for the excess charges. Thus, a majority of mass market customers are receiving nothing more than the same electrons or therms they would have received from the utility, but at a significantly higher price. These facts, combined with evidence in the record of ESCO marketing abuses, lack of price transparency, and high complaint rates, demonstrate that the Commission must take action to protect mass market customers and to ensure they receive commodity service at just and reasonable rates.

Further, in light of the pricing abuses ESCOs are committing against their customers, Staff recommends that the Commission direct the utilities to prohibit ESCOs from using their distribution systems to provide commodity service to mass market

CASE 15-M-0127, et al.

customers (both residential and small commercial, as defined by the Commission and discussed in sections III.C.1.a.(i) and III.C.1.b.(i) of this brief), unless Staff's eleven recommendations are implemented by the Commission (Tr. 2032, ln 18 to Tr. 2037). These 11 recommendations are discussed in detail in Section III.C.3.a, below.

Briefly, Staff's recommendations are that ESCOs not be allowed to use the utilities' systems to distribute their commodity unless the ESCO provides a guarantee that each customer's total electric and/or gas bills are lower than, or no greater than, that charged by the utility for delivery and commodity service over the calendar year. That said, an ESCO may provide customers energy generated through 100 percent renewable resources, that are delivered to and consumed in New York and otherwise in compliance with the Commission's environmental disclosure program requirements, at a premium to utility service. We also recommend that aggregation of customers be allowed through either a Not For Profit (NFP) or municipal entity or Community Choice Aggregation (CCA) utilizing a professional energy buyer acting as a fiduciary to the CCA and independent of the ESCO.

Commodity product and price transparency is a tremendous problem in the retail energy markets, as discussed in Section III.C.11., thus the Commission must direct that mass market ESCO customer bills disclose a relative bill comparison showing the current bill charges and what the customer would have paid had they taken delivery and commodity from their utility. Furthermore, the Commission must establish a reporting requirement to ensure that the Commission and the Department can monitor ESCOs to ensure that they are not charging customers more than what the utility would have charged over the calendar year. The protection of customer data is critical, and the Commission should direct the ESCOs to protect this confidential data with appropriate cyber security measures.

ESCO marketing practices are frequently abusive to customers, as discussed in detail in Section III.C.10. Therefore, the Commission should prohibit ESCOs from using the utilities' systems to deliver commodity to their customers unless

CASE 15-M-0127, et al.

they agree not to use door-to-door, point of sale, telephonic sales, or similar marketing practices, since the record proves that customers are often provided incorrect or incomplete information, coupled with a lack of transparency, upon which they make their decision as to whether to sign up with the ESCO.  ESCO marketing should be limited to direct mail, electronic communications (such as e-mail), or similar forms of marketing where the customer initiates contact with the ESCO.

Finally, the UBP should be amended to conform to our recommendations, ordering clauses as contained in Exhs. 724 (SP-12) and 725 (SP-13) should be adopted, and the Commission should provide for an orderly transition to implement our recommendations, and not allow itself to be distracted from implementing our recommendations by the offering of "value-added" services by the ESCOs in conjunction with their commodity offerings.

The Commission has the jurisdiction and authority to establish and modify the conditions under which ESCOs may offer electric and gas commodity service to customers, and even whether they should be prohibited from using the distribution utilities' systems to provide commodity service.  The Commission's authority to oversee ESCO product offerings, including setting limits on the prices charges by ESCOs, has been upheld by the courts.

In light of the above, the Commission should take action to reform the retail commodity marketplace to protect New York's mass market customers.  As discussed in detail in this brief, the Commission should take action to cap ESCO commodity prices at the utility rate.  This will serve to further the Commission's primary objective in establishing the retail energy markets -- lower commodity rates for customers.

CASE 15-M-0127, et al.

# II. BACKGROUND

## A.    PROCEDURAL HISTORY

### 1.    Creation of the Retail Markets

In the 1980's, utility regulators began unbundling utility service into transport and energy (commodity) components. (See Associated Gas Distribs. v Federal Energy Regulatory Commn., 824 F2d 981, 997-1001 [DC Cir. 1987] [affirming, as lawful, a decision of the Federal Energy Regulatory Commission (FERC) that "bundled" gas rates were discriminatory and anticompetitive and needed to be unbundled to yield open access to transportation in order to achieve "just and reasonable" rates]).  As a result of "unbundling," the cost for the provision of natural gas was billed as two components: a charge for the transportation and distribution of the gas, and a charge for the gas itself. The gas itself (commodity) could therefore be provided or contracted for by an independent, competitive, supplier.

In 1984, the New York Legislature amended the PSL to provide the Commission with the authority to require franchised providers of gas transportation and distribution services to open their pipelines to competitively provided gas. (PSL §66-d). The Commission later adopted a regulatory framework for non-utility gas marketers establishing policies and guidelines for the competitive gas market.[7]

With respect to electric commodity, the Commission began unbundling electric rates into distribution and commodity components in the 1990's in order to enable competition in the electric supply markets as well.  On June 7, 1995, the Commission adopted nine principles to guide the transition to competition for electric service, the primary principle being the realization of savings and other benefits.[8]

---

[7]    Case 93-G-0932, Proceeding on Motion of the Commission to Address Issues Associated with the restructuring of the Emerging Competitive Natural Gas Market, Opinion 94-26, Opinion and Order Establishing Regulatory Policies and Guidelines for Natural Gas Distributors (issued December 20, 1994) (Opinion 94-26).

[8]    Case 94-E-0952, supra, Opinion No. 95-7, Opinion and Order Adopting Principles to Guide the Transition to Competition (Issued June 7, 1995) at 5 (Opinion 95-7).

CASE 15-M-0127, et al.

Then, in Opinion 96-12, the Commission stated that the operation of market forces could be expected over time to produce retail rates that would be lower than would otherwise be expected under a regulated environment.[9]  The Commission's expectation was that retail competition and increased consumer choice would result in lower customer bills and the introduction of innovative products and services, and that there would be market based solutions to public policy issues, including aggressive pursuit of energy efficiency measures.[10]  The Commission subsequently adopted a set of rules and guidelines to govern interactions between the utilities, customers, and ESCOs known as the UBP.[11]

Also in 1996, the Albany County Supreme Court held that the Commission could effectuate competitive access to utility systems by unbundling utility rates into monopoly (transmission and distribution) and competitive (energy commodity) portions. (Matter of Energy Assn. of New York State v Pub. Serv. Commn. of State of New York, 169 Misc 2d 924, 932-37 [Sup Ct Albany County 1996], affd on other grounds, 273 AD2d 708 [3d Dept 2000]).

The Supreme Court further rejected utility claims "that the PSC may not allow market pressures to set rates for the generation component of electric service." (Energy Assn., 169 Misc.2d at 936).  In doing so, the court relied on Federal case law holding that "FERC's approval of market-based pricing was 'just and reasonable'" because, in part, FERC had emphasized that it would exercise its oversight powers to assure that a market rate remained 'just and reasonable.' (Id. at 936). The utilities did not

---

[9]   Case 94-E-0952, Competitive Opportunities Regarding Electric Service, Opinion No. 96-12, Opinion and Order Regarding Competitive Opportunities for Electric Service (Issued May 20, 1996) at 30-32 (Opinion 96-12).

[10]   Id. at 30-32.

[11]   Case 98-M-1343, In the Matter of Retail Access Business Rules, Order Adopting Uniform Business Practices and Requiring Tariff Amendments (issued January 22, 1999).

CASE 15-M-0127, et al.

appeal Albany County's decision; a PULP appeal was dismissed on standing grounds. (Energy Assn., 273 AD2d 708, 710-11).

Then, in 2002 the Legislature amended PSL §53; as a result, the Commission's regulations at 16 NYCRR Part 11 (the Home Energy Fair Practices Act or HEFPA) were also amended so that HEFPA protections extended to residential customers taking service from an ESCO. (L. 2002, c. 686). Moreover, the Commission developed several policies to promote the development of competitive retail energy markets[12] including: providing utilities with significant financial incentives to migrate blocks of customers to ESCOs;[13] using utility customer service call centers to facilitate the transfer of customers to ESCOs;[14] the purchase of ESCO accounts receivable by utilities in combination with the continuation of utility consolidated billing;[15] the unbundling of utility bill formats;[16] and procedures for making customers' utility account numbers more readily available to ESCOs.[17] In an Order issued October 15, 2008, the Commission concluded that statewide retail access markets were mature and that

---

[12] Case 00-M-0504, Provider of Last Resort Responsibilities, the Role of Utilities in Competitive Energy Markets, and Fostering the Development of Retail Competitive Opportunities, Statement of Policy on Further Steps Toward Competition in Retail Energy Markets (issued August 25, 2004)(2004 Policy Statement).

[13] Case 04-E-0572, Consolidated Edison Company of New York, Inc., Order Adopting Three-Year Rate Plan (issued March 24, 2005)(Con Edison Rate Order), Joint Proposal (JP), pp. 35-36.

[14] Case 05-M-0858, State-Wide Energy Services Company Referral Programs, Order Adopting ESCO Referral Program Guidelines and Approving an ESCO Referral Program Subject to Modifications (issued December 22, 2005).

[15] See Case 05-M-0333, Niagara Mohawk Power Corporation, Order Clarifying and Adopting Joint Proposal on Competitive Opportunities (issued April 20, 2006).

[16] Case 00-M-0504, supra, Order Directing Submission of Unbundled Bill Formats (issued February 18, 2005).

[17] Case 98-M-1343, Accent Energy LLC, Order Denying Petition and Making Other Findings (issued November 7, 2006).

CASE 15-M-0127, et al.

ratepayers should, therefore, no longer incur incremental costs related to promotional programs unless a particular program directly benefits ratepayers.[18]

 2.  **Growing Concerns with the Retail Markets**

  Then, in 2010, in response to many high bill complaints from ESCO customers, Department Staff began to investigate and evaluate the prices that ESCOs were charging.  (Tr. 2055-2056, lns. 20-3).  Staff subsequently reported that ESCOs were typically charging significantly higher commodity rates than the utilities for the exact same commodity with minimal or no value-added products.[19]  (Id.).  Attempts to informally work with ESCOs to reform the pricing schemes were ultimately unsuccessful, prompting the Commission to institute a proceeding in October 2012 to address the Commission's growing concern with the retail markets.[20]

  The October 2012 Order directed Staff to undertake a review of the retail markets for mass market customers to determine whether the market was functioning as intended, and to identify areas that could be improved.  (Tr. 2056-2057, lns. 21-2). Among the most significant of Staff's findings was the large premiums charged for commodity services by ESCOs compared to the utilities with no readily apparent energy-related value-added attributes.  (Tr. 2058, lns. 12-17).  Following that investigation, the Commission issued its Order Taking Actions to Improve the Residential and Small Non-

---

[18]  Case 07-M-0458, Policies and Practices Intended to Foster the Development of Competitive Retail Energy Markets, Order Determining Future of Retail Access Programs (issued October 27, 2008).

[19]  Energy-related value-added services are products or services that can be provided by ESCOs that enhance the value of traditional utility products or services to customers. (Tr. 2063, lns. 5-8).

[20]  Case 12-M-0476, et al., Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State., Order Instituting Proceeding and Seeking Comments Regarding the Operation of the Retail Energy Markets in New York State (issued October 19, 2012) (October 2012 Order).

CASE 15-M-0127, et al.

residential Retail Access Markets on February 25, 2014 (February 2014 Order).[21]  The February 2014 Order attempted to address the major flaws in the retail energy markets including, but not limited to, the lack of accurate, transparent commodity product pricing information, and predatory marketing behavior that frequently relied on customer confusion.[22]  The Commission found that:

> [A]s currently structured, the retail energy commodity market for residential and small commercial customers cannot be considered to be workably competitive.  Although there are a large number of suppliers and buyers, and suppliers can readily enter and exit the market, the general absence of information on market conditions, particularly the price charged by competitors, is an impediment to effective competition (i.e., neither buyers nor sellers have good information about prices).[23]

In addition to the higher prices charged by ESCOs compared to the utilities, the Commission also found that while there are a large number of ESCOs in the market, they lacked any competitive pressure that would cause the ESCOs to innovate and develop and provide real energy-related value-added services or products to mass market customers.[24]  The Commission took a variety of actions in the February 2014 Order directed at improving the retail markets including: (a) the creation of utility historic bill calculators; (b) the requirement that ESCOs report their historic pricing data on a quarterly basis to the Commission; (c) the expansion of the Power to Choose website, and a requirement that the ESCOs honor the prices quoted on the website; (d) the requirement that ESCOs provide low-income customers with products that guarantee savings, or provide energy-related value-added services designed to reduce the customer's overall bill; (e) the requirement that all door-to-door and telephonic sales be subject to independent third party verification; (f) the requirement that a standardized renewal

---

[21]  Case 12-M-0476 et al., supra, Order Taking Actions to Improve the Residential and Small Non-residential Retail Access Markets (issued February 25, 2014).

[22]  Id. at 4.

[23]  Id. at 10.

[24]  Id. at 11.

CASE 15-M-0127, et al.

notice be sent in an envelope clearly marked that the contract renewal offer is enclosed; (g) the creation of a streamlined process to facilitate prompt enforcement actions against ESCOs; and (h) the requirement that ESCOs file with the Department a list of entities marketing on their behalf.  (Tr. 2059-2060, lns. 21-19).

Four parties filed petitions for rehearing, reconsideration, and clarification of the February 2014 Order and, as a result, the Commission stayed several of the actions mandated by the February 2014 Order.[25]  The Commission stated that, given the breadth and complexity of the February 2014 Order, and the desire to first address the petitions for rehearing and the comments thereto, the Commission decided to stay the requirements regarding: (1) independent third party verifications; (2) service to low-income customers; (3) implementation of PSL §32(5)(d); (4) the filing of quarterly historic pricing reports; (5) price reporting on the power-to-choose website; (6) ESCO specific purchase of receivable (POR) rates; and, (7) specific redlines to the UBP.[26]  Subsequently, the Commission issued an Order on February 6, 2015 addressing, among other things, the conditions for ESCO service to low-income customers enrolled in their default utility's low-income assistance programs, third party verification requirements, and whether UBP changes were adopted in conformation with the State Administrative Procedure Act (SAPA).[27]  Among the directives in the February 2015 Order was the requirement that when serving low-income customers, an ESCO must either: 1) guarantee that the customer will pay no more than the customer would have paid the utility; or, 2) provide energy-related value-added services that do not dilute the effectiveness of the financial assistance programs provided by the utilities and funded by ratepayers.[28]  Additionally,

---

[25]  Case 12-M-0476 et al., supra, Order Granting Requests for Rehearing and Issuing a Stay (issued April 25, 2014).

[26]  Id. at 4-6.

[27]  Case 12-M-0476 et al., supra, Order Granting and Denying Petitions for Rehearing in Part (issued February 6, 2015) (February 2015 Order).

[28]  Id. at 6.

CASE 15-M-0127, et al.

the Commission directed that a Staff-led collaborative be convened to address implementation issues concerning the requirements for serving low-income customers.[29]

### 3.      **Protections for Low-Income Customers**

The collaborative met several times throughout 2015 and, ultimately, a Collaborative Report was filed with the Commission on November 5, 2015.[30]  (Tr. 2062, lns. 12-13; Tr. 2064, lns. 1-7).  Following the collaborative process, the Commission issued an Order on July 15, 2016 imposing a moratorium on new enrollments and renewals of low-income customers by ESCOs.[31]  The July 2016 Order found that, during the collaborative, many ESCOs indicated they were unwilling or unable to beat utility commodity prices, and that despite the efforts of the collaborative participants, no combination of commodity service and energy-related value-added services were developed that would provide a cost-effective benefit to low-income customers.[32]

Three parties filed petitions seeking rehearing or clarification, and the Commission clarified its July 2016 Order on September 19, 2016, affirming the protections directed for low-income customers in the July 2016 Order.[33]  The September 2016 Order, among other things, re-adopted the low-income moratorium on an emergency basis, and sought comments on whether to continue the moratorium, terminate it, or continue it with modifications.[34]  Then, on December 16, 2016, the

---

[29]   Id. at 7-8.

[30]   Case 12-M-0476 et al., supra, Report of the Collaborative Regarding Protections for Low-Income Customers of Energy Service Companies (November 5, 2015).

[31]   Case 12-M-0476 et al., supra, Order Regarding the Provision of Service to Low-Income Customers by Energy Service Companies (issued July 15, 2016) (July 2016 Order).

[32]   Id. at 17.

[33]   Case 12-M-0476 et al., supra, Order on Rehearing and Providing Clarification (issued September 19, 2016) (September 2016 Order).

[34]   Id. at 6-7.

CASE 15-M-0127, et al.

Commission issued an Order[35] stating that "[a]fter years of investigation and numerous thwarted attempts to address the persistent, unresolved problem of ESCO overcharges to residential customers in general and the specific issues arising from overcharges to [low-income customers]..."[36] it is necessary to convert the moratorium on ESCO service to low-income customers into a prohibition to protect low-income customers.  The December 2016 Order further stated that:

> In light of the persistent ESCO failure to address (or even apparently to acknowledge) the problem of overcharges to [low income] customers and the resulting diminution of financial assistance to those customers, by this Order, the moratorium on ESCO service to [low-income] customers directed in the July and September Orders is converted to a permanent prohibition on ESCO service to [low-income customers]. Further, the Department of Public Service is actively pursuing reforms to the retail market for mass-market customers (citation omitted). Through this process, the Commission will evaluate the products and services to be offered to mass-market customers, including energy related value-added products or services, as part of its broader effort to ensure just and reasonable rates for retail access customers.[37]

The ESCO trade associations, as well as individual ESCOs, challenged the Commission's authority to issue and enforce the July, September, and December 2016 low-income related Orders in New York State Supreme Court, which ultimately upheld the Commission Orders and denied and dismissed, in all respects, the petitioners' requests.  (National Energy Marketers Assn. v New York State Pub. Serv. Commn., 57 Misc. 3d 282 [Sup Ct Albany County 2017] appeal pending).  There the Court decided that the record before the Commission fully supported imposing a prohibition on ESCO service to low-income customers given "the overwhelming evidence that low-income [sic] ESCO customers are paying more than the utility would charge for energy..." and

---

[35]   Case 12-M-0476 et al., supra, Order Adopting A Prohibition On Service To Low-Income Customers By Energy Services Companies (issued December 16, 2016) (December 2016 Order).

[36]   Id. at 2.

[37]   Id. at 3.

CASE 15-M-0127, et al.

the fact that ESCOs, despite claims to the contrary, have been unable to identify a single energy-related value-added product or service that would provide price savings.  (Id. at 57 Misc. 3d 296; "In spite of ESCOs repeated insistence that the Commission recognized the price guarantee offered by the energy companies as a value-added project, this simply is not and was never the case, and instead the record establishes that the ESCOs during the Collaborative—and to this day—- were unwilling or unable to identify a value added *energy* product which would provide a price guarantee.").

4.    **Mass Market Customers and the Current Proceeding**

Turning to retail access issues as they relate to mass market customers in general, not just low-income customers, the Commission addressed the broader retail market concerns in its February 2016 Order which directed that, when serving a mass market customer, an ESCO must provide that customer with a product that either guarantees savings in comparison to what the customer would have paid as a full-service utility customer or provides at least 30 percent renewable electricity.[38]  In the February 2016 Order, the Commission again noted that mass market customers have not seen benefits from being ESCO customers.[39]  Staff then held a series of collaborative meetings with ESCOs, utilities, consumer advocates, and other stakeholders, between April 15, 2016 and March 19, 2017, and received comments from the parties on a number of issues related to the reshaping of the retail energy market for mass market customers.  (Tr. 2070, lns. 16-21).

The ESCO trade associations, as well as individual ESCOs, challenged the February 2016 Order, and Albany County Supreme Court restrained the Commission

---

[38]   Case 15-M-0127 et al., supra, Order Resetting Retail Energy Markets and Establishing Further Process (issued February 23, 2016) (February 2016 Order).

[39]   Id. at 2.

CASE 15-M-0127, et al.

from enforcing Ordering Clauses 1-3 of the Order.[40]  National Energy Marketers Assn. v New York State Pub. Serv. Commn., 53 Misc. 3d 641 [Sup Ct Albany County 2016]). The Court found that the Commission violated ESCOs' procedural due process rights insofar as the SAPA notice used by the Commission mentioned revisions to the UBP, but not with regard to the imposition of pricing protections to customers other than low-income customers.  However, the Court also concluded that the claim that the Commission lacks jurisdiction to impose pricing requirements on ESCOs "surely defies logic."  (Id. at 53 Misc. 3d 649-50).  The challenging parties appealed the Supreme Court's decision that the Commission has jurisdiction over ESCO prices and, on July 27, 2017, the Appellate Division, Third Department, affirmed that decision of the Supreme Court.  (Matter of Retail Energy Supply Assn. v Public Serv. Commn. of The State of New York, 152 A.D.3d 1133 [3d Dept 2017] appeal pending).  There, the Court found that "the PSC's broad statutory jurisdiction and authority over the sale of gas and electricity authorized it to impose the limitations set forth in the Reset Order," and further noted that "it is the PSC's broad jurisdiction that enabled it to allow ESCOs access to utility systems in the first place.  The PSC essentially maintains that this same authority allows it to impose limitations on ESCO rates as a condition to continued access.  We agree."  (Id. at 152 A.D.3d 1137-38).

Continuing its efforts to address concerns with the retail markets serving mass market customers, the Commission issued the December 2016 Notice which established two tracks (Track I and Track II) in these proceedings.  In Track I, the

---

[40]  Those three ordering clauses directed ESCOs to: (1) only enroll new customer or renew existing customers on products that guarantees that the customer will pay no more than were the customer a full-service customer of the utility or provide an electricity product derived from at least 30 percent renewable sources; (2) receive affirmative consent from customers prior to renewing from a fixed rate or guaranteed savings contract into a contract that provides renewable energy but does not guarantee savings; and (3) submit a filing by the Chief Executive Officer (CEO) or equivalent corporate officer of the ESCO certifying that any enrollments will comply with the conditions of the February 2016 Order.  The remaining Ordering Clauses were not vacated by the Court and remain in effect today.

CASE 15-M-0127, et al.

Commission expects the parties to address, in a litigated proceeding, "(a) whether ESCOs should be completely prohibited from serving their current products to mass market customers; (b) whether the regulatory regime, rules and Uniform Business Practices (UBP) applicable to ESCOs need to be modified to implement such a prohibition, to provide sufficient additional guidance as to acceptable rates and practices of ESCOs, or to create enforcement mechanisms to deter customer abuses and overcharging..."[41]  Track II, using a collaborative process, would commence in the future to consider whether new ESCO rules and products can be developed that would provide sufficient real value to mass market customers at just and reasonable rates.[42]

**B.     THE RETAIL MARKETS TODAY**

**1.     Overview of the Retail Energy Markets Serving Mass Market Customers (December 2016 Notice Questions 9, 10, 11, and 12)**

The percentage of residential and small commercial customers served by ESCOs is considerable.  (Tr. 2041-2042, lns. 5-4).  The distribution utilities provide, as of December 2016, electric delivery service to approximately 5.9 million residential customers, and approximately 927,700 small commercial customers.  (Tr. 2041, lns. 8-12).  Comparatively, as of December 2016, ESCOs provided electric supply service to approximately 1.2 million, or 20 percent, of residential customers, and 160,000, or 33 percent, of the non-residential small commercial customers.  (Exh. 712 (SP-2); Tr. 2041, lns. 17-23).  With respect to gas, the utilities provide gas delivery service to approximately 4.4 million residential customers and 414,000 small commercial customers in New York State.  (Tr. 2041, lns. 13-17).  ESCOs provided gas commodity supply service to approximately 754,000, or 17 percent, of the residential and 130,000, or 31.4 percent, of the small commercial customers.  (Tr. 2041-2042, lns. 24–4; see also Exh. 712 (SP-2)).

---

[41]  Id. at 3-4.

[42]  Id.

CASE 15-M-0127, et al.

### 2.  ESCO Registration and Eligibility

The requirements for an ESCO to obtain and maintain eligibility are defined in UBP §2.  The UBP sets forth the necessary contents of an ESCO's eligibility application, the review process undertaken by the Department of Public Service, the ongoing filings that an ESCO must make to maintain eligibility, as well as the conditions under which eligibility can be revoked.  (UBP §§2.A.-2.D.).  As of December 2016, there were approximately 155 eligible, and 140 active, electric commodity ESCOs, and 150 eligible, and 130 active, natural gas commodity ESCOs throughout the state.  (Tr. 2045, lns. 10-13).

### 3.  ESCO Business Practices

This subsection is not addressed here, but is instead addressed throughout this brief.

### 4.  Billing and Purchase of Receivables

See Section III.C.9. of this brief for a discussion of billing practices and purchase of receivables.

### 5.  Current Status of the UBP

### (December 2016 Notice Question 6)

The Commission's UBP serves not only to define an ESCO's interactions with customers and utilities, but also imposes the standards to which an ESCO must adhere in order to remain in compliance with the Commission's performance requirements (see Exh. 723 (SP-11)).  As such, the UBP defines and codifies all interactions between an ESCO, its customers, and the distribution utility.  Since it was established by the Commission in 1999, the UBP has been modified and refined numerous times in response to changes in the retail markets and/or customer abuses discovered through the customer complaint review process.  (Exh. 715 (SP-4)).  Notably, however, the UBP does not currently address issues regarding the prices charged by ESCOs, such as rate transparency, and does not set or cap those prices in any way.  (Tr. 2109, lns. 22-24).

-17-

CASE 15-M-0127, et al.

6.    **Monitoring and Enforcement**

**(December 2016 Notice Questions 5, 7, 14, and 15)**

As indicated, the UBP provides the standards by which ESCO compliance with their customer facing operations, including appropriate marketing practices, are measured. (Tr. 2050, lns. 1-5). Enforcement actions against ESCOs are typically initiated after a negative trend in customer complaints is noted by the Department's Call Center Staff or by anti-competitive complaints raised by competing ESCOs or the distribution utility. (Tr. 2104, lns. 11-15). A Staff investigation begins first by gathering the facts regarding the customer complaint or inquiry regarding an ESCO. (Tr. 2104, lns. 18-21). Staff then communicates with the affected parties directly via email or telephone to determine if in fact there appear to be UBP violations. (Tr. 2104-2105, lns. 21-3). If Staff observes a trend in complaints or UBP violations related to, for example, deceptive or anti-competitive marketing practices, or customer slamming,[43] or the ESCO's fails to meet compliance reporting requirements, including ESCO price reporting, notices of Apparent Failure (NOAFs) are issued, which detail the specifics of the complaints and alleged UBP violations by the ESCO or its agents, for which the ESCO is ultimately responsible. (Tr. 2103-2104, lns. 16-7).

Since January 2013, the Department of Public Service, Office of Consumer Services (OCS) has issued 79 NOAFs. (Tr. 2103, lns. 10-12). If the ESCO fails to adequately respond to or address the issues identified in Staff's NOAF, Staff recommends that the Commission issue an Order to Show Cause (OTSC) requiring the ESCO to explain why, in light of the allegations, it should be allowed to continue to market or otherwise not be subject to consequences or sanctions as provided for in the UBP. (Tr. 2108-2109, lns. 20-4). The Commission issued OTSCs to three ESCOs in 2013, six in 2015, six in 2016, and four were issued in 2017 as of the date testimony was filed. (Tr. 2109, lns. 7-10).

---

[43]   UBP §1 defines slamming as the enrollment of a customer by an ESCO without authorization.

CASE 15-M-0127, et al.

We caution the Commission that the relatively small number of Commission actions is no indication that the market is performing as it should or that the Commission's current enforcement powers are strong enough to correct the on-going failings of ESCOs serving the mass market.  Because the UBP currently does not address commodity price transparency, nor otherwise limit in any way the prices charged by ESCOs, the Commission is unable to address the fundamental flaw of price transparency in the retail markets which allows the majority of the ESCO community to aggressively market and charge commodity prices that significantly exceed the prices charged by the utility for supply.  (Tr. 2109-2110, lns. 21-5).  As the Staff Panel explained in its testimony, the current enforcement mechanisms are reactive, and typically driven by customer complaints or known UBP violations, and many mass market customer complaints concern high commodity prices and lack of transparency as to what they would pay after the "teaser rate" ended after a few months, which are presently not violations of the UBP.  (Tr. 2109, lns. 18-20).  The data in the record proves that, in aggregate, ESCOs have charged their residential customers over $1.3 billion more than they would have paid their default utility if they had remained with their utility for commodity service for the years 2014 through 2016.  (Exh. 711 (SP-1a Confidential); Exh. 720 (SP-8 Confidential)).  In addition to concerns regarding the prices charged by ESCOs, the Commission has made several attempts through the years to curtail aggressive marketing.  (Tr. 2110, lns. 6-9).  On a daily basis Staff hears from, and works with, customers who tell us that they were subjected to high pressure sales tactics by ESCO employees and agents.  (Tr. 2110, lns. 6-9).  In summary, the Commission cannot correct the flaws in the mass markets solely through amendments to the UBP or modifications to its enforcement process because the UBP does not regulate the prices ESCOs charge for their products.  Real change to the ESCO regulatory regime, as discussed in this brief, is required to protect residential and small commercial customers and ensure that their commodity rates are just and reasonable.

CASE 15-M-0127, et al.

# III.   ANALYSIS

## A.   REGULATORY REGIME

### 1.   The Commission's Vision in Opening the Competitive Markets

The Commission stated its expectation that retail competition and increased consumer choice should result in lower bills and the introduction of new products and services.[44]  The Commission posited that, over time, the market forces should produce lower retail commodity rates than would be expected in a fully regulated commodity environment and ESCOs would drive or at least facilitate the introduction of innovative products and services.[45]  The Commission further stated its expectation that there would be market-based solutions to public policy issues, including aggressive pursuit of energy efficiency measures and a competitive energy service market.[46]

The Supreme Court concluded that the Commission could use its ratemaking authority to effectuate competitive access to electric utility systems.  The Supreme Court further rejected utility claims "that the PSC may not allow market pressures to set rates for the generation component of electric service."  (Energy Assn. v Pub. Serv. Commn., 169 Misc 2d at 932-36 [Sup Ct Albany County, Nov 25, 1996] affd on other grounds, 273 AD2d 708 [3d Dept 2000]).

### 2.   Application of the Public Service Law to ESCOs
### (December 2016 Notice Questions 2, 3, 4, 12, and 20)

a. Scope of Commission Jurisdiction Under the PSL

The jurisdiction of the Commission to control ESCO product offerings, including setting limits on the prices charged by ESCOs, has been upheld by the courts.  Most recently, the Appellate Division, Third Department, held that "the PSC's broad

---

[44]  Case 94-E-0952, Competitive Opportunities Regarding Electric Service, Opinion No. 96-12, Opinion and Order Regarding Competitive Opportunities for Electric Service at 30-32 (Issued May 20, 1996) (Opinion 96-12).

[45]  Id. at 30.

[46]  Id. at 31.

CASE 15-M-0127, et al.

statutory jurisdiction and authority over the sale of gas and electricity authorized it to impose the limitations set forth in the Reset Order." (Matter of Retail Energy Supply Assn. v Public Serv. Commn. Of The State of New York, 152 A.D.3d 1133, 1137–8 [3d Dept. 2017] appeal pending).  The Court went on to hold that "it is the PSC's broad jurisdiction that enabled it to allow ESCOs access to utility systems in the first place," and agreed with the position of the Commission that "this same authority allows it to impose limitations on ESCO rates as a condition to continued access."  (Id. at 1138). ESCOs that want to utilize the utility distribution system to serve customers in New York are subject to the full regulation of the Commission as to whether they can use such systems.

The Commission has broad legal authority to oversee ESCOs, pursuant to its jurisdiction in Articles 1 and 2 of the PSL.[47]  ESCO eligibility requirements were originally created in Opinion 97-5,[48] and were reflected in the UBP in 2003.[49]  In both instances, the Commission's authority under PSL §66(5) was used to direct the distribution utilities to incorporate the applicable requirements in their respective tariffs. Since the eligibility requirements were originally established, those criteria have been amended on numerous occasions.  For example, in 2003, ESCOs were required to submit

---

[47]  See PSL §5 (Commission's broad statutory grant of authority over the sale of natural gas and electricity); see also Case 98-M-1343, In the Matter of Retail Access Business Rules, Order Adopting Amendments to the Uniform Business Practices, Granting in Part Petition on Behalf of Customers and Rejecting National Fuel Gas Distribution Corporation's Tariff Filing at 10 (issued October 27, 2008) (2008 Order); PSL §53 (stating Article 2 of the PSL applies to "any entity that, in any manner, sells or facilitates the sale or furnishing of gas or electricity to residential customers").

[48]  Case 94-E-0952, In the Matter of Competitive Opportunities Regarding Electric Service, Opinion and Order Establishing Regulatory Policies for the Provision of Retail Energy Services (issued May 19, 1997) (Opinion 97-5); Opinion and Order Deciding Petitions for Clarification and Rehearing (issued November 18, 1997) (Opinion 97-17).

[49]  Case 98-M-1343, supra, Order Adopting Revised Uniform Business Practices (issued November 21, 2003).

CASE 15-M-0127, et al.

sample standard customer agreements and disclosure statements in order to be deemed eligible to provide electricity and/or natural gas commodity service in New York.[50]  In adopting ESCO eligibility requirements, the Commission stated that such requirements are necessary to ensure that ESCOs provide consumer protections, to give the public confidence in ESCOs, to ensure competency of providers, to protect system reliability, and to oversee development of the market.[51]  Eligibility requirements remain a necessary baseline tool to accomplishing the Commission's related goals and policies.

In 2002, the Legislature amended PSL Article 2 to add PSL §53 and specifically to require that ESCOs adhere to PSL Article 2, also known as the Home Energy Fair Practices Act (HEFPA), which provides numerous protections to residential utility customers.  (L. 2002, c. 686).  Following this amendment, while ESCOs were required to afford HEFPA protections to customers, HEFPA also provides certain rights to utilities and ESCOs.  For instance, ESCOs could suspend or terminate the provision of utility distribution service to compel payment of unpaid ESCO commodity bills.  If, however, upon service termination the ESCO commodity bills exceeded what the utility would have charged for commodity, then a customer need only pay the lesser utility bill to reinstate service.  (PSL §32(5)(d)).

The Commission also has broad authority over utility  tariffs, which contain the rules and regulations of the particular electric and gas distribution utility and, as such, places conditions on when the distribution utilities may allow, or are required to allow, ESCOs to use utility's electric and gas systems to distribute electricity and natural gas to ESCO customers.[52]  In fact, the creation of competitive retail markets was an exercise of Commission ratemaking authority over jurisdictional utilities whereby the unbundling of electric rates was accomplished purely through the Commission's exercise of its authority to set "just and reasonable" rates for gas and electric utilities pursuant to PSL §65(1).

---

[50]  Id.

[51]  Opinion 97-5.

[52]  PSL §66(5).

CASE 15-M-0127, et al.

(Energy Assn. v PSC, 169 Misc 2d at 932-36).  The unbundling of utility rates enabled the creation of the retail market by subsequently imposing upon utilities the obligation to deliver eligible competitors' energy.  (Id. at 932-34).  In Energy Assoc., Albany County Supreme Court observed that the decision to restructure traditional monopoly utility markets had to advance the Legislature's purpose of bringing customers just and reasonable prices for electric service.  (Id. at 936-7).

Moreover, the Commission's obligation to ensure that the retail markets are providing just and reasonable rates is an ongoing obligation and central to the issues and concerns raised by the Commission in these proceedings (December 2016 Notice) and addressed in Staff testimony.  Restructuring of the utility monopolies was approved based on the assumption that the Commission would exercise continuing oversight to ensure that prices in the competitive energy markets would remain just and reasonable.  (Energy Assoc. v PSC, 169 Misc 2d at 936-7).  In upholding utility restructuring, the Court relied heavily on precedent stating FERC approval of market-based rates was reasonable because FERC would continue to exercise oversight power to ensure that market prices were just and reasonable.  (Energy Assoc. v PSC, 169 Misc 2d at 936, citing Elizabeth Town Gas Company v Federal Energy Regulatory Commn., 10 F3d 866, 869 [DC Cir 1993]).  Utility rates are set by the Commission and are, therefore, just and reasonable.

In satisfying its continuing obligation to ensure that retail markets are providing just and reasonable rates, the Commission may limit or otherwise control what products ESCOs can offer – including setting limits on price - in order to retain access to utility distribution systems.  Using utility rates to cap ESCO commodity offerings is a logical and reasonable proxy in the absence of full rate regulation of ESCO pricing. Absent such imposition of pricing requirements, the retail mass markets should not continue.  Restructured energy markets that have resulted in higher prices run contrary to the fundamental legal basis for such markets.  The Commission basis for unbundling rates or maintaining rate unbundling is absent, and not just and reasonable, if the resulting retail market rates were higher than comparable bundled utility rates.  In addition, if the

CASE 15-M-0127, et al.

ESCO rates are generally, and often significantly, higher than utility rates, it is not reasonable - and certainly not in the public interest - to continue to allow ESCOs access to utility systems.  The current system cannot be reconciled with the Commission's responsibility to ensure rates are just and reasonable.

Additionally, the Commission's authority over ESCO pricing through limiting competitive access was further solidified by Chapter 416 of the Laws of 2010, adding GBL §349-d (11-12) to preserve Commission authority over ESCO eligibility and marketing practices.[53]  GBL §349-d (11-12) is not a grant but rather a reservation of the Commission's authority to suspend ESCO eligibility or control their marketing practices. Those provisions recognize that the Commission's authority to control ESCO access to utility systems allows it to impose limits on such access.  There is, therefore, no question that the Commission has the jurisdiction and authority to establish and modify the conditions under which ESCOs may offer electric and gas commodity service to mass market customers.

b.  Should ESCOs Be Required to File Tariffs?

ESCOs should not be required to file tariffs.  Such a requirement is unnecessary to effectuate the pricing controls on ESCOs that we recommend because, as stated above, the Commission has jurisdiction over ESCO prices through its very broad powers to regulate the rates, service classifications, and the terms and conditions under which utility service is furnished to customers.[54]  Additionally, the expense and administrative burden associated with having each ESCO file a rate case would not make sense given the available alternative mechanisms to achieve the same goal.  Therefore, to effectuate the required changes in the mass markets, the Commission can direct the

---

[53]  GBL § 349-d (11 & 12)

[54]  Matter of Campo Corp. v. Feinberg, et al., 284 AD 302, at 304-307 (3rd Dept. 1952), aff'd. 303 NY 995.  In Campo, the Appellate Division held and the Court of Appeals affirmed at the Commission could prohibit the submetering and resale of electricity through tariffed terms and conditions of service.

CASE 15-M-0127, et al.

utilities to file tariff amendments in compliance with the Track I order it issues in these proceedings.

    c. Financial Oversight

       More rigorous financial oversight of ESCOs is necessary to ensure the retail markets meet the objectives identified by the Commission when it initially established the markets.  However, as discussed in Section III.A.2.a., above, the Commission need not assert jurisdiction under PSL Article 4 to exert control over the prices charged by ESCOs.  The Commission has authority to control practices of even non-jurisdictional entities such as ESCOs through the imposition of conditions on access to utility facilities.  (Matter of Campo Corp. v Feinberg, 279 AD 302, 306 3d Dept [1952]).  In Campo Corp., non-jurisdictional "submeterers" of electricity (i.e., owners of multiple-dwelling buildings that purchased electricity from the utility and resold it to their tenants) challenged a Commission decision to curtail that practice.  The Court held that although the Commission lacked authority to directly regulate submeterers, it did have authority to impose conditions upon the utility's provision of service to them.  (Id. at 305-06).  In this instance, the PSL precluded Commission jurisdiction over providers of submetered electricity.  (PSL §2 [10, 11, 12 and 13] [Exempting entities providing gas or electricity to their tenants]).  Subsequently, however, and identical to the application to ESCOs in the present proceedings, submeterers became subject to HEFPA under the 2002 amendments adding PSL §53.  (L. 2002, c. 686).  Thus, oversight over the products ESCOs can offer in New York, including the prices they can charge, can be effectuated through restrictions on access to the utility distribution system and the Commission's ongoing obligation to ensure that the rates arising out of the retail markets are just and reasonable.  (Retail Energy Supply Assn., 152 A.D.3d at 1137–8).

CASE 15-M-0127, et al.

3.    **Enforcement Powers Over ESCOs**

      **(December 2016 Notice Questions 2 and 19)**

    a.    <u>Commission's Enforcement Mechanisms and Efforts</u>

      The Commission has taken steps to ensure market participants are complying with Commission rules and regulations since the creation of the retail markets. Since January 2013, OCS has issued 79 NOAFs.  (Tr. 2103, lns. 16-23).  Violations warranting the issuance of an NOAF can include deceptive marketing practices, customer slamming, or an ESCO's failure to meet compliance reporting requirements as specified in the UBP, or otherwise not in compliance with a Commission order.  (Id.).  Following the issuance of an NOAF, the ESCO implements either improved training or procedural processes to address and resolve the immediate UBP violation concerns.  If the UBP violations are not remedied, or the ESCO fails to respond to the NOAF, Staff would request that the Commission issue an Order to Show Cause, directing the ESCO to explain why, in light of the allegations, it should be allowed to continue to market to customers in New York, or otherwise not be subject to consequences as provided for in the UBP.  (Tr. 2208-2209, lns. 22-24).

      While the existing enforcement mechanisms have been effective in addressing violations of the UBP that are brought to the attention of the Commission or OCS, they are not sufficient to address the concerns identified by Staff in its testimony. (Tr. 2209-2210, lns. 15-12).  As evident in the Commission's December 2016 Notice, there are ongoing concerns with the retail markets surrounding the prices charged by ESCOs and the lack of innovative products offered, which ultimately contributes to the lack of real value being offered to customers by the retail markets.[55]  Under the current UBP, there are no requirements or standards regarding the prices ESCOs can charge for commodity – thus there is nothing that can be enforced using the Commission's existing enforcement mechanisms.  Those mechanisms have proven insufficient to address the primary concerns identified by the Commission and at the heart of these proceedings.

---

[55]   December 2016 Notice at 3-4.

CASE 15-M-0127, et al.

b.    Attorney General's Enforcement Mechanisms and Efforts

This subsection is not addressed in this Brief.

4.    **Other State and Federal Laws Applicable to ESCOs**

This subsection is not addressed in this Brief.

B.    **USEFULNESS & ACCURACY OF COMPARING ESCO AND UTILITY RATES**

1.    **Utility Bill Comparison methodologies**

**(December 2016 Notice Questions 12, 16, and 17)**

In the February 2014 Order, the Commission addressed several major flaws in the mass markets, including the lack of accurate, transparent commodity product pricing information for customers, and predatory marketing behavior that too often relied on customer confusion.[56]  Therefore, to address the lack of commodity pricing transparency and utility-to-ESCO pricing comparisons, the Commission directed the utilities to develop historic bill calculators that would "…allow existing ESCO customers receiving a consolidated utility bill to compare the total amount charged, including utility delivery service and ESCO supply charges, with the total that the customers would have paid if purchasing commodity service from the utility for that period."[57]

In these proceedings, and to be responsive to the Commission's directives in questions 9, 10, and 11 of the December 2016 Notice, Staff performed a total utility-to-ESCO, bill-to-bill comparison.  (Tr. 2112, lns. 5-12).  The comparison of the total cost for energy, including commodity provided by an ESCO versus commodity provided by the utility, is more conservative and accurate comparison than if only comparing a customer's utility commodity service rate to an ESCO's commodity service rate.  (Id.).  In fact, such a comparison is to the ESCOs' advantage because it also reflects any tax advantages that an ESCO customer received.  (Tr. 2112, lns. 12-15).

---

[56]  February 2014 Order at 4.

[57]  Id. at 13-15.

CASE 15-M-0127, et al.

    To evaluate ESCO commodity charges relative to utility pricing, we aggregated the historical bill data provided by the utilities in response to Staff IR DPS-Utility 5 (Exh. 709).  This analysis was summarized in Exh. 716, which provides an aggregated relative total bill comparison of what ESCO customers were billed for ESCO commodity and utility delivery services, compared to what they would have been billed for commodity and delivery service from the default utility.  (Tr. 2113, lns. 9-16).  This data indicates that customers served by ESCOs were generally charged significantly more for ESCO provided commodity service than they would have been charged if they received commodity service from their utility.  (Id.).  Specifically, as shown at the top of page 1 of Exh. 716, residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have if they purchased commodity from their distribution utility during the 36 months ending December 31, 2016.  (Tr. 2113-2114, lns. 21-5).  Additionally, small commercial customers paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for the same 36-month period.  (Tr. 2114, lns. 5-14).  Combining the residential and small commercial customer classes, the mass market was charged by over $1.3 billion dollars more than had they remained on full utility service over this time period.  Finally, the data also shows that low-income customers (a subset of the residential customer mentioned above) who took commodity service from an ESCO collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility.  (Tr. 2114, lns. 5-14).

CASE 15-M-0127, <u>et</u> <u>al</u>.

The following examples use actual customer data in the record to illustrate the negative impact ESCO practices have on individual customers.[58]





CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, et al.

CASE 15-M-0127, <u>et</u> <u>al</u>.



While this total bill-to-bill comparison methodology remains the most effective, and perhaps the only accurate, way to consistently compare ESCO and utility charges, it does have its limitations.  Specifically, this comparison only reflects the amount that the ESCO tells the utility to bill the customer for ESCO service each month; the utility does not know what type of product (fixed, variable, or energy-related value-added services) the customer purchased from the ESCO; further, the utility can only report on accounts for which the utility bills using the consolidated utility billing (CUB) model.  (Tr. 2130-2131, lns. 15-21)  In other words, it does not account for, nor can Staff quantify, the amount of any overcharges that are likely to have accrued to customers who were billed directly by the ESCOs.  Furthermore, this analysis is also unable to account for any reduction in consumption that may have occurred as a result of some value-added energy efficiency products that an ESCO may have offered to its customers.  Nevertheless, for the reasons stated above, this methodology remains the most appropriate comparison methodology.

That said, Staff attempted to parse the commodity pricing disparity to identify and quantify any portion of premiums associated with the ESCO provided value-added products or other associated product benefits such as energy consumption reductions versus the total overall mark-up associated with the bundled product by asking the ESCOs to provide this information in response to Staff IRs DPS-ESCO 1 through 4. (Exh. 615)  In response to our requests, however, ESCO parties generally either refused to respond., or offered statements that the request to quantify the actual value of value-

CASE 15-M-0127, et al.

added products was beyond the scope of these proceedings, that the data was unavailable, or that it would be of no value and/or relevance.  (Tr. 2115-2116, lns. 23-2).  Moreover, individual review of those responses revealed no significant real dollar value associated with the "value-added" products claimed by the responding ESCOs.  (Tr. 2116, lns. 4-7).  ESCOs' substantive responses also failed to explain or describe what the value-added products were, or how the reported value was developed by the ESCO.  (Tr. 2116, lns. 8-11).  The limited substantive responses to the IRs (Exh. 615) that were received, however, included data that was not conducive to performing a consistent analysis.  (Tr. 2116, lns. 2-4).  As a result, Staff was unable to quantify or verify the actual value, if any, of the value-added benefits that ESCOs claim were provided to customers.  Thus, and as explained in detail below, the ESCOs' argument that the value-added products account for the significant pricing differences between the ESCO customers' bills for commodity and delivery and the "all-in" distribution utility bills is unsupported in the record and should be rejected by the Commission as, at best, a post hoc rationalization for the $1.3 billion in overcharges collected by ESCOs from their unsuspecting customers.  (Tr. 2116, lns. 11-18).

Several ESCO parties challenge any analysis comparing actual ESCO bills to what the default utility would have charged for the same billing period.  These parties assert that such a comparison is improper because ESCOs incur costs that utilities do not, ESCOs allegedly offer value-added products and services such as renewable energy and fixed rate contracts, and because utilities are allowed to recover costs outside of the period those costs were incurred.  (See, Tr. 253-257, lns. 15-3).  With respect to the costs incurred by ESCOs, such as customer acquisition and "overhead costs," no party to these proceedings put forth any evidence of the magnitude of these costs, or even whether these costs are experienced by a majority (or even any) of the ESCOs operating in New York.  (Tr. 253-254, lns. 15-11).  Moreover, even taking these speculative costs into account, vague reference to "overhead costs" does not justify the significant overcharges evidenced by the record in these proceedings.  Additionally, ESCO costs are not at issue

-37-

CASE 15-M-0127, et al.

in these proceedings.  What is at issue is the value ESCOs provide to customers and whether or not the prices charged by ESCOs are just and reasonable that is at issue here.

Turning to the issue of out-of-period adjustments, ESCO parties cite the fact that utilities are permitted to sometimes defer recovery of costs to soften increases in default rates or to true-up default revenues and costs and recover any under-collection in subsequent months.  (Tr. 254-255, lns. 11-7).  On its face, this argument is flawed in that it fails to recognize that such true-ups and out-of-period adjustments can be both negative and positive.  Notwithstanding the argument that out-of- period adjustments make a comparison between ESCO and utility bills improper it also fails when one considers that this analysis is done over periods of time longer than one month.  Staff acknowledges that, if one looks at such a comparison for a single month, potential out-of-period adjustments on the utility side might make the utility rate either appear more or less favorable compared to the ESCO.  However, when such a comparison is done over the course of an entire year, or as in these proceedings, over three consecutive years, the impact of any out-of-period adjustments is minimized because both the overcollection, for example, and the true-up are likely to be contained within the analysis.  It is important to remember that Staff aggregated the overpayments over a three-year period, and no out-of-period adjustments, polar vortexes, or other event could explain the over $1.3 billion in overcharges.

With respect to the argument that the analysis performed by Staff does not take into account any potential additional services offered by the ESCO, Staff acknowledged this as a potential shortcoming, but nonetheless, as discussed above, this type of comparison remains the most effective way to evaluate ESCO price performance in the retail markets.  Several ESCO parties argue that because Staff acknowledged that the bill-to-bill comparison has flaws, that the entire analysis should be disregarded.  (See, Tr. 292-294, lns. 234-280; Tr. 364-366, lns. 13-12; Tr. 695-696, no line numbers in this testimony; Tr. 812-815, lns. 5-3).  However, these parties at the same time fail to provide any reasonable alternative price comparison, and also fail to acknowledge that Staff in

CASE 15-M-0127, et al.

fact attempted to elicit the value of any alleged value-added products included on the ESCO side of the comparison, but that effort was stifled by the ESCO parties. (Tr. 2115-2116, lns. 23-2). These parties withheld this information as "not relevant to these proceedings" (Id.), and then argued that Staff's analysis is not creditable because it does not account for the very information withheld. This is a prime example of the obstructionist position taken by so many ESCO parties. Moreover, as discussed below, the substantial delta between utility and ESCO charges simply cannot be justified through the alleged offering of additional energy-related value-added services by ESCOs. Evidence in the record shows that, using renewable energy as an example, nearly every ESCO operating in New York offers a level of renewable energy that is practically identical to the level of renewable energy offered by the utility, thus refuting the claim that ESCO charges in excess of what the utility would have charged can be justified in part by the fact that ESCOs are providing a higher level of renewables to customers at a premium.

Additionally, this argument also assumes that customers in New York are actually taking products from ESCOs that include energy-related value-added services. Direct Energy witness Hanger lists products and services that ESCOs "can" offer such as (1) fixed rates, (2) renewable energy, (3) smart thermostats, (4) gift cards, (5) airline miles, (6) information regarding energy consumption, and (7) "more customer-friendly terms and conditions" (Tr. 255-256, lns. 21-13), but does not provide any hard evidence that ESCOs in New York are offering any or all of these products, nor that any New York customers actually take such products. Furthermore, there is no attempt to quantify the benefits associated with such products so as to potentially justify the over $1.3 billion in overcharges experienced by mass market customers who took ESCO service for the 36-month period ending June 2016.

Finally, several parties attempt to argue that the time period and customer class selected for this analysis is inappropriate. (See, Tr. 694-695, no line numbers in this testimony). Ignoring the fact that review of the most recent (at the time) 36-month time

CASE 15-M-0127, et al.

period was directed by the Commission itself,[60] the wealth of information and data collected for this three-year time period provides a more than sufficient data set for evaluation of relative ESCO price performance.  The claim that the data set is flawed because it does not include large commercial and industrial customers is also misguided as this proceeding is limited to addressing the recognized flaws with the retail markets serving mass market customers, not the markets serving large commercial and industrial customers.[61]  For example, NEM witness Cicchetti relies on ESCO data self-reported to U.S. Energy Department (EIA) which included both mass market as well as large commercial and industrial customers, which biases his analysis and is therefore of no use in these proceedings.  (Tr. 696-707, no line numbers in this testimony).  The use of EIA data is discussed in more detail in section III.C.2. of this brief.

The data sets and sources relied on by Staff for its analysis is the most comprehensive relative pricing comparison between New York ESCOs and utilities in the record.  (Exh. 701 (JSA-1 Confidential); Exh. 711 (SP-1a Confidential)).  This data is not just a sample, it is the entire universe of actual data for the three-year period that the parties were to analyze according to the Commission's directive in the December 2016 Notice.[62]  This is the only data set in evidence in these proceedings, and is the most reliable and accurate source of ESCO to utility price comparisons available.

## 2.    Utility Delivery and Supply Cost Allocations

Footnote 20 of the February 2014 Order explains that specific rate unbundling and cost allocation questions would be addressed and subsequently approved in individual rate cases based on detailed analyses which conform to provisions set forth

---

[60]   December 2016 Notice at 7-8.

[61]   Id. at 1-2.

[62]   December 2016 Notice at 7.

CASE 15-M-0127, et al.

by the Commission.[63]  These allocation questions are, therefore, outside the scope of these proceedings.

## C.   RESPONSE TO COMMISSION'S INQUIRIES ON THE FUTURE OF ESCOS IN THE MASS MARKET

### 1.   Should Retail Choice Continue in New York?
### (December 2016 Notice Question 1)

The evidence in the record clearly proves that the retail access mass markets for electricity and natural gas are not working as the Commission originally envisioned when it first established the retail markets in the 1990s.  (Tr. 2038, Exh. 724 (SP-12)).  The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products (Tr. 2039, lns. 8-11); this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.  Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.  (Tr. 2039-2040).

Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price and other factors, such as energy-related value-added products, since the terms and pricing of the ESCO product offerings are not transparent to customers.  For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start (Tr. 2080, lns. 4-6; Tr. 2082-2083, lns. 17-3), and after expiration of the teaser rate, the rate is changed to

---

[63]  See, Case 00-M-0504, Proceeding on Motion of the Commission Regarding Provider of Last Resort Responsibilities, the Role of Utilities in Competitive Energy Markets, and Fostering the Development of Retail Competitive Opportunities.

CASE 15-M-0127, et al.

what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated (Tr. 2084, lns 2-10; Tr. 2219-2220, lns. 22-4).  The transparency issues are discussed in detail below in Section C.11.

     a.   <u>ESCOs' Role in Residential Markets</u>

In light of the pricing abuses ESCOs are committing against their customers, Staff recommends that the Commission direct that the utilities prohibit ESCOs from using their distribution systems to provide commodity service to mass market customers (both residential and small commercial, as defined in sections III.C.1.a.(i) and III.C.1.b.(i) of this brief), unless our recommendations are implemented by the Commission (Tr. 2032, ln 18 to Tr. 2037).

Staff's first recommendation is that the commodity service product provided by the ESCO must either provide a guarantee that the mass market ESCO customer's overall electric or gas bill will be lower, or no greater, than that charged by the utility for delivery and commodity, or that 100 percent of the ESCO product is generated from renewable resources that are delivered to and consumed in New York and otherwise in compliance with the Commission's environmental disclosure program requirements. (Tr. 2033, lns. 1-14).

Second, the Commission should prohibit ESCOs from using the utility distribution systems to provide commodity service to aggregated mass market customers unless the customer aggregation is enabled through either a Community Choice Aggregation (CCA) model utilizing a professional energy buyer acting in a fiduciary manner that is independent of the ESCO (Tr. 2033, lns. 14-24), or the energy service provider is a not-for-profit (NFP) corporation or municipal entity (Tr. 2033-2034, lns. 24-3).

Third, in both instances, the Commission should monitor the performance of the CCA and NFP to ensure that they are providing competitive prices vis-á-vis the utility's default service (Tr. 2034, lns. 3-6).

CASE 15-M-0127, et al.

Fourth, mass market customer bills (whether individual or aggregated) must disclose a relative bill comparison in a manner acceptable to the Commission between the current bill charges and what the customer would have paid if the customer took both delivery and commodity service from the distribution utility (Tr. 2034, lns. 7-18).

Fifth, the Commission should direct that the utilities no longer provide Purchase of Receivables (POR) without recourse to ESCOs, but instead that POR only be offered to ESCOs with recourse, meaning that the ESCOs would not be made whole in the instance where funds for commodity service cannot be collected from the ESCO's customers (Tr. 2034-2035, lns. 18-2; Tr. 2155, lns. 1-3; Tr. 2157-2158, lns. 10-2; Tr. 2159, lns. 1-3)).

The sixth recommendation is that the Commission should require that ESCOs provide written reports on a calendar year basis, and that those filings contain the information necessary for the Commission to monitor the mass market and ensure that ESCOs are compliant with the Commission's new requirements (Tr. 2035, lns. 2-10), including that ESCO customers must be provided with 100 percent green energy or realize savings on their commodity compared to the default utility's offering.

Regarding ESCO marketing practices, the seventh recommendation is that the Commission should prohibit ESCOs from using door-to-door, point of sale, telephonic sales, or similar marketing practices (Tr. 2035, lns. 11-14). Instead, the Commission should direct ESCOs to limit their marketing to direct mail, electronic communications, or similar forms of marketing where the potential ESCO customer would respond to such marketing and otherwise initiate direct contact with the ESCO (Tr. 2035, lns. 15-22).

The eighth recommendation is that the Commission should require that the ESCOs ensure the protection of customer data, confidentiality and cyber security by being in compliance with UBP Section 4 and consistent with the National Institute of Standards and Technology Cyber Security Framework (NTS&TCS) (Tr. 2035-2036, lns. 22-12; Tr. 2188, lns. 9-16) or the applicable cyber security requirements of the North

CASE 15-M-0127, et al.

American Electric Reliability Corporation (NERC) (Tr. 2698-2700, lns. 9-3), as proposed in the UBP, Section 12 (Exh. 724 (SP-11)).

 The ninth recommendation is that the Commission should modify the UBP to conform to Staff's recommendations, which are shown on our redlined revisions to the UPB in Exh. 724 (SP-11). (Tr. 2036, lns. 12-14).

 The tenth recommendation is that the Commission should provide for an orderly transition to implement our recommendations, and direct interested parties to file with the Secretary proposals concerning the scope of Track II, and that the Commission issue an Order determining the scope and issues to be addressed in Track II. (Tr. 2036, lns. 14-20).

 The eleventh and final substantive recommendation is that the Commission should not delay or be distracted from implementing these recommendations by the prospect of potential value-added products that the ESCOs may offer to mass market customers until the transitional actions that we recommend have been implemented. The potential development of appropriate energy-related value-added products should occur later in a collaborative process in Track II, after the detrimental aspects of the current ESCO markets have been eliminated and customers can then make fully informed decisions regarding whether they want ESCO products based on full transparency of pricing for commodity products available to them, untainted by misleading or inappropriate marketing (Tr. 2036-2037, lns. 20-10).[64]

 (i) Defining Residential

 Presently, the Commission defines residential customers as those electric customer accounts that are not demand-metered. (Tr. 2038-2039, lns. 21-1).[65] The definition of a residential electric customer is clear, and we do not recommend that it be

---

[64] The twelfth recommendation is that the Commission adopt findings and ordering clauses consistent with our recommendations in testimony, Exh. 724 (SP-12) and Exh. 725 (SP-13).

[65] Case 15-M-0127, et al., supra, Order Resetting Retail Energy markets and Establishing Further Process (issued February 23, 2016), at 4, fn 2.

CASE 15-M-0127, et al.

modified.  Residential gas customers (and small commercial gas customers) are defined
as those customers whose annual gas consumption is not greater than 750 dekatherms
(dth), or equivalent, per year (Tr. 2039, lns. 1-3; Tr. 2043, lns. 1-6).[66]  While staff has
some concerns that the 750 dth threshold for small commercial gas customers may be too
low, we recommend this definition be maintained for Track I of these proceedings.
Staff's concerns with regard to the definition of a gas mass market threshold are
discussed below in Section III.C.1.b.(i).

 b. ESCO's Role in Non-Residential Markets

 (i) Defining Small Commercial

 The mass market includes small commercial customers, as defined above in
Section C.1.a.(i).  Therefore, Staff's recommendations in section C.1(a) apply to the mass
market small commercial electric and gas customers.  While there are concerns that the
threshold of 750 dth for small commercial customers may not be high enough to protect
all small commercial customers who are more like residential customers as to their ability
and sophistication to understanding the markets and buying gas commodity for contract
terms often measured in yearlong increments, at this time we recommend that this issue
be addressed in Track II, or that the Commission institute a proceeding limited to
investigating the threshold of 750 dth to determine whether it should be increased.

 (ii) Whether Small Commercial should be included in Mass Market

 The Commission should not modify the definition of mass market to
exclude small commercial customers.  Small commercial customers who are presently
defined by the Commission as part of the mass market are in need of the same consumer
protections in the UBP that are afforded to residential customers.  The customer
compliant data reveals that many of the complaints received are registered by small
commercial electric and gas customers that contend that they were either slammed or
subject to inappropriately aggressive and/or deceptive marketing practices.

---

[66] Id.

CASE 15-M-0127, et al.

   In addition, Staff is concerned that the 750 dth and below threshold that presently defines small commercial gas customers is actually set too low, as the threshold likely results in protections not being afforded to smaller commercial customers whose lack of technical expertise places them in the same situation as those at or below the threshold.  This endeavor is particularly important because, while the electric commodity market for non-demand commercial customers (small commercial customers) appears to have provided these customers with a small savings (0.1 percent or $940,000) over the 2014 to 2016 period, mass market commercial gas customers paid approximately $137.2 million, or 9.8 percent more between 2014 and 2016 than they would have if they had taken gas commodity from their utility (Tr. 2135, lns. 3-17).

   BBPC, LLC d/b/a Great Eastern Energy (GEE) witness Lukas raises two issues in his testimony concerning small commercial customers.  First, he proposes that instead of limiting the definition of small commercial gas customer to customers with usage of less than 750 dth, GEE claims that "some link" to the size of a residential customer is a "good proxy" for gas.  (Tr. 77-79, lns. 17-12).  Lukas states that he researched the issue and that, for lending purposes, banks will grant a residential mortgage on a four-family structure and a commercial loan for a larger building. (Tr. 78-79, lns. 16-3).  From this "analysis," which is not presented in the record, GEE claims that its proposal of 500 dth is a reasonable level. (Tr. 79, lns. 6-12).

   The Commission should reject Mr. Lukas' "analysis" because his argument is an attempt to convince the Commission to believe that the financial risk associated with small commercial gas customers has some relationship or nexus to residential customers and the sorts of mortgages they might be able to obtain from a bank.  This is a red herring, as the important distinction between mass market commercial customers and the larger commercial and industrial customers is not the size of their buildings or the sort of loans a bank might provide to them, but the sophistication of these customers and their ability to navigate the nuances of obtaining gas commodity service at rates that are competitive.  The Commission should be concerned with the small commercial

CASE 15-M-0127, et al.

customers' ability to negotiate with ESCOs in an equitable and transparent manner so that they know and understand the rate that they will be paying for gas commodity after the introductory rate term expires and whether it is likely to be competitive with the default utility and other ESCOs.

Lukas' second argument is that small commercial customers must make decisions on rent, fixtures and other inputs into whatever product or service they are selling, and therefore, tend to be more sophisticated than the residential customers they are "lumped" with.  (Tr. 98, lns. 5-9).[67]  Witness Lukas offers no evidence to support his claims.  The Commission should reject this argument as the question is not how sophisticated a small commercial customer is compared to a residential customer; the question is whether the small commercial gas customer has the sophistication to make informed decisions on commodity purchases that often cover a year or more time frame and often vary at the whim of the ESCO (unlike rent payments).  The fact is that the evidence adduced in these proceedings indicates that small commercial gas customers face the same problems and challenges in the retail energy markets as residential customers.

Witness Hanger claims that he could find no justification for inclusion of what he calls the "small business sector"[68] in the Commission's December 2016 Notice as he could find no justification for the Commission to conclude that the small business market is not working effectively.  (Tr. 241, lns. 12-16).  Mr. Hanger certainly offers no proof that the small commercial markets are operating "effectively," he merely offers the red herring that he could find no evidence in "major orders" indicating that the market was not working effectively, and describes the Commission's action "an egregious

---

[67]  Witness Hanger makes the very same argument in his testimony, and our criticism of Mr. Lukas' testimony applies to his as well. (Tr. 242, lns. 3-9).

[68]  It appears that witness Hanger is referring to small commercial customers, which is the terminology used by the Commission. Case 15-M-0127, et al., supra, Order Resetting Retail Energy markets and Establishing Further Process (issued February 23, 2016), at 4, fn 2.

CASE 15-M-0127, et al.

example of regulatory over-reach." (Tr. 241-242, lns. 15-2).  Mr. Hanger's claims are simply unsupported by the facts and the structure of the retail energy market itself and are in direct conflict with the Commission's longstanding and oft stated concerns for residential and small commercial customers participating in the retail energy markets.[69] The fact is, the December 2016 Notice properly included the small commercial markets in these proceedings as those markets are part of the mass market that the Commission directed be reviewed in these proceedings.  The evidence has shown that small commercial ESCO gas customers are paying approximately ten percent more in aggregate than they would pay for their local utility, and this percentage is often significantly higher when looking at ESCO provided gas commodity.  (Tr. 2136-2137, lns. 18-14).  Mr. Hanger's concerns should be rejected by the Commission, particularly because, as discussed in this brief, Staff has identified that small commercial customers have also experienced many of the same problems experienced by residential customers in the markets.

The Commission should adopt our recommendation to investigate expanding the definition of small commercial gas customer beyond 750 dth of usage to ensure that it is providing appropriate protections to these customers, who are often as misinformed and vulnerable to the ESCOs' marketing practices.

    (iii)   Whether Certain UBP Provisions Should Apply to Small Commercial?

All UBP provisions currently applicable to small commercial electric and gas customers should be continued.  There is no basis for limiting their applicability to only residential customers, as the evidence adduced in these proceedings shows that these customers need the protections (Tr. 2135, lns. 3-17; Tr. 2136-2137, lns. 18-20; Tr. 2138-2139, lns. 3-20), and that, in fact, the protections should possibly be expanded to commercial customers with annual gas usage above the 750 dth per year threshold.  The

---

[69]  See, February 2014 Order, February 2015 Order, February 2016 Order, December 2016 Order.

CASE 15-M-0127, <u>et al</u>.

Commission should reject any attempt to limit the applicability of the provisions of the UBP to only residential customers.

> ### 2. <u>ESCO's Place in the Competitive Market</u>
> ### (December 2016 Notice Questions 1, 2, 3, 9, and 13)

> a. <u>Whether ESCOs have "Market Power"</u>

Absent any market power, if an ESCO marks up its price over the prevailing competitive price, then one would expect that ESCO's market share to decline if the ESCO operates within a competitive market. (Tr. 3269, lns. 13-24). In analyzing the competitiveness of the retail commodity markets, both Staff and Direct Energy Services LLC (Direct Energy) relied upon the analytical framework (Tr. 3335, lns. 4-7) laid out in the Harvard Law Review article entitled <u>Market Power in Antitrust Cases</u>, by Richard A. Posner and William M. Landes. (Exh. 69 (JSA-6)). The first sentence of this seminal article defines the term "market power" as the ability of a firm or a group of firms acting jointly to raise prices above the competitive level, without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded. (<u>Id</u>.; Tr. 3334-3335, lns. 21-3). It is as simple as that. Exhibits 701 and 704 show that a significant number of ESCO suppliers have been able to consistently charge residential customers in excess of levels charged by the utilities, and some other lower priced ESCOs, for the entire three-year period covered by the pricing data set Staff entered into the record of this proceeding. (<u>See</u>, Exh. 701 (JSA-1 Confidential); Exh. 704 (JSA-3 Confidential); Tr. 3262, Tr. 4170, Tr. 4177, Tr. 4180, Tr. 4188, Tr. 4194).

Direct Energy, however, attempts to focus the market power question specifically on the elasticity of demand, and notes that the merger guidelines treat low elasticity of demand as a factor that enhances market power. (Tr. 3319, lns. 9-24). Both Staff and Direct Energy agree that a low elasticity of demand would make it more likely that market power could be exercised. (<u>Id</u>.). However, the ESCO parties' attempts to singularly focus the analysis of market power upon the necessarily difficult estimation of price elasticity is a red herring. (Tr. 3336-3337, lns. 24-6). ████████████

CASE 15-M-0127, et al.



To support this view Staff referred to the ability of an ESCO to sustain a significant, small but non-transitory, increase in prices (SSNIP) as a relevant indication of whether ESCOs' have market power.  (Tr. 3318, lns. 1-24; Tr. 3366).  This SSNIP test is outlined in the Department of Justice and Federal Trade Commission Merger Guidelines (Exh. 33).  Price elasticity plays into the ability to sustain a significant, small but non-transitory increase in prices (TR 3318, lns. 22-24).

Exhibit 704 (JSA-3 Confidential) reveals numerous instances where ESCOs have consistently charged residential customers in excess of levels charged by the utilities and some other ESCOs for the entire three-year period covered by the data provided in response to DPS-Utility 4 (Exh. 701 (JSA-1 Confidential)), without significantly losing market share.  (Tr. 4170, lns. 3-21; Confidential Tr. 3730 lns. 20-23; Tr. 4188 lns. 7–11).  All else equal, these sustained 20 percent plus mark-ups would clearly represent an exercise of market power.  However, is all else really equal?  Could these ESCOs be providing additional value beyond what is attributable to utility default service?  There is no dispute that customers paid more than 20 percent higher prices to take commodity service from these ESCOs.  The real question is whether the customer switching data on actual purchasing decisions by customers (Tr. 4189) is reflective of a reasonable valuation of those services. (Tr. 4190).  In fact, over the three-year time period, 30 percent (226 out of 746) of the ESCOs were billing customers in excess of 20 percent more than what the utility would have billed them for commodity, yet these ESCOs were able to remain in the market all three years.  (Tr. 4177, lns. 1-7).

CASE 15-M-0127, et al.

It is telling that parties decided to spend more time pointing out alleged anomalies in Staff's analysis of the data provided in Exh. 701 (JSA-1 Confidential), rather than using the data, which is the most comprehensive data set on pricing and purchasing decisions produced in this proceeding and in the record, in trying to prove their case. Moreover, these parties could have potentially used this rich pricing and customer demand data set, along with their own proprietary data, to show that the charge in excess of the utility's charge is attributable to a value-added service and not rent-seeking behavior, but failed to do so. (Confidential Tr. 3731-3732, lns. 20-6).

Although Staff did not have ESCO supplied information on whether the value of differentiated products could reasonably warrant a sustained, 20 percent mark-up in prices, Staff did provide its views on certain added value attributes. For example, in typical financial markets, a risk premium would range from 3.5 percent to 5.5 percent. (Tr. 4191, lns. 13-15). Thus, these 20 percent plus mark ups reflect more than just a hedge against price fluctuations. In contrast, the Staff Policy panel testified that a NYSEG 100 percent green product contained a green product adder of 2.5 cents per kWh. (Tr. 2869). A 2.5 cent per kWh adder would represent more than a 20 percent markup on most commodity rates (e.g. Exh. 65; Exh. 1402). However, the ESCO, utility, and spot market emission profiles are very similar (Tr. 3260), indicating that, on average, ESCOs are not providing a greener product. Thus, the 20 percent plus mark ups provided by the conventional ESCOs included in the emissions profiles in Exh. 705 (JSA-4), on average, should not be reflective of the value of a greener product. Also, the five "Specialty ESCOs," which Exhibit 705 (JSA-4) lists as providing noticeably different fuel shares than the Conventional ESCOS, at most would explain away the number of ESCOs that were billing customers in excess of 20 percent more than what the utility would have billed them for commodity from 226 out of 746 ESCOs to 191 of 746 (assuming that these five ESCOs were active in all six electric utility service areas).

Direct Energy offers the possibility that consumers may simply consider ESCO services and utility services to be different value propositions. (Tr. 255-256, lns.

CASE 15-M-0127, et al.

16-16).  In fact, Staff issued information requests to probe that possibility in more depth. (Tr. 3352, 17-25).  Unfortunately, however, Staff could not conclude, due to the lack of information provided by the ESCO parties, that the observed price differences were, or were not, based on how consumers valued those services.  (Tr. 3353-2254, lns. 15–9). The Staff Panel testified that the information they evaluated in Exhibit 704 (JSA-3 Confidential) reflected customers' actual purchasing decisions.  (Tr. 4189, lns. 17-20). The pertinent question, according to Staff, was whether that decision was based on a reasonable valuation.  (Tr. 4190, lns. 7-10).  When asked if utility default service customers are told the basis for this rate, that is, how much of it is based on the spot market, how much is a hedge, how much is included as capacity, how much is electricity, PULP witness Barbara Alexander responded, "No, they are not."  (Tr. 3657).

Staff did ask the ESCOs to provide information on the types of products they offered in the market.  (Tr. 3264, lns. 5-11).  However, there was not enough information in these responses to make a meaningful determination of either product type or the price charged for that product.  (Id.).  Moreover, where there's a significant price difference between the ESCO and the utility, the provider of a value-added service should have the burden of proof regardless of the complexities and difficulties that arise in performing studies to estimate the amounts by which consumers value products.  (Tr. 4195-4197, lns. 9–22).  Either a few individual, large ESCOs, or an association of ESCOs, would have the adequate resources to conduct a study that would identify reasonable amount of value-added by differentiated ESCO products.  (Tr. 4197, lns. 16-20).  Clearly, it was in the ESCOs' best interest not to present such a study.  Instead, witness Morris only argues, offhandedly, that revealed preference, simply by buying something, somehow proves that the price paid was commensurate with the actual value of that product.  (Tr. 555-557, lns. 7-24).  This conclusion, however, completely ignores the fact that, regardless of any "revealed preference," the Commission needs a basis to find that prices charged in the retail mass markets are just and reasonable.  The Commission should not let this deliberate obfuscation by the ESCO parties hinder it in

CASE 15-M-0127, et al.

finding that the differential between ESCO and utility service cannot be supported by the ESCOs' value-added claim; they are simply padding their retained earnings (profit).

RESA witness Makholm even acknowledged that his consulting firm, the National Economic Research Associates (NERA), has performed ordered logit studies to weigh how customers value the attributes of services in the past. (Tr. 1020, lns. 6-8). However, witness Makholm, somewhat superciliously argues that such a study would not be useful to the record in this proceeding and would leave the ALJs and the Commission with no ability to choose among the parties warring over the arcane econometrics study that would be in front of them. (Tr. 1019-1022, lns. 6–14).

But in fact, ordered logit analyses have been presented by NERA before the Commission in Case 90-C-0191 regarding the attributes associated with business telecom services. (Tr. 4196, lns. 7-21). A few single large ESCOs with adequate resources, or an association of ESCOs with adequate resources could have engaged in such a study for this proceeding. (Tr. 4196-4197, lns. 22-22).

Direct witness Kagan argues that it is difficult to state that the utilities' default rates were developed by appropriate 'transfer pricing principles.' (Tr. 254, lns. 6-11). However, Direct and others who hold this view had the opportunity to cross examine the Staff Rates Panel, witnesses Twergo and Wheeler, with a combined almost 70 years of experience in the energy industry, and sought only to generally attack the methodologies used to arrive at the merchant function charge (MFC), but proposed no solution to what they saw as a glaring problem. (Tr. 3149-3155). RESA witness Lacey goes further, stating that utilities are exerting market power by placing all costs in delivery and thus suppressing their commodity prices. (Tr. 1222, lns. 13-18). Lacey neglects the fact that the unbundling case was designed to place utilities and ESCOs on an even playing field, and that any disputes as to the components of the MFC are appropriately handled in individual utility rate cases. (Tr. 3116, lns. 5-15). Moreover, retail competition was implemented, carefully and slowly, with the intent to ensure customer protection, so that customers could realize rates lower than those

CASE 15-M-0127, et al.

currently being provided by utilities, or access to value-added products; and only if that market is effectively competitive.[70]  Witness Kagan affirmatively states that ESCO rates can generate savings (Tr. 183, lns. 5-6) over utility rates, but at no point was he able to demonstrate, using historical data from actual New York customer purchases, that ESCOs do provide value.  Given the resources at Direct's disposal, and given the critical issues raised in this proceeding, it is surprising that Direct's witnesses did not reconcile the charges as shown in Exh. 701 (JSA-1 Confidential) with the charges in Direct's proprietary data set (which was not entered into the record) to show instances where the overcharge was attributed to a value-added service.  It is readily apparent that the ESCO parties are derelict in their duty to defend the reasonableness of their high-priced sales to end-use customers by quantitatively showing that their products met either of these two conditions, nor have they made a showing regarding the Commission's requirement of an effective or workably competitive market.  They have not done so because they cannot make such a showing.

      b.    <u>The Functionality of Competitive Markets for Retail Commodity Services</u>

Though parties in this case would like to point out aspects of the market that exhibit the markers of competition, some of which have not been contested in this proceeding (e.g., markets function best when there are a large number of buyers and sellers; Tr. 164), they fail to provide substantive evidence regarding certain issues raised by Staff which point out how certain aspects deviate from what would typically be seen in a competitive market, such as a large number of ESCOs charging well in excess of the utilities and other ESCOs over the entire 2014 to 2016 time period.  (Tr. 3264; Tr. 4195-4197).  Furthermore, the ESCOs attempt to muddy the record by making analogies to other markets without laying a foundation as to how and why these two markets are similar.  (Tr. 2722-2729).

The testimony of the Staff Economics Panel reveals that a number of market characteristics in the retail access market are counter to what would be expected

---

[70]  Opinion 96-12 at 12-15.

CASE 15-M-0127, et al.

in a workably competitive market.  (Tr. 3278, lns. 3-6).  These unfavorable characteristics include (1) the ability of many ESCOs to charge significantly in excess of competitive price levels without losing market share, (2) the lack of price transparency, (3) high market concentration indices (HHIs), (4) the limited degree of ESCOs exiting the market, and (5) the lack of differentiating products and pricing strategies beyond what is currently available under utility default supply.  (Tr. 3278, lns. 6-15).  Whether these unfavorable characteristics are present in what the Commission intended to be a reasonably competitive retail markets was the key question raised in the February 25, 2014 Order.[71] Thus, we will discuss what the record shows for each of these market characteristics.

Regarding the ability of many ESCOs to charge significantly more than competitive price levels without losing market share (Tr. 3264; Tr. 4195–4197), markets for retail commodity services are not functioning as expected, and prices for many ESCOs reflect the exercise of market power.  (Tr. 4181, lns. 4-8; Tr. 3302 – 3303, lns. 24-17).  As indicated in Exh. 704 (JSA-3 Confidential), a significant number of ESCOs have been able to consistently charge residential customers in excess of levels charged by the utilities and some other ESCOs for the entire three-year period covered by the data provided in response to DPS-Utility 4 (Exh. 701 (JSA-1 Confidential)).  Large differences in prices do not appear to be the primary factor behind ESCOs remaining in or exiting the market.  (Tr. 4176-4177, lns. 14-19).  The competitive forces in the mass markets have failed, and retail commodity markets are not price competitive.  (See, Tr. 4180-4182).

Witness Kagan suggests the retail markets are workably competitive and even contestable.[72]  (Tr. 168-169, lns. 15–5).  However, Staff proved that there are other considerations that must hold true for a market to be perfectly contestable, and that, in

_____

[71]  See, February 2014 Order.

[72]  A contestable market is a market in which there are no barriers to entry or exit, and thus the threat of entry by competitors is sufficient to maintain the price discipline associated with perfect competition regardless of the number of competitors.  (Tr. 4163, lns. 18-24, citing Direct Energy witness Kagan at Tr. 168).

CASE 15-M-0127, et al.

fact, the existence of high mark-ups over the utility charge has not resulted in competitive entrants which undercut those high prices, to take over considerable market share – however, we simply see no evidence of this happening.  (Tr. 4163-4168).

Regarding the lack of price transparency, while some parties wish to focus on the perceived lack of transparency of the utility price, they conveniently ignore that the Commission exercises regulatory oversight over utility commodity pricing.  (Tr. 3402, lns. 10-15).  One of the threshold questions the Commission seeks to answer to in Track I is whether or not ESCOs have consistently offered lower prices than the incumbent utility on an annual basis, and whether offering lower prices could be done profitably.[73]  The evidence shows that, in very few instances ESCOs have been able to maintain a lower price, on an annual basis, than the utility (JSA-3), but that Staff was unable to determine whether the ESCOs were profitable.[74]  (Tr. 2172, lns. 14-16).  In fact, witness Cook would refer that the Commission design utility rates to make ESCOs more competitive.  (Tr. 644, lns. 1-6).  Witness Cook is arguing that the regulated utility commodity rate is simply too efficient and the only innovative solution ESCOs can come up with for competing is raising the utility rate.  Utility rates are efficient, and they are set by the Commission to be collected in a manner, including out-of-period adjustments, that is best for customers.  If ESCOs are to be a valuable and viable alternative, they must provide even more value than the incumbent utility, something they have not been doing.  If they cannot provide such value, it is not in the public interest to continue retail access for mass market customers.

Regarding high market concentration indices, the February 2014 Order in these proceedings mentioned the relationship between market concentration and market competitiveness.[75]  (Tr. 3244).  Staff presented in initial testimony an analysis based on

---

[73]   December 2016 Notice at 3-4.

[74]   However, one can make the assumption that if the ESCO remained in business, it must have been profitable.

[75]   February 2014 Order at 10.

CASE 15-M-0127, et al.

the Department of Justice/ Federal Trade Commission (DoJ/FTC) Horizontal Merger Guidelines' Herfindahl-Hirschman Indices (HHIs) that is used by economists as a screening tool to analyze the potential for anti-competitive behavior in a market.  (See, Tr. 3247, Tr. 3313, Tr. 3315, Tr. 3316).  No other party calculated market HHIs in their initial testimony, although Kagan spoke of them in general terms.  (Tr. 165).  Staff, in contrast, presented HHIs in two ways.  The Staff Economics Panel first calculated the HHIs including the kWh's, ccf's, or therms that each supplier and the incumbent utility sells to retail customers, and then subsequently removed the sales from the incumbent utility and calculated the HHIs based solely on the sales made by ESCOs.  (Tr. 3249; Exh. 702 (JSA-2)).  Given the market share impact of the incumbent utility in the "with" calculations, and since the change in the HHIs from the "with" to "without" calculations reflect that the incumbent utilities have the majority share of these retail markets, Staff concluded that the utilities retain the dominant share in these markets, and that continued regulation in these markets is warranted.  (Tr. 3249).

Witness Kagan also notes that the Commission has stated that the large C&I market is workably competitive[76] (HHI 2083) and, thus, a lower HHI for residential market means it is also workably competitive.  (Tr. 184, lns. 9-15).  However, Kagan fails to follow his own recommended methodology of consolidating ESCOs' market shares for those ESCOs under one parent company and recalculate those HHIs.  (Tr. 220, lns. 7-19).  If he did, this would result in increases to the HHI indices, undercutting his flawed argument regarding competitiveness of the market.   Moreover, Kagan ignores the fact that there is no one single measure that would point to a workably or non-workably competitive market, and market concentration is just one factor to be considered.  In fact, economists use the HHI as a screening tool. (Tr. 3247).  HHIs are not the be all, end all of market power examinations. (Tr. 3253, lns. 16-17).

---

[76]  Staff has not conducted an analysis as to whether the large C&I market is actually workably competitive.

CASE 15-M-0127, et al.

   With respect to the limited number of ESCOs exiting the market, large differences in prices do not appear to be the dominant factor behind ESCOs remaining in or exiting the market.  (Tr. 4176-4177, lns. 14–19).  Staff has shown that since 2010, the retail energy market migration has not significantly changed in either size or product offerings (Tr. 2157, lns. 1-3).  In addition, Exhibit 703 (JSA-3) shows evidence that many ESCOs have entered the market within the period of 2014-2016, have continued to sustain prices above the utility price, and have not lost significant market share.  For customers who do switch, Staff has shown evidence that customers are, in fact, switching back to the utility.  (Exh. 726 (SEP-1)).  In other words, competition is primarily between the utility and the ESCO, not between ESCOs, as should be expected.  Customers appear to be willing to take a chance on an ESCO initially, but it is more likely that they return to utility service when they find the utility price to be better, instead of switching to another ESCO.

   Regarding the lack of differentiating products and pricing strategies beyond what is currently available under utility default supply, Staff engaged in a lengthy discovery process with the intent of developing the record on the types of products offered in the market.  Unfortunately, there was not enough information in the ESCO's responses to make a meaningful determination of either product type (e.g., fixed rate product, variable rate product, green product) or the price charged for that product.  (Tr. 3264, lns. 5-11).  Absent responsive information from the ESCOs, Staff made its own attempt at distinguishing between fixed and variable rate products, and found that some Con Edison small commercial electric customers from 2014-2016, Central Hudson small commercial electric customers in 2014, and Orange & Rockland low-income electric customers in 2014 showed instances of savings over the utility.  Almost all other ESCO customers in those three service territories showed charges above those of the utility, as an absolute value and percent difference, for both fixed and variable rate products.  This suggests that in most all instances, for mass market customers, there has been no clear

CASE 15-M-0127, et al.

price benefit to either a fixed or variable ESCO rate over a default utility rate for the 2014-2016 period.  (Tr. 3264–3269, Exh. 706 (JSA-5)).

        c.      ESCOs' Impact on Commodity Prices: Rates in the Fully Regulated Market

        ESCO parties manipulate EIA data to manufacture a claim that ESCO participation in the New York energy market has, over the last decade and half, saved New Yorkers over $10 billion.  (Tr. 676–678, no line numbers in this testimony). According to these parties, by eliminating the utilities' monopoly on energy supply, and introducing competition into the marketplace, ESCOs have lowered energy costs for all New Yorkers, and put billions of dollars back into customers' pockets.  (Id.).  However, this is not the case.  (Tr. 3895-3898).  In fact, witness Yates shows that the $10 billion Dr. Cicchetti claims has been saved by "New Yorkers" was actually the difference between the $1.5 billion of extra cost burden incurred by residential customers, offset by $11.5 billion of savings to C&I ESCO customers.  (Tr. 3895, lns. 16-18).  Therefore, taken as a whole, Dr. Cicchetti's EIA data shows that ESCO participation in the mass market, the relevant customer segment for evaluation in these proceedings, does not result in net positive value for its customers.  (Tr. 3895, lns. 19-21).

        Moreover, NEM and RESA attempt to use EIA data to argue that since 2012, ESCOs actually have been selling more MWhs than the incumbent utilities.  (Tr. 698, no line numbers in this testimony).  However, NEM relied on all customer categories reported in the EIA dataset even though the focus of this proceeding is on mass market customers.  (Tr. 4173, lns. 4-7).  In contrast, the market shares for the subset of residential mass market customers shown in Exh. 726 (SEP-1) show the opposite. Notable is that in all instances except one (Con Edison electric), the incumbent utility's usage share of the residential market increased from 2014 to 2016.  (Tr. 4174, lns. 5-7; Exh. 726 (SEP-1)).  Additionally, in all instances, with the exception of O&R gas and electric, the incumbent utility market shares were above 70 percent for 2014 through 2016.  (Tr. 4173, lns. 10-16).

CASE 15-M-0127, et al.

These increases in utility default service market share are completely at odds with the decreases in utility markets share envisioned when residential markets were opened to retail competition.[77]  More incredulous are RESA's references to Dr. Alfred E. Kahn's advocacy of "the benefit of 'letting go' in markets where competition, even if sometimes with unpredictable results, was a better avenue to pursue than regulation." (Tr. 887).  The market share increases of the incumbent utilities occurring in the retail electricity and gas markets for residential customers over the 2014 to 2016 time period are simply not consistent with the dramatic decreases in incumbent utility market shares that were evident at the time parties were arguing for a relaxation of regulatory constraints on New York's telecommunications markets.  (Tr. 4173, lns. 17-24; Exh. 726 (SEP-1)).

The rate at which competitive forces impact pricing behaviors is important. (Tr. 4178-4179, lns. 21–12).  Even assuming that market forces alone could bring commodity rates for all customers down to competitive levels multiple years into the future, it would be problematic if the Commission were to waive its pricing oversight on rate levels in the present.  (Tr. 4179, 8-12).  Moreover, the record in this proceeding indicates that any competitive forces currently at work in the retail access market quite often take years to have a constraining impact on prices.  (Tr. 4180, lns. 6-16). Competitive forces have had over two decades to have a constraining impact on prices; time is up.  Exhibit 704 (JSA-3 Confidential) shows that a significant number of ESCO suppliers have been able to consistently charge residential customers in excess of levels charged by the utilities, and some other lower priced ESCOs, for the entire three-year period covered by the pricing data set in the record of this proceeding.  (Tr. 4180, 10-16; Exh. 701 (JSA-1 Confidential)).

The Commission did not envision a workably competitive market as one in which a significant number of ESCOs were charging 20 percent plus markups without being forced out of the market.  Also, indicative of the competitive failure of the ESCOs

---

[77]  Opinion 96-12, at 26; Opinion 97-5, at 5.

CASE 15-M-0127, et al.

is that, overall, instead of switching away from high priced ESCO offerings to lower-priced ESCO offerings, consumers were moving away from competition in general by moving back to, and increasing the market share of, utility default service.  (Tr. 4172, lns. 19-23).

Witness Kagan also suggests that ESCOs have beneficial impact on retail commodity markets via the role that ESCOs play in facilitating wholesale competition.  (Tr. 162, lns. 7-13).  We categorially refute this assertion.  Witness Kagan gives no quantitative support for this assertion.  In fact, Exh. 705 (JSA-4) shows that the great majority of ESCOs are not involved in long term supply agreements with generators, and no party has presented evidence to the contrary, such as redacted or confidential long-term agreements with generators.  Witness Makholm, in addition, confirms that wholesale markets drive down costs, and stated affirmatively that ESCOs do not own any generation (Tr. 764-765, lns. 15-12).  Furthermore, the Commission requires real-time pricing (mandatory hourly pricing) for large, interval metered utility customers in excess of 2MW.[78]  There, the Commission appropriately isolated these customers, as "targeting the largest customers could yield the level of demand response and load reductions advocated by the NYISO and Con Edison/O&R as being necessary to mitigate wholesale price spikes effectively."[79]

No ESCO presented evidence that they are uniquely situated to reduce wholesale market coincident peak through their various pricing schemes, or that their energy management services are economical for mass market customers to reduce wholesale market coincident peak or affect the bids by merchant generators.  In fact, the Impacted ESCO Coalition stated affirmatively that they only have demand response

---

[78]  Case 03-E-0641, Proceeding on Motion of the Commission Regarding Expedited Implementation of Mandatory Hourly Pricing for Commodity Service, Expedited Implementation of Mandatory Hourly Pricing for Commodity Service, Order Instituting Further Proceedings and Requiring the Filing of Draft Tariffs. (issued September 23, 2005).

[79]  Id. at 14.

CASE 15-M-0127, et al.

products aimed at NYISO peak period for large C&I customers, and none for residential customers.  (Tr. 4043-4044, lns. 6–13).

Thus, the evidence in the record highlights several characteristics which indicate that the retail energy market for residential mass market customers is not workably competitive.  Namely, many ESCOs are able to charge prices in excess of the utilities, and other lower priced ESCOs, without losing significant market share.  Additionally, the high HHI indices suggest a concentrated retail market.  Moreover, the similarity of the emissions profiles indicates that, on average, the ESCOs offers few distinguishable and innovative green products from those currently offered by the utility.  Finally, the lack of price transparency in both product attributes and relative pricing likely enhanced many ESCO's ability to sustain high prices.  The evidentiary phase of these proceedings was not commenced to base conclusions about market competitiveness on what the ESCOs would have us believe -- that when customers buy a product it is unquestionably worth that amount.  The ESCOs should have the burden of proof, and should not be allowed to argue that ESCOs have no role in quantitively defending the value of their products.  Taken in sum, not as isolated market characteristics, the evidence presented by the non-ESCO parties constitutes a strong indication that the market is not workably competitive, and the Commission's continued oversight and focus on customer protections is warranted.

3.    **Future Product Offerings**

**(December 2016 Notice Questions 1, 2, 3, 16, and 20)**

As explained in Section III.C.1., the utilities should be ordered, and tariffs should be filed, to prohibit the ESCOs' use of the utilities' systems to provide their commodity service, except where: (1) the products offer a guaranteed savings to mass market customers or, in the instance of low-income customers that take commodity service only from Commission approved ESCOs, to provide commodity service at a cost that is no greater than the default utility; (2) the ESCO provides 100 percent electricity generated from 100 percent renewable sources, as defined in and subject to the

CASE 15-M-0127, et al.

environmental attributes and delivery rules of the Commission's EDP; or, (3) the ESCO is engaged in customer aggregation using either the CCA model or the NFP model  (Tr. 2033, 2092).  Thus, Staff recommends that the Commission determine the following:

      a.    <u>Variable-Rate, Commodity-Only Products</u>

      As previously stated, the Commission should prohibit the ESCOs from using the utilities' distribution systems to provide any sort of variable-rate commodity-only products unless the ESCO guarantees that it will charge less, or no more, than the applicable utility's default commodity service on an annual basis.  (Tr. 2033, lns. 1-14).

      Witness Lukas proposes that variable rates be continued in the mass markets, but that benchmarks be used to establish a reference price for commodity service as a means of preventing "potential" ESCO overcharges.  (Tr. 50-51, lns. 5-6).  Mr. Lukas makes a number of proposals on how to benchmark gas and electric commodity prices (Tr. 62-63, lns. 1-11); however, these complicated calculations will not provide market clarity and transparency, but could confuse consumers even further, and thus should be rejected by the Commission.  The clearest way to ensure that mass market customers are not overcharged for commodity is to require that the utility price be shown in a side-by-side comparison on the customer's bill, and that the ESCOs guarantee that they will charge less, or no more, than the utility default service.

      Claiming that restricting variable rate products is a draconian and harmful step, witness Hanger proposes "reform" options, including requiring ESCOs to disclose variable rate product prices at the beginning of each applicable month, establishing "guardrails" to limit how much an ESCO variable rate product can increase each month, banning the sale to low-income customers, or prohibiting their sale to residential customers.  (Tr. 259, lns. 7-20).  After initially stating that his preference is to not intervene in any manner in ESCO pricing, he proposes, in the alternative, guardrails for a trial period and with a starting point of 30 percent increase from month-to-month, that would limit how much a variable rate could increase in any one month.  (Tr. 260, lns. 2-5).

CASE 15-M-0127, et al.

The proposals offered by Mr. Hanger should be rejected as inferior to Staff's recommendation on limiting such pricing to less than or equal to the utility's price.  Publishing the monthly price the month before it applies does not allow the customer to shop for the best commodity price; it only provides a "heads-up" as to what the commodity price will be next month.  The guardrails proposed would allow prices to only increase by 30 percent from month-to-month, which is hardly a benefit to customers who are already paying exorbitant rates as compared to what they would have paid had they remained with the utility.  We do agree, however, and the Commission already requires, that low-income customers are guaranteed savings over the default utility service.  We also agree with Mr. Hanger that prohibiting the sale of variable rate products is a logical reform to the mass markets.  That is why the Commission should determine that ESCOs are prohibited from using the utilities' systems to sell their variable products unless they guarantee that mass market customers will not be charged more than they would have been charged for default utility service.

Witness Lacey describes at length a number of measures that other states have implemented regarding variable rates.  (Tr. 1187-1192).  Mr. Lacey does not suggest that the Commission adopt any specific set of rules adopted in other states, but recommends that the Commission have the stakeholders address these potential solutions in a collaborative to explore these solutions.  (Tr. 1192-1193, lns. 13-7).  The time for stalling and stone walling by the ESCOs is over.  The Commission should reject this suggestion and adopt Staff's recommendation to cap variable rate products at no more than what the utility would have charged.

      b.     Fixed-Price Products

The Commission should prohibit the distribution utilities from providing ESCOs access to their systems to provide fixed-price commodity products to mass market customers (Tr. 2132) unless the product can be structured so that they provide a guaranteed savings when measured against the default utility on an annual basis.  (Tr. 2132, lns. 7-14).  The rationale for this recommendation is the generally significant

CASE 15-M-0127, et al.

premiums charged for fixed-price products – as evidenced by the data provided by the utilities in response to Staff IR DPS-Utility 5 – and the failure of ESCOs to quantify the "value" attributed to their fixed-price products in response to Staff IR DPS-ESCO 2. (Exh. 709 (SP-1); Exh. 710 (SP-1a); Exh. 711 (SP-1a Confidential)).  In addition, the utilities' budget billing process offers many of the same benefits as fixing the commodity price and does not impose any premium on the customer.  (Tr. 2131, lns. 15-21).  Fixed rate products stabilize only one of the four inputs to customers' bills.  (Tr. 2209, lns. 2-11).

Witness Lukas proposes that fixed-price products be continued in the mass markets, but that a "market price comparison" be used to benchmark commodity service as a means of identifying ESCOs that are "unjustifiably" taking advantage of mass market customers.  (Tr. 58, lns. 3-6).  Lukas suggests that this market price comparison would use the average of ESCO charges, as published in the Commission's Price to Compare website, for the commodity markets and set an upper bound of reasonableness above those average gas and electric commodity prices.  (Id.).  However, these complicated calculations will not provide market clarity and transparency, but could further confuse consumers, and should be rejected by the Commission.  The most clear and simple way to ensure that mass market customers are not overcharged for commodity is to require that the ESCOs guarantee that, on an annual basis, they will charge less, or no more, than the utility default service.  In the alternative, Lukas offers an "index based" benchmark similar to that discussed in his variable rate product proposal, and contained in a May 4, 2016 Staff Whitepaper (2016 Whitepaper), to monitor fixed prices.  (Tr. 59, lns. 12-17).  It should be noted that in his rebuttal testimony, Mr. Lukas criticizes Staff for not following the approach in the 2016 Whitepaper, noting the statement that fixed prices could provide value to customers.  (Tr. 90, lns. 4-8).  He claims that a fixed price offers value because the customer knows he or she will not pay more than the fixed price despite increased commodity prices.  (Tr. 90, lns. 15-16).  Staff's 2016 Whitepaper was

CASE 15-M-0127, et al.

simply a proposal for offered for comment and was never adopted, and the Commission should place no weight on the document since Track I is a litigated proceeding.

Direct Energy witnesses Kagan, Sharfman, and Cicchetti agree with Mr. Lukas, and make the statement that ESCOs offering a fixed-price product provide "clear" value for customers, allowing them to budget their energy costs. (Tr. 161, lns. 14-15; Tr. 355, lns. 11-13; Tr. 725, no line numbers in this testimony). Witness Kagan also argues that eliminating fixed prices for small business customers is a concern because he claims, without supporting evidence, that these customers rely on fixed-price offerings to manage their energy expense within their budgets. (Tr. 242, lns. 15-17). Witness Hanger also argues that fixed prices offer a benefit to customers, and that Staff's proposal would result in the termination of hundreds of thousands of current fixed-price contracts and prevent future customers from electing to take such products. (Tr. 295, lns. 294-298(sic)).

RESA witness Lacey views the "ESCO of the future" as one that provides innovative products that customers want, such as fixed-price commodity as customers often seek protection or "insurance" on their commodity prices, and that should be allowed in the markets going forward. (Tr. 1142, lns. 7-10; Tr. 1176, lns. 10-14). He believes that customers should be allowed to place the price risk on their ESCO(s). (Tr. 1256, lns. 4-5). In responding to Staff, Mr. Lacey opined that Staff's opinion of what constitutes a benefit does not matter; only the customer's opinion as to the "value" of that benefit matters. (Tr. 1275, lns. 5-6). Witness Lacey's final argument is that the budget billing offered by the utilities is not the same as a fixed-price product (Tr. 1275, lns. 13-14), noting that the ESCO fixed-price product does not use intra-period price adjustments or a true-up at the end of the year. (Tr. 1275, lns. 11-13).

The Commission should reject the arguments of the ESCO witnesses because the evidence in the record shows that the significant premium demanded by most ESCOs offering fixed-price products is a tremendous expense to the customer, and only fixes one input to the amount billed to the customer. Thus, the "insurance" price is too high, and most rational customers, presented with the facts in a transparent manner,

CASE 15-M-0127, et al.

would see this.  The mass markets, however, are not transparent and customers are not provided sufficient information by the ESCOs to determine if the product actually provides them "value."  If there is no way to analyze a fixed-price offering, then the customer cannot make a rational choice, and they are making a choice based on marketing tactics by the ESCO or, perhaps, fear.  Thus, the ESCOs' basic argument here is that customers should be left to their own decision-making process, whether or not they have any information or transparency as to the commodity markets or the premium charged by the ESCO.  It is simply a "buyer beware" mentality that the ESCOs have, and the Commission should step in and protect customers by ensuring just and reasonable rates.  The ESCOs' argument also completely ignores the fact that the Commission needs to be able to determine whether the rate is just and reasonable.  Therefore, the Commission should adopt Staff's recommendation on fixed prices to protect mass market customers.

     c.     Renewable Energy Products

     As discussed above in section III.C.3.a., the Commission should determine that the only renewable energy products ESCOs may offer to mass market customers, excluding low-income customers, is a 100 percent renewable resource energy product provided over the calendar year and generated from renewable resources.  (Tr. 2040, lns. 4-8).  This recommendation modifies the requirement the Commission intended to establish in the Reset Order,[80] that ESCOs provide to their customers "green products" that are comprised of at least 30 percent renewable energy.  (Tr. 2086).  The renewable energy may be generated by biomass, biogas, hydropower, solar, or wind as defined in

---

[80] Case 15-M-0127, et al., supra, Order Resetting Retail Energy Markets and Establishing Further Process (issued February 23, 2016)(Reset Order) at 14-16.

CASE 15-M-0127, et al.

and subject to the Commission's environmental attributes and delivery rules contained in the EDP.[81]  (Tr. 2086-2087, lns. 14-5).[82]

A large percentage of the electric commodity that customers purchase from the utilities is generated from renewable resources.  The utility-provided renewable resources come from utility-owned and contracted facilities, from renewable energy credits (RECs) (coupled with conversion transactions) utilities purchase for their customers to comply with the old Renewable Portfolio Standard (RPS) and the new Renewable Energy Standard (RES) mandates, and additional residual renewable resources blended into the New York Spot Market purchased that utilities make.  As a result, the Environmental Disclosure Labels on the Commission's website disclose that as of 2015 the utilities were currently satisfying between 11 percent and 28 percent of their electric load with power generated from renewable resources.  Those utility-provided resources are and will ratchet upward each year through 2030 due to the RES mandates. On the other hand, the Environmental Disclosure Labels on the Commission's website disclose that as of 2015 the ESCOs were providing very in the way of renewable resources other that what they were obtaining through the residual mix of the New York Spot Market where most ESCOs obtain virtually all of the power.  The Environmental Disclosure Labels show the fuel sources and air emissions used to generate the electricity commodity provided by each ESCO in New York on a portfolio basis.[83]  The Environmental Disclosure Label of Direct Energy is typical of the fuel source mix provided by ESCOs in New York and, in fact, only two ESCO vary significantly from

---

[81]  Under the EDP, energy labels are based on the environmental attributes of the energy purchased by the load serving entity (LSE) and are not affected by the separate purchase of Renewable Energy Certificates (RECs).

[82]  Case 15-E-0696, Environmental Disclosure Labeling Program, Notice Instituting Proceeding and Soliciting Comments on Environmental Disclosure Labeling Program (issued December 10, 2015).

[83]  Environmental Disclosure Labels for every ESCO operating in New York can be found on the Department's website at: https://nygats.ny.gov/ng/Report/getdto_view_Report_PublicEDPLabel.

CASE 15-M-0127, et al.

that mix.[84]  (Exh. 1301).  The Direct Energy label shows a virtually identical fuel mix to that of the label for the New York Spot Market.  The claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York.

Any market for voluntary purchases of additional renewable resources should not allow customers to pay voluntary premiums for renewable resources that ESCOs or utilities are already mandated to deliver, or for resources that an ESCO received by chance in the residual mix of the New York Spot Market.  Such purchases do not add value.  In addition, any market for voluntary purchases of additional renewable resources should not allow customers to pay voluntary premiums for renewable resources at a level that is below what the customer could have received without a premium from the utility company.  If there is to be voluntary purchases of additional renewable resources, they should provide obvious added value.  Staff recommends that the best way to do that is to require a 100% renewable resource product which will ensure that the value will be above what is already mandated through 2030.

Additionally, any argument that these labels do not reflect the actual products offered because they are reported on a total ESCO portfolio basis is misplaced. The fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot "divert" the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity

---

[84]   See Environmental Disclosure Labels at
https://nygats.ny.gov/ng/Report/getdto_view_Report_PublicEDPLabel.

CASE 15-M-0127, et al.

generated by non-renewable sources.[85]  An Environmental Disclosure label that nearly matches the spot market mix evidences that the ESCO is providing all its customers with the same level of renewables, without any bilateral agreements with renewable generators or conversion transactions, which would be reflected in the label.  Thus, in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a "green" commodity product.

GEE's witness argues that meeting our recommendation regarding 100 percent renewable energy is unreasonable because, he claims, without offering any analysis, that GEE has difficulty selling renewable products at a minor premium and that GEE's "electric desk" determined that the level at which it would have to price such a product would be too high and not attractive to customers.  (Tr. 97, lns. 8-12).  Yet, Direct witness Hanger sees no such problem and states that ESCOs can provide 100 percent renewable energy to their customers.  (Tr. 256, lns. 2-3).  Messrs. Hanger, Sharfman, and Lacey state in their rebuttal that Staff's proposal is radical and draconian. (Tr. 304, lns. 4-6; Tr. 419; Tr. 1269-1270).  Witness Hanger and Sharfman also claim, without offering any analysis, that a 50 percent product "could" meet the states 50 percent renewable goal by 2030, before the 2050 deadline. (Tr. 309, lns. 94-98(sic); Tr. 419).  Witness Lacey also asks that the Commission reject the proposed requirement that 100 percent renewable energy products comply with the New York environmental disclosure label program. (Tr. 1269-1270, lns. 18-8).

---

[85]  Case 94-E-0952, In the Matter of Competitive Opportunities Regarding Electric Service, filed in C 93-M-0229, Opinion NO. 98-19, Opinion and Order Adopting Environmental Disclosure Requirements and Establishing A Tracking Mechanism, Appendix page 1 of 12 (issued December 15, 1998); "An LSE can disaggregate its generation sources into separate products with different environmental characteristics, provide disclosure by product, and sell the products to different customers. However, disaggregation of the environmental characteristics of spot market purchases, except those that are otherwise subject to conversion transactions (further described below), is not permitted."

CASE 15-M-0127, et al.

The Commission should reject these arguments as they fail to acknowledge that the 100 percent requirement is the exception to our overarching position that ESCOs should be providing value to their customers by guaranteeing that they will save money over the year when compared to the default utility service or by providing them with 100 percent renewable energy at an uncapped cost.  However, should a ESCO create a "green" product with something less than 100 percent renewable energy, but is also willing to guarantee that customers will not pay more than the default utility rate over a year, then that product could be allowed.  In fact, one ESCO is currently serving customers with a 100 percent green product that also guarantees that the customer will pay no more than if the customer was a full-service utility customer.[86]  Finally, the recommendation that the ESCOs comply with the New York Environmental Disclosure Label program is to ensure that New York obtains the benefits of renewable generation. When an ESCO commits to sell a customer a renewable product, the Commission should ensure that the renewable energy is actually delivered in New York, and is not just a paper transaction that cannot be verified.  Thus, the Commission should determine that the only renewable energy products ESCOS may offer to mass market customers, excluding low-income customers, is a 100 percent renewable resource energy product provided over the calendar year and generated from renewable resources.

    d.    Value-Added or Bundled Products

Regarding energy-related value-added and "bundled products," the prospect of potential "value-added" products that the ESCOs could or do offer to mass market customers should not be considered until after the recommended transition to the new retail access mass markets has been implemented by the Commission.  (Tr. 2036-2037, lns. 20-2).  After the detrimental aspects of the current ESCO products and marketing activities are eliminated, the potential development of value-added products should then occur in the collaborative process contemplated in Track II.  (Tr. 2037, lns. 2-10).  At this

---

[86]  Case 12-M-0476, et al., supra, Order Approving Waiver and Authorizing Utility Expense Reduction, LLC to Serve Low-Income Customers (issued December 14, 1027).

CASE 15-M-0127, et al.

time, the only "value-added" products that may justify a modest premium over default utility pricing are 100 percent renewable energy products (Section c., above).

The ESCOs view any commodity product they offer as value-added simply because customers "value" them.  (See, Tr. 46, lns. 3-4; Tr. 187, lns. 1-7; Tr. 291, lns. 210-213(sic); Tr. 364, lns. 2-3).  What the ESCOs mean by this is that the effort to quantify these value-added products by the Commission is misplaced, that the Commission should simply accept that customers ascribe some value to these products and leave it at that, with no analysis.  In the ESCOs' view, it does not matter whether the Commission finds the value of value-added products reasonable; it's whether the customer does.  Yet, if these value-added products were actually providing real economic benefit to customers, the ESCOs would have quantified it and touted it in their testimony.  Claiming that only the customers should decide, in a market that lacks transparency, whether they are receiving value is akin to arguing that "buyer should beware."   The Commission must ensure that customers rates for commodity service are just and reasonable.  This is precisely why the Commission should, for Track I, set aside and not consider value-added products or services at this time.  First, the Commission must address and correct the pricing, transparency, and marketing of ESCOs.  After that is done, and the mass markets have transitioned as recommended by Staff, then the Commission should consider potential energy-related value-added services and the pricing of such products.

     e.   <u>CCA Products</u>

At the onset, it is important to note that CCA is still in its infancy and further evaluation is needed to determine whether or not CCA programs are providing real value to customers.  However, one of the primary differences between a CCA and a traditional ESCO offering is the fact that a CCA utilizes an independent expert or aggregator that works with the municipality to arrange favorable terms in ways that

CASE 15-M-0127, et al.

individual customers have not been able to do.[87]  The evidence in these proceedings shows that the aggregation of mass market customers could provide economic benefits to such customers, and that ESCOs could address the commodity energy needs of such customers with a significantly improved pricing performance.  (Tr. 2145, lns. 18-23). This is supported by the review of bill data from the Sustainable Westchester Community Choice Aggregation (SW CCA) provided by Con Edison and NYSEG, contained in Exh. 709 (SP-1), Exh. 711 (SP-1a Confidential), and summarized in Exh. 722 (SP-9).  (Tr. 2145-2146, lns. 18-5).  This data indicates that in the aggregate, from May 2016 (the start of the program) to the end of that calendar year, certain electric customers participating in the SW CCA in the NYSEG service area saved approximately eight percent on their total bill compared to what NYSEG would have charged for the bundled commodity and delivery service.  (Tr. 2146-2147, lns. 6-19).  In Con Edison's service territory, the SW CCA customers, who appear to have a more typical electric usage patterns and no electric heat, saved approximately 5.3 percent compared to what they would have paid for bundled service from Con Edison.  (Tr. 2147-2148, lns. 20-2).

While, of course, data for more than just the eight months from the SW CAA program would be preferable, the data suggests that aggregating enough mass market customers with a CCA administrator can save customers on their commodity service.  (Tr. 2148-2149, lns. 5-5).  Similarly, the Not For Profit (NFP) model offers some promise as our review of the NFP data indicates that mass market customers of some NFP ESCOs were able to provide commodity at a lower price than NFG over the 2016 calendar year.  (Tr. 2149-2150, lns. 9-11).

Therefore, the rules should be changed to prohibit ESCOs from providing commodity service to aggregated mass market customers directly.  Instead, the CCA must utilize a professional energy buyer independent of the ESCO and acting in a

---

[87]  Case 14-M-0224, Proceeding on Motion of the Commission to Enable Community Choice Aggregation Programs, Order Authorizing Framework for Community Choice Aggregation Opt-Out Program, at 2 (issued April 21, 2016)(CCA Framework Order).

CASE 15-M-0127, et al.

fiduciary capacity (Tr. 2033, lns. 14-24), or a NFP model where the ESCO is a bonafide not-for-profit corporation or municipal entity.  (Tr. 2033-2034, lns. 24-3).

        RESA witness Lacey argues that aggregators should be free to offer whatever product is best for a particular community (Tr. 1278, lns. 17-18), nor should they be limited in any way as to the price and products they offer.  (Tr. 1278-1279, lns. 18-2).  Witness Lacey also is concerned about limiting CCA to those facilitated through a NFP, municipality, or fiduciary buyer, since he claims, without any evidence, that they might not be viable business options for some entities.  (Tr. 1279, lns. 4-7).  Mr. Lacey believes that traditional ESCOs should not be prohibited from this market as excluding them will lead to potentially stifling innovative products, and he claims that ESCOs are able to quickly provide supply options to these CCA customers.  (Tr. 1279, lns. 14-19).  However, witness Lacey shows a lack of understanding of the New York market, provides no support for his assertions, and further fails to acknowledge that: (1) the framework for offering service through a CCA is not being addressed here, but instead has already been established by the Commission; (2) CCAs are still of an experimental nature; and (3) CCAs depend heavily on an expert buyer.[88]  In light of the overcharging of mass market customers by the ESCOs, the Commission should limit CCA facilitators to only NFPs or municipal entities to ensure that the Commission's and communities' CCA programs are benefiting customers by the utilization of an independent professional energy buyer acting in a fiduciary capacity.

    f.    Other Products

        There are no "other products" that Staff has to discuss.  However, any other potential ESCO products offerings should be discussed and developed in Track II of these proceedings, notwithstanding adoption of the above recommendations in Track I.

---

[88]    See, CCA Framework Order.

CASE 15-M-0127, et al.

4. **ESCO's Role in the Commission's Energy Policies, Including REV and CES**

   **(December 2016 Notice Questions 1 and 20)**

   The Commission has, in recent years, undertaken numerous energy initiatives, including the Reforming the Energy Vision (REV) initiative[89] and the Clean Energy Standard (CES) initiative.[90] While, currently, ESCOs can offer products to New York customers that may advance one or more of the goals of these initiatives, ESCOs are not essential to either initiative and, to date, have done little to materially contribute to either initiative.

   Several ESCO Parties have asserted that ESCOs play an essential role in advancing the Commission's REV and CES initiatives, claiming that ESCOs offer energy efficiency, green products and other Distributed Energy Resource (DER) products. (See, Tr. 268-269, lns. 12-15; Tr. 1139-1142, lns. 9-3). However, as discussed below, the ESCO parties offer no evidence to support these claims, and instead rely on assumptions and unsupported conclusions.

   As an initial matter, while the Commission has acknowledged that ESCOs can play a role in REV and other Commission initiatives, it is expected that DER providers will be the entities that will drive innovation and penetration of DER in furtherance of these important Commission initiatives.[91] (Tr. 2588, lns. 13-19). DER providers, as distinguished from ESCOs, do not sell commodity, and their practices are governed by the Uniform Business Practices for Distributed Energy Resource Suppliers

---

[89]  Case 14-M-0101, Proceeding on Motion of the Commission in Regard to Reforming the Energy Vision.

[90]  Case 15-E-0302, Proceeding on Motion of the Commission to Implement a Large-Scale Renewable Program and a Clean Energy Standard.

[91]  See, Case 14-M-0101, supra, Order Adopting Regulatory Policy Framework and Implementation Plan (issued February 26, 2015).

CASE 15-M-0127, et al.

and a separate registration process.[92]  (Tr. 2588, lns. 13-19).  Thus, the DER market is a market distinct from that of the ESCOs.[93]  In fact, in the DER Oversight Order, the Commission specifically mentions the retail markets, the shortcomings of those markets, and the need to provide the appropriate level of oversight to the DER markets to avoid making the same mistakes.[94]  It is expected that DER markets will provide the innovative products and services that, to at least some extent, ESCOs active in the retail markets were expected to promote, but which never materialized.  (Tr. 2596, lns. 2-14).  Therefore, while it is possible for an ESCO to provide DER services, they are not required to offer such services, and they are not expected to be the primary entity driving DER penetration in the market; and thus, ESCOs are not essential to or even needed to ensure the success of the Commission's REV and CES initiatives.

Moreover, even assuming that ESCOs are the entities primarily responsible for the introduction of DER (which they are not), evidence in the record shows that, even after approximately two decades, very few ESCOs are offering DER products and services, or any products that can remotely be considered innovative.  (Tr. 2596, lns. 2-14; Exh. 710 (SP-1a Public Redacted) and 711 (SP-1a Confidential) pages 163-1253).  In fact, there is scant evidence introduced in these proceedings that shows that ESCOs are in fact offering energy-related value-added products and services, and more importantly, that any customers in New York actually take those services from an ESCO.  Instead, the ESCO parties state on numerous occasions throughout the record that ESCOs offer such products and services to customers, but they provided little to no evidence to show that ESCOs are providing such products and services to New York State residents.  Indeed,

---

[92]  See, Case 15-M-0180, In the Matter of Regulation and Oversight of Distributed Energy Resource Providers and Products, Order Establishing Oversight Framework and Uniform Business Practices for Distributed Energy Resource Suppliers (issued October 19, 2017)(DER Oversight Order).

[93]  Id. at 1-3.

[94]  Id. at 2, and passim.

CASE 15-M-0127, et al.

the Commission should take notice of the ESCOs' failures in the mass markets and take a jaundiced view of their potential to be productive resources for DER services.

5. **ESCO Eligibility Requirements**

**(December 2016 Notice Questions 1 and 4)**

The ESCO eligibility process is thoroughly explained in the UBP §2. Exhibit 724 (SP-11) contains, in redline, several proposed changes to UBP, specifically requiring compliance with the proposed UBP §11 as part of an ESCO's eligibility requirement. These proposed changes include both the redlined changes that were proposed for comment in March 2016,[95] as well as several additional proposals offered as part of the Staff Panel Testimony. The latter includes, but is not limited to, a new §11 that proposes the additional consumer protections necessary for mass market customers that are reflective of the recommendations Staff offered in the initial testimony of the Staff Panel, and that are further supported by this brief. Additionally, depending on the Commission's determinations in Track I of these proceedings, further modifications of the UBP may be required. Any changes to the UBP should be implemented on a prospective basis and apply to ESCOs that are currently eligible to serve in New York State, as well as ESCOs that may apply for eligibility. In order to address the issues identified with the retail markets serving mass market customers, the Commission needs self-executing solutions that rely solely on enforcement.

6. **ESCO Reporting and Collateral Posting Requirements**

**(December 2016 Notice Question 20)**

One of the premier challenges in conducting the investigation directed by the Commission in the December 2016 Notice has been the unwillingness of ESCOs to provide information regarding their business practices, particularly with respect to specifics of the products and services that they claim to offer in New York. (Tr. 2115, lns. 10-24 – Tr 2116, lns. 1-4). Despite the multiple comments on the value of the

---

[95] Case 98-M-1343, In the Matter of Retail Access Business Rules, Notice Seeking Comments on Revisions to the Uniform Business Practices (March 8, 2016).

CASE 15-M-0127, et al.

products ESCOs are selling, including fixed rate products, the ESCOs were unwilling to quantify or provide the value of such products and services. Staff recommends additional reporting requirements that are necessary in order to effectively monitor and oversee the retail markets going forward. If the ultimate goal is to ensure that customers are receiving material value from participation in the retail markets, then accurate and transparent reporting on the products that ESCOs are offering to customers is essential. In particular, if an ESCO is charging prices for commodity in excess of the amount the utility would charge that same customer because the ESCO is offering an energy-related value-added service, then ESCOs should be required to report on the cost of the commodity, and separately state the cost of the energy-related value-added service so that the Commission, and the customer, can determine what the premium for that energy-related value-added service is, and then decide whether it is actually providing a value commensurate with the cost.

Some of the ESCOs claim that collateral posting requirements, or bonding, for ESCOs would have the same salutary effects as price controls by forcing bad actors out of the markets. (Tr. 606, lns. 11-14; Tr. 1170; Tr. 1216, lns. 12-15). Generally, the proponents of establishing bonding requirements ask that the Commission establish a collaborative process to determine specifics, such as the amount of the bond or posted collateral. (Id.). The Commission should reject the idea that bonding and collateral posting will have the same effect as ensuring that the ESCOs are charging just and reasonable rates, as it will not. Presently, the UBP place no limit on what an ESCO can charge a customer, so the Commission cannot currently seek consequences under the UBP against a bad actor charging unjust and unreasonable rates. Thus, the posting of a bond or collateral will not have the effect they claim, and the proposal should be rejected by the Commission. Additionally, this appears to be part of a hidden agenda advanced by the larger ESCOs to weed out the smaller ESCOs.

CASE 15-M-0127, et al.

### 7.  **ESCO Marketing practices**

### **(December 2016 Notice Questions 6 and 7)**

a.  ESCO Practices; Materials; Contracts; Scripts & Training Materials

The guidelines for ESCO marketing practices are explained in UBP §10. The Commission has, on several occasions, revised and strengthened those requirements in light of persistent abuses arising out of ESCO marketing.[96]  The Commission has taken a number of steps to address ESCO marketing abuses and, while the number of complaints has generally decreased, issues surrounding ESCO marketing practices continue to persist.  (Tr. 2102-2103, lns. 6-5; Tr. 3027-3028, lns. 20-5).  Marketing abuses, such as slamming and false representations regarding who the marketer represents or what the proposed products will actually provide, continue to drive a significant portion of customer complaints against ESCOs.  (Tr. 2105-2108, lns. 20-2). Additionally, a majority of such abuses arise out of direct door-to-door and telephonic marketing.  (Tr. 3027-3028, lns. 20-5; Tr. 3029, lns. 3-11).  ESCOs should therefore be prohibited from utilizing direct door-to-door, point of sale, telephonic sales, or similar marketing practices to enroll mass market customers.  Instead ESCOs' marketing practices should be limited to direct mail, electronic enrollments, or similar marketing channels whereby the consumer must respond and/or initiate direct contact with the ESCO.

### 8.  **Customer Information and Cyber Security**

### **(December 2016 Notice Question 6)**

As stated above, the Commission should require that the ESCOs ensure the protection of customer data, confidentiality, and cyber security by demonstrating compliance with UBP §4, and consistent with the National Institute of Standards and Technology Cyber Security Framework (NTS&TCS) (Tr. 2035-2036, lns. 22-12; Tr. 2188, lns. 9-16) or the applicable cyber security requirements of the North American Electric Reliability Corporation (NERC)(Tr. 2698-2700, lns. 9-3) as proposed in the

---

[96] See, e.g. February 2014 Order at 27-47.

CASE 15-M-0127, et al.

UBP, Section 12 (Exh. 724 (SP-11)).  The current UBP include protections against selling or otherwise improperly transferring customer information,[97] but does not address processes and procedures regarding cyber security necessary in the digital age where cyber security breaches have become more prevalent.  (Tr. 2187-2188, lns. 19-16).  No parties offered positions directly opposing the addition of cyber security requirements.

## 9.     **Purchase of Receivables and Billing Process**
### **(December 2016 Notice Question 8)**

a.     Purchase of Receivables

In the early stages of the retail markets, the Commission authorized utilities to purchase the ESCO accounts receivable in order to reduce ESCO operating costs, ensure that customers receive the full benefits of HEFPA, minimize the switching of payment-troubled customers back to full utility service, and further promote retail access migration.[98]  (Tr. 2053, lns. 4-14).  The Commission also noted that the purchase of receivables (POR) program would only be needed on a transitional basis to help jump-start the retail energy market, stating that "in the long run, ESCOs should no longer need the support of the utilities to provide customer care services, and should ultimately provide all customer services associated with the provision of commodity."[99]

Under the current POR construct, the utility purchases the ESCO receivables when they occur, at a discount (POR discount).  (Tr. 2053, lns. 16-18).  The discount amount varies by utility based on, among other things, the uncollectibles incurred by all of the ESCOs in that utility's service area.  (Tr. 2053, lns. 18-21).  Furthermore, the utilities purchase the ESCO receivables without recourse, which means that the utility cannot subsequently seek to collect from the ESCO any monies that it could not collect from the ESCO's customers.  (Tr. 2154-2155, lns. 17-3).  Pursuant to the rate plans of each utility, these POR discount rates are updated annually and are

---

[97]  See, UBP Section 4.

[98]  See, 2004 Policy Statement.

[99]  Id. at 16.

CASE 15-M-0127, et al.

composed of four components: (1) the uncollectibles discount rate; (2) the risk factor associated with the uncollectibles; (3) a credit and collections adder based upon forecasted POR receivables for the upcoming year; and, (4) a small administrative handling fee.  (Tr. 2155, lns. 11-19).

Question 8 of the December 2016 Notice asked "whether the Purchase of Receivables system for mass market customers should be modified in any way, including but not limited to, imposing 'purchase with recourse' provisions or tiered discount rates so that ESCOs with abusive practices bear more financial risk from such practices?"[100] GEE offers that the existing POR model should not be changed.  (Tr. 80, lns. 1-6).  GEE argues that modifying the POR system as proposed in the Staff testimony would subject ESCOs to additional costs in the form of "credit checks on customers, incremental credit and collection costs and the inability of ESCOs to pledge receivables to guaranty payments to utilities under gas retail choice programs."  (Tr. 81, lns. 14-17).  GEE also opines that if POR were eliminated, ESCOs would need to have the ability to terminate a customer's service for non-payment, and could also have a negative impact on competition by favoring larger ESCOs.  (Tr. 82-83, lns. 3-2).  Infinite Energy recommends eliminating POR altogether, requiring ESCOs to bear the costs.  (Tr. 642, lns 15-18).  RESA proposes modifications to the POR system to address the perverse incentive to engage in "distasteful business practices."  (Tr. 1197, lns. 1-11).  One such modification, RESA continues, would be the implementation of a "claw back" whereby, if an ESCO's bad debt exceeds a certain threshold, or the ESCO charges rates above a pre-determined pricing threshold, the ESCO would be charged the difference between the ESCO's actual bad debt, and the other pre-determined threshold.  (Tr. 1197-1198, lns. 11-6).  Other parties support reforms to the POR system, but provide no specific recommendations.  (See, Tr. 278, lns. 12-16).

The retail energy markets are now mature, albeit fundamentally flawed, steady state markets that are populated by a significant number of ESCOs that promote

---

[100]  December 2016 Notice at 6.

CASE 15-M-0127, et al.

themselves as well-established national providers of retail commodity services.  (Tr. 2156-2157, lns. 17-19).  Therefore, POR without recourse, using an overall ESCO uncollectible discount rate, is neither a necessary nor an appropriate mechanism to continue.  Moreover, POR without recourse can have potentially unfair effects on ESCOs and their customers because ESCOs with higher prices, and likely higher uncollectibles, are shielded from higher uncollectibles, while ESCOs with potentially lower prices and uncollectibles are paying an unnecessarily high POR discount rate to account for those higher uncollectibles.  (Tr. 2157-2158, lns. 19-2).  Accordingly, the Commission should direct the utilities to no longer provide the ESCOs the option of purchase of receivables without recourse.  Instead, the distribution utilities should be directed to provide ESCOs the option of purchase of receivables "with recourse."  Staff recognizes the complexities surrounding such a change and thus implementation of this new paradigm should be addressed with the parties, particularly the utilities.

      b.     <u>Billing Methodologies</u>

      1.     <u>Utility Consolidated Billing</u>

      As explained in detail in the Staff Policy Panel testimony, the Commission also directed the utilities to provide consolidated utility billing services (CUB) as an additional enticement to encourage ESCOs to participate in the developing market.  (Tr. 2051-2052, lns. 22-2).  CUB, which was enabled by Commission actions directing the utilities to completely unbundle their delivery and supply operations and bifurcate bills to separately show their unbundled delivery service and commodity supply service charges, allowed ESCOs to provide the utility with the customer's commodity charges to be separately identified on the customer's bill.  (Tr. 2052, lns. 2-10).  This lowered ESCOs' barrier to market entry, and greatly simplified their back office operational requirements.  Staff does not propose to eliminate CUB at this time, but recommends inclusion of a bill comparison on the customers' bill which will help to improve transparency for retail access customers.  The Commission should require that mass market ESCO customer

CASE 15-M-0127, et al.

bills include a "side-by-side" comparison showing the current bill charges and what the customer would have paid had they taken delivery and commodity from their utility.

2.    Dual Billing & Supplier Consolidated Billing

While we have no direct recommendations regarding changes to these billing model mechanisms at this time, though we expect that adoption of several of the recommendations of Staff and the proposals of other parties in these proceedings may impact these processes, and there may be a need to review these processes in Track II of this proceeding.

**10.    Customer Complaints**

**(December 2016 Notice Questions 1 and 14)**

A customer complaint regarding ESCO or utility services can be registered with the Department's Call Center via telephone, by email, fax, through the Commission's website, or in person.  (Tr. 2098-2099, lns. 22-3).  In the initial process, known as the Quick Resolution System, or QRS, Staff reviews the details of the concern to first determine if it falls within the Commission's jurisdiction and, if it does, a case is opened, the customer will receive a six-digit case number, and the concern is forwarded to the utility or ESCO for review and response.  (Tr. 2099, lns. 4-10).  If the customer is not satisfied with the utility or ESCO's response to their QRS concern, he or she will contact the Department again and, if appropriate, the concern is escalated to a complaint under the Standard Resolution System (SRS), which is the first step in the formal complaint process.  (Tr. 2099, lns. 10-16).  An escalated complaint requires a written response from the utility or ESCO, including what resolution will be offered, if any.  (Tr. 2099, lns. 16-20).

The Department's OCS compiles consumer complaint statistics monthly and these are publicly available on the Department's website.  (Tr. 2101, lns. 4-6).  The number of complaints is used as a performance indicator by which utilities are measured, and they are also tied to financial incentives.  The substance of a customer complaint is also evaluated for trends in utility activities that may require a more focused review.

CASE 15-M-0127, et al.

While ESCOs are not subject to financial adjustments predicated on the number of complaints, Staff does similarly review, document and track trends and the basis of consumer complaints about ESCO activities. (Tr. 2101).

Regarding ESCOs specifically, the Department's year-end complaint reports indicate a significant number of customer calls alleging deceptive marketing, by or on behalf of ESCOs.  For the years 2012 through 2016, the number of ESCO related complaints were: 322, 2,001, 2,510, 2,348 and 1,375 respectively.  (Tr. 2101-2102, lns. 16-6).  Similarly, the reports indicate that the Department registered 186, 289, 936, 1,076, and 664 escalated complaints for the years 2012 through 2016, respectively, about ESCOs.  (Id.).  In total, and on an equivalent per capita basis, the level of escalated complaints received by the Department concerning ESCOs during 2014 was several times the per capita escalated complaint rates of the combined gas and electric utilities, which also provide distribution and billing services, unlike the ESCOs.  (Tr. 2102, lns. 6-14; Exh. 612; Exh. 1123).  For 2015, the ESCO complaint rate per 100,000 customers rose to 5 times the comparable rate for the combined electric and gas utilities.  (see, Exh. 612).  This comparison modestly improved to 3.8 times the combined utilities complaint rate during 2016.  (see, Exh. 1123).

In summary, Staff remains concerned that despite the efforts to oversee and monitor ESCO activities and interactions with their customers, ESCOs have been unable to achieve the level of customer satisfaction that the regulated utilities are able to achieve.

The ESCOs generally characterize customer complaints against ESCOs as insignificant when compared to all initial complaints filed with the Commission.  Witness Sharfman claims that only 0.016 percent of customers filing complaints each month were ESCO customers.  (Tr. 404, lns. 10-14).  Mr. Lacey states that for 2016, the customer complaint rate for ESCOs is identical to the rate for utilities.  (Tr. 1097, lns. 13-16).  The Direct Energy Panel claims that Direct's customers (and two unspecified competitors) "show a high degree of satisfaction with the market." (Tr. 584, lns. 10-12).  Infinite Energy's witness Cook, however, acknowledges that although utility complaints have

-84-

CASE 15-M-0127, et al.

been stable on an annual basis, ESCO complaints have "skyrocketed" from one complaint per 1,000 in 2012 to one complaint per 390 customers in 2016.  (Tr. 655, lns. 8-13).

      The Commission should reject Direct's claim that its customers "show a high degree of satisfaction with the market" as satisfaction with the "market" and customer complaints about their commodity service, often due to marketing or pricing abuses, are not the same.  (Tr. 584, lns. 10-12).  The evidence shows that that for 2015, the ESCO complaint rate per 100,000 customers was five times that of the combination utilities (Exh. 612), and 3.8 times the combination utilities for 2016.  (Exh. 1123).

**11.**    **Transparency**

        **(December 2016 Notice Questions 16 and 17)**

      As stated in the Staff Panel testimony, one of the primary flaws with the current retail access markets for mass market customers is that they are not price transparent to customers.  (Tr. 2039, lns. 8-13).  Price and product transparency is the ability of the customer to know all of the bid prices and ask prices and trading quantities for given goods or services (such as electric and gas commodity) at any point in time, such that they cannot be misled by marketing claims.  A market where such information is not available or incomplete, is, by definition, less efficient as true and open competition is inhibited.  The Commission should recognize that as the retail markets are currently structured, mass market customers cannot make rational and fully informed decisions between commodity service from one of a number of ESCOs operating in the service territory, or the utility's default service, because the ESCOs are unwilling to provide the necessary information required to make a rational decision (Tr. 2081, lns. 10-20).  This is evidenced by the number of customers filing complaints with the Commission wherein they state that they were unaware of the rate they would pay for commodity after the ESCO's "teaser" rate expired, or that they were subject to aggressive marketing techniques (Tr. 2081, lns. 17-24; Tr. 2084, lns. 2-10; Tr. 2106-2107, lns. 13-17).

CASE 15-M-0127, et al.

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires (Tr. 2106-2107, lns. 13-7 and Tr. 2107-2108, lns. 16-2).  In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices (Tr. 2081, lns. 11-20).  Additionally, these problems would not occur if the ESCOs could not charge in excess of the utilities.

Price and product transparency is also an issue in the retail markets in situations where ESCOs bundle their commodity service with so-called energy-related value-added products, such as LED light bulbs, furnace maintenance plans, thermostats, and other products (Tr. 2084, lns. and Tr. 2114, lns. 23-24), where the incremental costs for those additional products are not disclosed.

The available data does, however, show that there was no significant (de minimis) real incremental value, or cost to the ESCO, associated with these products (Tr. 2116, lns. 4-18).  Through information requests propounded on the few ESCO parties to these proceedings (along with subpoenas to the non-party ESCOs), Staff attempted to obtain information from the ESCOs to identify the value (that is, the cost) of the value-added products they were providing to their customers, but that the ESCOs generally failed to provide data in response to DPS-ESCO 2 and 3 (Exh. 709 (SP-1); Exh. 710 (SP-1a); Exh. 711 (SP-1a Confidential)).; Tr. 2115-2116, lns. 10-11).  Those ESCOs that did provide substantive responses to DPS-ESCO 2 and 3 (Id.) did not provide Staff with data

CASE 15-M-0127, et al.

that could be used to perform a consistent analysis of the data among the ESCOs (Tr. 2116, lns. 2-4).

Thus, the cost incurred by the ESCOs in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs.  (Tr. 2116, lns. 12-18).  The $1.3 billion in charges over what these customers would have been charged had they taken default utility service cannot be explained away as the result of the costs incurred by the ESCOs to provide their customers with light bulbs and thermostats as "energy-related value-added products" (Tr. 2214, lns. 1-5; December 2016 Notice, at 7-8).  The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers.  (Tr. 2116, lns. 11-18).  These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market.  (Id.).  These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.  (Id.).

ESCOs also contend that their fixed-price offerings are "value-added" because these products guarantee that the customer will not be subject to the potential increase in commodity costs during the term of the agreement (Tr. 2063, lns. 10-13).  Of course, these products only offer price stability in the sense that customers know the rate they will be charged for the commodity itself over a fixed term.  A fixed-rate only provides "upside" protection if the commodity rate actually does rise above the fixed rate the ESCO offers; they do not provide any protection to customers if commodity prices go down ("downside protection").  While the Staff Panel acknowledges that fixed commodity prices might provide some de minimis incremental benefit to customers seeking to "fix" their commodity charges, that benefit is grossly outweighed by the fact

CASE 15-M-0127, et al.

that there is no downside protection for customers, that customer bills are still subject to fluctuations due to changes in customer usage patterns, and that the premiums charged customers to obtain this de minimis potential value are often unreasonable, as discussed below. Finally, customers can largely achieve the primary intent of the fixed price commodity option (levelized monthly billing) by using the budget billing that all utilities must offer to smooth and levelize the mass market customers' total commodity and delivery costs (their bills) over the year (Tr. 2084, lns. 19-24).

   The value of fixed-rate products is grossly overstated by the majority of ESCOs in their marketing, and does not provide the customer material "value" as the ESCOs claim. (Tr. 2132, lns. 1-14). In fact, while a few ESCOs charge a modest premium for their fixed price products, in the five to six percent range, the majority of ESCOs are charging premiums of 20 to 30 percent or more. (Id.). Since the utilities are required to offer budget billing programs, the monthly bill stability sought by some customers can be achieved without paying a premium over their otherwise available default and ESCO commodity options (Tr. 2132, lns. 14-24) and will further enable customers to realize the financial benefit when commodity prices do drop. Therefore, the Commission should not be distracted from implementing Staff's 12 recommendations by the prospect of potential energy-related value-added products offerings until all our recommendations have been implemented, and the ESCO mass markets have transitioned to the new paradigm we recommend (Tr. 2036-2037, lns. 20-10).

   The ESCOs see the current commodity mass market as transparent, although GEE's witness Lukas states that it has always been GEE's position that variable rate products are "most prone" to overcharges as they are not transparent. (Tr. 92, lns. 15-16). Mr. Kagan, testifying on behalf of Direct Energy, sees it differently and claims that ESCOs play a "critical role" in providing customers direct and transparent access to wholesale markets, and that the retail markets are transparent. (Tr. 161, lns. 15-16; Tr. 211, lns. 18-19). Mr. Sharfman, also testifying on behalf of Direct Energy, at least offers his definition of transparency, stating that the customer must know the price per unit of

CASE 15-M-0127, et al.

the commodity he or she is buying before receiving a bill.  (Tr. 363, lns. 1-3).  Sharfman does admit, however, later in his direct testimony, that longer term ESCO variable pricing offers may only show customers the price for the first month of the term, and so are less transparent.  (Tr. 366, lns. 4-6).  Mr. Lacey's, Mr. Lukas', and Dr. Cicchetti's testimony also claim that utility default service is not fully unbundled, therefore, consumers cannot be provided transparent price signals regarding the default service, and that delivery rates are inflated.  (Tr. 1210, lns. 15-16; Tr. 1255, lns. 8-11; Tr. 71-72, lns. 12-5; Tr. 690, no line numbers in this testimony).

The ESCOs hired witnesses did their best to dance around the fact that the retail markets are not transparent to customers, but even in their own pre-filed testimony, witnesses Lukas and Sharfman cannot ignore the reality of these markets and admit that variable priced ESCO commodity service is not transparent to customers.  Finally, the claims that the markets are not transparent because utility rates are not unbundled is simply incorrect, as explained in detail by the Staff Rates Panel.  (Tr. 3108-3120).  The ESCOs' proposals would raise delivery costs for customers, violate Commission regulations, and skew default delivery rates to make the ESCOs' rates appear to be lower. Thus, the ESCO claims that incomplete unbundling makes their commodity rates appear artificially high compared to the utility default rates is wrong and yet another effort by the ESCOs to explain away the $1.3 billion delta between their rates and the utilities' rates.

Finally, one recommendation that will help to improve transparency in the retail markets is inclusion of a comparison on the customer's bill.  The Commission should require mass market ESCO customer bills to include a comparison showing both the current charges with the ESCO, and what the customer would have paid had they taken delivery and commodity from their utility.  Such a comparison will assist customers in assessing whether the ESCO is living up to any promises of savings, or allow the customer to determine what premium they are paying for ESCO service.  Additionally, ESCOs that offer energy-related value-added products in the future should be required to

CASE 15-M-0127, <u>et al</u>.

disclose the price of that additional product on the customer bill, separate and apart from the price charged for commodity service.  Both recommendations will provide mass market ESCO customers with critical information right on their bill.

### Subsections III.C.12 – III.C.17 are not addressed in this brief.

These sections include: (1) Customer renewal process; (2) Customer shopping tools; (3) Customer choice; (4) Examples of competitive market frameworks in other states; (5) State agency & consumer advocacy group actions; and (6) Energy brokers.  Staff reserves the right to address these, and other points not addressed in this brief, in our reply brief.

CASE 15-M-0127, et al.

# IV.   CONCLUSION

The Commission should determine that the prices charged to residential and small commercial customers in the electric and gas mass markets are substantially higher than those charged by the utilities.  The ESCOs, NEMA and RESA seek to explain away this substantial difference by pointing to "value-added" services that they offer.  As Staff has proven, the tremendous difference in prices cannot be justified by light bulbs, thermostats, ridiculously high fixed-price offerings, "green" energy that is no more green than the energy provided by the utilities at a lower cost, and other "value-added" services and products.  Mass-market customers are in fact the victims of a failed market structure that has emboldened the ESCOs into taking advantage of customers trust in statements made to them by unscrupulous representatives of the ESCOs and marketing tricks, designed to obfuscate commodity prices to exact unconscionable commodity prices that are not just and reasonable.  Therefore, the Commission must take bold action to protect customers and ensure just and reasonable rates by either preventing the ESCOs' from using the utilities' systems to serve mass-market customers or fundamentally change the retail access requirements and rules in the manner proposed by Staff in this brief.

Respectfully Submitted,

F. THOMAS DWYER
STEVEN J. KRAMER

Staff Counsel