**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC, <br><br> Defendants. | No. 18 Civ. 2949 (ARR) (RER) |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

TABLE OF CONTENTS

**Page(s)**

Introduction ......................................................................................................................1

Factual Background ...........................................................................................................5

A.  The PSC deregulated the energy market and permitted ESCOs to set their own prices. ..........5

B.  Boris signs Susanna up for variable-rate electricity service with XOOM. ............................6

C.  Neither of the Mirkins ever had a natural gas contract with XOOM. ....................................8

D.  XOOM's rate-setting practices do not violate the 2013 Contract. ..........................................9

    1.  By necessity, rate-setting workbooks make predictions about the future that cannot reflect prior period adjustments or XOOM's ultimate costs. ........................................12

    2.  XOOM uses attrition rates and other considerations to account for other supply costs such as prior period adjustments. ................................................................13

    3.  XOOM adds a margin that incorporates prior period adjustments, balancing costs, and additional costs to provide energy to the customer. ....................................................15

E.  The Mirkins offer no evidence about the particular factors that influenced their variable rates, or for any particular variable rate set during the entire class period. ....................................16

Procedural History ...........................................................................................................17

Plaintiffs' Standard of Proof: Preponderance of the Evidence ....................................................18

Argument & Authorities: Certification is Inappropriate ............................................................18

A.  Ascertainability: The proposed class is improperly defined by subjective criteria. ...............19

B.  Commonality/Predominance: There is no classwide evidence of breach or damages. ...........20

    1.  Liability: The Mirkins offer no common evidence of XOOM's alleged breach. ..........21

    2.  Damages: The Mirkins' damages model does not match their liability theory. ............25

C.  Adequacy/Typicality: The Mirkins cannot represent the class because their claims are based on peculiar factual and legal foundations and seek to advance the Mirkins' personal interests at the expense of the class. .................................................................................................28

    1.  Boris has no contract, no standing, and is not a class member. ...................................28

    2.  Susanna was not subject to XOOM's natural gas pricing and is vulnerable to unique defenses. ...........................................................................................................31

D.  Superiority: A class action is not a superior method of deciding the Mirkins' case. ..............33

E.  The Mirkins' request for the Court to order notice to the class at XOOM's expense is premature and improper............................................................................................................33

Conclusion & Prayer ................................................................................................................34

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ackerman v. Coca-Cola Co.*,
No. 09 CV 395 DLI RML, 2013 WL 7044866 (E.D.N.Y. July 18, 2013)...........................33

*In re Beacon Assocs. Litig.*,
No. 09 CIV. 8362 LBS AJP, 2012 WL 1372145 (S.D.N.Y. Mar. 19, 2012) ........................29

*Bell v. Gateway Energy Servs. Corp.*,
No. 17-CV-3893 (KBF), 2017 WL 5956887 (S.D.N.Y. Nov. 29, 2017)........................27, 29

*Bell v. Gateway Energy Servs. Corp.*,
No. 31168/2018 (Rockland Cnty. Super. Ct. Sep. 13, 2018) ...................................5

*Benner v. Becton Dickinson & Co.*,
214 F.R.D. 157 (S.D.N.Y. 2003) ....................................................................30

*Bowling v. Johnson & Johnson*,
No. 17-CV-3982 (AJN) 2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019).........................28, 30

*Brecher v. Republic of Argentina*,
806 F.3d 22 (2d Cir. 2015) ...................................................................19, 20

*Cardona v. Maramont Corp.*,
43 Misc. 3d 1230(A), 993 N.Y.S.2d 643, 2014 WL 2558176 (N.Y. Sup. Ct. 2014)..................................................................................................4

*Cassese v. Washington Mut., Inc.*,
262 F.R.D. 179 (E.D.N.Y. 2009) ....................................................................29

*Comcast Corp. v. Behrend*
(133 S.Ct. 1426 [2013])..........................................................................4, 27

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...........................................................................21, 25, 26

*Dougan v. Sikorsky Airline Corp.*,
No. X03CV126033069, 2016 WL 921779 (Conn. Super. Ct. Feb. 11, 2016),
*vacated on other grounds*, 2017 WL 7806431 ...................................................4

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) .................................................................................33

*Gonzalez v. City of Waterbury*,
No. CIV A 306 CV 89 CFD, 2008 WL 747666 (D. Conn. Mar. 18, 2008) .........................28

iv

*In re IMAX Sec. Litig.*,
   272 F.R.D. 138 (S.D.N.Y. 2010) ..................................................................29

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ........................................................................18

*Johnson v. Nextel Commc'ns Inc.*,
   780 F.3d 128 (2d Cir. 2015) ......................................................................33

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ....................................................27, 32

*Lipstein v. UnitedHealth Grp.*,
   296 F.R.D. 279 (D.N.J. 2013) ....................................................................19

*Mai Nhia Thao v. Midland Nat. Life Ins. Co.*,
   549 F. App'x 534 (7th Cir. 2013) ..............................................................26

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................27

*Meimaris v. Royce*,
   No. 18CV04363GBDBCM, 2019 WL 5722130 (S.D.N.Y. Aug. 20, 2019) ..........27

*Michelman v. Clark-Schwebel Fiber Glass Corp.*,
   534 F.2d 1036 (2d Cir. 1976) ....................................................................24

*Mirkin v. Viridian Energy, Inc.*,
   No. 3:15-CV-1057 (SRU), 2016 WL 3661106 (D. Conn. July 5, 2016) ............32

*Mirkin v. XOOM Energy, LLC*,
   931 F.3d 173 (2d Cir. 2019) ..............................................................1, 4, 22

*In re Motors Liquidation Co.*,
   580 B.R. 319 (Bankr. S.D.N.Y. 2018) ........................................................28

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) ......................................................................31

*Perez v. Allstate Ins. Co.*,
   No. 11-CV-1812 JFB AKT, 2014 WL 4635745 (E.D.N.Y. Sept. 16, 2014) ........18

*In re Petrobas Sec.*,
   862 F.3d 250 (2d Cir. 2017) ..............................................................18, 21, 25

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
   No. 14-CV-10116 (VSB), 2020 WL 4699043 (S.D.N.Y. Aug. 12, 2020), *aff'd*
   2021 WL 4515256 (2d Cir. Oct. 4, 2021) ....................................................28

*Rambarran v. Dynamic Airways, LLC,*
    No. 14-CV-10138 KBF, 2015 WL 4523222 (S.D.N.Y. July 27, 2015)...........................18, 22

*Richards v. Direct Energy Servs., LLC,*
    915 F.3d 88 (2d Cir. 2019) ...................................................................... 5, 24, 31, 32

*Sicav v. James Jun Wang,*
    No. 12 CIV. 6682 PAE, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...........................22, 23

*Simmons v. Author Sols., LLC,*
    No. 13CV2801 DLC, 2015 WL 4002243 (S.D.N.Y. July 1, 2015)......................................20

*Union Grove Mill. & Mfg. Co. v. Faw,*
    426 S.E.2d 476 (N.C. Ct. App. 1993), *aff'd*, 436 S.E.2d 131 (N.C. 1993) ...........................30

*Wal–Mart Stores, Inc. v. Dukes*
    (131 S. Ct. 2541 [2011])......................................................................................4

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .......................................................................... 18, 20, 22, 25

**Rules**

Fed. R. Civ. P. 12(b)(6)'s ...........................................................................................22

Fed. R. Civ. P. 23 ...........................................................................................*passim*

Fed. R. Civ. P. 23(a) ........................................................................................... 18, 33

Fed. R. Civ. P. 23(a)(1)–(4) .......................................................................................18

Fed. R. Civ. P. 23(a)(2) .............................................................................................20

Fed. R. Civ. P. 23(b)(3) ..................................................................................... 18, 20, 33

Fed. R. Civ. P. 23(b)(3)(D)..........................................................................................33

Fed. R. Civ. P. 23(f) .................................................................................................33

**Other Authorities**

https://www.ca2.uscourts.gov/oral_arguments.html....................................................2, 26

Manual for Complex Litigation, Fourth, § 21.28 ...........................................................33

## INTRODUCTION

At the class certification stage, the Mirkins cannot rely on the presumption of truth that saved their complaint from dismissal. Instead, they have the burden to prove by a preponderance of the evidence that all of Rule 23's prerequisites are met. The Mirkins have not met that burden, so class certification should be denied.

"After years of extensive discovery," Class Cert. Mem. at 1, the Mirkins cannot substantiate their story of rates that "continued to rise even when the Market Supply Cost went down," *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 176 (2d Cir. 2019). That is because discovery proved the opposite. Without exception, the individuals who set XOOM's rates testified that supply costs were always the first and largest element of the standard variable rate. So, the claim that "XOOM completely ignored its own technical definition of 'supply costs' when setting rates" is false, Class Cert. Mem. at 2.

Likewise, the documentary evidence disproves the Mirkins' allegation that their rates were "untethered to" XOOM's supply costs, *id.* at 4. The evidence instead shows the two were closely related, always rising or falling together:



*See* Ex. A-1, Coleman Rpt. at 13 (comparing the Mirkins' rate to the cost estimates in XOOM's rate setting workbooks).

The Mirkins also have no evidence that XOOM's variable rate consisted of "outrageous profits." First Amended Complaint ("FAC") ¶ 62. Rather, discovery showed that the margin in XOOM's rate was used to make "prior period adjustments," was well below retail energy margins the Second Circuit has previously permitted, and covered other costs that the complaint acknowledged are proper. *See* FAC ¶ 77 (admitting that XOOM's contract included "'prior period adjustments, inventory and balancing costs'" in the variable rate); *id.* ¶ 54–55, Ex. 3 (including a "margin . . . to cover retailer fixed costs" in the Market Supply Cost the Mirkins created as a model of what they say was "required by the XOOM customer contract").

In short, discovery did not just fail to reveal evidence of wrongdoing—it confirmed that the Mirkins' rates were set precisely as the complaint (and the contract terms) said they should have been.

Given the disconnect between the allegations and the evidence, the Mirkins cannot support the story they told this Court or the Second Circuit. So, they offer evidence that tries to prove something else. The Mirkins' theory of breach is that XOOM's rates were not "based on its supply costs" because they did not "rise and fall" together, FAC ¶ 61, and that theory specifically permits XOOM to include a "substantial margin" in its rates. FAC ¶¶ 54–55. The Mirkins specifically admitted this point at oral argument in the Second Circuit, assuring the panel that they were "not taking the position that [XOOM is] not allowed a margin" and conceding that XOOM's rates did not have to be "identical to" its supply costs.[1]

But despite the Mirkins' unequivocal admission that XOOM is contractually allowed to include a margin in its rates, the Mirkins' experts—the same ones who created the Market Supply Cost **with a margin**—now say that XOOM is not allowed to include **any margin** in its variable

---

[1] https://www.ca2.uscourts.gov/oral_arguments.html (search for "Mirkin," listen at 2:31).

rate. Under that view and contrary to the Mirkins' express admissions in the complaint and at oral argument, XOOM cannot earn a profit, cover its fixed costs, or even make prior period adjustments. Rather, those experts say XOOM's contract required it to sell electricity and natural gas *at cost* (though they admit they lack the expertise to interpret the contract at all). They say it is no longer enough for XOOM's rates to rise and fall with costs—they must now equal them.

As XOOM will show in its summary judgment motion, the contractual interpretation advanced by the Mirkins' experts is both inadmissible and legally baseless, not to mention hopelessly inconsistent with the legal theories, factual allegations, and representations of counsel that allowed this case to survive dismissal. But for class certification purposes, the bigger problem is that the Mirkins' liability and damage models do not match their pleaded liability theory.

That problem manifests itself most clearly with respect to Rule 23's commonality and predominance requirements. The Mirkins claim they can satisfy those criteria because their experts can "detail what XOOM's actual supply costs are" and derive rates that are "based on the actual . . . terms" of XOOM's contracts. Class Cert. Mem. at 34. But the evidence tells a different story and shows the Mirkins' experts performed basic arithmetic to calculate the difference between XOOM's variable rates and an internal cost figure that estimates *some* of the costs described in the relevant contracts (like commodity costs) but not others (like prior period adjustments). The Mirkins' experts did not even try to account for supply costs like prior period adjustments, inventory, or balancing costs—much less the margin permitted by the contract and included in their own earlier Market Supply Cost. Accordingly, the Mirkins' evidence does not provide a common answer to the questions of breach or damages.

The Mirkins also fail to prove that they are typical and adequate class representatives. Here again, the evidence proves the opposite. Boris Mirkin is not even a class member or a party to a

3

contract with XOOM. So, his yet-to-be-articulated theory of recovery involves a highly individualized inquiry into the facts of his marriage with Susanna—an inquiry that cannot be repeated classwide. And while Susanna's individual claim is more straightforward, her evidence of typicality and adequacy is no stronger. With respect to natural gas customers, Susanna's claim is atypical because it is based on an entirely different set of supply costs that apply only to electricity. And with respect to the class as a whole, Susanna's typicality is undercut by her inability to offer any evidence that *her* rate "substantially exceeded" XOOM's cost or rose "when that cost fell," *Mirkin*, 931 F.3d at 176–77. Her adequacy is also undermined by her financial incentive to support Boris's invalid claim to the detriment of the class.

Despite these problems (along with additional problems of ascertainability, superiority, and class notice discussed below), the Mirkins ignore their burden and treat class certification as a foregone conclusion because they think this is "the type of case for which the class action device under Rule 23 was created." Class Cert. Mem. at 1. But even in cases involving uniform contracts, plaintiffs must satisfy all of Rule 23's requirements by a preponderance of the evidence. The Mirkins are not exempt from that burden simply because other plaintiffs have won class certification in cases involving different evidentiary records[2] or legal standards.[3] Rather, they must

---

[2] All four of the cases the Mirkins rely upon involved contracts that promised a "market" based rate and plaintiffs who offered the rates charged by other market participants as direct evidence of the "market" rate referenced in the contract. Here, by contrast, the Mirkins' evidence does not even try to measure supply costs like "prior period adjustments, inventory and balancing costs" expressly described in XOOM's contract.

[3] All but one of the ESCO class cases the Mirkins rely upon were rendered by New York or Connecticut courts that specifically rejected U.S. Supreme Court decisions that are binding on this Court. *See* Class Cert. Mem. at 3 n.2 (citing decisions by New York and Connecticut state courts); *see also Cardona v. Maramont Corp.*, 43 Misc. 3d 1230(A), 993 N.Y.S.2d 643, 2014 WL 2558176, at *12–13 (N.Y. Sup. Ct. 2014) (concluding that the decisions in "*Comcast Corp. v. Behrend* (133 S.Ct. 1426 [2013]) and *Wal–Mart Stores, Inc. v. Dukes* (131 S. Ct. 2541 [2011])" were "not controlling" in New York state court); *Dougan v. Sikorsky Airline Corp.*, No.

offer proof of their own. They have not done so, and class certification should be denied.

<u>FACTUAL BACKGROUND</u>

A.      **The PSC deregulated the energy market and permitted ESCOs to set their own prices.**

The New York Public Service Commission (the "PSC") deregulated the state's energy market in the late 1990s and early 2000s. Coleman Rpt. at 5–6. Before deregulation, utilities like ConEd, the Mirkins' utility, delivered and supplied electricity and natural gas at rates regulated by the PSC. *Id.* After deregulation, customers had the option to instead purchase electricity or natural gas supply from private, for-profit energy supply companies ("ESCOs") like XOOM. *Id.*

In this new market, the PSC specifically approved of sales agreements that offered a discounted introductory rate—what the Mirkins deride as a "teaser"—that transitioned to a standard rate when the discount expired:

> The offering of an introductory discount to attract customers into enrolling with a service provider is a common commercial vehicle deployed by many types of service providers, and customers are well aware of the fact that such discounts end after an introductory period[.]

Ex. A-4, 2005 PSC Order at 31–32. The PSC is not alone in this view. The Second Circuit said in an ESCO case that this is a "quotidian pricing practice[]" that has "long been mainstream across numerous sectors of American commerce." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 104 n.10 (2d Cir. 2019). So, the PSC decided ***not*** to "review [the] rates ESCOs charge or . . . to

---

X03CV126033069, 2016 WL 921779, at *3 (Conn. Super. Ct. Feb. 11, 2016) (finding that the Supreme Court's decision in "[*Dukes*] does not control" in Connecticut state court), *vacated on other grounds*, 2017 WL 7806431, at *7.

One of those cases is particularly irrelevant because the court had already dismissed the named plaintiff's claim for breach of contract, leaving only statutory claims based upon an extra-contractual statement. *See* Ex. A-3, *Bell v. Gateway Energy Servs. Corp.*, No. 31168/2018 at 19–25 (Rockland Cnty. Super. Ct. Sep. 13, 2018) (dismissing all of the plaintiff's contractual and quasi-contractual claims). Thus, *Bell* is irrelevant because it did not "address[] uniform breach of contract claims by New York customers like the Mirkins." Class Cert. Mem. at 3 n.3.

determine that their rates are just and reasonable" and left it to consumers to decide for themselves, "[u]pon conclusion of the introductory period, whether there are sufficient benefits to justify [their] continued participation in retail access or whether [they] should return to utility service[.]" 2005 PSC Order at 32 & n.8.

## B.    Boris signs Susanna up for variable-rate electricity service with XOOM.

The Mirkins' experience matches the PSC's expectations. Boris, who handles energy supply decisions in their household, shops around for energy rates.[4] *See* Ex. A-6, B. Mirkin Dep. 20:7–21:2; 21:8–24:24. When he did so in 2013, he saw XOOM's introductory rate was better than his current one. *See id.* at 25:6–13. Boris knew the rate would vary month-to-month and could be higher than his local utility. *See id.* at 27:19–23, 32:2–25. But he liked the introductory rate, so he signed Susanna up for electricity with XOOM. *See id.* at 25:8–13. XOOM then sent Susanna a contract (which the Mirkins call the "2013 Contract," Class Cert. Mem. at 1) that confirmed Boris's understanding that the rate could vary monthly and that savings were not guaranteed:

| XOOM SimpleFlex Variable Price Product | Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable.   Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs. You are responsible for all charges assessed and billed by your local utility for all applicable utility charges, which are not included in your rate. |

*   *   *

| Guaranteed Savings | There are no guaranteed savings in this Agreement at this time. |

Ex. 11 to Class Cert. Mem., 2013 Contract at 1; B. Mirkin Dep. 27:19–23 (testimony that Boris understood that his rate "could vary from month to month" because "[t]he contract said so").

---

[4] Susanna testified that she defers entirely to Boris on energy-related matters. *See* Ex. A-7, S. Mirkin Dep. 36:24–38:4, 40:11–41:3. She did not shop for rates, choose the plan type (fixed or variable), decide to switch, understand how XOOM's rates worked (or even that the rate was variable), or have any part in preparing the complaint. *See id.* at 57:16–58:21, 60:13–25, 69:9–18.

In Susanna's contract, XOOM also explained that her variable rate would be "based on XOOM's actual and estimated supply costs" and gave three examples of components included within those supply costs: "[1] prior period adjustments, [2] inventory and [3] balancing costs."[5] 2013 Contract at 1. The contract did not, however, say those components were the only ones that would influence Susanna's rate. Quite the opposite, the contract explicitly stated that its supply costs were "***not limited to***" the three listed examples, and the contract's agency provision explained that Susanna's rate would also include "market-based compensation" for the supply service XOOM was providing "on an arm's length basis":

> **AGENCY:** You hereby appoint XOOM Energy as agent for the purposes of (i) acquiring the supplies necessary to meet your electricity needs, and (ii) arranging, contracting for and administering transportation and related services over transmission facilities and those of the LDU needed to deliver electricity to your premises. These services are provided on an arm's length basis and market-based compensation is included in the price noted above.

*Id.* at 1–2.[6]

At all times, XOOM's pricing team used an Excel spreadsheet called the rate-setting workbook as the starting point for setting monthly rates. Each rate-setting workbook contains columns that list XOOM's then-current projections for certain supply cost components, which are tallied to show a cost total that XOOM used to help set rates.

And during the six months Susanna was a XOOM customer, XOOM's standard variable rates rose and fell with the supply costs estimated in the rate-setting workbooks (which XOOM's expert refers to as "COGS," or "costs of goods sold")—every month:

---

[5] The Mirkins point to a 2016 amendment to the 2013 Contract. But it is undisputed that the 2016 version is not the contract for any class member and is thus irrelevant. Class Cert. Mem. at 2. Moreover, the Mirkins cannot prove breach of the 2013 Contract through a later amendment. Their effort to do so speaks to their inability to prove breach of the relevant contract language.

[6] It is unclear why the Mirkins think this Agency provision is "irrelevant." Jan. 4, 2023 Letter, ECF No. 119 at 2. It describes the core of the parties' "arm's length" bargain—XOOM provides energy supply services to its customers, and its customers pay "market-based compensation" to XOOM. In addition to being expressly described in the 2013 Contract, that arrangement also serves as the foundation of the deregulated energy market.

| Month | Monthly Values (¢ / kWh) | | Changes in Monthly Values (¢ / kWh) | |
|---|---|---|---|---|
| | COGS | SimpleFlex Rate[31] | COGS | SimpleFlex Rate |
| Jun. 2013 | | 12.90 | | |
| Jul. 2013 | | 14.40 | | 1.50 |
| Aug. 2013 | | 14.90 | | 0.50 |
| Sep. 2013 | | 13.99 | | -0.91 |
| Oct. 2013 | | 14.90 | | 0.91 |
| Nov. 2013 | | 12.99 | | -1.91 |
| Correlation | | | 96.3% | |
| 99% CI | | | (-94.9% to 94.9%) | |
| P-Value | | | 0.24% | |

Coleman Rpt., Table 3 at 14. These facts directly contradict the complaint's allegations of a disconnect between costs and rates. In fact, the correlation between the supply costs and variable rates is so strong in these months that the probability that the two were not related is only 0.24%, which is less than 1 in 400. *See id.* In addition, the margin (of which profit is only a fraction, *see* Ex. A-11, Coppola Dep. 171:11–16) on these rates averages only ██—far from the "outrageous profits" alleged in the complaint.

During Susanna's time as a XOOM customer, Boris reviewed her bills and continued shopping for a better rate. *See* B. Mirkin Dep. 20:22–21:2, 30:2–4. When he found one in October 2013, he cancelled Susanna's contract without penalty and enrolled her with a competing ESCO. *See id.* at 38:15–40:9. That is how deregulated retail electricity service is designed to work, *see* 2005 PSC Order at 31–32.

## C.    Neither of the Mirkins ever had a natural gas contract with XOOM.

With respect to natural gas, the Mirkins never bought it from XOOM. Although the Mirkins gained class discovery about XOOM's natural gas customers by presenting Judge Reyes with a contract that supposedly "demonstrate[ed] that ***Plaintiff*** Boris Mirkin enrolled as a XOOM gas customer," ECF No. 64 at 2 (emphasis added), further discovery revealed ***Plaintiff*** Boris Mirkin never contracted with XOOM for anything. As the Mirkins have both now admitted, the Boris Mirkin listed on the contract presented to Judge Reyes is actually a "[d]istant relative" of the Boris

Mirkin who is a party to this case. B. Mirkin Dep. 19:12–20:5; S. Mirkin Dep. 34:13–36:5.

The Mirkins, of course, knew all along that Boris never signed up for natural gas service from XOOM. B. Mirkin Dep. 20:4–6. And while they were able to exploit that informational disparity to convince Judge Reyes that "there was a gas contract with Mr. Mirkin,"[7] Ex. A-5, Transcript of Motion to Compel Hearing at 16:7–9, they no longer contend that Boris was a natural gas customer. It is now undisputed that neither of the Mirkins ever had a contract with XOOM for natural gas supply service. B. Mirkin Dep. 19:4–20:6; S. Mirkin Dep. 34:10–37:10.

**D.    XOOM's rate-setting practices do not violate the 2013 Contract.**

Although the Mirkins claim that XOOM violated the 2013 Contract by setting rates "based on the arbitrary and ad hoc views of [its] employees," Class Cert. Mem. at 16, the evidence tells a different story. That evidence shows that various groups within XOOM met each month to conduct "rate-setting meetings" that set rates for a variety of fixed-rate and variable-rate products based on careful deliberation, discussion, and consideration of XOOM's supply costs. Ex. A-10, Park Dep. 32:10–19, 87:8–19 ("[W]e were doing . . . a hundred different markets and thousands of rates[.]"); Ex. A-8, Loehde Dep. 64:10–14, 69:6–14; Coppola Dep. 70:12–71:11, 184:14–20; Ex. A-13, Chidester Dep. 23:13–18. At those meetings, rates could be set for up to 20 markets and 1,000

---

[7] Judge Reyes drew this conclusion over XOOM's objection. XOOM explained at the motion to compel hearing that the complaint did not allege that Boris "actually signed up to receive natural gas," and XOOM's inability to find "billing data relating to Boris" left it "unclear whether or not . . . Boris paid anything" for his supposed natural gas supply service. *See* Transcript of Motion to Compel Hearing at 8:1–9:3.

This uncertainty prompted Judge Reyes to ask the Mirkins' counsel: "Does Boris have a gas contract with XOOM?" *Id.* at 10:8–9. Without equivocating, the Mirkins' counsel responded, "We have the contract that defendants produced," and represented that the contract included "***Boris' name***," "***his*** email address," and "***his*** phone number." *Id.* at 10:10–21 (emphasis added). Judge Reyes seemingly (and understandably) inferred that counsel was referring to ***Plaintiff*** Boris Mirkin and concluded that "there was a gas contract with Mr. Mirkin." *Id.* at 16:7–9. Judge Reyes then stopped XOOM's efforts to explain why its records did not necessarily show that Boris signed up for natural gas service and granted the motion to compel. *See id.* at 17:5–12.

different products, but not every product or market was covered at every meeting. *See* Loehde Dep. 64:10–14, 69:6–14, 158:6–159:9; Coppola Dep. 70:12–71:3.

To provide relevant information in a way that would apply to all the products that could be covered at a single meeting, XOOM's pricing team created the aforementioned rate-setting workbooks each month to aggregate data generated by pricing models that used information stored in XOOM's databases. *See, e.g.*, Ex. A-9, Loehde Corp. Dep. 186:20–23 ██████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████; Ex. A-8, Loehde Dep. 66:18–25 ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████; Coppola Dep. 263:4–16 ████████████████

████████████████████████████. As the workbook attached to the Mirkins' motion shows, a monthly workbook contains information about dozens of different fixed, variable, and introductory rates. *See, e.g.*, Ex. 26 to Class Cert. Mem., Exemplar Rate-Setting Workbook (rate-setting workbook listing data for 84 different products, including dozens of introductory and fixed rates that have "Intro" or "Lock" in the product name). For each product type and rate, the workbooks listed data about "Cost Components" like commodity charges and ancillary fees. *See, e.g., id.* (listing the same "Cost Components" for every product type, whether fixed, variable, or introductory). But, the rate-setting workbooks did not separately identify cost components that were only relevant to specific products. For example, the "[p]rior period adjustments" referenced in the 2013 Contract's definition of supply costs do not apply to fixed-rate products (since they are fixed). And for variable-rate products like the Mirkins', prior period adjustments were ████████████

██████████████████████████████████████████████████████████ Loehde Dep. 284:10–12. A partial example of a rate-setting workbook follows:





Ex. 26 to Class Cert. Mem., Exemplar Rate-Setting Workbook (split between columns 17 and 18 to fit vertically and redacted for confidentiality).

The Mirkins falsely claim that the decisions made at XOOM's monthly pricing meetings were based on "arbitrary and ad hoc views of employees" who "ignored [XOOM's] own technical definition of supply costs." Class Cert. Mem. at 2, 16. But the evidence—from the testimony of every witness the Mirkins deposed—showed that XOOM's unbroken practice was to treat its

11

expected "cost to delivery energy to the consumer" as the foundation of its "pricing methodology." Ex. A-12, Ulry Dep. 51:5–12, 68:13–69:3; Coppola Dep. 284:14–285:2 ("[T]he foundation of where pricing starts" and the "largest component" of XOOM's variable rate pricing "is the supply cost."); *see also id.* at 155:16–25, 175:7–14; Loehde Dep. 257:2–10; Loehde Corp. Dep. 289:9–290:12; Park Dep. 33:10–22, 34:20–35.

Indeed, without exception, the testimonial and documentary evidence shows that XOOM's standard variable rates were always determined by (1) starting with supply cost estimates made in rate-setting workbooks, (2) deciding whether prior period adjustments should be made to account for variations between previous supply cost estimates and the costs XOOM actually incurred, and (3) adding a margin that incorporated prior period adjustments, balancing costs, other costs to supply energy to the customer, and XOOM's profit.

> 1. *By necessity, rate-setting workbooks make predictions about the future that cannot reflect prior period adjustments or XOOM's ultimate costs.*

The fact that the 2013 Contract allows XOOM to charge a rate "based on XOOM's actual and estimated supply costs . . . includ[ing] but not limited to prior period adjustments, inventory and balancing costs" and "market-based compensation" for "services" to "meet [customers] electricity needs" dooms the Mirkins' claims. 2013 Contract at 1–2. So, they ignore many of those considerations and instead treat XOOM's rate-setting workbooks as a comprehensive statement of XOOM's "total actual supply costs" that capture all of the "actual and estimated supply costs" XOOM could consider when setting variable rates. The evidence, however, shows that the rate-setting workbooks were not designed to serve as XOOM's "technical definition of 'supply costs'" with respect to any particular product. Class Cert. Mem. at 2. Instead, they were a starting point for pricing that reflected the team's "best estimate" of what XOOM's supply costs would be in the upcoming month. Loehde Dep. 59:11-18; *see also id.* at 56:7–16. The future is uncertain when it

12

comes to issues like customer usage, weather, market conditions, and other variables that can impact costs. So, those estimates were an "an educated guess" as to what XOOM's ultimate costs would be on variable-rate products. Park Dep. 152:7-15; *see also* Coppola Dep. 43:3–9.

The cost projections in the rate-setting workbooks for variable-rate products are necessarily an estimate (at least in part) because it is "setting a rate for the future for energy that hasn't yet [been] consumed that [XOOM is] not buying yet. And only for one month." Park Dep. 80:15–82:18; Loehde Dep. 53:9–20 (noting that variable rate is based on "forward-looking information from one month"). Given that it is inherently uncertain, there is "more variability, more risk" in pricing a variable rate product. Park Dep. 80:15-81:2. Indeed, every month, XOOM would estimate costs for, among other things, ███████████████████████████████████

████████████████████████████████████████████████████████████████

███████████. Park Dep. 120:18-125:24; *see also* Coleman Rpt. at 22. The problem with the Mirkins' theory is that it treats a subset of costs as the totality of and final word on XOOM's "estimated and actual supply costs" because the rate-setting workbook adds them together in a "Total" column. But the workbook never purports to account for other supply costs, which "include but [are] not [ ] limited to prior period adjustments, inventory and balancing costs." 2013 Contract at 1.

2.  *XOOM uses attrition rates and other considerations to account for other supply costs such as prior period adjustments.*

From the starting point provided by the rate-setting workbooks, XOOM considered a number of additional data points at the rate-setting meetings. However, not all of those factors were relevant to XOOM's ***variable*** rates. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Loehde Dep. 76:24–

13

77:9, 136:22–137:4, 61:21–62:3, 77:11–22, 79:2–12, 82:10–20, 83:8–84:8; Park Dep. 83:7–84:10, 107:16–108:2 █████████████████████████████████████████████████████████. █████████████████████████████████████████████████. Likewise, █████████████████████████████████████. █████████████████████████████████████████████████████████. ██████████ Loehde Dep. 80:4–9; Park Dep. 98:16–99:19 (same).

████████████████████████████████████████████████████████. ████████████████████████████████████████████████████████. ██████████████████████████████████████. *See, e.g.*, Loehde Dep. 85:12–22 █████. ████████████████████████████████████████████████████████. ████████████████████████████████████████████████████████. ████████████. ████████████████████████████████████████████████████████.

████████████████████. *See* Loehde Dep. 209:11–20; Ulry Dep. 76:12–77:23, 78:11–79:13, 82:15–19, 85:7–17; Coppola Dep. 169:4–170:7 ██████████████████████████. ████████████████████████████████████████████████████████; *see also* Ex. A-2, Coleman Rebuttal Rpt. at 8–9 ████████████████████████████████████████████. ██████████████████████████████████████.

██████████████████████████████████████. ████████████████████████████████████████████████████████. ████████████████████████████████████████████████████████. ████████████. Loehde Dep. 85:23–87:9; *see also* Coppola Dep. 155:16–25, 170:12–19 █████. ████████████████████████████████████████████████████████. Instead,

14

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████   Loehde Dep. 85:23–87:9.

3.   *XOOM adds a margin that incorporates prior period adjustments, balancing costs, and additional costs to provide energy to the customer.*

After considering the relevant data, XOOM added a margin to the costs listed in the rate-setting workbooks to "create[ ] the final rate" for a given product. Park Dep. 34:20–35:8. However, that margin was based on the cost factors considered and decisions made by the rate setting team, and it was not pure "profit" as the Mirkins suggest. Coppola Dep. 172:24–173:11 ("[N]o, margin is not exclusively related to profit."). Rather, in the context of XOOM's rate-setting procedures, the term "margin" referred to an "adder" that encompassed any cost factors not reflected in the rate-setting workbooks. Coppola Dep. 172:4–5, 21–23 ("[A] margin is an adder that can be characterized as a margin, as an adder."); *see also id.* at 172:21–23 ("[A] margin is an adder. It's a margin over something."). The margin includes not just profit and fixed costs, but also prior period adjustments, balancing costs, and other costs to supply energy to the customer for which XOOM is permitted to charge "market-based compensation."

The Mirkins wrongly claim that since prior period adjustments were not specifically listed in the rate-setting workbooks they were never considered, Class Cert. Mem. at 18. But it is undisputed that ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. *See* Loehde Dep. 51:4–14, 71:3–23, 139:6–23, 251:6–22; Loehde Corp. Dep. 284:3–22; Coppola Dep. 169:4–170:7, 171:25–172:23, 285:19–25; Ulry Dep. 78:11–79:13, 82:15–19, 85:7–17. XOOM's historical rates show that to be true. *See* Coleman Rebuttal Rpt. at 6–10.



████████████████████████████████████ Coppola Dep. 171:11–172:17, ████████

███████████████████████████████████ Loehde Dep. 213:23–214:2.

Indeed, ██████████████████████████████████████████████████

████████████████████████████████ Coppola Dep. 248:21–24.

Finally, depending on the product, the margin could also include ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Park Dep. 44:15–45:11, 80:5–81:15; *see also* Loehde Corp. Dep. 90:5–91:14 ████████

███████████████████████; Coppola Dep. 280:23–81:9 ████████████████

██████. These are costs for services "necessary to meet [customers] electricity needs" that "are

provided on an arm's length basis and market-based compensation is included" for such services

in the variable "price[.]" 2013 Contract at 2.

**E.** **The Mirkins offer no evidence about the particular factors that influenced their variable rates, or for any particular variable rate set during the entire class period.**

Again, the Mirkins are wrong to suggest that the cost components tallied in the rate-setting

workbooks are "XOOM's own . . . technical definition of 'supply costs'" within the meaning of

the 2013 Contract. And even if they were, the evidence proves XOOM considered them carefully

and based its rates on them (in part). But the supply cost definition is in the contract itself, and

specifically includes other supply costs that are ***not*** listed as cost-components in the rate-setting

workbooks: "XOOM's actual and estimated supply costs . . . may ***include but not be limited to***

***prior period adjustments, inventory and balancing costs***." 2013 Contract at 1 (emphasis added).

To be clear, the rate-setting workbook's supply cost components are essential to XOOM's

pricing process—XOOM used their cost total as the starting point for its rate-setting methodology.

But the 2013 Contract expressly permits XOOM to build upon that foundation with a margin that

accounts for other components of costs like "prior period adjustments, inventory and balancing costs" and "market-based compensation" for the "services" XOOM provided in order to fill its customers' energy needs. *See* 2013 Contract at 1–2.

For these reasons, the Mirkins' assertion that XOOM's variable rate margins were composed ***entirely*** of "elements not related to XOOM's supply costs, such as XOOM's profit goals, utility rates, competitive intelligence, and attrition" is demonstrably false. Ex. 3 to Class Cert. Mem., Pls.' Expert Rpt. ¶ 53. Not only were utility rates and competitive intelligence not considered when setting variable rates, *see supra* at pp. 10–16, the Mirkins offer no evidence that XOOM included ***any*** of those things as a direct component of its variable rates as opposed to data points XOOM considered to inform decisions regarding elements like "prior period adjustments" and "market-based compensation" that directly factor into XOOM's variable rate. 2013 Contract at 1–2.

## PROCEDURAL HISTORY

The Mirkins initially filed suit in state court on April 18, 2018, and the case was timely removed to this Court. *See* ECF No. 1. The Mirkins alleged that XOOM's variable rate was higher than the "Market Supply Cost" their expert estimated, including a margin. *See* ECF No. 1-3 ¶¶ 47–49. XOOM moved to dismiss, *see* ECF No. 19, and the Court granted the motion because Susanna's contract did not promise a rate that would correspond to the Market Supply Cost. *See* ECF No. 24 at 8–19.

The Second Circuit affirmed dismissal of the Mirkins' implied covenant and unjust enrichment claims, but reversed with respect to the contract claim. *See* ECF No. 40 at 3, 9. The Mirkins now seek class certification on that claim with respect to a class of "New York XOOM

residential or small commercial customers" who received similar contracts and were charged a variable rate for electricity or natural gas. Class Cert. Mem. at 7.

### PLAINTIFFS' STANDARD OF PROOF: PREPONDERANCE OF THE EVIDENCE

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule" and must "prove that there are [] sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)*. The analysis is "rigorous" and frequently entails "overlap with the merits of" plaintiffs' claims. *Id.* Regardless of any such overlap, the burden rests squarely on Plaintiffs to prove, by a preponderance of the evidence, that all Rule 23 requirements are met. *See In re Petrobas Sec.*, 862 F.3d 250, 260 (2d Cir. 2017); *see also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."); *Perez v. Allstate Ins. Co.*, No. 11-CV-1812 JFB AKT, 2014 WL 4635745, at *12 (E.D.N.Y. Sept. 16, 2014) (same). They fail to do so.

### ARGUMENT & AUTHORITIES: CERTIFICATION IS INAPPROPRIATE

The Mirkins "seek certification under Rule 23(b)(3)," Class Cert. Mem. at 24. So, they must meet Rule 23(a)'s requirements of numerosity, commonality, typicality and adequacy, as well as Rule 23(b)(3)'s predominance and superiority requirements. *See* Fed. R. Civ. P. 23(a)(1)– (4). Failure to establish even one of these requirements precludes class certification, and "[c]ourts in this Circuit have consistently denied class certification motions where the party seeking certification failed to present sufficient evidence as to one or more Rule 23 elements." *Rambarran v. Dynamic Airways, LLC*, No. 14-CV-10138 KBF, 2015 WL 4523222, at *4 (S.D.N.Y. July 27, 2015). The Court should do the same here because the Mirkins failed to prove ascertainability,

commonality, predominance, typicality, adequacy, and superiority.

**A.**     **Ascertainability: The proposed class is improperly defined by subjective criteria.**

The Mirkins' fail at the outset with their proposed class definition, which does not satisfy Rule 23's ascertainability requirement. That requirement precludes class certification unless "the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). To prove ascertainability, it is necessary (though not always sufficient) for the class to be defined by reference to "objective criteria" that "establish the definite boundaries of a readily identifiable class." *Id.* at 25. But instead, the Mirkins propose a class definition that uses a subjective criterion to identify the class members:

> All New York XOOM residential or small commercial customers who were charged a variable rate for electricity or natural gas under the operative 2013 XOOM New York variable rate contract *or its equivalent language* at any time from January 1, 2013 through and including the date of judgment.

Class Cert. Mem. at 7 (emphasis added). The reference to contracts with "equivalent language" is subjective on its face, and the Mirkins offer no objective way to determine whether a contract's language is equivalent to or distinguishable from the 2013 Contract. *See Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 291 (D.N.J. 2013) ("A 'similarity' restriction presents its own problems, because a determination of similarity would not be based on objective criteria . . . . Determining the degree of similarity . . . would require a textual analysis of each specific plan, making the class not *readily* ascertainable."). Indeed, outside of the proposed class definition, the Mirkins never refer to contracts with "equivalent language" at all.

In theory, the ascertainability problem might have been avoided if the Mirkins had not included "or its equivalent language" in the definition. But such a revision would not solve the other fatal Rule 23 problems discussed below, and any definition change proposed in the Mirkins'

19

reply would require more briefing on the new definition. *See, e.g.*, *Simmons v. Author Sols., LLC*, No. 13CV2801 DLC, 2015 WL 4002243, at *4 n.4 (S.D.N.Y. July 1, 2015) (noting that it was necessary to "granted leave to file a sur-reply" in opposition to a class certification motion so that there would be "at least one round of adversarial briefing on the class definitions set forth in plaintiffs' reply"). And if the Mirkins stand by their proposed definition and suggest that the Court can determine at a later date whether a potential class member's contract is "equivalent" to or distinguishable from the 2013 Contract, they will be calling for "the kind of individualized mini-hearings that run contrary to the principle of ascertainability" and will "raise[] the specter of one-way intervention that motivated the 1966 amendments to Rule 23." *Brecher*, 806 F.3d at 26.

Class certification should be denied because defining a class in terms of "*subjective* criteria [is] inappropriate" and destroys ascertainability. *Id.* at 25 n.1.

**B.    Commonality/Predominance: There is no classwide evidence of breach or damages.**

Moving beyond the class definition, the Mirkins fail to satisfy Rule 23's commonality and predominance requirements. Those requirements impose a two-tiered burden that ensures a plaintiff's claims are sufficiently cohesive to merit class treatment. A plaintiff must first cross Rule 23(a)(2)'s commonality threshold by showing that the class members' claims all "depend upon a common contention" such that "determination of [that contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "What matters to class certification is not the raising of common 'questions'—even in droves—but rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (cleaned up).

And proving commonality is just the first step. Plaintiffs seeking certification under Rule 23(b)(3) must then demonstrate that "common questions" not only exist, but will "predominate

over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). This predominance requirement is "'far more demanding'" than commonality, and it "is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *In re Petrobras*, 862 F.3d at 270. Rather, the Court must take a "close look" at the plaintiff's case to assess predominance, even when doing so "requires inquiry into the merits of the claim." *Comcast*, 569 U.S. at 34, 35.

With respect to both commonality and predominance, the Mirkins identify two common questions that will supposedly predominate over any individual ones: breach and damages. *See* Class Cert. Mem. at 26 (proposing "whether XOOM failed to set rates in accord with 2013 Contract" and "[d]eterminations regarding the proper measure of damages" as common questions); *id.* at 32–36 (claiming that common questions of liability and damages will predominate). But their evidence shows the Mirkins have no method for answering these questions on a classwide basis.

### 1. Liability: The Mirkins offer no common evidence of XOOM's alleged breach.

The Mirkins' complaint accuses XOOM of "breach[ing] its contract with New York customers by charging variable rates not based on the factors specified in the customer agreements," FAC ¶ 71(a)— "i.e., 'XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments.'" FAC ¶¶ 77, 79. To support that breach theory, the Mirkins must supply at least two data points for each putative class member for each month of the class period: (1) the "actual and estimated supply costs" including but not limited to "prior period adjustments, inventory and balancing costs" applicable to that customer, and (2) the rate that customer was charged. Otherwise, a factfinder will have no way of knowing if a given customer's rate was based on the costs referenced in the contract.

The complaint alleges both data points in a chart that includes "the variable rates XOOM charged [the Mirkins]," and a "Market Supply Cost" that includes a margin and supposedly "corresponds to a rate that reflects 'actual and estimated supply costs,' as required by the XOOM customer contract." FAC ¶ 54. Applying Rule 12(b)(6)'s presumption of truth and drawing every reasonable inference in the Mirkins' favor, the Second Circuit determined that a comparison of those two data points was "sufficient to state a claim for breach of contract" because "XOOM's rates" allegedly "showed significant upward deviations from the Market Supply Cost and continued to rise even when that cost fell." *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177 (2d Cir. 2019). But the Mirkins can no longer rely on Rule 12(b)(6)'s lax standard. In ruling on a motion for class certification, the Court is not required or permitted to blindly credit the complaint's "estimate[s]" of the generic "costs of a retailer supplying a residential customer" or their claim that those estimates "correspond[] to a rate that reflects" the supply described in the 2013 Contract, including "prior period adjustments" and "balancing costs." FAC ¶¶ 54, 55.

Instead, the Mirkins now bear the burden to submit "enough evidence—by affidavits, documents, or testimony—to [show] by a preponderance of the evidence," *Rambarran*, 2015 WL 4523222, at *4, that XOOM's alleged breach can be proven "in one stroke," *Dukes*, 564 U.S. at 350. That showing requires data establishing what the total "estimated and actual supply costs" were—including "prior period adjustments," "balancing costs," and "market-based compensation"—for the rates charged to every class member. Otherwise, the factfinder is left with no point of reference to assess whether a particular class member's rate for a particular billing period was based on supply costs. *Sicav v. James Jun Wang*, No. 12 CIV. 6682 PAE, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) ("[P]laintiffs have not shown or explained, concretely, how damages would be calculated as to any individual purchaser."). And while XOOM's workbooks

are certainly vital to its rate-setting process and serve as the foundation for estimating XOOM's supply costs, the workbooks' "Total" column does not capture XOOM's other supply costs such as "prior period adjustments" or "balancing costs." *See supra* at pp. 10–16. Nor do they capture XOOM's market-based compensation for providing energy-related services. *See id.* The Mirkins do not offer a way to measure those factors.

The Mirkins try to provide a reference point with the testimony of energy economists who supposedly "calculated and analyzed [XOOM's] supply costs." *See* Class Cert. Mem. at 33. But they do not support that claim with evidence. And these experts directly refute the notion that they can "detail what XOOM's actual supply costs are." *Compare* Class Cert. Mem. At 34, *with* Pls.' Expert Rpt. ¶ 23(i) ("It is not in our scope to validate the data provided in discovery, including the accuracy of the costs reported [in the rate-setting workbooks]."). Indeed, the Mirkins' experts do not try to determine what the prior period adjustments, inventory, balancing costs, or the "market-based compensation" were at any relevant time—all of which are pricing components identified in the 2013 Contract. Instead, they take the "Total" column from XOOM's rate-setting workbooks and treat it as a stand-in for the "prior period adjustments, inventory[,] . . . balancing costs," and other actual and estimated supply costs referenced in the contract. *See* Pls.' Expert Rpt. ¶ 23(i).

The problem with that approach is that the cost components in the rate-setting workbooks do not—and are not designed to—reflect ***all*** the supply costs referenced in the 2013 Contract. Rather, those components are meant to serve as a "starting point" that XOOM can build upon at rate-setting meetings. Coppola Dep. 279:7–80:1; *see supra* Factual Background Part D. But as the Mirkins acknowledge in their evidence and arguments, that "starting point" figure does not account for all of the supply costs the variable rate was based upon:

> While the [rate-setting workbooks] do contain elements that build up to what they call "Total Cost," they never calculate XOOM's total estimated or actual costs

accounting for prior period adjustments, inventory, and balancing costs as provided in the Sales Agreements.

Pls.' Expert Rpt. ¶ 47; *see also* Class Cert. Mem. at 18 ("[T]he rate-setting workbooks do not anywhere identify any prior period adjustments or balancing costs, both of which were supply cost categories identified in the contract at issue here."). Thus, it is not possible for the Mirkins' experts or a factfinder to quantify what the "actual and estimated supply costs" were at any relevant time by looking solely at the cost components in the rate-setting workbooks.

To cover this gap in their evidence, the Mirkins pretend that XOOM was required to ignore prior period adjustments, market-based compensation, and other components specifically identified in the 2013 Contract and instead set rates based exclusively upon the costs listed in rate-setting workbooks. But that approach provides no support for the Mirkins' theory of breach. If a class were certified and the case tried, the factfinder would not be asked whether XOOM's variable rates exceeded the costs described in the rate-setting workbooks; it would have to determine whether XOOM's rates were based on its "actual and estimated supply costs," which again includes, but is not limited to, prior period adjustments, balancing costs, and market-based compensation.[8] And because the Mirkins bear the burden of proof with respect to breach, the factfinder could not simply assume without evidence that the "Total" column in the rate-setting workbooks reflects all of the supply costs referenced in the 2013 Contract. *Michelman v. Clark-*

---

[8] The Mirkins' experts apparently think otherwise and believe that a rate is automatically "contrary to" the 2013 Contract if it exceeds "the total costs" figure contained in a rate-setting workbook. *See* Pls.' Expert Rpt. ¶ 51. However, as the Second Circuit noted in another case involving the Mirkins' experts, that belief about what the 2013 Contract required "adds nothing" to the Mirkins' claim because (1) the Mirkins' experts expressly "declin[ed] to offer an opinion on how the [2013 Contract] should be interpreted," and (2) an experts' belief about what a contract permits is "irrelevant . . . because the construction of unambiguous contract terms is strictly a judicial function." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98 (2d Cir. 2019) (quotations omitted); *see also* Ex. A-14, Adamson Dep. 102:6–16 (testimony confirming that the Mirkins' experts are "not offering a legal interpretation" of "XOOM's contract language").

*Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir. 1976) (noting that "the finder of fact" cannot "return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial"). Instead, the factfinder could only draw inferences supported by ***evidence***, and the undisputed evidence shows that XOOM's variable rates included prior period adjustments and other appropriate supply costs that were not captured in the rate-setting workbooks—but ***were*** identified in the 2013 Contract. *See, e.g.*, Loehde Corp. Dep. 284:8–22 ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████; Loehde Dep. 251:6–22.

In assessing commonality and predominance, the "capacity of a class-wide proceeding to generate common ***answers***" is "[w]hat matters to class certification." *Dukes*, 564 U.S. at 350. As discussed, the Mirkins' evidence does not permit a class-wide answer to the common question of XOOM's alleged breach, much less that breach can be assessed in a manner that satisfies the "'far more demanding'" predominance standard. *In re Petrobras*, 862 F.3d at 270.

    2.    *Damages: The Mirkins' damages model does not match their liability theory.*

Even if the Mirkins could prove liability (they cannot), they would still have to prove damages. And if a class were certified, they would have to prove damages with a model that "measure[s] ***only*** those damages attributable to" their theory of liability. *Comcast*, 569 U.S. at 35. Without such a model, the Mirkins "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes" of commonality and predominance. *Id.*

The Mirkins offer no such model. The Mirkins offer a pair of damage models that treat ***any*** rate higher than the costs reflected in the rate-setting workbooks as an impermissible

"overcharge."[9] *See* Pls.' Expert Rpt. ¶ 64. This model bears no relationship to the liability theory that survived dismissal after the Mirkins included a margin in their ad hoc "Market Supply Cost," *see* FAC ¶ 55, and assured the Second Circuit they were "not taking the position that [XOOM is] not allowed a margin."[10] And even setting that problem aside, the Mirkins' damage model unquestionably fails to account for the contractually specified supply costs like prior period adjustments (although they are certainly not "limited" to the supply costs listed). Accordingly, it is not a viable option for "the translation of the [Mirkins'] *legal theory*" of breach "into an analysis of the economic impact *of that*" breach. *Comcast*, 569 U.S. at 38.

A perfect example of how the Mirkins' damages model fails to analyze the economic impact of XOOM's alleged breach is the 2014 polar vortex. ██████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████. Loehde Dep. 85:23–87:9, 209:11–20; Coppola Dep. 155:16–25, 170:12–19; Ulry Dep. 76:12–77:23. Yet,

---

[9] The Mirkins' alternative model performs the same arithmetic but takes an extra step to reduce the alleged "overcharge" by an amount that supposedly "allows XOOM a margin over Total Cost that equates to the fixed rate margin applied to its fixed rate customers." Pls.' Expert Rpt. ¶ 73. Not only does this ignore the fundamental differences between fixed-rate and variable-rate products, Park Dep. 80:7–82:18; Coppola Dep. 89:10–17; Loehde Dep. 53:9–20, 118:15–23, 160:22–161:5, 221:24–222:9, neither the Mirkins nor their experts contend that the 2013 Contract requires XOOM to set rates that include a margin equal to its fixed-rate products. Indeed, such a position would confirm that "based on" is not "exclusive[]," *Mai Nhia Thao v. Midland Nat. Life Ins. Co.*, 549 F. App'x 534, 537 (7th Cir. 2013), and that all that is required is that XOOM's variable rate has "some relationship to [its] supply costs" as the Mirkins represented in the Second Circuit, *see* https://www.ca2.uscourts.gov/oral_arguments.html. In any case, this alternative suffers from the same defect as the Mirkins' primary model: it makes no attempt to measure the difference between a rate based on XOOM's "actual and estimated supply costs" including "prior period adjustments" and "balancing costs" and XOOM's actual variable rates.

[10] This assurance was made after Judge Pooler noted that XOOM is "allowed to achieve a profit" profit and asked, "Aren't they allowed a margin, over and above these costs?" The exchange began approximately two minutes and twenty seconds into the oral argument recording posted on the Second Circuits website. *See* https://www.ca2.uscourts.gov/oral_arguments.html.

according to the Mirkins' theory, ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████, XOOM violated the 2013 Contract and overcharged its customers.[11] That is nonsense. The 2013 Contract did not say: XOOM's rates will be set to match the cost components stated in the "Total" column of XOOM's rate-setting workbooks to the exclusion of all supply costs and considerations. And it certainly did not ***require*** XOOM to pass along massive cost increases during a severe winter storm.

Accordingly, the Mirkins' failure to attempt quantifying what their rate would have been if it was based on "actual and estimated supply costs" including "prior period adjustments" and "balancing costs" (as opposed to the cost components in the rate-setting workbooks) is fatal to class certification for the reasons discussed in *Comcast*.

---

[11] Of course, the Mirkins were only XOOM customers for six months in 2013, five of which they paid variable rates, making them poor class representatives to explain how XOOM's pricing practices were supposedly improper during the 2014 polar vortex or any other future event that justifiably raised XOOM's costs. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 538 (S.D.N.Y. 2018) ("[T]he record strongly supports a finding of conflicts between class members in the context of this action, as a named plaintiff has incentive to establish trader-based manipulation only on days when it held trading positions that would have been harmed by that manipulation.").[12] It is clear, for example, that Boris cannot claim standing simply because Susanna incurred charges that impacted their shared finances. *See Bell v. Gateway Energy Servs. Corp.*, No. 17-CV-3893 (KBF), 2017 WL 5956887, at *1 n.1 (S.D.N.Y. Nov. 29, 2017) (concluding that "there can be no doubt that" a plaintiff had "no standing" when his "sole connection to the case [was] his marriage to" another plaintiff who had a contract with an ESCO); *Meimaris v. Royce*, No. 18CV04363GBDBCM, 2019 WL 5722130, at *13 (S.D.N.Y. Aug. 20, 2019) ("Many—indeed, most [spouses]—are financially and emotionally affected, for good or for ill, by the rise or fall of the other spouse's financial fortunes. It is well-settled, however, that this commonplace reality does not automatically give wives (or husbands) standing to sue for economic injuries allegedly inflicted on their marital partners."), *report and recommendation adopted,* No. 18CIV4363GBDBCM, 2019 WL 4673572 (S.D.N.Y. Sept. 25, 2019), *aff'd,* No. 19-3339-CV, 2021 WL 5170725 (2d Cir. Nov. 8, 2021). Likewise, Boris cannot enforce the 2013 contract as a third-party beneficiary because North Carolina law, which governs the 2013 Contract, does not allow such claims "when the contract is not made for the direct benefit of the third party and any benefit accruing to him is incidental." *Union Grove Mill. & Mfg. Co. v. Faw*, 426 S.E.2d 476, 479 (N.C. Ct. App. 1993), *aff'd*, 436 S.E.2d 131 (N.C. 1993).

**C.**  **Adequacy/Typicality: The Mirkins cannot represent the class because their claims are based on peculiar factual and legal foundations and seek to advance the Mirkins' personal interests at the expense of the class.**

The Mirkins' next failure involves Rule 23's adequacy and typicality requirements. These requirements focus on the Mirkins themselves, and they "tend to merge because they serve as guideposts for determining whether the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will "be fairly and adequately protected in their absence." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 143 (S.D.N.Y. 2010). To satisfy these requirements, the Mirkins must demonstrate not only that their claims arise "from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability," *Gonzalez v. City of Waterbury*, No. CIV A 306 CV 89 CFD, 2008 WL 747666, at *2 (D. Conn. Mar. 18, 2008) (cleaned up), but also that they are not "subject to unique defenses which threaten to become the focus of the litigation," *Bowling v. Johnson & Johnson*, No. 17-CV-3982 (AJN), 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019).

*1.   Boris has no contract, no standing, and is not a class member.*

To show typicality, the Mirkins argue that they and the putative class "were commonly bound by a Sales Agreement . . . that XOOM distributed to Class Members" and that they would "make the same legal arguments to prove Defendants' liability." Class Cert. Mem. at 28. With respect to Boris, those assertions are false: he ***never*** had a contract with XOOM, *see* B. Mirkin Dep. 19:12–20:6, 27:12–19, and his most recent pre-motion letter shows that his legal arguments will be markedly different from those of the class, *see* Doc. 119 at 3 (arguing that Boris is a "proper plaintiff" because he was "the primary decision-maker regarding the Mirkins' energy supply," the one who handles bills, and the one who signed Susanna up for a contract with XOOM). These peculiar aspects of Boris's claim disqualify him as a class representative for three reasons.

First, Boris lacks individual standing because he is not a party to a contract with XOOM and XOOM never charged him any amount for electricity or natural gas. *See Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, No. 14-CV-10116 (VSB), 2020 WL 4699043, at *4 (S.D.N.Y. Aug. 12, 2020) (holding that plaintiffs "lacked Article III standing to bring breach of contract claims in the absence of a valid assignment" when they were nonparties who "simply had no contract rights to vindicate"), *aff'd* 2021 WL 4515256 (2d Cir. Oct. 4, 2021); *In re Motors Liquidation Co.*, 580 B.R. 319, 342 (Bankr. S.D.N.Y. 2018) ("Non-parties to a contract ordinarily do not have a "'concrete and particularized injury.'"). On its own, that lack of standing disqualifies Boris as a class representative. *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) ("[A] plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him." (cleaned up)); *Cassese v. Washington Mut., Inc.*, 262 F.R.D. 179, 184 (E.D.N.Y. 2009) ("[A] class action plaintiff does not have standing to sue defendants for a breach of contract to which the plaintiff was not a party.").

Second, Boris is not even a member of the proposed class. This is not happenstance, but a result his counsel's voluntary decision to limit the proposed class to XOOM "customers who were charged a variable rate under" a contract with XOOM. Class Cert. Mem. at 7. That definition excludes Boris because he was never charged a variable rate under any contract with XOOM, and Boris cannot represent a class of which he is not a member. *See In re Beacon Assocs. Litig.*, No. 09 CIV. 8362 LBS AJP, 2012 WL 1372145, at *3 (S.D.N.Y. Mar. 19, 2012) ("In order to have standing to represent a class certified under Rule 23, a class representative must be part of the class." (cleaned up)).

And finally, Boris's peculiar situation requires different legal arguments than other class members would make. Unlike customers had contracts with XOOM and incurred charges under

those contracts, Boris will have to articulate some legal theory that would allow him to sue for a charge under a contract to which he is not party and never incurred a charge. Based on his latest pre-motion letter (which simply provides details about Boris's marital relationship with Susanna, *see* Doc. 119 at 3), he cannot do so.[12]

Nor will these problems be solved if Boris can manage to articulate ***some*** legal argument to justify his standing and ability to sue for breach of Susanna's contract. If such an argument exists, it will be based on the unique details of Boris's marital relationship to Susanna. Such an argument cannot possibly be generalized to the class without demanding similarly particularized inquiries into the individual circumstances of countless class members.

The Mirkins do not acknowledge the problems of including people like Boris in the class, so they do not even attempt to identify any "similar legal arguments to prove [XOOM's] liability" that would work for both Boris and putative class members. Class Cert. Mem. at 28. Accordingly, the Mirkins fail to demonstrate that Boris can satisfy typicality or adequacy. *See Bowling,* 2019 WL 1760162, at *7 (concluding that "typicality and adequacy" were not satisfied by a plaintiff

---

[12] It is clear, for example, that Boris cannot claim standing simply because Susanna incurred charges that impacted their shared finances. *See Bell v. Gateway Energy Servs. Corp.*, No. 17-CV-3893 (KBF), 2017 WL 5956887, at *1 n.1 (S.D.N.Y. Nov. 29, 2017) (concluding that "there can be no doubt that" a plaintiff had "no standing" when his "sole connection to the case [was] his marriage to" another plaintiff who had a contract with an ESCO); *Meimaris v. Royce*, No. 18CV04363GBDBCM, 2019 WL 5722130, at *13 (S.D.N.Y. Aug. 20, 2019) ("Many—indeed, most [spouses]—are financially and emotionally affected, for good or for ill, by the rise or fall of the other spouse's financial fortunes. It is well-settled, however, that this commonplace reality does not automatically give wives (or husbands) standing to sue for economic injuries allegedly inflicted on their marital partners."), *report and recommendation adopted,* No. 18CIV4363GBDBCM, 2019 WL 4673572 (S.D.N.Y. Sept. 25, 2019), *aff'd,* No. 19-3339-CV, 2021 WL 5170725 (2d Cir. Nov. 8, 2021). Likewise, Boris cannot enforce the 2013 contract as a third-party beneficiary because North Carolina law, which governs the 2013 Contract, does not allow such claims "when the contract is not made for the direct benefit of the third party and any benefit accruing to him is incidental." *Union Grove Mill. & Mfg. Co. v. Faw*, 426 S.E.2d 476, 479 (N.C. Ct. App. 1993), *aff'd*, 436 S.E.2d 131 (N.C. 1993).

who was subject to a defense that was "'meritorious enough to require . . . considerable time'" to rebut and there were "credible concerns" about whether the plaintiff purchased the product at issue (cleaned up)); *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 167 (S.D.N.Y. 2003) (typicality was lacking because the "named plaintiffs' legal arguments [would] be dissimilar to" the class).

> 2. *Susanna was not subject to XOOM's natural gas pricing and is vulnerable to unique defenses.*

Like Boris, Susanna never had a natural gas contract with XOOM and never incurred any charges for natural gas. While that fact does not cause **individual** standing problems for Susanna like those faced by Boris, it does implicate her typicality and **class** standing to represent a class of natural gas customers because XOOM's natural gas rates are based on an entirely different set of supply costs than those that apply to electricity. *See* Coleman Rpt. 21–23; *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 163 (2d Cir. 2012) ("[W]hile the alleged injury suffered by each Offering's Certificate-holder may 'flow from' the same Shelf Registration Statement[,] each of those alleged injuries has the potential to be very different—and could turn on very different proof."). And while that problem could be solved by limiting the class to electricity customers, Susanna faces other problems of typicality and adequacy that preclude class certification altogether.

Beginning with typicality, Susanna offers no evidence that her claims are typical of the unidentified class members who "were charged prices that were 'substantially higher and untethered to [XOOM's] supply costs,'" much less that her rates were "exorbitant and unconscionable." Class Cert. Mem. at 4 (quoting FAC ¶¶ 21, 58). Indeed, the evidence shows Susanna's experience was the opposite—her rate rose and fell in tandem with the cost components in the rate-setting workbooks, and the margin built into that rate never approached the retail energy margins the Second Circuit has already endorsed. *Compare, e.g.*, Coleman Rpt. at 13–14

31

(illustrating how Susanna's rate tracked the costs reflected in XOOM's rate-setting workbooks and the margin was on average ███████████████), *with Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 95 (2d Cir. 2019) (affirming summary judgment on claims challenging electricity rates that were "about 75% higher than" another ESCO's alleged "procurement costs"). And again, because the Mirkins' experts ignored supply costs like prior period adjustments that were included in XOOM's margins but not listed as cost components in rate-setting workbooks, Susanna has no evidence that the modest margins included in her rate were made up in any part of "non-supply cost criteria," Class Cert. Mem. at 1, as opposed to admittedly proper supply costs like prior period adjustments. *See* 2013 Contract at 1–2. Thus, even if the Mirkins could prove that *some* class members could state a claim under the legal theory that survived dismissal, Susanna would "not be a proper plaintiff" to pursue that theory. *Richards*, 915 F.3d at 100.

Nor would Susanna be an adequate class representative. As already discussed, Boris's attempt to recover damages under Susanna's contract creates individualized issues that would doom class certification even if the Mirkins could solve their other problems of commonality, predominance, superiority, and ascertainability. But despite that risk, Susanna has shown no sign that she will oppose Boris's claim. That approach cannot possibly benefit the class, but could advance Susanna's individual interests: Susanna supported a similar claim by Boris in another class action, doubling the Mirkins' total recovery when the case was settled. *See* S. Mirkin Dep. 76:24–77:4 (testifying that the Mirkins received $10,000 *each* when a previous class involving Susanna's electricity contract action was settled); *Mirkin v. Viridian Energy, Inc.*, No. 3:15-CV-1057 (SRU), 2016 WL 3661106, at *2, *2 n.4 (D. Conn. July 5, 2016) (noting that the Mirkins' claims against another ESCO were based on a contract to which only Susanna was a party). In cases involving the "potential conflict" posed by a close friendship between a class representative

and class counsel, courts have held that the relationship can "render a named plaintiff an inadequate class representative" out of concerns that the representative might "permit a settlement less favorable to the interests of absent class members." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 565 (S.D.N.Y. 2018). Here, the conflict is far greater, as Susanna's continued support of Boris's antagonistic claims may benefit her household finances but cannot possibly be in the best interest of the putative class.

Accordingly, Susanna does not satisfy typicality or adequacy.

**D.    Superiority: A class action is not a superior method of deciding the Mirkins' case.**

For reasons already discussed, the Mirkins have failed to demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Even if the Mirkins had satisfied Rule 23's other prerequisites, the problems with their liability theory, damage model, and individual claims would pose insurmountable "difficulties in managing a class action" based on the Mirkins' claims and evidence. Fed. R. Civ. P. 23(b)(3)(D); *Ackerman v. Coca-Cola Co.*, No. 09 CV 395 DLI RML, 2013 WL 7044866, at *21 (E.D.N.Y. July 18, 2013) ("[P]laintiffs have failed to sustain their burden of establishing the manageability of the classes because they have not presented a class-wide damages model that can be used based on common proof, or a reliable method of distributing damages to putative class members."). So, "[u]nder the circumstances of this case" and "even assuming arguendo that . . . the requirements of Rule 23(a)" were met, the Mirkins fail to satisfy the "superiority criteria of Rule 23(b)(3)." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 140 (2d Cir. 2015).

**E.    The Mirkins' request for the Court to order notice to the class at XOOM's expense is premature and improper.**

As an afterthought, the Mirkins ask the Court to direct that class notification be made at XOOM's expense. Class Cert. Mem. at 38. Aside from being premature, that request provides no

justification for deviating from "[t]he usual rule . . . that a plaintiff must initially bear the cost of notice to the class." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). Issues concerning notice should be addressed, if at all, when any appeal taken under Rule 23(f) has run its course. *See* Manual for Complex Litigation, Fourth, § 21.28 (noting that when an certification order is appealed under Rule 23(f), "the district court should ordinarily stay the dissemination of class notice to avoid the confusion and the substantial expense of renotification that may result from appellate reversal or modification after notice dissemination"). Of course, here, the Mirkins' request for class certification should be denied. So, the issue of class notification expenses need not be reached at all.

## CONCLUSION & PRAYER

For these reasons, XOOM respectfully requests that the Mirkins' motion for class certification be denied in full.

Dated: February 3, 2023

MCDOWELL HETHERINGTON LLP

*/s/ Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.
Diane S. Wizig (admitted *pro hac vice*)
James M. Chambers (admitted *pro hac vice*)
David L. Villarreal (admitted *pro hac vice*)
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
james.chambers@mhllp.com
david.villarreal@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on the 3rd day of February, 2023 via email on all counsel of record.

<u>/s/*Michael D. Matthews, Jr.*</u>
Michael D. Matthews, Jr.