# MDM Declaration Exhibit A-04

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

CASE 05-M-0858 – In the Matter of State-Wide Energy Services Company Referral Programs.

CASE 05-M-0332 – In the Matter of Central Hudson Gas & Electric Corporation's Plan to Foster the Development of Retail Energy Markets.

ORDER ADOPTING ESCO REFERRAL PROGRAM GUIDELINES AND
APPROVING AN ESCO REFERRAL PROGRAM SUBJECT TO MODIFICATIONS

Issued and Effective:  December 22, 2005

CASES 05-M-0858 and 05-M-0332

## TABLE OF CONTENTS

Page

BACKGROUND...................................................1

POSITIONS OF THE PARTIES....................................4

Initial Comments...........................................4

     A.  Central Hudson....................................4

     B.  ConEd/O&R.........................................5

     C.  CE Solutions.....................................6

     D.  CPB..............................................7

     E.  Constellation....................................8

     F.  Direct Energy....................................8

     G.  ENX/NSI..........................................8

     H.  KeySpan..........................................9

     I.  MXE..............................................9

     J.  NEM..............................................9

     K.  NFG.............................................10

     L.  NFR.............................................11

     M.  NYSEG/RG&E.......................................12

     N.  Niagara Mohawk...................................13

     O.  PULP.............................................15

     P.  SCMC.............................................16

     Q.  Select...........................................18

     R.  USES.............................................18

CASES 05-M-0858 and 05-M-0332

<u>TABLE OF CONTENTS</u> (Cont'd)

<u>Page</u>

Reply Comments.............................................19

     A.  Central Hudson...................................19

     B.  ConEd/O&R........................................19

     C.  CPB.............................................20

     D.  Direct Energy...................................21

     E.  NEM.............................................22

     F.  NFG.............................................22

     G.  NYSEG/RG&E......................................23

     H.  Niagara Mohawk..................................23

     I.  PULP............................................24

     J.  SCMC............................................24

THE ESCO REFERRAL PROGRAM GUIDELINES.......................26

Introduction..............................................26

Referral Program Guideline Proposals......................27

     A.  The O&R Model...................................27

     B.  The Notice Model................................29

     C.  SCMC's Principles...............................30

     D.  PULP's Principles...............................30

     E.  The NYSEG/RG&E and PULP
        Referral Program Arguments......................31

CASES 05-M-0858 and 05-M-0332

TABLE OF CONTENTS (Cont'd)

Page

Revising the Guidelines..............................33

A.   The Two Referral Program Options...................33

B.   The Final Guidelines..............................34

     1.   Continuation of Direct Enrollment............35

     2.   Referral Program Enrollment..................35

     3.   Selection of an ESCO.........................36

     4.   Contract Formation...........................37

     5.   The Remaining Proposed Guidelines............38

     6.   Additional Guideline Principles..............40

C.   Other Referral Program Proposals..................41

OPPOSITION TO THE INTRODUCTION
 OF COMPETITIVE MARKETS...................................42

A.   Introduction......................................42

B.   The Benefits of Competitive Markets...............43

C.   Statutory Authority...............................46

D.   Anti-Trust Issues.................................46

     1.   PULP's Policy Arguments......................46

     2.   Price Fixing Under
           the Anti-Trust Laws.........................49

     3.   The State Action Doctrines...................52

     4.   The Donnelly Act.............................55

     5.   The Noerr-Pennington Doctrine................57

E.   Conclusion........................................57

CASES 05-M-0858 and 05-M-0332

TABLE OF CONTENTS (Cont'd)

                                                                    Page

CENTRAL HUDSON'S ESCO REFERRAL PROGRAM.......................58

        A.   Central Hudson's Filing.......................58

        B.   Central Hudson's Program......................58

        C.   Approval of the Program.......................60

             1.   The Discount.............................60

             2.   Enrollment..............................62

             3.   Consumer Protection Measures............62

             4.   UBP Waivers.............................63

     D.   Conclusion........................................65

FURTHER PROCEEDINGS.........................................65

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service
Commission held in the City of
New York on December 14, 2005

COMMISSIONERS PRESENT:

William M. Flynn, Chairman
Thomas J. Dunleavy
Leonard A. Weiss
Neal N. Galvin
Patricia L. Acampora

CASE 05-M-0858 – In the Matter of State-Wide Energy Services
Company Referral Programs.

CASE 05-M-0332 – In the Matter of Central Hudson Gas & Electric
Corporation's Plan to Foster the Development of
Retail Energy Markets.

ORDER ADOPTING ESCO REFERRAL PROGRAM GUIDELINES AND
APPROVING AN ESCO REFERRAL PROGRAM SUBJECT TO MODIFICATIONS

(Issued and Effective December 22, 2005)

BY THE COMMISSION:

<u>BACKGROUND</u>

In the Statement of Policy on Further Steps Toward
Competition in Retail Energy Markets, issued August 25, 2004 in
Case 00-M-0504 (Policy Statement on Retail Markets), it was
decided that the development of retail markets for energy supply
could be encouraged through the deployment of transitional
mechanisms.  Among those interim steps were specific proposals
to facilitate the movement of customers from utility commodity
supply to taking commodity supply from alternative energy
providers like energy services companies (ESCOs).  One of the
most successful strategies for encouraging customer movement has
been implemented at Orange & Rockland Utilities, Inc. (O&R),

CASES 05-M-0858 and 05-M-0332

where the utility assists customers in exploring the benefits of retail access by referring them to ESCOs.

Under O&R's current Power Switch and predecessor Switch and Save programs for ESCO referrals and customer discounts (ESCO Referral Program), O&R offers customers telephoning its call center with a non-emergency inquiry the opportunity to enroll with ESCOs that offer a uniform discount to the price of utility energy commodity service over an introductory trial period of two months.  Customers that do not request enrollment with a particular ESCO are assigned at random;[1] they are queued and referred to an ESCO drawn, on a rotating basis, from the list of ESCOs participating in the program.

Other features of the O&R program include, in addition to call center enrollment, the enrolling of customers through the Internet and the mail (the customer completes and returns a postcard form to the utility).  Promptly following enrollment, the utility sends the customer a letter advising it of the enrollment and the ESCO to which it has been assigned.  Thereafter, the ESCO establishes a relationship with the customer or the customer can opt to return to utility commodity service.  O&R also has engaged in extensive outreach and education efforts directed towards encouraging customers to participate in the program.

In a Notice Soliciting Comments (the Notice) issued July 26, 2005 in Case 05-M-0858, however, it was suggested that establishing uniform state-wide conditions for the design of ESCO Referral programs might better promote customer migration while protecting consumer interests.  An alternative to the O&R

---

[1]  Prior to the Power Switch upgrade of the program, customer enrollment was restricted to the random assignment process.

CASES 05-M-0858 and 05-M-0332

model for ESCO referral programs was therefore presented in the Notice; the alternative would be implemented in conformance with proposed Guidelines (attached at Appendix A).

Under the Notice model, customers enrolling in a referral program would be required to affirmatively choose a specific ESCO, and each participating ESCO would individually set the level of discount and length of introductory period it would offer.  Utilities would be compelled to act as agents for ESCOs in enrolling customers.  A standard sales agreement would govern the relationship between all ESCOs and customers participating in a program.  After the introductory period ends, that contract would provide for a month-to-month term and an "open price," allowing the ESCO to modify the price upon notice to the customer.

Initial and reply comments on the proposed Notice model and its Guidelines were solicited.  Moreover, notice was published in the State Register on August 10, 2005, in conformance with State Administrative Procedure Act (SAPA) §202(1).  The SAPA §202(1)(a)(ii) comment period expired on September 26, 2005.  The parties that responded to the notices are listed, with abbreviations, and their comments are summarized, below.

Moreover, Central Hudson Gas & Electric Corporation (Central Hudson) has proposed an ESCO referral program, in conformance with its plans for promoting retail access that were approved in the Central Hudson Retail Order.[2]  In compliance with the Order, Central Hudson had discussed the details of implementing an ESCO Referral Program extensively in collaboration with other parties.  In a filing dated

---

[2]  Case 05-M-0332, supra, Order Accepting Retail Access Plan, Modifying Rate Plan, and Establishing Further Procedures (issued June 1, 2005).

CASES 05-M-0858 and 05-M-0332


September 6, 2005, it presented its specific ESCO Referral
Program, and asked that the program be approved, so that it
could take effect on December 1, 2005.

<u>POSITIONS OF THE PARTIES</u>

<u>Initial Comments</u>

    A.  <u>Central Hudson</u>

        Agreeing with the principle, expressed in the Notice,
that ESCO Referral Programs are a valuable interim approach to
promoting competition, Central Hudson asks for immediate
approval of its program, developed prior to issuance of the
Notice.  Central Hudson would not await the outcome of the
Notice proceeding, which could take months.

        Criticizing several of the Notice Guidelines, Central
Hudson complains that, if the uniform discount feature of the
program were eliminated, it would be difficult for utility call
center personnel to explain a multi-discount program to
inquiring customers.  It also notes that a uniform discount is
needed to ensure that the program creates benefits sufficient to
attract customer participation.  The utility sees an additional
obstacle to effective operation of its call centers if, instead
of random assignment of customers to ESCOs, each customer is
required to select an ESCO, because customers will hesitate to
choose among ESCOs in a phone conversation.

        Concerned that the standard sales agreement proposed
in the Notice is too complex, Central Hudson recommends that the
contract be re-worded in plain language.  The utility recommends
specific changes on the timing of a customer's cancellation
notice, the effective date of cancellation, the process ESCOs
follow in making price changes, and contract assignment.

        Central Hudson opposes the provision of the Notice
requiring utilities to act as agents for ESCOs, contending that
compelling an agency relationship is inconsistent with the

CASES 05-M-0858 and 05-M-0332

voluntary framework of New York agency law.  An agent, the utility adds, is a fiduciary, a role utilities cannot play for ESCOs because utilities compete with ESCOs in the same markets, and for a utility to act as a fiduciary to each ESCO is impossible when there might be incompatible interests among ESCOs.

If a state-wide approach to referral program is adopted, Central Hudson proposes that the program be implemented through funding from the Systems Benefit Charge (SBC).  The SBC funds would be used to establish an independent call center that would administer a state-wide program.

B.  ConEd/O&R

Consolidated Edison Company of New York, Inc. (Con Edison) and Orange and Rockland Utilities, Inc. (collectively, ConEd/O&R) report they remain committed to working diligently with interested parties on developing an ESCO Referral Program. The utilities, however, believe the O&R model facilitated customer movement by enabling consumers to swiftly and easily decide to participate in retail access.  The Notice model, the utilities maintain, does not replicate the simplicity of the O&R model.

Criticizing the proposed enrollment process, ConEd/O&R assert that requiring customers to select a particular ESCO will require utility personnel to undertake costly and confusing efforts to assist customers in making the selection.  The utilities protest that, contrary to Notice model requirements, they should not be responsible for ensuring that a customer is provided with a copy of the ESCO's terms and conditions, along with the opportunity to rescind the agreement within a three-day period, because the ESCO should undertake those responsibilities.

CASES 05-M-0858 and 05-M-0332

ConEd/O&R also complain that the Notice misstates Uniform Business Practices (UBP) requirements, by forcing utilities to offer prospective ESCO customers three methods of enrollment, when the UBP allows the ESCO to choose among the three methods.[3]  The utilities see other inconsistencies between the proposed Guidelines and the UBP and maintain that the UBP should be clarified or revised where appropriate.

Commenting in detail on the standard sales agreement, ConEd/O&R point out areas of inconsistency with the UBP and with utility billing and operating agreements with ESCOs.  The utilities maintain that re-wording is needed to clarify the introductory period term, the cancellation provisions, notice periods, various billing and payment provisions and the point of delivery for gas service.  They add that unless the contract highlights that its "open price" term allows ESCOs to effectuate a change to the contract price upon notice, the utilities are likely to see customer complaints about price increases.

C.  CE Solutions

Consolidated Edison Solutions, Inc. (CE Solutions) commends the O&R model as highly successful, and joins in the criticisms of the Notice model's features.  If a program does not provide for random assignment of customers to ESCOs, CE Solutions argues, a customer benefit -- ease of choice -- is lost.  Substituting varying discounts for the uniform discount during the introductory period, CE Solutions warns, is disadvantageous, because customer confusion will increase and customers choosing the largest initial discount are likely to see the highest subsequent price increases.

---

[3]  The most recent version of the UBP is set forth in Case 98-M-1343, Retail Access Business Rules, Order on Petitions for Rehearing and Clarification (issued July 15, 2004) and Errata Notice (issued August 2, 2004).

CASES 05-M-0858 and 05-M-0332

    D.   CPB

        Agreeing that ESCO Referral Programs are a valuable interim approach for promoting competition, the Consumer Protection Board (CPB) cautions that such programs must be properly designed to ensure that they yield the benefits intended.  CPB would also provide for the sunset of the referral programs, because they are intended as an interim measure.

        Informed customer choice, CPB insists, is a crucial feature of referral programs.  It therefore supports the enrollment and notification procedures provided for in the Notice, but joins in ConEd/O&R's critique of the "open price" term.  As to the discount, CPB would require uniformity in the form of a minimum 5% discount.  It believes that minimum is necessary for the program to yield benefits sufficient to attract consumers.  CPB would, however, permit ESCOs to offer a greater discount and to modify their offers periodically.

        Opposing requiring consumers to select an ESCO if they do not desire to do so, CPB explains that the requirement will compel customers to make the selection without sufficient information, or will bias their selection, such as favoring an ESCO as a result of its alphabetic position on the ESCO list.  CPB supports a random assignment process, with customers expressing a preference allowed to select a particular ESCO.

        CPB proffers several proposed modifications to the standard sales agreement.  It would modify the notice of cancellation provisions to make them consistent with existing requirements; modify the dispute resolution procedures to provide customers with information on filing a complaint with the Commission; require affirmative consent to changes in contract terms; and, eliminate unnecessary wording.

CASES 05-M-0858 and 05-M-0332

    E.  <u>Constellation</u>

       Constellation New Energy, Inc. (Constellation) supports requiring consistency among ESCO Referral Programs, but fears that the Notice approach would threaten the viability of those programs.  It joins SCMC's recommendations for modifying the Notice model and in criticisms of the theory that a utility should act as an agent for ESCOs.

    F.  <u>Direct Energy</u>

       While Direct Energy, Inc. (Direct Energy) favors a state-wide referral program, it joins in recommending rejection of the Notice model.  It believes complexities inherent in that model will greatly complicate utility call center operations, making it unlikely that utilities can effectively implement the program.  Those complexities, Direct Energy maintains, will similarly deter customers from participating.

       Direct Energy also claims that the Notice program is unattractive to ESCOs because, with the elimination of the uniform discount, they must arrive at and advertise their own discounts.  If they err by selecting a discount that is too low, they will not acquire new customers and their participation in the program will be effectively nullified.

    G.  <u>ENX/NSI</u>

       Energetix, Inc. and NYSEG Solutions, Inc. (collectively, ENX/NSI) criticize several features of the Notice model, including compelling utilities to act as agents for ESCOs.  ENX/NSI is also concerned that, under the Notice model, customers might be left with the mistaken impression that withdrawal during the introductory period will be effective immediately, when EDI procedures and bi-monthly billing arrangements may extend customer obligations beyond the time notice of withdrawal is given.

CASES 05-M-0858 and 05-M-0332

H. <u>KeySpan</u>

The Brooklyn Union Gas Company d/b/a KeySpan Energy Delivery New York and KeySpan Gas East Corporation d/b/a KeySpan Energy Delivery Long Island (KeySpan) supports adoption of administratively-efficient, low-cost referral programs that educate consumers on competitive energy alternatives.  While KeySpan joins in criticisms of requiring utilities to act as agents for ESCOs, it states it is willing to act as the enrollment administrator in a referral program.  It claims, however, that it should be compensated, by either customers or ESCOs, for the cost of undertaking that responsibility.

Turning to the customer education campaign described in the Notice, KeySpan maintains that utilities and ESCOs should be accorded the freedom to explain a particular referral program to customers in the manner they deem best.  Arguing that no public policy objective would be furthered by allowing customers to sample introductory offers among ESCOs, KeySpan would also limit customers to one introductory offer only.  Although it supports the standard sales agreement approach, KeySpan offers comments on several specific contract elements.

I. <u>MXE</u>

MXEnergy (MXE) supports adoption of a state-wide ESCO Referral Program, but opposes the Notice model.  Instead of that model's "open price" term, MXE would permit ESCOs to offer a fixed price and term as long as the ESCO does not impose an early cancellation fee.  The uniform discount feature of the O&R model, MXE adds, will not constitute price fixing if the Commission or the utility selects the discount.

J. <u>NEM</u>

National Energy Marketers Association (NEM) expresses its support for marketing approaches that reduce regulatory risk and acquisition costs for ESCOs, while protecting consumers.  It

CASES 05-M-0858 and 05-M-0332

believes a properly designed ESCO Referral Program can accomplish those objectives, notwithstanding the opposition of certain monopoly utilities to competitive retail markets.

Labeling the argument that referral programs could run afoul of anti-trust laws as a legal "red herring," NEM points out that the referral program price is set at a discount, and, it asserts, courts have decided discounting is not illegal under the anti-trust laws.  Continuing its analysis, NEM argues that a referral program would not be deemed a per se violation of anti-trust laws, and instead would be analyzed under the "rule of reason," where a variety of factors and information specific to the character and effect of the alleged restraint are taken into account.  NEM believes that referral programs would survive a "rule of reason" analysis, because they promote competition, a finding it says is supported by the success of the O&R program, at the utility where more than a 30% residential customer migration rate, the highest in New York, has been attained.  NEM adds that the Commission's approval of a referral program would immunize participants from anti-trust liability under the State Action doctrine.

The O&R model, NEM declares, should serve as the basis for state-wide ESCO Referral Programs.  In the alternative, NEM suggests a referral program where customer calls are randomly referred to a list of participating ESCOs for more information.  NEM stresses that timely implementation of referral programs is of paramount importance to the continued growth of retail energy markets.

K.  NFG

National Fuel Gas Distribution Corporation (NFG) protests that the breadth and extent of regulation suggested in the Notice go well beyond the guidance needed to establish successful ESCO Referral Programs.  Well-designed utility-

-10-

CASES 05-M-0858 and 05-M-0332

specific programs, NFG asserts, should be permitted, developed under guidelines that are advisory instead of binding.

NFG does not support a referral program, where customers are enrolled on a month-to-month basis beyond the introductory period, which NFG describes as an "opt out" method. Instead, NFG proposes that the customer automatically revert to utility service after the introductory period unless the customer affirmatively elects to enter into a longer-term contract with the ESCO. NFG believes that its method, which it describes as an "opt in" approach, would assure that customers are fully informed. It also asserts that this approach fulfills its obligation as a utility to secure the most beneficial service arrangements for its customers.

Commenting on the Guidelines, NFG argues they lack a rational basis and unreasonably alter legal relationships between utilities, ESCOs and customers. NFG opposes requiring a customer that does not express a preference to select an ESCO anyway, but, if a uniform discount is not required, it would assign the customer to the ESCO offering the greatest discount, rather than at random. NFG also questions the provisions requiring the utility to act as an agent for ESCOs; setting the notice period for making price changes; and establishing the delivery point for gas service. It adds that utilities should be allowed to switch gas customers as of the meter read date, rather than on the first of the month, because the UBP permits utilities to use either method.

L. NFR

National Fuel Resources, Inc. (NFR) would support adoption of a uniform discount, if at all possible and consistent with New York law. Analyzing the standard sales agreement, NFR supports the "open price," but expresses concern over the month-to-month term, because it would limit ESCO

-11-

CASES 05-M-0858 and 05-M-0332

pricing offers to variable rates.  Like NFG, NFR recommends that
a change in gas service provider be implemented on the meter
read date.

  M. <u>NYSEG/RG&E</u>

   New York State Electric & Gas Corporation (NYSEG) and
Rochester Gas & Electric Corporation (RG&E)(collectively,
NYSEG/RG&E) urge the Commission to reject ESCO Referral Programs
generally.[4]  The utilities object that the programs subsidize
ESCOs by unfairly assisting them in increasing market share
through artificial discounts and advantageous contractual
provisions.  The utilities also assert the programs create
customer confusion, because customers enticed into switching to
an ESCO to obtain the two-month discount may not realize long-
term benefits after the discount period ends.

   NYSEG/RG&E contend that promoting migration -- the
stated purpose of the referral programs -- is beyond the
Commission's authority under the Public Service Law.  Positing
that competition in electric markets is supposed to create new,
value added services, the utilities proclaim they see no such
services in referral programs.  They also dispute that such
programs create administrative efficiencies.

   Turning to the specifics of the Notice model,
NYSEG/RG&E protest that requiring them to act as agents for the
ESCOs is illegal.  Criticizing the "open price," they maintain
the notice required of ESCOs to change a price is inadequate to
protect customers, and they complain the standard contract
otherwise unduly favors ESCOs over customers.  Opposing the O&R
model as well, NYSEG/RG&E emphasize that, while the program has

---

[4] NYSEG/RG&E joins with PULP, the American Association of
Retired Persons and several charities in arguing that ESCO
Referral Programs have not been shown to result in benefits
for consumers.

CASES 05-M-0858 and 05-M-0332

been in place for five years, two-thirds of O&R's customers still have not opted to participate.

N.   <u>Niagara Mohawk</u>

Niagara Mohawk voices its concern that the Guidelines proposed in the Notice are overly restrictive and complex, and represent an unnecessary departure from the design of the successful O&R program.  Niagara Mohawk asserts that the Guidelines fail to explicitly state that participation in referral programs is voluntary, and the "open price" improperly allows ESCOs to change their prices after the introductory period without sufficient notice.  It opposes acting as an agent for ESCOs, and reiterates KeySpan's point that utilities should be compensated for incremental costs they incur in implementing a referral program.

Elaborating on a point made by other utilities, Niagara Mohawk notes the standard sales agreement contains a provision that states that "all natural gas sold under this Agreement shall be delivered to a location outside the State of New York, and that shall constitute the point at which the sale occurs."  The utility is concerned the provision conflicts with federal law and regulations that require a gas shipper to hold title to the gas it is having transported on an interstate pipeline.

Niagara Mohawk also maintains that there is no anti-trust law violation in referral programs that provide for uniform discounts.  Interpreting New York's anti-trust statute, the Donnelly Act, Niagara Mohawk argues that the uniform discount would be analyzed under a "rule of reason."  Since ESCOs are free to make additional offers outside the program or to forgo participation entirely, and the purpose of the program is to open the market to ESCOs by facilitating the movement of customers from monopoly providers to the market, Niagara Mohawk

CASES 05-M-0858 and 05-M-0332

believes the program would pass muster under the "rule of reason."

Turning to the federal anti-trust laws, Niagara Mohawk claims that the program qualifies for State Action immunity under the two-prong test established by the Supreme Court in California Retail Liquor Dealer's Assoc. v. Midcal Aluminum, Inc., 445 U.S. 97 (1980).  The first prong -- a "clearly articulated" policy to displace competition -- is satisfied, Niagara Mohawk asserts, through the Commission's many explanations in support of measures that assist in the transition to more competitive electric retail markets.  The test's second prong -- "active supervision" of the policy -- is met, the utility continues, through the exercise of the Commission's Public Service Law jurisdiction.

While the Donnelly Act does not provide for a State Action exception, Niagara Mohawk argues that New York courts have found that the Donnelly Act does not prevent the Commission from approving and implementing practices that might otherwise be deemed anti-competitive.  It therefore asserts that if the Commission were to select the uniform discount, it would survive anti-trust scrutiny.  Niagara Mohawk concludes that the mere perception that anti-trust issues exist, while warranting caution and prudence in designing the programs, does not justify the regulatory mandates that would be imposed under the Notice model.

Reporting that it has engaged with stakeholders in a collaborative process to design a referral program similar in structure to O&R's model, Niagara Mohawk delineates the provisions of its program.  Besides a uniform discount and random assignment, the program would allow both the utility and the ESCO to enroll customers.  The terms and conditions for the program would be set forth in contracts with ESCOs and in the

CASES 05-M-0858 and 05-M-0332

utility's tariffs.  ESCOs would be required to contact customers during the introductory period to educate them on retail access, and would take the opportunity to present a long-term contract. At the end of the introductory period, if the ESCO has not obtained the customer's affirmative consent to a contract, the customer would revert to the utility.

     O.   <u>PULP</u>

     According to the Public Utility Law Project (PULP), the overwhelming majority of residential customers prefer to take bundled service from their local utility over participation in competitive markets.  After detailing the history of the Commission's development of those markets, PULP complains that referral programs should not be adopted until the benefits of competition generally have been measured and evaluated.  PULP also complains that ESCO and utility prices cannot be easily compared because ESCO prices are not readily visible to customers.

     PULP then proposes the principles it believes should guide the design of referral programs.  Customer selection of an ESCO, PULP states, should not result in slamming -- the switching of a customer from one supplier to another without the customer's consent.  Similar consent, PULP continues, must be obtained before the terms of a contract between a customer and an ESCO are changed to avoid cramming -- the modification of contracts without consent.  PULP also proposes restrictions on redlining -- the practice of excluding customers from an offer based on geographic or socio-economic factors.

     PULP maintains that the Notice model and its Guidelines fail to meet its tests.  As to Guideline 1, PULP protests that it is drafted to benefit ESCOs.  Turning to Guideline 2, on the enrollment process, PULP opposes requiring utilities to act as agents for ESCOs, and contends that

CASES 05-M-0858 and 05-M-0332

enrollment of customers should be consummated only upon full and affirmative consent.

According to PULP, Guideline 3, which requires that all customers affirmatively choose a specific ESCO, is lacking, because the opportunity to make an affirmative choice depends upon the availability of information that the referral programs do not provide.  Analyzing Guideline 4, PULP describes the proposed "open price" as a one-sided benefit for ESCOs that does not conform with existing law.  PULP also objects that notice requirements are inadequate, and that it is unfair to compel customers to bear the cost of a special meter read upon a discontinuation of service that is the result of an ESCO's changes to contract terms.

Criticizing Guideline 5, PULP challenges the Commission's authority to adopt the UBP provisions relied upon in the Guidelines.  As a result, it believes ESCOs that fail to comply with the UBP may harm consumers without exposing themselves to sanctions.  Guideline 6, PULP insists, should allow the customer to revert to utility service without incurring any switching charges or liabilities.  Guideline 8, PULP believes, would allow ESCOs to "cram" new contract conditions onto customers regarding price, without written customer consent.  PULP also criticizes the proposed standard contract at great length, and would substantially re-write it. Given its criticisms, PULP concludes that referral programs should not be adopted.

P.  SCMC

The Small Customer Marketer Coalition and the Retail Energy Supply Association (collectively, SCMC) support the adoption of ESCO Referral Programs.  SCMC believes such programs are necessary to offset the inherent advantages utility monopolies continue to exercise in electric retail markets and

CASES 05-M-0858 and 05-M-0332

to assist customers in overcoming confusion when first exploring those markets.  Retail electric markets, SCMC stresses, are neither monopolized nor fully competitive, because they are still imbued with the vestiges of monopolization and regulatory oversight.  Any examination of competitive market or anti-trust principles, SCMC insists, must recognize that sophisticated programs are needed to address that hybrid market structure.

An ESCO Referral Program, SCMC discerns, should incorporate several critical elements.  It should provide for a defined customer benefit; simple and clear marketing messages; easy administration by utilities and ESCOs; minimal implementation costs; equitable treatment of all participating ESCOs; and, maximum customer participation.  The Notice model, it maintains, does not succeed in accomplishing those goals.

Under the Notice model, SCMC explains, introductory pricing would vary among ESCOs.  SCMC believes that a program providing for such a panoply of pricing alternatives and introductory periods cannot be successfully marketed to customers, because utilities could not communicate a precise message over the telephone to inquiring customers.  SCMC asserts that requiring customers to affirmatively select a specific ESCO will further complicate the implementation of a program.

SCMC believes that the uniform discount does not raise anti-trust concerns.  If the Commission establishes the discount, SCMC maintains, there is no restraint of trade because there is only unilateral conduct and an act of government to which anti-trust laws do not apply.

Proposing an alternative to the requirements of the Notice model, SCMC would implement the uniform discount by subtracting it from the tariffed rate for distribution service during the introductory period, with the ESCO reimbursing the utility for the value of the discount.  Under this approach, it

-17-

CASES 05-M-0858 and 05-M-0332

contends, all customers benefit from the uniform discount equally, while ESCOs may continue to sell commodity under their individual pricing mechanisms.

As to other issues, SCMC supports the Notice model requirement that utilities act as agents for the ESCOs.  It disagrees, however, with the Guideline that restricts the standard contract to a month-to-month term, arguing that amendment of the contract term should be permitted on the same basis as amendment of the "open price."  Proper notice of such an amendment, it concludes, would include identification of the new price and its commencement date, provided at least seven days prior to the inception of the new price.

Q.  Select

Select Energy New York, Inc. (Select) supports implementation of a standard state-wide ESCO Referral Program, based on SCMC's proposals.  It also proposes to allow those ESCOs serving only non-residential customers to participate in the program by accepting random assignment of non-residential customers while declining assignment of residential customers.

R.  USES

U.S. Energy Savings Corporation (USES) supports ESCO Referral Programs generally, but believes the complexity of the Notice model will reduce such a program's effectiveness in increasing migration.  It instead supports the O&R model, where, after customers are assigned to an ESCO at random, the ESCO can fully educate the customer as to its market choices at the customer's leisure.

USES proposes a few changes to the O&R model.  Rather than a percentage discount, it would allow ESCOs to offer variable or fixed rate prices, or a fixed-dollar rebate.  The rebate, it believes, creates an incentive for customers to participate in the program during a telephone call to a utility,

CASES 05-M-0858 and 05-M-0332

rather than procrastinate until commodity prices rise, as can be expected on a seasonal basis.

Reply Comments

 A. Central Hudson

    Central Hudson believes that none of the commentators have justified casting aside existing ESCO Referral Programs. It continues to advocate a utility-specific approach to implementation of those programs, because the lessons learned through experimentation will move retail markets forward, while imposing a uniform state-wide model would stifle market development.  The utility, however, would restrict enrollment in a program to the telephone method.

    If the uniform discount approach is rejected, Central Hudson opposes NFG's proposal to assign customers who do not choose an ESCO to the lowest-price ESCO available.  The utility also opposes SCMC's proposal to subtract the program discount from the distribution service rate instead of energy commodity, because so discounting delivery service would be unreasonably discriminatory in violation of PSL §65(1).  It, however, agrees with KeySpan that only one introductory offer per customer should be permitted and that utilities should recover the incremental costs of implementing a referral program.

 B. ConEd/O&R

    Characterizing opposition to the Notice model for ESCO Referral Programs as universal, ConEd/O&R urge the Commission to provide for more flexibility in implementing those programs. ConEd/O&R dismiss the positions of PULP and NYSEG/RG&E on referral programs as mere reiterations of their long-standing opposition to competition generally.

    ConEd/O&R join with Central Hudson in opposing SCMC's proposal to subtract a discount from the distribution rate, because reconfiguring the rate would render it inaccurate and

CASES 05-M-0858 and 05-M-0332

distort price signals.  Opposing USES, ConEd/O&R argue that its proposals to offer rebates and substitute fixed-price contracts for a uniform discount are outside the scope of a properly designed referral program.  They disagree with using SBC funds to support a state-wide call center effort, as Central Hudson suggests, and with tariffing conditions governing the relationship between ESCOs and their commodity customers, as Niagara Mohawk suggests.

ConEd/O&R support the adoption and implementation of a state-wide standard contract, but would require ESCOs to obtain a customer's affirmative consent to revisions to contractual terms.  If that position is not adopted, the utilities oppose SCMC's proposal to implement a price change upon seven days notice, arguing that period is too short a timeframe.

C.   CPB

Addressing the design of the ESCO Referral Program, CPB reports that, upon consideration of the comments submitted by other parties, it has changed one of its positions.  It now believes that a uniform discounts is an element essential to the success of a program.  It concurs with utilities and other parties that call center personnel simply cannot be expected to explain multiple ESCO offerings to potential customers over the telephone.  It also would allow for more flexibility implementing a state-wide program than it suggested in its initial comments.

CPB maintains that the incremental cost of implementing referral programs should not fall on utilities, and proposes that they be recovered from ESCOs instead.  It also supports limiting customers to participation in one introductory offer only.

-20-

CASES 05-M-0858 and 05-M-0332

D.  <u>Direct Energy</u>

Direct Energy presents a detailed analysis of the anti-trust laws, which it says is the only reason presented for substituting the Notice model for the O&R model.  According to Direct Energy, the anti-trust laws do not prevent the Commission from adopting the O&R model, or subject participants in programs modeled on the O&R model to anti-trust sanctions.

The federal Sherman Anti-Trust Act, Direct Energy notes, prohibits certain types of agreements, such as price fixing, that are illegal <u>per</u> <u>se</u>.  Agreements that do not constitute a <u>per</u> <u>se</u> violation, however, are reviewed under the more flexible "rule of reason," where the benefits of the challenged conduct are balanced against its possible anti-competitive effects.  Referral programs that promote an expeditious transition from fully-regulated utility monopoly service to competitive markets, says Direct Energy, satisfy the "rule of reason."

Moreover, Direct Energy asserts, where conduct is that of the State itself, there is no anti-trust law violation. Competitors that comply with state directives, Direct Energy asserts, also qualify for State Action immunity established in <u>Midcal Aluminum</u>, <u>supra</u>.  Reiterating Niagara Mohawk's arguments, Direct Energy asserts that the Commission's regulatory activities undertaken in conformance with the Public Service Law are sufficient to meet both prongs of the test established in that decision.

That parties collectively petitioned the Commission for a decision on the uniform discount, Direct Energy maintains, does not create anti-trust liability either.  The courts, it points out, have allowed parties, either individually or collectively, to petition state governmental authorities to take

-21-

CASES 05-M-0858 and 05-M-0332

an action, even if that action would constitute an anti-trust violation if the parties were to undertake it themselves.

Direct Energy also claims that the O&R model referral program does not violate the New York's Donnelly Act, General Business Law §340.  New York courts, it states, usually follow federal law in interpreting the Donnelly Act, and would apply the "rule of reason."  Although those courts have declined to incorporate the State Action immunity doctrine into the Donnelly Act, Direct Energy asserts the courts have adopted the Sherman Act principle that, if a state government agency enforces a program within the scope of its authority, participation in that program is not an anti-trust violation.

E.   NEM

Contrary to the position taken by NYSEG/RG&E and PULP, NEM argues that adoption of the O&R model for referral programs is well within the scope of the Commission's authority under the Public Service Law.  It also maintains that further investigation into the benefits of competitive markets is not needed, because it has already been determined in the Policy Statement on Retail Markets that competition is in the best interest of New York consumers, and the parties who oppose competition have not demonstrated otherwise.

As to PULP's proposal to require the filing of ESCO rates, NEM declares that competitive market conditions already result in rates that are reasonable.  NEM disagrees with NFG's analysis on requiring affirmative consent before customer enrollment with an ESCO is continued after the introductory period, because NEM believes the requirement would undermine the efficacy of the program and increase customer confusion.

F.   NFG

According to NFG, there is no support for the Notice model.  While it would permit utilities to select between

-22-

CASES 05-M-0858 and 05-M-0332

uniform discount of the O&R model and the ESCO-specific discount of the Notice model, subject to Commission approval of the model proposed, NFG joins in opposition to the Notice model provision compelling utilities to act as agents for ESCOs.

NFG also opposes SCMC's proposal to subtract the discount from the distribution rate.  Discerning that the approach might be intended to answer concerns that a uniform discount might violate anti-trust laws, NFG takes no position on the anti-trust issues, but nevertheless maintains that the approach cannot be squared with a utility's obligation to offer its customers only reasonable rates.

G.  NYSEG/RG&E

After reiterating their opposition to ESCO Referral Programs, NYSEG/RG&E agree with NFG that affirmative customer consent to continuation of a contract with an ESCO after the introductory period should be required.  In addition, they would not open referral programs to ESCOs that do not serve residential customers, because there is no proof that a program is needed for non-residential customers.  They also support utility recovery of the incremental costs of implementing referral programs.

H.  Niagara Mohawk

Niagara Mohawk details its opposition to a number of proposals other parties have presented.  It joins in opposing subtraction of a discount from the tariff distribution rate, characterizing it as potentially illegal, and states it is unable to support Central Hudson's proposal to administer a state-wide referral program through SBC funding.

Contradicting parties that reject referral programs premised upon opposition to retail access generally, Niagara Mohawk argues these parties' insistence that a demonstration of cost savings is a prerequisite to proving the worth of retail

CASES 05-M-0858 and 05-M-0332

access is misguided.  Whatever the cost savings, the utility
emphasizes, the introduction of competitive markets has
insulated consumers from the risks associated with utility
ownership of generation, has permitted customers to negotiate
rates that avoid market fluctuations, and has created the
opportunity for the development of new approaches to meeting
customers' energy services needs.

I.   PULP

Disputing SCMC's analysis, and describing it as ESCO-
centric, PULP argues the referral program SCMC proposes
undermines essential consumer protections.  PULP also argues
random assignment of customers to ESCOs is contrary to the
concept of customer choice, because, with random assignment, the
customer does not make a choice.  Continuing to oppose uniform
discounts, PULP opines that most parties recognize that setting
a uniform discount raises significant anti-trust issues.  The
Commission should not, PULP asserts, insulate such price-fixing
from anti-trust challenges through approval of the discount.
PULP maintains that defense of price fixers has no place in
devising a program to promote customer migration.

PULP also contends that a uniform discount could only
be adopted upon record evidence demonstrating the reasonableness
of the particular discount selected.  It believes ESCOs must
submit pricing information to adequately build such a record.

J.   SCMC

Characterizing PULP's arguments as an effort to impose
a socialistic model that substitutes bureaucratic fiat for the
interplay of competitive forces,[5] SCMC claims PULP is attempting
to improperly re-litigate decisions where arguments in
opposition to competition were rejected.  SCMC maintains that

---

[5]  SCMC Reply, p. 9.

CASES 05-M-0858 and 05-M-0332

there is no reason to review ESCO rates to determine if they are just and reasonable, because the market performs that function,[6] and that price visibility is available to customers though comparison shopping.  It dismisses PULP's other criticisms either directed towards problems that do not currently exist, such as slamming, or that are adequately addressed through other means, such as existing customer complaint procedures.

Turning to parties other than PULP, SCMC maintains that NYSEG/RG&E's attack on the O&R model is bereft of a rational basis, in light of the more than 50,000 customers that have participated in the O&R programs in the five years they have been in existence, and have expressed virtually no dissatisfaction.  SCMC complains that NYSEG/RG&E's proposal to investigate the benefits of competition before referral programs are adopted is beyond the scope of this proceeding.  SCMC states that it has already been determined that the functioning attributes of the competitive market are in place, and that customers have the opportunity to find competitive choices. SCMC asserts nothing more is needed.

Responding to NFG, SCMC opposes that utility's proposal to automatically return customers to the utility if they do not affirmatively enter into a contract with ESCOs by the end of the introductory period.  SCMC maintains that consumer interests can be adequately protected without the reversion, which would unfairly tilt the program against ESCOs by increasing the risks they face in participating.  SCMC would modify one of its positions, by accepting a notice period of 15 days before an "open price" change becomes effective.

---

[6]  The Commission, SCMC claims, reached a similar conclusion in Case 04-E-0572, Consolidated Edison Company of New York, Inc. – Electric Rates, Order Adopting Three-Year Rate Plan (issued March 24, 2005), pp. 48-49.

CASES 05-M-0858 and 05-M-0332

SCMC also defends use of a uniform introductory price discount, as a common commercial vehicle deployed in many industries, including credit cards and telephone services. There is no deceptive practice in such a discount, it maintains, because customers are fully informed about the terms and conditions attending the discount.  As to anti-trust issues, SCMC fully supports Direct Energy's analysis.

THE ESCO REFERRAL PROGRAM GUIDELINES

Introduction

In the Policy Statement on Retail Access, utilities were encouraged to develop ESCO Referral Programs based on the O&R model.  Transposing the model to other utilities, however, raised questions, and the Notice model was developed in reaction to those questions.  In responding to the Notice, a sizeable majority of utilities and ESCOs favored moving forward with the implementation of ESCO referral programs because they successfully promote the development of retail markets by encouraging customers to explore the benefits of retail access. While none of the parties supported the Notice model, and most favored the O&R model, many made suggestions for modifications to the models and the Notice Guidelines, which were described as overly prescriptive.

PULP and NYSEG/RG&E, however, opposed implementation of referral programs under the present circumstances, arguing that their adoption has not been justified.  Their opposition is also premised upon criticisms of competitive retail electric markets generally, and claims that we lack authority under the Public Service Law to adopt referral programs in particular, or promote competition generally.  PULP adds a contention that the programs would create the potential for violations of the anti-trust laws.  The criticisms NYSEG and PULP make of referral programs, however, are not persuasive, or do not outweigh the

CASES 05-M-0858 and 05-M-0332

benefits of those programs, and their legal and policy arguments are procedurally defective and lack substantive merit.

Therefore, as most of the parties advocate, we will base the design of referral programs on the O&R model, subject to modifications needed to protect consumer interests.  To effectuate that decision final Guidelines for the design of referral programs are needed.  Once final Guidelines are in place, we may proceed to examine specific utility proposals. Central Hudson's program is ready for our consideration, and is addressed below.

Referral Program Guideline Proposals

While appropriate final Guidelines on the design of ESCO Referral Programs are best drawn primarily from the successful O&R Model, some consumer protection measures derived from the Notice Model are appropriately included in those Guidelines.  The principles SCMC presents assist in developing those Guidelines; PULP's proposed principles are not helpful. Rejection of the policy arguments PULP and NYSEG level against referral programs, which lack merit, attends the adoption of the Guidelines.

 A. The O&R Model

Adopting the O&R model as the prototype for ESCO Referral Programs is appropriate.  O&R commenced implementation of its Switch and Save program in August 2000, and, in the more than five years the program and its successor have been in existence, their success has been impressive.  As discussed in the Central Hudson Retail Order, when O&R implemented its model in August 2000, only 9,836 of its residential electric and 9,794 of its residential gas customers were participating in competitive markets.  One year later, the figures had exploded to 32,711 residential electric and 25,986 residential gas participants.  As the Order goes on to explain:

CASES 05-M-0858 and 05-M-0332

> Currently, approximately 31% (56,213) of O&R's
> residential electric and 37% (40,010) of
> residential gas customers have switched to an
> alternative competitive supplier.  O&R reports
> that only about 1% of the customers that have
> participated...have returned to utility commodity
> service.  Therefore, the [O&R model] type of ESCO
> [referral] program has demonstrated its worth.[7]

The most important features of the O&R model are the 7% introductory discount from the utility's price for commodity service, over a two month introductory period, and, for customers that do not select an ESCO, random referral, on a rotating basis, to one of the ESCOs participating in the program.  The simplicity of that approach has enabled many customers to try retail access, because they can participate without expending significant effort or incurring significant risk.  The introductory discount creates a benefit that further encourages customers to explore retail access opportunities.  Most customers that embark upon retail access through the O&R model see no reason to return to utility service.  Moreover, given the simplicity of the program, O&R has avoided expensive implementation costs.

The success of the O&R model justifies its replication at other utilities.  Some questions, however, have been raised concerning the adequacy of consumer protections under the model.  As a result, some modifications to the model are needed before other utilities implement it.  We therefore turn to the Notice Model, and parties' proposals for the development of Guidelines governing the design of the programs.

---

[7]  Central Hudson Retail Order, p. 15.

CASES 05-M-0858 and 05-M-0332

    B.   <u>The Notice Model</u>

In the alternative to the O&R model described in the Notice, ESCOs must set their own discounts and identify the length of the introductory periods those discounts will remain in effect, but may modify those offers at any time.  Each customer is required to select the ESCO that will serve it.  These features of the Notice model render it unworkably burdensome to administer.

Call center representatives could not be expected to adequately explain to a prospective customer, over the telephone, a wide variety of different ESCO discount offers.  Asking a customer to select one ESCO during a telephone call when the customer has no knowledge of distinctions among various ESCOs, and with the call center representative prevented from assisting because he or she cannot favor one ESCO over another, would further complicate the call center's efforts.  Allowing ESCOs to modify their discounts and offers would create additional confusion, as errors in conveying the new information would inevitably arise.

ESCOs are also unlikely to participate in a Notice model program.  Because most individual ESCO discount offers would likely become lost in the confusion attending such a program, most ESCOs are likely to conclude that participation would not enable them to sign up significant numbers of new customers and so the substantial effort needed to present a workable discount within the framework of the program would be wasted.

The Notice Guidelines also require utilities to act as agents for all ESCOs.  It is not feasible, however, for utilities to act as agents for ESCOs that are their competitors, and when any particular ESCO's interest might deviate from the interests of other ESCOs.  Compelling utilities to act as agents

-29-

CASES 05-M-0858 and 05-M-0332

also raises substantial legal questions.  As a result, this feature of the Guidelines is not efficacious.

Another troublesome feature of the Notice model is the standard contract.  Devising one standard contract that all ESCOS and all customers will find acceptable is a difficult endeavor, as parties seek to preserve their positions in disputes over the terms and conditions.  So limiting the terms of the contract also could prevent ESCOS from responding to competitive market developments.

The obstacles to implementation of the Notice model would likely prevent it from serving as a reliable vehicle for facilitating retail access by encouraging customer movement to competitive providers.  It would be costly and difficult to implement, and ESCOS, utilities and customers might not desire to participate.  Therefore, we will not adopt the model as a guide to the development of referral programs.

C.   SCMC's Principles

SCMC presents what it believes are the critical elements of a successful ESCO Referral Program.  These elements include:  a definite customer benefit, a clear marketing message, ease of administration, minimization of implementation costs, and maximization of customer participation.  These principles correctly state the purposes of the referral programs, and the O&R model serves those purposes.

As a result, SCMC's arguments support the adoption of the O&R model.  In addition to the objectives SCMC elucidates, however, a referral program must also provide for legitimate consumer protections.

D.   PULP's Principles

PULP presents a series of principles that it argues should guide the development of ESCO Referral Programs.  Notably absent from those principles, however, is any encouragement for

CASES 05-M-0858 and 05-M-0332

customers to participate in retail markets; PULP disputes our decisions that find that encouraging customer movement to retail access is a legitimate public policy goal.

Moreover, while PULP's proposed principles are allegedly directed towards consumer protection, they overstate the risks and understate the benefits of retail access.  PULP insists that guidelines are needed to explicitly limit practices such as slamming, cramming and redlining.  While such practices are of course unacceptable, PULP has presented no evidence or foundation that would justify a conclusion that such practices have occurred under the O&R model or would occur under any properly designed referral program.  As a result, PULP's proposed principles do not assist in guiding the design of referral programs, although the development of proper guidelines that provide for consumer protection measures is a necessary step to implementing successful referral programs.

E.    The NYSEG/RG&E and PULP Referral Program Arguments

NYSEG/RG&E claim ESCO Referral Programs would not benefit customers because the program would create confusion, and expose consumers to fraudulent business practices.  PULP joins in some of those arguments.

As discussed in the Policy Statement on Retail Access, however, the transition from regulated monopoly service to retail markets is a complex endeavor.  Mechanisms to facilitate that transition, like ESCO Referral Programs, remain necessary.  Moreover, the criticisms NYSEG/RG&E and PULP make do not withstand a proper analysis.

The elements of the O&R model do not create customer confusion.  The offering of an introductory discount to attract customers into enrolling with a service provider is a common commercial vehicle deployed by many types of service providers, and customers are well aware of the fact that such discounts end

CASES 05-M-0858 and 05-M-0332

after an introductory period.  Moreover, facilitating enrollment into the program through utility personnel reduces confusion instead of increasing it, by making it easier for the customer to try retail access.  As a result, contrary to the NYSEG/RG&E criticisms, the programs assist customers in exploring retail markets.

NYSEG/RG&E also complain that ESCO referral programs do not create new efficiencies or new services for customers. While competition generally is expected to yield those benefits, their creation is not the purpose of a referral program.  Its function is to encourage customers to try retail access without incurring significant risk.  Upon conclusion of the introductory period, the customer decides for itself whether there are sufficient benefits to justify its continued participation in retail access or whether it should return to utility service. NYSEG/RG&E present no reason why customers should be deprived of that choice.

According to NYSEG/RG&E and PULP, referral programs are deficient because they might entice customers into contractual arrangements they do not understand.  Properly structured with consumer protection measures, however, the referral programs do not raise such a risk.[8]  Modifications to the Guidelines that achieve that goal, as set forth below, answer any claim that NYSEG/RG&E and PULP might have that the program disadvantages consumers.

---

[8]  Because competitive market forces are sufficient to restrain ESCO prices, there is no reason for us to embark in this proceeding upon a review of rates ESCOs charge or for us to determine that their rates are just and reasonable.  The ESCO price information available to customers participating in referral programs is also adequate.

CASES 05-M-0858 and 05-M-0332

Revising the Guidelines

Although the O&R model is adopted as the prototype for ESCO Referral Programs, some modifications to that model are needed, in order to properly protect consumer interests. Even though the Notice model is too cumbersome to adopt as the model for other programs, adequate consumer protections can be derived from the Notice, and added to the O&R model without detracting from that model's success. The proper consumer protection measures can be implemented through revised Guidelines, discussed below, that provide for two approaches to protecting consumer interests.

    A.   The Two Referral Program Options

Utilities may select between two options for adequately protecting consumer interests. Under the first option -- the "ESCO Service" approach -- the utility would enroll the customer for the introductory period and the ESCO would provide the commodity discount. Within five days of notice of the customer's enrollment, the ESCO would send the customer a contract for the post-introductory period. If the customer did not affirmatively agree to the contract, it would automatically revert to utility service at the end of the introductory period.

The second option -- the "ESCO Contract" approach -- would be derived from the consumer protections envisioned in the Notice model. Under that approach, ESCO utilities would enroll the customer, and within 5 days of notice of enrollment, would send the customer a contract. Unless the customer acts to rescind the contract within 3 days of receipt, that contract would govern during both the introductory period and the subsequent period.

Under the ESCO Service option, the customer is protected because it affirmatively enters into a contract for

-33-

CASES 05-M-0858 and 05-M-0332

the post-introductory period.  The ESCO Service option, however, has one potential shortcoming, in that there is no contract in effect for the introductory period.  As a result, utilities electing this option shall tariff provisions establishing the conditions that are in effect for the initial period of the referral program.  Those tariff provisions should provide that the customer will select, or be assigned to, an ESCO as its commodity service supplier during the introductory period; identify the amount of the standard discount; the length of the introductory period; allow the customer to withdraw from the program during the introductory period upon notice; and, provide for return of the customer to the utility if it does not affirmatively enter into a contract with the ESCO by the end of the introductory period.

The ESCO Contract option is also adequate to protect consumer interests, upon the consent to participate that customers express during their contact with the utility that authorizes their enrollment, so long as the ESCO sales agreement provided to the customer after it enrolls contains appropriate consumer protection measures.  In drafting those contracts, ESCOs shall meet some essential consumer protection principles, discussed below.

B.  The Final Guidelines

To accommodate the ESCO service and ESCO contract options and to protect consumers, and otherwise implement the O&R model for referral programs, the Guidelines for referral programs proposed in the Notice are modified and final Guidelines are adopted, attached as Appendix B.  The modifications and final Guidelines are explained below.  We will, however, consider utility-specific requests for deviations from the Guidelines, so long as those deviations further the

-34-

CASES 05-M-0858 and 05-M-0332

purposes of the programs and are not harmful to consumer interests.

### 1.   Continuation of Direct Enrollment

Guideline 1 currently provides that each ESCO should be allowed to freely continue to directly sign-up and enroll customers outside the referral program, notwithstanding the ESCO's participation in the referral program.  This principle is retained.

### 2.   Referral Program Enrollment

As Guideline 2 provides, utilities shall facilitate customer participation in ESCO Referral Programs by enrolling customers into the programs.  Utility enrollment is a feature crucial to success of a referral program, because it is ease of enrollment that encourages customers to participate and try retail access.  The language in Guideline 2 requiring utilities to act as agents for ESCOs, however, is rejected, for the reasons discussed above.

Guideline 2 also requires utilities to act in conformance with UBP §5, and to offer all customers the option to enter into sales agreements via any of three methods allowed under the UBP.  Guideline 2 therefore raises both enrollment and contract formation issues under the UBP, and its attendant Electronic Data Interchange (EDI) protocols.

As to the enrollment issues (contract formation issues are addressed below), the revised Guidelines permit utilities to restrict the enrollment process to the telephone method, through a utility call center, without opening the enrollment process to the electronic or written methods the UBP permits.  Requiring that customers be afforded the additional electronic or written options for enrolling could complicate the enrollment process, making it more difficult to implement a referral program.

CASES 05-M-0858 and 05-M-0332

While utilities should not be compelled to take the more difficult approach, utilities may desire to experiment with methods of enrolling customers into referral programs through methods in addition to telephone enrollment.  For example, O&R enrolls customers through its additional Internet and postcard methods.  Therefore, in filing for approval of referral programs, utilities may submit alternatives to call center enrollment for our consideration.

Allowing utilities to enroll customers into the program need not adversely affect the consumer protections available to customers.  To protect consumers from improper enrollments, utilities are directed to make and retain recordings of the conversations where customers consent to participate in a referral program.  Issuance of letters confirming enrollment is also required, sent to the customer within three days of the enrollment, advising them that enrollment has been completed and naming the ESCO that has been selected or assigned to serve the customer.  Utilities also shall include in their letter a reference to our consumer complaint resolution procedures available to ESCO customers, and other relevant information, as set forth as Attachment I to Appendix B.

3.  Selection of an ESCO

Guideline 3 requires that all customers must affirmatively choose a specific ESCO.  It is revised to provide that customers expressing a preference for a particular ESCO shall be allowed to select that ESCO, but that customers declining to express a preference shall be randomly assigned on a rotating basis among the ESCOs listed as participants in a program.  So modifying the Guideline will facilitate implementation of a workable ESCO Referral Program.

CASES 05-M-0858 and 05-M-0332

4. Contract Formation

Guideline 4 requires a standard form sales agreement; as discussed above, this approach is rejected because it unreasonably constrains ESCOs and customers in their mutual relationships and would likely result in a program that is unworkable. Guideline 4, however, provides for the consumer protection measures that were to be included in the standard contract, and many of those measures can accompany the implementation of referral programs.[9]

Under the ESCO Contract option, such measures can be implemented through the contract the ESCO sends its new customers, by establishing the principles the contract must be drafted to meet, without specifying the exact language needed to carry out the principles.[10] Appropriate consumer protection principles for such contracts, which include requiring ESCOs to confirm the introductory price discount and period, allowing customers to rescind the contract within three days after receipt, and allowing customers to cancel the contract upon notice during the introductory period, are set forth at Attachment II to Appendix B.

After the introductory period, the agreement would continue on a month-to-month basis, with cancellation by either party generally subject to the month-to-month limitation. The contract would provide for an "open price" allowing the ESCO to change its price upon 15 days notice to the customer, made

---

[9] NFG describes the ESCO Contract option as an "opt out" approach; use of that terminology is a misnomer because the customer opts in at the time of telephone consent under both the ESCO Service and ESCO Contract approaches.

[10] An ESCO that attempted to avoid implementing the principles could be expelled from an ESCO Referral Program, and its eligibility to supply commodity service in New York also could be withdrawn.

CASES 05-M-0858 and 05-M-0332

sufficiently prior to a scheduled meter read.[11]  The contract also would prohibit the ESCO from charging a termination fee and permit the ESCO to assign the contract only upon 30 days notice made sufficiently prior to a scheduled meter read.

Under the ESCO Service option, the contract formation process is somewhat different.  The ESCO would affirmatively contract with the customer prior to the end of the introductory period for service after that period, generally subject to UBP requirements for demonstrating consent to a sales agreement. The three UBP methods of demonstrating affirmative consent, telephonic, electronic and written, are, however, tied to the method the ESCO used to provide the proposed contract to the customer.

Nonetheless, we allow ESCOs to use any one of the three methods to demonstrate consent, even though a written proposed contract is provided to each participant in the program following enrollment.  The greater protection of a written proposal goes beyond UBP requirements, and should not restrict the means of demonstrating consent.  If a contract is not entered into in compliance with the UBP as implemented above, however, the customer would revert to utility service under the ESCO service option.

5.  The Remaining Proposed Guidelines

Proposed Guidelines 5 - 9 address a number of discrete issues.  Guideline 5 requires that the customer's affirmative consent be obtained for changes to the contract, except for changes to the "open price."  This provision would affect only the ESCO Contract option, and is continued in the Guideline principals applicable to that option.

---

[11] This would permit the customer to reject the price change and cancel the contract in time for a scheduled meter read, enabling it to avoid the cost of a special meter read.

CASES 05-M-0858 and 05-M-0332

Guideline 6 describes the right of the customer to switch to another ESCO or return to utility service.  It also provides that a change in gas commodity service provider must be made on the first of the month.  The return of the customer to utility service is already adequately addressed, with automatic reversion if no contract is formed under the ESCO Service Option, and through the month-to-month term under the ESCO Contract option.  Once either of those approaches has been effectuated, customer switching generally is an issue adequately addressed under the UBP.  Moreover, as NFG and NFR correctly point out, the UBP provisions allow utilities to elect to adopt methods of gas customer switching that are not limited to changes made on the first of a month.  As a result, this Guideline is no longer needed.[12]

Guideline 7 addresses the effect of EDI protocols on price changes made during the course of a referral program. Under the ESCO Service option, notice of a price change serves to demonstrate that an ESCO has obtained affirmative consent from a customer for a sales agreement that will take effect in the post-introductory period.  Under the ESCO Contract option, the EDI price change demonstrates that the ESCO has made a price change in conformance with requirements for that option.  The Guidelines are revised to reflect those principles.

Guidelines 8 and 9 address the steps utilities and ESCOs may take to promote and advertise ESCO Referral Programs. These provisions governing promotional practices remain generally appropriate, but should be combined into one Guideline.  Moreover, Guideline 8 addresses the UBP methods that

---

[12] A number of utilities objected to the gas delivery point provision of the standard contract; use of that provision will not be required.

CASES 05-M-0858 and 05-M-0332

may be employed to rescind a contract.[13]  The UBP approach is appropriate, as applied to the customer's right to rescind under the ESCO Contract option.

> 6.  Additional Guideline Principles

The proposed Guidelines did not address UBP waivers. Certain provisions of the UBP are inconsistent with the referral program approach; in particular, the UBP cannot be reconciled with utility enrollment of customers, because the UBP is premised upon ESCO enrollment.  The Guidelines shall establish that the waivers of UBP provisions, and related Electronic Data Interchange (EDI) protocols, needed to effectuate implementation of a particular referral program will be granted, upon the approval of the referral program.

Proposals to revise the UBP provisions and EDI protocols to accommodate ESCO Referral Programs are under consideration.[14]  Once UBP and EDI are revised to provide for referral programs, waivers will no longer be needed and this Guideline can be eliminated.

Among the new features that parties proposed for incorporation into the referral programs, one is added as a Guideline principle.  As several parties propose, customers should be limited to one introductory offer.  Since the purpose of the program is to encourage customers to experiment with

---

[13] Notwithstanding whether the method of contract formation was written, electronic or telephonic, UBP §5, Att. 1-3, provides for recession through telephonic or electronic communications.

[14] Pursuant to the State Administrative Procedure Act (SAPA) Notices in Case 98-M-0667 and 98-M-1343 of proposed changes to modify the UBP to accommodate ESCO referral programs, have been published in the State Register on February 2 and February 16, 2005.  Several parties including NYSEG/RG&E, Con Edison, Niagara Mohawk and SCMC, have commented in response to the Notices.

CASES 05-M-0858 and 05-M-0332

retail access, one experiment should be sufficient.  Allowing
customers to repeat their participation in the program could
become a form of gaming, as customers seek to replicate the 7%
discount without educating themselves on other offers in the
marketplace.  Such an approach could also overload a program,
rendering it less effective.

    C.  <u>Other Referral Program Proposals</u>

Other than the one-time limit on participation,
proposals for adding features to the referral programs are
rejected.  Some parties suggest that the discount should be
subtracted from the distribution rate for service, rather than
the commodity cost.  That approach, however, might distort
delivery rate price signals.  Moreover, one of the purposes of
an ESCO Referral Program is to train customers to examine their
commodity costs and seek out lower prices, and subtracting the
discount from the distribution rate would not serve that
function.  As a result, the distribution rate discount will not
be adopted.

Parties also suggest that rebates and fixed prices
might be substituted for the discount.  The commodity cost
discount approach, however, has worked well in the O&R model,
because it guarantees savings to customers and educates them on
the functioning of retail markets.  Because the discount is an
essential feature of a successful ESCO Referral Program, and
rebates and fixed price offers could complicate the
administration of a program where simplicity is a virtue,
experimentation with rebates and fixed prices does not appear
appropriate at this time.  ESCOs, of course, remain free to make
rebate and fixed price offers outside the scope of the program.

One ESCO suggests that it be allowed to participate in
a referral program for commercial customers, but not residential
customers.  Ease of implementation, however, is one of the

CASES 05-M-0858 and 05-M-0332

important features of an ESCO Referral Program, and the proposed restriction would make customer enrollment more complex. Moreover, another principle that should guide implementation of referral programs is fair treatment of all ESCOs.  Under that principle, any participating ESCO should be required to accept the random assignment of both residential and small commercial customers referred to it on a rotating basis.

Several utilities suggest that incremental costs associated with implementing ESCO Referral Programs should be recovered.  Cost recovery will not be addressed here.  Utilities may pursue recovery under their existing rate plans, or in future rate proceedings.

A number of parties make proposals in the event that the O&R model were rejected and the Notice model were adopted. Such proposals include funding, through the SBC, of a state-wide call center to implement the referral program, and, in a multi-discount program, referring customers to the ESCO offering the lowest discount.  Since the O&R model is adopted, and the Notice model rejected, these alternatives to the Notice model are not needed.

OPPOSITION TO THE INTRODUCTION
OF COMPETITIVE MARKETS

A.   Introduction

Claiming that competition has not been shown to benefit small customers, PULP and NYSEG/RG&E argue that, without a showing of benefits, our policies encouraging the growth of competitive markets, and our adoption of ESCO Referral Programs, are not just and reasonable.  They also propound theories on Public Service Law limitations they say restrict our authority to promote competition.

These parties are not entitled to transform this proceeding, which is limited to ESCO Referral Programs, into a

CASES 05-M-0858 and 05-M-0332

review of attacks on competition generally.  These arguments are rejected, as beyond the scope of this proceeding.  We also deny what are, in effect, motions to expand the scope of these proceedings, because the arguments these parties make have been rejected previously.

PULP claims that some of the features of the O&R model for ESCO Referral Programs give rise to anti-trust law violations.  PULP, however, has not described the alleged violations in sufficient detail to support a finding that they might occur and so its position cannot be adopted.  Moreover, in the absence of an analysis from PULP supporting its allegations, an analysis of anti-trust law conducted based on the actual facts and circumstances surrounding referral programs indicates that PULP's sketchy anti-trust allegations lack merit.

B.  The Benefits of Competitive Markets

Contrary to the contentions of NYSEG/RG&E and PULP, no further studies at this time are needed to demonstrate competition's benefits.  Competitive markets afford customers the opportunity to make an informed choice and then purchase the products and services they desire.  Neither PULP nor NYSEG/RG&E has justified revisiting the principle of customer choice, with the purpose of restricting customers' freedom to avail themselves of competitive market features like the discount under the ESCO referral program.

When a utility commodity service customer chooses to move to retail access service, whether through a referral program or otherwise, it is essentially deciding that the package of commodity rates, customer services, and other benefits that it can receive from an ESCO are collectively preferable to those that it would receive if it continued as a full-service utility customer.  Each customer making that choice retains the right to transfer to another ESCO or to return to

-43-

CASES 05-M-0858 and 05-M-0332

full utility service.  Given this context and the steps taken here to ensure that customers have the information they need to decide if they want to participate in a referral program, there is no reason to forestall implementation of those programs.

In making their arguments, PULP and NYSEG/RG&E attempt to reopen proceedings where their criticisms of competition have already been decided, without providing a basis that justifies revisiting these issues.  While PULP details in its comments the history, since 1996, of our policies for promoting the development of competitive markets for retail electric services, it fails to undermine any of the principles or findings that support those competitive market development policies.  Instead, its rendition of the development of those policies demonstrates that those policies have been carefully considered and have a rational basis, and so are well within our authority to adopt.

Moreover, the arguments PULP and NYSEG/RG&E make have been rejected, repeatedly and recently.  As stated in the Policy Statement on Retail Access:

> Competitive markets, where feasible, are the preferred means for promoting efficient energy services, and are well suited to deliver just and reasonable prices, while also providing customers with the benefit of greater choice, value and innovation.  Regulatory involvement will be tailored to reflect the competitiveness of the market.[15]

The Policy Statement on Retail Access also discusses the progress that has been made in the transition to competitive markets.  The infrastructure necessary to support competition has largely been implemented, with the utilities' divestiture of the generation they owned; the development of a reasonably

---

[15] Policy Statement on Retail Access, pp. 18-19.

CASES 05-M-0858 and 05-M-0332

competitive wholesale market administered by the New York State Independent System Operator; the adoption of EDI protocols for electronic transfer of information between utilities and ESCOS; and, UBP and other consumer protection rules that shield consumers against unfair business practices.[16]

Considering the arguments PULP and NYSEG/RG&E present would also require the reopening of other recent proceedings. We recently reaffirmed our policies in favor of competitive markets, beginning with the issuance of Opinion No. 96-12,[17] in the Central Hudson Retail Order, where policies for promoting retail markets were reviewed. The position taken by NYSEG/RG&E in that proceeding, which was essentially the same as they take here, was rejected as "wholly inconsistent with the policy objectives of fostering a competitive retail market."[18] Similar arguments were also rejected in the NFG order,[19] where it was decided that continuation of existing policies was justified, and that decision has been upheld by the courts to date.[20]

As we have determined repeatedly over the past decade, our policies for promoting competition are the best approach to the efficient provision of energy services at just and reasonable rates. Besides those benefits, the introduction of

---

[16] Policy Statement on Retail Access, p. 51.

[17] Case 94-E-0952, Competitive Opportunities for Electric Service, Opinion No.96-12 (issued May 20, 1996).

[18] Central Hudson Retail Order, pp. 22-23.

[19] Case 04-G-0718, National Fuel Gas Distribution Corporation, Order Canceling Rate Schedule Amendments and Continuing Low Income and Competitive Market Programs (Issued September 28, 2004).

[20] National Fuel Gas Distribution Corporation v. Public Service Commission, Index No.6712-04 (Alb. Cty. Sup. Ct. 2005).

CASES 05-M-0858 and 05-M-0332

competitive markets for energy commodity services has insulated consumers from the risks associated with utility ownership of generation, permitted customers to negotiate rates that avoid market fluctuations, and created the opportunity for the development of new approaches to meeting customers' energy services needs.  The opposition of PULP and NYSEG/RG&E to the policies that have yielded those benefits does not gain additional weight through their repetition in numerous proceedings over the past year and those arguments are rejected.

    C.  <u>Statutory Authority</u>

As to the statutory authority to implement competition, that question was resolved in the <u>Energy Association</u> decision.[21]  There, the same arguments PULP and NYSEG/RG&E make here on the statutory authority to promote competition were rejected, and neither PULP nor NYSEG have demonstrated that their arguments on our legal authority fall outside the ambit of that decision.  Accordingly, their arguments are rejected.

    D.  <u>Anti-trust Issues</u>

PULP asks that we, as a matter of discretion, decline to take actions that would immunize the uniform discount feature of ESCO Referral Programs from anti-trust sanctions.  PULP also questions if referral programs can comply with the anti-trust laws.  PULP's positions lack merit.

    1.  <u>PULP's Policy Arguments</u>

Characterizing the standard ESCO referral program introductory discount as "price fixing," PULP argues that the approach is inconsistent with the overall policy goal of promoting competition.  PULP adds a contention that the uniform

---

[21] <u>Energy Association of New York State v. Public Service Commission</u>, 169 Misc.2d 924, (Sup. Ct. Alb. Cty. 1996), <u>aff'd</u> 273 A.D.2d 708 (3d Dept. 2000), <u>lv. den.</u> 95 N.Y.2d 765 (2000).

CASES 05-M-0858 and 05-M-0332

discount is improper because it limits the savings that the competitive suppliers can offer to residential consumers.

In making its "price fixing" arguments, PULP mischaracterizes the purposes, provisions and practical effects of the referral programs.  Those programs depend upon a standard discount offered over a uniform introductory period.  Contrary to PULP's allegations, these features do not supplant typical competitive market functions and do not limit the savings competitive suppliers can offer customers, because ESCOs are free to offer greater discounts or other incentives outside participation in the program.  Similarly, customers may seek out discounts different from a program's discount, or freely select the ESCO whose services they prefer elsewhere in the competitive market, because that market continues to function as usual, with the referral programs acting as merely an added feature to it.

Referral programs are analogous, in function and operation, to the discount offers that regularly appear in markets as competitors seek to gain market share.  It is generally accepted that, for example, credit card companies will offer short-term discounts to their usual rates to gain customers.  The principle of the ESCO referral program is the same, except that it is the utility that advertises the discount on behalf of the consortium of ESCOs that will furnish the discount.  The utility's coordination of the offer on behalf of the consortium does no harm to the competitive market generally, and is substantially no different in its effect on the market from a discount a single competitor might offer.

PULP also disregards the role the discount plays in furthering the purpose of the ESCO Referral Program, which is to serve as a transition mechanism that will no longer be necessary

CASES 05-M-0858 and 05-M-0332

once competitive markets mature.[22]  The program and the discount allow ESCOs to attract customers from monopoly utility providers, facilitating their exit from those markets,[23] by making it easier for customers to explore the market.  As the programs are narrowly tailored to achieve the objective of smoothing the transition from utility monopoly service to competitive markets, PULP's arguments that they impede competition are unpersuasive.

PULP asserts that we should not insulate referral programs from anti-trust challenges.  Deciding the degree of competition that should be available in the provision of utility services, however, is a core function under the Public Service Law.  Determining whether, and the extent to which, monopoly service or competition among service providers is in the public interest has long been our responsibility,[24] and we have continued to decide such issues down to the present.[25]

---

[22] We will monitor the functioning of referral programs as a market transition mechanism, just as we monitor other features of the market.  See Case 05-G-0391, Central Hudson Gas & Electric Corporation, Order Directing the Future Termination of a Fixed Price Offer (issued July 22, 2005).  Therefore, the sunset review mechanism that CPB proposes is not needed.

[23] As the incumbent monopoly providers, NYSEG/RG&E appear to oppose this outcome; breaking the hold of monopoly providers on the competitive market is in accord with our policies of promoting markets that have been upheld both in Energy Association and National Fuel Gas Dist. Corp., supra.

[24] In the Matter of Oswego Power Transmission Co., 1 State Dept. Rptr.162 (P.S.C. Second Dist. 1912).

[25] See, e.g., Case 04-E-0733, Village of Springville, Order Granting Petition Subject to Conditions (issued December 23, 2004); Case 05-E-0264, Niagara Mohawk Power Corporation and Rochester Gas and Electric Corporation, Order Amending Certificate of Public Convenience and Necessity and Approving Limited Franchise (issued May 20, 2005).

CASES 05-M-0858 and 05-M-0332

        The degree of the availability of competition in
retail energy markets is at our discretion,[26] as is the degree of
immunization from the anti-trust laws arising out of our
supervision of those markets.[27]  Exercising that discretion here
in adopting a mechanism to smooth the transition from monopoly
service to retail markets, and superceding the anti-trust laws
to the extent necessary in doing so, is appropriate.

        2.  Price Fixing Under the Anti-Trust Laws

        In asserting that ESCO referral programs constitute a
violation of the anti-trust laws, PULP hints that the uniform
discount constitutes illegal price fixing.  That practice is
found when competitors agree to control prices in a particular
market to their profit and the disadvantage of consumers.
Referral program discounts offered by ESCOs to customers, with
both acting as voluntary participants in programs that are
administered by utilities and will be approved by us, and are
but one component of a market transitioning to competition, are
not an exercise of control over prices in violation of the anti-
trust laws.

        Nonetheless, it seems that PULP contends that the
uniform price feature of the referral programs is a horizontal
price-fixing scheme, in violation of the Sherman Anti-trust Act
and New York's Donnelly Act.  It appears, however, that the
courts would most likely find otherwise, for programs
implemented under the Guidelines we adopt here.

        Only a restraint so obviously injurious to competition
as to render further examination of the challenged practice

───────────────

[26]  See Opinion No. 96-12.

[27]  See, e.g., California CNG, Inc. v. Southern California Gas
Co., 96 F.3d 1193 (9th Cir. 1996); American Telephone &
Telegraph Co., 888 F. Supp. 221 (D. Mass. 1995).

CASES 05-M-0858 and 05-M-0332

unnecessary would be deemed a <u>per se</u> violation of the anti-trust laws by the courts.[28]  Instead of adopting that view of the discount, which PULP appears to expound, the courts would most likely analyze the uniform discount feature of the referral programs under the "rule of reason."  Even under arrangements where all participants in a market join in the alleged anti-competitive conduct, the "rule of reason" can apply, as it did where all National Collegiate Athletic Association (NCAA) member institutions participated in the NCAA's arrangements for televising college football.[29]  Allowing only two clearinghouses to control the music industry's licensing of copyrighted music was also reviewed under the "rule of reason."[30]

The uniform discount feature of the referral programs is even less restrictive than the NCAA and music industry restraints, because not all ESCOs are required to participate in the discount program and the program is merely one of many that can be offered in the competitive market.  As a result, it seems the "rule of reason" would most likely apply.

Under the "rule of reason," the facts and circumstances attending the alleged restraint are carefully analyzed, and its pro-competitive benefits are balanced against its possible anti-competitive effects, in evaluating if a

---

[28] While anti-trust issues may arise where participants in a agreement among participants in a referral program because, notwithstanding the random assignment feature of the programs, ESCOs continue to pursue each other's customers and customers market agree not to compete for customers, there is no such are free to switch to other providers (subject to contractual limitations typical to consumer transactions).

[29] <u>National Collegiate Athletic Ass'n v. Board of Regents</u>, 468 U.S. 85 (1984).

[30] <u>Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.</u>, 441 U.S. 1 (1979).

CASES 05-M-0858 and 05-M-0332

violation of the anti-trust laws has occurred.  Because the anti-competitive effects of the referral programs are small, and the overall intent of the programs is to further competition rather than to restrain it, the discount feature would likely survive a "rule of reason" analysis.

During a transition from regulation to more competitive markets, a program intended to break down a restraint of trade (such as utility monopoly control of retail markets), by opening those markets to competitors (such as ESCOs that offer customers new options), is acceptable under the "rule of reason."  Thus, a bank's actions in establishing affiliates to expand into new geographic territories, and then merging with those affiliates, was not an anti-trust law violation, even though the merger reduced the number of competitors in certain geographic areas.  Given that prior regulatory constraints had prevented the bank's expansion into those geographic areas, its actions still resulted in an overall increase in competition.[31] Moreover, where a nascent industry is developing, courts will be more hesitant to find an anti-trust law violation in new types of arrangements that are devised to meet new market challenges.[32]

Nor has it been demonstrated that a referral program gives rise to a conspiracy to fix prices.  ESCOs participating in a referral program have merely elected to join in a program where the discount has been set by others.[33]  Because there is no

---

[31] U.S. v. Citizens and Southern National Bank, 422 U.S. 86 (1975); see also, Association of Retail Travel Agents, Ltd. v. Air Transport Ass'n, 623 F.Supp. 893 (D.D.C. 1985).

[32] U.S. v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa. 1960).

[33] In O&R's initial implementation of the referral program concept, the utility itself set the discount; in the future, the level of the discount will be a feature of our approval of a particular referral program.

-51-

CASES 05-M-0858 and 05-M-0332

written or binding agreement among ESCOs, first, to establish
the level of the discount, and, second, to charge only that
discount to all customers, including those outside the program,
an anti-trust violation can be found only if a conspiracy can be
inferred from circumstantial evidence.  That is a difficult
proposition.[34]  Therefore, PULP has not only failed to support
its vague assertion that the uniform discount is in violation of
the anti-trust laws, it appears that the courts would find the
opposite.

### 3.  The State Action Doctrines

Even if it were assumed, as PULP appears to, that
participation in an ESCO referral program constitutes a
violation of the anti-trust laws, our approval of those programs
would most likely insulate all participants from application of
the anti-trust laws.  Parties other than PULP seem correct in
arguing participation would be deemed in conformance with a
sovereign act of government not subject to those laws, or would
be immunized under the State Action doctrine.  That is,
complying with requirements a governmental agency has
established for participation in a program is not an anti-trust
violation.

Where a state, as sovereign, adopts a restraint of
trade, an entity's participation in that restraint does not
raise anti-trust concerns.  For example, where a state decides
to implement a system of rent control, establishing maximum rent
levels for residential units, landlords charging the specified
rents do not commit an anti-trust law violation.[35]  Our Order
approving a referral program's terms and conditions, as a means

---

[34] See, <u>Monsanto Co. v. Spray-Rite Service Corp.</u>, 465 U.S. 752
(1984).

[35] <u>Fisher v. City of Berkeley</u>, 475 U.S. 260 (1986).

CASES 05-M-0858 and 05-M-0332

for transitioning to more competitive markets, similarly constitutes an act of government to which the anti-trust laws most likely do not apply.

Moreover, under the State Action doctrine, private behavior is immunized from federal anti-trust sanctions.  As the Supreme Court established in <u>Midcal Aluminum</u>, <u>supra</u>, where a governmental agency "clearly articulates" the State's policy in favor of establishing a challenged restraint, and "actively supervises" the application of that policy, entities that thereafter participate in the restraint in conformance with the policy are not subject to application of the federal anti-trust laws.  In general, where we act under the Public Service Law in regulating entities that provide utility services, the immunity is created,[36] and our approval of referral programs would appear to bring the programs within the scope of that immunity.

<u>Southern Motor Carriers Rate Conference, Inc. v. U.S.</u>, 471 U.S. 48 (1984) further supports the conclusion that approval of the referral programs immunizes them from anti-trust challenges.  That court addressed a collective ratemaking arrangement, where common carriers could voluntarily band together to submit proposed rates to various state commissions for approval, but each participant remained free to submit its own rate proposal.  The <u>Southern Motor Carriers</u> Court found that the federal anti-trust laws do not forbid the states to adopt policies that permit, but do not compel, anti-competitive conduct.  So long as a state clearly expressed its intent to adopt a permissive policy, that policy was sufficient to meet the "clear articulation" prong of the <u>Midcal</u> test.[37]

---

[36] <u>Capital Telephone Company v. City of Schenectady</u>, 750 F.2d 1154 (2nd Cir. 1984).

[37] <u>Southern Motor Carriers Rate Conference, Inc.</u>, 471 U.S. at 60.

CASES 05-M-0858 and 05-M-0332

As <u>Southern Motor Carriers</u> requires, there is "clear articulation" here.  The policies of transitioning to a more competitive market for electric services generally, and for utilizing the ESCO referral program as a mechanism for implementing that transition, have been fully formulated and thoroughly tested.  Those expressions of policy satisfy the "clear articulation" requirement.[38]

Nor does the absence of an explicit statute providing for the authority to manage the transition to competition through referral programs undermine our compliance with the "clear articulation" requirement.  If an agency action is a foreseeable outcome of a statutory provision, then it is sufficient to satisfy that test.[39]  Our authority to broaden or restrict the scope of competition when it is in the public interest is a foreseeable outcome of the Public Service Law.

As to the "active supervision" prong of the <u>Midcal</u> test, our normal administrative processes in reviewing, approving, and supervising the implementation of referral programs should constitute the requisite "active supervision." Upon our approval of a referral program, there is a review of the particular acts alleged to be anti-competitive, and those

---

[38] Decisions like <u>Cantor v. Detroit Edison Co.</u>, 428 U.S. 579 (1976) and <u>U.S. v. Rochester Gas and Electric Corp.</u>, 4 F.Supp.2d 172 (W.D.N.Y. 1998), where policies failed the "clear articulation" test, are inapposite; our justifications for competitive market policies and the deployment of referral programs would likely cure the failures those courts perceived.

[39] <u>Cine 42nd Street Theater Corp. v. Nederlander Organization</u>, 790 F.2d 1032 (2d Cir. 1986).  There, the court found clear articulation in the broad powers afforded an urban development corporation, which contracted with some theaters but not others in an effort to revitalize a theater district; the theaters that were successful in garnering contracts were immune from anti-trust suits brought by the losers.

CASES 05-M-0858 and 05-M-0332

that fail to accord with New York's policies are disapproved. This review and approval should ensure that each ESCO referral program is "actively supervised," distinguishing decisions where the immunity has been denied because of a lack of that supervision.[40]

4.   The Donnelly Act

Nor does the Donnelly Act, New York's version of anti-trust law, prohibit the uniform discount features of the referral programs, or subject participants to anti-trust liability.  New York courts have explained that the Donnelly Act was modeled on the federal Sherman Anti-Trust Act and that federal cases interpreting the Sherman Act should generally be followed by New York courts applying the Donnelly Act.[41]  As a result, the Donnelly Act prohibits the same kinds of practices in restraint of trade the Sherman Act prohibits, and New York courts would likely follow the "rule of reason" approach in analyzing the effects of ESCO referral programs on competition. Under that approach, finding a violation of the anti-trust laws is unlikely.

Moreover, although the New York courts have not adopted a State Action immunity doctrine, they do, like the federal courts, recognize that the sovereign actions of governmental agencies acting within the scope of their statutory powers are not subject to anti-trust law prohibitions or

---

[40]  See Federal Trade Commission v. Ticor Title Insurance Co., 504 U.S. 621 (1992).

[41]  Anheuser Busch, Inc. v. Abrams, 71 N.Y.2d 327 (1988); Duhamel v. Multiple Listing Service of Dutchess County, Inc., 108 Misc.2d 67 (Sup. Ct. Dutchess Cty. 1981); see also New York State v. Mobil Oil Company, 38 N.Y.2d 460 (1976).

CASES 05-M-0858 and 05-M-0332

sanctions.[42]  New York courts have also recognized that participants in government-supervised programs are not subject to sanctions under the Donnelly Act.[43]  For example, where a state regulatory agency supervises an activity, such as the operation of agricultural cooperative associations, the actions of the participants in those associations do not violate the Donnelly Act.[44]  As with federal anti-trust law, however, the failure of an agency to carry out its statutory responsibilities to supervise a program could result in the imposition of anti-trust liability.[45]  Proper approval of the referral programs, through the exercise our Public Service Law powers, would likely avoid that possibility.

Indeed, in Attorney General v. Lundy, 34 A.D. 698 (3rd Dept. 1970), the court found that our approval of a joint rate agreement, similar to that at issue in Southern Motor Carriers, conformed with "the statutory public interest expressed in the Donnelly Act."[46]  The court noted that we had investigated in detail the agreement we were approving, and that we had

---

[42] Commonwealth Electrical Inspection Services, Inc. v. Town of Clarence, 6 A.D.3d 1185 (4th Dept. 2004); Electrical Inspectors, Inc. v. Village of Lynbrook, 293 A.D.2d 537 (2nd Dept. 2002).

[43] Evans v. New York State Public Service Commission, 287 F.2d 43 (2d Cir. 2002); Capital Imaging Associates P.C. v. Mohawk Valley Medical Associates, Inc., 996 F.2d 537, 542 (2d Cir. 1993).

[44] Margrove, Inc. v. Upstate Milk Cooperative, Inc., 79 Misc.2d 309 (Sup. Ct. Monroe Cty. 1974), aff'd sub nom. Margrove, Inc. v. Wegman's Food Markets, 49 A.D.2d 669 (4th Dept. 1974).

[45] People v. Dairylea Cooperative, Inc., 114 Misc.2d 421 (Sup. Ct. Bronx Cty. 1982); see also People v. Elmhurst Milk & Cream Co., 116 Misc.2d 140 (Sup. Ct. Kings Cty. 1982).

[46] 34 A.D.2d at 699.

CASES 05-M-0858 and 05-M-0332

continuing jurisdiction over it, enabling us to either withdraw
our approval or act to bar anti-competitive practices beyond the
scope of our approval.  As a result, so long as the participants
complied with our regulatory authority, the additional sanctions
of the Donnelly Act were inapplicable.  Nothing distinguishes
our authority to review, approve and supervise the
implementation of referral programs from the circumstances in
Attorney General v. Lundy.  Therefore, it has not been shown
that referral programs violate the Donnelly Act.

     5.  The Noerr-Pennington Doctrine

     That ESCOs or other parties advocate in our
administrative proceedings a particular discount or other
feature of an ESCO Referral Program is not likely to subject
them to anti-trust liability.  Under the Noerr-Pennington
doctrine,[47] ESCOs and other parties are shielded from anti-trust
liability in petitioning for the adoption of programs, like an
ESCO referral program, even if participation in the relief
requested would constitute an anti-trust law violation in the
absence of governmental action.  This doctrine applies to state
law as well as federal law.[48]

    E.  Conclusion

     It has not been demonstrated that any provision of law
prevents the adoption of ESCO Referral Programs, or that we lack
the authority to adopt those programs, or that we should forgo
their adoption as an exercise of our discretion.  Accordingly,
we may adopt the Guidelines for those programs discussed above.

---

[47] Eastern Railroad Presidents Association v. Noerr Motor
Freight, 365 U.S. 127 (1961); United Mine Workers v.
Pennington, 381 U.S. 657 (1965).

[48] Music Center S.N.C. v. Prestini Musical Inst. Corp.,
874 F.Supp. 543 (E.D.N.Y. 1995).

CASES 05-M-0858 and 05-M-0332

## CENTRAL HUDSON'S ESCO REFERRAL PROGRAM

A. Central Hudson's Filing

In a filing dated September 6, 2005, Central Hudson requests approval of its ESCO Referral Program, which it has named Energy Switch. Describing the O&R model as one of the most successful retail access programs in the nation, Central Hudson notes that it based its ESCO Referral Program on that model. Moreover, Central Hudson states that its filing is made in compliance with the Central Hudson Retail Order, where it was directed to enter into collaborative discussions with parties on the content and implementation of a referral program.

After engaging in collaborative discussions, Central Hudson reports, it has devised an ESCO Referral Program that represents the best current practices and reflects enhancements requested by ESCOs. The utility also relates that it has performed the training of its call center representatives and installed the computer software modifications needed to implement the program. It announces that it is ready to commence the program as of December 1, 2005.

Observing that the Notice suggests that a state-wide approach to referral programs be adopted, Central Hudson requests exemption of its program from that uniform approach, at least in the interim before uniformity is required. Maintaining that its Energy Switch program represents "best practices," the utility argues that its implementation should not be delayed or prejudiced while awaiting the outcome of the Notice proceeding.

B. Central Hudson's Program

As to Energy Switch itself, Central Hudson proposes to offer enrollment to customers making inquiries to its call center. Customers are permitted to specifically request an ESCO, with customers that do not express a preference referred to participating ESCOs on a rotating basis.

-58-

CASES 05-M-0858 and 05-M-0332

Central Hudson would set the introductory discount at
7% of the average bi-monthly energy supply costs the
participating customer has incurred in the past 12 months.  If a
12 month history of usage is unavailable, the savings would be
calculated based on average usage for similar customers.  The 7%
discount would be funded by the ESCO supplying the energy.

The length of the introductory period would be no more
than two billing cycles; Central Hudson is currently the only
combination gas and electric utility still billing its customers
on a bi-monthly basis.  While the amount of the discount the
customer receives remains the same regardless of the length of
the introductory period, the ESCO may submit a rate change prior
to the end of either the first or second billing cycle.  If the
ESCO and the customer cannot agree to a contract by the end of
the second billing cycle, the ESCO must drop the customer, in an
EDI transaction, at least 15 days prior to the end of that cycle
and Central Hudson would resume commodity service to the
customer.

Central Hudson's program also contains consumer
protection measures.  The utility will record and retain for a
period of at least six months the telephone conversation where
the customer agrees to enroll in the program.  It will send each
customer enrolling in the program a standard form letter,
describing the program and identifying the ESCO that will serve
the customer.  Participating ESCOs are required to send a
contract proposal to each customer for service beyond the
introductory period no later than five days after Central Hudson
notifies them, again in an EDI transaction, of the enrollment.
The ESCO, in another EDI transaction, will notify the company

CASES 05-M-0858 and 05-M-0332

that the customer consents to a contract extending beyond the end of the introductory period.[49]

   C.  Approval of the Program

        Central Hudson's Energy Switch program is approved, subject to some modifications to enhance its consumer protection features.  We find that the 7% discount and random assignment of customers, who do not express a preference for a particular ESCO, are reasonable features of a program intended to facilitate the transition from regulated monopoly providers to a competitive market.

        1. The Discount

        For an ESCO referral program to serve as an appropriate transition mechanism, the discount must be set at a level that encourages customers to participate, but does not impose undue and unsustainable economic burdens on the ESCO providing the discounted commodity services.  As CPB points out, a discount of at least 5% is needed to attract customers to a program.  The 7% figure Central Hudson arrived at after engaging in collaborative discussions, however, indicates that ESCOs can sustain a discount at 7% level for the introductory period, as does use of the 7% discount at O&R.  Setting the discount at 7% therefore properly balances the function of attracting customers and with the burden imposed on ESCOs.

        PULP argues that the discount rate must be set based on a record including "cost information from the ESCOs showing the cost saving attributable to the referral program and showing how and to what extent these costs are being passed along to

---

[49] Central Hudson requests recovery of the incremental costs of implementing the program, which it estimates at $125,000; as discussed above, cost recovery will not be addressed here, and the utility may raise this issue in its ongoing rate proceeding.

CASES 05-M-0858 and 05-M-0332

consumers through the discount."[50]   The Public Service Law does not require the test PULP proposes.  Instead, the parties' comments and the collaborative conducted by Central Hudson yield sufficient record evidence to justify the 7% discount rate.

A comparison to programs for assisting low income customers is instructive.  In implementing those programs, low income customers are afforded a discount from the otherwise-applicable utility tariff rate.[51]   That discount is set at an amount that furthers the public interest in assuring that low-income customers can afford essential gas and electric service, while the funding for the discount is limited to the level of expenditure just and reasonable to the utility's other ratepayers.  The appropriate discount is generally arrived at through collaborative discussions and the submission of evidence similar to the evidence that justifies the 7% Energy Switch discount rate.  Indeed, PULP itself has advocated low-income discounts based on just that sort of evidence, with the justification of furthering the public interest.[52]   The same approach is sufficient to support approval of Central Hudson's 7% Energy Switch discount.[53]

---

[50] PULP Reply, p.6.

[51] See, e.g., Case 01-G-1668, New York State Electric & Gas Corporation, Order Concerning Rate Design, Economic Development, and Affordable Energy Program (issued September 23, 2004); Case 00-E-1273, Central Hudson Gas & Electric Corporation, Order Modifying Rate Plan (issued June 14, 2004).

[52] Case 01-M-0075, Niagara Mohawk Power Corporation, Opinion No. 01-6 (issued December 3, 2001).

[53] This approach is followed in making rates for other public policy programs as well.  See, e.g., Case 03-E-1761, Flexible Rate Contract Service, Order Approving Guidelines for Flexible Rate Contract Service (issued April 14, 2005).

CASES 05-M-0858 and 05-M-0332

Central Hudson would calculate the discount against a customer's average consumption, rather than against metered consumption over any particular period.  This approach avoids delays the customer might otherwise experience in realizing the discount, arising out of the utility's unusual bi-monthly billing cycle.  The utility's approach to calculating the discount ensures that, whenever the customer enrolls, the effect of the discount appears in its first bi-monthly bill after enrollment.  Therefore, Central Hudson's approach is approved, as an acceptable deviation from the usual practice of calculating the discount against metered consumption.

2.  <u>Enrollment</u>

Central Hudson follows "best practices" in allowing customers participating in Energy Switch to enroll with the ESCO of their choice if they have a preference.  If no preference is expressed, the customer would be referred to an ESCO drawn, on a rotating basis, from a list of program participants.  This practice accords with the modified Guidelines for referral programs discussed above, and is approved.

3.  <u>Consumer Protection Measures</u>

Central Hudson's approaches to consumer protection are generally in conformance with the ESCO Service option of the Guidelines.  Under the ESCO Service approach, however, no written contract is in effect for the introductory period. Central Hudson shall file a tariff that complies with the Guidelines, discussed above, that must attend the ESCO Service approach.  The Guidelines also require that Central Hudson issue an enrollment confirmation letter to customers participating in the program.  The utility's proposed form for that letter does not fully satisfy the Guidelines, and it is directed to conform its letter to the Guidelines' time limitations and requirements.

CASES 05-M-0858 and 05-M-0332

With these revisions, the Central Hudson Energy Switch program is acceptable and is approved.

    4. <u>UBP Waivers</u>

    Under the UBP's two step process for changing a service provider, the first step to enrolling with an ESCO is for the customer to agree to an ESCO's offer, which is subsequently embodied in a sales agreement the customer accepts. The second step is enrollment itself.  As currently described in the UBP, this transaction is primarily between the ESCO and the distribution utility, when the utility modifies its records, upon an EDI transaction with the ESCO, to reflect the customer's transfer to a provider as of a specific date.  If Central Hudson is to implement the enrollment process it contemplates for Energy Switch, waivers from the UBP provisions and EDI protocols are needed, to remain in effect until the time the UBP can be revised to accommodate referral programs.

    Like other ESCO referral programs, Central Hudson's Energy Switch program is premised upon an approach to customer agreement, enrollment, and notification that deviates from the UBP approach.  The utility, rather than the ESCO, enrolls the customer in the referral program for the introductory period. As a result, the ESCO does not transmit an EDI enrollment request to the utility.  Instead, the utility would transmit an EDI enrollment advisory to the ESCO to alert it to the customer's participation in the program.  The utility's actions are deemed to enroll the customers in the referral program for the introductory period, subject to the ESCO's responsibility to contract with the customers for the following period.

    These processes do not comport with the UBP and its EDI protocols.  UBP §5(B)(1)(a) prescribes that an ESCO will provide the customer with a sales agreement within three business days after enrollment.  Under Central Hudson's program,

CASES 05-M-0858 and 05-M-0332

however, the ESCO provides the customer with a sales agreement within five days after the utility notifies the ESCO that the customer has been enrolled.

Moreover, many of the protocols for EDI transactions set forth in Attachments 1, 2 and 3 to UBP §5, and provisions of UBP §5(D), which describes the enrollment process itself, are inconsistent with utility enrollment of customers.  Similarly, §5(E), which requires utility notification of the enrollment to the customer one day after receipt of the enrollment from an ESCO, is in conflict with Central Hudson's program, because the utility enrolls the customer and sends it a letter within 3 days notifying it of the enrollment.  UBP §5(H)(1), which addresses return of a customer to utility service is superfluous, because under Central Hudson's ESCO Service model, the ESCO will be responsible for executing the EDI transaction needed to accomplish the reversion.

Application of the UBP to the Energy Switch Program raises another issue.  Under Central Hudson's ESCO Service option approach, the ESCO will be responsible for obtaining customer consent to a contract before the end of the introductory period, or dropping the customer if consent cannot be obtained.  Notwithstanding that the ESCO will have sent the customer a written sales agreement for the post-introductory period, and the UBP would limit a demonstration of consent to a written response, the Guidelines allow the ESCO to demonstrate consent to that contract under any of the three means -- telephonic, electronic or written -- described in the UPB.

Waivers of the UBP are granted so that Central Hudson may implement its Energy Switch program as approved above.  The scope of the waiver encompasses any UBP provision that is inconsistent with that implementation.  Otherwise, however, the UBP remains in effect governing the relationship among

CASES 05-M-0858 and 05-M-0332

utilities, ESCOs and customers, particularly in the post-introductory period.  We will supervise the application of the waiver, addressing questions and resolving disputes to the extent necessary.  The waiver shall expire when the UBP is revised to accommodate ESCO Referral Programs.

    D.  <u>Conclusion</u>

       To implement its approach, Central Hudson shall make a compliance filing, revising its program to accommodate the above modifications.  That filing shall be submitted by January 13, 2006, and shall include the requisite tariff, to take effect February 1, 2006 on short notice.  The utility may then commence Energy Switch operations, effective as of February 1, 2006.  We will review the compliance filing and supervise Central Hudson's operation of the program, to ensure its terms and conditions comply with the Guidelines established here and shall require the utility to make any changes to the program, either before or after initial implementation, that are needed to bring the program into compliance with the Guidelines or this Order.

<u>FURTHER PROCEEDINGS</u>

       Other utilities besides Central Hudson have been considering ESCO referral programs.  NFG filed a proposed referral program on December 1, 2005 in Case 04-G-1047.  Further proceedings will be conducted there concerning its proposal.

       O&R has proposed modifications to its existing program that is already in place.  Niagara Mohawk is engaged in a collaborative to develop a retail access plan, and Con Edison has also been working on a referral program.  These utilities shall continue efforts to develop ESCO referral programs, as features of their retail access plans, in existing collaborative frameworks, where the effect of the Guidelines we adopt here can be discussed.  These utilities shall, however, conclude

CASES 05-M-0858 and 05-M-0332

collaborative efforts by filing a proposed program that conforms to the Guidelines, within 60 days of this Order.

Keyspan, RG&E, and NYSEG, however, have not yet begun work on ESCO Referral Programs.  Since it is uncertain when Keyspan will initiate a new rate proceeding, and RG&E is in the midst of a long-term rate plan, those two utilities should be directed to initiate collaboratives on the development of ESCO referral programs by February 1, 2006, and to file final programs for approval as soon as collaborative efforts can be concluded.  As to NYSEG, it is also directed to commence a collaborative on development of an ESCO Referral by the February 1 date, but it may conduct that collaborative to the extent appropriate in the context of its ongoing electric rate proceeding, Case 05-E-1222 and referral program issues may be raised there.  With these actions, the development of ESCO referral programs will proceed at each of New York's major electric and gas utilities.

The Commission orders:

1.  The Guidelines attached in Appendix B for the design of ESCO referral and discount programs are adopted, subject to the discussion in the body of this Order.

2.  Consolidated Edison Company of New York, Inc., Niagara Mohawk Power Corporation and Orange and Rockland Utilities, Inc. are directed to conduct the collaboratives and make the filings described in the body of this Order.

3.  The Brooklyn Union Gas Company d/b/a KeySpan Energy Delivery New York and KeySpan Gas East Corporation d/b/a KeySpan Energy Delivery Long Island, New York State Electric & Gas Corporation, and Rochester Gas & Electric Corporation are directed to initiate the collaboratives on the development of ESCO referral and discount programs described in the body of this Order.

CASES 05-M-0858 and 05-M-0332

4.   Central Hudson Gas & Electric Corporation is directed to file the tariff described in the body of this Order, on implementation of its ESCO referral and discount program by January 13, 2006, to take effect on February 1, 2006 on a temporary basis.  The tariff shall not become effective on a permanent basis until approved.

5.   The requirement of Public Service Law §66(12)(b) as to newspaper publication of the changes proposed in the tariff amendment filed in accordance with Ordering Clause 3 is waived.

6.   Central Hudson Gas & Electric Corporation shall submit, by January 13, 2006, the compliance filing on its proposed ESCO referral and discount program described in the body of this Order.

7.   Subject to the compliance filing required in Ordering Clause 6, Central Hudson Gas & Electric Corporation's filing establishing an ESCO referral and discount program is approved, with modifications, in conformance with the discussion in the body of this Order, and application of the Uniform Practices to the program is waived to the extent described in the body of this Order.

8.   These proceedings are continued.

By the Commission,


(SIGNED)                          JACLYN A. BRILLING
                                        Secretary

CASES 05-E-0858 and 05-M-0332                        APPENDIX A

## PROPOSED GUIDELINES FOR ESCO REFERRAL PROGRAMS

The details of Staff's proposed statewide guidelines for ESCO Referral Programs and standardized customer agreement for such programs are as follows.

All ESCO Referral Programs would have the following attributes:

1.  Each ESCO may continue to sign up and enroll customers directly.

2.  Utilities should continue to assist in the enrollment process.  Additionally, utilities would be required to enroll customers in this program on behalf of the ESCOs.  In doing so, the utilities will be acting as the agents of the ESCOs and, therefore, must comply with all UBP requirements that would otherwise apply to the ESCOs, including, but not limited to, the Customer Agreement Procedures, Customer Enrollment Procedures, and Customer Notification requirements in Section 5 of the UBP.  For example, the utilities must offer all customers the option to enter into sales agreements with the ESCOs via any of the methods allowed under UBP §5(B)(1) (*i.e.*, telephonic, electronic, or written).

3.  All customers must affirmatively choose a specific ESCO.

4.  A standard-form sales agreement, approved by the Commission and consistent with the requirements of the UBP, would govern the business relationship between the customer and the ESCO unless and until changed by agreement between the ESCO and the customer.  The proposed standard-form sales agreement is attached to this Notice as Appendix A; details of the agreement include:

CASES 05-E-0858 and 05-M-0332                    APPENDIX A

   i) Each ESCO must specify its energy commodity price for a minimum two-month "introductory period."[1] The ESCO's price during the introductory period must be expressed relative to the utility's commodity price (*e.g.*, an ESCO offering a discount would specify its price as a percentage off of the utility's commodity price).

   ii) After the introductory period, the agreement would be an "open price" contract, allowing the ESCO to change its price upon notice to the customer.

   iii) The term would be month-to-month.

   iv) The customer (or the ESCO, after the introductory period) could withdraw at any time without penalty.  To avoid being charged the commodity price of the customer's existing ESCO for the next billing period, the customer must give notice of withdrawal to the ESCO at least 15 days before the next scheduled meter reading, or request a special meter reading.  Special meter readings, however, are typically subject to a service charge.

  5. Any amendment to the terms and conditions, except price, as allowed under the "open price" provisions, would require the customer's affirmative consent, in a manner consistent with the UBP §(5)(B)(1).

  6. Once migrated, each customer would remain a customer of the ESCO unless or until the customer, or the ESCO, elects otherwise (*e.g.*, the customer could choose to return to the utility, or switch to another ESCO, or the ESCO[2] may choose no longer to provide service to the customer).

---

[1] The ESCO may offer a longer introductory period.

[2] Certain limitations may apply to the ESCO under law.

      i)   If the customer withdraws, or the ESCO decides no longer to provide service to the customer, and the customer does not choose another ESCO, the customer would be returned to the utility for full service.

      ii)  For gas customers, the change in providers will occur on the first of the month.

7.   At the time the ESCO sends the utility an EDI price change, the ESCO will be deemed to affirm and represent that its customers have been given proper notice of such price change.

8.   Information about the ESCO Referral Program must conspicuously disclose that (i) savings, if any, offered during the introductory period are not guaranteed beyond the introductory period; (ii) the ESCO may change its price, upon notice to the customer, after the introductory period; and (iii) a residential customer may rescind the sales agreement as follows:

      (a) if the customer's agreement was obtained telephonically, within three business days after the customer's receipt of a copy of the sales agreement;

      (b) if the customer's agreement was obtained electronically, within three business days after the customer's electronic acceptance of the sales agreement; or

      (c) if the customer's agreement was given in writing, within three business days after the customer's signing the sales agreement.

9.   Utilities and ESCOs may provide prospective ESCO customers with information about the ESCO Referral Program in several ways, including the internet, a dedicated toll-free telephone line; media advertising, and direct mailings.

CASES 05-M-0858 and 05-M-0332                    APPENDIX B

## GUIDELINES FOR ESCO REFERRAL PROGRAMS

1.  <u>Effect of ESCO Participation</u>.  An ESCO's participation
in an ESCO referral program shall not restrict its freedom to
continue making offers and enrolling customers outside of the
requirements of the program.

2.  <u>Selection of an ESCO</u>.  Customers participating in a
referral program shall be permitted to affirmatively choose a
specific ESCO.  Customers that do not express a preference will
be assigned at random, on a rotating basis, to an ESCO drawn
from the list of participants in the program.

3.  <u>Enrollment</u>.  Utilities shall enroll customers into a
referral program on behalf of ESCOs, and may accomplish
enrollment through a telephonic process implemented by their
call centers.  Utilities shall retain, for a period of six
months, a recording of the conversation where the customer
agrees to participate in the program.  Within three days of
enrollment, utilities shall send the customer a letter, drafted
in conformance with the standards established in Attachment I,
confirming enrollment, and shall, in an EDI transaction, notify
the ESCO of the enrollment.

4.  <u>The Introductory Period</u>.  ESCOs participating in a
referral program shall offer all customers referred to them the
introductory discount for the introductory period established
for that utility's program.  Customers may withdraw from the
program during the introductory period upon notice.  Customers
shall be limited to one introductory offer.

5.  <u>The ESCO Service Option</u>.  Under the "ESCO Service"
approach to establishing a referral program, the utility will
enroll the customer for the introductory period, and the ESCO
will provide the commodity discount.  The ESCO also will, within
five days of utility notice of enrollment, send the customer a

CASE 05-M-0858                                          APPENDIX B

contract for the post-introductory period.  If the customer does not affirmatively agree to the contract, as documented under one of the three methods established in the Uniform Business Practices (telephonic, electronic, or written), the customer will automatically revert to utility service at the end of the introductory period.  The utility will tariff the terms and conditions of the program.

      6.  The ESCO Contract Option.  Under the "ESCO Contract" approach to establishing a referral program, the utility will enroll the customer and the ESCO, within five days of utility notice of enrollment, will provide the customer with a sales agreement governing both the introductory and post-introductory periods.  That contract must conform to the principles established in Attachment II, and will take effect unless rescinded by the customer within three days of receipt under one of the methods established in the Uniform Business Practices.

      7.  EDI Confirmation of Transactions.   Under the ESCO Service approach, at the time the ESCO sends the utility an EDI price change the ESCO will be deemed to affirm and represent that it has obtained the customer's affirmative consent to a post-introductory period contract.  Under the ESCO Contract approach, at the time the ESCO sends the utility an EDI price change, the ESCO will be deemed to affirm and represent that it has given its customer proper notice of the price change.

      8.  Uniform Business Practices Waivers.  Consistent with the consumer protections incorporated in a referral program established in conformance with these Guidelines, the Uniform Business Practices will be waived to the extent necessary to accommodate implementation of the referral program, upon review and approval of that program as proposed by a utility.  The waiver will remain in effect until the time the Uniform Business

                              -2-

CASE 05-M-0858                                        APPENDIX B


Practices are modified to specifically address referral programs.

    9.  <u>Program Promotion</u>.  Utilities and ESCOs may promote referral programs by providing customers with accurate information through the Internet, a dedicated toll-free telephone line, media advertising, direct mailings and other appropriate means.  All informational materials promoting a referral program must conspicuously disclose that the savings offered during the introductory period are not guaranteed beyond that period.

CASES 05-M-0858 and 05-M-0332                         APPENDIX B


ATTACHMENT I

<u>REFERRAL PROGRAM ENROLLMENT LETTER</u>


A utility's enrollment confirmation letter to a customer participating in a referral program shall include the following:

1.  The effective date of the enrollment, and the name of the ESCO that will provide the service, and the type of service (electric, gas, or both).

2.  A description of the introductory discount, including the method of calculation, and the length of the introductory period.

3.  Identification of the location of the discount on the customer's bill, and a notice that utility budget billing arrangements will continue or can be initiated.

4.  A notice informing the customer that the ESCO will contact the customer soon to offer it a sales agreement, and describing the effect of the sales agreement under the applicable ESCO Service or ESCO Contract approach to the referral program, including the provisions for return to utility service.

5.  A notice informing the customer of its right to withdraw from the program during the introductory period upon notice.

6.  A description of the utility's roles and responsibilities as the delivery service provider and the utility's contact information.

7.  A description of the Commission's consumer complaint procedures available to ESCO customers, and information on contacting the Commission with a complaint about an ESCO.

CASES 05-M-0858 and 05-M-0332                           APPENDIX B

ATTACHMENT II

ESCO CONTRACT OPTION REQUIREMENTS

The contract the ESCO provides the customer under the ESCO Contract approach must provide for rescission upon three days notice documented under the Uniform Business Practices, conform to the provisions of the utility enrollment letter that are effective during the introductory period, and reflect the following principles for the period after the introductory period ends.

1.  The term of the sale agreement shall be month-to-month, allowing either party to cancel upon notice consistent with that term.

2.  The price for electric commodity service shall be set under an "open price" provision allowing the ESCO to change its price upon 15 day's notice to the customer, with that notice provided at least 30 days prior to the customer's next scheduled meter read.

3.  Notwithstanding any other provision of the contract, the customer shall be allowed to cancel the contract within the 15 day notice period of a price change from an ESCO.

4.  The customer may cancel the contract without payment of a penalty or termination fee to the ESCO.  If notice of cancellation is not given at least 15 days prior to the next scheduled meter reading, the customer may request a special meter reading, which is typically subject to a service charge.

5.  The ESCO must give 30 days notice, provided 30 days before a meter read, before it may assign a customer's contract to another service provider.

6.  Any change to the contract, other than to the open price provision, shall require the customer's affirmative consent, documented under one of the three methods specified in the Uniform Business Practices (telephonic, electronic or written).