# MDM Declaration Exhibit A-07

```
 1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
 4   No. 18 Civ. 2949(ARR)(RER)
     - - - - - - - - - - - - - - - - - - - -x
 5
     SUSANNA MIRKIN and BORIS MIRKIN,
 6   Individually and on Behalf of All Others
     Similarly Situated,
 7
                    Plaintiffs,
 8
             -against-
 9
     XOOM ENERGY, LLC AND XOOM ENERGY
10   NEW YORK, LLC,
11              Defendants.
12   - - - - - - - - - - - - - - - - - - - -x
13
        16 Court Street
14      Brooklyn, New York 11241
15
        August 30, 2022
16      10:21 a.m.
17
        DEPOSITION of SUSANNA MIRKIN (REDACTED),
18
19   a Plaintiff in the above-entitled action,
20   held at the above time and place, taken
21   before SAMUEL HITTIN, a Shorthand Reporter
22   and Notary Public of the State of New
23   York, pursuant to the Federal Rules of
24   Civil Procedure, order and stipulations
25   between Counsel.
```

Page 1

### Page 2

```
 1
 2  APPEARANCES:
 3
      WITTELS, McINTURFF, PALIKOVIC
 4    Attorneys for Plaintiffs
      SUSANNA MIRKIN and BORIS MIRKIN
 5       295 Madison Avenue
         New York, New York 10017
 6       (914)775-8862
 7    BY:  STEVEN WITTELS, ESQ.
      AND: STEVEN COHEN, ESQ.
 8
 9
10    MCDOWELL HETHERINGTON, LLP
      Attorneys for Defendants
11    XOOM ENERGY, LLC AND XOOM ENERGY
      NEW YORK, LLC
12       1001 Fannin Street, Suite 2700
         Houston, Texas 77002
13       (713)337-5580
14    BY:  MATT MATTHEWS, ESQ.
15
16  ALSO PRESENT:
17    VERITEXT VIDEOGRAPHER
18    BY:  ZEF COTA
19
           *   *   *
20
21
22
23
24
25
```

### Page 3

```
 1
 2              STIPULATIONS
 3     IT IS HEREBY STIPULATED, by and among
 4  the attorneys for the respective parties
 5  hereto, that:
 6     All rights provided by the C.P.L.R.,
 7  and Part 221 of the Uniform Rules for the
 8  Conduct of Depositions, including the
 9  right to object to any question, except as
10  to form, or to move to strike any
11  testimony at this examination is reserved;
12  and in addition, the failure to object to
13  any question or to move to strike any
14  testimony at this examination shall not be
15  a bar or waiver to make such motion at,
16  and is reserved to, the trial of this
17  action.
18     This deposition may be sworn to by the
19  witness being examined before a Notary
20  Public other than the Notary Public before
21  whom this examination was begun, but the
22  failure to do so or to return the original
23  of this deposition to counsel, shall not
24  be deemed a waiver of the rights provided
25  by Rule 3116, C.P.L.R., and shall be
```

### Page 4

```
 1
 2  controlled thereby.
 3     The filing of the original of this
 4  deposition is waived.
 5     IT IS FURTHER STIPULATED, a copy of
 6  this examination shall be furnished to the
 7  attorney for the witness being examined
 8  without charge.
 9
10         *   *   *
```

### Page 5

```
 1
 2        THE VIDEOGRAPHER:  Good morning.
 3  We are going on the record at
 4  10:22 a.m. Eastern Daylight Time on
 5  August 30, 2022.  Please note that the
 6  microphones are sensitive and may pick
 7  up whispering and private
 8  conversations.  Please mute your
 9  phones at this time.  Audio and video
10  recording will continue to take place
11  unless all parties agree to go off the
12  record.
13        This is media unit one of the
14  video-recorded deposition of Susanna
15  Mirkin, taken by counsel in the matter
16  of Susanna Mirkin and Boris Mirkin,
17  et al., versus XOOM Energy, LLC, and
18  XOOM Energy New York, LLC, filed in
19  the United States District Court,
20  Eastern Division of New York, Case
21  Number 18-CIV-2949.
22        The location of this deposition
23  is Veritext Brooklyn, 16 Court Street,
24  Brooklyn, New York.
25        My name is Zef Cota,
```

## Page 6

1  representing Veritext, and I am the
2  videographer. The court reporter is
3  Samuel Hittin, from the firm Veritext.
4  I am not authorized to administer an
5  oath, I am not related to any party in
6  this action, nor am I financially
7  interested in the outcome.
8      If there are any objections to
9  proceeding, please state them at the
10 time of your appearance. Counsel and
11 all present, including remotely, will
12 now state their appearances and
13 affiliations for the record, beginning
14 with the noticing attorney.
15     MR. MATTHEWS: This is Matt
16 Matthews with the law firm of McDowell
17 Hetherington on behalf of the
18 defendants, XOOM Energy.
19     MR. WITTELS: Steven Wittels for
20 the plaintiff, Mirkins. I'm together
21 with my co-counsel, Steve Cohen --
22 Steven Cohen, from the law firm
23 Wittels, McInturff, Palikovic.
24     MR. MATTHEWS: Thank you.

## Page 7

1      And appearing by phone, just to
2  listen, are Christina Dillard, who's
3  in-house counsel for XOOM, and Emily
4  Felix, who is also with the McDowell
5  Hetherington law firm.
6      THE VIDEOGRAPHER: Will the
7  court reporter please swear in the
8  witness, and then counsel may proceed.
9
10 S U S A N N A  M I R K I N, the Witness
11 herein, having first been duly sworn by
12 the Notary Public, was examined and
13 testified as follows:
14 BY COURT REPORTER:
15  Q.  Please state your name for the
16 record?
17  A.  Susanna Mirkin.
18  Q.  Please state your address for
19 the record?
20  A.  1677 East 34th Street, Brooklyn,
21 New York 11234.
22 EXAMINATION BY
23 MR. MATTHEWS:
24  Q.  Good morning, Ms. Mirkin.

## Page 8

S. MIRKIN
1  A.  Good morning.
2  Q.  Thank you for being here today.
3      Could you please state your full
4  name for the record.
5  A.  Susanna Mirkin.
6  Q.  Okay. And what is your maiden
7  name?
8  A.  Aminova.
9  Q.  And, Ms. Mirkin, have you been
10 deposed before?
11 A.  Have I been?
12 Q.  So the exercise that we're going
13 through here today as part of this lawsuit
14 is called a deposition.
15 A.  Okay.
16 Q.  Where -- I'm sure your counsel
17 has visited with you a little bit, but I'm
18 going to go over some ground rules, just
19 to be sure that we're on the same page and
20 that you understand. I'm going to ask you
21 questions and your answers are provided
22 under oath.
23     Do you understand that?
24 A.  Yes.

## Page 9

S. MIRKIN
1  Q.  Okay. And it's with the same
2  sort of weight and penalty -- potential --
3  that they would have in a court of law.
4      Do you understand that?
5  A.  I do.
6  Q.  Okay. And with that
7  understanding that that's, in a nutshell,
8  what a deposition is, have you ever given
9  your deposition before?
10 A.  With XOOM, or in general?
11 Q.  In any case.
12 A.  Yes.
13 Q.  Yes. And when was that?
14     [Whereupon, testimony is
15 continued in confidential portion of
16 transcript.]

**Page 32**

```
 1              S. MIRKIN
 2    Q.   Okay.  So you come to the United
 3  States when you were about 12 years old,
 4  right?
 5    A.   9.
 6    Q.   Oh.  Okay.  And did you move to
 7  New York right away?
 8    A.   Yes.
 9    Q.   And have been here ever since?
10    A.   Yes.
11    Q.   And you live in Brooklyn
12  currently?
13    A.   I do.
14    Q.   Have you always lived in
15  Brooklyn?
16    A.   I lived in Queens.
17    Q.   When did you live in Queens?
18    A.   I don't have exact dates, the
19  years.
20    Q.   That's okay.  What's the
21  ballpark?
22    A.   In 2000s.
23    Q.   Okay.  Do you remember the
24  address?
25    A.   No, not exactly.
```

**Page 33**

```
 1              S. MIRKIN
 2    Q.   Okay.  Aside from the period of
 3  time that you've lived in Queens, you've
 4  always lived in Brooklyn --
 5    A.   Mm-hmm.  Yes.
 6    Q.   -- ever since 1990?
 7         And your current address is
 8  what?
 9    A.   1677 East 34th Street, Brooklyn,
10  New York 11234.
11    Q.   And do you own or rent that
12  property?
13    A.   We own.
14    Q.   You and --
15    A.   My husband.
16    Q.   -- Boris Mirkin own it jointly?
17    A.   Yes.
18    Q.   And who lives there with you?
19    A.   Us and our kids.
20    Q.   How long have you lived at that
21  address?
22    A.   12 years.
23    Q.   Have you owned or rented any
24  other properties during that 12-year
25  period?
```

**Page 34**

```
 1              S. MIRKIN
 2    A.   No.
 3    Q.   Have you and Mr. Mirkin ever
 4  owned any other properties?
 5    A.   No.
 6    Q.   Do you remember the address you
 7  lived at before moving to 1677 East 34th?
 8    A.   I lived in Queens.
 9    Q.   I see.
10         Okay.  Ms. Mirkin, you've never
11  live in Staten Island, right?
12    A.   No.
13    Q.   Okay.  And do you understand
14  that there has been some documents
15  produced in this case that show a Boris
16  Mirkin receiving gas service from XOOM
17  Energy?
18    A.   I saw that, yes.
19    Q.   Okay.  But that is not your
20  husband?
21    A.   That is not my husband.
22    Q.   That's a different Boris Mirkin?
23    A.   Correct.
24    Q.   Is that Boris Mirkin related to
25  your husband?
```

**Page 35**

```
 1              S. MIRKIN
 2    A.   I think he's a cousin.
 3    Q.   Okay.
 4    A.   My husband would know more about
 5  this Boris Mirkin.
 6    Q.   Yes.  But just to show you --
 7         MR. MATTHEWS:  Can I have the
 8  stickers.  Thank you.
 9    Q.   Ms. Mirkin, I'm going to mark
10  this document, which is an e-mail.  The
11  heading says New Customer Enrollment, just
12  so we're -- we know we're talking about
13  the same thing.
14    A.   Sure.
15    Q.   I'm going to hand you that.
16    A.   Mm-hmm.
17         [Whereupon, document was marked
18  as Defendants' Exhibit 4 for
19  identification, as of this date.]
20    Q.   This is a document that's been
21  Bates-labeled XOOM INIT 12 through 13.
22         Have you seen this document
23  before?
24    A.   No.
25    Q.   No.  Fair enough.
```

8 (Pages 32 - 35)

**Page 36**

```
1           S. MIRKIN
2       The billing info there, you
3  see it shows Boris Mirkin, 21 Peggy Lane,
4  Staten Island, New York 10306?  Do you see
5  that?
6     A.   I see that.
7     Q.   And that's not your husband?
8     A.   That's not my husband.
9     Q.   And the phone number is not --
10    A.   That's --
11    Q.   -- your husband's phone number,
12 and you've never seen that e-mail address
13 either?
14    A.   No.
15    Q.   Okay.  So this account that is
16 referred to in Exhibit 4 is not an account
17 that ever belonged to or was used by you
18 or your husband?
19    A.   Correct.
20    Q.   And to the best of your
21 knowledge, you've never had natural gas
22 service with XOOM Energy, correct?
23    A.   Yes.  Correct.
24    Q.   And neither has your husband, to
25 the best of your knowledge?
```

**Page 37**

```
1           S. MIRKIN
2     A.   I'm not sure.  He takes care of
3  all the bills, so I'm not sure.
4     Q.   Okay.  Okay.  And you personally
5  don't know anything about the natural gas
6  rates that XOOM charged in New York since
7  it entered the market here, correct?
8     A.   The gas?
9     Q.   Yes, ma'am.
10    A.   No.
11    Q.   You said that your husband is
12 the one who takes care of the bills.  Is
13 he generally -- is it fair to say he's the
14 one who is generally in charge of energy
15 decisions in the house?
16    A.   Correct.
17    Q.   Does he consult with you about
18 retail energy decisions?
19    A.   Sure, we discuss it, but he
20 takes care of it at the end.
21    Q.   Okay.  Just help me understand
22 in a basic way how it works in your
23 household with respect to selecting energy
24 providers for electricity or natural gas.
25    A.   So he basically looks for the
```

**Page 38**

```
1           S. MIRKIN
2  best rates out there, and he just says,
3  you know, This is the best.  I say, Okay,
4  do whatever you want.
5     Q.   Do you know where he looks?
6     A.   Online.  I mean, that's the best
7  option out there.
8     Q.   Yeah.  Nothing -- I don't mean
9  to suggest there's anything wrong with
10 that.
11    A.   Right.
12    Q.   I'm just -- I don't -- I'm
13 trying to get a sense of, does he -- does
14 he call companies, does he go visit with
15 door-to-door salespeople, or does he --
16    A.   In my knowledge --
17    Q.   -- just do it online?
18        MR. WITTELS:  Object to the
19    form.  Multiple questions.  If you
20    want to break it up.
21        MR. MATTHEWS:  No.  That's okay.
22        MR. WITTELS:  You asked two at
23    the same time.
24        MR. MATTHEWS:  Yeah.  That's
25    okay.
```

**Page 39**

```
1           S. MIRKIN
2        MR. WITTELS:  Object to the
3    form.
4        If you understand it, you can
5    answer.
6        THE WITNESS:  Okay.
7     A.   In my knowledge, he looks
8  through the internet.  That's the best
9  way.
10    Q.   Okay.  So making retail energy
11 decisions in your house, how it generally
12 works is, Mr. Mirkin looks online to shop
13 for the best rates available, he sometimes
14 speaks with you about it, and then he is
15 the one who takes care of the actual
16 enrollment?
17    A.   Correct.
18        MR. WITTELS:  Object.
19        Give me time to answer --
20    object.  It's fine for you to answer.
21    Just give me time on the record before
22    you answer and after he asks his
23    question, please.
24        Object to the form of that.
25        You already answered.
```

9 (Pages 36 - 39)

**Page 40**

```
1        S. MIRKIN
2    Q.  Your answer was yes?
3    A.  Yes.
4    Q.  That's generally how it works?
5    A.  Right.
6    Q.  Okay.  Ms. Mirkin, do you know
7  who your current supplier is for
8  electricity?
9    A.  Con Edison.
10   Q.  Con Edison.
11       And since when has Con Edison
12 been your supplier for electricity?
13   A.  I'm not sure.
14   Q.  Do you know what your current
15 rate is for electricity?
16   A.  No.
17   Q.  Okay.  And do you know if your
18 rate is fixed or variable?
19   A.  I don't know.
20   Q.  With respect to natural gas,
21 who's your current supplier for natural
22 gas?
23   A.  National Grid.
24   Q.  And how long has National Grid
25 been your supplier for natural gas?
```

**Page 41**

```
1        S. MIRKIN
2    A.  I'm not sure.  My husband takes
3  care of everything, so I'm not sure.
4    Q.  That's okay.
5        Ms. Mirkin, have you ever heard
6  the term "ESCO"?
7    A.  Yes.
8    Q.  Okay.  And tell me, in your
9  words, what an ESCO is.
10   A.  ESCO is an energy supply
11 company.
12   Q.  You understand that's -- it's a
13 private company that's run for profit,
14 correct?
15       MR. WITTELS:  Objection.
16       You can answer, if you
17   understand what he's asking.  Don't
18   guess.
19   A.  I'm not sure what you mean.
20   Q.  Sure.  Okay.
21       You understand that Con Edison
22 and National Grid are default utility
23 options, correct?
24   A.  Correct.
25   Q.  Okay.  And that's contrasted, in
```

**Page 42**

```
1        S. MIRKIN
2  some ways, with an ESCO, which is a -- an
3  ESCO is a private company, and you
4  understand that its rates are not set by
5  regulators, correct?
6        MR. WITTELS:  Objection to the
7    form.
8        If you can -- if you know.  Only
9    if you know.
10   A.  I don't know.
11   Q.  Okay.  Do you understand the
12 utility rate to be a regulated rate?
13       MR. WITTELS:  Objection.
14   A.  I don't know.
15   Q.  Okay.  Do you understand an
16 ESCO's rate to be a competitive rate that
17 can move with the market?
18       MR. WITTELS:  Objection.
19   A.  According to the complaint that
20 you have, that I brought in, that we have
21 a list, and it has a grid where it
22 compares to market and XOOM or Con Edison
23 and other suppliers.  So I do have that at
24 hand.  And it was determined by the
25 experts and by our lawyers.
```

**Page 43**

```
1        S. MIRKIN
2    Q.  You're referring to the
3  allegations in the complaint?
4    A.  Correct.
5    Q.  Okay.  Did you help prepare
6  those allegations?
7    A.  Did I help?  No.
8    Q.  Okay.
9    A.  It was all with lawyers and
10 experts.
11       MR. WITTELS:  By the way, can
12   the witness have her documents back?
13       MR. MATTHEWS:  I'll give it to
14   her in a little bit.
15       MR. WITTELS:  I'd like her to
16   have the documents.  She brought them
17   and I'd like her to have them.
18       MR. MATTHEWS:  I understand.
19   But I'm going to test her recollection
20   about something.
21       MR. WITTELS:  No, no, you're
22   not.
23       MR. MATTHEWS:  You're welcome to
24   give her the documents when you --
25       MR. WITTELS:  No.  They're our
```

**Page 56**

```
 1            S. MIRKIN
 2    question, please.
 3           [Whereupon, a portion of the
 4    testimony was read back.]
 5           MR. WITTELS:  Objection.
 6    A.    So according to the contract --
 7    Q.    And you're looking at Exhibit 3
 8    right now?
 9    A.    Correct.
10    Q.    Okay.
11    A.    I just wanted to make sure
12    that -- that you know that I'm reading
13    from the contract.
14    Q.    Mm-hmm.
15    A.    It says our monthly variable
16    rate is based on XOOM's actual and
17    estimated supply costs.
18    Q.    I agree that the contract says
19    that.  Do you know anything about what
20    XOOM's actual or estimated supply costs
21    were during the time that you and your
22    husband were electricity customers of
23    XOOM?
24    A.    So the first month's, when we
25    applied, it was a teaser plan, which that
```

**Page 57**

```
 1            S. MIRKIN
 2    increased the next month, and the next
 3    month after that, until November.  So
 4    that's why -- that's why there's
 5    significant changes.
 6    Q.    I understand, but that wasn't my
 7    question.  My question was, do you know --
 8    you referred me to the contract language
 9    on Exhibit 3 --
10    A.    Mm-hmm.
11    Q.    -- that said the variable rate
12    would be based on XOOM's actual and
13    estimated supply costs --
14    A.    Correct.
15    Q.    -- right?
16          And my question is, do you know,
17    during the time period that you and your
18    husband were XOOM electricity customers,
19    what XOOM's actual and estimated supply
20    costs were?
21    A.    At the time, my husband probably
22    knew, because he does take care of the
23    bills and everything else with it.  So he
24    probably knew, yes.
25    Q.    As we sit here today, you don't
```

**Page 58**

```
 1            S. MIRKIN
 2    know what XOOM's actual and estimated
 3    supply costs were during the time period
 4    that you were a XOOM electricity customer?
 5    A.    At the time, no.
 6    Q.    Not at the time, and not today?
 7    A.    Can you repeat that?
 8    Q.    Sure.
 9          You have not ever had an
10    understanding about what XOOM's actual or
11    estimated supply costs were during the
12    time period that you were a XOOM customer,
13    correct?
14           MR. WITTELS:  Objection.
15    A.    So at the time when he had XOOM,
16    everything was taken care of by my
17    husband.  Then when we filed a complaint
18    and a lawsuit, that's when -- in my
19    attention, that I started to see the --
20    the table and the agreement and what the
21    rates are.
22    Q.    Right.  Maybe I'm asking a poor
23    question.  I'm not trying to.
24          You directed me to Exhibit 3,
25    which is the contract language, right?
```

**Page 59**

```
 1            S. MIRKIN
 2    A.    Right.
 3    Q.    And specifically, the phrase
 4    "actual" -- "XOOM's actual and estimated
 5    supply costs," right?
 6    A.    Mm-hmm.
 7    Q.    And my question is just, do you
 8    today or have you ever known what XOOM's
 9    actual and estimated supply costs were?
10           MR. WITTELS:  Objection.
11          You can answer.
12    A.    No.
13    Q.    Okay.  Your husband enrolled the
14    two of you in this contract with XOOM that
15    we see at Exhibit 3, correct?
16    A.    Correct.
17    Q.    And the -- do you know how he
18    enrolled?
19    A.    In my understanding, I think it
20    was online.
21    Q.    Okay.  And when did you first
22    hear about XOOM?
23    A.    When we applied.  When he talked
24    about it, the different rates and what's
25    out there was the lowest rate.  So that's
```

14 (Pages 56 - 59)

**Page 60**

```
1        S. MIRKIN
2   when I first heard about it.
3      Q.   Why did he enroll under your
4   name?
5      A.   To have something under my name,
6   to have residential proof.
7      Q.   Residential proof for you?
8      A.   Yes.
9      Q.   Did you need that for
10  employment?
11     A.   For employment.
12     Q.   I see.
13          At the time, did you understand
14  that the rate that you were enrolling with
15  XOOM was a rate that could vary from month
16  to month?
17     A.   My husband probably did, but it
18  wasn't in my understanding.  When we
19  applied, he told me it was the lowest
20  rate, and I agreed, so he took care of the
21  rest.
22     Q.   You didn't have an understanding
23  as to whether the rate was fixed or
24  variable at the time?
25     A.   No.
```

**Page 61**

```
1        S. MIRKIN
2      Q.   Okay.  You're not claiming in
3   this -- I understand that you take issue
4   with the rates that XOOM charged, with how
5   high they were --
6      A.   Mm-hmm.
7      Q.   -- right?
8      A.   Correct.
9      Q.   But you are not alleging that
10  XOOM had no right to charge you a variable
11  rate, right?
12         MR. WITTELS:  Objection to form.
13         You can answer.
14     A.   Can you repeat that?
15     Q.   Sure.
16         What I'm getting at is, you --
17  you don't dispute that you and your
18  husband enrolled in a variable rate plan
19  with XOOM?
20         MR. WITTELS:  Objection to form.
21         You can answer.
22     A.   If I understand that we enrolled
23  in a variable rate?  I do understand that.
24     Q.   Okay.  And you understand that
25  the contract permitted that rate to vary
```

**Page 62**

```
1        S. MIRKIN
2   from month to month according to the terms
3   of the contract?
4      A.   Correct.
5      Q.   Okay.  Looking back at that
6   phrase "actual and estimated supply
7   costs" -- do you see that on Exhibit 3?
8      A.   Yes.
9      Q.   What does that mean to you, that
10  the rate will be based on XOOM's actual
11  and estimated supply costs?
12     A.   I'm not sure.  It's for lawyers
13  to figure it out.
14     Q.   Okay.  You don't have any
15  personal understanding --
16     A.   No.
17     Q.   -- of what that means?
18     A.   No.
19     Q.   Okay.  And you don't have any
20  personal understanding about what XOOM's
21  actual and estimated supply costs were?
22         MR. WITTELS:  Asked and
23     answered.  Objection.
24         You can answer again.
25     A.   Can you repeat that?
```

**Page 63**

```
1        S. MIRKIN
2      Q.   You don't have an understanding
3   as to what XOOM's actual and estimated
4   supply costs were, correct?
5         MR. WITTELS:  Okay.  He's asked
6      it about three times, but I'm going to
7      allow you to answer again.
8         MR. MATTHEWS:  You just asked --
9      you told me to ask it again.
10        MR. WITTELS:  No.  I'm saying
11     you already asked the question, and
12     it's on the record that she's answered
13     that question.
14        But if -- we'll stop it at some
15     point, but you can answer again --
16        THE WITNESS:  Mm-hmm.
17        MR. WITTELS:  -- if you
18     understand the question.
19     A.   Can you repeat that?
20        MR. WITTELS:  Let's have the
21     reporter read it back so he doesn't
22     have to say it again.
23        [Whereupon, a portion of the
24     testimony was read back.]
25     A.   What they were?  No.  What they
```

```
1         S. MIRKIN
2      MR. WITTELS:  Objection.
3   A.   If they're not allowed?
4   Q.   It's not your position in the
5  case that XOOM is -- may not seek a profit
6  on its energy contracts?
7   A.   It's not my position, no.
8   Q.   Okay.  You agree that XOOM can
9  seek a profit on its contracts?
10  A.   XOOM or any --
11     MR. WITTELS:  Objection.
12     You can answer.
13  A.   XOOM or any company is allowed
14 to have a profit according to their
15 contract.
16  Q.   And what the contract allows is
17 the only limit on that profit, right?
18     MR. WITTELS:  Objection.
19  A.   The only limit on their profit?
20 What does that mean?
21  Q.   That the contract doesn't say --
22 let me ask it differently.
23     The contract doesn't say that
24 XOOM will only seek a specific profit
25 percentage, right?
                                    Page 68
```

```
1         S. MIRKIN
2  A.   It does not say that.
3  Q.   Okay.  And the energy markets do
4 not -- in New York, do not cap the profit
5 that XOOM can seek, right?
6      MR. WITTELS:  Objection.
7  A.   Do I know that?
8  Q.   I'm asking.
9  A.   I don't know that.
10 Q.   Okay.  With respect to utility,
11 do you know how XOOM's rates compared to
12 utilities rates during the time you were a
13 XOOM customer?
14 A.   At that time?
15 Q.   Mm-hmm.
16 A.   Probably my husband does.  I'm
17 not sure.  I didn't deal with the rates
18 and everything.  My husband did all of it.
19 Q.   I don't mean it as a criticism.
20 This is my only opportunity to talk to
21 you, and I'm trying to get your best
22 testimony about what you know and you
23 don't know.
24 A.   Mm-hmm.
25 Q.   And if you don't know, that's
                                    Page 69
```

```
1         S. MIRKIN
2 okay.
3  A.   Mm-hmm.
4  Q.   But that's my question.  Today,
5 you don't know how XOOM's variable rates
6 compared to the utilities rates during the
7 time you were a XOOM customer, right?
8      MR. WITTELS:  Objection.
9  A.   No, I don't.
10 Q.   Okay.  You've continued looking
11 at the table on Exhibit 2, at the rates,
12 and I'm going to direct you to look at the
13 table, if you don't mind.
14 A.   Sure.
15 Q.   The first month, where your rate
16 was 8.99 cents per kilowatt hour -- do you
17 see that?
18 A.   I see.  In May through June?
19 Q.   Yes, ma'am.
20     You are not arguing that that
21 rate was too high, right?
22 A.   No.
23 Q.   Okay.  That rate, you do not
24 believe breached your agreement with XOOM,
25 right?
                                    Page 70
```

```
1         S. MIRKIN
2      MR. WITTELS:  Objection.
3  A.   That rate, in knowledge of my
4 husband and I, that was a good rate.
5  Q.   And your lawsuit against XOOM is
6 based on this contract that we looked at,
7 at Exhibit 3, right?
8  A.   Right.
9  Q.   And just for completeness, I'm
10 going -- Exhibit 3 is just the first page
11 of that contract, right?  It's not the
12 full contract?
13 A.   Correct.
14 Q.   Okay.  I'm going to mark as
15 Exhibit 5 a full copy of those terms and
16 conditions.
17     [Whereupon, document was marked
18     as Defendants' Exhibit 5 for
19     identification, as of this date.]
20 Q.   And please take as much time as
21 you want to review it and confirm that
22 what I'm saying is accurate.
23 A.   You want me to read the whole
24 agreement?
25 Q.   No, no, no.  I'm not instructing
                                    Page 71
```

```
                    S. MIRKIN
 1                                              1                  S. MIRKIN
 2  don't remember anything specific about the   2    A.   No.
 3  decision to switch from XOOM to Viridian?    3    Q.   -- or with -- about XOOM?
 4    A.   Correct.                              4    A.   No.
 5    Q.   Okay.  You later sued Viridian        5    Q.   How did you find your lawyers?
 6  in a putative class action like this one,    6    A.   From Daniel, Daniel Hymowitz.
 7  right?                                       7    Q.   Is he someone you know?
 8    A.   Correct.                              8    A.   He's a family friend.
 9    Q.   And why?                              9    Q.   I see.
10    A.   Because of their rates.              10         And you spoke with him initially
11    Q.   What about their rates?              11  about Viridian?  Well, strike that.
12    A.   We spoke to the lawyers, and         12         I don't -- I don't mean to ask
13  they were overcharging us as well, so       13  about discussions you had with your
14  that's when we decided to sue them.         14  lawyers.  I don't think that an initial
15    Q.   Okay.  Tell me in your words         15  consultation would be, but in any event,
16  what that case was.                         16  Mr. Daniel was the lawyer you first met
17    A.   It was about the rates and how       17  with about a variable rate lawsuit?
18  they were overcharging us.                  18         MR. WITTELS:  Objection.
19    Q.   Okay.  And do you know how that      19    Q.   Is that right?
20  case was resolved?                          20    A.   With which company?
21    A.   Yes.  It was settled.                21    Q.   Any company.
22    Q.   When?                                22    A.   With Viridian and XOOM, correct.
23    A.   I believe two years ago.             23    Q.   Okay.  Okay.  We talked a little
24    Q.   And what payment did you receive     24  bit earlier about XOOM and other ESCOs
25  in connection with that settlement?         25  seeking a profit in connection with their
                                   Page 76                                         Page 78

                    S. MIRKIN                                      S. MIRKIN
 1                                              1
 2    A.   I received $10,000 under my           2  business.  Do you remember that?
 3  name, and under 10,000 under my husband's    3    A.   Correct.
 4  name.                                        4    Q.   Do you have any opinion about
 5    Q.   Okay.  Ms. Mirkin, do you mind        5  what's a reasonable profit margin for XOOM
 6  if we take a break?                          6  to charge?
 7    A.   Sure.                                 7    A.   No.
 8         THE VIDEOGRAPHER:  We're going        8         [Whereupon, testimony continues
 9  off the record at 11:39 a.m.                 9    in confidential transcript.]
10         [Whereupon, a short break was        10
11    taken.]                                   11
12         THE VIDEOGRAPHER:  We're back on     12
13    the record at 11:52 a.m.                  13
14    Q.   Ms. Mirkin, can you tell me the      14
15  names of the lawyers who are representing   15
16  you in this case?                           16
17    A.   Steven Cohen, Daniel Hymowitz,       17
18  and Steven.                                 18
19    Q.   Mr. Wittels?                         19
20    A.   Yes.                                 20
21    Q.   Anybody else?                        21
22    A.   No.                                  22
23    Q.   Okay.  Do you have any               23
24  agreements with other lawyers about this    24
25  lawsuit --                                  25
                                   Page 77                                         Page 79
```

19 (Pages 76 - 79)

## Page 98

```
 1
 2   A.  No.
 3   Q.  Okay.  Okay.  Thank you very
 4 much.
 5   A.  Okay.
 6       THE VIDEOGRAPHER:  We are off
 7 the record at 12:08 p.m., and this
 8 concludes today's testimony given by
 9 Susanna Mirkin.
10
11       [TIME NOTED:  12:07 p.m.]
12
    _____
13   SUSANNA MIRKIN
14 _____
    SUBSCRIBED AND SWORN TO
15 BEFORE ME THIS _____
    DAY OF _____, 2022.
16
    _____
17   NOTARY PUBLIC
18
19
20
21
22
23
24
25
```

## Page 99

```
 1
 2       I N D E X
 3
    WITNESS     EXAMINATION BY    PAGE
 4
    SUSANNA MIRKIN   MATT MATTHEWS   7, 94
 5            STEVEN WITTELS    92
 6
        E X H I B I T S
 7
 8 PLAINTIFF'S    DESCRIPTION      PAGE
 9 EXHIBIT 1 - CON EDISON RECORD     20
10 EXHIBIT 2 - PAGE 19 OF WITNESS'S  20
        COMPLAINT
11
    EXHIBIT 3 - FIRST PAGE OF SOME    20
12      CONTRACT TERMS AND
        CONDITIONS
13
    EXHIBIT 4 - BILLING INFORMATION   35
14      FOR BORIS MIRKIN,
        21 PEGGY LANE, STATEN
15      ISLAND, NEW YORK 10306
16 EXHIBIT 5 - FULL COPY OF THOSE    71
        TERMS AND CONDITIONS
17
18
19
20
21
22
23
24
25
```

## Page 100

```
 1
 2       CERTIFICATION
 3
 4   I, Samuel Hittin, a Notary Public for
 5 and within the State of New York, do
 6 hereby certify:
 7   That the witness whose testimony as
 8 herein set forth, was duly sworn by me;
 9 and that the within transcript is a true
10 record of the testimony given by said
11 witness.
12   I further certify that I am not
13 related to any of the parties to this
14 action by blood or marriage, and that I am
15 in no way interested in the outcome of
16 this matter.
17   IN WITNESS WHEREOF, I have hereunto
18 set my hand this 6th day of September,
19 2022.
20
21
22       SAMUEL HITTIN
23
24       *  *  *
25
```

## Page 101

```
 1
 2       ERRATA SHEET
        VERITEXT/NEW YORK REPORTING, LLC
 3
    CASE NAME: SUSANNA MIRKIN AND BORIS
 4      MIRKIN, ET AL VS. XOOM ENERGY,
        LLC, ET AL
 5 DATE OF DEPOSITION: AUGUST 30, 2022
    WITNESS' NAME: SUSANNA MIRKIN
 6
    PAGE/LINE(S)/   CHANGE     REASON
 7 ___/___/_____/_____
    ___/___/_____/_____
 8 ___/___/_____/_____
    ___/___/_____/_____
 9 ___/___/_____/_____
    ___/___/_____/_____
10 ___/___/_____/_____
    ___/___/_____/_____
11 ___/___/_____/_____
    ___/___/_____/_____
12 ___/___/_____/_____
    ___/___/_____/_____
13 ___/___/_____/_____
    ___/___/_____/_____
14 ___/___/_____/_____
    ___/___/_____/_____
15 ___/___/_____/_____
    ___/___/_____/_____
16 ___/___/_____/_____
    ___/___/_____/_____
17 ___/___/_____/_____
    ___/___/_____/_____
18 ___/___/_____/_____
19
    _____
20   SUSANNA MIRKIN
21 SUBSCRIBED AND SWORN TO
    BEFORE ME THIS_____ DAY
22 OF_____, 2022.
23 _____
    NOTARY PUBLIC
24
    MY COMMISSION EXPIRES_____
25
```