**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,<br><br>                    Defendants. | No. 18 Civ. 2949 (ARR) (RER) |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

I. Introduction ............................................................................................................ 1

II. Procedural & Factual Background ...................................................................... 3

   A. Susanna contracted with XOOM for electricity supply service............................ 3

   B. The Mirkins filed suit, and their claim survived following appeal. .................................. 4

   C. Discovery showed XOOM set Susanna's electricity rates based on its supply costs. ........ 7

      1. XOOM's rates are based on detailed supply cost data in monthly rate-setting workbooks, carefully considered by XOOM's pricing team. ........................................ 8

      2. Supply Costs were the main component of Susanna's rates. ...................................... 10

      3. Susanna's rates rose when costs rose and fell when costs fell.................................... 10

   D. The Mirkins try to salvage their case with a new damage model, which is not supported by the law or the facts. ...................................................................................... 12

III. Summary Judgment Standard ................................................................................ 13

IV. Argument & Authorities ............................................................................................ 14

   A. The undisputed evidence establishes XOOM's full compliance with the Contract. ........ 14

      1. A rate "based on actual and estimated supply costs" is one for which those costs are the foundational component, not the only component.................................................. 14

      2. The undisputed evidence shows that XOOM's "actual and estimated supply costs" are the foundational component of its variable rates. ........................................................ 18

   B. The Mirkins cannot rewrite the Contract to match their experts' unfounded belief that XOOM's right to earn a margin was non-existent or capped. ........................................... 22

      1. The Mirkins' no-margin model is precluded by their prior position that XOOM is allowed to include a margin and achieve a profit. ...................................................... 23

      2. The Mirkins' capped-margin model has no foundation in the Contract. .................... 25

   C. Boris's claim also fails because he never contracted with XOOM. ................................. 27

V. Conclusion & Prayer.................................................................................................... 27

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.*,
   748 F.3d 110 (2d Cir. 2014)................................................................24, 25

*Bacchus Assocs. v. Hartford Fire Ins. Co.*,
   766 F. Supp. 104 (S.D.N.Y. 1991)..............................................................22

*Bell v. Gateway Energy Servs. Corp.*,
   No. 17-CV-3893 (KBF), 2017 WL 5956887 (S.D.N.Y. Nov. 29, 2017) ................27

*Bowers v. City of High Point*,
   451 S.E.2d 284 (N.C. 1994)......................................................................17

*Effie Film, LLC v. Murphy*,
   564 F. App'x 631 (2d Cir. 2014) ...............................................................17

*Forte v. Direct Energy Servs., LLC*,
   No. 617CV264FJSATB, 2021 WL 6202592 (N.D.N.Y. Dec. 29, 2021), *aff'd*,
   No. 22-201, 2023 WL 382681 (2d Cir. Jan. 25, 2023)....................................13, 14

*Goodrich v. Rice*,
   331 S.E.2d 195 (N.C. Ct. App. 1985) .........................................................27

*Hagler v. Hagler*,
   354 S.E.2d 228 (N.C. 1987)......................................................................15

*Helix Energy Sols. Grp., Inc. v. Hewitt*,
   598 U.S. ----, No. 21-984, 2023 WL 2144441 (Feb. 22, 2023) .............................17

*Hughes v. United States*,
   138 S. Ct. 1765 (2018)............................................................................17

*Intellivision v. Microsoft Corp.*,
   484 F. App'x 616 (2d Cir. 2012) ...............................................................24, 25

*Lia v. Saporito*,
   541 F. App'x 71 (2d Cir. 2013) .................................................................25

*Madden v. DreamWorks, LLC*,
   No. 07 CV 5273 (ARR), 2009 WL 10706573 (E.D.N.Y. July 6, 2009) (Ross,
   J.)......................................................................................................17

*Mirkin v. Viridian*,
   No. 3:15-cv-1057, ECF No. 1 (D. Conn. July 10, 2015) .......................................4

*Mirkin v. XOOM Energy, LLC*,
   931 F.3d 173 (2d Cir. 2019), *available at*
   https://www.ca2.uscourts.gov/oral_arguments.html.........................................6, 7, 12

*N. Carolina Farm Bureau Mut. Ins. Co., Inc. v. Martin by & through Martin*,
   851 S.E.2d 891 (N.C. 2020).............................................................................16

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)....................................................................................24, 25

*Norem v. Lincoln Ben. Life Co.*,
   737 F.3d 1145 (7th Cir. 2013) ....................................................................16, 17

*Parker v. Glosson*,
   641 S.E.2d 735 (N.C. Ct. App. 2007) ..........................................................14, 27

*Richards v. Direct Energy Servs., LLC*,
   246 F. Supp. 3d 538 (D. Conn. 2017), *aff'd* 915 F.3d 88 (2d Cir. 2019) .........13, 26

*Richards v. Direct Energy Servs., LLC*,
   915 F.3d 88 (2d Cir. 2019)...............................................................10, 15, 23, 26

*Sanborn, et al. v. Viridian*,
   No. 3:14-cv-1731, ECF No. 163 (Feb. 16, 2018 preliminary class settlement
   approval order)..............................................................................................4

*Secured Asset Mgmt., LLC v. Cong. Beth Joseph Zwi Dushinsky*,
   No. 17CV05588DLICLP, 2019 WL 4861411 (E.D.N.Y. Sept. 30, 2019), *aff'd*
   828 F. App'x 815 (2d Cir. 2020) ....................................................................25

*Singleton v. Haywood Elec. Membership Corp.*,
   588 S.E.2d 871 (N.C. 2003)...........................................................................16

*Slam Dunk I, LLC v. Connecticut Gen. Life Ins. Co.*,
   853 F. App'x 451 (11th Cir. 2021) .................................................................17

*U.S. Tr. Co. of New York v. Shapiro*,
   835 F.2d 1007 (2d Cir. 1987).........................................................................24

*Yoselovsky v. Associated Press*,
   917 F. Supp. 2d 262 (S.D.N.Y. 2013).............................................................17

## Rules

Fed. R. Civ. P. 12(b)(6)...................................................................................2, 5

Fed. R. Civ. P. 56(a) .......................................................................................14

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019), "base" ....................................................16, 17

Jul. 29, 2016, BUSINESS INSIDER, https://www.businessinsider.com/11-little-known-facts-about-costco-2016-7 ....................................................................26

*Merriam-Webster Online Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/base ..............................................................15, 16

Merriam–Webster's Collegiate Dictionary (11th ed. 2007), "base" ..............................16

Shorter Oxford English Dictionary Vol. I, 192 (6th ed. 2007), "base" .........................16

> *Again Your Honor, we're not taking the position that they're not allowed a margin.*
> – The Mirkins' Counsel,
> arguing to the Second Circuit

## I.    INTRODUCTION

Summary judgment should be granted on Plaintiffs Susanna and Boris Mirkin's lone claim for breach of Susanna's electricity supply Contract with XOOM. The Mirkins allege XOOM breached the Contract provision that uses the phrase "based on" to describe the nonexclusive, main component of the rate Susanna agreed to pay during the few months she was a customer in 2013:

> Your monthly variable rate is ***based on*** XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs.

The Mirkins have recently asserted that "based on" does not describe the main component but the whole thing; that the rate must be based ***solely*** on supply costs, set by a 1:1 calculation so that the rate consists of nothing but supply costs—without any margin—and without permitting XOOM to consider anything other than supply costs. But that argument fails under the Contract's plain language. Under the ordinary meaning of *based on*, the Contract cannot be construed to require a rate that is *identical to* XOOM's supply costs. Rather, it describes a rate for which supply costs are the foundation. After all, when a movie is *based on* a true story, no one thinks it will be a documentary. Under its ordinary meaning, the phrase *based on* is unambiguous because a *base* is a thing's foundation. And because foundations are meant to be built upon. XOOM built its rate on its supply costs—just like the Contract said it would.

In fact, the Mirkins previously acknowledged in their original and amended complaints, in their appellate briefs, and at oral argument to the Second Circuit that the Contract permits XOOM to build on that foundation with a margin above supply costs. Embracing that position even helped the Mirkins persuade the Second Circuit that the complaint stated a plausible claim for relief.

1

So why the recent shift in the Mirkins' reading of the Contract? Its language obviously did not change between then and now—and the Mirkins have long argued that the pricing provision is unambiguous. *See* Ex. A-1, Appellants' Br. at 27. The difference is discovery. Discovery disproved every factual allegation about XOOM's rate-setting that the Mirkins used to survive dismissal.

The Second Circuit, applying Rule 12(b)(6)'s lenient standard, reversed this Court's dismissal and gave the Mirkins a chance to substantiate their allegations that XOOM's rates (including a "substantial margin") did not "rise and fall" with its supply costs. But a decision to allow discovery is not a judgment of wrongdoing. And when discovery does not back up the key facts alleged in a complaint—as here—the case must end. The Mirkins were given their chance. They took seven depositions of XOOM witnesses, each for nearly seven hours on the record. Not one person testified that XOOM ever set variable rates—in any month—without using the detailed supply cost information in its monthly "rate-setting workbook" spreadsheets. Every witness said those supply costs were always the starting point, the primary consideration, and the main component of XOOM's variable rates. No document in the tens of thousands of confidential emails, pricing spreadsheets, financial and strategic records produced in discovery suggests that XOOM ever did anything but methodically consider its supply costs and then set a rate that was based on them. And a correlation analysis by XOOM's expert shows that contrary to the complaint's allegations, Susanna's variable rate ***always*** rose and fell with XOOM's supply costs. The correlation was so strong that the chance rate changes were not related to cost changes is 0.24%—a less than a 1 in 400 chance.

In other words, discovery left the Mirkins with no choice but to drop their case or try to invent a new legal theory from scratch. They chose the latter, embracing a new interpretation of the Contract that requires XOOM's variable rates to equal the supply costs listed in its rate-setting

workbooks with *no margin*—despite the Contract stating that "market-based compensation" for XOOM's services will be "included in the price" of electricity. That position is inconsistent with the Contract's plain language and the complaint's allegations. But the Mirkins' new position also contradicts specific representations to the Second Circuit that allowed them to survive dismissal. So, the Mirkins are judicially estopped from now asserting that the rate must be identical to supply costs and cannot include a margin.

For all these reasons, summary judgment should now be granted.

## II.   PROCEDURAL & FACTUAL BACKGROUND[1]

### A.   Susanna contracted with XOOM for electricity supply service.

Ten years ago, Susanna Mirkin contracted with XOOM for electricity supply service. *See* Ex. A-8, B. Mirkin Dep. 26:20–27:17; Ex. A-20, New Customer Enrollment at 1–2. Under the Contract, XOOM agreed to supply her with electricity, and she agreed to pay a variable rate that would be "based on XOOM's actual and estimated supply costs":

| XOOM SimpleFlex Variable Price Product | Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable.  Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs. You are responsible for all charges assessed and billed by your local utility for all applicable utility charges, which are not included in your rate. |

The Contract explained that savings were not guaranteed, and that the price of electricity would include "market-based compensation" for XOOM's services:

| Guaranteed Savings | There are no guaranteed savings in this Agreement at this time. |

\*   \*   \*

| | |
| --- | --- |
| **AGENCY:** You hereby appoint XOOM Energy as agent for the purposes of (i) acquiring the supplies necessary to meet your electricity needs, and (ii) arranging, contracting for and administering transportation and related services over transmission facilities and those of the LDU needed to deliver electricity to your premises. These services are provided on an arm's length basis and market-based compensation is included in the price noted above. | |

---

[1] For additional background, XOOM incorporates by reference the factual background in its opposition to the Mirkins' motion for class certification.

3

Ex. A-9, S. Mirkin Dep. 71:14–72:19; Ex. A-19, Contract at 1–2.

Susanna began receiving service from XOOM in May 2013. Ex. A-18, Account Statement at 2. But after just six months, including one in which XOOM charged her an introductory rate below its costs, she terminated the Contract without penalty and switched to another provider called Viridian. *Id.* at 1; Ex. A-8, B. Mirkin Dep. 38:15–23. The Mirkins then subsequently decided to file suit—but not against XOOM—against Viridian.

**B.      The Mirkins filed suit, and their claim survived following appeal.**

In July 2015, the Mirkins (represented by their counsel here) filed a putative class action in the District of Connecticut against Viridian over its variable electricity rates. *See Mirkin v. Viridian*, No. 3:15-cv-1057, ECF No. 1 (D. Conn. July 10, 2015). That case was later consolidated with several other class actions against Viridian and then settled for a collective class (with $10,000 service awards for the Mirkins) in early 2018. *See id.*, ECF No. 112 (Dec. 20, 2017 consolidation order); *Sanborn, et al. v. Viridian*, No. 3:14-cv-1731, ECF No. 163 (Feb. 16, 2018 preliminary class settlement approval order).

With the Viridian case resolved, the Mirkins and their attorneys then set their sights on XOOM, filing this lawsuit in April 2018—some five years after Susanna cancelled service. Joined by Boris (who never contracted with XOOM[2]), Susanna alleged that XOOM breached the Contract

---

[2] Plaintiff Boris Mirkin never contracted with XOOM, but his distant relative—also named Boris Mirkin—had a natural gas contract. Ex. A-8, B. Mirkin Dep. at 19:9–21. When it suited their purposes during discovery, the Mirkins attached the other Boris's contract to a motion compel and described it as a contract between XOOM and "Plaintiff Boris Mirkin." Ltr. Mot. to Compel, ECF No. 64 at 2 (emphasis added). At the hearing on the motion, they specifically told Judge Reyes that the other Boris's contract "included Boris' name," "his email address," and "his phone number." Ex. A-7, Tr. of Mot. to Compel Hearing at 10:10–21, ECF No. 75. After hearing these representations, Judge Reyes concluded that "there was a gas contract with Mr. Mirkin" and compelled XOOM to produce classwide discovery regarding its natural-gas customers. *Id.* at 16:7–9; 17:5–12.

Having obtained discovery into XOOM's natural-gas customers, the Mirkins no longer have anything to gain from falsely suggesting that Boris had a natural gas Contract. For that reason,

by not setting rates "based on XOOM's actual and estimated supply costs." *See* Orig. Compl. ¶ 47, ECF No. 1-1. XOOM responded with a Rule 12(b)(6) motion to dismiss that this Court granted, dismissing the case in its entirety. Order on Mot. to Dismiss at 20, ECF No. 24.

The Mirkins appealed, arguing they had plausibly alleged XOOM breached its obligation to set variable rates made up of the "costs of procuring electricity . . . plus an appropriate margin[.]" Ex. A-1, Appellants' Br. at 13. Because the legal premise of that argument was uncontroversial (i.e., that XOOM's rates had to be based on supply costs but could also include a margin), the parties' appellate arguments focused on the factual allegations. Specifically, the parties disputed the plausibility of the Mirkins' allegations about two tables in the complaint that used public market information as a proxy for XOOM's internal supply costs to suggest that XOOM's rates did not rise and fall with its costs. *Id.* at 6–7, 30–34; *see* First. Am. Compl. ¶¶ 54–55, 61, ECF No. 42.

The first proxy was the so-called "Market Supply Cost," a figure the Mirkins hired an expert to generate "based on the costs" a retailer could have, using public information about wholesale costs of commodity, ancillaries, capacity, and various other electricity components in the New York Independent System Operator market. *See* First Am. Compl. ¶ 55; Ex. A-1, Appellants' Br. at 31–33. The "Market Supply Cost" also included "[a] substantial margin of 1.3 cents per kWh sold to cover retailer fixed costs," which translated to "an average 13.67% markup (margin)" over the Mirkins' estimate of XOOM's supply costs. First Am. Compl. ¶ 55. The Mirkins argued this table showed XOOM's rates went up when its costs went down, and that XOOM's rates were "exceedingly high" because they were "as much as 66.47%" above the

---

they now acknowledge that only Susanna had a contract with XOOM. Pls.' Pre-Motion Letter at 3, ECF No. 119.

wholesale costs, Ex. A–1, Appellants' Br. at 6–7, 32–33:

| Period | XOOM Rate | Market Supply Cost | Difference in % | XOOM Total Margin (Markup) on Wholesale Cost[27] |
|---|---|---|---|---|
| 5/10/2013–6/11/2013 | 8.99 (teaser) | 11.08 | -23.25% | N/A |
| 6/11/2013–7/11/2013 | 11.96 | 11.80 | -1.34% | 11.04% |
| 7/11/2013–8/9/2013 | 14.40 | 12.35 | 16.60% | 28.36% |
| 8/9/2013–9/10/2013 | 14.88 ↑ | 10.18 ↓ | 46.17% | 60.81% |
| 9/10/2013–10/8/2013 | 14.15 | 10.13 | 39.68% | 54.40% |
| 10/8/2013–11/7/2013 | 14.90 ↑ | 9.85 ↓ | 51.27% | 66.47% |

First Am. Compl. ¶ 54; Ex. A–1, Appellants' Br. at 32 (annotations added).

The Mirkins' second supply-cost proxy was Con Edison's rate, which they claimed was "a good indicator of XOOM's supply costs." First Am. Compl. ¶ 61. The Mirkins again included a table in the complaint and again argued that rate changes and cost changes should be correlated: "that XOOM's rate does not rise and fall with Con Edison's rate shows that XOOM's rate is not in fact based on its supply costs":

| Period | XOOM Rate[29] | Con Edison Supply Charge | Difference in % |
|---|---|---|---|
| 5/10/2013–6/11/2013 | 9.39 (teaser) | 10.06 | -6.66% |
| 6/11/2013–7/11/2013 | 12.50 | 11.20 | -10.40% |
| 7/11/2013–8/9/2013 | 15.05 | 12.36 | 21.76% |
| 8/9/2013–9/10/2013 | 15.55 ↑ | 9.78 ↓ | 60.00% |
| 9/10/2013–10/8/2013 | 14.79 | 10.12 | 46.15% |
| 10/8/2013–11/7/2013 | 15.57 ↑ | 9.82 ↓ | 58.55% |

Id.; see Ex. A–1, Appellants' Br. at 33–34.

At oral argument, the Second Circuit discussed these allegations and had the Mirkin's counsel clarify that their position was XOOM's rates had to be "[t]ied to but not identical" to its procurement costs. Oral Argument at 2:36–2:45 in *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173

6

(2d Cir. 2019), *available at* https://www.ca2.uscourts.gov/oral_arguments.html (search for "Mirkin"). The Mirkins' counsel also conceded that they were "not taking the position that [XOOM is] not allowed a margin." *Id.* at 2:27–2:36. With these assurances, the Second Circuit adopted the Mirkins' position and reversed this Court's dismissal. *See* Order and Mandate, ECF Nos. 40–41. And in its opinion, the Second Circuit made clear it was relying on the Mirkins' tables and related allegations that rate changes were not correlated to cost changes:

> We must therefore draw the reasonable inference from the Complaint and the [Proposed Amended Complaint] that XOOM's actual or estimated supply costs ***should track*** the Market Supply Cost.

> The Mirkins have alleged, with the support of expert calculations included in the Complaint and the [Proposed Amended Complaint] that XOOM's rates showed significant upward deviations from the Market Supply Cost and ***continued to rise even when that cost fell***. These allegations are sufficient to state a claim for breach of contract, as XOOM promised to base its rate on its supply costs and the Mirkins' allegations and calculations plausibly allege that did not occur.

*Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177 (2d Cir. 2019) (emphasis added); *see also id.* at 176 (relying on the allegation that XOOM's rates "continued to rise even when" the Mirkins' Con Edison proxy rate fell); *id.* at 178 (same).

**C.    Discovery showed XOOM set Susanna's electricity rates based on its supply costs.**

On remand, however, XOOM produced evidence in discovery that contradicted every one of the Mirkins' factual allegations. As summarized below, discovery showed that XOOM always carefully considered its supply costs when setting rates, that supply costs were always the main component of Susanna's rate, that Susanna's variable rate always rose and fell with XOOM's supply costs, and that XOOM's average margin on Susanna's variable rate was "approximately 22%," Ex. A-6, Pls.' Rebuttal Rpt. ¶ 31—about 1 cent per kWh more than the 13.67% margin the Mirkins themselves baked into the Market Supply Cost, and far less than the 66.47% "significant upward deviation" from wholesale costs the complaint alleged and the Second Circuit noted.

1.  <u>XOOM's rates are based on detailed supply cost data in monthly rate-setting workbooks, carefully considered by XOOM's pricing team.</u>

Discovery gave the Mirkins the details of the "spreadsheet-based model" XOOM used to set rates based on its actual and estimated supply costs. Ex. A-10, Loehde Dep. 59:11–18. Under that model, the foundational component of XOOM's rate is a set of calculations that XOOM used to make its "best estimate" of various costs it would incur to supply customers with electricity in the upcoming month. *Id.* The results of those calculations were summarized in documents known as "rate-setting workbooks," which provided a detailed summary of XOOM's expectations regarding certain cost components:



Ex. 26 to Class Cert. Mem., Exemplar Rate-Setting Workbook (excerpted and redacted for confidentiality). The sum of these cost components—reflected above in the column labelled "Total"—was known as "Cost of Goods Sold" or COGS. Ex. A-3, Coleman Rpt. at 10. The Mirkins agree that figure was the "starting point" of all of XOOM's rates for electricity supply, including the one briefly paid by Susanna. *See* Ex. A-5, Pls.' Expert Rpt. ¶ 53.

After calculating its COGS projections, the next step in XOOM's rate-setting process was to add a margin. But as the Mirkins' experts acknowledge, ***margins*** shown in the rate-setting workbooks do not reflect ***profit***, or even that XOOM earned any profit at all. Ex. A-16, Adamson Dep. 101:20–23; *see also* Ex. A-12, Park Dep. 44:15–24; Ex. A-13, Coppola Dep. 171:11–173:11

("[M]argin is not exclusively related to profit."); Ex. A-10, Loehde Dep. 181:3–18. Rather, margins accounted for secondary components of supply costs like prior period adjustments, fixed costs (which the Mirkins had accounted for in their Market Supply Cost estimate), and hopefully some profit to give XOOM the "market-based compensation" the Contract said XOOM could earn. Ex. A-10, Loehde Dep. 251:6–22; Ex. A-11, Loehde Corp. Dep. 263:20–264:5. Thereafter, the rate-setting workbooks were presented at pricing meetings to a team of decisionmakers who set final rates based on the workbooks' cost projections. Ex. A-10, Loehde Dep. 63:10–13.

Across all of XOOM's New York electricity products (introductory, fixed, and variable), this process yielded supply rates that were comparable to the average rates charged by the twenty other largest energy supply companies in New York (by market share) in 2013:



Ex. A-22, Summary Chart.

9

2. <u>Supply Costs were the main component of Susanna's rates.</u>

Discovery also showed, as the Mirkins now acknowledge, that this rate-setting procedure gave Susanna rates for which XOOM's supply costs were by far the main component. *See* Ex. A-5, Pls.' Expert Rpt. ¶ 53. Likewise, the Mirkins no longer contend that Susanna's rate included the "exceedingly high" margins described in the Complaint. First Am. Compl. ¶ 57. Instead, they put the figure at "approximately 22%," Ex. A-6, Pls.' Rebuttal Rpt. ¶ 31, which is far lower than the margins alleged in the complaint and those appropriately charged by other suppliers, First Am. Compl. ¶ 57; *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 95 (2d Cir. 2019) (rejecting summary judgment on a claim alleging that variables rates with 75% margins were "too high"). The Mirkins did not attempt to determine whether those margins covered XOOM's fixed costs or yielded a profit, Ex. A-16, Adamson Dep. 101:20–23; Ex. A-17, Eryilmaz Dep. 68:14–69:11, so the Mirkins can no longer claim that XOOM "reap[ed] outrageous profits" on Susanna's rates, First Am. Compl. ¶ 62.

3. <u>Susanna's rates rose when costs rose and fell when costs fell.</u>

Contrary to the complaint's allegations that Susanna's rates did not rise and fall with XOOM's costs—allegations that allowed the complaint to survive dismissal—discovery showed that there was ***never*** a time when Susanna's rate rose while COGS fell. Ex. A-3, Coleman Rpt. at 14–15. The changes in Susanna's rates were ***always*** correlated with a corresponding change to XOOM's underlying supply costs:



*Id.* at 12. According to the calculations performed by XOOM's expert, the odds that this near-perfect correlation would occur by chance are less than 1-in-400. *Id.*

The Mirkins cannot dispute these calculations, so they instead argue that "a correlation analysis does nothing to answer the key question of whether XOOM's New York variable rates are set according to its contract." Pls.' Pre-Motion Ltr. at 2 & n.3. But again, it was the Mirkins who used rising-and-falling correlations as a measure of whether rates were "based on" supply costs to survive dismissal, and they do not dispute that a correlation analysis is an appropriate tool "to determine whether and the degree to which XOOM's rates rose and fell with its supply costs." Ex. A-3, Coleman Rpt. at 6.

The Mirkins also argue that XOOM's "correlation analysis does not by itself indicate causation" because it would allow XOOM to charge "astronomical markups of 100% or more over its supply costs without violating the contract." *Id.* However, that puzzling critique has no connection to the realities of this case, and the Mirkins' own experts calculate the margin on Susanna's rates to be only about 22%. *See* Ex. A-6, Pls.' Rebuttal Rpt. ¶ 31. That margin is entirely unremarkable in American business. *See* Ex. A-4, Coleman Rebuttal Rpt. at 12–13 (the twenty-six companies in the Dow Jones Industrial Average that report cost of goods sold realized an average margin of approximately 45%).

11

**D.      The Mirkins try to salvage their case with a new damage model, which is not supported by the law or the facts.**

In short, following discovery, the undisputed evidence confirmed that XOOM fully complied with its contractual obligations and that its rates were set exactly as the Mirkins originally said they should have been:

| *The Mirkins told the Second Circuit the Contract rate should include . . .* | *And discovery confirmed XOOM's variable rates included. . .* |
|---|---|
| Procurement costs as "the primary component."[3] | Anticipated procurement costs (i.e., COGS) were largest component of Susanna's rate, and the "starting point" for the rate-setting process.[4] |
| A "margin[] over XOOM's supply costs."[5] | A margin over COGs.[6] |
| "[P]rior period adjustments, inventory, and balancing costs."[7] | Prior period adjustments and balancing costs were a component of XOOM's margin.[8] |
| "[L]egitimate overhead costs."[9] | Overhead costs were a component of the margin.[10] |

---

[3] Ex. A-1, Appellants' Br. at 5, 23; *see also* Ex. A-2, Appellants' Reply at 5; *Mirkin*, 931 F.3d at 177 (specifically relying on this allegation to support "the reasonable inference . . . that XOOM's actual or estimated supply costs should track the Market Supply Cost").

[4] *See* Ex. A-13, Coppola Dep. 279:1–280:1, 284:14–285:2; Ex. A-14, Ulry Dep. 51:5–12, 68:13–69:3; Ex. A-10, Loehde Dep. 257:2–10; Ex. A-11, Loehde Corp. Dep. 289:9–290:12; Ex. A-12, Park Dep. 33:10–22, 34:20–35:8.

[5] Ex. A-1, Appellants' Br. 31 & n.6; *see also id.* at 13 (acknowledging that this margin is part of a rate "based on 'actual and estimated supply costs'" and is added on top of "XOOM's costs of procuring electricity").

[6] *See* Ex. A-12, Park Dep. 34:20–35:8.

[7] Ex. A-1, Appellants' Reply at 15.

[8] Ex. A-10, Loehde Dep. 71:3–23, 139:6–23, 251:6–22; Ex. A-11, Loehde Corp. Dep. 284:3–22; Ex. A-13, Coppola Dep. 169:4–170:7, 171:11–172:23, 285:19–25; Ex. A-14, Ulry Dep. 78:11–79:13, 82:15–19, 85:7–17.

[9] Ex. A-1, Appellants' Br. at 13.

[10] Ex. A-10, Loehde Dep. 51:4–21, 70:5–71:23; Ex. A-11, Loehde Corp. Dep. 90:5–91:14, 263:11–264:5; Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15; Ex. A-13, Coppola Dep. 280:23–281:9.

| A "profit, which [XOOM] is allowed to achieve."[11] | Profit (if any) was a component of the margin.[12] |

The Mirkins' complaint, touting their Market Supply Cost allegations that specifically included a margin, had promised that "[w]ith discovery of XOOM's actual costs **and profits**, Plaintiffs will be able to create an even more precise model showing what XOOM's prices should have been under the terms of its customer contract." First Am. Compl. ¶ 58 (emphasis added). But because discovery instead showed XOOM's rates were based on costs and its gross margins were modest (not to mention the profits the Mirkins declined to quantify), the Mirkins abandoned their promise and instead created a basic "model" that simply calls anything above XOOM's costs (as listed in the rate setting workbooks) an "overcharge" without allowing any margin or profit. Ex. A-5, Pls.' Expert Rpt. ¶ 73. Instead of rising and falling with costs, the Mirkins now say that XOOM's rates must perfectly match its costs.

Of course, a damages model does not establish breach of the Contract. And even if it could, this no-margin theory is foreclosed by the Contract's plain terms and, the Mirkins have expressly disclaimed it. *See* Oral Argument at 2:29 ("Again Your Honor, we're not taking the position that they're not allowed a margin.").

### III.   SUMMARY JUDGMENT STANDARD

The Mirkins' class allegations do not change the summary judgment standard: if their individual claims lack merit, courts are authorized to grant summary judgment before considering whether class certification is otherwise proper. *Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 560 (D. Conn. 2017), *aff'd* 915 F.3d 88, 83 (2d Cir. 2019); *see also Forte v. Direct*

---

[11]   Oral Argument at 2:20–2:27.
[12]   Ex. A-10, Loehde Dep. 51:4–21, 70:5–71:23; Ex. A-11, Loehde Corp. Dep. 263:11–264:5; Ex. A-13, Coppola Dep. 171:11–16.

*Energy Servs., LLC*, No. 617CV264FJSATB, 2021 WL 6202592, at *1 (N.D.N.Y. Dec. 29, 2021), *aff'd*, No. 22-201, 2023 WL 382681 (2d Cir. Jan. 25, 2023). Doing so renders class certification moot. *Id.* Thus, disposition of this motion only requires the Court to consider whether XOOM has shown, with respect to the Mirkins' individual claims, that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV.  ARGUMENT & AUTHORITIES

### A.    The undisputed evidence establishes XOOM's full compliance with the Contract.

Under North Carolina's governing law,[13] a claim for breach of contract has two elements: "(1) existence of a valid contract and (2) breach of the terms of that contract." *Parker v. Glosson*, 641 S.E.2d 735, 737 (N.C. Ct. App. 2007) (cleaned up). Here, the Court's analysis can begin and end with the second element, which is fatal to the Mirkins' claims because (1) the Contract required that XOOM set rates based on, not identical to, its supply costs, and (2) the undisputed evidence shows that supply costs were the foundational component of Susanna's rates.[14]

1. A rate "based on actual and estimated supply costs" is one for which those costs are the foundational component, not the only component.

The Mirkins' pre-motion letter accuses XOOM of setting rates based on "arbitrary criteria that ***were not*** permitted under the contract." Pls.' Pre-Motion Ltr. at 1. But they never take an affirmative position on what criteria ***are*** permissible in their view. And their class certification brief suggests they never intend to make such an argument, but that they will instead rely on

---

[13] The Court has already held that North Carolina's substantive law applies through the Contract's enforceable choice-of-law provision. *See* Order on Mot. to Dismiss at 6.

[14] Of course, as discussed below, Boris's claim also fails on the first element because he admittedly was never party to a contract with XOOM. *See infra* Part IV.C. In the same vein, neither of the Mirkins had a contract with XOOM Energy, LLC, and they have yet to offer any evidence that would support liability under agency principles or a veil-piercing theory. *See* Ex. A-19, Contract at 1 (identifying "XOOM Energy New York, LLC" and "the Customer" as parties to Contract, but not XOOM Energy, LLC); Order on Mot. to Dismiss at 1 n.1 (declining to rule on the plausibility of the Mirkins' claims against XOOM Energy, LLC).

conclusions drawn by an expert who "is not offering a legal interpretation" and thinks it is up to "the judge or the jury or whoever" to decide what the Contract allows. Ex. A-16, Adamson Dep. 31:22–32:9. On that point, the Mirkins' experts are correct. Determination of XOOM's rights and obligations under the Contract's unambiguous language is "a matter of law for the court." *Hagler v. Hagler*, 354 S.E.2d 228, 234 (N.C. 1987); *Richards*, 915 F.3d at 98 (recognizing that opinions held by the Mirkins' experts were irrelevant to the interpretation of a contract).

Again, the Mirkins have already acknowledged that the Contract allows XOOM to set rates exactly as it did. Their original and amended complaints specifically allege that XOOM's rates could include "the costs of . . . supplying" electricity and a "margin to cover retailer fixed costs." Orig. Compl. ¶ 48; First Am. Compl. ¶ 55. Their appellate briefs likewise recognize that XOOM's rate could include components like "rent, salaries, taxes, and similar legitimate costs" that are not specifically listed on the face of the Contract. *See* Ex. A-1, Appellants' Br. at 13. And at oral argument in the Second Circuit, the Mirkins did not dispute Judge Pooler's statement that XOOM's rates could include "profit, which XOOM is allowed to achieve." *See* Oral Argument at 2:20–2:27.

The Mirkins, having made those affirmative arguments and unequivocal concessions, cannot credibly argue that XOOM's rates had to equal its underlying supply costs. But even if they tried, their argument would fail. As a matter of plain language, the Contract cannot be reasonably construed to require a rate for which supply costs were the only legitimate component.

Starting with the phrase "based on," the dictionary definition of the verb "base" is "to find a foundation or basis for: to find a base." *Merriam-Webster Online Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/base. This definition expressly contemplates the addition of other components (a "foundation or basis *for*" something), and an associated entry

defines the noun *base* as "the fundamental **part** of something." *Id.* (emphasis added).[15] As these definitions show, the Contract's use of the phrase "based on" communicates that XOOM's supply costs would be the "fundamental part" of the variable rate and a "foundation" to which other components would be added. *Id.* And conversely, these definitions exclude an interpretation in which supply costs are the **only** component of the rate—it is absurd to suggest that a foundation is something that can never be built upon, or that that the "fundamental part" of a thing is always equivalent to the thing itself. That is why everyone understands that "a story" can be "*based upon* real-life events" even if it includes fictionalized elements, *id.*; that a "company" can be "*based in* London" even if its operations span the globe, *id.*; and that a cake can be "'based on' flour, sugar, and eggs" even if contains other ingredients, *Norem v. Lincoln Ben. Life Co.*, 737 F.3d 1145, 1150 (7th Cir. 2013).

Under North Carolina law, the Court's interpretation can end with this "daily usage" of the phrase "based on" without delving into "restrictive meaning[s]" that phrase "may have acquired in legal usage." *N. Carolina Farm Bureau Mut. Ins. Co., Inc. v. Martin by & through Martin*, 851 S.E.2d 891, 896 (N.C. 2020); *see also Singleton v. Haywood Elec. Membership Corp.*, 588 S.E.2d 871, 875 (N.C. 2003) ("[N]on-technical words [in a contract] are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended."). But here, there is no tension between the everyday and legal meanings of *based on*.

The North Carolina Supreme Court, quoting Black's Law Dictionary, has said "'[b]ase' is

---

[15] Other dictionaries are in accord. Merriam-Webster's Collegiate Dictionary "defines the word 'base' as (1) 'a main ingredient;' (2) 'a supporting or carrying ingredient;' or (3) 'the fundamental part of something.'" *Norem*, 737 F.3d at 1149 (quoting Merriam–Webster's Collegiate Dictionary, 101 (11th ed. 2007)). And the Shorter Oxford English Dictionary defines "base" as "(1) 'Something on which a thing stands or by which it is supported;' or (2) 'The principal ingredient, the fundamental element.'" *Id.* (quoting Shorter Oxford English Dictionary Vol. I, 192 (6th ed. 2007)).

defined as '[b]ottom, foundation, groundwork, that on which a thing rests.'" *Bowers v. City of High Point*, 451 S.E.2d 284, 289–90 (N.C. 1994).[16] The United States Supreme Court has similarly relied on dictionary definitions of "base." *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. ----, No. 21-984, 2023 WL 2144441, at *7 (Feb. 22, 2023) (defining "'basis' and 'base' as the 'foundation' of a thing" (quoting Webster's New International Dictionary); *Hughes v. United States*, 138 S. Ct. 1765, 1775 (2018) ("To 'base' means '[t]o make, form, or serve as a foundation for,' or '[t]o use (something) as the thing from which something else is developed.' Likewise, a 'base' is '[t]he starting point or foundational part of something,' or '[a] point, part, line, or quantity from which a reckoning or conclusion proceeds.'" (quoting Black's Law Dictionary)).

The Second Circuit,[17] other federal circuits courts,[18] this Court,[19] and the Mirkins' counsel[20] likewise understand that the ordinary meaning of "based on" refers to a ***part*** of

---

[16] The first definition of the verb *base* in *Black's Law Dictionary* is "[t]o make, form, or serve as a foundation for." *Black's Law Dictionary* (11th ed. 2019). The other noun and verb definitions similarly treat a *base* as a starting point to which other things can be added. *See Black's Law Dictionary* (11th ed. 2019) (giving four definitions of the verb *base* including "3. To use (something) as the thing from which something else is developed"; and defining the noun *base* to include "1. The lowest or supporting part of something; the foundation . . . . 2. A determining ingredient; a common element that is united with others to form a product . . . . 3. The starting point or foundational part of something from which new ideas will develop . . .").

[17] *See, e.g.*, *Effie Film, LLC v. Murphy*, 564 F. App'x 631, 631–33 (2d Cir. 2014) (describing two screenplays as "based upon the same historical events" even though they both included details that were "not based on historical fact"); *Yoselovsky v. Associated Press*, 917 F. Supp. 2d 262, 265 (S.D.N.Y. 2013) (describing the Associated Press as "a not-for-profit news gathering cooperative based in New York City" even though it has "more than 240 locations worldwide").

[18] *Norem*, 737 F.3d at 1150 (holding that the ordinary meaning of the phrase "based on" is unambiguous and does not "impl[y] exclusivity"); *Slam Dunk I, LLC v. Connecticut Gen. Life Ins. Co.*, 853 F. App'x 451, 455 (11th Cir. 2021) ("Nothing about the plain and ordinary meaning of the phrase 'based on' connotes exclusivity").

[19] *Madden v. DreamWorks, LLC*, No. 07 CV 5273 (ARR), 2009 WL 10706573, at *1 (E.D.N.Y. July 6, 2009) (Ross, J.) (describing "Transformers" as a live-action film "based on the Hasbro toy line" even though the film introduced new elements, including a human protagonist).

[20] *See, e.g.*, Ex. A-1, Appellants' Br. at 13 (explaining that a rate "based on 'actual and estimated supply costs'" includes the "costs of procuring electricity . . . plus an appropriate

something—not an exclusive component.

Other language in the Contract confirms this interpretation and prohibits any other. The Contract uses the non-exclusive phrase "which may include but not be limited to," so the legitimate components of XOOM's variable rates can "not be limited to" the components identified in the Contract by name. Ex. A-19, Contract at 1–2. Likewise, a margin above costs is necessary to give effect to the Contract's "Agency" provision, which states that "market-based compensation" for XOOM's services is "included in the price" of electricity. *Id.* at 2. If electricity had to be sold at cost, then XOOM could not receive the "compensation" it is expressly allowed under the Contract.

Accordingly, the Contract is only susceptible to a single interpretation: "XOOM's actual and estimated supply costs" will be the foundational component of the variable rate, but not the *only* component. *Id.* at 1. Based on does not mean based *solely* on. Rather, the rate can also include "a margin, over and above [procurement] costs" to cover XOOM's other costs and yield a "profit, which XOOM is allowed to achieve." Oral Argument at 2:19–2:27.

2.  <u>The undisputed evidence shows that XOOM's "actual and estimated supply costs" are the foundational component of its variable rates.</u>

Because the Contract is unambiguous, summary judgment is due unless there is a genuine factual dispute as to whether XOOM's "actual and estimated supply costs" were the foundational component of Susanna's variable rate. No such dispute exists, as the record evidence shows that XOOM complied with the Contract by using supply costs as the foundational component when setting Susanna's electricity supply rate.

Indeed, the Mirkins took seven depositions of current or former XOOM employees, and those witnesses who were familiar with the rate-setting process testified without exception or

---

margin."); *id.* at 21 (describing the Market Supply Cost as "the rate based on Defendants' supply costs"); Ex. A-2, Appellants' Reply at 1, 4 (describing the "Market Supply Cost" as a rate that "*is based on* XOOM's supply costs" (emphasis in original)).

equivocation that the COGS estimate contained in the rate-setting workbooks was the foundation for all of XOOM's rates, including the variable rates Susanna was charged:

> <u>Former XOOM President Tom Ulry</u>:
>
> Our rate setting process was a bottom-up process, where we would start with a firm understanding [of] what we believed to be our cost to deliver the energy to the consumer. And then from there, we would look at a number of factors.

Ex. A-14, Ulry Dep. 71:7–13

> <u>Former XOOM SVP of Energy Supply & Pricing Andrew Coppola</u>:
>
> Well, the largest component [to the monthly rate setting process for New York] is the supply costs. That's – that's the guts. That's the foundation of where pricing starts.

Ex. A-13, Coppola Dep. 284:18–23.

> <u>Former XOOM Director of Supply Ryan Park</u>:
>
> [W]hat I would consider the foundational piece of information in [rate-setting] was what we call rate sheets at the time. And that would be provided by Jason Loehde and/or his team. They were printouts on really large pieces of paper that would attempt to shrink to size all of these supply costs or a summary of supply cost. Not all of the detail. And that would set the foundation for subsequent discussion. It was not the only information. It was a foundational primary starting point.
>
>         * * *
>
> So the process considering margins was probably the last thing that was layered in. So if you think about it like a cake, you have all these different supply costs that make up the bulk of the cake, ███████████████████████████████ ███████████ . . . . And then the last piece is margin and that creates the final rate.

Ex. A-12, Park Dep. 32:10–33:19, 34:23–35:8.

Working from the supply cost starting point, XOOM's pricing team would propose a rate designed to achieve a margin that would cover secondary components like (1) prior period adjustments and balancing costs, (2) overhead costs the Mirkins concede were legitimate, (3) and hopefully profit. *See* Ex. A-13, Coppola Dep. 171:11–16; Ex. A-10, Loehde Dep. 251:6–22; Ex. A-11, Loehde Corp. Dep. 90:5–91:11; Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15. And during

Susanna's time as a customer, COGS was always the first and largest component of her rate. *See* Ex. A-13, Coppola Dep. 279:1–280:1, 284:14–285:2; *see also* Ex. A-14, Ulry Dep. 51:5–12, 68:13–69:3; Ex. A-10, Loehde Dep. 257:2–10; Ex. A-11, Loehde Corp. Dep. 289:9–290:12; Ex. A-12, Park Dep. 33:10–22, 34:20–35:8.

This undisputed evidence thoroughly refutes the Mirkins' allegation that "XOOM completely ignored its own technical definition of 'supply costs'" when it set Susanna's rate. Class Cert. Mem. at 2. Nor do the Mirkins have any evidence that Susanna's rates were high enough to cover fixed costs and yield a profit, much less that XOOM earned "outrageously large profit margins" on those rates. Class Cert. Mem. at 33; *see also* Ex. A-17, Eryilmaz Dep. 66:17–69:11 (acknowledging that the Mirkins' experts did not account for fixed costs); Ex. A-16, Adamson Dep. 101:20–23 (same with respect to profit). But despite this lack of evidence, the Mirkins claim there is a fact issue on breach because "XOOM set rates based on numerous factors not contemplated in the contract—including hitting margin goals, utility prices, other energy companies' prices, attrition rates, and the prior month's variable rate." Pls.' Pre-Motion Ltr. at 1.

That argument misses the point on three levels. First, the Mirkins' argument assumes that supply costs were the ***only*** permissible component of Susanna's rate and that secondary components were categorically "not permitted." *Id.* That legal premise fails as a matter of law for reasons already discussed. *See supra* Part IV.A.1. Second, the Mirkins' list of "other factors" like attrition and competitor rates relies on general testimony about the data XOOM could access when it set fixed, introductory, and variable rates and the Mirkins offer no evidence that any of that data was a component of Susanna's variable rate. *See* Pls.' Pre-Motion Ltr. At 1–2. Indeed, the evidence shows that several of the data points in the Mirkins' list (i.e., ███████████████████████ ████████████████████) were only considered when setting fixed and introductory rates, and

they did not influence XOOM's variable rates at all. *See* Ex. A-10, Loehde Dep. 61:21–62:3, 75:9–23, 76:24–77:9, 77:11–22, 79:2–12, 80:4-9, 82:10–20, 83:8–84:8, 136:22–137:4; Ex. A-11, Loehde Corp. Dep. 181:4–182:15; Ex. A-12, Park Dep. 83:7–84:10, 98:16-99:19, 102:18–103:23, 107:16–108:2, 110:5–14. And finally, the Mirkins' attempt to treat "margin goals," "prior month's variable rate," and "attrition" as "non-supply cost factors," Pls.' Pre-Motion Ltr. at 2–3, is particularly misguided. As XOOM's witnesses explained, those data points were used to make the "prior period adjustments" expressly authorized in the Contract. *See* Ex. A-10, Loehde Dep. 79:14–80:9, 85:12–87:14, 209:11–20; Ex. A-14, Ulry Dep. 76:12–77:23, 78:11–79:13, 82:15–19, 85:7–17; Ex. A-13, Coppola Dep. 169:4–170:7; Ex. A-12, Park Dep. 197:3–199:25. For example, if XOOM's actual costs in a month turned out to be higher than those projected in the rate-setting workbooks (possibly resulting in losses, as in the 2014 polar vortex), XOOM could make adjustments when setting the next month's rate to account for the prior period. *See* Ex. A-13, Coppola Dep. 169:4–170:7 ("When XOOM has surplus costs that are exorbitantly above the costs that were projected in the pricing models, XOOM has the ability to recover these costs over time" through "prior period adjustments[.]").

As an alternative to their baseless attempt to characterize admittedly appropriate components of XOOM's rates into "arbitrary criteria that were not permitted under the Contract," the Mirkins argue that there is still a "genuine factual dispute" because "the factfinder could decide that the foundation of XOOM's rate setting was not supply costs, but rather profitability goals." Pls.' Pre-Motion Ltr. at 3. However, the Mirkins do not identify any evidence that could lead the factfinder to that conclusion, especially when the Mirkins offer no evidence that Susanna's rates yielded any profit ***at all*** and undisputed documentary evidence shows that procurement costs accounted for a greater portion of Susanna's rates than all other components combined. Indeed,

even the Mirkins' experts agree that "[c]osts were the starting point" of XOOM's procedure for setting rates. *See* Ex. A-5, Pls.' Expert Rpt. ¶ 53. Absent contrary evidence (which the Mirkins do not have), a reasonable factfinder could not conclude that Susanna's rates were not based on XOOM's supply costs. *Bacchus Assocs. v. Hartford Fire Ins. Co.*, 766 F. Supp. 104, 108 (S.D.N.Y. 1991) ("Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact.").

And even setting aside XOOM's direct evidence of its rate-setting procedures, the strength of the correlation between Susanna's rates and COGS leaves a less than 1-in-400 chance that the two were unrelated. *See* Ex. A-3, Coleman Rpt. at 1, 14–15. The Mirkins do not dispute that statistical fact, and their only rejoinder is the "maxim that 'correlation does not equal causation.'" *See* Pls.' Pre-Motion Ltr. at 2. XOOM and its expert never said otherwise. But here, causation is not at issue, and XOOM does not bear the burden of proof. Instead, the question is whether XOOM's variable rates have "some relationship to [its] supply costs," Oral Argument at 2:55–3:02, and the Mirkins do not dispute that "basic, universally accepted correlation principles" are a valid measure of "the strength of the relationship between" two variables, Ex. A-3, Coleman Rpt. at 6. XOOM's analysis showing a near perfect correlation is direct evidence that such a relationship exists. *Id.* at 14–15.

Accordingly, the Mirkins cannot genuinely dispute that XOOM's supply costs were a foundational component of Susanna's rate. That undisputed fact is fatal to "the straightforward breach of contract cause of action" the Mirkins advanced in the Second Circuit. Pls.' Pre-Motion Ltr. at 1. Summary judgment should be granted.

**B.     The Mirkins cannot rewrite the Contract to match their experts' unfounded belief that XOOM's right to earn a margin was non-existent or capped.**

Once discovery showed XOOM's supply costs were a foundational component of its rates,

the Mirkins realized they had to change their legal theory. But, so far, they have only tried to do so through their experts' reports that purportedly suggest XOOM "failed to comply with [its] contractual pricing obligations[,]" Class Cert. Mem. at 34, by including a margin in its rates.

That approach is fundamentally misguided. As the Second Circuit noted in another case involving the Mirkins' lead expert, an expert's opinion about a party's rights and obligations under a contract is "irrelevant" because "the construction of unambiguous contract terms is strictly a judicial function." *Richards*, 915 F.3d at 98 (cleaned up). Indeed, the Mirkins are aware of that limitation, so they made no attempt to "offer[] a legal interpretation" of the Contract. Ex. A-16, Adamson Dep. 32:3–9, 11:22–24; *id.* at 32:4–6 (acknowledging the permissibility of "non supply costs margins . . . is something that the judge or the jury or whoever . . . has to opine on"); Ex. A-17, Eryilmaz Dep. 33:18–34:6. Thus, as in *Richards*, "[the Mirkins'] experts' testimony adds nothing to [Susanna's] breach of contract claim." *Richards*, 915 F.3d at 98.

Regardless of who makes the argument, the Mirkins' new no-margin and capped-margin theories fail under the Contract's plain language for reasons already discussed. XOOM's obligation was to set variable rates for electricity supply based on its supply costs and there is no genuine dispute that XOOM did just that. *See supra* Part IV.A.2. In addition, these margin-based theories fail because (1) the no-margin theory is foreclosed as a matter of judicial estoppel and (2) the capped-margin theory is admittedly based on their experts' personal belief rather than anything in the Contract.

1. The Mirkins' no-margin model is precluded by their prior position that XOOM is allowed to include a margin and achieve a profit.

In the Second Circuit, the Mirkins affirmatively took the position that the "costs of procuring electricity" are not the only "legitimate" component of "a rate based on 'actual and estimated supply costs.'" *See* Ex. A-1, Appellants' Br. at 13; Ex. A-2, Appellants' Reply at 3, 15.

And when Judge Pooler stated at oral argument that XOOM is "allowed to achieve" a profit and asked whether XOOM's rates can include "a margin, over and above [procurement] costs," the Mirkins' counsel assured the panel that they were "not taking the position that they're not allowed a margin." *See* Oral Argument at 2:20–2:36. Those representations and concessions were "not gratuitous," and it was "very much in the [Mirkins'] interest" at the time "to take the position that" XOOM was allowed to include a margin in its rates. *U.S. Tr. Co. of New York v. Shapiro*, 835 F.2d 1007, 1008 (2d Cir. 1987). Having made those positions a central tenet of the argument they used to prevail on appeal, the Mirkins are judicially estopped from "relying on a contradictory argument to prevail in another phase" of this case. *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

In light of these arguments and concessions, the Mirkins cannot credibly contend the Contract's plain language prohibits rates that include a margin over supply costs. Nonetheless, the Mirkins' pre-motion letter and their reliance on their expert report suggests they intend to "deliberately chang[e] positions according to the exigencies of the moment" and argue that XOOM's variable rates could not include a margin. *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (quoting *New Hampshire*, 532 U.S. at 743)). As already discussed, that argument would fail on its merits. But as a matter of judicial estoppel, the Mirkins cannot make that argument at all.

Judicial estoppel is an aspect of the Court's equitable authority, not a doctrine of "inflexible prerequisites or an exhaustive formula." *Id.* (quoting *New Hampshire*, 532 U.S. at 751). For that reason, "the application of the judicial estoppel doctrine depends heavily on the 'specific factual context[ ]' before the court." *Id.* Here, however, the question is easy because the Mirkins' attempt to change positions would implicate the three most common "factors that typically inform the

decision whether to apply the doctrine" of judicial estoppel. *Id.*

First, it would be "clearly inconsistent" for the Mirkins to argue that XOOM's variable rates cannot include a margin above procurement costs when they unequivocally and repeatedly told the Second Circuit the exact opposite. *Id.* Second, the Mirkins' previous position "was adopted by" the Second Circuit when it "render[ed] a favorable judgment" on their appeal. *Secured Asset Mgmt., LLC v. Cong. Beth Joseph Zwi Dushinsky*, No. 17CV05588DLICLP, 2019 WL 4861411, at *7 (E.D.N.Y. Sept. 30, 2019), *aff'd* 828 F. App'x 815 (2d Cir. 2020); *see also Lia v. Saporito*, 541 F. App'x 71, 74 (2d Cir. 2013). And finally, "[p]ermitting [an] opportunistic, last-minute about-face" would "unfairly advantage[]" the Mirkins and "impose[] an unfair detriment on" XOOM by allowing the Mirkins' to use their previous position to reverse dismissal of their claims and secure immensely costly and time-consuming discovery while immunizing their baseless no-margin interpretation from scrutiny in a 12(b)(6) motion or in the court of appeals. *Intellivision*, 484 F. App'x at 621. Under the "specific factual context[]" of this case, these factors more than justify the invocation of judicial estoppel to hold the Mirkins to the position they used to secure reversal of this Court's previous judgment by barring the meritless position they specifically disclaimed. Allowing the Mirkins to do otherwise would both condone an intolerable abuse "of judicial machinery" and "undermin[e] the integrity of the judicial process." *New Hampshire*, 532 U.S. at 750.

2.  The Mirkins' capped-margin model has no foundation in the Contract.

As discussed, the Mirkins' first damage model (the no-margin model) rests on an indefensible misinterpretation of the Contract's requirements. Their second model, however, rests on nothing at all. Under that second model, XOOM is allowed to include a margin in its rates, but that margin cannot exceed the "fixed rate margin applied to [XOOM]'s fixed rate customers." Ex. A-5, Pls.' Expert Rpt. ¶ 73.

As the Mirkins' lead expert Seabron Adamson candidly admits, this margin cap is not based on anything in the Contract or an economic calculation of a rate that includes all the margin components XOOM was contractually allowed to include in its variable rates. *See* Ex. A-16, Adamson Dep. 69:13–70:3. Rather, the capped-margin model is based on Mr. Adamson's personal belief that "if the Court were to decide that a margin was allowed, that it can't be an uncapped margin," and he used the "margin from fixed rate customer" as the cap because he "really didn't have any information that would allow" him to calculate a "reasonable or appropriate" margin on his own. *Id.* at 70:17–21; 99:14–15.

As the Second Circuit has squarely explained, Mr. Adamson's personal belief is not a valid reason to impose a rate cap. He should know better than to suggest it again here. In *Richards*, as here, Mr. Adamson used an energy company's fixed-rate margins as a benchmark for "assessing the amount that [the supplier] should have charged its variable rate customers." *Richards*, 246 F. Supp. 3d at 552. The district court rejected that opinion because the contract could not be construed to "require[] . . . a specific profit margin" or "the same profit margin for each product the company sold," *id.* (citing *11 little-known facts about Costco, where shoppers come for the pizza and stay for the diamonds*, Jul. 29, 2016, BUSINESS INSIDER, https://www.businessinsider.com/11-little-known-facts-about-costco-2016-7), and the Second Circuit affirmed because "jurors are constrained by law, and not permitted to invent absent contract terms out of thin air." *Richards*, 915 F.3d at 98. Just as "no reasonable fact-finder could conclude that the phrase [based on business and market conditions] required Direct Energy to have a specific profit margin, or to have the same profit margin for each product the company sold;" *Richards*, 246 F. Supp. 3d at 552; the phrase "based on XOOM's actual and estimated supply costs" cannot be reasonably construed to cap XOOM's variable-rate margins at any level, much less the level applicable to fixed-rate products.

26

C.    **Boris's claim also fails because he never contracted with XOOM.**

Finally, with respect to Boris, the Mirkins' inability to offer evidence of breach is not the only reason for summary judgment. Rather, his claim also fails because he cannot establish its first element: "the existence of a valid contract." *Parker*, 641 S.E.2d at 737.

It is unclear whether Boris will attempt to articulate a legal rationale for his contract-claim-without-a-contract. But it is crystal clear that he cannot prevail. As a threshold matter, Boris does not have Article III standing. *See Bell v. Gateway Energy Servs. Corp.*, No. 17-CV-3893 (KBF), 2017 WL 5956887, at *1 (S.D.N.Y. Nov. 29, 2017) (dismissing a plaintiff's claim for lack of standing when his "sole connection to the case" was his marriage to a co-plaintiff who contracted with a defendant). And setting that problem aside, Boris clearly has no right to recover under Susanna's contract. He cannot recover as a third-party beneficiary because the Contract says "[t]here are no third-party beneficiaries." Ex. A-19, Contract at 3. He cannot recover as an assignee because XOOM did not consent to any assignment. *Id.* And he cannot recover as an agent because an agent is not a real party in interest. *See Goodrich v. Rice*, 331 S.E.2d 195, 199 (N.C. Ct. App. 1985).

Accordingly, Boris's claim fails because he did not contract with XOOM and does not have a legal basis to sue for an alleged (but unsubstantiated) breach of Susanna's contract.

V.    **CONCLUSION & PRAYER**

For these reasons, XOOM's motion for summary judgment should be granted, a final judgment entered, and the case closed.

Dated: March 8, 2023

MCDOWELL HETHERINGTON LLP

*/s/ Michael D. Matthews, Jr*
Michael D. Matthews, Jr.
Diane S. Wizig (admitted *pro hac vice*)
James M. Chambers (admitted *pro hac vice*)
David L. Villarreal (admitted *pro hac vice*)
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
james.chambers@mhllp.com
david.villarreal@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC
and XOOM Energy New York, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the 8th day of March, 2023 via email on all counsel of record.

/s/*Michael D. Matthews, Jr.*
Michael D. Matthews, Jr..