# MDM Declaration Exhibit A-02

# No. 18-3138

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of
All Others Similarly Situated,

*Plaintiffs-Appellants*,

v.

XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of New York
No. 18 Civ. 2949
Hon. Allyne R. Ross Presiding

**APPELLANTS' REPLY BRIEF**

Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic
**WITTELS LAW, P.C.**
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945

*Attorneys for Appellants and the Proposed Class*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................3

    I.      PLAINTIFFS' INITIAL COMPLAINT SHOULD BE
          SUSTAINED .......................................................................................3

    II.     IT WAS ERROR FOR THE DISTRICT COURT TO DISMISS
          THE INITIAL COMPLAINT WITH PREJUDICE AND
          WITHOUT STATING WHY AN AMENDMENT WOULD BE
          FUTILE ..............................................................................................9

    III.    PLAINTIFFS' REQUEST TO FILE AN AMENDED
          COMPLAINT SHOULD HAVE BEEN GRANTED .............................11

    IV.    THE DISTRICT COURT ABUSED ITS DISCRETION IN
          DENYING PLAINTIFFS' RECONSIDERATION MOTION ...............19

CONCLUSION .........................................................................................................21

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................2

*Basile v. Stream Energy Pa., LLC*,
  2016 WL 4611443 (M.D. Pa. Sept. 6, 2016)......................................7

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................2

*Burkeen v. A.R.E. Accessories, LLC*,
  2018 WL 6620183 (6th Cir. 2018) ..................................................10

*Cresci v. Mohawk Valley Cmty. Coll.*,
  693 F. App'x 21 (2d Cir. 2017) ....................................................9

*Daniyan v. Viridian Energy, Inc.*,
  2015 WL 4031752 (D. Md. June 30, 2015)........................................6

*Donnenfeld v. Petro, Inc.*,
  333 F. Supp. 3d 208 (E.D.N.Y. 2018) ..............................................6

*Edwards v. N. Am. Power & Gas, LLC*,
  120 F. Supp. 3d 132 (D. Conn. 2015)..............................................7

*Gonzales v. Agway Energy Servs., LLC*,
  2019 WL 910669 (N.D.N.Y. Feb. 25, 2019)......................................8

*Gonzales v. Agway Energy Servs., LLC*,
  2018 WL 5118509 (N.D.N.Y. Oct. 22, 2018) ....................................20

*Gorecki v. Clearview Elec., Inc.*,
  338 F. Supp. 3d 470 (W.D. Pa. 2018)..............................................6

*Hamlen v. Gateway Energy Servs. Corp.*,
  2017 WL 892399 (S.D.N.Y. Mar. 6, 2017)........................................5

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ....................................................9, 10

*Mercado v. Verde Energy USA, Inc.*,
  2019 WL 978531 (N.D. Ill. Feb. 28, 2019) ........................................................6

*Oladapo v. Smart One Energy, LLC*,
  2016 WL 344976 (S.D.N.Y. Jan. 27, 2016) ........................................................7

*Palmer v. Fannie Mae*,
  2018 WL 5830504 (2d Cir. Nov. 7, 2018) ........................................................10

*Richards v. Direct Energy Servs., LLC*,
  915 F.3d 88 (2d Cir. 2019) ................................................................................7

*Windley v. Starion Energy, Inc.*,
  2016 WL 197503 (S.D.N.Y. Jan. 8, 2016) ........................................................6

## **INTRODUCTION**

This is a straightforward breach of contract case. XOOM's customer contract requires that its residential home energy prices be based on its "supply costs." [A-29]. Plaintiffs allege that XOOM's excessive energy rates are not based on Defendants' supply costs. XOOM therefore breached the contract.

But Plaintiffs did not stop there. In their initial complaint Plaintiffs' consulting expert provided a chart of rates based on XOOM's costs (which costs are knowable because XOOM is merely a re-seller that purchases energy on New York's wholesale energy market). [A-19–A-20 at ¶ 47]. This chart shows that XOOM charged between 47% and 51% more than the contract allowed. *Id.*

Nevertheless, without oral argument the district court dismissed Plaintiffs' original complaint *with prejudice*. [A-57–A-58]. The district court primarily, and incorrectly, found that because the contract ties rates to XOOM's *internal* supply costs (which the district court wrongly concluded were unknowable) Plaintiffs' "complicated" calculations of the contract rate did not reflect XOOM's costs. *See* A-50 ("Plaintiffs' allegations fail because they conflate XOOM's internal costs with complicated factors that appear nowhere on the face of the agreement.").

Yet, when Plaintiffs moved to amend their complaint to emphasize to the district court that XOOM's costs are indeed knowable (because XOOM is simply an energy re-seller whose publicly available "supply costs" are over 90%

comprised of the wholesale cost of energy), the district court would have none of it—rejecting out of hand Plaintiffs' evidence-based allegations.  Even before the deadline for Plaintiffs' reply in support of their motion to amend, the district court faulted Plaintiffs for not seeking leave to amend prior to the initial dismissal order and ruled that Plaintiffs' proposed amendment would be futile.  [A-112–A-115].

According to the district court the proposed amendment apparently failed to address its "primary concern: that the contractual language allowing XOOM to set its prices in accordance with 'actual and estimated supply costs' does not require that XOOM set its prices in accordance with any of the market-related factors identified by plaintiffs . . . ."  [A-113].

The district court got it wrong.  Because XOOM is merely a re-seller, the publicly available data Plaintiffs used to calculate the rate XOOM should have charged *reflect* XOOM's supply costs.  And because Plaintiffs demonstrated that XOOM's prices are much higher than its costs their breach claim should have been sustained.  Indeed, on a motion to dismiss, once a plaintiff alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), all doubts accrue to the plaintiff.

## ARGUMENT

## I.    PLAINTIFFS' INITIAL COMPLAINT SHOULD BE SUSTAINED

Defendants' contract requires that XOOM's variable electricity rates be "based on XOOM's actual and estimated supply costs . . . ."  [A-19 at ¶ 44]. Plaintiffs' initial complaint alleges that XOOM's rates are not based on its actual and estimated supply costs—rather, XOOM consistently charges high rates that are untethered to its supply costs.  [A-19–A-20 at ¶¶ 46–49].  Plaintiffs also allege that a) XOOM is a broker with very few non-procurement overhead costs (A-10 at ¶ 20), b) the New York's Public Service Commission's staff recently concluded that unregulated energy service companies ("ESCOs") like XOOM are systematically hiding their rate-setting criteria (A-16–A-18 at ¶¶ 36–38), and c) XOOM intentionally fails to disclose the fact that its rates are unrelated to XOOM's supply costs.  [A-21 at ¶ 54].  Further, and critically, Plaintiffs identify XOOM's actual supply costs and provide a fact-based, pre-discovery calculation of the rate XOOM was contractually bound to charge for *each month* that Plaintiffs were XOOM customers.  [A-19–A-20 at ¶¶ 47–48].  These calculations are below:

| Period | XOOM Rate | Market Supply Cost | Difference in % |
|--------|-----------|--------------------|-----------------|
| 5/10/2013-6/11/2013 | 8.99 (teaser) | 11.03 | -18.53% |
| 6/11/2013-7/11/2013 | 11.96 | 11.89 | 0.60% |
| 7/11/2013-8/9/2013 | 14.40 | 12.36 | 16.52% |

| 8/9/2013-9/10/2013 | 14.88 | 10.1 | 47.33% |
|---|---|---|---|
| 9/10/2013-10/8/2013 | 14.15 | 10.12 | 39.85% |
| 10/8/2013-11/7/2013 | 14.90 | 9.82 | 51.73% |

Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Pls.' Class Action Compl. at 7 n.6 (ECF No. 20); Appellants' Opening Brief ("Appellants' Br.") at 18–19. In other words, the original complaint itemizes the cost-based rates XOOM contracted to charge (i.e., the "Market Supply Cost" above), and thereby demonstrates that XOOM's actual rates were substantially higher than the rates it should have charged. Thus, Plaintiffs' original complaint more than adequately pleads a breach of contract claim.

Despite these straightforward allegations Defendants claim that the initial complaint "incorrectly alleged that XOOM had breached the [contract] because XOOM's price was higher than Plaintiffs' 'Market Supply Rate,' which Plaintiffs manufactured for the purpose of litigation." Brief of the Defendants-Appellees ("Appellees' Br.") at 16, 20–22. Defendants mischaracterize Plaintiffs' allegations. The above-listed "Market Supply Cost" *is based on* XOOM's supply costs (which are publicly available) and Defendants' charging of rates unrelated to these supply costs violates the contract.

Likewise, Defendants are wrong to claim that "Plaintiffs did not allege anywhere that XOOM's prices were not consistent with XOOM's actual or

estimated supply costs." Appellees' Br. at 16–17. To the contrary, Plaintiffs'

entire theory of Defendants' breach hinges on the disconnect between XOOM's

rates and its supply costs. Indeed, it is quite telling that Defendants do not disclose

XOOM's supply costs in their brief. Clearly XOOM knows that doing so would

only further demonstrate its breach.

Defendants' cited cases also cannot detract from Plaintiffs' textbook contract

claim. *Id.* at 22–30. In *Hamlen*, the plaintiff claimed that the defendant ESCO

failed to base rates on "its cost for natural gas or market conditions," but critically

did not plead "how defendant filled its supply needs." *Hamlen v. Gateway Energy

Servs. Corp.*, No. 16 Civ. 3526 (VB), 2017 WL 892399, at *4 (S.D.N.Y. Mar. 6,

2017). Here, the opposite is true. Plaintiffs plead in their original complaint that

XOOM procures its energy at the wholesale rate and that the cost of "***wholesale

energy*** is the primary component of the non-overhead costs XOOM incurs." [A-20

at ¶ 51] (emphasis added); Appellants' Br. at 5. Because wholesale rates are

publicly available, Plaintiffs' initial complaint demonstrates that XOOM's rates are

not based on its supply costs. Appellants' Br. at 18–19.

*Daniyan* and *Windley* are equally inapposite. Appellees' Br. at 24–25. In

*Daniyan*, where the plaintiff claimed that the ESCO breached an implied

"reasonable price" contract term, the court found no breach because the contract

contained a rate formula. *Daniyan v. Viridian Energy, Inc.*, Civ. 14 No. 2715

5

(GLR), 2015 WL 4031752, at *3 (D. Md. June 30, 2015). Those facts do not match this case at all.

In *Windley*, the plaintiff's claim that the ESCO promised guaranteed savings—an oral promise made during a marketing call—was dismissed because the contract expressly disclaimed guaranteed savings and oral representations. *Windley v. Starion Energy, Inc.*, No. 14 Civ. 9053 (WHP), 2016 WL 197503, at *3 (S.D.N.Y. Jan. 8, 2016). Neither *Windley* nor *Daniyan* involved an ESCO accused of deviating from its contract's rate formula. The cases that do survived the dismissal phase.[1] The same outcome should have occurred here.[2]

---

[1] *See* Appellants' Br., n.3 at 21–22 (collecting cases); *see also Mercado v. Verde Energy USA, Inc.*, No. 18 Civ. 2068 (JBG), 2019 WL 978531, at *2 (N.D. Ill. Feb. 28, 2019) (sustaining consumers' claim that ESCO breached contractual promise to charge rates based on "market conditions," and stating that the "court leaves to another day the issues of whether, possibly, this language was ambiguous or that it perhaps meant nothing. This court sees no reason to make this matter more complicated than to focus on Verde's written promise and see if plaintiff can or cannot prove that it was breached."); *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 212, 218 (E.D.N.Y. 2018) (sustaining a breach claim where a home heating oil provider allegedly charged prices that did not vary based on "market conditions, including but not limited to, product availability, wholesale cost and other factors." The court stated that "[t]his language . . . can be readily interpreted as a promise that [the defendant's] price would decline when market prices did."); *Gorecki v. Clearview Elec., Inc.*, 338 F. Supp. 3d 470, 472, 476 (W.D. Pa. 2018) (sustaining the breach of contract claim where contract based rates on "wholesale market conditions," and defendant's rates stayed steady despite changes in wholesale costs).

[2] Defendants are wrong to attempt to distinguish *Edwards*, *Oladapo* and *Basile* based on the fact that the contracts in those cases explicitly referred to "wholesale

*Footnote continued on next page.*

This Court's opinion in *Richards* is also not on point. In *Richards*, the ESCO contracted to charge a variable rate based on "business and market conditions." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 92 (2d Cir. 2019). This Court held that the phrase "business and market conditions" is a "phrase which encompasses more than just procurement costs," and upheld a summary judgment finding that the ESCO's failure to base rates on its procurement costs did not violate the implied covenant of good faith and fair dealing. *Id.* at 92–93; *see also id.* at 99 (the contract does not "suggest that the variable rate bears a direct relationship to Direct Energy's procurement costs").

This case is the polar opposite of *Richards*. Here, the contract unambiguously ties XOOM's rates to Defendants' procurement costs—i.e., XOOM's "actual or estimated supply costs." [A-29]. Plaintiffs allege that

---

market rate," "changing gas market conditions," and "wholesale natural gas prices or other inputs to wholesale electric prices," respectively. Appellees' Br. at 29–30 (citing *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132 (D. Conn. 2015); *Oladapo v. Smart One Energy, LLC*, No. 14 Civ. 7117 (LTS), 2016 WL 344976, at *1 (S.D.N.Y. Jan. 27, 2016); *Basile v. Stream Energy Pa., LLC*, No. 15 Civ. 01518 (YK), 2016 WL 4611443, at *1 (M.D. Pa. Sept. 6, 2016)). In all three cases, consumers' rates were tied to discernible criteria. Here, while XOOM's contract states that its rates are tied to XOOM's supply costs, because XOOM is merely a broker that purchases energy at the wholesale rate, this case is the logical equivalent to *Edwards*, *Oladapo*, and *Basile*. Indeed, as the district court recognized, "XOOM's agreement *does* commit the electricity provider to set prices that are based on a specific variable: XOOM's costs." [A-49] (emphasis in original). XOOM's supply costs are knowable; Defendants' breach is thus objectively ascertainable.

XOOM's rates do not reflect those supply costs. [A-19–A-20 at ¶¶ 47–48]. That is a breach, plain and simple. Indeed, considering that brokers like XOOM purchase energy at the wholesale rate, the fact-finder can easily determine whether XOOM's rates bear any relation to XOOM's supply costs (they do not).

Moreover, the *Richards* plaintiff claimed the ESCO violated the covenant of good faith and fair dealing by setting its prices in bad faith. 915 F.3d at 96. Here, Plaintiffs' straightforward contract claim does not require a showing of bad faith.

Finally, it is important to note that the relevant claims in *Richards* were decided on summary judgment after discovery into the defendant's pricing practices. *Id.* at 98. Here, Plaintiffs have aptly demonstrated at the pleading stage that given the cost of wholesale electricity (which XOOM pays to procure energy), XOOM's rates are not based on its supply costs. This is precisely why Judge Mae D'Agostino in the Northern District of New York recently found that "at the pleadings stage, [*Richards* is] very different." *Gonzales v. Agway Energy Servs., LLC*, No. 518 Civ. (MAD) (ATB), 2019 WL 910669, at *3 (N.D.N.Y. Feb. 25, 2019); *see also id.* ("On a motion to dismiss, the pleadings, and not the evidence, are the object of attention."). On the present record there is no question that Plaintiffs have pled actionable breach. In sum, Plaintiffs' original complaint is well pled, and the district court erred in granting Defendants' dismissal motion.

## II.  IT WAS ERROR FOR THE DISTRICT COURT TO DISMISS THE INITIAL COMPLAINT WITH PREJUDICE AND WITHOUT STATING WHY AN AMENDMENT WOULD BE FUTILE

This Court's precedent establishes that the district court essentially gave Plaintiffs a "Hobson's choice: agree to cure deficiencies not yet fully briefed and decided or forfeit the opportunity to replead." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").  This is especially true in complex cases like the instant case, "where pleading defects may not only be latent, and easily missed or misperceived without full briefing and judicial resolution; they may also be borderline, and hence subject to reasonable dispute." *Id.* at 191; *see also Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) ("The proper time for a plaintiff to move to amend . . . is when the plaintiff learns from the District Court in what respect the complaint is deficient.  Before learning from the court what are its deficiencies, the plaintiff cannot know whether he is capable of amending the complaint efficaciously.").

Defendants thus wholly miss the mark in demanding that Plaintiffs be punished for not requesting an amendment before the district court ruled. Appellees' Br. at 2, 33.  The law of this Circuit could not be clearer—there was

9

nothing improper in Plaintiffs' awaiting the district court's dismissal ruling.

Similarly, it was error for the district court to dismiss the initial complaint with prejudice without engaging in a futility analysis. *Loreley*, 797 F.3d at 169 (vacating dismissal with prejudice where district court failed to analyze the issue of futility); *Palmer v. Fannie Mae*, No. 17 Civ. 2867, 2018 WL 5830504, at *2 (2d Cir. Nov. 7, 2018) ("While 'futility' is a valid reason for denying a motion to amend, this is true only where it is beyond doubt that the plaintiff can prove no set of facts in support of his amended claims.") (citation and alterations omitted); *Burkeen v. A.R.E. Accessories, LLC*, No. 17 Civ. 6437 (ELC), 2018 WL 6620183, at *3 (6th Cir. 2018) (dismissal should have been without prejudice where "[t]he district court . . . did not provide any explanation for dismissing the complaint with prejudice," and "foreclosed any future possibility of amendment without indicating any reason to believe that amendment would have been futile and without providing any other justifications for granting dismissal with prejudice."). Indeed, "[b]ecause there was no indication that amendment would have been futile and no other apparent justification was provided for the dismissal with prejudice, the district court . . . should have dismissed the claims without prejudice and with leave to amend." *Id.* at *3 (citation and alterations omitted).[3]

---

[3] Defendants miss the mark when they try to distinguish *Loreley* and *Palmer* on the grounds that in those cases "the plaintiffs requested permission to file an amended

*Footnote continued on next page.*

Finally, Defendants are incorrect to claim that the district court's error was harmless because the district court later considered Plaintiffs' proposed amended complaint.  Appellees' Br. at 34.  When Plaintiffs sought leave to amend the district court faulted Plaintiffs for not moving earlier and incorrectly applied a stringent reconsideration standard that is at odds with Rule 15's liberal amendment policy.  *Id.* at 42–43.  Had the district court allowed Plaintiffs to replead after its initial dismissal ruling, Plaintiffs' amended complaint would not have been evaluated under the (incorrectly applied) reconsideration standard.  Because the district court should have given Plaintiffs an opportunity to replead, its original dismissal order should be vacated.

## III.   PLAINTIFFS' REQUEST TO FILE AN AMENDED COMPLAINT SHOULD HAVE BEEN GRANTED

To address the concerns raised in the district court's initial dismissal ruling, Plaintiffs sought leave to amend their complaint to (i) further explain that XOOM's

---

complaint before the court ruled on the motions to dismiss, which were denied without consideration of their merits."  Appellees' Br. at 33.  As *Loreley* makes clear, the district court's error was to treat "[p]laintiffs' decision to stand by the complaint after a preview of Defendants' arguments—in the critical absence of a definitive ruling—as a forfeiture of the protections afforded by Rule 15."  *Loreley*, 797 F.3d at 190.  That the *Loreley* and *Palmer* plaintiffs requested leave to amend before the dismissal ruling played no part in this Court's analysis in either case.  Defendants' attempt to distinguish *Burkeen* also fails.  Appellees' Br. at 34.  Defendants correctly assert that the lower court in *Burkeen* "did not address the substance of the Plaintiffs' proposed [amendment] or indicate whether the amendment would be futile" (Appellants' Br. at 28–29), yet this is *exactly* what the district court did here when it dismissed Plaintiffs' initial complaint with prejudice.

supply costs are knowable (and that XOOM's breach is thus ascertainable), (ii) disclose the methodology Plaintiffs used to calculate the rate XOOM should have charged, and (iii) remove the complaint's references to reasonable consumer expectations.  Pls.' Mem. in Supp. of Pls.' Mot. to Alter or Amend J., or Alternatively, for Relief from J. or Order at 4–10 (ECF No. 27).  To the extent the district court's original dismissal ruling found real flaws in the initial complaint, Plaintiffs promptly cured those deficiencies and their amendment request should have been granted.

Nevertheless, Defendants claim that the proposed amendment was futile. Appellees' Br. at 35.  XOOM's primary futility argument is that at the dismissal stage the Court should improperly disregard Plaintiffs' calculated contract rate because "XOOM's agreement did not promise to charge 'wholesale' or 'market rate prices.'"  Appellees' Br. at 17; *see also id.* at 35–36 ("Plaintiffs' proposed amended complaint merely perpetuates their flawed argument that because XOOM's variable price . . . was at times higher than a 'wholesale' or 'market rate' for electricity, XOOM breached its contract with Plaintiffs."); *id.* at 43–45.

Defendants' main futility argument is misguided.  Plaintiffs' proposed amendment makes clear that XOOM purchases its energy at wholesale market rates on the New York wholesale energy market.  [A-79 at ¶ 47].  In other words, XOOM's supply costs ***include*** the wholesale cost of energy.  Critically, the

proposed amended complaint also a) alleges that wholesale energy costs make up over 90% of Defendants' supply costs [A-64 at ¶ 4], b) enumerates and explains the additional costs XOOM pays when it purchases energy on the wholesale market [A-80–A-81 at ¶ 53], and c) factors in those additional costs in calculating the contract rate XOOM agreed to charge [A-81–A-82 at ¶ 54].[4]

The amended complaint also explains that wholesale supply costs "are objectively determinable and mandated by regulation," and compares the wholesale cost of energy during Plaintiffs' exact billing cycles to XOOM's prices during those same billing cycles. [A-81 at ¶ 54]. This comparison, set forth on the following page, shows that XOOM's rates are not based on XOOM's supply costs:

---

[4] In their amended complaint Plaintiffs also attach a spreadsheet showing their calculations of the contract rate [A-103]. Although Defendants should know better, XOOM misleadingly claims that the supply cost components Plaintiffs used in their calculations "are not referenced in XOOM's agreement . . . ." Appellees' Br. at 38; id. at 43. XOOM's spurious claim aside, the amended complaint makes clear that the pricing components such as "load-weighted Zone J day ahead prices" were costs incurred by XOOM during the relevant billing cycle. [A-82 at ¶ 55].

| Period | XOOM Rate | Market Supply Cost | Difference in % | XOOM Total Margin (Markup) on Wholesale Cost[5] |
|---|---|---|---|---|
| 5/10/2013–6/11/2013 | 8.99 (*teaser*) | 11.08 | -23.25% | N/A |
| 6/11/2013–7/11/2013 | 11.96 | 11.80 | -1.34% | 11.04% |
| 7/11/2013–8/9/2013 | 14.40 | 12.35 | 16.60% | 28.36% |
| 8/9/2013–9/10/2013 | 14.88 | 10.18 | 46.17% | 60.81% |
| 9/10/2013–10/8/2013 | 14.15 | 10.13 | 39.68% | 54.40% |
| 10/8/2013–11/7/2013 | 14.90 | 9.85 | 51.27% | 66.47% |

[A-81–A-82 at ¶ 54].

This table demonstrates that XOOM's rates went up when the underlying wholesale market rates went up (compare XOOM's rates and the Market Supply Cost for the 6/11/2013–7/11/2013 and 7/11/2013–8/9/2013 billing periods) but **continued to climb** when the wholesale market rate **went down** (compare XOOM's rates and the Market Supply Cost for the 9/10/2013–10/8/2013 and 10/8/2013–11/7/2013 billing periods). The table also demonstrates that XOOM's total markup compared to its wholesale costs is exceedingly high (as much as 66.47%),

---

[5] This figure adds the percent margin associated with the 1.3¢ per kWh margin in Plaintiffs' "Market Supply Cost" to the "Difference in %" increase in XOOM's rates, on top of the already generous 1.3¢ per kWh margin.

14

which is especially concerning considering XOOM's low operating costs and its contractual pledge to base consumers' rates on XOOM's supply costs.

Tellingly, XOOM does not dispute Plaintiffs' calculations and it makes no attempt to demonstrate that XOOM's supply costs were higher than Plaintiffs allege. Instead, XOOM contorts the contract and misstates the record.

For example, XOOM argues that Plaintiffs' allegations bear "no relationship to the **non-exhaustive** list of factors XOOM promised to base its price upon in the Agreement." Appellees' Br. at 17, 44. This is a red herring. The contract provides that XOOM's rates will be based on its supply costs. While it is true that XOOM's supply costs "may include but not be limited to prior period adjustments, inventory and balancing costs" [A-19 at ¶ 44], the amended complaint establishes that the wholesale cost of energy makes up over 90% of Defendants' supply costs [A-64 at ¶ 4] and that the other listed components "cannot explain the drastic increases in XOOM's variable rate or the reason its rates are disconnected from the wholesale supply cost." [A-78–79 at ¶ 46].

Indeed, the amended complaint makes clear that "inventory" only applies to gas (not the electricity Plaintiffs purchased) and that normal system "balancing costs" are already incorporated into electricity's wholesale cost. *Id.* As for "prior period adjustments," the proposed amendment specifies that these "should balance out over time, as adjustments are both positive and negative." *Id.* Nevertheless,

15

XOOM appears to ask that this Court make the unsupported (and pre-discovery) merits ruling that XOOM's prior period adjustments were both *positive* and ***extraordinarily high*** for the months Plaintiffs were XOOM customers.  Such a determination simply cannot be made at the pleading stage.

Likewise, by emphasizing that the contract's enumerated supply costs are "non-exhaustive," XOOM asks the Court to give it *carte blanche* to set rates as it pleases.  Appellees' Br. at 17, 44.  The Court should not take the bait.  As the district court correctly observed, "XOOM's agreement *does* commit the electricity provider to set prices that are based on a specific variable: XOOM's costs."  [A-49] (emphasis in original).  Because XOOM has offered no proof of other supply costs that explain its high rates, Plaintiffs should be allowed to proceed to discovery.

Defendants also argue that Plaintiffs "cannot and do not allege that simply because XOOM is a 'market participant' in the NYISO Energy Market that the prices XOOM charged were not based on XOOM's actual or estimated supply costs . . . ."  Appellees' Br. at 37.  This is silly.  That XOOM is an NYISO market participant proves that XOOM paid wholesale rates for its electricity, and the publicly available wholesale cost of electricity in turn demonstrates that XOOM's high rates bear no relationship to Defendants' costs.

Relatedly, Defendants contend that comparing XOOM's rates to Plaintiffs' utility's rates (Con Edison) is "wholly irrelevant under the terms of XOOM's

16

contract." Appellees' Br. at 36. Defendants are wrong. In New York, utilities' rates generally reflect the NYISO wholesale rate because utilities purchase electricity directly from the NYISO. [A-84 at ¶ 60]. Thus, Con Edison's rates are a good indicator of XOOM's supply costs, as XOOM also pays the wholesale market rate. *Id.* As the comparison to Con Edison's rates demonstrates, XOOM's rates do not rise and fall with Con Edison's rates and thus XOOM's rates are not based on its supply costs. [A-84 at ¶ 61].

While the Con Edison rates are not a perfect reflection of the wholesale cost of electricity (utilities have true-ups and other adjustments in their rates), if XOOM's rates were based on its electricity supply costs, those rates would more or less move with Con Edison's rates. Notably, when Con Edison's rates rise, XOOM's rates go up, but when Con Edison's rates fall, XOOM's rates *rise*.

Confronted with this unassailable fact, XOOM (mis)directs the Court to the fact that between August/September 2013 and September/October 2013 XOOM's contractually-required rate decreased, whereas Con Edison's price increased. Appellees' Br. at 36. Defendants miss the point. During these two months Con Edison's rates and the rates XOOM contracted to charge were quite close:

| August/September Rates | September/October Rates |
|---|---|
| Con Edison – 9.78<br>XOOM Contract Rate – 10.18 | Con Edison – 10.12<br>XOOM Contract Rate – 10.13 |

This stands in stark contrast to the rates XOOM *actually charged* during this same period, which were more than 39% higher.  [A-81–A-82 at ¶ 54].

Next, Defendants distort the amended complaint's references to XOOM's marketing materials—references which further demonstrate that XOOM purchases its energy at wholesale rates.  Appellees' Br. at 37.  Indeed, while not denying Plaintiffs' allegation that XOOM purchases energy at wholesale, XOOM makes the irrelevant claims that (i) Plaintiffs did not rely on these marketing materials and (ii) the contract's merger clause disclaims additional warranties and representations.  Appellees' Br. at 37–38.  XOOM's claims cannot be taken seriously.  Plaintiffs do not need to have relied on XOOM's representations that it purchases energy at wholesale rates for those representations to support Plaintiffs' claims regarding XOOM's supply costs.  And the contract's merger clause does not deny that XOOM purchases energy at wholesale prices.

Finally, although XOOM provides no evidence that "estimated" supply costs justify its high rates, XOOM claims that Plaintiffs' calculated contract rate does not account for Defendants' estimated supply costs.  Appellees' Br. at 44–45.  Such a fact-specific claim simply cannot be resolved at the dismissal phase.  Moreover, the overwhelming share of XOOM's actual supply costs is the wholesale cost of electricity.  [A-64 at ¶ 4].  Accordingly, XOOM's estimated costs should not be substantially different from its actual costs.  Regardless, the

18

question of XOOM's estimated supply costs cannot be properly evaluated on the present record. Indeed, while the district court should have sustained the original complaint, given Plaintiffs' proposed amendment there can be no question that ***at this stage*** Plaintiffs have pled a valid contract claim.

## IV.   THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFFS' RECONSIDERATION MOTION

The district court should have never dismissed the original complaint. It then built on its original error when despite Plaintiffs' repeated attempts to address its concerns, it improperly refused Plaintiffs an opportunity to amend. The Federal Rules and this Court's precedent dictate that Plaintiffs have a right to test their claims on the merits, and the district court was wrong to impede Plaintiffs' rights.

Nevertheless, Defendants argue that the district court correctly concluded that "'[t]he agreement does not commit XOOM to set prices based on external factors like 'market rates' and plaintiffs' calculated 'Market Supply Cost' includes criteria that do not appear on the face of the agreement between the parties.'" Appellees' Br. at 48. Both Defendants and the district court are incorrect. Because the contract ties XOOM's rates to its supply costs and because XOOM purchases energy on New York's wholesale market, such "external factors" and "criteria that do not appear on the face of the agreement" (to use the district court's language) are "objectively determinable and mandated by regulation." [A-80–A-81 at ¶ 53, A-127]. This is why Plaintiffs were able to supply a highly precise, pre-discovery

calculation of the rates XOOM should have charged.  Accordingly, and because XOOM's supply costs are determinable, the district court should have credited Plaintiffs' allegations.[6]

This is also why Defendants cannot revive the district court's analysis of *Gonzales v. Agway Energy Servs., LLC*, No. 518 Civ. 235 (MAD) (ATB), 2018 WL 5118509 (N.D.N.Y. Oct. 22, 2018).  Defendants claim that the district court "correctly found that XOOM's Agreement does <u>not</u> contain any reference to the 'wholesale market,' 'wholesale prices,' 'competitive market rates,' or 'market-related circumstances,' and therefore Plaintiffs' reliance on *Gonzales* is misplaced."  Appellees' Br. at 48 (emphasis in original).  Yet because Plaintiffs allege (and XOOM does not dispute) that Defendants purchase energy at the wholesale market rate, XOOM's contractual promise to base rates on XOOM's supply costs has the ***exact same*** legal meaning as a contract that ties rates to the wholesale market rate.  In other words, this case is the *same* as *Gonzales* and the many other cases that survived the 12(b)(6) stage where prices were based on discernable criteria.  *See* n.1, *supra*.

---

[6] The district court's premature merits rulings regarding "prior period adjustments" and XOOM's "estimated" supply costs were echoed in Defendants' futility arguments and are addressed in section III, *supra*.

The district court should have allowed Plaintiffs to prove that Defendants breached their contract with Plaintiffs and the thousands of New York consumers this case seeks to protect. This Court should correct the district court's error.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should reverse the district court's dismissal and related rulings.


Dated: March 15, 2019
   Armonk, New York

     Respectfully submitted,

    By: /s/ Steven L. Wittels
     Steven L. Wittels (SW-8110)
     J. Burkett McInturff (JM-4564)
     Tiasha Palikovic (TP-5697)

     **WITTELS LAW, P.C.**
     18 HALF MILE ROAD
     ARMONK, NEW YORK 10504
     Telephone: (914) 319-9945
     Facsimile: (914) 273-2563
     slw@wittelslaw.com
     jbm@wittelslaw.com
     tpalikovic@wittelslaw.com

     *Attorneys for Appellants and the Proposed Class*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,836 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Mac 2018 Times New Roman 14-point font.

Dated: March 15, 2019

____/s/  Steven L. Wittels_____
        Steven L. Wittels