# MDM Declaration Exhibit A-07

Case 1:18-cv-02949-ARR-RER Document 145-9 Filed 09/02/23 Page 2 of 52 PageID #: 1290

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


SUSANNA MIRKIN,                    *      Case No. 18-CV-02949(ARR)
 *individual and on behalf*       *
 *of others similarly*            *
 *situated,*                      *
                                  *
                Plaintiffs,       *      Brooklyn, New York
                                  *      August 27, 2020
        v.                        *
                                  *
XOOM ENERGY, LLC, et al,          *
                                  *
                Defendants.       *
                                  *
* * * * * * * * * * * * * * *     *

          TRANSCRIPT OF CIVIL CAUSE FOR VIDEO MOTION HEARING
             BEFORE THE HONORABLE RAMON E. REYES, JR.
                 UNITED STATES MAGISTRATE JUDGE

   APPEARANCES:

   For the Plaintiff:            STEVEN L. WITTELS, ESQ.
                                 J. BURKETT MCINTURFF, III, ESQ.
                                 STEVEN D. COHEN, ESQ.
                                 Wittels McInturff Palikovic
                                 18 Half Mile Road
                                 Armonk, NY  10504

   For the Defendants:           DANIEL J. BROWN, ESQ.
                                 CHRISTOPHER A. ROJAO, ESQ.
                                 McCarter & English, LLP
                                 100 Mulberry Street
                                 Newark, NJ  07102




   Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1          (Proceedings commenced at 11:31 a.m.)

2          THE COURT:  Good morning.  This is Magistrate Judge

3     Reyes.  We are holding a video argument in Mirkin vs. Xoom,

4     docket no. 18-CV-2949.

5          Let's start with appearances for the plaintiff.  And

6     I'll ask you to do it in order of seniority, if you will.

7          MR. WITTELS:  Thank you, Your Honor.  Steven Wittels

8     from Wittels, McInturff, Palikovic for the plaintiffs and the

9     proposed class.  Good morning.

10          THE COURT:  Good morning.

11          All right.  You're muted.

12          MR. MCINTURFF:  How about now?

13          THE COURT:  Yes.

14          MR. MCINTURFF:  Okay.  Good morning, Your Honor.

15     Burkett McInturff from Wittels, McInturff and Palikovic on

16     behalf of plaintiffs in the proposed class.

17          MR. COHEN:  Good morning, Your Honor.  This is

18     Steven Cohen on behalf of plaintiffs in the proposed class

19     from Wittels, McInturff, Palikovic as well.

20          THE COURT:  Counsel for the defendant.

21          MR. BROWN:  Yes.  Thank you, Your Honor.  Daniel

22     Brown from McCarter & English on behalf of the XOOM

23     defendants.

24          MR. ROJAO:  And Good morning, Your Honor.  It's good

25     to see you virtually.  Chrisopher Rojao from McCarter &

3

English on behalf of defendants XOOM Energy, LLC and XOOM
Energy New York, LLC.

THE COURT:  All right.  So we have two motions to
discuss, one is a motion to compel brought by the plaintiffs,
and the other is also a motion for appointment of interim
class counsel that is also brought by the plaintiffs.

So whoever wants to speak for the plaintiffs on both
of those motions, I'll let you take the floor.

MR. WITTELS:  Your Honor, Steven Wittels.

May I just ask preliminarily, we had sort of
discussed it with my team here and I was going to make the
argument on the interim class counsel and Steven Cohen,
perhaps with backup from Mr. McInturff, was going to speak to
the motion to compel.  Is that acceptable?

THE COURT:  That's fine.  However you want to divvy
up the responsibilities.  I would prefer that we deal with the
motion to compel first and then move into the interim class
counsel motion.

MR. COHEN:  Okay, Your Honor.  I can speak to that.
This is Steven Cohen.

With regard to -- I guess we'll start with the
natural gas first.

The defendants claim in their response that we don't
-- that plaintiffs aren't alleging claims regarding gas
customers and that's completely false.  The complaint is

4

1    littered with references to gas and to energy generally.  In

2    the class definition, in paragraph 66, there's reference to

3    gas customers.  The breach of contract claim, paragraphs 79 to

4    80, both discuss gas and energy.  So this notion that they're

5    presenting that our complaint is solely regarding electricity

6    customers just is not accurate.  The first six paragraphs all

7    refer to gas and energy.

8         Second, the contract language for both gas customers

9    and electricity customers is identical.  They produced Boris

10   Mirkin's gas contract, but they haven't produced his billing

11   data, so we don't have that to confirm what gas prices he was

12   charged.

13        Also, defendants never objected to any of our

14   discovery requests on grounds that we were seeking gas.  So

15   the fact that they brought up this gas argument four or five

16   months after serving their discovery responses, that argument

17   is waived.  They first raised this in late April.  They served

18   the discovery responses the end of 2019.

19        Also, with regard to plaintiffs being electricity

20   customers, as we showed in footnote 2 of our letter, the

21   Second Circuit has made clear that a named plaintiff can sue

22   for a similar claim if the underlying harm is similar.  And

23   like I said, the electricity and gas contracts are identical

24   here.

25        We also need, you know -- for class purposes, we

5

1    need gas discovery to determine whether plaintiffs can

2    represent gas customers.

3          Defendants in their letter make some point about

4    certain types of costs being different.  Well, you know, okay,

5    then we need to show, you know, that there's commonality and

6    reciprocality for class purposes.

7          We also have -- from the Maryland litigation,

8    there's deposition testimony from XOOM's director of pricing

9    and structure that XOOM set electricity and gas rates using

10   the same process, so clearly, you know, clearly there's

11   similarities.

12         And finally in 2018, defendants filed something with

13   Judge Ross saying that they moved to strike our gas claims,

14   but they never did that any -- they never did that.  So they

15   conceded that gas claims are part of our case and our

16   complaint.

17               THE COURT:  Okay.

18               MR. COHEN:  Do you want me to move to customer

19   complaints or shall we deal with gas first?

20               THE COURT:  Let's deal with gas first.

21         So who wants to speak on that for the defendant?

22               MR. ROJAO:  I will speak on that, Your Honor.

23   Christopher Rojao from McCarter & English.

24         To respond to some of -- well, first I'll make a

25   couple of statements.

6

1          It's well settled that plaintiffs are only entitled

2     to discovery related to claims that they've actually pled and

3     for which they have standing to pursue.  In this case, neither

4     of those requirements are met with respect to natural gas

5     customers.

6        More specifically, as plaintiff acknowledged in their

7     letter, the amended complaint does not set forth specific

8     allegations regarding breach, breach of any natural gas

9     contract.

10          Indeed, the amended complaint alleges that

11     plaintiffs and their proposed class entered into a contract

12     with defendant XOOM for the provision of electricity.  It

13     alleges that XOOM agreed to charge plaintiff a variable rate

14     based on its actual and estimated supply of cost for

15     electricity.  That's paragraph 77, Your Honor.

16          It then alleges that plaintiffs in the proposed

17     class paid variable rates charged by XOOM for electricity and

18     that XOOM breached the electricity agreement because it did

19     not charge plaintiffs this manufactured market supply rate

20     that plaintiffs have calculated for purposes of this

21     litigation.

22          It does not allege anywhere that Boris or Susanna

23     were natural gas customers, that they paid anything to XOOM

24     for natural gas, or that XOOM breached any agreement to

25     provide natural gas service to plaintiffs or the proposed

1    class.

2             Further, plaintiffs admit that their market supply

3    rate that they calculated only applies to electricity costs.

4    It's written in bold lettering, Your Honor, on page 15 of the

5    amended complaint that says XOOM charges improperly high rates

6    for electricity.  It doesn't say XOOM charged improperly high

7    rates for natural gas or that plaintiffs were natural gas

8    customers.  So plaintiffs have not asserted any claim nor

9    offered any theory of liability pertaining to any breach of

10   any natural gas contract.

11            XOOM's not required to move to dismiss or strike

12   allegations or claims that haven't been pled yet.  That can be

13   done at the motion for certification stage.

14            In addition --

15            THE COURT:  So is it the defendants' contention that

16   gas is not implicated anywhere in the complaint?

17            MR. ROJAO:  No.  We understand that there's

18   references to gas in the complaint.  However, there's no

19   reference to any breach of any natural gas contract.  There's

20   no allegation, Your Honor.  I'm sorry.

21            There are references to gas in the complaint.

22   That's clear.  However, when you actually look at the

23   substantive allegations, it only alleges a claim for breach of

24   an electricity sales agreement.

25            And they don't allege that they were natural gas

1    customers.  They don't allege anywhere that Boris or Susanna

2    actually signed up to receive natural gas or that they paid

3    anything to XOOM for natural gas.  None of that's in the

4    complaint, Your Honor.  And that's all required for standing.

5    And that's required to state a claim.  And none of that's in

6    there.  So there's no claim for natural gas and, therefore,

7    there shouldn't be any discovery pertaining to natural gas.

8         Regarding their argument that natural gas is the

9    same as electricity, that's just not the case, Your Honor.

10   Those are two entirely different commodities.

11        THE COURT:  And so what would stop me from requiring

12   XOOM to produce Boris' -- apparently he had some gas contract

13   on another residential property with someone else, whoever

14   that is -- what would stop me from ordering XOOM to produce

15   that discovery related to his standing?

16        And then if, in fact, he was a gas customer and paid

17   money to XOOM for gas at an inflated rate permitting the

18   complaint to be amended and relate back to the original filing

19   because there is allegations -- perhaps general -- that gas is

20   involved -- paragraphs 1, 6, 66, others -- and then we have an

21   amended class complaint for gas and electric?

22        MR. ROJAO:  Thank you, Your Honor.  So I'll address

23   those points in turn.

24        In this litigation, it's unclear whether or not --

25   we already know that Boris has signed up in other people's

9

1    names to receive services, so we're not sure if there is

2    billing data relating to Boris, that Boris paid anything, or

3    if it's in somebody else's name.  So if plaintiffs want to

4    provide that information to us as to -- if he signed up in his

5    own name or someone else's name and who paid, we'd be happy to

6    look for that.

7          Regarding amending the complaint, Your Honor, we

8    would submit that the plaintiffs would need leave to file an

9    amended complaint.  And we would request a briefing on that

10   issue because we don't believe the plaintiffs were aware of

11   their claims previously at the time that they -- if they did

12   receive natural gas services, they would have been aware of

13   that.  And they didn't allege that claim in this lawsuit.

14          So I think we would request briefing on whether or

15   not plaintiffs would be entitled to relation back based on the

16   allegations in the complaint, whether or not they're

17   fictitious entities, all of that we would request briefing on.

18   But we wouldn't submit that it would be appropriate at this

19   time to simply permit an amended pleading with relation back

20   without legal briefing on that, Your Honor.

21          THE COURT:  Well, certainly XOOM had notice of the

22   gas claim, whether it's adequately pled or not.  So I don't

23   know how they would be prejudiced were I to grant an amended

24   pleading and allow it to relate back to the original filing.

25   And all that does is just extend the statute of limitations

1   period, right?  They could file tomorrow a new case on gas and

2   you would have a shorter statute of limitations period, right?

3          MR. ROJAO:  Well, Your Honor, they would need a

4   plaintiff who was a natural gas customer.  And they would need

5   a plaintiff who was a natural gas customer within the

6   limitations period tomorrow, and we submit that Boris would

7   not be that plaintiff.

8          THE COURT:  Mr. Cohen, does Boris have a gas

9   contract with XOOM?  Do you know?

10         MR. COHEN:  We have the contract that defendants

11  produced and on there is the account number.  So regarding

12  defense counsel's statement that they might not know how to

13  find it because it might be in someone else's name, they

14  should be able to pull it up based on the document they

15  produced that has the account number and the address.  So I

16  don't see why that would be any difficulty on their end.

17         THE COURT:  So it has an account number and address,

18  and it has two names or one name?

19         MR. COHEN:  The documents that we received, the

20  enrollment and the contract, I believe just has Boris' name.

21  It has his email address.  It has his phone number.

22         THE COURT:  Same email address and phone number that

23  he used for the electric?

24         MR. COHEN:  I believe it might be different, but I'd

25  have to double-check.

1          MR. ROJAO:  They are different, Your Honor.

2          THE COURT:  So let's say he used a different email

3     address and telephone number and it's at a different location,

4     what's the result of that?

5          MR. ROJAO:  Well, we know here, Your Honor, that he

6     signed up for the services in somebody else's name.  So is it

7     that somebody else is signing up in his name?

8          THE COURT:  Why do you -- why do you know that he

9     signed up for the services in somebody else's name?

10          MR. ROJAO:  He signed up in his wife's name.  The

11     plaintiffs have stated that.

12          THE COURT:  For which?

13          MR. ROJAO:  For this case.

14          THE COURT:  No.  No.  For the gas or the electric?

15          MR. ROJAO:  The electric.  The plaintiff signed up

16     in his wife's name.  Boris signed up in his wife's name.

17     Sorry, Your Honor.

18          MR. MCINTURFF:  Your Honor, this is Burkett

19     McInturff.  May I be heard briefly on this issue?

20          THE COURT:  Of course.

21          MR. MCINTURFF:  So first of all, just some

22     background.  When you sign up for energy, you're only able to

23     sign up for the energy of the name of the person that's on

24     your ConEd or National Grid account.  So if my wife is on our

25     ConEd account and I decide that, you know -- obviously with

12

1    consultation of my wife -- but if I decide to switch our

2    energy to, you know, XOOM, I can sign up and XOOM will allow

3    me to sign up, but it will -- the account will still be in my

4    wife's name because that's the account that ConEd has.

5    Because the way it works is XOOM's billing goes through ConEd.

6    And so once someone in the house with authority signs up, it

7    just -- the account name is the same name as the name on

8    whatever ConEd or Nation Grid has.  That's part one.

9             But point two, this is a bit of -- it's not

10   necessarily a tangent, but it's not the quickest and most

11   efficient way to resolve the issue.

12            In our opinion, the most efficient way to resolve

13   the issue is to look at the Second Circuit case law on class

14   standing.  And essentially that case law has been developed in

15   the context of when a consumer or a shareholder purchases a

16   product and they seek to represent other consumers or

17   shareholders in class actions who purchased similar products

18   where the issues are the same.

19            The case that I always remember is a case against

20   *Jamba Juice*.  And in *Jamba Juice*, the consumer purchased

21   banana-flavored Jamba Juice that was labeled as all natural.

22   And the consumer sued on behalf of the various Jamba Juice

23   flavors and said none of them are natural.  They're all

24   labeled all natural, but none of them are natural.  Some of

25   them have this chemical.  Some of them have a different

13

1    chemical.

2           And the defendants took a similar position as the

3    defense is taking in this case, which is, well, no, you only

4    purchased banana so you can't sue for strawberry or for

5    pineapple flavors.

6           And the Court, consistent with the robust body of

7    case law under this doctrine of class standing, said, no,

8    that's fundamentally an issue to be worked out at the class

9    certification stage.  Is this customer's claims -- where

10   unquestionably they have standing for the banana flavor, is

11   this customer's claims sufficiently similar under a Rule 23

12   analysis for that customer to represent the class?

13          And so the most efficient way to resolve this would

14   be let us have the gas discovery.  We'll do the Rule 23

15   analysis.

16          We believe confidently, consistent with our other

17   practice in this area, is is that these -- the issues with

18   relation to whether or not XOOM breached its gas contracts are

19   sufficiently similar to the issues with respect whether or not

20   XOOM breached it's electric contracts that we think that under

21   a Rule 23 rubric our client can represent gas customers.

22          As my colleague said, the contracts are the same.

23   The product is slightly different, but the contract is the

24   same.

25          So, you know, we can go down this route of

1    determining whether or not Mr. and Mrs. Mirkin have specific

2    Article 3 standing for gas.  Or we can follow the Second

3    Circuit and say, look, at this stage before discovery is over,

4    before we have moved for class certification, we're entitled

5    to see whether or not these products and issues are similar.

6          And just one final point.  Even if Boris and Susanna

7    Mirkin have standing, you know, concrete Article 3 standing to

8    pursue a gas claim, the issue is going to come up anyway

9    because the defendant is going to say, well, you know, the gas

10   claim is different from the electric claim.  Maybe you can

11   certify one.  Maybe you can't certify the other.  Maybe it's

12   unmanageable.  Maybe you can't try one or try the other.

13         So we're not really saving any time here finding out

14   whether or not, you know, Mr. Mirkin has Article 3 standing,

15   because the issues as to whether or not we can try in a single

16   case a breach of gas contract and a breach of electric

17   contract claim as a class action those are going to re-emerge.

18         So it's our opinion that the most efficient way to

19   deal with this issue is let us have the gas discovery.  We'll

20   have the dispute about the scope of the Rule 23 class at the

21   appropriate stage which is at Rule 23.

22         Thank you, Your Honor.

23         MR. ROJAO:  Your Honor, may I --

24         THE COURT:  Yes.

25         MR. ROJAO:  So a couple of points here.

1          The first is the *Jamba Juice* case, I don't have a

2     cite for that.  That wasn't cited in plaintiffs' brief so I

3     don't really know how to respond to that at this time.  Nor do

4     I think that's properly before the Court on this record.

5          But I will note that in cases that the plaintiff has

6     referenced, those type of consumer goods cases where there is

7     no contract, you might go to a store, there's not even a

8     receipt sometimes, those are very, very different than the

9     cases at issue here where there is a specific contract between

10    an entity, XOOM, and a party in the electricity context,

11    Susanna Mirkin.  They actually enrolled, signed and agreed to

12    terms and conditions of a specific contract that governed the

13    parties' relationship.

14         In the *Frito Lay* cases or the *Snapple* cases, there's

15    no specific contract that itemizes what exactly they're going

16    to do.

17         And so while I can appreciate plaintiffs' point with

18    respect to those similar consumer goods in terms of food or

19    Dunkin' Donuts or whatever it is, that's not the case here in

20    these commodities where there are specific contracts, there

21    are specific terms by which XOOM is going to provide those

22    services to the plaintiffs.

23         And for these specific claims where there are

24    contracts, the plaintiffs need to identify someone who is a

25    part of the contract, and identify someone who's paid money to

1    XOOM, identify someone who is damaged and assert claims on

2    behalf of that party.  Without that, there is no Article 3

3    standing in this case.

4             THE COURT:  This isn't a motion to dismiss for lack

5    of standing.

6             MR. ROJAO:  I understand that, Your Honor.

7             THE COURT:  This is a motion to compel discovery.

8             And I thought there was a gas contract with Mr.

9    Mirkin.

10            MR. ROJAO:  So, again, Mr. Mirkin apparently may

11   have enrolled to receive natural gas services, but as part of

12   this complaint, they haven't alleged that Mr. Mirkin was a

13   natural gas customer, that he paid anything to XOOM, or that

14   he was damaged in any way by XOOM with respect to that natural

15   gas contract.  That contract simply came up in terms of

16   reviewing things related to the Mirkins, but there's nothing

17   about that in the complaint.

18            THE COURT:  If it's not -- if it's not relevant, why

19   did you produce it?

20            MR. ROJAO:  It's relevant to show plaintiffs' prior

21   communications with XOOM and it's relevant to determine

22   whether or not --

23            THE COURT:  Prior communications about what, about

24   electric, no, about gas?

25            MR. ROJAO:  About signing up for -- how he signed up

17

1    for services, whether or not that was even him, Your Honor.

2           So we would submit that plaintiffs need to --

3           THE COURT:  How he signed up for what services, gas

4    services?  How is that relevant to his electric?

5           MR. ROJAO:  Well, we don't know if that was him and

6    that's the thing.  Again, he signs up --

7           THE COURT:  You don't have any records on -- you

8    don't have any records on whether he paid for gas?

9           MR. ROJAO:  We have to review that, Your Honor, and

10    that's the thing.  Because the records for Susanna --

11           THE COURT:  Motion to compel granted with respect to

12    gas only.

13           Now, let's move to the customer complaints.

14           The complaint has gas all over it.  I think the

15    plaintiffs did drop the ball in not specifically breaking out

16    their breach of contract claim, gas or electric, or having a

17    separate breach of contract claim for gas, but in the lead up

18    to that section, gas is all over the place.  It's fair game.

19    Putting aside whether there's standing, we're not there yet,

20    it's relevant.  The discovery request, it is relevant.

21           Federal rules are notice pleading and the I think

22    the defendants had plenty of notice that gas was in play.

23           Why do you need these customer complaints, Mr.

24    Cohen?

25           MR. COHEN:  It's more than just the customer

18

1    complaints.  It's we're seeking documents concerning the

2    customer complaints.  And what we're mostly concerned about is

3    statements that were made to customers or statements that were

4    made internally in response to complaints that these prices --

5    people were paying these exorbitant prices or, you know,

6    asking what their prices were based on.

7          We know that XOOM has already gathered and produced

8    documents concerning customer complaints in the other Maryland

9    litigation, so they can't complain that this is burdensome to

10   them.

11         In their letter they focus on complaints about

12   business practices and they say business practices over and

13   over again, but as they know what we're really focused on is

14   complaints concerning XOOM's pricing and XOOM's rates.  So,

15   you know, all these arguments about business practices is a

16   red herring.

17         Also, XOOM changed it's New York contract language

18   in or around 2016 we know, so we're wondering if that change

19   in contract language had to do with the fact that a customer

20   complained about pricing.  And in the process of responding,

21   XOOM was like, oh, whoops, you know, this pricing, this

22   language is not what we're actually doing.  We need to change

23   this language going forward.

24         Also, final point, XOOM said that they'd give us

25   documents regarding complaints through the Better Business

1    Bureau and Government agency complaints.  They also are

2    collecting from their -- collecting documents using custodian

3    or their compliance person, Patty Kulesa, and training

4    individual regarding folks who handled these customer calls.

5         So we don't understand the differentiation why the

6    Government agency complaints and Better Business Bureau

7    complaints are fair game, but, you know, private complaints

8    submitted through the website or through email or over the

9    phone they don't want to give us.  At least the documents

10   concerning them.

11        MR. ROJAO:  And I'll respond to that again, Your

12   Honor.

13        THE COURT:  Go ahead.

14        MR. ROJAO:  So plaintiffs' arguments regarding

15   business practices, that is pulled directly from their

16   requests.  So their requests are asking for all complaints

17   related to defendants' business practices.  That was how they

18   framed their requests.  And the requests themselves are

19   incredibly overbroad and could literally ask about any

20   complaint ever made to XOOM Energy, LLC or XOOM Energy New

21   York regarding anything.  So that was their request and that's

22   the language that they used.

23        This is a single claim, breach of contract case,

24   alleging that XOOM breached its electricity sales agreement

25   with plaintiffs by failing to charge them based on XOOM's

20

1    actual or estimated supply costs as set forth in the

2    agreement.

3         Plaintiffs have already argued in this case and to

4    the Second Circuit that customer complaints and perceptions

5    are irrelevant in order to avoid dismissal of their claims and

6    keep going in this case.

7         What the plaintiffs are trying to do here -- it

8    looks like they're trying to have their cake and eat it too.

9         They want to characterize their claims in one way

10   to avoid dismissal and avoid any consumer expectations

11   argument and then characterize them in a different way to

12   weaponize discovery and obtain all types of customer

13   complaints, irrelevant customer complaints which could include

14   ESI consisting large and costly multimedia audio recordings.

15   They want all of that, Your Honor.  None of that's relevant.

16        Plaintiffs have argued already that none of that's

17   relevant because they argued that this is an unambiguous

18   contract term and that customer complaints don't matter to

19   this case.  That's how -- that's one of the arguments they

20   made and succeeded on it in avoiding dismissal.

21        So now as part of the discovery process when they're

22   saying we want all these customer complaints, we want the

23   audio recordings of the customer complaints, which could

24   comprise several gigabytes of data because they're audio

25   recordings, they're not just a simple document --

21

THE COURT:  How would you even -- how would you even

find out which of these audio complaints concern pricing for

example?

MR. ROJAO:  Somebody would have to listen to each

one of them.  Hopefully it's not me.  But somebody would have

to listen to them and parse through them to determine what the

complaint is about, whether or not it's New York, whether or

not it's relevant to anything, Your Honor.  None of this is

relevant anyway.

So this fishing expedition is really not appropriate

and we think the motion to compel should be denied pursuant to

the plaintiffs' own arguments already in this case, Your

Honor.

THE COURT:  Which is the particular document request

that's at issue here?

MR. ROJAO:  There are several ones, but the key big

ones are 25 and 26.  They ask in requests 23 through 32, but

25 is the really overbroad one -- but all of them really.

MR. COHEN:  But, Your Honor, this specific dispute

was raised because plaintiffs sought production of the

customer-complaint related documents already produced in the

Maryland litigation.  That's how this came to a head.

We didn't specifically move on like our RFP-25 and

26.  What we're seeking here are customer complaints

concerning the -- concerning XOOM's pricing and documents

1 related to that.

2 And I didn't hear anything in counsel's response

3 about the documents that I said we were specifically seeking,

4 which is documents concerning defendants' employees responses

5 to the customer complaints, both internal and external, and

6 how, you know, what sort of responses they -- what sort of

7 actions they took including determining whether XOOM was

8 actually following its own complaint language and whether that

9 led to a change in the complaint language -- sorry, not the

10 complaint language -- the contract language.

11         THE COURT:  The contract.

12         MR. ROJAO:  I'll respond --

13         THE COURT:  So --

14         MR. ROJAO:  Oops, sorry.

15         THE COURT:  Before you do, Mr. Cohen, Mr. Rojao said

16 you argued or the plaintiffs argued to the Circuit that

17 customer complaints were irrelevant.  Is that correct?

18         MR. MCINTURFF:  I'll take that, Your Honor.  I was

19 the one that argued to the Circuit.

20         We argued that a consumer's perception of the

21 meaning of the contract, meaning -- so XOOM's contract says

22 XOOM's going to price its energy based on its actual and

23 estimated supply costs.  And we argued to the Second Circuit

24 that what a -- how a consumer interprets that language is

25 irrelevant to the Court's finding of whether or not XOOM --

1      the eventual merits ruling of whether or not XOOM complied

2      with those pricing terms.

3              But what we're seeking here are consumer's response

4      to XOOM's pricing.  Consumers don't read the fine print of

5      XOOM's contract.  But what they do see is how much money comes

6      out of their pocket.  And so what they tend to do when they

7      are getting overcharged is they call and they complain and

8      they say what is going on, why am I being charged this?

9              And what we're looking for is XOOM's response to

10     those complaints, which we believe will inform the contract

11     analysis as to whether or not XOOM was actually charging

12     prices consistent with what it agreed to charge pursuant to

13     the contract.

14              MR. ROJAO:  If I may respond, Your Honor?

15              So it seems as though, based on what I'm hearing, is

16     that the plaintiffs are withdrawing their request for the

17     actual customer complaint and want internal XOOM documents.

18     And from that perspective, we believe that the ESI collection,

19     which will include the search terms and the specific ESI

20     related pricing, would pick that information up anyway.

21              And so if they're not requesting the actual customer

22     calling in and saying, hi, whatever the issue is, we think

23     that would be produced as part of the ESI collection and the

24     search terms that we're negotiating now.

25              MR. COHEN:  Your Honor, in that regard, we don't

24

```
1     know exactly what defendants are going to produce.  I mean,

2     the reason why these issues are being raised is because, you

3     know, in the letter -- in letters or discussions down the road

4     they come back and say, oh, no, we're not going to give you

5     natural gas.  Oh, no, we're not going to give you customer

6     complaints.

7          So even if our search terms hit on certain of these

8     documents, we don't know if they're going to -- if they're

9     going to decide it's not relevant and we, you know, find that

10    out months down the line.

11         But also with regard to the customer complaints

12    themselves, we would still need them in order to understand

13    the -- you know, in order to understand the full line of

14    communication, even though that's not what we're focused on.

15         But if there's a -- if the call person then talks to

16    the compliance person and they raise some issue, we would

17    certainly want to know what the issue -- what the customer

18    called about or what customers are calling about that prompted

19    that.

20         So even though it's not what we're focused on, we

21    would -- it would still be something we would expect to be

22    produced in the line of documents that we're looking for.

23         MR. MCINTURFF:  And if I could just briefly add in

24    terms of the logistics of all of these calls, it's not really

25    that burdensome.  Because, you know, our firm has done cases
```

25

1    where we've had hundreds of thousands of complaint calls, and

2    when you get a number that looks like that, you don't listen

3    to every single call.  You do statistical sampling.  And

4    typically you can do a sample of a few hundred calls and

5    you'll get a representative sample of the -- of what's

6    actually going on.

7         So, I mean, none of us have an interest in listening

8    to thousands of complaint calls.  We certainly would do a very

9    targeted discovery.  And once it gets -- once the number gets

10   above a couple of hundred, you know, you do sampling.  So I

11   don't think there's such a concern about having to go down the

12   rabbit hole on this issue.

13        THE COURT:  When what number gets above a couple of

14   hundred?

15        MR. MCINTURFF:  The number of calls.

16        So if there's -- so, for example, calls are

17   typically organized in a database that have other customer

18   information.

19        If it appears that there is, as we suspect, a

20   substantial number of consumers calling and complaining about

21   their prices, which we can identify through general customer

22   service database notes -- you know, we don't have to listen to

23   the call to know whether or not a customer has called in any

24   complaints -- what you do is you look at the notes for some

25   set of customers.  And then once you realize, okay, wow, we've

1    got, you know, hundreds, thousands of potential complaints

2    here, we do a -- we do a statistically significant random

3    sample that is representative of the entire universe.

4         I mean, this is just how -- this is like how polling

5    is done.  We'll do a sample.  Typically the sample size is

6    anywhere from 50 to a couple of hundred calls.  And then based

7    on that sample, we can draw reasonable inferences -- because

8    it's statistically significant and representative -- we can

9    draw the inferences.  And we're not talking about, you know,

10   thousands and reviewing thousands and thousands and thousands

11   of call recordings.

12        MR. ROJAO:  Your Honor, if I can respond real quick?

13        THE COURT:  Go ahead.

14        MR. ROJAO:  I'm sorry.  I don't mean -- I'll be

15   brief, Your Honor.  A few issues with that.

16        First, collecting, storing all of these calls will

17   have hard costs for XOOM, that XOOM will need to incur.  So

18   it's not just a matter of picking up a call.  XOOM has to

19   collect all of the calls and then store them somewhere on a

20   database with an ESI vendor that's going to charge us for all

21   of these gigabytes and data.

22        And all of that will have hard costs for complaints

23   that, as I mentioned before and plaintiffs seem to allude to,

24   that aren't really relevant here because the contract

25   language, according to plaintiffs, was unambiguous

1    (indiscernible).  And so all of that will have hard costs.

2              Second, it seems as though plaintiffs are kind of

3    advising us as to how to do our ESI collection and review and

4    we don't really think that's appropriate.  Maybe that worked

5    for the plaintiffs in a different case, but ultimately we're

6    the ones that are going to have to collect this data and

7    review it for customer complaints that are relevant.

8              So plaintiffs overtures in that regard aren't really

9    fair to the defendants who are actually going to be the ones

10   that have to do this.  And I think we can all assume that if

11   something is missed during this statistical analysis, the

12   plaintiffs are going to be the first ones to come to the Court

13   and say, hey, where is this, you missed this, what's going on.

14             So it's not as simple as doing a statistical

15   analysis or something like that.  There could be other types

16   of issues in those customer complaints that are totally

17   irrelevant to this case that we're not just going to blanket

18   produce to plaintiffs.

19             THE COURT:  They're not asking for it to be blanket

20   produced.

21             MR. ROJAO:  Yes, Your Honor.

22             THE COURT:  They only want the complaints about

23   pricing apparently.

24             Is that right, Mr. Cohen?

25             MR. COHEN:  Yeah.  That's absolutely right.

1          And, Your Honor, I would just add that we know that

2     there was -- there's been gathering by XOOM and production of

3     customer-complaint related documents in the Maryland case.  So

4     to the extent that they're complaining about burden, we don't

5     know exactly what was done.  It appears there were complaint-

6     related documents provided for like a six-month period that's

7     relevant here.

8          So, you know, with more information regarding what

9     was done there, you know, maybe, you know, we could determine,

10    you know, whether what was produced there would be fine here,

11    but defendants have just shut down any discovery regarding

12    customer complaints so we don't --

13         THE COURT:  How many New York customers are there,

14    gas and electric, during the relevant period?

15         MR. ROJAO:  I don't know, Your Honor.

16         Two quick points about --

17         THE COURT:  I'm sorry.  How could you not know that

18    at this point?  You're dealing with a class action for your

19    client where it involves New York gas and electric customers.

20    It's a basic piece of information that they should be able to

21    know at this point.

22         MR. ROJAO:  Well, Your Honor, we have certain

23    assumptions, but a lot of that depends on which contracts

24    we're talking about, what period of time we're talking about,

25    natural gas verses electric.

29

So there are certain assumptions, but in order to

figure out, you know, we would need to go through and narrow

that.  And so now with some of the rulings that you made with

respect to natural gas, we're going to be able to narrow that.

But the other --

THE COURT:  I'm sorry, Mr. Rojao.  I don't know what

you just said.  It makes no sense to me.

It's a basic -- it's a basic piece of information

that your client should know from very early on in the case.

What are we looking at?  What is -- what is the potential

class?  Whether you disclose it to your adversary or not, they

don't do their own internal analysis and say we've got 20,000

gas customers in New York from day one to the present

potential class?

MR. ROJAO:  Your Honor, I apologize.  We do have

assumptions of that information based on what we believe the

plaintiffs' proposed class is alleging, meaning the contract

language change of February 2016, so we get rid of them.  We

have certain ideas about that for sure.

THE COURT:  And so that would be the universe of

customer complaints.  So customers -- complaints from those

people.  Are we talking 20,000 customers?  Are we talking 500?

What are we talking about?

MR. ROJAO:  More than 20,000, Your Honor, based on

preliminary estimates.

1          And without disclosing too much, because there are

2     certain things that we factored into it, I wouldn't want to

3     get to much, but more than 20,000, Your Honor.  Meaning I

4     don't want to reveal what we believe their class could be or

5     satiate the plaintiffs' appetite for what they think their

6     damages could be because that's not what we think this will

7     be.

8               THE COURT:  Where I'm going is --

9               MR. ROJAO:  I understand, Your Honor.

10              THE COURT:  -- what is the burden?  What is the

11    burden?  What is the real burden on XOOM to go through these

12    customer complaints, and whether it's a sample or whatever

13    produce, you know, produce them and XOOM's response to the

14    plaintiffs?  Because it seems to me that it is relevant.

15              And I don't buy the argument based on what Mr.

16    McInturff said about them arguing that customer complaints are

17    irrelevant.  Relevance is particular to -- goes to issues,

18    right?  It is relevant to this issue, it is relevant that

19    issue.

20              And, you know, customer complaints may be irrelevant

21    to how a contract is interpreted as a matter of law, but it

22    may be relevant to other issues in the case.

23              And I don't know much about how these customer

24    complaints are tracked, if there's some way of looking at, you

25    know, an account, a customer's account, to see if they raised

1    a complaint on pricing.  Easily.  And that could identify, you

2    know, the date of the call or something.  I just don't enough

3    about how much work it really is for XOOM to do this.

4              MR. WITTELS:  Could I just jump in, Your Honor, on

5    this point?

6              Our experience with energy cases -- and we've done

7    many of them -- is that most of the time when people are

8    calling up it's either about billing issues or they're

9    complaining about something.

10             And most of the -- and the reason we've been

11   bringing these suits -- with the PUC having shut down certain

12   type of conduct by the defendants -- is because people are

13   outraged by the costs and they complain.

14             So as my colleagues have explained, this is germane,

15   as Your Honor believes, and at a minimum we should get the

16   documents in the first phase that they've already produced

17   about complaints and they should start looking for the rest of

18   the class.

19             Because I'm hearing from defense counsel, well,

20   we've already cut off from 2016 based on this contract, we

21   don't know what they're trying to cut off because they're not

22   being disclosive and that's part of the problem.

23             Discovery is not a fishing expedition, but it's also

24   supposed to be what we defined, which is people who complained

25   and who were overcharged.  And that's why we're not

1   understanding what they're trying to cut off.  So it sounds

2   like we might be back if we're not getting cooperation.

3            MR. ROJAO:  Well, Your Honor --

4            MR. BROWN:  This is Daniel Brown.  If I may be heard

5   on that just real quickly?

6            The first thing, with respect to what was produced

7   in the other litigation, it's my understanding that was

8   subject to extensive motion to compel practice.  This was not

9   something that was just willingly turned over.

10           Additionally, that other case involves a number of

11  different states, number of different plaintiffs that are not

12  relevant to our current actions, so I don't know as if it's

13  just easy enough as just pressing the go button with respect

14  to what's been previously produced.

15           The second thing I would say is we have been in a

16  process of trying to define, in connection with the ESI

17  discovery, trying to agree on an end date.  So I don't want

18  the Court to get this impression that defendants are somehow

19  stonewalling plaintiffs constantly with respect to discovery.

20  We are trying to work together.

21           The reason why we flagged the 2016 date is because

22  the contract changed.  We are trying to identify that

23  information and that information identifies how big this class

24  is.  It also informs how much discovery, how far we have to

25  go.

33

1          So I would -- perhaps one thought may be to look for

2     customer complaints with respect to the time period that Mr.

3     Mirkin or the Mirkins I should say were actual customers of

4     XOOM.  We could maybe look at that time frame and figure out

5     what we're talking about and what the burden is and we can

6     have an open dialog with the plaintiffs on that.

7          And if we can't come to a resolution, we may, in

8     fact, have to come back to Your Honor, but at least that would

9     be some defined subset for us to get our arms around rather

10    than just everything.

11          THE COURT:  When were the Mirkins customers?

12          MR. ROJAO:  March 2013.

13          THE COURT:  Just one year or not even a full year?

14          MR. ROJAO:  Not even a full year.  They enrolled in

15    March and were cancelled by November.  They didn't actually

16    receive services I think until April or May, but they enrolled

17    in March.

18          MR. MCINTURFF:  Your Honor, may I be heard briefly

19    on counsel's proposal?

20          THE COURT:  Sure.

21          MR. MCINTURFF:  As a threshold matter, since we have

22    the ruling from Your Honor that the complaints are germane, I

23    think it's going to be most efficient if we work cooperatively

24    to try to figure out how to streamline getting the right

25    complaints.

34

1    As my adversary, but colleague, pointed out, we are

2    having discussions about narrowing the scope of the class

3    based on the discovery that has been obtained thus far.  I

4    don't think we need to get into the issue now as to which

5    complaints are germane.

6         For example, because -- for example, if counsel

7    would have made the suggestion on our meet and confer that,

8    you know, limiting complaint discovery to just when the

9    Mirkins were customers, we would have rejected that because

10   first of all the class period goes back six years from the

11   complaint and the class period is going to depend what we

12   think from the plaintiffs' perspective of the class that we're

13   going to be able to certify.

14        I mean, we're not going to -- we're not going to put

15   up a class that is facially uncertifiable -- and that's where

16   this 2016 contract amendment has come in and we're evaluating

17   that issue -- but I don't think we need to at this point, now

18   that Your Honor has ruled that the complaints are germane, get

19   into what exactly should be the cutoffs on either end because

20   that's a discussion that we haven't been able to have because

21   we were blocked on the issue of whether the complaints are

22   germane.

23        So I'm fairly confident that we will be able to

24   outline the parameters of a complaint production.  And then if

25   we have any issues, we can come back to Your Honor at some

1    point in the future.  I mean, this is a complex case.  There's

2    a lot of ESI.  There's a lot of work to be done.  But I don't

3    -- I don't think that this issue is -- the issue of what

4    complaints to produce is necessarily ripe at this point.

5            THE COURT:  Well, in light of the fact that I don't

6    have enough information to make any sort of definitive ruling

7    on what should be produced, for what period, how burdensome it

8    is, I think that's a good suggestion.

9            Customer complaints are relevant.  You need to

10   continue to meet and confer on that for the period of time.

11           And specifically what is it that will be produced?

12   Is it the audio?  Is it the customer notes?  Is it something

13   else?  I don't know.  You need to work -- figure that out.

14   And if you can't agree to it, then bring it back to me.

15           MR. MCINTURFF:  Thank you, Your Honor.

16           MR. ROJAO:  Thank you, Your Honor.

17           THE COURT:  Mr. Wittels, you want to talk about the

18   motion interim class counsel?

19           MR. WITTELS:  Yes, Your Honor.  Thank you.

20           The reason we're still pressing Rule 23(g)(3) and to

21   be appointed interim class counsel is because, now even more

22   perhaps than the situation we were in before, the Court in

23   Maryland denied class certification.

24           We face the situation where the defendants here will

25   not acknowledge either in writing, orally or otherwise that

36

1    they won't try to do a reverse auction.  Which means that with

2    a weakened plaintiffs' counsel, the *Todd* counsel, they are now

3    prime to perhaps file a notice of appeal and cut a sweetheart

4    deal that tries to encompass our New York plaintiffs and our

5    New York customers.  So we need the Court's protection as a

6    fiduciary to appoint us to make sure that that doesn't happen.

7         The defendants say in their letter of two days ago,

8    August 25th, that a reverse auction is not a plausible

9    concern.

10        Actually as I've just stated, it's more plausible

11   because this is the time when you go to a plaintiff who might

12   be willing to take less.  And we know they were having

13   settlement discussions before this motion was decided in

14   Maryland because they said -- when we were in front of you,

15   they acknowledged, well, we'll keep you involved in any

16   discussions.  Well, if there were any, we were never party to

17   it.

18        We're having obviously a communication gap with

19   defendants which is why we're here on a discovery motion.  We

20   can't get them to acknowledge that they won't cut a deal

21   elsewhere that would then leave us what?  The options that

22   they suggested?  They cite a case which says there's a

23   plethora of options.  None of the options are good and there's

24   certainly not a plethora.

25        What they're saying with that is let us go settle

1      out your claims in New York because that complaint was a broad

2      complaint.  Let us go settle out our complaint and then you

3      can object -- which is a terrible position to be in to have a

4      plaintiff trying to object to a class settlement -- or you can

5      try to intervene -- which is also not where we want to be

6      because we have our own claims for breach of contract that are

7      not in that case.

8              So we should be appointed interim class counsel to

9      protect exactly against the situation that the courts in all

10     of the cases we cited in our three letters -- we moved for

11     interim class counsel.  We put a reply in.  And we most

12     recently advised you of the *Todd* decision where we again cited

13     the need for it.

14             So we think that unless defendants are willing to

15     stipulate that they're not going to settle the New York claims

16     in any fashion in the *Todd* action then we should be appointed

17     counsel.  They're not opposing us in terms of our adequacy,

18     our competence to do this.  They just say there's no worry.

19     We think there is a worry.

20             And I can tell you one final point.  That in the

21     *Todd* -- we've had a -- we know that the *Todd* plaintiffs have

22     engaged -- *Todd* plaintiffs' counsel -- sorry, Your Honor --

23     have engaged in the past in that type of reverse auction

24     scenario and that's exactly another concern we have because we

25     know it's happened from that counsel.

1      And we don't want to be in the situation of coming

2  to the Court, in that court trying to object there to an

3  appointment, or to come back and tell Your Honor, you see,

4  this could have been prevented had we been appointed.

5      One final point -- I'm sorry for saying my last was

6  the final point -- which is that Judge Levy in this court was

7  faced with a similar situation and appointed us in a large

8  consumer class action where an other action had been filed in

9  New Jersey -- we had brought the case in New York -- and he

10 after thinking about it did appoint us, felt we were adequate

11 class counsel.  That was the *Ocwen* matter.

12      And courts do not only appoint interim class counsel

13 where there are multiple class actions.  That was a case where

14 there was only one other filed and ours.  And that's what we

15 have here.

16      So for those reasons, we think you should grant it.

17 It's not a permanent status.  It carries none of the indicia

18 which defendant worried about that suddenly you're giving your

19 imprimatur to the class, that it has merit, it simply for us

20 to be in control of the case and to protect the class

21 interests as a fiduciary.

22      MR. BROWN:  Yes, Your Honor.  This is Daniel Brown.

23 I will be addressing this motion.

24      I heard Mr. Wittels and I believe that there's just

25 a lot of what ifs, a lot of what ifs, you know, we may do

1    this, we may do that.

2            I could tell you there has not been any settlement

3    discussions.  We've confirmed -- we've told you when we were

4    before you in February that we would keep them in the loop

5    with respect to settlement discussions.  There have been none

6    with respect to the *Todd* litigation.

7            Now that the *Todd* court granted, sorry, denied class

8    certification, I think the concerns they have, this reverse

9    auction, has evaporated.

10            We are interested -- I don't know how to say this --

11    everyone on this call knows that after class cert's denied,

12    the class action is essentially over absent an appeal.

13            At this point, XOOM has prevailed in *Todd*.  We're

14    not going to try to do anything to undo that.

15            So the fear that we're going to reverse auction them

16    is really just that, it's a fear.

17            And I understand from Mr. Wittels that there have

18    been -- had this issue come up with this same firm in the

19    past, but there's a whole lot of ifs before we get to that

20    point.

21            The other thing is, and it's cited in our papers,

22    it's Judge Santos, sorry, not Judge Santos, it's the Santos

23    opinion out of the District of New Jersey where the

24    plaintiffs' counsel there tried for a second time to be

25    designated as interim class counsel and the District of New

1    Jersey denied that again saying that you have other options.

2          If there is a class -- if a competing class action

3    attempts to settle you out, attempts to take you out of the

4    game, you've got other chances.  You can intervene in that

5    case.  You can object to that.  You can move to stay.  There's

6    all sorts of other things that can be done.

7          And there's no need to have interim class counsel

8    appointed at this point when there is just a sort of ephemeral

9    threat that there will be somehow that there's a reverse

10   auction.

11         Additionally, the two cases are different.  I mean,

12   we noted in our paper back in -- I don't remember whether it

13   was January or February, that, you know, the way that class

14   was defined with respect to the *Todd* litigation it could

15   impact this one.  That's all we were flagging.  We didn't say

16   we were going to.  We didn't say we were trying to.  We said

17   it could happen.  We'll bring it to everyone's attention.

18         Now that that case has been -- class certification's

19   been denied, that class definition is out the window.

20         And on top of that, plaintiffs have gone out of

21   their way to show how their case is different and to show that

22   their case doesn't -- their case is all about contract under

23   New York law.  There's no contract claims in *Todd* so how are

24   we going to reverse auction them out?

25         I just -- I think there's a lot of distrust, there's

1    a lot of fear.  And I understand that that's happened to

2    plaintiffs in the past, so I can understand where they're

3    coming from, but I think it's misplaced here.

4           The second point I would note is that the vast

5    majority of the cases where interim class counsel is appointed

6    is when you've got multiple, competing class actions filed.  I

7    mean, you think about stock drop suits where there's 5 to 7 to

8    18 cases filed and you have to somehow coordinate those, cases

9    are consolidated, and there's interim class counsel because

10   you have to have one voice.  That's not the situation we're

11   dealing with here.  We have a single plaintiff, I'm sorry, a

12   single class action.

13          I think this case is more akin to the *Donaldson* case

14   out in the Central District of California that we cite in our

15   papers where the Court decided there's no special

16   circumstances at this point that are going to -- that caused

17   that court to appoint an interim class counsel before the

18   class certification stage.  And I think our case is a lot

19   similar in that, that there is no reason to do this at this

20   point.

21          With respect to our argument, XOOM's argument, that

22   this appointment at this point is now premature and

23   unnecessary, the plaintiffs, in their reply brief, they cite

24   to the *Scott vs. J.P. Morgan* case out of the Southern District

25   with Judge -- I'm going to say Judge Gardephe, G-A-R-D-E-P-H-

1     E.  And in that case --

2              THE COURT:  Gardephe.

3              MR. BROWN:  How is it pronounced?  I'm sorry.

4              THE COURT:  Gardephe.

5              MR. BROWN:  Gardephe?

6              THE COURT:  Right.  From the Southern District?

7              MR. BROWN:  That's correct.  Yes.

8              THE COURT:  Wait.  Is he from Southern or Northern?

9     He's Southern.  Paul Gardephe.

10             MR. BROWN:  Yes.  I have the -- that's correct.

11    Yes.  I've got it right here.  Gardephe.  Thank you, Your

12    Honor.

13             He did determine to appoint interim class counsel,

14    notwithstanding defendants' objections that it was premature

15    and unnecessary under the situation, but he also noted in

16    making that appointment that it appears likely that a -- I'm

17    quoting from the order, "It appears likely that a number of

18    motions will be filed early in this case, including a motion

19    to compel arbitration, a motion to dismiss, and a motion for

20    class certification."  Those aren't the situations that we're

21    in.  There's no motion to compel arbitration.

22             And I think it's interesting that if you dig a

23    little deeper into that Scott vs. J.P. Morgan case, it was

24    transferred to Judge Failla from the Southern District and

25    Judge Failla ultimately granted the motion to compel

1    arbitration because arbitration was required under that

2    individual's depository account agreement with the bank.

3           So after that, the named plaintiff had to compel,

4    sorry, had to arbitrate their case and that case was

5    ultimately dismissed on the insistence of the plaintiffs.

6           So I say that just as a cautionary tale because I

7    don't want -- we don't know what the future's going to hold in

8    this litigation.  I don't see any reason why we need to enter

9    an order appointing interim counsel when things can change in

10   the future.  And I think that that *Scott vs. J.P. Morgan* case

11   is a prime example of that.

12          One last point.  I think if you -- if you look at

13   the cases where there is either a single case or there's only

14   two cases where the interim class counsel have been appointed,

15   there are, as the *Donaldson* Court noted, there are some

16   special circumstances.

17          And the one case, in the *Friedman vs. Guthy-Renker*

18   case, there, the first class action was filed a year or so

19   before the second class action.  The first class action had

20   undergone significant proceedings, including four mediation

21   sessions, as well as a tentative settlement agreement before a

22   second class action was filed in New York, the first one being

23   in California.

24          At that point, there is an -- the Court determined

25   to appoint interim class counsel because the first case was so

44

1    far along.  Again, that's not the situation we're in.  The

2    facts are drastically different, such that we see no reason

3    why we need to have anyone appointed as interim class counsel

4    at this point.

5         And with that, I'll -- if you have any questions,

6    Your Honor.

7         THE COURT:  What is the harm to XOOM were

8    plaintiffs' counsel to be appointed as interim class counsel?

9    If any?

10        MR. BROWN:  Well, I think the harm is -- as we

11   pointed out in our opposition letter -- is that it does give

12   plaintiffs an imprimatur.  That there's a stamp on this that

13   this case is meritorious and I think it gives them a leg up on

14   their class certification.  They can say, look, we've already

15   interim class counsel.  We've represented the class.  We've

16   done X, Y and Z as interim class counsel.

17        So there's really not that much of a step, you know,

18   it's maybe a half step, not a whole step, maybe not three

19   steps, it just a little bit for class certification.  I think

20   that's our fear and that's the concern.

21        And I think part of that has been played out in

22   plaintiffs' letter from August 20th wherein they do describe

23   the *Todd* case and why they think it supports them.  But they

24   also go into why cases like this should be certified.

25        So we're already starting on class certification

1    arguments before any motions have been filed.  So that's our

2    concern and that's the harm to XOOM.

3              THE COURT:  Mr. Wittels, you want to respond?

4              MR. WITTELS:  Yes.  Thank you, Your Honor.

5              First, as Your Honor pointed out, there is no harm.

6    And defense counsel just articulated none.  Because there's

7    not, in any case we identified, a court stating that giving

8    interim class counsel status somehow gives plaintiffs a leg up

9    in the class certification arena.

10             In fact, the standards we pointed out in our letter

11   of July 31, document 68, don't involve that at all.  And the

12   Judicial Center, and the appointment under Rule 23(g), and the

13   manual recommend early appointment prior to class

14   certification to protect absent class members' interests.

15             And the standards don't involve our fear here, which

16   is just an enhancement as to the earlier -- as to the fact

17   that there could be a reverse auction, that is a compelling

18   reason.

19             But we've met the legal standards which are

20   essentially the four standards, the work we've done in

21   investigating, and these potential claims having to take this

22   case all the way up to the Second Circuit, get it reversed and

23   be where we are now, actively pursuing and pushing for the

24   discovery.

25             Our experience in handling class actions, which

1       they're not questioning, particularly that we've done and

2       settled three major energy class actions.

3               Our knowledge of this type of law, we're well versed

4       in that.  There's no doubt about it.

5               And the resources that we've committed to this.

6       We've expended and are willing to expend with the ESI

7       discovery what's necessary to protect this class.

8               So I think we've met overall the criteria under

9       23(g).

10             And as Your Honor pointed out, there is no harm to

11      appointing this.  The judge is not going to view the fact that

12      we are interim class counsel as a leg up.  I've never seen

13      such a term in any of the cases.  So there is no harm.

14            But there is a potential for harm that the

15      defendants still won't acknowledge, even on this phone call,

16      that they're not going to try a reverse auction.  And who

17      knows what the plaintiffs will try there in the *Todd* case now

18      that they're weakened.  So there is a plausible concern,

19      unlike defendants -- which defendants seem to deny by bringing

20      that up in their letter.

21            THE COURT:  Is there any -- he's back -- Mr. Brown,

22      is there --  XOOM is not contending that Mr. Wittels and his

23      colleagues are not -- haven't satisfied the Rule 23(g)

24      standard for appointment of counsel, is it?

25            MR. BROWN:  We have not put a statement of position

47

1    out in our letters before Your Honor that they are somehow

2    unfit to serve as class counsel, no.

3           And typically I don't think defendants do wade into

4    that fight with respect to interim class counsel motions,

5    especially where you've got multiple, different plaintiffs

6    competing with each other.

7           So to answer your question, no, we're not and we

8    have not in our letters.  So that's --

9           THE COURT:  So I think now is not the time.  There

10   is no threat.  There is no need.  And this should not be seen

11   as something that bootstraps, if you will, a motion for class

12   certification?

13          MR. BROWN:  (Indiscernible), Your Honor.

14          THE COURT:  I don't know if bootstraps is the right

15   term.

16          MR. BROWN:  I had thought bootstrap was -- that was

17   the same term that popped -- jumped into my head, Your Honor.

18          No.  Sorry.  No.  What you just laid out is exactly

19   our position and our concerns, that now is not the time and it

20   is not necessary in a situation where you have a single class

21   action.  It makes a lot of sense where you've got multiple,

22   competing class actions.

23          THE COURT:  All right.  I'm going to reserve

24   decision on that and I will write a -- whichever way I come

25   out, I will write a short summary order.

48

1          MR. BROWN:  Thank you, Your Honor.

2          MR. MCINTURFF:  Could I be heard on one discrete

3     point that counsel made, Your Honor?

4          THE COURT:  Sure.

5          MR. MCINTURFF:  On the bootstrap point, I just

6     looked back at our briefing in our -- in the class action that

7     Judge Levy appointed us as interim class counsel when we moved

8     for class certification.  That was a case assigned to Judge

9     Garaufis.  It was -- it involved 55,000 class members.

10         We ended up settling the case on the eve of class

11    certification decision.  I think we settled it for $39

12    million.  We had an excellent, excellent distribution to

13    class.

14         I just looked through that briefing, which was

15    incredibly complex and very long, and the only time the word

16    interim appeared in our signature block.  So we didn't use the

17    fact that we had been appointed interim class counsel in any

18    way to bootstrap, you know, to say that somehow the Court

19    should do less of an analysis on the Rule 23 at the Rule 23

20    stage.  And the main reason we didn't do that is because it's

21    totally irrelevant.  I mean, the 23(g) factors aren't the same

22    as the regular Rule 23 factors.

23         So there shouldn't be a concern about the

24    bootstrapping.  They can look at our briefing.  We're

25    certainly not going to deviate from our normal practices in

1    briefing if interim class counsel's granted.

2            MR. WITTELS:  And I will say briefly, if Your Honor

3    will just indulge me for one more minute, that it is --

4    defendants may not think it's a plausible concern, but it is a

5    real concern to us that there is a separate class action still

6    out there and the potential for a reverse auction that they

7    won't acknowledge, even on the record here today, yes, we

8    won't settle it.

9            They said in their -- when we were down before Your

10   Honor earlier in the year -- we're bringing to your attention

11   the possibility of some overlap.  That's still a potential

12   because the claims were pled broadly in the Maryland case.  So

13   we do have a concern.

14           And we know that the *Todd* plaintiffs have engaged in

15   that behavior before.  We know there was some settlement

16   discussions at some point with them.  If there's no fear by

17   the defendants that we should be worried about, then let them

18   stipulate on the record that we're proper and adequate counsel

19   which they acknowledge here today and we move forward.

20           THE COURT:  Last word, Mr. Brown.

21           MR. BROWN:  Thank you, Your Honor.

22           I was just going to note I don't believe that *Ocwen*

23   materials were cited in any of the letters before Your Honor

24   so I have not had an opportunity to look at that case or to

25   look at the briefing in that case.  I would be interested to

50

1    know if that was one where there were multiple cases filed

2    such that interim class counsel did make sense under that

3    circumstance.

4              I just don't -- they may not have done it in that

5    case and that may be their normal practice.  I don't know.

6    But my point is there's the -- specter's the wrong word to use

7    -- there's the veneer, there's the gloss that this is -- that

8    it should be more than it is.  That's really our position with

9    respect to the bootstrapping.  Perhaps bootstrapping is too

10   strong a word, but that's the concern there.

11             THE COURT:  Okay.  All right.  I will take it under

12   advisement and you'll know shortly.

13             MR. BROWN:  Thank you, Your Honor.

14             MR. WITTELS:  Your Honor, the only point is while we

15   may not have mentioned it, I thought we did, but if we didn't,

16   there was only one class action that was filed after ours in

17   New Jersey in federal court after we had already been

18   litigating it here in New York.  So it wasn't multiple class

19   actions.  It was the same scenario.  And Judge Levy felt that

20   the time had come where we should be appointed and it was to

21   protect the class's interested, which we did.

22             THE COURT:  The rule itself doesn't require multiple

23   class --

24             MR. WITTELS:  No.

25             THE COURT:  -- actions or even a second class action

51

1    to be filed before --

2              MR. WITTELS:  Right.

3              THE COURT:  -- interim class counsel can be

4    appointed, right?

5              MR. WITTELS:  Correct.

6              THE COURT:  All right.  I'll take it under

7    advisement, gentlemen.

8              MR. WITTELS:  Thank you.

9              THE COURT:  (Indiscernible) 12:30 I have to go.

10   Hopefully they're still waiting.

11             ALL COUNSEL:  Thank you, Your Honor.

12        (Proceedings concluded at 12:42 p.m.)

13        I, CHRISTINE FIORE, court-approved transcriber and

14   certified electronic reporter and transcriber, certify that

15   the foregoing is a correct transcript from the official

16   electronic sound recording of the proceedings in the above-

17   entitled matter.

18

19

20   _____ *Christine Fiore* _____     September

21   17, 2020

22      Christine Fiore, CERT

23