# MDM Declaration Exhibit A-08

```
 1
 2    UNITED STATES DISTRICT COURT
 3    EASTERN DISTRICT OF NEW YORK
 4    No. 18 Civ. 2949(ARR)(RER)
      - - - - - - - - - - - - - - - - - - - -x
 5
      SUSANNA MIRKIN and BORIS MIRKIN,
 6    Individually and on Behalf of All Others
      Similarly Situated,
 7
                    Plaintiffs,
 8
              -against-
 9
      XOOM ENERGY, LLC and XOOM ENERGY
10    NEW YORK, LLC,
11              Defendants.
12    - - - - - - - - - - - - - - - - - - - -x
13
         16 Court Street
14       Brooklyn, New York 11241
15       August 30, 2022
                                              1:28 PM
16
17       DEPOSITION of BORIS MIRKIN, a
18    Plaintiff in the above-entitled action,
19    held at the above time and place, taken
20    before SAMUEL HITTIN, a Shorthand Reporter
21    and Notary Public of the State of New
22    York, pursuant to the Federal Rules of
23    Civil Procedure, order and stipulations
24    between Counsel.
25                  *     *     *
```

Page 1

## Page 2

```
 1
 2  APPEARANCES:
 3
    WITTELS, McINTURFF, PALIKOVIC
 4  Attorneys for Plaintiffs
    SUSANNA MIRKIN and BORIS MIRKIN
 5     295 Madison Avenue
       New York, New York 10017
 6     (914)775-8862
 7  BY: STEVEN WITTELS, ESQ.
    AND: STEVEN COHEN, ESQ.
 8
 9
10  MCDOWELL HETHERINGTON, LLP
    Attorneys for Defendants
11  XOOM ENERGY, LLC AND XOOM ENERGY
    NEW YORK, LLC
12     1001 Fannin Street, Suite 2700
       Houston, Texas 77002
13     (713)337-5580
14  BY: MATT MATTHEWS, ESQ.
15
16  ALSO PRESENT:
17  VERITEXT VIDEOGRAPHER
18  BY: ZEF COTA
19
           *   *   *
20
21
22
23
24
25
```

## Page 3

1  
2       STIPULATIONS  
3    IT IS HEREBY STIPULATED, by and among  
4  the attorneys for the respective parties  
5  hereto, that:  
6    All rights provided by the C.P.L.R.,  
7  and Part 221 of the Uniform Rules for the  
8  Conduct of Depositions, including the  
9  right to object to any question, except as  
10  to form, or to move to strike any  
11  testimony at this examination is reserved;  
12  and in addition, the failure to object to  
13  any question or to move to strike any  
14  testimony at this examination shall not be  
15  a bar or waiver to make such motion at,  
16  and is reserved to, the trial of this  
17  action.  
18    This deposition may be sworn to by the  
19  witness being examined before a Notary  
20  Public other than the Notary Public before  
21  whom this examination was begun, but the  
22  failure to do so or to return the original  
23  of this deposition to counsel, shall not  
24  be deemed a waiver of the rights provided  
25  by Rule 3116, C.P.L.R., and shall be  

## Page 4

1  
2  controlled thereby.  
3    The filing of the original of this  
4  deposition is waived.  
5    IT IS FURTHER STIPULATED, a copy of  
6  this examination shall be furnished to the  
7  attorney for the witness being examined  
8  without charge.  
9  
10       *   *   *  

## Page 5

1  
2       THE VIDEOGRAPHER: Good  
3  afternoon. We are going on the record  
4  at 1:29 p.m. Eastern Daylight Time on  
5  August 30, 2022.  
6    This is media unit one of the  
7  video-recorded deposition of Boris  
8  Mirkin, taken by counsel for the  
9  defendant in the matter of Susanna  
10  Mirkin and Boris Mirkin, et al., verse  
11  XOOM Energy, LLC, and XOOM Energy New  
12  York, LLC, filed in the United States  
13  District Court of New York, Case  
14  Number 18-CIV-2949.  
15    The location of this deposition  
16  is Veritext Brooklyn, 16 Court Street,  
17  Brooklyn, New York.  
18    My name is Zef Cota,  
19  representing Veritext, and I am the  
20  videographer. The court reporter is  
21  Samuel Hittin, from the firm Veritext.  
22  I am not authorized to administer an  
23  oath, I am not related to any party in  
24  this action, nor am I financially  
25  interested in the outcome.  

2 (Pages 2 - 5)

```
1         B. MIRKIN
2    A.   Always in Brooklyn.
3    Q.   Your current address is 1677
4  East 34th Street?
5    A.   Yes, it is.
6    Q.   How long have you lived at that
7  address?
8    A.   12 years.
9    Q.   And you and your wife own that
10 property, correct?
11   A.   I own it, because I bought the
12 house before I got married.
13   Q.   Understood.
14   A.   So, technically, it's on me.
15   Q.   Understood.
16        And have you ever owned any
17 other properties?
18   A.   No.
19   Q.   Have you ever -- during the time
20 that you've lived on 34th Street, have you
21 also rented any additional properties?
22   A.   No.
23   Q.   Let me -- may I see the
24 documents that you have there?
25   A.   Yes.  (Handing).
                                        Page 18
```

```
1         B. MIRKIN
2  on Staten Island.
3    Q.   Got it.
4         And you've never had natural gas
5  service from XOOM?
6    A.   No, never.
7    Q.   Okay.  Is it fair to say that
8  with respect to decisions about energy
9  supply in your household that -- that
10 you're in charge of that?
11   A.   Yes.
12   Q.   Okay.  You're the one who
13 primarily is responsible for shopping and
14 comparing rates?
15   A.   Yes.  Correct.
16   Q.   Okay.  And you may consult with
17 your wife before enrolling in a new plan,
18 but it's mostly something that you handle,
19 in terms of the selection of the company,
20 right?
21   A.   Yes.
22   Q.   And in terms of reviewing and
23 paying bills, that's something that is --
24 primarily what you take care of as well,
25 right?
                                        Page 20
```

```
1         B. MIRKIN
2    Q.   Thank you.  Do we have -- oh,
3  there we go.  Thank you.
4         Okay.  I'm going to hand you
5  back that stack, and at the top is
6  Exhibit 4, what was previously marked as
7  Exhibit 4.
8    A.   Okay.
9    Q.   Have you seen this document
10 before?
11   A.   Yes.
12   Q.   This is a new customer
13 enrollment for natural gas, with a
14 February 2013 date.  It's an e-mail.
15        Do you see that?
16   A.   Yes.
17   Q.   The Boris Mirkin that's listed
18 on here is not you, correct?
19   A.   It's not me.
20   Q.   Okay.  Is that a relative?
21   A.   Distant relative.
22   Q.   Distant relative.  Okay.
23        But this is never an address
24 you've lived at --
25   A.   No.  It's not me.  I never lived
                                        Page 19
```

```
1         B. MIRKIN
2    A.   Yes.  Correct.
3    Q.   Who is your current electricity
4  supplier?  It's Con Ed?
5    A.   Con Edison, yes.
6    Q.   And it has been since 2016?
7    A.   I need to -- can I look --
8    Q.   Yes, sir.  There's a document --
9  you've got it in your hand there,
10 Exhibit 1.  And it shows a --
11   A.   2016, it looks like.
12   Q.   That document that you have in
13 your hand, Exhibit 1, is a Con Edison
14 document, or it has Con Edison's logo at
15 the top.  And it shows a list of ESCOs on
16 the right-hand side.
17        Do you see that?
18   A.   Yes.
19   Q.   And you have had service
20 agreements with each of those ESCOs for
21 electricity service?
22   A.   Yes.  Correct.
23   Q.   Have you ever had any contracts
24 for electricity supply from any other
25 ESCOs?
                                        Page 21
```

**Page 22**

```
1                B. MIRKIN
2    A.   Only those listed.
3    Q.   Only -- only the five listed?
4    A.   Only this, yes.  Five.
5         MR. WITTELS:  For electricity,
6    correct.
7    A.   Only this, yes.
8    Q.   Yes, sir.
9         So what it shows -- you seemed a
10   little bit confused by my last question.
11   Maybe not.  But what I meant was, in the
12   ESCO column, it lists, over time, in the
13   order in which you contracted with these
14   companies:  Energy Plus, Citizens
15   Choice --
16   A.   Yes.
17   Q.   -- XOOM, Viridian, and Reliant?
18   A.   Correct.
19   Q.   To the best of your knowledge,
20   those are the only five ESCOs that you've
21   ever contracted with for electricity
22   supply?
23   A.   Correct.  Yes.
24   Q.   Have you ever contracted with an
25   ESCO for natural gas supply?
```

**Page 23**

```
1                B. MIRKIN
2    A.   Yes, I also did.
3    Q.   Okay.  What ESCO was that?
4    A.   That was Citizens Choice.  There
5    were two.  One was Citizens Choice.  The
6    other one, I don't remember.
7    Q.   That's okay.  I'm just trying to
8    get your best testimony on things today.
9    If there's certain things you don't
10   remember or you don't know, that's
11   perfectly fine.
12        With respect to Citizens Choice
13   electricity service, the document that's
14   Exhibit 1 indicates that you had
15   electricity supply from Citizens Choice
16   from September of 2012 into January of
17   2013.
18        Do you see that?
19   A.   Yes, I see that.
20   Q.   And would that have been the
21   same period of time that you had natural
22   gas service with Citizens Choice,
23   roundabout?
24   A.   Not necessarily.  I don't
25   remember.  It was years ago.  Not
```

**Page 24**

```
1                B. MIRKIN
2    necessarily the same time period.  I don't
3    remember.
4    Q.   That's fine.
5         And you don't remember if it was
6    earlier or later?
7    A.   I don't remember.
8    Q.   Okay.  Your current supplier for
9    natural gas is National Grid?
10   A.   National Grid, yes.
11   Q.   Okay.  And it has been for many
12   years?
13   A.   National Grid?  Last time I used
14   an ESCO was early this year.
15   Q.   For natural gas?
16   A.   For natural gas, yes.
17   Q.   And which ESCO was that?
18   A.   I don't remember.
19   Q.   It's okay.
20   A.   All I remember is I switched
21   back to National Grid early this year.
22   Q.   Okay.
23   A.   I completely forgot the name.
24   There's so many names, so many companies.
25   Q.   That's okay.
```

**Page 25**

```
1                B. MIRKIN
2         Well, let's talk about XOOM --
3    A.   Yes.
4    Q.   -- which is the one we're here
5    to talk about today.
6         How did you first hear about
7    XOOM?
8    A.   I was shopping around for better
9    rates.  There were multiple ESCOs
10   available, and they had different offers.
11   And I found XOOM.  It seemed that their
12   rate was better than previous ESCO rates,
13   so I switched to XOOM.
14   Q.   Okay.  And you -- that shopping
15   and those comparisons that you were doing
16   were by comparing the rate that XOOM was
17   offering to your current -- your rate --
18   then current rate with Citizens Choice?
19   That was one part of it, right?
20   A.   Correct.
21   Q.   And the other part was to
22   compare the rates that were being offered
23   by other ESCOs, which you reviewed online?
24   A.   Correct.  Yes.
25   Q.   Did you speak with anyone on the
```

```
 1              B. MIRKIN
 2   telephone or in person with XOOM?
 3      A.   I believe I spoke to somebody,
 4   yes, to switch.  Yes, I spoke to somebody.
 5   I don't remember if in person or by phone,
 6   but I spoke to somebody.
 7      Q.   Okay.  Would it have been after
 8   you enrolled, there was a telephone call
 9   to confirm the details of your enrollment?
10           MR. WITTELS:  Objection.
11      Q.   Does that sound familiar?
12           MR. WITTELS:  Objection to form.
13           You can answer.
14      A.   That was, in order to switch to
15   XOOM, I spoke to somebody.
16      Q.   Okay.  I think we're saying the
17   same thing.  You went online and enrolled,
18   and then you spoke to someone with XOOM?
19      A.   I believe so, yes.
20      Q.   Okay.  When you enrolled with
21   XOOM -- let me hand you what I'm going to
22   mark as Exhibit 6 to your deposition.
23           [Whereupon, document was marked
24           as Defendants' Exhibit 6 for
25           identification, as of this date.]
                                         Page 26
```

```
 1              B. MIRKIN
 2      Q.   Do you remember receiving an
 3   e-mail -- this e-mail from XOOM?
 4      A.   Yes.  This is my e-mail.
 5      Q.   The e-mail address that's listed
 6   there under the billing info is your
 7   e-mail address?
 8      A.   It's mine, yes.
 9      Q.   Is that your phone number
10   as well?
11      A.   And my phone number, yes.
12      Q.   Okay.  The account was opened in
13   your wife's name?
14      A.   Correct.  Yes.
15      Q.   And why was that?
16      A.   At the time, she needed proof of
17   residence.
18      Q.   Got it.
19           At the time you enrolled with
20   XOOM, did you understand that your rate
21   would be a rate that could vary from month
22   to month?
23      A.   Yes.  The contract said so.
24      Q.   And if you look with me at
25   Exhibit 5 -- it's in the stack that you
                                         Page 27
```

```
 1              B. MIRKIN
 2   have in front of you.
 3      A.   Yes.
 4      Q.   Does Exhibit 5 appear to be the
 5   terms and conditions that you received
 6   from XOOM governing your electricity
 7   service?
 8      A.   Yes.
 9      Q.   And you're not contending in the
10   lawsuit that there's any other contract at
11   issue between you and XOOM, right?
12           MR. WITTELS:  Objection.
13      Q.   You can answer.
14           MR. WITTELS:  Do you understand
15   the question?
16      A.   That's the only contract?
17      Q.   That's what I'm getting at.
18   This is my only chance to talk to you, so
19   some of the questions -- I just -- you and
20   I have never spoken before, and I'm trying
21   to be sure I understand what your
22   contentions are in this lawsuit.  I think
23   I do, but sometimes I may just need to
24   confirm them.
25           So that's what I'm getting at.
                                         Page 28
```

```
 1              B. MIRKIN
 2   This Exhibit 5 is the only contract that
 3   you have had with XOOM, correct?
 4           MR. WITTELS:  Objection.
 5      A.   As far as I know, this is the
 6   only contract.
 7      Q.   Okay.  And in this case, you're
 8   alleging that XOOM breached this contract,
 9   right?
10      A.   Yes, I do.
11      Q.   Okay.  You're not alleging that
12   XOOM -- that a salesperson on the phone
13   lied to you about something, right?
14           MR. WITTELS:  Objection.
15           You can answer.
16           THE WITNESS:  I can answer?
17      A.   No, I'm not blaming any
18   salesperson.
19      Q.   Okay.  And you're not alleging
20   that there are any marketing materials
21   that were on the website or otherwise
22   shown to you that deceived you about
23   XOOM's rates?
24           MR. WITTELS:  Objection.
25           THE WITNESS:  I can still
                                         Page 29
```

8 (Pages 26 - 29)

```
                    B. MIRKIN
 1                                                   1         B. MIRKIN
 2   answer?                                         2       The contract that you have in
 3   Q.  Yes.                                        3   front of you, Exhibit 5, it does not
 4       MR. WITTELS:  Yeah, if you                  4   contain a promise from XOOM that your
 5   remember.                                       5   variable rates would beat the utility
 6   A.  What was the question?                      6   rate, right?
 7       MR. MATTHEWS:  Could you read it            7       MR. WITTELS:  Objection.
 8   back for him?                                   8       THE WITNESS:  Do I still have to
 9       [Whereupon, a portion of the                9   answer?
10   testimony was read back.]                      10       MR. WITTELS:  Yeah.  Unless I
11       MR. MATTHEWS:  Let me just ask             11   tell you not to, you have to answer.
12   it again.                                      12   A.  It doesn't have any promise.  It
13   Q.  You're not alleging that XOOM              13   just -- it does say the rate will be based
14   misrepresented anything to you in              14   on actual and estimated supply.  And I
15   marketing materials or on its website,         15   understand that the word "based" -- "based
16   right?                                         16   on" is synonymous to a promise.
17       MR. WITTELS:  Objection.                   17   Q.  Right.  But I'm asking a
18       THE WITNESS:  I don't have to              18   different question, which is, the contract
19   answer?                                        19   didn't say, We promise that your rate will
20       MR. WITTELS:  No, you have to              20   be better than the utility rate --
21   answer.                                        21       MR. WITTELS:  Objection.
22   A.  I'm only alleging that the                 22   Q.  -- right?
23   contract says that the cost or the rate        23       MR. WITTELS:  Objection.
24   will be based on XOOM's actual and             24   A.  As far as I understand, correct.
25   estimated supply costs.  And that was not      25   Yes.
                                        Page 30                                         Page 32

 1         B. MIRKIN                                 1         B. MIRKIN
 2   the case.                                       2   Q.  Okay.  And it didn't say that
 3   Q.  That's all I'm getting at.  I'm             3   the variable rate would be equal to or
 4   not trying to trick you.  I just -- if we       4   better than rates charged by other ESCOs,
 5   go to trial, I don't want to show up and        5   right?
 6   you say, and then a door-to-door salesman       6       MR. WITTELS:  Objection.  The
 7   showed up and lied to me about this.            7   contract speaks for -- well, I don't
 8   That's what I'm trying to figure out.           8   understand.  Double negatives.
 9       So your claim in this case is               9       Go ahead.  You can answer.
10   about an alleged breach of the terms and      10   A.  Before switching to XOOM, I
11   conditions that are Exhibit 5 to -- what      11   compared rates.  So I switched for a
12   you have in front you, right?                 12   reason.  The rate that was promised was
13       MR. WITTELS:  Object to the form          13   lower than the previous ESCO.
14   of that question.                             14   Q.  The initial rate was?
15       But you can answer it.                    15   A.  The initial rate was, yes.
16       I mean, it's not a statement,             16   Q.  But the contract doesn't promise
17   not a question.                                17   that the subsequent months' rates will be
18   A.  Yeah, I allege that the contract          18   better than other ESCO rates, right?
19   wasn't followed properly or correct.          19       MR. WITTELS:  Objection.
20   Q.  You're not alleging any sort of           20       THE WITNESS:  I should --
21   verbal misrepresentations to you, though,     21       MR. WITTELS:  Yeah, it's a
22   right?                                        22   follow-up.
23       MR. WITTELS:  Objection.                  23   A.  Right.
24   A.  Correct.  I don't.                        24   Q.  Okay.  The contract, as you
25   Q.  Okay.  Great.                             25   said, states that XOOM's monthly variable
                                        Page 31                                         Page 33
```

9 (Pages 30 - 33)

```
 1        B. MIRKIN
 2   rate is based on XOOM's actual and
 3   estimated supply costs.
 4         Do you see that?
 5   A.   Yes.
 6   Q.   Okay. And you -- what does
 7   "based on actual and estimated supply
 8   costs" mean to you?
 9   A.   It's a technical question. I
10   understood I would be charged exactly as
11   it says. Actual and estimated supply
12   costs. Not much more. I understood I
13   wouldn't be overcharged, or I wouldn't be
14   charged more than it says in the contract.
15   Q.   Okay. So you understood that
16   XOOM would charge you something more than
17   its actual or estimated supply costs?
18         MR. WITTELS: He didn't say
19   that. Objection.
20   A.   I said that XOOM would not
21   charge more than it says, more than actual
22   and estimated supply costs.
23   Q.   Right. But --
24   A.   Not more. But exactly as it
25   says.
                                      Page 34
```

```
 1        B. MIRKIN
 2   A.   Correct.
 3   Q.   Why do you believe that?
 4   A.   My attorneys hired experts who
 5   collected data and analyzed data, and
 6   experts advised me that I and many other
 7   customers were overcharged.
 8   Q.   Do you know what data your
 9   experts reviewed to come up with that
10   opinion?
11   A.   No, I don't.
12   Q.   Okay. And you're relying on
13   them as the basis for your belief that
14   XOOM's variable rates were not based on
15   its actual and estimated supply costs?
16   A.   Yes. They are the experts. I
17   should rely on them.
18   Q.   Yeah. That's fine. I'm just
19   trying to get at your understanding.
20         You personally don't have any
21   knowledge of what XOOM's actual and
22   estimated supply costs were?
23   A.   No, I don't.
24   Q.   Okay. Did you believe that XOOM
25   would limit its margins, its profit, below
                                      Page 36
```

```
 1        B. MIRKIN
 2   Q.   Did you believe that XOOM would
 3   charge you a rate that was equal to its
 4   actual and estimated supply costs?
 5         MR. WITTELS: Objection.
 6   A.   It's kind of a technical
 7   question. I believed what I read, based
 8   on -- that the rate would be based on
 9   actual and estimated supply costs.
10   Q.   Mm-hmm.
11         You understood XOOM was a
12   for-profit company, right?
13         MR. WITTELS: Objection.
14   A.   Yes.
15   Q.   And you don't dispute that XOOM
16   is allowed to make a profit?
17         MR. WITTELS: Objection.
18   A.   XOOM, like any other company, is
19   allowed to make profit. It's just -- I
20   expected this would be in line with the
21   contract, with the promise on the
22   contract.
23   Q.   Right.
24         And -- and you don't believe
25   that it was?
                                      Page 35
```

```
 1        B. MIRKIN
 2   a certain threshold?
 3         MR. WITTELS: Objection.
 4   A.   Don't know how XOOM would work
 5   with profits. All I know is the rate I
 6   expected would be based on exactly as it
 7   says, on actual and estimated supply
 8   costs.
 9   Q.   Mm-hmm.
10         And when you enrolled, what did
11   that phrase mean to you, "based on actual
12   and estimated supply costs"?
13   A.   That the rate would be
14   competitive compared to Con Edison and
15   compared to other ESCO companies.
16   Q.   Okay. I used the term "ESCO"
17   earlier. Do you remember that?
18   A.   Yes.
19   Q.   And you answered, so I assume
20   you understood. Do you know what an ESCO
21   is?
22   A.   It's an energy supply company.
23   Q.   Okay. A private company as
24   compared to the utility, right?
25   A.   I guess so.
                                      Page 37
```

### Page 38

```
 1                B. MIRKIN
 2    Q.  Or, well, it's -- you know that
 3  an ESCO is not the same thing as the
 4  utility, right?
 5    A.  It didn't matter to me.  All
 6  that matters is what rates I would get.
 7  Private or semiprivate don't make a
 8  difference.
 9    Q.  Right.  But do you have an
10  understanding about how the utilities
11  rates are set?
12    A.  Not really.
13    Q.  Okay.
14    A.  No.
15    Q.  You were able to cancel the XOOM
16  contract at any time, right?
17    A.  If I wanted, I would be able to,
18  yes.
19    Q.  Without penalty?
20    A.  There would be no penalty, yes.
21    Q.  You did switch from XOOM to
22  Viridian in October of 2013, right?
23    A.  Yes, I did.
24    Q.  And why did you switch from XOOM
25  to Viridian?
```

### Page 39

```
 1                B. MIRKIN
 2    A.  After being a XOOM customer for
 3  a while, I shopped around again for better
 4  rates.  I wasn't too happy with XOOM's
 5  rates, so I found another ESCO that
 6  offered me a better price.
 7    Q.  Right.
 8        How did that go?
 9    A.  I switched to Viridian, and I
10  used that ESCO for a while.  And I shopped
11  around again, and I switched again.
12    Q.  You ended up suing Viridian in a
13  putative class action like this, based on
14  its variable rates, right?
15    A.  Yes.
16    Q.  Okay.  Let's see.
17        Why did you decide to sue
18  Viridian?
19    A.  Their rates seemed to be not
20  competitive, so I got in touch with
21  attorneys.  And they advised me that I
22  could have a case, and I could represent
23  others also.
24    Q.  Got it.
25        And that was Mr. Wittels' firm
```

### Page 40

```
 1                B. MIRKIN
 2  and Daniel --
 3    A.  Daniel Hymowitz.
 4    Q.  -- Hymowitz?
 5    A.  Yes.
 6    Q.  To your knowledge, do you have
 7  agreements with any other attorneys
 8  related to this lawsuit against XOOM?
 9    A.  No.  Same attorneys.
10    Q.  Got it.
11        You understand in this lawsuit
12  you're seeking to represent a class of
13  other XOOM customers?
14    A.  Yes, I am.  I know.
15    Q.  And you understand that as the
16  named plaintiff, you have a duty to
17  represent their interests as well as
18  yours, right?
19    A.  That's correct.  Yes.
20    Q.  And you understand that in
21  connection with doing that, you may have
22  to attend the trial, right?
23    A.  Yes.
24    Q.  And you don't have a problem
25  with that?
```

### Page 41

```
 1                B. MIRKIN
 2    A.  No problem.
 3    Q.  And you understand that at the
 4  end of the day, you may not be compensated
 5  more than any of the other class members,
 6  right?
 7    A.  I understand that.
 8    Q.  And you're willing to help your
 9  attorneys through the end, regardless?
10    A.  Yes.  Correct.
11    Q.  Okay.  Mr. Mirkin, aside from
12  the lawsuit against XOOM and the lawsuit
13  against Viridian, what other lawsuits have
14  you been a party to?
15    A.  I had -- years ago, I had an
16  eviction case.
17    Q.  In that case, were you seeking
18  to evict someone, or were you being
19  evicted?
20    A.  I evicted somebody.
21    Q.  Okay.
22    A.  And I think I had another case,
23  just years ago, I may not have.
24    Q.  Okay.  The eviction proceeding,
25  you owned another property at some time?
```

## Page 42

1   B. MIRKIN
2   A. It was a co-op apartment.
3   Q. Okay. What was the address for
4 that apartment?
5   A. The address was 1620 Avenue I,
6 in Brooklyn.
7   Q. Thank you.
8      Any other lawsuits that you
9 recall?
10  A. I think there was another one.
11 I just don't remember. It wasn't
12 recently. I don't remember.
13     [Whereupon, testimony continues
14 in confidential transcript.]

## Page 48

1   B. MIRKIN
12     [Whereupon, a short break was
13 taken.]
14     THE VIDEOGRAPHER: We're back on
15 the record at 2:19 p.m.
16  Q. Mr. Mirkin, you told me you
17 personally have never been a XOOM natural
18 gas customer, right?
19  A. Correct.
20  Q. Okay. And you don't have any
21 personal knowledge about the variable
22 rates that XOOM charged natural gas
23 customers in New York, right?
24  A. Correct.
25  Q. Okay.

## Page 49

1
2      MR. MATTHEWS: Subject to
3 additional questions that were not
4 permitted today, I will pass the
5 witness.
6      And I appreciate your time.
7      THE WITNESS: Okay.
8      MR. WITTELS: No questions,
9 which is very rare for me.
10     MR. MATTHEWS: Okay. Thank you.
11     THE VIDEOGRAPHER: We are off
12 the record at 2:20 p.m. And this
13 concludes today's testimony given by
14 Boris Mirkin.
15
16     [TIME NOTED: 2:19 p.m.]
17
          _____
18         BORIS MIRKIN
19     _____
   SUBSCRIBED AND SWORN TO
20 BEFORE ME THIS _____
   DAY OF _____, 2022.
21
   _____
22 NOTARY PUBLIC

## Page 50

1
2       I N D E X
3
   WITNESS      EXAMINATION BY    PAGE
4
5  BORIS MIRKIN   MATT MATTHEWS    7
6
        E X H I B I T S
7
8  PLAINTIFF'S    DESCRIPTION      PAGE
9  EXHIBIT 6 -   E-MAIL FROM XOOM   26

```
 1
 2        CERTIFICATION
 3
 4     I, Samuel Hittin, a Notary Public for
 5  and within the State of New York, do
 6  hereby certify:
 7     That the witness whose testimony as
 8  herein set forth, was duly sworn by me;
 9  and that the within transcript is a true
10  record of the testimony given by said
11  witness.
12     I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage, and that I am
15  in no way interested in the outcome of
16  this matter.
17     IN WITNESS WHEREOF, I have hereunto
18  set my hand this 6th day of September,
19  2022.
20
21
22     SAMUEL HITTIN
23
24        *   *   *
25
                                            Page 51
```

```
 1
 2        ERRATA SHEET
      VERITEXT/NEW YORK REPORTING, LLC
 3
      CASE NAME: SUSANNA MIRKIN AND BORIS
 4       MIRKIN, ET AL VS. XOOM ENERGY,
         LLC, ET AL
 5  DATE OF DEPOSITION: AUGUST 30, 2022
      WITNESS' NAME: BORIS MIRKIN
 6
      PAGE/LINE(S)/   CHANGE      REASON
 7  ___/_____/_____/_____
     ___/_____/_____/_____
 8  ___/_____/_____/_____
     ___/_____/_____/_____
 9  ___/_____/_____/_____
     ___/_____/_____/_____
10  ___/_____/_____/_____
     ___/_____/_____/_____
11  ___/_____/_____/_____
     ___/_____/_____/_____
12  ___/_____/_____/_____
     ___/_____/_____/_____
13  ___/_____/_____/_____
     ___/_____/_____/_____
14  ___/_____/_____/_____
     ___/_____/_____/_____
15  ___/_____/_____/_____
     ___/_____/_____/_____
16  ___/_____/_____/_____
     ___/_____/_____/_____
17  ___/_____/_____/_____
     ___/_____/_____/_____
18  ___/_____/_____/_____
19  _____
        BORIS MIRKIN
20
21  SUBSCRIBED AND SWORN TO
      BEFORE ME THIS_____DAY
22  OF_____, 2022.
23  _____
        NOTARY PUBLIC
24
      MY COMMISSION EXPIRES_____
25
                                            Page 52
```

13 (Pages 51 - 52)

```
 1
 2              MR. MATTHEWS:  Subject to
 3      additional questions that were not
 4      permitted today, I will pass the
 5      witness.
 6              And I appreciate your time.
 7              THE WITNESS:  Okay.
 8              MR. WITTELS:  No questions,
 9      which is very rare for me.
10              MR. MATTHEWS:  Okay.  Thank you.
11              THE VIDEOGRAPHER:  We are off
12      the record at 2:20 p.m.  And this
13      concludes today's testimony given by
14      Boris Mirkin.
15
16              [TIME NOTED:  2:19 p.m.]
17
        _____
             *Boris Mirkin*
             Boris Mirkin (Oct 7, 2022 12:22 EDT)
18           BORIS MIRKIN
19      October 7, 2022
        _____
        SUBSCRIBED AND SWORN TO
20      BEFORE ME THIS _____
        DAY OF _____, 2022.
21

        _____
22           NOTARY PUBLIC
23
24
25
```

Page 49

```
                    ERRATA SHEET
          VERITEXT/NEW YORK REPORTING, LLC

    CASE NAME: SUSANNA MIRKIN AND BORIS
               MIRKIN, ET AL VS. XOOM ENERGY,
               LLC, ET AL
    DATE OF DEPOSITION: AUGUST 30, 2022
    WITNESS' NAME: BORIS MIRKIN

    PAGE/LINE(S)/      CHANGE              REASON
    _16_/__6-7___/Q. You work in the/correcting
    ____/_____/criminal    court?/the
    ____/_____/_____/record___
    _17_/__22___/"way"         ->/____
    ____/_      /"away"_____/correcting
    ____/       /____             /the
    ____/_____/_____/record___
```

(signature) Boris Mirkin
Boris Mirkin (Oct 7, 2022 12:22 EDT)
_____
       BORIS MIRKIN
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2022.
_____
     NOTARY PUBLIC

MY COMMISSION EXPIRES_____