# MDM Declaration Exhibit A-09

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
No. 18 Civ. 2949(ARR)(RER)
- - - - - - - - - - - - - - - - - - - -x

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                Plaintiffs,

          -against-

XOOM ENERGY, LLC AND XOOM ENERGY
NEW YORK, LLC,
                Defendants.
- - - - - - - - - - - - - - - - - - - -x

     16 Court Street
     Brooklyn, New York 11241

     August 30, 2022
     10:21 a.m.

     DEPOSITION of SUSANNA MIRKIN (REDACTED),
a Plaintiff in the above-entitled action,
held at the above time and place, taken
before SAMUEL HITTIN, a Shorthand Reporter
and Notary Public of the State of New
York, pursuant to the Federal Rules of
Civil Procedure, order and stipulations
between Counsel.
```

Page 1

**Page 2**

```
APPEARANCES:

    WITTELS, McINTURFF, PALIKOVIC
    Attorneys for Plaintiffs
    SUSANNA MIRKIN and BORIS MIRKIN
        295 Madison Avenue
        New York, New York 10017
        (914)775-8862
    BY:  STEVEN WITTELS, ESQ.
    AND: STEVEN COHEN, ESQ.


    MCDOWELL HETHERINGTON, LLP
    Attorneys for Defendants
    XOOM ENERGY, LLC AND XOOM ENERGY
    NEW YORK, LLC
        1001 Fannin Street, Suite 2700
        Houston, Texas 77002
        (713)337-5580
    BY:  MATT MATTHEWS, ESQ.

ALSO PRESENT:
    VERITEXT VIDEOGRAPHER
    BY:  ZEF COTA

            *   *   *
```

**Page 3**

          STIPULATIONS
  IT IS HEREBY STIPULATED, by and among the attorneys for the respective parties hereto, that:
  All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.
  This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116, C.P.L.R., and shall be

**Page 4**

controlled thereby.
  The filing of the original of this deposition is waived.
  IT IS FURTHER STIPULATED, a copy of this examination shall be furnished to the attorney for the witness being examined without charge.

            *   *   *

**Page 5**

          THE VIDEOGRAPHER:  Good morning. We are going on the record at 10:22 a.m. Eastern Daylight Time on August 30, 2022.  Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.
          This is media unit one of the video-recorded deposition of Susanna Mirkin, taken by counsel in the matter of Susanna Mirkin and Boris Mirkin, et al., versus XOOM Energy, LLC, and XOOM Energy New York, LLC, filed in the United States District Court, Eastern Division of New York, Case Number 18-CIV-2949.
          The location of this deposition is Veritext Brooklyn, 16 Court Street, Brooklyn, New York.
          My name is Zef Cota,

**Page 32**

```
1              S. MIRKIN
2    Q.  Okay.  So you come to the United
3  States when you were about 12 years old,
4  right?
5    A.  9.
6    Q.  Oh.  Okay.  And did you move to
7  New York right away?
8    A.  Yes.
9    Q.  And have been here ever since?
10   A.  Yes.
11   Q.  And you live in Brooklyn
12 currently?
13   A.  I do.
14   Q.  Have you always lived in
15 Brooklyn?
16   A.  I lived in Queens.
17   Q.  When did you live in Queens?
18   A.  I don't have exact dates, the
19 years.
20   Q.  That's okay.  What's the
21 ballpark?
22   A.  In 2000s.
23   Q.  Okay.  Do you remember the
24 address?
25   A.  No, not exactly.
```

**Page 33**

```
1              S. MIRKIN
2    Q.  Okay.  Aside from the period of
3  time that you've lived in Queens, you've
4  always lived in Brooklyn --
5    A.  Mm-hmm.  Yes.
6    Q.  -- ever since 1990?
7        And your current address is
8  what?
9    A.  1677 East 34th Street, Brooklyn,
10 New York 11234.
11   Q.  And do you own or rent that
12 property?
13   A.  We own.
14   Q.  You and --
15   A.  My husband.
16   Q.  -- Boris Mirkin own it jointly?
17   A.  Yes.
18   Q.  And who lives there with you?
19   A.  Us and our kids.
20   Q.  How long have you lived at that
21 address?
22   A.  12 years.
23   Q.  Have you owned or rented any
24 other properties during that 12-year
25 period?
```

**Page 34**

```
1              S. MIRKIN
2    A.  No.
3    Q.  Have you and Mr. Mirkin ever
4  owned any other properties?
5    A.  No.
6    Q.  Do you remember the address you
7  lived at before moving to 1677 East 34th?
8    A.  I lived in Queens.
9    Q.  I see.
10       Okay.  Ms. Mirkin, you've never
11 live in Staten Island, right?
12   A.  No.
13   Q.  Okay.  And do you understand
14 that there has been some documents
15 produced in this case that show a Boris
16 Mirkin receiving gas service from XOOM
17 Energy?
18   A.  I saw that, yes.
19   Q.  Okay.  But that is not your
20 husband?
21   A.  That is not my husband.
22   Q.  That's a different Boris Mirkin?
23   A.  Correct.
24   Q.  Is that Boris Mirkin related to
25 your husband?
```

**Page 35**

```
1              S. MIRKIN
2    A.  I think he's a cousin.
3    Q.  Okay.
4    A.  My husband would know more about
5  this Boris Mirkin.
6    Q.  Yes.  But just to show you --
7        MR. MATTHEWS:  Can I have the
8    stickers.  Thank you.
9    Q.  Ms. Mirkin, I'm going to mark
10 this document, which is an e-mail.  The
11 heading says New Customer Enrollment, just
12 so we're -- we know we're talking about
13 the same thing.
14   A.  Sure.
15   Q.  I'm going to hand you that.
16   A.  Mm-hmm.
17       [Whereupon, document was marked
18   as Defendants' Exhibit 4 for
19   identification, as of this date.]
20   Q.  This is a document that's been
21 Bates-labeled XOOM INIT 12 through 13.
22       Have you seen this document
23 before?
24   A.  No.
25   Q.  No.  Fair enough.
```

**Page 36**

```
 1            S. MIRKIN
 2            The billing info there, you
 3   see it shows Boris Mirkin, 21 Peggy Lane,
 4   Staten Island, New York 10306?  Do you see
 5   that?
 6       A.   I see that.
 7       Q.   And that's not your husband?
 8       A.   That's not my husband.
 9       Q.   And the phone number is not --
10       A.   That's --
11       Q.   -- your husband's phone number,
12   and you've never seen that e-mail address
13   either?
14       A.   No.
15       Q.   Okay.  So this account that is
16   referred to in Exhibit 4 is not an account
17   that ever belonged to or was used by you
18   or your husband?
19       A.   Correct.
20       Q.   And to the best of your
21   knowledge, you've never had natural gas
22   service with XOOM Energy, correct?
23       A.   Yes.  Correct.
24       Q.   And neither has your husband, to
25   the best of your knowledge?
```

**Page 37**

```
 1            S. MIRKIN
 2       A.   I'm not sure.  He takes care of
 3   all the bills, so I'm not sure.
 4       Q.   Okay. Okay.  And you personally
 5   don't know anything about the natural gas
 6   rates that XOOM charged in New York since
 7   it entered the market here, correct?
 8       A.   The gas?
 9       Q.   Yes, ma'am.
10       A.   No.
11       Q.   You said that your husband is
12   the one who takes care of the bills.  Is
13   he generally -- is it fair to say he's the
14   one who is generally in charge of energy
15   decisions in the house?
16       A.   Correct.
17       Q.   Does he consult with you about
18   retail energy decisions?
19       A.   Sure, we discuss it, but he
20   takes care of it at the end.
21       Q.   Okay.  Just help me understand
22   in a basic way how it works in your
23   household with respect to selecting energy
24   providers for electricity or natural gas.
25       A.   So he basically looks for the
```

**Page 38**

```
 1            S. MIRKIN
 2   best rates out there, and he just says,
 3   you know, This is the best.  I say, Okay,
 4   do whatever you want.
 5       Q.   Do you know where he looks?
 6       A.   Online.  I mean, that's the best
 7   option out there.
 8       Q.   Yeah.  Nothing -- I don't mean
 9   to suggest there's anything wrong with
10   that.
11       A.   Right.
12       Q.   I'm just -- I don't -- I'm
13   trying to get a sense of, does he -- does
14   he call companies, does he go visit with
15   door-to-door salespeople, or does he --
16       A.   In my knowledge --
17       Q.   -- just do it online?
18            MR. WITTELS:  Object to the
19       form.  Multiple questions.  If you
20       want to break it up.
21            MR. MATTHEWS:  No.  That's okay.
22            MR. WITTELS:  You asked two at
23       the same time.
24            MR. MATTHEWS:  Yeah.  That's
25       okay.
```

**Page 39**

```
 1            S. MIRKIN
 2            MR. WITTELS:  Object to the
 3       form.
 4            If you understand it, you can
 5       answer.
 6            THE WITNESS:  Okay.
 7       A.   In my knowledge, he looks
 8   through the internet.  That's the best
 9   way.
10       Q.   Okay.  So making retail energy
11   decisions in your house, how it generally
12   works is, Mr. Mirkin looks online to shop
13   for the best rates available, he sometimes
14   speaks with you about it, and then he is
15   the one who takes care of the actual
16   enrollment?
17       A.   Correct.
18            MR. WITTELS:  Object.
19            Give me time to answer --
20       object.  It's fine for you to answer.
21       Just give me time on the record before
22       you answer and after he asks his
23       question, please.
24            Object to the form of that.
25            You already answered.
```

**Page 60**

```
 1         S. MIRKIN
 2   when I first heard about it.
 3      Q.   Why did he enroll under your
 4   name?
 5      A.   To have something under my name,
 6   to have residential proof.
 7      Q.   Residential proof for you?
 8      A.   Yes.
 9      Q.   Did you need that for
10   employment?
11      A.   For employment.
12      Q.   I see.
13           At the time, did you understand
14   that the rate that you were enrolling with
15   XOOM was a rate that could vary from month
16   to month?
17      A.   My husband probably did, but it
18   wasn't in my understanding.  When we
19   applied, he told me it was the lowest
20   rate, and I agreed, so he took care of the
21   rest.
22      Q.   You didn't have an understanding
23   as to whether the rate was fixed or
24   variable at the time?
25      A.   No.
```

**Page 61**

```
 1         S. MIRKIN
 2      Q.   Okay.  You're not claiming in
 3   this -- I understand that you take issue
 4   with the rates that XOOM charged, with how
 5   high they were --
 6      A.   Mm-hmm.
 7      Q.   -- right?
 8      A.   Correct.
 9      Q.   But you are not alleging that
10   XOOM had no right to charge you a variable
11   rate, right?
12           MR. WITTELS:  Objection to form.
13           You can answer.
14      A.   Can you repeat that?
15      Q.   Sure.
16           What I'm getting at is, you --
17   you don't dispute that you and your
18   husband enrolled in a variable rate plan
19   with XOOM?
20           MR. WITTELS:  Objection to form.
21           You can answer.
22      A.   If I understand that we enrolled
23   in a variable rate?  I do understand that.
24      Q.   Okay.  And you understand that
25   the contract permitted that rate to vary
```

**Page 62**

```
 1         S. MIRKIN
 2   from month to month according to the terms
 3   of the contract?
 4      A.   Correct.
 5      Q.   Okay.  Looking back at that
 6   phrase "actual and estimated supply
 7   costs" -- do you see that on Exhibit 3?
 8      A.   Yes.
 9      Q.   What does that mean to you, that
10   the rate will be based on XOOM's actual
11   and estimated supply costs?
12      A.   I'm not sure.  It's for lawyers
13   to figure it out.
14      Q.   Okay.  You don't have any
15   personal understanding --
16      A.   No.
17      Q.   -- of what that means?
18      A.   No.
19      Q.   Okay.  And you don't have any
20   personal understanding about what XOOM's
21   actual and estimated supply costs were?
22           MR. WITTELS:  Asked and
23   answered.  Objection.
24           You can answer again.
25      A.   Can you repeat that?
```

**Page 63**

```
 1         S. MIRKIN
 2      Q.   You don't have an understanding
 3   as to what XOOM's actual and estimated
 4   supply costs were, correct?
 5           MR. WITTELS:  Okay.  He's asked
 6   it about three times, but I'm going to
 7   allow you to answer again.
 8           MR. MATTHEWS:  You just asked --
 9   you told me to ask it again.
10           MR. WITTELS:  No.  I'm saying
11   you already asked the question, and
12   it's on the record that she's answered
13   that question.
14           But if -- we'll stop it at some
15   point, but you can answer again --
16           THE WITNESS:  Mm-hmm.
17           MR. WITTELS:  -- if you
18   understand the question.
19      A.   Can you repeat that?
20           MR. WITTELS:  Let's have the
21   reporter read it back so he doesn't
22   have to say it again.
23           [Whereupon, a portion of the
24   testimony was read back.]
25      A.   What they were?  No.  What they
```

15 (Pages 60 - 63)

```
                          S. MIRKIN
 1         S. MIRKIN                          1         S. MIRKIN
 2  charged us?  Yes, I do, according to      2       MR. WITTELS:  Objection.
 3  Exhibit 2.                                3       Do you understand that?
 4     Q.  Right.  Yeah.  I'm with you.       4       THE WITNESS:  No, I don't
 5         All right.  You don't contend      5  understand that.
 6  that the contract with XOOM promised you  6     Q.  It doesn't say that it will
 7  and your husband savings, correct?        7  match increases or decreases in the supply
 8         MR. WITTELS:  Objection.           8  costs exactly, right?
 9     A.  What is "contend".                 9       MR. WITTELS:  Objection.  It
10     Q.  Your position in this case.      10  says what it says.
11         It is not your position in this  11       MR. MATTHEWS:  Don't coach her.
12  lawsuit that that contract promised you 12       MR. WITTELS:  I mean, you --
13  savings as compared to the utility?     13       MR. MATTHEWS:  You can say
14         MR. WITTELS:  Objection.         14  objection to form.  Look, I've sat
15         Go ahead.                        15  through the longest depositions with
16     A.  If they promised us savings?  I 16  you guys.  This is not taking that
17  mean, according to Exhibit 2, the      17  long, and it's --
18  difference in percentage, that went from 18      MR. WITTELS:  Okay.  Objection.
19  May to November, is so significant, and 19       MR. MATTHEWS:  Just note your
20  initially, when he signed up, when my  20  objection --
21  husband and I spoke about it, that was the 21    MR. WITTELS:  I mean, we can --
22  lowest rate.  So, yes, we are thinking 22       MR. MATTHEWS:  -- and stop
23  that it would be saving us.            23  taking.
24         MR. MATTHEWS:  Objection.       24       MR. WITTELS:  Objection to form.
25  Nonresponsive.                         25       You can answer, if you
                                 Page 64                                     Page 66

 1         S. MIRKIN                         1         S. MIRKIN
 2     Q.  I'm asking a different question.  2  understand.
 3  I'm not asking about your understanding or 3    A.  If it matched, no.  The contract
 4  your belief.  I'm just asking about what 4  does not say that.  It says the monthly
 5  the contract says.  And you would agree  5  variable rate will be based on XOOM's
 6  with me that the contract does not say you 6 actual and estimated supply costs.
 7  are guaranteed savings as compared to the 7    Q.  I agree.
 8  utility?                                 8       The contract does not say that
 9     A.  It doesn't say in the contract   9  XOOM will be the lowest rate in the
10  "savings," no.                         10  market, right?
11     Q.  Okay.  And the contract doesn't 11    A.  It doesn't.
12  say that the variable rate will be lower 12      MR. WITTELS:  Objection.
13  than the utility rate, right?          13    Q.  And it doesn't say that XOOM
14         MR. WITTELS:  Objection.        14  will limit its margins, right?
15     A.  No.  The contract says the      15       MR. WITTELS:  Objection.
16  monthly variable rate will be based on 16       THE WITNESS:  No, it doesn't say
17  XOOM's actual and estimated supply costs. 17 that.
18     Q.  Right.  And it doesn't say it   18    Q.  Okay.  Would you agree that XOOM
19  will be equal to those supply costs,   19  is allowed to seek a profit on the rates
20  right?                                 20  it charges?
21         MR. WITTELS:  Objection.        21    A.  I mean, any company is allowed
22     A.  No.                             22  according to the contract, for sure.
23     Q.  And it doesn't say that it will 23    Q.  Okay.  You don't contend that
24  correlate precisely with those supply  24  XOOM is not allowed to make a profit on
25  costs, right?                          25  its electricity contracts, right?
                                 Page 65                                     Page 67
```

16 (Pages 64 - 67)

**Page 68**

```
 1        S. MIRKIN
 2        MR. WITTELS:  Objection.
 3    A.  If they're not allowed?
 4    Q.  It's not your position in the
 5  case that XOOM is -- may not seek a profit
 6  on its energy contracts?
 7    A.  It's not my position, no.
 8    Q.  Okay.  You agree that XOOM can
 9  seek a profit on its contracts?
10    A.  XOOM or any --
11        MR. WITTELS:  Objection.
12        You can answer.
13    A.  XOOM or any company is allowed
14  to have a profit according to their
15  contract.
16    Q.  And what the contract allows is
17  the only limit on that profit, right?
18        MR. WITTELS:  Objection.
19    A.  The only limit on their profit?
20  What does that mean?
21    Q.  That the contract doesn't say --
22  let me ask it differently.
23        The contract doesn't say that
24  XOOM will only seek a specific profit
25  percentage, right?
```

**Page 69**

```
 1        S. MIRKIN
 2    A.  It does not say that.
 3    Q.  Okay.  And the energy markets do
 4  not -- in New York, do not cap the profit
 5  that XOOM can seek, right?
 6        MR. WITTELS:  Objection.
 7    A.  Do I know that?
 8    Q.  I'm asking.
 9    A.  I don't know that.
10    Q.  Okay.  With respect to utility,
11  do you know how XOOM's rates compared to
12  utilities rates during the time you were a
13  XOOM customer?
14    A.  At that time?
15    Q.  Mm-hmm.
16    A.  Probably my husband does.  I'm
17  not sure.  I didn't deal with the rates
18  and everything.  My husband did all of it.
19    Q.  I don't mean it as a criticism.
20  This is my only opportunity to talk to
21  you, and I'm trying to get your best
22  testimony about what you know and you
23  don't know.
24    A.  Mm-hmm.
25    Q.  And if you don't know, that's
```

**Page 70**

```
 1        S. MIRKIN
 2  okay.
 3    A.  Mm-hmm.
 4    Q.  But that's my question.  Today,
 5  you don't know how XOOM's variable rates
 6  compared to the utilities rates during the
 7  time you were a XOOM customer, right?
 8        MR. WITTELS:  Objection.
 9    A.  No, I don't.
10    Q.  Okay.  You've continued looking
11  at the table on Exhibit 2, at the rates,
12  and I'm going to direct you to look at the
13  table, if you don't mind.
14    A.  Sure.
15    Q.  The first month, where your rate
16  was 8.99 cents per kilowatt hour -- do you
17  see that?
18    A.  I see.  In May through June?
19    Q.  Yes, ma'am.
20        You are not arguing that that
21  rate was too high, right?
22    A.  No.
23    Q.  Okay.  That rate, you do not
24  believe breached your agreement with XOOM,
25  right?
```

**Page 71**

```
 1        S. MIRKIN
 2        MR. WITTELS:  Objection.
 3    A.  That rate, in knowledge of my
 4  husband and I, that was a good rate.
 5    Q.  And your lawsuit against XOOM is
 6  based on this contract that we looked at,
 7  at Exhibit 3, right?
 8    A.  Right.
 9    Q.  And just for completeness, I'm
10  going -- Exhibit 3 is just the first page
11  of that contract, right?  It's not the
12  full contract?
13    A.  Correct.
14    Q.  Okay.  I'm going to mark as
15  Exhibit 5 a full copy of those terms and
16  conditions.
17        [Whereupon, document was marked
18        as Defendants' Exhibit 5 for
19        identification, as of this date.]
20    Q.  And please take as much time as
21  you want to review it and confirm that
22  what I'm saying is accurate.
23    A.  You want me to read the whole
24  agreement?
25    Q.  No, no, no.  I'm not instructing
```

17 (Pages 68 - 71)

```
 1          S. MIRKIN
 2   you to read it, but I'm telling you that
 3   you are -- what I'm saying is, I don't
 4   want you to feel rushed, and I want you to
 5   take as much time as you want to, to be
 6   comfortable that what I'm telling you is
 7   accurate.
 8         So does this document that I've
 9   marked as Exhibit 5 appear to be the same
10   first page --
11      A.   Yeah.
12      Q.   I'm sorry.
13           Does Exhibit 5 appear to be the
14   same as it relates to the first page, as
15   Exhibit 3?
16      A.   Correct.
17      Q.   Okay.  And your lawsuit is about
18   this contract?
19      A.   Correct.
20      Q.   You are not alleging that a XOOM
21   sales rep lied to you or your husband,
22   right?
23           MR. WITTELS:  Objection.
24      A.   I'm not sure what you mean.
25   Sales rep?  I don't know if there was a
                                      Page 72
```

```
 1          S. MIRKIN
 2   sales rep.  I don't know.  My husband did
 3   all of it.  So whether he did it online or
 4   in person, I'm not sure.  You have to ask
 5   him.
 6      Q.   I will.  But this is my only
 7   chance to talk to you.  And I understand
 8   that you are suing my client for an
 9   alleged breach of the contract that I've
10   marked as Exhibit 5.  I understand that.
11   But what I'm asking is, you are
12   not alleging in this lawsuit that a sales
13   representative came to the house and lied
14   to you or your husband, right?
15           MR. WITTELS:  Objection to the
16      form.
17      A.   In my knowledge, no.
18      Q.   Okay.  And you're not alleging
19   that someone on a telephone, on behalf of
20   XOOM, lied to you or your husband about
21   variable rates, right?
22           MR. WITTELS:  Objection.
23           You can answer.
24      A.   In my knowledge, no.
25      Q.   And you are not alleging that
                                      Page 73
```

```
 1          S. MIRKIN
 2   XOOM, in an advertisement or a marketing
 3   letter, lied to you?
 4           MR. WITTELS:  Objection.
 5      A.   No.
 6      Q.   You're not alleging that XOOM
 7   made some sort of oral promise to you?
 8           MR. WITTELS:  Objection.
 9           You can answer.
10      A.   No.
11      Q.   You are not bringing a claim
12   against XOOM based on any other written
13   document, right?
14      A.   Just the contract.
15      Q.   Okay.
16           MR. WITTELS:  Object to the
17      previous question.
18      Q.   Ms. Mirkin, why did you switch
19   from XOOM to Viridian?
20      A.   Probably the rates.  My husband
21   did all of it, so I'm sure that was the
22   reason.
23      Q.   You're guessing about what his
24   reason was?
25      A.   No, I'm not guessing.  I'm sure
                                      Page 74
```

```
 1          S. MIRKIN
 2   it was the rates.
 3      Q.   Okay.  What do you remember
 4   about Viridian's rate?
 5      A.   I don't know any rates about
 6   Viridian.
 7      Q.   Okay.
 8      A.   I don't go into details with
 9   bills, everything my husband does with
10   rates and how much it's going to be.
11      Q.   Yeah, it's -- I'm -- I don't
12   mean it as a criticism.  It's okay if you
13   were not involved in the decision to
14   switch to Viridian.  But we've never met
15   before today, right?
16      A.   Right.
17      Q.   And we've never talked about
18   this lawsuit before today, right?
19      A.   Mm-hmm.
20      Q.   So I'm just trying to get a
21   sense of how you personally fit in to this
22   case and all of the decisions about
23   energy.
24      A.   Mm-hmm.
25      Q.   So is it fair to say that you
                                      Page 75
```

**Page 98**

```
 1
 2   A.  No.
 3   Q.  Okay.  Okay.  Thank you very
 4 much.
 5   A.  Okay.
 6       THE VIDEOGRAPHER:  We are off
 7   the record at 12:08 p.m., and this
 8   concludes today's testimony given by
 9   Susanna Mirkin.
10
11       [TIME NOTED:  12:07 p.m.]
12
     _____
13    SUSANNA MIRKIN
14  _____
     SUBSCRIBED AND SWORN TO
15  BEFORE ME THIS _____
     DAY OF _____, 2022.
16
     _____
17    NOTARY PUBLIC
18
19
20
21
22
23
24
25
```

**Page 99**

```
 1
 2       I N D E X
 3
     WITNESS      EXAMINATION BY    PAGE
 4
     SUSANNA MIRKIN   MATT MATTHEWS   7, 94
 5            STEVEN WITTELS   92
 6
         E X H I B I T S
 7
 8  PLAINTIFF'S    DESCRIPTION       PAGE
 9  EXHIBIT 1 - CON EDISON RECORD     20
10  EXHIBIT 2 - PAGE 19 OF WITNESS'S  20
         COMPLAINT
11
     EXHIBIT 3 - FIRST PAGE OF SOME   20
12       CONTRACT TERMS AND
         CONDITIONS
13
     EXHIBIT 4 - BILLING INFORMATION  35
14       FOR BORIS MIRKIN,
         21 PEGGY LANE, STATEN
15       ISLAND, NEW YORK 10306
16  EXHIBIT 5 - FULL COPY OF THOSE    71
         TERMS AND CONDITIONS
17
18
19
20
21
22
23
24
25
```

**Page 100**

```
 1
 2       CERTIFICATION
 3
 4   I, Samuel Hittin, a Notary Public for
 5  and within the State of New York, do
 6  hereby certify:
 7     That the witness whose testimony as
 8  herein set forth, was duly sworn by me;
 9  and that the within transcript is a true
10  record of the testimony given by said
11  witness.
12     I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage, and that I am
15  in no way interested in the outcome of
16  this matter.
17     IN WITNESS WHEREOF, I have hereunto
18  set my hand this 6th day of September,
19  2022.
20
21
22       SAMUEL HITTIN
23
24        *   *   *
25
```

**Page 101**

```
 1
 2       ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
 3
         CASE NAME: SUSANNA MIRKIN AND BORIS
 4       MIRKIN, ET AL VS. XOOM ENERGY,
         LLC, ET AL
 5  DATE OF DEPOSITION: AUGUST 30, 2022
     WITNESS' NAME: SUSANNA MIRKIN
 6
         PAGE/LINE(S)/   CHANGE      REASON
 7   ___/___/_____/_____
     ___/___/_____/_____
 8   ___/___/_____/_____
 9   ___/___/_____/_____
10   ___/___/_____/_____
11   ___/___/_____/_____
12   ___/___/_____/_____
13   ___/___/_____/_____
14   ___/___/_____/_____
15   ___/___/_____/_____
16   ___/___/_____/_____
17   ___/___/_____/_____
18   ___/___/_____/_____
19
     _____
20    SUSANNA MIRKIN
21  SUBSCRIBED AND SWORN TO
     BEFORE ME THIS_____DAY
22  OF_____, 2022.
23  _____
       NOTARY PUBLIC
24
     MY COMMISSION EXPIRES_____
25
```

```
 1
 2            MR. MATTHEWS:  Subject to
 3      additional questions that were not
 4      permitted today, I will pass the
 5      witness.
 6            And I appreciate your time.
 7            THE WITNESS:  Okay.
 8            MR. WITTELS:  No questions,
 9      which is very rare for me.
10            MR. MATTHEWS:  Okay.  Thank you.
11            THE VIDEOGRAPHER:  We are off
12      the record at 2:20 p.m.  And this
13      concludes today's testimony given by
14      Boris Mirkin.
15
16            [TIME NOTED:  2:19 p.m.]
17
        _____
                    *Boris Mirkin*
              Boris Mirkin (Oct 7, 2022 12:22 EDT)
18          BORIS MIRKIN
19      October 7, 2022
        _____
        SUBSCRIBED AND SWORN TO
20      BEFORE ME THIS _____
        DAY OF _____, 2022.
21
        _____
22          NOTARY PUBLIC
23
24
25
                                     Page 49
```

```
 1
 2                      ERRATA SHEET
            VERITEXT/NEW YORK REPORTING, LLC
 3
       CASE NAME: SUSANNA MIRKIN AND BORIS
 4                MIRKIN, ET AL VS. XOOM ENERGY,
                  LLC, ET AL
 5     DATE OF DEPOSITION: AUGUST 30, 2022
       WITNESS' NAME: BORIS MIRKIN
 6
       PAGE/LINE(S)/      CHANGE              REASON
 7     _16__/__6-7____/Q. You work in the/correcting
       ____/_____/criminal       court?/the
 8     ____/_____/_____/record___
       ____/_____/"way"           ->/____    _
       _17__/___22___ /"away"_____/correcting
 9     ____/_       /____              /the
       ____/_____/_____/record___
10     ____/_____/_____/____    _
       ____/_____/_____/_____
11     ____/_____/_____/_____
       ____/_____/_____/_____
12     ____/_____/_____/_____
       ____/_____/_____/_____
13     ____/_____/_____/_____
       ____/_____/_____/_____
14     ____/_____/_____/_____
       ____/_____/_____/_____
15     ____/_____/_____/_____
       ____/_____/_____/_____
16     ____/_____/_____/_____
       ____/_____/_____/_____
17     ____/_____/_____/_____
       ____/_____/_____/_____
18     ____/_____/==================/_____
19           Boris Mirkin
             Boris Mirkin (Oct 7, 2022 12:22 EDT)
             _____
20                    BORIS MIRKIN
21     SUBSCRIBED AND SWORN TO
       BEFORE ME THIS_____DAY
22     OF_____, 2022.
23     _____
            NOTARY PUBLIC
24
       MY COMMISSION EXPIRES_____
25
```