# MDM Declaration Exhibit A-16

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF NEW YORK

 3      SUSANNA MIRKIN and BORIS MIRKIN,

 4      Individually and on Behalf of All Others

 5      Similarly Situated,

 6             Plaintiffs,

 7         vs.                      No. 18 Civ. 2949(ARR) (RER)

 8      XOOM ENERGY, LLC and XOOM ENERGY

 9      NEW YORK, LLC,

10             Defendants.

11      --------------------------------x

12

13

14                  VIDEOTAPED DEPOSITION OF

15                     SEABRON ADAMSON

16                Tuesday, November 8, 2022

17                       10:06 a.m.

18                         Veritext

19                     101 Arch Street

20                Boston, Massachusetts 02110

21

22

23

24                 Laurie K. Langer, RPR
```

Page 1

```
                 APPEARANCES

ON BEHALF OF THE PLAINTIFF(s):
  BY: Steven L. Wittels, Esq.
      Ethan D. Roman, Esq. (appeared via Zoom.)
      Steven D. Cohen, Esq. (appeared via Zoom.)
         WITTELS MCINTURFF PALIKOVIC
         18 Half Mile Road
         Armonk, New York 10504
         (914) 319-9945
         slw@wittelslaw.com

ON BEHALF OF THE DEFENDANT(s):
  BY: Michael D. "Matt" Matthews, Jr., Esq.
         MCDOWELL HETHERINGTON LLP
         1001 Fannin Street, Suite 2700
         Houston, Texas 77002
         (713) 337-5580
         matt.matthews@mhllp.com

ALSO PRESENT:
    David C. Coleman
    Shawn Budd, Videographer
```

Page 2

```
                INDEX OF EXAMINATION

WITNESS: Seabron Adamson
EXAMINATION                              PAGE NO.
By Mr. Matthews                              5
By Mr. Wittels                             138

                INDEX TO EXHIBITS
NO.        DESCRIPTION                    PAGE NO.
Exhibit 1  Expert Report of Derya             8
           Eryilmaz and Seabron Adamson
Exhibit 2  Electricity Sales Agreement       12
Exhibit 3  Expert Report of David C.         47
           Coleman
Exhibit 4  Rebuttal Report of David C.       48
           Coleman
Exhibit 5  First Amended Class Action       113
           Complaint
Exhibit 6  Market Supply Cost Build Up      114

(Original exhibits attached to original transcript)
```

Page 3

P R O C E E D I N G S

VIDEOGRAPHER: Okay. We are on the record. This is the videographer speaking Shawn Budd with Veritext Legal Solutions. Today's date is November 8th, 2022 and the time is 10:06 a.m.

We are here in Boston, Massachusetts to take the video deposition of Seabron Adamson in the matter of Susanna Mirkin, et al, versus XOOM-Energy in New York, LLC.

Will counsel please introduce themselves for the record.

MR. WITTELS: Steven Wittels. Wittels McInturff and Palikovic for the Plaintiffs and the proposed class on behalf of the witness today, Mr. Adamson.

Appearing by video are also for the Plaintiffs in the proposed class Steven Cohen and Ethan Roman.

MR. MATTHEWS: My name is Matt Matthews, I'm with the law firm of McDowell Hetherington and I represent the Defendants XOOM Energy.

Also with me here today is David Coleman of the NorthBridge Group who is, has been designated as a

Page 4

testifying expert for XOOM.

VIDEOGRAPHER: The court reporter today is Laurie Langer. Will you please swear in the witness.

SEABRON ADAMSON,
having been satisfactorily identified by the production of his driver's license, and duly sworn by the Notary Public, was examined and testified as follows:

                    EXAMINATION

BY MR. MATTHEWS:
  Q. Good morning, Mr. Adamson. How are you?
  A. Good morning.
  Q. Thank you for being here today. Before we jump in, I'll quickly go over ground rules. I know you've been deposed before, --
  A. Uh-huh.
  Q. -- I'm sure you're familiar with them. But this is not meant to be any sort of endurance test, anytime you need a break just let me know, we can take a break.
      With, you know, the same qualification you always

Page 5

2 (Pages 2 - 5)

```
 1  agreements.  If you want to take that to be liability,
 2  liability I guess is a legal term.  But -- so I am
 3  addressing issues related to the consistency of the, the
 4  rates and the sales agreements.
 5     Q.  Okay.  And whether or not XOOM breached those
 6  provisions?
 7     A.  Well, I mean, again, "breach" seems a legal word.
 8  But whether it's -- whether the pricing was consistent
 9  with the, with the pricing required in the sales
10  agreements.
11     Q.  Okay.  Is "breach" a word that you have
12  difficulty with?
13     A.  No, I just.
14     Q.  You've worked in a lot of --
15     A.  Yeah.
16     Q.  -- litigation for a long time.
17     A.  Sure.  I just -- I don't know exactly what
18  implications you're trying to put to that.  I was just
19  trying to describe clearly what I did, which I think is
20  what's described here.
21     Q.  I guess put differently, you are offering an
22  opinion about whether or not XOOM complied with the
23  pricing provisions of its sales agreement?
24     A.  Yes.
                                                    Page 10
```

```
 1     Q.  Okay.  And so are you also offering an opinion
 2  about how the pricing terms of the sales agreements
 3  should be interpreted?
 4     A.  No.  I'm providing a -- my -- well, I'm providing
 5  my understanding of what it says and in the context of
 6  the, of electricity and gas markets and retail markets
 7  and how that works out.  Obviously, I'm not offering a
 8  legal opinion on the language.
 9     Q.  Okay.
10     A.  I'm offering my understanding based on knowledge
11  of these markets of how these, how these work.
12     Q.  Okay.  You're not offering a legal interpretation
13  of the pricing provisions in the XOOM sales agreement?
14         MR. WITTELS:  Objection.  I mean, I think he
15  asked -- he just answered it, didn't he?
16         MR. MATTHEWS:  Steve, please, no speaking
17  objections today.  Please.
18         MR. WITTELS:  But it's the same question.
19         MR. MATTHEWS:  "Objection form" is what's
20  appropriate to say, as you have reminded me.  Okay?
21     A.  I am not offering a legal opinion.
22     Q.  Okay.  Were you asked to assume a particular
23  interpretation of the pricing provisions?
24     A.  No, not really.  I mean, they're on the page.
                                                    Page 11
```

```
 1     Q.  Okay.  So the third bullet point says that you
 2  have been asked, "to determine whether XOOM set its
 3  rates as required by the sales agreements."
 4         Correct?
 5     A.  Yeah.  The consistency, you know, the consistency
 6  from an economic and commercial point between the rates
 7  and, and, you know, how it -- how it -- how it
 8  describes, I think, the phrase that we'll get, we'll get
 9  around to today about the actual and estimated supply
10  costs --
11     Q.  Yep.
12     A.  -- in the -- in the sales agreement.
13     Q.  Right.  That's -- that's where I was going next.
14         The sales agreement requires that rates be set,
15  "based on XOOM's actual and estimated supply costs."
16         Right?
17     A.  I don't have the phrasing in front of me, but
18  that sounds right.
19     Q.  We can do that.  I'm not trying to --
20     A.  Yeah.  I mean -- I think that's --
21     Q.  Bear with me one second.
22         MR. MATTHEWS:  May I mark this as Exhibit 2.
23         (Deposition Exhibit No. 2 marked for
24  identification.)
                                                    Page 12
```

```
 1     Q.  Okay.  And, Mr. Adamson, does this appear to be a
 2  copy of the sales agreement you were referring to?
 3     A.  Yes, I think so.  I mean, there were
 4  various, obviously various versions of these over time,
 5  but this looks like the one.
 6     Q.  This is the one that you analyzed --
 7     A.  Yes, I believe --
 8     Q.  -- in connection with preparing this report?
 9     A.  Yes, I believe so.
10     Q.  Okay.  And in connection with the assignment to
11  determine whether XOOM set its rates as required by the
12  sales agreements, can you direct me to the provisions
13  that you looked at that relate to rate setting?
14     A.  I mean, you know, obviously the -- the -- the
15  primary one is in this top right box, starting "your
16  rate."
17     Q.  "Your rate for energy purchases will be a
18  variable rate, per kilowatt hour, that may change on a
19  monthly basis, plus taxes and fees, if applicable.  Your
20  monthly variable rate is based on XOOM's actual and
21  estimated supply costs which may include but not be
22  limited to prior period adjustments, inventory and
23  balancing costs.  You are responsible for all charges
24  assessed and billed by your local utility for all
                                                    Page 13
```

4 (Pages 10 - 13)

**Page 30**

1  Q. In doing that rate conversion, do you interpret
2  that provision to mean that XOOM may include a margin in
3  its rate?
4      MR. WITTELS: Objection.
5  A. I don't see that listed here. You know, it says,
6  "actual and estimated supply costs." I don't see that
7  here. Sort of as we said, I anticipated that was going
8  to be kind of argued. I mean, when you have the reading
9  here, I don't see that. It says, "actual and estimated
10 supply costs," it doesn't talk about margin. I mean, so
11 I think the most straightforward reading of that is it
12 doesn't have margin in it.
13 Q. In your opinion XOOM may not include a margin in
14 its rate based on that contract provision?
15 A. I would say it's actual -- I mean, if they --
16 if -- it just needs to -- it needs to be to actual and
17 estimated supply costs. Which does not list here
18 "margin."
19 Q. Mr. Adamson, I'll stipulate that the word
20 "margin" is not in that provision.
21 A. Yes.
22 Q. You don't have to tell me that again.
23 A. Okay.
24 Q. I want to know, your interpretation is. You're

**Page 31**

1  offering an opinion of what this provision means; yes?
2  A. Yeah, I'm offering what I think is a, you know, a
3  relatively commonsensical commercial one. I'm -- my --
4  my ordinary reading of this is, you know, deal with
5  supply costs and, and that's what it says.
6  Q. And does it mean that XOOM may include a margin
7  on top of those supply costs?
8      MR. WITTELS: Objection.
9  A. They -- my kind of ordinary read of that is it
10 doesn't say that, unless, unless they are -- it's not
11 included in supply costs, it doesn't list that. And
12 it's not a, you know, direct actual supply cost. That's
13 what it says. So I think the answer to your question is
14 no.
15 Q. Okay.
16 A. If you were to say it does, okay, that's
17 different. That's a different view of the same thing.
18 Q. Okay. So if I said that rate setting provision
19 that we've been looking at based on actual and estimated
20 supply costs means that the rate will be consistent with
21 costs plus an appropriate margin, you would disagree?
22 A. I mean, the first order based on it said what it
23 says, yes. I mean, I -- I can -- I would guess you
24 would probably argue that. Which I believe Mr. Coleman

**Page 32**

1  has.
2      So I would, you know -- I imagine that that was,
3  imagined that that was going to come up. I think -- I
4  mean, whether, to the extent non supply costs margins
5  are included really is something that the judge or the
6  jury or whoever decides on this has to, has to opine on.
7  Q. Okay. Because you're not offering a legal
8  interpretation?
9  A. I am not offering a legal interpretation.
10 Q. Okay. If I said that I interpret that phrase
11 based on actual and estimated supply costs to mean that
12 XOOM's rate will rise and fall with its supply costs,
13 would you agree with that or disagree?
14     MR. WITTELS: Objection. By the way, when
15 you say "you," you the lawyer? I don't know what you
16 mean.
17 A. Sorry. Can you repeat the question.
18 Q. I say that when I, Matt.
19 A. Right. Okay. We get our pronouns right. Yeah.
20 Okay.
21 Q. Read that pricing provision, specifically the
22 phrase "based on XOOM's actual and estimated supply
23 costs," I think that means that XOOM's rates will rise
24 and fall with its supply costs. Would you agree with

**Page 33**

1  that reading or disagree?
2  A. I think that is -- if the rate is determined from
3  actual and estimated supply costs then that is likely to
4  be true, but that doesn't seem to be sufficient to me to
5  meet the requirement.
6  Q. What else would be required?
7  A. Well, again, as I -- as we tried to explain in
8  that rebuttal report, moving together is a very weak
9  measure of anything; right? So the real question is
10 not, not just do things move together, but, I mean,
11 obviously there are other elements of a mathematical
12 relationship between moving together. I don't think
13 moving together is sufficient to determine whether
14 that's, quote, based on.
15 Q. So if it's not just that it moves together, --
16 A. Uh-huh.
17 Q. -- what else is required?
18 A. Well, --
19     MR. WITTELS: Object to the form.
20 A. -- as I indicated -- as we indicated in our
21 rebuttal report, there needs to be an, an economically,
22 you know, reasonable relationship between those two,
23 because moving together, as I illustrated, and which, I
24 think, you know, everyone can understand, doesn't, it

**Page 62**

1  opinion.
2       MR. WITTELS: But usually if you're making a
3  statement you're taking it from there.
4       MR. MATTHEWS: Well, thank you for that
5  guidance. I'm learning a lot.
6    A. Well, I think it's probably around page....
7    Q. I'll find it for you. How about paragraph 23B
8  and 54.
9    A. 54. Right. Okay. Yes. Okay. Sorry, can you
10 repeat your question.
11   Q. Please, if you would, so we don't have any
12 confusion, if you would read both of those paragraphs.
13 And then I'll --
14      MR. WITTELS: Into the record, --
15   Q. -- proceed.
16      MR. WITTELS: -- or?
17      MR. MATTHEWS: No. No. Just to himself.
18   A. (Witness reviewing.) Okay.
19   Q. Okay. What -- you, generally speaking, opine
20 with reference to those prior period adjustments that
21 you were unable to substantiate whether XOOM considered
22 them in setting its rates; is that a fair statement?
23   A. Yeah. I mean, we looked at the information in
24 the rate setting workbooks, which was very extensive.

**Page 63**

1  There didn't seem to be any determination, calculation,
2  amounts or anything associated with prior period
3  adjustments as expected. I'm -- I was really kind of
4  expecting there to be, if you were making prior period
5  adjustments, to have some calculation of those, which I
6  never saw. So that's kind of just what it's a reference
7  to.
8    Q. Got it. So you're saying because XOOM didn't
9  memorialize it and document or a calculation that shows
10 how it was factored in, you have no evidence that they
11 considered it; is that fair?
12   A. Well, I'm saying I didn't, I didn't see
13 any -- there was no data suggesting that that was ever
14 calculated.
15   Q. Right.
16   A. And it seems to me that would be a calculation.
17   Q. There was testimony that it was considered;
18 right?
19   A. I think there was testimony that it was
20 considered and as I mentioned in paragraph 54, though,
21 there was testimony -- well, there was testimony I
22 believe that said, oh, it was part of this, what we
23 considered in some very broad abstract sense.
24   Q. Yep.

**Page 64**

1    A. And then there was testimony as I note in
2  paragraph 54 about potential kind of makeup losses,
3  which I guess you could consider some kind of prior
4  period adjustment. But in -- with an unrelated market
5  not related to New York. So there's testimony
6  that -- there's general testimony and then there's
7  specific testimony.
8    Q. About consideration of prior period adjustments?
9    A. Yes.
10   Q. Okay. Got it. We're on the same page.
11   A. Okay.
12   Q. The period of time --
13   A. Uh-huh.
14   Q. -- that you looked at for rate setting
15 procedures --
16   A. Uh-huh.
17   Q. -- goes from 2013 to 2021; right?
18   A. Yes. Broadly, yes.
19   Q. Broadly?
20   A. Yeah.
21   Q. Did you do any analysis of what other ESCOs
22 charged in New York during that same time period?
23   A. No.
24   Q. Okay. So you don't know how XOOM's rates

**Page 65**

1  compared to other ESCOs rates?
2    A. For purposes of this we never made a comparison.
3    Q. And you don't know if XOOM's rates were outside
4  of the range of what ESCOs were charging during that
5  time period?
6    A. No, we didn't look at that. It didn't seem very
7  relevant.
8    Q. Okay. What was relevant in the, your damage
9  analysis, was how much gross margin XOOM sought on top
10 of its supply costs; right?
11      MR. WITTELS: Objection.
12   A. Can you repeat that, again.
13   Q. Yep. What you believed was relevant in your
14 damage calculations was how much gross margin XOOM
15 sought on top of its supply costs?
16      MR. WITTELS: Objection.
17   A. I mean, that's a way that -- I think you're
18 putting a characterization of it. I think what really
19 the -- you're characterizing it -- one might
20 characterize it that way, but the, you know, as, as
21 discussed, the, you know, what's important is the
22 relationship between rates and, and supply costs. If
23 you want to characterize that as being a gross margin
24 calculation, I think you could formulate it that way,

17 (Pages 62 - 65)

**Page 66**

1  which is I think what you're doing. But I think you
2  understand what we did.
3     Q. I am, because I'm focusing in my question, I have
4  built this in on your damage calculation. So I
5  understand your position about bullet 3, let's call it.
6  Which is your opinions about whether or not XOOM's rate
7  setting was consistent or not, with the sale agreement.
8     But I'm talking about with respect to 4, after
9  you concluded --
10    A. Uh-huh.
11    Q. -- the rate was not consistent --
12    A. Right.
13    Q. -- that your damage model --
14    A. Right.
15    Q. -- and what they considered relevant was the
16 amount of gross margin that XOOM put on top of its
17 supply cost?
18    A. Are we discussing the Method 1 model or the
19 Method 2 model?
20    Q. Well, it's both; right?
21    A. Well, it's --
22    Q. Let's start with Method 1.
23    A. Okay. Right.
24    Q. Right. Method 1, what was relevant was the

**Page 67**

1  amount of gross margin that's input on top of its supply
2  costs; right?
3        MR. WITTELS: Objection.
4     A. Of the difference -- if you want to -- you're
5  expressing that as a form -- you're expressing the
6  delta, the difference, right, as a gross margin. That's
7  not exactly how it was calculated.
8        I mean, it was calculated just as there's
9  differences, not any -- you're saying a gross margin on
10 a gross margin calc -- I want to be specific about how
11 you're using the term "gross margin."
12    Q. I didn't think it was tricky. I mean, your
13 report says that you calculated by reference -- by
14 comparing XOOM's margin reports to XOOM's rate setting
15 workbooks; right?
16    A. Right. I was getting to the delta between rates
17 and costs.
18    Q. Okay.
19    A. It's just that it was in the margin setting
20 workbooks.
21    Q. So with respect to Model 1 the relevant
22 consideration was the delta between XOOM's total costs
23 and XOOM's margin?
24        MR. WITTELS: Objection.

**Page 68**

1     A. The -- between total cost and the rate.
2     Q. Okay. Which is the margin?
3        MR. WITTELS: Object.
4     A. The rate is not the margin.
5     Q. No, I know.
6     A. A rate is not a margin.
7     Q. The delta is. The delta is.
8     A. Okay. We can call that a margin, yes.
9     Q. The delta between the total costs --
10    A. Right.
11    Q. -- and the rate is --
12    A. Right.
13    Q. -- the margin; right?
14    A. That -- that -- you can characterize that as a
15 margin.
16    Q. Well, what would you characterize it?
17    A. I would just characterize it as a difference, as
18 a delta.
19    Q. Okay. You're not offering an opinion in this
20 case that under the sales agreement XOOM could not
21 charge more than the regulated utilities rate; right?
22    A. No. I mean, the comparison I made was between
23 supply costs and the rate under this contract.
24    Q. Right. And you're not offering a damage model

**Page 69**

1  that compares XOOM's variable rate charges to what
2  customers would have been charged by the utility during
3  the same time period?
4        MR. WITTELS: Objection.
5     A. No. The damage models as we discussed are the
6  two.
7     Q. Right. And you don't intend to offer an opinion
8  about that?
9     A. No. The only thing we used was a, as a graphical
10 comparison on the relationship between supply costs and
11 the utility rate, as an example. But the two models are
12 the two models.
13    ==Q. Yep. Okay. Are you offering an opinion about==
14 ==what is a reasonable or appropriate margin for an ESCO==
15 ==to charge?==
16    ==A. Well, to build the second model we needed an==
17 ==estimate of a margin. We really didn't have any==
18 ==information that would allow that to be created, since==
19 ==XOOM had, from what we can tell, had never done it that==
20 ==way. They had never tried to calculate a, or they did==
21 ==not present in any way, I can't say that they never==
22 ==tried. They did not present in the rate setting==
23 ==workbooks and other information calculations of any sort==
24 ==like that. So we used the margin from fixed rate==

18 (Pages 66 - 69)

Page 70

1  customers as a proxy of a rate that XOOM itself had
2  used. I can't go further than that because there's no
3  information.
4       MR. MATTHEWS: Can you read my question
5  back, please.
6       (Prior testimony read back.)
7            "Are you offering an opinion
8             about what is a reasonable or
9             appropriate margin for an ESCO
10            to charge?"
11  A. Yeah. Conceptually, yes. Conceptually, yes.
12     Thanks for reading that back.
13  Q. That's okay. And what is the opinion that you're
14  offering conceptually about that?
15  A. Well, I mean, it's obviously related to the
16  contract that we've been discussing, whether it's based
17  on supply costs, that, you know, if the Court were to
18  decide that a margin was allowed, that it can't be an
19  uncapped margin, that's why we made a second calculation
20  using the fixed rate margin as a proxy of what might be
21  an acceptable margin.
22  Q. Are you offering any opinion about what is an
23  acceptable or appropriate, a reasonable margin aside
24  from just using XOOM's fixed rate margin?

Page 71

1  A. We haven't offered that opinion, we don't have
2  any information to do that.
3  Q. Do you intend to?
4  A. If information were to be provided, but that
5  would have to come from XOOM. So I, in the absence of
6  not expecting anymore information to come, no.
7  Q. Well, we've gotten talking past each other again.
8  I'm talking conceptually. You've said that it will be
9  for the Court to decide whether a margin can be charged
10  and if so what's appropriate; right?
11  A. Right.
12  Q. And if we go to trial --
13  A. Uh-huh.
14  Q. -- and you take the witness stand --
15  A. Uh-huh.
16  Q. -- and I'm asking you questions and the judge
17  gets frustrated with my questions and says, "let's cut
18  to the chase. Mr. Adamson, what do you think is an
19  appropriate margin for an ESCO to charge?" What would
20  your answer be?
21       MR. WITTELS: Objection.
22  A. I would say conceptually it's got to be related
23  to the, related to the costs. And in a broad conceptual
24  basis.

Page 72

1  Q. And if he said, "but can you give me a cutoff
2  point? Is there a number that you can assign to that?"
3  Would you be able to give him one?
4       MR. WITTELS: Objection.
5  A. I wouldn't be able to give him a number on the
6  stand because I wouldn't have the, XOOM's internal
7  information, no.
8  Q. Okay. So the margin in your view, --
9  A. Uh-huh.
10  Q. -- the margin that is appropriate for an ESCO to
11  charge conceptually --
12  A. Uh-huh.
13  Q. -- is ESCO specific?
14  A. Well, again, we're talking about relation to a
15  specific contract, so.
16  Q. I'm not.
17  A. You're not.
18       MR. WITTELS: Don't interrupt him.
19  A. I am talking -- sorry. I'm talking about this
20  specific contract. Other ESCOs may have, and I'm sure
21  do, very different contractual forms. And in fact,
22  ESCOs -- even the same ESCO will have lots, may have
23  different pricing, right, under different arrangements.
24  We're talking about variable rate pricing here as

Page 73

1  opposed to fixed rate pricing.
2  Q. Uh-huh.
3  A. Fixed rate pricing, I think we can all agree, the
4  actual outturn margins could be quite different. A lot
5  depends on timing in that case; right? Okay. So I
6  don't know that there is a "single ESCO number" I don't
7  think that's a meaningful concept.
8  Q. Okay. Is there a single ESCO number for variable
9  rates that in your opinion would be a cap on what is an
10  appropriate or reasonable margin?
11  A. I don't have a number in mind because I don't
12  know what the, what would be claimed to be the types of,
13  of costs that, to be recovered in that margin. What I
14  don't -- you know, I don't have a number. What I am
15  offering is conceptually that the margin has to be based
16  on something from reality to be meaningful in the
17  context of this contract, and, you know, can't be
18  arbitrary.
19  Q. Okay.
20  A. But I don't have a number to give you.
21  Q. Okay. And would not be able to create one?
22       MR. WITTELS: Objection.
23  A. Not -- not on the information available right
24  now. I think that would need more inputs than are

19 (Pages 70 - 73)

**Page 82**

1  Q. And they operate in a deregulated competitive
2  market in New York; right?
3  A. Deregulated in some sense. I mean --
4  Q. Right.
5  A. -- retail electricity rates are not completely --
6  they're still subject to regulation.
7  Q. Agreed.
8  A. Right.
9  Q. But -- but a competitive rate is what an ESCO is
10 allowed to charge as opposed to a rate set by a
11 regulator; --
12     MR. WITTELS: Objection.
13 Q. -- right?
14     MR. WITTELS: Objection.
15 A. Well, I think you would need to be precise about
16 the statement. The -- that would depend on the what and
17 when.
18 Q. Okay. But we can agree at least that XOOM is a
19 for profit business operating in a competitive market?
20     MR. WITTELS: Objection.
21 A. XOOM is definitely a for profit business. I
22 mean, it's not subject to perfect competition in an
23 economic sense. Which would be a quite different set of
24 criteria. I think in the, as you're broadly

**Page 83**

1  characterizing it, I agree with you in -- in -- in
2  casual terms.
3  Q. Okay. Why doesn't XOOM get to make any profit
4  under Model 1?
5  A. The question is is whether XOOM gets to charge
6  the rates it agreed to under the contract. That's why I
7  used the example earlier, I can enter into -- I enter
8  into a contract, I sort of live or die by that contract;
9  right?
10    I mean, we've all entered in, probably in our
11 lives entered into contracts for things that ended up
12 costing to fulfill more than, than what we made. I used
13 the example of the building rehabilitation.
14    The real question to me is consistency with the
15 contract. Did they not make money at those rates? I
16 don't know. That's -- they don't report, as far as I've
17 seen, information on a contract-by-contract basis. But
18 the, you know, the question is around consistency with
19 the -- with the -- with the contract they signed here.
20 Q. In your opinion that contract only allows XOOM to
21 charge its supply costs?
22 A. Yeah. I mean, that's what -- that's what we
23 already discussed around the reading of supply costs,
24 and as you said, you know, supply costs it's total

**Page 84**

1  costs, that's what we use for Model 1. That's what
2  XOOM -- that's the data XOOM provided to the Court.
3  Q. Okay. Model 1, based on that calculation, would
4  actually result in XOOM losing money; right?
5  A. Is that out of your hypothesis, or?
6  Q. It's a question.
7  A. I don't know.
8  Q. You don't know?
9  A. The -- I mean, we don't have -- we haven't seen
10 any P & L by contract.
11 Q. Conceptually --
12 A. Uh-huh.
13 Q. -- Model 1 says XOOM can charge no more --
14 A. Uh-huh.
15 Q. -- than its reported supply costs in the rate
16 setting workbooks; right?
17 A. Uh-huh.
18 Q. That's what Model 1 measures; right?
19 A. Yeah, broadly. Yes.
20 Q. So at best --
21 A. Uh-huh.
22 Q. -- Model 1 makes XOOM profit neutral; right?
23 A. If you assume that their actual -- I think under
24 your construction you're saying under your, under your

**Page 85**

1  construction you're saying under the -- under the
2  scenario that their reported total costs was equal to
3  their actual marginal supply costs, broadly, yes, I
4  agree.
5  Q. Okay. In actuality, because as we discussed XOOM
6  and every other ESCO has certain fixed costs in addition
7  to its supply costs, Model 1 would result in XOOM losing
8  money; --
9     MR. WITTELS: Objection.
10 Q. -- right?
11    MR. WITTELS: Objection.
12 A. Losing money on, as a whole or on that specific
13 contract? Just for point of clarification.
14 Q. Under that calculation, on that contract.
15 A. On that contract?
16 Q. Yes.
17 A. Probably, yes. But, you know, businesses have
18 many -- have many, many activities where they don't make
19 a profit on that particular activity. I mean, Google
20 offers me a Gmail account and I'm not paying for it,
21 they have huge fixed costs of implementing that.
22 Q. I'm just -- I want to understand your -- this is
23 your opinion. Right?
24 A. I know my opinion.

22 (Pages 82 - 85)

**Page 86**

1  Q. And so I'm not at this point even arguing with
2  you about it. I just want to understand it.
3  A. Uh-huh.
4  Q. You've said that under Model 1 --
5  A. Right.
6  Q. -- anything above, --
7  A. Uh-huh.
8  Q. -- anything charged by XOOM above the supply
9  costs reported in the rate setting workbook is a damage;
10 right?
11 A. Yes.
12 Q. And that -- under that model --
13 A. Uh-huh.
14 Q. -- for those customers who were charged variable
15 rates by XOOM over the relative time period, XOOM would
16 lose money --
17       MR. WITTELS: Objection.
18 Q. -- for those customers in that contract language?
19       MR. WITTELS: Asked and answered.
20 Objection.
21 A. Possibly. I don't think that's the question in
22 front of us. As I said, I mean, the question is
23 consistency with the contractual language.
24 Q. Right.

**Page 87**

1  A. You said -- as you said yourself, they provided
2  their supply costs. What's the difference with supply
3  costs?
4  Q. I -- I don't know why this is difficult. Like,
5  the calculation isn't even difficult. I'm bad at math
6  and I can do this one. It's anything above the reported
7  supply cost is a damage under Model 1; --
8  A. Yes.
9  Q. -- correct?
10 A. Yes.
11 Q. Even if anything above that reported supply cost
12 included certain fixed costs, that if they weren't
13 reported in the rate setting workbooks it is a damage
14 under Model 1?
15       MR. WITTELS: Objection.
16 A. That is how the calculus -- that's how the
17 calculations go through, because that's how XOOM
18 reported its total costs, yes.
19 Q. And that is because your reading of the contract
20 is that XOOM can charge no more than the reported total
21 costs?
22 A. Since we went through this morning, it depends on
23 how you read supply costs. I read supply costs as, you
24 know, costs directly related to supply. XOOM reported

**Page 88**

1  this information back that we made the calculation on
2  around their costs.
3  Q. Let me see if I can go at it a different way.
4      Model 1 in your opinion accurately measures the
5  damages --
6  A. Uh-huh.
7  Q. -- flowing from what you believe is XOOM's
8  failure to set variable rates consistent with the
9  contract language?
10 A. Yes.
11 Q. And let's see. Paragraph 72 to your report.
12 A. Just give me one second to flip to the page.
13       MR. WITTELS: 72?
14 A. Uh-huh. Okay.
15 Q. Calculates the difference between XOOM's reported
16 supply costs and the rate that the regulated utility
17 charged; correct?
18 A. No. I don't think you said that right.
19 Q. Okay. What -- what does that calculate in
20 paragraph 72?
21 A. Well, the second sentence talks about XOOM's
22 total costs and the thing we just discussed; right?
23       As we -- as I indicate here we also did a, you
24 know, just a kind of a crosscheck calculation to see if

**Page 89**

1  it's in the same, you know, in the same order of
2  magnitude and just crosschecked it again to what XOOM
3  had reported the applicable utility rates to be. You
4  know, they're generally similar. So if you were to take
5  the deltas, not against XOOM's total cost but against
6  the utility rates, then you get 49 million, not 55
7  million.
8  Q. How is that different from what I asked?
9  A. You said, as I remember, this compares the, the
10 total cost to the -- I'm not exactly sure what you said,
11 but I think it had some consistency with that. If you
12 want to read it back.
13 Q. It's okay. The first sentence of 72 --
14 A. Uh-huh.
15 Q. -- calculates the difference between XOOM's
16 reported supply costs --
17 A. Uh-huh.
18 Q. -- and the rate that the utility charged?
19 A. Yes.
20 Q. Okay. And the utility in New York is required to
21 be profit neutral; right?
22 A. Well, you -- the utilities in New York are
23 actually investor owned, most of them are investor owned
24 utilities, so they're not, they are not nonprofit

23 (Pages 86 - 89)

Page 98

  1  A. Well, in a sense, yes, because the, you
  2  know -- well, first off, the fix rate is used as, you
  3  know, a way of coming up with a reasonable margin that,
  4  based on what XOOM itself set rates on. You know, it's
  5  not -- it's based on the information available.
  6     So one question then comes to, you know, are, is
  7  there some reason that, that XOOM would need to charge a
  8  higher rate on fixed rate customers? If so I don't
  9  really see what it is.
 10     MR. WITTELS: Variable.
 11  A. Sorry. On variable rate customers. I am -- we
 12  don't have any information to, to delve into that.
 13  Q. I'm asking conceptually. And it's okay if you
 14  are not offering this opinion. I'm not saying you
 15  should or you shouldn't be. I just want to know in this
 16  case are you going to offer an opinion that it is not
 17  fair for XOOM to seek a higher margin on variable rates
 18  conceptually than it does on fixed rates?
 19  A. In this context, yes. Because there is no XOOM
 20  provided despite all of the information about how those
 21  methods were set of how these margins came up. How
 22  these -- how the variable rate margins were determined
 23  and that's a reasonable proxy, yes.
 24  Q. Are you offering that opinion more broadly, that

Page 99

  1  in all circumstances -- and I'm asking this, to give you
  2  some prospective on why I'm asking, because you've done
  3  it in two cases now that I know of, set the fixed rate
  4  margin as a benchmark.
  5  A. Uh-huh.
  6  Q. So are you going to offer the opinion that in the
  7  ESCO world --
  8  A. Uh-huh.
  9  Q. -- it is not appropriate for an ESCO to seek a
 10  higher margin for variable rates than it does for fixed
 11  rates?
 12     MR. WITTELS: Objection.
 13  A. I mean, to me the rates have to be set for the
 14  contract. ==The -- the use of fixed rates seemed==
 15  ==appropriate for coming up with the reasonable proxy==
 16  given that, you know, the, the risks associated with the
 17  variable rates in general would be similar or probably
 18  lower. If you say that there are other fixed costs it's
 19  hard to see why they are different. We never saw
 20  anything in this case saying, demonstrating why there
 21  would be a difference between the two. If someone could
 22  present, you know, compelling economic evidence that
 23  says, "by God, I can prove to you that the costs of
 24  variable rate is completely different than fixed rate"

Page 100

  1  that might be a thing. But we -- we haven't seen that
  2  here. It was asked, but we haven't seen it.
  3  Q. Who asked?
  4  A. Well, the discovery request asked for costs and
  5  pricing methodologies and stuff.
  6  Q. Paragraph 75. It says -- this is towards the
  7  bottom, I suppose it's the last sentence.
  8     "It appears that XOOM was able to operate and
  9  make a reasonable profit selling fixed rate contracts
 10  with substantially lower margins than variable
 11  contracts, and yet arbitrarily imposed much higher
 12  margins on their variable rate customers?"
 13     Do you see that?
 14  A. Yes.
 15  Q. Where does it appear that XOOM was able to
 16  operate and make a reasonable profit selling fixed rate
 17  contracts with substantially lower margins?
 18  A. Well, the margins you can kind of see in the
 19  table, the average margins over years. As I say, it
 20  appears that they chose to offer those fixed rate
 21  margins over a considerable period of time.
 22  Q. Uh-huh.
 23  A. So they would have had -- XOOM would have had the
 24  opportunity to offer if it was saying, "oh, my God,

Page 101

  1  we're losing tons of money on all of our variable
  2  customers -- I mean, our fixed rate plans that could
  3  have been adjusted."
  4     But we don't -- as I mentioned before we don't
  5  have contract by contract P & Ls, for example.
  6  Q. Right. So I think we're saying the same thing.
  7  Your table 1 reflects gross margin for fixed rate
  8  customers; right?
  9  A. Yes.
 10  Q. Okay.
 11  A. I think so, yes.
 12  Q. But you don't know whether --
 13     VIDEOGRAPHER: I'm sorry. I didn't hear
 14  that. You're hitting the microphone.
 15  A. Oh, I'm sorry.
 16     VIDEOGRAPHER: Bring it up a little higher.
 17  A. How is that? Is that better?
 18     VIDEOGRAPHER: Great. Thank you.
 19  A. Okay. Thank you. Sorry.
 20  ==Q. That's okay. But you don't know if XOOM actually==
 21  ==made a net profit on those same customers?==
 22  ==A. No, we don't have -- we don't have customer==
 23  ==segment level profit and loss data.==
 24  Q. Okay. In the -- circling back to the Richards

26 (Pages 98 - 101)

Page 102

1  case real quick. In that case you were not offering a
2  legal interpretation of what the contract language
3  meant; right?
4      A. No, I would not have offered a legal
5  interpretation.
6      Q. And your interpretation of XOOM's contract
7  language here is similarly constrained. You -- in the
8  sense that you are not offering a legal interpretation
9  here, either?
10         MR. WITTELS: Objection.
11     Q. Right?
12     A. Yeah, I'm not offering a legal opinion, I think
13 as we discussed, yes.
14     Q. Not to any greater degree than you did in the
15 Richards case?
16     A. No. Just not offering a legal opinion.
17     Q. Okay. Look if you would at Exhibit 2, which is
18 the sales agreement.
19     A. Yep.
20     Q. And you directed me to -- we talked about the
21 key, the critical --
22     A. Uh-huh.
23     Q. -- rate setting provision earlier. And then you
24 directed me to a couple of others that you looked at,

Page 103

1  one being the price section.
2      A. Uh-huh.
3      Q. Do you remember that?
4      A. Yes.
5      Q. And then -- I'm not sure where it appears, but
6  you also pointed me to a provision about delivery
7  charges; do you remember that?
8          MR. WITTELS: What -- what's the question
9  here that you're asking him, Matt? I mean, what are you
10 asking?
11     A. Sorry. Can you repeat.
12     Q. So you -- when I asked you earlier about your
13 interpretation of this contract, or your review of
14 it, --
15     A. Uh-huh.
16     Q. -- let's say, you -- you mentioned the rate
17 setting provision that's at the top of the table; yes?
18     A. Uh-huh. Yes.
19     Q. And you mentioned the price section at the bottom
20 of page 1; yes?
21     A. Yes.
22     Q. And then you also mentioned some provision
23 related to delivery charges.
24     A. Well, delivery charges, like, utility delivery

Page 104

1  charges are also discussed at the rate setting --
2      Q. Okay.
3      A. -- thing, just if you read the last sentence. I
4  think what I was pointing to, just to cut the -- was --
5  there were things that came up was, it's under the title
6  thing. And it says, "delivered to a location considered
7  the point of delivery," you know, I was just commenting
8  that point of delivery obviously depends for a customer,
9  depending on what utility serves them in the state.
10     Q. Okay. Got it. Do you see the provision right
11 above that, the agency provision?
12     A. Uh-huh.
13     Q. Do you see the last sentence of that section,
14 "these services are provided on an arm's length basis
15 and market-based compensation is included in the price
16 noted above."
17        Did I read that correctly?
18     A. Yes.
19     Q. What does that sentence mean to you?
20     A. "These services are provided on an arm's length
21 basis and market-based compensation is included in the
22 price noted above." Well, where it says they have
23 energy, they have transportation, those of the LDU, the
24 transmission facilities and LDU have compensation that's

Page 105

1  market based.
2      Q. Okay. Do -- do you have any opinion about what
3  the price noted above refers to?
4      A. In the -- in the price noted above and the price
5  related to the arranging for and contracting
6  transportation, that's one possibility. No, I don't
7  have an express opinion about that.
8      Q. Okay. Fair enough. So this agency section in
9  that sentence specifically are not something that you
10 considered in connection with your evaluation of whether
11 or not XOOM set its rates consistent with the terms of
12 the sales agreement?
13     A. No. This seems to be referencing to
14 you -- they're specifically allowed to buy the energy
15 and arrange it through the transmission and LDU systems.
16     Q. Okay. So it was --
17     A. Which is not -- which is not, I don't think, very
18 controversial.
19     Q. So that -- that market-based compensation was not
20 factored into your damage calculations either; right?
21     A. No, because I focused on supply costs. This I
22 kind of take as being, these services are provided on an
23 arm's length basis, marketplace compensation.
24     Q. Okay. Let's talk about Mr. Coleman's correlation

**Page 138**

1 their retail business.
2 Q. Okay. Well, I guess --
3 A. For example, a bunch of the Texas companies have
4 retail supply businesses. We did a little bit on that,
5 but not a major thing. But a bunch of the Texas
6 companies had retail supply businesses that also had
7 substantial other businesses.
8 Q. I think I understand what you're saying. And you
9 didn't work for the retail side of their businesses, you
10 worked for the other side of their businesses?
11 A. Or sometimes we would be hired on some kind of
12 corporate strategy type engagement, which might be
13 pretty broad.
14 Q. Got it. Okay. I thank you for your time and
15 your patience with me.
16    MR. MATTHEWS: I'll pass the witness.
17 A. Thank you.
18 Q. Yes, sir.
19
20           EXAMINATION
21
22 BY MR. WITTELS:
23 Q. Mr. Adamson, I just really have one question for
24 you. You were asked by counsel for XOOM about whether

**Page 139**

1 the company was able to make any profits on its fixed
2 rate customers; do you remember that question?
3 A. Yeah. Not in exact wording, but I remember the
4 question.
5 Q. Yeah. And did you ask me to, whether you could
6 go back and review your report when we had a break?
7 A. Yeah, well -- yes, we were discussing the report.
8 Q. And did you reread paragraph 57?
9 A. Yes.
10 Q. And does that answer the question of whether XOOM
11 made money and was profitable on its fixed rate
12 customers?
13    MR. MATTHEWS: Objection. Leading.
14 A. Well, I just -- it just reminded me there was
15 a -- I had said that there was not a specific P&L, this
16 was a reference in the report to deposition testimony
17 from a XOOM witness about the profitability of this.
18 Q. And what did your report find and state?
19 A. I don't remember exactly how he worded it. I
20 think there had been a, in the deposition there was a
21 question about, it was around, I don't have the
22 transcript in front of me, of course, of the deposition,
23 but it was something around the line of were -- were a
24 fixed rate -- were fixed rate customers profitable for

**Page 140**

1 XOOM or some broad question.
2 Q. And the answer was?
3 A. I believe he said yes, they were, they were both
4 profitable. Both fixed rate and variable rate were
5 profitable.
6 Q. Okay. I have no further questions at this time.
7 Thanks.
8    MR. MATTHEWS: Thanks very much.
9 A. Thank you.
10    VIDEOGRAPHER: The time is 2:39, we are off
11 the record.
12    COURT REPORTER: And, Mr. Matthews, your
13 order?
14    MR. MATTHEWS: My order is an expedited
15 transcript, just, I don't need any print copies.
16 Electronic only. PDF exhibits.
17    COURT REPORTER: Expedite by Friday?
18    MR. MATTHEWS: Yes.
19    (Whereupon, the deposition concluded at
20 approximately 2:39 p.m.)

**Page 141**

            CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss.

   I, Laurie Langer, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

   I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

   In witness whereof, I have hereunto set my hand and seal this 11th day of November, 2022.

                NOTARY PUBLIC
                Commission Expires
                7/27/2023

```
 1        DEPOSITION ERRATA SHEET
 2
 3   Our Assignment No: 5544017
 4   Case Caption: Mirkin vs. XOOM Energy
 5
 6     DECLARATION UNDER PENALTY OF PERJURY
 7   I declare under penalty of perjury that I have
 8   read the entire transcript of my Deposition taken in the
 9   captioned matter or the same has been read to me, and
10   the same is true and accurate, save and except for
11   changes and/or corrections, if any, as indicated by me
12   on the DEPOSITION ERRATA SHEET hereof, with the
13   understanding that I offer these changes as if still
14   under oath.
15      Signed on the_____day of _____2022
16
17   _____
18     SEABRON ADAMSON
19
20
21
22
23
24   Job No. HOU5544017
                                              Page 142
```

```
 1   Steven L. Wittels, Esq.
 2   slw@wittelslaw.com
 3         November 11, 2022
 4   RE:  Mirkin, Susanna Et. Al. v. XOOM Energy, LLC And XOOM
     Energy New York, LLC
 5    11/8/2022, Seabron Adamson (#5544017)
 6    The above-referenced transcript is available for
 7   review.
 8    Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19   If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25
                                              Page 144
```

```
 1        DEPOSITION ERRATA SHEET
     Job No. HOU5544017
 2   Page No.____ Line No. ____ Change to:_____
 3   _____
 4   Reason for change: _____
 5   Page No.____ Line No. ____ Change to:_____
 6   _____
 7   Reason for change: _____
 8   Page No.____ Line No. ____ Change to:_____
 9   _____
10   Reason for change: _____
11   Page No.____ Line No. ____ Change to:_____
12   _____
13   Reason for change: _____
14   Page No.____ Line No. ____ Change to:_____
15   _____
16   Reason for change: _____
17   Page No.____ Line No. ____ Change to:_____
18   _____
19   Reason for change: _____
20   Page No.____ Line No. ____ Change to:_____
21   _____
22   Reason for change: _____
23   SIGNATURE:_____DATE:_____
24     SEABRON ADAMSON
                                              Page 143
```