# MDM Declaration Exhibit A-17

```
 1                                        Volume I
                                          Pages 1 to 102
 2                                        Exhibits None
 3              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 4
        - - - - - - - - - - - - - - - - -x
 5                                        :
        SUSANNA MIRKIN and BORIS          :
 6      MIRKIN, Individually and on       :
        Behalf of All Others              :
 7      Similarly Situated,               :  Civil Action
                  Plaintiffs,             :  No. 18 Civ. 2949
 8                                        :  (ARR)(RER)
                  vs.                     :
 9                                        :
        XOOM ENERGY, LLC; and XOOM        :
10      ENERGY NEW YORK, LLC,             :
                  Defendants.             :
11      - - - - - - - - - - - - - - - - -x
12              VIDEOTAPED DEPOSITION OF DERYA ERYILMAZ,
        Ph.D., a witness called by the Defendant, taken
13      pursuant to the Federal Rules of Civil Procedure,
        before Alexander K. Loos, Registered Diplomate
14      Reporter and Notary Public in and for the
        Commonwealth of Massachusetts, at the Offices of
15      Veritext Legal Solutions, 101 Arch Street, Suite
        650, Boston, Massachusetts, on Tuesday, November 15,
16      2022, commencing at 10:25 a.m.
17      PRESENT:
18          Wittels McInturff Palikovic
                (By Steven L. Wittels, Esq.; Steven D.
19              Cohen, Esq. (Via videoconference); and
                Ethan D. Roman, Esq. (Via videoconference))
20              E-mail:  Slw@wittelslaw.com
                         Sdc@wittelslaw.com
21                       Edr@wittelslaw.com
                18 Half Mile Road
22              Armonk, NY 10504
23              914.775.8862
24              for the Plaintiffs.

                                                     Page 1
```

```
 1    PRESENT (Continued):
 2
 3       McDowell Hetherington, LLP
 4          (By Michael D. Matthews, Jr., Esq.)
 5          E-mail: Matt.matthews@mhllp.com
 6          1001 Fannin Street
 7          Suite 2700
 8          Houston, TX 77002
 9          713.337.5580
10          for the Defendants.
11
12    ALSO PRESENT: David Coleman
13              Shawn Budd, Videographer
14
15               * * * * *
```

Page 2

```
 1              I N D E X
 2
     WITNESS         DIRECT  CROSS  REDIRECT  RECROSS
 3
 4
 5   DERYA ERYILMAZ,
 6   Ph.D.
 7
 8    BY MR. MATTHEWS    5       87
 9                              99
10    BY MR. WITTELS    81      98
11
12
13
14
15           * * * *
16
17           E X H I B I T S
18
19   NO.      DESCRIPTION         PAGE
20
21        (None)
22
23
24           * * * *
```

Page 3

```
 1           P R O C E E D I N G S
 2        THE VIDEOGRAPHER: Okay. We are on the
 3   record. This is the videographer speaking, Shawn
 4   Budd, with Veritext Legal Solutions.
 5        Today's date is November 15th, 2022, and
 6   the time is 9:25 a.m. We are here in Boston,
 7   Massachusetts to take the video deposition of Derya
 8   Eryilmaz, Ph.D., in the matter of Susan Mirkin, et
 9   al. vs. XOOM Energy, LLC, and XOOM Energy New York,
10   LLC.
11        Would counsel please introduce themselves
12   for the record.
13        MR. WITTELS: Steven Wittels from Wittels,
14   McInturff & Palikovic for plaintiffs and the
15   proposed class.
16        MR. ROMAN: Ethan Roman, Wittels McInturff
17   Palikovic for plaintiffs and the proposed class.
18        MR. COHEN: Steven Cohen, Wittels McInturff
19   Palikovic, for plaintiffs and the proposed class.
20        MR. MATTHEWS: This is Matt Matthews with
21   McDowell Hetherington for XOOM Energy, the
22   defendant.
23        Also with me today is XOOM's designated
24   testifying expert, David Coleman. XOOM's in-house
```

Page 4

```
 1   counsel, Christina Diller, may join us via Zoom at
 2   some point but will not be speaking.
 3        THE VIDEOGRAPHER: Okay. And would the
 4   court reporter please swear in the witness.
 5            DERYA ERYILMAZ, Ph.D.
 6   a witness called for examination by the Defendants,
 7   having been satisfactorily identified by the
 8   production of her driver's license and being first
 9   duly sworn by the Notary Public, was examined and
10   testified as follows:
11           DIRECT EXAMINATION
12     BY MR. MATTHEWS:
13     Q. Good morning, Dr. Eryilmaz. Thank you for
14   being here today.
15     A. Good morning.
16     Q. Before we dive into questions about the
17   case, I'll go over some basic ground rules and get a
18   little bit of information about your background.
19     A. Sure.
20     Q. First of all, have you been deposed before?
21     A. No.
22     Q. First time?
23     A. First time.
24     Q. Okay. Great.
```

Page 5

2 (Pages 2 - 5)

**Page 14**

1  Q. I see.
2     So in model one, when you are referring to
3  an "overcharge," you are referring to anything that
4  XOOM charged over its reported supply costs from the
5  rate-setting workbooks?
6  A. And some other data sets. But yes, overall
7  that sounds reasonable.
8  Q. What other data sets?
9  A. We relied on, I think, three sets of data,
10 primarily -- I would say four sets of data to be
11 more accurate -- based on the data produced in the
12 discovery requests.
13    So rate-setting workbooks were one of the
14 set of data. The other one was interval data where
15 it had most of the -- it was more interval meter
16 data where it presented the usage information by
17 these XOOM customers, and -- and then we have
18 received electric and gas separately, so I guess
19 that's where the third and the fourth. And we also
20 looked at the margin reports that XOOM produced when
21 they were setting their rates.
22    So those were the four forms of data sets
23 that we received, and I -- I have compiled all of
24 them in one single data set.

**Page 15**

1  Q. Uh-huh.
2  A. There were more than a thousand files --
3  Q. Uh-huh.
4  A. -- and I've compiled into one data set to
5  be able to conduct the methodologies that we
6  describe in the report.
7  Q. Right.
8     So I understand what you're saying about
9  the sources of the information and the way in which
10 you calculated things under model one.
11    But just to be sure we're saying the same
12 thing --
13 A. Sure.
14 Q. -- with respect to what you've referred to
15 as an "overcharge," that is the difference between
16 the rate XOOM charged and the supply costs that were
17 reported in its rate-setting workbooks, correct?
18    MR. WITTELS: Objection to form.
19    But you can answer.
20    THE WITNESS: I guess -- let me redefine
21 what the data has and why we took the difference.
22    So what this sales agreement says, it's
23 "based on XOOM's actual and estimated supply costs."
24 And that's what we request as data to be able to

**Page 16**

1  understand whether, you know, XOOM's charged rates
2  are complying with this.
3     And what we found, that there was -- the
4  rates were higher than the actual and estimated
5  supply costs. So that discrepancy represented as
6  overcharge, or damages.
7  BY MR. MATTHEWS:
8  Q. Is what I'm saying different than that?
9     MR. WITTELS: Objection to the form.
10    You can answer.
11    THE WITNESS: I guess it's close. What
12 you're describing is close. It's just -- maybe you
13 can rephrase and I can reaffirm.
14    I don't remember how did you define it.
15 BY MR. MATTHEWS:
16 Q. Sure.
17    I understood that you looked at usage as
18 well --
19 A. Yeah, uh-huh.
20 Q. -- but when you refer to the
21 "overcharge" --
22 A. Yeah.
23 Q. -- you are describing the difference
24 between the supply costs reported in the

**Page 17**

1  rate-setting workbooks and the rates that XOOM
2  actually charged --
3  A. That's correct.
4  Q. -- correct?
5  A. That sounds correct, yes.
6     MR. WITTELS: Objection.
7     You can answer.
8     THE WITNESS: One thing that I would say,
9  the -- I guess I want to add that the actual and
10 estimated supply cost information did not only
11 coming from the rate-setting workbooks. There were
12 multiple other data sources that we looked at, so
13 that's what I'm saying.
14 BY MR. MATTHEWS:
15 Q. That's what I was getting at.
16    ==What are the other data sources from which==
17 ==you pulled XOOM's actual and estimated supply costs?==
18 A. ==The interval data, as I mentioned, that had==
19 ==that. And then there were, you know, some summary==
20 ==data sets that XOOM produced.==
21    ==So I guess, to sum up, all the data came==
22 ==from XOOM. We didn't really add anything outside of==
23 ==XOOM's produced discovery.==
24 Q. Uh-huh.

Page 18

 1   A.   But the data came in multiple forms.
 2       So all I did was compile all the different
 3   sets of data and put together that time series
 4   between 2013 and 2020, '21, including rates and the
 5   costs, and I took the difference.  And that's the
 6   overcharge --
 7   Q.   Uh-huh.
 8   A.   -- that I've calculated.
 9   Q.   The interval data that you're mentioning is
10   just data about usage for electricity and natural
11   gas, right?
12   A.   There were other information -- that data
13   set had included other information like meter IDs
14   and, you know, the ZIP codes and the programs that
15   the customers are involved in.  But primarily the
16   usage information that we gathered from that and
17   matched it to the rate-setting workbook information,
18   too.
19   Q.   Yes.
20       But the supply cost information that you
21   used in your data calculations came only from the
22   rate-setting workbooks, correct?
23   A.   There was a summary spreadsheet produced
24   that had, like, a complete information.  We used

Page 19

 1   some of the data to gather that, and then some of
 2   from the rate-sitting workbooks, because it came in
 3   pieces, as I mentioned.  So it was not, like, a
 4   complete data set that was produced in discovery,
 5   like handed to us as a complete data set.  There
 6   were more than a thousand spreadsheets, and we dig
 7   into each one of them and compiled them into a
 8   single spreadsheet.
 9       So, I mean, I cannot tell you which Bates
10   number would be which at this moment because there
11   were a thousand data sets.
12   Q.   Sure.  And I'm not asking for that.
13   A.   Yeah.
14   Q.   And I'm not suggesting that you did
15   anything wrong.  I just want to know the source of
16   the information from which you took what you are
17   referring to as the actual and estimated supply cost
18   information.
19   A.   Source was XOOM.
20   Q.   And more specifically in terms of
21   documents, the source was the rate-setting workbooks
22   that were produced in multiple versions?
23   A.   I guess, yeah.  I guess -- let me clarify.
24       Rate-setting workbooks was one of the

Page 20

 1   primary data sets, but there were other data sets
 2   that we had to go through and match the information.
 3   Q.   For supply costs?
 4   A.   Yes.
 5   Q.   What are the other documents?
 6   A.   I mean, I -- the other document is the
 7   interval data and that summary data set that they
 8   provided, as we requested from them, the -- like a
 9   chunk of data that was summarized in one
10   spreadsheet.
11   Q.   And the summary included supply cost
12   information?
13   A.   Yes.
14   Q.   Yes?
15       But the interval data did not include
16   supply cost information, correct?
17       MR. WITTELS:  Objection.
18       THE WITNESS:  The -- the -- so I don't have
19   the data in front of me, but the interval data
20   included the rate that was charged, not -- the final
21   rate that was charged, not the supply cost, as far
22   as I remember.
23   BY MR. MATTHEWS:
24   Q.   Understood.

Page 21

 1       So in model one, what you are referring to
 2   as the "overcharge" is anything that XOOM charged
 3   over and above its reported supply costs that were
 4   included in the rate-setting workbooks?
 5   A.  Yes.  I would say.
 6   Q.  Okay.  How about model two?  How does model
 7   two work?
 8   A.  Model two is -- the assumptions are a
 9   little bit different there.  We assumed, in case --
10   you know, it doesn't say in the contract, but
11   assumed this court, there is a margin appropriate
12   for -- for adding to the -- to the cost.  Then we
13   calculated an alternative way.  If there was a
14   margin allowed, then we had their margin-setting
15   workbooks, and so we calculated their margin
16   percentages and they were given for fixed- and
17   variable-rate customers.
18       So what we realized in that data set,
19   variable-rate customers had substantially higher
20   margin rate than the fixed-rate customers.  So we
21   basically said, if XOOM -- I mean the difference,
22   the overcharge as defined is the difference between
23   the total -- the rates and the total cost plus the
24   fixed-rate customers' margins.  That's how we

```
 1    Q.  Why did you leave full-time employment at
 2  CRA?
 3    A.  I took a new job.  Recently it's -- I'm in
 4  transition to it right now.  As you know, in
 5  litigation, you can't drop all the cases that you
 6  have immediately.  So this is one of the cases that
 7  were ongoing.  So I'm in transition to a new job.
 8    Q.  Right.  And congratulations.
 9    A.  Thank you.
10    Q.  Why did you decide to change jobs?
11    A.  I guess the new opportunity seems to be
12  that I will be still, you know, in the energy
13  industry and will be leading a big corporation's
14  decarbonization portfolio.  So that seemed to be an
15  exciting opportunity.  That's why.
16    Q.  And that's with Amazon?
17    A.  Yes.  Yes, that's correct.
18    Q.  And what will your job be there?
19    A.  I am leading their -- again, I mentioned
20  decarbonization portfolio of their supply chain.  So
21  I'll be working with their internal and external
22  suppliers to help them invest in renewable energy.
23    Q.  And what does that mean on a more basic
24  level?
                                                Page 30
```

```
 1    A.  I will be managing their renewable energy
 2  programs, I guess, yeah.  And then help the company
 3  to have more clean production and more clean
 4  energy -- purchase more clean energy, invest in
 5  clean energy.  So that will be helping them
 6  strategize that.
 7    Q.  I see.
 8        So sort of two sides of it:  One is the
 9  purchasing energy from --
10    A.  Market.
11    Q.  -- more clean sources?
12    A.  Right.
13    Q.  Right?  Green energy, whether wind or
14  solar?
15    A.  Yeah.  Uh-huh.
16    Q.  And then, on the other side, making
17  investments in renewable companies?
18    A.  Right.  Yeah.
19        Virtual power plants or, you know, maybe
20  Amazon has, like, their on-site solar portfolio, so
21  I will help them to sort of -- where are the best
22  places in the world to invest in these kinds of
23  things.  So that will be it.
24    Q.  Understood.
                                                Page 31
```

```
 1        Okay.  Is the -- since you left CRA, is the
 2  rate that CRA is paid for your time in this case the
 3  same as what is stated in the CRA report?
 4    A.  Yeah.
 5    Q.  That financial arrangement between CRA and
 6  the plaintiffs has not changed?
 7    A.  Well, so I don't fully remember my rate
 8  when I was at CRA.  But potentially there's a
 9  contractor rate structure that -- that may have
10  adjusted, but I guess I don't -- my short answer is
11  I'm not sure.
12    Q.  Okay.  What is your financial arrangement
13  under the contractor agreement?
14    A.  I get paid per hourly.
15    Q.  And what do you get paid per hour?
16    A.  I believe it was listed in the report.  It
17  was 450, I believe.
18    Q.  Okay.
19    A.  Per hour, yeah.
20        But, yeah, the report should have the most
21  accurate number.  I don't have it in front of me.
22    Q.  Okay.  And you've agreed to continue
23  serving as a designated expert in this case,
24  correct?
                                                Page 32
```

```
 1    A.  Correct.
 2    Q.  And what is the specialized subject matter
 3  on which you personally have been asked to opine?
 4    A.  On the quantitative analysis section.
 5        So I have been in the energy industry for
 6  more than ten years now, and I have a Ph.D. in
 7  applied economics which requires me to do a lot of
 8  quantitative analysis in the energy space, so I'm
 9  familiar with energy data, and I teach at
10  Northeastern data analytics for energy economists.
11  So that, I believe, makes me qualified to do the --
12  the quantitative analysis, so that's the part that I
13  will -- that I provided my opinion.
14    Q.  Okay.  Data analytics and quantitative
15  analysis; is that a fair summary of it?
16    A.  Yeah.  Of energy industry, I would say,
17  specifically, because that's what my expertise is.
18    Q.  Okay.  Are you offering any opinion about
19  how the pricing terms of the sales agreement should
20  be interpreted?
21    A.  Well, I guess -- if you're asking me to --
22  that I'm giving a legal opinion?  Or is that how
23  my -- how I interpret the contract?  I guess can you
24  rephrase the question?  I'm not following.
                                                Page 33
```

```
 1    Q.  Okay.  Are you offering any personal
 2   interpretation of how the pricing terms of the sales
 3   agreement -- let me rephrase it.
 4         You're not offering a legal interpretation
 5   of the sales agreement, right?
 6    A.  No.
 7    Q.  Okay.  Are you offering any opinion about
 8   how the pricing terms of the sales agreement should
 9   be interpreted?
10    A.  I guess as an energy economist, this -- you
11   know, there are terms in the -- in this contract
12   that only people who work a long time in the energy
13   industry -- like actual and estimated supply costs,
14   for example, is an industry-specific term.
15         So I am reading this as the contract says.
16   You know, based on actual and estimated supply
17   costs.
18         So my interpretation of that is the rates
19   should be according to this language.  And I guess I
20   know what it means to be looking at the supply cost,
21   and that's what I'm understanding.
22    Q.  Okay.  Are you offering an opinion about
23   what "based on" XOOM's actual and estimated supply
24   costs means?
                                                   Page 34
```

```
 1    A.  I mean, "based on" means -- "based on
 2   actual and estimated supply costs" means very -- I
 3   mean to me, very close to -- the rate should be very
 4   close to XOOM's actual and estimated supply costs.
 5    Q.  Okay.  And what is that opinion based on?
 6    A.  That is based on the contract language that
 7   has, you know, "actual and estimated supply costs."
 8         And "supply costs" are very specific
 9   technical terms in the industry.  So by reading
10   this, the XOOM's rates should be very close to the
11   supply costs of -- supply costs that XOOM
12   calculates.
13    Q.  So to you, "based on" means very close to?
14    A.  Very close to.  At the -- yeah.  At the
15   minimum, very close to, yeah.
16    Q.  Does it -- it doesn't mean equal to?
17    A.  Very close to.  It may mean equal to, or
18   virtually -- virtually equal.
19    Q.  What does "virtually equal" mean?
20    A.  Very close to, I would say.  It should be
21   very close to XOOM's actual and estimated supply
22   costs.
23    Q.  Do you think this is a cost pass-through
24   contract?
                                                   Page 35
```

```
 1         MR. WITTELS:  Objection.
 2         THE WITNESS:  What do you mean when you say
 3   "cost pass-through"?
 4   BY MR. MATTHEWS:
 5    Q.  Do you believe that XOOM can seek to
 6   recover any margin under this contract?
 7    A.  Under this contract, no.  Because it
 8   doesn't say that.  As far as I can read, it doesn't
 9   say that it can recover any margin.  It says it
10   should be based on actual and estimated supply cost.
11    Q.  And in your opinion, "based on actual and
12   estimated supply costs" means equal to actual and
13   estimated supply costs?
14    A.  If it's not exactly equal to, it should be
15   very close to, as I mentioned.  Very, very close to.
16    Q.  And what does "very close to" mean?
17    A.  Well, so "very close to" means that -- that
18   the -- there's no big discrepancy between the cost
19   and the final rate that's charged.  So it should be
20   very, very similar.
21    Q.  Uh-huh.
22         And what is a "big discrepancy"?
23    A.  That cannot be explained by the contract or
24   by any economic justification that should be very
                                                   Page 36
```

```
 1   big.
 2    Q.  Right.  And in your opinion --
 3    A.  Uh-huh.
 4    Q.  -- what is a "big discrepancy" between
 5   actually and estimated supply costs and rate?
 6    A.  I mean, if, by looking at XOOM data, the
 7   rates that were charged were extreme -- were about
 8   50 percent higher than the costs that were charged,
 9   and that suggested that the XOOM was overcharging
10   its customers their supply costs.  So that -- that
11   was a good -- by looking at the data, that was a
12   good indication of that was not based on XOOM's
13   actual and estimated supply costs.
14         MR. MATTHEWS:  I'm respectfully going to
15   object as nonresponsive.
16    Q.  I'm asking a different question.
17    A.  Okay.
18    Q.  You're offering an opinion that "based on
19   actual and estimated supply costs" means "very close
20   to," which you have also said means "not a big
21   discrepancy from."
22    A.  Uh-huh.  Sure.
23    Q.  Right?
24         MR. WITTELS:  Objection.  Objection.
                                                   Page 37
```

```
 1        THE REPORTER: It was what?
 2        THE WITNESS: It was Loehde. I don't
 3   remember the witness' last name. Sorry.
 4        BY MR. MATTHEWS:
 5        Q. But you have some recollection -- I'm not
 6   asking you to identify the witness, but you have
 7   some recollection of XOOM witnesses testifying to
 8   the fact that XOOM has fixed costs that are not
 9   included in the supply costs reported in the
10   rate-setting workbooks, right?
11        A. I remember, like, a witness defining a
12   fixed cost; but I don't really remember, like,
13   whether it was included in the supply costs or not
14   at this moment. I mean, if it's in front of me, I
15   can take a look at it, but I don't remember the
16   specific wording.
17        Q. When you prepared the calculation for model
18   one, did you take into account XOOM's fixed costs?
19        A. No. I actually just took the supply cost
20   related information and calculated the actual and
21   estimated supply costs as produced by XOOM.
22        Q. So if XOOM did not include fixed costs in
23   the supply costs reported in the rate-setting
24   workbook --
                                                  Page 66
```

```
 1        A. Uh-huh.
 2        Q. -- then those fixed costs would be included
 3   in what you have characterized as an "overcharge"
 4   under model one, right?
 5        MR. WITTELS: Objection.
 6        THE WITNESS: As I mentioned, those fixed
 7   costs are not considered as part of supply costs;
 8   therefore, they are not included in the model.
 9        BY MR. MATTHEWS:
10        Q. They're not --
11        A. Included my calculation. I only considered
12   supply -- the components of the supply cost.
13        Q. They would not be included in the supply
14   cost portion of your calculation, correct?
15        MR. WITTELS: Objection.
16        THE WITNESS: Again, I only considered the
17   supply cost components. Because, you know, we are
18   interested in looking at the supply costs and what
19   the rate has been charged by XOOM.
20        BY MR. MATTHEWS:
21        Q. Yeah.
22        A. So anything beyond supply cost is not
23   included in the supply cost column.
24        Q. Okay. How is that different from what I
                                                  Page 67
```

```
 1   said?
 2        MR. WITTELS: Objection.
 3        THE WITNESS: I guess I thought you were
 4   saying that supply costs are -- you know, may -- you
 5   know, I don't know.
 6        I guess the way I understand it from what
 7   you've described is have I considered supply cost
 8   plus the other costs? But I did not. I just took
 9   the components of the supply cost, and I added them
10   up -- I mean they were all, like, in a total supply
11   column -- and calculated the excess -- excess
12   charges.
13        Q. Understood.
14        So if fixed costs -- if XOOM has fixed
15   costs in addition to the reported supply costs --
16        A. Uh-huh.
17        Q. -- then the only place that those fixed
18   costs appear in your calculation under model one
19   would be in the overcharge itself?
20        MR. WITTELS: Objection.
21        BY MR. MATTHEWS:
22        Q. Correct?
23        MR. WITTELS: Objection.
24        THE WITNESS: I mean, I cannot tell from
                                                  Page 68
```

```
 1   just looking at the data what that excess charge is
 2   included. They do not define -- XOOM did not define
 3   where that excess charge came from.
 4        There was no calculation providing that,
 5   that included the fixed cost. They -- there was no
 6   calculation that showed that rate included fixed
 7   costs as I reviewed the data. The data came in as
 8   rate versus the total cost of the components of the
 9   supply cost, or the total cost, and then the
10   difference. I cannot tell what is included in the
11   discrepancy. It was not described in the data.
12        BY MR. MATTHEWS:
13        Q. Okay. Model two.
14        A. Uh-huh.
15        Q. Model two, as we covered earlier, is
16   essentially the same as model one, except that it
17   allows XOOM to recover the same gross margin on
18   variable-rate customers that XOOM's documents
19   reported it recovered for fixed-rate customers,
20   right?
21        A. Right.
22        Again, we -- exactly. The method one plus,
23   if there was a margin -- you know, there's -- it
24   doesn't say in the contract that there should be a
                                                  Page 69
```

18 (Pages 66 - 69)

**Page 70**

1  margin.
2       But if -- suppose there is a margin.  We
3  basically provided that as an example to show, you
4  know, what would be the charge look like.
5       And looking at the margin reports, at least
6  the margin that should be charged should be equal to
7  the fixed-rate customers, which, you know, XOOM has
8  made -- you know, has charged its fixed-rate
9  customers, too, a margin.  So there was that rate
10 taken to calculate the overcharges.
11    Q.  And the purpose of -- of illustrating that
12 second model was in case the court or the jury
13 decides that some recovery of margin is
14 appropriate --
15    A.  Yes.
16    Q.  -- right?
17       But you don't believe that that reading of
18 the contract is appropriate, right?
19    A.  No.  By the read of the contract, it didn't
20 specify margin, this contract, so -- and that's why
21 I don't believe, yes.
22    Q.  So, in your view, if a contract doesn't
23 specify that the company will recover margin, then
24 the company is not allowed to recover margin?

**Page 71**

1       MR. WITTELS:  Objection.
2       THE WITNESS:  I mean, this is -- I mean,
3  I'm not a contract expert, but its contract -- it
4  says -- it should be charging what it says in the
5  contract.  As -- I mean, you know, if -- what
6  happens, for example, if a customer doesn't, you
7  know, oblige with their contract?  There's
8  implications for that, too.  So if it doesn't say in
9  the contract, yes, that shouldn't be charged.
10    BY MR. MATTHEWS:
11    Q.  If it doesn't specify a margin, it
12 shouldn't be charged?
13       MR. WITTELS:  Objection.
14       THE WITNESS:  Yes.
15    BY MR. MATTHEWS:
16    Q.  And that's -- to be clear, that's your view
17 more broadly?  I'm not just asking about this
18 specific XOOM contract --
19    A.  Uh-huh.
20    Q.  -- correct?
21       MR. WITTELS:  Objection.
22       THE WITNESS:  I guess -- what's the
23 question?
24

**Page 72**

1  BY MR. MATTHEWS:
2     Q.  If -- if an ESCO does not specify in a
3  variable-rate contract that the rate will include
4  margin, then, in your view, that ESCO cannot seek to
5  recover margin --
6        MR. WITTELS:  Objection.
7  BY MR. MATTHEWS:
8     Q.  -- on its variable rate?
9        MR. WITTELS:  She didn't say that.
10 Objection.
11       THE WITNESS:  Is that a hypothetical
12 example that -- are we just talking about X ESCO
13 here, or --
14 BY MR. MATTHEWS:
15    Q.  Yes.
16    A.  Is that a hypothetical example?
17    Q.  Yes.
18    A.  If -- again, I mean, I am looking at this
19 contract.  If another X ESCO was giving me a
20 contract that doesn't list the margin, yes, then I
21 would be looking at the specifics that they have put
22 in the contract to determine their rates.
23    Q.  Understood.  Thank you.
24       In connection with this case, you have not

**Page 73**

1  done any analysis of how XOOM's variable rates
2  compared to the utilities' rates, correct?
3     A.  We -- I think Figure 1 in our report does
4  present a -- like an illustration or -- like
5  presents the data that shows the total cost versus
6  the utility rate.
7     Q.  Shows how the two moved over the same
8  period of time?
9     A.  Exactly.
10    Q.  Okay.  But you're not offering an opinion
11 in this case that under the sales agreement, that
12 XOOM was not permitted to charge more than the
13 utility, right?
14       MR. WITTELS:  Objection.
15       THE WITNESS:  No.  I mean, XOOM -- I mean
16 our basis was the actual and estimated supply cost,
17 whatever it should be charging.
18 BY MR. MATTHEWS:
19    Q.  And the utility's rate is irrelevant to
20 that consideration, right?
21       MR. WITTELS:  Objection.
22       THE WITNESS:  It is irrelevant for this
23 contract.  But we showed -- you know, our figure
24 presents, you know, whether the total cost and

Case 1:18-cv-02949-ARR-RER   Document 145-19   Filed 05/05/23   Page 10 of 11 PageID #: 4295

```
 1            RECROSS-EXAMINATION
 2     BY MR. WITTELS:
 3        Q.  As part of its analysis, the NYPSC -- and
 4     I'm reading from your report -- said that it had
 5     extensive -- an extensive set of hearings and
 6     investigation, right?  That's what you wrote on
 7     Paragraph 34?
 8        A.  Uh-huh.  Yes.
 9        Q.  Okay.  You didn't read all the hearings and
10     detail -- strike that.
11            You didn't review all of the transcripts of
12     the hearings, correct?
13        A.  No.
14        Q.  So they may well have looked at contracts
15     to analyze whether the PSC thought they were -- the
16     ESCOs were overcharging customers, correct?
17            MR. MATTHEWS:  Objection, leading.
18            THE WITNESS:  That is possible, yes.  I did
19     not read all of the documents that's produced in the
20     proceeding to come up with this order.
21            That's possible that there are transcripts
22     that lists and discusses that contract review and
23     opinions about that.
24            MR. WITTELS:  Okay.  I have no further
                                                    Page 98
```

```
 1     questions.
 2          FURTHER REDIRECT EXAMINATION
 3     BY MR. MATTHEWS:
 4        Q.  Dr. Eryilmaz, did you review any hearing
 5     transcripts from the PSC proceedings?
 6        A.  No.  I reviewed the order in detail.
 7            MR. MATTHEWS:  Got it.
 8            Thank you very much.
 9            MR. WITTELS:  Okay.  Thank you.
10            THE VIDEOGRAPHER:  The time is 12:52.
11     We're off the record.
12            THE REPORTER:  Copy, Mr. Wittels?
13            MR. WITTELS:  Put on the record read and
14     sign, please.
15            THE REPORTER:  And a copy?  You're
16     ordering a copy?
17            MR. WITTELS:  No.  Just read and sign.
18     That's how it works.
19            THE REPORTER:  Off the record?
20            MR. WITTELS:  Off the record.
21            (Whereupon, the deposition was
22             concluded at 12:52 p.m.)
23
24
                                                    Page 99
```

```
 1               C E R T I F I C A T E
 2        I, DERYA ERYILMAZ, Ph.D., do hereby certify that
 3     I have read the foregoing transcript of my
 4     testimony, and further certify under the pains and
 5     penalties of perjury that said transcript
 6     (with/without) suggested corrections is a true and
 7     accurate record of said testimony.
 8        Dated at _____, this ____ day of _____,
 9     2022.
10
11                  _____
                                                    Page 100
```

```
 1            SUGGESTED CORRECTIONS
 2     RE:  SUSANNA MIRKIN and BORIS MIRKIN, Individually
          and on Behalf of All Others Similarly Situated vs.
 3     XOOM ENERGY, LLC; and XOOM ENERGY NEW YORK, LLC
 4     WITNESS:  DERYA ERYILMAZ, Ph.D., Vol. I
 5     The above-named witness wishes to make the following
       changes to the testimony as originally given:
 6
 7     PAGE  LINE    SHOULD READ         REASON
 8     ___   ___  _____   _____
 9     ___   ___  _____   _____
10     ___   ___  _____   _____
...
                                                    Page 101
```

26 (Pages 98 - 101)

Veritext Legal Solutions
346-293-7000

```
 1  COMMONWEALTH OF MASSACHUSETTS)
 2  SUFFOLK, SS.              )
 3     I, Alexander K. Loos, RDR and Notary Public in
 4  and for the Commonwealth of Massachusetts, do hereby
 5  certify that there came before me on the 15th day of
 6  November, 2022, at 10:25 a.m., the person
 7  hereinbefore named, who was by me duly sworn to
 8  testify to the truth and nothing but the truth of
 9  her knowledge touching and concerning the matters in
10  controversy in this cause; that she was thereupon
11  examined upon her oath, and her examination reduced
12  to typewriting under my direction; and that the
13  deposition is a true record of the testimony given
14  by the witness.  I further certify that I am neither
15  attorney or counsel for, nor related to or employed
16  by, any attorney or counsel employed by the parties
17  hereto or financially interested in the action.
18                          ve hereunto set my hand
19                          l this 27th day of
20
21
22
23  Notary Public
24  Commission expires 5/5/28
```
Page 102

```
 1  Steven Wittles
 2  Slw@wittelslaw.com
 3                  November 28, 2022
 4  RE: Mirkin vs. XOOM Energy
 5  DEPOSITION OF: Derya Eryilmaz 5544030
 6     The above-referenced witness transcript is
 7  available for read and sign.
 8     Within the applicable timeframe, 30 days,  the witness
 9  should read the testimony to verify its accuracy. If
10  there are any changes, the witness should note those
11  on the attached Errata Sheet.
12     The witness should sign and notarize the
13  attached Errata pages and return to Veritext at
14  errata-tx@veritext.com.
15     According to applicable rules or agreements, if
16  the witness fails to do so within the time allotted,
17  a certified copy of the transcript may be used as if
18  signed.
19            Yours,
20            Veritext Legal Solutions
21
22
23
24
25
```
Page 103

27 (Pages 102 - 103)