UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,

Defendants.

No. 18 Civ. 2949 (ARR) (RER)

---

## DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendants contend that there is no genuine issue to be tried with respect to the following facts:

**A. Susanna Mirkin contracted with XOOM to receive variable rate electricity service for six months in 2013.**

1. In March 2013, Susanna Mirkin contracted with XOOM for electricity supply service. Ex. A-8, B. Mirkin Dep. 25:6–27:14.

2. XOOM confirmed Susanna's enrollment in an email sent on March 13, 2013. *See* Ex. A-20, New Customer Enrollment at 1–2; Ex. A-8, B. Mirkin Dep. 26:20–27:17.

3. The March 13 email attached the Electricity Sales Agreement between XOOM and Susanna Mirkin (the "Contract"). Ex. A-19, Contract at 1–2.

4. The Contract included the following terms:

| XOOM SimpleFlex Variable Price Product | Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable. Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs. You are responsible for all charges assessed and billed by your local utility for all applicable utility charges, which are not included in your rate. |

\* \* \*

| Guaranteed Savings | There are no guaranteed savings in this Agreement at this time. |

\* \* \*

**AGENCY:** You hereby appoint XOOM Energy as agent for the purposes of (i) acquiring the supplies necessary to meet your electricity needs, and (ii) arranging, contracting for and administering transportation and related services over transmission facilities and those of the LDU needed to deliver electricity to your premises. These services are provided on an arm's length basis and market-based compensation is included in the price noted above.

\* \* \*

**CHOICE OF LAWS:** This Agreement shall be governed by the laws of the state of North Carolina without recourse to such states choice of law rules.

*Id.* at 1–3; Ex. A-8, B. Mirkin Dep. 28:4–8; Ex. A-9, S. Mirkin Dep. 72:13–19.

5. After receiving her enrollment confirmation, Susanna began to receive electricity supply service pursuant to the Contract on May 10, 2013. *See* Ex. A-18, Account Statement at 2.

6. Susanna continued to receive electricity supply service pursuant to the Contract until the Contract was cancelled without penalty and she began to receive service from Viridian on November 17, 2013. *See id.* at 1; Ex. A-8, B. Mirkin Dep. 38:15–23.

**B.    COGS was the foundation of XOOM's rate-setting procedures.**

7. At all relevant times, Susanna's rates were set pursuant to XOOM's "spreadsheet-based model." Ex. A-10, Loehde Dep. 59:11–60:2, 65:24–66:10. Under that model, the foundational component of XOOM's rates was a set of calculations that XOOM used to make its "best estimate" of various costs it would incur to supply its consumers with electricity in the upcoming month. *Id.*

8. The results of those calculations were summarized in documents known as "rate-setting workbooks," which provided a detailed summary of the projected cost components for all of the fixed, variable, and introductory rates XOOM offered in the workbook's area of coverage. *See, e.g.*, Ex. A-11, Loehde Corp. Dep. 186:20–23

2



); Ex. A-10, Loehde Dep. 66:18–25 (

); Ex. A-13, Coppola Dep. 263:4–16 (

); Ex. A-12, Park Dep. 120:18–125:25; Ex. 26 to Class Cert. Mem., Exemplar Rate-Setting Workbook; *see also* Ex. A-3, Coleman Rpt. at 22.

9. However, 

. Ex. A-13, Coppola Dep. 171:11–16; Ex. A-10, Loehde Dep. 51:4–21, 70:5–22, 251:6–22; Ex. A-11, Loehde Corp. Dep. 90:5–91:11; Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15; *see also* Ex. A-11, Loehde Corp. Dep. 263:11–264:5 (

).

10. The sum of the cost components projected in the rate-setting workbooks was provided as a "Total" figure in the rate-setting workbooks, and that figure can be referred to as "Cost of Goods Sold" or COGS. *See* Ex. A-3, Coleman Rpt. at 4.

11. COGS was "the foundation of where pricing starts" and the "largest component" of XOOM's variable rate pricing. Ex. A-13, Coppola Dep. 279:1–280:1, 284:14–285:2; *see also* Ex. A-14, Ulry Dep. 51:5–12, 68:13–69:3; Ex. A-10, Loehde Dep. 257:2–10; Ex. A-11, Loehde Corp. Dep. 289:9–290:12; Ex. A-12, Park Dep. 33:10–22, 34:20–35; Ex. A-5, Pls.' Expert Rpt. ¶ 53.

**C.   A margin was added to COGS to yield a final rate.**

12. After calculating its COGS projections, the next step in XOOM's rate-setting process was to add a margin, which was calculated in the rate-setting workbooks as the percentage

3

difference between COGS and a rate proposed by analysts on the pricing team. Ex. A-10, Loehde Dep. 51:4–21, 68:2–8, 181:3–18.

13. Once the margins were added, the rate-setting workbooks were presented to a team of decisionmakers at rate-setting meetings, at which point final rates were set for multiple markets and products. *Id.* at 63:10–13, 64:10–14, 69:6–14, 158:6–159:9; Ex. A-13, Coppola Dep. 70:12–71:3; Ex. A-12, Park Dep. 32:10–19, 87:8–19; Ex. A-15, Chidester Dep. 23:13–18.

**D.  XOOM's margins include prior period adjustments, balancing charges, and all other cost components referenced in the contract.**

14. The margin in XOOM's rate "is not exclusively related to profit." Ex. A-13, Coppola Dep. 172:24–173:11. Rather, in the context of XOOM's rate-setting procedures, the term "margin" simply meant an "adder" or "a margin over something." *Id.* at 171:11–173:11; Ex. A-12, Park Dep. 44:15–24. ▮

▮

▮. Ex. A-13, Coppola Dep. 171:11–16; Ex. A-10, Loehde Dep. 251:6–22; Ex. A-11, Loehde Corp. Dep. 90:5–91:11; Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15.

15. For example, ▮

▮

▮. Ex. A-10, Loehde Dep. 251:6–22; *see also id.* at 51:4–21, 70:5–71:23, 139:6–23, 209:11–20; Ex. A-11, Loehde Corp. Dep. 284:3–22; Ex. A-13, Coppola Dep. 169:4–170:7, 171:25–172:23, 285:19–25; Ex. A-14, Ulry Dep. 76:12–77:23, 78:11–79:13, 82:15–19, 85:7–17.

4

16. ███████████████████ Ex. A-13, Coppola Dep. 171:11–172:17, ███████████████████ Ex. A-10, Loehde Dep. 213:23–214:2.

17. When costs went down but the variable rate went up, it was generally ███████████████████ Ex. A-13, Coppola Dep. 248:21–24.

18. Margin could also include ███████████████████ Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15; *see also* Ex. A-11, Loehde Corp. Dep. 90:5–91:14 (███████████████████); Ex. A-13, Coppola Dep. 280:23–281:9 (███████████████████).

19. Because a variable rate product is "[f]undamentally . . . different than a fixed rate product," and the two have "a different product term, different costs, et cetera," the margins are different as well. Ex. A-10, Loehde Dep. 118:15–23; *see also id.* 160:22–161:5, 221:24–222:9; Ex. A-13, Coppola Dep. 89:10–17 ███████████████████); Ex. A-12, Park Dep. 80:7–14.

20. Due to the increased volatility of variable rates and the fact that rates are set before actual costs are known, a higher margin in a variable rate may yield less of a profit than a lesser margin in a fixed rate, or even no profit at all. Ex. A-12, Park Dep. 150:3–152:6.

**E.  XOOM did not consider competitive intelligence or sales trends when setting variable rates and considered attrition when implementing prior period adjustments.**

21. ███████████████████

5

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. Ex. A-10, Loehde

Dep. 61:21–62:3, 75:9–23, 76:24–77:9, 77:11–22, 79:2–12, 82:10–20, 83:8–84:8, 136:22–137:4;

Ex. A-11, Loehde Corp. Dep. 181:4–182:15; Ex. A-12, Park Dep. 83:7–84:10, 102:18–103:23,

107:16–108:2, 110:5–14.

22. Likewise, ██████████████████████████████████████████

████████████████████████████ Ex. A-10, Loehde Dep. 80:4–9; Ex. A-12, Park Dep. 98:16–

99:19.

23. As to ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. A-10, Loehde Dep. 85:12–22.

24. Rather, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. A-10,

Loehde Dep. 85:23–87:14; *see also id.* 209:11–20; Ex. A-14, Ulry Dep. 76:12–77:23, 78:11–

79:13, 82:15–19, 85:7–17; Ex. A-13, Coppola Dep. 169:4–170:7.

25. Thus, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████. Ex. A-10, Loehde Dep. 79:14–80:9, 85:12–87:14, 209:11–20; Ex. A-12, Park Dep.

99:20–100:13, 197:3–199:25; Ex. A-13, Coppola Dep. 169:4–170:7; Ex. A-14, Ulry Dep. 76:12–

77:23, 78:11–79:13, 82:15–19, 85:7–17.

**F.  Susanna's electricity rates were based on COGs.**

26. For her first month, Susanna had an introductory rate of $12.90 cents/kWh. Ex.

6

A-3, Coleman Rpt. at 14.

27. Susanna paid variable rates for 5 months. *Id.*

28. The variable rates during those 5 months rose and fell with the COGs described in XOOM's rate-setting workbooks:



*See* Ex. A-3, Coleman Rpt. at 12. The odds that this near-perfect correlation would occur by chance are less than 1-in-400. *Id.*

29. While Susanna was a customer, the margin between Susanna's variable rate and the COGs reflected in XOOM's rate-setting workbooks "was approximately 22%[.]" Ex. A-6, Pls.' Rebuttal Rpt. ¶ 31; *see also* Ex. A-3, Coleman Rpt. at 14.

30. While Susanna was a customer, XOOM's COGS were always the largest component of her monthly rate. *See* Ex. A-5, Pls.' Expert Rpt. ¶ 53.

31. In 2013, the year Susanna was a customer, XOOM's average electricity supply rate was 11.19 cents/kWh, which was in line with the rates charged by other ESCOs in New York:

7



See Ex. A, Matthews Decl. ¶¶ 6–7 (providing the judicially noticeable source data from the Energy Information Administration the ("EIA") that was used to generate this chart); Ex. A-22, Summary Chart; *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 07 CIV. 10470, 2013 WL 6869410, at *4 (S.D.N.Y. Dec. 30, 2013) (taking judicial notice of an "EIA website report"); *Fed. Election Comm'n v. Hall-Tyner Election Campaign Comm.*, 524 F. Supp. 955, 959 n.7 (S.D.N.Y. 1981) ("Of course, any facts subject to judicial notice may be properly considered in a motion for summary judgment."), *aff'd*, 678 F.2d 416 (2d Cir. 1982).

**G.    Boris Mirkin never contracted with XOOM for anything, and Susanna Mirkin never contracted with XOOM for natural gas supply service.**

32.    Boris Mirkin never had a contract with XOOM for electricity supply service, so he was never charged a variable rate for electric supply service by XOOM. *See* Ex. A-8, B. Mirkin

8

Dep. 27:12–14.

33. Boris never had a contract with XOOM for natural gas supply service, so he was never charged a variable rate for natural gas supply service by XOOM. *See id.* at 19:4–20:6, 48:16–24; *see also* Ex. A-9, S. Mirkin Dep. 34:10–36:14.

34. Susanna never had a contract with XOOM for natural gas supply service, so she was never charged a variable rate for natural gas supply service by XOOM. Ex. A-9, S. Mirkin Dep. 36:15–37:10.

35. Neither of the Mirkins ever had a contact with XOOM Energy, LLC. *See* Ex. A-19, Contract at 1 (identifying "XOOM Energy New York, LLC" and "the Customer" as parties to the Contract, but not XOOM Energy, LLC).

**H.     Oral Argument in the Second Circuit.**

36. On June 11, 2019, the Second Circuit held oral argument in connection with the Mirkins' appeal from the Court's initial judgment of dismissal. A true and correct recording of that argument is available on the Second Circuit's website. *See* Oral Argument, *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019), *available at* https://www.ca2.uscourts.gov/oral_arguments.html (search for "18-3138" or "Mirkin"); *see also ADP, LLC v. Lynch*, No. CV 2:16-01053, 2019 WL 1149469, at *2 (D.N.J. Mar. 13, 2019) ("The Court takes judicial notice of the recording of the oral argument available on the Third Circuit's website."); *Jackson v. Broad. Music, Inc.*, No. 04 CV 5948 (TPG), 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006), *aff'd*, No. 06-2283-CV, 2007 WL 2914516 (2d Cir. Oct. 5, 2007) (quoting *Harris v. New York State Dep't of Health*, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002) ("[T]he court may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual

9

assertions in a subsequent action[.]'"); *Hall-Tyner Election Campaign Comm.*, 524 F. Supp. at 959 n.7.

37. At the beginning of the oral argument, the following exchange occurred between Judge Pooler and the Mirkins' counsel:

| | |
|---|---|
| Counsel: | May it please the Court. This is a simple breach of contract case. The Defendants' contract requires that their energy rates be based on the Defendants' supply costs. |
| Judge Pooler: | That's not their only basis, but it is the basis to start the calculation. Is that your argument? |
| Counsel: | No your honor. That is the only basis. The Contract says it's based— |
| Judge Pooler: | Don't they have other things that they say will enter into the cost of the energy? |
| Counsel: | No Your Honor. . . . |

Oral Argument at 0:40–1:18.

38. Less than a minute later, the following exchange occurred between Judge Pooler and the Mirkins' counsel:

| | |
|---|---|
| Counsel: | The rate that is published and that an energy company such as XOOM pays to purchase energy is composed of dozens of components, most of those components are regulated costs and regulated components, and a balancing cost is one of those components. |
| Judge Pooler: | Does that include their profit, which they're allowed to achieve? Aren't they allowed a margin, over and above these costs? |
| Counsel: | Again your honor, we're not taking the position that they're not allowed a margin. We're taking the position that their rates have to be tied to their supply costs which is what their contract— |
| Pooler: | Tied to, but not identical. Isn't that what your argument is? |
| McInturff: | No Your Honor, our argument—eh, eh—Tied to but not identical, they must reflect their costs. These companies are very lean businesses. They're essentially brokers and traders. They have very low overhead. They buy on the wholesale market and resell to consumers, so the wholesale— |

10

| | |
|---|---|
| Pooler: | What you're saying is that the ultimate price to the consumer has to have some relationship to their supply costs. |
| McInturff: | Correct. And instead, not evidence, of essentially, price gouging, margins that are well in excess of the underlying costs. |

Oral Argument at 1:58–3:11.

Dated: March 8, 2023                                                  MCDOWELL HETHERINGTON LLP

*/s/ Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.
Diane S. Wizig (admitted *pro hac vice*)
James M. Chambers (admitted *pro hac vice*)
David L. Villarreal (admitted *pro hac vice*)
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
james.chambers@mhllp.com
david.villarreal@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*