# Exhibit 13

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION


OPINION NO. 96-12

CASES 94-E-0952 et al. - In the Matter of Competitive
Opportunities Regarding Electric
Service.


OPINION AND ORDER REGARDING
COMPETITIVE OPPORTUNITIES FOR ELECTRIC SERVICE

Issued and Effective:  May 20, 1996

<u>TABLE OF CONTENTS</u>

| | <u>Page</u> |
|---|---|
| INTRODUCTION | 1 |
| PROCEDURAL HISTORY | 6 |
|   Collaborative Efforts | 6 |
|   Public Input | 7 |
|     1.  Public Involvement Program | 7 |
|     2.  Educational Forums and Public Statement Hearings | 8 |
|     3.  Other Direct Consumer Contacts | 9 |
|     4.  Summary of Public Input | 11 |
| SUMMARY OF THE RECOMMENDED DECISION | 11 |
| SUMMARY OF POSITIONS OF MAJOR INTEREST GROUPS | 15 |
|   Industrial and Large Commercial Consumers | 15 |
|   Residential and Small Commercial Consumers | 17 |
|   Investor-Owned Utilities | 18 |
|   Labor Unions | 19 |
|     1.  Utility Workers of America | 19 |
|     2.  International Brotherhood of Electrical Workers | 19 |
|   Publicly-Owned Utilities | 19 |
|     1.  Municipal Electric Utilities Association | 19 |
|     2.  Power Authority of the State of New York | 20 |
|   Competitors | 20 |
|     1.  Independent Power Producers | 20 |

CASE 94-E-0952

2.  Energy Service Companies                    21

Environmentalists                               21

## TABLE OF CONTENTS

                                              Page

Department of Public Service Staff              22

Other Public Agencies                           22

VISION AND GOALS FOR THE FUTURE REGULATORY REGIME   24

Vision                                          24

Goals                                           26

1.  Lowering Rates for Consumers                26

2.  Increasing Customer Choice                  26

3.  Continuing Reliability of Service           27

4.  Continuing Programs That are
    in the Public Interest                      27

5.  Allaying Concerns About Market Power        27

6.  Continuing Customer Protections
    and the Obligation to Serve                 27

MAJOR ISSUES NEEDING DECISION                   28

Competition in General                          28

1.  State/Federal Coordination                  31

2.  Wholesale/Retail Competition                36

    a.  Overall Balancing of
        Benefits and Risks                      37

    b.  Simultaneous Retail Access              40

    c.  Standard for Retail Access              40

    d.  Pilot Programs                          42

CASE 94-E-0952

System Reliability                                          44

Strandable Costs                                            46

   1.  Parties' Positions                   47

TABLE OF CONTENTS

                                      Page

   2.  Overall Policy                        48

   3.  Individual Determinations             51

   4.  Independent Power
       Producer Contracts                 51

   5.  Mechanisms                            52

Environmental and Public Policy                            53

Market Power/Corporate Structure                           57

   1.  Divestiture of Assets                59

   2.  Load Pockets                          60

   3.  Structure of the Independent
       System Operator                    63

Obligation to Serve                                        64

   1.  Provider of Last Resort              65

   2.  Energy Service Companies             67

   3.  Consumer Protections                 69

OTHER ISSUES                                               69

  Reporting Requirements                           69

  Reciprocity Issues                               71

IMPLEMENTATION PLAN                                        72

FINDINGS UNDER STATE ENVIRONMENTAL

CASE 94-E-0952

QUALITY REVIEW ACT                          76

FLEXIBLE RATE GUIDELINES                    81

SITHE PROPOSAL                              83

CONCLUSION                                  88

ORDER                                       92

## TABLE OF CONTENTS

APPENDICES

    Appendix A - Listing of Briefs on Exceptions and
                 Briefs Opposing Exceptions

    Appendix B - Abbreviations

    Appendix C - Flexible Retail Poolco Model

    Appendix D - Summary of Exceptions to
                 Recommended Decision

    Appendix E - Flexible Rates

    Appendix F - Other Cases Being Considered in
                 This Proceeding

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION


COMMISSIONERS:

  John F. O'Mara, Chairman
  Lisa Rosenblum
  Harold A. Jerry, Jr.
  William D. Cotter
  Eugene W. Zeltmann


CASES 94-E-0952 et al. - In the Matter of Competitive
                         Opportunities Regarding Electric
                         Service.[1]


OPINION NO. 96-12

OPINION AND ORDER REGARDING
COMPETITIVE OPPORTUNITIES FOR ELECTRIC SERVICE

(Issued and Effective May 20, 1996)


BY THE COMMISSION:


INTRODUCTION

     The provision of electric service in a time of
increasing competitive options facing consumers raises numerous
complex issues.  This proceeding was established to seek ways the
industry could be restructured in light of these options, taking
account of the need to lower rates for all customers in order to
spur economic development in the State and to avoid jeopardizing
safe and reliable electric service.

     An investigation of these matters was begun in 1993,[2]

_____

   [1]   Attached as Appendix F is a list of other cases being
         considered in this opinion and order.

   [2]   Case 93-M-0229, Proceeding on Motion of the Commission to
         Address Competitive Opportunities Available to Customers
         of Electric and Gas Service and Develop Criteria for
         Utility Responses, Order Instituting Proceeding (issued
         March 19, 1993).  The case number was subsequently
         changed to 94-E-0952, to reflect that the subject matter

CASE 94-E-0952

as we considered guidelines for the implementation of flexible
pricing and the use of negotiated contracts for customers facing
competitive options.  We adopted such guidelines, which have been
in place since 1994.[3]

On August 9, 1994,[4] an investigation of issues related
to the future regulatory regime for the provision of electric
service in light of competitive opportunities was instituted.
The overall objective was "to identify regulatory and ratemaking
practices that will assist in the transition to a more
competitive electric industry designed to increase efficiency in
the provision of electricity while maintaining safety,
environmental, affordability, and service quality goals."[5]  The
parties were first "urged to work collaboratively to identify a
few comprehensive principles to guide the transition" to a more
competitive industry structure.[6]

After considering the parties' collaborative efforts
and issuing proposed principles for comment, we adopted, on
June 7, 1995,[7] principles to "form the basis for the development

---

is limited to electric service, although the case was
originally instituted to address both gas and electric
service.  Cases 93-M-0229 and 94-E-0952, Order Deciding
Petitions for Rehearing and Clarification (issued
November 30, 1994), pp. 7-8.

[3]   Case 93-M-0229, _supra_, Opinion No. 94-15 (issued July 11,
1994), mimeo pp. 31-32.  Flexible rates are being offered
by Long Island Lighting Company, New York State Electric
& Gas Corporation, Niagara Mohawk Power Corporation, and
Rochester Gas and Electric Corporation.

[4]   Case 93-M-0229, _supra_, Order Instituting Phase II of
Proceeding (issued August 9, 1994).

[5]   _Ibid._, pp. 1-2.

[6]   _Ibid._, pp. 2-3.

[7]   Case 94-E-0952, Opinion No. 95-7 (issued June 7, 1995).

-2-

CASE 94-E-0952

of a framework for movement toward a more competitive electric marketplace."[8]  For the remainder of the proceeding, the parties were asked to continue to work collaboratively, which was said to have "great potential to lead to innovative public policy solutions."[9]  After a year-long collaborative process, which allowed parties ample opportunities to present their interests and positions on this complex matter both orally and in writing, a recommended decision prepared by Administrative Law Judge Judith A. Lee and then-Deputy Director Ronald Liberty[10] was issued on December 21, 1995.  The recommended decision set forth a proposed model for restructuring the electric industry in New York, identified specific questions for parties to address in their briefs, and highlighted certain issues for the parties to develop further in order to present us with needed information in a timely manner.[11]

Briefs on exceptions were due January 19, 1996, and briefs opposing exceptions were due February 2, 1996, according

--------

[8]     Case 93-M-0229, _supra_, Order Instituting Phase II of Proceeding, p. 3.

[9]     Case 94-E-0952, Opinion No. 95-7, mimeo p. 10.

[10]    At the time, Mr. Liberty was Deputy Director in the Department of Public Service's Energy and Water Division. He is currently Director of the Electric Division.

[11]    Specifically, the parties were asked to work on issues regarding load pockets (a load area that, because of transmission system limitations, requires that some generation be located within the area for reliable service) and an independent system operator (ISO).  A report on load pockets was submitted on February 21, 1996, and a report on the independent system operator was submitted on April 22, 1996.

-3-

CASE 94-E-0952

to a notice issued December 22, 1995.[12]  Additionally, comments
on a petition filed by Sithe Energies, Inc., on December 8, 1995,
entitled "Energizing New York, A Pro-Investor Plan for Ratepayer
Relief" (the Sithe proposal) were authorized in conjunction with
the same briefing schedule.[13]  Appendix A consists of lists of
the parties that filed briefs on exceptions and briefs opposing
exceptions.  Oral argument by the parties was held before us on
March 27, 1996.

     As to flexible rates, during this phase of the case,
further examination of the following very limited issues was
requested:

     (1)   the development of new incentive
          frameworks regarding contracts
          having prices set for longer than
          seven years; and

     (2)   the treatment of incentives for
          special attraction contracts in
          comparison with those for retention
          contracts and other economic
          development rates.[14]

     A recommended decision analyzing these flexible rate

---

[12]    A notice was also issued on February 16, 1996, stating
that further filings would not be accepted without our
permission.  A motion was filed on February 23, 1996, by
Multiple Intervenors, asking for permission from the
Secretary to file an additional document entitled "Joint
Statement in Support of the Implementation of Retail
Competition."  This motion was denied at our session on
March 14, 1996.  Similarly, a letter from Michael
Schnitzer of the NorthBridge Group (representing the
Energy Association), dated April 3, 1996, was also denied
inclusion in the formal record at our session on
April 17, 1996.

[13]    The Sithe proposal and the comments are discussed _infra_.

[14]    Case 93-M-0229, _supra_, Order Instituting Phase II of
Proceeding, pp. 4-5.

CASE 94-E-0952

issues, prepared by Judge Lee and Mr. Liberty, was submitted on
October 19, 1995.[15]  The conclusion of the flexible rates
recommended decision was that we should:  "(1) continue the
general limitation of fixed prices in contracts with flexible
rates to seven years; and (2) allow negotiated rates for
attraction contracts, with appropriate sharing mechanisms for
such contracts to be developed in individual utility rate cases."
The flexible rates recommended decision further stated that
"[t]he guidelines adopted previously should be found to be
generally applicable to both retention and attraction
contracts."[16]  Briefs on exceptions to the flexible rates
recommended decision were filed by Consolidated Edison Company of
New York, Inc., Multiple Intervenors, and Department of Public
Service staff.[17]  Additional comment about the continued
applicability of flexible rates in light of proposed changes
(specifically regarding a non-bypassable charge for strandable
costs) was requested in the recommended decision issued
December 21, 1995.

        This opinion and order reviews the procedural history
of this case and the parties' positions, sets forth our vision of
the future regulatory regime and the goals we expect to be
achieved, and describes the strategies that should be used to
accomplish the goals.[18]

---

[15]     To distinguish between the two recommended decisions
         issued in this case, the one issued October 19, 1995 is
         referred to as "flexible rates recommended decision,"
         while the more comprehensive recommended decision,
         issued December 21, 1995, addressing restructuring issues, is
         referred to as "recommended decision" (cited as R.D.).

[16]     Flexible Rates R.D., p. 17.

[17]     This matter is discussed infra.

[18]     Abbreviations used in this opinion and order are listed
         in Appendix B.

-5-

CASE 94-E-0952

<u>PROCEDURAL HISTORY</u>

<u>Collaborative Efforts</u>

In accordance with our instructions to proceed to develop the issues collaboratively, the parties met regularly between March and November 1995.  All meetings were open to the public[19] and minutes were circulated to the active parties after each meeting.  Accomplishments gained through these efforts included the mutual education of the parties through seminars, the development by the active parties of a comprehensive report describing proposed restructuring models, along with a glossary of terms,[20] and discussion of the risks and benefits of proceeding with different restructuring approaches.

Many parties expressed their satisfaction with the progress made during the year of working together and suggested that these collaborative efforts continue, in order to work further on the important issues raised in this proceeding.[21]

The recommended decision stated:

The collaborative effort of the active parties involved months of very hard work and was an effective way to bring parties with disparate interests together to discuss issues of critical importance to all.  The parties are to be commended for their ability to persevere through many difficult hours,

---

[19]   The process was not one of formal settlement negotiations, which would be confidential.

[20]   This report is entitled "Restructuring New York's Electric Industry:  Alternative Models and Approaches," Final Phase II Report, September 1995 (the Report).  The accompanying glossary of terms is referred to in this opinion and order as "Glossary."

[21]   R.D., pp. 7-8 and 17-19.  In their briefs after the recommended decision, several parties, including the Energy Association and staff, urge further collaboration to address specified issues on a state-wide basis.

-6-

CASE 94-E-0952

> especially considering the numerous players
> involved.  Significant progress was made in
> narrowing differences and developing a common
> understanding of the complexities involved in
> any restructuring of the electric industry.
> This progress, as several parties state,
> should be the basis for further
> collaboration.[22]

Public Input

Public input was actively sought during this proceeding, first through an intensive public involvement program supported by many active parties, and then by educational forums and public statement hearings held after the recommended decision was issued.  Additionally, consumer input was received through letters, computer messages, and telephone calls.

1.  Public Involvement Program

The public involvement program was accomplished through the efforts of many active parties, most notably the New York State Consumer Protection Board (CPB), New York State Department of Public Service staff (staff), Multiple Intervenors (MI), and three utilities (Consolidated Edison of New York, Inc. (Con Edison), New York State Electric & Gas Corporation (NYSEG), and Niagara Mohawk Power Corporation (Niagara Mohawk)).  It was intended "to gather consumer input on issues related to the restructuring and deregulation of the State's electricity industry and to develop a public education program to support the Public Service Commission's Competitive Opportunities Proceeding."[23]

---

[22]     R.D., p. 8 (footnote omitted).

[23]     "Competitive Opportunities Public Involvement Work Plan," circulated to active parties by New York State Consumer Protection Board, August 11, 1995, p. 1.  This program

-7-

CASE 94-E-0952

Through written inquiries and after discussions with groups of consumers, a range of concerns and interests was expressed, including the following:

(1)   reliable electric service is important to customers;

(2)   customers in general would like a choice among electric suppliers, if lower prices and improved service result;

(3)   industrial customers are interested in immediate competition at the retail level; and

(4)   residential and small business customers believe all customers should benefit from increased competition in a restructured industry, and the opportunity for supplier choice should occur simultaneously rather than for only large customers initially.

2.   Educational Forums and
       Public Statement Hearings

Under the leadership of staff, educational forums and public statement hearings were held between February 14, 1996 and March 7, 1996, at ten different locations throughout the State, including at least one within the service territory of each major electric utility.[24]  Both the forums and the hearings were well attended, with a total of more than 540 attendees and over 120 speakers.

---

took place during the proceeding, before the recommended decision was issued.

[24]   Forums and hearings were held in Loudonville (Albany), Poughkeepsie, Rochester, Syracuse, Johnson City (Binghamton), New York City, Williamsville (Buffalo), New City, Hempstead, and Plattsburgh.

-8-

CASE 94-E-0952

Views raised included concerns about high utility rates, the need for consumer awareness of the complex issues involved in restructuring, kinds of competition preferred, and suggested conditions if competition is allowed.  The opinions expressed ranged from support for immediate retail access for all consumers to concerns about the need for consumer and environmental protections.[25]

3.   Other Direct Consumer Contacts

Consumer Services Division staff arranged many different ways for consumers to provide the Commission with input about these critical matters.  Staff set up a special telephone line with an 800 number and arranged a special computer site on the World Wide Web.

As of May 14, we had received 2,042 comments from the public.[26]  Comments were received from many types of customers. Many were submitted by individuals not affiliated with any party in this proceeding, but some were submitted as part of organized efforts by various parties to have their points of view represented.[27]

Overall, 42% (854) of customer contacts indicated

---

[25]   The transcripts of all these hearings were available to us for our deliberations.

[26]   Letters were received from 96 people, 94 comments were received electronically via the PSC's World Wide Web site, and 1,852 comments were received via the 1-800 Customer Opinion Line.

[27]   For example, there appears to have been an effort by utility employees to register comments opposing deregulation, claiming that their jobs would be lost. Also, students from several state university campuses expressed support for the position of New York Public Interest Research Group (NYPIRG), which favors a wholesale model.

CASE 94-E-0952

support for some form of competition, deregulation or
restructuring.  Of these, 279 people expressed support for
Niagara Mohawk's PowerChoice proposal, a retail model.  An
additional 10 respondents also expressed a specific interest in a
retail structure.  Additionally, 394 consumers expressed support
for a wholesale model.  Finally, 171 consumers expressed general
interest in increased competition in the industry.  The common
themes expressed by those who support competition are as follows,
listed in descending order of frequency:

  ·     Current utility bills are too high.

  ·     Utilities are wasteful and inefficient, and
      their personnel receive excessive salaries.

  ·     High electricity prices are causing
      industries to move, creating job losses.

  ·     Customers would like to choose their
      electricity providers.

        Some consumers offer specific recommendations for us to
consider.  They are as follows, again listed in descending order
of frequency:

  ·     The transition should not degrade
      environmental quality, reduce energy
      efficiency, or limit the use of renewable
      resources.

  ·     The Commission should proceed carefully as it
      moves toward competition, allowing sufficient
      time for consumer education and input.

  ·     Consumer protections and low-income programs
      should be maintained.

  ·     The benefits of competition should be
      available to all customers, not just large
      customers.

-10-

CASE 94-E-0952

On the other hand, 35% (724) of the consumer comments expressed opposition to deregulating the industry.  The common themes expressed by those who oppose deregulation are as follows, in descending order of frequency:

· High rates are due to high taxes on utility services, not the structure of the industry.

· Deregulation has not worked well in other industries such as telephone and airlines.

· People are concerned about loss of jobs in the utility industry.

· There is serious concern about deterioration of system reliability, safety, and service quality.

· Deregulation will increase rates.

· Competition will benefit only large customers.

· High rates are due to IPP contracts, not the industry structure.

· High rates are due to policy mistakes of the government.

· There is no study showing that deregulation will reduce costs.

4.  Summary of Public Input

Our review of all the public comments shows widespread interest in this case, and the public at large shares many of the same positions and concerns expressed by the active parties. Individuals want to know more about how they will be affected directly by our decision and are interested in our continuing efforts to inform them about coming electric industry changes and the expected effects on customers.  All of the public comments are an important part of information we considered in reaching

-11-

CASE 94-E-0952

our decision, and we have benefitted from them.  Indeed, some of the comments offered us practical ideas for resolving complex issues, and the comment process provided an opportunity for meaningful dialogues on some of the knottier issues presented.

      For these reasons, and consistent with the suggestions of many commentors, further outreach and education efforts will be made, and further opportunities for comments by the public will be provided, as we proceed with the next phase of this case.

<u>SUMMARY OF THE RECOMMENDED DECISION</u>

      The recommended decision applied the principles to the restructuring proposals developed during this case.

      The overall conclusion of the recommended decision was that we should adopt a "flexible retail poolco[28] model" of electric competition.[29]  This type of model allows for the existence of a fully functioning pool (with hourly spot market prices established) that accommodates individual retail physical bilateral contracts,[30] to be administered by an independent system operator.  As a first step, a wholesale poolco model with an independent system operator and market mechanisms would be established in such a way as to allow an orderly and rapid

-----

[28]    Different pricing mechanisms are possible under restructuring models.  These pricing mechanisms are commonly called "poolco" and "bilateral."  A poolco model has a centrally dispatched spot market power pool.  A bilateral contracts model involves direct contracts between a power producer and user or intermediary outside of a centralized power pool.

[29]    This model is described in Appendix C.  It is essentially the same model as was described in an attachment to the recommended decision, with some minor clarifying changes.

[30]    "Physical bilateral contracts" are agreements "between two parties for the physical delivery of electricity."  The Glossary, p. 4.

-12-

CASE 94-E-0952

transition to full retail access.

In making this recommendation, the following conclusions, among others, were reached:

> All possible efforts to reduce electric rates should be continued, including efforts to ease the high tax burdens in the State and to reduce utility commitments under independent power producer contracts that include obligations for payments well above current wholesale prices . . . .
>
> Retail competition has the potential to benefit all customers by providing greater choice among their electricity providers as well as increased pricing and reliability options.  But retail access brings with it significant risks and requires considerable caution, and should be provided only if it is in the best interests of all consumers . . . .
>
> Reliability of the bulk power system is critical and should not be sacrificed in any way for potential lower rates from retail access.  In order to ensure reliability, effective competition at the wholesale level should be established first, with an eye toward adding retail access as rapidly as possible once a market is established and reliability is ensured.  Also, during the wholesale phase, consideration could be given to the development of effective competition among energy service companies, which does not appear to exist today . . . .
>
> As to strandable costs . . ., a generic decision can address the definition, method for measurement, requirements for mitigation, a preferable recovery mechanism, and a standard for recovery.  The calculation, the amount to be recovered from ratepayers, and the timing of recovery should be left to individual rate cases or special proceedings that should begin during 1996 . . . .
>
> [S]trandable costs, which could be the subject of a separate recovery mechanism

-13-

CASE 94-E-0952

(outside the market), must be prudent,
verifiable, and non-mitigatable.

The calculation of strandable costs requires
comparing an asset's book value to its market
price.  In order to be "verifiable," there
should be a way to check any preliminary
estimate of a strandable cost, after the
market price is known . . . .

Creative means should be used by utilities
and independent power producers to reduce the
amount of strandable costs before they are
considered for recovery. The Commission
should implement incentives aimed at lowering
costs to be recovered [from] ratepayers, and
could use existing ratemaking tools, . . . or
could develop new ones aimed at reducing
specific costs . . . .

Recovery of strandable costs should be
accomplished by a non-bypassable access
charge imposed by the distribution
company . . . .

The Commission's principles allow the
utilities "a reasonable opportunity" to
recover strandable costs, consistent with the
rest of the principles . . . .  Utilities are
entitled to present a case or make arguments
showing why it would be reasonable for
recovery to be allowed, given the
Commission's requirements for mitigation and
the utilities' market opportunities.  There
must also be a "reasonable opportunity" for
consumers to realize savings and receive
reasonable prices.  This requires a careful
balancing of interests and expectations, and
may vary utility by utility.

Any restructuring model should include a
mechanism for recovering costs required to be
spent on environmental and other public
policy considerations that would not
otherwise be recovered in a competitive
market.  A non-bypassable system benefits
charge appears to be a fair way to ensure
that such programs be continued. These
matters should be thoroughly examined in the

-14-

CASE 94-E-0952

> context of individual utility filings . . . .
>
> In any model under which the production of
> electricity is deregulated, it must be
> separated from transmission and distribution
> systems in order to prevent onset of market
> power.  While outright divestiture would
> accomplish this most effectively, it would
> also foreclose the Commission's access to
> books and records related to generation
> assets . . . .  Utilities should make
> individual proposals regarding preferable
> corporate structures, explaining how market
> power will be alleviated.
>
> In order to protect all customers,
> transmission and distribution companies will
> need to remain obligated to serve all
> customers, at least in the short term.
> Consumer protections currently in place for
> both residential and non-residential
> customers should remain.  It is premature to
> conclude that energy services should be
> deregulated, without a record supporting the
> existence of effective competition in the
> market . . . .[31]

The recommended decision also suggested that all
investor-owned utilities be directed to file, within six months
of our opinion and order, comprehensive long-term proposals
addressing all these matters, including specifically:
(1) calculations of any recoverable strandable costs, along with
a plan for recovery, showing potential rate impacts; (2) evidence
showing that any area where generation is proposed to be
competitive is not a load pocket, or a proposal to compensate for
the existence of such a load pocket; (3) proposals for separating
generation from transmission and distribution, with evidence that
market power advantages will not result; (4) proposals for
phasing in retail access for all customers, if that is what the

---

[31]    R.D., pp. 107-111.

CASE 94-E-0952

utility's customers want; and (5) descriptions of the utility's proposed relationship with an independent system operator.[32] Finally, the recommended decision concluded that compliance with the State Environmental Quality Review Act (SEQRA)[33] could best be achieved by the preparation of a draft generic environmental impact statement and completion of the SEQRA review process.

<u>SUMMARY OF POSITIONS OF MAJOR INTEREST GROUPS</u>

This section summarizes the overall positions of the parties in this proceeding, as divided into the following interest groups:  industrial and large commercial consumers, residential and small commercial consumers, investor-owned utilities, labor unions, publicly-owned utilities, competitors (independent power producers and energy service companies), environmentalists, Department of Public Service staff, and other public agencies.  All exceptions to the recommended decision have been considered, and this section reflects only the major themes raised by the briefs.[34]

<u>Industrial and Large Commercial Consumers</u>

Industrial and large commercial consumer interests are represented by the following parties:  May Department Stores and Sears Roebuck and Company (May/Sears), Multiple Intervenors, Nassau Suffolk Water Commissioners Association (Nassau/Suffolk Water), New York Energy Buyers Forum/Columbia University/Greater

---

[32]    <u>Ibid.</u>, p. 113.

[33]    Environmental Conservation Law, Article 8.

[34]    Attached as Appendix D is a summary of exceptions to the recommended decision, organized by interest group. Additional information about the exceptions raised by parties' briefs, as related to specific issues needing decision, is included later in this opinion and order.

-16-

CASE 94-E-0952

New York Hospital Association (Energy Buyers), Owners Committee on Electric Rates (Owners Committee), State & City Supervised Housing for Equity in Electric Rates (SCSHEER), and the United States Department of Defense (DOD).

In general, industrial and large commercial customers urge that retail access be implemented very soon.[35]   The overriding concern from most of the large consumer representatives is a sense of urgency for lower prices.

Industrial customers, represented by MI, May/Sears, and Energy Buyers, generally favor restructuring models that allow them to choose their providers as soon as possible.   These parties oppose the recommended decision's suggestion that a wholesale model be adopted before one allowing retail access, claiming that any delay may cause increased bypass of the electric system by large customers or greater use of flexible rates, both of which could result in higher rates for remaining customers.   Owners Committee, representing large landlords in New York City, however, supports the recommended decision's evolution from a wholesale model to full retail access, claiming that concerns about reliability and security are paramount.

Some parties, including MI and May/Sears, state their strong preferences for a model allowing physical bilateral contracts, seeing no evidence that reliability would be impaired. A target date for retail access is seen as critical to industrial customers, and the lack of a specific implementation schedule in

---

[35]   For example, Multiple Intervenors proposes a three-year phase-in of retail access, with largest customers beginning January 1, 1997.   Energy Buyers also suggests a phase-in, beginning January 1, 1997, with no restrictions on customer access to retail by January 1, 2001.   Other large customers request implementation "as soon as practicable" (May/Sears) or within one year after wholesale competition is established (Nassau/Suffolk Water).

CASE 94-E-0952

the recommended decision is considered a major impediment to progress.

Multiple Intervenors suggests that January 1, 1997 be the date retail access begins.  SCSHEER, representing New York City public supervised, limited profit housing, prefers targeted demonstrations of retail bilateral transactions across all customer classes as a way to clear a path to retail access.

Residential and Small Commercial Consumers

The following parties are representative of residential and small commercial consumers:  American Association of Retired Persons (AARP), Citizens Advisory Panel (CAP), Citizens Utility Board (CUB), New York Citizens for a Sound Economy (New York Citizens), New York State Consumer Protection Board, and the Public Utility Law Project of New York, Inc. (PULP).

Residential consumers, in comparison to larger consumers, are somewhat skeptical of the benefits retail access would necessarily bring them, and are supportive of the recommended decision's approach.  AARP emphasizes the need to move slowly to ensure reliability and expresses the fear that retail competition would hurt small and low-income consumers. CAP states that any change in structure must benefit all consumers and agrees with the recommended decision's emphasis on proceeding deliberately yet cautiously.  CUB urges us to exercise caution and states that competition should be limited to the wholesale level.  CUB opposes retail access for any class of customers.

PULP, representing low-income consumers, is very critical of the recommended decision's adoption of a flexible retail poolco model, which it claims is inferior to its proposed wholesale poolco model.  PULP is concerned with the recommended decision's implicit rejection of its economic arguments, which it regarded as extremely persuasive support for the Energy

-18-

CASE 94-E-0952

Association's proposal for a wholesale model.

        CPB, representing the interests of small commercial and residential customers, urges the implementation of retail access quickly, which it claims would benefit all consumers, as long as certain safeguards are in place.[36]  CPB suggests the imposition of a definite timetable:  that retail access should be implemented two years after the initiation of wholesale competition.

Investor-Owned Utilities

        Positions of utilities in New York State are represented by the Energy Association.[37]

        While the Energy Association agrees with several aspects of the recommended decision, it questions their record basis and it favors continued collaboration to resolve outstanding issues.  The EA is extremely critical of the recommended decision's standard for recovery of stranded costs, however, and continues to assert strongly its legal argument that utilities have a constitutional right to a reasonable opportunity for full recovery.  It also argues that recovery cannot be limited by a balancing of consumer and other interests, and it

---

[36]    CPB was the only party representing small commercial customers that filed briefs in this case.  Letters supporting CPB's position were submitted by about a dozen retail establishments and the Retail Council.

[37]    The Energy Association (EA) represents the following investor-owned utility companies:  Central Hudson Gas & Electric Corporation, Con Edison, Long Island Lighting Company (LILCO), NYSEG, Niagara Mohawk, Orange and Rockland Utilities, Inc., Rochester Gas and Electric Corporation, and The Brooklyn Union Gas Company.  A brief opposing exceptions was separately filed by the Long Island Lighting Company, in response to specific statements made by Suffolk County about the Commission's previous Shoreham decision.

-19-

CASE 94-E-0952

contends that the recommended decision's conclusions are inconsistent with the prudent investment standard.  The Energy Association reiterates its preference for a wholesale poolco model and states that retail access should be implemented only if it is found to be in the best interests of all consumers. Claiming that advocates of mandatory retail access overstate its benefits and overlook its risks, the EA insists that there has been no demonstration that retail choice would provide greater economic benefits than the wholesale poolco model.  Further, the EA challenges our authority to order widespread retail access or divestiture of utility assets.  Finally, the EA argues, no competitive model should be adopted until the generic issues identified in the recommended decision have been resolved.

<u>Labor Unions</u>
    1.  <u>Utility Workers of America</u>
        The Utility Workers of America (Utility Workers), representing workers at Con Edison, is very skeptical about the cost savings to be produced by competition and is concerned about many questions that it claims remain unanswered.  The union asserts that no specific, quantitative evidence has shown that any proposed restructuring will actually lower rates and benefit consumers and others.

    2.  <u>International Brotherhood of Electrical Workers</u>
        The International Brotherhood of Electrical Workers (IBEW) supports the Energy Association's proposed wholesale model, but argues that a study is needed to determine the projected impact of restructuring on the work force.  Among other issues affecting utility workers, IBEW sees a need to establish strict safety and reliability standards, along with training and apprenticeship standards, and it states that existing labor agreements should not be subverted.

CASE 94-E-0952

Publicly-Owned Utilities
    1.  Municipal Electric Utilities Association
        The Municipal Electric Utilities Association (MEUA)
advocates a wholesale model, allowing bilateral contracts,
claiming it is the only model that is consistent with the Federal
Power Act and that allows us any significant role in the future
regulation of retail rates.  MEUA argues that investor-owned
utilities are not entitled to any recovery of strandable costs in
light of the findings of the federal court in the Cajun case.[38]

    2.  Power Authority of the State of New York
        The Power Authority of the State of New York (NYPA)
urges the prompt movement toward retail access, on a definite
implementation schedule.  It sees no evidence that reliability
concerns should delay retail access.  NYPA proposes to buy all
the state's transmission facilities, claiming this would both
mitigate the utilities' strandable costs[39] and eliminate the
need for all utilities to divest generation.[40]

Competitors
    1.  Independent Power Producers
        Independent Power Producers of New York, Inc. (IPPNY)
states that it is satisfied with many of the recommended

---

[38]  Cajun Elec. Power Coop., Inc. v. FERC, 28 F.3d 173 (D.C. Cir. 1994).

[39]  NYPA would issue debt at interest rates lower than the total cost of debt, equity, and income taxes paid by utilities.  The premium paid to utilities would be used to offset strandable costs (e.g., buy-out IPP contracts). NYPA would make payments to localities in lieu of property taxes.

[40]  Under NYPA's proposal, NYPA would retain ownership of its generation.

CASE 94-E-0952

decision's conclusions and that it finds the recommended
decision's preferred model to be acceptable, with some
clarifications.  It reiterates its concern about any mandatory
changes to independent power producer (IPP) contracts.
Significantly, on behalf of the independent power producers that
it finances, Interested Lenders (encompassing major banking
institutions) asserts that any changes to IPP contracts must be
mutually acceptable.  Interested Lenders claims that any efforts
to abrogate these contracts will harm New York's business
environment.

    2.  <u>Energy Service Companies</u>

Energy service companies, represented by Enron, Joint
Supporters, and the Wheeled Electric Power Company (WEPCO), argue
strongly that there must be a date certain for retail access.
Enron supports retail competition and suggests certain
protections to prevent a "flexible poolco" model from becoming a
monopoly merchant.  Joint Supporters states that any prolonged
transition involving wholesale competition could stifle the
growth of competition in retail energy services.  Joint
Supporters also suggests that utility filings should address
specific proposals for how the energy services market will be
encouraged and developed.  WEPCO urges that we immediately
implement a trial retail access program with the involvement of
all customer classes and the certification of vendors, and that
retail access for all customers should become available by
January 1, 1998.

<u>Environmentalists</u>

A broad coalition of environmentalists and other public
interest representatives is represented by the Public Interest

CASE 94-E-0952

Intervenors (PII).[41]  In addition, the Grand Council of the
Crees raises specific concerns about potential negative
environmental impacts on Canada.

    While PII is generally supportive of the recommended
decision and particularly its endorsement of a system benefits
charge, it requests that retail access proposals be further
examined.  PII states that a decision by New York to move
unilaterally to retail access could harm both its economy and the
environment.

    PII also would like us to pay additional attention to
renewable resources and include portfolio management[42] as part
of the transmission and distribution company's continued
obligation to serve.

Department of Public Service Staff

    Department of Public Service staff considers the
recommended decision to be overly cautious in its failure to
specify a date certain for retail access and adopt a firm

---

[41] Public Interest Intervenors consists of the following:
American Lung Association, American Wind Energy
Association, Citizen Action, Citizens Advisory Panel,
Citizens Utility Board, Environmental Advocates, Hudson
Riverkeeper, Hudson River Sloop Clearwater, Natural
Resources Defense Council, New York Public Interest
Research Group, New York Rivers United, Pace Energy
Project, Scenic Hudson, Sierra Club-Atlantic Chapter, The
Association For the Protection of the Adirondacks, The
New York Energy Efficiency Council, The Adirondack
Council, Association For Energy Affordability, Inc., and
Citizens Campaign For the Environment.

[42] Portfolio management refers to resource planning and
procurement functions.  According to the Glossary, it can
"also be defined as the aggregation and management of a
diverse portfolio of supply (and demand-reduction)
resources which will act as a hedge against various risks
that may affect specific resources."  The Glossary, p.
38.

-23-

CASE 94-E-0952

recommendation on strandable cost sharing.  Staff also suggests
that we explicitly address issues such as market mechanisms,
transmission pricing, and public policy concerns.  Urging
adoption of a flexible retail poolco model, staff claims that a
marketplace of competing energy service companies cannot develop
with wholesale competition.  Staff supports simultaneous retail
access for all classes of customers.  Staff also argues that we
have the authority to require a sharing of uneconomic investments
that balances ratepayer and investor interests, as well as the
authority to implement a competitive market structure.  Staff
considers the recommended period of wholesale competition to be
too long and suggests an ambitious implementation schedule,
stating that, with the full cooperation of the parties, the
transition to a competitive retail market could begin in early
1998.


Other Public Agencies

        Several public entities other than Department of Public
Service staff and CPB set forth their positions in this
proceeding, including the City of New York (NYC), Nassau County,
New York State Department of Economic Development (DED), New York
State Department of Law (DOL), and Suffolk County.
        The City of New York, Nassau County, and the New York
State Department of Economic Development were generally
supportive of the recommended decision.  NYC considers the
recommended decision to be a well-balanced plan to introduce the
benefits of competition to all customer classes without
sacrificing reliability, to which it accords first priority.  NYC
urges us to adopt the recommended decision's schedule for utility
filings, which it considers a reasonable plan for moving forward.
        Nassau County suggests that we adopt the recommended
decision, which, it says, includes the key components of its
position.  Nassau County would like to see the recommended

-24-

CASE 94-E-0952

decision transformed into a Commission order.

DED supports the recommended decision's flexible retail poolco model with a first step of a flexible wholesale poolco model to ensure reliability, and urges us to adopt it.  DED considers the wholesale phase to be an opportunity to correct market imperfections if necessary and suggests that we further the movement to competition by deciding additional issues and setting certain guidelines to ensure statewide uniformity.

DOL, on the other hand, believes we should focus on requiring immediate electric rate reductions.  DOL also strongly argues for a sharing of strandable costs, which it asserts we have the legal authority to impose.

Suffolk County claims that we need to motivate the utilities to file restructuring proposals and should no longer protect utilities from competition.  Retail access, according to Suffolk County, should be required or encouraged, and a specific implementation plan leading to competition should be proposed by us, rather than waiting for utilities to propose their own plans.

## VISION AND GOALS FOR THE
## FUTURE REGULATORY REGIME

### Vision

Our vision for the future of the electric industry in light of competitive opportunities includes the following factors: (1) effective competition in the generation and energy services sectors; (2) reduced prices resulting in improved economic development for the State as a whole; (3) increased consumer choice of supplier and service company; (4) a system operator that treats all participants fairly and ensures reliable service; (5) a provider of last resort for all consumers and the continuation of a means to fund necessary public programs; (6) ample and accurate information for consumers to use in making

CASE 94-E-0952

informed decisions; and (7) the availability of information that permits adequate oversight of the market to ensure its fair operation.

First, there should be effective competition in both the generation and energy services sectors.  We expect enough players to participate so that no single provider of service dominates the market as a whole or any part of it, controls the price of electricity, or limits customer options.  An effective market requires many buyers and sellers.  Throughout this movement toward competition, we expect all market participants to act with the highest integrity and to engage in ethical behavior that is above reproach.

Second, competition should result in lower electric prices in New York State overall than currently.  The large difference between New York's prices and the national average electric price should begin to shrink, rather than growing as it has under regulation.  As a result of these lower prices, New York's competitive position will improve and economic development will be furthered, with the creation of additional jobs and increased opportunities for businesses and residents.

Third, consumers will have more opportunities to choose a producer of electricity and to decide on preferable energy service options.  Consumers should be able to choose not only their suppliers, but also the terms of their service through various contract options, including the design of their rates and the length of their contracts for service.  If desired, consumers should be able to purchase power from different locations, constrained only by the need for continued reliability.  Energy service packages should be available that include demand side management and other service options, possibly along with meter reading and billing choices.  Additionally, customers should see the emergence and proliferation of non-traditional suppliers, such as brokers, marketers, and aggregators, who will offer to

CASE 94-E-0952

act as intermediaries between customers and utilities and will be available to combine customers so that preferable pricing and service options are offered even to small customers.

Fourth, the system will be operated by an entity that is independent of all energy suppliers who are participants in the new competitive market.  Along with a market exchange mechanism that will determine the price of generation, a system operator will ensure customers continue to enjoy the high level of reliability that exists today.

Fifth, all consumers will be assured of having an available provider of electricity.  In this way, regardless of whether they take advantage of the new options, consumers could at least count on the safe and adequate provision of electric service at reasonable rates.  Also, necessary public programs will be funded and carried out if they are not otherwise provided by the market.

Sixth, consumers will be provided reliable information about available options and will be given assistance in making wise choices about the provision of electric service.  Thus, consumers will be fully educated about the new players in the competitive market and will be able to take advantage of the available benefits.  Also, consumers will be aware of the mechanisms in place to resolve individual problems if they develop under the new industry structure.

Seventh, information will be available that will permit adequate oversight of the new market for electricity and protection of consumers from abuse.  This will provide an opportunity to ensure that competitors are acting in a way that is consistent with this vision.

Goals

In general, the principles we adopted June 7, 1995 set forth the overall goals of the future regulatory regime by

-27-

CASE 94-E-0952

briefly stating the advantages to be gained and the limitations that are necessary as the State moves toward a more competitive electric industry.  Translating these guiding principles into specific goals should help sharpen the focus of what is expected to be accomplished as the industry is transformed.

Consistent with the foregoing vision, general goals for the future include the following:

1.  <u>Lowering Rates for Consumers</u>

Market forces overall are expected to produce, over time, rates that will be lower than they would be under a regulated environment.  As we move toward competition, our expectation is that rates overall will be reduced.

2.  <u>Increasing Customer Choice</u>

Increased customer choice among types of services and prices to be paid should mean allowing customers throughout the State the opportunity to choose among a number of suppliers (such as generators and energy service companies (ESCOs)) of electricity and other services.  Customers will also be able to choose to lower their levels of electric service in return for economic benefits.[43]

3.  <u>Continuing Reliability of Service</u>

In order to protect all consumers, any new system involving competition in the generation sector must have reliability of the bulk power system as a top priority, including an independent system operator (ISO) that must have the authority and means to continue to provide this reliability.

---

[43]  An example of this is interruptible electric service, that could be tailor-made to an individual customer's desires.

-28-

CASE 94-E-0952

    4.   Continuing Programs that are
          in the Public Interest

        We have the responsibility to ensure that electric
service is provided safely, cleanly, and efficiently.  This
responsibility may entail continuing specific measures to
preserve certain programs such as energy efficiency, research and
development, environmental protections, and low-income beyond
what competitive markets provide.


    5.   Allaying Concerns About Market Power

        No competitor or group of competitors should be able to
exercise undue market power over other competitors either because
of market power at another stage of production (vertical market
power) or because of dominance at the same stage of production
(horizontal market power).  The clearest way to preclude vertical
market power is to have divestiture of (1) generation,
(2) transmission and distribution, and (3) energy services.
Horizontal market power can be avoided by ensuring that a
sufficient number of independent competitors participate in the
market.


    6.  Continuing Customer Protections
         and the Obligation to Serve

        Statutory requirements make clear that our mandate is
to ensure that all New Yorkers have access to safe and reliable
service at just and reasonable rates.[44]  Each customer must be

──────────────

        [44]   As the electric industry moves toward a competitive
        environment, prices in the near term may be restructured
        to more closely reflect costs.  We are cognizant of the
        needs of customers who may at times face financial
        hardship which could jeopardize their access to electric
        service.  In this regard, examination of cost-effective
        and competitively neutral approaches to address this
        issue must be ongoing.

CASE 94-E-0952

able to count on at least one supplier who will continue to
provide service at reasonable rates in the event that (a) the
customer chooses to make no change from its current situation,
(b) a new supplier fails to meet its obligations, or
(c) competitive alternatives are not yet available in the area.

<u>MAJOR ISSUES NEEDING DECISION</u>

Numerous issues are raised by emerging competition.
The technical and legal issues are complex; and this opinion and
order analyzes only those issues that have immediate decisional
consequences, specifically those related to:  (1) competition in
general, including state/federal coordination and
wholesale/retail competition, (2) system reliability,
(3) strandable costs, (4) environmental and public policy
considerations, (5) corporate structure and market power, and
(6) obligation to serve.

<u>Competition in General</u>

A threshold question is whether to move toward
competition in the first place.  Most parties support moving
toward some form of competition in the provision of electric
services, and we agree.

First, competition should result in lower bills as
competitors have a greater incentive to lower costs than do
utilities under a regulatory regime.  This has generally been the
experience of the electric industry abroad and other deregulated
industries.  As customer choice increases, further pressure is
applied to lower costs or provide customers with tailor-made
options.  And as prices fall, economic growth is encouraged.
Additionally, innovation and the introduction of new products and
services should be stimulated as competitors vie for customer
business.  We also expect to see market-based solutions to public
policy issues rather than regulatory mandates.  Competitive

-30-

CASE 94-E-0952

providers (generators and energy service companies) would bear
more of the risk of investment decisions, and customers less,
than under regulation.  Finally, energy efficiency measures
(_e.g._, demand side management) could be pursued more aggressively
in a competitive energy service market.

        In order to maintain system reliability and quality
during the transition to competition, current safeguards, such as
service quality standards, will need to be continued.
Competition will also offer customers more choices and some may
choose lower service levels in order to achieve an economic
benefit.  These choices should be available as long as such
reduced service levels do not adversely affect other consumers,
who may desire higher quality service.  Some parties have
expressed a concern that elimination of cross-subsidies among
customer classes or otherwise shifting cost burdens could
increase rates for some customer classes in order to benefit
others.  This concern could be addressed, at least during the
transition, by establishing multi-year rate cap plans.  The
utility labor unions emphasize that downsizing by utilities could
hurt utility workers, although as utilities and other providers
find ways to expand their opportunities in the new industry, new
jobs may be created.  Finally, because of the serious
transmission constraints for electricity flow into New York City
and Long Island, competition in those areas will have to be
introduced in ways that address mitigation of the potential
market power problems that could be created.

        Moreover, we must take account of technological
developments and the movement toward competition elsewhere.
Advances in generation technology and a changed marketplace have
made production of power more inexpensive and have prompted the
calls for access to such cheaper sources of power.  Breakthroughs
in combined cycle combustion turbine generation, pollution
control technologies, and inexpensive and plentiful supplies of

-31-

CASE 94-E-0952

natural gas and coal have dramatically reduced the cost of
producing power compared to the large, older plants that were
built to the state of the art of their day.  Electric system
coordination makes it possible to provide access to alternative
sources of generation both physically and through contracts.
Economic tools introduced into the telecommunications and natural
gas industries are now being translated for application in the
electric industry.  These changes in the industry illustrate that
market forces, rather than government action, are increasingly
driving the transition to competition.

        These advances have been spurred in part by federal and
state laws designed to promote competition.  In implementing
these laws over nearly twenty years, the Federal Energy
Regulatory Commission has moved to open the electric system to
competition, most recently with its landmark rulemakings on
transmission open access issued less than one month ago.
Together, these developments herald a new competitive environment
in which generators, power marketers, and energy service
providers are actively seeking ways to serve end users with
economical sources of power and related products and services.
It is to the forces of this emerging marketplace that electric
utilities must adapt to survive and prosper.  Utility regulators,
too, must change and respond to the evolving competitive
environment in the best interest of ratepayers.  In securing the
future of safe, reliable power at reasonable cost, government not
only may, but must respond to these pragmatic considerations.
Consequently, as the electric industry becomes more competitive,
it is appropriate to adjust the regulatory framework

        We believe that introducing competition to the electric
industry in New York has the potential to reduce rates over time,
increase customer choice, and encourage economic growth; and we
declare our intent to encourage competition wherever feasible.
Because of differences in individual service territories,

CASE 94-E-0952

particularly due to the existence of transmission constraints, the level and type of strandable costs, and financial conditions, competition should be implemented on an individual company basis, taking into account the fact that some problems must be worked out collectively.  Utilities are encouraged to make creative proposals, specifically designed to best meet the needs of their customers and the realities of their particular cost structures, financial conditions, and system constraints, if any.  Given that our intention is to move toward competition statewide for its potential consumer benefits, and the need to maintain a high level of system reliability, the proposals should be consistent with these general policy directions.

    1.   State/Federal Coordination

        Our decision to further competitive opportunities in electric markets in large measure mirrors similar efforts at the federal level.  The Federal Energy Regulatory Commission (FERC) recently issued two final rules in major rulemakings addressing open access and stranded costs at the wholesale level[45] and the Open Access Same-Time Information System.[46]  FERC's efforts should generally assist the transition to a more competitive marketplace through the filing by utilities of non-discriminatory open access transmission service tariffs, the transparent provision of information on wholesale power transactions, and the required separation of wholesale marketing and transmission operation functions.

        FERC properly noted its deference to states on several matters, including retail service to ultimate consumers, service

---

[45]    RM 94-7-001 and RM 95-8-000, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (issued April 24, 1996).

[46]    RM 95-9-000, Order No. 889, FERC Stats. & Regs. ¶ 31,037 (1996) (issued April 24, 1996).

CASE 94-E-0952

reliability, generation and transmission siting, and authority to impose non-bypassable retail stranded cost charges. For example, FERC stated:

> This Final Rule will not affect or encroach upon state authority in such traditional areas as the authority over local service issues, including reliability of local service; administration of integrated resource planning and utility buy-side and demand-side decisions, including DSM; authority over utility generation and resource portfolios; and authority to impose non-bypassable distribution or retail stranded cost charges.[47]

More generally, FERC stated that it would "provide deference to state commission recommendations regarding certain transmission/local distribution matters that arise when retail wheeling occurs," and "will defer to recommendations by state regulatory authorities concerning where to draw the jurisdictional line under . . . [FERC's seven-indicator] test for local distribution facilities, and how to allocate costs for such facilities to be included in rates, provided that such recommendations are consistent with essential elements of the Final Rule."[48]   FERC's final rules, however, raise issues that

---

[47]   RM 94-7-001 and RM 95-8-000, Order No. 888 (issued April 24, 1996), p. 434, n. 544.

[48]   Ibid., pp. 437-438, n. omitted.  The seven indicators are:  (1) Local distribution facilities are normally in close proximity to retail customers.  (2) Local distribution facilities are primarily radial in character.  (3) Power flows into local distribution systems; it rarely, if ever, flows out.  (4) When power enters a local distribution system, it is not reconsigned or transported on to some other market.  (5) Power entering a local distribution system is consumed in a comparatively restricted geographical area.  (6) Meters are based at the transmission/local distribution

-34-

CASE 94-E-0952

warrant additional review, and it will be useful to set forth here our view of the jurisdictional lines between FERC's regulatory responsibilities and our own.

The Public Service Law vests us with broad authority over the construction, safety and reliability of electric facilities, the prices charged by electric utilities to classes of customers, and the requisite customer service standards and protections.[49]  We have generally, but not always, set rates to allow the utilities sufficient revenues to recover prudently incurred costs and to provide a fair return on investment. However, we are not bound to any particular ratesetting approach in exercising our authority to set "just and reasonable rates."[50]  And we have prescribed standards for ensuring the reliability, safety and, as appropriate, the environmental compatibility of electric generation, transmission, and distribution facilities.[51]

FERC's jurisdiction over electric utilities is derived from the Federal Power Act,[52] which limits FERC's authority "to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate

_____

interface to measure flows into the local distribution system.   (7) Local distribution systems will be of reduced voltage.  Ibid., p. 401.

[49]   See, e.g., PSL §§30-50; 64-76; 106-08, 110-119a; Article VII; and Article X (which subjects the siting and construction of new generation facilities to review by the New York State Board on Electric Generating Siting and the Environment).

[50]   Matter of Abrams v. Public Service Comm'n., 67 N.Y.2d 205, 216 (1986).

[51]   E.g., 16 NYCRR, Parts 85-86, 88, 102, 105, and 125-27.

[52]   16 U.S.C. §824 et seq.

-35-

CASE 94-E-0952

commerce . . . ."[53]  This authority, however, ". . . shall not apply to the other sale of electric energy . . .,"[54] and "federal regulation . . . extend[s] only to those matters which are not subject to regulation by the states."[55]  The Act specifically reserves to the states jurisdiction "over facilities used for the generation of electric energy or over facilities used in local distribution . . . ."[56]

As noted by the Supreme Court, the Federal Power Act introduces a "mechanical test which would bring under federal regulation all sales of electric energy except those specifically exempted, and would exclude all retail sales."[57]  The Court has read this section as drawing "a bright line easily ascertained, between federal and state jurisdiction."[58]  While the Federal Power Act established federal regulation over wholesale transactions of electric utilities in interstate commerce, it left exclusive authority to the states over generation, retail sales, and local distribution of electricity.[59]

The dual nature of federal and state regulation of electric services is not unique.  In the telecommunications industry, for example, the Supreme Court held that, although the states' setting of depreciation charges was alleged to frustrate

---

[53]   16 U.S.C. §824(b).

[54]   Id.

[55]   16 U.S.C. §824(a).

[56]   Ibid., §824(b).

[57]   Federal Power Comm'n. v. Southern California Edison Co., 376 U.S. 205, 211 (1964), reh'g denied, 377 U.S. 913 (1964).

[58]   Ibid., p. 215.

[59]   Arkansas Electric Cooperative Corp. v. Arkansas Public Service Comm'n., 461 U.S. 375, 378-79 (1983).

-36-

CASE 94-E-0952

a federal plan to modernize the telephone network, the federal agency's alleged need to rectify the situation did not diminish the states' jurisdiction; it therefore rejected the Federal Communications Commission's preemption argument.[60]  Thus, federal and state interaction may affect both costs and revenues, but such consequences do not alter the jurisdictional boundaries established by Congress.[61]

In order to facilitate state/federal cooperation, utilities should submit three filings to both us and FERC.[62] The first filing should be made by each utility to distinguish and classify transmission and distribution facilities for each company.  These submissions should delineate those facilities over which FERC may exercise authority versus those that are local in character and subject to state jurisdiction.  The second filing to be made jointly by the utilities should address transmission pricing.  Proper pricing of transmission services is necessary for ensuring maximum efficiencies in a competitive wholesale or retail market.  The third filing should also be made jointly by the utilities to address the formation of an independent system operator to supplant the New York Power Pool as the grid operator for the integrated transmission system in the State and a market exchange that will establish visible spot market prices.  We must have confidence that the independent system operator is established with adequate independence, authority, and means to provide for the reliability of the bulk

---

[60]     Louisiana v. Federal Communications Comm'n., 476 U.S. 355 (1986).

[61]     Id.

[62]     The requirement that these filings be submitted to FERC is contained within its Order No. 888.  While we have some differences with statements in the order, which we are presenting to FERC, we welcome FERC's call for state/federal coordination on these filings.

-37-

CASE 94-E-0952

power system, in order for us to fulfill our statutory responsibility for the assurance of safe and reliable service. Because these filings involve reliability and pricing issues that are integrally connected with the success of a movement toward competition, we should work closely with FERC to ensure the transition is handled properly and the public is well served. Therefore, we expect the utilities to work collaboratively with our staff to present these filings to us before they are submitted to FERC for its approval.  In order to move the competitive agenda forward expeditiously, we expect these filings to be submitted to us and to FERC by October 1, 1996.

    2.  <u>Wholesale/Retail Competition</u>

        A wholesale model allows generating companies to compete to sell their power.  In the "poolco" version, the generators bid into a pool which establishes a "spot" or hourly price based on the bids.  Transmission and distribution utilities would then buy from the pool at the spot price.  A flexible poolco model would allow transmission and distribution utilities to buy their power from a pool at spot market prices, from generators under physical bilateral contracts, or from the pool with contracts for differences with generators or power marketers.  In the bilateral version, the generators would each contract with one or more transmission and distribution utilities.  A retail model includes an opportunity for each individual retail customer to buy electricity from a generator (either directly or through a power marketer/broker) rather than through a regulated utility.  The transmission and distribution utility would simply deliver power to end-users.

        One difference between retail and wholesale is the role

-38-

CASE 94-E-0952

of energy service companies.[63]  The retail model introduces into the power market players that may have no direct interest in generation; instead, the energy service companies will have an incentive to find the most efficient means of obtaining and delivering power and to provide innovative service packages to customers.  Because the retail model introduces many more buyers, it heightens the role of the independent system operator in managing and dispatching power flows and administering associated financial transactions.

After analyzing both the risks and benefits of both types of models, including potential effects on customers, the recommended decision concluded that retail access has the potential to benefit all customers by providing greater choice among electricity providers as well as increased pricing and reliability options.

This section addresses the following subjects that are raised by wholesale and retail competition:  benefits and risks; simultaneous retail access; pilot programs; and a standard for retail access.

a.  Overall Balancing of Benefits and Risks

While competition in the wholesale electric market can be expected to provide some consumer benefits, significant additional benefits can be obtained by moving toward retail competition.  First, maximum efficiencies in any competitive market depend on the proper pricing of transmission services. Retail access, however, allows a greater number of market

---

[63]    Under a retail model, energy service companies could sell electricity directly to customers and could provide a variety of services, including energy efficiency services.  Under a wholesale model, the energy service companies would be precluded from selling electricity directly to customers.

CASE 94-E-0952

participants, which should result in lower prices, along with a greater incentive to provide diverse terms, conditions, and pricing in response to customer interest.

Customers of all sizes have expressed a preference for allowing customer choice.  This is particularly true for commercial and industrial customers, who maintain that the business climate in New York would likely improve if retail access were available for them at some definite time in the future.

Differences among customers make it difficult for a wholesale model to meet the variety of needs under tariff-based options.  Customers acting in their own self-interest, when presented with a variety of market choices, will arrange their consumption to maximize their welfare and save costs.  This should lead to a wide variety of customer options.  Allowing customers to choose among providers encourages creative marketing and permits a dissatisfied customer to change providers. Finally, retail competition is most likely to stimulate a competitive ESCO market and encourage ESCOs to find ways to deliver power and services at lower prices.

Concerns about retail access include the possibility of cost shifting.  Cost shifting could occur when common costs are not reduced proportionately as customers choose competitive alternatives.  This could increase the burden on remaining customers.  Any resultant cost shifting should be limited so that no classes of customers receive sudden increases when retail competition is available.  Retail competition, therefore, should be established within a structure of a well-designed ISO/market mechanism and carefully designed revenue allocation and rate design of wires charges on the transmission and distribution (T&D) system, at least until such time as stranded costs are no longer an issue.  Price caps are one potential mechanism for resolving this matter.

-40-

CASE 94-E-0952

One issue that arose in the case and again at the oral argument is whether financial "contracts for differences" offered in a wholesale model can replicate the benefits available in a retail model.  Financial "contracts for differences," as used in this case, are financial instruments entered into between a customer and a third party (e.g., generator, marketer, or aggregator) to set the price for generation supply.  Such contracts can be short term (1-2 months) or longer term (3-5 years or more), depending on the customer's needs.  Under such a contract the customer pays the pool the market price for generation supply and the seller pays (or receives from) the customer the difference between the market price and the contract price over the contract term.  (Such contracts are common in the gas industry.)  Supporters of these arrangements say that customers can achieve all the benefits attributed to the more complex "physical bilateral" contracts.

Physical bilateral contracts are agreements between a customer and supplier for the "physical" delivery of specific generation.  These are generally longer term instruments than contracts for differences, and the pricing, terms, and conditions are negotiable between buyer and seller.  While such contracts cannot physically provide for the delivery of the actual power being generated by the supplier, a continual tracking of generation output vs. customer usage over time can simulate that condition.  The contract would deal with pricing and supply of any differences between generation and usage over any increment of time.  The balancing needs of such contracts may make them more complex and costly for the ISO to administer, and the recommended decision suggested that such additional costs be borne by those choosing such contractual arrangements.

While the utilities believe customers will receive maximum benefits from contracts for differences, large customers are not convinced.  Such customers prefer to have the option to

-41-

CASE 94-E-0952

contract with a provider for the output of a specific source of generation.  Customers believe that more innovative and creative deals can be struck using bilateral contracts than limiting the options to contracts for differences.

    After reviewing the parties' positions, we are not convinced that the administration of physical bilateral contracts is so complex as to warrant their rejection.  We expect that such contracts will be required to comply with the rules established by the ISO so as to ensure reliability.  As long as the parties to such contracts pay the additional administrative costs (including the costs to maintain system reliability) associated with them, other customers should not incur any cost burdens or other adverse effects.  And if, in fact, such arrangements bring net benefits to the customers who choose them, they will better meet our vision and goals for the new competitive market.

                    *      *      *

    After balancing the benefits and risks, we are convinced that we should move toward retail competition.  A market with multiple buyers and sellers offers greater incentives and opportunities for lower prices, greater innovation, and expanded choice of options for customers.  The potential concerns over moving to retail competition can be allayed by providing safeguards for consumers during the transition and thereafter. The movement to increased competition should, at the onset, be designed to accommodate retail access in such a way as to maintain bulk system reliability and avoid "rate shock" for any customer class.  Specifically, we adopt the flexible retail poolco model accepted in the recommended decision.[64]  This model allows for retail access via both contracts for differences and

_____

    [64]    A description of the flexible retail poolco model is attached as Appendix C.

-42-

CASE 94-E-0952

physical bilateral arrangements.

   b.   Simultaneous Retail Access

      Some have suggested that all customer classes should
have access to retail competition at the same time in order to
avoid favoring one class over another.  Simultaneous access helps
avoid the concern held by some that those who go first will get
most of the benefits.  Although giving all classes retail access
at the same time may be more complicated than a structured phase-
in, simultaneous retail access is still the preferable approach
if achievable.

      Consistent with our intent to minimize rate shock for
any customer classification, retail access should be pursued for
its potential economic development benefits.[65] If the total
load subject to competition needs to be limited at the start for
administrative or practical reasons, such limitations may be set
as a percentage of load or the full load in a geographical area,
but experience in serving all customer classes should still be
gained.  Efforts to limit participation should be temporary, and
such approaches will need to be justified by the utilities
proposing them.

   c.   Standard for Retail Access

      Because of a concern that small consumers could be
disadvantaged by cost shifting in the wake of retail access, the
recommended decision proposed that the Commission consider
setting a standard, similar to that set for "streaming" in the

---

[65]   Even though smaller-use customers may need to be
aggregated, retail access for all customers should not be
delayed.

-43-

CASE 94-E-0952

gas industry,[66] that would allow retail access to go into effect only in a manner that produced benefits even for non-participants.

Many parties advocating retail access see no need for a standard, arguing that retail access, in and of itself, will benefit all consumers.  Some parties appear concerned that the standard of ensuring positive benefits for all consumers will unduly hinder the movement toward retail access, which many customers (particularly the larger ones) are clearly demanding.

Some consumer representatives favor the setting of a standard, but appear somewhat skeptical of how one would be imposed.  CUB is concerned that the standard would not meaningfully protect residential customers unless accompanied by clear and detailed standards for application and enforcement.

The Energy Association asserts that a standard would be needed if retail access can be imposed, and it does not oppose consideration of the "streaming" standard for the purpose stated in the recommended decision.  IBEW states that the standard should be at least as demanding as the one set for transactions in the gas industry, claiming that the gas industry is of far less significance to the economic health of New York than the electric industry.

IPPNY states that application of the "streaming" standard would be appropriate, with the clarification that it really means that retail access would be cost-effective over time (which is the test proposed in the recommended decision for the continuation of public policy programs).

MI, in contrast, sees no need for a standard for

---

[66]    R.D., pp. 51-52 and 67-68.  "Streaming" is the arrangement by a local distribution company for certain gas supplies dedicated to certain customers or markets. As several parties point out, streaming is not the same as retail access.

-44-

CASE 94-E-0952

assessing retail wheeling, since the benefits of a fully
competitive market will inure to all consumers.  According to MI,
full retail competition will cause all consumers to pay less; but
a wholesale poolco model will cause retail prices to increase,
necessitating more discounts and resultant cost shifting.

Staff asserts that the statutory requirement under the
Public Service Law is not that each customer benefit from retail
access, but rather that, _overall_, ratepayers will benefit.[67]
Arguing that streaming cannot be equated to retail access, staff
states that ratepayers are expected to benefit from increased
choices.

The Public Service Law's explicit requirement that
retail wheeling be authorized only if it is found to be in "the
overall best interest of the ratepayers" is a sufficient
standard.  Consequently, we must reject the streaming standard
suggested in the recommended decision.  As we stated previously,
retail access can be pursued for its potential economic
development benefits as long as it is consistent with our intent
to minimize rate shock for any customer classification.

d.  Pilot Programs

Some parties (including SCSHEER, Nassau/Suffolk Water,

---

[67]    Staff is referring to Public Service Law §66(12-b(b)),
which provides as follows:

The commission may also authorize utility
corporations to contract with existing or
prospective industrial and commercial
customers to wheel or deliver electricity or
gas purchased directly by such customers,
provided that the commission finds that such
arrangements are in the overall best interest
of the rate payers of the corporation, and
that the rates and fees for services provided
adequately compensate the corporation for use
of its facilities.

CASE 94-E-0952

and WEPCO) suggest that we immediately implement targeted demonstrations or pilot programs for retail access.  WEPCO states that outstanding generic issues should be resolved at the same time as retail wheeling trials are conducted.  Nassau/Suffolk Water states that pilot direct access programs for retail customers would help in the transition and a contribution of some share of pilot program savings to the utility could be used to write off strandable costs.[68]  SCSHEER asserts that a clear path to retail access should be established, by including targeted demonstrations of retail bilateral transactions across all customer classes.

MI, however, strongly opposes the implementation of limited pilot programs, instead asserting that benefits will flow to all customers from the implementation of retail access on a definite schedule beginning January 1, 1997,[69] for large customers.

We received various petitions seeking orders directing electric utilities to deliver electricity purchased by end-user groups.  These include:

> (1) Cases 95-E-0922, 95-E-0923 and 95-E-0924.  Petitions of the Villages of Patchogue and Sag Harbor and the City of Cortland for authority to conduct direct access/retail wheeling "pilot"

---

[68] Nassau/Suffolk Water states as follows:  "All participants in the pilot program would have to agree to pay strandable costs as ordered by the Commission and to begin to contribute immediately some share of their pilot program savings to the utility to be used to write off strandable costs, if any." Nassau/Suffolk Water's Brief Opposing Exceptions, p. 10.

[69] MI's Brief on Exceptions, p. 20.  At the oral argument, MI stated that a date of January 1, 1998 would also be reasonable.

-46-

CASE 94-E-0952

programs.

(2) Case 94-E-0385.  Petition of the
Education/Electric Buying Group
(Long Island) to purchase
electricity on the wholesale market
and to direct LILCO to distribute
such purchases to member school
districts.

(3) Case 95-E-0141.  Petition of Nassau
County to authorize retail wheeling
to all residents and businesses in
Nassau County.

Wheeled Electric Power Company, an active electric power
marketer, sponsors the first four petitions.  LILCO is the
serving utility in each case, except that the City of Cortland is
served by Niagara Mohawk.

        We favor pilot retail access programs that do not
impose inordinate complication or delay because they can be
helpful for identification and correction of practical problems
that have not yet been considered.[70]  Also pilot programs can be
viewed as demonstrating our commitment to resolving issues in an
orderly and timely manner.  The above petitions are referred to
the current cases for the serving utilities, specifically our
consideration of Niagara Mohawk's PowerChoice proposal and our

---

[70]    For example, in our recent decision approving a retail
access pilot program for Orange and Rockland Utilities,
Inc., we stated that adoption of that pilot program was
"reasonable in light of the electric industry's impending
transition to a more competitive environment.  The pilot
program promises to provide valuable information and
experience about retail access to the company,
participating customers, and the Commission."  Cases
95-E-0491 et al., Orange and Rockland Utilities, Inc. -
Rates, Order Concerning Settlement Agreements (issued
May 3, 1996), p. 5.

-47-

CASE 94-E-0952

recently initiated investigation of LILCO's rates.[71]

System Reliability

      The recommended decision concluded that reliability of the bulk power system is critical and must not be jeopardized by the pursuit of lower prices through competition.  To preserve reliability, the recommended decision proposed that effective competition at the wholesale level should be established first, with an eye toward adding retail access as rapidly as possible once a market is established and reliability is ensured.

      All parties agree that system reliability is critical and should not be jeopardized in any way, but they differ as to whether additional physical bilateral contracts may impair reliability.  The Energy Association sees such a risk, but Multiple Intervenors and Enron, among others, doubt that reliability will be adversely affected.[72]

      The Owners Committee and New York City especially emphasize reliability.  New York City states that its first priority is service reliability, and it urges us to preserve current reliability levels as a condition to the implementation of retail access.  The Owners Committee is gratified that the recommended decision considers reliability and security of the system to be of paramount importance.  While supporting the evolution from a wholesale poolco approach to full retail access, the Owners Committee remains concerned about the independent system operator's ability to maintain reliability.

      The importance of a reliable bulk power electric system

---

[71]    See Cases 94-E-0098 and 94-E-0099, where Niagara Mohawk's proposal is being considered, and Case 96-E-0132, where LILCO's rates are being investigated.

[72]    It appears likely that fewer physical bilateral transactions would take place under a wholesale model than under a retail model.

CASE 94-E-0952

cannot be over-emphasized.  Consumers now rely on very high
service quality, and their well being, and the state's economic
growth, require that it be maintained.  No changes in the future
regulatory regime should be allowed to compromise reliability,
even if the intention is to lower consumer prices.

        Accordingly, the disquiet over reliability expressed by
some parties is certainly understandable, given the major changes
in the provision of electric service that are being contemplated.
But the transition to competition need not impair the reliability
of the bulk electric system as long as the system is designed
correctly.  A properly designed and functioning independent
system operator must be able to ensure continued high levels of
reliability.  The independent system operator needs sufficient
resources and authority to ensure reliability.  A transition to a
wholesale model (even if for only a short period of time) will
allow a test of the proper design of the ISO.

        Related to the structure of the ISO is the question of
how installed capacity reserves, needed to maintain a high level
of reliability, should be handled.  One solution is to let the
market handle these matters, allowing customers, as a whole, to
determine the acceptable level of reliability and reserve margin.
Another is to have the ISO seek capacity through competitive
bidding.  A third solution is to continue oversight of this
function, which could include ISO load forecasting; reporting of
generation types and quantities offered to the ISO, as well as
anticipated reserve margin shortfalls; and review of such matters
as transmission constraints and incipient load pockets.

        Because of our statutory obligation to ensure safe and
adequate service,[73] the ISO should report to us on key
reliability information.  Once adequate experience is gained with
the restructured electric system, we may determine whether we

_____

        [73]     Public Service Law §§65 and 66.

                              -49-

CASE 94-E-0952

still need to review reliability data.

It is important that the ISO have the authority and the means to ensure the day-to-day operational reliability of the bulk power system.  These issues should be addressed in the filings to be submitted to us and to FERC[74] by October 1, 1996.

Strandable Costs

Strandable costs are those costs incurred by utilities that may become unrecoverable during the transition from regulation to a competitive market for electricity.

The recommended decision found that, while a generic decision can address certain aspects of the strandable cost issue, the calculation, the amount to be recovered from ratepayers, and the timing of recovery should be left to individual rate cases or utility specific proceedings that should begin during 1996.

The recommended decision also stated that creative means should be used by utilities and independent power producers to reduce the amount of strandable costs before they are considered for recovery, and that appropriate incentives should be implemented.  Additionally, recovery of strandable costs was recommended to be generally accomplished by a non-bypassable access charge or wires charge imposed by the distribution company.  Strandable cost recovery was also expected to require a careful balancing of interests and expectations, and to vary utility by utility.

---

[74]    The need for state/federal coordination regarding reliability is discussed supra.  ISO issues related to market power are addressed infra.

-50-

CASE 94-E-0952

1.  Parties' Positions

        In general, no new policy positions were articulated on
exceptions or at oral argument that were not previously known.
The Energy Association appears to be looking for opportunities
for recovery of the billions of dollars it estimates may be
stranded by a move toward a competitive market for generation.[75]
Bolstered by assurances from FERC of an opportunity to fully
recover stranded costs (at least at the wholesale level), and
possibly similar assurances in other state jurisdictions, the
Energy Association takes an extremely strong stand on this point.
At the other extreme are parties, most notably Municipal Electric
Utilities Association (MEUA), who assert that the Cajun case[76]
precludes any strandable cost recovery.[77]

----

[75]    During the proceeding, the Energy Association and staff
        estimated the total strandable cost statewide as being
        $25 billion and $14.4 billion, respectively (present
        value over an 11-year period, beginning in 1997).
        Although efforts have been made to reconcile these
        estimates, they still appear to be at least $4 billion
        apart.  However, the important strandable cost figures
        are not those calculated statewide, but rather those for
        each utility.

[76]    Cajun Elec. Power Coop., Inc. v. FERC, 28 F.3d 173 (D.C.
        Cir. 1994).

[77]    These parties overstate the significance of Cajun for
        their positions.  The decision, to be sure, contains
        wording that implies denial of stranded cost recovery on
        the grounds that the imposition of those costs in
        Entergy's transmission rates meant that Cajun could not
        compete in the market.  But the main point of the
        decision appears to be the requirement of a hearing by
        FERC before a decision is made.

CASE 94-E-0952

2.  <u>Overall Policy</u>

        Although there are many acceptable methods for setting utility rates, we generally have based rates on estimates of utilities' operating costs over a projected "rate year."  If projected revenues have been less than the amount needed to cover prudent and reasonable costs (including depreciation and a reasonable rate of return), we normally, but not always,[78] have allowed companies to increase rates.

        Competition could result in reduced sales volumes for utilities whose customers opt for competitive alternatives.  And while the loss of customers should also cause operating costs to decline, operating cost reductions may be less than revenue losses, because rates exceed marginal costs.  In that event, competition might lead to revenue requirement deficiencies--or so-called stranded investment.[79]

        The Energy Association (EA) argues that utilities are legally entitled to recover (and to earn a return on) stranded investment.  Specifically, EA contends that if competition results in revenue requirement deficiencies, the Commission <u>must</u> set each utility's rates so that total company revenues continue to cover fixed and variable costs (depreciation, a return on investment, and all prudent operating expenses).  In support of its position, EA presents two arguments; but neither is compelling.

        First, the Energy Association argues that a "regulatory

---

[78]  <u>E.g.</u>, Cases 28316 and 28612, <u>Rochester Gas and Electric Corporation - Steam Rates</u>, Opinion No. 84-19, Opinion and Order Concerning Steam Service and Determining Revenue Requirement (issued July 11, 1984).

[79]  Of course, in order to maintain earnings, companies with reduced sales normally cut costs in addition to the cost savings inherent in fewer customers and find ways to increase revenues through creative business plans.

CASE 94-E-0952

compact" guarantees utilities recovery of all investments that were once intended to meet customer demand.  If there is a regulatory compact, it provides that in return for the provision of safe and adequate service, utilities are entitled to "just and reasonable rates."[80]  While "just and reasonable" rates must reflect a reasonable balancing of ratepayer and shareholder interests,[81] they may or may not include stranded investment.

EA's second argument is that a "prudent investment rule" assures utilities recovery of all prudent costs incurred in the provision of service.  In <u>Matter of Abrams v. Public Serv. . of the State of N.Y.</u>, the Court of Appeals rejected a claim by the Attorney General that the Commission had erred in allowing Con Edison to recover its investment in a pumped storage project that was ultimately cancelled.  In doing so, the New York State Court of Appeals stated that "the New York Public Service Commission is not <u>bound</u> under <u>Hope Gas Co.</u> (<u>supra</u>) to use the 'prudent investment' approach and, indeed, it has not always done so (<u>see</u>, <u>Matter of Rochester Gas & Elec. Corp. v Public Serv. .</u>, 108 A.D.2d 35, 37; <u>Matter of Rochester Gas & Elec. Corp. v Public Serv. .</u>, 85 A.D.2d 486, <u>supra</u>)."[82]  Therefore, while it upheld

_____

[80]   <u>E.g.</u>, <u>Matter of Rochester Gas and Elec. Corp. v. Public Serv. Comm'n. of the State of N.Y.</u>, 108 A.D.2d 35, 37 (3rd Dep't 1985); <u>Market Street Ry. Co. v. Railroad Comm'n of California</u>, 324 U.S. 548, 567 (1945); <u>Los Angeles Gas & Elec. Corp. v. Railroad Comm'n. of California</u>, 289 U.S. 287 (1932); <u>San Diego Land and Town Co. v. Jasper</u>, 189 U.S. 439 (1903).

[81]   The regulatory compact perceived by EA allows for no consideration of customer impact in the ratemaking process.  A "compact" that ignored ratepayers impact would not be "just and reasonable."  See, <u>Democratic Cent. Comm. of the District of Columbia v. Washington Metro. Area Transit Comm'n.</u>, 485 F.2d 886, <u>cert. denied</u>, 415 U.S. 935 (1973).

[82]   67 N.Y.2d 205, 215 (1986).

-53-

CASE 94-E-0952

the Commission's decision as a reasonable exercise of discretion, the Court noted that the Commission could have <u>denied</u> Con Edison recovery of part of its investment in the project. "The PSC <u>does have</u> the discretion under <u>Hope Gas Co.</u> to permit no more than partial recovery of investment in a subsequently abandoned facility."[83]  Thus, New York State law[84] does not require the public to pay excessive rates in order to provide a company a return on stranded investment.[85]

As the electric industry becomes more competitive, it is appropriate to adjust the regulatory framework.  Consistent with the recently adopted incentive plans for New York Telephone and Rochester Telephone Corp., a longer ratesetting horizon, together with increasing regulatory flexibility, including <u>no</u> cap on earnings, and a realignment of regulatory risks to make investment decisions more market-oriented, should increasingly become the norm in the electric industry.[86]  This approach, while still employing cost-of-service regulation for monopoly

---

[83]     67 N.Y.2d at 217 (emphasis added).  The court also went on to cite the Commission's decision denying Rochester Gas and Electric rate recovery of its prudent cost of capital relating to the utility's steam plant.

[84]     In <u>Matter of St. Lawrence Gas Co. v. Public Serv. Comm'n. of the State of N.Y.</u>, 54 A.D.2d 815 (3rd Dep't. 1976), <u>aff'd</u>, 42 N.Y.2d 461 (1977), the Court of Appeals upheld a Commission decision disallowing prudent "start-up" costs.

[85]     See also <u>Permian Basin Area Rate Cases</u>, 390 U.S. 747, 800 (1964), and <u>Federal Power Commission v. Hope National Gas Co.</u>, 320 U.S. 591, 602 (1944).

[86]     Consistent with a more competitive marketplace, the two largest telephone companies in the State have voluntarily entered into long-term plans that cap prices for customers without choices, and provide vastly increased regulatory and earnings  flexibility for the companies and their shareholders.

-54-

CASE 94-E-0952

aspects of the electric industry, relies more on market forces for investment decisions and setting prices.  We would hope that utilities respond aggressively to these new competitive pressures by mitigating stranded costs, improving their productivity, and increasing revenues.  These forces, together with increasingly innovative rate designs and a more streamlined regulatory process, should produce lower rates and generate economic development and growth.  The utility filings we are directing are expected to reflect these trends.

We have considerable leeway to set rates that balance ratepayer and shareholder interests.  While we do not accept EA's legal arguments, we are not rejecting appropriate rate recovery. Cost recovery will ultimately depend upon the particular circumstances of each utility.

3.  Individual Determinations

We here set forth some of the matters to be considered in individual determinations.  As noted in the recommended decision, in order to be eligible for rate recovery, strandable investment must be prudent.

Consistent with the case-by-case approach, we do not now adopt a universally applicable sharing formula for strandable costs.  But every effort should be made to mitigate those costs, and we will consider incentives wherever possible to do so. Further, utilities may well have opportunities to enhance their markets and products in order to expand their revenue bases and enhance their financial well-being.

CASE 94-E-0952

    4.  Independent Power
      <u>Producer Contracts</u>

     A significant percentage of strandable costs arises from above-market-price IPP contracts.[87]  Arguments are being asserted by the IPPs and their lending institutions that any government-sanctioned abrogation of contracts would have far-reaching economic consequences.  In any event, it does not appear wise for us to adopt a generic formula to be applied statewide to the recovery of strandable costs due to IPP contracts, without consideration for IPP concerns and the unique circumstances of each utility.  Some IPP contracts may be bought out or renegotiated, and these efforts are appropriately being pursued at this time, regardless of the emerging competitive market. Interested parties are strongly encouraged to pursue agreements that reduce rates to benefit ratepayers.  If parties are unwilling, however, to restructure these contracts voluntarily, we shall pursue policies to mitigate the impact of such contracts on rates.

     Like utilities and other generators, independent power producers stand to gain in the long run from a competitive power marketplace that provides new opportunities to sell electricity at market prices.  Therefore, we offer IPPs an opportunity to present information to us about their plans for the transition to electric competition.  We urge the IPPs to work cooperatively with our staff and to move forward aggressively in appropriate forums to seek solutions such as a buyout of contracts or a renegotiation of them so as to align them more closely with a competitive framework.

---

[87]    According to staff's estimates, IPP contracts are about 38% of the total strandable costs.  R.D., p. 29.

CASE 94-E-0952

  5.  Mechanisms

        The strandable cost issue should not in any way
discourage individual utilities from filing rate cap plans, as
was accomplished in the telecommunication industry for NYNEX and
Rochester Telephone Corp.  Recovery of strandable costs through
access fees (or distribution charges) could also be
considered.[88]

        Regarding the issue of whether an access fee for
recovery of strandable costs must be truly non-bypassable, the
recommended decision asked parties to address the effect on this
issue of our current flexible rate guidelines.  Currently,
customers with contracts for negotiated or flexible rates would
be able to avoid any access fee, as the current contract rate may
not be sufficient to recover all transmission and distribution
costs including an allowance for strandable costs.

        Commenting parties overwhelmingly assert that we should
not change our flexible rate guidelines at this time, but should
hold open the possibility of re-evaluating them later, when the
competitive market has developed.[89]

        Flexible rates, as they are implemented in accordance
with the current guidelines, appear to be serving an appropriate
purpose in that they allow customers with competitive
alternatives to negotiate electric rates that keep them on the
electric system.  Modifications to this policy could cause
strandable costs borne by each of the remaining customers to
increase, if they resulted in more customers bypassing the
electric system.  Rather than implementing any changes in a
fragmented fashion, we will reassess the flexible rate guidelines

------

[88]   Of course, other creative suggestions for recovery
mechanisms are not precluded.

[89]   Staff suggests the need for flexible rates should be
reassessed in 1998.

-57-

CASE 94-E-0952

and the need for them after the competitive market has been in effect for a few years.[90]

Any recovery mechanism for utility strandable costs might be assessed as a charge upon the local distribution system. A reasonable place to assess a state stranded cost recovery charge, therefore, is as part of the distribution charge from the T&D company.

Environmental and Public Policy

The recommended decision concluded that:

Any restructuring model should include a mechanism for recovering costs required to be spent on environmental and other public policy considerations that would not otherwise be recovered in a competitive market. A non-bypassable system benefits charge appears to be a fair way of ensuring that such programs can be continued. These matters should be thoroughly considered in the context of individual utility filings. Additionally, since the adoption of a competitive model has the potential for significant adverse environmental impacts, the State Environmental Quality Review Act (SEQRA) requires that Department of Public Service staff prepare an environmental impact statement, so that the mandated weighing of environmental benefits will be available to the Commission as it decides this case.[91]

---

[90]    Additional issues related to the flexible rate guidelines are addressed infra.

[91]    R.D., p. 110.  The R.D. cited to Public Service Law §5(2) which reads as follows:

The commission shall encourage all persons and corporations subject to its jurisdiction to formulate and carry out long-range programs, individually or cooperatively, for the performance of their public service responsibilities with economy, efficiency, and

CASE 94-E-0952

Public Interest Intervenors, Citizens Advisory Panel, CPB,[92] IPPNY, Joint Supporters, Nassau County, and staff agree with the recommended decision's suggestion that there be a system benefits charge.

Joint Supporters states that we should administer a system benefits charge so as to stimulate competitive behavior by market entrants and to ensure the quality of energy efficiency programs.  Joint Supporters further states that the charge should be high enough to continue a vigorous market in fuel-neutral energy efficiency and renewable energy during the transition to competition.

Public Interest Intervenors claims such a charge could be administered by a utility or by a governmental or quasi-governmental authority.  The actual funding level, according to PII, should be the subject of further analysis and negotiation among the parties.  PII further asserts that we should explicitly recognize portfolio management as an essential attribute of a distribution company's obligation to serve, and continue policies to encourage the utility to assemble a least-cost resource mix.  PII also favors policies that encourage investment in renewable alternatives.

Staff agrees that, during the transition, transmission and distribution companies should fund public policy programs through a system benefits charge, but it would limit the funding to that needed for basic services and reduce even those levels as

---

care for the public safety, the preservation of environmental values and the conservation of natural resources.

[92]    CPB states environmental protection should be achieved using a market-based approach, with regulation only becoming necessary if there is market failure.  However, according to CPB, other public policy objectives (including low-income assistance and rural access) should be funded by a system benefits charge.

-59-

CASE 94-E-0952

competitive alternatives develop.

DED believes a system benefits charge could be imposed but only after certain steps are taken.  First, there would be a determination that the competitive market does not meet the identified public policy goal, and that there is no existing alternative.  Then, parties to a distribution company rate case would suggest ways for the utility to meet the public policy goal and cover its attendant costs.  Finally, a determination would be made as to the least costly manner for achieving the public policy goal without interfering with the market.  A uniform system benefits charge could then be imposed, but it should be a separate item on utility bills.

Multiple Intervenors, in contrast, totally opposes such a fund, claiming the market can and should provide any needed funding for environmental and public policy programs.  May/Sears would preclude bypass of any needed system benefits fund, but it believes most programs will be provided by the market.  New York Citizens expresses some concerns about the use of the proposed system benefits charge, and urges that any such charge should provide consumers with full information.  Energy Buyers asserts that such a charge should not be assessed without a prior demonstration that the benefits are both cost-effective and systemwide.  DOD prefers a market-based approach to environmental and DSM programs (with regulation only when there is market failure).

The Energy Association objects to a system benefits charge and to any other mechanism that uses utility rates to fund programs more appropriately funded through the market place or taxes.  MEUA strenuously opposes a system benefits charge, claiming that the concept itself is anti-competitive, and that social and public policy programs should be administered on a utility-specific basis, with charges being regulated through rate cases.

-60-

CASE 94-E-0952

As to SEQRA, MI maintains that SEQRA does not require environmental review at this stage of the proceeding.  In contrast, PII argues that the movement to a competitive industry structure is a sufficient action to trigger the SEQRA review process.  EA was also critical of the SEQRA review process.

We assumed lead agency status and issued a positive declaration that the action may have a significant effect on the environment;[93] issued a draft generic environmental impact statement;[94] and subsequently issued a final generic environmental impact statement.[95]  The findings required under SEQRA are addressed <u>infra</u>.

A system benefits charge would provide a funding source during the transition, and possibly over the long term, for public policy initiatives that are not expected to be adequately addressed by competitive markets.  It would be designed to ensure that the cost of carrying out these public policy initiatives was fairly allocated across most, if not all, users of the power distribution system, and recovered in a competitively neutral manner.  Initially, the system benefits charge would be set at approximately the level of current utility expenditures, with the expectation that these charges will be closely scrutinized with respect to their impacts on rates.  Programs funded in this way, along with the innovative programs likely to be developed by energy service companies, provide ample reason to be confident, as we are, that cost-effective energy conservation measures, including demand side management, will flourish in the new

---

[93]   Case 94-E-0952, <u>Memorandum and Resolution</u> (issued February 13, 1996).

[94]   Case 94-E-0952, <u>Order Concerning Draft Generic Environmental Impact Statement</u> (issued March 6, 1996).

[95]   Case 94-E-0952, <u>Memorandum and Resolution</u> (issued May 3, 1996).

CASE 94-E-0952

environment.  We anticipate the levels of energy efficiency programs accomplished in this way will be higher than existing levels.

In light of the potential benefits, a system benefits charge should be put in place during the transition to retail competition.  The use of a system benefits charge should be revisited sometime after retail competition has commenced to determine whether the level of these programs is sufficient and whether the continued use of a system benefits charge is required.

To ensure that funding is provided consistent with our policy and that any fund is administered properly, we will continue to oversee these programs.

Market Power/Corporate Structure

Decisions regarding corporate structure involve consideration of different ways to structure the ownership of functionally separate activities, such as generation.  The three basic options are as follows, using generation as an example:

(1) Functional Separation, which allows for continued vertical integration. Books and records would be segregated to show separately the generation function from all the others.  Generation would still be integrated with the utility, but all relevant costs would be removed from the regulated revenue requirement and recovered through prices set competitively.

(2) Structural Separation, which allows for a separate subsidiary or other structure, such as a holding company, which is identifiable and separate from the other functions of the parent utility.  The separate entity would have its own

-62-

CASE 94-E-0952

> set of books, employees, and
> finances.  While the utility would
> continue to own generation, it
> would be priced on the basis of the
> competitive market.
>
> (3)  Divestiture, which involves the
>       sale or spin-off of a utility's
>       generation or transmission
>       assets.[96]

The recommended decision found that it was preferable
to separate generation from transmission and distribution systems
to prevent concentration of market power.  The recommended
decision also stated that corporate structure need not be uniform
for all utilities statewide, and it suggested that utilities make
individual proposals regarding preferable corporate structures,
explaining how market power will be alleviated.[97]

Most parties appear to agree that generation needs to
be separated from transmission and distribution, but they differ
greatly about whether divestiture is necessary to avoid
concentrated market power.

CPB prefers divestiture in principle but regards
structural separation as more feasible and would adopt it as a
minimum requirement.  CPB further asserts that our access to
books and records can be ensured under either structural
separation or divestiture, and that the ISO should not own any
generation.

Staff favors divestiture, stating that it would be the
most effective means of preventing anti-competitive behavior and
would allow for up-front quantification of strandable costs.

---

[96]   It should be noted that to avoid having one firm exercise
excessive control over the generation market, it may be
necessary to have generation plants spun off or sold to
several independent firms.

[97]   R.D., pp. 110-111.

-63-

CASE 94-E-0952

Staff views structural separation as a less desirable alternative which may be acceptable in some circumstances, but urges that utilities be barred from filing merely a functional separation plan.

May/Sears states that functional separation would appear to satisfy the basic requirement that generation be separated; but to avoid even the appearance of conflict, according to May/Sears, ISO owners and/or governing boards must have no connection to generation.

PULP, in contrast, believes the recommended decision erred in suggesting that utilities should divest generation. The Energy Association similarly says functional separation provides a sufficient structural solution and that utilities should not have the burden of proving that divestiture is unnecessary.

NYPA claims that its proposed purchase of the bulk transmission facilities would eliminate the need for investor-owned utilities to divest generation.

The Owners Committee states that we should play a continuing role in policing anti-competitive behavior. Nassau County also claims that we should monitor activities of the market and any ISO to ensure that the prices to those with market strength do not differ unjustly from prices paid by smaller consumers.

Suffolk County urges us to favor a corporate structure that would promote competition, and says we should create a strong incentive for utilities to restructure.

1.  Divestiture of Assets

Critical to a movement toward a restructured industry is the need to avoid undue concentration of market power and particularly the use of monopoly power on the distribution side to unduly restrict choice on the generation side. Divestiture of generation and energy services is a clear way to allay concerns

-64-

CASE 94-E-0952

about vertical market power and avoid anti-competitive behavior
(such as cross-subsidies among affiliates in both competitive and
monopoly environments, and favored treatment of affiliates).
Divestiture may create a larger number of competing generating
companies and ESCOs, which can result in a dynamic and aggressive
market.  Also, an advantage of divesting generation is that a
clear market value for generating assets is established, allowing
a determination of, and hence greater recovery of, strandable
costs early in the process.

We strongly encourage divestiture,[98] particularly of
generation assets, but do not require it immediately.  Incentives
for divestiture should be worked out individually for each
company in conjunction with its filing.

Market power concerns similar to those regarding
ownership of generation are raised when a utility owns both the
transmission and distribution facilities and an energy service
company operating in the same service territory.  Vertical
integration of energy service and transmission and distribution
could result in cross-subsidization of energy service company
operations and provide company marketers with special access to
customer and system information.  These opportunities to game the

---

[98]    While competition encourages efficiency and induces
suppliers to charge prices approximating marginal costs,
suppliers with dominant market power are more likely to
earn excessive profits or charge prices that reflect
wasteful practices.  In order to ensure that electricity
customers are not subject to the abuses of dominant
market power, we reserve our authority to protect
consumers if a supplier obtains dominant market power.
(Public Service Law §66(12).)  We will also take a
variety of steps, such as the prevention of the formation
of dominant market power, to protect the consumers.  For
example, we will exercise our authority to address stock
or asset acquisitions that would lead to dominant market
power. (Public Service Law §70.)  We also have authority
under various provisions of the Public Service Law,
including §§69 and 108, to regulate mergers.

CASE 94-E-0952

system could dampen the interest of new entrants in the electric retail market.  While divestiture of energy service company operations is encouraged, for now we will allow utilities to continue to provide energy services to their customers either directly or through an affiliate.  Other issues related to energy service companies, along with the obligation to serve, are discussed later in this opinion and order.

    2.   <u>Load Pockets</u>

    "Load pockets" exist when, due to transmission system limitations, some generation must be located within a particular location in order to continue the provision of reliable service. Because in an open market, competing generators set the price for energy production, this situation may create horizontal market power concerns.

    In accordance with the recommended decision, a *"Report on Load Pocket Identification and Description,"* dated February 21, 1996, was submitted by Department of Public Service staff, who coordinated efforts by the active parties to describe load pockets in New York State and identify some potential solutions to the market power problems created by load pockets. The report revealed the existence of over 30 load pockets around the State, finding that they exist at various times within each utility's territory and that the largest and most significant are in the territories of Con Edison and LILCO.  The report also suggested a variety of mitigation techniques, including continued cost-of-service regulation.  It concluded that additional efforts were needed to analyze the existence of market power and the best ways to mitigate it.

    The report offered the following suggestions for coping with load pockets:

    (1)  transmission system reinforcements

-66-

CASE 94-E-0952

(including line reinforcements, equipment reinforcements, and readjustment of system flows);

(2) new generation (which would not change the existence of a load pocket, but could reduce or eliminate market power within that load pocket);

(3) reconfiguration of loads;

(4) demand side actions (through a variety of means including increased equipment efficiency and reducing loads);

(5) contractual methods (such as contracts for differences to remove any incentive for a generator to demand excessive prices through the exercise of market power, the execution of a contract for resources[99] before competition starts, and providing for needed resources with an appropriate lead time);

(6) continued regulation;

(7) price caps (could be either absolute or formula-based, set by a regulator or by a contract);

(8) an increase in the number of owners of generation; and

(9) mitigation of market power through steps taken by the independent system operator.

As to next steps, the report states that additional

---

[99] A "contract for resources" is a means of mitigating a generator's market power in a load pocket situation. It limits the prices based on agreed upon terms and conditions.

-67-

CASE 94-E-0952

studies and analyses are needed to further understand and mitigate the load pocket issue.  First, as suggested in the recommended decision, the report recommends that utilities should perform studies for their individual filings that will better define the location, nature, and duration of major load pockets during the next five years.  Second, the report recommends that interested parties continue their efforts to craft guidelines on how to mitigate the market power caused by various categories of load pockets.[100]

The additional studies and analyses of the existence and mitigation of the market power that may result from constrained transmission areas are ongoing and should continue following the issuance of this opinion and order.[101]  Parties should continue to analyze the mitigation methods that have been identified, along with other potential innovative solutions that protect ratepayers from monopoly pricing while allowing the benefits of a competitive market.  Because there appear to be transmission limitations in the downstate area, we expect the parties to pay particular attention to market power concerns in that area of the State.

---

[100]  The report also recommends that a study be performed to define load pockets across franchise areas.

[101]  On April 15, 1996, staff, on behalf of the parties, submitted a work plan to address these issues.  This effort should be adapted to ensure that work can be completed by October 1, 1996.

CASE 94-E-0952

     3.  Structure of the
       Independent System Operator

     Related to concerns about market power are questions about the structure of the ISO[102] and market exchange.[103]  NYPA has set forth one proposal, in which NYPA would purchase all transmission facilities from the utilities at a premium (which could be used to reduce strandable costs somewhat) and would become the ISO.  NYPA, however, did not propose to divest its generation assets, which raises other concerns about market power and independence.

     Another suggestion is that the T&D companies own and operate the ISO, while a third potential approach is to have an independent operator own and operate the ISO.

     In order to allay concerns about favoritism and market power, the owner/operator of the ISO should not own or have control over generation of its own that could unduly impact the competitive market, and should be truly independent.  Functional separation of generation, as NYPA suggests, may not be sufficient to allay market power concerns.  If the T&D companies operate the ISO and separate generation from other functions only structurally, they will have to demonstrate how vertical market power concerns will be alleviated.  FERC's Order No. 888 reaches the same conclusion:  it found that an ISO should be structured in a fair and non-discriminatory manner, and be independent of any individual market participant or any one class of

---

[102]    The function of the ISO is to operate and coordinate the electric grid.  The ISO would be responsible for the reliability of the state's transmission system.  As system operator, the ISO would dispatch generation based on market pricing while enabling the exercise of bilateral trading.

[103]    The primary function of the market exchange is to establish market prices.

-69-

CASE 94-E-0952

participants.[104]

NYPA's proposals need careful consideration, and
require the development of additional detail.  Under the
leadership of staff, parties are instructed to work
collaboratively to examine the feasibility of these proposals,
and, if appropriate, to incorporate these further details into
their ongoing work on the ISO structure and procedures.  The
parties should consider how ownership of generation assets should
be handled to address market power concerns.

In addition, a market exchange function needs to be
established to serve as the bidding or market forum for spot
market transactions.  The details of the ownership, governance,
practices, and procedures of both the ISO and the market exchange
must be completed.[105]  Filings should be submitted to us and to
FERC, by October 1, 1996, which detail the ownership, governance,
practices, and procedures to be implemented for both the ISO and
market exchange.[106]

Obligation to Serve

The recommended decision concluded as follows:

In order to protect all customers,
transmission and distribution companies will
need to remain obligated to serve all
customers, at least in the short term.
Consumer protections currently in place for
both residential and non-residential

---

[104]   RM 94-7-001 and RM 95-8-000, Order No. 888 (issued
April 24, 1996), p. 280.

[105]   On April 22, 1996, the parties, under the leadership of
staff, submitted a report on their ISO work up to this
point.  This work should be completed in accordance with
this opinion and order.

[106]   The need for state/federal coordination and other ISO
issues related to reliability are addressed supra.

-70-

CASE 94-E-0952

> customers should remain.  It is premature to
> conclude that energy services should be
> deregulated, without a record supporting the
> existence of effective competition in the
> market.  The current risks of unregulated
> monopoly in this critical area outweigh any
> potential gains.[107]

The recommended decision also noted that energy service companies may have a new, enhanced role to play in the provision of electricity under a retail model, and could become the primary contact point between the regulated transmission and distribution companies and customers.

1.  Provider of Last Resort

The Energy Association objects to the recommended decision's conclusion that the obligation to serve should continue without substantial change.

May/Sears supports the short-term solution that local distribution companies retain the obligation to serve and asserts that the distribution company should retain the obligation to serve customers without choices even after the implementation of competition.  May/Sears expresses confidence that the Commission and the Legislature will build in an adequate safety net for vulnerable core customers.  According to May/Sears, competitive energy service companies should not share in the obligation to serve.

Energy Buyers states that the obligation to serve should be strictly limited to the actual provision of electricity and that all other services should be market-based and unregulated.  Energy Buyers asserts that the utilities' obligation to serve will change under competitive conditions.

The question of whether transmission and distribution

---

[107]     R.D., p. 111.

CASE 94-E-0952

companies should serve as the providers of last resort must be evaluated in the context of the statutory mandate to ensure the provision of electric service safely and adequately at just and reasonable rates.  Residential customers generally take some degree of comfort with the provider of last resort being their familiar utility.  T&D companies would be set up to fully serve the needs of residential and small business customers with complaint mechanisms already in place.  Also, residential customers would be fully covered under the Home Energy Fair Practices Act (HEFPA)[108] if the T&D company remained as the provider of last resort, ensuring consistency with existing practice.

In telecommunications, the funding for "riskier" customers historically has been through access charges.  With the introduction of competition, we have used the "serve-or-pay" approach in order to encourage carriers to serve all segments of the market, including riskier customers.[109]  This approach provides carriers offering service to all customers a discount on certain access charges in recognition of the increased risk assumed.

In our gas industry restructuring case, we found that "Protections for residential customers [full HEFPA Protections] must remain in effect . . . .  That is, should a marketer discontinue supply, the customer will continue to receive gas service from the LDC [local distribution company].  The LDC then

---

[108]    Public Service Law §30 et seq.

[109]    Case 94-C-0095, Proceeding on Motion of the Commission to Examine Issues Related to the Continuing Provision of Universal Service and to Develop a Regulatory Framework for the Transition to Competition in the Local Exchange Market, Order Instituting Framework for Directory Listings, Carrier Interconnection and Intercarrier Compensation (issued September 27, 1995).

CASE 94-E-0952

will be required to provide full HEFPA protection prior to
termination."[110]   Recognizing, however, that competition is
still emerging in the gas industry, we directed a review of HEFPA
rules to determine whether changes are warranted.

On balance, the T&D company should continue to be the
provider of last resort for electric service, at least for the
short term while other options are more fully explored and
developed by staff and interested parties.   In both our gas and
telephone competition policies, the Commission has made clear
that given the essential nature of utility services, customers
shall have access to service at a reasonable rate during the
transition to a competitive environment.[111]

2.   Energy Service Companies

The recommended decision found no current market for
energy service companies.[112]   The Citizens Advisory Panel
agrees, and sees a need for continued consumer protections, to be
provided by the transmission and distribution company.

CPB states that we should apply appropriate consumer
safeguards to energy service companies while encouraging their
growth.

Owners Committee supports the development of energy
service companies, but not if this development results in
disruptions of service.

---

[110]   Case 93-G-0932, Gas Restructuring Case, Order Concerning
Compliance Filings (issued March 28, 1996), pp. 19-21.

[111]   In fact, Congress in the 1996 Telecommunications Act
included comprehensive provisions on carrier of last
resort requirements.

[112]   The recommended decision suggested that since service
disruptions could result from improper provision of
energy services, adequate protections should exist.
R.D., pp. 87-88.

CASE 94-E-0952

SCSHEER believes that the foundation for vigorous competition among energy service companies already exists. According to SCSHEER, we should take into account empirical data that it presented during this proceeding, which show that competition among energy service companies does now exist.

According to staff, the marketplace of competing energy service companies cannot develop if competition is limited to the wholesale level and will do so only if retail access is allowed.

The Energy Association disagrees with staff's conclusions that an energy service company sector cannot develop under wholesale competition.

Joint Supporters believes that utility filings should also address proposals for energy services.  It asserts as well that any wholesale market should allow energy services participants to sell financial contracts for differences in combination with energy efficiency, energy management services, fuel, and other commodities or services.

Enron agrees with staff that metering and billing should be competitive services.  According to Enron, both services must be unbundled on bills.

Citizens Utility Board believes we should regulate energy service companies to prevent abusive marketing.

Energy service companies have the potential to interact with customers with more creativity than they have thus far.  It is likely that customers will see packages of energy services, different fuels, varieties of rate plans, and other creative ideas, as the market develops and grows.  Those offerings, in turn, should foster development of the market.

Another issue related to customer protections is whether to license or certify energy service companies.  This seems to be an important step during the transition phase given the public's concerns about the credibility of the ESCOs.  A further advantage of licensing ESCOs is that data can be gathered

-74-

CASE 94-E-0952

about how they are working, how many and what kind of complaints they are getting, and what level of service quality they are delivering.  Additionally, a mechanism is needed to ensure that the companies are financially reliable.

On the other hand, licensing places additional limitations on the marketplace, possibly limiting the growth of the ESCO market.

In our judgment, the need to protect consumers is paramount, and ESCOs should be licensed or certified by a state entity.  The licensing requirements should provide basic information but should not be onerous.

Since it appears that energy service companies are interested in performing billing and metering functions, these matters need further attention.  Concerns about ensuring meter accuracy, among other issues, need to be addressed, and should be more fully explored by the parties.

3.  Consumer Protections

The recommended decision found that basic consumer protections should continue as part of the transmission and distribution company's obligation to serve.

The Home Energy Fair Practices Act currently affords residential customers certain consumer protections.[113]  These protections have served to ensure the safety and well-being of New York's utility customers.  Because of this law, any provider serving residential customers, whether it be a transmission and distribution company or an energy service company, is obligated to ensure that these customers continue to get basic statutory protections.  During the transition to customer choice, these

---

[113]  Public Service Law §30 et seq.  Among other things, the statute requires that all residential consumers receive service without undue delay and are protected from unwarranted disconnections.

CASE 94-E-0952

protections shall continue to apply.[114]  An agreement to provide
consumer protections could be a condition of licensing or
certifying any energy service company serving residential
customers.  As real choice develops, however, it may be sensible
to seek to streamline such requirements for new entrants while
ensuring that the provider of last resort continues to provide
them, a model we recently adopted for the gas industry.

OTHER ISSUES

Reporting Requirements

        In view of the concern about unregulated monopolies and
our role in monitoring the developing competitive market, the
recommended decision solicited suggestions regarding the types of
reporting requirements that would be needed.

        The responses ranged from statements that no special
requirements would be needed (Energy Association) to extensive
descriptions of needed information (staff).[115]  Joint Supporters
suggests that, after three years, a review be conducted to see
whether consumer protection functions can be phased out or
transferred to the Consumer Protection Board (where treatment of
consumers by other businesses is monitored).  NYPA points out
that with true competition, generation entities should have few
reporting requirements.  CPB refers to our reporting requirements
in the telecommunications area, which it says have been well
received, as a model to be adopted for use here.

        It is reasonable to expect some information necessary

---

[114]    Under a "serve-or-pay" model, the provider of last resort
         would be compensated for assuming these additional
         obligations.

[115]    Staff also recommended that the reporting requirements be
         reexamined at a checkpoint in three to five years.
         Staff's Brief on Exceptions, A-3.

CASE 94-E-0952

to ensure that effective competition in generation[116] and energy
services exists and is available to all participants.

         We may also need to continue to receive certain
reliability information particularly at the bulk power system
level.  Also, it will be necessary to continue to receive service
quality data sufficient to allow us to monitor the quality of
service being provided to customers.  During the transition to
competition, we expect to reduce the amount of information being
submitted.  We will balance that goal with the need for companies
to continue to report sufficient information to ensure that
customers are not affected adversely by declining service quality
or predatory business practices.[117]


Reciprocity Issues

         The recommended decision also asked parties to consider
how energy transactions occurring with other states and Canada
should influence New York's decisions at this time.  The
recommended decision asked for comments on whether there may be
unanticipated impacts depending on the way "New York addresses
such issues as strandable cost recovery and the development of a

---

[116]   Under current law, we may review the books and records of
        fully divested generation companies.  If the generating
        entity remains an "electric corporation" owning or
        operating electric plant (Public Service Law §§2(12) and
        (13)) and is not a qualifying facility under PURPA, then
        we have discretion regarding the extent of recordkeeping
        and review of books and records it may require.  See,
        e.g., Case 91-E-0350, Wallkill Generating Company, L.P.,
        Order Establishing Regulatory Regime (issued April 11,
        1994).

[117]   Our recent experience with service problems in NYNEX's
        service territory shows how important it is to provide
        adequate customer service oversight during a transition
        to increased competition.

-77-

CASE 94-E-0952

competitive market."[118]

The answers from the parties show a considerable range of positions regarding this issue.  For example, the Energy Association sees important concerns that have not yet been addressed, and that could result in unanticipated impacts and unfair advantages to some players.  Other parties, including staff, DED, and Joint Supporters, express a preference for a regional approach, but state a concern that New York's actions not be delayed pending the actions in all other jurisdictions. WEPCO asserts that reciprocity issues should be addressed during the restructuring process, but should not delay the transition to full retail competition.

MEUA considers this issue to be another reason for us to be cautious about moving toward retail access, since greater wholesale competition would be controlled by FERC and would not be influenced by New York's reciprocity policy.  Public Interest Intervenors and the Grand Council of the Crees raise concerns about potentially significant environmental issues that could result from increasing electricity imports into New York.

Reciprocity concerns seem to involve only electricity imported to New York.  Power sold outside the State seems to be viewed as a benefit, since it brings in revenues that might not otherwise be obtained.  This revenue might be used to help lower electric rates to New York ratepayers.

The concerns related to imported power appear to be primarily environmental in nature.  For example, power might come from sources that have environmental consequences either for the region in which they are located or for New York itself (as in the case of certain increased air pollution).  These issues have been addressed through the State Environmental Quality Review Act (SEQRA) review process, discussed infra.

---

[118]   R.D., pp. 60-62.

CASE 94-E-0952

        Accordingly, reciprocity issues do not appear to be a
compelling reason to slow down the development of effective
competition in New York.  Developments in other states and Canada
should be considered during the transition, but should not in and
of themselves delay actions that we believe are in consumers'
best interests.


                        IMPLEMENTATION PLAN
        Given the complexity and uncertainties of moving toward
competition, some parties question whether a specific time should
be set for the advent of competition.
        A main benefit of setting a timetable is that it would
give parties a goal and expectation that should move the process
along.  It also provides industrial and commercial customers an
incentive to invest based on an expectation of retail choice and
not to seek ways to avoid the system through bypass or moving
operations out of state.  Therefore, we adopt a goal of having
wholesale competition in place early in 1997 and retail access
underway early in 1998.
        There are many necessary steps to be taken in order to
achieve a more competitive arrangement in the electric industry
in New York, and these must be carefully managed.  We envision
two major phases of this work.  The first will take place over
the period between the time of this decision and the utility
filings.  While a six-month period for these filings has been
recommended, given the time that has elapsed since the
recommended decision was issued coupled with the need for
customers to enjoy the benefits of competition as quickly as
possible, we require that these filings be submitted by
October 1, 1996.
        The second phase will take place as these filings are
dealt with in this proceeding or otherwise reviewed.  The entire
process will be geared to the establishment of a competitive

                              -79-

CASE 94-E-0952

wholesale power market in early 1997 and the introduction of retail access early in 1998.  While some may regard this schedule as aggressive, the need to achieve the goals of competition is urgent and we must proceed without undue delay.

We expect collaboration among staff, the seven major utilities, and other interested parties, to accomplish the following activities by October 1, 1996, consistent with the rest of this opinion and order:

    (1)  filings by each utility with us and subsequently FERC to distinguish and classify transmission and distribution facilities, for each company, and by the utilities to address transmission pricing consistent with FERC's new policy on open access and the needs of a retail competition model;

    (2)  a filing by the utilities with us and subsequently FERC setting forth the structure, activities, authority, and procedures of the Independent System Operator and the Market Exchange (including the relationship of the Market Exchange to the ISO), consistent with the established retail access policy;

    (3)  the proposed resolution of market power problems as related to load pockets, consistent with the work plan filed on April 15, 1996;[119]

    (4)  recommendations regarding ESCOs in a retail competitive market including the development of licensing or certifying requirements, consumer safeguards, transfer of the obligation to serve to ESCOs, funding mechanisms that might be needed to

------------------------------------------------------------

[119]  The parties should be sure to address market power problems caused by multi-utility load pockets.

-80-

CASE 94-E-0952

> assure fairness among all ESCOs, and
> matters related to billing and
> metering functions;
>
> (5)   completion of a report by staff to
>       streamline the reporting requirements
>       necessary for us to monitor the new
>       competitive market to ensure
>       effective competition in generation
>       and energy services, as well as
>       certain reliability information
>       needed to assess performance of the
>       ISO; and
>
> (6)   the continuation of public forums by
>       both the staff and utilities in order
>       to provide education and consumer
>       input related to competition and the
>       needs in each particular service
>       territory.

Because of the need to proceed expeditiously, an administrative law judge will be available to mediate and resolve disputes that may arise among the parties during these collaborative efforts.

Shortly after the FERC filings are approved, we anticipate a wholesale competitive market will begin in early 1997.  The experience gained in the wholesale market prior to the introduction of retail access will allow parties to become more familiar with what can be expected in the way of market prices. By October 1, 1996, each major electric utility (except Niagara Mohawk, because it has already submitted its PowerChoice program, and, at least for now, LILCO, because we have already initiated an investigation of rates[120] and the Long Island Power Authority

---

[120]   Case 96-E-0132, <u>Proceeding on Motion of the Commission as to the Rates, Charges, Rules and Regulations of Long Island Lighting Company for Electric Service to Determine if Opportunities Exist to Reduce Electric Prices</u>, Order Directing Rate Filing (issued April 25, 1996).

CASE 94-E-0952

is analyzing its structure)[121] must file in this proceeding a rate/restructuring plan consistent with our policy and vision for increased competition.[122]

In order to move the competitive agenda forward expeditiously, the utilities are encouraged to consult with the Department of Public Service, and other interested parties as needed, in developing their individual filings.  The process for reviewing these filings will also allow an opportunity for comment by interested parties.

These filings should address, at a minimum, the following matters:

> (1)   the structure of the utility both in the short and long term, the schedule and cost to attain that structure, a description of how that structure complies with our vision and, in cases where divestiture of generation is not proposed, effective mechanisms that adequately address resulting market power concerns;

> (2)   a schedule for the introduction of retail access to all of the utility's customers, and a set of unbundled tariffs that is consistent with the retail access program;

> (3)   a rate plan to be effective for a significant portion of the transition that incorporates our goal of moving to a competitive market, including

---

[121]   The municipal utilities under our jurisdiction will ultimately be required to comply with the new policy but not at the present time.

[122]   In order to provide us with a complete view of the State's electricity providers, we request that NYPA also submit such a plan.

-82-

CASE 94-E-0952

>        mechanisms to reduce rates[123] and
>        address strandable costs;
>
> (4)    identification of the public policy
>        programs, whose funding is not
>        recoverable in a competitive market,
>        that need special rate treatment and
>        competitively neutral mechanisms to
>        recover such costs;
>
> (5)    an examination of the load pockets
>        unique to the utility, identification
>        of potential market power problems,
>        and proposals to mitigate market
>        power; and
>
> (6)    a plan for the provision of energy
>        services, including addressing the
>        continued provision of customer
>        protections consistent with an
>        emerging competitive market.

FINDINGS UNDER
STATE ENVIRONMENTAL QUALITY REVIEW ACT

On May 3, 1996, the Commission issued a Final Generic Environmental Impact Statement (FGEIS) in this proceeding. As lead agency for environmental impact review, the Commission makes these findings pursuant to §8-0109(8) of the State Environmental Quality Review Act and 6 NYCRR §617.11 of its implementing regulations. The proposed action in this proceeding is the adoption of a policy supporting increased competition in electric markets, including a preferred method to achieve electric competition; and regulatory and ratemaking practices that will assist in the transition to a more competitive and efficient

---

[123] We note that a result of restructuring in both the gas and telecommunications industries is that many commercial and industrial users experienced significant rate reductions primarily as a result of competitive options, while smaller rate reductions were generally experienced in the residential sector.

-83-

CASE 94-E-0952

electric industry, while maintaining safety, environmental, affordability, and service quality goals.

The FGEIS disclosed certain environmental impacts, facts, and conclusions that are considered here.  The likely environmental effects of a shift to a more competitive market for electricity are not fully predictable due to:

(1)   the complexity of the electric industry in New York;

(2)   the interaction of New York's regulatory activities with those of other states and the federal government;

(3)   the level and types of market responses; and

(4)   the lack of relevant examples of such a shift to competition.


In general, the proposed action will have environmental impacts that are modest or not distinguishable from those of alternative actions, including the no-action alternative identified by the FGEIS as the evolving regulatory model.  Apart from the areas of substantial concern noted below, the FGEIS did not identify reasonably likely significant adverse impacts.

With respect to air quality impacts related to oxides of nitrogen and sulfur, it appears likely that the retail or wholesale electric market structures would have greater impacts than the no action alternative.  It appears likely that, in the absence of mitigation measures, research and development in environmental and renewables areas would lose funding if competitive restructuring moves forward.  In addition, there would likely be a decrease in the amount of cost-effective energy efficiency during any transition to wholesale or retail competition, with a long-term reduction in energy efficiency in a

-84-

CASE 94-E-0952

wholesale market; in a genuinely competitive retail market, energy efficiency may stabilize or increase.

Electric industry restructuring will have impacts on the human environment as well. Specifically, retirements of electric generating stations under competition will have local economic effects and displace workers at those plants. These impacts will likely be limited to the localities in which generating plants are retired or constructed, or where new transmission or distribution facilities are constructed. Moreover, from an overall New York State perspective, it is likely that a shift to competition, if successful in reducing the cost of electricity, will yield considerable net benefits of an economic and social nature. Reduced electricity prices should yield increased economic growth and employment statewide well in excess of the jobs lost at retired plants. New plants may be built to meet growing demand, and ancillary businesses such as energy service companies providing DSM and related services should grow considerably. These businesses will have jobs and property taxes associated with them, though their locations are not yet known.

In order to address the adverse environmental effects identified above on air quality, energy efficiency, and research and development, several mitigation measures will be employed as necessary. First, a system benefits charge will be used as appropriate to fund DSM and research and development in environmental and renewable resource areas during the transition to competition. Second, the competitive restructuring will be monitored closely to ensure that specific mitigation measures are implemented if needed. Finally, the Commission will support and assist efforts by New York State and federal agencies to ensure that adverse environmental impacts to the state's air quality from upwind sources of air contamination do not occur as a result

-85-

CASE 94-E-0952

of the movement toward competition.[124]

Notwithstanding the mitigation measures identified, the proposed action to restructure the electric industry may result in an unavoidable adverse environmental impact on air quality related to oxides of nitrogen and sulfur, loss of some DSM activity, loss of some research and development funding in the environmental and renewables areas, and displacement of workers and local economic loss where plants are closed. Nevertheless, weighing and balancing these likely environmental effects of the shift to competition in the electric industry in New York with social, economic, and other essential considerations, leads to the conclusion that implementing the proposed action toward greater competition is desirable. A chief economic consideration regarding greater competition in the electricity market is the benefit of lower rates to customers. A principal social consideration is the benefit of increased customer choice from among generators, marketers, and energy services companies. Other essential considerations include continued provision of reliable electric service, maintenance of programs and activities, such as those involving fuel diversity, research and development, energy efficiency, environmental protection, and customer protections (including the obligation to serve) that are in the public interest, and continued assurance that concerns over the exercise of undue market power will be addressed.

Although likely environmental effects are hard to predict and the simulated scenarios examined were not model-specific, the flexible retail poolco model (under which a competitive market is expected to flourish) could yield as much

---

[124]    In order to assess whether additional mitigation measures are required in specific cases, each utility may be required to file with its restructuring plans a completed full environmental assessment form with a recommendation on whether further environmental review is necessary.

CASE 94-E-0952

or more energy efficiency as the evolving regulatory model, and potentially at a lower cost.  A situation in which many sellers compete to offer customers the best service at the least cost could overcome some of the market barriers which have left many efficiency opportunities unexploited.  Moreover, over the long term, a flexible retail poolco model driven by market forces may provide as much or more research and development than would occur under the evolving regulatory model.  Wholesale competition, by contrast, does not offer very good prospects for market driven electric energy efficiency or research and development to improve consumer functions.  The monopoly seller might recover stranded assets through a volumetric wires charge which would present a strong disincentive to promoting reduced consumption through energy efficiency and technological improvements.

Regarding social and economic considerations, because many suppliers, marketers, and ESCOs are expected to enter the market under a flexible retail poolco model, customers will be more likely to have increased choices in obtaining electric services than under a wholesale model in which a regulated transmission and distribution company sells electricity to all end users.  Similarly, prices to all classes of customers are expected to be lower under such a model than under a long-term wholesale model, because vigorous competition by a large number of buyers and sellers is expected to drive down the price of electricity on the wholesale level, while competition among companies striving to improve the efficiency of their operations, in order to attract and retain customers, is anticipated to lead to lower prices on the retail level.  ESCOs are also expected to assume the price volatility risk inherent in a retail model.

Concerning the maintenance of reliable electric service, market signals under a flexible retail poolco model are expected to provide proper price signals in the electric generation market, so that the safety and reliability of New

CASE 94-E-0952

York's bulk electric system should not be jeopardized.  Moreover, the reliability of the electric system will continue to be monitored and appropriate measures taken to ensure reliability in the event of market failure.  Finally, regarding public policy initiatives, a wholesale model has no advantage over a retail model.

On the basis of the foregoing discussion, the Commission makes the findings stated above regarding the environmental impacts of the proposed action and certifies that:

> (1)  the requirements of the State Environmental Quality Review Act, as implemented by 6 NYCRR Part 617, have been met;
>
> (2)  consistent with social, economic, and other essential considerations, from among the reasonable alternatives available, the action being undertaken is one that avoids or minimizes adverse environmental impacts to the maximum extent practicable, and that adverse environmental impacts will be avoided or minimized to the maximum extent practicable by incorporating as conditions to the decision those mitigative measures that were identified as practicable;[125] and
>
> (3)  as applicable to the coastal area, the action being undertaken is consistent with applicable policies set forth in 19 NYCRR §600.5,

---

[125]  These mitigation measures are:  (1) monitoring environmental impacts; (2) system benefits charge; and (3) assisting efforts undertaken by other agencies to address interstate pollution transport.

-88-

CASE 94-E-0952

> regarding development, fish and
> wildlife, agricultural lands,
> scenic quality, public access,
> recreation, flooding and erosion
> hazards, and water resources.

### FLEXIBLE RATES GUIDELINES

As previously stated, we asked that two limited flexible rate issues be addressed in this proceeding--issues related to contracts having prices set for longer than seven years and the treatment of special attraction contracts.

The flexible rates recommended decision (issued October 19, 1995) suggested retaining the general limitation of fixed prices for seven years (unless a longer term is approved on a case-by-case basis) and allowing negotiated rates for attraction contracts, in accordance with the existing flexible rate guidelines.  The flexible rate guidelines and a summary of the briefs that were filed are attached as Appendix E.  This section provides a brief analysis of the main exceptions.

Multiple Intervenors urges that utilities be allowed to enter into fixed flexible rate contracts for periods longer than seven years without prior approval, claiming that the seven-year limitation restricts the utilities' ability to compete and that adequate incentive mechanisms currently exist.

Because any utility can petition for a longer fixed price term, it appears unnecessary to change the guideline at this time.  Given the many substantive restructuring changes being contemplated during the transition to competition, and the decision reached earlier in this opinion and order to revisit these guidelines in their entirety in a few years, the existing approach is sufficient.

Staff prefers that sharing mechanisms for attraction contracts be the same as those for retention contracts, due to a concern about the parties' time and resources when the reasons

-89-

CASE 94-E-0952

for using a sharing mechanism are the same for both types of contracts.  Staff also believes that certain kinds of sharing mechanisms could result in perverse incentives.

Without diminishing staff's concerns, it appears that sharing mechanisms ought to be developed by the parties in each case, with maximum flexibility for creative solutions.  Parties should not be precluded from evaluating each case on its unique circumstances.

We therefore adopt the recommended decision on flexible rates.

Additionally, the more comprehensive recommended decision (issued December 21, 1995) asked parties to address the effect of the flexible rate guidelines on the potential restructuring of the electric industry.[126]  In response, staff asserts that the current guidelines, which require DSM audits as a condition of eligibility for flexible rate contracts, should be changed at this time.  Specifically, staff states that we should now adopt a flexible approach to the requirement for independent and comprehensive DSM audits, but that utilities should continue to be responsible for considering the energy efficiency opportunities of individual customers in the development of the prices and services offered under flexible rate tariffs.

Public Interest Intervenors opposes this proposed change, claiming that staff's suggestion would disadvantage utilities and interfere with customers' ability to consider carefully ways to lower their bills.[127]

Despite this objection, the flexible rate guidelines will be clarified in accordance with staff's suggestion, because the current rigid requirement that DSM audits be independent and

---

[126]    R.D., pp. 81-83.

[127]    PII's Brief Opposing Exceptions, p. 41.

-90-

CASE 94-E-0952

of specified detail is often inconsistent with the concept of a flexible contract and the move toward competition where customers are more responsible for their energy-related choices.  An approach that takes into account the specific circumstances of each situation is more appropriate, especially considering the transition to competition.  This is particularly important when considering that the basic purpose of the flexible rate program is to ensure the maximum possible contribution to a utility's system by customers who have alternatives, remembering that if these customers pursued their alternatives, they would no longer help cover to the utility's system costs.

<u>SITHE PROPOSAL</u>

By petition dated December 8, 1995, Sithe Energies, Inc. filed its plan for achieving ratepayer benefits, entitled "Energizing New York:  A Pro-Investor Plan for Ratepayer Relief," along with data and analyses prepared by Booz-Allen & Hamilton, Inc.  Sithe requests that we initiate a separate proceeding to consider this petition, which, among other things, alleges and suggests the following:

(1)    adoption of incentives for merger of New York's investor-owned utilities, from seven utilities to two utilities, in order to save about $1.2 billion;

(2)    refinancing of utility assets with public debt so that ratepayers can enjoy over $5 billion in savings between 1996 and 2006;

(3)    establishment of a "blue ribbon" panel to consider closure of nuclear plants;

(4)    provision of 300 MW of energy and capacity for economic development purposes by independent power producers; and

(5)    the postponement of retail wheeling for

CASE 94-E-0952

> five years or until the current excess
> capacity is absorbed, in order to prepare
> markets for competition.

By notice issued December 22, 1995, the Secretary
authorized parties to submit comments on the Sithe proposal in
accordance with the briefing schedule set in this case.  As a
result, many parties commented on the proposal, either within
their briefs or by separate documents.[128]

Most of the parties commenting urge rejection of the
Sithe proposal and see no need for a separate proceeding beyond
this one.  May/Sears calls the proposal "creative but bizarre,"
and urges that it be rejected unless more detail is provided to
allow further analysis.[129]  MI says the proposal provides no
benefits to consumers and is anti-competitive, and argues that it
should be rejected because it "would exacerbate the utilities'
market power, delay customer choice for at least a decade, and
perpetuate uncompetitively high electric rates."[130]
Nassau/Suffolk Water states that the proposal appears to stifle
competition and asserts that there was no time to evaluate the
method and assumptions used.  IBEW claims that the proposal
should be firmly rejected without any further consideration,

---

[128]  The following parties commented on the Sithe proposal:
CUB, EA (with separate comments from Niagara Mohawk,
Orange and Rockland Utilities, Inc. (Orange and
Rockland), and Rochester Gas and Electric Corporation
(Rochester Gas and Electric)), IBEW, May/Sears, MI,
Nassau/Suffolk Water, CPB, DED, DOL, Staff, NYPA, and
Utility Workers.  Comments by Orange and Rockland were
submitted by letter to the Secretary dated December 22,
1995.  Additionally, Sithe filed a response to the
comments on February 2, 1996.  The proceeding to consider
the Sithe proposal has been designated Case 95-E-1134.

[129]  May/Sears' Brief on Exceptions, p. 29.

[130]  Multiple Intervenors' Comments in Opposition to the
Petition of Sithe Energies, Inc., p. 2.

-92-

CASE 94-E-0952

since it calls for utility workers to suffer, protects Sithe's market from new entrants, and lacks any significant reduction in Sithe's huge profit.

In contrast, CUB asserts that the Sithe proposal should be carefully considered in the next phase of this proceeding and points out that there has been no opportunity for inquiry or careful analysis.  According to CUB, Sithe's proposed approach ought to be thoroughly evaluated.

Turning to the specifics of Sithe's proposal, several parties see flaws in the merger incentive.  Staff states that customer choice would be dampened by the creation of larger monopolies and claims that the potential savings are overstated by double counting.  Utility Workers wonders how combining utilities would increase competition.  Niagara Mohawk claims that mergers would not yield promised savings and could entail unintended negative consequences.  Also, according to Niagara Mohawk, the market, not regulators, should drive mergers, and the proposed timetable is unrealistic, allowing no time for necessary FERC and Justice Department review.  Orange and Rockland considers the merger incentive program premature, stating that the merger of vertically integrated utilities will produce very different results than would the merger of electric distribution companies.  Orange and Rockland believes that the purported savings are speculative, largely undocumented, and in all likelihood illusory, claiming that mergers will occur if they make financial sense.  Rochester Gas and Electric agrees with Orange and Rockland, adding that available data show no reason to conclude that large utilities produce lower rates and greater customer satisfaction than do small utilities.  NYPA considers the proposed regulatory measures to encourage mergers to be unnecessary if retail competition is introduced on a firm schedule.

CPB criticizes the merger proposal for failing to

-93-

CASE 94-E-0952

address corporate structure issues and creating a powerful duopoly.  DED believes the proposal is contrary to the movement toward competition, since it would result in two utilities having tremendous market power.  DED also states that the FERC Commissioners have put utilities on notice that the antitrust implications of mergers will require serious consideration and that potential efficiencies may not justify the risk of increased market power.  DOL states that the merger feature is not a model for introducing competition, but rather is a proposal to reduce rates, and questions whether mergers would result in timely benefits by reducing rates, since, according to DOL, it may take about three years to realize efficiency savings.  Also, DOL claims that authorizing incentives to encourage mergers would not be any protection against future rate increases.

As to the possibility of refinancing utility assets with public debt, DED claims this is not within our jurisdiction. Utility Workers claims that this would not yield savings to New Yorkers.

The creation of a "blue ribbon" panel to evaluate whether nuclear plants should be closed generated some interest. CUB regards the proposal as timely.[131]  Utility Workers has no objection to convening such a panel to determine the cost/benefit impacts of continued nuclear plant operation.  Staff states that this proposal could be considered as part of individual utility rate filings.  On the other hand, DED claims that there is no need for such a panel, which would create an unnecessary layer of review.  According to DED, there is a need to evaluate closure of nuclear plants in the context of the transition to competition.

As to the proposal to allow IPPs to provide 300 MW to

---

[131]   CUB states, however, that such a panel must include independent consumer representation, and its activities should maximize public access and involvement.

-94-

CASE 94-E-0952

businesses, DED claims this proposal is not within our jurisdiction. DOL asserts that this is the only attractive part of the proposal, but states that allocation of IPP power for economic development purposes can be done without approval. According to staff, this proposal duplicates current business development and attraction rate programs. NYPA also points to New York's existing economic development program, claiming that such a program already works and an IPP program would be unnecessary.

The postponement of retail wheeling for five years troubles several parties, including Multiple Intervenors, CPB, and DED. CPB is concerned that this aspect of the proposal would deprive consumers of large savings, while DED states that this would interfere with economic development.

Sithe, in response, points out that it sought action only on two parts of its proposal--establishment of a merger incentive program and the establishment of a panel to consider nuclear plant closure--and that the remaining three parts were included only to provide us with a full understanding of the proposal to lower rates. Sithe regards its proposal as a creative way to achieve lower rates, and says its merger incentive plan is compatible with competitive initiatives. According to Sithe, several parties, including staff, recognize that utility mergers can result in efficiencies that would ultimately benefit ratepayers. As to the proposal for a "blue ribbon" panel, Sithe claims that the main reason for setting up such a panel is the need for an objective and consistent evaluation of whether it is in the best interests of ratepayers to continue nuclear plant operations.

As Sithe points out, it is asking us to take only two actions: create a merger incentive program and establish a "blue ribbon" panel. But, largely for the reasons provided in the parties' comments, we decline to take even these actions.

-95-

CASE 94-E-0952

Utility mergers can and should take place if (but only if) they make good economic sense and do not lead to undue market power. There is no need for specific incentives for corporate rearrangements to occur, and we will not establish financial incentives to encourage such changes.

Nor is there any need for a special "blue ribbon" panel to address closure of nuclear plants. The disposition of nuclear plants will have to be considered in utility divestiture plans and utilities will have to explain the rationale for continued operation. While the exploration of statewide solutions may be appropriate, it is not necessary to establish a special panel. Creation of a separate panel, as DED points out, would result in an unnecessary additional layer of review.

Finally, Sithe's suggestion that retail wheeling be delayed for five years or until the current excess capacity is absorbed conflicts with our conclusion, explained above, that we should move toward retail access with due speed.[132]

CONCLUSION

In accordance with the above discussion, the following summarizes our policy direction:

Competition

· Competition in the generation and energy services sectors of the electric industry will be pursued for its potential to reduce rates over the long term, to increase customer choices, and for other economic development advantages.

· The utilities should propose mitigation

---

[132]   Sithe's proposal is also inconsistent with Niagara Mohawk's "PowerChoice" plan, which is currently under consideration in Cases 94-E-0098 and 94-E-0099.

CASE 94-E-0952

measures for any part of their service territories where transmission constraints create excessive market power.  Further analysis of this area is ongoing and should be addressed in each utility's filing.

Wholesale and Retail Competition

· Retail competition has the potential to benefit all customers by providing greater choice among their electricity providers as well as increased pricing and reliability options, and is expected to be available for all customer classes.

· In order to ensure an orderly transition to retail competition, a short wholesale competitive phase will be implemented.  Wholesale competition is expected to begin in early 1997, and retail competition is expected to begin in early 1998.

· By October 1, 1996, each utility is to file with us and subsequently FERC a proposal to distinguish and classify transmission and distribution facilities, and utilities are to file a transmission pricing proposal consistent with moving toward retail access.

System Reliability

· Reliability of the bulk power system is of paramount importance and must not be sacrificed in any way for the potential for lower prices from retail access. The independent system operator must have the independence, authority and the means to ensure reliability of the bulk power system and filings needed to establish this entity are to be completed by October 1, 1996.

-97-

CASE 94-E-0952

Strandable Costs

· The calculation of the amount of
  strandable costs to be recovered from
  ratepayers, and the timing of recovery
  will be determined individually for
  each utility as a part of the rate
  plans required to be submitted.  Those
  rate plans require a careful balancing
  of interests and expectations and may
  vary utility by utility.

· Creative means must be used by
  utilities and independent power
  producers to reduce the amount of
  strandable costs before they are
  considered for recovery.  Incentives
  aimed at lowering costs to be recovered
  from ratepayers, including the buyout
  or renegotiation of IPP contracts,
  should be implemented.

· Recovery of strandable costs may be
  accomplished by a non-bypassable
  distribution charge imposed by the
  transmission and distribution company.

· Utilities should have a reasonable
  opportunity to seek recovery of
  strandable costs consistent with the
  goals of lowering rates, fostering
  economic development, increasing
  customer choices, and maintaining
  reliable service.

Environmental and Public Policy

· Costs required to be spent on necessary
  environmental and other public policy
  programs that would not otherwise be
  recovered in a competitive market will
  generally be recovered by a non-
  bypassable system benefits charge.
  These matters will be thoroughly
  considered in the context of individual
  utility filings.

Market Power/Corporate Structure

-98-

CASE 94-E-0952

- In a wholesale or retail competitive model, generation and energy service functions should be separated from transmission and distribution systems in order to prevent the onset of vertical market power. Total divestiture of generation would accomplish this most effectively and is encouraged. As to energy services, to the extent that divestiture will provide consumer benefits (lower rates, increased choice, and reduced likelihood of market power abuse), divestiture of this function is encouraged.

- Horizontal market power (including problems raised by load pockets) raises significant concerns and must be addressed specifically through the ongoing collaborative work of the parties and especially through the individual utility filings directed by this opinion and order.

Obligation to Serve/Customer Protections

- The development of a robust market for energy services is encouraged. However, in order to protect all customers, transmission and distribution companies will need to remain obligated to serve all customers, at least in the short term. Consumer protections currently in place must remain. The relationship of the energy service function to the T&D company should be addressed in individual utility filings.

In order to implement this policy direction, we adopt a two-prong approach. There will be a collaborative effort among staff, the utilities, and other interested parties, to accomplish technical studies (including addressing market power concerns, the role of energy service companies, and reporting

-99-

CASE 94-E-0952

requirements), necessary FERC filings, and public educational forums by October 1, 1996.  Also, five utilities[133] will submit filings by October 1, 1996, to address, at a minimum, the utilities' structure, retail access proposals, long-term rate plans, public programs, market power, and energy services.  After October 1, 1996, we will review the filings.

In conclusion, all possible efforts to reduce electric rates should be continued, including efforts to ease the high tax burdens in New York State and to reduce utility commitments under independent power producer contracts that include obligations for payments well above current wholesale prices.  Finally, we shall reduce regulation as competition emerges.

<u>The Commission orders</u>:

1.  Except as here granted, all exceptions to the recommended decisions of Administrative Law Judge Judith A. Lee and then-Deputy Director Ronald Liberty in this proceeding, issued October 19, 1995, and December 21, 1995, are denied.

2.  By not later October 1, 1996, Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., New York State Electric & Gas Corporation, Orange and Rockland Utilities, Inc., and Rochester Gas and Electric Corporation shall file proposed plans for rate/restructuring, as discussed in the foregoing opinion.

---

[133]   These include all the major electric utilities in the State, except for Niagara Mohawk and, at least for now, LILCO, whose rates and structures are currently being considered in other proceedings and forums.

-100-

CASE 94-E-0952

      3.  Cases 94-E-0952, 95-E-0922, 95-E-0923, 95-E-0924, 94-E-0385, and 95-E-0141 are continued.   Case 95-E-1134 is closed.

                                    By the Commission,


      (SIGNED)                   JOHN C. CRARY
                                Secretary

CASE 94-E-0952

APPENDICES

**Case 94-E-0952 – COMPETITIVE OPPORTUNITIES
Briefs on Exceptions (due 1/19/96)**

**29 Briefs on Exceptions, and 5 separate filings regarding the Sithe proposal**

1.   American Association of Retired Persons (AARP)
2.   Citizens Advisory Panel (CAP)
3.   Citizens Utility Board (CUB)
4.   City of New York  (NYC)
5.   Energy Association of NYS (EA)
6.   Enron Capital and Trade Resources (Enron)
7.   Independent Power Producers of New York, Inc. (IPPNY)
8.   Interested Lenders
9.   International Brotherhood of Electrical Workers (IBEW)
10.  Joint Supporters
11.  May Department Stores Company/Sears Roebuck and Co.
     (May/Sears)
12.  Multiple Intervenors (MI)
13.  Municipal Electric Utilities Association (MEUA)
14.  Nassau County (Nassau)
15.  Nassau Suffolk Water Commissioners Association
     (Nassau/Suffolk Water)
16.  New York Citizens for a Sound Economy (New York Citizens)
17.  New York Energy Buyers Forum/Columbia University/Greater NY
     Hospital Association (Energy Buyers)
18.  New York State Consumer Protection Board (CPB)
19.  New York State Department of Economic Development  (DED)
20.  New York State Department of Law (DOL)
21.  New York State Department of Public Service staff (staff)
22.  Owners Committee on Electric Rates (Owners Committee)
23.  Power Authority of the State of New York (PASNY)
24.  Public Interest Intervenors (PII)
25.  Public Utility Law Project of New York, Inc.  (PULP)
26.  State & City Supervised Housing for Equity in Electric Rates
     (SCSCHEER)
27.  Suffolk County (Suffolk)
28.  Utility Workers of America, Local 1-2 (Utility Workers)
29.  Wheeled Electric Power Company/Association for Competition
     in Electricity (WEPCO)

**Separate filings received on Sithe proposal:**
     1.   Multiple Intervenors
     2.   New York State Department of Economic Development
     3.   Niagara Mohawk Power Corporation
     4.   Orange and Rockland Utilities, Inc. (dated 12/22/95)
     5.   Rochester Gas & Electric Corporation

CASE 94-E-0952                          APPENDIX A
                                        Page 2 of 2


## Briefs Opposing Exceptions (due 2/2/96)

**25 Briefs Opposing Exceptions, and 1 filing regarding the Sithe proposal**

1.   Citizens Advisory Panel (CAP)
2.   Energy Association of NYS (EA)
3.   Enron Capital and Trade Resources (Enron)
4.   Grand Council of the Crees
5.   Independent Power Producers of New York, Inc. (IPPNY)
6.   Joint Supporters
7.   Long Island Lighting Company (LILCO)
8.   May Department Stores Company/Sears Roebuck and Co.
     (May/Sears)
9.   Multiple Intervenors (MI)
10.  Municipal Electric Utilities Association (MEUA)
11.  Nassau Suffolk Water Commissioners Association
     (Nassau/Suffolk Water)
12.  New York Energy Buyers Forum/Columbia University/Greater NY
     Hospital Association (Energy Buyers)
13.  New York State Consumer Protection Board (CPB)
14.  New York State Department of Economic Development (DED)
15.  New York State Department of Law (DOL)
16.  New York State Department of Public Service staff (staff)
17.  Owners Committee on Electric Rates (Owners Committee)
18.  Power Authority of the State of New York (PASNY)
19.  Public Interest Intervenors (PII)
20.  Public Utility Law Project of New York, Inc. (PULP)
21.  State & City Supervised Housing for Equity in Electric Rates
     (SCSCHEER)
22.  Suffolk County (Suffolk)
23.  United States Department of Defense (DOD)
24.  Utility Workers of America, Local 1-2 (Utility Workers)
25.  Wheeled Electric Power Company/Association for Competition
     in Electricity (WEPCO)

**Separate filing received on Sithe proposal:**
     Sithe Energies, Inc.

APPENDIX B

## <u>CASE 94-E-0952 - ABBREVIATIONS</u>

**AARP** - American Association of Retired Persons

**ACE** - Association for Competition in Electricity

**CAP** - Citizens Advisory Panel

**CPB** - New York State Consumer Protection Board

**Cogen** - Cogen Energy Technology L.P.

**CUB** - Citizens Utility Board

**D** - distribution

**DED** - New York State Department of Economic Development

**disco** - distribution company

**DOD** - United States Department of Defense and all Federal Executive Agencies

**DOL** - New York State Department of Law

**DSM** - demand side management

**EA** - Energy Association of New York State

**EAF** - environmental assessment form

**EIS** - environmental impact statement

**Energy Buyers** - New York Energy Buyers Forum, Columbia University, and the Greater New York Hospital Association

**Enron** - Enron Capital & Trade Resources

**EPA** - United States Environmental Protection Agency

**ESCO** - energy service company

**FERC** - Federal Energy Regulatory Commission

**FGEIS** - Final Generic Environmental Impact Statement

**genco** - generation company

**GRT** - gross receipts tax

**IBEW** - International Brotherhood of Electrical Workers

**IOU** - investor-owned utility

**IPP** - independent power producer

**IPPNY** - Independent Power Producers of New York, Inc.

**IRP** - integrated resource planning

**ISO** - independent system operator

**LDC** - local distribution company

**May/Sears** - May Department Stores Company and Sears Roebuck and Co.

**MEUA** - Municipal Electric Utilities Association of New York State

**MI** - Multiple Intervenors

**Nassau** - Nassau County

**Nassau/Suffolk** - Nassau Suffolk Water Commissioners Association

**New York Citizens** - New York Citizens for a Sound Economy Foundation

**NFIB** - National Federation of Independent Business

**NOPR** - Notice of Proposed Rulemaking

**NUG** - non-utility generator

**NYC** - City of New York

**NYPA** - New York Power Authority

**NYPP** - New York Power Pool

**NYSERDA** - New York State Energy Research and Development Authority

**Owners Committee** - Owners Committee on Electric Rates

**PASNY** - Power Authority of the State of New York (same as New York Power Authority or NYPA)

**PII** - Public Interest Intervenors

**PSC** - New York State Public Service Commission (or the Commission)

**PSL** - Public Service Law

**PULP** - Public Utility Law Project of New York, Inc.

**QF** - Qualifying facility

**RD** - Recommended Decision

**R&D** - research & development

**Report** - "Restructuring New York's Electric Industry: Alternative Models and Approaches," Final Phase II Report, September 1995

**RTG** - regional transmission group

**SCSHEER** - State & City Supervised Housing for Equity in Electric Rates

**SEQRA** - State Environmental Quality Review Act

**Staff** - New York State Department of Public Service staff

**Suffolk** - Suffolk County

**T** - transmission

**transco** - transmission company

**TSO** - transmission system operator

**Utility Workers** - Utility Workers Union, Local 1-2

**WEPCO** - Wheeled Electric Power Company

Case 1:18-cv-02949-ARR-RER   Document 147-14   Filed 05/05/23   Page 112 of 160 PageID #: 5041

## FLEXIBLE RETAIL POOLCO MODEL

This appendix briefly describes the competitive model suggested by the recommended decision, the flexible retail poolco model.  The following areas are covered:  (A) generation; (B) transmission - independent system operator; (C) distribution; (D) customer service; (E) marketers, brokers, aggregators, and energy services companies; (F) role of NYPA; and (G) public matters (including demand-side management, research and development, and environmental).

A.   Generation

In areas where there is effective competition, generation should be largely deregulated.[1]  Pricing mechanisms would comprise both an active spot market and the opportunity for energy service companies, marketers and brokers, and customers to contract for electricity with generating companies.  Customers may enter into contracts with individual generators for physical delivery of electricity or may choose financial contracts for differences.  Initially, a wholesale-only competitive market would be formed.  ISO rules and market mechanisms, however, should be established in such a way as to quickly and efficiently accommodate retail access, including physical bilateral retail contracts, once such access is allowed in the various utility service territories.  Once retail access exists, generation would be unbundled from other services.

---

[1]      The determination of which areas do not have effective competition must be made after consideration of the relevant facts, and may require hearings.

Nuclear plants may require special consideration because of their relatively high fixed costs, the need to run them as baseload units, and the uncertainty of future cost obligations such as decommissioning and spent fuel disposal.


B.  <u>Transmission - Independent System Operator</u>

A properly functioning independent system operator (ISO) is essential for for any poolco model, and becomes even more important in a voluntary or flexible poolco that accommodates physical bilateral retail contracts.

While the details of how it would operate require further development, the ISO would have complete responsibility for providing reliable service.  The ISO would likely be regulated by the FERC with input from the State, and the FERC would determine proper enforcement rules, including financial penalties, to ensure the continued provision of reliable service at the transmission level.  Further, the ISO can be expected to remain bound by reliability criteria established by the NERC and NPCC.[1]

The ISO must be truly independent of players in the generation market in order to avoid the risk that those players gain undue market power.  Mechanisms must be in place to ensure that independence and the ISO must be explicitly prohibited from owning any generation assets that are used in a functioning competitive market.  (It may be acceptable for the ISO or a distribution company to own generation used primarily for

---

[1]      North American Electricity Reliability Council (NERC); Northeast Power Coordinating Council (NPCC).

reliability purposes.)  The ISO could be owned in any of three ways. Each has advantages and disadvantages, and we do not here express a preference among the three:[1]

    (1)  The ISO could be independent of any public utility;

    (2)  The distribution companies could jointly own the ISO; and

    (3)  NYPA could be the transmission system operator, as its staff suggests.

The ISO would coordinate the supply of electricity and maintain the reliability, security, and stability of the bulk power system.  Its major responsibilities would include scheduling power transactions, managing transmission congestion, and providing non-discriminatory and comparable access to the grid.  It also would provide control area services (including voltage support, spinning reserve, and load balancing) and could assess penalties against generators for failure to meet specified criteria.  The ISO would not participate directly in the purchase or sale of power on the competitive market, except as needed for reliability purposes.  It would determine the day ahead schedule, which all suppliers must comply with, and would ensure that system information was available fairly and rapidly to all participants.

The ISO would charge those participants who use its services, either on a fixed or variable basis (or both) that properly reflects its cost of doing business.

---

[1]  Some of these advantages and disadvantages relate to reliability, corporate structure, and NYPA's proposal to be the transmission system operator.

It is likely that the ISO would charge additional fees to those participants with bilateral contracts, to compensate the ISO for the additional cost of providing balancing services or other services needed to maintain system integrity.  In any bilateral contract, a generator would be prohibited from committing to do anything that violates the ISO's operating procedures, and the ISO will be able to override any contract provision that has the potential to impair system integrity or increase system risk.

Transmission tariffs, setting rates, terms and conditions, would be under FERC jurisdiction, although the Commission could participate in the FERC's proceeding if that were advantageous to the State.  The formation of a regional transmission group (RTG), consistent with FERC's policy, should not be ruled out, although a properly structured ISO could perform the functions of an RTG.  The RTG, if established, would provide open access, long-term planning, and handle pricing and dispute resolution for the transmission grid.  The RTG would also determine when new transmission lines are needed.

C.  Distribution

The regulated transmission and distribution companies would continue to be responsible for owning, operating, and maintaining the distribution system.

D.  <u>Customer Service</u>

      Customer services (including meter reading, billing and payment collection, and responses to consumer inquiries) will be provided by transmission and distribution companies or energy service companies.  The Commission will maintain its existing forum for resolving consumer complaints.

E.  <u>Marketers, Brokers, Aggregators, and Energy Service Companies</u>

      Energy efficiency services and the packaging of other innovative services may continue to be provided by energy services companies (ESCOS) including marketers, brokers, and aggregators.  When full retail access becomes available, deregulated ESCOS could become the primary interface between customers and the distribution company.  Customers would then contract with ESCOS for essential services, including power purchased on their behalf in the competitive generation market.

F.  <u>Role of NYPA</u>

      NYPA's proposal is that NYPA become the sole owner and operator of transmission.  NYPA suggests it would support the establishment of an RTG subject to FERC's regulation to help minimize concerns over owning generation and exerting market power.  Since it has no authority over NYPA, the Commission cannot mandate any particular role, yet the proper functioning of

APPENDIX C
Page 6 of 6

this entity is important to the success of the operation of any competitive model in New York State.[1]

It is clear that the role of NYPA needs to be reconsidered as a competitive generation market emerges in New York.  Part of this consideration should include the treatment of nuclear plants generally (NYPA owns two of the state's six operating nuclear plants).  Any major changes in the role of NYPA will likely require legislation.


G.    Public Matters

At least as a transitional mechanism, a system benefits charge should be imposed to ensure that public policy programs may be continued to the extent deemed necessary by the Commission in individual proceedings.

---

[1]   According to NYPA, it currently owns and operates 12 generating plants (providing about one-fourth of the State's electricity) and more than 1,400 circuit miles of high voltage transmission lines.  NYPA's Initial Comments, p. 1.  Some of NYPA's generation (particularly its hydro plants) cannot be sold at market prices because of long-term contracts tied to the cost of providing such power.

CASE 94-E-0952
COMPETITIVE OPPORTUNITIES CASE
APPENDIX D
SUMMARY OF EXCEPTIONS TO RECOMMENDED DECISION[1]

I.   INDUSTRIAL AND LARGE COMMERCIAL CONSUMERS

         May Department Stores and
           Sears Roebuck and Company (May/Sears)
         Multiple Intervenors (MI)
         Nassau Suffolk Water Commissioners
           Association (Nassau/Suffolk Water)
         New York Energy Buyers, Columbia University,
           Greater New York Hospital
           Association (Energy Buyers)
         Owners Committee on Electric Rates
           (Owners Committee)
         State & City Supervised Housing for
           Equity in Electric rates (SCSHEER)
         United States Department of Defense (DOD)

II.  RESIDENTIAL AND SMALL COMMERCIAL CONSUMERS

         American Association of Retired Persons (AARP)
         Citizens Advisory Panel (CAP)
         Citizens Utility Board (CUB)
         Consumer Protection Board (CPB)
         New York Citizens for a Sound
           Economy (New York Citizens)
         Public Utility Law Project
           of New York, Inc. (PULP)

III. INVESTOR-OWNED UTILITIES

         Energy Association (EA)
         Long Island Lighting Company (LILCO)

IV.  LABOR UNIONS

         International Brotherhood of Electrical
           Workers (IBEW)
         Utility Workers of America, Local 1-2
           (Utility Workers)

V.   PUBLICLY-OWNED UTILITIES

         Municipal Electric Utilities
           Association (MEUA)
         Power Authority of the State of New
           York (PASNY) or New York Power
           Authority (NYPA)

_____

[1] This summary of exceptions is a rough overview of the exceptions
received, using the words of the parties themselves, wherever
possible.

CASE 94-E-0952                                        **APPENDIX D**

        VI.   COMPETITORS (INDEPENDENT POWER PRODUCERS
                AND ENERGY SERVICE COMPANIES)

              A.   Independent Power Producers

              Independent Power Producers of
                New York, Inc. (IPPNY)
              Interested Lenders

              B.   Energy Service Companies

              Enron Capital and Trade
                Resources (Enron)
              Joint Supporters
              Wheeled Electric Power Company/
                Association for Competition in
                Electricity (WEPCO)

       VII.   ENVIRONMENTALISTS

              Grand Council of the Crees
              Public Interest Intervenors (PII)

      VIII.   NEW YORK STATE DEPARTMENT OF
                PUBLIC SERVICE STAFF (Staff)

       IX.    OTHER PUBLIC AGENCIES

                  City of New York (NYC)
                  Nassau County (Nassau)
                  New York State Department of
                    Economic Development (DED)
                  Department of Labor (DOL)
                  Suffolk County (Suffolk)

APPENDIX D
CASE 94-E-0952
COMPETITIVE OPPORTUNITIES CASE


<u>SUMMARY OF EXCEPTIONS TO RECOMMENDED DECISION</u>


I.   INDUSTRIAL AND LARGE COMMERCIAL CONSUMERS

**May Department Stores**
**<u>Sears Roebuck and Company (May/Sears)</u>**

Broadly and with numerous reservations supports RD.

Can support flexible retail poolco structure with reservations.

Commission must set a target date by which all utilities must institute some degree of retail wheeling.

Continues to support unequivocally retail bilateral model.  Do not need initial establishment of wholesale model before retail access.

Supports position that utilities are not entitled to full recovery of strandable costs.  Support suggestion that a set percentage of recovery be denied as a proxy of mitigation efforts on a going-forward basis.  Difficult to see what incentives would be effective to encourage IPPs to renegotiate their contracts.

To extent there needs to be a system benefits fund, it should be non-bypassable; however, most programs will be provided by market.

Functional separation would appear to satisfy basic requirement that generation be separated; but to avoid even appearance of conflict, ISO owners and/or governing boards must have no connection to generation.

Supports short-term solution that local distribution companies retain the obligation to serve; disco should retain the obligation to serve core customers even after implementation of competition.  Competitive escos should not share in obligation to serve.

**Reply:**
There is no merit to EA's claim that there is no record evidence.  Commission is entitled to and should make all determinations regarding matters within its jurisdiction.

Supports balancing in RD for stranded cost recovery.

To extent existing Public Service Law does not authorize the Commission to order retail wheeling for residential customers, this authority should be sought from the Legislature.

CASE 94-E-0952                                              **APPENDIX D**

        Introduction of retail wheeling will not negatively
effect system reliability.

        Disagrees with MI that retail access should only be
allowed initially to the largest customers; advocates
simultaneous access for all customer classes to the greatest
extent feasible (but this does not mean retail access should be
delayed until it can be offered to every customer).

        Cannot find with mathematical certainty "proof" of
benefits of competition; what is certain is that present paradigm
is not working; the introduction of competition in other
industries has resulted in benefits.

        Confident that the Commission and Legislature will
build in adequate safety net for vulnerable core customers.


        **Multiple Intervenors (MI)**

        Commission should not adopt a wholesale-only poolco
(will not result in lower prices; precludes customer choice;
precludes competition for merchant services).

        Retail access must be implemented on a definitive
expedited schedule (utilities should not dictate implementation
schedule; implementation of direct access should begin January 1,
1997; retail competition will benefit all consumers;  standard
for gas streaming is not appropriate for assessing whether retail
access should be implemented; system reliability will not be
compromised in retail market).

        Commission should not allow full recovery of stranded
costs (principles require sharing;  RD fails to limit recovery in
accordance with principles; utilities should have burden of
proving that any costs that are not mitigated should be recovered
from customers;  Commission should impute a level of mitigation
of stranded costs; non-bypassable access charge should not be
used to recover stranded costs).

        Commission should reject universal system benefits
charge (Commission has recognized that environmental values can
be preserved without a non-bypassable system benefits charge;
such a charge is incompatible with competition and will increase
the price of electricity for all consumers; such a charge
violates Cajun; will complicate Commission's regulatory
processes).

        Current flexible rate guidelines should not be
modified.

        Recommendation regarding staff's SEQRA motion would
unnecessarily delay the Commission's decision (SEQRA does not

                                **-2-**

CASE 94-E-0952                                              **APPENDIX D**

require Environmental Impact Statement now and one should not be
prepared prematurely;  Environmental Assessment Form does not
support a positive declaration).

**Reply:**

Commission should adopt a retail access model.

Commission should reject EA's efforts to delay
restructuring.

Commission has authority to order restructuring without
evidentiary hearings (Neither the State Administrative Procedure
Act nor the Public Service Law mandate a hearing; collaborative
processes are a lawful means of performing rulemaking).

Commission should not allow full recovery of stranded
costs (only this Commission has jurisdiction over New York State
retail stranded costs; utilities are not Constitutionally
entitled to full stranded cost recovery; NYPA's proposal for
"mitigation" of stranded costs would allow full recovery).

Commission should adopt a bottom-up or asset valuation
approach for determining stranded costs (EA's proposed changes to
the bottom-up approach should be rejected; Commission should
disregard the stranded cost analyses prepared by staff and EA).

Commission has authority to order retail wheeling.

Proposals for limited pilot programs (by WEPCO and
Nassau/Suffolk Water) should be rejected.

Compliance with SEQRA need not delay Commission's
decision.

PII's recommendations that the disco have a portfolio
management function and that renewable resources should be
mandated should be rejected.

**Nassau Suffolk Water Commissioners
Association (Nassau/Suffolk Water)**

RD represents astonishing achievement (is an accurate
and clear summary of work and position of parties; NY is again
leading the country; Commission should act swiftly.

Supports development of factual data regarding load
pockets (specifically interested in impact on Long Island).

Retail access must be provided to all customers.

Flexible rate policy should be maintained or expanded

**-3-**

CASE 94-E-0952                                          **APPENDIX D**

until competition renders it obsolete.

        As to ISO structure, long-term planning function would
be handled by Regional Transmission Group, and market making
function would be provided by separate group.

        Regarding strandable costs, Commission should adopt
RD's recommendation that utilities provide an initial estimate,
to be checked subsequently, with modifications (utilities should
be required to pay interest on over recovered strandable costs,
but would not be allowed to recover interest on under recovered
costs;  second calculation should be 18 months after first, and
third calculation should be two years later);  Commission should
make it clear that utilities should expect to recover only those
costs that cannot be mitigated and the evidentiary showing must
be compelling; finally, all NUGs and their primary lenders should
be served a copy of the Commission decision.

        Only companies and jurisdictions allowing reciprocal
direct access should be allowed to compete for load in New York.

        Nothing in LIPA's proposal to restructure LILCO is
inconsistent with a flexible retail poolco model.

        Sithe proposal appears to stifle competition, but if
consolidations of utility functions reduce costs without
adversely affecting competition, they should be considered.

        Pilot programs should be opened immediately to
municipal entities to gain experience with direct access.

**Reply:**

        In response to the EA's arguments regarding strandable
cost recovery, the RD's recommendations are consistent with state
and federal law;  the RD does not fail to recognize utilities'
constitutional rights and does not ignore the prudent investment
rule; Commission may wish to reward, with enhanced returns, those
utilities that aggressively mitigate strandable cost and embrace
competition.

        Pilot direct access program for retail customers would
aid in transition and savings could be used to write off
strandable costs.

        **New York Energy Buyers, Columbia University,**
        **Greater New York Hospital Association (Energy Buyers)**

        Commends RD on recommendation to adopt retail model and
on proposal to allow customers to purchase electricity either
through a poolco or bilateral contract.

**-4-**

CASE 94-E-0952                                                APPENDIX D

Retail wheeling should be approved for all classes and should be implemented pursuant to a schedule.

Retail access to electricity is not equivalent to streaming of gas.

Utilities should not decide when and how retail access should be accomplished.

The RD incorrectly states areas of differences between electric and gas utilities.

There is no evidence that more bilateral contracts will expose system to greater risks or that there will be more bilateral contracts in a retail market.

It is not reasonable for utilities to be permitted to recover 100% of their strandable costs.

Calculation of stranded costs should be performed by independent auditors or experts not tied to utilities.

Utilities must prove existence of load pockets as natural monopolies before it can be assumed effective competition is not possible.

System benefits charge should not be assessed without a prior demonstration that the benefits are both cost effective and system wide.

Stranded costs should be determined at a fixed point in time, not subject to future recalculation (finality of past costs is required for development of effective market).

Obligation to serve should be strictly limited to actual provision of service (all other services should be market-based and unregulated).

Market mechanism must be established which is separate from ISO.

Flexible rate policy should continue as a customer option.

**Reply:**

Commission should reject EA proposals that would delay implementation of competition.

There is no legal or policy reason for assuring full recovery of strandable costs without mitigation (prudent investment rule is not applicable to transition to competition; 100% recovery should be rejected; true-ups of strandable costs

**-5-**

CASE 94-E-0952                                                    **APPENDIX D**

should not be linked to market prices and asset values; imputed
mitigation is a reasonable offset to strandable cost; an exit fee
is discriminatory, inequitable, and anti-competitive).

Commission has statutory authority to order retail
wheeling.

Intrastate retail wheeling is subject to State
jurisdiction.
Commission should not adopt a wholesale-only poolco
model (it will not reduce operating costs to the level achieved
by a retail model; it increases inequities among customers; it
impedes customer choice; and retail access should be approved).

Staff's transmission pricing scheme should not be
adopted by this Commission (it is unworkable for customers
purchasing under bilateral contracts; it will cause downstate
customers to be captive to utilities; staff's proposal for spot
market pricing of energy and transmission does not meet FERC's
requirements).

Utilities' obligation to serve will change under
competitive conditions.

If any pilot programs are approved, they should be
available across customer categories and rate classes.

Commission has no authority over taxes and EA's claims
that they should be reduced must be rejected.

### **Owners Committee on Electric Rates (Owners Committee)**

Gratified that RD considers reliability and security of
paramount importance; supports evolution from wholesale poolco to
full retail access; still concerned about independent system
operator's ability to maintain reliability.

Large load pockets in New York City and Long Island
limit ability to obtain savings from wholesale competition alone.

Standard for allowing retail access should be that
other customers are not harmed.

Flexible rates must be available to "nominally captive
customers" and those who can leave the system.

ISO and transmission and distribution utilities must
both be responsible for system reliability and security.

Should be sharing of cost of strandable investments
only to extent they are actually incurred and cannot be
mitigated.

CASE 94-E-0952                                          **APPENDIX D**

**Reply:**

Need caution when implementing retail access. Commission must take into account many concerns, including financial integrity of utilities.

Supports development of escos, but not if results in disruptions of service. Commission should play a continuing role in policing anticompetitive behavior.

**State & City Supervised Housing for
Equity in Electric Rates (SCSHEER)**[1]

Should provide definitive early target date for introduction of retail access within 2 years of initiation of preferred model.

Should incorporate clear path to retail access including targeted demonstrations of retail bilateral transactions across all customer classes.

Should recognize foundation for vigorous competition among energy service companies already exists.
Should recognize that all customer classes are capable of achieving aggregated market power.

Should provide guidance to Legislature that NYPA's mandate to supply power to customers should be broadened during transition.

**Reply:**

Should adopt recommendations that there be a firm timetable for adoption of retail bilateral transactions.

Commission should recognize illogic and circularity of requiring evidence of competition before it allows to occur.

Commission should take into account empirical evidence presented by SCSHEER that competition among escos already exists.

Commission should include a clear process for transition from wholesale to retail competition, with a demonstration phase, with experiments across all customer

---

[1]     SCSHEER is a voluntary association addressing the electricity needs and costs of publicly supervised, limited profit housing. Its members include six property owners/operators with 16,500 dwelling units at 39 locations.

**-7-**

classes.

        Bilateral transactions already occur, and there is no evidence that it endangers system reliability.

        Wholesale poolco is a step backwards from the measure of true competition that already exists on the wholesale level.

        Transmission constraints that make a load pocket out of New York City and Long Island also limit the effectiveness of wholesale competition in those areas.

        Endorses concept of simultaneous access for bilateral retail transactions by all ratepayers, and disagrees that any class needs to lose out in a competitive market (through aggregation, all types of customers can gain).


              **United States Department of Defense (DOD)**[1]

**Reply:**
        Concurs with many parties urging the initiation of competition.

        Agrees with the need for a timetable for direct retail access for all consumers.
        Recognizes the paramount importance of reliability and agrees that the ISO would ensure reliability if given appropriate authority.

        Agrees with recommended decision that utilities are not entitled to full recovery of strandable costs.

        Prefers a market-based approach to environmental and DSM programs (with regulation when there is market failure).


**II.   RESIDENTIAL AND SMALL COMMERCIAL CONSUMERS**

**American Association of Retired Persons (AARP)**

        Supports RD generally but wants to ensure wholesale competition will provide benefits before rushing to retail competition (which could hurt small and low-income consumers).

---

[1]     Exceptions were filed on behalf of the United States Department of Defense as an electric consumer, and not as an expression of policy concerns by the Federal Government or any other federal agency.

CASE 94-E-0952                                          **APPENDIX D**

        Should move slowly to ensure continued reliability;
should not eliminate all protections and standards.

        Recommendation on strandable costs is vague and leaves
too many decisions to individual cases.

        Other parties should have opportunity to respond to
utilities' corporate structure plans.


### Citizens Advisory Panel (CAP)

        RD is sensible by stressing need to proceed
deliberately yet cautiously, but excepts to conditional
endorsement of retail model.

        Changes in structure must benefit <u>all</u> consumers.

        Fully agrees with RD as to strandable costs and need
for system benefits charge.

        Also agrees with RD as to lack of esco market and
continuation of consumer protections.

        Supports extensive public outreach and education.

**Reply:**

        Commission must evaluate risks of direct retail access
before committing to a schedule to implement retail access.

        Commission must maintain a broad perspective and use
all available means to lower electric bills.

        Providing simultaneous retail access to all consumers
does not ensure equal opportunity.

        A universal system benefits charge provides accurate
price signals.


### Citizens Utility Board (CUB)

        Restructuring should not be authorized without
assurances of lower prices for all consumers.

        Mere Commission fiat cannot assure that true
competition will develop and prevent market power exploitation.

        Commission should limit competition to wholesale level.

        Commission should not subsidize generators through
strandable cost recovery fees.

**-9-**

CASE 94-E-0952                                          **APPENDIX D**

Commission should regulate energy service companies to prevent abusive marketing.

Sithe proposal should be given consideration in next phase of proceeding.

### New York Citizens for a Sound Economy (New York Citizens)

Supports more competitive market structure, but poolco model would limit market transactions and could result in abusive practices by dominant suppliers.

Two-tiered transition to retail access raises potential for cost-shifting while limiting potential benefits of competition (Commission should adopt retail bilateral model with set transition period).

Bilateral model could be integrated into the regional system being developed by FERC.

Standard for retail access should be based on assumption of increase in consumer and producer surplus and reduced deadweight loss associated with move to competition; need to look at benefits to customers as a whole.

Reconciling different estimates of strandable costs is important step toward developing a consensus position on recovery.

Need thorough analysis before implementing an incentive system for strandable cost mitigation.

Has some concerns about use of system benefits charge as proposed; any such charge should provide consumers with full information.

### New York State Consumer Protection Board (CPB)[1]

RD represents important milestone; concurs fully with RD's endorsement of retail access concept, but process and structure for implementation need clarification.

---

[1]   While CPB is really a public agency and could have been listed with the other public agencies in Section VIII, its participation in this proceeding was predominantly as an advocate for residential and small business consumers in the State.  For this reason, it is included in this section with the other consumer representatives.

CASE 94-E-0952                                              **APPENDIX D**

Timetable for retail access should be established (retail competition implemented two years after initiation of wholesale competition).

There should be a presumption in favor of retail access rather than reliance on the gas "streaming" standard (all consumers should benefit from retail competition).

Simultaneous retail access for all customers is essential.

Commission should apply appropriate consumer safeguards to energy service companies (and should encourage their growth).

Structural separation should be the minimum requirement to address market power concerns (while divestiture is preferable, structural separation appears more feasible; Commission's access to books and records can be assured under structural separation or divestiture; ISO should not own any generation).

Strandable costs should be shared (based on fairness, Commission's principles and precedent, and economic impacts; as to mitigation, it is reasonable to impute expected efficiencies but should not be confused with disallowance of non-mitigatable costs; suggestion that certain IPPs be subject to retail entry fee has merit, but prefers staff's suggestions to encourage renegotiation; revenues lost under flexible rate contracts after the Commission's decision should be borne entirely by utilities).

System benefits charge recommendation should be approved with modifications.

Impact on other states and Canada should be subordinated to need for lower rates in New York.

Commission should rely on its experience with telecommunications reporting requirements as well as its ability to condition subsidiary approvals to monitor electric competition.

Sithe proposal should be rejected.

**Reply:**

EA's arguments regarding the issuance of an RD are unfounded.

Responding to EA's and IBEW's exceptions, strandable costs must be shared.

Cost shifting under any model is unwarranted.

**-11-**

CASE 94-E-0952                                        APPENDIX D

Only the retail model will result in lower prices for all customer classes (in response to positions by EA, CAP, and CUB).  In event a wholesale competition or evolving regulatory model were adopted, consumer protections would be needed.

Simultaneous retail access for all customer classes is required.

Obligation to serve should remain with disco in the short term.

NYPA's proposal for a single consolidated deregulation proceeding should be rejected.

CPB's residential and small business survey provides valid evidence of consumers' preference for retail choice.

ISO governing board should include municipal utilities.

Divestiture of generation within a load pocket should be considered.

Flexible rates should not be expanded.

### Public Utility Law Project of New York, Inc. (PULP)

RD erred by proposing adoption of flexible retail poolco model (erred in heavy reliance on customer opinion in determining that the Commission should adopt a retail model; erred by concluding that many customers are convinced that retail access will be of great benefit to them; erred in concluding either that a retail access model will result in lower prices or in prices no higher than PULP's proposed model; erred to extent concluded that retail model effectively provides customers greater choice; erred to extent it found that Commission has broad discretion to allow retail access; erred in recommending that question be changed from whether retail access should be provided into questions of when and for whom).

RD erred by failing to adopt PULP's equal contribution pricing approach to strandable costs (RD proposed unduly complicated method for recovery; erred in assertion that calculation requires comparison between market and book value of asset or expenditure; erred in proposing appropriate recovery period be as short as possible).

RD erred by concluding that utilities should divest generation.

RD erred by failing to propose that Commission adopt PULP's competitive model, which is a wholesale poolco model which is the same as a "virtual retail access model."

**-12-**

CASE 94-E-0952                                                    **APPENDIX D**

**Reply:**

PULP is willing to examine critically conventional
wisdom in current debate on competition and not simply accept it
at face value.

Parties' filings fail to recognize the importance of
market sustainability of current and future prices and to
recognize that only competition encouraging economic bypass is in
the public interest.

PULP's proposed model is most likely to achieve
Commission's goals of reasonable prices for consumers provided by
suppliers maximizing economic efficiency.


**III.   INVESTOR-OWNED UTILITIES**

**Energy Association (EA)**

Not really an RD, no record to support it; should
allow continued collaboration (will work on independent system
operator issues after 2/2).

Positive aspects of the RD:

flexible poolco (if properly implemented, can ensure
reliability, economic efficiency, and fair payment of
costs); wholesale v. retail transition needed (should
only go to retail access if in best interests of
all); prudency of strandable costs; corporate
structure up to each utility; major outstanding
issues remain.

Negative aspects of the RD:

standard for recovery of strandable costs is based on
legal precedent not Commission's principles;
utilities already recognize obligation to mitigate
strandable costs to extent practicable; failure to
address regulatory reform; selection of retail poolco
needs further analysis; failure to adequately address
obligation to serve; proceedings for individual
companies not appropriate.

RD fails to address lawful changes which would make
possible reductions in electric prices, both in the short and
long term.

Utilities are entitled to reasonable opportunity of
recovering the existing costs they incurred in meeting their
obligations to serve the public.  Regarding determination
regarding strandable costs: RD does not recognize utilities'

**-13-**

constitutional right to reasonable opportunity for full recovery;
RD's conclusions are inconsistent with prudent investment rule;
recovery cannot be limited by balancing of consumer interests or
expectations; cannot condition recovery on speed of transition
from wholesale to retail competition, level of price, and
magnitude of strandable costs; RD errs in suggesting that some
percentage of strandable costs might be denied recovery as
surrogate for presumed cost reductions that cannot be measured;
RD fails to consider the impact of special accounting rules; RD's
jurisdictional conclusions are in error; conclusions regarding an
exit fee are in error.

Excepts to RD's conclusion that obligation to serve
should continue without any meaningful change.

Excepts to RD's excessive reliance on using rates,
through a system benefits charge or other means, to fund
environmental or public policy programs more appropriately funded
through the market place or taxes.

Objects to extent RD could be construed to recommend
that functional separation is only a sufficient structural
solution for short term or that utilities have burden of proving
divestiture is not necessary.

No competitive model should be adopted until generic
issues identified in RD are resolved (six-month period for
preparation of individual filings should not commence until key
generic issues are resolved and clear policy guidance is provided
by the Commission; nuclear issues should be resolved before any
competitive model is adopted).

Excepts to RD's assumption that Commission has
authority to order widespread retail access.

Excepts to RD's SEQRA recommendations.  (Assuming
staff's environmental assessment form is adequate, the next step
must be preparation of a draft environmental impact statement and
circulation of that to the public for comment;  Commission may
not legally make a decision concerning the adoption of a
competitive model pending the completion of the draft
environmental impact statement process;  Commission reliance on
staff's vague and ambiguous environmental assessment form and
potentially a generic environmental impact statement, to avoid
providing a full explanation of the potential environmental
impacts, is not consistent with SEQRA.)

Commission should allow utilities to continue to employ
rate mechanisms such as flexible rates that are of benefit to all
customers.

CASE 94-E-0952                                           **APPENDIX D**

**Reply:**

Wholesale competition would achieve fundamental change
in industry, and will provide significant benefits.  Concerns
about direct retail access are significant and cannot be ignored.
Denial of recovery of utility investments is not a legitimate
source of "benefits" from restructuring of the industry.
Commission should not adopt a "command and control" approach to
restructuring.

Advocates of mandatory retail access overstate its
benefits and overlook its risks.  (Case had not been made that
retail models will produce benefits justified by their risks;
adoption of a wholesale poolco model would represent a
fundamental change from the current structure;  there has been no
demonstration that retail choice would provide greater economic
benefits than wholesale poolco model; wholesale poolco model
provides choice to retail customers; a poolco structure will not
result in higher prices than a bilateral structure; proponents of
mandatory retail access understate the reliability risks;
mandatory retail access presents risks to small customers from
cost shifting; Commission lacks a legal basis for mandating
retail access.  As to corporate structure, there has been no
exploration of major issues which need to be addressed as a
predicate to a reasoned conclusion on issues related to corporate
structure; and CPB's advocacy of structural separation or
divestiture is without merit.  As to the ISO, it does not need to
be structured from the outset to enable retail access, and NYPA's
proposal to purchase the transmission system should be rejected.)

No legitimate or convincing arguments have been
presented to justify denial of strandable cost recovery by
utilities (adoptions of a presumed amount of strandable cost
mitigation at this time would be unlawful; strandable cost
recovery is not prohibited by the antitrust laws; the recovery of
strandable costs need not interfere with efficient competition).

Staff's conclusion that an esco sector cannot develop
under wholesale competition is wrong, as is staff's proposal to
limit utility esco functions.

## Long Island Lighting Company (LILCO)

Excepts to one issue raised by Suffolk County that is
LILCO-specific (specifically, Suffolk County states the
Commission can find that its prior decision regarding Shoreham
was a mistake).

Suffolk County's exception to the RD's reference to
Shoreham is without basis.  Commission has already determined the
Shoreham prudence issues; the Commission should not reverse its
prior determination; Commission should dismiss Suffolk's

**-15-**

CASE 94-E-0952                                      **APPENDIX D**

statements regarding the history and regulatory treatment of Shoreham.

## IV.  LABOR UNIONS

### International Brotherhood of Electrical Workers (IBEW)

Deregulation, restructuring and re-regulation must be implemented to provide maximum benefits for all, including the workforce (need study on projected employment and economic impacts).

Vital considerations are:  that utility employees are important components of the State's economy and must be appropriately considered; stringent safety and reliability standards must be established, maintained, and enforced for all industry participants; need training and apprenticeship standards; need provision for continued safe and reliable operation of nuclear units; recovery of stranded assets should be used to compensate and retrain workers; should not subvert existing labor agreements; no new power plants should be built until Commission certifies shortage has been absorbed by markets; should resist transition to retail competition until benefits are clear.

Should take immediate actions to lower rates, including repealing taxes.

Major concern in any deregulated industry is safety and reliability.

### Utility Workers of America, Local 1-2 (Utility Workers)

Agrees with RD that time has come for factual records to be developed (but not within recommended compressed time frames); Commission should eliminate factors causing high rates and force rates to decline while maintaining safe and adequate service; competition may not produce significant cost savings; unacceptable to have service disruptions with electricity (an essential commodity); many questions remain unanswered at this time.

There is a lack of specific quantified evidence showing that proposed rate restructure will achieve appropriate goals of lowering rates and providing benefits to all consumers and stakeholders.

Effective competition and real benefits should precede deregulation.

Commission must establish that any reduction in cost would also translate into a reduction in price.

**-16-**

**Reply:**

        Three reasons cause pressure for competition: Regulation has not done a good enough job; competitors claim they can provide electricity for less than the price charged by utilities; technology shift enables new generating plants to produce electricity at lower cost than utilities.

        Does not believe competition will result in lower prices to customers; proponents of competition have cited no study for their claims of benefit.

        Before any action is taken, Commission should have analyses (subject to cross-examination) showing that (1) if competition is allowed, the market will become competitive and not an unregulated monopoly or oligopoly; and (2) competition will provide benefits while not producing a decline in service quality, reliability, or environmental and safety goals.

    Exceptions opposed:
A.  There is no evidence that competition will produce benefits or that all customers will share in those benefits (and it will be extremely difficult to assure that all customers share in benefits, if any).

B.  Staff's recommendation that the Commission reject the standard for retail access is an inappropriate reversal of the position that competition will provide benefits to everyone.

C.  Despite staff's recommendation that the Commission should reject an _overly_ cautious approach, a cautious approach must be taken.

D.  Despite staff's suggestion that T&D companies should continue the obligation to serve, the obligation to serve and supply is inconsistent with competition.

E.  Despite PII's suggestions that the Commission should recognize portfolio management as an essential attribute of the obligation to serve and continue policies encouraging a least cost resource mix, these are regulated concepts that are inconsistent with competition.

F.  The Energy Association's statement that the Commission should move toward the establishment of a competitive wholesale market is inconsistent with the EA's own position concerning the need for evidence before taking action.

G.  In response to CPB's argument that there should be a presumption in favor of retail access rather than reliance on the gas streaming standard, there should be no presumption in favor of either retail access or wholesale competition.

CASE 94-E-0952                                    APPENDIX D

H.  The recommended decision does not correctly acknowledge the tremendous need for retail access, as WEPCO asserts.

I.  Consumers should not be wholly absolved of responsibility for strandable costs, as CUB states.

J.  CPB's recommendation that lost revenues under new flexible rate contracts should be borne 100% by the utilities is short-sighted, not in the public interest, and would not be an incentive to mitigate strandable costs.

K.  Disagrees with PII's recommendation that the Commission adopt the RD's conclusion that a non-bypassable system benefits charge should be part of any model.  Social programs should be borne equally by all participants, not just utilities.

L.  It would be inappropriate to establish an implementation schedule, either for retail access or wholesale competition.

M.  Disagrees with Joint Supporters' assertion that a prolonged transitional procedure involving a wholesale poolco may stifle growth of competition in energy services.  Unaware of any study establishing that there will be such growth or that it will provide benefits.

N.  An environmental impact statement should be prepared.

O.  Despite SCSHEER's statement that, through association, all customer classes are capable of achieving aggregated market power and procuring power supply on an advantageous basis, there is no evidence that aggregation for residential and small commercial customers will be possible without substantial expenditures for metering and other devices.


V.  **PUBLICLY-OWNED UTILITIES**

        **Municipal Electric Utilities Association (MEUA)**

        Advocates wholesale bilateral model as only model consistent with Federal Power Act, and which allows PSC any viable role in future retail rate regulation.

        Grounds on which its exceptions rest:  A.  open access to transmission; B.  disaggregation of utility functions; C.  one statewide transmission provider (ISO); D.  bundled utility services at local level; E.  cost based rates as a price cap; and F.  essential role of bilateral transactions.

        RD should have recognized that unbundled comparable transmission service is the key to restructuring and market-based price of generation.

-18-

CASE 94-E-0952                                         **APPENDIX D**

        RD erred in failing to recognize that an open access
single-system grid, not a poolco, is the key to lower rates.

        RD erred in assuming the existing investor-owned
utilities should recover strandable costs related to generation;
they are not entitled to recover any level of strandable costs
under the Cajun case.

        Monitoring the cost data of non-utility affiliated
generators may not be desirable.  However, retail distribution
rates must be on file.

        Reciprocity issues are another reason for the
Commission to be cautious in considering the implementation of
any level of retail competition; at the wholesale level, this
matter is out of the Commission's hands.

        Supports gas streaming standard if and when retail
access is allowed, namely that all customer classes be
demonstrated to benefit.

        Different options for ownership of the ISO are
supportable; each option is preferable to the status quo.

        Strenuously opposes a system benefits charge; the
concept is anticompetitive; social and public policy programs
should be administered on a utility specific basis and charges
should be regulated through rate cases.

        Any state action must recognize the sanctity of
contracts.  Commission should not assume markets would be more
competitive if all potential participants were subject to same
generation costs. (The fact that MEUA members purchase preference
power from NYPA does not constitute a barrier to a competitive
market.)

**Reply:**

        Opposes any exceptions which fail to recognize that
unbundled comparable transmission service is the key to corporate
restructuring and market power concerns.

        Opposes deregulation of generation until vertical and
horizontal market power is mitigated.

        Opposes locational based marginal pricing of
transmission services.

        Opposes any attempt to recover strandable costs from
users of only transmission service.

        Continues to believe wholesale bilateral model is the
most practical model to increase efficiency, consistent with

                                 **-19-**

CASE 94-E-0952                                        **APPENDIX D**

federal and state law and contractual rights, while insuring just
and reasonable rates.

### Power Authority of the State of New York (PASNY)
### or New York Power Authority (NYPA)

        Endorsement of retail competition is positive step, but
need specific schedule for implementation of full retail access
(no evidence that reliability concerns should delay retail
choice;  should establish specific timetable for retail choice to
provide proper incentives for the transition;  federally required
wholesale open access transmission will secure most of the
benefits of the wholesale poolco model preferred by the RD).

        RD does not provide an adequate basis for the
development of effective competition (energy service companies
should be allowed to compete; effective competition can exist in
energy service company market).

        As to mitigation, Commission should investigate
feasibility of NYPA's proposed purchase of bulk transmission
facilities; this would eliminate need for investor-owned
utilities to divest generation.

        Should have single consolidated proceeding for all
utilities' long-term restructuring proposals.

        Has not advocated strandable cost recovery on a
customer cross-sectional basis, as the RD stated.

        Logical way to implement reporting requirements is to
phase in competition in an orderly, scheduled manner, so
Commission can evaluate effect at each stage.  Once true
competition is introduced into generation market, generation
entities should have few reporting requirements.

        It is neither necessary nor feasible to resolve all
local and regional issues simultaneously, but need certain
safeguards when New York begins service under a new regime.

        Retail competition should be implemented as long as it
is in the interest of the State.  Gas streaming standard may be
too narrowly defined for electric industry.

**Reply:**

        As to retail access schedule, EA's concerns about
retail competition compromising reliability or consumer
protection are not supported by evidence.  Existing bilateral
contracts have not caused degradation in reliability.  EA's
proposed wholesale model would be but an evolutionary change from

**-20-**

the status quo, not the kind of substantial renovation necessary to lower bills.

As to NYPA's proposed ownership of bulk transmission system, the purchase of the utilities' transmission facilities would obviate staff's requirement that utilities divest generation because of market power concerns, and would mitigate stranded costs by purchasing assets at an "uplifted" price and applying net proceeds against utility contractual overpayments to IPPs.

Properly designed ISO is critical to proper functioning of market.  Agrees with EA that collaborative process should continue toward common goal of developing properly functioning ISO.

## VI.   COMPETITORS (INDEPENDENT POWER PRODUCERS AND ENERGY SERVICE COMPANIES)

### A.   INDEPENDENT POWER PRODUCERS

#### Independent Power Producers of New York, Inc. (IPPNY)

Agrees with much of observations, recommendations, and conclusions of RD; would accept preferred model in its entirety (with clarifications).

Commission may need to receive reports of prices bid into power exchange, but should not require reporting of formerly regulated generators cost or terms of private contracts.

As to reciprocity, FERC will make it the rule at the wholesale level and it is largely irrelevant at the retail level if stranded costs are recovered properly.

Agrees that transition from wholesale to retail competition should be accomplished as quickly as possible, consistent with need to lower rates as quickly as possible. Standard for retail access could be cost effective over the long term.

ISO could be owned by completely independent investor owned utility.

Agrees with much of RD's findings regarding strandable costs, but disagrees with strong test proposed for mitigation (utilities must be entitled to a reasonable opportunity to recover their non-mitigatable stranded costs;  disagrees strongly with mitigation proposals for IPP costs, especially any form of an entry fee which would really be a tax, and would be unlawful, inequitable, and counterproductive.)

CASE 94-E-0952                                         **APPENDIX D**

        Above-market costs incurred by T&D companies in
fulfilling renewable resource obligations should be included in
system benefits charge and recovered through access fee (as
proposed in California's restructuring proceeding).

        Clarifications to RD's preferred model:  NERC and NPCC
reliability standards should be reviewed periodically;
independent, investor-owned ISO should be considered; and ISO
should respect contracts while protecting reliability.

        Commission should require utilities to file a good-
faith restructuring plan that includes retail access, and burden
should be on utility to demonstrate why that plan or some other
retail plan should not be adopted.  No objection to establishment
of wholesale market before retail market, and no objection to
phase in for retail access, but does object to notion that
restructuring proposals might exclude retail access altogether.

**Reply:**

        Reporting requirements should be strictly limited in
scope, unlike staff's proposal.

        Staff's apparent opposition to even further
consideration of independent ownership of the ISO are
inconsistent with its own position and otherwise lack merit.

        Defers to PII's arguments as to why it is appropriate
to continue low-income, R&D, renewable, and other public policy
programs in a competitive marketplace, and why a system benefits
charge is appropriate.

        As to strandable costs, there can only be two ways to
mitigate them:  decrease the costs associated with potentially
stranded assets, or increase the economic value of those assets.
Implementing substantial rate design changes (such as the one
proposed by Dr. Miles Bidwell) will help to smooth the average
customer's transition from regulation to competition.  Deviation
from access fee approach or to the use of a usage-sensitive
access fee would be like revisiting the decision to allow
recovery in the first place.  Only an access fee meets criteria
of being the least usage-sensitive means possible and as close to
the retail customer as possible.  (MI previously supported this,
and now opposes the access fee approach.)  IPPs take exceptions
to claims that they should "share the pain."  If Commission
requires massive write-offs, IPPs will be forced to resist
competition at every turn.  As EA points out, the emergence of
competition has place in peril the applicability of Statement of
Financial Accounting Standard No. 71, which allowed the retention
of deferred assets and liabilities on the utilities' books.
Opposes the exception of the parties calling for less than full
recovery of stranded costs and agrees with EA that every facet of
the strandable cost issue must be handled with utmost care.

No party appears to object to IPPNY's proposed clarification to the preferred model, except for staff's unpersuasive objection to the consideration of an independent, investor-owned ISO.

### Interested Lenders

Many IPPs have already responded to calls to mitigate high energy costs and have voluntarily renegotiated contracts.

Some measures staff suggests be imposed if IPPs do not cooperate are aimed at contract abrogation or coercing renegotiations.  There should be no direct or indirect interference with contracts.  Must focus on mutually acceptable changes.

The ability to rely on contracts is a critical underpinning of business.  Efforts to abrogate contracts will harm New York's business environment.

## B. ENERGY SERVICE COMPANIES

### Enron Capital and Trade Resources (Enron)

Pleased that RD recommends retail competition; RD chose right fundamental course to competition, yet Enron is not enthusiastic about "poolco" mechanism (but with a few clarifications and a little fine tuning, could provide essential prerequisites); sooner New York moves to restructure industry and more open resulting market, larger benefits for everyone.

Need protections to prevent "flexible poolco" model from becoming a monopoly merchant (participation in any market mechanism such as a pool or power exchange must be voluntary; there should be no limitation on the development of competing market mechanisms; pool members and non-members should have the same relationship to the ISO; all market participants should enjoy transmission access on same prices, terms, and conditions).

Should carefully consider how far Commission should go in defining new market structure.

Need deadline for retail access (by January 1, 1998 like Niagara Mohawk's PowerChoice).

Independent system operator must remain separate from all market participants.

All customers will enjoy benefits of competition.

**Reply:**

Effective wholesale competition already exists in New York; only way to make a "wholesale only" scenario worse would be to adopt a poolco structure.

Commission should only focus on most critical restructuring issues and leave rest to market (a centrally created market structure has significant dangers; should reject staff position on transmission pricing since Commission need not duplicate FERC's work in this area and market will provide best pricing mechanism).

Strongly opposes EA's call for delay; also no need to delay retail access until more is known about esco industry; no reason to expect any reduction in reliability due to competition.

ISO should not be owned or controlled by any market participant, and must provide exactly same services and level of access to all.

Metering and billing should be competitive services, as staff supports (but must be unbundled on bills).

Urges adoption of RD's proposed model with clarifications and modifications.

### Joint Supporters

Need date certain for retail access.

Economic development benefits of competitive opportunities are real and help all ratepayers and taxpayers.

Healthy competition benefits consumers, providers, and the economy.  The overall best interest standard for retail access can be that positive benefits for other customers result.

A prolonged transition involving wholesale poolco may stifle growth of competition in retail energy services.

Commission should not accept transitional wholesale poolco model without establishing a statewide date by which retail access should be established and/or completed.

Utility filings should also address proposals for energy services, including corporate structure and issues of market power.

Any wholesale market should allow energy services participants to sell financial contracts for differences in combination with energy efficiency, energy management services, fuel and/or other measures.

CASE 94-E-0952                                    **APPENDIX D**

        Should not delay availability of contracts for differences, alone or in conjunction with other resources.

         Need "clear market signals" on retail access.

        In load pockets, Commission should encourage competitive local dispersed generation.

        All stakeholders should have an opportunity to participate in public input.

        After three years, a review should be conducted to determine if competitive criteria are met and whether functions can be phased out or transferred to the Consumer Protection Board.

        New York State should not defer its actions pending the completion of actions of other jurisdictions.

        Commission should administer a system benefits charge to stimulate competitive behavior by market entrants and to ensure the quality of energy efficiency programs.

**Reply:**

        Commission should continue the generic case and should seek collaborative resolution of issues including ISO functions, spot market pricing and procedures, examination of loads and load pockets, wires charge mechanisms, consumer safeguards, and anti-competitive behavior (RD to be issued by 12/31/96).

        All public involvement processes should be opened to the participation of all parties.

        The meter is the control point for retail competition, and discos should establish a date certain by which customers can take control and provide their own meter.

        Commission should adopt the system benefits charge and set a level of support sufficient to continue a vigorous market in fuel neutral energy efficiency and renewable energy during the transition to competition.

CASE 94-E-0952                                                    APPENDIX D

## Wheeled Electric Power Company/
## Association for Competition in Electricity (WEPCO)[1]

Commends RD's thorough evaluation of issues; advocated retail bilateral model but would accept flexible poolco model.

Standard for streaming is not appropriate for retail access; standard instead should be that retail access should be implemented for all customer classes as soon as possible except where it can be shown by substantial evidence that a significant portion of the State's consumers would be worse off with a particular form of retail access.

Commission should set schedule requiring retail access available to all consumers by January 1, 1998.

No evidence that bilateral contracts threaten reliability.

Should have trial retail access programs (must involve all customer classes and vendors must be certified).

Working group could investigate restructuring proceedings in neighboring states and FERC, with reports filed by April 1, 1996.

Regarding the ISO, there is no need for one entity to own all transmission capacity, since control is critical point.

Wholesale competition is not precursor to retail access.

Recovery for stranded cost is not mandated.  Regulators have great discretion in the way they set rates.  In considering whether a strandable cost is eligible for recovery, depends on circumstances under which cost or obligation was incurred.  Under competition, economic efficiency requires that utility management maximize the risk-adjusted present value of future cash flows, and historic cost of utility's assets has nothing to do with this. Stranded cost recovery can be justified only it is accompanied by an improvement in quality of service.  Support mitigation measures to include other business opportunities. Overall objective should be to minimize the absolute value of strandable costs, minimize the period of recovery, and maximize incentives and opportunities for mitigation on part of utilities.

---

[1] This is a joint filing by Wheeled Electric Power Company, an energy services company, and Association for Competition in Electricity, a non-profit association open to all consumers. This set of exceptions could have been listed either with consumers or competitors, since both interests are represented by the one filing.

CASE 94-E-0952                                                **APPENDIX D**

Utilities should be ordered to file data to disaggregate utility's current costs.

**Reply:**

Retail competition in gas, telecommunications, and other industries has greatly benefitted consumers.  There is a need for retail competition, and it should begin no later than January 1, 1998.

Utilities should begin mitigating strandable costs now.

The ISO should be truly independent.

The need to resolve all generic issues before moving toward retail access will only delay benefits of retial access (should resolve generic issues in parallel with retail wheeling trial programs).

CASE 94-E-0952                                        APPENDIX D

## VII.   ENVIRONMENTALISTS

### Grand Council of the Crees

Concerned that retail wheeling in New York might result in dramatically increased power imports from Hydro-Quebec.  Even with a wholesale poolco structure, specific measures are needed to ensure no undesirable impacts.

Increased imports from unilateral deregulation may increase stranded investment in New York State and may cause serious environmental problems in exporting regions, with potential impacts in New York as well.

Commission should study further the economic and environmental impacts of increased participation of Hydro-Quebec.

### Public Interest Intervenors (PII)

In general, supports resolution as recommended with several exceptions.

Commission should implement elements of RD that foster competitive wholesale markets, but should not sanction retail access until risks and costs are adequately resolved (should clarify that committed to bringing about wholesale market and to explore whether retail competition can be fostered in way to benefit all consumers;  should not adopt retail access unless it improves on fairness and efficiency of wholesale model).

Non-bypassable system benefits charge can be administered by utility, governmental, or quasi-governmental authority (actual funding level should be subject of further analysis and negotiation among the parties).

Commission must be sensitive to how its goals for economic and environmental improvement could be undercut by actions taken by other states and provinces (decision by New York to move unilaterally to retail access could harm economy and environment).

Commission should explicitly recognize portfolio management as an essential attribute of disco's obligation to serve, and continue policies which will encourage the utility to assemble a least cost resource mix.

RD fails to institute policies needed to support continued public and private investment in renewable alternatives.

Generally supports RD's treatment of strandable costs, and especially two-part process to determine actual levels.

**-28-**

CASE 94-E-0952                                          **APPENDIX D**

Would like to see this process explicitly adopted by Commission.

Assessing competition in various markets is extremely important function that will be assisted through reporting of disaggregated information in a number of areas.

As to procedural matters, supports bifurcation of issues into those that are utility-specific and policy matters requiring consistency.  Need clearer direction from Commission so utility-specific proceedings will not be unduly contentious, chaotic, and unproductive.

**Reply:**

Arguments to eliminate or reduce scope of proposed system benefits charge should be rejected (benefits of consumer supported investments in energy efficiency have been significant and real; market-compatible mechanisms are needed to maintain cost-effective levels of investment in energy efficiency and other initiatives; private investments in energy efficiency and other initiatives will fall short of level needed to sustain full economic and environmental benefits and should be supplemented by such a charge rather that taxes; Commission has legal authority to institute such a charge; staff's concern over exercise of market power on the demand side must be addressed under any model adopted).

Commission should reject calls for establishment of retail access by date certain (no quantitative analysis bearing out claimed benefits of retail access; retail access must be shown to be in overall best interests of consumers before it is adopted; benefits of restructuring must be made available to all consumers simultaneously and proportionately).

Commission should accept RD's recommendation that an environmental impact statement should be prepared before the selection of a restructuring model (timely environmental review will assist the Commission; selection of a model is policy making action requiring SEQRA review;  staff's environmental assessment form amply supports a positive declaration; RD correctly concludes that preparation of an environmental impact statement must precede and inform the Commission's decision; Commission should clarify that it intends to comply fully with all of SEQRA's procedural and substantive mandates).

Flexible rate guidelines requiring an independent comprehensive energy audit should be retained.

Agrees with staff that public policy matters should be addressed generically in this case.

CASE 94-E-0952                                            APPENDIX D

VIII.  **DEPARTMENT OF PUBLIC SERVICE STAFF**

    **New York State Department of**
    **Public Service Staff (Staff)**

    Objects to RD's overly cautious approach.

    RD omits key issues such as market mechanisms, transmission pricing and public policy concerns.

    Period of wholesale competition is too long.

    Utilities should not be allowed to file only a functional separation plan.

    Should be simultaneous retail access for all electric customer classes.

    Marketplace of competing energy service companies cannot develop at wholesale level before retail access by energy service companies is allowed by Commission.

    Commission should clarify importance of customer choice (will lead to lower rates).

    Notion of when and how retail access should be allowed should not be left to the utilities.

    Certain statewide efforts should continue generically (including development of statewide transmission pricing plan, market exchange, wires charge mechanism, conduct to protect against anticompetitive practices, framework for licensing of energy service companies, and reporting requirements).

    RD's schedule for utility specific proceedings is too short.

    Commission should reassess need for flexible rates in 1998 but should now adopt a flexible approach to the implementation of the current guideline requiring independent and comprehensive DSM audits (should only require a good faith effort of the part of the customers to work with the company in an assessment and consideration of energy efficiency opportunities).

    Commission should adopt staff's flexible retail poolco model and staff's schedule for implementation.

**Reply:**

    Commission has exclusive authority to determine manner, amount and timing of rate recovery for uneconomic utility investments during the transition to competition (Congress assigned the states jurisdiction over rate recovery of

investments made to serve retail customers;  Commission has
authority to require sharing of uneconomic investments that
balances ratepayer and investor interests in the transition to
competition--Commission is vested with broad discretion and
latitude in establishing just and reasonable rates; Commission is
not bound to follow the prudent investment rule and has not
always adhered to it; even if the Commission based recovery on
the prudent investment rule, it would not have to allow recovery
of stranded costs;  rate recovery of current costs through a non-
bypassable wires charge is neither an illegal tying arrangement
nor anticompetitive).

        Commission has broad authority to implement a
competitive market structure (has authority to require retail
access -- is not preempted by Federal Power Act; can condition
rates to provide for retail access; can use its authority to
order retail access to fulfill a federal policy of open access;
could use its ratemaking authority to fulfill a federal policy of
open access; has authority to order improvement in transmission
of electricity); Commission can use its authority to condition
rates to achieve a competitive market.

        Parties' efforts to delay this proceeding should be
rejected by the Commission (Commission has authority to require
utilities to file plans; decision to adopt competitive model
should not be delayed while non-decisional information, specific
to detailed implementation, is gathered and studied;  caution
must be taken to ensure that changes do not result in unregulated
monopolies, competitive market is in fact developing, and
electric service continues to be safe, reliable and reasonable;
many issues raised in opposition to retail competition are
equally applicable to wholesale; extensive write-offs would not
be required under statement of Financial Accounting Standard
No. 71).

        Commission should reject arguments against flexible
retail poolco model (best interests of economy and all classes of
customers must be represented in competitive model; T&D
companies, as supplier of last resort, should be obliged to sell
electricity at spot market prices to all customers who so desire;
utilities should not act as portfolio managers for ratepayers
during a transitional wholesale phase; during the transition, T&D
companies should continue to provide basic and limited public
policy programs to be funded through a system benefits charge).

        Review of potential environmental impacts of
competition should proceed now.

CASE 94-E-0952                                                    **APPENDIX D**

### IX.   OTHER PUBLIC AGENCIES

#### City of New York (NYC)

Generally supports RD, as well balanced plan to introduce benefits of competition to all customer classes without sacrificing reliability.

First priority is service reliability.  Urges Commission to embrace preservation of current reliability as condition to retail access.

Wants opportunity to review load pocket information before staff presents to PSC.  Commission should consider an appropriate generic remedy, such as performance-based regulation, to prevent monopoly pricing within load pockets.

Agrees with RD's conclusions about strandable costs. Does not accept the notion a priori that all strandable costs should be recovered by utilities.

RD's schedule for individual utility filings is reasonable and the Commission should adopt it.

#### Nassau County (Nassau)

Supports RD, which contains five major points that were key components of Nassau County's position (result of competition must result in lower rates to all customer classes simultaneously; retail access model will best achieve lower rates for all customers; distribution lines should continue to be regulated and owned by a utility; stranded costs can be treated as a separate issue; high standards for reliability of service cannot be compromised).

Commission should adopt RD and make it a Commission order.

Commission should monitor activities of the market and any ISO to ensure prices to those with market strength do not differ unjustly from prices paid by smaller consumers. Commission might also need to review ISO's short and long-term plans to ensure reliability.

Standard for retail access for electricity should be different from standard used in gas industry because the marketplaces are different.  Gas market does not really provide open access to all residential and small commercial customers.

ISO should be truly independent, chosen by competitive bid, with no ties to any generators.

Opposes the imposition of stranded costs on ratepayers in a competitive marketplace.

System benefits charge should be charged by the monopoly distribution service, but funds should be transferred to Commission to be dispensed.

### New York State Department of Economic Development (DED)

Supports RD's flexible retail poolco model with wholesale poolco as first step to ensure reliability.

Commission should adopt RD's proposed model.

Wholesale phase will provide an opportunity to correct market imperfections if necessary.

Regional or national approach is preferable, but not feasible in short term.  No information supports conclusion that reduced reliability may result from increased imports.  Fuel diversity requirements should be set on national basis.

Commission can further movement to competition by deciding additional issues and setting certain guidelines.

Standard for retail access should be that it is in overall best interest of consumers.

Preferable ownership arrangement for ISO is a privately held enterprise.

Must be uniform way to measure stranded costs.

Commission should provide incentives to utilities to mitigate strandable costs and a rebuttable presumption may be appropriate.  However, applicability of specific proposals for mitigation should be on a utility-specific basis.

If competitive market does not meet identified public policy goal, and there is no existing alternative, parties to a disco rate case should suggest ways for utility to meet public policy goal and costs.  Determination should then be made as to the least cost manner to achieve public policy goal without interfering with market.  May then impose a uniform system benefits charge, which should be a separate item on bills.

Commission should continue flexible rate guidelines.

Concurs with recommended schedule to move towards retail competition.  Should have another phase of this proceeding to collaborate on rules for independent system operator and power exchange, and transmission pricing to be filed at FERC.  The next

phase should also establish guidelines for imposing public policy programs.

**Reply:**

Commission should endorse a flexible retail poolco model with a first step of flexible wholesale poolco (benefits of retail competition are evident; retail access should be permitted if in overall best interests of ratepayers; simultaneous retail access is optimal but phased-in access is acceptable; retail service should unbundled as soon as practicable and the esco market should be allowed to develop; obligation to serve must be redefined prior to deregulation; retail access should begin when reliability is ensured).

Disallowance of prudent and verified strandable costs are not mitigation incentives and should be rejected.

A mechanism for a universal benefits charge should be developed, but only when market-based means are insufficient to satisfy necessary public policy objectives.

### New York State Department of Law (DOL)

Commission should implement RD's proposal that there be rate reductions based on imputation of extent to which Commission can reasonably anticipate mitigation of strandable costs.

Commission should require immediate electric rate reductions.

Any Commission opinion adopting a competitive model should produce rate decreases for all customers. Commission should follow "no losers" test (so no rates will increase regardless of competitive model implemented).

**Reply:**

There should and can be a sharing of stranded costs (there will be no significant rate reductions if customers are required to pay all stranded costs; the sharing of costs by utilities and customers would be both equitable and lawful).

### Suffolk County (Suffolk)

Need to motivate utilities to file restructuring proposals; should no longer protect utilities from competition.

Stranded cost collection will not allow utilities to move to competitive prices. Rates are already too high (must be lowered by 30% to 40%).

CASE 94-E-0952                                      **APPENDIX D**

          Commission cannot ignore Shoreham and must be creative
and flexible.  Claim that Long Island is a "load pocket" could
block competitive imports to Suffolk County.

          FERC will determine ISO duties and governance.

          Commission should require or encourage utilities to
provide retail access.  Regulatory approach to retail access
(such as using the gas streaming standard) is not likely to work;
constraining eligible buyers by requiring the party with the most
to lose to prove the buyer's case will not promote retail
competition.

          It is not enough to endorse goal of competition;
regulators cannot ignore market realities; must address
strandable cost problem in light of market realities and workable
solutions.

**Reply:**

          Commission should be promoting a transition to
competition so that there can be less regulation.

          Commission must adopt a position on stranded costs for
all utilities that realistically recognizes the tradeoffs against
the market and competition and proposes a workable balance.
Should reject EA's proposal on strandable costs.  Any follow-up
proceedings must provide an opportunity for discovery and a
hearing.

          Commission must propose a specific implementation plan
that would lead to competition rather than wait for utilities to
propose their own plans.

          Commission must promote corporate restructuring that
would promote competition.  While an ISO would be regulated by
FERC, the Commission should create a strong incentive for
utilities to propose corporate restructuring either by an ISO or
disaggregation.

**APPENDIX E**
**CASE 94-E-0952**

<u>FLEXIBLE RATES</u>

The general guidelines adopted for flexible rates are as follows:

1.  The intent of flexible rates for electric customers is to maintain contestable customers on the utilities' systems, in a way that benefits all ratepayers.

2.  Flexible rates should be available for electric customers who have realistic competitive alternatives. A utility is not mandated to offer such rates if, in the utility's judgment, the rates would not be advantageous to the utility's customers as a whole.

3.  The tariffs in place for Niagara Mohawk, NYSEG, and RG&E should serve as models for flexible rates. . . .[1]

4.  The loss of revenues due to discounts should be shared between shareholders and ratepayers.  The extent and manner of sharing will be determined in the context of individual rate cases.

5.  Independent and comprehensive DSM audits are required in conjunction with the offering of flexible rates, but there will be a flexible approach to implementation.

6.  The potential cost to the customer of complying with environmental regulations sufficient to meet minimum environmental permitting requirements will be taken into consideration when determining whether a customer has a realistic competitive alternative.

7.  A floor price for flexible rates will be calculated by each utility, and will generally be set at no

---

[1]  Omitted from this list is the reference to a summary of the tariff filings for the three companies identified.

lower than the marginal cost of
service to the customer plus 1¢/kWh.

8.   Prices in contracts for flexible
rates generally will not be fixed
for longer than a seven-year
period, unless a longer term is
approved by the Commission in
response to a utility's petition.

9.   Utilities offering flexible rates
must file quarterly reports on the
use of these rates, including
information about the number of
contracts, amount of load,
percentage of discounts, effect of
DSM audits, and environmental
considerations as they relate to
the feasibility of competitive
alternatives with regard to the
acquisition of needed environmental
permits (referred to in guideline 6
above).  Staff will analyze these
reports and provide regular updates
to the Commission.[1]

**SUMMARY OF**
**EXCEPTIONS TO FLEXIBLE RATES RECOMMENDED DECISION**

Briefs on exceptions were due November 20, 1995.
Briefs were received from Department of Public Service Staff
(staff), Multiple Intervenors (MI), and Consolidated Edison
Company of New York, Inc. (Con Edison).

Staff:

  Supports resolution of most issues, but takes exception to two
issues:  incentives for attraction customers and sharing "found"
revenues.

1.   Sharing mechanism/incentive for attraction
contracts should be the same as for retention contracts.

Sharing mechanisms that are different for attraction
and retention contracts (while not required by RD, but could
result) could result in parties expending tremendous amounts of
time and resources, and makes little sense when the reasons for

---

[1]  Case 93-M-0229, <u>supra</u>, Opinion No. 94-15 (issued July 11, 1994),
     pp. 31-32.

CASE 94-E-0952                                          APPENDIX E

using a sharing mechanism are the same for both types of
contracts.

        2.  Sharing "found" revenues for attraction contracts
results in perverse incentives that could exacerbate free rider
problem.

        If stockholders can keep "found" revenues by simply
alleging that a discount was needed to attract customers, there
is a strong incentive to offer too many attraction contracts, to
detriment of remaining customers.  Found revenues should not be
shared.

        3.  Core customer protections, such as exit fees and
rate caps, must be considered when flexible rate tariffs are
proposed.


MI:

   Supports RD's findings that the following issues are beyond the
scope of this case:  exit fees and similar mechanisms; caps;
floor price.  Excepts to (1) continuation of fixed prices for
seven years;  (2)  requirement of sharing for attraction
contracts; and (3) requirement of energy audits for attraction
contracts.

        1.  Utilities should be allowed to enter into fixed
rate contracts for periods exceeding seven years without prior
Commission approval.

        A.  Seven year term limit hinders utilities' ability to
compete.

        Should allow each customer to determine whether a long
term contracts meets its needs.  These customers do not need
protection by Commission.

        B.  Adequate incentive mechanisms currently exist.

        Protection for core customers exists for retention
contracts less than seven years.  No basis to conclude it does
not provide sufficient protection for contracts with fixed prices
longer than seven years.  Commission should not impose
unnecessary, artificial restraint on terms.

        2.  Commission should not order ratepayers to pay for a
share of discounts that result from attraction contracts.

        (However, if Commission accepts recommendation that
there should be sharing, MI agrees the level should be considered
in individual cases.)


                            -3-

Attraction contracts are different from retention contracts; attraction contracts do not result in lost revenues, rather they increase revenues. Thus utilities have a strong incentive to offer contracts rates at level that attracts new load because they increase revenues and profits. Sharing would result in windfall to shareholders. No sharing is consistent with transition to competition (removes regulatory oversight, while ensure utilities are held accountable for business decisions.)

3. Energy efficiency audits should not be required by attraction contracts.

Agrees this is beyond scope of this proceeding, but disagrees that energy audits are required. Prior Opinion did not establish energy audit as precondition for attraction contracts, only retention contracts. In any event, this requirement would impede efforts of utilities to attract load.

4. Commission should adopt determinations in RD that issues regarding exit fees, caps and floor prices are beyond scope of case.

A. Exit fees and similar mechanisms should not be required.

In any event, should not be a uniform requirement.

B. Caps on ratepayer exposure should not be required.

Proper forum would be individual rate cases.

C. Floor price should not be changed.

In any event, CPB's proposal to change it is based on an erroneous assumption that discounted rates may be unreasonably low unless marginal costs are calculated on an individual customer basis; and would impede abilities of utilities to respond in timely fashion to competition.

Con Edison:

Does not except to the recommendation on the issue of the contract term, or to the finding that exit fees, caps, floor prices, and environmental externalities are beyond the scope of this proceeding. As to sharing, agrees that rate proceedings are best forum for deciding how revenues from all energy sales should be treated, and agrees that ratemaking policies ought to advance economic development efforts. But in anticipation of exceptions to RD, addresses rate treatment accorded to flexible rate initiatives.

PSC should adopt the RD.  Should permit flexible rate policies to evolve so they benefit both customers and investors.

1.  The rate treatment of "attraction" contracts must address the need to encourage economic development.

RD's recognition of potential harmful effects of Staff's proposal (of sharing being compared with full tariff rates, as for retention contracts) is important if utilities are to advance State's strong interest in encouraging economic growth and job development.

Staff's two arguments in support of its position lack merit. First, consistency is a wholly insufficient basis for extending the retention policy to attraction contracts (need strong and proactive efforts to increase New York's job base). Second, argument that such a policy is needed to prevent free riders provides no basis for applying staff's punitive policy to attraction rates.  (Retention customers are rewarded for maintaining the status quo, while new load customer actively demonstrates commitment through action.  Thus there is not the same free rider problem.  Also, new load is a source of new revenue, which has a positive effect on other customers.)

Staff's approach sends the wrong signal, saying utilities' efforts to use innovative approaches to attract new loads will be punished.  NY should allow successful utilities to be rewarded.  PSC should consider new business growth to be good growth that increases employment opportunity and enlarges tax base.

2.  PSC's flexible rate policies must be permitted to evolve.

PSC should replace as soon as possible the perverse policy that punishes utilities that are successful in retaining contestable load.

3.  Utility-specific rate proceedings are an appropriate forum to address flexible rate issues.

Under Con Edison's revenue-per-customer ratemaking mechanism, flexible rates would have different impacts than under mechanisms applicable to other utilities.

CASE 94-E-0952                                              APPENDIX F


OTHER CASES BEING
CONSIDERED IN THIS PROCEEDING


CASE 95-E-1134 - Petition of Sithe Energies, Inc. for Adoption of
                 a program that would encourage a merger of New
                 York State's Investor-Owned Utilities and for
                 Establishment of a "blue ribbon" panel to
                 consider the closure of nuclear power plants,
                 filed in 93-M-0229.


CASE 95-E-0922 - Petition of the Village of Patchogue for
                 Authority to Conduct a Direct Access/Retail
                 Wheeling Pilot Program within the Village
                 Boundaries and an Order requiring the Long
                 Island Lighting Company to Deliver the Power to
                 the End Users.


CASE 95-E-0923 - Petition of the Village of Sag Harbor for
                 Authority to Conduct a Direct Access/Retail
                 Wheeling Pilot Program within the Village
                 Boundaries and an Order requiring the Long
                 Island Lighting Company to Deliver the Power to
                 the End Users.


CASE 95-E-0924 - Petition of the City of Cortland for Authority
                 to Conduct a Direct Access/Retail Wheeling Pilot
                 Program within the Village Boundaries and an
                 Order requiring the Niagara Mohawk Power
                 Corporation to Deliver the Power to the End
                 Users.


CASE 95-E-0141 - Petition of the County of Nassau to authorize
                 retail wheeling for all classes of electric
                 customers, including residents, businesses and
                 industries in Nassau County beginning January 1,
                 1996.


CASE 94-E-0385 - Petition of the Education/Electric Buying Group
                 for Authority to lower the operating costs of
                 public school districts on Long Island by
                 purchasing electric power which would otherwise
                 be generated by the Long Island Lighting
                 Company.