# Exhibit 17

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

CASE 15-M-0127  -  In the Matter of Eligibility Criteria for Energy Service Companies.

CASE 12-M-0476  -  Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State.

CASE 98-M-1343  -  In the Matter of Retail Access Business Rules.

ORDER ADOPTING CHANGES TO THE RETAIL ACCESS ENERGY MARKET AND ESTABLISHING FURTHER PROCESS

Issued and Effective: December 12, 2019

## TABLE OF CONTENTS

INTRODUCTION................................................... 1

BACKGROUND.................................................... 2

NOTICE OF PROPOSED RULE MAKING................................ 5

PUBLIC COMMENTS............................................... 6

LEGAL AUTHORITY............................................... 6

BRIEF SUMMARY OF PARTY POSITIONS............................. 8

  Non-ESCO Parties .......................................... 8

  ESCO Parties .............................................. 9

DISCUSSION AND CONCLUSIONS................................... 10

  Order Implementation ..................................... 14

I. Enhanced ESCO Eligibility Criteria ...................... 14

  I.A. Non-ESCO Party Positions Regarding ESCO Eligibility Requirements .............................................. 16

  I.B. ESCO Party Positions Regarding ESCO Eligibility Requirements .............................................. 18

  I.C. Conclusions Regarding ESCO Eligibility Requirements .... 22

    I.C.1. Method(s) of Marketing ........................... 23

    I.C.2. Types of Products Offered ........................ 23

    I.C.3. Complaint Data for Other States of Operation ....... 24

    I.C.4. Data Security Breaches ........................... 24

    I.C.5. Bankruptcy History ............................... 24

    I.C.6. Financial Assurances/Collateral Requirements ....... 25

    I.C.7. ESCO Officer Certification ........................ 26

    I.C.8. Additional Eligibility Review Process .............. 26

II. Access to and Transparency of Pricing Information ........ 30

  II.A. Non-ESCO Parties' Positions Regarding Access to and Transparency of Pricing Information ....................... 31

  II.B. ESCO Parties' Positions Regarding Access to and Transparency of Pricing Information ....................... 32

CASE 15-M-0127, et al.

II.C. Conclusions Regarding Access to and Transparency of Pricing Information ......................................... 32

  II.C.1. Utility-Provided Price Comparisons ............... 33

  II.C.2 Utility-Provided Cost Itemizations ................ 36

III. Product Offerings ...................................... 37

 III.A. Variable-rate, Commodity-only Service ............... 37

  III.A.1. Non-ESCO Party Positions Regarding Variable-rate Commodity-only Service ................................... 38

  III.A.2. ESCO Party Positions Regarding Variable-rate Commodity-only Service ................................... 38

  III.A.3. Conclusions Regarding Variable-rate, Commodity-only Service ................................................ 39

   III.A.3.a. The Merchant Function Charge .................. 42

   III.A.3.b. Out-of-Period Adjustments .................... 43

 III.B. Non-Energy-Related Value-Added Products and Services . 43

 III.C. Energy-Related, Value-Added Products and Services .... 44

  III.C.1 Non-ESCO Party Positions Regarding Energy-Related, Value-Added Products and Services ........................ 45

  III.C.2. ESCO Party Positions Regarding Energy-Related, Value-Added Products and Services ........................ 47

  III.C.3. Conclusions Regarding Energy-Related, Value-Added Products and Services ................................... 50

 III.D. Fixed-Rate Products ................................ 56

  III.D.1. Non-ESCO Party Positions Regarding Fixed-Rate Products ................................................ 57

  III.D.2. ESCO Party Positions Regarding Fixed-Rate Products 59

  III.D.3. Conclusions Regarding Fixed-Rate Products ........ 64

 III.E. Renewably Sourced Commodity ........................ 70

  III.E.1. Non-ESCO Party Positions Regarding Renewably Sourced Commodity ................................................ 72

  III.E.2. ESCO Party Positions Regarding Renewably Sourced Commodity ................................................ 74

  III.E.3. Conclusions Regarding Renewably Sourced Commodity 75

CASE 15-M-0127, <u>et</u> <u>al.</u>

III.E.3.a. Minimum Renewable Percentage .................. 77

III.E.3.b. Eligible Electricity .......................... 78

III.E.3.c. Transparency of Information and Disclosures ... 80

III.E.4. Pricing of Renewably Sourced Commodity .......... 81

III.E.5. Low-Income Customers ........................... 82

IV.  ESCO Marketing Practices ............................... 83

IV.A. Non-ESCO Party Positions Regarding Additional Restrictions on ESCO Marketing Practices ................... 84

IV.B. ESCO Party Positions Regarding Proposed Restrictions on ESCO Marketing Practices .................................. 87

IV.C. Conclusions Regarding Proposed Restrictions on ESCO Marketing Practices ....................................... 88

V.   ESCO Billing Methodologies ............................. 92

V.A. Non-ESCO Party Positions Regarding Billing Methodologies 93

V.B. ESCO Party Positions Regarding Billing Methodologies ... 93

V.C. Conclusions Regarding Billing Methodologies ............ 95

VI.  Utility Purchase of ESCO Receivables .................... 96

VI.A. Non-ESCO Party Positions Regarding POR Reform ......... 98

VI.B. ESCO Party Positions Regarding POR Reform ............. 99

VI.C. Conclusions Regarding POR Reform .................... 101

VII. Considering the Definition of Small Non-Residential Customers ................................................. 102

VII.A. Non-ESCO Party Positions Regarding the Definition of Small Non-Residential Customers ........................... 103

VII.B. ESCO Party Positions Regarding the Definition of Small Non-Residential Customers ................................ 104

VII.C. Conclusions Regarding the Definition of Small Non-Residential Customers ....................................... 106

VIII. Community Choice Aggregation......................... 107

The Commission orders: .................................... 108

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service
Commission held in the  City of
New York on December 12, 2019

COMMISSIONERS PRESENT:

John B. Rhodes, Chair
Diane X. Burman, concurring, in part and dissenting, in part
James S. Alesi
Tracey A. Edwards
John B. Howard

CASE 15-M-0127  -   In the Matter of Eligibility Criteria for
Energy Service Companies.

CASE 12-M-0476  -   Proceeding on Motion of the Commission to
Assess Certain Aspects of the Residential
and Small Non-residential Retail Energy
Markets in New York State.

CASE 98-M-1343  -   In the Matter of Retail Access Business
Rules.

ORDER ADOPTING CHANGES TO THE RETAIL ACCESS ENERGY MARKET AND
ESTABLISHING FURTHER PROCESS

(Issued and Effective December 12, 2019)

BY THE COMMISSION:

<u>INTRODUCTION</u>

In this Order, the Commission strengthens protections
for residential and small commercial customers (mass-market
customers) in the retail energy market.  The Commission protects
these customers by remedying unfair business practices that have
been used by various retail energy market participants and by
adopting limitations on the types of products that may be
offered to mass-market customers by energy services companies

CASE 15-M-0127, et al.


(ESCOs)[1] to ensure that those customers are receiving value from
the retail energy market.  In designing and implementing these
changes, the Commission relies on its extensive experience
regarding the retail energy market.  The Commission is also
guided by the considerable record in the instant proceedings,
which parties were invited to develop for the purpose of further
illuminating the current state of the Retail Energy Market.

In this Order, the Commission: (1) increases ESCO
accountability by enhancing eligibility criteria and
implementing other changes in the eligibility process; (2)
empowers customers by improving transparency of ESCO product and
pricing information, primarily through an on-bill comparison of
ESCO to utility commodity prices and through required itemizing
of ESCO charges; and (3) prohibits ESCO product offerings that
lack energy-service-based value by adopting restrictions on the
types of products and services ESCOs are allowed to offer mass-
market customers, as more fully discussed below.  In some
instances, as discussed below, further process is required
before certain customer protections can be implemented.


BACKGROUND

This track of these proceedings was instituted in
response to a Notice, issued December 2, 2016 (December Notice),[2]
after lengthy investigation and repeated action by the
Commission to course-correct the Retail Energy Market for
electricity and natural gas.  During the last 30 years, the

---

[1]   ESCOs are entities eligible to sell electricity and/or
      natural gas to end-use customers using the transmission or
      distribution system of a utility. ESCOs also may perform
      other retail service functions.

[2]   See Cases 15-M-0127 et al., Notice of Evidentiary and
      Collaborative Tracks and Deadline for Initial Testimony and
      Exhibits (issued December 2, 2016) (December Notice).

CASE 15-M-0127, et al.

Commission has witnessed significant, and in some instances unexpected, changes in the Retail Energy Market.  Ultimately, the Commission reached the conclusion that this market had not evolved as originally intended and, more importantly, was not providing sufficient energy-related benefits for customers.

The December Notice stated that "the Commission has determined that the retail markets serving mass-market [residential and small commercial] customers are not providing sufficient competition or innovation to properly serve consumers."[3]  The notice informed parties that the Commission had specific concerns about reports of customer abuses in the retail access market, including "overcharging," as well as the lack of innovation with respect to energy efficiency and energy management services.  For these and other reasons, the evidentiary track of these proceedings was commenced to, among other things, consider whether: the regulatory regime applicable to ESCOs requires modification; new ESCO rules and products could be developed that would provide the desired benefits to residential and small commercial customers; or the retail access market should be closed entirely.  In furtherance of this inquiry, the parties were requested to submit testimony and exhibits with respect to certain enumerated topics, including the parties' positions with respect to the continuation of the retail access market, whether the regulatory regime can and/or should be modified and how customer abuses and overcharging could be further deterred or eliminated.

The record in these proceedings consists of initial testimony, rebuttal testimony, cross-examination testimony and exhibits, initial briefs, reply briefs, and public comments. The evidentiary hearing took place before two Administrative Law

---

[3]    December Notice, p. 3.

CASE 15-M-0127, <u>et</u> <u>al.</u>

Judges (ALJs) over ten days in Albany, beginning on Wednesday, November 29, 2017 and continuing through Tuesday, December 12, 2017.  The transcript of the hearing consists of 4,233 pages of testimony and cross-examination of 22 witnesses and panels of witnesses.

  Nineteen parties were active in submitting testimony, conducting cross-examination and/or submitting briefs: AARP New York (AARP); Agway Energy Services, LLC (Agway); the Joint Utilities (Central Hudson Gas & Electric Corporation; Consolidated Edison Company of New York, Inc.; KeySpan Gas East Corp. d/b/a National Grid; National Fuel Gas Distribution Corporation; New York State Electric & Gas Corporation; Niagara Mohawk Power Corporation; Orange and Rockland Utilities, Inc.; Rochester Gas and Electric Corporation; and The Brooklyn Union Gas Company d/b/a National Grid NY); the City of New York (NYC); Constellation Energy Gas Choice, LLC (Constellation); Direct Energy Services LLC (Direct Energy); Drift Marketplace, Inc. (Drift); ENGIE Resources LLC and ENGIE Retail, LLC d/b/a Think Energy (collectively, ENGIE); Great Eastern Energy (GEE); the Impacted ESCO Coalition (IEC); Infinite Energy, Inc. d/b/a Intelligent Energy (Infinite); National Energy Marketers Association (NEMA); Staff of the New York State Department of Public Service (Staff); the Office of the New York State Attorney General and the Utility Intervention Unit, Division of Consumer Protection, of the New York State Department of State (collectively, UIU/NYAG); the Public Utility Law Project of New

CASE 15-M-0127, et al.

York, Inc. (PULP); Retail Energy Supply Association (RESA); Robison Energy, LLC (Robison); and The OE Group (OE Group).[4]

Initial briefs were filed by Agway, NYC, Constellation, Direct Energy, GEE, IEC, Infinite, NEMA, Staff, UIU/NYAG, PULP, and RESA.  Reply briefs were filed by AARP, Agway, Joint Utilities, Constellation, Direct Energy, Drift, GEE, IEC, Infinite, NEMA, Staff, UIU/NYAG, RESA, and Robison. Staff's motion to strike NEMA's late-filed reply brief was granted by the ALJs.[5]

NOTICE OF PROPOSED RULE MAKING

Pursuant to the State Administrative Procedure Act (SAPA) §202(1), a Notice of Proposed Rulemaking was published in the State Register on June 7, 2017 [SAPA No. 15-M-0127SP8].[6]  The time for submission of comments pursuant to the Notice expired on July 22, 2017.  No comments were received in response to the SAPA Notice.

---

[4]  Following the ALJs' determination that parties to the evidentiary proceeding would be subject to information requests and other discovery, approximately 30 ESCOs who were previously parties to the proceedings withdrew their party status.  See Transcript of Procedural Conference Held in Albany on January 26, 2017 (filed February 8, 2017), p. 15, ln. 16 – p. 19, ln. 17; See also Evidentiary Hearing Transcript (Tr.) 2115, ln. 10-2116, ln. 2; Tr. 2182, ln. 15-24.

[5]  Cases 15-M-0127 et al., Ruling on Staff's Motion to Strike (issued May 24, 2018).  The Commission had denied NEMA's previous motion for an extension of time to file a reply brief.  See Cases 15-M-0127 et al., Confirming Order (issued May 21, 2018).

[6]  SAPA Notice.

CASE 15-M-0127, et al.

## PUBLIC COMMENTS

Outside of the statutory notice-and-comment period, the Commission received few public comments related to this track of the proceedings.  The Queens and Bronx Chambers of Commerce opposed any changes in how ESCOs provide service to mass-market customers, out of concerns that such changes would hamper the role of ESCOs and would force small ESCOs out of the market.  The Queens Chamber of Commerce disagreed with Staff's proposal to require ESCOs to guarantee savings on commodity service and the inclusion of small commercial customers in the definition of "mass-market" customers.  It further opined that the Commission should consider fixed-rate commodity pricing as a value-added service.  A non-party ESCO stated its support for reducing the threshold definition of a gas mass-market customer from 750 to 400 or 500 dekatherms/year to increase the choices available to small businesses.  A customer commented that he was overcharged by an ESCO and opposes any attempt to keep misconduct by ESCOs confidential in these proceedings.  Another customer sought a comprehensive investigation into ESCO business practices, claiming that an ESCO employed deceptive and fraudulent business practices and overcharged him 250% more than what the utility would have charged him, without his consent.

## LEGAL AUTHORITY

The Public Service Law (PSL) expressly provides the Commission authority to limit or discontinue ESCOs' access to utility distribution systems based on whether such access is just and reasonable in all respects.  PSL § 5(1)(b) grants the Commission authority over, among other things, both the sale and the distribution of natural gas and electricity.  In addition, PSL §§ 65 and 66 provide the Commission specific authority over utilities and their distribution services.  As is relevant here,

CASE 15-M-0127, et al.

and pursuant to PSL § 65(1), a utility's distribution services must be, "in all respects[,] just and reasonable."

    This state's highest court has recognized that these and other PSL provisions empower the Commission to regulate ESCO access to utility systems.  The Court of Appeals held that "the legislature has delegated to the [Commission] the authority to condition ESCOs' eligibility to access utility [distribution systems] on such terms and conditions that the [Commission] determines to be just and reasonable."[7]  This broad authority encompasses, among other things, the power to "prohibit utilities from distributing overpriced [ESCO] products."[8]  As a corollary power, the Commission is authorized to require that ESCOs prove, as a condition of accessing utility systems, that their products do not harm customers.[9]

    PSL § 66 provides additional authority relevant to ESCO sales.  Most notably, PSL § 66(12-a) provides the Commission authority to require that utility bills, which often include charges for applicable ESCO service, be simple and clear.  Accordingly, the Commission has express authority to require that utility billing reflect ESCO charges in a transparent manner that best facilitates customer understanding of the cost of ESCO service.

    Given the Commission's broad power to determine what is required for ESCO access to utility systems to ensure the provision of just and reasonable energy service to customers, as well as the Commission's express authority to regulate utility

---

[7]   Matter of National Energy Marketers Assn. v. New York State Pub. Serv. Commn., 33 N.Y.3d 336, 351 (2019), reargument denied, 33 N.Y.3d 1130 (2019) (NEMA v. PSC); see also PSL §66-d(2).

[8]   NEMA v. PSC, 33 N.Y.3d at 351.

[9]   Matter of National Energy Marketers Assn. v. New York State Pub. Serv. Commn., 167 A.D.3d 88, 93, 95 (3d. Dept. 2018).

CASE 15-M-0127, et al.


billing to encourage transparency, the Commission has ample
authority to implement each of the following recommendations.


<u>BRIEF SUMMARY OF PARTY POSITIONS</u>

<u>Non-ESCO Parties</u>

        The non-ESCO parties (Staff, UIU/NYAG, PULP, AARP,
NYC) all agree that the current retail access market does not
benefit customers.  Some argue the Commission should shut down
the market entirely while others argue that the Commission
should implement systematic and substantial reforms to limit
ESCO products and/or ESCO prices.

        Staff provided data that it obtained from the
utilities demonstrating that, on average, ESCO customers paid
$1.2 billion more than utility customers would have paid for
commodity service during the 36-month period ending December 31,
2016.[10]  Staff, UIU/NYAG, PULP, and AARP generally believe that
ESCO prices are unreasonable and that ESCO products lack actual
benefits for the customers, even when alleged value-added
products or services are bundled with commodity.  Due to the
evidence of ESCO "overcharges," the lack of demonstrated
financial value in ESCO offerings, and in light of the history
of customer complaints against ESCOs, Staff, UIU/NYAG, and PULP
advocate that the Commission should prohibit ESCOs from serving
mass-market customers or, if the Commission allows the market to
continue, restrict product offerings, pricing, and marketing.
For its part, NYC believes that ESCOs could provide "real and
measurable value" to customers if they were to provide
guaranteed savings plans, services and products to help reduce

---

[10]   Tr. 2113-2114; Hearing Exhibit 716; see also Hearing Exhibit
       703; Tr. 3254-3256.

CASE 15-M-0127, et al.

or manage customers' electric bill, energy efficiency services, or other innovative products or services.[11]

ESCO Parties

      In general, the ESCO parties (NEMA, RESA, Direct Energy, Agway, Constellation, GEE, IEC, Infinite) believe that little or nothing is wrong with the retail access market and argue that Commission interference with ESCOs' current access to customers is unwarranted.  Those ESCOs that acknowledge room for market improvement offer suggestions that range from mild to moderate reforms.  Some of those reforms suggested by the ESCOs require shifting certain responsibilities from utilities to ESCOs, thereby granting ESCOs more power and more immediate access to customers.  As examples, some ESCOs suggest the Commission adopt more rigorous eligibility criteria, while others suggest that the Commission shift responsibility for certain business operations, such as billing and collecting, from utilities to ESCOs.

      In general, the ESCO parties argue that Staff's price comparison between utilities and ESCOs is flawed.[12]  The ESCOs also generally contend that the retail access market is functioning well.  While most of the ESCOs acknowledge that there are some "bad actors" in the market that are taking advantage of customers, those same ESCOs argue that the Commission should use existing regulations to penalize bad-acting ESCOs.  The ESCOs also generally believe that any market failures can and should be remedied through regulatory fine-tuning, such as: increasing eligibility requirements for ESCOs, including requiring a bond or other security instrument;

---

[11]   NYC Initial Brief, p. 13-14.

[12]   See Tr. 358-363, 365-369; Hearing Exhibit 8.

CASE 15-M-0127, et al.

increasing the Commission's use of Orders to Show Cause to address bad-acting ESCOs; and eliminating utility purchases of ESCO receivables without recourse.

### DISCUSSION AND CONCLUSIONS

The record compiled in these proceedings suggests that, despite the Commission's previous efforts, little has changed in New York's retail access market since 2014,[13] when the Commission observed that complaint rates for the retail access market were high, prices for customers in the retail access market are higher than the utility commodity prices, and the retail access market has failed to produce meaningful energy-related innovation over its decades of existence.[14]  Indeed, according to the data and analysis offered by the ESCO Direct Energy, mass-market ESCO customers generally paid significantly more for both gas and electric commodities than utility customers did, excepting for a very short period early in 2014 (i.e. the so-called "Polar Vortex").[15]  While some mass-market ESCO customers saved money during the time period analyzed

---

[13]  However, as to a specific subset of that market, low-income customers, the Commission has implemented new strong customer protection reforms to protect low-income customers from bad-acting ESCOs.  Those reforms have been upheld in New York State Courts.  See generally, Matter of National Energy Marketers Assn. v. New York State Pub. Serv. Commn., 167 A.D.3d 88 (3d Dept. 2018).

[14]  Cases 12-M-0476, et al., Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State, Order Taking Actions to Improve Residential and Small Nonresidential Retail Access Markets (issued February 25, 2014), p. 10 (February 2014 Order).

[15]  Hearing Exhibit 9.

CASE 15-M-0127, et al.


(2014-2016), PULP estimated the number of customers who realized a savings to be less than 25% of all ESCO customers.[16]

The most commonly offered ESCO product continues to be a commodity-only, variable-rate product, that frequently is provided at a higher price than charged by the utilities.  While some ESCOs provide fixed-rate products, ESCO customers who receive such service - an estimated 20% of all ESCO customers[17] - pay a significant premium for that service.  Finally, to the extent that any value-added products and services are available to New York customers, those products and services are, by and large, not energy related.  Rather, they are typically products that are more accurately described as marketing devices or one-time offers intended to induce customers to enroll with the ESCO.  The items - such as frequent flyer miles, gift cards, sports tickets, LED light bulbs, and "smart" thermostats - frequently have a market value that is much lower than the amount customers ultimately pay to the ESCO over the course of the contract in excess of what they would have paid to the utilities.  Moreover, many of the aforementioned items have nothing to do with providing energy services and therefore serve none of the goals of the energy retail market.  As to the items that have a tangential relationship to energy services - lightbulbs, thermostats, etc. - these items offer little or no value for the purposes of the energy retail market given that customers can easily purchase these items outside of that market; we find no convincing proof that customers receive any

---

[16]   Tr. 3827-3830.  Direct Energy alleges in rebuttal that a small majority of ESCO small commercial customers – 52% - saved money during the relevant period.  Tr. 402-403.  See also Tr. 2135.

[17]   Tr. 2118.

-11-

CASE 15-M-0127, et al.

meaningful value when these easily accessible retail items are tethered to the receipt of commodity energy.

Finally, the record establishes that the complaint rate for ESCOs remains unacceptably high.  Between 2014 and 2016, the Department's Office of Consumer Services (OCS) received more than 11,000 initial complaints about ESCOs.[18] About half of these initial complaints alleged deceptive ESCO marketing practices, and there is a positive correlation between the level of extra cost associated with ESCO service and the overall number of initial complaints made to OCS.[19]

The record establishes that many of the concerns raised by the non-ESCO parties about the current operation of the retail access market are warranted.  The Commission shares those concerns, particularly regarding the lack of easily accessible and comprehensible product and pricing information and, the number of complaints alleging that bad-acting ESCOs were misleading and exploiting customers.  Thus, we conclude that significant changes to provisions governing retail access are needed to provide adequate protections for New York customers.  If market participants are unwilling, or unable, to provide material benefits to customers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended.

Nonetheless, the Commission recognizes that some ESCOs appear to offer customers product and service choices that are not available from the utilities.  Some of these types of product offerings may have the potential to advance policy goals of the State, including the development of renewable energy and promotion of energy-related products and services that help

---

[18]   Tr. 2101-2102.

[19]   Tr. 3866; Hearing Exhibits 957, 998.

-12-

CASE 15-M-0127, et al.

customers lower their energy consumption and/or save on their energy bills. Moreover, fixed-rate commodity products, which utilities are not permitted to offer, might, in certain limited instances, provide some small marginal value due to the predictability of commodity unit costs for financial planning purposes – although fixed rates do not prevent fluctuation in monthly bills due to variations in energy use over time and seasonal weather changes.

Because certain ESCO products and services have the potential to provide some benefits to customers and help the State advance its clean energy goals, the Commission determines that, at this time, the regulated retail energy market will continue. However, the continuation of the markets is contingent on the participants' unconditional commitment to, and strict compliance with, the reforms adopted herein, which are intended to enhance transparency for customers, provide greater customer protection from bad-acting ESCOs, and ensure that only the products and services that truly benefit the customers and the State will be offered, at just and reasonable rates. While many of the reforms adopted herein are interrelated to some extent, the Commission finds that each new customer protection requirement is independently justified. Moreover, while we take decisive steps here to better protect customers, we anticipate that a successful retail access market will likely require further analysis and action from the Commission as the market responds to the instant reforms and as, more generally, energy markets change over time. We further anticipate that such issues, as they arise, will likely be best addressed in rulemaking proceedings that are more focused on particular aspects of the market than the instant evidentiary-proceeding track.

CASE 15-M-0127, et al.

Order Implementation

Unless otherwise set forth herein, requirements adopted in this Order governing ESCO terms of service are implemented as of the effective date of the amended Uniform Business Practices (UBP), 60 days from the effective date of this Order.

## I.   ENHANCED ESCO ELIGIBILITY CRITERIA

Approximately 200 ESCOs are deemed eligible in New York to provide electricity and natural gas.  The record establishes that the majority of ESCOs in New York continue to offer solely commodity resale to mass-market customers.  Given the high number of complaints received by the Department concerning ESCOs, the Commission strengthens the criteria by which ESCOs obtain, and then continue to exercise, the privilege of access to utility systems and continue to participate in the retail energy market.

In 1999, the Commission established criteria that ESCOs must satisfy to become eligible to sell electricity or natural gas in New York State, and to maintain eligibility, as detailed in the UBP § 2.[20]  Through the use of the plain-language term "eligibility," the Commission made clear that it does not grant ESCOs licenses.  This is because, among other reasons, it would be improper for ESCOs to obtain a property interest in utility systems that are "clothed with a public interest", given

---

[20]  See Case 98-M-1343, Matter of Retail Access Business Rules, Order Adopting Revised Uniform Business Practices (issued January 19, 2018), Appendix A.  The UBP are incorporated into each utility's tariff.  See also Case 98-M-1343, Order on Rehearing and Providing Clarification (issued September 23, 2019).

CASE 15-M-0127, et al.

that ESCOs do not share utilities' public-interest obligations.[21]
The Commission's eligibility regime properly reflects the fact
that access to utility systems is a privilege over which the
Commission retains significant discretion,[22] a point which is
repeatedly emphasized via the UBP's numerous provisions
regarding ESCOs' obligation for maintaining eligibility.  An
ESCO's failure to adhere to the Commission's eligibility
criteria subject it to consequences, including suspension or
revocation of its eligibility to operate in New York.

Applicants for ESCO eligibility are required to
submit, among other things: a Retail Access Eligibility Form; a
variety of sample forms, including sales agreements; sample
promotional materials; internal procedures to prevent
unauthorized and illegal conversion of accounts – practices
known as "slamming"; the name and contact information for the
applicant's main office; the name and contact information for
any entity holding an ownership interest of 10% or more; and an
explanation of any regulatory or criminal sanctions imposed
during the last 36 months against any senior officers or entity
holding a 10% or more ownership interest.  The ESCO is required
to file annually a statement that the filed application
information remains accurate or provide a description of any
revisions to the application information.  Every three years,
the ESCO is required to update all the information in the
application.

The Commission adopted these criteria to ensure that
ESCOs participating in New York's retail energy market satisfy

---

[21]   Rochester Gas & Elec. Corp. v. Pub. Serv. Comm'n of State of
       N.Y., 71 N.Y.2d 313, 322 (1988); see also Matter of Retail
       Energy Supply Assn. v Public Serv. Commn. of The State of New
       York, 152 A.D.3d 1133, 1139 [2017], affd sub nom NEMA v. PSC,
       33 N.Y.3d 336.

[22]   NEMA v. PSC, 33 N.Y.3d at 350.

CASE 15-M-0127, et al.

minimum eligibility conditions and facilitate development of
competitive retail energy markets, including the development of
innovative energy-related services or products that may be
offered.  While Department staff currently review the contents
of the applications for completeness and compliance with the UBP
requirements, there is no process by which Department staff can
review and make a determination as to an applicant's overall
fitness or qualifications to operate as an ESCO in a manner that
is beneficial to consumers.[23]

        To maintain eligibility, at least once every 30 days
an ESCO must post on the Department's "Power to Choose" website
a price for each commodity-only product offered to residential
customers.[24]  The ESCO is not permitted to charge newly enrolled
customers more than the prices posted for that specific product
at the time of the enrollment.


I.A.  Non-ESCO Party Positions Regarding ESCO Eligibility
      Requirements

        Staff does not make any recommendation for substantive
amendments to the UBPs that regulate ESCO eligibility.  Rather,
Staff recommends that the Commission amend UBP § 2(D), which
requires ESCOs to perform certain tasks in order to maintain
eligibility, to impose new reporting requirements set forth in a
proposed UBP section, section 11.[25]  The proposed UBP Section 11
would require ESCOs to, among other things, file an annual
report containing: basic financial statements, in accordance

---

[23]  The UBP do contain a separate provision for creditworthiness
      standards that, if not met, could subject the ESCO to a
      demand by the distribution utility to post and maintain
      financial assurances, such as a bond or a deposit, or some
      other means of establishing creditworthiness.  See UBP § 3.

[24]  UBP § 2(D)(4).

[25]  Hearing Exhibit 723.

CASE 15-M-0127, et al.

with the Uniform System of Accounts for gas and electric
utilities; information specific to the ESCO's New York
operations regarding the number of mass-market customers served,
the ESCO's revenues, with commodity unbundled from any value-
added service, the "cost of goods sold", the cost of value-added
services provided in New York, the units of sales by kWh or
therm, and the amount of capital deployed in the State.[26]

        Notably, Staff did not join the ESCOs' call for
bonding or collateral requirements.  According to Staff, bonding
and collateral requirements would not have the same effect as
ensuring that ESCOs are charging just and reasonable rates.
Staff also expresses concern that the call for such financial
surety by some larger ESCOs is an attempt by those ESCOs to
"weed out" smaller ESCOs.[27]

        For its part, NYC opines that a more rigorous
application process, like a licensing structure, could improve
customer protections without adversely affecting the retail
access market.[28]  NYC believes that the Commission should
actively review an ESCO's fitness to serve customers before the
ESCO is permitted to operate in the state.  NYC suggests that an
"officer certification" requirement, pursuant to which an ESCO
corporate officer would affirm that he or she understands that
the ESCO must comply with all relevant laws and regulations,
could be an effective tool when prosecuting bad-acting ESCOs.[29]

        Finally, NYC supports a requirement that ESCOs post
some form of collateral or other financial assurances.  NYC

----

[26]   Hearing Exhibit 723 (UBP proposed §11(F)).

[27]   Staff Initial Brief, p. 78.

[28]   NYC Initial Brief, p. 23.

[29]   NYC Initial Brief, p. 23; Tr. 1460.  Direct Energy also
       supported an officer or management affirmation.  See Tr. 179.

CASE 15-M-0127, et al.

opines that this collateral would be available to make customers whole if the ESCO engages in misconduct and/or to deter misconduct in the first place.[30]

UIU/NYAG recommends that the UBPs be modified to enhance eligibility criteria by requiring the disclosure of investigations and complaints in other states that were made against the ESCO and its marketing agents.  UIU/NYAG believe that eligibility should be denied to any ESCO with a history of "poor performance."[31]  In addition, they recommend that ESCOs be required to post a performance bond, similar to the security requirements established by the utilities and the New York Independent System Operator (NYISO).[32]  UIU/NYAG propose that the amount of the security required should be determined based upon the number of customers served by the ESCO and the amount the ESCO historically has charged customers above the utility price.  If the ESCO has not charged more than the utility, then the amount should be a pro-rated share of the average overcharge of all ESCOs.  According to UIU/NYAG, this financial security requirement would ensure that ESCOs operating in New York have the resources to make customers whole if there is a violation of the contract or any applicable law or regulation.


I.B.  ESCO Party Positions Regarding ESCO Eligibility
      Requirements

Constellation urges the Commission to look to the eligibility standards in other states as a guidepost for potential changes to the rules and process in New York for ESCO

---

[30]   NYC Initial Brief, p. 24.  Direct Energy and RESA support a
       collateral or other financial assurance requirement.

[31]   Tr. 1542-1543. (UIU/NYAG does not define "poor performance").

[32]   Tr. 1544.

CASE 15-M-0127, et al.

eligibility.[33]  Constellation offers Delaware, Connecticut, Illinois, Ohio, Pennsylvania, Virginia, and the District of Columbia as examples of jurisdictions that require an ESCO to demonstrate that it has the technical, managerial, operational and financial capability to adequately provide the public with gas and/or electricity service.  Similarly, Constellation points out, New Jersey requires an ESCO to demonstrate its "financial integrity" by submitting, among other things, financial statements and other information to demonstrate that the applicant can satisfy its financial requirements.  Constellation explains that some states, like Connecticut, New Hampshire, California, and Delaware, require an applicant to post some type of financial assurance, such as a surety bond or a letter of credit.[34]

Drift, GEE, and Direct Energy similarly support a more rigorous application process for ESCOs, with heightened eligibility requirements.[35]  Drift is concerned that, without more barriers to entry in place, "fly by night" companies will continue to infiltrate the market, rapidly enroll customers on unfavorable contract terms, and then sell the customers to other ESCOs.  These parties believe that strengthening the eligibility requirements is a way to expand customer protection without endangering legitimate ESCO operations.

Drift, GEE, and Direct Energy also recommend that the Commission establish a financial assurance requirement.  For its part, Direct Energy believes that each ESCO should be required to post a financial surety in an amount between $1 million and

---

[33]  Constellation Initial Brief, pp. 20-24.

[34]  Id., p. 26.

[35]  Drift Initial Brief, pp. 17-18; Tr. 83-84, 247-248.

CASE 15-M-0127, et al.

$5 million, depending on the number of meters the ESCO serves.[36] Direct Energy, much like most ESCOs that support financial assurances, suggests that such requirement would provide a means for customer refunds and deter bad-acting companies or companies with suspect financial abilities from entering the marketplace.

The IEC similarly urges the Commission to adopt a formal licensing process that has "comprehensive eligibility requirements", including a demonstration of financial fitness, and an opportunity for Department staff to make a substantive determination of eligibility.[37]  Financial fitness could be established, according to the IEC, through the submission of documentation, such as audited financial statements, banking records, or credit reports.  The IEC notes that ESCOs currently are required to satisfy financial assurances with both the NYISO and local utilities and, thus, requiring multiple additional assurances are prejudicial to smaller, less liquid ESCOs.[38] Thus, the IEC recommends that the Commission require ESCOs to post financial assurance that is relative to the risk the ESCOs' products pose to customers.[39]

RESA points out that there is wide support among the parties - ESCOs and non-ESCOs alike - for Commission action to strengthen the eligibility requirements.  RESA believes that stronger requirements would send a signal to customers and other market participants that all active ESCOs in the market have the skills and financial capability to operate responsibly in a

---

[36]  Tr. 248.

[37]  IEC Initial Brief, pp. 37-39; IEC Reply Brief, p. 17. Robison supports the positions offered on this issue by the IEC. Robison Reply Brief, p. 10.

[38]  IEC Reply Brief, p. 21.

[39]  IEC Initial Brief, pp. 38-40.

CASE 15-M-0127, et al.

complex market.[40]  Specifically, RESA suggests that the
Commission should require all new applicants to "demonstrate
experience with wholesale energy procurement, energy risk
management and hedging."[41]  In addition, RESA believes that new
applicants should be required to demonstrate that they have
experience developing and offering energy-related products and
services.[42]  RESA believes that any ESCO that does not have
experience in these areas should be required to present a plan
to develop these capabilities before it is authorized to operate
in New York.

As for existing ESCOs, RESA believes that the
Commission should establish a bonding requirement that is
reasonably tied to the amount of risk to which the customers are
subjected.  RESA disagrees with the suggestion by UIU/NYAG that
the bonding requirement be tied to any alleged "overcharge"
because such recommendation would be difficult to implement,
given that prices fluctuate from year to year, and, more
importantly, "it is a false premise" to label any difference
between an ESCO and a utility price as an "overcharge".[43]

Finally, RESA believes that New York's retail access
market requires "greater assurance that each ESCO has the
financial wherewithal to honor existing contracts" and to comply
with the UBP.[44]  According to RESA, the lack of any bonding or

---

[40]   RESA Initial Brief, pp. 38-39.  Infinite Energy supports the
       positions set forth by RESA regarding ESCO eligibility.
       Infinite Energy Initial Brief, p. 19.

[41]   RESA Initial Brief, p. 39; Tr. 1171-1172.

[42]   Direct Energy similarly suggested that ESCO applicants be
       required to demonstrate relevant industry expertise.  See Tr.
       249.

[43]   RESA Initial Brief, p. 40.

[44]   RESA Initial Brief, p. 41.

CASE 15-M-0127, et al.

other collateral requirement in New York is in stark contrast to
other states with competitive electricity and gas markets.  RESA
believes that any collateral requirements adopted by the
Commission should take into consideration factors such as: the
type of marketing the ESCO uses; the number of customers served;
and the ESCO's UBP compliance history.[45]


I.C. Conclusions Regarding ESCO Eligibility Requirements

        The Commission adopts enhanced eligibility
requirements as discussed below.  These stricter eligibility
requirements will ensure that only the ESCOs that are prepared
to comply with rules and regulations and uphold policy goals and
expectations are participating in the retail access market.
Enhancing the quality and trustworthiness of market participants
should, in turn, reduce the exposure to risk for customers and
improve confidence in the marketplace.

        Currently, the UBP requires ESCOs to complete an
application including information such as company name and
contact information, a list of products and services to be
offered, and sample sales agreements of products and services to
be offered.  The collection of additional information from all
ESCOs, as discussed herein, will assist Department staff in its
review of applications and assist staff in determining which
applicants are likely to comply with eligibility and operations
requirements.  Consequently, the UBP is amended to impose
additional application requirements, as follows.  Those
modifications are reflected in the red-lined text of the amended
UBP, attached hereto as APPENDIX A, and shall become effective
60 calendar days after issuance of this Order.

---

[45] RESA Initial Brief, p. 42; Tr. 1169-1171.

CASE 15-M-0127, et al.

### I.C.1. Method(s) of Marketing

Department staff are better able to monitor the retail market when staff knows each ESCO's method(s) of marketing. Therefore, staff shall modify the ESCO eligibility application to include a checklist for the applicant to identify method(s) by which the ESCO intends to market to customers. This checklist shall include, at a minimum, the following methods: door-to-door; other in-person, including events; telemarketing; direct mail; through partners (with attached list of partners); and online advertisements. Staff may add additional methods, in the initial filing or as part of future updates, as needed.

### I.C.2. Types of Products Offered

Pursuant to the following sections of this Order, any product marketed by an ESCO after the effective date of the modified UBP adopted in this Order must meet at least one of three criteria, with one exception noted below: (a) it must include guaranteed savings; (b) it must be a fixed-rate product compliant with a price limit; or, (c) it must be a renewably sourced product compliant with rules regarding content, sourcing, and transparency, discussed below in the Products Offering section. As part of its application for eligibility, an ESCO must identify in which of these categories it intends to offer products.

The Commission provides one exception to these three criteria and allows Agway a limited opportunity to continue to offer its EnergyGuard service, due to the specific, credible evidence Agway submitted regarding the energy-related value of this product. As discussed below, the Commission permits a limited opportunity for other ESCOs to apply for the opportunity to sell a product/service similar to EnergyGuard.

-23-

CASE 15-M-0127, et al.

I.C.3. Complaint Data for Other States of Operation

ESCOs will be required to disclose each state in which they operate or have operated within the 24 months prior to the date of the application and provide any data in their possession regarding complaint history in those states.  If the ESCO operates under multiple trade names, it must identify each name used and the state(s) in which each name is used.  This information will be used by Department staff, in its discretion, to contact the regulatory agencies in those states to obtain information regarding the ESCO's complaint history.  The Commission will retain discretion to consider complaint history in other states as a basis for denying or withdrawing ESCO eligibility.

I.C.4. Data Security Breaches

As a general matter, ESCOs must make all reasonable efforts to prevent and discover security breaches associated with customer proprietary information.  ESCOs that apply to operate in New York will be required to list and describe any security breaches associated with customer proprietary information that occurred in any jurisdiction in which it operates, under any trade name, within the 24 months prior to the application, and actions taken by the applicant in response to the incident.  ESCOs also shall provide specific policies and procedures addressing how they intend to secure customer data. The Commission retains discretion to consider in its eligibility determinations ESCOs' security vulnerabilities as a basis for denying or withdrawing ESCO eligibility.

I.C.5. Bankruptcy History

ESCO applicants will be required to disclose any history of bankruptcy, dissolution, merger, or acquisition activities during the 24 months prior to the application.  This data will provide Department staff with access to information

-24-

CASE 15-M-0127, et al.

about the ESCO's recent financial history, without seeking historical data that is stale or unduly burdensome to compile. This information also must be provided for each trade name used as well as for affiliates of the ESCO, including upstream owners and subsidiaries. The Commission will consider this information, in its discretion, in determining ESCO eligibility.

> I.C.6. <u>Financial Assurances/Collateral Requirements</u>

ESCO applicants will be required to provide proof of financial assurance. This may take the form of bonding, collateral, a letter of credit or the like, or may take the form of a meaningful demonstration that the ESCO is sufficiently capitalized for the amount and type of business the ESCO is conducting in New York. A demonstration of financial health will ensure that ESCOs that guarantee pricing, such as through savings guarantee or fixed-rate contract, are able to fulfill that guarantee. Such requirement will both deter bad-acting ESCOs from entering the market and ensure that ESCOs do not take on responsibilities they may not be able to fulfill. Likewise, it will help deter ESCOs from attempting to strategically exit the market in a manner that allows them to capture the value of their energy services contracts while evading their obligations to customers.

A financial assurance requirement would provide a means to ensure that customers who were wronged by an ESCO by overcharging or other financial injury can be made whole. Moreover, this requirement will help ensure that only ESCOs that are ready, willing, and able to compete in the retail access market in full compliance with the UBP will populate the market.

In order to properly protect customers while simultaneously encouraging market participation from smaller ESCOs, a sufficient financial assurance must have a relationship to the amount of business a particular ESCO does in the state.

CASE 15-M-0127, et al.

To develop a proper methodology for assessing entry level and ongoing financial assurance requirements, Staff is directed to consult with interested stakeholders and propose both an appropriate form of financial assurance and a reasonable methodology for calculating the required amount.  A report of Staff's recommendations will be due within 120 calendar days of the date of this Order.

I.C.7. ESCO Officer Certification

ESCOs will be required to provide as part of the application an "officer certification", as was recommended by NYC.  Such certification must be a document sworn to by a high-level officer of the ESCO, such as the president or chief operating officer or equivalent, in which the officer affirms that the ESCO is willing and able to comply with all applicable laws and regulations.  Annually thereafter, each ESCO must file this officer certification to affirm that the ESCO is following all applicable laws and regulations.

I.C.8. Additional Eligibility Review Process

Under the current UBP, an applicant that submits the required information is automatically deemed eligible to operate as an ESCO in New York.  The fact that this process relies on an assumption of good faith participation in the market has likely contributed to bad-acting ESCOs' ability to participate in the market.  To remedy the unintended effects of this presumption, a more thorough review process is necessary.  The amended process will allow Department staff to recommend to the Commission that the Commission deny an entity's application to operate as an ESCO in New York, for good cause shown.  In any instance that Department staff recommends denial of an application, the applicant shall be afforded an opportunity to provide information in support of its application to the Commission

CASE 15-M-0127, et al.

before a final determination is made.[46]  Furthermore, an ESCO
will not be eligible to operate in New York State until its
application has been approved by staff or the Commission.

Department staff's application review process
generally will be guided by the eligibility requirements
identified in the UBP and any relevant Commission order.[47]  Those
requirements create various mechanisms by which the Department
and the Commission may acquire materials that directly bear on
the applicant's ability and willingness to provide electric
and/or gas service while complying with relevant consumer
protection provisions.  Historically, applicants' eligibility
largely has been evaluated based upon whether they submitted the
necessary documents and/or information.  Going forward, staff
will continue to assess whether applicants have submitted the
required documents and information and will assess what those
documents and information reveal about the applicant's
likelihood of compliance with the UBP if the ESCO were deemed
eligible to operation in New York.

To provide a few illustrative examples of factors to
be considered during this eligibility review process, staff will
assess not only whether an applicant has submitted the required
marketing materials and sales agreements, it also will assess
whether those marketing materials contain any obviously false or
misleading information, including claims about the applicant's

---

[46]  This opportunity is intended to permit response and/or
rebuttal to any arguments raised by staff and is not intended
to permit supplementation of a deficient application.  The
Commission retains the right to consider, in its eligibility
determination, the significance of any applicant's failure to
make a prima facie case for eligibility in its initial
application.

[47]  See generally UBP § 2.

CASE 15-M-0127, et al.

service that are inconsistent with laws, rules, or regulations.[48]
Staff also receives considerable information regarding an
applicant's managerial staff, contractors, and subcontractors,
as well as information regarding whether any senior management
has been engaged in, or has worked for ESCOs that have engaged
in, violations of law, regulations or rules.[49]  Department staff
now will be empowered to recommend to the Commission that an
applicant's eligibility be denied in any situation in which an
applicant employs senior management, or hires
contractors/subcontractors, that have a history of legal
noncompliance and/or disregard for relevant customer
protections.

　　　　These examples are not exhaustive.  They are intended
to illustrate that staff should evaluate applications in
relationship to the clear substantive concerns that underpin the
requirements for various submissions in the application process.
We reiterate that staff's discretion is significantly
constrained in this exercise, inasmuch as it is not authorized
deny an applicant eligibility.  Rather, in appropriate
circumstances, staff shall provide a recommendation to the
Commission when it believes an applicant is unqualified for
eligibility.  The Commission then will perform a de novo review
of the application.

　　　　Existing ESCOs that currently are validly operating in
New York will continue to be eligible to operate pending the
effective date of the modified UBP adopted in this Order.
However, all currently operating ESCOs that wish to continue
operations by enrolling new customers or renewing contracts with
existing customers following the effective date of the modified

---

[48]　See UBP §§ 2.B.1.b., 2.B.1.l.

[49]　See UBP § 2.B.1.K.

CASE 15-M-0127, et al.

UBP (i.e., 60 calendar days following the date of this Order) must file an application in accordance with the modified UBP no later than 30 calendar days after the effective date of the UBP (i.e., an application must be filed within 90 calendar days of the effective date of this Order). To the extent that the information submitted in such application, or other information available to Department staff, suggests that an ESCO's eligibility to operate should be revoked, staff shall make such recommendation to the Commission, and consideration of that ESCO's eligibility shall follow the process for denial of an application discussed above.[50]

The eligibility of any currently operating ESCO to enroll new customers or renew contracts with existing customers shall be immediately and automatically suspended if the ESCO fails to submit a new application within 30 calendar days of the effective date of the UBP as modified in this Order. While such suspension will bar the ESCO from entering any new agreements with customers, it will not relieve the ESCO of its outstanding legal obligations under existing contracts. The ESCO's eligibility will be restored only after it has filed a new application and Department staff or the Commission has approved that application.

In addition, Department staff periodically will review the eligibility of each ESCO operating in New York and make a recommendation to the Commission if it finds that the ESCO should not be permitted to continue its New York operations. Thus, ESCOs must be prepared to provide Department staff with any and all information that is necessary to establish eligibility. An eligibility review process that includes both

---

[50]   We note that, to any extent that they conflict, this specific eligibility-determination process supersedes the more generic process described in UBP §§ 2.D.5 and 2.D.6.

CASE 15-M-0127, et al.

an initial and periodic assessment of the fitness of an ESCO
will enhance the customer protections already in place and
ensure that only the most qualified ESCOs provide service to New
York customers.

At a minimum, the process should include regular
updates from the ESCOs, including prompt filings for any major
changes and annual filing of all updates, combined with a formal
reassessment every several years, or more frequently as needed.
Staff is directed to file a review process guidance document
within 60 days of the issuance of this Order.

II.   ACCESS TO AND TRANSPARENCY OF PRICING INFORMATION

The evidence in the record demonstrates that, on
average, mass-market ESCO customers pay more for their electric
and/or gas service than utility customers pay.  While certain
ESCO products may justifiably cost the customer more, it is
troubling that, after the extensive process associated with this
track, neither ESCOs nor any other party have shown, to any
meaningful degree of certainty, that ESCO charges above utility
rates were generally – or in any specific instances – justified.
The reasons for the pricing discrepancies between ESCOs and
utilities are unclear due, in part, to the fact that the State's
utilities, which deliver the commodity sold by ESCOs to the ESCO
customers and frequently perform all of the ESCOs' billing
functions, are not privy to data regarding what type of products
or additional services the ESCO customers have contracted to
obtain from the ESCOs.  Further, commodity costs for ESCO
customers are not unbundled and identified separately from any
value-added product or service purportedly supplied by the ESCO,
either in the ESCOs' communication to the utilities or on the
customers' bills.  ESCOs' collective failure to use the instant
track to establish, to any reasonable degree of certainty, that

-30-

CASE 15-M-0127, et al.

customers receive valuable energy-related services that justify the specific premiums they pay for ESCO service underscores and supports the Commission's long-held concern that many customers may only be taking ESCO service due to their misunderstanding of the products and/or prices that they are purchasing from the ESCO.

The lack of specific data and information about the types of products ESCO customers are receiving is problematic for several reasons.  Most importantly, though, without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable.  In addition, the lack of easily accessible data about the various types of products offered by the ESCOs, including the pricing, makes it difficult for customers to make fair comparisons among the ESCO offerings to decide which ESCO product might be beneficial for them.

The retail market cannot function properly if it leaves the Commission -- or customers -- unable to easily assess the value of permissible ESCO products.  Itemized, transparent pricing data matched with clearly described ESCO products will better allow customers to compare ESCOs' products against one another and against the value of utility commodity service.

II.A.   <u>Non-ESCO Parties' Positions Regarding Access to and Transparency of Pricing Information</u>

Staff and PULP believe that the utilities, where Consolidated Utility Billing (CUB) is used, and ESCOs, where Consolidated ESCO Billing (CEB) or dual-billing is used, should be required to produce an on-bill comparison for all ESCO customers.  They suggest that the comparison show what the ESCO customer is being billed for commodity and delivery service during the identified period and provide the customer with the

CASE 15-M-0127, et al.

amount he or she would have paid had the customer remained with the default utility.[51]

The Joint Utilities do not oppose Staff's recommendation, but caution that the development and implementation of an on-bill comparison will have significant cost and other resource requirements.  They request that the implementation time-frame and estimated resource requirements be investigated prior to adoption of this recommendation.[52]

II.B.   ESCO Parties' Positions Regarding Access to and
         Transparency of Pricing Information

Most ESCO parties do not directly address or oppose an on-bill comparison but, rather, focus on the validity of comparing monthly ESCO charges to the charges of the default utility.  These parties argue that any comparison is inherently flawed, given, among other reasons, that ESCOs incur costs that utilities do not, ESCOs provide value-added products and services not offered by utilities, and utilities can recover costs outside the periods in which the costs are incurred.[53]

II.C.   Conclusions Regarding Access to and Transparency of
         Pricing Information

One of the purposes of allowing ESCOs to participate in the retail energy market was to offer customers the option to choose among energy providers, with the understanding that

---

[51]  Tr. 3460-3461.  This is like the practice adopted in Connecticut.  Staff Initial Brief, pp. 82-83, 89.

[52]  Joint Utilities Reply Brief, pp. 4-5.

[53]  See, e.g., tr. 253-257, 292-294, 364-366, 695-696, 812-815. Agway Initial Brief, pp. 1-2; Constellation Initial Brief, pp. 18-20; Direct Energy Brief, pp. 12-13, 15-16, 44; Direct Energy Reply Brief, p. 23; Infinite Energy Reply Brief, pp. 14-15; NEMA Initial Brief, pp. 56-57.  See also RESA Initial Brief, §III.C.3; GEE Initial Brief, pp. 10-11; GEE Reply Brief, pp. 19-20, 23-24.

CASE 15-M-0127, et al.

"[c]ustomers acting in their own self-interest, when presented with a variety of market choices, will arrange their consumption to maximize their welfare and save costs."[54]  Thus, in theory, the ESCO business model is "dependent on creating value for the end customer"[55] and the expectation that, when an ESCO customer does not perceive value, he or she simply will change ESCOs or return to utility service.

However, for ESCO customers to perceive the existence or lack of value, the customers must have easy access to sufficient, clearly conveyed pricing information.  Customers with such access can easily educate themselves, and an educated customer base will, in turn, increase competitive pressure on ESCOs to the benefit of customers through a more competitive and efficient market.[56]  Simply put, price transparency clearly furthers the purposes of the retail energy market, and we reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue.

II.C.1.   Utility-Provided Price Comparisons

Customers' ability to easily make accurate price comparisons is a critical component of achieving the goals articulated by the Commission when it established competitive markets.  The on-bill comparison suggested by Staff and PULP is a promising method for empowering customers to make informed choices, and therefore the Commission supports the comparison as a requirement placed on utilities that bill on behalf of ESCOs.

---

[54]   Cases 94-E-0952 et al., Matter of Competitive Opportunities Regarding Electric Service, Opinion 96-12, p. 40.

[55]   RESA Initial Brief, p. 80.

[56]   Case 12-M-0476, supra, Order Instituting Proceeding and Seeking Comments Regarding Operation of Retail Energy Markets (issued October 19, 2012), p. 5.

CASE 15-M-0127, et al.

Ideally, the first page of each utility bill sent to a customer
would contain a conspicuous price comparison that shows the ESCO
name and charge for the prior billing period and what that
charge would have been for the same period had the customer
received commodity from the utility.  A clear price comparison
would also identify the difference between those two amounts in
a manner that unambiguously conveys whether the customer is
saving money or paying a premium for the ESCO service.  The
Commission also finds that customers could benefit from a bill
that contains a chart showing the preceding 12-month period and
a comparison of the ESCO price paid by the customer and the
price the utility would have charged over that term.  An ideal
price comparison also would identify the difference between
those two 12-month amounts in a manner that unambiguously
conveys whether the customer is saving money or paying a premium
for the ESCO service over that term.

        The Commission is cognizant of the fact that the
aforementioned on-bill price comparison is merely one mechanism
for achieving the desired result of making accurate,
comprehensible pricing information readily available to
customers.  While an on-bill comparison is expected to be a
necessary element for achieving this goal, the Commission
recognizes that it may not be, in and of itself, sufficient.

        The utilities already use a variety of methods, in
addition to the traditional utility bill, to convey service
information to customers and those various methods can also
serve as potential opportunities for educating and empowering
customers.  The Commission anticipates that utilities likely
will need to use more than one existing method, and perhaps
adopt new methods, to effectively convey price comparison
information to customers.  The methods for conveying price
comparison information could include, but are not limited to,

CASE 15-M-0127, et al.

websites, regular mail, email, customer service representative interactions, and interactive voice recording system interactions.

We recognize that achieving these goals requires a tailored approach given that each utility may face unique hurdles to ubiquitously conveying price-comparison information. As one obvious example, differences in the utilities' information technology systems could alter the costs, or reasonable implementation timelines, between the utilities if we were to direct utilities to provide identical information in an identical manner on a unified timeline. Mindful of the need to consider individual characteristics of utilities' billing systems, the Commission directs Staff to collaborate with the utilities and develop individualized plans that set forth, for each utility, a timely and cost-effective pathway toward maximizing the dissemination of useful price-comparison information to customers.

The Commission generally finds that an inflexible timeline placed upon plan filings or implementation dates would be imprudent at this juncture. Nonetheless, we stress that empowering customers in this manner is of the utmost importance to retail energy market reform. Further, the price transparency goals articulated herein clearly implicate the utilities' legal obligations to convey price information simply and clearly regarding energy services and, more generally, to do business in a manner consistent with the public interest. Therefore, we direct the utilities and Staff to act in a prompt and diligent manner for the purpose of creating a Joint Billing Plan for each utility that meets the foregoing parameters and is supported by both Staff and the respective utility. To the extent that Staff and any utility are unable to reach a mutually agreed upon, binding Joint Billing Plan within a reasonable time, Staff shall

CASE 15-M-0127, et al.

file a proposed Billing Plan for Commission review and
consideration.  The utility will then have an opportunity to
make a filing identifying and explaining the areas of the
Billing Plan to which they object and offering alternative
proposals.  The underscore our expectation and - our direction –
that the utilities will act in a prompt manner to expand the
opportunities for meaningful price comparison and transparency.

　　　　II.C.2 Utility-Provided Cost Itemizations

　　　　Our conclusions on itemized billing are consistent
with our findings in the previous section (II.C.1.) regarding
utility-provided price comparison information.  The Commission
finds that ESCO customers could meaningfully compare services
and products among the various energy retailers if they received
itemized ESCO pricing data.  Customers would benefit from a bill
that clearly differentiated charges for commodity from charges
for non-commodity products and services they receive from the
ESCO.  With itemized pricing information, customers would be
able to precisely determine the cost associated with the ESCO
commodity supply, as well as the additional cost associated with
value-added products and services.

　　　　The Joint Billing Plan directed above shall also
address the implementation of itemized billing by each utility.
The Joint Billing Plan may also address viable alternative or
additional methods – other than traditional utility bills – for
providing customers with information that itemizes the costs
associated with ESCO services.  The timelines for this
implementation may follow or differ from the timelines regarding
the provision of price comparison information, depending on
relevant circumstances.

CASE 15-M-0127, et al.

### III. PRODUCT OFFERINGS

ESCOs represent a competitive alternative to traditionally regulated utilities and, ideally, their market participation would spur innovation and provide the types of products and services envisioned in the Reforming the Energy Vision (REV) proceeding,[57] such as energy efficiency management, integration of renewable resources and increased customer engagement. Thus, to the extent that ESCOs can or do operate as something more than mere generic commodity providers, they have potential to provide valuable products and services to mass-market customers.

The Commission recognizes that, based upon actual costs, certain ESCO products will be more expensive than default utility service. However, because energy services are essential to customers' health and wellbeing, the additional cost to customers must not outweigh the purported benefits to them. Consequently, we adopt the following reforms regarding the range of permissible ESCO product offerings.

### III.A. Variable-rate, Commodity-only Service

Based on the record before it, the Commission cannot accurately identify the specific number of mass-market ESCO customers who receive commodity-only, variable-rate service. However, variable-rate, commodity-only service is obtainable from the utility, most often at a lower price than from an ESCO and without any termination fee. We find that there is no demonstrated customer benefit to allowing ESCOs to offer this service to mass-market customers.

---

[57] See Case 14-M-0101, Reforming the Energy Vision – Policy, Order Adopting Regulatory Policy Framework and Implementation Plan (issued February 26, 2015).

CASE 15-M-0127, et al.

### III.A.1.  Non-ESCO Party Positions Regarding Variable-rate Commodity-only Service

Staff compared the 2014-2015 emissions profiles for various utilities and ESCOs selling electricity, which were derived from environmental disclosure labels, with the emission profile of the New York State spot market and found that the conventional ESCOs and Mid-Hudson Large Utilities had similar emissions profiles.  Staff suggests that similar emissions profiles indicates that the ESCOs likely had few bilateral contracts or physical hedges and, instead, purchased a large amount of energy off the spot market.[58]  According to Staff, other utilities, specialty ESCOs and not-for-profit entities apparently enter into more bilateral contracts and physical hedges.  Thus, Staff does not believe that the disparity in variable-rate electric commodity offered by ESCOs and the utilities can be fully explained by any alleged commodity procurement costs.  According to Staff and others, there is no need for the ESCOs to provide variable-rate service to customers at a premium to the default utility commodity cost because that service is readily available from the utilities at a just and reasonable rate.

### III.A.2.  ESCO Party Positions Regarding Variable-rate Commodity-only Service

While some ESCOs argue that they provide their customers, including those that take variable-rate commodity, with a better customer service experience, which purportedly justifies a higher cost, they provided no proof at the evidentiary hearing to substantiate this claim.  Nor did any ESCO attempt to justify or explain how the significantly higher

---

[58]   Tr. 3259-3262.  According to Staff, most, if not all, load serving entities (LSEs) in New York, including ESCOs, also use financial hedges and such transactions would not be reflected in emissions profile data.

CASE 15-M-0127, et al.

costs associated with ESCO service for variable-rate electric commodity was in reasonable proportion to any claimed customer service benefit to customers.

RESA suggested that simply being an ESCO customer provides a customer with benefits not offered by the utilities because ESCOs buy electricity on the wholesale market to optimize prices, while the utility simply passes through the commodity costs.[59]  In making this claim, RESA appears to suggest that variable-rate, commodity-only ESCO customers save money. However, RESA has not made any evidentiary showing to support that proposition.  Furthermore, the utilities also purchase most or all of the electricity they supply from the wholesale market and RESA has not demonstrated that utility purchasing practices fail to optimize prices.  Moreover, the credible pricing data in the record leads us to conclude that mass-market ESCO customers, on average, spend significantly more money than utility customers.

III.A.3.  Conclusions Regarding Variable-rate, Commodity-only Service

Because customers receive no value when they pay a premium for variable-rate commodity-only service from ESCOs, ESCOs will be prohibited from offering variable-rate, commodity-only service except where the offering includes guaranteed savings.[60]

As has been demonstrated in these proceedings in the context of low-income customer protection,[61] it is possible for

---

[59]  Tr. 809, 814, 911, 974-977.

[60]  This is a point supported by NYC.  See NYC Initial Brief, p. 14.

[61]  See 12-M-0476 et al., Order Adopting a Prohibition on Service to Low-Income Customers by Energy Service Companies (issued December 16, 2016).

CASE 15-M-0127, et al.

some ESCOs to serve customers at a guaranteed savings. Saving customers money was a crucial policy goal articulated by the Commission when the retail access market was initially opened. Thus, rather than prohibit variable-rate, commodity-only offerings, such offerings will be permitted only if the ESCO guarantees to serve the customer at a price below the price charged by the utility on an annually reconciled basis.

The Commission successfully implemented a guaranteed savings requirement in the Low-Income Proceeding. In the Low-Income Proceeding, ESCOs have been required to petition the Commission for permission to provide a guaranteed savings offering to low-income customers. While an ESCO that wants to provide service to customers who do not qualify as low-income will not be required to petition the Commission for permission to offer a guaranteed savings product to those customers, the ESCO will be required to submit information on the product to Department staff and to make annual reports to Department staff on the product. Consistent with the requirements in the Low-Income Proceeding, the initial submission to staff must include, at a minimum, the following: (a) an ability to calculate what the customer would have paid to the utility; (b) a willingness and ability to ensure that the customer will be paying no more than what they would have been paid to the utility; and (c) appropriate reporting and ability to verify compliance with these assurances. If staff believes that a submission is insufficient to demonstrate the ESCO's intention and/or ability to provide a guaranteed savings product, staff shall attempt to resolve this issue with the ESCO or recommend that the Commission bar the ESCO from offering a guaranteed savings product, as staff deems appropriate. In the case of a recommendation to the Commission, the ESCO will have the

CASE 15-M-0127, et al.

opportunity to respond before the Commission renders its decision.

The product must guarantee savings on an annual basis, or with greater frequency; to achieve this, the ESCO must perform a reconciliation on an annual basis, or with greater frequency, and provide a credit or refund[62] to any customers who were billed more over the relevant period than they would have been billed had they remained on the utility default supply rate. ESCOs providing a guaranteed savings product must also perform such a reconciliation when customers taking such products cancel their ESCO service and must provide a credit or refund to any customers who were billed more over the relevant period, either since the end of the previous reconciliation period or since the customer was enrolled if no reconciliation period had yet ended, than they would have been billed had they remained on the utility default supply rate.

In either case, the credit or refund must be at least as large as the difference between what the customer was billed during the relevant period and what the customer would have been billed had the customer remained on the utility default supply rate. Department staff will monitor this process through reporting from ESCOs and utilities; if staff concludes that any ESCO has failed to provide a required credit or refund, staff may instruct the utilities to temporarily withhold a portion of the payments that would be remitted to that ESCO under the purchase of receivables. The utility shall withhold the portion as instructed by staff until instructed otherwise by staff or the Commission. Department staff shall work with the ESCO to ensure that an appropriate credit or refund is made and then

---

[62] ESCOs are required to provide refunds if no ongoing relationship with a customer allows for a credit against outstanding charges for ESCO service.

CASE 15-M-0127, et al.

instruct the utilities to release the funds; if staff and the
ESCO are unable to come to an agreement on the appropriate
credit or refund, staff shall make a filing with the Commission
requesting the Commission make a finding on the appropriate
credit and refund.  The ESCO will have an opportunity to respond
to this filing, and it may make any arguments regarding
justifications for its actions and/or rights to receipt of the
withheld funds at that time.  The Commission then may find that
no additional credit or refund was required, and the funds held
by the utility should be released, may find that an additional
credit or refund is required and direct that credit or refund be
made using the funds held by the utility, or may make other
appropriate findings and determinations.

### III.A.3.a.  The Merchant Function Charge

In discussing variable-rate commodity service, some
ESCOs advocate for an updated methodology to calculate each
utility's Merchant Function Charge (MFC).[63]  The MFC, and the
policies underlying such, were adopted by the Commission in
2004.[64]  Inasmuch as the MFC is litigated and adjusted as part of
each utility's individual rate case, this proceeding is not an
appropriate forum in which to make any changes to the MFC.  To
the extent any ESCO takes issue with cost allocation and rate

---

[63]  GEE Initial Brief, pp. 27-32; Agway Reply Brief, p. 3; NEMA
Initial Brief, pp. 57-58.

[64]  Case 00-M-0504, Proceeding on Motion of the Commission
Regarding Provider of Last Resort Responsibilities, the Role
of Utilities in Competitive Energy Markets, and Fostering the
Development of Retail Competitive Opportunities, Statement on
Unbundling and Order Directing Tariff Filings (issued August
25, 2004) (Unbundling Order).

CASE 15-M-0127, et al.

design issues, they can participate in the utilities' rate cases.[65]

### III.A.3.b. Out-of-Period Adjustments

Similarly, some ESCOs complain that out-of-period adjustments made by utilities, with the Commission's approval, make it impossible for ESCOs to be competitive with the utilities, particularly in the context of variable-rate gas commodity service.[66] These ESCOs do not acknowledge, however, that out-of-period adjustments by the utilities ultimately are a zero-sum game: for any downward adjustment made to a customer's bill, a corresponding out-of-period increase must be made. This process moderates fluctuations in customer bills that otherwise would result from market activity.[67] Thus, out-of-period adjustments do not unfairly provide the utilities a pricing advantage when a price comparison is made on an annual basis.

### III.B. Non-Energy-Related Value-Added Products and Services

Value-added products and services that have no energy-related benefit and/or that are offered as a one-time promotion do not further the energy policy goals of the State and, therefore, provide no value in the context of the retail energy market. These promotional items, such as gift cards or other "swag," are frequently offered as promotions to induce customers to sign a contract with the ESCO. However, the market value of these items often is significantly less than the price the customer ultimately pays for the item or service over the term of the contract. Accordingly, because these promotional items

---

[65]   UIU/NYAG Initial Brief, pp. 26-27.

[66]   See, e.g., GEE Initial Brief, pp. 12, 16, 20; Agway Reply Brief, p. 3.

[67]   See, e.g., Joint Utilities Reply Brief, pp. 5-6.

CASE 15-M-0127, et al.

typically do not provide any energy-related benefit to customers, ESCOs are prohibited from offering them to prospective customers as inducements to sign a contract.

III.C.  Energy-Related, Value-Added Products and Services

The Commission expected that allowing ESCOs to market commodity to customers would lead to productive innovation.  It anticipated that ESCOs would offer products and services to customers that utilities could not offer.  That expectation has been only partially fulfilled.  Today, in addition to variable-rate, commodity-only service, which is obtainable from the utilities, ESCOs in New York offer products and services that are not obtainable from the utilities, including: commodity plus some additional product and/or service; fixed-rate commodity products; and renewably-sourced commodity products.  Fixed-rate commodity and renewably-sourced commodity are each discussed separately below; other than those products, ESCOs have offered little or no evidence that they offer innovative or novel energy-related products and services.  In other words, there is little to no credible evidence on this record that the so-called "value-added" product and services offered by ESCOs are, in fact, providing a valuable benefit to customers.

The parties hold widely disparate viewpoints on whether ESCOs should be authorized to continue marketing "value-added" products and services to mass-market customers.  The parties generally agree that there is potential for value-added products or services to provide measurable value to New York customers, but the parties fiercely dispute issues such as whether such products and services are already being offered in New York, and to what extent; who should determine the value of such products; how value should be defined; and what product offerings should be considered to be value-added.

-44-

CASE 15-M-0127, et al.

### III.C.1    Non-ESCO Party Positions Regarding Energy-Related, Value-Added Products and Services

Staff, UIU/NYAG and NYC argue that the record on what value-added products and services are offered by ESCOs in New York is meager and that any products bundled with commodity should provide real and measurable value to customers at just and reasonable rates.  Staff recommends that the permissible ESCO products and services should be limited, asserting, among other reasons, that ESCOs have been "overcharging" customers for these products.[68]  While Staff acknowledges that its utility-to-ESCO price-comparison analysis was incomplete to the extent that it could not ascertain which, if any, ESCO charges included additional products or services, Staff asserts that "there is scant evidence introduced in these proceedings that shows that ESCOs are in fact offering energy-related value-added products and services, and more importantly, that any customers in New York actually take those services from an ESCO."  Staff's general concern is that ESCO customers have not received sufficient value to justify the price those customers paid, which is on average more than the price charged by the utility for commodity service.

Staff argues that, while ESCOs provided witness testimony about what value-added products and services are generally offered, or could be offered, in New York, by and large no ESCO provided actual data showing: which value-added products it in fact offers in New York; how many customers have in fact contracted for such services; the cost to ESCOs of providing such services to customers; or what, if any, benefit customers received from selecting the value-added product or service.  Staff explains that it attempted to collect such

---

[68]    Staff Initial Brief, pp. 71-72.

CASE 15-M-0127, et al.

information from the ESCOs during the discovery phase of these proceedings, but that the ESCOs largely failed to respond to its inquiries.[69] Having received insufficient data in response to its inquiries, Staff posits that the costs incurred by ESCOs to procure and offer value-added products must be de minimis and, therefore, likely cannot explain the significantly higher prices charged by many ESCOs.

Staff maintains that ESCOs have the burden of proof to show that the value-added products they offer provide commensurate value to customers to justify the cost. Staff believes that the ESCOs' failure to advance any data regarding the costs of value-added products and services suggests that such data, if it had been revealed, would not support the ESCOs' position. Staff avers that the Commission has an obligation to ensure that service is just and reasonable and cannot simply leave the reasonableness of the commodity price, where it includes a value-added product or service, to be assessed by customers. To do so, it asserts, would be a breach of the Commission's statutory duty. Accordingly, Staff recommends that the potential development of appropriate energy-related, value-added products be reviewed in a collaborative process in Track II, only after more immediate measures to protect mass-market customers are implemented.[70]

While NYC acknowledges that ESCOs have the potential to help the State and municipalities achieve clean energy goals, NYC, along with UIU/NYAG, asserts that innovation by ESCOs is lacking. These parties contend that, while the ESCOs filled the

---

[69] Also, in the lead up to the evidentiary hearing, various ESCOs withdrew from the proceeding and, consequently, did not exercise the opportunity to present evidence on this and other points. See n. 4, above.

[70] Staff Initial Brief, p. 44.

CASE 15-M-0127, et al.

record with testimony about innovative products and services
offered by ESCOs in other jurisdictions and with testimony about
products and services that, in theory, could be offered in New
York, the record has little evidence of products that are
offered in New York.

UIU/NYAG, and to a certain extent PULP,[71] take the
position that ESCOs have not proven either that they offer
innovative products to customers or that the prices they charge
for such products are justified compared to the price of default
utility service.  UIU/NYAG stresses the importance of
quantifying the value of bundled services because, if a
customer's energy bill is unpaid, the customers may have their
service disconnected.  Consequently, UIU/NYAG contends that
ESCOs should be prohibited from selling any allegedly value-
added products to mass-market customers until they objectively
demonstrate that the value-added product or service provides
quantifiable value to customers.

### III.C.2.  ESCO Party Positions Regarding Energy-Related, Value-Added Products and Services

ESCOs generally argue that a broad view of what
constitutes "value-added" should be taken and customer choice
should not be restricted in any way.  For instance, NEMA claims
that "ESCOs provide value-added services such as fixed-rate
products, green products, product bundling, brand loyalty
programs, and customer service conveniences that traditional

---

[71]   Tr. 3883-3884.

CASE 15-M-0127, et al.

default service do not, and cannot, offer customers."[72]   Other ESCOs described products and services that they provide customers, including: improved customer service experiences; "smart" thermostats; heating system maintenance service; rebate and incentive programs; community support and affinity groups; and products that allow customers to better manage their usage through energy efficiency upgrades or smart devices.[73]   They also described products that are offered by ESCOs in other jurisdictions, such as free nights and weekends, discounted LED light bulbs and online energy management tools.   According to the ESCOs, these products distinguish their service from default commodity service provided by the utilities and, therefore, there should be no price restrictions on these products and services.

    ESCOs claim that, in the retail market, the customers should be in the position of determining what product attributes appeal to them and will seek out products that meet their needs and values.   They contend that in selecting an ESCO product, a customer may value enhanced customer service, loyalty programs and energy efficiency tools.   All these attributes, the ESCOs maintain, have a cost to offer, and they take issue with Staff's position that such cost is de minimis and claim that, depending

---

[72]   NEMA Initial Brief, p. 26; see also Tr. 1114, Table FL-1. NEMA further opines that "[e]nergy management tools bundled with commodity provide significant value in reducing consumers' bottom line expenses and consumption" and asserts that such products are essential to New York's energy future. NEMA Initial Brief, p. 66.   However, NEMA does not claim that any of its member ESCOs provide energy-management tools in New York and, to the extent that NEMA is referring to what ESCOs may be doing in other jurisdictions, we find that information to be irrelevant to our inquiry in this case.

[73]   See. e.g., IEC Initial Brief, pp. 26-27; Tr. 4022-4023; GEE Initial Brief, p. 27.

CASE 15-M-0127, et al.

on the product or service offered, the cost in fact may be significant.

ESCOs emphasize, however, that the cost incurred by the ESCOs in providing value-added products or services is not an appropriate measure of value from the customer's perspective. Direct Energy categorizes any attempt by the Commission to establish a cost-based premium for value-added products or services as a fundamental misunderstanding of "the proper operation of competitive markets."[74] Most ESCOs opine that the appropriate method of valuing the product is assessing whether the customer that received the product or service was satisfied with that product or service at the price that he or she paid. In this regard, Direct Energy, NEMA and RESA point out that Staff did not attempt to assess either whether customers received the products and services for which they bargained or whether those customers were satisfied with their ESCO-provided product or service.[75] Direct Energy contends both that the customer satisfaction data it provided shows that its customers are satisfied with the products and services Direct Energy provides and that Staff ignored that data.

However, not all ESCOs share the belief that the New York market provides customers innovative value-added products and services. These ESCOs typically blame the lack of innovation on several phenomena in the New York energy market that they contend inhibit innovation. For instance, ENGIE asserts that the market does not allow for customer-specific load data and price signals. It suggests that the Commission should consider "lifting barriers to innovation such as provision of accurate and timely consumer historical usage

---

[74]  Direct Energy Initial Brief, p. 15.

[75]  RESA Initial Brief, p. 10; NEMA Initial Brief, p. 65; Tr. 1264-1265.

CASE 15-M-0127, et al.

information in a standardized format and establishing price signals to positively affect consumer behavior." ENGIE also believes that customers should own their energy data and have control over who can access and connect to their energy information, more like commercial and industrial customers.[76] ENGIE additionally asserts that utility default service rates, ESCO pricing and NYISO settlements should be based on actual, rather than deemed, consumption profiles so that proper pricing signals could inform customer behavior.[77] Essentially, ENGIE urges a "consumer-focused" path and a shift in focus from the commodity price to the total cost and, ultimately, value.[78]

### III.C.3.  Conclusions Regarding Energy-Related, Value-Added Products and Services

As an initial point, throughout these proceedings the parties often have used differing or competing definitions of "value" and "value-added." When Staff raised the issue of "value," it tended to refer to an objectively quantifiable monetary value. When ESCO parties used the term, they tended to refer to an inherent, theoretical, or subjective value that, they argue, is not easily quantifiable monetarily. From the ESCOs' perspective, a product or service necessarily has value if customers choose to purchase it.

In establishing how the Commission traditionally has used the terms "value" and "value-added," the Commission's Order Taking Actions to Improve the Residential and Small Non-Residential Retail Access Markets, issued February 25, 2014 in Cases 12-M-0476 et al. (Retail Access Order) is instructive. There, the Commission specifically declined to adopt definitions

---

[76]  Tr. 23-24.

[77]  Tr. 23.

[78]  Tr. 21.

CASE 15-M-0127, et al.

of "value" and "value-added" that were different from the common understanding and usage.  The Commission stated that "value" and "value-added" mean "something more than the standard; something that exceeds the expectations associated with provision of what is otherwise an undifferentiated commodity."[79]  Further, "whether a particular offering falls within the definition of 'value-added' may depend on a case-by-case qualitative assessment."[80]

In discussing the products and services offered by ESCOs in the retail access market, the definition of "value" and "value-added" articulated in the Retail Access Order remains operative.  In the retail energy supply context, a value-added product or service is an enhancement to the commodity supply.  Thus, when a product or service is described in this order as "value-added," that term should be understood as referring to bundled services - commodity service plus some additional product(s) or service(s).

It is both notable and troubling that no ESCO party could or would produce objective evidence regarding: the specific value-added products or services that are currently offered in New York; how many ESCO customers elect to receive those products and services; the level of premium ESCO customers are charged for the value-added product or service; and what type and level of benefit is obtained by customers who receive the products or services offered.  We recognize that the ESCO parties could have produced highly detailed information about their actual products and services, but, instead, they generally chose to present information around purported products and services that ESCOs might offer or that they do offer in unspecified numbers or circumstances.  Thus, we must consider

---

[79]  Cases 12-M-0476 et al., Retail Access Order, p. 2, n. 3.

[80]  Id.

-51-

CASE 15-M-0127, et al.

whether ESCOs should be permitted to offer value-added products
and services in the future based on a record in which ESCOs
appeared to believe that it was in their best interest not to
better inform the Commission on the actual state of the retail
market.

Nonetheless, we recognize that, whether, or to what
extent, such products are currently offered, appropriate value-
added products and services have the potential to provide
benefits to customers.  We reiterate, however, that, consistent
with the purposes of the retail energy market, only energy-
related products and services will satisfy the Commission's
definition of value-added products or services.  As a notable
example of a service that meets this definition, Agway offers
"EnergyGuard" as a service bundled with both natural gas and
electricity supply.  Agway claims that this service, which it
describes as "[s]imilar to a pre-paid maintenance contract,"
provides its customers with "valuable and essential peace of
mind."  Agway asserts that the value of the EnergyGuard service
is quantifiable, in that the service covers the cost of most
parts and repairs to the residential customer's air conditioning
unit, up to $1,000 annually, as well as the additional cost for
electrical wiring repairs, up to $1,000 annually.

Among the energy-related value-added products or
services that ESCOs could develop are demand-management programs
or tools, voluntary dynamic pricing programs or tools, and
energy-efficiency measures.  These offerings would both further
the State's energy policy goals and provide meaningful value to
the customer.  Other examples of desirable energy-related,
value-added products and services include: sophisticated energy-
management services and smart-grid technologies; energy storage
products; and electric vehicle-related services.  However, most
or all of these products can be, and currently are, provided by

-52-

CASE 15-M-0127, et al.

other companies separately from energy supply service.
Considering whether ESCO products that include such services are
beneficial to customers would require both consideration of
whether and how ESCOs could and would be willing to provide
those services and of whether the tethering of those services
with energy supply by ESCOs would create benefits.  Any company,
ESCO or not, may currently provide such services separately from
energy supply service so long as they comply with established
rules for those service, including the Uniform Business
Practices for Distributed Energy Resources where applicable.

Because certain of these products and services overlap
with the REV and/or DER proceedings,[81] Staff and other interested
stakeholders are directed to explore in Track II of these
proceedings which, if any, energy-related products and services
are most likely to benefit customers and advance the State's
energy policy goals, which products and services can or should
be offered by ESCOs and which are more appropriately offered by
DER providers, and what rules, including pricing and disclosure
requirements, should be applied to ESCO products including such
energy-related products and services.

Because, with the exception of Agway's EnergyGuard
product, no meaningful evidence was provided to demonstrate that
any energy-related value-added product or service currently
offered provides benefits to customers comparable to its costs,
the provision of such a product or service is not sufficient at
this time to demonstrate that an ESCO offering benefits
customers and should be permitted.  Therefore, during the
pendency of Track II of these proceedings and with the exception

---

[81]   See Case 15-M-0180, In the Matter of Regulation and Oversight
of Distributed Energy Resource Providers and Products, Order
Establishing Oversight Framework and Uniform Business
Practices for Distributed Energy Resource Suppliers (issued
October 19, 2017) (DER Proceeding).

CASE 15-M-0127, et al.

of Agway's EnergyGuard product, all ESCO products offered following the effective date of the revised UBP must, as discussed elsewhere in this order, qualify as permitted products under the rules for guaranteed savings products, fixed-rate products, or renewably-sourced products; no product that is noncompliant with these rules may be offered on the basis that it includes an energy-related value-added product or service or may charge higher prices than permitted under those rules on the basis that those prices are for the energy-related value-added product or service. ESCOs may offer energy-related value-added products or services as part of an offering that also complies with those rules and meets the price requirements under those rules.

To be clear, Track II of these proceedings may result in rules that permit certain energy-related value-added products and services to be offered as an additional cost to or without the requirement of being paired with a compliant guaranteed savings, fixed-rate, or renewably sourced product. Because Agway provided detailed evidence demonstrating that EnergyGuard provides a unique benefit that may be reasonably comparable to its costs, Agway may continue to offer EnergyGuard during this interim period. If new requirements for such products result from Track II, Agway must comply with those requirements. If any other ESCO wishes to offer a product like EnergyGuard during the pendency of Track II, it may submit a petition for waiver to the Commission explaining the benefits its product provides and how they will reasonably relate to its cost.

Finally, some parties argue that the Commission should not be an arbiter of the rates ESCOs charge for value-added products and services and that the ESCOs negotiate rates with customers without any Commission interference. The Commission rejects this contention. This position ignores the statutory

CASE 15-M-0127, <u>et</u> <u>al.</u>

mandate of the Commission to ensure that all New Yorkers are receiving safe and reliable electric and gas service at just and reasonable rates.  Some ESCOs claim that requiring them to meet or beat the default utility price would be unfair, and likely impossible, given they are offering additional products and/or services that are not included in the default utility's rates. The Commission recognizes that reasonable rates do not necessarily require an ESCO to meet or beat the utility price when providing bona fide energy-related, value-added products and services to its customers.

The Track II process should address this issue by focusing on, first, determining how to identify actual energy-related value-added products and services that may be provided by an ESCO along with energy supply service and, second, ensuring that pricing for such products is transparent.  The Track II process should then address whether ESCOs have shown a sufficient willingness and ability to provide such value-added products such that the Commission should consider expanding the category of permissible value-added products or services.

In the instance of EnergyGuard and in any other instance in which the Commission concludes that ESCOs meet this threshold criteria and therefore are permitted to charge prices higher than the utility default supply rate for energy-related, value-added products and services, pricing transparency will ensure that the customer and the Commission can identify the portion of the total ESCO bill that is attributable to commodity and the portion that is attributable to the energy-related, value-added product or service.  Price and product transparency will empower customers to be better able to evaluate whether ESCOs are providing them with value, or whether they believe that a better value could be obtained from default utility service or another ESCO.  The Commission will ensure this level

-55-

CASE 15-M-0127, et al.

of transparency via the on-bill price comparison and unbundled bill structure that will be required.[82]

III.D.  Fixed-Rate Products

There is limited data in the record from which an accurate estimation can be made as to how many mass-market customers opt for a fixed-rate product.  This is because, as Staff explained, the raw customer data maintained by the utilities does not distinguish among the various ESCO products.[83]  Nevertheless, Staff attempted to discern how many mass-market customers were on a fixed-rate plan by analyzing bill fluctuations in the customer data it received from the utilities.  By Staff's estimation, between 13% and 30% of mass-market ESCO customers in New York currently are served on a fixed-rate plan.[84]  Most ESCOs again chose to forego the opportunity to better inform the Commission as to the realities of their businesses, as they did not identify how many of their customers take a fixed-rate product, produce their own estimate, or challenge Staff's estimate.[85]  The notable exceptions are GEE, which reports that 90% of its mass-market customers take fixed-rate service, and Direct Energy, which report that it serves 36% of its mass-market customers on a fixed-rate plan.[86]

Some parties generally agree that there are some mass-market customers who might perceive value in fixed-rate products

---

[82]  Supra, Section II, Access To and Transparency of Pricing Information.

[83]  Staff Initial Brief, pp. 36, 58, 65-66.

[84]  Tr. 2958; 3258.

[85]  An exception, Constellation criticized Staff's estimation of the percentage of ESCO customers who receive a fixed-rate product and claims that the estimates are inaccurate (See Constellation Reply Brief, pp. 8-9).

[86]  Tr. 46, 409; Hearing Exhibit 47 [Confidential version].

CASE 15-M-0127, et al.

and that ESCO-offered fixed-rate products, in some form, should continue to be permitted by the Commission.[87]  However, the parties hotly dispute whether and how the Commission should regulate the terms and conditions under which ESCOs are permitted to offer fixed-rate products.

### III.D.1.  Non-ESCO Party Positions Regarding Fixed-Rate Products

Staff acknowledges that some customers may choose fixed-rate products because the customer believes that fixed rates can help them avoid unit cost volatility in the commodity markets and/or help them budget their energy costs on a monthly basis.[88]  Staff posits, however, that the majority of ESCOs have been charging "significant premiums", in the range of "20 to 30 percent or more", for fixed-rate products.[89]  In Staff's view, if a customer is paying more to an ESCO on a monthly basis for a fixed-rate product than he or she would have paid to the utility for a variable-rate product, then the customer has been overcharged.

It is Staff's position that ESCOs should be allowed to offer fixed-rate products only if the ESCO also provides a monthly price guarantee as compared to what the customer's bill with its utility would have been.[90]  According to Staff, any potential value associated with fixed-rate products is in decline, given that the "risk of significant commodity rate swings has been greatly reduced" due to the utilities' "more-surgically target[ed] hedging at peak prices and local price

---

[87]   See e.g., NYC's Initial Brief, pp. 11, 15; UIU/NYAG Initial Brief, p. 36; Staff Initial Brief, p. 32.

[88]   Staff Initial Brief, p. 32.; Tr. 2063, 2364, 2549, 2684-2685.

[89]   Ibid., pp. 66, 88.

[90]   Staff Initial Brief, p. 64.

CASE 15-M-0127, et al.

conditions." [91]  Staff also believes that the advancement of new technologies, such as battery storage, likely will cause that risk to continue to decline.  Due to this declining risk of commodity price swings, Staff states, it makes little sense to allow fixed-rate products to be offered unless the ESCO can provide additional benefits to the customer, such as a price guarantee.

Staff also asserts that the value of fixed-rate products is undercut by the availability of budget billing from the utilities.[92]  According to Staff, budget billing provides customers with the desired price stability without the price premium associated with fixed-rate products.

According to UIU/NYAG, ESCOs have not demonstrated that the fixed-rate products offer mass-market customers anything of additional value, but nevertheless charge a significant premium.[93]  UIU/NYAG also asserts that, due to the lack of transparent, historical pricing data available to the public, it is impossible for a mass-market customer to discern the amount of the premium associated with a fixed-rate product. UIU/NYAG therefore agree with Staff that ESCOs should be required to offer a price guarantee if the Commission permits them to continue offering fixed-rate products.

UIU/NYAG further opine that fixed-rate products, as currently offered, do not provide customers with price certainty because the amount of the customers' bills changes monthly based upon customer's commodity usage.[94]  In addition, UIU/NYAG assert, even when a customer saves money with a fixed-rate product in a

---

[91]   Ibid., pp. 35-36.

[92]   Ibid., p. 88.

[93]   UIU/NYAG Initial Brief, pp. 33-37.

[94]   Ibid., pp. 35-36.

CASE 15-M-0127, et al.

given month, that savings is often negated by the significant premium charged in the other months of the contract.  For these reasons, it is UIU/NYAG's opinion that customers who desire price certainty from month to month would be best served by enrolling with the utility-offered budget billing program.

NYC supports the continuation of fixed-rate product offerings, inasmuch as they "hav[e] potential to provide value to customers" who prefer to know what the electricity or gas price will be every month.[95]  However, NYC believes that the premium charged for a fixed-rate product should be reasonable, and that "a fixed-price product that is four or five times above the spot market price does not provide value, and negates the perceived benefit that was gained from a fixed supply cost."[96]

III.D.2. ESCO Party Positions Regarding Fixed-Rate Products

Constellation, NEMA, and RESA believe that fixed-rate products provide value to customers in the form of price stability and cost certainty.[97]  RESA opines that the true value of fixed-rate products cannot be evaluated without consideration of innovative energy efficiency technologies.[98]  According to RESA, when fixed-rate products are used in conjunction with energy management tools the value to customers is high. Constellation and RESA disagree with Staff's position that the price for fixed-rate products should be capped and assert that the best way to determine whether the premium charged for the product is excessive is to look to customer purchasing

---

[95]   NYC Initial Brief, p. 15.

[96]   Id.

[97]   Constellation Reply Brief, pp. 5-6; NEMA Initial Brief, p. 60; RESA Initial Brief, p. 30.

[98]   RESA Initial Brief, p. 31.

CASE 15-M-0127, et al.

decisions.[99]  RESA states that Staff's opinion as to whether fixed-rate products offer value to customers is irrelevant and that is it up to the individual customers to determine whether value exists in any given product.[100]

Constellation also takes issue with Staff's position that the risk of commodity price swings has been reduced in recent years.  According to Constellation, there were significant commodity price swings as recently as early 2018, and it is impossible for anyone to predict the future price of energy commodities.[101]  Constellation states that it is not appropriate to judge the value associated with a fixed-rate product in hindsight.

Constellation, Direct Energy and RESA do not believe that budget billing is an equivalent alternative to fixed-rate products.[102]  Constellation states that budget billing does not provide customers with any certainty with respect to their monthly energy bill because, although the customers' monthly bills are levelized, the price per kilowatt-hour is still subject to significant market price volatility and the customer is subject to a reconciliation charge at the end of the budget period.  In contrast, Constellation explains, customers on a fixed-rate plan know with certainty the unit price of commodity every month.  Thus, Constellation believes, customers on a budget-billing plan are not insulated against price fluctuation in the same way that customers on a fixed-rate plan would be.

---

[99]   See Tr. 410; RESA Initial Brief, p. 32.

[100]  RESA Initial Brief, p. 32.

[101]  Constellation Reply Brief, pp. 9-10.

[102]  Constellation Reply Brief, pp. 12-13; Direct Energy Initial Brief, pp. 17-18; RESA Initial Brief, p. 33.

CASE 15-M-0127, et al.

Constellation and RESA point out that, in any event, ESCO customers retain the option to be on a budget-billing plan. According to these parties, the customers with the most insulation against price fluctuation are those who opt for a fixed-rate contract with an ESCO and enroll in a budget-billing plan with the utility.[103]  They explain that this is because the utility calculates the customer's monthly budget bill amount by multiplying an estimated monthly usage, which is based upon the customer's most recent 12-month historical data, by the actual commodity costs in each month.  The customer's bill is then subject to a reconciliation at the end of the year if the usage estimate was not accurate.  Therefore, RESA points out, with budget billing the utility customer ultimately always pays a price associated with commodity market volatility.[104]  In comparison, with a monthly fixed rate and a budget bill, RESA suggests that the ESCO customer is not exposed to monthly commodity cost fluctuations and benefits from a stable monthly usage estimate.

Direct Energy adds that the Commission previously has dismissed arguments that budget billing is just as effective as utility hedging activities in eliminating bill fluctuations.[105]  Direct Energy believes that a fixed-rate product should be viewed as a form of "price insurance" or hedging, even if the

---

[103]  Constellation Reply Brief, p. 15; RESA Initial Brief, p. 33.

[104]  RESA Initial Brief, pp. 34-35.

[105]  Direct Energy Initial Brief, pp. 18-19, quoting Case 06-M-1017, Proceeding on Motion of the Commission as to the Policies, Practices and Procedures for Utility Commodity Supply Service to Residential and Small Commercial and Industrial Customers, Order Requiring Development of Utility-Specific Guidelines for Electric Commodity Supply Portfolios and Instituting a Phase II to Address Longer-Term Issues (issued April 19, 2007) (Supply Portfolio Order).

CASE 15-M-0127, et al.

price ultimately ends up being substantially higher than what the customer would have paid as a utility customer.[106]  According to Direct Energy, while a fixed-rate customer may pay more than the default utility price during periods of stable or declining commodity costs, that same customer "will be pleased by his or her purchase" if the commodity costs increase.[107]

NEMA generally contends, without providing any specifics, that disallowing fixed-rate products would "impair[] the functionality of the state's retail energy markets."[108]  NEMA claims that more than 1.6 million customers in New York chose to enroll with an ESCO and asserts that those customers' choices should not have to be justified to the government.[109]

NEMA does not believe that it is possible or necessary to establish a reference price for fixed-rate products.  NEMA believes that the premium associated with fixed-rate products is transparent to customers when ESCOs fully disclose the contract term and per-kWh or per-therm rate for fixed-rate products.[110]  According to NEMA, the decision to purchase a fixed-rate product should be left to the customer.

RESA asserts that customers already have access to many tools to understand the pricing associated with their energy supply, including the Power to Choose website, individual ESCO websites, and Commission-mandated, standardized contract disclosures.  According to RESA, some customer confusion will remain regardless of the amount of information available to

---

[106] Tr. 193.

[107] Direct Energy Brief, p. 22, quoting Tr. 306.

[108] NEMA Initial Brief, p. 62.

[109] See NEMA Reply Brief, p. 3.

[110] NEMA Initial Brief, p. 71

CASE 15-M-0127, et al.

customers, since some customers will always be confused or have trouble understanding energy contracts.[111]

For its part, GEE agrees with Staff that remedial measures should be taken to further protect mass-market customers and, to that end, generally supports "some form of price cap" for fixed-rate products.[112]  However, GEE takes issue with Staff's recommendation to cap the price for fixed-rate products at the utility price.[113]  GEE explains that comparing fixed-rate prices to the utility rates is inappropriate because the utilities provide only variable-rate service and, therefore, are not subject to the risks and costs associated with fixed-rate products.[114]  According to GEE, because the fixed-rate products offered by an ESCO are reflective of the market conditions at the time the contract with the customer is made and future commodity prices are highly variable, the only appropriate way to evaluate the reasonableness of a fixed-rate product is to establish a forward-looking benchmark price.[115] GEE believes that a "Market Price Comparison" benchmark, whereby the average ESCO price for a fixed-rate product should be

---

[111]  RESA Initial Brief, pp. 63-64.

[112]  GEE Reply Brief, p. 1.

[113]  GEE Initial Brief, pp. 20-23.

[114]  GEE Initial Brief, p. 21.  GEE identifies the risks as including being over- or under-hedged, an under-collection of fixed costs, utility cash-outs and NYSIO reconciliations.

[115]  GEE Initial Brief, p. 23.

CASE 15-M-0127, et al.

determined and then a "zone of reasonableness" above that average price would be determined.[116]

III.D.3.  Conclusions Regarding Fixed-Rate Products

As some ESCOs have noted, the Commission previously acknowledged that fixed-rate product offerings could have the potential to provide value to customers.[117]  However, the record in this case establishes that customers who choose fixed-rate ESCO products frequently pay a significant premium for the product.  Fixed-rate products cannot provide meaningful benefits to customers unless they are reasonably priced.

There is evidence in this record demonstrating that, even with the utilities' hedging activities, utility customers' bills for commodity can vary during the year.[118]  Fixed-rate contracts have the potential to provide customers who may be particularly risk-averse with some protection against unit cost fluctuations that they may experience with the variable-rate product offered by utilities.[119]  Fixed-rate products also allow customers to know the unit price of commodity prior to usage. By knowing the unit price prior to usage, these customers may be

---

[116]  GEE Initial Brief, p. 23.  GEE offers a zone of reasonableness of up to 20% above average as an example. Alternatively, GEE supports the approach outlined in a Staff Whitepaper on Benchmark Reference Prices.  In that whitepaper, Staff proposed a "just and reasonable" reference price for a 12-month fixed-rate product be established each month for each utility operating in the State.  Cases 15-M-0127 et al., supra, Staff Whitepaper on Reference Price Benchmarks (Filed May 4, 2016).

[117]  Case 12-M-0476, supra, Order Instituting Proceeding, pp. 4-5. (issued Oct. 19, 2012).

[118]  Hearing Exhibit 11 (Direct Energy's Exhibit – Utility Weighed Average Bill Price Comparison); Tr. 384-389.

[119]  Tr. 383.

CASE 15-M-0127, et al.

able to budget their finances by adjusting their commodity use during the year.[120]

The Commission acknowledges that utility budget-billing is not the same as a fixed-rate ESCO product.  As several ESCOs point out, while budget billing levelizes a customer's bill for a period of time, the bill amount is based upon forecasts of usage and estimated delivery and commodity rates and any additional amount owed by the customer due to the actual rates and usage are recouped from the customer at the end of the budget-billing period.[121]  Whereas, with fixed-rate products, the customer knows the exact unit price for the commodity prior to the usage period and, ideally would adjust his or her usage to control the amount of the monthly bill.  If the ESCO misjudges the actual cost to procure commodity, the ESCO may not recoup any additional payment from the fixed-rate customers.

ESCOs may face additional risks and incur additional costs when offering a fixed-rate product.  Some of the risks identified by GEE include being over- or under-hedged, under-collecting fixed costs and risks associated with utility cash-outs and/or NYISO reconciliations.[122]  In addition, as GEE explains, ESCOs may enter into derivatives agreements with a creditworthy organization to obtain the financial collateral needed to hedge commodity supply, or enter into transactions directly on commodity exchanges and agreeing to adhere to exchange-mandated margin requirements.[123]  These activities,

---

[120]  See, e.g., NYC's Initial Brief, p. 15.

[121]  Hearing Exhibit 1125; tr. 2359-2360, 3265. Conversely, a customer could receive a credit if his or her usage was less than forecasted.

[122]  Tr. 48-49.

[123]  Tr. 47-48.

CASE 15-M-0127, et al.

among others, result in the ESCO incurring expenses, which must be reflected and recovered in the charges to customers.

It is worth noting that fixed-rate products may provide certain benefits to the supplying ESCO, which is able to make its own purchasing and hedging decisions.  Contracts for fixed-rate products are generally for a term of at least one year and often include a cancellation fee, thereby providing the ESCO with revenue certainty.

Considering the Commission's statutory mandate to ensure that all customers receive safe and reliable gas and electric service at just and reasonable rates, there must be an evaluation of the costs versus the benefits of fixed-rate products offered by ESCOs.  For example, when it evaluated whether to encourage supply hedging by utilities, the Commission stated: "That hedging practices may over time cost somewhat more than the average of wholesale spot market prices is not a reason to forgo hedging, so long as the price incurred in obtaining the hedge is not more costly than the benefit of the volatility reductions that are achieved."[124]  The same must be said of ESCO-offered fixed-rate contracts: if the cost incurred is significantly more than the value of the benefit achieved, then the Commission cannot permit ESCOs to offer such products.

Staff's opinion is that the cost to customers significantly exceeds any benefit gained and, thus, fixed-rate products as currently offered should be discontinued.  Staff claims that "the majority" of ESCOs operating in New York charge a premium of "20 to 30 percent or more" than the utility price, a price that already includes the cost of hedging.  However, there is insufficient evidence in the record compiled in these proceedings to justify this claim.  Rather, the record evidence

---

[124]  Supply Portfolio Order, p. 10.

CASE 15-M-0127, et al.

demonstrates that, while some ESCOs charge a premium in that range, others charge a smaller average premium.

While Staff's quantitative position that "the majority" of ESCOs charge a premium of more than 20% is overstated based upon record evidence, we share Staff's ultimate concern: any premium charged for a fixed-rate product must be just and reasonable.  The information in the record suggests that most ESCOs could continue to offer fixed-rate products if a reasonable price cap were adopted.

A trailing 12-month average utility supply rate offers a meaningful baseline against which to judge the reasonableness of the price of ESCO fixed-rate products, as it is a reasonable proxy in the absence of more detailed forecast data.  Further, because a typical risk premium in financial markets ranges between 3.5% to 5.5%,[125] we believe that a reasonable price premium associated with fixed-rate ESCO products would be 5%. Thus, as an interim measure, fixed-rate products will be limited to a price no greater than the trailing 12-month average utility supply rate plus a premium of no more than 5%.  The utilities shall ensure that this data is provided on their websites for each mass-market service class and for each mass-market customer grouping that receives different supply rates based on the applicable tariff.[126]  The utilities also shall establish a standard quarterly schedule for updating this data. Specifically, utilities shall publish on their websites 12-month average utility supply rates within 15 days of March 31, June 30, September 30, and December 31.  Following the effective date of the modified UBP as established in this order, ESCOs fixed-

---

[125]  See, e.g., tr. 4191.

[126]  For example, National Grid groups customers by load zone and charges each customer based on supply costs in that customer's load zone, while Con Edison groups customers into two regions.

CASE 15-M-0127, <u>et</u> <u>al.</u>

rate products must be offered for a price no more than 5% greater than the trailing 12-month average utility supply rate. ESCOs are required to implement any necessary modifications to any new fixed-rate contracts based on a change in the referenced average within five days of the deadline for utility publication (April 20, July 20, October 20, and January 20).

While the Commission is allowing fixed-rate products to continue so long as the ESCOs comply with the pricing requirements, we leave open the possibility that, upon future consideration, fixed-rate products sold at prices higher than utility rates will be disallowed entirely.  Staff should monitor the initial results of the instant reform - imposing a premium cap - and then evaluate the need for future additional customer-protection proposals regarding fixed-rate products, including prohibition of the product, in light of customers' rights to reasonably and transparently priced energy services.

Finally, concerns raised by certain parties regarding the renewal of fixed-rate contracts must be addressed.  Some parties complain that customers who initially sign a fixed-rate contract with an ESCO ultimately end up, often unwittingly, on a variable-rate contract once the term of the initial contract expires.[127]  Currently, the UBP requires ESCOs to obtain affirmative consent from a customer before making any material change to the customer's contract.[128]  NYC and UIU/NYAG believe that the UBP should be amended to specify that a "material change" would include any change to the rate or the product when a contract is renewed.[129]  This amendment would require the ESCO to obtain affirmative consent from a customer who originally

---

[127]  See, <u>e.g.</u>, UIU/NYAG Initial Brief, pp. 45-46; NYC Initial Brief, p. 25.  See also, PULP Brief, p. 19.

[128]  UBP § 5 (B)(5)(d).

[129]  NYC Initial Brief, p. 25; UIU/NYAG Initial Brief, p. 46.

CASE 15-M-0127, et al.

enrolled with a fixed-rate contract before re-enrolling, or renewing, that customer on a variable-rate contract.

For its part, PULP argues that "negative option" renewal contracts that move fixed-rate customers to variable-rate contracts of unlimited duration at the end of the fixed-rate contract term should be prohibited.

In contrast, RESA maintains that the existing rule requiring affirmative consent for any material change is sufficient to protect customers. RESA argues that any change to the affirmative consent requirement would add costs to ESCOs and unnecessarily burden customers. Instead of affirmative consent, RESA proposes that the UBP be amended to ensure that customers are provided with 30 days' notice at the time of a contract renewal when the renewal entails a significant rate change or product conversion.[130] Considering that all future variable-price commodity-only ESCO contracts will be required to be offered at a guaranteed savings, a fixed-rate ESCO customer that is rolled over to a variable-price commodity-only contract will be protected from unreasonably high prices and/or rate shock associated with the change in contract terms. Thus, any ESCO that automatically renews a fixed-price customer shall be required to place that customer on a variable-price commodity-only contract, unless the ESCO obtains affirmative customer consent to continue with a fixed-rate plan, even if the contract otherwise provides for the renewal of the existing fixed-rate plan.[131]

---

[130] RESA Initial Brief, p. 7071; Tr. 1183-1184

[131] See generally Matter of National Energy Marketers Assn. v. New York State Pub. Serv. Commn., 167 A.D.3d 88, 98 [3d Dept. 2018] ("No ESCO ha[s] a contractual right to renewal of any particular contract once it expire[s]").

CASE 15-M-0127, et al.

Further, as proposed by NYC and UIU/NYAG, any change to a customer's rate or product or service type, whether during the contract or at the time of renewal, will be considered a material change that triggers the requirement of affirmative consent. The UBPs have been amended to reflect these new requirements.

III.E.  Renewably Sourced Commodity

New York's State Energy Plan is a comprehensive and ambitious clean energy policy designed to combat climate change and modernize the State's electric system to improve system reliability, efficiency and sustainability.  As part of this plan, the Commission adopted the Clean Energy Standard (CES), which, among other things, sets a goal of having 50% of the State's electricity be generated from renewable resources by 2030.[132]  This requirement has been enhanced by the enactment of the Climate Leadership and Community Protection Act, which requires, inter alia, that that 70% or more of electricity consumed in New York come from renewable energy systems in 2030 and 100% of electricity consumed in New York is zero emissions by 2040.  To encourage development of the generation resources that will be necessary to achieve this goal, the Commission adopted a Renewable Energy Standard (RES) as part of the CES. The RES imposes upon all load-serving entities (LSEs), including ESCOs, an obligation to serve their customers by procuring renewable energy in proportion to the total load served by the

---

[132]  See Cases 15-E-0302 et al., Proceeding on Motion of the Commission to Implement a Large-Scale Renewable Program and a Clean Energy Standard, Order Adopting a Clean Energy Standard (issued August 1, 2016) (CES Order), p. 2, 22, 154. See also Executive Order No. 24 (2009) [9 N.Y.C.R.R. 7.24]; continued, Executive Order No. 2 (2011) [9 N.Y.C.R.R. 8.2].

CASE 15-M-0127, et al.

LSE.[133]  The current RES annual LSE obligation for 2019 is 0.78% of each LSE's total load served.  To satisfy this obligation, the LSEs may: purchase Renewable Energy Credits (RECs) from the New York State Energy Research and Development Authority (NYSERDA); purchase qualified RECs from renewable resources that came into operation after January 1, 2015 and meet certain eligibility criteria (Tier 1 Resources);[134] or make Alternative Compliance Payments (ACP) to NYSERDA.  Importantly, only electricity that is deliverable into New York qualifies as RES-eligible electricity.[135]

     The record established that few, if any, utilities voluntarily purchase more renewably sourced electricity than they are required to procure under the RES.  As such, most mass-market customers are not provided an opportunity by their default utility to purchase a higher percentage of renewable electricity.[136]  The retail access market can provide such opportunities to mass-market customers.  The record establishes that, as of December 2016, 54 ESCOs offered some form of a "green" or renewable product.  Those ESCOs provided

---

[133] CES Order, p. 13-14. See also Case 15-E-0302, supra, Clean Energy Standard Phase 3 Implementation Plan Proposal (filed July 27, 2018), p. 4 (current Annual LSE Obligations for years 2018-2021) and Order Approving Phase 3 Implementation Plan (December 14, 2018) (Phase 3 Order), p. 13.

[134] CES Order, Appendix A.  RES eligible generation sources are: Biogas, such as from anaerobic digestion; Biomass, such as commercially harvested wood or agricultural residue; Liquid Biofuel; Fuel Cells; Hydroelectric; Solar (Photovoltaics); Tidal/Ocean; and Wind.

[135] CES Order, Appendix A, p. 7 of 8.

[136] A notable exception is NYSEG, which offers its customers the option to purchase a 100% renewable product for a premium of 2.5 cents per kWh. Tr. 2869.

CASE 15-M-0127, et al.

approximately 328,000 MWhs of renewably sourced electricity in 2015.[137]

While all the parties agree that, if the retail access market continues, ESCOs should be permitted to offer renewably sourced electricity to mass-market customers, there is no consensus among the parties as to what the terms and conditions of that service should be.  Most notably, the parties have disparate positions on issues surrounding the level of renewable mix that should be required and the value of allowing ESCOs to purchase nationally-sourced RECs.

III.E.1.  Non-ESCO Party Positions Regarding Renewably Sourced Commodity

Staff posits that the "best" way to permit customers to voluntarily purchase additional renewably resourced commodity, while ensuring that customers receive "obvious value" for such premiums, is to limit ESCO offerings to "a value-added electric commodity product where 100% of the electricity provided each calendar year was generated from renewable resources."[138]  Staff suggests that acceptable renewable generation sources be biomass, biogas, hydropower, solar energy and wind energy, as defined in and subject to the environmental attributes and delivery rules of the Commission's Environmental Disclosure Program (EDP).[139]  Staff explained that the utilities' generation mix in certain territories currently approaches 30%

---

[137]  Tr. 2090-2091.  This data is the most recent data available. Staff's position is that there is no reason to believe these figures have significantly changed in the last few years.

[138]  Tr. 2033. Staff Initial Brief, pp. 67-68.

[139]  Tr. 2092.

CASE 15-M-0127, et al.

renewable and it argues that "the bar for ESCO products should be set higher."[140]

NYC does not advocate for a specific percentage mix, but it generally supports a framework in which ESCOs purchase New York-based RECs through the New York Generation Attribution Tracking System (NYGATS) for their products to qualify as "green" energy products.[141]  NYC admits, however, that Staff's proposal of 100% renewable might not be possible "in today's [market] construct" and reserved judgment as to what percentage mix it might consider acceptable.[142]

PULP supports renewable product offerings but believes that ESCOs should be required to provide a percentage mix of renewables that exceeds what is currently available in the NYISO market.  It also believes that, to the extent that ESCOs purchase RECs, they must purchase RECs for which the "attributes are purchased so that the incremental renewable energy resource actually flows into the ISO-New York wholesale market."[143]  PULP does not support ESCOs purchasing nationally-sourced RECs because, in its opinion, those RECs do not provide any direct benefits to New York customers.[144]

---

[140]  Tr. 2090.

[141]  NYC Initial Brief, pp. 16-17.

[142]  Tr. 1503.

[143]  Tr. 3461.

[144]  Tr. 3461-3462.  In the alternative, PULP opines that any ESCO that uses nationally sourced RECs, rather than NY-sourced RECs, be required to conspicuously disclose to customers that their purchase of the ESCO's renewable product does not result in any additional renewable resources in the New York wholesale market.

CASE 15-M-0127, et al.

III.E.2.  ESCO Party Positions Regarding Renewably Sourced Commodity

Direct Energy criticizes Staff's recommendation that ESCOs be required to provide a 100% renewable product.[145]  Direct Energy posits that any amount of renewable product sold that exceeds the current NYISO average mix of 30% "could help reduce carbon pollution that drives climate change."[146]  Other ESCOs are similarly critical of the proposed 100% requirement, arguing that such a high percentage necessarily would make such a product offering too expensive to successfully market to mass-market customers.[147]  ESCOs further argue that Staff's proposed 100% requirement overlooks customers who may be willing to voluntarily purchase a green product but either cannot afford or do not want to pay for a 100% renewably sourced product.[148]  Some ESCOs argue that, if the Commission were to adopt Staff's proposal, fewer customers would voluntarily purchase renewable products than they do now due to the excessive cost.[149]

Some ESCOs posit that, regardless of the pricing concerns, it is not currently possible for ESCOs to offer renewably sourced commodity in a mix greater than that offered by the utilities.  NEMA claims that, "at this phase of the market" in New York, ESCOs purchase renewable energy from the same NYISO pool as the utilities and, practically speaking, do

---

[145]  Direct Energy Brief, p. 20.

[146]  Tr. 310.

[147]  See, e.g., tr. 97, 132-133 (GEE claims that it already experiences trouble selling its "Green-e" renewable product at "a minor premium."). See also tr. 310 (Direct Energy) and tr. 4018 (The IEC says 100% renewable is not cost effective for customers).

[148]  See, e.g., tr. 1269-1270.

[149]  See, e.g., tr. 420, 1270.

CASE 15-M-0127, et al.

not have the ability to enter into bilateral contracts with renewable generators.[150]  The IEC similarly asserts that there are not enough RECs in New York's market to sustain a requirement that all ESCOs offer a 100% renewable product that is EDP-compliant.[151]

As for any locational or delivery requirement, Direct Energy and RESA disagree with any proposal that limits the purchase of RECs to those traded in the NYGATS.[152]  According to Direct Energy, carbon emissions do not respect artificially created boundaries and create problems on a global scale and, therefore, any renewable energy products that reduce carbon emissions, no matter where situated, should be encouraged.[153] Direct Energy generally opines that a requirement that ESCOs trade in NY-specific RECs ultimately would harm global efforts to combat climate change.  RESA similarly argues that any renewably sourced product, even those generated out of state, provide value to New York customers.[154]

III.E.3.  Conclusions Regarding Renewably Sourced Commodity

As discussed more fully below, ESCOs will be permitted to offer a renewable product that is less than 100% renewable, so long as: (1) the renewable percentage mix is at least 50% greater than is required by the RES LSE obligation for the year; (2) the ESCO complies with the RES locational and delivery requirements when procuring RECs or entering into bilateral contracts; and (3) there is transparency of information and

---

[150]  Tr. 757, 769-770.

[151]  Tr. 4018, 4098-4099.  See also IEC Initial Brief, pp. 32-33; IEC Reply Brief, p. 13.

[152]  See also IEC Initial Brief, pp. 32-33.

[153]  Tr. 311-312.

[154]  See tr. 1298-1299.  See also tr. 4019 (the IEC panel advocates use of nationally sourced RECs).

CASE 15-M-0127, et al.

disclosures provided to the customers.  To address concerns regarding the current availability of renewably sourced electricity and RECs, ESCOs will not be limited to procuring electricity or RECs from RES Tier 1 eligible generation facilities, however.  Rather, any generation facility satisfying the Climate Leadership and Community Protection Act (CLCPA) definition of "renewable" - and whose electrical output satisfies the locational and delivery requirements – will be eligible, regardless of the facility's vintage.[155]  Finally, ESCOs will be required to make certain disclosures to customers and to Department staff in such a way that claims of the renewable content of the advertised product can be easily tracked and verified.

Customers who voluntarily buy clean energy "are New York's most valuable asset towards achieving the [CES] goals"[156] and "successful stimulation of customer-initiated choices will have a necessary impact on the trajectory of the required acquisitions to achieve the [targeted goals]."[157]  While the record does not establish that ESCOs have provided significant contributions to the State's progress toward achieving its 2016 clean energy goal of 50% renewables by 2030,[158] it is

---

[155]  The CLCPA defines renewable resources as "systems that generate electricity or thermal energy through use of the following technologies: solar thermal, photovoltaics, on land and offshore wind, hydroelectric, geothermal electric, geothermal ground source heat, tidal energy, wave energy, ocean thermal, and fuel cells which do not utilize a fossil fuel resource in the process of generating electricity."  This definition is similar, but not identical, to the RES eligibility requirements established in the CES Order.

[156]  CES Order, p. 9.

[157]  CES Order, p. 88.

[158]  CES Order, pp. 22, 154 (referencing the goal of 50% renewables by 2030).

-76-

CASE 15-M-0127, et al.

nevertheless possible that mass-market customers' voluntary renewable purchases in the future will make material contributions toward achieving the Clean Energy goals. Consequently, ESCOs will be permitted to offer renewably sourced products under the following terms and conditions.

III.E.3.a. Minimum Renewable Percentage

The minimum percentage of renewably sourced energy offered by ESCOs in any given year must be the existing annual Tier 1 LSE obligation as established by the CES Order plus 50%, but in no case greater than 100%.[159]  For example, the Tier 1 LSE obligation for 2019 is 0.78%.  Therefore, any ESCO offering a renewable product in 2019 would be required to market only renewable products that are at least 50.78% renewable.  Once the Tier 1 LSE obligation reaches 50%, the products will be required to be 100% renewable, and that requirement will remain fixed as the Tier 1 LSE obligation increases above that level.  As discussed below, the ESCOs must also abide by the locational and delivery requirements established in the CES Order.

While this requirement is less stringent than the one for which Staff advocated, this requirement nevertheless ensures that ESCOs are providing meaningfully more renewable energy than is currently offered and advances the State's clean energy policies.  As one Staff witness eventually conceded, even if ESCOs were not required to provide 100% renewable products, if more customers purchased renewable ESCO products that contain incrementally more renewably sourced commodity than is offered by the utilities, the State's goal of 50% renewable energy by 2030 could be obtained more easily.[160]

---

[159]  CES Order; Implementation Plan, Table 1.
[160]  Tr. 2315-2316.

CASE 15-M-0127, et al.

In setting this requirement, the reasonable observations regarding the current level of available RECs in the NYGATS and the perceived costs associated with procuring a 100% renewable product have been considered.  Moreover, we disagree with Staff that the average mass-market customer would not find value in electricity that is only partially "green."  On the other hand, as PULP, Staff and others argued, it makes little sense to permit ESCOs to offer renewably sourced commodity if the percentage of renewable energy is equal to or less than what is obtainable from the NYISO spot market or what is offered currently by the utilities.  This requirement strikes the proper balance between the recognized value of incremental additions of renewably sourced energy against the need for a floor that protects customers against misleading claims regarding "green" ESCO products.

### III.E.3.b.  Eligible Electricity

ESCOs will be required to satisfy their minimum renewable requirement in the same ways they satisfy their annual CES requirements and by entering into purchase agreements with any generator of any vintage that satisfies the CLCPA definition of "renewable."  In other words, ESCOs will be permitted to satisfy their minimum renewable requirement by: (1) by purchasing RECs from eligible renewable generators through NYGATS; (2) by purchasing Tier 1 RECs from NYSERDA; (3) by procuring RECs from eligible renewable generators through bilateral contracts; (4) by making Alternative Compliance Payments (ACP) to NYSERDA; or (5) by entering into bundled energy and REC purchase agreements with eligible renewable generators.

Based on the information in the record, the majority of the ESCOs in New York that offer renewable products appear to have been obtaining RECs from other states or markets, primarily

-78-

CASE 15-M-0127, et al.

Texas.  Staff, PULP and others make valid points in stating that it is important that the electricity associated with ESCO-offered renewable products be delivered and consumed within New York State.[161]  Furthermore, it is difficult or impossible for New York regulators and customers to evaluate whether, and to what extent, the purchase of RECs from Texas and other states actually results in increased generation of renewable energy.  Therefore, all voluntary renewable electricity purchases made by ESCOs will be subject to the same locational and delivery requirements as Tier-1-eligible REC purchases.[162]  While it may be true that the production and use of renewable energy, no matter where the generation of such is situated, is beneficial to countering climate change on a global scale, the Commission is committed to ensuring that customers in New York pay a premium only for renewable energy that has a direct benefit in this State and that represents an incremental increase in the amount of renewable energy generated.  The ESCOs' concerns that, at this time, it may be more economical or logistically easier to purchase RECs from other markets have been considered.  However, simply put, ESCO purchases of RECs from outside the NYISO market will not advance the clean energy goals adopted by this State and, therefore, will not be permitted to continue.  The perceived difficulties or cost increases ESCOs may encounter in the short-term will benefit the market in the long-term by increasing the demand for renewable generation in the State.  This increased demand is expected to encourage renewable energy developers to increase investments in the State, which will in

---

[161]  Under the RES, out-of-state intermittent renewable generators are permitted to participate in the Tier 1 solicitations under certain circumstances.  See CES Order, Appendix A, p. 7.  We see no reason to deviate from this practice.

[162]  CES Order, Appendix A.

CASE 15-M-0127, et al.


turn provide various benefits to New York ratepayers that
otherwise would not exist.[163]

### III.E.3.c.  Transparency of Information and Disclosures

Concerns regarding the opacity of ESCO-offered
renewable energy products are valid.  Without access to clear,
easily accessible information, including price information,
customers cannot make rational purchasing decisions.  Thus, the
Commission adopts CEGC's suggestion that ESCOs be required to
disclose the type of renewable energy content of each product
the ESCO offers.[164]  PULP's recommendation that an ESCO be
required to disclose the percentage of renewable energy in each
product, as well as the amount by which the ESCO product
percentage exceeds the mix existing in the NYISO also is
reasonable.[165]  Accordingly, the Commission requires each ESCO
post this information on its website, in all marketing
materials, and in individual customer contracts.[166]

NYGATS can meet most or all of the reporting and
compliance needs identified by Staff.  As part of its
application and subsequent updates, an ESCO offering a renewably
sourced product or products must identify the percentage of
renewable electricity that will be advertised for that product.
ESCOs should then ensure that all transactions are recorded in
NYGATS and properly associated with their account.  Department
Staff should verify compliance through review of these NYGATS

---

[163] Some ESCO witnesses on the IEC Panel, who initially expressed
concerns about the availability of in-state RECs, eventually
conceded the logic of this theory.  See tr. 4100-4101.

[164] CEGC Initial Brief, p. 35.

[165] Tr. 3543.

[166] See generally CEGC Initial Brief, p 28; Conn. Gen. Stat. §
16-24o(h)(6).

CASE 15-M-0127, et al.

accounts.  Consistent with the RES requirements, ESCOs have until the close of the NYGATS reporting period for a calendar year, which occurs during the second quarter of the following calendar year, to ensure that they have sufficient RECs in their NYGATS accounts.

III.E.4.  Pricing of Renewably Sourced Commodity

We recognize that ESCOs likely cannot provide renewable energy in a percentage greater than the utility at a price that is equal to or less than the utility.  Nonetheless, the premium charged by the ESCO for a renewable product must be commensurate with the incremental costs it incurs to provide the product.

All parties acknowledge that there is an added cost associated with the provision of renewable energy in an amount greater than is required by the CES Order.  Yet, little evidence was presented regarding how much more expensive it is or would be for ESCOs to provide a renewable product.  One ESCO witness estimated that customers may be willing to pay a price differential for a "green" ESCO product of 2 cents per kWh.[167] Other testimony suggested that the potential premium associated with a 100% renewable product could range from half of one cent to 2.5 cents per kWh.  One ESCO that currently offers a 100% renewable, EDP-compliant product provided evidence that it charges its customers about 10% to 15% more than traditional utility service for the renewable product.[168]  However, when questioned directly, several ESCO witnesses could not state what the percentage of renewable mix was for their products, much

---

[167]  Tr. 715-716.

[168]  Tr. 4052.  Other IEC Panel members could not testify as to how much more their green product cost over utility prices. Tr. 4052-4054.

CASE 15-M-0127, et al.

less how much more expensive their renewable product was compared to the utility.[169]  Thus, on this record, it is difficult to identify with any certainty a reasonable premium for the renewable product.

However, with an on-bill price comparison, as was directed in Section II, supra, the premium associated with the renewable product compared to the utility product will be readily apparent to a customer.  This will enable customers to ascertain whether they believe they are receiving a fair value for the price that the ESCO charges for that product.  If the customer at any time decides that they are unwilling or unable to bear the cost of the renewable product, then they will be free to switch to another ESCO or return to the utility.  ESCOs that offer renewably-source products compliant with the requirements of the above sections are not required to disclose any additional information to customers before the on-bill price comparison is implemented.

III.E.5.  Low-Income Customers

Finally, Staff argues that ESCOs should be prohibited from offering renewable electric commodity products to low-income, mass-market customers, unless the ESCO is willing to provide the 100% renewable commodity to such customers at a guaranteed savings.[170]  Staff explains that it takes this position due to the fact that low-income customers' rates are subsidized by other ratepayers and such subsidy should be fully utilized to assist low-income customers meet their basic needs

---

[169]  See UIU/NYAG Initial Brief, pp. 38-39 (summarizing pertinent parts of the transcript).

[170]  Tr. 2092.

CASE 15-M-0127, et al.

rather than diverted to what essentially would be a subsidy for the development of renewable resources.[171]

The Appellate Division, Third Department, recently upheld the Commission's prohibition on ESCOs serving low-income assistance program participants unless an ESCO can guarantee that the customer will pay no more than he or she would have paid to the utility.[172] We find that this requirement remains appropriate, and we note that ESCOs can always provide renewable commodity products to those low-income customers if the product meets the aforementioned price-guarantee requirements.


IV.   ESCO MARKETING PRACTICES

Section 10 of the UBP governs ESCO marketing standards.  The standards apply to ESCOs and their representatives when marketing to customers in New York.  The current standards are the result of a gradual iterative process of increasing the specificity and restrictiveness of the applicable standards to ESCO marketing practices resulting from persistent, unacceptably high numbers of customer complaints alleging ESCO deceptive marketing.  The current standards include training requirements to ensure marketing representatives are knowledgeable about ESCO products, including applicable termination fees; customer rights, including provisions of the Home Energy Fair Practices Act; and the ESCOs' mechanisms for handling questions, disputes and complaints.  The standards provide specific requirements for contact with customers depending on whether the customer is contacted in person, via telephone or by electronic means.  The standards

---

[171]  Tr. 2096, 2701.

[172]  Matter of National Energy Marketers Assn. v. New York Pub. Serv. Commn., 167 A.D.3d. 88 (November 1, 2018).

CASE 15-M-0127, et al.

also specify, among other things, marketer identification requirements and a requirement to provide customers with a copy of the ESCO Bill of Rights.

The UBP specifically prohibits ESCOs from engaging in misleading and deceptive conduct and requires ESCOs to provide customers with written documentation to support product offerings or with a relevant web address if requested.  The marketing standards also require that ESCOs provide written information in plain language designed to be easily understood by customers, including in languages other than English when appropriate.  The UBP also requires third-party verification for all sales consummated through door-to-door and telemarketing activities.

IV.A.   Non-ESCO Party Positions Regarding Additional Restrictions on ESCO Marketing Practices

Staff acknowledges that the Commission has acted previously to reign in ESCO marketing abuses.  However, Staff points out that marketing abuses, including enrollment of a customer by an ESCO without the customer's authorization (slamming) and misrepresentation of both products and the marketers themselves, continue to result in a significant percentage of customer complaints related to ESCOs.  Considering that complaints of alleged ESCO improprieties continue at significantly higher rates than the number of complaints received by the utilities on a per-100,000 customers served basis, Staff recommends that ESCOs be prohibited from engaging in door-to-door, point-of-sale, telemarketing or similar marketing practices to enroll customers.  Staff further recommends that ESCO marketing practices should be limited to direct mail, electronic enrollments, or similar activities

-84-

CASE 15-M-0127, et al.

whereby the customer must affirmatively respond to or initiate direct contact with the ESCO.

UIU/NYAG support prohibiting door-to-door and telemarketing sales.  They also recommend other improvements aimed at better protecting customers.  Specifically, UIU/NYAG recommends the Commission require ESCOs to: (1) disclose to Department staff and the Commission all investigations and complaints against them and their agents in New York and other jurisdictions; (2) post performance bonds before being deemed eligible to participate in the New York retail energy market; (3) use standardized contracts for energy commodity service to mass-market customers so customers can easily compare contractual terms and product offerings; (4) substantiate any claims ESCOs make regarding how customers can save money on their utility bills by switching from default utility service to an ESCO; and (5) pay monetary penalties imposed by the Commission for any instances of violating the UBP.

NYC argues that transparency regarding pricing and products and marketing practices need to be improved.  NYC attests to the continuing problem of predatory sales tactics based on its experience with the significant number of customer complaints lodged with its Department of Consumer Affairs.  It recommends improving marketing practices by providing customers greater protections from aggressive sales tactics and from marketers who misrepresent themselves as working for the incumbent utility.  Similarly, NYC supports increased oversight and additional measures to eliminate telemarketing abuse.

PULP's primary position is that ESCOs provide no discernable benefit to residential customers and, therefore, should not be allowed to market to mass-market customers at all. PULP argues that ESCOs regularly misrepresent the beneficial attributes of the products they offer as compared to default

CASE 15-M-0127, et al.

utility service.  PULP rejects any argument that the solution to marketing problems is enhanced enforcement.  It states that enhanced enforcement efforts would only result in an undue cost burden on the public and a strain on already limited government resources.

PULP further argues that it is important to evaluate third-party sales contractors to ensure compliance with existing UBP requirements because, according to PULP, many of these contractors are compensated by the ESCOs based on successful enrollment of customers.  PULP further argues that ESCOs are not properly overseeing their contractors/agents, based on the ESCOs' failure to provide it with documentation of such oversight in response to PULP's discovery requests.  It also believes that ESCOs do not properly train their sales agents, do not audit or investigate sales agents, and do not properly document investigatory or enforcement programs.  According to PULP, the ESCOs' failure to maintain internal oversight ignores customers' complaints about rates, prices, marketing and sales practices.

Although PULP's primary position is to exclude ESCOs from the mass-market, it also offers specific improvements in the alternative.  PULP recommends that ESCOs be prohibited from enrolling known low-income customers.  To improve price transparency for customers, PULP recommends the Commission require ESCOs to provide notices to customers that show the price per kWh to which the customer will be or is subject and how that price compares with the applicable default utility service price.

AARP agrees with PULP that ESCOs should not be allowed to serve mass-market customers.  In the alternative, AARP agrees with Staff's recommendations to limit marketing activities to

CASE 15-M-0127, et al.


direct mail, electronic communications or other activities
requiring the customer to initiate contact with the ESCO.


IV.B.  ESCO Party Positions Regarding Proposed Restrictions on
       ESCO Marketing Practices

     RESA contends that arguments in favor of additional
restrictions of marketing activities fail to address the fact
that the marketing abuses that do occur are in violation of the
existing rules that, RESA argues, must be better enforced.

     Responding to calls to end door-to-door marketing,
RESA points out that the prevalence of door-to-door sales among
ESCOs is because the Commission requires ESCOs to obtain a
customer's account number at enrollment.  According to RESA,
eliminating the account number requirement would allow for
alternative marketing approaches, including mall kiosk and
storefront sales.  RESA additionally claims that door-to-door
marketing provides ESCOs an opportunity to educate customers
about their supply options and that banning in-person marketing
would negatively impact ESCOs' ability to promote energy
efficiency and energy management.

     Agway, NEMA, Constellation, and the IEC all oppose
Staff's recommendation to ban certain types of marketing and
argue that existing rules and regulations related to marketing
are adequate but must be more rigorously enforced.  Agway and
IEC acknowledge marketing abuses but maintain that banning
certain marketing practices will not protect residential and
small commercial customers more than better enforcement of
existing rules.  In seeking to shift the responsibility for such
abuses and also preserve marketing flexibility, both parties
suggest that lax enforcement of rules has contributed to the
prevalence of marketing abuses.  According to Agway, if the

CASE 15-M-0127, et al.


Commission "ruthlessly weed[s] out bad actors, innovative and responsive companies will succeed."[173]

Infinite Energy argues that prohibiting ESCOs from directly marketing to potential customers contradicts state law because, although GBL Section 349-d reiterates the Commission's authority to regulate ESCOs, the statute does not specifically permit the Commission to prohibit certain forms of marketing. Infinite Energy also argues that the Commission has enough regulatory power to protect customers without having to prohibit door-to-door sales, including third-party verification, identification requirements, and reminding customers to sign-up for do-not-call-lists and to post "No Solicitation" signs. Infinite also suggests that ESCOs that repeatedly commit fraud or otherwise violate the UBP be penalized or banned from the market.

Constellation disputes any claim that predatory marketing and deceptive business practices are significant issues in the ESCO market. NEMA supports the idea of increased transparency but joins Constellation in the belief that that ESCO marketing practices are not fooling customers into paying substantially more for commodity service. NEMA reiterates its claim that Staff did not perform any independent analysis or other research into what motivates customers to pay for ESCO products or what value customers ascribe to such products.


IV.C.  Conclusions Regarding Proposed Restrictions on ESCO Marketing Practices

Based upon the number of customer complaints that continue to be made against ESCOs, and the likely need for increased enforcement activities, the large number of ESCO

---

[173]  Agway Initial Brief, p. 15.

CASE 15-M-0127, et al.

customers that pay significant premiums for products with little or no apparent added benefit, and the market's dearth of innovation and value-added services, it appears that a material level of misleading marketing practices continues to plague the retail access market.  Whether or not ESCOs are purposefully deceiving or preying on unsuspecting customers, many ESCO marketing practices nevertheless could be perceived by mass-market customers as misleading.  Moreover, these problems persist despite the Commission's actions over the years to improve the function of the market, through efforts aimed at both limiting undesirable behavior of ESCOs and their representatives and by eliminating barriers and otherwise supporting ESCOs' business activities.

Based on the history of increasing marketing regulation and ongoing marketing problems, PULP's suggestion, which is supported by AARP, to prohibit ESCOs from engaging in any marketing activities with residential and small commercial customers is an attractive proposition.  It is evident that Staff, other State Agencies, as well as a multitude of parties and other interested participants, including some ESCOs, have devoted substantial efforts and resources over the years to develop a competitive market for mass-market customers.  But the record in these proceedings reveals that these efforts have not succeeded in eliminating customer abuse and instilling a commitment to compliance on the part of the ESCOs.  Thus, it is tempting to simply prohibit the ESCOs from marketing to mass-market customers.  Ultimately, however, less drastic actions can and will be taken to further reform and fine-tune the market so that ESCOs can continue to work toward fulfilling the promises they have made in these proceedings to provide customers with real benefits and introduce innovation into the marketplace.

CASE 15-M-0127, et al.

Similarly, Staff's proposal, supported by UIU/NYAG, to prohibit door-to-door, point-of-sale, telemarketing or similar practices to enroll customers, is attractive.  It narrowly and directly addresses that aspect of the retail markets that is generating most of the complaints, without extending beyond the desire to reduce complaints related to ESCO marketing abuses. It also leaves open multiple formats for ESCOs to communicate with potential customers to not unduly stifle their message.

The fact that problems related to ESCO marketing practices have persisted, despite the Commission's continued efforts to improve and strengthen applicable regulations and standards, argues against the adoption of any of the additional, incremental measures that are supported by many of the ESCO parties.  With each strengthening of marketing and verification rules, significant compliance issues continued.  In fact, ESCO-related complaint rates steadily increased through 2015, only showing some improvement in 2016.  The persistence of complaints related to ESCO marketing practices is indicative of some ESCOs continuing to skirt rules and attempting to avoid accountability as part of their business model.  As RESA points out, an approach involving further restrictions and/or compliance hurdles related to marketing activity would again fail to address the fact that marketing abuses that do occur are in violation of the existing rules.

It is recognized that many parties in this case believe that incremental regulations and oversight have the potential to deliver commensurate incremental improvements in customer complaint rates and price transparency and competitiveness.  Based on the information in this record, however, the incremental approach has not effectively advanced the Commission's vision of: effective competition; reduced prices; increased choice of supply and services; ample and

-90-

CASE 15-M-0127, et al.

accurate information for customers to make informed decisions; and enough information to permit adequate oversight of the market.  Accordingly, additional incremental marketing measures are unlikely to significantly shift the trajectory of the residential and small commercial ESCO markets.

The approach espoused by several parties to more aggressively pursue wrongdoers is ostensibly attractive but complicated by practical and administrative limitations and costs.  It also improperly shifts the focus away from the party responsible for the customer abuses.  To be sure, the Commission has over the years aggressively sought improvements to the market, by implementing restrictions, increasing oversight, and pursuing enforcement actions.  Enforcement also has been pursued by the NYAG.  Despite these efforts, which should have served as a warning and a deterrent to other bad-actors that misconduct would not be tolerated, marketing and related complaints persist.  Finally, as PULP explains, increased enforcement is expensive and resource-intensive and the benefits from such an endeavor are likely to be negligible.  Thus, the increased costs associated with more enforcement activity would outweigh the likely benefit that may be obtained.  We recognize that these regulatory methods are particularly expensive for ratepayers, as they often depend on individual determinations.  Indeed, certain ESCOs may promote these marketing reforms because they may believe such reforms are relatively ineffective compared to what would be more efficient regulations that they hope to avoid. While this is not to say that the Department and the NYAG should retreat from the current level of enforcement activities, the Commission recognizes that customers receive the most benefit from efficient and cost-effective market reforms.  As to current regulations and law, the Department and NYAG should continue to

CASE 15-M-0127, et al.

monitor the ESCOs and ensure that bad-actors face appropriate consequences.

In this order, numerous reforms have been adopted that are expected to provide enhanced customer protections from bad-acting ESCOs, including reforms to: strengthen ESCO eligibility requirements to ensure that only responsible ESCOs occupy the marketplace; prohibit or limit various ESCO products and services; and improve customers' access to more transparent information, including pricing information, about the ESCO products and services they receive. These reforms render the need for more incremental marketing restrictions unnecessary at this time.

V.   ESCO BILLING METHODOLOGIES

Currently in New York, ESCO customers are billed in one of three ways. ESCO customers may receive: (1) one bill from the utility that contains both the utility's delivery charge and the ESCO's commodity charge (consolidated utility billing or CUB); (2) one bill from the ESCO that contains both the ESCO's commodity charge and the utility's delivery charge (consolidated ESCO billing or CEB); or (3) two bills – one from the ESCO for commodity and one from the utility for delivery (dual billing). While dual billing is common for commercial and industrial customers, most parties agree that residential customers typically prefer to receive one bill. The vast majority of residential ESCO customers, other than gas ESCO

CASE 15-M-0127, et al.

customers in the National Fuel Gas Corporation (NFG) service territory, are billed through consolidated utility billing.[174]


V.A.  Non-ESCO Party Positions Regarding Billing Methodologies

NYC and UIU/NYAG take no position on CUB, CEB, or dual billing.  Staff similarly takes no position on any of the various billing methodologies but says that there may be a need to reevaluate billing methods in a future track of these proceedings.  The Joint Utilities urge the Commission to recognize that "significant complexity and cost" would be associated with a decision to make CEB mandatory.


V.B.  ESCO Party Positions Regarding Billing Methodologies

RESA and many ESCOS believe that "customer billing is the most direct and sustained interaction that energy suppliers have with their customers" and that "invoicing carries tremendous influence and opportunity to advance the State's initiatives to modernize the energy marketplace."  Many ESCO parties opine that the CUB model presents a barrier to effective communication with ESCO customers.  RESA believes that the CUB's lack of space for ESCOs to have "detailed line items" causes customer confusion and essentially causes the commodity cost to be hidden from customers.  Infinite Energy and NEMA echo RESA's concerns.  Infinite Energy adds that CUB causes some customers

---

[174] In the NFG service territory, approximately 23 ESCOs use CEB. Those ESCOs operate under a single retailer model, wherein the ESCOs purchase delivery service from NFG and then resell the delivery service to their customers along with commodity. No ESCO outside the NFG territory provides CEB, purportedly due to certain operational, system, and legal complexities involved in providing CEB when the ESCO does not or is not able to purchase delivery service from the utility.

CASE 15-M-0127, et al.

to mistakenly believe that the utility is the sole company serving them.

NEMA and Drift opine that CEB is a more desirable billing system, because ESCOs that use that method can offer more information to the customer about additional products and services. Drift states that a CEB also provides the ESCOs an opportunity to develop more robust customer relationships by delivering information on the bill. RESA and Infinite Energy go so far as to recommend that the Commission require all ESCOs to use CEB so that the full array of value-added products and services can be explained to customers. According to RESA, this reform would place downward pressure on ESCO pricing, address concerns raised by Staff about price transparency, and address other parties' concerns about the appropriateness of tasking utilities with incorporating ESCOs' value-added products and services into their billing systems. Infinite Energy adds that certain customer abuses would not be as prevalent if ESCOs were required to be responsible for their own billing. PULP supports CEB to the extent that it would require ESCOs to be responsible for the billing and collections associated with their products.

GEE believes that, when CEB is permissible but not required, as it is now, an ESCO that opts to use the CEB system would create "diseconomies of scale" by duplicating many of the merchant functions already in place at the utilities, including credit checks on customers, incremental credit and collection costs and the purchase of a billing system. GEE explains that those ESCOs then must pass on the additional costs to customers, thereby rendering it difficult for them to remain competitive with the ESCOs that avoid those costs by using CUB.

Robison does not oppose mandatory CEB but notes that it would implicate other rights and responsibilities, including the power to terminate customers' service. The IEC and Agway

CASE 15-M-0127, et al.

support CUB as a billing method.  The IEC believes that CUB is a useful tool for smaller ESCOs because it allows them to outsource the costs associated with billing without those costs being passed on to ESCO customers.  Agway believes that CUB is an efficient system for customers to receive one bill. According to Agway, CUB also permits ESCOs to properly size their billing and collection systems, avoids duplicate billing systems, and limits ESCOs' exposure to uncollectable accounts. Agway also states, however, that it would not be opposed if CEB were mandatory.

V.C.  Conclusions Regarding Billing Methodologies

While various ESCO parties may be frustrated by perceived limitations in the CUB model with respect to customer communication, ESCOs are not currently required to use the CUB method.  Rather, ESCOs that believe that the CUB method restricts their ability to effectively market value-added products and services, or otherwise interact with customers, can separately bill customers under the dual billing method.

The suggestion of various parties that the CEB system should be the only permissible billing system is rejected.  To be sure, CEB would require ESCOs to take more responsibility for costs associated with their business operations, such as developing and maintaining a billing system and, possibly, purchasing utility receivables.  However, there are two troubling consequences associated with mandating CEB to the exclusion of the CUB and dual-billing models and those consequences have not been adequately explored in this phase of these proceedings.

First, as some ESCOs point out, mandating CEB would give ESCOs more influence over termination of service to customers.  For example, if ESCOs were required to purchase

CASE 15-M-0127, et al.

utility accounts receivable, ESCOs may have the exclusive
authority to direct service termination.  Given that
historically this market has been rife with both alleged and
proven instances of customer abuse, not all ESCOs can be
entrusted with this authority.  Further process would need to be
established to fully ascertain the extent to which ESCOs would
or should have the power to disconnect service.

Second, to effectuate CUB, ESCOs must transmit
valuable data about customer usage and pricing to utilities.  In
turn, this data is accessible to the Commission and Department
staff and is one important means by which the Commission
exercises oversight over the marketplace.  If CEB were required
throughout all utility territories, this information will not be
readily accessible to the Department without imposing customer
usage and pricing data sharing obligations on the ESCOs and
significantly undermining customer protections.
For now, all existing billing methodologies available
to ESCOs will be permitted.  ESCOs that continue to use CUB may
reach out directly to customers with any marketing materials
and/or other messages regarding their products and services.

VI.  UTILITY PURCHASE OF ESCO RECEIVABLES

Under the existing paradigm, distribution utilities
provide billing and collection service for the majority of ESCOs
serving residential customers through CUB.  The utilities are
authorized to purchase accounts receivable from the ESCOs
operating in their respective service territories.  Utilities
purchase receivables due to ESCOs at a Commission-approved
discount rate and without recourse, meaning that the utility may
not pursue a collection action against the ESCO if the utility
ultimately is unable to collect from the ESCO customer.  The
purchase of receivables (POR) discount is applied pursuant to a

-96-

CASE 15-M-0127, et al.

formula, usually described in the utility's tariff, that takes into consideration, among other factors, the collective level of uncollectible accounts associated with the ESCOs in that utility's territory.

Many parties, both ESCO and non-ESCO alike, criticize the CUB model's use of a POR without recourse system.  They opine that guaranteed compensation by utilities for POR may provide refuge for bad-acting ESCOs.  They assert that, using this system, an ESCO acting in bad faith could enter into a contract with a customer at an exorbitant rate without the financial and business risk of collecting from the customer. According to Infinite Energy, CUB and the POR without recourse system "give ESCOs little incentive to charge competitive prices."  Infinite Energy describes POR without recourse as providing a platform for abuse that "simply could not have happened to this degree had ESCOs been responsible for issuing and collecting their own bills."  Staff opines that the POR without recourse system also disadvantages ESCOs offering competitive prices because the discount is based on the overall level of collectibles for that utility's territory.

Generally, the parties fall into two different categories: those that agree that the POR system requires modification and those that believe the POR system should remain unchanged.  The parties that believe that the POR system requires modification differ in how the program should be altered, but they generally agree that the system may provide a platform for some ESCOs to take advantage of a guaranteed payment by the distribution utility and assert the program lacks transparency.

There are generally three different proposals to modify the existing CUB POR without recourse system: (1) convert the POR system to one with recourse; (2) develop a POR system

-97-

CASE 15-M-0127, et al.

with a claw-back mechanism that the utilities could use to collect from ESCOs only in specific circumstances; and (3) adopt an ESCO-specific or tiered discount rate.  Some ESCOs suggest that CUB should be eliminated and all ESCOs required to take over billing and collection responsibilities and issue a CEB, thus eliminating the POR issue.

VI.A.  Non-ESCO Party Positions Regarding POR Reform

Staff supports a system of POR with recourse.  In support of its position, Staff provides historical context concerning this issue.  Staff states that the Commission allowed utilities to purchase the ESCO accounts receivable without recourse in the infancy of the retail market "to reduce ESCO operating costs, ensure that customers receive the full benefits of HEFPA, minimize the switching of payment-troubled customers back to full utility service, and further promote retail access migration."  Staff argues that the Commission intended the utilities' operational support of the ESCOs to be temporary, with the goal that ESCOs would take over all aspects of customer-care services when the market matured.  Staff asserts that the retail market is now mature and comprised of many ESCOs, some that hold themselves out as established national providers.  Staff opines that since the market is mature, POR without recourse should no longer continue.  It asserts that both customers and ESCOs alike would benefit by the discontinuance of POR without recourse: customers may see lower ESCO prices because, without the utilities' guaranteed purchase of receivables, an ESCO may establish lower prices to limit exposure to bad debt; ESCOs that generally charge lower prices than their competitors would benefit from paying a lower POR discount rate.  Staff recognizes, and other parties agree, that

CASE 15-M-0127, et al.

further discussion and development of Staff's proposal would be necessary before it could be implemented.

PULP supports the elimination of POR and requiring ESCOs to bill and collect for their products and services to eliminate the opportunity for ESCOs to charge high prices while receiving the benefit of utility billing and collections. Alternatively, as another means of protecting customers, PULP suggests that the Commission adopt reforms it adopted in 2014 that prohibited utilities from terminating or threatening to terminate service for any ESCO charges that exceed what the utility would have charged for default service.

The Joint Utilities share other parties' concerns that Staff's proposed POR with recourse system has cost and policy implications that must be further evaluated. The Joint Utilities encourage an evaluation of the cost of moving to a "with recourse" system before making any determination. The Joint Utilities caution that switching to a "with recourse" POR system, will give ESCOs more authority for disconnecting customers for non-payment.[175] They opine that additional costs will be borne by utilities and ESCOs to monitor HEFPA compliance in terminating service.

VI.B. ESCO Party Positions Regarding POR Reform

Many parties generally take issue with Staff's proposal because they support a different option or they prefer the existing POR system. Other bases for opposition include the allegation that Staff has failed to substantiate claims of abuse stemming from the existing POR system, that the proposed system is out of touch with competitive utility retail markets that use

---

[175] GEE agrees with most of the arguments made by the Joint Utilities regarding this issue.

CASE 15-M-0127, et al.

non-recourse POR programs, and that the proposal fails to address a long-term strategy for ESCO billing.

For its part, Infinite Energy is suspect of the Joint Utilities' arguments against moving to a POR with recourse system.  It says that the utilities benefit from the existing system because the utilities are guaranteed to always collect the bad debt arising from ESCO POR because it is "redistributed among their paying customers when the Commission sets their rates."  It alleges that utilities derive benefits from the ESCOs' customers "without having to take on any short-term risk of serving them."  Infinite Energy states that Staff's proposal is "the most reasonable and would be a partial improvement," although it recommends the Commission take another approach, described below.

RESA believes that the POR system should be reformed to disincentivize ESCOs that engage in undisciplined pricing behavior, but claims the best solution is for the Commission to establish POR controls.  RESA contends that a POR claw-back provision, like that implemented by FirstEnergy in Pennsylvania, should be adopted.  Under that arrangement, a penalty is imposed on an ESCO if its annual bad debt rate exceeds 150% of the residential class average of bad debt and the ESCO charges rates above a pre-determined threshold.  RESA opines that adopting the exact system would be appropriate only if New York moved to a new default service model.  However, it suggests a similar claw-back mechanism be implemented with the goal of penalizing those ESCOs with an unusually high level of bad debt and excessive or abnormally high commodity rates, while at the same time producing a lower POR discount rate for other ESCOs.

For its part, GEE gives qualified support to the implementation of ESCO-specific or tiered discount rates to curb abusive ESCO practices, noting that the Commission previously

CASE 15-M-0127, et al.

supported such an approach, although it was never implemented. However, GEE also believes that modifying the purchase of receivables construct would not be in the interest of customers because both the utilities and ESCOs would be performing redundant functions and the costs associated with those functions would be borne by both utility and ESCO entities, increasing costs to all customers.  It argues that there is no evidence of abuse of the POR system and that ending the "without recourse" system will limit competition by favoring large national ESCOs.

Finally, certain ESCO parties advocate for eliminating CUB altogether and requiring ESCOs to obtain their own billing systems and engage in CEB.  RESA explains that reform of the POR program should be considered only a short-term solution and instead changes to the billing system would improve transparency and allow ESCOs to directly engage customers.  RESA, Infinite Energy and others suggest that the best way to provide transparency, patch weaknesses in the system and transition into the retail market originally envisioned by the Commission is by moving to a system where the ESCO is responsible for billing and collections.

VI.C.  Conclusions Regarding POR Reform

It appears that one of the most significant drivers behind arguments favoring modification of the POR system is to eliminate the opportunity for unsavory ESCOs to charge mass-market customers excessive rates for service without absorbing concomitant risk.  Yet, throughout this order, reforms to the retail access market have been adopted that will enhance customer protections and ensure that ESCO products are delivered at reasonable rates.  Consequently, there will be much less opportunity for bad-acting ESCOs to operate in the marketplace

-101-

CASE 15-M-0127, et al.

and charge excessive rates for the products and services they offer.  Thus, as stated by the Joint Utilities and GEE, as a practical matter, overhauling the POR system may not be worth its cost if the underlying concern is largely mitigated via other reforms.

However, the utilities will be required to track and maintain, by individual ESCO, additional data regarding uncollectible accounts.  At present, the utilities do not track ESCO-specific uncollectible accounts or calculate uncollectible factors for each ESCO.  Should there be a need to modify the POR system in the future, such data would provide a basis for establishing either an ESCO-specific POR discount rate or a tiered ESCO POR discount rate.


VII.  CONSIDERING THE DEFINITION OF SMALL NON-RESIDENTIAL CUSTOMERS

Despite the fact that the Commission did not notice that it was considering altering the definitional boundaries of the retail-energy mass market in the instant proceeding, certain parties raised and/or disputed two unnoticed issues: (1) whether small non-residential customers should continue to be treated similarly to residential customers and (2) how small non-residential gas customers should be identified.  The Commission addresses these issues only due to the fact that no Commission action is needed: already-existing definitions remain appropriate.

Since 2012, the Commission has been evaluating the residential and small non-residential retail market and whether the structure of that market is supporting public policy goals.  Residential and small non-residential customers have been grouped together as "mass-market" customers; these two groups are, numerically, the largest groups of customers in the State, though the significant usage of many large customers means that

CASE 15-M-0127, et al.

large customers make up a significant portion of the electric and gas usage in the State.  Small non-residential electric customers are defined as non-demand metered customers and small non-residential gas customers are defined as those using less than or equal to 750 dekatherms (dth) per year, which had been GEE's suggestion.

VII.A.  Non-ESCO Party Positions Regarding the Definition of Small Non-Residential Customers

In advancing its positions in these proceedings, Staff applies the currently accepted definition of the mass market. Staff maintains that small non-residential customers "are more like residential customers as to their ability and sophistication to understanding the markets and buying gas commodity for contract terms often measured in yearlong increments" and, therefore, should continue to be included in the definition of the mass market and afforded the additional protections that label provides.  Staff also asserts that the definition of small non-residential customers should be maintained in these proceedings and, in fact, cautions that the threshold of 750 dth/year may be too low.  In so doing, it explains that, while small commercial electric retail customers experienced some savings between 2014 and 2016, small commercial gas retail customers paid approximately $137.2 million, or 9.8%, more than they would have during the same time if they had taken gas commodity from their utility.  Staff suggests that a proceeding limited to investigating the threshold level associated with small non-residential gas customers could be instituted to determine whether the threshold should be modified.

CASE 15-M-0127, et al.

VII.B.   <u>ESCO Party Positions Regarding the Definition of Small Non-Residential Customers</u>

Most ESCO parties urge that small non-residential customers should be excluded from the mass-market label and treat all commercial customers the same.  They assert that small commercial customers should be excluded from the mass market because they are necessarily more sophisticated than residential customers and, therefore, do not require the same level of regulatory oversight and protections.  According to the ESCOs, identifying small non-residential customers as mass-market customers limits small business owners' options with regards to retail energy services.  The ESCOs further assert that small commercial customers' business acumen and expectations in selecting an energy service provider make them more akin to large commercial and industrial customers than residential customers.  The ESCOs contend that Staff agrees that small commercial customers represent a separate market segment and, as business owners, must engage in transactions involving significant amounts of money and contract terms.

Some ESCO parties claim that there never has been a showing that small businesses require special protection or that small businesses have experienced pricing or marketing abuses on par with those alleged for residential ESCO customers.  ESCO parties maintain that small business customers have benefitted by receiving retail service, with over half of small non-residential customers saving money between 2014 and 2016.  They cite data provided by Staff that shows small non-residential electric customers collectively benefitted between 2014 and 2016 with a total savings of $940,000, paying 0.1% less than if they had purchased electric commodity from the utilities.  While on the gas side small business customers did not save overall, the ESCO parties opine that the modest 9.8% cost of service over the utility price, approximately $137.2 million, is most likely due

-104-

CASE 15-M-0127, et al.

to the prevalence of fixed-rate contracts, a conscious decision by business owners to limit their exposure to commodity market volatility.

Some ESCO parties contend that the definition of small non-residential gas customers should be re-examined, and the threshold lowered, thereby excluding some of those customers from the mass market.  Many ESCO parties suggest that the 750 dth/year threshold is arbitrary, and some claim a different or lower threshold should be adopted.  GEE, who originally proposed the 750 dth/year threshold, states that, while the proposal was based on five times the average residential customer's usage, it had erroneously assumed the average usage level was 150 dth/year.  It now asserts that the average residential usage level is much closer to 100 dth/year and recommends a threshold level of 500 dth/year.  The IEC also advocates for a 500 dth/year threshold, claiming that this standard would align New York with other states such as Illinois, Kentucky, New Jersey and Ohio.

GEE also recommends a modification to the definition of small non-residential customer so that if a customer is disqualified as a small non-residential customer by either having a demand meter on the electric side or exceeding the applicable threshold dth/year on the gas side, the customer would be treated in the same manner for both commodities and not be classified as a mass-market customer.  GEE alleges that treating the same customer as sufficiently sophisticated for one commodity but not the other is illogical.

RESA believes that any evaluation of a given customer's need for customer protections based solely on the volume of energy that customer used is irrational.  For its part, Direct Energy argues that, to the extent the Commission believes any subset of non-residential customers require special

-105-

CASE 15-M-0127, et al.


protections, it should conduct further proceedings to identify which types of customers require those protections.  It further claims that small non-residential customers should be allowed an efficient process to opt out of protections if they wish.


VII.C.  Conclusions Regarding the Definition of Small Non-Residential Customers

        Small non-residential customers will not be excluded from the definition of the mass market at this time.  Small non-residential customers may have more sophistication in entering contractual arrangements than most residential customers, but the parties have offered no compelling reason to strip small non-residential customers of the protections they currently have.  While ESCOs have presented an argument that inclusion in the mass market would limit small non-residential customer choice, they have not explained how small non-residential customer choice is limited.  In fact, as the ESCOs acknowledge, small non-residential customers continue to contract with ESCOs for commodity service under the existing paradigm and none of these customers have come forward to say that their choices are restricted.  There is no compelling reason to depart from the current definition of small non-residential gas customers. While RESA complains that any volumetric threshold standard is irrational because it fails to consider the customer's level of sophistication, we disagree.  It is entirely reasonable to correlate the amount of a commodity used by a business to the level of attention a business owner likely dedicates to investigating ways to reduce his or her costs associated with that commodity.  Of course, there always will be exceptions: some smaller customers will be quite savvy business owners and some larger customers will be less capable in that regard. Nevertheless, a volumetric standard remains a rational and

CASE 15-M-0127, et al.


administratively efficient means of estimating a customer's level of sophistication.

The threshold level of 750 dth/year for gas customers will not be modified at this time.  While ESCOs believe the threshold level is too high and Staff opines that it may be too low, no persuasive arguments have been presented by the parties for either lowering or raising the threshold level.


### VIII. COMMUNITY CHOICE AGGREGATION

Most parties did not opine in much detail on the future of Community Choice Aggregation (CCA) in the context of these proceedings.  However, NYC indicated support for "a framework for ESCO regulation that is flexible enough to accommodate opting for CCA, or similar arrangement."[176]  Staff recommends that all aggregation be "enabled through either a Community Choice Aggregation (CCA) model utilizing a professional energy buyer acting in a fiduciary manner that is independent of the ESCO or the energy service provider is a not-for-profit (NFP) corporation or municipal entity."[177]

RESA recommends that communities be "afforded flexibility to select the business partners and vendors who can best assist the community in meeting its energy procurement and policy objectives" while following public contracting rules. The IEC raised a concern with the fairness of the current CCA playing field, wherein smaller ESCOs competitively bid against larger ESCOs to be retail providers.

The currently authorized CCA projects will continue to be monitored and all future CCA projects will be individually evaluated as they are proposed.  It would imprudent and

---

[176]  NYC Initial Brief, p. 19.
[177]  Tr. 2033-2034.

CASE 15-M-0127, et al.

inappropriate to adopt any broad changes to the CCA processes in these proceedings. Any proposed modification to the CCA process should be raised in the context of the CCA oversight case (Case 14-M-0224).

The Commission orders:

1. Consistent with the body of this Order (Section III) and subject to any exceptions identified therein, effective 60 calendar days from the date of this Order, energy service companies (ESCOs) shall enroll new residential or small non-residential customers (mass-market customers) or renew existing mass-market customer contracts for gas and/or electric service only if at least one of the following conditions is met: (1) enrollment includes a guaranteed savings over the utility price, as reconciled on an annual basis; (2) enrollment is for a fixed-rate commodity product that is priced at no more than 5% greater than the trailing 12-month average utility supply rate; (3) enrollment is for a renewably sourced electric commodity product that (a) has a renewable mix that is at least 50% greater than the ESCO's current Renewable Energy Standard (RES) obligation, (b) the ESCO complies with the RES locational and delivery requirements when procuring Renewable Energy Credits (RECs) or entering into bilateral contracts for renewable commodity supply, and (3) there is transparency of information and disclosures provided to the customer with respect to pricing and commodity sourcing.

2. Consistent with the body of this Order (Section III.D.3), effective 60 calendar days from the date of this Order, any mass-market customer contract for a fixed-rate commodity service that is subject to automatic renewal shall be renewed by the ESCO only as a contract for variable-rate, commodity-only service that includes a guaranteed savings over

CASE 15-M-0127, et al.

the utility price, unless the ESCO obtains affirmative customer consent to renew the contract as a fixed-rate contract that is priced at no more than 5% greater than the trailing 12-month average utility supply rate.

3. Consistent with the body of this Order (Section III.C.3), Department of Public Service Staff (staff) is directed to convene a collaborative in Track II of these proceedings to explore: (1) which, if any, ESCO-offered energy-related products and services are most likely to benefit customers and advance the State's energy policy goals, which products and services can or should be offered by ESCOs bundled with commodity, and which are more appropriately offered separately from commodity; and (2) what rules, including pricing and disclosure requirements, should be applied to ESCO-offered energy-related products and services.

4. Consistent with the body of this Order (Section II.C), staff is directed to collaborate with each utility and develop individualized plans that set forth, for each utility, a timely and cost-effective pathway toward maximizing the dissemination of useful price-comparison information to customers, including but not limited to on-bill price comparisons of utility and ESCO price information and itemized billing.

5. Revisions to Section 2 and Section 5 of the Uniform Business Practices are adopted in accordance with the discussion of the body of the Order. The revisions shall be effective 60 days following the date this Order is issued.

6. ESCOs currently operating in New York that intend to continue to renew contracts with customers in New York and/or enroll new customers in New York following the effective date of Ordering Clause No. 1 (i.e., 60 calendar days following the date of this Order) are directed to file an application in accordance

CASE 15-M-0127, et al.

with the body of this Order no later than 30 calendar days following the date the revisions to the Uniform Business Practices become effective (i.e., no later than 90 calendar days following the date of this Order).

7.   Electric and gas distribution utilities that have tariffed provisions providing for retail access shall publish on their websites 12-month trailing average utility supply rates within 15 days of March 31, June 30, September 30, and December 31 each year, starting with a filing within 15 days of December 31, 2019, for each mass-market service class and for each mass-market customer grouping that receives different supply rates based on the applicable tariff.  The published averages shall include all charges and credits that apply to full-service customer bills but would not apply to ESCO customer bills for the applicable service class and customer grouping.  Each utility shall file a letter in Cases 15-M-0127, 12-M-0476, 98-M-1343 at the time it posts the data for the 12-month trailing average ending December 31, 2019.

8.   Electric and gas distribution utilities that have tariffed provisions providing for retail access are directed to file tariff amendments or addenda to incorporate or reflect in their tariffs the Uniform Business Practices revisions approved in Ordering Clause No. 5.  The tariff revisions shall be filed, on not less than one day's notice, to become effective on or before February 10, 2020.

9.   The requirements of Public Service Law Section 66(12)(b) as to newspaper publication of the tariff revisions filed in accordance with Ordering Clause No. 7 are waived because the process in this proceeding and this Order give adequate notice of the changes.

10. Department of Public Service staff is directed to file a report of financial surety recommendations for ESCO

CASE 15-M-0127, et al.

eligibility, in accordance with the body of this Order (Section I.C), within 120 days of the date this Order is issued.

11. Department of Public Service staff is directed to file a guidance document for the periodic review of ESCO eligibility, in accordance with the body of this Order (Section I.C), within 60 days of the issuance of this Order.

12. Central Hudson Gas & Electric Corporation; Consolidated Edison Company of New York, Inc.; KeySpan Gas East Corp. d/b/a National Grid; National Fuel Gas Distribution Corporation; New York State Electric & Gas Corporation; Niagara Mohawk Power Corporation; Orange and Rockland Utilities, Inc.; Rochester Gas and Electric Corporation; and, The Brooklyn Union Gas Company d/b/a National Grid NY are directed to commence tracking and maintaining data regarding uncollectible accounts, by individual ESCO.

13. In the Secretary's sole discretion, the deadlines set forth in this order may be extended. Any request for an extension must be in writing, must include a justification for the extension and must be filed at least one day prior to the affected deadline.

14. These proceedings are continued.

By the Commission,


(SIGNED)                    MICHELLE L. PHILLIPS
                                    Secretary

-111-

# STATE OF NEW YORK
# PUBLIC SERVICE COMMISSION

# UNIFORM BUSINESS PRACTICES
# CASE 98-M-1343

December 2019

# TABLE OF CONTENTS

SECTION 1:  DEFINITIONS ............................................................................................... 1

SECTION 2:  ELIGIBILITY REQUIREMENTS ................................................................ 6

SECTION 3:  CREDITWORTHINESS............................................................................... 16

SECTION 4:  CUSTOMER INFORMATION .................................................................... 21

SECTION 5:  CHANGES IN SERVICE PROVIDERS ..................................................... 25

SECTION 6:  CUSTOMER INQUIRIES ........................................................................... 41

SECTION 7:  DISTRIBUTION UTILITY INVOICES...................................................... 43

SECTION 8:  DISPUTES INVOLVING DISTRIBUTION UTILITIES, ESCOs OR DIRECT CUSTOMERS ................................................................... 45

SECTION 9:  BILLING AND PAYMENT PROCESSING............................................... 47

SECTION 10:  MARKETING STANDARDS ................................................................. 61

# SECTION 1:  DEFINITIONS

As used in the Uniform Business Practices (UBP), the following terms shall have the following meanings:

<u>Assignment</u> – Transfer by one ESCO to another ESCO of its rights and responsibilities relating to provision of electric and/or gas supply under a sales agreement.

<u>Bill ready</u> – A consolidated billing practice that requires each non-billing party, after receiving customers' usage data, to calculate its charges and send via EDI charges, billing information, and bill messages to the billing party in a form that allows the transfer of the information to the bill in a format the billing party selects.

<u>Billing cycle</u> – The period for which a customer is billed for usage of electricity or natural gas.

<u>Billing services agreement (BSA)</u> – An agreement between the distribution utility and the ESCO stating the billing practices and procedures and the rights and responsibilities of billing and non-billing parties relating to issuance of consolidated bills to customers.

<u>Budget billing</u> – A billing plan that provides for level or uniform amounts due each billing period over a set number of periods, typically 12 months, and determined by dividing projected annual charges by the number of periods.  Installment amounts may be adjusted during the period and may include reconciliations at the end of the budget period to account for differences between actual charges and installment amounts.

<u>Business day</u> – Monday through Friday, except for public holidays.

<u>Consolidated billing</u> – A billing option that provides customers with a single bill combining charges from more than one service  provider and issued by a distribution utility providing delivery service (utility consolidated bill) or by a commodity supplier (ESCO consolidated bill).

<u>Customer inquiry</u> – A question or request for information from a customer relating to a rate, term, or condition of service provided by an ESCO, distribution utility or other service provider.

<u>Cramming</u> – The addition of unauthorized charges to a customer's bill.

<u>Deferred payment agreement (DPA)</u> – A fair and equitable payment plan agreed upon by a customer and utility and/or a customer and an ESCO that allows a customer to pay an overdue amount in installments.  A DPA is based upon the customer's financial circumstances and ability to pay the overdue amount while making payment on current charges.

<u>Demand</u> – The amount of electricity or natural gas that is or could be immediately needed by a customer at any given point in time referred to as customer load.  For consolidated billing, the term is used in the context of "billing period demand" for customer bills.

    <u>Electric</u> – The amount of electricity, measured in kilowatts (kW), that a customer uses at a point in time, the customer's usage averaged over a period, or capacity of facilities reserved for the customer for stand-by or other service.

    <u>Natural Gas</u> – The amount of gas measured in cubic feet or therms that a customer uses or may use over a period, or capacity of facilities reserved for the customer for stand-by or other service.

Direct customer – An entity that purchases and schedules delivery of electricity or natural gas for its own consumption and not for resale.  A customer with an aggregated minimum peak connected load of 1 MW to a designated zonal service point qualifies for direct purchase and scheduling of electricity provided the customer complies with NYISO requirements.  A customer with annual usage of a minimum of 3,500 dekatherms of natural gas at a single service point qualifies for direct purchase and scheduling of natural gas.

Distribution utility – A gas or electric corporation owning, operating, or managing electric or gas facilities for the purpose of distributing gas or electricity to end users.

Distribution utility customer account number – A number used by a distribution utility to identify the account of a utility customer.

Distribution utility tariff – A schedule of rates, terms and conditions of services provided by a distribution utility.

Door-to-door sales – The sale of energy services in which the ESCO or the ESCO's representative personally solicits the sale, and the buyer's agreement or offer to purchase is made at a place other than the places of business of the seller; provided that "door-to-door sales" shall not include any sale which is conducted and consummated entirely by mail, telephone or other electronic means, or during a scheduled appointment at the premises of a buyer of nonresidential utility service, or through solicitations of commercial accounts at trade or business shows, conventions or expositions.

Drop – A transaction that closes a customer's account with a provider.  This term is used when:  (1) a customer's enrollment is pending and the customer rescinds the enrollment; (2) a customer enrolled with an ESCO returns to distribution utility service or enrolls with another ESCO; or (3) the ESCO discontinues service to a customer.

Dual billing – A billing option that provides for separate calculation of charges and presentation of bills to the customer by the distribution utility and ESCO.

Electronic data interchange (EDI) – The computer-to-computer exchange of routine information in a standard format using established data processing protocols.  EDI transactions are used in retail access programs to switch customers from one supplier to another or to exchange customers' history, usage, or billing data between a distribution utility or MDSP and an ESCO.  Transaction set standards, processing protocols and test plans are authorized in orders issued by the Public Service Commission in Case 98-M-0667, In the Matter of Electronic Data Interchange and available on the Department of Public Service website at:   www.dps.ny.gov/98m0667.htm.

Energy broker – A non-utility entity that performs energy management or procurement functions on behalf of customers or ESCOs but does not make retail energy sales to customers.

Energy services company (ESCO) – An entity eligible to sell electricity and/or natural gas to end-use customers using the transmission or distribution system of a utility.  ESCOs may perform other retail service functions.

ESCO marketing representative – An entity that is either the ESCO or a contractor/vendor conducting, on behalf of the ESCO, any marketing activity that is designed to enroll customers with the ESCO.

Enroll/Enrollment – The process used to switch a customer from a distribution utility to an ESCO or from one ESCO to another.

Enrollment date – The effective date for commencement of electric or natural gas service from an ESCO or distribution utility.

Guarantor – An entity that agrees to pay another's debt or perform another's duty, liability, or obligation.

Independent Third-Party Verification – the confirmation of a customer's agreement to take service from an ESCO or authorization for the ESCO to request information by a Verification Agent.

Interval data – Actual energy usage for a specific time interval for a specific period recorded by a meter or other measurement device.

Load profile – Actual or estimated customer energy usage by interval over a period representing usage for a customer or average usage for a customer class.

Lockbox – A billing payment receipt method agreed upon by a distribution utility and an ESCO, involving use of a third-party financial institution to receive and disburse customer payments.

Marketing - The publication, dissemination, or distribution of informational and advertising materials regarding the ESCO's services and products to the public by print, broadcast, electronic media, direct mail, or by telecommunication.

Meter – A device for determination of the units of electric or natural gas service supplied to consumers.

Meter Data Service Provider (MDSP) – An entity that provides meter data services, consisting of meter readings, meter data translations, and customer association, validation, editing and estimation.

Meter Service Provider (MSP) – An entity that installs, maintains, tests and removes meters, or other measurement devices and related equipment.

Multi-retailer model – A model for retail access that involves provision of electric or natural gas supply and of delivery service, provided separately to end use customers by two or more entities.

New York State Independent System Operator (NYISO) -  An independent management organization, authorized by the Federal Energy Regulatory Commission, operating the bulk electric transmission system.

New delivery customer – A customer initiating delivery service by a distribution utility.

Nomination – A request for delivery of a physical quantity of natural gas or for its delivery at a specific point under a purchase, sale, or transportation agreement.

Office of Consumer Services – Office, within the Department of Public Service, which receives and makes determinations concerning customer complaints.  Office of Consumer Services (OCS) identifies the exiting Office or its successor in the event the Office name is changed.

Pay-as-you-get-paid method – A payment processing method offered by a billing party presenting consolidated bills, whereby the billing party forwards payment to the non-billing party after receiving payment from the customer.

Pending enrollment – A stage in processing an enrollment that commences with validation of an enrollment transaction request and ends on the enrollment date that the new supplier is expected to deliver energy.

Pending ESCO – An ESCO is a pending ESCO from the date of receipt of an EDI notice containing the effective date for a customer's enrollment until the ESCO commences commodity service for that customer.

Plain Language – Written in clear and coherent manner using words with common and everyday meaning and avoiding legal or energy industry terms, acronyms, and abbreviations that a person of ordinary intelligence would not be expected to understand. If use of a technical term is necessary, the term is clearly defined in the portion of the text where it is used.

Purchased accounts receivable – A debt owed to an ESCO by a customer for receipt of supplies of gas or electricity and transferred to a distribution utility in exchange for consideration.

> With recourse – Purchase of accounts receivable with recourse by a distribution utility means that the ESCO remains liable if its customers fail to make payments. A distribution utility that purchases accounts receivable with recourse sends payments to an ESCO at predetermined intervals for amounts billed that are not in dispute and may offset subsequent purchase payments against or obtain reimbursement from an ESCO of any unpaid amounts.

> Without recourse – Purchase of accounts receivable without recourse by a distribution utility means that the ESCO is not liable if its customers fail to make payments. A distribution utility that purchases accounts receivable without recourse sends payments to an ESCO at predetermined intervals for amounts billed that are not in dispute and has no right to seek reimbursement from an ESCO of any unpaid amounts.

Rate ready – A consolidated billing practice that requires each non-billing party to furnish in advance of the billing cycle, rates, rate codes or prices (fixed and/or variable), tax rates, billing information, and bill messages to the billing party. The billing party, after receipt of usage data from the MDSP, uses the information on record to calculate the non-billing party's charges.

Residential customer – An individual or occupant of a residential premise as defined in 16 NYCRR Part 11.2(a)(2).

Sales agreement – An agreement between a customer and an ESCO that contains the terms and conditions governing the supply of electricity and/or natural gas provided by an ESCO. The agreement may be a written contract signed by the customer or a statement supporting a customer's verifiable verbal or electronic authorization to enter into an agreement with the ESCO for the services specified.

Single retailer model – A model for retail access that involves provision of electric and/or natural gas service to end users by an ESCO that purchases delivery service from the distribution utility and resells it along with electricity and/or natural gas to end users.

Slamming – Enrollment of a customer by an ESCO without authorization.

<u>Special meter reading</u> – An actual meter reading performed, upon request, on a date that is different than the regularly scheduled meter reading date.

<u>Special needs customer</u> – A customer who has a certified medical emergency condition, who is elderly, blind or physically challenged, or who may suffer serious impairment to health or safety as a result of service termination during cold weather periods and, thus, is eligible for special procedures before termination of service under the Home Energy Fair Practices Act (HEFPA) (Public Service Law §32(3)).

<u>Switch</u> – Transfer of a customer from one ESCO to another, from a distribution utility to an ESCO, or from an ESCO to a distribution utility.

<u>Switching cycle</u> – For electric service, the period between the date of the last meter read and the next regularly scheduled meter read. For gas customers, the period between the date of the last meter read and the next regularly scheduled meter read or the first day of the month and the first day of the following month.

<u>Termination Fee</u> – An amount specified in an ESCO sales agreement where such agreement permits the ESCO to assess and collect a charge in such amount to a customer who terminates the agreement before the end of a term described in that agreement, regardless of whether the assessed amount is identified as a fee, a charge, liquidated damages or a methodology for the calculation of damages, and regardless of whether it is fixed, scaled or subject to calculation based on market factors.  In the event the customer is deceased before the end of such contract term, no fee for termination or early cancellation shall be assessed.

<u>Verification Agent</u> - An entity that is an independent vendor/contractor conducting, on behalf of the ESCO, verification of an agreement, resulting from telephonic or door-to-door marketing with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information, as required by Section 5, Attachment 1 of the UBP.  In the limited circumstance where the verification is only of customer authorization for release of information, the entity does not need to be independent of the ESCO.

# SECTION 2:  ELIGIBILITY REQUIREMENTS

A.  Applicability

This Section sets forth the process that an applicant is required to follow for a Department of Public Service (the Department) finding of eligibility to sell natural gas or electricity as an ESCO, that an ESCO is required to follow to maintain eligibility, and that a distribution utility is required to follow for discontinuance of an ESCO's or Direct Customer's participation in a distribution utility's retail access program.

B.  Application Requirements

1.  Applicants seeking eligibility to sell natural gas and/or electricity as ESCOs are required to submit to the Department an application package containing the following information and attachments:

a.  A completed Retail Access Eligibility Application Form (Application), available on the Department  website ( www.dps.ny.gov). The Application shall require the applicant to:

   i.  identify the methods by which it intends to market its products and services to customers;

   ii.  identify the category/categories of commodity products it intends to provide to customers (e.g. variable-rate, fixed-rate, or renewably sourced commodity);

   iii.  disclose each state in which the applicant operates as an ESCO or has operated within the 24 months preceding the date of application and provide any data in its possession regarding complaint history;

   iv.  disclose any other trade names used by the applicant and the state in which the trade name was/is used;

   v.  disclose and describe any data breaches associated with customer proprietary information that occurred in any jurisdiction within the 24 months preceding the date of application, as well as any actions taken by the applicant in response to the incident(s);

   vi.  disclose and describe specific policies and procedures established by the applicant to secure customer data; and

   vii.  disclose any history of bankruptcy, dissolution, merger, or acquisition activities in the 24 months preceding the date of application, including data for affiliates of the ESCO applicant and upstream owners and subsidiaries.

b.  A sample standard Sales Agreement for each customer class that meets the requirements set forth in Section 5.B.3, infra.

c.  Sample forms of the notices sent upon assignment of sales agreements, discontinuance of service, or transfer of customers to other providers.

d.  A sample ESCO bill used when dual billing is in effect and, if applicable, a sample ESCO consolidated bill, with terms stated in clear, plain language;

e.  Procedures used to obtain customer authorization for ESCO access to a

customers' historic usage or credit information;

    f.  Sample copies of informational and promotional materials that the ESCO uses for mass marketing purposes;

    g.  Proof of registration with the New York State Department of State;

    h.  Internal procedures for prevention of slamming and cramming;

    i.  Name, postal and e-mail addresses, and telephone and fax numbers for the applicant's main office;

    j.  Names and addresses of any entities that hold ownership interests of 10% or more in the ESCO, including a contact name for corporate entities and partnerships;

    k.  Detailed explanation of any criminal or regulatory sanctions imposed during the previous 36 months against any senior officers of the ESCO or any entities holding ownership interests of 10% or more in the ESCO;

    l.  An Officer Certification document sworn to by a high-level officer of the ESCO applicant, such as the Chief Executive Officer, President or the equivalent, in which the officer affirms that the ESCO is willing and able to comply with all applicable laws and regulations;

    m. A copy of the ESCO's quality assurance program, which is designed to monitor (a) compliance with Section 10 of the UBP and (b) accuracy of the ESCO marketing materials provided to prospective customers;

    n.  A completed Service Provider Contact Form, which can be found on the Department's website http://www.dps.ny.gov/ocs.html, identifying the ESCO's employee(s) responsible for resolving consumer complaints received by the Department and referred to the ESCO; and

    o.  A list of the entities, including contractors and sub-contractors, that will market to customers on behalf of the ESCO.  The list must include the entities' names, addresses, phone numbers and owners, managers, and/or principals. This list must be updated regularly as entities are added or removed.

2.  Applicants shall submit to the Department the name of the utility that will test designated EDI transactions required for syntactical verification in the Phase I testing program.  The Department shall maintain a list of ESCOs that successfully complete Phase I  test requirements by transaction type.

3.  An ESCO that knowingly makes false statements in its application package is subject to denial or revocation of eligibility.

4.  If the application package contains information that is a trade secret or sensitive for security reasons, the applicant may request that the Department withhold disclosure of the information, pursuant to the Freedom of Information Law (Public Officers Law Article 6) and Public Service Commission regulations (16 NYCRR §6-1.3).

C.  Department Review Process

1.  The Department shall review the Application information and documentation submitted by  each applicant and make an initial determination as to the applicant's likelihood of compliance with the Uniform Business Practices if the ESCO were deemed eligible to operate in the State.  To enable the Department to make a thorough and assessment of an application, an ESCO shall notify the Department of any major  changes in the information submitted in the Retail Access Eligibility

Application Form and/or application package that occurs during the Department review process.

2. Following its review of the Application information and documentation, the Department shall advise the applicant, in writing, if the Application is approved and the applicant is eligible to operate in the State and if satisfaction of Phase I EDI testing requirement has been verified by the utility designated by the applicant.

3. ESCOs deemed eligible to provide commodity service by the Department must begin serving customers within two-years from the date of the letter notifying the ESCO of their eligibility status (eligibility letter). The ESCO that does not begin serving customers within such two-year period may be required to conduct additional EDI testing before enrollments will be processed.

4. If following its review of the Application information and documentation the Department determines that the applicant is not likely to comply with the UBP if the ESCO were deemed eligible, the Department may recommend to the Commission that, for good cause shown, the Commission deny the ESCO's Application.

5. In any instance that the Department recommends to the Commission that an ESCO applicant be denied eligibility, the applicant shall be afforded an opportunity to provide to the Commission with a response in rebuttal to the Department's recommendation and in support of its application before the Commission renders a final eligibility determination.

6. The Department shall periodically review the eligibility of each ESCO operating in New York and make a recommendation to the Commission if the Department finds that the ESCO should not be permitted to continue operating in New York.

D. Maintaining ESCO Eligibility Status

1. An ESCO shall submit by January 31 each year (January 31 Statement):

   a. a statement that the information and attachments in its Retail Access Eligibility Form and application package are current; or

   b. a description of revisions to the Retail Access Eligibility Form and application package and a copy of the revised portions or, at the ESCO's option, a copy of the revised portions identifying the revisions by highlighting or other means; and

   c. An Officer Certification document, as required by Section 2.B.l.

2. An ESCO shall update all the information it submitted in its original application package to the Department every three years, starting from the date of its eligibility letter, consistent with the requirements of UBP Section 2.B. An ESCO's status as an eligible supplier is continuous from the date of the Department eligibility letter, unless revoked or otherwise limited in accordance with UBP Section 2.D.5. If the three-year anniversary date falls within one month of January 31, the ESCO shall resubmit its application package in lieu of the January 31 statement.

3. An ESCO shall file with the Secretary, a separate average unit price for products with no energy-related value-added services for each of two groups of customers and by load zone: i) residential price fixed for a minimum 12-month period; ii) residential variable price. The averages should be weighted by the amount of commodity sold at each price within each customer category. ESCOs shall also file the number of customers purchasing products in those categories. ESCOs shall file the required information quarterly, reflecting data over that period,

within 30 days of the end of each calendar quarter (i.e., data must be provided no later than April 30th, July 30th, October 30th and January 30th of each year).[1]

4. An ESCO shall submit at other times during the year:

   a. A description of any major change in the Retail Access Eligibility Application Form  and/or application package and a copy of the revised portions or, at the  ESCO's option, a copy of the revised portions identifying the revisions by  highlighting or other means.  For purposes of Subdivision D of this Section,  the term, "major change," means a revision in the terms and conditions  applicable to the business relationship between the ESCO and its customers,  including provisions governing the process for termination of sales  agreements.

   b. Changes in marketing plans, including changes to the list required in sub-section B.1.n of this Section of the UBP.

   c. Changes in the ESCO's business and customer service information displayed on the Department's Website.

   d. At least once every thirty days, each ESCO serving residential customers must post a price for each product it offers to those customer classes (e.g., fixed-price, variable-price, renewable energy, with each type of value-added service, etc.) on the Power to Choose website.  Each ESCO must guarantee to charge new customers no more than the price of the ESCOs posted offers at the time of the customer's agreement for each product.

   e. Changes in personnel responsible for resolving consumer complaints received by the Department and referred to the ESCO.

5. An ESCO may be subject to the consequences listed in UBP Section 2.D.6.b for reasons, including, but not limited to:

   a. false or misleading information in the application package;

   b. failure to adhere to the policies and procedures described in its Sales Agreement;

   c. failure to comply with required customer protections;

   d. failure to comply with applicable NYISO requirements, reporting requirements, or Department oversight requirements;

   e. failure to provide notice to the Department of any material changes in the information contained in the Retail Access Eligibility Form or application package;

---

[1]   If the Power-to-Choose website is modified to allow ESCOs to file this information there, the Department may notify ESCOs that compliance with this provision may be accomplished in that manner.

f.  failure to comply with the UBP terms and conditions, including discontinuance requirements;

g.  failure to comply with EDI transaction set standards and processing protocols and/or use properly functioning EDI systems;

h.  repeated failures to comply with price reporting requirements, reporting misleading price information, or continuing to fail to comply with price reporting requirements after withdrawal of eligibility to enroll new customers;

i.  failure to comply with the Commission's Environmental Disclosure Requirements or failure to comply with other Commission Orders, Rules or Regulations;

j.  failure to reply to a complaint filed with the Department and referred to the ESCO within the timeframe established by the Department' Office of Consumer Services which is not less than five days;

k.  any of the reasons stated in Subdivision F of this Section; or

l.  a material pattern of consumer complaints on matters within the ESCO's control;

m. failure to comply with any federal, state, or local laws, rules, or regulations related to sales or marketing; or 'No Solicitation' signage on the premises; or

n.  failure to comply with any of the Marketing Standards set forth in Section 10 of the UBP.

6.  In determining the appropriate consequence for a failure or non-compliance in one or more of the categories set forth in UBP Section 2.D.5, the Commission or Department may take into account the nature, the circumstances, including the scope of harm to individual customers, and the gravity of the failure or non-compliance, as well as the ESCO's history of previous violations.

a.  The Commission or Department shall:

1.  Either (a) notify the ESCO in writing of its failure to comply and request that the ESCO take appropriate corrective action or provide remedies within the directed cure period, which will be based on a reasonable amount of time given the nature of the issue to be cured; or (b) order that the ESCO show cause why a consequence should not be imposed.

2.  The Commission may impose the consequences listed in subparagraph b of this paragraph if (a) ESCO fails to take corrective actions or provide remedies within the cure period; or (b) the Commission determines that the incident or incidents of non-compliance are substantiated and the consequence is appropriate.

3.  Consequences shall not be imposed until after the ESCO is provided notice and an opportunity to respond.

4.  The notice of consequences imposed by the Commission will be published on the Department's website.

    b. Consequences for non-compliance in one or more of the categories set forth in UBP Section 2.D.5 may include one or more of the following restrictions on an ESCO's opportunity to sell electricity and/or natural gas to retail customers:

      1. Suspension from a specific Commission approved retail program in either a specific service territory or all territories in New York;

      2. Suspension of the ability to enroll new customers in either a specific service territory or all service territories in New York;

      3. Imposition of a requirement to record all telephonic marketing presentations, which shall be made available to the Department for review;

      4. Reimbursements to customers who did not receive savings promised in the ESCO's sales agreement/Customer Disclosure Statement or substantially demonstrated to have been included in the ESCO's marketing presentation or to customers who incurred costs as a result of the ESCO's failure to comply with the marketing standards set forth in Section 10 of the UBP;

      5. Release of customers from sales agreements without imposition of early termination fees;

      6. Revocation of an ESCO's eligibility to operate in New York; and,

      7. Any other measures that the Commission may deem appropriate.

    c. Consequences imposed pursuant to this paragraph shall continue to apply until the ESCO's failure to comply with the UBP has been cured or the Commission or Department has determined that no further cure is necessary.

7. An ESCO's eligibility to serve customers is valid unless: the ESCO abandons its eligibility status; or such status is revoked by the Commission through a final order pursuant to UBP Section 2.D.6.

8. The Department shall notify distribution utilities upon notice to the ESCO, and the NYISO if applicable, of any determination to revoke an ESCO's eligibility to sell natural gas and/or electricity. The distribution utility shall notify the ESCO's customers, in accordance with paragraph 3 of Subdivision F of this Section, of any Department revocation of an ESCO's eligibility.

E. Distribution Utility Requirements

1. After receipt of the Department's compliance letter, the ESCO shall notify the distribution utility, and NYISO if applicable, of its eligibility status and intent to complete the process to commence operation in the distribution utility's service area, including execution of any operating agreement that is required.

2. Upon satisfaction of the distribution utility's and, if applicable the NYISO's requirements, and successful completion of EDI testing conducted by the distribution utility, the ESCO may enter into an operating agreement, if any is required, with the distribution utility to commence operations in its service territory.

F.  Discontinuance of an ESCO's and Direct Customer's Participation in a Retail Access Program

1.  In accordance with the procedures established in this Subdivision, a distribution utility may discontinue an ESCO's or Direct Customer's participation in its retail access program for the following reasons:

a.  Failure to act that is likely to cause, or has caused, a significant risk or condition that compromises the safety, system security, or operational reliability of the distribution utility 's system, and the ESCO or Direct Customer failed to eliminate immediately the risk or condition upon verified receipt of a non-EDI notice;

b.  Failure to provide natural gas (provided zero quantity) to the distribution utility's city gate;

c.  Failure to pay an invoice upon the due date;

d.  Failure to provide for delivery of at least 95% of the amount of natural gas directed by a distribution utility for delivery or at least 80% of the daily metered usage of the ESCO's customers or a Direct Customer's specified load or lower percentages included in a balancing program established in a distribution utility's tariff and/or any operating agreement;

e.  Failure to maintain a creditworthiness standard or provide required security;

f.  Failure to comply with the terms and conditions of a distribution utility's tariff, operating agreement, or Gas Transportation Operating Procedures (GTOP) Manual to the extent that said documents are consistent with the provisions of the UBP;

g.  Discontinuance of an ESCO's or Direct Customer's participation in a distribution utility's retail access program by the NYISO; or,

h.  Commission determination that an ESCO is not eligible to sell natural gas or electricity to retail customers.

2.  To initiate the discontinuance process, a distribution utility shall send a non-EDI discontinuance notice by overnight mail and verified receipt, to the ESCO or Direct Customer and the Department.  The notice shall contain the following information:

a.  The reason, cure period, if any, and effective date for the discontinuance;

b.  A statement that the distribution utility shall notify the ESCO's customers of the discontinuance if the ESCO fails to correct the deficiency described in the notice within the cure period, unless the Department directs the distribution utility to stop the discontinuance process;

c.  The distribution utility may suspend the ESCO's right to enroll customers until correction of the deficiency; and

d.  Correction of the deficiency within the cure period, or a Department directive, will end the discontinuance process.

3.  The distribution utility shall send notices to the ESCO's customers informing them of the discontinuance and providing the following information:

    a. The discontinuance shall or did occur on one of the following dates selected by the distribution utility:  the scheduled meter read date, the first day of the month, or another date, if readings are estimated, or on the date of a special meter read;

    b. Customers have the option to select another ESCO or return to full utility service or, if a program authorizing random assignment is in effect, to enroll with a designated ESCO through that program;

    c. Names and telephone numbers of ESCOs offering service to retail customers in the distribution utility's service territory;

    d. Any ESCO selected by a customer may file an enrollment request on the customer's behalf with the distribution utility, and the distribution utility shall charge no fee for changing the customer's provider to the new ESCO; and,

    e. During any interim between discontinuance of a customer's current ESCO and enrollment with a new ESCO, the distribution utility shall provide service under its applicable tariff, unless the distribution utility notified the customer that it is terminating its delivery services to the customer on or before the discontinuance date.

4. The distribution utility shall submit a sample copy of its discontinuance notice to the Department for review and approval prior to distribution to customers.

5. The distribution utility may request permission from the Department to expedite the discontinuance process, upon a showing that it is necessary for safe and adequate service or in the public interest.  Any expeditious discontinuance process shall include the ESCO or Direct Customer, and the distribution utility.

6. Upon any discontinuance, an ESCO or Direct Customer shall remain responsible for payment or reimbursement of any and all sums owed under the distribution utility tariffs, any tariffs on file with the FERC and service agreements relating thereto, or any agreements between the ESCO and the distribution utility.

7. The notice requirements and time limits for a distribution utility to discontinue an ESCO's or Direct Customer's participation in a distribution utility's retail access program (discontinue participation) are:

    a. Upon a distribution utility determination that an ESCO's or Direct Customer's action, or failure to act, is likely to cause, or has caused, a significant risk or condition that compromises the safety, system security, or operational reliability of the distribution utility's system and that the ESCO or Direct Customer failed to eliminate immediately the risk or condition upon verified receipt of a non-EDI notice, the distribution utility may discontinue participation as soon as practicable.

    b. Upon a distribution utility determination that an ESCO or Direct Customer responsible for the delivery of natural gas failed, except under force majeure conditions, to deliver natural gas (provided zero quantity) to the distribution utility's service territory for its load, the distribution utility may discontinue participation no sooner than two business days after receipt by the ESCO or Direct Customer of a discontinuance notice.

    c. Upon a distribution utility determination that an ESCO or Direct Customer failed to pay an invoice on the due date, as specified in the distribution

utility's tariff, and the ESCO's or Direct Customer's required security or credit limit is insufficient to cover the unpaid amount, with interest, the distribution utility may discontinue participation no sooner than ten business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer pays the amount due

d. on or before the expiration of the cure period, the distribution utility shall stop the process to discontinue participation.

e. Upon a distribution utility determination that an ESCO or Direct Customer responsible for the nomination and delivery of natural gas failed, except in force majeure conditions, to nominate and/or deliver sufficient natural gas to the distribution utility's service territory to satisfy at least 95% of the amount of natural gas directed by a distribution utility for delivery or at least 80% of the daily metered usage of the ESCO's customers or the Direct Customer's specified load or lower percentages included in a balancing program established in a distribution utility's tariffs and/or any operating agreement on any three days during any month,  the distribution utility may initiate a discontinuance process no sooner than five business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer provides adequate assurances and a description of any necessary process changes that ensure adequate nominations and deliveries on or before the expiration of the cure period, the distribution utility shall stop the discontinuance process.  Upon a determination to continue the discontinuance process because the assurances and proposed process changes are inadequate, the distribution utility shall notify the ESCO or Direct Customer that it will discontinue participation no later than 15 business days from the expiration of the cure period.  The distribution utility shall notify the ESCO's customers that the distribution utility will discontinue participation on or before the expiration of 15 business days from the end of the cure period.  If a failure to provide sufficient natural gas for any 3 days during a calendar month occurred during the past 12 months and the distribution utility sent a related discontinuance notice for each occurrence, it may discontinue participation no sooner than two business days after receipt by an ESCO or Direct Customer of a discontinuance notice.

f. Upon a distribution utility determination that an ESCO or Direct Customer failed to provide or maintain a creditworthiness standard or required security, the distribution utility may initiate a discontinuance process no sooner than five business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer satisfies the creditworthiness standard or provides the required security on or before the expiration of the cure period, the distribution utility shall stop the discontinuance process.  Upon a determination to continue with the discontinuance process because the ESCO or Direct Customer failed to comply with the creditworthiness standard or provide adequate security, the distribution utility shall notify the ESCO or Direct Customer that it will discontinue participation no later than 15 business days from the expiration of the cure period.  The distribution utility shall notify the ESCO's customers that it will discontinue participation on or before 15 days from the expiration

of the cure period.  If a failure to comply with the creditworthiness standard or provide adequate security occurred twice during the past 12 months and the distribution utility sent a related discontinuance notice for each failure, it may discontinue participation no sooner than two business days after receipt by an ESCO or Direct Customer of a discontinuance notice.

g. Upon a distribution utility determination that an ESCO or Direct Customer failed, except in force majeure conditions, to comply with any other applicable provision of the distribution utility's tariff, operating agreement, or GTOP manual, the distribution utility may initiate a discontinuance process no sooner than ten business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer provides adequate assurances and a description of any necessary process changes that ensure compliance on or before the expiration of the cure period, the distribution utility shall stop the discontinuance process.  Upon a determination to continue the discontinuance process because the assurances and proposed process changes are inadequate, the distribution utility shall notify the ESCO or Direct Customer that it will discontinue participation no later than 15 business days from the expiration of the cure period.  The distribution utility shall notify the ESCO's customers that it will discontinue participation on or before the expiration of 15 business days after the end of the cure period.

# SECTION 3:  CREDITWORTHINESS

A. Applicability

   This Section establishes creditworthiness standards that apply to ESCOs and Direct Customers.  An ESCO's and Direct Customer's participation in a distribution utility's retail access program is contingent upon satisfaction of creditworthiness requirements and provision of any security.

B. ESCOs

   1. An ESCO shall satisfy a distribution utility's creditworthiness requirements if:

      a. The ESCO, or a guarantor, maintains a minimum rating from one of the rating agencies and no rating below the minimum from one of the other two rating agencies.  For the purposes of this Section, minimum rating shall mean "BBB" from Standard & Poor's, "Baa2" from Moody's Investor Service, or "BBB" from Fitch Ratings (minimum rating);  or,

      b. The ESCO enters into a billing arrangement with the distribution utility, whereby the distribution utility bills customers on behalf of the ESCO and retains the funds it collects to offset any balancing and billing service charges provided that the distribution utility has a priority security interest with a first right of access to the funds.  The ESCO shall submit an affidavit from a senior officer attesting to such utility interest and right. Except that an ESCO serving customers outside of such billing arrangement, must satisfy the security requirements of UBP Section 3.D with respect to those customers.

   2. If an ESCO, or a guarantor, is not rated by Standard & Poor's, Moody's Investor Service or Fitch Ratings, it shall satisfy a distribution utility's creditworthiness requirements if the ESCO, or a guarantor:

      a. Maintains a minimum "1A2" rating from Dun & Bradstreet (Dun and Bradstreet minimum rating) and the ESCO maintains 24 months good payment history with the distribution utility; and,

      b. Provides any security required by the distribution utility, calculated in accordance with Subdivision D, after deduction of the following unsecured credit allowances:

| Rating | Unsecured Credit Allowance |
|---|---|
| 5A1 or 5A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 4A1 or 4A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 3A1 or 3A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 2A1 or 2A2 | 50% of an ESCO's tangible net worth, up to $500,000 |
| 1A1 or 1A2 | 50% of an ESCO's tangible net worth, up to $375,000 |

An ESCO shall provide information, upon request of the distribution utility, to enable the distribution utility to verify the ESCO's equity.  The distribution utility may request reasonable information to obtain the verification and shall safeguard it as confidential information and protect it from public disclosure.  The distribution utility may deny the unsecured credit allowance to any ESCO that fails to provide the requested information.

3. A distribution utility may require an ESCO to provide and maintain security in the full amount of the distribution utility's credit risk, calculated in accordance with Subdivision D, if:

   a. The ESCO, or a guarantor, is not rated;

   b. The ESCO, or a guarantor, with a minimum rating is placed on credit watch with negative implications or is rated below the minimum rating;

   c. The ESCO, or a guarantor, is rated below the Dun & Bradstreet minimum rating or the ESCO fails to maintain 24 months good payment history with the distribution utility; or,

   d. An ESCO issuing consolidated bills fails to render timely bills to customers or to make timely payments to the distribution utility.

4. If a distribution utility's credit risk, associated with an ESCO's participation in its retail access program, exceeds 5% of the distribution utility's average monthly revenues for the applicable service, the distribution utility may require the ESCO, in addition to maintaining a minimum rating, to provide and maintain security in the amount of such excess credit risk.

C. Direct Customers

A Direct Customer shall satisfy a distribution utility's creditworthiness requirements if:

1. Its account is current and remained current for the past 12 months; and,

2. If its debt is rated, it maintains a minimum rating of its long-term unsecured debt securities from one of the rating agencies and no rating below the minimum rating from one of the other two rating agencies.

D. Calculation of Credit Risk and Security

The distribution utility shall calculate its credit risk and establish its security requirements as follows:

1. Delivery Service Risk

   a. For an ESCO that issues a consolidated bill under a multi-retailer model, a distribution utility may require security in an amount no greater than 45 days of peak usage of the ESCO's customers' projected energy requirements during the next 12 months, priced at the distribution utility's applicable delivery service rate and including relevant customer charges.

   b. For an ESCO that bills customers for delivery and commodity services under a single retailer model, a distribution utility may require security in an amount no greater than 60 days of peak usage of the ESCO's customers' projected energy requirements during the next 12 months, priced at the distribution utility's applicable delivery service rate and including relevant customer charges.

   c. Upon an ESCO request, the distribution utility shall establish separate security requirements for summer (April 1 - October 31) and winter (November 1 - March 31) and may retain winter security until the end of two months (April and May) after the end of the winter period.

2. Natural Gas Imbalance Risk

   a. The distribution utility may require an ESCO or Direct Customer to provide security in an amount no greater than the ESCO's customers' or a Direct Customer's projected maximum daily quantity times peak forecasted NYMEX price for the next 12 months and for upstream capacity to the city gate times 10 days.

   b. Upon the request of an ESCO or Direct Customer, the distribution utility shall establish separate security requirements for summer (April 1 - October 31) and winter (November 1 - March 31) and may retain winter security until the end of two months (April and May) after the end of the winter period.

3. Major Change in Risk

   a. A major change shall mean a change in credit risk of more than the greater of 10% or $200,000.

   b. The ESCO or Direct Customer shall promptly notify the distribution utility and the Department of any major change in credit and or rating risk.

   c. The distribution utility may require an ESCO or a Direct Customer, within five days, to provide additional amounts of security if a major change occurs to increase its credit risk, as follows:

      1. If Standard & Poors, Moody's Investor Service, or Fitch Ratings downgrades an ESCO's, or its guarantor's, rating or a Direct Customer's

debt below the minimum rating or Dun & Bradstreet downgrades an ESCO's, or its guarantor's, rating or a Direct Customer's debt; or,

2. An increase occurs in customer usage or in energy prices and such increase is sustained for at least 30 days.

d. In the event that a major change occurs to decrease a distribution utility's credit and/or rating risk, results in compliance by an ESCO or Direct Customer with creditworthiness requirements, and elimination of the basis for holding some or all of the security, the distribution utility shall return or release the excess amount of the ESCO's or Direct Customer's security with accumulated interest, if applicable. The distribution utility shall return such amount within five business days after receipt of an ESCO or Direct Customer notice informing the distribution utility of the occurrence of such major change.

E. Security Instruments

1. The following financial arrangements are acceptable methods of providing security:

a. Deposit or prepayment, which shall accumulate interest at the applicable rate per annum approved by the Public Service Commission for "Other Customer Capital";

b. Standby irrevocable letter of credit or surety bond issued by a bank, insurance company or other financial institution with at least an "A" bond rating;

c. Security interest in collateral; or,

d. Guarantee by another party or entity with a credit rating of at least "BBB" by S&P, "Baa2" by Moody's, or "BBB" by Fitch; or

e. Other means of providing or establishing adequate security.

2. A distribution utility may refuse to accept any of these methods for just cause provided that its policy is applied in a nondiscriminatory manner to any ESCO.

3. If the credit rating of a bank, insurance company, or other financial institution that issues a letter of credit or surety bond to an ESCO or Direct Customer falls below an "A" rating, the distribution utility shall allow a minimum of five business days for an ESCO or Direct Customer to obtain a substitute letter of credit or surety bond from an "A" rated bank, insurance company, or other financial institution.

F. Lockbox

If the distribution utility and ESCO arrange for a lockbox, security requirements are reduced by 50% provided that the arrangement includes the following:

1. Agreement on allocation of funds and the first right of the distribution utility, in the event of an ESCO's financial difficulty, to obtain funds in the lockbox deposited to the credit of the ESCO;

2. Establishment of rules for managing the lockbox;

3. Agreement on conditions for terminating the lockbox for non-compliance with the rules or for failure to receive customer payments on a timely basis; and,

4. Responsibility of an ESCO for any costs associated with implementing and administering the lockbox.

G. Calling on Security

1. If an ESCO or Direct Customer fails to pay the distribution utility, in accordance with UPB Section 7, Invoices, the distribution utility may draw from security provided that the distribution utility notifies the ESCO or Direct Customer five business days' in advance of the withdrawal and the ESCO or Direct Customer fails to make full payment before the expiration of the five business days.

2. If an ESCO receives a discontinuance notice or elects to discontinue service to customers and owes amounts to the distribution utility, the distribution utility may draw from the security provided by the ESCO without prior notice.

3. If an ESCO files a petition or an involuntary petition is filed against an ESCO under the laws pertaining to bankruptcy, the distribution utility may draw from security, to the extent permitted by applicable law.

H. Application by Distribution Utilities

1. Within ten business days after receipt of a complete ESCO application, a distribution utility shall complete its evaluation of initial creditworthiness, state the rationale for its determination, and provide the calculation supporting the credit limit and any resulting security requirement.

2. A distribution utility shall perform, at least annually, an evaluation, at no charge, of an ESCO's satisfaction of creditworthiness standards and security requirements.

3. A distribution utility shall perform evaluations of creditworthiness, security requirements, and security calculations in a non-discriminatory and reasonable manner.

4. Pending resolution of any dispute, the ESCO or Direct Customer shall provide requested security within the time required in this Section.

5. A distribution utility may reduce or eliminate any security requirement provided that it reduces or eliminates the requirement in a nondiscriminatory manner for any ESCO or Direct Customer.  The distribution utility may request reasonable information to evaluate credit risk.  If an ESCO or Direct Customer fails to provide the requested information, a distribution utility may deny the ESCO or Direct Customer an opportunity to provide lower or no security.

# SECTION 4:  CUSTOMER INFORMATION

A.  Applicability

This Section establishes practices for release of customer information by distribution utilities or MDSPs to ESCOs and Direct Customers and identifies the content of information sets.  The distribution utility or MDSP and an ESCO shall use EDI standards, to the extent developed, for transmittal of customer information and may transmit data, in addition to the minimum information required, via EDI or by means of an alternative system.

B.  Customer Authorization Process

The distribution utility or MDSP shall provide information about a specific customer requested by an ESCO authorized by the customer to receive the information.

1.  An ESCO shall obtain customer authorization to request information, in accordance with the procedures in UBP Section 5, Changes in Service Providers, Attachments 1, 2, and 3.  An ESCO shall inform its customers of the types of information to be obtained, to whom it will be given, how it will be used, and how long the authorizations will be valid.  The authorization is valid for no longer than six months unless the sales agreement provides for a longer time.

2.  A distribution utility and a MDSP shall assume that an ESCO obtained proper customer authorization if the ESCO is eligible to provide service and submits a valid information request.

3.  An ESCO shall retain, for a minimum of two years or for the length of the sales agreement whichever is longer, verifiable proof of authorization for each customer.  Verification records shall be provided by an ESCO, upon request of the Department, within five calendar days after a request is made.  Locations for storage of the records shall be at the discretion of the ESCOs.

4.  Upon request of a customer, a distribution utility and/or MDSP shall block access by ESCOs to information about the customer.

5.  An ESCO and its agent shall comply with statutory and regulatory requirements pertaining to applicable state and federal do-not-call registries.

C.  Customer Information Provided to ESCOs[1]

1.  Release of Information.  A distribution utility and a MDSP shall use the following practices for transferring customer information to an ESCO:

a.  A distribution utility shall provide the information in the Billing Determinant Information Set upon acceptance of an ESCO's enrollment request and the information in the Customer Contact Information Set and the Credit Information Set, upon ESCO request.

---

[1]  Upon enrollment of a customer, an ESCO shall receive usage data and any subsequent changes, corrections and adjustments to previously supplied data or estimated consumption for a period, at the same time that the distribution utility validates them for use.  An ESCO issuing consolidated bills is entitled to receive billing information, in accordance with UBP Section 9, Billing and Payment Processing.

b.  The distribution utility or MDSP shall respond within two business days to valid requests for information as established in EDI transaction standards and within five business days to requests for data and information for which an EDI transaction standard is not available.  The distribution utility or MDSP shall provide the reason for rejection of any valid information request.

2.  Customer Contact Information Set. The distribution utility or MDSP, to the extent it possesses the information, shall provide, upon an ESCO request, consumption history for an electric account and consumption history and/or[1] a gas profile for a gas account.

   a.  Consumption history[2] for an electric or gas account shall include:

      1.  Customer's service address;

      2.  Electric or gas account indicator;

      3.  Sales tax district used by the distribution utility and whether the utility identifies the customer as tax exempt;

      4.  Rate service class and subclass or rider by account and by meter, where applicable;

      5.  Electric load profile reference category or code, if not based on service class, whether the customer's account is settled with the ISO utilizing an actual 'hourly' or a 'class shape' methodology, or Installed Capacity (ICAP) tag, which indicates the customer's peak electricity demand;

      6.  Customer's number of meters and meter numbers;

      7.  Whether the customer receives any special delivery or commodity "first through the meter" incentives, or incentives from the New York Power Authority;

      8.  The customer's Standard Industrial Classification (SIC) code;

      9.  Usage type (e.g., kWh or therm), reporting period, and type of consumption (actual, estimated, or billed);

      10. Whether the customer's commodity service is currently provided by the utility;

      11. 12 months, or the life of the account, whichever is less, of customer data via EDI and, upon separate request, an additional 12 months, or the life of the account, whichever is less, of customer data via EDI or an alternative system at the discretion of the distribution utility or MDSP, and, where applicable, demand information;[3] if the customer has more than one meter associated with an account, the distribution utility or MDSP shall provide the applicable information, if available, for each meter; and

---

[1]  If a distribution utility or MDSP offer a gas profile and consumption history, an ESCO may choose either option.  A distribution utility or MDSP shall make available, upon request, class average load profiles for electric customers.

[2]  A distribution utility or MDSP, in addition to EDI transmittal, may provide Web based access to customer history information.

[3]  A distribution utility may provide data for a standard 24 months or life of the account, whichever is less, as part of its Customer Contract Information Set.

       12. Electronic interval data in summary form (billing determinants aggregated in the rating periods under a distribution utility's tariffs) via EDI, and if requested in detail, via an acceptable alternative electronic format.

  b.  A gas profile for a gas account shall include:

      1.  Customer's service address;

      2.  Gas account indicator;

      3.  Customer's number of meters and meter numbers;

      4.  Sales tax district used by the distribution utility for billing and whether the utility identifies the customer as tax exempt;;

      5.  The customer's Standard Industrial Classification (SIC) code;

      6.  Whether the customer's commodity service is currently provided by the utility;

      7.  Rate service class and subclass or rider, by account and by meter, where applicable;

      8.  Date of gas profile; and,

      9.  Weather normalization forecast of the customer's gas consumption for the most recent 12 months or life of the account, whichever is less, and the factors used to develop the forecast.

3.  Billing Determinant Information Set. Upon acceptance of an ESCO enrollment request, a distribution utility shall provide the following billing information for an electric or gas account, as applicable[1]:

  a.  Customer's service address, and billing address, if different;

  b.  Electric and/or gas account indicator;

  c.  Meter reading date or cycle and reporting period;

  d.  Billing date or cycle and billing period;

  e.  Meter number, if available;

  f.  Distribution utility rate class and subclass, by meter;

  g.  Description of usage measurement type and reporting period;

  h.  Customer's load profile group, for electric accounts only;

  i.  Life support equipment indicator;

  j.  Gas pool indicator, for gas accounts only;

  k.  Gas capacity/assignment obligation code;

  l.  Customer's location based marginal pricing zone, for electric accounts only; and,

  m.  Budget billing indicator.[2]

---

[1]  As specified in the EDI standard for an enrollment request and response, the distribution utility may transmit additional data elements, based upon the request, the responding distribution utility, and the commodity type.

[2]  This indicator is limited to 12 month levelized payment plans and does not include other payment plans.

4. Credit Information Set.  The distribution utility or MDSP shall provide credit information for the most recent 24 months or life of the account, whichever is less, upon receipt of an ESCO's electronic or written affirmation that the customer provided authorization for release of the information to the ESCO.   Credit information shall include number of times a late payment charge was assessed and incidents of service disconnection.

D.  Direct Customer Information

A Direct Customer shall receive usage data and any subsequent changes, corrections and adjustments to previously supplied data, and estimated consumption for a period, at the same time that the distribution utility validates them for use.  The distribution utility or MDSP shall make available, upon request, to an electric Direct Customer, a class load profile for its service class.

E.  Charges for Customer Information

No distribution utility or MDSP shall impose charges upon ESCOs or Direct Customers for provision of the information described in this Section.  The distribution utility may impose an incremental cost-based fee, authorized in tariffs for an ESCO's request for customer data for a period in excess of 24 months or for detailed interval data per account for any length of time.

F.  Unauthorized Information Release

An ESCO, its employees, agents, and designees, are prohibited from selling, disclosing or providing any customer information obtained from a distribution utility or MDSP, in accordance with this Section, to others, including their affiliates, unless such sale, disclosure or provision is required to facilitate or maintain service to the customer or is specifically authorized by the customer or required by legal authority. If such authorization is requested from the customer, the ESCO shall, prior to authorization, describe to the customer the information it intends to release and the recipient of the information.

# SECTION 5:  CHANGES IN SERVICE PROVIDERS

A.  Applicability

This Section establishes practices for receiving, processing, and fulfilling requests for changing a customer's electricity or natural gas provider and for obtaining a customer's authorization for the change.  A change in a provider includes transfer from: (1) one ESCO to another; (2) an ESCO to a distribution utility; and (3) a distribution utility to an ESCO.  This Section also establishes practices for:  an ESCO's drop of a customer or a customer's drop of an ESCO, retention of an ESCO after a customer's relocation within a distribution utility's service area, assignment of a customer, and initiation or discontinuance of procurement of electricity or natural gas supplies by a Direct Customer.  This Section does not establish practices for obtaining other energy-related services or changing billing options.

The process of changing a service provider is comprised of two steps.  For enrollment with an ESCO, the first step is obtaining customer agreement, and any required third-party verification, to accept electric and/or natural gas service according to the terms and conditions of an offer.  A sales agreement establishes the terms and conditions of the customer's business arrangement with the ESCO.  The second step is enrollment and the distribution utility's modification of its records to list the customer's transfer to a provider on a specific date.  The second step is primarily between the ESCO and the distribution utility.

B.  Customer Agreement

An ESCO, or its agent, may solicit and enter into a sales agreement with a customer subject to the following requirements.

1.  The ESCO shall obtain a customer agreement to initiate service and enroll a customer and customer authorization to release information to the ESCO by means of one of the following methods.

   a.  Telephone agreement and authorization, preceded, or followed within three business days, by provision of a sales agreement, in accordance with requirements in Attachment 1 – Telephonic Agreement and Authorization/Third Party Verification Requirements;

   b.  Electronic agreement and authorization, attached to an electronic version of the sales agreement, in accordance with requirements in Attachment 2 – Electronic Agreement and Authorization Requirements; or

   c.  Written agreement bearing a customer's signature on a sales agreement (original or fax copy of a signed document), in accordance with requirements in Attachment 3 – Written Agreement and Authorization Requirements.

2. For any sale resulting from either door-to-door or telephonic marketing, each enrollment is only valid with an independent third-party verification.

3. The ESCO shall provide residential customers the right to cancel a sales agreement within three business days after its receipt (cancellation period).

4. The standard Sales Agreements for each customer class shall include the following information written in plain language:

   a. Terms and conditions applicable to the business relationship between the ESCO and the customer which includes:

      1. provisions governing the process for rescinding or terminating an agreement by the ESCO or the customer including provisions stating that a residential customer may rescind the agreement within three business days after its receipt;

      2. the placeholder for the price or how the price is determined, the terms and conditions of the agreement, including the term and end date, if any, of the agreement, the amount of the termination fee and the method of calculating the termination fee, if any, the amount of late payment fees, if applicable, and the provisions, if any, for the renewal of the agreement; and,

      3. a clear description of the conditions, if any, that must be present in order for savings to be provided to the customer, if savings are guaranteed.

   b. Such contract shall also include on the first page thereof a Customer Disclosure Statement (the Statement).  The text within this Statement shall state in plain language the terms and conditions described above and set forth in Attachment 4 – Sample Customer Disclosure Statement.  When the form contract is used by the ESCO as its agreement with the customer, the Customer Disclosure Statement shall also contain the price term of the agreement.  In the event that the text in the Statement differs from or is in conflict with a term stated elsewhere in the agreement, the term described by the text in the Statement shall constitute the agreement with the customer notwithstanding a conflicting term expressed elsewhere in the agreement.

   c. Procedures for resolving disputes between the ESCO and a customer;

   d. Consumer protections provided by the ESCO to the customer;

   e. Method for applying payments and consequences of non-payment;

   f. Any charges and fees, services, options or products offered by the ESCO;

   g. Department contact information, including the Department ESCO hotline at 1-888-697-7728;

   h. ESCO contact information, including a local or toll-free number from the customer's service location, and procedures used for after-hours contacts and emergency contacts, including transfer of emergency calls directly to a distribution utility and/or an answering machine message that includes an emergency number for direct contact with the distribution utility.

   i. A statement that the ESCO shall provide at least 15 calendar days' notice prior  to any cancellation of service to a customer; and

    j.  If a condition of service, a statement that the ESCO reserves the right to assign the contract to another ESCO.

5.  Additional terms and conditions applicable to residential customers and customers solicited via door-to-door sales include:

    a.  Prepayments – no agreement for the provision of energy by an ESCO shall require a prepayment.  Where an ESCO is the billing party, it may offer a customer an option of prepayment.  Any agreement providing for prepayment  may be cancelled by the customer, without penalty within 90 calendar days  from the date of such agreement.  Any unused portion of the prepayment shall  be returned to the customer within 30 business days following cancellation of  the agreement.

    b.  Termination fees – no agreement for the provision of energy by an ESCO shall require a termination or early cancellation fee in excess of either a) $100 for any contract with a remaining term of less than 12 months; or b) $200 for any contract with a remaining term of more than 12 months or; c) twice the estimated bill for energy services for an average month, provided that an estimate of an average monthly bill was provided to the customer when the offer was made by the ESCO along with the amount of any early termination fee.  To calculate such average monthly bill, the ESCO may use an average of the customer's actual usage for the previous twelve months or if such data is unavailable at the time the offer is made apply the usage for a typical customer in that service classification as reported by the distribution utility or the Commission, and multiply it by the ESCO's estimate of the average annual rate that will be charged under the agreement.

    c.  Variable charges – all variable charges must be clearly and conspicuously identified in all contracts, sales agreements and marketing materials.

    d.  Material changes and renewals – no material changes shall be made in the terms or duration of any contract for the provision of energy by an ESCO without the express consent of the customer obtained under the methods authorized in the UBP.  This shall not restrict an ESCO from renewing a contract by clearly informing the customer in writing, not less than thirty days nor more than sixty days prior to the renewal date, of the renewal terms and the customer's option to reject the renewal terms.  A customer shall not be charged a termination fee as set forth in Section 5.B.3.1.a herein, if the customer objects to such renewal within three business days of receipt of the first billing statement under the agreement as renewed.  Regarding contract renewals or an initial sales agreement  that specifies that the agreement automatically renews on a monthly, all  changes to the terms of the contract, including changes to the commodity rate, product or service type,  will be considered material and will require that the ESCO obtain the  customer's express consent for renewal.

    e.  A renewal notice in the standardized format provided by the Department, must be used.

    f.  The renewal notice must be enclosed in an envelope which states in bold lettering:  "IMPORTANT: YOUR [ESCO NAME] CONTRACT RENEWAL OFFER IS ENCLOSED. THIS MAY AFFECT THE PRICE YOU PAY FOR ENERGY SUPPLY."

    g.  When a fixed-rate agreement is renewed as a fixed-rate agreement, the  ESCO shall provide the customer with an additional notice before the issuance  of the first billing statement under the terms of the contract as renewed, but  not more than 10 days prior to the date of the issuance of that bill.  This notice shall inform the customer of the new rate and of his or her opportunity to object to the renewal, without the imposition of any early termination fees, within three days of receiving the first billing statement under the terms of the contract as renewed.

C.  Provision of List of ESCOs to Customers

Distribution utilities shall offer to provide a customer who requests initiation of delivery service with an up-to-date list of ESCOs and provide the list at any time, upon request of any customer.

D.  Customer Enrollment Procedures

1.  An ESCO shall transmit:

    a.  An electric enrollment request to a distribution utility no later than 5 business days prior to the effective date of the enrollment.

    b.  A gas enrollment request to a distribution utility no later than 10 business days prior to the effective date of the enrollment.

    c.  The enrollment request shall contain at a minimum, the information required for processing set forth in Attachment 5, Enrollment Request.

2.  The distribution utility shall process enrollment requests in the order received.

3.  The distribution utility shall accept only one valid enrollment request[1] for each commodity per customer during a switching cycle.  If the distribution utility receives multiple enrollment requests for the same customer during a switching cycle, it shall accept the first valid enrollment request and reject subsequent requests.

4.  An ESCO shall submit an enrollment request after it obtains customer authorization, and third-party verification where required, and it has provided the sales agreement to the customer.  For telephonic enrollments, in which the ESCO sends the customer the sales agreement via US Mail, the ESCO shall provide for two business days for the customer to receive the sales agreement.

5.  After receipt of an enrollment request, the distribution utility shall, within one business day, acknowledge its receipt, and provide a response indicating rejection and the reason, or acceptance and the effective date for the change of provider.

---

[1]  Criteria for determining the validity of an EDI transaction are described in the EDI processing protocols adopted in Case 98-M-0667, Electronic Data Interchange.

6. Upon acceptance of an enrollment request, the distribution utility shall contemporaneously send a notice to the incumbent ESCO that the customer's service with that ESCO will be terminated on the effective date of the new enrollment. In the event that the distribution utility receives notice from the pending ESCO, the incumbent ESCO (with specific customer authorization for each cancellation), or the customer, prior to the effective date that a pending enrollment is cancelled, the distribution utility shall transmit a request to reinstate service to the incumbent ESCO, unless the incumbent ESCO previously terminated service to the customer or the customer requests a return to full utility service.

7. With the exception of a new installation use of an interim estimate of consumption or a special meter reading,[1] a change of providers is effective: for an electric customer, on the next regularly scheduled meter reading date; and, for a gas customer, on the next regularly scheduled meter reading date or the first day of the month, in accordance with provisions set forth in the distribution utility's tariff.[2] The distribution utility shall set the effective date, which shall be no sooner than 5 business days after receipt of an enrollment request. Service to new delivery customers is effective after the installation is complete and, if necessary, inspected.

8. An off-cycle change of an electric service provider is allowed no later than 15 calendar days before the date requested for the change if a new ESCO or a customer arranges for a special meter reading or agrees to accept an interim date for estimating consumption. The ESCO or customer is required to pay the cost for any special meter reading, in accordance with provisions set forth in the distribution utility's tariff. A change based upon an interim estimate of consumption or a special meter reading is effective on the date of the interim estimate or special meter reading. Off-cycle changes of gas service providers are allowed if the incumbent and new ESCO agree on an effective date no later than 15 calendar days following the request.

E. Customer Notification

1. The distribution utility shall send no later than one calendar day after acceptance of an enrollment request a verification letter to the customer notifying the customer of the acceptance. The notice shall inform the customer that if the enrollment is unauthorized or the customer decides to cancel it, the customer is required immediately to so notify the distribution utility and the pending ESCO.

2. Upon receipt of such cancellation, the distribution utility shall cancel the pending enrollment and reinstate the customer with the incumbent ESCO, if any, or the distribution utility, provided that the distribution utility is notified prior to the planned effective date. If the distribution utility is notified on or after the planned effective date, the change to the new provider shall occur and remain effective for

---

[1] If meters are read bimonthly and bills are issued monthly using estimated usage, the effective date for the interim months is the date usage is estimated for billing purposes.

[2] If meters are not read within two business days of the scheduled meter reading day, the distribution utility or MDSP shall estimate usage as of the scheduled meter reading day. The effective date for a change of provider is that date, except where changes of natural gas suppliers are scheduled for the first of the month.

one billing cycle.  The customer shall return to full utility service at the end of the next switching cycle, unless the customer is enrolled by another ESCO in accordance with this section prior to the next switching cycle.

3.  If a customer notifies the pending ESCO of such cancellation, the pending ESCO shall send a customer's drop request to the distribution utility within one business day.

F.  Rejection of Enrollment Requests

The distribution utility may reject an enrollment request for any of the following reasons:

1.  Inability to validate the transaction;

2.  Missing or inaccurate data in the enrollment request;

3.  ESCO's ineligibility to provide service in the specified territory;

4.  No active or pending delivery service;

5.  A pending valid prior enrollment request; or

6.  The account is coded as ineligible for switching.

G.  Customer Relocations Within a Service Territory

1.  A customer requesting relocation of service within a distribution utility's service territory and continuation of its ESCO service, arranges for continuation at the new location of delivery service by contacting the distribution utility and of commodity service by contacting the ESCO.[1]  Each provider contacted by the customer shall remind the customer of the need to contact the other provider to initiate the change in service or arrange for a conference call with the other provider and customer, and within two days, notify the other provider that a customer requested relocation of service.

2.  The distribution utility's representative shall inform the customer, or the customer's agent, and the ESCO of the effective dates, contingent upon the customer's approval, for discontinuance of service at one location and commencement of service at the new location.  The ESCO shall confirm to the distribution utility that it shall continue service to the customer at the new location.

3.  In the event that the ESCO is unable or does not wish to continue service to the customer at the new location, the distribution utility shall provide full utility service to the customer.

H.  Customers Returning to Full Utility Service

1.  A customer arranges for a return to full utility service by contacting either the ESCO or the distribution utility in accordance with this paragraph.  An ESCO contacted by the customer shall, within one business day, process the customer's request to return to full utility service. A utility contacted by a customer shall remind the customer to contact the ESCO about the customer's returning to full

---

[1]   In the Single Retailer Model, the customer contacts only its ESCO.  The ESCO notifies the distribution utility of the customer's new service location and mailing address, if applicable.  Direct customers contact only the distribution utility.

utility service provided, however, that if the customer has already contacted the ESCO or wants to proceed without contacting the ESCO, the utility shall, within one business day, process the customer's request to return to full utility service. If a change to full utility service results in restrictions on the customer's right to choose another supplier or application of a rate that is different than the one applicable to other full-service customers, the distribution utility shall provide advance notice to the customer.

2. A Direct Customer that intends to change from procuring its own supplies to full utility service shall notify the distribution utility.

3. No ESCO shall transfer 5,000 or more customers during a billing cycle to full utility service, unless it provides no less than 60 calendar days' notice to the distribution utility and Department.  The transfers shall occur on the customers' regularly scheduled meter reading dates, unless the distribution utility and ESCO agree to a different schedule.

4. The following process sets forth the steps for an ESCO's return of a customer to full utility service.

   a. An ESCO may discontinue service to a customer and return the customer to full utility service provided that the ESCO notifies the customer and the distribution utility no later than 15 calendar days before the effective date of the drop.  The ESCO's right to discontinue service to any customer is subject to any limitations contained in its sales agreement.

   b. An ESCO's notice to retail customers shall provide the following information:

      1. Effective date of the discontinuance, established by the distribution utility, unless the ESCO arranged for an off-cycle date;

      2. Statement that the customer has the option to select another ESCO receive full utility service from the distribution utility, or, if available in the distribution utility's service area and the customer is eligible, accept random assignment by the distribution utility to an ESCO; and,

      3. Statement that customer shall receive full utility service until the customer selects a new ESCO and the change in providers is effective, unless the distribution utility notified the customer that it will terminate its delivery service on or before the discontinuance date.

   c. The ESCO shall provide a sample form of the notice it plans to send to its customers when it transfers 5,000 or more customers to the Department for review no later than five calendar days before mailing the notice to customers.

I. New Delivery Customers

1. A customer may initiate distribution utility delivery service and subsequently enter into a customer agreement with an ESCO for commodity supply or arrange for both services at the same time.

2. A customer may authorize an ESCO to act as the customer's agent (ESCO agent) in establishing distribution utility service. The ESCO agent shall retain, and produce upon request, documentation that the customer authorized the ESCO to act as the customer's agent.

3. An ESCO acting as a customer's agent shall establish a new delivery account on behalf of the customer and enroll the customer with the distribution utility so that

ESCO commodity service commences when distribution utility delivery service begins.  The ESCO shall retain, and produce upon request, documentation that the customer authorized the ESCO to act as the customer's agent.  An ESCO that is a customer's agent is authorized to submit the customer's application for new delivery service, in compliance with requirements for such applications stated in the law, rules and distribution utility tariffs.  An ESCO shall provide the customer's name, service address and, if different, mailing address, telephone number, customer's requested service date for initiation of delivery service, and information about any special need customers, including any need for life support equipment.  An ESCO shall refer a customer directly to a distribution utility for arrangement of distribution related matters, such as contribution-in-aid of construction and construction of facilities necessary to provide delivery service and settling of arrears and posting security.

4. Upon a customer's application for service, the distribution utility shall provide an ESCO with the effective date for initiation of delivery service and any other customer information provided to an ESCO in an acceptance of an enrollment request.  The distribution utility may notify the customer of the acceptance.

J.  Multiple Assignments of Sales Agreements

1. An ESCO may assign all or a portion of its sales agreements to other ESCOs provided that the assigned sales agreements clearly authorize such assignments or the ESCO provides notice to its customers prior to the assignments and an opportunity for each customer to choose another ESCO or return to full utility service. An ESCO shall provide a written notice no later than 30 calendar days prior to the assignment or transfer date to each customer and distribution utility. The notice to the distribution utility shall include a copy of the assignment document, with financial information redacted, executed by the officers of the involved ESCOs, and a copy of the notice sent to the customer, or, if a form notice, a copy of the form and a list of recipients.

2. The assignment documents shall specify the party responsible for payment or reimbursement of any and all sums owed under any distribution utility tariff or Federal Energy Regulatory Commission tariff and any service agreements relating thereto, and under any agreements between ESCOs and distribution utilities and between ESCOs and their customers.

3. An ESCO's notices to customers shall provide the following information:

   a. Effective date of the assignment;

   b. The name, mailing and e-mail addresses, and telephone number of the assigned ESCO; and,

   c. Any changes in the prices, terms and conditions of service, to the extent permitted by the sales agreement.

4. The ESCO shall provide sample forms and any major modifications of such notices to the Department for review no later than five calendar days before mailing them to customers.

5. The distribution utility shall, within two business days after receipt of an assignment request, acknowledge and initiate processing of the request and send written notice of the request to the ESCO's assigned customer.

K. Unauthorized Customer Transfers

1. A change of a customer to another energy provider without the customer's authorization, commonly known as slamming, is not permitted.  The distribution utility shall report slamming allegations to the Department on at least a monthly basis.

2. An ESCO that engages in slamming shall refund to a customer the difference between charges imposed by the slamming ESCO that exceed the amount the customer would have paid its incumbent provider and pay any reasonable costs incurred by the distribution utility to change the customer's provider from the ESCO that engaged in slamming to another provider.

3. ESCOs shall retain two years or for the length of the sales agreement  whichever is longer, documentation of a customer's authorization to change  providers.  Such documentation shall comply with the requirements described in Attachments 1, 2 or 3.

L. Lists of ESCO Customers, Budget Billing, Charges and Fees

1. A distribution utility, upon an ESCO's request, shall provide at no charge, once each calendar quarter, a list of the ESCO's customers at the time of the request and, monthly, the number of accounts enrolled with an ESCO and the ESCO's sales (kWh and/or dekatherms).  ESCOs may obtain such customer lists at other times for cost-based fees set forth in distribution utility tariffs.

2. A distribution utility shall adjust its bills rendered under a budget billing plan on the effective date for changing a provider and include the adjustments in the customer's next bill.

3. Upon enrollment of a distribution utility customer with an ESCO or return of an ESCO customer to full utility service, a distribution utility shall impose no restrictions on the number or frequency of changes of gas or electricity providers, except as provided in this paragraph.  The distribution utility shall accept only one valid enrollment request for each commodity per customer during a switching cycle.  If multiple requests are received for the same customer during a switching cycle, the distribution utility shall accept the first valid enrollment request and reject subsequent enrollment requests.

4. A distribution utility shall impose no charge for changing a customer's gas or electricity provider.

5. A distribution utility may establish a fee in its tariffs for a special meter reading.

**Attachment 1**

**Telephonic Agreement and Authorization/Third Party Verification Requirements**

A.  A voice-recorded verification is required to enter into a telephonic agreement or a door to door agreement, with a customer to initiate service and begin enrollment. Use of either an Independent Third Party or an Integrated Voice Response system to obtain customer authorization is required for any telephone solicitation or sales resulting from door-to-door marketing.  Verification by an Independent Third Party or an Integrated Voice Response system shall be recorded and conducted without the ESCO marketing representative's presence, either on the telephone or in person. A voice-recorded verification shall verify the following information to substantiate the customer's agreement or authorization:

1.  Do you understand that this conversation is recorded and that oral acceptance of the [ESCO name]'s offer is an agreement to initiate service and begin enrollment?

2.  Is it [specific date] at [specific time]?

3.  Do you understand that the marketing representative represents [specific ESCO] and that [specific ESCO] is not the distribution utility?

4.  If the sale was conducted through door-to-door marketing, has the marketer left the premises?

5.  Are you [specify customer's name]/Please state your name (or is your company name [specify company name]/Please state your company's name)?

6.  Do you live at [specific address]/Please state your address (or is your company located at [specific company address]/Please state your company's address)?

7.  Is your email address [specific e-mail address] /Please provide your email address (if the customer chose to provide it)?

8.  Is your distribution utility account number [specify account number]/ Please state your distribution utility account number?

9.  Are you the primary account holder or do you have authority to make changes to this account?

10. If the sale was conducted through door-to-door marketing: did the ESCO marketing representative provide you with the sales agreement, his/her business card or contact information and leave a copy of the ESCO Consumer Bill of Rights?

11. If the sale was conducted through telemarketing: did the ESCO marketing representative offer to mail you a copy of the ESCO Consumer Bill of Rights or did the ESCO marketing representative tell you how to find the ESCO Consumer Bill of Rights online?

    12. Did you agree to the terms of service as reviewed with you by the [ESCO name]  representative on [INSERT ENROLLMENT DATE]?

      a.  The price of____(electricity and/or natural gas) under the contract is ___for___months (years).

      b.  Or the price of____(electricity and/or natural gas) under the contract is a variable rate and will vary month-to-month.

      c.  The early termination fee (if any) is___(this may be a methodology instead of a dollar amount).

    13. If savings is guaranteed (compared to the utility rate), a plain description of the type of savings and the conditions that must be present in order for the customer to be eligible for savings. If savings is not guaranteed (as compared to the utility supply service) a statement indicating such;

    14. Please be advised that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by your utility and the utility will also be available to respond to leaks or other emergencies should they occur;

    15. Do you authorize the release of the following information from your distribution utility: [specify information] and do you understand that you may rescind this authorization at any time by calling [specify toll free number] or e-mailing [specify e-mail address]?

    16. For residential enrollments only:  Do you understand that you may rescind the agreement within three business days after its receipt by [describe how such rescission can be accomplished] and if you do not rescind the agreement, an enforceable agreement will be created?

B.  The ESCO, or its agent, shall provide a copy of any Customer Disclosure Statement and sales agreement to the customer by mail, e-mail or fax within three business days after the telephone agreement and independent third-party verification occurs.  The sales agreement shall set forth the customer's rights and responsibilities and describe the offer in detail, including the specific prices, terms, and conditions of ESCO service.  Such agreement shall be substantially the same, in form and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b.

C.  The independent third-party verification shall be conducted in the same language used in marketing or sales materials presented to the customer and communicated clearly and in plain language.

D.  An ESCO shall retain independent third-party verification records for two years from the effective date of the agreement and/or authorization or for the length of the sales agreement whichever is longer.  In the event of any dispute involving agreement. authorization and/or the independent third-party verification, the ESCO shall make available the audio recording of the customer's agreement and/or authorization, including the

independent third-party verification within five business days after a  request from the Department.

**Attachment 2**

**Electronic Agreement and Authorization Requirements**

A. To enter into an electronic agreement with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information, an ESCO, or its agent, shall electronically record communications with the potential customer. As required in Section 5, the Electronic Agreement and authorization may also require an independent third-party verification call, which must include the information in Attachment 1.  An ESCO shall provide the following electronic information, as applicable, to substantiate the customer's agreement and/or authorization:

1. A statement that electronic acceptance of a sales agreement is an agreement to initiate service and begin enrollment;

2. The Customer Disclosure Statement and the sales agreement containing the prices, terms and conditions applicable to the customer, which, if printed as a physical document, would be substantially the same, in form, and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b.

3. If savings are guaranteed, or guaranteed under only certain circumstances, the ESCO must provide a written statement which includes a plain language description of the conditions that must be present in order for the savings to be provided;

4. An identification number and date to allow the customer to verify the specific sales agreement to which the customer assents;

5. A statement from the ESCO that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by the customer's utility; and that said utility will also be available to respond to leaks or other emergencies should they occur;

6. A requirement that the customer accept or not accept the sales agreement by clicking the appropriate box, displayed as part of the terms and conditions; after the customer clicks the appropriate box to accept the sales agreement, the system shall display a conspicuous notice that the ESCO accepts the customer;

7. Use of an electronic process that prompts a customer to print or save the sales agreement and provides an option for the customer to request a hard copy of the sales agreement; an ESCO shall send the hard copy by mail within three business days after a customer's request;

8. A description of the types of information that the ESCO needs to obtain from a distribution utility or MDSP and the purposes of its use, a request that the customer provide authorization for release of this information, and the effective duration of the authorization;

9. A requirement that the customer agree or not agree to provide such authorization by clicking the appropriate box, displayed as part of the terms and conditions;

10. A statement that a residential customer may rescind the agreement and authorization within three business days after electronic acceptance of the sale agreement; a statement that a customer may rescind the authorization for release of information at any time; provision of a local or toll-free telephone number, and/or an e-mail address for these purposes; upon cancellation of the agreement, the ESCO shall provide a cancellation number;

11. Verification of the date and time of the electronic agreement and authorization; and

12. Provision by the customer of the customer's name, address, distribution utility customer account number, and any additional information to verify the customer's identify.

B. The ESCO shall, within three business days of any final agreement to initiate service to a customer, send an electronic confirmation notice to the customer at the customer's e-mail address.

C. The ESCO shall use an encryption standard that ensures the privacy of electronically transferred customer information, including information relating to enrollment, renewal, re-negotiation, and cancellation.

D. Upon request of a customer, the ESCO shall make available additional copies of the sales agreement throughout its duration.  An ESCO shall provide a toll-free telephone number and e-mail address for a customer to request a copy of the sales agreement.

E. An ESCO shall retain documentation of a customer's agreement in a retrievable format for two years from the effective date of the customer's acceptance and/or authorization or for the length of the sales agreement whichever is longer.  In the event of any dispute involving an electronic agreement or authorization, the ESCO shall provide a copy of the customer's acceptance of the sales agreement and/or authorization for release of information or provide on-line access to the acceptance and/or authorization within five calendar days after a request from the Department.

Attachment 3

### Written Agreement and Authorization Requirements

A.  An ESCO may enter into a written agreement (original or fax copy of a signed document) with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information.  As required in Section 5, the Electronic Agreement and authorization may also require an independent third-party verification call, which must include the information in Attachment 1.  A sales agreement shall contain, in addition to the Customer Disclosure Statement discussed in UBP Section 2.B.1.b.2, the following information, as applicable:

1.  A statement that a signature on a sales agreement is an agreement to initiate service and begin enrollment;

2.  A description of the specific prices, terms, and conditions of ESCO service applicable to the customer, which is substantially the same, in form and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b and, if savings are guaranteed, or guaranteed under only certain circumstances, the ESCO must provide a plain language description of the conditions that must be present in order for the savings to be provided;

3.  A description of the types of information that the ESCO needs to obtain from a distribution utility or MDSP, the purposes of its use, and effective duration of the authorization;

4.  A statement that acceptance of the agreement is an authorization for release of such information;

5.  A customer signature and date; the sales agreement shall be physically separate from any check, prize or other document that confers any benefit on the customer as a result of the customer's selection of the ESCO;

6.  A statement that a residential customer may rescind the agreement within three business days after signing the sales agreement; a statement that a customer may rescind the authorization for release of information at any time; provision of a local, toll-free telephone number, and/or e-mail address for these purposes; the customer may fax a copy of a signed sales agreement to the ESCO; upon cancellation of the agreement, the ESCO shall provide a cancellation number; and

7.  The customer's name, mail and any e-mail address (if the customer chooses to provide it), distribution utility account number, and any additional information to verify the customer's identify.

8.  A statement from the ESCO that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by the customer's utility; and that said utility will also be available to respond to leaks or other emergencies should they occur;

B.  ESCOs shall retain written agreements and/or authorizations for two years from the effective date of the agreement and/or authorization or for the length of the agreement whichever is longer.  In the event of any dispute involving a sales agreement or authorization, the ESCO shall provide a copy of the sales agreement and/or authorization within five business days after a request from the Department.

SECTION 5

**Attachment 4**

### Sample Customer Disclosure Statement

| | |
|---|---|
| Price | |
| Fixed or Variable and, if variable, how the price is determined | |
| Length of the agreement and end date | |
| Process customer may use to rescind the agreement without penalty | |
| Amount of Early Termination Fee and method of calculation | |
| Amount of Late Payment Fee and method of calculation | |
| Provisions for renewal of the agreement | |
| Conditions under which savings to the customer are guaranteed | |

**Attachment 5**

**Enrollment and Drop Requests Information Requirements**

A.  An ESCO shall provide the following information for enrollment requests, and an ESCO or distribution utility shall provide the following information for drop requests:

1.  Utility ID (DUNS# or tax ID);

2.  ESCO ID (DUNS# or tax ID);

3.  Commodity requested (electric or gas); and,

4.  Customer's utility account number (including check digit, if applicable).

B.  The following information is required for enrollment requests:

1.  Customer's bill option;

2.  For distribution utility rate ready consolidated billing:

   a.  an ESCO's fixed charge, commodity price, sales and use tax rate or rate code;

   b.  ESCO customer account number;

   c.  budget billing status indicator; and,

   d.  tax exemption percent and portion taxed as residential.

3.  For Single Retailer Model:  special needs indicator;

4.  For gas service:  gas capacity assignment/obligation indicator, and, if applicable, gas pool ID, gas supply service options, and human needs indicator;

5.  For electric service:  indicator for a partial requirements customer, if applicable.

C.  The following information is required for drop requests:

1.  Reason for the drop;

2.  For distribution utility request, service end date;

3.  For ESCO initiated request, effective date of customer move, if applicable; and

4.  For ESCO initiated request in Single Retailer Model, customer's service and mailing address.

# SECTION 6:  CUSTOMER INQUIRIES

A.  Applicability

This Section establishes requirements for responses by an ESCO or distribution utility to retail access customer inquiries.  An ESCO or distribution utility shall respond to customer inquiries sent by means of electronic mail, telecommunication services, mail, or in meetings.  The subjects raised in inquiries may result in the filing of complaints.

B.  General

1.  Distribution utilities and ESCOs shall provide consistent and fair treatment to customers.

2.  Distribution utilities and ESCOs shall maintain processes and procedures to resolve customer inquiries without undue discrimination and in an efficient manner and provide an acknowledgement or response to a customer inquiry within 2 days and, if only an acknowledgement is provided, a response within 14 days.

3.  Distribution utilities and ESCOs shall provide local or toll-free telephone access from the customer's service area to customer service representatives (CSRs) responsible for responding to customer inquiries and complaints.

4.  CSRs shall obtain information from the customer to access and verify the account or premises information.  Once verification is made, the CSR shall determine the nature of the inquiry, and, based on this determination, decide whether the distribution utility or the ESCO is responsible for assisting the customer.

5.  The CSR shall follow normal procedures for responding to inquiries.  If the inquiry is specific to another provider's service, the CSR shall take one of the following actions:

   a.  Forward/transfer the inquiry to the responsible party;

   b.  Direct the customer to contact the responsible party; or,

   c.  Contact the responsible party to resolve the matter and provide a response to the customer.

6.  Each distribution utility and ESCO shall maintain a customer service group to coordinate and communicate information regarding customer inquiries and designate a representative to provide information relating to customer inquiries to the Department.

7.  ESCOs may provide a teletypewriter (TTY) system or access to TTY number, consistent with distribution utility tariffs.

C.  Specific Requests for Information

1.  A distribution utility or ESCO shall respond directly to customer inquiries for any information that is related to commodity supply and/or delivery service, to the extent it has the necessary information to respond.

2.  The entity responsible for the accuracy of meter readings shall respond to customer inquiries related to usage.

3. The distribution utility and ESCO shall respond to customer inquiries about billing and payment processing, in accordance with UBP Section 9, Billing and Payment Processing.

D. Emergency Contacts

1. An emergency call means any communication from a customer concerning an emergency situation relating to the distribution system, including, but not limited to, reports of gas odor, natural disaster, downed wires, electrical contact, or fire.

2. The ESCO CSR shall transfer emergency telephone calls directly to the distribution utility or provide the distribution utility's emergency number for direct contact to the distribution utility.  If no ESCO CSR is available, the ESCO shall provide for after-hours emergency contacts, including transfer of emergency calls directly to a distribution utility or an answering machine message that includes an emergency number for direct contact to the distribution utility.

3. Each ESCO shall provide periodic notices or bill messages to its customers directing them to contact the distribution utility in emergency situations and providing the emergency number.

# SECTION 7:  DISTRIBUTION UTILITY INVOICES

A.  Applicability

This Section establishes procedures for invoices of charges for services provided by the distribution utility directly to an ESCO or Direct Customer.  A distribution utility and ESCO or Direct Customer may agree to establish other arrangements and procedures for presentation and collection of invoices for services rendered.

B.  Invoices

1.  An ESCO or Direct Customer shall pay the full amount due, without deduction, set-off or counterclaim, within 20 calendar days after the date of electronic transmittal or postmarked date (due date).  Subsequent to the due date, charges are overdue and subject to late payment charges at the rate of 1.5% per month.  The overdue charges include the amount overdue, any other arrears, and unpaid late payment charges.  The distribution utility may provide, upon request, supporting or back-up data in electronic form, if available on its computer system.

2.  A distribution utility shall provide interest at the rate of 1.5% on an overpayment caused by the distribution utility's erroneous billing, provided that it may, without applying interest, credit all or a portion of the overpayment to the next bill issued within 30 days and/or refund all or a portion of the overpayment, upon request, within 30 days after its receipt.  The distribution utility shall refund any credit balances, upon request.

3.  An ESCO or Direct Customer shall make payments by means of an electronic funds transfer. A distribution utility shall use any partial payments first to pay any arrears and second to pay current charges.

C.  Billing Inquiries and Disputes

1.  An ESCO or Direct Customer shall make any claims relating to inaccuracies of invoices in writing no later than 90 calendar days after the date of electronic transmittal or postmarked date.  ESCOs and/or Direct Customers are responsible for payment of disputed charges during any pending dispute.

2.  A distribution utility shall designate an employee and provide a telephone number and e-mail address for receipt of inquiries from an ESCO or Direct Customer relating to invoices.  The employee shall direct an ESCO or Direct Customer that presents an inquiry or complaint to the responsible and knowledgeable person able to explain charges on an invoice.

3.  A distribution utility shall acknowledge in writing receipt of an inquiry within five calendar days after its receipt.  A distribution utility shall investigate and respond in writing to the inquiry within 20 calendar days after its receipt.

4.  A distribution utility shall refund any overpayments, including interest, within five calendar days after it makes a determination that an ESCO or Direct Customer made an overpayment.  It may provide the refund by applying a credit to any overdue amounts or making direct payment of any remainder.  The distribution utility shall provide refunds by means of an electronic funds transfer.  Interest is calculated at the rate of 1.5 % per month from the date of the overpayment to the refund.

5.  No interest is required on overpayments voluntarily made by an ESCO or Direct Customer to an account, unless an overpayment is applied to security.

# SECTION 8:  DISPUTES INVOLVING DISTRIBUTION UTILITIES, ESCOs OR DIRECT CUSTOMERS

A.  Applicability

This Section describes the dispute resolution processes available at the Department to resolve disputes relating to competitive energy markets involving utilities, ESCOs and/or Direct Customers, including disputes alleging anti-competitive practices.  The processes are not available to resolve disputes between retail customers and ESCOs or distribution utilities.  They are also not applicable to matters that, in the opinion of the Department Staff, should be submitted by formal petition to the Public Service Commission for its determination or are pending before a court, state or federal agency.  The availability of the processes does not limit the rights of a distribution utility, ESCO or Direct Customer to submit any dispute to another body for resolution.

B.  Dispute Resolution Processes

The parties shall in good faith use reasonable efforts to resolve any dispute before invoking any of these processes.  Distribution utility tariffs and operating and service agreements between the parties shall identify the processes used to resolve disputes and shall refer to the dispute resolution processes described in this Section as acceptable processes to resolve disputes.

1.  Standard Process

The parties shall use a method to send documents described in this paragraph that will verify the date of receipt.

Any distribution utility, ESCO or Direct Customer may initiate a formal dispute resolution process by providing written notice to the opposing party and Department Staff.  Such notice shall include a statement that the UBP dispute resolution process is initiated, a description of the dispute, and a proposed resolution with supporting rationale.  Department Staff may participate in the process at this or any later point to facilitate the parties' discussions and to assist the parties in reaching a mutually acceptable resolution.

a.  No later than ten calendar days following receipt of the dispute description, if no mutually acceptable resolution is reached, the opposing party shall provide a written response containing an alternative proposal for resolution with supporting rationale and send a copy to Department Staff.

b.  No later than ten days after receipt of the response, if no mutually acceptable resolution is reached, any party or Department Staff may request that the parties schedule a meeting for further discussions.  The parties shall meet no later than 15 calendar days following such request, upon advance notice to Department Staff, unless the parties and Department Staff agree upon another date.  The Department may assign one or more Staff members to assist the parties in resolving the dispute.

c.  If no mutually acceptable resolution is reached within 40 calendar days after receipt of the written description of the dispute, any party may request an initial decision from the Department.  A party to the dispute may appeal the initial decision to the Public Service Commission.

    d.  If the parties reach a mutually acceptable resolution of the dispute, they shall provide to Department Staff a description of the general terms of the resolution.

2.  Expedited Process

In the event that an emergency situation arises to justify immediate resolution of a dispute, any party may file a formal dispute resolution request with the Secretary to the Public Service Commission asking for expedited resolution.  An emergency situation includes, but is not limited to, a threat to public safety or system reliability or a significant financial risk to the parties or the public.  The filing party shall provide a copy of the request to other involved parties and the Department Staff designated to receive information related to dispute resolution under this Section.  The request shall describe in detail the emergency situation requiring expedited resolution, state in detail the facts of the dispute, and, to the extent known, set forth the positions of the parties.

# SECTION 9:  BILLING AND PAYMENT PROCESSING

A. Applicability

This Section establishes requirements[1] for billing and payment processing options offered by a distribution utility and ESCO in a multi-retailer model.  This Section does not establish requirements for billing and payment processing in the single retailer model.  A distribution utility and ESCO shall comply with the requirements established in this Section, unless they agree upon modifications or other procedures for billing and payment processing in a Billing Services Agreement.

B. Billing and Payment Processing Options:  General Requirements

1. A distribution utility shall offer to ESCOs without undue discrimination the billing and payment processing options available in its service territory.

2. A customer participating in a retail access program shall select from the billing and payment processing options offered by ESCOs.

3. A distribution utility shall allow its customers to select, through their ESCOs, one of the billing and payment options available in the distribution utility's service territory.  An ESCO may offer to its customers billing and payment processing options available in the customer's service territory and shall maintain or provide for the capability of issuing a separate bill for its services under the dual billing option.  An ESCO customer may direct the billing party to send its consolidated bills or dual bills to a third party for processing and payment.

4. A distribution utility or ESCO may perform the responsibilities of a billing party for a customer and the other provider (non-billing party) based upon the billing and payment processing options available to the customer and the customer's choice.

5. A distribution utility or MDSP shall make validated usage information available to the billing and non-billing parties at the time that the distribution utility or MDSP determines that the information is acceptable.[2]

6. Information on customer usage, billing, and credit is confidential. A distribution utility or MDSP may release such information, upon a customer's authorization, in accordance with the UBP Section 5, Changes in Service Providers.

7. A distribution utility and ESCO shall demonstrate the technical capability to exchange information electronically for their billing and payment processing options.

8. An ESCO shall provide 60 calendar days' notice by mail, e-mail or fax to a distribution utility of any plan to offer a billing option that is not currently offered to its customers.  The distribution utility may agree to a shorter notice period preceding initiation of the option.  The 60 calendar-day notice shall not impose any obligation on any party to proceed without a successful test of data exchange capability and the fulfillment of other obligations described in this Section.  If an ESCO later changes its system, it shall provide adequate advance notice and conduct any additional testing required.

---

[1] The requirements are applicable when EDI is available upon issuance by the Commission of data standards applicable to a bill model and operational upon successful completion of the testing required for a bill model.

[2] A distribution utility or MDSP shall provide electronic interval data in summary form (billing determinants aggregated in the rating periods under a distribution utility's tariffs) via EDI and, if requested, in detail via an acceptable alternative electronic format if retrieved from meters.

9. A distribution utility and an ESCO are responsible for separately remitting their tax payments to the appropriate taxing authorities.

10. Where the ESCO is the billing party, it may offer a customer an option of prepayment. Where a distribution utility is the consolidated billing party, the distribution utility is not required to support processing of prepayments or application of customer prepayments to ESCO charges.

C. Consolidated Billing: General Requirements

1. A distribution utility and ESCO shall establish in a billing services agreement (BSA) detailed expectations for their responsibilities, including consequences for any failure to carry out such responsibilities.

2. A distribution utility may use the bill ready or rate ready method[1] for issuing consolidated bills. An ESCO that offers consolidated billing shall use a bill ready method.

3. A customer receiving delivery service from a distribution utility that is a combination natural gas and electric corporation (combination retail access customer) may receive a consolidated bill for both energy services if:

   a. The distribution utility issues the consolidated bill;

   b. One ESCO supplies the customer with both natural gas and electricity;

   c. An ESCO supplying only one of the commodities agrees to bill for charges for the service provided by the other ESCO; or,

   d. Separate distribution utility accounts are established for each service.

4. A combination retail access customer may receive separate consolidated bills for each commodity or a dual bill for one commodity and a consolidated bill for the other provided that the distribution utility's system is capable of providing separate accounts for each commodity. A distribution utility shall establish bill cycles and payment due dates. A distribution utility may charge a fee, as set forth in its tariff, to an ESCO to establish, upon the ESCO's request, a separate account for one of the commodities the distribution utility provides.

D. Consolidated Billing: Functions and Responsibilities

1. A billing party shall perform the following functions and responsibilities:

   a. If the bill ready method is used, receive bill charges and other billing information from the non-billing party;

   b. If the rate ready method is used, receive rates, rate codes and/or prices (fixed and/or variable) and other billing information from the non-billing party;

   c. Receive bill messages and bill inserts from the non-billing party;

   d. If the bill ready method is used, acknowledge receipt of the non-billing party's information and accept or reject it;

   e. If the rate ready method is used,[1] calculate billed charges, including sales and use taxes; the non-billing party is required to provide the customer's sales and use tax rate to the billing party;

   f. Print or make available electronically consolidated bills that state the non-billing party's charges, including taxes, arrearages, late fees, and bill messages;

---

[1] A distribution utility electing the rate ready method for utility consolidated billing is not obligated to calculate or bill separately for other goods and services that an ESCO may provide.

   g.  Insert in bill envelopes consolidated bills and inserts required by statute, regulation or Public Service Commission order;

   h.  Stamp, sort and mail consolidated bills or, if authorized, transmit bills electronically;

   i.  Cancel and rebill charges;

   j.  Notify the non-billing party of amounts billed, by account, within two business days after rendering bills to customers;

   k.  Receive and record customer payments;

   l.  Allocate and transmit the non-billing party's share of receipts, by account, to the non-billing party;

   m.  Respond to general inquiries and complaints about the bill and its format; refer customers to the non-billing party for inquiries and complaints related to the non-billing party's rates, charges, services, or calculations; and,

   n.  Maintain records of billing information, including amounts collected, remaining and transferred, and dates.

2.  If the bill ready method is used, each party shall calculate and separately state sales and use taxes applicable to its charges; if the rate ready method is used, the billing party shall calculate and separately state the state sales and use taxes applicable to its charges and the non-billing party's charges.

3.  A party that requires a customer's deposit shall administer it.  If a non-billing party applies a customer deposit to an outstanding balance, it shall notify the billing party.

4.  Upon receipt of payments, a non-billing party shall notify the billing party.

5.  To initiate consolidated billing using the rate ready method, the non-billing party shall provide the billing party with the rates, rate codes, and/or prices (fixed and/or variable) and tax rates necessary to calculate the non-billing party's charges.  The billing party shall specify in the BSA the number of prices for each service class per commodity accepted, deadline for transmission, effective date, and acceptable frequency of changes.[2]

6.  The billing party may process special handling requests from customers provided that it obtains agreement from the non-billing party for requests that affect it;

7.  The billing party is not required to calculate or provide separate statements to customers regarding gross receipts taxes applicable to a non-billing party's charges.  The non-billing party may calculate and provide information on the gross receipts taxes applicable to its charges in a bill message or, if the bill ready method is used, as a line item on the bill.

8.  The non-billing party may offer special billing features, such as budget billing or average payment plans.

---

[1]  A distribution utility is not required to calculate or bill for ESCO services that are not directly related to the commodity it delivers.

[2]  If a billing party's billing system is capable of providing the service, a billing party shall, upon request, apply a different rate, rate code, and/or price and tax rate to usage during different portions of the billing cycle to service provided after the effective date of the change.  The non-billing party shall request a change in the rate, rate code, and/or price no later than four business days prior to the effective date requested.

E. Consolidated Billing:  Initiation, Changes or Discontinuance

   1. Initiation

      a. An ESCO that proposes to issue consolidated bills shall establish and provide to a distribution utility written procedures for billing and payment processing that ensure billing accuracy and timeliness, proper distribution of a distribution utility's bill messages and inserts, and proper allocation and transfer of distribution utility funds.

      b. No distribution utility may impose a fee on an ESCO to process its application to offer consolidated billing.

   2. Changes

      A request to change a customer's billing option shall be made on or before 15 calendar days prior to the scheduled meter reading date.

   3. Suspension and Discontinuance

      a. A distribution utility may suspend or discontinue an ESCO's right to offer consolidated billing as a billing party or a non-billing party for failure to comply with a BSA. Suspension of the right to offer consolidated billing means that the ESCO is prohibited from offering consolidated billing to new customers.

      b. Upon a determination by a distribution utility to suspend or discontinue an ESCO's right to offer consolidated billing to customers, it shall provide notice on or before 15 calendar days prior to the proposed date for the suspension or discontinuance (cure period) to the ESCO and state the reason for its determination.  Upon failure of the ESCO to correct the deficiency on or before the expiration of the cure period, the distribution utility may require a change to dual billing for the ESCO's customers.

      c. Upon discontinuance of consolidated billing rights, an ESCO may reapply to the distribution utility to offer consolidated billing.  A distribution utility shall expedite consideration of such requests.  Customers may begin receiving consolidated bills again after requirements are satisfied, including submission of transaction requests to establish consolidated billing for customers.

F. Consolidated Billing:  Customer Requests

   1. A customer may request an ESCO to change its billing option.  The ESCO shall request the bill option change on or before 15 calendar days prior to the scheduled meter reading date. An EDI change request is used to request a change in a customer's bill option.  After receipt of the change request, a distribution utility shall, within one business day, acknowledge receipt of the request and, within two days, provide a response indicating rejection and the reason or acceptance and the effective date.

   2. No distribution utility may impose a charge on a customer or an ESCO for changing a billing option.

   3. When more than one request to change a customer's billing option is transmitted for a billing cycle, a billing party shall accept the last timely request received.

   4. A distribution utility may deny a request to initiate consolidated billing or discontinue consolidated billing for a customer with an amount past due for at least 38 calendar days, unless the past due amount is subject to a DPA and the customer is fulfilling DPA obligations.

G.  Consolidated Billing:  Content

1.  A billing party may decide upon the format for its consolidated bill provided that it states a summary of total charges and separately states distribution utility and ESCO charges in sufficient detail to allow a customer to judge their accuracy.  Such separate statements shall appear in clearly separated portions of the bill and identify their source, distribution utility or ESCO.  An ESCO that provides consolidated billing shall state on its consolidated bill the unadjusted distribution utility charges for delivery services provided by a distribution utility, without change.

2.  A consolidated bill shall contain the information listed in Attachment 1, General Information, preferably in a summary section.  The billing party may place the information on the bill in any order or location.

3.  A consolidated bill shall contain the information listed in Attachment 2, Distribution Utility Content, separately stated for each distribution utility.

4.  A consolidated bill shall contain the information listed in Attachment 3, ESCO Content, separately stated for each ESCO.

5.  If the rate ready method is used, the ESCO shall provide to the distribution utility information listed in Attachment 3, ESCO Section Content, to the extent necessary for the distribution utility to calculate and issue bills.  To initiate utility consolidated billing using the rate ready method, an ESCO shall provide the information to the distribution utility on or before 15 calendar days prior to the scheduled meter reading date.  An ESCO may request a price or rate change no later than four business days prior to its effective date.

6.  If a billing party and non-billing party agree to show the non-billing party's logo on the bill, the non-billing party shall provide it in an acceptable electronic format at least thirty days before its initial use.

7.  If the rate ready method is used, a non-billing party is not required to provide information after it is initially submitted, except when a change is made.

8.  When an ESCO issues a consolidated bill and the distribution utility transmits bill ready data, the distribution utility shall transmit to the ESCO at the appropriate time the applicable information listed in Attachment 2, Distribution Utility Content, items d – q, and the customer's name and service address.

9.  When an ESCO issues consolidated bills on behalf of other ESCOs and distribution utilities and the other ESCOs provide information, the non-billing ESCOs shall provide bill ready information listed in Attachment 3, ESCO Content to the billing ESCO.

10.  No party shall engage in cramming.

11.  A non-billing party may display its bill messages up to 480 characters in length on the bill provided that the billing party raises no reasonable objection to the message.  There is no limit in message length for the billing party.  If the bill ready method is used, the non-billing party shall transmit the text of the messages or agreed upon message codes in the same EDI transaction as the billed charges.  If the rate ready method is used, a non-billing party shall submit a common bill message on or before 15 calendar days before the date used.  Unless a final print date is provided, the billing party shall continue to print the message on bills until

the non-billing party transmits a different message or requests its discontinuance.  In emergencies requiring printing of messages on bills, the billing party shall accommodate the needs of the non-billing party, if practicable.

12. The billing party shall, in a timely manner, print on bills or insert into bill envelopes information that a statute, regulation, or Public Service Commission order requires a distribution utility or ESCO to send to its customers. The billing party may not assess charges for inclusion of required inserts that do not exceed one-half ounce.  A distribution utility may charge for any excess weight in accordance with its tariff.  The party responsible for providing the information shall submit it to the billing party.  If the information is provided in a bill insert, the responsible party shall deliver the inserts in preprinted bulk form in a proper size on or before 15 calendar days before the date requested for initiation of distribution to customers to a location designated by the billing party.

13. Due dates and other general payment terms and conditions shall be identical for distribution utility and ESCO charges, unless different terms and conditions would have no impact on them.  In the event of a conflict, the distribution utility's payment terms and conditions shall govern.

H. Consolidated Billing:  Bill Issuance

1. No late charge may be applied to customers' bills for distribution utility charges, if payment is received by the billing party within the grace period.

2. If the bill ready method is used, the non-billing party shall transmit its charges and other information to the billing party on or before two business days after receipt of valid usage data for a customer account.  If the rate ready method is used, the non-billing party shall transmit any revisions in rate and/or price data to the billing party on or before four business days prior to the prescribed date.

3. If the bill ready method is used, a billing party that receives a non-billing party's transaction within the prescribed time and rejects the transaction for cause shall, within one business day after receipt of the transaction, send the non-billing party an EDI reject transaction and state the reason for the rejection.  The non-billing party may, if time permits, submit a corrected file containing billing charges for inclusion in the current billing statement.

4. If a non-billing party's transaction is sent to the billing party outside the prescribed time frame, the billing party may reject the transaction and shall notify the non-billing party on or before two business days after its receipt that the charges were not billed.  The non-billing party may resubmit its charges the following billing period in accordance with prescribed time limits and without late charges.  If the bill ready method is used, the non-billing party may submit a separate bill to the customer and notify the billing party of the action.  The parties may also agree that the billing party shall hold the non-billing party's charges for inclusion in the next bill.

5. If a non-billing party's transaction is accepted using the bill ready method, the billing party shall render a bill within two business days after receipt of the transaction.  If a rate ready method is used, a billing party shall render a bill in accordance with the distribution utility's regular bill issuance schedule.  A bill is rendered upon transfer to the custody of the U.S. Postal Service or other delivery service or, if authorized by a customer, sent electronically to a valid e-mail address or telefax number, displayed on a secure website, or presented directly to the customer or customer's representative.

6. If the billing party has not purchased a non-billing party's accounts receivable, is able to process the non-billing party's transaction, and is unable to render a bill within the prescribed time, the billing party shall notify the non-billing party immediately. A billing party shall afford customers the same grace period to pay the bill.

7. If the rate ready method is used, the billing party shall provide to the non-billing party within two business days after bill issuance, a statement of the accounts billed, date of issuance and amount of the non-billing party's charges shown on the bill (past due, current, and late payment charges and taxes).

I. Consolidated Billing: Cancellations and Rebills

1. If non-billing party errors occur and are not corrected before the bill is issued, a billing party is not required to cancel bills or issue new bills. The non-billing party shall provide any necessary explanations to the customer and billing party and make any necessary adjustments on the next bill.

2. If billing party errors cause the non-billing party charges to miss the billing window, the billing party shall cancel and reissue the bills within two business days after notification, unless the billing party and non-billing party arrange an alternative bill correction process.[1] A billing party shall afford customers the same grace period to pay bills.

3. If no party errs, the parties may agree to cancel and rebill.

4. To cancel a bill, a billing party shall:

   a. Cancel usage by billing period;

   b. Send consumption in the cancel transaction that matches consumption sent in the original transaction;

   c. Send cancelled usage at the same level of detail as the original usage;

   d. Using the rate ready method, if a bill is to be cancelled and reissued, recalculate charges and issue revised bills to customers within two business days after receipt of the revised usage data;

   e. Using the bill ready method, if a bill is to be cancelled and reissued, issue the revised bill to customers within two business days after receipt of the revised usage data.

5. To restate usage for a period, the distribution utility or MDSP shall first cancel usage for that period and then send the full set of restatement transactions.

J. Consolidated Billing: Payment Processing and Remittance

1. The parties shall set forth their responsibilities, performance parameters, financial arrangements and other details associated with payment processing and remittance in a BSA, subject to the requirements in this Section.

   a. In the Pay-as-You-Get-Paid Method, the billing party sends payments to the non-billing party, within two business days of receipt and posting of the funds and processes the payments in accordance with the required priority for application of payments established in this Section.

   b. A BSA shall establish procedures for processing payments made on any purchased accounts receivable.

---

[1] Such errors do not include usage-related adjustments necessary when an actual meter reading becomes available to replace an estimated reading required, for example, because a customer denies access to a meter.

2. Payment Processing

   a. The billing party shall notify the non-billing party that payment is received and send payments to the non-billing party, within two business days after receipt and posting, by use of Electronic Funds Transfer (EFT), Automated Clearing House (ACH), or similar means to banks or other entities as agreed upon by the parties. The notice shall include, in account detail, the payments received from customers, the date payments are posted, the date payments are transferred, and the amounts allocated to the non-billing party's charges.

   b. The billing party may impose late payment charges on unpaid amounts not in dispute for the non-billing party provided the terms of the late payment charges are stated in a tariff or a sales agreement and previously disclosed to the customers. If the bill ready method is used, each party shall calculate its late payment charges. If the rate ready method is used, the billing party shall calculate the non-billing party's late payment charges under terms agreed upon by the parties. If a customer's check is returned for any reason, the billing party may charge the customer's account for the return fee and any reasonable administrative fee.

   c. Upon failure of the billing party to pay the non-billing party its proper share of customer payments within two business days after their receipt and posting or at the time agreed upon when accounts receivable are purchased, the billing party shall pay interest on the unremitted amount. The billing party shall calculate the interest at the rate of 1.5 percent per month from the date the payment was due to be received by the non-billing party or its bank.[1] The payment of interest is in addition to, and not in lieu of, the rights and remedies otherwise available to the parties.

3. Collections

The billing party is not responsible for collection of non-billing party funds, unless agreed to in a BSA.

4. Application of payments

   a. The billing party[2] shall allocate customer payments to the following categories of charges on the bill or contained in a notice that are not in dispute in this order of priority of payment: (1) amounts owed to avoid termination, suspension or disconnection of commodity or delivery service; (2) amounts owed under a DPA, including installment payments and current charges; (3) arrears; and (4) current charges not associated with a DPA. The billing party shall pro-rate payments to the charges within each category in proportion to each party's charges in that category. After satisfaction of the charges in a category, assuming available funds, the remainder of the payment shall apply to the next highest category according to the priority of payments and in the same manner as described above until the payment is exhausted.

---

[1] Upon request, the billing party shall provide the non-billing party with a verified copy of the posting log of payments received and transferred to the non-billing party during any calendar month specified by the non-billing party.

[2] Distribution utilities supplying delivery service for both natural gas and electricity to customers receiving consolidated bills shall apply the receipts to the separate services in accordance with their regular procedures. Where a consolidated bill displays delivery charges for separate gas and electric distribution utilities, the customer's payments shall be first prorated between the utility accounts in accordance with the amount each is due compared with the total amount due both distribution utilities.

    b.  The billing party may retain any payment amounts in excess of the amounts due as prepayments for future charges or return the excess amounts to customers.  The billing party shall, in a timely manner, combine any excess payment amounts with the customer's payment on the next bill, and allocate and pro-rate the sum as set forth in Section 9.J.4.a.[1]

    c.  When the billing or non-billing party enters into a multi-month payment agreement with a customer or waives any charges, that party shall notify the other party of such action.

    d.  The billing party shall hold payments received without account numbers or enough information for the billing party to identify the accounts and attempt to obtain information to identify the payer.  If sufficient information is not obtained to identify the account information prior to the next bill, the billing party shall present the unpaid amount and late charge, if applicable, on the bill.  If the customer contacts the billing party to inquire about the late charge and the lack of payment credit, the billing party shall resolve the matter and reverse the late charges.  The billing party shall notify the non-billing party of the matter and its resolution and then allocate payments as necessary to balance the account.

5.  Multiple Account Payment Processing

Processing of a single customer payment for multiple accounts requires proactive action on the part of the billing party and the non-billing party to apply payments correctly.  The parties shall set forth arrangements for multiple account payment processing in a BSA.

6.  Non-billing Party's Balance

    a.  Except as provided in Section 9.J.6 d., when a final bill is issued, the billing party shall maintain a current and past due balance for each account of the non-billing party until payment of the last bill issued for service provided by the non-billing party or 23 days after issuance of such bill, whichever is sooner.  After such time, the account shall be considered "inactive."

    b.  Except as provided in Section 9.J.6 d., when a customer changes to a new ESCO, the billing party shall continue to receive and apply a customer's payments for the active account of the prior ESCO.  If the customer does not pay the outstanding balance owed to the prior ESCO on or before 23 days after the final bill containing the prior ESCO's charges is issued, the billing party shall notify the ESCO and report the balance due.

    c.  With regard to a new distribution utility/ESCO relationship following a change of ESCOs or a change in a distribution utility, the new billing party shall, upon request of the new non-billing party, bill for the balances that may exist at the time of the change.  The new billing party may include the arrears on current bills or in a separate bill if its billing system is not capable of accepting prior charges.  If a change of providers occurs, a distribution utility is not required to post any arrears of the prior ESCO on consolidated bills issued after the final billing of its charges, unless the arrears become the property of the new ESCO, and it provides documentation of its property right to the distribution utility.

---

[1]   Where the customer elects to make a charitable donation, such as funding a low-income program, satisfaction of the donation shall be made prior to allocation and pro-ration of the customer's excess payment.

    d. Upon ESCO termination of the commodity supply of a residential customer due to failure to pay charges, the billing party shall maintain a current and past due balance for the account of the terminating ESCO for one year from the date of termination by the ESCO. In the event that the terminating ESCO seeks suspension of delivery service within one year of the termination, or the residential customer has a DPA, the billing party shall maintain a current and past due balance for each account of the terminating ESCO until the arrears are paid in full.

7. Customer Disputes: Initiating a Bill Complaint

    a. A customer or authorized representative may initiate a customer complaint regarding some or all of the charges on the customer's bill at any time.

    b. When a complaint relates to the entire bill, to only the billing party's charges or services, or, using the rate ready method, to calculation of the billing or non-billing party's charges, the customer should contact the billing party. The billing party shall resolve the complaint and, if appropriate, place the customer's account in dispute. In the event the inquiry concerns only a non-billing party's bill, charges, services, or calculations, the billing party shall refer the customer to the non-billing party.

8. Customer Complaints: Notification

    a. Upon a determination that a complaint affects the entire bill, the billing party shall notify the non-billing party of the subject and amount in dispute, if known.

    b. The non-billing party shall inform the billing party of disputes related to non-billing party charges that would affect the billing process.

    c. Once such complaints are resolved and the billed amounts are no longer in dispute, the other party shall be notified.

K. Consolidated Billing: Call Centers

A billing party shall provide call centers with toll-free or local telephone access available 24 hours a day and an answering machine or voice mail service during the hours when call center staff is not available. A billing party shall maintain adequate staff to respond to customers' inquiries or refer inquiries to the non-billing party, where appropriate, within two business days.

L. Dual Billing

1. The distribution utility and ESCO, acting as separate billing parties, shall render separate bills directly to the customer or the customer's representative. The customer or its representative shall pay the distribution utility and the ESCO separately.

2. The distribution utility's bill shall conform to the standards set by the Public Service Commission.

3. The distribution utility or MDSP shall transmit usage data to the ESCO at the time the information is available for rendering bills to customers, which may or may not coincide with meter reading cycle dates.

4. The ESCO may decide upon its bill format provided that it states its charges in sufficient detail to allow customers to judge the accuracy of their bills. At a minimum, an ESCO shall provide the following information:

    a. Customer's name and billing address and, if different, service address;

    b. Customer's account number or ID;

    c.   Period or date associated with each product or service billed;

    d.   Name of the entity rendering the bill;

    e.   Address to which payments should be sent or the location where payments may be made;

    f.   Local or toll-free number for billing inquiries; if an ESCO enrolls and communicates with customers electronically, an e-mail address and telephone number with area code;

    g.   Due date for payment and a statement that late payment charges shall apply to payments received after the due date; and

    h.   Amount and date of payments received since the last bill.

5.   Whenever a distribution utility or MDSP cancels consumption for an account, it shall provide a notice of cancellation and restated billing parameters for the  account to an ESCO and a distribution utility, if applicable, and shall:

    a.   Cancel usage by billing period;

    b.   Send consumption in the cancel transaction that matches consumption sent in the original transaction;

    c.   Send cancelled usage at the same level of detail as the original usage; and,

    d.   To restate usage for a period, cancel usage for that period and send the full set of billing parameter restatements.

CASE 98-M-1343                                                                   SECTION 9

**Attachment 1**

### General Information

A.  Customer name

B.  Service address

C.  Billing address, if different than service address

D.  Billing party account number, if any

E.  Start of billing cycle period (prior meter reading date for metered customers)

F.  Starting period meter reading (for metered customers)

G.  End of billing cycle period (current meter reading date for metered customers)

H.  Ending period meter reading (for metered customers)

I.  Billing period metered usage, any multiplier necessary to convert usage to billing units and resulting billing units (for metered customers)

J.  Billing period demand, if applicable

K.  Indicators, if usage is estimated, actual or customer provided

L.  Total current charges (total of billing and non-billing party charges, including late charges and taxes)

M.  Total prior billed charges (total of billing and non-billing party prior bill charges, including prior late charges and taxes)

N.  Total credits since last bill (total of billing and non-billing party credits);

O.  Date through which the credits are applied

P.  Total current bill (total of billing and non-billing party charges plus prior bill charges less credits)

Q.  Billing party name (and billing party logo, if billing party wishes it shown)

R.  Billing party address

S.  Billing party toll-free or local telephone number, and for a billing party that enrolls and communicates electronically with customers, an e-mail address and telephone number with area code, in lieu of a toll-free or local telephone number

T.  Distribution utility toll free-or local telephone number and emergency telephone number

U.  Method and location for payments

V.  Date of bill

W.  Payment due date

X.  Billing party messages of any length that apply in general to the bill and services provided by billing and non-billing parties, that are not reasonably objectionable to the parties

**Attachment 2**

## Distribution Utility Content

A. Distribution utility name, and logo, if the parties agree

B. Distribution utility address, if the distribution utility is not the billing party

C. Distribution utility toll-free or local telephone number for inquiries about the distribution utility portion of the bill, if the distribution utility is not the billing party, and distribution utility emergency number

D. Distribution utility customer account number, if the distribution utility is not the billing party

E. Distribution utility rate classification identifier

F. Distribution utility rates per billing unit, if applicable

G. Distribution utility rates not based on billing units, if applicable, and unbundled, if applicable

H. Distribution utility charge adjustments and adders, separately stated

I. Taxes on distribution utility charges, if separately stated

J. Billing period total distribution utility charges

K. Prior billing period total distribution utility charges, including any prior late charges

L. Credits on prior distribution utility charges

M. Net prior distribution utility balance remaining, unless included in total prior billed charges stated in the General Information Section

N. Late charge for unpaid prior distribution utility balance, unless included in total prior billed charges stated in the General Information Section

O. Total amount due for distribution utility services

P. If a budget bill, applicable billing information and resulting budget bill amount due for distribution utility services

Q. The distribution utility's bill message, if any, up to 480 characters, if the distribution utility is not the billing party

CASE 98-M-1343                                                                          SECTION 9

**Attachment 3**

**ESCO Content**

A.  ESCO name and logo, if parties agree

B.  ESCO address, if the ESCO is not the billing party

C.  ESCO toll-free or local telephone number for billing inquiries if the ESCO is not the billing party; ESCOs that enroll and communicate electronically with customer may provide an e-mail address and telephone number with area code in lieu of a toll-free or local telephone number; if a rate ready method is used, the billing party shall include a notice directing ESCO customers to call the billing party first to clarify bill calculations

D.  ESCO account number, if the ESCO is not the billing party and has a unique account number

E.  ESCO rate classification, if applicable

F.  ESCO rate per billing unit, if applicable

G.  ESCO rate not based on distribution utility unit, if applicable

H.  ESCO charge adjustments and adders, if any, separately stated

I.  Taxes on ESCO charges, if required to be separately stated

J.  Billing period total ESCO charges

K.  Prior billing period total ESCO charges, including any prior late charges, unless included in total prior billed charges stated in the General Information Section

L.  Credits on prior ESCO charges

M.  Net prior ESCO balance remaining

N.  Total amount due for ESCO services

O.  If a budget bill, applicable billing information and resulting budget bill amount due

P.  The ESCO's bill message, if any, up to 480 characters, if the ESCO is the non-billing party.

## SECTION 10:  MARKETING STANDARDS

A. Applicability

This Section describes the standards that ESCOs and ESCO marketing representatives must follow when marketing to customers in New York.

B. Training of Marketing Representatives

1. ESCOs shall ensure that the training of their marketing representatives includes:

   a. Knowledge of this Section and awareness of the other Sections of the New York Uniform Business Practices;

   b. Knowledge of the ESCO's products and services;

   c. Knowledge of ESCO rates, payment options and the customers' right to cancel, including the applicability of an early termination fee;

   d. Knowledge of the applicable provisions of the Home Energy Fair Practices Act that pertains to residential customers; and,

   e. The ability to provide the customer with a toll-free number from which the customer may obtain information about the ESCO's mechanisms for handling billing questions, disputes, and complaints.

C. Contact with Customers

1. In-Person Contact with Customers[1]

   ESCO marketing representatives who contact customers in person at a location other than the ESCO's place of business for the purpose of selling any product or service offered by the ESCO shall, before making any other statements or representations to the customer:

   a. Introduce him or herself with an opening statement that identifies the ESCO which he or she represents as an Energy Services Company, identifies him or herself as a representative of that specific ESCO; explains that he or she does not represent the distribution utility; and, explains the purpose of the solicitation.

   b. Produce identification, to be visible at all times thereafter, which:

      1. Prominently displays in reasonable size type face the first name and employee identification number of the marketing  representative;

      2. Displays a photograph of the marketing representative and depicts the legitimate trade name and logo of the ESCO they are representing;

      3. Provides the ESCO telephone number for inquires, verification and complaints.

   c. During the sales presentation, the marketing representative must also state that if customer purchases natural gas and/or electricity from the ESCO, that the customer's utility will continue to deliver their energy and will respond to any leaks or emergencies. This requirement may be fulfilled either (a) by an oral statement by the ESCO marketing representative, or (b) written material left by the ESCO marketing representative. Further, ESCOs that are affiliates of distribution utilities should not describe or disclose their relationship to the distribution utility unless such information is specifically requested by the customer.

---

[1] Including but not limited to marketing encompassed in the definition of door to door sales.

    d.   An ESCO marketing representative must provide each prospective residential customer a business card or similar tangible object with the ESCO marketing representative's first name and employee identification number;  ESCO's name, address, and phone number; date and time of visit and website  information for inquires, verification and complaints.

    e.   An ESCO marketing representative must provide each prospective residential customer or customer that is marketed to via door to door marketing, with a copy of the ESCO Consumers Bill of Rights, before the ESCO marketing representative makes his or her sales presentation.

    f.   An ESCO marketing representative must provide the customer with written information regarding ESCO products and services immediately upon request which must include the ESCOs name and telephone number for inquires, verification and complaints.  Any written materials, including contracts, sales agreements, marketing materials and the ESCO Consumers Bill of Rights, must be provided to the customer in the same language utilized to solicit the customer.

    g.   Where it is apparent that the customer's English language skills are insufficient to allow the customer to understand and respond to the information conveyed by the ESCO marketing representative or where the customer or another third party informs the ESCO marketing representative of this circumstance, the ESCO marketing representative shall either find a representative in the area who is fluent in the customer's language to continue the marketing activity in his/her stead or terminate the in-person contact with the customer.  The use of translation services and language identification cards is permitted.

    h.   An ESCO marketing representative must leave the premises of a customer when requested to do so by the customer or the owner/occupant of the premises.

    i.   As stated in Section 5.B.2, for any sale resulting from door-to-door marketing, each enrollment is only valid with an independent third-party verification in conformance with Section 5, Attachment 1.  The verification must occur after the marketing agent has left the customer's premises and must be completed before the ESCO may enroll a customer.

    j.   All ESCOs who have ESCO marketing representatives conducting door-to-door marketing must maintain a daily record, by zip code, of the  territories in which the ESCO's marketing representatives have conducted door-to-door marketing.  The information should be in a form that can be reported to Staff upon request and should be retained by the ESCO for a minimum of six months.

2.   Telephone Contact with Customers

ESCO marketing representatives who contact customers by telephone for the purpose of selling any product or service offered by the ESCO shall:

    a.   Provide the ESCO marketing representative's first name and, on request, the identification number;

    b.   State the name of the ESCO on whose behalf the call is being made;

    c.   Never represent that the ESCO marketing representative is an employee or representative or acting on behalf of a distribution utility.  In addition, the ESCO marketing representative must clearly indicate that taking service from an ESCO will not affect the customer's distribution service and such service will continue to be provided by the customer's distribution utility;

d. State the purpose of the telephone call;

e. Where it is apparent that the customer's English language skills are insufficient to allow the customer to understand and respond to the information conveyed by the ESCO representative or where the customer or another third party informs the ESCO marketing representative of this circumstance, the ESCO marketing representative will immediately transfer the customer to a representative who speaks the customer's language, if such a representative is available, or terminate the call; and,

f. Remove Customers' names from the marketing database upon Customers' request.

g. When marketing to residential customers the ESCO marketing representative must also:

   1. Explain that he or she does not represent the distribution utility;

   2. Explain the purpose of the solicitation;

   3. Notify each prospective customer of the ESCO Consumer Bill of Rights, where they can find it, and also provide a copy of the ESCO Consumer Bill of Rights with any written material sent to the customer including the sales agreement; and,

   4. Provide any written materials, including contracts, sales agreements, marketing materials and the ESCO Consumers Bill of Rights, must be provided to the customer in the same language utilized to solicit the customer.

h. As stated in Section 5.B.2, for any sale resulting from telephonic marketing, each enrollment is only valid with an independent third-party verification in conformance with Section 5, Attachment 1.  The verification must be completed before the ESCO may enroll a customer.

3. Electronic Enrollments

   a. When marketing to residential customers the ESCO Consumer Bill of Rights should be provided to prospective customers as a non-avoidable screen, which a customer must affirmatively acknowledge to verify they have seen the document, prior to effecting an enrollment.

4. Conduct

   ESCOs shall:

   a. Not engage in misleading or deceptive conduct as defined by State or federal law, or by Commission rule, regulation, or Order;

   b. Not make false or misleading representations including misrepresenting rates or savings offered by the ESCO;

   c. Provide the customer with written information, upon request, or with a website address at which information can be obtained, if the customer requests such information via the internet;

   d. Use reasonable efforts to provide accurate and timely information about services and products.  Such information will include information about rates, contract terms, early termination fees and right of cancellation consistent with Section 2 of the UBP and any other relevant Section;

   e. Ensure that any product or service offerings that are made by an ESCO contain information written in plain language that is designed to be understood by the customer. This shall include providing any written information to the customer in a language in which the ESCO representative has substantive discussions with the customer or in which a contract is negotiated;

    f.   Investigate customer inquiries and complaints concerning marketing practices within five days of receipt of the complaint; and,

    g.   Cooperate with the Department and PSC regarding marketing practices proscribed by the UBP and with local law enforcement in investigations concerning deceptive marketing practices.

5.  Dispute Resolution

ESCOs will maintain an internal process for handling customer complaints and resolving disputes arising from marketing activities and shall respond promptly to complaints forwarded by the Department.