# Exhibit 18

# No. 18-3138

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of
All Others Similarly Situated,

*Plaintiffs-Appellants*,

v.

XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of New York
No. 18 Civ. 2949
Hon. Allyne R. Ross Presiding

## APPELLANTS' OPENING BRIEF

Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic
**WITTELS LAW, P.C.**
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945

*Attorneys for Appellants and the Proposed Class*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES .................................................................................2

STATEMENT OF THE CASE...............................................................................2

    I.     OVERVIEW OF PLAINTIFFS' ALLEGATIONS ................................. 2

    II.    THE DISTRICT COURT'S FLAWED SEPTEMBER 21 RULING DISMISSING THE INITIAL COMPLAINT WITH PREJUDICE ........ 4

    III.   PLAINTIFFS' PROPOSED AMENDED COMPLAINT SEEKS TO ADDRESS THE DISTRICT COURT'S CONCERNS ..................... 6

    IV.   THE DISTRICT COURT'S IMPROPER NOVEMBER 2 REFUSAL TO ALLOW PLAINTIFFS TO REPLEAD.......................... 7

    V.    THE DISTRICT COURT REFUSES TO RECOGNIZE THE ERRORS IN ITS NOVEMBER 2 RULING.......................................... 10

STATEMENT OF FACTS .................................................................................11

    I.     XOOM PROVIDES NO SERVICES BEYOND PRICE BROKERING............................................................................. 11

    II.    XOOM OFFERS ENERGY RATES BASED ON ITS SUPPLY COSTS.................................................................................. 12

    III.   PRACTICES LIKE XOOM'S HAVE DEPRIVED NEW YORK CONSUMERS MORE THAN $1 BILLION ......................................... 14

SUMMARY OF ARGUMENT ..............................................................................15

STANDARD OF REVIEW ..................................................................................17

ARGUMENT .................................................................................................18

    I.     PLAINTIFFS AQUADETLY PLED BREACH OF CONTRACT IN THEIR FIRST COMPLAINT........................................................... 18

II.    THE DISTRICT COURT ERRED IN DISMISSING
       PLAINTIFFS' COMPLAINT WITH PREJUDICE WITHOUT
       EXPLAINING WHY AMENDMENT WOULD BE FUTILE .............. 28

III.   THE DISTRICT COURT ERRED IN DENYING PLAINTIFFS
       LEAVE TO AMEND THEIR COMPLAINT ........................................ 30

       A.    Plaintiffs' Proposed FAC Addressed and Cured the District
             Court's Perceived Deficiencies.......................................................30

       B.    The District Court's November 2 Rejection of Plaintiffs'
             Amendment Request Was an Abuse of Discretion ......................35

       C.    The District Court's November 2 Ruling Incorrectly
             Concluded Plaintiffs' Proposed Amendment Was Futile.............38

IV.    THE DISTRICT COURT OVERLOOKED KEY FACTUAL AND
       LEGAL MATTERS WHEN IT DENIED APPELLANTS'
       RECONSIDERATION MOTION ......................................................... 44

CONCLUSION ...................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
   404 F.3d 566 (2d Cir. 2005) ........................................................................ 15, 35

*Aks v. IDT Energy*,
   No. L-4936-14 (N.J. Super. Ct. Civ. Div. Nov. 6, 2014) ..................................22

*Arrow Enter. Computing Sols., Inc. v. BlueAlly LLC*,
   No. 15 Civ. 37 (FL), 2015 WL 6393831 (E.D.N.C. Oct. 22, 2015) .................19

*Austin v. Kiwi Energy NY LLC, et al.*,
   No. 515350/17 (Sup. Ct. Kings Cnty., Jan. 2, 2018).........................................22

*Basile v. Stream Energy Pa., LLC*,
   No. 15 Civ. 1518 (YK), 2016 WL 4611443 (M.D. Pa. Sept. 6, 2016) ..............21

*Becnel v. Deutsche Bank AG*,
   838 F. Supp. 2d 168 (S.D.N.Y.2011) ............................................................9, 43

*Brown v. Ginn*,
   640 S.E.2d 787 (2007) ......................................................................................28

*Carolina Power & Light Co. v. Bowman*,
   51 S.E.2d 191 (1949) ........................................................................................27

*Chen v. Hiko Energy, LLC*,
   No. 14 Civ. 1771 (VLB), 2014 WL 7389011 (S.D.N.Y. Dec. 29, 2014) ..........22

*Claridge v. N. Am. Power & Gas*, LLC,
   No. 15 Civ. 1261, 2015 WL 5155934 (PKC) (S.D.N.Y. Sept. 2, 2015)............21

*Commander Oil Corp. v. Barlo Equip. Corp.*,
   215 F.3d 321 (2d Cir. 2000) ............................................................................18

*Cresci v. Mohawk Valley Cmty. Coll.*,
   693 F. App'x 21 (2d Cir. 2017) ........................................................................35

*Crosby v. City of Gastonia*,
   635 F.3d 634 (4th Cir. 2011) ...........................................................................19

*Edwards v. N. Am. Power & Gas, LLC*,
  120 F. Supp. 3d 132 (D. Conn. 2015)..................................................22

*Foman v. Davis*,
  371 U.S. 178 (1962)........................................................................37

*Fritz v. N. Am. Power & Gas, LLC*,
  No. 14 Civ. 634 (WWE) (D. Conn. Jan. 29, 2015) ...........................22

*Gonzales v. Agway Energy Servs., LLC*,
  No. 518 Civ. 235 (MAD) (ATB), 2018 WL 5118509 (N.D.N.Y. Oct. 22, 2018)
  ........................................................................................................44

*Gruber v. Starion Energy, Inc.*,
  No. 14 Civ. 1828 (SRU) (D. Conn. Apr. 7, 2015)..............................22

*In re Assicurazioni Generali, S.P.A.*,
  592 F.3d 113, 120 (2d Cir. 2010) ....................................................18

*In re Molycorp, Inc. Securities Litigation*,
  No. 13 Civ. 5697 (PAC), 2016 WL 3002424 (S.D.N.Y. May 23, 2016)..........45

*Janese v. Fay*,
  692 F.3d 221 (2d Cir. 2012) ............................................................46

*Komoda v. Palmco Energy*,
  No. L-3263-14 (N.J. Super. Ct. Civ. Div. Sept. 19, 2014).................22

*Landau v. Viridian Energy PA LLC*,
  223 F. Supp. 3d 401 (E.D. Pa. 2016).................................................21

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
  797 F.3d 160 (2d Cir. 2015) .................................................. 6, 28, 36

*Lynn v. Lynn*,
  689 S.E.2d 198 (2010) .....................................................................27

*Melville v. Spark Energy, Inc.*,
  No. 15 Civ. 8706 (RBK), 2016 WL 6775635 (D.N.J. Nov. 15, 2016) .............21

*Mirkin v. Viridian Energy, Inc.*,
  No. 15 Civ. 1057 (SRU), 2016 WL 3661106 (D. Conn. July 5, 2016)....... 22, 27

*Oladapo v. Smart One Energy, LLC*,
  No. 14 Civ. 7117 (LTS), 2016 WL 344976 (S.D.N.Y. Jan. 27, 2016) ............22

*Palmer v. Fannie Mae*,
  No. 17 Civ. 2867, 2018 WL 5830504 (2d Cir. Nov. 7, 2018).........................29

*Richardson Greenshields Sec., Inc. v. Lau*,
  825 F.2d 647 (2d Cir. 1987) ..............................................................................46

*Ruotolo v. City of New York*,
  514 F.3d 184 (2d Cir. 2008) ....................................................... 18, 43

*Salvaggio v. New Breed Transfer Corp.*,
  564 S.E.2d 641 (N.C. Ct. App. 2002)................................................................41

*Sanborn v. Viridian Energy, Inc.*,
  No. 14 Civ. 1731 (SRU) (D. Conn. Apr. 1, 2015)..............................................22

*Schwartz v. HSBC Bank USA, N.A.*,
  No. 14 Civ. 9525 (KPF), 2017 WL 2634180 (S.D.N.Y. June 19, 2017) ...........46

*Scutti Enters., LLC. v. Park Place Entm't. Corp.*,
  322 F.3d 211 (2d Cir. 2003) ..............................................................................17

*Serdarevic v. Centex Homes, LLC*,
  760 F. Supp. 2d 322 (S.D.N.Y. 2010) ................................................................23

*Smith v. Hogan*,
  794 F.3d 249 (2d Cir. 2015) ..............................................................................46

*Sobiech v. U.S. Gas & Elec., Inc.*,
  No. 14 Civ. 4464 (GAM) (E.D. Pa. Feb. 4, 2015)..............................................21

*Steketee v. Viridian Energy, Inc.*,
  No. 15 Civ. 0585 (SRU) (D. Conn. Dec. 2, 2015) .............................................21

*Tully v. N. Am. Power & Gas, LLC*,
  No. 14 Civ. 634 (WWE) (D. Conn. Oct. 29, 2015) (same)................................22

*Williams v. Citigroup Inc.*,
  659 F.3d 208 (2d Cir. 2011) ..................................................... passim

*Woods v. Nationwide Mut. Ins. Co.*,
  246 S.E.2d 773 (N.C. 1978) ..............................................................................42

*Yang Chen v. Hiko Energy, LLC*,
   No. 14 Civ. 1771 (VB) (S.D.N.Y. July 9, 2014) ...............................................27

*Zervos v. Verizon N.Y., Inc.*,
   252 F.3d 163 (2d Cir.2001) ...............................................................18

**Rules**

Fed. R. Civ. P. 15 .................................................................... 9, 37, 38, 43

Fed. R. Civ. P. 59(a)................................................................35

Fed. R. Civ. P. 59(e)................................................................ 9, 42, 43

Fed. R. Civ. P. 60(b) ................................................................ 9, 35, 42, 43

**Other Authorities**

Elena D'Agostino, *Contracts of Adhesion*, *in* ENCYCLOPEDIA OF LAW AND
   ECONOMICS (Aug. 19, 2017) ...............................................26

Yannis Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention to
   Standard Form Contracts*, 43 J. LEGAL STUDIES 1 (2014) ..................................26

vi

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over Plaintiffs-Appellants Susanna and Boris Mirkin's claims pursuant to 28 U.S.C. § 1332(d). This is a class action filed under Rule 23 of the Federal Rules of Civil Procedure, the amount in controversy exceeds $5,000,000, and the members of the Class are citizens of a different state than Defendant Appellee XOOM Energy, LLC. [A-67 at ¶ 14].[1] On September 21, 2018, the district court granted Appellees' motion to dismiss Appellants' class action complaint *with prejudice*, finding that Appellants had failed to state their breach of contract claim. Thereafter, on November 2, 2018, the district court denied Appellants' Federal Rules of Civil Procedure 59(e) and 60(b) motion to alter or amend the September 21 dismissal order and allow Appellants to file an amended complaint. On November 19, 2018, Appellants moved the district court to reconsider its November 2nd Order. On December 6, 2018, the district court denied the reconsideration motion.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 as the district court entered a final order dismissing Appellants' case. [A-38, A-58].

Appellants timely filed their initial Notice of Appeal on October 19, 2018 [A-104], and timely filed Amended Notices of Appeal on November 6 and December 13, 2018 [A-116, A-129].

---

[1] Citations to "A__" refer to the Joint Appendix.

## STATEMENT OF ISSUES

1.      Did the district court err in its September 21st dismissal order when it ruled that Plaintiffs' Class Action Complaint failed to state a claim that Defendants breached the terms of their customer contract with Plaintiffs and the Class?

2.      Did the district court err in dismissing Plaintiffs' Class Action Complaint *with prejudice* without explaining why an amendment would be futile?

3.      Did the district court err in its November 2nd ruling denying Plaintiffs' post-dismissal request to amend their complaint, which motion and attached proposed amended complaint sought to address the deficiencies identified in district court's September 21st dismissal ruling?

4.      Did the district court overlook key factual and legal matters when it denied Plaintiffs' motion to reconsider its November 2nd ruling denying Plaintiffs leave to amend their complaint?

## STATEMENT OF THE CASE

## I.      OVERVIEW OF PLAINTIFFS' ALLEGATIONS

Defendants supply residential electricity to thousands of New York households.  This case involves Defendants' breach of the pricing terms of their consumer contract.  Specifically, this proposed class action challenges Defendant-Appellants' Xoom Energy, LLC and Xoom Energy New York, LLC's (together "XOOM") breach of their contractual promise to base their electricity rates on

XOOM's energy supply costs (i.e., the cost XOOM pays for electricity).  XOOM neither makes nor delivers residential electricity.  [A-11 at ¶ 20].  Instead, XOOM is merely a broker—it purchases electricity on New York's wholesale market and resells it to consumers under the terms of its consumer contract.  *Id*.  XOOM does not even bill customers, as billing is handled by the local electric utility.  XOOM's form contract represents that its rates will go up and down "based on XOOM's actual and estimated supply costs . . . ."  [A-19 at ¶ 44].  Despite its contract's plain language, however, XOOM charges a substantially higher rate that is untethered to its supply costs.  [A-19 at ¶ 46].  XOOM therefore breached its customer contract.

　　　As discussed below, Plaintiffs' original complaint and proposed amended complaint demonstrate that, based on the price of electricity XOOM purchased from New York's wholesale energy market (the "Market Supply Cost" in the table below), Defendants gouged Plaintiffs (by as much as 66.47% [A-83 at ¶ 57]) compared to Defendants' supply costs.  Critically, Plaintiffs' complaints show that the prices XOOM charged consumers rose when XOOM's supply cost increased— and remained elevated or even ***went up*** even when XOOM's supply costs ***went down***.  The table on the next page demonstrates XOOM's pricing practices and breach of its contractual promise to base consumers' rates on its supply costs.

| Period | XOOM Rate | Market Supply Cost | Difference in % | XOOM Total Margin (Markup) on Wholesale Cost[2] |
|--------|-----------|-------------------|-----------------|---------------------------------------------------|
| 5/10/2013–6/11/2013 | 8.99 (*teaser*) | 11.08 | -23.25% | N/A |
| 6/11/2013–7/11/2013 | 11.96 | 11.80 | -1.34% | 11.04% |
| 7/11/2013–8/9/2013 | 14.40 | 12.35 | 16.60% | 28.36% |
| 8/9/2013–9/10/2013 | 14.88 | 10.18 | 46.17% | 60.81% |
| 9/10/2013–10/8/2013 | 14.15 | 10.13 | 39.68% | 54.40% |
| 10/8/2013–11/7/2013 | 14.90 | 9.85 | 51.27% | 66.47% |

[A-81–A-82 at ¶ 54].

Appellants Susanna and Boris Mirkin filed their Class Action Complaint on April 18, 2018.  [A-1].  Defendants filed their 12(b)(6) motion on July 27, 2018 (ECF No. 19).

## II.   THE DISTRICT COURT'S FLAWED SEPTEMBER 21 RULING DISMISSING THE INITIAL COMPLAINT WITH PREJUDICE

On September 21, 2018, the district court granted the motion to dismiss *with prejudice*.  [A-38].  Specifically, the district court found that Plaintiffs had not pled

---

[2] This figure adds percent margin associated with the 1.3¢ per kWh margin in Plaintiffs' "Market Supply Cost" to the "Difference in %" increase in XOOM's rates over the already generous 1.3¢ per kWh margin.

that XOOM purchases its energy on the wholesale market [A-47], that Plaintiffs should have disclosed the calculations their expert used to derive the rates XOOM should have charged [A-40], and that reasonable consumers do not understand how to determine XOOM's supply costs [A-46–A-49]—which latter conclusion curiously afforded XOOM more pricing discretion than the contract's clear mandate that prices be based on its supply costs.

There are three reasons the district court's initial dismissal order should be reversed: (i) Plaintiffs' original complaint explicitly pled that the cost of "**_wholesale energy_** is the primary component of the non-overhead costs XOOM incurs" [A-20 at ¶ 51] (emphasis added), and provided the exact rate they allege XOOM was contractually bound to charge; (ii) disclosing Plaintiffs' underlying calculations was not necessary to plead breach of contract—particularly because XOOM merely re-sells energy it purchases on the public wholesale market; and (iii) consumers' expectations of an unambiguous pricing term in a form contract drafted by XOOM are irrelevant to determining whether XOOM breached its contractual commitment.  Plaintiffs' original complaint stated a claim for breach of contract and the district court's original dismissal order should not stand.

The district court also erred in dismissing the complaint *with prejudice* without explaining why an amendment would be futile.  *See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 191 (2d Cir.

2015) ("By not giving Plaintiffs a chance to replead . . . the district court not only violated the liberal spirit of Rule 15 . . . it also skirted the key issue of futility.").

## III.   PLAINTIFFS' PROPOSED AMENDED COMPLAINT SEEKS TO ADDRESS THE DISTRICT COURT'S CONCERNS

On October 19, 2018, Appellants moved to alter or amend the district court's original dismissal ruling, or alternatively, for relief from the September 21 judgment to allow Plaintiffs to file an amended complaint, which was attached to Plaintiffs' motion.  [A-59, A-62].  The proposed amended complaint attempted to cure the district court's perceived pleading defects in the following three ways:

*First*, to allay the district court's misplaced concern that Plaintiffs' original complaint did not describe how XOOM procures its energy, Plaintiffs' proposed First Amended Class Action Complaint (the "FAC") specifically alleges that XOOM purchases its energy at wholesale market rates on the New York wholesale energy market.  [A-79 at ¶ 47].  Plaintiffs then supported their allegations with several publicly-available XOOM statements confirming that it purchases energy on New York's wholesale market [A-79–A-80 at ¶¶ 47–52], an allegation that the wholesale cost of energy makes up over 90% of Defendants' supply costs (A-64 at ¶ 4), and an explanation that the components of wholesale electric rates "are objectively determinable and mandated by regulation."  [A-81 at ¶ 53].  The FAC then compares the wholesale cost of energy during Plaintiffs' exact billing cycles (with a substantial added margin) to XOOM's prices during the same period.  [A-

81 at ¶ 54].  This comparison shows that XOOM's rates are not based on XOOM's supply costs, that its rates went **up** when the wholesale market rate went **down**, and that its markup (including a generous margin) was as much as 66.47%.  [A-81–A-82 at ¶ 54].  Plaintiffs also compared XOOM's rates to Plaintiffs' utility's rate (Con Edison), which comparison showed that like wholesale market rates (where, like XOOM, Con Edison purchases electricity), XOOM's prices went **up** even when Con Edison's rates went **down**.

*Second*, to assuage any concerns about the methodology used to calculate the contractually-required XOOM rate, Plaintiffs attached their expert's calculations as Exhibit 3 to the proposed FAC.  [A-102].  These calculations are derived from publicly-available wholesale market data, which costs are "objectively determinable and mandated by regulation."  [A-80–A-81 at ¶ 53].  This more than satisfied Plaintiffs' burden at the pleading stage.

*Third*, to focus the district court's attention on the XOOM contract's plain meaning Plaintiffs removed the references to reasonable consumers' expectations.

## IV.   THE DISTRICT COURT'S IMPROPER NOVEMBER 2 REFUSAL TO ALLOW PLAINTIFFS TO REPLEAD

On November 2, 2018, the district court denied Appellants' motion to file an amended complaint, concluding that amendment would be futile.  [A-107].  The district court again committed several reversible errors.

7

***First***, the district court disregarded Plaintiffs' allegations that XOOM purchases energy on New York's wholesale market and concluded that XOOM was not required to set its rates based on the cost of wholesale energy. [A-113]. This was error because the wholesale cost of energy ***overwhelmingly*** drives XOOM's supply costs. [A-64 at ¶ 4].

***Second***, the district court relied on the fact that the wholesale rate's inputs "do not appear on the fact of the contract." [A-114]. This is irrelevant. The contract bases XOOM's rate on its supply costs. The wholesale market rate (a known price made up of several publicly-available components) makes up at least 90% of XOOM's costs. [A-64 at ¶ 4]. That that the contract doesn't reference the wholesale market rate's components does not change the fact that XOOM's costs are known and that its rates do not reflect its costs.

***Third***, the district court concluded that "plaintiffs do not adequately address [the district court's] concerns by removing all references to the expectations of a 'reasonable consumer' and alleging instead that the term 'actual and estimated supply costs' is 'unambiguous.'" [A-114–A-115]. The district court ruled that notwithstanding Plaintiffs' new allegations their reading of the XOOM contract was not "reasonable." [A-115]. This was error because considering the disconnect between XOOM's costs and its rates as pled in the FAC, the issue of whether

8

Plaintiffs' (or the Court's) reading of XOOM's contract is "reasonable" cannot be resolved on the pleadings.

**Fourth**, despite having dismissed Plaintiffs' original complaint with prejudice the district court held that Plaintiffs had failed to supply grounds under Rules 59(e) or 60(b) to vacate the dismissal order and allow amendment.  [A-110].  Specifically, the district court's November 2 ruling stated that "plaintiffs do not identify any case law or factual allegations that they believe the court overlooked in its September 21 order."  *Id.*  The district court erred, as Plaintiffs were not required to demonstrate that the September 21 dismissal order was wrongly decided.  Instead, Rules 59(e) and 60(b) are merely the procedural vehicles a plaintiff can use to make the Rule 15 amendment request when her case is dismissed with prejudice.  Further, the district court stressed finality and disregarded this Court's "strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011).  Yet, "it is reversible error for a court to address only concerns of finality without also taking into account the nature of the proposed amendment, in light of [this Court's] strong preference for resolving disputes on the merits."  *Becnel v. Deutsche Bank AG*, 838 F. Supp. 2d 168, 170–71 (S.D.N.Y.2011) (quoting *Williams*, 659 F.3d at 213) (internal quotation marks omitted).

## V.    THE DISTRICT COURT REFUSES TO RECOGNIZE THE ERRORS IN ITS NOVEMBER 2 RULING

On November 19, 2018, Appellants moved the district court to reconsider its November 2 ruling.  ECF No. 32.  On December 6, 2018, the district court denied Appellants' motion for reconsideration.  [A-119].  In so doing, the district court made a merits ruling that Plaintiffs' calculations of the rate XOOM was contractually bound to charge "does not demonstrate that XOOM has not considered other legitimate criteria that may impact its 'actual and estimated' costs in setting its rates."  [A-127].  This was also reversible error.  In disregarding Plaintiffs' detailed factual allegations, the district court overlooked the crucial claim that XOOM's prices are ***not*** based on its ***supply*** costs, not "other legitimate criteria."  Because XOOM's electricity supply costs are known, XOOM's exorbitant rates do not reflect "other legitimate criteria" devised by the district court.  [A-80–A-81 at ¶ 53, A-127].  Appellants timely filed their notices of appeal.

At its core, the district court's decision to effectively make findings of fact at the pleading stage infused the court's rulings at every turn.  Aside from its disregard of applicable precedents and abuse of discretion, the district court's errors have prevented Plaintiffs from pursuing this important consumer protection action.  Residential energy is one of the largest monthly costs New York families face, to prey on them as Defendants have done here is unconscionable.  Plaintiffs' pleadings more than adequately state a contract claim and they should be permitted

10

to seek recovery of the many millions of dollars XOOM has unjustly taken from New York consumers.

## STATEMENT OF FACTS

### I.   XOOM PROVIDES NO SERVICES BEYOND PRICE BROKERING

In a major break with past policy, in 1996 New York deregulated its retail energy supply market.  [A-10 at ¶ 18].  Before deregulation, residential consumers could only purchase energy from the local utility.  [A-5 at ¶ 2].  The thinking behind deregulation was that a competitive market would lower energy prices and provide other meaningful benefits.  [A-6 at ¶ 3].  Policy makers assumed that the new third-party energy services companies ("ESCOs") would be more aggressive than the monopoly utility in reducing wholesale purchasing costs and overhead and thereby lower prices.  [A-5–A-6, A-10–A-11 at ¶¶ 1–3, 18, 23].  Because of deregulation, a flood of ESCOs descended on New York to compete against traditional utilities.  The results—in New York and elsewhere—have been devastating, as consumers have lost billions of dollars from ESCOs' exorbitant pricing.  [A-12–A-16 at ¶¶ 25–28, 33–34].

ESCOs like XOOM neither make nor deliver electricity.  [A-10–A-11 at ¶¶ 20–22].  All of the elements involved in generating and delivering electricity to consumers are handled by third parties.  *Id.*  The only "service" ESCOs like XOOM provide is price-setting—buying electricity from generators and reselling it

to consumers. *Id.* In this limited function ESCOs like XOOM compete against distribution utilities like Con Edison, which are required to offer electricity to consumers at rates that are approved by regulators like New York's Public Service Commission. *Id.* Like the utilities, XOOM buys the same electricity, generated by the same generation companies, from the same electricity pool, run by the same exchange (the New York Independent System Operator). *Id.* The only "service" XOOM provides is its price brokering service. *Id.*

To consumers there is no difference between XOOM's electricity and the utility's electricity. *Id.* The consumer receives the exact same electricity from the exact same generator through the exact same wires regardless of whether the consumer signed up with XOOM or the utility. *Id.* The only difference to the consumer is the price she is charged. *Id.*

## II.   XOOM OFFERS ENERGY RATES BASED ON ITS SUPPLY COSTS

Because XOOM has nothing to do with the generation, transmission, or distribution of electricity, nor even with the process of metering and billing for its use, XOOM's only distinguishing feature is the price it sets. XOOM entices consumers with low, introductory teaser rates, but when the teaser rate expires, consumers are charged variable rates. [A-6 at ¶ 4].

XOOM provides consumers a uniform customer contract, which states that the "[customer's] monthly variable rate is based on XOOM's ***actual and estimated***

12

***supply costs*** which may include but not be limited to prior period adjustments, inventory and balancing costs." [A-19 at ¶ 44] (emphasis added).

For an ESCO such as XOOM, a rate based on "actual and estimated supply costs" varies in accordance with XOOM's costs of procuring electricity in the wholesale market, plus an appropriate margin (mark-up) to cover the legitimate overhead costs. [A-19–A-20 at ¶¶ 47–48]. Such overhead costs such as rent, salaries, taxes, and similar legitimate costs are included in XOOM's margin. [A-120 at ¶ 48]. Critically, however, for variable rate setting purposes these costs are relatively fixed each month, and thus cannot be the basis for XOOM's rate fluctuations. *Id.* Instead, it is XOOM's energy procurement costs that are the "supply costs" that fluctuate. [A-19–A-20 at ¶¶ 47–52]. Thus, monthly changes in electricity procurement costs should be the only "supply costs" that cause XOOM's rates to fluctuate.

But as set forth in Plaintiffs' pleadings, the rates XOOM charged Appellants were not commensurate with XOOM's supply costs. [A-78 at ¶ 45]. XOOM purchases its energy at wholesale market rates on the New York wholesale energy market. [A-79 at ¶ 47]. The wholesale cost of energy makes up over 90% of Defendants' supply costs. [A-64 at ¶ 4]. Considering these two facts, Plaintiffs (with their expert's assistance) were able to calculate XOOM's supply costs and demonstrate that XOOM's prices exceeded its supply costs by as much as 66%.

[A-81–A-82 at ¶ 54].  In fact, the work performed by Plaintiffs' expert

demonstrates that XOOM's rates moved **up** even as its supply costs went **down**.

[A-83 at ¶ 57].

## III.   PRACTICES LIKE XOOM'S HAVE DEPRIVED NEW YORK CONSUMERS MORE THAN $1 BILLION

Plaintiffs' analysis of XOOM's rates and allegations align with the New

York Public Service Commission ("PSC") staff's recent findings of "massive $1.3

billion" in customer overcharges in New York's ESCO market:

> The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.

> * * *

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers. These overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market.  These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.

[A-75–A-77 at ¶¶ 37–38].  Just as the PSC's staff concluded about New York's

ESCOs, Plaintiffs' expert's analysis and allegations show that XOOM's rates are

not tied to the underlying cost XOOM incurs to supply consumers' energy.  [A-81–

14

82 at ¶¶ 54–55]. Because XOOM purchases its energy on the wholesale market, those costs are independently verifiable. [A-81 at ¶ 53]. As the PSC staff have found, ESCOs like XOOM are taking advantage of consumers' inability to engage in the same type of analysis Plaintiffs' expert has undertaken here and are overcharging consumers due to their own "greed." [A-75–A-77 at ¶¶ 37–38]. While XOOM has obviously joined an industry-wide scheme, XOOM's customer contract does not allow such practices. Plaintiffs seek to enforce their rights under the contract and put a stop to XOOM's price gouging.

## SUMMARY OF ARGUMENT

This is a straightforward breach of contract case that cannot be adjudicated at the pleading stage. The district court substituted its opinion on the central question of whether XOOM breached its customer contract and the district court's decisions amounted to a preemptive summary judgment. Moreover, the district court failed to appreciate the fact that under Rule 15 leave to amend is "freely given" prior to trial and that the Second Circuit has a "strong preference for resolving disputes on the merits." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005); *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011).

The district court's desire to dispose of this case at the pleading stage animated every aspect of the proceedings below.  The following paragraphs address Plaintiffs' arguments regarding each of the four issues raised in this appeal.

*First*, the district court's September 21, 2018 order ended this consumer protection action even though Plaintiffs established the rate XOOM should have charged under the terms of its customer contract and demonstrated that XOOM's rates were much higher.

*Second*, the district court was wrong to dismiss Plaintiffs' original complaint *with prejudice* without explaining why an amendment would be futile.

*Third*, the September 21 dismissal order repeatedly noted that Plaintiffs failed to plead that XOOM purchases its energy on New York's wholesale energy market.  Yet, when Plaintiffs attempted to amend their complaint with allegations that XOOM purchases its electricity at wholesale market rates on the New York wholesale energy market [A-79 at ¶ 47], the district court held that amendment was futile.

The district court also concluded that "the contractual language allowing XOOM to set its prices in accordance with 'actual and estimated supply costs' does not require that XOOM set its prices in accordance with any of the market-related factors identified by plaintiffs . . . ."  [A-113].  This was error.  The factors Plaintiffs identified *are* XOOM's supply costs.

16

Moreover, the district court overemphasized considerations of finality and disregarded the fact that pre-trial leave to amend is "freely given." *Aetna*, 404 F.3d at 603.

**Fourth**, in denying Plaintiffs' reconsideration motion the district court issued a summary judgment ruling that Plaintiffs' rate calculations do "not demonstrate that XOOM has not considered other legitimate criteria that may impact its 'actual and estimated' costs in setting its rates." [A-127]. This overlooks the crucial fact that Plaintiffs allege XOOM's prices are ***not*** based on its supply costs. Because XOOM's electricity supply costs "are objectively determinable and mandated by regulation," XOOM's exorbitant rates are not based on other, non-disclosed "legitimate" costs. [A-80–A-81 at ¶ 53, A-127].

As fully explained below, the district court erred in indulging every presumption against Plaintiffs' breach claim. Appellants ask that the Court reverse and remand with instructions to allow Appellants to proceed to with discovery.

## STANDARD OF REVIEW

This Court "review[s] *de novo* the grant of a motion to dismiss under Rule 12(b)(6), accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor." *Scutti Enters., LLC. v. Park Place Entm't. Corp.*, 322 F.3d 211, 214 (2d Cir. 2003). A complaint may not be dismissed "unless it appears beyond doubt, even when the complaint is liberally construed,

that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (internal quotation marks and citation omitted).

As for Plaintiffs' post-dismissal motion to replead, this Court "review[s] the district court's denial of a postjudgment motion for leave to replead for abuse of discretion." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011) (citing *In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 120 (2d Cir.2010); *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir.2008)). "A district court abuses its discretion when its ruling 'rests on an error of law' or 'cannot be located within the range of permissible decisions.'" *Id.* (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir.2001)). "Leave to amend shall be freely given, and this court reviews the district court's actions for abuse of discretion." *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000).

Finally, the standard applicable to Plaintiffs' appeal of the district court's denial of their reconsideration motion is abuse of discretion. *Gottlieb v. S.E.C.*, 420 F. App'x 59 (2d Cir. 2011).

## ARGUMENT

## I. PLAINTIFFS AQUADETLY PLED BREACH OF CONTRACT IN THEIR FIRST COMPLAINT

XOOM's contract states that North Carolina law applies. [A-31]. "Under North Carolina law, the 'elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.'" *Arrow*

*Enter. Computing Sols., Inc. v. BlueAlly LLC*, No. 15 Civ. 37 (FL), 2015 WL 6393831, at *3 (E.D.N.C. Oct. 22, 2015) (citing *Crosby v. City of Gastonia*, 635 F.3d 634, 645 (4th Cir. 2011)). Plaintiffs' original Complaint pleads a classic breach of contract: (i) an existing contract [A-19 at ¶ 41], with a term representing that XOOM's variable rate "is based on XOOM's ***actual and estimated supply costs*** which may include but not be limited to prior period adjustments, inventory and balancing costs" [A-19 at ¶ 44]; (ii) which XOOM breached by failing to base its rates on its actual and estimated supply costs and, instead, consistently charged extraordinarily high rates that did not reflect XOOM's supply costs [A-19–A-20 at ¶¶ 46–49]; (iii) thereby causing damage in the form of rates that were higher than Plaintiffs contracted for [A-20–A-21 at ¶¶ 50–57]. Breach of contract has thus been pled and nothing more is required.

Yet Plaintiffs did not stop there. They substantiated their allegations with factual support. *See* A-10 at ¶ 20 (establishing that XOOM is essentially an energy broker); A-16–A-18 at ¶¶ 36–38 (detailing the PSC Staff's findings that ESCOs are abusing the lack of pricing transparency in New York's residential energy markets and obfuscating the criteria they use to set rates); A-21 at ¶ 54 (alleging that XOOM intentionally fails to disclose the fact that its rates are untethered to XOOM's supply costs). Plaintiffs also went as far as providing a pre-discovery calculation of a rate that *actually* reflects XOOM's supply costs for *each month*

during which Plaintiffs were XOOM electricity customers. [A-19–A-20 at ¶¶ 47–48]. These calculations are set forth in the table below:

| Period | XOOM Rate | Market Supply Cost | Difference in % |
|---|---|---|---|
| 5/10/2013-6/11/2013 | 8.99 (teaser) | 11.03 | -18.53% |
| 6/11/2013-7/11/2013 | 11.96 | 11.89 | 0.60% |
| 7/11/2013-8/9/2013 | 14.40 | 12.36 | 16.52% |
| 8/9/2013-9/10/2013 | 14.88 | 10.1 | 47.33% |
| 9/10/2013-10/8/2013 | 14.15 | 10.12 | 39.85% |
| 10/8/2013-11/7/2013 | 14.90 | 9.82 | 51.73% |

Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Pls.' Class Action Compl. at 7 n.6 (ECF No. 20).

XOOM's rate is calculated based on "the costs of a retailer [i.e., an ESCO like XOOM] supplying a residential customer for each [of Plaintiffs' billing period[s]." [A-20 at ¶ 48]. Specifically, XOOM's energy costs included "load weighted) Zone J day-ahead prices [the service zone applicable to Plaintiffs], ancillary services costs, capacity costs, renewable portfolio standard (RPS) costs, and various charges and taxes related to New York's Independent Systems Operator." *Id*. Plaintiffs also added a substantial margin to cover an ESCO's fixed costs. *Id.* These costs were then calculated separately for each of the months during which Plaintiffs received service from XOOM and tabulated to show the

glaring disconnect between XOOM's pricing and XOOM's supply costs.  [A-19–A-20 at ¶ 47].  This table demonstrates that XOOM's rates were "consistently and substantially" higher than the rate based on Defendants' supply costs.  [A-19–A-20 at ¶¶ 47–49].  This more than satisfies Plaintiffs' burden at the pleading stage.

In fact, Plaintiffs' allegations are consistent with, and more detailed than, the slew of recent cases where courts across the nation have denied motions to dismiss substantially similar breach claims brought in other ESCO consumer class actions.[3]

---

[3] *See, e.g.*, *Melville v. Spark Energy, Inc.*, No. 15 Civ. 8706 (RBK), 2016 WL 6775635, at *5 (D.N.J. Nov. 15, 2016) (sustaining contract claim where contract stated rate was based on market conditions and defendant set rates higher than those of other energy suppliers); Tr. of Oral Arg. at 24–29, *Steketee v. Viridian Energy, Inc.*, No. 15 Civ. 0585 (SRU) (D. Conn. Dec. 2, 2015), ECF No. 46 (sustaining contract claim that defendant agreed to charge rates based on wholesale market conditions and then charged a rate unrelated to those conditions), Ex. 1 of Decl. of Steven L. Wittels in Supp. of Pls.' Opp'n to Defs.' Mot. to Dismiss (Wittels Decl., Ex. 1, ECF No. 21-1); *Sobiech v. U.S. Gas & Elec., Inc.*, No. 14 Civ. 4464 (GAM) (E.D. Pa. Feb. 4, 2015), ECF No. 24 (denying motion to dismiss breach of contract claim arising from promise to base rates on "market-related factors") (Wittels Decl., Ex. 2, ECF No. 21-2); *Basile v. Stream Energy Pa., LLC*, No. 15 Civ. 1518 (YK), 2016 WL 4611443, at *4 (M.D. Pa. Sept. 6, 2016) (breach of contract claim sustained where contract stated that rates "may fluctuate and [are] subject to change at the sole discretion of Stream energy, based upon the fluctuation of wholesale [electricity] prices or other inputs to wholesale electric prices[.]"; *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 410 (E.D. Pa. 2016) (finding breach of contract where rates were consistently higher than the local utility's rates); *Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261 (PKC), 2015 WL 5155934, at *6 (S.D.N.Y. Sept. 2, 2015) (holding that, because "variable market based rates" may be interpreted as referring to prevailing market rates charged by competing ESCOs, the fact that the defendant charged more than its competitors was sufficient to allege breach of "promise to set its monthly variable rates according to market rates"); *Chen v. Hiko Energy, LLC*, No. 14 Civ.

*Footnote continued on next page*

---

1771 (VLB), 2014 WL 7389011, at *4 (S.D.N.Y. Dec. 29, 2014) (sustaining contract claim "[g]iven the dramatic differences in pricing between defendant and [local utility], it is plausible defendant's rates were not, in fact, reflective of the wholesale cost of electricity or gas, market-related factors, and defendant's 'costs, expenses and margins.'"); *Mirkin v. Viridian Energy, Inc.*, No. 15 Civ. 1057 (SRU), 2016 WL 3661106, at *9 (D. Conn. July 5, 2016) (sustaining the breach of contract claim and ruling that "the contract at issue . . . did not give [the defendant] unfettered discretion" to establish a variable rate wholly unrelated to wholesale market conditions); *Oladapo v. Smart One Energy, LLC*, No. 14 Civ. 7117 (LTS), 2016 WL 344976, at *2, 3 (S.D.N.Y. Jan. 27, 2016) (denying motion to dismiss breach of contract claims, notwithstanding contract provision that "prices would be set at [defendant's] 'sole discretion, in response to changing gas market conditions'"); *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 147, 148 (D. Conn. 2015) (sustaining good faith and fair dealing claim and stating that the defendant denied the plaintiff what "he [] reasonably expected to receive under the contract.") (internal citation omitted); Ruling on Def.'s Mot. to Dismiss at 2, 6, *Tully v. N. Am. Power & Gas, LLC*, No. 14 Civ. 634 (WWE) (D. Conn. Oct. 29, 2015), ECF No. 68 (sustaining breach of contract claims and stating that the contractual terms of a "variable market based rate plan" are "at least ambiguous, and . . . could be construed as unfair or deceptive misrepresentations to induce consumers to contract with defendant." ) (Wittels Decl., Ex. 3, ECF No. 21-3); Tr. of Oral Arg. at 42, *Gruber v. Starion Energy, Inc.*, No. 14 Civ. 1828 (SRU) (D. Conn. Apr. 7, 2015), ECF Nos. 46, 53 (same) (Wittels Decl., Ex. 4, ECF No. 21-4); Tr. of Oral Arg. at 36–39, *Sanborn v. Viridian Energy, Inc.*, No. 14 Civ. 1731 (SRU) (D. Conn. Apr. 1, 2015), ECF No. 40 (stating that "the complaint does allege bad faith on the part of [defendant] with respect to the establishment of electric supply rates that are a multiple of the wholesale price that's prevailing in the market, and that seems to be at least potentially done in bad faith, i.e., in an effort to price-gouge.") (Wittels Decl., Ex. 5, ECF No. 21-5); Ruling on Def.'s Mot. to Dismiss at 7, *Fritz v. N. Am. Power & Gas, LLC*, No. 14 Civ. 634 (WWE) (D. Conn. Jan. 29, 2015), ECF No. 42 (sustaining breach of contract claim) (Wittels Decl., Ex. 6, ECF No. 21-6); *Austin v. Kiwi Energy NY LLC, et al.*, No. 515350/17, at 9 (Sup. Ct. Kings Cnty., Jan. 2, 2018) (same) (Wittels Decl., Ex. 7, ECF No. 21-7); *Aks v. IDT Energy*, No. L-4936-14, at 4 (N.J. Super. Ct. Civ. Div. Nov. 6, 2014) (same) (Wittels Decl., Ex. 8, ECF No. 21-8); *Komoda v. Palmco Energy*, No. L-3263-14, at 3 (N.J. Super. Ct. Civ. Div. Sept. 19, 2014) (same) (Wittels Decl., Ex. 9, ECF No. 21-9).

Nevertheless, the district court's September 21, 2018 order disposed of Plaintiffs' claims *with prejudice*.  The dismissal order erred in three key ways.

***First***, despite recognizing that "[w]hen analyzing the terms of a contract, [the court] must 'resolve all ambiguities in the contract in [p]laintiffs' favor'" ([A-46] (citing *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010)) the dismissal order repeatedly (and incorrectly) observed that in calculating the contractually-required rate Plaintiffs neglected to plead that XOOM purchases its energy at the wholesale rate.  [A-47, A-50, A-51].  This was error.

Plaintiffs' original complaint set forth a XOOM rate that was based on "the costs of a retailer [i.e., an ESCO like XOOM] supplying a residential customer for each [of Plaintiffs' billing] period[s]" [A-20 at ¶ 48], and further alleged that "[t]he cost of ***wholesale energy*** is the primary component of the non-overhead costs XOOM incurs."  [A-20 at ¶ 51] (emphasis added).  Plaintiffs' original complaint also made clear that ESCOs like XOOM "are essentially brokers and traders:  they neither make nor deliver gas or electricity, but merely buy energy from a producer and re-sell it to consumers."  [A-11 at ¶ 20].  In other words, by pleading that (i) Plaintiffs' calculated rate was based on an energy retailer's costs, (ii) that the primary component of XOOM's costs is "[t]he cost of ***wholesale energy***," and (iii) that XOOM is merely a broker that buys and re-sells energy, Plaintiffs *did* plead

that XOOM purchases energy at the wholesale rate.  Indeed, it makes no sense for a broker like XOOM to pay more than the wholesale rate.

Yet the district court's failure to recognize Plaintiffs' specific allegations led it to find a disconnect between XOOM's "actual and estimated" supply costs and Plaintiffs' calculated XOOM rate (the proposed "Market Supply Cost" in the Complaint, [A-50, A-51]), which Plaintiffs derived from the relevant wholesale market costs.  [A-47] ("XOOM does not claim in the agreement or elsewhere that it purchases its electricity on the wholesale market, and plaintiffs make no specific allegations about the mechanism by which 'XOOM fill[s] its supply needs.'"); [A-50] ("Plaintiffs' allegations fail because they conflate XOOM's internal costs with complicated factors that appear nowhere on the face of the agreement."); [A-51] (Plaintiffs' "manufactured 'Market Supply Cost' is far too attenuated from XOOM's 'actual or estimated supply costs' to demonstrate breach.").

Even if the district court were correct (it was not) that Plaintiffs failed to tie XOOM's supply costs to the cost of electricity in New York's wholesale market, such an omission is not fatal at the *pleading* stage.  Plaintiffs supplied the exact rate they allege XOOM was contractually bound to charge.  A mere comparison between the rates Plaintiffs alleged XOOM should have charged (which allegation must be taken as true at this early pleading stage) and the rates XOOM actually charged is sufficient at this stage.

*Second*, the district court faulted Plaintiffs for not disclosing their underlying calculation of the rates XOOM was contractually bound to charge and labeled Plaintiffs' rate "manufactured" and "fabricated."  [A-49, A-51].  Yet such disclosure was not strictly necessary to plead a plausible, non-conclusory breach of contract claim—especially because XOOM merely re-sells energy it purchases on the wholesale market.

*Third*, the starting point for much of the district court's analysis in its September 21 dismissal order was an ordinary consumer's reasonable expectations of the meaning of XOOM's consumer contract.  [A-46] ("Plaintiffs argue that a reasonable customer would have interpreted XOOM's reference to its 'actual and estimated supply costs' as a promise that its variable rates would bear some relationship to 'wholesale prices.'").[4]  While Plaintiffs recognize that other ESCO

---

[4] *See also* [A-47] ("Plaintiffs attempt to equate XOOM's 'actual and estimated supply costs' to a verifiable, external rate of electricity costs, which can be ascertained by customers and easily compared to the rate they were actually charged."); [A-48] ("Customers—at least those without any background in the electricity market or the numerous factors that may determine the cost of an individual electric provider—would have no basis for predicting XOOM's actual or estimated costs.  As a result, customers have no mechanism for comparing their actual rates to the cost of the utility, since the agreement provides them with limited information about the factors used to determine XOOM's costs."); [A-49] ("[T]he multiple factors plaintiffs use to calculate their fabricated 'Market Supply Rate' demonstrate just how little resemblance this figure bears to the expectations of a reasonable customer.  While a reasonable customer may plausibly expect that XOOM will set rates based on its costs, a reasonable consumer would likely *not* assume the XOOM's cost will be based, for example, on '(load-weighted) Zone J day-ahead prices[.]'") (emphasis in original).

plaintiffs' counsel have invoked the reasonable expectations doctrine to determine the ESCO contract's meaning, we believe that the dismissal order's analysis (as well as the PSC staff's findings, [A-16–A-18 at ¶¶ 36–38]) demonstrate that doctrine's inapplicability here.

The overwhelming scholarly research shows that consumers do not read fine print contracts like XOOM's and thus cannot form reasonable expectations about a particular contract provision—here, XOOM's commitment to charge prices based on its actual and estimated supply costs. *See* Elena D'Agostino, *Contracts of Adhesion*, *in* ENCYCLOPEDIA OF LAW AND ECONOMICS (Aug. 19, 2017) ("In the globalized mass production economy . . . contracts are usually proposed by sellers to consumers on a take-it-or-leave-it basis without negotiation [and] . . . [c]onsumers usually do not read the whole contract."). In fact, an empirical study of online consumers showed only one or two in every 1,000 access online retailers' contracts for even a second prior to agreeing to the terms. Yannis Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention to Standard Form Contracts*, 43 J. LEGAL STUDIES 1 (2014).

This is why the district court's two cited cases with "comparable complaints" are inapposite. [A-50–A-51]. First, in the Mirkins' successful suit against Viridian Energy there were no allegations that Viridian breached these consumers' reasonable expectations. First Amended Class Action Complaint ¶ 47,

26

*Mirkin v. Viridian Energy, Inc.*, No. 15 Civ. 1057 (SRU) (D. Conn. Dec. 18, 2015),

ECF No. 47.  In fact, there were no allegations that the Mirkins had any

expectations regarding the consumer contract at all; instead the Mirkins relied on

Viridian's marketing.  *Id.*

    *Yang Chen* is similarly distinguishable because in that case the plaintiff

alleged New York consumer fraud claims related to the ESCO's promise to

provide energy based on "market related factors."  Consolidated Class Action

Complaint ¶ 15, *Yang Chen v. Hiko Energy, LLC*, No. 14 Civ. 1771 (VB)

(S.D.N.Y. July 9, 2014), ECF No. 21.

    Indeed, there was no need for the district court to rely on a consumer's

reasonable expectations of the contract's plain language, as the pricing term

("actual and estimated supply costs") is unambiguous and an ordinary consumer's

expectations are thus irrelevant.  *Lynn v. Lynn*, 689 S.E.2d 198, 205 (2010) ("It is

the general law of contracts that the purport of a written instrument is to be

gathered from its four corners, and the four corners are to be ascertained from the

language used in the instrument.") (quoting *Carolina Power & Light Co. v.

Bowman*, 51 S.E.2d 191, 199 (1949)).  "When the language of the contract is clear

and unambiguous, construction of the agreement is a matter of law for the court . . .

and the court cannot look beyond the terms of the contract to determine the

intentions of the parties."  *Id.*  (quoting *Piedmont Bank & Trust Co. v. Stevenson*,

339 S.E.2d 49, 52, *aff'd per curiam*, 344 S.E.2d 788 (1986)); *see also Brown v. Ginn*, 640 S.E.2d 787, 790 (2007) ("The intent of the parties is determined by examining the plain language of the contract."). Considering consumers' expectations adds nothing to the contract's plain meaning because XOOM drafted and imposed the contract. The reasonable expectations doctrine is not appropriate when only one party (XOOM) writes the contract.

In sum, the district court's September 21 dismissal should be reversed, and Plaintiffs should be allowed to proceed to discovery.

## II. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' COMPLAINT WITH PREJUDICE WITHOUT EXPLAINING WHY AMENDMENT WOULD BE FUTILE

The district court dismissed Plaintiffs' claims with prejudice without making any finding whatsoever that repleading would be futile. [A-38–A-57]. This was reversible error. *See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 191 (2d Cir. 2015) ("By not giving Plaintiffs a chance to replead . . . the district court not only violated the liberal spirit of Rule 15 . . . it also skirted the key issue of futility. At this stage, the district court has not identified any issue as to which (i) the complaint is deficient and (ii) amendment would be futile.") (internal citation and quotation marks omitted); *see also id.* at 169 (vacating dismissal with prejudice where 1) the district court had asked plaintiffs if they wished to amend their complaint during a pre-motion conference

regarding defendants' 12(b)(6) motion, 2) plaintiffs declined that opportunity to amend, and 3) the court later dismissed plaintiffs' claims with prejudice and denied leave to amend, without analyzing the issue of futility); *Palmer v. Fannie Mae*, No. 17 Civ. 2867, 2018 WL 5830504, at *2 (2d Cir. Nov. 7, 2018) (vacating dismissal with prejudice where the lower court erroneously found that any attempt to amend would be futile without fully considering all facts); *see also id.* ("While 'futility' is a valid reason for denying a motion to amend, this is true only where it is beyond doubt that the plaintiff can prove no set of facts in support of his amended claims.") (citation and alterations omitted); *Burkeen v. A.R.E. Accessories, LLC*, No. 17 Civ. 6437 (ELC), 2018 WL 6620183, at *3 (6th Cir. 2018) (same) (dismissal should have been without prejudice where "[t]he district court . . . did not provide any explanation for dismissing the complaint with prejudice," and "foreclosed any future possibility of amendment without indicating any reason to believe that amendment would have been futile and without providing any other justifications for granting dismissal with prejudice."). Indeed, "[b]ecause there was no indication that amendment would have been futile and no other apparent justification was provided for the dismissal with prejudice, the district court . . . should have dismissed the claims without prejudice and with leave to amend." *Id*. at *3 (citation and alterations omitted).

## III. THE DISTRICT COURT ERRED IN DENYING PLAINTIFFS LEAVE TO AMEND THEIR COMPLAINT

### A. Plaintiffs' Proposed FAC Addressed and Cured the District Court's Perceived Deficiencies

On October 19, 2018, Appellants filed a motion requesting that the district court alter or amend its dismissal ruling, or alternatively, for relief from its judgment and to allow Plaintiffs to file their proposed First Amended Class Action Complaint (the "FAC"). [A-59, A-62]. The FAC attempted to cure the district court's perceived pleading defects in the following three ways:

*First*, to allay the district court's (incorrect) observation that Plaintiffs' original complaint did not describe how XOOM procures its energy, Plaintiffs' proposed FAC specifically alleges that XOOM purchases its energy at wholesale market rates on the New York wholesale energy market. [A-79 at ¶ 47]. Plaintiffs then support their allegation with factual research and analysis showing the following:

   a. XOOM is recognized as a "Market Participant" on the New York Independent System Operator's ("NYISO") wholesale energy market. [A-79 at ¶ 47].[5]

   b. Language from XOOM's webpage stating 1) that ESCOs like XOOM buy energy from the wholesale markets, 2) that XOOM is "aligned with one of the world's largest energy wholesalers, enabling [it] to buy energy

---

[5] NYISO is the federally regulated entity that administers New York's wholesale electricity market.

on a competitive basis," and 3) that XOOM's customers purchase their energy "at market-based prices . . . ." [A-79 at ¶¶ 48–49].

c. A XOOM marketing presentation stating that XOOM's rates fluctuate "with [the] wholesale market[.]" [A-80 at ¶ 52].

Notably, the FAC also alleges that the wholesale cost of energy makes up over 90% of Defendants' supply costs [A-64 at ¶ 4] and explains the components that contribute to the additional costs an ESCO like XOOM pays when it purchases energy on the wholesale market. [A-80–A-81 at ¶ 53]. ***Critically***, the FAC explains that wholesale supply costs "are objectively determinable and mandated by regulation." *Id.* Then the FAC compares the wholesale cost of energy during Plaintiffs' exact billing cycles (with a substantial added margin of 1.3¢ per kWh sold)[6] to XOOM's prices during the same billing cycles. [A-81 at ¶ 54]. This comparison, set forth in both the FAC and the table on the following page shows that XOOM's rates are not based on XOOM's supply costs:

---

[6] During Plaintiffs' billing cycle this represents an average 13.67% markup (margin) over XOOM's supply costs. This is a substantial margin for a service that consumers passively purchase and that the utility delivers and bills for, which saves XOOM significant overhead costs. [A-82 at ¶ 55]. Further, through the New York purchase of receivables program XOOM quickly offloads its credit risk to the utility, which saves XOOM overhead for collections. [A-69–A-70 at ¶ 22]. This program was instituted by New York's energy regulator to, among other reasons, reduce ESCOs' operating costs. *Id.*

31

| Period | XOOM Rate | Market Supply Cost | Difference in % | XOOM Total Margin (Markup) on Wholesale Cost[7] |
|---|---|---|---|---|
| 5/10/2013– 6/11/2013 | 8.99 (*teaser*) | 11.08 | -23.25% | N/A |
| 6/11/2013– 7/11/2013 | 11.96 | 11.80 | -1.34% | 11.04% |
| 7/11/2013– 8/9/2013 | 14.40 | 12.35 | 16.60% | 28.36% |
| 8/9/2013– 9/10/2013 | 14.88 | 10.18 | 46.17% | 60.81% |
| 9/10/2013– 10/8/2013 | 14.15 | 10.13 | 39.68% | 54.40% |
| 10/8/2013– 11/7/2013 | 14.90 | 9.85 | 51.27% | 66.47% |

[A-81–A-82 at ¶ 54].

This table demonstrates two key facts. First, it shows that XOOM's rates went up when the underlying wholesale market rates went up (compare XOOM's rates and the Market Supply Cost for the 6/11/2013–7/11/2013 and 7/11/2013–8/9/2013 billing periods) but ***continued to climb*** when the wholesale market rate ***went down*** (compare XOOM's rates and the Market Supply Cost for the 9/10/2013–10/8/2013 and 10/8/2013–11/7/2013 billing periods). Further,

---

[7] This figure adds the percent margin associated with the 1.3¢ per kWh margin in Plaintiffs' "Market Supply Cost" to the "Difference in %" increase in XOOM's rates, on top of the already generous 1.3¢ per kWh margin.

XOOM's total markup compared to its wholesale costs is exceedingly high (as much as 66.47%), especially considering its low operating costs and its contractual pledge to base consumers' rates on XOOM's supply costs.

Next, Plaintiffs' FAC included a new table (inserted below) comparing XOOM's rate to Plaintiffs' utility's rate (Con Edison) during the same billing periods.  [A-84 at ¶ 61].

| Period | XOOM Rate[8] | Con Edison Supply Charge | Difference in % |
|---|---|---|---|
| 5/10/2013– 6/11/2013 | 9.39 (*teaser*) | 10.06 | -6.66% |
| 6/11/2013– 7/11/2013 | 12.50 | 11.20 | -10.40% |
| 7/11/2013– 8/9/2013 | 15.05 | 12.36 | 21.76% |
| 8/9/2013– 9/10/2013 | 15.55 | 9.78 | 60.00% |
| 9/10/2013– 10/8/2013 | 14.79 | 10.12 | 46.15% |
| 10/8/2013– 11/7/2013 | 15.57 | 9.82 | 58.55% |

In New York, the rates utilities charge generally reflect the NYISO wholesale rate because Con Edison purchases electricity directly from the NYISO. [A-84 at ¶ 60].  Thus, Con Edison's NYISO purchases are a good indicator of XOOM's supply costs, as XOOM also pays the wholesale market rate.  *Id.*

---

[8] Because the Con Edison Supply Charge includes New York City's 4.5% gross receipts tax, that amount was added to the XOOM rate to allow an "apples to apples" comparison.

As the comparison to Con Edison's rates demonstrates, XOOM's rate does not rise and fall with Con Edison's rate and thus XOOM's rate is not in fact based on its supply costs. [A-84 at ¶ 61]. While the Con Edison rates are not a perfect reflection of the wholesale cost of electricity (utilities have true-ups and other adjustments in their rates), if XOOM's rates were based on its supply costs, those rates would more or less move with Con Edison's rates. Notably, when Con Edison's rates rise, XOOM's rates go up, but when Con Edison's rates fall, XOOM's rates *rise*.

**Second**, to address the Court's concerns about the methodology used for calculating XOOM's rate, Plaintiffs attached their expert's calculations as Exhibit 3 to the proposed FAC. [A-102]. These calculations are factually derived from publicly available data regarding wholesale market costs, which are "objectively determinable and mandated by regulation." [A-80–A-81 at ¶ 53]. This more than satisfied Plaintiffs' burden at the pleading stage.

**Third**, to focus the district court's attention on the XOOM contract's plain meaning we removed all references to a reasonable consumer's expectations from the FAC.

To the extent the district court's September 21 dismissal ruling identified legitimate flaws in Plaintiffs' initial complaint, the proposed FAC cured those deficiencies and Plaintiffs' amendment request should have been granted.

34

## B.   The District Court's November 2 Rejection of Plaintiffs' Amendment Request Was an Abuse of Discretion

Even before Plaintiffs were scheduled to file their reply in further support of their motion to amend, on November 2, 2018 the district court denied the requested amendment.  [A-107].  This too was reversible error.  "Rule 15(a) directs that leave to amend should be 'freely given.'"  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005).  As instructed by the Second Circuit, "[t]he proper time for a plaintiff to move to amend the complaint is when the plaintiff learns from the District Court in what respect the complaint is deficient.  Before learning from the court what are its deficiencies, the plaintiff cannot know whether he is capable of amending the complaint efficaciously."  *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017); *see also Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 190 ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").

Indeed, labeling the operative complaint deficient, yet not affording Plaintiffs an opportunity to cure the district court's perceived deficiencies, was a "clear error of law," "obvious injustice," "manifest injustice," "mistake," and "other reason that justifies relief" constituting grounds for post-judgment relief under Rules 59(a) and 60(b).

35

Further, in not holding oral argument on either Defendants' dismissal motion or Plaintiffs' vacatur motion and issuing its November 2 opinion before giving Plaintiffs the opportunity to file their reply, the district court put Plaintiffs in an untenable position. It was unfair indeed for the district court to "agree" with Defendants' claim that Plaintiffs failed to specify "in their motion papers what that manifest injustice could be." [A-110]. Had the district court not ruled before the deadline for Plaintiffs' reply, Plaintiffs would have dispelled any doubt that dismissing Plaintiffs' claims with prejudice was the manifest injustice Plaintiffs' vacatur motion sought to cure.

The district court was also wrong to fault Plaintiffs for not seeking leave to replead *before* the original September 21 dismissal order was issued. [A-111–A-112]. This Court has labeled such a requirement as a "Hobson's choice: agree to cure deficiencies not yet fully briefed and decided or forfeit the opportunity to replead." *Loreley*, 797 F.3d at 190. This is especially true in complex cases like the instant case, "where pleading defects may not only be latent, and easily missed or misperceived without full briefing and judicial resolution; they may also be borderline, and hence subject to reasonable dispute." *Id.* at 191.

This Court's ruling in *Williams v. Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011) (per curiam) is particularly instructive. *Williams* shared the identical procedural posture of this case. *Id.* at 210. District Judge Loretta A. Preska

36

dismissed the plaintiff's "complaint without granting leave to replead" and denied the plaintiff's "postjudgment motion (through which she sought leave to replead)." *Id.*  This Court held "that the district court, in denying the postjudgment motion, applied a standard that overemphasized considerations of finality at the expense of the liberal amendment policy embodied in the Federal Rules of Civil Procedure." *Id.*

Specifically, like the district court's November 2 ruling, in *Williams* Judge Preska rejected the plaintiff's postjudgment vacatur motion because the plaintiff had not "demonstrated any basis for the extraordinary remedy of reconsideration" and did "not explain why she should be granted leave to replead at this stage when she failed to request an opportunity to replead in the first instance." *Id.* at 212. While the district court's November 2 ruling correctly noted that *Williams* did not require the Court to *sua sponte* grant leave to replead ([A-112]), the district court ignored *Williams'* other key holding.  In reversing Judge Preska's denial of the *Williams* plaintiff's vacatur motion, this Court explained that the "permissive standard" of Rule 15 "is consistent with our strong preference for resolving disputes on the merits."  *Id.* at 212–13 (internal quotation marks omitted); *see also id.* at 213–14 (analyzing the Supreme Court's ruling in *Foman v. Davis*, 371 U.S. 178, 182 (1962) where the Supreme Court "ruled that the district court abused its discretion and violated the liberal spirit of Rule 15 by denying the [postjudgement]

motion," and concluding that "[t]he *Foman* holding cannot be reconciled with the proposition that the liberal spirit of Rule 15 necessarily dissolves as soon as final judgment is entered."). *Williams* is binding precedent and Plaintiffs' request to replead should have been granted.

## C.    The District Court's November 2 Ruling Incorrectly Concluded Plaintiffs' Proposed Amendment Was Futile

When the district court denied Plaintiffs' request to replead it stated that when it initially dismissed Plaintiffs' case with prejudice, its "primary concern" was that "the contractual language allowing XOOM to set its prices in accordance with 'actual and estimated supply costs' does not require that XOOM set its prices" in the same way calculated by Plaintiffs.  [A-113].  In other words, the district court reiterated its factual conclusion that XOOM's supply costs are not necessarily tied to XOOM's procurement cost on New York's wholesale market.

Yet as discussed in Point III(A), *supra*, Plaintiffs' FAC addressed the district court's primary concern by specifically alleging that XOOM purchases its energy at wholesale market rates.  [A-79].  Plaintiffs then supported this allegation with extensive factual research and analysis detailing XOOM's supply costs and demonstrating that XOOM's rates do not match XOOM's wholesale acquisition costs which, ***critically***, are "objectively determinable and mandated by regulation." Mem. in Supp. of Pls.' Mot. to Alter or Amend J. at 5 (ECF No. 27); *see also id.* at 5–7 (demonstrating based on this known data regarding XOOM's costs that its

38

electricity rates are substantially higher than its supply costs); A-78 at ¶ 46, A-80–A-81 at ¶53, A-82 at ¶ 55 (further explaining XOOM's costs).  For example, for the three billing periods from August 9, 2013 to November 7, 2013, XOOM charged Plaintiffs a rate that was 50% higher than what XOOM was contractually permitted to charge.  [A-81–A-82 at ¶ 54].  These allegations, which must be taken as true, show that XOOM breached its customer contract.

Nevertheless, the district court's November 2 ruling found that Appellants failed to address its "primary concern:  that the contractual language allowing XOOM to set its prices in accordance with 'actual and estimated supply costs' does not require that XOOM set its prices in accordance with any of the market-related factors identified by plaintiffs—*regardless* of new allegations about XOOM's electricity purchasing arrangements."  [A-113] (emphasis in original).

This was error.  The factors Appellants identified for the district court ***are*** XOOM's supply costs.  If XOOM does not set its prices in line with its supply costs, it breaches its contract—end of story.  Of course, the contract does not *require* XOOM to set its prices in accordance with any criteria Plaintiffs identify, unless (as we did here) Plaintiffs identify XOOM's supply costs, which we did because ***XOOM's publicly-available documents state that XOOM purchases electricity on the wholesale market***.  [A-79–A-80 at ¶¶ 47–52].

Likewise, the November 2 ruling incorrectly stated that Plaintiffs gained nothing by adding allegations about information on XOOM's website and marketing materials because "these new allegations do not change the fact that the contractual language used by XOOM in its electricity sales agreement does *not* commit XOOM to charge rates that match market-based prices or wholesale rates." [A-113–A-114] (emphasis in original) (citing FAC ¶¶ 48–52). Plaintiffs' proposed new allegations, which detail XOOM's public statements that it purchases energy at wholesale market rates, were pled to demonstrate the plausibility of Plaintiffs' claim that "XOOM purchases its energy either directly from the New York Independent System Operator ('NYISO') or pursuant to an agreement(s) that ties XOOM's supply costs to prices in the NYISO wholesale market." [A-79 at ¶ 47]. Obviously, XOOM's claim in its marketing that it purchases energy at the wholesale rate does not change the contract's requirement that XOOM's rates be based on its supply costs. Instead, XOOM's marketing supports Plaintiffs' claim that it obtains its energy via the wholesale market, which costs are known and prove that XOOM's rates are not based on its supply costs.

This is also why the November 2 ruling was wrong to find that "while the plaintiffs' proposed inclusion of the Market Supply Cost calculations would provide additional context for their allegations, this information still demonstrates that the factors the plaintiffs included in their calculation *do not* appear on the face

of the contract." [A-114]. There is no dispute as to the contract's contents. Instead, Plaintiffs allege that XOOM procures energy at the wholesale cost—a known price—and that Defendants' rates do not reflect these costs, which is a breach of XOOM's contract. The calculations merely demonstrate this fact.

The district court also committed error when it concluded that "plaintiffs do not adequately address [the district court's] concerns by removing all references to the expectations of a 'reasonable consumer' and alleging instead that the term 'actual and estimated supply costs' is 'unambiguous.'" [A-114–A-115]. Plaintiffs' removal of the references to the expectations of reasonable consumers was to address the district court's unanticipated heavy reliance on a reasonable consumer's supposed understanding of the meaning of a complicated fine-print form contract the customer did not draft, could not negotiate, and did not read. As Appellants made clear in their first attempt to point the district court to the appropriate criteria for construing XOOM's customer contract's plain meaning (Mem. in Supp. of Pls.' Mot. to Alter or Amend J. at 9–10, ECF No. 27)—the reasonable expectations doctrine "is not appropriate when only one party (XOOM) drafted the contract." Indeed, in concluding that "plaintiffs [did] not adequately address [the district court's] concerns by removing all references to the expectations of a 'reasonable consumer,'" the district court relied on *Salvaggio v. New Breed Transfer Corp.*, 564 S.E.2d 641, 642 (N.C. Ct. App. 2002), where an

41

employment agreement was "negotiated between the parties." [A-115]. As *Salvaggio* makes clear, in cases like the instant one "[w]here the language of a contract is 'clear and only one reasonable interpretation exists, the courts must enforce the contract as written . . . .'" *Id.* at 643 (quoting *Woods v. Nationwide Mut. Ins. Co.*, 246 S.E.2d 773, 777 (N.C. 1978)). Here, there is no dispute that XOOM's rates must be based on "XOOM's actual and estimated supply costs . . . ." [A-78]. The only dispute is whether XOOM complied with the terms of its contract, ***which is a question of fact***—especially when one considers the well-pled allegations of the proposed FAC.[9]

Finally, it was reversible error for the district court to find that Plaintiffs failed to satisfy the criteria under Rules 59(e) or 60(b) to vacate the dismissal order. The district court's November 2 ruling stated that "plaintiffs do not identify any case law or factual allegations that they believe the court overlooked in its September 21 order." [A-110]. Similarly, the district court concluded that "[a]side from repeating the standard for a 60(b) motion, plaintiffs provide no arguments

---

[9] The November 2 ruling also incorrectly stated that Plaintiffs "wish to remove two causes of action originally pleaded in their first complaint: breach of the implied covenant of good faith and fair dealing, and unjust enrichment." [A-113]. Plaintiffs removed those causes of action because the district court's September 21 Opinion and Order dismissed them, not because Plaintiffs simply decided to remove them. [A-51–A-56].

regarding why they should be entitled to this 'extraordinary' form of relief, so I decline to grant it."  [A-112].

Yet, and as the November 2 ruling recognized "[a] party seeking to file an amended complaint postjudgment must first have the judgment vacated or set aside pursuant to Fed. R. Civ. P. 59(e) or 60(b)."  [A-109] (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)).  Plaintiffs were not required to demonstrate that the dismissal order was wrongly decided.  Instead, Rules 59(e) and 60(b) are merely the procedural vehicles a plaintiff can use to make the Rule 15 amendment request when a case has been dismissed with prejudice.  Indeed, in evaluating the Rule 15 amendment request (*see* discussion in Point III(B), *supra*), the district court disregarded this Court's "strong preference for resolving disputes on the merits" in favor of considerations of finality.  *Williams*, 659 F.3d at 212–13.  "[I]t is reversible error for a court to address only concerns of finality without also taking into account the nature of the proposed amendment, in light of [this Court's] strong preference for resolving disputes on the merits."  *Becnel v. Deutsche Bank AG*, 838 F. Supp. 2d 168, 170–71 (S.D.N.Y. 2011) (quoting *Williams*, 658 F.3d at 213) (internal quotation marks omitted).  Plaintiffs should have been allowed to file their proposed amended complaint.

## IV.   THE DISTRICT COURT OVERLOOKED KEY FACTUAL AND LEGAL MATTERS WHEN IT DENIED APPELLANTS' RECONSIDERATION MOTION

In its final order, the district court stated that "plaintiffs cite no facts or law that I overlooked when I concluded that plaintiffs' proposed amendments would be futile.  Instead, plaintiffs argue that I did not place sufficient weight on new allegations they argue are more important than I found them to be."  [A-125].  The district court further made the merits ruling that Plaintiffs' calculation of the rate(s) XOOM was contractually bound to charge "does not demonstrate that XOOM has not considered other legitimate criteria that may impact its 'actual and estimated' costs in setting its rates."  [A-127].  Respectfully, this is plainly incorrect.  The district court overlooked the crucial fact that XOOM's prices are not based on its supply costs.  Because XOOM's electricity supply costs "are objectively determinable and mandated by regulation," XOOM's exorbitant rates do not reflect "other legitimate criteria" devised by the district court.  [A-80–A-81 at ¶ 53, A-127].

The district court also wrongly distinguished *Gonzales v. Agway Energy Servs., LLC*, No. 518 Civ. 235 (MAD) (ATB), 2018 WL 5118509 (N.D.N.Y. Oct. 22, 2018) and the many other well-pled breach of contract actions against ESCOs on the grounds that the other contracts based the ESCOs' prices on "other market-related factors" in addition to "the cost of electricity."  [A-127].  XOOM's contract

bases prices on XOOM's supply costs.  Because Plaintiffs allege (and XOOM cannot dispute) that Defendants purchase energy at the wholesale market rate, XOOM's contractual promise to base its rates on XOOM's supply costs has the *exact same* legal meaning as a contract that ties rates to the wholesale market rate. In other words, this case is the *same* as the cases that survived the 12(b)(6) stage where the relevant pricing terms were based on "market-related factors."

For the district court to end this suit on the pleadings without discovery was to impermissibly prejudge the merits.  Based on *Gonzales* and the slew of energy cases where courts have denied motions to dismiss on factual allegations substantially similar to the Mirkin Plaintiffs' here,[10] the district court should have permitted Plaintiffs to prove that Defendants breached their contracts with Plaintiffs and the thousands of New York consumers this case seeks to protect.

Indeed, in supporting its conclusion that "the district court first considered whether plaintiffs had demonstrated that they were entitled to relief under the Federal Rules of Civil Procedure," the court relied on inapposite cases.  [A-123]. For example, in *In re Molycorp, Inc. Securities Litigation*, No. 13 Civ. 5697 (PAC), 2016 WL 3002424, at *3 (S.D.N.Y. May 23, 2016), the court denied leave to amend because the plaintiffs sought leave to amend seven months after the defendant's motion to dismiss was filed and did not attach a proposed amended

---

[10] *See supra* footnote 3.

45

complaint.  Here, by contrast, the time between the date on which Defendants filed

their dismissal motion (June 27, 2018) and the date of Plaintiffs' request for leave

to amend (October 19, 2018) was less than four months and Plaintiffs supplied the

district court with a proposed amendment.  *See Richardson Greenshields Sec., Inc.*

*v. Lau*, 825 F.2d 647, 653 (2d Cir. 1987) (collecting cases where leave to amend

was granted after delays ranging from two to five years).[11]

The district court also incorrectly relied on *Smith v. Hogan*, 794 F.3d 249,

256 (2d Cir. 2015) and *Janese v. Fay*, 692 F.3d 221, 229 (2d Cir. 2012) for the

proposition that it does not have to provide plaintiffs "with leave to amend at all

times."  [A-124].  Neither *Smith* nor *Janese* cited *Williams* and as acknowledged

by the district court, both are in direct tension with the Second Circuit's "strong

preference for resolving disputes on the merits."  *Williams*, 659 F.3d at 212–13.[12]

---

[11] Likewise, the district court's citation to *Sahni v. Staff Attorneys Ass'n*, No. 14 Civ. 9873 (NSR), 2018 WL 654467, at *5 (S.D.N.Y. Jan. 30, 2018) is inapposite. In *Sahni* the plaintiffs argued that reconsideration is warranted due to "newly discovered evidence." *Id.*  The *Sahni* court concluded that relief under rule 60(b)(2) was not warranted because "the movant ostensibly had knowledge of the evidence before judgment was entered." *Id.  See also Becnel v. Deutsche Bank AG*, 838 F. Supp. 2d 168, 171 (S.D.N.Y. 2011) (same) ("[Plaintiff] puts forth that he has newly discovered evidence in the form of the report of Dr. Frank J. Fabozzi.").  Here, by contrast, Plaintiffs included additional allegations to address the district court's perceived deficiencies in the initial complaint.

[12] The district court also relied on the non-binding *Schwartz v. HSBC Bank USA, N.A.*, No. 14 Civ. 9525 (KPF), 2017 WL 2634180, at *6 n.3 (S.D.N.Y. June 19, 2017), which followed *Janese* and *Smith*.  However, *Schwartz* is easily

*Footnote continued on next page*

The district court was wrong to dismiss the original complaint. Further, it only amplified its original error when despite Plaintiffs' repeated attempts to address its concerns it steadfastly and incorrectly refused Plaintiffs an opportunity to amend. The Federal Rules of Civil Procedure and this Court's precedent dictate that Plaintiffs have a right to test their claims on the merits. The district court's repeated refusal to allow Plaintiffs to exercise their rights was reversible error.

## CONCLUSION

For the reasons stated above, the Court should reverse the district court's dismissal and related rulings.

Dated:  January 18, 2019
          Armonk, New York

                              Respectfully submitted,

                      By:  /s/ Steven L. Wittels
                            Steven L. Wittels (SW-8110)
                            J. Burkett McInturff (JM-4564)
                            Tiasha Palikovic (TP-5697)

                            **WITTELS LAW, P.C.**
                            18 HALF MILE ROAD
                            ARMONK, NEW YORK 10504
                            Telephone: (914) 319-9945
                            Facsimile: (914) 273-2563
                            slw@wittelslaw.com
                            jbm@wittelslaw.com
                            tpalikovic@wittelslaw.com

                            *Attorneys for Appellants and the Proposed Class*

---

distinguishable because the *Schwartz* plaintiffs amended the complaint twice before seeking leave to amend. *Id*.

# CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
## APPELLATE PROCEDURE 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 11,186 words, excluding the parts of the

document exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionately spaced typeface using Microsoft Word

for Mac 2018 Times New Roman 14-point font.

Dated: January 18, 2019

_____/s/  Steven L. Wittels_____
        Steven L. Wittels