# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

Plaintiffs,

v.

XOOM ENERGY, LLC and
XOOM ENERGY NEW YORK, LLC

Defendants.

Case No. 18 Civ. 2949 (ARR) (RER)

---

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS CONCERNING PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), Plaintiffs Boris Mirkin and Susanna Mirkin ("Plaintiffs") respectfully submit the following response to Defendants XOOM Energy, LLC and XOOM Energy New York, LLC's ("Defendants" or "XOOM") Statement of Material Facts in Support of Their Motion for Summary Judgment. Pursuant to Local Rule 56.1, Plaintiffs set forth correspondingly numbered paragraphs responding to each numbered paragraph in XOOM's statement, *see* ¶ 1 through ¶ 38. Pursuant to Local Rule 56.1, Plaintiffs set forth additional paragraphs containing a separate, short and concise statement of additional

material facts as to which they contend show there exist genuine issues of fact to be tried with respect to Defendants' motion for summary judgment, *see* ¶ 39 through ¶ 117.[1]

## STATEMENT NO. 1:

In March 2013, Susanna Mirkin contracted with XOOM for electricity supply service. Ex. A-8, B. Mirkin Dep. 25:6–27:14.

## RESPONSE TO STATEMENT NO. 1:

Plaintiffs do not dispute that Plaintiff Susanna Mirkin's name is listed in the email confirmation XOOM sent the Mirkins after they contracted with XOOM. Ex. 1 at Mirkins_00004. To the extent that Defendants' Statement No. 1 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed. In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13. Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account. *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 1 on the grounds that the cited evidence does not support the purported factual statement set forth therein, as required by Local Rule 56.1. Plaintiffs further object to Statement No. 1 on the grounds that it (1) misstates the contents of XOOM exhibit A-8, which consists of excerpts from the deposition testimony of

---

[1] Plaintiffs' response uses the same citation conventions as set forth in their accompanying Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. Plaintiffs object to all headings set forth in Defendants' statement, which are not reproduced herein, as attorney argument without citation to evidence that would be admissible, as required by Local Rule 56.1.

Boris Mirkin describing how he, not Susanna, signed up with XOOM; and (2) the Exhibit includes alterations made by XOOM's counsel.

**STATEMENT NO. 2:**

XOOM confirmed Susanna's enrollment in an email sent on March 13, 2013. *See* Ex. A-20, New Customer Enrollment at 1–2; Ex. A-8, B. Mirkin Dep. 26:20–27:17.

**RESPONSE TO STATEMENT NO. 2:**

Plaintiffs do not dispute that XOOM's confirmation email was addressed to Plaintiff Susanna Mirkin. Ex. 1 at Mirkins_00004. To the extent that Defendants' Statement No. 2 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed. In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13. Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account. *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 2 on the grounds that the cited evidence does not support the purported factual statement set forth therein, as required by Local Rule 56.1. Plaintiffs further object to Statement No. 2 on the grounds that it (1) misstates the contents of XOOM exhibit A-8, which consists of excerpts from the deposition testimony of Boris Mirkin describing how he, not Susanna, signed up with XOOM; (2) misstates the contents of XOOM exhibit A-20, which shows that XOOM's confirmation email was sent to

Boris's email address, Ex. 4, B. Mirkin Tr. 27:5–11; and (3) the Exhibit includes alterations made by XOOM's counsel.

**STATEMENT NO. 3:**

The March 13 email attached the Electricity Sales Agreement between XOOM and Susanna Mirkin (the "Contract"). Ex. A-19, Contract at 1–2.

**RESPONSE TO STATEMENT NO. 3:**

Plaintiffs do not dispute that XOOM's March 13, 2013 email to the Mirkins attached the Electricity Sales Agreement between XOOM and the Mirkins ("2013 Contract"). To the extent that Defendants' Statement No. 3 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed. In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13. Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account. *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 3 on the grounds that (1) the cited evidence does not support the purported factual statement set forth therein, as required by Local Rule 56.1; and (2) it misstates the contents of XOOM Exhibit A-19, which does not state that it is an agreement between XOOM and Plaintiff Susanna Mirkin.

**STATEMENT NO. 4:**

The Contract included the following terms:

| XOOM SimpleFlex Variable Price Product | Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable.   Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs. You are responsible for all charges assessed and billed by your local utility for all applicable utility charges, which are not included in your rate. |

\* \* \*

| Guaranteed Savings | There are no guaranteed savings in this Agreement at this time. |

\* \* \*

| **AGENCY:** You hereby appoint XOOM Energy as agent for the purposes of (i) acquiring the supplies necessary to meet your electricity needs, and (ii) arranging, contracting for and administering transportation and related services over transmission facilities and those of the LDU needed to deliver electricity to your premises. These services are provided on an arm's length basis and market-based compensation is included in the price noted above. |

\* \* \*

| **CHOICE OF LAWS:** This Agreement shall be governed by the laws of the state of North Carolina without recourse to such states choice of law rules. |

*Id.* at 1–3; Ex. A-8, B. Mirkin Dep. 28:4–8; Ex. A-9, S. Mirkin Dep. 72:13–19.

## RESPONSE TO STATEMENT NO. 4:

Plaintiffs do not dispute that the 2013 Contract includes the excerpted terms.  Plaintiffs otherwise object to Statement No. 4 on the grounds that (1) the cited evidence includes alterations made by XOOM's counsel; and (2) it selectively excerpts passages from the cited Exhibit without the proper context.  Plaintiffs further state that the contents of the 2013 Contract speak for themselves.

**STATEMENT NO. 5:**

After receiving her enrollment confirmation, Susanna began to receive electricity supply service pursuant to the Contract on May 10, 2013. *See* Ex. A-18, Account Statement at 2.

**RESPONSE TO STATEMENT NO. 5:**

Plaintiffs do not dispute that the Mirkins began receiving their electricity supply from XOOM beginning approximately May 10, 2013.  To the extent that Defendants' Statement No. 5 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed.  In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home.  Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13.  Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account.  *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11.  Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 5 on the grounds that the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 6:**

Susanna continued to receive electricity supply service pursuant to the Contract until the Contract was cancelled without penalty and she began to receive service from Viridian on November 17, 2013. *See id.* at 1; Ex. A-8, B. Mirkin Dep. 38:15–23.

**RESPONSE TO STATEMENT NO. 6:**

That Plaintiffs switched their energy supplier from XOOM to Viridian is not material. Plaintiffs do not dispute that the Mirkins began receiving their electricity supply from Viridian beginning approximately November 17, 2013. To the extent that Defendants' Statement No. 6 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed. In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13. Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account. *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 6 on the grounds that (1) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (2) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 7:**

At all relevant times, Susanna's rates were set pursuant to XOOM's "spreadsheet-based model." Ex. A-10, Loehde Dep. 59:11–60:2, 65:24–66:10. Under that model, the foundational component of XOOM's rates was a set of calculations that XOOM used to make its "best estimate" of various costs it would incur to supply its consumers with electricity in the upcoming month. *Id.*

**RESPONSE TO STATEMENT NO. 7:**

Disputed.  XOOM's rate setting process worked as follows.  XOOM held monthly rate-setting meetings for "up to 20 markets and 1,000 different products" and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks.  Class Cert. Opp'n at 9–10. Discovery shows these workbooks contained XOOM's internal supply cost calculations, but XOOM disregarded these calculations.

In fact, ███████████████████████████████████████████████████████

███████████████████████████████.  *See* Ex. 19, Loehde Tr. 61:11–19 ████████

█████████████████████████); Ex. 20, Coppola Tr. 88:10–14 (█████████████

██████████).  Instead, ████████████████████████████████████████████

█████████████████ Ex. 19, Loehde Tr. 61:11–19; Ex. 21, Park Tr. 32:10–19 (██████

██████████████████████████████████████).

The record ████████████████████████████████████████████████████

██████████████████████████████████████.  Quite the opposite: Director of Product Management for XOOM's Supply Team Ryan Park and SVP of Energy Supply and Pricing Andrew Coppola ████████████████████████████████████

█████████████████████████████████████████████████████████████

████.  Ex. 22 at XOOM_MIRKIN_065820 (emphasis added).  In fact, consistent with XOOM's middleman role, ████████████████████████████████████████████

███████.  *See* Ex. 20, Coppola Tr. 143:5–7 (██████████████████████████

███████████████████████).

Moreover, on February 11, 2016, XOOM substantially modified the pricing term in its form contract to give itself discretion to set rates based on a broad range of criteria.  The 2016 contract states:

> Your rate may be based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Ex. 40, 2/11/16 Sales Agreement; *see also* Ex. 41, Defs.' Interrog. Resps., at 6–7 (No. 24) ("[T]he February 11, 2016 contract language applied to New York customers that [first] enrolled in a variable rate plan on or after February 11, 2016."). These updated pricing criteria are absent from the 2013 Contract.  *See* Ex. 1 at Mirkins_00004.

The record further shows that this material language shift allowing XOOM to base rates "upon a number of factors" including "pricing strategies" was intended to better reflect XOOM's practices.  Both XOOM's corporate witness Loehde and its SVP of Energy Supply and Pricing Coppola admitted that ███████████████████████████████ ██████████████████████████ Ex. 24, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Ex. 20, Coppola Tr. 98:11–18.   Conceding that XOOM's rate-setting process violated the 2013 Contract, ████████████████████████████████████████████ ██████████████████████████████ Ex. 24, XOOM 30(b)(6) Tr. 134:2–135:15 (emphasis added). XOOM's expert agreed, testifying that XOOM used its "pricing strategies" when setting rates pursuant to the 2013 Contract. Ex. 8, Coleman Tr. 66:11–15.

Further, the rates XOOM ultimately charged the Mirkins shows XOOM's markup over and above its "Total Costs" ██████████████████████████ during the Mirkins' short tenure.



Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n); Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

In addition, over the Mirkins' short tenure as XOOM customers, the markup XOOM applied to Plaintiffs' rates was .



Class Cert. Opp'n at 8; Ex. 9, Pls.' Rebuttal Rep. Ex. 7.

In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13. Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account. *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 7 on the grounds that the cited evidence includes alterations made by XOOM's counsel.

## STATEMENT NO. 8:

The results of those calculations were summarized in documents known as "rate-setting workbooks," which provided a detailed summary of the projected cost components for all of the fixed, variable, and introductory rates XOOM offered in the workbook's area of coverage. *See, e.g.*, Ex. A-11, Loehde Corp. Dep. 186:20–23 ██████████████████████████████████████████████████████████████████████████████████ ██████████████); Ex. A-10, Loehde Dep. 66:18–25 (██████████████████████ ██████████████████████████████████████████); Ex. A-13, Coppola Dep. 263:4–16 (██████████████████████████████████); Ex. A-12, Park Dep. 120:18–125:25; Ex. 26 to Class Cert. Mem., Exemplar Rate-Setting Workbook; *see also* Ex. A-3, Coleman Rpt. at 22.

## RESPONSE TO STATEMENT NO. 8:

Disputed.  XOOM's rate setting process worked as follows.  XOOM held monthly rate-setting meetings for "up to 20 markets and 1,000 different products" and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks.  Class Cert. Opp'n at 9–10. Discovery shows these workbooks contained XOOM's internal supply cost calculations, but XOOM disregarded these calculations.



In fact, ██████████████████████████████████████████████████

████████████████████████████.  *See* Ex. 19, Loehde Tr. 61:11–19 ████████

████████████████████████); Ex. 20, Coppola Tr.  88:10–14 (████████████████

████████).  Instead, ████████████████████████████████████████████

████████████       Ex. 19, Loehde Tr. 61:11–19; Ex. 21, Park Tr. 32:10–19 (████████

████████████████████████████████████).

The record also ████████████████████████████████████████████████

████████████████████████████████████.  Quite the opposite: Director of Product Management for XOOM's Supply Team Ryan Park and SVP of Energy Supply and Pricing Andrew Coppola ████████████████████████████████

████████████████████████████████████████████████████████████████

████.  Ex. 22 at XOOM_MIRKIN_065820 (emphasis added).  In fact, consistent with XOOM's middleman role, ████████████████████████████████████████████

████████.  *See* Ex. 20, Coppola Tr. 143:5–7 ████████████████████████████

████████████████████████████).

Moreover, on February 11, 2016, XOOM substantially modified the pricing term in its form contract to give itself discretion to set rates based on a broad range of criteria. The 2016 contract states:

> Your rate may be based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Ex. 40, 2/11/16 Sales Agreement; *see also* Ex. 41, Defs.' Interrog. Resps., at 6–7 (No. 24) ("[T]he February 11, 2016 contract language applied to New York customers that [first] enrolled in a variable rate plan on or after February 11, 2016."). These updated pricing criteria are absent from the 2013 Contract. *See* Ex. 1 at Mirkins_00004.

The record further shows that this material language shift allowing XOOM to base rates "upon a number of factors" including "pricing strategies" was intended to better reflect XOOM's practices. Both XOOM's corporate witness Loehde and its SVP of Energy Supply and Pricing Coppola admitted that ███████████████████████████████████ ████████████████████ Ex. 24, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Ex. 20, Coppola Tr. 98:11–18. Conceding that XOOM's rate-setting process violated the 2013 Contract, ██████████████████████████████████████████████████ ████████████████████████████." Ex. 24, XOOM 30(b)(6) Tr. 134:2–135:15 (emphasis added). XOOM's expert agreed, testifying that XOOM used its "pricing strategies" when setting rates pursuant to the 2013 Contract. Ex. 8, Coleman Tr. 66:11–15.

Further, the rates XOOM ultimately charged the Mirkins shows XOOM's markup over and above its "Total Costs" ██████████████████████████ during the Mirkins' short tenure.



Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n); Ex.

3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

In addition, over the Mirkins' short tenure as XOOM customers, the markup XOOM

applied to Plaintiffs' rates was ███████████████████████████

███████████████████████████████████████████

████████████████████.



Class Cert. Opp'n at 8; Ex. 9, Pls.' Rebuttal Rep. Ex. 7.

Plaintiffs otherwise object to Statement No. 8 on the grounds that (1) Statement No. 8 refers to "those calculations" but does not explain what those calculations are; and (2) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 9:**



However, █████████████████████████████████████

████████████████████████████████████████████████

███████████████████. Ex. A-13, Coppola Dep. 171:11–16; Ex. A-10, Loehde Dep. 51:4–21, 70:5–22, 251:6–22; Ex. A-11, Loehde Corp. Dep. 90:5–91:11; Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15; *see also* Ex. A-11, Loehde Corp. Dep. 263:11–264:5 (████████████████████████████████████████████

██████████████████████████████).

**RESPONSE TO STATEMENT NO. 9:**

Disputed. Risk premiums were included in rate-setting workbooks as part of supply costs. Ex. 19, Loehde Tr. 214:23–25, 238:23–3. Plaintiffs do not dispute that XOOM's rate-setting workbooks included a "Total Cost" formulation and █████████████████

█████████████████████. Plaintiffs otherwise object to Statement No. 9 on the grounds that (1) it attempts to set forth attorney argument; (2) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (3) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 10:**

The sum of the cost components projected in the rate-setting workbooks was provided as a "Total" figure in the rate-setting workbooks, and that figure can be referred to as "Cost of Goods Sold" or COGS. *See* Ex. A-3, Coleman Rpt. at 4.

**RESPONSE TO STATEMENT NO. 10:**

Plaintiffs do not dispute that XOOM's rate-setting workbooks included a "Total Cost" formulation set forth in the workbooks and that XOOM's expert refers to the "Total Cost" as the "Cost of Goods Sold" or "COGS."

**STATEMENT NO. 11:**

COGS was "the foundation of where pricing starts" and the "largest component" of XOOM's variable rate pricing. Ex. A-13, Coppola Dep. 279:1–280:1, 284:14–285:2; *see also* Ex. A-14, Ulry Dep. 51:5–12, 68:13–69:3; Ex. A-10, Loehde Dep. 257:2–10; Ex. A-11, Loehde Corp. Dep. 289:9–290:12; Ex. A-12, Park Dep. 33:10–22, 34:20–35; Ex. A-5, Pls.' Expert Rpt. ¶ 53.

**RESPONSE TO STATEMENT NO. 11:**

Disputed. XOOM's rate setting process worked as follows. XOOM held monthly rate-setting meetings for "up to 20 markets and 1,000 different products" and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks. Class Cert. Opp'n at 9–10. Discovery shows these workbooks contained XOOM's internal supply cost calculations, but XOOM disregarded these calculations.



In fact, [REDACTED]

[REDACTED]. *See* Ex. 19, Loehde Tr. 61:11–19 [REDACTED]

[REDACTED]); Ex. 20, Coppola Tr. 88:10–14 ([REDACTED]

[REDACTED]). Instead, [REDACTED]

[REDACTED] Ex. 19, Loehde Tr. 61:11–19; Ex. 21, Park Tr. 32:10–19 ([REDACTED]

[REDACTED]).

The record also ███████████████████████████████████████████████████

███████████████████████████████████████. Quite the opposite:

Director of Product Management for XOOM's Supply Team Ryan Park and SVP of Energy

Supply and Pricing Andrew Coppola ████████████████████████████████████

████████████████████████████████████████████████████████████████

████. Ex. 22 at XOOM_MIRKIN_065820 (emphasis added). In fact, consistent with

XOOM's middleman role, ████████████████████████████████████████

████████. *See* Ex. 20, Coppola Tr. 143:5–7 ████████████████████████████

███████████████████████).

Moreover, on February 11, 2016, XOOM substantially modified the pricing term in

its form contract to give itself discretion to set rates based on a broad range of criteria. The

2016 contract states:

> Your rate may be based upon a number of factors, which may include but not
> be limited to, the fluctuation of wholesale commodity costs or other
> components of wholesale prices (including but not limited to capacity related
> costs, fluctuations in energy supply and demand, and weather patterns) and
> XOOM's pricing strategies.

Ex. 40, 2/11/16 Sales Agreement; *see also* Ex. 41, Defs.' Interrog. Resps., at 6–7 (No. 24)

("[T]he February 11, 2016 contract language applied to New York customers that [first]

enrolled in a variable rate plan on or after February 11, 2016."). These updated pricing criteria

are absent from the 2013 Contract. *See* Ex. 1 at Mirkins_00004.

The record further shows that this material language shift allowing XOOM to base

rates "upon a number of factors" including "pricing strategies" was intended to better reflect

XOOM's practices. Both XOOM's corporate witness Loehde and its SVP of Energy Supply

and Pricing Coppola admitted that ████████████████████████████████████

████████████████████" Ex. 24, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Ex. 20,

17

Coppola Tr. 98:11–18.   Conceding that XOOM's rate-setting process violated the 2013 Contract, ███████████████████████████████████████████ ████████████████████████████ Ex. 24, XOOM 30(b)(6) Tr. 134:2–135:15 (emphasis added).  XOOM's expert agreed, testifying that XOOM used its "pricing strategies" when setting rates pursuant to the 2013 Contract.  Ex. 8, Coleman Tr. 66:11–15.

Further, the rates XOOM ultimately charged the Mirkins shows XOOM's markup over and above its "Total Costs" ████████████████████████ during the Mirkins' short tenure.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n"); Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

In addition, over the Mirkins' short tenure as XOOM customers, the markup XOOM applied to Plaintiffs' rates was ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████.



Class Cert. Opp'n at 8; Ex. 9, Pls.' Rebuttal Rep. Ex. 7.

Plaintiffs otherwise object to Statement No. 11 on the grounds that (1) it attempts to set forth attorney argument; (2) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (3) the cited evidence includes alterations made by XOOM's counsel.

## STATEMENT NO. 12:

After calculating its COGS projections, the next step in XOOM's rate-setting process was to add a margin, which was calculated in the rate-setting workbooks as the percentage difference between COGS and a rate proposed by analysts on the pricing team. Ex. A-10, Loehde Dep. 51:4–21, 68:2–8, 181:3–18.

## RESPONSE TO STATEMENT NO. 12:

Disputed. XOOM's rate setting process worked as follows. XOOM held monthly rate-setting meetings for "up to 20 markets and 1,000 different products" and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks. Class Cert. Opp'n at 9–10.

Discovery shows these workbooks contained XOOM's internal supply cost calculations, but XOOM disregarded these calculations.

In fact, ██████████████████████████████████ ██████████████████████████████.  *See* Ex. 19, Loehde Tr. 61:11–19 ████ ████████████████████████████); Ex. 20, Coppola Tr. 88:10–14 (█████████ ████████).  Instead, ██████████████████████████████████████ ████████  Ex. 19, Loehde Tr. 61:11–19; Ex. 21, Park Tr. 32:10–19 (████████ ██████████████████████████████).

The record also █████████████████████████████████ ████████████████████████████████████.  Quite the opposite: Director of Product Management for XOOM's Supply Team Ryan Park and SVP of Energy Supply and Pricing Andrew Coppola ███████████████████████████████ ████████████████████████████████████████████████ ████.  Ex. 22 at XOOM_MIRKIN_065820 (emphasis added).  In fact, consistent with XOOM's middleman role, ██████████████████████████████████ ████████.  *See* Ex. 20, Coppola Tr. 143:5–7 (███████████████████ ████████████████████).

Moreover, on February 11, 2016, XOOM substantially modified the pricing term in its form contract to give itself discretion to set rates based on a broad range of criteria.  The 2016 contract states:

> Your rate may be based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Ex. 40, 2/11/16 Sales Agreement; *see also* Ex. 41, Defs.' Interrog. Resps., at 6–7 (No. 24) ("[T]he February 11, 2016 contract language applied to New York customers that [first] enrolled in a variable rate plan on or after February 11, 2016."). These updated pricing criteria are absent from the 2013 Contract. *See* Ex. 1 at Mirkins_00004.

The record further shows that this material language shift allowing XOOM to base rates "upon a number of factors" including "pricing strategies" was intended to better reflect XOOM's practices. Both XOOM's corporate witness Loehde and its SVP of Energy Supply and Pricing Coppola admitted that ███████████████████████████████████████ ███████████████████████ Ex. 24, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Ex. 20, Coppola Tr. 98:11–18. Conceding that XOOM's rate-setting process violated the 2013 Contract, ███████████████████████████████████████████ ███████████████████████████████ Ex. 24, XOOM 30(b)(6) Tr. 134:2–135:15 (emphasis added). XOOM's expert agreed, testifying that XOOM used its "pricing strategies" when setting rates pursuant to the 2013 Contract. Ex. 8, Coleman Tr. 66:11–15.

Further, the rates XOOM ultimately charged the Mirkins shows XOOM's markup over and above its "Total Costs" ███████████████████████████ during the Mirkins' short tenure.



Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n); Ex.

3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

In addition, over the Mirkins' short tenure as XOOM customers, the markup XOOM

applied to Plaintiffs' rates was ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████.



Class Cert. Opp'n at 8; Ex. 9, Pls.' Rebuttal Rep. Ex. 7.

Plaintiffs do not dispute that XOOM added a margin to its Total Costs, and the percentage difference between the proposed rate and margin was calculated in XOOM's rate-setting workbooks.  Plaintiffs otherwise object to Statement No. 12 on the grounds that the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 13:**

Once the margins were added, the rate-setting workbooks were presented to a team of decisionmakers at rate-setting meetings, at which point final rates were set for multiple markets and products. *Id.* at 63:10–13, 64:10–14, 69:6–14, 158:6–159:9; Ex. A-13, Coppola Dep. 70:12–71:3; Ex. A-12, Park Dep. 32:10–19, 87:8–19; Ex. A-15, Chidester Dep. 23:13–18.

**RESPONSE TO STATEMENT NO. 13:**



Disputed.  XOOM witnesses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Ex. 21, Park Tr. 34:20–36:16 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  Plaintiffs otherwise object to Statement No. 13 on the grounds that (1) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (2) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 14:**

The margin in XOOM's rate "is not exclusively related to profit." Ex. A-13, Coppola Dep. 172:24–173:11. Rather, in the context of XOOM's rate-setting procedures, the term "margin" simply meant an "adder" or "a margin over something." *Id.* at 171:11–173:11; Ex.

A-12, Park Dep. 44:15–24. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. Ex. A-13, Coppola Dep. 171:11–16; Ex. A-10, Loehde Dep. 251:6–22; Ex. A-11, Loehde Corp. Dep. 90:5–91:11; Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15.

**RESPONSE TO STATEMENT NO. 14:**

Disputed.  Risk premiums were included in rate-setting workbooks as part of supply costs. Ex. 19, Loehde Tr. 214:23–25, 238:23–3. ██████████████████████████

███████████████████. *See* Ex. 20, Coppola Tr. 143:5–7 ████████████████

████████████████████████████████████).   Neither XOOM's rate-setting workbooks nor any of the other documents XOOM circulated for its rate setting meetings ████████████████████████████████████. *See* Ex. 2, Pls.' Expert Rep. ¶ 23(d)

████████████████████████████████████████████████████████████

████████████████████████████████████), ¶ 47 (████████████████████████

████████████████████████████████████████████████████████████

████████████████████), ¶ 51 ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████); Ex. 8, Coleman Tr. 95:17–96:4 (███████████

████████████████████████████████████████████████████████████

████████████████████████████).  Further, ████████████████████████████

████████████████████████████████████████████████████████████

████████.  *See* Ex. 12 (exemplar margin report).

Plaintiffs otherwise object to Statement No. 14 on the grounds that (1) it attempts to set forth attorney argument; (2) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (3) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 15:**

For example, ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████. Ex. A-10, Loehde Dep. 251:6–22; *see also id.* at 51:4–21, 70:5– 71:23, 139:6–23, 209:11–20; Ex. A-11, Loehde Corp. Dep. 284:3–22; Ex. A-13, Coppola Dep. 169:4–170:7, 171:25–172:23, 285:19–25; Ex. A-14, Ulry Dep. 76:12–77:23, 78:11– 79:13, 82:15–19, 85:7–17.

**RESPONSE TO STATEMENT NO. 15:**

Disputed.  XOOM's rate setting process worked as follows.  XOOM held monthly rate-setting meetings for "up to 20 markets and 1,000 different products" and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks.  Class Cert. Opp'n at 9–10. Discovery shows these workbooks contained XOOM's internal supply cost calculations, but XOOM disregarded these calculations.



In fact, █████████████████████████████████████████████ █████████████████████████████████. *See* Ex. 19, Loehde Tr. 61:11–19 ███████ █████████████████████████); Ex. 20, Coppola Tr. 88:10–14 (███████████████ █████████).  Instead, █████████████████████████████████████████



██████████ Ex. 19, Loehde Tr. 61:11–19; Ex. 21, Park Tr. 32:10–19 (██████████████████████).

The record also █████████████████████████████████████. Quite the opposite: Director of Product Management for XOOM's Supply Team Ryan Park and SVP of Energy Supply and Pricing Andrew Coppola ███████████████████████████████████████████████████████████████████████████████████. Ex. 22 at XOOM_MIRKIN_065820 (emphasis added). In fact, consistent with XOOM's middleman role, ████████████████████████████████████. *See* Ex. 20, Coppola Tr. 143:5–7 ████████████████████████████).

Moreover, on February 11, 2016, XOOM substantially modified the pricing term in its form contract to give itself discretion to set rates based on a broad range of criteria. The 2016 contract states:

> Your rate may be based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Ex. 40, 2/11/16 Sales Agreement; *see also* Ex. 41, Defs.' Interrog. Resps., at 6–7 (No. 24) ("[T]he February 11, 2016 contract language applied to New York customers that [first] enrolled in a variable rate plan on or after February 11, 2016."). These updated pricing criteria are absent from the 2013 Contract. *See* Ex. 1 at Mirkins_00004.

The record further shows that this material language shift allowing XOOM to base rates "upon a number of factors" including "pricing strategies" was intended to better reflect XOOM's practices. Both XOOM's corporate witness Loehde and its SVP of Energy Supply

and Pricing Coppola admitted that ███████████████████████████████████

████████████████████   Ex. 24, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Ex. 20,

Coppola Tr. 98:11–18.   Conceding that XOOM's rate-setting process violated the 2013

Contract, ██████████████████████████████████████████████████████████

████████████████████████   Ex. 24, XOOM 30(b)(6) Tr. 134:2–135:15

(emphasis added). XOOM's expert agreed, testifying that XOOM used its "pricing strategies"

when setting rates pursuant to the 2013 Contract.  Ex. 8, Coleman Tr. 66:11–15.

Further, the rates XOOM ultimately charged the Mirkins shows XOOM's markup

over and above its "Total Costs" ████████████████████████   during the Mirkins'

short tenure.

█████████████████████████████████████████████████████████████████

Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n"); Ex.

3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

In addition, over the Mirkins' short tenure as XOOM customers, the markup XOOM

applied to Plaintiffs' rates was ████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████ .



Class Cert. Opp'n at 8; Ex. 9, Pls.' Rebuttal Rep. Ex. 7.

Moreover, neither XOOM's rate-setting workbooks nor any of the other documents XOOM circulated for its rate setting meetings 

. *See* Ex. 2, Pls.' Expert Rep. ¶ 23(d)

), ¶ 47 (

), ¶ 51

); Ex. 8, Coleman Tr. 95:17–96:4 (

). Further,

. *See* Ex. 12 (exemplar margin report).

Plaintiffs otherwise object to Statement No. 15 on the grounds that (1) it attempts to set forth attorney argument; (2) the cited evidence does not support the support the purported

factual statement set forth therein, as required by Local Rule 56.1; and (3) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 16:**

 Ex. A-13, Coppola Dep. 171:11– 172:17, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Ex. A-10, Loehde Dep. 213:23–214:2.

**RESPONSE TO STATEMENT NO. 16:**

Disputed. Neither XOOM's rate-setting workbooks nor any of the other documents XOOM circulated for its rate setting meetings ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 2, Pls.' Expert Rep. ¶ 23(d)▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



), ¶ 47 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ), ¶ 51 ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); Ex. 8, Coleman Tr. 95:17–96:4 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ). Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 12 (exemplar margin report). Plaintiffs do not dispute that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Plaintiffs otherwise object on the grounds that the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1.

Plaintiffs further object to Statement No. 16 on the grounds that (1) it misstates the contents of the cited Exhibits, neither of which refers to "balancing charges;" (2) it attempts to set forth attorney argument; and (3) the cited evidence includes alterations made by XOOM's counsel.

## STATEMENT NO. 17:

When costs went down but the variable rate went up, it was generally "[t]o compensate for prior period adjustments and balancing costs[.]" Ex. A-13, Coppola Dep. 248:21– 24.

## RESPONSE TO STATEMENT NO. 17:

Disputed.  Neither XOOM's rate-setting workbooks nor any of the other documents XOOM circulated for its rate setting meetings ███████████████████████████. See Ex. 2, Pls.' Expert Rep. ¶ 23(d)███████████████████████████████████████████████), ¶ 47 (███████████████████████████████████████), ¶ 51 ████████████████████████████████████████████████████████████████████████████████████████████████); Ex. 8, Coleman Tr. 95:17–96:4 (██████████████████████████████████████). Further, ███████████████████████████████████████████. See Ex. 12 (exemplar margin report).  Plaintiffs do not dispute that ████████████████████████████.



Plaintiffs further object to Statement No. 17 on the grounds that (1) it attempts to set forth attorney argument; and (2) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 18:**

Margin could also include █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15; *see also* Ex. A-11, Loehde Corp. Dep. 90:5–91:14 (████████████████████████████

████████████); Ex. A-13, Coppola Dep. 280:23–281:9 (████████████

████████████).

**RESPONSE TO STATEMENT NO. 18:**

Disputed.  Consistent with XOOM's middleman role, ███████████████

███████████████████████████████. *See* Ex. 20, Coppola Tr. 143:5–7 ███████

████████████████████████████████). Furthermore, █████████

████████████████████████████████████. *See* Ex. 12 (exemplar margin report); Ex. 38 (exemplar rate-setting workbook).

Plaintiffs otherwise object to Statement No. 18 on the grounds that (1) it attempts to set forth attorney argument; (2) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (3) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 19:**

Because a variable rate product is "[f]undamentally . . . different than a fixed rate product," and the two have "a different product term, different costs, et cetera," the margins

31

are different as well. Ex. A-10, Loehde Dep. 118:15–23; *see also id.* 160:22–161:5, 221:24–222:9; Ex. A-13, Coppola Dep. 89:10–17 

); Ex. A-12, Park Dep. 80:7–14.

## RESPONSE TO STATEMENT NO. 19:

Disputed.   XOOM could adjust variable rates if its supply costs unexpectedly increased but could not do the same for its locked in fixed rate plans.  Ex. 2, Pls.' Expert Rep. ¶ 56.  As a mere middleman,

.  *See* Ex. 42, Dep. Tr. of Thomas Ulry, dated May 12, 2022 ("Ulry Tr.") 86:4–87:7

); Ex. 43 at 3

).

Yet it is undisputed that

.  *See* Ex. 2, Pls.' Expert Rep. ¶¶ 55, 59, 75.

Critically, fixed rate customers were          for XOOM.  *See* Ex. 20, Coppola Tr. 198:4–8.  Nevertheless, Director of Product Management Ryan Park acknowledged that

Ex. 44 at

XOOM_MIRKIN_015251.

Plaintiffs otherwise object to Statement No. 19 on the grounds that (1) it attempts to set forth attorney argument; (2) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (3) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 20:**

Due to the increased volatility of variable rates and the fact that rates are set before actual costs are known, a higher margin in a variable rate may yield less of a profit than a lesser margin in a fixed rate, or even no profit at all. Ex. A-12, Park Dep. 150:3–152:6.

**RESPONSE TO STATEMENT NO. 20:**

Disputed. This assertion is not borne out in XOOM's rate-setting workbooks nor its margin reports. *See* Ex. 12 (exemplar margin report); Ex. 38 (exemplar rate-setting workbook).

Moreover, XOOM could adjust variable rates if its supply costs unexpectedly increased but could not do the same for its locked in fixed rate plans. Ex. 2, Pls.' Expert Rep. ¶ 56. As a mere middleman, ██████████████████████████████████ ██ . *See* Ex. 42, Dep. Tr. of Thomas Ulry, dated May 12, 2022 ("Ulry Tr.") 86:4–87:7 ████████████████████████████████████████████████████ ████████████ ); Ex. 43 at 3 ████████████████████████████ ████████████████████████████ ).

Yet it is undisputed that ████████████████████████████████ ████████████████████████████ . *See* Ex. 2, Pls.' Expert Rep. ¶¶ 55, 59, 75. Critically, fixed rate customers were ████████ for XOOM. *See* Ex. 20, Coppola Tr. 198:4–8. Nevertheless, Director of Product Management Ryan Park acknowledged that ████████ ███████████████████████████████████████████████ Ex. 44 at XOOM_MIRKIN_015251.

Plaintiffs otherwise object to Statement No. 20 on the grounds that (1) it attempts to set forth attorney argument; (2) the cited evidence does not support the support the purported

factual statement set forth therein, as required by Local Rule 56.1; and (3) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 21:**



. Ex. A-10, Loehde Dep. 61:21–62:3, 75:9–23, 76:24–77:9, 77:11–22, 79:2–12, 82:10–20, 83:8–84:8, 136:22–137:4; Ex. A-11, Loehde Corp. Dep. 181:4–182:15; Ex. A-12, Park Dep. 83:7–84:10, 102:18–103:23, 107:16–108:2, 110:5–14.

**RESPONSE TO STATEMENT NO. 21:**

Disputed. 

. *E.g.*, Ex. 23, Defs.' Suppl. Resps. to Reqs. for Admis., at 3–5 (RFA Nos. 31–36); Ex. 20, Coppola Tr. 37:11–38:4, 38:18–39:19, 84:12–19 ( ); *id.* at 107:6–108:1 ( ); *id.* at 237:22–239:3 ( ); Ex. 34, Chidester Tr. 99:8–14 ( ); Ex. 35, *Todd v. XOOM* Dep. Tr. of Michael Chester, dated Oct. 11, 2018, 16:21–23, 68:10–12, 70:21–25 ( ).

XOOM's internal documents support these admissions.   For example, ██████

███████████████████████████████████████████.   *See* Ex. 36 at 14–

19, 22 (column R).  This practice was ongoing while the Mirkins were XOOM customers.

Ex. 37, at XOOM_MIRKIN_005413 (██████████████████████████████

█████████████████████████████████████████████).

Plaintiffs otherwise object to Statement No. 21 on the grounds that (1) it attempts to

set forth attorney argument; (2) the cited evidence does not support the support the purported

factual statement set forth therein, as required by Local Rule 56.1; and (3) the cited evidence

includes alterations made by XOOM's counsel.

**STATEMENT NO. 22:**

Likewise, ████████████████████████████████████

████████████████████ Ex. A-10, Loehde Dep. 80:4–9; Ex. A-12, Park Dep.

98:16– 99:19.

**RESPONSE TO STATEMENT NO. 22:**

Disputed. ██████████████████████████.  Ex. 23, Defs.'

Supp. Responses to Pls.' First Set of Reqs. For Admis. at 3 (No. 32).

Plaintiffs otherwise object to Statement No. 22 on the grounds that (1) it attempts to

set forth attorney argument; and (2) the cited evidence includes alterations made by XOOM's

counsel.

**STATEMENT NO. 23:**

As to █████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Ex. A-10, Loehde Dep. 85:12–22.

**RESPONSE TO STATEMENT NO. 23:**

Disputed. Ex. 29 at XOOM_MIRKIN_024527 (████████████████████████ ████████████████████████████████████████████).

Plaintiffs otherwise object to Statement No. 23 on the grounds that (1) it misstates the contents of the cited Exhibits, for instance, XOOM Exhibit A-10 states that after some time in 2014, ██████████████████████████████████████████████ ████████████████████████████, Ex. A-10, Loehde Dep. 85:23–18; and (2) the cited evidence includes alternations made by XOOM's counsel.

**STATEMENT NO. 24:**

Rather, ███████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████ Ex. A-10, Loehde Dep. 85:23–87:14; *see also id.* 209:11–20; Ex. A-14, Ulry Dep. 76:12–77:23, 78:11–79:13, 82:15–19, 85:7–17; Ex. A-13, Coppola Dep. 169:4–170:7.

**RESPONSE TO STATEMENT NO. 24:**

Disputed. XOOM used non-supply costs as the starting point for setting variable rates. *See, e.g.*, Ex. 27, at XOOM_MIRKIN_018504 (██████████████████████ ████████████████████████████████); Ex. 30 at XOOM_ MIRKIN_012147 (████████████████████████████████ ████████); Ex. 32 at XOOM_MIRKIN_023637 (██████████████████ ████████████████████████). Additional evidence showing XOOM's rate setting process was not driven by supply costs includes the following:

- In April 2013, CEO Tom Ulry admitted that ███████████████ ███████ ████ ██████ ████ ██████ Ex. 26 at XOOM_MIRKIN_063242.

- Preceding a 2015 company-wide meeting, Director of Pricing and Structuring Jason Loehde circulated a list of questions that could be used at the meeting regarding XOOM's rate setting process. Ex. 27 at XOOM_MIRKIN_018504. One of Loehde's proposed questions was ██████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████ *Id.* Tellingly, ██████ ██████████ .

- In November 2015, Loehde provided ██████████████ to Financial Planning & Analysis Manager Tom Miller. Ex. 28 at XOOM_MIRKIN_020937. CFO David Vail replied ████████ ████████████ *Id.* Loehde's response? ████████████ *Id.*

- XOOM increased New York rates to meet margin goals when there were shortfalls elsewhere. In February 2017, Mr. Loehde gave Senior Vice President of Energy Supply and Pricing Andrew Coppola ████████ ██████████████ Ex. 29 at XOOM_MIRKIN_024527. In response, Coppola asked whether ██████████████████████████ ██████████████ *d.* Loehde noted that XOOM was ██████████████████████████████████████████████ ██████████████ *Id.*

- ██████████████████████████████████████████████████ ██████████. For example, ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████ Ex. 30 at XOOM_MIRKIN_012147. ██████████████████████████████████████████████████ ██████████████████████████████████████████ *Id.* ██████████████████████████████████████████ Ex. 31 at XOOM_MIRKIN_012176.

- Similarly, in November 2016, when Loehde said he was ██████████ ██████████████████████████████████████████████████ ██████████████████████████████████████ Ex. 32 at XOOM_MIRKIN_023637.

Discovery also shows that ██████████████████████████

████████████████████████ Ex. 33 at XOOM_MIRKIN_065173 ██████████████

████████████████████████████████████████████████████

████████████████████████ ).

Plaintiffs otherwise object to Statement No. 24 on the grounds that (1) it attempts to set forth attorney argument; and (2) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 25:**

Thus, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████. Ex. A-10, Loehde Dep. 79:14–80:9, 85:12–87:14, 209:11–20; Ex. A-12, Park Dep. 99:20–100:13, 197:3–199:25; Ex. A-13, Coppola Dep. 169:4–170:7; Ex. A-14, Ulry Dep. 76:12–77:23, 78:11–79:13, 82:15–19, 85:7–17.

**RESPONSE TO STATEMENT NO. 25:**

Disputed. Ex. 29 at XOOM_MIRKIN_024527 (████████████████████████

████████████████████████████████████████████████████ ).

Plaintiffs otherwise object to Statement No. 25 on the grounds that (1) it attempts to set forth attorney argument; (2) misstates the contents of the cited Exhibits, for instance, XOOM Exhibit A-13 does not mention attrition rates; (3) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (4) the cited evidence includes alterations made by XOOM's counsel.

**STATEMENT NO. 26:**

For her first month, Susanna had an introductory rate of $12.90 cents/kWh. Ex. A-3, Coleman Rpt. at 14.

**RESPONSE TO STATEMENT NO. 26:**

Disputed.  Plaintiffs' teaser rate for their first month they purchased energy from XOOM was ████████████████████████ Ex. A-3, Coleman Rpt. At 14.  To the extent that Defendants' Statement No. 26 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed.  In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home.  Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13.  Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account.  *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11.  Upon enrollment, XOOM sent the 2013 Contract to Boris's email address.  Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

**STATEMENT NO. 27:**

Susanna paid variable rates for 5 months. *Id.*

**RESPONSE TO STATEMENT NO. 27:**

Plaintiffs do not dispute that the Mirkins were enrolled in XOOM's variable rate product for approximately six months.  To the extent that Defendants' Statement No. 27 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed.  In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home.  Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13.  Boris was the primary decision-

maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account. *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

## STATEMENT NO. 28:

The variable rates during those 5 months rose and fell with the COGs described in XOOM's rate-setting workbooks:



*See* Ex. A-3, Coleman Rpt. at 12. The odds that this near-perfect correlation would occur by chance are less than 1-in-400. *Id.*

## RESPONSE TO STATEMENT NO. 28:

Disputed. Even a brief glance at the Mirkins' rates shows that XOOM's supply costs and variable rates were *not* correlated. *See* Defs.' Br. at 10–11. XOOM charged Plaintiffs a varying monthly markup of between ▮▮▮▮ over just a six-month period.



Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n); Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

Further, in June 2013, XOOM's supply costs were ███████, and its variable rate was ████████.   Class Cert. Opp'n at 8.   But in September 2013, the supply costs were ***lower***, ██████████████, but the variable rate was ***higher***, ████████████. *Id.*   This spread between XOOM's supply costs is telling:  in June 2013, XOOM charged ████████ more than its supply costs but in September XOOM charged █████████ more than its supply costs (████████████).   Plaintiffs' experts noted that from their review of XOOM's costs and rates, there "are many examples of months during which the reported supply costs decrease but XOOM's rates increase or stay the same," even though XOOM's rates must be based on its supply costs.  Ex. 3, Pls.' Rebuttal Rep. ¶ 10.  Indeed, even XOOM's expert had to admit that XOOM rates sometimes went up even though supply costs went down.  Ex. 8, Coleman Tr. 105:4–8.

Documents further confirm this.  For example, in September 2016, Pricing Analyst David Ordog circulated rate setting workbooks ██████████████████

███████████████████████████████████████████████████████

Ex. 49 at XOOM_MIRKIN_022815.

Furthermore, the 2013 Contract says nothing about correlation of XOOM's rates and costs. Ex. 8, Coleman Tr. 49:18–23. "An underlying assumption of Mr. Coleman's analysis is that if the rates charged and XOOM's costs are correlated, then this would demonstrate that XOOM's rates were "based on" its actual and estimated supply costs, as required in the [2013 Contract]. [T]his assumption is unwarranted and would allow XOOM to charge any rate, no matter how high." Ex. 3, Pls.' Rebuttal Rep. ¶ 8. "[A]ll that Mr. Coleman's "correlation analysis" shows is that XOOM's rates and costs tend to move broadly in the same way from month to month – a very weak standard. There are many . . . months during which the reported supply costs decrease but XOOM's rates increase or stay the same." *Id.* ¶ 10. XOOM tries to brush off the maxim that "correlation does not equal causation" by saying "causation is not at issue," Defs.' Br. at 22, conflating legal and statistical causation.

Moreover, XOOM's figures "are not high correlation coefficients." Ex. 3, Pls.' Rebuttal Rep. ¶ 10. Worse, XOOM's expert did not isolate other factors that could be correlated with XOOM's variable rates—*e.g.*, the prior month's rate—to show that the reason XOOM's rates and costs broadly moved together over time was because the rates were "caused" by the costs. "For example, the number of shark attacks at the beach may be highly correlated from month to month with the number of ice cream sales at the beach. But this reflects that people want to swim in the ocean and eat ice cream in the summer – not that ice cream attracts sharks." Ex. 3, Pls.' Rebuttal Rep. ¶ 11. Mr. Coleman also conceded at deposition that just because two things are correlated, it does not mean that one is "based on" the other. Ex. 8, Coleman Tr. 74:10–75:7. In fact, Mr. Coleman conceded that correlation

between XOOM's rates and costs and whether XOOM's rates were "acceptable" are "completely separate question[s]." *Id.* at 72:1–73:12.

Plaintiffs otherwise object to Statement No. 28 on the grounds that it attempts to set forth attorney argument.

## STATEMENT NO. 29:

While Susanna was a customer, the margin between Susanna's variable rate and the COGs reflected in XOOM's rate-setting workbooks "was approximately 22%[.]" Ex. A-6, Pls.' Rebuttal Rpt. ¶ 31; *see also* Ex. A-3, Coleman Rpt. at 14.

## RESPONSE TO STATEMENT NO. 29:

Plaintiffs do not dispute that the margin the Mirkins were charged over the entire period they were XOOM customers was approximately 22%, compared to fixed rate margins of ▮ over the same period. Ex. 3, Pls.' Rebuttal Rep. ¶ 31. Further, XOOM charged Plaintiffs a varying monthly markup of between ▮ over just a six-month period.



Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n); Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

To the extent that Defendants' Statement No. 29 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed.  In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home.  Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13.  Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account.  *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11.  Upon enrollment, XOOM sent the 2013 Contract to Boris's email address.  Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

## STATEMENT NO. 30:

While Susanna was a customer, XOOM's COGS were always the largest component of her monthly rate.  *See* Ex. A-5, Pls.' Expert Rpt. ¶ 53.

## RESPONSE TO STATEMENT NO. 30:

Disputed. XOOM used non-supply costs as the starting point for setting variable rates.  *See, e.g.*, Ex. 27, at XOOM_MIRKIN_018504 (█████████████████████████████████████████████████████████████████); Ex. 30 at XOOM_MIRKIN_012147 (█████████████████████████████████████████████████████████); Ex. 32 at XOOM_MIRKIN_023637 (███████████████████████████████████████████).  Additional evidence showing XOOM's rate setting process was not driven by supply costs includes the following:

- In April 2013, CEO Tom Ulry admitted that ███████████████████ ████████ ████████ ████ ██████ Ex. 26 at XOOM_MIRKIN_063242.

- Preceding a 2015 company-wide meeting, Director of Pricing and Structuring Jason Loehde circulated a list of questions that could be used at the meeting

44

regarding XOOM's rate setting process.  Ex. 27 at XOOM_MIRKIN_018504.
One of Loehde's proposed questions was ███████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████ *Id.*  Tellingly, ████████████████████
██████████████████ .

- In November 2015, Loehde provided ██████████████████ to Financial
  Planning   &   Analysis   Manager   Tom   Miller.   Ex.   28   at
  XOOM_MIRKIN_020937.  CFO David  Vail replied ██████████████████████
  ██████████████████ *Id.*  Loehde's response? ██████████ *Id.*

- XOOM increased  New York rates to meet margin goals when there were
  shortfalls elsewhere.   In February 2017, Mr. Loehde gave Senior Vice
  President of Energy Supply and Pricing  Andrew Coppola ███████████████
  ████████████████████████████ Ex. 29 at XOOM_MIRKIN_024527. In
  response, Coppola asked whether ██████████████████████████████████████
  ████████████████████████████████ *Id.*  Loehde noted that ████████████
  ██████████████████████████████████████████████████████████████████
  ██████████████ *Id.*

- ██████████████████████████████████████████████████████████████████
  ████████████████████████████ .  For example, ██████████████████████
  ██████████████████████████████████████████████████████████████████
  ██████████████ Ex. 30 at XOOM_MIRKIN_012147. ██████████████████████
  ██████████████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████████ *Id.*
  Coppola then emailed Park, Loehde, and Vail, ██████████████████████████
  ██████████████████████████████████████████████████ Ex. 31 at
  XOOM_MIRKIN_012176.

- Similarly,  in November 2016, when Loehde said he was ███████████████
  ██████████████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████ Ex.  32  at
  XOOM_MIRKIN_023637.

Discovery also shows that ██████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████ Ex. 33 at XOOM_MIRKIN_065173 ██████████



. *E.g.*, Ex. 23, Defs.' Suppl. Resps. to Reqs. for Admis., at 3–5 (RFA Nos. 31–36); Ex. 20, Coppola Tr. 50:8–51:2, 84:20–85:7 ); *id.* at 107:6–108:1 ( ); *id.* at 237:22–239:3 ( ); Ex. 21, Park Tr. 33:10–22, 98:10–15, 99:20–100:22 ( ); Ex. 24, Dep. Tr. of XOOM's Corporate Witness Jason Loehde, dated July 28, 2022 ("XOOM 30(b)(6) Tr.") 83:10–23 ( ); Ex. 25, *Todd v. XOOM Energy Md., LLC* Dep. Tr. of former XOOM CEO Thomas Ulry, dated Mar. 20, 2019, 101:10–22 ( ).

To the extent that Defendants' Statement No. 30 implies that Plaintiff Boris Mirkin is not a proper party to this action, further disputed. In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13. Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account. *Id.* at 27:12–18; Ex. 5, Dep.

Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11.  Upon enrollment, XOOM sent the 2013 Contract to Boris's email address.  Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 30 on the grounds that (1) it attempts to set forth attorney argument; (2) it misstates the contents of XOOM Exhibit A-5, as it does not contain the proportion of XOOM's variable rates that were comprised of its supply costs, much less state that "XOOM's COGS were always the largest component of" the Mirkins' rates; and (3) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1.

**STATEMENT NO. 31:**

In 2013, the year Susanna was a customer, XOOM's average electricity supply rate was 11.19 cents/kWh, which was in line with the rates charged by other ESCOs in New York:



*See* Ex. A, Matthews Decl. ¶¶ 6–7 (providing the judicially noticeable source data from the Energy Information Administration the ("EIA") that was used to generate this chart); Ex. A-22, Summary Chart; *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 07 CIV. 10470, 2013 WL 6869410, at *4 (S.D.N.Y. Dec. 30, 2013) (taking judicial notice of an "EIA website report"); *Fed. Election Comm'n v. Hall-Tyner Election Campaign Comm.*, 524 F. Supp. 955, 959 n.7 (S.D.N.Y. 1981) ("Of course, any facts subject to judicial notice may be properly considered in a motion for summary judgment."), *aff'd*, 678 F.2d 416 (2d Cir. 1982).

**RESPONSE TO STATEMENT NO. 31:**

Disputed.  Paragraphs 6–7 of the Matthews Declaration show that XOOM's average rate in 2013 was **higher** than the average for ESCOs in New York.

To the extent that Defendants' Statement No. 31 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed.  In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13.  Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account.  *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11.   Upon enrollment, XOOM sent the 2013 Contract to Boris's email address.  Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 31 on the grounds that (1) it attempts to set forth attorney argument; and (2) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1.

**STATEMENT NO. 32:**

Boris Mirkin never had a contract with XOOM for electricity supply service, so he was never charged a variable rate for electric supply service by XOOM. *See* Ex. A-8, B. Mirkin Dep. 27:12–14.

**RESPONSE TO STATEMENT NO. 32:**

Plaintiffs do not dispute that Boris Mirkin did not sign the 2013 Contract with XOOM. Otherwise, disputed.  To the extent that Defendants' Statement No. 32 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed.  In March 2013, believing they

49

would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home.  Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13.  Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account.  *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 32 on the grounds that (1) it attempts to set forth attorney argument; (2) it misstates the contents of XOOM Exhibit A-8, which states only that the Mirkins' XOOM account was opened in his wife Susanna's name; (3) the cited evidence does not support the support the purported factual statement set forth therein, as required by Local Rule 56.1; and (4) the cited evidence includes alterations made by XOOM's counsel.

## STATEMENT NO. 33:

Boris never had a contract with XOOM for natural gas supply service, so he was never charged a variable rate for natural gas supply service by XOOM. *See id.* at 19:4–20:6, 48:16–24; *see also* Ex. A-9, S. Mirkin Dep. 34:10–36:14.

## RESPONSE TO STATEMENT NO. 33:

Plaintiffs do not dispute that Boris Mirkin was not a counterparty to a XOOM contract for natural gas supply.  To the extent that Defendants' Statement No. 30 implies that Plaintiff Boris Mirkin is not a proper party to this action, disputed.  In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home.  Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022

("B. Mirkin Tr."), 25:2–13.  Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on their account. *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email address. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

Plaintiffs otherwise object to Statement No. 33 on the grounds that the cited evidence includes alterations made by XOOM's counsel.

## STATEMENT NO. 34:

Susanna never had a contract with XOOM for natural gas supply service, so she was never charged a variable rate for natural gas supply service by XOOM. Ex. A-9, S. Mirkin Dep. 36:15–37:10.

## RESPONSE TO STATEMENT NO. 34:

Not material.  Plaintiffs do not dispute that Susanna Mirkin was not a counterparty to a XOOM contract for natural gas supply.

Plaintiffs otherwise object to Statement No. 34 on the grounds that the cited evidence includes alterations made by XOOM's counsel.

## STATEMENT NO. 35:

Neither of the Mirkins ever had a contact with XOOM Energy, LLC. *See* Ex. A-19, Contract at 1 (identifying "XOOM Energy New York, LLC" and "the Customer" as parties to the Contract, but not XOOM Energy, LLC).

## RESPONSE TO STATEMENT NO. 35:

Not material.  Plaintiffs do not dispute that neither of them had a contract naming XOOM Energy, LLC as the counterparty.  To the extent Statement No. 35 implies that XOOM

Energy, LLC is not a proper party to this action, disputed.  XOOM admitted in its Answer to the First Amended Complaint that "XOOM Energy New York, LLC is a subsidiary of XOOM Energy, LLC with no separate real property holdings or marketing department."  ECF No. 44 ¶ 11.  Other than its response to the FAC allegations regarding the parties, XOOM's Answer did not distinguish between the two entities.  *See generally* ECF No. 44.

**STATEMENT NO. 36:**

On June 11, 2019, the Second Circuit held oral argument in connection with the Mirkins' appeal from the Court's initial judgment of dismissal.  A true and correct recording of that argument is available on the Second Circuit's website.  *See* Oral Argument, *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019), *available at* https://www.ca2.uscourts.gov/oral_arguments.html (search for "18-3138" or "Mirkin"); *see also ADP, LLC v. Lynch*, No. CV 2:16-01053, 2019 WL 1149469, at *2 (D.N.J. Mar. 13, 2019) ("The Court takes judicial notice of the recording of the oral argument available on the Third Circuit's website."); *Jackson v. Broad. Music, Inc.*, No. 04 CV 5948 (TPG), 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006), *aff'd*, No. 06-2283-CV, 2007 WL 2914516 (2d Cir. Oct. 5, 2007) (quoting *Harris v. New York State Dep't of Health*, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002) ("[T]he court may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action[.]'")); *Hall-Tyner Election Campaign Comm.*, 524 F. Supp. at 959 n.7.

**RESPONSE TO STATEMENT NO. 36:**

Plaintiffs do not dispute that on June 11, 2019, the Second Circuit held oral argument regarding Plaintiffs' appeal of the order dismissing the initial complaint, or that a recording of that argument is available on the Second Circuit's website.

Plaintiffs otherwise object to Statement No. 36 on the grounds that it attempts to set forth attorney argument.

**STATEMENT NO. 37:**

At the beginning of the oral argument, the following exchange occurred between Judge Pooler and the Mirkins' counsel:

> Counsel:    May it please the Court. This is a simple breach of contract case. The Defendants' contract requires that their energy rates be based on the Defendants' supply costs.
>
> Judge Pooler:   That's not their only basis, but it is the basis to start the calculation. Is that your argument?
>
> Counsel:    No your honor. That is the only basis. The Contract says it's based—
>
> Judge Pooler:  Don't they have other things that they say will enter into the cost of the energy?
>
> Counsel:    No Your Honor. . . .

Oral Argument at 0:40–1:18.

**RESPONSE TO STATEMENT NO. 37:**

Not material.

Plaintiffs otherwise object to Statement No. 37 on the grounds that it selectively excerpts passages from the cited argument without context.

**STATEMENT NO. 38:**

Less than a minute later, the following exchange occurred between Judge Pooler and the Mirkins' counsel:

Counsel:    The rate that is published and that an energy company such as XOOM pays to purchase energy is composed of dozens of components, most of those components are regulated costs and regulated components, and a balancing cost is one of those components.

Judge Pooler:   Does that include their profit, which they're allowed to achieve? Aren't they allowed a margin, over and above these costs?

Counsel:    Again your honor, we're not taking the position that they're not allowed a margin. We're taking the position that their rates have to be tied to their supply costs which is what their contract—

Pooler:    Tied to, but not identical. Isn't that what your argument is?

McInturff:    No Your Honor, our argument—eh, eh—Tied to but not identical, they must reflect their costs. These companies are very lean businesses. They're essentially brokers and traders. They have very low overhead. They buy on the wholesale market and resell to consumers, so the wholesale—

Pooler:    What you're saying is that the ultimate price to the consumer has to have some relationship to their supply costs.

McInturff:    Correct. And instead, not evidence, of essentially, price gouging, margins that are well in excess of the underlying costs.

Oral Argument at 1:58–3:11.

**RESPONSE TO STATEMENT NO. 38:**

Not material.

Plaintiffs otherwise object to Statement No. 38 on the grounds that it selectively excerpts passages from the cited argument without context.

## ADDITIONAL MATERIAL FACTS WITH RESPECT TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

39. In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, B. Mirkin Tr. 25:2–13.

40. Boris was the primary decision-maker regarding the Mirkins' energy supply even though Susanna's name was listed on the account. *Id.* at 27:12–18; Ex. 5, S. Mirkin Tr., 37:11–20, 60:3–11.

41. Upon enrollment, XOOM sent the 2013 Contract to Boris's email. Ans. ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.

42. The 2013 Contract required XOOM to set its variable rates "based on XOOM's actual and estimated supply costs." Ex. 1 at Mirkins_00004.

43. The Mirkins were XOOM customers from May 2013 to November 2013. FAC ¶ 54; Ans. ¶ 54.

44. XOOM's markup over and above its "Total Costs" climbed substantially from ████████ during the Mirkins' short tenure.



Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n"); Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

39.     XOOM's CEO expressed to CFO David Vail and SVP of Energy Supply and Pricing Andrew Coppola that a ███████████████████████████████████████ ████████████ Ex. 7 at XOOM_MIRKIN_069057.

40.     In June 2013, XOOM's supply costs were ██████████, and its variable rate was ██████████. Class Cert. Opp'n at 8. But in September 2013, the supply costs were **lower**, ████████████████, but the variable rate was **higher**, ████████████████ ██████. *Id.* The spread between XOOM's supply costs and rates is also telling: in June 2013, XOOM charged ████████ more than its supply costs but in September XOOM charged ████████ more than its supply costs (██████████████).

41.     XOOM's expert conceded that XOOM's rates sometimes went up even though its supply costs went down. Ex. 8, Coleman Tr. 105:4–8.

42.     The markup XOOM applied to Plaintiffs' rates was well above the margin XOOM applied to its contemporaneous fixed rates (████████████████████████) and fluctuated with ranges from ████████ above XOOM's fixed rate margin.

Class Cert. Opp'n at 8; Ex. 9, Pls.' Rebuttal Rep. Ex. 7.  The markup XOOM applied to Plaintiffs' variable rates that was ***above*** the margin XOOM applied to its contemporaneous fixed rates (███████████████) ranges from ███████.

39.     As the data above demonstrates, the Mirkins were damaged each month they were XOOM customers, with total damages between $36 and $85 depending on which damages method is used.  Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31.

40.     XOOM's data shows that on average "the Mirkins were assessed with margins that were ████████ those charged to fixed rate customers during the same period."  Ex. 3, Pls.' Rebuttal Rep. ¶ 31.

41.     In response to Plaintiffs' requests for production of all documents concerning XOOM's costs of procuring energy for its New York customers, XOOM produced its supply cost tabulations in the form of its rate-setting workbooks.  *See* Ex. 10, Defs.' Resps. to Pls.' First Req. for Prod. of Docs., dated Dec. 24, 2019, at 21, 23–26 (RFP Nos. 38, 41–47); Ex. 11, Ltr. Regarding Defs.' Am. Resps. to Pls.' First Req. for Prod. of Docs., dated Nov. 20, 2020, at 5 (XOOM pointing to its rate-setting workbooks as the relevant source of supply costs and pricing for New York).

42.     Neither XOOM's rate-setting workbooks nor any of the other documents XOOM circulated for its rate setting meetings ███████████████████████ ██████. Ex. 2, Pls.' Expert Rep. ¶ 23(d) █████████████████████ ████████████████████████████████████████ ██████), ¶ 47 (██████████████████████████████████ ██████████████████████████████████); Ex. 8, Coleman Tr.

95:17–96:4 (█████████████████████████████████████████████████

█████████████████████████████████████).

43.     XOOM's separate margin reports, which show XOOM's unit and gross

margins for each market, ██████████████████████████████.   *See* Ex. 12 at

XOOM_MIRKIN_047611.

44.     XOOM also did not produce any document showing that ██████████

██████████████████████████████████████████████████, nor any

evidence that it considered and valued any of these cost components when setting rates for

New York variable rate customers.   *See, e.g.*, Ex. 2, Pls.' Expert Rep. ¶ 51 ██████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████).

45.     Instead, the ████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████ Ex. 2, Pls.' Expert Rep. ¶ 52.

46.     ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████ Ex. 2, Pls.'

Expert Rep. ¶ 52.

47.     ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████ Ex. 2, Pls.' Expert Rep. ¶ 52.

48.     In 1996, the PSC deregulated the market for retail energy supply after then-

corporate superstar Enron's unprecedented lobbying campaign.   FAC ¶ 2.

49. After New York energy markets were deregulated, consumers were permitted to choose from a variety of companies selling energy. *See* FAC, ECF No. 42 ¶¶ 2, 19; *see also* Ans. ¶¶ 2, 19.

50. The "general goals" for deregulation included lowering rates for consumers and increasing consumer choice; the hope was that competition in energy markets would result in reduced supply costs, thereby lowering consumers' rates. Ex. 13, Cases 94-E-0952, *et al.*, *In the Matter of Competitive Opportunities Regarding Elec. Serv.*, No. 96-12 (May 20, 1996) ("1996 Ord."), at 28; FAC ¶ 27.

51. Under deregulation, when consumers choose ESCOs (like XOOM) to supply their electricity and/or natural gas, local utilities continue to deliver energy to consumers' homes or places of business. Ans. ¶ 21; FAC ¶¶ 19, 21; *Mirkin*, 931 F.3d at 175.

52. ESCOs are middlemen: they do not generate, transmit, or distribute energy to retail consumers, but instead arrange supply from the wholesale market. *Mirkin*, 931 F.3d at 175; Ex. 2, Pls.' Expert Rep. ¶ 25.

53. Local utilities continue delivering the energy, billing, and managing payment risks. Ans. ¶ 23; Ex. 2, Pls.' Expert Rep. ¶ 25.

54. Because the utility handles billing, ESCOs can service large customer bases with far lower costs than would be needed if ESCOs billed consumers directly. FAC ¶ 23.

55. The 2009 sponsoring memo of New York's ESCO Consumer Bill of Rights—codified as G.B.L. § 349-d—recognized that New York's deregulatory experiment was plagued with "companies whose business model is based on taking unfair advantage of consumers" and subjecting them to "onerous contracts" and "short-term 'teaser' rates

followed by skyrocketing variable prices." Ex. 14, ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 3–4 (2009).

56.    I n February 2014, the PSC found that New York's ESCOs: (1) "failed to provide" energy products or services that had value to customers, Ex. 15, Cases 12-M-0476, *et al.*, *Ord. Taking Actions to Improve the Resid. and Small Non-Resid. Retail Access Mkts.*, at 2–3; (2) "are not providing sufficient competition or innovation to properly serve customers," *id.* at 3; (3) did not create a "workably competitive" market for consumers, *id.* at 10; (4) that because of "the general absence of information on market conditions, particularly the price charged by competitors," ESCOs did not face "effective competition (*i.e.*, neither buyers nor sellers have good information about prices)," *id.* at 10; and (5) faced "almost no competitive pressure to innovate and provide value-added services or products to" customers, *id.* at 11.

57.    PSC staff announced that over a 3-year period, 2014 through 2016, roughly two million New York residential and small business customers paid ESCOs like XOOM over $1.3 billion more than they would have paid their utilities ***for the exact same electricity and gas***. Ex. 16, Cases 15-M-0127, *et al.*, Dep't of Pub. Serv. Staff Redacted Initial Br., at 2 (Mar. 30, 2018).

58.    In recognition of the rampant problems with ESCOs and after conducting extensive hearings and further investigation, in December 2019 the PSC ***banned*** the exact type of variable rate plan into which XOOM enrolled the Mirkins and the Class. Ex. 17, Cases 15-M-0127, et al., *Ord. Adopting Changes to the Retail Access Energy Mkt. and Estab. Further Process*, Dec. 12, 2019 ("2019 Ord.") at 88–90; Ex. 2, Pls.' Expert Rep. ¶¶ 23(g),

34–35.  This ban followed a two-year PSC investigation of ESCO practices that culminated in a 10-day evidentiary hearing.  Ex. 17, 2019 Ord. at 3–4.

59.     The PSC also found that variable energy rates like those XOOM charged here are "[t]he most commonly offered ESCO product" and frequently are at "a higher price than charged by the utilities," concluding the variable rate ESCO "market serves no proper purpose and should be ended."  *Id.* at 11–12.  The PSC further found it "troubling" that even after considering reams of evidence "neither ESCOs nor any other party have shown . . . that ESCO charges above utility rates were generally – or in any specific instances – justified."  *Id.* at 30. This highlighted the PSC's "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of [ESCOs'] products and/or prices."  *Id.* at 31. Based on these findings, the PSC banned variable energy rates like those XOOM charged to Plaintiffs. *Id.* at 39.  Now, if an ESCO charges consumers more than the utility, the consumer is owed a refund for the difference.  *Id.*

60.     Here, the difference between what XOOM charged Class Members and what their utilities would have charged for the exact same energy is over ███████.  Ex. 2, Pls.' Expert Rep. ¶ 72.

61.     XOOM's rates in 2013 were higher than the average of other ESCOs' rates. XOOM Ex. A-22.

62.     From the start of this case, Plaintiffs have consistently claimed that XOOM breached the 2013 Contract by not basing rates on its actual and estimated supply costs.  *See, e.g.*, FAC ¶ 45 ("the rates XOOM charged Plaintiffs were not commensurate with XOOM's supply costs"), ¶ 56 ("XOOM's rate was consistently and substantially higher than the rate based on Defendants' supply costs"), ¶ 59 (XOOM breached the 2013 Contract because

"consumers do not receive a price based on [] XOOM's actual and estimated supply costs"), ¶ 63 (variable rate "should have been based on XOOM's supply costs, which it was not").

63.     Because XOOM's supply costs were internal, prior to discovery Plaintiffs engaged experts to determine XOOM's supply costs under the assumption that like other ESCOs XOOM purchased energy supply on New York's wholesale markets.  This resulted in the pre-discovery proxy for XOOM's supply costs called the "Market Supply Cost." *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 175–76 (2d Cir. 2019); FAC ¶ 54.

64.     Plaintiffs' Market Supply Cost figure included a "substantial margin of 1.3¢ per kWh sold to cover retailer fixed costs," which equates to an additional 13.67% above the supply cost of XOOM's energy, *id.* ¶ 55, even though PSC staff had already found that these fixed costs do "not justify the significant overcharges levied on New York consumers."  FAC ¶ 38.

65.     After the original Complaint was dismissed, *see* ECF No. 24, Plaintiffs appealed, *see* ECF No. 39.  Plaintiffs argued that they properly pled that although XOOM is required to charge a rate based on its actual and estimated supply costs, it instead "charges a substantially higher rate that is untethered to" costs, thereby breaching the 2013 Contract.  Ex. 18, Appellants' Br. at 2.

66.     While it is true that on appeal Plaintiffs argued that "a rate based on 'actual and estimated supply costs' varies in accordance with XOOM's costs of procuring electricity in the wholesale market, plus an appropriate margin,"  Plaintiffs made clear (i) that "it is XOOM's energy procurement costs that are the 'supply costs' that fluctuate," and "monthly changes in electricity procurement costs should be the only 'supply costs' that cause XOOM's rates to fluctuate," and (ii) any margin must reflect "legitimate overhead costs and

"[c]ritically, however, for variable rate setting purposes these costs are relatively fixed each month, and thus cannot be the basis for XOOM's rate fluctuations." *Id.* at 13.

67.     At the Second Circuit oral argument, Plaintiffs' counsel clarified that XOOM was not allowed to extract massive margins but nevertheless claim its rates were "based" on XOOM's supply costs regardless of the spread between XOOM's supply costs and its ultimate rates.     U.S.     Court     of     Appeals,     2d     Cir.,     at     2:20–3:10, https://www.ca2.uscourts.gov/oral_arguments.html (enter "Mirkin" in search box and click "search").

68.     The Second Circuit reversed dismissal, holding Plaintiffs' allegations that "XOOM promised to base its rates on its supply costs" were sufficient because "the Mirkins' allegations and calculations plausibly allege that this did not occur." *Mirkin*, 931 F.3d at 177.

69.     XOOM held monthly rate-setting meetings for "up to 20 markets and 1,000 different products" and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks. Class Cert. Opp'n at 9–10.



70.     ███████████████████████████████████████████████████ ███████████████████████. *See* Ex. 19, Dep. Tr. of Jason Loehde, dated July 27, 2022 ("Loehde Tr.") 61:11–19 ██████████████████████████████); Ex. 20, Dep. Tr. of Andrew Coppola, dated May 11, 2022 ("Coppola Tr.") 88:10–14 ████████ ███████).

71.     Instead, ████████████████████████████████████████ ███████████     Ex. 19, Loehde Tr. 61:11–19; Ex. 21, Dep. Tr. of Ryan Park, dated July

22, 2022 ("Park Tr.") 32:10–19 (████████████████████████████████
███████████).

72.     Director of Product Management for XOOM's Supply Team Ryan Park and
SVP of Energy Supply and Pricing Andrew Coppola were ████████████████
█████████████████████████████████████████████
████████████. Ex. 22 at XOOM_MIRKIN_065820.

73.     ████████████████████████████████████████████.
*See* Ex. 20, Coppola Tr. 143:5–7 ████████████████████████
████████████).

74.     ████████████████████████████████████
████████████████████████████████████████████
████████████. *E.g.*, Ex. 23, Defs.' Suppl. Resps. to Reqs. for Admis., at 3–5 (RFA Nos.
31–36); Ex. 20, Coppola Tr. 50:8–51:2, 84:20–85:7 ████████████████
████████████████████████████████████); *id.* at 107:6–108:1 (██████
████████████████████████████████████████████
████); *id.* at 237:22–239:3 (████████████████████████
████████████████████████████████████████████
████████████████████████); Ex. 21, Park Tr. 33:10–22, 98:10–15, 99:20–
100:22 (████████████████████████████████████
████████); Ex. 24, XOOM 30(b)(6) Tr. 83:10–23 ████████████████
████████████████████████); Ex. 25, *Todd v. XOOM Energy Md., LLC* Dep. Tr. of former
XOOM CEO Thomas Ulry, dated Mar. 20, 2019, 101:10–22 (████████████████
████████████████████████). .

75.     In April 2013, CEO Tom Ulry admitted that █████████████████████ ██████████████████████████ Ex. 26 at XOOM_MIRKIN_063242.

76.     Preceding a 2015 company-wide meeting, Director of Pricing and Structuring Jason Loehde circulated a list of questions that could be used at the meeting regarding XOOM's rate setting process.  Ex. 27 at XOOM_MIRKIN_018504.  One of the questions was ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████ *Id.*  Tellingly, █████████████████████████████.

77.     In November 2015, Loehde provided ████████████████ to Financial Planning & Analysis Manager Tom Miller.  Ex. 28 at XOOM_MIRKIN_020937.  CFO David Vail replied ██████████████████████████ *Id.*  Loehde's response? █████████ *Id.*

78.     XOOM increased New York rates to meet margin goals when there were shortfalls elsewhere.  In February 2017, Loehde gave SVP of Energy Supply and Pricing Andrew Coppola ██████████████████████████ Ex. 29 at XOOM_MIRKIN_024527.  In response, Coppola asked whether ████████████████ ██████████████████████████ *Id.*  Loehde noted that ████████████████████████████████████████████████████████████ ██████████████████████████████████ *Id.*

79.     ██████████████████████████████ ████████████████████████████████████████████████ Ex. 30 at XOOM_MIRKIN_012147.

██████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* He then emailed Park,

Loehde, and Vail, ████████████████████████████████████████

█████████████ Ex. 31 at XOOM_MIRKIN_012176.

80.    In November 2016, when Loehde said he was ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ Ex. 32 at

XOOM_MIRKIN_023637.

81.    ████████████████████████████████████████████

████████████. Ex. 33 at XOOM_MIRKIN_065173████████████

██████████████████████████████████████████████████████

██████).

82.    XOOM witnesses admitted that ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████.

83.    XOOM's expert acknowledged that ████████████████████

████████████████████████████. Ex. 8, Coleman Tr. 54:5–55:17.

84.    ████████████████████████████████████████████

████████████. Ex. 20, Coppola Tr. 37:11–38:4, 38:18–39:19, 84:12–19 (████████

████████████████████████████████████); *id.* at 107:6–108:1 (████████

███████████████████████████████████████████); *id.* at

237:22–239:3 (███████████████████████████████████████████

███████████████████████████████████████████

███████████████████); Ex. 34, Dep. Tr. of Troy Chidester, dated June 24, 2022, 99:8–14

(███████████████████████████████); Ex. 35, *Todd v. XOOM* Dep. Tr.

of Michael Chester, dated Oct. 11, 2018, 16:21–23, 68:10–12, 70:21–25 (██████████

███████████████████████████████████████████

███████████████████.

85.   ███████████████████████████████████████████

██████. *See* Ex. 36 at 14–19, 22 (column R)

86.   ███████████████████████████████████████████

███████████████. Ex. 37, at XOOM_MIRKIN_005413 (██████████████████

███████████████████████████████████████████

██████.

87.   ███████████████████████████████████████████. For example, in

February 2017, ███████████████████████████████████████████

███████████████ Ex. 29 at XOOM_MIRKIN_024527.

88.   XOOM's rate-setting workbooks contain XOOM's proposed rates, XOOM's "Total Costs," and the resulting margin that XOOM would achieve.  Ex. 38 (exemplar rate-setting workbook).

89.   Margin reports showed, by market, unit and gross margins for XOOM's variable and fixed rate customers.  *See* Ex. 12 at XOOM_MIRKIN_047611 (exemplar margin report); *id.* at 4 (███████████████████████████████).

90. ██████████████████████████████████████████████████

███████████████. Ex. 19, Loehde Tr. 48:17–25 (████████████████████████

████████████████████████████████████████████).

91.     On February 11, 2016, XOOM modified the pricing term in its form contract

to give itself discretion to set rates based on broad criteria.  The 2016 contract states:

> Your rate may be based upon a number of factors, which may include but not
> be limited to, the fluctuation of wholesale commodity costs or other
> components of wholesale prices (including but not limited to capacity related
> costs, fluctuations in energy supply and demand, and weather patterns) and
> XOOM's pricing strategies.

Ex. 40, 2/11/16 Sales Agreement; *see also* Ex. 41, Defs.' Interrog. Resps., at 6–7 (No. 24)

("[T]he February 11, 2016 contract language applied to New York customers that [first]

enrolled in a variable rate plan on or after February 11, 2016.").

92.     Both XOOM's corporate witness Loehde and its SVP of Energy Supply and

Pricing Coppola███████████████████████████████████████████████

████████████████████████ Ex. 24, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Ex. 20,

Coppola Tr. 98:11–18. ████████████████████████████████████████

███████████████████████████████████████████ Ex. 24, XOOM 30(b)(6) Tr.

134:2–135:15.

93.     XOOM's expert testified that XOOM used its "pricing strategies" when setting

rates pursuant to the 2013 Contract.  Ex. 8, Coleman Tr. 66:11–15.

94.     XOOM could adjust variable rates if its supply costs unexpectedly increased

but could not do the same for its locked in fixed rate plans.  Ex. 2, Pls.' Expert Rep. ¶ 56.

95.     As a middleman, ████████████████████████████████████████

███████. *See* Ex. 42, Dep. Tr. of Thomas Ulry, dated May 12, 2022 ("Ulry Tr.") 86:4–87:7

████████████████████████████████████████████████████████████████

██████████); Ex. 43 at 3 ████████████████████████████████

████████████████████████████).

96.    ████████████████████████████████████████████

████████████████████████. *See* Ex. 2, Pls.' Expert Rep. ¶¶ 55, 59, 75.

97.    Fixed rate customers were ████████ for XOOM. *See* Ex. 20, Coppola Tr. 198:4–8.

98.    Director of Product Management Ryan Park acknowledged that ████████ ███████████████████████████████████████████ Ex. 44 at XOOM_MIRKIN_015251.

99.    After analyzing the record, Plaintiffs' experts concluded that there is ███ ████████████████████████████████████████████ ███████████████████ Ex. 2, Pls.' Expert Rep. ¶ 59.

100.    An "average customer wouldn't know what a 'supply cost' means" because "it's an energy-industry-specific terminology." Ex. 46, Eryilmaz Tr. 51:22–52:9.

101.    Mr. Coleman disagrees that consumers do not understand what "supply costs" means, but that opinion is based on "more than two decades of experience" and his "understanding how those terms are commonly used in the energy industry." Ex. 8, Coleman Tr. 24:20–25:3, 28:24–29:12.

102.    Both of Plaintiffs' damages methods incorporate XOOM's internal reported supply cost metric. Ex. 2, Pls.' Expert Rep. ¶¶ 62, 73.

103.    XOOM drafted the 2013 Contract. Ex. 42, Ulry Tr. 39:9–41:18.

104.    During the 2014 polar vortex, ██████████████████████████
████████████. Ex. 47 at XOOM_MIRKIN_007285 ("███████████████████████
██████████████████████████).

105.    ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██. Ex. 48 at 4; *see also* Ex. 19, Loehde Tr. 219:5–22, 249:2–250:11 (████████████
██████████████████████████████████████████████).

106.    ██████████████████████████████████████████████ Class Cert. Opp'n at 10.

107.    XOOM's correlation standard is "very weak." Rebuttal Rep. ¶ 10.

108.    There "are many examples of months during which the reported supply costs decrease but XOOM's rates increase or stay the same," even though XOOM's rates must be based on its supply costs. Ex. 3, Pls.' Rebuttal Rep. ¶ 10. For example, in September 2016, Pricing Analyst David Ordog ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████ Ex. 49 at XOOM_MIRKIN_022815.

109.    The 2013 Contract says nothing about correlation of XOOM's rates and costs. Ex. 8, Coleman Tr. 49:18–23.

110.    "[A]ll that Mr. Coleman's "correlation analysis" shows is that XOOM's rates and costs tend to move broadly in the same way from month to month – a very weak standard. There are many . . . months during which the reported supply costs decrease but XOOM's rates increase or stay the same." *Id.* ¶ 10.

111.    XOOM's figures "are not high correlation coefficients."  Ex. 3, Pls.' Rebuttal Rep. ¶ 10.

112.    Mr. Coleman conceded that just because two things are correlated, it does not mean that one is "based on" the other.  Ex. 8, Coleman Tr. 74:10–75:7.

113.    Correlation between XOOM's rates and costs and whether XOOM's rates were "acceptable" are "completely separate question[s]."  *Id.* at 72:1–73:12.

114.    "Many of the figures in the Coleman Report have been formatted in a way which obscures the actual relationship between XOOM's stated costs and the rates charged."  Ex. 3, Pls.' Rebuttal Rep. ¶¶ 2(a), 4–7.  Those charts use different scales for costs and rates to make it appear they were much closer than they were in reality.  The effect is clear, as seen in the following images: first, Mr. Coleman's chart with different scales, and then Plaintiffs' chart, which applies the same scale to both costs and rates.  *Id.* at p. 3, Figures 1–2.



115.    XOOM conceded that Boris is the person who signed up with XOOM.  Class Cert. Opp'n at 6.

116.    The word "margin" appears nowhere in the 2013 Contract.  Ex. 1 at Mirkins_00004–06.

117.    XOOM Energy New York, LLC is a subsidiary of XOOM Energy, LLC with no separate real property holdings or marketing department.  Ans. ¶ 11.

Dated: April 14, 2023

Respectfully submitted,

/s/ Steven L. Wittels

Steven L. Wittels
**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Ethan D. Roman
305 BROADWAY, 7TH FL.
NEW YORK, NEW YORK 10504
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
slw@wittelslaw.com
jbm@wittelslaw.com
edr@wittelslaw.com

Daniel Hymowitz
**HYMOWITZ LAW GROUP, PLLC**
1629 Sheepshead Bay Road
Brooklyn, NY 11235
Telephone: (718) 807-9900
Facsimile:  (866) 521-6040
daniel@hymowitzlaw.com

Andrey Belenky
Dmitry Kheyfits
**KHEYFITS BELENKY LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
Facsimile:  (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

*Co-Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2023, the foregoing was served via email on all counsel of record.

By:    /s/ Steven L. Wittels
          Steven L. Wittels