**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC, <br><br> Defendants. | No. 18 Civ. 2949 (ARR) (RER) |

**CONSOLIDATED**
**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AND**
**SUR-REPLY IN FURTHER OPPOSITION TO CLASS CERTIFICATION**

## **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................... 1

II.    SUMMARY JUDGMENT REPLY ........................................................................... 3

    A.   Contract Interpretation: XOOM advances the only reasonable interpretation. ............ 3

        1.   The Mirkins' proposed interpretations are not reasonable. ..................................... 4

        2.   The Mirkins cannot create ambiguity by pointing to nonbinding authority accepting an interpretation of *based on* that the Mirkins unequivocally reject. ..... 7

        3.   The Mirkins' expert evidence is inadmissible and irrelevant. ............................. 10

    B.   No Genuine Factual Dispute: The Mirkins' evidence does not raise a factual dispute as to whether supply costs were the foundation of Susanna's variable rates .............. 11

        1.   The Mirkins offer no evidence that non-supply cost considerations were the foundational component of Susanna's rates. ........................................................ 11

        2.   The undisputed correlation between changes in Susanna's rates and XOOM's costs further refutes the Mirkins' baseless assertion that XOOM "ignored" supply costs ...................................................................................................................... 14

        3.   The terms of a different contract are not evidence that XOOM breached the Contract with Susanna years earlier ...................................................................... 15

    C.   Boris was not a third-party beneficiary ......................................................................... 17

III.   CLASS CERTIFICATION SUR-REPLY ................................................................. 18

IV.    CONCLUSION ......................................................................................................... 21

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                      **Page(s)**

*Bald Head Island Utilities, Inc. v. Vill. of Bald Head Island*,
   599 S.E.2d 98 (N.C. Ct. App. 2004) ...................................................................6

*Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co., Inc. of Raleigh*,
   500 S.E.2d 108 (N.C. Ct. App. 1998) ............................................................4, 8

*Beachcrete, Inc. v. Water St. Ctr. Assocs., L.L.C.*,
   615 S.E.2d 719 (N.C. Ct. App. 2005) ...............................................................6

*Brecher v. Republic of Argentina*,
   806 F.3d 22 (2d Cir. 2015) ..............................................................................21

*Chaisson v. Simpson*,
   673 S.E.2d 149 (N.C. Ct. App. 2009) ...............................................................9

*Christenbury Eye Ctr., P.A. v. Medflow, Inc.*,
   802 S.E.2d 888 (N.C. 2017) .............................................................................9

*Donin v. Just Energy Grp. Inc.*,
   Case No 17-cv-5787 (WFK)(SJB), ECF No. 111 .........................................18

*Fleisher v. Phoenix Life Ins. Co.*,
   18 F. Supp. 3d 456 (S.D.N.Y. 2014) .........................................................7, 8, 9

*Holshouser v. Shaner Hotel Grp. Properties One Ltd. P'ship*,
   518 S.E.2d 17 (N.C. Ct. App. 1999), *aff'd*, 524 S.E.2d 568 (N.C. 2000) .........17, 18

*Kiobel v. Royal Dutch Petroleum Co.*,
   No. 02 CIV. 7618 KMW HBP, 2004 WL 5719589 (S.D.N.Y. Mar. 31, 2004) ....................20

*Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*,
   192 F.3d 337 (2d Cir. 1999) ............................................................................15

*Lynn v. Lynn*,
   689 S.E.2d 198 (N.C. Ct. App. 2010) .............................................................15

*Mirkin v. XOOM Energy, LLC*,
   931 F.3d 173 (2d Cir. 2019) ..............................................................................3

*N. Carolina Farm Bureau Mut. Ins. Co., Inc. v. Martin by & through Martin*,
   851 S.E.2d 891 (N.C. 2020) .............................................................................8

*Poor v. Hill*,
   530 S.E.2d 838 (N.C. Ct. App. 2000) .............................................................15

*Richards v. Direct Energy, Servs., LLC*,
    246 F. Supp. 3d 538 (D. Conn. 2017) .......................................................5, 6, 8, 13

*Richards v. Direct Energy Srvcs., LLC*,
    915 F.3d (2d Cir. 2019)........................................................................ *passim*

*Simpson v. Beaufort Cty. Lumber Co.*,
    137 S.E. 311 (N.C. 1927)........................................................................9

*Smith v. Childs*,
    437 S.E.2d 500 (N.C. Ct. App. 1993) ...................................................10

*Southpark Mall Ltd. P'ship v. CLT Food Mgmt., Inc.*,
    544 S.E.2d 14 (N.C. Ct. App. 2001) .......................................................8

*State v. Philip Morris USA Inc.*,
    685 S.E.2d 85 (N.C. 2009)...............................................................4, 8, 9

*Walton v. City of Raleigh*,
    467 S.E.2d 410 (N.C. 1996)....................................................................4

*Weyerhaeuser Co. v. Carolina Power & Light Co.*,
    127 S.E.2d 539 (N.C. 1962)....................................................................6

## Other Authorities

Fed. R. Civ. P. 23 ........................................................................18, 20, 21

Fed. R. Evid. 702(a)............................................................................10

# I.     INTRODUCTION

Were the variable rates XOOM charged Plaintiff Susanna Mirkin for five months in 2013 "based on XOOM's actual and estimated supply costs" as required by the Contract? That is the narrow question before the Court. XOOM's motion established that the answer is 'yes' as a matter of law, and nothing in the Mirkins' lengthy response can distract from that conclusion.

As the Court's original dismissal order explained, the Mirkins' case theory was that the Contract "commits XOOM to using its costs *as the foundation* for its rate-setting." MTD Order 11 n.7 (emphasis added), ECF No. 24. Discovery proved that is exactly what XOOM did. Every fact witness testified that supply costs were always the primary component of XOOM's variable rates. The undisputed evidence also shows that Susanna's rates included margins averaging only 22%, not the 44% average margin alleged in the complaint. And, contrary to the complaint's allegations, Susanna's rates always rose and fell with XOOM's supply costs—with a statistical correlation so strong that the chance her rate changes were not related to cost changes is less than 1 in 400. The Mirkins' response offers no contrary evidence about Susanna's rates.

XOOM's motion also established that *based on* cannot mean *equal to* supply costs. XOOM went through that interpretive trouble because it anticipated the Mirkins would oppose summary judgment by arguing its rates must be based solely on supply costs in line with their experts' first damage model. But the Mirkins defied expectations and remain true to their representations to the Second Circuit that: supply costs need only be the rates' *primary* component; rates could include a margin over costs; and margin could include a profit. Indeed, the Mirkins disavow their experts' contention that XOOM could not charge a margin and affirm that their position remains "consistent with . . . the Court's approach at dismissal," Pls.' MSJ Resp. 7–8. These concessions significantly narrow the summary judgment inquiry because there is no dispute that:

- Supply costs are *not* "'the only permissible component'" of the variable rate,

1

*id.* at 39 (quoting Defs.' MSJ Br. 20) (emphasis removed);

- The Contract **permits** "an appropriate margin" above supply costs, *id.* at 20; and

- "The [Contract] is silent as to an appropriate margin," *id.* at 45.

These are not the only unexpected positions the Mirkins take. Despite arguing on appeal that the Contract contains "an unambiguous pricing term;" Appellants' Br. 5, the Mirkins now argue the term *based on* is ambiguous and so the jury should get to decide how much margin XOOM can recover. Not so. Under North Carolina law, the Court can look to the dictionary "daily usage" of *base* which is the "foundation" or "fundamental part" of something; Defs.' MSJ Br. 15–16; or it can reach the same conclusion by looking to the same meaning numerous courts have given the term; *id.* at 16–17. To raise an ambiguity, the Mirkins have to advance a reasonable alternative interpretation of *based on*. They do not. Instead, they say it could mean "virtually identical or very close to" (i.e., the "modest margin" theory) or "directly proportional to" (i.e., the "generous margin" theory) its supply costs. Those readings are objectively unreasonable and completely disconnected from the term *based on*, so no ambiguity exists as a matter of law.

At bottom, the Mirkins are not entitled to present their unreasonable interpretations to a jury. And given that the Mirkins offer no evidence XOOM breached when it charged Susanna variable rates based on its supply costs, there is no genuine dispute that XOOM complied with the Contract's unambiguous terms. These problems are fatal to the Mirkins' individual claims and the Court can grant summary judgment without addressing class certification. But even if class issues are reached,[1] the same problems only further undermine the putative class claims too. Summary judgment should be granted and (if reached) class certification denied.

---

[1] XOOM's arguments regarding class certification are included pursuant to the Court's order granting "leave to incorporate their sur-reply in opposition to plaintiffs' class certification motion" into its summary judgment reply. *See* Text Order, April 7, 2023.

## II.   SUMMARY JUDGMENT REPLY

**A.   Contract Interpretation: XOOM advances the only reasonable interpretation.**

As XOOM previously explained, "the Contract cannot be reasonably construed to require a rate for which supply costs were the only legitimate component." Defs.' MSJ Br. 15. In their response, the Mirkins repeatedly agree with that point and pretend they never thought otherwise. *See, e.g.*, Pls.' MSJ Resp. 31 n.13 (insisting it "is not true" that the Mirkins think "XOOM must charge only its supply costs"). Thus, while the Mirkins now claim that the phrase *based on* is ambiguous, the Court's interpretive analysis can start with a point of common ground: the Contract unquestionably permits variable rates that include a margin above supply costs.[2]

From that point of agreement, the Mirkins argue that *based on* is ambiguous and "offer two alternatives that use objective facts to construct a rate that the jury can adopt as the contractually required rate." *Id.* at 5. But neither alternative has anything to do with the term *based on* and instead focus on what a permissible margin might be.[3] Their first interpretation is that the rate must be "virtually identical or very close to" supply costs, which the Mirkins say allows a "modest" margin that would only cover fixed costs and overhead, *id.* at 7, while the second interpretation of "directly proportional to" would allow a "generous" capped margin that could match—but not exceed—XOOM's fixed rate margins, *id.* at 45. Importantly, the Mirkins make no attempt to explain why they believe *based on* could mean any of those things. They just say it does.

The Mirkins' argument fundamentally misunderstands the concept of ambiguity. Under

---

[2] The Mirkins' concession that XOOM could charge a margin renders the parties' judicial estoppel arguments moot. XOOM reserves the right to re-raise that doctrine should the Mirkins survive summary judgment and shift their case theory yet again.

[3] This disconnect is no surprise. The Mirkins' focus on the reasonableness of XOOM's margin is a claim that sounds in bad faith, not the Contract's express terms that are admittedly "silent as to an appropriate margin." Pls.' MSJ Resp. 45. But the Court previously dismissed their implied covenant claim, and the Second Circuit affirmed that dismissal after they declined to challenge it on appeal. *See Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 174 n.1 (2d Cir. 2019).

3

North Carolina law, a contract is not ambiguous merely because parties "differ as to the interpretation." *State v. Philip Morris USA Inc.*, 685 S.E.2d 85, 96 (N.C. 2009) (quotations omitted); *Walton v. City of Raleigh*, 467 S.E.2d 410, 412 (N.C. 1996) (same). Rather, an ambiguity only exists if the Contract's language "is fairly and reasonably susceptible to either of the constructions asserted by the parties." *Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co., Inc. of Raleigh*, 500 S.E.2d 108, 111 (N.C. Ct. App. 1998) (cleaned up); *Philip Morris*, 685 S.E.2d at 96 (same). In other words, North Carolina law does not deem a contractual term ambiguous *per se* and then allow a party—and certainly not a jury—to add whatever restricting language they like. To prevail on their position that the Contract is ambiguous, the Mirkins had to come forward with their own reasonable interpretation of what *based on* means. They have not.

More specifically, the Mirkins' ambiguity argument fails because (1) the term *based on* is not reasonably susceptible to their interpretations that really just impose restrictions on XOOM's margin, and (2) the Mirkins cannot present their unreasonable interpretations to the jury simply because another plaintiff in a case dealing with materially different contract language (*Fleischer*) said *based on* connoted exclusivity, an interpretation the Mirkins explicitly reject when they concede that supply costs are not the only permissible component of the variable rate.

1. The Mirkins' proposed interpretations are not reasonable.

Although the Mirkins candidly acknowledge that the Contract "is silent as to an appropriate margin," Pls.' MSJ Resp. 45, they use the guise of a supposed ambiguity in the term *based on* to contend that the jury should be allowed to fill the contractual silence with an additional term.[4] As

---

[4] The Mirkins' response carefully avoids committing to a rate XOOM should have charged, and instead suggests that the determination of a fair rate should be left to the jury. That approach is not only procedurally improper as it would circumvent their summary judgment burden, but it also contradicts their claim that, "[w]ith discovery of XOOM's actual costs and profits," they would "create an even more precise model showing what XOOM's prices should have been under the terms of" the Contract. *See* First Am. Compl. ¶ 58. In other words, at the dismissal stage, the

a first alternative, they say *based on* might mean very close or virtually identical to XOOM's supply costs, such that XOOM was allowed only a modest margin. And second, they posit that a jury could think *based on* means directly proportional to supply costs, allowing XOOM to charge a fixed margin on top of costs. The source for those interpretations is not a dictionary definition, a case, or even an appeal to common usage. Instead, the Mirkins cite their experts as the only source for their legal argument. That is improper as a matter of law and, regardless of their source, both interpretations are facially unreasonable readings of the Contract.

The Second Circuit's decision in *Richards* explains why these interpretations fail as a matter of law. The *Richards* plaintiff, just like the Mirkins, attempted to rely on testimony from the same expert (Seabron Adamson) to argue that a jury might agree with him that a "specific limitation" on margin not found in an ESCO's contract should be retroactively imposed. *Richards v. Direct Energy Srvcs., LLC*, 915 F.3d at 88, 98 n.5 (2d Cir. 2019). The panel rejected that argument because "jurors are constrained by law, and not permitted to invent absent contract terms out of thin air." *Id.* The Mirkins attempt to distinguish *Richards* by arguing the ESCO in that case had contractual "discretion to set a profit margin of its choosing." Pls.' MSJ Resp. 46 (quoting *Richards v. Direct Energy, Servs., LLC*, 246 F. Supp. 3d 538, 552 (D. Conn. 2017)). The district- and circuit level-decisions in *Richards* show that distinction is meaningless. As the decisions explain, the ESCO's inclusion of a reference to its discretion is not the reason the plaintiff's proposed restriction failed; rather, it was the ***absence*** of language that could be construed to

---

Mirkins said: Give us discovery and we'll tell you what the rates should have been. But now that discovery has disproven their theories, they say: Only the jury can tell you what the rates should have been! This shift is telling. At bottom, the Mirkins' claim is not really about how XOOM's rates relate to its contract language. It is an effort to have a jury retroactively regulate variable rates that, until 2018, the New York PSC left to private contracting parties and the competitive market. *See* Defs.' MSJ Ex. A-3, Coleman Rpt. at 29–31 (explaining that the New York PSC made a reasoned decision to leave rate-setting to ESCOs when it deregulated the market).

"require[] a specific margin" or "the same profit margin for each product the company sold." *Richards*, 246 F. Supp. 3d at 552; *see also Richards* 915 F.3d at 98 (rejecting the plaintiff's proposed margin restriction because the contract did not support that "specific limitation").

That rationale applies equally here. Again, the Mirkins acknowledge that the Contract "is silent as to an appropriate margin," Pls.' MSJ Resp. 45, and they offer no reasonable interpretation that would restrict XOOM's margin to recoupment of fixed costs and overhead while excluding all other components or the same margin charged on its fixed rates. Thus, the Contract governing Susanna's rates provides no more support for a limitation on margin than the one in *Richards*.

And even without the guidance of *Richards*, the Mirkins' proposed restrictions fail under North Carolina law. As courts in that state routinely recognize, the rules of contract construction cannot be "used to rewrite provisions to fit the needs of a litigant," *Beachcrete, Inc. v. Water St. Ctr. Assocs., L.L.C.*, 615 S.E.2d 719, 722 (N.C. Ct. App. 2005), or to "insert what the parties elected to omit" under "the guise of construction," *Bald Head Island Utilities, Inc. v. Vill. of Bald Head Island*, 599 S.E.2d 98, 100 (N.C. Ct. App. 2004) (quoting *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 127 S.E.2d 539, 541 (N.C. 1962)). Here, the Mirkins certainly could have selected an electricity product that placed restrictions on the components of the margin or capped the margin at a certain level (i.e., an indexed rate), but instead they chose a variable contract they concede "is silent as to an appropriate margin." Pls.' MSJ Resp. 45. Having made that decision, the Mirkins cannot add specific restrictions under "the guise of construction." *Bald Head Island*, 599 S.E.2d at 100.

To be perfectly clear, the absence of specific restrictions on the components and amount of the margin does not mean there are ***no*** restrictions or that XOOM has "unfettered discretion" to impose rates like those posited in the Mirkins' extreme hypotheticals. Pls.' MSJ Resp. 46; *id.* at

42 (arguing that XOOM's position would allow "a rate 10 times that of its supply costs"). XOOM's rates are still limited by the plain meaning of *based on*. As XOOM previously acknowledged, that term unambiguously "communicates that XOOM's supply costs would be the 'fundamental part' of the variable rate and a 'foundation' to which other components would be added." Defs.' MSJ Br. 16. If a rate was ten times greater than supply costs, then supply costs would be a minor component of the rate, not a "fundamental part" as the Contract requires. *Id.* But so long as supply costs are the "foundation" and the "fundamental part" of the variable rate, the Contract's admitted "silen[ce] as to an appropriate margin" forecloses the interpretations the Mirkins advance here.

2. <u>The Mirkins cannot create ambiguity by pointing to nonbinding authority accepting an interpretation of *based on* that the Mirkins unequivocally reject.</u>

To distract from their failure to offer a reasonable alternative interpretation of the Contract, the Mirkins cite the Southern District of New York's decision in *Fleisher*, which applied New York law to determine whether an insurance company's cost-of-insurance rates were "based on" a list of six "specifically enumerated" actuarial factors. *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 470 (S.D.N.Y. 2014). Drawing largely on judicial experience with "New York's views on the interpretation of insurance contracts," that court concluded that the plaintiff's proposed interpretation of that contract language was reasonable and adopted that interpretation instead of the defendant's reasonable alternative. *Id.* at 472–74.

*Fleisher* is irrelevant here because the Mirkins do not share its conclusion that *based on* is exclusive. In construing an insurance contract under New York law, that case concluded that the contract at issue could plausibly be construed as meaning "COI rate adjustments must be 'based on' the enumerated factors ***and only those factors***." *Compare Fleisher*, 18 F. Supp. 3d at 470, *with* Pls.' MSJ Resp. 31 at n.13 (refusing to argue that the Contract's language means "XOOM must charge only its supply costs"), *and id.* at 7, 8, 20 (admitting XOOM's rates could include a margin

above supply costs). Here, the Mirkins aggressively and repeatedly *reject* that interpretation and make clear that they do *not* contend "that 'supply costs were the *only* permissible component' of variable rates." *Id.* at 39.[5] Thus, the court's conclusion about the meaning of "based on" in *Fleisher* does not create ambiguity here because it is not one of "the constructions asserted by the parties," and the Mirkins do not contend that *Fleisher*'s reasoning supports restrictions on margins of the kind they propose here. *Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co. of Raleigh*, 500 S.E.2d 108, 111 (N.C. Ct. App. 1998) (cleaned up); *Philip Morris*, 685 S.E.2d at 96.

And even if the Mirkins advanced *Fleisher*'s construction of "based on," that decision's reasoning still would not apply here. As XOOM explained, dictionary definitions are not an unnecessary complication in North Carolina like the *Fleisher* court thought they are in New York,[6] but rather a "reliable guide" to contractual meaning of the non-technical term *based on. N. Carolina Farm Bureau Mut. Ins. Co., Inc. v. Martin by & through Martin*, 851 S.E.2d 891, 896 (N.C. 2020). In accordance with that reliable guidance, ordinary usage, the overwhelming weight of persuasive authority,[7] and surrounding contractual context, the Contract's use of the term *based on* cannot be reasonably construed to give an exhaustive "recipe" of the components included in

---

[5] *See also, e.g.*, MSJ Resp. 31 n.13 (describing XOOM's prediction that the Mirkins would argue that "XOOM must charge only its supply costs" as "baseless[]," a "strawman," and "not true); *id.* at 7 ("Plaintiffs' first contractual reading allows for modest margin" to cover fixed costs); *id.* at 8 (advancing an argument that "does not mean [the Mirkins] are refusing XOOM any margin whatsoever"); *id.* at 20 (agreeing that "a rate based on" supply costs can include "an appropriate margin" above supply costs to reflect "legitimate overhead costs").

[6] The Court need not consider whether *Fleisher* was correct as a matter of New York law to treat the "dictionary definitions of 'base'" as an "unnecesar[y] complicat[ion]." *Fleisher*, 18 F. Supp. 3d at 473. Here, the Court's analysis is guided by North Carolina law, so interpretation of "based on" must be "consistent with its plain dictionary meaning." *Southpark Mall Ltd. P'ship v. CLT Food Mgmt., Inc.*, 544 S.E.2d 14, 16 (N.C. Ct. App. 2001).

[7] *See* Defs.' MSJ Br. 17 n. 17–19 (citing cases). That authority also includes the Second Circuit's decision in *Richards*, which explained that "the contract unambiguously allowed" the defendant's rate-setting procedure without struggling to discern the meaning of "based on." *See Richards*, 915 F.3d at 100.

XOOM's variable rates. *See* Defs.' MSJ Br. 14–18.

Moreover, any arguable ambiguity that may have existed in *Fleisher* is eliminated by "the Contract's 'Agency' provision, which states that 'market-based compensation' for XOOM's services is 'included in the price' of electricity." Defs.' MSJ Br. 18. The Mirkins do not propose ***any*** alternative interpretation of that language or dispute that *market-based compensation* unambiguously includes a profit. Instead, they contend that the Court should ignore that term altogether because its placement is too remote to affect "prominent pricing provision on [the Contract's] front page." Pls. MSJ Resp. 32.

The Mirkins cite no authority to support that argument—because they cannot. North Carolina law has long recognized that a valid contract can include "many pieces of paper" that are "connected physically or by internal reference." *Chaisson v. Simpson*, 673 S.E.2d 149, 159 (N.C. Ct. App. 2009) (quoting *Simpson v. Beaufort Cty. Lumber Co.*, 137 S.E. 311, 312 (N.C. 1927)). And because the Agency term on the second page is unquestionably part of the same contract as the pricing provision on the first, the Contract must be "construe[d] as a whole" with both terms "considered with reference to each other." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 802 S.E.2d 888, 892 (N.C. 2017) (cleaned up). And in doing so, the Court's overriding task "is not 'to find discord in differing clauses, but to harmonize all clauses if possible.'" *Philip Morris*, 685 S.E.2d at 632 (cleaned up). The only interpretation that fulfills that demand is the one advanced by XOOM, which allows secondary components like "market-based compensation" to be included in "the price noted above"—i.e., the "monthly variable rate . . . based on XOOM's actual and estimated supply costs." *See* Defs.' MSJ Br. 18.

Accordingly, the Mirkins' attempt to avoid summary judgment with a manufactured ambiguity fails. They do not advance a reasonable alternative interpretation of the Contract's

language, so no ambiguity exists as a matter of law.

3. The Mirkins' expert evidence is inadmissible and irrelevant.

In a final attempt to create a fact issue on contract interpretation where none exists, the Mirkins cite irrelevant testimony about the meaning of the pricing provision's use of *supply costs* to argue that the meaning of *based on* is a question for the jury. *See* Pls.' MSJ Resp. 33. That argument fails on its face because the parties' interpretive dispute does not involve competing meanings of *supply costs*. Rather, the only portion of the pricing term that the *Mirkins* now say is ambiguous is *based on*, so their expert testimony is irrelevant.

And even if the testimony were relevant (it is not), neither the Mirkins nor their experts contend that *based on* has a specialized meaning that requires "scientific, technical, or otherwise specialized knowledge" to comprehend, so expert testimony is wholly inappropriate. Fed. R. Evid. 702(a). Nor do the Mirkins' experts claim that the meaning of *based on* is a matter within their expertise or a term without an ordinary meaning. *See* Defs.' MSJ Ex. A-16, Adamson Dep. 31:4–5 (admitting *based on* has an "ordinary meaning"), Ex. A-17, Eryilmaz Dep. 35:1–12 (indicating that *supply costs* is a technical term, but not saying the same of *based on*); Pls.' MSJ Resp. Ex. 46 at 52:11–54:24 (indicating how the expert believed an ordinary consumer would interpret *based on* while saying the consumer "may not be able to interpret what the components of 'supply cost' is"). In fact, the Mirkins' experts rightfully admit they are not offering a legal interpretation of the Contract at all. Defs.' MSJ Ex. A-16, Adamson Dep. 32:7–9, Ex. A-17, Eryilmaz Dep. 34:4–6.

Because *based on* is not a technical term upon which expert testimony has been, or even can be, offered, the Mirkins' evidence regarding their experts' understanding of that term is both inadmissible and irrelevant. *See Richards*, 915 F.3d at 98 (holding that the Mirkins' experts' opinion as to "legal meaning" was irrelevant because "the construction of unambiguous contract terms is strictly a judicial function" (quotations omitted)); *Smith v. Childs*, 437 S.E.2d 500, 507

(N.C. Ct. App. 1993) (holding that an experts' testimony as to the meaning of ambiguous term "should have been excluded" because the term was not technical). It can and should be ignored.

**B.    No Genuine Factual Dispute: The Mirkins' evidence does not raise a factual dispute as to whether supply costs were the foundation of Susanna's variable rates.**

Because their ambiguity argument fails as a matter of law, the only potential fact issue the Mirkins are left with is whether XOOM's supply costs were the foundation of Susanna's rates. On this point the Mirkins argue that the evidence creates a factual dispute as to whether Susanna's rates were based on XOOM's supply costs under the term's ordinary meaning—i.e., whether they were the foundational component. The evidence tells a different tale. The Mirkins' various assertions of fact issues are either totally unsupported, affirmatively undermined by the Mirkins' own evidence and admissions, or both. There is no genuine dispute that Susanna's rates were based on XOOM's supply costs.

1.    The Mirkins offer no evidence that non-supply cost considerations were the foundational component of Susanna's rates.

The Mirkins' claim that they have "voluminous evidence" that shows "XOOM's rates were not based on its supply costs[,]" Pls.' MSJ Resp. 21–25, is directly contradicted by the record. They concede that rates were set at meetings where decisionmakers were presented with pre-assembled "rate-setting workbooks" that "contained XOOM's internal supply cost calculations," like XOOM explained. *Id.* at 21. So, they are left making the absurd—and completely unsupported—accusation that XOOM "disregarded" those cost calculations after taking the time and expense to create them each month. *Id.* Because they cannot point to evidence that these supply costs were ignored (because no such evidence exists), the Mirkins offer evidence that XOOM included a margin ***in addition to*** its supply costs. *Id.* at 22. That is entirely appropriate for reasons already discussed.

Nor do the Mirkins offer any evidence of any non-supply cost components included in Susanna's rates, which are the only rates that matter to this motion. Instead, much of their evidence simply provides general background about the information available at rate-setting meetings, but does not indicate which pieces of that information, if any, were used to set variable rates in those months.[8] And the rest of the Mirkins' evidence focuses on internal discussions about rate-setting that occurred before or after Susanna's short time as a customer between June and November 2013, including:

- an April 2013 email that increased margins in response to wholesale price increases caused by "persistently cold weather" and a "major transmission line going down"[9];

- a 2014 email ███████████████████████████████████████████████
  ████████████████████████████████[10];

- a 2015 email that provides a few questions and answers about "rate setting" and "costs" to be used in a "game" at an all-hands meeting[11];

- a 2015 email that made a small adjustment to margins on natural gas[12];

- a 2017 email that discusses options to deal with a "significant" unanticipated "volume change due to weather" that resulted in an unanticipated margin shortfall[13];

---

[8] *See* Pls.' MSJ Ex. 19 at 61:6–19 (███████████████████████████████████
███████████████████████████████████); Ex. 20 at 37:11–
38:4, 38:18–39:19, 84:12–19, 88:10–14, 107:6–108:1, 237:22–239:3 (████████████
██████████████████████████████████████████████████████
████████); Ex. 23 at 3–5 (objecting to requests for admission that were "***not*** limited to residential variable rate electricity and natural gas customers" and admitting only ████████
███████████████████████████████████████); Ex. 34 at 99:8–14 (acknowledging that ████████
██████████ but not indicating that they influenced variable rates); Ex. 35 at 16:21–23, 68:10–12, 70:21–25 (same)
[9] Pls.' MSJ Ex. 26.
[10] Pls.' MSJ Ex. 22 (emphasis added).
[11] Pls.' MSJ Ex. 27.
[12] Pls.' MSJ Ex. 28.
[13] Pls.' MSJ Ex. 29.

- a 2014 email exchange that explored potential solutions to an unplanned margin shortfall[14];

- a 2016 email that declined to lower gas rates when the margin was "need[ed]" to cover upcoming anticipated costs[15]; and

- a 2014 email that explored solutions to a margin shortfall, ████████████ ████████████████████████████████████████████████████ ████████████████████████████.[16]

At most, those emails show that XOOM's goal to achieve a margin above costs was occasionally hindered by unanticipated circumstances. But Susanna's individual claim only challenges the variable rates XOOM charged her from June to November 2013, Pls.' MSJ Resp. 12, and the Mirkins' evidence does not include a single mention of a circumstance that arose or a decision that was made during that time.

The Second Circuit discussed in *Richards* that the plaintiff's contract claim failed because his evidence was similarly flawed:

> [Richards'] argument is largely predicated on the theory that Direct Energy unjustifiably unmoored its variable rate from Direct Energy's procurement costs. But Richards focuses exclusively on Direct Energy's pricing practices in 2014 and 2015, yet Richards left Direct Energy in 2013. For the three months that Richards paid it, the variable rate and Direct Energy's costs stayed constant . . . . Richards would thus not be a proper plaintiff even if his legal theory had any merit, which it does not.

*Richards*, 915 F.3d at 100.

Aside from their focus on discrete situations that arose outside the short time when Susanna paid variable rates in 2013, the Mirkins' remaining evidence shows only that (1) Susanna was charged rates that included a margin over COGS, and (2) the amount of the margin was always a fraction of COGS. *See* Pls.' MSJ Resp. 12. But they offer no evidence on which a factfinder could

---

[14] Pls.' MSJ Exs. 30, 31.
[15] Pls.' MSJ Ex. 32.
[16] Pls.' MSJ Ex. 33.

assess what components were in that margin—or that XOOM ever made a profit above its fixed costs at all. Quite the contrary, their evidence regarding other time periods suggests that the margin on Susanna's rates might have resulted in a ***net loss*** once overhead and fixed costs were accounted for. *See* Pls.' MSJ Ex. 7 at XOOM_MIRKIN_069065 (financial records from a time when a gross margin of 28% did not cover fixed costs and overhead). From that evidence, the only reasonable conclusion a factfinder could draw is that supply costs were not the ***only*** component of Susanna's rates. But again, that is permissible under the Contract and the Mirkins' own evidence confirms that supply costs were always the ***largest*** component by far. *See* Pls.' L.R. 56.1 Counterstatement 55 (showing that "Total Cost" always accounted for between 66% and 80% of Susanna's rates). Thus, there is no dispute at all that XOOM's supply costs were always the first and largest component of Susanna's rates: in other words, their base.

2. The undisputed correlation between changes in Susanna's rates and XOOM's costs further refutes the Mirkins' baseless assertion that XOOM "ignored" supply costs.

In response to XOOM's expert's evidence of a near perfect correlation between changes in Susanna's rate and XOOM's underlying COGS, the Mirkins accuse XOOM of "conflating legal and statistical causation" and dismiss that evidence as "very weak." Pls.' MSJ Resp. 40–41. However, the Mirkins offer no evidence to create a factual dispute on the "statistical fact" that there is less than a "1-in-400 chance" that Susanna's rate was set without reference to COGS. *Id.* at 10. Their conclusory critiques of that evidence do not blunt its significance as the only "direct evidence" of the relationship between Susanna's rates and COGS.

And more to the point at this procedural juncture, XOOM's correlation evidence refutes the Mirkins' attempt to survive summary judgment. To try to create a fact issue, they baselessly assert that XOOM "systematically disregarded its supply costs" to set rates for Susanna that were "untethered to" those costs. Pls.' MSJ Resp. 5, 43. As the parties with the burden of proof, the

14

Mirkins must "produce evidence from which the fact-finder could reasonably" find that occurred, and that evidence must be strong enough for a factfinder to reasonably conclude that the correlation between Susanna's rates and XOOM's underlying costs was simply a 1-in-400 coincidence. *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 346 (2d Cir. 1999). But again, they have pointed to no evidence that happened at any time, much less when she was a customer in 2013.

And finally, even if the Mirkins had such evidence, they do not explain how it would establish breach. If the factfinder concluded that XOOM complied sheerly by chance, then the finding would still be that XOOM ***complied*** with the Contract because the rates happened to be based on supply costs. Accordingly, the Mirkins have "no right to take the case to" a trial in the hopes that they will obtain a verdict based on "surmise, speculation, and conjecture." *Id.*

3. The terms of a different contract are not evidence that XOOM breached the Contract with Susanna years earlier.

Throughout their briefs, the Mirkins argue that they can prove XOOM breached the Contract by pointing to the terms of a contract that was not used until 2016. But for the reasons already discussed, the Contract is not ambiguous, and Susanna cannot rely on extrinsic evidence like the 2016 contract to interpret her own unambiguous contract. *See Lynn v. Lynn*, 689 S.E.2d 198, 205 (N.C. Ct. App. 2010) (internal marks and citation omitted) ("[E]xtrinsic evidence may be consulted when the plain language of the contract is ambiguous."). Nor can she point to the terms of another contract to which she is not a party to establish breach. *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000) ("The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of ***that*** contract.") (emphasis added). Nevertheless, the Mirkins insist the 2016 contract's language allowing "XOOM to base rates 'upon a number of factors' including 'pricing strategies'" means that XOOM was "prohibited" from using "'pricing

strategies' to set rates under the [Contract]'" at issue here. *See* Pls.' MSJ Resp. 25–26. That argument fails for at least three reasons.

First, the argument assumes that the Contract only allowed XOOM to include rate components that were explicitly identified. But the Mirkins have now rejected that assumption,[17] so it is undisputed that the Contract does not require supply costs to be "the ***only*** permissible component" or place specific restrictions that either permit or prohibit secondary components included in the margin. *See supra* Part II.A.1–2; *see also* Defs.' MSJ Br. 14–18, (explaining why the Contract's unambiguous language requires a rate for which supply costs "are the foundational component, not the only component"); *id.* at 22–26 (explaining why the Mirkins cannot "rewrite the Contract" to impose specific restrictions not found in the Contract's text). Rather, XOOM was admittedly allowed to use "pricing strategies" and secondary components so long as the overall rates were "based on" supply costs. *See supra* Part II.A.1.

Second, the Contract cannot be reasonably construed to categorically prohibit "pricing strategies." Pls.' MSJ Resp. 26. A company's decision to set rates "based on" costs is unquestionably a pricing strategy, as are the use of prior period adjustments and the inclusion of a gross margin. Thus, the Contract cannot be reasonably construed to prohibit ***all*** pricing strategies, because several strategies are expressly disclosed—including the one that XOOM employed when it set rates that were *based on* its supply costs.

And finally, the Mirkins offer no evidence that any particular "pricing strategies" played a role in how Susanna's rates were set, much less that XOOM employed an improper strategy that yielded a rate not *based on* supply costs. Instead, the Mirkins' only evidence with respect to

---

[17] *See* Pls.' MSJ Resp. 39 ("Plaintiffs do not assume that 'supply costs were the ***only*** permissible component' of variable rates." (quoting Defs.' MSJ Br. 20)).

Susanna's rate confirms that she was charged rates for which supply costs were a larger component than all other components combined. *See* Pls.' L.R. 56.1 Counterstatement 55 (showing that "Total Cost" always accounted for between 66% and 80% of Susanna's rates). Thus, even if there was conflicting evidence about the specific strategies XOOM employed when it set Susanna's rates (there is not), that dispute would not be material. The undisputed evidence confirms that XOOM complied with the Contract, so it does not matter what strategies, formulas, or directives it used to achieve that outcome. No matter how it was achieved,[18] Susanna's rates' compliance with the Contract precludes a finding of breach.

## C.  Boris was not a third-party beneficiary.

The Mirkins acknowledge that Boris "is not a direct party to the contract," but they insist that he has a contract claim against XOOM as a third-party beneficiary because he interacted with XOOM on Susanna's behalf by using Susanna's electricity. Pls.' MSJ Resp. 46; *see also* Pls.' L.R. 56.1 Counterstatement 49 (acknowledging that Boris was not a signatory to the Contract).

That argument is meritless. Under North Carolina law, Boris could only be a third-party beneficiary if the Contract "was executed for [Boris's] direct, and not incidental, benefit." *Holshouser v. Shaner Hotel Grp. Properties One Ltd. P'ship*, 518 S.E.2d 17, 25 (N.C. Ct. App. 1999), *aff'd*, 524 S.E.2d 568 (N.C. 2000). Under that standard, "[i]t is not enough that the contract, in fact, benefit[ed]" Boris because he used electricity that XOOM sold to Susanna. *Id.* at 25.

---

[18] To be clear, the Mirkins are wrong to argue that ███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Pls.' MSJ Resp. 22. Indeed, the Mirkins "do not dispute" that the workbooks used complex formulas to calculate COGS, which the Mirkins describe as "a 'Total Cost' formulation," Pls.' L.R. 56.1 Counterstatement 10, and members of management frequently participated in setting rates based on the workbook COGS figures, Defs.' MSJ Ex. A-12 at 36:22–37:16, 39:13–19, 40:3–8. So, the Mirkins' complaint really seems to be that XOOM did not implement the specific (but unspecified) formulas or record-keeping practices they would prefer, but they cite nothing in the Contract that required such practices.

Rather, under the applicable law, the Mirkins must provide evidence of XOOM's intent "to confer a legally enforceable benefit on" Boris. *Id.*

Here, the only evidence of XOOM's intent is the contract's statement that "[t]here are no third-party beneficiaries." Defs.' MSJ Ex. A-19, Contract at 3. That language "must be construed strictly against" Boris, and it makes "clear that [XOOM] did not intend that [Boris] receive a legally enforceable right under the [C]ontract." *Holshouser*, 518 S.E.2d at 25. Accordingly, Boris's claim fails as a matter of North Carolina law.[19] *Id.* at 25 (affirming summary judgment on a purported third-party beneficiary's contract claim when the relevant contract stated that it did not "confer any rights on any party as a third party beneficiary").

## III.  CLASS CERTIFICATION SUR-REPLY[20]

The Mirkins' opening motion for class certification offered their experts' reports and deposition testimony as their sole evidence of commonality and predominance. When XOOM explained why that evidence was insufficient to meet the Mirkins' Rule 23 burden, the Mirkins attached nearly 300 pages of new evidence to their reply brief meant to satisfy their movant's burden. That evidence does not remedy the problems with the Mirkins' initial showing, but it does raise three new issues that are independently fatal to class certification.

*First*, the Mirkins' new evidence raises myriad questions that would undermine commonality, predominance, and typicality if shown to the factfinder. Each piece of new evidence involves a discrete situation in which XOOM was deciding whether to change rates. To be clear,

---

[19] To avoid this conclusion, the Mirkins cite an unpublished case from this district in which Judge Kuntz concluded that a plaintiff was a third-party beneficiary to an electric supply contract between her spouse an ESCO. *See* Pls.' MSJ Resp. 47. However, Judge Kuntz drew that conclusion under New York law, and he did not address a contract that expressly disclaimed the existence of third-party beneficiaries. *See Donin v. Just Energy Grp. Inc.*, Case No 17-cv-5787 (WFK)(SJB), ECF No. 111 at 8–9. Nothing in that decision suggests that Boris is a third-party beneficiary under the facts of this case and North Carolina law.

[20] This sur-reply is included pursuant to leave of the Court. *See* Text Order, April 7, 2023.

XOOM maintains that this evidence of **how** rates were set is irrelevant to the class claims because XOOM's rates were based on supply costs as a matter of law. And, as discussed, if the ultimate rate was based on supply costs, then XOOM complied with the Contract no how it arrived at the rate. But the Mirkins still advocate for admission of evidence about the underlying discussions and decision-making process. So if the Court rejects XOOM's position and allows the Mirkins to show these emails to the factfinder, then a determination of whether XOOM's rate-setting process involved a decision that violated the contract could not be made without (1) determining what, if any, action was taken based on the discussions reflected in the evidence, (2) which, if any, class members' rates were affected by that action, and (3) whether the action taken was consistent with or violative of the Contract's pricing terms.

For example, the March 19, 2014, email does not support liability because it discusses a decision to ███████████████████████████████ with no mention of the variable-rate products at issue in this case, while the February 2, 2017 email does not support liability because it proposed that variable rates should **not** be increased to cover an unanticipated shortfall caused by unseasonable weather. Pls.' Class Cert. Reply Exs. 2, 10. And even if the Mirkins managed to prove that XOOM implemented a particular course of action, they would still have to show whether (and how) the action affected each of the variable rates at issue here, which are set separately each month for every utility territory in New York. *See* Defs.' Class Cert. Resp. 10–11. Absent such evidence, the factfinder could not determine whether the decision impacted the rates at issue as opposed to the dozens of other rates XOOM set for New York and thousands of rates it set for other markets each month. *See id.* at 10–11. If the Mirkins were to present "abundant" evidence of this sort at a class action trial, the proceedings would devolve into an endless series of mini-trials in which the factfinder would have to evaluate individual rate-setting

decisions. And the results of those trials would only affect the subset of class members in the utility region affected by a given decision in a given month, and those subsets never include Susanna or Boris. The necessity of a "multitude of mini-trials" means that "Rule 23(b)(3)'s predominance requirement has not been met." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 CIV. 7618 KMW HBP, 2004 WL 5719589, at *11 (S.D.N.Y. Mar. 31, 2004) (collecting cases).

*Second*, the new evidence disproves the Mirkins' excuse for advancing models of liability and damages in which other costs and "prior period adjustment costs . . . are [] not represented." *See* Ex. 3 to Class Cert. Mot., Pls.' Expert Rpt. ¶ 63. The Mirkins' experts claimed that omission was justified because ████████████████████████████████████

████████████████████████████████ *Id.* at ¶ 23(d). However, the Mirkins' reply evidence specifically includes a document that shows other costs were considered in calculating gross margins and calculates prior period adjustments for both electricity and natural gas and shows that they were included in XOOM's gross margin. *See* Pls.' Class Cert. Reply Ex. 15 at XOOM_Mirkin_069062, 069065, 069071 (showing costs considered in gross margin and including prior period adjustments ("PPAs") as a component of a "gross margin analysis"). Thus, if the Mirkins' experts truly could not identify any documents reflecting prior period adjustments, it is not because such documents did not exist or XOOM did not produce them. Rather, it is because the experts failed to assess the impact of "prior period adjustments and other appropriate supply costs that were not captured in the rate-setting workbooks—but *were* identified in the 2013 contract." Defs.' Class Cert. Resp. 25.

*Finally*, the Mirkins' defense of Boris's involvement in this case claims he is "a member of the Class" because he "was charged a variable rate." Pls.' Class Cert. Reply 38. By attempting to include non-accountholders like Boris who did not contract with XOOM in the class definition,

the Mirkins undermine their argument that "[t]he class is ascertainable by reference to XOOM's business records." *Id.* at 27. Of course, Boris—and other non-accountholders like him—are not known to XOOM and so are not reflected in its records. Thus, the Mirkins' reply also shows why they cannot satisfy Rule 23's ascertainability requirement. They have identified no objective criteria that would " establish the definite boundaries of a readily identifiable class" including Boris. *Brecher v. Republic of Argentina*, 806 F.3d 22, 25 (2d Cir. 2015).

## IV.   CONCLUSION

Accordingly, summary judgment should be granted and the case closed. Should the Court also address class certification, that motion should be denied.


Dated: May 5, 2023                         MCDOWELL HETHERINGTON LLP

                                           */s/ Michael D. Matthews, Jr*
                                           Michael D. Matthews, Jr.
                                           Diane S. Wizig (admitted *pro hac vice*)
                                           James M. Chambers (admitted *pro hac vice*)
                                           David L. Villarreal (admitted *pro hac vice*)
                                           MCDOWELL HETHERINGTON LLP
                                           1001 Fannin Street, Suite 2400
                                           Houston, Texas 77002
                                           Telephone: (713) 337-5580
                                           Facsimile: (713) 337-8850
                                           matt.matthews@mhllp.com
                                           diane.wizig@mhllp.com
                                           james.chambers@mhllp.com
                                           david.villarreal@mhllp.com

                                           *Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the foregoing has been served on the 5th day of May, 2023 via email on all counsel of record.

/s/<u>*Michael D. Matthews, Jr.*</u>
Michael D. Matthews, Jr.
