# EXHIBIT 1

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): 23-_____-cv   _____ Caption [use short title]

Motion for: Petition Pursuant to Fed. R. Civ. P. 23(f) for

Leave to Appeal District Court Order Certifying

Class

Set forth below precise, complete statement of relief sought:

XOOM Defendants seek permission, pursuant to Fed. R. Civ.

P. 23(f) and Fed. R. App. P. 5(a) to appeal from the decision          **Mirkin v. XOOM Energy, LLC, et al.**

and order of the United States District Court for the

Eastern District of New York granting Plaintiff's motion for

class certification.

MOVING PARTY: XOOM Defendants            OPPOSING PARTY: Plaintiff Susanna Mirkin

☐ Plaintiff   ☑ Defendant

☐ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: Michael D. Matthews, Jr.       OPPOSING ATTORNEY: Steven L. Wittels

[name of attorney, with firm, address, phone number and e-mail]

McDowell Hetherington LLP              Wittels McInturff Palikovic

1001 Fannin Street, Suite 2400          18 Half Mile Road

Houston, Texas 77002                 Armonk, New York 10504

Court- Judge/ Agency appealed from: The Honorable Allyne R. Ross, United States District Court, Eastern District of New York

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes  ☐ No (explain): _____
_____

Opposing counsel's position on motion:
☐ Unopposed  ☑ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes  ☐ No  ☐ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:
Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☐ No
Requested return date and explanation of emergency: _____
_____
_____
_____

Is oral argument on motion requested?  ☑ Yes  ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes  ☐ No  If yes, enter date: _____

Signature of Moving Attorney:

/s/ Michael D. Matthews, Jr. Date: 9/14/2023 _____   Service by: ☐ CM/ECF  ☑ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# No. _____

---

In the United States Court of Appeals
for the Second Circuit

---

**Susanna Mirkin,**

*Plaintiff–Respondent,*

*v.*

**XOOM Energy, LLC, and
XOOM Energy New York, LLC,**

*Defendants–Petitioners.*

---

ON PETITION FOR REVIEW FROM AN ORDER CERTIFYING CLASS ON AUGUST 31, 2023
BY THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK
CASE NO. 1:18-CV-02949
THE HONORABLE ALLYNE R. ROSS

---

## DEFENDANTS' PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

---

Michael D. Matthews, Jr.
Diane S. Wizig
MCDOWELL HETHERINGTON LLP
1001 Fannin St., Suite 2400
Houston, Texas 77002
Telephone: 713-337-5580
matt.matthews@mhllp.com
diane.wizig@mhllp.com

James M. Chambers
MCDOWELL HETHERINGTON LLP
1000 Ballpark Way, Suite 209
Arlington, Texas 76006
Telephone: 817-631-7561
james.chambers@mhllp.com

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Petitioners hereby state that the sole member and manager of Defendant-Petitioner XOOM Energy New York, LLC is XOOM Energy, LLC and the sole member and manager of Defendant-Petitioner XOOM Energy, LLC is XOOM Energy Global Holdings, LLC. Defendants-Petitioners further state there are no subsidiaries that are not wholly owned by Defendants-Petitioners and that NRG Energy, Inc. is a publicly held company that owns 10% or more of Defendant-Petitioner.

# **TABLE OF CONTENTS**

QUESTIONS PRESENTED FOR REVIEW ...........................................................1

INTRODUCTION .................................................................................................2

BACKGROUND ...................................................................................................4

    I.    XOOM contracted to set variable rates "based on [its] actual and estimated supply costs." .................................................................................4

    II.    Plaintiff sued, alleging her rates were not based on "market-supply costs," and promising to show what XOOM's rates should have been. ..................4

    III.    Discovery showed XOOM's supply costs were the foundation of Plaintiff's rates and those of every other class member. ..............................................5

    IV.    The district court adopted a strict "proportionate-margin construction" of the contract and found fact issues regarding the components of the margin built into Plaintiff's rates. ...................................................................................6

    V.    The district court certified a class encompassing more than 5,600 rates set over a ten-year period. ..............................................................................8

ARGUMENT .......................................................................................................11

    I.    The Court should correct the district court's reliance on a repudiated standard to resolve pervasive confusion in the district courts. ...................................11

    II.    Commonality and predominance are not met, so the district court's certification order is subject to inevitable reversal. ......................................14

        A.    No factfinder could determine the factors that influenced the class members' rates without assessing over 5,600 rate-setting decisions..15

        B.    Plaintiff's damage models undisputedly do not constitute classwide evidence of the rates XOOM allegedly should have charged.............17

III.  The district court erred by ignoring Plaintiff's atypicality simply because the issue overlaps with the merits of her claim...........................................19

CONCLUSION ......................................................................................................22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allegra v. Luxottica Retail N. Am.*,
341 F.R.D. 373 (E.D.N.Y. 2022)................................................................12

*Authors Guild, Inc. v. Google Inc.*,
721 F.3d 132 (2d Cir. 2013) ...................................................................19

*Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*,
86 S.E. 1025 (N.C. 1915)......................................................14, 17, 18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)........................................................13, 16, 18, 20

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978).................................................................................19

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982).................................................................................20

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983).................................................................................13

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ........................................12, 13, 19, 20

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015) ...........................................................14, 15

*Leider v. Ralfe*,
No. 01 CIV. 3137 (HB), 2003 WL 22339305 (S.D.N.Y. Oct. 10, 2003) ....................................................................................................12

*Mirkin v. XOOM Energy, LLC*,
342 F. Supp. 3d 320 (E.D.N.Y. 2018) .............................................4, 5

*Mirkin v. XOOM Energy, LLC*,
931 F.3d 173 (2d Cir. 2019) .................................................................5, 8

*Parker v. Time Warner Ent. Co., L.P.*,
    331 F.3d 13 (2d Cir. 2003) ...................................................................12

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017) .............................................................13

*Richards v. Direct Energy Servs., LLC*,
    915 F.3d 88 (2d Cir. 2019) ...............................................................18

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
    262 F.3d 134 (2d Cir. 2001) .....................................................3, 4, 11

*Troitino v. Goodman*,
    35 S.E.2d 277 (1945) ...................................................................14, 17

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) .............................................................12

## Rules

Fed. R. Civ. P. Rule 23 ................................................................*passim*

Fed. R. Civ. P. Rule 23(a) .................................................................20

Fed. R. Civ. P. 23(a)(2), (b)(3) ........................................................14

Fed. R. Civ. P. Rule 23(b)(2) ..............................................................8

Fed. R. Civ. P. Rule 23(f) .........................................................1, 4, 11

## Other Authorities

16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
    Federal Practice & Procedure § 3931.1 (3d ed. 2012)......................19

Defendants XOOM Energy, LLC and XOOM Energy New York, LLC (together "XOOM") petition under Rule 23(f) for permission to appeal an order granting class certification entered on August 31, 2023, by the United States District Court for the Eastern District of New York.

## QUESTIONS PRESENTED FOR REVIEW

I.  Does Rule 23's class certification standard include a "general preference" for class certification and a "tend[ency] to err" in that direction?

II. Did the district court err in concluding that an overcharge claim can be resolved on a class basis despite the absence of any common proof of breach and despite Plaintiff's evidence showing that a common resolution is impossible?

III. Did the district court err in accepting as classwide proof of overcharge damages a model that undisputedly does not consider the rates XOOM allegedly should have charged?

IV. Did the district court err by ignoring an argument about Plaintiff's atypicality simply because the argument overlapped with the merits of her claim?

1

## INTRODUCTION

The district court erroneously certified a class of customers who allegedly were overcharged for one or more of the 5,600+ different variable rates XOOM charged for retail energy during a nearly eleven-year period, without any evidence of what those rates should have been. Each of those thousands of rates represents a discrete decision made during XOOM's rate-setting process—a monthly process the district court found "is of central importance" to liability but "not so simple" because the rates are not set uniformly or by formula. Many cost considerations go into each rate, including adjustments for actual costs from prior periods. That complexity is why Plaintiff Susanna Mirkin never proposed a way to determine the amount of any alleged overcharge in her six months of rates, much less a common method for determining alleged overcharges in one stroke for the class.

Plaintiff's evidentiary failures are dispositive. Under North Carolina's substantive law, a plaintiff cannot prove liability or damages for an alleged overcharge without first proving what the correct charge should have been. And under Rule 23, a plaintiff seeking to certify an overcharge class must prove the correct charge can be calculated classwide without individualized inquiries.

The district court committed four independent legal errors in granting certification despite Plaintiff's evidentiary failures. *First*, an improper "general preference" for certification permeated its order, inappropriately flipping the burden

2

of proof onto XOOM and causing the remaining errors. *Second*, the district court certified an overcharge class without any proof of what any one of the rates should have been or of how to calculate them. In doing so, it wrongly imported the summary judgment burden and faulted XOOM for not proving the absence of fact issues on liability. But under Rule 23, any such fact issues cut the other way: the individualized questions about rate-setting decisions would be multiplied thousands of times over for a class. *Third*, the district court erred by accepting Plaintiff's damage model that admittedly does not try to calculate the rates XOOM allegedly should have charged. And *fourth*, the district court explicitly "ignored" XOOM's typicality arguments, impermissibly taking a wait-and-see approach on the merits of Plaintiff's claim.

These errors fall squarely within two categories this Court recognizes as "warrant[ing] interlocutory review." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001). First, the district court's application of a "general preference" is emblematic of a pervasive misunderstanding of the class certification standard, and correction of that error is "of fundamental importance to the development of the law of class actions . . . ." *Id.* at 140. And second, the district court's certification of an overcharge claim without any common evidence from which liability or damages can be determined will "be inevitably reversed by this Court on appeal after final judgment," so it is "particularly appropriate" to permit

immediate appeal and "spare the parties and the district court the expense and burden of litigating the matter to final judgment . . . ." *Id.* at 139.

For these reasons, the Court should permit this appeal under Rule 23(f).

## **BACKGROUND**

### I. **XOOM contracted to set variable rates "based on [its] actual and estimated supply costs."**

Plaintiff purchased variable-rate electricity from XOOM for six months in 2013. A-2. Her contract provided for a "variable rate, per kWh, that may change on a monthly basis," and would be "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs" plus "market-based compensation" for XOOM's supply service. A-2; A-24. The district court found this language was in XOOM's contracts with thousands of other electricity and natural gas customers. A-8.

### II. **Plaintiff sued, alleging her rates were not based on "market-supply costs," and promising to show what XOOM's rates should have been.**

When Plaintiff[1] filed suit alleging that her rates were "'not commensurate with XOOM's supply costs,'" she did not know what those costs were. *Mirkin v. XOOM Energy, LLC ("Mirkin I")*, 342 F. Supp. 3d 320, 323 (E.D.N.Y. 2018). So she hired an expert to create an *ad hoc* "Market Supply Cost" alleged to "correspond[] to" the

---

[1] Plaintiff's husband Boris was her co-plaintiff until the district court granted summary judgment on his claim. *See* A-39–40.

"'actual and estimated supply costs' referenced" in her contract. *Id.* at 323. Using those calculations, Plaintiff alleged she was overcharged. *Id.* at 324.

On XOOM's motion, the district court dismissed because Plaintiff's Market Supply Cost did not plausibly reflect XOOM's internal supply costs. *Mirkin I*, 342 F. Supp. 3d at 324. Plaintiff appealed, arguing her allegations about similarities between the Market Supply Cost and XOOM's supply costs plausibly alleged a claim, and promising that with discovery she would show what XOOM's rates should have been under the contract. *Mirkin v. XOOM Energy, LLC (Mirkin II)*, 931 F.3d 173, 177-78 (2d Cir. 2019).[2] This Court agreed and reversed. *Id.*

## III. Discovery showed XOOM's supply costs were the foundation of Plaintiff's rates and those of every other class member.

On remand, XOOM produced evidence that refuted the complaint's core allegation of a disconnect between Plaintiff's rates and XOOM's supply costs. Instead of "substantially exceed[ing]" costs and "ris[ing] even when" costs "went down," Plaintiff's rate always rose when XOOM's estimate of certain benchmark costs known as "COGS" rose and fell when XOOM's estimated COGS fell.

---

[2] The Court "affirm[ed] the District Court's dismissal of" Plaintiff's other claims. *See Mirkin II*, 931 F.3d at 174 n.1.



A-64. Plaintiff's rates had a margin above XOOM's estimated COGS averaging only

29%—about $0.01/kWh, give or take a cent. A-25.

## IV. The district court adopted a strict "proportionate-margin construction" of the contract and found fact issues regarding the components of the margin built into Plaintiff's rates.

When discovery disproved her allegations, Plaintiff changed course and

attacked the margin included in her rate instead of the cost/rate correlation. Under

her new theory, it was not enough for rates to rise and fall with XOOM's costs.

Instead, Plaintiff now argued XOOM's margin had to remain below some nebulous

threshold that "limit[ed] XOOM to charging rates that are close or proportionate to

its supply costs." A-28, A-33. Plaintiff did not try to define "close or proportionate"

or to calculate an "appropriate" margin, and her experts expressly disclaimed having

either the data or expertise to attempt that definition or calculation. *See* A-50

(admission that Plaintiff's experts "really didn't have any information that would

allow" them to offer an opinion as to "a reasonable or appropriate margin").

6

XOOM then moved for summary judgment, arguing that a rate "based on" supply costs can still include a margin above costs, and that Plaintiff offered no evidence that the margin included in her rates was improper by any metric. *See* A-A-28. XOOM also pointed out Plaintiff's failure to offer any evidence that the margin on her rates included any component other than contractually permitted supply costs, including a supply cost known as "prior period adjustments." A-35.

Although the district court agreed that XOOM was contractually authorized to include a "margin on top of supply costs[,]" it determined the contract's language was vague—though not ambiguous—such that it required rates to "remain proportionate, but not equal to" XOOM's actual and estimated supply costs. *See* A-31–32. Under this "proportionate-margin construction," the district court said XOOM is "allow[ed] a margin so long as it is not untethered to . . . actual and estimated supply costs." *See* A-32.[3]

The district court then determined there is a triable fact issue as to whether XOOM included margins in Plaintiff's rates that "did not directly correspond to XOOM's internal COGS metric." *See* A-31–32. However, it did not indicate what an appropriate margin would be, nor articulate any legal or evidentiary basis by

---

[3] XOOM maintains that the district court's contract interpretations on summary judgment were erroneous too, but limits its arguments here to why the district court's own reading defeats commonality and predominance.

7

which a permissible margin could be determined. *See* A-33 (stating only that the contract "does not allow unbounded discretion" without offering any basis of determining the boundaries). In addition, the district court found "ample testimonial evidence" that XOOM's margin included permitted supply costs known as "prior period adjustments." A-37. Nonetheless, it found that did not eliminate a factual dispute about whether such adjustments "actually impacted *[Plaintiff's]* rates." *Id.* (emphasis added).

## V. The district court certified a class encompassing more than 5,600 rates set over a ten-year period.

After denying summary judgment, the district court considered Plaintiff's motion to certify a Rule 23(b)(2) class defined in relevant part as:

> All New York XOOM residential or small commercial customers who were charged a variable rate for electricity or natural gas under the operative 2013 XOOM New York variable rate sales contract or its equivalent language at any time from January 1, 2013 through and including the date of judgment.

A-4. This class definition includes four electricity products in seven utility zones and two natural gas products in eight utility zones,[4] and the rates for those products were set separately each month for each zone. *See* A-23. So, the class definition

---

[4] *See* A-2–3 (referencing standard residential and small commercial electricity products, clean residential and small commercial electricity products, and residential and small commercial natural gas products); Ex. A-1 to Class Cert. Resp. at pp. 15–17, 23–25 (identifying the relevant utility zones).

8

encompasses more than 40 rates set every month in a class period 128 months long and counting, which combines to more than 5,600 discrete rate-setting decisions.

The summary judgment order described the complexities of XOOM's monthly process for setting each of these rates. XOOM started with a massive Excel spreadsheet "that summarized projected costs for each of XOOM's products" and concluded with rates that "were eventually finalized for multiple markets and products by a team of decisionmakers at a rate-setting meeting." A-23. Only one element of XOOM's monthly decisions was relatively constant: its estimates of certain benchmark supply costs for the upcoming month (COGS for electricity and WACOGS[5] for natural gas) were compiled into the spreadsheet as the starting point for each rate-setting decision. A-23. Plaintiff freely admits this estimated supply cost figure is the only aspect of XOOM's rate-setting process included in her damage models. At the same time, however, XOOM's *estimated* supply cost projections indisputably did not reflect its *actual* supply costs because they could not; of course, actual costs for the upcoming month were unknowable when rates were set. A-23. That is why the contracts allowed consideration of other supply cost factors, including prior period adjustments. A-35.

The district court acknowledged XOOM had "no set formula for incorporating

_____

[5] "WACOG" refers to the estimated benchmark supply costs XOOM calculated for its natural gas products. *See* Ex. A-1 to Class Cert. Resp. at p. 23.

9

prior period adjustments" into specific monthly rates. A-35. Rather, these costs were incorporated into the margin through a separate budgeting process and then implemented, as appropriate, by a team of decision-makers at rate-setting meetings held at least once a month. A-23–24. Although Plaintiff acknowledged "that prior period adjustments were 'captured through the budgeting process,'" she offered no evidence about that budgeting process, A-23–24, nor any evidence of how those adjustments should have factored into any or all of the 5,600+ rates encompassed within the certified class, A-13. Likewise, Plaintiff offered no evidence about the proportionate margin XOOM was allowed to include in class members' rates under the district court's construction of the contract. A-32.

Thus, a factfinder would have no way of determining liability or damages for Plaintiff, much less for any class member. It is impossible to look at the only two data points Plaintiff provides—XOOM's estimated supply costs and final rates—for any one of the 5,600+ rates and determine the amount XOOM could permissibly charge under the contract. Plaintiff proposed no way to account for the contractually authorized prior period adjustments or a "proportionate" margin. A-32. And without a way to measure permissible rates, the factfinder cannot assess whether any of those rates constituted an overcharge (i.e., liability) or calculate the amount of any overcharge (i.e., damages). But the district court erred on the side of certification anyway, wrongly concluding that liability and damages are common questions that

10

will predominate over individual issues. *See* A-18–19.

## ARGUMENT

Under Rule 23(f), the Court has "unfettered discretion" to permit immediate appeal from an order granting class certification both to correct an error regarding the certification standard that is "of fundamental importance to the development of the law of class actions," and to avoid "the expense and burden of litigating the matter to a final judgment" subject to inevitable reversal on appeal. *Sumitomo Copper Litig., Ltd.*, 262 F.3d at 138-40. Review is warranted when the "certification order implicates a legal question about which there is a compelling need for immediate resolution[,]" or when a "questionable" certification order threatens to sound a death knell for the case. *Id.* at 139.

Both circumstances are present here. First, the district court's application of an incorrect class certification standard is an issue of "fundamental importance to the development of the law of class actions," and that error has evaded this Court's review for over a decade despite being pervasive among the district courts. *Id*. at 139. And second, the district court's conclusions are subject to inevitable reversal due to Plaintiff's failure to offer evidence from which a factfinder could assess her overcharge allegations. Those errors should be corrected now.

## I.    The Court should correct the district court's reliance on a repudiated standard to resolve pervasive confusion in the district courts.

The district court's first error was adopting a "general preference" for granting

11

class certification. A-7 (quoting *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 392 (E.D.N.Y. 2022)). With that preference, the district court set out to "err on the side of class certification," reasoning that an incorrect decision "is always subject to modification should later developments during the course of trial so require." A-7 (quoting *Allegra*, 341 F.R.D. at 392).

Traced to its origin, the district court's certification preference comes from a 20-year-old statement from District Judge Scheindlin, who gleaned that preference from this Court's decisions in *Visa Check* and *Parker*. *See Leider v. Ralfe*, No. 01 CIV. 3137 (HB), 2003 WL 22339305, at *11 (S.D.N.Y. Oct. 10, 2003) (citing *Parker v. Time Warner Ent. Co., L.P.*, 331 F.3d 13, 18 (2d Cir. 2003), and *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)).

But a lot has changed in Rule 23 jurisprudence since then. In 2006, this Court adopted a preponderance-of-the-evidence standard and placed that burden squarely on the party seeking class certification. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). In the same decision, this Court specifically engaged with—and rejected—Judge Scheindlin's understanding of *Visa Check* and *Parker* in a lengthy "clarification of a district court's role in assessing a motion for class certification." *Id.* at 39–40 (a district court can only certify after it "resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is

12

*persuaded* to rule, based on the relevant facts and the applicable legal standard, that the requirement is met" (emphasis added)). The Supreme Court has also since "[r]epeatedly . . . emphasized" the need for a rigorous analysis that "probe[s] behind the pleadings" into issues that "overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013). And most recently, this Court held that "the possibility of post-certification procedural tailoring" should not influence a district court's assessment or otherwise "attenuate the obligation to take a 'close look'" at the evidence. *See In re Petrobras Sec.*, 862 F.3d 250, 274 (2d Cir. 2017).

The district court's expressed "preference" for certification is incompatible with this binding Supreme Court and circuit-level precedent. A-7; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983) (noting that the preponderance-of-the-evidence standard does not "express[] a preference for one side's interests"). Plainly, the ability to revisit certification later did not permit the district court to "err on the side of certification." A-7. Rather, its goal should have been to avoid erring at all by probing the record to determine if Plaintiff had met her burden. *See IPO*, 471 F.3d at 32 ("[W]hether an incorrect legal standard has been used is an issue of law to be reviewed de novo."). As discussed below, that inquiry would have shown that Plaintiff did not.

## II. Commonality and predominance are not met, so the district court's certification order is subject to inevitable reversal.

Under North Carolina law, a plaintiff claiming to have been overcharged must present proof that "the amount charged by a defendant was in excess" of the amount she should have been charged. *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86 S.E. 1025, 1026 (N.C. 1915). That means Plaintiff cannot prevail by simply complaining about her rates; she must also prove the amount she allegedly ***should have been*** charged. *Id.*; *see also Troitino v. Goodman*, 35 S.E.2d 277, 282 (1945) (measuring contract damages as "the pecuniary difference between [the plaintiff's] position upon breach of the contract and what it would have been, had the contract been performed"). And under Rule 23, Plaintiff also had to prove that a factfinder could determine the correct rate under the contract 5,600+ times over without delving into individualized inquiries about the components and circumstances that influenced each of those rates. *See* Fed. R. Civ. P. 23(a)(2), (b)(3); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 147 (2d Cir. 2015) (reversing certification where a factfinder could not "resolve the whole of any of the class members' cases without further individualized" inquiries).

Plaintiff offered no such evidence, but the district court still concluded that liability and damages are common, predominant questions susceptible to common resolution. That was error because (A) Plaintiff's complaints about the components of class members' rates cannot be assessed without thousands of individualized

14

inquiries into how 5,600+ rates were set, and (B) Plaintiff offers no evidence, much less classwide evidence, of what the rates should have been.

**A.    No factfinder could determine the factors that influenced the class members' rates without assessing over 5,600 rate-setting decisions.**

The district court's first error regarding commonality and predominance was its conclusion that a "factfinder at trial" could resolve "the constitution of supply costs" for all 5,600+ rates in "one stroke." A-13–14. That determination was erroneous for two independent reasons.

First, the district court impermissibly faulted XOOM for failing to prove how it considered prior period adjustments when setting each of the 5,600+ rates at issue. In the face of XOOM's "ample testimonial evidence" that contractually-authorized prior period adjustments were included in at least some of the class members' rates, A-35, the burden was on ***Plaintiff*** to offer affirmative "evidentiary proof" that a factfinder could use to identify and assess the role those adjustments played in all 5,600+ rates without looking at individual evidence. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015). Plaintiff offered no such evidence. Yet the district court still found commonality and predominance satisfied due to its prior conclusion that ***XOOM*** had not met its "burden at summary judgment" to prove the "constitution of supply costs" to the district court's satisfaction. A-13.

Second, the district court treated Plaintiff's scattershot "witness testimony, expert testimony, and documents and communications related to the rate-setting

15

process" as common proof of liability without even trying to examine it under the applicable standard. A-13. The requisite "close look" at Plaintiff's evidence would have shown that, far from establishing a common rate-setting process applicable to the thousands of rates in the class period, Plaintiff's evidence showed an irregular, changing, circumstance-specific process that impacted rates product-to-product and month-to-month. *Comcast*, 569 U.S. at 34 (noting that courts must take a "close look" at the plaintiff's case to assess predominance, even when doing so "requires inquiry into the merits of the claim"). For example, the district court referenced XOOM's alleged "practice of raising New York rates based on losses in other markets" after the 2014 polar vortex. A-4. But neither Plaintiff nor the district court believe that XOOM implemented that practice 128 months in a row across six different products or fifteen utility zones. Nor could it have affected Plaintiff herself, who left XOOM in 2013. Further, the evidence underpinning that alleged practice proves XOOM was making discrete decisions in response to unusual circumstances. *See* A-36–37 (describing evidence of rate fluctuations attributable to unusual weather and transmission line outages in early 2013, and the polar vortex in 2014). So, even assuming Plaintiff's evidence concerned the composition of XOOM's variable rates (as opposed to fixed or introductory rates), its value is limited at best. A close look—or even a cursory one—would have shown that those emails cannot be relevant to the entire class period or every one of the rates at issue.

All of Plaintiff's evidence suffers from this deficiency: it is all product-specific, rate-specific, and concerns a discrete time. The record contains no evidence on which a factfinder could decide "in one stroke" whether the considerations that affected the 5,600+ rates were "consistent with the contract." A-13.

**B.** **Plaintiff's damage models undisputedly do not constitute classwide evidence of the rates XOOM allegedly should have charged.**

Even if classwide evidence of a common rate-setting procedure existed, a factfinder still could not assess Plaintiff's overcharge claim on a class basis. That is because, no matter how XOOM set rates, the factfinder would still need to compare the allegedly improper rates to the rates class members allegedly should have been charged. *Blalock Hardware*, 86 S.E. at 1026; *Troitino*, 35 S.E.2d at 282. It is undisputed that Plaintiff's damage models incorporate only the first variable: rates the class members were charged. They do not attempt to calculate the rates the class members should have been charged under the district court's proportionate-margin construction of the contract. Nor could Plaintiff remedy this failure by creating a different model that includes an "appropriate margin" because her experts readily admitted that they "didn't have any information that would allow that to be created." A-50.

To paper over this deficiency, Plaintiff's experts used an average of XOOM's fixed-rate margins as a placeholder until the "judge or the jury or whoever decides" what the class members' margin should have been. A-48. That is improper under

17

North Carolina law and this Court's precedent in *Richards v. Direct Energy*. The overcharge claim must fail because Plaintiff admittedly has "no evidence whatever as to . . . the correct . . . charge," and she cannot remedy that failure with a placeholder margin that would affirmatively violate the district court's proportionate-margin construction of the contract.[6] *See Blalock Hardware*, 86 S.E. at 1026; *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98 n.5 (2d Cir. 2019) (rejecting an identical damage model from the very same expert Plaintiff uses here because that contract did not require variable-rate margins to equal fixed-rate margins either). Nor can Plaintiff defer that question for trial in the hopes that the factfinder will "invent" a margin cap "out of thin air" to remedy her expert's inability to calculate one. *Id.* Plaintiff's evidence-free approach does not satisfy her burden to submit "evidentiary proof" of a classwide damage model, and the district court's acceptance of Plaintiff's model without assessing the accuracy of its inputs fell short of the rigorous inquiry Rule 23 demands. *See Comcast*, 569 U.S. at 35 ("[A]t the class-certification stage (as at trial), any model supporting a 'plaintiff's damages

---

[6] The district court rightly rejected Plaintiff's first model, which allowed for no margin at all. Plaintiff's second damage model uses fixed-rate margins that did not "remain proportionate" to variable-rate supply costs "over time," which necessarily violates the district court's proportionate-margin construction of the contract. *See* A-32; *see also* A-51 ("We're talking about variable rate pricing here as opposed to fixed rate pricing. . . . Fixed rate pricing, I think we can all agree, the actual outturn margins could be quite different."); Ex. 3 to Mot. for Class Cert. at p. 25 (showing that XOOM's fixed-rate margins fluctuated over the class period)..

case must be consistent with its liability case'"); *IPO*, 471 F.3d at 42.

## III.  The district court erred by ignoring Plaintiff's atypicality simply because the issue overlaps with the merits of her claim.

Plaintiff's failure to offer evidence of an appropriate margin or what her rates should have been is fatal to her typicality as a class representative too. As XOOM argued, Plaintiff failed to present any evidence that the "modest margins included in her rate" were typical of the "exorbitant and unconscionable" rates she says other class members allegedly paid. *See* A-42–43; *see also* A-70–72 (identifying additional typicality problems raised by the nearly 300 pages of new evidence attached to the class certification reply). The district court did not reject XOOM's argument, or even consider it. Rather, it "ignore[d]" the argument altogether "because the merits of plaintiff's claim are separate from whether her claim is typical of the class." *See* A-15.

But an overlap with a merits issue does not relieve a district court of its obligation to engage in a "rigorous analysis" of Rule 23's requirements. *See supra* Argument Part I.A. And as courts and commentators routinely note, Rule 23's typicality requirement is an "obvious example[]" of a "question[] entering into determination of class action questions" that is also "intimately involved with the merits" of the class representative's claim. *Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132, 134–35 (2d Cir. 2013) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12 (1978)); *see* 16 Charles Alan Wright, Arthur R. Miller & Edward H.

19

Cooper, Federal Practice & Procedure § 3931.1 (3d ed. 2012) ("The typicality and adequacy of the representative parties must be measured against the nature of the claims on the merits.").

If the district court had considered and rejected XOOM's argument about Plaintiff's atypicality, that conclusion would be subject to reversal under abuse-of-discretion review. But its refusal to even "entertain" XOOM's argument "simply because [it] would also be pertinent to the merits determination . . . ran afoul of [controlling] precedents requiring precisely that inquiry." *Comcast*, 569 U.S. at 34. That misapplication of the governing standard constitutes a reversible error subject to *de novo* review. *See IPO*, 471 F.3d at 32.

If the district court had considered the substance of XOOM's typicality argument, it would have faced a concrete example of the interrelated problems it failed to see with commonality and predominance. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge."). Specifically, in discussing the merits of Plaintiff's individual claim at summary judgment, the Court said fact questions existed about whether Plaintiff's margin was proportionate to costs because "[a]s shown in the following chart, the markup fluctuated . . . twice rising (in September and November) even when XOOM's Total Cost measure fell:"

20

| Month | XOOM's Internal "Total Cost" ($/kWh) | Actual Rate Charged to Mirkins ($/kWh) | XOOM's Markup Above "Total Cost" |
|-------|--------------------------------------|----------------------------------------|----------------------------------|
| June | 0.1078 | 0.1290 | 20% |
| July | 0.1181 | 0.1440 | 22% |
| August | 0.1215 | 0.1490 | 23% |
| September | 0.1021 | 0.1399 | 37% |
| October | 0.1176 | 0.1490 | 27% |
| November | 0.0903 | 0.1299 | 44% |

A-34–35. But what is a jury to make of October, when the markup *fell* even though "Total Cost" went up? Could that still constitute an overcharge? And what about June to August when the Markup moved with and stayed relatively proportionate to Total Cost—could that be an overcharge too? Plaintiff offered no evidence by which the jury could decide whether any one of her six rates constituted an overcharge.

And without classwide evidence of an appropriate margin or what the rates should have been, the jury would encounter the same problems thousands of times over. Resolution of any problems for Plaintiff's individual claim would do nothing to resolve the claims of the rest of the class because, as shown, there is no evidence from which a liability determination can be made on her individual claim either. *See* A-70–72. Rather, the factfinder would have to assess Plaintiff's sporadic evidence, piece by piece, to determine whether it had any influence on any one of the 5,600+ variable rates XOOM charged the class.

## CONCLUSION

The Court should grant the petition and permit XOOM to appeal the district court's order granting class certification.

Respectfully submitted,

McDowell Hetherington LLP

By: */s/ Michael D. Matthews, Jr.*
    Michael D. Matthews, Jr.

*Attorney for Defendants-Petitioners*
*XOOM Energy, LLC and*
*XOOM Energy New York, LLC*

## CERTIFICATE OF COMPLIANCE

1.      This petition complies with the word limits of Fed. R. App. P.5(c)(1) because, excluding the parts exempted by Fed. R. App. P. 5(c) and 32(f), it contains 4,938 words, consisting of 4,883 words counted by the software used to prepare this brief, and an additional 55 words contained in pdf screenshots not counted by that software.

2.      This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


By: */s/ Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.

# No. 23-_____

---

In the United States Court of Appeals
for the Second Circuit

---

**Susanna Mirkin,**

*Plaintiff–Respondent,*

*v.*

**XOOM Energy, LLC, and
XOOM Energy New York, LLC,**

*Defendants–Petitioners.*

---

ON PETITION FOR REVIEW FROM AN ORDER CERTIFYING CLASS ON AUGUST 31, 2023
BY THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK
CASE NO. 1:18-CV-02949
THE HONORABLE ALLYNE R. ROSS

---

## APPENDIX TO PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

---

Michael D. Matthews, Jr.
Diane S. Wizig
MCDOWELL HETHERINGTON LLP
1001 Fannin St., Suite 2400
Houston, Texas 77002
Telephone: 713-337-5580
matt.matthews@mhllp.com
diane.wizig@mhllp.com

James M. Chambers
MCDOWELL HETHERINGTON LLP
1000 Ballpark Way, Suite 209
Arlington, Texas 76006
Telephone: 817-631-7561
james.chambers@mhllp.com

# <u>TABLE OF CONTENTS</u>

Opinion and Order (Class Certification), *Mirkin v. XOOM Energy, LLC*, No. 18-CV-2949-ARR (E.D.N.Y. Aug. 31, 2023) (Doc. 152) ......................................A-1

Opinion and Order (Summary Judgment), *Mirkin v. XOOM Energy, LLC*, No. 18-CV-2949-ARR (E.D.N.Y. Aug. 14, 2023) (Doc. 151) ....................................A-20

Excerpts from Defendant's Response in Opposition to Motion for Class Certification (partially redacted), dated February 3, 2023 (Doc. 134).........................A-41

Exhibit A-16 in Support of Defendants' Motion for Summary Judgment – Excerpts from November 8, 2022 Deposition of Seabron Adamson (Doc 145-18) .....A-44

Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment, dated March 8, 2023 (Doc. 145-25) ...........................................A-58

Excerpts from Consolidated Reply in Support of Defendants' Motion for Summary Judgment and Sur-Reply in Further Opposition to Class Certification (partially redacted), dated May 5, 2023 (Doc. 149).................................A-69

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN, Individually and on Behalf of All
Others Similarly Situated,

$\qquad$ *Plaintiffs*,

-against-

XOOM ENERGY, LLC, and XOOM ENERGY NEW
YORK, LLC,

$\qquad$ *Defendants*.

18-CV-2949 (ARR) (RER)

**OPINION & ORDER**

ROSS, United States District Judge:

In this putative class action, plaintiff Susanna Mirkin, a former residential electricity customer of defendants XOOM Energy, LLC, and XOOM Energy New York, LLC (collectively, "XOOM"), alleges she was charged exorbitant electricity rates in breach of the pricing terms contained in a contract for variable-rate energy service.[1] Plaintiff moves for an order certifying this case as a class action, appointing herself as class representative, and appointing the law firm Wittels McInturff Palikovic as lead class counsel. Pl.'s Mot. for Class Certification ("Pl.'s Mot."), ECF No. 131.[2] For the following reasons, the motion is granted.

---

[1] Susanna Mirkin originally sued alongside her husband, Boris Mirkin. However, after finding that Boris lacked a contractual relationship with XOOM sufficient to support standing, I granted summary judgment as to his claim and dismissed him from the case. Op. & Order 19–21, ECF No. 151; *Mirkin v. XOOM Energy, LLC*, No. 18-CV-2949 (ARR) (RER), 2023 WL 5200294 (E.D.N.Y. Aug. 14). The parties' arguments about whether Boris is a proper lead plaintiff are therefore moot.

[2] Plaintiff also moved for an order directing that notification of class action certification be made to the class at defendants' expense. Pl.'s Mot. 2. Because plaintiff withdrew that request in her reply, Pl.'s Reply Mem. of L. in Support Mot. for Class Certification ("Pl.'s Reply") 42 n.20, ECF No. 135, I do not address it herein.

### BACKGROUND[3]

XOOM is an independent energy service company ("ESCO") that offers an assortment of energy products to residential and commercial customers as an alternative to their local utilities. During the time period relevant to this lawsuit, XOOM's products included electricity and natural gas supply offered at either a variable or fixed rate. In May 2013, Susanna Mirkin began receiving residential electricity service from XOOM at a variable monthly rate pursuant to a form Electricity Sales Agreements ("ESA" or "contract"). Decl. of Steven L. Wittels in Opp'n to Mot. for Summ. J. ("Wittels MSJ Decl."), Ex. 1 ("Enrollment Email & ESA"), at 4–6, ECF No. 147-2. The ESA contained the following pricing term:

> Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable. Your monthly variable rate is **based on XOOM's actual and estimated supply costs** which may include but not be limited to prior period adjustments, inventory and balancing costs.

*Id.* at 4 (emphasis added). Plaintiff cancelled her service after six months. Defs.' Local Rule 56.1 Statement ("Defs.' 56.1") ¶ 6, ECF No. 146-25 (filed under seal).[4]

XOOM used a standard agreement containing the "actual and estimated supply costs" language for New York residential and small business variable rate customers from 2013 to 2016 for both electricity and natural gas service. Decl. of Steven L. Wittels in Supp. of Mot. for Class Certification ("Wittels Class Certification Decl."), Ex. 11, ECF No. 133-11 (residential electricity contract); *id.* Ex. 12, ECF No. 133-12 (residential gas contract); *id.* Ex. 13, ECF No. 133-13

---

[3] The facts of this case are detailed in my prior opinion denying XOOM's motion for summary judgment, familiarity with which is assumed. I recount the facts necessary to resolve the present motion, drawing in large part on the factual record developed at summary judgment.

[4] Several of the documents cited herein have been filed under seal pursuant to a discovery confidentiality order, *see* ECF No. 48-1; they are hereby deemed unsealed to the extent that their contents are quoted or described in this order.

(commercial electricity contract); *id.* Ex. 14, ECF No. 133-14 (residential SimpleClean electricity contract); *id.* Ex. 15, ECF No. 133-15 (commercial SimpleClean electricity contract). The same contract term applied to two additional groups: (1) New York customers who signed up for fixed rate contracts but did not renew at a fixed rate upon expiration and (2) variable rate customers of Planet Energy, which XOOM acquired in 2013 to enter the New York market. Wittels Class Certification Decl., Ex. 3 ("Pl.'s Expert Report"), at 11–12, ECF No. 138-3 (filed under seal); *id.* Ex. 17, at 39:24–40:8, ECF No. 138-17 (filed under seal).

The question at the center of the suit is whether the variable rates XOOM charged its customers were "based on XOOM's actual and estimated supply costs." In my ruling on XOOM's motion for summary judgment, I determined that North Carolina law mandates a strict construction of the vague pricing term against the drafter such that the contract required the monthly variable rates to be determined *only* by XOOM's actual and estimated supply costs. Op. & Order 12. This does not mean that the rate must equal the supply costs, but that it must vary according to those costs. *Id.* at 13.

If the measure of actual and estimated supply costs were undisputed, the putative class would have a relatively straightforward case centered on three variables: the supply costs, the rate charged, and a reasonable margin.[5] However, the parties dispute what the supply costs are and whether it is possible to identify them. During discovery, XOOM produced rate-setting workbooks that its decisionmakers used to set rates at regular meetings. Those workbooks contain an internal cost calculation labeled "Total Cost" or "COGS," which is essentially the sum of the costs XOOM incurs when procuring energy on the wholesale market. Plaintiff says that "Total Cost" equals

---

[5] Plaintiff concedes that XOOM can charge at least a modest margin under the contract. *See* Op. & Order 6; Pls.' Mem. of L. in Opp'n to Mot. Summ. J. 7–9, ECF No. 147.

"supply cost," whereas XOOM says that "Total Cost" and "supply cost" are different. According to XOOM, the Total Cost figure contains most but not all the components that make up the "actual and estimated supply cost." Crucially, XOOM argues that the Total Cost does not include prior period adjustments—rate increases made over time to recover unanticipated costs—because prior period adjustments were included in the margin. (In XOOM's rate-setting workbooks, the Total Cost plus the margin equals the rate charged to the customer.) On this theory, prior period adjustments entered the margin via a separate budgeting process that set margin goals, which in turn helped guide rate-setting decisions across all of XOOM's products. Plaintiff's theory is that XOOM either did not incorporate prior period adjustments or other supply costs into the margin at all, or that XOOM's practice of raising New York rates based on losses in other markets was not permitted under the contract. In my decision on summary judgment, I determined that whether prior period adjustments were factored into the margin and whether prior period adjustments impacted plaintiff's rates are disputed questions of material fact. Op. & Order 17.

> Plaintiff moves to certify the following class:

> All New York XOOM residential or small commercial customers who were charged a variable rate for electricity or natural gas under the operative 2013 XOOM New York variable rate sales contract or its equivalent language at any time from January 1, 2013 through and including the date of judgment.

> Excluded from the Class are the officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest, all federal, state and local government entities and any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

Pl.'s Mot. 2. Plaintiff estimates the class includes 80,000 to 110,000 people. Pl.'s Mem. of L. in Support Mot. for Class Certification ("Pl.'s Mem.") 12–13, ECF No. 137 (filed under seal).

A-4

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 23(a), plaintiffs may sue on behalf of a class where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Rule 23 does not set forth a mere pleading standard," and the party seeking certification bears the burden of "affirmative[ly] demonstrat[ing] [her] compliance with the Rule—that is, [s]he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rule 23's four requirements of numerosity, commonality, typicality, and adequate representation "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Id.* at 349. A plaintiff must satisfy all four criteria of Rule 23(a) to obtain class certification.

A prospective lead plaintiff must also demonstrate compliance with one of the three requirements of Rule 23(b). *See id.* at 345. Here, plaintiff seeks certification under Rule 23(b)(3), which mandates "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The additional requirements of predominance and superiority restrict certification to cases where a class action would "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quotation omitted).

Finally, in addition to these prerequisites, the Second Circuit recognizes in Rule 23 an implied standard of ascertainability, which demands that a class be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). "Ascertainability requires only that a proposed class is defined using objective criteria that establish a membership with definite boundaries." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716 (2d Cir. 2023) (quotation omitted). Ascertaining the class need not be an administratively easy task—"[t]he only relevant inquiry is whether determinations as to class membership are objectively *possible*." *Id.* at 717 (quotation omitted).

I may certify a class only if, "after a rigorous analysis," *Wal-Mart Stores*, 564 U.S. at 351 (quotation omitted), I find that the prerequisites of Rule 23(a) and Rule 23(b) have been satisfied by a "preponderance of the evidence," *Johnson v. Nextel Commc'ns., Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). The "rigorous analysis" will frequently "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores*, 564 U.S. at 351. The Second Circuit has clarified the permissible scope of merits determinations at the certification stage as follows:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement . . . .

*In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *clarified on denial of reh'g*, 483 F.3d 70 (2d Cir. 2007).

A-6

Additionally, "the Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 392 (E.D.N.Y. 2022) (quotation and alteration omitted). Thus, district courts in this Circuit tend to err on the side of class certification, "for it is always subject to modification should later developments during the course of the trial so require." *Id.* (quoting *In re Kind LLC "Healthy & All Natural" Litig.*, 337 F.R.D. 581, 593 (S.D.N.Y. 2021)).

## DISCUSSION

### I. Plaintiff Has Satisfied the Requirements of Rule 23.

Plaintiff moves to certify a class defined as "[a]ll New York XOOM residential or small commercial customers who were charged a variable rate for electricity or natural gas under the operative 2013 XOOM New York variable rate sales contract or its equivalent language at any time from January 1, 2013 through and including the date of judgment." Pl.'s Mot. 2. XOOM opposes the motion, arguing that plaintiff fails to satisfy the requirements of Rule 23.

#### A. The Proposed Class is Ascertainable.

At the outset, XOOM argues that plaintiff's proposed class is not ascertainable because it relies on the subjective criterion of "equivalent language." Defs.' Opp'n to Mot. for Class Certification ("Defs.' Opp'n") 19–20, ECF No. 139 (filed under seal). XOOM warns that this definition will require individual determinations of class-member eligibility unless plaintiff provides an objective way of determining whether contract language is equivalent. *Id.* But the ascertainability inquiry is a "modest threshold requirement" that "will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). There is no fundamental indeterminacy in plaintiff's proposed

class definition. XOOM attempts to find subjectivity in the phrase "equivalent language," but in context it is clear that "equivalent language" means a contract with the same pricing term promising a variable rate "based on XOOM's actual and estimated supply costs." The proposed definition establishes a membership with the following definite boundaries:

> (1) XOOM New York variable rate customers who originally signed up as variable rate customers between 2013 and February 10, 2016; (2) XOOM New York variable rate customers who originally signed up as XOOM fixed rate customers and who were rolled into a variable rate contract prior to 2021; and (3) Planet Energy New York customers who became XOOM variable rate customers in or around 2013.

Pl.'s Reply 25–26. Because the proposed class definition is not indeterminate, I find that plaintiff has satisfied Rule 23's implied ascertainability requirement.

**B.  The Proposed Class is Sufficiently Numerous.**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiff's expert estimates that the proposed class consists of somewhere between 80,000 to 110,000 members, Pl.'s Expert Report ¶ 23(b), and XOOM does not dispute that joinder would be impracticable. Given the size of the proposed class, I find that the numerosity requirement has been satisfied. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (explaining Second Circuit presumption that numerosity is satisfied at forty members).

**C.  Common Questions of Law or Fact Predominate Over Individual Questions.**

*1.  Commonality.*

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" depending upon "a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 349–50 (quotation omitted). Not all questions of law or fact need to be common—"for the purposes of Rule 23(a)(2) even a single common question will do." *Id.* at 359 (quotation and alterations omitted). I find that plaintiff presents at least two common questions, breach and damages, and thus that plaintiff has satisfied the Rule 23(a)(2) requirement.

Plaintiff argues that commonality is satisfied because the claims of the proposed class depend on the common contention that XOOM breached its form contract and because damages can be calculated with a common formula. Plaintiff's experts have developed two proposed damages models. The first compares XOOM's actual rate to its reported Total Cost, calculating damages as "the difference between the variable rates charged by XOOM and the Total Cost, multiplied by the total energy usage for the month." Pl.'s Expert Report ¶ 64. The second damages model assumes that XOOM was allowed to charge its variable rate customers the same margin it charged its fixed-rate customers, an approximately 19% markup. *Id.* ¶¶ 73, 76. This model calculates damages as the difference between the variable rates and the Total Cost plus the fixed-rate margin, multiplied by the total energy usage. *See id.* ¶¶ 64, 73. Plaintiff's experts estimate that the putative class was overcharged in total by approximately $55 million under the first damages model and $27.5 million under the second, and that Mrs. Mirkin was overcharged by approximately $85 under the first model and $36 under the second. *Id.* ¶¶ 65, 77; Wittels Class Certification Decl., Ex. 29 ("Pls.' Expert Rebuttal Report") ¶¶ 29–31, ECF No. 138-29 (filed under seal).

XOOM responds that the commonality requirement cannot be satisfied because plaintiff offers no common evidence capable of proving breach and damages. Essentially, XOOM's argument depends on one of the central summary judgment issues: whether plaintiff can identify

"actual and estimated supply costs," a necessary data point to establish liability and calculate damages. XOOM claims that plaintiff provides no way to measure the supply costs because XOOM's internal cost calculation—the Total Cost or COGS figure—does not incorporate prior period adjustments or balancing costs, which are both identified as supply costs in the contract. Next, XOOM claims that plaintiff fails to provide a model that would measure only damages attributable to her theory of liability, for essentially the same reason—failure to accurately identify supply costs or an appropriate margin.

Claims for breach of a form contract are particularly well-suited for class certification. *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." (quoting *Kleiner v. First Nat'l Bank of Atl.*, 97 F.R.D. 683, 692 (N.D. Ga. 1983))); *Hanks v. Lincoln Life & Annuity Co. of N.Y.*, 330 F.R.D. 374, 380 (S.D.N.Y. 2019); *Dover v. Brit. Airways, PLC (UK)*, 321 F.R.D. 49, 54 (E.D.N.Y. 2017); *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 124 (2d Cir. 2013) (explaining that breach of contract cases "requir[ing] examination of individual contract language" are generally not amenable to class certification). The proposed class encompasses only individuals who entered a form contract containing identical pricing language. Central to the class's case is a common question undoubtedly capable of common resolution: whether XOOM's rates were set in breach of the common contract language. Indeed, XOOM's breach of contract defense relies on common proof—evidence of XOOM's process for determining the variable rate margin. And if XOOM is found to have breached the contract, the class would need a single damages model to apportion liability. I find that plaintiff has satisfied the "low hurdle" of the commonalty requirement. *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415,

424 (S.D.N.Y. 2014) (quotation omitted); *see also Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261 (PKC), 2016 WL 7009062, at *4 (S.D.N.Y. Nov. 30, 2016) ("The claims of the proposed class turn on the 'common contention' that [defendant] misleadingly described its method for calculating variable monthly rates, a claim that 'is capable of classwide resolution . . . .'" (quoting *Wal-Mart Stores*, 564 U.S. at 350)).

XOOM's arguments about the supply cost determination are well-taken but have little bearing on "the narrow question of whether there are questions of law or fact common to the class as a whole." *Dover*, 321 F.R.D. at 55 n.1. They are more relevant to Rule 23(b)(3)'s predominance requirement, to which I now turn given its relationship to commonality. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997) (observing that "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions").

### 2. Predominance

A class may be certified under Rule 23(b) if both (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quotation omitted). In other words, common issues must be more prevalent than individual issues. *Dover*, 321 F.R.D. at 57.

A common issue is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof," as opposed to individual issues, where "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 Newberg & Rubenstein on Class Actions § 4:50 (5th ed. 2012)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* at 453–44 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005)).

As discussed above, there are two common issues in this lawsuit: breach and damages. Plaintiff argues that these common questions predominate over any individual questions. XOOM argues that plaintiff cannot answer the breach or damages using common proof because its actual and estimated supply costs include not only the internal Total Cost calculation, a number known and produced during discovery, but also prior period adjustments, a supply cost incorporated into rates on an ad hoc basis and not produced in discovery as a discrete number. XOOM claims that in the absence of a measurement for prior period adjustments, balancing costs, and inventory, plaintiff cannot prove breach or damages on a classwide basis, and a finding of predominance is therefore precluded. Plaintiff counters that XOOM's objection is a common defense and that its common proof does incorporate all supply costs referenced in the contract, and any variables left out were "not real supply costs." Pl.'s Reply 29. Besides the rate-setting numbers, plaintiff says the class's case would also rely on additional common proof such as the form contract, internal XOOM communications, discovery responses, business records, and witness testimony. Pl.'s

Mem. 35. In sur-reply, XOOM responds that the use of employee emails to demonstrate the rate-setting process is not common proof because any conclusions from the evidence would require individualized determinations of the impact of any action discussed in those communications. Consol. Reply in Supp. Mot. Summ. J. & Sur-Reply in Opp'n to Class Certification ("Defs.' Sur-Reply") 19, ECF No. 150 (filed under seal).

As discussed in my summary judgment decision, one of the central disputes of material fact is whether plaintiff's rate fluctuations were caused by permissible supply costs incorporated into the margin. Op. & Order 16–17. Specifically, I found that a reasonable jury could conclude that XOOM did not factor prior period adjustments into its margin or that XOOM's practice of adjusting the margin to cover cost overruns and meet revenue goals was not permitted under the contract. *Id.* at 17. I need not delve too far into the merits and decide at this stage how XOOM in fact set its rates, because that decision may be made by the factfinder at trial "in one stroke." *Wal-Mart Stores*, 564 U.S. at 350. The central issue common to all class members is the constitution of supply costs, an issue the factfinder can resolve through witness testimony, expert testimony, and documents and communications related to the rate-setting process.[6] If the contract allowed XOOM to incorporate prior period adjustments and other supply costs into the margin, and they in fact did so consistent with the contract, the class will fail together. If XOOM did not incorporate prior

---

[6] In its sur-reply, XOOM points out that a consolidated quarterly financial statement attached as an exhibit to the Mirkins' summary judgment reply includes prior period adjustments as a component of a "gross margin analysis," and faults plaintiff for not finding further documents substantiating the role of prior period adjustments in rate-setting. Defs.' Sur-Reply 20 ("[I]f the Mirkins' experts truly could not identify any documents reflecting prior period adjustments, it is not because such documents did not exist or XOOM did not produce them."). It is unclear what if anything the financial statement means in the context of the parties' dispute, and, in any event, XOOM's blame seems entirely misplaced. XOOM bore the burden at summary judgment and thus had every reason to substantiate its motion with evidence reflecting the incorporation of prior period adjustments in its margins—and failed to do so.

period adjustments and other supply costs into the margin, or did so in violation of the contract, the class will prevail together. Either way, the outcome will be determined by common evidence, rather than evidence that differs between class members.

Having discussed breach, I turn to damages. The Second Circuit instructs that "courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis." *In re U.S. Foodservice Pricing Litig.*, 729 F.3d at 123 n.8. XOOM principally argues that plaintiff has failed to demonstrate that damages are susceptible of measurement across the entire class because she has not proposed a model that "measure[s] *only* those damages attributable to" her theory of liability. Defs.' Opp'n 25 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). According to XOOM, the two proposed models are inadequate because the first treats any rate higher than the Total Cost number as impermissible, and the second arbitrarily incorporates the margin charged on XOOM's fixed rate product. *Id.* at 26. XOOM may be correct that the first damages model fails to accurately measure the damages attributable to XOOM's alleged liability, given plaintiff's concession at summary judgment that XOOM could charge a reasonable margin under the contract. *See* Op. & Order 6. But the second model is entirely consistent with plaintiff's theory. Under *Comcast*, "[c]alculations need not be exact, but . . . any model supporting a plaintiff's damages case must be consistent with its liability case." 569 U.S. at 35 (citation and quotation omitted). Whether plaintiff's second model, which calculates damages based on rate, cost, and margin, is accurate depends on the accuracy of the inputs, namely the supply cost and margin. But XOOM does not dispute that the algorithm itself is faulty—any measure of damages in this case would undoubtedly be based on the rate, cost, and margin. Plaintiff has therefore proposed a damages model consistent with her theory of liability.

Because plaintiff has identified a damages model that would apply to each class member, I find that damages are capable of measurement on a classwide basis. The damages formula would of course yield individualized damages calculations, but this is no barrier to class certification. *Roach*, 778 F.3d at 408 ("The Supreme Court did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations.").

In sum, because plaintiff's theory of liability raises issues of breach and damages common to the class that can be proven with common evidence and which predominate over individualized issues, I find that plaintiff has satisfied the Rule 23(a) commonality and Rule 23(b) predominance factors.

### D. Plaintiff's Claims are Typical of the Class Claims.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement, which "tend[s] to merge" with the commonality requirement, *Wal-Mart Stores*, 564 U.S. at 349 n.5 (quotation omitted), "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability," *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (quotation omitted). The standard is "not demanding." *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 379 (S.D.N.Y. 2015).

XOOM does not seriously contest that plaintiff's claim is typical of other electricity customers, but instead argues that her claim is not typical of the claims of natural gas customers because plaintiff received only electric service.[7] Though XOOM's natural gas supply costs

---

[7] XOOM does assert that Susanna is not typical of electricity customers who were charged allegedly "exorbitant and unconscionable" rates because her rates were based on XOOM's actual and estimated supply costs. Defs.' Opp'n 31. I ignore this argument because the merits of

necessarily differ from its electricity supply costs, there is no question that the form contract contained identical language for electric and natural gas customers. *Compare* Wittels Class Certification Decl., Ex. 11, *with id.* Ex. 12. And XOOM does not claim that it used a different rate-setting process for its electric and natural gas customers. Because the electric and natural gas customer claims arise from the same rate-setting process and will rely on similar legal arguments to prove liability, I have no doubt that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)); *see also Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015) ("[T]he claims only need to share the same essential characteristics, and need not be identical . . . ." (quotation omitted)). I thus find that the typicality criterion is satisfied.

### E. Plaintiff and Her Counsel Will Fairly and Adequately Protect the Class.

Rule 23(a)(4) requires that the lead plaintiffs "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Two factors generally inform whether a named plaintiff is an adequate representative: "(1) absence of conflict and (2) assurance of vigorous prosecution." *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (quotation omitted). The adequacy inquiry encompasses class counsel, requiring that plaintiff's attorneys are "qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quotation omitted).

XOOM argues that plaintiff is an inadequate class representative because she has "shown no sign" that she will oppose her husband's claim against XOOM even though it "cannot . . . be in

plaintiff's claim are separate from whether her claim is typical of the class. *See Dover*, 321 F.R.D. at 54.

the best interest of the putative class" to have a class representative who lacks standing to sue in the first place. Defs.' Opp'n 32–33. Even assuming Susanna's marital relationship to her original co-plaintiff posed a conflict, this argument is moot now that Boris has been dismissed from the case. XOOM offers no other justification for Susanna's purported inadequacy, and I see no reason why she is not an adequate plaintiff. Mrs. Mirkin sat for a deposition and responded to written discovery requests. In her deposition she appears knowledgeable of and invested in the case, and she has no apparent conflicts with the class she would be representing. In addition, her counsel are well-qualified and experienced in litigating class actions, including similar cases against ESCOs. I find that adequacy has been satisfied.

### F.  A Class Action is Superior to Other Available Methods in this Case.

The second and final requirement of Rule 23(b)(3) is superiority, which requires a plaintiff to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The following four factors are particularly useful guides: (1) class members' interests in individually controlling the litigation; (2) the extent and nature of any other litigation concerning the controversy; (3) the interest in concentrating the litigation in one forum; and (4) the potential difficulties in managing the suit as a class action. Fed. R. Civ. P. 23(b)(3).[8]

"As the Supreme Court has said, Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 130 (citing

---

[8] Though Rule 23(b)(3) describes these factors as pertinent to both predominance and superiority, "most courts analyze the Rule 23(b)(3)(A) to (D) factors solely in determining whether a class suit will be a superior method of litigation." 2 Newberg and Rubenstein on Class Actions § 4:68 (6th ed.).

*Amchem Prods., Inc.*, 521 U.S. at 617). Such is the case here. According to plaintiff, she suffered damages of approximately $6 to $15 per month that she was a XOOM customer. Given the size of these claims, any individual class member would have very little interest in spending the time and resources to litigate a claim individually. Thus, it is not surprising that I am aware of no individual litigation already initiated against XOOM by anyone covered under the proposed class definition.

The only superiority ground that XOOM contests is the manageability factor. Without much elaboration, XOOM summarizes its complaints as: "problems with [plaintiff's] liability theory, damage model, and individual claims would pose insurmountable difficulties in managing a class action." Defs.' Opp'n 33 (internal quotation marks omitted). For the reasons stated in my discussion of the other certification requirements, I disagree. Plaintiff has established that the case hinges on issues of common proof and has presented an acceptable damages model, and XOOM's arguments about the problems with plaintiff's individual claims are without merit. XOOM has suggested no other reason a class action is not superior to an alternative in this case, and I see none. This case involves a large class with small individual claims that become significant only in the aggregate. The class action mechanism is meant for this very situation, and I find that a class action is superior to any alternative. *Amchem Prods., Inc.*, 521 U.S. at 617.

### CONCLUSION

For the foregoing reasons, I certify the following class:

All New York XOOM residential or small commercial customers who were charged a variable rate for electricity or natural gas under the operative 2013 XOOM New York variable rate sales contract or its equivalent language at any time from January 1, 2013 through and including the date of judgment.

Excluded from the Class are the officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest, all federal, state and local government entities and

any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

Based on their work performed in this action to date and experience handling class actions generally, and because I find their representation to be fair and adequate, I appoint Wittels McInturff Palikovic as lead class counsel. *See* Fed. R. Civ. P. 23(g). I appoint Susanna Mirkin as class representative.

Within 21 days, class counsel shall submit a proposed form of notice to class members and a proposed plan for distributing notice. *See* Fed. R. Civ. P. 23(c)(2)(B).

SO ORDERED.

_____/s/_____

Allyne R. Ross
United States District Judge

Dated:      August 31, 2023
              Brooklyn, New York

A-19

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN, Individually
and on Behalf of All Others Similarly Situated,

         *Plaintiffs*,

    -against-

XOOM ENERGY, LLC, and XOOM ENERGY NEW
YORK, LLC,

         *Defendants*.

18-CV-2949 (ARR) (RER)

**OPINION & ORDER**

ROSS, United States District Judge:

    Plaintiffs Susanna Mirkin and Boris Mirkin, a married couple residing together in

Brooklyn, bring this putative class action against defendants XOOM Energy, LLC, and XOOM

Energy New York, LLC (collectively, "XOOM"). XOOM, an independent energy service

company ("ESCO"), provided residential electricity to the Mirkins for six months at a variable rate

pursuant to a March 2013 contract with Susanna Mirkin. The Mirkins' amended complaint asserts

a claim for breach of that contract, alleging that XOOM charged them exorbitant rates. Following

discovery, XOOM moved for summary judgment, principally arguing that it had no contract with

Boris Mirkin and that it did not breach its contract with Susanna Mirkin. For the following reasons,

I grant the motion as to Boris Mirkin and deny it as to Susanna Mirkin.

# BACKGROUND[1]

*Factual Background*

In 1996, New York deregulated its energy markets with the goal of fostering competition and lowering rates for consumers. Pls.' 56.1 ¶¶ 48–50. Deregulation allowed the proliferation of ESCOs like XOOM, which purchase energy from producers on the wholesale market and sell it to consumers. *Id.* ¶¶ 51–52. ESCOs are essentially middlemen—unlike utilities, they do not generate or deliver electricity. *Id.* ¶ 52.

In March 2013, Boris Mirkin applied under his wife's name to receive residential electricity service through XOOM's SimpleFlex variable rate plan. Pls.' 56.1, at 2. XOOM sent Boris a new customer enrollment email stating that the Mirkins' electricity service would be switched to XOOM following approval of the enrollment application and that they would receive electricity at an introductory (or "teaser") rate of $0.0899 per kWh. Decl. of Steven L. Wittels in Opp'n to Mot. for Summ. J. ("Wittels Decl."), Ex. 1 ("Enrollment Email & ESA"), at 1–2, ECF 147-2. The email attached a copy of an Electricity Sales Agreement ("ESA" or "contract"), which described the company's pricing policies and services. *Id.* at 4–6. The ESA contained several terms that are relevant to the present motion. First, and most importantly, it stated:

> Your rate for energy purchases will be a variable rate, per kWh, that may change
> on a monthly basis, plus taxes and fees, if applicable. Your monthly variable rate is

---

[1] The background facts, which are viewed in the light most favorable to the non-movants, are drawn from the parties' submissions in connection with the motion for summary judgment, including Defendants' Local Rule 56.1 Statement ("Defs.' 56.1"), ECF No. 146-25 (filed under seal), Plaintiffs' Local Rule 56.1 Counterstatement ("Pl.'s 56.1"), ECF No. 148-52 (filed under seal), and Defendants' Response to Plaintiffs' Local Rule 56.1 Statement of Additional Material Facts ("Defs.' 56.1 Response"), ECF No. 150-1 (filed under seal).

Many of the documents supporting summary judgment have been filed under seal pursuant to a discovery confidentiality order, *see* ECF No. 48-1; they are hereby deemed unsealed to the extent that their contents are quoted or described in this order.

> ***based on XOOM's actual and estimated supply costs*** which may include but not
> be limited to prior period adjustments, inventory and balancing costs.

*Id.* at 4 (emphasis added). The contract also provided that "[t]here are no guaranteed savings in

this Agreement at this time." *Id.* On the next page, under a header labeled "AGENCY," the contract

stated:

> You hereby appoint XOOM Energy as agent for the purposes of (i) acquiring the
> supplies necessary to meet your electricity needs, and (ii) arranging, contracting for
> and administering transportation and related services over transmission facilities
> and those of the [Local Distribution Utility ("LDU")] needed to deliver electricity
> to your premises. These services are provided on an arm's length basis and market-
> based compensation is included in the price noted above.

*Id.* at 5. Finally, a choice of law provision designates North Carolina law as governing the contract.

*Id.* at 6.

XOOM began providing the Mirkins with electricity two months later, in May 2013. Defs.'

56.1 ¶¶ 1, 5. After the first month's teaser rate, the rate increased and fluctuated at higher levels

from then on.[2] Am. Compl. ¶ 43, ECF No. 42; Pls.' 56.1 ¶ 44, at 55.[3] The Mirkins canceled their

XOOM energy service in November 2013, after six months. Defs.' 56.1 ¶ 6.

Because the Mirkins claim that XOOM violated the agreement to set its rates based on

actual and estimated supply costs, the process by which XOOM set rates is of central importance.

At a high level, XOOM set its variable rates by calculating or estimating the cost of procuring

energy for its customers and adding a markup, or margin, to that cost, thereby producing the rate

---

[2] Though the ESA stated the Mirkins would be charged a teaser rate of $.0899 per kWh, Am.
Compl. ¶¶ 41–43; Answer ¶ 43, the parties apparently agree that the rate for the first month of
service was $.1290 per kWh, Pls.' 56.1, at 39.

[3] Plaintiffs' Local Rule 56.1 statement of additional material facts repeats certain numbered
paragraphs. *See* Pls.' 56.1, at 55–58. Where a duplicated paragraph number is cited, I have included
the page number for clarity.

charged to customers' monthly bills. In reality, the process was not so simple, and the parties disagree about how XOOM ultimately determined the monthly rates.

However, a few aspects of the process are beyond peradventure. XOOM utilized spreadsheets to estimate and calculate certain costs of procuring electricity. Defs.' 56.1 ¶ 7. These cost calculations were aggregated in "rate-setting workbooks" that summarized the projected costs for each of XOOM's products. *Id.* ¶ 8. The rate-setting workbooks listed the sum of projected cost components under the label "Total Cost," a figure XOOM also refers to as the "Cost of Goods Sold" or "COGS." *Id.* ¶ 10. After determining the Total Cost figure, analysts on the pricing team proposed a rate. *Id.* ¶ 12. The percentage difference between the proposed rate and COGS comprised the margin. *Id.* Rates were eventually finalized for multiple markets and products by a team of decisionmakers at a rate-setting meeting. *Id.* ¶ 13.

It is important to clarify that the Total Cost or COGS number may not represent XOOM's "actual and estimated supply costs," as that term is used in the contract, because the parties dispute whether all supply cost components were included in the Total Cost. XOOM says that prior period adjustments,[4] balancing charges, risk premiums, broker and sales channel costs, and other "non-supply costs" were accounted for in a separate budgeting process[5] and added to the margin. Defs.'

---

[4] "Prior period adjustments" refers to the practice of raising rates in future months to recover unanticipated costs over time. Mem. in Support Mot. for Summ. J. ("Defs.' Mot.") 21, ECF No. 146-1 (filed under seal).

[5] XOOM Director of Pricing and Structuring Jason Loehde explained the incorporation of prior period adjustments into the budget as follows:

> Prior period adjustments flowed into our actual costs and actual results. And so they would only be reflected when we made—next made a budget plan iteration. So if we updated the budget at some point during the year, those costs would be reflected in what we ultimately came up with at that point.

56.1 ¶¶ 9, 14–15; Pls.' 56.1 ¶ 106. This budgeting process "looked at [XOOM's] margins in aggregate across the portfolio," rather than on a market-by-market basis. Loehde Dep. 210:2–6. If margins were falling short of annual budget projections—say, for example, due to the 2014 polar vortex—XOOM's decisionmakers could make "overall adjustment[s] to the portfolio" through several "levers," including the increase of variable rates. *Id.* at 210:2–211:24. The Mirkins accept that prior period adjustments were "captured through the budgeting process," Pls.' 56.1 ¶ 106, but maintain that "there is no evidence that prior period adjustments, balancing charges, broker costs, or risk premiums were included in XOOM's margin," Pls.' 56.1, at 24; *see also* Wittels Decl., Ex. 8, at 95:17–96:4, ECF No. 148-9 (filed under seal) (XOOM expert stating he did not see any prior period adjustment calculations in data XOOM provided); Loehde Dep. 214:7–25 (acknowledging risk premiums were included as costs in the rate-setting workbooks). To the extent the Mirkins acknowledge that XOOM made rate adjustments based on unanticipated cost overruns, they argue that XOOM did so in violation of the contract. For example, plaintiffs point to the polar vortex as an instance of XOOM increasing variable rates in New York to offset significant losses in other states because attrition was lower in New York than in other markets. Pls.' Mem. of L. in Opp'n to Mot. Summ. J. ("Pls.' Opp'n") 39, ECF No. 148 (filed under seal).

The Mirkins also present a different interpretation of the rate-setting process, contending that XOOM "disregarded" its internal supply cost calculations when setting variable rates. *E.g.*, Pls.' 56.1, at 25. By this account, XOOM's rate-setting meetings were guided by pricing strategies designed to protect its margin and achieve revenue goals, leading XOOM to calculate its margin, and therefore set its ultimate rate, based on considerations such as profit, competitor and utility

---

Decl. of Michael D. Matthews ("MDM Decl."), Ex. A-10 ("Loehde Dep."), at 251:13–19, ECF No. 146-12 (filed under seal).

rates, sales trends, attrition, and geographic market elasticity, rather than supply costs. Pls.' 56.1 ¶¶ 74–75.

During the Mirkins' six months as XOOM customers, XOOM's internal Total Cost figure accounted for 66% to 80% of the total rate charged. Pls.' 56.1 ¶ 44, at 55. In other words, XOOM added a margin on top of cost that ranged from 20% to 44%, as shown by the following chart:

| Month | XOOM's Internal "Total Cost" ($/kWh) | Actual Rate Charged to Mirkins ($/kWh) | XOOM's Markup Above "Total Cost" |
|---|---|---|---|
| June | 0.1078 | 0.1290 | 20% |
| July | 0.1181 | 0.1440 | 22% |
| August | 0.1215 | 0.1490 | 23% |
| September | 0.1021 | 0.1399 | 37% |
| October | 0.1176 | 0.1490 | 27% |
| November | 0.0903 | 0.1299 | 44% |

Pls. 56.1, at 10 (reformatted). The Mirkins do not claim that XOOM cannot charge any margin at all, such that the rate must be equal to XOOM's costs. Pls.' Opp'n 7–9. Rather, they argue that the margins were excessive because the rates were not set in accordance with the ESA's pricing terms. The present motion is thus principally concerned with whether the "Actual Rate" in the above chart was "based on XOOM's actual and estimated supply costs," keeping in mind that the internal "Total Cost" measure may not necessarily equal XOOM's "actual and estimated supply costs."

In 2016, XOOM changed the pricing terms in its form contract. The revised agreement included the following pricing term:

> Your rate may be based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Pls.' 56.1 ¶ 91. In December 2019, the New York Public Service Commission banned ESCOs from offering variable rate energy plans that did not guarantee savings to consumers. *Id.* ¶ 58.

A-25

*Procedural Background*

Plaintiffs' original complaint, filed in New York state court, asserted claims for breach of contract, breach of the implied covenant of faith and fair dealing, and unjust enrichment. Complaint, ECF No. 1-2. XOOM removed the action to federal court and moved to dismiss. I granted XOOM's motion under Federal Rule of Civil Procedure 12(b)(6) and denied the Mirkins' post-judgment motion for leave to amend. *Mirkin v. XOOM Energy, LLC*, 342 F. Supp. 3d 320 (E.D.N.Y. 2018); *Mirkin v. XOOM Energy, LLC*, No. 18-cv-2949 (ARR) (RER), 2018 WL 11169574 (Nov. 2, 2018). On appeal, the Second Circuit affirmed the dismissal of the implied covenant and unjust enrichment claims, reversed the dismissal of the breach of contract claim, and remanded with direction to grant permission to file the proposed amended complaint. *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 174, 178 (2d Cir. 2019). After the Mirkins filed their amended complaint, the parties proceeded to discovery. In March 2023, the Mirkins moved to certify the proposed class, Mot. to Certify Class, ECF No. 131, and in May 2023, XOOM moved for summary judgment, Mot. for Summ. J., ECF No. 145.[6]

## LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County*

---

[6] I have reserved decision on the class certification motion pending disposition of the present motion for summary judgment. *See Encarnacion v. Astrue*, 491 F. Supp. 2d 453, 459 (S.D.N.Y. 2007), *aff'd*, 568 F.3d 72 (2d Cir. 2009); *Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 560 (D. Conn. 2017), *aff'd*, 915 F.3d 88 (2d Cir. 2019) (noting that Federal Rule of Civil Procedure 23(c)(1) "affords district courts with flexibility when presented with both a dispositive motion and a motion for class certification").

*of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). In deciding this motion, I must construe the facts in the light most favorable to the Mirkins, as the non-moving party, and draw all reasonable inferences in their favor. *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021).

The moving party has the burden of demonstrating the absence of a dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant carries its burden, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation marks omitted). In doing so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts[] and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal citations and quotation marks omitted).

## DISCUSSION

**I.    There is a Genuine Dispute as to Whether XOOM Breached the Contract.**

Under North Carolina law, which the parties agree applies in this case, a plaintiff can state a claim for breach of contract if she establishes that (1) a valid contract exists, and (2) the defendant breached the terms of that contract. *See Crosby v. City of Gastonia*, 635 F.3d 634, 645 (4th Cir. 2011). There is no dispute that a valid contract exists between XOOM and Susanna Mirkin, so for now the only issue is whether XOOM breached that contract. (Below, in Part II, I also address whether a valid contract exists between XOOM and Boris Mirkin.) XOOM, which has the initial burden as the moving party, principally argues that there is no genuine dispute that it fully complied with the terms of the ESA because (1) the contract unambiguously required only that XOOM use its actual and estimated supply costs as a foundational component of the variable energy rates, and (2) the evidence establishes that supply costs were the foundational component

of those rates. *See* Mem. in Support Mot. for Summ. J. ("Defs.' Mot.") 18, ECF No. 146-1 (filed under seal).

**A. The Contract is Not Ambiguous and Must Be Construed Consistent with Plaintiffs' Reading.**

XOOM's form contract stated that plaintiffs' monthly variable rate would be "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." Enrollment Email & ESA 4. The crucial question is the meaning of the phrase "based on." XOOM argues that the phrase unambiguously communicates that XOOM's supply costs merely had to be a foundational component of the ultimate rate. The Mirkins argue that the phrase is ambiguous but should be understood as limiting XOOM to charging rates that are close or proportionate to its supply costs.

Whether "based on" is ambiguous is an important question because an ambiguous contract term would defeat summary judgment. Under North Carolina law, when "an agreement is ambiguous and the intention of the parties is unclear, . . . interpretation of the contract is for the jury." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 658 S.E.2d 918, 921 (N.C. 2008). A contract contains ambiguity "when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Register v. White*, 599 S.E.2d 549, 553 (N.C. 2004). "Thus, if there is uncertainty as to what the agreement is between the parties, a contract is ambiguous." *Schenkel & Shultz, Inc.*, 658 S.E.2d at 921. Non-technical words in a contract "are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Singleton v. Haywood Elec. Membership Corp*, 588 S.E.2d 871, 875 (N.C. 2003).

I find that "based on" is not ambiguous as used in the contract. A word or phrase is ambiguous if it has more than one linguistic meaning. "Base," of course, has multiple meanings:

in baseball, for example, it means "any of the four stations at the corners of a baseball infield"; in a variant of rummy, a base is "the least number of natural cards that will form a canasta when a required number of natural or wild cards is added." *Base*, Merriam-Webster's Unabridged Dictionary (accessed July 20, 2023), https://unabridged.merriam-webster.com/unabridged/base; *see also Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 472–73 (S.D.N.Y. 2014) ("[T]here are literally dozens of dictionary definitions of 'base' for use in different literal and figurative contexts."). However, in the present context, "base" is a verb that means: "[t]o make, form, or serve as a foundation for . . . [t]o place on a foundation; to ground . . . [t]o use (something) as the thing from which something else is developed." *Base*, Black's Law Dictionary (11th ed. 2019); *see also Base*, Merriam-Webster's Unabridged Dictionary (accessed July 17, 2023), https://unabridged.merriam-webster.com/unabridged/base (choose "base (verb)") (defining as "to make or form a foundation for . . . to use as a base or basis for"). Given this definition, the parties do not seriously dispute that the verbal phrase "based on" means that the variable rate must be founded on or have a basis in XOOM's supply costs. Thus, the contract does not contain an ambiguity that must be interpreted by the jury.

The central issue with the contract term is vagueness, not ambiguity. Whereas ambiguous terms have multiple meanings, vague terms are imprecise. As a result, courts generally must use rules of construction to determine the legal operation of vague words. 5 Corbin on Contracts § 24.3 (2023). Many courts, including those of North Carolina, do not always distinguish ambiguity from vagueness, or interpretation (discernment of meaning) from construction (determination of legal effect). *See id.* In the context of the present case, "based on" is unambiguous because we understand its general linguistic meaning, but "based on" is vague because it is not clear what effect the phrase has on the legal operation of the contract.

The parties present dueling constructions. XOOM contends that "based on XOOM's actual and estimated supply costs" means that supply costs must be the foundational component of the variable rate, but that the contract does not otherwise restrict XOOM's discretion to layer additional sums on top of the supply costs—so long as the margin does not vastly exceed supply costs. *See* Consol. Reply in Supp. Mot. Summ. J. & Sur-Reply in Opp'n to Class Cert. ("Defs.' Reply") 7, ECF No. 150 (filed under seal) (acknowledging that a rate "ten times greater than supply costs" would not comply with the contract). XOOM's reading is not unreasonable. In normal usage, "based on" can mean a foundation from which something is developed, as in a movie that is "based on" a true story, where real-life events are developed into a narrative through the addition of fictional elements. *See Norem v. Lincoln Ben. Life Co.*, 737 F.3d 1145, 1150 (7th Cir. 2013).

The Mirkins offer an equally (or perhaps more) plausible construction: that "based on" connotes exclusivity and limits XOOM's discretion such that the rates can be determined only by XOOM's actual and estimated supply costs. Plaintiffs' construction finds support in case law. In *Fleisher v. Phoenix Life Insurance Co.*, the parties sparred over the meaning of a contract term stating an insurance rate would be "'based on' six enumerated factors." 18 F. Supp. 3d at 471. The court observed the following:

> In everyday parlance, when you make a calculation "based on" specific factors, you take only those factors into account; the calculation is made "relying on" or "building on" those factors. You calculate a baseball player's batting average "based on" his number of hits and his number of at bats—nothing more and nothing less. The area of a rectangle is calculated "based on" its width and length, while velocity is calculated "based on" distance and time.

*Id.* Consistent with this construction, the *Fleisher* court found that the average insured could plausibly read the contract's use of "based on" as limiting the calculation to the six enumerated factors. *Id.*

Because both parties present plausible constructions of the legal effect of the contested contract phrase, we must locate a rule of decision to break the tie. Under North Carolina law, "[o]ne of the most fundamental principles of contract interpretation is that ambiguities are to be construed against the party who prepared the writing," *Chavis v. S. Life Ins. Co.*, 347 S.E.2d 425, 427 (N.C. 1986), because the drafter "had the best opportunity to protect its interests," *Silvers v. Horace Mann Ins. Co.*, 378 S.E.2d 21, 25 (N.C. 1989).[7] Though this principle of construction is pronounced in general terms, it is "usually applied in cases involving an adhesion contract or where one party is in a stronger bargaining position." *Joyner*, 361 S.E.2d at 905–06. Thus, before applying this rule, "the record should affirmatively show that the form of expression in words was actually chosen by one [party] rather than by the other." *Id.* at 906 (quoting 3 Corbin on Contracts § 559 (1960 and Supp. 1984)). Here, there is no question that XOOM chose the language in the ESA, which was a contract of adhesion. Defs.' 56.1 Response ¶ 103.

I therefore apply North Carolina's rule of construction and conclude that the agreement requires the monthly variable rates to be determined by XOOM's actual and estimated supply costs—and only those costs.

XOOM objects to this construction on several grounds—all unavailing. First, XOOM argues that an exclusive reading would not allow the addition of any margin on top of supply costs, a position incompatible with the Mirkins' concession regarding the permissibility of a reasonable margin. *See* Defs.' Mot. 15 (arguing that supply costs cannot be "the only legitimate component"

---

[7] Though courts do not always distinguish between the concepts of interpretation and construction or ambiguity and vagueness, at least one North Carolina court has recognized that the rule of construing contracts against the drafter "is essentially one of legal effect, of construction rather than interpretation, since it can scarcely be said to be designed to ascertain the meanings attached by the parties." *Joyner v. Adams*, 361 S.E.2d 902, 905 (N.C. Ct. App. 1987) (quotation omitted).

of the variable rate). But XOOM is mistaken. A variable rate that varies depending only on the actual and estimated supply costs must *vary* according to those costs, but it does not have to *equal* those costs. In other words, the margin would have to remain proportionate, but not equal to the supply costs over time. Second, XOOM argues that this reading is foreclosed by the contract's agency provision, which states that "market-based compensation is included in the price noted above." Enrollment Email & ESA 5. But the meaning of the compensation term in the agency provision is unclear. It is at least plausible that "market-based compensation" refers to compensation owed to the electricity supplier and LDU for their role in the procurement and delivery of electricity, which would be included "in the price noted above" as a supply cost. Even if the compensation term refers to XOOM's compensation, that meaning would be entirely compatible with the proportionate-margin construction, which allows a margin so long as it is not untethered to the actual and estimated supply costs. Third, XOOM claims that the non-exclusive phrase "which may include but not be limited to" means the legitimate components of XOOM's rates cannot be limited to components identified in the contract. Defs.' Mot. 18. But that phrase occurs in the following sentence: "Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." Enrollment Email & ESA 4. In context, the non-exclusive phrase—which is followed by example supply cost components—clearly modifies "actual and estimated supply costs," not "[y]our monthly variable rate."

Finally, in its reply, XOOM points out that the Mirkins acknowledge the contract "is silent as to an appropriate margin" and argue that any interpretation capping the margin would improperly impose an additional term not contained in the contract. Defs.' Reply 4–7. Citing *Richards v. Direct Energy Services*, XOOM argues that jurors cannot "invent absent contract

terms" to require a specific margin in an ESCO contract that does not explicitly set a cap. 915 F.3d 88, 98 & n.5 (2d Cir. 2019). But *Richards* held that a contract stating an ESCO had "discretion" to set a variable energy rate "based upon business and market conditions" unambiguously did not require rates to be tied to procurement costs. *Id.* at 97–98. The contention that *Richards* forecloses any limitation on a margin where a contract is silent as to the margin requires an overreading of inapposite dicta contained in a footnote. *See id.* at 98 n.5. *Richards* in fact confirms that contractual silence does not allow unbounded discretion, because discretion granted by a contract must be "exercise[d] . . . in good faith." *Id.* at 99 (quoting 23 Williston on Contracts § 63:22 (4th ed. 2018)); *see also Cole v. Wells Fargo Bank, N.A.*, No. 15-CV-39 (MR), 2016 WL 737943, at *7 (W.D.N.C. Feb. 23, 2016) (contracts contain an implied "obligation to exercise discretion reasonably and with proper motive" (quotation and alteration omitted)).

In sum, I find that the contract required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs. Next, I consider whether XOOM has presented sufficient evidence demonstrating that it complied with the terms of the agreement as construed under North Carolina law.

## B. There is a Genuine Dispute as to Whether XOOM's Rates Were Based on its Actual and Estimated Supply Costs.

XOOM principally argues that summary judgment is warranted because there is no question that "actual and estimated supply costs" were the foundational component of the variable rates. And though it seems true that COGS was always the largest component of the Mirkins' rate and that additional costs and charges were layered on top of the supply costs to form the margin, *see* Defs.' Mot. 19–20, to prevail on summary judgment XOOM must demonstrate that the ultimate rates were undoubtedly determined solely by its actual and anticipated supply costs.

XOOM principally offers two forms of evidence: direct evidence of XOOM's rate-setting procedures and statistical evidence demonstrating the correlation between the Mirkins' rates and XOOM's supply costs. The direct evidence demonstrates that XOOM decisionmakers clearly considered supply costs when setting rates. As previously explained, XOOM calculated the sum of various cost components listed in rate-setting workbooks to reach a number labeled Total Costs, or COGS; analysts then added a margin on top of COGS; and finally, the preliminary rate calculations were presented at a pricing meeting where a team of decisionmakers would set a final rate. Defs.' Mot. 8–9. Because this process made COGS "always the first and largest component of [the] rate," XOOM says it is undisputed that the rate-setting procedure complied with the contract. *Id.* at 20. And the statistical evidence shows that there was a close correlation between the Mirkins' rates and the Total Cost figure. Indeed, XOOM's expert explains that the there is a "less than 1-in-400 chance that the two were unrelated." *Id.* at 22.

However, I find that XOOM has failed to demonstrate that there is no genuine dispute of material fact as to whether it breached the contract. XOOM's arguments and evidence certainly show that it considered its supply costs when calculating the Mirkins' monthly rates. And if all XOOM had to do under the contract was consider and incorporate its supply costs into the final rate, it would likely prevail. But under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs. XOOM has not done so.

First, XOOM has failed to adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric. As shown in the following chart, the markup fluctuated over the six months the Mirkins received XOOM's variable rate product, twice rising (in September and November) even when XOOM's Total Cost measure fell:

| Month | XOOM's Internal "Total Cost" ($/kWh) | Actual Rate Charged to Mirkins ($/kWh) | XOOM's Markup Above "Total Cost" |
|---|---|---|---|
| June | 0.1078 | 0.1290 | 20% |
| July | 0.1181 | 0.1440 | 22% |
| August | 0.1215 | 0.1490 | 23% |
| September | 0.1021 | 0.1399 | 37% |
| October | 0.1176 | 0.1490 | 27% |
| November | 0.0903 | 0.1299 | 44% |

Pls. 56.1, at 10 (reformatted).

XOOM advances three unsuccessful responses to this evidence. The first is that it could charge any markup it wanted under the contract so long as supply costs were the starting point of its rate calculation. I have already explained that the prevailing contract construction renders that argument unavailing. The second is that the Total Cost or COGS number does not constitute its "actual and estimated supply costs" because some of its supply costs—such as prior period adjustments—are incorporated in the margin. XOOM presents ample testimonial evidence supporting the general proposition that prior period adjustments were included in the margin and therefore responsible for rate fluctuations, *see* Defs.' 56.1 ¶¶ 14–18, but no documentary evidence demonstrating how non-COGS supply costs actually impacted the Mirkins' rates.[8] And the Mirkins counter with evidence that none of the documents considered at rate-setting meetings mention prior period adjustments. Pls.' 56.1 ¶¶ 42–43, at 57–58. To the extent the record contains evidence of prior period adjustments being implemented, it appears that XOOM aggregated cost overruns into annual and revised budgets, which it used to inform rate-setting decisions for over a thousand products across many markets, in at least one occasion leading XOOM to raise New

---

[8] According to XOOM Director of Product Management Ryan Park, there was no set formula for incorporating prior period adjustments. MDM Decl., Ex. A-12, at 198:15–17, ECF No. 146-14 (filed under seal) ("There's certainly a human element in terms of factoring in, you know, prior period adjustments.").

York variable rates to make up for unanticipated costs in other regions. *See* Loehde Dep. 64:12–14; 69:10–14; 210:2–211:24. Based on this evidence, viewed in the light most favorable to the Mirkins, a reasonable jury could find either that XOOM did not factor prior period adjustments into its margin or that cross-market margin adjustments made on the basis of relative regional consumer elasticity (or other considerations) were inconsistent with the terms of the ESA. Therefore, whether permissible supply costs incorporated in the margin determined the monthly change in markup is a disputed material fact. Third, XOOM points to its expert evidence of a "near perfect correlation" between the rate and XOOM's COGS. Defs.' Reply 14. However, the statistical correlation seems to prove at most that XOOM incorporated its internal cost calculation into the rate. The correlation does not tell us whether XOOM added a permissible markup above its cost calculation.

Even if XOOM were able to meet its burden, the Mirkins have presented evidence sufficient to demonstrate the existence of a question of fact as to whether XOOM set the Mirkins' monthly variable rate in compliance with the contract. Several pieces of evidence suggest that XOOM relied on pricing strategies or other considerations to determine the monthly variable rate in the New York market. First, it appears that XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and that rates were set accordingly. For example, Director of Pricing and Structuring Jason Loehde suggested that rates determined margins, explaining in his deposition that "we would input a proposed rate into the rate setting workbook and then there would be a calculated margin that results from the rate that we input." Loehde Dep. 67:12–16. And XOOM CEO Tom Ulry acknowledged that most of the pricing team "wasn't even privy to the operating expenses and things like that," but that they were privy to "[t]he gross margin goal for the month." Wittels Decl., Ex. 25, at 101:16–22, ECF No. 148-26 (filed under seal). Finally, in

A-36

April 2013, a few months before the Mirkins signed up for XOOM's service, Ulry explained that electricity rates in New York had increased because "[w]holesale rates are up and we raised our margins so we could lower them elsewhere." Wittels Decl., Ex. 26, at 1, ECF No. 148-27 (filed under seal); *see also* Loehde Dep. 210:20–212:4 (explaining that XOOM increased variable rates for New York customers to make up for margin shortfalls sustained in markets outside New York).

Second, the record indicates that XOOM considered several factors besides supply costs when setting its monthly rates. For example, Loehde sent an email before a 2015 meeting listing monthly rate-setting process considerations, including "[p]ositioning in relation to price to compare, creating a value proposition for customer, prices of our competitors, regulatory requirements, competitive trends, target margins." Pls.' 56.1 ¶ 76; Wittels Decl., Ex. 27, ECF No. 148-28 (filed under seal); *see also* Wittels Decl., Ex. 20 ("Coppola Dep."), at 50:18–24, ECF No. 148-21 (filed under seal) (Senior Vice President of Energy Supply and Pricing Andrew Coppola confirming that XOOM considered many factors when setting prices, including "[a]ttrition, sales growth, regulatory changes, [and] competitors").

Third, XOOM's 2016 amendment to its form Electricity Sales Agreement supports an inference that XOOM set its rates based on pricing strategies. The amended contract states that the variable rate would be "based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices . . . *and XOOM's pricing strategies*." Pls.' 56.1 ¶ 91 (emphasis added). In the Rule 30(b)(6) deposition of XOOM, Loehde explained that XOOM's rate-setting process did not change between 2013 and 2016, and so "the updated language is just simply providing more accurate language to our customers." Wittels Decl., Ex. 24, at 134:19–24, ECF No. 148-25 (filed under seal). And Coppola

confirmed that in 2013 XOOM customer rates were "based in part" on XOOM's pricing strategies. Coppola Dep. 98:11–14.

XOOM responds by arguing that the use of pricing strategies was permissible under the contract. Defs.' 56.1 Response ¶ 92. But, as explained, the contract as construed according to North Carolina law required XOOM's rates to be determined by its actual and estimated supply costs. XOOM also argues that reliance on record evidence from 2015 and 2016 is irrelevant because the Mirkins were customers for only six months in 2013. But XOOM's witnesses have asserted that XOOM's pricing process remained constant from 2013 to 2016.

In sum, there is a genuine question of fact as to whether XOOM set the Mirkins' rates based on supply costs or based on other considerations, such as pricing strategies driven by margin goals.

## II.    Summary Judgment is Granted as to Boris Mirkin's Claim.

XOOM's final argument is that summary judgment should be granted as to Boris Mirkin's claim either because he lacks Article III standing or because he is neither a party to nor a third-party beneficiary of the contract with XOOM and thus cannot sustain his claim under North Carolina law.

To satisfy the requirements of Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the summary judgment stage, a plaintiff must support standing with specific facts, by affidavit or other evidence, that are assumed to be true for the purpose of the motion. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs argue that Boris has standing because he was the primary decision-maker regarding the family's energy supply and they enrolled in the

XOOM variable rate plan using Boris's email and phone number. Pls.' 56.1 ¶¶ 39–41, at 55. However, because standing requires an injury to a plaintiff's own legally protected interests, a breach of contract claim can be maintained only where the plaintiff is a party to the contract, an intended third-party beneficiary of that agreement, or an assignee of the claim. *Rynasko v. New York University*, 63 F.4th 186, 193 (2d Cir. 2023). The Mirkins concede that Boris is not a party to the contract and do not argue that he is an assignee of Susanna's claim. *See* Pls.' Opp'n 46 ("Boris Mirkin . . . is not a direct party to the contract with XOOM."). The only question is whether he is a third-party beneficiary.

As previously explained, to prevail on a breach of contract claim under North Carolina law, a plaintiff must prove that (1) a valid contract exists, and (2) the defendant breached the terms of that contract. *See Crosby*, 635 F.3d at 645. A third party can sue for breach of contract by additionally showing that "(3) the contracting parties 'intended primarily and directly to benefit him or the class of persons to which he belongs.'" *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 117 (4th Cir. 2020) (quoting *DeMent v. Nationwide Mut. Ins. Co.*, 544 S.E.2d 797, 801 (N.C. Ct. App. 2001)). Under North Carolina law, it is not enough for a contract to incidentally benefit a third party—the parties must "intend it to benefit the plaintiff directly." *Holshouser v. Shaner Hotel Grp. Properties One Ltd. P'ship*, 518 S.E.2d 17, 25 (N.C. Ct. App. 1999), *aff'd*, 524 S.E.2d 568 (2000). In determining the parties' intent, North Carolina courts "consider the circumstances surrounding the transaction as well as the actual language of the contract." *Id.* (quotation and alteration omitted).

Here, the actual language of the contract provides the answer. The ESA explicitly states: "There are no third-party beneficiaries to this Agreement." Enrollment Email & ESA 4. This language clearly indicates that XOOM did not intend that the contract directly benefit a third-party

such as Boris. *See Holshouser*, 518 S.E.2d at 25. Because Boris was not a third-party beneficiary, he lacks standing to sue for breach. *Rynasko*, 63 F.4th at 194–95. I therefore grant XOOM's motion as to Boris's claim for breach of contract.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is granted in part and denied in part. Specifically, I grant summary judgment for XOOM as to Boris Mirkin's claim for breach of contract because he was neither a party to nor a third-party beneficiary of the contract. I deny summary judgment as to Susanna Mirkin's claim for breach of contract because she contracted to receive residential electricity from XOOM and there is a genuine dispute as to whether XOOM breached the contract.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:     August 14, 2023
           Brooklyn, New York

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,<br><br>　　　　　　　Defendants. | No. 18 Civ. 2949 (ARR) (RER) |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

A-41

who was subject to a defense that was "'meritorious enough to require . . . considerable time'" to rebut and there were "credible concerns" about whether the plaintiff purchased the product at issue (cleaned up)); *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 167 (S.D.N.Y. 2003) (typicality was lacking because the "named plaintiffs' legal arguments [would] be dissimilar to" the class).

      *2.    Susanna was not subject to XOOM's natural gas pricing and is vulnerable to unique defenses.*

Like Boris, Susanna never had a natural gas contract with XOOM and never incurred any charges for natural gas. While that fact does not cause **individual** standing problems for Susanna like those faced by Boris, it does implicate her typicality and **class** standing to represent a class of natural gas customers because XOOM's natural gas rates are based on an entirely different set of supply costs than those that apply to electricity. *See* Coleman Rpt. 21–23; *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 163 (2d Cir. 2012) ("[W]hile the alleged injury suffered by each Offering's Certificate-holder may 'flow from' the same Shelf Registration Statement[,] each of those alleged injuries has the potential to be very different—and could turn on very different proof."). And while that problem could be solved by limiting the class to electricity customers, Susanna faces other problems of typicality and adequacy that preclude class certification altogether.

Beginning with typicality, Susanna offers no evidence that her claims are typical of the unidentified class members who "were charged prices that were 'substantially higher and untethered to [XOOM's] supply costs,'" much less that her rates were "exorbitant and unconscionable." Class Cert. Mem. at 4 (quoting FAC ¶¶ 21, 58). Indeed, the evidence shows Susanna's experience was the opposite—her rate rose and fell in tandem with the cost components in the rate-setting workbooks, and the margin built into that rate never approached the retail energy margins the Second Circuit has already endorsed. *Compare, e.g.*, Coleman Rpt. at 13–14

(illustrating how Susanna's rate tracked the costs reflected in XOOM's rate-setting workbooks and the margin was on average ████████████████), *with Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 95 (2d Cir. 2019) (affirming summary judgment on claims challenging electricity rates that were "about 75% higher than" another ESCO's alleged "procurement costs"). And again, because the Mirkins' experts ignored supply costs like prior period adjustments that were included in XOOM's margins but not listed as cost components in rate-setting workbooks, Susanna has no evidence that the modest margins included in her rate were made up in any part of "non-supply cost criteria," Class Cert. Mem. at 1, as opposed to admittedly proper supply costs like prior period adjustments. *See* 2013 Contract at 1–2. Thus, even if the Mirkins could prove that *some* class members could state a claim under the legal theory that survived dismissal, Susanna would "not be a proper plaintiff" to pursue that theory. *Richards*, 915 F.3d at 100.

Nor would Susanna be an adequate class representative. As already discussed, Boris's attempt to recover damages under Susanna's contract creates individualized issues that would doom class certification even if the Mirkins could solve their other problems of commonality, predominance, superiority, and ascertainability. But despite that risk, Susanna has shown no sign that she will oppose Boris's claim. That approach cannot possibly benefit the class, but could advance Susanna's individual interests: Susanna supported a similar claim by Boris in another class action, doubling the Mirkins' total recovery when the case was settled. *See* S. Mirkin Dep. 76:24–77:4 (testifying that the Mirkins received $10,000 *each* when a previous class involving Susanna's electricity contract action was settled); *Mirkin v. Viridian Energy, Inc.*, No. 3:15-CV-1057 (SRU), 2016 WL 3661106, at *2, *2 n.4 (D. Conn. July 5, 2016) (noting that the Mirkins' claims against another ESCO were based on a contract to which only Susanna was a party). In cases involving the "potential conflict" posed by a close friendship between a class representative

A-43

# MDM Declaration Exhibit A-16

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF NEW YORK

 3     SUSANNA MIRKIN and BORIS MIRKIN,

 4     Individually and on Behalf of All Others

 5     Similarly Situated,

 6          Plaintiffs,

 7       vs.                    No. 18 Civ. 2949(ARR) (RER)

 8     XOOM ENERGY, LLC and XOOM ENERGY

 9     NEW YORK, LLC,

10          Defendants.

11     -------------------------------x

12

13

14                VIDEOTAPED DEPOSITION OF

15                   SEABRON ADAMSON

16              Tuesday, November 8, 2022

17                    10:06 a.m.

18                     Veritext

19                  101 Arch Street

20             Boston, Massachusetts 02110

21

22

23

24                Laurie K. Langer, RPR
```

Page 1

| | |
|---|---|
| 1        APPEARANCES | 1        P R O C E E D I N G S |

Page 2 / Page 4:

1        APPEARANCES

2

3 ON BEHALF OF THE PLAINTIFF(s):

4    BY: Steven L. Wittels, Esq.

5      Ethan D. Roman, Esq. (appeared via Zoom.)

6      Steven D. Cohen, Esq. (appeared via Zoom.)

7       WITTELS MCINTURFF PALIKOVIC

8       18 Half Mile Road

9       Armonk, New York 10504

10      (914) 319-9945

11      slw@wittelslaw.com

12

13 ON BEHALF OF THE DEFENDANT(s):

14    BY: Michael D. "Matt" Matthews, Jr., Esq.

15      MCDOWELL HETHERINGTON LLP

16      1001 Fannin Street, Suite 2700

17      Houston, Texas 77002

18      (713) 337-5580

19      matt.matthews@mhllp.com

20

21 ALSO PRESENT:

22    David C. Coleman

23    Shawn Budd, Videographer

24

Page 2

1      P R O C E E D I N G S

2

3      VIDEOGRAPHER: Okay. We are on the record.

4 This is the videographer speaking Shawn Budd with

5 Veritext Legal Solutions. Today's date is November 8th,

6 2022 and the time is 10:06 a.m.

7      We are here in Boston, Massachusetts to take

8 the video deposition of Seabron Adamson in the matter of

9 Susanna Mirkin, et al, versus XOOM-Energy in New York,

10 LLC.

11      Will counsel please introduce themselves for

12 the record.

13      MR. WITTELS: Steven Wittels. Wittels

14 McInturff and Palikovic for the Plaintiffs and the

15 proposed class on behalf of the witness today,

16 Mr. Adamson.

17      Appearing by video are also for the

18 Plaintiffs in the proposed class Steven Cohen and Ethan

19 Roman.

20      MR. MATTHEWS: My name is Matt Matthews, I'm

21 with the law firm of McDowell Hetherington and I

22 represent the Defendants XOOM Energy.

23      Also with me here today is David Coleman of

24 the NorthBridge Group who is, has been designated as a

Page 4

Page 3 / Page 5:

1      INDEX OF EXAMINATION

2

3 WITNESS: Seabron Adamson

4 EXAMINATION            PAGE NO.

5 By Mr. Matthews        5

6 By Mr. Wittels         138

7

8      INDEX TO EXHIBITS

9 NO.     DESCRIPTION        PAGE NO.

10 Exhibit 1   Expert Report of Derya     8

11      Eryilmaz and Seabron Adamson

12 Exhibit 2   Electricity Sales Agreement    12

13 Exhibit 3   Expert Report of David C.    47

14      Coleman

15 Exhibit 4   Rebuttal Report of David C.   48

16      Coleman

17 Exhibit 5   First Amended Class Action    113

18      Complaint

19 Exhibit 6   Market Supply Cost Build Up   114

20

21 (Original exhibits attached to original transcript)

22

23

24

Page 3

1 testifying expert for XOOM.

2      VIDEOGRAPHER: The court reporter today is

3 Laurie Langer. Will you please swear in the witness.

4

5

6       SEABRON ADAMSON,

7 having been satisfactorily identified by the production

8 of his driver's license, and duly sworn by the Notary

9 Public, was examined and testified as follows:

10

11

12        EXAMINATION

13

14 BY MR. MATTHEWS:

15   Q. Good morning, Mr. Adamson. How are you?

16   A. Good morning.

17   Q. Thank you for being here today. Before we jump

18 in, I'll quickly go over ground rules. I know you've

19 been deposed before, --

20   A. Uh-huh.

21   Q. -- I'm sure you're familiar with them. But this

22 is not meant to be any sort of endurance test, anytime

23 you need a break just let me know, we can take a break.

24      With, you know, the same qualification you always

Page 5

**Page 10**

```
 1   agreements.  If you want to take that to be liability,
 2   liability I guess is a legal term.  But -- so I am
 3   addressing issues related to the consistency of the, the
 4   rates and the sales agreements.
 5       Q.  Okay.  And whether or not XOOM breached those
 6   provisions?
 7       A.  Well, I mean, again, "breach" seems a legal word.
 8   But whether it's -- whether the pricing was consistent
 9   with the, with the pricing required in the sales
10   agreements.
11       Q.  Okay.  Is "breach" a word that you have
12   difficulty with?
13       A.  No, I just.
14       Q.  You've worked in a lot of --
15       A.  Yeah.
16       Q.  -- litigation for a long time.
17       A.  Sure.  I just -- I don't know exactly what
18   implications you're trying to put to that.  I was just
19   trying to describe clearly what I did, which I think is
20   what's described here.
21       Q.  I guess put differently, you are offering an
22   opinion about whether or not XOOM complied with the
23   pricing provisions of its sales agreement?
24       A.  Yes.
```

**Page 11**

```
 1       Q.  Okay.  And so are you also offering an opinion
 2   about how the pricing terms of the sales agreements
 3   should be interpreted?
 4       A.  No.  I'm providing a -- my -- well, I'm providing
 5   my understanding of what it says and in the context of
 6   the, of electricity and gas markets and retail markets
 7   and how that works out.  Obviously, I'm not offering a
 8   legal opinion on the language.
 9       Q.  Okay.
10       A.  I'm offering my understanding based on knowledge
11   of these markets of how these, how these work.
12       Q.  Okay.  You're not offering a legal interpretation
13   of the pricing provisions in the XOOM sales agreement?
14           MR. WITTELS:  Objection.  I mean, I think he
15   asked -- he just answered it, didn't he?
16           MR. MATTHEWS:  Steve, please, no speaking
17   objections today.  Please.
18           MR. WITTELS:  But it's the same question.
19           MR. MATTHEWS:  "Objection form" is what's
20   appropriate to say, as you have reminded me.  Okay?
21       A.  I am not offering a legal opinion.
22       Q.  Okay.  Were you asked to assume a particular
23   interpretation of the pricing provisions?
24       A.  No, not really.  I mean, they're on the page.
```

**Page 12**

```
 1       Q.  Okay.  So the third bullet point says that you
 2   have been asked, "to determine whether XOOM set its
 3   rates as required by the sales agreements."
 4       Correct?
 5       A.  Yeah.  The consistency, you know, the consistency
 6   from an economic and commercial point between the rates
 7   and, and, you know, how it -- how it -- how it
 8   describes, I think, the phrase that we'll get, we'll get
 9   around to today about the actual and estimated supply
10   costs --
11       Q.  Yep.
12       A.  -- in the -- in the sales agreement.
13       Q.  Right.  That's -- that's where I was going next.
14       The sales agreement requires that rates be set,
15   "based on XOOM's actual and estimated supply costs."
16   Right?
17       A.  I don't have the phrasing in front of me, but
18   that sounds right.
19       Q.  We can do that.  I'm not trying to --
20       A.  Yeah.  I mean -- I think that's --
21       Q.  Bear with me one second.
22           MR. MATTHEWS:  May I mark this as Exhibit 2.
23           (Deposition Exhibit No. 2 marked for
24   identification.)
```

**Page 13**

```
 1       Q.  Okay.  And, Mr. Adamson, does this appear to be a
 2   copy of the sales agreement you were referring to?
 3       A.  Yes, I think so.  I mean, there were
 4   various, obviously various versions of these over time,
 5   but this looks like the one.
 6       Q.  This is the one that you analyzed --
 7       A.  Yes, I believe --
 8       Q.  -- in connection with preparing this report?
 9       A.  Yes, I believe so.
10       Q.  Okay.  And in connection with the assignment to
11   determine whether XOOM set its rates as required by the
12   sales agreements, can you direct me to the provisions
13   that you looked at that relate to rate setting?
14       A.  I mean, you know, obviously the -- the -- the
15   primary one is in this top right box, starting "your
16   rate."
17       Q.  "Your rate for energy purchases will be a
18   variable rate, per kilowatt hour, that may change on a
19   monthly basis, plus taxes and fees, if applicable.  Your
20   monthly variable rate is based on XOOM's actual and
21   estimated supply costs which may include but not be
22   limited to prior period adjustments, inventory and
23   balancing costs.  You are responsible for all charges
24   assessed and billed by your local utility for all
```

| | |
|---|---|
| 1  Q. In doing that rate conversion, do you interpret | 1  has. |
| 2  that provision to mean that XOOM may include a margin in | 2  So I would, you know -- I imagine that that was, |
| 3  its rate? | 3  imagined that that was going to come up. I think -- I |
| 4  MR. WITTELS: Objection. | 4  mean, whether, to the extent non supply costs margins |
| 5  A. I don't see that listed here. You know, it says, | 5  are included really is something that the judge or the |
| 6  "actual and estimated supply costs." I don't see that | 6  jury or whoever decides on this has to, has to opine on. |
| 7  here. Sort of as we said, I anticipated that was going | 7  Q. Okay. Because you're not offering a legal |
| 8  to be kind of argued. I mean, when you have the reading | 8  interpretation? |
| 9  here, I don't see that. It says, "actual and estimated | 9  A. I am not offering a legal interpretation. |
| 10  supply costs," it doesn't talk about margin. I mean, so | 10  Q. Okay. If I said that I interpret that phrase |
| 11  I think the most straightforward reading of that is it | 11  based on actual and estimated supply costs to mean that |
| 12  doesn't have margin in it. | 12  XOOM's rate will rise and fall with its supply costs, |
| 13  Q. In your opinion XOOM may not include a margin in | 13  would you agree with that or disagree? |
| 14  its rate based on that contract provision? | 14  MR. WITTELS: Objection. By the way, when |
| 15  A. I would say it's actual -- I mean, if they -- | 15  you say "you," the lawyer? I don't know what you |
| 16  if -- it just needs to -- it needs to be to actual and | 16  mean. |
| 17  estimated supply costs. Which does not list here | 17  A. Sorry. Can you repeat the question. |
| 18  "margin." | 18  Q. I say that when I, Matt. |
| 19  Q. Mr. Adamson, I'll stipulate that the word | 19  A. Right. Okay. We get our pronouns right. Yeah. |
| 20  "margin" is not in that provision. | 20  Okay. |
| 21  A. Yes. | 21  Q. Read that pricing provision, specifically the |
| 22  Q. You don't have to tell me that again. | 22  phrase "based on XOOM's actual and estimated supply |
| 23  A. Okay. | 23  costs," I think that means that XOOM's rates will rise |
| 24  Q. I want to know, your interpretation is. You're | 24  and fall with its supply costs. Would you agree with |
| Page 30 | Page 32 |
| 1  offering an opinion of what this provision means; yes? | 1  that reading or disagree? |
| 2  A. Yeah, I'm offering what I think is a, you know, a | 2  A. I think that is -- if the rate is determined from |
| 3  relatively commonsensical commercial one. I'm -- my -- | 3  actual and estimated supply costs then that is likely to |
| 4  my ordinary reading of this is, you know, deal with | 4  be true, but that doesn't seem to be sufficient to me to |
| 5  supply costs and, and that's what it says. | 5  meet the requirement. |
| 6  Q. And does it mean that XOOM may include a margin | 6  Q. What else would be required? |
| 7  on top of those supply costs? | 7  A. Well, again, as I -- as we tried to explain in |
| 8  MR. WITTELS: Objection. | 8  that rebuttal report, moving together is a very weak |
| 9  A. They -- my kind of ordinary read of that is it | 9  measure of anything; right? So the real question is |
| 10  doesn't say that, unless, unless they are -- it's not | 10  not, not just do things move together, but, I mean, |
| 11  included in supply costs, it doesn't list that. And | 11  obviously there are other elements of a mathematical |
| 12  it's not a, you know, direct actual supply cost. That's | 12  relationship between moving together. I don't think |
| 13  what it says. So I think the answer to your question is | 13  moving together is sufficient to determine whether |
| 14  no. | 14  that's, quote, based on. |
| 15  Q. Okay. | 15  Q. So if it's not just that it moves together, -- |
| 16  A. If you were to say it does, okay, that's | 16  A. Uh-huh. |
| 17  different. That's a different view of the same thing. | 17  Q. -- what else is required? |
| 18  Q. Okay. So if I said that rate setting provision | 18  A. Well, -- |
| 19  that we've been looking at based on actual and estimated | 19  MR. WITTELS: Object to the form. |
| 20  supply costs means that the rate will be consistent with | 20  A. -- as I indicated -- as we indicated in our |
| 21  costs plus an appropriate margin, you would disagree? | 21  rebuttal report, there needs to be an, an economically, |
| 22  A. I mean, the first order based on it said what it | 22  you know, reasonable relationship between those two, |
| 23  says, yes. I mean, I -- I can -- I would guess you | 23  because moving together, as I illustrated, and which, it |
| 24  would probably argue that. Which I believe Mr. Coleman | 24  think, you know, everyone can understand, doesn't, it |
| Page 31 | Page 33 |

Veritext Legal Solutions
346-293-7000

1   opinion.
2       MR. WITTELS:  But usually if you're making a
3   statement you're taking it from there.
4       MR. MATTHEWS:  Well, thank you for that
5   guidance.  I'm learning a lot.
6   A. Well, I think it's probably around page....
7   Q. I'll find it for you.  How about paragraph 23B
8   and 54.
9   A. 54.  Right.  Okay.  Yes.  Okay.  Sorry, can you
10  repeat your question.
11  Q. Please, if you would, so we don't have any
12  confusion, if you would read both of those paragraphs.
13  And then I'll --
14      MR. WITTELS:  Into the record, --
15  Q. -- proceed.
16      MR. WITTELS:  -- or?
17      MR. MATTHEWS:  No.  No.  Just to himself.
18  A. (Witness reviewing.)  Okay.
19  Q. Okay.  What -- you, generally speaking, opine
20  with reference to those prior period adjustments that
21  you were unable to substantiate whether XOOM considered
22  them in setting its rates; is that a fair statement?
23  A. Yeah.  I mean, we looked at the information in
24  the rate setting workbooks, which was very extensive.

Page 62

1  There didn't seem to be any determination, calculation,
2  amounts or anything associated with prior period
3  adjustments as expected.  I'm -- I was really kind of
4  expecting there to be, if you were making prior period
5  adjustments, to have some calculation of those, which I
6  never saw.  So that's kind of just what it's a reference
7  to.
8  Q. Got it.  So you're saying because XOOM didn't
9  memorialize it and document or a calculation that shows
10  how it was factored in, you have no evidence that they
11  considered it; is that fair?
12  A. Well, I'm saying I didn't, I didn't see
13  any -- there was no data suggesting that that was ever
14  calculated.
15  Q. Right.
16  A. And it seems to me that would be a calculation.
17  Q. There was testimony that it was considered;
18  right?
19  A. I think there was testimony that it was
20  considered and as I mentioned in paragraph 54, though,
21  there was testimony -- well, there was testimony I
22  believe that said, oh, it was part of this, what we
23  considered in some very broad abstract sense.
24  Q. Yep.

Page 63

1  A. And then there was testimony as I note in
2  paragraph 54 about potential kind of makeup losses,
3  which I guess you could consider some kind of prior
4  period adjustment.  But in -- with an unrelated market
5  not related to New York.  So there's testimony
6  that -- there's general testimony and then there's
7  specific testimony.
8  Q. About consideration of prior period adjustments?
9  A. Yes.
10  Q. Okay.  Got it.  We're on the same page.
11  A. Okay.
12  Q. The period of time --
13  A. Uh-huh.
14  Q. -- that you looked at for rate setting
15  procedures --
16  A. Uh-huh.
17  Q. -- goes from 2013 to 2021; right?
18  A. Yes.  Broadly, yes.
19  Q. Broadly?
20  A. Yeah.
21  Q. Did you do any analysis of what other ESCOs
22  charged in New York during that same time period?
23  A. No.
24  Q. Okay.  So you don't know how XOOM's rates

Page 64

1  compared to other ESCOs rates?
2  A. For purposes of this we never made a comparison.
3  Q. And you don't know if XOOM's rates were outside
4  of the range of what ESCOs were charging during that
5  time period?
6  A. No, we didn't look at that.  It didn't seem very
7  relevant.
8  Q. Okay.  What was relevant in the, your damage
9  analysis, was how much gross margin XOOM sought on top
10  of its supply costs; right?
11      MR. WITTELS:  Objection.
12  A. Can you repeat that, again.
13  Q. Yep.  What you believed was relevant in your
14  damage calculations was how much gross margin XOOM
15  sought on top of its supply costs?
16      MR. WITTELS:  Objection.
17  A. I mean, that's a way that -- I think you're
18  putting a characterization of it.  I think what really
19  the -- you're characterizing it -- one might
20  characterize it that way, but the, you know, as, as
21  discussed, the, you know, what's important is the
22  relationship between rates and, and supply costs.  If
23  you want to characterize that as being a gross margin
24  calculation, I think you could formulate it that way,

Page 65

17 (Pages 62 - 65)

| | |
|---|---|
| 1 which is I think what you're doing. But I think you | 1 A. The -- between total cost and the rate. |
| 2 understand what we did. | 2 Q. Okay. Which is the margin? |
| 3 Q. I am, because I'm focusing in my question, I have | 3 MR. WITTELS: Object. |
| 4 built this in on your damage calculation. So I | 4 A. The rate is not the margin. |
| 5 understand your position about bullet 3, let's call it. | 5 Q. No, I know. |
| 6 Which is your opinions about whether or not XOOM's rate | 6 A. A rate is not a margin. |
| 7 setting was consistent or not, with the sale agreement. | 7 Q. The delta is. The delta is. |
| 8 But I'm talking about with respect to 4, after | 8 A. Okay. We can call that a margin, yes. |
| 9 you concluded -- | 9 Q. The delta between the total costs -- |
| 10 A. Uh-huh. | 10 A. Right. |
| 11 Q. -- the rate was not consistent -- | 11 Q. -- and the rate is -- |
| 12 A. Right. | 12 A. Right. |
| 13 Q. -- that your damage model -- | 13 Q. -- the margin; right? |
| 14 A. Right. | 14 A. That -- that -- you can characterize that as a |
| 15 Q. -- and what they considered relevant was the | 15 margin. |
| 16 amount of gross margin that XOOM put on top of its | 16 Q. Well, what would you characterize it? |
| 17 supply cost? | 17 A. I would just characterize it as a difference, as |
| 18 A. Are we discussing the Method 1 model or the | 18 a delta. |
| 19 Method 2 model? | 19 Q. Okay. You're not offering an opinion in this |
| 20 Q. Well, it's both; right? | 20 case that under the sales agreement XOOM could not |
| 21 A. Well, it's -- | 21 charge more than the regulated utilities rate; right? |
| 22 Q. Let's start with Method 1. | 22 A. No. I mean, the comparison I made was between |
| 23 A. Okay. Right. | 23 supply costs and the rate under this contract. |
| 24 Q. Right. Method 1, what was relevant was the | 24 Q. Right. And you're not offering a damage model |
| Page 66 | Page 68 |

| | |
|---|---|
| 1 amount of gross margin that's input on top of its supply | 1 that compares XOOM's variable rate charges to what |
| 2 costs; right? | 2 customers would have been charged by the utility during |
| 3 MR. WITTELS: Objection. | 3 the same time period? |
| 4 A. Of the difference -- if you want to -- you're | 4 MR. WITTELS: Objection. |
| 5 expressing that as a form -- you're expressing the | 5 A. No. The damage models as we discussed are the |
| 6 delta, the difference, right, as a gross margin. That's | 6 two. |
| 7 not exactly how it was calculated. | 7 Q. Right. And you don't intend to offer an opinion |
| 8 I mean, it was calculated just as there's | 8 about that? |
| 9 differences, not any -- you're saying a gross margin on | 9 A. No. The only thing we used was a, as a graphical |
| 10 a gross margin calc -- I want to be specific about how | 10 comparison on the relationship between supply costs and |
| 11 you're using the term "gross margin." | 11 the utility rate, as an example. But the two models are |
| 12 Q. I didn't think it was tricky. I mean, your | 12 the two models. |
| 13 report says that you calculated by reference -- by | 13 Q. Yep. Okay. Are you offering an opinion about |
| 14 comparing XOOM's margin reports to XOOM's rate setting | 14 what is a reasonable or appropriate margin for an ESCO |
| 15 workbooks; right? | 15 to charge? |
| 16 A. Right. I was getting to the delta between rates | 16 A. Well, to build the second model we needed an |
| 17 and costs. | 17 estimate of a margin. We really didn't have any |
| 18 Q. Okay. | 18 information that would allow that to be created, since |
| 19 A. It's just that it was in the margin setting | 19 XOOM had, from what we can tell, had never done it that |
| 20 workbooks. | 20 way. They had never tried to calculate a, or they did |
| 21 Q. So with respect to Model 1 the relevant | 21 not present in any way, I can't say that they never |
| 22 consideration was the delta between XOOM's total costs | 22 tried. They did not present in the rate setting |
| 23 and XOOM's margin? | 23 workbooks and other information calculations of any sort |
| 24 MR. WITTELS: Objection. | 24 like that. So we used the margin from fixed rate |
| Page 67 | Page 69 |

18 (Pages 66 - 69)

A-50

**Page 70**

1  customers as a proxy of a rate that XOOM itself had
2  used. I can't go further than that because there's no
3  information.
4       MR. MATTHEWS: Can you read my question
5  back, please.
6       (Prior testimony read back.)
7          "Are you offering an opinion
8          about what is a reasonable or
9          appropriate margin for an ESCO
10         to charge?"
11 A. Yeah. Conceptually, yes. Conceptually, yes.
12      Thanks for reading that back.
13 Q. That's okay. And what is the opinion that you're
14 offering conceptually about that?
15 A. Well, I mean, it's obviously related to the
16 contract that we've been discussing, whether it's based
17 on supply costs, that, you know, if the Court were to
18 decide that a margin was allowed, that it can't be an
19 uncapped margin, that's why we made a second calculation
20 using the fixed rate margin as a proxy of what might be
21 an acceptable margin.
22 Q. Are you offering any opinion about what is an
23 acceptable or appropriate, a reasonable margin aside
24 from just using XOOM's fixed rate margin?

**Page 71**

1  A. We haven't offered that opinion, we don't have
2  any information to do that.
3  Q. Do you intend to?
4  A. If information were to be provided, but that
5  would have to come from XOOM. So I, in the absence of
6  not expecting anymore information to come, no.
7  Q. Well, we've gotten talking past each other again.
8  I'm talking conceptually. You've said that it will be
9  for the Court to decide whether a margin can be charged
10 and if so what's appropriate; right?
11 A. Right.
12 Q. And if we go to trial --
13 A. Uh-huh.
14 Q. -- and you take the witness stand --
15 A. Uh-huh.
16 Q. -- and I'm asking you questions and the judge
17 gets frustrated with my questions and says, "let's cut
18 to the chase. Mr. Adamson, what do you think is an
19 appropriate margin for an ESCO to charge?" What would
20 your answer be?
21      MR. WITTELS: Objection.
22 A. I would say conceptually it's got to be related
23 to the, related to the costs. And in a broad conceptual
24 basis.

**Page 72**

1  Q. And if he said, "but can you give me a cutoff
2  point? Is there a number that you can assign to that?"
3  Would you be able to give him one?
4       MR. WITTELS: Objection.
5  A. I wouldn't be able to give him a number on the
6  stand because I wouldn't have the, XOOM's internal
7  information, no.
8  Q. Okay. So the margin in your view, --
9  A. Uh-huh.
10 Q. -- the margin that is appropriate for an ESCO to
11 charge conceptually --
12 A. Uh-huh.
13 Q. -- is ESCO specific?
14 A. Well, again, we're talking about relation to a
15 specific contract, so.
16 Q. I'm not.
17 A. You're not.
18      MR. WITTELS: Don't interrupt him.
19 A. I am talking -- sorry. I'm talking about this
20 specific contract. Other ESCOs may have, and I'm sure
21 do, very different contractual forms. And in fact,
22 ESCOs -- even the same ESCO will have lots, may have
23 different pricing, right, under different arrangements.
24 We're talking about variable rate pricing here as

**Page 73**

1  opposed to fixed rate pricing.
2  Q. Uh-huh.
3  A. Fixed rate pricing, I think we can all agree, the
4  actual outturn margins could be quite different. A lot
5  depends on timing in that case; right? Okay. So I
6  don't know that there is a "single ESCO number" I don't
7  think that's a meaningful concept.
8  Q. Okay. Is there a single ESCO number for variable
9  rates that in your opinion would be a cap on what is an
10 appropriate or reasonable margin?
11 A. I don't have a number in mind because I don't
12 know what the, what would be claimed to be the types of,
13 of costs that, to be recovered in that margin. What I
14 don't -- you know, I don't have a number. What I am
15 offering is conceptually that the margin has to be based
16 on something from reality to be meaningful in the
17 context of this contract, and, you know, can't be
18 arbitrary.
19 Q. Okay.
20 A. But I don't have a number to give you.
21 Q. Okay. And would not be able to create one?
22      MR. WITTELS: Objection.
23 A. Not -- not on the information available right
24 now. I think that would need more inputs than are

19 (Pages 70 - 73)

| | |
|---|---|
| 1 Q. And they operate in a deregulated competitive | 1 costs, that's what we use for Model 1. That's what |
| 2 market in New York; right? | 2 XOOM -- that's the data XOOM provided to the Court. |
| 3 A. Deregulated in some sense. I mean -- | 3 Q. Okay. Model 1, based on that calculation, would |
| 4 Q. Right. | 4 actually result in XOOM losing money; right? |
| 5 A. -- retail electricity rates are not completely -- | 5 A. Is that out of your hypothesis, or? |
| 6 they're still subject to regulation. | 6 Q. It's a question. |
| 7 Q. Agreed. | 7 A. I don't know. |
| 8 A. Right. | 8 Q. You don't know? |
| 9 Q. But -- but a competitive rate is what an ESCO is | 9 A. The -- I mean, we don't have -- we haven't seen |
| 10 allowed to charge as opposed to a rate set by a | 10 any P & L by contract. |
| 11 regulator; -- | 11 Q. Conceptually -- |
| 12 MR. WITTELS: Objection. | 12 A. Uh-huh. |
| 13 Q. -- right? | 13 Q. -- Model 1 says XOOM can charge no more -- |
| 14 MR. WITTELS: Objection. | 14 A. Uh-huh. |
| 15 A. Well, I think you would need to be precise about | 15 Q. -- than its reported supply costs in the rate |
| 16 the statement. The -- that would depend on the what and | 16 setting workbooks; right? |
| 17 when. | 17 A. Uh-huh. |
| 18 Q. Okay. But we can agree at least that XOOM is a | 18 Q. That's what Model 1 measures; right? |
| 19 for profit business operating in a competitive market? | 19 A. Yeah, broadly. Yes. |
| 20 MR. WITTELS: Objection. | 20 Q. So at best -- |
| 21 A. XOOM is definitely a for profit business. I | 21 A. Uh-huh. |
| 22 mean, it's not subject to perfect competition in an | 22 Q. -- Model 1 makes XOOM profit neutral; right? |
| 23 economic sense. Which would be a quite different set of | 23 A. If you assume that their actual -- I think under |
| 24 criteria. I think in the, as you're broadly | 24 your construction you're saying under your, under your |
| Page 82 | Page 84 |

| | |
|---|---|
| 1 characterizing it, I agree with you in -- in -- in | 1 construction you're saying under the -- under the |
| 2 casual terms. | 2 scenario that their reported total costs was equal to |
| 3 Q. Okay. Why doesn't XOOM get to make any profit | 3 their actual marginal supply costs, broadly, yes, I |
| 4 under Model 1? | 4 agree. |
| 5 A. The question is is whether XOOM gets to charge | 5 Q. Okay. In actuality, because as we discussed XOOM |
| 6 the rates it agreed to under the contract. That's why I | 6 and every other ESCO has certain fixed costs in addition |
| 7 used the example earlier, I can enter into -- I enter | 7 to its supply costs, Model 1 would result in XOOM losing |
| 8 into a contract, I sort of live or die by that contract; | 8 money; -- |
| 9 right? | 9 MR. WITTELS: Objection. |
| 10 I mean, we've all entered in, probably in our | 10 Q. -- right? |
| 11 lives entered into contracts for things that ended up | 11 MR. WITTELS: Objection. |
| 12 costing to fulfill more than, than what we made. I used | 12 A. Losing money on, as a whole or on that specific |
| 13 the example of the building rehabilitation. | 13 contract? Just for point of clarification. |
| 14 The real question to me is consistency with the | 14 Q. Under that calculation, on that contract. |
| 15 contract. Did they not make money at those rates? I | 15 A. On that contract? |
| 16 don't know. That's -- they don't report, as far as I've | 16 Q. Yes. |
| 17 seen, information on a contract-by-contract basis. But | 17 A. Probably, yes. But, you know, businesses have |
| 18 the, you know, the question is around consistency with | 18 many -- have many, many activities where they don't make |
| 19 the -- with the -- with the contract they signed here. | 19 a profit on that particular activity. I mean, Google |
| 20 Q. In your opinion that contract only allows XOOM to | 20 offers me a Gmail account and I'm not paying for it, |
| 21 charge its supply costs? | 21 they have huge fixed costs of implementing that. |
| 22 A. Yeah. I mean, that's what -- that's what we | 22 Q. I'm just -- I want to understand your -- this is |
| 23 already discussed around the reading of supply costs, | 23 your opinion. Right? |
| 24 and as you said, you know, supply costs it's total | 24 A. I know my opinion. |
| Page 83 | Page 85 |

1   Q. And so I'm not at this point even arguing with
2  you about it. I just want to understand it.
3   A. Uh-huh.
4   Q. You've said that under Model 1 --
5   A. Right.
6   Q. -- anything above, --
7   A. Uh-huh.
8   Q. -- anything charged by XOOM above the supply
9  costs reported in the rate setting workbook is a damage;
10  right?
11   A. Yes.
12   Q. And that -- under that model --
13   A. Uh-huh.
14   Q. -- for those customers who were charged variable
15  rates by XOOM over the relative time period, XOOM would
16  lose money --
17     MR. WITTELS: Objection.
18   Q. -- for those customers in that contract language?
19     MR. WITTELS: Asked and answered.
20  Objection.
21   A. Possibly. I don't think that's the question in
22  front of us. As I said, I mean, the question is
23  consistency with the contractual language.
24   Q. Right.

Page 86

1   A. You said -- as you said yourself, they provided
2  their supply costs. What's the difference with supply
3  costs?
4   Q. I -- I don't know why this is difficult. Like,
5  the calculation isn't even difficult. I'm bad at math
6  and I can do this one. It's anything above the reported
7  supply cost is a damage under Model 1; --
8   A. Yes.
9   Q. -- correct?
10   A. Yes.
11   Q. Even if anything above that reported supply cost
12  included certain fixed costs, that if they weren't
13  reported in the rate setting workbooks it is a damage
14  under Model 1?
15     MR. WITTELS: Objection.
16   A. That is how the calculus -- that's how the
17  calculations go through, because that's how XOOM
18  reported its total costs, yes.
19   Q. And that is because your reading of the contract
20  is that XOOM can charge no more than the reported total
21  costs?
22   A. Since we went through this morning, it depends on
23  how you read supply costs. I read supply costs as, you
24  know, costs directly related to supply. XOOM reported

Page 87

1  this information back that we made the calculation on
2  around their costs.
3   Q. Let me see if I can go at it a different way.
4     Model 1 in your opinion accurately measures the
5  damages --
6   A. Uh-huh.
7   Q. -- flowing from what you believe is XOOM's
8  failure to set variable rates consistent with the
9  contract language?
10   A. Yes.
11   Q. And let's see. Paragraph 72 to your report.
12   A. Just give me one second to flip to the page.
13     MR. WITTELS: 72?
14   A. Uh-huh. Okay.
15   Q. Calculates the difference between XOOM's reported
16  supply costs and the rate that the regulated utility
17  charged; correct?
18   A. No. I don't think you said that right.
19   Q. Okay. What -- what does that calculate in
20  paragraph 72?
21   A. Well, the second sentence talks about XOOM's
22  total costs and the thing we just discussed; right?
23     As we -- as I indicate here we also did a, you
24  know, just a kind of a crosscheck calculation to see if

Page 88

1  it's in the same, you know, in the same order of
2  magnitude and just crosschecked it again to what XOOM
3  had reported the applicable utility rates to be. You
4  know, they're generally similar. So if you were to take
5  the deltas, not against XOOM's total cost but against
6  the utility rates, then you get 49 million, not 55
7  million.
8   Q. How is that different from what I asked?
9   A. You said, as I remember, this compares the, the
10  total cost to the -- I'm not exactly sure what you said,
11  but I think it had some consistency with that. If you
12  want to read it back.
13   Q. It's okay. The first sentence of 72 --
14   A. Uh-huh.
15   Q. -- calculates the difference between XOOM's
16  reported supply costs --
17   A. Uh-huh.
18   Q. -- and the rate that the utility charged?
19   A. Yes.
20   Q. Okay. And the utility in New York is required to
21  be profit neutral; right?
22   A. Well, you -- the utilities in New York are
23  actually investor owned, most of them are investor owned
24  utilities, so they're not, they are not nonprofit

Page 89

23 (Pages 86 - 89)

| | |
|---|---|
| 1   A. Well, in a sense, yes, because the, you | 1   that might be a thing. But we -- we haven't seen that |
| 2   know -- well, first off, the fix rate is used as, you | 2   here. It was asked, but we haven't seen it. |
| 3   know, a way of coming up with a reasonable margin that, | 3   Q. Who asked? |
| 4   based on what XOOM itself set rates on. You know, it's | 4   A. Well, the discovery request asked for costs and |
| 5   not -- it's based on the information available. | 5   pricing methodologies and stuff. |
| 6      So one question then comes to, you know, are, is | 6   Q. Paragraph 75. It says -- this is towards the |
| 7   there some reason that, that XOOM would need to charge a | 7   bottom, I suppose it's the last sentence. |
| 8   higher margin on fixed rate customers? If so I don't | 8   "It appears that XOOM was able to operate and |
| 9   really see what it is. | 9   make a reasonable profit selling fixed rate contracts |
| 10      MR. WITTELS: Variable. | 10   with substantially lower margins than variable |
| 11   A. Sorry. On variable rate customers. I am -- we | 11   contracts, and yet arbitrarily imposed much higher |
| 12   don't have any information to, to delve into that. | 12   margins on their variable rate customers?" |
| 13   Q. I'm asking conceptually. And it's okay if you | 13   Do you see that? |
| 14   are not offering this opinion. I'm not saying you | 14   A. Yes. |
| 15   should or you shouldn't be. I just want to know in this | 15   Q. Where does it appear that XOOM was able to |
| 16   case are you going to offer an opinion that it is not | 16   operate and make a reasonable profit selling fixed rate |
| 17   fair for XOOM to seek a higher margin on variable rates | 17   contracts with substantially lower margins? |
| 18   conceptually than it does on fixed rates? | 18   A. Well, the margins you can kind of see in the |
| 19   A. In this context, yes. Because there is no XOOM | 19   table, the average margins over years. As I say, it |
| 20   provided despite all of the information about how those | 20   appears that they chose to offer those fixed rate |
| 21   methods were set of how these margins came up. How | 21   margins over a considerable period of time. |
| 22   these -- how the variable rate margins were determined | 22   Q. Uh-huh. |
| 23   and that's a reasonable proxy, yes. | 23   A. So they would have had -- XOOM would have had the |
| 24   Q. Are you offering that opinion more broadly, that | 24   opportunity to offer if it was saying, "oh, my God, |
| Page 98 | Page 100 |
| 1   in all circumstances -- and I'm asking this, to give you | 1   we're losing tons of money on all of our variable |
| 2   some prospective on why I'm asking, because you've done | 2   customers -- I mean, our fixed rate plans that could |
| 3   it in two cases now that I know of, set the fixed rate | 3   have been adjusted." |
| 4   margin as a benchmark. | 4      But we don't -- as I mentioned before we don't |
| 5   A. Uh-huh. | 5   have contract by contract P & Ls, for example. |
| 6   Q. So are you going to offer the opinion that in the | 6   Q. Right. So I think we're saying the same thing. |
| 7   ESCO world -- | 7   Your table 1 reflects gross margin for fixed rate |
| 8   A. Uh-huh. | 8   customers; right? |
| 9   Q. -- it is not appropriate for an ESCO to seek a | 9   A. Yes. |
| 10   higher margin for variable rates than it does for fixed | 10   Q. Okay. |
| 11   rates? | 11   A. I think so, yes. |
| 12      MR. WITTELS: Objection. | 12   Q. But you don't know whether -- |
| 13   A. I mean, to me the rates have to be set for the | 13      VIDEOGRAPHER: I'm sorry. I didn't hear |
| 14   contract. The -- the use of fixed rates seemed | 14   that. You're hitting the microphone. |
| 15   appropriate for coming up with the reasonable proxy | 15   A. Oh, I'm sorry. |
| 16   given that, you know, the, the risks associated with the | 16      VIDEOGRAPHER: Bring it up a little higher. |
| 17   variable rates in general would be similar or probably | 17   A. How is that? Is that better? |
| 18   lower. If you say that there are other fixed costs it's | 18      VIDEOGRAPHER: Great. Thank you. |
| 19   hard to see why they are different. We never saw | 19   A. Okay. Thank you. Sorry. |
| 20   anything in this case saying, demonstrating why there | 20   Q. That's okay. But you don't know if XOOM actually |
| 21   would be a difference between the two. If someone could | 21   made a net profit on those same customers? |
| 22   present, you know, compelling economic evidence that | 22   A. No, we don't have -- we don't have customer |
| 23   says, "by God, I can prove to you that the costs of | 23   segment level profit and loss data. |
| 24   variable rate is completely different than fixed rates" | 24   Q. Okay. In the -- circling back to the Richards |
| Page 99 | Page 101 |

Veritext Legal Solutions
346-293-7000

A-54

| | |
|---|---|
| 1　case real quick. In that case you were not offering a | 1　charges are also discussed at the rate setting -- |
| 2　legal interpretation of what the contract language | 2　　　Q. Okay. |
| 3　meant; right? | 3　　　A. -- thing, just if you read the last sentence. I |
| 4　　　A. No, I would not have offered a legal | 4　think what I was pointing to, just to cut the -- was -- |
| 5　interpretation. | 5　there were things that came up was, it's under the title |
| 6　　　Q. And your interpretation of XOOM's contract | 6　thing. And it says, "delivered to a location considered |
| 7　language here is similarly constrained. You -- in the | 7　the point of delivery," you know, I was just commenting |
| 8　sense that you are not offering a legal interpretation | 8　that point of delivery obviously depends for a customer, |
| 9　here, either? | 9　depending on what utility serves them in the state. |
| 10　　　MR. WITTELS: Objection. | 10　　　Q. Okay. Got it. Do you see the provision right |
| 11　　　Q. Right? | 11　above that, the agency provision? |
| 12　　　A. Yeah, I'm not offering a legal opinion, I think | 12　　　A. Uh-huh. |
| 13　as we discussed, yes. | 13　　　Q. Do you see the last sentence of that section, |
| 14　　　Q. Not to any greater degree than you did in the | 14　"these services are provided on an arm's length basis |
| 15　Richards case? | 15　and market-based compensation is included in the price |
| 16　　　A. No. Just not offering a legal opinion. | 16　noted above." |
| 17　　　Q. Okay. Look if you would at Exhibit 2, which is | 17　　　Did I read that correctly? |
| 18　the sales agreement. | 18　　　A. Yes. |
| 19　　　A. Yep. | 19　　　Q. What does that sentence mean to you? |
| 20　　　Q. And you directed me to -- we talked about the | 20　　　A. "These services are provided on an arm's length |
| 21　key, the critical -- | 21　basis and market-based compensation is included in the |
| 22　　　A. Uh-huh. | 22　price noted above." Well, where it says they have |
| 23　　　Q. -- rate setting provision earlier. And then you | 23　energy, they have transportation, those of the LDU, the |
| 24　directed me to a couple of others that you looked at, | 24　transmission facilities and LDU have compensation that's |
| Page 102 | Page 104 |
| 1　one being the price section. | 1　market based. |
| 2　　　A. Uh-huh. | 2　　　Q. Okay. Do -- do you have any opinion about what |
| 3　　　Q. Do you remember that? | 3　the price noted above refers to? |
| 4　　　A. Yes. | 4　　　A. In the -- in the price noted above and the price |
| 5　　　Q. And then -- I'm not sure where it appears, but | 5　related to the arranging for and contracting |
| 6　you also pointed me to a provision about delivery | 6　transportation, that's one possibility. No, I don't |
| 7　charges; do you remember that? | 7　have an express opinion about that. |
| 8　　　MR. WITTELS: What -- what's the question | 8　　　Q. Okay. Fair enough. So this agency section in |
| 9　here that you're asking him, Matt? I mean, what are you | 9　that sentence specifically are not something that you |
| 10　asking? | 10　considered in connection with your evaluation of whether |
| 11　　　A. Sorry. Can you repeat. | 11　or not XOOM set its rates consistent with the terms of |
| 12　　　Q. So you -- when I asked you earlier about your | 12　the sales agreement? |
| 13　interpretation of this contract, or your review of | 13　　　A. No. This seems to be referencing to |
| 14　it, -- | 14　you -- they're specifically allowed to buy the energy |
| 15　　　A. Uh-huh. | 15　and arrange it through the transmission and LDU systems. |
| 16　　　Q. -- let's say, you -- you mentioned the rate | 16　　　Q. Okay. So it was -- |
| 17　setting provision that's at the top of the table; yes? | 17　　　A. Which is not -- which is not, I don't think, very |
| 18　　　A. Uh-huh. Yes. | 18　controversial. |
| 19　　　Q. And you mentioned the price section at the bottom | 19　　　Q. So that -- that market-based compensation was not |
| 20　of page 1; yes? | 20　factored into your damage calculations either; right? |
| 21　　　A. Yes. | 21　　　A. No, because I focused on supply costs. This I |
| 22　　　Q. And then you also mentioned some provision | 22　kind of take as being, these services are provided on an |
| 23　related to delivery charges. | 23　arm's length basis, marketplace compensation. |
| 24　　　A. Well, delivery charges, like, utility delivery | 24　　　Q. Okay. Let's talk about Mr. Coleman's correlation |
| Page 103 | Page 105 |

**Page 138**

1 their retail business.
2 Q. Okay. Well, I guess --
3 A. For example, a bunch of the Texas companies have
4 retail supply businesses. We did a little bit on that,
5 but not a major thing. But a bunch of the Texas
6 companies had retail supply businesses that also had
7 substantial other businesses.
8 Q. I think I understand what you're saying. And you
9 didn't work for the retail side of their businesses, you
10 worked for the other side of their businesses?
11 A. Or sometimes we would be hired on some kind of
12 corporate strategy type engagement, which might be
13 pretty broad.
14 Q. Got it. Okay. I thank you for your time and
15 your patience with me.
16 MR. MATTHEWS: I'll pass the witness.
17 A. Thank you.
18 Q. Yes, sir.
19
20 EXAMINATION
21
22 BY MR. WITTELS:
23 Q. Mr. Adamson, I just really have one question for
24 you. You were asked by counsel for XOOM about whether

**Page 139**

1 the company was able to make any profits on its fixed
2 rate customers; do you remember that question?
3 A. Yeah. Not in exact wording, but I remember the
4 question.
5 Q. Yeah. And did you ask me to, whether you could
6 go back and review your report when we had a break?
7 A. Yeah, well -- yes, we were discussing the report.
8 Q. And did you reread paragraph 57?
9 A. Yes.
10 Q. And does that answer the question of whether XOOM
11 made money and was profitable on its fixed rate
12 customers?
13 MR. MATTHEWS: Objection. Leading.
14 A. Well, I just -- it just reminded me there was
15 a -- I had said that there was not a specific P&L, this
16 was a reference in the report to deposition testimony
17 from a XOOM witness about the profitability of this.
18 Q. And what did your report find and state?
19 A. I don't remember exactly how he worded it. I
20 think there had been a, in the deposition there was a
21 question about, it was around, I don't have the
22 transcript in front of me, of course, of the deposition,
23 but it was something around the line of were -- were a
24 fixed rate -- were fixed rate customers profitable for

**Page 140**

1 XOOM or some broad question.
2 Q. And the answer was?
3 A. I believe he said yes, they were, they were both
4 profitable. Both fixed rate and variable rate were
5 profitable.
6 Q. Okay. I have no further questions at this time.
7 Thanks.
8 MR. MATTHEWS: Thanks very much.
9 A. Thank you.
10 VIDEOGRAPHER: The time is 2:39, we are off
11 the record.
12 COURT REPORTER: And, Mr. Matthews, your
13 order?
14 MR. MATTHEWS: My order is an expedited
15 transcript, just, I don't need any print copies.
16 Electronic only. PDF exhibits.
17 COURT REPORTER: Expedite by Friday?
18 MR. MATTHEWS: Yes.
19 (Whereupon, the deposition concluded at
20 approximately 2:39 p.m.)

**Page 141**

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss.

I, Laurie Langer, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 11th day of November, 2022.

NOTARY PUBLIC
Commission Expires
7/27/2023

36 (Pages 138 - 141)

| | |
|---|---|
| 1     DEPOSITION ERRATA SHEET | 1  Steven L. Wittels, Esq. |
| 2 | 2  slw@wittelslaw.com |
| 3  Our Assignment No: 5544017 | 3     November 11, 2022 |
| 4  Case Caption: Mirkin vs. XOOM Energy | 4  RE: Mirkin, Susanna Et. Al. v. XOOM Energy, LLC And XOOM |
| 5 |   Energy New York, LLC |
| 6    DECLARATION UNDER PENALTY OF PERJURY | 5  11/8/2022, Seabron Adamson (#5544017) |
| 7    I declare under penalty of perjury that I have | 6   The above-referenced transcript is available for |
| 8  read the entire transcript of my Deposition taken in the | 7  review. |
| 9  captioned matter or the same has been read to me, and | 8   Within the applicable timeframe, the witness should |
| 10  the same is true and accurate, save and except for | 9  read the testimony to verify its accuracy. If there are |
| 11  changes and/or corrections, if any, as indicated by me | 10  any changes, the witness should note those with the |
| 12  on the DEPOSITION ERRATA SHEET hereof, with the | 11  reason, on the attached Errata Sheet. |
| 13  understanding that I offer these changes as if still | 12   The witness should sign the Acknowledgment of |
| 14  under oath. | 13  Deponent and Errata and return to the deposing attorney. |
| 15    Signed on the_____day of_____2022 | 14  Copies should be sent to all counsel, and to Veritext at |
| 16 | 15  errata-tx@veritext.com. |
| 17  _____ | 16 |
| 18    SEABRON ADAMSON | 17  Return completed errata within 30 days from |
| 19 | 18  receipt of testimony. |
| 20 | 19   If the witness fails to do so within the time |
| 21 | 20  allotted, the transcript may be used as if signed. |
| 22 | 21 |
| 23 | 22     Yours, |
| 24  Job No. HOU5544017 | 23     Veritext Legal Solutions |
|               Page 142 | 24 |
| | 25 |
| |             Page 144 |

| | |
|---|---|
| 1    DEPOSITION ERRATA SHEET | |
|   Job No. HOU5544017 | |
| 2  Page No.____ Line No. ____ Change to:_____ | |
| 3 | |
| 4  Reason for change: _____ | |
| 5  Page No.____ Line No. ____ Change to:_____ | |
| 6 | |
| 7  Reason for change: _____ | |
| 8  Page No.____ Line No. ____ Change to:_____ | |
| 9 | |
| 10  Reason for change: _____ | |
| 11  Page No.____ Line No. ____ Change to:_____ | |
| 12 | |
| 13  Reason for change: _____ | |
| 14  Page No.____ Line No. ____ Change to:_____ | |
| 15 | |
| 16  Reason for change: _____ | |
| 17  Page No.____ Line No. ____ Change to:_____ | |
| 18 | |
| 19  Reason for change: _____ | |
| 20  Page No.____ Line No. ____ Change to:_____ | |
| 21 | |
| 22  Reason for change: _____ | |
| 23  SIGNATURE:_____DATE:_____ | |
| 24    SEABRON ADAMSON | |
|              Page 143 | |

37 (Pages 142 - 144)

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

No. 18 Civ. 2949 (ARR) (RER)

Plaintiffs,

v.

XOOM ENERGY, LLC and XOOM ENERGY
NEW YORK, LLC,

Defendants.

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendants contend that there is no genuine issue to be tried with respect to the following facts:

**A.   Susanna Mirkin contracted with XOOM to receive variable rate electricity service for six months in 2013.**

1.   In March 2013, Susanna Mirkin contracted with XOOM for electricity supply service. Ex. A-8, B. Mirkin Dep. 25:6–27:14.

2.   XOOM confirmed Susanna's enrollment in an email sent on March 13, 2013. *See* Ex. A-20, New Customer Enrollment at 1–2; Ex. A-8, B. Mirkin Dep. 26:20–27:17.

3.   The March 13 email attached the Electricity Sales Agreement between XOOM and Susanna Mirkin (the "Contract"). Ex. A-19, Contract at 1–2.

4.   The Contract included the following terms:

| XOOM SimpleFlex Variable Price Product | Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable.   Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs. You are responsible for all charges assessed and billed by your local utility for all applicable utility charges, which are not included in your rate. |
| --- | --- |

A-58

\*    \*    \*

| Guaranteed Savings | There are no guaranteed savings in this Agreement at this time. |
|---|---|

\*    \*    \*

**AGENCY:** You hereby appoint XOOM Energy as agent for the purposes of (i) acquiring the supplies necessary to meet your electricity needs, and (ii) arranging, contracting for and administering transportation and related services over transmission facilities and those of the LDU needed to deliver electricity to your premises. These services are provided on an arm's length basis and market-based compensation is included in the price noted above.

\*    \*    \*

**CHOICE OF LAWS:** This Agreement shall be governed by the laws of the state of North Carolina without recourse to such states choice of law rules.

*Id.* at 1–3; Ex. A-8, B. Mirkin Dep. 28:4–8; Ex. A-9, S. Mirkin Dep. 72:13–19.

5.      After receiving her enrollment confirmation, Susanna began to receive electricity supply service pursuant to the Contract on May 10, 2013. *See* Ex. A-18, Account Statement at 2.

6.      Susanna continued to receive electricity supply service pursuant to the Contract until the Contract was cancelled without penalty and she began to receive service from Viridian on November 17, 2013. *See id.* at 1; Ex. A-8, B. Mirkin Dep. 38:15–23.

**B.      COGS was the foundation of XOOM's rate-setting procedures.**

7.      At all relevant times, Susanna's rates were set pursuant to XOOM's "spreadsheet-based model." Ex. A-10, Loehde Dep. 59:11–60:2, 65:24–66:10. Under that model, the foundational component of XOOM's rates was a set of calculations that XOOM used to make its "best estimate" of various costs it would incur to supply its consumers with electricity in the upcoming month. *Id.*

8.      The results of those calculations were summarized in documents known as "rate-setting workbooks," which provided a detailed summary of the projected cost components for all of the fixed, variable, and introductory rates XOOM offered in the workbook's area of coverage. *See, e.g.*, Ex. A-11, Loehde Corp. Dep. 186:20–23 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2

A-59



); Ex. A-10, Loehde Dep. 66:18–25 (

); Ex. A-13, Coppola Dep. 263:4–16 (

); Ex. A-12, Park Dep. 120:18–125:25; Ex. 26 to Class Cert. Mem., Exemplar Rate-Setting Workbook; *see also* Ex. A-3, Coleman Rpt. at 22.

9.      However, 

. Ex. A-13, Coppola Dep. 171:11–16; Ex. A-10, Loehde Dep. 51:4–21, 70:5–22, 251:6–22; Ex. A-11, Loehde Corp. Dep. 90:5–91:11; Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15; *see also* Ex. A-11, Loehde Corp. Dep. 263:11–264:5 (

).

10.     The sum of the cost components projected in the rate-setting workbooks was provided as a "Total" figure in the rate-setting workbooks, and that figure can be referred to as "Cost of Goods Sold" or COGS. *See* Ex. A-3, Coleman Rpt. at 4.

11.     COGS was "the foundation of where pricing starts" and the "largest component" of XOOM's variable rate pricing. Ex. A-13, Coppola Dep. 279:1–280:1, 284:14–285:2; *see also* Ex. A-14, Ulry Dep. 51:5–12, 68:13–69:3; Ex. A-10, Loehde Dep. 257:2–10; Ex. A-11, Loehde Corp. Dep. 289:9–290:12; Ex. A-12, Park Dep. 33:10–22, 34:20–35; Ex. A-5, Pls.' Expert Rpt. ¶ 53.

**C.    A margin was added to COGS to yield a final rate.**

12.     After calculating its COGS projections, the next step in XOOM's rate-setting process was to add a margin, which was calculated in the rate-setting workbooks as the percentage

3

A-60

difference between COGS and a rate proposed by analysts on the pricing team. Ex. A-10, Loehde Dep. 51:4–21, 68:2–8, 181:3–18.

13.     Once the margins were added, the rate-setting workbooks were presented to a team of decisionmakers at rate-setting meetings, at which point final rates were set for multiple markets and products. *Id.* at 63:10–13, 64:10–14, 69:6–14, 158:6–159:9; Ex. A-13, Coppola Dep. 70:12–71:3; Ex. A-12, Park Dep. 32:10–19, 87:8–19; Ex. A-15, Chidester Dep. 23:13–18.

**D.     XOOM's margins include prior period adjustments, balancing charges, and all other cost components referenced in the contract.**

14.     The margin in XOOM's rate "is not exclusively related to profit." Ex. A-13, Coppola Dep. 172:24–173:11. Rather, in the context of XOOM's rate-setting procedures, the term "margin" simply meant an "adder" or "a margin over something." *Id.* at 171:11–173:11; Ex. A-12, Park Dep. 44:15–24. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. A-13, Coppola Dep. 171:11–16; Ex. A-10, Loehde Dep. 251:6–22; Ex. A-11, Loehde Corp. Dep. 90:5–91:11; Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15.

15.     For example, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓. Ex. A-10, Loehde Dep. 251:6–22; *see also id.* at 51:4–21, 70:5–71:23, 139:6–23, 209:11–20; Ex. A-11, Loehde Corp. Dep. 284:3–22; Ex. A-13, Coppola Dep. 169:4–170:7, 171:25–172:23, 285:19–25; Ex. A-14, Ulry Dep. 76:12–77:23, 78:11–79:13, 82:15–19, 85:7–17.

16.　███████████████████████████ Ex. A-13, Coppola Dep. 171:11–172:17, ██████████████████████████████████

Ex. A-10, Loehde Dep. 213:23–214:2.

17.　When costs went down but the variable rate went up, it was generally ███████ ███████████████████████████████ Ex. A-13, Coppola Dep. 248:21–24.

18.　Margin could also include ███████████████████████████

████████████████████████████████████████

██████████████████████████████ Ex. A-12, Park Dep. 44:15–45:11, 80:5–81:15; *see also* Ex. A-11, Loehde Corp. Dep. 90:5–91:14 (███████████████████████████); Ex. A-13, Coppola Dep. 280:23–281:9 (███████████████████████████████

███████).

19.　Because a variable rate product is "[f]undamentally . . . different than a fixed rate product," and the two have "a different product term, different costs, et cetera," the margins are different as well. Ex. A-10, Loehde Dep. 118:15–23; *see also id.* 160:22–161:5, 221:24–222:9; Ex. A-13, Coppola Dep. 89:10–17 █████████████████████████████████████

██████████████████████████████████████████████████████);

Ex. A-12, Park Dep. 80:7–14.

20.　Due to the increased volatility of variable rates and the fact that rates are set before actual costs are known, a higher margin in a variable rate may yield less of a profit than a lesser margin in a fixed rate, or even no profit at all. Ex. A-12, Park Dep. 150:3–152:6.

**E.　XOOM did not consider competitive intelligence or sales trends when setting variable rates and considered attrition when implementing prior period adjustments.**

21.　██████████████████████████████████████████

A-62

███████████████████████████████████████████████████████

██████████████████████████████████████████████. Ex. A-10, Loehde

Dep. 61:21–62:3, 75:9–23, 76:24–77:9, 77:11–22, 79:2–12, 82:10–20, 83:8–84:8, 136:22–137:4;

Ex. A-11, Loehde Corp. Dep. 181:4–182:15; Ex. A-12, Park Dep. 83:7–84:10, 102:18–103:23,

107:16–108:2, 110:5–14.

22.    Likewise, ██████████████████████████████████████████

████████████████████████ Ex. A-10, Loehde Dep. 80:4–9; Ex. A-12, Park Dep. 98:16–

99:19.

23.    As to ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ Ex. A-10, Loehde Dep. 85:12–22.

24.    Rather, ██████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. A-10,

Loehde Dep. 85:23–87:14; *see also id.* 209:11–20; Ex. A-14, Ulry Dep. 76:12–77:23, 78:11–

79:13, 82:15–19, 85:7–17; Ex. A-13, Coppola Dep. 169:4–170:7.

25.    Thus, ███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████. Ex. A-10, Loehde Dep. 79:14–80:9, 85:12–87:14, 209:11–20; Ex. A-12, Park Dep.

99:20–100:13, 197:3–199:25; Ex. A-13, Coppola Dep. 169:4–170:7; Ex. A-14, Ulry Dep. 76:12–

77:23, 78:11–79:13, 82:15–19, 85:7–17.

**F.    Susanna's electricity rates were based on COGs.**

26.    For her first month, Susanna had an introductory rate of $12.90 cents/kWh. Ex.

6

A-3, Coleman Rpt. at 14.

27.     Susanna paid variable rates for 5 months. *Id.*

28.     The variable rates during those 5 months rose and fell with the COGs described in XOOM's rate-setting workbooks:



*See* Ex. A-3, Coleman Rpt. at 12. The odds that this near-perfect correlation would occur by chance are less than 1-in-400. *Id.*

29.     While Susanna was a customer, the margin between Susanna's variable rate and the COGs reflected in XOOM's rate-setting workbooks "was approximately 22%[.]" Ex. A-6, Pls.' Rebuttal Rpt. ¶ 31; *see also* Ex. A-3, Coleman Rpt. at 14.

30.     While Susanna was a customer, XOOM's COGS were always the largest component of her monthly rate. *See* Ex. A-5, Pls.' Expert Rpt. ¶ 53.

31.     In 2013, the year Susanna was a customer, XOOM's average electricity supply rate was 11.19 cents/kWh, which was in line with the rates charged by other ESCOs in New York:

A-64



*See* Ex. A, Matthews Decl. ¶¶ 6–7 (providing the judicially noticeable source data from the Energy

Information Administration the ("EIA") that was used to generate this chart); Ex. A-22, Summary

Chart; *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 07 CIV. 10470, 2013 WL

6869410, at *4 (S.D.N.Y. Dec. 30, 2013) (taking judicial notice of an "EIA website report"); *Fed.*

*Election Comm'n v. Hall-Tyner Election Campaign Comm.*, 524 F. Supp. 955, 959 n.7 (S.D.N.Y.

1981) ("Of course, any facts subject to judicial notice may be properly considered in a motion for

summary judgment."), *aff'd*, 678 F.2d 416 (2d Cir. 1982).

**G.    Boris Mirkin never contracted with XOOM for anything, and Susanna Mirkin never contracted with XOOM for natural gas supply service.**

32.    Boris Mirkin never had a contract with XOOM for electricity supply service, so he

was never charged a variable rate for electric supply service by XOOM. *See* Ex. A-8, B. Mirkin

Dep. 27:12–14.

33.     Boris never had a contract with XOOM for natural gas supply service, so he was never charged a variable rate for natural gas supply service by XOOM. *See id.* at 19:4–20:6, 48:16–24; *see also* Ex. A-9, S. Mirkin Dep. 34:10–36:14.

34.     Susanna never had a contract with XOOM for natural gas supply service, so she was never charged a variable rate for natural gas supply service by XOOM. Ex. A-9, S. Mirkin Dep. 36:15–37:10.

35.     Neither of the Mirkins ever had a contact with XOOM Energy, LLC. *See* Ex. A-19, Contract at 1 (identifying "XOOM Energy New York, LLC" and "the Customer" as parties to the Contract, but not XOOM Energy, LLC).

**H.     Oral Argument in the Second Circuit.**

36.     On June 11, 2019, the Second Circuit held oral argument in connection with the Mirkins' appeal from the Court's initial judgment of dismissal. A true and correct recording of that argument is available on the Second Circuit's website. *See* Oral Argument, *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019), *available at* https://www.ca2.uscourts.gov/oral_arguments.html (search for "18-3138" or "Mirkin"); *see also ADP, LLC v. Lynch*, No. CV 2:16-01053, 2019 WL 1149469, at *2 (D.N.J. Mar. 13, 2019) ("The Court takes judicial notice of the recording of the oral argument available on the Third Circuit's website."); *Jackson v. Broad. Music, Inc.*, No. 04 CV 5948 (TPG), 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006), *aff'd*, No. 06-2283-CV, 2007 WL 2914516 (2d Cir. Oct. 5, 2007) (quoting *Harris v. New York State Dep't of Health*, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002) ("[T]he court may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual

9

assertions in a subsequent action[.]'"); *Hall-Tyner Election Campaign Comm.*, 524 F. Supp. at 959 n.7.

37.    At the beginning of the oral argument, the following exchange occurred between Judge Pooler and the Mirkins' counsel:

| | |
|---|---|
| Counsel: | May it please the Court. This is a simple breach of contract case. The Defendants' contract requires that their energy rates be based on the Defendants' supply costs. |
| Judge Pooler: | That's not their only basis, but it is the basis to start the calculation. Is that your argument? |
| Counsel: | No your honor. That is the only basis. The Contract says it's based— |
| Judge Pooler: | Don't they have other things that they say will enter into the cost of the energy? |
| Counsel: | No Your Honor. . . . |

Oral Argument at 0:40–1:18.

38.    Less than a minute later, the following exchange occurred between Judge Pooler and the Mirkins' counsel:

| | |
|---|---|
| Counsel: | The rate that is published and that an energy company such as XOOM pays to purchase energy is composed of dozens of components, most of those components are regulated costs and regulated components, and a balancing cost is one of those components. |
| Judge Pooler: | Does that include their profit, which they're allowed to achieve? Aren't they allowed a margin, over and above these costs? |
| Counsel: | Again your honor, we're not taking the position that they're not allowed a margin. We're taking the position that their rates have to be tied to their supply costs which is what their contract— |
| Pooler: | Tied to, but not identical. Isn't that what your argument is? |
| McInturff: | No Your Honor, our argument—eh, eh—Tied to but not identical, they must reflect their costs. These companies are very lean businesses. They're essentially brokers and traders. They have very low overhead. They buy on the wholesale market and resell to consumers, so the wholesale— |

10

A-67

Pooler:   What you're saying is that the ultimate price to the consumer has to have some relationship to their supply costs.

McInturff:   Correct. And instead, not evidence, of essentially, price gouging, margins that are well in excess of the underlying costs.

Oral Argument at 1:58–3:11.

Dated: March 8, 2023                    MCDOWELL HETHERINGTON LLP

                                        _/s/ Michael D. Matthews, Jr._
                                        Michael D. Matthews, Jr.
                                        Diane S. Wizig (admitted *pro hac vice*)
                                        James M. Chambers (admitted *pro hac vice*)
                                        David L. Villarreal (admitted *pro hac vice*)
                                        MCDOWELL HETHERINGTON LLP
                                        1001 Fannin Street, Suite 2400
                                        Houston, Texas 77002
                                        Telephone: (713) 337-5580
                                        Facsimile: (713) 337-8850
                                        matt.matthews@mhllp.com
                                        diane.wizig@mhllp.com
                                        james.chambers@mhllp.com
                                        david.villarreal@mhllp.com

                                        *Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiffs,

v.

XOOM ENERGY, LLC and XOOM ENERGY
NEW YORK, LLC,

                    Defendants.

No. 18 Civ. 2949 (ARR) (RER)

## CONSOLIDATED
## REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND
## SUR-REPLY IN FURTHER OPPOSITION TO CLASS CERTIFICATION

Rather, under the applicable law, the Mirkins must provide evidence of XOOM's intent "to confer a legally enforceable benefit on" Boris. *Id.*

Here, the only evidence of XOOM's intent is the contract's statement that "[t]here are no third-party beneficiaries." Defs.' MSJ Ex. A-19, Contract at 3. That language "must be construed strictly against" Boris, and it makes "clear that [XOOM] did not intend that [Boris] receive a legally enforceable right under the [C]ontract." *Holshouser*, 518 S.E.2d at 25. Accordingly, Boris's claim fails as a matter of North Carolina law.[19] *Id.* at 25 (affirming summary judgment on a purported third-party beneficiary's contract claim when the relevant contract stated that it did not "confer any rights on any party as a third party beneficiary").

### III. Class Certification Sur-Reply[20]

The Mirkins' opening motion for class certification offered their experts' reports and deposition testimony as their sole evidence of commonality and predominance. When XOOM explained why that evidence was insufficient to meet the Mirkins' Rule 23 burden, the Mirkins attached nearly 300 pages of new evidence to their reply brief meant to satisfy their movant's burden. That evidence does not remedy the problems with the Mirkins' initial showing, but it does raise three new issues that are independently fatal to class certification.

*First*, the Mirkins' new evidence raises myriad questions that would undermine commonality, predominance, and typicality if shown to the factfinder. Each piece of new evidence involves a discrete situation in which XOOM was deciding whether to change rates. To be clear,

---

[19] To avoid this conclusion, the Mirkins cite an unpublished case from this district in which Judge Kuntz concluded that a plaintiff was a third-party beneficiary to an electric supply contract between her spouse an ESCO. *See* Pls.' MSJ Resp. 47. However, Judge Kuntz drew that conclusion under New York law, and he did not address a contract that expressly disclaimed the existence of third-party beneficiaries. *See Donin v. Just Energy Grp. Inc.*, Case No 17-cv-5787 (WFK)(SJB), ECF No. 111 at 8–9. Nothing in that decision suggests that Boris is a third-party beneficiary under the facts of this case and North Carolina law.

[20] This sur-reply is included pursuant to leave of the Court. *See* Text Order, April 7, 2023.

XOOM maintains that this evidence of *how* rates were set is irrelevant to the class claims because XOOM's rates were based on supply costs as a matter of law. And, as discussed, if the ultimate rate was based on supply costs, then XOOM complied with the Contract no how it arrived at the rate. But the Mirkins still advocate for admission of evidence about the underlying discussions and decision-making process. So if the Court rejects XOOM's position and allows the Mirkins to show these emails to the factfinder, then a determination of whether XOOM's rate-setting process involved a decision that violated the contract could not be made without (1) determining what, if any, action was taken based on the discussions reflected in the evidence, (2) which, if any, class members' rates were affected by that action, and (3) whether the action taken was consistent with or violative of the Contract's pricing terms.

For example, the March 19, 2014, email does not support liability because it discusses a decision to ██████████████████████████████████████ with no mention of the variable-rate products at issue in this case, while the February 2, 2017 email does not support liability because it proposed that variable rates should *not* be increased to cover an unanticipated shortfall caused by unseasonable weather. Pls.' Class Cert. Reply Exs. 2, 10. And even if the Mirkins managed to prove that XOOM implemented a particular course of action, they would still have to show whether (and how) the action affected each of the variable rates at issue here, which are set separately each month for every utility territory in New York. *See* Defs.' Class Cert. Resp. 10–11. Absent such evidence, the factfinder could not determine whether the decision impacted the rates at issue as opposed to the dozens of other rates XOOM set for New York and thousands of rates it set for other markets each month. *See id.* at 10–11. If the Mirkins were to present "abundant" evidence of this sort at a class action trial, the proceedings would devolve into an endless series of mini-trials in which the factfinder would have to evaluate individual rate-setting

A-71

decisions. And the results of those trials would only affect the subset of class members in the utility region affected by a given decision in a given month, and those subsets never include Susanna or Boris. The necessity of a "multitude of mini-trials" means that "Rule 23(b)(3)'s predominance requirement has not been met." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 CIV. 7618 KMW HBP, 2004 WL 5719589, at *11 (S.D.N.Y. Mar. 31, 2004) (collecting cases).

*Second*, the new evidence disproves the Mirkins' excuse for advancing models of liability and damages in which other costs and "prior period adjustment costs . . . are [] not represented." *See* Ex. 3 to Class Cert. Mot., Pls.' Expert Rpt. ¶ 63. The Mirkins' experts claimed that omission was justified because ████████████████████████████████████████ ████████████████████████████████████████ *Id.* at ¶ 23(d). However, the Mirkins' reply evidence specifically includes a document that shows other costs were considered in calculating gross margins and calculates prior period adjustments for both electricity and natural gas and shows that they were included in XOOM's gross margin. *See* Pls.' Class Cert. Reply Ex. 15 at XOOM_Mirkin_069062, 069065, 069071 (showing costs considered in gross margin and including prior period adjustments ("PPAs") as a component of a "gross margin analysis"). Thus, if the Mirkins' experts truly could not identify any documents reflecting prior period adjustments, it is not because such documents did not exist or XOOM did not produce them. Rather, it is because the experts failed to assess the impact of "prior period adjustments and other appropriate supply costs that were not captured in the rate-setting workbooks—but *were* identified in the 2013 contract." Defs.' Class Cert. Resp. 25.

*Finally*, the Mirkins' defense of Boris's involvement in this case claims he is "a member of the Class" because he "was charged a variable rate." Pls.' Class Cert. Reply 38. By attempting to include non-accountholders like Boris who did not contract with XOOM in the class definition,

A-72

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 14, 2023, I caused true and accurate copies of the foregoing petition, certificate of compliance, accompanying appendix, and motion information statement to be served by e-mail, in accordance with Federal Rule of Appellate Procedure 25(c)(2), upon the following counsel:

Steven L. Wittels
J. Burkett McInturff
Ethan D. Roman
WITTELS MCINTURFF PALIKOVIC
305 BROADWAY, 7TH FL.
NEW YORK, NEW YORK 10504
Telephone: (914) 775-8862
slw@wittelslaw.com
jbm@wittelslaw.com
edr@wittelslaw.com

Daniel Hymowitz
HYMOWITZ LAW GROUP, PLLC
1629 Sheepshead Bay Road
Brooklyn, NY 11235
Telephone: (718) 807-9900
daniel@hymowitzlaw.com

Andrey Belenky
Dmitry Kheyfits
KHEYFITS BELENKY LLP
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
abelenky@kblit.com
dkheyfits@kblit.com

By: */s/ Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, by email on September 14, 2023, in accordance with Federal Rule of Appellate Procedure 25(c)(2), and by U.S. mail on September 15, 2023, I caused true and accurate copies of the foregoing petition, certificate of compliance, accompanying appendix, and motion information statement to be served upon the following counsel:

Steven L. Wittels
J. Burkett McInturff
Ethan D. Roman
WITTELS MCINTURFF PALIKOVIC
305 BROADWAY, 7TH FL.
NEW YORK, NEW YORK 10504
Telephone: (914) 775-8862
slw@wittelslaw.com
jbm@wittelslaw.com
edr@wittelslaw.com

Daniel Hymowitz
HYMOWITZ LAW GROUP, PLLC
1629 Sheepshead Bay Road
Brooklyn, NY 11235
Telephone: (718) 807-9900
daniel@hymowitzlaw.com

Andrey Belenky
Dmitry Kheyfits
KHEYFITS BELENKY LLP
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
abelenky@kblit.com
dkheyfits@kblit.com

By: */s/* Diane S. Wizig
Diane S. Wizig