UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,<br><br>　　　　　　　Defendants. | No. 18 Civ. 2949 (ARR) (RER) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>MOTION TO STAY PROCEEDINGS PENDING RULE 23(f) PETITION AND APPEAL</u>**

TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. PROCEDURAL AND FACTUAL BACKGROUND............................................................... 3

   A. Plaintiff Survived Dismissal by Promising to Show What XOOM's Rates Should Have Been Under the Contract—But She Never Did. ................................................................. 3

   B. Discovery Showed that XOOM's Monthly Rate-Setting Process Is "Not So Simple," Leading to Denial of Summary Judgment. ........................................................................... 3

   C. An Incorrect Legal Standard Was Employed to Certify the Class. ................................... 4

III. ARGUMENT ............................................................................................................................ 5

   A. XOOM Is Likely to Succeed on Appeal. ............................................................................ 5

      1) The Class Order Applied an Improper Preference for Class Certification. .................. 6

      2) An Overcharge Class Was Certified Despite an Absence of Evidence to Show What XOOM's Rates Should Have Been........................................................................... 7

         a. The Class Order Will Be Reversed Absent Common Proof of Actual Supply Costs ............................................................................................................................. 7

         b. Certification Also Will Be Reversed Because of the Absence of Proof of What a "Reasonable" and "Proportionate" Margin Is. ......................................................... 10

   B. XOOM Will Be Irreparably Harmed Absent a Stay. ....................................................... 12

   C. A Stay Will Not Injure Plaintiff. ...................................................................................... 13

   D. The Public Interest Favors a Stay. ................................................................................... 14

   E. XOOM's Likelihood of Success and the Balance of Hardships Warrant a Stay. ............. 14

IV. CONCLUSION....................................................................................................................... 15

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*In re Apple & ATTM Antitrust Litig.*,
   No. C 07-05152 JW, 2010 WL 11489069 (N.D. Cal. Sept. 15, 2010) ...................................14

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) .....................................................................................................6

*Blair v. Equifax Check Servs., Inc.*,
   181 F.3d 832 (7th Cir. 1999) ................................................................................................13

*Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*,
   86 S.E. 1025 (N.C. 1915) ........................................................................................................7

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) ..............................................................................................................14

*Brown v. Peregrine Enters., Inc.*,
   No. 22 CIV. 1455, 2022 WL 17593321 (S.D.N.Y. Dec. 13, 2022) ......................................13

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
   598 F.3d 30 (2d Cir. 2010) .....................................................................................................6

*Earl v. Boeing Co.*,
   21 F.4th 895 (5th Cir. 2021) .................................................................................................14

*In re Elec. Books Antitrust Litig.*,
   No. 11 MD 2293 (DLC), 2014 WL 1641699 (S.D.N.Y. Apr. 24, 2014) ...............................15

*Hilton v. Braunskill*,
   481 U.S. 770 (1987) ................................................................................................................5

*Johnson v. Nextel Commc'ns Inc.*,
   780 F.3d 128 (2d Cir. 2015) .................................................................................................10

*Kiobel v. Royal Dutch Petroleum Co.*,
   No. 02 CIV. 7618 KMW HBP, 2004 WL 5719589 (S.D.N.Y. Mar. 31, 2004) ....................12

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215, 221 (2d Cir. 2008) ..........................................................................................14

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002) ...............................................................................................12

*Nelson v. G.Skill USA, Inc.*,
   No. 22-CV-6175-FPG, 2023 WL 3300408 (W.D.N.Y. May 8, 2023) ....................................14

*New York Times Co. v. Dep't of Health & Hum. Servs.*,
   No. 20 CIV. 3063, 2021 WL 235138 (S.D.N.Y. Jan. 25, 2021)..................................................6

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)...........................................................................................14, 15

*Readick v. Avis Budget Grp., Inc.*,
   No. 12 CIV. 3988 PGG, 2014 WL 1683799 (S.D.N.Y. Apr. 28, 2014)..................................14

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
   No. 14CIV2590VMRWL, 2018 WL 3830921 (S.D.N.Y. Aug. 13, 2018)..............................15

*Strougo v. Barclays PLC*,
   194 F. Supp. 3d 230 (S.D.N.Y. 2016).....................................................................................15

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
   262 F.3d 134 (2d Cir. 2001)...................................................................................6, 7, 12, 13

*Sutherland v. Ernst & Young LLP*,
   856 F. Supp. 2d 638 (S.D.N.Y. 2012).....................................................................................13

*Thapa v. Gonzales*,
   460 F.3d 323 (2d Cir. 2006)......................................................................................................5

*U.S. SEC v. Citigroup Global Markets Inc.*,
   673 F.3d 158 (2d Cir. 2012)......................................................................................................5

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..............................................................................................................7, 10

**Other Authorities**

Fed. R. Civ. P Rule 23 ................................................................................................... *passim*

## I. PRELIMINARY STATEMENT

This case warrants a stay while the Second Circuit considers XOOM's Rule 23(f) Petition and appeal. XOOM does not merely disagree with the certification Order's reasoning or argue it was an abuse of discretion. Rather, this is the rare case that raises a substantial legal question that should be resolved now: Did the Order employ the wrong legal standard when it adopted a "preference" for and "err[ed] on the side of" certification? The answer to that question is 'yes,' which means the appeal will be subject to *de novo* review. And XOOM is likely to succeed on its Petition and appeal because the Court's improper standard led to certification despite an absence of evidence on liability or damages for a class encompassing 5,700+ unique rate-setting decisions.

An 'absence of evidence' is not hyperbole. Plaintiff does not have evidence to establish or measure any overcharge even as to her individual claim, much less common proof for the class. In fact, she openly refuses to say what her rates should have been during her six months as a customer in 2013. And although the Court construed XOOM's contract to allow a "reasonable" and "proportionate" margin on top of its costs, Plaintiff has never said what a "reasonable" or "proportionate" margin is. Instead, Plaintiff punts, saying the jury can just pick whatever margin it thinks XOOM should have charged based on no evidence at all. But that is backwards: a jury cannot say what the rates should have been unless Plaintiff first submits admissible evidence on that point. Nor can she rely on expert testimony for the margin because her expert testified he is ***not*** offering an opinion about what a "reasonable" margin might be. Plaintiff cannot sustain her burden at trial by simply asking the jury to invent a margin out of thin air. This problem—a complete lack of proof—is pervasive across the class for the entire ten-year period (and counting).

But that is not Plaintiff's only Rule 23 problem. The Court's contract construction at summary judgment means individualized rate-setting issues will predominate too. The Court construed XOOM's contract to mean every rate must "be determined by XOOM's actual and

1

estimated supply costs—and only those costs." And while the Court acknowledged that "XOOM decisionmakers clearly considered supply costs when setting rates," it found fact questions about whether the supply costs *determined* any rate, leaving Plaintiff to prove rate-determination issues to the jury. The Court's construction necessarily requires thousands of inquiries into whether each rate was determined by XOOM's actual and estimated supply costs because XOOM sets four electricity rates in seven utility zones and two natural gas rates in eight utility zones monthly:

$$\begin{aligned} &\mathbf{4} \text{ } \textit{electricity products} \text{ x } \mathbf{7} \text{ } \textit{electricity utility zones} \\ &+ \mathbf{2} \text{ } \textit{gas products} \text{ x } \mathbf{8} \text{ } \textit{gas utility zones} \\ &\text{x } \mathbf{130} \text{ } \textit{months} \\ &= \mathbf{5{,}720} \text{ rate decisions for the jury} \end{aligned}$$

It is undisputed that none of these rates was set according to a formula or standardized methodology. Instead, each month, forty-four rates were set through an iterative process that took voluminous supply cost data from a variety of sources which was then considered by a number of people who applied their judgment to analyze and weigh it in ways that differed each month based on estimates about the coming month (*i.e.*, estimated supply costs) and adjustments for prior ones (*i.e.*, actual supply costs). There is simply no evidence that could enable a factfinder to decide, in one stroke, what "determined" each rate—much less to calculate an alternative rate that XOOM supposedly should have charged. XOOM's appeal is likely to succeed for this reason too.

  A stay is also appropriate because the balance of hardships tilts decidedly in XOOM's favor. A stay cannot harm Plaintiff or the class, who can request prejudgment interest. But, without a stay, XOOM will have to prepare for 5,700+ mini-trials and endure reputational harm from the class notice process—all before the Second Circuit weighs in. And if the Petition is granted and certification reversed, these efforts will have been wasted and class members left confused by an unnecessary notice process.

## II.  PROCEDURAL AND FACTUAL BACKGROUND

**A.  Plaintiff Survived Dismissal by Promising to Show What XOOM's Rates Should Have Been Under the Contract—But She Never Did.**

Plaintiff Susanna Mirkin purchased variable-rate residential electricity from XOOM in Brooklyn for six months in 2013. Ex. A (Class Order) at 2. Five years later, she filed this case on behalf of customers who purchased any of twenty-eight different electricity products (clean or standard, residential or commercial, in one of seven utility zones) or sixteen natural gas products (residential or commercial, in one of eight utility zones) since 2013. *See, e.g., id.* at 2–3.

Plaintiff survived dismissal by promising that, "[w]ith discovery of XOOM's actual costs and profits," she would "show[] what XOOM's prices should have been under the terms of its customer contract." Doc. 42 (FAC) ¶ 58; *see also* Doc. 41-1. But after years of discovery, including complete access to XOOM's records of its supply costs, Plaintiff still refuses to say what any one of XOOM's rates should have been, other than 'lower.' She now insists the jury should be allowed to make up those figures without evidence—in other words, arbitrarily.

**B.  Discovery Showed that XOOM's Monthly Rate-Setting Process Is "Not So Simple," Leading to Denial of Summary Judgment.**

On summary judgment, the Court construed Plaintiff's contract to mean that XOOM's "monthly variable rates" would "be determined by XOOM's actual and estimated supply costs— and only those costs" as well as "a reasonable margin" that remained "proportionate" to those costs, Ex. B (SJ Order) at 12, 13, a construction with four permissible rate-setting variables:

| | COSTS | | | | | + | MARGIN |
|---|---|---|---|---|---|---|---|
| | 1 | | 2 | | 3 | | 4 |
| *Determined by* | Actual supply costs | *and* | Estimated supply costs | *which may include* | Prior period adjustments | *Plus* | "Reasonable" and "proportionate" margin |

3

The Court found that XOOM presented ample evidence of these variables showing that XOOM "clearly considered supply costs when setting rates," that its estimated costs were "always the largest [rate] component" and were closely correlated to the rates, and that "ample testimonial evidence support[ed] the general proposition that prior period adjustments were included in the margin and therefore responsible for rate fluctuations." SJ Order at 15, 14, 16. But it found fact questions in XOOM's evidence about whether those cost considerations "determined" the rates.

At trial, the burden will flip. The Court's construction necessarily means that Plaintiff will now have the burden to show that each of XOOM's 5,700+ rates was determined by something *other* than these four permissible variables—and what the resulting rate **should have been**. Plaintiff admittedly has proof only of XOOM's estimated supply costs (variable 1) in the form of XOOM's rate-setting workbooks. But it is undisputed those workbooks did not capture the actual supply costs (variable 2), including prior period adjustments (variable 3) that XOOM was allowed to consider and, evidence shows, did consider. *Id.* at 2–4; *id.* at 16. And Plaintiff has no proposal for how to calculate variable four: a reasonable and proportionate margin. *Id.* at 15.

C.  **An Incorrect Legal Standard Was Employed to Certify the Class.**

The summary judgment conclusion that no uniform, comprehensive evidence exists of the actual costs and prior period adjustments XOOM considered in rate-setting should have doomed class certification. That lack of proof means the "central" question of whether the rates included an overcharge cannot be answered in one stroke. At certification, Plaintiff should not have prevailed by simply claiming there was a gap in the evidence. Rather, she needed to submit common proof a jury could use to conclude that XOOM's rates—across the board—included an overcharge because they were "determined" by something other than its actual supply costs, estimated supply costs, and prior period adjustments plus a "reasonable" and "proportionate" margin. But the Class Order does not assess whether a jury could determine what any of the 5,700+

4

rates *should have been* or whether any rate included an overcharge. Instead, the class was certified based on an admitted preference for certification. Ex. A (Class Order) at 7.

Nor did the Class Order hold Plaintiff to her Rule 23 burden to show that individualized issues of fact would not predominate—a burden she could not meet. XOOM, in contrast, submitted significant evidence undermining predominance. But rather than take the requisite close look at the record or hold Plaintiff to her burden, the Class Order improperly faulted XOOM for not making its affirmative showing on *summary judgment*. *See, e.g., id.* at 13 n.6.

The certified class now encompasses thousands of rate-setting decisions, each with unique supply costs and varying considerations. Given that Plaintiff's contract claim now hinges on "the process by which XOOM set rates," Ex. B (SJ Order) at 3, there can be no dispute that individual issues will predominate as to each of those rate-setting decisions at trial. And despite bringing an overcharge claim, Plaintiff still refuses to say what any one of the 5,700+ rates should have been.

### III.   ARGUMENT

Rule 23(f) permits a district court to stay proceedings when a party seeks to appeal a class-certification decision. Courts consider four factors: (1) likelihood of success on the merits; (2) irreparable harm to the applicant; (3) harm to other interested parties; and (4) the public interest. *U.S. SEC v. Citigroup Global Markets Inc.*, 673 F.3d 158, 162–163 (2d Cir. 2012) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). These factors are assessed on a "sliding scale," meaning "more of one excuses less of the other." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (quotation marks and citations omitted). A stay "should issue" when the movant shows even "some possibility of success" and "the balance of hardships tips decidedly in [its] favor." *Id*. at 335.

**A.     XOOM Is Likely to Succeed on Appeal.**

"'The Second Circuit has long recognized that the 'likelihood of success on the merits' that is required for . . . a stay can be satisfied if there are 'serious questions' going to the merits of the

5

dispute . . . .'" *New York Times Co. v. Dep't of Health & Hum. Servs.*, No. 20 CIV. 3063, 2021 WL 235138, at *1 (S.D.N.Y. Jan. 25, 2021) (quoting, *inter alia*, *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).

XOOM's Petition raises such serious questions. The Class Order is premised on the two types of errors the Second Circuit says "warrant interlocutory review." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139–140 (2d Cir. 2001). First, it expressed **and applied** an improper (but oft-repeated) preference for class certification. Correction of that error is "of fundamental importance to the development of the law of class actions . . . ." *Id.* at 139. Second, certification will "be inevitably reversed by th[e Second Circuit] on appeal after final judgment" because Plaintiff cannot prove her overcharge claim without any evidence (common or otherwise) from which liability or damages can be determined and because of predominant individualized issues about rate-setting. Immediate appeal is "particularly appropriate" to "spare the parties and the district court the expense and burden of litigating the matter to final judgment . . . ." *Id*. at 140.

### 1) The Class Order Applied an Improper Preference for Class Certification.

First, as discussed in XOOM's 23(f) briefing, Exs. C, D,[1] the Court improperly professed and displayed "a general preference" for, and a "tend[ency] to err on the side of," certification. Ex. A (Class Order) at 5, 7. Plaintiff has not denied that the standard was incorrect. Instead, she has argued that there is "no proof" the Class Order applied that incorrect standard. *See* Doc. 155-1 (23(f) Answer) at 12. But Plaintiff does not say why the Second Circuit would not "take the district court at its word" on that point. *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 96 (2d Cir. 2023). And as discussed further below, certification of the class despite Plaintiff's lack of common proof on actual supply costs or a reasonable margin, as well as the predominance

---

[1] The reasons XOOM will succeed on appeal are explained more thoroughly in its Rule 23(f) Petition and proposed Reply. *See* Exs. C and D, incorporated herein by reference.

of individual rate-determination issues, shows that the improper legal standard was determinative.

Although binding Supreme Court and Second Circuit precedent prohibit putting a thumb on the scale in favor of certification, *see* Ex. C (Petition) at 1, district courts within the Second Circuit repeatedly express a preference for class certification. Because the oft-repeated but wrong standard employed by the Court has thus far "escape[d] effective review," the issue is ripe for interlocutory review. *Sumitomo*, 262 F.3d at 140. Nothing could be of more "fundamental importance to the development of the law of class actions" than the appropriate standard. *Id.*

### 2) An Overcharge Class Was Certified Despite an Absence of Evidence to Show What XOOM's Rates Should Have Been.

When viewed through the lens of the appropriate legal standard on *de novo* review, the Class Order will inevitably be reversed. Plaintiff brings an overcharge claim but has no common proof that every rate included an overcharge (*i.e.*, liability) or its amount (*i.e.*, damages). This is not a failure she can remedy for two fundamental reasons: (a) first, there is no common proof as to how actual supply costs, including prior period adjustments, impacted each rate, and (b) second, she has no evidence of what a reasonable and proportionate margin might be, for her or the class.

### a. The Class Order Will Be Reversed Absent Common Proof of Actual Supply Costs.

To prevail on a contract claim, a plaintiff alleging an overcharge must prove that "the amount charged by a defendant was in excess" of the amount she should have been charged. *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86 S.E. 1025, 1026 (N.C. 1915). Plaintiff therefore will need to furnish proof to allow a factfinder to adjudicate the ***existence*** and ***amount*** of the alleged overcharge in her six rates to prevail on her individual claim. She has never tried.

The problem that this failure of proof creates is magnified thousands of times over for the class. Plaintiff needed to show she has evidence to prove an overcharge in XOOM's 5,700+ rates "in one stroke" to satisfy commonality and predominance. *Wal-Mart Stores, Inc. v. Dukes*, 564

7

U.S. 338, 350 (2011). In lieu of such common proof, Plaintiff offered only a damage model derived from XOOM's "rate-setting worksheets." But as the Court recognized, those worksheets do not reflect the actual supply costs that XOOM was entitled to, and did, consider, including prior period adjustments. Ex. B (SJ Order) at 4–5. The Court specifically found that XOOM had "present[ed] ample testimonial evidence supporting the general proposition that prior period adjustments were included in the margin and therefore responsible for rate fluctuations," and that, though not reduced to a line-item on the rate-setting workbooks, prior period adjustments were incorporated as part of XOOM's budgeting process. *Id.* at 16–17. In other words, as to XOOM's permissible cost-components, Plaintiff has evidence of only one of three variables:

| | 1 | | 2 | | 3 |
|---|---|---|---|---|---|
| Determined by | Actual supply costs | and | Estimated supply costs | which may include | Prior period adjustments |

Plaintiff's model therefore cannot "in one stroke" answer the central question of liability: whether XOOM's rates included an overcharge. To establish whether any one rate was properly determined by actual supply costs, including prior period adjustments, the parties will have to call one or more of the multiple witnesses from the rate-setting meeting in question to discuss any impact that actual supply costs had on the rate for the particular product and zone, including discussion of the rate-setting worksheet and emails, for each of 5,700+ rates. In short, the totality of XOOM's supply costs, and their impact on each rate, can be determined at trial only with voluminous product- and month-specific documentary and testimonial evidence. *Id.* at 16.

That determination will be difficult at best. As the Court recognized, XOOM's supply cost considerations are complex. They varied substantially—and not just in amount. Indeed, the "estimated and actual supply costs for [electricity and natural gas] each are material[ly] different":

8



Ex. E (XOOM Expert Report) at 22. Supply costs also differ by utility zone, as shown by XOOM's estimated supply costs and corresponding rates for standard residential electricity and natural gas:



*Id.* at 15-17, 23-25. This also shows that supply costs varied, often markedly, over time too.

And just as *estimated* supply costs vary across product, time, and place, the record shows that *actual* supply costs varied too.[2] The impact that actual costs arising out of the 2014 Polar

---

[2] XOOM's expert explained why companies like XOOM "often need to set rates for the upcoming month based on estimated, as opposed to actual, supply costs" and only subsequently incorporate "prior period adjustments":
> These [supply cost] estimates will generally differ from the actual supply costs, which are only known with certainty after the rate period has passed. . . . 'Prior period adjustments' simply refers to the commonplace practice of considering differences between what costs were previously estimated and what they turned out to be. . . . Prior period adjustments may lead to changes in rates that may not obviously track contemporaneous supply cost estimates but are nonetheless reflections of prior period supply costs.

Ex. F (XOOM Expert Rebuttal Report) at 8.

9

Vortex had on subsequent rates proves the point. It is undisputed that the Polar Vortex caused XOOM's costs to "increase[] . . . suddenly," and XOOM recovered those increased actual costs over time through prior period adjustments. Ex. G (Loehde Dep.) 85:23–87:9, 209:11–20; Ex. H (Coppola Dep.) 155:16–25, 170:12–19; Ex. I (Ulry Dep.) 76:12–77:23. Yet, Plaintiff's damage model does not account for such variations, nor does it account for the fact that those increased actual costs incurred in 2014 could not have affected the rates of Plaintiff in 2013 or the vast majority of rates charged in the nearly ten years since that extreme weather event.

Thus, neither liability nor damages can be resolved "in one stroke," and so commonality and predominance cannot be met as a matter of law. *Dukes*, 564 U.S. at 350; *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 147 (2d Cir. 2015). Plaintiff's briefing to date has attempted to sidestep this problem by arguing that this case involves an ordinary breach-of-contract claim that is susceptible to common proof. Not so. The individual issues arise not from interpretation of uniform contract terms, but the decidedly varying question of whether each of the 5,700+ rates contained an overcharge or if they were simply based on XOOM's supply costs plus a margin.

    b. <u>Certification Also Will Be Reversed Because of the Absence of Proof of What a "Reasonable" and "Proportionate" Margin Is.</u>

Although the Court held that XOOM could include a "reasonable" and "proportionate" margin in its rates, Plaintiff admits she is offering no relevant evidence that could allow a jury to conclude what such a margin would be. So, Plaintiff admittedly has *no* admissible evidence—common or otherwise—of three of the four permissible rate-setting variables:

| Determined by | 1<br>Actual supply costs | and | 2<br>Estimated supply costs | which may include | 3<br>Prior period adjustments | Plus | 4<br>"Reasonable" and "proportionate" margin |
|---|---|---|---|---|---|---|---|

In response, Plaintiff has pointed only to her damage model that includes a single *illustrative* margin: the *average* of what her expert calculated XOOM's *fluctuating* fixed-rate residential electricity margins to be. It does not account for variations in commodity, product, place, or time. Nor is it relevant evidence of a reasonable margin. Indeed, Plaintiff's expert readily concedes his model is not representative of a reasonable margin because he is ***not*** offering an opinion on what a reasonable margin would be:

> Q. Are you offering an opinion about what is an acceptable or appropriate, **a reasonable margin** aside from just using XOOM's fixed rate margin [as a "proxy of what might be an acceptable margin"]?
>
> A. **We haven't offered that opinion**, we don't have any information to do that.

Ex. J (Pl.'s Expert Dep) at 70:22-71:2. He also conceded that he would not be able to offer an opinion about a reasonable margin at trial:

> Q. You've said that it will be for the Court to decide whether a margin can be charged and if so what's appropriate; right?
>
> A. Right.
>
> Q. And if we go to trial--and you take the witness stand--and I'm asking you questions and the judge gets frustrated with my questions and says "**Let's cut to the chase. Mr. Adamson, what do you think is an appropriate margin for an ESCO to charge**." What would your answer be?
>
> A. I would say conceptually it's got to be related to the, related to the costs. And in a broad conceptual basis.
>
> Q. And if [the judge] said, "But can you give me a cutoff point? Is there a number that you can assign to that?" Would you be able to give her one?
>
> A. **I wouldn't be able to give [her] a number on the stand** because I wouldn't have the, XOOM's internal information, no.

11

*Id.* 71:8-72:7 (cleaned up). And XOOM information aside, he likewise conceded he could not provide a general industry opinion about an "ESCO number for variable rates that in [his] opinion would be a cap on what is an appropriate or reasonable margin," stating "I don't have a number to give you" and agreeing that he "would not be able to create one." *Id.* 73:8-74:10. So, it is not just that an appropriate margin cannot be determined "in one stroke," as Rule 23 requires. Plaintiff's lack of proof means it cannot be determined at all.

In fact, Plaintiff has repeatedly acknowledged her failure of proof by insisting that she need not offer any evidence of a permissible margin. She says the *jury* will supply that number. But juries can make only findings that are supported by admissible evidence. The jury will not be able to invent a margin to save Plaintiff from her evidentiary failure.

\* \* \*

These fundamental errors in the Class Order mean that XOOM has a strong likelihood of prevailing on appeal and the Court should stay proceedings pending that process. *Cf. Kiobel v. Royal Dutch Petroleum Co.*, No. 02 CIV. 7618 KMW HBP, 2004 WL 5719589, at *11 (S.D.N.Y. Mar. 31, 2004) (A "multitude of [100+] mini-trials" means that "Rule 23(b)(3)'s predominance requirement has not been met." (citing, *inter alia*, *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002)); *see Sumitomo*, 262 F.3d at 140 (holding stay may issue if "likelihood of error on the part of the district court tips the balance of hardships in favor of the party seeking the stay").

**B.      XOOM Will Be Irreparably Harmed Absent a Stay.**

Although litigation costs do not typically constitute irreparable harm, this case is extraordinary. Certification multiplied the scope and cost of trial a thousandfold because, instead of focusing on Plaintiff's *six* variable rates, there will be *5,700+* mini-trials. Voluminous rate-specific documentary and testimonial evidence from over a decade will be required. *See, e.g.,* Ex. G (Loehde Dep.), at 63:23-65:9 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████

███████████████████████████████████████

███████████████████). Moreover, it is entirely unclear at this point how liability or damages can even be tried without evidence of an overcharge. Thus, the stakes of this Class Order, which increased the burden by orders of magnitude, warrant a stay. *See Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 835 (7th Cir. 1999) ("[A] stay would depend on a demonstration that the probability of error in the class certification decision is high enough that the costs of pressing ahead in the district court exceed the costs of waiting.").

Absent a stay, XOOM also will be forced to prepare motions to decertify the class and to exclude Plaintiff's experts—all without the benefit of the Second Circuit's guidance. Further, the burden of preparing for and trying thousands of factual issues will put undue pressure on XOOM to settle despite meritorious arguments against certification and the underlying claim. *See Blair*, 181 F.3d at 834 ("[A] grant of class status can put considerable pressure on the defendant to settle, even when the plaintiff's probability of success on the merits is slight"); *Sumitomo*, 262 F.3d 140.

**C.    A Stay Will Not Injure Plaintiff.**

In contrast, a stay would impose no harm on Plaintiff or the class. If the Second Circuit rules in XOOM's favor, Plaintiff will have avoided the expense of class notice, pretrial motions, and trial. And if the class proceeds, Plaintiff and the class could request prejudgment interest to compensate for any delay. *Brown v. Peregrine Enters., Inc.*, No. 22 CIV. 1455, 2022 WL 17593321, at *4 (S.D.N.Y. Dec. 13, 2022) (granting stay pending appeal where, *inter alia*, "Plaintiffs' monetary harm could be 'fully remedied by an award of pre-judgment interest'") (quoting *Sutherland v. Ernst & Young LLP*, 856 F. Supp. 2d 638, 643 (S.D.N.Y. 2012)).

Plaintiff cannot reasonably claim that a delay of a few months while the Second Circuit considers the fully briefed Rule 23(f) Petition will prejudice her when she waited ***five years*** to file

13

this case. Indeed, in the interim, she sued the ESCO that sold her electricity *after* XOOM, eventually settling the case on a class basis. *See Mirkin v. Viridian Energy, Inc.*, (D. Conn.) No. 3:15-CV-1057, Doc. 1 (Complaint) ¶ 27 (alleging in 2015 that the Mirkins paid Viridian's rates in July 2014). And as to the class members, a stay will inure to their benefit because it will limit the confusion that might arise if class notice is sent prior to consideration of XOOM's Petition.

D.   **The Public Interest Favors a Stay.**

As district courts regularly hold, proceeding while an appeal is pending is likely to waste significant judicial resources. *See, e.g.*, *Nelson v. G.Skill USA, Inc.*, No. 22-CV-6175-FPG, 2023 WL 3300408, at *6 (W.D.N.Y. May 8, 2023) ("Considerations of judicial economy are frequently viewed as relevant to the public interest" and "weigh against the investment of court resources that may prove to have been unnecessary."); *Readick v. Avis Budget Grp., Inc.*, No. 12 CIV. 3988 PGG, 2014 WL 1683799, at *6 (S.D.N.Y. Apr. 28, 2014) (same); *see also Earl v. Boeing Co.*, 21 F.4th 895, 900 (5th Cir. 2021) ("[T]he public interest supports staying district court proceedings to avoid potentially wasteful and unnecessary litigation costs where, as here, the appellant has shown a substantial likelihood of success on appeal."). This stay would also eliminate "the risk of significantly confusing the class consumers." *In re Apple & ATTM Antitrust Litig.*, No. C 07-05152 JW, 2010 WL 11489069, at *3 (N.D. Cal. Sept. 15, 2010). The public interest favors a stay.

E.   **XOOM's Likelihood of Success and the Balance of Hardships Warrant a Stay.**

Because XOOM has raised substantial legal questions as to whether the Class Order was erroneous, and the balance of hardships tips decidedly in favor of a stay, the Court should enter a stay. *See In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (noting stay pending resolution of Rule 23(f) appeal); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 221 (2d Cir. 2008) (noting, in opinion decertifying class, that the court had stayed proceedings below) (*partially abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).

Plaintiff has argued that, because all available opinions from Second Circuit district courts have denied opposed Rule 23(f) motions to stay in recent years, XOOM's motion should be denied too. But Plaintiff's cases are inapposite. None involved "questionable" class orders based on erroneous legal standards, decisions that implicated issues fundamental to class action litigation that frequently evade review, or classes that would necessitate thousands of mini-trials. All involved Rule 23(f) petitions seeking abuse of discretion rather than *de novo* review. And many involved unusual circumstances that made continuation of the case inevitable—like *Strougo v. Barclays PLC*, 194 F. Supp. 3d 230, 233–35 (S.D.N.Y. 2016), where the defendants did not even "address the merits of their appeal regarding class certification," and plaintiffs "represented that they intend[ed] to continue th[e] action even on an individual basis;" or *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2014 WL 1641699, at **12–13 (S.D.N.Y. Apr. 24, 2014), where class notice had already issued and trial was three months away; or *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, No. 14CIV2590VMRWL, 2018 WL 3830921, at *1 (S.D.N.Y. Aug. 13, 2018), where the Second Circuit had already "thrice denied Rule 23(f) petitions" in "very similar" cases.

Plaintiff acknowledges in her premotion letter, as she must, that the Second Circuit itself recently granted a stay pending appeal in *Petrobras*. The fact that the appeal in that case was expedited does not alter the significance of the stay. It shows that the Second Circuit has recently affirmed that a stay can and should be granted where, as here and in *Petrobas*, a defendant pursuing a Rule 23(f) appeal has shown it is likely to succeed and the balance of hardships tilts in its favor.

### IV. CONCLUSION

For these reasons, the Court should stay proceedings pending resolution of XOOM's Rule 23(f) Petition and, if granted, appeal of the Class Order.

| | |
|---|---|
| Dated: November 6, 2023 | MCDOWELL HETHERINGTON LLP |
| | */s/ Michael D. Matthews, Jr* |

15

>Michael D. Matthews, Jr.
>Diane S. Wizig (admitted *pro hac vice*)
>James M. Chambers (admitted *pro hac vice*)
>David L. Villarreal (admitted *pro hac vice*)
>MCDOWELL HETHERINGTON LLP
>1001 Fannin Street, Suite 2400
>Houston, Texas 77002
>Telephone: (713) 337-5580
>Facsimile: (713) 337-8850
>matt.matthews@mhllp.com
>diane.wizig@mhllp.com
>james.chambers@mhllp.com
>david.villarreal@mhllp.com
>
>*Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*