MDM Declaration Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated, | |
| *Plaintiffs*, | 18-CV-2949 (ARR) (RER) |
| -against- | **OPINION & ORDER** |
| XOOM ENERGY, LLC, and XOOM ENERGY NEW YORK, LLC, | |
| *Defendants*. | |

ROSS, United States District Judge:

Plaintiffs Susanna Mirkin and Boris Mirkin, a married couple residing together in Brooklyn, bring this putative class action against defendants XOOM Energy, LLC, and XOOM Energy New York, LLC (collectively, "XOOM"). XOOM, an independent energy service company ("ESCO"), provided residential electricity to the Mirkins for six months at a variable rate pursuant to a March 2013 contract with Susanna Mirkin. The Mirkins' amended complaint asserts a claim for breach of that contract, alleging that XOOM charged them exorbitant rates. Following discovery, XOOM moved for summary judgment, principally arguing that it had no contract with Boris Mirkin and that it did not breach its contract with Susanna Mirkin. For the following reasons, I grant the motion as to Boris Mirkin and deny it as to Susanna Mirkin.

## BACKGROUND[1]

### *Factual Background*

In 1996, New York deregulated its energy markets with the goal of fostering competition and lowering rates for consumers. Pls.' 56.1 ¶¶ 48–50. Deregulation allowed the proliferation of ESCOs like XOOM, which purchase energy from producers on the wholesale market and sell it to consumers. *Id.* ¶¶ 51–52. ESCOs are essentially middlemen—unlike utilities, they do not generate or deliver electricity. *Id.* ¶ 52.

In March 2013, Boris Mirkin applied under his wife's name to receive residential electricity service through XOOM's SimpleFlex variable rate plan. Pls.' 56.1, at 2. XOOM sent Boris a new customer enrollment email stating that the Mirkins' electricity service would be switched to XOOM following approval of the enrollment application and that they would receive electricity at an introductory (or "teaser") rate of $0.0899 per kWh. Decl. of Steven L. Wittels in Opp'n to Mot. for Summ. J. ("Wittels Decl."), Ex. 1 ("Enrollment Email & ESA"), at 1–2, ECF 147-2. The email attached a copy of an Electricity Sales Agreement ("ESA" or "contract"), which described the company's pricing policies and services. *Id.* at 4–6. The ESA contained several terms that are relevant to the present motion. First, and most importantly, it stated:

> Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable. Your monthly variable rate is

---

[1] The background facts, which are viewed in the light most favorable to the non-movants, are drawn from the parties' submissions in connection with the motion for summary judgment, including Defendants' Local Rule 56.1 Statement ("Defs.' 56.1"), ECF No. 146-25 (filed under seal), Plaintiffs' Local Rule 56.1 Counterstatement ("Pl.'s 56.1"), ECF No. 148-52 (filed under seal), and Defendants' Response to Plaintiffs' Local Rule 56.1 Statement of Additional Material Facts ("Defs.' 56.1 Response"), ECF No. 150-1 (filed under seal).

Many of the documents supporting summary judgment have been filed under seal pursuant to a discovery confidentiality order, *see* ECF No. 48-1; they are hereby deemed unsealed to the extent that their contents are quoted or described in this order.

> *based on XOOM's actual and estimated supply costs* which may include but not
> be limited to prior period adjustments, inventory and balancing costs.

*Id.* at 4 (emphasis added). The contract also provided that "[t]here are no guaranteed savings in this Agreement at this time." *Id.* On the next page, under a header labeled "AGENCY," the contract stated:

> You hereby appoint XOOM Energy as agent for the purposes of (i) acquiring the
> supplies necessary to meet your electricity needs, and (ii) arranging, contracting for
> and administering transportation and related services over transmission facilities
> and those of the [Local Distribution Utility ("LDU")] needed to deliver electricity
> to your premises. These services are provided on an arm's length basis and market-
> based compensation is included in the price noted above.

*Id.* at 5. Finally, a choice of law provision designates North Carolina law as governing the contract. *Id.* at 6.

XOOM began providing the Mirkins with electricity two months later, in May 2013. Defs.' 56.1 ¶¶ 1, 5. After the first month's teaser rate, the rate increased and fluctuated at higher levels from then on.[2] Am. Compl. ¶ 43, ECF No. 42; Pls.' 56.1 ¶ 44, at 55.[3] The Mirkins canceled their XOOM energy service in November 2013, after six months. Defs.' 56.1 ¶ 6.

Because the Mirkins claim that XOOM violated the agreement to set its rates based on actual and estimated supply costs, the process by which XOOM set rates is of central importance. At a high level, XOOM set its variable rates by calculating or estimating the cost of procuring energy for its customers and adding a markup, or margin, to that cost, thereby producing the rate

---

[2] Though the ESA stated the Mirkins would be charged a teaser rate of $.0899 per kWh, Am. Compl. ¶¶ 41–43; Answer ¶ 43, the parties apparently agree that the rate for the first month of service was $.1290 per kWh, Pls.' 56.1, at 39.

[3] Plaintiffs' Local Rule 56.1 statement of additional material facts repeats certain numbered paragraphs. *See* Pls.' 56.1, at 55–58. Where a duplicated paragraph number is cited, I have included the page number for clarity.

3

charged to customers' monthly bills. In reality, the process was not so simple, and the parties disagree about how XOOM ultimately determined the monthly rates.

However, a few aspects of the process are beyond peradventure. XOOM utilized spreadsheets to estimate and calculate certain costs of procuring electricity. Defs.' 56.1 ¶ 7. These cost calculations were aggregated in "rate-setting workbooks" that summarized the projected costs for each of XOOM's products. *Id.* ¶ 8. The rate-setting workbooks listed the sum of projected cost components under the label "Total Cost," a figure XOOM also refers to as the "Cost of Goods Sold" or "COGS." *Id.* ¶ 10. After determining the Total Cost figure, analysts on the pricing team proposed a rate. *Id.* ¶ 12. The percentage difference between the proposed rate and COGS comprised the margin. *Id.* Rates were eventually finalized for multiple markets and products by a team of decisionmakers at a rate-setting meeting. *Id.* ¶ 13.

It is important to clarify that the Total Cost or COGS number may not represent XOOM's "actual and estimated supply costs," as that term is used in the contract, because the parties dispute whether all supply cost components were included in the Total Cost. XOOM says that prior period adjustments,[4] balancing charges, risk premiums, broker and sales channel costs, and other "non-supply costs" were accounted for in a separate budgeting process[5] and added to the margin. Defs.'

---

[4] "Prior period adjustments" refers to the practice of raising rates in future months to recover unanticipated costs over time. Mem. in Support Mot. for Summ. J. ("Defs.' Mot.") 21, ECF No. 146-1 (filed under seal).

[5] XOOM Director of Pricing and Structuring Jason Loehde explained the incorporation of prior period adjustments into the budget as follows:

> Prior period adjustments flowed into our actual costs and actual results. And so they would only be reflected when we made—next made a budget plan iteration. So if we updated the budget at some point during the year, those costs would be reflected in what we ultimately came up with at that point.

56.1 ¶¶ 9, 14–15; Pls.' 56.1 ¶ 106. This budgeting process "looked at [XOOM's] margins in aggregate across the portfolio," rather than on a market-by-market basis. Loehde Dep. 210:2–6. If margins were falling short of annual budget projections—say, for example, due to the 2014 polar vortex—XOOM's decisionmakers could make "overall adjustment[s] to the portfolio" through several "levers," including the increase of variable rates. *Id.* at 210:2–211:24. The Mirkins accept that prior period adjustments were "captured through the budgeting process," Pls.' 56.1 ¶ 106, but maintain that "there is no evidence that prior period adjustments, balancing charges, broker costs, or risk premiums were included in XOOM's margin," Pls.' 56.1, at 24; *see also* Wittels Decl., Ex. 8, at 95:17–96:4, ECF No. 148-9 (filed under seal) (XOOM expert stating he did not see any prior period adjustment calculations in data XOOM provided); Loehde Dep. 214:7–25 (acknowledging risk premiums were included as costs in the rate-setting workbooks). To the extent the Mirkins acknowledge that XOOM made rate adjustments based on unanticipated cost overruns, they argue that XOOM did so in violation of the contract. For example, plaintiffs point to the polar vortex as an instance of XOOM increasing variable rates in New York to offset significant losses in other states because attrition was lower in New York than in other markets. Pls.' Mem. of L. in Opp'n to Mot. Summ. J. ("Pls.' Opp'n") 39, ECF No. 148 (filed under seal).

The Mirkins also present a different interpretation of the rate-setting process, contending that XOOM "disregarded" its internal supply cost calculations when setting variable rates. *E.g.*, Pls.' 56.1, at 25. By this account, XOOM's rate-setting meetings were guided by pricing strategies designed to protect its margin and achieve revenue goals, leading XOOM to calculate its margin, and therefore set its ultimate rate, based on considerations such as profit, competitor and utility

---

Decl. of Michael D. Matthews ("MDM Decl."), Ex. A-10 ("Loehde Dep."), at 251:13–19, ECF No. 146-12 (filed under seal).

rates, sales trends, attrition, and geographic market elasticity, rather than supply costs. Pls.' 56.1 ¶¶ 74–75.

During the Mirkins' six months as XOOM customers, XOOM's internal Total Cost figure accounted for 66% to 80% of the total rate charged. Pls.' 56.1 ¶ 44, at 55. In other words, XOOM added a margin on top of cost that ranged from 20% to 44%, as shown by the following chart:

| Month | XOOM's Internal "Total Cost" ($/kWh) | Actual Rate Charged to Mirkins ($/kWh) | XOOM's Markup Above "Total Cost" |
|---|---|---|---|
| June | 0.1078 | 0.1290 | 20% |
| July | 0.1181 | 0.1440 | 22% |
| August | 0.1215 | 0.1490 | 23% |
| September | 0.1021 | 0.1399 | 37% |
| October | 0.1176 | 0.1490 | 27% |
| November | 0.0903 | 0.1299 | 44% |

Pls. 56.1, at 10 (reformatted). The Mirkins do not claim that XOOM cannot charge any margin at all, such that the rate must be equal to XOOM's costs. Pls.' Opp'n 7–9. Rather, they argue that the margins were excessive because the rates were not set in accordance with the ESA's pricing terms. The present motion is thus principally concerned with whether the "Actual Rate" in the above chart was "based on XOOM's actual and estimated supply costs," keeping in mind that the internal "Total Cost" measure may not necessarily equal XOOM's "actual and estimated supply costs."

In 2016, XOOM changed the pricing terms in its form contract. The revised agreement included the following pricing term:

> Your rate may be based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Pls.' 56.1 ¶ 91. In December 2019, the New York Public Service Commission banned ESCOs from offering variable rate energy plans that did not guarantee savings to consumers. *Id.* ¶ 58.

6

*Procedural Background*

Plaintiffs' original complaint, filed in New York state court, asserted claims for breach of contract, breach of the implied covenant of faith and fair dealing, and unjust enrichment. Complaint, ECF No. 1-2. XOOM removed the action to federal court and moved to dismiss. I granted XOOM's motion under Federal Rule of Civil Procedure 12(b)(6) and denied the Mirkins' post-judgment motion for leave to amend. *Mirkin v. XOOM Energy, LLC*, 342 F. Supp. 3d 320 (E.D.N.Y. 2018); *Mirkin v. XOOM Energy, LLC*, No. 18-cv-2949 (ARR) (RER), 2018 WL 11169574 (Nov. 2, 2018). On appeal, the Second Circuit affirmed the dismissal of the implied covenant and unjust enrichment claims, reversed the dismissal of the breach of contract claim, and remanded with direction to grant permission to file the proposed amended complaint. *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 174, 178 (2d Cir. 2019). After the Mirkins filed their amended complaint, the parties proceeded to discovery. In March 2023, the Mirkins moved to certify the proposed class, Mot. to Certify Class, ECF No. 131, and in May 2023, XOOM moved for summary judgment, Mot. for Summ. J., ECF No. 145.[6]

## LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County*

---

[6] I have reserved decision on the class certification motion pending disposition of the present motion for summary judgment. *See Encarnacion v. Astrue*, 491 F. Supp. 2d 453, 459 (S.D.N.Y. 2007), *aff'd*, 568 F.3d 72 (2d Cir. 2009); *Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 560 (D. Conn. 2017), *aff'd*, 915 F.3d 88 (2d Cir. 2019) (noting that Federal Rule of Civil Procedure 23(c)(1) "affords district courts with flexibility when presented with both a dispositive motion and a motion for class certification").

*of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). In deciding this motion, I must construe the facts in the light most favorable to the Mirkins, as the non-moving party, and draw all reasonable inferences in their favor. *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021).

The moving party has the burden of demonstrating the absence of a dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant carries its burden, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation marks omitted). In doing so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts[] and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal citations and quotation marks omitted).

## DISCUSSION

### I.   There is a Genuine Dispute as to Whether XOOM Breached the Contract.

Under North Carolina law, which the parties agree applies in this case, a plaintiff can state a claim for breach of contract if she establishes that (1) a valid contract exists, and (2) the defendant breached the terms of that contract. *See Crosby v. City of Gastonia*, 635 F.3d 634, 645 (4th Cir. 2011). There is no dispute that a valid contract exists between XOOM and Susanna Mirkin, so for now the only issue is whether XOOM breached that contract. (Below, in Part II, I also address whether a valid contract exists between XOOM and Boris Mirkin.) XOOM, which has the initial burden as the moving party, principally argues that there is no genuine dispute that it fully complied with the terms of the ESA because (1) the contract unambiguously required only that XOOM use its actual and estimated supply costs as a foundational component of the variable energy rates, and (2) the evidence establishes that supply costs were the foundational component

8

of those rates. *See* Mem. in Support Mot. for Summ. J. ("Defs.' Mot.") 18, ECF No. 146-1 (filed under seal).

### A. The Contract is Not Ambiguous and Must Be Construed Consistent with Plaintiffs' Reading.

XOOM's form contract stated that plaintiffs' monthly variable rate would be "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." Enrollment Email & ESA 4. The crucial question is the meaning of the phrase "based on." XOOM argues that the phrase unambiguously communicates that XOOM's supply costs merely had to be a foundational component of the ultimate rate. The Mirkins argue that the phrase is ambiguous but should be understood as limiting XOOM to charging rates that are close or proportionate to its supply costs.

Whether "based on" is ambiguous is an important question because an ambiguous contract term would defeat summary judgment. Under North Carolina law, when "an agreement is ambiguous and the intention of the parties is unclear, . . . interpretation of the contract is for the jury." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 658 S.E.2d 918, 921 (N.C. 2008). A contract contains ambiguity "when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Register v. White*, 599 S.E.2d 549, 553 (N.C. 2004). "Thus, if there is uncertainty as to what the agreement is between the parties, a contract is ambiguous." *Schenkel & Shultz, Inc.*, 658 S.E.2d at 921. Non-technical words in a contract "are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Singleton v. Haywood Elec. Membership Corp*, 588 S.E.2d 871, 875 (N.C. 2003).

I find that "based on" is not ambiguous as used in the contract. A word or phrase is ambiguous if it has more than one linguistic meaning. "Base," of course, has multiple meanings:

in baseball, for example, it means "any of the four stations at the corners of a baseball infield"; in a variant of rummy, a base is "the least number of natural cards that will form a canasta when a required number of natural or wild cards is added." *Base*, Merriam-Webster's Unabridged Dictionary (accessed July 20, 2023), https://unabridged.merriam-webster.com/unabridged/base; *see also Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 472–73 (S.D.N.Y. 2014) ("[T]here are literally dozens of dictionary definitions of 'base' for use in different literal and figurative contexts."). However, in the present context, "base" is a verb that means: "[t]o make, form, or serve as a foundation for . . . [t]o place on a foundation; to ground . . . [t]o use (something) as the thing from which something else is developed." *Base*, Black's Law Dictionary (11th ed. 2019); *see also Base*, Merriam-Webster's Unabridged Dictionary (accessed July 17, 2023), https://unabridged.merriam-webster.com/unabridged/base (choose "base (verb)") (defining as "to make or form a foundation for . . . to use as a base or basis for"). Given this definition, the parties do not seriously dispute that the verbal phrase "based on" means that the variable rate must be founded on or have a basis in XOOM's supply costs. Thus, the contract does not contain an ambiguity that must be interpreted by the jury.

The central issue with the contract term is vagueness, not ambiguity. Whereas ambiguous terms have multiple meanings, vague terms are imprecise. As a result, courts generally must use rules of construction to determine the legal operation of vague words. 5 Corbin on Contracts § 24.3 (2023). Many courts, including those of North Carolina, do not always distinguish ambiguity from vagueness, or interpretation (discernment of meaning) from construction (determination of legal effect). *See id.* In the context of the present case, "based on" is unambiguous because we understand its general linguistic meaning, but "based on" is vague because it is not clear what effect the phrase has on the legal operation of the contract.

The parties present dueling constructions. XOOM contends that "based on XOOM's actual and estimated supply costs" means that supply costs must be the foundational component of the variable rate, but that the contract does not otherwise restrict XOOM's discretion to layer additional sums on top of the supply costs—so long as the margin does not vastly exceed supply costs. *See* Consol. Reply in Supp. Mot. Summ. J. & Sur-Reply in Opp'n to Class Cert. ("Defs.' Reply") 7, ECF No. 150 (filed under seal) (acknowledging that a rate "ten times greater than supply costs" would not comply with the contract). XOOM's reading is not unreasonable. In normal usage, "based on" can mean a foundation from which something is developed, as in a movie that is "based on" a true story, where real-life events are developed into a narrative through the addition of fictional elements. *See Norem v. Lincoln Ben. Life Co.*, 737 F.3d 1145, 1150 (7th Cir. 2013).

The Mirkins offer an equally (or perhaps more) plausible construction: that "based on" connotes exclusivity and limits XOOM's discretion such that the rates can be determined only by XOOM's actual and estimated supply costs. Plaintiffs' construction finds support in case law. In *Fleisher v. Phoenix Life Insurance Co.*, the parties sparred over the meaning of a contract term stating an insurance rate would be "'based on' six enumerated factors." 18 F. Supp. 3d at 471. The court observed the following:

> In everyday parlance, when you make a calculation "based on" specific factors, you take only those factors into account; the calculation is made "relying on" or "building on" those factors. You calculate a baseball player's batting average "based on" his number of hits and his number of at bats—nothing more and nothing less. The area of a rectangle is calculated "based on" its width and length, while velocity is calculated "based on" distance and time.

*Id.* Consistent with this construction, the *Fleisher* court found that the average insured could plausibly read the contract's use of "based on" as limiting the calculation to the six enumerated factors. *Id.*

11

Because both parties present plausible constructions of the legal effect of the contested contract phrase, we must locate a rule of decision to break the tie. Under North Carolina law, "[o]ne of the most fundamental principles of contract interpretation is that ambiguities are to be construed against the party who prepared the writing," *Chavis v. S. Life Ins. Co.*, 347 S.E.2d 425, 427 (N.C. 1986), because the drafter "had the best opportunity to protect its interests," *Silvers v. Horace Mann Ins. Co.*, 378 S.E.2d 21, 25 (N.C. 1989).[7] Though this principle of construction is pronounced in general terms, it is "usually applied in cases involving an adhesion contract or where one party is in a stronger bargaining position." *Joyner*, 361 S.E.2d at 905–06. Thus, before applying this rule, "the record should affirmatively show that the form of expression in words was actually chosen by one [party] rather than by the other." *Id.* at 906 (quoting 3 Corbin on Contracts § 559 (1960 and Supp. 1984)). Here, there is no question that XOOM chose the language in the ESA, which was a contract of adhesion. Defs.' 56.1 Response ¶ 103.

I therefore apply North Carolina's rule of construction and conclude that the agreement requires the monthly variable rates to be determined by XOOM's actual and estimated supply costs—and only those costs.

XOOM objects to this construction on several grounds—all unavailing. First, XOOM argues that an exclusive reading would not allow the addition of any margin on top of supply costs, a position incompatible with the Mirkins' concession regarding the permissibility of a reasonable margin. *See* Defs.' Mot. 15 (arguing that supply costs cannot be "the only legitimate component"

---

[7] Though courts do not always distinguish between the concepts of interpretation and construction or ambiguity and vagueness, at least one North Carolina court has recognized that the rule of construing contracts against the drafter "is essentially one of legal effect, of construction rather than interpretation, since it can scarcely be said to be designed to ascertain the meanings attached by the parties." *Joyner v. Adams*, 361 S.E.2d 902, 905 (N.C. Ct. App. 1987) (quotation omitted).

12

of the variable rate). But XOOM is mistaken. A variable rate that varies depending only on the actual and estimated supply costs must *vary* according to those costs, but it does not have to *equal* those costs. In other words, the margin would have to remain proportionate, but not equal to the supply costs over time. Second, XOOM argues that this reading is foreclosed by the contract's agency provision, which states that "market-based compensation is included in the price noted above." Enrollment Email & ESA 5. But the meaning of the compensation term in the agency provision is unclear. It is at least plausible that "market-based compensation" refers to compensation owed to the electricity supplier and LDU for their role in the procurement and delivery of electricity, which would be included "in the price noted above" as a supply cost. Even if the compensation term refers to XOOM's compensation, that meaning would be entirely compatible with the proportionate-margin construction, which allows a margin so long as it is not untethered to the actual and estimated supply costs. Third, XOOM claims that the non-exclusive phrase "which may include but not be limited to" means the legitimate components of XOOM's rates cannot be limited to components identified in the contract. Defs.' Mot. 18. But that phrase occurs in the following sentence: "Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." Enrollment Email & ESA 4. In context, the non-exclusive phrase—which is followed by example supply cost components—clearly modifies "actual and estimated supply costs," not "[y]our monthly variable rate."

Finally, in its reply, XOOM points out that the Mirkins acknowledge the contract "is silent as to an appropriate margin" and argue that any interpretation capping the margin would improperly impose an additional term not contained in the contract. Defs.' Reply 4–7. Citing *Richards v. Direct Energy Services*, XOOM argues that jurors cannot "invent absent contract

13

terms" to require a specific margin in an ESCO contract that does not explicitly set a cap. 915 F.3d 88, 98 & n.5 (2d Cir. 2019). But *Richards* held that a contract stating an ESCO had "discretion" to set a variable energy rate "based upon business and market conditions" unambiguously did not require rates to be tied to procurement costs. *Id.* at 97–98. The contention that *Richards* forecloses any limitation on a margin where a contract is silent as to the margin requires an overreading of inapposite dicta contained in a footnote. *See id.* at 98 n.5. *Richards* in fact confirms that contractual silence does not allow unbounded discretion, because discretion granted by a contract must be "exercise[d] . . . in good faith." *Id.* at 99 (quoting 23 Williston on Contracts § 63:22 (4th ed. 2018)); *see also Cole v. Wells Fargo Bank, N.A.*, No. 15-CV-39 (MR), 2016 WL 737943, at *7 (W.D.N.C. Feb. 23, 2016) (contracts contain an implied "obligation to exercise discretion reasonably and with proper motive" (quotation and alteration omitted)).

In sum, I find that the contract required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs. Next, I consider whether XOOM has presented sufficient evidence demonstrating that it complied with the terms of the agreement as construed under North Carolina law.

### B. There is a Genuine Dispute as to Whether XOOM's Rates Were Based on its Actual and Estimated Supply Costs.

XOOM principally argues that summary judgment is warranted because there is no question that "actual and estimated supply costs" were the foundational component of the variable rates. And though it seems true that COGS was always the largest component of the Mirkins' rate and that additional costs and charges were layered on top of the supply costs to form the margin, *see* Defs.' Mot. 19–20, to prevail on summary judgment XOOM must demonstrate that the ultimate rates were undoubtedly determined solely by its actual and anticipated supply costs.

14

XOOM principally offers two forms of evidence: direct evidence of XOOM's rate-setting procedures and statistical evidence demonstrating the correlation between the Mirkins' rates and XOOM's supply costs. The direct evidence demonstrates that XOOM decisionmakers clearly considered supply costs when setting rates. As previously explained, XOOM calculated the sum of various cost components listed in rate-setting workbooks to reach a number labeled Total Costs, or COGS; analysts then added a margin on top of COGS; and finally, the preliminary rate calculations were presented at a pricing meeting where a team of decisionmakers would set a final rate. Defs.' Mot. 8–9. Because this process made COGS "always the first and largest component of [the] rate," XOOM says it is undisputed that the rate-setting procedure complied with the contract. *Id.* at 20. And the statistical evidence shows that there was a close correlation between the Mirkins' rates and the Total Cost figure. Indeed, XOOM's expert explains that the there is a "less than 1-in-400 chance that the two were unrelated." *Id.* at 22.

However, I find that XOOM has failed to demonstrate that there is no genuine dispute of material fact as to whether it breached the contract. XOOM's arguments and evidence certainly show that it considered its supply costs when calculating the Mirkins' monthly rates. And if all XOOM had to do under the contract was consider and incorporate its supply costs into the final rate, it would likely prevail. But under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs. XOOM has not done so.

First, XOOM has failed to adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric. As shown in the following chart, the markup fluctuated over the six months the Mirkins received XOOM's variable rate product, twice rising (in September and November) even when XOOM's Total Cost measure fell:

| Month | XOOM's Internal "Total Cost" ($/kWh) | Actual Rate Charged to Mirkins ($/kWh) | XOOM's Markup Above "Total Cost" |
|---|---|---|---|
| June | 0.1078 | 0.1290 | 20% |
| July | 0.1181 | 0.1440 | 22% |
| August | 0.1215 | 0.1490 | 23% |
| September | 0.1021 | 0.1399 | 37% |
| October | 0.1176 | 0.1490 | 27% |
| November | 0.0903 | 0.1299 | 44% |

Pls. 56.1, at 10 (reformatted).

XOOM advances three unsuccessful responses to this evidence. The first is that it could charge any markup it wanted under the contract so long as supply costs were the starting point of its rate calculation. I have already explained that the prevailing contract construction renders that argument unavailing. The second is that the Total Cost or COGS number does not constitute its "actual and estimated supply costs" because some of its supply costs—such as prior period adjustments—are incorporated in the margin. XOOM presents ample testimonial evidence supporting the general proposition that prior period adjustments were included in the margin and therefore responsible for rate fluctuations, *see* Defs.' 56.1 ¶¶ 14–18, but no documentary evidence demonstrating how non-COGS supply costs actually impacted the Mirkins' rates.[8] And the Mirkins counter with evidence that none of the documents considered at rate-setting meetings mention prior period adjustments. Pls.' 56.1 ¶¶ 42–43, at 57–58. To the extent the record contains evidence of prior period adjustments being implemented, it appears that XOOM aggregated cost overruns into annual and revised budgets, which it used to inform rate-setting decisions for over a thousand products across many markets, in at least one occasion leading XOOM to raise New

---

[8] According to XOOM Director of Product Management Ryan Park, there was no set formula for incorporating prior period adjustments. MDM Decl., Ex. A-12, at 198:15–17, ECF No. 146-14 (filed under seal) ("There's certainly a human element in terms of factoring in, you know, prior period adjustments.").

16

York variable rates to make up for unanticipated costs in other regions. *See* Loehde Dep. 64:12–14; 69:10–14; 210:2–211:24. Based on this evidence, viewed in the light most favorable to the Mirkins, a reasonable jury could find either that XOOM did not factor prior period adjustments into its margin or that cross-market margin adjustments made on the basis of relative regional consumer elasticity (or other considerations) were inconsistent with the terms of the ESA. Therefore, whether permissible supply costs incorporated in the margin determined the monthly change in markup is a disputed material fact. Third, XOOM points to its expert evidence of a "near perfect correlation" between the rate and XOOM's COGS. Defs.' Reply 14. However, the statistical correlation seems to prove at most that XOOM incorporated its internal cost calculation into the rate. The correlation does not tell us whether XOOM added a permissible markup above its cost calculation.

Even if XOOM were able to meet its burden, the Mirkins have presented evidence sufficient to demonstrate the existence of a question of fact as to whether XOOM set the Mirkins' monthly variable rate in compliance with the contract. Several pieces of evidence suggest that XOOM relied on pricing strategies or other considerations to determine the monthly variable rate in the New York market. First, it appears that XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and that rates were set accordingly. For example, Director of Pricing and Structuring Jason Loehde suggested that rates determined margins, explaining in his deposition that "we would input a proposed rate into the rate setting workbook and then there would be a calculated margin that results from the rate that we input." Loehde Dep. 67:12–16. And XOOM CEO Tom Ulry acknowledged that most of the pricing team "wasn't even privy to the operating expenses and things like that," but that they were privy to "[t]he gross margin goal for the month." Wittels Decl., Ex. 25, at 101:16–22, ECF No. 148-26 (filed under seal). Finally, in

17

April 2013, a few months before the Mirkins signed up for XOOM's service, Ulry explained that electricity rates in New York had increased because "[w]holesale rates are up and we raised our margins so we could lower them elsewhere." Wittels Decl., Ex. 26, at 1, ECF No. 148-27 (filed under seal); *see also* Loehde Dep. 210:20–212:4 (explaining that XOOM increased variable rates for New York customers to make up for margin shortfalls sustained in markets outside New York).

Second, the record indicates that XOOM considered several factors besides supply costs when setting its monthly rates. For example, Loehde sent an email before a 2015 meeting listing monthly rate-setting process considerations, including "[p]ositioning in relation to price to compare, creating a value proposition for customer, prices of our competitors, regulatory requirements, competitive trends, target margins." Pls.' 56.1 ¶ 76; Wittels Decl., Ex. 27, ECF No. 148-28 (filed under seal); *see also* Wittels Decl., Ex. 20 ("Coppola Dep."), at 50:18–24, ECF No. 148-21 (filed under seal) (Senior Vice President of Energy Supply and Pricing Andrew Coppola confirming that XOOM considered many factors when setting prices, including "[a]ttrition, sales growth, regulatory changes, [and] competitors").

Third, XOOM's 2016 amendment to its form Electricity Sales Agreement supports an inference that XOOM set its rates based on pricing strategies. The amended contract states that the variable rate would be "based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices . . . *and XOOM's pricing strategies*." Pls.' 56.1 ¶ 91 (emphasis added). In the Rule 30(b)(6) deposition of XOOM, Loehde explained that XOOM's rate-setting process did not change between 2013 and 2016, and so "the updated language is just simply providing more accurate language to our customers." Wittels Decl., Ex. 24, at 134:19–24, ECF No. 148-25 (filed under seal). And Coppola

confirmed that in 2013 XOOM customer rates were "based in part" on XOOM's pricing strategies. Coppola Dep. 98:11–14.

XOOM responds by arguing that the use of pricing strategies was permissible under the contract. Defs.' 56.1 Response ¶ 92. But, as explained, the contract as construed according to North Carolina law required XOOM's rates to be determined by its actual and estimated supply costs. XOOM also argues that reliance on record evidence from 2015 and 2016 is irrelevant because the Mirkins were customers for only six months in 2013. But XOOM's witnesses have asserted that XOOM's pricing process remained constant from 2013 to 2016.

In sum, there is a genuine question of fact as to whether XOOM set the Mirkins' rates based on supply costs or based on other considerations, such as pricing strategies driven by margin goals.

## II.   Summary Judgment is Granted as to Boris Mirkin's Claim.

XOOM's final argument is that summary judgment should be granted as to Boris Mirkin's claim either because he lacks Article III standing or because he is neither a party to nor a third-party beneficiary of the contract with XOOM and thus cannot sustain his claim under North Carolina law.

To satisfy the requirements of Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the summary judgment stage, a plaintiff must support standing with specific facts, by affidavit or other evidence, that are assumed to be true for the purpose of the motion. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs argue that Boris has standing because he was the primary decision-maker regarding the family's energy supply and they enrolled in the

19

XOOM variable rate plan using Boris's email and phone number. Pls.' 56.1 ¶¶ 39–41, at 55. However, because standing requires an injury to a plaintiff's own legally protected interests, a breach of contract claim can be maintained only where the plaintiff is a party to the contract, an intended third-party beneficiary of that agreement, or an assignee of the claim. *Rynasko v. New York University*, 63 F.4th 186, 193 (2d Cir. 2023). The Mirkins concede that Boris is not a party to the contract and do not argue that he is an assignee of Susanna's claim. *See* Pls.' Opp'n 46 ("Boris Mirkin . . . is not a direct party to the contract with XOOM."). The only question is whether he is a third-party beneficiary.

As previously explained, to prevail on a breach of contract claim under North Carolina law, a plaintiff must prove that (1) a valid contract exists, and (2) the defendant breached the terms of that contract. *See Crosby*, 635 F.3d at 645. A third party can sue for breach of contract by additionally showing that "(3) the contracting parties 'intended primarily and directly to benefit him or the class of persons to which he belongs.'" *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 117 (4th Cir. 2020) (quoting *DeMent v. Nationwide Mut. Ins. Co.*, 544 S.E.2d 797, 801 (N.C. Ct. App. 2001)). Under North Carolina law, it is not enough for a contract to incidentally benefit a third party—the parties must "intend it to benefit the plaintiff directly." *Holshouser v. Shaner Hotel Grp. Properties One Ltd. P'ship*, 518 S.E.2d 17, 25 (N.C. Ct. App. 1999), *aff'd*, 524 S.E.2d 568 (2000). In determining the parties' intent, North Carolina courts "consider the circumstances surrounding the transaction as well as the actual language of the contract." *Id.* (quotation and alteration omitted).

Here, the actual language of the contract provides the answer. The ESA explicitly states: "There are no third-party beneficiaries to this Agreement." Enrollment Email & ESA 4. This language clearly indicates that XOOM did not intend that the contract directly benefit a third-party

20

such as Boris. *See Holshouser*, 518 S.E.2d at 25. Because Boris was not a third-party beneficiary, he lacks standing to sue for breach. *Rynasko*, 63 F.4th at 194–95. I therefore grant XOOM's motion as to Boris's claim for breach of contract.

### CONCLUSION

For the foregoing reasons, the motion for summary judgment is granted in part and denied in part. Specifically, I grant summary judgment for XOOM as to Boris Mirkin's claim for breach of contract because he was neither a party to nor a third-party beneficiary of the contract. I deny summary judgment as to Susanna Mirkin's claim for breach of contract because she contracted to receive residential electricity from XOOM and there is a genuine dispute as to whether XOOM breached the contract.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:      August 14, 2023
            Brooklyn, New York