MDM Declaration Exhibit J

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NEW YORK

3      SUSANNA MIRKIN and BORIS MIRKIN,

4      Individually and on Behalf of All Others

5      Similarly Situated,

6            Plaintiffs,

7        vs.                    No. 18 Civ. 2949(ARR) (RER)

8      XOOM ENERGY, LLC and XOOM ENERGY

9      NEW YORK, LLC,

10           Defendants.

11     -------------------------------x

12

13

14                VIDEOTAPED DEPOSITION OF

15                SEABRON ADAMSON

16              Tuesday, November 8, 2022

17                    10:06 a.m.

18                    Veritext

19                  101 Arch Street

20             Boston, Massachusetts 02110

21

22

23

24              Laurie K. Langer, RPR

                                          Page 1

1 which is I think what you're doing. But I think you
2 understand what we did.
3    Q. I am, because I'm focusing in my question, I have
4 built this in on your damage calculation. So I
5 understand your position about bullet 3, let's call it.
6 Which is your opinions about whether or not XOOM's rate
7 setting was consistent or not, with the sale agreement.
8       But I'm talking about with respect to 4, after
9 you concluded --
10   A. Uh-huh.
11   Q. -- the rate was not consistent --
12   A. Right.
13   Q. -- that your damage model --
14   A. Right.
15   Q. -- and what they considered relevant was the
16 amount of gross margin that XOOM put on top of its
17 supply cost?
18   A. Are we discussing the Method 1 model or the
19 Method 2 model?
20   Q. Well, it's both; right?
21   A. Well, it's --
22   Q. Let's start with Method 1.
23   A. Okay. Right.
24   Q. Right. Method 1, what was relevant was the

Page 66

1    A. The -- between total cost and the rate.
2    Q. Okay. Which is the margin?
3       MR. WITTELS: Object.
4    A. The rate is not the margin.
5    Q. No, I know.
6    A. A rate is not a margin.
7    Q. The delta is. The delta is.
8    A. Okay. We can call that a margin, yes.
9    Q. The delta between the total costs --
10   A. Right.
11   Q. -- and the rate is --
12   A. Right.
13   Q. -- the margin; right?
14   A. That -- that -- you can characterize that as a
15 margin.
16   Q. Well, what would you characterize it?
17   A. I would just characterize it as a difference, as
18 a delta.
19   Q. Okay. You're not offering an opinion in this
20 case that under the sales agreement XOOM could not
21 charge more than the regulated utilities rate; right?
22   A. No. I mean, the comparison I made was between
23 supply costs and the rate under this contract.
24   Q. Right. And you're not offering a damage model

Page 68

1 amount of gross margin that's input on top of its supply
2 costs; right?
3       MR. WITTELS: Objection.
4    A. Of the difference -- if you want to -- you're
5 expressing that as a form -- you're expressing the
6 delta, the difference, right, as a gross margin. That's
7 not exactly how it was calculated.
8       I mean, it was calculated just as there's
9 differences, not any -- you're saying a gross margin on
10 a gross margin calc -- I want to be specific about how
11 you're using the term "gross margin."
12   Q. I didn't think it was tricky. I mean, your
13 report says that you calculated by reference -- by
14 comparing XOOM's margin reports to XOOM's rate setting
15 workbooks; right?
16   A. Right. I was getting to the delta between rates
17 and costs.
18   Q. Okay.
19   A. It's just that it was in the margin setting
20 workbooks.
21   Q. So with respect to Model 1 the relevant
22 consideration was the delta between XOOM's total costs
23 and XOOM's margin?
24       MR. WITTELS: Objection.

Page 67

1 that compares XOOM's variable rate charges to what
2 customers would have been charged by the utility during
3 the same time period?
4       MR. WITTELS: Objection.
5    A. No. The damage models as we discussed are the
6 two.
7    Q. Right. And you don't intend to offer an opinion
8 about that?
9    A. No. The only thing we used was a, as a graphical
10 comparison on the relationship between supply costs and
11 the utility rate, as an example. But the two models are
12 the two models.
13   Q. Yep. Okay. Are you offering an opinion about
14 what is a reasonable or appropriate margin for an ESCO
15 to charge?
16   A. Well, to build the second model we needed an
17 estimate of a margin. We really didn't have any
18 information that would allow that to be created, since
19 XOOM had, from what we can tell, had never done it that
20 way. They had never tried to calculate a, or they did
21 not present in any way, I can't say that they never
22 tried. They did not present in the rate setting
23 workbooks and other information calculations of any sort
24 like that. So we used the margin from fixed rate

Page 69

18 (Pages 66 - 69)

1   customers as a proxy of a rate that XOOM itself had
2   used.  I can't go further than that because there's no
3   information.
4        MR. MATTHEWS:  Can you read my question
5   back, please.
6        (Prior testimony read back.)
7              "Are you offering an opinion
8              about what is a reasonable or
9              appropriate margin for an ESCO
10             to charge?"
11  A.  Yeah.  Conceptually, yes.  Conceptually, yes.
12       Thanks for reading that back.
13  Q.  That's okay.  And what is the opinion that you're
14  offering conceptually about that?
15  A.  Well, I mean, it's obviously related to the
16  contract that we've been discussing, whether it's based
17  on supply costs, that, you know, if the Court were to
18  decide that a margin was allowed, that it can't be an
19  uncapped margin, that's why we made a second calculation
20  using the fixed rate margin as a proxy of what might be
21  an acceptable margin.
22  Q.  Are you offering any opinion about what is an
23  acceptable or appropriate, a reasonable margin aside
24  from just using XOOM's fixed rate margin?

*Page 70*

1   A.  We haven't offered that opinion, we don't have
2   any information to do that.
3   Q.  Do you intend to?
4   A.  If information were to be provided, but that
5   would have to come from XOOM.  So I, in the absence of
6   not expecting anymore information to come, no.
7   Q.  Well, we've gotten talking past each other again.
8   I'm talking conceptually.  You've said that it will be
9   for the Court to decide whether a margin can be charged
10  and if so what's appropriate; right?
11  A.  Right.
12  Q.  And if we go to trial --
13  A.  Uh-huh.
14  Q.  -- and you take the witness stand --
15  A.  Uh-huh.
16  Q.  -- and I'm asking you questions and the judge
17  gets frustrated with my questions and says, "let's cut
18  to the chase.  Mr. Adamson, what do you think is an
19  appropriate margin for an ESCO to charge?"  What would
20  your answer be?
21       MR. WITTELS:  Objection.
22  A.  I would say conceptually it's got to be related
23  to the, related to the costs.  And in a broad conceptual
24  basis.

*Page 71*

1   Q.  And if he said, "but can you give me a cutoff
2   point?  Is there a number that you can assign to that?"
3   Would you be able to give him one?
4        MR. WITTELS:  Objection.
5   A.  I wouldn't be able to give him a number on the
6   stand because I wouldn't have the, XOOM's internal
7   information, no.
8   Q.  Okay.  So the margin in your view, --
9   A.  Uh-huh.
10  Q.  -- the margin that is appropriate for an ESCO to
11  charge conceptually --
12  A.  Uh-huh.
13  Q.  -- is ESCO specific?
14  A.  Well, again, we're talking about relation to a
15  specific contract, so.
16  Q.  I'm not.
17  A.  You're not.
18       MR. WITTELS:  Don't interrupt him.
19  A.  I am talking -- sorry.  I'm talking about this
20  specific contract.  Other ESCOs may have, and I'm sure
21  do, very different contractual forms.  And in fact,
22  ESCOs -- even the same ESCO will have lots, may have
23  different pricing, right, under different arrangements.
24  We're talking about variable rate pricing here as

*Page 72*

1   opposed to fixed rate pricing.
2   Q.  Uh-huh.
3   A.  Fixed rate pricing, I think we can all agree, the
4   actual outturn margins could be quite different.  A lot
5   depends on timing in that case; right?  Okay.  So I
6   don't know that there is a "single ESCO number" I don't
7   think that's a meaningful concept.
8   Q.  Okay.  Is there a single ESCO number for variable
9   rates that in your opinion would be a cap on what is an
10  appropriate or reasonable margin?
11  A.  I don't have a number in mind because I don't
12  know what the, what would be claimed to be the types of,
13  of costs that, to be recovered in that margin.  What I
14  don't -- you know, I don't have a number.  What I am
15  offering is conceptually that the margin has to be based
16  on something from reality to be meaningful in the
17  context of this contract, and, you know, can't be
18  arbitrary.
19  Q.  Okay.
20  A.  But I don't have a number to give you.
21  Q.  Okay.  And would not be able to create one?
22       MR. WITTELS:  Objection.
23  A.  Not -- not on the information available right
24  now.  I think that would need more inputs than are

*Page 73*

19 (Pages 70 - 73)

Page 74

1 available at present.
2 Q. Okay. You don't have an industrywide opinion
3 about what is an appropriate or a reasonable margin that
4 an ESCO can charge on a variable rate?
5 MR. WITTELS: Objection.
6 A. I mean, I probably have a, a rough sense of maybe
7 what I would expect roughly the numbers to work out
8 about. But, you know -- you know, based on, you know,
9 what I -- just a sense of that. I don't have a precise
10 number to give you here.
11 Q. What -- what are the rough numbers that you
12 referred to?
13 A. You know, I would be -- I would be -- I wouldn't
14 be surprised, having done calculations that, you know,
15 you got a number, 15 percent, 20 percent, something like
16 that. I mean, you know, here we use the fixed rate one
17 and it came out those were on average about 20 percent.
18 That -- that is an indicator.
19 Q. Okay.
20 MR. MATTHEWS: Can we go off the record.
21 VIDEOGRAPHER: The time is 12:00 p.m., we
22 are going off the record.
23 (Short break taken.)
24 VIDEOGRAPHER: We back on the record, the

Page 75

1 time is 12:14.
2 Q. Mr. Adamson, let's talk about your damage models
3 which relates to the fourth bullet point of your
4 assignment --
5 A. Uh-huh.
6 Q. -- to develop a damage model.
7 A. Uh-huh.
8 Q. And you and Dr. Eryilmaz --
9 A. Eryilmaz.
10 Q. -- developed two models; --
11 A. Yes.
12 Q. -- right?
13 Okay. So Model 1 is described starting on page
14 20 under Section 3.1.
15 A. Uh-huh.
16 Q. Right?
17 A. Yes.
18 Q. So here the total costs that are referenced here,
19 again, is the supply cost build up contained in the rate
20 setting workbooks; right?
21 A. Yes, I believe that's what it says, yes.
22 Q. All right. And as you described earlier, Model 1
23 takes the difference between those total costs and the
24 variable rate that XOOM charged?

Page 76

1 MR. ROMAN: Sorry if I'm interrupting. But
2 we can't hear anything for people remotely right now. I
3 don't know if we're on the record or talking, but I
4 can't hear anything.
5 MR. WITTELS: We're on the record. Can you
6 hear?
7 (Pause for technical issue.)
8 MR. ROMAN: I just heard Matt. That's good.
9 Thank you.
10 (Pause for technical issue.)
11 A. Can you --
12 Q. Yeah.
13 MR. MATTHEWS: May I ask you to read that
14 back.
15 (Prior testimony read back.)
16 "All right. And as you
17 described earlier, Model 1
18 takes the difference between
19 those total costs and the
20 variable rate that XOOM
21 charged?"
22 A. Yes.
23 MR. WITTELS: Yeah. Objection.
24 A. Broadly, yes.

Page 77

1 Q. And the third dataset that is relevant to the
2 calculation under Model 1 is customer usage; right?
3 A. Yes, they're quantities, yes.
4 Q. So you take customer usage and multiply that by
5 supply costs; right?
6 A. Okay.
7 Q. And then you take customer usage and multiply
8 that by the rates; right?
9 A. Are you continuing --
10 Q. Is that correct so far?
11 A. I'm trying to remember exactly how it was
12 implemented. It may have just been -- it may have -- it
13 may have been implemented as the difference in the rates
14 times the quantity.
15 Q. Okay. Got it.
16 A. I think we're talking about --
17 Q. We're saying the same thing.
18 A. -- the same general -- I think we're talking
19 about the same general thing.
20 Q. The -- we're saying the same thing.
21 In other words, it's looking at calculating
22 everything XOOM charged above total costs.
23 A. Yeah. Yeah, above the, the supply costs, total
24 costs, the delta times quantities.

20 (Pages 74 - 77)