**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC <br><br> Defendants. | Case No. 18-CV-2949 (ARR) (JAM) |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING RULE 23(f) PETITION AND APPEAL**

---

**WITTELS MCINTURFF PALIKOVIC**
Ethan D. Roman
Steven L. Wittels
J. Burkett McInturff
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
edr@wittelslaw.com
slw@wittelslaw.com
jbm@wittelslaw.com

**HYMOWITZ LAW GROUP, PLLC**
Daniel Hymowitz
1629 SHEEPSHEAD BAY ROAD
BROOKLYN, NY 11235
Telephone: (718) 807-9900
Facsimile: (866) 521-6040
daniel@hymowitzlaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
Dmitry Kheyfits
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

Dated:   November 20, 2023

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

PROCEDURAL AND FACTUAL BACKGROUND................................................................ 3

   I.    JUDGE ROSS DENIED XOOM'S SUMMARY JUDGMENT MOTION
        BECAUSE WHETHER XOOM SET ITS VARIABLE RATES BASED ON ITS
        SUPPLY COSTS IS A DISPUTED QUESTION OF MATERIAL FACT ..................... 3

        A.    Discovery Revealed XOOM's Detailed Compilations of Its Supply Costs,
               and Excessive Margins Untethered to Those Costs .................................................. 4

        B.    The Contract Allows Only a Consistent, Reasonable Margin and XOOM
               Failed to Show that Its Margins Included Undisclosed Supply Costs .................... 5

        C.    The Court Accepted Plaintiff's Damages Methodology and the Question of
               the Appropriate Margin Is for the Factfinder .......................................................... 6

   II.   XOOM'S RATES WERE UNIFORMLY UNTETHERED TO SUPPLY COSTS........... 6

   III.  FOLLOWING A RIGOROUS RULE 23 ANALYSIS, JUDGE ROSS GRANTED
        CLASS CERTIFICATION................................................................................................ 7

        A.    Commonality........................................................................................................... 8

        B.    Predominance.......................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

   I.    XOOM'S RULE 23(F) PETITION WILL FAIL ON THE MERITS ............................... 9

        A.    Judge Ross Applied the Correct Preponderance of the Evidence Standard............. 9

        B.    Plaintiff Will Use Common Evidence to Demonstrate XOOM's Breach .............. 10

        C.    Plaintiff Will Use Common Evidence to Establish Margin and Thus
               Damages ............................................................................................................... 12

   II.   XOOM FAILS TO IDENTIFY ANY IRREPARABLE HARM ABSENT A
        STAY ............................................................................................................................. 13

   III.  PLAINTIFF AND THE CLASS WOULD BE INJURED BY A STAY ........................ 14

   IV.  THE PUBLIC INTEREST FAVORS TIMELY RESOLUTION OF THIS ACTION..... 14

   V.   ON BALANCE, XOOM FAILS TO DEMONSTRATE A STAY IS
        WARRANTED ............................................................................................................... 15

# **TABLE OF AUTHORITIES**

*Cases*

*Bell v. Gateway Energy Servs. Corp.*,
  No. 31168/2018, NYSCEF No. 152 (Rockland Cnty. Sup. Ct. Jan. 8, 2021) ........................... 1

*Blair v. Equifax Check Services, Inc.*,
  181 F.3d 832 (7th Cir. 1999) ........................................................................................... 14

*BLT Steak LLC v. Liberty Power Corp., L.L.C.*,
  No. 151293/2013, NYSCEF No. 376 (N.Y. Cnty. Sup. Ct. Aug. 14, 2020) ........................... 1

*Brown v. Peregrine Enterprises, Inc.*,
  No. 22-CV-1455, 2022 WL 17593321 (S.D.N.Y. Dec. 13, 2022) .......................................... 14

*Chen-Oster v. Goldman, Sachs & Co.*,
  No. 10-CV-6950, 2018 WL 10038786 (S.D.N.Y. Apr. 17, 2018) ...................................... 2, 15

*Claridge v. N. Am. Power & Gas, LLC*,
  No. 15-CV-1261, 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016).............................................. 1

*Earl v. Boeing Co.*,
  21 F.4th 895 (5th Cir. 2021) ............................................................................................. 15

*Galloway ex rel. Melissa Galloway Snell Living Tr. Dated May 1, 2018 v. Snell*,
  885 S.E.2d 834 (N.C. 2023)................................................................................................. 6

*In re Apple & ATTM Antitrust Litig.*,
  No. 07-CV-5152, 2010 WL 11489069 (N.D. Cal. Sept. 15, 2010) ........................................ 15

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009)............................................................................................ 9, 10

*In re Elec. Books Antitrust Litig.*,
  No. 11-MD-2293, 2014 WL 1641699 (S.D.N.Y. Apr. 24, 2014)...................................... 2, 14

*In re Grupo Televisa Sec. Litig.*,
  No. 18-CV-1979, 2020 WL 4670580 (S.D.N.Y. Aug. 7, 2020)............................................... 2

*In re Initial Pub. Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)................................................................................................... 2

*In re Petrobras Sec.*,
  193 F. Supp. 3d 313 (S.D.N.Y. 2016)................................................................................... 2

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)............................................................................................ 15

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015)............................................................................................ 2

*Kaye v. Amicus Mediation & Arb. Grp., Inc.*,
    No. 13-CV-347, 2014 WL 5092876 (D. Conn. Oct. 10, 2014) ................................... 2

*LaCour v. Colgate-Palmolive Co.*,
    No. 16-CV-8364, 2021 WL 3542295 (S.D.N.Y. Aug. 10, 2021)........................... 2, 14

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)............................................................................................ 15

*Morris v. Alle Processing Corp.*,
    No. 08-CV-4874, 2013 WL 6199579 (E.D.N.Y. Nov. 27, 2013) ............................... 2

*Nelson v. G.Skill USA, Inc.*,
    No. 22-CV-6175, 2023 WL 3300408 (W.D.N.Y. May 8, 2023)................................. 15

*Pryce v. Progressive Cas. Ins. Co.*,
    No. 19-CV-1467, 2022 WL 2467013 (E.D.N.Y. June 10, 2022) ..................................... *passim*

*Readick v. Avis Budget Grp., Inc.*, No. 12-CV-3988,
    2014 WL 1683799 (S.D.N.Y. Apr. 28, 2014) ............................................................ 15

*Roberts v. Verde Energy, USA, Inc.*,
    No. X07-HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017),
    *aff'd*, 2019 WL 1276501 (Conn. Super. Ct. Feb. 1, 2019) ........................................ 1

*Roseman v. Bloomberg L.P.*, No. 14-CV-2657,
    2017 WL 5176379 (S.D.N.Y. Nov. 7, 2017).............................................................. 2

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
    No. 14-CV-2590, 2018 WL 3830921 (S.D.N.Y. Aug. 13, 2018)............................... 2

*Steinberg v. Nationwide Mut. Ins. Co.*,
    224 F.R.D. 67 (E.D.N.Y. 2004)................................................................................... 15

*Strougo v. Barclays PLC*,
    194 F. Supp. 3d 230 (S.D.N.Y. 2016)........................................................................ 2

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
    262 F.3d 134 (2d Cir. 2001)........................................................................................ 2

***Rules***

Fed. R. Civ. P. 23(a) ................................................................................................... 8

Fed. R. Civ. P. 23(b) ................................................................................................... 8

Fed. R. Civ. P. 23(c)(4)(B) .......................................................................................... 2

Fed. R. Civ. P. 23(f) ............................................................................................. *passim*

Plaintiff Susanna Mirkin ("Plaintiff") respectfully submits this Opposition to Defendants XOOM Energy, LLC and XOOM Energy New York, LLC's (together, "Defendants" or XOOM") motion to stay pending Defendants' Rule 23(f) petition and appeal ("Motion").[1]

## **INTRODUCTION**

This action seeks to redress XOOM's pricing practices that caused over 100,000 New York consumers and small businesses to overpay for their electricity and natural gas. In the Court's 19-page certification order, Judge Ross certified the Class after carefully applying the correct standards and weighing the evidence developed over 5+ years of litigation. This was no surprise, as classes have been certified in at least four other similar actions against energy service companies ("ESCOs") like XOOM that—as here—were alleged to breach the pricing provisions of their form customer contracts.[2] As Judge Ross observed, claims for breach of standardized contracts "are particularly well-suited for class certification." Certification Order at 10, Dkt. No. 152 ("Order").

In addition to recognizing Plaintiff's readily certifiable claim, Judge Ross had a full record for evaluating certification. In fact, the Order was issued just two weeks after the Court denied XOOM's summary judgment motion. These two motions occasioned an immense exchange of information, including 214 pages of briefing, 145 exhibits, 5 declarations, and 4 expert reports.

Dissatisfied, XOOM filed a Rule 23(f) petition and now the instant Motion for an indefinite stay while the Second Circuit labors through the petition. However, Rule 23(f) appeal criteria will

---

[1] Accompanying this memorandum is the Declaration of Ethan D. Roman, dated Nov. 20, 2023 ("Roman Decl."). References in this memorandum to "Ex." refer to the Roman Decl. exhibits. References to "XOOM Ex." refer to exhibits to the Declaration of Michael D. Matthews, dated Nov. 6, 2023.

[2] *Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261, 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016); *Roberts v. Verde Energy, USA, Inc.*, No. X07-HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017), *aff'd*, 2019 WL 1276501 (Conn. Super. Ct. Feb. 1, 2019); *Bell v. Gateway Energy Servs. Corp.*, No. 31168/2018, NYSCEF No. 152 (Rockland Cnty. Sup. Ct. Jan. 8, 2021); *BLT Steak LLC v. Liberty Power Corp., L.L.C.*, No. 151293/2013, NYSCEF No. 376 (N.Y. Cnty. Sup. Ct. Aug. 14, 2020).

"rarely be met" and "parties should not view Rule 23(f) as a vehicle to delay proceedings[.]" *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001). Rule 23(f) is highly exacting due to the "longstanding view that the district court is often in the best position to assess the propriety of the class and has the ability, pursuant to Rule 23(c)(4)(B), to alter or modify the class, create subclasses, and decertify the class whenever warranted." *Id.*

In addition, this Circuit affords "greater deference to district court decisions granting class certification than to decisions declining to certify a class," *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015), and where "the district court has applied the proper legal standards in deciding whether to certify a class, its decision may only be overturned if it constitutes an abuse of discretion." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 (2d Cir. 2006).

These high bars are why district courts in this Circuit have denied *every* contested Rule 23(f) stay request identified by Class Counsel in the past 10 years.[3]  In fact, even in the rare cases where the petitions are granted, stays are still denied.  *See Strougo*, 194 F. Supp. 3d at 233 (petition granted but stay denied).  Indeed, defense counsel agreed with Judge Reyes at this Motion's October 17, 2023, pre-motion hearing that there is a "hi[gh] bar" for a stay.  Ex. 1, 10/17/2023 Hr'g Tr. at 3:13–18.  Judge Reyes also made clear that he was "skeptical [] a stay is appropriate here," yet XOOM barreled ahead.  *Id.* at 15:17–18.

---

[3] *See Pryce v. Progressive Cas. Ins. Co.*, No. 19-CV-1467, 2022 WL 2467013, at *3 (E.D.N.Y. June 10, 2022); *LaCour v. Colgate-Palmolive Co.*, No. 16-CV-8364, 2021 WL 3542295, at *2 (S.D.N.Y. Aug. 10, 2021); *In re Grupo Televisa Sec. Litig.*, No. 18-CV-1979, 2020 WL 4670580, at *1 (S.D.N.Y. Aug. 7, 2020); *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, No. 14-CV-2590, 2018 WL 3830921, at *2 (S.D.N.Y. Aug. 13, 2018); *Chen-Oster v. Goldman, Sachs & Co.*, No. 10-CV-6950, 2018 WL 10038786, at *2 (S.D.N.Y. Apr. 17, 2018); *Roseman v. Bloomberg L.P.*, No. 14-CV-2657, 2017 WL 5176379, at *3 (S.D.N.Y. Nov. 7, 2017); *Strougo v. Barclays PLC*, 194 F. Supp. 3d 230, 236 (S.D.N.Y. 2016); *In re Petrobras Sec.*, 193 F. Supp. 3d 313, 318 (S.D.N.Y. 2016); *Kaye v. Amicus Mediation & Arb. Grp., Inc.*, No. 13-CV-347, 2014 WL 5092876, at *2 (D. Conn. Oct. 10, 2014); *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1641699, at *13 (S.D.N.Y. Apr. 24, 2014); *Morris v. Alle Processing Corp.*, No. 08-CV-4874, 2013 WL 6199579, at *3 (E.D.N.Y. Nov. 27, 2013).

The four Rule 23(f) stay factors **_all_** show that XOOM's motion should be swiftly denied:

(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Pryce*, 2022 WL 2467013, at *1 (cleaned up).  Factors one and two "are the most critical."  *Id.*

Here, XOOM is unlikely to win on the merits, as it simply seeks a "do over" of the Court's careful summary judgment and class certification rulings by arguing for the wrong standard of review, distorting the record, and proffering a certification defense that assumes XOOM wins at trial.  There is no doubt XOOM will vigorously try this case, but even a cursory reading of the Order demonstrates that Judge Ross faithfully applied the relevant standard and was well within her discretion to certify a class.  Further, the decade of rulings by district courts in this Circuit on similar stay requests makes clear that further litigation costs—the only irreparable harm XOOM claims—are insufficient, and that both the public interest and the prejudice to the Class of delay heavily disfavor a stay.  In sum, Your Honor should promptly reject XOOM's efforts to prevent this 5½-year-old consumer protection action from proceeding through Class notice and on to trial.

## PROCEDURAL AND FACTUAL BACKGROUND

**I.    JUDGE ROSS DENIED XOOM'S SUMMARY JUDGMENT MOTION BECAUSE WHETHER XOOM SET ITS VARIABLE RATES BASED ON ITS SUPPLY COSTS IS A DISPUTED QUESTION OF MATERIAL FACT**

Under XOOM's non-negotiable form contract, its monthly energy rates must vary "based on XOOM's actual and estimated supply costs, which may include but not be limited to prior period adjustments, inventory and balancing costs."  Order at 2.  Plaintiff alleges that after an introductory teaser rate, XOOM began charging excessive rates that were untethered to its supply costs.  *See* Order at 2–4.  Plaintiff filed suit, claiming XOOM breached the contract's pricing term and raised three key common questions of material fact: (1) what are XOOM's "actual and

estimated supply costs"; (2) what is the legal operation of the contract's promise that rates will be "based on" XOOM's supply costs; and (3) what margin, if any, is allowed?

A.      **Discovery Revealed XOOM's Detailed Compilations of Its Supply Costs, and Excessive Margins Untethered to Those Costs**

Discovery shows that for each monthly variable rate XOOM maintained rate-setting workbooks containing an internal cost calculation labeled "Total Cost" or "COGS" (cost of goods sold), which Judge Ross found "is essentially the sum of the costs XOOM incurs when procuring energy on the wholesale market." Order at 3. To wit, XOOM's "supply costs" under the contract. The workbooks also listed margin, and "the Total Cost plus the margin equals the rate[.]" *Id.* at 4.

These workbooks are damning for XOOM, as they show wildly varying and excessive margins inconsistent with XOOM's promise to charge monthly rates "based on XOOM's actual and estimated supply costs." Given this predicament (and looming eight-figure liability), XOOM conjured up a theory—one that flouts the clear documentary evidence—that the workbooks' "margin" actually contains undifferentiated and undocumented "supply costs." XOOM then claims that once those ephemeral supply costs move from the "margin" column to the "Total Costs" or "COGS" side of the ledger, XOOM's excessive rates will be "based on" its supply costs.

There is no documentary evidence whatsoever supporting XOOM's fanciful claim. Instead, discovery shows the opposite. XOOM's rates were based on a host of non-supply cost factors, including pricing strategies, profit goals, competitor and utility rates, sales trends, attrition, and shortfalls in non-New York markets. Order at 13; Summary Judgment Order at 5–6, 17, Dkt. No. 151 ("MSJ Order"). In fact, on February 11, 2016, XOOM overhauled the contract's pricing term to explicitly allow it to set rates based on, *inter alia*, "pricing strategies." *Id.* at 6.[4] But XOOM's own witnesses repeatedly admitted that XOOM had always based its variable rates on

_____

[4] Customers subject to this contract language are not included in the Class Judge Ross certified.

XOOM's "pricing strategies," and that this change did not affect how rates were set but instead was "simply" made to "provid[e] more accurate language to our customers." *Id.* at 18–19.

## B.    The Contract Allows Only a Consistent, Reasonable Margin and XOOM Failed to Show that Its Margins Included Undisclosed Supply Costs

For the second common question—the legal import of XOOM's promise that variable rates would be "based on" supply costs—Judge Ross found that the contract "required the variation in those rates to be determined solely by XOOM's actual and estimated supply costs." MSJ Order at 14. Any margin XOOM added to costs "would have to remain proportionate, but not equal to the supply costs over time." *Id.* at 13. In other words, XOOM's contract is a cost-plus contract.

With this backdrop, Judge Ross found that XOOM failed to meet its summary judgment burden. MSJ Order at 13–17. Specifically, though XOOM's corporate witnesses conveniently testified that "prior period adjustments"—increases to recover costs from prior months—were "included in the margin and therefore responsible for rate fluctuations," Judge Ross found no "***documentary*** evidence demonstrating" this claim. *Id.* at 16 (emphasis added); Order at 13 n.6 (XOOM "had every reason to substantiate its motion with evidence reflecting the incorporation of prior period adjustments in its margins—and failed to do so"). In addition, even assuming XOOM incorporated supply costs into its margin, Judge Ross found that the jury could still find breach of contract. Order at 13–14. Finally, Judge Ross ruled that the jury could find breach when XOOM used cost overruns in other markets to increase Class rates. *Id.* at 13 (citing MSJ Order at 17).

Moreover, even if XOOM had met its burden, the Court found that Plaintiff presented enough contrary evidence. *Id.* at 17–19. The MSJ Order identified "[s]everal pieces of evidence" suggesting "that XOOM relied on pricing strategies or other considerations" which would constitute breach, including that "it appears that XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and that rates were set accordingly." *Id.* at 17.

C.      **The Court Accepted Plaintiff's Damages Methodology and the Question of the Appropriate Margin Is for the Factfinder**

Regarding the appropriate margin, at summary judgment and class certification Plaintiff used two separate damages models to show what XOOM's rates should have been. Order at 9. Judge Ross rejected the first model, but accepted and aptly described the second:

> The second damages model assumes that XOOM was allowed to charge its variable rate customers the same margin it charged its fixed-rate customers, an approximately 19% markup. This model calculates damages as the difference between the variable rates and the Total Cost plus the fixed rate margin . . . .

Order at 9 (cleaned up). The Court found this model "entirely consistent" with Plaintiff's liability theory. *Id.* at 14. Under this model, Plaintiff was damaged by $36 and the Class by roughly $27,500,000. *Id.* at 9. Whether the 19% margin applies will be determined by the factfinder. *See Galloway ex rel. Melissa Galloway Snell Living Tr. Dated May 1, 2018 v. Snell*, 885 S.E.2d 834, 836 (N.C. 2023) (where a contract is ambiguous, its "effect is a factual question for the jury").[5]

## II.      XOOM'S RATES WERE UNIFORMLY UNTETHERED TO SUPPLY COSTS

XOOM admits that it "always" set rates via a uniform process. XOOM Ex. D, Defs.' Reply in Support of Rule 23(f) Pet., at 8.[6] This process involved XOOM pricing and product team members who, rather than use a formula based on supply costs, MSJ Order at 16, set rates based on the ad hoc views expressed at rate-setting meetings. Although meeting attendees reviewed workbooks containing XOOM's "Total Cost," XOOM's margin, and the rate derived therefrom, *id.* at 4, the evidence shows that XOOM's rates were "guided by pricing strategies" designed to "protect" margin, "achieve revenue goals," and other non-supply factors, *id.* at 5–6.

---

[5] Although at summary judgment the Court found XOOM's contract was vague, not ambiguous, Judge Ross noted North Carolina courts (the applicable law) "do not always distinguish ambiguity from vagueness, or interpretation . . . from construction." MSJ Order at 12 (citing 5 Corbin on Contracts § 24.3 (2023)).

[6] XOOM's claim that the opposite is "undisputed," Defs.' Br. at 2, is incorrect and is a reversal of its prior position. XOOM's new (and incorrect) claim should be disregarded.

III.   **FOLLOWING A RIGOROUS RULE 23 ANALYSIS, JUDGE ROSS GRANTED CLASS CERTIFICATION**

Two weeks after the MSJ Order, Judge Ross faithfully applied the relevant standards and was well within her discretion to find each Rule 23 requirement met by a preponderance of the evidence.   Order at 8 (ascertainability, numerosity); *id.* at 10 (commonality); *id.* at 15 (predominance); *id.* at 16 (typicality); *id.* at 17 (adequacy), *id.* at 18 (superiority).

The Order first found that "[t]he question at the center of this suit is whether the variable rates XOOM charged its customers were 'based on XOOM's actual and estimated supply costs.'" *Id.* at 3.  Judge Ross also reiterated that the contract required "variable rates to be determined *only* by XOOM's actual and estimated supply costs." *Id.*  (emphasis in original).  "This does not mean that the rate must equal the supply costs, but that it must vary according to those costs." *Id.*

Judge Ross further noted that "[i]f the measure of actual and estimated supply costs were undisputed, the putative class would have a relatively straightforward case centered on three variables: the supply costs, the rate charged, and a reasonable margin." *Id.*  "However, the parties dispute what the supply costs are and whether it is possible to identify them." *Id.*

Judge Ross then noted that Plaintiff contends the rate-setting workbooks' "Total Cost" equals the "supply costs" of the contract's pricing term, whereas XOOM claims that intangible and undocumented "prior period adjustments" were buried in the workbooks' margin figure. *Id.* XOOM also claimed that "prior period adjustments" could be used to recoup losses in non-Class markets. *Id.* Judge Ross carefully noted that the MSJ Order had already "determined that whether prior period adjustments were factored into the margin and whether prior period adjustments impacted plaintiff's rates are disputed questions of material fact." *Id.*

Following these observations, Judge Ross correctly identified the Court's obligations at certification—noting that she could only certify a class if a "rigorous analysis" showed "that the

prerequisites of Rule 23(a) and Rule 23(b) have been satisfied by a preponderance of the evidence." *Id.* at 6 (quotation omitted).  Judge Ross then found certification warranted, and as set forth below, exhibited particular care when explaining her findings of commonality and predominance.

### A.  Commonality

Judge Ross found "at least two common questions, breach and damages."  *Id.* at 9.  Noting that "[c]laims for breach of contract are particularly well-suited for class certification" (collecting cases), the Court emphasized that customers with the same form contract raise "a common question undoubtedly capable of common resolution: whether XOOM's rates were set in breach of the common contract language."  *Id.* at 10.  XOOM's defenses also rely on common proof, namely, "evidence of XOOM's process for determining the variable rate margin."  *Id.*  Regarding damages, the Class would need only "a single damages model to apportion liability."  *Id.*

### B.  Predominance

Judge Ross carefully examined XOOM's claim that its supply costs were *per se* unidentifiable and rejected it because "a reasonable jury could conclude that XOOM did not factor prior period adjustments into its margin or that XOOM's practice of adjusting the margin to cover cost overruns and meet revenue goals was not permitted under the contract."  *Id.*  (citing MSJ Order at 17).  The question of whether XOOM could add these "costs" to margin predominated:

> If the contract allowed XOOM to incorporate prior period adjustments and other supply costs into the margin, and they in fact did so consistent with the contract, the class will fail together.  If XOOM did not incorporate prior period adjustments and other supply costs into the margin, or did so in violation of the contract, the class will prevail together.  Either way, the outcome will be determined by common evidence, rather than evidence that differs between class members.

*Id.* at 13–14.

Similarly, Judge Ross found that Plaintiff's damages model, which incorporates XOOM's profitable fixed rate margin, was "entirely consistent with Plaintiff's theory."  *Id.* at 14.  The Court

further noted that "XOOM does not dispute that the algorithm itself is faulty—any measure of damages in this case would undoubtedly be based on the rate, cost, and margin." *Id.*

## ARGUMENT

**I.     XOOM'S RULE 23(F) PETITION WILL FAIL ON THE MERITS**
*(Responding to Defs.' Point III.A, Defs.' Br. at 5–12)*

    **A.     Judge Ross Applied the Correct Preponderance of the Evidence Standard**
    *(Responding to Defs.' Point III.A.1, Defs.' Br. at 6–7)*

The Order clearly recited that the Rule 23 requirements must be met by a preponderance of the evidence, Order at 6, and that district courts must conduct a rigorous analysis and resolve factual disputes, *id.*  Judge Ross's 19-page Order faithfully applied this framework and also incorporated the detailed 21-page MSJ Order issued just two weeks earlier.

Nevertheless, as a last-ditch effort, XOOM cherry-picks two snippets from the Order, misinterprets them as applying a standard with a "preference" for certification. *See* Defs.' Br. at 6–7.  XOOM then claims this supposed error displaces the default Rule 23(f) standard (abuse of discretion) and conveniently occasions *de novo* appellate review.  Defs.' Br. at 1.  XOOM further claims the district courts of this Circuit commit the same error, *id.* at 6, yet no case law suggests that courts reject the preponderance standard, apply the wrong standard, or that Judge Ross did so here.  In fact, XOOM fails to show any instance where Judge Ross's supposed "preference" affected a finding.  Nor can it.  Instead, XOOM conclusorily claims that because *de novo* review is warranted, its stay petition is different from the many others denied over the last decade.  Defs.' Br. at 15.  XOOM's legal gymnastics typify the adage that "if you can't tie a knot, tie a lot."

In fact, XOOM's argument is nearly identical to one rejected as "misleading" by the Third Circuit in *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774 (3d Cir. 2009).  The *Constar* defendant seized on the district court's statements that it "adopted a liberal construction of Rule 23" and "any error[,] if there is to be one, should be committed in favor of allowing a class action," claiming the

wrong standard was applied.  *Id.* at 781.  But in *Constar*, like here, the district court also noted that the correct standard was "a rigorous analysis and findings that the class satisfies all the requirements of Rule 23," and undertook that analysis.  *Id.* at 782.  The Third Circuit thus found the defendant's "characterization of the class certification standard applied by the District Court" was "misleading[]" and "incorrect."  *Id.*  The same is true here.[7]

### B.   Plaintiff Will Use Common Evidence to Demonstrate XOOM's Breach
*(Responding to Defs.' Point III.A.2.a, Defs.' Br. at 7–10)*

XOOM's disagreements with Judge Ross's findings and resolution of merits questions—the pricing term's construction and whether Plaintiff could prove XOOM breached that term—do not (and cannot) show an abuse of discretion.

In fact, Plaintiff will prove breach with common evidence, including the sharp divergence between XOOM's rates and its detailed and well-documented supply cost compilations, XOOM's practice of using of non-supply cost factors (including target margins, profit, and "pricing strategies") to set rates, XOOM's practice of using Class rates to recoup overruns in non-Class markets, and XOOM's post-hoc fabrication that its margins actually contain undisclosed supply costs.  Order at 3, 12–14; MSJ Order 17–19.  Just as the Order found, there is no need to delve into each individual rate-setting decision because "[t]he central issue common to all class members is the constitution of supply costs, an issue the factfinder can resolve through witness testimony, expert testimony, and documents and communications related to the rate-setting process."  Order at 13.  Thus, whether XOOM was allowed "to incorporate prior period adjustments and other supply costs into the margin, and [whether] they in fact did so consistent with the contract," will

---

[7] XOOM is also wrong that "Plaintiff has not denied that the standard was incorrect." Defs.' Br. at 6. Plaintiff has repeatedly shown that the Order clearly laid out and faithfully applied the preponderance of the evidence standard XOOM now claims was absent. *See, e.g.*, Ex. 2, Pl.'s Resp. in Opp'n to Defs.' Rule 23(f) Pet. at 7–10, 12–13; Ex. 3, Pl.'s Opp'n to Defs.' Mot. to File Reply at 12–13.

be "determined by common evidence, rather than evidence that differs between class members." *Id.* at 13–14. In other words, Judge Ross already considered—and clearly rejected—XOOM's claim that a class is inappropriate because the trial will involve "5,700+ unique rate-setting decisions" and that XOOM's supply costs were in fact secreted into margins. Defs.' Br. at 4.

XOOM does not agree, but its claim that there is "no common proof as to how actual supply costs, including prior period adjustments, impacted each rate" relies on the assumption that the jury will side with XOOM on at least three key common classwide issues. Defs.' Br. at 7.

First, XOOM admits that it "always" used a uniform process to set rates. XOOM Ex. D at 8. In fact, Judge Ross found that it was "beyond peradventure" that the process was standardized. MSJ Order at 4. XOOM's rates were based on "pricing strategies or other considerations," and "XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and [] rates were set accordingly." *Id.* at 17–19. As XOOM's Director of Pricing and Structuring admitted, staff would plug a rate into the workbooks and then look at the margin "that results from the rate we input." *Id.* at 17. Similarly, XOOM's CEO admitted "that most of the pricing team 'wasn't even privy to the operating expenses and things like that,' but that they were privy to '[t]he gross margin goal for the month.'" *Id.* Both executives also admitted that XOOM raised New York margins "so we could lower them elsewhere." *Id.* at 18. This is just the tip of the iceberg— XOOM witnesses made a host of classwide admissions that XOOM set rates using numerous non-cost factors. Pl.'s Class Cert. Mem. at 16–18, Dkt. No. 137; Pl.'s Reply on Class Cert. at 14– 19, 21–23, Dkt. No. 140. This process unmistakably violates Judge Ross's finding that the contract is cost-plus. If the jury agrees, liability will be determined in one stroke.

Second, assuming XOOM's standard rate-setting process does not *per se* breach, if the jury rejects XOOM's dubious claim that prior period adjustments or other supply costs were secretly

incorporated into margins (because, *inter alia*, there is no documentation), then XOOM's "Total Cost figure" equals XOOM's supply costs, quickly establishing classwide liability. That is a likely outcome. As the contract's drafter, XOOM knew its customers would eventually seek an accounting of its supply costs; it is simply not credible for XOOM to claim that it buried certain supply costs in its margins while simultaneously tabulating a "Total Cost" figure.

XOOM's lack of evidence for its common defense regarding prior period adjustments is also classwide, uniform proof. *See* Order at 10 ("Indeed, XOOM's breach of contract defense relies on common proof—evidence of XOOM's process for determining the variable rate margin."). As to XOOM's claim that "for each of the 5,700+ rates" the jury cannot rely on XOOM's own supply cost compilations but instead must hear from "witnesses from the rate-setting meeting in question" on the "actual supply costs . . . for the particular product and zone," Defs.' Br. at 8, this is compelling evidence that XOOM invents supply costs out of thin air.

Third, assuming XOOM can prove its supply costs were included in margins, the jury could still find that XOOM could not account for costs from non-Class geographies. *See* MSJ Order at 5, 18. The Order is clear: the question of breach can be answered "in one stroke." Order at 13.

C.   **Plaintiff Will Use Common Evidence to Establish Margin and Thus Damages**
     *(Responding to Defs.' Point III.A.2.b, Defs.' Br. at 10–12)*

The Court found that the Class needs only "a single damages model," *id.* at 10, and the specific amount of XOOM's overcharges is contained therein, *id.* at 14. The model also contains an appropriate margin: the profitable margins XOOM charged its riskier fixed rate customers. XOOM is thus wrong to claim that Plaintiff "admits" she offers "no relevant evidence" allowing a jury to find a reasonable and proportionate margin. Defs.' Br. at 10. If the jury applies the fixed rate margin, the rate that "should have been" charged flows from the damages model (the mechanics of which are undisputed) and each rate is determined "in one stroke." Order at 14–15.

12

Next, XOOM distorts the record when it claims that Judge Ross "recognized" its rate-setting worksheets do not reflect supply costs. Defs.' Br. at 8. Instead, the MSJ Order noted Plaintiff's contention that "there is no evidence that prior period adjustments" or other supply costs were included in XOOM's margins, MSJ Order at 4–5, and to any extent "XOOM made rate adjustments on unanticipated cost overruns," Plaintiff's position is "that XOOM did so in violation of the contract," *id.*; *see also* Order at 3 ("the parties dispute what the supply costs are and whether it is possible to identify them"). [8, 9] In sum, XOOM fails to demonstrate a likelihood of success.

## II. XOOM FAILS TO IDENTIFY ANY IRREPARABLE HARM ABSENT A STAY
*(Responding to Defs.' Point III.B, Defs.' Br. at 12–13)*

XOOM asserts that this case is "extraordinary," Defs.' Br. at 12, but its arguments are routine. Other than rehashing its merits arguments, the only harm XOOM identifies is litigation costs. Defs.' Br. at 12–13. This claim has been "consistently" rejected in this Circuit. *Pryce v. Progressive Cas. Ins. Co.*, No. 19 Civ. 1467 (RJD) (RER), 2022 WL 2467013, at *2 (E.D.N.Y. June 10, 2022) ("Courts within the Circuit, however, have consistently held that a movant is not irreparably harmed by the prospect of litigation costs, even if substantial.").

XOOM's settlement pressure claim is merely a reformulation of "litigation costs." *Id.* at *2. Further, given the $23 billion enterprise value of XOOM's publicly traded parent NRG

---

[8] XOOM's colorful charts, Defs.' Br. at 8, 10, merely show XOOM's **position** on these factual disputes that the evidence does not support.

[9] In accepting Plaintiff's damages model, Judge Ross also rejected XOOM's criticisms of Plaintiff's experts. The Motion's cited deposition snippets, Defs.' Br. at 11, addressed counsel's question of exactly how little margin XOOM would need to still be profitable; the expert advised that he would need to see XOOM's internal costs, including non-supply costs not referenced in the contract. XOOM Ex. J at 70:22–72:7. Nor did Plaintiff's expert "concede" he could not provide a margin at trial, Defs.' Br. at 11, but rather disclaimed the ability to calculate XOOM's overall profitability absent additional information. XOOM Ex. J at 69:13–70:3. XOOM's claim that Plaintiff's experts "could not provide a general industry opinion" about the appropriate margin for an ESCO's variable rates, Defs.' Br. at 12, is not accurate, as the expert clearly simply stated he "would need more inputs than are available at present." XOOM Ex. J at 73:8–74:10.

Energy, Inc.,[10] "it is difficult to conceive of an amount of money sufficiently 'ruinous' to coerce" XOOM into settlement." *Id.* In fact, if this "theory carried the day, requests to stay pending Rule 23(f) appeal would be granted as a matter of course, since the certification of every class imposes at least some settlement pressure on defendants." *Id.* Tellingly, *Pryce* has still not settled.[11]

## III.   PLAINTIFF AND THE CLASS WOULD BE INJURED BY A STAY
*(Responding to Defs.' Point III.C, Defs.' Br. at 13–14)*

Although XOOM claims Plaintiff and the Class should take solace in the availability of prejudgment interest, Defs.' Br. at 13, "class members have a valid interest in the prompt resolution of the case," *Pryce*, 2022 WL 2467013, at *3. A stay "would also delay any recovery due plaintiffs[.]" *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1641699, at *12 (S.D.N.Y. Apr. 24, 2014).[12] XOOM makes no argument as to the harm caused by delay.[13, 14]

## IV.   THE PUBLIC INTEREST FAVORS TIMELY RESOLUTION OF THIS ACTION
*(Responding to Defs.' Point III.D, Defs.' Br. at 14)*

XOOM's two points regarding risk to the public absent a stay are (1) a waste of judicial resources, and (2) potential confusion of Class members. Defs.' Br. at 14. Neither holds water.

---

[10] YAHOO! FINANCE, *NRG Energy, Inc.*, https://finance.yahoo.com/quote/NRG/key-statistics (last visited Nov. 20, 2023).

[11] XOOM cites the out-of-circuit *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir. 1999). But the *Blair* quote addresses the likelihood of success on the merits, not irreparable harm, and that opinion also did not decide a stay motion; its discussion of a stay's appropriateness was an "abstraction[.]" *Id.* at 835.

[12] *See also LaCour v. Colgate-Palmolive Co.*, No. 16 Civ. 8364 (KMW), 2021 WL 3542295, at *2 (S.D.N.Y. Aug. 10, 2021) (class and public served by "resolv[ing] the claims at issue efficiently and, if damages are owed, to compensate consumers for any losses they may have suffered.").

[13] XOOM's remaining claims—that Plaintiff "waited five years to file this case" and that she also sued another ESCO that, like XOOM, overcharged her for her energy supply—are irrelevant to the Class. Defs.' Br. at 13–14.

[14] XOOM's reliance on *Brown v. Peregrine Enterprises, Inc.*, No. 22-CV-1455, 2022 WL 17593321 (S.D.N.Y. Dec. 13, 2022) is unavailing. The interlocutory appeal in *Brown* concerned a motion to strike collective action claims during discovery, but the court allowed discovery to proceed on the individual plaintiff's claims. *Id.* at *1. Here, discovery is complete and the case is proceeding to trial.

"The public interest weighs against a stay for similar reasons of judicial economy" and "[c]ourts within the Circuit have continually held that the public interest lies in the swift resolution of cases, particularly when the likelihood of success on appeal is speculative at best." *Pryce*, 2022 WL 2467013, at *3 (collecting cases).[15]

On Class member confusion, *In re Apple & ATTM Antitrust Litig.*, No. 07-CV-5152, 2010 WL 11489069, at *3 (N.D. Cal. Sept. 15, 2010), is inapposite because it merely stayed notice after the case had already been stayed. *Id.* Any risks of Class member confusion can also be addressed during the notice process. *See Chen-Oster*, 2018 WL 10038786, at *1.

## V.   ON BALANCE, XOOM FAILS TO DEMONSTRATE A STAY IS WARRANTED
*(Responding to Defs.' Point III.E, Defs.' Br. at 14–15)*

All four stay factors weigh against XOOM.  XOOM's only claim as to the legion of cases denying nearly identical stay requests is that this time is different.  It is not.[16]

Because XOOM fails to establish any of the Rule 23(f) stay factors, this Court should rule consistently with every other district court in this Circuit in the past 10 years and deny the Motion.

---

[15] XOOM's cases are inapposite.  Both *Nelson v. G.Skill USA, Inc.*, No. 22-CV-6175, 2023 WL 3300408, at *2 (W.D.N.Y. May 8, 2023), and *Readick v. Avis Budget Grp., Inc.*, No. 12-CV-3988, 2014 WL 1683799, at *2 (S.D.N.Y. Apr. 28, 2014), concern the "first-filed" rule for overlapping class cases and stayed the later-filed case using a different legal test. *Earl v. Boeing Co.*, 21 F.4th 895, 900 (5th Cir. 2021), did not address public interest other than noting the defendant there "show[ed] a substantial likelihood of success on appeal." Here, XOOM has made no such showing.

[16] XOOM's cases do not change this fact.  The Second Circuit, not the district court, stayed *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017)—apparently the only stay issued in this Circuit in the last 10 years— only after granting the Rule 23(f) petition and expediting the appeal.  Neither has occurred here.  Similarly, in *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 220–21 (2d Cir. 2008), the Second Circuit issued a stay when it granted the Rule 23(f) petition.  Notably, *McLaughlin* involved $800 billion in damages on complicated fraud claims, including issues of reliance.  In contrast, as recognized by Judge Ross, "[c]laims for breach of a form contract are particularly well-suited for class certification."  Order at 10 (citing *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004)).

Dated: November 20, 2023                        Respectfully submitted,

                                                 /s/ Ethan D. Roman
                                                Ethan D. Roman
                                                J. Burkett McInturff
                                                **WITTELS MCINTURFF PALIKOVIC**
                                                J. Burkett McInturff
                                                305 BROADWAY, 7TH FLOOR
                                                NEW YORK, NEW YORK 10504
                                                Telephone: (914) 775-8862
                                                Facsimile: (914) 775-8862
                                                edr@wittelslaw.com
                                                jbm@wittelslaw.com

                                                *Class Counsel for Plaintiff and the Class*

                                                Daniel Hymowitz
                                                **HYMOWITZ LAW GROUP, PLLC**
                                                1629 SHEEPSHEAD BAY ROAD
                                                BROOKLYN, NY 11235
                                                Telephone: (718) 807-9900
                                                Facsimile: (866) 521-6040
                                                daniel@hymowitzlaw.com

                                                Andrey Belenky
                                                Dmitry Kheyfits
                                                **KHEYFITS BELENKY LLP**
                                                1140 AVENUE OF THE AMERICAS, 9TH FLOOR
                                                NEW YORK, NY 10036
                                                Telephone: (212) 203-5399
                                                Facsimile: (212) 203-6445
                                                abelenky@kblit.com
                                                dkheyfits@kblit.com

                                                *Co-Counsel for Plaintiff and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 20, 2023, the foregoing was served via email on all counsel of record.


By:  <u>/s/ Ethan D. Roman   </u>
Ethan D. Roman