# Exhibit 2

# No. 23-1267

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated,

*Plaintiff-Respondent*,

v.

XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,

*Defendants-Petitioners*.

ON PETITION FOR REVIEW FROM AN ORDER CERTIFYING CLASS ON AUGUST 31, 2023
BY THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK
CASE NO. 18 CIV. 2949
THE HON. ALLYNE R. ROSS PRESIDING

---

**PLAINTIFF'S ANSWER IN OPPOSITION TO DEFENDANTS' PETITION
FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL
RULE OF CIVIL PROCEDURE 23(f)**

---

Ethan D. Roman
J. Burkett McInturff
Steven L. Wittels
**WITTELS MCINTURFF PALIKOVIC**
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862

*Lead Class Counsel for Plaintiff and the Class*

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

RELEVANT PROCEDURAL AND FACTUAL BACKGROUND .......................4

    I.    THE DISTRICT COURT DENIED XOOM'S SUMMARY
          JUDGMENT MOTION, HOLDING THAT XOOM'S
          CONTRACT REQUIRES RATES TO BE DETERMINED BY
          XOOM'S SUPPLY COSTS .................................................................... 4

    II.    FOLLOWING A RIGOROUS RULE 23 ANALYSIS, THE
          DISTRICT COURT GRANTED CLASS CERTIFICATION ................ 6

          A.    Commonality.....................................................................8

          B.    Predominance....................................................................8

          C.    Typicality .........................................................................9

ARGUMENT ...............................................................................................................10

    I.    STANDARD OF REVIEW.................................................................... 10

    II.    XOOM'S PETITION FAILS BOTH *SUMITOMO* PRONGS .............. 10

    III.    THE DISTRICT COURT APPLIED THE PREPONDERANCE
           OF THE EVIDENCE STANDARD ...................................................... 12

    IV.    XOOM'S COMPLAINTS ABOUT COMMONALITY AND
           PREDOMINANCE ARE THINLY VEILED CHALLENGES TO
           THE DISTRICT COURT'S RESOLUTION OF MERITS ISSUES,
           NOT CLASS CERTIFICATION ISSUES............................................ 13

          A.    XOOM's Standardized Rate Setting Process Violated the
               Contract and There Is No Need to Assess Each Individual
               Rate ...............................................................................13

          B.    Plaintiff's Damages Model Measures Classwide Damages
               Based on the Rates XOOM Should Have Charged .....................18

    V.    PLAINTIFF IS UNQUESTIONABLY TYPICAL OF THE CLASS .... 21

CONCLUSION ........................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Bell v. Gateway Energy Services Corp.*,
No. 31168/2018 (Rockland Cnty. Super. Ct. Jan. 8, 2021),
NYSCEF No. 152 ......................................................................................2

*Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*,
86 S.E. 1025 (N.C. 1915) ........................................................................21

*BLT Steak LLC v. Liberty Power Corp., L.L.C.*,
No. 151293/2013 (N.Y. Cnty., Super. Ct. Aug. 14, 2020),
(NYSCEF No. 376) ...................................................................................2

*Claridge v. N. Am. Power & Gas, LLC*,
No. 15 Civ. 1261 (PKC), 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) ..............1

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ......................................................................... 18, 19

*Hasemann v. Gerber Prods. Co.*,
331 F.R.D. 239 (E.D.N.Y. 2019) .......................................................18

*In re Cablevision Cons. Litig.*,
10 Civ. 4992 (JS) (AKT), 2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014)...........18

*Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24, 31 (2d Cir. 2006) ................................................... 11, 12

*In re Petrobas Secs.*,
862 F.3d 250 (2d Cir. 2017) ....................................................... 12, 13

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015) ......................................... 11, 12, 15, 16

*Knipe v. Skinner*,
999 F.2d 708 (2d Cir. 1993) .................................................................16

*Richards v. Direct Energy Servs., LLC*,
915 F.3d 88 (2d Cir. 2019) ...................................................................20

*Roberts v. Verde Energy, USA, Inc.*,
  No. X07-HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct.
  Dec. 6, 2017), *aff'd*, 2019 WL 1276501 (Conn. Super. Ct. Feb. 1, 2019).............1

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  293 F.R.D. 287 (E.D.N.Y. 2013) ........................................................................19

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
  262 F.3d 134 (2d Cir. 2001) ........................................................... 10, 11

*Troitino v. Goodman*,
  35 S.E.2d 277 (N.C. 1945) ..................................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................12

**Rules**

Fed. R. Civ. P. 23(a)..................................................................................7

Fed. R. Civ. P. 23(b) ................................................................................7

Fed. R. Civ. P. 23(c)(4)(B) .......................................................................10

Fed. R. Civ. P. 23(f)............................................................... 1, 3, 10, 23

Plaintiff Susana Mirkin respectfully submits her answer in opposition to Defendants XOOM Energy, LLC and XOOM Energy New York, LLC's (together "XOOM") Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) ("Petition") the District Court's August 31, 2023 Opinion and Order granting class certification ("Order").

## **INTRODUCTION**

XOOM's Rule 23(f) petition is a delay tactic. XOOM's customer contract promised Plaintiff and roughly 100,000 other New Yorkers that their variable natural gas and electricity rates would be "based on" XOOM's "actual and estimated supply costs." Plaintiff alleges that XOOM's rates were not based on its supply costs. In its 19-page Order, the District Court certified a class of XOOM's New York customers after carefully applying the relevant standards and weighing the evidence developed over more than five years of litigation.

This was no surprise, as at least four other similar class actions have been certified against other third-party energy service companies ("ESCOs") like XOOM that—as here—were alleged to have breached the uniform pricing provisions of their form contracts.[1] Indeed, as the District Court noted in the Order, claims for breach of standardized contracts "are particularly well-suited for class certification." A-10.

---

[1] *Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261 (PKC), 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016); *Roberts v. Verde Energy, USA, Inc.*, No. X07-

*footnote continued on next page*

In addition to identifying Plaintiff's readily certifiable claim, the District Court had a full record for considering the class certification questions. In fact, the Order was issued just two weeks after the District Court denied XOOM's summary judgement motion. These two motions occasioned an immense exchange of information, including 214 pages of briefing, 145 exhibits, 5 declarations, and 4 expert reports. Those submissions included XOOM's admission that variable rates were "always determined" through a uniform process that was followed "without exception."

The well-developed record also revealed XOOM's common defense to the Class's breach claim. XOOM's rate-setting process relied on workbooks containing XOOM's "Total Cost" or "COGS" ("cost of goods sold")—which the District Court found are "essentially the sum of the costs XOOM incurs when procuring energy on the wholesale market." A-3. Nevertheless, XOOM claims that it also secretly accounted for additional supposed "supply costs" in the separate "margin" line item of its workbooks. Critically, despite XOOM's common defense that it used its margins to account for additional supply costs, XOOM produced no documentary evidence of this practice and thus the District Court found that a reasonable jury

---

HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017), *aff'd*, 2019 WL 1276501 (Conn. Super. Ct. Feb. 1, 2019); *Bell v. Gateway Energy Servs. Corp.*, No. 31168/2018 (Rockland Cnty. Super. Ct. Jan. 8, 2021), NYSCEF No. 152 (A-92); *BLT Steak LLC v. Liberty Power Corp., L.L.C.*, No. 151293/2013 (N.Y. Cnty., Super. Ct. Aug. 14, 2020), (NYSCEF No. 376).

could conclude that no such practice occurred or that it unfolded in a way that violated the contract. A-13. Either way, the District Court found that the "central issue common to all class members" is which XOOM costs constitute "supply costs" under the contract, "an issue the factfinder can resolve through witness testimony, expert testimony, and documents and communications related to the rate-setting process." A-13. The District Court also correctly found that this question can be answered "in one stroke." *Id.*

Further, in denying XOOM's summary judgment motion the District Court ruled that the contract allowed XOOM only a consistent margin. A-32. On the heels of this key ruling, the District Court had no trouble concluding that if XOOM did not in fact incorporate supply costs into its margin, "or did so in violation of the contract, the class will prevail together," correctly observing that "the outcome will be determined by common evidence, rather than evidence that differs between class members." A-14. This was especially true given the District Court's summary judgment finding that "[s]everal pieces of evidence" suggested "that XOOM relied on pricing strategies or other considerations to determine the monthly variable rate," A-36–A-38, including evidence that "revenue goals" were a primary consideration in XOOM's rate-setting process. A-36.

With a class action trial looming, XOOM now seeks delay via its Rule 23(f) petition. Yet even a cursory reading of the Order demonstrates that the District Court

3

faithfully applied the relevant standard and was well within its discretion to find that common questions predominate and that Plaintiff's claims are typical. XOOM's Petition should be denied.

## RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

## I.     THE DISTRICT COURT DENIED XOOM'S SUMMARY JUDGMENT MOTION, HOLDING THAT XOOM'S CONTRACT REQUIRES RATES TO BE DETERMINED BY XOOM'S SUPPLY COSTS

In May 2013, XOOM began supplying electricity to Plaintiff Susanna Mirkin's home in Brooklyn. A-2. Under XOOM's non-negotiable form contract, its monthly energy rates would vary "based on XOOM's actual and estimated supply costs, which may include but not be limited to prior period adjustments, inventory and balancing costs." *Id.*

At summary judgment, the parties offered competing readings of the above-quoted pricing term. A-28–A-33. In its August 14, 2023, Summary Judgment Opinion and Order ("MSJ Order") the District Court resolved these issues in rulings that carried over to its class certification findings issued just two weeks later.

At the outset, the District Court construed the pricing term's legal effect and found that by agreeing to "base" variable rate fluctuations on XOOM's supply costs, the contract "required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs." A-33. Acknowledging that XOOM could add a margin to its supply costs, the District Court ruled that any "margin

4

would have to remain proportionate, but not equal to the supply costs over time." A-32.

The MSJ Order then considered—and rejected—XOOM's three justifications for its rates. A-35. First, XOOM argued that the pricing term allowed it to add any amount of margin to its supply costs, so long as it did not "vastly exceed" them. A-30; A-35. This argument was foreclosed by the MSJ Order's contract construction. A-35.

Second, XOOM claimed, then and now, that additional supply costs including "prior period adjustments" (increases to recover costs from prior months) were in fact included in XOOM's margin (instead of the supply cost side of the ledger) and that those elusive costs caused XOOM's fluctuating margins. *See, e.g.*, Pet. at 7. The MSJ Order correctly observed, however, that XOOM had not produced **any** "documentary evidence" identifying these additional so-called costs or how they impacted rates, and that **none** of the documents considered at rate-setting meetings mentioned these costs. A-13; A-35.

Third, XOOM argued that the contract only required correlation between costs and margins, but the District Court found that correlation did not answer the question of whether "XOOM added a permissible markup above its cost calculation." A-36.

On this record, the District Court found that XOOM failed to meet its summary judgment burden. A-34–A-36. In fact, even if XOOM had made the

requisite threshold showing, the District Court found that Plaintiff had presented sufficient contrary evidence. A-36–A-38. Specifically, the District Court identified "[s]everal pieces of evidence" suggesting "that XOOM relied on pricing strategies or other considerations to determine the monthly variable rate" which would constitute breach. *Id.* This included evidence that led the District Court to find that "it appears that XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and that rates were set accordingly." A-36.

## II. FOLLOWING A RIGOROUS RULE 23 ANALYSIS, THE DISTRICT COURT GRANTED CLASS CERTIFICATION

Two weeks after the MSJ Order, on August 31, 2023, the District Court issued its Order, which began by noting that "[t]he question at the center of this suit is whether the variable rates XOOM charged its customers were 'based on XOOM's actual and estimated supply costs.'" A-3. The District Court also observed that its MSJ Order found that "the contract required the monthly variable rates to be determined *only* by XOOM's actual and estimated supply costs." *Id.* (emphasis in original). "This does not mean that the rate must equal the supply costs, but that it must vary according to those costs." *Id.*

The Order also noted that "[i]f the measure of actual and estimated supply costs were undisputed, the putative class would have a relatively straightforward case centered on three variables: the supply costs, the rate charged, and a reasonable margin." *Id.* "However, the parties dispute what the supply costs are and whether

it is possible to identify them." *Id.* During discovery, XOOM produced rate-setting workbooks containing an internal cost calculation labeled "Total Cost" or "COGS" which the District Court found "is essentially the sum of the costs XOOM incurs when procuring energy on the wholesale market." *Id.* The workbooks also listed margin and "the Total Cost plus the margin equals the rate[.]" A-4.

The District Court then relayed Plaintiff's position that "Total Cost" equals the "supply costs" of the contract's pricing term, whereas XOOM claims that "prior period adjustments" (not mentioned in the workbooks) were in fact buried in the workbooks' margin figure, though no documentary evidence shows this. *Id.* XOOM also claimed that "prior period adjustments" could be used to recoup losses in non-Class markets. *Id.* The District Court was careful to note that the MSJ Order had already "determined that whether prior period adjustments were factored into the margin and whether prior period adjustments impacted plaintiff's rates are disputed questions of material fact." *Id.*

Following these observations, the District Court correctly identified its obligations at certification—noting that it could only certify a class if a "rigorous analysis" showed "that the prerequisites of Rule 23(a) and Rule 23(b) have been satisfied by a preponderance of the evidence." A-6 (quotation omitted). The District Court then found certification warranted, and as set forth below, exhibited particular care when explaining its findings of commonality, predominance, and typicality.

7

## A.    Commonality

On commonality, the District Court found "at least two common questions, breach and damages."  A-9.  Noting that "[c]laims for breach of contract are particularly well-suited for class certification," (collecting cases) it emphasized that the Class encompasses only individuals who entered identical form contracts, raising "a common question undoubtedly capable of common resolution: whether XOOM's rates were set in breach of the common contract language."  A-10.  It further noted that XOOM's defenses rely on common proof, namely, "evidence of XOOM's process for determining the variable rate margin."  *Id.*

With respect to damages, the District Court similarly found the Class would need only "a single damages model to apportion liability."  *Id.*  XOOM's claims about supposed supply costs not listed in its rate-setting workbooks (*i.e.*, the "prior period adjustments" XOOM claims were incorporated into margin) were considered but had "little bearing on the narrow question of whether there are questions of law or fact common to the class as a whole."  *Id.* (quotation omitted).  Instead, XOOM's claims about extra supply costs were better addressed in the predominance inquiry.

## B.    Predominance

On predominance, the District Court carefully reviewed, and rejected, XOOM's claim that its supply costs were unidentifiable.  A-13.  Instead, it found that "a reasonable jury could conclude that XOOM did not factor prior period

adjustments into its margin or that XOOM's practice of adjusting the margin to cover cost overruns and meet revenue goals was not permitted under the contract." *Id.* (citing A-35–A-36). Thus, the District Court determined that the question of whether XOOM was contractually allowed to add these undisclosed supply costs to its margin (a practice referenced seriatim in the Petition) predominated:

> If the contract allowed XOOM to incorporate prior period adjustments and other supply costs into the margin, and they in fact did so consistent with the contract, the class will fail together. If XOOM did not incorporate prior period adjustments and other supply costs into the margin, or did so in violation of the contract, the class will prevail together. Either way, the outcome will be determined by common evidence, rather than evidence that differs between class members.

A-13–A-14.

Similarly, the District Court found that Plaintiff's damages model, which incorporates XOOM's profitable fixed-rate margin, was "entirely consistent with Plaintiff's theory." A-14. It further noted that "XOOM does not dispute that the algorithm itself is faulty—any measure of damages in this case would undoubtedly be based on the rate, cost, and margin." *Id.*

## C. Typicality

Finally, the District Court found that XOOM did not seriously contest typicality. A-15. Because XOOM only argued that Plaintiff was not typical because her rates were "based on XOOM's actual and estimated supply costs," (*i.e.*, that

XOOM did not breach), the Order properly disregarded XOOM's merits contention as "separate" from the question whether Plaintiff's *claims* are typical.  A-15–A-16.

## ARGUMENT

### I.    STANDARD OF REVIEW

Permission to appeal under Rule 23(f) is granted only when the petitioner demonstrates either: (1) a "substantial showing" that certification will effectively terminate the litigation and the certification order is "sufficiently questionable,"[2] or (2) that certification "implicates a legal question about which there is a compelling need for immediate resolution."  *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).  Neither criterion is present here.

### II.    XOOM'S PETITION FAILS BOTH *SUMITOMO* PRONGS

As *Sumitomo* makes clear, circumstances warranting Rule 23(f) review will "rarely be met."  *Id.* at 140.  In fact, limiting interlocutory appeals to just two narrow circumstances prevents "the needless erosion of the final judgment rule and the policy values it ensures, including efficiency and deference."  *Id.*  Rule 23(f) review is also "tempered by [the] longstanding view that the district court is often in the best position to assess the propriety of the class and has the ability, pursuant to Rule 23(c)(4)(B), to alter or modify the class, create subclasses, and decertify the class

---

[2] *Sumitomo* (and XOOM) provide an example of a "sufficiently questionable" certification order: one subject to inevitable reversal.  262 F.3d at 139; Pet. at 11.

10

whenever warranted." *Id.* at 139.  Further, this Court affords "greater deference to district court decisions granting class certification than to decisions declining to certify a class." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

As to the first *Sumitomo* prong—that the certification order will inevitably be reversed after final judgment—XOOM's complaints are merely disagreements with the District Court's resolution of key merits questions: the construction of XOOM's pricing term and the question of whether its rate-setting practices breach that term. As set forth in Sections III–V below, XOOM's merits arguments fall far short of demonstrating that that Order will be reversed on appeal.

Regarding the second *Sumitomo* prong,  XOOM misconstrues the Order when its claims that the District Court applied the wrong standard.   Here, the preponderance of the evidence standard was closely followed.

Further, it is beyond dispute that if "the district court has applied the proper legal standards in deciding whether to certify a class, its decision may only be overturned if it constitutes an abuse of discretion." *Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 (2d Cir. 2006).  The abuse of discretion standard applies both to the District Court's "ultimate decision on class certification as well as her rulings as to Rule 23 requirements." *Id.*  Because XOOM does not argue (let alone establish) that the District Court abused its discretion, the Petition should be rejected *in toto*.

11

## III. THE DISTRICT COURT APPLIED THE PREPONDERANCE OF THE EVIDENCE STANDARD
*(Responding to Point I, Pet. at 11–13)*

The District Court faithfully applied the correct standard: preponderance of the evidence. A-6. Nevertheless, XOOM wrongly claims that the District Court adopted a "general preference" for certification. Pet. at 11. To create controversy where none exists, XOOM takes a single quote from the Order out of context and attempts to inflate it into an issue "of fundamental importance to the development of the law of class actions." *Id.* XOOM is misreading should be rejected.

The District Court carefully considered the record evidence and found that Plaintiff satisfied each Rule 23 requirement by a preponderance of the evidence. In fact, the Order enunciates the ***exact principles*** XOOM claims were somehow ignored. A-5 (moving party must satisfy Rule 23 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)), A-6 (preponderance standard (citing *Johnson v. Nextel Commc'ns., Inc.*, 780 F.3d at 137), *id.* (District Court must conduct a rigorous analysis and resolve factual disputes (citing *Dukes*, 564 U.S. at 351; *In re IPO*, 471 F.3d at 41)). Tellingly, XOOM provides no proof that these standards were abandoned in favor of a preference for certification.

XOOM also wrongly claims that "the possibility of post-certification procedural tailoring" affected the Order. *See* Pet. at 13 (citing *In re Petrobas Secs.*, 862 F.3d 250, 274 (2d Cir. 2017)). But the District Court was aware of, and cited,

*In re Petrobas*.  A-7.  Again, XOOM does not point to a single instance of the Order turning on the possibility of post-certification tailoring.

Nor could it, as the Order found that each Rule 23 requirement was supported by a preponderance of the evidence.   A-8 (ascertainability, numerosity), A-10 (commonality), A-15 (predominance), A-16 (typicality), A-17 (adequacy), A-18 (superiority).  The Petition thus makes no showing that the Order committed an error of "fundamental importance to the development of the law of class actions."

## IV.   XOOM'S COMPLAINTS ABOUT COMMONALITY AND PREDOMINANCE ARE THINLY VEILED CHALLENGES TO THE DISTRICT COURT'S RESOLUTION OF MERITS ISSUES, NOT CLASS CERTIFICATION ISSUES
*(Responding to Point II, Pet. at 14–19)*

### A.   XOOM's Standardized Rate Setting Process Violated the Contract and There Is No Need to Assess Each Individual Rate
*(Responding to Point II.A, Pet. at 15–17)*

There is no dispute that XOOM set variable rates via a uniform process.  A-76 (variable rates "always determined" by uniform process followed "without exception.").  XOOM also did not use a specific formula that based rates on supply costs.  A-35.  Instead, XOOM's pricing and product group members set rates at meetings, A-23–A-25, where they used rate-setting workbooks containing XOOM's "Total Cost," XOOM's margin, and the rate derived therefrom.  A-3.  The record shows, however, that XOOM's rates were set using a host of non-supply cost factors,

including target margins.  A-88; *see also* Class Cert. Mem. at 15–17, ECF No. 137 (sealed); ECF No. 138-3 at ¶ 52, (sealed).

Unable to avoid this critical, classwide evidence, XOOM offers two failed merits arguments for why the District Court abused its discretion in finding commonality and predominance.

First, XOOM claims that it surreptitiously included "prior period adjustments" and other undisclosed supply costs in its margins and that it would thus be impossible to prove that rates were not based on its supply costs.  Pet. at 15.  Using this convenient (but conspicuously undocumented) claim, XOOM argues that a classwide trial would require the factfinder to "identify and assess the role those adjustments played in all 5,600+ rates without looking at individual evidence."  *Id.* XOOM's argument distorts the record.

As the District Court recognized, there is no need to delve into each rate-setting decision because "[t]he central issue common to all class members is the constitution of supply costs, an issue the factfinder can resolve through witness testimony, expert testimony, and documents and communications related to the rate-setting process."  A-13.  In other words, the question of XOOM's breach hinges on whether Plaintiff is correct that the "Total Cost" line item in XOOM's rate-setting workbooks is the appropriate contractual supply cost or whether XOOM is correct that its excessive and fluctuating margins were contractually permitted to (and in

fact did) incorporate additional undisclosed so-called supply costs. The District Court did not abuse its discretion in finding that this common question predominates.

Indeed, the District Court had already "found that a reasonable jury could conclude that XOOM did not factor prior period adjustments into its margin or that XOOM's practice of adjusting the margin to cover cost overruns and meet revenue goals was not permitted under the contract." A-13. Thus, the question of whether XOOM was allowed "to incorporate prior period adjustments and other supply costs into the margin, and [whether] they in fact did so consistent with the contract," will be "determined by common evidence, rather than evidence that differs between class members." A-13–A-14.

XOOM cites *Johnson v. Nextel Communications, Inc.*, 780 F.3d 128, 138 (2d Cir. 2015), for its claim that Plaintiff offered no "evidentiary proof" that the factfinder could use in assessing Plaintiff's contention that XOOM's undisclosed prior period adjustments were "not real supply costs." Pet. at 15; A-12. But as the District Court recognized, Plaintiff provided this proof. A-13 ("witness testimony, expert testimony, and documents and communications related to the rate-setting process"); *see also* A-12 ("internal XOOM communications, discovery responses, business records, and witness testimony"). Moreover, *Johnson* only requires that

Plaintiff show that common issues predominate, 780 F.3d at 138, and the District Court found that she did. A-13.[3]

Further, XOOM only raised the argument about determining "5,600+ rates" in its sur-reply opposing class certification, *compare* A-77–A-84 (opposition commonality and predominance sections) *with* A-90–A-91 (class certification sur-reply), and that claim should therefore not be considered. *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).

Second, XOOM claims that the common evidence showing that its rate setting process was driven by XOOM's revenue goals will be useless at trial because this important evidence is highly "product-specific, rate-specific, and concerns a discrete time." Pet. at 15–17. This is balderdash. As the District Court observed in its MSJ Order, XOOM repeatedly admitted its standardized rate-setting process relied on non-contractual factors (primarily revenue goals) to determine variable rates. A-36–A-38. This included testimony from XOOM's Director of Pricing and Structuring that staff would plug a rate into the workbooks and then look at the margin "that results from the rate we input." A-36. Similarly, XOOM's CEO "acknowledged

---

[3] The Petition also mischaracterizes the Order's footnote 6 when it claims that the District Court placed the burden on XOOM to show what its supply costs were. Pet. at 15. Footnote 6 is clear that at summary judgment XOOM "had every reason to substantiate its motion with evidence reflecting the incorporation of prior period adjustments in its margin" but tellingly "failed to do so." A-13. This was not shifting the burden, but rather the District Court again noting that the question of what constitutes "supply costs" can be answered with common proof.

that most of the pricing team 'wasn't even privy to the operating expenses and things like that,' but that they were privy to '[t]he gross margin goal for the month.'" *Id.* Both the CEO and Director of Pricing also admitted that XOOM would raise New York margins "so we could lower them elsewhere." A-37.

But that is not all: the MSJ Order also noted that "the record indicates that XOOM considered several factors besides supply costs when setting monthly rates" and that XOOM admitted that when it amended its form contract in 2016 to allow rates based on "pricing strategies" its rate setting process stayed exactly the same, since "the updated language is just simply providing more accurate language to our customers." *Id.*[4] Based on this evidence, the District Court concluded that "it appears that XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and that rates were set accordingly." A-36.

Yet the evidence cited in the MSJ Order is just the tip of the iceberg. XOOM witnesses made a host of classwide admissions that XOOM set variable rates using various non-contractual factors, Class Cert. Mem. at 17, ECF No. 137 (sealed), including target margins, revenue goals, energy rates set by competitors, attrition rates, and sales growth. A-36–A-37; *see also* Class Cert. Mem. at 16–18, ECF No. 137 (sealed); Reply on Class Cert. at 14–19, 21–23, ECF No. 140 (sealed).

---

[4] XOOM cannot dispute that this conduct affected Plaintiff's rates. *See* Pet. at 16.

17

XOOM is thus wrong to claim that the District Court mistook narrow evidence for classwide evidence. Pet. at 16–17. In sum, and consistent with the four other class certification rulings in analogous energy litigation, the District Court correctly found that the question of whether XOOM breached its form contract is a common one that predominates. A-10; A-13–14.

### B. Plaintiff's Damages Model Measures Classwide Damages Based on the Rates XOOM Should Have Charged
*(Responding to Point II, II.B, Pet. at 14, 17–19)*

The Order clearly lays out Plaintiff's damages methodology:

> The second damages model assumes that XOOM was allowed to charge its variable rate customers the same margin it charged its fixed-rate customers, an approximately 19% markup. This model calculates damages as the difference between the variable rates and the Total Cost plus the fixed rate margin, multiplied by the total energy usage.

A-9 (cleaned up). The District Court found that this model "is entirely consistent" with Plaintiff's liability theory. A-14.

Indeed, Plaintiff's damages model hews closely to the cases where damages models with alternative theories satisfied the strictures of *Comcast*. *See, e.g.*, *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 276, 278 (E.D.N.Y. 2019) (*Comcast* met where plaintiffs identified multiple methods of quantifying alleged price premium in consumer protection class action); *In re Cablevision Cons. Litig.*, 10 Civ. 4992 (JS) (AKT), 2014 WL 1330546, at *13 (E.D.N.Y. Mar. 31, 2014) (damages methodology for breach of contract was "straightforward" and "directly

linked to [p]laintiffs' theory of liability"); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 305 (E.D.N.Y. 2013) ("single, uniform and purely mechanical" damages methodology met *Comcast*).

XOOM is therefore incorrect when it claims that Plaintiff does "not attempt to calculate the rates the class members should have been charged under the district court's proportionate-margin construction of the contract." Pet. at 17. The opposite is true: XOOM consistently charged significantly higher margins to variable rate customers than it charged its riskier fixed rate customers. A-74; A-86. Applying XOOM's profitable fixed rate margins to XOOM's variable rate "Total Cost" yields precise damages under the District Court's proportionate-margin construction. A-9.

Moreover, as endorsed by the District Court, A-14–A-15, the determination of an appropriate margin will be left to the factfinder. ECF No. 138-3 ¶ 73 n.51 (sealed). The District Court held that XOOM's variable rates could only include "a reasonable margin." A-3, A-14; *see also* A-31, A-33. Plaintiff's damages model applies such a reasonable margin—the same one applied to XOOM's riskier (and profitable) fixed rate products.

XOOM also misconstrues Plaintiff's expert's statement that he "didn't have any information that would allow that to be created." Pet. at 17. That testimony addressed defense counsel's question of exactly how little margin XOOM would need to charge to still be profitable; the expert advised that he would need to see

XOOM's internal costs, including non-supply costs not referenced in the contract. A-51 at 70:22–73:24. Nor did Plaintiff's experts "disclaim[] having either the data or expertise" to calculate an appropriate margin, Pet. at 6, they rather disclaimed the ability to calculate XOOM's overall profitability. A-50–A-51 at 69:13–70:3.

XOOM similarly distorts Plaintiff's expert report to claim that "fixed-rate margins fluctuated over the class period." Pet. at 18. Not true. The cited chart shows that variable rate margins varied wildly, while fixed rate margins were wholly consistent. ECF No. 138-3 at 25, Table 1 (sealed) (showing spread of nearly 30% between XOOM's highest and lowest average annual variable rate margins). Indeed, the District Court found that XOOM's fixed rate margin was roughly 19%. A-9

XOOM's reliance on *Richards v. Direct Energy Services, LLC*, 915 F.3d 88, 98 n.5 (2d Cir. 2019), does not undo the linkage between Plaintiff's damages model and liability theory. XOOM claims that the *Richards* "contract did not require variable-rate margins to equal fixed-rate margins either." Pet. at 18. Yet the District Court rejected this exact claim at summary judgment:

> Citing *Richards v. Direct Energy Services*, XOOM argues that jurors cannot 'invent absent contract terms' to require a specific margin in an ESCO contract that does not explicitly set a cap. 915 F.3d 88, 98 & n.5 (2d Cir. 2019). But *Richards* held that a contract stating an ESCO had 'discretion' to set a variable energy rate 'based upon business and market conditions' unambiguously did not require rates to be tied to procurement costs. *Id.* at 97–98. The contention that *Richards* forecloses any limitation on a margin where a contract is silent as to the margin requires an overreading of inapposite dicta contained in a footnote. *See id.* at 98 n.5.

20

A-32–A-33.[5]

At bottom, XOOM's damages arguments rely on factual distortions and a misreading of Rule 23 and the Order. The District Court did not abuse its discretion in assessing Plaintiff's damages model. A-15.[6]

## V.   PLAINTIFF IS UNQUESTIONABLY TYPICAL OF THE CLASS

The District Court found that Plaintiff's claim is typical because "there is no question that the form contract contained identical language" for all Class Members. A-16. XOOM does not dispute that it used the "same rate-setting process" for the Class and that they "will rely on similar legal arguments to prove liability." A-16.

Further, the District Court found that XOOM "does not seriously contest that plaintiff's claim is typical of other electricity customers, but instead argues that her claim is not typical of the claims of natural gas customers because plaintiff received only electric service." A-15. That was XOOM's primary typicality argument, which XOOM does not appeal.

---

[5] XOOM's cite to two bygone North Carolina cases adds nothing to its claim that Plaintiff's damages model is impermissibly imprecise. One case, *Blalock Hardware Co. v. Seaboard Air Line Railway Co.*, 86 S.E. 1025 (N.C. 1915), involves a plaintiff who presented "no evidence whatsoever" about a railroad rate, while the other, *Troitino v. Goodman*, 35 S.E.2d 277 (N.C. 1945), concerns reasonably foreseeable damages and double recovery.

[6] The Court should also reject XOOM's attempt to relitigate its summary judgment loss on its claim that Plaintiff supposedly relies on a "new theory" of breach following discovery, *see* Pet. at 6, because the District Court unmistakably found that Plaintiff's damages model is consistent with her liability theory, A-14.

Instead, XOOM made an additional throwaway argument that Plaintiff's claims are not typical because XOOM did not breach. A-42–A-43. Specifically, XOOM claimed that because the pricing term only required rates that correlated with costs, and because XOOM was allowed to inflate its margins with undisclosed "prior period adjustments," Plaintiff loses on the merits and thus her claims were not typical. *Id.* These are the exact arguments the District Court rejected at summary judgment, A-35, and thus rightly deemed irrelevant to the typicality analysis.

Nevertheless, XOOM now stakes its entire typicality appeal on its throwaway argument. XOOM claims that the Order "ignored" its argument that it did not breach with Plaintiff. Pet. at 19. Rather than ignore the argument because it overlapped with a merits question (as XOOM wrongly claims), the District Court correctly found that this issue was entirely "separate" from typicality because Plaintiff's theory of breach is ***identical*** to the classwide theory of breach. A-15–A-16. Indeed, if anything, XOOM's typicality argument underscores Plaintiff's typicality, as XOOM's merits defense is the same defense it mounts for the Class. XOOM's typicality appeal should be rejected.

## **CONCLUSION**

For the reasons stated above, this Court should deny XOOM's petition for

interlocutory review pursuant to Rule 23(f).

Dated:  September 25, 2023             Respectfully submitted,
        New York, New York

                                  By:  /s/ Ethan D. Roman
                                       Ethan D. Roman (ER-5569)
                                       J. Burkett McInturff (JM-4564)
                                       Steven L. Wittels (SW-8110)

                                       **WITTELS MCINTURFF PALIKOVIC**
                                       305 BROADWAY, 7TH FLOOR
                                       NEW YORK, NEW YORK 10007
                                       Telephone: (914) 775-8862
                                       Facsimile: (914) 775-8862
                                       edr@wittelslaw.com
                                       jbm@wittelslaw.com
                                       slw@wittelslaw.com

                                       *Lead Class Counsel for*
                                       *Plaintiff and the Class*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the word limits of Fed. R. App. P. 5(c)(1) because it contains 5,183 words, excluding the parts of the document exempted by Fed. R. App. P. 5(c) and 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:   September 25, 2023    By:  /s/ Ethan D. Roman _____
         New York, New York       Ethan D. Roman

# No. 23-1267

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated,

*Plaintiff-Respondent,*

v.

XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,

*Defendants-Petitioners.*

ON PETITION FOR REVIEW FROM AN ORDER CERTIFYING CLASS ON AUGUST 31, 2023
BY THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK
CASE NO. 18 CIV. 2949
THE HON. ALLYNE R. ROSS PRESIDING

---

**APPENDIX TO PLAINTIFF'S ANSWER IN OPPOSITION TO
DEFENDANTS' PETITION FOR PERMISSION TO APPEAL PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)**

---

Ethan D. Roman
J. Burkett McInturff
Steven L. Wittels
**WITTELS MCINTURFF PALIKOVIC**
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862

*Lead Class Counsel for Plaintiff and the Class*

# TABLE OF CONTENTS

Plaintiffs' Memorandum of Law in Support of Motion for Class
Certification, Excerpted (Partially Redacted), dated December 16, 2022
(ECF No. 132) ...................................................................... A-73

Defendants' Response in Opposition to Plaintiffs' Motion for Class
Certification, Excerpted (Partially Redacted), dated February 3, 2022
(ECF No. 134) ...................................................................... A-75

Plaintiffs' Reply Memorandum of Law in Support of Motion for Class
Certification, Excerpted (Partially Redacted), dated March 24, 2023
(ECF No. 135) ...................................................................... A-85

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for
Summary Judgment, Excerpted (Partially Redacted), dated April 14, 2023
(ECF No. 147) ...................................................................... A-87

Consolidated Reply in Support of Defendants' Motion for Summary
Judgment and Sur-Reply in Further Opposition to Class Certification,
Excerpted (Partially Redacted), dated May 5, 2023 (ECF No. 149) .................. A-89

*Bell v. Gateway Energy Servs. Corp.*, Decision and Order Granting Class
Certification, No. 31168/2018 (Rockland Cnty. Super. Ct. Jan. 8, 2021),
NYSCEF No. 152 .................................................................. A-92

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>XOOM ENERGY, LLC and<br>XOOM ENERGY NEW YORK, LLC<br><br>                    Defendants. | Case No. 18 Civ. 2949 (ARR) (RER)<br><br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

**WITTELS MCINTURFF PALIKOVIC**
Steven L. Wittels
J. Burkett McInturff
Steven D. Cohen
Ethan D. Roman
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
sdc@wittelslaw.com
edr@wittelslaw.com

**HYMOWITZ LAW GROUP, PLLC**
Daniel Hymowitz
1629 Sheepshead Bay Road
Brooklyn, NY 11235
Telephone: (718) 807-9900
Facsimile: (866) 521-6040
daniel@hymowitzlaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
Dmitry Kheyfits
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

Dated:   December 16, 2022

Energy Supply Account Statement at Mirkins_00061 (showing that the Mirkins switched from XOOM to a different energy supplier as of November 2013).

## VI. PLAINTIFFS' EXPERTS DETERMINED CLASS DAMAGES USING COMMON PROOF

Plaintiffs' experts Dr. Derya Eryilmaz and Seabron Adamson, who have a combined 35+ years of experience in the field of energy economics, have furnished two detailed reports, as well as deposition testimony, describing how they (i) calculated each Class Member's damages using common evidence and standardized damages models, and (2) determined the Class's total damages. As described in their expert reports, Dr. Eryilmaz and Mr. Adamson prepared two different damages models to compute class damages. Ex. 3, Pls.' Expert Rep. at ¶¶ 23(h), 60–77.

The experts' first damages model calculates the amount that XOOM overcharged its variable rate customers relative to what the company should have charged customers had XOOM based the rates on its actual reported supply costs, as required by the 2013 Contract. *Id.* at ¶¶ 62–72. This method determines the overcharges for each month by taking the difference between the rate XOOM charged and XOOM's reported supply costs and multiplying that difference by the customer's energy usage. *Id.* In order to perform these calculations, the experts thoroughly analyzed customer data and reports prepared and maintained by XOOM in the ordinary course of its business. *Id.* at ¶¶ 38–49.

For their second damages model, Plaintiffs' experts adjusted the overcharge formula in the event that the ultimate factfinder determines that, even though not specified, the contract would still contain an implied term allowing XOOM to charge customers a reasonable "margin" in excess of its supply costs. This alternative model applies the much lower (but still profitable) margins XOOM used for its New York fixed rate customers. *See* Ex. 3, Pls.' Expert Rep. at ¶¶ 73–77.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated, | No. 18 Civ. 2949 (ARR) (RER) |
| Plaintiffs, | |
| v. | |
| XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC, | |
| Defendants. | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

expected "cost to delivery energy to the consumer" as the foundation of its "pricing methodology." Ex. A-12, Ulry Dep. 51:5–12, 68:13–69:3; Coppola Dep. 284:14–285:2 ("[T]he foundation of where pricing starts" and the "largest component" of XOOM's variable rate pricing "is the supply cost."); *see also id.* at 155:16–25, 175:7–14; Loehde Dep. 257:2–10; Loehde Corp. Dep. 289:9–290:12; Park Dep. 33:10–22, 34:20–35.

Indeed, without exception, the testimonial and documentary evidence shows that XOOM's standard variable rates were always determined by (1) starting with supply cost estimates made in rate-setting workbooks, (2) deciding whether prior period adjustments should be made to account for variations between previous supply cost estimates and the costs XOOM actually incurred, and (3) adding a margin that incorporated prior period adjustments, balancing costs, other costs to supply energy to the customer, and XOOM's profit.

     1.     *By necessity, rate-setting workbooks make predictions about the future that cannot reflect prior period adjustments or XOOM's ultimate costs.*

The fact that the 2013 Contract allows XOOM to charge a rate "based on XOOM's actual and estimated supply costs . . . includ[ing] but not limited to prior period adjustments, inventory and balancing costs" and "market-based compensation" for "services" to "meet [customers] electricity needs" dooms the Mirkins' claims. 2013 Contract at 1–2. So, they ignore many of those considerations and instead treat XOOM's rate-setting workbooks as a comprehensive statement of XOOM's "total actual supply costs" that capture all of the "actual and estimated supply costs" XOOM could consider when setting variable rates. The evidence, however, shows that the rate-setting workbooks were not designed to serve as XOOM's "technical definition of 'supply costs'" with respect to any particular product. Class Cert. Mem. at 2. Instead, they were a starting point for pricing that reflected the team's "best estimate" of what XOOM's supply costs would be in the upcoming month. Loehde Dep. 59:11-18; *see also id.* at 56:7–16. The future is uncertain when it

12

reply would require more briefing on the new definition. *See, e.g.*, *Simmons v. Author Sols., LLC*,

No. 13CV2801 DLC, 2015 WL 4002243, at *4 n.4 (S.D.N.Y. July 1, 2015) (noting that it was

necessary to "granted leave to file a sur-reply" in opposition to a class certification motion so that

there would be "at least one round of adversarial briefing on the class definitions set forth in

plaintiffs' reply"). And if the Mirkins stand by their proposed definition and suggest that the Court

can determine at a later date whether a potential class member's contract is "equivalent" to or

distinguishable from the 2013 Contract, they will be calling for "the kind of individualized mini-

hearings that run contrary to the principle of ascertainability" and will "raise[] the specter of one-

way intervention that motivated the 1966 amendments to Rule 23." *Brecher*, 806 F.3d at 26.

Class certification should be denied because defining a class in terms of "*subjective* criteria

[is] inappropriate" and destroys ascertainability. *Id.* at 25 n.1.

## B.  Commonality/Predominance: There is no classwide evidence of breach or damages.

Moving beyond the class definition, the Mirkins fail to satisfy Rule 23's commonality and

predominance requirements. Those requirements impose a two-tiered burden that ensures a

plaintiff's claims are sufficiently cohesive to merit class treatment. A plaintiff must first cross Rule

23(a)(2)'s commonality threshold by showing that the class members' claims all "depend upon a

common contention" such that "determination of [that contention's] truth or falsity will resolve an

issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

"What matters to class certification is not the raising of common 'questions'—even in droves—

but rather the capacity of a class-wide proceeding to generate common answers apt to drive the

resolution of the litigation." *Id.* (cleaned up).

And proving commonality is just the first step. Plaintiffs seeking certification under Rule

23(b)(3) must then demonstrate that "common questions" not only exist, but will "predominate

over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). This predominance requirement is "'far more demanding'" than commonality, and it "is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *In re Petrobras*, 862 F.3d at 270. Rather, the Court must take a "close look" at the plaintiff's case to assess predominance, even when doing so "requires inquiry into the merits of the claim." *Comcast*, 569 U.S. at 34, 35.

With respect to both commonality and predominance, the Mirkins identify two common questions that will supposedly predominate over any individual ones: breach and damages. *See* Class Cert. Mem. at 26 (proposing "whether XOOM failed to set rates in accord with 2013 Contract" and "[d]eterminations regarding the proper measure of damages" as common questions); *id.* at 32–36 (claiming that common questions of liability and damages will predominate). But their evidence shows the Mirkins have no method for answering these questions on a classwide basis.

1.      *Liability: The Mirkins offer no common evidence of XOOM's alleged breach.*

The Mirkins' complaint accuses XOOM of "breach[ing] its contract with New York customers by charging variable rates not based on the factors specified in the customer agreements," FAC ¶ 71(a)— "i.e., 'XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments.'" FAC ¶¶ 77, 79. To support that breach theory, the Mirkins must supply at least two data points for each putative class member for each month of the class period: (1) the "actual and estimated supply costs" including but not limited to "prior period adjustments, inventory and balancing costs" applicable to that customer, and (2) the rate that customer was charged. Otherwise, a factfinder will have no way of knowing if a given customer's rate was based on the costs referenced in the contract.

The complaint alleges both data points in a chart that includes "the variable rates XOOM charged [the Mirkins]," and a "Market Supply Cost" that includes a margin and supposedly "corresponds to a rate that reflects 'actual and estimated supply costs,' as required by the XOOM customer contract." FAC ¶ 54. Applying Rule 12(b)(6)'s presumption of truth and drawing every reasonable inference in the Mirkins' favor, the Second Circuit determined that a comparison of those two data points was "sufficient to state a claim for breach of contract" because "XOOM's rates" allegedly "showed significant upward deviations from the Market Supply Cost and continued to rise even when that cost fell." *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177 (2d Cir. 2019). But the Mirkins can no longer rely on Rule 12(b)(6)'s lax standard. In ruling on a motion for class certification, the Court is not required or permitted to blindly credit the complaint's "estimate[s]" of the generic "costs of a retailer supplying a residential customer" or their claim that those estimates "correspond[] to a rate that reflects" the supply described in the 2013 Contract, including "prior period adjustments" and "balancing costs." FAC ¶¶ 54, 55.

Instead, the Mirkins now bear the burden to submit "enough evidence—by affidavits, documents, or testimony—to [show] by a preponderance of the evidence," *Rambarran*, 2015 WL 4523222, at *4, that XOOM's alleged breach can be proven "in one stroke," *Dukes*, 564 U.S. at 350. That showing requires data establishing what the total "estimated and actual supply costs" were—including "prior period adjustments," "balancing costs," and "market-based compensation"—for the rates charged to every class member. Otherwise, the factfinder is left with no point of reference to assess whether a particular class member's rate for a particular billing period was based on supply costs. *Sicav v. James Jun Wang*, No. 12 CIV. 6682 PAE, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) ("[P]laintiffs have not shown or explained, concretely, how damages would be calculated as to any individual purchaser."). And while XOOM's workbooks

are certainly vital to its rate-setting process and serve as the foundation for estimating XOOM's supply costs, the workbooks' "Total" column does not capture XOOM's other supply costs such as "prior period adjustments" or "balancing costs." *See supra* at pp. 10–16. Nor do they capture XOOM's market-based compensation for providing energy-related services. *See id.* The Mirkins do not offer a way to measure those factors.

The Mirkins try to provide a reference point with the testimony of energy economists who supposedly "calculated and analyzed [XOOM's] supply costs." *See* Class Cert. Mem. at 33. But they do not support that claim with evidence. And these experts directly refute the notion that they can "detail what XOOM's actual supply costs are." *Compare* Class Cert. Mem. At 34, *with* Pls.' Expert Rpt. ¶ 23(i) ("It is not in our scope to validate the data provided in discovery, including the accuracy of the costs reported [in the rate-setting workbooks]."). Indeed, the Mirkins' experts do not try to determine what the prior period adjustments, inventory, balancing costs, or the "market-based compensation" were at any relevant time—all of which are pricing components identified in the 2013 Contract. Instead, they take the "Total" column from XOOM's rate-setting workbooks and treat it as a stand-in for the "prior period adjustments, inventory[,] . . . balancing costs," and other actual and estimated supply costs referenced in the contract. *See* Pls.' Expert Rpt. ¶ 23(i).

The problem with that approach is that the cost components in the rate-setting workbooks do not—and are not designed to—reflect ***all*** the supply costs referenced in the 2013 Contract. Rather, those components are meant to serve as a "starting point" that XOOM can build upon at rate-setting meetings. Coppola Dep. 279:7–80:1; *see supra* Factual Background Part D. But as the Mirkins acknowledge in their evidence and arguments, that "starting point" figure does not account for all of the supply costs the variable rate was based upon:

> While the [rate-setting workbooks] do contain elements that build up to what they call "Total Cost," they never calculate XOOM's total estimated or actual costs

23

accounting for prior period adjustments, inventory, and balancing costs as provided
in the Sales Agreements.

Pls.' Expert Rpt. ¶ 47; *see also* Class Cert. Mem. at 18 ("[T]he rate-setting workbooks do not

anywhere identify any prior period adjustments or balancing costs, both of which were supply cost

categories identified in the contract at issue here."). Thus, it is not possible for the Mirkins' experts

or a factfinder to quantify what the "actual and estimated supply costs" were at any relevant time

by looking solely at the cost components in the rate-setting workbooks.

To cover this gap in their evidence, the Mirkins pretend that XOOM was required to ignore

prior period adjustments, market-based compensation, and other components specifically

identified in the 2013 Contract and instead set rates based exclusively upon the costs listed in

rate-setting workbooks. But that approach provides no support for the Mirkins' theory of breach.

If a class were certified and the case tried, the factfinder would not be asked whether XOOM's

variable rates exceeded the costs described in the rate-setting workbooks; it would have to

determine whether XOOM's rates were based on its "actual and estimated supply costs," which

again includes, but is not limited to, prior period adjustments, balancing costs, and market-based

compensation.[8] And because the Mirkins bear the burden of proof with respect to breach, the

factfinder could not simply assume without evidence that the "Total" column in the rate-setting

workbooks reflects all of the supply costs referenced in the 2013 Contract. *Michelman v. Clark-*

---

[8] The Mirkins' experts apparently think otherwise and believe that a rate is automatically
"contrary to" the 2013 Contract if it exceeds "the total costs" figure contained in a rate-setting
workbook. *See* Pls.' Expert Rpt. ¶ 51. However, as the Second Circuit noted in another case
involving the Mirkins' experts, that belief about what the 2013 Contract required "adds nothing"
to the Mirkins' claim because (1) the Mirkins' experts expressly "declin[ed] to offer an opinion on
how the [2013 Contract] should be interpreted," and (2) an experts' belief about what a contract
permits is "irrelevant . . . because the construction of unambiguous contract terms is strictly a
judicial function." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98 (2d Cir. 2019)
(quotations omitted); *see also* Ex. A-14, Adamson Dep. 102:6–16 (testimony confirming that the
Mirkins' experts are "not offering a legal interpretation" of "XOOM's contract language").

*Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir. 1976) (noting that "the finder of fact" cannot "return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial"). Instead, the factfinder could only draw inferences supported by ***evidence***, and the undisputed evidence shows that XOOM's variable rates included prior period adjustments and other appropriate supply costs that were not captured in the rate-setting workbooks—but ***were*** identified in the 2013 Contract. *See, e.g.*, Loehde Corp. Dep. 284:8–22 ███████████████████████████████████████████████

████████████████████████████████; Loehde Dep. 251:6–22.

In assessing commonality and predominance, the "capacity of a class-wide proceeding to generate common ***answers***" is "[w]hat matters to class certification." *Dukes*, 564 U.S. at 350. As discussed, the Mirkins' evidence does not permit a class-wide answer to the common question of XOOM's alleged breach, much less that breach can be assessed in a manner that satisfies the "'far more demanding'" predominance standard. *In re Petrobras*, 862 F.3d at 270.

    2.    *Damages: The Mirkins' damages model does not match their liability theory.*

Even if the Mirkins could prove liability (they cannot), they would still have to prove damages. And if a class were certified, they would have to prove damages with a model that "measure[s] ***only*** those damages attributable to" their theory of liability. *Comcast*, 569 U.S. at 35. Without such a model, the Mirkins "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes" of commonality and predominance. *Id.*

The Mirkins offer no such model. The Mirkins offer a pair of damage models that treat ***any*** rate higher than the costs reflected in the rate-setting workbooks as an impermissible

"overcharge."[9] *See* Pls.' Expert Rpt. ¶ 64. This model bears no relationship to the liability theory that survived dismissal after the Mirkins included a margin in their ad hoc "Market Supply Cost," *see* FAC ¶ 55, and assured the Second Circuit they were "not taking the position that [XOOM is] not allowed a margin."[10] And even setting that problem aside, the Mirkins' damage model unquestionably fails to account for the contractually specified supply costs like prior period adjustments (although they are certainly not "limited" to the supply costs listed). Accordingly, it is not a viable option for "the translation of the [Mirkins'] *legal theory*" of breach "into an analysis of the economic impact *of that*" breach. *Comcast*, 569 U.S. at 38.

A perfect example of how the Mirkins' damages model fails to analyze the economic impact of XOOM's alleged breach is the 2014 polar vortex. ███████████ ████████████████████████████████████████████████ ████████████████████████████████████. Loehde Dep. 85:23–87:9, 209:11–20; Coppola Dep. 155:16–25, 170:12–19; Ulry Dep. 76:12–77:23. Yet,

---

[9] The Mirkins' alternative model performs the same arithmetic but takes an extra step to reduce the alleged "overcharge" by an amount that supposedly "allows XOOM a margin over Total Cost that equates to the fixed rate margin applied to its fixed rate customers." Pls.' Expert Rpt. ¶ 73. Not only does this ignore the fundamental differences between fixed-rate and variable-rate products, Park Dep. 80:7–82:18; Coppola Dep. 89:10–17; Loehde Dep. 53:9–20, 118:15–23, 160:22–161:5, 221:24–222:9, neither the Mirkins nor their experts contend that the 2013 Contract requires XOOM to set rates that include a margin equal to its fixed-rate products. Indeed, such a position would confirm that "based on" is not "exclusive[]," *Mai Nhia Thao v. Midland Nat. Life Ins. Co.*, 549 F. App'x 534, 537 (7th Cir. 2013), and that all that is required is that XOOM's variable rate has "some relationship to [its] supply costs" as the Mirkins represented in the Second Circuit, *see* https://www.ca2.uscourts.gov/oral_arguments.html. In any case, this alternative suffers from the same defect as the Mirkins' primary model: it makes no attempt to measure the difference between a rate based on XOOM's "actual and estimated supply costs" including "prior period adjustments" and "balancing costs" and XOOM's actual variable rates.

[10] This assurance was made after Judge Pooler noted that XOOM is "allowed to achieve a profit" profit and asked, "Aren't they allowed a margin, over and above these costs?" The exchange began approximately two minutes and twenty seconds into the oral argument recording posted on the Second Circuits website. *See* https://www.ca2.uscourts.gov/oral_arguments.html.

according to the Mirkins' theory, █████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████, XOOM violated the 2013 Contract and overcharged its customers.[11]

That is nonsense. The 2013 Contract did not say: XOOM's rates will be set to match the cost components stated in the "Total" column of XOOM's rate-setting workbooks to the exclusion of all supply costs and considerations. And it certainly did not *require* XOOM to pass along massive cost increases during a severe winter storm.

Accordingly, the Mirkins' failure to attempt quantifying what their rate would have been if it was based on "actual and estimated supply costs" including "prior period adjustments" and "balancing costs" (as opposed to the cost components in the rate-setting workbooks) is fatal to class certification for the reasons discussed in *Comcast*.

---

[11] Of course, the Mirkins were only XOOM customers for six months in 2013, five of which they paid variable rates, making them poor class representatives to explain how XOOM's pricing practices were supposedly improper during the 2014 polar vortex or any other future event that justifiably raised XOOM's costs. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 538 (S.D.N.Y. 2018) ("[T]he record strongly supports a finding of conflicts between class members in the context of this action, as a named plaintiff has incentive to establish trader-based manipulation only on days when it held trading positions that would have been harmed by that manipulation.").[12] It is clear, for example, that Boris cannot claim standing simply because Susanna incurred charges that impacted their shared finances. *See Bell v. Gateway Energy Servs. Corp.*, No. 17-CV-3893 (KBF), 2017 WL 5956887, at *1 n.1 (S.D.N.Y. Nov. 29, 2017) (concluding that "there can be no doubt that" a plaintiff had "no standing" when his "sole connection to the case [was] his marriage to" another plaintiff who had a contract with an ESCO); *Meimaris v. Royce*, No. 18CV04363GBDBCM, 2019 WL 5722130, at *13 (S.D.N.Y. Aug. 20, 2019) ("Many—indeed, most [spouses]—are financially and emotionally affected, for good or for ill, by the rise or fall of the other spouse's financial fortunes. It is well-settled, however, that this commonplace reality does not automatically give wives (or husbands) standing to sue for economic injuries allegedly inflicted on their marital partners."), *report and recommendation adopted,* No. 18CIV4363GBDBCM, 2019 WL 4673572 (S.D.N.Y. Sept. 25, 2019), *aff'd,* No. 19-3339-CV, 2021 WL 5170725 (2d Cir. Nov. 8, 2021). Likewise, Boris cannot enforce the 2013 contract as a third-party beneficiary because North Carolina law, which governs the 2013 Contract, does not allow such claims "when the contract is not made for the direct benefit of the third party and any benefit accruing to him is incidental." *Union Grove Mill. & Mfg. Co. v. Faw*, 426 S.E.2d 476, 479 (N.C. Ct. App. 1993), *aff'd*, 436 S.E.2d 131 (N.C. 1993).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                                    Plaintiffs,

        v.

XOOM ENERGY, LLC and
XOOM ENERGY NEW YORK, LLC

                                    Defendants.

Case No. 18 Civ. 2949 (ARR) (RER)

**ORAL ARGUMENT REQUESTED**

---

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

---

**WITTELS MCINTURFF PALIKOVIC**
Steven L. Wittels
J. Burkett McInturff
Ethan D. Roman
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
slw@wittelslaw.com
jbm@wittelslaw.com
edr@wittelslaw.com

**HYMOWITZ LAW GROUP, PLLC**
Daniel Hymowitz
1629 SHEEPSHEAD BAY ROAD
BROOKLYN, NY 11235
Telephone: (718) 807-9900
Facsimile: (866) 521-6040
daniel@hymowitzlaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
Dmitry Kheyfits
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

Dated:   March 24, 2023

the Company's ███████████████████████████████████████

███████████████████████████████████████

██████████ Wittels Ex. 16, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Wittels Ex. 22, Coppola

Tr. 98:11–18. ████████████████████████████████

███████████████████████████ Wittels Ex. 16, XOOM 30(b)(6) Tr. 134:2–135:15

(emphasis added), ██████████████████

█████████████ ████████████████████████████

███████████████████████████████████████

███████████████████████. Wittels Ex. 2, Coleman Tr. 66:11–15.

In sum, these admissions show that from day one XOOM uniformly used "pricing strategies" to set variable rates even though the 2013 Contract prohibited doing so. The 2016 change therefore serves as further proof of XOOM's breach of the 2013 Contract.

## IV. VARIABLE RATE CONTRACTS POSE LESS RISK THAN FIXED RATE CONTRACTS, ████████████████████████████████████

XOOM claims there is "more risk" in pricing variable rate products. Opp'n at 13. XOOM is wrong both logically and factually. XOOM obviously had flexibility to adjust variable rates if supply costs (the biggest and most variable of XOOM's costs) unexpectedly increased but could not do the same for its fixed rate plans. Wittels Ex. 3, Pls.' Expert Rep. ¶ 56. The evidence confirms this logic. *See* Roman Ex. 21, Dep. Tr. of CEO Thomas Ulry 86:4–87:7 ████████

███████████████████████████████████████

██████████ Roman Ex. 22 at 3 ████████████████████

███████████████████████████████ Indeed, ███████████████

███████████████████████████████. *Id.*

███████████████████████████████████████

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                           Plaintiffs,

        v.

XOOM ENERGY, LLC and
XOOM ENERGY NEW YORK, LLC

                       Defendants.

Case No. 18 Civ. 2949 (ARR) (RER)

**ORAL ARGUMENT REQUESTED**

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**WITTELS MCINTURFF PALIKOVIC**
Steven L. Wittels
J. Burkett McInturff
Ethan D. Roman
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
slw@wittelslaw.com
jbm@wittelslaw.com
edr@wittelslaw.com

**HYMOWITZ LAW GROUP, PLLC**
Daniel Hymowitz
1629 SHEEPSHEAD BAY ROAD
BROOKLYN, NY 11235
Telephone: (718) 807-9900
Facsimile: (866) 521-6040
daniel@hymowitzlaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
Dmitry Kheyfits
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

Dated: April 14, 2023

overhead costs, and (iii) that "these costs are relatively fixed each month, and thus cannot be the basis for XOOM's rate fluctuations." *Id.* at 13.[5]

The Second Circuit reversed dismissal, holding Plaintiffs' allegations that "XOOM promised to base its rates on its supply costs" were sufficient because "the Mirkins' allegations and calculations plausibly allege that this did not occur." *Mirkin*, 931 F.3d at 177. As set forth below, abundant discovery shows this to be the case.[6]

## IV. VOLUMINOUS EVIDENCE DEMONSTRATES THAT XOOM'S RATES WERE NOT BASED ON ITS SUPPLY COSTS AND THUS THERE ARE GENUINE DISPUTES OF FACTS MATERIAL TO XOOM'S MOTION
*(Responding to Defs.' Point II.C, Defs.' Br. 7–11)*

### A. ████████████████████████████████████████████
*(Responding to Defs.' Point II.C.1, Defs.' Br. at 8–9)*

XOOM's rate setting process worked as follows: XOOM held monthly rate-setting meetings for "up to 20 markets and 1,000 different products," and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks. Class Cert. Opp'n at 9–10. These workbooks contained XOOM's internal supply cost calculations, which XOOM disregarded.

---

[5] XOOM misrepresents the Second Circuit oral argument by taking Plaintiffs' counsel's statements completely out of context, claiming Plaintiffs conceded that the 2013 Contract allows XOOM any margin it wants. Def.'s Br. at 6–7, 23–24. Not so. Plaintiffs' counsel merely clarified that XOOM was not allowed to extract massive margins but nevertheless claim its rates were "based" on XOOM's supply costs regardless of the spread between XOOM's supply costs and its ultimate rates. U.S. COURT OF APPEALS, 2D CIR., at 2:20–3:10, https://www.ca2.uscourts.gov/oral_arguments.html (enter "Mirkin" in search box and click "search"). Now, discovery shows XOOM's rates were not only not tied to its supply costs, but arbitrarily set according to a host of factors not included in the 2013 Contract, including XOOM's desired and excessive margins. Any so-called change in Plaintiffs' position simply reflects what discovery shows.

[6] XOOM's reference to Plaintiffs' prior litigation against Viridian Energy to suggest that Plaintiffs brought this suit for their own financial gain, Defs.' Br. at 9, is both irrelevant and improper: irrelevant because the contracts in the two cases are different and improper because, as concerned citizens and current and former members of the NYPD, Ex. 4, B. Mirkin Tr. 15:10–21; Ex. 5, S. Mirkin Tr. 27:27–28:15, Plaintiffs seek to vindicate the rights of the over 110,000 consumers who were similarly harmed by XOOM's conduct.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

     Plaintiffs,

v.

XOOM ENERGY, LLC and XOOM ENERGY
NEW YORK, LLC,

     Defendants.

No. 18 Civ. 2949 (ARR) (RER)

---

**CONSOLIDATED**
**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AND**
**SUR-REPLY IN FURTHER OPPOSITION TO CLASS CERTIFICATION**

Rather, under the applicable law, the Mirkins must provide evidence of XOOM's intent "to confer a legally enforceable benefit on" Boris. *Id.*

Here, the only evidence of XOOM's intent is the contract's statement that "[t]here are no third-party beneficiaries." Defs.' MSJ Ex. A-19, Contract at 3. That language "must be construed strictly against" Boris, and it makes "clear that [XOOM] did not intend that [Boris] receive a legally enforceable right under the [C]ontract." *Holshouser*, 518 S.E.2d at 25. Accordingly, Boris's claim fails as a matter of North Carolina law.[19] *Id.* at 25 (affirming summary judgment on a purported third-party beneficiary's contract claim when the relevant contract stated that it did not "confer any rights on any party as a third party beneficiary").

## III. CLASS CERTIFICATION SUR-REPLY[20]

The Mirkins' opening motion for class certification offered their experts' reports and deposition testimony as their sole evidence of commonality and predominance. When XOOM explained why that evidence was insufficient to meet the Mirkins' Rule 23 burden, the Mirkins attached nearly 300 pages of new evidence to their reply brief meant to satisfy their movant's burden. That evidence does not remedy the problems with the Mirkins' initial showing, but it does raise three new issues that are independently fatal to class certification.

*First*, the Mirkins' new evidence raises myriad questions that would undermine commonality, predominance, and typicality if shown to the factfinder. Each piece of new evidence involves a discrete situation in which XOOM was deciding whether to change rates. To be clear,

---

[19] To avoid this conclusion, the Mirkins cite an unpublished case from this district in which Judge Kuntz concluded that a plaintiff was a third-party beneficiary to an electric supply contract between her spouse an ESCO. *See* Pls.' MSJ Resp. 47. However, Judge Kuntz drew that conclusion under New York law, and he did not address a contract that expressly disclaimed the existence of third-party beneficiaries. *See Donin v. Just Energy Grp. Inc.*, Case No 17-cv-5787 (WFK)(SJB), ECF No. 111 at 8–9. Nothing in that decision suggests that Boris is a third-party beneficiary under the facts of this case and North Carolina law.

[20] This sur-reply is included pursuant to leave of the Court. *See* Text Order, April 7, 2023.

18

XOOM maintains that this evidence of *how* rates were set is irrelevant to the class claims because XOOM's rates were based on supply costs as a matter of law. And, as discussed, if the ultimate rate was based on supply costs, then XOOM complied with the Contract no how it arrived at the rate. But the Mirkins still advocate for admission of evidence about the underlying discussions and decision-making process. So if the Court rejects XOOM's position and allows the Mirkins to show these emails to the factfinder, then a determination of whether XOOM's rate-setting process involved a decision that violated the contract could not be made without (1) determining what, if any, action was taken based on the discussions reflected in the evidence, (2) which, if any, class members' rates were affected by that action, and (3) whether the action taken was consistent with or violative of the Contract's pricing terms.

For example, the March 19, 2014, email does not support liability because it discusses a decision to ████████████████████████████████ with no mention of the variable-rate products at issue in this case, while the February 2, 2017 email does not support liability because it proposed that variable rates should *not* be increased to cover an unanticipated shortfall caused by unseasonable weather. Pls.' Class Cert. Reply Exs. 2, 10. And even if the Mirkins managed to prove that XOOM implemented a particular course of action, they would still have to show whether (and how) the action affected each of the variable rates at issue here, which are set separately each month for every utility territory in New York. *See* Defs.' Class Cert. Resp. 10–11. Absent such evidence, the factfinder could not determine whether the decision impacted the rates at issue as opposed to the dozens of other rates XOOM set for New York and thousands of rates it set for other markets each month. *See id.* at 10–11. If the Mirkins were to present "abundant" evidence of this sort at a class action trial, the proceedings would devolve into an endless series of mini-trials in which the factfinder would have to evaluate individual rate-setting

Case 1:18-cv-02949-ARR-JAM Document 126-20 Filed 12/04/23 Page 52 of 59 PageID #: 8057

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
--------------------------------------------------X
DANIELLE BELL, individually and on behalf of
others similarly situated,

                     Plaintiffs,

    -against-

GATEWAY ENERGY SERVICES CORP.,

                     Defendant.
--------------------------------------------------X
EISENPRESS, J.

**DECISION & ORDER
(Motion #12)**

Index No.: 31168/2018

      The following papers numbered 1-7 were read on this motion by Plaintiff Danielle

Bell, for an Order granting Class Certification and appointing Plaintiff and her counsel as Class

Representative and Class Counsel:

| **PAPERS** | **NUMBERED** |
| --- | --- |
| NOTICE OF MOTION/MEMORANDUM OF LAW IN SUPPORT/AFFIRMATION IN SUPPORT/EXHIBITS 1-19 | 1-3 |
| MEMORANDUM OF LAW IN OPPOSITION/AFFIRMATION IN OPPOSITION/ EXHIBITS A-P | 4-5 |
| MEMORANDUM OF LAW IN REPLY/AFFIRMATION IN REPLY/EXHIBITS 1-6 | 6-7 |

      Upon the foregoing papers, these motions are determined as follows:

      Plaintiff Danielle Bell, a resident of New City, New York, commenced this putative

class action by Summons and Verified Complaint dated March 1, 2018, alleging that defendant

Gateway Energy Services Corporation ("Gateway"), of Montebello, New York, overcharged her

and thousands of New York consumers for natural gas and/or electricity, in violation of General

Business Law ("GBL") Section 349. Plaintiff seeks to certify the following class:

> All Gateway customers who were charged on a fixed rate plan at
> any time and were converted to a variable rate plan for natural
> gas and/or electricity services in New York from May of 2014 to

1

A-92

Case 1:18-cv-02949-ARR-JAM Document 212 Filed 12/04/23 Page 53 of 59 PageID #: 8058

the present. [1]

Plaintiff's claims, and those of the proposed class, arise from an alleged unlawful and deceptive misrepresentation made by Gateway Energy Services Corporation ("Gateway") regarding the competitiveness of its variable rate energy pricing plans made in the "Welcome Letter" and/or "Renewal Letter" provided by Gateway to its customers before they entered into a contract with Gateway.

"CPLR article 9, which authorizes class action suits in New York, and sets forth the criteria to be considered in granting class action certification, is to be liberally construed. The determination to grant class action certification rests in the sound discretion of the Supreme Court, 'and any error should be resolved in favor of allowing the class action. [internal citations omitted]'" Kidd v Delta Funding Corp., 289 AD2d 203, 734 N.Y.S.2d 848 (2d Dept 2001) "The primary issue on a motion for class certification is whether the claims as set forth in the complaint can be efficiently and economically managed by the court on a classwide basis. The class representative has the burden of establishing the prerequisites of certification. [internal citations omitted]" Globe Surgical Supply v GEICO Ins. Co., 59 AD3d 129, 136–37, 871 N.Y.S.2d 263 (2d Dept 2008).

CPLR Section 901(a) states:

> "One or more members of a class may sue or be sued as representative parties on behalf of all if: (1) the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable; (2) there are questions of law or fact common to the class which predominate over any questions affecting only individual members; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; (4) the representative parties will fairly and adequately protect the interests of the class; and (5) a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

---

[1] Excluded form the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which any Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

2

A-93

FILED: ROCKLAND COUNTY CLERK 02/25/2021 04:15 PM INDEX NO. 031168/2018

NYSCEF DOC. NO. 152 Case 1:18-cv-02949-ARR-JAM Document 72-2 Filed 12/04/23 Page 54 of 59 PageID #: RECEIVED NYSCEF: 02/25/2021

8059

These CPLR Sec. 901(a) criteria, which are commonly referred to a numerosity, commonality, typicality, adequacy of representation, and superiority, are to be "liberally construed" by the reviewing Court. <u>Wilder v. May Dept. Stores Co.</u>, 23 A.D.3d 646, 649, 804 N.Y.S.2d 423 (2d Dept. 2005).

**Numerosity**. Plaintiff contends that the class is so numerous that joinder of all members is impracticable. According to Plaintiff, Gateway's records indicate that the proposed Class encompasses more than 8,000 gas and electricity accounts with service addresses in New York. Defendant Gateway disputes numerosity and argues that Ms. Bell has produced no evidence that the same letters were sent to anyone else in the putative class. Gateway argues that even if on reply Plaintiff shows evidence that others received the letters, she cannot show that all persons who received the letter were influenced by it. Upon reply, Plaintiff points out that defense counsel on August 6, 2019, produced spreadsheets affixed with Bate stamps, which contained the entire charge history of all accounts meeting the putative class definition in the Verified Class Action Complaint dated March 1, 2018, and more specifically, those New York customers who enrolled with Gateway on a fixed rate and were later charged a variable rate because they failed to cancel or renew on or after May 23, 2014. Additionally, Defendant produced a multitude of documents which al contain the same "competitive" representation. In the instant case, the Court finds that the numerosity requirement has been met with some 8,223 proposed class members. See <u>Pruitt v. Rockefeller Center Properties, Inc</u>., 167 A.D.2d 14, 21, 574 N.Y.S.2d 672 (1st Dept. 1991)(action involving thousands of class members clearly meets the statute's numerosity requirement.)

**Commonality**. Plaintiff argues that the requirement of commonality is met here since there are at least two common questions that are determinative of every class member's claim. First, common to every class member's claim is whether Gateway represented that its variable rate would be competitive and second is a determination of the proper amount of damages, i.e. the difference between what Gateway charged or what customers would have

3

A-94

FILED: ROCKLAND COUNTY CLERK 02/25/2021 04:15 PM     INDEX NO. 031168/2018

NYSCEF DOC. NO. 152     Case 1:18-cv-02949-ARR-JAM   Document 172-22   Filed 12/04/23   Page 55 of 59 PageID #: RECEIVED NYSCEF: 02/25/2021
8060

paid had they been utility customers. Plaintiff argues that the entire proposed class' claims can be adjudicated using a common set of proof, including the Welcome and Renewal Letters based upon the documents themselves. Damages can be adjudicated using common proof, to wit, Gateway's business records as compared to publicly available date regarding utility rates.

Defendant contends that there is no commonality because Ms. Bell offers no method of determining the "net impression" of Gateway's statements on a class-wide basis. Gateway contends that Plaintiff must prove that the challenged statements were made to all 8,000 plus putative class members and she fails to show there is some common thread running through the communications sent to all class members that would enable the jury to assess the "net effect" of the statements. Gateway further argues that there is no workable damages model, as comparison to utility rates is not proper.

To meet the standard of commonality, class members' claims need only be substantially similar, not identical in every aspect. Freeman v. Great Lakes Energy Partners, LLC, 12 A.D.3d 1170, 1171, 785 N.Y.S.2d 640 (4th Dept. 2004). "[I]ndeed, [the commonality] rule requires predominance, not identity or unanimity, among class members." Id. Moreover, the mere presence of a question of individual reliance does not preclude class action certification. Super Glue Corp v. Avis Rent A Car System, Inc., 132 A.D.2d 604, 607, 517 N.Y.S.2d 764 (2d Dept. 1987)

In the instant matter, the Court finds that Plaintiff has met the commonality standard. Although some of the letters and terms and conditions may vary somewhat, each contains the representation that Gateway's rates would be competitive, thus posing a common question. Additionally, the Court finds that comparison to the local utility rates is appropriate given the fact that Orange and Rockland had approximately 80% of the market and Defendant's own employee, Sam Gifford, compared Gateway's rates to the local utility, finding that Gateway's rates were 190% above the local utility.

4

A-95

**Typicality**.

Plaintiff argues that typicality is satisfied because all class members were victims of the same misconduct, i.e. Gateway's deceptive representations regarding its variable rate, and they suffered the same injury, i.e. paying a rate that was higher than they would have paid had Gateway not misrepresented that its variable rate would be competitive. Additionally, the Complaint contains allegations of plan-wide misrepresentations and non-disclosures, which she alleges, by definition, were not individualized.

In opposition, Defendant Gateway contends that typicality is not present because Ms. Bell was not influenced or injured by Gateway's statement that its variable rates would be competitive, since she never wanted variable rates. Defendant further argues that Ms. Bell is subject to unique rebuttals and defenses that preclude her from serving as a class representative, including that she had easily navigated the renewal process on three prior occasions; was aware variable rates could go up and down each month; and Gateway's action in sending a "no-strings attached" un-cased check and partially used gift card, means Ms. Bell has no standing.

To be typical, "it is not necessary that the claims of the named plaintiff be identical to those of the class." <u>Super Glue Corp v. Avis Rent A Car System, Inc.</u>, 132 A.D.2d 604, 607, 517 N.Y.S.2d 764 (2d Dept. 1987). The requirement is satisfied even if the class representative cannot personally assert all the claims made on behalf of the class. <u>Pruitt</u>, 167 A.D.2d at 22. Typicality is satisfied by establishing that the claims representative parties arise "out of the same course of conduct and are based on the same theories as the other class members." <u>Ackerman v. Price Waterhouse</u>, 252 A.D.2d 179, 201, 683 N.Y.S.2d 179 (1st Dept. 1998). Moreover, the typicality requirement relates to the nature of the claims and the underlying transaction, not the amount or measure of damages, and the claim that plaintiff's damages may differ from those of other members of the class is not a proper basis to deny class certification. <u>Vickers v. Home Federal Sav. And Loan Ass'n of East Rochester</u>, 56 A.D.2d

5

A-96

62, 65, 390 N.Y.S.2d 747 (4th Dept. 1977).

Here, whether or not Ms. Bell may have navigated the renewal process better than other proposed class members, or whether she did not intentionally seek to be placed on the variable rate, does not negate typicality where Ms. Bell's claims arise out of the same course of conduct- i.e. the representation that Gateway's energy rates would be competitive-as other class members. Moreover, contrary to Gateway's contentions, there are no unique defenses related to lack of standing. The Court made a finding with respect to the summary judgment motions that there exists a live controversy sufficient to confer standing. The Court noted that defendant' s reliance on a single 78 year old case, Tractor & Equipment Corp v. Chain Belt Co., 50 F. Supp. 1001, 1004 (S.D.N.Y. 1942), for the proposition that her retention of a check for an unreasonable period of time constitutes acceptance of an offer, is simply misplaced. In Tractor and Equipment Corp., the Court did not rule that plaintiff had accepted the offer based upon retention of the check, but rather, that this raised a triable issue of fact to be determined by the jury. In the instant matter, however, a plain reading of the letter accompanying the check and gift cards- which stated that there were "no-strings attached"- make clear that no settlement offer was being made. If there was no settlement offer being made, Plaintiff's failure to cash the check could not constitute an acceptance of an offer, rendering the Tractor and Equipment Corp. case inapplicable to the instant facts.

**Adequacy and Superiority**. The Court finds that Plaintiff and her counsel will fairly and adequately protect the class, as there does not appear to be any conflicts which exists between class representatives and class members; the representative appears to have familiarity with the lawsuit and financial resources; and counsel has demonstrated both competence and experience as class counsel. Additionally, the Court finds that the class action is superior to other available methods for the fair and efficient adjudication of this controversy, particularly given the modest value of each individual claim and the cost of individual litigation. Additionally, Plaintiff represents that she is unaware of any other litigation concerning class

6

A-97

members' claims.

**CPLR Sec. 902**. Once the Court has determined the prerequisites set forth in CPLR Sec. 901 have been met, the Court must then consider the additional factors set forth in CPLR Sec. 902. Among the matters which the court shall consider in determining whether the action may proceed as a class action are (1)The interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) The impracticability or inefficiency of prosecuting or defending separate actions; (3) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (4) The desirability or undesirability of concentrating the litigation of the claim in the particular forum; (5) The difficulties likely to be encountered in the management of a class action." CPLR §902.

Here, the Court finds that these additional factors, called "feasibility considerations," favor certification in this case. There is no evidence that individual class members are seeking to control their own action, as it does not appear that there is other pending litigation which seeks to raise the same claims. Additionally, New York is the most desirable and suitable forum since the claims arise under New York law, the suit arises from Gateway's conduct in New York and all of the class members and accounts are, or were, maintained in New York. Additionally, the class action will conserve judicial resources and prevent inconsistent adjudications.

Accordingly, it is hereby

**ORDERED** that Plaintiff's Motion to Certify the Class is GRANTED in its entirety; and it is further

**ORDERED** that the certified class will consist of: "All Gateway customers who were charged on a fixed rate plan at any time and were converted to a variable rate plan for

7

A-98

natural gas and/or electricity services in New York from may of 2014 to the present. [2]; and it is further

**ORDERED** that Danielle Bell is appointed as Class Representative and Kohn, Swift & Graf, P.C. and the Frederick Law Group, PLLC are appointed as Plaintiff's counsel; and it is further

**ORDERED** that the parties are directed to appear for a conference via Microsoft Teams on February 18, 2021 at 2 p.m.  The Court shall provide the link for the conference the day prior.

The foregoing constitutes the Decision and Order of this Court on Motion #10.

Dated:   New City, New York
         January 8, 2021

_____
HON. SHERRI L. EISENPRESS, A.J.S.C.

To:    All Counsel via NYSCEF

_____

[2]Excluded form the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which any Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

A-99