EXHIBIT A-2

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                                    Plaintiffs,

          v.

XOOM ENERGY, LLC and
XOOM ENERGY NEW YORK, LLC

                                    Defendants.

Case No. 18 Civ. 2949 (ARR) (RER)

**ORAL ARGUMENT REQUESTED**

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**WITTELS MCINTURFF PALIKOVIC**
Steven L. Wittels
J. Burkett McInturff
Ethan D. Roman
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
slw@wittelslaw.com
jbm@wittelslaw.com
edr@wittelslaw.com

**HYMOWITZ LAW GROUP, PLLC**
Daniel Hymowitz
1629 SHEEPSHEAD BAY ROAD
BROOKLYN, NY 11235
Telephone: (718) 807-9900
Facsimile: (866) 521-6040
daniel@hymowitzlaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
Dmitry Kheyfits
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com
dkheyfits@kblit.com

Dated:  April 14, 2023

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

PROCEDURAL AND FACTUAL BACKGROUND ................................................. 11

   I.   THE MIRKINS ENROLL IN XOOM'S VARIABLE RATE PLAN AND ARE
      CHARGED RATES THAT ARE NOT BASED ON XOOM'S SUPPLY COSTS ........ 11

   II.  NEW YORK'S ENERGY DEREGULATION EXPERIMENT RESULTED IN
      RAMPANT OVERCHARGING BY ESCOS LIKE XOOM ........................................... 17

   III. PLAINTIFFS HAVE ALWAYS MAINTAINED THAT XOOM'S VARIABLE
      RATES WERE NOT BASED ON ITS ACTUAL AND ESTIMATED SUPPLY
      COSTS, BREACHING THE 2013 CONTRACT ............................................................ 19

   IV. VOLUMINOUS EVIDENCE DEMONSTRATES THAT XOOM'S RATES
      WERE NOT BASED ON ITS SUPPLY COSTS AND THUS THERE ARE
      GENUINE DISPUTES OF FACTS MATERIAL TO XOOM'S MOTION ................... 21

      A.  ██████████████████████████████████ .............................. 21

      B.  XOOM's Rate-Setting Process Was Not Tethered to Its Supply Costs ................. 22

   V.  XOOM'S 2016 CONTRACT AMENDMENT CONFIRMS XOOM'S BREACH ........ 25

   VI. ███████████████████████████████████████ ............. 26

ARGUMENT ............................................................................................................... 27

   I.   LEGAL STANDARD ................................................................................................... 27

   II.  THERE ARE MYRIAD FACTUAL DISPUTES AS TO XOOM'S BREACH .............. 28

      A.  "Based On" Is Ambiguous and Thus Must Be Construed Against XOOM .......... 28

      B.  XOOM's Contract Requires that Its Rates Be Either Virtually Identical to,
          Very Close to, or Directly Proportional to its Supply Costs ................................... 33

          1.  Plaintiffs Offer the Better Reading of XOOM's Contract and Should
             Be Allowed to Present that Reading to the Jury ............................................. 33

2.  Discovery Shows that XOOM Breached Even Its Own Incorrect "Foundation" Reading of the 2013 Contract, Thus Creating Another Material Dispute ............................................................. 36

C.  Supply Costs' Role in XOOM's Rate Setting Process Is Heavily Disputed ......... 37

D.  Plaintiffs' Contract Interpretation Is Reasonable, Their Margin Analysis Is Sound, and Judicial Estoppel Is Not Warranted ............................... 43

1.  There Is No Justification for Judicial Estoppel Here ...................... 43

2.  Plaintiffs Are Not Rewriting the Contract and *Richards* Is Wholly Inapposite, as Noted by Multiple Courts in This Circuit ............................... 45

III.  BORIS MIRKIN IS A PROPER PLAINTIFF ................................ 46

CONCLUSION ................................................................ 48

# TABLE OF AUTHORITIES

## Cases

*A & Z Appliances, Inc. v. Elec. Burglar Alarm Co.*,
  90 A.D.2d 802 (2d Dep't 1982) ........................................................................... 4

*Adelphia Recovery Trust v. Goldman, Sachs & Co.*,
  748 F.3d 110 (2d Cir. 2014) ............................................................................... 44

*Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*,
  446 F.3d 313 (2d Cir. 2006) ............................................................................... 28

*Bell v. Gateway Energy Servs. Corp.*,
  No. 17 Civ. 3893 (KBF), 2017 WL 5956887 (S.D.N.Y. Nov. 29, 2017) ................................. 47

*Bowers v. City of High Point*,
  451 S.E.2d 284 (N.C. 1994) ............................................................................... 31

*Claridge v. N. Am. Power & Gas, LLC*,
  No. 15 Civ. 1261 (PKC), 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) ................................. 5

*DeRosa v. Nat'l Envelope Corp.*,
  595 F.2d 99 (2d Cir. 2010) ............................................................................... 43

*Donin v. Just Energy*,
  No. 17 Civ. 5787 (WFK) (SJB), ECF No. 111 (E.D.N.Y. Sept. 24, 2021) ............................. 47

*Effie Film, LLC v. Murphy*,
  564 F. App'x 631 (2d Cir. 2014) (summary order) ................................................... 31

*Fleisher v. Phoenix Life Ins. Co.*,
  18 F. Supp. 3d 456 (S.D.N.Y. 2014) ................................................................ 29, 30

*Gay v. Saber Healthcare Grp., LLC*,
  842 S.E.2d 635 (N.C. Ct. App. 2020), *aff'd*, 854 S.E.2d 578 (Mem) (N.C. 2021) ............. 8, 28

*Gould Morris Elec. Co. v. Atlantic Fire Ins. Co.*,
  50 S.E.2d 295 (N.C. 1948) ............................................................................... 8

*Halo Optical Prods., Inc. v. Liberty Sport, Inc.*,
  No. 14 Civ. 282 (MAD) (TWD), 2017 WL 1082443 (N.D.N.Y. Mar. 22, 2017) ................... 46

*Harewood v. APL Ltd.*,
  No. 14 Civ. 1668 (ARR) (VMS), 2015 WL 12591648 (E.D.N.Y. Aug. 24, 2015) ................. 44

*Helix Energy Solutions Grp., Inc. v. Hewitt,*
    598 U.S. ----, 2023 WL 2144441 (Feb. 22, 2023) .................................................. 31

*Henry Avocado Corp. v. Z.J.D. Brother, LLC,*
    No. 17 Civ. 4559 (ARR) (RLM), 2019 WL 1586865 (E.D.N.Y. Apr. 12, 2019) ............. 28, 41

*Hernandez v. NJK Contractors, Inc.,*
    No. 09 Civ. 4812 (ARR) (VMS), 2013 WL 12363005 (E.D.N.Y. Feb. 12, 2013)................. 39

*Hughes v. United States,*
    138 S.Ct. 1765 (2018) ............................................................................ 31

*Intellivision v. Microsoft Corp.,*
    484 Fed. App'x 616 (2d Cir. 2012) (summary order).............................................. 44

*Jedrejcic v. Croatian Olympic Comm.,*
    190 F.R.D. 60 (E.D.N.Y. 1999) .................................................................... 44

*Jones v. Jones,*
    824 S.E.2d 185 (N.C. Ct. App. 2019), *aff'd* 837 S.E.2d 872 (Mem) (N.C. 2020) ................... 8

*Lia v. Saporito,*
    541 Fed. App'x 71 (2d Cir. 2013)................................................................... 44

*Madden v. DreamWorks, LLC,*
    No. 07 Civ. 5273 (ARR), 2009 WL 10706573 ..................................................... 31

*Martinez v. Agway Energy Servs., LLC,*
    No. 18 Civ. 235 (MAD) (ATB), 2022 WL 1091607 (N.D.N.Y. Apr. 12, 2022)............... 35, 46

*Melville v. HOP Energy, LLC,*
    No. 21 Civ. 10406 (KMK), 2023 WL 2648775 (S.D.N.Y. Mar. 27, 2023) .................... 1, 4, 46

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.,*
    906 F.2d 884 (2d Cir. 1990)........................................................................ 28

*Mirkin v. XOOM Energy, LLC,*
    931 F.3d 173 (2d Cir. 2019)................................................................... *passim*

*N. Carolina Farm Bureau Mut. Ins. Co., Inc. v. Martin ex rel. Martin,*
    851 S.E.2d 891 (N.C. 2020)........................................................................ 31

*New Hampshire v. Maine,*
    532 U.S. 732 (2001)................................................................................ 44

*Norem v. Lincoln Benefit Life Co.*,
 737 F.3d 1145 (7th Cir. 2013) ............................................... 30

*Resolution Trust Corp. v. Gregor*,
 872 F. Supp. 1140 (E.D.N.Y. 1994) ....................................... 43

*Richards v. Direct Energy Servs., LLC*
 915 F.3d 88 (2d Cir. 2019) ................................................... 46

*Richards v. Direct Energy Servs., LLC*,
 246 F. Supp. 3d 538 (D. Conn. 2017) ................................... 46

*Secured Asset Mgmt. LLC v. Cong Beth Joseph Zwi Dushinsky*,
 No. 17 Civ. 5588 (DLI) (CLP), 2019 WL 4861411 (E.D.N.Y. Sept. 30, 2019) ..................... 44

*Silvers v. Horace Mann Ins. Co.*,
 378 S.E.2d 21 (N.C. Ct. App. 1989) .................................... 4, 29

*Singleton v. Haywood Elec. Membership Corp.*,
 588 S.E.2d 871 (N.C. 2003) .................................................. 31

*Slam Dunk I, LLC v. Conn. Gen. Life Ins. Co.*,
 853 Fed. App'x 451 (Mem) (11th Cir. 2021) ........................ 31

*Stanley v. Direct Energy Servs., LLC*,
 466 F. Supp. 3d 415 (S.D.N.Y. 2020) ............................. 35, 46

*Trustees of Loc. 7 Tile Ind. Welfare Fund v. Atlantic Exterior Wall Sys., LLC*,
 No. 20 Civ. 4505 (ARR) (RER), 2023 WL 2632493 (E.D.N.Y. Mar. 24, 2023) ................... 27

*U.S. ex rel Kester v. Novartis Pharms. Corp.*,
 43 F. Supp. 3d 332 (S.D.N.Y. 2014) ..................................... 30

*U.S. Trust Co. of N.Y. v. Shapiro*,
 835 F.2d 1007 (2d Cir. 1987) ................................................ 44

*Vayngurt v. Sw. Credit Sys., L.P.*,
 No. 16 Civ. 2261 (ARR) (VMS), 2016 WL 6068132 (E.D.N.Y. Oct. 14, 2016) ............... 5, 42

*Vogt v. State Farm Life Ins. Co.*,
 963 F.3d 753 (8th Cir. 2020) ................................................ 30

*Whitman v. Am. Trucking Ass'ns, Inc.*,
 531 U.S. 457 (2001) .............................................................. 32

*Yoselovksy v. Associated Press*,
  917 F. Supp. 2d 262 (S.D.N.Y. 2013) ........................................................... 31

*Zirogiannis v. Seterus, Inc.*,
  221 F. Supp. 3d 292 (E.D.N.Y. 2016) .......................................................... 48

**Statutes**

N.Y. Gen. Bus. L. § 349-d ......................................................................... 17

**Other Authorities**

Case 15-M-0127, et al., Department of Public Service Staff Redacted Initial Brief
  (Mar. 30, 2018) ............................................................................ 18, 32

Case 15-M-0127, et al., *Ord. Adopting Changes to the Retail Access Energy Market
  and Establishing Further Process*, Dec. 12, 2019 ............................................ 18, 19

Cases 12-M-0476, *et al.*, *Ord. Taking Actions to Improve the Resid. and Small
  Non-Resid. Retail Access Mkts.* .................................................................. 18

Cases 94-E-0952, *et al.*, *In the Matter of Competitive Opportunities Regarding Electric
  Service*,   96-12 (May 20, 1996) ............................................................... 17

ESCO Consumers Bill of Rights, New York Sponsors Memorandum,
  2009 A.B. 1558 (2009) ........................................................................... 18

U.S. COURT OF APPEALS, 2D CIR.,
  https://www.ca2.uscourts.gov/oral_arguments.html ............................................. 21

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................ 27

Plaintiffs Susanna and Boris Mirkin ("Plaintiffs") respectfully submit this Opposition to Defendants XOOM Energy, LLC and XOOM Energy New York, LLC's (together, "Defendants," "XOOM," or the "Company") Motion for Summary Judgment ("Motion").[1]

## INTRODUCTION

XOOM's summary judgment argument boils down to a request that the Court release it from the specific pricing term of the contract it drafted and provided to Plaintiffs and more than 110,000 other New York consumers. Discovery shows that after drafting its contract, XOOM systematically violated the pricing term and overcharged New Yorkers by tens of millions of dollars. Considering the stakes for XOOM, it is thus no surprise that XOOM goes to great lengths to wriggle out from under its contractual commitment. But buried in the parties' myriad detailed factual disputes are five key aspects of law and fact that unquestionably require a trial on issues of fact by a jury.

*First*, the parties' disputes are deeply factual. Plaintiffs claim that XOOM breached the requirement in its New York form contract (the "2013 Contract") to set its variable rates "based on XOOM's actual and estimated supply costs." Ex. 1 at Mirkins_00004. Plaintiffs' breach claim raises two ascertainable questions of fact: (1) what are XOOM's actual and estimated supply costs? and (2) were its variable rates "based on" those costs?

As to XOOM's supply costs, both the Second Circuit and other courts in this Circuit construing the contracts of other energy supply companies ("ESCOs") like XOOM recognize that "supply costs" consist of identifiable criteria not subject to XOOM's discretion. *See, e.g.*, *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177–78 (2d Cir. 2019); *Melville v. HOP Energy, LLC*, No. 21 Civ. 10406 (KMK), 2023 WL 2648775, at *6 (S.D.N.Y. Mar. 27, 2023). In fact, the phrase

---

[1] Accompanying this memorandum is the Declaration of Steven L. Wittels, dated Apr. 14, 2023 ("Wittels Decl."). References in this memorandum to "Ex." refer to the Wittels Decl. exhibits.

"actual and estimated supply costs" is an industry-specific term that requires specialized expertise to delineate and identify. Discovery shows that the costs embodied by this term of art were captured in XOOM's internal records in a calculation that XOOM labeled "Total Cost" and was maintained for each of its monthly energy rates. Discovery also demonstrates that XOOM applied widely varying markups on its supply costs that resulted in rates that were both substantially and unpredictably higher than its "Total Cost" calculations.

Specifically, discovery shows that 

. *See* Ex. 2, Expert Report of Derya Eryilmaz, Ph.D. and Seabron Adamson, dated Oct. 3, 2022 ("Pls.' Expert Rep.") ¶ 52

Under the Second Circuit's reading of the 2013 Contract, such "significant upward deviations from" XOOM's supply costs violate the contract's pricing term. *Mirkin*, 931 F.3d at 177.

Faced with this fact, XOOM now argues its "Total Cost" was not in fact "total" and that its large markup actually included additional unidentified and uncalculated supposed "supply costs." The dispute XOOM raises is clearly factual and renders summary judgment inappropriate. Indeed, the Second Circuit found it "notable" that "XOOM failed" to identify "a single factor that could cause such substantial deviations" from the supply costs it incurred to serve the Mirkins. *Id.* Discovery has only confirmed the Second Circuit's observation.

As to whether XOOM's variable rates were "based on" its supply costs, XOOM admits that the meetings where the Mirkins' rates were set encompassed "up to 20 markets and 1,000

2

different products" and were driven by ████████████████████████████████████

███████████████  Further, XOOM's Board and management never required XOOM's product or

pricing groups to base variable rates on supply costs.  Instead, just weeks before the Mirkins

became customers the Company's CEO admitted that XOOM ███████████████████████████

█████████████████████████  As XOOM's SVP of Energy Supply and Pricing put it, ████████

████████████████████████████████████████████

     This alone dooms summary judgment, but there is more.  Critically, XOOM amended its

form contract in 2016 to give itself wide discretion to base variable rates on its internal "pricing

strategies," and XOOM witnesses testified that the Company had ████████████████████████

███████████████████████  In fact, XOOM's 30(b)(6) witness admitted that the "███████████

██████████████████████████████████████████████████████," thus

acknowledging that the 2013 Contract's pricing term was never followed.  XOOM further insists

that it was allowed to charge the Mirkins a substantial margin above its supply costs but never

explains how it did not breach the contract with ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████.  Indeed, over their brief tenure, the Mirkins were charged markups

that exceeded XOOM's ███████████████████████████.

     XOOM knows that these facts are not consistent with the 2013 Contract so it rests most of

its defense on the term "based on."  To make its case, XOOM analogizes the contract's "based on"

language to a movie claiming to be "based on" a true story.  This is an apt analogy, but not one

that is good for XOOM.  To continue XOOM's analogy, its motion boils down to a claim that just

because the actors in its movie wear cowboy hats, ride horses down dusty roads, and use lassos,

the movie is "based on" the showdown at the O.K. Corral.  XOOM's movie may qualify as a

"western," but the uncontested facts make plain that XOOM's movie version is not "based on" a true story.  Both documents and testimonial evidence show that XOOM never "based" consumers' variable rates on its own "true" reported "supply costs."

**Second,** the principles that should guide the Court's analysis at summary judgment favor Plaintiffs.  For example, the parties disagree regarding whether XOOM breached.  There is no dispute, however, that XOOM's contract is one of adhesion, and it is "a canon of contract construction that a form contract will be construed most strongly against the party who prepared it."  *A & Z Appliances, Inc. v. Elec. Burglar Alarm Co.*, 90 A.D.2d 802, 802 (2d Dep't 1982); *see also Silvers v. Horace Mann Ins. Co.*, 378 S.E.2d 21, 25 (N.C. Ct. App. 1989) (All contracts "must be construed against the drafter, which had the best opportunity to protect its interests.").  Indeed, courts in this Circuit recognize that the transaction underlying this case involves "less-informed consumers" purchasing "something as universally necessary as utility services."  *Melville*, 2023 WL 2648775, at *9.  It is also true at summary judgment that all inferences must be drawn in the non-movant's, *i.e.*, Plaintiffs' favor.

Likewise, XOOM claims that because the 2013 Contract requires that its rates be "based on" XOOM's supply costs, it can (i) assess whatever markup it wants, (ii) change the size of the markup whenever it wants, and (iii) explain its markup however it wants.  But that renders the pricing term meaningless.  As Plaintiffs' energy market experts made plain, XOOM's claim that its rates are "based on" its supply costs "makes a mockery of any retail supply contract – the customer is liable to pay any amount that XOOM asks for – and they do not even know what that rate would be until after the fact."  Ex. 3, Expert Rebuttal Report of Derya Eryilmaz, Ph.D. and Seabron Adamson, dated Nov. 4, 2022 ("Pls.' Rebuttal Rep.") ¶ 19.  Indeed, it is precisely this type of post hoc justification that led the New York Public Service Commission ("PSC") to

convene an expansive investigation into ESCOs' pricing practices and then ***ban*** the exact variable rate pricing practices XOOM employed against the Mirkins and 110,000+ New York consumers. The PSC's grounds?  It made no commercial sense for consumers to pay substantially more for the exact same energy they could buy at cost from the utility.  Your Honor's case law echoes this sentiment when it makes clear that "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Vayngurt v. Sw. Credit Sys., L.P.*, No. 16 Civ. 2261 (ARR) (VMS), 2016 WL 6068132, at *4 (E.D.N.Y. Oct. 14, 2016) (Ross, J.).  This also makes summary judgment inappropriate.

   ***Third***, discovery shows that despite promising a rate "based on" its supply costs XOOM simply conjured up the highest rate it thought the market could bear.  Because XOOM's rates were untethered to its supply costs, to calculate damages Plaintiffs look to XOOM's internally compiled "Total Cost" for energy supply each month.  Using XOOM's own supply costs, Plaintiffs offer two alternatives that use objective facts to construct a rate that the jury can adopt as the contractually required rate.  This too makes summary judgment unwarranted.  *See Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261 (PKC), 2016 WL 7009062, at *3 (S.D.N.Y. Nov. 30, 2016) (Noting that if an ESCO set rates inconsistent with a contract, damages could be "the difference between [the] actual charged rate and a hypothetical rate calculated pursuant to the factors described in the [contract].").

   As a first alternative, if read from a reasonable consumer's perspective the term "based on" means that XOOM would charge a rate that is ***virtually identical*** to or ***very close to*** XOOM's supply costs.  Akin to a claim that a movie is based on a true story, reasonable consumers would understand the 2013 Contract to mean that XOOM's rates would hew very closely to its supply costs.  That is decidedly not what happened here.  For example, below is a graph that shows the

substantial and fluctuating markup XOOM applied on top of its internally reported costs when it set Class Members' natural gas rates over eight years.  The blue line represents XOOM's supply costs and the black line shows XOOM's variable rate.



**NIMO**
**SimpleFlex Natural Gas Rate and WACOG**

Ex. 3, Pls.' Rebuttal Rep. ¶ 6.  The divergence between the above two lines represents millions of dollars in excessive charges paid by New York consumers.  The next page contains a similar graph showing that the rates XOOM charged Plaintiffs (in blue) were substantially higher than XOOM's supply costs (in orange).



Notably, XOOM's markup (the distance between the two lines) climbed substantially during the Mirkins' tenure—███████████████████████████. As the Second Circuit noted, these are "significant upward deviations from" XOOM's supply costs. *Mirkin*, 931 F.3d at 177 ("XOOM promised to base its rates on its supply costs and the Mirkins' allegations and calculations plausibly allege that this did not occur.").

Despite XOOM's contrary claims, Plaintiffs' first contractual reading allows for modest margin to cover XOOM's minimal fixed costs and tracks consumers' experience as market participants. XOOM's primary competitor is the utility, and the utility's supply rate generally reflects energy supply costs. First Amended Complaint ("FAC") ¶¶ 60–61, ECF No. 42; *see also* Ex. 2, Pls.' Expert Rep. ¶ 68 ("[T]he utility rate covers the same set of general supply costs as the supply costs of an ESCO such as XOOM."). Since XOOM pays those same supply costs, it would be reasonable for consumers to expect the pricing term to require XOOM's rates be almost identical to its supply costs, just like its main competitor's rates. This is also consistent with

XOOM's marketing, FAC ¶¶ 51–52, and the Court's approach at dismissal when it looked to a reasonable consumer's expectations, ECF No. 24 at 9–11.

This reading is also consistent with the North Carolina law that governs the 2013 Contract. *Jones v. Jones*, 824 S.E.2d 185, 195 (N.C. Ct. App. 2019), *aff'd* 837 S.E.2d 872 (Mem) (N.C. 2020) (The "heart of a contract is the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties[.]" (quoting *Gould Morris Elec. Co. v. Atlantic Fire Ins. Co.*, 50 S.E.2d 295, 297 (N.C. 1948))). North Carolina also follows the doctrine that contract language is construed "against the drafter—the party responsible for choosing the questionable language." *Gay v. Saber Healthcare Grp., LLC*, 842 S.E.2d 635, 640 (N.C. Ct. App. 2020), *aff'd*, 854 S.E.2d 578 (Mem) (N.C. 2021).

Moreover, Plaintiffs' reading tracks the PSC's findings that ESCOs like XOOM use vague pricing terms to obscure their price gouging, which led the PSC to ban the exact variable rate practices that XOOM used on Plaintiffs and the Class. Under this theory Plaintiffs' damages are $85, which generally tracks what Plaintiffs' utility would have charged. Classwide damages under this method are ███████, similar to the ██████ the class would have saved if they had remained with their utilities.

To be sure, Plaintiffs' use of XOOM's "Total Cost" does not credit XOOM's claimed margins or its post hoc attempt to add supply costs to its margins in the form of previously undocumented "prior period adjustments" or other unnamed items. But that also does not mean Plaintiffs are refusing XOOM any margin whatsoever. The problem for XOOM is that discovery shows that it never "attempted to build up or justify the higher margins it charged to variable rate customers" and that Plaintiffs' experts evaluated XOOM's claimed margins and found them "arbitrarily high," "untethered to costs," and "not consistently tied to any increase or decrease in

XOOM's costs."  Ex. 2, Pls.' Expert Rep. ¶¶ 57, 59, 74.  In fact, XOOM admitted to the Second Circuit that it is simply a middleman with minimal fixed costs. *Mirkin*, 931 F.3d at 175.  Given the abundant record evidence that XOOM (as a middleman) did not include a margin as part of its "Total Cost" calculations, it is not unreasonable for Plaintiffs to take XOOM's "Total Cost" figure as the rate "based on" XOOM's supply costs.

As a second option, the jury could conclude that (although XOOM's main competitor, the utility, sells the same energy at cost) a reasonable consumer would understand "based on" to mean ***directly proportional*** to XOOM's supply costs such that XOOM could charge a reasonable, and consistent, margin.  Plaintiffs' second model reflects this reasonable interpretation.  XOOM criticizes this as a "capped-margin" model, but XOOM's alternative would allow it to charge a rate that is not "based on" XOOM's costs in any meaningful sense.  Plaintiffs' alternative reading that XOOM was required to charge a margin that is directly proportional to its supply costs does not mean XOOM can charge whatever markup it wants, especially because XOOM is a middleman with minimal fixed costs as admitted to the Second Circuit.  Accordingly, Plaintiffs reasonably looked to XOOM's margins for ████████████████████████████████████████

████.  Under this reading, XOOM charged Plaintiffs varying monthly markups that beat XOOM's monthly fixed rate margins by ██████████.  Had XOOM applied the same markup as its fixed rate, Plaintiffs would have paid $36 less, and classwide damages would be ██████████. What Plaintiffs' second model does not permit, however, is for XOOM to add inconsistent and unreasonable markups to supply costs that are undisclosed to consumers, which then produce an arbitrarily high and unpredictable rate that consumers do not see until after the fact.  Yet that is exactly what XOOM did here when it charged a markup that climbed substantially from ██████

███ over just a six-month period. Both damages theories are eminently reasonable and should be presented to the jury.

**Fourth,** even assuming XOOM was correct (and it is not) that "based on" only means XOOM's supply costs need to provide some sort of "foundation" that can be "built upon," there are genuine factual disputes about whether XOOM's supply costs played a "significant, foundational role" in its variable rates. As noted above, XOOM admits ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████. Considering these facts, the jury could decide that the "foundation" of XOOM's rates were not XOOM's supply costs, but rather its profitability goals.

**Fifth**, XOOM's defenses only raise further factual issues. For example, XOOM claims that there is a "1-in-400 chance that" XOOM's supply costs and rates were "unrelated," but Plaintiffs' experts call that a "very weak standard." That XOOM's rates and costs tend to move broadly in the same way from month to month does not mean XOOM could charge Plaintiffs markups varying from ████████ over just a six-month period, especially when XOOM's corresponding ████████ fixed rate markups during the same months were ████████████ ███. Similarly, for the first time in five years of litigation XOOM now claims that the factfinder should look to an unrelated contract section called "Agency" that XOOM claims allows it to add additional (unspecified) markups. But XOOM produced no evidence for how this provision worked in rate setting, nor how it allowed XOOM to assess markups that were multiples of those applied to the fixed rate plans subject to the same "Agency" term.

XOOM also claims Plaintiffs conceded (before discovery) that XOOM was allowed to charge excessive margins. This is a distortion. Before having the benefit of any discovery

whatsoever Plaintiffs added a 13.67% markup to the wholesale cost of the Mirkins' energy to plausibly show (at the pleading stage) that XOOM's rates were not "based on" its supply costs. XOOM's attempt to twist this representative margin into an admission that it could charge any margin it wants only raises the jury question as to whether the fluctuating markup of ███████ XOOM charged Plaintiffs over just a six-month period constitutes a rate "based on" XOOM's supply costs. To be sure, XOOM claims its rates always rose and fell with its supply costs and that other ESCOs (with other contracts) were contractually permitted to charge more, but that does not answer the key question here: whether the substantial and fluctuating markups XOOM assessed here represent a rate "based on" XOOM's supply costs.

In sum, XOOM's summary judgment arguments simply highlight the extant genuine disputes of material fact in this case. The liability question here is straightforward: Were XOOM's rates "based on" its "actual and estimated supply costs?" Plaintiffs say "no," because evidence shows XOOM prioritized other factors, primarily internal margin and profit goals, with other considerations coming in a distant second. XOOM says "yes," because it claims its supply costs were *a* factor in setting variable rates. XOOM's motion would require the Court to resolve all disputed facts in its favor, which is unwarranted. The myriad factual disputes clearly demonstrate that XOOM is not entitled to summary judgment. Your Honor should deny XOOM's motion so that the parties may present their evidence to the jury.

## PROCEDURAL AND FACTUAL BACKGROUND

**I.    THE MIRKINS ENROLL IN XOOM'S VARIABLE RATE PLAN AND ARE CHARGED RATES THAT ARE NOT BASED ON XOOM'S SUPPLY COSTS**
*(Responding to Defs.' Points II.A, II.C.3, Defs.' Br. at 3–4, 10–11)*

In March 2013, believing they would save money, Boris and Susanna Mirkin enrolled in a XOOM variable rate plan to obtain electricity service for their family home. Ex. 4, Dep. Tr. of Boris Mirkin, dated Aug. 30, 2022 ("B. Mirkin Tr."), 25:2–13. Boris was the primary decision-

maker regarding the Mirkins' energy supply even though Susanna's name was on the account. *Id.* at 27:12–18; Ex. 5, Dep. Tr. of Susanna Mirkin, dated Aug. 30, 2022 ("S. Mirkin Tr."), 37:11–20, 60:3–11. Upon enrollment, XOOM sent the 2013 Contract to Boris's email. Defs.' Answer to FAC ("Ans."), ECF No. 44, ¶ 41; Ex. 4, B. Mirkin Tr., 27:2–4.[2]

The Mirkins were XOOM customers from May 2013 to November 2013. FAC ¶ 54; Ans. ¶ 54. After receiving a lower teaser rate in the first month, XOOM began dramatically overcharging the Mirkins in relation to its supply costs. Ans. ¶ 43; FAC ¶¶ 41–43; Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31. Below is a table showing the variation between XOOM's internal supply cost calculations (its "Total Costs") and the rate XOOM charged the Mirkins. This table shows that XOOM's markup climbed from ███████ during Plaintiffs' short tenure.



Defs.' Opp'n to Pls.' Mot. for Class Certification at 8, ECF No. 139 ("Class Cert. Opp'n"); Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31; Ex. 6, Pls.' Rebuttal Rep. Ex. 6.

---

[2] Regarding the other "Boris Mirkin" whose contract XOOM produced in discovery, defense counsel's effort to smear Plaintiffs' counsel is inappropriate. *See* Defs.' Br. at 4–5. Casting aspersions at Plaintiffs' counsel for a (mistaken) belief, without the benefit of discovery, that a natural gas contract for "Boris Mirkin" dated 7+ years before the conference was *Plaintiff* Boris Mirkin has no bearing on XOOM's motion. XOOM could have cleared our confusion up using its own documents but chose not to. That XOOM now regrets this strategic choice does not warrant an attack on our integrity.

As the above table reveals, each month the Mirkins were XOOM customers XOOM charged a rate that included a markup that was well above XOOM's supply costs and thus was not virtually identical to or very close to XOOM's supply costs.  In other words, XOOM's rates represent "significant upward deviations from" XOOM's supply costs which the Second Circuit found is "sufficient to state a claim for breach of contract[.]"  *Mirkin*, 931 F.3d at 177.  This was acknowledged by XOOM's CEO, who expressed to CFO David Vail and SVP of Energy Supply and Pricing Andrew Coppola that a proposed ███████████████████████████████ ███████████████  Ex. 7 at XOOM_MIRKIN_069057.  A margin that is █████████████████ does not result in a rate that is based on XOOM's supply costs.

Further, despite XOOM's contrary claims, the Mirkins' rates show that XOOM's supply costs and variable rates were *not* correlated.  For example, in June 2013, XOOM's supply costs were ██████████, and its variable rate was █████████.  Class Cert. Opp'n at 8.  But in September 2013, the supply costs were *lower*, ██████████████████, but the variable rate was *higher*, ███████████████████.  *Id.*  The spread between XOOM's supply costs and rates is also telling—in June 2013, XOOM charged █████████ more than its supply costs but in September XOOM charged ████████ more than its supply costs ██████████████.  Indeed, XOOM's expert conceded that XOOM's rates sometimes went up even though its supply costs went down.  Ex. 8, Dep. Tr. of David Coleman, dated Nov. 16, 2022 ("Coleman Tr.") 105:4–8.  This of course completely defeats XOOM's correlation argument.  Defs.' Br. at 2, 10–11, 22.

XOOM's breach is also evident under Plaintiff's more permissive second damages model.  As the table below demonstrates, the markup XOOM applied to Plaintiffs' rates was *well above* the margin XOOM applied to its contemporaneous fixed rates (█████████████████) and *fluctuated wildly* with ranges from ████████████ above XOOM's fixed rate margin.  No reasonable

consumer would expect to be charged ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and there is no commercially reasonable basis for XOOM to have done so here.  Worse, no reasonable person would agree to a rate "based on" XOOM's supply costs and expect fluctuating markups that were ▮▮▮▮▮▮▮▮ higher than the markups XOOM applied to its ▮▮▮▮ fixed rate plans.



Class Cert. Opp'n at 8; Ex. 9, Pls.' Rebuttal Rep. Ex. 7.

As either of Plaintiffs' damages models demonstrate, the Mirkins were damaged each month they were XOOM customers, with total damages between $36 and $85 depending on which damages method is used.  Ex. 3, Pls.' Rebuttal Rep. ¶¶ 30–31.

Nevertheless, XOOM wrongly insists that it set Plaintiffs' rates "based on its supply costs." Defs.' Br. at 7.  But XOOM's defense only further demonstrates its breach.  For example, comparing apples and oranges, XOOM claims there was no breach because it only charged "about 1 cent per kWh more than the 13.67% margin the Mirkins themselves baked into the Market Supply Cost, and far less than the 66.47% 'significant upward deviation' from wholesale costs the complaint alleged and the Second Circuit noted." *Id.*  XOOM's math is more than a little misleading.  First, by trying to focus the Court on "1 cent per kWh" XOOM attempts to obscure the fact that—with the aid of discovery—the data shows that on average "the Mirkins were

assessed with margins that were ███████████ those charged to fixed rate customers during the same period." Ex. 3, Pls.' Rebuttal Rep. ¶ 31.

Second, XOOM's focus on the delta between Plaintiffs' pre-discovery 13.67% margin and the much higher margins unearthed in discovery misconstrues both the 2013 Contract's plain language and the Second Circuit's ruling. The key question here is whether XOOM's rates hew closely to its supply costs. As the data comparing XOOM's "Total Cost" to its ultimate rate clearly shows, it was not reasonable for XOOM (as a middleman) to add a ███████████ markup to its supply costs when it agreed to charge a rate "based on" its supply costs.

XOOM effectively concedes excessive markups when it tries to claim (without basis) that its markup included additional undisclosed and unaccounted for "supply costs." Specifically, XOOM claims its markup encompasses "supply costs like prior period adjustments," "fixed costs," and "hopefully some profit." Defs.' Br. at 7. Notably, this claim in XOOM's brief is at direct odds with both XOOM's own witness testimony and its own document production. In response to Plaintiffs' requests for production of all documents concerning XOOM's costs of procuring energy for its New York customers, XOOM produced its supply cost tabulations in the form of its rate-setting workbooks. *See* Ex. 10, Defs.' Resps. to Pls.' First Req. for Prod. of Docs., dated Dec. 24, 2019, at 21, 23–26 (RFP Nos. 38, 41–47); Ex. 11, Ltr. Regarding Defs.' Am. Resps. to Pls.' First Req. for Prod. of Docs., dated Nov. 20, 2020, at 5 (XOOM pointing to its rate-setting workbooks as the relevant source of supply costs and pricing for New York). Yet neither XOOM's rate-setting workbooks nor any of the other documents XOOM circulated for its rate setting meetings include ██████████████████████████.[3] Likewise, Plaintiffs analyzed

---

[3] *See* Ex. 2, Pls.' Expert Rep. ¶ 23(d) ( ███████████████████████████████
████████████████████████████████████████████████ , ¶ 47 ███

*Footnote continued on next page.*

XOOM's separate margin reports, which show XOOM's unit and gross margins for each market, but these reports ███████████████████████████████. Ex. 12 at XOOM_MIRKIN_047611.

XOOM also did not produce any document showing that ███████████████████████

████████████████████████████, nor any evidence that it considered and valued any of these cost components when setting New York variable rates. *See, e.g.*, Ex. 2, Pls.' Expert Rep.

¶ 51 ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████. Instead, the "████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████" *Id.* ¶ 52.

████████████████████████████████████████████████

███████████████ *Id.* ███████████████████████████████

███████████████████████. *Id.*

In other words, when now required to explain why it added a substantial and fluctuating markup that grew from ███████████ during the Mirkins' 6-month tenure, XOOM belatedly claims this markup somehow included additional supply costs and fixed costs. But discovery disproves this. What actually occurred was XOOM's pricing team ███████████████████████████

██████████████████████████████████████████████. This fact—not XOOM's post hoc explanations with no record basis—is what explains the varied markup the Mirkins were charged.

---

███████████████████); Ex. 8, Coleman Tr. 95:17–96:4 ████████████████

████████████████████████████████████████████████.

## II. NEW YORK'S ENERGY DEREGULATION EXPERIMENT RESULTED IN RAMPANT OVERCHARGING BY ESCOS LIKE XOOM

In 1996, the PSC deregulated New York's retail energy supply market after Enron's unprecedented lobbying efforts. FAC ¶ 2. Thereafter, consumers could choose from a variety of energy suppliers. *See* FAC ¶¶ 2, 19; *see also* Ans. ¶¶ 2, 19. The "general goals" for deregulation included lowering rates for consumers and increasing consumer choice; the hope was that competition in energy markets would result in reduced supply costs, thereby lowering consumers' rates. Ex. 13, Cases 94-E-0952, *et al.*, *In the Matter of Competitive Opportunities Regarding Elec. Serv.*, No. 96-12 (May 20, 1996) ("1996 Ord."), at 28; FAC ¶ 27.

Under deregulation, ESCOs (like XOOM) supply consumers' electricity and/or natural gas, while the local utilities continue to deliver energy to consumers' homes or places of business. Ans. ¶ 21; FAC ¶¶ 19, 21; *Mirkin*, 931 F.3d at 175. ESCOs are middlemen: they do not generate, transmit, or distribute energy, but instead arrange supply from the wholesale market. *Mirkin*, 931 F.3d at 175; Ex. 2, Pls.' Expert Rep. ¶ 25. The utilities handle delivery, billing, and manage payment risks. Ans. ¶ 23; Ex. 2, Pls.' Expert Rep. ¶ 25. This allows ESCOs to service large customer bases with far lower costs. FAC ¶ 23.

Unfortunately, deregulation's main result has been the proliferation of ESCOs like XOOM whose business model is taking advantage of the vast information asymmetry between consumers and their ESCOs. FAC ¶ 28. As a result of this extensive misconduct, states like New York began enacting post-deregulation remedial legislation directly targeting ESCOs' business practices. *Id.* The 2009 sponsoring memo of New York's ESCO Consumer Bill of Rights—codified as G.B.L. § 349-d—recognized that New York's deregulatory experiment was plagued with "companies whose business model is based on taking unfair advantage of consumers" and subjecting them to

17

"onerous contracts" and "short-term 'teaser' rates followed by skyrocketing variable prices." Ex. 14, Sponsors Mem., 2009 A.B. 1558, at 3–4 .

Then, in February 2014, the PSC found that New York's ESCOs: (1) "failed to provide" services that had value to customers, Ex. 15, Cases 12-M-0476, *et al.*, *Ord. Taking Actions to Improve the Resid. and Small Non-Resid. Retail Access Mkts.*, at 2–3; (2) "are not providing sufficient competition or innovation to properly serve customers," *id.* at 3; (3) did not create a "workably competitive" market, *id.* at 10; (4) did not face "effective competition (*i.e.*, neither buyers nor sellers have good information about prices)," *id.* at 10; and (5) faced "almost no competitive pressure to innovate and provide value-added services or products to" customers, *id.* at 11. Unfortunately, the PSC's 2014 findings did not curb ESCOs' abuses.

Next, in 2018, and just weeks before this case was filed, PSC staff announced that over a 3-year period, 2014 through 2016, roughly two million New York residential and small business customers paid ESCOs like XOOM over $1.3 billion more than they would have paid their utilities *for the exact same energy*. Ex. 16, Cases 15-M-0127, *et al.*, Dep't of Pub. Serv. Staff Redacted Initial Br., at 2 (Mar. 30, 2018). PSC staff concluded that the "primary problem" was "the lack of transparency to customers on ESCO prices" which "allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than" they would have paid the utility. *Id.* at 41.

In recognition of these rampant problems, in December 2019 the PSC **banned** the exact type of variable rate plan into which XOOM enrolled the Mirkins and the Class. Ex. 17, Cases 15-M-0127, et al., *Ord. Adopting Changes to the Retail Access Energy Mkt. and Estab. Further Process*, Dec. 12, 2019 ("2019 Ord.") at 88–90; Ex. 2, Pls.' Expert Rep. ¶¶ 23(g), 34–35. This

ban followed a two-year PSC investigation of ESCO practices that culminated in a 10-day evidentiary hearing. Ex. 17, 2019 Ord. at 3–4.

The PSC also found that variable energy rates like XOOM's are "[t]he most commonly offered ESCO product" and but that the variable rate ESCO "market serves no proper purpose and should be ended." *Id.* at 11–12. The PSC further found it "troubling" that even after considering reams of evidence "neither ESCOs nor any other party have shown . . . that ESCO charges above utility rates were generally – or in any specific instances – justified." *Id.* at 30. This highlighted the PSC's "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of [ESCOs'] products and/or prices." *Id.* at 31. Consequently, the PSC banned variable energy rates like those XOOM charged here. *Id.* at 39. Now, if an ESCO charges more than the utility, the consumer is owed a refund for the difference. *Id.* Here, that difference is over

██████. Ex. 2, Pls.' Expert Rep. ¶ 72.[4]

## III. PLAINTIFFS HAVE ALWAYS MAINTAINED THAT XOOM'S VARIABLE RATES WERE NOT BASED ON ITS ACTUAL AND ESTIMATED SUPPLY COSTS, BREACHING THE 2013 CONTRACT
*(Responding to Defs.' Points II.B, II.D, Defs.' Br. at 4–7, 12–13)*

From the start of this case, Plaintiffs have consistently claimed that XOOM breached the 2013 Contract by not basing rates on its actual and estimated supply costs. *See, e.g.*, FAC ¶ 45 ("the rates XOOM charged Plaintiffs were not commensurate with XOOM's supply costs"), ¶ 56 ("XOOM's rate was consistently and substantially higher than the rate based on Defendants' supply costs"), ¶ 59 (XOOM breached the 2013 Contract because "consumers do not receive a price based on [] XOOM's actual and estimated supply costs"), ¶ 63 (variable rate "should have been based on XOOM's supply costs, which it was not").

---

[4] It is unclear why XOOM listed competitors' 2013 rates. *See* Defs.' Br. at 9. These are irrelevant. But it is notable that XOOM's variable rates are ██████████ of other ESCOs' rates that the PSC used to justify its ban on the variable rate products XOOM sold to Plaintiffs and the Class.

Because XOOM's actual supply costs were non-public, prior to discovery Plaintiffs engaged experts to determine XOOM's supply costs under the assumption that like other ESCOs XOOM purchased energy supply on New York's wholesale markets. This resulted in the pre-discovery proxy for XOOM's supply costs called the "Market Supply Cost." *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 175–76 (2d Cir. 2019); FAC ¶ 54. To illustrate the disconnect between XOOM's supply costs and its variable rates, Plaintiffs' Market Supply Cost figure included a "substantial margin of 1.3¢ per kWh sold to cover retailer fixed costs," which equates to an additional 13.67% above the supply cost of XOOM's energy, *id.* ¶ 55, even though PSC staff had already found that these fixed costs do "not justify the significant overcharges levied on New York consumers." FAC ¶ 38. Plaintiffs made clear however, that "[w]ith discovery of XOOM's actual costs and profits," they would "create an even more precise model showing what XOOM's prices should have been under the terms of" the 2013 Contract. *Id.* ¶ 58. As an alternative proxy for XOOM's supply costs, Plaintiffs alleged that XOOM's variable rates evidenced breach when compared to ConEd rates. FAC ¶ 61.

After the original Complaint was dismissed, Plaintiffs appealed. ECF No. 39. Plaintiffs argued that they properly pled that XOOM "charges a substantially higher rate that is untethered to" costs, thereby breaching the 2013 Contract. Ex. 18, Appellants' Br. at 2. While it is true that on appeal Plaintiffs argued that "a rate based on 'actual and estimated supply costs' varies in accordance with XOOM's costs of procuring electricity in the wholesale market, plus an appropriate margin," Plaintiffs made clear (i) that "it is XOOM's energy procurement costs that are the 'supply costs' that fluctuate," and "monthly changes in electricity procurement costs should be the only 'supply costs' that cause" rate fluctuations, (ii) that any margin must reflect "legitimate

overhead costs, and (iii) that "these costs are relatively fixed each month, and thus cannot be the basis for XOOM's rate fluctuations." *Id.* at 13.[5]

The Second Circuit reversed dismissal, holding Plaintiffs' allegations that "XOOM promised to base its rates on its supply costs" were sufficient because "the Mirkins' allegations and calculations plausibly allege that this did not occur." *Mirkin*, 931 F.3d at 177. As set forth below, abundant discovery shows this to be the case.[6]

## IV. VOLUMINOUS EVIDENCE DEMONSTRATES THAT XOOM'S RATES WERE NOT BASED ON ITS SUPPLY COSTS AND THUS THERE ARE GENUINE DISPUTES OF FACTS MATERIAL TO XOOM'S MOTION
*(Responding to Defs.' Point II.C, Defs.' Br. 7–11)*

### A. ███████████████████████████████████████████████████████
*(Responding to Defs.' Point II.C.1, Defs.' Br. at 8–9)*

XOOM's rate setting process worked as follows: XOOM held monthly rate-setting meetings for "up to 20 markets and 1,000 different products," and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks. Class Cert. Opp'n at 9–10. These workbooks contained XOOM's internal supply cost calculations, which XOOM disregarded.

---

[5] XOOM misrepresents the Second Circuit oral argument by taking Plaintiffs' counsel's statements completely out of context, claiming Plaintiffs conceded that the 2013 Contract allows XOOM any margin it wants. Def.'s Br. at 6–7, 23–24. Not so. Plaintiffs' counsel merely clarified that XOOM was not allowed to extract massive margins but nevertheless claim its rates were "based" on XOOM's supply costs regardless of the spread between XOOM's supply costs and its ultimate rates. U.S. COURT OF APPEALS, 2D CIR., at 2:20–3:10, https://www.ca2.uscourts.gov/oral_arguments.html (enter "Mirkin" in search box and click "search"). Now, discovery shows XOOM's rates were not only not tied to its supply costs, but arbitrarily set according to a host of factors not included in the 2013 Contract, including XOOM's desired and excessive margins. Any so-called change in Plaintiffs' position simply reflects what discovery shows.

[6] XOOM's reference to Plaintiffs' prior litigation against Viridian Energy to suggest that Plaintiffs brought this suit for their own financial gain, Defs.' Br. at 9, is both irrelevant and improper: irrelevant because the contracts in the two cases are different and improper because, as concerned citizens and current and former members of the NYPD, Ex. 4, B. Mirkin Tr. 15:10–21; Ex. 5, S. Mirkin Tr. 27:27–28:15, Plaintiffs seek to vindicate the rights of the over 110,000 consumers who were similarly harmed by XOOM's conduct.



In fact, ████████████████████████████████████████

████████████████████████████████. *See* Ex. 19, Dep. Tr. of Jason Loehde, dated July

27, 2022 ("Loehde Tr.") 61:11–19 ████████████████████████████); Ex. 20,

Dep. Tr. of Andrew Coppola, dated May 11, 2022 ("Coppola Tr.") 88:10–14 (█████████

██████). Instead, ████████████████████████████████████████

██████ Ex. 19, Loehde Tr. 61:11–19; Ex. 21, Dep. Tr. of Ryan Park, dated July 22, 2022 ("Park

Tr.") 32:10–19 (████████████████████████████████).

Tellingly, the record also lacks █████████████████████████

██████████████████████████. Quite the opposite:

Director of Product Management for XOOM's Supply Team Ryan Park and SVP of Energy Supply

and Pricing Andrew Coppola were ████████████████████████████

████████████████████████████. Ex. 22 at

XOOM_MIRKIN_065820 (emphasis added). In fact, consistent with XOOM's middleman role,

████████████████████████████████████. *See* Ex. 20, Coppola

Tr. 143:5–7 ████████████████████████████.

**B.    <u>XOOM's Rate-Setting Process Was Not Tethered to Its Supply Costs</u>**
*(Responding to Defs.' Point II.C.2, Defs.' Br. at 10)*

The record is replete with XOOM admissions and documents that show XOOM's rates

were not based on its supply costs. ████████████████████████████

████████████████████████████████████████████████

████████████████████████. *See, e.g.*, Ex. 23, Defs.' Suppl. Resps. to Reqs.

for Admis., at 3–5 (RFA Nos. 31–36).[7]

---

[7] *See also* Ex. 20, Coppola Tr. 50:8–51:2, 84:20–85:7 ████████████████████████

████████████████████; *id.* at 107:6–108:1 (█████████████

*Footnote continued on next page.*

Further, Plaintiffs have unearthed abundant evidence showing XOOM's rate setting process was not driven by supply costs, including the following:

- In April 2013, CEO Tom Ulry admitted that  Ex. 26 at XOOM_MIRKIN_063242.

- Preceding a 2015 company-wide meeting, Director of Pricing and Structuring Jason Loehde circulated a list of questions that could be used at the meeting regarding XOOM's rate setting process. Ex. 27 at XOOM_MIRKIN_018504. One of the questions was  *Id.* Tellingly, .

- In November 2015, Loehde provided to Financial Planning & Analysis Manager Tom Miller. Ex. 28 at XOOM MIRKIN_020937. CFO David Vail replied, *Id.* Loehde's response? *Id.*

- XOOM increased New York rates to meet margin goals when there were shortfalls elsewhere. In February 2017, Loehde gave SVP of Energy Supply and Pricing Andrew Coppola Ex. 29 at XOOM MIRKIN_024527. In response, Coppola asked whether *Id.* Loehde noted that *Id.*

-  . For example, Ex. 30 at XOOM MIRKIN_012147.

---

); *id.* at 237:22–239:3 Ex. 21, Park Tr. 33:10–22, 98:10–15, 99:20–100:22 ; Ex. 24, Dep. Tr. of XOOM's Corporate Witness Jason Loehde, dated July 28, 2022 ("XOOM 30(b)(6) Tr.") 83:10–23 ( ); Ex. 25, *Todd v. XOOM Energy Md., LLC* Dep. Tr. of former XOOM CEO Thomas Ulry, dated Mar. 20, 2019, 101:10–22 ( ).

██████████████████████████████████████ *Id.* He then emailed Park, Loehde, and Vail, ███████████████████████
███████████████████████ Ex. 31 at XOOM_MIRKIN_012176.

- Similarly, in November 2016, when Loehde said he was ████████████████████
███████████████████████████████████████
███████████████████████████████████████ Ex. 32 at
XOOM_MIRKIN_023637.

Discovery also shows that ██████████████████████████████████
███████████████████. Ex. 33 at XOOM_MIRKIN_065173 ████████████████████
████████████████████████████████████████████████
███████). XOOM witnesses admitted that ████████████████████████
██████████████████████████████████████████████ CEO.[8] XOOM's
expert also acknowledged that ██████████████████████████████████
███████████████████. Ex. 8, Coleman Tr. 54:5–55:17.

Furthermore, ████████████████████████████████████████
█████████████. Ex. 20, Coppola Tr. 37:11–38:4, 38:18–39:19, 84:12–19 (██████
████████████████████████████████); *id.* at 107:6–108:1 (████
████████████████████████████████████); *id.* at 237:22–239:3
(██████████████████████████████████████████
████████████████████████████████); Ex. 34, Dep. Tr. of
Troy Chidester, dated June 24, 2022, 99:8–14 ████████████████████████████
███); Ex. 35, *Todd v. XOOM* Dep. Tr. of Michael Chester, dated Oct. 11, 2018, 16:21–23, 68:10–

_____

[8] Ex. 21, Park Tr. 34:20–36:16 (████████████████████████████████████
██████████████████████████████████████).



12, 70:21–25 (

).

XOOM's internal documents support these admissions. For example, █████████

███████████████████████████████████████. *See* Ex. 36 at 14–19, 22

(column R). This practice was ongoing while the Mirkins were XOOM customers. Ex. 37, at

XOOM_MIRKIN_005413 (███████████████████████████████████████

███████████████████). XOOM also considered ████████ For example, in

February 2017, ███████████████████████████████████████████

██████████ Ex. 29 at XOOM_MIRKIN_024527.

XOOM's rate-setting workbooks confirm the flexibility of XOOM's rate setting practices.

These workbooks contain XOOM's proposed rates, XOOM's "Total Costs," and the resulting

margin XOOM would achieve. Ex. 38 (exemplar rate-setting workbook). Margin reports showed,

by market, unit and gross margins for XOOM's variable and fixed rate[9] customers. *See* Ex. 12 at

XOOM_MIRKIN_047611 (exemplar margin report); *id.* at 4 ████████████████████████

████████████████). █████████████████████████████████████████

███████████████████████████████████████████████████████.[10]

## V.    XOOM'S 2016 CONTRACT AMENDMENT CONFIRMS XOOM'S BREACH

On February 11, 2016, XOOM substantially modified the pricing term in its form contract

to give itself discretion to set rates based on broad criteria. The 2016 contract states:

> Your rate may be based upon a number of factors, which may include but not be limited
> to, the fluctuation of wholesale commodity costs or other components of wholesale prices

---

[9] In addition to variable rate products like the one the Mirkins enrolled in, XOOM offered products that had
a fixed rate for a set time period. *See* Ex. 39 (exemplar fixed rate contract).

[10] Ex. 19, Loehde Tr. 48:17–25 (XOOM employees reviewed those reports during rate-setting meetings).

(including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies.

Ex. 40, 2/11/16 Sales Agreement; *see also* Ex. 41, Defs.' Interrog. Resps., at 6–7 (No. 24) ("[T]he February 11, 2016 contract language applied to New York customers that [first] enrolled in a variable rate plan on or after February 11, 2016."). These updated pricing criteria are conspicuously absent from the 2013 Contract.

The record further shows that this material language shift allowing XOOM to base rates "upon a number of factors" including "pricing strategies" 

█████. Both XOOM's corporate witness Loehde and its SVP of Energy Supply and Pricing

Coppola admitted that ████████████████████████████████████████████

██████████ Ex. 24, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Ex. 20, Coppola Tr. 98:11–18.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Ex. 24, XOOM 30(b)(6) Tr. 134:2–135:15 (emphasis added). ███████████████████

█████████████████████████████████████████████. Ex. 8, Coleman Tr.

66:11–15. In short, ██████████████████████████████████████

█████████████████████████. This alone creates a material factual dispute.

**VI.** ████████████████████████████████████████████████

████████████████████████████████████████████████

There are also factual disputes as to whether XOOM's practice of ██████████████

████████████████████████████████████████████████████████.

XOOM could adjust variable rates if its supply costs unexpectedly increased but could not do the same for its locked in fixed rate plans. Ex. 2, Pls.' Expert Rep. ¶ 56. As a mere middleman,

█████████████████████████████████████████. *See* Ex. 42, Dep. Tr. of

Thomas Ulry, dated May 12, 2022 ("Ulry Tr.") 86:4–87:7 ███████████████

███████████████████████████████████████████); Ex. 43 at 3 ████████

████████████████████████████████████████████

Yet it is undisputed that ██████████████████████████████████████

████████████████████████████. *See* Ex. 2, Pls.' Expert Rep. ¶¶ 55, 59, 75. Critically, fixed

rate customers were ███████ for XOOM. *See* Ex. 20, Coppola Tr. 198:4–8. Nevertheless,

Director of Product Management Ryan Park acknowledged that █████████████████

████████████████████████████████" Ex. 44 at XOOM_MIRKIN_015251.

This raises a key factual question: How can XOOM's rates be based on supply costs when

███████████████████████████████████████████████?

After analyzing the record, Plaintiffs' experts concluded that ████████████████

██████████████████████████████████████████████

████████████████ Ex. 2, Pls.' Expert Rep. ¶ 59. Worse, the margins XOOM charged the

Mirkins were both (i) ███████████████████████████████████, and (ii) the

████████████████████████████████████████████

████████. The jury would be well within its authority to find ████████████████

███████████████████████████████, XOOM's rates were not based on its supply costs.

## **ARGUMENT**

### **I.      LEGAL STANDARD**

Summary judgment is only appropriate if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). At this juncture, a court "is not to resolve disputed issues but rather to determine

whether there is a genuine issue to be tried." *Trustees of Loc. 7 Tile Ind. Welfare Fund v. Atlantic

Exterior Wall Sys., LLC*, No. 20 Civ. 4505, 2023 WL 2632493, at *2 (E.D.N.Y. Mar. 24, 2023)

(Ross, J.). Courts must "resolve all ambiguities and draw all inferences in favor of the non-moving party." *Henry Avocado Corp. v. Z.J.D. Brother, LLC*, No. 17 Civ. 4559, 2019 WL 1586865, at *6 (E.D.N.Y. Apr. 12, 2019) (Ross, J.).

## II.  THERE ARE MYRIAD FACTUAL DISPUTES AS TO XOOM'S BREACH
*(Responding to Defs.' Point IV.A, Defs.' Br. at 14–22)*

Above, Plaintiffs laid out just some of the many facts and admissions showing that XOOM did not set its New York variable rates according to the 2013 Contract's requirements. *Supra* pp. 21–25. XOOM's selective record snippets and citations, almost exclusively self-serving testimony reciting the legal standard XOOM seeks to apply, are directly contradicted by record evidence. This evidence shows that rather than base its rates on actual and estimated supply costs, XOOM set rates according to a number of factors that XOOM admits are not supply costs, and then juiced those rates to meet its primary goal of achieving target profits.

### A.    "Based On" Is Ambiguous and Thus Must Be Construed Against XOOM

Contractual terms are unambiguous if they have "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (quotation omitted). Ambiguous terms are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 316 (2d Cir. 2006) (internal quotation marks and citation omitted). Contract language is construed "against the drafter—the party responsible for choosing the questionable language." *Gay v. Saber Healthcare Grp., LLC*, 842 S.E.2d 635, 640 (N.C. Ct. App. 2020), *aff'd*, 854 S.E.2d 578 (Mem) (N.C. 2021); *see also Silvers v. Horace Mann Ins. Co.*,

378 S.E.2d 21, 25 (N.C. Ct. App. 1989) (All contracts "must be construed against the drafter, which had the best opportunity to protect its interests."). XOOM's burden is thus to "demonstrat[e] that it would be unreasonable for the average [person] reading the [contract] to construe it" as Plaintiffs do, leaving XOOM's interpretation as "the *only* construction that could fairly be placed." *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 469 (S.D.N.Y. 2014) (emphasis in original).

XOOM's definition of "based on," Defs.' Br. at 15–18, is far from the silver bullet Defendants envision. Indeed, courts regularly hold that "based on" contract language is ambiguous at summary judgment. *Fleisher* is instructive. There, an insurance policy stated that the insurance rate "will be based on [defendant's] expectations of six specifically enumerated factors," listing those factors. *Id.* at 470. The plaintiff argued that the term "based on" should be construed as a limiting phrase and adjustments could only be "based on" the six enumerated factors. *Id.* The defendant disagreed, claiming it should be allowed to include other unenumerated factors. The *Fleisher* court began by noting that "[a]mbiguity alone compels me to reject [defendant's] interpretation" because the policy must be construed against the drafter and there was "no conceivable argument that [plaintiff's] reading is 'unreasonable'." *Id.* at 471. The court then examined dictionary definitions of "based on," finding it was "entirely reasonable" "to interpret the phrase 'based on' as exhaustive." *Id.* After all: "In everyday parlance, when you make a calculation 'based on' specific factors, you take only those factors into account; the calculation is made 'relying on' or 'building on' those factors. You calculate a baseball player's batting average 'based on' his number of hits and his number of at bats—nothing more and nothing less. The area of a rectangle is calculated 'based on' its width and length, while velocity is calculated 'based on' distance and time." *Id.* It was "perfectly plausible" for ordinary consumers to think a price "based on" enumerated factors was limited to only those factors. *Id.*

The *Fleisher* court further noted that defendant's "decision to list six specific factors fairly implies that all other factors are excluded" from the calculations. *Id.* at 472. The court then distinguished XOOM's main case, *Norem v. Lincoln Benefit Life Co.*, 737 F.3d 1145 (7th Cir. 2013), concluding that "the Seventh Circuit has unnecessarily complicated a simple issue" because "the phrase 'based on' is commonly understood to mean that something is created in reliance on identified factors." *Fleisher*, 18 F. Supp. 3d at 472–73. The *Fleisher* court specifically critiqued the cake recipe analogy XOOM quotes because

> recipes are exhaustive lists of all the ingredients needed . . . . Highly experienced chefs might be able to play with recipes, but the average home cook (the person analogous to the average [XOOM customer]) follows them slavishly, without adding other, undisclosed ingredients. The cakes they bake are 'based on' the ingredients listed in the recipe—they include those ingredients and none other.

*Id.* at 473. Other courts concur. *See, e.g.*, *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 763–64 (8th Cir. 2020) ("based on" was ambiguous and rejecting *Norem*). And in other contexts, courts in this Circuit agree with Plaintiffs' reading of "based on." In *qui tam* actions, courts hold that "based on" means "substantially similar to," eventually prompting a statutory change to adopt that meaning. *U.S. ex rel Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 346 (S.D.N.Y. 2014).

Here, Plaintiffs' construction of "based on" is better than XOOM's highly permissive reading, just as was the case in *Fleisher*. But at minimum, just as in *Fleisher*, XOOM cannot win

summary judgment because "based on" is ambiguous.[11],[12]  Further, XOOM drafted the contract. Ex. 42, Ulry Tr. 39:9–41:18.  Nevertheless, Defendants seek to have the Court apply their interpretation of an ambiguous terms and disputed facts.[13]

All but admitting that XOOM's rates are not "based on" its supply costs, Defendants attempt to shoehorn the 2013 Contract's unrelated "**AGENCY**" provision into the pricing provision. Defs.' Br. at 3, 9, 18.  The 2013 Contract's pricing provision appears prominently on page 1, in a box labeled "**XOOM SimpleFlex Variable Price Product**." Ex. 1, at Mirkins_00004 (emphasis in original).  This section makes plain that XOOM's variable rates must be "based on XOOM's actual and estimated supply costs." *Id.*[14]  In the middle of page 2, the 2013 Contract

---

[11] XOOM's remaining cases do not alter this conclusion. *N. Carolina Farm Bureau Mut. Ins. Co., Inc. v. Martin ex rel. Martin*, 851 S.E.2d 891 (N.C. 2020) and *Singleton v. Haywood Elec. Membership Corp.*, 588 S.E.2d 871 (N.C. 2003), both apply to "non-technical" terms, but "supply costs" is a technical term that ordinary consumers would not understand. *Helix Energy Solutions Grp., Inc. v. Hewitt*, 598 U.S. ----, 2023 WL 2144441, at *7 (Feb. 22, 2023) and *Bowers v. City of High Point*, 451 S.E.2d 284, 289–90 (N.C. 1994) addressed the words "base" or "basis" in a statute, not "based on" in a contract. *Hughes v. United States*, 138 S. Ct. 1765 (2018) is about Sentencing Guidelines, clearly inapposite. *Effie Film, LLC v. Murphy*, 564 F. App'x 631, 632 (2d Cir. 2014) (summary order), supports Plaintiffs because the issue there was whether a screenplay was "substantially similar" to a valid copyright, applying Plaintiffs' interpretation here.  The meaning of "based" was not at issue in *Yoselovksy v. Associated Press*, 917 F. Supp. 2d 262 (S.D.N.Y. 2013), (not to mention that the AP is headquartered in New York, *see About Us*, ASSOCIATED PRESS, https://www.ap.org/about/, or *Madden v. DreamWorks, LLC*, No. 07 Civ. 5273 (ARR), 2009 WL 10706573 (Ross, J.).  *Slam Dunk I, LLC v. Conn. Gen. Life Ins. Co.*, 853 Fed. App'x 451 (Mem) (11th Cir. 2021), applied Florida law and agreed with *Norem*—the *Fleisher* case is more on point and has the better reading.

[12] XOOM's claim that "the Mirkins have long argued that the pricing provision is unambiguous," Defs.' Br. at 2, misrepresents the contents of Plaintiffs' Appellate Brief.  Plaintiffs argued that the term "actual and estimated supply costs"—not "based on"—is unambiguous. Ex. 18, Appellants' Br. at 27.

[13] XOOM further premises its Motion on a strawman argument, baselessly asserting that Plaintiffs claim XOOM must charge only its supply costs. Defs.' Br. at 20.  This is not true.  Plaintiffs' position is that XOOM's rates "ought to be very closely tied to supply costs and not include a lot of things that are not related to supply costs." Ex. 45, Dep. Tr. of Seabron Adamson, dated Nov. 8, 2022 ("Adamson Tr.") 24:13– 24.  The fact that Plaintiffs found "a lot of things that are not related to supply costs" and no justification for XOOM's margins is not Plaintiffs ignoring the contract or prior arguments, but rather applying the facts developed in discovery to Plaintiffs' theory of the case.

[14] Underscoring XOOM's unreasonable contractual interpretation, there is separate provision on page 1 of the 2013 Contract titled "**PRICE**." Ex. 1 at Mirkins_00004.  XOOM notably does not attempt to incorporate this provision, which says nothing about "market-based compensation," into the price the

*Footnote continued on next page.*

contains another provision titled "**AGENCY**" that is sandwiched between the "**CANCELLATION**" and "**TITLE**" paragraphs:

> **AGENCY**: You hereby appoint XOOM Energy as agent for the purposes of (i) acquiring the supplies necessary to meet your electricity needs, and (ii) arranging for and administering transportation and related services over transmission facilities and those of the LDU needed to deliver electricity to your premises. These services are provided on an arm's length basis and market-based compensation is included in the price noted above.

*Id.* at 2. In other words, the customer appoints XOOM as her agent to acquire energy supply and to play the ESCO's limited role in the commodity's delivery to her. For these two services "market-based compensation is included in the price noted above." But there is no actual "price noted above," and there is nothing in the 2013 Contract suggesting this single sentence at the end of the unrelated "AGENCY" section amends the prominent pricing provision on the 2013 Contract's front page—much less that this single line completely reverses the pricing provision and allows XOOM to charge rates based on "market-based compensation"[15] as opposed to its actual and estimated supply costs. To borrow a maxim used in statutory interpretation, a sophisticated commercial actor like XOOM "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

---

Mirkins agreed to pay. *See also infra* p. 32. Furthermore, Plaintiffs are not claiming, nor have they ever claimed, that the 2013 Contract guaranteed savings. *Cf.* Defs.' Br. at 3.

[15] Moreover, it bears noting that PSC staff concluded that undefined "market rate" terms in ESCO contracts were "obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market," thus "resulting in the fattening of ESCOs' retained earnings." Ex. 16, Cases 15-M-0127, *et al.*, Dep't of Pub. Serv. Staff Redacted Initial Br., at 87 (Mar. 30, 2018).

**B. XOOM's Contract Requires that Its Rates Be Either Virtually Identical to, Very Close to, or Directly Proportional to its Supply Costs**
*(Responding to Defs.' Point IV.A.1, Defs.' Br. at 14–18)*

1. Plaintiffs Offer the Better Reading of XOOM's Contract and Should Be Allowed to Present that Reading to the Jury

The 2013 Contract required that XOOM's rates be based on its supply costs. Ex. 1 at Mirkins_00004. Thus, under Plaintiffs' first reading XOOM's "rate ought to be very closely tied to supply costs and not include a lot of things that are not related to supply costs." Ex. 45, Adamson Tr. 24:13–24. To be sure, an "average customer wouldn't know what a 'supply cost' means" because "it's an energy-industry-specific terminology." Ex. 46, Eryilmaz Tr. 51:22–52:9; *see also id.* at 53:21–54:5 ("'supply cost' is a very specific energy industry terminology"); *id.* at 34:10–34:17 ("actual and estimated supply costs" is "an industry-specific term" that "only people who work a long time in the energy industry" will understand). Thus, in this context a rate "based on" XOOM's "actual and estimated supply costs" should be "virtually equal" to and at "minimum, very close to" XOOM's supply costs. *Id.* at 35:14–35:22.[16]

The evidence here unmistakably shows that XOOM's rates were not virtually identical or very close to its supply costs. *Supra* pp. 11–13. Alternatively, XOOM's rates were not set in direct proportion to XOOM's supply costs. *Supra* pp. 13–15. Instead, depending on which of Plaintiffs' damages models is ultimately adopted, XOOM overcharged Plaintiffs by between $36 and $85 over what the 2013 Contract required. Record evidence confirms this. For example, just weeks before XOOM began charging Plaintiffs, XOOM's CEO Tom Ulry ███████████████

---

[16] Mr. Coleman agrees without saying so. *See* Ex. 8, Coleman Tr. 24:20–25:3, 28:24–29:12 (disagreeing that consumers do not understand what "supply costs" means, but that opinion is based on "more than two decades of experience" and his "understanding how those terms are commonly used in the energy industry.")

███████████████████████████████████████ Ex. 26 at XOOM_MIRKIN_063242.  That is not "based on" XOOM's supply costs.

Likewise, when XOOM amended its contract in 2016 to allow rates based "upon a number of factors" including "pricing strategies," ████████████████████████████████████ ██████████████████████.  Ex. 24, XOOM 30(b)(6) Tr. 134:2–135:15.  Indeed, XOOM's corporate witness Loehde and its SVP of Energy Supply and Pricing Coppola █████████████ ████████████████████████████████████████ Ex. 24, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; Ex. 20, Coppola Tr. 98:11–18; *see also* Ex. 8, Coleman Tr. 66:11–15 (XOOM's expert agreeing with same).  Again, such rates are not "based on" supply costs.

The fact that ████████████████████████████████████████████ ████████████████████████ "during the period when they were XOOM customers" is also conclusive proof that XOOM's rates were not "based on" XOOM's supply costs.  Ex. 3, Pls.' Rebuttal Rep. ¶ 31.  That ██████████████████████████████████████ ██████████████████████████ also does not help XOOM.

Unable to rebut these facts, XOOM now claims supply costs need only be *a* component of its rates, and thus it could charge Plaintiffs a large and varying markup.  Defs.' Br. at 18.  Yet this is a question of fact.  XOOM's assertion that the contract's "plain language" gives it carte blanche is thus wrong.  Defs.' Br. at 15.[17]  In fact, after the Second Circuit weighed in on the meaning of the 2013 Contract, at least three other courts in this Circuit have correctly noted that the 2013 Contract's supply costs term is the more restrictive of two "goalposts" around "which other similar cases may fall based upon the language of their specific contracts."  *Martinez v. Agway Energy*

---

[17] Plaintiffs' expert Mr. Adamson's statement that it is up to the factfinder to determine whether XOOM breached the 2013 Contract is therefore correct.  *See* Defs.' Br. at 14–15.  Defendants' expert agrees.  Ex. 8, Coleman Tr. 49:6–17.

*Servs., LLC*, No. 18 Civ. 235 (MAD) (ATB), 2022 WL 1091607, at *3 (N.D.N.Y. Apr. 12, 2022);

*Melville v. HOP Energy, LLC*, No. 21 Civ. 10406 (KMK), 2023 WL 2648775, at *6 (S.D.N.Y.

Mar. 27, 2023); *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 425 (S.D.N.Y. 2020).

Indeed, XOOM's explanation as to why its supply costs are "a foundation" that can be "built upon" is deeply flawed. Defs.' Br. at 16. For example, XOOM claims that because the 2013 Contract's pricing term "uses the non-exclusive phrase 'which may include but not be limited to'" ***to describe the components of XOOM's supply costs*** XOOM's "variable rates can 'not be limited' to the components identified in the contract by name." Defs.' Br. at 15. XOOM's inventive reading should be rejected because it would render meaningless the limitation that XOOM's rates be "based on" supply costs. *See Meehancombs Glob. Credit Opportunities Master Fund, LP v. Caesars Ent. Corp.*, 162 F. Supp. 3d 200, 210 (S.D.N.Y. 2015) ("[C]ourts should avoid interpretations that render contract terms meaningless or superfluous.").

XOOM likewise claims "a margin above costs is necessary to give effect to the Contract's 'Agency' provision, which refers to "market-based compensation" for XOOM's minimal role in the delivery of energy (an entirely different contractual provision). This too would swallow the 2013 Contract's pricing term. *See supra* pp. 31–32. And XOOM's position makes no sense: if it intended "market-based compensation" to be a pricing term, it would have put that language in the pricing term. Plaintiffs' breach theory does not accept the "market-based compensation" claim, nor does it need to for summary judgment purposes.

XOOM also argues that because (pre-discovery) Plaintiffs' complaint included a margin on top of our (pre-discovery) calculations of the price XOOM was contractually bound to charge (based on the wholesale cost of energy), Plaintiffs somehow "already acknowledged that the Contract allows XOOM to set rates exactly as it did." Defs.' Br. at 15. Not so. Prior to discovery,

Plaintiffs' calculations included a 13.67% margin to "cover retailer fixed costs," FAC ¶ 55, but as also noted in Plaintiffs' complaint the PSC staff had already found that these fixed costs do "not justify the significant overcharges levied on New York consumers." FAC ¶ 38. Plaintiffs also noted on appeal that their exemplar supply costs included a margin to cover "legitimate overhead costs" but that "these costs are relatively fixed each month, and thus cannot be the basis for XOOM's rate fluctuations." Ex. 18, Appellants' Br. at 13. With the aid of discovery, Plaintiffs' experts have now concluded that "XOOM added a margin to its variable customers' rates which is unrelated to its costs" and that those "margins are not consistently tied to any increase or decrease in XOOM's actual and estimated supply costs." Ex. 2, Pls.' Expert Rep. ¶ 74.

> 2. Discovery Shows that XOOM Breached Even Its Own Incorrect "Foundation" Reading of the 2013 Contract, Thus Creating Another Material Dispute

Even if the Court were to accept XOOM's reading that its supply costs could serve as a "foundation" for sky-scraping rates that markedly fluctuated month to month (it should not), the record contradicts XOOM's claim its supply costs were the starting point. *See, e.g.*, Ex. 27, at XOOM_MIRKIN_018504 (█████████████████████████████████████████████████████ █████████████████████████████████████████████); Ex. 30 at XOOM_ MIRKIN_012147 (███████████████████████████████████████████████ ████████); Ex. 32 at XOOM_MIRKIN_023637 (██████████████████████████ █████████████████████████████); *see also supra* pp. 22–25.

Plaintiffs also dispute that XOOM's supply costs were in fact "the foundational component of its variable rate." Defs.' Br. at 18. Plaintiffs' experts found that "XOOM charged rates far in excess of the total costs it self-reported" and its rate-setting workbooks "show that the rates charged are not based on any observable calculation." Ex. 2, Pls.' Expert Rep. ¶ 52. Plaintiffs'

experts show that XOOM's rate calculations "fail to include or provide any 'actual or estimated' costs that would add up" to XOOM's rates.  *Id.*

Seeking to justify its breach post hoc, XOOM next claims it is allowed to make a profit. Defs.' Br. at 18.  But this is exactly what Plaintiffs' second damages method addresses.  Ex. 2, Pls.' Expert Rep. ¶¶ 73–77.  Anticipating the argument that XOOM be permitted to charge a margin (even though "margin" is not a factor listed in the 2013 Contract), Plaintiffs' experts applied XOOM's ███████ fixed rate margins to variable rate customers, which further shows its variable rate margins were both unreasonably high and erratic.  *Id.* ¶ 73.

XOOM complains that Plaintiffs "never take an affirmative position on what criteria are permissible" for setting rates under the 2013 Contract.  Defs.' Br. at 14–15.  Incorrect.  As set forth above, Plaintiffs posit two plausible readings of the term "based on" and XOOM's "supply costs" were identified in discovery.  Both of Plaintiffs' methods incorporate XOOM's internal reported supply cost metric. Ex. 2, Pls.' Expert Rep. ¶¶ 62, 73.  As to other criteria, Plaintiffs' experts were careful to analyze XOOM's margins for other potential supply costs like prior period adjustments but found none.  Ex. 2, Pls.' Expert Rep. ¶ 59.  That the experts found no legitimate justification for XOOM's hyper-inflated margins does not indicate that Plaintiffs failed to incorporate prior period adjustments, but rather that XOOM never did so.

### C.  Supply Costs' Role in XOOM's Rate Setting Process Is Heavily Disputed
*(Responding to Defs.' Point IV.A.2, Defs.' Br. at 18–22)*

Plaintiffs uncovered myriad evidence showing that in setting New York variable rates, XOOM disregarded supply costs, implemented a host of non-supply cost factors, and prioritized profit over all else.  *Supra* pp. 22–25.  In contrast, XOOM points only to deposition excerpts reciting the standard XOOM would have the Court apply.  Defs.' Br. at 18–19.  But these excerpts are contradicted by deposition admissions and XOOM's documents.  For example, internal

documents show XOOM regularly based its rates on margin and profit goals, not supply costs. *See, e.g.*, Ex. 30 at XOOM_MIRKIN_012147 (██████████████████████████████████████ ██████████████████████████████████); Ex. 32 at XOOM_MIRKIN_023637 (██████████████████████████████████████████████████████████████████ ██████); *see also supra* pp. 22–25. Moreover, ████████████████████████████ ████████████████████. *See, e.g.*, Ex. 26 at XOOM_MIRKIN_063242 (████████████ ██████████████████████████████████████████████████████); Ex. 33 at XOOM_MIRKIN_065173 (████████████████████████████████████████████████ ████████████████████████). The 2013 Contract does not allow, and XOOM does not argue, that ██████████████████████████████████████████. ██████████████████████████████████████████. *See supra* pp. 22, 24–25 (████████████████████████████████████████████ ████████████████████████████████████████). XOOM's discovery responses are similar. Ex. 23, Defs.' Supp. Resps. to Pls.' First Set of Reqs. For Admis. at 3–5 (Nos. 31–36) (████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████). ████████████████ ████████████████████████████████. Ex. 29 at XOOM_MIRKIN_024527 (█████ ██████████████████████████████████████████████████████ ██████████"); *see also* Ex. 8, Coleman Tr. 55:18–56:3 (████████████████████ ██████████████████████████████████).

For prior period adjustments, Plaintiffs analyzed (and rejected) XOOM's margin data because XOOM did not even attempt to quantify those adjustments and the record shows XOOM's

priority was hitting its target profit goals, not making prior period adjustments. XOOM cites the 2014 polar vortex as an example of how prior period adjustments could be used, Defs.' Br. at 21, but is careful not to mention that ████████████████████████████████. Ex. 47 at XOOM_MIRKIN_007285 ███████████████████████████████████████

███████). And critically lacking from XOOM's account of how it set rates during the polar vortex—███████████████████████████████████████████████

███████—is any mention of supply costs. *Id.* In fact, ████████████████████████████

███████████████████████████████████████████████

████████████. Ex. 48 at 4; *see also* Ex. 19, Loehde Tr. 219:5–22, 249:2–250:11 (███████

████████████████████████████████████████████).

XOOM's deposition snippets may amount to ***disputes*** regarding what discovery shows, but such factual disputes only underscore that XOOM's Motion should be denied. *See Hernandez v. NJK Contractors, Inc.*, No. 09 Civ. 4812 (ARR) (VMS), 2013 WL 12363005, at *9 (E.D.N.Y. Feb. 12, 2013) (this Court denying summary judgment where damages were factually disputed). Indeed, Plaintiffs' evidence voids XOOM's claims that its selective deposition citations are "undisputed evidence" that defeats Plaintiffs' case. Defs.' Br. at 20.

XOOM's remaining arguments are likewise easily dispatched. As noted above at pp. 14–16, Plaintiffs do not assume that "supply costs were the ***only*** permissible component" of variable rates, Defs.' Br. at 20 (emphasis in original). Instead, after analyzing XOOM's cost and margin data, Plaintiffs found no justification for XOOM's margins and therefore rejected them. *See* Ex. 2, Pls.' Expert Rep. ¶¶ 50–52. Second, there is abundant evidence that the Mirkins' rates were not "based on" XOOM's supply costs (*see supra* pp. 22–25), which dispenses with XOOM's claim that "the Mirkins offer no evidence that any of that data was a component of Susanna's variable

rate." Defs.' Br. at 2. Third, XOOM's attempt to pack a host of non-supply costs into "prior period adjustments" (which the 2013 Contract labels a component of supply costs) only highlights XOOM's strained reading. Further, as XOOM admits, ███████████████████████████████████

████████████████████ Class Cert. Opp'n at 10, which *is* reflected in Plaintiffs' damages model through expert analysis (and rejection) of XOOM's margins, Ex. 2, Pls.' Expert Rep. ¶¶ 50–59.

XOOM next claims that Plaintiffs have not shown it profited from the Mirkins. Defs.' Br. at 21–22. But a XOOM executive confirmed in his deposition that ████████████████████

███████████, Ex. 20, Coppola Tr. 198:4–8, which is why Plaintiffs' second damages method applies the fixed rate margins to XOOM's variable rates, Ex. 2, Pls.' Expert Rep. ¶¶ 73–77. Under this method, the Mirkins were overcharged by \$36. Ex. 3, Pls.' Rebuttal Rep. ¶ 31.

XOOM's turn to its correlation argument fares no better. This "statistical fact," Defs.' Br. at 22, falls apart quickly. As noted by Plaintiffs' experts, XOOM's correlation standard is "very weak." Rebuttal Rep. ¶ 10. Even a brief glance at the Mirkins' rates shows that XOOM's supply costs and variable rates were *not* correlated. *See* Defs.' Br. at 10–11. As already noted, XOOM charged Plaintiffs a varying monthly markup of between 20% to 44% over just a six-month period.

Documents further confirm this. For example, in September 2016, Pricing Analyst David Ordog ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████." Ex. 49 at XOOM_MIRKIN_022815. These admissions and documents are consistent with the rates XOOM charged Plaintiffs and their theory of breach—XOOM prioritized factors other than supply costs when setting variable rates. *See* FAC ¶¶ 45, 56–59.

Furthermore, Defendants' correlation analysis misses the heart of this case. The 2013 Contract says nothing about mere correlation of rates and costs. Ex. 8, Coleman Tr. 49:18–23.

"An underlying assumption of Mr. Coleman's analysis is that if the rates charged and XOOM's costs are correlated, then this would demonstrate that XOOM's rates were "based on" its actual and estimated supply costs, as required in the [2013 Contract].  [T]his assumption is unwarranted and would allow XOOM to charge any rate, no matter how high."  Ex. 3, Pls.' Rebuttal Rep. ¶ 8.  "[A]ll that Mr. Coleman's "correlation analysis" shows is that XOOM's rates and costs tend to move broadly in the same way from month to month – a very weak standard.  There are many . . . months during which the reported supply costs decrease but XOOM's rates increase or stay the same."  *Id.* ¶ 10.  XOOM tries to brush off the maxim that "correlation does not equal causation" by saying "causation is not at issue," Defs.' Br. at 22, conflating legal and statistical causation.

Moreover, XOOM's figures "are not high correlation coefficients."  Ex. 3, Pls.' Rebuttal Rep. ¶ 10.  Worse, XOOM's expert did not isolate other factors that could be correlated with XOOM's variable rates—*e.g.*, the prior month's rate—to show that the reason XOOM's rates and costs broadly moved together over time was because the rates were "caused" by the costs.  "For example, the number of shark attacks at the beach may be highly correlated . . . with the number of ice cream sales at the beach.  But this reflects that people want to swim in the ocean and eat ice cream in the summer – not that ice cream attracts sharks."  Ex. 3, Pls.' Rebuttal Rep. ¶ 11.  Mr. Coleman also conceded that just because two things are correlated, it does not mean that one is "based on" the other.  Ex. 8, Coleman Tr. 74:10–75:7.  In fact, he conceded that correlation between XOOM's rates and costs and whether XOOM's rates were "acceptable" are "completely separate question[s]."  *Id.* at 72:1–73:12.  XOOM's argument would require the Court to impermissibly construe ambiguities and factual inferences in its favor.  *Henry Avocado Corp. v. Z.J.D. Brother, LLC*, No. 17 Civ. 4559 (ARR) (RLM), 2019 WL 1586865, at *6 (E.D.N.Y. Apr.

12, 2019) (Ross, J.) (ambiguities and factual inferences must be construed in favor of non-moving party).  In short, the Coleman report should be given no credence here.[18, 19]

In fact, XOOM's argument—as admitted by its expert—is that so long as rates and costs were correlated XOOM could not have breached the 2013 Contract.  Defs.' Br. at 22.  But as XOOM well knows, "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."  *Vayngurt v. Sw. Credit Sys., L.P.*, No. 16 Civ. 2261 (ARR) (VMS), 2016 WL 6068132, at *4 (E.D.N.Y. Oct. 14, 2016) (Ross, J.).  Taking XOOM's position at face value, it could charge any rate, even a rate 10 times that of its supply costs, so long as XOOM's "starting point" was its supply costs.  This position is clearly unreasonable—not to mention that it renders the 2013 Contract's pricing term meaningless—and this Court should not countenance such a result.

---

[18] The chart from Mr. Coleman's report showing company profit margins in unrelated industries highlights a lack of rigor and true motive—seeking any possible post hoc rationale for its rates.  *See* Ex. 50, XOOM's Expert Rebuttal Report of David C. Coleman, dated Nov. 4, 2022, at 12–13.  Immediately evident from the chart is that none of these companies are ESCOs, and many are in fields with extremely high R&D expenses, where larger margins offset research costs that do not pan out.  *See* Ex. 45, Adamson Tr. 121:7–123:24.  XOOM does not explain these companies' relevance beyond an extremely broad, generic statement that XOOM's margins are "unremarkable in American business."  Defs.' Br. at 11.  This does not show XOOM complied with the 2013 Contract's pricing term.  Finally, Mr. Coleman admitted the information from his chart showing company-wide margins was "substantively" different than analyzing an individual product line, such as XOOM's New York variable rate margins.  Ex. 8, Coleman Tr. 88:13–20.

[19] Moreover, the images in Mr. Coleman's report are misleading.  "Many of the figures in the Coleman Report have been formatted in a way which obscures the actual relationship between XOOM's stated costs and the rates charged."  Ex. 3, Pls.' Rebuttal Rep. ¶¶ 2(a), 4–7.  Those charts use different scales for costs and rates to make it appear they were much closer than they were in reality.  The effect is clear, as seen in the following images: first, Mr. Coleman's chart with different scales, and then Plaintiffs' chart, which applies the same scale to both costs and rates.  *Id.* at p. 3, Figures 1–2.



### D. Plaintiffs' Contract Interpretation Is Reasonable, Their Margin Analysis Is Sound, and Judicial Estoppel Is Not Warranted
*(Responding to Defs.' Point IV.B, Defs.' Br. at 22–26)*

As explained above, Plaintiffs' experts analyzed XOOM's costs and margins and found no reasonable justification for XOOM's rates. *Supra* p. 27. XOOM's dispute of those findings fails.

### 1. There Is No Justification for Judicial Estoppel Here
*(Responding to Defs.' Point IV.B.1, Defs.' Br. at 23–25)*

Recognizing that it applied varying markups to the supply costs associated with the Mirkins' usage, XOOM seeks victory by default when it asks the Court to apply judicial estoppel to Plaintiffs' first damages model. Defs.' Br. at 23–24. Yet XOOM's judicial estoppel claim is based on a misrepresentation of Plaintiffs' position in the Second Circuit appeal and fails to show any of the traditional conditions that may warrant judicial estoppel.

Typically, judicial estoppel applies if: "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *DeRosa v. Nat'l Envelope Corp.*, 595 F.2d 99, 103 (2d Cir. 2010). "Judicial estoppel is a rarely used doctrine and exists to protect the court, not a party, from a party's chicanery." *Resolution Trust Corp. v. Gregor*, 872 F. Supp. 1140, 1153 (E.D.N.Y. 1994) (Ross, J.). XOOM fails to show any of judicial estoppel's three prerequisites.

As explained above, Plaintiffs' current position is not inconsistent with their position on appeal. *Supra* pp. 19–21. Not only have Plaintiffs consistently alleged and argued that XOOM breached the 2013 Contract by failing to base its variable rates on its supply costs, but now discovery has shown that XOOM systematically disregarded its supply costs and charged Plaintiffs markups that grew from ███████ over a six-month period. Further, as Your Honor has previously noted, when circumstances in a case change, that does not render positions reflecting

those changed circumstances "inconsistent" with those that came before. *See Jedrejcic v. Croatian Olympic Comm.*, 190 F.R.D. 60, 66 n.6 (E.D.N.Y. 1999) (Ross, J.).

Nor did Plaintiffs claim XOOM was allowed to assess any margin it pleased, and that claim was certainly not adopted by the Second Circuit. The Second Circuit found Plaintiffs' allegation that "XOOM promised to base its rates on its supply costs" were sufficient because "the Mirkins' allegations and calculations plausibly allege that this did not occur." *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177 (2d Cir. 2019). Plaintiffs' reliance on "publicly available NYISO data" for the Market Supply Cost metric was "sufficient "plausibly allege breach. *Id.* In fact, the Second Circuit opinion does not even contain the words "margin" or "profit." *See generally id.*

Finally, Plaintiffs gained no "unfair advantage." In fact, Your Honor's case law rejects XOOM's exact "unfair advantage" claim here, *i.e.*, "secur[ing] immensely costly and time-consuming discovery," Defs.' Br. at 25. "While it is true that denying defendants' motion would allow this case to proceed to a trial on the merits, the mere continuation of litigation does not represent an unfair advantage for the purposes of judicial estoppel. To hold otherwise would render the unfair advantage factor meaningless, easily satisfied in every single case." *Harewood v. APL Ltd.*, No. 14 Civ. 1668, 2015 WL 12591648, at *5 (E.D.N.Y. Aug. 24, 2015) (Ross, J.).[20]

---

[20] Defendants' cited cases are inapposite. *U.S. Trust Co. of N.Y. v. Shapiro*, 835 F.2d 1007, 1008 (2d Cir. 1987) found judicial estoppel appropriate where plaintiff's counsel made an "unequivocal concession" regarding payment of attorney fees at appeal and then tried to reverse course on remand. In *Intellivision v. Microsoft Corp.*, 484 Fed. App'x 616, 619 (2d Cir. 2012) (summary order), plaintiffs contended from case filing to just before summary judgment that they owned patent applications as principals of the corporate defendant, but then claimed they owned the patents in their individual capacity. In *New Hampshire v. Maine*, 532 U.S. 732, 751–53 (2001), New Hampshire tried to change a position about a river boundary it had sought in separate litigation 30 years earlier. The party judicially estopped in *Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110, 117–19 (2d Cir. 2014) was attempting to redo a bankruptcy plan after not objecting to it for over four years. In *Secured Asset Mgmt. LLC v. Cong Beth Joseph Zwi Dushinsky*, No. 17 Civ. 5588 (DLI) (CLP), 2019 WL 4861411, at *7–*8 (E.D.N.Y. Sept. 30, 2019), a party prevailed in an earlier proceeding claiming that a loan had not accelerated, then in a new action, claimed the loan had accelerated. And finally, the plaintiff in *Lia v. Saporito*, 541 Fed. App'x 71, 73 (2d Cir. 2013) (summary order), previously argued he had no ownership interest in an LLC, but then filed a complaint alleging he owned 75% of it. Defendants' request for judicial estoppel here should thus be denied.

2.      Plaintiffs Are Not Rewriting the Contract and *Richards* Is Wholly
        Inapposite, as Noted by Multiple Courts in This Circuit
        *(Responding to Defs.' Point IV.B.2, Defs.' Br. at 25–26)*

Plaintiffs' second damages method addressees the fact that a rate "based on" XOOM's must at least be proportional to XOOM's supply costs and not instead include markups ranging from ██████████ over a six-month period.  Likewise, consumers' reasonable expectations and reasonable commercial practices do not allow XOOM to charge a margin that is untethered to the parties' commercial reality—XOOM is a middleman with very low overhead, XOOM's main competitor is the utility, and Plaintiffs are consumers (that did not draft the 2013 Contract) who were billed after the fact.  Discovery shows that XOOM did not base its rates on its supply costs, the word "margin" appears nowhere in the 2013 Contract, and XOOM did not justify its changing variable rate margins.  Ex. 2, Pls.' Expert Rep. ¶¶ 56, 59.  Nevertheless, because the factfinder may determine that a rate "based on" XOOM's supply costs could be directly proportional (as opposed to virtually identical) to XOOM's supply costs, Plaintiffs chose a generous standard—XOOM's ██████ fixed rate margins.  *Id.* ¶¶ 57, 73.  Unfortunately for XOOM, even then its breach is clear.  Further, in the event the factfinder determines XOOM was entitled to a different margin, Plaintiffs' experts can easily calculate damages using that figure.  *Id.* ¶ 73 n.51.

XOOM styles this as Plaintiffs' expert's "personal view" that XOOM could not apply an "uncapped margin."  Defs.' Br. at 26.  Not so.  XOOM is wrong.  There is no commercially reasonable reading of the pricing term that allows XOOM to charge whatever margin it wanted and then to wildly vary that margin over the Mirkins' short tenure.  The contract is silent as to an appropriate margin, so Plaintiffs' second model gives XOOM the benefit of the doubt and asks what margin was commercially reasonable for XOOM charge?

Plaintiffs' approach is simple, applying a margin XOOM already found acceptable—and ████████—to charge its customers.  That is all.  XOOM's reliance on *Richards v. Direct Energy*

*Servs., LLC* is thus way off base. In *Richards*, the contract at issue allowed the defendant to set variable rates "based upon business and market conditions." 915 F.3d 88, 97 (2d Cir. 2019). The district court held that term gave defendant "discretion to set a profit margin of its choosing when determining variable rates" because "the phrase 'business and market conditions'" could not imply a specific profit margin. 246 F. Supp. 3d 538, 552 (D. Conn. 2017). There is no such discretion allowed or language present in the 2013 Contract. In fact, after the Second Circuit weighed in on the meaning of the 2013 Contract, at least three other courts in this Circuit have correctly noted that XOOM's contract here constitutes the more restrictive of two "goalposts" around "which other similar cases may fall based upon the language of their specific contracts." *Martinez v. Agway Energy Servs., LLC*, No. 18 Civ. 235 (MAD) (ATB), 2022 WL 1091607, at *3 (N.D.N.Y. Apr. 12, 2022); *Melville v. HOP Energy, LLC*, No. 21 Civ. 10406 (KMK), 2023 WL 2648775, at *6 (S.D.N.Y. Mar. 27, 2023); *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 425 (S.D.N.Y. 2020). In other words, the contract here is on the opposite end of the spectrum as the *Richards* contract. XOOM's argument misstates the *Richards* holdings and again would lead to a commercially unreasonable result that upends the parties' reasonable expectations, *i.e.*, giving XOOM unfettered discretion to set rates when it promised rates "based on" its "supply costs."[21]

### III. BORIS MIRKIN IS A PROPER PLAINTIFF
*(Responding to Defs.' Point IV.C, Defs.' Br. at 27)*

Boris Mirkin, a 20+ year veteran officer of the New York Police Department, Ex. 4, B. Mirkin Tr. 15:10–21, is not a direct party to the contract with XOOM, *see* Defs.' Br. at 27. Instead, he is married to, lives with, and shares finances with Susanna Mirkin—whose name is on their

---

[21] Moreover, courts regularly hold that damages for breach of contract is an issue that cannot be decided at summary judgment. *See Halo Optical Prods., Inc. v. Liberty Sport, Inc.*, No. 14 Civ. 282 (MAD) (TWD), 2017 WL 1082443, at *9 (N.D.N.Y. Mar. 22, 2017) (damages were a "reasonable price" but the exact amount was "a question of fact that precludes summary judgment").

ConEd account.  XOOM is wrong that this disqualifies him as a party.  While it was Susanna who contracted with XOOM, it was Boris who enrolled them.  *Id.* 59:13–16.  Boris was also the primary decision-maker on the family's energy supply, *id.* at 37:11–20, Boris handles the Mirkins' bills, *id.* at 36:24–37:3, and the email account and phone number the Mirkins used for XOOM belong to Boris, *id.* at 27:5–11.  Further, XOOM admits that Boris signed up.  Class Cert. Opp'n at 6.

XOOM cites *Bell v. Gateway Energy Servs. Corp.*, No. 17 Civ. 3893 (KBF), 2017 WL 5956887 (S.D.N.Y. Nov. 29, 2017), but there, the improper plaintiff's "sole connection" to the case was his marriage to another named plaintiff.  *Id.* at *1 n.1.  Here, the record is replete with Boris's connections and the facts here are nearly identical to *Donin v. Just Energy*, No. 17 Civ. 5787 (WFK) (SJB), ECF No. 111 (E.D.N.Y. Sept. 24, 2021).  In that case against an ESCO, one of the plaintiff spouses was not a party to the contract.  *Id.* at *8.  But, just as with Boris, that non-contracting plaintiff received emails from the defendant.  *Id.*  Judge Kuntz held that the spouse was a direct beneficiary and thus had standing as a third-party beneficiary.  *Id.* at *8–*9.  Boris is even more connected than the *Donin* plaintiff, as he made the decision to enroll, handles the bills, and both his email and his phone number were provided to XOOM.  Ex. 5, S. Mirkin Tr. 27:5–11, 34:24–37:3, 37:11–20, 59:13–16.  And XOOM's (failed) performance of its contract with Susanna was rendered directly to Boris, in the form of the energy that powered his home.[22, 23]

---

[22] As an afterthought, XOOM throws in a footnote claiming Plaintiffs have not offered evidence of liability against XOOM Energy, LLC.  Defs.' Br. at 14.  This theory does not appear to be a basis for XOOM's motion, but there are facts indicating both Defendants are liable for XOOM's breach.  *See* Ans. ¶ 11 ("XOOM admits that XOOM Energy New York, LLC is a subsidiary of XOOM Energy, LLC with no separate real property holdings or marketing department.").  Other than its response to the FAC allegations regarding the parties, XOOM's Answer did not distinguish between the two entities.  *See generally* Ans.

[23] Plaintiffs expect XOOM's summary judgment reply will argue in part that evidence set forth in Plaintiffs' reply brief in support of class certification, ECF No. 140, contains "new evidence."  *See* ECF No. 143 (XOOM's sur-reply application).  This argument is wrong.  Plaintiffs' initial certification brief set forth why this case is appropriate for class treatment.  ECF No. 137.  XOOM's opposition challenged whether Plaintiffs met the burden for certification, including as to commonality and predominance, and challenged

*Footnote continued on next page.*

# CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion for Summary Judgment.

Dated: April 14, 2023        Respectfully submitted,

        /s/ Steven L. Wittels
        Steven L. Wittels
        **WITTELS MCINTURFF PALIKOVIC**
        J. Burkett McInturff
        Ethan D. Roman
        305 BROADWAY, 7TH FL.
        NEW YORK, NEW YORK 10504
        Telephone: (914) 775-8862
        Facsimile: (914) 775-8862
        slw@wittelslaw.com
        jbm@wittelslaw.com
        edr@wittelslaw.com

        Daniel Hymowitz
        **HYMOWITZ LAW GROUP, PLLC**
        1629 Sheepshead Bay Road
        Brooklyn, NY 11235
        Telephone: (718) 807-9900
        Facsimile: (866) 521-6040
        daniel@hymowitzlaw.com

        Andrey Belenky
        Dmitry Kheyfits
        **KHEYFITS BELENKY LLP**
        1140 Avenue of the Americas, 9th Floor
        New York, NY 10036
        Telephone: (212) 203-5399
        Facsimile: (212) 203-6445
        abelenky@kblit.com
        dkheyfits@kblit.com

        *Co-Counsel for Plaintiffs and the Proposed Class*

---

the factual support in Plaintiffs' initial brief. ECF No. 139. The reply therefore presented the discovery demonstrating why XOOM's arguments against class certification were wrong. ECF No. 140. It is well-established that "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." *Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 298–99 (E.D.N.Y. 2016) (quotation omitted). That is exactly what happened in Plaintiffs' reply. Furthermore, XOOM's letter conflates new "facts" with new "arguments" and fails for that reason as well.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2023, the foregoing was served via email on all counsel of record.

By:   <u>/s/ Steven L. Wittels  </u>
        Steven L. Wittels