# EXHIBIT A-3

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF NEW YORK
 3      SUSANNA MIRKIN and BORIS MIRKIN,
 4      Individually and on Behalf of All Others
 5      Similarly Situated,
 6            Plaintiffs,
 7         vs.                    No. 18 Civ. 2949(ARR) (RER)
 8      XOOM ENERGY, LLC and XOOM ENERGY
 9      NEW YORK, LLC,
10            Defendants.
11      --------------------------------x
12
13
14                 VIDEOTAPED DEPOSITION OF
15                     SEABRON ADAMSON
16                Tuesday, November 8, 2022
17                        10:06 a.m.
18                         Veritext
19                      101 Arch Street
20                Boston, Massachusetts 02110
21
22
23
24              Laurie K. Langer, RPR
```

Page 1

1  Q. In doing that rate conversion, do you interpret
2  that provision to mean that XOOM may include a margin in
3  its rate?
4      MR. WITTELS: Objection.
5  A. I don't see that listed here. You know, it says,
6  "actual and estimated supply costs." I don't see that
7  here. Sort of as we said, I anticipated that was going
8  to be kind of argued. I mean, when you have the reading
9  here, I don't see that. It says, "actual and estimated
10 supply costs," it doesn't talk about margin. I mean, so
11 I think the most straightforward reading of that is it
12 doesn't have margin in it.
13 Q. In your opinion XOOM may not include a margin in
14 its rate based on that contract provision?
15 A. I would say it's actual -- I mean, if they --
16 if -- it just needs to -- it needs to be to actual and
17 estimated supply costs. Which does not list here
18 "margin."
19 Q. Mr. Adamson, I'll stipulate that the word
20 "margin" is not in that provision.
21 A. Yes.
22 Q. You don't have to tell me that again.
23 A. Okay.
24 Q. I want to know, your interpretation is. You're

Page 30

1  offering an opinion of what this provision means; yes?
2  A. Yeah, I'm offering what I think is a, you know, a
3  relatively commonsensical commercial one. I'm -- my --
4  my ordinary reading of this is, you know, deal with
5  supply costs and, and that's what it says.
6  Q. And does it mean that XOOM may include a margin
7  on top of those supply costs?
8      MR. WITTELS: Objection.
9  A. They -- my kind of ordinary read of that is it
10 doesn't say that, unless, unless they are -- it's not
11 included in supply costs, it doesn't list that. And
12 it's not a, you know, direct actual supply cost. That's
13 what it says. So I think the answer to your question is
14 no.
15 Q. Okay.
16 A. If you were to say it does, okay, that's
17 different. That's a different view of the same thing.
18 Q. Okay. So if I said that rate setting provision
19 that we've been looking at based on actual and estimated
20 supply costs means that the rate will be consistent with
21 costs plus an appropriate margin, you would disagree?
22 A. I mean, the first order based on it said what it
23 says, yes. I mean, I -- I can -- I would guess you
24 would probably argue that. Which I believe Mr. Coleman

Page 31

1  has.
2      So I would, you know -- I imagine that that was,
3  imagined that that was going to come up. I think -- I
4  mean, whether, to the extent non supply costs margins
5  are included really is something that the judge or the
6  jury or whoever decides on this has to, has to opine on.
7  Q. Okay. Because you're not offering a legal
8  interpretation?
9  A. I am not offering a legal interpretation.
10 Q. Okay. If I said that I interpret that phrase
11 based on actual and estimated supply costs to mean that
12 XOOM's rate will rise and fall with its supply costs,
13 would you agree with that or disagree?
14     MR. WITTELS: Objection. By the way, when
15 you say "you," you the lawyer? I don't know what you
16 mean.
17 A. Sorry. Can you repeat the question.
18 Q. I say that when I, Matt.
19 A. Right. Okay. We get our pronouns right. Yeah.
20 Okay.
21 Q. Read that pricing provision, specifically the
22 phrase "based on XOOM's actual and estimated supply
23 costs," I think that means that XOOM's rates will rise
24 and fall with its supply costs. Would you agree with

Page 32

1  that reading or disagree?
2  A. I think that is -- if the rate is determined from
3  actual and estimated supply costs then that is likely to
4  be true, but that doesn't seem to be sufficient to me to
5  meet the requirement.
6  Q. What else would be required?
7  A. Well, again, as I -- as we tried to explain in
8  that rebuttal report, moving together is a very weak
9  measure of anything; right? So the real question is
10 not, not just do things move together, but, I mean,
11 obviously there are other elements of a mathematical
12 relationship between moving together. I don't think
13 moving together is sufficient to determine whether
14 that's, quote, based on.
15 Q. So if it's not just that it moves together, --
16 A. Uh-huh.
17 Q. -- what else is required?
18 A. Well, --
19     MR. WITTELS: Object to the form.
20 A. -- as I indicated -- as we indicated in our
21 rebuttal report, there needs to be an, an economically,
22 you know, reasonable relationship between those two,
23 because moving together, as I illustrated, and which, I
24 think, you know, everyone can understand, doesn't, it

Page 33

9 (Pages 30 - 33)

Veritext Legal Solutions
346-293-7000

**Page 58**

1  total costs if it was at all higher?
2       MR. WITTELS: Objection.
3    A. Again, I think that goes back to the whole margin
4  discussion we had earlier.
5    Q. So --
6    A. Do we need to repeat that, or?
7    Q. You can just say yes.
8       MR. WITTELS: Objection.
9    A. It's not a yes or no question. I mean, I think
10  there's -- we already had the whole discussion about
11  margin. We can repeat it if you like.
12       This -- and this is actually just really a
13  comparison of numbers. It just shows that the rates and
14  the total costs are quite different. So it's
15  just -- it's actually just discussing the data. This
16  actual sentence. Just to be clear.
17    Q. Mr. Adamson, did you read XOOM's witnesses
18  deposition transcripts?
19    A. I don't know how many there were. I read some of
20  them. And I would say I or -- and Derya read what
21  seemed like relevant parts of those. I certain -- I
22  don't know that I -- I certainly didn't read all of the
23  witness depositions from, from page 1 to page how many.
24    Q. Right. The ones you did read, do you recall the

**Page 59**

1  witnesses testifying that in XOOM's rate setting process
2  supply costs as reflected in the rate setting workbooks,
3  were at least the starting point for that process?
4    A. I -- yeah. I, you know, broadly characterized.
5  I don't remember exactly how they worded it, but broadly
6  conceptually, yes, I'll agree -- I agree with you.
7    Q. Okay. I'll -- if you can flip with me to
8  paragraph 53.
9    A. Yeah.
10    Q. Do you see about halfway down, this is in
11  reference to testimony with a witness Ryan Park. You
12  write that, "costs were the starting point for the
13  rates."
14    A. Uh-huh. Yes. I remember -- I remember
15  Mr. Parks. I don't remember exactly how he
16  characterized it, but I agree with you that's what he
17  said.
18    Q. Okay. And do you recall other witnesses
19  testifying to the same effect, that costs were the
20  starting point for the rates?
21    A. Mr. Park is the one I remember off the top of my
22  head. I can't remember who else said that. There were
23  at least four or five different transcripts that all
24  overlapped in content sometimes.

**Page 60**

1    Q. Right. And do you recall some of those others
2  without -- I'm not asking you their names -- do you
3  recall some of those others testifying that costs were
4  the starting point in the rate setting process?
5       MR. WITTELS: Objection.
6    A. I don't remember a specific line about that, no.
7  I remember the Park one, but it may have been, I'm not
8  disputing that they may have said it somewhere. I don't
9  have -- I don't have an image of that read, myself
10  reading that at this point, like I do with the Park one.
11    Q. Mr. Adamson, do you recall how long Susanna
12  Mirkin was a XOOM electricity customer?
13    A. I think from the data or from a table, six or
14  seven months. But I don't know the exact -- I certainly
15  don't know the exact number of months.
16    Q. Okay. And do you have an opinion about whether
17  XOOM based her rates on something other than its actual
18  and estimated supply costs during the period that she
19  was a customer?
20    A. To my understanding her rate wasn't set under a
21  different process. And so I think her -- her rate was
22  set under the same process of the others and therefore
23  subject to the same criticism.
24    Q. Okay.

**Page 61**

1    A. I haven't seen anything where they said we have a
2  specific method for calculating the rate which is very
3  different for this one person?
4    Q. Do you remember the time period that she was an
5  electricity customer?
6    A. The duration or the, like, the dates?
7    Q. The dates.
8    A. I think it was in 2013, perhaps.
9    Q. And do you recall any witness who was asked about
10  pricing during those particular months?
11    A. Not off the top of my head.
12    Q. You write in your report that you were unable to
13  substantiate that XOOM considered prior period
14  adjustments in setting rates. Do you recall that
15  opinion?
16       MR. WITTELS: Which page -- which page are
17  we on?
18    A. Yeah, do you have a page reference? It would be
19  helpful. But, I mean, I think I know what you're
20  talking about, but do you have one?
21    Q. I don't know.
22    A. Okay.
23       MR. WITTELS: You don't know?
24       MR. MATTHEWS: No, it's just a general

**Page 62**

 1  opinion.
 2         MR. WITTELS: But usually if you're making a
 3  statement you're taking it from there.
 4         MR. MATTHEWS: Well, thank you for that
 5  guidance. I'm learning a lot.
 6     A. Well, I think it's probably around page....
 7     Q. I'll find it for you. How about paragraph 23B
 8  and 54.
 9     A. 54. Right. Okay. Yes. Okay. Sorry, can you
10  repeat your question.
11     Q. Please, if you would, so we don't have any
12  confusion, if you would read both of those paragraphs.
13  And then I'll --
14         MR. WITTELS: Into the record, --
15     Q. -- proceed.
16         MR. WITTELS: -- or?
17         MR. MATTHEWS: No. No. Just to himself.
18     A. (Witness reviewing.) Okay.
19     Q. Okay. What -- you, generally speaking, opine
20  with reference to those prior period adjustments that
21  you were unable to substantiate whether XOOM considered
22  them in setting its rates; is that a fair statement?
23     A. Yeah. I mean, we looked at the information in
24  the rate setting workbooks, which was very extensive.

**Page 63**

 1  There didn't seem to be any determination, calculation,
 2  amounts or anything associated with prior period
 3  adjustments as expected. I'm -- I was really kind of
 4  expecting there to be, if you were making prior period
 5  adjustments, to have some calculation of those, which I
 6  never saw. So that's kind of just what it's a reference
 7  to.
 8     Q. Got it. So you're saying because XOOM didn't
 9  memorialize it and document or a calculation that shows
10  how it was factored in, you have no evidence that they
11  considered it; is that fair?
12     A. Well, I'm saying I didn't, I didn't see
13  any -- there was no data suggesting that that was ever
14  calculated.
15     Q. Right.
16     A. And it seems to me that would be a calculation.
17     Q. There was testimony that it was considered;
18  right?
19     A. I think there was testimony that it was
20  considered and as I mentioned in paragraph 54, though,
21  there was testimony -- well, there was testimony I
22  believe that said, oh, it was part of this, what we
23  considered in some very broad abstract sense.
24     Q. Yep.

**Page 64**

 1     A. And then there was testimony as I note in
 2  paragraph 54 about potential kind of makeup losses,
 3  which I guess you could consider some kind of prior
 4  period adjustment. But in -- with an unrelated market
 5  not related to New York. So there's testimony
 6  that -- there's general testimony and then there's
 7  specific testimony.
 8     Q. About consideration of prior period adjustments?
 9     A. Yes.
10     Q. Okay. Got it. We're on the same page.
11     A. Okay.
12     Q. The period of time --
13     A. Uh-huh.
14     Q. -- that you looked at for rate setting
15  procedures --
16     A. Uh-huh.
17     Q. -- goes from 2013 to 2021; right?
18     A. Yes. Broadly, yes.
19     Q. Broadly?
20     A. Yeah.
21     Q. Did you do any analysis of what other ESCOs
22  charged in New York during that same time period?
23     A. No.
24     Q. Okay. So you don't know how XOOM's rates

**Page 65**

 1  compared to other ESCOs rates?
 2     A. For purposes of this we never made a comparison.
 3     Q. And you don't know if XOOM's rates were outside
 4  of the range of what ESCOs were charging during that
 5  time period?
 6     A. No, we didn't look at that. It didn't seem very
 7  relevant.
 8     Q. Okay. What was relevant in the, your damage
 9  analysis, was how much gross margin XOOM sought on top
10  of its supply costs; right?
11         MR. WITTELS: Objection.
12     A. Can you repeat that, again.
13     Q. Yep. What you believed was relevant in your
14  damage calculations was how much gross margin XOOM
15  sought on top of its supply costs?
16         MR. WITTELS: Objection.
17     A. I mean, that's a way that -- I think you're
18  putting a characterization of it. I think what really
19  the -- you're characterizing it -- one might
20  characterize it that way, but the, you know, as, as
21  discussed, the, you know, what's important is the
22  relationship between rates and, and supply costs. If
23  you want to characterize that as being a gross margin
24  calculation, I think you could formulate it that way,

17 (Pages 62 - 65)

**Page 66**

 1  which is I think what you're doing.  But I think you
 2  understand what we did.
 3     Q.  I am, because I'm focusing in my question, I have
 4  built this in on your damage calculation.  So I
 5  understand your position about bullet 3, let's call it.
 6  Which is your opinions about whether or not XOOM's rate
 7  setting was consistent or not, with the sale agreement.
 8        But I'm talking about with respect to 4, after
 9  you concluded --
10     A.  Uh-huh.
11     Q.  -- the rate was not consistent --
12     A.  Right.
13     Q.  -- that your damage model --
14     A.  Right.
15     Q.  -- and what they considered relevant was the
16  amount of gross margin that XOOM put on top of its
17  supply cost?
18     A.  Are we discussing the Method 1 model or the
19  Method 2 model?
20     Q.  Well, it's both; right?
21     A.  Well, it's --
22     Q.  Let's start with Method 1.
23     A.  Okay.  Right.
24     Q.  Right.  Method 1, what was relevant was the

**Page 67**

 1  amount of gross margin that's input on top of its supply
 2  costs; right?
 3        MR. WITTELS:  Objection.
 4     A.  Of the difference -- if you want to -- you're
 5  expressing that as a form -- you're expressing the
 6  delta, the difference, right, as a gross margin.  That's
 7  not exactly how it was calculated.
 8        I mean, it was calculated just as there's
 9  differences, not any -- you're saying a gross margin on
10  a gross margin calc -- I want to be specific about how
11  you're using the term "gross margin."
12     Q.  I didn't think it was tricky.  I mean, your
13  report says that you calculated by reference -- by
14  comparing XOOM's margin reports to XOOM's rate setting
15  workbooks; right?
16     A.  Right.  I was getting to the delta between rates
17  and costs.
18     Q.  Okay.
19     A.  It's just that it was in the margin setting
20  workbooks.
21     Q.  So with respect to Model 1 the relevant
22  consideration was the delta between XOOM's total costs
23  and XOOM's margin?
24        MR. WITTELS:  Objection.

**Page 68**

 1     A.  The -- between total cost and the rate.
 2     Q.  Okay.  Which is the margin?
 3        MR. WITTELS:  Object.
 4     A.  The rate is not the margin.
 5     Q.  No, I know.
 6     A.  A rate is not a margin.
 7     Q.  The delta is.  The delta is.
 8     A.  Okay.  We can call that a margin, yes.
 9     Q.  The delta between the total costs --
10     A.  Right.
11     Q.  -- and the rate is --
12     A.  Right.
13     Q.  -- the margin; right?
14     A.  That -- that -- you can characterize that as a
15  margin.
16     Q.  Well, what would you characterize it?
17     A.  I would just characterize it as a difference, as
18  a delta.
19     Q.  Okay.  You're not offering an opinion in this
20  case that under the sales agreement XOOM could not
21  charge more than the regulated utilities rate; right?
22     A.  No.  I mean, the comparison I made was between
23  supply costs and the rate under this contract.
24     Q.  Right.  And you're not offering a damage model

**Page 69**

 1  that compares XOOM's variable rate charges to what
 2  customers would have been charged by the utility during
 3  the same time period?
 4        MR. WITTELS:  Objection.
 5     A.  No.  The damage models as we discussed are the
 6  two.
 7     Q.  Right.  And you don't intend to offer an opinion
 8  about that?
 9     A.  No.  The only thing we used was a, as a graphical
10  comparison on the relationship between supply costs and
11  the utility rate, as an example.  But the two models are
12  the two models.
13     Q.  Yep.  Okay.  Are you offering an opinion about
14  what is a reasonable or appropriate margin for an ESCO
15  to charge?
16     A.  Well, to build the second model we needed an
17  estimate of a margin.  We really didn't have any
18  information that would allow that to be created, since
19  XOOM had, from what we can tell, had never done it that
20  way.  They had never tried to calculate a, or they did
21  not present in any way, I can't say that they never
22  tried.  They did not present in the rate setting
23  workbooks and other information calculations of any sort
24  like that.  So we used the margin from fixed rate

--- Page 70 ---

1  customers as a proxy of a rate that XOOM itself had
2  used. I can't go further than that because there's no
3  information.
4      MR. MATTHEWS: Can you read my question
5  back, please.
6      (Prior testimony read back.)
7          "Are you offering an opinion
8           about what is a reasonable or
9           appropriate margin for an ESCO
10          to charge?"
11  A. Yeah. Conceptually, yes. Conceptually, yes.
12     Thanks for reading that back.
13  Q. That's okay. And what is the opinion that you're
14  offering conceptually about that?
15  A. Well, I mean, it's obviously related to the
16  contract that we've been discussing, whether it's based
17  on supply costs, that, you know, if the Court were to
18  decide that a margin was allowed, that it can't be an
19  uncapped margin, that's why we made a second calculation
20  using the fixed rate margin as a proxy of what might be
21  an acceptable margin.
22  Q. Are you offering any opinion about what is an
23  acceptable or appropriate, a reasonable margin aside
24  from just using XOOM's fixed rate margin?

--- Page 71 ---

1  A. We haven't offered that opinion, we don't have
2  any information to do that.
3  Q. Do you intend to?
4  A. If information were to be provided, but that
5  would have to come from XOOM. So I, in the absence of
6  not expecting anymore information to come, no.
7  Q. Well, we've gotten talking past each other again.
8  I'm talking conceptually. You've said that it will be
9  for the Court to decide whether a margin can be charged
10  and if so what's appropriate; right?
11  A. Right.
12  Q. And if we go to trial --
13  A. Uh-huh.
14  Q. -- and you take the witness stand --
15  A. Uh-huh.
16  Q. -- and I'm asking you questions and the judge
17  gets frustrated with my questions and says, "let's cut
18  to the chase. Mr. Adamson, what do you think is an
19  appropriate margin for an ESCO to charge?" What would
20  your answer be?
21      MR. WITTELS: Objection.
22  A. I would say conceptually it's got to be related
23  to the, related to the costs. And in a broad conceptual
24  basis.

--- Page 72 ---

1  Q. And if he said, "but can you give me a cutoff
2  point? Is there a number that you can assign to that?"
3  Would you be able to give him one?
4      MR. WITTELS: Objection.
5  A. I wouldn't be able to give him a number on the
6  stand because I wouldn't have the, XOOM's internal
7  information, no.
8  Q. Okay. So the margin in your view, --
9  A. Uh-huh.
10  Q. -- the margin that is appropriate for an ESCO to
11  charge conceptually --
12  A. Uh-huh.
13  Q. -- is ESCO specific?
14  A. Well, again, we're talking about relation to a
15  specific contract, so.
16  Q. I'm not.
17  A. You're not.
18      MR. WITTELS: Don't interrupt him.
19  A. I am talking -- sorry. I'm talking about this
20  specific contract. Other ESCOs may have, and I'm sure
21  do, very different contractual forms. And in fact,
22  ESCOs -- even the same ESCO will have lots, may have
23  different pricing, right, under different arrangements.
24  We're talking about variable rate pricing here as

--- Page 73 ---

1  opposed to fixed rate pricing.
2  Q. Uh-huh.
3  A. Fixed rate pricing, I think we can all agree, the
4  actual outturn margins could be quite different. A lot
5  depends on timing in that case; right? Okay. So I
6  don't know that there is a "single ESCO number" I don't
7  think that's a meaningful concept.
8  Q. Okay. Is there a single ESCO number for variable
9  rates that in your opinion would be a cap on what is an
10  appropriate or reasonable margin?
11  A. I don't have a number in mind because I don't
12  know what the, what would be claimed to be the types of,
13  of costs that, to be recovered in that margin. What I
14  don't -- you know, I don't have a number. What I am
15  offering is conceptually that the margin has to be based
16  on something from reality to be meaningful in the
17  context of this contract, and, you know, can't be
18  arbitrary.
19  Q. Okay.
20  A. But I don't have a number to give you.
21  Q. Okay. And would not be able to create one?
22      MR. WITTELS: Objection.
23  A. Not -- not on the information available right
24  now. I think that would need more inputs than are

Page 74

```
 1  available at present.
 2    Q. Okay. You don't have an industrywide opinion
 3  about what is an appropriate or a reasonable margin that
 4  an ESCO can charge on a variable rate?
 5        MR. WITTELS: Objection.
 6    A. I mean, I probably have a, a rough sense of maybe
 7  what I would expect roughly the numbers to work out
 8  about. But, you know -- you know, based on, you know,
 9  what I -- just a sense of that. I don't have a precise
10  number to give you here.
11    Q. What -- what are the rough numbers that you
12  referred to?
13    A. You know, I would be -- I would be -- I wouldn't
14  be surprised, having done calculations that, you know,
15  you got a number, 15 percent, 20 percent, something like
16  that. I mean, you know, here we use the fixed rate one
17  and it came out those were on average about 20 percent.
18  That -- that is an indicator.
19    Q. Okay.
20        MR. MATTHEWS: Can we go off the record.
21        VIDEOGRAPHER: The time is 12:00 p.m., we
22  are going off the record.
23        (Short break taken.)
24        VIDEOGRAPHER: We back on the record, the
```

Page 75

```
 1  time is 12:14.
 2    Q. Mr. Adamson, let's talk about your damage models
 3  which relates to the fourth bullet point of your
 4  assignment --
 5    A. Uh-huh.
 6    Q. -- to develop a damage model.
 7    A. Uh-huh.
 8    Q. And you and Dr. Eryilmaz --
 9    A. Eryilmaz.
10    Q. -- developed two models; --
11    A. Yes.
12    Q. -- right?
13      Okay. So Model 1 is described starting on page
14  20 under Section 3.1.
15    A. Uh-huh.
16    Q. Right?
17    A. Yes.
18    Q. So here the total costs that are referenced here,
19  again, is the supply cost build up contained in the rate
20  setting workbooks; right?
21    A. Yes, I believe that's what it says, yes.
22    Q. All right. And as you described earlier, Model 1
23  takes the difference between those total costs and the
24  variable rate that XOOM charged?
```

Page 76

```
 1        MR. ROMAN: Sorry if I'm interrupting. But
 2  we can't hear anything for people remotely right now. I
 3  don't know if we're on the record or talking, but I
 4  can't hear anything.
 5        MR. WITTELS: We're on the record. Can you
 6  hear?
 7        (Pause for technical issue.)
 8        MR. ROMAN: I just heard Matt. That's good.
 9  Thank you.
10        (Pause for technical issue.)
11    A. Can you --
12    Q. Yeah.
13        MR. MATTHEWS: May I ask you to read that
14  back.
15        (Prior testimony read back.)
16            "All right. And as you
17            described earlier, Model 1
18            takes the difference between
19            those total costs and the
20            variable rate that XOOM
21            charged?"
22    A. Yes.
23        MR. WITTELS: Yeah. Objection.
24    A. Broadly, yes.
```

Page 77

```
 1    Q. And the third dataset that is relevant to the
 2  calculation under Model 1 is customer usage; right?
 3    A. Yes, they're quantities, yes.
 4    Q. So you take customer usage and multiply that by
 5  supply costs; right?
 6    A. Okay.
 7    Q. And then you take customer usage and multiply
 8  that by the rates; right?
 9    A. Are you continuing --
10    Q. Is that correct so far?
11    A. I'm trying to remember exactly how it was
12  implemented. It may have just been -- it may have -- it
13  may have been implemented as the difference in the rates
14  times the quantity.
15    Q. Okay. Got it.
16    A. I think we're talking about --
17    Q. We're saying the same thing.
18    A. -- the same general -- I think we're talking
19  about the same general thing.
20    Q. The -- we're saying the same thing.
21      In other words, it's looking at calculating
22  everything XOOM charged above total costs.
23    A. Yeah. Yeah, above the, the supply costs, total
24  costs, the delta times quantities.
```

**Page 78**

1  Q. And -- okay. And I appreciate. I probably
2  shouldn't use your defined term "total costs" because
3  the supply costs doesn't include certain fixed costs;
4  right? The supply costs that are set forth in the rate
5  setting workbook.
6  A. I mean, the -- the total costs includes -- I
7  mean, I -- what was reported as the things that sum up
8  the total costs, yes.
9  Q. That sum up to the total of the supply costs;
10 right?
11 A. Yeah. I think in the rate setting workbooks the
12 column is labeled Total Cost, as I remember.
13 Q. Got it. But it doesn't include supply costs, and
14 the total cost that's listed in the rate setting
15 workbook doesn't include things like overhead and taxes
16 and marketing costs. Those sorts of costs; right?
17     MR. WITTELS: Objection.
18 A. Sorry. I think your question may have had
19 multiple parts. The total cost -- the total costs in
20 the rate setting workbooks had a bunch of columns.
21 Q. Uh-huh.
22 A. Right? So is the -- is your question what are
23 those columns?
24 Q. No. I probably asked a poor question.

**Page 79**

1  ESCOs generally have supply costs; correct?
2  A. Yes.
3  Q. And then ESCOs, in the course of doing, running
4  their business have certain additional costs that are
5  not supply costs; right?
6  A. If you want to characterize it that way, yes.
7  Q. Okay. And the Model 1 calculation --
8  A. Uh-huh.
9  Q. -- does not include any costs that are not supply
10 costs; right? The Model 1 calculation only calculates
11 supply costs?
12     MR. WITTELS: That's two questions.
13 Objection.
14 A. The Model 1 calculation uses, uses the supply
15 costs represented by the total cost. As I understand
16 your question you're saying did, for example, was, in
17 the, in XOOM's reported total costs did it have these
18 other elements he raised.
19    And I was trying to refer to to kind of purposes
20 of clarity to say the rate setting workbook total costs
21 that we saw -- well, I mean, they are what they are.
22 That is XOOM's reported numbers. It didn't mention
23 marketing costs. I think you mentioned that as a thing.
24 So supply costs, yes. So we made a comparison with

**Page 80**

1  supply costs based on total costs.
2  Q. The Total Cost column in the rate setting
3  workbook?
4  A. Yes.
5  Q. Okay. And do you understand the Total Cost
6  column in the rate setting workbook to include overhead
7  costs?
8  A. Not as -- not as described. Not -- not as
9  obviously described in the rate setting workbooks that I
10 saw.
11 Q. Okay. Do you understand it to include taxes that
12 XOOM pays?
13 A. Are we talking about corporate taxes or are we
14 talking about taxes on, involving energy purchases or
15 something?
16 Q. Corporate taxes.
17 A. Like, corporate income taxes?
18 Q. Yes.
19 A. Not that I see. Not that I saw.
20 Q. And do you understand it to include rent?
21 A. Like, facilities rent?
22 Q. Yes, sir.
23 A. There -- there was not a column for that, no.
24 Q. Okay. And do you understand it to include other

**Page 81**

1  acquisition costs of acquiring customers?
2  A. If they -- that was not a broken out category.
3  Q. Okay. So in a nutshell under Model 1 you're
4  calculating all of the gross margin that XOOM obtained
5  from those customers?
6     MR. WITTELS: Objection.
7     Can you repeat that question.
8     (Prior testimony read back.)
9        "So in a nutshell under Model 1
10       you're calculating all of the
11       gross margin that XOOM obtained
12       from those customers?"
13 A. I mean, we're calculating the difference between
14 total costs and rates times quantities. I think that's
15 the calculation.
16 Q. Yeah. Okay. But under this model XOOM doesn't
17 get to make any margin; correct?
18 A. Unless it was built into the total cost that they
19 reported.
20 Q. In the rate setting workbook?
21 A. In the rate setting workbooks.
22 Q. Okay. XOOM's a for profit business; right? You
23 understand that?
24 A. Yes.