**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SUSANNA MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiffs,

v.

XOOM ENERGY, LLC and XOOM ENERGY
NEW YORK, LLC,

                    Defendants.

No. 18 Civ. 2949 (ARR) (JAM)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DECERTIFY THE CLASS**

**TABLE OF CONTENTS**

Table of Authorities ......................................................................................................... ii

I.   Preliminary Statement............................................................................................. 1

II.  Procedural and Factual Background ....................................................................... 4

    A.  Plaintiff Survived Dismissal Because She Promised to Show What XOOM's Rates Should Have Been Under the Contract—But She Cannot.................................. 4

    B.  The Court Construed the Contract to Permit a "Reasonable" and "Proportionate" Margin but Found that Fact Issues Remained as to the Components of the Rates......................... 5

    C.  The Court Certified a Class Now Encompassing More than 5,800 Rates Set Over an Eleven-Year (and Growing) Period. ......................................................... 7

III. Standard ................................................................................................................. 7

    A.  The Court Has an Ongoing Duty to Monitor Compliance with Rule 23. ........... 7

    B.  This Is Not a Motion for Reconsideration. ...................................................... 8

IV.  Argument ............................................................................................................. 11

    A.  The Class Must Be Decertified for Lack of Commonality and Predominance Because Plaintiff Has No Viable Overcharge Model........................................ 11

        1)  Model One Cannot Satisfy Commonality or Predominance Because It Contains No Margin Input. ................................................................................. 13

        2)  Model Two Cannot Satisfy Commonality or Predominance Because It Does Not Include a Proportionate Margin. ......................................................... 13

        3)  Model Two Cannot Satisfy Commonality or Predominance Because It Cannot Show a Reasonable Margin. .................................................................. 14

        4)  Neither Model Can Satisfy Commonality or Predominance Because Neither Considers XOOM's Actual Costs.............................................................. 21

    B.  In the Absence of a Viable Damage Model, This Case Is Not Susceptible to Classwide Resolution in One Stroke. .............................................................. 22

        1)  The Absence of Common Evidence of Actual Costs Destroys Predominance. ......... 22

        2)  XOOM's Evidence of Actual Costs Is Individualized, Abundant, and Varied. ......... 25

    C.  Plaintiff's Atypicality Also Requires Decertification.................................... 29

    D.  No Other Theory of Breach Can Save the Class Because Plaintiff's Only Pleaded Theory of Recovery Requires Proof of an Overcharge. .............................. 30

V.   Conclusion ........................................................................................................... 31

i

<u>T<small>ABLE OF</small> A<small>UTHORITIES</small></u>

**Page(s)**

**Cases**

*Abdi v. McAleenan*,
    405 F. Supp. 3d 467 (W.D.N.Y. 2019) ...................................................................10

*In re Amla Litig.*,
    320 F. Supp. 3d 578 (S.D.N.Y. 2018)....................................................................21

*Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*,
    86 S.E. 1025 (N.C. 1915)..........................................................................11, 12, 21

*Bryan Builders Supply v. Midyette*,
    274 N.C. 264, 162 S.E.2d 507 (N.C. 1968) ..........................................................31

*Cline v. Cline*,
    128 S.E.2d 401 (N.C. 1962)..............................................................................19, 21

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)......................................................................11, 13, 14, 22

*In re Credit Suisse First Bos. Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
    250 F.R.D. 137 (S.D.N.Y. 2008) ...........................................................................19

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    No. 17CV4576GHWBCM, 2023 WL 2870484 (S.D.N.Y. Apr. 10, 2023)...........................20

*Duracell Inc. v. Glob. Imports, Inc.*,
    No. 17-MC-185 (KNF), 2018 WL 5619983 (S.D.N.Y. Aug. 16, 2018) ...............................20

*Fleisher v. Phoenix Life Ins. Co.*,
    No. 11 CIV. 8405 CM JCF, 2014 WL 409164 (S.D.N.Y. Jan. 31, 2014)...............................10

*Fox v. Bd. of Trustees of State Univ. of N.Y.*,
    42 F.3d 135 (2d Cir. 1994)......................................................................................32

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)......................................................................................7, 8, 30

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
    907 F. Supp. 2d 492 (S.D.N.Y. 2012), *aff'd sub nom. Gulino v. Bd. of Educ. of*
    *N.Y.C. Sch. Dist. of City of N.Y.*, 555 F. App'x 37 (2d Cir. 2014)...........................10

*In re Hampton*,
    407 B.R. 443 (B.A.P. 10th Cir. 2009) ...................................................................20

*Hershkowitz v. Think Tech Labs, LLC*,
   651 F. App'x 15 (2d Cir. 2016) ...........................................................................20

*Intersal, Inc. v. Hamilton*,
   373 N.C. 89 (N.C. 2019) .........................................................................11, 12, 21

*Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*,
   645 F. Supp. 3d 95 (E.D.N.Y. 2022) ...................................................................16

*Jin v. Shanghai Original, Inc.*,
   990 F.3d 251 (2d Cir. 2021)........................................................................7, 8, 10

*Johnson v. Nextel Commc'ns Inc.*,
   780 F.3d 128 (2d Cir. 2015)...........................................................................22, 30

*In re KIND LLC "Healthy & All Natural" Litig.*,
   627 F. Supp. 3d 269 (S.D.N.Y. 2022) ..............................................................8, 30

*Kiobel v. Royal Dutch Petroleum Co.*,
   No. 02 CIV. 7618 KMW HBP, 2004 WL 5719589 (S.D.N.Y. Mar. 31, 2004) ....................30

*Mazzei v. Money Store*,
   829 F.3d 260 (2d Cir. 2016)........................................................................ *passim*

*Mirkin et al v. XOOM Energy, LLC et al.*,
   342 F. Supp. 3d 320 (E.D.N.Y. 2018) ....................................................................4

*Mirkin v. XOOM Energy, LLC*,
   931 F.3d 173 (2d Cir. 2019)....................................................................................5

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)................................................................................30

*Naphcare Inc. v. Guilford Cnty.*,
   No. 1:07CV174, 2008 WL 4371770 (M.D.N.C. Sept. 18, 2008) ...........................21

*Onosamba-Ohindo v. Searls*,
   No. 1:20-CV-00290 EAW, 2023 WL 4107978 (W.D.N.Y. June 21, 2023)...........10

*Peaseley v. Virginia Iron, Coal & Coke Co.*,
   194 S.E.2d 133 (N.C. 1973)..................................................................................21

*Polyzen, Inc. v. RadiaDyne, LLC*,
   No. 5:11-CV-662-D, 2015 WL 690835 (E.D.N.C. Feb. 18, 2015),
   *reconsideration granted on other grounds*, No. 5:11-CV-662-D, 2015 WL
   4713235 (E.D.N.C. Aug. 7, 2015) .........................................................................31

*Powell v. Ward,*
    487 F. Supp. 917 (S.D.N.Y. 1980), *aff'd and modified*, 643 F.2d 924 (2d Cir.
    1981) ....................................................................................................................10

*Price v. L'Oreal USA, Inc.*
    2021 WL 4459115, at **3–4 (S.D.N.Y. Sept. 29, 2021)...............................................22, 23

*Remijas v. Neiman Marcus Grp., LLC,*
    341 F. Supp. 3d 823 (N.D. Ill. 2018) .....................................................................................9

*Richards v. Direct Energy Servs., LLC,*
    915 F.3d 88 (2d Cir. 2019)............................................................................16, 17, 21, 31

*Rodriguez v. It's Just Lunch Int'l,*
    No. 07-CV-9227 (SHS), 2018 WL 3733944 (S.D.N.Y. Aug. 6, 2018)...................................9

*Schmalz v. Sovereign Bancorp, Inc.,*
    868 F. Supp. 2d 438 (E.D. Pa. 2012) ...................................................................................19

*Troitino v. Goodman,*
    35 S.E.2d 277 (N.C. 1945)............................................................................................11, 21

*United States v. Bright,*
    No. 22-1644-CR, 2023 WL 3830783 (2d Cir. June 6, 2023) ...................................................8

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011)................................................................................................................22

*White Indus., Inc. v. Cessna Aircraft Co.,*
    845 F.2d 1497 (8th Cir. 1988) .............................................................................................30

*Wu v. Pearson Educ. Inc.,*
    No. 09 Civ 6557(KBF), 2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012) ............................8, 22

**Other Authorities**

Fed. R. Civ. P. 23 ............................................................................................................. *passim*

Fed. R. Civ. P. 83 .........................................................................................................................9

L.R. 6.3 .........................................................................................................................................9

## I.   PRELIMINARY STATEMENT

This is not a motion for reconsideration. As Rule 23 contemplates, district courts can and should revisit orders on class certification, and have the authority to "alter[] or amend[]" class orders at any time "before final judgment." Fed. R. Civ. P. 23(c)(1)(C). The Second Circuit has repeatedly cited that provision to emphasize not only a district court's authority to decertify a class, but also the "affirmative duty of monitoring its class decisions" as the case develops. *Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (quotations omitted). The key development warranting decertification here is XOOM's timely motion to exclude Plaintiff's experts' damage models and related testimony. Without those models, Plaintiff cannot prove the existence or amount of any overcharge—and both are necessary showings for breach and damages in this case.

Plaintiff's evidentiary gap on both common questions the Court identified (breach and damages) means the Class Order now must be altered. The Court relied on Plaintiff's experts' "Model Two" to find predominance satisfied. Importantly, however, the Court did not decide the accuracy of Model Two or its inputs. As explained in this motion and XOOM's forthcoming motion to exclude, Plaintiff cannot satisfy her burden to demonstrate Model Two's admissibility because it is unreliable and misaligned with Plaintiff's overcharge theory. Plaintiff thus has no evidence from which a jury could determine what XOOM's rates should have been, and there can be no adjudication of breach or damages under her overcharge theory.

Indeed, Plaintiff has no evidence to establish even a single overcharge. The Court held that the Contract allows three components to determine XOOM's variable rates: (1) estimated supply costs, (2) actual supply costs, including prior period adjustments and balancing costs, and (3) a "reasonable" and "proportionate" margin. But by Plaintiff's own admission, Model Two does not use a reasonable or proportionate margin, and it does not try to account for any actual supply costs.

1

It is, therefore, fundamentally incompatible with Plaintiff's overcharge theory, leaving her with no proof (common or otherwise) to establish the existence of any overcharge or its amount.

Plaintiff's only response to her evidentiary failure on breach and damages has been to say that the jury can make up a margin. That is incorrect for at least two reasons. First, there is no evidence from which a jury could determine a reasonable margin. Plaintiff and her experts testified they cannot say what a reasonable margin would be. Yet Plaintiff now suggests that a jury—with less expertise and the same dearth of evidence—can simply invent a margin. But it is fundamental that a jury must have evidence supporting each of its determinations. Where, as here, there is no evidence to support a finding on a key component of the alleged breach, there is no submissible case. Second, a jury-invented margin still would not remedy Model Two's failure to account for XOOM's *actual* supply costs. Plaintiff's suggestion is that the jury-invented margin can be added to XOOM's *estimated* supply costs only. That suggestion ignores that XOOM's actual costs are a permissible building block of its rates. Without that piece of XOOM's supply costs, it is impossible for Plaintiff to say what any one rate should have been.

This actual cost problem is not theoretical. There is documentary evidence from virtually every month in the class period showing that XOOM's actual costs were different from its estimated costs. And the Court has acknowledged there is ample testimony that XOOM considered its actual costs. But Plaintiff refuses to offer a way (in Model Two or otherwise) to assess what the actual costs were, whether they permissibly impacted the rate each month, and what XOOM's rates including actual costs should have been.

For these reasons, Plaintiff does not have admissible evidence from which the jury could determine the inputs for two of the three rate components in the Court's contract construction:



This absence of evidence needed to prove an overcharge breach and damages means commonality and predominance are destroyed, and decertification is now warranted.

Plaintiff's lack of common proof will force the jury to make an impossibly high number of individual determinations at trial. XOOM sets *four* electricity rates in *seven* utility zones and *two* natural gas rates in *eight* utility zones each month—that is 5,800+ different rates over the 134-month class period (and counting). Actual costs were required to be a basis for those rates. And they were—but not in the same way at all times. Determining the rate will require consideration of evidence specific to actual costs for each commodity, zone, and month. Although there is no **common** proof of what those actual costs were, there unquestionably is proof. It is simply varied and unwieldy, so Plaintiff would rather ignore it. Documentary evidence of actual costs (including prior period adjustments and balancing costs), such as Consolidated Financial Statements, Gross Margin Analyses, and email correspondence, as well as witness testimony must be considered for each commodity (if not each rate) in each of the 134+ months in the class period. In other words, because XOOM's actual supply costs—much less their impact on each rate—cannot be determined in one stroke as Rule 23 demands, each of the 5,800+ rates will potentially necessitate its own factual inquiry.

Without a viable overcharge model, Plaintiff can no longer meet Rule 23's commonality or predominance requirements, and the class must be decertified.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

**A.   Plaintiff Survived Dismissal Because She Promised to Show What XOOM's Rates Should Have Been Under the Contract—But She Cannot.**

> "With discovery of XOOM's ***actual costs*** and profits, Plaintiffs will be able to create an even more precise model showing what XOOM's prices should have been under the terms of the customer contract." Doc. 42 (FAC) ¶ 58 (emphasis added).

Plaintiff Susanna Mirkin purchased variable-rate standard residential electricity from XOOM in Brooklyn for six months starting in summer 2013. Doc. 152 (Class Order) at 2. Her contract provided for a "variable rate, per kWh, that may change on a monthly basis," which would be "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." *Id.* at 2, 24.

Five years later, Plaintiff filed this case on behalf of all New York customers who paid XOOM a variable rate for electricity or natural gas for at least one month from January 1, 2013 to the present. *See, e.g.*, *id.* at 2–3. She alleged that her rates were "'not commensurate with XOOM's supply costs.'" Doc. 1-2 ¶ 46. And to approximate the costs, she hired an expert to create an unexplained "Market Supply Cost" alleged to "correspond[] to" the "'actual and estimated supply costs' referenced" in her contract. *Mirkin et al v. XOOM Energy, LLC et al.*, 342 F. Supp. 3d 320, 324 (E.D.N.Y. 2018). Those calculations were speculative and undisclosed, but they were submitted as the only factual basis for Plaintiff's overcharge allegation. *Id.* at 323–24.

On XOOM's motion, this Court dismissed Plaintiff's claims because her "Market Supply Cost" did not plausibly reflect XOOM's internal supply costs. *Id.* at 324. Plaintiff appealed, arguing that her allegations about similarities between the Market Supply Cost and XOOM's supply costs plausibly alleged a claim. Doc. 28. She also promised that, "[w]ith discovery of XOOM's ***actual costs*** and profits," she would "show[] ***what XOOM's prices should have been*** under the terms of its customer contract." Doc. 42 (FAC) ¶ 58 (emphasis added). The Second

4

Circuit allowed her contract claim to proceed on that promise. *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177-78, 174 n.1 (2d Cir. 2019). But five years later, Plaintiff still will not say what she believes her own rates should have been, much less the class's rates—because she and her experts do not have a way to identify the existence or amount of any overcharge. And if Plaintiff cannot now tell this Court what her rates should have been, then she will not be able to tell a jury either.

**B.    The Court Construed the Contract to Permit a "Reasonable" and "Proportionate" Margin but Found that Fact Issues Remained as to the Components of the Rates.**

In discovery, XOOM produced evidence refuting Plaintiff's core allegation of a disconnect between XOOM's rates and supply costs. Instead of "substantially exceed[ing]" costs and "ris[ing] even when" costs "went down," as Plaintiff had alleged, the rates always rose when XOOM's estimate of benchmark costs known as "COGS" (for cost of goods sold) rose and fell when estimated COGS fell in near perfect correlation. Ex. A-1[1] (Coleman Rpt.) at 12. So Plaintiff changed course and attacked the margin included in her rates instead. It was no longer enough, she now claimed, for rates to rise and fall with XOOM's costs (as they unquestionably did). Instead, she argued that XOOM's margin must also be "reasonable, and consistent." Ex. A-2 (Pl. MSJ Resp.) at 9.

Plaintiff and her experts did not try to define "reasonable" or "consistent," nor did they attempt to calculate an "appropriate" margin. Instead, Plaintiff acknowledged that "what margin was commercially reasonable for XOOM [to] charge" was an open question. *Id.* at 45. And her experts only ***posed*** that question—they did not try to answer it: "The contract is silent as to an appropriate margin, so Plaintiffs' second model . . . asks what margin was commercially reasonable for XOOM charge [*sic*]?" *Id.* In fact, her experts expressly disclaimed having either the

---

[1] All exhibits beginning with "A-" are annexed to the Matthews Declaration. All exhibits beginning with "B-" are annexed to the Loehde Declaration.

data or expertise to define or calculate a reasonable margin (though they did not say what data they might need). Ex. A-3 (Adamson Dep.) at 69:13-79:2 (disclaiming any opinion as to "a reasonable or appropriate margin").

XOOM then moved for summary judgment, arguing that a rate "based on" supply costs can still include a margin above costs, and that Plaintiff offered no evidence that XOOM's margin was improper. Doc. 145-1; SJ Order at 9. XOOM showed Plaintiff failed to offer evidence that the margin on her rates included anything other than contractually permitted supply costs, including "prior period adjustments" (or "PPAs") and "balancing costs." *Id.* at 16. But the Court found fact questions after adopting a contract construction that XOOM's "monthly variable rates" had to "be determined by XOOM's actual and estimated supply costs—and only those costs" as well as "a reasonable margin" that was "proportionate" to those costs. SJ Order at 12, 13. The Court's construction has three permissible rate-setting components:



The Court left open what an appropriate margin would be as well as the legal and evidentiary bases by which a permissible margin could be determined by a factfinder. *See id.* at 14 (stating only that the contract "does not allow unbounded discretion").

At the same time, the Court found that XOOM "clearly considered supply costs when setting rates," that its estimated costs were "always the largest [rate] component" and were closely correlated to the rates, and that "ample testimonial evidence support[ed] the general proposition that prior period adjustments were included in the margin and therefore responsible for rate

fluctuations." SJ Order at 15, 14, 16, 18. Nonetheless, the Court found a factual dispute remained

as to whether such adjustments "actually impacted [Plaintiff's] rates." *Id.* (emphasis added).

### C.   The Court Certified a Class Now Encompassing More than 5,800 Rates Set Over an Eleven-Year (and Growing) Period.

The Court then certified a Rule 23(b)(2) class defined in relevant part as:

> All New York XOOM residential or small commercial customers who were charged a variable rate for electricity or natural gas under the operative 2013 XOOM New York variable rate sales contract or its equivalent language at any time from January 1, 2013 through and including the date of judgment.

Class Order at 4. The class includes four electricity products in seven utility zones and two natural

gas products in eight utility zones. Class Order at 2–3 (referencing residential or commercial and

standard or green electric and gas products); Ex. A-1 (Coleman Rpt.) at 15–17, 23–25 (identifying

the relevant utility zones). XOOM set rates each month by commodity, product and zone, so the

class definition encompasses 44 rates each month for 134 months to date. In other words, this case

now concerns more than 5,800 discrete rate-setting decisions (and counting).

### III.   STANDARD

### A.   The Court Has an Ongoing Duty to Monitor Compliance with Rule 23.

"A district court is required to monitor class proceedings and 'reassess [its] class rulings

as the case develops.'" *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261 (2d Cir. 2021) (affirming

decertification, quoting *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999)). The Court

therefore "has the affirmative duty of monitoring its class decisions in light of the evidentiary

development of the case." *Mazzei*, 829 F.3d 260, 266 (2d Cir. 2016) (cleaned up, emphasis added).

That obligation to "ensure that a certified class satisfies Rule 23" is a continuing one, extending

"throughout the litigation . . . ." *Jin*, 990 F.3d at 262 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457

U.S. 147, 160 (1982)).

7

"Actual, not presumed, conformance with Rule 23 remains indispensable" to the continued maintenance of a class action," and, "[c]onsequently, a 'district court may—and should—decertify a class when the standards of Rule 23 have not been met.'" *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 295 (S.D.N.Y. 2022) (quoting *Falcon*, 457 U.S. 147 at 160; *Wu v. Pearson Educ. Inc.*, No. 09 Civ. 6557(KBF), 2012 WL 6681701, at *5 (S.D.N.Y. Dec. 21, 2012)).

**B.      This Is Not a Motion for Reconsideration.**

Subjecting this motion to decertify to the time limitations and standards applicable to a motion for reconsideration is incompatible with the Court's "affirmative duty" to monitor the class and "ensure" compliance with Rule 23. *Mazzei*, 829 F.3d at 266; *Jin*, 990 F.3d at 262. As the Second Circuit recently recognized, there is no bar, in the rules or applicable case law, to decertifying the class any time before a judgment is entered: "[W]e have never held that a significant intervening event is necessary and such a requirement does not exist in the text of Rule 23." *Jin*, 990 F.3d at 262. On the other hand, declining to decertify after a showing that the class does not meet the Rule 23 requirements would flout the Second Circuit's directive that "[t]he district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts," *Mazzei*, 829 F.3d at 267 (quotation marks and citation omitted). *Mazzei* confirms that motions to decertify can and should be granted, even at later stages of litigation, if the class does not meet Rule 23's requirements. In that case, the district court decertified the class because of "the failure of class-wide evidence" upon a motion made *after a jury had returned a verdict in the plaintiff's favor*. *Mazzei*, 829 F.3d at 266-273.

The case law shows how fundamentally different motions for reconsideration are from motions to decertify. "The standard for granting a motion for reconsideration 'is strict, and reconsideration will generally be denied unless the *moving party* can point to controlling decisions

8

or data that the court overlooked.'" *United States v. Bright*, No. 22-1644-CR, 2023 WL 3830783, at *2 (2d Cir. June 6, 2023) (citation omitted, emphasis added). In contrast, on a motion to decertify, the Court "must . . . decertify as appropriate in response to the progression of the case from assertion to facts," and it is not the movant, but the *plaintiff* that bears the burden. *Mazzei*, 829 F.3d at 266; *see id.* at 270 ("In opposing the decertification motion, [plaintiff] retained the burden to demonstrate that these [Rule 23(b)(3)] requirements were satisfied.") (citations omitted); *see also Rodriguez v. It's Just Lunch Int'l*, No. 07-CV-9227 (SHS), 2018 WL 3733944, at *2 (S.D.N.Y. Aug. 6, 2018) ("In opposing a decertification motion, as in the original class certification analysis, plaintiffs retain the burden to demonstrate that these requirements were satisfied by a preponderance of the evidence." (quotation marks and citation omitted)). A motion to decertify thus cannot be treated as a motion for reconsideration—the two are subject to different standards and burdens of persuasion. *See Remijas v. Neiman Marcus Grp., LLC*, 341 F. Supp. 3d 823, 825–26 (N.D. Ill. 2018) ("Motions to decertify a class are not subject to the heightened standards of review applied to motions for reconsideration.").[2]

And even if there had been a deadline for a decertification motion (though, as discussed, Second Circuit precedent prohibits any such deadline before entry of judgment), it could not precede the deadline for the parties' motions in limine, including the motion to strike experts, because the arguments in XOOM's motion to strike (which Judge Marutollo found is a motion in limine) form the foundation of the decertification-motion, and XOOM's motion to strike is timely.

---

[2] Plaintiff contends that decertification motions are subject to Local Rule 6.3's 14-day limit for reconsideration motions. Doc. 180 at 4. However, that deadline does not apply when "otherwise provided . . . by statute or rule." L.R. 6.3. Here, Rule 23 provides otherwise. The relief XOOM seeks—*i.e.*, decertification under Rule 23(c)(1)(C)—can be granted at any time "before final judgment." Fed. R. Civ. P. 23(c)(1)(C). The local rules cannot—and do not purport to—override that provision or restrict alterations or amendments to class orders not sought within 14 days. *See* Fed. R. Civ. P. 83 ("A local rule must be consistent with . . . federal statutes and rules . . . .").

What's more, XOOM is not aware of any court anywhere rejecting as untimely an initial motion to decertify, particularly one filed within months of the class certification order. The Class Order was issued just six months ago, and XOOM timely filed a Rule 23(f) petition for leave to appeal within fourteen days. *Cf. Powell v. Ward*, 487 F. Supp. 917, 921–22 (S.D.N.Y. 1980) (finding challenge years after certification untimely where "Defendants did not oppose certification at that time . . . and did not raise any such objection on appeal"), *aff'd and modified*, 643 F.2d 924 (2d Cir. 1981); *Fleisher v. Phoenix Life Ins. Co.*, No. 11 CIV. 8405 CM JCF, 2014 WL 409164, at *2 (S.D.N.Y. Jan. 31, 2014) (denying motion to decertify that was not the parties' first challenge to certification order).

Finally, while an "intervening event" can be a basis for decertification, it is not a necessary one—a "compelling reason[]" is sufficient. *See Abdi v. McAleenan*, 405 F. Supp. 3d 467, 474–75 (W.D.N.Y. 2019) ("In general, a court may not disturb its prior findings absent some significant intervening event, or a showing of compelling reasons to reexamine the question." (quotation marks and citation omitted)). Such "[c]ompelling reasons 'include . . . the need to correct a clear error or prevent manifest injustice.'" *Id.* (emphasis added, quoting *Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 907 F. Supp. 2d 492, 504 (S.D.N.Y. 2012), *aff'd sub nom. Gulino v. Bd. of Educ. of N.Y.C. Sch. Dist. of City of N.Y.*, 555 F. App'x 37 (2d Cir. 2014)). And even if an "intervening event" is an appropriate impetus for decertification, such an "intervening event need not be 'significant'—instead, the district court need only find that a previously satisfied requirement of Rule 23 is now lacking." *Onosamba-Ohindo v. Searls*, No. 1:20-CV-00290 EAW, 2023 WL 4107978, at *4 (W.D.N.Y. June 21, 2023) (quoting *Jin*, 990 F.3d at 262).

For these reasons, the Court should (and indeed has an affirmative duty to) consider this motion to decertify on its merits.

## IV.  ARGUMENT

**A.  The Class Must Be Decertified for Lack of Commonality and Predominance Because Plaintiff Has No Viable Overcharge Model.**

Rule 23(b)(3) demands a damage model consistent with a plaintiff's alleged injury. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("If respondents prevail on their claims, they would be entitled only to damages resulting from . . . the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."). Where, as here, a damage model[3] is inconsistent with the legal theory of the claim, class certification cannot stand. *Id.* (criticizing lower court's conclusion that it was "unnecessary to decide whether the methodology was a just and reasonable inference or speculative"). This Court certified an overcharge theory but Plaintiff has no viable overcharge model.

Under North Carolina law, a plaintiff claiming to have been overcharged—like Plaintiff here—must present proof that "the amount charged by a defendant was in excess" of the amount she should have been charged. *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86 S.E. 1025, 1026 (N.C. 1915); *see also Troitino v. Goodman*, 35 S.E.2d 277, 282 (N.C. 1945) (measuring contract damages as "the pecuniary difference between [an injured party's] position upon breach of the contract and what it would have been, had the contract been performed"). Indeed, the "amount" of damages is a critical component of a North Carolina breach-of-contract claim. *See Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09 (N.C. 2019) (listing "the amount of damages resulting to plaintiff" among the "necessary allegations for a breach-of-contract claim" and holding that "fail[ure] to allege an amount of damages" meant there was no viable contract claim under

---

[3] XOOM refers to Plaintiff's experts' models as "damage" models for consistency with federal procedural case law only. For the reasons just discussed in this Part, however, any model that purportedly establishes and measures an overcharge must serve as proof of ***breach*** too.

North Carolina law). That means Plaintiff cannot prevail on an overcharge claim merely by complaining about *how* her rates were set; instead, she must prove ***the amount she should have been charged***. *Blalock*, 86 S.E. at 1026. Without that proof, Plaintiff cannot establish liability, let alone damages. *Id.*; *Intersal*, 373 N.C. at 109.

Under the Court's Contract construction, Plaintiff only has a submissible claim if she can establish the ***amount*** of all three components for every rate at issue:



But, as will be discussed in XOOM's motion to strike and below, her models are missing inputs for **component 2** and **component 3**. So, it is impossible for her (or a jury) to solve for X.

Plaintiffs' "Model One" has no input at all for the margin, and therefore fails on its face.[4] Model Two has placeholders for margins, but not "proportionate" ones; rather, they vary in amount and percentage with every rate. *See* Ex. A-7 (Model Two). Further, Plaintiff's experts are not opining that the margin illustrated in Model Two is a "reasonable" one but admit they are unable to say what a "reasonable" margin is. Plaintiff has no evidence of a reasonable and proportionate margin—and no basis on which a jury could decide a margin input (**component 3**).

Similarly, Plaintiff's Models One and Two both entirely omit actual supply costs (**component 2**), leaving the cost input incomplete. This matters because, without a complete cost input, Plaintiff cannot say what she should have been charged. She cannot show the existence or

---

[4] The Class Order correctly observed that Model One is incompatible with the Court's contract construction allowing for a reasonable and proportionate margin. *See* Class Order at 14.

amount of any overcharge for this additional reason.

Plaintiff's failure to present a damage model consistent with her liability theory means Rule 23(b)(3) is not satisfied, *Comcast*, 569 U.S. at 38, and decertification must follow.

### 1) Model One Cannot Satisfy Commonality or Predominance Because It Contains <u>No</u> Margin Input.

The Court construed the Contract as permitting XOOM to include a "reasonable" and "proportionate" margin. Class Order at 3; SJ Order at 13. Model One, however, includes no margin at all. *See* Class Order at 14 (noting that "the first damages model fails to accurately measure the damages attributable to XOOM's alleged liability, given plaintiff's concession at summary judgment that XOOM could charge a reasonable margin under the contract"); Ex. A-6 (Model One). Thus, Model One cannot satisfy *Comcast*'s requirement that the damage model be consistent with the theory of Plaintiff's certified overcharge claim. *Comcast*, 569 U.S. at 38.

### 2) Model Two Cannot Satisfy Commonality or Predominance Because It Does Not Include a <u>Proportionate</u> Margin.

The Court ruled at summary judgment that XOOM's variable-rate margins "would have to remain proportionate . . . to the supply costs over time." SJ Order at 13. But Model Two does not provide for a *proportionate* margin at all. Instead, Model Two assumes that the margin for each variable rate should be the same as XOOM's *fixed*-rate margin for the same electricity or gas product (residential or commercial, standard or green), in the same utility zone, in that particular month—a margin that shifts each month, but not based on or in proportion to costs. Ex. A-7 (Model Two). Model Two's margins shift within and across months according to the way each fixed-rate margin changes—resulting in Model Two margin calculations that differ (in amount and as a percentage of costs) each month.[5] *Id.* Because Model Two does not attempt to calculate margins

---

[5] Although Plaintiff consistently refers to a 19% average margin, Model Two does not apply an average margin. It instead applies rate- and month- specific margins that fluctuate.

that are proportionate to XOOM's costs, it is incompatible with the Court's proportionate-margin

construction, and decertification is warranted under *Comcast*, 569 U.S. at 38.

### 3) Model Two Cannot Satisfy Commonality or Predominance Because It Cannot Show a <u>Reasonable</u> Margin.

Model Two does not suggest what a *reasonable* margin might be either. It only "***asks*** what

margin was commercially reasonable for XOOM [to] charge" and leaves the answer up to the

factfinder. Ex. A-2 (Pl. MSJ Resp.) at 45 (emphasis added). In fact, Plaintiff's experts admit they

cannot say what a reasonable margin is, and they offer no opinion about how the jury should come

up with the answer. So, for this second reason, Plaintiff has no evidence for the margin input

(**component 3**) that the Court's Contract interpretation and certified overcharge claim requires.

Plaintiff has acknowledged that the contract itself "is silent as to an appropriate

margin . . . ." *Id*. And Plaintiff's experts admit they cannot opine on what a reasonable variable-

rate margin would be and, indeed, "didn't have any information that would allow that to be

created." As Mr. Adamson explained:

> Q. Are you offering an opinion about what is an acceptable
> or appropriate, *a reasonable margin* aside from just using
> XOOM's fixed rate margin [as a "proxy of what might be an
> acceptable margin"]?
>
> A. *We haven't offered that opinion*, we don't have any
> information to do that.

Ex. A-3 (Adamson Dep.) at 70:22-71:2 (emphases added). He also admitted that he would not be

able to offer an opinion about a reasonable margin when it matters most—at trial:

> Q. You've said that it will be for the Court to decide
> whether a margin can be charged and if so what's
> appropriate; right?
>
> A. Right.
>
> Q. And if we go to trial--and you take the witness stand-
> -and I'm asking you questions and the judge gets frustrated
> with my questions and says "**Let's cut to the chase. Mr.**

> **Adamson, what do you think is an appropriate margin for an ESCO to charge.**" What would your answer be?
>
> A. I would say conceptually it's got to be related to the, related to the costs. And in a broad conceptual basis.
>
> Q. And if [the judge] said, "But can you give me a cutoff point? Is there a number that you can assign to that?" Would you be able to give her one?
>
> A. **I wouldn't be able to give [her] a number on the stand** because I wouldn't have the, XOOM's internal information, no.[6]

*Id.* 71:8-72:7 (cleaned up, emphases added). He likewise conceded that he could not provide a more general industry opinion about an "ESCO number for variable rates that in [his] opinion would be a cap on what is an appropriate or reasonable margin," and he "would not be able to create one." *Id.* 73:8-74:10. And Plaintiff has no other witness, expert or otherwise, who can testify to what a reasonable or proportionate margin on XOOM's variable rates would be.[7]

Plaintiff has since theorized that her expert *might* have been able to opine about a reasonable and proportionate margin if he had asked for and received unspecified "additional information." But even if that were true, the time for new expert opinions closed long ago. *See* Doc. 109-1 (expert disclosure deadline of September 16, 2022). Plaintiff had the opportunity to seek an expert opinion to try to fill this evidentiary gap, but she did not. Now, whether Plaintiff might have been able to secure evidence to satisfy her burden is irrelevant; what matters is that she did not. *Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 106 (E.D.N.Y. 2022) (Ross, J.) (excluding expert opinions not disclosed in an expert's initial report).

---

[6] It is unclear what Mr. Adamson meant by "XOOM's internal information." He did not explain and Plaintiff has not claimed XOOM failed to produce any such information.

[7] Plaintiff and her experts also have no evidence about other ESCOs' margins. They cannot say how XOOM's margins or rates compare to its ESCO competitors in New York or elsewhere. Indeed, Mr. Adamson testified that such information was not gathered or considered because "[i]t didn't seem very relevant." Ex. A-3 (Adamson Dep.) at 64:21-65:7.

Instead of suggesting a "reasonable" *variable-rate* margin, Plaintiff's experts used XOOM's assorted, month-by-month *fixed-rate* margins as illustrative placeholders until the "judge or the jury or whoever decides" what the class's margins should have been. Ex. A-3 (Adamson Dep.) at 31:18–32:9. But to be clear, Plaintiff's experts did not say those fixed-rate margins were reasonable or that a jury *should* use them. *Id.* at 70:22-71:2, 71:8-72:7. They were simply intended to illustrate how Plaintiff believes a damages calculation could work. *Id.* at 31:18–32:9.

And even if Plaintiff's experts had opined that fixed-rate margins should be used as proxies for reasonable variable-rate margins, it would not be allowed. The Second Circuit has recognized—in a case involving Plaintiff's expert—that a contract that is silent about margin does not require variable-rate margins to equal fixed-rate margins. *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98 (2d Cir. 2019) (rejecting Mr. Adamson's model because the contract did not require variable-rate margins to equal fixed-rate margins). This Court previously concluded that *Richards* does not "foreclose[s] any limitation on a margin where a contract is silent as to the margin." SJ Order at 14. But the issue here is different. It is not whether **any** limit on the margin is proper; the Court has already concluded that there are limits—the margin must be both reasonable and proportionate. The issue here is whether the contract imposes "the **specific limitation** that [Plaintiff] now argues for"—i.e., a requirement unsupported by the contractual language or other evidence that variable-rate margins be the same as fixed-rate margins. *Richards* has already answered that question in the negative. As *Richards* notes in a discussion of Mr. Adamson's testimony, "jurors are constrained by law, and not permitted to invent absent contract terms out of thin air." *Richards*, 915 F.3d at 98 n.5.

Further, even ignoring *Richards*, Plaintiff has no evidence suggesting that fixed-rate margins (or an average of them) are akin to variable-rate margins in the industry generally or for

XOOM specifically. Instead, the evidence shows a factfinder could ***not*** accept the fixed-rate margins as a reasonable variable-rate margin. Plaintiff's own expert recognized that fixed-rate margins are "quite different . . . ." *See* Ex. A-3 (Adamson Dep.) at 72:8–73:7 ("Fixed rate pricing, I think we can all agree, the actual outrun margins could be quite different."); *see also* Loehde Decl. ¶¶ 30–31. Fixed rates are subject to different pricing and market considerations than variable rates. For example, fixed-rate customers are locked in for a set time, reducing the risk of attrition and providing XOOM with the certainty needed to purchase energy many months in advance; variable-rate customers can cease doing business with XOOM anytime by canceling without penalty, so their needs are not so easily predicted. *Id.* ¶ 30.

Plaintiff's evidentiary failure with respect to a reasonable margin (**component 3**) is compounded when considered in the context of the class. The products at issue varied by commodity (electricity or gas), type (commercial or residential, and for electricity, standard or green), and utility zone (seven zones for electricity and eight for gas). Each of these 44 rates were set based on different supply cost considerations each month.

Yet, Plaintiff asks the Court to treat gas and electricity—two very different products with very different costs bases and different degrees of volatility—as though they were the same. Loehde Decl. ¶ 11 (explaining why power market is more volatile); Ex. A-1 (Coleman Rpt.) at 22. (detailing differences in cost bases for gas versus electricity). Plaintiff would also ask the jury to assume that the market for green electricity—for which customers are often willing to pay a premium—is the same as the market for standard electricity. Loehde Decl. ¶ 32. And Plaintiff would ask the factfinder to presume, without any supporting evidence, that the variable-rate market in New York City ("one of the most volatile and expensive gas markets in the country") is the same as that near Niagara Falls (where hydropower is readily available,) (Loehde Decl. ¶ 14), the

17

same in Brooklyn as in Buffalo, the same in Long Island as in Lake George. But as these electric

and natural gas utility maps show, the state is not a homogenous market for either commodity:





Plaintiff has no evidence to support her claim that every product in these varying markets

should have been subject to identical margins for every month for eleven years. And the burden of

establishing a "reasonable" and "proportionate" variable-rate margin—both on a Rule 23 inquiry

18

and at trial—falls on Plaintiff, not XOOM. *See, e.g., In re Credit Suisse First Bos. Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 140 (S.D.N.Y. 2008) ("In order to decide whether or not to decertify this class, the Court must determine whether Plaintiff has carried his burden of demonstrating that each element of Rule 23 is met by a preponderance of the evidence.").

Plaintiff waves off this evidentiary failure and says that the jury can just decide for itself what seems reasonable. But, again, the jury cannot invent a margin out of thin air. Plaintiff must introduce evidence that would ***allow*** the jury to reach a conclusion. *See Cline v. Cline*, 128 S.E.2d 401, 404 (N.C. 1962) ("Damages are never presumed. The burden is always upon the complaining party to establish ***by evidence*** such facts as will furnish a basis for their assessment, according to some definite and legal rule." (emphasis added, quotation marks omitted)); *see also, e.g., Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 458 (E.D. Pa. 2012) ("[T]he reasonableness of the interest rate is generally a question of fact that requires the presentation of evidence." (citing cases)); *In re Hampton*, 407 B.R. 443 (B.A.P. 10th Cir. 2009) ("The Creditors offered no evidence of what a reasonable rate of return would have been, leaving the court without any frame of reference to determine if Debtor had overestimated the potential rate of return."). *Cf. Hershkowitz v. Think Tech Labs, LLC*, 651 F. App'x 15, 19 (2d Cir. 2016) (remanding for determination of "reasonable value of services rendered" where there was in fact an "evidentiary basis upon which to determine the reasonable value" of plaintiff's services).

Even on a motion for attorneys' fees, where the factfinder (i.e., the court) has experience and knowledge concerning prevailing rates, some evidence is required to show a proffered rate is reasonable. *See, e.g., DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17CV4576GHWBCM, 2023 WL 2870484, at *4 (S.D.N.Y. Apr. 10, 2023) ("In the absence of any evidence concerning the reasonable hourly rates for the timekeepers whose work is at issue, the Court has no choice but

19

to rely on decisional law, the rates awarded in prior cases, and the court's own familiarity with the rates prevailing in the district." (quotation marks and citations omitted)); *Duracell Inc. v. Glob. Imports, Inc.*, No. 17-MC-185 P1 (KNF), 2018 WL 5619983, at *8 (S.D.N.Y. Aug. 16, 2018) (finding suggested hourly rates unreasonable because no evidence supported them), *report and recommendation adopted*, No. 17-MC-185, 2019 WL 549064 (S.D.N.Y. Feb. 12, 2019). How then can the Court task a lay jury with determining what a reasonable variable-rate margin is for six different products in seven or eight markets without any evidence?

This is not merely an academic question, as Plaintiff's own rates show. Even if the cost inputs in Model Two are correct (though, as discussed below, they are not), the absence of an input for a reasonable margin (**component 3**) is critical to questions of both breach and damages. For example, using a margin of 19% (the average of fixed-rate margins for four different XOOM products over an arbitrary five-year period that Plaintiff's experts have used as an exemplar), Plaintiff would have been overcharged by $23.16 over the course of six months. But if a reasonable margin were only slightly higher, say, 22%, she would have no damage at all for *half* her rates. And if a reasonable margin were just 27%, she would have been undercharged by nearly $3. A small variation in the applicable margin thus can mean the difference between a successful overcharge claim and one that fails. But Plaintiff offers no evidence of any economic, legal, or commercial principle that would enable the jury to select one of these margins or reject the others. *Peaseley v. Virginia Iron, Coal & Coke Co.*, 194 S.E.2d 133, 147 (N.C. 1973) ("It is incumbent upon the plaintiff to present facts, as to all reasonable factors involved, that the jury may have a basis for determining damages."). Because she has "no evidence whatever as to . . . the correct . . . . charge," Plaintiff cannot succeed on her own overcharge claim, much less the claims of her fellow class members. *Blalock*, 86 S.E. at 1026; *Intersal*, 373 N.C. at 108–09; *Troitino*, 35 S.E.2d at 282;

20

*Cline*, 128 S.E.2d at 404; *see also In re Amla Litig.*, 320 F. Supp. 3d 578, 591 (S.D.N.Y. 2018) (decertifying unjust-enrichment class because "there [wa]s no evidence in the record of what th[e] value" of the products was, and there was no "other theory of classwide relief").[8]

### 4) Neither Model Can Satisfy Commonality or Predominance Because Neither Considers XOOM's <u>Actual Costs</u>.

To meet her burden on this motion, Plaintiff must show that a class trial is capable of "'generat[ing] common *answers* apt to drive the resolution of the litigation,'" *Wu*, 2012 WL 6681701, at *5 (emphasis in original, quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). But both Model One and Model Two account for only *estimated* supply costs (**component 1**, from the rate-setting workbooks), ignoring the abundant evidence XOOM produced of its *actual* supply costs (**component 2**), including prior period adjustments and balancing costs—costs that XOOM both considered and was entitled to consider in setting rates. Because they do not try to address actual costs, the models are decidedly not the kind of overarching "evidentiary proof" capable of producing any answers central to this litigation "in one stroke." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015); *Walmart*, 564 U.S. at 351. No factfinder can conclude that XOOM's rates were overcharges without considering the month-specific, and sometimes product- and zone-specific, evidence of XOOM's actual costs. The failure to consider this permissible rate component means the damage models are not consistent with the prevailing theory of the case. *See Comcast*, 569 U.S. at 38 (finding, "[i]n light of the model's inability to

---

[8] Plaintiff has suggested that *Naphcare Inc. v. Guilford Cnty.*, No. 1:07CV174, 2008 WL 4371770, at **7–9 (M.D.N.C. Sept. 18, 2008), permits her to get away with furnishing no evidence of what a reasonable margin is. But in that case, the court (not a jury) supplied a missing term using "the structure and purpose of the parties' agreement" as the "measuring stick for the reasonable expectations of the parties." Here, the Court has already supplied such a missing term by construing the contract as permitting a "reasonable" and "proportionate" margin. And as Plaintiff has acknowledged, the contract here supplies no evidence of what a reasonable margin would have been. *See* Doc. 147, at 45 ("The contract is silent as to an appropriate margin . . . .").

bridge the differences" between varying prices, that "Rule 23(b)(3) cannot authorize treating subscribers . . . as members of a single class").

Courts regularly decertify classes for this very reason. For example, in *Price v. L'Oreal USA, Inc.*, the district court decertified a class after "several of [plaintiff's expert's] assumptions regarding the inputs for the equation . . . were rejected as unreliable" because "Plaintiffs have not provided a means of calculating class-wide damages consistent with Plaintiffs' alleged injury -- that they paid a price premium because of the [alleged conduct]," No. 17 CIV. 614 (LGS), 2021 WL 4459115, at **3–4 (S.D.N.Y. Sept. 29, 2021). So too here. Plaintiff's damage models must be rejected, leaving her with no common proof for breach or damages. The class should be decertified.

**B.    In the Absence of a Viable Damage Model, This Case Is Not Susceptible to Classwide Resolution in One Stroke.**

**1)   The Absence of Common Evidence of Actual Costs Destroys Predominance.**

Plaintiff's experts try to deal with actual supply costs (**component 2**) in one stroke by simply ignoring them. They admittedly chose not to include any actual supply cost input in their models because those costs were not neatly packaged in XOOM's rate-setting workbooks (like estimated costs).[9] [Adamson Dep. 61:12-64:9 (citing ¶¶ 23(d) and 54 of CRA report]. But the fact that XOOM's actual supply costs are not consistently summarized in one place does not mean they can be disregarded. Quite the opposite, they will play a significant role at trial. There is "ample testimonial evidence," SJ Order at 16, and extensive documentary evidence, *see* Loehde Decl., that XOOM tracked and considered actual supply costs—month by month, and sometimes product by product and even zone by zone. Hundreds of documents show XOOM's analysis and consideration of its actual supply costs, including prior period adjustments and balancing costs. *See, e.g.*, Ex. B-

---

[9] Plaintiff and her experts did not discard XOOM's actual costs in their Market Supply Cost calculations used to survive dismissal, but only chose to ignore them once they realized actual costs cannot be addressed in a common way as Rule 23 demands.

2 (Gross Margin Analysis for January 2013 showing additional COGs for power captured as prior period adjustments); Ex. B-38 (similar document for June 2018). In many cases, XOOM's actual costs exceeded the estimated costs used in Plaintiff's damage models.

But before considering a sample of that actual-supply-cost evidence, it is important to first understand why it matters.[10] It matters because it is individualized proof of a permissible cost component (**component 2**) that varied significantly over time and impacted rate-setting every month. Loehde Decl. ¶¶ 5-8,. It is undisputed that XOOM set rates every month. SJ Order at 3-4. Even just a sample of XOOM's documentary evidence of actual supply costs (including prior period adjustments and balancing) shows the actual costs and adjustments were not the same each month—and yet Plaintiff's models do not try to account for actual supply costs at all. So, whether and how much actual supply costs permissibly impacted XOOM's rates are questions that must also be considered on a month-by-month, commodity-specific, and zone-specific basis (if not a product-by-product basis). Plaintiff's models cannot answer those questions for all 5,800+ rates in one stroke. Without a model that accounts for actual supply costs (**component 2**) on Plaintiff's side, and with XOOM's individualized evidence of that input on the other, this case cannot be resolved without hundreds (if not thousands) of mini-trials to adjudicate the impact XOOM's actual supply costs should have—and in fact did have—on each rate.

For example, whether and the degree to which XOOM factored prior period adjustments into its margin, or adjusted its margin to cover actual cost overruns, are not questions that can be answered yes or no for the entire class. XOOM's actual cost adjustments in one month (or for one commodity) are not determinative or predictive of adjustments in any other month (or for another

---

[10] The Court previously noted that it was unclear what a XOOM quarterly financial statement showing prior period adjustments as a component of a gross margin analysis meant in the context of the parties' dispute. Class Order at 13, n.6.

commodity). To illustrate:

- Each month, from January 2013 to the present, XOOM set multiple product rates (residential/commercial, standard/green) for two commodities, in seven electric and eight gas utility zones across New York. Loehde Decl. ¶ 9. The rates were not set by a mathematical formula; instead, XOOM permissibly set rates based on its consideration of actual supply costs including prior period adjustments and balancing. *See* SJ Order at 12.

- XOOM's evidence of actual supply costs (summarized in Part IV.B.2, *infra*) shows that the existence and extent of prior period adjustments and cost overruns differed by month, commodity, and utility zone. So, the existence and degree of XOOM's adjustments likewise varied. Adjustments were not the same each month.

These variations—and varied evidence—matter because many class members were only customers for a handful of months. Plaintiff was a customer for only six months in 2013, and she, like many others, only purchased one of XOOM's two commodities. Breach and damages therefore must be determined (at least) by month and commodity because, for example:

- It is possible a jury could decide the evidence shows XOOM adjusted margins in 2014 to account for cost overruns resulting from the polar vortex—and that such adjustments resulted in an overcharge in those months. But it could simultaneously conclude there was no evidence of such adjustments (or a breach) when Plaintiff was a customer in 2013.[11]

- Similarly, a jury could decide that the evidence of prior period adjustments for natural gas allowed an increase for one month of natural gas rates, but not for electricity rates. It might then find an overcharge for one commodity that month and not the other.

Because Plaintiff offers no way to assess actual supply costs in one stroke, there are countless variations like these that can only be managed by slogging through separate questions about each rate for each commodity each month. The variety of individualized evidence about actual supply costs—which is a proper cost component, *see* SJ Order at 12—makes it impossible for breach to

---

[11] Anecdotes about particular rate-setting situations are no substitute for classwide proof. No reasonable factfinder could assume that rate adjustments XOOM made in 2014 to account for polar vortex cost-overruns have any bearing on whether XOOM breached at any other time. The 2014 polar vortex was an anomaly, causing the "[h]ighest gas and power prices in several years." Ex. B-39. It is not evidence that shows breach across 5,800+ rate-setting decisions, including some made a decade later when the polar vortex was a distant memory.

be an all-or-nothing, binary question for the class period. And Plaintiff does not have common evidence or a method for considering actual costs that suggests otherwise.

### 2) XOOM's Evidence of Actual Costs Is Individualized, Abundant, and Varied.

As for the evidence, to get a sense of the volume and variety of actual-cost information at issue, take just the first six months of the class period:

| Jan 2013 | A financial package showed higher than estimated COGS, including nearly **$190,000 in PPAs for power**. Ex. B-40. <br><br> A Gross Margin Analysis showed "**negative variances in NYISO of ($-142k)**." Ex. B-2. |
| --- | --- |
| Feb 2013 | A financial package showed **COGS that were higher than the forecast**, as well as power COGS in the form of **PPAs that exceeded the forecast** (the latter of which also was discussed in an email). Ex. B-41. |
| Mar 2013 | A financial package showed **COGS overall were higher than the forecast**, with some additional COGS **PPAs** related to both gas and power. Ex. B-43. |
| Apr 2013 | A financial package shows COGS **PPAs** for both gas and power **made the COGS overall exceed the estimate**. Ex. B-45. <br><br> A spreadsheet showing revenue and COGS for the month was updated accordingly, and **actual COGS for both gas and power exceeded the estimate**. *See also* Exs. B-50 (April 2013 Financial Package further showing these PPAs related to COGS); B-44 (email discussing "unfavorable PPA" relating to gas for April 2013). <br><br> A Gross Margin by Market Summary Analysis showing "Prior Period Adj" for April COGS by New York utility. Ex. B-46. |
| May 2013 | Consolidated Financial Statements showing the **gas COGS and COGS PPAs were higher than forecast**, and XOOM employees noted an unfavorable variance attributable in part "to the **NYISO capacity cost of approximately $250K**" and a "**March 2013 PPA adjustment of $655k**." Ex. B-47. <br><br> The Flash Report showed that XOOM had a negative margin ("-6%") because of COGS for NYISO. Ex. B-49. |
| June 2013 | The Consolidation Financial Statements show **actual COGS exceeded the forecast**, and in addition there were **higher COGS, including PPAs, for both power and gas**. Ex. B-48. There also was a "variance . . . attributed to the **NYISO capacity cost of approximately $175K**." *Id.* |

These first six months are not an anomaly. As identified by Bates label in Mr. Loehde's declaration, XOOM has similar documentary evidence for virtually every month of the class period.[12] Loehde Decl. ¶ 18. And for the reasons discussed, XOOM will be entitled to present this evidence at trial to show that actual supply costs including prior period adjustments and balancing costs permissibly impacted rates each month for each commodity in each utility zone.

This evidence will include spreadsheets showing actual costs (prior period adjustments, balancing costs, and COGS) that exceeded the estimates for certain months, commodities, and utility zones:

**XOOM** energy
**BUDGET TO ACTUALS (CONSOLIDATED)**
**March 31, 2013**

|  |  | Month-to-Date | | |
| --- | --- | --- | --- | --- |
|  |  | Budget | Actual | Variance |
| **GROSS MARGIN:** |  |  |  |  |
| Revenue |  | 13,762,362 | 14,338,017 | 575,655 |
| COGS |  | 10,214,398 | 11,107,691 | (893,293) |

| | Gas | | | | | | Power | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Budget | Current Month Estimate | Budget to Estimate Variance | PPAs | Total Gas GM (Est + PPAs) | Total Budget to Actual Variance | Budget | Current Month Estimate | Budget to Estimate Variance | PPAs | Total Power GM (Est + PPAs) | Total Budget to Actual Variance |
| Revenue | 7,541,461 | 7,079,541 | (461,920) | 753,828 | 7,833,369 | 291,908 | 6,220,901 | 7,341,157 | 1,120,256 | (808,509) | 6,504,648 | 283,747 |
| COGS | 5,737,978 | 6,238,805 | (501,173) | 134,705 | 5,371,510 | (366,468) | 4,476,419 | 5,660,613 | 1,184,194 | 75,568 | 5,736,181 | 1,259,762 |

Ex. B-43 (March 2013).

| | Monthly Actual (with PPA) | |
| --- | --- | --- |
| | 1/31/2013 | 2/28/2013 |
| Gross Revenue Gas Estimate | $ 9,101,490 | $ 8,030,956 |
| PPA | 753,828 | 969,891 |
| COGS Gas Estimate | $ 6,644,211 | $ 5,810,359 |
| PPA | 134,705 | 1,009,550 |

---

[12] By agreement of the parties, XOOM was obligated to search for and produce electronic discovery up to January 1, 2020 only.

Ex. B-50 (April 2013).



Ex. B-46 (April 2013).

Some documents include granular detail, like these spreadsheets showing New York gas balancing costs by utility zone:

Exs. B-51–B-53; *see also, e.g.,* Exs. B-54 (NY Gas Imbalance for September 2016); B-55 (same for November 2016).

But as Plaintiff's experts acknowledged, the evidence of XOOM's actual costs is not limited to a tidy set of systematic monthly spreadsheets like the rate-setting workbooks. Emails are also part of the story and show an ongoing month-by-month effort to manage and account for actual costs. For example, in December 2014, XOOM employees emailed about an anticipated

27

plan to "reduce PPAs." Ex. B-3. In November 2015, XOOM noted that one of the "[m]ain outliers

for th[at] month's variance were gas non-commodity ConEd cost adjustments . . . which had . . . a

negative impact to overall COGS." Ex. B-5. And numerous emails between XOOM employees

show regular discussion of increases in COGS over the original estimate. *See, e.g.*, Ex. B-23

(January 2017); Ex. B-27 (June 2017); Ex. B-29 (September 2017); Ex. B-31 (December 2017);

Ex. B-33 (May 2018). XOOM's Senior Director of Pricing and Structure requested and regularly

received analysis of the delta between actual and estimated costs in New York, and the variances

between estimated costs and actual supply costs were considered when XOOM set rates for

upcoming months. Loehde Decl. ¶¶ 23–24; Exs. B-6–B-20. Mr. Loehde's Declaration discusses

and attached several more examples of XOOM's recording, analysis, and consideration of actual

supply costs (which differed from the estimates Plaintiff's experts exclusively used). *See* Loehde

Decl. ¶¶ 20–28; Exs. B-2–B-37.

      The actual supply costs in these records—which represent only a small portion of the

evidence XOOM has produced—were among the actual supply costs that XOOM was entitled to

(and did) consider in setting rates for class members over the course of more than eleven years.

Without considering that granular evidence of actual costs (**component 2**), a jury cannot determine

whether any of the 5,800+ rates represented an overcharge. *See White Indus., Inc. v. Cessna

Aircraft Co.*, 845 F.2d 1497, 1502–03 (8th Cir. 1988) (affirming decertification based on

predominance of individualized issues where fact questions varied by "geographic markets"). The

thousands of mini-trials that evidence will require compels decertification. *See Kiobel v. Royal

Dutch Petroleum Co.*, No. 02 CIV. 7618 KMW HBP, 2004 WL 5719589, at *11 (S.D.N.Y. Mar.

31, 2004) (A "multitude of [100+] mini-trials" means that "Rule 23(b)(3)'s predominance

requirement has not been met." (citing, *inter alia*, *Moore v. PaineWebber, Inc.*, 306 F.3d 1247,

1253 (2d Cir. 2002)); *Johnson*, 780 F.3d at 147 (reversing certification where a factfinder could not "resolve the whole of any of the class members' cases without further individualized" inquiries); *In re KIND*, 627 F. Supp. 3d at 295 (decertifying class for lack of predominance); *Mazzei*, 829 F.3d at 267 ("The district judge must . . . decertify as appropriate in response to the progression of the case from assertion to facts.") (quotation marks and citation omitted).

## C.     Plaintiff's Atypicality Also Requires Decertification.

Plaintiff's failure to offer evidence of an appropriate margin is fatal to not only commonality and predominance, but also to her typicality as a class representative. In fact, Plaintiff's atypicality provides a concrete example of the commonality and predominance failings of the class. *See Falcon*, 457 U.S. at 158 n.13 ("The commonality and typicality requirements of Rule 23(a) tend to merge."). Even by Plaintiff's own calculations under Model Two,[13] XOOM's margins on her SimpleFlex rates in Zone J (the most expensive zone in New York state) were ***below*** her (problematic) exemplar 19% margin in ***half*** the months she was a customer:

| Month | SimpleFlex "Margin" Per Plaintiff | Month | SimpleFlex "Margin" Per Plaintiff |
|---|---|---|---|
| 6/1/2013 | 16% | 9/1/2013 | 27% |
| 7/1/2013 | 18% | 10/1/2013 | 21% |
| 8/1/2013 | 18% | 11/1/2013 | 30% |

Ex. A-7 (Model Two). And, again, that Model Two calculation does not account for actual supply costs (meaning the actual margins are likely even lower).

Moreover, the bulk of Plaintiff's evidence of XOOM's rate-setting focuses on discrete situations in years after she stopped being a XOOM customer. *See, e.g., Richards*, 915 F.3d at 100 (commenting that plaintiff would not have been "a proper plaintiff" because he complained of pricing practices in years *after* he ceased being a customer).

---

[13] As discussed above and in XOOM's forthcoming motion to exclude Plaintiff's experts' damage models and related testimony, Model Two is inaccurate and unreliable because it has no margin input at all and because the inputs it does use do not account for actual supply costs.

Thus, Ms. Mirkin's claims are not typical of the class, and decertification is warranted for that additional reason.

## D. No Other Theory of Breach Can Save the Class Because Plaintiff's Only Pleaded Theory of Recovery Requires Proof of an Overcharge.

Plaintiff has made the alternative argument that Model Two's problems do not defeat class treatment by pointing to the Class Order's articulation of a non-overcharge theory of breach:

> If the contract allowed XOOM to incorporate prior period adjustments and other supply costs into the margin, and they in fact did so consistent with the contract, the class will fail together[, and conversely, i]f XOOM did not incorporate prior period adjustments and other supply costs into the margin, or did so in violation of the contract, the class will prevail together.

Class Order at 13–14. Even if it were possible to establish a claim for breach of contract under North Carolina law in the absence of evidence showing an overcharge and its amount (and it is not, *see* Part IV.A *supra*), such a claim could result in nominal damages only. *See Bryan Builders Supply v. Midyette*, 274 N.C. 264, 271–72, 162 S.E.2d 507, 511–12 (N.C. 1968) ("Notwithstanding the fact that owners' evidence with reference to their damages . . . as to breach of contract . . . was minimal . . . , [u]pon owners showing a breach of contract . . . , they were entitled to recover nominal damages." (cleaned up)); *Polyzen, Inc. v. RadiaDyne, LLC*, No. 5:11-CV-662-D, 2015 WL 690835, at *7 (E.D.N.C. Feb. 18, 2015) ("Finally, Polyzen mentions, without argument, a lack of specified damages. A party may prevail on breach of contract and recover nominal damages only."), *reconsideration granted on other grounds*, No. 5:11-CV-662-D, 2015 WL 4713235 (E.D.N.C. Aug. 7, 2015)).

The problem for Plaintiff and the class, however, is that the operative complaint does not seek nominal damages. *See* FAC (seeking only "actual damages," "compensatory damages," or damages generally). Federal procedural law therefore precludes recovery of nominal damages. *See Fox v. Bd. of Trustees of State Univ. of N.Y.*, 42 F.3d 135, 141 (2d Cir. 1994)) (finding argument

that plaintiffs were entitled "to recover nominal damages . . . fails primarily because there is absolutely no specific mention in the Complaint of nominal damages," and "[n]or can a request for such damages be inferred from the language of [the Complaint]," including from "the Complaint's boilerplate prayer for 'such other relief as the Court deems just and proper'").

Because nominal damages are not available in this case, there is no submissible question of breach that can justify class treatment. Rule 23 cannot be satisfied regardless of Plaintiff's theory of breach.

## V.   CONCLUSION

For the reasons stated above, the Court should decertify the class.

Dated: March 1, 2024                    MCDOWELL HETHERINGTON LLP

                                        _/s/ Michael D. Matthews, Jr_____
                                        Michael D. Matthews, Jr.
                                        Diane S. Wizig (admitted *pro hac vice*)
                                        James M. Chambers (admitted *pro hac vice*)
                                        David L. Villarreal (admitted *pro hac vice*)
                                        MCDOWELL HETHERINGTON LLP
                                        1001 Fannin Street, Suite 2400
                                        Houston, Texas 77002
                                        Telephone: (713) 337-5580
                                        Facsimile: (713) 337-8850
                                        matt.matthews@mhllp.com
                                        diane.wizig@mhllp.com
                                        james.chambers@mhllp.com
                                        david.villarreal@mhllp.com

                                        *Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the 1st day of March, 2024 via email on all counsel of record.

/s/*Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.