# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN, Individually and on
Behalf of All Others Similarly Situated

Plaintiff,

v.

XOOM ENERGY, LLC and XOOM
ENERGY NEW YORK, LLC,

Defendants.

Case No.: 18 Civ. 2949 (ARR) (JAM)

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DECERTIFY THE CLASS

---

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Steven L. Wittels
Ethan D. Roman
305 Broadway 7th Floor
New York, New York 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com
slw@wittelslaw.com
edr@wittelslaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
1140 Avenue of the Americas, 9th Floor
New York, New York 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

**SCHLAM STONE & DOLAN LLP**
Richard Dolan
Bradley D. Simon
26 Broadway
New York, New York 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Dated:   April 5, 2024

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............................. 5

I.    THE COURT'S CONTRACT CONSTRUCTION AT SUMMARY
      JUDGMENT UPENDED XOOM'S EARLIER CERTIFICATION
      AND LIABILITY DEFENSES ........................................................................ 5

II.   THE COURT'S CLASS CERTIFICATION RULING EXPOSES FURTHER
      CRITICAL WEAKNESSES IN XOOM'S COMMON DEFENSE ..................... 8

III.  THE DECERTIFICATION MOTION IS XOOM'S LATEST IN A STRING
      OF ATTEMPTS TO EVADE ITS CONTRACT WITH THE CLASS ................ 11

ARGUMENT .............................................................................................................. 12

I.    LEGAL STANDARD FOR DECERTIFICATION MOTIONS ......................... 12

II.   XOOM'S MOTION IS AN UNTIMELY AND DISFAVORED MOTION
      FOR RECONSIDERATION ............................................................................. 14

III.  THE COURT'S FINDING THAT PLAINTIFF'S DAMAGES MODEL IS
      CONSISTENT WITH *COMCAST* SHOULD NOT BE RECONSIDERED ............ 17

      A.  The Court Appropriately Accepted Plaintiff's Damages Model .......................... 17

      B.  XOOM Has the Burden of Proving Its Unlikely Defense That
          Undocumented Yet Permissible Costs Incorporated into Its Margin
          Drove Rate Fluctuations ......................................................................... 19

IV.   THE CLASS WILL RELY ON THE APPROVED MODEL TWO AND
      XOOM PROVIDES NO BASIS FOR RECONSIDERATION ........................... 23

      A.  The Court Already Found That Model Two Accommodates a
          Proportionate Margin and XOOM Presents No Facts or Law
          Supporting Reconsideration ..................................................................... 23

      B.  The Court Already Found That Model Two Accommodates a
          Reasonable Margin and the Model Itself Need Not "Show" Such a
          Margin ................................................................................................... 26

          1.  Plaintiff's Experts Opined on What Constitutes a Reasonable Margin
              by Demarcating the Outer Bound of Reasonableness ............................... 26

          2.  There Are Additional Measures of Reasonableness ................................. 28

          3.  XOOM's Rehashed Reliance on Richards Remains Unavailing ................. 29

i

4.   Fixed Rate Margins Are an Acceptable Proxy ................................................. 30

5.   XOOM Recycles Its Challenge to the Products Included in the Class ........... 31

V.    XOOM REFRAMES ITS REJECTED PREDOMINANCE ARGUMENT
ABOUT "ACTUAL" COSTS AS A *COMCAST* ATTACK ....................................... 32

VI.   THE COURT ALREADY HELD THAT THE COMPOSITION OF
XOOM'S SUPPLY COSTS IS A PREDOMINANT CLASSWIDE
QUESTION OF FACT, AND XOOM'S CLAIMS ABOUT ACTUAL
COSTS PROVIDE NO BASIS TO RECONSIDER THAT RULING ....................... 33

VII.  XOOM PROVIDES NO "COMPELLING REASON" TO RECONSIDER
THE QUESTION OF PLAINTIFF'S TYPICALITY ................................................. 38

VIII. XOOM'S NOMINAL DAMAGES ARGUMENT IS NOT A COMPELLING
REASON TO RECONSIDER OF THE RULE 23 FINDINGS ................................. 39

CONCLUSION.................................................................................................................... 41

ii

# TABLE OF AUTHORITIES

**Cases**

*Abdi v. McAleenan,*
    405 F. Supp. 3d 467 (W.D.N.Y. 2019) ................................................................14

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002) ...............................................................................25

*Bayer Healthcare LLC v. Baxalta Inc.,*
    989 F.3d 964 (Fed. Cir. 2021) .............................................................................27

*Beaudry v. Telecheck Servs., Inc.,*
    No. 07 Civ. 842, 2010 WL 2901781 (M.D. Tenn. July 20, 2010) ...........................16

*Bell v. Gateway Energy Services Corp.,*
    No. 31168/2018 (Rockland Cnty. Super. Ct. Jan. 8, 2021) ...................................1, 38

*Blalock Hardware Co. v. Seaboard Air Line Ry. Co.,*
    86 S.E. 1025 (N.C. 1915) ....................................................................................23

*BLT Steak LLC v. Liberty Power Corp., L.L.C.,*
    No. 151293/2013 (N.Y. Cnty., Super. Ct. Aug. 14, 2020) ....................................1

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
    310 F.R.D. 69 (S.D.N.Y. 2015) ..........................................................................26

*Carter v. City of Yonkers,*
    345 F. App'x 605 (2d Cir. 2009) .........................................................................28

*Chavez v. Occidental Chem. Corp.,*
    35 N.Y.3d 492 (2020) .........................................................................................1

*Claridge v. N. Am. Power & Gas, LLC,*
    No. 15 Civ. 1261 (PKC), 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) ..............1, 18, 38

*Cline v. Cline,*
    128 S.E.2d 401 (N.C. 1962) ................................................................................30

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) .....................................................................................*passim*

*Connor B., ex rel. Vigurs v. Patrick,*
    278 F.R.D. 30 (D. Mass. 2011) ...........................................................................15

*Cronin v. Fam. Educ. Co.,*
    105 F. Supp. 2d 136 (E.D.N.Y. 2000) .................................................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................................37

*Donovan v. Phillip Morris USA, Inc.*,
    No. 06 Civ. 12234 (DJC), 2012 WL 957633 (D. Mass. Mar. 21, 2012) ....................................17

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    No. 17 Civ. 4576 (GHW) (BCM), 2023 WL 2870484 (S.D.N.Y. Apr. 10, 2023) ....................30

*Dupler v. Costco Wholesale Corp.*,
    249 F.R.D. 29 (E.D.N.Y. 2008) ............................................................................................... 1

*Duracell Inc. v. Glob. Imports, Inc.*, No. 17 MC 185 (KNF),
    2018 WL 5619983 (S.D.N.Y. Aug. 16, 2018) ...........................................................................30

*Ely–Cruikshank Co. v. Bank of Montreal*,
    81 N.Y.2d 399 (1993) ................................................................................................................40

*Fleisher v. Phoenix Life Ins. Co.*,
    No. 11 Civ. 8405 (CM) (JCF), 2014 WL 409164 (S.D.N.Y. Jan. 31, 2014) ...........................15

*Forrest Const. Co., LLC v. Laughlin*,
    337 S.W.3d 211 (Tenn. Ct. App. 2009) ....................................................................................20

*Fox v. Bd. of Trs. of State Univ. of N.Y.*,
    42 F.3d 135 (2d Cir. 1994) .......................................................................................................40

*Fox v. Bd. of Trs. of State Univ. of N.Y.*,
    764 F. Supp. 747 (N.D.N.Y. 1991), *aff'd*, 42 F.3d 135 (2d Cir. 1994) ...................................40

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
    394 F.3d 1368 (Fed. Cir. 2005) ...............................................................................................27

*Gary v. Sheahan*,
    188 F.3d 891 (7th Cir. 1999) ....................................................................................................15

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
    907 F. Supp. 2d 492 (S.D.N.Y. 2012) ......................................................................................14

*Hasemann v. Gerber Prod. Co.*,
    331 F.R.D. 239 (E.D.N.Y. 2019) ..............................................................................................25

*Hernandez v. Miller*,
    No. 22 Civ. 6964 (VSB), 2022 WL 17584025 (S.D.N.Y. Dec. 12, 2022) ...............................16

*Hershkowitz v. Think Tech Labs, LLC*,
    651 F. App'x 15 (2d Cir. 2016) ................................................................................................30

*In re Allegheny Int'l, Inc.*,
   158 B.R. 343 (Bankr. W.D. Pa. 1992) ........................................................................28

*In re Amla Litig.*,
   320 F. Supp. 3d 578 (S.D.N.Y. 2018) .........................................................................30

*In re DC Water & Sewer Auth.*,
   561 F.3d 494 (D.C. Cir. 2009) ...................................................................................15

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   No. 13 Civ. 7789 (LGS), 2022 WL 3971006 (S.D.N.Y. Aug. 31, 2022) ...................15

*In re Hampton*,
   407 B.R. 443 (B.A.P. 10th Cir. 2009) ........................................................................30

*In re Joint E. & S. Dist. Asbestos Litig.*,
   52 F.3d 1124 (2d Cir. 1995) .......................................................................................37

*In re KIND LLC "Healthy & All Natural" Litig.*,
   627 F. Supp. 3d 269 (S.D.N.Y. 2022) ...................................................................37, 38

*In re Mercedes-Benz Tele Aid Cont. Litig.*,
   267 F.R.D. 113 (D.N.J. 2010).................................................................................16, 17

*In re Motor Fuel Temp. Sales Prac. Litig.*,
   279 F.R.D. 598 (D. Kan. 2012) ..................................................................................15

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   No. 15 Civ. 6549 (CM) (RWL), 2022 WL 4298767 (S.D.N.Y. Sept. 19, 2022) .......14

*In re Sept. 11 Litig.*,
   811 F. Supp. 2d 883 (S.D.N.Y. 2011) ....................................................................21, 22

*In Re Ugl-Unicco Serv. Co.*,
   357 N.L.R.B. 801 (2011) ............................................................................................28

*In re Waterman S.S. Corp.*,
   200 B.R. 770 (Bankr. S.D.N.Y. 1996).........................................................................22

*Int'l Broth. of Teamsters v. United States*,
   431 U.S. 324 (1977).....................................................................................................22

*Intersal, Inc. v. Hamilton*,
   373 N.C. 89 (N.C. 2019)..............................................................................................23

*Jeffers v. City of New York*,
   No. 14 Civ. 6173 (CBA) (ST), 2018 WL 904230 (E.D.N.Y. Feb. 13, 2018)............40

*Jermyn v. Best Buy Stores, L.P.*,
  276 F.R.D. 167 (S.D.N.Y. 2011) ......................................................................................12, 13

*Jin v. Shanghai Original, Inc.*, *Jin v. Shanghai Original, Inc.*,
  990 F.3d 251 (2d Cir. 2021) ....................................................................................................13

*Johnson v. City of New York*,
  302 A.D.2d 463 (2d Dep't 2003) ............................................................................................21

*Johnson v. Nextel Commcn's Inc.*,
  780 F.3d 128 (2d Cir. 2015) ...................................................................................................37

*Kiobel v. Royal Dutch Petroleum Co.*,
  No. 02 Civ. 7618 (KMW) (HBP), 2004 WL 5719589 (S.D.N.Y. Mar. 31, 2004) ...................37

*Kurtz v. Costco Wholesale Corp.*,
  818 F. App'x 57 (2d Cir. 2020) .........................................................................................26, 37

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
  784 F.3d 78 (2d Cir. 2015) .....................................................................................................40

*M. Carbine Restoration, Ltd. v. Sutherlin*,
  544 So. 2d 455 (La. Ct. App. 1989) ........................................................................................20

*Martinez v. Agway Energy Servs., LLC*,
  88 F.4th 401 (2d Cir. 2023) ..............................................................................................13, 37

*Mazzei v. Money Store*,
  308 F.R.D. 92 (S.D.N.Y. 2015), *aff'd*, 829 F.3d 260 (2d Cir. 2016)........................................12

*Mazzei v. Money Store*,
  829 F.3d 260 (2d Cir. 2016) ...................................................................................................38

*McNamara v. Felderhof*,
  410 F.3d 277 (5th Cir. 2005) ..................................................................................................15

*Med. Soc'y of the State of NY v. UnitedHealth Group Inc*,
  No. 16 Civ. 5265 (JPO), 2021 WL 4263717 (S.D.N.Y. Sept. 20, 2021)...................................12

*Melville v. HOP Energy, LLC*,
  No. 21 Civ. 10406 (KMK), 2023 WL 2648775 (S.D.N.Y. Mar. 27, 2023) ..............................10

*Mirkin v. XOOM*,
  No. 23-1267 (2d Cir.) ..............................................................................................................12

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ..................................................................................................37

*Naphcare, Inc.v. Guilford Cty.*,
  No. 07 Civ. 174, 2008 WL 4371770 (M.D.N.C. Sept. 18, 2008).............................32

*Nat'l Commc'ns Ass'n Inc. v. AT & T Corp.*,
  238 F.3d 124 (2d Cir. 2001) ....................................................................................22

*Nayab v. Cap. One Bank (USA), N.A.*,
  942 F.3d 480 (9th Cir. 2019) ...................................................................................22

*Onosamba-Ohindo v. Searls*,
  No. 20 Civ. 290, 2023 WL 4107978 (W.D.N.Y. June 21, 2023) .............................14

*Peaseley v. Virginia Iron, Coal & Coke Co.*,
  194 S.E.2d 133 (N.C. 1973)..............................................................................23, 30

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)..................................................................................................12

*Price v. L'Oreal USA, Inc.*,
  No. 17 Civ. 614 (LGS), 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021)....................33

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) ....................................................................................39

*Roberts v. Verde Energy, USA, Inc.*,
  No. X07-HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017) .............1

*Rodriguez v. Kaiaffa, LLC*,
  253 A.3d 13 (Conn. 2020) .........................................................................................1

*Schmalz v. Sovereign Bancorp, Inc.*,
  868 F. Supp. 2d 438 (E.D. Pa. 2012) .......................................................................30

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  293 F.R.D. 287 (E.D.N.Y. 2013)..............................................................................26

*SourceOne Dental, Inc. v. Patterson Cos., Inc.*,
  No. 15 Civ. 5440, 2018 WL 2172667 (E.D.N.Y. May 10, 2018) .............................37

*Stinson v. City of New York*,
  No. 10 Civ. 4228 (RWS), 2014 WL 4742231 (S.D.N.Y. Sept. 23, 2014)................12

*Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*,
  No. 19 Civ. 1349 (FJS) (CFH), 2022 WL 3594949 (N.D.N.Y. July 15, 2022)........16

*Troitino v. Goodman*,
  35 S.E.2d 277 (N.C. 1945)........................................................................................23

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016)..................................................................................36

*United States v. Denver & R G R Co*,
  191 U.S. 84 (1903)....................................................................................21

*United States v. One Parcel of Prop. Located at 194 Quaker Farms Rd., Oxford, Conn.*,
  85 F.3d 985 (2d Cir. 1996) ......................................................................21

*Upstate N.Y. Eng'rs Health Fund by Harrigan v. DiPizio Constr. Co.*,
  No. 514 Civ. 1539 (MAD) (TWD), 2017 WL 5713213 (N.D.N.Y. Nov. 28, 2017)................27

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) .................................................................25, 26

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...................................................................12, 14

*White Indus., Inc. v. Cessna Aircraft Co.*,
  845 F.2d 1497 (8th Cir. 1988) ...............................................................37

*Woodling v. Garrett Corp.*,
  813 F.2d 543 (2d Cir. 1987) ...................................................................20

*Zimmerman v. Portfolio Recovery Assocs., LLC*,
  No. 09 Civ. 4602 (PGG), 2013 WL 1245552 (S.D.N.Y. Mar. 27, 2013)...................13

**Rules**

Conn. Prac. Book §§ 9-7–9-10 ...............................................................1

Fed. R. Civ. P. 15(b)...........................................................................40

Fed. R. Civ. P. 23 ........................................................................*passim*

Fed. R. Civ. P. 60(b)..........................................................................16

N.Y. C.P.L.R. § 902 ............................................................................1

**Treatises**

2 McCormick on Evid. § 337 ..............................................................21, 22

W. Rubenstein, A. Conte & H. Newberg,
  *Newberg on Class Actions* § 7:47 (4th ed. 2011) ......................................15

**Other Authorities**

*Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019) ...................................................................5

Richard Nagareda, *Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. Rev. 97, 107 (2009) ...........................................................................................36

## INTRODUCTION

XOOM's customer contract promised Plaintiff and 124,529 other New Yorkers that their variable rates for natural gas and electricity would be "based on" XOOM's "actual and estimated supply costs." Plaintiff alleges that XOOM's rates were not based on those costs. In its 19-page Order certifying the Class, this Court applied the relevant standards and weighed the evidence developed over five years of litigation. ECF 152 ("Class Order"). The Class Order was issued just two weeks after—and expressly relied on—the Court's 21-page summary judgment Order that construed XOOM's contract and identified material issues of fact. ECF 151 ("MSJ Order").

Considering the MSJ Order's findings, certification was no surprise: "The question at the center of this suit is whether the variable rates XOOM charged its customers were 'based on XOOM's actual and estimated supply costs.'" Class Order at 3. Courts have long recognized that claims for breach of standardized contracts "are particularly well-suited for class certification." Class Order at 10 (collecting cases); *see also Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (E.D.N.Y. 2008) ("[a]n overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action."). Indeed, at least four other class actions have been certified against third-party energy service companies ("ESCOs") like XOOM that were alleged to have breached the pricing term of their form contracts.[1]

The Court also had a robust record upon which to base its Rule 23 findings, as in addition to Plaintiff's readily certifiable claim, the concurrently briefed class certification and summary

---

[1] *Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261 (PKC), 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016); *Bell v. Gateway Energy Servs. Corp.*, No. 31168/2018 (Rockland Cnty. Sup. Ct. Jan. 8, 2021), NYSCEF No. 152 (ECF No. 133-6); *BLT Steak LLC v. Liberty Power Corp., L.L.C.*, No. 151293/2013 (N.Y. Cnty. Sup. Ct. Aug. 14, 2020), NYSCEF No. 376; *Roberts v. Verde Energy, USA, Inc.*, No. X07-HHDCV15-6060160-S, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017), *aff'd*, 2019 WL 1276501 (Conn. Super. Ct. Feb. 1, 2019). New York's C.P.L.R. § 902 and Connecticut Practice Book §§ 9-7–9-10 closely track Rule 23. *Chavez v. Occidental Chem. Corp.*, 35 N.Y.3d 492, 503 (2020); *Rodriguez v. Kaiaffa, LLC*, 253 A.3d 13, 27 n.15 (Conn. 2020).

judgment motions occasioned an immense exchange of information, including 214 pages of briefing, 145 exhibits, 5 declarations, and 4 expert reports. Nevertheless, unhappy with the Court's findings, XOOM sought leave for a Rule 23(f) interlocutory appeal, claiming that Plaintiff lacked evidence of breach and that a Class trial would require thousands of mini-trials. The Second Circuit rejected XOOM's petition. XOOM then sought the Court's permission to file a motion to decertify the Class even though the post-certification record remains unchanged and there have been no developments of law bearing on the Court's Rule 23 findings.

In granting XOOM leave to file the instant motion, the Court directed XOOM to explain why it "should not construe [this motion] as an untimely motion for reconsideration of the class certification opinion[.]" XOOM offers two arguments in response. First, XOOM claims decertification motions can never be considered reconsideration motions. Numerous cases disagree, including one cited by XOOM. Courts do not countenance serial reargument of Rule 23 findings, particularly when, like here, the reconsideration request follows a Rule 23(f) denial. Courts have even found that reconsideration motions are barred under such circumstances because they subvert the Rule 23(f) process. Second, XOOM claims its ***future*** *Daubert* motion, which it has not filed or shared with Plaintiff, "***is***" the key development justifying reconsideration. If so, this motion is doomed from the start, as the case law strongly disfavors preemptive placeholder motions. XOOM has failed to adequately respond to the Court's query.

Yet undeterred by law or logic, XOOM nevertheless applies the decertification label and proceeds as if that alone invokes the Court's "affirmative duty" to reassess its class findings ***and*** requires Plaintiff to reestablish all Rule 23 prerequisites XOOM opts to challenge. To bolster this shaky premise, XOOM casts a multitude of previously rejected class certification challenges into a hypothetical that assumes the Court has used XOOM's "forthcoming" *Daubert* motion to reopen

the Rule 23 inquiry.  Aside from its obvious procedural flaw, XOOM's proposal is unsuccessful, since even a preview of XOOM's motion to exclude demonstrates fatal defects.

The garden variety criticisms of Plaintiff's experts that XOOM believes will trigger its chain reaction are at best contentions that go to the opinions' probative value or hair-splitting directed at the experts' inputs and assumptions.  For example, XOOM warns that "Model Two does not use a reasonable or proportionate margin."  But XOOM's complaint is with a calculation—made almost a year before the Court construed the contract to be a cost-plus contract requiring a fixed margin—that can easily be adjusted.  Model Two is not "misaligned" with Plaintiff's liability theory and XOOM's critique targets a replaceable data point, not an aspect of the model's logic that the Court specifically evaluated and authorized at class certification.  Class Order at 14.  Moreover, it is well settled that only flaws large enough to deprive an expert of adequate grounds for their conclusions warrant exclusion of evidence.

Likewise, XOOM excises snippets of irrelevant deposition testimony and repurposes failed class challenges to claim that Plaintiff lacks evidence the jury could use to assess a "reasonable" margin.  Yet the record the Court relied on at class certification is both clear and unchanged.  Plaintiff offered XOOM's fixed rate margins as the maximum possible reasonable margin.  Courts regularly accept proof of acceptable maximums or ranges as proof of "reasonableness."

Underlying most of XOOM's supporting claims are fundamental and easily corrected misreadings of the law.  For example, XOOM lodges multiple attacks under the mistaken belief that any critique of a class damages model triggers a wholesale reassessment under a restrictive reading of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  Not so.  Second Circuit law is clear that *Comcast* does not require such exactitude and courts routinely accept models that—unlike here—omit consideration of potentially significant elements.

3

Similarly, XOOM wrongly claims that Plaintiff bears the burden to prove negatives about XOOM's implausible defense that undocumented "actual" supply costs drove the fluctuations in XOOM's margins.  XOOM has the burden on the factual claims it makes (based solely on testimony) in defense of the fluctuating margins evident in XOOM's own rate-setting metrics.  The Court made clear at summary judgment that "under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs."  MSJ Order at 15.   XOOM ignores this ruling and bases much of its motion on the claim that Plaintiff has failed to establish a point that XOOM bears the burden of proving.  Multiple cost-plus cases and established burden-shifting doctrines plainly place the burden on XOOM to prove its implausible claim that it used entirely undocumented costs to calculate margin fluctuations.  What follows from XOOM's failure to prove its factual claim is on XOOM, not the Class.

Finally, XOOM attaches a hodgepodge of documents to its motion that allegedly show differences between estimated and actual costs.  XOOM then argues that to hold a class trial, the Court must require Plaintiff to show how she would use these documents to perform the margin calculations that are utterly absent from the otherwise extensive documentation of XOOM's rate-setting practices.  Again, that is XOOM's burden.  Moreover, these documents—none of which show actual costs determining XOOM's varying margins—constitute additional uniform proof *supporting* Plaintiff's position on the "disputed material fact" of "whether permissible supply costs incorporated in the margin determined the monthly change in [XOOM's] markup."  MSJ Order at 17.   In short, even setting aside the fact that XOOM's motion *is* a reconsideration motion, none of XOOM's arguments come close to providing a compelling reason for the Court to re-do its Rule 23 analysis—especially since the record remains unchanged since class certification *and* the Second Circuit rejected XOOM's Rule 23(f) petition.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

**I.    THE COURT'S CONTRACT CONSTRUCTION AT SUMMARY JUDGMENT UPENDED XOOM'S EARLIER CERTIFICATION AND LIABILITY DEFENSES**

It is undisputed that XOOM "always determined" Class monthly variable rates through a uniform process that was followed "without exception."  Defs.' Class Opp'n Br. at 12, ECF 134 ("Class Opp'n").  As this Court observed, that uniform rate-setting process began with XOOM's calculating and compiling its monthly variable rate "Total Cost" or "COGS" ("cost of goods sold") into rate-setting workbooks—these calculations are "essentially the sum of the costs XOOM incurs when procuring energy on the wholesale market."  Class Order at 3.  "After determining the Total Cost figure, analysts on the pricing team proposed a rate[,]" and "[t]he percentage difference between the proposed rate and COGS comprised the margin," which was also recorded for each monthly rate in XOOM's workbooks.  MSJ Order at 4.  XOOM called its standardized rate-setting practice "the 'spreadsheet-based model' XOOM used to set rates based on its actual and estimated supply costs."  Defs.' MSJ Br., ECF 145-1 ("MSJ Br.") at 8 (citing ECF 146-12, Deposition of Director of Pricing and Structuring Jason Loehde, dated July 27, 2022 ("Loehde Tr.") 59:11–18).

At summary judgment, the Court found XOOM's variable rate pricing term "vague," MSJ Order at 10, and construed it as a cost-plus contract.[2]  Specifically, the Court found that XOOM's contract requires that any variation in Class rates "be determined by XOOM's actual and estimated supply costs—and *only* those costs."  MSJ Order at 12 (emphasis added); *see also id.* at 14 ("I find that the contract required the variation in the variable rates to be determined *solely* by XOOM's actual and estimated supply costs." (emphasis added)).  While the Court found that XOOM could add a margin to its monthly COGS, any margin must be fixed and "remain proportionate . . . ."  *Id.*

---

[2] A "cost-plus contract" is as "[a] contract in which payment is based on a fixed fee or a percentage added to the actual cost incurred[.]" *Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019).

at 13.   Under the Court's "proportionate-margin construction," the margin must also be "reasonable."  *Id.* at 12–13; Class Order at 3, 14.  Finally, and critically, "under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs," and must "adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric."  MSJ Order at 15.

The Court's contract construction upended XOOM's earlier defenses.  In the run-up to the summary judgment ruling, XOOM admitted that it set Class rates based on a different—and legally incorrect—contract reading.  MSJ Br. at 16.  To start, XOOM believed it could use any number of unrecorded "components" to set Class rates.  *Id.*  Specifically, XOOM mistakenly believed its contract required only that supply costs be the "'foundation' to which other ***components*** would be ***added***" via undocumented ad hoc adjustments to its variable rates.  *Id.* (emphasis added).

XOOM also admitted that the margins layered on top of its workbooks' COGS figure were ***varying and inconsistent***.  Class Opp'n at 12; MSJ Br. at 8.  In fact, it mistakenly argued that the fluctuating monthly variable rate margins reflected its ***discretion*** to pad margins with "prior period adjustments" (which are "variations between previous supply cost estimates and the [supply] costs XOOM actually incurred") as well "balancing costs," "other costs to supply energy to the customer, and XOOM's profit."  Class Opp'n at 12.  Although "prior period adjustments" and "balancing costs" are specifically enumerated supply costs in the contract, prior to summary judgment XOOM admitted that it believed the technical term "prior period adjustments" allowed it to adjust variable rate margins using undocumented "data points" such as "margin goals," the "prior month's variable rate," and whether its rates would cause customer "attrition."  MSJ Br. at 21.  None of these so called "data points" are permissible "supply costs" under the Court's contract construction, and none are specifically delineated in the monthly margin figures in XOOM's

workbooks.  *See* MSJ Order at 17 (Loehde: "[W]e would input a proposed rate into the rate setting workbook and then there would be a calculated margin that results from the rate we input.").

Under XOOM's longstanding contract (mis)interpretation, "so long as supply costs are the 'foundation' and the 'fundamental part' of the variable rate," XOOM position was that "***how*** rates were set is irrelevant," though XOOM conceded that a rate 10 times its supply costs would be excessive.  Defs.' MSJ Reply Br. at 6–7, 19, ECF 149 ("MSJ Reply") (emphasis in original); *see also id.* at 16 ("the Contract cannot be reasonably construed to prohibit ***all*** pricing strategies, because several strategies are expressly disclosed—including the one that XOOM employed when it set rates that were *based on* its supply costs.") (emphasis in original).  XOOM even claimed that "***it does not matter*** what strategies, formulas, or directives it used" to set Class rates.  *Id.* at 17 (emphasis added).  Again, XOOM has never disputed that Class rates were set this way and instead always claimed this rate-setting practice was "entirely appropriate."  *Id.* at 11.

At summary judgment, however, the Court ruled that XOOM's contract was a cost-plus contract, that "the process by which XOOM set rates is of central importance[,]" that "XOOM must show that its rates were determined by its actual and estimated supply costs," and that XOOM must "adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric."  MSJ Order at 15.  Yet because XOOM has "no documentary evidence demonstrating how non-COGS supply costs actually impacted [Plaintiff's] rates," XOOM's only remaining defense was its claim that "the Total Cost or COGS number does not constitute its 'actual and estimated supply costs' because some of its supply costs—such as prior period adjustments—are incorporated in the margin."  *Id.* at 16.

In other words, XOOM claimed that its "Total Costs" were not in fact the "total costs" used to set rates under its cost-plus contract.  Instead, XOOM's "Margins" supposedly actually included

completely undocumented and uncalculated additional "supply costs."  But the only evidence supporting XOOM's contention is its witnesses' unsupported say-so.  *Id.*  Accordingly, on this record, the Court found that "whether permissible supply costs incorporated in the margin determined the monthly change in markup is a disputed material fact" and the factfinder must "tell us whether XOOM added a permissible markup above its cost calculation."  *Id.* at 17; *see also id.* at 19 ("[T]here is a genuine question of fact as to whether XOOM set the Mirkins' rates based on supply costs or based on other considerations, such as pricing strategies driven by margin goals."); *id.* at 17 ("Several pieces of evidence suggest that XOOM relied on pricing strategies or other considerations to determine the monthly variable rate in the New York market[,]" and "it appears that XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and that rates were set accordingly.").

## II.   THE COURT'S CLASS CERTIFICATION RULING EXPOSES FURTHER CRITICAL WEAKNESSES IN XOOM'S COMMON DEFENSE

Two weeks after its summary judgment ruling, the Court turned to class certification, emphasizing that "one of the central disputes of material fact is whether plaintiff's rate fluctuations were caused by permissible supply costs incorporated into the margin," and that if the jury finds the contract allowed XOOM's claimed margin-padding practice and XOOM "in fact did so consistent with the contract, the class will fail together."  Class Order at 14.  However, if the jury finds the contract did not allow XOOM to include supply costs in its margins, or if margin variations were not caused exclusively by permissible supply costs, or if XOOM incorporated supply costs into margins in a way that violated the contract, "the class will prevail together."  *Id.*

This ruling put XOOM's common defense in an even more precarious position as XOOM had already admitted that it followed "no specific formula" to set its rates, ECF 148-20, Loehde Tr. 61:6–19, and that it used a host of indisputably non-supply costs to pad margins.  For example,

"[o]ne factor XOOM considered when setting variable rates was customer attrition." Defs.' Sealed Class Opp'n Br., ECF 139 ("Sealed Class Opp'n"), at 14 (citing ECF 139-9, Loehde Tr. 85:12 – 22). XOOM also admitted that its actual margin was never fixed and "include[d] not just profit and fixed costs but also . . . other costs to supply energy to the customer for which XOOM [believed it was contractually] permitted to charge 'market-based compensation.'" Class Opp'n at 15. XOOM further admitted that ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████ Sealed Class Opp'n at 16 (summarizing testimony).[3]

Critically, XOOM's common defense has "no documentary evidence demonstrating how" only contractually permissible supply costs determined rates and XOOM personnel freely admitted that "there was no set formula for incorporating" supposed supply costs into XOOM's margins. MSJ Order at 16. Instead, XOOM admitted there was "certainly a human element" of "factoring in" these wholly undocumented and uncalculated but supposedly permissible supply costs. *Id.*

Discovery also shows that this "human element" resulted in XOOM taking advantage of "less-informed consumers in providing something as universally necessary as utility services."

---

[3] *See also* ECF 138-22, Deposition of former Senior Vice President of Energy Supply and Pricing Andrew Coppola, dated May 11, 2022 ("Coppola Tr.") 50:8–51:2, 84:20–85:7 ████████████████████████████
███████████████████████████████████████████ ; *id.* at 107:6–108:1 ████████████
████████ ); *id.* at 237:22–239:3 ████████████████████████████████████████████████
██████████████████████████████████████████████████████████████ ); ECF 138-23, Deposition of former Director of Product Management Ryan Park, dated July 22, 2022 ("Park Tr.") 33:10– 22, 98:10–15, 99:20–100:22 (admitting ███████████████████████████████████████████████
████████████ ); ECF 138-16, Deposition of XOOM's 30(b)(6) corporate witness, Director of Pricing and Structuring Jason Loehde, dated July 28, 2022 ("XOOM 30(b)(6) Tr.") 83:10–23 ████████████████████
████████████ ); ECF 138-25, Deposition of former Chief Executive Officer Thomas Ulry, dated Mar. 20, 2019, in *Todd v. XOOM Energy Maryland, LLC*, No. 15 Civ. 154 (D. Md.) 101:10–22 (████████████████████████████████████████████████████████████ ); ECF 138-2, Deposition of David Coleman, dated November 16, 2022 ("Coleman Tr.") 54:5– 55:17 (███████████████████████████
██████████████████████████████████████████████████████████████ .

*Melville v. HOP Energy, LLC*, No. 21 Civ. 10406 (KMK), 2023 WL 2648775, at *9 (S.D.N.Y. Mar. 27, 2023). Both the CEO and the Director of Pricing and Structuring admitted that XOOM would raise New York margins "so we could lower them elsewhere." MSJ Order at 18. As Coppola put it, " ██████████████████████████████████ " ECF 141-12. Indeed, in 2014, key employees were told that ████████████████████████ ██████████████████████████████████████████ ████████████████████ ECF 141-2 at XOOM_MIRKIN_065820. In short, the record demonstrates XOOM did not incorporate supply costs into an otherwise reasonable fixed margin— its actual practice was completely different (and prohibited by the contract).

In truth, XOOM had no formula for ensuring that its varying margins fluctuated only from permissible supply costs. XOOM management never required the product or pricing groups to base variable rates on supply costs. Pl.'s' Sealed Class Br., ECF 140 at 11. For example, ████ ████████████████████████████████████████ ████████████████████████████ *Id.*

Indeed, XOOM prepared and directed its employees to consider various ***non-supply cost reports*** (such as ████████████████████████ ) during rate setting meetings. ECF 138-17, Loehde Tr. 48:17–25. For example, in February 2017, Director of Pricing and Structuring Jason Loehde suggested ████████████████████████ ████████████ ECF 141-9 at XOOM_MIRKIN_024527. ████████████ ████████████████████████████████████████ ████████████████████████████████ ECF 141-7 at XOOM_MIRKIN_018504. His answers ████████████████████████ ████ *Id.* Likewise, Loehde's questions contain no indication of XOOM's claimed practice

of layering unknown and undocumented supply costs on top of an otherwise fixed margin. In fact, XOOM produced no documentary evidence whatsoever showing that it maintained a fixed variable rate margin to which other components were added, much less a process or formula for incorporating any supposed additional supply costs. *See* MSJ Order at 16.

It is thus no surprise that at summary judgment the Court observed that "the record indicates that XOOM considered several factors besides supply costs when setting monthly rates." *Id.* at 18. The Court also noted XOOM's admission that when it amended its form contract in 2016 to allow rates based on "pricing strategies" its rate setting process stayed the same, since "the updated language is just simply providing more accurate language to our customers." *Id.*[4]

Accordingly, XOOM's admitted rate setting practice facially violates the contract, which, as construed by the Court in its Summary Judgment Order, requires "XOOM [to] show that its rates were determined by its actual and estimated supply costs," and that any margin was both fixed and reasonable. MSJ Order at 12–15. Because XOOM's margins varied, under the Court's contract construction XOOM is now required to—but likely cannot—meet its burden.

## III. THE DECERTIFICATION MOTION IS XOOM'S LATEST IN A STRING OF ATTEMPTS TO EVADE ITS CONTRACT WITH THE CLASS

Given this case's ample record, the Court found that a reasonable jury could conclude that: (1) XOOM was not permitted to incorporate supply costs into its margins; or (2) even if it was, it did not in fact do so; or (3) even if it did so, the margin adjustments unfolded in a way that violated the contract. Class Order at 13 (citing MSJ Order at 17). Under any circumstance, the Court found that the questions of "whether plaintiff's rate fluctuations were caused by permissible supply costs

---

[4] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ECF 138-16, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; ECF 138-22, Coppola Tr. 98:11–18. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ECF No. 138-2, Coleman Tr. 66:11–15.

incorporated into the margin," and "how XOOM in fact set its rates" are questions that would be answered "by the factfinder at trial 'in one stroke.'"  Class Order at 13 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Faced with an uphill battle created by its many key admissions and repudiated contract reading, XOOM has spent the last seven months trying to escape accountability via repeated and sustained attacks on the Court's class certification order, including a failed Rule 23(f) interlocutory appeal and a related stay motion.  *See* ECF 153, 155, 166–76, 180; *Mirkin v. XOOM*, No. 23-1267 (2d Cir.) ECF 1, 23, 28, 33, 36.  XOOM knows that "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually" and that "most of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).  This is why XOOM has now also filed this decertification motion—which, as discussed below is actually a thinly-veiled untimely reconsideration motion that nevertheless falls far short of meeting the standard for decertification.

## ARGUMENT

## I.    LEGAL STANDARD FOR DECERTIFICATION MOTIONS

A class defendant may not abuse a court's obligation to reassess class rulings by serially relitigating class findings.  A "court ordinarily 'may not disturb its prior [certification] findings,'" *Med. Soc'y of the State of NY v. UnitedHealth Group Inc*, No. 16 Civ. 5265 (JPO), 2021 WL 4263717, at *1 (S.D.N.Y. Sept. 20, 2021) (quoting *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011)), because "the factual underpinnings of a court's prior certification order are deemed to be the law of the case." *Stinson v. City of New York*, No. 10 Civ. 4228 (RWS), 2014 WL 4742231, at *2 (S.D.N.Y. Sept. 23, 2014) (quotation omitted).  As the moving party, XOOM bears "a heavy burden to prove the necessity of . . . the drastic step of decertification[.]" *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015), *aff'd*, 829 F.3d 260 (2d Cir. 2016) (quotation

omitted).    Decertification is an "extreme step, particularly at a late stage in the litigation." *Zimmerman v. Portfolio Recovery Assocs., LLC*, No. 09 Civ. 4602 (PGG), 2013 WL 1245552, at *2 (S.D.N.Y. Mar. 27, 2013) (quotation omitted).    "[T]he Court must take into consideration that an eve-of-trial decertification could adversely and unfairly prejudice class members, who may be unable to protect their own interests."  *Jermyn*, 276 F.R.D. at 169 (cleaned up).

Here, nothing has changed in the seven months since the Court's August 2023 summary judgment and class certification rulings that ***even suggests*** the Court should revisit its Rule 23 findings.    In fact, ***the record is unchanged***, as discovery closed in 2022.    Rule 23 is also unchanged, and it remains true that "[c]laims for breach of a form contract are particularly well-suited for class certification."  Class Order at 10.  In fact, the only relevant developments since the August 2023 certification ruling have been wholly negative for XOOM: (1) it lost its Rule 23(f) appeal and related stay motion, ECF 174; Dec. 6, 2023 Text Order; and (2) the Second Circuit singled out XOOM's contract here as disallowing any rate-setting discretion whatsoever, *see Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) (noting that whether an ESCO's contract specifically allows for rate-setting discretion is a "dispositive question" and that XOOM's contract here does not provide for any discretion).

This is why XOOM's emphasis on the claim that Plaintiff bears the burden of proof at decertification, Defs.' Br. at 9, is misleading: the threshold question is whether a decertification analysis should be undertaken in the first place, and XOOM bears—but fails to carry—this "heavy burden" because it cannot show "a sufficient change in law or circumstance," or, in fact, ***any change*** in law or circumstance.  *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262, n.18 (2d Cir. 2021); *see also In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15 Civ. 6549 (CM)

(RWL), 2022 WL 4298767, at *6 (S.D.N.Y. Sept. 19, 2022) (denying reconsideration where there was "no significant intervening event that has occurred since class certification").

Instead, XOOM claims there is a "compelling reason" to undo certification.  Defs.' Br. at 10.  But, as XOOM's cited cases make clear, "compelling reasons" include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Abdi v. McAleenan*, 405 F. Supp. 3d 467, 474 (W.D.N.Y. 2019) (quotation omitted).  Here, XOOM can show no such "compelling reason:" there has been no change in controlling law,[5] and as explained below, there is neither "new evidence" nor a "need to correct a clear error or prevent manifest injustice."  Instead, XOOM is simply asking the Court—on the heels of the Second Circuit denying XOOM's Rule 23(f) petition and on the exact same record— to reverse itself.  *See In re Namenda*, 2022 WL 4298767, at *7 (noting that in the absence of any "compelling reason," "the court is, in effect, faced with a (very) belated motion for reargument.")

## II.    XOOM'S MOTION IS AN UNTIMELY AND DISFAVORED MOTION FOR RECONSIDERATION
*(Responding to Defs.' Point III.B, Defs.' Br. at 8–10)*

To wit, when the Court authorized this motion it cautioned that "[i]f defendants proceed with filing their anticipated motion, they are directed to address why I should not construe it as an untimely motion for reconsideration of the class certification opinion [152], given that the class certification opinion was filed two weeks after the summary judgment opinion [151] and expressly relied on the summary judgment opinion's construction of the contract."  Feb. 8, 2024 Text Order.  While XOOM offers two responses to the Court's request, neither suggests the Court erred in viewing XOOM's motion as, in substance, one for reconsideration.

---

[5] In both *Abdi,* 405 F. Supp. 3d at 473, and *Onsamba-Ohindo v. Searls,* No. 20 Civ. 290, 2023 WL 4107978, at *7 (W.D.N.Y. June 21, 2023) (both before the same judge), intervening U.S. Supreme Court decisions impacted class viability.  Likewise, in *Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 907 F. Supp. 2d 492, 507–09 (S.D.N.Y. 2012) the class was decertified in the wake of *Dukes*, 564 U.S. 338.

14

First, XOOM claims a decertification motion can never be treated as a reconsideration motion. Defs.' Br. at 9–10. None of XOOM's cases support this position, and in fact, one held the exact opposite. *See Fleisher v. Phoenix Life Ins. Co.*, No. 11 Civ. 8405 (CM) (JCF), 2014 WL 409164, at *2 (S.D.N.Y. Jan. 31, 2014) (denying "motion to decertify . . . which is really an untimely motion for reconsideration"). Other courts agree. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2022 WL 3971006, at *2 (S.D.N.Y. Aug. 31, 2022); *In re Motor Fuel Temp. Sales Prac. Litig.*, 279 F.R.D. 598, 600 (D. Kan. 2012).

Requests to reconsider class certification are viewed with particular disfavor where, as here, they follow denial of a Rule 23(f) petition—the proper mechanism for seeking review of a certification decision. Indeed, "[a]llowing litigants to file a motion at any time during the litigation, even when no subsequent case law or new facts have had any impact on the original rationale, would render Rule 23(f) meaningless." *Connor B., ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 35 (D. Mass. 2011). Numerous circuit courts have likewise recognized in the context of Rule 23(f) that untimely reconsideration motions cannot be repackaged in a decertification wrapper. *See, e.g.*, *Gary v. Sheahan*, 188 F.3d 891, 892–93 (7th Cir. 1999) ("[W]e do not think that it matters what caption the litigant places on the motion to reconsider. . . . Otherwise, by styling a motion to reconsider as a motion to decertify the class, a litigant could defeat the function of the ten-day line drawn in Rule 23(f)."); *see also In re DC Water & Sewer Auth.*, 561 F.3d 494, 496–97 (D.C. Cir. 2009) (same, quoting *Gary*); *McNamara v. Felderhof*, 410 F.3d 277, 281 (5th Cir. 2005) (same).

Serial reargument of class issues is likewise strongly disfavored. *See* W. Rubenstein, A. Conte & H. Newberg, *Newberg on Class Actions* § 7:47 (4th ed. 2011) (noting that "[i]n the absence of materially changed or clarified circumstances, or the occurrence of a condition on which the initial class ruling was expressly contingent, courts should not condone a series of

rearguments on the class issues by either the proponent or the opponent of class, in the guise of motions to reconsider the class ruling").

Second, XOOM claims that a forthcoming *Daubert* motion—yet to be filed or shared with Plaintiff— "form[s] the foundation of the decertification motion . . . ." Defs.' Br. at 9. In other words, XOOM's reconsideration motion is at best a premature placeholder for a motion it intends to file in the future after it hopes to win an unfiled *Daubert* motion. Such maneuvering is disfavored. Courts in this Circuit dismiss premature motions, including preemptive expert challenges. *See Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*, No. 19 Civ. 1349 (FJS) (CFH), 2022 WL 3594949, at *1 (N.D.N.Y. July 15, 2022) (collecting cases); *see also Hernandez v. Miller*, No. 22 Civ. 6964 (VSB), 2022 WL 17584025, at *2 (S.D.N.Y. Dec. 12, 2022) (admonishing a "duplicative and premature" motion); *Beaudry v. Telecheck Servs., Inc.*, No. 07 Civ. 842, 2010 WL 2901781, at *2 (M.D. Tenn. July 20, 2010) ("Typically, courts dismiss premature motions." (collecting cases from the Second and Third Circuits)).

The case law also strongly cuts against viewing XOOM's motion as anything other than one for reconsideration. For example, in *In re Mercedes-Benz Tele Aid Cont. Litig.*, 267 F.R.D. 113 (D.N.J. 2010), *op. modified on reconsideration*, No. 07 Civ. 2720 (DRD), 2010 WL 2976496 (D.N.J. July 22, 2010), the court noted that "[a]s a preliminary matter. . . there is no procedural vehicle by which" defendant could move to decertify. *Id.* at 134. This was because there was no "change in controlling law" and thus, the only "available means" for defendant's filing was "as a request for reconsideration pursuant to Federal Rule of Civil Procedure 60(b)." *Id.* Moreover, the *Mercedes* defendant did "not point to any new evidence that was not available at the time of" class certification. *Id.* at 135. As to the defendant's claim that there were errors in the certification opinion, "that assertion is belied by the fact that the Court of Appeals has already refused the

company's request for interlocutory review under Rule 23(f)." *Id.*  "Thus, implicit in the denial of

the company's request for interlocutory review was a holding that this Court's Opinion certifying

the class would not justify a grant of reconsideration under Rule 60(b)." *Id.*  Going further, the

*Mercedes* court noted that "[a]fter a thorough review of the case law in this and other circuits, the

Court has been unable to find a single case in which a district court entertained a motion for

reconsideration of an order certifying a class after a request for interlocutory review of that order

pursuant to Rule 23(f) was denied.  As an issue of first impression, the Court finds that motions

for reconsideration are barred under such circumstances.  To hold otherwise would allow litigants

to, at least in theory, receive relief from a district court that has already been denied by a court of

appeals." *Id.*  These exact circumstances are present here.[6]

## III.   THE COURT'S FINDING THAT PLAINTIFF'S DAMAGES MODEL IS CONSISTENT WITH *COMCAST* SHOULD NOT BE RECONSIDERED
*(Responding to Defs.' Point IV.A, Defs.' Br. at 11–21)*

### A.   The Court Appropriately Accepted Plaintiff's Damages Model

At class certification, the Court understood, described, and accepted Plaintiff's second

damages model ("Model Two") as consistent with *Comcast*.  Class Order at 14–15.  Specifically,

for Rule 23's commonality prong, the Court found that Class Members would need only "a single

damages model to apportion liability." *Id.* at 10.  For predominance, the Court found that Model

Two, which incorporated a hypothetical margin, was "entirely consistent with Plaintiff's theory"

under *Comcast*. *Id.* at 14.  The Court further noted that "XOOM does not dispute that the algorithm

---

[6] The court in *Donovan v. Phillip Morris USA, Inc.*, No. 06 Civ. 12234 (DJC), 2012 WL 957633 (D. Mass. Mar. 21, 2012) reached the same conclusion.  "[T]he proper method for challenging an adverse class certification decision prior to judgment is to seek interlocutory review pursuant to Fed. R. Civ. P. 23(f) . . . ." *Id.* at *5.  "Reconsideration outside of this channel is disfavored, as it would undermine the fourteen-day deadline to appeal a class certification order and would essentially give an unhappy litigant the power to seek reconsideration of an order at any time . . . ." *Id.* (quotation omitted).  XOOM seeks exactly what *Donovan* cautioned against—reconsideration "even when no subsequent case law or new facts have had any impact on the original rationale" from the certification order.

itself is faulty—any measure of damages in this case would undoubtedly be based on the rate, cost, and margin." *Id.*; *see also Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261 (PKC), 2016 WL 7009062, at *3 (S.D.N.Y. Nov. 30, 2016) (whether "damages should instead reflect the difference between [an ESCO's] actual charged rate and a hypothetical rate calculated pursuant to the factors described in the Sales Agreement" raises "common questions on damages").

Model Two is a simple algorithm that tracks the inputs of XOOM's rate-setting workbooks. Class Order at 14. When a reasonable and proportionate margin is determined, each instance of breach and resulting damages will be readily identifiable. XOOM knows this, as its own memo assesses Plaintiff's damages using three different margins (19%, 22%, and 27%) using this exact calculation. Defs.' Br. at 20.

Nevertheless, XOOM ignores the Court's Rule 23 findings and oddly claims that Model Two is "inconsistent with the legal theory of the claim," and thus "class certification cannot stand." Defs.' Br. at 11. XOOM also claims Model Two fails *Comcast* owing to a merits claim that "Plaintiff cannot now tell this Court what her rates should have been[.]" Defs.' Br. at 5; *see also* Defs.' Br. at 12 ("Plaintiff cannot prevail on an overcharge claim merely by complaining about *how* her rates were set" but instead "must prove *the amount she should have been charged*.") (emphasis in original). But XOOM's arguments do not even remotely suggest—much less compel—the Court to reconsider its *Comcast* findings.

Indeed, the Court already analyzed and rejected XOOM's exact same claim at class certification—"XOOM claims that plaintiff fails to provide a model that would measure only damages attributable to her theory of liability, for essentially the same [summary judgment] reason—failure to accurately identify supply costs or an appropriate margin." Class Order at 10; *see also* Class Opp'n at 25 (XOOM claiming "[t]he Mirkins' damages model does not match their

liability theory."); *id.* at 22 (claiming Plaintiff's burden "requires data establishing" what the "total 'estimated and actual supply costs' were, including "market-based compensation" for "the rates charged to every class member."); *id.* at 23 (workbooks do not "capture XOOM's market-based compensation for providing energy-related services.").

XOOM now recasts these same material factual disputes as supposed shortcomings of Model Two, claiming the model does not account for XOOM's actual supply costs or propose a reasonable fixed margin. Defs.' Br. at 12–13. But those "components" (as XOOM labels them), are actually questions of fact the Court has teed up for trial: "whether plaintiff's rate fluctuations were caused by permissible supply costs incorporated into the margin," and what a reasonable, proportionate margin is. Class Order at 3–4, 10, 13–14.

### B.   XOOM Has the Burden of Proving Its Unlikely Defense That Undocumented Yet Permissible Costs Incorporated into Its Margin Drove Rate Fluctuations

The Court made clear at summary judgment that "under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs." MSJ Order at 15. XOOM's criticisms of Plaintiff's damages model ignore this ruling and are based on a misunderstanding of the burdens at trial. XOOM contends that Plaintiff lacks a "submissible claim" unless her damages model can "establish the ***amount***" of (1) the permissible supply costs XOOM allegedly incorporated into its margin (assuming the jury disagrees with Plaintiff that such a rate-setting practice itself constitutes breach), and (2) the baseline reasonable and proportionate margin. Defs.' Br. at 12. XOOM is wrong. XOOM makes the factual claim that undocumented additional supply costs explain why its workbooks' margins fluctuate, and it is XOOM's burden to establish its contention.

Through record evidence and expert testimony, Plaintiff will prove that XOOM's rates were not based on XOOM's own documented COGS. This is more than sufficient to discharge

Plaintiff's burden and for the jury to find in the Class's favor.  XOOM claims undocumented additional supply costs explain why its workbooks' margins fluctuate.

To start, XOOM is wrong about which party bears the burden of proof.  It is the law of the case that XOOM bears the burden of proving of proving its enigmatic claim it incorporated permissible supply costs into its margin.  MSJ Order at 15.  Notwithstanding the contract's choice-of-law clause, forum law applies to questions of burdens of proof.  *See Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987) ("The question of burden of proof . . . is regarded by New York law as a question of procedure to which the law of the forum applies."); *see also Cronin v. Fam. Educ. Co.*, 105 F. Supp. 2d 136, 139 (E.D.N.Y. 2000) ("[C]hoice of law provisions [] choose only substantive law, not procedural law concerning matters such as burdens of proof.").

Further, in cost-plus contract cases like this one, courts put the burden to prove costs on the party that incurred them.  *See, e.g.*, *Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 223 (Tenn. Ct. App. 2009) ("In any cost-plus contract there is an implicit understanding between the parties that the cost must be reasonable and proper.  The [seller] is under a duty of itemizing each and every expenditure made . . . and where the [purchaser] denies being indebted to the [seller] the latter has the burden of proving each and every item of expense . . . ." (cleaned up)); *M. Carbine Restoration, Ltd. v. Sutherlin*, 544 So. 2d 455, 458 (La. Ct. App. 1989) ("Once the existence of a cost-plus contract has been established, the [seller] also has a duty to submit an itemization of each and every expenditure made . . . because there is an implicit agreement between the parties that the costs will be reasonable.  Presentation of invoices and statements of accounts, accompanied by proof of payment, is the proper method of proving the cost . . . ." (internal citations omitted)).  Because the Court construed the contract at issue here as a cost-plus contract, the party that incurred the costs—XOOM—must prove those costs.

At least three additional established doctrines are also in accord.  First, XOOM has exclusive access to the proof (or lack thereof) of whether it incorporated permissible supply costs into its variable rate margins.  "Burden-shifting where one party has superior access to evidence on a particular issue is a common feature of our law." *United States v. One Parcel of Prop. Located at 194 Quaker Farms Rd., Oxford, Conn.*, 85 F.3d 985, 990 (2d Cir. 1996).  "It is generally inappropriate to place the burden of proof on a party in the case where the facts governing the resolution of the controversy are within the exclusive knowledge of the opposing party." *Johnson v. City of New York*, 302 A.D.2d 463, 464 (2d Dep't 2003).[7]  Because Plaintiff will prove that XOOM's rates were not based on its documented COGS and XOOM has exclusive and superior access to evidence of the supply costs it claims were supposedly also included in margins, XOOM rightfully bears the burden of proving that Class rate fluctuations were driven by permissible supply costs incorporated in XOOM's margins.

Second, even if the parties had equal access to evidence (they do not), XOOM appropriately bears the burden because otherwise, Plaintiff would be left to prove a negative. Longstanding Supreme Court precedent makes clear that "when the opposite party must, from the nature of the case, himself be in possession of full and plenary proof to disprove the negative averment, and the other party is not in possession of such proof, then it is manifestly just and reasonable that the party which is in possession of the proof should be required to adduce it; or, upon his failure to do so, we must presume it does not exist, which of itself establishes a negative." *United States v. Denver & R G R Co*, 191 U.S. 84, 92 (1903).  The Second Circuit is in accord. *Nat'l Commc'ns Ass'n Inc. v. AT & T Corp.*, 238 F.3d 124, 130–31 (2d Cir. 2001) ("First, all else

---

[7] S*ee also In re Sept. 11 Litig.*, 811 F. Supp. 2d 883, 894 (S.D.N.Y. 2011) ("Where a defendant has superior access to knowledge of relevant facts, courts may shift a burden to the defendant, by permitting the plaintiff to make an initial showing and obtain the benefit of a presumption." (citing 2 McCormick on Evid. § 337)).

being equal, the burden is better placed on the party with easier access to relevant information. . . . Second, all else again being equal, courts should avoid requiring a party to shoulder the more difficult task of proving a negative.").[8]  Here, XOOM seeks to make Plaintiff distinguish between any proper and improper (undocumented) factors that XOOM claims are (undocumented) components of XOOM's varying margins.   However, Plaintiff has already presented ample ***documented*** evidence that the fluctuations in XOOM's rates were not due to recorded supply costs. Indeed, XOOM admits as much.   XOOM cannot now unfairly require Plaintiff to prove the negative that XOOM's varying margins were ***not*** in fact driven by its post hoc justifications.

Third, the Supreme Court has explained that "[p]resumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof." *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 359 n.45 (1977).  Courts may "shift a burden of production in consideration of 'the judicial estimate of the probabilities of the situation'" thereby "shift[ing] the burden to the party 'who contends the more unusual event has occurred.'" *In re Sept. 11 Litig.*, 811 F. Supp. 2d at 894 (quoting 2 McCormick on Evid. § 337).   Here, XOOM's rate-setting workbooks expressly identify XOOM's COGS calculations.  As the Court has already recognized, "XOOM has failed to adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric."  MSJ Order at 15.   XOOM's idiosyncratic defense is that there were other costs not

---

[8] *See also Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 494 (9th Cir. 2019) (Courts shift the burden of proving a negative to a defendant because "holding otherwise would impose upon the plaintiffs a difficult, if not an impossible, task of requiring them to produce evidence that a fact is not the case, though evidence to the contrary could be readily produced by the defendant" and "it is a general rule of evidence that where the subject-matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party" (cleaned up)); *In re Waterman S.S. Corp.*, 200 B.R. 770, 775 (Bankr. S.D.N.Y. 1996) ("An even more persuasive basis for placing the burden of proof on MALC is the general rule that when the true facts relating to a dispute are particularly within the knowledge of one party, then the burden of proving an issue lies with the knowledgeable party.  Waterman should not have to prove a negative.").

reflected in its Total Costs calculations that somehow explain its fluctuating margins.  *See* Class

Order at 13 n.6 (XOOM "had every reason to substantiate its [Summary Judgment] motion with

evidence reflecting the incorporation of prior period adjustments in its margins—and failed to do

so.").  Given the implausibility of XOOM's claim, it should bear the burden of proving it.[9]

## IV.   THE CLASS WILL RELY ON THE APPROVED MODEL TWO AND XOOM PROVIDES NO BASIS FOR RECONSIDERATION
*(Responding to Defs.' Point IV.A.1–3, Defs.' Br. at 13–21)*

### A.   The Court Already Found That Model Two Accommodates a Proportionate Margin and XOOM Presents No Facts or Law Supporting Reconsideration

Model Two is a simple formula that tracks the components of XOOM's rate-setting

workbooks.[10]  MSJ Order at 4.  The Court understood and agreed with this in granting class

certification when it found that "[t]he second damages model assumes that XOOM was allowed

to charge its variable rate customers the same margin it charged its fixed-rate customers, an

approximately 19% markup."  Class Order at 9.  The Court made clear that XOOM's criticism of

that model "depends" on the "central summary judgment issues" of identifying "supply costs [and]

an appropriate margin."  *Id.* at 9–10.

In another effort to recast disputed issues of fact as bearing on Rule 23, XOOM oddly

claims that Model Two is incompatible with the Court's "proportionate margin" construction

---

[9] XOOM's North Carolina case citations, Defs.' Br. at 11–12, 20–21, do not require a different conclusion about burden.  The plaintiff in *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86 S.E. 1025, 1026 (N.C. 1915) presented "no evidence what[so]ever" about the railroad rate that was the subject of the case. *Troitino v. Goodman*, 35 S.E.2d 277, 282–83 (N.C. 1945) concerned reasonably foreseeable damages and double recovery.  *Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09 (N.C. 2019) reversed dismissal of a contract claim pursuant to *res judicata* because although breach of that contract was raised in an administrative proceeding that a court eventually reviewed, plaintiff's petition for judicial review "failed to allege an amount of damages" and therefore the contract claim had not been decided on the merits. *Peaseley v. Virginia Iron, Coal & Coke Co.*, 194 S.E.2d 133, 147 (N.C. 1973) held only that the plaintiff had failed to present evidence of "reasonable expenses" incurred in servicing a contract and remanded to the trial court to determine what her net profits would have been under the contract, rather than her gross profits.

[10] The Class will not rely on Model 1 because that model was not approved by the Court at class certification.  *See* Class Order at 14.

issued just two weeks prior to certification.  Defs.' Br. at 13.  That is not true.  Plaintiff's damages model can accommodate whatever reasonable margin the jury determines, including the 19% figure the Court identified at class certification.  Class Order at 9.

XOOM faults Plaintiff's experts' damages **calculations** (not the model itself) because Plaintiff's experts' October 2022 report—written nearly a year **before** the Court construed the contract to require a single fixed margin—used the delta between XOOM's excessive margins and XOOM's corresponding (rather than average) contemporaneous fixed rate margins.  Defs.' Br. at 13.  XOOM's argument not only lacks merit, but it was also available at class certification.  XOOM explicitly acknowledged that one of Plaintiff's contract readings at summary judgment was that "*based on* means directly proportional to supply costs, allowing XOOM to charge a fixed margin on top of costs."  XOOM MSJ Reply at 5.  In fact, XOOM wrongly claimed that the "only source" for this construction was Plaintiff's expert.  *Id.*  Yet XOOM made the strategic choice **not** to criticize Plaintiff's experts' calculations when Rule 23 questions were before the Court.

Moreover, XOOM is incorrect that a change to Model Two's arithmetic stemming from the Court's cost-plus contract construction, MSJ Order at 12–13, rather than a series of contemporaneous fixed margins, means that the model **itself** is misaligned with Plaintiff's liability theory.  The experts' report makes clear that Model Two "allows XOOM a margin over Total Cost that equates to the fixed rate margin applied to its fixed rate customers."  ECF 138-3, Pl's Expert Rep. ¶ 73.  XOOM cries foul because the report's next sentence states "[t]o **calculate** the damages" the experts used the "self-reported margins on fixed rate contract by region and month," but that same sentence also explains that "[i]f the Court or factfinder determines that a different margin was appropriate here (e.g., 10%) we would easily be able to update our calculations to reflect a different margin assumption."  *Id.*

Again, XOOM's criticizes the calculations, not the model itself.  The report later states that "[b]y allowing XOOM a margin equivalent to its fixed rate margins – averaging approximately 19% – our damage model anticipates a potential argument by XOOM that it was permitted to include a margin." *Id.* ¶ 76.  It was indeed these two report paragraphs (¶¶ 73, 76) that the Court cited when it described Model Two as permissibly assuming "that XOOM was allowed to charge its variable rate customers the same margin it charged its fixed-rate customers, an approximately 19% markup."  Class Order at 9.

The model's theory is unchanged and its arithmetic can easily be updated to incorporate the margin determined at trial, which the Court's certification order recognized by finding Plaintiff's second model "entirely consistent with plaintiff's theory" and noting that "[c]alculations need not be exact . . . ."  Class Order at 14 (citing *Comcast*, 569 U.S. at 35).  Even if re-tooling Model Two's math could be considered a flaw (it cannot), it is well settled that "'[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible.  . . . The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (cleaned up).[11]

Further, "*Comcast* need not be read at this stage to require a court to engage in detailed analysis[.]"  *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 278 (E.D.N.Y. 2019); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) ("*Comcast* does not suggest that damage calculations must be so precise at this juncture."); *Carpenters Pension Trust Fund of St.*

---

[11] *See also Cruz v. Kumho Tire Co.*, No. 10 Civ. 219, 2015 WL 2193796, at *5 (N.D.N.Y. May 11, 2015) (same); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17 Civ. 4576 (DEH) (BCM), 2024 WL 1115944, at *6 (S.D.N.Y. Mar. 14, 2024) ("If there are flaws in an expert's reasoning, only flaws large enough such that the expert lacks good grounds for his or her conclusions should lead to a court excluding evidence." (cleaned up)).

*Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) (*Comcast* and Rule 23(b)(3) require only "minimal scrutiny" of damages models); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 305 (E.D.N.Y. 2013) ("*Comcast*, therefore, does not create a heightened standard for satisfaction of Rule 23(b)(3) predominance.").

Indeed, Model Two goes far beyond the kinds of preliminary and potentially problematic methodologies that can satisfy *Comcast*. *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (damages model satisfies *Comcast* even though it "fails to consider some arguably significant variables"); *Waggoner*, 875 F.3d at 106 (*Comcast* satisfied even though "damages model failed to account for variations in inflation over time"). Model Two is more than adequate, and XOOM marshals no case law to support its contrary claim. *See* Defs.' Br. 13–14.

**B.** **The Court Already Found That Model Two Accommodates a Reasonable Margin and the Model Itself Need Not "Show" Such a Margin**

XOOM also advances the odd claim that Model Two is flawed because the model itself "does not suggest what a *reasonable* margin might be. . . ." Defs.' Br. at 14. Clearly, *Comcast* does not require the model itself to supply a disputed input—much less an input the Court already highlighted as "one of the central summary judgment issues." Class Order at 9–10. Nevertheless, XOOM offers a motley mix of recycled or otherwise faulty arguments.

*1.    Plaintiff's Experts Opined on What Constitutes a Reasonable Margin by Demarcating the Outer Bound of Reasonableness*

Pivoting from its unorthodox claim almost immediately, XOOM turns to direct attacks on Plaintiff's expert's intended testimony, ***not*** the damages model itself. But XOOM's complaints about testimony of course have no bearing on whether Model Two satisfies *Comcast*. What's more, they are incorrect. For example, the record shows that Plaintiff's experts explicitly opined that XOOM's fixed rate margin was the ***highest*** possible reasonable margin allowable under the contract, and that any margin above that sum would be unreasonable. Specifically, their report

26

plainly states that "the margin on variable rate contracts should not be higher than the margin on the corresponding fixed rates contracts on average."  ECF 138-3, Pl's Expert Rep.  ¶ 76; *id.* ¶ 73 (XOOM "substantially overcharged its customers by imposing an unreasonably high margin on its variable rate customers as compared to its fixed rate customers.").  Yet, XOOM wrongly claims that Plaintiff's lead expert Mr. Adamson admitted to not offering any opinion regarding a reasonable margin for computing Class rates. Defs.' Br. at 14–15.  But, as Mr. Adamson repeated at his deposition, when asked "are you going to offer an opinion that it is not fair for XOOM to seek a higher margin on variable rates conceptionally than it does on fixed rates," Mr. Adamson responded "[i]n this context, yes."  Ex. A to the Declaration of J. Burkett McInturff, dated April 5, 2024 ("McInturff Decl."), Deposition of Seabron Adamson, dated November 8, 2022 ("Adamson Tr.") 98:13–23.[12]

Providing, as Mr. Adamson does, the outer bounds of a range is sufficient.  Courts regularly accept proof of acceptable maximums or ranges as proof of "reasonableness."  For example, the Federal Circuit approved admission of an expert's reasonable royalty analysis that determined only the end points of the royalty range, *i.e.*, the minimum and maximum royalty rate the patent holder could have expected from a hypothetical negotiation.  *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 983–84 (Fed. Cir. 2021) ("[D]istrict court did not err in allowing the jury to hear [expert]'s testimony regarding a range of possible hypothetical reasonable royalty rates instead of a single proposed royalty rate.").  The additional supporting case law is legion.[13]

---

[12] References to "Ex." refer to exhibits to the McInturff Declaration.

[13] *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (jury could determine damages within the "wide range of reasonable royalty rates propounded by each party's damages expert"). Similarly (and logically), courts in this Circuit determine "reasonable hourly rates" by reference to ranges. *See Upstate N.Y. Eng'rs Health Fund by Harrigan v. DiPizio Constr. Co.*, No. 514 Civ. 1539 (MAD) (TWD), 2017 WL 5713213, at *2–3 (N.D.N.Y. Nov. 28, 2017) (collecting cases); *Carter v. City of Yonkers*,

*Footnote continued on next page.*

2.     *There Are Additional Measures of Reasonableness*

Further, and notably, XOOM's former SVP of Energy Supply also admitted that XOOM's fixed rate margins were **profitable**.  *See* ECF 138-22, Coppola Tr. 198:4–8 ("Both products were profitable.").  Yet Plaintiff does not intend to offer only the highest possible reasonable margin at trial.  For example, in 2019, the New York Public Service Commission ("PSC") found that "a reasonable price premium associated with fixed-rate ESCO products would be 5%" and therefore limited fixed rate products to "a price no greater than the trailing 12-month average utility supply rate plus a premium of no more than 5%."  ECF 138-10, Cases 15-M-0127, et al., Ord. Adopting Changes to the Retail Access Energy Market and Establishing Further Process, Dec. 12, 2019 ("2019 PSC Order") at 67.  The PSC found a 5% margin reasonable "because a typical risk premium in financial markets ranges between 3.5% and 5.5%."  *Id.*  The PSC further found that ESCOs' fixed rate products had historically included "a significant premium" that deprived customers of the "meaningful benefits" of locking in a rate, and that the PSC needed to impose a margin cap to ensure fixed rate products were "reasonably priced."  *Id.* at 64.  The PSC also noted that under its proposed "reasonable price cap," "most ESCOs could continue to offer fixed-rate products" and still remain profitable.  *Id.* at 67.  The jury would thus be well within its rights to adopt 5% as a reasonable margin.[14]

---

345 F. App'x 605, 608 (2d Cir. 2009) (approving district court's determination of reasonable rates on the basis of "consider[ing] the range of approved rates" for comparable work).  Other applications of the same method—determining "reasonableness" by reference to maximums—are myriad.  *See, e.g.*, *In re Allegheny Int'l, Inc.*, 158 B.R. 343, 354–55 (Bankr. W.D. Pa. 1992) (relying on expert testimony that a "'reasonable' profit for a [similar] company . . . would range from 20% to 35%" in determining damages "[b]ased on a reasonable 35% profit margin"); *In Re Ugl-Unicco Serv. Co.*, 357 N.L.R.B. 801, 810 (2011) (defining "reasonable period of bargaining" with reference to a maximum number of months).

[14] XOOM is therefore wrong to claim "there is no evidence from which a jury could determine a reasonable margin."  Defs.' Br. at 2; *see also id.* at 14–19.  In fact, XOOM's claim is based on a misreading of Plaintiff's lead expert's deposition testimony.  *See* Defs.' Br. at 14.  XOOM's brief excises snippets of testimony about topics that are **different** than the question of a reasonable margin under XOOM's contract.

*Footnote continued on next page.*

28

3.      *XOOM's Rehashed Reliance on Richards Remains Unavailing*

XOOM next cites *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88 (2d Cir. 2019) in support of its claim that Plaintiff's experts did not opine that fixed-rate margins could be "used as proxies for reasonable variable-rate margins." Defs.' Br. at 16.  But both the factual and legal bases of this claim are incorrect.  The Class Order expressly acknowledges that Model Two "assumes that XOOM was allowed to charge its variable rate customers the same margin it charged fixed rate customers, an approximately 19% markup," and found that Model Two satisfies *Comcast*.  Class Order at 9, 14. Plaintiff's expert even used the word "proxy" when he explicitly testified that he was using XOOM's fixed rate margins to show the highest possible reasonable margin.  Ex. A, Adamson Tr. 98:15–23.

Moreover, XOOM's citation to *Richards* is inapposite.  XOOM claims the "Second Circuit has recognized—in a case involving Plaintiff's expert—that a contract that is silent about margins does not require variable-rate margins to equal fixed-rate margins." Defs.' Br. at 16.  *Richards* does not bear the weight XOOM places on it and XOOM ignores this Court's prior caution that XOOM was "overreading . . . inapposite dicta contained in a footnote" in *Richards*.  MSJ Order at 14.  In *Richards*, unlike here, the ESCO's pricing term was "unambiguous," did not "suggest that the variable rate bears a direct relationship to [the ESCO's] procurement costs," and thus expert

---

*Id.*  In the first snippet, XOOM's lawyer asked the expert to set aside the fixed rate proxy and opine as to how little a margin XOOM could charge while maintaining ***profitability***, which is why the expert referred to XOOM's internal figures.  Ex. A, Adamson Tr. 70:22–73:24.  Notably, Mr. Adamson had already testified that whether XOOM would profit from its contract with the Class was independent of the question of whether XOOM had met "its contractual obligation."  *Id.* at 20:5–17.  In the later snippets, XOOM's lawyer—who had just admitted he and Mr. Adamson were "talking past each other"—jumbled the concepts of "an appropriate margin for ***an*** ESCO" and XOOM's profitability and asked Mr. Adamson to opine "conceptually."  *Id.* at 71:7–72:7.  Mr. Adamson clarified that "I'm talking about this specific contract" and that "[o]ther ESCOs may have, and I'm sure do, very different contractual forms," and even "the same ESCO will have lots, may have different pricing . . . under different arrangements." *Id.* at 72:19–24.  This is also why XOOM is wrong to claim that margins charged by other ESCOs (with different contracts) are relevant to setting a reasonable fixed margin in this case.  Defs.' Br. at 15, n.7.

testimony regarding the pricing term's "*legal meaning*" was irrelevant. *Richards*, 915 F.3d at 98

(emphasis in original). Here, the Court supplied the contract's legal operation and Plaintiff's

expert simply offered testimony regarding a reasonable margin, which is a far cry from what the

Second Circuit rejected in *Richards*.[15, 16]

### 4.   *Fixed Rate Margins Are an Acceptable Proxy*

XOOM also jumps to the merits (again) in claiming that "the evidence shows a factfinder

could ***not*** accept the fixed-rate margins as a reasonable variable-rate margin" because "[f]ixed

rates are subject to different pricing and market considerations." Defs.' Br. at 17. This, of course,

is a common classwide dispute. XOOM also made this argument at certification and there is no

reason for it to get a do-over. *See* Class Opp'n at 26 (XOOM claiming that use of fixed rate

margins in Model Two "ignore[s] the fundamental differences between fixed-rate and variable -

rate products"); *id.* at 13 (claiming that variable rates pose "more risk").

---

[15] It is misleading for XOOM to claim that Plaintiff would have jurors "invent absent contract terms out of thin air." Def's Br. at 16 (citing *Richards*, 915 F.3d at 98, n.5). The cited footnote makes plain that when a pricing term is "*not* ambiguous" and "nothing in that [term] suggests the specific limitation that [the plaintiff] argues for[,]" it is "patently incorrect" to ask the jury to adopt a different meaning. *Richards*, 915 F.3d at 98, n.5. That is far from the inquiry occasioned by the Court's contract construction.

[16] XOOM's cited cases regarding presenting evidence needed for jury findings also do not change the fact that Plaintiff's expert has offered sufficient evidence. Instead, XOOM cherry picks inapposite and *sui generis* exemplars. *See Cline v. Cline*, 128 S.E.2d 401, 404 (N.C. 1962) (no evidence of the cost of the underlying "value of the thing sold"); *Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 458 (E.D. Pa. 2012) (plaintiff failed to "allege any facts relating to credit standing or the prevailing retail rate for comparable loans" as required by the relevant regulation); *In re Hampton*, 407 B.R. 443, at *3 (B.A.P. 10th Cir. 2009) ("Creditors failed to present any evidence that Debtor knew his statements were false at the time he made them."); *Hershkowitz v. Think Tech Labs, LLC*, 651 F. App'x 15, 19 (2d Cir. 2016) (no evidence of hourly wages or reasonable compensation in employment contract dispute); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17 Civ. 4576 (GHW) (BCM), 2023 WL 2870484, at *4 (S.D.N.Y. Apr. 10, 2023) (court relying on precedent for appropriate hourly rates where not supplied by movant in attorney's fee motion); *Duracell Inc. v. Glob. Imports, Inc.*, No. 17 MC 185 (KNF), 2018 WL 5619983, at *8 (S.D.N.Y. Aug. 16, 2018) (movant did not provide precedent for requested hourly rate of paralegals in attorney's fee motion); *Peaseley v. Virginia Iron, Coal & Coke Co.*, 194 S.E.2d 133, 147 (N.C. 1973) (reversing lower court because plaintiff relied on a witness who "g[a]ve a mere guess or opinion, unsupported by facts, as to the amount of damages[.]"); *In re Amla Litig.*, 320 F. Supp. 3d 578, 591 (S.D.N.Y. 2018) (rejecting damages theory zero product value while court found product, though defective, retained some value).

Additionally, Plaintiff disputes XOOM's common defense and will marshal common evidence in response.  For example, ███████████████████████████████████ ████████████████████████████████████████████████████████  ECF 141-21, Deposition of former CEO Thomas Ulry at 86:4–87:7; ECF 141-22 at 3 (XOOM internal document explaining that ████████████████████████████████████████ ██████████████████████████.  Indeed, ████████████████████████████ ████████████████████  *Id.*  Despite this classwide admission, it is undisputed that XOOM consistently assigned much higher margins to variable rate customers than to fixed rate customers.  *See* ECF 138-3, Pl.'s Expert Rep. ¶¶ 55, 59, 75.[17]



>    5.   *XOOM Recycles Its Challenge to the Products Included in the Class*

Next, XOOM revives its failed typicality argument from class certification when it asserts that the same margin cannot be applied to different products.  Defs.' Br. at 17.  The Court already rejected XOOM's claim that Plaintiff could not represent gas customers because she purchased only electricity.  Class Order at 15–16.  This was because XOOM's form contract uses the same pricing term for all Class Members.  *See* Class Order at 15 ("Though XOOM's natural gas supply costs necessarily differ from its electricity supply costs, there is no question that the form contract contained identical language[.]").[18]  XOOM did not vary its form contracts among Class Members and the legal effect of that contract likewise should not vary.  Further, "XOOM does not claim it

---

[17] XOOM is also wrong to suggest that Plaintiff's experts disavow using a fixed rate margin as a benchmark for a variable rate margin.  Defs.' Br. at 17.  Again, Plaintiff's expert made clear that "the margin from fixed rate customers [is] a proxy of a rate that XOOM itself had used" "of what might be an acceptable margin."  Ex. A, Adamson Tr. at 69:13–70:21.  In fact, the PSC has found that margins for variable rates should be *lower* than fixed.  2019 PSC Order at 38, 67 (requiring ESCOs to charge less than utility rates for variable rate products but allowing a premium of 5% over utility rates for fixed rate products).

[18] In reality, the number of products is 1—the same wholesale energy supplied by the utility at cost.  Even a charitable view to XOOM provides a count of 2 products, electricity and natural gas, which again, the Court found no distinction between for Rule 23 purposes.  Class Order at 15.

used a different rate-setting process for its [different] customers[,]" and because their "claims arise

from the same rate-setting process and will rely on similar legal arguments to prove liability," there

is "no doubt" they should be treated alike. *Id.* at 15–16. Moreover, XOOM's Total Costs, rates,

and margins for these products are in the same workbooks, *see* ECF 138-26, and all rates were set

at the same meetings in the same way, Class Opp'n at 9.

XOOM claims that the "variable-rate market" differs in various New York regions and

thus the same reasonable margin cannot apply. Defs.' Br. at 18–19. Again, XOOM used the exact

same cost-plus contract and rate-setting process in these markets. Class Order at 15–16. This is

why the Court ***can*** "task a lay jury with determining what a reasonable variable-rate margin is for

six different products in seven or eight markets . . ." Defs.' Br. at 20.[19, 20]

## V.   XOOM REFRAMES ITS REJECTED PREDOMINANCE ARGUMENT ABOUT "ACTUAL" COSTS AS A *COMCAST* ATTACK
*(Responding to Defs.' Point IV.A.4, Defs.' Br. at 21–22)*

After accepting Plaintiff's damages model as "entirely consistent with plaintiff's theory"

the Court noted that whether Model Two "which calculates damages based on rate, cost, and

margin is accurate depends on the accuracy of the inputs, namely the supply cost and margin."

---

[19] XOOM cites *Naphcare, Inc. v. Guilford Cty.*, No. 07 Civ. 174, 2008 WL 4371770 (M.D.N.C. Sept. 18, 2008), in a footnote and suggests that Plaintiff seeks to use that case to "get away with furnishing no evidence of what a reasonable margin is." Defs.' Br. at 21, n.8. As discussed on p. 28 *supra*, Plaintiff has ample evidence to present to a jury regarding a reasonable margin.

[20] XOOM's claim about the difference between so called "green" electricity and standard "brown" electricity, *see* Defs.' Br. at 17, is a red herring because (1) these customers were subject to the exact same pricing term as XOOM's other variable rate customers; and (2) XOOM's "green" electricity customers receive the exact same "brown" electricity, XOOM merely purchases renewable energy credits to supposedly offset the environmental impacts of "brown" electricity. McInturff Decl. ¶ 3; *see* Ex. B, 30(b)(6) Tr. 190:6–191–8; Ex. C, Park Tr. 124:19–23. Moreover, these minimal offset costs are reflected in XOOM's rate-setting workbooks as supply costs. McInturff Decl. ¶ 4; Ex. B, 30(b)(6) Tr. 190:6–191–8. Furthermore, XOOM's "green" electricity customers (under the "SimpleClean" and "BizClean" plans) comprise less than 1% of the Class. McInturff Decl. ¶ 5. Finally, that green energy customers were supposedly "often willing to pay a premium," Defs.' Br. at 17, is irrelevant to their contractual right to a rate "based on" XOOM's supply costs.

Class Order at 14.  Nevertheless, XOOM now seeks reconsideration when it claims that Model Two fails to include XOOM's purported "actual supply costs" as a cost variable and is thus not consistent with "the prevailing theory of the case."  Defs.' Br. at 21.  XOOM is still wrong. *Comcast* requires Plaintiffs' damages model to be consistent with ***Plaintiff's*** theory of liability, not Defendants'.  Class Order at 14.  Here, Plaintiff disputes XOOM's unproven claims that its "Total Cost or COGS number does not constitute its 'actual and estimated supply costs' because some of its supply costs—such as prior period adjustments—are incorporated in the margin," and this Court has already held that this dispute raises a material issue of fact.  MSJ Order, pp. 16–17. XOOM offers no grounds for the Court to reconsider its *Comcast* findings.[21]

## VI. THE COURT ALREADY HELD THAT THE COMPOSITION OF XOOM'S SUPPLY COSTS IS A PREDOMINANT CLASSWIDE QUESTION OF FACT, AND XOOM'S CLAIMS ABOUT ACTUAL COSTS PROVIDE NO BASIS TO RECONSIDER THAT RULING
*(Responding to Defs.' Point IV.B, Defs.' Br. at 22–29)*

XOOM's brief repeatedly acknowledges, as it must, that at summary judgment the Court construed XOOM's contract to require that rates be set using a mathematical, cost-plus formula. Defs.' Br. at 2–3, 6, 12.  XOOM also acknowledges, as it must, that XOOM's "rates were not set by a mathematical formula[.]"  *Id.* at 24.  Nevertheless, XOOM claims the supposed "absence" of common evidence of actual costs destroys predominance.  *Id.* at 22.  XOOM already made this exact same challenge at class certification.  *See* Class Opp'n at 22–24 (arguing that because XOOM's rate-setting workbooks do not contain evidence of actual supply costs, "it is not possible

---

[21] XOOM's cite to *Price v. L'Oreal USA, Inc.*, No. 17 Civ. 614 (LGS), 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021) is easily distinguished.  The *Price* plaintiffs' damages model—a price premium analysis seeking to assign a value to challenged marketing claims—failed to isolate an additional, unchallenged marketing claim.  *Id.* at *4–5.  Accordingly, the *Price* court found the model failed *Comcast. Id.* at *6.  Here, Plaintiff's model uses XOOM's self-reported COGS plus a hypothetical reasonable margin to compute Class damages, which is (and was) "entirely consistent" with Plaintiff's liability theory.  Class Order at 14.

for the Mirkins experts or a factfinder to quantify what the 'actual and estimated supply costs' were at any relevant time by looking solely at the cost components in the rate-setting workbooks.").

The Class Order also rejected this attack.  Specifically, the Court outlined XOOM's claim that its varying margins incorporate actual costs "into rates on an ad hoc basis and not produced in discovery as a discrete number," Class Order at 12, but dismissed that critique because "one of the central disputes of material fact is whether plaintiff's rate fluctuations were caused by permissible supply costs incorporated into the margin."  *Id.* at 13 (citing MSJ Order at 17).

Yet, in another reframing of the exact same "actual costs" argument, XOOM now claims that because "Plaintiff offers no way to assess actual supply costs in one stroke, there are countless variations . . . that can only be managed by slogging through separate questions about each rate for each commodity each month."  Defs.' Br. at 24; *see also id.* at 27 ("[T]he evidence of XOOM's actual costs is not limited to a tidy set of systematic monthly spreadsheets like the rate-setting workbooks.").  There are at least five reasons this recurring claim remains inaccurate.

***First***, XOOM's argument ignores the jury's various options for class liability findings, including that the contract barred XOOM from incorporating costs into margins, that XOOM did not "in fact do so," or that XOOM did so "in violation of the contract."  Class Order at 13–14.  If the jury agrees with Plaintiff's evidence on any of these, any actual costs not reflected in XOOM's supply costs calculations fall by the wayside.  If the jury finds that adding costs to margin was not allowed, then XOOM has to live with its own reported margins.

As for whether XOOM "in fact" added costs to margin, the supposed "actual cost" evidence XOOM produced in discovery and cited in its brief in fact proves that XOOM breached, as none of the supposed "actual" costs are ever documented as flowing into the margins reflected in XOOM's rate-setting workbooks.  This makes sense that XOOM would not bother doing so

because many of these adjustments are immaterial or even out in the long run.[22]  After all, why

would  XOOM



Ex. B, XOOM 30(b)(6) Tr. 126:17–127:1; Ex. D, Coppola Tr. 282:5–20.  And

Ex. E, Dep. Tr. of David Coleman ("Coleman Tr.") 35:6–

17; ECF 139-2, Defs.' Expert Report at 14

).  XOOM has not shown any proof of a material difference between the workbooks'

highly accurate cost estimates and XOOM's actual costs and the cherry-picked examples in

XOOM's brief do not change this fact.

If the jury determines that XOOM was permitted to add costs into margin, its actual cost

evidence further shows that it did not do so in a manner consistent with the contract, including

using "aggregated cost overruns into annual and revised budgets, which it used to inform rate-

setting decisions for over a thousand products across many markets, in at least one occasion leading

XOOM to raise New York variable rates to make up for unanticipated costs in other regions."  MSJ

Order at 16–17 (citing ECF 146-12, Loehde Tr. 64:12–14, 69:10–14, 210:2–211:4.  XOOM's

supposed "actual cost" evidence is consistent with the Court's observation, as it typically is not

---

[22] Many of XOOM's cited documents show adjustments that *decreased* XOOM's supply costs.  *See, e.g.*, Loehde Decl. Ex. B-8 (showing higher gross margin than anticipated in New York); Ex. B-40 (although not specific to New York, prior period adjustments for gas COGS were three times more favorable to XOOM as the unfavorable adjustments for electricity COGS).

specific to New York state, let alone specific utility zones within New York.[23, 24]  Actual costs did not drive Class rates in any way remotely consistent with a cost-plus contract.[25]

**Second**, XOOM's claim that Plaintiff lacks evidence of actual costs goes to the probative value of evidence that is relevant to the merits, not questions of class certification.  "When, as here, 'the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016) (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 107 (2009)).  But XOOM cannot avoid the reality that it already lost on this precise issue at summary judgment.  *See* MSJ Order at 15 ("XOOM has failed to adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric.").

**Third**, as discussed on pp. 19–23 *supra*, XOOM bears the burden of showing how supposed actual costs caused XOOM's excessive and varied margins.  If XOOM's rates were based on actual (or even estimated) costs, XOOM would be able to show for every Class rate exactly how it tabulated supply costs and applied a reasonable and proportionate margin.  It cannot.

**Fourth**, even if XOOM were correct that Model Two lacks a necessary cost variable (it is not), it still does not raise a viable basis for excluding Plaintiff's expert report because its critique "focuses almost entirely on [Plaintiffs' experts'] factual inputs and assumptions rather than [their] methodology," meaning XOOM's arguments "go to the probative value of [the experts']

---

[23] *See, e.g.*, Loehde Decl. Exs. B-41; B-43; B-50.

[24] Moreover, XOOM's exhibits do *not* represent XOOM's "actual" costs.  The majority are not final positions.  *See, e.g.*, Loehde Decl. Ex. B-1 ███████████; Ex. B-2 ("potential negative variances"); Exs. B-4–B-36 ("estimates" and "preliminary" results).

testimony, not its admissibility[.]" *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, No. 15 Civ. 5440, 2018 WL 2172667, at *6 (E.D.N.Y. May 10, 2018) (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995)).[26]

*Fifth*, in a telling effort to avoid a critical failure of its common defense, XOOM retreats to a contract construction that allows it to merely "consider" actual costs when setting Class rates. Defs.' Br. at 28. Yet both this Court and the Second Circuit have made clear that XOOM's cost-plus contract provides no rate-setting discretion. MSJ Order at 10, 14; *see also Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) (XOOM's "agreement did not describe the monthly variable rate as being set according to the ESCO's discretion."). In sum, the facts show that Plaintiff's experts' testimony and their damages model easily hurdle applicable requirements, and the law requires that Plaintiff be permitted to call them at trial.[27]

---

[26] *See also Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 61–62 (2d Cir. 2020) (affirming accepted damages model because its "failure to include variables will affect the analysis' probativeness, not its admissibility.") (quotation omitted). It is for the "jury [to] decide how probative [the damages model] is." *SourceOne Dental*, 52 F.3d at 1135; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("the traditional and appropriate means of attacking" admissible evidence is not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.").

[27] XOOM's cited cases are inapposite. *White Indus., Inc. v. Cessna Aircraft Co.*, 845 F.2d 1497 (8th Cir. 1988) involved nationwide antitrust claims by an aircraft dealer. The *White* class was decertified because *none* of the sales the plaintiff complained of "occurred in geographic competition with" the plaintiff. *Id.* at 1499. That is why geographic differences mattered in *White*—XOOM is wrong to insinuate there a blanket rule precluding classes that cross geographic markets. Moreover, the *White* plaintiff compared prices in its immediate geographic area to markets nationwide, which the court rejected. *Id.* at 1502–03. The Class here is limited to New York customers with the same pricing term. The "mini-trials" in *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW) (HBP), 2004 WL 5719589 (S.D.N.Y. Mar. 31, 2004) involved both ascertaining class membership, *id.* at *5–6, and determining liability with respect to 118 attacks by Nigerian government agents over a ten-year period, *id.* at *10–11. Here, the Class has already been ascertained and the case centers on XOOM's performance of a form contract common to all Class Members. *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) was a RICO case involving individualized oral misrepresentations. *Johnson v. Nextel Commc'n's Inc.*, 780 F.3d 128, 146–47 (2d Cir. 2015) involved individualized inquiries due to each class member's state law regarding legal malpractice and conflict waivers. Decertification was granted in *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 295 (S.D.N.Y. 2022) because the plaintiffs had different theories of the meaning of "all natural," the challenged marketing. Moreover, their expert opinion was excluded as misleading,

*Footnote continued on next page.*

**VII.   XOOM PROVIDES NO "COMPELLING REASON" TO RECONSIDER THE QUESTION OF PLAINTIFF'S TYPICALITY**
*(Responding to Defs.' Point IV.C, Defs.' Br. at 29–30)*

In finding typicality met, the Court noted that "XOOM does not seriously contest that plaintiff's claim is typical of other electricity customers."  Class Order at 15–16.  XOOM instead claimed only that Plaintiff could not represent natural gas customers, which the Court quickly dispatched.  *Id.*  XOOM also argued that Plaintiff lost on the merits, but the Court "ignore[d] this argument because the merits of plaintiff's claim are separate from whether her claim is typical of the class."  *Id.* at 15–16, n.7.

Typicality is readily satisfied where all Class Members were injured under the same contract.  *See, e.g., Claridge*, 2016 WL 7009062, at *4 (finding ESCO plaintiffs' claims typical where they were "directed toward [defendant's] statements made in a widely dispersed document and a uniform contract"); ECF 133-6, *Bell v. Gateway Energy Servs. Corp.*, No. 31168/2018 (Rockland Cnty. Super. Ct. Jan. 8, 2021), NYSCEF No. 152 (typicality where ESCO plaintiff's claims involving uniform contract language arose out of the same course of conduct as the class claims).  The Court has already ruled on typicality and XOOM presents no compelling reason— especially one that was not available at certification—for the Court to revisit its findings.

XOOM's second bite at the typicality apple is premised on its margin-related criticisms of Model Two, including the model's alleged failure to "account for actual supply costs . . . ."  Defs.' Br. at 29.  As shown above, these attacks are deeply flawed, *supra* pp. 23–27, and the Court already found these arguments were entirely "separate" from typicality because Plaintiff's theory of breach is identical to the Class's, Class Order at 15–16.

---

meaning the plaintiffs lacked an alternative meaning of "all natural."  *Id.*  Finally, the class in *Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016) was decertified because there was no classwide evidence of privity between the defendant and class members whose loans were serviced, but not owned, by it.

XOOM's next typicality claim is based on its mistaken belief class treatment is barred if there is any given month where XOOM did not breach. Defs.' Br. at 29. Not so. As the Court recognized when certifying the Class, individualized damages calculations "are no barrier to class certification," Class Order at 15 (citing *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015), and such calculations are certainly not grounds for reconsideration.

Finally, XOOM recycles its criticisms of Model Two regarding actual supply costs. Defs.' Br. at 29. Again, these arguments are meritless. *Supra* pp. 33–37. XOOM offers no compelling reason for the Court to reverse itself.[28], [29]

## VIII. XOOM'S NOMINAL DAMAGES ARGUMENT IS NOT A COMPELLING REASON TO RECONSIDER OF THE RULE 23 FINDINGS
*(Responding to Defs.' Point IV.D, Defs.' Br. at 30)*

Lastly, XOOM claims the Class should be decertified because if Plaintiff is unable to establish actual damages, she should be barred from presenting any class case given that she did not explicitly plead nominal damages. XOOM provides no reason why it did not raise this claim at class certification. But more importantly, XOOM's contention is twice mistaken.

---

[28] As a throwaway, XOOM claims Plaintiff lacks typicality because "the bulk" of the Class's common evidence was generated after Plaintiff left XOOM, Defs.' Br. at 29, but that does not make the evidence irrelevant to Plaintiff's or any other Class Member's claims. *See* Class Order at 12 (chronicling Plaintiff's common proof). XOOM also made this same argument at class certification. Class Opp'n at 27 n. 11 ("[t]he Mirkins were only XOOM customers for six months in 2013, . . . making them poor class representatives to explain how XOOM's pricing practices were supposedly improper" at later dates). XOOM's citation of the "proper plaintiff" snippet from *Richards* in this context is misleading, as the "proper plaintiff" statement was in reference to the Second Circuit's finding that the plaintiff had failed to prove his *individual* claim by "focus[ing] exclusively" on pricing practices that post-dated his tenure as a customer when "[f]or the three months that Richards paid it, the variable rate and [the ESCO's costs] stayed constant." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 100 (2d Cir. 2019). That is clearly not how Plaintiff is using the common proof here. Also, XOOM should not have cited the *Richards* "proper plaintiff" language without clarifying that it was *not* being used in the Rule 23 context, as the class certification motion in *Richards* had previously been denied as moot and was *not* on appeal. *Id.* at 106.

[29] XOOM does not ask the Court to reconsider the Class Order's findings in favor of numerosity, ascertainability, adequacy, or superiority. Class Order at 7–8, 16–18.

First, Plaintiff can and will prove classwide entitlement to substantial damages, not merely nominal damages.  Second, even if Plaintiff fails, she can recover nominal damages, which "are always available in breach of contract actions[.]"  *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (quoting *Ely–Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993)).  As the Second Circuit explained, "even if [plaintiff's] allegations of substantial damages were, as Defendants argue, too 'speculative' to support its claims, [plaintiff] would have plausible claims for nominal damages."  *Id.*  This was so even though the *Luitpold* complaint did not seek nominal damages.  *See* Complaint, *Luitpold*, No. 11 Civ. 681 (S.D.N.Y.), ECF 1.  XOOM's only case cite, *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135 (2d Cir. 1994), does not counsel otherwise.  In that case—stemming from alleged First Amendment violations, not breach of contract—the plaintiff sought only declaratory relief and attorney's fees.  The District Court ruled (and the Second Circuit affirmed) that because the complaint lacked "any claims for monetary damages" the court "simply cannot read into [a] complaint a claim for damages, nominal or otherwise, where none exists."  *Fox v. Bd. of State Univ. of N.Y.*, 764 F. Supp. 747, 756 (N.D.N.Y. 1991), *aff'd*, 42 F.3d 135 (2d Cir. 1994).  Accordingly, here, and as with ***all*** of its other arguments, XOOM falls far short of presenting a compelling reason for the Court to reconsider its recent certification ruling.[30, 31]

---

[30] However, if the Court prefers, Plaintiff can amend her complaint to include a prayer for nominal damages. *See* Fed. R. Civ. P. 15(b); *see also Jeffers v. City of New York*, No. 14 Civ. 6173 (CBA) (ST), 2018 WL 904230, at *2 (E.D.N.Y. Feb. 13, 2018) ("Because Plaintiffs have produced a considerable amount of evidence since they filed their complaint, this Court first recommends that the complaint be amended to conform to the proof offered at summary judgment . . . .").

[31] Considering XOOM's claim that Plaintiff must re-establish all Rule 23 elements in opposition to XOOM's reconsideration motion, *see* Defs.' Br. at 9, Plaintiff hereby incorporates all arguments made in ECF Nos. 137 (sealed Certification Memorandum of Law) and 141 (sealed Certification Reply).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully asks that the Court deny Defendants'

Motion to Decertify the Class.


Dated: April 5, 2024

**WITTELS McINTURFF PALIKOVIC**

 /s/ J. Burkett McInturff         
J. Burkett McInturff
Steven L. Wittels
Ethan D. Roman
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com
slw@wittelslaw.com
edr@wittelslaw.com

*Class Counsel for Plaintiff and the Class*

Richard Dolan
Bradley D. Simon
**SCHLAM STONE & DOLAN LLP**
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Andrey Belenky
**KHEYFITS BELENKY LLP**
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

*Co-Counsel for Plaintiff and the Class*