# Exhibit A

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF NEW YORK
 3      SUSANNA MIRKIN and BORIS MIRKIN,
 4      Individually and on Behalf of All Others
 5      Similarly Situated,
 6             Plaintiffs,
 7         vs.                      No. 18 Civ. 2949(ARR) (RER)
 8      XOOM ENERGY, LLC and XOOM ENERGY
 9      NEW YORK, LLC,
10             Defendants.
11      ---------------------------------x
12
13
14                 VIDEOTAPED DEPOSITION OF
15                     SEABRON ADAMSON
16                Tuesday, November 8, 2022
17                       10:06 a.m.
18                         Veritext
19                      101 Arch Street
20                Boston, Massachusetts 02110
21
22
23
24                 Laurie K. Langer, RPR
```

Page 1

```
 1      A.  XOOM is allowed to make a profit, but it has to
 2   corres -- but it has to -- it has to meet the conditions
 3   of the contract that it's on.  Lots of --
 4           MR. WITTELS:  Let him answer.
 5      A.  Lots of companies sign contracts.  Somebody signs
 6   a contract to rehabilitate the building across the way
 7   here; right?  They say, "oh, we signed the contract, and
 8   by the way, to rehabilitate this building it's going to
 9   cost $10 million."  That's the price.  It may cost nine
10   in which case they make a profit or it may cost eleven
11   in which they don't make a profit.  The key is if you
12   have a contract that they said that they were going to
13   do it for $10 million, then they're locked in to their
14   contractual commitment.
15           Of course XOOM is able to make a contract as long
16   as -- make a profit, but it's got to meet its
17   contractual obligation.
18      Q.  Okay.  Here's what I'm trying to do.  I'm trying
19   to set a baseline --
20      A.  Uh-huh.
21      Q.  -- to be sure we're on the same page about what
22   measure you used to determine whether or not --
23      A.  Uh-huh.
24      Q.  -- XOOM set its rates consistent with the sales
```

Page 20

1  that compares XOOM's variable rate charges to what
2  customers would have been charged by the utility during
3  the same time period?
4         MR. WITTELS:  Objection.
5     A.  No.  The damage models as we discussed are the
6  two.
7     Q.  Right.  And you don't intend to offer an opinion
8  about that?
9     A.  No.  The only thing we used was a, as a graphical
10 comparison on the relationship between supply costs and
11 the utility rate, as an example.  But the two models are
12 the two models.
13    Q.  Yep.  Okay.  Are you offering an opinion about
14 what is a reasonable or appropriate margin for an ESCO
15 to charge?
16    A.  Well, to build the second model we needed an
17 estimate of a margin.  We really didn't have any
18 information that would allow that to be created, since
19 XOOM had, from what we can tell, had never done it that
20 way.  They had never tried to calculate a, or they did
21 not present in any way, I can't say that they never
22 tried.  They did not present in the rate setting
23 workbooks and other information calculations of any sort
24 like that.  So we used the margin from fixed rate

Page 69

```
 1      customers as a proxy of a rate that XOOM itself had
 2      used.  I can't go further than that because there's no
 3      information.
 4                  MR. MATTHEWS:  Can you read my question
 5      back, please.
 6                  (Prior testimony read back.)
 7                              "Are you offering an opinion
 8                              about what is a reasonable or
 9                              appropriate margin for an ESCO
10                              to charge?"
11         A.   Yeah.  Conceptually, yes.  Conceptually, yes.
12              Thanks for reading that back.
13         Q.   That's okay.  And what is the opinion that you're
14      offering conceptually about that?
15         A.   Well, I mean, it's obviously related to the
16      contract that we've been discussing, whether it's based
17      on supply costs, that, you know, if the Court were to
18      decide that a margin was allowed, that it can't be an
19      uncapped margin, that's why we made a second calculation
20      using the fixed rate margin as a proxy of what might be
21      an acceptable margin.
22         Q.   Are you offering any opinion about what is an
23      acceptable or appropriate, a reasonable margin aside
24      from just using XOOM's fixed rate margin?
```

Page 70

```
 1        A.   We haven't offered that opinion, we don't have
 2   any information to do that.
 3        Q.   Do you intend to?
 4        A.   If information were to be provided, but that
 5   would have to come from XOOM.  So I, in the absence of
 6   not expecting anymore information to come, no.
 7        Q.   Well, we've gotten talking past each other again.
 8   I'm talking conceptually.  You've said that it will be
 9   for the Court to decide whether a margin can be charged
10   and if so what's appropriate; right?
11        A.   Right.
12        Q.   And if we go to trial --
13        A.   Uh-huh.
14        Q.   -- and you take the witness stand --
15        A.   Uh-huh.
16        Q.   -- and I'm asking you questions and the judge
17   gets frustrated with my questions and says, "let's cut
18   to the chase.  Mr. Adamson, what do you think is an
19   appropriate margin for an ESCO to charge?"  What would
20   your answer be?
21             MR. WITTELS:  Objection.
22        A.   I would say conceptually it's got to be related
23   to the, related to the costs.  And in a broad conceptual
24   basis.
```

Page 71

```
 1      Q.  And if he said, "but can you give me a cutoff
 2   point?  Is there a number that you can assign to that?"
 3   Would you be able to give him one?
 4             MR. WITTELS:  Objection.
 5      A.  I wouldn't be able to give him a number on the
 6   stand because I wouldn't have the, XOOM's internal
 7   information, no.
 8      Q.  Okay.  So the margin in your view, --
 9      A.  Uh-huh.
10      Q.  -- the margin that is appropriate for an ESCO to
11   charge conceptually --
12      A.  Uh-huh.
13      Q.  -- is ESCO specific?
14      A.  Well, again, we're talking about relation to a
15   specific contract, so.
16      Q.  I'm not.
17      A.  You're not.
18             MR. WITTELS:  Don't interrupt him.
19      A.  I am talking -- sorry.  I'm talking about this
20   specific contract.  Other ESCOs may have, and I'm sure
21   do, very different contractual forms.  And in fact,
22   ESCOs -- even the same ESCO will have lots, may have
23   different pricing, right, under different arrangements.
24   We're talking about variable rate pricing here as
```

Page 72

1	opposed to fixed rate pricing.
2	    Q.  Uh-huh.
3	    A.  Fixed rate pricing, I think we can all agree, the
4	actual outturn margins could be quite different.  A lot
5	depends on timing in that case; right?  Okay.  So I
6	don't know that there is a "single ESCO number" I don't
7	think that's a meaningful concept.
8	    Q.  Okay.  Is there a single ESCO number for variable
9	rates that in your opinion would be a cap on what is an
10	appropriate or reasonable margin?
11	    A.  I don't have a number in mind because I don't
12	know what the, what would be claimed to be the types of,
13	of costs that, to be recovered in that margin.  What I
14	don't -- you know, I don't have a number.  What I am
15	offering is conceptually that the margin has to be based
16	on something from reality to be meaningful in the
17	context of this contract, and, you know, can't be
18	arbitrary.
19	    Q.  Okay.
20	    A.  But I don't have a number to give you.
21	    Q.  Okay.  And would not be able to create one?
22	        MR. WITTELS:  Objection.
23	    A.  Not -- not on the information available right
24	now.  I think that would need more inputs than are

1      A.   Well, in a sense, yes, because the, you
2   know -- well, first off, the fix rate is used as, you
3   know, a way of coming up with a reasonable margin that,
4   based on what XOOM itself set rates on.  You know, it's
5   not -- it's based on the information available.
6           So one question then comes to, you know, are, is
7   there some reason that, that XOOM would need to charge a
8   higher rate on fixed rate customers?  If so I don't
9   really see what it is.
10              MR. WITTELS:  Variable.
11     A.   Sorry.  On variable rate customers.  I am -- we
12   don't have any information to, to delve into that.
13     Q.   I'm asking conceptually.  And it's okay if you
14   are not offering this opinion.  I'm not saying you
15   should or you shouldn't be.  I just want to know in this
16   case are you going to offer an opinion that it is not
17   fair for XOOM to seek a higher margin on variable rates
18   conceptually than it does on fixed rates?
19     A.   In this context, yes.  Because there is no XOOM
20   provided despite all of the information about how those
21   methods were set of how these margins came up.  How
22   these -- how the variable rate margins were determined
23   and that's a reasonable proxy, yes.
24     Q.   Are you offering that opinion more broadly, that

Page 98

```
 1                          CERTIFICATE
 2
 3       COMMONWEALTH OF MASSACHUSETTS
 4       SUFFOLK, ss.
 5
 6          I, Laurie Langer, Registered Professional Reporter
         and Notary Public in and for the Commonwealth of
 7       Massachusetts, do hereby certify that the witness whose
         deposition is hereinbefore set forth, was duly sworn by
 8       me and that such deposition is a true record of the
         testimony given by the witness.
 9
10
            I further certify that I am neither related to or
11       employed by any of the parties in or counsel to this
         action, nor am I financially interested in the outcome
12       of this action.
13
            In witness whereof, I have hereunto set my hand and
14       seal this 11th day of November, 2022.
15
16
17
18                          NOTARY PUBLIC
                            Commission Expires
19                          7/27/2023
20
21
22
23
24
                                                          Page 141
```