## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | No. 18 Civ. 2949 (ARR) (JAM) |
| v. | |
| XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION TO DECERTIFY THE CLASS

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ....................................................................................... 1

II. ARGUMENT ............................................................................................................ 3

    A. Plaintiff retains her burdens under Rule 23 and on the merits at trial. ......................... 3

        1. Plaintiff has a continuing burden to show the class satisfies Rule 23's
            requirements.................................................................................................. 3

        2. Plaintiff must prove all elements of her overcharge claim to prevail at trial—
            including actual supply costs to show what XOOM's rates should have been....... 6

            a. To prevail on the merits at trial, Plaintiff must prove the amount she and the
                class should have been charged for every rate....................................................7

            b. Plaintiff cannot avoid her burden to prove what she should have .....................
                been charged. ........................................................................................8

    B. Plaintiff's response confirms that her experts' Model Two is inadmissible. ...............11

        1. Model Two omits an input for actual supply costs entirely. ...................................11

        2. Model Two admittedly lacks a proportionate-margin input.................................11

    C. Without a viable damage model that accounts for actual supply costs and an
        appropriate margin, the class lacks Rule 23 commonality and predominance. .......... 13

        1. Model Two's omission of actual supply costs will force the jury to deal with
            abundant and varying documentary and testimonial evidence for each rate. ....... 13

         2. Plaintiff's "margin-later" approach separately requires decertification. .............. 17

            a. Plaintiff's experts' belief that it is appropriate to use a fixed-rate margin as the
                outer bound for reasonableness is completely unsupported ........................... 17

            b. Second Circuit precedent prohibits subjective and unsupported expert
                opinions that are based on assumptions about findings a jury might later
                make ................................................................................................ 19

            c. The PSC's Reset Order is not admissible evidence of a limit on XOOM's
                margin ............................................................................................... 20

    D. Plaintiff's new outer bound for a reasonable margin means she and most of the class
        have no damages, raising new typicality, commonality, and predominance issues.... 23

i

**III.**   **CONCLUSION** ............................................................................................................ 27

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allegra v. Luxottica Retail N. Am.*,
  341 F.R.D. 373 (E.D.N.Y. 2022) ...........................................................................13

*Ariza v. City of New York*,
  139 F.3d 132 (2d Cir. 1998)..................................................................................22

*Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*,
  86 S.E. 1025 (N.C. 1915)......................................................................................7, 8

*Bouaphakeo v. Tyson Foods, Inc.*,
  214 F. Supp. 3d 748 (N.D. Iowa 2016).................................................................26

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)................................................................................12, 13, 27

*In re DC Water & Sewer Auth.*,
  561 F.3d 494 (D.C. Cir. 2009) ................................................................................5

*Donovan v. Phillip Morris USA, Inc.*,
  No. 06 Civ. 12234 (DJC), 2012 WL 957633 (D. Mass. Mar. 21, 2012) ..................4

*Fleisher v. Phoenix Life Ins. Co.*,
  2014 WL 409164, at *2 (S.D.N.Y. Jan. 31, 2014)..................................................5

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  7789, 2022 WL 3971006, at *2 (S.D.N.Y. Aug. 31, 2022).................................5, 21

*Forrest Const. Co., LLC v. Laughlin*,
  337 S.W.3d 211 (Tenn. Ct. App. 2009) ................................................................10

*Gary v. Sheahan*,
  188 F.3d 891 (7th Cir. 1999) ..................................................................................5

*Guerrero v. Bank of Am. N.A.*,
  No. 321CV00333RJCDSC, 2022 WL 19407279 (W.D.N.C. July 1, 2022).....................23, 24

*Intersal, Inc. v. Hamilton*,
  373 N.C. 89 (N.C. 2019)......................................................................................7, 8

*Jin v. Shanghai Original, Inc.*,
  990 F.3d 251 (2d Cir. 2021)...........................................................................3, 4, 5

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015)......................................................................15

*In re KIND LLC "Healthy & All Natural" Litig.*,
    627 F. Supp. 3d 269 (S.D.N.Y. 2022).........................................................5

*Kiobel v. Royal Dutch Petroleum Co.*,
    No. 02 CIV. 7618, 2004 WL 5719589 (S.D.N.Y. Mar. 31, 2004) ...........15

*M. Carbine Restoration, Ltd. v. Sutherlin*,
    544 So. 2d 455 (La. Ct. App.)...................................................................10

*Martinez v. Agway Energy Servs., LLC*,
    88 F.4th 401 (2d Cir. 2023) ...............................................18, 19, 20, 21

*Mazzei v. Money Store*,
    829 F.3d 260 (2d Cir. 2016)............................................................3, 5, 15

*Mck Enterprises, LLC v. Levi*,
    219 N.C. App. 647, 722 S.E.2d 798 (2012)...............................................10

*McNamara v. Felderhof*,
    410 F.3d 277 (5th Cir. 2005) ......................................................................5

*Medtronic, Inc. v. Mirowski Fam. Ventures*,
    LLC, 571 U.S. 191 (2014) ...........................................................................9

*In re Mercedes-Benz Tele Aid Cont. Litig.*,
    267 F.R.D.113 (D.N.J. 2010),..................................................................4, 5

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    279 F.R.D. 598 (D. Kan. 2012)...................................................................4

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    No. 115CV6549CMRWL, 2022 WL 4298767 (S.D.N.Y. Sept. 19, 2022) ............................3

*Price v. L'Oreal USA, Inc.*,
    No. 17 CIV. 614 (LGS), 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021)....................4, 16, 22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019).................................................................25

*Raymond v. Marks*,
    116 F.3d 466 (2d Cir. 1997)........................................................................9

*Richards v. Direct Energy Servs.*,
    915 F.3d 88 (2d Cir. 2019).................................................................18, 21

*Sevugan v. Direct Energy Servs., LLC*,
   931 F.3d 610 (7th Cir. 2019) ...................................................................................21

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
   262 F.3d 134 (2d Cir. 2001).....................................................................................5

*The Medical Society of the State of New York v. UnitedHealth Group Inc.*,
   No. 16-CV-5265 (JPO), 2021 WL 4263717 (S.D.N.Y. Sept. 20, 2021) ...........................3, 12

*Troitino v. Goodman*,
   35 S.E.2d 277 (N.C. 1945).............................................................................7, 24, 25

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016).............................................................................14, 25, 26, 27

*United States v. McCombs*,
   30 F.3d 310 (2d Cir. 1994).......................................................................................9

*Connor B., ex rel. Vigurs v. Patrick*,
   278 F.R.D. 30 (D. Mass. 2011)..................................................................................4

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..........................................................................................25, 26

*Wu v. Pearson Educ. Inc.*,
   No. 09 CIV. 6557 KBF, 2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012)...........................16, 17

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .................................................................10

Fed. R. Civ. P. 23 ............................................................................................ *passim*

Fed. R. Civ. P. 56 ...................................................................................................9

Fed. R. Evid. 401 ...........................................................................................12, 13

Fed. R. Evid. 403 .................................................................................................22

Fed. R. Evid. 702 ............................................................................................ *passim*

Fed. R. Evid. 803 .................................................................................................22

## I.   PRELIMINARY STATEMENT

XOOM's decertification motion showed that Plaintiff has no admissible proof (common or otherwise) of two of the three components that the Court held must determine XOOM's rates: (1) actual supply costs and (2) a reasonable and proportionate margin. Plaintiff's response confirms XOOM was correct. In fact, XOOM's motion proved the point so thoroughly that Plaintiff does not even try to rebut it with evidence. Instead, for the first time, she makes the incredible claim that she does not need that evidence—now or at trial—because she says *XOOM* has the burden of proving its actual supply costs. She also insists that the *jury* can select any margin it feels is appropriate without supporting evidence from her. In other words, instead of assuring the Court she has the common proof she needs, Plaintiff disclaims having any burden. She is wrong. Plaintiff retains the burden on this motion to show Rule 23's requirements are met, and she will of course have the burden to prove her overcharge claim at trial. But without a model that accounts for actual supply costs and a permissible margin, she has no way to prove breach or damages, either for herself or the class. Nor does she have a manageable way to conduct a class trial without weeks of minitrials about how XOOM's actual supply costs impacted monthly rate setting.

Plaintiff's effective surrender on both disputed elements of her claim (breach and damages) is the culmination of her long retreat from the proof problems she has faced since discovery began. The case survived dismissal on Plaintiff's promise that she would be able to show "what XOOM's prices should have been" using "discovery of XOOM's *actual costs* and profits." FAC ¶ 58 (emphasis added). That discovery was produced, and a class was then certified based on her insistence that her experts could account for all costs XOOM considered in rate-setting. But Plaintiff now realizes they cannot do so, and instead argues that XOOM's summary judgment burden to show its rates were based on its supply costs carries over to trial—it does not. Plaintiff's trial burden to show what XOOM's rates *should have been* means an admissible model must

account for XOOM's ***actual*** supply costs even if Plaintiff disputes that XOOM used them. Model Two's omission of actual supply costs does not mean actual supply cost proof can be excluded at trial; nor does it mean the jury's analysis of that proof can be streamlined. It means Model Two cannot serve as common proof on breach or damages and should be excluded under Rule 702.

Plaintiff's recognition of these proof problems seems to have prompted her misguided burden-shifting theories. But not even shifting the trial burden onto XOOM would allow the class to remain certified. Plaintiff's Rule 23 problems would remain even if XOOM was required to prove what its rates should have been (it isn't). The mountain of documentary and "ample testimonial evidence" of XOOM's actual costs and how they affected rates would still raise thousands of individualized defenses that warrant decertification. So, regardless of whether that evidence is presented in Plaintiff's case-in-chief or XOOM's, individualized determinations of what XOOM's rates should have been based on actual supply costs will predominate.

With respect to margin, Plaintiff tries to evade her burden by arguing that, although her experts' current opinions do not account for a proportionate margin, new opinions offered in their amended report will. But Rule 702 requires Plaintiff to establish the reliability of a model ***before*** offering it to oppose decertification or at trial. Plaintiff is also incorrect to claim it is no problem that her experts do not opine as to a reasonable margin because the jury can later pick one and plug it into the model themselves. But a verdict cannot stand without an evidentiary basis for the jury's findings and Model Two does not provide one when it comes to a permissible margin.

These Rule 23 problems cannot be solved. Indeed, Plaintiff does not plan to even try grappling with XOOM's actual supply costs at trial. Her counsel recently indicated that instead she plans to move *in limine* to exclude XOOM's evidence of actual supply costs altogether for unspecified reasons. But because XOOM's actual supply costs are indisputably relevant to what

rates "based on XOOM's actual and estimated supply costs" should have been, they will inevitably be admitted and create thousands of minitrials on both breach and damages regardless of who bears the burden of proof. Whether Plaintiff can win those minitrials is beside the point under Rule 23; it is their necessity that renders certification improper. Thus, Plaintiff's response only underscores that, consistent with its "affirmative duty of monitoring its class decisions," the Court should decertify the class. *Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (quotations omitted).

## II.   ARGUMENT

### A. Plaintiff retains her burdens under Rule 23 and on the merits at trial.

#### 1.   Plaintiff has a continuing burden to show the class satisfies Rule 23's requirements.

*Mazzei*, cited by both parties as the Second Circuit's controlling authority on the decertification standard, unequivocally holds that the party advocating for continued certification "retain[s] the burden to demonstrate that the[] [Rule 23] requirements [a]re satisfied." *Mazzei*, 829 F.3d at 270. Plaintiff therefore retains that burden here. Her misguided attempt to shift it to XOOM relies on (a) outdated cases and (b) two post-*Mazzei* cases that rely on pre-*Mazzei* standards.[1] In 2021, the Second Circuit reaffirmed *Mazzei* and district courts' ongoing duty to ensure Rule 23's requirements are met at every stage of litigation until final judgment. *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261 (2d Cir. 2021) ("A district court is required to monitor class proceedings and 'reassess [its] class rulings as the case develops.'"); *id.* at 262 (the obligation to "ensure that a certified class satisfies Rule 23" continues "throughout the litigation").

---

[1] Even those two cases recognize that a court "may decertify a class if it appears that the requirements of Rule 23 are not in fact met." *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 115CV6549CMRWL, 2022 WL 4298767, at *6 (S.D.N.Y. Sept. 19, 2022) (quotation marks and citation omitted); *The Medical Society of the State of New York v. UnitedHealth Group Inc.*, No. 16-CV-5265 (JPO), 2021 WL 4263717, at *1 (S.D.N.Y. Sept. 20, 2021) (same). And regardless, those cases do not change the outcome here because, even if a significant intervening event is required, XOOM meets that burden: the Court's scrutiny of Model Two's inputs will show it is not a viable damage model and that it must be excluded.

Because of this binding precedent, Plaintiff also tries to avoid her Rule 23 burden by relabeling XOOM's motion as one for reconsideration. As an initial matter, that label would not support continued certification **even if** Plaintiff was correct. The Court can decertify *sua sponte* any time it finds that "the requirements of Rule 23 are no longer met," and it does not matter if that finding is in response to a motion to decertify or on the Court's own initiative to fulfill its "affirmative duty" to "reassess [its] class rulings." *See Jin*, 990 F.3d at 261. But more importantly, XOOM is not seeking reconsideration or asking the Court to reverse itself. Rather, XOOM is properly asking the Court to address an issue the Class Order specifically did not decide: the inadmissibility of Model Two and the inaccuracy of its inputs. XOOM's timely arguments[2] to exclude Model Two are precisely the sort of reasons that courts can—and should—revisit certification. *See Price v. L'Oreal USA, Inc.*, No. 17 CIV. 614 (LGS), 2021 WL 4459115, at \*\*3–4 (S.D.N.Y. Sept. 29, 2021) (decertifying class because plaintiff's expert's damage model previously relied on was, like here, unreliable and not "consistent with [p]laintiffs' alleged injury").

Plaintiff makes two flawed arguments about why XOOM's motion should nonetheless be treated as untimely and subject to harsher standards. Both fail. First, she cites a handful of district cases to show a motion to decertify theoretically can be construed as a motion for reconsideration. Those cases are all inapposite. The vast majority are out-of-circuit and easily distinguished.[3] And

---

[2] As discussed *infra*, Plaintiff does not argue that XOOM's expert arguments are late. Quite the opposite, she contends they are **premature** because XOOM has not yet filed its *Daubert* motion. This heads-I-win-tails-you-lose approach essentially suggests that XOOM's motion is simultaneously months too late and also months too early.

[3] *In re Motor Fuel Temperature Sales Pracs. Litig.*, 279 F.R.D. 598, 615 (D. Kan. 2012) (citing local rule to construe decertification motion as "essentially a motion to reconsider based on intervening change in controlling law"); *Donovan v. Phillip Morris USA, Inc.*, No. 06 Civ. 12234 (DJC), 2012 WL 957633, at \*5 (D. Mass. Mar. 21, 2012) (reaching merits of decertification under Rule 23); *Connor B., ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 35 (D. Mass. 2011) (same); *In re Mercedes-Benz Tele Aid Cont. Litig.*, 267 F.R.D.113, 137–159 (D.N.J. 2010) ("fully address[ing] the company's arguments" on the motion to decertify on their merits), *op. modified on*

4

the only two from this Circuit support XOOM's position, not Plaintiff's. As XOOM explained, *Fleisher v. Phoenix Life Ins. Co.* not only predates *Mazzei* but concerned **consecutive challenges** to a district court's class order. No. 11 Civ. 8405 (CM) (JCF), 2014 WL 409164, at *2 (S.D.N.Y. Jan. 31, 2014). The *Fleisher* defendant sought reconsideration of an order denying decertification—not decertification in the first instance like XOOM.[4] And *In re Foreign Exch. Benchmark Rates Antitrust Litig.* recognized that "an intervening event is not required to decertify a class," that the "district court has the affirmative duty of monitoring its class decisions in light of evidentiary development of the case," and "may decertify a class if it appears that the requirements of Rule 23 are not in fact met." No. 13 Civ. 7789, 2022 WL 3971006, at *2 (S.D.N.Y. Aug. 31, 2022) (quotation marks and citations omitted). Indeed, while the defendant there "d[id] not argue that 'a previously satisfied requirement of Rule 23 is now lacking,'" the court addressed the motion to decertify "on the merits," citing the "court's special duty when a proceeding will bind absent class members . . . ." *Id.* Certainly, the Court should reach the merits here too.

---

*reconsideration*, No. 07 Civ. 2720 (DRD), 2010 WL 2976496 (D.N.J. July 22, 2010). Plaintiff also cites three Circuit-level decisions addressing jurisdiction over a Rule 23(f) petition. *Gary v. Sheahan*, 188 F.3d 891, 893 (7th Cir. 1999); *In re DC Water & Sewer Auth.*, 561 F.3d 494, 495–96 (D.C. Cir. 2009); *McNamara v. Felderhof*, 410 F.3d 277, 279–80 (5th Cir. 2005). Needless to say, those cases are inapposite too. There is no jurisdictional limitation on when class certification can be re-examined. Quite the opposite, a class must be reevaluated under Rule 23 until entry of judgment. *Mazzei*, 829 F.3d at 266; *Jin*, 990 F.3d at 261.

[4] Plaintiff wrongly suggests that XOOM's Rule 23(f) petition was a first motion to decertify because the Second Circuit considered and rejected similar arguments. That mischaracterization conflates two different procedural mechanisms subject to very different standards and burdens. *Compare Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) (a Rule 23(f) *petitioner* (XOOM) bears the burden on standards are so high that they "will rarely be met."); *with In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 295 (S.D.N.Y. 2022) ("[A] district court may—and should—decertify a class when the standards of Rule 23 have not been met.") (cleaned up). Moreover, XOOM does not make the same arguments here as it did in its Rule 23(f) petition. That petition sought to challenge the Class Order, while XOOM's decertification motion is based on an issue the Class Order did not reach: the inadmissibility of Model Two due to the inaccuracy of its inputs.

For good measure, Plaintiff also argues the opposite side of timeliness, insisting that XOOM's motion is premature because decertification will be fully briefed before *Daubert* motions are filed. But that timing is the product of Plaintiff's procedural maneuvers, not XOOM's. XOOM tried to prevent these issues months ago before any deadlines were set by asking that decertification and *Daubert* motions be briefed before pretrial exchanges commenced. Plaintiff refused. Judge Marutollo then granted Plaintiff's requests to set a Joint Pretrial Order Deadline, directed XOOM to file its *Daubert* as a *limine* motion, and ordered the parties to propose decertification briefing deadlines. *See* Jan. 19 Dkt. Order. After the Court entered decertification deadlines, the parties set deadlines for exchanging pretrial materials, including motions *in limine*. Those agreed deadlines would have allowed XOOM to serve its *Daubert* motion on March 29—three weeks before filing its fully briefed decertification motion on April 19. But just three days before the date to exchange *limines* and *Dauberts*, Plaintiff first announced her intention to amend her experts' report and seek an extension of the decertification briefing. The chaos that her belated requests caused is the only reason that XOOM's decertification motion will be fully briefed on May 10 before the now-May 20 deadline to file *Daubert* motions. *See* Apr. 18 Dkt. Order. Thus, Plaintiff's labeling XOOM's motion a "premature placeholder" is misleading at best.

And in any event, XOOM's decertification arguments are not premature or any mystery to Plaintiff. In January, XOOM told Plaintiff and the Court that its *Daubert* arguments would be the basis of its decertification motion. And XOOM's further explanation of those arguments in its March 1 decertification motion is what prompted Plaintiff's request to amend her expert opinions. Plaintiff's timeliness challenges, like all her attempts to avoid her Rule 23 burden, are misplaced.

   2.   <u>Plaintiff must prove all elements of her overcharge claim to prevail at trial—including actual supply costs to show what XOOM's rates should have been.</u>

XOOM's motion established that Plaintiff does not have common proof of actual supply

costs, and thus has no way to show in one stroke what XOOM's variable rates should have been, as the Court's contract construction requires[5]:



It is undisputed that the only common evidence of XOOM's costs are the ***estimated*** costs in the rate-setting workbooks. Plaintiff's response admits that she lacks common evidence of XOOM's actual costs and that Model Two does not account for them. But her response also says that is no problem because the burden of proof is on XOOM, not her. That is incorrect.

> a. *To prevail on the merits at trial, Plaintiff must prove the amount she and the class should have been charged for every rate.*

There is one claim in this case: an overcharge claim under North Carolina law. Plaintiff does not deny that North Carolina law governs the substance of her claim, or that North Carolina requires she prove that "the amount charged by a defendant was in excess" of the amount she should have been charged. *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86 S.E. 1025, 1026 (N.C. 1915); *see also Troitino v. Goodman*, 35 S.E.2d 277, 282 (N.C. 1945) (contract damages are "the pecuniary difference between [an injured party's] position upon breach of the contract and what it would have been, had the contract been performed"). The "amount" of damages is critical to a North Carolina contract claim. *See Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09 (N.C. 2019) ("the amount of damages resulting to plaintiff" is an essential element of a contract claim).

Here, Plaintiff admits that XOOM has actual supply costs but contends there is no evidence

XOOM *used* them to set its rates. Proving that alone is not enough though. On an overcharge claim, Plaintiff cannot just show that *how* XOOM set rates was improper; instead, she must prove ***the amount XOOM should have charged***. Her contract claim rises and falls with proof of that amount. If she cannot prove the ***amount*** of each alleged overcharge—which (under the Court's construction) requires evidence of XOOM's actual supply costs—she cannot establish breach, much less damages. *See Blalock*, 86 S.E. at 1026; *Intersal*, 373 N.C. at 109. She has to show what the rates should have been if the actual supply costs ***were*** used. *Id.*

Plaintiff does not deny this fundamental point—because she cannot. Instead, she tries to minimize it by relegating North Carolina law to a footnote in the latter half of her brief. But Plaintiff's footnote still confirms that North Carolina law requires her to prove the amount of any overcharge as a prerequisite for liability and to measure damages. And just as in *Blalock*, Plaintiff has (in her words) "presented 'no evidence what[so]ever' about the [] rate that [is] the subject of the case." Decert. Resp. 23 n.9.

### b.  *Plaintiff cannot avoid her burden to prove what she should have been charged.*

Plaintiff's proof problems lead to decertification and judgment for XOOM. So Plaintiff, trying to avoid those consequences, mischaracterizes her burden on actual supply costs. She says XOOM is insisting she prove XOOM's defense—i.e., that she prove the amount of actual costs XOOM ***in fact*** used to set its rates. Of course, XOOM is not asking Plaintiff to prove how XOOM permissibly used actual supply costs.[6] XOOM is simply holding Plaintiff to her burden to prove

---

[6] Based on this mis-framing of her burden, Plaintiff points to so-called "established doctrines" that she says shift the burden onto XOOM based on its supposed superior access to information about how it incorporated its actual supply costs into the rates. Decert. Resp. 21–23. But after five years of discovery, XOOM has no better access to the evidence than Plaintiff. XOOM produced the abundant documentary evidence of its actual supply costs that it will introduce at trial, *see* Decert. Mot. 24–29. Plaintiff simply wants to ignore it because it is individualized.

her overcharge claim by showing what the rates should have been per the contract. And, showing what the rates *should have been* requires accounting for what XOOM's actual supply costs *were*, as one of the three permissible rate components. Plaintiff cannot, so she offers three reasons why she should not bear the burden of proof on actual costs at trial. All assume the Court accepts her mischaracterization of her burden and all are without merit.

Plaintiff's first approach curiously relies on the Court's application of the summary judgment standard. She asserts that the Court flipped the burden on her contract claim when it denied XOOM's summary judgment motion. Plainly, the fact that XOOM as the movant bore the burden at summary judgment to show the absence of a fact dispute does not mean that XOOM as the defendant bears the burden at trial to prove that it did *not* overcharge its customers. Nothing in the Court's Order suggests XOOM's Rule 56 burden somehow carries over to trial.

Second, Plaintiff contends that the Court should not apply North Carolina substantive law to the burden question, but instead should apply New York procedural law here. It is axiomatic, however, that "the burden of proof is a *substantive* aspect of a claim." *Medtronic, Inc. v. Mirowski Fam. Ventures*, LLC, 571 U.S. 191, 199 (2014) (emphasis added, quotation marks and citations omitted); *see United States v. McCombs*, 30 F.3d 310, 323–24 (2d Cir. 1994) ("Presumptions and other matters related to the burden of proof are considered matters of substantive law, governed by the law of the jurisdiction whose substantive law applies to the merits of the question in issue."). As such, Plaintiff's burden of proof is governed by North Carolina law.[7]

Third, Plaintiff tries to recast her contract as a "cost-plus" contract (another new theory she never before advanced) because she believes that will shift the burden onto XOOM to prove its

---

[7] Even if Plaintiff's resort to New York law had merit (it does not), it would be of no matter. Like North Carolina (and all states), New York places the burden of proof for a contract claim on the plaintiff. *See, e.g., Raymond v. Marks*, 116 F.3d 466 (2d Cir. 1997).

actual costs. She is wrong on several levels. As an initial matter, XOOM's contract does not fall within the cost-plus category. Such contracts are used primarily in the construction context and, unlike here, specify the "plus" amount. *See, e.g.*, *Mck Enterprises, LLC v. Levi*, 219 N.C. App. 647, 722 S.E.2d 798 (2012) ("contract price was listed as '[c]ost plus 15%'"); *Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019) (A "cost-plus contract" is "[a] contract in which payment is based on a fixed fee or a percentage added to the actual cost incurred."). Moreover, the two construction cases Plaintiff cites were issued not under the laws of North Carolina or even New York, but Louisiana and Tennessee. *See M. Carbine Restoration, Ltd. v. Sutherlin*, 544 So. 2d 455 (La. Ct. App.) (applying Louisiana law); *Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211 (Tenn. Ct. App. 2009) (applying Tennessee law and relying on Louisiana cases). And most importantly, there is nothing unique about the burden of proving breach on a cost-plus contract under the law of any state. Rather, Plaintiff's cases simply apply the familiar rule that a ***plaintiff*** bears the burden of proof on all elements of a contract claim—no matter the type of contract. *See M. Carbine Restoration,* 544 So. 2d at 458 ("Once the existence of a cost-plus contract has been established, the contractor [plaintiff] also has a duty to [establish its costs]" to show the amount contractually owed); *Forrest Const. Co.*, 337 S.W.3d at 223 (same).

In sum, Plaintiff cannot cite a single case relieving her of the obligation to prove the amount of every alleged overcharge to establish liability and recover actual damages.[8] Rule 23 requires that she present common proof of XOOM's actual supply costs now to avoid decertification, and North Carolina's substantive law demands such proof at trial.

---

[8] As discussed in Part IV.D of XOOM's motion, Plaintiff's inability to prove any overcharge or its amount leaves her with the option to prove a breach capable of entitling her to nominal damages only. Her failure to plead them, however, forecloses that possibility.

**B. Plaintiff's response confirms that her experts' Model Two is inadmissible.**

Model Two will be excluded because its inputs for (1) "actual and estimated supply costs" and (2) a "reasonable" and "proportionate" margin cannot satisfy Rule 702's threshold criteria for admissibility. Model Two therefore cannot serve as competent evidence to maintain certification now—or as proof of breach or damages at trial.

### 1. Model Two omits an input for actual supply costs entirely.

It is beyond dispute that XOOM's actual supply costs were not detailed in its monthly rate-setting workbooks—those workbooks showed only "estimated costs," which were the only type of costs XOOM could consider in advance for a given month. Loehde Decl. ¶ 7. The actual costs would not be known until weeks or months later. *Id*. ¶ 15. It is likewise undisputed that the rate-setting workbooks' estimated cost figure furnished the only "cost" input for Model Two. *See* Pl. Expert Rpt. ¶ 62 ("the 'Total Cost' was taken from the RSWs"). So, Model Two admittedly does not account for actual costs. It unquestionably is not based on "sufficient facts or data"—or ***any*** facts or data—about actual supply costs and should be excluded. Fed. R. Evid. 702(b).

Plaintiff's response on this point is that her model need not address actual supply costs because she does not bear the burden to prove how XOOM incorporated its actual supply costs into its rates. As discussed in Part IV.A, however, she is wrong. Plaintiff must have a model capable of measuring what she believes every rate ***should have been*** if XOOM's "actual and estimated supply costs" determined each one—and she must make that showing irrespective of XOOM's defense that it properly incorporated its actual supply costs into every rate. *See id.*

### 2. Model Two admittedly lacks a proportionate-margin input.

Plaintiff does not deny that Model Two's use of "XOOM's corresponding (rather than average) contemporaneous fixed margins" is inconsistent with the Court's proportionate-margin

11

construction. *See* Decert. Resp. 24. Rather, she says that inconsistency is okay because the model's admittedly deficient margin input is "a replaceable data point" that can be "easily updated to incorporate the margin determined at trial," as opposed to "an aspect of the model's logic." Decert. Resp. 3. Put differently, Plaintiff's position is that Model Two is just an equation, not evidence. And she says the ***jury*** could use Model Two's "algorithm" in ***new*** calculations performed after "a reasonable and proportionate margin is determined" by the ***jury***—without evidence of a reasonable or proportionate margin. Decert. Resp. 17–18. She does not claim that the jury could "apportion liability" by accepting Model Two's calculations as-is. Rather, Plaintiff concedes Model Two cannot ***currently*** measure damages but insists it will be able to ***after a verdict is rendered*** when she updates its "arithmetic . . . to incorporate the margin determined at trial." *Id.* at 25.

Plaintiff's refusal to defend Model Two's ***current*** calculations means she cannot use that model on this motion or at trial. With a non-proportionate margin input, the model unquestionably lacks "sufficient facts or data" to furnish proof of damages under the proportionate-margin interpretation of the contract. Fed. R. Evid. 702(c). For the same reason, Model Two is neither relevant nor helpful to the resolution of any disputed fact. *See* Fed. R. Evid. 702(a) (expert evidence must "help the trier of fact to understand the evidence or to determine a fact in issue"); Fed. R. Evid. 401 (relevant evidence must tend to make a "fact of consequence" "more or less probable than it would be without the evidence"). Because Model Two lacks a proportionate margin input, it cannot help the jury determine what the class members' rates would have been if they included proportionate margins. As a result, Model Two is inadmissible under Rules 401 and 702, and it cannot "serve as evidence of damages." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to" the plaintiff's class theory).

12

To resist this conclusion, Plaintiff claims that Model Two is proof of commonality even without a reliable margin input because "*Comcast* does not require the model itself to supply a disputed input." Decert. Resp. 26. XOOM agrees that *Comcast* does not address that issue;[9] that is why the Court previously declined to address the validity of Model Two's inputs on the class motion.  But now is the time for the Court to reach the issue under Rule 702. Before Plaintiff can offer Model Two at trial, she must "demonstrate" by a preponderance that it "is based on sufficient facts or data" and otherwise admissible. *See* Fed. R. Evid. 702(a); Fed. R. Evid. 401. And to even reach a class trial, she must demonstrate the reliability not only of Model Two's "methods," but also of "the facts on which" that model relies. *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 393 (E.D.N.Y. 2022). Plaintiff cannot shoulder those burdens by offering a "simple algorithm" and promising to fill in the blanks after the jury returns a verdict. $COGS + \_\_\_\_ = \_\_\_\_$ is not admissible evidence, or even a fact. It is an empty equation with blanks where evidence should be.

To maintain class certification and prove overcharges at trial, Plaintiff must fill each of those blanks with "disputed inputs" the jury could accept ***even if*** that will "entail overlap with the merits" of her claim. *Id.* at 391 (quoting *Comcast*, 569 U.S. at 33–34). Plaintiff admits Model Two lacks those inputs, so she cannot rely on that model for commonality or predominance.[10]

**C. Without a viable damage model that accounts for actual supply costs and an appropriate margin, the class lacks Rule 23 commonality and predominance.**

    1. <u>Model Two's omission of actual supply costs will force the jury to deal with abundant and varying documentary and testimonial evidence for each rate.</u>

---

[9] *Comcast* did not address the question because the models in that case were not missing facts or data necessary to measure the plaintiff's liability theory. Rather, the problem there was that the expert models accounted for ***too many*** facts to measure "***only*** those damages attributable to" the plaintiff's theory of injury. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

[10] This Rule 702 analysis is not exhaustive. Model Two has many more substantive and methodological flaws, which XOOM addresses fully in its *Daubert* motion.

XOOM's motion established that Plaintiff has no way to prove XOOM's actual supply costs at trial in common fashion—with or without Model Two. In response, Plaintiff admits she does not plan to address actual supply costs at trial in ***any*** fashion, which means she will be unable to prove the rates XOOM should have charged. And even if she could ignore actual supply costs, XOOM would still be entitled to present its abundant and varied evidence of them. That means no part of this case, neither liability, nor damages, can be resolved "in one stroke" as Rule 23 requires.

The only time Plaintiff even acknowledges XOOM's substantial evidence of actual costs, she misrepresents it, calling it a "classwide defense"—although that position is incompatible with an overcharge claim for actual damages. *See* Part IV.A.2, *supra*. Again, Plaintiff must account for XOOM's actual supply costs if she is to prove what her rates should have been. As XOOM's motion showed, its evidence of actual supply costs is specific to certain rates for certain commodities in certain months, and even certain utility zones in some instances.

Thus, even if the jury is allowed to consider Model Two, it will still have to consider thousands of documents showing actual costs that are relevant only for some rates. The question of what rate XOOM should have charged is not a common one. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member *to make a prima facie showing* [or] *the issue is susceptible to generalized, class-wide proof*." (emphases added)).

For example, take the first month Plaintiff paid XOOM a variable rate for residential electricity in June 2013. Because Model Two does not account for actual supply costs, even if it is admitted, the jury will be asked to consider:

(1)  not only Model Two, which shows "P's calc of actual cost" as "0.10782" (derived from only estimated supply costs reflected in the relevant rate-setting workbook); but also

(2)   the May 2013 Consolidated Financial Statement that shows prior period adjustments ("PPAs") were higher than forecast, an unfavorable variance due in part "to the NYISO capacity cost of approximately $250K" and a "March 2013 PPA adjustment of $655k;"

(3)   a May 2013 Flash Report showing a negative margin due to NYISO costs, Ex. B-47;[11]

(4)   the June 2013 Consolidated Financial Statement, which shows actual costs exceeding the forecast as well as higher costs, including PPAs, for both power and gas, and a "variance . . . attributed to the NYISO capacity cost of approximately $175K," Ex. B-48; and

(5)   testimony about how XOOM used these actual supply costs to determine Plaintiff's rate.

And that is just for one product in one month. The jury will have to do that exercise for the residential gas rates, the commercial electricity and gas rates, and both commercial and residential green electricity rates for June 2013, and similar exercises will ensue for each of the other 135+ months in the class period. The jury will have to consider not only the estimated costs set forth in Plaintiff's model (if admitted, or the rate-setting workbooks themselves if not), but also the actual costs shown in contemporaneous documents for both "prior periods" and the month itself.

As a practical matter, the jury cannot be expected to sort through and digest thousands of pages of disparate actual cost information. If mini trials cannot be avoided because of the evidence in the record, then the class must be decertified. *See Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 147 (2d Cir. 2015) (reversing certification where defendant's role formed a piece of "every class member's claim" because "that piece, in and of itself, does not resolve the whole of any of the class members' cases without further individualized consideration"); *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 CIV. 7618, 2004 WL 5719589, at *11 (S.D.N.Y. Mar. 31, 2004) (rejecting Plaintiff's argument "that class members were injured pursuant to the defendants' illegal course of conduct and that the allegation of a course of conduct somehow means that the defendants are

---

[11] Exhibits beginning B- are annexed to the Declaration of Jason Loehde dated March 1, 2024. Exhibits beginning A- are annexed to the Declaration of Michael D. Matthews, Jr., dated March 1, 2024. Numerical exhibits are annexed to the Reply Declaration of Michael D. Matthews, Jr., dated May 10, 2024.

either liable to all plaintiffs or to no plaintiffs"); *Mazzei*, 829 F.3d at 267 ("The district judge must . . . decertify as appropriate in response to the progression of the case from assertion to facts.").

At best, Plaintiff is left with a model that requires consideration of individualized actual cost evidence ***in addition to*** the model. Plaintiff says that the jury can choose to adopt or reject Model Two in full and, in either case, the class claim will rise or fall as a unit. But she is wrong to suggest Model Two presents only those binary options. It leaves literally thousands of possible outcomes for the jury to choose from. And the jury cannot make any decision about Model Two until ***after*** XOOM presents evidence of actual supply costs and how they impacted each of 6,000+ rates at issue—because Plaintiff's argument that the jury could ultimately reject that individualized evidence does not deprive XOOM of its Seventh Amendment and due process rights to present it.

Further, Model Two does not account for the possibility that the jury could decide the evidence shows overcharges in some months and undercharges in others. Nor does Model Two provide any way to reverse engineer lump-sum damages to determine the amount due to any class member. So, the jury will have to fill out a verdict form that distinguishes between each month, zone, and product, asking if Plaintiff proved the amount of overcharge for that rate and, if so, what that amount is, 44 times for each month for more than eleven years, or approximately 6,000 times. *See* Ex. 1 (verdict form); XOOM's Pretrial Order Statement on Damages. Model Two offers no alternative. The trial thus will not be capable of "generat[ing] common *answers* apt to drive the resolution of the litigation," as a class trial must. *Wu v. Pearson Educ. Inc.*, No. 09 CIV. 6557 KBF, 2012 WL 6681701, at *5 (S.D.N.Y. Dec. 21, 2012) (emphasis in original, quotations omitted).

The consequence of Plaintiff's evidentiary failure must be decertification. *See Price*, 2021 WL 4459115, at **3–4 (decertifying class after "several of [plaintiff's expert's] assumptions regarding the inputs for the equation . . . were rejected as unreliable" because "Plaintiffs have not

provided a means of calculating class-wide damages consistent with Plaintiffs' alleged injury"). There is nothing inequitable about this result. Plaintiff made a strategic choice to ignore the abundant documentary evidence of actual supply costs despite approximately 100 years of North Carolina law requiring proof of the amount of an overcharge. Plaintiff has had full access to XOOM's actual-cost documentation for years but ignored it because it is individualized.

In short, because Plaintiff cannot meet her burden of proof without resorting to individualized evidence, she has not tried. It is not enough for Plaintiff's model to be consistent with her theory of liability. Rather, her model, and her theory of liability, must be consistent with the evidence in the record and the Court's contract construction. *See, e.g.*, *Wu*, 2012 WL 6681701, at *7 (noting that "[t]he evidence in the record suggests that this sort of complexity" that "prevent[s] a class-wide proceeding from supplying a common answer pervades"). Plaintiff cannot make up a theory that ignores thousands of documents that she has had in her possession for years because accounting for them would defeat class treatment. The class must be decertified.

2.  Plaintiff's "margin-later" approach separately requires decertification.

Having acknowledged (as she must) that Model Two's calculations violate the proportionate-margin requirement, Plaintiff proposes three alternatives that she says will allow the jury to pick an appropriate margin: (a) using XOOM's fixed-rate margins as goalposts for reasonableness; (b) presenting a yet-to-be disclosed average margin and then letting the jury pick whatever average margin it wants; and (c) asking the jury to adopt a cap the New York PSC announced for fixed-rate prices in 2019. Because these options all rely on inadmissible evidence and are prohibited by Second Circuit precedent, none can solve Plaintiff's Rule 23 problems.

a.  *Plaintiff's experts' belief that it is appropriate to use a fixed-rate margin as the outer bound for reasonableness is completely unsupported.*

Although Plaintiff can no longer defend the way her experts used XOOM's non-

17

proportionate contemporaneous fixed-rate margins in Model Two, she insists they should be allowed to "opine[] that XOOM's [non-proportionate] fixed rate margin [is] the **highest** possible reasonable margin allowable under the contract." Class Cert. Resp. 26. Even if that opinion was timely disclosed (it was not) or an accurate description of her expert's deposition testimony (it is not), it still would not constitute admissible evidence of what XOOM's margins should have been.

The Second Circuit has repeatedly held that the reasonableness of an ESCO's rates is measured against the rates charged by other ESCOs. *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 417 (2d Cir. 2023) (rejecting an expert's "subjective views on the reasonableness of margins . . . without providing any evidence [the ESCOs rates] were any higher than competing ESCOs' rates"); *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019) (same). And Plaintiff's experts offer no information about those rates. In fact, they admittedly ignored them because they "didn't seem very relevant." Adamson Dep. 64:21–65:7. Absent such evidence, Plaintiff cannot create a dispute as to reasonableness by offering his expert's "subjective and unsupported view of what a 'reasonable margin' would have been." *Martinez*, 88 F.4th at 414.

Nor is there any merit to Plaintiff's claim that her experts "explicitly opined" XOOM's fixed-rate margins are the "highest possible reasonable margin allowable under [the variable-rate] contract." *See* Decert. Resp. 26. They did not say so. And even if they had, it would be of no matter because, as the Second Circuit said when Plaintiff's expert previously tried to use an ESCO's fixed-rate margins as a cap on its variable rates, an expert's opinion "on what factors [a] variable rate **should** reflect" under a contract is not a proper subject of expert testimony. *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98 (2d Cir. 2019). Rather, it is a legal question to be resolved under the contract's language. *Id.* Thus, use of the fixed-rate margins as a limit on variable-rate margins "in the **context of this contract**" is irrelevant and inadmissible because Plaintiff's experts

did not opine that that limit exists as a standard of reasonableness "in the ESCO world" overall. *See* Adamson Dep. 73:15–18 (emphasis added); *id.* 99:6–18 ("Q. So are you going to offer the opinion that in the ESCO world it is not appropriate for an ESCO to seek a higher margin for variable rates than it does for fixed rates? A. I mean, to me the rates have to be set for the contract." (cleaned up)). Plaintiff's experts are not contract experts.

Accordingly, Plaintiff cannot rely on XOOM's fixed-rate margins—or even an average of them—as evidence because they have no tendency to show an appropriate variable-rate margin.

b. *Second Circuit precedent prohibits subjective and unsupported expert opinions that are based on assumptions about findings a jury might later make.*

Relying on a footnote in her expert disclosures, Plaintiff argues that her experts are "able to update [Model Two's] calculations" if the "factfinder determines that a different margin was appropriate here (e.g., 10%)." Decert. Resp. 24 (quoting CRA's report). Maybe so, but that statement of support for her expert's mathematical ability does not constitute "a computation" of damages or an expert disclosure, and Plaintiff offers no reason she should be able to expand that footnote into a classwide damage model that was never subject to a rebuttal report, tested at a deposition, or scrutinized under Rule 23's demanding standard. That failure to disclose alone is enough to warrant excluding a model that uses a new input for margin.

But that is not the only reason that approach must fail. The Second Circuit's *Martinez* decision would preclude Plaintiff's footnote-model even if it was timely disclosed and supported. In *Martinez*, as here, the plaintiff's expert calculated class damages in an ESCO case by modelling the difference between the charges the class members incurred and the charges they would have incurred if their rate was calculated as "[COGS] plus various margins." *See* Ex. 2 pp. 13–14. After offering those models, the expert opined that the ESCOs' rates "were not based upon its costs" because the class members still incurred "large amount[s] of overcharges" under the models that

19

allowed "reasonable margins of 5 and 10 percent." *Id.* at 14. And in his conclusion, the expert stated that he could perform different calculations in the future with "appropriate margin parameters" supplied by the "jury or finder of fact." *Id.* at 18. In short, the expert model in *Martinez* was identical to the footnote-model here, but timely disclosed and fully developed.[12] Yet even without the disclosure problems Plaintiff has here, that model was not admissible in *Martinez*.

In *Martinez*, the Second Circuit affirmed the district court's determination that the expert's margin assumptions were inadmissible because the experts' "subjective views on the reasonableness of margins" did not satisfy Rule 702's demands. *Martinez*, 88 F.4th at 414. Plaintiff's forthcoming "update" to her model will inevitably have the same flaw due to her expert's admission that they lack access to "information that would allow [a reliable margin input for Model Two] to be created." Adamson Dep. 73:3–7. Thus, no matter what margin Plaintiff chooses to use as the input for the "single ESCO number" that her expert could not supply in his timely reports or at his deposition, *id.*, it will necessarily be too "subjective and unsupported" to satisfy Rule 702's requirements for admissibility. *Martinez*, 88 F.4th at 414; Adamson Dep. 73:3–7 ("'a single ESCO number'" is not "a meaningful concept").

      c.   *The PSC's Reset Order is not admissible evidence of a limit on XOOM's margin.*

As a final attempt to salvage her failure of proof on margin, Plaintiff turns away from her experts completely and offers a 2019 order from an administrative PSC proceeding (the "Reset Order") as "an additional measure[] of reasonableness" she can use to contradict her experts' testimony. Apart from the disclosure problems that prevent Plaintiff from building a new damage

---

[12] Plaintiff says she is going to unveil an amended model the same day this reply is filed. That model has no bearing on this motion because Plaintiff chose not to rely on it. *See* April 18 Dkt. Order (declining to extend certain deadlines because "plaintiff's opposition to XOOM's motion to decertify the class does not rely on any forthcoming amendments to the expert report"). Thus, the Court should resolve this motion without considering Plaintiff's "forthcoming" model.

model with the Reset Order at its foundation,[13] this approach is inappropriate because the Reset Order is not relevant to Plaintiff's or the class's claims and because it does not constitute admissible evidence on the variable-rate margin any ESCO should or should not achieve.

As a preliminary matter, the Reset Order issued in December 2019, more than a year after this case was filed, nearly seven years after the class period commenced, and many years after Plaintiff and most of the class contracted with XOOM. And the PSC did not require ESCOs to comply with the Reset Order's fixed-rate price cap until April 16, 2021. Controlling Second Circuit precedent holds it therefore cannot be competent evidence for Plaintiff or a majority of the class. *See Martinez*, 88 F.4th at 417 (rejecting relevance of the Reset Order because, *inter alia*, "such a public policy did not prevail until the Commission announced its new ESCO rules in 2019—more than three years after [plaintiff] contracted with Agway").

The Reset Order also is irrelevant because its substance does not suggest anything about ESCO variable-rate margins that could be helpful to the jury. The Reset Order never discusses what an appropriate margin is for a variable rate. Indeed, it says nothing at all about fixed or variable-rate ***margins***—it addresses ***prices***. As the Second Circuit has recognized, the question of what a reasonable variable-rate price is really is a question about the variable rates that *other ESCOs* charged. *See, e.g.*, *Martinez*, 88 F.4th at 416 (considering how Agway's variable rates compared "to rates offered by other ESCOs in territories where Agway operated, for each quarter from 2014 to 2019"); *Richards*, 915 F.3d at 99 (rejecting contention that variable rate was "too high" where there was "no evidence that it was any higher than its competitors' rates"); *Sevugan*

---

[13] Plaintiff's experts did not try to build a model based on the PSC's order, not that it would have made a difference. The *Martinez* plaintiff's expert did, and his opinions were still excluded. *See* Ex. 2 p. 6 (explaining how the Reset Order "pertain[ed] to [plaintiff's expert's] analysis"). Nothing in the Reset Order suggests what ESCOs' variable margins should be.

*v. Direct Energy Servs., LLC*, 931 F.3d 610, 616–17 (7th Cir. 2019) ("Without any information about valid market comparators, such as other alternative retail energy suppliers, [plaintiff's] breach of contract claim is speculative and implausible."). The PSC did not consider that question, and therefore the Reset Order cannot be instructive. The PSC did not review or synthesize information about margins, nor did it make any findings about them. It made only a policy judgment about how ESCO's fixed and variable ***rates*** (not margins) should compare to utility ***rates*** (not supply costs). *See* Reset Order at 40 ("variable-rate, commodity-only offerings . . . will be permitted only if the ESCO guarantees to serve the customer at a ***price*** below the ***price*** charged by the utility on an annually reconciled basis" (emphasis added)). That is irrelevant here. It does not concern margin, and using that utility comparison here would flout the Court's ruling that the margin be "proportionate."

Plaintiff argues that the 5% price cap the PSC chose to impose on ESCO fixed-rate prices over utility prices is evidence of a reasonable variable-rate margin over XOOM's costs. This is not an apples-to-apples comparison. Plaintiff has no evidence to suggest that a fixed-rate ***price*** is comparable to or any indication of a reasonable variable-rate ***margin***. To the contrary, her own expert recognized as an indisputable truth that the margins for fixed rates "could be quite different." *See* Ex. A-3 (Adamson Dep.) at 72:8–73:7 ("Fixed rate pricing, I think we can all agree, the actual outrun margins could be quite different."). In any event, the 5% ***price*** limit over the "the trailing 12-month average utility supply rate" that the PSC imposed on fixed-rate products (and only from 2021 onwards) is not a pronouncement that a 5% margin over costs is reasonable for even a fixed-rate, let alone a variable-rate—it is not a comment or limit on ***margin*** at all. Indeed, under the Reset Order it would not matter if an ESCO's fixed rate had a 105% margin, as long as the rate itself satisfied the 5% price limit.

And even if the Reset Order contained relevant information, the risk of prejudice inherent in telling the jury what the PSC concluded was an appropriate fixed (not variable) price over the utility (not supply costs) beginning in *2021* far outweighs any probative value. Fed. R. Evid. 403. The Reset Order is also hearsay with no applicable exception.[14]

### D. Plaintiff's new outer bound for a reasonable margin means she and most of the class have no damages, raising new typicality, commonality, and predominance issues.

Model Two calculates the difference between XOOM's variable-rate margins and its fixed-rate margin for the same electricity or gas product (residential or commercial), in the same utility zone, in that particular month. Those fixed-rate margins shift each month, but not based on or in proportion to costs—so they do not "remain proportionate . . . over time." SJ Order 13. And they range from *a low of -27% to a high of 59%*. *See* Ex. A-7 p. 4 (-27% SureLock Margin for NGrid_NM in December 2020; 59% SureLock Margin for CenHud in October 2016).

Again, Plaintiff does not deny that Model Two's use of non-proportionate margin inputs renders its calculations fundamentally incapable of measuring liability or damages under the proportionate-margin construction. *See* Decert. Resp. 23–26. But Plaintiff contends that she can solve this problem at trial by asking the jury to treat Model Two's non-proportionate margin inputs as guideposts "demarcating the outer bound of reasonableness." Decert. Resp. 26.

Whatever figure is used in her experts' forthcoming amended report, the fundamental problem with Plaintiff's new "outer-bound" theory is her assumption that she can ask the jury to find that the "fixed rate margin was the highest possible reasonable margin *allowable* under the

---

[14] Rule 803(8)(C)'s "Public Records" exception for "factual findings from a legally authorized investigation" does not apply because the Reset Order was entered in a prospective rule-making proceeding, not an "investigation." *See Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir. 1998) (affirming exclusion of a report that "made generalized recommendations regarding future departmental behavior" and "did not, and was not intended to, set forth factual findings based on a factual investigation" as required by Fed. R. Evid. 803(8)(C)").

contract"—but then ask the jury to find liability and damages based on calculations that impose a margin cap far *lower* than that allowable maximum. Decert. Resp. 27; *id.* at 28 ("Plaintiff does not intend to offer only the highest possible reasonable margin at trial."). That is simply not how contracts work. If a margin is within the range "allowable under the contract," Decert Resp. 27, Plaintiff cannot ask the jury to find that the margins should have been lower. *See, e.g.*, *Guerrero v. Bank of Am. N.A.*, No. 321CV00333RJCDSC, 2022 WL 19407279, at *7 (W.D.N.C. July 1, 2022) (dismissing a claim that a defendant breached the implied covenant by charging "rates at extreme ends" of the range allowable, which would "essentially . . . rewrite the terms of the contract and impose additional obligations on Defendant"), *report and recommendation adopted in relevant part*, No. 321CV00333RJCDSC, 2023 WL 2712484 (W.D.N.C. Mar. 30, 2023).

What's more, under Plaintiff's current conception of reasonableness, her own fixed-rate benchmark affirmatively proves her margins *were* reasonable. Her new position is that those margins—which range up to *59%*—were "allowable under the contract." Decert. Resp. 26; *see* Ex A-7 (reflecting a 59% margin included in the fixed rate for natural gas[15] sold in NFG in October 2016). But Plaintiff's own evidence shows that her margins were never that high. So, even if she is allowed to rely on fixed-rate margins as the outer limit of reasonableness, she cannot try to prove liability or damages by arguing that her margin should have been *lower*. Rather, she will have to prove she was injured by an alleged *fluctuation* among her margins—all of which were permissible under her fixed-rate margin limit. *Guerrero*, 2022 WL 19407279, at *7; *Troitino*, 35 S.E.2d at 282 (contract damages measure "the pecuniary difference between [the plaintiff's]

---

[15] Although this margin was achieved on natural gas, Plaintiff contends there is "no doubt" electricity and natural gas should be "treated alike" with respect to the reasonableness of their margins. Decert. Resp. 31–32, 31 n.18. Plaintiff does not (and cannot) contend that a 59% margin was reasonable for only a specific rate, so it was presumptively reasonable as to her.

position upon breach of the contract and what it would have been, had the contract been performed"). Plaintiff could have attempted to model those damages by calculating what her rate would have been if her margins were stable over time, but not lower. She declined to do so, presumably because any conceivable model would show that she was ***undercharged*** overall. *See* Ex. 3 (showing Plaintiff was undercharged by $5 compared to what she would have been charged if her rates included proportionate, but not arbitrarily reduced, margins).

As Plaintiff is quick to point out, this problem would not foreclose an award of nominal damages if she could show a rate was not determined by XOOM's costs. *See* Decert. Resp. 39–40. But as discussed in XOOM's motion, Plaintiff did not plead nominal damages or ever suggest she might seek them until XOOM highlighted her inability to prove an overcharge. Plaintiff's newfound desire to pursue nominal damages could raise insurmountable problems at a class trial anyway. If Plaintiff seeks to recover actual damages for some class members and nominal damages for others, the jury could not give a "common answer[]" on the questions of breach or damages. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."). Instead, the jury would have to make detailed findings that would preserve XOOM's substantive, procedural, and constitutional rights to avoid liability to class members who were not overcharged. *See Troitino*, 35 S.E.2d at 282 (contract plaintiffs are "not entitled to be enriched by the breach"); *Tyson Foods*, 577 U.S. at 458 (Rule 23 does not "giv[e] plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (rejecting class evidence that did not "preserve the defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense").

Those findings would have to be detailed enough for the Court and the parties to "reverse engineer the verdict" to determine "which [class members] the jury found to be injured (or not)." *Tyson Foods*, 577 U.S. at 464 (Roberts, C.J., concurring); *id.* at 461 (agreeing that "the question whether uninjured class members may recover is one of great importance" and tasking the district court to determine in the first instance whether any "methodology [would] be successful in identifying uninjured class members") (majority opinion). Otherwise, there would be "no way to ensure" that any award of actual damages would "go only to [overcharged] class members," which would lead to a pointless award that "cannot stand." *Id.* at 464 (Roberts, C.J., concurring).

On the facts of this case, the jury's findings could not be reverse-engineered from a lump-sum verdict.[16] Rather, it would have to return a special verdict that made 6,000+ findings as to the difference (whether positive, negative, or none) between the charges the class members incurred for each rate and the charges they would have incurred if their rate complied with the contract. *See* Ex. 1 (verdict form). Without those detailed findings, there would be no way to know whether the jury accepted all, some, or none of the arguments XOOM will make about subsets of the class period.[17] And without that information, there would be no way to know "which [class members] are entitled to share in [any] award" of actual damages and which of them are not. *Tyson Foods*,

---

[16] In *Tyson Foods*, the district court was able to distribute the award due to a combination of substantive evidentiary presumptions, the defendant's waived objections, the invited-error doctrine, and the parties' agreed-upon "filters" that rendered over 600 class members ineligible to share in the damage award. *Bouaphakeo v. Tyson Foods, Inc. (Tyson Remand)*, 214 F. Supp. 3d 748, 753–54 (N.D. Iowa 2016). Not one of those mitigating factors applies here.

[17] If, for example, the jury returned a lump-sum verdict of $5 million without any additional findings, there would be no way to know if they believed most of the class was modestly overcharged, half of the class was moderately overcharged, or a small group was significantly overcharged. Nor could the parties know if the jury accepted all, some, or none of the arguments XOOM will make as to its actual costs in limited subsets of the class, or even what margin the jury found that XOOM should have used in any rate. With 6,000+ rates at issue and factual disputes about multiple components for each of them, there are countless permutations of findings the jury could make that add up to $5 million in damages.

577 U.S. at 461; *id.* at 466 (Roberts, C.J., concurring) ("[I]f there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand.").

For all these reasons, Plaintiff's concession that *her* margins fell within the range of reasonableness (as she now defines it) is fatal to commonality, predominance, and typicality, as she can no longer contend that every class member "was grossly overcharged" because their rates included "outrageously large profit margins," and her claim is not typical of class members (if any) who suffered that injury. *See Dukes*, 564 U.S. at 352–53 ("commonality and typicality" depend on "the existence of a class of persons who have suffered the same injury" as the class representative (cleaned up)). And because Plaintiff now apparently wishes to pursue claims for nominal damages on behalf of class members (like her) who were not overcharged, she can no longer deny that "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34; *see also Tyson Foods*, 577 U.S. at 466. Accordingly, Plaintiff's response only raises new reasons that decertification must be granted.

### III.   CONCLUSION

For these reasons and those in XOOM's motion, the Court should decertify the class.

Dated: May 10, 2024

M<small>C</small>D<small>OWELL</small> H<small>ETHERINGTON</small> LLP

*/s/ Michael D. Matthews, Jr*
Michael D. Matthews, Jr.
Diane S. Wizig (admitted *pro hac vice*)
James M. Chambers (admitted *pro hac vice*)
David L. Villarreal (admitted *pro hac vice*)
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
james.chambers@mhllp.com
david.villarreal@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*