**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,<br><br>                Defendants. | No. 18 Civ. 2949 (ARR) (RER) |

**MEMORANDUM OF LAW IN SUPPORT OF XOOM'S MOTION**
**TO EXCLUDE PLAINTIFF'S TIMELY EXPERT DISCLOSURES**

# **TABLE OF CONTENTS**

I.   Introduction .................................................................................................................. 1

II.  Factual & Procedural Background ............................................................................... 3

   A.  Plaintiff and the class members contracted with XOOM to buy electricity or natural gas at variable rates based on XOOM's actual and estimated supply costs. ................................. 3

   B.  Plaintiff hired CRA to provide expert testimony and model classwide damages. .............. 3

   C.  The Court denied summary judgment and granted class certification. .............................. 6

   D.  Plaintiff abandoned Model One. ........................................................................................ 7

   E.  Plaintiff served an untimely amended report that abandons Models One and Two in favor of three brand new models. ................................................................................................. 7

III. Legal Standard ............................................................................................................. 7

IV.  Argument & Authorities .............................................................................................. 8

   A.  Plaintiff's failure to supplement Model Two's calculations renders it inadmissible as common proof for the certified class. ................................................................................ 8

   B.  Binding precedent demands exclusion of CRA's models and opinions because they are irrelevant and inadmissible, as the Second Circuit just reaffirmed. .................................. 9

   C.  Model Two is inadmissible under Rule 702. .................................................................... 15

      a.  Model Two is irrelevant and unhelpful. ...................................................................... 15

      b.  Rule 702(b): Model Two is not based on sufficient facts or data. ............................. 17

         i.   Margin: Model Two has no reliable input for the "reasonable" and "proportionate" margin XOOM should have charged. ......................................... 17

         ii.  Supply Costs: Model Two does not have any input for supply costs. .................. 20

      c.  Rule 702(c), (d): Model Two does not reflect the reliable application of reliable principles to the facts of this case. ............................................................................. 20

   D.  Most of CRA's other opinions are inadmissible under Rule 702 too. .............................. 24

V.   Conclusion & Prayer .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brecher v. Republic of Argentina*,
  806 F.3d 22 (2d Cir. 2015)................................................................................23

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..................................................................................8, 25

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)........................................................................................8

*Hickory Sec. Ltd. v. Republic of Argentina*,
  493 F. App'x 156 (2d Cir. 2012) ....................................................................23

*Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*,
  645 F. Supp. 3d 95 (E.D.N.Y. 2022) ..............................................................17

*Martinez v. Agway Energy Servs.*,
  88 F.4th 401 (2d Cir. 2023) ................................................................... *passim*

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005)........................................................................7, 8

*Puricelli v. Argentina*,
  797 F.3d 213 (2d Cir. 2015)...........................................................................23

*Red Hawk, LLC v. Colorforms Brand LLC*,
  No. 20-CV-9032 (VEC), 2022 WL 16570948 (S.D.N.Y. Nov. 1, 2022) ...............8

*Richards v. Direct Energy Servs.*,
  915 F.3d 88 (2d Cir. 2019)..............................................................2, 13, 14, 15

*Seijas v. Republic of Argentina*,
  606 F.3d 53 (2d Cir. 2010)..............................................................................22

*Sevugan v. Direct Energy Servs.*,
  931 F.3d 610 (7th Cir. 2019) .....................................................................13, 14

*Troitino v. Goodman*,
  35 S.E.2d 277 (N.C. 1945)..................................................................... *passim*

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016).........................................................................................9

**Other Authorities**

FED. R. CIV. P. 26 .................................................................................................................2, 7, 8

FED. R. EVID. 403 .....................................................................................................................8

FED. R. EVID. 702 ............................................................................................................. *passim*

L.R. 56.1 ....................................................................................................................3, 20, 21

## I.   INTRODUCTION

Plaintiff Susanna Mirkin contracted with XOOM[1] to buy electricity at variable rates "based on XOOM's actual and estimated supply costs." Since the case began, her legal theory has been that the variable rates could include a margin above costs that does not change over time. Her experts at Charles River Associates ("CRA") initially agreed with that theory. They generated the "market supply cost" alleged in the complaints and endorsed rate calculations that included a static "margin of 1.3¢" over the estimated "market supply cost." Compl. ¶ 54 n.27, Doc. 42.

By the time expert disclosures were due in October 2022, however, CRA changed its mind. Rather than allow a static margin above costs, CRA said the contract allowed no margin at all. Based on that misreading, CRA built two new models: "Model One," which does not allow any margin; and "Model Two," which CRA created at counsel's instruction in case the "the Court were to decide that a margin was allowed." Ex. 10, Adamson Dep. 70:17–18.[2] Model Two does allow a margin, but not a proportionate one. Its margin inputs fluctuate monthly with XOOM's margin estimates for its fixed-rate products in the same month (as low as -27% and up to 59%). Plaintiff served this ***fluctuating***-margin Model Two in October 2022 but then argued for a ***proportionate*** margin in support of class certification and against summary judgment. Plaintiff stood by Model Two even after the Court adopted her proportionate-margin construction in August 2023, insisting it was fine as recently as February 2024 in a letter to the Court opposing decertification.

But her experts at CRA have now changed their minds once again. XOOM's March 1 decertification motion forced them to acknowledge that Model Two's algorithm cannot accommodate the Court's proportionate-margin construction. To solve that problem (which

---

[1] Plaintiff contracted only with XOOM Energy New York, LLC. The distinctions between the two defendants are irrelevant under Rule 702, so they are referred to collectively as "XOOM."

[2] All Exhibits are annexed to the Declaration of Michael D. Matthews, Jr.

Plaintiff ignored over XOOM's objections since September 2023), CRA went back to the drawing board and created three brand new models (Methods A, B, and C). But because those new models are undeniably late, they will be excluded, forcing Plaintiff to continue defending Model Two.

Model Two is not just conceptually flawed; it is also missing years of calculations. XOOM produced additional charge data for August 2021 through January 2024 by agreement nearly three months ago, but CRA has never supplemented Model Two's calculations to include it. Model Two's calculations still end in July 2021, just as they did when they were originally served. They provide no information for any later months. Presumably, the failure to supplement Model Two means Plaintiff no longer intends to rely on it at trial. Nor could she. Model Two is irredeemably obsolete and the Rule 26 deadline for supplementation has passed.

And even if Model Two had been timely supplemented, it would still fail to satisfy Rule 702's threshold admissibility requirements. Model Two is inadmissible under the Second Circuit's decisions in *Richards* and *Martinez* because it relies on CRA's "subjective and unsupported view of what a 'reasonable margin'" would have been without including reliable data about the margins achieved by other ESCOs. *See Martinez v. Agway Energy Servs.*, 88 F.4th 401, 414 (2d Cir. 2023). Model Two is inadmissible for reasons beyond that binding authority too. As discussed, it admittedly does not use a "proportionate" margin input as required by the contract interpretation Plaintiff advanced and the Court adopted . For that and other reasons, Model Two is unhelpful to the trier of fact, its inputs are incomplete and unreliable, and its algorithm is mathematically incapable of measuring damages under the proportionate-margin construction.

Accordingly, and for other reasons discussed below, the Court should exclude Model Two and other opinions expressed in Plaintiff's original expert disclosures.[3]

---

[3] Methods A, B, and C will be addressed by separate motion per the Court's May 14 Order.

## II.   FACTUAL & PROCEDURAL BACKGROUND

**A.   Plaintiff and the class members contracted with XOOM to buy electricity or natural gas at variable rates based on XOOM's actual and estimated supply costs.**

Plaintiff signed up to receive variable electricity supply service from XOOM in March 2013. Doc. 151, SJ Order 2. That service was governed by a written contract with this rate description:

> Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable. Your monthly variable rate is based on XOOM's ***actual and estimated supply costs*** which may include but not be limited to prior period adjustments, inventory and balancing costs.

*Id.* at 2–3 (emphasis added). Other XOOM customers received contracts with similar language, including members of the now-certified class. *See* Doc. 152, Class Order 7–8.

Plaintiff's service began on May 10, 2013. *See* Pl.'s L.R. 56.1 Statement No. 5, Doc. 52. She does not dispute that she received the correct introductory rate for the first month. *See* Doc. 42, Compl. ¶ 43. However, she alleges, on behalf of herself and the class, that she was charged rates that violated the contract after their introductory rates expired. *See id.*

**B.   Plaintiff hired CRA to provide expert testimony and model classwide damages.**

Plaintiff made timely expert disclosures in two written reports: the CRA Report and the CRA Rebuttal Report, which were authored by consultants named Seabron Adamson and Derya Eryilmaz.[4] *See* Ex. 1, CRA Report; Ex. 5, CRA Rebuttal Report. Broadly speaking, the CRA Report does two things, it: (1) opines that XOOM set New York variable rates that "did not conform with the requirements of its contracts," from March 2013 to July 2021, and (2) calculates the amount that XOOM's variable-rate customers were purportedly overcharged during that time using two different models. Ex. 1, CRA Report § 2.3, ¶ 46, ¶ 61. Model One, which was CRA's

---

[4] Plaintiff did not include Dr. Eryilmaz on her trial witness list, and Mr. Adamson's untimely May 10 report states that Dr. Eryilmaz is no longer associated with CRA.

primary model, measured damages against rates equal to XOOM's estimated supply costs for the upcoming month with no margin, while the alternative Model Two allowed a margin above estimated supply costs capped at the level of XOOM's contemporaneous fixed-rate margin for what CRA believed was an equivalent product. Ex. 1, CRA Report ¶ 61(a)–(b). In simpler terms, Model Two took whatever fixed-rate margin XOOM estimated it would achieve in a month and, if the variable-rate margin for the same commodity (e.g., residential electricity) was higher, Model Two used that delta to calculate damages. In its Rebuttal Report, CRA offered commentary on XOOM's expert disclosures and calculated Plaintiff's individual damages under Models One and Two. *See* Ex. 5, CRA Rebuttal Report ¶ 2(a)–(f) (summary of rebuttal opinions).

In depositions taken after Plaintiff served the CRA reports, Mr. Adamson and Dr. Eryilmaz acknowledged three fundamental shortcomings with their opinions and models.

First, their opinions assume that XOOM was contractually prohibited from seeking a profit or including any margin in its rates. *See, e.g.*, Ex. 11, Eryilmaz Dep. 63:10–13 ("Q. Why doesn't XOOM get to seek a profit under this sales contract? A. The sales contract did not mention margin in their statement, so that's why."); Ex. 10, Adamson Dep. 31:6–14 (his "kind of ordinary read of" the contract prohibited "a margin on top of" supply costs). Both admitted that legal interpretation was beyond their expertise and "anticipated" the Court would disagree with their no-margin interpretation. *See* Ex. 11, Eryilmaz Dep. 50:23–24 ("[W]e anticipated, you know, the court may say a margin is appropriate for this case."); *see also id.* at 70:22–71:3 ("I mean, I'm not a contract expert[.]"); Ex. 10, Adamson Dep. 32:7–9 (declining to offer a legal interpretation). But they relied on their incorrect contract interpretation anyway—adopted without guidance from Plaintiff's counsel—as the foundation of their opinions on breach and for the now-abandoned Model One. *Id*. at 10:21-24 (confirming CRA is opining that XOOM did not comply with the pricing

provision); *id.* at 11:22–24 (but was not asked to assume an interpretation). So, Model One reflected their opinions about breach and damages, not Model Two. *Id.* at 83:14–84:2 (opining contract does not allow margin), 88:4-10 ("Q . . . Model 1 in your opinion accurately measures the damages…from what you believe is XOOM's failure to set variable rates consistent with the contract language? A. Yes.").

Second, Mr. Adamson testified that he could not opine as to what a "reasonable" margin would have been or calculate such a margin:

> Q.  . . . Are you offering an opinion about what is a reasonable or appropriate margin for an ESCO to charge?
>
> A.  Well, to build the second model we needed an estimate of margin. **We really didn't have any information that would allow that to be created** . . . ."

*See, e.g.*, Ex. 10, Adamson Dep. 69:16–20. Thus, even though Model Two has margin inputs, it does not purport to use an ***accurate*** input for a reasonable margin (since CRA admits it "did not have any information that would allow that to be created"). *Id.* Rather, it simply uses XOOM's fixed-rate margins as placeholders (ranging from -27% up to 59%), "basically . . . as an example to show, you know, what the charge would look like" if you suppose that "the court or the jury" supplied the margin inputs CRA was unable to calculate. *See* Ex. 11, Eryilmaz Dep. 70:2–16. However, both Mr. Adamson and Dr. Eryilmaz declined to say that any economic principle required XOOM to tether its variable-rate margins to the margins it achieved on its contemporaneous fixed-rate products, or that such margins were reasonable. *See id*. 70:17–21. In fact, Dr. Eryilmaz admitted: "I don't believe" Model Two's margin assumption "is appropriate." *Id*. at 70:11:21.

And finally, CRA claimed to lack sufficient facts or data to opine as to what XOOM's

actual supply costs were,[5] or even to determine whether specific margins would allow XOOM to cover overhead—much less earn a profit. *See* Ex. 1, CRA Report ¶ 23(i) ("It is not in our scope to validate the data provided in discovery, including the accuracy of the costs reported."); Ex. 10, Adamson Dep. 80:5–10, 84:3–10, 101:4–5; Ex. 11, Eryilmaz Dep. 68:14–69:3. Nor did CRA have access to data that would allow it to compare XOOM's variable-rate margins to the margins achieved by other ESCOs. *See id.*. at 77:17–24. In other words, CRA admittedly cannot opine on what a reasonable margin would be in relation to other ESCOs, or in relation to XOOM's ability to cover its actual costs and earn a profit.

## C.   The Court denied summary judgment and granted class certification.

XOOM moved for summary judgment after the close of discovery. In ruling on that motion, the Court rejected XOOM's argument that the contract permits rates for which supply costs were the foundational component.   A "proportionate-margin construction" was instead adopted that permits rates to "be determined by XOOM's actual and estimated supply costs—and only those costs," which means XOOM's margin must "remain proportionate, but not equal to the supply costs over time."[6] SJ Order 12, 13. Under that interpretation, the Court denied summary judgment based on factual disputes as to the composition of XOOM's costs and margins. SJ Order 4, 14–19.

Thereafter, the Court certified Plaintiff's lone overcharge claim as a class action based, in part, on its finding that common questions of breach and damages would predominate with the aid of Model Two. *See* Class Order 8–15. However, that finding did not involve a substantive assessment of CRA's opinions, testimony, or models. The Court instead correctly noted that Model Two's validity would ultimately "depend[] on the accuracy of the inputs." Class Order 14.

---

[5] CRA's amended report goes further, admitting that XOOM's "actual costs are not reflected in XOOM's rate-setting workbooks" they use as the foundation for all models.

[6] XOOM maintains that its interpretation is correct and will advance it on any appeal.

**D.      Plaintiff abandoned Model One.**

XOOM's decertification motion explained why Model One would be excluded at trial. In response, Plaintiff expressly abandoned Model One. *See* Doc. 204, Decert. Resp. 23 n.10 ("The Class will not rely on Model 1"). In light of Plaintiff's concession, and to minimize the issues for the Court, this motion does not address the substantive deficiencies of Model One in detail.

**E.      Plaintiff served an untimely amended report that abandons Models One and Two in favor of three brand new models.**

At 11:49 p.m. on May 10—a few hours after filing the parties' Proposed Pretrial Order and after receiving XOOM's decertification reply—Plaintiff served an amended expert report that wholly replaces Models One and Two with "Methods A, B, and C." XOOM is in the process of analyzing those new "Methods" and drafting a brief addressing their procedural untimeliness (and substantive problems to the extent XOOM is able to do so without the benefit of discovery).

For the purposes of this motion, the critical feature of Plaintiff's amended report is what is missing: any supplemented calculations under Models One or Two using the dataset XOOM produced about rates charged after "the period beginning on March 2013 and ending on July 2021," Ex. 1 p.3 n.6. Under Rule 26(e) and the Court's express order, Plaintiff may no longer supplement Model One or Model Two to include that data. CRA's opinions and calculations regarding the charges class members incurred are thus irredeemably incomplete.

### III.      LEGAL STANDARD

"The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). That rule provides that a qualified expert may only offer opinion testimony "if the proponent demonstrates to the court that it is ***more likely than not***" that the testimony (a) "will help the trier of fact," (b) "is based on sufficient facts or data," (c) "is the product of reliable principles and

methods," and (d) has been "reliably applied . . . to the facts of the case." *See* Fed. R. Evid. 702 (emphasis added). "Rule 702 governs the district court's responsibility to ensure that 'any and all [expert] testimony or evidence admitted is not only relevant, but reliable.'" *Nimely*, 414 F.3d at 396 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). "In addition to the requirements of Rule 702, expert testimony is subject to Rule 403" and is excludable "'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id.* at 397 (quoting Fed. R. Evid. 403).

"An expert's opinion is relevant if it will 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Red Hawk, LLC v. Colorforms Brand LLC*, No. 20-CV-9032 (VEC), 2022 WL 16570948, at *3 (S.D.N.Y. Nov. 1, 2022) (quoting Fed. R. Evid. 702(a)). "Proffered testimony is not helpful to the jury if it 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Id.* (quoting *Nimely*, 414 F.3d at 397).

"[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Id.* at 396. "'[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

## IV.   ARGUMENT & AUTHORITIES

**A.   Plaintiff's failure to supplement Model Two's calculations renders it inadmissible as common proof for the certified class.**

Under Rule 26(e) and the Court's express order setting a deadline for supplementation, Plaintiff was allowed to "supplement Model Two's calculations to account for" the customer data

8

XOOM produced earlier this year. Doc. 187 at 4 n.4. XOOM told Plaintiff and the Court that it would not oppose such a supplement, and XOOM fully expected CRA to update Model Two using that data given that Plaintiff's decertification response relied on Model Two.

CRA defied those expectations. Model Two's calculations were not updated at all—presumably because Plaintiff and CRA finally recognized its fatal deficiencies. But whatever the reason, the decision not to update Model Two's calculations renders it hopelessly incomplete for the certified class. To model classwide damages, Plaintiff needs evidence of liability and damages for class members who paid variable rates after July 2021. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (class action plaintiffs cannot rely on evidence that would not establish liability in individual actions filed by each class member). Plaintiff's incomplete disclosures do not fit that bill because they cannot help the jury assess liability or damages with respect to class members who incurred variable charges after July 2021. *See* Fed. R. Evid. 702(a)–(d) (requiring expert evidence to be helpful to the factfinder, based on "sufficient facts or data," and the product of a reliable method applied reliably "to the facts of the case"). XOOM has long said Plaintiff has no common proof of the contract's actual costs or margin components; she now also lacks a model that can serve as common proof of ***estimated*** costs for any month after July 2021.

Accordingly, in addition to the underlying defects XOOM further discusses below, Model Two should be excluded because it does not even attempt to model overcharges for the class.

**B.    Binding precedent demands exclusion of CRA's models and opinions because they are irrelevant and inadmissible, as the Second Circuit just reaffirmed.**

This Court need not chart a new course to conclude that Model Two must be excluded as unreliable and based on insufficient data. The Second Circuit recently affirmed exclusion of nearly identical opinions—based on equally unreliable and insufficient data—in *Martinez*, another class action alleging that an ESCO overcharged a variable-rate customer. *Martinez v. Agway Energy*

9

*Servs.*, 88 F.4th 401, 414 (2d Cir. 2023). The plaintiff's expert in *Martinez* (like CRA here) modeled damages using different margins, but (like CRA here) he did not offer a reliable opinion about what a reasonable margin would be, expecting to leave that issue to the jury. The district court excluded plaintiff's expert under Rules 702 and 403 and the Second Circuit affirmed, holding that the conclusions about overcharges were based on "unreliable methodology and insufficient data" including "his subjective views on the reasonableness of margins." *Martinez*, 88 F.4th at 414. This Court should reach the same conclusion and exclude CRA's opinions and models here because they mirror those of plaintiff's expert in *Martinez*—and are equally flawed. In fact, the flaws here are more pervasive and incurable.

In *Martinez*, the plaintiff alleged that an ESCO was overcharging its variable-rate electricity customers in New York and Pennsylvania. *Martinez*, 88 F.4th at 405. To support that claim, the plaintiff retained an expert named Dr. Frank Felder to prepare models for calculating classwide overcharges. *See id.* at 414. In *Martinez*, as here, the contract allowed the ESCO to set rates that included a margin above costs. *See id.* at 413 ("Agway was entitled to consider its 'costs, expenses and margins,' when setting rates"); Class Order 14 (recognizing that the class members rates can include "a reasonable margin under the contract"). So, as here, Dr. Felder's overcharge model's calculations of the rate the class members allegedly should have been charged had to include an input for the reasonable margin the contract admittedly allowed. *Martinez*, 88 F.4th at 414 (affirming exclusion of an overcharge model that used "unreliable methodology and insufficient data" to quantify "what a 'reasonable margin'" should have been under the class members' contracts); Class Order 14 ("[A]ny measure of damages in this case would undoubtedly be based on the rate, cost, and margin.").

Although Dr. Felder claimed his overcharge model could calculate "[w]hat Agway customers on variable pricing would have saved, that is how much they were overcharged, ***if they were charged a rate by Agway that reflected its costs plus a reasonable margin***," Ex. 12, Felder Report 1 (emphasis added), Dr. Felder did not have an affirmative opinion about the margin Agway should have included in its rates. Instead, he, like CRA here, simply opined that there should theoretically be ***some*** sort of limit on margin while offering no expert testimony as to where the limit ***actually is***:

| Dr. Felder's Opinion in *Martinez* | CRA's Opinion Here |
|---|---|
| "Presumably there's some limit on the amount of margin they could charge…but ***I didn't go and draw, do a, you know, a hard line where that limit is***."[7] | "Q. Is there a single ESCO number for variable rates that in your opinion would be a cap on what is an appropriate or reasonable margin?<br><br>A. What I am offering is conceptually that the margin has to be based on something from reality to be meaningful in the context of this contract . . . But ***I don't have a number to give you***."[8]<br><br>"Q. …how much more could the rate be than actual and estimated supply costs on a dollar-per-unit basis…?<br><br>A. …***there's no, like, specific percentage I can tell you that it should be X percent higher***…"[9] |

Without an affirmative opinion as to the margin Agway was allowed to include, Dr. Felder deferred to the jury, performing illustrative calculations of damages "using various margins" he thought the jury might adopt and promising he could update those calculations after trial to reflect

---

[7] Ex. 14, Felder Dep. 172:6-11.
[8] Ex. 10, Adamson Dep. 73:14–20.
[9] Ex. 11, Eryilmaz Dep. 41:20-21, 42:2-4.

11

whatever "the jury or finder of fact concludes" the margin should have been. Ex. 13, Felder

Rebuttal ¶ 32; Ex. 12, Felder Report 16. That is exactly what CRA has done here by using XOOM's

fluctuating fixed-rate margins in Model Two as a "proxy of what might be an acceptable margin,"

Ex. 10, Adamson Dep. 70:20–21. Dr. Felder likewise modeled a calculation based on the margins

in a different product offered by the ESCO—using Agway's "Introductory Rate Margins" as a

proxy. Ex. 12, Felder Report 8–14. Like CRA, Dr. Felder left it to the jury to decide what margin

was actually appropriate:

| Dr. Felder's Opinion in *Martinez* | CRA's Opinion Here |
|---|---|
| "Assuming that a jury or finder of fact concludes that Agway should have been selling electricity under its variable rate based on its COGS and the other expenses that I just described and perhaps escalated to recover some lower margin than it charged, I can calculate the relevant overcharges."[10]<br><br>"If asked, I can calculate for a given set of customers, for a given period of time, for a given margin (if any), the overcharge for each individual customer."[11] | "…to the extent non supply costs margins are included really is something that the judge or the jury or whoever decides on this has to, has to opine on."[12]<br><br>"Dr. Eryilmaz and Mr. Adamson further show that if the factfinder determines that a margin is appropriate, the experts can calculate damages applying such a margin."[13] |

The similarities between Dr. Felder's approach in *Martinez* and CRA's here are

remarkable. Even more remarkable is that in *Martinez*, **CRA** Vice President (Dr. Debra J. Aron)

testified on behalf of the ESCO defendant regarding the deficiencies in Dr. Felder's opinions:

---

[10] Ex. 12, Felder Report 18.
[11] Ex. 12, Felder Report at 16.
[12] Ex. 10, Adamson Dep. 32:2-6.
[13] Pl.'s Class Certification MOL, Doc. 132 36.

| CRA's Opinion in *Martinez* | CRA's Opinion Here |
|---|---|
| "Dr. Felder offers no foundation, no evidence, and no analysis for asserting that the margins he imposes are reasonable, are consistent with actual margins in the industry, or are consistent with competition in an unregulated market."[14] | "[T]o build the second model we needed an estimate of a margin. We really didn't have any information that would allow that to be created."[15]<br><br>"I don't have a number to give you [as a cap on a reasonable or appropriate margin]. . . . I think that would need more inputs than are available at present."[16] |

The *Martinez* court found that Dr. Felder's approach failed to satisfy Rule 702's threshold prerequisites for admissibility. CRA's in this case approach is equally deficient.

The Second Circuit and others have consistently recognized that the reasonableness of an ESCO's variable rates and margins is assessed by comparison to those of other ESCOs. *See Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019) (rejecting claim that ESCO's rates were "too high" without "evidence [they were] any higher than its competitors' rates"); *id.* ("To determine if a price is commercially reasonable it must be compared to the range of other prices in the market." (cleaned up)); *Martinez*, 88 F.4th at 414 (same, following *Richards'* precedent); *Sevugan v. Direct Energy Servs.*, 931 F.3d 610, 617 (7th Cir. 2019) (dismissing complaint that ESCO's margin was unreasonable when it did not "allege [the] adder was greater than that charged by other market participants"). Absent such data, the expert's overcharge opinions in *Martinez* were "inadmissible under Federal Rule of 702" and "legally insufficient . . . to raise a triable issue of fact" on the plaintiff's overcharge claim. *Martinez*, 88 F.4th at 414.

---

[14] Ex. 15, Aron Report ¶ 18.
[15] Ex. 10, Adamson Dep. 69:16–18.
[16] Ex. 10, Adamson Dep. 73:8–74:1.

So too here. CRA declined to compare XOOM's rates or margins to those of other ESCOs because CRA mistakenly thought the comparison would be irrelevant:

> Q.   Did you do any analysis of what other ESCOs charged
>      in New York during that same time period?
>
> A.   No.
>
> Q.   Okay. So you don't know how XOOM's rates compared
>      to other ESCOs rates?
>
> A.   For purposes of this we never made a comparison.
>
> Q.   And you don't know if XOOM's rates were outside the
>      range of what ESCOs were charging during that time
>      period?
>
> A.   No, we didn't look at that. It didn't seem very
>      relevant.

Ex. 5, Adamson Dep. 64:21–65:7. CRA's failure to compare XOOM's rates or margins to those of other ESCOs renders their overcharge opinions irrelevant, "inadmissible under [Rule 702]," and "legally insufficient . . . to raise a triable issue of fact" as to Plaintiff's allegations of classwide overcharges and unreasonable margins. *Martinez*, 88 F.4th at 414; *see Richards*, 915 F.3d at 98 (rejecting Mr. Adamson's opinion as to "what factors [a] variable rate should reflect" under a contract as "'irrelevant and inadmissible'" (citation omitted)).

Pursuant to *Martinez*'s explicit holding, the consistent binding and persuasive authority in *Richards* and *Sevugan*, and Mr. Adamson's and Dr. Eryilmaz's own admissions, Model Two and related opinions are unquestionably based on "unreliable methodology and insufficient data" to determine what any class members' rate allegedly should have been. *Martinez*, 88 F.4th at 414. That failure independently requires the Court to find Model Two and CRA's related opinions both irrelevant and "inadmissible under Federal Rule of Evidence 702." *Id.*; *Richards*, 915 F.3d at 98.

14

**C.      Model Two is inadmissible under Rule 702.**

Between the failure to supplement Model Two's calculations and *Martinez*'s binding precedent, Plaintiff cannot credibly seek to introduce Model Two as evidence at trial. If she does (and is somehow able to overcome the problems already discussed), she will then face her burden of satisfying Rule 702's threshold criteria by a preponderance of the evidence. She cannot.

*a.   Model Two is irrelevant and unhelpful.*

Rule 702(a)'s first requirement demands a showing that CRA's opinions "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Here, the Court has said the factfinder will be asked to resolve "two common issues in this lawsuit: breach and damages." Class Order 12. CRA's opinions are not helpful as to either issue.

With respect to breach, CRA opines that "XOOM's pricing does not conform with the requirements of [the contract]" because the "rates charged to customers [were] much higher than its total actual reported costs." Ex. 1, CRA Report ¶¶ 38–59. CRA's conclusions about "consistency with the contract" (i.e., liability) incorrectly assume that the "contract only allows XOOM to charge its supply costs" without any margin. Ex. 10, Adamson Dep. 83:14–84:1; *see also id.* 30:13–31:14, 56:4–57:11, 88:4–10, 118:13–19 (explaining how his opinions assume no margin was allowed). That assumption is foreclosed by the Court's summary judgment order, which specifically rejected an interpretation of the contract that would treat supply costs as "'the only legitimate component' of the variable rate" in favor of a "proportionate-margin construction, which allows a margin" above costs. SJ Order 12–13. In assessing the question of breach, the jury will be bound to follow the Court's proportionate-margin construction. CRA's mistaken opinions based on its own misinterpretation that the contract allows no margin are irrelevant, inadmissible, and profoundly unhelpful to that inquiry. *See Richards*, 915 F.3d 88, 98 (2d Cir. 2019) ("expert

testimony regarding the meanings of contractual provisions is irrelevant and hence inadmissible"
(cleaned up)).

Second, as to damages, CRA's opinions are based on a model that violates the contract.
Under North Carolina Law, contract damages are measured as "the pecuniary difference between
[an injured party's] position upon breach of the contract and what it would have been, had the
contract been performed." *Troitino v. Goodman*, 35 S.E.2d 277, 282 (N.C. 1945). Thus, the
factfinder's task will be to determine the difference between the charges the class members
incurred if the margins in their rates had "remain[ed] proportionate, but not equal to [XOOM's
actual and estimated] supply costs over time." SJ Order 13.

Model Two does not try to make that comparison. Instead, it shows how CRA could
hypothetically calculate damages "if the Court were to decide that a margin was allowed." *See*
Adamson Dep. 70:17–18. Model Two cannot function without numerical inputs for an appropriate
margin, and Mr. Adamson admits he cannot help the jury decide what those inputs should be:

> Q. And if we go to trial, and you take the witness stand,
> and I'm asking you questions, and the judge gets
> frustrated with my questions and says, 'let's cut to
> the chase. **Mr. Adamson, what do you think is an
> appropriate margin for an ESCO to charge?**" What would
> your answer be?
>
> A. I would say conceptually it's got to be related to
> the, related to the costs. And in a broad conceptual
> basis.
>
> Q. And if [she] said, "but can you give me a cutoff
> point? **Is there a number that you can assign to that?**"
> Would you be able to give [her] one?
>
> A. **I wouldn't be able to give [her] a number on the stand**
> because I wouldn't have the, XOOM's internal
> information, no.

Ex. 10, Adamson Dep. 71:12–72:7 (objections and uh-huhs omitted). As that passage shows, CRA

16

cannot offer any help to the jurors with respect to "an appropriate or reasonable margin." *Id.* at 73:23–74:1. Rather, CRA's experts—with their 35+ years of combined industry experience—will ask the ***jury*** for help because they cannot supply a reasonable margin. *Id.*; CRA Report ¶¶ 10–22. CRA's testimony therefore cannot be helpful at trial because they do not even attempt to calculate damages unless the jury first overcomes the question that stymied CRA by supplying the margin inputs for 6,000+ overcharge calculations.

Accordingly, CRA's testimony that XOOM violated a margin prohibition the Court says does not exist (i.e., Model One), and its model measuring overcharges against rates the contract admittedly did not require (i.e., Model Two), should be excluded. Rather than assist the factfinder, CRA's opinions and models "would be confusing, irrelevant, and [would] not assist the jury." *Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 108 (E.D.N.Y. 2022) (Ross, J.) (excluding an expert's opinion that the alleged discrimination was unfair because it would not help the jury answer the question at issue: whether the discrimination existed).

> b.  *Rule 702(b): Model Two is not based on sufficient facts or data.*

Rule 702's next requirement demands proof that CRA's overcharge models and opinions are "based on sufficient facts or data." Fed. R. Evid. 702(b). Here, that data must include, at a minimum, reliable inputs for "the rate, cost, and margin" because "***any*** measure of damages in this case would undoubtedly be based on" that data. Class Order 14 (emphasis added); *see also Troitino*, 35 S.E.2d at 282 (measuring damages as the pecuniary difference between breach and compliance). With respect to margin and costs, Model Two is based on data that are inadequate and, in some instances, does not include the data at all.

> i.  Margin: Model Two has no reliable input for the "reasonable" and "proportionate" margin XOOM should have charged.

As discussed, "a reasonable margin" is a necessary component of "***any*** measure of damages

in this case." SJ Order 14. Model Two does not include that essential component, and Plaintiff cannot remedy that failure by asking the jury to manufacture a margin at trial.

For Model Two, CRA used data about XOOM's fixed-rate margins to illustrate how they could calculate damages if "the court or the jury decides that some recovery of margin is appropriate." Ex. 11, Eryilmaz Dep. 70:2–16. However, the fixed-rate margin inputs are fatally insufficient because they fluctuate without regard to costs—i.e., they do not satisfy the contract's proportionate-margin requirement, requiring margins to "remain proportionate, but not equal to the supply costs over time" and not be "untethered to" those costs. SJ Order 13. In fact, Plaintiff has no evidence that even a single one of the thousands of fixed-rate margin inputs used in Model Two is either proportionate or tethered to XOOM's variable-rate costs. *See* Ex. 4 (Model Two's fixed-rate margin inputs).

CRA's calculations of Plaintiff's individual damages under Model Two show the problem. Those calculations measure "the difference between XOOM's [allegedly disproportionate] margins on variable rates" and the SureLock fixed-rate margins highlighted below:

| year | month | date | Xoomrates Interval Data $/kWh ConED_zoneJ | Usage kWh ConED_zoneJ | SimpleFlex Margin (%) ConED_zoneJ | SureLock Margin (%) ConED_zoneJ | (2) Xoom * Usage * Excess Margin ConED_zoneJ |
|---|---|---|---|---|---|---|---|
| 2013 | 6 | 6/1/2013 | 0.1290 | 370 | 16% | 13% | 2 |
| 2013 | 7 | 7/1/2013 | 0.1440 | 710 | 18% | 11% | 8 |
| 2013 | 8 | 8/1/2013 | 0.1490 | 800 | 18% | 11% | 9 |
| 2013 | 9 | 9/1/2013 | 0.1399 | 500 | 27% | 16% | 8 |
| 2013 | 10 | 10/1/2013 | 0.1490 | 280 | 21% | 12% | 4 |
| 2013 | 11 | 11/1/2013 | 0.1299 | 230 | 30% | 11% | 6 |

*See* Ex. 7 (highlighting added)[17]; *see also* Exs. 2 and 4.[18] As that chart shows, XOOM's fixed-rate margins fluctuate month-to-month, so they fail the contract's requirement that margins "remain proportionate . . . over time." SJ Order 13.

This pattern is repeated across all of Model Two's inputs. CRA's class calculations under Model Two include fixed-rate margin inputs that vary wildly, from a low of -27% to a high of 59%. *See* Ex. 3 at p. 4 (-27% SureLock Margin for NGrid_NM in December 2020; 59% SureLock Margin for NFG in October 2016). And unlike the margins included in XOOM's variable rates (which are closely correlated to the rate-setting workbooks' Total Costs, *see* Doc. 145-5, Coleman Report 4), there is no evidence of any relationship of any kind between XOOM's variable-rate supply costs and its contemporaneous fixed-rate margins.

Plaintiff and CRA acknowledge this problem, and they make no attempt to defend Model Two's non-proportionate inputs. *See* Doc. 204, Resp. to Mot. to Decertify, 3 (minimizing the problem with Model Two's ***non-proportionate*** margin input by calling it "a replaceable data point"); Ex. 8, Amended CRA Report, 37–38 (acknowledging that Model Two's margin inputs did not "align . . . with the court's ruling at summary judgment"). But they did not supplement Model Two with a new data point. Thus, it is undisputed that Model Two ***does not*** include sufficient data to measure damages as "the pecuniary difference between" the charges incurred

---

[17] CRA's calculation spreadsheets are set to display figures rounded to the nearest whole number. However, the actual calculations were performed with the following unrounded figures as the input for XOOM's SureLock Margin:

| | |
|---|---|
| June 2013 | 13.1610169491525%; |
| July 2013 | 10.5038759689922%; |
| Aug. 2013 | 10.5984848484848%; |
| Sept. 2013 | 15.6000000000000%; |
| Oct. 2013 | 12.2950819672131%; |
| Nov. 2013 | 11.1475409836066%.. |

[18] XOOM provided the Court with electronic copies of these models in their native Excel format on the hard drive containing its trial exhibits as DXI 06D, DXI 06E, and DXI 07B.

and the charges the class would have incurred if their rates included a proportionate margin. *See Troitino*, 35 S.E.2d at 282. Accordingly, Model Two indisputably fails to satisfy Rule 702(b)'s demand for "sufficient facts or data." Fed. R. Evid. 702(b).

ii.   Supply Costs: Model Two does not have any input for supply costs.

Model Two also lacks adequate data about the "actual and estimated supply costs" XOOM's rates were required to be based on. *See* SJ Order 12. In fact, supply costs are not even an input for that model. Instead of "calculat[ing] damages based on rate, cost, and margin" as the court assumed, Class Order 14, Model Two's algorithm lacks any data about costs, using rates and margins as the only inputs. *See* Ex. 7 (omitting costs from Model Two's calculations of Plaintiff's damages); Ex. 3 (same for the class-wide calculations). By omitting costs from Model Two's inputs, CRA committed the exact violation Plaintiff accuses XOOM of committing: they "'disregarded' [XOOM's] internal supply cost calculations when setting [the] variable rates" against which Model Two measures damage. SJ Order 5 (quoting Plaintiff's Rule 56.1 Counterstatement). Thus, Model Two is unquestionably not based on sufficient facts or data"—or *any* facts or data—about XOOM's costs. Fed. R. Evid. 702(b)

c.   *Rule 702(c), (d): Model Two does not reflect the reliable application of reliable principles to the facts of this case.*

Even with accurate inputs, CRA's testimony and opinions will be inadmissible due to methodological errors that violate Rule 702's requirements for reliable methods and applications. *See* Fed. R. Evid. 702(c), (d) (requiring the proponent of expert testimony to demonstrate that (c) "the testimony is the product of reliable principles and methods," and "(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case"). CRA's models fail those requirements on two levels.

First, CRA's models completely ignore all the months when XOOM's variable-rate

margins were *lower* than the fixed-rate margin. Under the proportionate-margin construction, XOOM was not only *allowed* to charge margins above its contemporaneous fixed-rate margins in each of those months—it was *required* to do so in order to maintain consistency over time. By ignoring contractual undercharges, CRA's models arbitrarily forgive some deviations from the contract while penalizing others, thereby putting some class members in a situation significantly better than they would have occupied if XOOM's rates had fulfilled the contractual demands of the proportionate-margin construction. *Troitino*, 35 S.E.2d at 282 (parties "not entitled to be enriched by" contract damages).

Second, CRA's models do not model rates that "vary *according to costs*" using a margin that "remain[s] proportionate, but not equal to the supply costs over time." SJ Order 13 (emphasis added). Indeed, Model Two is incapable of modelling rates that vary according to XOOM's costs because its calculations model XOOM's margins as a percentage of XOOM's variable rates, not a percentage above costs—as discussed, costs do not even factor into the equation. *See* Ex. 7 (individual Model Two calculations omit a cost input); Ex. 3 (same for the class).

Once again, Plaintiff's individual experience illustrates these defects in concrete terms. If Model Two's fixed-rate margin data is replaced with a reasonable 22% margin,[19] its calculations would show that she was *undercharged* overall:

---

[19] CRA acknowledges that "the margin that the Mirkins were charged during the period when they were XOOM customers was approximately 22%." *See* CRA Rebuttal ¶ 31; *see also* Pls.' Rule 56.1 Counterstatement 43 (admitting the same). Plaintiff offers no evidence that a gross margin of 22% is excessive or unreasonable by any standard, or even that a 22% margin would cover XOOM's actual costs and yield a profit.

| | | | Xoomrates Interval Data $/kWh | Usage kWh | SimpleFlex Margin (%) | SureLock Margin (%) | (2) Xoom * Usage * Excess Margin |
|---|---|---|---|---|---|---|---|
| year | month | date | ConED_zoneJ | ConED_zoneJ | ConED_zoneJ | ConED_zoneJ | ConED_zoneJ |
| 2013 | 6 | 6/1/2013 | 0.1290 | 370 | 16% | 22% | -3 |
| 2013 | 7 | 7/1/2013 | 0.1440 | 710 | 18% | 22% | -4 |
| 2013 | 8 | 8/1/2013 | 0.1490 | 800 | 18% | 22% | -4 |
| 2013 | 9 | 9/1/2013 | 0.1399 | 500 | 27% | 22% | 3 |
| 2013 | 10 | 10/1/2013 | 0.1490 | 280 | 21% | 22% | 0 |
| 2013 | 11 | 11/1/2013 | 0.1299 | 230 | 30% | 22% | 3 |

*See* Ex. 8 (modelling Plaintiff's damages using Model Two's calculations for each month, but modified to include a 22% margin). But instead of reflecting that outcome, Model Two ignores the months in which Plaintiff saved money and incorrectly reports she was overcharged by $6:

| date | year | month | Mirkins |
|---|---|---|---|
| 6/1/2013 | 2013 | 6 | - |
| 7/1/2013 | 2013 | 7 | - |
| 8/1/2013 | 2013 | 8 | - |
| 9/1/2013 | 2013 | 9 | 3 |
| 10/1/2013 | 2013 | 10 | - |
| 11/1/2013 | 2013 | 11 | 3 |

*See* Ex. 8 (showing Model Two's final output for Plaintiff's individual damages if Model Two's margin inputs are modified to allow a 22% margin).

By ignoring undercharges, Model Two fails to measure the difference between the rates Plaintiff paid and rates that complied with the Court's proportionate-margin construction. *Troitino*, 35 S.E.2d at 282. It instead impermissibly puts Plaintiff in a ***better*** position than she would have occupied with a proportionate margin by allowing disproportionately low margins in four of the six months that she was a customer. *Troitino*, 35 S.E.2d at 282 (breach-of-contract plaintiffs are "not entitled to be enriched by the breach"). Even assuming a 19% "exemplar" margin, this defect in Model Two yields an unreliable damage calculation that fails to account for hundreds of months when the variable-rate margins were 19% or lower. *See* Ex. 3. Extended to the class, this flaw will result in damage calculations that impermissibly subject XOOM to liability far greater than it would face in actions filed by each class member individually, fatally undermining a verdict based on Model Two's algorithm. *See Seijas v. Republic of Argentina (Seijas I)*, 606 F.3d 53, 58–59 (2d

22

Cir. 2010) (vacating class judgment relying on expert's aggregate damage estimates without estimating damages for each violation, and without "using appropriate procedures to ensure that the damages awards roughly reflect the aggregate amount owed to [individual] class members"); *Hickory Sec. Ltd. v. Republic of Argentina (Seijas II)*, 493 F. App'x 156, 161 (2d Cir. 2012) (same); *Puricelli v. Argentina (Seijas III)*, 797 F.3d 213, 219 (2d Cir. 2015) (same); *Brecher v. Republic of Argentina (Seijas IV)*, 806 F.3d 22, 27 (2d Cir. 2015) (same).

Nor does Model Two reliably calculate damages under the proportionate-margin construction in the two months that Plaintiff was allegedly overcharged. Under Model Two, a 22% margin would be calculated as a percentage of XOOM's ***rates***, not as a percentage of ***actual and estimated supply costs*** like the Court's construction demands. That Model Two calculation would decide that a 22% margin would be equal to $.030778/kWh in September and $.028578/kWh in November:

|  | Plaintiff's Rate ($/kWh) | Margin Input (%) | Margin Total ($/kWh) |
| --- | --- | --- | --- |
| September 2013 | 0.1399 | 22% | .030778 |
| November 2013 | 0.1299 | 22% | .028578 |

As a percentage of XOOM's rates, these margins are proportionate over time. But as a percentage of XOOM's estimated supply costs, they fluctuate: the September margin is about 30% of XOOM's alleged costs, and the November margin is about 32% of XOOM's alleged costs. *See* Ex. 6 at 2 (reporting Total Costs of approximately .1021/kWh in September and $.0903/kWh in November 2013).

This variation is unacceptable on the facts of this case. To reliably measure damages, a model must measure the difference between the variable rates XOOM charged and alternative rates that fulfill the requirement of margins that "remain proportionate . . . ***to the supply costs*** over time." SJ Order 13 (emphasis added). Model Two is fundamentally incapable of that calculation

because it does not include costs as an input, much less use equations that can add a proportionate margin to costs. *See* Ex. 7 (omitting costs from Model Two's calculations of Plaintiff's damages); Ex. 3 (same for the class-wide calculations). In fact, imposing a static margin equal to 22% of costs yields disproportionate variation far beyond what Plaintiff experienced—with margins over costs that fluctuate widely and exceed 75% in some months.[20]

Based on these failures, Model Two can never calculate the difference between the charges the class members incurred on XOOM's variable rates and the charges they would have incurred if the margins in their rates had "remain[ed] proportionate, but not equal to the supply costs over time." SJ Order 13. Thus, even with accurate inputs for the rate components (which are lacking for reasons already discussed), CRA's models would fail Rule 702's reliability requirements. *See* Fed. R. Evid. 702(c), (d); *Martinez*, 88 F.4th at 414 (affirming exclusion of unreliable opinion).

**D.      Most of CRA's other opinions are inadmissible under Rule 702 too.**

In addition to Model Two and the opinions discussed above, CRA's report contains a number of opinions that are irrelevant, inappropriate, or beyond their expertise, including:

- Statements that merely describe the contents of evidence that the jury is fully capable of assessing for itself, *see* CRA Report ¶ 23(c) (indicating that XOOM's rates were higher than Total Costs, an assessment that requires no expertise beyond the ability to compare two numbers); *id.* ¶ 23(d)–(f) (describing XOOM's rate-setting process based on CRA's selective acceptance and rejection of documentary and testimonial evidence, which is the province of the jury); *see also id.* ¶ 23(i) (acknowledging that it "is not in [CRA's] scope to validate the data provided in discovery, including the accuracy of the costs reported");

- Statements that are irrelevant to any disputed issue; *see* CRA Report ¶ 23(g) (describing legal, legislative, or regulatory proceedings, which do not govern any issue in this case and with respect to which CRA's experts lack any relevant expertise).

---

[20] For example, the November 2019 residential variable rate in RGE was $.0899. Calculated as a percentage of that rate, a 22% margin would be $.019778. *See* Ex. 2. Relative to the Total Costs of $.0271/kWh Model One reports for that month, that is a 76% margin. *Id.*

Similarly, CRA's rebuttal report makes statements that exceed the boundaries of CRA's relevant expertise, including:

- Statements that simply describe evidence the jury can assess for itself, *see* Ex. 5, CRA Rebuttal Report 2(a) (describing the formatting used in XOOM's expert's report); and

- Statements attempting to interpret the contract or offer legal opinions about legal, legislative, or regulatory proceedings, *see* CRA Rebuttal Report 2(d), (e), (f).

None of these opinions are matters on which CRA can help the jury decide a relevant issue, and many of these opinions are not matters on which CRA can claim expertise. Plaintiff cannot establish that those opinions meet the threshold requirements for admissibility under Rule 702.

## V.    CONCLUSION & PRAYER

For these reasons, the Court should strike CRA's timely reports and testimony in their entirety as irrelevant and unreliable under Rule 702 and *Daubert*, including:

- Any opinions about breach, the requirements of the class members' contracts, the consistency of XOOM's conduct with regard to the contracts, or overcharges, including but not limited to those disclosed in paragraphs 23(c)–(h), 23(j), 38–79 of CRA's Report and paragraphs 2(b)–(f), 4–32 of CRA's Rebuttal Report;

- The damage models described in paragraphs 60–79 of CRA's Report, paragraphs 29–32 of CRA's Rebuttal Report, and the associated calculations or workpapers;

- The other opinions disclosed in paragraphs 28–79 of CRA's Report and paragraphs 2(a) and 4–7 of CRA's Rebuttal Report;

- Any other opinions, apart from rebuttal opinions disclosed in CRA's Rebuttal Report, not disclosed in CRA's Report.

Dated: May 20, 2024                     MCDOWELL HETHERINGTON LLP

                                        */s/ Michael D. Matthews, Jr*
                                        Michael D. Matthews, Jr.
                                        Diane S. Wizig (admitted *pro hac vice*)
                                        James M. Chambers (admitted *pro hac vice*)
                                        David L. Villarreal (admitted *pro hac vice*)

Netra Sreeprakash
Justin Chapa (*pro hac* forthcoming)
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
james.chambers@mhllp.com
david.villarreal@mhllp.com
netra.sreeprakash@mhllp.com
justin.chapa@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC
and XOOM Energy New York, LLC*

26

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the 20th day of May, 2024 via email on all counsel of record.

/s/*Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.