# EXHIBIT 10

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF NEW YORK
 3      SUSANNA MIRKIN and BORIS MIRKIN,
 4      Individually and on Behalf of All Others
 5      Similarly Situated,
 6           Plaintiffs,
 7        vs.                    No. 18 Civ. 2949(ARR) (RER)
 8      XOOM ENERGY, LLC and XOOM ENERGY
 9      NEW YORK, LLC,
10           Defendants.
11      --------------------------------x
12
13
14              VIDEOTAPED DEPOSITION OF
15                  SEABRON ADAMSON
16              Tuesday, November 8, 2022
17                     10:06 a.m.
18                      Veritext
19                   101 Arch Street
20            Boston, Massachusetts 02110
21
22
23
24              Laurie K. Langer, RPR
```

Page 1

**Page 10**

1  agreements. If you want to take that to be liability,
2  liability I guess is a legal term. But -- so I am
3  addressing issues related to the consistency of the, the
4  rates and the sales agreements.
5     Q. Okay. And whether or not XOOM breached those
6  provisions?
7     A. Well, I mean, again, "breach" seems a legal word.
8  But whether it's -- whether the pricing was consistent
9  with the, with the pricing required in the sales
10 agreements.
11    Q. Okay. Is "breach" a word that you have
12 difficulty with?
13    A. No, I just.
14    Q. You've worked in a lot of --
15    A. Yeah.
16    Q. -- litigation for a long time.
17    A. Sure. I just -- I don't know exactly what
18 implications you're trying to put to that. I was just
19 trying to describe clearly what I did, which I think is
20 what's described here.
21    **Q. I guess put differently, you are offering an**
22 **opinion about whether or not XOOM complied with the**
23 **pricing provisions of its sales agreement?**
24    **A. Yes.**

**Page 11**

1     Q. Okay. And so are you also offering an opinion
2  about how the pricing terms of the sales agreements
3  should be interpreted?
4     A. No. I'm providing a -- my -- well, I'm providing
5  my understanding of what it says and in the context of
6  the, of electricity and gas markets and retail markets
7  and how that works out. Obviously, I'm not offering a
8  legal opinion on the language.
9     Q. Okay.
10    A. I'm offering my understanding based on knowledge
11 of these markets of how these, how these work.
12    Q. Okay. You're not offering a legal interpretation
13 of the pricing provisions in the XOOM sales agreement?
14      MR. WITTELS: Objection. I mean, I think he
15 asked -- he just answered it, didn't he?
16      MR. MATTHEWS: Steve, please, no speaking
17 objections today. Please.
18      MR. WITTELS: But it's the same question.
19      MR. MATTHEWS: "Objection form" is what's
20 appropriate to say, as you have reminded me. Okay?
21    A. I am not offering a legal opinion.
22    Q. Okay. Were you asked to assume a particular
23 interpretation of the pricing provisions?
24    A. No, not really. I mean, they're on the page.

**Page 12**

1     Q. Okay. So the third bullet point says that you
2  have been asked, "to determine whether XOOM set its
3  rates as required by the sales agreements."
4     Correct?
5     A. Yeah. The consistency, you know, the consistency
6  from an economic and commercial point between the rates
7  and, and, you know, how it -- how it -- how it
8  describes, I think, the phrase that we'll get, we'll get
9  around to today about the actual and estimated supply
10 costs --
11    Q. Yep.
12    A. -- in the -- in the sales agreement.
13    Q. Right. That's -- that's where I was going next.
14    The sales agreement requires that rates be set,
15 "based on XOOM's actual and estimated supply costs."
16    Right?
17    A. I don't have the phrasing in front of me, but
18 that sounds right.
19    Q. We can do that. I'm not trying to --
20    A. Yeah. I mean -- I think that's --
21    Q. Bear with me one second.
22      MR. MATTHEWS: May I mark this as Exhibit 2.
23      (Deposition Exhibit No. 2 marked for
24 identification.)

**Page 13**

1     Q. Okay. And, Mr. Adamson, does this appear to be a
2  copy of the sales agreement you were referring to?
3     A. Yes, I think so. I mean, there were
4  various, obviously various versions of these over time,
5  but this looks like the one.
6     Q. This is the one that you analyzed --
7     A. Yes, I believe --
8     Q. -- in connection with preparing this report?
9     A. Yes, I believe so.
10    Q. Okay. And in connection with the assignment to
11 determine whether XOOM set its rates as required by the
12 sales agreements, can you direct me to the provisions
13 that you looked at that relate to rate setting?
14    A. I mean, you know, obviously the -- the -- the
15 primary one is in this top right box, starting "your
16 rate."
17    Q. "Your rate for energy purchases will be a
18 variable rate, per kilowatt hour, that may change on a
19 monthly basis, plus taxes and fees, if applicable. Your
20 monthly variable rate is based on XOOM's actual and
21 estimated supply costs which may include but not be
22 limited to prior period adjustments, inventory and
23 balancing costs. You are responsible for all charges
24 assessed and billed by your local utility for all

```
 1    Q.  In doing that rate conversion, do you interpret
 2  that provision to mean that XOOM may include a margin in
 3  its rate?
 4         MR. WITTELS:  Objection.
 5    A.  I don't see that listed here.  You know, it says,
 6  "actual and estimated supply costs."  I don't see that
 7  here.  Sort of as we said, I anticipated that was going
 8  to be kind of argued.  I mean, when you have the reading
 9  here, I don't see that.  It says, "actual and estimated
10  supply costs," it doesn't talk about margin.  I mean, so
11  I think the most straightforward reading of that is it
12  doesn't have margin in it.
13    Q.  In your opinion XOOM may not include a margin in
14  its rate based on that contract provision?
15    A.  I would say it's actual -- I mean, if they --
16  if -- it just needs to -- it needs to be to actual and
17  estimated supply costs.  Which does not list here
18  "margin."
19    Q.  Mr. Adamson, I'll stipulate that the word
20  "margin" is not in that provision.
21    A.  Yes.
22    Q.  You don't have to tell me that again.
23    A.  Okay.
24    Q.  I want to know, your interpretation is.  You're
                                                     Page 30
```

```
 1  offering an opinion of what this provision means; yes?
 2    A.  Yeah, I'm offering what I think is a, you know, a
 3  relatively commonsensical commercial one.  I'm -- my --
 4  my ordinary reading of this is, you know, deal with
 5  supply costs and, and that's what it says.
 6    Q.  And does it mean that XOOM may include a margin
 7  on top of those supply costs?
 8         MR. WITTELS:  Objection.
 9    A.  They -- my kind of ordinary read of that is it
10  doesn't say that, unless, unless they are -- it's not
11  included in supply costs, it doesn't list that.  And
12  it's not a, you know, direct actual supply cost.  That's
13  what it says.  So I think the answer to your question is
14  no.
15    Q.  Okay.
16    A.  If you were to say it does, okay, that's
17  different.  That's a different view of the same thing.
18    Q.  Okay.  So if I said that rate setting provision
19  that we've been looking at based on actual and estimated
20  supply costs means that the rate will be consistent with
21  costs plus an appropriate margin, you would disagree?
22    A.  I mean, the first order based on it said what it
23  says, yes.  I mean, I -- I can -- I would guess you
24  would probably argue that.  Which I believe Mr. Coleman
                                                     Page 31
```

```
 1  has.
 2         So I would, you know -- I imagine that that was,
 3  imagined that that was going to come up.  I think -- I
 4  mean, whether, to the extent non supply costs margins
 5  are included really is something that the judge or the
 6  jury or whoever decides on this has to, has to opine on.
 7    Q.  Okay.  Because you're not offering a legal
 8  interpretation?
 9    A.  I am not offering a legal interpretation.
10    Q.  Okay.  If I said that I interpret that phrase
11  based on actual and estimated supply costs to mean that
12  XOOM's rate will rise and fall with its supply costs,
13  would you agree with that or disagree?
14         MR. WITTELS:  Objection.  By the way, when
15  you say "you," you the lawyer?  I don't know what you
16  mean.
17    A.  Sorry.  Can you repeat the question.
18    Q.  I say that when I, Matt.
19    A.  Right.  Okay.  We get our pronouns right.  Yeah.
20  Okay.
21    Q.  Read that pricing provision, specifically the
22  phrase "based on XOOM's actual and estimated supply
23  costs," I think that means that XOOM's rates will rise
24  and fall with its supply costs.  Would you agree with
                                                     Page 32
```

```
 1  that reading or disagree?
 2    A.  I think that is -- if the rate is determined from
 3  actual and estimated supply costs then that is likely to
 4  be true, but that doesn't seem to be sufficient to me to
 5  meet the requirement.
 6    Q.  What else would be required?
 7    A.  Well, again, as I -- as we tried to explain in
 8  that rebuttal report, moving together is a very weak
 9  measure of anything; right?  So the real question is
10  not, not just do things move together, but, I mean,
11  obviously there are other elements of a mathematical
12  relationship between moving together.  I don't think
13  moving together is sufficient to determine whether
14  that's, quote, based on.
15    Q.  So if it's not just that it moves together, --
16    A.  Uh-huh.
17    Q.  -- what else is required?
18    A.  Well, --
19         MR. WITTELS:  Object to the form.
20    A.  -- as I indicated -- as we indicated in our
21  rebuttal report, there needs to be an, an economically,
22  you know, reasonable relationship between those two,
23  because moving together, as I illustrated, and which, I
24  think, you know, everyone can understand, doesn't, it
                                                     Page 33
```

9 (Pages 30 - 33)

**Page 54**

1  that is contained in the rate setting workbooks; right?
2    A. Yes. I think that's a -- that's a good shorthand
3  description.
4    Q. The rate setting workbooks have columns --
5    A. Yes.
6    Q. -- for different components of supply costs;
7  right?
8    A. Right. And they aggregate to this Total Cost
9  Column, yes.
10   Q. Got it.
11   A. So that total cost is as -- is from XOOM's data.
12   Q. Got it.
13   A. That's not a defined by ESCO.
14      VIDEOGRAPHER: You're rubbing your
15 microphone. Thanks. Pull it higher. Thanks.
16   A. (Indicating.) Okay. Thank you.
17   Q. So circling back to the statement in 23C. "XOOM
18 set its rates much higher than and inconsistently with
19 the company's 'total cost' reported in its rate setting
20 workbooks."
21     What does "inconsistently with" mean in that
22 context?
23   A. Well, it's, you know, substantially higher. You
24 know, going back to your -- they also -- I mean, going

**Page 55**

1  back to your point around moving together, they don't
2  move together completely, but they are much, on average,
3  substantially higher by, by a large amount than the
4  total cost that XOOM self reported.
5    Q. Here's what I'm getting at. Is "inconsistently
6  with" different than "much higher" or is it the same?
7    A. Largely together. I think.
8    Q. Largely the same?
9    A. Yeah.
10   Q. The fact that it was much higher made it
11 inconsistent with?
12   A. Yes.
13   Q. Is that a fair way to say it?
14   A. Yes. And by an amount which is grossly
15 different. So, you know, obvious to the naked eye.
16   Q. Okay. In terms of its relative --
17   A. Levels.
18   Q. -- level over cost?
19   A. Yes. On average, yes.
20   Q. You didn't do a correlation analysis of XOOM's
21 supply costs to its rates; correct?
22   A. No. Because as I said, I don't find that is a
23 particularly meaningful metric in this regard.
24   Q. But what I'm trying to understand in asking you

**Page 56**

1  about this particular phrase, "much higher than and
2  inconsistently with."
3    A. Uh-huh.
4    Q. Is whether you ascribe any particular meaning to
5  "inconsistently with" that goes beyond the level of the
6  rate being, in your words, much higher than the costs?
7    A. Well, this specific sentence is a comparison
8  directly of the rates and total costs as reported by
9  XOOM. So this is really just looking at two variables
10 from their data. You know, what I think was intended to
11 be implied here is it was much higher than on average
12 by, by a very large amount and that, that made it
13 inconsistent with total costs.
14   Q. Understood. Under the sales agreement could a
15 variable rate be slightly higher than supply costs and
16 be consistent with total costs?
17      MR. WITTELS: Can you read that back.
18      (Prior testimony read back.)
19          "Under the sales agreement
20          could a variable rate be
21          slightly higher than supply
22          costs and be consistent with
23          total costs?"
24   Q. Let me -- let me rephrase it. Under the sales

**Page 57**

1  agreement --
2    A. Uh-huh.
3    Q. -- could the variable rate be slightly higher
4  than total costs and still be consistent with total
5  costs?
6       MR. WITTELS: Objection.
7    A. I think this takes us back to the discussion we
8  already had about the margin and all of that. You know,
9  if -- total costs, I mean, this is total costs as, as
10 reported by XOOM as the sum, as you -- as you put it of
11 all the supply costs. And, you know, to my first read,
12 well, why aren't you charging your supply costs? So,
13 you know, I was -- we were -- this sentence is just
14 saying -- it's very different. I don't -- I'm not -- I
15 wasn't trying to make any incredible narrow point, which
16 I'm not sure I'm understanding.
17   Q. My point is here you have said it was
18 inconsistent with total costs. The rate was
19 inconsistent with total costs because it was "much
20 higher;" right?
21   A. Yes.
22   Q. And so I'm just asking, in your opinion --
23   A. Uh-huh.
24   Q. -- would the rates still be inconsistent with

```
 1  opinion.
 2         MR. WITTELS:  But usually if you're making a
 3  statement you're taking it from there.
 4         MR. MATTHEWS:  Well, thank you for that
 5  guidance.  I'm learning a lot.
 6     A.  Well, I think it's probably around page....
 7     Q.  I'll find it for you.  How about paragraph 23B
 8  and 54.
 9     A.  54.  Right.  Okay.  Yes.  Okay.  Sorry, can you
10  repeat your question.
11     Q.  Please, if you would, so we don't have any
12  confusion, if you would read both of those paragraphs.
13  And then I'll --
14         MR. WITTELS:  Into the record, --
15     Q.  -- proceed.
16         MR. WITTELS:  -- or?
17         MR. MATTHEWS:  No.  No.  Just to himself.
18     A.  (Witness reviewing.)  Okay.
19     Q.  Okay.  What -- you, generally speaking, opine
20  with reference to those prior period adjustments that
21  you were unable to substantiate whether XOOM considered
22  them in setting its rates; is that a fair statement?
23     A.  Yeah.  I mean, we looked at the information in
24  the rate setting workbooks, which was very extensive.
                                                  Page 62
```

```
 1  There didn't seem to be any determination, calculation,
 2  amounts or anything associated with prior period
 3  adjustments as expected.  I'm -- I was really kind of
 4  expecting there to be, if you were making prior period
 5  adjustments, to have some calculation of those, which I
 6  never saw.  So that's kind of just what it's a reference
 7  to.
 8     Q.  Got it.  So you're saying because XOOM didn't
 9  memorialize it and document or a calculation that shows
10  how it was factored in, you have no evidence that they
11  considered it; is that fair?
12     A.  Well, I'm saying I didn't, I didn't see
13  any -- there was no data suggesting that that was ever
14  calculated.
15     Q.  Right.
16     A.  And it seems to me that would be a calculation.
17     Q.  There was testimony that it was considered;
18  right?
19     A.  I think there was testimony that it was
20  considered and as I mentioned in paragraph 54, though,
21  there was testimony -- well, there was testimony I
22  believe that said, oh, it was part of this, what we
23  considered in some very broad abstract sense.
24     Q.  Yep.
                                                  Page 63
```

```
 1     A.  And then there was testimony as I note in
 2  paragraph 54 about potential kind of makeup losses,
 3  which I guess you could consider some kind of prior
 4  period adjustment.  But in -- with an unrelated market
 5  not related to New York.  So there's testimony
 6  that -- there's general testimony and then there's
 7  specific testimony.
 8     Q.  About consideration of prior period adjustments?
 9     A.  Yes.
10     Q.  Okay.  Got it.  We're on the same page.
11     A.  Okay.
12     Q.  The period of time --
13     A.  Uh-huh.
14     Q.  -- that you looked at for rate setting
15  procedures --
16     A.  Uh-huh.
17     Q.  -- goes from 2013 to 2021; right?
18     A.  Yes.  Broadly, yes.
19     Q.  Broadly?
20     A.  Yeah.
21     Q.  Did you do any analysis of what other ESCOs
22  charged in New York during that same time period?
23     A.  No.
24     Q.  Okay.  So you don't know how XOOM's rates
                                                  Page 64
```

```
 1  compared to other ESCOs rates?
 2     A.  For purposes of this we never made a comparison.
 3     Q.  And you don't know if XOOM's rates were outside
 4  of the range of what ESCOs were charging during that
 5  time period?
 6     A.  No, we didn't look at that.  It didn't seem very
 7  relevant.
 8     Q.  Okay.  What was relevant in the, your damage
 9  analysis, was how much gross margin XOOM sought on top
10  of its supply costs; right?
11         MR. WITTELS:  Objection.
12     A.  Can you repeat that, again.
13     Q.  Yep.  What you believed was relevant in your
14  damage calculations was how much gross margin XOOM
15  sought on top of its supply costs?
16         MR. WITTELS:  Objection.
17     A.  I mean, that's a way that -- I think you're
18  putting a characterization of it.  I think what really
19  the -- you're characterizing it -- one might
20  characterize it that way, but the, you know, as, as
21  discussed, the, you know, what's important is the
22  relationship between rates and, and supply costs.  If
23  you want to characterize that as being a gross margin
24  calculation, I think you could formulate it that way,
                                                  Page 65
```

17 (Pages 62 - 65)

**Page 66**

1  which is I think what you're doing.  But I think you
2  understand what we did.
3     Q.  I am, because I'm focusing in my question, I have
4  built this in on your damage calculation.  So I
5  understand your position about bullet 3, let's call it.
6  Which is your opinions about whether or not XOOM's rate
7  setting was consistent or not, with the sale agreement.
8     But I'm talking about with respect to 4, after
9  you concluded --
10    A.  Uh-huh.
11    Q.  -- the rate was not consistent --
12    A.  Right.
13    Q.  -- that your damage model --
14    A.  Right.
15    Q.  -- and what they considered relevant was the
16 amount of gross margin that XOOM put on top of its
17 supply cost?
18    A.  Are we discussing the Method 1 model or the
19 Method 2 model?
20    Q.  Well, it's both; right?
21    A.  Well, it's --
22    Q.  Let's start with Method 1.
23    A.  Okay.  Right.
24    Q.  Right.  Method 1, what was relevant was the

**Page 67**

1  amount of gross margin that's input on top of its supply
2  costs; right?
3         MR. WITTELS:  Objection.
4     A.  Of the difference -- if you want to -- you're
5  expressing that as a form -- you're expressing the
6  delta, the difference, right, as a gross margin.  That's
7  not exactly how it was calculated.
8       I mean, it was calculated just as there's
9  differences, not any -- you're saying a gross margin on
10 a gross margin calc -- I want to be specific about how
11 you're using the term "gross margin."
12    Q.  I didn't think it was tricky.  I mean, your
13 report says that you calculated by reference -- by
14 comparing XOOM's margin reports to XOOM's rate setting
15 workbooks; right?
16    A.  Right.  I was getting to the delta between rates
17 and costs.
18    Q.  Okay.
19    A.  It's just that it was in the margin setting
20 workbooks.
21    Q.  So with respect to Model 1 the relevant
22 consideration was the delta between XOOM's total costs
23 and XOOM's margin?
24        MR. WITTELS:  Objection.

**Page 68**

1     A.  The -- between total cost and the rate.
2     Q.  Okay.  Which is the margin?
3         MR. WITTELS:  Object.
4     A.  The rate is not the margin.
5     Q.  No, I know.
6     A.  A rate is not a margin.
7     Q.  The delta is.  The delta is.
8     A.  Okay.  We can call that a margin, yes.
9     Q.  The delta between the total costs --
10    A.  Right.
11    Q.  -- and the rate is --
12    A.  Right.
13    Q.  -- the margin; right?
14    A.  That -- that -- you can characterize that as a
15 margin.
16    Q.  Well, what would you characterize it?
17    A.  I would just characterize it as a difference, as
18 a delta.
19    Q.  Okay.  You're not offering an opinion in this
20 case that under the sales agreement XOOM could not
21 charge more than the regulated utilities rate; right?
22    A.  No.  I mean, the comparison I made was between
23 supply costs and the rate under this contract.
24    Q.  Right.  And you're not offering a damage model

**Page 69**

1  that compares XOOM's variable rate charges to what
2  customers would have been charged by the utility during
3  the same time period?
4         MR. WITTELS:  Objection.
5     A.  No.  The damage models as we discussed are the
6  two.
7     Q.  Right.  And you don't intend to offer an opinion
8  about that?
9     A.  No.  The only thing we used was a, as a graphical
10 comparison on the relationship between supply costs and
11 the utility rate, as an example.  But the two models are
12 the two models.
13    Q.  Yep.  Okay.  Are you offering an opinion about
14 what is a reasonable or appropriate margin for an ESCO
15 to charge?
16    A.  Well, to build the second model we needed an
17 estimate of a margin.  We really didn't have any
18 information that would allow that to be created, since
19 XOOM had, from what we can tell, had never done it that
20 way.  They had never tried to calculate a, or they did
21 not present in any way, I can't say that they never
22 tried.  They did not present in the rate setting
23 workbooks and other information calculations of any sort
24 like that.  So we used the margin from fixed rate

18 (Pages 66 - 69)

**Page 70**

```
 1  customers as a proxy of a rate that XOOM itself had
 2  used.  I can't go further than that because there's no
 3  information.
 4        MR. MATTHEWS:  Can you read my question
 5  back, please.
 6        (Prior testimony read back.)
 7            "Are you offering an opinion
 8              about what is a reasonable or
 9              appropriate margin for an ESCO
10              to charge?"
11     A.  Yeah.  Conceptually, yes.  Conceptually, yes.
12        Thanks for reading that back.
13     Q.  That's okay.  And what is the opinion that you're
14  offering conceptually about that?
15     A.  Well, I mean, it's obviously related to the
16  contract that we've been discussing, whether it's based
17  on supply costs, that, you know, if the Court were to
18  decide that a margin was allowed, that it can't be an
19  uncapped margin, that's why we made a second calculation
20  using the fixed rate margin as a proxy of what might be
21  an acceptable margin.
22     Q.  Are you offering any opinion about what is an
23  acceptable or appropriate, a reasonable margin aside
24  from just using XOOM's fixed rate margin?
```

**Page 71**

```
 1     A.  We haven't offered that opinion, we don't have
 2  any information to do that.
 3     Q.  Do you intend to?
 4     A.  If information were to be provided, but that
 5  would have to come from XOOM.  So I, in the absence of
 6  not expecting anymore information to come, no.
 7     Q.  Well, we've gotten talking past each other again.
 8  I'm talking conceptually.  You've said that it will be
 9  for the Court to decide whether a margin can be charged
10  and if so what's appropriate; right?
11     A.  Right.
12     Q.  And if we go to trial --
13     A.  Uh-huh.
14     Q.  -- and you take the witness stand --
15     A.  Uh-huh.
16     Q.  -- and I'm asking you questions and the judge
17  gets frustrated with my questions and says, "let's cut
18  to the chase.  Mr. Adamson, what do you think is an
19  appropriate margin for an ESCO to charge?"  What would
20  your answer be?
21        MR. WITTELS:  Objection.
22     A.  I would say conceptually it's got to be related
23  to the, related to the costs.  And in a broad conceptual
24  basis.
```

**Page 72**

```
 1     Q.  And if he said, "but can you give me a cutoff
 2  point?  Is there a number that you can assign to that?"
 3  Would you be able to give him one?
 4        MR. WITTELS:  Objection.
 5     A.  I wouldn't be able to give him a number on the
 6  stand because I wouldn't have the, XOOM's internal
 7  information, no.
 8     Q.  Okay.  So the margin in your view, --
 9     A.  Uh-huh.
10     Q.  -- the margin that is appropriate for an ESCO to
11  charge conceptually --
12     A.  Uh-huh.
13     Q.  -- is ESCO specific?
14     A.  Well, again, we're talking about relation to a
15  specific contract, so.
16     Q.  I'm not.
17     A.  You're not.
18        MR. WITTELS:  Don't interrupt him.
19     A.  I am talking -- sorry.  I'm talking about this
20  specific contract.  Other ESCOs may have, and I'm sure
21  do, very different contractual forms.  And in fact,
22  ESCOs -- even the same ESCO will have lots, may have
23  different pricing, right, under different arrangements.
24  We're talking about variable rate pricing here as
```

**Page 73**

```
 1  opposed to fixed rate pricing.
 2     Q.  Uh-huh.
 3     A.  Fixed rate pricing, I think we can all agree, the
 4  actual outturn margins could be quite different.  A lot
 5  depends on timing in that case; right?  Okay.  So I
 6  don't know that there is a "single ESCO number" I don't
 7  think that's a meaningful concept.
 8     Q.  Okay.  Is there a single ESCO number for variable
 9  rates that in your opinion would be a cap on what is an
10  appropriate or reasonable margin?
11     A.  I don't have a number in mind because I don't
12  know what the, what would be claimed to be the types of,
13  of costs that, to be recovered in that margin.  What I
14  don't -- you know, I don't have a number.  What I am
15  offering is conceptually that the margin has to be based
16  on something from reality to be meaningful in the
17  context of this contract, and, you know, can't be
18  arbitrary.
19     Q.  Okay.
20     A.  But I don't have a number to give you.
21     Q.  Okay.  And would not be able to create one?
22        MR. WITTELS:  Objection.
23     A.  Not -- not on the information available right
24  now.  I think that would need more inputs than are
```

**Page 74**

1  available at present.
2  Q. Okay. You don't have an industrywide opinion
3  about what is an appropriate or a reasonable margin that
4  an ESCO can charge on a variable rate?
5      MR. WITTELS: Objection.
6  A. I mean, I probably have a, a rough sense of maybe
7  what I would expect roughly the numbers to work out
8  about. But, you know -- you know, based on, you know,
9  what I -- just a sense of that. I don't have a precise
10 number to give you here.
11 Q. What -- what are the rough numbers that you
12 referred to?
13 A. You know, I would be -- I would be -- I wouldn't
14 be surprised, having done calculations that, you know,
15 you got a number, 15 percent, 20 percent, something like
16 that. I mean, you know, here we use the fixed rate one
17 and it came out those were on average about 20 percent.
18 That -- that is an indicator.
19 Q. Okay.
20      MR. MATTHEWS: Can we go off the record.
21      VIDEOGRAPHER: The time is 12:00 p.m., we
22 are going off the record.
23      (Short break taken.)
24      VIDEOGRAPHER: We back on the record, the

**Page 75**

1  time is 12:14.
2  Q. Mr. Adamson, let's talk about your damage models
3  which relates to the fourth bullet point of your
4  assignment --
5  A. Uh-huh.
6  Q. -- to develop a damage model.
7  A. Uh-huh.
8  Q. And you and Dr. Eryilmaz --
9  A. Eryilmaz.
10 Q. -- developed two models; --
11 A. Yes.
12 Q. -- right?
13     Okay. So Model 1 is described starting on page
14 20 under Section 3.1.
15 A. Uh-huh.
16 Q. Right?
17 A. Yes.
18 Q. So here the total costs that are referenced here,
19 again, is the supply cost build up contained in the rate
20 setting workbooks; right?
21 A. Yes, I believe that's what it says, yes.
22 Q. All right. And as you described earlier, Model 1
23 takes the difference between those total costs and the
24 variable rate that XOOM charged?

**Page 76**

1      MR. ROMAN: Sorry if I'm interrupting. But
2  we can't hear anything for people remotely right now. I
3  don't know if we're on the record or talking, but I
4  can't hear anything.
5      MR. WITTELS: We're on the record. Can you
6  hear?
7      (Pause for technical issue.)
8      MR. ROMAN: I just heard Matt. That's good.
9  Thank you.
10     (Pause for technical issue.)
11 A. Can you --
12 Q. Yeah.
13     MR. MATTHEWS: May I ask you to read that
14 back.
15     (Prior testimony read back.)
16         "All right. And as you
17         described earlier, Model 1
18         takes the difference between
19         those total costs and the
20         variable rate that XOOM
21         charged?"
22 A. Yes.
23     MR. WITTELS: Yeah. Objection.
24 A. Broadly, yes.

**Page 77**

1  Q. And the third dataset that is relevant to the
2  calculation under Model 1 is customer usage; right?
3  A. Yes, they're quantities, yes.
4  Q. So you take customer usage and multiply that by
5  supply costs; right?
6  A. Okay.
7  Q. And then you take customer usage and multiply
8  that by the rates; right?
9  A. Are you continuing --
10 Q. Is that correct so far?
11 A. I'm trying to remember exactly how it was
12 implemented. It may have just been -- it may have -- it
13 may have been implemented as the difference in the rates
14 times the quantity.
15 Q. Okay. Got it.
16 A. I think we're talking about --
17 Q. We're saying the same thing.
18 A. -- the same general -- I think we're talking
19 about the same general thing.
20 Q. The -- we're saying the same thing.
21    In other words, it's looking at calculating
22 everything XOOM charged above total costs.
23 A. Yeah. Yeah, above the, the supply costs, total
24 costs, the delta times quantities.

20 (Pages 74 - 77)

**Page 78**

1  Q. And -- okay. And I appreciate. I probably
2  shouldn't use your defined term "total costs" because
3  the supply costs doesn't include certain fixed costs;
4  right? The supply costs that are set forth in the rate
5  setting workbook.
6  A. I mean, the -- the total costs includes -- I
7  mean, I -- what was reported as the things that sum up
8  the total costs, yes.
9  Q. That sum up to the total of the supply costs;
10 right?
11 A. Yeah. I think in the rate setting workbooks the
12 column is labeled Total Cost, as I remember.
13 Q. Got it. But it doesn't include supply costs, and
14 the total cost that's listed in the rate setting
15 workbook doesn't include things like overhead and taxes
16 and marketing costs. Those sorts of costs; right?
17      MR. WITTELS: Objection.
18 A. Sorry. I think your question may have had
19 multiple parts. The total cost -- the total costs in
20 the rate setting workbooks had a bunch of columns.
21 Q. Uh-huh.
22 A. Right? So is the -- is your question what are
23 those columns?
24 Q. No. I probably asked a poor question.

**Page 79**

1     ESCOs generally have supply costs; correct?
2  A. Yes.
3  Q. And then ESCOs, in the course of doing, running
4  their business have certain additional costs that are
5  not supply costs; right?
6  A. If you want to characterize it that way, yes.
7  Q. Okay. And the Model 1 calculation --
8  A. Uh-huh.
9  Q. -- does not include any costs that are not supply
10 costs; right? The Model 1 calculation only calculates
11 supply costs?
12      MR. WITTELS: That's two questions.
13 Objection.
14 A. The Model 1 calculation uses, uses the supply
15 costs represented by the total cost. As I understand
16 your question you're saying did, for example, was, in
17 the, in XOOM's reported total costs did it have these
18 other elements he raised.
19      And I was trying to refer to to kind of purposes
20 of clarity to say the rate setting workbook total costs
21 that we saw -- well, I mean, they are what they are.
22 That is XOOM's reported numbers. It didn't mention
23 marketing costs. I think you mentioned that as a thing.
24 So supply costs, yes. So we made a comparison with

**Page 80**

1  supply costs based on total costs.
2  Q. The Total Cost column in the rate setting
3  workbook?
4  A. Yes.
5  Q. Okay. And do you understand the Total Cost
6  column in the rate setting workbook to include overhead
7  costs?
8  A. Not as -- not as described. Not -- not as
9  obviously described in the rate setting workbooks that I
10 saw.
11 Q. Okay. Do you understand it to include taxes that
12 XOOM pays?
13 A. Are we talking about corporate taxes or are we
14 talking about taxes on, involving energy purchases or
15 something?
16 Q. Corporate taxes.
17 A. Like, corporate income taxes?
18 Q. Yes.
19 A. Not that I see. Not that I saw.
20 Q. And do you understand it to include rent?
21 A. Like, facilities rent?
22 Q. Yes, sir.
23 A. There -- there was not a column for that, no.
24 Q. Okay. And do you understand it to include other

**Page 81**

1  acquisition costs of acquiring customers?
2  A. If they -- that was not a broken out category.
3  Q. Okay. So in a nutshell under Model 1 you're
4  calculating all of the gross margin that XOOM obtained
5  from those customers?
6      MR. WITTELS: Objection.
7      Can you repeat that question.
8      (Prior testimony read back.)
9          "So in a nutshell under Model 1
10         you're calculating all of the
11         gross margin that XOOM obtained
12         from those customers?"
13 A. I mean, we're calculating the difference between
14 total costs and rates times quantities. I think that's
15 the calculation.
16 Q. Yeah. Okay. But under this model XOOM doesn't
17 get to make any margin; correct?
18 A. Unless it was built into the total cost that they
19 reported.
20 Q. In the rate setting workbook?
21 A. In the rate setting workbooks.
22 Q. Okay. XOOM's a for profit business; right? You
23 understand that?
24 A. Yes.

21 (Pages 78 - 81)

**Page 82**

1  Q. And they operate in a deregulated competitive
2  market in New York; right?
3  A. Deregulated in some sense. I mean --
4  Q. Right.
5  A. -- retail electricity rates are not completely --
6  they're still subject to regulation.
7  Q. Agreed.
8  A. Right.
9  Q. But -- but a competitive rate is what an ESCO is
10 allowed to charge as opposed to a rate set by a
11 regulator; --
12     MR. WITTELS: Objection.
13 Q. -- right?
14     MR. WITTELS: Objection.
15 A. Well, I think you would need to be precise about
16 the statement. The -- that would depend on the what and
17 when.
18 Q. Okay. But we can agree at least that XOOM is a
19 for profit business operating in a competitive market?
20     MR. WITTELS: Objection.
21 A. XOOM is definitely a for profit business. I
22 mean, it's not subject to perfect competition in an
23 economic sense. Which would be a quite different set of
24 criteria. I think in the, as you're broadly

**Page 83**

1  characterizing it, I agree with you in -- in -- in
2  casual terms.
3  Q. Okay. Why doesn't XOOM get to make any profit
4  under Model 1?
5  A. The question is is whether XOOM gets to charge
6  the rates it agreed to under the contract. That's why I
7  used the example earlier, I can enter into -- I enter
8  into a contract, I sort of live or die by that contract;
9  right?
10    I mean, we've all entered in, probably in our
11 lives entered into contracts for things that ended up
12 costing to fulfill more than, than what we made. I used
13 the example of the building rehabilitation.
14    The real question to me is consistency with the
15 contract. Did they not make money at those rates? I
16 don't know. That's -- they don't report, as far as I've
17 seen, information on a contract-by-contract basis. But
18 the, you know, the question is around consistency with
19 the -- with the -- with the contract they signed here.
20 Q. In your opinion that contract only allows XOOM to
21 charge its supply costs?
22 A. Yeah. I mean, that's what -- that's what we
23 already discussed around the reading of supply costs,
24 and as you said, you know, supply costs it's total

**Page 84**

1  costs, that's what we use for Model 1. That's what
2  XOOM -- that's the data XOOM provided to the Court.
3  Q. Okay. Model 1, based on that calculation, would
4  actually result in XOOM losing money; right?
5  A. Is that out of your hypothesis, or?
6  Q. It's a question.
7  A. I don't know.
8  Q. You don't know?
9  A. The -- I mean, we don't have -- we haven't seen
10 any P & L by contract.
11 Q. Conceptually --
12 A. Uh-huh.
13 Q. -- Model 1 says XOOM can charge no more --
14 A. Uh-huh.
15 Q. -- than its reported supply costs in the rate
16 setting workbooks; right?
17 A. Uh-huh.
18 Q. That's what Model 1 measures; right?
19 A. Yeah, broadly. Yes.
20 Q. So at best --
21 A. Uh-huh.
22 Q. -- Model 1 makes XOOM profit neutral; right?
23 A. If you assume that their actual -- I think under
24 your construction you're saying under your, under your

**Page 85**

1  construction you're saying under the -- under the
2  scenario that their reported total costs was equal to
3  their actual marginal supply costs, broadly, yes, I
4  agree.
5  Q. Okay. In actuality, because as we discussed XOOM
6  and every other ESCO has certain fixed costs in addition
7  to its supply costs, Model 1 would result in XOOM losing
8  money; --
9     MR. WITTELS: Objection.
10 Q. -- right?
11    MR. WITTELS: Objection.
12 A. Losing money on, as a whole or on that specific
13 contract? Just for point of clarification.
14 Q. Under that calculation, on that contract.
15 A. On that contract?
16 Q. Yes.
17 A. Probably, yes. But, you know, businesses have
18 many -- have many, many activities where they don't make
19 a profit on that particular activity. I mean, Google
20 offers me a Gmail account and I'm not paying for it,
21 they have huge fixed costs of implementing that.
22 Q. I'm just -- I want to understand your -- this is
23 your opinion. Right?
24 A. I know my opinion.

22 (Pages 82 - 85)

Page 86:

1  Q. And so I'm not at this point even arguing with
2  you about it. I just want to understand it.
3  A. Uh-huh.
4  Q. You've said that under Model 1 --
5  A. Right.
6  Q. -- anything above, --
7  A. Uh-huh.
8  Q. -- anything charged by XOOM above the supply
9  costs reported in the rate setting workbook is a damage;
10 right?
11 A. Yes.
12 Q. And that -- under that model --
13 A. Uh-huh.
14 Q. -- for those customers who were charged variable
15 rates by XOOM over the relative time period, XOOM would
16 lose money --
17    MR. WITTELS: Objection.
18 Q. -- for those customers in that contract language?
19    MR. WITTELS: Asked and answered.
20 Objection.
21 A. Possibly. I don't think that's the question in
22 front of us. As I said, I mean, the question is
23 consistency with the contractual language.
24 Q. Right.

Page 87:

1  A. You said -- as you said yourself, they provided
2  their supply costs. What's the difference with supply
3  costs?
4  Q. I -- I don't know why this is difficult. Like,
5  the calculation isn't even difficult. I'm bad at math
6  and I can do this one. It's anything above the reported
7  supply cost is a damage under Model 1; --
8  A. Yes.
9  Q. -- correct?
10 A. Yes.
11 Q. Even if anything above that reported supply cost
12 included certain fixed costs, that if they weren't
13 reported in the rate setting workbooks it is a damage
14 under Model 1?
15    MR. WITTELS: Objection.
16 A. That is how the calculus -- that's how the
17 calculations go through, because that's how XOOM
18 reported its total costs, yes.
19 Q. And that is because your reading of the contract
20 is that XOOM can charge no more than the reported total
21 costs?
22 A. Since we went through this morning, it depends on
23 how you read supply costs. I read supply costs as, you
24 know, costs directly related to supply. XOOM reported

Page 88:

1  this information back that we made the calculation on
2  around their costs.
3  Q. Let me see if I can go at it a different way.
4  Model 1 in your opinion accurately measures the
5  damages --
6  A. Uh-huh.
7  Q. -- flowing from what you believe is XOOM's
8  failure to set variable rates consistent with the
9  contract language?
10 A. Yes.
11 Q. And let's see. Paragraph 72 to your report.
12 A. Just give me one second to flip to the page.
13    MR. WITTELS: 72?
14 A. Uh-huh. Okay.
15 Q. Calculates the difference between XOOM's reported
16 supply costs and the rate that the regulated utility
17 charged; correct?
18 A. No. I don't think you said that right.
19 Q. Okay. What -- what does that calculate in
20 paragraph 72?
21 A. Well, the second sentence talks about XOOM's
22 total costs and the thing we just discussed; right?
23    As we -- as I indicate here we also did a, you
24 know, just a kind of a crosscheck calculation to see if

Page 89:

1  it's in the same, you know, in the same order of
2  magnitude and just crosschecked it again to what XOOM
3  had reported the applicable utility rates to be. You
4  know, they're generally similar. So if you were to take
5  the deltas, not against XOOM's total cost but against
6  the utility rates, then you get 49 million, not 55
7  million.
8  Q. How is that different from what I asked?
9  A. You said, as I remember, this compares the, the
10 total cost to the -- I'm not exactly sure what you said,
11 but I think it had some consistency with that. If you
12 want to read it back.
13 Q. It's okay. The first sentence of 72 --
14 A. Uh-huh.
15 Q. -- calculates the difference between XOOM's
16 reported supply costs --
17 A. Uh-huh.
18 Q. -- and the rate that the utility charged?
19 A. Yes.
20 Q. Okay. And the utility in New York is required to
21 be profit neutral; right?
22 A. Well, you -- the utilities in New York are
23 actually investor owned, most of them are investor owned
24 utilities, so they're not, they are not nonprofit

## Page 98

1  A. Well, in a sense, yes, because the, you
2  know -- well, first off, the fix rate is used as, you
3  know, a way of coming up with a reasonable margin that,
4  based on what XOOM itself set rates on. You know, it's
5  not -- it's based on the information available.
6     So one question then comes to, you know, are, is
7  there some reason that, that XOOM would need to charge a
8  higher rate on fixed rate customers? If so I don't
9  really see what it is.
10    MR. WITTELS: Variable.
11 A. Sorry. On variable rate customers. I am -- we
12 don't have any information to, to delve into that.
13 Q. I'm asking conceptually. And it's okay if you
14 are not offering this opinion. I'm not saying you
15 should or you shouldn't be. I just want to know in this
16 case are you going to offer an opinion that it is not
17 fair for XOOM to seek a higher margin on variable rates
18 conceptually than it does on fixed rates?
19 A. In this context, yes. Because there is no XOOM
20 provided despite all of the information about how those
21 methods were set of how these margins came up. How
22 these -- how the variable rate margins were determined
23 and that's a reasonable proxy, yes.
24 Q. Are you offering that opinion more broadly, that

## Page 99

1  in all circumstances -- and I'm asking this, to give you
2  some prospective on why I'm asking, because you've done
3  it in two cases now that I know of, set the fixed rate
4  margin as a benchmark.
5  A. Uh-huh.
6  Q. So are you going to offer the opinion that in the
7  ESCO world --
8  A. Uh-huh.
9  Q. -- it is not appropriate for an ESCO to seek a
10 higher margin for variable rates than it does for fixed
11 rates?
12    MR. WITTELS: Objection.
13 A. I mean, to me the rates have to be set for the
14 contract. The -- the use of fixed rates seemed
15 appropriate for coming up with the reasonable proxy
16 given that, you know, the, the risks associated with the
17 variable rates in general would be similar or probably
18 lower. If you say that there are other fixed costs it's
19 hard to see why they are different. We never saw
20 anything in this case saying, demonstrating why there
21 would be a difference between the two. If someone could
22 present, you know, compelling economic evidence that
23 says, "by God, I can prove to you that the costs of
24 variable rate is completely different than fixed rate"

## Page 100

1  that might be a thing. But we -- we haven't seen that
2  here. It was asked, but we haven't seen it.
3  Q. Who asked?
4  A. Well, the discovery request asked for costs and
5  pricing methodologies and stuff.
6  Q. Paragraph 75. It says -- this is towards the
7  bottom, I suppose it's the last sentence.
8     "It appears that XOOM was able to operate and
9  make a reasonable profit selling fixed rate contracts
10 with substantially lower margins than variable
11 contracts, and yet arbitrarily imposed much higher
12 margins on their variable rate customers?"
13    Do you see that?
14 A. Yes.
15 Q. Where does it appear that XOOM was able to
16 operate and make a reasonable profit selling fixed rate
17 contracts with substantially lower margins?
18 A. Well, the margins you can kind of see in the
19 table, the average margins over years. As I say, it
20 appears that they chose to offer those fixed rate
21 margins over a considerable period of time.
22 Q. Uh-huh.
23 A. So they would have had -- XOOM would have had the
24 opportunity to offer if it was saying, "oh, my God,

## Page 101

1  we're losing tons of money on all of our variable
2  customers -- I mean, our fixed rate plans that could
3  have been adjusted."
4     ==But we don't -- as I mentioned before we don't==
5  ==have contract by contract P & Ls, for example.==
6  Q. Right. So I think we're saying the same thing.
7  Your table 1 reflects gross margin for fixed rate
8  customers; right?
9  A. Yes.
10 Q. Okay.
11 A. I think so, yes.
12 Q. But you don't know whether --
13    VIDEOGRAPHER: I'm sorry. I didn't hear
14 that. You're hitting the microphone.
15 A. Oh, I'm sorry.
16    VIDEOGRAPHER: Bring it up a little higher.
17 A. How is that? Is that better?
18    VIDEOGRAPHER: Great. Thank you.
19 A. Okay. Thank you. Sorry.
20 Q. That's okay. But you don't know if XOOM actually
21 made a net profit on those same customers?
22 A. No, we don't have -- we don't have customer
23 segment level profit and loss data.
24 Q. Okay. In the -- circling back to the Richards

| | |
|---|---|
| 1  Q. I'm with you. But my question is about the<br>2  margin.<br>3  A. Yeah. The potential margin?<br>4  Q. Yeah. That you included a --<br>5  A. Uh-huh.<br>6  Q. -- potential margin in the Complaint.<br>7  A. Right. Right.<br>8  Q. And in this Market Supply Cost Build Up that was<br>9  an attachment to the --<br>10 A. Right.<br>11 Q. -- Complaint; right?<br>12 A. Yes.<br>13 Q. But you do not include a margin in Model 1;<br>14 correct?<br>15 A. No, that's in Model 2.<br>16 Q. Okay. And you did not include it in Model 1<br>17 because in your view the contract language does not<br>18 state that it should be included?<br>19 A. Yes.<br>20 Q. So why did you include it in the Complaint?<br>21 A. Well, again, these were numbers built up with no<br>22 data. And, you know, we presented kind of with and<br>23 without. Like -- Like I actually do in Model 1 and<br>24 Model 2.<br>Page 118 | 1  included in paragraph 54, the column that says,<br>2  Difference in Percentage.<br>3  A. Uh-huh.<br>4  Q. That factors in margin; right?<br>5  A. Yep. Yes. I think so. Because it looks<br>6  like -- well, actually -- that's a good question because<br>7  this actually refers to the table at the bottom. I -- I<br>8  think so. I mean, I don't think it's possible to see<br>9  exactly on here.<br>10 Q. Okay --<br>11 A. Because there is, like, a period interpolation on<br>12 here.<br>13 Q. So just looking at 54.<br>14 A. Uh-huh.<br>15 Q. Footnote 27, do you see that in the table?<br>16 A. Yep. Okay. Yep. I see that.<br>17 Q. And Footnote 27 says that that adds percent<br>18 margin; right?<br>19 A. That adds the 1.3 cents. Yes, I agree with you.<br>20 Q. Okay. Did you review the Complaint that is<br>21 Exhibit 5 before it was filed?<br>22 A. No, I don't think so. I don't remember it.<br>23 Q. Okay. Do you think that 13.67 percent margin is<br>24 a generous or substantial margin for an ESCO, generally<br>Page 120 |
| 1  Q. But I'm just talking about the margin. The<br>2  inclusion of the margin in the Market Cost Build Up, why<br>3  did you include margin in the Market Cost Build Up? You<br>4  had the contract language at that time.<br>5  A. We had the contract language but nothing else.<br>6  Nothing about the process, nothing about how they had<br>7  done it. I mean, I think that was pre, certainly pre, I<br>8  ever saw, any of the deposition or any of the<br>9  analysis -- discovery analysis; right?<br>10 Q. Yeah, but you -- you told me that the reason it's<br>11 not included in Model 1, the reason the margin is not<br>12 included in Model 1, is because of the contract<br>13 language; --<br>14 A. Right.<br>15 Q. -- right?<br>16    So if that's the case and you had the contract<br>17 language when the Complaint was filed, why did you<br>18 include margin in this Market Cost Build Up?<br>19 A. This is -- I mean, as an example, like I said, we<br>20 presented kind of both ways. It's got total with and<br>21 total without. I mean, it's pretty comparable to me how<br>22 we present it in the report with the two models. Maybe<br>23 I'm missing your point.<br>24 Q. That's okay. Because the -- the table that's<br>Page 119 | 1  speaking?<br>2  A. Almost 14 percent, I mean, it's not immaterial.<br>3  Q. Okay.<br>4  A. I don't know, I didn't write the word "generous."<br>5  Q. Those aren't your words?<br>6  A. No.<br>7  Q. Okay. Do you recall the graph in Mr. Coleman's<br>8  rebuttal report that shows gross margin for certain<br>9  companies in the Dow Jones?<br>10 A. Oh, the thing at the back?<br>11 Q. Yes.<br>12 A. Yes. Is it possible we can flip to that?<br>13 Q. Yes.<br>14 A. Tell me what page it is. Sorry.<br>15 Q. It's at page 13.<br>16 A. Oh, okay.<br>17 Q. Yes?<br>18 A. Okay.<br>19 Q. Do you have an opinion about which of these are<br>20 unreasonable gross margins, if any?<br>21 A. I mean, I --<br>22    MR. WITTELS: Object. Objection.<br>23 A. I mean, as I understand it these are a summary of<br>24 things he got from Yahoo; right? So these are<br>Page 121 |

### Page 138

 1  their retail business.
 2     Q. Okay. Well, I guess --
 3     A. For example, a bunch of the Texas companies have
 4  retail supply businesses. We did a little bit on that,
 5  but not a major thing. But a bunch of the Texas
 6  companies had retail supply businesses that also had
 7  substantial other businesses.
 8     Q. I think I understand what you're saying. And you
 9  didn't work for the retail side of their businesses, you
10  worked for the other side of their businesses?
11     A. Or sometimes we would be hired on some kind of
12  corporate strategy type engagement, which might be
13  pretty broad.
14     Q. Got it. Okay. I thank you for your time and
15  your patience with me.
16        MR. MATTHEWS: I'll pass the witness.
17     A. Thank you.
18     Q. Yes, sir.
19
20             EXAMINATION
21
22  BY MR. WITTELS:
23     Q. Mr. Adamson, I just really have one question for
24  you. You were asked by counsel for XOOM about whether

### Page 139

 1  the company was able to make any profits on its fixed
 2  rate customers; do you remember that question?
 3     A. Yeah. Not in exact wording, but I remember the
 4  question.
 5     Q. Yeah. And did you ask me to, whether you could
 6  go back and review your report when we had a break?
 7     A. Yeah, well -- yes, we were discussing the report.
 8     Q. And did you reread paragraph 57?
 9     A. Yes.
10     Q. And does that answer the question of whether XOOM
11  made money and was profitable on its fixed rate
12  customers?
13        MR. MATTHEWS: Objection. Leading.
14     A. Well, I just -- it just reminded me there was
15  a -- I had said that there was not a specific P&L, this
16  was a reference in the report to deposition testimony
17  from a XOOM witness about the profitability of this.
18     Q. And what did your report find and state?
19     A. I don't remember exactly how he worded it. I
20  think there had been a, in the deposition there was a
21  question about, it was around, I don't have the
22  transcript in front of me, of course, of the deposition,
23  but it was something around the line of were -- were a
24  fixed rate -- were fixed rate customers profitable for

### Page 140

 1  XOOM or some broad question.
 2     Q. And the answer was?
 3     A. I believe he said yes, they were, they were both
 4  profitable. Both fixed rate and variable rate were
 5  profitable.
 6     Q. Okay. I have no further questions at this time.
 7  Thanks.
 8        MR. MATTHEWS: Thanks very much.
 9     A. Thank you.
10        VIDEOGRAPHER: The time is 2:39, we are off
11  the record.
12        COURT REPORTER: And, Mr. Matthews, your
13  order?
14        MR. MATTHEWS: My order is an expedited
15  transcript, just, I don't need any print copies.
16  Electronic only. PDF exhibits.
17        COURT REPORTER: Expedite by Friday?
18        MR. MATTHEWS: Yes.
19        (Whereupon, the deposition concluded at
20  approximately 2:39 p.m.)

### Page 141

                CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss.

    I, Laurie Langer, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

    I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

    In witness whereof, I have hereunto set my hand and seal this 11th day of November, 2022.

                NOTARY PUBLIC
                Commission Expires
                7/27/2023

36 (Pages 138 - 141)