EXHIBIT 11

```
 1                                      Volume I
                                        Pages 1 to 102
 2                                      Exhibits None
 3                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 4
             - - - - - - - - - - - - - - - - -x
 5                                             :
             SUSANNA MIRKIN and BORIS          :
 6           MIRKIN, Individually and on       :
             Behalf of All Others             :
 7           Similarly Situated,              :  Civil Action
                            Plaintiffs,       :  No. 18 Civ. 2949
 8                                            :  (ARR)(RER)
                     vs.                      :
 9                                            :
             XOOM ENERGY, LLC; and XOOM       :
10           ENERGY NEW YORK, LLC,            :
                            Defendants.       :
11           - - - - - - - - - - - - - - - - -x
12                   VIDEOTAPED DEPOSITION OF DERYA ERYILMAZ,
             Ph.D., a witness called by the Defendant, taken
13           pursuant to the Federal Rules of Civil Procedure,
             before Alexander K. Loos, Registered Diplomate
14           Reporter and Notary Public in and for the
             Commonwealth of Massachusetts, at the Offices of
15           Veritext Legal Solutions, 101 Arch Street, Suite
             650, Boston, Massachusetts, on Tuesday, November 15,
16           2022, commencing at 10:25 a.m.
17           PRESENT:
18               Wittels McInturff Palikovic
                         (By Steven L. Wittels, Esq.; Steven D.
19                       Cohen, Esq. (Via videoconference); and
                         Ethan D. Roman, Esq. (Via videoconference))
20                       E-mail:  Slw@wittelslaw.com
                                  Sdc@wittelslaw.com
21                                Edr@wittelslaw.com
                         18 Half Mile Road
22                       Armonk, NY 10504
23                       914.775.8862
24                       for the Plaintiffs.

                                                     Page 1
```

1    BY MR. MATTHEWS:
2       Q.  So what does a "big discrepancy" mean to
3    you in that context?
4          MR. WITTELS:  Objection to form.
5          THE WITNESS:  If the XOOM's rates --
6    charged rate is not very -- is not equal or very
7    close to actual and estimated supply costs, then --
8    then there's a discrepancy.
9    BY MR. MATTHEWS:
10      Q.  I understand.
11         But I'm -- I'm trying to -- to get you to
12   tell me --
13      A.  Uh-huh.
14      Q.  -- what "very close to" means.
15         Does it mean 20 percent higher?
16         MR. WITTELS:  Objection.  I think she's
17   told you.
18         THE WITNESS:  So I guess -- let me step
19   back and explain.
20         So if it says "based on XOOM's actual and
21   estimated supply costs," then, you know, they
22   convert this into a rate, right?  So XOOM's costs
23   should be not -- XOOM's rates should be very, very
24   close to -- when you're converting this into a rate,
                                                      Page 38

1    hour.  And the cost is basically a more gross term.
2          So you take that cost, divide it by the
3    amount of usage, and you get a dollar per unit
4    basis.  So that is actually -- the cost is driving
5    the rate.
6          So that means it shouldn't be far away from
7    what the cost is presented.  All you do is you take
8    that cost and convert it into a per-unit basis.  So
9    therefore what you have is an actual and estimated
10   cost is your main driver of what you obtain as a
11   rate.  So you transform into a rate, per-unit basis.
12         So that's why I am defining, when you say
13   "based on," it should be very close to the actual
14   and estimated supply costs, because that's driven
15   by -- that's one of the key inputs to drive the
16   rate.
17      Q.  Does "very close to" mean "equal to"?
18         MR. WITTELS:  Objection, asked and
19   answered.
20   BY MR. MATTHEWS:
21      Q.  On a per-dollar per-unit basis?
22         MR. WITTELS:  Objection.
23         THE WITNESS:  As I mentioned, even if it's
24   not the actual equal, but it should be super close
                                                      Page 40

1    that should be very close to the actual and
2    estimated supply costs that presented in their data
3    sets.
4    BY MR. MATTHEWS:
5       Q.  Okay.  If the rate was ten percent higher,
6    in your opinion, would that still be very close to
7    actual and estimated supply costs?
8       A.  No.  Then that would be still there's --
9    that is -- that is still not the actual and
10   estimated supply cost.  It's above that.
11      Q.  I understand.  I'm not good at math, but I
12   know that.
13         But I'm asking -- you said it had to be
14   "very close to."  And you distinguish that from
15   being exactly equal to, right?
16      A.  Uh-huh.
17      Q.  Do you agree with that?
18         MR. WITTELS:  Objection.  Objection to
19   form.
20         THE WITNESS:  So -- okay.  Let me explain
21   it this way:
22         So rate is, like, dollar per megawatt hour,
23   right?  So when we are charged by utilities or
24   energy companies, we are charged dollar per megawatt
                                                      Page 39

1    to, very close to what the actual and estimated
2    supply cost is.
3    BY MR. MATTHEWS:
4       Q.  Is that two percent more?  Is it five
5    percent more?
6          What does "very close to" mean to you?  You
7    are a mathematician and a data analytics --
8       A.  Sure.
9       Q.  -- specialist.
10         So I would like to know, in your view,
11   mathematically, how much more could the rate be than
12   actual and estimated supply costs on a
13   dollar-per-unit basis and still fall within your
14   definition of "very close to."
15         MR. WITTELS:  Objection.  Objection to
16   form.
17         THE WITNESS:  I guess -- so as I mentioned
18   that when you are transforming the rate from cost,
19   you are taking a lump sum and converted into a rate.
20   So then there's no, like, specific percentage I can
21   tell you that it should be X percent higher.  It
22   should be based on whatever the cost is and you
23   convert that into a rate per-unit basis.
24         So that means you're taking the actual and
                                                      Page 41

Veritext Legal Solutions
346-293-7000

**Page 42**

1 estimated supply costs in order to derive your rate.
2 So that means there's no specific, you know, magic
3 percentage that I can tell you that, even if it's
4 within that percentage, I can't tell you that. But
5 that -- to me, when it's based on you take a value
6 and convert that into a per-unit basis, then you
7 take that actual and estimated supply cost as it is,
8 and then you convert that into a rate.
9     BY MR. MATTHEWS:
10    Q.  Uh-huh.
11    A.  So that's how you would do it. And that's
12 why it should be very close to, I guess.
13    Q.  And that's the calculation you did under
14 model one, right?
15    A.  That's -- that's correct.
16    Q.  And you are going to tell the ladies and
17 gentlemen of the jury that if the rate charged was
18 anything above the supply costs under that
19 calculation, that XOOM should have to give that
20 money back, right?
21    A.  Yes.
22    Q.  Okay. Which would mean that, in your view,
23 "based on actual and estimated supply costs" under
24 model one means equal to supply costs --

**Page 43**

1     MR. WITTELS: Objection.
2     BY MR. MATTHEWS:
3     Q.  -- right?
4     MR. WITTELS: Objection.
5     THE WITNESS: It's -- I guess exact equal
6 to definition is -- doesn't fit here because, as I
7 mentioned, rate is a transformation of cost.
8     So what -- essentially I'm taking this
9 actual and estimated supply costs and converting
10 into a rate. That's why it cannot be 1:1 equal, but
11 it has to be very close to what is presented in the
12 actual cost.
13    BY MR. MATTHEWS:
14    Q.  It's effectively 1:1 equal, right? That's
15 what model one seeks to do --
16    MR. WITTELS: Objection.
17    BY MR. MATTHEWS:
18    Q.  -- right?
19    MR. WITTELS: Please don't interrupt her.
20 Objection.
21    THE WITNESS: Model one takes the
22 discrepancy that we found in the rate versus the
23 XOOM's actual and estimated supply costs. That's
24 correct.

**Page 44**

1     BY MR. MATTHEWS:
2     Q.  Okay. Thanks.
3     And in your opinion, "based on actual and
4 estimated supply costs" also means that XOOM cannot
5 consider anything other than actual and estimated
6 supply costs when setting its rates, correct?
7     A.  Again, I would look at the contract. It
8 says:
9         "... based on actual and estimated
10    supply costs, which may include, but not
11    limited to prior period adjustments" --
12    THE REPORTER: "Which may include, but
13    not..."
14    MR. WITTELS: Slow down so he can take --
15 the reporter has to take it.
16    THE WITNESS: Oh, I'm sorry.
17    Which -- I guess:
18        "... which may include, but not be
19    limited to prior period adjustments,
20    inventory and balancing costs."
21    So to your question, it may include these,
22 but -- may include these, but other than that, yes,
23 it should be based on actual and estimated supply
24 costs.

**Page 45**

1     BY MR. MATTHEWS:
2     Q.  And nothing else?
3     A.  Uh-uh. No.
4     Q.  Correct?
5     A.  Correct.
6     Q.  Okay. Let me hand you what has previously
7 been marked as Exhibit 5 to -- which is a copy of
8 the --
9     A.  Complaint.
10    Q.  -- first amended class action complaint.
11 And I also hand you what was previously marked as
12 Exhibit 6, which is an exhibit to that class action
13 complaint --
14    A.  Right.
15    Q.  -- called "market supply cost build up."
16    Have you seen these documents before?
17    A.  Yes.
18    Q.  Did you prepare the market supply cost
19 build up that is Exhibit 6?
20    A.  This one? No. I was not part of this case
21 at the time.
22    Q.  Okay. There we go.
23    And you would disagree with -- let me --
24 let me find the paragraph.

12 (Pages 42 - 45)

1    A.   That is correct, yes.
2    Q.   But when you did that, you took out the
3  margin, right, for model one?
4    A.   For model one, yes.
5        By looking at the contract, it says it
6  should be based on actual and estimated supply
7  costs.  So we prepared method one to show that,
8  whether it's based on actual and estimated supply
9  costs.
10    Q.   You had the contract at the time that the
11  market supply cost build up was prepared, right?
12    A.   As I mentioned, I was not part of the case.
13    Q.   CRA did.
14    A.   CRA was part of it.  But when this was
15  prepared, I didn't review this.  So, I mean, I don't
16  know if that's your question.  I reviewed this once
17  I was involved with this case.
18    Q.   Was it your decision, personally, to remove
19  margin from any sort of calculation of overcharge?
20    A.   It was our -- you know, Seabron and I have
21  decided to build model one based on what the
22  contract says that would be the appropriate method.
23  But if we would -- we anticipated, you know, the
24  court may say a margin is appropriate for this case.

Page 50

1    Q.   Uh-huh.
2    A.   Then we came up with an alternative method
3  to show what the overcharges would look like if
4  there was a margin considered.
5    Q.   Uh-huh.
6    A.   So that's the approach that we presented in
7  method two.
8    Q.   Uh-huh.
9        But you believe, looking back at Exhibit 2,
10  the contract terms --
11    A.   Yes.
12    Q.   -- that an average customer would read the
13  pricing provision that's listed in the box at the
14  top of the document?
15    A.   Uh-huh.
16  *Q.   And would conclude that they are going to
17  get electricity from XOOM at cost?
18        MR. WITTELS:  Can you repeat the question?
19        Read back the question, please.
20        *(Record read)
21        MR. WITTELS:  Objection.
22        THE WITNESS:  Well, the customer will get
23  this agreement; and they would read that it would be
24  based on XOOM's actual and estimated supply costs,

Page 51

1  and they would assume it would be based on actual
2  and estimated supply costs.
3        But an average customer wouldn't know what
4  a "supply cost" means, but it's an
5  energy-industry-specific terminology.  So that's
6  what they -- from what they read, they would think
7  that they would be based on actual and estimated
8  supply costs, and they would -- that's what they
9  would be charged at.
10    BY MR. MATTHEWS:
11    Q.   And you think an average customer -- I'm
12  focused on the phrase "based on" -- would think that
13  "based on" means equal to?
14        MR. WITTELS:  Objection.  It's about ten
15  times you've asked it.
16        THE WITNESS:  As I mentioned before, I
17  think "based on" in this context is we are having a
18  cost, converting into a rate, so it should be very
19  close to -- to the -- to the actual and estimated
20  supply costs.
21    BY MR. MATTHEWS:
22    Q.   Converting it directly into a rate --
23    A.   Rate.
24    Q.   -- with no margin added, correct?

Page 52

1    A.   Yes.  No margin, because it's not listed in
2  this.
3    Q.   You think that's what an average customer
4  would believe reading that language?
5    A.   In this context, in this contract, they
6  would read this and think that it would be based on
7  actual and estimated supply costs.
8        MR. WITTELS:  Why are you laughing?  You
9  can go to the court and laugh, too.  I don't think
10  you should be laughing at witnesses.
11        MR. MATTHEWS:  If this is the opinion that
12  they want to present in this case that "based on"
13  means equal to, they should say so.  I don't know
14  why that's difficult if that is the opinion that
15  they're advancing.
16        MR. WITTELS:  I think she's asked it --
17  answered your questions appropriately, and I don't
18  know why you're laughing.  But we'll see what the
19  court thinks.
20    BY MR. MATTHEWS:
21    Q.   Dr. Eryilmaz, you believe that an average
22  customer would read that language "based on actual
23  and estimated supply costs" and would believe that
24  XOOM's rate would be a direct conversion of its

Page 53

14 (Pages 50 - 53)

1 you mean by that?
2     Q.  Okay.  You're not familiar with that
3 concept in the -- in the retail energy world?
4     A.  No.  I have not worked with indexed rate
5 data.
6     Q.  Whether you've worked with indexed rate
7 data or you haven't, you have no understanding of
8 what an indexed rate is?
9     A.  If you define -- if you give me the
10 definition, I might understand, but I don't know.
11    Q.  Well, I'm not trying to --
12    A.  I don't know.
13    Q.  -- force an understanding on you.
14       You don't have an understanding --
15    A.  No, I don't.
16    Q.  -- of what an indexed rate is?
17    A.  Uh-uh.
18    Q.  Is -- how many cases -- let me back up.
19       You've been retained as a potential
20 testifying expert witness in this case --
21    A.  Right.
22    Q.  -- correct?
23       And have you been retained as a potential
24 testifying expert in other cases before?

Page 62

1     A.  No.
2     Q.  This is the first?
3     A.  This is the first one.
4     Q.  You understand that XOOM's a for-profit
5 business in a deregulated, or semi-deregulated,
6 competitive market, right?
7     A.  Yes.
8        MR. WITTELS:  Objection.
9     BY MR. MATTHEWS:
10    Q.  Why doesn't XOOM get to seek a profit under
11 this sales contract?
12    A.  The sales contract did not mention margin
13 in their statement, so that's why.
14    Q.  So, in your opinion, XOOM just entered into
15 a bad contract?
16    A.  Yes.  I mean, they are -- I guess they
17 are -- the way they framed what their rates are
18 going to be based on is these factors, and margin is
19 not listed here, so...
20    Q.  And, in your view, that will result in XOOM
21 losing money?
22       MR. WITTELS:  Objection.
23    BY MR. MATTHEWS:
24    Q.  Or should result in XOOM losing money?

Page 63

1        MR. WITTELS:  Objection.
2        THE WITNESS:  I don't know, should or not.
3     BY MR. MATTHEWS:
4     Q.  Well --
5        MR. WITTELS:  Let her answer.
6        THE WITNESS:  Um.
7        MR. MATTHEWS:  I didn't mean to cut you
8 off.
9        MR. WITTELS:  You cut her off.
10       MR. MATTHEWS:  Well, you're
11 characterizing it that way, but --
12       MR. WITTELS:  You started talking when she
13 was --
14       MR. MATTHEWS:  Well, let me ask.
15    Q.  Do you have more to say?
16       Please go ahead.
17    A.  I mean, to your question, I don't know if
18 they lose money or they should lose money.
19       There was a contract, and it says that the
20 rate is based on actual and estimated supply costs.
21 And based on this contract, that's the rates that --
22 should be based on that.
23       And if -- margin is not listed here, so,
24 therefore, this is the way they formed their

Page 64

1 contract, and that's the rate should be.
2     Q.  Okay.  We talked about under model one --
3     A.  Uh-huh.
4     Q.  -- the supply cost that was used in that
5 calculation is the -- the total cost column that
6 came from the rate-setting workbooks, right?
7     A.  Right.
8     Q.  And you understand that XOOM, and other
9 ESCOs, have certain fixed costs that are not part of
10 those supply costs, correct?
11    A.  Correct.  Fixed costs are not considered a
12 supply cost.
13       Supply costs are pretty specific, and fixed
14 costs, every business may have fixed cost.  It's
15 normal to have a fixed cost as a business.
16    Q.  And you've reviewed XOOM witness testimony
17 that XOOM has fixed costs that are not included in
18 the supply cost reported in the rate-setting
19 workbook, right?
20    A.  I don't remember the specific person or the
21 witness, but I remember that he testified -- he --
22 his transcript included a definition for a fixed
23 cost, I think.  It was Loehde or -- I don't
24 remember.

Page 65

17 (Pages 62 - 65)

1    THE REPORTER:  It was what?
2    THE WITNESS:  It was Loehde.  I don't
3  remember the witness' last name.  Sorry.
4  BY MR. MATTHEWS:
5    Q.  But you have some recollection -- I'm not
6  asking you to identify the witness, but you have
7  some recollection of XOOM witnesses testifying to
8  the fact that XOOM has fixed costs that are not
9  included in the supply costs reported in the
10  rate-setting workbooks, right?
11    A.  I remember, like, a witness defining a
12  fixed cost; but I don't really remember, like,
13  whether it was included in the supply costs or not
14  at this moment.  I mean, if it's in front of me, I
15  can take a look at it, but I don't remember the
16  specific wording.
17    Q.  When you prepared the calculation for model
18  one, did you take into account XOOM's fixed costs?
19    A.  No.  I actually just took the supply cost
20  related information and calculated the actual and
21  estimated supply costs as produced by XOOM.
22    Q.  So if XOOM did not include fixed costs in
23  the supply costs reported in the rate-setting
24  workbook --

Page 66

1  said?
2    MR. WITTELS:  Objection.
3    THE WITNESS:  I guess I thought you were
4  saying that supply costs are -- you know, may -- you
5  know, I don't know.
6    I guess the way I understand it from what
7  you've described is have I considered supply cost
8  plus the other costs?  But I did not.  I just took
9  the components of the supply cost, and I added them
10  up -- I mean they were all, like, in a total supply
11  column -- and calculated the excess -- excess
12  charges.
13    Q.  Understood.
14    So if fixed costs -- if XOOM has fixed
15  costs in addition to the reported supply costs --
16    A.  Uh-huh.
17    Q.  -- then the only place that those fixed
18  costs appear in your calculation under model one
19  would be in the overcharge itself?
20    MR. WITTELS:  Objection.
21  BY MR. MATTHEWS:
22    Q.  Correct?
23    MR. WITTELS:  Objection.
24    THE WITNESS:  I mean, I cannot tell from

Page 68

1    A.  Uh-huh.
2    Q.  -- then those fixed costs would be included
3  in what you have characterized as an "overcharge"
4  under model one, right?
5    MR. WITTELS:  Objection.
6    THE WITNESS:  As I mentioned, those fixed
7  costs are not considered as part of supply costs;
8  therefore, they are not included in the model.
9  BY MR. MATTHEWS:
10    Q.  They're not --
11    A.  Included my calculation.  I only considered
12  supply -- the components of the supply cost.
13    Q.  They would not be included in the supply
14  cost portion of your calculation, correct?
15    MR. WITTELS:  Objection.
16    THE WITNESS:  Again, I only considered the
17  supply cost components.  Because, you know, we are
18  interested in looking at the supply costs and what
19  the rate has been charged by XOOM.
20  BY MR. MATTHEWS:
21    Q.  Yeah.
22    A.  So anything beyond supply cost is not
23  included in the supply cost column.
24    Q.  Okay.  How is that different from what I

Page 67

1  just looking at the data what that excess charge is
2  included.  They do not define -- XOOM did not define
3  where that excess charge came from.
4    There was no calculation providing that,
5  that included the fixed cost.  They -- there was no
6  calculation that showed that rate included fixed
7  costs as I reviewed the data.  The data came in as
8  rate versus the total cost of the components of the
9  supply cost, or the total cost, and then the
10  difference.  I cannot tell what is included in the
11  discrepancy.  It was not described in the data.
12  BY MR. MATTHEWS:
13    Q.  Okay.  Model two.
14    A.  Uh-huh.
15    Q.  Model two, as we covered earlier, is
16  essentially the same as model one, except that it
17  allows XOOM to recover the same gross margin on
18  variable-rate customers that XOOM's documents
19  reported it recovered for fixed-rate customers,
20  right?
21    A.  Right.
22    Again, we -- exactly.  The method one plus,
23  if there was a margin -- you know, there's -- it
24  doesn't say in the contract that there should be a

Page 69

18 (Pages 66 - 69)

Page 70

```
 1   margin.
 2        But if -- suppose there is a margin.  We
 3   basically provided that as an example to show, you
 4   know, what would be the charge look like.
 5        And looking at the margin reports, at least
 6   the margin that should be charged should be equal to
 7   the fixed-rate customers, which, you know, XOOM has
 8   made -- you know, has charged its fixed-rate
 9   customers, too, a margin.  So there was that rate
10   taken to calculate the overcharges.
11        Q.   And the purpose of -- of illustrating that
12   second model was in case the court or the jury
13   decides that some recovery of margin is
14   appropriate --
15        A.   Yes.
16        Q.   -- right?
17        But you don't believe that that reading of
18   the contract is appropriate, right?
19        A.   No.  By the read of the contract, it didn't
20   specify margin, this contract, so -- and that's why
21   I don't believe, yes.
22        Q.   So, in your view, if a contract doesn't
23   specify that the company will recover margin, then
24   the company is not allowed to recover margin?
```

Page 71

```
 1        MR. WITTELS:  Objection.
 2        THE WITNESS:  I mean, this is -- I mean,
 3   I'm not a contract expert, but its contract -- it
 4   says -- it should be charging what it says in the
 5   contract.  As -- I mean, you know, if -- what
 6   happens, for example, if a customer doesn't, you
 7   know, oblige with their contract?  There's
 8   implications for that, too.  So if it doesn't say in
 9   the contract, yes, that shouldn't be charged.
10        BY MR. MATTHEWS:
11        Q.   If it doesn't specify a margin, it
12   shouldn't be charged?
13        MR. WITTELS:  Objection.
14        THE WITNESS:  Yes.
15        BY MR. MATTHEWS:
16        Q.   And that's -- to be clear, that's your view
17   more broadly?  I'm not just asking about this
18   specific XOOM contract --
19        A.   Uh-huh.
20        Q.   -- correct?
21        MR. WITTELS:  Objection.
22        THE WITNESS:  I guess -- what's the
23   question?
24
```

Page 72

```
 1        BY MR. MATTHEWS:
 2        Q.   If -- if an ESCO does not specify in a
 3   variable-rate contract that the rate will include
 4   margin, then, in your view, that ESCO cannot seek to
 5   recover margin --
 6        MR. WITTELS:  Objection.
 7        BY MR. MATTHEWS:
 8        Q.   -- on its variable rate?
 9        MR. WITTELS:  She didn't say that.
10   Objection.
11        THE WITNESS:  Is that a hypothetical
12   example that -- are we just talking about X ESCO
13   here, or --
14        BY MR. MATTHEWS:
15        Q.   Yes.
16        A.   Is that a hypothetical example?
17        Q.   Yes.
18        A.   If -- again, I mean, I am looking at this
19   contract.  If another X ESCO was giving me a
20   contract that doesn't list the margin, yes, then I
21   would be looking at the specifics that they have put
22   in the contract to determine their rates.
23        Q.   Understood.  Thank you.
24        In connection with this case, you have not
```

Page 73

```
 1   done any analysis of how XOOM's variable rates
 2   compared to the utilities' rates, correct?
 3        A.   We -- I think Figure 1 in our report does
 4   present a -- like an illustration or -- like
 5   presents the data that shows the total cost versus
 6   the utility rate.
 7        Q.   Shows how the two moved over the same
 8   period of time?
 9        A.   Exactly.
10        Q.   Okay.  But you're not offering an opinion
11   in this case that under the sales agreement, that
12   XOOM was not permitted to charge more than the
13   utility, right?
14        MR. WITTELS:  Objection.
15        THE WITNESS:  No.  I mean, XOOM -- I mean
16   our basis was the actual and estimated supply cost,
17   whatever it should be charging.
18        BY MR. MATTHEWS:
19        Q.   And the utility's rate is irrelevant to
20   that consideration, right?
21        MR. WITTELS:  Objection.
22        THE WITNESS:  It is irrelevant for this
23   contract.  But we showed -- you know, our figure
24   presents, you know, whether the total cost and
```

19 (Pages 70 - 73)

1 utility rates, how they compare. We presented that
2 in our report.
3     BY MR. MATTHEWS:
4     Q. Yes. But the XOOM -- that's XOOM's
5 reported supply costs compared to the utility's
6 rate, right?
7     A. Utility, yeah.
8     Q. But you don't believe that a comparison of
9 XOOM's rate to the utility's rate is relevant here?
10     MR. WITTELS: Objection.
11     BY MR. MATTHEWS:
12     Q. Right?
13     A. No. I guess we -- we -- we used that
14 Figure 1 to show what the utility in that territory
15 charged and what that compares to the total cost
16 of -- of the -- of XOOM.
17     Q. But you're not offering any sort of damage
18 model that seeks to compare XOOM's rate to the
19 utility's rate, right?
20     MR. WITTELS: Objection.
21     THE WITNESS: We provided a cross-check
22 analysis on, you know, what would the overcharges
23 look like if XOOM has charged utility rates instead
24 of, you know, its total cost. So that's the

Page 74

1 they had just stayed with the utility, right?
2     MR. WITTELS: Objection.
3     THE WITNESS: I guess that doesn't -- I
4 mean, it's not to show that whether they better off,
5 but it shows -- if the utility rate was charged to
6 these customers --
7     BY MR. MATTHEWS:
8     Q. Uh-huh.
9     A. -- against the rate that was -- that XOOM
10 was charging, that would be slightly lower because,
11 you know, the utility's rates were slightly higher
12 than the total cost that's presented in the XOOM's
13 rate-setting workbooks.
14     Q. Right. I understand the purpose for which
15 it was shown in the report.
16     A. Uh-huh.
17     Q. I'm asking factually, if the court awarded
18 the damages that you have advocated for under model
19 one, is it true that XOOM's variable-rate customers
20 would recoup more money than they would under the
21 damage model that you've illustrated using the
22 utility rate?
23     MR. WITTELS: Objection.
24     THE WITNESS: When you say "recoup more

Page 76

1 cross-check analysis that we did in our report that
2 yielded a little bit lower damages, I think 49
3 million, about that.
4     BY MR. MATTHEWS:
5     Q. Uh-huh.
6     49 million under that model instead of 55
7 and a half --
8     A. Yeah.
9     Q. -- right?
10     A. So that was a cross-check analysis. That
11 was not, you know, separate models.
12     We presented two methods only. Uh-huh.
13     Q. Right. Meaning that if customers had
14 stayed with the utility -- I'm sorry.
15     Meaning that if -- XOOM variable-rate
16 customers would do better than they would have had
17 they just stayed with the utility, right?
18     MR. WITTELS: Objection.
19     THE WITNESS: I don't understand when you
20 say "better off."
21     BY MR. MATTHEWS:
22     Q. If -- if XOOM's variable-rate customers
23 were awarded the damages that you have put forth
24 under model one, they would be better off than if

Page 75

1 money," is that like -- clearly, the calculation
2 shows that utilities -- that the value that goes
3 down to 49 million because utility's rate -- rates
4 were slightly higher than the total cost. So the
5 damages would be slightly lower than the method one.
6     And when you say recouped, the customers
7 recoup, I don't know what you mean by that.
8     Q. Recoup, as in recover damages.
9     A. Yeah. I mean --
10     Q. Do you understand that?
11     A. What is the question? I guess I'm not
12 following the question.
13     Q. I think we've got it.
14     Did you do any analysis of what other ESCOs
15 charged over the same time period?
16     A. No.
17     Q. And you don't know how XOOM's rates
18 compared to other ESCOs' rates during that time?
19     A. No. That's private information, so I
20 wouldn't be able to.
21     Q. What's private information?
22     A. I mean the other ESCOs' data was not
23 available to us, so I was not able to compare it to
24 the other.

Page 77

20 (Pages 74 - 77)

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.            )
3      I, Alexander K. Loos, RDR and Notary Public in
4  and for the Commonwealth of Massachusetts, do hereby
5  certify that there came before me on the 15th day of
6  November, 2022, at 10:25 a.m., the person
7  hereinbefore named, who was by me duly sworn to
8  testify to the truth and nothing but the truth of
9  her knowledge touching and concerning the matters in
10  controversy in this cause; that she was thereupon
11  examined upon her oath, and her examination reduced
12  to typewriting under my direction; and that the
13  deposition is a true record of the testimony given
14  by the witness.  I further certify that I am neither
15  attorney or counsel for, nor related to or employed
16  by, any attorney or counsel employed by the parties
17  hereto or financially interested in the action.
18  ve hereunto set my hand
19  d this 27th day of
20
21
22
23  Notary Public
24  Commission expires 5/5/28

                                        Page 102

1  Steven Wittles
2  Slw@wittelslaw.com
3              November 28, 2022
4  RE: Mirkin vs. XOOM Energy
5  DEPOSITION OF: Derya Eryilmaz 5544030
6      The above-referenced witness transcript is
7  available for read and sign.
8      Within the applicable timeframe, 30 days,  the witness
9  should read the testimony to verify its accuracy. If
10  there are any changes, the witness should note those
11  on the attached Errata Sheet.
12      The witness should sign and notarize the
13  attached Errata pages and return to Veritext at
14  errata-tx@veritext.com.
15      According to applicable rules or agreements, if
16  the witness fails to do so within the time allotted,
17  a certified copy of the transcript may be used as if
18  signed.
19              Yours,
20              Veritext Legal Solutions
21
22
23
24
25

                                        Page 103

                                27 (Pages 102 - 103)