EXHIBIT 13

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NAOMI GONZALES,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>AGWAY ENERGY SERVICES, LLC,<br><br>　　　　　　　　　Defendant. | Case No. 5:18-cv-235 (MAD/ATB) |

**EXPERT REBUTTAL REPORT OF FRANK FELDER, PH.D.**

## I.   Introduction

1.  I have previously submitted an expert report ("Felder Report," "my Expert Report," or "my original report") in this matter on July 23, 2020.  I am responding to the Expert Report of Dr. Debra J. Aron ("Dr. Aron's Report" or "her report") dated September 21, 2020.

2.  My original report contained references to all of the documents that I used in that report.  The vast majority of documents were Agway's and were identified in Tables 2 and 5 of my original report; the one other major reference was a New York Public Service Commission (NYPSC) Order of a proceeding in which Agway was an active member.  My original report provided the Bates Numbers for all Agway related materials and the reference to the NYPSC Order, which is readily available on the internet.  My original report clearly identified and listed these materials within the report, specifically identified numerical assumptions, and provided a detailed illustration of how my calculations were performed.  In Exhibit 1 of this Rebuttal Report, I list all of the materials that I relied upon in both my original report and this Rebuttal Report.

3.  In my original report, I presented my qualifications, expertise and experience in analyzing the electric power sector and in particular the intersection of electric power system engineering, markets and public policy.  In my deposition taken by the Defendant, I also discussed the basis for my analyses and findings, which included my educational experience, industry experience, research, teaching, references cited in my original report, and the quantitative analyses that I performed.[1]  In short, I have conducted research, teaching, professional training, and consulting on the engineering, economic and public policy analysis of retail and wholesale electricity markets for 25 years.  For instance, twice I conducted a two-day professional training session on electricity markets for Direct Energy, which operates its own retail energy business and is also the electricity supplier to Agway in this matter and have conducted similar courses worldwide for almost twenty years.  I am currently engaged as an electricity market design consultant to the New England Power Pool (NEPOOL), the stakeholder organization that works with the New England electricity wholesale market operator (referred to as ISO-NE, standing for the Independent System Operator – New England), the counterpart of the New York Independent System Operator NYISO and PJM Interconnection,[2] the two relevant wholesale market operators in this matter.

## II.   Terminology

4.  To help clarify my discussion, I use the following terminology in this Rebuttal Report.

5.  I use the term *Agway* to refer to *Agway Energy Services, LLC*.

6.  I use the abbreviation *ESCOs* to refer to Energy Service Companies such as Agway that sell electricity to retail consumers.

---

[1] Deposition of Frank A. Felder, August 26, 2020, hereafter Felder Deposition.
[2] PJM Interconnection is also an Independent System Operator but for historical reasons is referred to as PJM.

7. Agway is a wholly-owned subsidiary of Suburban Propane Partners, L.P. or *Suburban Propane*.

8. I use the term *Agway's Customer Agreement* to refer to both Agway's Welcome Letter and Disclosure Statement provided to the Plaintiff.

9. I use the term *Variable Rate* and *Variable Rate Customer* to refer to the monthly price that Agway charges and the customer that pays that rate per its Customer Agreement.  It is synonymous with *Variable Price*.

10. Agway's Disclosure Statement to the Plaintiff sets the Variable Rate as follows:

"The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."[3]

11. I use the term *Introductory Rate* to refer to the introductory price that Agway uses to solicit potential customers and charges a customer for the initial one to two months, which is lower than its Variable Rate.

12. I use the term *Price to Compare* as the appropriate utility price that a consumer pays or would have paid if it purchases or would have purchased electricity from its local utility. This term is synonymous with default service price.

13. I use the term *EnergyGuard* to refer to Agway's warranty service for electric appliances and wires.  A marketing brochure, the *EnergyGuard Brochure*, accompanies Agway's Welcome Letter and Disclosure Statement.

14. I use the term *ESCO Pricing Data* to refer to the data presented in Dr. Aron's Report comparing Agway's Variable Rate to the Variable Rates of other ESCOs.

15. I use the term *NYPSC 2019 Order* to refer to the NYPSC Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process in Case no. 15-M-0127, dated December 12, 2019.

16. I use the abbreviation *COGS* to refer to cost of goods sold, that is the cost of the electricity that Agway purchases from Direct Energy and resales to its customers.

17. I use the abbreviation *kWh* for *kilowatt-hour*, the unit of measurement for retail electricity sales.

---

[3] Agway Residential Customer Disclosure Statement, AGWAY 583795.

**III.    Summary of Opinions**

18. Even if every claim and argument that is made in Dr. Aron's Report is accepted at face value (which should not be as I discuss further below), the following findings that I made in my Expert Report are not disputed or even questioned by Dr. Aron:

   a) "Assuming that a jury or finder of fact concludes that Agway should have been selling electricity under its variable rate based on its COGS [cost of goods sold] and the other expenses that I just described and perhaps escalated to recover some lower margin than it charged, I can calculate the relevant overcharges."[4]

   b) "I have calculated the overcharges Agway charged its customers assuming different margins and whether EnergyGuard should be included.  I have demonstrated that the method I have used can be applied to Agway's aggregate sales and to each customer individually using a standardized formula.  If asked and provided the appropriate margin parameters, I could calculate the overcharges for each member of the class."[5]

19. Even if every claim and argument that is made in Dr. Aron's Report regarding EnergyGuard, the appliance and electrical warranty service Agway provided its customers, is accepted at face value, these claims and arguments are not relevant to this dispute.  The dispute is not over the value of EnergyGuard, although below I discuss this issue, but its cost and whether its cost should be factored into the overcharge calculations I performed in my Expert Report.

20. Even if every claim and argument that is made in Dr. Aron's Report regarding whether I conducted an independent and proper examination of the facts and evidence in this matter are accepted at face value, none of them individually or collectively quantify how much I over or underestimated overcharges or whether my calculations have material errors.  In short, if my work was not independent or improper, as Dr. Aron's Report erroneously claims, her report should have been able to quantify the magnitude, direction and materiality of my errors, which it does not do.

21. Many of the claims in Dr. Aron's Report that my original report was incomplete or not independent also apply to her report.

22. My Expert Report is not biased or directed by the Plaintiff's attorneys.  In numerous cases Dr. Aron's Report claims that I made errors in assumptions and calculations (which I respond to below) and that in some cases these errors would result in overstating overcharges and in other cases understate overcharges.  If my original report were systematically biased, then one would expect to find errors that only overstated overcharges not understated them as well.  I correct these issues and find that the changes in my overcharge calculations is an increase in overcharges, i.e., my original overcharge calculations were too low and therefore were to the benefit of the Defendant.

---

[4] Felder Expert Report p. 18.
[5] Felder Expert Report p. 18.

4

23. Dr. Aron's Report does not offer a numerical margin that Agway should be allowed to recovery per its contract with its customers let alone any basis for that numerical margin. It is quite telling that Agway's economic expert, a Ph.D. economist with over 25 years of experience working for a prominent economic consulting firm, does not offer an opinion of what margin Agway is permitted to earn under its contract. Instead, Dr. Aron's Report makes points about economic theory, accounting versus economic cost of capital, economic risk, among other distractions, that are not tethered to the wording in Agway's Customer Agreement.

24. The data provided in Dr. Aron's Report regarding comparing Agway's prices to other ESCOs' variable rates substantiates the findings in my original report that Agway was not providing a "**competitive monthly variable price**" as it promises in its Welcome Letter to its customers.[6] This ESCO Pricing Data clearly shows that Agway does not offer a rate that is competitive with other ESCOs' variable rates, even when Agway was not offering EnergyGuard. In fact, many ESCOs consistently offer lower prices for electricity and, in many cases, other ESCOs offer significantly lower prices than Agway.

25. Despite the claims in Dr. Aron's Report,[7] in my original report (and in this Rebuttal Report), I analyzed the fundamental allegations in this matter including whether Agway's rates are competitive, and whether they comport with the variable rate methodology language in Agway's Disclosure Statement.

26. Despite the claims in Dr. Aron's Report, in my original report I do consider whether Agway's price includes EnergyGuard.[8]

27. Furthermore, in this Rebuttal, I find that Dr. Aron's Report did not demonstrate let alone quantify the value of EnergyGuard (despite the fact that its value is irrelevant as noted above). It is Agway and Dr. Aron's Report that are claiming EnergyGuard has a material value, yet neither Agway nor Dr. Aron's Report has been able to quantify this value. The consumer survey that Agway conducted, and which Dr. Aron's Report relies upon to claim EnergyGuard has some unquantifiable value, is fatally flawed due to its statistical bias. This survey contains both a leading question about the value of EnergyGuard and sampling error. The survey only asks Agway customers who use EnergyGuard, i.e., have their broken equipment repaired, does not ask the vast majority of customers who never need to use the warranty service, and does so without ever disclosing the amount customers were charged for EnergyGuard, making it impossible for consumers to assess the service's value. Even if the Agway's EnergyGuard Survey was not fatally flawed due to its biased question, sampling error, and not being transparent about its costs to Agway's customers, it is irrelevant because it attempts to ascertain the value of EnergyGuard by asking a biased sample of Agway's customers their perceived value of EnergyGuard whereas the Agway Customer Agreement sets Agway's price based upon actual costs, not individuals' perceptions of value. Furthermore, even under assumptions extremely favorable to the Defendant, I find that

---

[6] AGWAY 583794, bold in the original.
[7] Dr. Aron's Report ¶14.
[8] Dr. Aron's Report ¶16.

EnergyGuard's economic value is small and does not justify Agway's overcharges.

28. The burden is on Dr. Aron's Report to demonstrate that the following questions her report raises are relevant to this dispute given Agway's Customer Agreement, and if so, provide the answers:  what the market price of electric EnergyGuard would be if sold separately; what the prices of comparable warranty products, if any, are in the market; what Agway's margin is on electric EnergyGuard; what the margins on comparable warranty products in the marketplace, if any, are; what Agway's costs of risk bearing are; and any other relevant facts given the "cost," not "value," wording of Agway's Customer Agreement.

29. Dr. Aron's Report relies heavily on the asserted claim that Agway demonstrated to the NYPSC that EnergyGuard provides value to consumers, but as discussed below, this claim, besides being irrelevant given the language of Agway's Customer Agreement, overstates what the NYPSC determined.

30. Even if EnergyGuard has value and its value were part of Agway's Variable Rate methodology per the Customer Agreement (which it is not), it does not follow that Agway can charge whatever it wants.  Dr. Aron's Report makes no attempt to quantify EnergyGuard's value and to further demonstrate how much of that quantifiable value should be included in the Variable Rate.

31. In my Expert Report, I use the Price to Compare charged by utilities as an appropriate benchmark based upon my experience in the industry, the public policy behind the Price to Compare, how the Price to Compare is determined, and supported my finding by citing the NYPSC Order.  The Price to Compare is an appropriate benchmark for analyzing whether Agway charged a "**competitive monthly variable price**".  As suggested by its name, the Price to Compare is an appropriate benchmark because in general customers compare the utilities' Price to Compare with the rates of ESCOs, Agway's customers make these comparisons, Agway's marketing to prospective customers invites them to make this comparison, and Agway, along with Dr. Aron's Report,[9] acknowledges that the utilities are Agway's primary competitors.

32. In my Expert Report, I calculate overcharges using various margins so that a reasonably prudent person could assess the appropriate margin per Agway's Customer Agreement.  Agway's Customer Agreement does not define margin, as suggested by Dr. Aron's Report, to mean economic cost of capital, positive economic margin, sufficient margin for Agway to be viable on an ongoing basis, or consistent with margins in comparable unregulated industries or any industries.[10]  In my experience as an industry analyst and participant, ESCOs margins can be small.  Dr. Aron's Report does not quantify, let alone justify, what Agway's margin should be.  Her report does not demonstrate that the use of an introductory margin (or any of the other margins I use) is not reasonable given Agway's Customers Agreement.

---

[9] Dr. Aron's Report ¶38.  "Agway operates in competition with the incumbent electric utilities in New York and Pennsylvania and with other ESCOs that do business in Agway's service footprint in these states."
[10] Dr. Aron's Report ¶18 and ¶157-158.

33. As discussed in my original report, in calculating overcharges, it is appropriate only to consider those monthly overcharges that are positive and not offset them with negative overcharges that occur in other months.  I based this conclusion on Agway's Customer Agreement in which the Welcome Letter says, "**competitive monthly variable price**" and the contractual language that sets Agway's Variable Rate, which is done on a monthly basis. The claim in Dr. Aron's Report that this is inconsistent with economic principles, which I dispute below, is irrelevant since Agway's Customer Agreement does not stipulate that its pricing has to be consistent with Dr. Aron's economic theory.  Finally, as discussed below, even if negative overcharges are included in my overcharge calculations, because such occurrences were rare, their impact is small.

34. Dr. Aron's Report strays beyond its area of expertise to make claims about the relevance of class or subclass definitions and the need for individualized inquiries.


*NOTE:  Roman Numeral Sections IV and V intentionally omitted to align my Roman Numeral Sections with those in Dr. Aron's Report.*


**VII.    My Expert Report Addresses the Foundational Allegations of Prices and Costs in This Case and Provides the Nexus between the Allegations and My Overcharge Calculations**

35. Dr. Aron's Report claims that I do not establish a casual nexus between the allegations of bad faith and economic damages and that I did not conduct an independent assessment of the allegations in this case.[11]

36. The nexus between the allegations and my overcharge calculations could not be clearer: Agway did not comply with its Customer Agreement, that is the language in its Welcome Letter and in its Disclosure Statement.  In my original report, I cite the wording from the Plaintiff's Welcome Letter in which states:  "**We're excited to be providing you with this special offer, you will receive a competitive monthly variable price starting with your next scheduled meter reading.**"[12]  In my original report, I also cite the wording from the Disclosure Statement that sets how Agway sets its Variable Rate:  "The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."[13]  I then proceed to calculate overcharges based upon this language using Agway provide data and two different methodologies.  If and when a class (or possible subclass) is determined, then the nexus between the Plaintiffs and the rest of the class is established.

---

[11] Dr. Aron's Report ¶78-88.
[12] Felder Expert Report p. 9, citing AGWAY 583794, bold in the original.
[13] Felder Expert Report p. 9 citing Agway's Residential Customer Disclosure Statement provided to the Plaintiff, AGWAY 583795.

37. Dr. Aron's Report lists additional information and investigative activities that, in her non-legal opinion, I should have undertaken.[14]  Dr. Aron's Report does not demonstrate how any information garnered from such activities would have materially altered my overcharge calculations.  For instance, Dr. Aron's Report does not specifically identify any issue in the Plaintiff's responses to interrogatories, Agway's responses to interrogatories, Agway's responses to document requests, Agway's initial disclosures, the EnergyGuard Brochure, Ms. Gonzales's audio verification call of her enrollment with Agway, or whether Ms. Gonzales used EnergyGuard, that is relevant to my original report.  This is one of several examples in which Dr. Aron's Report raises a laundry list of issues but provides no specifics on how they are relevant or how they materially affect my findings in my original report.  Moreover, Dr. Aron's Report does not disclose whether Dr. Aron undertook any such activities, and if not, why not and if so, which ones, and why and what were the results of them, are not presented in her report.

38. Agway's Disclosure Statement in paragraph 21 entitled "Entire Agreement" states:  "This Agreement contains the entire agreement between the parties and supersedes all prior negotiations, proposals, understandings, representations and oral or written agreements with respect to the subject matter hereof."[15]  Given this contractual language, it is not at all clear how listening to a scripted audio verification call would have informed my thinking on Agway's Customer Agreement.  Likewise, whether Ms. Gonzales used or did not use EnergyGuard is not relevant to whether Agway appropriately set its Variable Price because the Customer Agreement's pricing methodology makes no such caveat.

39. In the subsequent section VII.A. of Dr. Aron's Report, it proceeds to analyze, although incorrectly, the relationship between Agway's costs and rates.  Her report's analysis explicitly establishes the nexus between Agway's Customer Agreement and overcharges for not just the Plaintiff but other potential class members as well.


**A.  My Original Report Demonstrates that Agway's Prices Do Not Reflect Their Costs**

40. Dr. Aron's Report claims that that my original report does not "attempt to demonstrate that Agway's prices do not reflect Agway's costs as described in its customer Agreements."[16]  Dr. Aron's Report then conducts a correlation analysis between the sum of Agway's variable and fixed costs and the prices it charges.[17]

41. Dr. Aron's Report uses the following equation as the basis of its correlation analysis:[18]

$$variable\ rate = supply\ cost + fixed\ adder \qquad (1)$$

---

[14] See Dr. Aron's Report ¶79-84.
[15] Plaintiff's Disclosure Agreement, AGWAY 583796.
[16] Dr. Aron's Report ¶90.
[17] Dr. Aron's Report ¶91-97.
[18] Dr. Aron's Report ¶92.

42. Nowhere in the Customer Agreement, whether in the Welcome Letter or Disclosure Statement, does it state that Agway's Variable Rate will be correlated to its supply costs plus a fixed adder.  Instead, the dispute whether Agway's Variable Rate is a competitive, market costs-based rate, not whether Agway correctly added its supply cost to a fixed adder.  In contrast, my overcharge calculations and the underlying allegations in this case are not whether Agway's costs are correlated or are reflected in its prices but whether its Variable Rates reflect the methodology and pricing factors set forth in Agway's Customer Agreement.

43. Dr. Aron's Report estimates the correlation between the expected variable rate and the actual variable rate of 0.956 with a statistical significance at the 99 percent level.[19]  From this result, Dr. Aron's Report concludes "that Agway's pricing structure is consistent with the plain language its Agreement."[20]

44. This conclusion in Dr. Aron's Report is irrelevant to the matter at hand.  First, it does not define what is meant by *pricing structure* or why pricing structure is relevant to whether Agway charged Variable Rates per its Customer Agreement.  Second, it does not identify the plain language in Agway's Customer Agreement that the pricing structure is consistent with.  Third, neither the term *pricing structure* nor *consistent with* appear in Agway's Customer Agreement.  In fact, the plain language of the Disclosure Statement sets Variable Rates as follows:  "The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."[21]

45. In New York, ESCO Consumers have a Bill of Rights in which they are entitled to "simple and clear disclosure, of the terms and conditions of the agreement between you [the consumer] and the ESCO including all variable charges or fees."[22]  In Pennsylvania, the Energy Consumer Bill of Rights entitles consumers to "The right to unbiased, accurate and understandable information to help shop for power and to save money in the deregulated environment."[23]  Dr. Aron's Report routinely employees economic terminology and concepts that are not contemplated by – let alone mentioned in – Agway's Consumer Agreement to interpret it, which is contrary to the both the New York and Pennsylvania versions of their Energy Consumer Bill of Rights.

46. The New York and Pennsylvania Customer Bill of Rights require ESCOs such as Agway to provide clear and understandable contractual language.  According to Dr. Aron's Report (see

---

[19] When I have taught undergraduate and graduate introductory statistic classes, I point out that it is very uncommon to have correlation coefficients close to one in the social sciences and to be very skeptical of such results when the do occur.  Even in the physical sciences, such high correlations are not common; I have literally split the atom, which requires extreme precision, and if I were presented results, for example the calibration of nuclear instrumentation, that contained such a high correlation, I would suspect there was a flaw in the measurement protocol.
[20] Dr. Aron's Report ¶97.
[21] Agway Residential Customer Disclosure Statement to Ms. Gonzales, AGWAY 583795.
[22] http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7BF4911730-F600-4674-AD80-46FB9307D582%7D accessed October 4, 2020.
[23] https://www.puc.state.pa.us/general/consumer_ed/pdf/Consumer_Bill_Of_Rights.pdf accessed October 4, 2020.

below for further analysis), a customer would have to understand sufficient economic theory, at least as presented and interpreted in Dr. Aron's Report, to appreciate the following:

a) Cost means value as Agway perceives some of its customers perceive it,[24]
b) Margin includes the economic capital cost,[25]
c) Margin also includes economic risk, such as that associated with EnergyGuard that may not be captured in accounting data,[26]
d) Competitive means "consistent" or "within the range" of other ESCO variable rates,[27]
e) Competitive means that Agway's rate will not be "the highest variable rate,"[28]
f) Competitive does not mean competitive with the utilities Price to Compare,[29] and
g) Agway's costs include Suburban Propane shared costs with Agway.[30]

47. To illustrate why the correlation analysis conducted in Dr. Aron's Report is irrelevant, consider the numerical example in Table 1 in which I present three cases. In Case A, the ESCO charges its variable costs plus its fixed adder; in Case B, the ESCO charges its variable costs plus two times its fixed adder; and in Case C, the ESCO charges its variable costs plus three times its fixed adder. I add the same small random number to the actual price in each case so that the Actual Rate and the Expected Rate are not 100% correlated, i.e., have a correlation of 1.0. Following the tables below, I report the correlation coefficient between the first column in Table 1, the Actual Rate, which equals the sum of the random component plus the variable cost and the fixed adder, and the Expected Rate, which is the sum of the variable cost and fixed adder (last column).

**Table 1:  Comparison of Correlations Between Expected Prices and Actual Prices at Different Levels of Fixed Costs**

**Case A:  ESCO Charges Variable Cost Plus Fixed Cost**

| Actual Rate | Random Component | Variable Cost | Fixed Cost | Expected Rate |
|---|---|---|---|---|
| 6.0 | 0.02 | 1.0 | 5.0 | 6.0 |
| 6.2 | 0.10 | 1.1 | 5.0 | 6.1 |
| 5.8 | 0.02 | 0.9 | 4.9 | 5.8 |
| 5.8 | 0.03 | 0.8 | 5.0 | 5.8 |
| 6.1 | 0.04 | 1.2 | 4.9 | 6.1 |
| 6.0 | 0.08 | 0.9 | 5.0 | 5.9 |
| 6.0 | 0.08 | 0.9 | 5.0 | 5.9 |

**Case B:  ESCO Charges Variable Cost Plus Two Times Fixed Cost**

---

[24] Dr. Aron's Report ¶143.
[25] Dr. Aron's Report ¶158.
[26] Dr. Aron's Report ¶154.
[27] Dr. Aron's Report ¶115 and ¶121.
[28] Dr. Aron's Report ¶114.
[29] Dr. Aron's Report ¶104.
[30] Dr. Aron's Report ¶165.

| | | | | |
|---|---|---|---|---|
| 12.0 | 0.02 | 2.0 | 10.0 | 12.0 |
| 12.3 | 0.10 | 2.2 | 10.0 | 12.2 |
| 11.6 | 0.02 | 1.8 | 9.8 | 11.6 |
| 11.6 | 0.03 | 1.6 | 10.0 | 11.6 |
| 12.2 | 0.04 | 2.4 | 9.8 | 12.2 |
| 11.9 | 0.08 | 1.8 | 10.0 | 11.8 |
| 11.9 | 0.08 | 1.8 | 10.0 | 11.8 |

**Case C:  ESCO Charge Variable Cost Plus Three Times Fixed Cost**

| | | | | |
|---|---|---|---|---|
| 19.0 | 0.02 | 4.0 | 15.0 | 19.0 |
| 19.5 | 0.10 | 4.4 | 15.0 | 19.4 |
| 18.3 | 0.02 | 3.6 | 14.7 | 18.3 |
| 18.2 | 0.03 | 3.2 | 15.0 | 18.2 |
| 19.5 | 0.04 | 4.8 | 14.7 | 19.5 |
| 18.7 | 0.08 | 3.6 | 15.0 | 18.6 |
| 18.7 | 0.08 | 3.6 | 15.0 | 18.6 |

| | | |
|---|---|---|
| Case A Correlation: | Variable + Fixed | 0.9777 |
| Case B Correlation: | Variable + 2x Fixed | 0.9937 |
| Case C Correlation: | Variable + 3x Fixed | 0.9983 |

48. Observe that in all three cases, the correlation coefficient is very close to one.  Similarly, Dr. Aron's Report observes a very high correlation coefficient, but there is no way to know from her analysis if her report is observing Case A, B or C, that is whether the ESCO is charging the sum of its variable costs plus its fixed cost or some higher multiple of its fixed cost.  This illustrates why the analysis performed in Dr. Aron's Report is irrelevant to the issue of whether Agway is overcharging its customers per its Customer Agreement.

49. Furthermore, it is not a coincidence that the correlation coefficient increases as the multiple of fixed costs increases, if, as in this case, the random component does not scale with the increases in fixed costs.  The reason is if the random component between the actual price and the expected price (the first and last columns respectively) becomes relatively smaller as the fixed costs are increased, then there is a higher correlation between the two.  So, it is possible that finding in Dr. Aron's Report of such a high correlation is due in part to Agway's high fixed costs.

## B.  Agway's Variable Rate is Not Competitive with Those of Its Competitors

50. Dr. Aron's Report claims that the utilities' Price to Compare is not an appropriate benchmark for three reasons.  First, the NYPSC has allowed Agway to continue to market its EnergyGuard service and therefore that justifies Agway charging a price above the utilities'

11

Price to Compare.[31]  Second, the utilities Price to Compare are prices that are set in
regulatory proceedings below market prices.[32]  Third, the utility is only one supplier in the
market and therefore one must assess the prices of other ESCOs.[33]  I respond to each in
turn.[34]

51. The fact that the NYPSC permits Agway to sell EnergyGuard with its Variable Rate product
does not permit Agway to charge whatever it wants; it is still bound by reasonableness.[35]

52. The fact that the NYPSC permits Agway to sell EnergyGuard does not mean that Agway
complied with its Customer Agreement.  The NYPSC Order (issued on December 12, 2019),
which as I pointed out in my deposition is not dispositive,[36] does not override or supersede
Agway's Customer Agreement.  The Plaintiff's Customer Agreement does not use the term
*value* when discussing Variable Rates; instead it uses the term *cost*.  Per Agway's Customer
Agreement, its Variable Rates must be based on cost not value.  Moreover, even if the
NYPSC overrides Agway's Customer Agreement, which it does not, it would not apply
before December 12, 2019.

53. Moreover, the Plaintiff's Customer Agreement does not explicitly identify EnergyGuard
costs when discussing Variable Rates or prices (also noted by an Agway customer as I
indicate below).  A fair reading of the Customer Agreement is that EnergyGuard is to be
provided at no cost.  Dr. Aron's Report does reference a May 18, 2020 New York residential
customer disclosure statement that does mention "(including those expenses relating to its
EnergyGuard[TM] program) and margins."[37]  Note, however, that the new language regarding
EnergyGuard uses the term *expenses* not *value*.  Expenses refer to costs, such as those
reported in a travel expense report, not to value.  The fact that when Agway updated its
disclosure statements related to EnergyGuard it had the opportunity to insert the term *value*,

---

[31] Dr. Aron's Report ¶103.
[32] Dr. Aron's Report ¶105.
[33] Dr. Aron's Report ¶106.
[34] Dr. Aron's Report, (¶98), seems to be hung up on the fact that I do not consider myself an economist.  My
experience as a Professor has been that the standard by which one considers oneself an economist, sociologist, etc. is
based on having a doctoral degree in that field.  Out of courtesy to my academic colleagues and given my
professional temperament, I do not call myself an economist, although I have more than sufficient qualifications to
be an expert on the pricing of electricity, electricity markets, and related issues.  Moreover, the pricing that occurs in
electricity markets flows explicitly from the underlying power system engineering and mathematics that solves
problem of economic dispatch, unit commitment, and reliability planning.  These are the mathematical and
engineering algorithms that the NYISO and PJM, the two relevant wholesale market administrators that administer
the markets and set prices, use.  It, therefore, not surprisingly, many researchers and analysts in this field do not have
doctoral degrees in economics but are heavily trained in engineering and applied mathematics.  I would note that the
consulting industry employs a less strict definition than I do; I have observed over the years many professionals
refer to themselves as economists without the accompanying doctoral degree and I try always to judge their work
based upon its merit not their credentials.  In particular, Dr. Aron and I have at least one mutual colleague that has a
very similar background to mine who works on the application of economic analysis to competitive electricity
markets.  See http://www.crai.com/expert/seabron-adamson.
[35] NYPSC 2019 Order p. 54-55
[36] Felder Deposition 08/26/2020 pp. 116:22-130:25.
[37] Dr. Aron's Report, ¶42, citing AGWAY 770877.  See also ¶43, citing a recent Pennsylvania Disclosure Statement,
AGWAY 770883.

but it chose instead to insert the term *expenses* is significant.

54. Even if EnergyGuard has value, Agway promised customers to charge a "**competitive monthly variable rate**"[38]. Nowhere in Agway's Welcome Letter, Disclosure Statement, or accompany EnergyGuard materials does Agway say that its prices include the value of EnergyGuard whether in bold, italics or standard print.

55. In a subsequent section, I review the evidence of whether EnergyGuard has value, and find that even using extremely generous assumptions in favor of the Defendant its value is immaterial.  Moreover, neither Agway nor Dr. Aron's state the quantitative value of EnergyGuard, let alone provide supporting analyses and evidence as discussed below.

56. Dr. Aron's Report states that "When the price of one product includes a value-added service that another supplier does not provide, as an economic matter the prices are not directly comparable."[39]  Notice that this quotation uses the term *directly*.  It is also true that as an economic matter, as well as a practical one, that consumers compare similar products and services and account for the differences in prices and quality.  This is exactly what I do in my Expert Report regarding EnergyGuard in light of the plain language regarding costs in Agway's Customer Agreement.

57. In fact, the Pennsylvania Energy Consumer Bill of Rights requires "The Right to a 'price to compare' from both the utility and competitive supplier so you are able to make an "apples-to-apples" comparison."[40]  Neither Agway or Dr. Aron's Report provides this "apples-to-apples" comparison.

58. Moreover, Agway acknowledges that utilities offer comparable services to Agway and it sets its introductory rates with this fact in mind.  Agway routinely and systematically collects the utilities' Price to Compare data.  As Dr. Aron's Report points out, "a rational firm's objective is to maximize its profits"[41] and therefore it follows that the time, expense and opportunity cost incurred to collect, maintain, and use utility Price to Compare data by Agway must have been for an important profit maximizing reason.

59. In fact, Agway makes clear that collecting utility Price to Compare data was done as part of its marketing effort.  Patricia Robinson, Agway's Director of Operations and Accounting,[42] testified that in a given service territory the utility is Agway's main competitor compared to other ESCOs:

"Q. Is the utility generally the main competitor for Agway in most of the service territory or in all the service territory?

---

[38] AGWAY 583794, bold in the original.
[39] Dr. Aron's Report ¶103.
[40] https://www.puc.state.pa.us/general/consumer_ed/pdf/Consumer_Bill_Of_Rights.pdf accessed October 4, 2020, p. 1.
[41] Dr. Aron's Report ¶131.
[42] Robinson Deposition 24:20-21.

A. Probably.

Q. Where do you -- what circumstances would the utility not be the primary competitor?

A. Well, there are many, many ESCOs now and all those ESCOs are competing for the same customers.  So you've got the utility and the ESCOs all as our competitors."[43]

60. Ms. Robinson further explains that up until December 2019 Agway's Introductory Rates were pegged to the utility's Price to Compare by subtracting from the Price to Compare an amount (e.g., $0.003/kWh which equals 0.3 cents/kWh) so that the Introductory Rate is lower than the utility's Price to Compare and that this process occurred monthly, which is when updates to the Price to Compare occur, and distributed to the telemarketers.[44]

61. Agway's practice of setting its Introductory Rate is not surprising given how prospective customers compare the ESCO rate to their utility rates.  For instance, an Agway customer made the following complaint to the Better Business Bureau:[45]

"In an effort to save on my energy bills over my utility company I decided to sign up for a third-party supplier Agway energy, promising a competitive rate. In the first month I received a promotional rate that is not even half a penny less than my default utility's rate.[46] Then the surprise comes in the second month when they start charging me 125% over my utility's price to compare rate. They charge me what is virtually the same rate as the utility company in the first month and then in the next month charge me more than double what my utility company would have charged me. This is not competitive in any way with my utility or any other suppliers".

Another customer complaint:

"Agway Promised me that they can better negotiate Energy price in the market and hence my energy bill will be lesser if I switch to them. After switching to Agway, based on the report provided by RG&E my bill increased and was double in some cases.

| Electricity ReadDate | Usage History ReadType | kwh | ESCO Billed | Utility Billed [RG&E would have billed] |
|---|---|---|---|---|
| 2018-08-16 | RGE | 328 | $29.96 | $16.63 |
| 2018-06-18 | RGE | 738 | $76.69 | $32.74 |
| 2018-04-16 | RGE | 1065 | $77.66 | $61.94 |
| 2018-02-15 | RGE | 1190 | $94.08 | $56.83 |
| 2017-12-18 | RGE | 1230 | $91.04 | $55.51 |

---

[43] Robinson Deposition 128:6-15.
[44] Robinson Deposition 130:19-131:17 and 129:9-14.
[45] https://www.bbb.org/us/ny/syracuse/profile/natural-gas-companies/agway-energy-services-llc-0041-31925/complaints, accessed October 4, 2020.
[46] This is consistent with Ms. Robinson's testimony that Agway subtracts a small amount, e.g., 0.3 cents/kWh from the Price to Compare.

|          |         |        |               |
|----------|---------|--------|---------------|
| 2017-10-17 | RGE 562 | $40.43 | $26.54".[47] |

62. For this second customer, the overcharge amounts to $159.67 over a 6-month period.[48]

63. Below I discuss in detail the issue of EnergyGuard's value, but at this point it is worth noting a Customer who connected the dots regarding Agway's Introductory Rate, Variable Rate, and EnergyGuard:

"I would like the company to stand by their statement that they will provide competitive market variable rate. I have never received any letter from Agway after my enrollment. And I took screenshots of the enrollment page which is attached to this message. At the time of enrollment their Peco offer was that for the "first 30 days you will be charged 6.8 cents per kWh. At the end of this introductory period, you will be charged our competitive market based monthly variable rate." Nowhere does it say that they will charge extra for the so called "EnergyGuard" imaginary service. This company uses their EnergyGuard service as a front to overcharge their customers fully knowing that a customer as myself who live in an apartment will never need or utilize their so-called imaginary "service" as my apartment do not even have a central air conditioning unit and PECO already provides all the electrical line repair service that Agway claims that they provide. In their enrollment website they deceptively mention that we "need more than competitive prices from your energy supplier— you need value, flexibility, and convenience, clearly stating that they will provide "competitive prices" and "value" in addition to "superior customer service" which so far has not been true. They lie to customers saying that they will provide a "competitive market based variable rate" right on their website, and then overcharge their customers right after the promo period ends. As a second note they also offered a $50 gift card if I sign up for the service, and their excessive rate increase on the very 2nd month of service is an obvious ploy to get their customers to pay for the sign up bonus gift card. However, I have never received the gift card they claimed they will give and charged me an excessive rate to cover their promo $50 gift card which I never received. On the phone they lie saying that the rate increased because of the excessive cold all around the country, while PECO rate has not changed much since the last few years and in fact went down and all of the competition from *** energy to ***** electric are offering rates that are even lower or similar to PECO. All I ask of this company is to refund me the portion of the overcharged rate. Regards, ***** ***".[49]

64. The above complaint is supported by expert testimony of Barbara Alexander regarding Agway's Services. Her summary and analysis of the marketing and communication of Agway is the following:

"Agway Energy sells electric and natural gas supply service to residential customers through

---

[47] https://www.bbb.org/us/ny/syracuse/profile/natural-gas-companies/agway-energy-services-llc-0041-31925/complaints, accessed October 4, 2020.

[48] I subtracted the ESCO (Agway) amount from what the customer would have paid to Rockland Gas and Electric (RG&E) a utility located in New York State.

[49] https://www.bbb.org/us/ny/syracuse/profile/natural-gas-companies/agway-energy-services-llc-0041-31925/complaints, accessed October 4, 2020.

telemarketing, direct mail, and internet sales, primarily through its relationship to fuel oil and propane fuel dealer, Suburban Propane.  According to its marketing materials, enrollment with Agway's variable rate electric and natural gas service includes a central air or natural gas furnace repair program that covers repairs and labor for a given calendar year.  The terms of service disclose that the energy price is introductory, after which "a monthly variable rate, to be determined at Agway's discretion, will apply."  The contract terms then list a variety of wholesale market factors that will influence Agway's variable price.  The sample sales presentation and the terms and conditions statement provided by Agway do not state the price for electricity or natural gas stated separate from the bundled repair service.  As a result, consumers are unable to determine the "value" of the price offered by this ESCO and compare the proposed price with either the utility's default service or other ESCO prices that do not include this bundled repair feature.  Furthermore,  Agway's terms of service do not in fact state a pricing methodology and, as a result, reflect a price that would allow Agway to charge any variable price it determines is reasonable without any basis for any customer to challenge the basis for the resulting price or determine whether the price complied with the contractual obligation to state the price for the product.  This type of contract term is unreasonable.  I conclude the Agway has marketed its products and services to New York residential customers in a deceptive manner in that its sales "promises" are not reflected in its terms of service and that its variable rate disclosures are insufficient and unreasonable."[50]

65. Dr. Aron's Report claims that there are "at least two reasons in addition to the fact that the utility does not offer a comparable value-added product to Agway's electric EnergyGuard" that the Price to Compare is not a valid benchmark for assessing whether an ESCO's rate is competitive.[51]  Her report only provides two additional reasons.

66. First, Dr. Aron's Report states that "the utility's Price to Compare is regulated, whereas Agway's is not."[52]  Her Report implies that the Price to Compare is too low, based the fact that "several participants raised concerns of costs between delivery and supply services at least in New York."[53]

67. Assume for the moment that the claim that the utility Price to Compare is too low.  Dr. Aron's Report does not provide any reason let alone a good one why this is relevant to this matter.  For prospective customers, they would compare Agway's offer to purchasing from the utility, among other options.  If the utility Price to Compare had a structural reason to be lower than Agway's rate, than that would be advantageous to consumers.  Perhaps the claim that the Price to Compare is too low has some public policy importance regarding the performance of retail electricity markets, but it has absolutely no bearing on this case.

68. Furthermore, the supporting evidence for this last claim – the Price to Compare is not a valid benchmark – provided in Dr. Aron's Report is extremely weak given that it is only mentions

---

[50] Testimony of Barbara R. Alexander on Behalf of the Public Utility Law Project of New York, Nov. 15, 2017, Before the State of New York Public Service Commission, Case 15-M-0127, 12-M—476 and 98-M-1343.
[51] Dr. Aron's Report ¶ 104.
[52] Dr. Aron's Report ¶ 105.  When utilities are the default providers, that is purchasing electricity on behalf of their customers who choose not to purchase from an ESCO, how they purchase electricity is regulated but the price is not since it based upon wholesale market conditions.
[53] Dr. Aron's Report ¶ 105.

several participants who have so-called "concerns".  The NYPSC rejected these concerns given that it uses the Price to Compare in its Order assessing ESCO variable rate offerings. Furthermore, I have been involved from the formation of retail electricity markets in the northeast and have observed market participants, typically ESCOs, are perennially claiming that the Price to Compare is too low.  It is in the economic self-interest of ESCOs to try to increase the Price to Compare because if they can do so, they are increasing the prices of their competitors.[54]  Recall if a utility's Price to Compare is increased, then when Agway offers an Introductory Rate pegged at the utility Price to Compare minus a small amount, it earns more than with a lower Price to Compare.

69.  Dr. Aron's Report proposes a second reason why the utility Price to Compare is not an appropriate benchmark and that is because it is only one supplier in the market.[55]  The claim in Dr. Aron's Report should be re-stated as the utility Price to Compare is not the only benchmark as opposed to it not the appropriate benchmark.

70.  I now turn to the ESCO pricing analysis conducted in Dr. Aron's Report.[56]  As mentioned above, Dr. Aron's Report claims that the utility is only one supplier in the market and therefore one must assess the prices of other ESCOs.[57]  In summary, Dr. Aron's Report does not demonstrate that Agway's rates were competitive; instead her report shows that they were more expensive than many other ESCOs.

71.  Dr. Aron's Report conducts two analyses using New York only data.  The first ESCO pricing analysis compares Agway's Variable Rate to those of other ESCOs during times and utility service locations in which Agway was not providing EnergyGuard.[58]  Her report's second analysis, Agway's Variable Rate is compared to other ESCOs' variable rates in which Agway was offering EnergyGuard.[59]  Based upon these two analyses, Dr. Aron's Report finds that "The Evidence Is, Contrary to Dr. Felder's Unsupported Conclusion, That Agway's Variable Rate is Consistent with Those of Its Competitors".[60]  Furthermore, her report states "I find that Agway's variable rate is within the range of variable rates offered by other ESCOs in New York."[61]

72.  Even if the findings in Dr. Aron's Report are taken at face value, they do not show that Agway's Variable Rate is competitive.  It is revealing that the terms used in Dr. Aron's report are "consistent" or "within the range of variable rates" as opposed to Agway's Variable Rates are competitive. The terms "consistent" and "within the range of variable

---

[54] This did not originate with retail electricity markets:  "People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices…. But though the law cannot hinder people of the same trade from sometimes assembling together, it ought to do nothing to facilitate such assemblies, much less to render them necessary" (Adam Smith, Wealth of Nations, 1776, Book IV Chapter VIII, p. 145, para. c27 available at https://www.adamsmith.org/adam-smith-quotes assessed Oct. 4, 2020.

[55] Dr. Aron's Report, ¶106.

[56] Dr. Aron's Report, ¶111-121 and Exhibits 5-12.

[57] Dr. Aron's Report, ¶106.

[58] Dr. Aron's Report, ¶112.

[59] Dr. Aron's Report, ¶116.

[60] Dr. Aron's Report, Section Heading VII. B., p. 28.

[61] Dr. Aron's Report, ¶108 which is referring to ¶106.

rates" do not appear in Agway's welcome letter or contractual terms.  Dr. Aron's Report does not provide the economic basis for the use of these terms or why they were selected as the benchmark instead of the term "competitive".  Notably, customers use the term "competitive market variable rates"[62] and not "consistent" or "within the range of variable rates".

73. The term "competitive" is a fundamental term in economics.[63]  Much of microeconomic analysis is directed at evaluating whether and the extent to which markets and the behavior of market participants are competitive.  The Report of Dr. Aron avoids using the term "competitive" to describe its findings regarding Agway's Variable Rates and Agway's behavior.  Moreover, Dr. Aron's Report does not affirmatively find that Agway's Variable Rate was competitive, both the term used in Agway's Welcome Letter and the term one would expect an economist to use given its importance in economic thinking.  In short, it is a revealing and glaring omission of Dr. Aron's Report that it does not dispositively state that "Agway's Variable Rates were competitive or complied with Agway's Customer Agreement."

74. The terms "consistent" or "within the range of variable rates" are vague.  Dr. Aron's Report does not define what it would mean for Agway's Variable Rate to be "inconsistent" or "not within the range of variable rates."  In order to conduct a proper scientific analysis, Dr. Aron's Report should have defined the criteria and methodology beforehand to make this assessment and then conducted the appropriate analysis.  Dr. Aron's Report does not provide any evidence that this was done.  Moreover, these findings of "consistent" or "within the range of variable rates" in Dr. Aron's Report are unfalsifiable, vague, and irrelevant to the facts of this case and the language in Agway's Customer Agreement.

75. Dr. Aron's Report does not conduct a scientific analysis of Agway's Variable Rates compared to those of other ESCOs.  Her report's analysis excludes the utility Price to Compare, which consumers, the NYPSC, Agway, and Dr. Aron's report acknowledge are competitive prices to Agway.

76. The ESCO pricing data that Dr. Aron's Report cites in both of her analyses clearly shows that Agway's Variable Rate was not competitive with many ESCOs.  For instance, Exhibit 6 of Dr. Aron's Report reveals that 37% of the time, Agway's Variable Rate was above the median variable rates of other ESCO's.  Exhibit 6 does not provide the data to determine how many times Agway offered the lowest price, the second lowest price, and so forth.  A review of Exhibit 7, which contains 18 comparisons, shows that between 5 to 26 ESCOs have lower Variable Rates than Agway when comparing Agway without EnergyGuard to ESCOs without any value-added service, and on average, 14.4 ESCOs have lower variable prices than Agway.  Dr. Aron's Report does not provide any justification, let alone an economic one, that says if there are 5 to 26 ESCOs with lower Variable Rates than Agway that Agway's Variable Rates comply with its Customer Agreement.

---

[62] https://www.bbb.org/us/ny/syracuse/profile/natural-gas-companies/agway-energy-services-llc-0041-31925/complaints, accessed October 4, 2020.

[63] I am not implying that Agway's Welcome Letter use of the term "competitive" should be interpreted as an economic term of art.

77. A review of Exhibit 8 from Dr. Aron's Report shows there are 7 to 22 or more ESCOS with lower Variable Rates than Agway when comparing Agway with EnergyGuard to ESCOs without any value-added service.  The average (mean) of ESCOs with variable prices lower rates than Agway's Variable Rate is 11.3.

78. Dr. Aron's Report does not include competing ESCOs' fixed rate offerings in her analysis, nor does she explain why these types of comparison are not informative in determining if Agway's Variable Rates were competitive and based upon market costs.

79. The ESCO Pricing Data used in Dr. Aron's Report is contained in 5,204 Excel files.  Her report does not quantify the difference in rates for those ESCOs that offered lower rates than Agway.  A review of Exhibit 7, which contains comparisons of New York ESCO rates by utility zone and time period when Agway was not offering EnergyGuard, shows that in almost all cases there is one or more ESCOs offering rates substantially lower than Agway's, on the order of $0.05/kWh or half a cent per kWh.

80. Given these results, it defies common sense to claim that a particular vendor, in this case Agway, is competitive if there are on average numerous competitors with lower prices (both with and without EnergyGuard) but this is what Dr. Aron's Report concludes.  It is revealing that in Exhibit 6 and 12, Dr. Aron Reports the percentage of the time that Agway's Variable was not the highest rate.  This is not relevant when evaluating whether Agway's Variable Rate is competitive to know the percentage of the time that Agway's Variable Rate is not the highest.  This comparison is not substantiated and has no basis in economics.

81. Dr, Aron's Report does not conduct a scientifically-sound statistical analysis of whether Agway's Variable Rate is competitive with the utility Price to Compare or other ESCOs.  Dr. Aron's Report does not assess whether its data is a representative sample and, if so, the error in that sample.  Dr. Aron's Report does not ask, let alone answer the question whether Agway's Variable Rate over the entire time period complies with Agway's Customer Agreement.

82. Dr. Aron's ESCO Pricing Data only considers New York and does not consider Pennsylvania.

**C.  Agway's Rates are Based Upon with Wholesale Rates as Reflected in the Utilities' Price to Compare**

83. Dr. Aron's Report does not conduct an analysis demonstrating that Agway's Variable Rates are Based Upon Wholesale Market Conditions.  In contract, my overcharge calculations, both in my original report and in this rebuttal demonstrate that based upon the utility's Price to Compare, which are based upon wholesale market conditions, Agway substantially overcharged its Variable Rate Customers.

**VIII.   My Overcharge Methodologies are Directly Related to the Facts and Allegations in This Case**

19

84. Despite the claims in Dr. Aron's Report,[64] the analysis in my original report makes clear that the alleged bad act is Agway not complying with its Customer Agreement and that in not complying it results in substantial overcharges paid for by Agway's customers. To substantiate my findings, I calculated overcharges using two different methodologies and different assumptions based upon the wording of in Agway's Customer Agreement and Agway's own data.

**A.  I Provided a Theory of Damages in Which it is Correct to Count Only Positive "Overcharges"**

85. As I noted in my original report and in Dr. Aron's Report,[65] I only counted positive monthly overcharges in my total overcharge calculations.  As I pointed out in my original report and in my deposition, Variable Rate customers are monthly and for each month should receive the value of their agreement, as in the case of the Plaintiff who was promised a "**competitive monthly variable price**", and not have one month affect another month."[66]

86. Immediately below, I respond to each of the three reasons that Dr. Aron's Report provides why I should have included negative monthly overcharges in my calculations.  I observe that none of her reasons rely upon the wording of Agway's Customers Agreement or dispute my statement in my original report that Variable Rate customers are entitled each month to the value of their agreement.

87. Dr. Aron's Report claims that my interpretation is at odds with economic theory for two reasons.  First, Dr. Aron's Report incorrectly infers that I believe that competitive prices means the lowest price of the available similar alternatives.  Based upon this misinterpretation, Dr. Aron's Report states that it is inconsistent with economic theory because rational firms has an objective to offer a price that maximizes profit not to offer the lowest price.[67]  Noteworthy, Agway's Customer Agreement does not say that Agway's Variable Rate will be priced in order for Agway to maximize profits and for good reason. Economic actors routinely enter into arrangements that legally restrict their economic actions in order for parties, in this case, a seller and buyers, to conduct business.

88. The second economic reason, which Dr. Aron's Report asserts without any substantiation, is that "It is contrary to standard economic models of consumer decision-making that teach that consumers would weigh positive months against negative ones when considering whether they are better off with one provider or another."[68]  Consumers, if promised the benefit of a "**competitively monthly variable price,**" would expect to receive the benefits of that promise and not weight positive months against negative ones.

---

[64] Dr. Aron's Report ¶126-129.
[65] Dr. Aron's Report ¶150.
[66] Felder Report pp. 12-13.
[67] Dr. Aron's Report ¶131.
[68] Dr. Aron's Report ¶132.

89. The third reason that Dr. Aron's Report claims that negative months should be counted is that the NYPSC in its 2019 Order did not mandate that commodity-only, variable rate ESCO guarantee savings for customers each month, but could be done so on an annual basis or with greater frequency, in part because utilities make out-of-period adjustments that would make monthly comparisons difficult.[69]  Furthermore, Dr. Aron's Report finds that the NYPSC logic is consistent with economic logic because "Economic rationality dictates that when considering a choice of two providers, the customer would consider whether overall welfare would be higher with one than the other over the period of time during which the customer intends to remain with the provider, considering that in some monthly one provider might offer a better price, and in others the other might be preferred."[70]  Again, the analysis in Dr. Aron's Report ignores Agway's Customer Agreement, which promises monthly variable pricing and does not mention that the pricing from one month carries over to another. Agway could have offered a Variable Rate based upon a customer's entire tenure with Agway, could have excluded the utility's Price to Compare from its definition of competitive, and could have explicitly identified the value of EnergyGuard (which I address immediately below) in its Customer's Agreement but chose not to do so.

90. Moreover, the NYPSC Order was about ESCOs being required to offer savings for Variable Rate Customers compared to the utility's Price to Compare.  In my overcharge calculations, overcharges would have been zero if Agway offered its Variable Rate Customers exactly at the utility's Price to Compare.  My overcharge calculations are more lenient than the situation the NYPSC Order is contemplating and therefore the rational for guaranteeing saving over a year or other period of time does not apply to my overcharge analysis.

91. Dr. Aron's Report further claims that unless I am suggesting that customers would switch their energy supplier every month, my failure to include negative overcharges is biased and improper because I have provided no basis that customers do shop monthly for energy versus what the NYPSC implicitly suggest is on annual basis.[71]  Agway's Customer Agreement promises a "**competitively monthly variable price**" so that they do not have to shop monthly for energy.

92. In my original report's workpapers that I provided to Dr. Aron, I calculated using my first methodology (COGS plus overhead with no margin) the overcharges including negative months.  That value is $30,497,574 compared the overcharge using the same assumptions but not including negative months of $30,657, 890, a difference of $160,316 or 0.52% of my original reported overcharge for this set of assumptions.  Further below, in Exhibit 3 where I amend my overcharge calculations from my original report based upon Dr. Aron's Report, I then report the impact of not including negative overcharges in Exhibit 4, and the impact is

---

[69] Dr. Aron's Report ¶133-134.  Dr. Aron's Report cites the NYPSC 2019 Order, p. 43 referencing out-of-period adjustments.  This same page notes that out-of-period adjustments are "particularly applicable in the context of variable-rate [natural] gas commodity service", which is due to weather fluctuations that drive natural gas demand for heating.

[70] Dr. Aron's Report ¶135.

[71] Dr. Aron's Report ¶135.  The NYPSC 2019 Order does not explicitly finds that customer shop annual for energy; moreover, it states that true ups be done on an annual basis or more frequently, as Dr. Aron's Report acknowledged, ¶134.

also small, between 0.2% and 1.5% based upon my amended COGS overcharge analysis.

**B.  I Account for the Value of EnergyGuard and Its Costs**

93.  Dr. Aron's Report claims that EnergyGuard provides value to Agway's customers and relies heavily on Agway conducted survey of customers who use the EnergyGuard service. EnergyGuard covers the cost of repairs of appliances and electrical wiring.  After the repair is finished, customers are asked to complete a short survey regarding their experience with EnergyGuard.  At this point, the customer has paid for EnergyGuard as part of its electricity bill and then is asked in the survey's fifth question:  "How valuable do you feel this Peace of Mind coverage is to you and your family?"[72]  This question is leading and therefore biased and not statistically valid.[73]

94.  Note that Agway only surveys its customers whose equipment has broken and are receiving service to repair their equipment.  The survey does not ask Agway customers who never availed themselves of EnergyGuard to have their equipment repaired.

95.  For a survey instrument to have any validity, it must investigate a representative sample, typically done through a randomized process, of the population of interest, in this case all of Agway's customers.  This concept of a representative sample is fundamental to statistics and is taught at the start of the semester in introductory statistics classes.  If the sample is not representative, that is, it is biased due to sampling error, the sample, in this case Agway's survey, should not be used to make any generalizations.[74]

96.  Table 2 below illustrates the sampling error of Agway's survey.  The green box indicates the rough proportion of the time out of the remaining area that an Agway customer used EnergyGuard.  Although not drawn exactly to scale, the table below represents the fact that 99.7% Agway's Customers do not use EnergyGuard (calculation provided below).  Agway's EnergyGuard Survey only asks a subset of the "green" customers and does not ask any non-

---

[72] Dr. Aron's Report Exhibit 19.

[73] "Leading questions are questions a researcher asks that may cause a respondent to answer in a biased, particular way. Leading questions are a vital issue of survey and question design, and should be avoided when conducting either quantitative or qualitative survey research. A leading question often aligns with the goals of the researcher, and thus can prime the respondent to unknowingly support the views held by the researcher. Also, including leading questions in survey design can harm both the results and credibility of the research. In addition, using questions that lead respondents can negatively affect objectivity and ethics of both the researcher and the study. Bad questions lead to bad results, and leading questions are among the most common types of bad questions."  Sage Research Methods, The Sage Encyclopedia of Communication Research Methods, 2017, Mike Allen (editor), available at https://methods.sagepub.com/reference/the-sage-encyclopedia-of-communication-research-methods/i14288.xml.

[74] See, for example, *Introductory Statistics*, Barbara Illowsky and Susan Dean, OpenStax, 2018 Rice University, available at https://openstax.org/details/books/introductory-statistics.  "One of the main concerns in the field of statistics is how accurately a statistic estimates a parameter.  The accuracy really depends on how well the sample represents the population.  The sample must contain the characteristics of the population to be a **representative sample**."  (Bold in the original, p. 7.)  "**A sample should have the same characteristics as the population it is representing.**"  (Bold in the original, p. 17.)  "In statistics, **a sampling bias** is created when a sample is collected from a population and some members of the population are not as likely to be chosen as others (remember, each member of the population should have an equally likely chance of being chosen).  When a sampling bias happens, there can be incorrect conclusions drawn about the population that is being studied."  (Bold in the original, p. 20.)

users of EnergyGuard, represented by the "white" area.  By ignoring non-users of EnergyGuard, the resulting sampling error biases the results making them unusable to generalize from regarding the "value" of EnergyGuard.

**Table 2:  Illustration of the Bias of Agway's EnergyGuard Survey Due to Sampling Error**



97.   Moreover, Agway's survey asks customers at the time of using EnergyGuard, that is after they have paid for it, whether it has value.  At no point does Agway provide any transparency regarding the amount customers are overcharged for EnergyGuard.  Customers do not know the cost they paid for EnergyGuard and when they are asked, they do not have the necessary information to discern its value.  Furthermore, it is not at all surprising that customers when using EnergyGuard say they value it when asked at the time of use.  By definition they value EnergyGuard because they are using it.

98.   As a result, Agway's EnergyGuard survey is completely irrelevant to support the claim that EnergyGuard has value.  The question is leading and biased, and the survey's sample, which neither Agway nor Dr. Aron's Report claim is scientifically based, i.e., random, is biased.

99.   Furthermore, Dr. Aron's Report finds "While we do not know what the experiences were of consumers who did not respond to the survey, the fact that the respondents reported positive experiences at high rates indicates that at least some customers perceived electric EnergyGuard as valuable."[75]

100.   Even if this finding regarding the value of EnergyGuard based upon Agway's survey is taken at face value, it vague.  The best that Dr. Aron's Report can find is that "some customers perceived" EnergyGuard's value.  Certainly Agway's customers, such as the one whose complaint I cite above, that will never use EnergyGuard because they are not liable for the covered repairs, find no value in EnergyGuard.

101.   Dr. Aron's Report does not quantify "some" or the perceived value of EnergyGuard.  This vagueness and inability to estimate its value is revealing.  If EnergyGuard was such a valuable product, an economist of Dr. Aron's education and expertise supported by one of the top economic consulting firms in the country, if not worldwide, would have been able to

---

[75] Dr. Aron's Report ¶147.

provide a reasonable estimate.  This vague finding suggests, along with my numerical calculations below, that even under favorable light to Agway, the value of EnergyGuard is small and immaterial.

102.    Even if EnergyGuard has a high value, and that value, instead of cost, is relevant per the Customer Agreement, which it is not, it does not necessarily mean that Agway should be paid this full purported value under its Customer Agreement.

103.    As noted above, it is impossible for customers to assess the value of EnergyGuard because they do not know how much it is costing them because its cost is bundled (i.e., non-transparent) with their price of electricity as pointed out by Ms. Alexander.

104.    The NYPSC 2019 Order points out at length the importance of transparency in ESCO pricing as indicated in the following citations from this order:

"(2) empowers customers by improving transparency of ESCO product and pricing information, primarily through an on-bill comparison of ESCO to utility commodity prices and through required itemizing of ESCO charges."[76]

"Simply put, price transparency clearly furthers the purposes of the retail energy market, and we reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue."[77]

"Further, the price transparency goals articulated herein clearly implicate the utilities' legal obligations to convey price information simply and clearly regarding energy services and, more generally, to do business in a manner consistent with the public interest."[78]

"In the instance of EnergyGuard and in any other instance in which the Commission concludes that ESCOs meet this threshold criteria and therefore are permitted to charge prices higher than the utility default supply rate for energy-related, value-added products and services, pricing transparency will ensure that the customer and the Commission can identify the portion of the total ESCO bill that is attributable to commodity and the portion that is attributable to the energy-related, value-added product or service."[79]

105.    Dr. Aron's Report discusses a hypothetical and numerically generic and unsupported illustration of the value of EnergyGuard claiming that risk averse consumers would be willing to pay more than the expected cost of repairs.[80]  I conduct a more detailed analysis tethered to the facts in this case.

106.    Using Agway's data, I calculate the value of Agway's EnergyGuard making extremely favorable assumptions for Agway.  I calculated the average actual EnergyGuard cost per

---

[76] NYPSC 2019 Order p. 2.
[77] NYPSC 2019 Order p. 33
[78] NYPSC 2019 Order p. 35.
[79] NYPSC 2019 Order p. 55.
[80] Dr. Aron's Report ¶149.

customer from October 2011 through September 2018 and found that it is $2.13 per customer using Agway's Profit and Loss Statements, which also contains the reported number of customers per year.[81]   Agway reports that the average cost per electricity consumer per year of EnergyGuard is approximately $2.13 and the annual cost per call is $400 for gas and wires and $340 for air conditioning.[82]   That means that the probability of a customer having to repair its electrical wires or air conditioning can be calculated using the following equation:

$$\text{Cost of EnergyGuard/customer/year} = (\text{Probability of Customer Calling for Service}) \times (\text{Cost of Repairs})$$

107.   The Probability of Customer Calling for Service, therefore, equals $2.13/($400+$340) = 0.0029 or 0.29%.  In other words, if EnergyGuard costs on average $2.13 per customer and the average total cost of repairs is $740, then 0.29% of customers, 2.9 customers per 1000 customers, called for repairs.

108.   Following the outlines of the abovementioned illustration in Dr. Aron's Report and using assumptions extremely favorable to Agway (as well as ignoring the fact that Agway, per its customer contract, can charge the *cost* not the *value* of EnergyGuard), I estimate the value of EnergyGuard.  Again, the Plaintiff's Customer Agreement does not even mention the cost of EnergyGuard.

109.   Assume an extremely risk averse customer is concerned that she may have to pay $2,000 in repairs and would have to borrow money at an extremely high interest rate to do so.  There is a 0.29% chance that this would occur (actually less because the typical repairs cost $740 not the $2,000 maximum payment covered by EnergyGuard).  Assume the customer would have to borrow money at 29.99% annual percentage penalty rate (APR), that is the interest rate if you miss a monthly payment.[83]   So this hypothetical consumer, extremely risk averse who may have to borrow money for repairs at almost twice the typical credit card rate of 16%, has a 0.29% chance of paying $ 2,600 (= $2,000x1.2999) in a year without EnergyGuard.  The expected cost per year to this extremely risk averse customer is $7.48 (=$2,600*0.0029).

110.   As noted above, Agway's EnergyGuard's cost per customer per year is $2.13.  Assuming, again re-iterating all of the extremely favorable assumptions made, that all of Agway's consumers valued EnergyGuard at $7.48 then the total value of Agway's EnergyGuard service is 3.51 (=$7.48/2.13) times its EnergyGuard's cost.  The cost of EnergyGuard over

---

[81] Profit and Loss Statements are AGWAY 000141-000148.

[82] 2017 AES Budget Presentation.ppt (last modified Oct. 5, 2016 12:19 PM), p. 9.  See also 2017 AES Budget Presentation.ppt (last modified Sept. 20, 2016 12:40 PM), p. 11 EnergyGuard cost per customer per year $2.18. Another Agway budget presentation dated September 26, 2017 reports $4.16 per residential customer for the costs EnergyGuard electric wires and air conditioning (2018 AES Budget Presentation_draft.pptx (last modified Sept. 12, 2017 10:36 AM), p. 12); yet another, dated October 7, 2016 has the number $2.67 per customer (2017 AES Budget Presentation.ppt (last modified Sept. 20, 2016 2:30 PM) at p. 11).  Agway's EnergyGuard costs from October 2010 through September 2018 is $583,900 out of total expenses of $82,249,003, which is 0.7% of expenses.

[83] https://www.bankrate.com/finance/credit-cards/current-interest-rates/, accessed October 12, 2020.

the time period of my overcharge calculations in my Expert Report is $583,900.[84]  This cost would translate into a total value, again using extremely favorable assumptions, to $2,051,283 (=3.51*$583,900).

111.   Note that in this calculation Agway makes an annual margin of 351%; its costs are $2.13 per customer per year and charges the full value of $7.48 (again based on these extremely favorable assumptions) to all of its customers.

112.   A more reasonable, but still favorable, calculation of the value of EnergyGuard would use the following assumptions.  So, this other hypothetical consumer, risk averse who may have to borrow money for repairs at the typical credit card rate of 16%, has a 0.29% chance of paying on average $ 858.40 (= $740x1.16) in a year without EnergyGuard.  The expected cost per year to this risk averse customer is $2.473 (=$858*0.0029), which would translate into a total value of $677,324 (=1.16*$583,900) using the ratio of 1.16 (=$2.47/$2.13).

113.   Using this value of $2,051,283, this would adjust my overcharge calculations in my Expert Report, Table 6, using the utilities' Price to Compare downward from $56.6 million to $54.6 million a 3.7% decrease.  Using the more reasonable value, the overcharges in this scenario are $56.0 as 1.2% decrease.  (Exhibit 2 codifies the assumptions I used in my EnergyGuard Value Analysis in my amended overcharge calculations and accounting for EnergyGuard through November 2019.)  In my amended overcharge calculations provide below I conduct a complete analysis of assuming an EnergyGuard value for all of my overcharge calculations.  The important point here, even if EnergyGuard's value should be included in my overcharge analysis, which it should not, then its impact is small.

114.   The concern raised in Dr. Aron's Report regarding Agway's customers, particularly low-income and risk averse customers, having the benefit of EnergyGuard ignores the fact that Agway's customers were overpaying for their electricity.  Those overcharges are certain, unlike the value of EnergyGuard, which is uncertain, and are reducing consumers' available income every month.

115.   Dr. Aron's Report discusses the additional financial risk of EnergyGuard that should be considered.  Her report does not quantify this risk nor demonstrate that it is material.  Moreover, Agway's own budget presentations assess the variance between EnergyGuard actual and expected budget and frequently find that these differences are small and have occurred in Agway's favor.  For example, in 2016, Agway's actual EnergyGuard expenses were $0.7 million vs. a budget of $0.9 million or costing $0.2 million less than budgeted.[85]  Moreover, according to Agway, it can diversify its EnergyGuard risk across of its customers, which reduces its risk.[86]  In 2017, Agway's projected actual EnergyGuard expenses were

---

[84] Felder Expert Report p. 13.  Below, I account for the costs of EnergyGuard from September 2018 thru November 2019 that I did not do in my original report as noted by Dr. Aron when considering the value of EnergyGuard in my amended overcharge calculations.  Dr. Aron's Report did not quantify the costs of EnergyGuard during this period.
[85] 2017 AES Budget Presentation.ppt (last modified Oct. 5, 2016 12:19 PM), p. 3.
[86] Direct Testimony of Michael Schueler, Suburban Propane, L.P. (owner of Agway), Proceeding on the Motion to Assess Certain Aspects of the Residential and Small Nonresidential Retail Energy Markets in New York State, et. al., Case 15-M0127, 12-M-0476, 98-M1343, January 4, 2018: "Agway mitigates its risk in part through marketing

$0.9 million vs. a budget of $1.0 million or costing $0.1 million less than budgeted.[87] Finally, if EnergyGuard's cost are appropriately included into Agway's Variable Rate, then any increase (or decrease) in its costs due to financial risk or otherwise, would be covered by changes in Agway's Variable Rate.

### IX. My Overcharge Methodologies Are Directly Related to the Facts and Allegations in This Case

#### A. My Methodology #1 Assumptions Are Reasonable

116.   In my original report I calculated overcharges using different margin assumptions.  Dr. Aron's Report claims that my assumptions are "utterly arbitrary" and that I do not given any evidence that they are reasonable.[88]

117.   Dr. Aron's Report does not provide any quantitative analysis that disputes my assumptions.  Neither Agway nor her report propose let alone justify what the appropriate margin is for Agway per the Customer Agreement.  The fact that both Agway and its economic expert cannot quantify the margins that should be used in the Variable Rate pricing language, language Agway wrote, is revealing.

118.   Dr. Aron's Report raises multiple issues regarding the different margin assumptions that I used.  All of these issues also apply to her report as well.  Dr. Aron's Report does not demonstrate that when Agway's Customer Agreement when uses the term *margin* it means *profits* and in particular *economic profits* instead of *accounting profits*, that the term *margin* means revenues sufficient for Agway to remain viable in the long run (or what the term *long run* means), that Agway's Introductory Rate margin is not sufficient for Agway to be sustainable in the long run, that margins of 5 or 10 percent are not sufficient for Agway to be sustainable in the long run or do not cover Agway's economic cost of capital, what Agway's risk-adjusted cost of capital is, what Agway's margin should be given that it offers EnergyGuard, or offer any analysis of the margins of Agway's competitors.

119.   If neither Dr. Aron's Report nor Agway can quantify what the numerical margin should be per Agway's Customer Agreement, it is reasonable to use a numerical value of zero as a baseline.  In my original report I also analyze overcharges using non-zero numerical values.

#### B. I Account for All of Agway's Electric Service Costs that Agway Has Quantified

120.   Dr. Aron's Report lists expenses that are paid for by Suburban Propane, the owner of Agway Energy, that are not charged to Agway although benefit Agway and therefore do not

---

and selling its service across a large and varied base of potential customers in order to increase revenue opportunities" (p. 4, lines 13-14).
[87] 2018 AES Budget Presentation_draft.pptx (last modified Sept. 12, 2017 10:36 AM), p. 3.
[88] Dr. Aron's Report ¶155-156.

appear in Agway's Profit and Loss Statements.[89]  According to Dr. Aron's Report, these shared resources provide economies of scale and result in a more efficient use of resources, and, as a result, my overcharge calculations are overstated because I do not include the costs of shared services.

121.    Dr. Aron's Report does not analyze Agway's Customer Agreement to show that Suburban Propane's costs should be included.  In fact, Agway's Customer Agreement does not mention Suburban Propane.  Instead it uses the terms "Agway's costs."[90]  If Agway wanted to include Suburban Propane's costs in its Customer Agreement, it should have included the term "the costs of shared services with Suburban Propane."  This is a problem of entirely Agway's making.

122.    Dr. Aron's Report does not quantify these claimed additional costs or show that they should be recovered as part of the Variable Rate in Agway's Customer Agreement.  Since neither Agway nor Dr. Report's quantify these costs, they should be ignored.  This is also an example of how Dr. Aron's Report makes implementing Agway's Customer Agreement impossible because it reads into the Agreement terms that are not in it and then does not quantify them.

123.    If Agway produced these costs, I could include them if relevant and appropriate; as I have already demonstrated with including Agway's overhead costs in my overcharge analysis.

**C.  My Overcharge Methodology #1 is Sound**

124.    Based upon the items identified in Dr. Aron's Report regarding my Overcharge Methodology #1, I have amended my overcharge calculations to:

1. Remove Agway's customers in the PEPCO electric utility service territory since they are not located in Pennsylvania,[91]
2. Add sales of Agway customers in the RG&E electric utility service territory for the three months that were originally omitted,[92]

---

[89] Dr. Aron's Report ¶164-170.

[90] AGWAY 583795 both in the table at the top of the page and in paragraph 3. Price.

[91] Dr. Aron's Report ¶172.  Agway's Variable Rate customers in the PEPCO service territory bought 3,026 kWh out of the 165,924,722 kWh of the total electricity sales I analyzed in my original report.  The corresponding reduction in overcharges is small:  for the COGS case with no margin, the reduction is $60 out of $30,657,890 No EnergyGuard.

[92] Dr. Aron's Report ¶173.  These omitted sales were for Agway Variable Rate customers in one utility, RG&E, for three months out of 96 months.  They were omitted because in the Agway produced spreadsheets that I pulled the Variable Rate related data from, the summary Pivot Table in the spreadsheet did not break out these sales into product categories that I could distinguish Variable Rate sales from other sales, and therefore to be conservative (i.e., favor the Defendant), I omitted them.  Using the underlying Agway data, I have now broken out Variable Rate Sales from Introductory Rate and Green Variable Rate sales.  This adds 3,550,383 kWh, which is 0.2% of the total sales analyzed in my original report.  The net impact on my amended overcharge calculation is to increase them in a non-material manner.  Dr. Aron's Report identifies 4.8 million kWh that are missing, whereas I find 3.5 million kWh, but some of those are non-Variable Rate Sales (footnote 206, p. 49, Dr. Aron's Report).

3. Apply the NYSERDA fee starting in April 2017 not December 2011,[93]
4. Remove the double counting of the Direct Energy National Grid charge for the period from November 2013 through November 2019,[94] and
5. Include EnergyGuard costs from October 2018 through November 2019.[95]

125.    My origin report's Table 1 should be amended to Table 3 below, where PEPCO is removed from the list of Pennsylvania Electric Utilities.

**Table 3:  New York State and Pennsylvania Electric Utilities**

| New York Electric Utilities | Pennsylvania Electric Utilities |
|---|---|
| Central Hudson | Duquesne |
| Con Edison | MetEd |
| National Grid | PECO |
| Niagara Mohawk | Penelec |
| NY State Electric and Gas | PPL |
| Orange and Rockland | WPENN |
| Rochester Gas & Electric | |

126.    Of these five issues, only the first and last one result in overstating damages, the first one by $60 in the COGS, No Margin case and the last one by $69,634.  The remaining three issues increase overcharges.  In Exhibit 3, I report my amended overcharge calculations, which have been updated to address all of these issues.

127.    Dr. Aron's Report claims that in my original report I should have included negative damages months based upon the 2019 NYPSC Order.  Furthermore, Dr. Aron's Report claims that my original report should have included the benefits that customers had when they were on an Introductory Rate.  As I explained in my original report, Agway's Customer Agreement sets its Variable Rate monthly; Agway's customers should be given the benefit of the bargain every month and not have one month's savings carryover to another month.  As pointed out previously, Agway's Customer Agreement provides its customers to benefit from a "**competitively monthly variable price**."  The same reasoning applies to Agway's Introductory Rate.  Furthermore, it is not a customer "benefit" of Agway's Introductory Rate

---

[93] Dr. Aron's Report ¶176.  As I noted in my original report, p. 11, footnote 13, that if I provided updated information, I could adjust my overcharge calculations.  Dr. Aron' Report based this information in part on interviews with Agway employees, which I do not have access to.

[94] Dr. Aron's Report ¶177.  The combined impact of removing the NYSERDA fee prior to April 2017 and removing the double counting of the Direct Energy National Grid charge is to reduce Agway's COGS and therefore increase overcharges.  The combined impact in the no margin case is to increase overcharges by $7,400,402.

[95] Dr. Aron's Report ¶178.  Dr. Aron's Report did not provide the costs of EnergyGuard during this period.  To account for EnergyGuard's costs for these 14 months, I took the cost of EnergyGuard from Agway's Profit and Loss Statement from October 2017 through September 2018 and multiplied by 14/12 to scale up these costs the 14-month period of October 2018 through November 2019.  The increase in Agway's costs and the reduction in overcharges is $236,948, which is a 0.79% decrease in the overcharge calculations from my original report for the COGS, No Margin with EnergyGuard case.  The reported EnergyGuard costs in Agway's Profit and Loss Statements include coverage of customers of introductory and green variable products, which I did not adjust for and therefore I overstate the EnergyGuard costs applicable to Variable Rate Customers.

to entice customers to be Variable Rate Customers who are then overcharged.

128.    In short, my Methodology #1 is reliable and can easily be updated to incorporate new information.  The issues raised in Dr. Aron's Report show at best that assumptions I used were biased against the Plaintiffs and in favor of the Defendant.  Nonetheless, my amended overcharge calculations address all of the issues Dr. Aron's Report raises.

## X.  My Second Methodology is Supported by the Facts of the Case and is Unbiased

### A.  My Overcharge Scenarios in My Methodology #2 are Supported by the Facts in this Case

129.    In my second overcharge pricing methodology, I use the utility Price to Compare in two analyses.  First, given that Agway's Welcome Letter promised a "**competitively monthly variable price**," I use the utility's Price to Compare as the competitive monthly price and calculated overcharges.  If Agway would have charged customers a competitive monthly price as it promised, customers would not have suffered the associated overcharges that I calculated.  The term *Price to Compare*, the public policy in requiring utilities to offer to sale energy at the Price to Compare based upon market conditions, the fact that Agway considered utilities as competitors, and the fact that Agway set its Introductory Rate based upon the utility Price to Compare all substantiate using the Price to Compare as a competitive benchmark, despite the claim in Dr. Aron's Report.[96]  In my original report (and further below in my amended overcharge calculations), I do account for EnergyGuard both its costs and value.[97]

130.    I also use the utility's Price to Compare as a substitute for Agway's COGS and add Agway's overhead costs.  ESCOs are purchasing wholesale electricity from the same wholesale markets as the utilities.  Agway, or its supplier Direct Energy, can register with each of the wholesale market operators in New York and Pennsylvania (i.e., NYISO and PJM), and purchase the requisite energy, capacity, ancillary services, and other services.  Both in New York and Pennsylvania, the utilities purchase electricity from the wholesale market, either directly from the NYISO or through a request for proposal process.  There are not quantity or purchaser discounts offered by either NYISO or PJM despite the claim in Dr. Aron's Report.[98]  As I point out in my original report, the major motivations for retail electricity competition is to encourage ESCOs to procure electricity more cost competitively than the utility.[99]

---

[96] Dr. Aron's Report ¶181.
[97] Contrary to Dr. Aron's Report ¶182.
[98] Dr. Aron's Report ¶186.
[99] Felder Report, p. 4.  Dr. Aron's Report ¶185 argues that since Agway has an incentive to obtain its resources at the lowest possible cost and therefore there is no reason to believe that Agway could obtain electricity more cheaply than it does.  Just because Agway has the incentive to obtain its resources at the lowest possible cost, it does not mean that it competent at doing so.  Dr. Aron presents no evidence that Agway investigated other purchasing options, that the utilities have buying power that ESCOs do not, or disputes the fact that utilities are purchasing electricity from the same wholesale market that Agway via Direct Energy is.

131.    Dr. Aron's ESCO pricing analysis, particularly the analysis comparing Agway's Variable Rate for times and locations in which Agway did not offer EnergyGuard to other ESCOs that did not offer a value-added service with their Variable Rate, demonstrates that many ESCOs are able to charge Variable Rates lower than Agway, presumably in part due to the ability to purchase electricity a lower cost than from Direct Energy.

132.    Moreover, when I worked for an ESCO in New York, we purchased electricity directly from the NYISO and resold it to residential customers.  We increased our purchases from the real-time energy market instead of the day-ahead energy market when we anticipated the real-time market to have a lower price to undercut the utility's Price to Compare, which was based upon the day-ahead energy market and therefore were able to charge a price lower than the utility's Price to Compare.

133.    Agway committed to provide a **"competitive monthly variable price."**  It did not commit to a "competitive monthly variable price plus a margin," which is why I did not include a margin in this analysis even though I included Agway's overhead costs and the costs of EnergyGuard in my original report.[100]


**B.  The Utility Price to Compare Is Reliable and the Level of Aggregation is Appropriate Given Them**

134.    I used Agway's utility Price to Compare data in my analysis, which is reasonable because it reflects the data that Agway would have been using in its pricing, as indicated above in how Agway sets its Introductory Rates.  I used the contemporaneous Price to Compare data that Agway had available at the time it was determining its Variable Rate.

135.    Dr. Aron's Report compares Central Hudson's Price to Compare with the data collected by Agway and finds that there is no relationship between them prior to October 2017 and after October 2017 there is an apparent lag of one month.  In my analysis I used the Price to Compare based upon the month that Agway reported it in its data to be consistent with how Agway documented it.  Nevertheless, I conducted a sensitivity analysis by adjusting Agway's Price to Compare back one month.  Exhibit 5 presents the impact on my amended overcharge calculations by adjusting the timing of the Price to Compare by 1 month.

136.    Furthermore, as I explained in my deposition,[101] due to the billing cycle, there is a slight mismatch between the monthly Price to Compare that a utility reports and when any individual customer's electric meter is read.  Utilities spread meter reading over the 22 or so business days in a month so that about 1/22 of their customers have their meters read on the first business day of the month, 1/22 on the second, and so on throughout the month.  As a result, there is always going to be a slight mismatch between the Price to Compare based upon the daily average of prices in a month and what an individual customer's Price to Compare should have been based upon its billing cycle.  Nonetheless the utility Price to Compare, and in fact its public policy purpose, is to provide a price for customers to compare

---

[100] Responding to Dr. Aron's Report ¶187.
[101] Felder Deposition 88:13-25.

or benchmark against ESCO prices.

137.    Dr. Aron's Report notes that utilities' residential prices vary within a month due to the customer's zone, rate class, usage amounts (profile code), and may vary by hour, peak/off-peak hours and other factors and that I compared Agway's customer-specific prices to the single utility Price to Compare.[102]  Dr. Aron's Report does not conduct any analysis to indicate that these differences are material or that my level of aggregation is inappropriate. Moreover, as I pointed out in my original report and in my deposition, if necessary, the utilities provide the Price to Compare adjusted for rate class, zone, etc.  The weblinks in Exhibit 6 show that utility Price to Compare data is available and, as applicable, broken down by rate class and zone.

## C.  My Methodology #2 is Sound

138.    Dr. Aron's Report points out that Agway does not know whether the Merchant Function Charge (MFC) was included when it collected the utility Price to Compare data.[103]  The MFC only applies to Agway's New York customers and not its Pennsylvania ones.  It is in Agway's interest as a profit maximizing firm to include the MFC when setting its Introductory Rate because it would want to set this rate as high as possible so long as it is slightly below the utility's Price to Compare.  In any event, the MFC only affects my Price to Compare overcharges and not my COGS analysis, and as demonstrated in Exhibit 7, even potentially double counting the MFC, which favors the Defendant, the overcharges based upon the Price to Compare are substantial.

139.    Dr. Aron's Report reiterates the issues raised with my Methodology #1 that apply to Methodology #2.  As previously discussed, I have addressed those issues, which are reflected in my amended overcharges.[104]

## XI.  My Methodology Can Distinguish Between Purported Class Members Who Were Harmed by the Purported Bad Acts and Those Who Were Not

140.    Dr. Aron's Report argues that my methodology does not distinguish between customers who were harmed by the alleged bad acts and those who were not.[105]  Dr. Aron provides two reasons to support this claim.  First, it is consistent with economic theory that customers would be willing to pay a price that on average exceeds the PTC for the value of EnergyGuard.  Second, according to Dr. Aron's Report, I do not account for the differences in the information that may have been provided to customers.  In particular, the language "competitive monthly variable price" does not appear in all customers' welcome letters.

---

[102] Dr. Aron's Report ¶192-193.
[103] Dr. Aron's Report ¶195.
[104] The NYSERDA charge and the Direct Energy National Grid charge do not apply to Methodology #2 as I explained in my original report, p. 14.
[105] Dr. Aron's Report ¶199.

141.    Agway's Customer Agreement does not say customers pay the value of EnergyGuard; the
        Plaintiff's Agreement does not mention EnergyGuard in the Variable Pricing Language.

142.    Above I estimate a very favorable value of EnergyGuard and use it to estimate
        overcharges and find it to be minimal, at best.

143.    Even if not all customer welcome letters contained the language "competitive monthly
        variable price", Agway still has to comply with the pricing methodology in its Disclosure
        Statement, and based upon my overcharge calculations, Agway overcharged for
        EnergyGuard and incorporated unreasonable margins.

144.    I conducted my analysis based upon the Plaintiff in this case; if and when a class or
        subclass is finalized, then my analysis would apply to the class.  Until then, the points in Dr.
        Aron's Report regarding class definition are irrelevant and outside of her expertise.


**XII.    I Appropriately Calculated Individual Damages**

145.    Dr. Aron's Report states that my example of an individual customer's bill is just one
        example, not necessarily randomly chosen, does not include EnergyGuard and incorrectly
        cites a reference.  The purpose of my example was not to conduct a statistical analysis – I
        have no need to because I evaluated all of the applicable billing data – but for the case of one
        individual customer and month, to illustrate my calculations in detail.  It also demonstrates
        that I, if asked, could do this for each individual Agway customer using standardized
        formulas.  In Exhibit 8, I reproduce the illustration noting that EnergyGuard is not included
        and correct the typographical error in the customer identification number in my original
        report.


**XIII.   My Expert Report Acknowledges the Role of Value-Added Services Regarding the
Policy Purpose of Electricity Deregulation**

146.    My original report identifies both costs and choices as the motivation for electricity
        deregulation.[106]  It also includes the consideration of EnergyGuard.  My original report
        further notes that many additional services are not valuable.  My analysis above shows that
        even in the most favorable light EnergyGuard has minimal value.  Moreover, neither Agway
        nor Dr. Aron's report has quantified the value of EnergyGuard and at best claims it provides
        value to some customers based upon a statistically flawed and biased customer survey.  Dr.
        Aron's report relies upon the NYPSC finding allowing Agway to sell EnergyGuard; hardly a
        ringing endorsement as my analysis above indicates both based upon the text of the NYPSC
        documents and my overly favorable calculations regarding EnergyGuard's minimal value at
        best.

147.    My experience is that lower prices is the major motivation for deregulation.  This is
        consistent with the regulatory documents Dr. Aron's Report cites, my experience in the

---

[106] Felder Report p. 4.

industry, the regulatory proceedings in other states, and the complaints of Agway customers, and other proceedings that I have been involved in.

**Exhibit 1:  Materials Relied Upon in Felder's Expert and Rebuttal Reports**

**My original report:**

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|------|------|------|------|
| Jan |  | 770873 | 000072 | 000073 | 529386 | 529398 | 529410 | 529422 | 529434 |
| Feb |  | 000063 | 000064 | 000065 | 529387 | 529399 | 529411 | 529423 | 529435 |
| Mar |  | 000093 | 000094 | 000095 | 529388 | 529400 | 529412 | 529424 | 529436 |
| Apr |  | 000041 | 000042 | 000043 | 529389 | 529401 | 529413 | 529425 | 529437 |
| May |  | 000101 | 000102 | 529379 | 529390 | 529402 | 529414 | 529426 | 529438 |
| Jun |  | 000086 | 000087 | 529378 | 529391 | 529403 | 529415 | 529427 | 529439 |
| Jul |  | 000079 | 000080 | 529380 | 529392 | 529404 | 529416 | 529428 | 529440 |
| Aug |  | 000049 | 000050 | 529381 | 529393 | 529405 | 529417 | 529429 | 529441 |
| Sep |  | 000123 | 000124 | 529382 | 529394 | 529406 | 529418 | 529430 | 529442 |
| Oct |  | 000116 | 000117 | 529383 | 529395 | 529407 | 529419 | 529431 | 529443 |
| Nov |  | 000109 | 000110 | 529384 | 529396 | 529408 | 529420 | 529432 | 529444 |
| Dec | 00055 | 000056 | 000057 | 529385 | 529397 | 529409 | 529421 | 529433 |  |

| Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|------|------|
| Jan |  | 713270 | 713254 | 713303 | 589554 | 713330 | 713304 |
| Feb | 712828 | 713281 | 713255 | 713300 | 713327 | 612232 | 713301 |
| Mar | 712829 | 713256 | 713257 | 713310 | 713333 | 713311 | 713312 |
| Apr | 308342 | 713259 | 713730 | 713154 | 589547 | 713322 | 713296 |
| May | 712830 | 713262 | 713732 | 713194 | 713335 | 713313 | 713314 |
| Jun |  | 713735 | 713734 | 713192 | 713332 | 713307 | 713308 |
| Jul | 712831 | 713264 | 713737 | 713189 | 713331 | 612235 | 713306 |
| Aug | 712853 | 713266 | 713267 | 589549 | 713323 | 713297 | 713298 |
| Sep | 712825 | 713268 | 713269 | 713404 | 713405 | 713409 | 713320 |
| Oct | 712826 | 713272 | 713743 | 713401 | 713339 | 713317 | 713318 |
| Nov | 713277 | 713276 |  | 589562 | 713337 | 612241 | 713316 |
| Dec | 713279 | 713278 | 713751 | 713324 | 713325 | 713299 | 713155 |

U.S.-Canadian Power System Outage Task Force final report on the 2003 Blackout, p. 5.

New York Public Service Commission (NYPSC) issued on December 12, 2019 an Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process. AGWAY 583794, Agway's Welcome Letter to Plaintiff

AGWAY 583795, Agway Residential Customer Disclosure Statement to Plaintiff

AGWAY 277298

https://www.coned.com/_external/cerates/supply_charges.asp

https://www.puc.state.pa.us/general/consumer_ed/pdf/Electric_Bill_Breakdown-PECO_RH.pdf

Documents identified in Exhibit A of my original report

**My Rebuttal Report**:

Felder Expert Report, July 23, 2020 and the supporting materials used in that report

Felder workpapers prepared in support of Felder Expert Report, July 23, 2020

Expert Report of Dr. Debra J. Aron, September 21, 2020

Felder workpapers prepared in support of this rebuttal report

Deposition of Frank A. Felder, August 26, 2020

http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7BF4911730-F600-4674-AD80-46FB9307D582%7D accessed October 4, 2020

https://www.puc.state.pa.us/general/consumer_ed/pdf/Consumer_Bill_Of_Rights.pdf accessed October 4, 2020

http://www.crai.com/expert/seabron-adamson.

AGWAY 770883

https://www.bbb.org/us/ny/syracuse/profile/natural-gas-companies/agway-energy-services-llc-0041-31925/complaints, accessed October 4, 2020.

Testimony of Barbara R. Alexander on Behalf of the Public Utility Law Project of New York, Nov. 15, 2017, Before the State of New York Public Service Commission, Case 15-M-0127, 12-M—476 and 98-M-1343.

https://www.adamsmith.org/adam-smith-quotes assessed Oct. 4, 2020.

Sage Research Methods, The Sage Encyclopedia of Communication Research Methods, 2017, Mike Allen (editor), available at  https://methods.sagepub.com/reference/the-sage-encyclopedia-of-communication-research-methods/i14288.xml.

*Introductory Statistics*, Barbara Illowsky and Susan Dean, OpenStax, 2018 Rice University, available at https://openstax.org/details/books/introductory-statistics.

2017 AES Budget Presentation.ppt (last modified Oct. 5, 2016 12:19 PM)

2017 AES Budget Presentation.ppt (last modified Sept. 20, 2016 12:40 PM)

2017 AES Budget Presentation.ppt (last modified Sept. 20, 2016 2:30 PM)

2018 AES Budget Presentation_draft.pptx (last modified Sept. 12, 2017 10:36 AM)

https://www.bankrate.com/finance/credit-cards/current-interest-rates/

Direct Testimony of Michael Schueler, Suburban Propane, L.P. (owner of Agway), Proceeding on the Motion to Assess Certain Aspects of the Residential and Small Nonresidential Retail Energy Markets in New York State, et. al., Case 15-M0127, 12-M-0476, 98-M1343, January 4, 2018

Memo to CRA Staff dated May 18, 2020, from John Coyle and Jennifer Gorga Capone

References in Exhibit 6 of this Rebuttal.  The links in Exhibit 3 include webpages listing individual files that contain the Merchant Function Charge.  I provided the links but do not list out each individual file.

Defendant's July 9, 2018 Production, Exhibits 2, 2-B, 2-C, 2-D, 3-A, 3-B, 3-C, 3-D, 3-E, 6.

AGWAY 000141-000148

**Exhibit 2:  Assumptions and Calculations Used EnergyGuard Value Analysis**

| Assumption | Calculation | |
| --- | --- | --- |
| EG Cost/Customer/Year | $ | 2.13 |
| Cost per EG call gas & wires | $ | 400 |
| Cost per EG call air conditioning | $ | 340 |
| | | |
| Penalty Credit Card Interest Rate | | 29.99% |
| Regular Credit Card Interest Rate | | 16.00% |
| | | |
| Maximum EG Payout | $ | 2,000 |

**Calculations**

| | | |
| --- | --- | --- |
| Probability Customer Uses EG @ $2.70 EG Cost | | 0.288% |
| Probability Customer Not Use EG @ $2.70 EG Cost | | 99.712% |
| | | |
| EG Gross Value Extremely Risk Averse Customer | $ | 7.48 |
| EG Gross Value Risk Averse Customer | $ | 2.47 |
| | | |
| EG Cost Over the Time Period | $ | 820,848 |
| | | |
| Ratio of EG Value to Cost, Extremely Risk Averse | | 3.51 |
| Ratio of EG Value to Cost, Risk Averse | | 1.16 |
| | | |
| EG Value, Extremely Risk Averse | $ | 2,883,837 |
| EG Value, Risk Averse | $ | 952,183 |

38

**Exhibit 3:  Amended Overcharge Calculations**

**Methodology #1:  Cost of Goods Sold Overcharge Calculations**

|  | Amended | | Original Overcharges | |
|---|---|---|---|---|
|  | **No Energy Guard** | **Energy Guard** | **No Energy Guard** | **Energy Guard** |
| Overcharge:  No Margin | $38,117,154 | $37,296,306 | $30,657,890 | $30,073,990 |
| Overcharge:  Introductory Rate Margin | $32,452,158 | $31,631,310 | $25,010,541 | $24,426,641 |
| Overcharge:  5% Margin | $31,840,676 | $31,019,828 | $24,034,746 | $23,450,847 |
| Overcharge:  10% Margin | $25,575,952 | $24,755,104 | $17,581,928 | $16,998,028 |

**Methodology #2:  Utility Price to Compare Overcharge Calculations**

|  | Amended | | Original Overcharges | |
|---|---|---|---|---|
|  | **No Energy Guard** | **Energy Guard** | **No Energy Guard** | **Energy Guard** |
| Overcharge:  No Margin | $36,855,552 | $36,034,704 | $36,797,334 | $36,213,434 |
| Overcharge:  No Overhead & No Margin | $56,749,508 | $55,928,661 | $56,647,884 | $56,063,984 |

*If it is determined that the value, instead of the cost, of EnergyGuard should be included, then $952,183 should be subtracted from the No Energy Guard overcharge calculations.*

Notes

The following adjustments were made to my overcharge calculations in my original report:

1. Removed Agway's customers in the PEPCO electric utility service territory since they are not located in Pennsylvania,
2. Added sales of Agway customers in the RG&E electric utility service territory for the three months that were originally omitted,
3. Applied the NYSERDA fee starting in April 2017 not December 2011,
4. Removed the double counting of the Direct Energy National Grid charge for the period from November 2013 through November 2019, and
5. Included EnergyGuard costs from October 2018 through November 2019.

**Exhibit 4:  Amended Overcharges Including Negative Monthly Overcharges for Methodology #1, Cost of Goods Sold**

|  | **Amended with Negative Overcharges** | |
|---|---|---|
| **Methodology #1** | **No Energy Guard** | **Energy Guard** |
| Overcharge:  No Margin | $38,029,612 | $37,208,764 |
| Overcharge:  Introductory Rate Margin | $32,307,177 | $31,486,329 |
| Overcharge:  5% Margin | $31,620,219 | $30,799,372 |
| Overcharge:  10% Margin | $25,210,827 | $24,389,979 |
| | | |
| Differences Without and With Negative Overcharges | | |
| Overcharge:  No Margin | ($87,542) | ($87,542) |
| Overcharge:  Introductory Rate Margin | ($144,981) | ($144,981) |
| Overcharge:  5% Margin | ($220,456) | ($220,456) |
| Overcharge:  10% Margin | ($365,125) | ($365,125) |
| | | |
| % Differences Without and With Negative Overcharges | | |
| Overcharge:  No Margin | -0.23% | -0.23% |
| Overcharge:  Introductory Rate Margin | -0.45% | -0.46% |
| Overcharge:  5% Margin | -0.69% | -0.71% |
| Overcharge:  10% Margin | -1.43% | -1.47% |

**Exhibit 5:  Impact on Overcharge Calculations by Adjusting Agway's Price to Compare by One Month Using Amended Overcharge Calculations**

|  | 1 Month Shift Amended Overcharges | |
| --- | --- | --- |
| **Methodology #2** | **No Energy Guard** | **Energy Guard** |
| Overcharge:  No Margin | $37,597,267 | $36,776,420 |
| Overcharge:  No Overhead & No Margin | $57,649,800 | $56,828,952 |

|  | Amended Overcharges | |
| --- | --- | --- |
|  | **No Energy Guard** | **Energy Guard** |
| Overcharge:  No Margin | $36,855,552 | $36,034,704 |
| Overcharge:  No Overhead & No Margin | $56,749,508 | $55,928,661 |

| **Difference** | | |
| --- | --- | --- |
| Overcharge:  No Margin | $741,715 | $741,715 |
| Overcharge:  No Overhead & No Margin | $900,291 | $900,291 |

| **% Difference** | | |
| --- | --- | --- |
| Overcharge:  No Margin | 2.0% | 2.0% |
| Overcharge:  No Overhead & No Margin | 1.6% | 1.6% |

**Agway's Price to Compare data is shifted back one month, e.g., Dec. 2011 becomes Nov. 2011.**

41

**Exhibit 6:  New York and Pennsylvania Utilities Purchase Electricity from the New York Wholesale Electricity Market and Provide Price to Compare Data by Customer Rate Class and Zone (as applicable)**

Searches on standard search engine using the utility's name and price to compare bring up the links below.  In many cases, the links below contain other relevant links, which I do not reference.  Links active of October 12, 2020.

New York Utilities

- Central Hudson

https://www.cenhud.com/account-resources/rates/gas--electric-supply-prices/

https://www.cenhud.com/globalassets/pdf/billexplained_electric.pdf

- Con Edison

https://www.coned.com/en/rates-tariffs/rates

https://www.coned.com/en/rates-tariffs/rates

https://apps.coned.com/CEMyAccount/csol/MSCcc.aspx

https://www.coned.com/_external/cerates/supply_charges.asp

https://www.coned.com/_external/cerates/elec_MFC_PSC10.asp

- National Grid/Niagara Mohawk

https://www9.nationalgridus.com/niagaramohawk/home/rates/4_elec_supply.asp

https://www.nationalgridus.com/Upstate-NY-Home/Rates/Rate-Statements

- NYSEG

https://ebiz1.nyseg.com/cusweb/opcosupplyprice.aspx

https://www.nyseg.com/wps/portal/nyseg/home/!ut/p/z0/fY1La8MwEIR_jY_pqnlBjiaEFhPnBaWKLmYjb5RN7JUjy27z7-tC6a0dGJiB4RswoMEI9uwwsheshn4082LynK9ep0u12a63Y7VX2cti8XaYrLIZZGCGgfpDqfomjEO-zB2YBuNlxHL2oLFHcYFLofjhw60FffE1gW4p9GypxuaH_M_1QObr_W5SMNZLpM8IWh4tOXShQGt9JzFRv0Fs0UlJoY0o5cN34cRV9ZQoqsjGwLYZzOISVZ8tNDdz3NXv6RevH0ny/

https://ebiz1.nyseg.com/cusweb/opcosupplyprice.aspx

- ORG

https://www.oru.com/en/pike/energy-choice-programs/price-to-compare

https://www.oru.com/_external/orurates/tariffsandregulatorydocuments/newyork/merchantfunctioncharge.html

- RGE

https://www.rge.com/wps/portal/rge/home/!ut/p/z0/fcyxDoIwFIXhV2Fh9d6qMXQkxGA0Et2gC6mlNlW8hVKIvr2dHN2-Pzk5IKAGQXKxRgbrSPaxG7FrN-y8P2wLrEqe5XjFosgu1WmN5RqOIP4P4oN9jKPIQShHQb8D1N5oaXwrlXIzhRR_INXO1Gk_BUndx83-Zvt-leLgrbJkIibFeIqMv-4qRa-XhPEkGoanaL79sgE6/

https://ebiz1.rge.com/cusweb/opcosupplyprice.aspx


Pennsylvania Utilities

- Duquesne

https://www.duquesnelight.com/service-reliability/service-map/rates/residential-rates

https://www.duquesnelight.com/service-reliability/service-map/rates/tariff-resources/procurement/previous-polr-results

- MetEd (FirstEnergy) (NEED HISTORICAL)

https://www.firstenergycorp.com/customer_choice/pennsylvania/met-ed_penelec/your_price_to_compare.html
- PECO

https://www.peco.com/MyAccount/MyService/Pages/ElectricPricetoCompare.aspx

- Penelec (FirstEnergy)

https://www.firstenergycorp.com/customer_choice/pennsylvania/met-ed_penelec/your_price_to_compare.html

- PPL

https://www.pplelectric.com/site/Ways-to-Save/Rates-and-Shopping/Price-to-Compare

file:///Users/frankafelder/Downloads/PTCHistoryUpdate.pdf

file:///Users/frankafelder/Downloads/Price-to-Compare%20Jun-1-2020-Nov-30-2020-1.pdf

- WPENN (FirstEnergy)

https://www.firstenergycorp.com/customer_choice/pennsylvania/west_penn_power/price_to_compare.html

**Exhibit 7:  Merchant Function Charge is Small, and Impact on Damages is Small**

|  | Amended with Explicit MFC | |
|---|---|---|
|  | **No Energy Guard** | **Energy Guard** |
| Overcharge:  No Margin | $32,269,624 | $31,448,777 |
| Overcharge:  No Overhead & No Margin | $51,725,302 | $50,904,454 |

|  | Amended | |
|---|---|---|
| **Methodology #2** | **No Energy Guard** | **Energy Guard** |
| Overcharge:  No Margin | $36,855,552 | $36,034,704 |
| Overcharge:  No Overhead & No Margin | $56,749,508 | $55,928,661 |

| **Differences** |  |  |
|---|---|---|
| Overcharge:  No Margin | ($4,585,928) | ($4,585,928) |
| Overcharge:  No Overhead & No Margin | ($5,024,207) | ($5,024,207) |

| **% Differences** |  |  |
|---|---|---|
| Overcharge:  No Margin | -12.4% | -12.7% |
| Overcharge:  No Overhead & No Margin | -8.9% | -9.0% |

45

**Exhibit 8:  Reproduced Individual Customer Overcharge Analysis from Felder Report**

**Customer-Level Calculation for Account #394440, May 2018**

| | |
|---|---|
| Time Period | April 2 to May 2, 2018 |
| Customer Identification Number | #39440 (Note 1) |
| Utility | National Grid |
| Customer Type | Residential |
| Product Name | Electric Rate Ready Code Variable Rate |
| Excel Spreadsheet Bates Number | AGWAY 529426 |
| Excel Row Number | 1662 |

| | Agway COGS | PTC COGS |
|---|---|---|
| Units Sold (kWh) | 946 | 946 |
| Electric Revenue (Invoice) | $67.96 | $67.96 |
| Average HIP (Hess) Cost (COGS) | $32.96 | $33.11 |
| NYSERDA Fee @$0.005/kWh | $4.73 | n/a |
| Gross Receipt Tax (ConEd only) | $0.00 | $0.00 |
| Direct Energy Fee for National Grid | $2.37 | n/a |
| Overhead @$0.0122/kWh | $11.54 | $11.57 |
| | | |
| Overcharge:  No Margin | $16.34 | $23.28 |
| Overcharge:  Introductory Rate Margin @$0.003184/kWh | $13.33 | |
| Overcharge:  5% Margin | $13.76 | |
| Overcharge:  10% Margin | $11.18 | |
| Overcharge, No Overhead | | $34.85 |

*Note 1.  Corrected the Customer Identification Number used in my original report. Calculation for illustration only; does not include the costs of EnergyGuard.*