# EXHIBIT 4

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF NEW YORK
 3       SUSANNA MIRKIN and BORIS MIRKIN,
 4       Individually and on Behalf of All Others
 5       Similarly Situated,
 6              Plaintiffs,
 7          vs.                      No. 18 Civ. 2949(ARR) (RER)
 8       XOOM ENERGY, LLC and XOOM ENERGY
 9       NEW YORK, LLC,
10              Defendants.
11       -------------------------------x
12
13
14                 VIDEOTAPED DEPOSITION OF
15                      SEABRON ADAMSON
16                 Tuesday, November 8, 2022
17                         10:06 a.m.
18                          Veritext
19                      101 Arch Street
20                Boston, Massachusetts 02110
21
22
23
24              Laurie K. Langer, RPR

                                                      Page 1
```

**Page 62**

1  opinion.
2       MR. WITTELS: But usually if you're making a
3  statement you're taking it from there.
4       MR. MATTHEWS: Well, thank you for that
5  guidance. I'm learning a lot.
6    A. Well, I think it's probably around page....
7    Q. I'll find it for you. How about paragraph 23B
8  and 54.
9    A. 54. Right. Okay. Yes. Okay. Sorry, can you
10 repeat your question.
11   Q. Please, if you would, so we don't have any
12 confusion, if you would read both of those paragraphs.
13 And then I'll --
14      MR. WITTELS: Into the record, --
15   Q. -- proceed.
16      MR. WITTELS: -- or?
17      MR. MATTHEWS: No. No. Just to himself.
18   A. (Witness reviewing.) Okay.
19   Q. Okay. What -- you, generally speaking, opine
20 with reference to those prior period adjustments that
21 you were unable to substantiate whether XOOM considered
22 them in setting its rates; is that a fair statement?
23   A. Yeah. I mean, we looked at the information in
24 the rate setting workbooks, which was very extensive.

**Page 63**

1  There didn't seem to be any determination, calculation,
2  amounts or anything associated with prior period
3  adjustments as expected. I'm -- I was really kind of
4  expecting there to be, if you were making prior period
5  adjustments, to have some calculation of those, which I
6  never saw. So that's kind of just what it's a reference
7  to.
8    Q. Got it. So you're saying because XOOM didn't
9  memorialize it and document or a calculation that shows
10 how it was factored in, you have no evidence that they
11 considered it; is that fair?
12   A. Well, I'm saying I didn't, I didn't see
13 any -- there was no data suggesting that that was ever
14 calculated.
15   Q. Right.
16   A. And it seems to me that would be a calculation.
17   Q. There was testimony that it was considered;
18 right?
19   A. I think there was testimony that it was
20 considered and as I mentioned in paragraph 54, though,
21 there was testimony -- well, there was testimony I
22 believe that said, oh, it was part of this, what we
23 considered in some very broad abstract sense.
24   Q. Yep.

**Page 64**

1    A. And then there was testimony as I note in
2  paragraph 54 about potential kind of makeup losses,
3  which I guess you could consider some kind of prior
4  period adjustment. But in -- with an unrelated market
5  not related to New York. So there's testimony
6  that -- there's general testimony and then there's
7  specific testimony.
8    Q. About consideration of prior period adjustments?
9    A. Yes.
10   Q. Okay. Got it. We're on the same page.
11   A. Okay.
12   Q. The period of time --
13   A. Uh-huh.
14   Q. -- that you looked at for rate setting
15 procedures --
16   A. Uh-huh.
17   Q. -- goes from 2013 to 2021; right?
18   A. Yes. Broadly, yes.
19   Q. Broadly?
20   A. Yeah.
21   Q. Did you do any analysis of what other ESCOs
22 charged in New York during that same time period?
23   A. No.
24   Q. Okay. So you don't know how XOOM's rates

**Page 65**

1  compared to other ESCOs rates?
2    A. For purposes of this we never made a comparison.
3    Q. And you don't know if XOOM's rates were outside
4  of the range of what ESCOs were charging during that
5  time period?
6    A. No, we didn't look at that. It didn't seem very
7  relevant.
8    Q. Okay. What was relevant in the, your damage
9  analysis, was how much gross margin XOOM sought on top
10 of its supply costs; right?
11      MR. WITTELS: Objection.
12   A. Can you repeat that, again.
13   Q. Yep. What you believed was relevant in your
14 damage calculations was how much gross margin XOOM
15 sought on top of its supply costs?
16      MR. WITTELS: Objection.
17   A. I mean, that's a way that -- I think you're
18 putting a characterization of it. I think what really
19 the -- you're characterizing it -- one might
20 characterize it that way, but the, you know, as, as
21 discussed, the, you know, what's important is the
22 relationship between rates and, and supply costs. If
23 you want to characterize that as being a gross margin
24 calculation, I think you could formulate it that way,

**Page 66**

1  which is I think what you're doing. But I think you
2  understand what we did.
3     Q. I am, because I'm focusing in my question, I have
4  built this in on your damage calculation. So I
5  understand your position about bullet 3, let's call it.
6  Which is your opinions about whether or not XOOM's rate
7  setting was consistent or not, with the sale agreement.
8        But I'm talking about with respect to 4, after
9  you concluded --
10    A. Uh-huh.
11    Q. -- the rate was not consistent --
12    A. Right.
13    Q. -- that your damage model --
14    A. Right.
15    Q. -- and what they considered relevant was the
16 amount of gross margin that XOOM put on top of its
17 supply cost?
18    A. Are we discussing the Method 1 model or the
19 Method 2 model?
20    Q. Well, it's both; right?
21    A. Well, it's --
22    Q. Let's start with Method 1.
23    A. Okay. Right.
24    Q. Right. Method 1, what was relevant was the

**Page 67**

1  amount of gross margin that's input on top of its supply
2  costs; right?
3        MR. WITTELS: Objection.
4     A. Of the difference -- if you want to -- you're
5  expressing that as a form -- you're expressing the
6  delta, the difference, right, as a gross margin. That's
7  not exactly how it was calculated.
8        I mean, it was calculated just as there's
9  differences, not any -- you're saying a gross margin on
10 a gross margin calc -- I want to be specific about how
11 you're using the term "gross margin."
12    Q. I didn't think it was tricky. I mean, your
13 report says that you calculated by reference -- by
14 comparing XOOM's margin reports to XOOM's rate setting
15 workbooks; right?
16    A. Right. I was getting to the delta between rates
17 and costs.
18    Q. Okay.
19    A. It's just that it was in the margin setting
20 workbooks.
21    Q. So with respect to Model 1 the relevant
22 consideration was the delta between XOOM's total costs
23 and XOOM's margin?
24       MR. WITTELS: Objection.

**Page 68**

1     A. The -- between total cost and the rate.
2     Q. Okay. Which is the margin?
3        MR. WITTELS: Object.
4     A. The rate is not the margin.
5     Q. No, I know.
6     A. A rate is not a margin.
7     Q. The delta is. The delta is.
8     A. Okay. We can call that a margin, yes.
9     Q. The delta between the total costs --
10    A. Right.
11    Q. -- and the rate is --
12    A. Right.
13    Q. -- the margin; right?
14    A. That -- that -- you can characterize that as a
15 margin.
16    Q. Well, what would you characterize it?
17    A. I would just characterize it as a difference, as
18 a delta.
19    ==Q. Okay. You're not offering an opinion in this==
20 ==case that under the sales agreement XOOM could not==
21 ==charge more than the regulated utilities rate; right?==
22    ==A. No. I mean, the comparison I made was between==
23 ==supply costs and the rate under this contract.==
24    ==Q. Right. And you're not offering a damage model==

**Page 69**

1  ==that compares XOOM's variable rate charges to what==
2  ==customers would have been charged by the utility during==
3  ==the same time period?==
4        MR. WITTELS: Objection.
5     ==A. No. The damage models as we discussed are the==
6  ==two.==
7     ==Q. Right. And you don't intend to offer an opinion==
8  ==about that?==
9     A. No. The only thing we used was a, as a graphical
10 comparison on the relationship between supply costs and
11 the utility rate, as an example. But the two models are
12 the two models.
13    Q. Yep. Okay. Are you offering an opinion about
14 what is a reasonable or appropriate margin for an ESCO
15 to charge?
16    A. Well, to build the second model we needed an
17 estimate of a margin. We really didn't have any
18 information that would allow that to be created, since
19 XOOM had, from what we can tell, had never done it that
20 way. They had never tried to calculate a, or they did
21 not present in any way, I can't say that they never
22 tried. They did not present in the rate setting
23 workbooks and other information calculations of any sort
24 like that. So we used the margin from fixed rate

```
 1  customers as a proxy of a rate that XOOM itself had
 2  used.  I can't go further than that because there's no
 3  information.
 4         MR. MATTHEWS:  Can you read my question
 5  back, please.
 6         (Prior testimony read back.)
 7             "Are you offering an opinion
 8                about what is a reasonable or
 9                appropriate margin for an ESCO
10                to charge?"
11     A.  Yeah.  Conceptually, yes.  Conceptually, yes.
12        Thanks for reading that back.
13     Q.  That's okay.  And what is the opinion that you're
14  offering conceptually about that?
15     A.  Well, I mean, it's obviously related to the
16  contract that we've been discussing, whether it's based
17  on supply costs, that, you know, if the Court were to
18  decide that a margin was allowed, that it can't be an
19  uncapped margin, that's why we made a second calculation
20  using the fixed rate margin as a proxy of what might be
21  an acceptable margin.
22     Q.  Are you offering any opinion about what is an
23  acceptable or appropriate, a reasonable margin aside
24  from just using XOOM's fixed rate margin?
                                                    Page 70
```

```
 1     A.  We haven't offered that opinion, we don't have
 2  any information to do that.
 3     Q.  Do you intend to?
 4     A.  If information were to be provided, but that
 5  would have to come from XOOM.  So I, in the absence of
 6  not expecting anymore information to come, no.
 7     Q.  Well, we've gotten talking past each other again.
 8  I'm talking conceptually.  You've said that it will be
 9  for the Court to decide whether a margin can be charged
10  and if so what's appropriate; right?
11     A.  Right.
12     Q.  And if we go to trial --
13     A.  Uh-huh.
14     Q.  -- and you take the witness stand --
15     A.  Uh-huh.
16     Q.  -- and I'm asking you questions and the judge
17  gets frustrated with my questions and says, "let's cut
18  to the chase.  Mr. Adamson, what do you think is an
19  appropriate margin for an ESCO to charge?"  What would
20  your answer be?
21         MR. WITTELS:  Objection.
22     A.  I would say conceptually it's got to be related
23  to the, related to the costs.  And in a broad conceptual
24  basis.
                                                    Page 71
```

```
 1     Q.  And if he said, "but can you give me a cutoff
 2  point?  Is there a number that you can assign to that?"
 3  Would you be able to give him one?
 4         MR. WITTELS:  Objection.
 5     A.  I wouldn't be able to give him a number on the
 6  stand because I wouldn't have the, XOOM's internal
 7  information, no.
 8     Q.  Okay.  So the margin in your view, --
 9     A.  Uh-huh.
10     Q.  -- the margin that is appropriate for an ESCO to
11  charge conceptually --
12     A.  Uh-huh.
13     Q.  -- is ESCO specific?
14     A.  Well, again, we're talking about relation to a
15  specific contract, so.
16     Q.  I'm not.
17     A.  You're not.
18         MR. WITTELS:  Don't interrupt him.
19     A.  I am talking -- sorry.  I'm talking about this
20  specific contract.  Other ESCOs may have, and I'm sure
21  do, very different contractual forms.  And in fact,
22  ESCOs -- even the same ESCO will have lots, may have
23  different pricing, right, under different arrangements.
24  We're talking about variable rate pricing here as
                                                    Page 72
```

```
 1  opposed to fixed rate pricing.
 2     Q.  Uh-huh.
 3     A.  Fixed rate pricing, I think we can all agree, the
 4  actual outturn margins could be quite different.  A lot
 5  depends on timing in that case; right?  Okay.  So I
 6  don't know that there is a "single ESCO number" I don't
 7  think that's a meaningful concept.
 8     Q.  Okay.  Is there a single ESCO number for variable
 9  rates that in your opinion would be a cap on what is an
10  appropriate or reasonable margin?
11     A.  I don't have a number in mind because I don't
12  know what the, what would be claimed to be the types of,
13  of costs that, to be recovered in that margin.  What I
14  don't -- you know, I don't have a number.  What I am
15  offering is conceptually that the margin has to be based
16  on something from reality to be meaningful in the
17  context of this contract, and, you know, can't be
18  arbitrary.
19     Q.  Okay.
20     A.  But I don't have a number to give you.
21     Q.  Okay.  And would not be able to create one?
22         MR. WITTELS:  Objection.
23     A.  Not -- not on the information available right
24  now.  I think that would need more inputs than are
                                                    Page 73
```

**Page 78**

1  Q. And -- okay. And I appreciate. I probably
2  shouldn't use your defined term "total costs" because
3  the supply costs doesn't include certain fixed costs;
4  right? The supply costs that are set forth in the rate
5  setting workbook.
6  A. I mean, the -- the total costs includes -- I
7  mean, I -- what was reported as the things that sum up
8  the total costs, yes.
9  Q. That sum up to the total of the supply costs;
10 right?
11 A. Yeah. I think in the rate setting workbooks the
12 column is labeled Total Cost, as I remember.
13 Q. Got it. But it doesn't include supply costs, and
14 the total cost that's listed in the rate setting
15 workbook doesn't include things like overhead and taxes
16 and marketing costs. Those sorts of costs; right?
17     MR. WITTELS: Objection.
18 A. Sorry. I think your question may have had
19 multiple parts. The total cost -- the total costs in
20 the rate setting workbooks had a bunch of columns.
21 Q. Uh-huh.
22 A. Right? So is the -- is your question what are
23 those columns?
24 Q. No. I probably asked a poor question.

**Page 79**

1     ESCOs generally have supply costs; correct?
2  A. Yes.
3  Q. And then ESCOs, in the course of doing, running
4  their business have certain additional costs that are
5  not supply costs; right?
6  A. If you want to characterize it that way, yes.
7  Q. Okay. And the Model 1 calculation --
8  A. Uh-huh.
9  Q. -- does not include any costs that are not supply
10 costs; right? The Model 1 calculation only calculates
11 supply costs?
12    MR. WITTELS: That's two questions.
13 Objection.
14 A. The Model 1 calculation uses, uses the supply
15 costs represented by the total cost. As I understand
16 your question you're saying did, for example, was, in
17 the, in XOOM's reported total costs did it have these
18 other elements he raised.
19    And I was trying to refer to to kind of purposes
20 of clarity to say the rate setting workbook total costs
21 that we saw -- well, I mean, they are what they are.
22 That is XOOM's reported numbers. It didn't mention
23 marketing costs. I think you mentioned that as a thing.
24 So supply costs, yes. So we made a comparison with

**Page 80**

1  supply costs based on total costs.
2  Q. The Total Cost column in the rate setting
3  workbook?
4  A. Yes.
5  Q. Okay. And do you understand the Total Cost
6  column in the rate setting workbook to include overhead
7  costs?
8  A. Not as -- not as described. Not -- not as
9  obviously described in the rate setting workbooks that I
10 saw.
11 Q. Okay. Do you understand it to include taxes that
12 XOOM pays?
13 A. Are we talking about corporate taxes or are we
14 talking about taxes on, involving energy purchases or
15 something?
16 Q. Corporate taxes.
17 A. Like, corporate income taxes?
18 Q. Yes.
19 A. Not that I see. Not that I saw.
20 Q. And do you understand it to include rent?
21 A. Like, facilities rent?
22 Q. Yes, sir.
23 A. There -- there was not a column for that, no.
24 Q. Okay. And do you understand it to include other

**Page 81**

1  acquisition costs of acquiring customers?
2  A. If they -- that was not a broken out category.
3  Q. Okay. So in a nutshell under Model 1 you're
4  calculating all of the gross margin that XOOM obtained
5  from those customers?
6     MR. WITTELS: Objection.
7     Can you repeat that question.
8     (Prior testimony read back.)
9        "So in a nutshell under Model 1
10       you're calculating all of the
11       gross margin that XOOM obtained
12       from those customers?"
13 A. I mean, we're calculating the difference between
14 total costs and rates times quantities. I think that's
15 the calculation.
16 Q. Yeah. Okay. But under this model XOOM doesn't
17 get to make any margin; correct?
18 A. Unless it was built into the total cost that they
19 reported.
20 Q. In the rate setting workbook?
21 A. In the rate setting workbooks.
22 Q. Okay. XOOM's a for profit business; right? You
23 understand that?
24 A. Yes.

21 (Pages 78 - 81)

**Page 98**

1  A. Well, in a sense, yes, because the, you
2  know -- well, first off, the fix rate is used as, you
3  know, a way of coming up with a reasonable margin that,
4  based on what XOOM itself set rates on. You know, it's
5  not -- it's based on the information available.
6    So one question then comes to, you know, are, is
7  there some reason that, that XOOM would need to charge a
8  higher rate on fixed rate customers? If so I don't
9  really see what it is.
10    MR. WITTELS: Variable.
11  A. Sorry. On variable rate customers. I am -- we
12  don't have any information to, to delve into that.
13  Q. I'm asking conceptually. And it's okay if you
14  are not offering this opinion. I'm not saying you
15  should or you shouldn't be. I just want to know in this
16  case are you going to offer an opinion that it is not
17  fair for XOOM to seek a higher margin on variable rates
18  conceptually than it does on fixed rates?
19  A. In this context, yes. Because there is no XOOM
20  provided despite all of the information about how those
21  methods were set of how these margins came up. How
22  these -- how the variable rate margins were determined
23  and that's a reasonable proxy, yes.
24  Q. Are you offering that opinion more broadly, that

**Page 99**

1  in all circumstances -- and I'm asking this, to give you
2  some prospective on why I'm asking, because you've done
3  it in two cases now that I know of, set the fixed rate
4  margin as a benchmark.
5  A. Uh-huh.
6  Q. So are you going to offer the opinion that in the
7  ESCO world --
8  A. Uh-huh.
9  Q. -- it is not appropriate for an ESCO to seek a
10  higher margin for variable rates than it does for fixed
11  rates?
12    MR. WITTELS: Objection.
13  A. I mean, to me the rates have to be set for the
14  contract. The -- the use of fixed rates seemed
15  appropriate for coming up with the reasonable proxy
16  given that, you know, the, the risks associated with the
17  variable rates in general would be similar or probably
18  lower. If you say that there are other fixed costs it's
19  hard to see why they are different. We never saw
20  anything in this case saying, demonstrating why there
21  would be a difference between the two. If someone could
22  present, you know, compelling economic evidence that
23  says, "by God, I can prove to you that the costs of
24  variable rate is completely different than fixed rate"

**Page 100**

1  that might be a thing. But we -- we haven't seen that
2  here. It was asked, but we haven't seen it.
3  Q. Who asked?
4  A. Well, the discovery request asked for costs and
5  pricing methodologies and stuff.
6  Q. Paragraph 75. It says -- this is towards the
7  bottom, I suppose it's the last sentence.
8    "It appears that XOOM was able to operate and
9  make a reasonable profit selling fixed rate contracts
10  with substantially lower margins than variable
11  contracts, and yet arbitrarily imposed much higher
12  margins on their variable rate customers?"
13    Do you see that?
14  A. Yes.
15  Q. Where does it appear that XOOM was able to
16  operate and make a reasonable profit selling fixed rate
17  contracts with substantially lower margins?
18  A. Well, the margins you can kind of see in the
19  table, the average margins over years. As I say, it
20  appears that they chose to offer those fixed rate
21  margins over a considerable period of time.
22  Q. Uh-huh.
23  A. So they would have had -- XOOM would have had the
24  opportunity to offer if it was saying, "oh, my God,

**Page 101**

1  we're losing tons of money on all of our variable
2  customers -- I mean, our fixed rate plans that could
3  have been adjusted."
4    But we don't -- as I mentioned before we don't
5  have contract by contract P & Ls, for example.
6  Q. Right. So I think we're saying the same thing.
7  Your table 1 reflects gross margin for fixed rate
8  customers; right?
9  A. Yes.
10  Q. Okay.
11  A. I think so, yes.
12  Q. But you don't know whether --
13    VIDEOGRAPHER: I'm sorry. I didn't hear
14  that. You're hitting the microphone.
15  A. Oh, I'm sorry.
16    VIDEOGRAPHER: Bring it up a little higher.
17  A. How is that? Is that better?
18    VIDEOGRAPHER: Great. Thank you.
19  A. Okay. Thank you. Sorry.
20  ==Q. That's okay. But you don't know if XOOM actually==
21  ==made a net profit on those same customers?==
22  ==A. No, we don't have -- we don't have customer==
23  ==segment level profit and loss data.==
24  Q. Okay. In the -- circling back to the Richards

26 (Pages 98 - 101)

**Page 138**

1  their retail business.
2  Q. Okay. Well, I guess --
3  A. For example, a bunch of the Texas companies have
4  retail supply businesses. We did a little bit on that,
5  but not a major thing. But a bunch of the Texas
6  companies had retail supply businesses that also had
7  substantial other businesses.
8  Q. I think I understand what you're saying. And you
9  didn't work for the retail side of their businesses, you
10 worked for the other side of their businesses?
11 A. Or sometimes we would be hired on some kind of
12 corporate strategy type engagement, which might be
13 pretty broad.
14 Q. Got it. Okay. I thank you for your time and
15 your patience with me.
16     MR. MATTHEWS: I'll pass the witness.
17 A. Thank you.
18 Q. Yes, sir.
19
20         EXAMINATION
21
22 BY MR. WITTELS:
23 Q. Mr. Adamson, I just really have one question for
24 you. You were asked by counsel for XOOM about whether

**Page 139**

1  the company was able to make any profits on its fixed
2  rate customers; do you remember that question?
3  A. Yeah. Not in exact wording, but I remember the
4  question.
5  Q. Yeah. And did you ask me to, whether you could
6  go back and review your report when we had a break?
7  A. Yeah, well -- yes, we were discussing the report.
8  Q. And did you reread paragraph 57?
9  A. Yes.
10 Q. And does that answer the question of whether XOOM
11 made money and was profitable on its fixed rate
12 customers?
13     MR. MATTHEWS: Objection. Leading.
14 A. Well, I just -- it just reminded me there was
15 a -- I had said that there was not a specific P&L, this
16 was a reference in the report to deposition testimony
17 from a XOOM witness about the profitability of this.
18 Q. And what did your report find and state?
19 A. I don't remember exactly how he worded it. I
20 think there had been a, in the deposition there was a
21 question about, it was around, I don't have the
22 transcript in front of me, of course, of the deposition,
23 but it was something around the line of were -- were a
24 fixed rate -- were fixed rate customers profitable for

**Page 140**

1  XOOM or some broad question.
2  Q. And the answer was?
3  A. I believe he said yes, they were, they were both
4  profitable. Both fixed rate and variable rate were
5  profitable.
6  Q. Okay. I have no further questions at this time.
7  Thanks.
8      MR. MATTHEWS: Thanks very much.
9  A. Thank you.
10     VIDEOGRAPHER: The time is 2:39, we are off
11 the record.
12     COURT REPORTER: And, Mr. Matthews, your
13 order?
14     MR. MATTHEWS: My order is an expedited
15 transcript, just, I don't need any print copies.
16 Electronic only. PDF exhibits.
17     COURT REPORTER: Expedite by Friday?
18     MR. MATTHEWS: Yes.
19     (Whereupon, the deposition concluded at
20 approximately 2:39 p.m.)
21
22
23
24

**Page 141**

            CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss.

I, Laurie Langer, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 11th day of November, 2022.

NOTARY PUBLIC
Commission Expires
7/27/2023

36 (Pages 138 - 141)