# EXHIBIT 5

```
                                        Volume I
                                        Pages 1 to 102
                                        Exhibits None
             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK

    - - - - - - - - - - - - - - - - -x
                                       :
    SUSANNA MIRKIN and BORIS           :
    MIRKIN, Individually and on        :
    Behalf of All Others               :
    Similarly Situated,                :   Civil Action
              Plaintiffs,              :   No. 18 Civ. 2949
                                       :   (ARR)(RER)
         vs.                           :
                                       :
    XOOM ENERGY, LLC; and XOOM         :
    ENERGY NEW YORK, LLC,              :
              Defendants.              :
    - - - - - - - - - - - - - - - - -x
             VIDEOTAPED DEPOSITION OF DERYA ERYILMAZ,
    Ph.D., a witness called by the Defendant, taken
    pursuant to the Federal Rules of Civil Procedure,
    before Alexander K. Loos, Registered Diplomate
    Reporter and Notary Public in and for the
    Commonwealth of Massachusetts, at the Offices of
    Veritext Legal Solutions, 101 Arch Street, Suite
    650, Boston, Massachusetts, on Tuesday, November 15,
    2022, commencing at 10:25 a.m.
    PRESENT:
        Wittels McInturff Palikovic
            (By Steven L. Wittels, Esq.; Steven D.
            Cohen, Esq. (Via videoconference); and
            Ethan D. Roman, Esq. (Via videoconference))
            E-mail:  Slw@wittelslaw.com
                     Sdc@wittelslaw.com
                     Edr@wittelslaw.com
            18 Half Mile Road
            Armonk, NY 10504
            914.775.8862
            for the Plaintiffs.
```

Page 1

**Page 38**

BY MR. MATTHEWS:
Q. So what does a "big discrepancy" mean to you in that context?
    MR. WITTELS: Objection to form.
    THE WITNESS: If the XOOM's rates -- charged rate is not very -- is not equal or very close to actual and estimated supply costs, then -- then there's a discrepancy.
BY MR. MATTHEWS:
Q. I understand.
    But I'm -- I'm trying to -- to get you to tell me --
A. Uh-huh.
Q. -- what "very close to" means.
    Does it mean 20 percent higher?
    MR. WITTELS: Objection. I think she's told you.
    THE WITNESS: So I guess -- let me step back and explain.
    So if it says "based on XOOM's actual and estimated supply costs," then, you know, they convert this into a rate, right? So XOOM's costs should be not -- XOOM's rates should be very, very close to -- when you're converting this into a rate,

**Page 39**

that should be very close to the actual and estimated supply costs that presented in their data sets.
BY MR. MATTHEWS:
Q. Okay. If the rate was ten percent higher, in your opinion, would that still be very close to actual and estimated supply costs?
A. No. Then that would be still there's -- that is -- that is still not the actual and estimated supply cost. It's above that.
Q. I understand. I'm not good at math, but I know that.
    But I'm asking -- you said it had to be "very close to." And you distinguish that from being exactly equal to, right?
A. Uh-huh.
Q. Do you agree with that?
    MR. WITTELS: Objection. Objection to form.
    THE WITNESS: So -- okay. Let me explain it this way:
    So rate is, like, dollar per megawatt hour, right? So when we are charged by utilities or energy companies, we are charged dollar per megawatt

**Page 40**

hour. And the cost is basically a more gross term.
    So you take that cost, divide it by the amount of usage, and you get a dollar per unit basis. So that is actually -- the cost is driving the rate.
    So that means it shouldn't be far away from what the cost is presented. All you do is you take that cost and convert it into a per-unit basis. So therefore what you have is an actual and estimated cost is your main driver of what you obtain as a rate. So you transform into a rate, per-unit basis.
    So that's why I am defining, when you say "based on," it should be very close to the actual and estimated supply costs, because that's driven by -- that's one of the key inputs to drive the rate.
Q. Does "very close to" mean "equal to"?
    MR. WITTELS: Objection, asked and answered.
BY MR. MATTHEWS:
Q. On a per-dollar per-unit basis?
    MR. WITTELS: Objection.
    THE WITNESS: As I mentioned, even if it's not the actual equal, but it should be super close

**Page 41**

to, very close to what the actual and estimated supply cost is.
BY MR. MATTHEWS:
Q. Is that two percent more? Is it five percent more?
    What does "very close to" mean to you? You are a mathematician and a data analytics --
A. Sure.
Q. -- specialist.
    So I would like to know, in your view, mathematically, how much more could the rate be than actual and estimated supply costs on a dollar-per-unit basis and still fall within your definition of "very close to."
    MR. WITTELS: Objection. Objection to form.
    THE WITNESS: I guess -- so as I mentioned that when you are transforming the rate from cost, you are taking a lump sum and converted into a rate. So then there's no, like, specific percentage I can tell you that it should be X percent higher. It should be based on whatever the cost is and you convert that into a rate per-unit basis.
    So that means you're taking the actual and

**Page 42**

1  estimated supply costs in order to derive your rate.
2  So that means there's no specific, you know, magic
3  percentage that I can tell you that, even if it's
4  within that percentage, I can't tell you that.  But
5  that -- to me, when it's based on you take a value
6  and convert that into a per-unit basis, then you
7  take that actual and estimated supply cost as it is,
8  and then you convert that into a rate.
9        BY MR. MATTHEWS:
10       Q.  Uh-huh.
11       A.  So that's how you would do it.  And that's
12  why it should be very close to, I guess.
13       Q.  And that's the calculation you did under
14  model one, right?
15       A.  That's -- that's correct.
16       Q.  And you are going to tell the ladies and
17  gentlemen of the jury that if the rate charged was
18  anything above the supply costs under that
19  calculation, that XOOM should have to give that
20  money back, right?
21       A.  Yes.
22       Q.  Okay.  Which would mean that, in your view,
23  "based on actual and estimated supply costs" under
24  model one means equal to supply costs --

**Page 43**

1          MR. WITTELS:  Objection.
2          BY MR. MATTHEWS:
3       Q.  -- right?
4          MR. WITTELS:  Objection.
5          THE WITNESS:  It's -- I guess exact equal
6  to definition is -- doesn't fit here because, as I
7  mentioned, rate is a transformation of cost.
8          So what -- essentially I'm taking this
9  actual and estimated supply costs and converting
10 into a rate.  That's why it cannot be 1:1 equal, but
11 it has to be very close to what is presented in the
12 actual cost.
13         BY MR. MATTHEWS:
14      Q.  It's effectively 1:1 equal, right?  That's
15 what model one seeks to do --
16         MR. WITTELS:  Objection.
17         BY MR. MATTHEWS:
18      Q.  -- right?
19         MR. WITTELS:  Please don't interrupt her.
20 Objection.
21         THE WITNESS:  Model one takes the
22 discrepancy that we found in the rate versus the
23 XOOM's actual and estimated supply costs.  That's
24 correct.

**Page 44**

1        BY MR. MATTHEWS:
2        Q.  Okay.  Thanks.
3            And in your opinion, "based on actual and
4  estimated supply costs" also means that XOOM cannot
5  consider anything other than actual and estimated
6  supply costs when setting its rates, correct?
7        A.  Again, I would look at the contract.  It
8  says:
9            "... based on actual and estimated
10       supply costs, which may include, but not
11       limited to prior period adjustments" --
12       THE REPORTER:  "Which may include, but
13       not..."
14       MR. WITTELS:  Slow down so he can take --
15 the reporter has to take it.
16       THE WITNESS:  Oh, I'm sorry.
17       Which -- I guess:
18           "... which may include, but not be
19       limited to prior period adjustments,
20       inventory and balancing costs."
21       So to your question, it may include these,
22 but -- may include these, but other than that, yes,
23 it should be based on actual and estimated supply
24 costs.

**Page 45**

1       BY MR. MATTHEWS:
2       Q.  And nothing else?
3       A.  Uh-uh.  No.
4       Q.  Correct?
5       A.  Correct.
6       Q.  Okay.  Let me hand you what has previously
7  been marked as Exhibit 5 to -- which is a copy of
8  the --
9       A.  Complaint.
10      Q.  -- first amended class action complaint.
11 And I also hand you what was previously marked as
12 Exhibit 6, which is an exhibit to that class action
13 complaint --
14      A.  Right.
15      Q.  -- called "market supply cost build up."
16         Have you seen these documents before?
17      A.  Yes.
18      Q.  Did you prepare the market supply cost
19 build up that is Exhibit 6?
20      A.  This one?  No.  I was not part of this case
21 at the time.
22      Q.  Okay.  There we go.
23         And you would disagree with -- let me --
24 let me find the paragraph.

**Page 66**

```
 1       THE REPORTER:  It was what?
 2       THE WITNESS:  It was Loehde.  I don't
 3  remember the witness' last name.  Sorry.
 4       BY MR. MATTHEWS:
 5    Q.  But you have some recollection -- I'm not
 6  asking you to identify the witness, but you have
 7  some recollection of XOOM witnesses testifying to
 8  the fact that XOOM has fixed costs that are not
 9  included in the supply costs reported in the
10  rate-setting workbooks, right?
11    A.  I remember, like, a witness defining a
12  fixed cost; but I don't really remember, like,
13  whether it was included in the supply costs or not
14  at this moment.  I mean, if it's in front of me, I
15  can take a look at it, but I don't remember the
16  specific wording.
17    Q.  When you prepared the calculation for model
18  one, did you take into account XOOM's fixed costs?
19    A.  No.  I actually just took the supply cost
20  related information and calculated the actual and
21  estimated supply costs as produced by XOOM.
22    Q.  So if XOOM did not include fixed costs in
23  the supply costs reported in the rate-setting
24  workbook --
```

**Page 67**

```
 1    A.  Uh-huh.
 2    Q.  -- then those fixed costs would be included
 3  in what you have characterized as an "overcharge"
 4  under model one, right?
 5       MR. WITTELS:  Objection.
 6       THE WITNESS:  As I mentioned, those fixed
 7  costs are not considered as part of supply costs;
 8  therefore, they are not included in the model.
 9       BY MR. MATTHEWS:
10    Q.  They're not --
11    A.  Included my calculation.  I only considered
12  supply -- the components of the supply cost.
13    Q.  They would not be included in the supply
14  cost portion of your calculation, correct?
15       MR. WITTELS:  Objection.
16       THE WITNESS:  Again, I only considered the
17  supply cost components.  Because, you know, we are
18  interested in looking at the supply costs and what
19  the rate has been charged by XOOM.
20       BY MR. MATTHEWS:
21    Q.  Yeah.
22    A.  So anything beyond supply cost is not
23  included in the supply cost column.
24    Q.  Okay.  How is that different from what I
```

**Page 68**

```
 1  said?
 2       MR. WITTELS:  Objection.
 3       THE WITNESS:  I guess I thought you were
 4  saying that supply costs are -- you know, may -- you
 5  know, I don't know.
 6       I guess the way I understand it from what
 7  you've described is have I considered supply cost
 8  plus the other costs?  But I did not.  I just took
 9  the components of the supply cost, and I added them
10  up -- I mean they were all, like, in a total supply
11  column -- and calculated the excess -- excess
12  charges.
13    Q.  Understood.
14       So if fixed costs -- if XOOM has fixed
15  costs in addition to the reported supply costs --
16    A.  Uh-huh.
17    Q.  -- then the only place that those fixed
18  costs appear in your calculation under model one
19  would be in the overcharge itself?
20       MR. WITTELS:  Objection.
21       BY MR. MATTHEWS:
22    Q.  Correct?
23       MR. WITTELS:  Objection.
24       THE WITNESS:  I mean, I cannot tell from
```

**Page 69**

```
 1  just looking at the data what that excess charge is
 2  included.  They do not define -- XOOM did not define
 3  where that excess charge came from.
 4       There was no calculation providing that,
 5  that included the fixed cost.  They -- there was no
 6  calculation that showed that rate included fixed
 7  costs as I reviewed the data.  The data came in as
 8  rate versus the total cost of the components of the
 9  supply cost, or the total cost, and then the
10  difference.  I cannot tell what is included in the
11  discrepancy.  It was not described in the data.
12       BY MR. MATTHEWS:
13    Q.  Okay.  Model two.
14    A.  Uh-huh.
15    Q.  Model two, as we covered earlier, is
16  essentially the same as model one, except that it
17  allows XOOM to recover the same gross margin on
18  variable-rate customers that XOOM's documents
19  reported it recovered for fixed-rate customers,
20  right?
21    A.  Right.
22       Again, we -- exactly.  The method one plus,
23  if there was a margin -- you know, there's -- it
24  doesn't say in the contract that there should be a
```

18 (Pages 66 - 69)

**Page 70**

1  margin.
2      But if -- suppose there is a margin. We
3  basically provided that as an example to show, you
4  know, what would be the charge look like.
5      And looking at the margin reports, at least
6  the margin that should be charged should be equal to
7  the fixed-rate customers, which, you know, XOOM has
8  made -- you know, has charged its fixed-rate
9  customers, too, a margin. So there was that rate
10 taken to calculate the overcharges.
11     Q. And the purpose of -- of illustrating that
12 second model was in case the court or the jury
13 decides that some recovery of margin is
14 appropriate --
15     A. Yes.
16     Q. -- right?
17        But you don't believe that that reading of
18 the contract is appropriate, right?
19     A. No. By the read of the contract, it didn't
20 specify margin, this contract, so -- and that's why
21 I don't believe, yes.
22     Q. So, in your view, if a contract doesn't
23 specify that the company will recover margin, then
24 the company is not allowed to recover margin?

**Page 71**

1        MR. WITTELS: Objection.
2        THE WITNESS: I mean, this is -- I mean,
3  I'm not a contract expert, but its contract -- it
4  says -- it should be charging what it says in the
5  contract. As -- I mean, you know, if -- what
6  happens, for example, if a customer doesn't, you
7  know, oblige with their contract? There's
8  implications for that, too. So if it doesn't say in
9  the contract, yes, that shouldn't be charged.
10    BY MR. MATTHEWS:
11    Q. If it doesn't specify a margin, it
12 shouldn't be charged?
13       MR. WITTELS: Objection.
14       THE WITNESS: Yes.
15    BY MR. MATTHEWS:
16    Q. And that's -- to be clear, that's your view
17 more broadly? I'm not just asking about this
18 specific XOOM contract --
19    A. Uh-huh.
20    Q. -- correct?
21       MR. WITTELS: Objection.
22       THE WITNESS: I guess -- what's the
23 question?
24

**Page 72**

1    BY MR. MATTHEWS:
2    Q. If -- if an ESCO does not specify in a
3  variable-rate contract that the rate will include
4  margin, then, in your view, that ESCO cannot seek to
5  recover margin --
6        MR. WITTELS: Objection.
7    BY MR. MATTHEWS:
8    Q. -- on its variable rate?
9        MR. WITTELS: She didn't say that.
10 Objection.
11       THE WITNESS: Is that a hypothetical
12 example that -- are we just talking about X ESCO
13 here, or --
14    BY MR. MATTHEWS:
15    Q. Yes.
16    A. Is that a hypothetical example?
17    Q. Yes.
18    A. If -- again, I mean, I am looking at this
19 contract. If another X ESCO was giving me a
20 contract that doesn't list the margin, yes, then I
21 would be looking at the specifics that they have put
22 in the contract to determine their rates.
23    Q. Understood. Thank you.
24       In connection with this case, you have not

**Page 73**

1  done any analysis of how XOOM's variable rates
2  compared to the utilities' rates, correct?
3     A. We -- I think Figure 1 in our report does
4  present a -- like an illustration or -- like
5  presents the data that shows the total cost versus
6  the utility rate.
7     Q. Shows how the two moved over the same
8  period of time?
9     A. Exactly.
10    Q. Okay. But you're not offering an opinion
11 in this case that under the sales agreement, that
12 XOOM was not permitted to charge more than the
13 utility, right?
14       MR. WITTELS: Objection.
15       THE WITNESS: No. I mean, XOOM -- I mean
16 our basis was the actual and estimated supply cost,
17 whatever it should be charging.
18    BY MR. MATTHEWS:
19    Q. And the utility's rate is irrelevant to
20 that consideration, right?
21       MR. WITTELS: Objection.
22       THE WITNESS: It is irrelevant for this
23 contract. But we showed -- you know, our figure
24 presents, you know, whether the total cost and

19 (Pages 70 - 73)

**Page 74**

```
 1  utility rates, how they compare.  We presented that
 2  in our report.
 3       BY MR. MATTHEWS:
 4       Q.  Yes.  But the XOOM -- that's XOOM's
 5  reported supply costs compared to the utility's
 6  rate, right?
 7       A.  Utility, yeah.
 8       Q.  But you don't believe that a comparison of
 9  XOOM's rate to the utility's rate is relevant here?
10          MR. WITTELS:  Objection.
11       BY MR. MATTHEWS:
12       Q.  Right?
13       A.  No.  I guess we -- we -- we used that
14  Figure 1 to show what the utility in that territory
15  charged and what that compares to the total cost
16  of -- of the -- of XOOM.
17       Q.  But you're not offering any sort of damage
18  model that seeks to compare XOOM's rate to the
19  utility's rate, right?
20          MR. WITTELS:  Objection.
21          THE WITNESS:  We provided a cross-check
22  analysis on, you know, what would the overcharges
23  look like if XOOM has charged utility rates instead
24  of, you know, its total cost.  So that's the
```

**Page 75**

```
 1  cross-check analysis that we did in our report that
 2  yielded a little bit lower damages, I think 49
 3  million, about that.
 4       BY MR. MATTHEWS:
 5       Q.  Uh-huh.
 6          49 million under that model instead of 55
 7  and a half --
 8       A.  Yeah.
 9       Q.  -- right?
10       A.  So that was a cross-check analysis.  That
11  was not, you know, separate models.
12          We presented two methods only.  Uh-huh.
13       Q.  Right.  Meaning that if customers had
14  stayed with the utility -- I'm sorry.
15          Meaning that if -- XOOM variable-rate
16  customers would do better than they would have had
17  they just stayed with the utility, right?
18          MR. WITTELS:  Objection.
19          THE WITNESS:  I don't understand when you
20  say "better off."
21       BY MR. MATTHEWS:
22       Q.  If -- if XOOM's variable-rate customers
23  were awarded the damages that you have put forth
24  under model one, they would be better off than if
```

**Page 76**

```
 1  they had just stayed with the utility, right?
 2          MR. WITTELS:  Objection.
 3          THE WITNESS:  I guess that doesn't -- I
 4  mean, it's not to show that whether they better off,
 5  but it shows -- if the utility rate was charged to
 6  these customers --
 7       BY MR. MATTHEWS:
 8       Q.  Uh-huh.
 9       A.  -- against the rate that was -- that XOOM
10  was charging, that would be slightly lower because,
11  you know, the utility's rates were slightly higher
12  than the total cost that's presented in the XOOM's
13  rate-setting workbooks.
14       Q.  Right.  I understand the purpose for which
15  it was shown in the report.
16       A.  Uh-huh.
17       Q.  I'm asking factually, if the court awarded
18  the damages that you have advocated for under model
19  one, is it true that XOOM's variable-rate customers
20  would recoup more money than they would under the
21  damage model that you've illustrated using the
22  utility rate?
23          MR. WITTELS:  Objection.
24          THE WITNESS:  When you say "recoup more
```

**Page 77**

```
 1  money," is that like -- clearly, the calculation
 2  shows that utilities -- that the value that goes
 3  down to 49 million because utility's rate -- rates
 4  were slightly higher than the total cost.  So the
 5  damages would be slightly lower than the method one.
 6          And when you say recouped, the customers
 7  recoup, I don't know what you mean by that.
 8       Q.  Recoup, as in recover damages.
 9       A.  Yeah.  I mean --
10       Q.  Do you understand that?
11       A.  What is the question?  I guess I'm not
12  following the question.
13       Q.  I think we've got it.
14          Did you do any analysis of what other ESCOs
15  charged over the same time period?
16       A.  No.
17       Q.  And you don't know how XOOM's rates
18  compared to other ESCOs' rates during that time?
19       A.  No.  That's private information, so I
20  wouldn't be able to.
21       Q.  What's private information?
22       A.  I mean the other ESCOs' data was not
23  available to us, so I was not able to compare it to
24  the other.
```

20 (Pages 74 - 77)

**Page 94**

1  at that spot, but they would consider what has
2  happened since ESCOs were allowed, and, like,
3  probably realize that this is the -- this is a
4  potential problem.  So they've come up with this
5  order.
6      So that's not a decision based on 2019.
7  It's obviously looking back at the relevant cases,
8  and the problems that had happened in the past.
9  BY MR. MATTHEWS:
10  Q.  But the guaranteed savings requirement that
11  you referred to does not apply retroactively,
12  correct?
13      MR. WITTELS:  Objection.
14      THE WITNESS:  I would -- I mean, I would
15  assume so.
16      I mean, they -- what I'm saying is that
17  they would look at whatever has happened in the
18  past, before 2019, given that time period, and then
19  that would lead to a decision in 2019 based on their
20  review of what -- what has happened since ESCOs were
21  allowed I guess within that time period.
22  BY MR. MATTHEWS:
23  Q.  No question.  I agree.
24  A.  Uh-huh.

**Page 95**

1  Q.  My question is:  Do you know whether or not
2  the guaranteed savings requirement that you refer to
3  applied retroactively to rates that ESCOs charged
4  prior to 2019?
5      MR. WITTELS:  Objection.
6      THE WITNESS:  I mean, it -- it would not
7  apply, I guess, to before 2019.
8      But that's, in 2019, they've decided that
9  there has been overcharges based on the ESCOs
10  charging rates by looking at the ESCOs' rates
11  previously, prior to 2019.  That's what led to this
12  decision.
13  BY MR. MATTHEWS:
14  Q.  And when you say "overcharges" there, do
15  you just mean charges that are higher than what the
16  PSC would like to see?
17  A.  Based on the contracts that these ESCOs
18  have defined with their customers, correct.
19  Q.  Is it --
20      Go ahead.  I'm sorry if I cut you off.
21  A.  That would be my answer.
22  Q.  Is it your understanding that the PSC
23  reviewed contract terms and engaged in a contract
24  analysis in reaching this order?

**Page 96**

1  A.  No.  They would review their -- I guess the
2  regulatory body would review cases like this, right,
3  today what we are discussing, and see what the
4  potential issue with the charges, and make that
5  determination.  They wouldn't go ahead and look at
6  the contracts individually, but they would look at
7  the similar cases that has happened in the prior
8  2019 period and come up with this decision.
9  Q.  Uh-huh.
10      You don't have any belief that the PSC
11  looked at this case specifically when with entering
12  that order, right?
13      MR. WITTELS:  Objection.
14      THE WITNESS:  It didn't list XOOM, but --
15  but ESCO -- XOOM is an ESCO.  So any ESCO defined
16  who is not providing gains to the customers, or
17  then -- then that category, ESCO -- XOOM is an ESCO.
18  That's considered in this bucket, I guess.
19  BY MR. MATTHEWS:
20  Q.  For sure.
21      You're not aware of any testimony in that
22  New York PSC proceeding that related to XOOM
23  specifically, right?
24      MR. WITTELS:  Objection.

**Page 97**

1      You don't -- do you know?
2      THE WITNESS:  No.
3  BY MR. MATTHEWS:
4  Q.  So you're not aware of any testimony in
5  that New York proceeding, the PSC proceeding, that
6  related to XOOM specifically, right?
7      MR. WITTELS:  Objection.
8      THE WITNESS:  No.
9  BY MR. MATTHEWS:
10  Q.  And you're not aware of any instance in
11  which the New York PSC specifically considered this
12  lawsuit in reaching the decision with the reset
13  order, correct?
14      MR. WITTELS:  Objection.
15      THE WITNESS:  I -- I don't know.
16      I mean, I don't have knowledge of what
17  cases that they have considered.  But when you
18  define ESCO, XOOM may be very much in that list.  I
19  am not sure what they have reviewed to get to that
20  order.
21      MR. MATTHEWS:  Got it.
22      Okay.  Thank you very much.
23      Pass the witness.
24

```
 1  COMMONWEALTH OF MASSACHUSETTS)
 2  SUFFOLK, SS.              )
 3     I, Alexander K. Loos, RDR and Notary Public in
 4  and for the Commonwealth of Massachusetts, do hereby
 5  certify that there came before me on the 15th day of
 6  November, 2022, at 10:25 a.m., the person
 7  hereinbefore named, who was by me duly sworn to
 8  testify to the truth and nothing but the truth of
 9  her knowledge touching and concerning the matters in
10  controversy in this cause; that she was thereupon
11  examined upon her oath, and her examination reduced
12  to typewriting under my direction; and that the
13  deposition is a true record of the testimony given
14  by the witness.  I further certify that I am neither
15  attorney or counsel for, nor related to or employed
16  by, any attorney or counsel employed by the parties
17  hereto or financially interested in the action.
18                    ve hereunto set my hand
19                    l this 27th day of
20
21
22
23  Notary Public
24  Commission expires 5/5/28
```

Page 102

```
 1  Steven Wittles
 2  Slw@wittelslaw.com
 3                  November 28, 2022
 4  RE: Mirkin vs. XOOM Energy
 5  DEPOSITION OF: Derya Eryilmaz 5544030
 6     The above-referenced witness transcript is
 7  available for read and sign.
 8     Within the applicable timeframe, 30 days,  the witness
 9  should read the testimony to verify its accuracy. If
10  there are any changes, the witness should note those
11  on the attached Errata Sheet.
12     The witness should sign and notarize the
13  attached Errata pages and return to Veritext at
14  errata-tx@veritext.com.
15     According to applicable rules or agreements, if
16  the witness fails to do so within the time allotted,
17  a certified copy of the transcript may be used as if
18  signed.
19             Yours,
20             Veritext Legal Solutions
21
22
23
24
25
```

Page 103