**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SUSANNA MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                Plaintiffs,

v.

XOOM ENERGY, LLC and XOOM ENERGY
NEW YORK, LLC,

                Defendants.

No. 18 Civ. 2949 (ARR) (RER)

## MEMORANDUM OF LAW IN SUPPORT OF
## XOOM's MOTIONS *IN LIMINE*

## TABLE OF CONTENTS

1.  MIL No. 1: The Court should prohibit Plaintiff from offering evidence or argument that XOOM breached any implied contract term, including the implied covenant of good faith and fair dealing. ......................................................................................................... ........1

2.  MIL No. 2: The Court should prohibit Plaintiff from offering evidence or argument that an implied or unwritten rate cap exists in Plaintiff's or the Class's contracts. ........................6

3.  MIL No. 3: The Court should prohibit Plaintiff from offering evidence or argument that XOOM's variable rates or variable-rate margins were unreasonable ........................................8

4.  MIL No. 4: The Court should prohibit Plaintiff from offering evidence or argument of XOOM's fixed rates or fixed-rate margins. .............................................................................10

5.  MIL No. 5: The Court should prohibit Plaintiff from offering evidence or argument of any proposed "exemplar margin." ...............................................................................................13

6.  MIL No. 6: The Court should prohibit Plaintiff from offering evidence or argument suggesting that a particular variable rate or variable-rate margin was profitable for XOOM, or that an alternative rate or margin would have been profitable. ............................17

7.  MIL No. 7: The Court should prohibit Plaintiff from offering evidence or argument relating to the rates and margins of other ESCOs, including: rates charged by other ESCOs; costs incurred by other ESCOs; margins achieved by other ESCOs; and how XOOM's rates, costs, or margins compared to those of other ESCOs. ..................................18

8.  MIL No. 8: The Court should prohibit Plaintiff from offering evidence regarding regulated utility rates, including: rates charged by regulated utilities; costs incurred by regulated utilities; margins achieved by regulated utilities; and how XOOM's rates, costs, or margins compared to those of regulated utilities. ............................................21

9.  MIL No. 9: The Court should prohibit Plaintiff from offering evidence regarding contracts that do not include the same pricing term as Plaintiff's contract. ...........................25

10. MIL No. 10: The Court should prohibit Plaintiff from offering expert evidence regarding the meaning of contract terms. ................................................................................28

11. MIL No. 11: The Court should prohibit Plaintiff from offering evidence or argument regarding or referring to NRG Energy Inc. or any other non-party affiliated with XOOM. ....................................................................................................................................29

12. MIL No. 12: The Court should prohibit Plaintiff from offering evidence or argument related to the PSC's 2019 Reset Order, or any other proceedings or filings before regulatory and legislative bodies. ...........................................................................................30

I.   Not one of the regulatory or legislative documents is relevant......................................32

    A. The majority of the documents post-date Plaintiff's time as a XOOM

       customer and the start of the class period........................................................ ....32

    B. The regulatory and legislative history documents are irrelevant.............................33

II.  The regulatory and legislative documents are highly prejudicial. ... ............................36

III. The regulatory and legislative documents are inadmissible hearsay. ...........................37

IV.  The regulatory and legislative documents cannot serve as expert evidence.................39

13. MIL No. 13: The Court should prohibit Plaintiff from seeking or referring to punitive damages and from referencing a "deceptive advertising" theory. ...........................................41

14. MIL No. 14: The Court should prohibit Plaintiff from introducing deposition testimony from available witnesses as part of her case in chief. ..............................................45

15. MIL No. 15: XOOM should be permitted to redact from any party or joint trial exhibit its trade-secret information that the Court excludes. ...................................................47

Conclusion .....................................................................................................................................48

4876-5320-7743, v. 6

T<small>ABLE</small> O<small>F</small> A<small>UTHORITIES</small>

**Page(s)**

**Cases**

*In re Actos End-Payor Antitrust Litig.*,
  No. 13-CV-9244 (RA), 2018 WL 840099 (S.D.N.Y. Feb. 12, 2018) ......................................4

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.*,
  748 F.3d 110 (2d Cir. 2014)........................................................................................................4

*Ariza v. City of New York*,
  139 F.3d 132 (2d Cir. 1998)......................................................................................................37

*Banks v. Yokemick*,
  144 F. Supp. 2d 272 (S.D.N.Y. 2001)........................................................................................45

*Booker v. Washington Mut. Bank, F.A.*,
  2007 WL 475330 (M.D.N.C. Feb. 9, 2007)...............................................................................42

*Britt-Wagner v. D&B Enterprises of Florence, LLC*,
  2022 WL 2651847 (E.D.N.C. July 8, 2022) .............................................................................42

*California v. Southland Royalty Co.*,
  436 U.S. 519 (1978)...................................................................................................................25

*City of New York v. Pullman Inc.*,
  662 F.2d 910 (2d Cir. 1981)................................................................................................38, 39

*Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*,
  20 F.4th 303 (7th Cir. 2021) .....................................................................................................26

*Cross Sound Cable Co. v. Long Island Lighting Co.*,
  No. 21-2771 (KAM) (ARL), 2022 WL 16789978 (E.D.N.Y. Sept. 13, 2022)........................26

*Day v. Moscow*,
  955 F.2d 807 (2d Cir. 1992)........................................................................................................4

*Deltacom, Inc. v. Budget Telecom, Inc.*,
  2011 WL 2036676 (E.D.N.C. May 22, 2011) ..........................................................................42

*Desrosiers v. Flight Int'l of Fla. Inc.*,
  156 F.3d 952 (9th Cir. 1998) ....................................................................................................39

*Dusenbery v. United States*,
  534 U.S. 161 (2002)...................................................................................................................26

*In re Elec. Arts, Inc.*,
   298 F. App'x 568 (9th Cir. 2008) ........................................................47

*Everlight Elecs. Co. v. Nichia Corp.*,
   No. 12-CV-11758, 2016 WL 278812 (E.D. Mich. Jan. 22, 2016) ..........................47

*Great Am. Emu Co. v. E.J. McKernan Co.*,
   509 F. Supp. 3d 528 (E.D.N.C. 2020).....................................................42

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
   No. 205-CV-302, 2007 WL 1074933 (D. Vt. Apr. 6, 2007) ...................................47

*Intellivision v. Microsoft Corp.*,
   484 F. App'x 616 (2d Cir. 2012) ..........................................................4

*Kapirulja v. United States*,
   No. 05 CR 1246 RO, 2010 WL 7634133 (S.D.N.Y. Sept. 14, 2010)....................39

*Kapirulja v. United States*,
   2011 WL 4526270 (S.D.N.Y. Sept. 29, 2011)..........................................39

*Kolb v. Suffolk Cnty.*,
   109 F.R.D. 125 (E.D.N.Y. 1985).........................................................45

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   957 F.3d 184 (3d Cir. 2020)..............................................................16

*Mamani v. Sanchez Bustamante*,
   968 F.3d 1216 (11th Cir. 2020) .........................................................38

*Martinez v. Agway Energy Servs.*,
   88 F.4th 401 (2d Cir. 2023) ....................................................... *passim*

*Mirkin v. XOOM Energy, LLC*,
   931 F.3d 173 (2d Cir. 2019).............................................................2

*Mountaineer Motors of Lenoir, LLC v. Carvana, LLC*,
   2023 WL 6931787 (W.D.N.C. Oct. 19, 2023).........................................43

*Naphcare, Inc. v. Guilford Cnty.*,
   2008 WL 4371770 (M.D.N.C. Sept. 18, 2008).........................................6

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)..................................................................4, 31

*Nixon v. Warner Commc'ns, Inc.*,
   435 U.S. 589 (1978)....................................................................47

v

*Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*,
  671 F.3d 261 (2d Cir. 2012)....................................................................................4

*Pastor v. State Farm Mut. Auto. Ins. Co.*,
  487 F.3d 1042 (7th Cir. 2007) ...........................................................................26, 27

*Pearce v. E.F. Hutton Grp., Inc.*,
  653 F. Supp. 810 (D.D.C. 1987) ............................................................................38

*Peaseley v. Virginia Iron, Coal & Coke Co.*,
  194 S.E.2d 133 (N.C. 1973).....................................................................................13

*Peat, Inc. v. Vanguard Rsch., Inc.*,
  378 F.3d 1154 (11th Cir. 2004) ...............................................................................16

*Popper v. Hartford Fin. Servs. Grp.*,
  682 F. Supp. 3d 469 (E.D.N.C. 2023),
  *aff'd*, No. 23-1450, 2024 WL 773581 (4th Cir. Feb. 26, 2024)............................43

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019) ................................................................................14

*Recycling Equip., Inc. v. E Recycling Sys.*,
  2014 WL 6977766 (W.D.N.C. Dec. 9, 2014) .......................................................6, 13

*Reynolds v. Univ. of Pennsylvania*,
  483 F. App'x 726 (3d Cir. 2012) ............................................................................26

*Richards v. Direct Energy Servs.*,
  915 F.3d 88 (2d Cir. 2019)................................................................................ *passim*

*Robbins v. Whelan*,
  653 F.2d 47 (1st Cir. 1981).....................................................................................38

*SciGrip v. Osae*,
  838 S.E.2d 334 (N.C. 2020)....................................................................................41

*Sevugan v. Direct Energy Servs.*,
  931 F.3d 610 (7th Cir. 2019) ...........................................................23, 24, 33, 36

*Shelton v. Duke Univ. Health Sys.*,
  633 S.E.2d 113 (N.C. Ct. App. 2006) ......................................................................6

*Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.*,
  15 F.3d 327 (4th Cir. 1994) ...............................................................................41, 42

*TJF Servs. v. Transp. Media, Inc.*,
  2020 WL 1870768 (E.D.N.C. Feb. 13, 2020).........................................................43

*Toole v. McClintock*,
    999 F.2d 1430 (11th Cir. 1993) ........................................................................39

*Toussie v. Allstate Ins. Co.*,
    2016 WL 6537670 (E.D.N.Y. Nov. 3, 2016) ......................................................42

*Travel Ctr. of Fairfield Cnty., Inc. v. Royal Cruise Line Ltd.*,
    154 F. Supp. 2d 281 (D. Conn. 2001), *aff'd*, 43 F. App'x 461 (2d Cir. 2002) ........................3

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................14, 16, 33, 44

*United Air Lines, Inc. v. Austin Travel Corp.*,
    867 F.2d 737 (2d Cir. 1989) ...........................................................................39

*United Food Grp., LLC v. Cargill, Inc.*,
    No. CV 11-7752 SS, 2015 WL 13868984 (C.D. Cal. June 8, 2015) ....................................39

*United States v. Am. Tel. & Tel. Co.*,
    498 F. Supp. 353 (D.D.C. 1980) .....................................................................37

*United States v. Cent. Gulf Lines, Inc.*,
    747 F.2d 315 (5th Cir. 1984) .........................................................................38

**Statutes**

N.C. Gen. Stat. Ann. § 25-2-305...........................................................................9

New York General Business Law § 349-d ................................................................30

North Carolina Unfair and Deceptive Trade Practices Act ....................................................43, 44

Rules Enabling Act .....................................................................................14

U.C.C. § 2–305 ........................................................................................9

**Other Authorities**

Fed. R. Civ. P. 9 ......................................................................................43

Fed. R. Civ. P. 15 .....................................................................................5

Fed. R. Civ. P. 16 .....................................................................................5

Fed. R. Civ. P 23 ...................................................................................5, 14, 48

Fed. R. Civ. P. 26 ...............................................................................19, 21, 24

Fed. R. Civ. P. 30 .....................................................................................45

4876-5320-7743, v. 6

Fed. R. Civ. P. 32 ..........................................................................................................45, 46

Fed. R. Civ. P. 37 ............................................................................................... *passim*

Fed. R. Evid. 401 ..................................................................................................15, 23, 28

Fed. R. Evid. 402 ............................................................................................... *passim*

Fed. R. Evid. 403 ............................................................................................... *passim*

Fed. R. Evid. 407 ..................................................................................................25, 26, 27

Fed. R. Evid. 702 ..................................................................................................15, 39, 40

Fed. R. Evid. 801 ..........................................................................................................37

Fed. R. Evid. 803 ..................................................................................................37, 38, 39

Pursuant to Section IV(A)(13) of the Court's individual practices and procedures, XOOM moves for an order resolving the following evidentiary issues *in limine*.

1. **MIL No. 1: The Court should prohibit Plaintiff from offering evidence or argument that XOOM breached any implied contract term, including the implied covenant of good faith and fair dealing.**

Plaintiff's original complaint claimed that XOOM breached its contract with her and the Class in two ways: (1) by breaching an ***express*** contractual promise to set rates "based on" costs, Orig. Compl. ¶¶ 67–73, Doc. 1-2; and (2) by "arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge" customers in violation of the "***implied*** covenant of good faith and fair dealing," Orig. Compl. ¶¶ 74–80 (emphasis added). On XOOM's motion, both claims were dismissed with prejudice. *See* Doc. 24, MTD Order; Doc. 25, Judgment 1.

Following that dismissal, Plaintiff adjusted her strategy. Instead of alleging that XOOM breached express ***and*** implied contractual duties, Plaintiff chose to abandon her implied covenant claim and instead focus on trying to salvage only her claim for express contractual breach. Plaintiff even candidly explained to the Court the strategic calculus that prompted her new approach: she believed it would "not weaken [her] claims because . . . ordinary consumer's expectations" were "irrelevant" to a claim that XOOM breached the contract's express "'actual and estimated supply costs' term." Doc 27, Mot. to Alter or Amend 9–10.

Having settled on a strategy, Plaintiff fully committed to it. When the Court denied her motion to alter or amend after finding she could not "adequately address [the original complaint's defects] by removing all references to the expectations of a 'reasonable consumer,'" Plaintiff filed a motion to reconsider repeating that she was not pursuing an implied covenant claim or any claim based on a reasonable consumer's expectations. *See* Doc. 30, Order on Mot. to Alter or Amend 8; Doc. 33, Mot. to Reconsider 6. When the Court denied her reconsideration motion too, Plaintiff maintained her express-breach-only strategy in the Second Circuit by:

1

- declining to challenge the dismissal of the implied covenant claim in her opening brief, Ex. 1,[1] Plaintiff-Appellant's Opening Br. 2 (statement of issues);

- seeking reversal of the Court's denial of leave to file the amended complaint that "removed all references to the expectations of a 'reasonable consumer," *id.* at 41–42;

- advancing a "straightforward contract claim that ***does not*** require a showing of bad faith," Ex. 2, Plaintiff-Appellant's Reply Br. 8, in an attempt to avoid problems that arose when "other ESCO plaintiff's counsel" accused ESCOs of violating the implied covenant or their customer's "reasonable expectations," Ex. 1, Plaintiff-Appellant's Opening Br. 25–27;

- repeatedly insisting that consumer expectations were "irrelevant" to Plaintiff's express breach theory and affirmatively insisting that the amended complaint does ***not*** accuse XOOM of breaching the contract by violating its customers' reasonable expectations[2];

Plaintiff's express-breach-only strategy culminated at oral argument when the Second Circuit panel directly asked whether the original complaint's implied covenant claim was viable:

> [Q]  Why do you believe your implied covenant claim is viable?

> [A]  Your honor, the district court dismissed the implied covenant claim as duplicative of the contract claim. **We decided not to challenge the implied covenant claim**, so at this point it's just breach of contract.[3]

Shortly thereafter, Plaintiff's counsel was asked "why should [the panel]" look at the original complaint "which has three causes of action—two of which you just told us you dropped" when

---

[1] All Exhibits are annexed to the Declaration of Michael D. Matthews, Jr.

[2] *See also* Ex. 1, Plaintiff-Appellant's Opening Brief 28 ("Considering consumers' expectations adds nothing to the contract's plain meaning."); *id.* at 26 (insisting that the class members "***cannot form reasonable expectations*** about a particular contract provision—here, XOOM's commitment to charge prices based on its actual and estimated supply costs" (emphasis added)); *id.* at 27 ("[T]he pricing term ('actual and estimated supply costs') is unambiguous and an ordinary ***consumer's expectations are thus irrelevant***. (emphasis added)).

[3] Oral Argument at 7:15–7:35 in *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019), *available at* https://www.ca2.uscourts.gov/oral_arguments.html (search for "Mirkin").

the amended complaint was "limited to the breach of contract and drops the others?"[4] After confusingly indicating that Plaintiff wanted to proceed on both her amended and original complaints, counsel committed to the chosen strategy and stood on the amended complaint:

> [A]   If we have to stand on one complaint, we would stand
>       on the second one.[5]

Taking Plaintiff's counsel at his word, the Second Circuit issued an opinion and mandate that expressly "affirm[ed] the dismissal of" Plaintiff's implied covenant claim because "[t]he dismissal of that claim [was] not challenged on appeal." Doc. 41-1, Mandate 3 n.1. That mandate is final and Plaintiff's strategic decision cannot be changed.

If Plaintiff wanted to salvage her implied covenant claim following this Court's dismissal, she certainly could have attempted to do so. She had that opportunity when filing her post-judgment motions and on appeal to the Second Circuit. But she declined to do so, and it is too late to reverse course now. To pursue a contract claim against XOOM based on the covenant of good faith and fair dealing that "is implied in every contract," she had to start by "plead[ing] a claim for breach of [that] covenant." *Travel Ctr. of Fairfield Cnty., Inc. v. Royal Cruise Line Ltd.*, 154 F. Supp. 2d 281, 289 (D. Conn. 2001), *aff'd*, 43 F. App'x 461 (2d Cir. 2002). But, as discussed above, Plaintiff refused to do so, opting instead to plead an express-breach claim designed to make "ordinary consumer's expectations . . . irrelevant." Doc 27, Mot. to Alter or Amend 9–10. Having made that decision, Plaintiff cannot proceed to trial on an unpleaded implied covenant claim that, according to her proposed jury instructions, specifically ***requires*** an inquiry into the class members' reasonable expectations. *See Travel Ctr. of Fairfield Cnty.*, 154 F. Supp. 2d at 289 (declining a proposed jury instruction on an unpleaded claim for breach of the covenant of good

---

[4] Oral Argument at 9:30–9:59.
[5] Oral Argument at 9:59–10:01.

3

faith and fair dealing), *aff'd*, 43 F. App'x at 461 (rejecting the plaintiff's "meritless" appellate arguments "concerning the breach of the implied covenant of good faith and fair dealing"); Doc. 210-8, Pl.'s Proposed Jury Instructions 12("In considering what constitutes bad faith, you should consider a number of factors, including the expectations of the parties and the purposes for which the contract was made.").

Nor may Plaintiff solve this problem by seeking leave to amend her complaint. Indeed, two non-discretionary doctrines prohibit her from doing taking that approach. First, her previous commitments to an express-breach-only theory mean that Plaintiff is judicially estopped from even making that request. *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (Judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." (quoting *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001))); *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (quoting *New Hampshire*, 532 U.S. at 749). And second, the mandate from the Second Circuit prohibits the Court from allowing amendment because "the mandate rule" prohibits amendments that revive "issues previously waived by the parties or decided by the appellate court." *In re Actos End-Payor Antitrust Litig.*, No. 13-CV-9244 (RA), 2018 WL 840099, at *3 (S.D.N.Y. Feb. 12, 2018) (cleaned up).[6]

---

[6] *See also Day v. Moscow*, 955 F.2d 807, 812 (2d Cir. 1992) ("Where issues have been explicitly or implicitly decided on appeal, the law-of-the-case doctrine obliges the district court on remand to follow the decision of the court of appeals." (cleaned up)); *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 671 F.3d 261, 271 (2d Cir. 2012) (vacating a judgment in which a district court

Should Plaintiff make a request for leave to amend her complaint anyway, she could never hope to justify an amendment at this juncture under any conceivable standard. Rules 15(a), 15(b), and 16(b)(4) all prohibit an amendment as prejudicial as the one Plaintiff would need here. By choosing not to plead or even hint that she was pursuing an implied covenant claim, Plaintiff deprived XOOM of the opportunity to take discovery on it, avoided having to defend it on summary judgment, and shirked her burden to prove that Rule 23's requirements are still met on a claim that depends on consumer expectations and subjective motivations. Allowing that claim now would require XOOM to submit a supplemental brief in support of its motion to decertify to address the problems of typicality, commonality, and predominance Plaintiff would face without common proof that the Class reasonably expected a particular benefit (which she herself admittedly did not) and that XOOM had an improper motive when it set every one of the thousands of rates at issue. And before XOOM could do that, it would be entitled to conduct discovery on those issues, and it would seek leave to move for summary judgment on Plaintiff's as-of-yet unchallenged claim for breach of the implied covenant. This would add years of delay to these already protracted proceedings.

Accordingly, the Court should prohibit Plaintiff from offering any evidence or argument that XOOM breached any implied term, including the covenant of good faith and fair dealing.

---

erroneously entertained arguments on remand from an appeal that "impliedly decided" the argument had been waived).

5

2.   **MIL No. 2: The Court should prohibit Plaintiff from offering evidence or argument that an implied or unwritten rate cap exists in Plaintiff's or the Class's contracts.**

In a letter to the Court, Plaintiff indicated that she would ask the jury to "suppl[y]" an unwritten term in the Class Members' contracts that would cap margins at a certain level. Decert. Pre-Motion Letter 6, Doc. 180 ("[W]here a contract lacks a term, the factfinder supplies it 'in a way that honest, fair, and just persons would[.]'" To justify that request, Plaintiff cited two North Carolina cases: *Recycling Equipment*, which deals with the implied covenant, and *Naphcare*, which deals with the "doctrine of implication of unexpressed terms." *See* Decert. Pre-Motion Letter 6, Doc. 180 (citing *Recycling Equip., Inc. v. E Recycling Sys.*, 2014 WL 6977766, at *5 (W.D.N.C. Dec. 9, 2014), and *Naphcare, Inc. v. Guilford Cnty.*, 2008 WL 4371770, at *7 (M.D.N.C. Sept. 18, 2008)).

Plaintiff's resort to the implied covenant fails for reasons already discussed, *see supra*, MIL No. 1.

Plaintiff's invocation of the doctrine of implication of unexpressed terms fares no better. Under North Carolina law, that doctrine does not allow juries to invent new contractual terms or to make any findings at all. Rather, that doctrine allows "***the Court***"—not the factfinder—to supply missing contractual terms, and courts may only exercise that authority to supply terms that were "inadvertently omitted" from an ambiguous contract. *See Naphcare*, 2008 WL 4371770, at *7. That doctrine does not apply here because the Court already held that the contract was unambiguous, and Plaintiff does not—and cannot—contend that the parties "inadvertently" omitted a term from the contracts that would cap XOOM's margin at a specific level. *See* Doc. 151, SJ Order 10 ("[T]he contract does not contain an ambiguity that must be interpreted by the jury."); *id.* at 13 (acknowledging that the contract is unambiguous and also "silent as to an appropriate margin"); *Shelton v. Duke Univ. Health Sys.*, 633 S.E.2d 113 (N.C. Ct. App. 2006)

6

(rejecting the doctrine's applicability to a contract that was "free from ambiguity").

Accordingly, Plaintiff cannot ask the jury to "supply" a specific term. The Court construed the contract and found it unambiguous, so there is no room for additional terms. The Court therefore should prohibit any evidence or argument that suggests the contract capped XOOM's margins or rates at a particular level.

4876-5320-7743, v. 6

3.    **MIL No. 3: The Court should prohibit Plaintiff from offering evidence or argument that XOOM's variable rates or variable-rate margins were unreasonable.**

In its summary judgment order, the Court relied on the Second Circuit's decision in *Richards v. Direct Energy* to conclude that XOOM does not have "unbounded discretion" when it sets rates or margins. Doc. 151, SJ Order 14 (citing *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019)). Specifically, the Court concluded that *Richards*'s discussion of the implied covenant of good faith and fair dealing confirms that "discretion granted by a contract must be 'exercise[d] . . . in good faith.'" *Id.* As discussed in MIL No. 1, Plaintiff should be precluded from advancing any evidence or argument that rests on an alleged breach of the implied covenant because that claim was dismissed and is not at issue. Evidence or argument regarding the alleged unreasonableness of XOOM's variable rates or variable-rate margins is therefore irrelevant, prejudicial, and should be excluded from trial. *See* Fed. R. Evid. 402; Fed. R. Evid. 403.

But even if the Court somehow allows Plaintiff's previously dismissed and now unpleaded implied covenant claim, argument and evidence regarding (un)reasonableness must still be excluded. As *Richards* shows, the existence of a duty to act in good faith in every contract does not automatically give rise to a triable dispute as to whether an ESCO's rates or margins were unreasonable. Rather, to advance that theory at trial, Plaintiff must offer ***evidence*** that XOOM's variable rates and margins were unreasonable in comparison to the variable rates and margins set by ***other ESCOs***. *See Richards*, 915 F.3d at 99 (affirming summary judgment on an implied covenant claim challenging variable rates that were generally 75% higher than an ESCO's procurement costs because the plaintiff offered "no evidence that [an ESCOs' variable rate] was any higher than its competitors' rates" or that the ESCO's conduct was out of step with "similar . . . pricing behavior" by other ESCOs"); *id.* (explaining "that merchants act in good faith when setting open price terms if they adhere to 'reasonable commercial standards of fair dealing in the

8

trade'" and that, "[t]o determine if a price is commercially reasonable[ ] it must be compared to the range of other prices in the market." (citing Connecticut caselaw applying U.C.C. § 2–305)); *see also* N.C. Gen. Stat. Ann. § 25-2-305 (North Carolina's codification of U.C.C. § 2–305).

Here, Plaintiff failed to disclose any relevant evidence regarding the variable rates or margins charged by other ESCOs, which is the only metric by which commercial reasonableness may be judged.[7] Indeed, her experts took the position that other ESCO rates are not relevant. *See* Ex. 4, Adamson Dep. 64:21–65:7; Ex. 5, Eryilmaz Dep. 78:14–24 (Plaintiff's experts declined to compare EIA.gov average New York rates to XOOM's rates). As a result, she cannot argue at trial that XOOM's margins or rates were unreasonably high—or in any way higher than other ESCOs. *See* Fed. R. Civ. P. 37(c)(1) (excluding undisclosed evidence). And even if Plaintiff had disclosed such evidence, it would be inadmissible because its relevance would relate solely to the implied-covenant claim that, as discussed in MIL No. 1, Plaintiff cannot pursue. *See* Fed. R. Evid. 402; Fed. R. Evid. 403; MIL No. 1.

Accordingly, beyond her failure to plead a claim based on the implied covenant, Plaintiff should be precluded from offering any evidence or argument that XOOM's rates or margins were unreasonable or set in bad faith because it is not supported by any admissible evidence.

---

[7] As XOOM will further explain in its motions challenging Plaintiff's experts, they do not attempt to compare XOOM's rates or margins to those achieved by other market participants. For this reason and others, XOOM separately moves to preclude any evidence or argument regarding the prices charged by other market participants, including those of other ESCOs and regulated utilities. *See* MIL Nos. 7, 8.

9

4.     **MIL No. 4: The Court should prohibit Plaintiff from offering evidence or argument of XOOM's fixed rates or fixed-rate margins.**

Plaintiff's deposition designations and the parties' exhibit lists[8] contain and refer to the rates XOOM's fixed-rate customers were charged and the margins XOOM expected to achieve on those rates based on its estimated supply costs. That evidence should be excluded because it is irrelevant to Plaintiff's individual and class claims, and it is prejudicial to XOOM, for five reasons.

First, XOOM's fixed rates and fixed-rate margins are simply irrelevant to Plaintiff's claim. Plaintiff was never a fixed-rate customer and has therefore never had a claim against XOOM based on its fixed-rate pricing. Rather, Plaintiff signed up with XOOM on a variable-rate plan. She was therefore only ever charged a set introductory rate followed by five months of variable rates—the variable rates at issue in this case. None of the class members has a claim based on XOOM's fixed-rate pricing either.

Second, the *Richards* decision forecloses any argument that XOOM's fixed- and variable-rate margins be linked as Plaintiff suggests. To impose that "specific limitation," the jury would have to "invent" an absent contract term that expressly links fixed- and variable-margins. *Richards v. Direct Energy Servs.*, 915 F.3d 88, 98 (2d Cir. 2019). Both *Richards* and North Carolina precedent preclude Plaintiff from proceeding on that theory. *Id.*; MIL Nos. 1, 2.

Third, it is undisputed that XOOM's fixed-rate margins did not satisfy the variable-rate contracts' requirement that the variable-rate margin "remain proportionate" to its variable-rate "supply costs over time." Doc. 151, SJ Order 13. Quite the opposite, it is undisputed that XOOM's fixed-rate margins experienced wide fluctuations that "did not directly correspond" to its supply costs, dipping to -27% in some months of the class period and rising to 59% in others. *See* Ex.

---

[8] As discussed in MIL No. 15, XOOM seeks leave to redact excluded trade-secret information from otherwise relevant documents on its own or the Joint Exhibit Lists.

Doc. 216-4 4 (-27% SureLock Margin for NGrid_NM in December 2020; 56% SureLock Margin for NFG in October 2016).[9]

Fourth, Plaintiff does not contend that XOOM could consider its fixed-rate margins when it was setting its variable rates. Instead, Plaintiff survived summary judgment by successfully arguing that the class members' rates had to be "determined *solely by* [XOOM's] actual and anticipated supply costs." SJ Order 14. Under this interpretation of the contract, XOOM's fixed-rate margins would not have been among the supply costs XOOM could have considered when setting variable rates, so Plaintiff cannot argue that XOOM was *required* to set its variable rates based on "other considerations" like fixed-rate margins. *See* SJ Order 19 (denying summary judgment because there was "a genuine factual question as to whether XOOM set [Plaintiff's] rates based on supply costs or based on other considerations").

And fifth, even considered from Plaintiff's perspective, she does not contend that XOOM's fixed-rate margins were "'based on actual and estimated [variable-rate] supply costs,' as that term is used in the contract." SJ Order 4. Quite the opposite, Plaintiff's evidence shows that XOOM's fixed rates were set at the same meetings where decisionmakers allegedly "'disregarded' [XOOM's] internal supply cost calculations" and set margins and rates "based on considerations such as profit, competitor and utility rates, sales trends, attrition, and geographic market elasticity, rather than supply costs." SJ Order 5–6.

For these reasons, evidence of XOOM's *fixed* rates and associated margins cannot help the factfinder determine what the class members' *variable* rates should have been under a contract that "requires the monthly rates to be determined by XOOM's actual and estimated supply costs—and

---

[9] XOOM provided the Court electronic copies of Plaintiff's models in their native Excel format on the hard drive of its trial exhibits as DXI 06D, DXI 06E, DXI 07A, and DXI 07B.

only those costs." SJ Order 18. Rather, such evidence could only provide examples of rates that include a ***disproportionate*** margin with no direct relationship (or even indirect correlation) to XOOM's variable-rate costs. Accordingly, Plaintiff should be precluded from offering evidence or argument regarding XOOM's fixed rates or the components of those rates because that evidence is both irrelevant and unduly prejudicial. *See* Fed. R. Evid. 402; Fed. R. Evid. 403.

5.    **MIL No. 5: The Court should prohibit Plaintiff from offering evidence or argument of any proposed "exemplar margin."**

Plaintiff has argued that she can prove breach and damages by asking the jury to adopt a 19% "exemplar margin"[10] as the "reasonable fixed margin" that should have been included in the class members' rates. *See* Doc. 180 at 6 (citing *Recycling Equip., Inc. v. E Recycling Sys.*, 2014 WL 6977766, at *5 (W.D.N.C. Dec. 9, 2014)). The exemplar margin she has pointed to, however, is improper and inadmissible for three reasons.

First, Plaintiff disclosed no evidence in discovery of any commercial standard or other principle that would cap XOOM's variable-rate margins at any such exemplar. Quite the opposite, Plaintiff and her experts all specifically declined to opine that it would be unreasonable for XOOM's margins to exceed a specific percentage at all, much less that the margins could never reasonably exceed 19%. *See* Ex. 3, S. Mirkin Dep. 78:4–7 ("Q. Do you have any opinion about what's a reasonable profit margin for XOOM to charge? A. No."); Ex. 4, Adamson Dep. 71:16–72:7 (explaining why Plaintiff's expert "wouldn't be able to give . . . a number on the stand" for a "'cutoff point'" for a reasonable margin); Ex. 5, Eryilmaz Dep 41:20-21, 42:2-4 ("there's no, like, specific percentage I can tell you that it should be X percent"). Under governing law, that means Plaintiff cannot ask the jury to use that margin to assess liability or calculate damages. *See Peaseley v. Virginia Iron, Coal & Coke Co.*, 194 S.E.2d 133, 147 (N.C. 1973) ("A witness will not be permitted to give a mere guess or opinion, unsupported by facts, as to the amount of damages arising upon a breach of contract. . . . It is incumbent upon the plaintiff to present facts, as to all

---

[10] Plaintiff's untimely amended expert report seemingly abandons her original 19% exemplar and proposes both lower exemplars and a slightly higher exemplar in its stead. As XOOM will explain in its challenge to that amended report, her new exemplars raise new problems without solving any of the existing ones. However, XOOM was not allowed to take discovery on the new exemplars, so its argument on why they are insufficient too will be subject to further discovery if the Court declines to simply exclude the amended report as untimely.

reasonable factors involved, that the jury may have a basis for determining damages."); *see also Martinez v. Agway Energy Servs.*, 88 F.4th 401, 414 (2d Cir. 2023) (concluding that an expert's "subjective and unsupported view of what a 'reasonable margin' would have been" for an ESCO's variable rates was "legally insufficient" to prove overcharges); *id.* at 414 (2d Cir. 2023) (rejecting a claim that an ESCO's rates were set in bad faith absent evidence its rates were higher than those of other ESCOs); *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019) (same).

Second, the exemplar impermissibly reflects a calculated "average" that is both irrelevant and inadmissible with respect to many class members' individual claims. As Plaintiff's expert reports show, XOOM's fixed-rate margins—which are the basis for her reasonable-margin exemplar—exceeded the 19% exemplar nearly ***1,200 times*** between March 2013 and February 2018[11] alone, ***often for years at a time***. *See* Doc. 216-3 (fixed-margin data utilized by Plaintiff's experts with margins above 19% highlighted). In every such instance, the 19% exemplar would be inadmissible in an individual action by class members because it would inappropriately inflate their alleged damages. That means the 19% exemplar is inadmissible to prove the Class claims because it does not represent the margin XOOM was required to include in every rate for the Class. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (explaining that representative evidence is only admissible in a class action if the same evidence "could have been used to establish liability in an individual action" brought by each class member under the Rules Enabling Act, the Constitution, and Rule 23); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d

---

[11] Plaintiff's exemplar was inappropriate when served. Despite having data through June 2021, her experts inexplicably chose to calculate their average only through early 2018. Her amended expert report does not update the 19% average to account for either the pre-existing three-year gap or the updated data XOOM recently produced through January 2024. Thus, the 19% exemplar would be inadmissible for the additional reason that it averages fixed-rate margins for only an arbitrary subset that is less than half of the class period.

619, 625 (D.C. Cir. 2019) (rejecting class evidence that did not "preserve the defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense" in a class action); Fed. R. Evid. 402; Fed. R. Evid. 403.

To illustrate the problem, imagine a class member who bought commercial gas in the RGE zone from September 2013 to February 2014. During that time, the hypothetical class member's variable-rate margins were always on par with or *lower* than XOOM's fixed-rate margins:

| Month | Variable-Rate Margin (RGE gas)[12] | Fixed-Rate Margin (RGE gas) |
|---|---|---|
| Sept. 2013 | 41% | 44% |
| Oct. 2013 | 30% | 37% |
| Nov. 2013 | 37% | 36% |
| Dec. 2013 | 31% | 31% |
| Jan. 2014 | 33% | 37% |
| Feb. 2014 | 25% | 27% |

In an individual action, this commercial gas customer could not ignore XOOM's actual, *higher* fixed-rate margins in those six months in favor of a hypothetical average calculated from *over 1,600+* irrelevant margins XOOM achieved selling other commodities and products in other zones during an arbitrary 60-month time period. *See* Fed. R. Evid. 401; Fed. R. Evid. 402; Fed. R. Evid. 702. Those other months, margins, and products incorporated into the exemplar are irrelevant to that individual customer's claims. If all other class members filed 120,000+ individual actions, the 19% exemplar would be similarly inadmissible in each of those actions because the average is

---

[12] The data in this chart is taken from the margin inputs in Exhibit 5 to CRA's Report.

based almost exclusively on margins that would not be relevant to any one class member. Aggregating those claims into a single class action does not change the rules of evidence to render otherwise irrelevant evidence admissible, limit the constitutional and common-law rights XOOM would have in individual actions against each of the class members, or allow Plaintiff to prove the class members' claims with evidence that is completely irrelevant to individual class members. *See Tyson Foods*, 577 U.S. at 458; *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 193 (3d Cir. 2020) (vacating a class certification order based on liability and damage evidence that "relie[d] on an average hypothetical price" that would not apply to individual class members). Because the 19% exemplar is not relevant to every individual class member's claim, it cannot be relevant to the class claims either.

Finally, the 19% exemplar is inadmissible because it is based exclusively on inadmissible data about XOOM's fixed-rate margins. As discussed, that data should be excluded because it is both irrelevant and prejudicial. *See* MIL No. 4. Mirkin cannot transform those individually irrelevant data points into admissible evidence by adding some of them together and calculating the average value. *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004) (prohibiting summary evidence of data that would be inadmissible if introduced directly).

Accordingly, the Court should preclude Plaintiff from offering any evidence or making any argument at trial regarding any "exemplar" margin based on XOOM's fixed-rate margins. *See* Fed. R. Evid. 402; Fed. R. Evid. 403.

4876-5320-7743, v. 6

6.    **MIL No. 6: The Court should prohibit Plaintiff from offering evidence or argument suggesting that a particular variable rate or variable-rate margin was profitable for XOOM, or that an alternative rate or margin would have been profitable.**

To justify her exemplars that are based on XOOM's fixed-rate margins, Plaintiff has frequently implied that those margins would have allowed XOOM to earn a profit. *See, e.g.*, Doc. 180, Decert. Pre-Motion Letter 6. However, Plaintiff disclosed no evidence in discovery that would support that conclusion. On the contrary, her experts also repeatedly acknowledged at their depositions that they could not determine whether XOOM made a net profit on particular products or customers, and their models ignored many of the variables necessary to perform that calculation, including overhead, marketing costs, taxes, and rent. Ex. 4, Adamson Dep. 79:19–81:2 (conceding marketing costs, taxes, and rent are not included in the models), 101:20–23 (admitting he did not know "if XOOM actually made a net profit"); Ex. 5, Eryilmaz Dep. 68:24–69:11 (acknowledging no costs beyond supply costs are considered in the models).

Plaintiff has attempted to fill this gap in her experts' testimony by citing testimony that suggests XOOM's fixed-rate and variable-rate margins were profitable overall. Even if that were true, it would not follow that an across-the-board 19% margin would have been profitable. Rather, by the nature of averages, one would expect an across-the-board 19% margin to cause XOOM to *lose* money on approximately half of the rates it set—by definition, an average value can be higher than half the underlying data points, but lower than the other half.

The undisputed evidence bears this out. Plaintiff's experts' Model Two shows that XOOM set fixed rates with estimated margins that *exceeded* 19% over 1,200 times between March 2013 and February 2018, rising to at least 59% during the class period. So, even assuming XOOM did make an overall profit on its fixed-rate products, it was only able to do so by setting fixed rates that included margins higher than 19% more than 1,200 times. In those months, a factfinder could

17

not reasonably assume that a margin of only 19% would have been profitable. Quite the opposite, the only reasonable assumption would be that cutting XOOM's margins would either reduce or eliminate any profit it earned in those months. And even then, the arbitrary February 2018 cutoff for the data underlying Plaintiff's 19% exemplar renders that figure utterly worthless to describe anything that happened in the six-year period beginning in March 2018. Even in ordinary times, a jury could not reasonably assume that XOOM's margins were static during that period, and the last six years have been far from ordinary in the energy markets.

Moreover, Plaintiff disclosed no evidence that would support her assumption that a profitable fixed-rate margin would be similarly profitable if applied to XOOM's variable-rate products. Rather, Plaintiff's experts admitted that is not the case: "Fixed rate pricing, I think we can all agree, the actual outturn margins could be quite different." Ex. 5, Adamson Dep. 73:3–4. Those differences are precisely why ESCOs (like virtually all other businesses) typically do not adopt a single margin applicable to all products, but instead "have different pricing . . . under different arrangements." *Id.* at 72:19–23.

If Plaintiff wanted to determine whether XOOM could earn a profit on its variable rates if the margins were set at a particular level, she could have engaged an expert to perform that calculation. Having declined to do so, she should not be allowed to speculate based on insufficient data that particular rates were profitable, or that XOOM could have earned a profit if its variable rates included hypothetical alternative margins.

Accordingly, the Court should preclude Plaintiff from offering any evidence or argument that any particular fixed-rate or variable-rate margin was profitable, or that an alternative variable-rate margin would have been profitable if it had been included in the class members' rates. *See* Fed. R. Evid. 402; Fed. R. Evid. 403.

7.      **MIL No. 7: The Court should prohibit Plaintiff from offering evidence or argument relating to the rates and margins of other ESCOs, including: rates charged by other ESCOs; costs incurred by other ESCOs; margins achieved by other ESCOs; and how XOOM's rates, costs, or margins compared to those of other ESCOs.**

Under Rule 26, Plaintiff was required to produce all documents she or her experts would rely on to calculate the class members' alleged overcharges. *See* Fed. R. Civ. P. 26(a)(1)–(2), (e). In discovery, Plaintiff produced an expert report as her sole evidence of damages.[13] Plaintiff's experts declined to compare XOOM's rates or margins to the rates and margins set by other ESCOs because the comparison "didn't seem very relevant." Ex. 4, Adamson Dep. 64:21–65:7; *see* Ex. 6, Eryilmaz Dep. 78:14–24 (Plaintiff's experts declined to compare EIA.gov average New York rates to XOOM's rates). Having declined to produce such information in discovery—and having taken the position it is irrelevant to her damage calculations—Plaintiff cannot offer such evidence at trial. *See* Fed. R. Civ. P. 37(c)(1); Fed. R. Evid. 402; Fed. R. Evid. 403.

Evidence or argument regarding the rates of XOOM's private ESCO competitors that XOOM tracked should also be excluded because they do not reflect other ESCOs' *variable* rates. *See* Ex. 6, Loehde Dep. 79:3–12; Ex. 7, Park Dep. 107:16–110:14. Rather, they reflect competitors' contemporaneous fixed-rate and introductory-rate offerings. *Id.* Nor can other ESCOs' fixed *rates* inform a factfinder about what *margins* were achieved on those rates. But even if Plaintiff had such evidence about other ESCOs' margins (she does not), it still would not be admissible. As discussed, Plaintiff has no implied covenant claim and should not be allowed to argue that XOOM's margins were unreasonable. *See* MIL Nos. 1, 2. Thus, the only triable issue is

---

[13] As the Court is familiar, Plaintiff produced an amended expert report on May 10—eighteen months after expert discovery closed. XOOM therefore takes the position that allowing it would severely prejudice XOOM, and that it should not be considered on the merits. If the amended report is allowed, however, XOOM will re-brief this issue at the appropriate time.

whether XOOM's variable rates were based on its "actual and estimated supply costs" including a proportionate margin. Plainly, **external rates** cannot say anything about XOOM's **internal costs**. Competitor rates reflected in XOOM's business records are therefore irrelevant to any issue, are likely to cause juror confusion, and would be prejudicial to XOOM. *See* Fed. R. Evid. 402; Fed. R. Evid. 403.

Accordingly, Plaintiff should be precluded under FRCP 37, FRE 402, and FRE 403 from offering any evidence or argument relating to:

- rates set and charged by other ESCOs;

- costs incurred by other ESCOs;

- margins achieved by other ESCOs; and

- how XOOM's rates, costs, or margins compared to those of other ESCOs.

8.     **MIL No. 8: The Court should prohibit Plaintiff from offering evidence regarding regulated utility rates, including: rates charged by regulated utilities; costs incurred by regulated utilities; margins achieved by regulated utilities; and how XOOM's rates, costs, or margins compared to those of regulated utilities.**

The Court should exclude all evidence—whether in the form of exhibits, deposition designations, or live testimony, including expert evidence or otherwise—of rates charged for electricity or natural gas by regulated utilities. *See, e.g.,* Doc. 210-3, Plaintiff's Dep. Designations 25, 27; PX46. For reasons similar to those described in MIL No. 7, utility rates should be excluded under Rule 37 because Plaintiff's sole evidence of damages (i.e., her experts' initial reports) specifically declined to calculate alleged overcharges by comparing XOOM's rates, margins, or costs to those of regulated utilities. *See* Ex. 4, Adamson Dep. 68:19–69:8 ("And you're not offering a damage model that compares XOOM's variable rate charged to what customers would have been charged by the utility during the same time period? . . . A. No."); Ex. 5, Eryilmaz Dep. 74:8–75:12. In fact, Plaintiff's experts admit utility data is not relevant to XOOM's contract:

> [Q]   Okay. But you're not offering an opinion in this case that under the sales agreement, that XOOM was not permitted to charge more than the utility, right?
>
> [A]   No. I mean, XOOM – I mean our basis was the actual and estimated supply cost, whatever it should be charging.
>
> [Q]   And the utility's rate is irrelevant to that consideration, right?
>
> [A]   **It is irrelevant for this contract.**

*Id.* at 73:10–23 (objections excluded) (emphasis added). Because Plaintiff failed to produce such information in discovery and conceded its irrelevance, the information is inadmissible at trial. *See* Fed. R. Civ. P. 26(a)(1)–(2), (e); Fed. R. Civ. P. 37(c)(1); Fed. R. Evid. 402; Fed. R. Evid. 403.

Nor could information regarding regulated utility rates—including their costs and

margins—have any relevance here. Plaintiff's contract provides no basis for measuring the rates XOOM charged against a utility's rates, so they are entirely irrelevant to her sole contract claim (as Plaintiff's experts admitted). Furthermore, any such evidence would seriously prejudice XOOM and should be excluded on Rule 403 grounds as well.

As the Court knows, it has construed Plaintiff's contract to allow XOOM to charge a "reasonable" margin on top of its actual and estimated supply costs. The Second Circuit has unequivocally held in this context that a "reasonable margin" can be determined only by looking to XOOM's "private competitors'" margins. *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019) (rejecting argument that ESCO's rate was too high where "there is no evidence that it was any higher than its competitors' rates"). Thus, the rates a regulated utility charged are irrelevant as a matter of law. *Id.*

In *Richards*, too, the plaintiff tried to assert that utility rates were "the proper comparator" for the ESCO defendant's variable rates. *Id.* The Second Circuit rejected that theory, explaining:

> If we were to hold private electricity suppliers liable for departing from the Standard Service Rates, we would in effect make those [regulator]-approved rates binding on private electricity suppliers like Direct Energy. Yet the entire point of electricity deregulation was to allow the market, rather than [the state public utilities regulator], to determine rates.

*Id.* Similarly, in *Martinez*, the Second Circuit recently affirmed a court's exclusion of an expert report that claimed "that the proper comparison for [an ESCO's] variable rate is solely the rates of the incumbent utilities." *Martinez v. Agway Energy Servs.*, 88 F.4th 401, 414 (2d Cir. 2023). The Second Circuit held that "the proffered comparisons between Agway's prices and those of the default utilities are legally insufficient—without more, and in light of the Agreement's express terms—to raise a triable issue of fact as to [plaintiff]'s breach of contract . . . claim[]." *Id.* In other words, *Martinez* reaffirmed the holding in *Richards* that **public** utilities' regulated rates have no

bearing on whether a ***private*** ESCO's variable rates are reasonable or appropriate.

The Second Circuit is not the only federal appellate Court to conclude that utility prices are not an acceptable comparator for ESCO rates. In *Sevugan*, the Seventh Circuit similarly rejected a plaintiff's attempt to use regulated utility rates as an indication of what "market" prices were. *Sevugan v. Direct Energy Servs.*, 931 F.3d 610, 616–17 (7th Cir. 2019) ("[The utility]'s price is not a market price at all; it is a regulated price. . . . [T]hus [the utilities] are not proper comparators with [the ESCO defendant] to gauge market price. At bottom, plaintiff]'s claim that [defendant] did not charge rates commensurate with [the utility], or with the wholesale price . . . , fails to allege a breach.").

Moreover, even without reference to the binding Second and persuasive Seventh Circuit authority, the regulated utility rates are irrelevant and should be excluded. They have no bearing at all on any of the three rate-setting components the Court said must determine XOOM's rates: (1) its actual supply costs, (2) its estimated supply costs, and (3) a reasonable and proportionate margin. The supply costs (components one and two) are unique to XOOM and should be proven with reference to only XOOM's internal data. And as for the margin (component three), utility rates are facially irrelevant to a determination of what is reasonable or proportionate because New York's regulated utilities must be profit-neutral by law. Thus, because they do not have "any tendency to make a fact more or less probable than it would be without the evidence," the utility rates should be excluded. Fed. R. Evid. 401(a).

Even if the utility rates had any relevance (they do not), the risk of jury confusion and prejudice to XOOM requires that they be excluded. Fed. R. Evid. 403. The rates are fundamentally different because regulated utilities in New York are profit-neutral while the contract admittedly allowed XOOM to achieve a profit on its variable rates. Comparisons of XOOM's rates with the

23

profit-neutral utility rates can only unfairly harm XOOM in the jury's eyes.

In sum, in accordance with the controlling precedents of *Richards* and *Martinez* and the persuasive authority of *Sevugan*, and in compliance with FRCP 26 and 37 as well as FRE 402 and 403, the Court should exclude the following evidence as undisclosed, irrelevant, and prejudicial:

- rates set and charged by regulated utilities;

- costs incurred by regulated utilities;

- margins achieved by regulated utilities; and

- how XOOM's rates, costs, or margins compared to those of regulated utilities.

9.      **MIL No. 9: The Court should prohibit Plaintiff from offering evidence regarding contracts that do not include the same pricing term as Plaintiff's contract.**

Plaintiff's Exhibit List improperly includes contracts that are not at issue, including: (1) a version of XOOM's New York variable-rate contract first used to enroll new customers after amending its pricing language in 2016 (more than three years after the class period started), PX4 (the "2016 Variable Contract Amendment"); and (2) a fixed-rate contract, PX63. Those contracts are not at issue, and Plaintiff does not contend they are within the class definition. Yet Plaintiff has designated them and testimony about them anyway. *See, e.g.*, Doc. 210-3, Plaintiff's Dep. Designations 4, 9, 20, 21.

The Court excluded these other contracts from the class definition precisely because their pricing terms are different from the Plaintiff's contract that is at the center of this dispute. All such contracts and testimony relating to them, including deposition designations and live testimony, should be excluded because those contracts are irrelevant and, moreover, any probative value is heavily outweighed by the risk of prejudice to XOOM. The 2016 Variable Contract Amendment is also barred by the subsequent-remedial-measures rule. Fed. R. Evid. 407.

Plaintiff's contract—like the contracts of all class members—provides that her "monthly variable rate would be 'based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." Doc. 151, SJ Order 9; Doc. 152, Class Cert. Order 7–8 (defining class to include only customers with contracts that contain "the same pricing term" as Plaintiff's). Thus, the pricing terms that applied to other products (like XOOM's fixed-rate products, PX63) or were implemented in later time periods (like XOOM's 2016 Variable Contract Amendment, PX4) have no bearing on Plaintiff's contract claim or whether XOOM breached the pricing provision of any class member. Fed. R. Evid. 402; *see, e.g., California v. Southland Royalty Co.*, 436 U.S. 519, 539 (1978) (Stevens, J. dissenting) (noting

25

that what parties did "under other contracts" not at issue "is irrelevant"); *Cross Sound Cable Co. v. Long Island Lighting Co.*, No. 21-2771 (KAM) (ARL), 2022 WL 16789978, at *2 (E.D.N.Y. Sept. 13, 2022) (holding that "clauses in other agreements [are] not relevant to the issues presented in this action").

And even if XOOM's inapplicable, non-governing contracts with different terms had any marginal relevance (though the law is clear that they do not), admission of testimony or documents concerning those contracts' pricing terms offered to other customers would be unduly prejudicial, causing juror confusion regarding XOOM's obligations under the very different contractual language at issue here. Fed. R. Evid. 403.

The 2016 Variable Contract Amendment should also be excluded under Rule of Evidence 407, which precludes use of a subsequent contract as evidence that a prior version was breached or misapplied. *See Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 311 (7th Cir. 2021) ("We have recognized that revising language in an insurance policy does not constitute an admission that an alternative interpretation of the original language was correct."); *Reynolds v. Univ. of Pennsylvania*, 483 F. App'x 726, 733 (3d Cir. 2012) (affirming district court's ruling "that Rule 407 barred evidence of . . . website revisions as subsequent remedial measures in [a] breach of contract action"); *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1045 (7th Cir. 2007) ("[T]o use at a trial a revision in a contract to argue the meaning of the original version would violate Rule 407 of the Federal Rules of Evidence, the subsequent-repairs rule, by discouraging efforts to clarify contractual obligations, thus perpetuating any confusion caused by unclarified language in the contract." (citations omitted); *see also Dusenbery v. United States*, 534 U.S. 161, 172 (2002) (noting, in holding that defendant "ought not be penalized . . . simply because [it] has since upgraded its policies," that various "areas of the law . . . have for strong policy

26

reasons resisted rules crediting the notion that, 'because the world gets wiser as it gets older, therefore it was foolish before.'" (quoting Advisory Committee's Notes on Fed. Rule Evid. 407, (1994 ed.)). In *Pastor*, as here, the plaintiff "want[ed] to use the evidence that [Defendant], to avert future liability to persons in the position of the plaintiff, changed the [contract], to establish [Defendant]'s 'culpable conduct,'" but "[t]hat is one of the grounds that evidence of subsequent corrective action may *not* be used to establish." 487 F.3d at 1045.

For all these reasons, Plaintiff should be precluded from offering into evidence—whether through exhibits or testimony—any contract other than those that contain "the same pricing term" as Plaintiff's contract, Class Cert. Order 7–8, including but not limited to PX4 and PX63. *See* Fed. R. Evid. 402; Fed. R. Evid. 403; Fed. R. Evid. 407.

4876-5320-7743, v. 6

10.     **MIL No. 10: The Court should prohibit Plaintiff from offering expert evidence regarding the meaning of contract terms.**

The Court should exclude all purported expert evidence—whether it originates with Plaintiff's experts or XOOM's—regarding the meaning or interpretation of Plaintiff's contract.

Plaintiff's witness descriptions indicate that she intends to elicit and offer testimony from her own expert and XOOM's regarding "Breach of Service Agreement." She also has designated deposition testimony by XOOM's expert concerning the meaning of terms in Plaintiff's contract. Doc. 210-1 4; Doc. 210-3, Plaintiff's Dep. Designations 24, 26, 27. That is plainly inappropriate and should be prohibited.

The Second Circuit has held in the context of an ESCO agreement that an expert's interpretation of a contract's pricing term is "irrelevant" with respect to "*its legal meaning* because 'the construction of unambiguous contract terms is strictly a judicial function.'" *Richards v. Direct Energy Servs.*, 915 F.3d 88, 98 (2d Cir. 2019) (emphasis in original, citation omitted). Here, the Court has already concluded that the terms of Plaintiff's contract are unambiguous and construed them such that the jury may simply be instructed on their meaning. Doc. 151, SJ Order at 10 ("[T]he contract does not contain an ambiguity that must be interpreted by the jury."). Thus, there can be no useful purpose for expert testimony regarding the meaning of the contract's terms. *See* Fed. R. Evid. 401.

Further, in light of its irrelevance, any testimony by an expert concerning the legal meaning of contract terms can serve only to confuse the jury. *See* Fed. R. Evid. 403.

For these reasons, under Federal Rules of Evidence 402 and 403, Plaintiff should be barred from soliciting expert testimony—whether from her own experts or from XOOM's expert—concerning the meaning of any terms in Plaintiff's contract.

11.    **MIL No. 11: The Court should prohibit Plaintiff from offering evidence or argument regarding or referring to NRG Energy Inc. or any other non-party affiliated with XOOM.**

In 2018, XOOM Energy Global Holdings LLC ("Global Holdings") was acquired by NRG Energy, Inc ("NRG"). Global Holdings is the sole member and manager of XOOM Energy, LLC. However, Global Holdings and NRG are both nonparties, and the terms of the acquisition (including the terms of the acquisition, such as the price paid, and details about NRG, such as its revenues, profitability, size, etc.) do not make any disputed fact in this case more less likely to be true.. Accordingly, Plaintiff should be precluded from offering evidence regarding or referring to NRG, Global Holdings, or any other non-party organization affiliated with XOOM, including but not limited to the February 8, 2024 SEC Form 10-K for NRG, PX41, as well as any evidence or argument regarding NRG's and Global Holdings' size, revenue, or profitability. This information is irrelevant, has no probative value, and to the extent any probative value exists, it is substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 402; Fed. R. Evid. 403.

12.     **MIL No. 12: The Court should prohibit Plaintiff from offering evidence or argument related to the PSC's 2019 Reset Order, or any other proceedings or filings before regulatory and legislative bodies.**

Plaintiff's Exhibit List includes the New York Public Service Commission's ("PSC") 2019 Reset Order, several other documents related to that regulatory proceeding, and the legislative Sponsoring Memorandum that led to the 2014 passage of New York General Business Law 349-d, a consumer protection statute related to energy sales. *See* PX35–40. These regulatory and legislative documents, and any related testimony or argument, are entirely irrelevant to the lone breach contract claim at issue here. Plaintiff and the class have never pursued a GBL 349-d claim (or any statutory claim) or any cause of action alleging consumer deception. Evidence and argument about the generalized energy consumer protection considerations that led to GBL 349-d and the Reset Order can only prejudice XOOM by wrongly suggesting that XOOM was a specific focus of those considerations or that XOOM did something improper in the past.

New York first deregulated the market for retail energy supply in the 1990s, giving consumers the ability to buy electricity from any licensed ESCO. The first of the exhibits at issue relates to that regulatory change. PX35 (May 20, 1996, Cases 94-E-0952 et al., NY Public Service Commission Opinion No. 96-12 (the "1996 Opinion")). Subsequently, the state legislature passed a law setting certain standards for ESCOs. PX36 is the Sponsoring Memorandum for that statute. *See* PX36 (Bill No. A01558 Sponsoring Memorandum for GBL § 349-d (the "Sponsoring Memorandum")). Although these documents reflect rules that were in place when Plaintiff purchased electricity from XOOM in 2013, they were not incorporated into her contract, and Plaintiff has not suggested that XOOM did not comply with the relevant regulations or statutes.

In 2016, years after Plaintiff stopped being a XOOM customer, the PSC began a review of New York's deregulated energy markets generally to consider whether any ***future*** changes were

30

warranted. The "Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits" (the "2016 Notice") marked PX37 signaled the start of that process. *See* PX37 ("Among the measures to be considered are . . . whether **new** ESCO rules and products can be developed that would provide sufficient real value to mass-market customers such that new products could be provided to them by ESCOs in the future . . .."). The PSC accepted submissions from outside groups, including ESCOs and groups critical of ESCOs generally (though not of XOOM particularly). PX37. The March 30, 2018 Department of Public Service ("DPS") Staff Redacted Initial Brief (the "2018 Initial Brief") marked PX38 was one such submission. It summarized customer protection considerations, discussed certain deregulation challenges, and made recommendations to the PSC for prospective policy changes.

That PSC review process led to the 2019 Reset Order that imposed certain new requirements for ESCOs in New York that went into effect on April 16, some eight years after the class period commenced and Susanna Mirkin purchased electricity from XOOM. It says nothing, even prospectively, about margins or pricing for variable-rate products.

These documents have no relevance to this contract dispute. The regulations, statutes, and regulatory proceedings were not incorporated in, and are not relevant to, Plaintiff's or class members' contracts or rates. None of the documents discuss contract interpretation, variable-rate margins, how variable rates should be set, or what margins are reasonable for an ESCO to include in its rates. Plaintiff's expert Dr. Derya Eryilmaz conceded that the PSC did not review contract terms or engage in any contract analysis and she was not aware of any instance in which the PSC considered XOOM specifically:

> [Q] Is it your understanding that the PSC reviewed contract
>     terms and engaged in a contract analysis in reaching this
>     order?
>
> [A] No…

```
          ...

     [Q}  You're not aware of any testimony in that New York PSC
          proceeding related to XOOM specifically, right?

     [A]  No.

          ...

     [Q]  And you're not aware of any instance in which the New
          York PSC specifically considered this lawsuit in reaching
          the decision with the Reset Order, right?

     [A]  I -- I don't know. I mean, I don't have knowledge of what
          cases they have considered [but XOOM is an ESCO].
```

Ex. 5, Eryilmaz Dep. 95:22-97:20 (objections omitted).

Plaintiff seeks to introduce these regulatory documents anyway only because she hopes that the jury will improperly apply the *prospective* changes the PSC made to the private energy market beginning in *2021* to hold XOOM liable to the class *retroactively* all the back to 2013. But controlling precedent establishes that such extraneous and regulatory and legislative documents cannot *ex post facto* alter the terms of Plaintiff's agreement with XOOM. Because these documents have no bearing on Plaintiff's contract claim, they cannot be used as evidence for the class claim either. Finally, the documents all constitute inadmissible hearsay and should be excluded as such, and they cannot serve as expert evidence.

## I. Not one of the regulatory or legislative documents is relevant.

A. <u>The majority of the documents post-date Plaintiff's time as a XOOM customer and the start of the class period.</u>

As a preliminary matter, all but two of these documents are categorically irrelevant because they post-date the start of the class period in January 2013 and Plaintiff's time as a XOOM customer mid-2013. These include: the 2016 Notice, the 2018 Initial Brief, the 2019 Reset Order, and the 2024 Notice. PX37–PX40.

The Second Circuit recently addressed this same timing issue in *Martinez*, holding that the 2019 Reset Order Plaintiff seeks to admit here was irrelevant to a plaintiff's claim because "public policy did not prevail until the Commission announced its new ESCO rules in 2019—more than three years after [the plaintiff] contracted with [the ESCO]." *Martinez v. Agway Energy Servs.*, 88 F.4th 401, 417 (2d Cir. 2023). For exactly that reason, none of the regulatory and legislative history documents post-dating the start of her time as a XOOM customer in 2013 (PX37–40) are relevant to Plaintiff's claim. It must be excluded as to the class too because evidence that could not "have been used to establish liability in an individual action" cannot be used to establish liability for the class. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016).

B.   The regulatory and legislative history documents are irrelevant.

Nor has Plaintiff ever articulated the relevance of these documents—because there is none. The question of whether an ESCO charged appropriate variable rates can be answered only by looking to the variable rates that *other ESCOs charged. See, e.g.*, *Martinez*, 88 F.4th at 416 (considering how Agway's variable rates compared "to rates offered by other ESCOs in territories where Agway operated, for each quarter from 2014 to 2019"); *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019) (rejecting contention that variable rate was "too high" where there was "no evidence that it was any higher than its competitors' rates"); *Sevugan v. Direct Energy Servs.*, 931 F.3d 610, 616–17 (7th Cir. 2019) ("Sevugan's claim that Direct Energy did not charge rates commensurate with ComEd, or with the wholesale price of PJM, fails to allege a breach. Without any information about valid market comparators, such as other alternative retail energy suppliers, Sevugan's breach of contract claim is speculative and implausible."). Plaintiff chose not to rely on evidence of other ESCOs' rates she cannot use prospective regulatory changes as a substitute measure.

Here, the Court's proportionate-margin construction of the contract means the relevant

reference point is even more granular: the *margins* that other ESCOs achieved on their variable rates. The reasonable and proportionate margin is the only rate-setting component that indirectly can be evaluated by reference to other ESCOs' rates. The other two rate-setting components—XOOM's actual supply costs and estimated supply costs—are XOOM-specific. But none of the regulatory or legislative history documents on Plaintiff's Exhibit List address the variable-rate margins that other ESCOs achieved. Therefore, they will not be helpful to the jury.

Plaintiff has previously noted that the Sponsoring Memorandum that led to GBL 349-d's passage, PX36, mentions "short-term 'teaser' rates followed by skyrocketing variable prices" as a motivation for enacting "a meaningful set of standards" for the energy industry. But Plaintiff has never alleged a GBL § 349-d claim or *any* claim based on alleged deception. And neither the Sponsoring Memorandum nor GBL § 349-d say anything about what margin other ESCOs were entitled to charge or tended to charge for variable-rate products. XOOM's contract terms do not incorporate GBL § 349-d, the Sponsoring Memorandum, or any regulation discussed in the documents Plaintiff has appended to her Exhibit List. Those legislative and regulatory documents can have no bearing on this Plaintiff's lone contract claim.

Likewise, the 2019 Reset Order, PX9, which, again, post-dates Plaintiff's time as a customer and the start of the class period, says nothing at all about variable-rate margins. The PSC did not undertake an analysis of variable-rate margins or anything about ESCO margins. The PSC made only a policy judgment about how ESCO's variable *rates* (not margins) should compare to utility *rates*. *See* 2019 Reset Order at 40 (providing that "variable-rate, commodity-only offerings . . . will be permitted only if the ESCO guarantees to serve the customer at a price below the *price* charged by the utility on an annually reconciled basis" (emphasis added)).

Plaintiff argued in her opposition to decertification that the 5%-over-***utility-rates*** cap the

34

PSC chose to impose on *fixed*-rate products is evidence of what a reasonable margin over *supply costs* is for *variable*-rate products.[14] That clearly is not an apples-to-apples comparison. First, Plaintiff has no evidence to suggest that a fixed-rate margin is comparable to a variable-rate margin in the energy industry. Indeed, her own expert recognized that the reverse is true: margins for fixed-rate pricing "could be quite different." *See* Ex. 4, Adamson Dep. 72:8–73:7 ("Fixed rate pricing, I think we can all agree, the actual outturn margins could be quite different."). In any event, the 5% limit over "the trailing 12-month average utility supply *rate*" that the PSC imposed on fixed-rate products (from April 2021 onwards, *see* 2019 Reset Order at 28) is not a pronouncement that a 5% margin over *costs* is reasonable for even a fixed-rate, let alone a variable-rate, energy product. If anything, the Reset Order suggests that the 5% cap that Plaintiff now seeks to impose on variable-rate margins is wildly unreasonable. Department of Public Service Staff found that ESCOs charge a premium of "20 to 30 percent or more' [over] the utility price," which means that the margins XOOM charged Plaintiff—all of which were within or below that range— were all more than reasonable. For example, while utilities' overhead costs are baked into their rates, XOOM's overhead costs are not included in its supply costs. A margin over a utility rate therefore is not at all equivalent to a margin over supply costs.

Moreover, the Reset Order's discussion of utility rates is irrelevant because the regulated utility rates are not part of Plaintiff's theory of liability on her lone claim for breach of contract. There is no contractual basis for such a comparison, and imposing one here would be entirely inappropriate—as the Second Circuit has repeatedly said in other variable-rate cases. *See, e.g., Richards*, 915 F.3d at 99 ("If we were to hold private electricity suppliers liable for departing from

---

[14] This argument also underlies one of Plaintiff's expert's new methods and will therefore be discussed in XOOM's forthcoming motion to exclude the amended report.

the Standard Service Rates, we would in effect make those [regulator]-approved rates binding on private electricity suppliers like Direct Energy. Yet the entire point of electricity deregulation was to allow the market, rather than [the regulator], to determine rates."); *Martinez*, 88 F.4th at 414 ("As explained above and below, the proffered comparisons between Agway's prices and those of the default utilities are legally insufficient—without more, and in light of the Agreement's express terms—to raise a triable issue of fact as to Gonzales's breach of contract . . . claim[].."); *see also Sevugan*, LLC, 931 F.3d at 617 (finding that plaintiff who did not "allege Direct Energy's adder was greater than that charged by other market participants . . . has not plausibly alleged Direct Energy charged him unreasonably for this component of the price").

Further, documents related to the 2019 Reset Order are irrelevant for exactly the same reasons as the 2019 Reset Order itself. These include the 2016 Notice and 2018 Initial Brief, PX37–38, which were merely earlier, preliminary documents connected with the process that resulted in the 2019 Reset Order, and the 2024 Notice, PX40, which provides notice to XOOM of possible non-compliance with the 2019 Reset Order. Indeed, the probative value of these documents is even lower than the 2019 Reset Order because none carries its finality.

## II. The regulatory and legislative documents are highly prejudicial.

Even if the 2019 Reset Order and related documents, PX37–39, contained relevant information (they do not), the risk of prejudice in allowing the jury to hear that the PSC concluded that, beginning in April 2021, *fixed-rates* (not margins) should be tethered to the prior year's *utility rates*, risks juror confusion and far outweighs any probative value. Fed. R. Evid. 403.

Similarly, the 2024 Notice, PX40, does not relate to the breach or damages questions here and is merely a notification about potential steps to be taken in the future. It therefore has the potential to confuse the issues and prejudice the jury against XOOM. Permitting the introduction of unproven allegations about XOOM's compliance with regulations that are not part of the

36

contracts at issue here would severely harm XOOM, and the documents lack any probative value that could justify such harm.

### III. The regulatory and legislative documents are inadmissible hearsay.

Moreover, all the regulatory and legislative documents Plaintiff seeks to use at trial are hearsay, and no exception applies. Each is a statement made outside of the trial that Plaintiff seeks to "offer[] in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c).

All but the 2024 Notice were created in connection with a ***prospective*** rule-making proceeding, not an "investigation" within the meaning of Rule 803(8)(A)(iii), so the "Public Records" exception for "factual findings from a legally authorized investigation" does not apply. *See Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir. 1998) (affirming exclusion of a report that "made generalized recommendations regarding future departmental behavior" that "did not, and was not intended to, set forth factual findings based on a factual investigation" because it was "not the type of factual investigatory report contemplated by Fed. R. Evid. 803(8)(C)"); *United States v. Am. Tel. & Tel. Co.*, 498 F. Supp. 353, 360–61 (D.D.C. 1980) ("It is certainly true that, to the extent that a proceeding is clearly rule-making—directed in focus to regulation of future conduct, with any fact-finding at most incidental and used primarily for predictive purposes—it is not addressed to past facts, and it therefore cannot result [in] factual findings under Rule 803(8)(C).").

What's more, the 5%-above-the-utility cap that the PSC imposed on fixed rates in the 2019 Reset Order was not a factual finding, but rather, only a prediction (based on a third-party's assessment of risk, not the government's analysis of profitability) that "most ESCOs *could* continue to offer fixed-rate products" at such a rate. 2019 Reset Order pp. 67–68 (emphasis added); *see Am. Tel.*, 498 F. Supp. at 363 (holding that statements that "contain a mixture of statements of fact, legal conclusions, predictions of future events, and prospective rulings" did not qualify "as

'factual findings'" under Rule 803(8)).[15]

Even the 2019 Reset Order's limited mention of ESCO pricing shows that it and the related documents (like the 2018 Initial Brief) lack the hallmarks of reliability and trustworthiness that Rule 803(8)(A) requires. Neither document is reliable with respect to prevailing ESCO prices and premiums: the 2019 Reset Order expressly ***declined*** to make a factual finding with respect to the 2018 Initial Brief's statement that "the majority of ESCOs charge a premium of more than 20%," and the 2019 Reset Order described those figures as "overstated based upon record evidence.". Plainly, the record before the PSC concerning reasonable margins for energy products was not well developed. *See City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) (holding that report did not satisfy Rule 803 requirement that evidence "constitute the 'findings' of an agency or official"; noting that the court "attach[ed] substantial significance to the fact that the report expressly declined to state a conclusion on the most significant safety question"). And the Reset Order cannot be deemed "trustworthy," as Rule 803(8)(A)(iii) demands, because it does not

---

[15] The fact that the PSC relied on an unverified statement regarding a "typical risk premium" for its conclusion that a 5% fixed-rate margin-over-utility-rate could be sufficiently profitable for ESCOs to continue to offer such products shows that the conclusion was not the product of the kind of fact-finding Rule 803(8)(C) envisions. The PSC conducted no analysis of ESCO rates, margins, overhead costs, or profitability, but instead merely cited some unsupported figures wholly unconnected from margins and profitability. *See Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1241 (11th Cir. 2020) ("'[T]he record sought to be admitted must be made from matters within the *personal* knowledge of the public official making the record or his agent or someone *with a duty to report the matter to a public official*.'" (emphasis added, quoting *United States v. Cent. Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984)); *Robbins v. Whelan*, 653 F.2d 47, 52 (1st Cir. 1981) ("[T]he reporting agency must have firsthand knowledge of the investigation by which it accumulates the published factual findings that Rule 803(8)(C) contemplates, since it is the quality of the investigation that determines the caliber of the results."). Because the PSC was not authorized to investigate what constitutes a typical risk-premium—and therefore the PSC's conclusory statement regarding the 5% topper was not a product of a "legally authorized investigation." *See Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 814 (D.D.C. 1987) (finding that "Rule 803(8)(C) is inapplicable" where, *inter alia*, "the evaluation, comments, and criticisms . . . [we]re not within the scope of the Subcommittee's investigatory authority in this matter").

assess reasonable commercial behavior during the relevant time period. *See, e.g.*, *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 743 (2d Cir. 1989) (affirming district court's exclusion of government reports about industry as "untrustworthy because they do not reflect real concerns of the business world"). For these reasons, PX35–PX39 are not admissible under the public-records exception.

As for the 2024 Notice, PX40, it also does not meet the standard for the "Public Records" hearsay exception because it does not contain "factual findings" at all, but rather only preliminary, speculative statements subject to revision or alteration. *See City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) (finding "an interim report subject to revision and review . . . did not satisfy the express requirement of the Rule that the proffered evidence must constitute the 'findings' of an agency or official"); *United Food Grp., LLC v. Cargill, Inc.*, No. CV 11-7752 SS, 2015 WL 13868984, at *8 (C.D. Cal. June 8, 2015) (finding documents concerning ongoing investigation inadmissible under Rule 803(8) (citing cases)); *Toole v. McClintock*, 999 F.2d 1430, 1434-35 (11th Cir. 1993) ("Rule 803 makes no exception for tentative or interim reports subject to revision and review.").

## IV. The regulatory and legislative documents cannot serve as expert evidence.

Finally, the regulatory and legislative documents, PX35–40, do not satisfy the criteria for admissibility of expert opinion with regard to ESCOs' margins.[16] For the reasons discussed above, any opinion by the PSC concerning ESCO margins is not based on sufficient facts or data, is not the product of reliable principles and methods, and does not "reflect[] a reliable application of the

_____

[16] *See Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 962 (9th Cir. 1998) ("[T]he district court's 'gatekeeper' role [under *Daubert* and Rule 702] is not abrogated simply because the evidence falls under Rule 803(8)(C)."); *Kapirulja v. United States*, No. 05 CR 1246 RO, 2010 WL 7634133, at *10 (S.D.N.Y. Sept. 14, 2010) ("The fact that the hearsay objection . . . was overruled does not imply that a *Daubert* objection would have been unsuccessful."), *report and recommendation adopted*, No. 09 CIV. 4088 RO, 2011 WL 4526270 (S.D.N.Y. Sept. 29, 2011).

principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d).

Moreover, any such opinion is untimely because it was not disclosed before the Court-ordered deadline, which passed more than eighteen months ago. *See* Rule 26(a)(2).

*      *      *

For the foregoing reasons, Plaintiff should be precluded from offering Exhibits PX35–PX40 at trial and from offering any other evidence or making statements related to proceedings before the PSC, including briefs, orders, and other documents filed in such proceedings.

40

13.     **MIL No. 13: The Court should prohibit Plaintiff from seeking or referring to punitive damages and from referencing a "deceptive advertising" theory.**

Plaintiff recently informed XOOM and the Court of her intent to seek punitive damages on her breach of contract claim, supposedly predicated on a "deceptive advertising" theory. The Court should not allow her to do so—or to present any related evidence or argument.

As an initial matter, such claims are not properly before the Court. Plaintiff has not pleaded or pursued a theory of recovery based on punitive damages. *See* Doc. 42, First Am. Compl. 26. Plaintiff also has not requested leave to amend her Complaint. And even if she had, XOOM's contracts admittedly contain a valid and enforceable punitive-damages waiver. Although she acknowledges the waiver, Plaintiff asks the Court to allow her to seek punitive damages anyway for unspecified reasons. Having changed her mind at the eleventh hour, XOOM will be substantially prejudiced if Plaintiff is allowed to proceed at trial on issues on that would have been subject to discovery—but were not—and that could have been dismissed either at the pleading stage or summary judgment. *See* Fed. R. Evid. 403.

Regardless of the procedural improprieties of this new theory, Plaintiff's belated attempt to inject punitive damages fails as a matter of law. North Carolina bars the recovery of punitive damages on breach of contract claims except in cases of a breach of contract to marry or where the plaintiff pleads and proves "the commission of an identifiable tort." *See, e.g.*, *SciGrip v. Osae*, 838 S.E.2d 334, 348–49 (N.C. 2020) (stating also that even an "intentional breach of contract does not constitute a separate tort"). Neither exception applies here. Plaintiff never has pleaded or otherwise alleged that XOOM engaged in tortious conduct, let alone identified a tort that XOOM may have committed in conjunction with an "aggravating element such as malice or recklessness," as required to recover punitive damages on a contract claim. *See Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.*, 15 F.3d 327, 331 (4th Cir. 1994).

41

Courts applying North Carolina law have not allowed plaintiffs to seek punitive damages on breach-of-contract claims even when tort claims were previously part of a case. *See Booker v. Washington Mut. Bank, F.A.*, 2007 WL 475330, at *6 (M.D.N.C. Feb. 9, 2007) (holding that plaintiff could not seek punitive damages without "stat[ing] a sufficient claim for an independent tort to accompany her breach of contract allegations"); *Deltacom, Inc. v. Budget Telecom, Inc.*, 2011 WL 2036676, at *8 (E.D.N.C. May 22, 2011) (dismissing punitive-damages claim given dismissal of tort claims); *Britt-Wagner v. D&B Enterprises of Florence, LLC*, 2022 WL 2651847, at *2 (E.D.N.C. July 8, 2022) (agreeing that, "with only a breach of contract claim remaining, plaintiff's claim for punitive damages fails as a matter of law");  *Great Am. Emu Co. v. E.J. McKernan Co.*, 509 F. Supp. 3d 528, 543 n.3 (E.D.N.C. 2020) ("[W]here plaintiff's tort claims have been dismissed, plaintiff may not assert punitive damages."). Here, Plaintiff never had (and still does not have) a pleaded tort claim, and she should not be allowed to raise tort theories for the first time in front of a jury. *See* Fed. R. Evid. 403.

To satisfy the predicate tort requirement, Plaintiff apparently intends to argue that XOOM's alleged breach of contract also constitutes "deceptive advertising." But North Carolina law does not recognize such a tort claim, and to be "identifiable," Plaintiff must rely on a cause of action that "exists under North Carolina law." *Strum*, 15 F.3d at 331 (plaintiff could not base breach-of-contract punitive damages request on allegation of "intentional damage to real property" where the plaintiff "point[ed] [the court] to no cases recognizing such an action"). This Court reached the same conclusion in considering the availability of punitive damages on a breach of contract claim under New York law, which is similar to North Carolina law on the same subject. *See Toussie v. Allstate Ins. Co.*, 2016 WL 6537670, at *3 (E.D.N.Y. Nov. 3, 2016) (Ross, J.) ("The first element requires pleading commission of an independent tort, such as fraud. Without such an allegation,

42

plaintiffs' relief for a claim of denial of a valid insurance claim in New York is limited to breach of contract claims." (citation omitted)). Plaintiff therefore should not be allowed to seek punitive damages or raise her new, unpleaded "deceptive advertising" theory at trial.

Plaintiff has not yet mentioned the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA"). But the result would be the same if Plaintiff tries to pursue her newfound and non-existent "deceptive advertising" claim under that statute—because the UDTPA "does not permit [Plaintiff] to transmute a breach of contract claim into" an "award[] [of] punitive or treble damages." *Popper v. Hartford Fin. Servs. Grp.*, 682 F. Supp. 3d 469, 477 (E.D.N.C. 2023) (internal citations omitted), *aff'd*, No. 23-1450, 2024 WL 773581 (4th Cir. Feb. 26, 2024).

Plaintiff's proposed deceptive advertising theory is particularly inappropriate at this juncture. UDTPA claims hinge on matters such as reliance and "alleged misrepresentations and fraudulent statements," and thus are appropriately subject to Rule 9(b). *See Mountaineer Motors of Lenoir, LLC v. Carvana, LLC*, 2023 WL 6931787, at *7 (W.D.N.C. Oct. 19, 2023). Plaintiff never pleaded, pursued, or even hinted at such a claim. XOOM accordingly has not had the opportunity to prepare defenses and take discovery on such theories, which necessarily require delving into, among other things, how Plaintiff subjectively perceived specific statements and acted in reliance on them. XOOM will be prejudiced if it is forced to do so for the first time at trial. *See* Fed. R. Evid. 403.

Plaintiff's deceptive advertising approach also fatally undermines her class-based theory of liability. UDTPA claims "are 'not readily susceptible to classwide proof' because of the individual inquiry required." *TJF Servs. v. Transp. Media, Inc.*, 2020 WL 1870768, at *5 (E.D.N.C. Feb. 13, 2020) (collecting cases). Despite the prior class certification here, XOOM has the right to raise defenses (and Plaintiff has evidentiary burdens) that apply in an individual action.

43

*See, e.g., Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) ("Class certification is a procedural device that cannot 'giv[e] plaintiffs and defendants different rights . . . than they could have asserted in an individual action.'"). To establish a UDTPA theory of liability, then, Plaintiff would need to present evidence showing (among other things) reliance and damages for each individual class member, which necessarily would require mini-trials. *Id.* at 463 (stating that a class verdict requires evidence of "liability and damages" for "for each individual plaintiff"). Notably, Plaintiff justified class certification by arguing that her "straightforward breach of contract claim" would ***not*** "face the hurdles" of reliance and causation that arise in class actions involving tort and statutory claims based on allegedly deceptive advertising. *See* Doc. 132, Pl.'s Class Cert. MOL. 1 n.3. Plaintiff should be held to her prior representations that this is a pure breach of contract case, or she must abandon the class-based approach she has relied upon for the past six years.

For all these reasons, Plaintiff's unsubstantiated request for punitive damages and her unpleaded "deceptive advertising" theory should be excluded from trial under Federal Rules of Evidence 402 and 403.

14.     **MIL No. 14: The Court should prohibit Plaintiff from introducing deposition testimony from available witnesses as part of her case in chief.**

In discussing various pretrial matters, Plaintiff's counsel stated their intention to introduce and read from deposition transcripts as part of Plaintiff's affirmative trial presentation, even for witnesses who are available at trial. In fact, they say they plan to both introduce deposition testimony *and* call the witnesses live. The Rules plainly foreclose that approach. Deposition testimony may be read for an available witness only if the deponent was a XOOM "officer, director, managing agent, or designee under Rule 30(b)(6)" at the time they were deposed. Fed. R. Civ. P. 32(a)(3); *see Banks v. Yokemick*, 144 F. Supp. 2d 272, 288 (S.D.N.Y. 2001) ("[D]eposition testimony is only a substitute, not to be resorted to if the witness can appear in person."); *Kolb v. Suffolk Cnty.*, 109 F.R.D. 125, 128 (E.D.N.Y. 1985) (denying plaintiff leave to designate eight of defendant's employees where they were not unavailable for trial).[17]

None of the depositions Plaintiff has designated qualifies for the exception to live testimony under Rule 32(a)(3) except for Jason Loehde's testimony as XOOM's corporate representative under Federal Rule of Civil Procedure 30(b)(6).[18] Plaintiff's other proposed deposition designations are for individuals who *were not* XOOM officers, directors, or managing agents at the time of their deposition, and that includes Mr. Loehde in his personal capacity. (Under Rule 32, Mr. Loehde's individual deposition, taken the day before the Rule 30(b)(6) deposition,

---

[17] For purposes of this MIL, XOOM does not oppose Plaintiff's use of deposition testimony from witnesses whom Plaintiff establishes are unavailable at trial as provided for in the Rules. *See* Fed. R. Civ. P. 32(a)(4) (setting forth five instances in which deposition testimony may be introduced for *unavailable* witnesses). XOOM does, however, maintain all its other objections to deposition designations for unavailable witnesses, including holding Plaintiff to her burden to show that adducing testimony in that manner will not cause "undue delay, wast[e] time, or needlessly present[] cumulative evidence" under Federal Rule of Evidence 403.

[18] As noted in the parties' pretrial filings, XOOM objects to Plaintiff's designations for Mr. Loehde's 30(b)(6) deposition on other grounds under the Federal Rules of Evidence.

can be used at trial only if he is not available.) Indeed, when deposed, several of the witnesses were no longer XOOM employees at all.

Accordingly, the Court should prohibit Plaintiff from using deposition designations for available witnesses except for impeachment purposes or as otherwise allowed under the Federal Rules of Evidence. Fed. R. Civ. P. 32(a)(2).

15. **MIL No. 15: XOOM should be permitted to redact from any party or joint trial exhibit its trade-secret information that the Court excludes.**

Much of the information in the exhibits on Plaintiff's Exhibit Lists, XOOM's Exhibit Lists, and the Joint Exhibit List includes information that the parties agree constitutes XOOM's trade secrets. Insofar as the Court excludes any category of information per XOOM's requests above, XOOM requests leave to redact such information from publication to the jury or the public insofar as it also constitutes trade-secret information. *See Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 598 (1978)) (holding that "the right to inspect and copy judicial records is not absolute," and, in particular, "the common-law right of inspection has bowed before the power of a court to insure that its records are not used . . . as sources of business information that might harm a litigant's competitive standing."); *In re Elec. Arts, Inc.*, 298 F. App'x 568, 569–70 (9th Cir. 2008) (reversing district court's decision not to seal exhibit containing "confidential and commercially sensitive information," noting that "[a] redacted version of Trial Exhibit 80, not containing [the sensitive information], need not be filed under seal and may be made available to the public"); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, No. 205-CV-302, 2007 WL 1074933, at *2 (D. Vt. Apr. 6, 2007) (permitting the parties to propose redactions of trade secret information, and noting that "[t]he balance to be struck between the need to protect legitimate trade secrets and the need for public access to the materials on which this Court bases its decision depends on" whether the information is "critical to the determination of an issue, or . . . highly tangential"); *Everlight Elecs. Co. v. Nichia Corp.*, No. 12-CV-11758, 2016 WL 278812, at *3 (E.D. Mich. Jan. 22, 2016) ("[T]he Court will redact . . . testimony and documents (or portions thereof) that constituted . . . actual trade secrets and confidential information . . . .").

**Conclusion**

For the reasons set forth above, the Court should grant XOOM's motions *in limine* and preclude Plaintiff from offering evidence of, argument regarding, or otherwise referring to the matters discussed above.

Dated: May 20, 2024

McDowell Hetherington LLP

*/s/ Michael D. Matthews, Jr*
Michael D. Matthews, Jr.
Diane S. Wizig (admitted *pro hac vice*)
James M. Chambers (admitted *pro hac vice*)
David L. Villarreal (admitted *pro hac vice*)
Netra Sreeprakash
Justin Chapa R. Chapa (*pro hac* forthcoming)
McDowell Hetherington LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
james.chambers@mhllp.com
david.villarreal@mhllp.com
netra.sreeprakash@mhllp.com
justin.chapa@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*

48

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on the 20th day of May, 2024, via email on all counsel of record.

<u>/s/*Michael D. Matthews, Jr.*</u>
Michael D. Matthews, Jr.

4876-5320-7743, v. 6