**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSANNA MIRKIN and BORIS MIRKIN, Individually and on Behalf of All Others Similarly Situated, | No. 18 Civ. 2949 (ARR) (RER) |
| Plaintiffs, | |
| v. | |
| XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF XOOM'S MOTION
<u>TO EXCLUDE PLAINTIFF'S UNTIMELY EXPERT DISCLOSURES</u>**

## TABLE OF CONTENTS

I. Introduction ........................................................................................................................... 1

II. Factual & Procedural Background ...................................................................................... 2

    A. Plaintiff's experts understood the proportionate margin theory when they developed the damage model attached to her Original Complaint. ........................................................ 2

    B. CRA replaces the Market Supply Cost formula with Models One and Two. .................... 3

    C. Plaintiff continues to advance her proportionate-margin contract construction and insists that Model Two is aligned with that interpretation. ........................................................... 4

    D. Taking Plaintiff at her word, the Court finds that Model Two is "consistent with" the proportionate-margin construction Plaintiff asked the Court to adopt. ............................. 5

    E. Plaintiff secures certification and defends the Class Order by insisting Model Two satisfies *Comcast* because it reflects her own case theory. ................................................. 5

    F. Plaintiff forged a path to trial by denying Model Two's faults, only to use those faults as an excuse to present three brand new, previously undisclosed models. ............................. 6

    G. CRA's New Report finally admits that Model Two was never aligned with Plaintiff's proportionate-margin construction. ................................................................................... 7

III. Argument & Authorities ..................................................................................................... 8

    A. The opinions and models in CRA's New Report must be excluded as untimely. .............. 8

        1. Rule 26: CRA's New Report contains untimely new opinions, not a timely supplement. ................................................................................................................. 8

            a. The New Report's brand-new opinions are untimely under Rule 26(a)(2)(D). ....... 8

            b. The New Report is not a timely supplement under Rule 26(e). ............................ 10

        2. Rule 37: Plaintiff should be precluded from relying on CRA's New Report. ............ 15

            a. Plaintiff cannot show substantial justification or harmlessness. ............................ 15

            b. The appropriate sanction for Plaintiff's untimely disclosure is exclusion. ........... 18

    B. The opinions and models in CRA's New Report must be excluded under Rule 702 too. 21

        1. CRA's new opinions and models are inadmissible under *Martinez*'s binding precedent. ................................................................................................................. 22

        2. XOOM's initial review of CRA's New Report reveals numerous flaws that warrant exclusion under Rule 702, and discovery would undoubtedly reveal more problems. .................................................................................................. 24

            a. CRA's New Report uses a defective, previously undisclosed algorithm. .............. 25

            b. Supply Costs: Methods A, B, and C do not use XOOM's reported supply costs. . 27

c.  Margin: Methods A, B, and C are based on insufficient facts and data. ................ 28

d.  Usage: CRA does not disclose how usage is calculated. ....................................... 30

IV. Conclusion & Prayer ............................................................................................... 30

# TABLE OF AUTHORITIES

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.*,
  748 F.3d 110 (2d Cir. 2014) ............................................................................12

*Anthem, Inc. v. Express Scripts, Inc.*,
  660 F. Supp. 3d 169 (S.D.N.Y. 2023) ..............................................................20

*Canales v. United States*,
  No. 19-CV-0834, 2021 WL 5830765 (E.D.N.Y. Dec. 8, 2021) ..........................8

*Coene v. 3M Co.*,
  303 F.R.D. 32 (W.D.N.Y. 2014) .............................................................8, 10, 18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................5, 14, 16

*Ebewo v. Martinez*,
  309 F. Supp. 2d 600 (S.D.N.Y. 2004) ........................................................ *passim*

*Est. of Jackson by Jackson v. Cnty. of Suffolk*,
  No. 2:12-CV-1455, 2019 WL 1676000 (E.D.N.Y. Apr. 17, 2019) (Ross, J.) ..............11, 15

*Hines v. BMG Rts. Mgmt. (US)*,
  No. 20-CV-3535, -- F. Supp. 3d --, 2023 WL 6214264 (S.D.N.Y. 2023) ..............16, 19, 21

*Intellivision v. Microsoft Corp.*,
  484 F. App'x 616 (2d Cir. 2012) ......................................................................12

*Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*,
  645 F. Supp. 3d 95 (E.D.N.Y. 2022) (Ross, J.) ............................................15, 19

*Kunstler v. City of New York*,
  242 F.R.D. 261 (S.D.N.Y.2007) .......................................................................15

*Lewis v. FMC Corp.*,
  786 F. Supp. 2d 690 (W.D.N.Y. 2011) ......................................................14, 15, 19

*Lidle v. Cirrus Design Corp.*,
  No. 08 Civ. 1253, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) ......................14

*Mannoia v. Farrow*,
  476 F.3d 453 (7th Cir. 2007) ...........................................................................19

*Martinez v. Agway Energy Servs., LLC*,
  88 F.4th 401 (2d Cir. 2023) ..............................................................13, 22, 24, 28

iv

*Mirkin v. XOOM Energy, LLC*,
    931 F.3d 173 (2d Cir. 2019) ..................................................................13

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................................12

*Pagliaro v. Stevens Transp., Inc.*,
    No. 10 Civ. 0268, 2011 WL 2671567 (S.D.N.Y. July 6, 2011) ..................20

*Ritchie Risk-Linked Strategies Trading (Ireland) v. Coventry First*,
    280 F.R.D. 147 (S.D.N.Y. 2012) .............................................................15

*Sharpe v. U.S.*,
    230 F.R.D. 452 (E.D. Va. 2005) .............................................................19

*Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*,
    118 F.3d 955 (2d Cir.1997) ..................................................................18

*Torres v. Dematteo Salvage Co. Inc.*,
    No. CV 14-774, 2016 WL 845326 (E.D.N.Y. Mar. 2, 2016) .....................20

*Valassis Commc'ns, Inc. v. News Corp.*,
    No. 17-CV-7378, 2020 WL 1982963 (S.D.N.Y. Apr. 24, 2020) ................20

**Other Authorities**

Fed. R. Civ. P. 16(b) ...................................................................................8, 9

Fed. R. Civ. P. 23 ...........................................................................6, 11, 12, 20

Fed. R. Civ. P. 26(a)(2)(B) ......................................................................8, 14, 16

Fed. R. Civ. P. 26(a)(2)(D) .........................................................................8, 10

Fed. R. Civ. P. 26(e) ................................................................................ *passim*

Fed. R. Civ. P. 37 .....................................................................................8, 15, 21

Fed. R. Evid. 403 ...........................................................................................22

Fed. R. Evid. 702 .................................................................................... *passim*

L.R. 56.1 ........................................................................................................4

## I.   INTRODUCTION

There has been a mismatch between Plaintiff's legal theory and her experts' opinions since their original report ("CRA's Original Report") was served in October 2022. Plaintiff's legal theory has been that XOOM was required to charge variable rates that included a proportionate margin above its costs, while her experts' models assumed that XOOM's margin must be either non-existent (CRA's "Model One") or non-proportionate (CRA's "Model Two"). For over a year and a half, Plaintiff ignored that mismatch and assured this Court and the Second Circuit that CRA's Model Two was aligned with her proportionate-margin theory of liability because its underlying "algorithm" could accommodate a proportionate margin to be determined at trial.

With those assurances, the Court set a Joint Pretrial Order deadline. The parties then spent many hundreds of hours preparing for the trial Plaintiff said she was ready for, conferring weekly for months, and filing a lengthy Joint Pretrial Order meant to embody all claims and defenses at issue. But a few hours *after* that filing, and just minutes before midnight, Plaintiff unveiled "amended" expert disclosures ("CRA's New Report") in which CRA completely abandons the Original Report and its algorithms. In their place, CRA offers ***three new models***—Methods A, B, and C—that use a brand-new algorithm and feed in three proportionate-margin inputs. The difference between Model Two's algorithm and the new Methods' algorithm is undeniable:

**Model Two:**

`[variable rate]*[usage]*([variable margin]-[fixed margin])`

**Methods A, B, C:**

`([variable rate]*[usage])-([usage]*[variable cost]*(1+[margin input])`

Not only is the algorithm entirely new, but CRA's New Report ***directly contradicts*** their earlier opinions. CRA previously testified that utility rates are "irrelevant for this contract," but they now use the same "irrelevant" utility rates as the basis for the margin input in new Methods

1

A and B. In fact, CRA now calls Method A's utility comparison "the best comparator margin to use for setting a variable rate in accordance with [this contract]." These are by no means the only new and different opinions. The New Report is not a supplement or an update, but a series of entirely new approaches. Instead of proceeding on evidence she used to survive summary judgment, certify a class, overcome XOOM's 23(f) appeal, and oppose decertification, Plaintiff now wants to try to prove liability and damages using new opinions and untested expert evidence.

So why the dramatic shift? Plaintiff had no choice. As CRA explains, Model Two was designed to use a fluctuating fixed-rate margin input, and its algorithm is mathematically incapable of accommodating any proportionate-margin input. In other words, Plaintiff realized that XOOM's decertification arguments are correct and insurmountable: Model Two is fundamentally mismatched with Plaintiff's proportionate-margin legal theory and the class must be decertified.

At this juncture, Plaintiff cannot possibly excuse her untimely attempt to remedy Model Two's problems. Apart from being enormously prejudicial to XOOM and immensely disruptive in the last stage of this 2018 case, Plaintiff's late disclosures are also futile. CRA's new models share some of Model Two's failures and introduce a host of new ones. And XOOM's substantive analysis to date is far from exhaustive. If the New Report is not excluded as untimely (and it should be) then XOOM would need months of discovery to fully evaluate CRA's three new methods, including evaluation of CRA's workpapers, preparation of a rebuttal report, and depositions—all at Plaintiff's expense. XOOM should not be forced to endure this additional prejudice, so the Court should exclude the opinions and models in CRA's New Report now.

## II.    FACTUAL & PROCEDURAL BACKGROUND

### A.    Plaintiff's experts understood the proportionate margin theory when they developed the damage model attached to her Original Complaint.

Plaintiff hired CRA six years ago, before she filed suit. She did so because her case rests

on the allegation that XOOM breached a contractual duty to set rates "based on [its] supply cost," Doc. 1-2, Orig. Compl. ¶ 4, and that claim requires allegations of a disconnect between the rates she was charged and the rates she allegedly should have been charged under the contract.

To do that at the pleading stage without the benefit of XOOM's cost information, Plaintiff engaged CRA to calculate "a rate that reflects 'actual and estimated supply costs,' as required by the XOOM customer contract." Orig. Compl. ¶ 47; Ex. A-1[1], Adamson Dep. 114:12–23. CRA created a "Market Supply Cost" that allegedly showed what Plaintiff's rates would have been if they included XOOM's assumed "costs [of] supplying a residential customer for each period" ***plus*** an additional "margin to cover retailer fixed costs." Orig. Compl. ¶ 48.

For the cost component of this Market Supply Cost, CRA relied on publicly available data to estimate what XOOM's supply costs might have been. *See* Am. Compl. ¶ 55. But with respect to the margin, CRA could not rely on public data because ESCOs like XOOM do not publicize their margins. So the margin component of the Market Supply Cost—a static 1.3 ¢ per kWh—was chosen by CRA based on "the contract language but nothing else." *See* Ex. A-1, Adamson Dep. 119:5; Doc. 42, Am. Compl. ¶ 55; *id.* at Ex. 3.

## B.   CRA replaces the Market Supply Cost formula with Models One and Two.

After a trip to the Second Circuit, the case survived dismissal and proceeded to discovery. Plaintiff and CRA obtained mountains of data from XOOM and testimony about XOOM's internal costs, margins, and profits. With access to that data, CRA could have updated the Market Supply Cost by (1) replacing its cost estimates with new data obtained from XOOM's records, and (2) adding a static margin in an amount CRA deemed sufficient to "cover retailer fixed costs."[2] Am.

---

[1] Exhibits with the prefix "A-" are annexed to the Declaration of Michael D. Matthews, Jr.
[2] If CRA had modelled damages using a formula designed to cover XOOM's "actual and estimated supply costs" plus a static margin that would cover its fixed costs, XOOM is confident the results would

Compl. ¶ 55. Instead, CRA created two new models that specifically refused to allow XOOM a proportionate margin that would cover costs: Model One, which allowed XOOM no margin whatsoever, and Model Two, which imposed a cap on XOOM's margin that fluctuated monthly in accordance with whatever estimated margin was included in fixed rates governed by different contracts. *See* Ex. A-2, CRA Orig. Rep. ¶ 61.[3]

**C.   Plaintiff continues to advance her proportionate-margin contract construction and insists that Model Two is aligned with that interpretation.**

In its briefing on summary judgment and class certification, XOOM argued that Models One and Two were inadmissible, irrelevant, and could not support Plaintiff's claim—much less that of a putative class. *See, e.g.* Doc. 139, Def. Class Resp. 25–27; Doc. 145-1, Def. SJ Mem. 22–26; Doc. 149, Def. SJ Reply 10–11 (arguing that Plaintiff's expert evidence was "inadmissible and irrelevant"); *see also, e.g.*, Doc. 149-1, Def. Resp. to Pl.'s L.R. 56.1 Statement ¶¶ 99, 100, 110, 112 (objecting to CRA's Original Report multiple grounds, including the reliability of the data and opinions). With respect to Model Two in particular, XOOM argued it was deficient because "the phrase 'based on XOOM's actual and estimated supply costs' cannot be reasonably construed to cap XOOM's variable-rate margins at . . . the level applicable to fixed-rate products." Def. SJ Mem. 26. Additionally, XOOM explained this problem was fatal to class certification because Model Two did "not match [Plaintiff's] theory of liability." Doc. 139, Def. Class Resp. 25–27.

Plaintiff disagreed. After an unsuccessful attempt to justify her no-margin theory (Model

___

show that Plaintiff and the class were not overcharged. Presumably, that is why CRA and Plaintiff have consistently refused to take that approach, despite Plaintiff's promise in that "[w]ith discovery of XOOM's actual costs and profits, Plaintiffs will be able to create an even more precise model showing what XOOM's prices should have been under the terms of its customer contract." Am. Compl. ¶ 58.

[3] The problems with Models One and Two are discussed at length in XOOM's motion to strike Plaintiff's timely expert disclosures, Doc. 215.

One) [4], Plaintiff advanced her proportionate-margin interpretation of the contract to defend Model Two. Doc. 147, Pl. SJ Resp. 9. Under that interpretation, Plaintiff argued "that XOOM was required to charge a margin that is directly proportional to its supply costs," and she accused XOOM of breaching that provision by including "varying monthly markups" in its rates. *Id.* at 9. Plaintiff then insisted that Model Two "reflects" the proportionate-margin construction by modelling what the class members' rates would have been if their margins had been both "consistent" on a month-to-month basis and "profitable." *Id.* (claiming Model Two allows XOOM to "charge a reasonable, and consistent, margin"); *id.* (arguing Model Two could "reasonably" lower XOOM's variable-rate margins to the levels achieved on its fixed-rate *because* XOOM's fixed-rate products "were also profitable for XOOM"); *id.* at 37 (same); *id.* at 45 (same). As CRA now admits, that was incorrect. Ex. A-3, CRA New Rep. ¶ 101.

**D.    Taking Plaintiff at her word, the Court finds that Model Two is "consistent with" the proportionate-margin construction Plaintiff asked the Court to adopt.**

In an August 2023 summary judgment order, the Court held that the contract's pricing term is "not ambiguous" and concluded that it "must be construed consistent with Plaintiff's reading." Doc. 151, SJ Order 9. Under that interpretation, XOOM was allowed to include a margin above costs in its variable rates, but the "margin would have to remain proportionate . . . over time" to XOOM's underlying supply costs. *Id.* at 13. As Plaintiff has acknowledged, that was not a new take on the meaning of the pricing term, but rather an adoption of the "exact construction [Plaintiff] offered at summary judgment." Doc. 180, Joint Decert. Ltr. 4–5.

**E.    Plaintiff secures certification and defends the Class Order by insisting Model Two satisfies *Comcast* because it reflects her own case theory.**

The Court granted class certification two weeks after denying summary judgment. The

---

[4] Plaintiff has since abandoned Model One altogether. *See* Doc. 204, Pl. Decert. Resp. 23 n.10, ("The Class will not rely on Model 1").

Class Order considered whether Model Two was "consistent with the classwide theory of liability and capable of measurement on a classwide basis." Doc. 152, Class Order 14. In doing so, the Court specifically found that Model Two's "incorporat[ion of] the margin charged on XOOM's fixed rate product" was not an impediment to class certification because that margin input[5] was "entirely consistent with plaintiff's theory of liability." *Id.*

Since the Class Order, XOOM has repeatedly argued that Model Two cannot measure damages under the proportionate-margin interpretation of the contract. *See* Doc.153-1, Def. 23(f) Pet.; Doc. 167, Def. Stay Mem.; Doc. 197, Def. Decert Mem.; Doc. 215, Def. Daubert Mem. In response, Plaintiff has denied Model Two's faults and pressed her claim toward trial by arguing the Court's summary judgment order simply adopted her own contract interpretation, and that Model Two accurately reflected that theory. *See* Doc. 155-1, Pl. 23(f) Resp.; *See* Doc. 171, Pl. Stay Resp.; Doc. 180, Joint Ltr. Decert.; Doc. 204, Pl. Decert. Resp.

## F. Plaintiff forged a path to trial by denying Model Two's faults, only to use those faults as an excuse to present three brand new, previously undisclosed models.

Plaintiff's refusal to acknowledge Model Two's flaws has kept this case moving toward trial. *See* Doc. 174, Rule 23(f) Mandate; Dec. 6 Doc. Entry, Stay Order; Jan. 19 Min. Entry, Scheduling Order. But after seeing XOOM's decertification motion in March, Plaintiff realized that her short-term tactical victories would ultimately lead to defeat. Plaintiff cannot survive decertification or secure a verdict at trial using Model Two unless she first satisfies Rule 702's threshold requirements for admissibility and then uses Model Two at trial to prove damages on her overcharge theory. As XOOM has explained (most recently in its motion to strike Plaintiff's timely expert disclosures), Model Two is not up to those tasks. Thus, a trial strategy built on Model Two was always destined to fail—the only question was how long Plaintiff's would delay admitting it.

---

[5] The Court declined, however, to assess the input's "accuracy." Class Order 14.

The answer: until it was too late. Plaintiff delayed acknowledging Model Two's failure until hours after filing the Joint Pretrial Order, and just thirteen minutes before midnight on May 10, 2024, when she served an "amended" expert report that "replaces the original report," deletes Model Two and replaces it with three brand new models: Methods A, B, and C. *See* Ex. A-3, CRA New Rep.; Ex. A, Matthews Decl. ¶ 3. Those new disclosures are untimely and must be excluded.

**G.     CRA's New Report finally admits that Model Two was never aligned with Plaintiff's proportionate-margin construction.**

CRA's New Report makes no attempt to update Model Two's calculations to include XOOM's most recent data productions. Rather, CRA built new algorithms from scratch because Model Two's math did not "align . . . with the court's ruling at summary judgment that the [contract's] pricing term permits only a single proportionate margin." Ex. A-3, CRA New Rep ¶ 101. Then, CRA fed different data into those algorithms, replacing the cost, margin, and usage data utilized in Model Two with a different set of figures CRA generated using undisclosed formulas. After that, CRA offered three new margin caps (which CRA named Methods A, B, and C[6]) that expressly ***contradict*** the Original Report and the testimony given at CRA's depositions.

CRA's New Report is a grossly untimely disclosure of opinions and models that Plaintiff should have disclosed—if at all—by the original October 2022 deadline for expert disclosures. Her failure to meet that deadline independently warrants the exclusion of CRA's New Report. And substantively, CRA's New Report does not solve Model Two's problems; rather, it exacerbates those problems and introduces new ones. Accordingly, the Court should exclude the opinions and methods disclosed in CRA's New Report and impose all other sanctions necessary to mitigate the prejudice of Plaintiff's untimely expert disclosures.

---

[6] XOOM adopts CRA's nomenclature for simplicity but, as discussed below, the new 'methods' are in fact new ***models*** untethered to Model Two or anything else disclosed in the Original Report.

## III.   ARGUMENT & AUTHORITIES

**A.   The opinions and models in CRA's New Report must be excluded as untimely.**

In addressing XOOM's motion to exclude CRA's Amended Report as untimely, the Court "must first determine whether [CRA's New Report] may be properly characterized as" containing "new opinion[s] and [] therefore untimely under Rule 26(a)(2)(D)[,]" or, alternatively, "a supplemental report and [] therefore timely under Rule 26(e)[.]" *Coene v. 3M Co.*, 303 F.R.D. 32, 43 (W.D.N.Y. 2014). Because that analysis unquestionably shows that CRA's New Report is an untimely new expert disclosure, the Court must then determine whether Plaintiff can avoid Rule 37(c)(1) sanctions by proving that her untimeliness is "substantially justified" or "harmless." *Id.* She cannot, and the only appropriate sanction here is to exclude CRA's New Report.

1.   Rule 26: CRA's New Report contains untimely new opinions, not a timely supplement.

   a.   *The New Report's brand-new opinions are untimely under Rule 26(a)(2)(D).*

Under Rule 26(a)(2)(D) and the Court's scheduling order, October 3, 2022, was the parties' agreed-upon deadline to serve expert disclosures "accompanied by a written report" that was "prepared and signed by [CRA]" and contained, among other things, "a complete statement of all opinions [CRA] will express and the basis and reasons for them" and "the facts or data" CRA considered in forming those opinions. *See* Fed. R. Civ. P. 26(a)(2)(B), (B)(i)–(ii); Doc. 115 (noting the parties' agreement to an October 2022 expert disclosure deadline per Judge Reyes' case-management plan).[7] To meet that deadline, Plaintiff served an expert report that disclosed opinions

---

[7] Plaintiff has not previously argued that her untimely disclosure can be excused with a modified scheduling order pursuant to Rule 16(b). That is no surprise given that she cannot possibly meet Rule 16(b)'s good cause standard when the New Report's opinions are based on information that was available to CRA when the Original Report issued. *See Canales v. United States*, No. 19-CV-0834, 2021 WL 5830765, at *2 (E.D.N.Y. Dec. 8, 2021) ("[E]ach of the new reports presented new theories based on information that was available before the close of discovery. This precludes a finding of good cause."). Nor could Plaintiff satisfy Rule 16(b)'s good cause standard *even if* this Court's contract construction and the

her experts formed, including their use of Model One and Model Two to project the amount of overcharge damages they thought the class incurred. *See* Ex. A-2, CRA Orig. Rep. While those models are inadmissible for a number of reasons discussed in XOOM's motion to strike that report, *see* Doc. 215, Def. Daubert Mem., there is no dispute that they were timely disclosed.

The same cannot be said for CRA's New Report. Plaintiff withheld the New Report until May 10, 2024—a full ***nineteen months*** after the deadline to disclose "a complete statement" of CRA's opinions. *See* Ex. A-3, CRA New Rep.; Ex. A, Matthews Decl. ¶ 3. Despite its title, CRA's new report does not 'amend' anything. Rather, it is a brand-new report that fully abandons CRA's previous opinions using Models One and Two, replaces them with a different algorithm and three previously undisclosed methodologies, and tries to justify the change by offering new expert "opinions" that ***directly contradict*** opinions and sworn testimony CRA previously gave in this case. *See* Ex. B, Coleman Decl. ¶¶ 3–4, 6; *see also* Ex. A-3, CRA New Rep. ¶ 1 ("This Amended Report ***replaces*** the [Original Report]") (emphasis added). For example, under the Original Report's logic, CRA's expert opinion was that the regulated utility's rate "is irrelevant for this contract." Ex. A-4, Eryilmaz Dep. 74:8–75:12; *see* Ex. A-1, Adamson Dep. 68:19–69:9 ("And you're not offering a damage model that compares XOOM's variable rate charged to what customers would have been charged by the utility during the same time period? . . . A. No."). By contrast, CRA's New Report uses the very same utility rates to generate a margin input for Methods A and B—and promotes Method A's utility-rate margin input as representing "the best comparator." Ex. A-3, CRA New Rep. ¶ 18(j).

Thus, the opinions and damage models in the New Report are "properly characterized as [] new opinion[s] and [are] therefore untimely under Rule 26(a)(2)(D)." *Coene*, 303 F.R.D. at 43;

---

Second Circuit's explanation of the contract language were new in 2023. As discussed in Part III.A.1.b, Plaintiff continued defending CRA's Original Report and Model Two for many months afterward.

*id.* at 44 ("Common sense suggests (and numerous decisions confirm) that an expert report that discloses new opinions is in no way a mere supplement to a prior report." (cleaned up)).

> ### b.   The New Report is not a timely supplement under Rule 26(e).

To try to justify her untimely disclosures, Plaintiff has cited Rule 26(e) and three so-called "developments" she and CRA say "occurred after the Original Report was submitted." Ex. A-3, CRA New Rep. ¶ 2; *see* Doc. 187, Joint Ltr. on Am. Rep. 1. The "new information" and "new legal developments on key issues in this case" they point to are: (1) XOOM's agreed production of recent rate setting workbooks and charge data, (2) the Court's supposed "clarif[ication of] the meaning of the pricing term" in its summary judgment order, and (3) the Second Circuit's opinion in *Martinez* somehow "ma[king] clear that the pricing term did not give XOOM discretion to use any subjective process or factors to set monthly variable rates." Ex. A-3, CRA New Rep. ¶ 2; *see* Doc. 187, Joint Ltr. on Am. Rep. 1.

Only the first—i.e., data XOOM produced after the Original Report—falls within the ambit of Rule 26(e) supplementation. And if CRA had simply expanded Model Two's calculations to include data XOOM produced after the report was prepared, that justification would have merit.[8] *See* Fed. R. Civ. P. 26(e)(1)–(e)(1)(A) (allowing parties to "supplement or correct" discovery disclosures "in a timely manner" if they "learn[] that in some material respect the disclosure or response is incomplete or incorrect"). Indeed, XOOM expressly agreed that Plaintiff could do just that: update Model Two with recent data. *See* Doc. 187, Joint Ltr. on Am. Rep. 4 n. 4.

But that is not what Plaintiff did. Instead of asking CRA to update Model Two's calculations, she instructed them "to prepare [an] Amended Report" that uses new algorithms, different inputs, and overhauled opinions that allegedly arise from the Court's August 2023

---

[8] XOOM did not expect CRA to update Model One because, again, Plaintiff abandoned it.

summary judgment order and the Second Circuit's December 2023 *Martinez* decision. Neither is a new development, so the wholesale revision of Plaintiff's expert disclosure is not allowed at this juncture.[9] CRA's New Report is based on information about Plaintiff's legal theory that CRA unquestionably had access to, ***and even cited***, when they prepared the Original Report. As this Court has acknowledged, Rule 26(e) does not "permit a party to supplement an expert report at any time it wishes," which would "wreak havoc on docket control and amount to unlimited expert opinion preparation." *Est. of Jackson by Jackson v. Cnty. of Suffolk*, No. 2:12-CV-1455, 2019 WL 1676000, at *2 (E.D.N.Y. Apr. 17, 2019) (Ross, J.) (cleaned up). Rather, the Rule permits new disclosures only when "the information relied upon by the expert was previously unavailable to him." *Id.*

Plaintiff's suggestion that the Court's proportionate-margin contract construction on summary judgment somehow warrants her untimely do-over on expert disclosures is not only false, but it is also contrary to the position she took as early as her September 2023 Answer to XOOM's Rule 23(f) Petition and as recently as her February 2024 Position on XOOM's Motion to Decertify. *See* Docs. 172-2, 180. Indeed, Plaintiff's pronouncement that she intended to serve the Amended Report due in part to the Court's summary judgment order was made (for the first time) mere weeks after she argued that XOOM should not be allowed to file its decertification motion because the Court's summary judgment contract construction was nothing new, but just an adoption of the interpretation that Plaintiff always advanced:

> XOOM now claims "neither party" advocated for the "proportionate" margin contract construction and thus the Court was blind to the attendant Rule 23 implications. Not so. ***Plaintiff offered this exact construction at summary judgment***, which XOOM's briefing called a "capped" margin model six times. This

---

[9] Moreover, having waited ***nine months*** from the Court's summary judgment order and ***five months*** from the Second Circuit's *Martinez* decision to serve CRA's Amended Report, Plaintiff cannot possibly satisfy Rule 26(e)(1)(A)'s additional requirement that supplementation occur "in a timely manner" either.

is why a heading in the MSJ Order (p. 9) states that ***XOOM's contract "must be construed consistent with plaintiff's reading."*** (cleaned up).

Doc. 187, Joint Decert. Ltr. 6 (emphasis added). Plaintiff has also consistently claimed that her Model Two is "relevant evidence" of a proportionate margin. *See* Doc. 171, Pl. Resp. Stay 12.[10] So, her assertion now that the Court's August 2023 proportionate-margin construction is novel and inconsistent with her existing models directly contradicts what she argued for the prior seven+ months. Having defeated XOOM's Rule 23(f) Petition on those grounds, and successfully propelled this case forward to trial despite XOOM's criticisms of Model Two, Plaintiff must be judicially estopped from "relying on a contradictory argument to prevail in another phase" of this case to allow her untimely expert disclosures. *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

In light of her prior statements, Plaintiff cannot credibly contend the Court's proportionate-margin construction is a new development warranting brand-new expert opinions. Nonetheless, Plaintiff's position in the parties' pre-motion letter and statements CRA makes in its Amended Report suggest she intends to "deliberately chang[e] positions according to the exigencies of the moment" and argue that the proportionate-margin construction was not her theory all along. *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (quoting *New Hampshire*, 532 U.S. at 743)). As discussed, that argument would fail on its merits because Plaintiff's Original Complaint disclosed her (and CRA's) case theory built around a static and proportionate margin. As a matter of judicial estoppel, Plaintiff cannot make that argument at all.

---

[10] *See also, e.g.*, Doc. 172-2, Pl. 23(f) Answer 19 (Model Two "yields precise damages under the District Court's proportionate-margin construction."); Doc. 172-1, Oct. 27 Tr. 12 (Plaintiff's counsel arguing that "Judge Ross considered our theory. She considered our damages model. She endorsed it."); Pl. Stay Resp. 6 ("The Court Accepted Plaintiff's Damages Methodology and the Question of the Appropriate Margin Is for the Factfinder.").

If CRA was unsure about Plaintiff's legal theory on whether the contract allowed a margin (or how margin was required to be set), they did not need to wait for a summary judgment opinion. Rather, they could have simply reviewed the Original Complaint and the Amended Complaint, which specifically alleged that XOOM was "required by the customer contract" to set rates that included a static, non-varying margin large enough to "cover retailer fixed costs." Am. Compl. ¶¶ 54–55; *see* Ex. A-5, CRA Orig. Rep. Ex. 1 (listing Plaintiff's Amended Complaint and exhibits in the Original CRA Report's list of documents considered).

Likewise, CRA did not need to see the Second Circuit's decision in *Martinez* to know what that court has to say about the differences between the contract in this case and the one it addressed in *Richards*. Rather, CRA could have simply reviewed the passage *Martinez* was citing, which came from the Second Circuit's opinion **issued five years ago in this case**. *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) (quoting the explanation in this case of the "'critical[]'" difference "between the contractual language in *Mirkin* and that in *Richards*" (quoting *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 178 (2d Cir. 2019)). *See* Ex. A-5, CRA Orig. Rep. Ex. 1 (listing the Second Circuit's opinion in this this case in the Original CRA Report's list of documents considered); *see also* Ex. A-1, Adamson Dep. 91:7–96:16 (pointing to differences in the contract language in *Richards* and this case).

CRA could have fully understood Plaintiff's longstanding legal theory in this case—the same legal theory the Court adopted on summary judgment—by simply reviewing the documents relied on in the Original Report. And if CRA was still unsure after that review,[11] Plaintiff's counsel could—and should—have educated CRA about the legal theory they would advance based on the proportionate-margin construction. That would have allowed CRA to include Methods A, B, and

---

[11] After all, CRA admittedly lacks the expertise to interpret the contract's language. *See* Ex. A-1, Adamson Dep. 11:12–21.

C in its original 2022 disclosures[12] as alternatives to Models One and Two. The parties' disagreement would have then centered on the merits of those methodologies—months ago—not their untimeliness now. But CRA did not ask Plaintiff's counsel to describe their legal theory, and Plaintiff's counsel did not ask CRA to assume it. *See* Ex. A-1, Adamson Dep. 11:22–24 ("Q. . . . Were you asked to assume a particular interpretation of the pricing provisions? A. No, not really."). The result was a fatal mismatch between the legal theory Plaintiff advanced to survive summary judgment and secure class certification and the damage models she disclosed to "translat[e]" that theory "into an analysis of the economic impact" of XOOM's alleged conduct. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013).

XOOM's briefing has explained that mismatch *ad nauseum*. *See supra* Part II. By abandoning Model Two, Plaintiff's counsel have now also acknowledged the disconnect. If Plaintiff wanted to correct it and "align" CRA's opinions with the legal theory she would advance on class certification and summary judgment, the time to do so was long ago. *See* Fed. R. Civ. P. 26(a)(2)(B), (B)(i)–(ii). Instead, she ignored Model Two's problems. Plaintiff's decision to try to correct them now "does not grant a license" to serve a new report under Rule 26(e) simply because Plaintiff now "wants to bolster" CRA's deficient opinions with new methods she could have disclosed by the original deadline. *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011) (cleaned up); *see Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) (Rule 26(e) "is not . . . a vehicle to permit a party to serve a deficient

---

[12] The New Report's margin inputs are based on data that was available when the Original Report issued. Methods A and B rely on CRA's misinterpretation of a regulatory order issued in 2019, while Method C uses data XOOM produced about its fixed-rate margins and the rates charged by utilities in some portions of the class period long before expert discovery closed. *See* Ex. A-3, CRA New Rep. ¶ 74; Ex. A-5, CRA Orig. Rep. Ex. 1 at 1 (citing "[r]ate setting workbooks," "[m]argin reports," and "[h]istorical utility data produced in discovery"); *id.* at 2 (citing "New York Public Service Commission, 'Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process,' December 12, 2019").

opening report and then remedy the deficiency through the expedient of a 'supplemental' report.").

Accordingly, the "additional and new evidence and opinions" mean CRA's New Report "cannot

be construed as a supplemental report under Fed. R. Civ. P. 26(e)." *Lewis*, 786 F. Supp. 2d at 705.

2.  Rule 37: Plaintiff should be precluded from relying on CRA's New Report.

Under Rule 37(c)(1), Plaintiff's failure to serve CRA's Amended Report by the October

2022 deadline for expert disclosures means she "is not allowed to use" CRA's untimely opinions

and models now or at trial without first showing that the failure "was substantially justified or

harmless." Fed. R. Civ. P. 37(c)(1); *see also Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins.

Co.*, 645 F. Supp. 3d 95, 106 (E.D.N.Y. 2022) (Ross, J.) (excluding expert opinions because they

were not timely disclosed). And while the Court has discretion to "consider lesser sanctions prior

to precluding evidence as a sanction for discovery violations," *Est. of Jackson*, 2019 WL 1676000,

at *3, some sanction is mandatory. In this case, only exclusion will suffice.

*a.  Plaintiff cannot show substantial justification or harmlessness.*

To avoid sanctions, Plaintiff bears the burden to prove substantial justification for or

harmlessness arising from the untimely Amended Report. *See* Fed. R. Civ. P. 37(c)(1). "Substantial

justification means justification to a degree that could satisfy a reasonable person that parties could

differ as to whether the party was required to comply with the disclosure request." *Kunstler v. City

of New York*, 242 F.R.D. 261, 264–65 (S.D.N.Y. 2007) (internal quotations and citations omitted).

"Harmlessness means an absence of prejudice." *Ritchie Risk-Linked Strategies Trading (Ireland)

v. Coventry First*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012). Plaintiff can prove neither.

As to justification, Plaintiff has no legitimate explanation for her untimely expert

disclosure.[13] Her counsel, as experienced class action attorneys, admittedly know "[t]he first step in a damages study" should have been "the translation of" their proportionate-margin legal theory "into an analysis of the economic impact of that event." *Comcast*, 569 U.S. at 38; *see also* Pl.'s Class Mem. 35 (acknowledging the Court's duty "at the class certification stage to ensure that" Model Two was "consistent with the classwide theory of liability and capable of measurement on a classwide basis"). So Plaintiff cannot possibly justify her counsel's failure to ask CRA to model damages that could accommodate a proportionate margin input.

The truth is that Plaintiff, her counsel, and CRA ignored the problems with Model Two until they could avoid them no longer. XOOM filed its motion to decertify, detailing the flaws in Model Two and the Original Report, on March 1. *See* Doc. 197, Def. Decert. Mem. Three weeks later—and just three days before the parties' agreed deadline to exchange expert motions—Plaintiff raised her request to amend CRA's opinions with XOOM for the first time. *See* Doc. 187, Joint Ltr. on Am. Rep. at 4–5. Where, as here, "the disclosing party [seeks] to offer a new theory out of time when the responding party has demonstrated that the disclosing party's initial theory is incorrect," there cannot be substantial justification as a matter of law. *Hines v. BMG Rts. Mgmt. (US)*, No. 20-CV-3535, -- F. Supp. 3d --, 2023 WL 6214264, at *3 (S.D.N.Y. 2023). Permitting the belated disclosure "would render the completeness requirements of Rule 26(a)(2)(B) meaningless." *Id.*

Nor can Plaintiff show that her untimely disclosure was harmless. Quite the contrary, the prejudice to XOOM is substantial and cannot be overstated. If Plaintiff had included a

---

[13] As discussed, Plaintiff's stated reasons for amending her expert disclosures now—a 2023 Second Circuit decision discussing ***2019*** opinions, and this Court's 2023 summary judgment order adopting her ***2018*** contract construction—are nothing new. *See* Part III.A.1.b, *supra*. Plaintiff knew about those decisions when she insisted on proceeding to trial, arguing then that Model Two was unassailable and decertification unwarranted. So, neither decision can justify—much less substantially justify—her belated desire to overhaul CRA's opinions and models through the New CRA Report.

proportionate-margin model in her original expert disclosures, XOOM would have been able to explore that model in a deposition and served a rebuttal report as a matter of course. Now, XOOM will have to ask for permission to seek discovery, which will more than double the expense of expert discovery. If Plaintiff had timely disclosed Methods A, B, and C, XOOM would have served a single expert rebuttal report, taken one round of expert depositions, and addressed the models' defects in a single round of *Daubert* briefing. Plaintiff's failure to do so means she has already forced XOOM to incur all those expenses to challenge Models One and Two, and her retreat from those models turns that expenditure into an utter waste. On top of that waste, Plaintiff has now forced XOOM to file this motion and accompanying expert declaration in order to challenge the timeliness of Methods A, B, and C without the chance to fully explore the models' technical faults, and she seeks to further force another round of expert reports, depositions, and *Daubert* motions. Plaintiff's late disclosure will at least **double** the number of expert depositions XOOM must take, **triple** the number motions XOOM must file to fully challenge Plaintiff's expert disclosures, and at least **triple** the number of rebuttal opinions XOOM must obtain from its own expert.

On top of all that future prejudice, XOOM has already been severely prejudiced by building a defense around a damage model (Model Two) Plaintiff is now poised to abandon. The time and resources XOOM poured into its summary judgment and class certification briefing, 23(f) appeal, decertification briefing, and pretrial filings for the past **nineteen months** will have been wasted if Plaintiff is allowed to rely on the opinions and models in CRA's New Report. Indeed, XOOM has spent hundreds of hours (and many hundreds of thousands of dollars) preparing for trial on the current record since the Joint Pretrial Order deadline was set at Plaintiff's insistence over XOOM's request to resolve its expert and decertification motions first. Plaintiff's counsel told Judge Marutollo then, in opposing XOOM's request to stay pretrial work, that they "disagree" with

XOOM's expert arguments and that those arguments would simply "be part of an *in limine* motion[,]" filed with the Joint Pretrial Order. Ex. A-6, Jan. 19 Tr. 9:6-9. But instead, Plaintiff served a new report hours afting filing the parties' Joint Pretrial Order, forcing XOOM to scramble to file this second expert motion just twenty days later.

Had Plaintiff simply acknowledged the disconnect between Model Two and her proportionate-margin construction at that time, XOOM would not have wasted untold time and resources challenging a (now admittedly) deficient model. She did not. So, allowing her belated disclosures would require the parties to redo not only expert discovery, class certification, and summary judgment, but also all the pretrial work and *limine* motions that XOOM has undertaken since February that could have been avoided.

Plaintiff cannot prove harmlessness under any standard. *See, e.g., Coene*, 303 F.R.D. at 44 (untimely disclosure not harmless where non-disclosing party's expert disclosure had already been made and both parties' experts had been deposed).

> *b.   The appropriate sanction for Plaintiff's untimely disclosure is exclusion.*

In determining whether Plaintiff should be precluded from relying on the New CRA Report or a lesser sanction would be appropriate, the Court should consider four factors: "(1) the party's explanation for the failure to comply with the discovery [requirement]; (2) the importance of . . . the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [expert opinions]; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955, 961 (2d Cir.1997).

Here, Plaintiff's inability to justify her late disclosure and the enormous prejudice that disclosure would cause to XOOM leads to the inescapable conclusion that CRA's New Report must be excluded. That result is not a drastic remedy, but rather what Plaintiff asked for when she

moved for class certification and opposed summary judgment: the chance "to present [the proportionate-margin construction] to the jury," and to argue to the Court (and, perhaps, the jury) that Model Two "reflects this reasonable interpretation." Doc. 147, Pl. SJ Resp. 33, 9. Plaintiff can hardly claim that it would be unfair or prejudicial to give her exactly what she asked for, and she should not be allowed to change her mind at this juncture—without justification and with prejudice to XOOM. Accordingly, the Court should exclude CRA's New Report under Rule 37(c)(1).

Courts, including this one, correctly preclude a party's use of untimely opinions when the disclosing party's delay was much shorter than Plaintiff's and would result in far less prejudice and disruption than CRA's New Report would cause here. *See, e.g., Jakobovits*, 645 F. Supp. 3d at 106 (excluding expert opinions served just *thirty days* after disclosure deadline based on prejudice to opposing party); *Hines*, 2023 WL 6214264 at *3 (excluding plaintiff's untimely expert materials offered in opposition to summary judgment *four months* after expert discovery deadline); *Lewis*, 786 F. Supp. 2d at 705 (granting motion to preclude plaintiff's use of new expert opinions offered to avoid summary judgment approximately *eight months* after service of timely supplemental report); *Mannoia v. Farrow*, 476 F.3d 453, 456–57 (7th Cir. 2007) (affirming district court's exclusion of expert testimony disclosed in response to summary judgment only *one month* following discovery deadline); *Sharpe v. U.S.*, 230 F.R.D. 452, 462–63 (E.D. Va. 2005) (denying motion to use out-of-time expert disclosure made *five weeks* after initial disclosure deadline and *one day* after rebuttal deadline in effort to oppose summary judgment).

On the other hand, Plaintiff has never pointed to, and XOOM has been unable to find, any case anywhere in which a party was permitted to rely on new expert opinions served more than a year (let alone more than eighteen months) after expert discovery closed. Rather, the few cases that Plaintiff previously cited where a party requested to rely on new expert opinions considered

requests that were promptly made ***within a few weeks*** of the close of expert discovery. *See Anthem, Inc. v. Express Scripts, Inc*., 660 F. Supp. 3d 169 (S.D.N.Y. 2023) ("request was made approximately *one month* after the Court issued the Opinion[ that] foreclosed [plaintiff]'s prior damages theories" (emphasis added)); *Torres v. Dematteo Salvage Co. Inc*., No. CV 14-774, 2016 WL 845326 (E.D.N.Y. Mar. 2, 2016) (granting motion to allow new expert *one month* after deadline); *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378, 2020 WL 1982963 (S.D.N.Y. Apr. 24, 2020) (granting motion filed *mere weeks* later); *Pagliaro v. Stevens Transp., Inc.*, No. 10 Civ. 0268, 2011 WL 2671567 (S.D.N.Y. July 6, 2011) (request made *two months* after discovery closed). Plaintiff's delay of over eighteen months is a far cry from the few weeks in those cases.

There is also not a single case allowing a plaintiff to use replacement expert opinions disclosed after a class was certified based on the opinions in the original report. Nor is there a case allowing new damage models disclosed after a defendant's Rule 23(f) Petition was denied based on the plaintiff's representations that the original damage model "yields precise damages under the District Court's [contract] construction." Doc. 155-1, Pl. 23(f) Answer 19. And XOOM certainly has not been able to unearth a case refusing to exclude new damage models disclosed after the Joint Pretrial Order was filed and after the opposing party filed a decertification motion premised on the original models' deficiencies—because none exists.

Far from exercising diligence to lessen XOOM's prejudice, Plaintiff delayed service of CRA's New Report as long as she possibly could. On April 1, Plaintiff represented to XOOM and the Court that, "[b]y April 19, 2024, Plaintiff's expert will amend and supplement" the Original Report. *See* Doc. 187, Joint Ltr. on Am. Rep. 1. But Plaintiff thereafter refused XOOM's request to honor her commitment, instead waiting until the last minutes of May 10 (i.e., three weeks after her self-imposed deadline) to serve CRA's New Report. Ex. A, Matthews Decl. ¶ 3. Plaintiff's

timing means XOOM was forced to prepare this motion in a mere twenty days. But more importantly, it means that the Joint Pretrial Order—which is supposed reflect all claims and defenses to be tried—does not even address Plaintiff's new theory on liability and damages. That omission by itself should result in exclusion of CRA's New Report.

The prejudice to XOOM if Plaintiff is somehow allowed to rely on CRA's New Report would be enormous. Precluding Plaintiff from using CRA's new opinions and models is the only proper remedy in these extreme circumstances. *See Hines*, 2023 WL 6214264 at *3 ("The purpose of [Rule 37(c)(1)] is to 'prevent the practice of 'sandbagging' an opposing party with new evidence.'" (quoting *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004))

## B.      The opinions and models in CRA's New Report must be excluded under Rule 702 too.

Even if CRA's New Report is not excluded on untimeliness alone (it should be), Plaintiff should still be precluded from relying on it at trial under Rule 702 and *Daubert* because (1) the binding precedent of *Martinez* compels that result, and (2) just an initial review of Methods A, B, and C has exposed fatal flaws that no amount of additional discovery can fix. Discovery would only serve to deepen those flaws and identify others.

Again, the substantive defects XOOM discusses here are not based on an exhaustive analysis of CRA's New Report. As XOOM's expert David Coleman explains, many of the calculations CRA provided "show only the final step in his calculations," and so cannot be evaluated or critiqued as presented. Ex. B, Coleman Decl. ¶ 5. So, if the Court were to re-open expert discovery at Plaintiff's expense as a Rule 37 sanction instead of precluding the new opinions (which would still not sufficiently cure XOOM's prejudice for all the reasons discussed), that discovery process would undoubtedly reveal additional flaws in the New Report that XOOM would raise at the appropriate time.

21

1.  CRA's new opinions and models are inadmissible under *Martinez*'s binding precedent.

In its motion to strike Plaintiff's timely expert disclosures, XOOM explained how the Second Circuit's opinion in *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 414 (2d Cir. 2023), is fatal to admissibility of CRA's original models. *See* Doc. 215, Def.  Daubert Mem. 9– 14. CRA's new models suffer the same fatal defects.

In *Martinez*, the Plaintiff's expert modeled damages using several different margins, including a model that assumed the margin should have been 5% above the ESCO's supply costs, and another that allowed the ESCO to charge rates that did not exceed those of regulated utilities. *See* Ex. A-7, Felder Rep. 13, 14–15. The district court excluded both models (and all others) under Rules 702 and 403. *Martinez*, 88 F.4th at 414. And the Second Circuit affirmed, finding that conclusions about overcharges were based on "unreliable methodology and insufficient data" including "[the expert's] subjective views on the reasonableness of margins." *Id.* This Court should reach the same conclusion and exclude the opinions and models in CRA's New Report because their opinions and methods mirror those of plaintiff's expert in *Martinez*—and are equally flawed. In fact, the flaws here are more pervasive and incurable.

In *Martinez*, the plaintiff alleged that an ESCO was overcharging its variable-rate electricity customers in New York and Pennsylvania. *Martinez*, 88 F.4th at 405. To support that claim, the plaintiff retained an expert named Dr. Frank Felder to prepare models for calculating classwide overcharge damages. *See id.* at 414. In *Martinez*, as here, the contract allowed the ESCO to set rates that included a margin above costs. *See id.* at 413 ("Agway was entitled to consider its 'costs, expenses and margins,' when setting rates"); Class Order 14 (recognizing that class members' rates can include "a reasonable margin under the contract"). So, as here, the overcharge model's calculations of the rate the class members allegedly should have been charged had to

include an input for the reasonable margin the contract admittedly allowed. *Martinez*, 88 F.4th at 414 (affirming exclusion of an overcharge model that used "unreliable methodology and insufficient data" to quantify "what a 'reasonable margin'" should have been under the class members' contracts); Class Order 14 ("[A]ny measure of damages in this case would undoubtedly be based on the rate, cost, and margin.").

Dr. Felder claimed that his overcharge model could calculate "[w]hat Agway customers on variable pricing would have saved, that is how much they were overcharged, *if they were charged a rate by Agway that reflected its costs plus a reasonable margin*." Ex. A-7, Felder Rep. 1 (emphasis added). As an alternative model, Dr. Felder measured overcharges as the difference between the ESCO's rate and the rates charged by regulated utilities, which he justified by claiming that a 2019 Reset Order issued by the New York Public Service  "found" that "the appropriate benchmark in comparing an ESCO's variable rate." *Id.* at 15. Despite offering these opinions, Dr. Felder did not opine that either model reflected industry norms or practices, and he was unable to identify a specific margin that would be unreasonable:

| Dr. Felder's Opinion in *Martinez* | CRA's Opinion Here |
| --- | --- |
| "Presumably there's some limit on the amount of margin they could charge…but *I didn't go and draw, do a, you know, a hard line where that limit is*."[14] | "Q: Is there a single ESCO number for variable rates that in your opinion would be a cap on what is an appropriate or reasonable margin?<br><br>A: What I am offering is conceptually that the margin has to be based on something from reality to be meaningful in the context of this contract . . . But *I don't have a number to give you*."[15] |

---

[14] Ex. A-8, Felder Dep. 172:6-11.
[15] Ex. A-1, Adamson Dep. 73:14–20. CRA's New Report does not contain an opinion on what a reasonable or appropriate margin would be based on industry norms or practices either. Rather, it proposes three margins that CRA believes are appropriate *under the contract*. *See* Ex. A-3, CRA New Rep. ¶ 18(j).

Without affirmative opinions as to an industry standard to cap margins at a particular level, the Second Circuit affirmed exclusion of Dr. Felder's opinions because his calculations were based on his "subjective and unsupported view of what a 'reasonable margin' would have been," and his "proffered comparisons between [the ESCO's] prices and those of the default utilities [were] legally insufficient" to show what the rates should have been under the contract at issue. *Martinez*, 88 F.4th at 414. CRA's New Report commits the same errors. Methods A, B, and C are "legally insufficient" because they make assumptions that are entirely "subjective and unsupported" or incorrectly assume that the New York PSC's 2019 Reset Order imposed an extra-contractual requirement that XOOM match the utility's rate or cap its margins at 5%. *Martinez*, 88 F.4th at 414. Under *Martinez*, that assumption fails because the Reset Order does not justify a "subjective and unsupported" 5% cap on margins, *id.*, and the Reset Order's guaranteed-savings requirement does not retroactively cap ESCO rates that—like Plaintiff's—were set before the order took effect, *id.* at 417 n.12; *see also* Ex. A-3, CRA New Rep. 17 n.45 (acknowledging that the Reset Order's guaranteed-saving requirement became "effective" in "April 2021").

Thus, under *Martinez*'s holding, CRA's New Report is unquestionably based on "unreliable methodology and insufficient data" to determine what any class members' rate allegedly should have been. *Martinez*, 88 F.4th at 414. That failure on its own renders CRA's models and opinions—in both the Original Report **and** the New Report—irrelevant and "inadmissible under Federal Rule of Evidence 702." *Id*.

2. <u>XOOM's initial review of CRA's New Report reveals numerous flaws that warrant exclusion under Rule 702, and discovery would undoubtedly reveal more problems.</u>

As discussed, the Court should exclude CRA's New Report without scrutinizing it because the new opinions are fatally untimely and inadmissible under *Martinez*. Nor can XOOM fully explore the problems with CRA's New Report in this motion absent time and access to analyze

the new algorithm CRA used to perform calculations underlying its new models, including a number of unjustified leaps of logic and math XOOM has uncovered in the twenty days since it received CRA's New Report. Nonetheless, XOOM discusses below the defects it has been able to identify without the time and discovery tools it is entitled to.

> *a.  CRA's New Report uses a defective, previously undisclosed algorithm.*

Since class certification, Plaintiff has insisted that the "algorithm" underlying Model Two is not in dispute. XOOM has consistently disagreed. *See* Part II, *supra*; Doc. 215, Def. Daubert Mem. But now, that disagreement is moot because CRA abandoned Model Two's algorithm and replaced it with a new algorithm with different math and different inputs.[16]

The difference is stark. As XOOM explained in its challenge to Model Two, that model was mathematically incapable of measuring damages under the proportionate margin construction because it calculated margins as a percentage of XOOM's rates (not of supply costs) and those calculations did not include an input for the costs XOOM's rates were allegedly supposed to be based on. *See id*. CRA's New Report agrees with XOOM. CRA abandons Model Two's algorithm and replaces it with an algorithm that uses new inputs to perform different mathematical operations. *See* Ex. B, Coleman Decl. ¶ 3–4, 6. The differences are undeniable algebraic facts:

**Model Two:**

`[variable rate]*[usage]*([variable margin]-[fixed margin])`

**Methods A, B, C:**

`([variable rate]*[usage])-([usage]*[variable cost]*(1+[margin input])`

Moreover, in many months during the class period, CRA's new methods simply do not function.

---

[16] In this regard, CRA's New Report fully undermines Plaintiff's argument in response to decertification—i.e., that the forthcoming amended report would prove Model Two's "theory is unchanged and its arithmetic can easily be updated to incorporate the margin determined at trial," Doc. 204, Pl. Decert. Resp. 25. By choosing to propose three new models with entirely different algorithms than Model Two's, CRA has admitted that both the theory has changed and that no arithmetic update can save Model Two.

When the new methods' formulas result in an undercharge, the new algorithm returns a zero value. *See id.* at ¶ 11. That failure always affects the reliability of the methodology, and the problem grows depending on the margin input. *See id.* With Method B's 5% margin, the aggregate calculation is off by $75,000; with Method C's 21.2% margin, CRA's new algorithm overstates aggregate damages by nearly $900,000; and at XOOM's average variable-rate margin of 68%,[17] the algorithm overstates damages by ***nearly $40 million***. *See id.*

On an individual level, these algorithmic changes turn an undercharge into an overcharge for Plaintiff. With a 21.2% margin input, Model Two says she was *undercharged*, while Method C says she was *overcharged* at the exact same margin input. *See id.* In the aggregate, this algorithmic flaw is magnified enormously—at XOOM's supposed average variable-rate margin of 68%, CRA's new methodologies would falsely report over $13 million in damages when the class was actually ***undercharged*** by more than $26 million. *See id.*

Given these problems, the algorithms disclosed in CRA's New Report are unquestionably unhelpful and unreliable. A reliable model should be able to accommodate any finding the jury makes about the margins XOOM was allowed to charge, but CRA's methods cannot perform that function. Rather, by design, they will always fail to measure damages for some portion of the class, and that failure could easily extend to a majority of the class—i.e., every class member who paid a rate for which CRA's new algorithm returns a zero value—***even if*** the jury could accept Plaintiff's inadmissible margin assumptions. Accordingly, if CRA's New Report is not excluded as untimely, it should be excluded because the algorithm underlying Methods A-C is inherently unreliable and cannot be reliably applied to the facts of this case. *See* Fed. R. Evid. 702(c)–(d).

---

[17] Or at least, that's what CRA says XOOM's average variable-rate margin is. *See* Ex. A-3, CRA New Rep. ¶ 69. In its last report, CRA reported average margins that were much lower. *See* Ex. A-2, CRA Orig. Rep. ¶ 75. CRA does not explain why these figures changed so drastically, nor has XOOM had the ability to check, but it is obviously the result of undisclosed changes in CRA's underlying math.

*b.  Supply Costs: Methods A, B, and C do not use XOOM's reported supply costs.*

In Plaintiff's original disclosures, CRA assumed that the "Total Cost" figures in XOOM's rate-setting workbooks were equivalent to "the 'actual and estimated supply costs'" referenced in the class members' contracts. Ex. A-2, CRA Orig. Rep. ¶ 60. Based on that assumption (which is admittedly flawed[18]), CRA used "XOOM's reported 'Total Costs'" as an input for the calculations disclosed in its original report. *Id.* at ¶ 61(a).

Methods A, B, and C do not follow suit. Instead of using "Total Costs" as a direct input, CRA now uses aggregate figures called "Variable Plan Costs." These figures combine Total Costs for multiple energy products, ***but CRA does not disclose the formula used to perform that aggregation***. Ex. B, Coleman Decl. ¶ 7. Nor does CRA fully explain what products are included in those aggregate calculations and which are excluded (e.g., electricity, gas, residential, commercial, green), although the Total Cost figures for at least ***some*** products in the class were excluded because CRA did not want to bother with the math. *See* Ex. A-3, CRA New. Rep. ¶ 49 n.49. However, at least one thing is clear—CRA's aggregate "Variable Plan Costs" calculations do ***not*** include, or even attempt to include, XOOM's "actual [supply] costs." *Id.*

In a case that turns upon the composition of XOOM's actual and estimated supply costs, these omissions are fatal. CRA has failed to show that its supply cost inputs were "based on sufficient facts or data," "the product of reliable principles and methods," or "a reliable application of the principles and methods to the facts of the case," rendering the model's outputs unhelpful, irrelevant, and inadmissible. *See* Fed. R. Evid. 702(a)–(d).

---

[18] XOOM has long argued that Model One and Model Two are flawed because they do not account for actual supply costs, including prior period adjustments. CRA's New Report concedes the point, stating the "Total Cost" figure reflects only estimated supply costs and that the "'actual costs' are not reflected in rate-setting workbooks." Ex. A-3, CRA New Rep. ¶ 1.4(e); *id.* at ¶ 72.

### c. *Margin: Methods A, B, and C are based on insufficient facts and data.*

As discussed, the Second Circuit has held that models like CRA's are inadmissible because they rest on "legally insufficient" margin assumptions that attempt to measure the reasonableness of XOOM's margins without opining that CRA's proposed alternatives reflect industry norms or practices. *See Martinez*, 88 F.4th at 414. But setting that overriding problem aside, there would still be fatal flaws in the margin inputs used in CRA's New Report.[19]

For Method A, CRA uses incomplete data to assume that XOOM's rates should have included "a 7.33% margin based on the average difference between XOOM's documented supply costs and the utility rates." Ex. A-3, CRA New Rep. ¶ 91. While XOOM has been unable to verify the accuracy of CRA's utility rate inputs, it has been able to determine that CRA's underlying calculations are flawed because they omit data about the utility rates charged in a vast subset of the class period. *See* Ex. B, Coleman Decl. ¶¶ 8, 10(a).

For Method B, CRA assumes that the PSC "selected" 5% as a margin that would be "reasonable for fixed rate products." Ex. A-3, CRA New Rep. ¶ 74. However, the PSC made no such finding nor did it make the Reset Order retroactive—it was concerned with the difference between utility and ESCO rates ***not*** margins going forward. Ex. B, Coleman Decl. ¶ 10(b). Nothing in the order expresses concern over ESCO margins.[20]

For Method C, Plaintiff uses undisclosed calculations to create the "fixed margin" inputs she used to determine XOOM's average fixed rates. These inputs are substantially different than the margin figures reported in XOOM's workbooks, and CRA does not disclose the algorithms,

---

[19] In addition to the flaws discussed here, CRA's margin assumptions are all based on its flawed Variable Supply Cost figures, which compounds the errors for reasons discussed in Part III.B.2.a, *supra*.

[20] Indeed, it is hard to imagine a reason the PSC or a consumer might care about margin—they care about rates. If a rate is competitive then the ESCO's margin is irrelevant. By contrast, a consumer paying the highest rate on the market is unlikely to keep paying that rate even if they learn the margin is razor thin.

inputs, or logic used to create these figures. *See id.* at ¶ 10(c).

And for all the methods, CRA ignores XOOM's fixed costs, overhead and profit. In light of Plaintiff's previous concessions, *see* Doc. 145-1, Def. SJ. Mem. 23–25, and her complaint's express allegations, *see* Am. Compl. ¶ 55, this failure renders the margin assumptions in CRA's New Report unreasonable because they require margins far ***lower*** than the supposedly profitable fixed-rate margins for a vast majority of the rates at issue. *See* Ex. B, Coleman Decl. ¶ 10(a)-(c).

Additionally, these new models are based not on ***XOOM's*** costs, but on regulatory orders and undisclosed calculations that were both unknown and unknowable to XOOM when it was setting rates for Plaintiff and most of the class. *Id.* at ¶¶ 8–10. For obvious reasons, XOOM could not rely on the Reset Order—issued in 2019 and effective in 2021—when setting Plaintiff's rates in 2013. Likewise, XOOM could not predict and then average its fixed rates over an arbitrary 131-month period when it was setting rates earlier in the class period.

And as discussed, Method A ("the best comparator" in CRA's view) and Method B ***directly contradict*** CRA's prior testimony. Although both rely on utility rates to generate a margin input, CRA previously gave sworn testimony that the utility's rate "is irrelevant for this contract." Ex. A-3, Eryilmaz Dep. 74:8–75:12; *see* Ex. A-1, Adamson Dep. 68:19–69:9 ("And you're not offering a damage model that compares XOOM's variable rate charged to what customers would have been charged by the utility during the same time period? . . . A. No."). Those conflicting opinions cannot be reconciled and so are inherently unreliable.

Finally, CRA's new margin inputs are inappropriate because they are misaligned with Plaintiff's latest theory of reasonableness. Plaintiff argued just last month that a class could remain certified because she will present evidence at trial that "XOOM's fixed rate margin was the ***highest*** possible reasonable margin allowable under the contract, and that any margin above that sum was

29

unreasonable." Doc. 204, Pl. Decert. Resp. 26 (emphasis in original). As XOOM explained in reply, that theory renders the "outer bound" of reasonableness to be 59%. Doc. 212, Def. Decert. Reply 23. CRA's New Report, however, says that 21.2% is the "absolute maximum of what could be considered an economincally reasonsable margin" under the contract. CRA New Rep. ¶ 109. So, Plaintiff's theory and CRA's opinions are out-of-step yet again.

For all these reasons, the New CRA Report is futile because the margin inputs are based on unhelpful, insufficient, and unreliable data and methods. *See* Fed. R. Evid. 702.

> d. *Usage: CRA does not disclose how usage is calculated.*

Model Two included an input that reflected aggregate usage for each month and region. The new models also include that input, but the values are completely different. CRA's New Report claims that the difference is due to XOOM's production of additional data. *See* Ex. A-3, CRA New Rep. ¶ 45. However, the numbers seem to include usage for products that CRA declined to include in its supply cost calculations and, because CRA did not show their math, the usage numbers cannot be validated. *Id.* at ¶ 49 n.49; Ex. B, Coleman Decl. ¶ 5.

## IV.   CONCLUSION & PRAYER

Accordingly, the Court should strike CRA's New Report in its entirety as untimely or, in the alternative, as irrelevant and unreliable. Plaintiff should be prohibited from relying on the models and opinions in CRA's New Report now or at trial.

Dated: May 30, 2024                                      MCDOWELL HETHERINGTON LLP

                                                                  */s/ Michael D. Matthews, Jr*
                                                                  Michael D. Matthews, Jr.
                                                                  Diane S. Wizig (admitted *pro hac vice*)
                                                                  James M. Chambers (admitted *pro hac vice*)
                                                                  David L. Villarreal (admitted *pro hac vice*)
                                                                  Netra Sreeprakash
                                                                  Justin Chapa R. Chapa (*pro hac* forthcoming)
                                                                  MCDOWELL HETHERINGTON LLP

1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
james.chambers@mhllp.com
david.villarreal@mhllp.com
netra.sreeprakash@mhllp.com
justin.chapa@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on the 30th day of May, 2024 via email on all counsel of record.

<u>/s/*Michael D. Matthews, Jr.*</u>
Michael D. Matthews, Jr.