# EXHIBIT A-1

```
1                UNITED STATES DISTRICT COURT
2                EASTERN DISTRICT OF NEW YORK
3        SUSANNA MIRKIN and BORIS MIRKIN,
4        Individually and on Behalf of All Others
5        Similarly Situated,
6              Plaintiffs,
7          vs.                    No. 18 Civ. 2949(ARR) (RER)
8        XOOM ENERGY, LLC and XOOM ENERGY
9        NEW YORK, LLC,
10             Defendants.
11       --------------------------------x
12
13
14                  VIDEOTAPED DEPOSITION OF
15                      SEABRON ADAMSON
16               Tuesday, November 8, 2022
17                       10:06 a.m.
18                        Veritext
19                     101 Arch Street
20              Boston, Massachusetts 02110
21
22
23
24                 Laurie K. Langer, RPR
```

Page 1

**Page 10**

1  agreements. If you want to take that to be liability,
2  liability I guess is a legal term. But -- so I am
3  addressing issues related to the consistency of the, the
4  rates and the sales agreements.
5      Q. Okay. And whether or not XOOM breached those
6  provisions?
7      A. Well, I mean, again, "breach" seems a legal word.
8  But whether it's -- whether the pricing was consistent
9  with the, with the pricing required in the sales
10 agreements.
11     Q. Okay. Is "breach" a word that you have
12 difficulty with?
13     A. No, I just.
14     Q. You've worked in a lot of --
15     A. Yeah.
16     Q. -- litigation for a long time.
17     A. Sure. I just -- I don't know exactly what
18 implications you're trying to put to that. I was just
19 trying to describe clearly what I did, which I think is
20 what's described here.
21     Q. I guess put differently, you are offering an
22 opinion about whether or not XOOM complied with the
23 pricing provisions of its sales agreement?
24     A. Yes.

**Page 11**

1      Q. Okay. And so are you also offering an opinion
2  about how the pricing terms of the sales agreements
3  should be interpreted?
4      A. No. I'm providing a -- my -- well, I'm providing
5  my understanding of what it says and in the context of
6  the, of electricity and gas markets and retail markets
7  and how that works out. Obviously, I'm not offering a
8  legal opinion on the language.
9      Q. Okay.
10     A. I'm offering my understanding based on knowledge
11 of these markets of how these, how these work.
12     Q. Okay. You're not offering a legal interpretation
13 of the pricing provisions in the XOOM sales agreement?
14        MR. WITTELS: Objection. I mean, I think he
15 asked -- he just answered it, didn't he?
16        MR. MATTHEWS: Steve, please, no speaking
17 objections today. Please.
18        MR. WITTELS: But it's the same question.
19        MR. MATTHEWS: "Objection form" is what's
20 appropriate to say, as you have reminded me. Okay?
21     A. I am not offering a legal opinion.
22     Q. Okay. Were you asked to assume a particular
23 interpretation of the pricing provisions?
24     A. No, not really. I mean, they're on the page.

**Page 12**

1      Q. Okay. So the third bullet point says that you
2  have been asked, "to determine whether XOOM set its
3  rates as required by the sales agreements."
4         Correct?
5      A. Yeah. The consistency, you know, the consistency
6  from an economic and commercial point between the rates
7  and, and, you know, how it -- how it -- how it
8  describes, I think, the phrase that we'll get, we'll get
9  around to today about the actual and estimated supply
10 costs --
11     Q. Yep.
12     A. -- in the -- in the sales agreement.
13     Q. Right. That's -- that's where I was going next.
14        The sales agreement requires that rates be set,
15 "based on XOOM's actual and estimated supply costs."
16        Right?
17     A. I don't have the phrasing in front of me, but
18 that sounds right.
19     Q. We can do that. I'm not trying to --
20     A. Yeah. I mean -- I think that's --
21     Q. Bear with me one second.
22        MR. MATTHEWS: May I mark this as Exhibit 2.
23        (Deposition Exhibit No. 2 marked for
24 identification.)

**Page 13**

1      Q. Okay. And, Mr. Adamson, does this appear to be a
2  copy of the sales agreement you were referring to?
3      A. Yes, I think so. I mean, there were
4  various, obviously various versions of these over time,
5  but this looks like the one.
6      Q. This is the one that you analyzed --
7      A. Yes, I believe --
8      Q. -- in connection with preparing this report?
9      A. Yes, I believe so.
10     Q. Okay. And in connection with the assignment to
11 determine whether XOOM set its rates as required by the
12 sales agreements, can you direct me to the provisions
13 that you looked at that relate to rate setting?
14     A. I mean, you know, obviously the -- the -- the
15 primary one is in this top right box, starting "your
16 rate."
17     Q. "Your rate for energy purchases will be a
18 variable rate, per kilowatt hour, that may change on a
19 monthly basis, plus taxes and fees, if applicable. Your
20 monthly variable rate is based on XOOM's actual and
21 estimated supply costs which may include but not be
22 limited to prior period adjustments, inventory and
23 balancing costs. You are responsible for all charges
24 assessed and billed by your local utility for all

Page 66

```
 1  which is I think what you're doing.  But I think you
 2  understand what we did.
 3     Q.  I am, because I'm focusing in my question, I have
 4  built this in on your damage calculation.  So I
 5  understand your position about bullet 3, let's call it.
 6  Which is your opinions about whether or not XOOM's rate
 7  setting was consistent or not, with the sale agreement.
 8        But I'm talking about with respect to 4, after
 9  you concluded --
10     A.  Uh-huh.
11     Q.  -- the rate was not consistent --
12     A.  Right.
13     Q.  -- that your damage model --
14     A.  Right.
15     Q.  -- and what they considered relevant was the
16  amount of gross margin that XOOM put on top of its
17  supply cost?
18     A.  Are we discussing the Method 1 model or the
19  Method 2 model?
20     Q.  Well, it's both; right?
21     A.  Well, it's --
22     Q.  Let's start with Method 1.
23     A.  Okay.  Right.
24     Q.  Right.  Method 1, what was relevant was the
```

Page 67

```
 1  amount of gross margin that's input on top of its supply
 2  costs; right?
 3        MR. WITTELS:  Objection.
 4     A.  Of the difference -- if you want to -- you're
 5  expressing that as a form -- you're expressing the
 6  delta, the difference, right, as a gross margin.  That's
 7  not exactly how it was calculated.
 8        I mean, it was calculated just as there's
 9  differences, not any -- you're saying a gross margin on
10  a gross margin calc -- I want to be specific about how
11  you're using the term "gross margin."
12     Q.  I didn't think it was tricky.  I mean, your
13  report says that you calculated by reference -- by
14  comparing XOOM's margin reports to XOOM's rate setting
15  workbooks; right?
16     A.  Right.  I was getting to the delta between rates
17  and costs.
18     Q.  Okay.
19     A.  It's just that it was in the margin setting
20  workbooks.
21     Q.  So with respect to Model 1 the relevant
22  consideration was the delta between XOOM's total costs
23  and XOOM's margin?
24        MR. WITTELS:  Objection.
```

Page 68

```
 1     A.  The -- between total cost and the rate.
 2     Q.  Okay.  Which is the margin?
 3        MR. WITTELS:  Object.
 4     A.  The rate is not the margin.
 5     Q.  No, I know.
 6     A.  A rate is not a margin.
 7     Q.  The delta is.  The delta is.
 8     A.  Okay.  We can call that a margin, yes.
 9     Q.  The delta between the total costs --
10     A.  Right.
11     Q.  -- and the rate is --
12     A.  Right.
13     Q.  -- the margin; right?
14     A.  That -- that -- you can characterize that as a
15  margin.
16     Q.  Well, what would you characterize it?
17     A.  I would just characterize it as a difference, as
18  a delta.
19     Q.  Okay.  You're not offering an opinion in this
20  case that under the sales agreement XOOM could not
21  charge more than the regulated utilities rate; right?
22     A.  No.  I mean, the comparison I made was between
23  supply costs and the rate under this contract.
24     Q.  Right.  And you're not offering a damage model
```

Page 69

```
 1  that compares XOOM's variable rate charges to what
 2  customers would have been charged by the utility during
 3  the same time period?
 4        MR. WITTELS:  Objection.
 5     A.  No.  The damage models as we discussed are the
 6  two.
 7     Q.  Right.  And you don't intend to offer an opinion
 8  about that?
 9     A.  No.  The only thing we used was a, as a graphical
10  comparison on the relationship between supply costs and
11  the utility rate, as an example.  But the two models are
12  the two models.
13     Q.  Yep.  Okay.  Are you offering an opinion about
14  what is a reasonable or appropriate margin for an ESCO
15  to charge?
16     A.  Well, to build the second model we needed an
17  estimate of a margin.  We really didn't have any
18  information that would allow that to be created, since
19  XOOM had, from what we can tell, had never done it that
20  way.  They had never tried to calculate a, or they did
21  not present in any way, I can't say that they never
22  tried.  They did not present in the rate setting
23  workbooks and other information calculations of any sort
24  like that.  So we used the margin from fixed rate
```

**Page 70**

1  customers as a proxy of a rate that XOOM itself had
2  used. I can't go further than that because there's no
3  information.
4      MR. MATTHEWS: Can you read my question
5  back, please.
6      (Prior testimony read back.)
7          "Are you offering an opinion
8           about what is a reasonable or
9           appropriate margin for an ESCO
10          to charge?"
11  A. Yeah. Conceptually, yes. Conceptually, yes.
12     Thanks for reading that back.
13  Q. That's okay. And what is the opinion that you're
14  offering conceptually about that?
15  A. Well, I mean, it's obviously related to the
16  contract that we've been discussing, whether it's based
17  on supply costs, that, you know, if the Court were to
18  decide that a margin was allowed, that it can't be an
19  uncapped margin, that's why we made a second calculation
20  using the fixed rate margin as a proxy of what might be
21  an acceptable margin.
22  Q. Are you offering any opinion about what is an
23  acceptable or appropriate, a reasonable margin aside
24  from just using XOOM's fixed rate margin?

**Page 71**

1  A. We haven't offered that opinion, we don't have
2  any information to do that.
3  Q. Do you intend to?
4  A. If information were to be provided, but that
5  would have to come from XOOM. So I, in the absence of
6  not expecting anymore information to come, no.
7  Q. Well, we've gotten talking past each other again.
8  I'm talking conceptually. You've said that it will be
9  for the Court to decide whether a margin can be charged
10  and if so what's appropriate; right?
11  A. Right.
12  Q. And if we go to trial --
13  A. Uh-huh.
14  Q. -- and you take the witness stand --
15  A. Uh-huh.
16  Q. -- and I'm asking you questions and the judge
17  gets frustrated with my questions and says, "let's cut
18  to the chase. Mr. Adamson, what do you think is an
19  appropriate margin for an ESCO to charge?" What would
20  your answer be?
21     MR. WITTELS: Objection.
22  A. I would say conceptually it's got to be related
23  to the, related to the costs. And in a broad conceptual
24  basis.

**Page 72**

1  Q. And if he said, "but can you give me a cutoff
2  point? Is there a number that you can assign to that?"
3  Would you be able to give him one?
4     MR. WITTELS: Objection.
5  A. I wouldn't be able to give him a number on the
6  stand because I wouldn't have the, XOOM's internal
7  information, no.
8  Q. Okay. So the margin in your view, --
9  A. Uh-huh.
10  Q. -- the margin that is appropriate for an ESCO to
11  charge conceptually --
12  A. Uh-huh.
13  Q. -- is ESCO specific?
14  A. Well, again, we're talking about relation to a
15  specific contract, so.
16  Q. I'm not.
17  A. You're not.
18     MR. WITTELS: Don't interrupt him.
19  A. I am talking -- sorry. I'm talking about this
20  specific contract. Other ESCOs may have, and I'm sure
21  do, very different contractual forms. And in fact,
22  ESCOs -- even the same ESCO will have lots, may have
23  different pricing, right, under different arrangements.
24  We're talking about variable rate pricing here as

**Page 73**

1  opposed to fixed rate pricing.
2  Q. Uh-huh.
3  A. Fixed rate pricing, I think we can all agree, the
4  actual outturn margins could be quite different. A lot
5  depends on timing in that case; right? Okay. So I
6  don't know that there is a "single ESCO number" I don't
7  think that's a meaningful concept.
8  Q. Okay. Is there a single ESCO number for variable
9  rates that in your opinion would be a cap on what is an
10  appropriate or reasonable margin?
11  A. I don't have a number in mind because I don't
12  know what the, what would be claimed to be the types of,
13  of costs that, to be recovered in that margin. What I
14  don't -- you know, I don't have a number. ==What I am==
15  ==offering is conceptually that the margin has to be based==
16  ==on something from reality to be meaningful in the==
17  ==context of this contract, and, you know, can't be==
18  ==arbitrary.==
19  ==Q. Okay.==
20  ==A. But I don't have a number to give you.==
21  Q. Okay. And would not be able to create one?
22     MR. WITTELS: Objection.
23  A. Not -- not on the information available right
24  now. I think that would need more inputs than are

19 (Pages 70 - 73)

Page 90

1  organizations.
2  Q. But as it relates to rates that they charge
3  customers in New York, they are required to be profit
4  neutral; right?
5       MR. WITTELS: Objection.
6  A. I -- again, the utilities themselves are for
7  profit, investor owned companies. I think what you're
8  talking about is the procurement function in the kind of
9  default service rate. Is that what you're referring to?
10  Q. Yes.
11  A. I think that -- I think with that -- with that
12  characterization I think that that is they are passing
13  through their costs. Is my understanding of how it's
14  done.
15  Q. Supply services that the regulated utility
16  provides customers in New York, are profited for the
17  utility?
18  A. I haven't expressed that opinion. There's a
19  little subtly there about what, I mean, how the utility
20  itself as an aggregate is regulated. I think
21  you're -- I think you're missing something. The -- the
22  passthrough -- the recovery of the utility's default
23  service costs is done without a markup, I agree with you
24  then.

Page 91

1  Q. Okay. So based on those calculations that are
2  shown in paragraph 72, under Model 1 customers would
3  actually be put in a better position than if they had
4  just stayed with the utility rather than switching with
5  XOOM; right?
6  A. Generally, yes.
7  Q. Let's talk about the Richards case. Richard
8  versus Direct Energy was a variable rate case, --
9  A. Uh-huh.
10  Q. -- that filed a putative class action in the
11  District of Connecticut; right?
12  A. If you say so. I don't remember all the details
13  about it.
14  Q. Okay. Do you remember how it resolved?
15  A. No.
16  Q. Okay. You prepared a report for the plaintiff in
17  that case; correct?
18  A. Yes.
19  Q. Okay. And --
20  A. Well, with -- with someone else.
21  Q. Right. And you wrote, and the District Court
22  later quoted your opinion, "retailers such as DES must
23  charge some margin on their variable rate sales to cover
24  their legitimate costs of doing business."

Page 92

1  Do you remember writing that?
2  A. No. Not right now. But I'm assuming you're
3  reading it correctly.
4  Q. Okay. Is that a view that you no longer hold?
5  A. Well, in general you have to -- no. I mean, yes.
6  In the sense -- they have to -- in general they have to
7  charge a margin, the question is whether they can charge
8  that margin on these contracts given this wording.
9  Q. Okay. And in Richards the contract language that
10  was at issue was that the rate must be "based on
11  business and market conditions."
12  Right?
13  A. Yeah.
14  Q. And your interpretation of that is that it should
15  be interpreted as a rate that is consistent with the
16  cost of procuring power in the wholesale market, plus an
17  appropriate margin to cover the legitimate costs and
18  risks of supplying variable rate customers."
19  Do you remember that?
20       MR. WITTELS: Is that a direct quote?
21       MR. MATTHEWS: It is.
22  A. I'm sorry. What was the question?
23       MR. WITTELS: Could you read it back and
24  tell us where the quote starts, please.

Page 93

1       MR. MATTHEWS: I -- I can do it.
2  A. Just read out the quote again, please.
3  Q. Sure. This is -- this is from the Court's
4  opinion and I will quote your -- the Court is quoting
5  your report. And I'll tell you when it starts.
6  So the Court wrote, "Mr. Richard's experts
7  further concluded that the phrase, 'business and market
8  conditions' should be interpreted as a rate that is
9  consistent with the cost of procuring power in the
10  wholesale market, plus an appropriate margin to cover
11  the legitimate costs and risks of supplying variable
12  rate customers."
13  Do you remember that?
14  A. I don't remember the exact wording, but I trust
15  your reading.
16  Q. So we had in Richards the phrase, "based on
17  business and market conditions;" right?
18  A. Uh-huh.
19  Q. And we have in this case the phrase, "based on
20  actual and estimated supply costs."
21  Right?
22  A. Uh-huh.
23  Q. So why in the Richards case did you believe it
24  was okay, or that that phrase should be interpreted as a

24 (Pages 90 - 93)

```
 1  rate that is consistent with the costs plus an
 2  appropriate margin, but in this case your opinion that,
 3  is that based on actual and estimated supply costs does
 4  not allow for recovery of an appropriate margin?
 5      A.  Okay.  Well, I mean, obviously those are two very
 6  different wordings.  Right?  I mean, here we have a
 7  very -- in this particular case, with the Mirkins, we
 8  have this specific contractual language around supply
 9  costs, which as I remember wasn't -- that actual and
10  estimated supply costs and the examples of direct supply
11  costs were not in that contractual language; correct?
12  As you just read out.
13          Here we have this very specific contractual
14  language which, you know, as I said, my first, my first
15  reading of that is, you know, what it says, "specific
16  actual and estimated supply costs."
17          So, you know, as we saw in the report, if the
18  Court were to find that that phrase should be
19  interpreted to mean having a margin, we, we produced the
20  second model with a margin.  But, you know, that's
21  really kind of for the Court, in my mind, to determine.
22  You know, my first read is supply costs are pretty
23  narrowly defined as supply costs.  It doesn't include
24  marketing costs, for example, that you mentioned.  So,
                                                   Page 94
```

```
 1  you know, that's why Model 1 went with, went with supply
 2  costs.
 3      Q.  Okay.  In the contract language here, one of the
 4  reasons that you have opined --
 5      A.  Uh-huh.
 6      Q.  -- that XOOM has constrained its --
 7      A.  Uh-huh.
 8      Q.  -- supply costs is that the contract language
 9  doesn't reference margin; right?
10      A.  Uh-huh.
11      Q.  But the Richards --
12          MR. WITTELS:  You have to say -- you have to
13  say, "yes."  You can't say, "uh-huh."
14      A.  I'm sorry.  I think, yes.
15      Q.  But the Richards contract language, based on
16  business and market conditions, didn't reference margin
17  either; right?
18      A.  No.  But it also doesn't have the specific
19  construction here.
20      Q.  Okay.  Are -- are you now prepared to provide
21  contract interpretation?
22      A.  No.  But I'm just saying it doesn't have the same
23  word.  I mean, it doesn't -- it doesn't work the same
24  way.
                                                   Page 95
```

```
 1      Q.  Okay.
 2      A.  I don't mean construction in a legal sense, I
 3  mean just the wording is different; right?  I mean, the
 4  pricing provisions are different.
 5      Q.  The words are not exactly the same, I will agree
 6  with you on that.
 7      A.  Well, and in my mind the economic meaning of the
 8  words is not the same.  Clearly the words are not the
 9  same.  It's not the same words on the page on the left
10  and the right.  But to me, I mean, I -- I interpret the
11  meaning of those to be somewhat different.
12      Q.  I can tell.
13      A.  Uh-huh.
14      Q.  But neither one referenced margin or profit;
15  right?
16      A.  No.
17      Q.  Okay.  All right.  Model 2.
18      A.  Okay.
19      Q.  Let's look at where that begins.
20      A.  Page 23.
21      Q.  So Model 2 in plain terms is like Model 1 except
22  that you also factored in the margin that XOOM charged
23  its fixed rate customers; right?
24      A.  Yeah, in broad terms, yes.
                                                   Page 96
```

```
 1      Q.  Okay.  And that's essentially the damage model
 2  used in the Richards case; right?
 3          MR. WITTELS:  Objection.
 4      A.  I don't exactly remember how that one, that one
 5  worked.  That was maybe, like, seven or eight years ago.
 6  But I'm -- so I'll -- I won't say I remember
 7  specifically how the model worked there.
 8      Q.  Okay.  You -- are you offering the opinion that
 9  it's inappropriate for XOOM to seek a higher margin for
10  variable rates than it does for fixed rates?
11      A.  That that -- the -- you know, with the assumption
12  of the margin, so, I mean, everything we're predicated
13  here is on the assumption of the applicability of the
14  margin under this specific contract.  I -- we need a
15  reasonable margin to charge.
16          We used the fixed rate margin as, you know,
17  indicative of a rate that, a margin that XOOM itself had
18  charged in the same months, in the same periods, blah,
19  blah, blah, all being equal, and as, as an indicator of
20  what a reasonable margin might be.
21      Q.  Okay.  And are you offering an opinion in this
22  case that it would be unreasonable for XOOM to target a
23  higher margin on its variable rates than it does on its
24  fixed rates?
                                                   Page 97
```

Page 114

1   A. Okay.
2   Q. As you can tell by the --
3   A. Okay.
4   Q. You can verify it.
5   A. I believe you. It makes sense.
6   Q. There's a file stamp at the top.
7   A. Yeah, it makes sense.
8       MR. MATTHEWS: And this I'll mark as
9   Exhibit 6.
10      (Deposition Exhibit No. 6 marked for
11  identification.)
12  Q. Is another exhibit to the Complaint as you can
13  also verify from the file stamp at the top. Which is a
14  document titled Market Supply Cost Build Up.
15      Do you see that?
16  A. Yes.
17  Q. Okay. Have you seen that Market Supply Cost
18  Build Up before?
19  A. Yes.
20  Q. This is Exhibit 6. Did you prepare it?
21  A. I think people at CRA prepared it. I think I may
22  have reviewed it. I don't know that I completely
23  prepared it, but I certainly reviewed it.
24  Q. Got it. It -- it is a document that CRA --

Page 115

1   A. Contributed to. Yes.
2   Q. -- contributed to. And you reviewed before it
3   was filed?
4   A. I think I reviewed it. I don't know anything
5   about the filing. I wasn't part the filing process, but
6   I reviewed it, I think, before it got sent to counsel.
7   Q. Got it. And this, this Market Supply Cost Build
8   Up is also summarized in the body of the Complaint
9   itself starting at paragraph 54.
10  A. Okay.
11  Q. Do you see that?
12  A. Yes.
13  Q. Okay. And did -- let's see if it corresponds.
14      The table that's presented in paragraph 54 is
15  that also something that you and your colleagues at CRA
16  helped to prepare?
17  A. I don't remember that. I mean, it's possible.
18  It was years ago. But I don't remember that.
19  Q. Okay.
20  A. If it is I don't remember -- I didn't do it
21  personally, I don't think.
22  Q. Okay.
23  A. I don't remember that one at all.
24  Q. Exhibit 6, the Supply Cost Build Up you did?

Page 116

1   A. Somebody at CRA did, yes.
2   Q. I'm sorry. Poor question.
3       You do have a recognition of --
4   A. Yeah, there was a --
5   Q. -- reviewing that?
6   A. Yeah. It's -- yes.
7   Q. Okay. This estimate of Market Supply Cost Build
8   Up that's Exhibit 6 --
9   A. Uh-huh.
10  Q. -- includes a 13.67 percent margin at the bottom;
11  right? Do you see that?
12  A. I don't see 13.67. I see 1.3, but that's in
13  different units. Is that what you're referring to?
14  Sorry. Just to be clear.
15  Q. Well, the reason I know that is if you look at
16  paragraph 55 of Exhibit 5.
17  A. Yeah. Yeah, that says 1.3 cents.
18  Q. Right.
19  A. Right.
20  Q. And if you flip to the next page.
21  A. Right. Okay.
22  Q. That explains that that represents an average
23  13.67 percent markup?
24  A. Okay. Yes. Sorry. I was looking for 13.67 on

Page 117

1   this page.
2   Q. That's okay.
3   A. Yeah.
4   Q. A margin of 1.3 cents which equates to a
5   13.67 percent margin over XOOM's estimated supply costs;
6   right?
7   A. Over -- over the build up costs.
8   Q. Correct.
9   A. Yeah. Sorry. Yeah.
10  Q. That's okay.
11  A. Yeah, so there's the build up costs and then it
12  says "potential margin," so.
13  Q. So why did you include some margin in the Market
14  Supply Cost Build Up and the discussion of Market Supply
15  Cost Build Up in the Complaint, but not in Model 1?
16  A. Well, Model 1 we had more -- by Model 1 we had
17  both -- we had more information in discovery and this
18  was just based on, you know, put together from some
19  public information; right? And just added something in
20  there made it a bit more conservative.
21      But the, you know, there was no information about
22  the actual rate setting process. I mean, these
23  were -- these numbers, as I remember, were based on
24  New York ISO numbers.

30 (Pages 114 - 117)

```
 1     Q. I'm with you. But my question is about the
 2  margin.
 3     A. Yeah. The potential margin?
 4     Q. Yeah. That you included a --
 5     A. Uh-huh.
 6     Q. -- potential margin in the Complaint.
 7     A. Right. Right.
 8     Q. And in this Market Supply Cost Build Up that was
 9  an attachment to the --
10     A. Right.
11     Q. -- Complaint; right?
12     A. Yes.
13     Q. But you do not include a margin in Model 1;
14  correct?
15     A. No, that's in Model 2.
16     Q. Okay. And you did not include it in Model 1
17  because in your view the contract language does not
18  state that it should be included?
19     A. Yes.
20     Q. So why did you include it in the Complaint?
21     A. Well, again, these were numbers built up with no
22  data. And, you know, we presented kind of with and
23  without. Like -- Like I actually do in Model 1 and
24  Model 2.
                                                    Page 118
```

```
 1     Q. But I'm just talking about the margin. The
 2  inclusion of the margin in the Market Cost Build Up, why
 3  did you include margin in the Market Cost Build Up? You
 4  had the contract language at that time.
 5     A. We had the contract language but nothing else.
 6  Nothing about the process, nothing about how they had
 7  done it. I mean, I think that was pre, certainly pre, I
 8  ever saw, any of the deposition or any of the
 9  analysis -- discovery analysis; right?
10     Q. Yeah, but you -- you told me that the reason it's
11  not included in Model 1, the reason the margin is not
12  included in Model 1, is because of the contract
13  language; --
14     A. Right.
15     Q. -- right?
16        So if that's the case and you had the contract
17  language when the Complaint was filed, why did you
18  include margin in this Market Cost Build Up?
19     A. This is -- I mean, as an example, like I said, we
20  presented kind of both ways. It's got total with and
21  total without. I mean, it's pretty comparable to me how
22  we present it in the report with the two models. Maybe
23  I'm missing your point.
24     Q. That's okay. Because the -- the table that's
                                                    Page 119
```

```
 1  included in paragraph 54, the column that says,
 2  Difference in Percentage.
 3     A. Uh-huh.
 4     Q. That factors in margin; right?
 5     A. Yep. Yes. I think so. Because it looks
 6  like -- well, actually -- that's a good question because
 7  this actually refers to the table at the bottom. I -- I
 8  think so. I mean, I don't think it's possible to see
 9  exactly on here.
10     Q. Okay --
11     A. Because there is, like, a period interpolation on
12  here.
13     Q. So just looking at 54.
14     A. Uh-huh.
15     Q. Footnote 27, do you see that in the table?
16     A. Yep. Okay. Yep. I see that.
17     Q. And Footnote 27 says that that adds percent
18  margin; right?
19     A. That adds the 1.3 cents. Yes, I agree with you.
20     Q. Okay. Did you review the Complaint that is
21  Exhibit 5 before it was filed?
22     A. No, I don't think so. I don't remember it.
23     Q. Okay. Do you think that 13.67 percent margin is
24  a generous or substantial margin for an ESCO, generally
                                                    Page 120
```

```
 1  speaking?
 2     A. Almost 14 percent, I mean, it's not immaterial.
 3     Q. Okay.
 4     A. I don't know, I didn't write the word "generous."
 5     Q. Those aren't your words?
 6     A. No.
 7     Q. Okay. Do you recall the graph in Mr. Coleman's
 8  rebuttal report that shows gross margin for certain
 9  companies in the Dow Jones?
10     A. Oh, the thing at the back?
11     Q. Yes.
12     A. Yes. Is it possible we can flip to that?
13     Q. Yes.
14     A. Tell me what page it is. Sorry.
15     Q. It's at page 13.
16     A. Oh, okay.
17     Q. Yes?
18     A. Okay.
19     Q. Do you have an opinion about which of these are
20  unreasonable gross margins, if any?
21     A. I mean, I --
22        MR. WITTELS: Object. Objection.
23     A. I mean, as I understand it these are a summary of
24  things he got from Yahoo; right? So these are
                                                    Page 121
```

```
 1  their retail business.
 2     Q. Okay. Well, I guess --
 3     A. For example, a bunch of the Texas companies have
 4  retail supply businesses. We did a little bit on that,
 5  but not a major thing. But a bunch of the Texas
 6  companies had retail supply businesses that also had
 7  substantial other businesses.
 8     Q. I think I understand what you're saying. And you
 9  didn't work for the retail side of their businesses, you
10  worked for the other side of their businesses?
11     A. Or sometimes we would be hired on some kind of
12  corporate strategy type engagement, which might be
13  pretty broad.
14     Q. Got it. Okay. I thank you for your time and
15  your patience with me.
16           MR. MATTHEWS: I'll pass the witness.
17     A. Thank you.
18     Q. Yes, sir.
19
20                EXAMINATION
21
22  BY MR. WITTELS:
23     Q. Mr. Adamson, I just really have one question for
24  you. You were asked by counsel for XOOM about whether
```
Page 138

```
 1  the company was able to make any profits on its fixed
 2  rate customers; do you remember that question?
 3     A. Yeah. Not in exact wording, but I remember the
 4  question.
 5     Q. Yeah. And did you ask me to, whether you could
 6  go back and review your report when we had a break?
 7     A. Yeah, well -- yes, we were discussing the report.
 8     Q. And did you reread paragraph 57?
 9     A. Yes.
10     Q. And does that answer the question of whether XOOM
11  made money and was profitable on its fixed rate
12  customers?
13           MR. MATTHEWS: Objection. Leading.
14     A. Well, I just -- it just reminded me there was
15  a -- I had said that there was not a specific P&L, this
16  was a reference in the report to deposition testimony
17  from a XOOM witness about the profitability of this.
18     Q. And what did your report find and state?
19     A. I don't remember exactly how he worded it. I
20  think there had been a, in the deposition there was a
21  question about, it was around, I don't have the
22  transcript in front of me, of course, of the deposition,
23  but it was something around the line of were -- were a
24  fixed rate -- were fixed rate customers profitable for
```
Page 139

```
 1  XOOM or some broad question.
 2     Q. And the answer was?
 3     A. I believe he said yes, they were, they were both
 4  profitable. Both fixed rate and variable rate were
 5  profitable.
 6     Q. Okay. I have no further questions at this time.
 7  Thanks.
 8           MR. MATTHEWS: Thanks very much.
 9     A. Thank you.
10           VIDEOGRAPHER: The time is 2:39, we are off
11  the record.
12           COURT REPORTER: And, Mr. Matthews, your
13  order?
14           MR. MATTHEWS: My order is an expedited
15  transcript, just, I don't need any print copies.
16  Electronic only. PDF exhibits.
17           COURT REPORTER: Expedite by Friday?
18           MR. MATTHEWS: Yes.
19           (Whereupon, the deposition concluded at
20  approximately 2:39 p.m.)
21
22
23
24
```
Page 140

```
 1                CERTIFICATE
 2
 3  COMMONWEALTH OF MASSACHUSETTS
 4  SUFFOLK, ss.
 5
 6     I, Laurie Langer, Registered Professional Reporter
    and Notary Public in and for the Commonwealth of
 7  Massachusetts, do hereby certify that the witness whose
    deposition is hereinbefore set forth, was duly sworn by
 8  me and that such deposition is a true record of the
    testimony given by the witness.
 9
10     I further certify that I am neither related to or
    employed by any of the parties in or counsel to this
11  action, nor am I financially interested in the outcome
    of this action.
12
13
       In witness whereof, I have hereunto set my hand and
14  seal this 11th day of November, 2022.
15
16
17
18  NOTARY PUBLIC
       Commission Expires
19     7/27/2023
20
21
22
23
24
```
Page 141

36 (Pages 138 - 141)

Veritext Legal Solutions
346-293-7000