# EXHIBIT A-8

# Exhibit D

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF NEW YORK
2
   Civil Action No. 5:18-cv-235 (MAD/ATB)
3
   - - - - - - - - - - - - - - - - - - - X
4
   NAOMI GONZALES,
5
                          Plaintiff,
6              v.
7  AGWAY ENERGY SERVICES, LLC
8                          Defendant.
9  - - - - - - - - - - - - - - - - - - - X
10
                  August 26, 2020
11                   10:28 a.m.
12            DEPOSITION of Expert Witness, FRANK
13  ANDREW FELDER, PH.D., held via Virtual Zoom, Veritext
14  Legal Solutions, 290 West Mount Pleasant Avenue,
15  #3200, Livingston, New Jersey, before Cynthia Zoller,
16  R.P.R., Notary Public and Certified Court Reporter of
17  the State of New Jersey.
18
19
20
21
22
23
24
25

```
 1   A P P E A R A N C E S:

 2

 3

 4   FINKELSTEIN, BLANKINSHIP,
     FREI-PEARSON & GARBER, LLP91
 5            Attorneys for Plaintiff
              445 Hamilton Avenue, Suite 605
 6            White Plains, New York  10601
 7   BY:  GREG BLANKINSHIP, ESQ.
          CHANTAL KHALIL, ESQ.
 8   PHONE:  914-298-3281
             914-298-3294
 9   EMAIL:  gblankinship@fbfglaw.com
             ckhalil@fbfglaw.com
10

11
     BEVAN, MOSCA & GUIDITTA, PC
12            Attorneys for Defendant
              222 Mount Airy Road
13            Basking Ridge, New Jersey  07920
14   BY:  JOHN COYLE, ESQ.
          JENNIFER GORGA CAPONE, ESQ.
15   PHONE:  908-848-5922
             908-753-8300
16   EMAIL:  jcoyle@bmg.law
             jcapone@bmg.law
17

18

19   Also present:
20   CHARLES RIVER ASSOCIATES
     Debra J. Aron, Ph.D.
21   One South Wacker Drive 34th Floor
     Chicago, Illinois  60606
22   DAron@crai.com
23

24   Brian James, Videographer
     VERITEXT

25
```

Case 5:18-cv-00235-MAD-ATB Document 137-6 Filed 08/06/21 Page 4 of 30
Case 5:18-cv-00235-MAD-ATB Document 137-6 Filed 08/06/21 Page 31 of 30 PageID #:
11102

Page 26

1          A.     Page 8, Footnote 9.

2          Q.     Okay.  Have you reviewed any EnergyGuard

3    brochures provided to Ms. Gonzales?

4          A.     No.

5          Q.     Have you reviewed any EnergyGuard

6    brochures provided to any Agway customer?

7          A.     No.

8          Q.     Other than the welcome letter for Ms.

9    Gonzales, have you reviewed any other welcome

10   letters?

11         A.     No, I have not.

12         Q.     Do you have an understanding as you sit

13   here today, whether the welcome letters were the same

14   for customers of Agway at all utilities in New York?

15         A.     I don't have an understanding one way or

16   the other.

17         Q.     Do you have an understanding whether the

18   welcome letters for New York customers of Agway

19   changed over the course of time?

20         A.     I don't know.

21         Q.     Same question for Pennsylvania.  Did you

22   review any Pennsylvania welcome letters for customers

23   of Agway?

24         A.     No.

25         Q.     Do you have an understanding if Agway

Page 46

1    not do you think if anyone --

2                MR. BLANKINSHIP: Objection.

3         A.    I would guess some people do, but I just

4    don't know one way or the other.

5         Q.    But to you, you made a choice not to

6    purchase it?

7                MR. BLANKINSHIP: Same objection.

8         Q.    Correct?

9         A.    Is there a question?

10        Q.    Because to you, you did whatever internal

11   calculation you did.  You determined that the

12   benefits did not -- you tell me, what general

13   calculation did you do in deciding not to purchase

14   it?

15               MR. BLANKINSHIP: Objection, outside the

16   scope of his expert report.

17        A.    I looked at the cost, I looked at my

18   existing warranties on my appliances and decided not

19   to purchase that additional service.

20        Q.    Do you know how many customers of

21   variable rate electricity Agway has right now?

22        A.    No.

23        Q.    Do you know what percentage of Agway's

24   electrical variable rate customers submit EnergyGuard

25   claims?

Page 47

1        A.      No.

2        Q.      Do you know, do you know how much the

3   average covered claim that is paid by Agway for

4   EnergyGuard repairs for an electrical variable rate

5   customer is?

6        A.      No.  Presumably, it's less than $1,000.

7        Q.      What makes you say that?

8        A.      It provides up to a maximum of $1,000 for

9   parts and labor per each service plan each calendar

10  year that you are a customer.

11       Q.      My question, you said less than $1,000, I

12  mean, I suppose it could be $1,000?

13       A.      Less than or equal to $1,000, correct.

14  Thank you.

15       Q.      And that's with respect to, I guess, the

16  breakdown of the residential central air conditioning

17  unit or problem with electrical wiring, correct?

18       A.      If you are just rereading the paragraph

19  you read into the record, I agree.

20       Q.      Other than as I read the paragraph, do

21  you have a different understanding of the EnergyGuard

22  service?

23       A.      No.

24       Q.      Okay. So the maximum annual benefit to a

25  residential customer of Agway is $2,000 per calendar

1    answered.

2          A.     Well, again, in this -- in energy in

3    general, electricity in particular, hedging

4    instruments, which are a risk management tool, which

5    is what insurance and warranties do in general, I

6    have studied those.  I will --

7          Q.     Okay.  So with respect to hedging and

8    other types of energy purchases, to the extent that

9    those are actually insurance, that's something you've

10   done professionally, correct?

11         A.     I think I said, and the reporter can

12   correct me, insurance-like or risk management-like

13   instruments, so insurance hedging, warranties are

14   primarily to manage risk and so as they pertained to,

15   I've studied those as they've pertained to

16   electricity primarily in natural gas.

17         Q.     Have you ever studied in your

18   professional career any warranties for consumers?

19         A.     I don't understand what a warranty for

20   consumer is.

21         Q.     Okay.  Well, let me back up. Have you

22   ever in the course of your professional career

23   studied insurance provided to residential consumers

24   in New Jersey, New York, Pennsylvania, any state?

25         A.     Life insurance?  Health insurance?  What

Page 55

1  insurance are you talking about?

2       Q.     Any insurance, any insurance.

3       A.     Any?

4       Q.     The globe of insurance.

5       A.     I have not studied the globe of

6  insurance.

7              MR. BLANKINSHIP: Objection, vague.

8       Q.     In the course of your work in this

9  matter, this matter being the Gonzales matter, have

10 you done any analysis about the statistical

11 properties of the risks against which EnergyGuard

12 customers are insured?

13      A.     No, I have not.

14      Q.     Did you perform an analysis to identify

15 insurance products sold in the marketplace that would

16 be economically comparable to EnergyGuard?

17      A.     No, I did not.

18      Q.     Did you perform an analysis to compare

19 the prices, costs, and risks of EnergyGuard with any

20 other comparable insurance or warranty products?

21      A.     I did not.

22      Q.     Are you aware -- are you familiar with

23 the insurance-related financial metric known as "loss

24 ratio"?

25      A.     No.

1  rates in different zones in a month in New York?

2         A.     Yes.

3         Q.     And do you agree with me that customers

4  at a different rate classification from a utility

5  might be charged different rates?

6         A.     Yes.

7         Q.     For example, one common one in New York

8  is residential heat or residential non-heat,

9  referring to whether they have electrical heat,

10  correct?

11         A.     That's correct.

12         Q.     So for example, a customer that has

13  residential electric heat is charged a higher rate

14  per kilowatt than a customer who does not have

15  electric heat?

16         A.     Is there a question?

17         Q.     I thought that was it.  Would you agree

18  with that statement?

19         A.     I haven't looked, but there are different

20  rates.  It's per kilowatt hour, not kilowatt, but

21  putting that unit aside, yes, there are different

22  classes of residential customers and they could be

23  charged different energy supply rates.

24         Q.     Is that something you took into account

25  as part of your opinion on -- and by the way, when I

Case Case:5:18-91400235-MAD-ATB Document 207-1037-iled Filed/06/21age Page 131 of 30geID #:
11108

1    say your opinion for the next while of questioning,

2    I'm referring to your opinion on IV about the

3    comparison between the default charge.

4         A.    So the methodology that I described in my

5    report, I can account for different price to compares

6    for the same utility in different zones and I've done

7    that in the past.  In this case, given the data and

8    the aggregation, I aggregated as Agway did, using

9    price to compares provided by Agway to calculate my,

10   to make my calculations.

11        Q.    Okay.  So the answer is you used the

12   information that Agway had for price to compare

13   without doing any independent modification of that

14   number?

15        A.    That's correct, I used the price to

16   compare provided by Agway, prices to compare provided

17   by Agway, correct.

18        Q.    And those are the numbers listed in your

19   Table V, actually, Table V of your report?

20        A.    No.  Those are the, those are the Bates

21   Numbers of the documents, the Excel spreadsheets that

22   I pulled the price to compare, that's correct.

23        Q.    Thank you, that's what I meant. Those

24   were the Bates numbers -- sorry -- Table V contains

25   the Bates numbers of the documents you looked at to

Case Case 5:18-cv-00235-MAD-ATB Document 137-6 Filed 08/06/21 Page 11 of 30 PageID #: 11109

1  get the price to compare for your comparison?

2          A.      Correct.

3          Q.      Do you know if in fact, those were the

4  prices to compare for those utilities at those months

5  listed?

6          A.      I did not reconfirm that they were.

7          Q.      So the answer is no, you don't know?

8          MR. BLANKINSHIP: Objection.

9          A.      That's correct.  That's correct.  I mean,

10  I checked the reasonableness of them, but no, I did

11  not go back and cross-check with the utility's price

12  to compare.  I used the data that Agway provided me.

13          Q.      Do you know if Agway's witnesses, the

14  30(B)6 witnesses were asked any questions as to how

15  they calculated the price to compare that's on those

16  sheets that you referenced in Table V?

17          A.      As I indicated earlier, I did not review

18  those depositions.

19          Q.      I asked a more subtle question.  Do you

20  know if Agway's witnesses at the deposition testified

21  about how the price to compare is calculated that

22  goes on these sheets that you referenced in Table V?

23          MR. BLANKINSHIP:  Objection, asked and

24  answered.

25          A.      I believe I've answered that question,

Case 1:18-cv-00235-MAD-ATB Document 137-6 Filed 08/06/21 Page 13 of 31 PageID #: 11110

1   but no, I do not know what they said or didn't say

2   with respect to how they tabulated the price to

3   compares based on the Excel spreadsheets or the big

4   numbers I reference in Table V.

5        Q.    Do you know if the number that they have

6   put, they being Agway -- withdraw the question.

7             Do you know if the number that Agway has

8   put in the price to compare on those spreadsheets, do

9   you know what rate class that's for?

10       A.    The -- it's for residential, but I do not

11  know, and I suspect it's for the major residential

12  class, but no, unless it's stipulated in the

13  document.

14       Q.    Why would you assume it's for the major

15  residential class?

16       A.    Well, electric heat in New York and the

17  northern states is relatively small so typically,

18  there's a standard residential SC1, Service Class 1

19  is typically, for utilities not everywhere in all

20  utilities in the U.S. and that is their typical

21  residential rate.  There could be other residential

22  rates for heating, there could be, again, it depends

23  on the utility, but no, I did not double-check, as I

24  said before, which rate class, the price to compare

25  that they pulled.

Case Case:5:18-cv-00235-MAD-ATB Document 137-6 Filed 03/06/21 Page 131 of 30 ID #: 11111

1      Q.     When you looked at the Agway customer

2  base, do you know if Agway had any customers who were

3  on the S -- you said Service Class 1, as opposed to

4  Service Class 2?

5      A.     I did not check that one way or the

6  other.

7      Q.     So is it possible that your table

8  compares prices Agway charged customers for Service

9  Class 1 to rates to price to compare for customers

10  for Service Class 2?

11      A.     It is possible that -- well, it is

12  possible that the data that Agway provided me had a

13  rate for one residential rate class when they were

14  serving a customer for a different rate class. That

15  being said, in their analysis in their spreadsheets,

16  they were doing that comparison, which I then

17  developed.

18      Q.     Do you know what Agway used these pricing

19  worksheets, and I'm referring to the ones that are

20  identified by the Bates number in Table V, do you

21  know what Agway used those for?

22      A.     I inferred, like every other ESCO, they

23  monitor the price to compare as part of their

24  business analyses.

25      Q.     What are you basing that on in this

1  particular case?

2      A.      Well, one is the name of price to

3  compare; secondly, they collected the data

4  systematically for utilities over the time period;

5  three, it makes economic sense for a company who is

6  selling a product to compare it to other, other

7  products, the prices of similar, identical products

8  and it's consistent with my experience as working for

9  an ESCO and consistent with my experience of the

10 various ESCO litigation cases that I have been

11 involved in and it is consistent with what the New

12 York Public Service Commission, among many other

13 states did, in analyzing the value proposition of

14 variable rate products.

15     Q.      You are referring to Reset Order 2?

16     A.      That's the abbreviation for the New York

17 Public Service Commission order, that, as well as

18 orders and similar reports done in other states.

19     Q.      Okay.  I'm going to circle back at the

20 moment, but I just want to put on the record so that

21 we're all clear we're talking about the same thing.

22 When either of us said Reset Order 2 referring to the

23 New York State -- sorry, withdrawn -- we are

24 referring to the State of New York Public Service

25 Commission Order, December 12th, 2019, adopting

Case 1:18-cv-09035-JMAD-ATB Document 2009-10 Filed 08/06/21 Page 151 of 30gelD #: 11113

1   changes to the retail access energy market and

2   establishing further process, correct?

3          A.      Yes.  I cite it on Page 7 of my report.

4          Q.      Page 6?  6?  It's cited in your report.

5          A.      It's cited in my report.  I stand

6   corrected, it started on Page 6.  Thank you.

7          Q.      You call it the PSC Order.  Would you

8   rather call it PSC Order instead of Reset Order 2,

9   that just how I refer to it?

10         A.      Yeah.  Either way works, whatever you are

11  comfortable with.

12         Q.      Okay.  I'll probably switch between them

13  and I'll write myself a note and I'll probably get it

14  wrong. Reset Order 2, New York PSC Order, referring

15  to that December 19th order?

16         A.      Yes.

17         Q.      And that's what you reference in your

18  testimony?

19         A.      Yes.  My report exhibit that we are

20  talking about, yes.

21         Q.      Now, that's not a decision from a court,

22  correct?

23                 MR. BLANKINSHIP: Objection, vague, calls

24  for --

25         A.      It's a decision from the New York Public

Page 83

1    Service Commission, which is a regulatory body that
2    issued a report.  They went through a judicial-like
3    process, but it's -- regulatory agencies in the U.S.,
4    energy regulatory agencies, such as, the Public
5    Service Commission, Federal Regulatory Commission and
6    so forth, do have quasi-judicial function, but no, I
7    would not refer to it as a court, I would refer to it
8    as a public service commission.
9         Q.    Do you think that NY PSC Order or Reset
10   Order 2 is relevant to your opinions here?
11        A.    Yes, as I describe in my report.
12        Q.    So even though it's not a judicial
13   because of it's a quasi-judicial, I think was your
14   term, from the regulatory agency, that's something
15   that an expert in your field would rely on?
16        A.    I'm not relying on it because it's a
17   quasi-judicial, although, they went through a
18   process, as I described, in terms of witnesses,
19   testimony, hearings and paper filings and so forth,
20   the reason I rely upon it is, it is consistent with
21   the history of deregulation in the United States,
22   which I reference in my report, it's consistent with
23   my experience and background, it's consistent with
24   the reports, similar reports of other agencies,
25   government agencies, some are public service

Page 84

1    commissions will be analogue in other states and it's

2    consistent with my findings in this matter.

3         Q.    Okay. Did you participate in the

4    underlying proceedings on behalf of any entity?

5              MR. BLANKINSHIP: Objection, vague.

6         A.    No, I did not.

7              MR. COYLE:  Mr. Blankinship had an

8    objection.  Did you hear it, Cindy?

9    (Discussion was held off the record.)

10        Q.    Did you monitor in some fashion, the

11   underlying proceedings?

12             MR. BLANKINSHIP: Same objection.

13        A.    I -- not while they were active going on,

14   no, I did not.

15        Q.    Subsequent to them concluding, did you

16   have a chance to look back at the underlying

17   proceedings?

18        A.    The 181-page report or so, does reflect

19   the testimony and the input of multiple stakeholders

20   so when they summarize a particular issue, and this

21   is common among not just regulatory agencies, but

22   certainly in my field, they would summarize the

23   input, the arguments, the facts and then they would

24   render their findings and the other regulatory

25   proposals or policy changes so yes, as part of the

Case Case 5:18-cv-09035-JMD-ATB Document 103-6 Filed 03/06/21 Page 181 of 30 PageID #: 11116

1   caused by the timing in billing and collection."  Did

2   I read that correctly?

3          A.    That's right.  So this would be in this

4   case, based on previous month, as indicated.

5          Q.    I apologize, I thought you were done.

6   Would that generally be your understanding of a

7   market price adjustment, regardless of what's written

8   on the bill?

9                MR. BLANKINSHIP: Objection, vague.

10         A.    They are not always, necessarily -- I'm

11  not sure the key element is that they are retroactive

12  or not, but yes, and in this case, the market price

13  adjustment was $1.27 out of a total electricity cost

14  of $63.40.

15         Q.    Right.  I guess you could also say 1.27

16  out of the total supply commodity cost of $60.62,

17  correct?

18         A.    Yes, that's right.  That would be the

19  right comparison.  It would be compared to the total

20  supply charge, yes.

21         Q.    And one of them is maybe 9 percent as

22  opposed to being 1, 2 percent?  I'm sort of,

23  apologizes, I'm not an economist.

24         A.    I understand, I understand.  You don't

25  have to be an economist, neither am I, to understand

Case 1:18-cv-09035-JMF-RWL Document 137-6 Filed 08/06/21 Page 20 of 31 PageID #: 11117

1    delivery, while customers who purchase from ESCO's do

2    not."  Did I read that correctly?

3           A.     Yes, you did.

4           Q.     So is that, generally speaking, when we

5    pull up the Tax Law sections if we need to.  I'll

6    tell you the Tax Law sections are utterly, enormous.

7    We can pull them up.  The law will be what the law

8    is.  The law isn't what John Coyle says, it is the

9    law is the law.

10                  Do you have an understanding that in the

11    late 1990's that New York imposed a waiver of this

12    tax on customers who receive electricity from an

13    ESCO?

14                  MR. BLANKINSHIP: Objection to the scope.

15           A.     As I testified before, I was working for

16    an ESCO at the time and I mentioned that, yes.

17           Q.     And that if you read to the next section,

18    it says, "Competition among ESCO's is well developed.

19    New York utilities offer multiple alternative ESCO

20    gas and electricity suppliers.  This exemption

21    perpetuates unequal treatment among utility

22    customers; for example, a business purchasing its

23    electricity from the local utility company will pay a

24    sales tax on its total electric or gas bill, while

25    another business purchasing gas or electricity from

1   distribution company are charging, before the removal

2   of the exemption, they are charging the same price to

3   compare, right, then the, by switching to, by being

4   on the ESCO, there's an additional savings.  If I do

5   not account for that additional savings, I

6   understated the overcharges.

7         Q.    Well, did you account for that savings?

8         MR. BLANKINSHIP: Objection, asked and

9   answered.

10        A.    As I said, I did not.

11        Q.    Do have any idea what the magnitude of

12   the, do you have any idea of the magnitude of the

13   sales tax savings for the customers in your Chart 5

14   for 2013 would be?

15        A.    No I don't, but I'll, I'll try to

16   calculate that.

17        Q.    Did you calculate the transmission --

18   withdrawn.

19        I realize I, too, like you, am not an

20   economist, but to me, if Agway charges you $10 for a

21   commodity charge and the utility charged you $10 for

22   a commodity charge, and the utility charges you $2.00

23   for tax -- the utility doesn't charge you for tax --

24   but you are charged $2.00 for tax from the utility,

25   you are paying more for being on the utility, right?

Case Case:5:18-4900235-JMAD-ATBurDoot229n1037-iedFib60083/06/21agePage23110P8geID #:
11119

1          MR. BLANKINSHIP: Objection.  Asked and

2  answered, argumentative.

3      A.     Right.  So if I switch to the ESCO, I

4  save that money. I did not account for that and

5  therefore, my overcharges would underestimate the

6  benefit of switching to Agway.

7      Q.     Okay.  Then, I agree.  I thought you were

8  saying before, you would have understated the amount

9  of the overcharge and I think your last statement is

10  more correct.  May be you misspoke earlier.  I

11  thought you --

12      A.     Let's read back that statement that I

13  just said.

14      Q.     Why don't we forget what you may or may

15  not have said before.

16      A.     No.  No.  That's now how this --

17          MR. BLANKINSHIP:  Objection.  You are

18  mischaracterizing his testimony.

19          MR. COYLE: Sure, that's why we have a

20  court reporter.

21      Q.     The question is, would you agree that

22  if -- then I'm going to ask it again and Mr.

23  Blankinship is going to object, asked and answered,

24  so that's where we are -- if Agway charges you $10

25  for supply and the utility charged you $10 for

Case Case: 1:28-cv-0035-JMAD-ATB Document 1037-6 Filed 08/06/21 Page 23 of 30 PageID #: 11120

1          MR. BLANKINSHIP:  I'm sorry.  There was a

2     big, long pause there so I thought that meant you

3     were done with your question.

4          MR. COYLE:  Fair, wouldn't be the first

5     time.

6          Q.     Would you like me to re ask the question,

7     Dr. Felder?

8          A.     Please.

9          Q.     How would your methodology allow you to

10    determine a customer's specific price to compare?

11         A.     It would be in Formula 2.  I would

12    replace the cost of goods sold with the -- in Formula

13    2 it would be using the costs -- what the customer

14    would have paid if they were purchasing electricity

15    from the utility so that would be all the components

16    of the price to compare.

17         Q.     What data would you use for that

18    customer's specific price to compare?

19         A.     The customer, its rate class, and the

20    zone that it's in and the period of time and if data

21    was sufficiently available, you could do it on a

22    billing cycle, as we've discussed previously.

23         Q.     But you didn't do that?

24         MR. BLANKINSHIP:  Objection, Asked and

25    answered, argumentative.

Case 5:18-cv-00235-MAD-ATB Document 103-6 Filed 08/06/21 Page 24 of 31 PageID #: 11121

1    A.    I did not do that.  I did that using

2  aggregate data, that's correct.

3    Q.    And I know we are going to go through

4  this one more time.  Where would you get that data

5  that you are talking about to determine that for

6  every customer?

7          MR. BLANKINSHIP: Objection, asked and

8  answered.

9    A.    Well, I've done this in the past.  So for

10 Con Ed they have a website that lists the price to

11 compare, what you are calling the apples to apples,

12 what you are calling the price to compare and the

13 components that go into that and you get through the

14 website and you pull those files and then you combine

15 the supply charge, the merchant function charge or

16 the equivalent merchant supply charge, whatever, put

17 those together and that becomes the price that's then

18 used in the calculations, as I described.

19   Q.    Okay.  And I know we keep talking over

20 this, but you didn't do that here.  You just did --

21         MR. BLANKINSHIP:  Same objection.

22         MR. COYLE:  I'm sorry.  Mr. Blankinship,

23 same objection?

24         MR. BLANKINSHIP:  He can answer.

25   A.    I'm happy to answer for the fifth, sixth

1    period, geography and the utilities that I listed,

2    but that it's still, as I note in my report in

3    Section 7, that's still being determined, is my

4    understanding.

5           Q.     In the course of doing your calculations

6    for overcharges, I note that according to your table,

7    there were some months where the utility price was

8    higher that you calculated than the ESCO price, than

9    Agway's price, correct?

10          A.     Yes.

11          Q.     It appears to me that you then did not

12   include that negative amount in calculating how much

13   Agway overcharged its customers; is that correct?

14          A.     That's correct.

15          Q.     Why did you do that?

16          A.     We were referring to Page 12 and 13 of my

17   testimony, just for reference, and as I state there

18   is, I call those negative overcharges and given the,

19   the customer welcome letter and the conditions, the

20   what we've been calling the terms and conditions or

21   the disclosure statement and the fact that the

22   variable rate is then on a monthly basis, that I only

23   included the times on the overcharges were positive;

24   in other words, when a customer paid more than my

25   benchmark, because that was the, the agreement that

Case Case:5:18-cv-00235-MAD-ATBurDocument1037-6Filed 08/06/21 Page 26 of 31 Page ID #:
11123

1    they had with Agway.

2           Q.      Who had with Agway?

3           A.      The customer.

4           Q.      The customer?

5           A.      Variable customers.

6           Q.      So let me ask you a question.  If in

7    month A, August, I'm charged, I'm on Agway and I'm

8    charged $5 less than what I would have been on my

9    utility and in the next month I'm charged $4 more

10   than I would have been on the utility, your opinion

11   is that in the aggregate, I have been, I have been

12   overcharged, Agway overcharged me $4 more than if I

13   had been on the utility?

14          MR. BLANKINSHIP: Objection, incomplete

15   hypothetical, lack of foundation and mischaracterizes

16   his testimony, compound.

17          A.      I looked at each month individually and

18   as I say on Page 12 and 13, the plaintiff was

19   promised a competitive monthly variable price and so

20   I looked at each month individually and asked whether

21   or not they were, depending on the different

22   benchmarks I used and cases, to calculate the

23   overcharge so that's correct, I would only have

24   looked at the month where they were overcharged $4.

25   They were promised, in my understanding or committed

Case 1:18-cv-00235-MAD-ATB Document 137-6 Filed 08/06/21 Page 27 of 30

1          MR. BLANKINSHIP: Objection.

2          A.     Yes.  The costs for EnergyGuard for those

3     fixed and variable customers, I added all of it in.

4          Q.     Okay.  Have you calculated any other ESCO

5     profit margins in New York at anytime?

6          A.     If you mean by -- yes, profit margin

7     margins, yes.

8          Q.     In connection with this report or in

9     connection with something else?

10         A.     In connection with something else.

11         Q.     In connection with another expert report

12    you prepared?

13         A.     Yes.

14         Q.     Do you have an understanding as you sit

15    here today, what is, what are the spread of profit

16    margins for ESCO's in New York in 2020?

17         A.     I, well, first, ESCO's tend to keep their

18    data confidential, for obviously commercial reasons

19    and other reasons. Those calculations I did, I would

20    have to check, they were a couple of years ago,

21    several years ago.

22         Q.     So would your answer be no?

23         A.     I'm sorry, that's right.  I have not

24    looked at any, I have not seen any 2020 data.  If

25    Agway would like to provide it, that would be, I

Case Case5:18-cv-00235-MAD-ATB Document 137-6 Filed 08/06/21 Page 28 of 31 PageID #:
11125

1  would take a look at it.  I'm not sure it's relevant

2  though, but so.

3       Q.     Well, let's leave the objections to Mr.

4  Blankinship.

5       A.     Okay.  I'm sorry, I didn't mean it that

6  way, I just -- so no, I have not looked at any 2020

7  ESCO margins.

8            MR. BLANKINSHIP: I'm going to object to

9  your colloquy there, Mr. Coyle.  That wasn't an

10  objection.  He was explaining his views on --

11       Q.     Okay.  Then I withdraw that.

12            Okay. So you don't think  that the price

13  and the profit margins of other ESCO's is relevant to

14  your analysis?

15       A.     Well, for the price to compare analysis,

16  no, because the idea is that's the benchmark that an

17  ESCO or comparable good be providing or less.  In

18  fact, the point of point of restructuring as we've

19  gone on, or I've gone on, is to do that.  With

20  respect to the cost of goods service analysis and I

21  include it in expenses and other factors, I think the

22  issue is, is whether or not Agway was charging its

23  costs or fees, etcetera, based on the contract that

24  we've read from.

25       Q.     Do you have the disclosure, the customer

1  industry, as a consultant, as part of litigation, as

2  being involved in the energy service industry, that's

3  the basis for using a margin of both 5 and 10 percent

4  and the fact that even with those margins, if Agway

5  would have been able to procure electricity at a much

6  lower cost commensurate with the price to compare,

7  they would have made a substantial amount of money.

8       Q.    So other than, I know you said your

9  experience in the industry and your testimony is what

10  your testimony was, I'm not going to paraphrase it,

11  there's not a specific thing that you've pointed to

12  to say what the profit marriage for any other ESCO

13  is?

14            MR. BLANKINSHIP: Objection, asked and

15  answered, scope.

16       A.    As I said for my analysis, which is a

17  two-pronged analysis, it doesn't depend on the margin

18  of another ESCO, it depends on the agreement that we

19  talked about in different manifestations and the

20  utility price to compare and my experience and

21  background in the industry.

22       Q.    Okay.  Would you agree with me, though

23  that the residential customer disclosure statement

24  allows Agway to include its expenses and margins?

25       A.    I can go back and check, but yes, that

Case 5:18-cv-00235-MAD-ATB Document 137-6 Filed 08/06/21 Page 291 of 30 PageID #:
11127

1    sounds like familiar language.

2         Q.    That actually charges or other

3    assessments in Agway's costs, expenses and margins,

4    that's what I was referring to.

5              MR. BLANKINSHIP:  Objection.

6         A.    Right.  Presumably, there's some limit on

7    the amount of margin they could charge.

8         Q.    What's the limit?

9         A.    Well, I think 5 or 10 percent is a

10   reasonable margin, but I didn't go and draw, do a,

11   you know, a hard line where that limit is.

12        Q.    Well, you just said there should be some

13   limit to it and Questions 5 and 10 are both rather

14   radically different numbers.  What is the, what is

15   the margin that Agway contractually, in your opinion,

16   was obligated to charge?

17             MR. BLANKINSHIP: Objection.  There's no

18   question, that's just a statement.

19             MR. COYLE:  That wasn't a statement.  I

20   said what was, that's why it's a question.

21        Q.    What was the margin that Agway was

22   permitted to charge, question?

23             MR. BLANKINSHIP: Objection, asked and

24   answered.

25        A.    I did a two-pronged analysis based on the

Page 244

CERTIFICATE

    I, CYNTHIA ZOLLER, Certified Court
Reporter of the State of New Jersey, License No.
30X100178500, do hereby certify that the foregoing is
a true and accurate record of the proceedings.
    I DO FURTHER CERTIFY that I am not
related through blood or through marriage, to any of
the parties to this action, and that I have no
financial interest in this action.

*Cynthia Zoller, R.P.R.*

Cynthia Zoller, C.C.R., R.P.R.
Notary Public of the State of New Jersey

My Commission Expires June 30, 2022