# Exhibit B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,<br><br>                Defendants. | No. 18 Civ. 2949 (ARR) (JAM) |

**DECLARATION OF DAVID COLEMAN**

Pursuant to 28 U.S.C. § 1746, I, David Coleman, hereby declare as follows:

1. I am over the age of twenty-one (21) and am fully competent to make this Declaration. The statements contained herein are true and correct and are within my personal knowledge.

2. I make this Declaration on behalf of XOOM Energy New York, LLC in support of its Motion to Exclude Plaintiff's Untimely Expert Disclosures. Counsel for XOOM provided me a copy of the Amended Expert Report of Seabron Adamson dated May 10, 2024, and I have done an initial review of the methodologies, models, and opinions it provides therein. My initial observations made in the limited time available to me are summarized below.

3. **The CRA Amended Expert Report[1] contains three approaches to calculating overcharges. All three of these approaches, Methods A, B, and C, are completely new and novel analytical approaches. There are no calculations represented in the CRA Original Report[2] that even remotely resemble these approaches**. In its Original Report, CRA proposes two overcharge calculations, Models 1 and 2. Model 1 simply calculates the difference between charges assessed at XOOM's variable rates and charges as calculated at a rate set equal to XOOM's estimated supply costs with no margin allowed.[3] Model 2 calculates the difference between charges assessed at XOOM's variable rates and a proxy rate set equal to XOOM's estimated supply cost plus a margin in each corresponding month equal to the margin XOOM charged for its fixed rate products, or 2,649 individual monthly fixed rate margins. In the CRA Amended Report, Method A

---

[1] See Amended Expert Report of Seabron Adamson, issued May 10, 2024 (CRA Amended Report).
[2] See Expert Report of Derya Eryilmaz and Seabron Adamson, issued October 3, 2022 (CRA Original Report).
[3] CRA Original Report, Exhibit 4.

1

calculates, for each individual month, the XOOM estimated supply cost and the corresponding utility default service rate and then calculates an implied margin difference expressed as a percentage of estimated supply cost. CRA then calculates <u>one single average utility margin</u> as the average percentage over time as a single number[4] to calculate overcharges in each month as the difference between the XOOM variable rate and estimated supply cost grossed-up for the average utility margin.[5] In Method B, CRA calculates overcharges simply by comparing the XOOM variable rate in each month to 105% of XOOM's estimated supply costs. The 5% gross-up figure comes from the NY Reset Order.[6] In Method C, CRA calculates a margin for fixed rate products for each utility in each month and then averages all of the values to arrive at <u>one single value</u> equal to 21.23%. It is unclear where these figures came from or how they were calculated as they are presented as values with no supporting calculations.[7] CRA then calculates overcharges as the difference between XOOM's variable rate and 121.23% of XOOM's estimated supply costs.[8] In all three Methods, only monthly overcharges are counted. Any monthly undercharges are ignored.

4.  **None of the three Methods described in CRA's Amended Report reproduce or update the same overcharge calculations that were presented in its Original Report.** Methods A, B, and C are, in fact, new analytical approaches that produce different results than either of the methods discussed in CRA's original report. This suggests that the methodology, not only the data, has changed. Methods A and B have no analogous calculations in CRA's Expert Report. Method C is most analogous to Model 2 from CRA's Expert Report. However, when we compare the calculations performed in each month, the allowable margin clearly differs. This difference is not due to the inclusion of new or revised data. Rather, it reflects a difference in methodology. Previously, the allowed margin changed by month. In its new calculations, it appears to be constant over time. The following table illustrates the differences in allowable margin as presented in Model 2 (Original Expert Report) vs. Method C (Amended Expert Report) for residential electric customers served by NYSEG during the months of January – March 2015.

|  | Month | XOOM Var. Rate $/kWh | XOOM COGS $/kWh | Actual Margin | Fixed Rate Margin $/kWh | Allowed margin % of COGS |
|---|---|---|---|---|---|---|
| **Model 2** | 1/1/2015 | 0.1599 | 0.1280 | 0.0319 | 0.0341 | **26.6%** |
|  | 2/1/2015 | 0.0999 | 0.0668 | 0.0331 | 0.0258 | **38.6%** |
|  | 3/1/2015 | 0.0949 | 0.0553 | 0.0396 | 0.0248 | **44.9%** |
| **Method C** | 1/1/2015 | 0.1599 | 0.1280 | 0.0319 | 0.0272 | **21.2%** |
|  | 2/1/2015 | 0.0999 | 0.0668 | 0.0331 | 0.0142 | **21.2%** |
|  | 3/1/2015 | 0.0949 | 0.0553 | 0.0396 | 0.0117 | **21.2%** |

---

[4] CRA Amended Report, Exhibit 3.
[5] *Id*., Exhibit 4.
[6] "Thus, as an interim measure, fixed-rate products will be limited to a price no greater than the trailing 12-month average utility supply rate plus a premium of no more than 5%." NY Reset Order, p. 67.
[7] CRA Amended Report, Exhibit 6.
[8] *Id*., Exhibit 7.

2

5. **The overcharge calculations provided by CRA in the workpapers for its Amended Report show only the final step in its calculations, are often presented as values only without supporting formulae, and are insufficiently detailed to allow for expert critique**. Without an opportunity for discovery, I am unable to determine whether the preceding, but unshown, calculations were performed accurately. For example, in its workpaper for Exhibit 6, CRA presents <u>3,415 values for fixed rates margins</u> charged by XOOM across different utilities, months, customer classes, and electric/gas commodities. There is no supporting evidence for any of these calculations and I am unable to determine what data CRA used to derive them, or even what they represent. CRA defines margin both as % of Rate and % of supply costs. Without supporting calculations, I am unable to determine which definition CRA uses to calculate its fixed rate margins or whether CRA has performed the calculation correctly. CRA also reports, as values only, what it labels as "Variable Plan Costs", for "Electric Res", "Electric Com", "Gas Res", and "Gas Com" customer groups. CRA does not identify the source of these costs, what products they encompass, or how the "Varaible Plan Cost" is calculated. In my review of the Rate Setting Workbooks, I noted a wide variety of product names for variable rate products.[9] CRA has not indicated which products it considered when calculating its "Variable Plan Costs." Because it is unclear what products CRA included in its "Variable Plan Costs", it is possible that the usage CRA reports may include products which it did not consider in its "Variable Plan Cost" calculation. It is difficult to estimate the amount of effort that would be required to fully analyze CRA's new approaches. However, it would not be unreasonable to expect equal to or greater effort that was required to analyze CRA's original report. For comparison, that effort required over 130 hours of work from me and my staff.

6. **Model 2 cannot be consistent with the Court's determination that XOOM's variable rates must vary solely on the basis of supply costs. CRA's current Method C appears to be an attempt to modify Model 2 in such a way that it can be compliant with the Court's interpretation. However, it simply represents a new and different calculation and is unworkable for all the reasons discussed elsewhere in this declaration**. Amending Model 2 to include more complete data does not and cannot make it compliant with the Court's ruling. Model 2 calculates overcharges on the basis of allowable fixed rate margins that vary by location, by month, by customer type, and by commodity. These variations are not strictly determined by supply costs. Therefore, CRA's original Model 2 cannot be made consistent with the court's interpretation. It appears that CRA has altered its methodology in Model 2 in an attempt to make it compliant with the court's interpretation. In doing so, CRA has simply developed a new and novel approach, Method C, that is not an update or supplement to Model 2.

---

[9] I noted 46 unique electric variable rate product names and 21 unique gas variable rate product names.

3

7. **All three Methods are unworkable because they rely exclusively on figures derived from XOOM's estimated supply cost inputs to its rate-setting workbooks, while the Court has ruled that XOOM's variable rates must vary solely on the basis of XOOM's estimated and actual supply costs. None of CRA's Methods incorporate actual supply costs. I have also been unable to determine or verify how CRA calculated its aggregated estimated supply cost inputs because it does not disclose that calculation**. CRA's calculations do not account for actual supply costs in any way. The court has ruled that rates must be set "solely on the basis of XOOM's actual and estimated supply costs." CRA's damage calculations rely on the premise that XOOM's rates should have been set strictly proportionally to XOOM's estimated supply costs. However, had XOOM set rates in this way, it would necessarily have had to ignore its actual supply costs. CRA's Methods cannot be consistent with the Court's ruling that variable rates be set solely on the basis of XOOM's actual and estimated supply costs.

8. **All three of CRA's proposed overcharge calculations are unworkable and unstable because they all rely on future data that could not have been known by XOOM or any other market participant at the time of service**. The overcharge calculations in CRA's new methods represent ex post facto judgements using information that was not available to XOOM at the time of service. It would be unreasonable to calculate overcharges based on benchmarks that were unknowable at the time of service. Method A utilizes data on XOOM estimated supply costs and utility rates through January 2024 to calculate an allowable margin of 7.33%. This figure could not have been calculated until those supply costs and utility rate figures as late as January 2024 had been observed. Method B utilizes a 5% margin referenced in a December 2019 NY PSC order, which could not have been known prior. Method C utilizes data on XOOM fixed rate margins through January 2024. Like Method A, these values could not have been known until XOOM's fixed rate prices and supply costs were observed as late as January 2024. There is no reasonable way that XOOM or any other ESCO could be expected to price its variable rates subject to margin caps that would only be determined at some point in the future based on future utility rate, future PSC determinations, or future fixed rate offerings that have not yet been observed. Since CRA's calculations change materially with the inclusion of more recent data, we would expect that an objective observer in the future would reach a different overcharge calculation than CRA's current figures. As such, its current figures are inherently unstable and unreliable.

9. **CRA materially misapplies the 5% margin used in Method B versus how that same figure is described in the NY PSC's Reset Order**. CRA materially misrepresents what the 5% margin from the NY Reset Order means and misapplies it when calculating overcharges. In the order, the 5% figure represents an allowable price premium above the

utility rate that ESCOs can charge for fixed rate products.[10] This is not how CRA utilizes the figure. Instead, CRA adopts the figure of 5%, but re-interprets it as the maximum allowable margin above XOOM's estimated supply costs, rather than the maximum allowable price premium over the prevailing utility rate. CRA has determined that the utility rate has historically reflected a price premium of 7.33% above XOOM's estimated supply costs.[11] By CRA's own calculations, the 5% allowable margin he uses in Method B would require XOOM to price its variable rate product below the prevailing utility rate, on average. That is not commercially reasonable.

10. **None of the new proposed methodologies represent reasonable or appropriate measures for overcharges.** CRA's three new methods calculate overcharges using three separate benchmark margin levels. However, none is appropriate or reasonable.

    a. In Method A, the comparison between the regulated utility rate and the unregulated XOOM variable price is inappropriate and misleading. There are valid reasons why ESCOs' unregulated retail prices may differ from the regulated utility Price-to-Compare. ESCOs and LDCs (utilities) may acquire supply from the same wholesale markets, but their costs and risks of doing so may differ. For example, adjustments and reconciliations included in utility rates may distort comparisons to contemporaneous wholesale market conditions and ESCO prices. Further, XOOM's variable price offered customers more price stability than the utility rate. In addition, CRA omits utility default service rates for a large subset of the class period. During the period March 2013 – January 2024, CRA omits utility default service rate data for 24% of residential electric rates, 26% of commercial electric rates, 35% of residential gas rates, and 36% of commercial gas rates.[12] CRA provides no explanation as to why they have omitted this data. Omitted data has not been included in the 7.33% figure CRA calculates and uses in Method A and it is unclear how the figure would change had all relevant data been included.

    b. Method B "borrows" an allowable margin of 5% from the NY Reset Order. However, since CRA materially mischaracterizes how the NY PSC describes and utilizes the 5% figure, its allowable margin in Method B is essentially arbitrary. The figure, as utilized by the NY PSC, represents a margin above the utility price, not a margin above estimated supply costs. Even had CRA utilized the 5% figure as intended by the NY PSC, it would be an inappropriate benchmark margin to use in this case, as it would tie XOOM's variable rates to factors other than its estimated and actual supply costs. By

---

[10] P. 67. "…we believe that a reasonable price premium associated with fixed-rate ESCO products would be 5%. Thus, as an interim measure, fixed-rate products will be limited to a price no greater than the trailing 12-month average utility supply rate plus a premium of no more than 5%."

[11] CRA Amended Report, Exhibit 3.

[12] CRA Amended Report, Exhibit 3. No electric utility rate data is reported after May 2021. No gas utility rate data is reported after July 2021.

5

      using the 5% figure in way utterly inconsistent with the NY PSC's intent, CRA has further divorced it from any supporting logic or merit.

   c.  Method C implicitly assumes that that level of margin XOOM should have included in its variable rates was constant over time and was equal to the margin XOOM ultimately included in its fixed rate offerings. This is an inappropriate and unreasonable benchmark. First, business conditions change over time. It would be unreasonable for XOOM to ignore changing business conditions when setting their variable rates, and it would be unreasonable for a customer to assume that XOOM would do so. Second, XOOM had no prior knowledge of how it would ultimately set its fixed rate margins in future periods. It would be unreasonable to expect that XOOM would know, in advance, what margins it would include in its fixed rate offerings for the period 2013-2024. It would be unreasonable for customers to expect that XOOM would have this information and use it to set variable rates. Third, variable rate and fixed rate products are different products with different risk characteristics. It would be unreasonable for XOOM to use the margin it charges on fixed rate products to set variable rates.

11.  **Methods A, B, and C do not account for undercharges and simply return a zero when an undercharge should have been reported.** In each method, overcharges are calculated by comparing the XOOM variable rate to XOOM's estimated supply costs grossed-up for some margin (referred to here as a "proxy rate"). When the XOOM variable rate exceeds the proxy rate, the formulae return an overcharge amount. However, when the XOOM variable rate is less than the proxy rate, the formulae return zero. In short, the formulae used by all three Methods fail to give credit for undercharges. This simple mathematical error has significant ramifications. In Method B, which assumes a margin of 5% in the proxy rate, this error produces an overcharge that is $75,000 too high. In Method C, which assumes a margin of 21.2% in the proxy rate, this error produces an overcharge that is $875,000 too high. Using a margin of 68%, which CRA asserts has been XOOM's average variable rate margin, the error produces an over charge that is $40,000,000 too high.[13] When a margin of 68% is inputted into the formulae used by Methods A, B, and C, they calculate overcharges of $13,000,000 and ignore undercharges of $40,000,000, with customers being undercharged by a net $26,000,000. On an individual level, this algorithmic error can change an undercharge into an overcharge. For example, a margin input of 21.2% produces a net undercharge for the Plaintiff under Model 2. However, Method C discards undercharges, leaving only an overcharge.

---

[13] CRA Amended Report, ¶69.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 30, 2024.

                 *David Coleman*
                 David Coleman