# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

Plaintiffs,

v.

XOOM ENERGY, LLC and
XOOM ENERGY NEW YORK, LLC

Defendants.

Case No. 18 Civ. 2949 (ARR) (RER)

**ORAL ARGUMENT REQUESTED**

---

**PLAINTIFF SUSANNA MIRKIN AND THE CERTIFIED CLASS'S
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DAVID COLEMAN**

---

**WITTELS MCINTURFF PALIKOVIC**
Ethan D. Roman
J. Burkett McInturff
Steven L. Wittels
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
edr@wittelslaw.com
jbm@wittelslaw.com
slw@wittelslaw.com

**SCHLAM STONE & DOLAN LLP**
Richard Dolan
Bradley D. Simon
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NEW YORK 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

Dated:  May 20, 2024

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................... 4

I.   EXPERT DISCOVERY TOOK PLACE BEFORE THE COURT'S SUMMARY
     JUDGMENT AND CLASS CERTIFICATION RULINGS ............................................... 4

II.  THE COURT'S AUGUST 14, 2023, SUMMARY JUDGMENT ORDER
     CLARIFIED THE CONTRACT'S MEANING ................................................................ 8

ARGUMENT ..................................................................................................................... 9

I.   LEGAL STANDARD......................................................................................... 9

II.  THE CORRELATION THEORY IS INCONSISTENT WITH THE COURT'S
     CONTRACT CONSTRUCTION AND THEREFORE IRRELEVANT ........................ 12

     A.  Mr. Coleman's Correlation Graphics Will Mislead the Jury ...................................... 13

     B.  Mr. Coleman's Cumulative Summary of Witness Testimony Should Be
         Excluded ............................................................................................... 14

III. THE "NO MARGIN CAP" THEORY IS INCONSISTENT WITH THE
     COURT'S CONTRACT CONSTRUCTION AND THEREFORE IRRELEVANT ....... 15

IV.  THE DIFFERENCE BETWEEN NATURAL GAS AND ELECTRIC SERVICE
     IS IRRELEVANT............................................................................................... 15

V.   THE GROSS MARGIN COMPARISON IS UNRELIABLE AND UNHELPFUL........ 15

VI.  THAT CLASS MEMBERS COULD HAVE SWITCHED ENERGY PROVIDERS
     IS IRRELEVANT AND INADMISSIBLE ...................................................... 17

VII. MR. COLEMAN'S ADMISSIONS AT HIS DEPOSITION ARE ADOPTIVE
     ADMISSIONS AND ARE ADMISSIBLE IN PLAINTIFF'S CASE-IN-CHIEF .......... 18

CONCLUSION................................................................................................................. 19

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*,
    364 F. Supp. 3d 291 (S.D.N.Y. 2019) .................................................. 11

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) .......................................................... 10

*Arista Records LLC v. Usenet.com, Inc.,*
    608 F. Supp. 2d 409 (S.D.N.Y. 2009) ........................................... 11, 15

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
    666 F. Supp. 3d 328 (S.D.N.Y. 2023) ............................................. 13

*BNSF Ry. Co. v. LaFarge Sw., Inc.*,
    No. 06 Civ. 1076 (MCA) (LFG), 2009 WL 4279580 (D.N.M. Feb. 3, 2009)......................... 19

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996) ............................................................ 10

*Bourjaily v. United States*,
    483 U.S. 171 (1987)..................................................................... 9

*Collins v. Wayne Corp.*,
    621 F.2d 777 (5th Cir. 1980) ........................................................ 18

*Daubert v. Merrill Dow Pharm., Inc.*,
    509 U.S. 579 (1993)................................................................ *passim*

*Dean v. Watson*,
    No. 93 Civ. 1846, 1996 WL 88861 (N.D. Ill. Feb. 28, 1996).................................. 19

*Durham v. Cty. of Maui*,
    804 F. Supp. 2d 1068 (D. Haw. 2011) ............................................ 19

*Farr Man Coffee Inc. v. Chester*,
    No. 88 Civ. 1692 (DNE), 1993 WL 248799 (S.D.N.Y. June 28, 1993)......................... 19

*Glendale Fed. Bank, FSB v. United States*,
    39 Fed. Cl. 422 (Fed. Cl. 1997) .................................................... 19

*In re Elec. Books Antitrust Litig.*,
    No. 11 MDL 2293 (DLC), 2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014)........................ 14

*In re Mirena IUD Prod. Liab. Litig.,*
   169 F. Supp. 3d 396 (S.D.N.Y. 2016) ................................................... 10

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II),*
   341 F. Supp. 3d 213 (S.D.N.Y. 2018) .............................................. 10, 16

*In re Platinum-Beechwood Litig.,*
   469 F. Supp. 3d 105 (S.D.N.Y. 2020) ................................................... 11

*Jakobovits as Trustee of Lite Trust I v. PHL Variable Ins. Co.,*
   645 F. Supp. 3d 95 (E.D.N.Y. 2022) ............................................... 13, 15

*LaSalle Bank Nat. Ass'n v. CIBC Inc.,*
   No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ...................... 11

*Long Island Housing Servs., Inc. v. NPS Holiday Square LLC,*
   No. 18 Civ. 3583 (DG) (JMW), 2021 WL 4122739 (E.D.N.Y. Sept. 9, 2021) ...................... 12

*Long v. Fairbank Farms, Inc.,*
   No. 09 Civ. 592 (GZS), 2011 WL 2516378 (D. Me. May 31, 2011) ....................................... 19

*Marx & Co. v. Diners' Club, Inc.,*
   550 F.2d 505 (2d Cir. 1977) ..................................................................... 12

*Martinez v. Agway Energy Servs., LLC,*
   88 F.4th 401, 411 (2d Cir. 2023) ......................................................... 1, 9

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ................................................................... 10

*Pearlman v. Cablevision Sys. Corp.,*
   No. 10 Civ. 4992 (JS) (GRB), 2015 WL 9462104 (E.D.N.Y. Dec. 28, 2015) ................. 11, 18

*Shatkin v. McDonnell Douglas Corp.,*
   727 F.2d 202 (2d Cir. 1984) ............................................................. 11, 16

*Spurlin v. Air & Liquid Sys. Corp.,*
   537 F. Supp. 3d 1162 (S.D. Cal. 2021) ................................................... 19

*Tipton v. Union Tank Car Co.,*
   No. 15 Civ. 311 (TAV) (DCP), 2018 WL 11651649 (E.D. Tenn. Mar. 5, 2018) ................. 19

*Twelve Sixty LLC v. Extreme Music Libr. Ltd.,*
   No. 17 Civ. 1479 (PAC), 2020 WL 2749708 (S.D.N.Y. May 26, 2020) ............................... 16

*United States v. Amuso,*
　　21 F.3d 1251 (2d Cir. 1994) ................................................................................. 11

*United States v. Duncan,*
　　42 F.3d 97 (2d Cir. 1994) .................................................................................... 11

**Rules**

Fed. R. Evid. 401 ...................................................................................................... 11

Fed. R. Evid. 403 ................................................................................................. 11, 13

Fed. R. Evid. 702 ............................................................................................... *passim*

Fed. R. Evid. 801 ................................................................................................. 4, 18

Plaintiff Susanna Mirkin and the Class respectfully submit this Memorandum of Law in support of their Motion *in Limine* to Exclude the Testimony of David Coleman.[1]

## **INTRODUCTION**

This Court's contract construction at summary judgment rendered XOOM's expert's opinion irrelevant.  XOOM's customer contract—which promised Plaintiff and 124,529 other New Yorkers that their variable rates for natural gas and electricity would be "based on" XOOM's "actual and estimated supply costs"—required that XOOM's rates be "determined solely" by "supply costs—and only those costs."  ECF 151, Opinion and Order Denying Summary Judgment, ("MSJ Order") at 12, 14.  While the Court held that XOOM could add a margin to its supply costs, any such margin must be fixed and "remain proportionate . . . ."  *Id.* at 13.  Further, under the Court's "proportionate-margin construction," the margin must also be "reasonable."  *Id.* at 12–13; *see also* ECF 152, Opinion and Order Granting Class Certification ("Class Order") at 3, 14.  And both this Court and the Second Circuit have made it clear that XOOM's form contract rules out any discretion in the rate-setting process.  *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) (noting that whether an ESCO's contract specifically allows for rate-setting discretion is a "dispositive question" and that XOOM's contract here does not provide for any discretion whatsoever.)

XOOM's expert David Coleman provided his expert opinions on XOOM's supply costs, margins, and Plaintiff's claim.  His report—issued before the Court construed XOOM's contract at summary judgment—relied on a correlation analysis comparing XOOM's supply costs and its variable rates.  He concluded that the correlation showed that XOOM's rates "were in fact based

---

[1] Accompanying this memorandum is the Declaration of Ethan D. Roman, dated May 20, 2024 ("Roman Decl.").  References in this memorandum to "Ex." refer to the Roman Decl. exhibits.

on" its supply costs.   Mr. Coleman further opined that XOOM's contract required no cap whatsoever on XOOM's rates or margins, and that Plaintiff could have switched energy providers to avoid any alleged damages.   In his rebuttal report, Mr. Coleman also compares XOOM's New York variable and fixed rate margins with the company-wide gross margin of twenty-six supposed "comparator" companies.

Mr. Coleman's correlation and "no margin cap" theories cannot be presented to the jury because they are directly at odds with the Court's contract construction.   As Your Honor recognized at summary judgment: "[Mr. Coleman's] correlation does not tell us whether XOOM added a permissible markup above its cost calculation."   MSJ Order at 17.   Likewise, the contract does impose a cap on XOOM's rates and margins because it requires (1) the rates to be based on costs alone, and (2) that any margin remain fixed, proportionate, and reasonable.   Mr. Coleman's opinions, which are based entirely on an erroneous interpretation of the contract, will not be helpful to a jury, are irrelevant, and are thus inadmissible under Rule 702 and *Daubert*.

But there are also other defects in Mr. Coleman's reports that will mislead and confuse the jury.   For example, Mr. Coleman's correlation analysis is illustrated with a series of graphics comparing XOOM's supply costs and rates.   But even though both of these variables are measured using the same metric (*i.e.*, cents per therm or kWh), Mr. Coleman's graphics use different scales for each of them, as illustrated on the following page:



Figure 1: NIMO rate versus cost comparison from the Coleman Report

These mismatching scales falsely suggest that XOOM's supply costs and variable rates were nearly equivalent—which is demonstrably incorrect. Any remaining probative value of Mr. Coleman's correlation analysis is far outweighed by the graphics' misleading and confusing nature. The chart of twenty-six comparator companies fares no better, as it compares XOOM's specific margins for specific products in a specific geographic region with the ***company-wide*** gross margins of other companies, which Mr. Coleman admitted were "substantively" different. Moreover, none of these twenty-six companies sell retail gas or electricity. In fact, the margins of Class Members' default utilities—XOOM's main competitors—are conspicuously absent from Mr. Coleman's list. This "apples to oranges" comparison is neither helpful nor relevant and similar comparisons are regularly excluded under Rule 702.

As to Mr. Coleman's claim that "Plaintiff and all other XOOM customers" could have switched providers to mitigate damages, this claim is belied by Mr. Coleman's own admission that XOOM's customers could not have quantified the company's supply costs without access to internal company information. Moreover, it is inadmissible as a legal conclusion. Plaintiff is also submitting a separate motion *in limine* to exclude XOOM's mitigation defense.

Indeed, Mr. Coleman made a host of other admissions during his deposition that undermine XOOM's defenses, including that XOOM's rate-setting workbooks are the documents that contain

3

the company's "estimated and actual supply costs" (rather than the variety of other documents XOOM claims purportedly evidence "actual" costs), that XOOM set its rates by using factors that are not supply costs, that XOOM had no formula for setting rates (or margins), that XOOM used "pricing strategies" to set New York variable rates when that was not permitted by its contract, and that there was "no way of quantifying what XOOM's prior period adjustments were in a given month." Because Mr. Coleman was XOOM's agent, and because by listing him as a trial witness, XOOM authorized Mr. Coleman to speak on its behalf, his testimony is admissible as a party admission under Rule 801(d)(2)(C) and (D). Accordingly, even though Mr. Coleman should not be permitted to present his expert opinions to the jury because they are irrelevant and misleading, Plaintiff should be permitted to use Mr. Coleman's admissions as part of Plaintiff's case-in-chief.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    EXPERT DISCOVERY TOOK PLACE BEFORE THE COURT'S SUMMARY JUDGMENT AND CLASS CERTIFICATION RULINGS

On October 3, 2022, XOOM served the Expert Report of David C. Coleman on behalf of Defendants. XOOM served an amended version of that report on October 31, 2022. Ex. A ("Coleman Report"). The Coleman Report contains four primary conclusions.

- First and second, Mr. Coleman conducted a statistical correlation analysis of XOOM's supply costs and concluded that this analysis showed that XOOM based its variable rates on its actual and estimated supply costs. *Id.* §§ V–VI, pp. 10–28.

- Third, XOOM was not required to cap its rates or gross margins under the contract. *Id.* § VII, pp. 28–30.

- Fourth, Plaintiff and the Class "could have avoided any alleged harm by terminating their service with XOOM." *Id.* § VII, pp. 31–33.

The report also includes a "brief history" of energy deregulation in New York. *Id.* § III, pp. 5–6.

In support of his correlation analysis that purports to support the first two opinions, Mr. Coleman analyzed XOOM's supply costs to test whether they were correlated with XOOM's

4

variable rates (notably, Mr. Coleman relied on the same figures from the rate-setting workbooks as Plaintiff's expert).  Ex. A, Coleman Report at 6, 13–20, 23–28.  The purpose of this analysis was to test an allegation that "XOOM's variable electric and natural gas rates did not 'rise and fall' with XOOM's actual and estimated supply costs."  *Id.* at 6 (citing ECF 43, First Am Compl. ¶ 61); *see also* Ex. A. Coleman Report at 10–11 (describing allegations in the operative complaint). Using this analysis, Mr. Coleman concluded that XOOM's variable rates "were in fact based on" its supply costs.  *Id.* at 21, 28.

The Coleman Report also employed a series of deceptive graphics to misrepresent the relationship between XOOM's supply costs and variable rates.  *Id.* at 15–17, 23–25, 48–62.  These graphics were intentionally constructed to distort undisputed facts.  They employ two different scales for XOOM's supply costs and variable rates, which make XOOM's supply costs and rates appear roughly equivalent.  *Id.*[2]  Below is an example of the Coleman Report's graphics (with the mismatching scales highlighted in yellow):

**Figure 1: NIMO rate versus cost comparison from the Coleman Report**



*Id.* at 25.  Even though both factors are measured in cents per therm, the scale for XOOM's rates is nearly double the one for supply costs.  This flattens the graph's lines and minimizes the

---

[2] Only one graphic uses the same scale for XOOM's supply costs and variable rates.  *Id.* at 62.

difference between XOOM's rates and supply costs.  In contrast, the next image is the same graphic with the same scale for costs and rates:



Figure 2: NIMO rate versus cost comparison on the same scale

ECF 138-29, Plaintiff's Expert Rebuttal Report of Derya Eryilmaz and Seabron Adamson, dated Nov. 4, 2022 ("Plaintiff Rebuttal") at 3.  Further undermining the credibility of Mr. Coleman's graphs, he conceded at deposition that their purpose was to show that XOOM's supply costs and variable rates directly tracked each other.  Ex. B, Deposition of David Coleman, dated Nov. 16, 2022 ("Coleman Tr.") at 99:24–100:6.

Turning to Mr. Coleman's third opinion, which addresses whether XOOM was required to "cap" its margins or variable rates, the Coleman Report concludes that "[n]either the NYPSC [New York Public Service Commission], nor the Contract required XOOM to cap its [variable] rates at any particular level, nor was XOOM restricted with respect to the gross margin it could include in its" variable rates.  Ex. A, Coleman Report at 28.  This Court has definitively rejected that contract construction.

Mr. Coleman's fourth opinion is that Ms. Mirkin had "no obligation . . . to continue purchasing supply from XOOM after her introductory rate expired."  Ex. A, Coleman Report at 31.  He further claims that Plaintiff "knew of her opportunity to shop for a better rate and was fully

capable of doing so." *Id.* at 32.   However, Mr. Coleman admitted during his deposition that customers would not be able to identify and quantify XOOM's actual supply costs without access to the company's internal data.  Ex. B, Coleman Tr. 31:24–32:8.

On November 4, 2022, Defendants served Mr. Coleman's Rebuttal Report ("Rebuttal Report").  *See* Ex. C.  The Rebuttal Report reiterates the correlation analysis from the original report and includes Mr. Coleman's opinion on prior period adjustments, which he based on the deposition testimony of XOOM witnesses.  Ex. C, Rebuttal Report §§ IV–V, pp. 2–10.  The Rebuttal Report also maintains that XOOM did not have to cap its rates or margins.  *Id.* § VI, pp. 10–14.[3]  To support this point, the report includes a chart of the gross margins of companies listed in the Dow Jones Industrial Average compared to the margins for specific XOOM products in New York, a comparison Mr. Coleman admitted was "substantively different."  Ex. B, Coleman Tr. at 88:8–20.  Further, none of these companies are ESCOs.  *Id.* at 88:4–7.

During Mr. Coleman's November 16, 2022 deposition, he made a series of critical concessions and admissions that undermine XOOM's defense of its rate-setting process. Specifically, Mr. Coleman:

- Conceded that ESCO customers in New York were overcharged by $1.4 billion between 2014 and 2016 compared to what they would have paid if they had used utility service instead, Ex. B, Coleman Tr. at 18:6–20:20;

- Agreed that XOOM's customers would not be able to identify and quantify XOOM's actual supply costs without access to the company's internal data, *id.* at 31:24–32:8;

- Admitted that he compiled XOOM's supply costs from the company's rate-setting workbooks and found "no discrepancies" in Plaintiff's expert calculations, *id.* at 34:22–35:17;

---

[3] The Rebuttal Report also briefly criticized Plaintiff's expert report's benchmarks for reasonable variable rate margins.  *Id.* § VII, pp. 14–16.

- Agreed that Plaintiff's expert model "was based on taking all the data that XOOM had provided for what it said were its total costs," *id.* at 36:23–37:8;

- Admitted that the figures from XOOM's rate-setting workbooks were the company's "estimated and actual supply costs," *id.* at 38:3–16;

- Conceded he could not identify any advantage ESCOs provided consumers when compared to utilities, *id.* at 41:7–42:11;

- Asserted that XOOM's contract allowed basing rates on non-supply costs, *id.* at 50:3–51:5;

- Conceded that XOOM set rates using factors that are not supply costs, *id.* at 55:8–17;

- Admitted that XOOM did not use a formula to set variable rates, *id.* at 55:18–56:3;

- Agreed that XOOM used "pricing strategies" to set rates before that language was included in the company's contracts, *id.* at 66:11–15;

- Acknowledged that the NYPSC found that for customers like Ms. Mirkin, there was no advantage from switching from their utility to an ESCO like XOOM, *id.* at 80:18–81:1;

- Conceded he could not compare XOOM's margins to those of other ESCOs, *id.* at 86:1–11; and

- Agreed that there was "no way of quantifying what XOOM's prior period adjustments were in a given month," *id.* at 95:17–96:4.

## II.   THE COURT'S AUGUST 14, 2023, SUMMARY JUDGMENT ORDER CLARIFIED THE CONTRACT'S MEANING

The Coleman Report, Rebuttal Report, and Mr. Coleman's deposition all pre-date the Court's August 14, 2023 MSJ Order.  In that Order, the Court construed the "vague" language in the contract's pricing term requiring XOOM to set New York variable rates "based on XOOM's actual and estimated supply costs."  MSJ Order at 10.

The Court construed the contract as a cost-plus contract.  Specifically, the Court found that any variation in Class rates must "be determined by XOOM's actual and estimated supply costs—and **only** those costs."  *Id.* at 12 (emphasis added); *see also id.* at 14 ("I find that the contract

required the variation in the variable rates to be determined ***solely*** by XOOM's actual and estimated supply costs." (emphasis added)).   While the Court found that XOOM could add a margin to its supply costs, any such margin must be fixed and "remain proportionate . . . ." *Id.* at 13.   Under the Court's "proportionate-margin construction," the margin must also be "reasonable." *Id.* at 12–13; Class Order at 3, 14.

Critically, "under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs," and must "adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric."   MSJ Order at 15.   Moreover, both this Court and the Second Circuit have found that XOOM's contract provided no rate-setting discretion.  *Id.* at 14; *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) (noting that whether an ESCO's contract specifically allows for rate-setting discretion is a "dispositive question" and that XOOM's contract here does not provide for any discretion). As set forth below, the Court's contract construction directly contradicts Mr. Coleman's opinions and renders them irrelevant and inadmissible.

## **ARGUMENT**

### I.   **LEGAL STANDARD**

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Further, the proponent of expert opinion has the burden of establishing admissibility by a preponderance of the evidence.   Fed. R. Evid. 702, advisory committee's note to the 2000 amendment (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).   If an expert report "is based

on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 266 (2d Cir. 2002).  To be admitted, "it is critical that an expert's analysis be reliable at every step." *Id.* at 267.

Under *Daubert*, trial courts serve as "gatekeepers" to ensure expert testimony is reliable and relevant to the issues at trial. *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). For an expert's data and methods to be reliable, they must meet some industry standard for sufficient rigor; expert opinion cannot be based on mere conjecture. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("Expert testimony should be excluded if it is speculative or conjectural.").  Likewise, expert testimony should be excluded where the proffered opinion is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 266.  "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).

Moreover, trial courts examine the actual analysis employed by the proffered experts in reaching their conclusions and hold that the analysis must clearly lead to the conclusions.  "Courts have found analytical gaps to be too great, for example, when a critical step in a prospective expert's reasoning is based on a highly dubious analogy." *See, e.g.*, *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) (quoting *In re Mirena IUD Prod. Liab. Litig.,* 169 F. Supp. 3d 396, 439 (S.D.N.Y. 2016) ("[A] subjective comparison of muscle of a pig heart to a female uterus creates simply too great an analytical gap between the data and the opinion proffered to pass muster under Rule 702 and

*Daubert*.") (cleaned up); *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (rejecting expert methodology based on an "apples and oranges" comparison).

In addition to the requirements of Rule 702, expert testimony is also subject to Rule 401's relevancy requirement. *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 114 (S.D.N.Y. 2020). Further, under Rule 403, "the Court may still exclude relevant evidence 'if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues [or] misleading the jury. . . .'" *Id.* (quoting Fed. R. Evid. 403). "The Rule 403 [probative value] inquiry is particularly important in the context of expert testimony, 'given the unique weight such evidence may have in a jury's deliberations.'" *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 325 (S.D.N.Y. 2019) (citation omitted).

"In addition, an expert witness may not offer testimony which merely rehashes the testimony of percipient witnesses." *LaSalle Bank Nat. Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) (quoting *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.")). "An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge." *Arista Records LLC v. Usenet.com, Inc.,* 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009).

Last, it is well-settled that expert testimony must be excluded where it "states a legal conclusion." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). "Indeed, expert witness testimony should not be permitted where the expert testifies to what is 'necessary 'to fulfill the covenant' (of the contract).'" *Pearlman v. Cablevision Sys. Corp.*, No. 10 Civ. 4992 (JS) (GRB),

2015 WL 9462104, at *11 (E.D.N.Y. Dec. 28, 2015) (quoting *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509 (2d Cir. 1977)).

## II.   THE CORRELATION THEORY IS INCONSISTENT WITH THE COURT'S CONTRACT CONSTRUCTION AND THEREFORE IRRELEVANT

The Court's contract construction at summary judgment destroyed the essential premise for Mr. Coleman's correlation theory, rendering it irrelevant and inadmissible.  There are at least two reasons for this.

First, testimony about correlation will not assist the jury in understanding the evidence or determining a fact in issue.  Instead, it is likely to confuse or mislead the jury.  The issue is not whether XOOM's costs and its rates generally went up and down more or less in tandem, but whether XOOM's rates were "determined solely by" its supply costs—"and only those costs" plus a fixed, proportionate, and reasonable margin.  MSJ Order at 12–14.  The Court already recognized at summary judgment that Mr. Coleman's correlation analysis is not on point: "XOOM points to its expert evidence of a 'near perfect correlation' between the rate and XOOM's COGS. . . . However, the statistical correlation seems to prove at most that XOOM incorporated its internal cost calculation into the rate.  The correlation does not tell us whether XOOM added a permissible markup above its cost calculation."  *Id.* at 17.  In other words, any testimony regarding correlation should be excluded because it does not address the issue the jury will be tasked with deciding and could confuse the jury.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful."); *see also Long Island Housing Servs., Inc. v. NPS Holiday Square LLC*, No. 18 Civ. 3583 (DG) (JMW), 2021 WL 4122739, at *9–10 (E.D.N.Y. Sept. 9, 2021) (excluding expert testimony unrelated to issues in case because "it could very well confuse or mislead a trier of fact").

Second, Mr. Coleman's correlation theory is irrelevant. Again, correlation does not address whether XOOM's rates were "determined solely by" XOOM's "supply costs—and only those costs" plus a fixed reasonable margin, and for that reason is irrelevant. *Jakobovits as Trustee of Lite Trust I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 108–10 (E.D.N.Y. 2022) (Ross, J.) (expert testimony that insurer generally discriminated between policies was irrelevant where issue was whether discrimination was unfair); *see also Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 372 (S.D.N.Y. 2023) (irrelevant expert testimony excluded). Even if it had some minimal relevance, the probative value of presenting testimony to the jury addressing a rejected contract construction is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues [or] misleading the jury." Fed. R. Evid. 403.

### A.      Mr. Coleman's Correlation Graphics Will Mislead the Jury

Even if the Court permits Mr. Coleman to testify about his correlation theory (it should not), his presentation should be limited to avoid misleading the jury. As noted above, the Coleman Report uses misleading graphics comparing XOOM's supply costs and variable rates—the different scales make it appear that XOOM's costs and rates were roughly equivalent. Mr. Coleman admitted that the purpose of these charts was to show that XOOM's supply costs and variable rates directly tracked each other. Ex. B, Coleman Tr. 99:24–100:6.

These graphics should be barred pursuant to Rule 403. They are clearly and deliberately misleading—their purpose is to give the jury the false impression that XOOM's supply costs and rates were similar where discovery shows that XOOM's variable rates far exceeded its supply costs. Given that the unit of measurement is the same for both the supply costs and variable rates (in the example below, cents per therm), it is clear that there is no legitimate purpose to using different scales (especially without expressly noting the discrepancy) and therefore confirms that these graphics are intended to—and will—mislead the jury. Indeed, a comparison between Mr.

13

Coleman's graphic using differential scales (Figure 1) and one using co-equal scales (Figure 2) plainly demonstrates the distortion that Mr. Coleman's graphics create:





ECF 138-29, Plaintiff Rebuttal at 3.  Such misleading graphs should not be presented to the jury. *See In re Elec. Books Antitrust Litig.*, No. 11 MDL 2293 (DLC), 2014 WL 1282298, at * 10–11 (S.D.N.Y. Mar. 28, 2014) (excluding misleading graphs and charts).

### B.   Mr. Coleman's Cumulative Summary of Witness Testimony Should Be Excluded

The Rebuttal Report's recitation of witness testimony, Ex. C at 3, is likewise inadmissible. This is because "[a]n expert who simply regurgitates what a party has told him provides no

assistance to the trier of fact through the application of specialized knowledge." *Arista Records,* 608 F. Supp. 2d at 424.

### III.   THE "NO MARGIN CAP" THEORY IS INCONSISTENT WITH THE COURT'S CONTRACT CONSTRUCTION AND THEREFORE IRRELEVANT

Mr. Coleman's opinion regarding XOOM's margins is based on the premise that "[n]either the NYPSC, nor the Contract required XOOM to cap its [variable] rates at any particular level, nor was XOOM restricted with respect to the gross margin it could include in its" variable rates. Ex. A, Coleman Report at 28.  But the Court expressly rejected that premise of his analysis.  Not only does "the contract require[] the variation in the variable rates to be determined ***solely*** by XOOM's actual and estimated supply costs," MSJ Order at 14 (emphasis added), but XOOM's margin must be fixed and reasonable.  *Id.* at 12–13; Class Order at 3, 14.  Just as with correlation, the Court's contract construction renders Mr. Coleman's opinion about XOOM's margins legally irrelevant and misleading because it proceeds from a contract construction that was rejected by the Court. His opinion evidence is therefore inadmissible.  *Jakobovits*, 645 F. Supp. 3d at 108–10.

### IV.   THE DIFFERENCE BETWEEN NATURAL GAS AND ELECTRIC SERVICE IS IRRELEVANT

The Coleman Report devotes three pages to the differences between electricity and natural gas.  Ex. A at 21–23.  This too contradicts the Court's findings: "Though XOOM's natural gas supply costs necessarily differ from its electricity supply costs, there is no question that the form contract contained identical language for electric and natural gas customers."  Class Order at 15–16.  This proposed testimony is unhelpful and irrelevant to the claims at issue, would only serve to confuse and mislead the jury, and is thus inadmissible.  *Jakobovits*, 645 F. Supp. 3d at 108–10.

### V.   THE GROSS MARGIN COMPARISON IS UNRELIABLE AND UNHELPFUL

The Rebuttal Report compares XOOM's gross margin for its New York fixed and variable rate products to the company-wide gross margins for 26 of the 30 companies included in the Dow

Jones Industrial Average ("DJIA"), "a stock market index composed of 30 large businesses spanning a wide range of industries." Ex. C, Rebuttal Report at 12. Of these 26 companies, none are ESCOs. Ex. B, Coleman Tr. at 87:20–88:7. Further, Mr. Coleman explained that this analysis used the company-wide gross margin of the DJIA companies, *id.* at 88:8–12, which is "substantively" different than XOOM's New York margins for specific products, *id.* at 88:13–20. Mr. Coleman did not review particular contracts to test whether the DJIA companies' margins served as valid comparators to XOOM. *Id.* at 88:21–89:1.[4] Setting aside the fact that the entire premise for his "comparator" analysis of margin rates was rejected by the Court, his analysis is unreliable and inadmissible on its own terms.

In fact, Mr. Coleman did not even try to explain why the DJIA companies are valid comparators to XOOM, either in the Rebuttal Report or at his deposition. This is the exact kind of unreliable and untested opinion testimony that is regularly excluded. *See Twelve Sixty LLC v. Extreme Music Libr. Ltd.*, No. 17 Civ. 1479 (PAC), 2020 WL 2749708, at *8–9 (S.D.N.Y. May 26, 2020) (excluding testimony where expert "provides no reasoning or methodology that the Court can test for its reliability, applies no theory or technique that has been subjected to peer review, and otherwise gives the Court no way to assess the 'evidentiary relevance and reliability . . . of the principles that underlie [his] proposed submission.'" (quoting *Daubert*, 509 U.S. at 594–95) (alterations in original)). Moreover, this "highly dubious" analogy, comparing apples and oranges, is not sufficiently rigorous for expert testimony. *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (rejecting expert methodology based on an "apples and oranges" comparison); *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp.3d

---

[4] Plaintiff's expert Seabron Adamson noted at his deposition that the chart included "gross margins reported for generally very large corporations . . . in entirely different business" lines. ECF 147-47, Dep. Tr. of Seabron Adamson, dated Nov. 8, 2022, at 122:15–123:24.

213, 241 (S.D.N.Y. 2018) ("Courts have found analytical gaps to be too great, for example, when a critical step in a prospective expert's reasoning is based on a highly dubious analogy.").

## VI.   THAT CLASS MEMBERS COULD HAVE SWITCHED ENERGY PROVIDERS IS IRRELEVANT AND INADMISSIBLE

The Coleman Report claims that Plaintiff had "no obligation . . . to continue purchasing supply from XOOM after her introductory rate expired."  Ex. A, Coleman Report at 31.  Further, Mr. Coleman claims that Plaintiff "knew of her opportunity to shop for a better rate and was fully capable of doing so."  *Id.* at 32.  This argument is irrelevant and the legal conclusion Mr. Coleman seeks to draw from it is wrong and inadmissible.

As Mr. Coleman conceded at deposition, XOOM's customers were unable to identify and quantify XOOM's actual supply costs without access to the company's internal data.  Ex. B, Coleman Tr. at 31:24–32:8.  This lack of knowledge inhibited the Class's ability to "determine[e] whether remaining an ESCO customer continues to meet their satisfaction."  Ex. A, Coleman Report at 32.  Any probative value of this proffered testimony is therefore outweighed by its danger of misleading the jury under Rule 403.

Moreover, while couched as expert testimony, Mr. Coleman's opinion is in fact a legal conclusion on mitigation of damages.[5]  As we show in in Plaintiff's motion *in limine* No. 12, under North Carolina law, a mitigation defense requires a showing that Plaintiff or the Class knew or reasonably should have known of XOOM's breach, which even he acknowledged they did not.  Not only is Mr. Coleman's opinion premised on a falsity, but it is also plainly improper and inadmissible.  *Pearlman v. Cablevision Sys. Corp.*, No. 10 Civ. 4992 (JS) (GRB), 2015 WL

---

[5] The issue is addressed more fully in Plaintiff's separate motion in limine to exclude XOOM's mitigation of damages defense.

9462104, at *11 (E.D.N.Y. Dec. 28, 2015) ("an expert is barred from proffering an opinion with respect to the parties' legal obligations pursuant to a contract") (citation omitted).[6]

## VII.   MR. COLEMAN'S ADMISSIONS AT HIS DEPOSITION ARE ADOPTIVE ADMISSIONS AND ARE ADMISSIBLE IN PLAINTIFF'S CASE-IN-CHIEF

While the Court should find Mr. Coleman's opinions to be inadmissible as expert opinions, it should nevertheless allow Plaintiff to affirmatively present the numerous party admissions he made during his deposition. *See supra* p. 7–8. There are at least two separate doctrines that allow Plaintiff to use Mr. Coleman's deposition testimony, even over a hearsay objection.

First, Mr. Coleman's admissions can be attributed to XOOM under Rule 801(d)(2)(C). *Collins v. Wayne Corp.*, 621 F.2d 777, 780–83 (5th Cir. 1980). In *Collins*, the defendant retained an expert to investigate a bus crash and plaintiff sought to introduce his deposition testimony at trial. *Id.* at 780. The Fifth Circuit held that this testimony was admissible under Rule 801(d)(2)(C) because the expert was employed by the defendant to investigate the accident. *Id.* at 782. In providing his deposition, the expert was performing the function he was hired to perform and thus, his investigation report and deposition testimony explaining his analysis was an admission of the defendant. *Id.* Similarly, here, XOOM retained Mr. Coleman to investigate Plaintiff's claim of breach of contract. Ex. A, Coleman Report at 4. He then testified about his opinions at his deposition, performing the function he was retained to perform. Mr. Coleman's admissions are XOOM's admissions and are therefore admissible as a party statement. *Collins*, 621 F.2d at 780–

---

[6] As to the Coleman Report's "brief history" of deregulation, Ex. A, Coleman Report at 5–6, Plaintiff does not contend that a general background on the energy industry is inadmissible despite XOOM's stated intent to pursue a motion *in limine* excluding regulatory history and actions. But the Coleman Report is wrong when it states that ESCOs "were not subject to price regulation by the NYPSC or any other regulatory body." *Id.* at 6. In fact, Mr. Coleman appears to have recognized and corrected this error in his rebuttal report. Ex. C, Rebuttal Report at 12 ("In New York's deregulated market, it is not the place of anyone other than the NYPSC or the customer to determine what an appropriate market rate is . . . ."). Self-contradictory testimony is unhelpful and risks misleading or confusing the jury.

83; *see also Long v. Fairbank Farms, Inc.*, No. 09 Civ. 592 (GZS), 2011 WL 2516378, at *9–10 (D. Me. May 31, 2011) (expert's deposition testimony admissible as party admission); *BNSF Ry. Co. v. LaFarge Sw., Inc.*, No. 06 Civ. 1076 (MCA) (LFG), 2009 WL 4279580, at *4 n.3 (D.N.M. Feb. 3, 2009) (same); *Dean v. Watson*, No. 93 Civ. 1846, 1996 WL 88861, at *3–4 (N.D. Ill. Feb. 28, 1996) (same); *Farr Man Coffee Inc. v. Chester*, No. 88 Civ. 1692 (DNE), 1993 WL 248799, at *14 n.30 (S.D.N.Y. June 28, 1993) (expert report admissible as party admission).

Second, because XOOM has offered Mr. Coleman as a trial witness, ECF No. 210-2 at 6, his deposition admissions are now party admissions. *Glendale Fed. Bank, FSB v. United States*, 39 Fed. Cl. 422, 424–25 (Fed. Cl. 1997) (expert was authorized to speak for party once put forward for trial); *see also Spurlin v. Air & Liquid Sys. Corp.*, 537 F. Supp. 3d 1162, 1169 n.3 (S.D. Cal. 2021); *Tipton v. Union Tank Car Co.*, No. 15 Civ. 311 (TAV) (DCP), 2018 WL 11651649, at *4–5 (E.D. Tenn. Mar. 5, 2018); *Durham v. Cty. of Maui*, 804 F. Supp. 2d 1068, 1070 (D. Haw. 2011). "[W]hen an expert is put forward for trial it is fair and reasonable to presume they have been authorized [to speak on a party's behalf]. This of necessity includes prior deposition testimony of that expert." *Glendale*, 39 Fed. Cl. at 425.

Because Mr. Coleman was an agent of XOOM, was authorized to speak on XOOM's behalf at his deposition and/or when he was included on XOOM's trial witness list, ECF No. 210-2 at 6–7, his deposition testimony is admissible in Plaintiff's case-in-chief even though his expert opinions are not admissible.

## **CONCLUSION**

For the reasons stated herein, Plaintiff requests that the Court exclude the expert testimony and opinion of David Coleman and allow his admissions to be presented to the jury during Plaintiff's case-in-chief.

Dated: May 20, 2024

**WITTELS MCINTURFF PALIKOVIC**

 /s/ Ethan D. Roman
Ethan D. Roman
J. Burkett McInturff
Steven L. Wittels
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
edr@wittelslaw.com
jbm@wittelslaw.com
slw@wittelslaw.com

*Class Counsel for Plaintiff and the Class*

Richard Dolan
Bradley D. Simon
**SCHLAM STONE & DOLAN LLP**
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Andrey Belenky
**KHEYFITS BELENKY LLP**
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

*Co-Counsel for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2024, the foregoing was served via email on all counsel of record.

By:     <u>/s/ Ethan D. Roman</u>
        Ethan D. Roman