## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,<br><br>Defendants. | Case No.: 18 Civ. 2949 (ARR) (JAM) |

---

### PLAINTIFF SUSANNA MIRKIN AND THE CERTIFIED CLASS'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE*

---

**WITTELS MCINTURFF PALIKOVIC**
Ethan D. Roman
J. Burkett McInturff
Steven L. Wittels
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
edr@wittelslaw.com
jbm@wittelslaw.com
slw@wittelslaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NEW YORK 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

**SCHLAM STONE & DOLAN LLP**
Richard Dolan
Bradley D. Simon
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Dated:  May 20, 2024

**<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT .......................................................................................................... 7

I.   MOTION *IN LIMINE* NO. 1:  XOOM BEARS THE BURDEN TO PROVE THAT FLUCTUATIONS IN ITS VARIABLE RATE MARGINS WERE "DETERMINED SOLELY BY" PERMISSIBLE SUPPLY COSTS ........................ 7

     A.   Introduction ................................................................................. 7

     B.   Additional Relevant Background ..................................................... 14

     C.   Argument ..................................................................................... 20

II.  MOTION *IN LIMINE* NO. 2:  FINANCIAL DOCUMENTS THAT DO NOT CONTAIN EVIDENCE OF SUPPLY COSTS TIED TO CALCULATING XOOM'S NEW YORK VARIABLE RATES ARE INADMISSIBLE ................................................................................ 27

III. MOTION *IN LIMINE* NO. 3:  XOOM SHOULD BE PRECLUDED UNDER RULE 37 FROM CONTRADICTING ITS RULE 30(B)(6) TESTIMONY AND REPEATED REPRESENTATIONS THAT ITS RATE-SETTING PROCESS WAS CONSISTENT THROUGHOUT THE CLASS PERIOD ........... 33

IV.  MOTION *IN LIMINE* NO. 4:  XOOM SHOULD BE PRECLUDED FROM CLAIMING THAT THE UNIFORM PRICING TERM PERMITS FLUCTUATING MARGINS FOR DIFFERENT PRODUCT TYPES, IN DIFFERENT UTILITY ZONES, AND IN DIFFERENT MONTHS ...................... 36

V.   MOTION *IN LIMINE* NO. 5:  XOOM SHOULD BE BARRED FROM INTRODUCING EVIDENCE OF ITS SUBJECTIVE SUPPLY COST CONSIDERATIONS ........................................................................... 38

VI.  MOTION *IN LIMINE* NO. 6: XOOM SHOULD BE PRECLUDED FROM CLAIMING THE CONTRACT ALLOWS MARKET-BASED COMPENSATION TO BE INCLUDED AS AN ADDITIONAL RATE COMPONENT ................................................................................. 42

VII. MOTION *IN LIMINE* NO. 7:  XOOM SHOULD BE PRECLUDED FROM ATTACKING AND DISREGARDING THE COURT'S RULE 23 FINDINGS .... 43

VIII. MOTION *IN LIMINE* NO. 8:  XOOM SHOULD BE PRECLUDED FROM PRESENTING NEEDLESSLY CUMULATIVE TESTIMONY ............................ 47

i

IX.    MOTION *IN LIMINE* NO. 9:  PLAINTIFF SHOULD BE PERMITTED
       TO USE XOOM WITNESSES' DEPOSITION TRANSCRIPTS AND
       OTHER ADMISSIONS IN HER CASE-IN-CHIEF ................................................ 48

X.     MOTION *IN LIMINE* NO. 10:  PLAINTIFF'S EXPERT SHOULD BE
       PERMITTED TO TESTIFY TWICE ...................................................................... 52

XI.    MOTION *IN LIMINE* NO. 11:  XOOM SHOULD BE PRECLUDED FROM
       OFFERING EVIDENCE REGARDING ITS AFFIRMATIVE DEFENSES
       BECAUSE THEY FAIL AS A MATTER OF LAW ................................................ 54

       A.    Release (XOOM's Third Affirmative Defense) .................................. 55

       B.    Waiver (XOOM's Third Affirmative Defense) .................................. 55

       C.    Estoppel (XOOM's Third Affirmative Defense) ............................... 56

       D.    Unclean Hands (XOOM's Third Affirmative Defense) ..................... 56

       E.    Laches (XOOM's Third Affirmative Defense) .................................. 57

       F.    Mistake (XOOM's Third Affirmative Defense) ................................ 57

       G.    Assumption of Risk (XOOM's Fourth Affirmative Defense) ........... 57

       H.    Ratification (XOOM's Fifth Affirmative Defense) ........................... 58

       I.    Parol Evidence (XOOM's Eighth and Ninth Affirmative Defenses) ................ 58

       J.    Accord and Satisfaction (XOOM's Tenth Affirmative Defense) ...................... 58

       K.    Voluntary Payment (XOOM's Tenth Affirmative Defense) .............................. 58

       L.    Adequate Remedy at Law (XOOM's Thirteenth Affirmative Defense) ........... 59

       M.    Election of Remedies (XOOM's Sixteenth Affirmative Defense) ................... 59

       N.    Lack of Standing (XOOM's Seventeenth Affirmative Defense) ...................... 59

       O.    Class Certification (XOOM's Eighteenth Affirmative Defense) ...................... 60

       P.    Statute of Limitations (XOOM's Twenty-Second Affirmative Defense) .......... 60

       Q.    Failure To Exhaust Administrative Remedies (XOOM's Fifteenth Defense) ... 61

       R.    Proximate Cause (XOOM's Twenty-First Defense) ......................................... 61

XII.    MOTION *IN LIMINE* NO. 12:  XOOM SHOULD BE BARRED FROM
        OFFERING EVIDENCE OF CUSTOMERS' FAILURE TO MITIGATE
        DAMAGES .................................................................................................... 62

XIII.   MOTION *IN LIMINE* NO. 13:  THE JURY SHOULD BE INSTRUCTED
        ON PUNITIVE DAMAGES ..................................................................... 63

        A.    XOOM's Violation of GBL § 349 Was an Independent Tortious Act ............... 64

        B.    XOOM's Tortious Conduct Is Accompanied by an Element of Aggravation ... 67

        C.    The Punitive Damages Waiver in XOOM's Contract Is Unenforceable ........... 67

XIV.    MOTION *IN LIMINE* NO. 14:  XOOM SHOULD BE PRECLUDED FROM
        INTRODUCING EVIDENCE RELATING TO THE "MARKET SUPPLY
        COST" CALCULATION FROM PLAINTIFF'S PRE-DISCOVERY
        COMPLAINT ....................................................................................... 68

XV.     MOTION *IN LIMINE* NO. 15:  XOOM SHOULD BE PRECLUDED FROM
        INTRODUCING EVIDENCE OF OTHER COMPANIES' MARGINS ................. 69

XVI.    MOTION *IN LIMINE* NO. 16:  XOOM SHOULD BE PRECLUDED FROM
        INTRODUCING EVIDENCE REGARDING MS. MIRKIN'S
        INVOLVEMENT IN LITIGATION AGAINST VIRIDIAN ENERGY ................. 71

XVII.   MOTION *IN LIMINE* NO. 17:  XOOM SHOULD BE PRECLUDED FROM
        INTRODUCING EVIDENCE REGARDING PLAINTIFF'S EXPERT'S
        OPINION AND REPORT IN *RICHARDS V. DIRECT ENERGY* ........................... 72

XVIII.  MOTION *IN LIMINE* NO. 18:  XOOM SHOULD BE PRECLUDED FROM
        INTRODUCING EVIDENCE REGARDING MS. MIRKIN'S AND CLASS
        COUNSEL'S MOTIVATIONS FOR BRINGING THIS ACTION ........................ 76

CONCLUSION ........................................................................................................ 78

# TABLE OF AUTHORITIES

## Cases

*24/7 Recs., Inc. v. Sony Music Ent., Inc.*,
  566 F. Supp. 2d 305 (S.D.N.Y. 2008) ................................................................. 35

*Abraham v. WPX Prod. Prods., LLC*,
  184 F. Supp. 3d 1150 (D.N.M. 2016) .................................................................. 45

*Am. Pipe & Construction Co. v. Utah*,
  414 U.S. 538 (1974) ............................................................................................. 60

*Babcock v. Jackson*,
  12 N.Y.2d 473 (1963) .......................................................................................... 64

*Bemis v. Edwards*,
  45 F.3d 1369 (9th Cir. 1995) ............................................................................... 75

*Best v. Ford Motor Co.*,
  557 S.E.2d 163 (N.C. Ct. App. 2001) .................................................................. 55

*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*,
  141 F. Supp. 2d 320 (E.D.N.Y. 2001) ................................................................. 76

*Bobby Floars Toyota, Inc. v. Smith*,
  269 S.E.2d 320 (N.C. Ct. App. 1980) .................................................................. 58

*Borchardt v. United States*,
  133 F.R.D. 547 (E.D. Wis. 1991) ........................................................................ 52

*Brown v. Pressner Trading Corp.*,
  475 N.Y.S.2d 405 (1st Dep't 1984) ..................................................................... 62

*Bueno v. LR Credit 18, LLC*,
  269 F. Supp. 3d 16 (E.D.N.Y. 2017) ................................................................... 68

*Builders Supplies Co. v. Gainey*,
  192 S.E.2d 449 (N.C. 1972) ................................................................................ 57

*Campbell v. Consol. Rail Corp.*,
  No. 05 Civ. 1501, 2009 WL 36889 (N.D.N.Y. Jan. 6, 2009) .............................. 32

*Chen v. Hiko Energy, LLC*,
  No. 14 Civ. 1771 (VLB), 2014 WL 7389011 (S.D.N.Y. 2014) ........................... 65

*Chum Ltd. v. Lisowski*,
  No. 98 Civ. 5060, 2001 WL 1164664 (S.D.N.Y. Oct. 2, 2001) ........................... 49

*City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*,
    No. 10 Civ. 4372, 2014 WL 12610207 (D. Minn. Apr. 3, 2014) ............................................. 45

*City-Wide Asphalt Paving, Inc. v. Alamance County*,
    513 S.E.2d 335 (N.C. Ct. App. 1999) .................................................................................... 57

*Cobalt Multifamily Invs. I, LLC v. Shapiro*,
    857 F. Supp. 2d 419 (S.D.N.Y. 2012) .............................................................................. 54, 62

*Collins v. Davis*,
    315 S.E.2d 759 (N.C. Ct. App. 1984) .................................................................................... 56

*Creech v. Melnik*,
    495 S.E.2d 907 (N.C. Ct. App. 1998) .................................................................................... 56

*Cronin v. Fam. Educ. Co.*,
    105 F. Supp. 2d 136 (E.D.N.Y. 2000) ................................................................................... 14

*Dahlin v. Lyondell Chem. Co.*,
    No. 14 Civ. 85, 2016 WL 4690390 (S.D. Iowa Mar. 24, 2016) .............................................. 74

*Darby v. Cisneros*,
    509 U.S. 137 (1993) ............................................................................................................. 61

*Dean v. Mattox*,
    108 S.E.2d 541 (N.C. 1959) ................................................................................................. 58

*Dilek v. Watson Enterprises, Inc.*,
    885 F. Supp. 2d 632 (S.D.N.Y. 2012) ................................................................................... 14

*Disability Advocs., Inc. v. Paterson*,
    No. 03 Civ. 3209 (NGG) (MDG), 2009 WL 1312112 (E.D.N.Y. May 8, 2009) .................... 38

*Duncanson v. Wine & Canvas IP Holdings LLC*,
    No. 16 Civ. 788, 2019 WL 13176341 (S.D. Ind. Mar. 19, 2019) ...................................... 55, 56

*Dwyer v. Allbirds, Inc.*,
    598 F. Supp. 3d 137 (S.D.N.Y. 2022) ................................................................................... 65

*Dyber v. Quality King Distributors, Inc.*,
    No. 06 Civ. 735 (LDW) (AKT), 2006 WL 8424100 (E.D.N.Y. Dec. 12, 2006) ...................... 77

*Eastman Kodak Co. v. Agfa-Gevaert N.V.*,
    560 F. Supp. 2d 227 (W.D.N.Y. 2008) .............................................................................. 50, 52

*Erazo v. SCM Grp. N. Am.*,
    No. 16 Civ. 2386 (RRM) (RER), 2019 WL 1044365 (E.D.N.Y. Mar. 5, 2019) .................... 36

*Estate of Thompson v. Kawasaki Heavy Indus., Ltd.*,
   933 F. Supp. 2d 1111 (N.D. Iowa 2013) ............................................................................ 74, 75

*Exist, Inc. v. Tokio Marine Am. Ins. Co.*,
   No. 22 Civ. 1679 (AT), 2024 WL 96347 (S.D.N.Y. Jan. 9, 2024) ........................................ 65

*Ford Motor Credit Co. v. Hairston*,
   06 Civ. 04, 2006 WL 2850615 (W.D. Va. Oct. 2, 2006) ...................................................... 63

*Forrest Const. Co., LLC v. Laughlin*,
   337 S.W.3d 211 (Tenn. Ct. App. 2009) ................................................................................ 21

*Gleit v. Francois-Bodine*,
   No. 18 Civ. 311, 2018 U.S. Dist. LEXIS 85038 (S.D.N.Y, May 18, 2018) .......................... 64

*Goes v. Vogler*,
   937 N.W.2d 190 (Neb. 2020) ............................................................................................... 21

*Goldberger Co., LLC v. Uneeda Doll Co., Ltd.*,
   No. 16 Civ. 4630 (AJP), 2017 WL 3098110 (S.D.N.Y. July 21, 2017) ................................. 33

*Gomez v. Tyson Foods, Inc.*,
   No. 08 Civ. 21, 2013 WL 991494 (D. Neb. Mar. 13, 2013) ................................................. 45

*Hart v. RCI Hosp. Holdings, Inc.*,
   90 F. Supp. 3d 250 (S.D.N.Y. 2015) .............................................................................. 70, 77

*Henderson v. Garcia Motorrad, LLC*,
   789 S.E.2d 569 (Table) (N.C. Ct. App. 2016) ...................................................................... 61

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v.*
   *Matthew Bender & Co., Inc.*,
   37 N.Y.3d 169 (2021) ..................................................................................................... 65, 66

*Home Indem. Co. v. Lane Powell Moss & Miller*,
   43 F.3d 1322 (9th Cir. 1995) ............................................................................................... 62

*Hosbrook v. Ethicon, Inc.*,
   No. 20 Civ. 88, 2021 WL 4452289 (S.D. Ohio Sept. 29, 2021) ...................................... 42, 43

*Howell v Waters*,
   347 S.E.2d 65 (N.C. Ct. App. 1986) .................................................................................... 57

*Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*,
   No. 06 Civ. 4262, 2009 WL 10679721 (E.D. La. Aug. 4, 2009) .......................................... 50

*In re Gen. Motors LLC*,
   No. 14 MDL 2543 (JMF), 2015 WL 8578945 (S.D.N.Y. Dec. 9, 2015) ............................... 51

*In re Sept. 11 Litig.*,
  811 F. Supp. 2d 883 (S.D.N.Y. 2011) ........................................................... 23, 25

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) .......................................................................... 44

*In re Waterman S.S. Corp.*,
  200 B.R. 770 (Bankr. S.D.N.Y. 1996)............................................................ 24

*Int'l Broth. of Teamsters v. United States*,
  431 U.S. 324 (1977)........................................................................................ 25

*Irish v. Tropical Emerald LLC*,
  No. 18 Civ. 82 (PKC) (SJB), 2021 WL 5899048 (E.D.N.Y. Dec. 14, 2021).......................... 36

*J.S.X. through D.S.X. v. Foxhoven*,
  No. 17 Civ. 417, 2019 WL 13167146 (S.D. Iowa May 23, 2019) ........................................... 51

*JBR Contractors, Inc. v. E & W, LLC*,
  991 A.2d 18 (Table) (Del. 2010) ................................................................... 21

*Jeffers v. City of New York*,
  No. 14 Civ. 6173 (CBA) (ST), 2018 WL 904230 (E.D.N.Y. Feb. 13, 2018)........................... 68

*Johnson v. City of New York*,
  302 A.D.2d 463 (2d Dep't 2003) ................................................................... 23

*Johnson v. Holder*,
  564 F.3d 95 (2d Cir. 2009) ............................................................................ 20

*Katt v. City of New York*,
  151 F. Supp. 2d 313 (S.D.N.Y. 2001) ............................................................ 75

*Kerner v. Gilt*,
  296 So. 2d 428 (La. Ct. App. 1974)................................................................ 21

*Kozak v. Liberty Mar. Corp.*,
  No. 20 Civ. 3684 (MMH), 2024 WL 1558809 (E.D.N.Y. Apr. 10, 2024)............................... 32

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
  108 F.3d 1531 (2d Cir. 1997) .................................................................... 54, 64

*Lear Auto. Dearborn, Inc. v. Johnson Controls, Inc.*,
  789 F. Supp. 2d 777 (E.D. Mich. 2011)........................................................... 51

*Leopold v. Baccarat, Inc.*,
  174 F.3d 261 (2d Cir. 1999) .......................................................................... 77

vii

*Liberty Constr. Co., LLC v. Curry,*
    No. M-2019-951-COA-R3-CV, 2020 WL 6158461 (Tenn. Ct. App. Oct. 21, 2020) ............. 21

*Little v. Rose,*
    208 S.E.2d 666 (N.C. 1974) ............................................................................................ 62, 63

*Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.,*
    911 F. Supp. 76 (E.D.N.Y. 1996) ........................................................................................ 34

*Lujan v. Cabana Mgmt., Inc.,*
    284 F.R.D. 50 (E.D.N.Y. 2012) .......................................................................................... 35

*M. Carbine Restoration, Ltd. v. Sutherlin,*
    544 So. 2d 455 (La. Ct. App. 1989) .................................................................................... 22

*Martinez v. Agway Energy Servs., LLC,*
    88 F.4th 401 (2d Cir. 2023) ................................................................................. 5, 13, 38, 39

*Medtronic, Inc. v. Mirowski Fam. Ventures, LLC,*
    571 U.S. 191 (2014) ............................................................................................................ 14

*Melville v. HOP Energy, LLC,*
    No. 21 Civ. 10406 (KMK), 2023 WL 2648775 (S.D.N.Y. Mar. 27, 2023) ........................... 67

*Montera v. Premier Nutrition Corp.,*
    No. 16 Civ. 6980, 2022 WL 1465044 (N.D. Cal. May 9, 2022) .......................................... 77

*Nat'l Commc'ns Ass'n Inc. v. AT & T Corp.,*
    238 F.3d 124 (2d Cir. 2001) ............................................................................................... 24

*Nayab v. Cap. One Bank (USA), N.A.,*
    942 F.3d 480 (9th Cir. 2019) .............................................................................................. 24

*Nye v. Lipton,*
    273 S.E.2d 313 (N.C. Ct. App. 1980) ................................................................................. 55

*Orlander v. Staples, Inc.,*
    802 F.3d 289 (2d Cir. 2015) ............................................................................................... 66

*Patterson v. Balsamico,*
    440 F.3d 104 (2d Cir. 2006) ............................................................................................... 35

*Pierson v. Ford Motor Co.,*
    No. 06 Civ. 6503, 2008 WL 7084522 (N.D. Cal. Aug. 1, 2008)........................................... 74

*Poor v. Hill,*
    530 S.E.2d 838 (N.C. Ct. App. 2000) ................................................................................. 61

*Portfolio Recovery Assocs., LLC v. King*,
    14 N.Y.3d 410 (2010) ........................................................................ 60

*Ray v. Norris*,
    337 S.E.2d 137 (N.C. Ct. App. 1985) ................................................ 56

*Reilly v. Natwest Mkts. Group Inc.*,
    181 F.3d 253 (2d Cir. 1999) ............................................................. 34

*Rhee-Karn v. Lask*,
    674 F. Supp. 3d 75 (S.D.N.Y. 2023) ................................................ 21

*Richards v. Direct Energy Services, LLC*,
    No. 14 Civ. 1724 (D. Conn.) ............................................................ 72

*Richards v. Direct Energy Servs., LLC*,
    915 F.3d 88 (2d Cir. 2019) ................................................... 70, 72, 73

*S.E.C. v. R. A. Holman & Co.*,
    34 F.R.D. 139 (S.D.N.Y. 1963) ........................................................ 75

*S.E.C. v. Treadway*,
    438 F. Supp. 2d 218 (S.D.N.Y. 2006) .............................................. 32

*Sabre v. First Dominion Capital, LLC*,
    No. 01 Civ. 2145 (BSJ) (HBP), 2001 WL 1590544 (S.D.N.Y. Dec. 12, 2001) ...................... 33

*SCM Corp. v. Xerox Corp.*,
    76 F.R.D. 214 (D. Conn. 1977) ........................................................ 52

*Shamblin v. Obama for Am.*,
    No. 13 Civ. 2428, 2015 WL 4250528 (M.D. Fla. July 13, 2015) .......... 45

*Shore v. Farmer*,
    522 S.E.2d 73 (N.C. 1999) ............................................................... 64

*Singh v City of New York*,
    189 A.D.3d 1697 (2d Dep't 2020) .................................................... 64

*Sioux Steel Co. v. Prairie Land Mill Wright Servs.*,
    No. 16 Civ. 2212, 2022 WL 17082541 (N.D. Ill. Nov. 18, 2022) ............... 21, 41, 43

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    No. 17 Civ. 8457 (JMF), 2024 WL 1208778 (S.D.N.Y. Mar. 21, 2024) .................. 46

*Slate v. Potter*,
    No. 04 Civ. 782, 2005 WL 2429877 (M.D.N.C. Sept. 29, 2005) ............ 61

*SM Kids, LLC v. Google LLC,*
    963 F.3d 206 (2d Cir. 2020) ........................................................................... 59

*Sparf v. United States,*
    156 U.S. 51 (1895).......................................................................................... 45

*Spread Enters. v. First Data Merch. Servs. Corp.,*
    No. 11 Civ. 4743 (ADS) (ETB), 2012 WL 3679319 (E.D.N.Y. Aug. 22, 2012) ................... 66

*Stanley v. Direct Energy Servs.,* LLC,
    466 F. Supp. 3d 415 (S.D.N.Y. 2020) ............................................................. 66

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003)........................................................................................ 64

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,*
    73 F.3d 1178 (2d Cir. 1995) ........................................................................... 14

*Stratton v. Thompson/Ctr. Arms, Inc.,*
    608 F. Supp. 3d 1079 (D. Utah 2022)............................................................. 48

*Swierkiewicz v. Sorema N. A.,*
    534 U.S. 506 (2002)........................................................................................ 69

*Thermal Design, Inc. v. M & M Builders, Inc.,*
    698 S.E.2d 516 (N.C. App. 2010).................................................................... 62

*Triangle Park Chiropractic v. Battaglia,*
    532 S.E.2d 833 (N.C. Ct. App. 2000).............................................................. 59

*Trustpilot Damages LLC v. Trustpilot Inc.,*
    No. 21-cv-2837, 2022 WL 2124865 (2d Cir. June 13, 2022)............................ 66

*United States v. Aguilar,*
    883 F.2d 662 (9th Cir. 1989) .......................................................................... 55

*United States v. Crown,*
    99 Cr. 1044, 2000 WL 35593864 (S.D.N.Y. May 31, 2000) ............................ 54

*United States v. Denver & R G R Co,*
    191 U.S. 84 (1903).......................................................................................... 24

*United States v. Jackson,*
    598 F.3d 340 (7th Cir. 2010) .......................................................................... 55

*United States v. Johnson,*
    No. 19 Cr. 405, 2024 WL 1486760 (N.D. Ill. Apr. 5, 2024) ............................ 53

x

*United States v. Kraeger,*
    711 F.2d 6 (2d Cir. 1983) ............................................................... 45

*United States v. Leonardi,*
    623 F.2d 746 (2d Cir. 1980) ........................................................... 75

*United States v. One Parcel of Prop. Located at 194 Quaker Farms Rd., Oxford, Conn.,*
    85 F.3d 985 (2d Cir. 1996) ............................................................. 23

*United States v. Romanello,*
    No. 22 Cr. 194 (EK), 2023 WL 8283435 (E.D.N.Y. Nov. 27, 2023) ...................... 75

*United States v. Salzano,*
    No. 22 Cr. 690, 2024 WL 866885 (D.N.J. Feb. 26, 2024) ............................. 53

*United States v. Scully,*
    No. 14 Cr. 208 (ADS), 2015 WL 5826493 (E.D.N.Y. Oct. 6, 2015) .................... 54

*United States v. Sorensen,*
    73 F.4th 488 (7th Cir. 2023) ..................................................... 54, 55

*United States v. Weber,*
    843 F. App'x 364 (2d Cir. 2021) ................................................... 45

*United States v. Zakhari,*
    No. 19 Cr. 208, 2021 WL 4139146 (W.D. Ky. Sept. 10, 2021) ........................ 53

*W. Const. Co. v. Atl. Coast Line Ry. Co.,*
    116 S.E. 3 (N.C. 1923) ............................................................ 61

*Wilson v. Maricopa Cnty.,*
    04 Civ. 2873, 2007 WL 686726 (D. Ariz. Mar. 2, 2007) ........................... 74, 76

*Wilson v. Nw. Mut. Ins. Co.,*
    625 F.3d 54 (2d Cir. 2010) ........................................................ 65

*Woodling v. Garrett Corp.,*
    813 F.2d 543 (2d Cir. 1987) ....................................................... 14

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,*
    84 N.Y.2d 309 (1994) .............................................................. 64

## Statutes

N.Y. Gen. Bus. L. § 349 ......................................................... *passim*

N.Y. Gen. Bus. L. § 349-d ....................................................... *passim*

## Other Authorities

*Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019) ................................................................ 8

## Rules

Fed. R. Civ. P. 15(b) ................................................................................................................ 68

Fed. R. Civ. P. 23 ............................................................................................................... *passim*

Fed. R. Civ. P. 30(b)(6) ........................................................................................................... 34

Fed. R. Civ. P. 32 ......................................................................................................... 49, 50, 51

Fed. R. Civ. P. 37 .............................................................................................................. *passim*

Fed. R. Evid. 106 ............................................................................................................... 29, 69

Fed. R. Evid. 401 ............................................................................................................... *passim*

Fed. R. Evid. 402 ............................................................................................................... *passim*

Fed. R. Evid. 403 ............................................................................................................... *passim*

Fed. R. Evid. 602 ..................................................................................................................... 69

Fed. R. Evid. 611(a) ................................................................................................................ 53

Fed. R. Evid. 801 ........................................................................................................... 50, 51

Fed. R. Evid. 802 ..................................................................................................................... 69

Fed. R. Evid. 1002 ................................................................................................................... 69

## Treatises

17 AM. JUR. 2D CONTRACTS § 495 (2010) ................................................................................ 22

2 McCORMICK ON EVID. § 337 ......................................................................................... 23, 25

2 WEINSTEIN'S FED. EVID. § 403.04[1][b], at 403–36 (2d ed. 1998).......................................... 77

E. Allan Farnsworth, CONTRACTS § 4.24 (2d ed.1990) ........................................................... 55

RESTATEMENT (SECOND) OF CONTRACTS § 90, cmt. (a) ............................................................ 55

RESTATEMENT (SECOND) OF CONTRACTS § 239 ....................................................................... 56

RESTATEMENT (SECOND) OF CONTRACTS § 267 ....................................................................... 56

**PRELIMINARY STATEMENT**

The trial in this breach of contract action will not be complicated, but the Court's intervention is necessary to stop XOOM from disrupting the proceedings with irrelevant, excessive, and impermissible evidence.  XOOM's customer contract promised more than 120,000 New York residents transparent pricing for their natural gas and electricity.  The Court's summary judgment and class certification rulings make clear that a straightforward method exists to determine whether XOOM's rates exceeded those promised in its contract.  Facing conclusive evidence that it added over $100,000,000 in unauthorized markups to consumers' monthly utility bills, XOOM now seeks to disrupt the trial by confusing the issues and ambushing Plaintiff with entirely new factual theories.  The Court should protect the jury's ability to make the relevant determinations in this case, which are whether XOOM's rate-setting process complied with the contract, and what the resulting damages are.  The Court's summary judgment and class certification rulings provide a clear roadmap for doing this and allowing XOOM to present legitimate defenses.  The Court should require XOOM to conform its case to the Court's framework for adjudicating this matter.

Under the Court's construction of XOOM's contract, XOOM's customers were guaranteed monthly variable gas and electricity rates that were "determined solely by" XOOM's "supply costs."  ECF 151, Opinion and Order Denying Summary Judgment ("MSJ Order") at 14.  Thus, "the process by which XOOM set rates is of central importance."  *Id.* at 4.

That process is largely undisputed.  Relying on Defendants' Local Rule 56.1 Statement, the Court found "beyond peradventure" the following aspects of XOOM's rate-setting process:

(1)   XOOM's calculations of its projected supply costs "were aggregated in 'rate-setting workbooks'" that listed the sum of estimated supply costs "under the label 'Total Cost,' a figure XOOM also refers to as the 'Cost of Goods Sold' or 'COGS.'"  *Id.* (citing ECF 146-25, Defendants' Local Rule 56.1 Statement ("Defs.' 56.1")).

1

**(2)**   "After determining the Total Cost figure, analysts on the pricing team proposed a rate." *Id.*

**(3)**   "The percentage difference between the proposed rate and COGS comprised the margin." *Id.*

**(4)**   "Rates were eventually finalized for multiple markets and products by a team of decisionmakers at a rate-setting meeting." *Id.*

The Court also held that XOOM was permitted to add a markup, or "margin" on top of its supply costs, but that any margin must be fixed and "remain proportionate." *Id.* at 13.  Under this "proportionate-margin construction," XOOM's margin must also be "reasonable." *Id.* at 12–13; *see also* ECF 152, Opinion and Order Granting Class Certification ("Class Order") at 3, 14 (same).

After defining this straightforward rate calculation for all Class rates—***XOOM's supply costs + reasonable fixed margin = rate***—the Court then looked at two key pieces of uncontested data, both apparent in XOOM's rate-setting workbooks: (1) XOOM's supply cost calculations, referred to as "COGS" or "Total Costs" in the workbooks; and (2) the fluctuating margins XOOM imposed over those documented supply costs.  MSJ Order at 15–16.  Observing that XOOM's margins varied wildly, the Court found that "under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs," and must "adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric" in the workbooks. *Id.* at 15.

Given the uncontested evidence of XOOM's own documented supply costs and oscillating margins, XOOM came up with a highly implausible defense. *Id.*  XOOM claims that its own documented "the Total Cost or COGS number does not constitute its 'actual and estimated supply costs' because some of its supply costs—such as prior period adjustments—are incorporated in the margin." *Id.* at 16.  In other words, XOOM claims that its supply cost calculations do not contain

2

*all* of its supply costs and that its margins do not contain **solely** its margins but are instead a hodgepodge of a margin plus alleged additional and unspecified "supply costs." *Id.*

There are several reasons why XOOM's claim must be rejected. **First**, XOOM's supply cost calculations contained in its rate-setting workbooks as "COGS" or "Total Costs" were highly detailed and accurate, and there is no evidence of other supply cost calculations. Instead, XOOM witnesses and its employees consistently testified that the workbooks' supply cost calculations had a "very high level of accuracy" and were "extremely reliable." Ex. A, Dep. Tr. of XOOM's 30(b)(6) Designee, XOOM's Director of Pricing and Structuring Jason Loehde, dated July 28, 2022 ("XOOM 30(b)(6) Tr.") 126:16–127:1 (noting that there were no "systemic errors" in the workbooks); *id.* at 288:25–289:8; *see also* ECF 146-15, Dep. Tr. of Andrew Coppola, XOOM's former Senior Vice President of Energy Supply and Pricing, dated May 11, 2022 ("Coppola Tr.") 281:14–282:1 (workbooks are up to date and contain "the latest snapshot of everything that we can know about those costs up till that moment"); *id.* at 282:3–20 (supply costs in the workbooks are compiled with "99 percent certainty"). The record evidence confirms this, as internal documents comparing XOOM's monthly COGS estimates from its workbooks to XOOM's actual supply costs show minuscule variations. *See, e.g.*, JX1083 ("less than a -0.041% variance" between actual and estimated COGS); JX1073 ("less than -0.03%"); JX1075 ("less than 0.10%"). XOOM itself emphasized to the Court that it would never disregard those internal supply cost calculations "after taking the time and expense to create them each month," as it would be "absurd—and completely unsupported" for XOOM to do so. ECF 149, Defs.' MSJ Reply Br. ("MSJ Reply") at 11; *see* ECF 145-1, Defs.' Opening MSJ Br. ("MSJ Br.") at 2 ("Not one [of XOOM's witnesses] testified that XOOM ever set variable rates—in any month—without using the detailed supply cost information in its monthly 'rate-setting workbook' spreadsheets."). Yet

3

XOOM now claims that these "Total Costs" were not total—instead, other unspecified supply costs, inexplicably unaccounted for in the "COGS" metric, were supposedly secreted into XOOM's "margins."

**Second**, there is no evidence that XOOM included supply cost calculations to its margins and it is too late for XOOM to concoct a completely new story to present to the jury.  To start, despite claiming that an actual, true margin was only a subcomponent of the "margins" XOOM charged above its COGS, XOOM has never disclosed, much less produced, evidence of the supposed actual margin to which these allegedly permissible supply costs were added.  Similarly, XOOM has not produced a shred of evidence containing any calculations showing ***any*** supply costs (let alone identifiable ones) being added to a "true" margin.  In fact, XOOM's own expert witness was never told about these wholly undocumented and undisclosed calculations.  *See* MSJ Order at 5 (noting XOOM's expert's admission that he was not shown such calculations).  As the Court noted, XOOM offered "testimonial evidence supporting the **general proposition** that prior period adjustments were included in the margin and therefore responsible for rate fluctuations, *see* ECF 146-25, Defs.' 56.1 ¶¶ 14–18, but **no documentary evidence** demonstrating how non-COGS supply costs actually impacted [Plaintiff's] rates."  MSJ Order at 16 (emphasis added).  Rule 37 is intended to prevent trial-by-ambush, which is evidently what XOOM is planning.

**Third**, there is strong evidence that XOOM used a host of non-supply costs to set its fluctuating margins, including, as the Court noted at summary judgment, XOOM's own admissions.  MSJ Order at 4 (citing testimony of XOOM's Director of Pricing and Structuring Jason Loehde); *see also* ECF 146-25, Defs.' 56.1 ¶¶ 14–18 (margin included, *inter alia*, "inherent . . . risk premium," and partner and broker payments); ¶¶ 21–25 (margins were padded on account of customer "attrition," other undisclosed "data point(s)," and "sales trends").  XOOM even

4

admitted that its variable rates were determined by XOOM's "pricing strategies" and not calculated at all.  In short, XOOM has already admitted that it used "pricing strategies" to set monthly rates, just as a restaurant might set the price of the daily special.  *See, e.g.*, Ex. A, XOOM 30(b)(6) Tr. 134:2–21 (although XOOM's form contract was amended in February 2016 to expressly allow rates based on "pricing strategies," "[n]othing in the way we calculate estimated and actual supply costs and our pricing strategies has ever changed as a result of the language change . . . the updated language is just simply providing more accurate language to our customers").  XOOM's internal documents also confirm that it set variable rates on an entirely discretionary basis.  For example, preceding a 2015 company-wide meeting, Loehde circulated questions regarding XOOM's rate-setting process, one of which was "[w]hat are three things that get considered in our monthly rate setting process?" PX11 at XOOM_MIRKIN_018504.  His answers did not even mention supply costs, but they did list "target margins."  *Id.*

These copious admissions are present in the record because before the Court's summary judgment ruling, XOOM took the position that "it could charge any markup it wanted so long as supply costs were the starting point of its rate calculation."  MSJ Order at 16.  In fact, XOOM claimed that "***it does not matter*** what strategies, formulas, or directives it used" to set Class rates. ECF 149, MSJ Reply at 17 (emphasis added).  XOOM also admitted that it believes "***how*** rates were set is irrelevant."  *Id.* at 19 (emphasis in original).  But these admissions are fatal for XOOM's defense.  This Court and the Second Circuit have already made clear that nothing about XOOM's rate calculations can be subjective—they must be grounded in objectively demonstrable calculations.  *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) (noting that whether an ESCO's contract specifically allows for rate-setting discretion is a "dispositive

question" and that XOOM's specific contract here does "not describe the monthly variable rate as being set according to the ESCO's discretion").

On this straightforward record the Court outlined the issues for trial. First, regarding XOOM's fanciful claim that the fluctuating margins evident from its workbooks varied "solely" on account of "supply costs" and "only those costs" (MSJ Order at 12, 14) the Court made clear that a reasonable jury could conclude that: (1) XOOM was not permitted to incorporate supply costs into its margins; or (2) even if it was, it did not in fact do so; or (3) even if it did so, the margin adjustments unfolded in a way that violated the contract. Class Order at 13 (citing MSJ Order at 17). Second, per the contract, the margins XOOM imposed over the COGS figures documented in XOOM's workbooks must be shown to be reasonable and fixed. MSJ Order at 12–13; *see also* Class Order at 3, 14.

A trial on these issues is no herculean task. Yet after having failed in its appeal of the Court's class certification order and then updating its class-wide charging data, XOOM can now see that its "pricing strategies" overcharged its New York customers by more than $100,000,000. Faced with irrefutable evidence of both breach and damages, XOOM is resorting to an attempt to make this case untriable. For example, XOOM conveniently claims that because its secret supply cost calculations were not documented, XOOM's pricing team members will have to testify for 35 Court days about how undocumented supply costs caused an otherwise fixed (but undisclosed) margin to fluctuate in a variety of New York gas and electricity utility zones. ECF 210, Joint Pretrial Order ("PTO") at 5. XOOM argues that this extensive testimony will make a class trial so unwieldy that XOOM escapes class-wide accountability. *See* ECF 212, Defs.' Decertification Reply Br. ("Decert. Reply") at 15. In other words, XOOM's only remaining defense of its New

Case 1:18-cv-02949-ARR-JAM   Document 233   Filed 06/03/24   Page 20 of 93 PageID #: 11191

York rates is to impede the trial. *See id.* ("As a practical matter, the jury cannot be expected to sort through and digest thousands of pages of disparate actual cost information.").

The motions *in limine* that follow thus share a common theme: countering XOOM's concerted effort to derail these proceedings. As explained below, to ensure a fair and orderly trial in this important consumer protection action, the following motions should be granted in full.

## ARGUMENT

I.   **MOTION *IN LIMINE* NO. 1: XOOM BEARS THE BURDEN TO PROVE THAT FLUCTUATIONS IN ITS VARIABLE RATE MARGINS WERE "DETERMINED SOLELY BY" PERMISSIBLE SUPPLY COSTS**

### A. Introduction

This motion attacks a key element of XOOM's effort to impede the trial. XOOM's effort to make Plaintiff disprove XOOM's implausible defense that its fluctuating variable rate margins actually reflect a buildup of permissible supply costs. MSJ Order at 16. The Court construed the contract to require that variable rates be "determined solely by" XOOM's "supply costs." MSJ Order at 14. However, overwhelming evidence produced in discovery, including XOOM's own damning admissions, reveals that XOOM ignored this contractual obligation.

In response, XOOM now seeks to shift the burden of proof by demanding that Plaintiff ***disprove*** XOOM's claim that secret, undocumented supply cost calculations explain its excessive and fluctuating margins. This illogical defense hinges on the fabricated notion that rates demonstrably not "determined solely by" XOOM's documented supply costs were derived from hidden supply cost calculations never produced in discovery. Using this curious claim as its starting point, XOOM contends that ***Plaintiff*** loses because she cannot prove XOOM's secret supply cost calculations yielded improper rates.

XOOM's claim defies both logic and law. First, overwhelming evidence shows that XOOM did not calculate rates "determined solely by" its supply costs, let alone via some hidden

7

formula whereby undisclosed supply costs were added to XOOM's margins.  As noted above, XOOM has already claimed to this Court that "***it does not matter*** what strategies, formulas, or directives it used" to set Class rates.  ECF 149, MSJ Reply at 17 (emphasis added).  XOOM believes that "***how*** rates were set is irrelevant." *Id.* at 19 (emphasis in original).

Second, the Court has already ruled that XOOM bears the burden of demonstrating that it correctly calculated Class rates: "[U]nder the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs." MSJ Order at 15.  A host of case law supports the Court's conclusion, and the Court's summary judgment findings leave no doubt that because XOOM never produced an additional set of supply cost calculations that include its newly claimed, secret calculations, XOOM unquestionably breached the contract.

At summary judgment, the Court found the pricing term's phrase "based on" to be vague and construed it to require XOOM's "monthly variable rates to be determined by XOOM's actual and estimated supply costs—and only those costs." MSJ Order at 10–14.  The Court further found that while XOOM's rates must be "determined solely by" its supply costs, XOOM was entitled to add a "proportionate" and "reasonable" margin to those costs, thereby delineating a cost-plus calculation:  variable rates could be calculated by adding a "reasonable," fixed margin to XOOM's "supply costs." MSJ Order at 13–14.[1]

The Court then looked at two key pieces of uncontested data: (1) the supply cost "COGS" or "Total Costs" calculations in XOOM's rate-setting workbooks; and (2) the fluctuating margins

---

[1] A "cost-plus contract" is "[a] contract in which payment is based on a fixed fee or a percentage added to the actual cost incurred." *Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019).  XOOM ***agrees*** with the Court's cost-plus construction.  For example, in recent court filings XOOM has repeatedly represented that the "Court's contract construction requires" a rate calculation of "**COSTS**" "plus" "**MARGIN**" that yields "What XOOM Should Have Charged."  ECF 212, Decert. Reply at 7; *see also* ECF 197, Defs.' Opening Decertification Br. ("Decert. Br.") at 3, 6, 12 (same).

XOOM imposed over those documented supply costs.  Because XOOM's margins varied wildly, the Court concluded that "XOOM has failed to adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric."  *Id.* at 15.

In response, XOOM makes the outlandish claim that the "supply cost" and "margin" inputs to this cost-plus equation actually included a secret and undocumented buildup of additional undisclosed supply costs.  *Id.* at 16.  Notably, XOOM has not produced these additional supply cost calculations nor disclosed the "true" margin upon which these costs were supposedly layered.

At trial, XOOM will bear the burden of substantiating its fanciful explanation for its excessive rates.  If XOOM cannot meet the burden of establishing that its fluctuating margins were "determined solely by" permissible supply costs, the jury should be instructed that permissible supply costs were *not* incorporated into XOOM's variable rate margins.  As described above and discussed in more detail below, overwhelming evidence shows that the fluctuations in XOOM's margins were not caused by fluctuations in permissible supply costs secretly included in a still-secret margin.

In discovery XOOM produced detailed rate-setting workbooks showing: (1) XOOM's supply cost tabulations for each monthly variable rate; (2) the variable rate XOOM ultimately charged; and (3) the margin XOOM achieved over its supply cost tabulations.  But discovery also showed XOOM's pricing team simply chose a rate based on profitability targets set by XOOM management without any relationship—let alone the required "determined solely by" relationship—to XOOM's supply costs.  XOOM even admitted that its variable rates were determined by XOOM's "pricing strategies" rather than calculated via a cost-plus formula.

The margins XOOM's pricing strategies yielded over its documented supply costs were both excessive and varying—a clear violation of XOOM's contractual obligation to charge variable

rates "determined solely by" its supply costs plus a reasonable fixed margin.  The "method" by which XOOM obtained a margin over its documented supply costs was also entirely subjective. XOOM simply decided what rate it wanted to charge to meet profitability (and other) goals, and its "margin" was simply the result of the rate that was selected.  For example, if XOOM's supply costs were 10 cents per Kilowatt-hour ("kWh") and its monthly variable rate was 14 cents per kWh, XOOM's margin was 40%.  If supply costs were the same 10 cents but the rate was 17 cents, then XOOM's margin was 70%.  Instead of using a cost-plus formula, XOOM's ultimate rates drove margins.

This practice is wholly inconsistent with the Court's cost-plus contract construction.  Under the Court's construction, XOOM was required to apply a single, fixed (and reasonable) margin to its "supply costs."  MSJ Order at 13–14.  While variable rates could fluctuate, rate changes could **only** be caused by changes in XOOM's supply costs.  *Id.*  Yet XOOM's rate-setting workbooks and abundant other documentary evidence show that XOOM **did not** use a single margin and instead selected variable rates based on its ad hoc "pricing strategies."  As a result, the rate XOOM chose each month yielded unreasonable and varying margins over supply costs.

XOOM's rate-setting practices were established by its own workbooks, a trove of internal documents and communications, and numerous admissions.  The Court's summary judgment directive was clear: "XOOM must show that its rates were determined by its actual and estimated supply costs," and XOOM must "adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric" recorded in the workbooks. MSJ Order at 15.

XOOM is not able to do this.  Consequently, XOOM is left with only its highly implausible claim that its fluctuating monthly variable rate margins that were added to its documented supply

costs are not actually margins, and instead flow from an undisclosed and entirely undocumented calculation. *See, e.g.*, MSJ Order at 16–17.

Merely describing XOOM's defense reveals its incongruity. To justify its rates, XOOM's alleged secret margin calculation begins with an unidentified, allegedly fixed, true margin to which XOOM then added still secret (and undocumented) "actual supply costs" to create the margin XOOM actually charged. *Id.* at 17; *see also* ECF 197, Decert. Br. at 3, 6, 12. Not only did XOOM keep this "methodology" of arriving at its margin secret from Plaintiff and the Class throughout discovery, but it also kept it secret from its employees, none of whom mentioned it in their testimony, as well as from its own expert whom it asked to opine in this case.

Moreover, not a single document in the record supports XOOM's claim about its margins— not its rate-setting workbooks, not the other internal documents showing its rate-setting process, not the report by its own expert, not any documents at all. In contrast, XOOM's workbooks contain documented and highly accurate supply costs and XOOM's rates. The excessive fluctuating margins XOOM obtained over those documented supply costs is also readily identifiable from the workbooks. The Court's summary judgment ruling even contains a chart showing XOOM's fluctuating margins. MSJ Order at 15–16. This uncontroverted Class-wide evidence shows that XOOM's variable rates were not "determined solely by" XOOM's "supply costs." *Id.* at 14. To distract from this evidence, XOOM claims there are missing puzzle pieces that, if located, would show contractually compliant rate calculations. Here is a graphical representation of XOOM's claim about how its fluctuating variable rate margins were derived:



XOOM's defense suggests that once those (undisclosed) additional supply costs are identified and segregated from XOOM's excessive margins, a single fixed (but thus far, secret) margin will emerge. Yet *none* of the evidence XOOM produced in discovery references any such calculations or phantom fixed margin. Nor did XOOM produce *any* documents showing how it calculated undisclosed supply costs and added them to an otherwise fixed and unidentified variable rate margin. *See* MSJ Order at 16 (noting that XOOM produced "no documentary evidence" of this practice and citing testimony from XOOM senior management that "[t]here's certainly a human element" in how XOOM allegedly factored undisclosed supply costs calculations into variable rate margins). In fact, to date XOOM still has not disclosed what this secret fixed margin is.

Nevertheless, XOOM contends that its fantastical claim creates an evidentiary gap *Plaintiff* must fill. XOOM claims Plaintiff cannot show an overcharge unless she proves XOOM did *not* calculate and incorporate (undocumented) permissible supply costs into its (undisclosed) fixed variable rate margin. *See* ECF 197, Decert. Br. 11–12, 21; *see also* ECF 210, PTO at 14.[2] XOOM also conveniently claims that because these secret costs were not documented, XOOM's pricing team members will have to testify for 35 Court days about how undocumented supply costs caused an otherwise fixed (but undisclosed) margin to fluctuate in a variety of New York gas and electricity utility zones. ECF 210, PTO at 5.

The Court should reject these tactics. First and most obviously, because no evidence of calculations showing supply costs flowing into margins was ever disclosed during discovery, XOOM should be precluded under Rule 37 from demanding that Plaintiff come up with these

---

[2] XOOM's claim assumes the jury determines that XOOM was contractually permitted to sneak undocumented supply costs into the margins added to the supply costs documented in its rate-setting workbooks—an unlikely outcome. *See* Class Order at 13. XOOM's argument is the equivalent of a shopkeeper telling a customer that charges are owed even though they are not itemized on a bill.

calculations to prove breach.  Plaintiff deposed the key witnesses in charge of setting XOOM's New York rates.  None of those witnesses ever mentioned anything about calculations of XOOM's undocumented supply costs being added to a secret fixed margin.  Instead, consistent with XOOM's own 56.1 statement, those witnesses admitted to a wholly discretionary process that did not involve additional supply cost calculations relevant to variable rates beyond the supply costs that were meticulously and systematically compiled into XOOM's rate-setting workbooks.  Even if there was any truth to XOOM's story about its variable rate margins containing a secret buildup of permissible supply costs—and we do not believe there is—the time for XOOM to disclose its secret calculations was during discovery.

While Plaintiff bears the burden of proving ultimate liability, XOOM bears the burden of proving the myth it proffers to explain away the fluctuating monthly variable rate margins it added to its documented COGS—and must do so consistent with its obligation to have produced the relevant evidence during discovery.  XOOM cannot be allowed to turn the trial into an ambush.

 In particular, XOOM bears the burden of proof as to (1) the exact amount of supply costs, if any, that were allegedly added to its otherwise fixed variable rate margin.  XOOM likewise bears the burden of showing that (2) the only costs supposedly added to the fixed margin were permissible "supply costs," and (3) that once disaggregated from any supposed supply cost adder, XOOM's monthly variable rate margin over its documented supply costs was constant.  And as this Court and the Second Circuit have noted, nothing about these calculations can be subjective— they must be grounded in objectively demonstrable calculations.  *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) (whether an ESCO's contract specifically allows for rate-setting discretion is a "dispositive question" and XOOM's specific contract here does "not describe the monthly variable rate as being set according to the ESCO's discretion.").

In short, XOOM must show its math.  In fact, similar to any other cost-plus scenario XOOM must show **all** of the math it claims justifies its rates.  If it cannot, XOOM's customers should get the benefit of the doubt.  This is both the law of the case and is consistent with settled case law.  The Court should therefore issue an order rejecting XOOM's claim that Plaintiff bears the burden of proving which permissible supply costs, if any, were added to XOOM's variable rate margins.  Second, the Court should direct XOOM that it cannot offer any new claims about its rate-setting process that were not disclosed in discovery.  These orders will prevent a trial by surprise and will clarify to the jury that to the extent XOOM makes factual claims regarding undisclosed supply cost adders to an undisclosed fixed margin, XOOM bears the burden of proof as to both pillars of that curious defense.[3]

### B.  Additional Relevant Background

XOOM admits that it "always determined" Class monthly variable rates through a uniform process that was followed "without exception."  ECF 134, Defs.' Class Opp'n Br. ("Class Opp'n") at 12.  As this Court has already observed, that uniform rate-setting process began with XOOM

---

[3] Forum law applies to the question of burdens of proof, not the contract's North Carolina law designation. *See Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987) ("The question of burden of proof . . . is regarded by New York law as a question of procedure to which the law of the forum applies."); *see also Cronin v. Fam. Educ. Co.*, 105 F. Supp. 2d 136, 139 (E.D.N.Y. 2000) ("[C]hoice of law provisions [] choose only substantive law, not procedural law concerning matters such as burdens of proof."); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1205 (2d Cir. 1995) ("Allocation of the burden of proof is determined pursuant to New York law, even with respect to those policies whose substantive interpretation is governed by Texas law."); *Dilek v. Watson Enterprises, Inc.*, 885 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) ("Plaintiff correctly notes that, under New York choice-of-law rules, the parties' choice of law governs substantive but not procedural issues. The question of burden of proof is regarded by New York law as a question of procedure to which the law of the forum applies." (cleaned up)).  XOOM claims in its trial memorandum that the Supreme Court has established that the question of which law applies to burden of proof issues is a matter of substantive law.  ECF 210, PTO at 12.  However, XOOM misconstrues those cases, which hold that when a statutory action contains a provision assigning the burden of proof or a presumption, that provision is a substantive part of the action.  *See, e.g., Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) (discussing assignment of burden of proof for claim arising under Declaratory Judgment Act but relating to a counterclaim under the Patent Act).  That is a categorically different issue than the one presented here—the assignment of burden on proving discrete factual claims is a procedural matter determined by forum law.

calculating its monthly "Total Cost" or "COGS" for each variable rate and compiling those costs into rate-setting workbooks—these calculations are "essentially the sum of the costs XOOM incurs when procuring energy on the wholesale market."  Class Order at 3.  "After determining the Total Cost figure, analysts on the pricing team proposed a rate," and "[t]he percentage difference between the proposed rate and COGS comprised the margin."  MSJ Order at 4.  XOOM calls this standardized rate-setting "the 'spreadsheet-based model' XOOM used to set rates based on its actual and estimated supply costs."  ECF 145-1, MSJ Br. at 8 (citing ECF 146-12, Dep. Tr. of Director of Pricing and Structuring Jason Loehde, dated July 27, 2022 ("Loehde Tr.") 59:11–18).

Despite extolling its "spreadsheet-based model" XOOM has "no documentary evidence demonstrating how non-COGS supply costs actually impacted [Plaintiff's] rates," thus XOOM's only remaining defense is its unsupported factual claim that "the Total Cost or COGS number does not constitute its 'actual and estimated supply costs' because some of its supply costs—such as prior period adjustments—are incorporated in the margin."  MSJ Order at 16.  In other words, XOOM oddly contends its "Total Costs" were not in fact the "supply costs" used to set Class rates.  Instead, XOOM claims its fluctuating variable rate margins supposedly included completely undocumented and uncalculated additional, permissible "actual supply costs."  *See, e.g.*, MSJ Order at 16–17.  XOOM thus asks the Court, the jury, and its 100,000+ customers to believe that once those (undisclosed) additional supply costs are identified and segregated from the margin apparent from XOOM's rate-setting workbooks, a single fixed (undisclosed) margin will emerge.

In noting that XOOM "must show that its rates were determined by its actual and estimated supply costs," and must "adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric," (MSJ Order at 15) this Court did not address what documents or testimony XOOM would be permitted to offer to make the required

15

"showing" and "explanation" at trial, nor did the Court address the consequences of XOOM's failure to produce such evidence during discovery.  Consistent with Rule 37, the Court should preclude XOOM from offering any such documentary or testimonial evidence that should have been but was not disclosed during discovery.[4]

XOOM's *post hoc* claim about its fluctuating margins is also undone by its own prior admissions.  In the lead-up to summary judgment, XOOM admitted to believing it could use any number of unrecorded "components" to set Class rates.  ECF 145-1, MSJ Br. at 16.  Specifically, XOOM admitted that it believed its contract required only that supply costs be the "'foundation' to which other ***components*** would be ***added***" via undocumented ad hoc adjustments to its variable rates.  *Id.* (emphasis added).  This directly contradicts XOOM's current claim that secret cost components were used to build up its margins at the time its rates were being set.

XOOM also admitted that the margins layered on top of its workbooks' COGS figure were ***varying and inconsistent***.  ECF 134, Class Opp'n at 12; ECF 145-1, MSJ Br. at 8.  In fact, XOOM even argued that the fluctuating monthly margins reflected its ***discretion*** to pad margins with "prior period adjustments" (which are "variations between previous supply cost estimates and the [supply] costs XOOM actually incurred") as well as "balancing costs," "other costs to supply energy to the customer, and XOOM's profit."  ECF 134, Class Opp'n at 12.  Although "prior period adjustments" and "balancing costs" are specifically enumerated supply costs in the contract, prior to summary judgment XOOM admitted that it believed the technical term "prior period adjustments" allowed it to adjust variable rate margins using undocumented non-supply cost "data points" such as "margin goals," the "prior month's variable rate," and whether its rates would cause customer "attrition."  ECF 145-1, MSJ Br. at 21; *see also* ECF 146-25, Defs.' 56.1 ¶ 14.  None of

---

[4] Preclusion under Rule 37 is further discussed *infra* in Plaintiff's motion *in limine* No. 3, pp. 34–35.

these so called "data points" are permissible "supply costs" under the Court's contract construction, none are specifically delineated in the figures in XOOM's rate-setting workbooks, and XOOM has produced no calculations whatsoever showing how these "data points" were used to build up to XOOM's fluctuating variable rate margins. In fact, XOOM has admitted to doing the opposite. *See* MSJ Order at 17 ("[W]e would input a proposed rate into the rate setting workbook and then there would be a calculated margin that results from the rate we input." (quoting ECF 146-12, Loehde Tr. at 67:12–16)).

Under XOOM's longstanding contract (mis)interpretation, "so long as supply costs are the 'foundation' and the 'fundamental part' of the variable rate," XOOM's position was that "***how*** rates were set is irrelevant." ECF 149, MSJ Reply at 6–7, 19 (emphasis in original); *see also id.* at 16 ("[T]he Contract cannot be reasonably construed to prohibit ***all*** pricing strategies, because several strategies are expressly disclosed—including the one that XOOM employed when it set rates that were *based on* its supply costs." (emphasis in original)). XOOM even claimed that "***it does not matter*** what strategies, formulas, or directives it used" to set Class rates. *Id.* at 17 (emphasis added). XOOM has never disputed that Class rates were set this way and instead always claimed this rate-setting practice was "entirely appropriate." *Id.* at 11.

XOOM has also already admitted that it had "no specific formula" for setting rates, ECF 148-20, Loehde Tr. 61:6–19, and that it used a host of indisputably non-supply costs to pad margins. For example, "[o]ne factor XOOM considered when setting variable rates was customer attrition." ECF 139, Defs.' Sealed Class Opp'n Br. ("Sealed Class Opp'n") at 14 (citing ECF 139-

17

9, Loehde Tr. 85:12 –22).  XOOM also admitted that its margins included payments to the "sales channel partner or broker" and an "inherent" risk premium.  *Id.* at 16 (summarizing testimony).[5]

XOOM's CEO and its Director of Pricing and Structuring admitted that XOOM would raise New York margins "so we could lower them elsewhere."  MSJ Order at 18.  As Park put it, "if we have to squeeze a market, we should squeeze New York power."  PX23 at XOOM_MIRKIN_065173.  Indeed, in 2014, key employees were told that XOOM's "new mindset" should be to set prices with the aim of "protecting margins," and to "follow the competitor pricing pack (probably on the higher end)" in New York.  PX24 at XOOM_MIRKIN_ 065820.  In short, XOOM did not incorporate supply costs into an otherwise reasonable fixed margin—its actual practice was completely different (and plainly prohibited by the contract).

XOOM had no formula for ensuring that its varying margins fluctuated only because of permissible supply costs.  Management never required the product or pricing groups to base variable rates on supply costs.  ECF 140, Pl.'s Sealed Opening Class Br. at 11.  XOOM's CEO even "acknowledged that most of the pricing team 'wasn't even privy to the operating expenses and things like that,' but that they were privy to '[t]he gross margin goal for the month.'"  *Id.*

---

[5] *See also* ECF 138-22, Coppola Tr. 50:8–51:2, 84:20–85:7 (XOOM considered "[a]ttrition, sales growth, regulatory changes, [and] competitors" when setting rates); *id.* at 107:6–108:1 (admitting competitors' prices were unrelated to supply costs, but XOOM nonetheless considered them when setting rates); *id.* at 237:22–239:3 (margin targets, current and trending sales activity and utility rates, customer attrition, historical market pricing, and competitors' offers considered when setting rates); ECF 138-23, Dep. Tr. of former Director of Product Management Ryan Park, dated July 22, 2022 ("Park Tr.") 33:10–22, 98:10–15, 99:20–100:22 (admitting customer attrition is not a supply cost but was considered when setting rates); Ex. A, XOOM 30(b)(6) Tr. 83:10–23 (prior month's rate was considered when setting rates); ECF 138-25, Dep. Tr. of former Chief Executive Officer Thomas Ulry, dated Mar. 20, 2019, in *Todd v. XOOM Energy Maryland, LLC*, No. 15 Civ. 154 (D. Md.) 101:10–22 (XOOM considered the "gross margin for the month" when setting rates); Ex. B, Dep. Tr. of David Coleman, dated November 16, 2022 ("Coleman Tr.") 54:5–55:17 (XOOM's expert acknowledging that XOOM considered factors "which are not actual and estimated supply costs" when setting rates).

Indeed, XOOM prepared and directed its employees to consider various **non-supply cost reports** (including attrition, sales, and competitor rate reports) during rate setting meetings.  ECF 138-17, Loehde Tr. 48:17–25.  For example, in February 2017, Director of Pricing and Structuring Jason Loehde suggested raising rates because "attrition rates are still in a reasonable range."  JX7 at XOOM_MIRKIN_024527.   Preceding a 2015 company-wide meeting, Loehde circulated questions regarding XOOM's rate-setting process, one of which was "[w]hat are three things that get considered in our monthly rate setting process?"  PX11 at XOOM_MIRKIN_018504.  His answers did not even mention supply costs, but they did list "target margins."  *Id.*  Likewise, Loehde's questions contain no indication of XOOM's claimed practice of layering unknown and undocumented supply costs on top of an otherwise (undisclosed) fixed margin.  XOOM has not even disclosed the alleged fixed variable rate margin to which permissible supply costs were allegedly added, much less produced evidence of a process or formula for adding supposed additional supply costs into this secret margin.  *See* MSJ Order at 16.

And XOOM never disclosed to its own expert in this case, whom XOOM retained to render an opinion about its rate-setting practices, that it was using secret, undocumented supply costs in an equally secret calculation to adjust an otherwise fixed (and undisclosed) margin that, by some odd twist of fate, XOOM's own witnesses never mentioned in their testimony about XOOM's rate-setting practices.  MSJ Order at 5 (observing that XOOM's expert admitted "he did not see any prior period adjustment calculations in data XOOM provided")

It is thus no surprise that at summary judgment the Court observed that "the record indicates that XOOM considered several factors besides supply costs when setting monthly rates."  *Id.* at 18.  The Court also noted XOOM's admission that when it amended its form contract in 2016

to allow rates based on "pricing strategies" its rate setting process stayed the same, since "the updated language is just simply providing more accurate language to our customers." *Id.*[6]

Accordingly, XOOM's admitted rate-setting practice facially violates the contract, which, as construed by the Court at summary judgment, requires "XOOM [to] show that its rates were determined by its actual and estimated supply costs," and that any margin was both fixed and reasonable. MSJ Order at 12–15. Because XOOM's margins varied, under the Court's contract construction XOOM is now required to—but clearly cannot—meet its burden.

## C. Argument

There are at least two reasons why the Court should find that XOOM bears the burden at trial of proving: (1) the exact amount of supply costs, if any, that were allegedly added to its otherwise fixed variable rate margin; (2) that the only costs supposedly added to the fixed margin were proper "supply costs," and; (3) that once disaggregated from any supposed supply cost adder, XOOM's monthly variable rate margin over its documented supply costs was constant.

***First***, the Court has already ruled that "under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs," and must "adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric." MSJ Order at 15. That is the law of the case. *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise[.]" (internal quotation marks omitted)); *see also*

---

[6] As both the Company's corporate witness Loehde and Coppola admitted, XOOM had "always" based its New York variable rates on "XOOM's pricing strategies." Ex. A, XOOM 30(b)(6) Tr. 20:5–10, 134:2–135:15; ECF 138-22, Coppola Tr. 98:11–18. XOOM's expert agreed, testifying that with respect to XOOM's contract, XOOM factored in "pricing strategies" when setting rates—despite acknowledging this was not in the contract. Ex. B, Coleman Tr. 66:11–15.

*Rhee-Karn v. Lask*, 674 F. Supp. 3d 75, 79 (S.D.N.Y. 2023) ("Accordingly, [Defendant] is precluded from arguing or presenting evidence at trial" that "disregard[s] or depart[s] from Judge Cote's [summary judgment] decision."); *Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, No. 16 Civ. 2212, 2022 WL 17082541, at *3 (N.D. Ill. Nov. 18, 2022) ("Plaintiff's motion [in limine] is granted as agreed to the extent it seeks to bar Defendants from relitigating this Court's rulings on claim construction or eliciting testimony that contradicts this Court's rulings" because "a court's claim construction is law of the case for purposes of trial and . . . no party may contradict the court's construction to a jury[.]" (citation omitted)).

**Second**, the Court has determined that XOOM's contract is a cost-plus contract.  *See* MSJ Order at 11 ("I find that the contract required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs."); *see also id.* at 13 (XOOM may charge a "proportionate" margin on top of supply costs and the Court's "proportionate-margin construction" allows "a margin so long as it is not untethered to the actual and estimated supply costs.").  When it comes to proving "costs" in cost-plus cases, courts hold that the party claiming costs has the burden to prove them.  *See, e.g.*, *Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 223 (Tenn. Ct. App. 2009) ("In any cost-plus contract there is an implicit understanding between the parties that the cost must be reasonable and proper.  The [seller] is under a duty of itemizing each and every expenditure made . . . and where the [purchaser] denies being indebted to the [seller] the latter has the burden of proving each and every item of expense . . . ." (cleaned up)); *Liberty Constr. Co., LLC v. Curry*, No. M-2019-951-COA-R3-CV, 2020 WL 6158461, at *2 (Tenn. Ct. App. Oct. 21, 2020) (same); *Kerner v. Gilt*, 296 So. 2d 428, 431 (La. Ct. App. 1974) (same).[7]

---

[7] *See also Goes v. Vogler*, 937 N.W.2d 190, 197 (Neb. 2020) ("[T]he cost-plus contract required that . . . [seller] was required to present its actual costs to the [buyer] . . . ."); *JBR Contractors, Inc. v. E & W, LLC*, 991 A.2d 18 (Table), at *2 n.7 (Del. 2010) ("In a cost-plus contract, the [seller] is under a duty of itemizing

*Footnote continued on next page.*

XOOM's specious attempt to explain its excessive charges relies on undisclosed additional "supply costs" that were not documented via any objective means.  These ephemeral supply costs were then supposedly applied in some equally undocumented and entirely subjective manner to an undisclosed supposedly fixed margin.  That entirely undocumented process was then applied (XOOM claims) to the documented costs detailed in XOOM's rate-setting workbooks to come up with XOOM's monthly variable rates.  Assuming arguendo that any such defense can be presented at trial, the burden of proving its components necessarily falls on XOOM.

The law applicable to cost-plus contracts, detailed above, strongly supports the conclusion that XOOM appropriately bears the burden to show how additional supply costs were used to calculate alleged increases to an otherwise fixed (and disclosed) monthly variable rate margin that was then applied to the documented supply costs in XOOM's workbooks.  XOOM's detailed rate-setting workbooks show specific monthly supply cost tabulations and monthly variable rates.  The excessive and fluctuating margins XOOM achieved as a result of its rates can also be derived from the workbooks.  This is documentary evidence of a process that breaches the Court's cost-plus contract construction.  As the party claiming its own rate-setting workbooks show only a portion of its cost-plus calculations, *XOOM* must fill in the gaps it claims exist, not Plaintiff.  A contrary framework incentivizes the cost-incurring seller to ignore the cost-plus contract and make its customer cure the seller's deficient expense records and calculations.  That is unfair.  The

---

each and every expenditure and where the other party denies being indebted to the [seller] the latter has the burden of proving each and every item of expense." (quoting 17 Am. Jur. 2d Contracts, § 495 (2010)) (cleaned up)); *M. Carbine Restoration, Ltd. v. Sutherlin*, 544 So. 2d 455, 458 (La. Ct. App. 1989) ("Once the existence of a cost-plus contract has been established, the [seller] also has a duty to submit an itemization of each and every expenditure made . . . because there is an implicit agreement between the parties that the costs will be reasonable.  Presentation of invoices and statements of accounts, accompanied by proof of payment, is the proper method of proving the cost . . . ." (internal citations omitted)).

cost-incurring seller is the only party with ***direct proof*** of its costs and calculations.  The seller thus bears the burden of proving them.

The case law on cost-plus contracts is highly instructive.  It is also not *sui generis*.  At least three additional established doctrines dictate that XOOM should bear the burden to prove its costs.

**(1) The Doctrine of Superior Access to Evidence.**  XOOM has exclusive access to the supply costs calculations it alleges caused the fluctuating variable rate margins that are apparent from its workbooks' calculations.  XOOM should thus bear the burden to "adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric."  MSJ Order at 15.  "Burden-shifting where one party has superior access to evidence on a particular issue is a common feature of our law."  *United States v. One Parcel of Prop. Located at 194 Quaker Farms Rd., Oxford, Conn.*, 85 F.3d 985, 990 (2d Cir. 1996).  "It is generally inappropriate to place the burden of proof on a party in the case where the facts governing the resolution of the controversy are within the exclusive knowledge of the opposing party." *Johnson v. City of New York*, 302 A.D.2d 463, 464 (2d Dep't 2003).[8]

Here, XOOM has exclusive access to the evidence of its still-undisclosed, supposedly fixed and reasonable variable rate margin.  XOOM also has exclusive access to the evidence of the undisclosed supply costs that it claims were used in the unidentified calculations that produced the large and fluctuating variable rate margins that ***are*** documented and determinable.  XOOM appropriately bears the burden to prove the rate-setting calculations it claims occurred apart from the calculations reflected in its workbooks.  Plaintiff will present the COGS and margin evidence from XOOM's workbooks.  If XOOM continues to claim that the margins apparent from those

---

[8] S*ee also In re Sept. 11 Litig.*, 811 F. Supp. 2d 883, 894 (S.D.N.Y. 2011) ("Where a defendant has superior access to knowledge of relevant facts, courts may shift a burden to the defendant, by permitting the plaintiff to make an initial showing and obtain the benefit of a presumption." (citing 2 McCormick on Evid. § 337)).

workbooks are built up from additional undisclosed supply costs, XOOM should bear the burden of proving this improbable claim.   Especially since these alleged calculations are not documented in the workbooks themselves—or in any other XOOM document produced in discovery.  If XOOM contends its own rate-setting calculations are incomplete, XOOM, not Plaintiff, bears the burden of showing the allegedly complete (and contractually compliant) calculations.

     **(2) Plaintiff Should Not Be Required to Prove a Negative.**  Even if the parties had equal access to evidence (they do not), a party should not have the burden of proving a negative when the opposing party can adduce affirmative evidence.   Longstanding Supreme Court precedent makes clear that "when the opposite party must, from the nature of the case, himself be in possession of full and plenary proof to disprove the negative averment, and the other party is not in possession of such proof, then it is manifestly just and reasonable that the party which is in possession of the proof should be required to adduce it; or, upon his failure to do so, we must presume it does not exist, which of itself establishes a negative."  *United States v. Denver & R G R Co.*, 191 U.S. 84, 92 (1903).  The Second Circuit agrees.  *Nat'l Commc'ns Ass'n Inc. v. AT & T Corp.*, 238 F.3d 124, 130–31 (2d Cir. 2001) ("First, all else being equal, the burden is better placed on the party with easier access to relevant information. . . .  Second, all else again being equal, courts should avoid requiring a party to shoulder the more difficult task of proving a negative.").[9]

---

[9] *See also Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 494 (9th Cir. 2019) (Courts shift the burden of proving a negative to a defendant because "holding otherwise would impose upon the plaintiffs a difficult, if not an impossible, task of requiring them to produce evidence that a fact is not the case, though evidence to the contrary could be readily produced by the defendant" and "it is a general rule of evidence that where the subject-matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party" (cleaned up)); *In re Waterman S.S. Corp.*, 200 B.R. 770, 775 (Bankr. S.D.N.Y. 1996) ("An even more persuasive basis for placing the burden of proof on MALC is the general rule that when the true facts relating to a dispute are particularly within the knowledge of one party, then the burden of proving an issue lies with the knowledgeable party.  [The opposing party] should not have to prove a negative.").

XOOM would have Plaintiff prove a negative—that fluctuations in XOOM's rates were **not** caused by undocumented supply costs incorporated into an undisclosed but fixed margin. Instead, XOOM should bear the burden to prove this occurred, and if it cannot, it should be presumed that supply costs were **not** incorporated into XOOM's excessive and varying margins.

**(3) XOOM Should Bear the Burden of Proof on Its Implausible Claim.**  The Supreme Court has explained that "[p]resumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof." *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 359 n.45 (1977).  Courts may "shift a burden of production in consideration of 'the judicial estimate of the probabilities of the situation'" thereby "shift[ing] the burden to the party 'who contends the more unusual event has occurred.'" *In re Sept. 11 Litig.*, 811 F. Supp. 2d at 894 (quoting 2 McCormick on Evid. § 337).

Here, XOOM advances the more unusual account.  As XOOM itself argued to the Court, "rates were set at meetings where decisionmakers were presented with pre-assembled 'rate-setting workbooks' that 'contained XOOM's internal supply cost calculations.'" ECF No. 149, MSJ Reply at 11.  XOOM itself emphasized that it would never disregard those calculations "after taking the time and expense to create them each month."  *Id.*  It would be "absurd—and completely unsupported" for XOOM to do so.  *Id.*; *see* ECF No. 145-1, MSJ Br. at 2 ("Not one [of XOOM's witnesses] testified that XOOM ever set variable rates—in any month—without using the detailed supply cost information in its monthly 'rate-setting workbook' spreadsheets.").  Despite making these claims to the Court, XOOM would now have the Court believe that its fluctuating variable rate margins incorporate additional supply costs calculations that were not produced in discovery. There is no documentary evidence that such calculations occurred.  There is not even documentary

evidence that XOOM maintained a fixed variable rate margin to which the alleged undocumented supply costs were allegedly added.  XOOM has not even revealed what this secret margin is.

As the Court has already recognized, XOOM "had every reason to substantiate its [Summary Judgment] motion with evidence reflecting the incorporation of prior period adjustments in its margins—and failed to do so." Class Order at 13 n.6

At trial Plaintiff will present XOOM's own rate-setting records and the admissions by its witnesses explaining how they went about setting its variable rates.  Nowhere prior to XOOM's post-discovery filings was there ever any mention of secret, undocumented supply cost calculations that were supposedly factored into an otherwise fixed margin in some wholly subjective fashion.  It now appears that XOOM will contend that its own records are in fact incomplete and its witnesses did not testify accurately or truthfully about how they went about setting XOOM's variable rates.  XOOM thus clearly advances the more unusual fact pattern.  The Court has already noted that "[s]everal pieces of evidence suggest that XOOM relied on pricing strategies or other considerations to determine the monthly variable rate in the New York market," and "it appears that XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and that rates were set accordingly."  MSJ Order at 17.  On this record, XOOM should bear the burden of proving its curious claim.

Accordingly, the Court should issue an order rejecting XOOM's claim that Plaintiff bears the burden of proving which permissible supply costs, if any, were added to XOOM's variable rate margins.  Second, the Court should direct XOOM that it cannot offer any new claims about its rate-setting process that were not disclosed in discovery.  These orders will ensure a fair and orderly trial and make clear to the jury that XOOM bears the burden of proof as to (1) the exact amount of supply costs, if any, that were allegedly added to its otherwise fixed variable rate margin; (2)

that the only costs supposedly added to the fixed margin were proper "supply costs;" and (3) that once disaggregated from any supposed supply cost adder, XOOM's monthly variable rate margin over its documented supply costs was constant.  If XOOM cannot meet its burden, it should be presumed that permissible supply costs were ***not*** incorporated into XOOM's margins.

## II.   MOTION *IN LIMINE* NO. 2:   FINANCIAL DOCUMENTS THAT DO NOT CONTAIN EVIDENCE OF SUPPLY COSTS TIED TO CALCULATING XOOM'S NEW YORK VARIABLE RATES ARE INADMISSIBLE

The Court should preclude XOOM from offering financial documents that do not contain specific evidence of XOOM using alleged supply costs to calculate New York variable rates.[10] Any document that does not clearly evince an alleged supply cost flowing into a XOOM margin or rate is irrelevant and/or cumulative of XOOM's rate-setting workbooks because, as its own witnesses testified, the workbooks are the most comprehensive, accurate, and reliable evidence of XOOM's supply costs.  XOOM seeks to introduce approximately 1,500 non-workbook financial records, but these documents are incomplete, irrelevant, and confuse the issues.

The Court has already ruled that XOOM's rates must equal the COGS figures in its rate-setting workbooks plus a fixed margin.  MSJ Order at 14–15.  XOOM's workbooks are comprehensive internal documents containing XOOM's calculations and documentation of its supply costs and margin during its regular course of business.  XOOM's own expert admitted that the workbooks ***are*** the source of XOOM's actual and estimated supply costs.  Ex. B, Coleman Tr. 38:3–16 (agreeing that if the Court found XOOM's rates had to "equal" actual and estimated

---

[10] This motion specifically addresses the parties' joint exhibits JX4 and JX1031–1152, and XOOM's exhibits DX1–45, DX47–51, DX53–343, DX 345–425, DX428, DX431–33, DX435–80, DX482–599, DX601–754, DX756–823, DX831–62, DX864–81, DX883–974, DX976–1368, DX1371–77, DX1376–1426, DX1458, DX1461–64, and DX1470–73.  *See* ECF 210-6–7.

supply costs, the supply cost tabulations contained in the workbooks would be the appropriate measure of damages).

XOOM witnesses and its employees have testified that the workbooks contain XOOM's rate-setting calculations and that the workbooks' COGS figures had a "very high level of accuracy" and were "extremely reliable."  Ex. A, XOOM 30(b)(6) Tr. 126:16–127:1 (noting that there were no "systemic errors" in the workbooks); *id.* at 288:25–289:8 ("I think the rate setting workbooks are extremely reliable.  We had a process to keep costs and inputs as up to date as possible."); *see also* 146-15, Coppola Tr. 281:14–282:1 (the workbooks are up to date and contain "the latest snapshot of everything that we can know about those costs up till that moment"); *id.* at 282:3–20 (the supply costs in the workbooks are compiled with "99 percent certainty").  The record evidence confirms this testimony.  Internal documents comparing XOOM's monthly COGS estimates from the workbooks to XOOM's actual supply costs show minuscule variations.  *See, e.g.*, JX1083 ("less than a -0.041% variance" between actual and estimated COGS); JX1073 ("less than -0.03%"); JX1075 ("less than 0.10%").

XOOM's response to this record is its implausible defense that certain additional undisclosed supply costs were secretly hidden in the margins evident from XOOM's workbooks.  But XOOM's claim requires evidence that those supposed additional supply costs—and only those supply costs—flowed into the margin figures.  The non-workbook financial documents XOOM seeks to introduce as evidence of "actual" supply costs are only relevant if they clearly evince an alleged supply cost flowing into a XOOM rate or margin.  XOOM's problem is that ***none*** of these additional proposed exhibits show a linkage between supposed supply costs and XOOM's margins or rates.  Even worse, the overwhelming majority of these documents do not even specifically tie

supposed "actual" costs to the state of New York, let alone the specific markets corresponding to the utility zones in New York.[11]

Nevertheless, XOOM seeks to offer well over 1,000 documents it claims contain XOOM's "actual" supply costs.  XOOM's claim is not accurate and even a cursory review of these documents confirms as much.  XOOM's non-workbook financial exhibits fall in one or more of five categories:

**(1) Financial Reports.**  These documents show the company's overall financial performance by month.  There are several reasons these reports do not shed any light on XOOM's claim that a separate set of undisclosed supply cost tabulations flowed into its margin.  *See* MSJ Order at 15 (the Court recounting XOOM's claim that the workbooks' "Total Cost or COGS number does not constitute its 'actual and estimated supply costs' because some of its supply costs—such as prior period adjustments—are incorporated in the margin.").  First and foremost, though XOOM's financial reporting sometimes mentions prior period adjustments on a company-wide level (meaning not specific to New York), they make no effort to attribute those adjustments to the supply costs XOOM asserts were allegedly added to margins.  *See, e.g.*, Ex. C, DX1383 at XOOM_MIRKIN_064179, 64188 (July 2013 financials showing higher than anticipated supply costs, but only because of higher than anticipated demand, which resulted in higher gross profits and no indication that this prior period adjustment flowed into a later rate's margin);[12] *id.* at XOOM_MIRKIN_064177 (showing prior period adjustments favorable to

---

[11] Because XOOM never disclosed this highly dubious story during discovery, any evidence in support should be precluded pursuant to Rule 37.  *See infra* Plaintiff's motion *in limine* No. 3, pp. 34–35.

[12] Plaintiff is including this (and one other XOOM exhibit) as exhibits to this motion *in limine* because the versions XOOM submitted to the Court do not include full families, which is contrary to XOOM's exhibit list and is objectionable under Rules 106 (incomplete writings) and 403 (lack of context may mislead the jury or confuse issues).

XOOM, but not broken out by market); JX1146 at XOOM_MIRKIN_070210 (August 2016 financials showing higher than anticipated margins because of lower actual costs); *id.* at XOOM_MIRKIN_070219 (overall favorable prior period adjustments not broken out by market). Nothing in these documents shows an effort by XOOM to use prior period adjustments (whether market-specific or not) to calculate New York variable rates or margins. Moreover, even where the documents show prior period adjustments, they are frequently favorable to XOOM and thus do not justify XOOM's excessive margins. *See id.*; JX1146 at XOOM_MIRKIN_070210 (gas and electricity margins higher than anticipated due to prior period adjustments). Even if these documents were relevant (and they are not), they do not show consistently higher than anticipated supply costs—a fact that is entirely consistent with XOOM's testimony about the accuracy of its workbooks' supply cost tabulations. These documents are irrelevant and inadmissible under Rules 401 and 402.

(2) **Scorecards.** These documents, also called flash reports, purport to compare XOOM's actual financial results with forecasts. *See, e.g.*, JX1032; JX1105. Just like the financial reports, the scorecards do not show any calculation, or even practice, of actual "supply costs" flowing into XOOM rates or margins. Moreover, the scorecards often show no prior period adjustments. *See* JX1105 at XOOM_MIRKIN_037103 (blank adjustments for each state, including New York). These documents are likewise irrelevant and inadmissible under Rules 401 and 402.

(3) **Shaping Curves and Hedges.** These documents show costs that XOOM incurred, *see e.g.*, DX3 (shaping); DX11 (shaping); Ex. D, DX781 (hedges),[13] but those costs already flow into XOOM's workbooks' COGS tabulations. Ex. A, XOOM 30(b)(6) Tr. 210:23–211:4 (although

---

[13] To the extent these documents are supposed to show financial results given that the documents include a "P&L" indicator, these hedging documents make no effort to attribute the figures contained therein to any calculation of New York rates or margins.

shaping was performed in separate files, the results fed into the workbooks); *id.* at 207:21–208:10 (hedges were kept in one central repository that fed into the workbooks).  These documents are entirely cumulative of the workbooks and are thus inadmissible under Rule 403.

**(4) Margin Estimates.**  These documents show XOOM's forecasted financial metrics for a given month compared to preliminary actual financial results.  *E.g.*, JX1070; JX1073.  They do not contain any calculation that extrapolates XOOM's supply costs into any sort of rate-setting calculation, nor are they even specific to New York.  These documents also confirm that the rate-setting workbooks' COGS estimates were extremely accurate.  *See* JX1073 at XOOM_MIRKIN_018249 (for March 2015, XOOM's COGS had a "difference of less than -0.03% from our initial COGS estimate).  These documents are inadmissible under Rules 401 and 402 because they are irrelevant, and to the extent they are relevant, are inadmissible as cumulative under Rule 403.

**(5) PDF Versions of Workbooks.**  These are partial versions of workbooks.  *See e.g.*, DX52; DX53.  These PDF prints from the Excel versions of XOOM's workbooks are inadmissible because they are cumulative of the workbooks pursuant to Rule 403.  Further, because the Excel workbooks are the complete documents and are thus the best evidence of XOOM's costs and rates, the PDF versions are inadmissible pursuant to Rule 1002.

Despite the shortcomings of these documents, which are either irrelevant or cumulative of the workbooks, XOOM nevertheless intends to offer more than 1,000 of them at trial.  To the extent there is any narrow probative value to non-workbook financial documents, the limited probative value is substantially outweighed by unfair prejudice, confusion of the issues, risk of misleading the jury, and waste of time due to cumulative evidence.  XOOM has already conceded that the workbooks are both accurate and reliable and were the documents that were used internally to set

31

its rates during the Class period.  The Court has already determined that XOOM must justify the varying margins it obtained over the workbooks' COGS figures.  The Court should not countenance any effort to bombard the jury with voluminous and confusing financial records that do not specifically show supply costs "determining" XOOM's margins.

Courts routinely exclude cumulative evidence with little additional probative value.  *See, e.g.*, *Kozak v. Liberty Mar. Corp.*, No. 20 Civ. 3684 (MMH), 2024 WL 1558809, at *8 (E.D.N.Y. Apr. 10, 2024) ("[T]he exhibits' probative value is substantially outweighed by the risk of needlessly presenting cumulative evidence."); *S.E.C. v. Treadway*, 438 F. Supp. 2d 218, 223 (S.D.N.Y. 2006) (excluding "such extrinsic evidence [that] is unnecessary, cumulative, and would cause undue delay"); *Campbell v. Consol. Rail Corp.*, No. 05 Civ. 1501, 2009 WL 36889, at *3 n.4 (N.D.N.Y. Jan. 6, 2009) ("that alternative evidentiary avenues exist by which [a party] can potentially meet" his burden "thus confer[s] on the evidence in question 'cumulative' or 'needless' quality for purposes of" Rule 403).

Accordingly, the Court should preclude XOOM from introducing financial documents that are not clear evidence of supply costs feeding directly into XOOM's margins or rates or are merely cumulative.  These documents are irrelevant under Rule 401 and unfairly prejudicial, cumulative, confusing, misleading, and waste time under Rule 403.[14]  Such documents would only serve to distract the jury from the central question to be decided at trial: whether XOOM's variable rates were "determined solely" by XOOM's supply costs plus a fixed, reasonable margin.

---

[14] The PDF workbooks are entirely cumulative of the Excel versions and are likewise inadmissible.

### III.   MOTION *IN LIMINE* NO. 3:   XOOM SHOULD BE PRECLUDED UNDER RULE 37 FROM CONTRADICTING ITS RULE 30(B)(6) TESTIMONY AND REPEATED REPRESENTATIONS THAT ITS RATE-SETTING PROCESS WAS CONSISTENT THROUGHOUT THE CLASS PERIOD

Plaintiff respectfully asks the Court to preclude any evidence or testimony contradicting XOOM's prior admissions that its rates were determined by a uniform process throughout the Class period.  Plaintiff seeks this relief because despite XOOM consistently maintaining that its rate-setting process had always been uniform, it refused Plaintiff's proposed stipulation to that effect.  Instead, it appears that XOOM plans to devote 35 trial days and offer over 1,000 exhibits in an effort to paint an entirely new picture of its rate-setting process, thereby relitigating the Court's class certification decision and making the trial unmanageable.

Throughout discovery and in its summary judgment and class certification briefing, XOOM consistently and accurately represented that its rate-setting process was uniform throughout the Class period.  For example, in opposing class certification, XOOM argued that "*without exception*" its variable rates were "*always determined*" by the same process.  ECF 134, Class Opp'n at 12 (emphases added).  XOOM's witnesses confirmed this.  Jason Loehde, whose testimony binds XOOM as its Rule 30(b)(6) designee,[15] was particularly clear: "Q: [D]id XOOM's methodology and practice for setting rates for its New York variable rate customers change over time since 2013?  A: *It has not changed at all over time*."  Ex. A, XOOM 30(b)(6) Tr. 20:5–10 (emphasis added).  When asked about XOOM's February 2016 change in contract language to allow variable rates based on "pricing strategies," Loehde testified that "[t]his change in language had no difference, no bearing on how we estimated our supply cost to our customer and how we

---

[15] *Goldberger Co., LLC v. Uneeda Doll Co., Ltd.*, No. 16 Civ. 4630 (AJP), 2017 WL 3098110, at *8 (S.D.N.Y. July 21, 2017) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity." (quoting *Sabre v. First Dominion Capital, LLC*, No. 01 Civ. 2145 (BSJ) (HBP), 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001))).

priced our products" and "[n]othing in the way we calculate estimated and actual supply costs and our pricing strategies has ever changed as a result of the language change." *Id.* at 134:2–135:15. Loehde left no room for doubt.

Based on XOOM's prior binding testimony and representations about the undisputed facts, the Court recognized that XOOM's rate-setting process was consistent: "XOOM's breach of contract defense relies on common proof—evidence of XOOM's process for determining the variable rate margin." Class Order at 10; MSJ Order at 4–6 (citing Defs.' 56.1 to describe this uniform process). In other words, because XOOM set all rates in the same manner, its unorthodox claim that its fluctuating margins were due to permissible additional supply costs hidden therein is common to all Class Members.

But now, as the case is heading to trial, XOOM is laying the groundwork for complete course reversal. The Court should not permit it to do so. Indeed, if XOOM had a problem with its own 30(b)(6) testimony—given by the employee in charge of the very rate-setting functions he testified about on XOOM's behalf—it should have corrected any supposed errors long ago. It did not. Thus, XOOM should be precluded at trial from contradicting its own Rule 30(b)(6) testimony, as well its prior representations to the Court, pursuant to Rule 37. *See Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 268–69 (2d Cir. 1999) (affirming trial court's exclusion of witnesses intended to contradict 30(b)(6) testimony pursuant to Rule 37).

Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), that party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 37's purpose is to avoid surprise or trial by ambush. *See, e.g.*, *Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 911 F. Supp. 76, 79-80 (E.D.N.Y. 1996).

34

This Court has "broad discretion in deciding whether and how to fashion a sanction pursuant to Rule 37." *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 68 (E.D.N.Y. 2012).  In determining whether to exclude evidence under Rule 37, courts consider: (1) the party's explanation for the failure to comply with its disclosure obligations; (2) the importance of the evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new information; and (4) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (quotation omitted).

Here, XOOM is seeking to present a completely new factual theory at trial that (1) was never disclosed during discovery, and (2) contradicts everything XOOM has said on the subject throughout the case.  If there were any truth to XOOM's new story about how it set its variable rates and margins during the Class period, there is no conceivable excuse for its failure to disclose it to Plaintiff or its own expert during discovery, and even less excuse for making contradictory representations to the Court on the prior motions.  XOOM's rate-setting procedures have always been a central issue in this case, making its inexcusable failure to disclose this new story earlier in the case highly prejudicial.  And a continuance would require reopening discovery and going back to square one on a key aspect of the case after more than six years of litigation, intensive discovery, expert reports, summary judgment and class certification motions, and now extensive efforts to prepare this case for trial.

Indeed, in these circumstances "[p]reclusion is 'automatic' unless the non-disclosure was substantially justified or harmless, or unless the district court in its discretion chooses an alternative sanction as provided in Rule 37(c)(1)." *24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 566 F. Supp. 2d 305, 318 (S.D.N.Y. 2008).  Accordingly, courts routinely exclude new factual theories offered after discovery has closed. *See, e.g.*, *id.* (excluding new theory "not disclosed until a few months

before trial, well after the close of discovery"); *Irish v. Tropical Emerald LLC*, No. 18 Civ. 82 (PKC) (SJB), 2021 WL 5899048, at *5 (E.D.N.Y. Dec. 14, 2021) (striking a new defense theory and finding the defendants' conduct "patently improper and unfair" where "Defendants failed to disclose [a declaration with a new factual theory] prior to fact discovery being closed"); *Erazo v. SCM Grp. N. Am.*, No. 16 Civ. 2386 (RRM) (RER), 2019 WL 1044365, at *17 (E.D.N.Y. Mar. 5, 2019) (disallowing a party to "introduce this evidence or to advance these entirely new theories at this late date").

Up to the eve of trial, XOOM has clearly and unequivocally maintained that its rate-setting procedures were consistent and uniform.  At no point did XOOM or its witnesses claim or detail some secret, undocumented process by which a "proportionate" and fixed margin complying with its contractual obligations was padded with equally secret and undocumented additional supply costs.  Even today, XOOM has not disclosed even the most basic information about this process, including (1) how it worked, and specifically how XOOM calculated how these supposed supply costs impacted its otherwise fixed (and secret) margin; (2) who carried it out; and (3) which specific supply costs that are not contained in XOOM's rate-setting workbooks were used in that process.  Yet XOOM claims that it needs 35 trial days and some 1,000 exhibits to tell this story.  That approach to litigation is the very definition of trial by ambush and XOOM should be held to the binding testimony of its corporate representative and the claims it made to Your Honor.

## IV.    MOTION *IN LIMINE* NO. 4:   XOOM SHOULD BE PRECLUDED FROM CLAIMING THAT THE UNIFORM PRICING TERM PERMITS FLUCTUATING MARGINS FOR DIFFERENT PRODUCT TYPES, IN DIFFERENT UTILITY ZONES, AND IN DIFFERENT MONTHS

The Court should preclude any evidence or argument suggesting that XOOM was contractually permitted to reap different margins for different products—*i.e.*, electricity, natural gas, or so-called "green" electricity—for different utility zones, or for different months.  Such

arguments are plainly barred by the Court's binding contract construction.  Nevertheless, XOOM's proposed jury instructions include that "[t]he costs and *margins* for each month need not be the same for each utility zone or product, and the costs and *margins* need not be the same for each month."  ECF No. 210-9, Defs.' Proposed Jury Instructions at 11 (emphasis added).

At summary judgment, the Court held that XOOM's margins could not vary between products, utility zones, or months, holding "that the contract required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs."  MSJ Order at 14. Although XOOM could add a margin, it must be fixed and "reasonable," and "proportionate . . . to the supply costs over time."  *Id.* at 12–13; Class Order at 3, 14.  At class certification, the Court rejected XOOM's argument that customers who purchased different products should be treated differently.  Instead, the Court held that "there is no question that the form contract contained identical language for electric and natural gas customers."  Class Order at 16.  The Court also noted that "XOOM does not claim that it used a different rate-setting process for its electric and natural gas customers."  *Id.*  The Court's contract construction completely forecloses XOOM's argument that margins—all governed by contracts with identical pricing language—could vary across products, utility zones, and over time.[16]

---

[16] With respect to "green" electricity, XOOM now claims that separate markets exist for "green" and "standard" electricity and that "customers are often willing to pay a premium" for green energy.  ECF 197, Decert. Br. at 17.  What XOOM believes customers may be "willing to pay" is irrelevant.  The only relevant question is what the contract allowed XOOM to charge—and the Court's binding contract construction does not distinguish between "green" and "standard" electricity because the contract itself contains no such distinction.  Further, customers who purchased XOOM's "green" electricity used the exact same "brown" electricity as XOOM's other customers.  The only difference is that for "green" electricity XOOM purchased and paired renewable energy credits with these customers' "brown" electricity—the cost of those credits is reflected in the workbooks as supply costs. Ex. A, XOOM 30(b)(6) Tr. at 190:6–191:8.  Thus, a "green" premium is already incorporated into XOOM's supply costs.  Further, XOOM's "green" customers "comprise a tiny percentage of the Class, 0.1% of the account numbers reflected in XOOM's data that consumed only 0.1% of the total electricity XOOM sold to the Class."  Ex. E, Pl.'s Am. Expert Rep. at 20 n.49.  Accordingly, even if evidence regarding customers' supposed willingness to pay a premium for "green" products was relevant (it is not), XOOM's only purpose for introducing such evidence would be to confuse the issues and to mislead the jury, which is impermissible under Rule 403.

Because Plaintiff's and all Class Members' claims are based on an identical pricing term that is subject to the Court's "proportionate-margin construction," there is no permissible basis for XOOM to ask the jury to allow varying margins by product, utility zone, or month. *See Disability Advocs., Inc. v. Paterson*, No. 03 Civ. 3209 (NGG) (MDG), 2009 WL 1312112, at *2 (E.D.N.Y. May 8, 2009) (granting motion to exclude from trial issues that had been previously decided by court). Instead, Plaintiff's and the Class's rates must "be determined solely by XOOM's" supply costs. MSJ Order at 14. Any suggestion otherwise is contrary to the law of the case, has no probative value, and is subject to exclusion under Rules 401 and 402. Further, even if the Court were to find it minimally probative with respect to green energy, this evidence would nevertheless create inevitable confusion and waste valuable trial time, rendering it inadmissible under Rule 403.

## V.    MOTION *IN LIMINE* NO. 5:    XOOM SHOULD BE BARRED FROM INTRODUCING EVIDENCE OF ITS SUBJECTIVE SUPPLY COST CONSIDERATIONS

This breach of contract case arises from the non-negotiable form contract XOOM drafted. At summary judgment, the Court determined that XOOM's variable rates must be calculated based on a specific, cost-plus formula: (1) "the contract required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs," MSJ Order at 14; and (2) while XOOM was entitled to add a "proportionate" and "reasonable" margin to its workbooks' COGS figure, any variation in Class rates must "be determined by XOOM's actual and estimated supply costs—and *only* those costs," *id.* at 12 (emphasis added). This Court and the Second Circuit further held that XOOM's contract affords it no rate-setting discretion. *Id.* at 10, 14; *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023).

XOOM does not (and cannot) dispute the Court's cost-plus construction. For example, in recent court filings XOOM has repeatedly represented that the "Court's contract construction

requires" a rate calculation of "**COSTS**" "plus" "**MARGIN**" that yields "What XOOM Should Have Charged."  ECF 212, Decert. Reply at 7; *see also* ECF 197, Decert. Br. at 3, 6, 12 (same).

Nevertheless, XOOM continues to misleadingly argue that its rate-setting complied with the contract because it "***considered***" its supply costs when setting rates or because supply costs "***affected***" XOOM's ultimate rates.  *See, e.g.,* ECF 212, Decert. Reply at 1–2 (emphasis added). However, the contract does not permit mere consideration of supply costs or for costs to merely affect the ultimate rates; under the Court's controlling reading, XOOM's variable rates must have been "determined solely by" its supply costs.  MSJ Order at 14.  Any subjective consideration of supply costs is irrelevant—indeed, it is proof of XOOM's breach.  XOOM's purpose is to use this latest semantic dodge in an effort to evade the Court's definitive declaration of its contractual obligations.  The Court should thus preclude any suggestion that XOOM adequately performed the contract when it subjectively "considered" its supply costs or because those costs "affected" XOOM's ultimate rates.

The Court's contract construction is clear that XOOM was required to charge a rate that equaled its supply costs plus a reasonable, fixed margin.  MSJ Order at 13–14.  This calculation (supply costs + fixed margin = rate) does not permit any rate-setting discretion.  And if this Court's repeated rulings left any room for doubt, the Second Circuit recently singled out XOOM's contract as an "agreement [that] did not describe the monthly variable rate as being set according to the ESCO's discretion." *Martinez*, 88 F.4th at 411.  XOOM does not disagree.  It has taken to including an image in its briefing illustrating how objective and straightforward this calculation is:



*See, e.g.*, ECF 197, Decert. Br. at 3.  Nevertheless, XOOM persists in claiming that it could set rates based on subjective considerations (emphases added):

- "[E]ach rate was set at monthly meetings that *considered* estimated future supply costs and actual past supply costs. . . ." Defs.' Reply in Support of Motion for Leave to File a Reply in Support of Rule 23(f) Petition, No. 23-1267, ECF 36 at 3.

- "[R]ates were set through an iterative process that took voluminous supply cost data from a variety of sources which was then *considered* by a number of people *who applied their judgment* to analyze and weigh it in ways that differed each month based on estimates about the coming month (*i.e.*, estimated supply costs) and adjustments for prior ones (*i.e.*, actual supply costs)."  ECF 168, Defs.' Br. in Support of Mot. to Stay ("Defs.' Stay Br.") at 2.

- "The certified class now encompasses thousands of rate-setting decisions, each with unique supply costs and *varying considerations*."  *Id.* at 5.

- XOOM's workbooks "do not reflect the actual supply costs that XOOM was entitled to, and did, *consider*, including prior period adjustments."  *Id.* at 8.

- "XOOM's supply cost *considerations are complex*."  *Id.*

- "'Prior period adjustments' simply refers to the commonplace practice of *considering differences* between what costs were previously estimated and what they turned out to be . . . ." *Id.* at 9 n.2.

- "[T]he Court has acknowledged there is ample testimony that *XOOM considered its actual costs*."  Decert. Br. at 2.

- "Actual costs were required to be a basis for those rates.  And they were—*but not in the same way at all times*."  *Id.* at 3.

- "[R]ates were set based on *different supply cost considerations* each month."  *Id.* at 17.

40

- "XOOM tracked and **considered actual supply costs**—month by month, and sometimes product by product and even zone by zone. Hundreds of documents show XOOM's **analysis and consideration of its actual supply costs**, including prior period adjustments and balancing costs." *Id.* at 22.

- "**The rates were not set by a mathematical formula**; instead, XOOM permissibly set rates **based on its consideration of actual supply costs** including prior period adjustments and balancing." *Id.* at 24.

- "[T]he variances between estimated costs and actual supply costs **were considered when XOOM set rates** for upcoming months." *Id.* at 28.

Because XOOM's subjective discretion plays absolutely no part in the contract's rate-setting

equation, XOOM should be barred from discussing its "consideration" of supply costs at trial. For

the same reason, any such evidence is irrelevant to the determination of whether XOOM's rates

were "determined solely by" its supply costs. MSJ Order at 14.

In short, XOOM should be prohibited from asking the jury, directly or indirectly, to adopt

a reading of the contract that is contrary to the Court's definitive construction. *See Sioux Steel*

*Co. v. Prairie Land Mill Wright Servs.*, No. 16 Civ. 2212, 2022 WL 17082541, at *3 (N.D. Ill. Nov.

18, 2022) ("Plaintiff's motion [in limine] is granted as agreed to the extent it seeks to bar

Defendants from relitigating this Court's rulings on claim construction or eliciting testimony that

contradicts this Court's rulings" because "a court's claim construction is law of the case for

purposes of trial and . . . no party may contradict the court's construction to a jury[.]" (citation

omitted)).

Any evidence that XOOM complied with its contract because it subjectively "considered"

supply costs or that its rate-setting process resulted in rates that were merely "affected" by supply

costs is therefore irrelevant under Rules 401 and 402. Moreover, any (nonexistent) probative value

of such evidence is substantially outweighed by unfair prejudice to Plaintiff, confusion of the

issues, misleading the jury, and waste of time and therefore inadmissible under Rule 403. *See,*

*e.g.*, *Hosbrook v. Ethicon, Inc.*, No. 20 Civ. 88, 2021 WL 4452289, at *8 (S.D. Ohio Sept. 29,

2021) (granting motion *in limine* to preclude evidence that is "excluded under the law of the case doctrine and is also not relevant pursuant to Fed. Rule 401").

Accordingly, the Court should exclude all evidence and any argument regarding XOOM's subjective considerations, discretion, and analysis of supply costs, or such costs merely "affecting" XOOM's variable rates.   Likewise, the Court should instruct the jury that XOOM had no rate-setting discretion and that the rates XOOM charged New Yorkers must have been "determined solely by" a calculation resulting from the addition of a fixed, reasonable margin to XOOM's documented supply costs.  MSJ Order at 14.

## VI.    MOTION *IN LIMINE* NO. 6: XOOM SHOULD BE PRECLUDED FROM CLAIMING THE CONTRACT ALLOWS MARKET-BASED COMPENSATION TO BE INCLUDED AS AN ADDITIONAL RATE COMPONENT

XOOM proposes to instruct the jury to include "market-based compensation" in each variable rate "either by including that compensation as a component of the costs or margin [the jury uses] to determine the rate the contract required." Defs.' Proposed Jury Instructions at 11 (Instruction II.C).  But the Court expressly rejected this exact same attempt to modify the contract's pricing term at summary judgment and the Court's contract construction forecloses XOOM's claim.

The contract's pricing term, through which XOOM promised to set variable rates "based on" its "actual and estimated supply costs," appears prominently on the contract's first page. Conversely, the "Agency" provision that mentions "market-based compensation" is tucked away in the middle of page two and concerns the appointment of XOOM as the customer's agent for acquiring electricity.   MSJ Order at 3.  That provision states that "market-based compensation" is "included in the price noted above."  *Id.*

At summary judgment, XOOM claimed the Agency provision allowed it to add fluctuating margins to its workbooks' COGS figure on account of the contract's reference to "market-based compensation."  *Id.* at 13.  The Court disagreed, holding that XOOM's receipt of compensation

42

for its "role in the procurement and delivery of electricity" was "entirely compatible with the proportionate-margin construction, which allows a margin so long as it is not untethered to the actual and estimated supply costs." *Id.* After expressly considering the contract's Agency provision, the Court held that "the contract required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs." *Id.* at 14. Thus, any "market-based compensation" is already included in the cost-plus formula delineated by the Court at summary judgment. Any consideration of "market-based compensation" is irrelevant to whether XOOM's rates were set in compliance with the Court's proportionate-margin construction, would be an invalid revision to the Court's contract construction, and any discussion of "market-based compensation" will only confuse the jury.

Contract construction is a point of law, and the Court's construction is the law of the case. *Sioux Steel Co.*, 2022 WL 17082541, at *3; *Hosbrook*, 2021 WL 4452289, at *8. XOOM should be barred from confusing and misleading the jury by invoking the "market-based compensation" term. Such evidence is irrelevant and should be excluded under Rules 402 and 403.

## VII. MOTION *IN LIMINE* NO. 7:  XOOM SHOULD BE PRECLUDED FROM ATTACKING AND DISREGARDING THE COURT'S RULE 23 FINDINGS

The question of Rule 23 compliance is for the Court, not the jury. The Court has made its Rule 23 determination and XOOM should adhere to the Court's Class Order. The Court should accordingly exclude from trial any evidence or argument that would have the jury either (1) reevaluate the Court's Rule 23 findings, or (2) try this case as a series of mini-trials. Plaintiff seeks this relief because XOOM is proposing to put settled Rule 23 issues in front of the jury and is ignoring the Court's Class Order. For example, one of XOOM's proposed jury instructions asks the jury to "determine monthly costs and margins for each residential and small commercial XOOM variable-rate product (including every gas and electricity product) for each of the utilities

served by XOOM in New York since January 1, 2013."   ECF 210-9, Defs.' Proposed Jury Instructions at 11 (Instruction II.C).  This instruction is based on the false premise that—although the pricing term was the same—XOOM was contractually permitted to assess different margins for different products, customer classes, and utility zones.  The Court rejected this typicality argument at class certification and XOOM should not be permitted to revive it at trial.  Class Order at 15–16.  Moreover, XOOM has repeatedly admitted that its rate-setting process for **all** Class Members was consistent throughout the Class period.  The Court's Rule 23 findings are not for the jury to second-guess, are patently irrelevant to the jury's task, and if put forward, would only confuse and mislead the jury.

XOOM's proposed jury instructions also disregard the Court's Rule 23 finding that the jury's determination will turn on its assessment of "how XOOM in fact set its rates," which the Court's certification order made clear could be decided in "one stroke."  Class Order at 13; *see also id.* (observing that the jury could find that: (1) XOOM was not permitted to incorporate supply costs into its margins; or (2) even if it was, it did not in fact do so; or (3) even if it did so, the margin adjustments unfolded in a way that violated the contract (citing MSJ Order at 17)).  The facts surrounding "how XOOM in fact set its rates" were adduced in discovery and few disputes remain.   XOOM cannot now charge the jury with evaluating thousands of individual (discretionary) rate-setting decisions.

"To certify a class, a district court must make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (cleaned up).  "Rule 23 issues, including those of a Class Representative or predominance are issues of law for the Court, not the jury."  *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, No. 10 Civ. 4372, 2014 WL

12610207, at *4 (D. Minn. Apr. 3, 2014) (granting plaintiff's motion to preclude argument on Rule 23 factors at trial).[17]

Indeed, XOOM's proposal to have the jury assess Rule 23 compliance ignores the most basic precept that will govern this trial: "The judge decides questions of law; the jury, questions of fact." *Sparf v. United States*, 156 U.S. 51, 89 (1895).  Applying this indisputable principle, the Second Circuit has explained that courts should exclude evidence that is "is likely to confuse a jury on the distinction between questions of law, which are for the court to decide, and questions of fact, which are for the jury." *United States v. Weber*, 843 F. App'x 364, 366 (2d Cir. 2021) (quoting *United States v. Kraeger*, 711 F.2d 6, 7 (2d Cir. 1983) (per curiam)).

The Court should thus exclude as irrelevant under Rules 401 and 402 any argument or evidence that would have the jury effectively reassess or disregard the Court's Rule 23 findings. This includes, at minimum, purported differences in the rate-setting process for different utility zones or products, discrete monthly rate-setting decisions, differences in the operative contracts governing Class Member purchases, the purported need to decide the merits of Class Members' claims individually, or the inadequacy of Ms. Mirkin or Class counsel.  This Court has already found that this case can be adjudicated on a class basis.  Dissatisfied, XOOM filed an unsuccessful Rule 23(f) petition to appeal the Class Order.  *See* ECF 174, Order Denying Defs.' Rule 23(f) Pet. Now pending before the Court is Defendants' untimely motion for reconsideration repackaged as

---

[17] *See also Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1204 (D.N.M. 2016) (precluding expert evidence going to Rule 23 factors at class certification because "whether the case meets [R]ule 23's class certification requirements is an issue for the Court to decide").  This is because "complex procedural proceedings, such as those undertaken at the Rule 23 class certification stage, pose a significant risk of juror confusion."  *Shamblin v. Obama for Am.*, No. 13 Civ. 2428, 2015 WL 4250528, at *2 (M.D. Fla. July 13, 2015) (internal citation omitted); *see also Gomez v. Tyson Foods, Inc.*, No. 08 Civ. 21, 2013 WL 991494, at *2 (D. Neb. Mar. 13, 2013) ("The court finds that [defendant] should not be allowed to raise issues regarding Rule 23 certification that have been determined as a matter of law.").

a motion for decertification.  ECF 194, Defs.' Mot. for Decert.  Once decided, this Court and the Second Circuit will have ruled three times on the Rule 23 questions.

XOOM should not get a fourth bite at the apple by trying to turn the Class trial into a series of mini-trials.  The jury's role is to decide whether XOOM's largely undisputed and uniform rate-setting process complied with its contractual obligations, and if not, to determine damages. Evidence and argument going to, for example, why XOOM decided to charge a higher or lower variable rate in any given month does not bear on the issues within the jury's province.  Rather, to the extent evidence of monthly rate-setting decisions is shown to the jury, it should be for the limited purpose of illustrating "how XOOM in fact set its rates," which can be decided in "one stroke."  Class Order at 13

The Court should not countenance Defendants' attempt to overturn the Court's Rule 23 determinations via the jury.  The Court construed the contract to require rates be set by a simple formula (supply costs plus a fixed reasonable margin) with no room for discretion or variation, and XOOM cannot now argue that its rate-setting process varied across utility zones, products, or Class Members or that its margins could vary accordingly.  Similarly, XOOM cannot argue that the jury should evaluate each of XOOM's monthly rate-setting decisions and each resulting monthly rate.  Thus, the Court should find all evidence and argument that would reargue or undo the Class Order inadmissible as irrelevant under Rules 401 and 402.

Moreover, even if the Court finds there is some limited probative value to this evidence, it is nevertheless inadmissible pursuant to Rule 403, because evidence regarding already decided Rule 23 factors would confuse the issues, unfairly prejudice the Class, likely mislead the jury, and waste time.  *Cf. Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17 Civ. 8457 (JMF), 2024 WL 1208778, at *3 (S.D.N.Y. Mar. 21, 2024) ("To the extent that Class-Representative-specific evidence has

some slight relevance to the issue of materiality, such evidence has little, if any, probative value, and that value is greatly outweighed by the potential for jury confusion." (quotation omitted)). This is particularly true here, where XOOM is requesting seven weeks to present its case-in-chief, a thinly veiled attempt to try this class action as a series of individual, discretionary rate-setting decisions.[18]  *See id.* at *3 n.3 ("The probative value of such evidence with respect to adequacy and typicality would be substantially outweighed by the dangers of jury confusion and undue prejudice to the class.").  And most problematically, it flouts the Class Order and seeks to improperly task the jury with determining questions of law.  Accordingly, the Court should exclude all argument and evidence that disregards or seeks to relitigate the Class Order.

## VIII.   MOTION *IN LIMINE* NO. 8:   XOOM SHOULD BE PRECLUDED FROM PRESENTING NEEDLESSLY CUMULATIVE TESTIMONY

Plaintiff seeks to preclude XOOM from presenting needlessly cumulative testimony in an effort to confuse and exhaust the jury and the Court.  Plaintiff seeks this relief because XOOM has threatened to turn this straightforward trial into a mire of thousands of monthly rate-setting decisions.  *See, e.g.*, ECF 197, Decert. Br. at 23.  XOOM's stratagem should be rejected pursuant to Rule 403.

XOOM's plan is as transparent as it is improper.  Even though the trial concerns a simple breach of contract claim focused on how XOOM set its rates and the appropriate fixed margin (Class Order at 13), XOOM seeks **35 court days** for its case in chief, ECF 210, PTO at 5, and has designated over 2,700 exhibits, ECF 210-5, Joint Ex. List; ECF 210-7, Defs.' Ex. List.  Yet, as the Court has already held, this case turns on a form contract that required XOOM's rates to be set based on its "actual and estimated supply costs—and only those costs," MSJ Order at 12, to which

---

[18] Plaintiff's motions *in limine* nos. 1–4, 8, 14–17, 17 also address XOOM's revealed strategy of attempting to make this case untriable.

XOOM could add a fixed, reasonable margin, *id.* at 12–13; Class Order at 3, 13–14.  XOOM used the same rate-setting procedure throughout the Class period and has raised the curious defense that despite its workbooks' detailed cost calculations, XOOM inexplicably hid additional costs in its variable rate margins.  MSJ Order at 16 (noting XOOM's claim that "the Total Cost or COGS number does not constitute its 'actual and estimated supply costs' because some of its supply costs—such as prior period adjustments—are incorporated in the margin").

As explained in detail above, given the limited nature of the remaining issues for trial, that XOOM's newly concocted defense should be precluded under Rule 37, and the uniformity of the controlling contractual provisions, there is no justification for devoting 35 trial days to XOOM's defense.  The truth is that XOOM seeks to present a parade of witnesses to testify regarding individual rate-setting decisions (such "decisions" are barred by the Court's contract construction).

For these reasons, the Court should preclude XOOM from attempting to present needless cumulative evidence, undue delay, time wasting, and confusing the issues.  *See, e.g.*, *Stratton v. Thompson/Ctr. Arms, Inc.*, 608 F. Supp. 3d 1079, 1091 (D. Utah 2022) (observing that "it is true that a party may not elicit the same testimony on the same subject from multiple witnesses").  At minimum, the Court should require a clear and specific offer of proof from XOOM showing that its proposed trial presentation is necessary and appropriate rather than an attempt at a filibuster.

IX.    **MOTION *IN LIMINE* NO. 9:  PLAINTIFF SHOULD BE PERMITTED TO USE XOOM WITNESSES' DEPOSITION TRANSCRIPTS AND OTHER ADMISSIONS IN HER CASE-IN-CHIEF**

Plaintiff respectfully seeks a pre-trial ruling that Plaintiff is permitted to offer admissions by XOOM using relevant portions of deposition transcripts from the depositions of former and current XOOM employees Thomas L. Ulry, Andrew Coppola, Troy Chidester, Ryan Park, Patricia Kulesa, and Jason Loehde, in both his individual and corporate representative capacities, as well

as XOOM's expert David Coleman.[19]  XOOM attended those depositions and had the opportunity to cross-examine the witnesses at that time,[20] but has objected "to the use of deposition testimony from any witness who is available for trial, other than for the purpose of impeachment," relying on Fed. R. Civ. P. 32(a)(4).[21]  ECF 210-3, Pl.'s Dep. Designations at 29.  Plaintiff also intends to use at trial other XOOM admissions, such as those in its Local Rule 56.1 Statement, ECF 146-25, and in other filings with the Court.[22]

XOOM's objection fails for several reasons.  First, "the issue of availability is entirely irrelevant under Rule 32(a)(3)(B),[23] which plainly entitles plaintiff to offer deposition designations of any witness, whether available or not, who 'is at a greater distance than 100 miles from the place of trial.'"  *Chum Ltd. v. Lisowski*, No. 98 Civ. 5060, 2001 WL 1164664, at *1 (S.D.N.Y. Oct. 2, 2001) (denying objection to deposition designations for available witnesses).  Here, the seven deponents reside in North Carolina, South Carolina, Massachusetts, or Texas, *i.e.*, outside of the 100-mile radius.[24]

---

[19] The admissibility of Mr. Coleman's deposition testimony is further discussed in Plaintiff's separately filed motion *in limine* to exclude his expert testimony.

[20] With respect to Mr. Ulry's testimony from a separate litigation in Maryland that XOOM produced in discovery of this matter, XOOM's defense counsel in that case was present and had the opportunity to cross-examine him.

[21] Plaintiff assumes that XOOM's actual citation to "Fed. R. Evid. 32(a)(4)," rather than Fed. R. Civ. P 32(a)(4), is simply an error.

[22] Plaintiff does not intend to offer those documents as exhibits, but to instead read the relevant portions as XOOM's admissions.  Plaintiff will provide XOOM with a list of the admissions and the source document from which each admission comes well in advance of trial.

[23] Subsequent to this decision, the numbering of the provision cited in this case, Fed. R. Civ. P. 32(a)(3)(B), was changed to Fed. R. Civ. P. 32(a)(4)(B).

[24] *See* ECF 210-2, Defendants' Witness List (XOOM listing residences of Loehde, Coppola, Ulry, and Chidester in North Carolina, Park in Texas, and Coleman in Massachusetts); *see also* ECF 210-1, Plaintiff's Witness List (listing Kulesa's last known address in South Carolina).

Second, Fed. R. Civ. P. 32(a)(1) permits a party's use of a deposition "for any . . . purpose permitted by the Federal Rules of Evidence."  Consequently, "[n]umerous courts have held that depositions can be allowed under this rule as long as they satisfy Federal Rule of Evidence 801." *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. 06 Civ. 4262, 2009 WL 10679721, at *1 (E.D. La. Aug. 4, 2009) (citing cases); *see also Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 560 F. Supp. 2d 227, 310 (W.D.N.Y. 2008), *judgment entered*, No. 02 Civ. 6564, 2008 WL 5115252 (W.D.N.Y. Dec. 4, 2008), and *aff'd*, 351 F. App'x 441 (Fed. Cir. 2009) ("[Rule 32] permits the substantive admission of depositions which fall within the ambit of Fed. R. Evid. 801(d)(2) irrespective of whether the deponent is available to testify at trial."  (citing cases)).

Here, the testimonies of Ulry, Coppola, Chidester, Park, Kulesa, and Loehde are admissible pursuant to Fed. R. Evid. 801(d)(2).  The testimony of Jason Loehde, XOOM's 30(b)(6) witness, is admissible as a statement "made by the party in an individual or representative capacity," within the meaning of Rule 801(d)(2)(A).  Messrs. Ulry, Coppola, Park, Loehde (in his individual capacity), and Ms. Kulesa are all current or former XOOM executives testifying about matters within the scope of their duties at XOOM, while Mr. Chidester is a former XOOM employee whose duties included rate-setting, which he testified about at deposition.  Mr. Coleman, the expert XOOM retained to opine on the propriety of its rate-setting practices, reviewed the materials XOOM provided him (which included much of the XOOM witness testimony listed above) and testified about XOOM's practices at his deposition.

The deposition testimony from these XOOM executives, designated representative, employees and agents are admissible as admissions by XOOM on multiple independent grounds: (1) as statements from persons whom XOOM "authorized to make a statement on the subject" within the meaning of Rule 801(d)(2)(C); (2) as statements "made by the party's agent or employee

on a matter within the scope of that relationship and while it existed," pursuant to Rule 801(d)(2)(E); and (3) as statements that "the party manifested that it adopted or believed to be true" within the meaning of Rule 801(d)(2)(B).  XOOM's citation to their testimony in connection with a prior motion, and with respect to Mr. Loehde, XOOM's submission of a declaration from him in support of a prior motion, *see* ECF 195, Decl. of Jason Loehde, plainly show that XOOM "adopted [it] of believed [it] to be true."  Further, XOOM gave its expert witness the deposition transcripts of Messrs. Loehde, Park, Coppola, and Chidester, *see* ECF 146-5, Expert Report of David Coleman ("Coleman Report") at 63 (Ex. DCC-4), to inform his assessment of XOOM's rate-setting practices.  Mr. Coleman relied on this testimony.  *Id.* at 20–21.  In providing this testimony to its expert, XOOM further adopted it for purposes of Rule 801.  *See Lear Auto. Dearborn, Inc. v. Johnson Controls, Inc.*, 789 F. Supp. 2d 777, 785 (E.D. Mich. 2011) (materials provided to expert were adoptive admissions under Rule 801(d)(2)(B)); *cf. In re Gen. Motors LLC*, No. 14 MDL 2543 (JMF), 2015 WL 8578945, at *4 (S.D.N.Y. Dec. 9, 2015) (materials relied on by CEO in congressional testimony were adoptive admissions under Rule 801(d)(2)(B))

Alternatively, the deposition testimony by these witnesses "is also admissible under FRCP 32(a)(2) because Plaintiff[] seek[s] to offer the testimony against Defendants, a purpose that is 'allowed by the [Federal Rules of Evidence].'"  *J.S.X. through D.S.X. v. Foxhoven*, No. 17 Civ. 417, 2019 WL 13167146, at *3 (S.D. Iowa May 23, 2019).

Third, Fed. R. Civ. P. 32(a)(3) permits an adverse party to use "for any purpose" the deposition of anyone who when deposed was the party's officer, director, managing agent or Rule 30(b)(6) designee.  Accordingly, the rule expressly permits the designation of the deposition transcripts of at least Mr. Loehde, who was designated as XOOM's 30(b)(6) witness.

Finally, Rule 32(a)(4)(e) permits the use of a deposition, whether of a party or non-party, "for any purpose" if the Court finds on "motion and notice, that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live testimony in open court—to permit the deposition to be used." Here, XOOM "[c]learly . . . had notice that deposition testimony was to be used, because the Pre–Trial Order expressly provided for designation, counter-designation and objections to designated deposition testimony. Thus, there was both application and notice." *Eastman Kodak*, 560 F. Supp. 2d at 311–12. Moreover, "the deposition excerpts are not offered to the exclusion of live testimony but as a supplement to live testimony in order to shorten the trial time." *Id.* (overruling objection to designation of available witness' deposition testimony). Indeed, courts routinely permit the designation of deposition testimony "due to cost considerations" or "a desire not to waste trial time." *Id.* at 312; *see also Borchardt v. United States*, 133 F.R.D. 547, 548 (E.D. Wis. 1991) (permitting deposition designations in lieu of live testimony in view of court's "prefer[ence] to use the most cost-effective method of providing the facts to the fact-finder whenever possible"); *SCM Corp. v. Xerox Corp.*, 76 F.R.D. 214, 216 (D. Conn. 1977) (permitting deposition designations and noting that the trial length can serve as an 'exceptional circumstance' justifying such use).

## X.   MOTION *IN LIMINE* NO. 10:   PLAINTIFF'S EXPERT SHOULD BE PERMITTED TO TESTIFY TWICE

Allowing Plaintiff's energy economist to testify twice during Plaintiff's case-in-chief promotes efficiency and will educate the jury on the issues it will hear during trial. The inner workings of the wholesale energy market and the specific role of ESCOs within that market are not widely understood by the general public. Plaintiff thus intends to call her expert twice: initially to provide background on New York's wholesale and retail energy markets and relevant regulatory

activity, and later to testify about his opinions relating to XOOM's rate-setting and to present his damages model.  This is the most efficient way to proceed and it does not prejudice XOOM.

To streamline the issues for the jury and provide background on the key points of contention at trial, Plaintiff's expert should be permitted to first explain the background and functioning of New York's deregulated energy market, the role of ESCOs within that market, and the regulatory and legislative responses to ESCOs' role in that market over time.  This largely uncontested information will equip the jury to understand the context of the arguments and evidence presented later in the trial.

Once Plaintiff has established specific facts regarding her involvement and XOOM's rate-setting practices, Plaintiff intends to call her expert to testify regarding his opinions relevant to the jury's determination of breach and damages.  This later testimony will focus on how XOOM sets its rates, the margins involved, and the extent to which customers were overcharged.  Staging the expert's testimony in this way allows the jury to take in foundational knowledge before diving into the specifics of the case.  Plaintiff's expert consents to being called to testify twice.

Consistent with Rule 611(a), the Court has "control over the mode and order of examining witnesses."  Courts also routinely allow witnesses to testify twice.  *See, e.g.*, *United States v. Salzano*, No. 22 Cr. 690, 2024 WL 866885, at *19 (D.N.J. Feb. 26, 2024) (granting motion *in limine* to allow expert witness to testify twice during case-in-chief); *United States v. Johnson*, No. 19 Cr. 405, 2024 WL 1486760, at *1 (N.D. Ill. Apr. 5, 2024) ("To streamline the presentation of the issues, Officer Sack may testify twice. . . ."); *United States v. Zakhari*, No. 19 Cr. 208, 2021 WL 4139146, at *8 (W.D. Ky. Sept. 10, 2021) (allowing witness to testify twice, once as an expert and once as a fact witness).

Here, allowing Plaintiff's expert to testify twice streamlines the presentation of evidence bringing the jury up to speed on little-known topics before delving into the specifics of XOOM's conduct.  There is no prejudice to XOOM because it can cross-examine the expert both times.  Therefore, Plaintiff respectfully requests permission to call her expert to testify in two parts.

## XI.   MOTION *IN LIMINE* NO. 11:   XOOM SHOULD BE PRECLUDED FROM OFFERING EVIDENCE REGARDING ITS AFFIRMATIVE DEFENSES BECAUSE THEY FAIL AS A MATTER OF LAW

XOOM should not be allowed to introduce evidence related to irrelevant and insufficient affirmative defenses.  With respect to waiver, estoppel, release, ratification, assumption of risk, accord and satisfaction, voluntary payment, parol evidence, election of remedies, lack of standing, class certification, statute of limitations, and failure to exhaust administrative remedies, XOOM has failed to adduce sufficient evidence in support of one or more elements of those defenses.  With respect to unclean hands, laches, mistake, and the existence of adequate remedy at law, those defenses are equitable, and Plaintiff no longer seeks equitable relief.[25]  Accordingly, these defenses are insufficient as a matter of law.[26]

"The law is clear that a district judge may preclude an affirmative defense by granting a motion *in limine*."  *United States v. Scully*, No. 14 Cr. 208 (ADS), 2015 WL 5826493, at *2 (E.D.N.Y. Oct. 6, 2015)  (citing *United States v. Crown,* 99 Cr. 1044, 2000 WL 35593864 (S.D.N.Y. May 31, 2000), *aff'd,* 12 F. App'x 59 (2d Cir. 2001)); *see also United States v. Sorensen*, 73 F.4th 488, 491 (7th Cir. 2023) ("A court may preclude an affirmative defense by motion *in*

---

[25] Unless specified otherwise North Carolina law governs these defenses because they are substantive.  *See Cobalt Multifamily Invs. I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 434 (S.D.N.Y. 2012) ("[T]he law governing an affirmative defense to a claim is the same as the law governing the claim itself."); *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540–41 (2d Cir. 1997) (same).

[26] XOOM also asserts an offset / mitigation of damages defense.  This is subject to the separate motion *in limine* No. 12 and is therefore not addressed here.  Similarly, Plaintiff addresses the availability of punitive damages in motion *in limine* No. 13.

*limine* if the court accepts as true the evidence proffered by the defendant and finds that that evidence, even if believed, would be insufficient as a matter of law to support the affirmative defense.") (cleaned up). "The sole question presented in such situations is whether the evidence, as described by the defendant, is insufficient as a matter of law to support the proffered defense." *United States v. Aguilar,* 883 F.2d 662, 692 (9th Cir. 1989). Accordingly, a district court "may, and often should, preclude a defendant from introducing evidence of a proposed defense where the defendant cannot establish all elements of that defense." *Sorensen*, 73 F.4th at 491 (citing *United States v. Jackson*, 598 F.3d 340, 349–50 (7th Cir. 2010)).

### A. Release (XOOM's Third Affirmative Defense)

A release is a "formal written statement reciting that the obligor's duty is immediately discharged." *Best v. Ford Motor Co.*, 557 S.E.2d 163, 165 (N.C. Ct. App. 2001) (citing E. Allan Farnsworth, *Contracts* § 4.24 (2d ed.1990)).

XOOM has not produced a single "formal written statement" discharging XOOM's obligations under the Service Agreement. In the absence of a single release, this defense is meritless and XOOM should be precluded from adducing evidence about this defense.

### B. Waiver (XOOM's Third Affirmative Defense)

"A party may waive a contract right by a voluntary and intentional relinquishment of a known right." *Nye v. Lipton*, 273 S.E.2d 313, 317 (N.C. Ct. App. 1980).

None of XOOM's trial evidence suggests that any Class Member waived any right under their respective contracts with XOOM, or more specifically waived the right to be charged only at the contractually permissible rate. Accordingly, evidence of this defense should be precluded "because no reasonable jury could find each element of the defense met." *Duncanson v. Wine & Canvas IP Holdings LLC*, No. 16 Civ. 788, 2019 WL 13176341, at *2 (S.D. Ind. Mar. 19, 2019) (excluding evidence of waiver defense).

### C.  Estoppel (XOOM's Third Affirmative Defense)

"Estoppel prevents a person from showing the truth contrary to a representation of fact made by him after another has relied on the representation."  RESTATEMENT (SECOND) OF CONTRACTS § 90, comment (a).

This doctrine is wholly inapplicable.  None of XOOM's trial evidence indicates that any Class Member made a representation of fact on which XOOM relied.  More specifically, there was nothing a Class Member could have "represented" to XOOM that would have any bearing on that Class Member's right to be charged only the contractually permissible rate.  Accordingly, evidence of this defense should be precluded "because no reasonable jury could find each element of the defense met."  *Duncanson*, 2019 WL 13176341, at *2 (excluding evidence of estoppel defense).

### D.  Unclean Hands (XOOM's Third Affirmative Defense)

This doctrine prevents recovery in equity where the party seeking relief comes to court with unclean hands.  *Ray v. Norris*, 337 S.E.2d 137, 141 (N.C. Ct. App. 1985).  "The maxim applies to the conduct of a party with regard to the specific matter before the court as to which the party seeks equitable relief and does not extend to that party's general character."  *Creech v. Melnik*, 495 S.E.2d 907, 913 (N.C. Ct. App. 1998).  "The clean hands doctrine denies equitable relief only to litigants who have acted in bad faith, or whose conduct has been dishonest, deceitful, fraudulent, unfair, or overreaching in regard to the transaction in controversy."  *Collins v. Davis*, 315 S.E.2d 759, 762 (N.C. Ct. App. 1984), *aff'd*, 312 N.C. 324 (1984).

Unclean hands is a defense to equitable relief and is inapplicable here, where Plaintiff seeks only monetary damages, and XOOM should be precluded from offering evidence in support of this defense.  *See Duncanson*, 2019 WL 13176341, at *2 (excluding unclean hands defense).

56

### E.  Laches (XOOM's Third Affirmative Defense)

"Laches is the negligent omission for an unreasonable time to assert a right enforceable in equity." *Builders Supplies Co. v. Gainey*, 192 S.E.2d 449, 456 (N.C. 1972).  "Laches is an equitable defense and is not available in an action at law." *City-Wide Asphalt Paving, Inc. v. Alamance County*, 513 S.E.2d 335, 338 (N.C. Ct. App. 1999).  XOOM should be precluded from offering any evidence in support of the laches defense.

### F.  Mistake (XOOM's Third Affirmative Defense)

XOOM's mistake defense is both inapplicable and unsupported here.  Mistake is a defect in the formation of the agreement.  *Howell v Waters*, 347 S.E.2d 65, 69 (N.C. Ct. App. 1986) ("The formation of a binding contract may be affected by a mistake.").  Here, the parties have stipulated that "[f]or the contracts included in the Class definition, XOOM does not dispute their validity or enforceability in this action."  ECF 210 at 24.  That stipulation extinguished this defense.

### G.  Assumption of Risk (XOOM's Fourth Affirmative Defense)

Assumption of the risk can act as a defense to breach where one party assumes the risk of performing even if a condition precedent to the counterparty's performance has not occurred.  RESTATEMENT (SECOND) OF CONTRACTS §§ 239 and 267.  XOOM's contract does not include conditions precedent to any party's performance.  Nor has XOOM presented any evidence that its failure to perform was justified by the non-occurrence of a condition.  Accordingly, XOOM should be precluded from introducing any evidence related to this defense.[27]

---

[27] XOOM also includes the language relating to the "direct and proximate cause" of the Class's damages. ECF 210, PTO at 18.  This relates to torts, not contracts.  The assumption of risk defense to a breach of contract action is quite narrow and not applicable here.

### H.  Ratification (XOOM's Fifth Affirmative Defense)

A party may ratify a contract through conduct that binds the party to an otherwise voidable contract.  *See Bobby Floars Toyota, Inc. v. Smith*, 269 S.E.2d 320, 322 (N.C. Ct. App. 1980). Again, the parties stipulated that XOOM's contract is valid and enforceable.  ECF 201 at 24. Ratification is thus inapplicable and any evidence related to it should be precluded.

### I.  Parol Evidence (XOOM's Eighth and Ninth Affirmative Defenses)

The Court has construed the relevant contract provision (finding it unambiguous but vague) and that construction is now the law of the case.  *See generally* MSJ Order.  Parol evidence is thus irrelevant.  This defense should be dismissed.

### J.  Accord and Satisfaction (XOOM's Tenth Affirmative Defense)

"An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty.  Performance of the accord discharges the original duty."  RESTATEMENT (SECOND) OF CONTRACTS § 281.  None of XOOM's trial evidence suggests that any Class Member promised to accept a stated performance in satisfaction of XOOM's original contractual obligations.  XOOM should be precluded from introducing any evidence relating to this defense because it cannot, as a matter of law, establish any of its elements.

### K.  Voluntary Payment (XOOM's Tenth Affirmative Defense)

"A voluntary payment, with a knowledge of all the facts, cannot be recovered back, although there was no debt.  But a payment under a mistake of fact may be."  *Dean v. Mattox*, 108 S.E.2d 541, 545 (N.C. 1959).

Class Members' payments for electricity and gas were not voluntary.  These essential utilities would have been discontinued if customers had not paid their bills.  Moreover, as discussed in Plaintiff's motion *in limine* No. 12 regarding mitigation of damages, because XOOM's rates are set by reference to its internal supply costs, Class Members cannot be charged with knowledge

that XOOM was miscalculating its rates.  Accordingly, XOOM cannot establish the "knowledge of all the facts" element or the "voluntary" element of the voluntary payment defense and should be precluded from introducing evidence concerning this defense.

**L.   Adequate Remedy at Law (XOOM's Thirteenth Affirmative Defense)**

Plaintiff no longer seeks equitable relief, and seeks only remedies at law (*i.e.*, damages). Therefore, defenses that would preclude equitable relief are no longer relevant and XOOM should be precluded from introducing evidence about them.

**M. Election of Remedies (XOOM's Sixteenth Affirmative Defense)**

Because plaintiff is only seeking damages and there has been no prior judgment against Defendants for their breach, the defense based on the doctrine of election of remedies is inapplicable.  *See Triangle Park Chiropractic v. Battaglia*, 532 S.E.2d 833, 835 (N.C. Ct. App. 2000) ("A plaintiff is deemed to have made an election of remedies, and therefore estopped from suing a second defendant, only if he has sought and obtained final judgment against a first defendant and the remedy granted in the first judgment is repugnant or inconsistent with the remedy sought in the second action.").  XOOM should be precluded from introducing any evidence regarding this defense.

**N.   Lack of Standing (XOOM's Seventeenth Affirmative Defense)**

To satisfy the requirements of Article III standing, "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).  Each Class Member suffered injury due to XOOM's breach—improperly calculated rates.  That injury is directly traceable to Defendants' conduct and a damages award will redress the injury.  Each Class Member satisfies Article III's standing requirements and XOOM should be precluded from introducing any evidence challenging the standing of any Class

Member.  To the extent XOOM claims any particular Class rate or Class Member did not result in damages, that is a question of the measure of damages, not Article III injury.

### O.  Class Certification (XOOM's Eighteenth Affirmative Defense)

XOOM's class certification challenge was rejected by this Court in the Class Order and by Second Circuit in XOOM's failed Rule 23(f) petition, *see* ECF 174, Order Denying Defs.' Rule 23(f) Pet.  XOOM then moved for decertification (a thinly veiled motion for reconsideration).  ECF 194.  After three attacks on certification, XOOM should be precluded from challenging certification at trial, as it is not an issue for the jury's consideration.  This is more fully discussed in motion *in limine* No. 7 seeking to preclude XOOM disregarding or relitigating the Class Order.

### P.  Statute of Limitations (XOOM's Twenty-Second Affirmative Defense)

The statute of limitations is a procedural question governed by New York law.  *See Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 416 (2010) ("Choice of law provisions typically apply to only substantive issues, and statutes of limitations are considered procedural because they are deemed as pertaining to the remedy rather than the right.") (cleaned up).  Under New York law, the statute of limitations on the breach of contract claim is six years.  The original complaint was filed on April 18, 2018.  This tolled the statute of limitations for all Class Members. *Am. Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).  The Court defined the Class as "[a]ll New York residential or small commercial customers who were charged a variable rate for electricity or natural gas . . . at any time from January 1, 2013 through and including the date of judgment."  Class Order at 18.  January 1, 2013 is fewer than six years before Plaintiff filed her original complaint.  Accordingly, no claim falls outside the statute of limitations and this defense lacks merit.  XOOM should be precluded from introducing any evidence in support of this defense.

### Q.  Failure To Exhaust Administrative Remedies (XOOM's Fifteenth Defense)

XOOM's failure to exhaust administrative remedies defense is inapplicable.  This Court already found that the dispute resolution clause of XOOM's contract is permissive, not mandatory. ECF 24, Opinion and Order Granting Motion to Dismiss ("MTD Order") at 7.  The Court further held that XOOM's customers "like plaintiffs here, may file a case in federal or state court without exhausting other resolution channels."  *Id.* at 8.  This is the law of the case.

Moreover, whether a party is barred from recovery because of a failure to exhaust administrative remedies is a question of law, not a question of fact to be presented to the jury.  *See, e.g.*, *Darby v. Cisneros*, 509 U.S. 137, 152 n.13 (1993) (describing the "failure to exhaust administrative remedies" as "legal grounds" to dispose of a case); *Slate v. Potter*, No. 04 Civ. 782, 2005 WL 2429877, at *2 (M.D.N.C. Sept. 29, 2005) (same).  Accordingly, XOOM should be precluded from introducing evidence regarding this affirmative defense to the jury.

### R.  Proximate Cause (XOOM's Twenty-First Defense)

XOOM asserts that Plaintiff's damages were not proximately caused by XOOM.  This defense is meritless.  XOOM set its own rates and its overcharges were proximately (and directly) caused by XOOM.  XOOM presents no evidence or theory as to who else could have proximately caused Plaintiff's damages.  And in any event, proximate cause is not an element of a breach of contract claim in North Carolina, and whether or not Plaintiff's damages were proximately caused by XOOM has no bearing on this action.  *See Henderson v. Garcia Motorrad, LLC*, 789 S.E.2d 569 (Table), at *7 (N.C. Ct. App. 2016) ("In order to prevail on a claim for breach of contract, a party must show: (1) existence of a valid contract; and (2) breach of the terms of that contract." (quoting *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000))); *see also W. Const. Co. v. Atl. Coast Line Ry. Co.*, 116 S.E. 3, 5 (N.C. 1923) (proximate cause analysis applies to negligence

actions but not contract actions).   Therefore, the Court should not permit XOOM to introduce evidence regarding proximate cause.

## XII.   MOTION *IN LIMINE* NO. 12:  XOOM SHOULD BE BARRED FROM OFFERING EVIDENCE OF CUSTOMERS' FAILURE TO MITIGATE DAMAGES

Plaintiff respectfully asks the Court to exclude any evidence or argument relating to her supposed failure to mitigate damages.  Plaintiff seeks this relief because XOOM has pled failure to mitigate as an affirmative defense, ECF 44, Answer at 15 (Sixth Defense), and XOOM's expert claims that because there was "no barrier that might prevent [Plaintiff] from switching back to" utility service for electricity, this "means that Plaintiff was fully capable of avoiding any further alleged harm due to XOOM's rates."  ECF 146-5, Coleman Report at 32–33.

In a breach of contract action, the non-breaching party has a duty to mitigate damages only if that party "knew or should have known" of the other party's breach or repudiation.  *Little v. Rose*, 208 S.E.2d 666, 670 (N.C. 1974); *see also Thermal Design, Inc. v. M & M Builders, Inc.*, 698 S.E.2d 516, 524 (N.C. App. 2010) (injured party must "use ordinary care and prudence to minimize his damages").[28]  The duty is only applicable when the nonbreaching party "knew or should have known" of the breach.  *See Little*, 208 S.E.2d at 670; *see also Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1329 (9th Cir. 1995) (same).  In other words, a plaintiff cannot exercise "ordinary care and prudence" to mitigate damages until the plaintiff is aware that she was damaged by defendant's breach.  As one court explained:

> It would be an absurd misapplication of the rule for mitigation of damages to expect the Plaintiff to minimize the injury before the discovery of the breach.  It would be equally absurd to extend the principle of mitigation of damages to make the non-

---

[28] North Carolina law governs mitigation because "the law governing an affirmative defense to a claim is the same as the law governing the claim itself."  *Cobalt Multifamily Invs. I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 434 (S.D.N.Y. 2012).  However, the same result is required under New York law.  *See, e.g.*, *Brown v. Pressner Trading Corp.*, 475 N.Y.S.2d 405, 407 (1st Dep't 1984) (duty to mitigate damages is "measured from the time [plaintiff] learns of the [breach] and for a reasonable time thereafter in which [plaintiff] must decide his course of action").

breaching party responsible for preempting all damages by requiring them to police the other party's performance at every step in order to detect a breach at the earliest possible moment.

*Ford Motor Credit Co. v. Hairston*, 06 Civ. 04, 2006 WL 2850615, at *4 (W.D. Va. Oct. 2, 2006).

Here, Plaintiff and the Class had no duty to mitigate because XOOM's concealed its breach (based on misapplication of its supply costs) from customers. As this Court has already found:

> Customers—at least those without any background in the electricity market or the numerous factors that may determine the costs of an individual electricity provider—would have no basis for predicting XOOM's actual or estimated costs. As a result, customers have no mechanism for comparing their actual rates to the costs of the utility, since the agreement provides them with limited information about the factors used to determine XOOM's costs.

ECF 24, MTD Order at 11. Thus, without access to XOOM's internal and non-public information regarding its supply costs, Plaintiff and the Class cannot be charged with notice of XOOM's breach. Further, Plaintiff and the Class had a right to rely on Defendants' representations, namely XOOM's representation in its form contract that it would charge variable rates based on its actual and estimated supply costs. *See Little*, 208 S.E.2d at 670; *see also* PX29 at 2 (assuring customers that their variable rates would be "based on XOOM Energy's actual and estimated supply costs").

Thus, because XOOM's mitigation defense is highly implausible, any mitigation evidence is irrelevant under Rules 401 and 402, or at minimum subject to exclusion under Rule 403 because any probative value is substantially outweighed by unfair prejudice, confusion of the issues, and the potential to mislead the jury and waste time.

## XIII. MOTION *IN LIMINE* NO. 13: THE JURY SHOULD BE INSTRUCTED ON PUNITIVE DAMAGES

The Court should instruct the jury to consider Plaintiff's claim for punitive damages. Plaintiff seeks this instruction because she will prove that XOOM's breach of contract is of a nature that entitles the Class to both compensatory and punitive damages. Although North Carolina law generally does not allow punitive damages for breach of contract claims, "[w]hen the breach of

63

contract also constitutes or is accompanied by an identifiable tortious act, the tort committed may be grounds for recovery of punitive damages" if "the tortious conduct [is] accompanied by or partake[s] of some element of aggravation."  *Shore v. Farmer*, 522 S.E.2d 73, 76 (N.C. 1999). Here XOOM's conduct constitutes a violation of both GBL § 349, New York's consumer protection statute, and New York's specific ESCO consumer protection law, GBL § 349-d.[29]  That violation constitutes an independent tortious act accompanied by an element of aggravation— XOOM's willful and knowingly misleading statement about how it variable rates would be calculated, followed by overcharging 124,530 consumers for a universal necessity.  This is the precise fact pattern where punitive damages can serve their purposes of "deterrence and retribution."  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

## A.      XOOM's Violation of GBL § 349 Was an Independent Tortious Act

A violation of GBL § 349 is considered a tort.  *Gleit v. Francois-Bodine*, No. 18 Civ. 311, 2018 U.S. Dist. LEXIS 85038 (S.D.N.Y, May 18, 2018) (characterizing claim arising under GBL § 349 as "a statutory tort"); *Singh v City of New York*, 189 A.D.3d 1697, 1699 (2d Dep't 2020)

---

[29] Importantly, while the breach of contract claim is governed by North Carolina law, whether the action "constitutes or is accompanied by" an independent tort is governed by New York law.  *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997) ("It is possible that, under New York's choice of law rules, the law of different jurisdictions can apply to the tort claims and the contract claims in a given suit."); *Babcock v. Jackson*, 12 N.Y.2d 473, 484 (1963) (applicable law can vary for different aspects of a case and "it is more than likely that it is the law of the place of the tort which will be controlling . . . .").  Because North Carolina contract law requires that the Court determine whether the breach constitutes an independent tort, the Court must apply tort law.  New York tort law applies the "interest analysis" in which the law of the jurisdiction that "has the greatest concern with the specific issue raised in the litigation governs.  *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 319 (1994) (quoting *Babcock v. Jackson,* 12 N.Y.2d at 481).  The energy was contracted for and delivered in New York, all Class Members are residents of or have domiciles in New York, and all relevant marketing and advertising happened in New York.  Therefore, New York clearly has the "greatest concern" with XOOM's deceptive practices, and so New York law governs the question of whether XOOM's breach of contract "also constitutes or is accompanied by an identifiable tortious act."

(finding GBL § 349 is "a claim sounding in tort"); *Exist, Inc. v. Tokio Marine Am. Ins. Co.*, No. 22 Civ. 1679 (AT), 2024 WL 96347, at *1 (S.D.N.Y. Jan. 9, 2024) (same).

Like GBL § 349, GBL § 349-d provides broad consumer protections, including § 349-d(3) which explicitly prohibits and ESCO's deceptive conduct, and § 349-d(10), which provides a private right of action that mirrors the one provided in GBL § 349(h).  GBL § 349-d(3) also has the same elements as § 349(a).  *Chen v. Hiko Energy, LLC*, No. 14 Civ. 1771 (VLB), 2014 WL 7389011, at *6 (S.D.N.Y. 2014).  To prove a violation of either law, Plaintiff must show: "(1) the defendant's conduct was consumer-oriented; (2) the defendant's act or practice was deceptive or misleading in a material way; and (3) the plaintiff suffered an injury as a result of the deception." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 176 (2021).

"A defendant engages in consumer-oriented activity if the company's actions cause any consumer injury or harm to the public interest." *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 148 (S.D.N.Y. 2022) (internal citations and quotation marks omitted).  "This requirement is liberally construed, and 'may be satisfied by showing that the conduct at issue potentially affects similarly situated consumers.'" *Id.* at 149 (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010)).  Further, GBL § 349 applies to both individual consumers and businesses.  *See Himmelstein*, 37 N.Y.3d at 177–78 (New York Court of Appeals rejecting limiting the statute to individual consumers because it "is focused on the seller's deception"); *see also Spread Enters. v. First Data Merch. Servs. Corp.*, No. 11 Civ. 4743 (ADS) (ETB), 2012 WL 3679319, at *7

(E.D.N.Y. Aug. 22, 2012) ("However, a business may bring a GBL § 349 action where it is harmed by conduct also directed at consumers.").[30]

XOOM's conduct was misleading in a material way.  Specifically, it is well-settled that an ESCO's false claim in the pricing term of its customer contract about how variable rates are set, even while reserving the right to charge a margin, can serve as a basis for a claim under GBL § 349.  *See, e.g.*, *Stanley v. Direct Energy Servs.*, LLC, 466 F. Supp. 3d 415, 434 (S.D.N.Y. 2020) ("Plaintiff also alleges Defendant's representations that it would seek to provide a 'Market' 'Pricing Type' through a 'monthly variable rate methodology' suggested to customers that its variable rates would be correlated to some measure of market rates, which could mean supply costs or other ESCO rates.").

Here, XOOM's contract requires any "variation in the variable rates to be determined ***solely*** by XOOM's actual and estimated supply costs."  Class Order at 14 (emphasis added).  At trial, Plaintiff will present ample evidence that XOOM set variable rates based on non-supply cost factors, which renders the pricing term materially deceptive and misleading.  *Orlander v. Staples, Inc.*, 802 F.3d 289, 301 (2d Cir. 2015) ("Accordingly, Plaintiff has sufficiently alleged a 'materially misleading' practice, one that could lead a reasonable consumer to expect *much* more service than Staples has provided.")

A jury's finding of liability and damages on Plaintiff's breach of contract necessarily establishes the elements of GBL § 349 and GBL § 349-d because if a jury finds XOOM breached its contract and caused Plaintiff and the Class damages, then *a fortiori* XOOM's practice of providing an express pricing term in its contract and failing to comply with that provision was

---

[30] While the Second Circuit has yet to reach the issue post-*Himmelstein*, it has noted it "would be inclined to agree" that *Himmelstein* "rejected" the claim that GBL § 349 does "not cover business-to-business transactions."  *Trustpilot Damages LLC v. Trustpilot Inc.*, No. 21-cv-2837, 2022 WL 2124865, at *3 n.5 (2d Cir. June 13, 2022).

"deceptive or misleading in a material way" and caused the Class Members to "suffer[] an injury as a result of the deception."

### B.   XOOM's Tortious Conduct Is Accompanied by an Element of Aggravation

XOOM's tortious conduct is accompanied by at least two elements of aggravation.  First, the subject matter of XOOM's contract was the supply of "something as universally necessary as utility services."  *Melville v. HOP Energy, LLC*, No. 21 Civ. 10406 (KMK), 2023 WL 2648775, at *9 (S.D.N.Y. Mar. 27, 2023).

Second, XOOM's deceptive practices were willful and wanton.  XOOM's tortious conduct persisted for years, consistent with the New York Public Service Commission's ("NYPSC") finding that ESCOs like XOOM have "take[n] advantage of the mass market customers' lack of knowledge and understanding of . . . the electric and gas commodity markets."  ECF 147-17, Cases 15-M-0127, *et al.*, Dep't of Pub. Serv. Staff Redacted Initial Br. (Mar. 30, 2018) at 68.  But XOOM continued with its practices, charging customers exorbitant markups over its supply costs even after the NYPSC required that ESCOs' variable rate products "must guarantee savings [compared to utility rates] on an annual basis or with greater frequency."  ECF 147-16, Case 15-M-0127, et al., *Ord. Adopting Changes to the Retail Access Energy Market and Establishing Further Process* (Dec. 12, 2019) ("2019 PSC Order") at 48.  Such willful disregard for government oversight and the public's wellbeing amounts to an element of aggravation.

### C.     The Punitive Damages Waiver in XOOM's Contract Is Unenforceable

The punitive damages waiver in XOOM's contract cannot prevent recovery of punitive damages when the basis for the punitive damages is GBL §§ 349 and 349-d.  GBL § 349-d(8) provides that "[a]ny waiver by a buyer of energy services of the provisions of this section shall be deemed void and unenforceable by the ESCO as contrary to public policy."  Because § 349-d(10) provides consumers the right to recover punitive damages, *see Bueno v. LR Credit 18, LLC*, 269 F.

Supp. 3d 16, 23 (E.D.N.Y. 2017),[31] any purported waiver of that right is unenforceable pursuant

to § 349-d(8).[32]   The Court should instruct the jury on punitive damages.

XIV.   **MOTION *IN LIMINE* NO. 14:   XOOM SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE RELATING TO THE "MARKET SUPPLY COST" CALCULATION FROM PLAINTIFF'S PRE-DISCOVERY COMPLAINT**

Prior to discovery Plaintiff estimated XOOM's supply costs using publicly available

information on wholesale market costs, referring to this proxy as the "Market Supply Cost" in the

operative complaint.   ECF 42, First Amended Complaint ("FAC") ¶¶ 54–55.   This proxy was used

to plausibly allege that XOOM's rates were not based on its supply costs.   *Mirkin v. XOOM Energy,*

*LLC*, 931 F.3d 173 (2d Cir. 2019).   In discovery, Plaintiff obtained XOOM's rate-setting

workbooks which detail XOOM's supply costs, thus mooting the Market Supply Cost estimate.

Any evidence regarding this pre-discovery metric is therefore irrelevant under Rules 401 and 402

and prejudicial, misleading, and confusing under Rule 403.   Nevertheless, XOOM has indicated

that it intends to offer evidence about Plaintiff's pre-discovery supply cost estimate at trial,

evidently to sidestep the Court's ruling that its rates must be determined solely by its supply costs.[33]

---

[31] GBL § 349-d(10) contains virtually identical wording as the original § 349(h) it was based on. Accordingly, cases interpreting GBL § 349(h), such as *Bueno*, apply with equal force to cases like this one involving GBL § 349-d(10).

[32] While the claims arising solely out of the breach of contract are governed by North Carolina law, the basis for the punitive damages instruction is that the breach of contract "also constitutes" a violation of GBL §§ 349 and 349-d.   Therefore, North Carolina law requires the application of tort law, and New York's choice-of-law rules require that New York law govern the tort aspects of the dispute.   New York law is clear that the punitive damages waiver cannot get around the express private right of action in GBL § 349-d(10) statutory mandate of § 349-d(8).   *Bueno*, 269 F. Supp. 3d at 23.

[33] Plaintiff does not intend to introduce any evidence or argument related to the Market Supply Cost and XOOM should not either.   However, the Court may, at its discretion, allow Plaintiff to amend the complaint to exclude the Market Supply Cost so that the evidence to be presented at trial conforms to the complaint and the proof adduced in discovery.   *See* Fed. R. Civ. P. 15(b); *see also Jeffers v. City of New York*, No. 14 Civ. 6173 (CBA) (ST), 2018 WL 904230, at *2 (E.D.N.Y. Feb. 13, 2018) ("Because Plaintiffs have produced a considerable amount of evidence since they filed their complaint, this Court first recommends that the complaint be amended to conform to the proof offered at summary judgment . . . .").

Plaintiff's pre-discovery estimate of XOOM's supply costs is thus irrelevant. Plaintiff expressly noted in her pre-discovery complaint that "[w]ith discovery of XOOM's actual costs and profits," Plaintiff would "create an even more precise model showing what XOOM's prices should have been under the terms of" XOOM's form contract. ECF 42, FAC ¶ 58; *cf. Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) ("Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case."). Now, Plaintiff has done just that using XOOM's own supply costs calculations. The Market Supply Cost is therefore irrelevant and should be excluded as irrelevant under Rules 401 and 402, or at minimum excluded under Rule 403 because any probative value is substantially outweighed by unfair prejudice, confusion of the issues, and the potential to mislead and waste time.

## XV.   MOTION *IN LIMINE* NO. 15:   XOOM SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OF OTHER COMPANIES' MARGINS

Plaintiff and the Class respectfully ask the Court to preclude any evidence regarding the margins of (1) other ESCOs, and (2) other companies more generally. Plaintiff seeks this relief because XOOM intends to rely on other ESCOs' margins (achieved under different contracts) and the gross margins of twenty-six companies included in the Dow Jones Industrial Average. ECF 146-6, Rebuttal Report of David Coleman at 12–14.[34] Such margins are not relevant to the question of a permissible margin for XOOM to charge here. But even if relevant, these comparisons would be inadmissible pursuant to Rules 106, 602, 802, and/or 1002. Moreover, under Rule 403, such evidence will unfairly prejudice Plaintiff, confuse the jury, and waste time— harms that far outweigh any probative value.

---

[34] With respect to XOOM's expert report, this issue is addressed in Plaintiff's separately filed motion *in limine* to exclude expert testimony.

The Court has determined that XOOM is permitted to add a reasonable and proportionate margin to the COGS set forth in XOOM's workbooks.   What other companies may have charged for different products or services, governed by different contractual commitments, is patently irrelevant.   Any evidence and argument at trial regarding the appropriate fixed margin for XOOM should be limited to the specific contractual and regulatory framework in which XOOM operated. Evidence of other ESCOs' margins or the margins of other companies has no bearing on those key issues.   *See, e.g.*, *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 273 (S.D.N.Y. 2015) (excluding evidence with "no bearing" on core issues, which "serve[d] only to confuse, inflame, and introduce unfair prejudice").

Moreover, evidence regarding other ESCOs' margins (with different contracts) will mire this case in mini-trials focused on disputes about what other ESCOs were permitted to charge under ***their*** contracts.   Indeed, XOOM's continued resort to the inapposite contract (and resulting rate-setting discretion) at issue in *Richards v. Direct Energy Services, LLC*, 915 F.3d 88 (2d Cir. 2019), amply illustrates the distraction and delay that will ensue if XOOM is permitted to introduce other ESCOs' margins.[35]   This would of course inhibit, rather than assist, the jury in the issues it will decide.   Rule 403 is intended to prevent such wasteful and irrelevant sideshows.

Permitting XOOM to introduce evidence of other ESCO' margins would also significantly prejudice Plaintiff as its only purpose would be to mask XOOM's misconduct by reference to the potential misconduct of other companies—since similar misconduct was so widespread among

---

[35] This issue is addressed in Plaintiff's motion *in limine* No. 17 below.

ESCOs that it led the NYPSC to ban the exact variable rates XOOM charged here.[36]  Accordingly,

Plaintiff requests that any evidence or argument regarding other companies' margins be excluded.

## XVI.   MOTION *IN LIMINE* NO. 16:   XOOM SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE REGARDING MS. MIRKIN'S INVOLVEMENT IN LITIGATION AGAINST VIRIDIAN ENERGY

Plaintiff and the Class respectfully ask the Court to preclude any evidence regarding

Plaintiff's involvement in prior litigation against another ESCO—Viridian Energy, Inc.—and the

settlement of that action.  Plaintiff seeks this relief because even though *Viridian* is irrelevant here,

XOOM has repeatedly referenced it in its filings.  *See, e.g.*, ECF 134, Class Opp'n at 32; ECF

145-1, MSJ Br. at 4; ECF 168, Defs.' Stay Br. at 14.  Moreover, Plaintiff proposed a stipulation

that the parties would not introduce evidence about the *Viridian* case, but XOOM refused.

XOOM's use of this prior litigation at trial should be precluded under Rules 401, 402, and 403

because it has no probative value and would severely prejudice Plaintiff.

The trial focus is on XOOM's actions, including the promises XOOM made in its contract

and the question of whether XOOM kept them.  The fact that Plaintiff previously sued a different

ESCO regarding a different contract has no bearing on the questions the jury will need to answer.

Instead, the only reason XOOM seeks to introduce evidence regarding *Viridian* is to suggest that

Plaintiff's only reason for bringing this case is her own financial gain—as XOOM has claimed

multiple times.  *E.g.*, ECF 134, Class Opp'n at 32 ("That approach cannot possibly benefit the

class, but could advance Susanna's individual interests: Susanna supported a similar claim by

Boris in another class action, doubling the Mirkins' total recovery when the case was settled.").

---

[36] Specifically, the NYPSC found that there was a "lack of easily accessible and comprehensible product and pricing information," and there was "no demonstrated benefit" to allowing ESCOs to offer variable rate plans to consumers "because that service is readily available from the utilities at a just and reasonable rate," and ESCOs were unable to show that charging prices higher than utility rates was justified, ECF 147-16, 2019 PSC Order at 3, 12, 30, 37–38.

That is plainly improper.  *See, e.g.*, *Hart*, 90 F. Supp. 3d at 273 (excluding evidence that had "no bearing" on core issues and "serve[d] only to confuse, inflame, and introduce unfair prejudice."). Further, the Court has already determined that Ms. Mirkin is an adequate class representative and XOOM's efforts to impugn her motives in this breach of contract case would seek to relitigate settled Rule 23 issues.  Class Order at 17 (Ms. Mirkin "has no apparent conflicts with the class she would be representing").    Evidence or argument regarding the *Viridian* litigation should be excluded under Rules 401 through 403.

## XVII.    MOTION *IN LIMINE* NO. 17:    XOOM SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE REGARDING PLAINTIFF'S EXPERT'S OPINION AND REPORT IN *RICHARDS V. DIRECT ENERGY*

Plaintiff and the Class intend to offer expert testimony during their case-in-chief. Plaintiff's expert, Seabron Adamson, will testify generally about the ESCO industry and about his damages methodology.    As an energy economist, Mr. Adamson previously offered expert testimony in another ESCO breach of contract litigation, *Richards v. Direct Energy Services, LLC*, No. 14 Civ. 1724, (D. Conn.).  However, his report and work in that case—which involved a pricing term that expressly gave the ESCO "discretion" to set rates based on "business and market conditions"—is not relevant here.   Plaintiff and the Class do not intend to offer evidence or argument regarding Mr. Adamson's work in *Richards*.  Mr. Adamson also did not rely on his work in *Richards* for his work in this case.  Accordingly, there is no legitimate purpose for XOOM to introduce evidence of Mr. Adamson's work in *Richards*, and the Court should exclude this evidence as irrelevant under Rules 401 and 402.

By way of brief background, in *Richards* the court granted the defendant's motion for summary judgment, which was affirmed by the Second Circuit.  *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 93 (2d Cir. 2019).  As this Court recognized, in affirming, the Second Circuit found that a contract that expressly gave the ESCO "'discretion' to set a variable energy rate 'based

upon business and market conditions' unambiguously did not require rates to be tied to procurement costs." MSJ Order at 14 (quoting *Richards*, 915 F. 3d at 97–98). Even so, as also recognized in this Court's MSJ Order, the Second Circuit cautioned that "discretion granted by a contract must be 'exercise[d] . . . in good faith.'" *Id.* (quoting *Richards*, 915 F. 3d at 99). Accordingly, this Court rejected XOOM's reading of *Richards* as barring any cap on its margin. *See id.* at 14 (noting that XOOM's argument relied on "overreading of inapposite dicta contained in a footnote" in *Richards* and citing *Richards*, 915 F. 3d at 98 n.5).

The *Richards* opinions include brief discussions of Mr. Adamson's work in *Richards* including the footnote analyzed in the MSJ Order at 14.[37] Because the court granted summary judgment to the defendant, there was no *Daubert* motion, and the court did not address whether his testimony was admissible.

---

[37] The relevant discussion in the Second Circuit opinion is as follows:

> Richards's experts' testimony adds nothing to his breach of contract claim. These experts opined only on what factors the variable rate should reflect, in their view, while declining to 'offer an opinion on' how the [contract's pricing term] should be interpreted. Confidential App. 374; *see also id.* at 164 ('I'm not the expert on, you know, legal meaning of business and market conditions. But as an economist, you know, I do have an opinion professionally....'). And the experts' interpretation of the [contract's pricing term] would be irrelevant even if they had opined on its legal meaning because 'the construction of unambiguous contract terms is strictly a judicial function.' 31A Am. Jur. 2d Expert and Opinion Evidence § 294 (2018) (explaining that, 'unless the words or phrases [in a contract] . . . are terms of art,' expert testimony 'regarding the meanings of contractual provisions [is] irrelevant and hence inadmissible')."[5]

> [5] For the same reason, the dissent's observation that ambiguous contract language creates a jury question regarding the parties' intent, *Dissenting Op.* at 111, misses the point. In the context of Richards's claim, the Evergreen clause is *not* ambiguous. Richards himself testified that even he did not interpret the contract as he would now have us read it. *See* J.A. 135 (agreeing that Direct Energy had "[p]retty much" complete discretion in deciding how to set its variable rate). While there might be some pricing considerations that would fall outside the "business and market conditions" that Direct Energy was explicitly authorized to consider, nothing in that phrase suggests the specific limitation that Richards now argues for. The dissent's contention that a "reasonable juror ... could find that Direct Energy tied its price-setting discretion to its cost of doing business," *Dissenting Op.* at 111, is patently incorrect, so long as jurors are constrained by law, and not permitted to invent absent contract terms out of thin air.

*Richards*, 915 F.3d at 98.

Defendants' only purpose for introducing evidence or argument of Mr. Adamson's work in *Richards* is to suggest to the jury that other courts have questioned his reliability or to confuse the jury about what the contract in ***this*** case required.  In *Richards,* the Second Circuit noted only that he declined to offer an opinion on a point of law, a position with which that court plainly agreed, and said nothing about his substantive opinions as an energy economist.  Evidence or argument about Mr. Adamson's opinions in *Richards* is irrelevant and should be precluded.

The case law strongly supports that result.  Courts routinely prohibit evidence that an expert's report was previously excluded in separate litigation.  *See, e.g.*, *Dahlin v. Lyondell Chem. Co.*, No. 14 Civ. 85, 2016 WL 4690390, at *3 (S.D. Iowa Mar. 24, 2016) ("The Court finds evidence of an expert's exclusion or inclusion in a prior case irrelevant and therefore inadmissible."); *Estate of Thompson v. Kawasaki Heavy Indus., Ltd.*, 933 F. Supp. 2d 1111, 1152 (N.D. Iowa 2013) ("An attempt to present [an admissibility] ruling of another court regarding [an expert] would be an attempt to circumvent my role as the 'gatekeeper' in this case by asking the jurors to substitute for mine the judgment of another court, in another case, about whether or not an expert is qualified."); *Pierson v. Ford Motor Co.*, No. 06 Civ. 6503, 2008 WL 7084522, at *5 (N.D. Cal. Aug. 1, 2008) ("The transcript [of the expert's testimony] will not be admitted as evidence nor will prior judicial findings or rulings be admitted."); *Wilson v. Maricopa Cnty.*, 04 Civ. 2873, 2007 WL 686726, at *11 (D. Ariz. Mar. 2, 2007) ("The Court concludes that an expert's disqualification in a previous trial is of dubious relevance in this case. . . .  Even if Defendants could show that circumstances in the previous trial were highly similar to this case, such a showing would require an amount of time disproportionate to the relevancy of the prior disqualification.").  What's more, unlike those cases, in *Richards* the district court accepted Adamson's testimony and report for purposes of summary judgment, and the Second Circuit noted that he was correct in

74

declining to offer an opinion on a question of law.  In short, this Court should preclude XOOM from offering evidence or argument about Mr. Adamson's report or testimony in *Richards* or any other cases in which he has offered expert testimony.

Even if Defendants were to frame this evidence as being offered for impeachment only it would still be inadmissible.  *See Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) ("Whereas an inconsistent statement by a testifying witness can be used to impeach that witness's credibility, an inconsistent account by another source is offered to show an alternative view of the truth."); *see also Thompson*, 933 F. Supp. 2d at 1152 ("[N]othing about this principle suggests that 'vigorous cross-examination' includes impeachment with a prior court's exclusion of the witness pursuant to the *Daubert* standards.  Rather, it means that [defendant] is free to cross-examine, vigorously, [the expert's] opinions *in this case*, based on his reasoning, methodology, and the facts and assumptions on which he relied *in this case*.") (emphasis in original).  For this reason, it is well established in the Second Circuit that "a witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them."  *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980); *see also United States v. Romanello*, No. 22 Cr. 194 (EK), 2023 WL 8283435, at *2 (E.D.N.Y. Nov. 27, 2023) (testifying witness may not be impeached by out-of-court statements of a non-testifying third-party); *S.E.C. v. R. A. Holman & Co.*, 34 F.R.D. 139, 140 (S.D.N.Y. 1963) ("[A] third party's statement (an investigator's) is not admissible for impeachment of the investor.").

Finally, prior judicial discussions of Mr. Adamson are irrelevant—they have no bearing on his credibility or expertise in ***this case***.  *See, e.g.*, *Katt v. City of New York*, 151 F. Supp. 2d 313, 363 n.41 (S.D.N.Y. 2001), *aff'd sub nom. Krohn v. New York City Police Dep't*, 60 F. App'x 357 (2d Cir. 2003) ("[T]he testimony given in this case stands or falls on its own merits; the value of

[the expert's] testimony or lack of it in other cases is not relevant to this inquiry."); *Maricopa Cnty.*, 2007 WL 686726, at *11 (finding prior court's analysis of expert report "of dubious relevance").

Even if there were some limited relevance to prior judicial analyses of Mr. Adamson's work in other cases, it would be substantially outweighed by the risk of confusion, delay, misleading the jury, and unfair prejudice under Rule 403.  "To appropriately meet the evaluations of another judge [of an expert] would require the jury to delve deeply into the case that judge was trying.  This enterprise is not appropriate under Rule 403." *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 325 (E.D.N.Y. 2001).  This is because "[t]he difficulty in assessing the probative force of comments by a judge on the credibility of a witness is especially great for a jury, which may give exaggerated weight to a judge's supposed expertise on such matters." *Id.* at 323.  Indeed, pursuing this course would require a substantial investment of time just to explain the basic underlying facts of *Richards* or any other case and how they materially differ from this case.  Moreover, Mr. Adamson would have no ability to adequately rebut the prior court's comments. *See id.* at 325 ("When a judge attacks a witness there is no effective defense.").

Accordingly, XOOM should be precluded from introducing such evidence under Rules 401 through 403.

## XVIII.   MOTION *IN LIMINE* NO. 18:   XOOM SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE REGARDING MS. MIRKIN'S AND CLASS COUNSEL'S MOTIVATIONS FOR BRINGING THIS ACTION

Plaintiff respectfully asks the Court to preclude any evidence or argument regarding Plaintiff's and counsel's supposed motivations for pursuing this action.  Plaintiff seeks this relief because XOOM refused to stipulate that it would not introduce such evidence and argument.[38]

---

[38] XOOM appropriately agreed not to bring up similarly irrelevant attorney's fees in front of the jury. ECF 210, PTO at 24 (stipulation number 8).

Evidence or argument related to Plaintiff's or counsel's motivation for bringing the suit or to how Plaintiff became involved in it is irrelevant.  In *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250 (S.D.N.Y. 2015), the court granted the plaintiff's motion *in limine* to exclude evidence and arguments as to "(1) the motivation and conduct of class counsel," "(2) the opt-out rate within the class," "(3) advertising by class counsel," and "(4) lawyer-driven lawsuits."  *Id.* at 271.  Calling the defendant's opposition "remarkabl[e]," the court noted that these topics "are ***categorically irrelevant***."  *Id.* (emphasis added).  Indeed, "[a]s federal courts have repeatedly held, it is difficult to see how an inquiry into the circumstances surrounding the instigation of the action could affect the substance of the claim." *Dyber v. Quality King Distributors, Inc.*, No. 06 Civ. 735 (LDW) (AKT), 2006 WL 8424100, at *2 (E.D.N.Y. Dec. 12, 2006) (citation omitted).

Plainly, the only reason for delving into the motivations for bringing the lawsuit is to attempt to sway the jury into deciding the issues based on factors other than the evidence and legal instructions presented at trial.  *See Leopold v. Baccarat, Inc.*, 174 F.3d 261, 270 (2d Cir. 1999) ("Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case.") (quoting 2 Weinstein's Federal Evidence § 403.04[1][b], at 403–36 (2d ed. 1998)).  Therefore, courts routinely exclude this type of evidence as irrelevant and likely to mislead.  *See, e.g.*, *Montera v. Premier Nutrition Corp.*, No. 16 Civ. 6980, 2022 WL 1465044, at *1 (N.D. Cal. May 9, 2022) (precluding evidence regarding how plaintiffs became involved in case, any reference that the case was "lawyer-driven," and evidence or argument regarding the attorney's motivation.).  This Court should reach the same conclusion and preclude all evidence regarding Plaintiff's and Counsel's motivation for bringing this suit pursuant to Rules 401 through 403.

## **CONCLUSION**

For the reasons stated herein, Plaintiff requests that the Court: (1) order that XOOM bears the burden of proof as to the following: (i) the exact amount of supply costs, if any, that were allegedly added to its otherwise fixed variable rate margin, (ii) that the only costs supposedly added to the fixed margin were proper "supply costs," (iii) that once disaggregated from any supposed supply cost adder, XOOM's monthly variable rate margin over its documented supply costs was constant, and (iv) that if XOOM cannot meet this burden, it is presumed that permissible supply costs were not incorporated into XOOM's margins (MIL No. 1); (2) order that XOOM cannot offer any new claims about its rate-setting process that were not disclosed in discovery; (3) preclude the evidence addressed in §§ II–VIII, XI–XII, XIV–XVIII (MIL Nos. 2–8, 11–12, 14–18); and (4) permit the evidence, procedures, and instructions addressed in §§ IX–X, and XIII (MIL Nos. 9–10, 13).

Dated: May 20, 2024

**WITTELS MCINTURFF PALIKOVIC**

 /s/ Ethan D. Roman
Ethan D. Roman
J. Burkett McInturff
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
edr@wittelslaw.com
jbm@wittelslaw.com

*Class Counsel for Plaintiff and the Class*

Richard Dolan
Bradley D. Simon
**SCHLAM STONE & DOLAN LLP**
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Andrey Belenky
**KHEYFITS BELENKY LLP**
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

*Co-Counsel for Plaintiff and the Class*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 20, 2024, the foregoing was served via email on all counsel of record.

By: <u>/s/ Ethan D. Roman </u>
   Ethan D. Roman