**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                Plaintiffs,

v.

XOOM ENERGY, LLC and XOOM ENERGY
NEW YORK, LLC,

                Defendants.

---

No. 18 Civ. 2949 (ARR) (RER)

 

**XOOM'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DAVID COLEMAN**

## <u>TABLE OF CONTENTS</u>

I.   Introduction ...................................................................................................... 1

II.  Factual Background .......................................................................................... 2

  A.  Mr. Coleman's Report validates XOOM's position that its New York variable rates were "based on" its actual and estimated supply costs. .............................. 2

  B.  Plaintiff serves CRA's now-abandoned Original Report .................................... 4

  C.  Mr. Coleman's Rebuttal Report undermines CRA's Original Report in full. .................... 5

III. Legal Standard ................................................................................................. 5

IV. Argument & Authorities .................................................................................... 6

  A.  Relevance: Plaintiff's arguments regarding relevance are conclusory and baseless. ......... 6

    1.  The correlation analysis, including its representative graphics, is relevant and admissible. ............................................................................................ 6

    2.  Mr. Coleman's opinions regarding CRA's proposed margin caps are relevant. .......... 9

    3.  Plaintiff's assertion that the differences between the supply costs and market structure for electricity as opposed to natural gas are irrelevant is conclusory and unfounded. 10

    4.  Mr. Coleman's opinions supporting a mitigation defense are more relevant than ever. ............................................................................................ 11

  B.  Reliability: Mr. Coleman's gross margin opinions pass muster under Rule 702. ............ 13

  C.  Deposition Testimony: Rule 32 prohibits use of Mr. Coleman's deposition testimony... 16

V.  Conclusion & Prayer ....................................................................................... 19

## **TABLE OF AUTHORITIES**

**Cases**                                                                **Page(s)**

*Amorgianos v. Nat'l R.R. Passenger Corp.*
  303 F.3d 256 (2d Cir. 2002)............................................................................5

*Arista Records v. Usenet.com*,
  608 F. Supp. 2d 409 (S.D.N.Y. 2009).............................................................8

*Bell v. Prefix, Inc.*,
  No. 05-74311, 2009 WL 3614350 (E.D. Mich. Nov. 2, 2009)...............................12

*Clerveaux v. E. Ramapo Cent. Sch. Dist.*,
  984 F.3d 213 (2d Cir. 2021)............................................................................7

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).......................................................................5, 6, 11, 13

*In re Elec. Books Antitrust Litig.*,
  No. 11 MDL 2293 (DLC), 2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014)...............9

*Fields v. BNSF Ry. Co.*,
  No. CIV-16-213-KEW, 2021 WL 7966593 (E.D. Okla. Sept. 29, 2021)................11

*LaSalle Bank Nat. Ass'n v. CIBC Inc.*,
  No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ...............17, 18

*Mazloum v. D.C. Metro. Police Dep't*,
  248 F.R.D. 725 (D.D.C. 2008)................................................................15, 16

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
  341 F. Supp. 3d 213 (S.D.N.Y. 2018)..............................................................15

*Napier v. Bossard*,
  102 F.2d 467 (2d Cir. 1939)............................................................................16

*New York v. United States Dep't of Com.*,
  351 F. Supp. 3d 502 (S.D.N.Y.), aff'd in part, rev'd in part and remanded sub
  nom. Dep't of Com. v. New York, 139 S. Ct. 2551 (2019).....................................7

*Niver v. Travelers Indemn. Co. of Ill.*,
  430 F. Supp. 2d 852 (N.D. Iowa 2006)............................................................15

*Pearlman v. Cablevision Sys.*,
  No. 10 Civ. 4992 (JS) (GRB), 2015 WL9462104 (E.D.N.Y. Dec. 28, 2015) .........12

*Salsman v. Witt*,
  466 F.2d 76 (10th Cir. 1972) ..........................................................................16

*Shatkin v. McDonnell Douglas Corp.*,
   727 F.2d 202 (2d Cir. 1984)..................................................................................15

*Twelve Sixty LLC v. Extreme Music Libr. Ltd.*,
   No. 17 Civ. 1479 (PAC), 2020 WL 2749708 (S.D.N.Y. May 26, 2020) ..............15

*United States v. Duncan*,
   42 F. 3d 97 (2d Cir. 1994)....................................................................................17

*Veeco Inst. v. SGL Carbon*,
   No. 17-CV-2217 (PKC), 2017 WL 8676438 (E.D.N.Y. Dec. 26, 2017)................7

*Young & Assocs. Pub. Rels. v. Delta Air Lines*,
   216 F.R.D. 521 (D. Utah 2003) ...........................................................................16

**Other Authorities**

Fed. R. Civ. P. 32 ...............................................................................................6, 15

Fed. R. Evid. 403 .......................................................................................................8

Fed. R. Evid. 702 ............................................................................................ *passim*

Fed. R. Evid. 803 .....................................................................................................16

# I.   INTRODUCTION

There is no issue on which Plaintiff can legitimately challenge the opinions of XOOM's expert David Coleman. She understands that she cannot argue that Mr. Coleman's opinions are unreliable due to any inaccuracies or improper calculations. But because she knows his testimony is damaging to her case, Plaintiff instead tries to manufacture issues of relevance by mischaracterizing this Court's prior rulings, attacking opinions Mr. Coleman has never given, and declaring other critical (and admittedly reliable) testimony to be irrelevant without explanation. Those arguments are meritless and Plaintiff's motion should be denied.

As the Court knows, Plaintiff and the Class received energy supply from XOOM at variable rates that their contracts said would be "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." Accordingly, Mr. Coleman's Report analyzed whether XOOM in fact based its variable rates on its supply costs. His starting points were Plaintiff's claim that the variable rates were not based on supply costs and XOOM's position, supported by uniform witness testimony, that supply costs were always the primary consideration in rate-setting. Mr. Coleman thus compared changes in XOOM's variable prices to corresponding changes in supply costs to determine whether the data was consistent with Plaintiff's position or XOOM's. He concluded that the data contradicted Plaintiff's claim and corroborated XOOM's witness testimony, and he provided statistical analyses and graphs showing XOOM's rates and supply costs and were so strongly correlated that the chance that rate changes were not related to cost changes was effectively zero.

Plaintiff's lead argument is that Mr. Coleman should not be permitted to testify about that correlation analysis because the Court found it to be irrelevant under the contract's construction announced on summary judgment. Not so. The Court said only that the correlation analysis was insufficient grounds on which to grant XOOM summary judgment—i.e., that the analysis alone

did not resolve the disputed fact of whether XOOM's rates were "based on" supply costs as a matter of law. But the Court did not say that it was irrelevant to Plaintiff's claim or XOOM's defenses. The correlation analysis and its representative graphics are plainly probative of whether XOOM complied with the contract, and Plaintiff has offered no viable argument to exclude them.

Plaintiff's secondary arguments for exclusion are equally meritless. The challenged expert opinions are all reliable, relevant, and should be admitted at trial. And with respect to Plaintiff's motion for an *in limine* ruling that she can introduce Mr. Coleman's deposition testimony in her case-in-chief, that request is entirely inappropriate because (among other reasons) Mr. Coleman will be available and present at trial. Plaintiff's motion should be denied in full.

## II.   FACTUAL BACKGROUND

Plaintiff does not attack Mr. Coleman's qualifications, which are outlined in his report and will not be repeated here. *See* Ex. A-1, Coleman Rep. The recitation below focuses on the portions of his reports that are challenged.

### A.   Mr. Coleman's Report validates XOOM's position that its New York variable rates were "based on" its actual and estimated supply costs.

Mr. Coleman's Report focused primarily on his analysis of whether XOOM set its rates in accordance with the contract—i.e., "based on [its] actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." *Id.* at 10–23. Because Plaintiff alleged that XOOM breached that provision by charging variable rates that were "untethered to the supply costs," Mr. Coleman analyzed XOOM's variable prices in comparison to its reported supply costs captured in its rate-setting workbooks.

As a component of this analysis, Mr. Coleman considered the extent to which XOOM's variable prices, in actual practice, moved up or down with its supply costs. He opined:

A statistical correlation analysis of XOOM's electric [and natural gas] supply costs ([known as COGS or WACOGs]) and XOOM's historical [variable electric and

2

natural gas] rates, demonstrates that XOOM *did base its variable rates for retail electricity [and natural gas] supply on its actual and estimated supply costs*.

*Id.* at 4 (emphasis added). Indeed, the statistical evidence and correlation values were so strong that he concluded "the probability that [Plaintiff's variable rates] did not 'rise and fall' with XOOM's supply costs as she alleges is less than 1-in-400, or only about .24%." *Id.* at 33. And as to the class, Mr. Coleman opined the same:

> The statistical evidence independently demonstrates that XOOM's [variable electric and natural gas] rates for the period [2013 through 2020] were based on XOOM's supply costs. In fact, the likelihood that month-over-month or year-over-year changes to XOOM's [variable rates in New York] during that period were not based on changes in XOOM's supply costs is effectively zero.

*Id.* Moreover, Mr. Coleman concluded that his statistical correlation analysis was "entirely consistent" with the "testimony regarding XOOM's rate-setting process," which showed that XOOM's variable rates were, in fact, "based on XOOM's supply costs." *Id.*

Mr. Coleman also graphically depicted this relationship in Figures 5 and 6. For example, Plaintiff's SimpleFlex Electric Rates in ConEd Zone J showed near-perfect correlation:



*Id.* at 49 (Figure 5). Plaintiff does not challenge the reliability of Mr. Coleman's correlation analysis or the graphical figures depicting that analysis. She instead attacks only their relevance, claiming a correlation analysis is irrelevant under the Court's contract construction. She is wrong.

3

The correlation analysis and its associated graphics are entirely consistent with the Court's contract construction. They are probative of whether "the variation in variable rates [was] determined solely by XOOM's actual and estimated supply costs," Pl. Mem. 15 (quoting SJ Order 14), and Plaintiff offers no viable argument to the contrary.

Plaintiff also contends that two other opinions in Mr. Coleman's Report should be excluded on relevance grounds. First, she wrongly claims that Mr. Coleman's opinion that neither the law nor the contract imposed a margin cap on XOOM is now irrelevant because the Court "expressly rejected the premise of that analysis." *Id.* at 15. And second, she contends that his explanation of the differences between the supply costs for electricity versus natural gas is somehow irrelevant. Like her argument on the correlation analysis, these secondary arguments are premised on the false notion that the Court's contract construction rendered his opinions irrelevant. So, just like her attempt to exclude the correlation analysis, both of her secondary arguments fail too.[1]

## B.   Plaintiff serves CRA's now-abandoned Original Report.

The same day XOOM served Mr. Coleman's Report, Plaintiff served one from her experts at Charles River Associates (CRA). Ex. A-4, CRA Orig. Rep. CRA's Original Report opined that the contract did not allow XOOM to charge any margin above supply costs at all, and purported to measure class overcharges on that theory in what they called Model One. *Id.* at ¶ 61. They also put forward Model Two as a backup alternative only if the Court determined the contract allowed a margin. *Id.* Model Two imposed a cap on XOOM's margin that fluctuated monthly in accordance with whatever estimated margin was included in fixed rates governed by different contracts.

Plaintiff and CRA have since abandoned the Original Report and its models. *See* Doc. 204,

---

[1] Plaintiff concedes that she is not contesting the admissibility of Mr. Coleman's summary of the history of retail energy regulation in New York, Coleman Rep. 5; Pl. Mem. 18 n.6

Pl. Decert. Resp. 23 n. 10 ("The Class will not rely on Model 1"); Ex. A-5, CRA New Rep. ¶ 1 (stating it "replaces the original report"). CRA's New Report, served on May 10, puts forward three brand-new models based on entirely new algorithms: Methods A, B, and C. *See* Ex. A-5, CRA New Report.[2]

## C.   Mr. Coleman's Rebuttal Report undermines CRA's Original Report in full.

Mr. Coleman's Rebuttal Report properly focused on the flaws in CRA's Original Report, including Model One and Model Two. *See* Ex. A-2, Coleman Reb. Rep. While Mr. Coleman offered four rebuttal opinions, Plaintiff seeks to exclude just one: "There is no economic or market justification for the suggestion that XOOM should have capped its margin at any level." *Id.* at 10.

Notably, Plaintiff does not seek to exclude Mr. Coleman's opinions that: CRA's Original Report's failed to address whether XOOM based its rates on its supply costs, and his associated criticisms of Model One and Model Two, *id.* at 2–6, 14–16; and XOOM appropriately considered prior period adjustments when setting its rates, and his associated statistical analysis, *id.* at 6–10.

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.

This Court "has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both [1] rests on a reliable foundation and [2] is relevant to the

---

[2] CRA's New Report should be excluded for all the reasons explained in XOOM's Motion to Exclude Plaintiff's Untimely Expert Disclosures, *see* Doc. 229. But as just one more instance of prejudice to XOOM resulting from Plaintiff's untimely disclosures, XOOM had to prepare this brief in support of rebuttal opinions that Mr. Coleman gave in response to the now-abandoned CRA Original Report.

task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.* 303 F.3d 256, 265 (2d Cir. 2002)

(*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The testimony is relevant if it

"ha[s] any tendency to make the existence of any fact that is of consequence to the determination

of the action more probable or less probable than it would be without the evidence." *Id.* (citation

omitted). To determine reliability, courts "consider the indicia of reliability in Rule 702, namely,

[a] that the testimony is grounded on sufficient facts or data; [b] that the testimony 'is the product

of reliable principles and methods'; and [c] that 'the witness has applied the principles and methods

reliable to the facts of the case.'" *Id.* (quoting Fed. R. Evid. 702).

## IV.   ARGUMENT & AUTHORITIES

Rather than attack Mr. Coleman's qualifications or the reliability of his analyses, Plaintiff's

motion is premised almost exclusively on relevance. In fact, the only opinion that Plaintiff argues

is unreliable is one that Mr. Coleman offered about gross margins in rebuttal to CRA's now-

abandoned Models One and Two. But none of Plaintiff's arguments—whether based on relevance,

reliability, or otherwise—pass muster. The testimony that Plaintiff moves to exclude is relevant,

reliable, and will be helpful to the jury.

In addition to her exclusion requests, Plaintiff also asks the Court to rule *in limine* on the

admissibility of so-called "admissions" Mr. Coleman allegedly made at his deposition. That

request should be summarily denied. Because Mr. Coleman will be present at trial, Federal Rule

of Civil Procedure 32 rightly prohibits reading his deposition testimony. The Court should deny

Plaintiff's motion in full.

**A.   Relevance: Plaintiff's arguments regarding relevance are conclusory and baseless.**

1.   The correlation analysis, including its representative graphics, is relevant and admissible.

Again, Plaintiff does not challenge the accuracy of the correlation calculations or the

reliability of Mr. Coleman's methodology—because she cannot. Her experts at CRA testified that:

they "trust[]" that the rates and costs are positively correlated as stated in his Report; they did not check his math "but he seems to know his math;" they "sort of assumed it was correct;" "conceptually, [his] correlation analysis was done appropriately . . . the analysis itself seems to be right;" and that while they did not redo the calculations, they "trust his work." Ex. A-6, Adamson Dep. 107:7-23; Ex. A-7, Eryilmaz Dep. 25:18-27:16. Thus, Mr. Coleman's conclusions regarding near-perfect correlation between XOOM's supply costs and its variable rates are unchallenged and unassailable. Nor does Plaintiff challenge Mr. Coleman's determination that these correlations are, in fact, statistically significant. She instead limits her challenge to relevance, which fails for the reasons below.

Plaintiff's argument to exclude Mr. Coleman's statistical analysis is based on the incorrect argument that the Court's contract construction rendered his analysis irrelevant. But that argument misrepresents the Court's holding on summary judgment and then makes several inappropriate leaps of logic. Plaintiff starts by claiming that the Court found Mr. Coleman's "correlation analysis is not on point," Pl. Mem. 12, but that simply is not true. Rather, the Court's determination on summary judgment was limited to the observation that Mr. Coleman's correlation analysis addressed only XOOM's supply costs, not a permissible margin. SJ Order 17 ("The correlation does not tell us whether XOOM added a permissible markup above its cost calculation."). Plaintiff cites no authority for the proposition that expert testimony is stripped of all probative value if it addresses some contractual rate-setting components and not others—because the case law says the opposite. *See Veeco Inst. v. SGL Carbon*, No. 17-CV-2217 (PKC), 2017 WL 8676438, at *2 (E.D.N.Y. Dec. 26, 2017) (recognizing that plaintiff's correlation analysis did not "prove" its claim but nonetheless denying motion to exclude because it still addressed "one factor" of the dispositive issue and was "supportive" of plaintiff's position); *New York v. United States Dep't of Com.*, 351

F. Supp. 3d 502, 591 (S.D.N.Y.) (correlation analysis admissible because it was indicative of dispositive issue even if it was "incapable of establishing it" on its own), a*ff'd in part, rev'd in part and remanded sub nom. Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019); *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 219 (2d Cir. 2021) (giving special weight to "near-perfect" correlation). Here, the correlation analysis is plainly probative of the central issue in this case: whether XOOM's variable rates were, in fact, based on its supply costs.[3]

Critically, Mr. Coleman's analysis did not invent a new theory. Rather, it corroborates unquestionably relevant witness testimony about the association between XOOM's supply costs and its variable rates.[4] The correlations simply quantify what the jury will hear from XOOM's witnesses and provide a helpful validation that, consistent with fact witness testimony, XOOM's variable rates were based on its supply costs. The correlations are offered for this appropriate purpose, Plaintiff does not dispute that the correlations were accurately computed, and in this factual context the correlations will assist the jury in understanding the pricing evidence.

Plaintiff also cites Rule 403, arguing that Mr. Coleman's correlation analysis and its graphics should be excluded due to a risk of misleading the jury. Again, she is mistaken. Varying

---

[3] To the extent Plaintiff maintains that Mr. Coleman's correlation analysis is irrelevant because it is not independently dispositive of breach, she necessarily concedes that CRA's models all suffer the same flaw. Moreover, CRA's models incorporate irrelevant data by relying on data that Plaintiff claims XOOM was not even allowed to consider in rate-setting, including: fixed-rate margins (Model Two and Method C) and rates charged by the regulated utility (Methods A and B). Under Plaintiff's logic, then, CRA's models must be excluded as irrelevant for these reasons as well.

[4] Plaintiff confusingly argues that Mr. Coleman's recitation of that witness testimony relied on to form his opinions is inadmissible as cumulative and "simply regurgitates what a party has told him." Pl. Mem. 14. As discussed, that testimony is a factual predicate for Mr. Coleman's opinions, and he concludes that his correlation analysis corroborates the witness testimony. Those witnesses will testify to the underlying facts; Mr. Coleman's testimony will not be used for that purpose. *Cf. Arista Records v. Usenet.com*, 608 F. Supp. 2d 409, 425 (S.D.N.Y. 2009) (excluding expert testimony that "simply accept[ed]" what party witnesses told him without applying any "specialized knowledge" to those facts).

scales on the graphs are no reason for exclusion, and Plaintiff cites no authority to the contrary. Mr. Coleman will explain at trial why he presented the charts the way he did—to overlay rate changes and cost changes to illustrate their relationship. *See* Ex. A-3, Coleman Dep. 99:16-21 ("[T]he relevant test there is do they rise and fall with costs."). And if Plaintiff thinks there is any potential confusion at trial, she can dispel it in cross examination. Exclusion is not the appropriate remedy here, especially where Plaintiff has not challenged the reliability of the underlying correlation analysis. *Cf. In re Elec. Books Antitrust Litig.*, No. 11 MDL 2293 (DLC), 2014 WL 1282298, at **10–11 (S.D.N.Y. Mar. 28, 2014) (excluding graphs where underlying correlation analysis was successfully challenged on Rule 702 reliability grounds).

For these reasons, Plaintiff's motion to exclude Mr. Coleman's correlation analysis fails.

2. Mr. Coleman's opinions regarding CRA's proposed margin caps are relevant.

Plaintiff's request to exclude the so-called "No Margin Cap" testimony is similarly based on a misreading of the Court's summary judgment order. Plaintiff wrongly claims the Court "expressly rejected" Mr. Coleman's premise that the market, New York Public Service Commission, and contract did not require "XOOM to cap its [variable rates] at any particular level, nor was XOOM restricted with respect to the gross margin" it could charge variable-rate customers. The Court did no such thing. In truth, the Court ***agreed*** with Mr. Coleman that the contract does not cap XOOM's rates or margins at a particular level when it acknowledged that the contract is "silent as to the margin" in the summary judgment order. SJ Order 14.[5]

Plaintiff also mischaracterizes the opinion she seeks to exclude by insinuating that Mr. Coleman says nothing more than "there was no margin cap." In truth, Section VII of his Report

---

[5] CRA agreed with the Court and Mr. Coleman too. When asked to agree that "[t]he contract doesn't say anything about capping margin," Plaintiff's expert said: "It doesn't use—it doesn't use the word 'margin' at all." Ex. A-6, Adamson Dep. 125:20-23.

spans four pages and details why XOOM's margin was not capped "*at any particular level*," Ex. A-1, Coleman Rep. 28 (emphasis added), while Sections VI and VII in the Rebuttal Report explain for six pages why CRA's proposed benchmarks *in particular* are arbitrary, *see* Ex. A-2, Coleman Reb. Rep. 10–16. Plaintiff's conclusory argument that these expert opinions are somehow irrelevant is fundamentally flawed and unavailing. If the Court permits CRA to testify on its proposed margin caps (and it should not for all the reasons in XOOM's motions to exclude those opinions) then Plaintiff's request to exclude XOOM's rebuttal testimony must be denied.

3.  Plaintiff's assertion that the differences between the supply costs and market structure for electricity as opposed to natural gas are irrelevant is conclusory and unfounded.

Plaintiff's sole basis for asking the Court to exclude Mr. Coleman's testimony that "[t]he natural gas wholesale market is materially different than the wholesale market for electricity supply," Ex. A-1, Coleman Rep. 21–23, is the uncontroversial fact that XOOM's electricity and natural gas contracts contained the same pricing language. It is entirely unclear why Plaintiff believes those separate concepts—wholesale market structure on the one hand and consumer-facing pricing language on the other—are even related to begin with. As Mr. Coleman explains, they are not: "the[] differences [between electricity and natural gas] may not be readily apparent to most retail customers, but they are material for energy suppliers such as XOOM. Principal among these differences is the way in which energy suppliers purchase wholesale electricity and natural gas," *id.* at 21–22. So, here again, the premise of Plaintiff's argument is fatally flawed.

But more importantly, the relevance of Mr. Coleman's testimony on the topic is not hard to see. As Plaintiff herself contends, her claim will rise or fall with what the evidence shows about XOOM's rate-setting process—i.e., *what* factors were considered and *how* to ultimately "determine" variable rates. *See* Pl. Mem. 15 (quoting SJ Order 14 ("the contract required the variation in the variable rates to be *determined* solely by XOOM's actual and estimated supply

costs") (emphasis added))). Thus, to adjudicate whether any of XOOM's rates included an overcharge because they allegedly were not determined by supply costs, the jury must first understand what those supply costs are. That necessarily entails an understanding of how supply costs differ as between electricity and natural gas. Mr. Coleman breaks this down in a way that will be helpful to the jury's understanding, for example in this easy-to-understand chart:

| Electricity | Natural Gas |
|---|---|
| • Around-the-clock energy<br>• Load shaping<br>• Capacity<br>• Ancillary services<br>• Alternative / Renewable Energy Credits | • Commodity gas<br>• Pipeline transportation charges<br>• Gas storage costs<br>• Inventory working capital |

Ex. A-1, Coleman Rep. 22 (Table 10). This testimony highlights one of the reasons Plaintiff does not have common evidence when it comes to the different supply costs that apply to different energy commodities. But that is no reason for exclusion under Rule 702, it is a reason to grant XOOM's motion to decertify. Plaintiff's request to exclude this testimony should be denied.

4.  <u>Mr. Coleman's opinions supporting a mitigation defense are more relevant than ever.</u>

Plaintiff's final relevance challenge is to Mr. Coleman's testimony that Plaintiff (and the class) could shop for a better rate and switch energy providers at any time. *See* Pl. Mem. 17–18. The crux of Plaintiff's argument is that this testimony is irrelevant because it goes to XOOM's mitigation defense that she separately moved to exclude in her MIL No. 12. But as XOOM explains in its concurrently filed response to MIL No. 12, that motion should be denied.[6]

Indeed, whether Plaintiff or class members could have avoided alleged harm due to XOOM's rates by switching to a different utility service provider, like the incumbent utility, is a

---

[6] XOOM hereby incorporates by reference its arguments in opposition to Plaintiff's MIL No. 12.

question of fact that the jury should decide following trial. It is not a question of law that the Court can resolve in the jury's place on a motion *in limine*. *See, e.g., Fields v. BNSF Ry. Co.*, No. CIV-16-213-KEW, 2021 WL 7966593, at *1 (E.D. Okla. Sept. 29, 2021) (denying plaintiff's motion *in limine* on evidence that Plaintiff failed to mitigate damages because "[a]t this stage of the proceedings, it is impossible for this Court to rule on this issue in a vacuum without the benefit of considering the evidence on mitigation of damages"); *Bell v. Prefix, Inc.*, No. 05-74311, 2009 WL 3614350, at *2 (E.D. Mich. Nov. 2, 2009) (noting that "a motion *in limine* [is] not a proper vehicle in which to challenge mitigation," and denying *motion in limine* to strike that affirmative defense).

And regardless, Plaintiff's legal argument that class members were under no duty to mitigate because they were "without access to the company's internal data," Pl. Mem. 17, is without merit. If Plaintiff prevails on her overcharge claim, then a class member (including Plaintiff) could have been on reasonable notice they were being "overcharged" without knowing the details of XOOM's supply costs. This is particularly true in light of CRA's New Report, which introduces new Methods A and B that purport to measure overcharges against the corresponding utility's rates. Those utility rates were publicly available, which means that any class member (again, including Plaintiff) could have determined in short order how XOOM's rates compared to the utilities'. Moreover, Plaintiff's argument does not apply at all to class members who remained XOOM variable-rate customers following receipt of the administrator's notice of this certified class earlier this year. For all these reasons, XOOM is entitled to present its mitigation defense.

Plaintiff separately contends that the testimony is an inappropriate legal conclusion on mitigation of damages. It is not. Rather, it is a well-reasoned expert opinion based on Mr. Coleman's experience and knowledge regarding retail energy deregulation in New York. *See* Ex. A-1, Coleman Rep. 31–33. Mr. Coleman explains that the market structure means, among other

things, customers are "responsible for monitoring their future purchases and ultimately for determining whether remaining an ESCO customer continues to meet their satisfaction." *Id.* at 31–32. It also means that Plaintiff always had "regulated, cost-based Default Service" available to her. *Id.* at 32. This is a far cry from the "impermissible interpretation of the Terms of Service" that the court excluded as a "legal conclusion" in the case Plaintiff cites. *Cf. Pearlman v. Cablevision Sys. Corp.*, No. 10 Civ. 4992 (JS) (GRB), 2015 WL9462104, at *11 (E.D.N.Y. Dec. 28, 2015).

**B.    Reliability: Mr. Coleman's gross margin opinions pass muster under Rule 702.**

In her only Rule 702 and *Daubert* challenge to reliability, Plaintiff asks the Court to exclude Mr. Coleman's analysis of the margins reported by companies included in the Dow Jones Industrial Average (DJIA). This analysis is offered in rebuttal to CRA's assertion in its Original Report that it would be unreasonable to charge its variable-rate customers any margin above the one XOOM charged its fixed-rate customers. *See* Ex. A-2, Coleman Reb. Rep. 12–14. Thus Mr. Coleman prepared this analysis because, "it [was] instructive to assess whether CRA's judgment of [] what constitutes a 'reasonable' margin is consistent with commercial experience." *Id.* at 12.

Using publicly available data, Mr. Coleman assessed the range of gross margin (i.e., margin over COGs) realized by the 26 companies in the DJIA that report COGs, most of which sell consumer products and services. *Id.* That analysis showed: "The average gross margin earned by the 26 DJIA companies is more than two times larger than the [average] gross margin" CRA's Model Two sought to impose on XOOM's variable rates:

13



*Figure 2: Financial Analysis of DJIA Companies Demonstrates the Wide Range of Commercial Gross Margins[28]*

*Id.* at 13. Based on that analysis, Mr. Coleman concluded that "CRA's position that XOOM was limited to the level of margins it charged its fixed rate customers . . . ignores the commercial reality that many other companies rightly charge higher gross margins." *Id.* at 14.

To try and avoid the damaging consequences of the jury hearing that evidence, Plaintiff labels it unreliable by falsely claiming that Mr. Coleman "did not even try to explain why the DIJA companies are valid comparators to XOOM, either in the Rebuttal Report or at his deposition." Pl. Mem. 16. In truth, Mr. Coleman gave that explanation in his Rebuttal Report, justifying the comparator companies by cogently explaining that they are ones that "report cost of goods sold or a close equivalent," as XOOM has. Ex. A-2, Coleman Reb. Rep. 12. Plaintiff must have been satisfied with that explanation because she did not test or otherwise probe it at his deposition.

14

Plaintiff also claims this evidence is unreliable because the DJIA companies report company-wide gross margins, "which is 'substantively' different than XOOM's New York margins for specific products." Pl. Mem. 16. First, it is not clear why that difference would make the margin comparisons unreliable. Second, the DJIA graph shows (in orange) XOOM's gross margins for variable-rate electricity and natural gas and for fixed-rate electricity and natural gas. And if Mr. Coleman had instead consolidated those four product margins, the graph would have made XOOM's gross margins look lower in comparison to the DJIA companies than its variable-rate products do on their own.

Moreover, Plaintiff glosses over the critical fact that the DJIA analysis is offered in rebuttal. It tests the reliability of CRA's proposed comparator margins and is *not* offered as Mr. Coleman's opinion of a valid comparator in its own right. Plaintiff's case law addressing the admissibility of an expert opinion that depends on the reliability of a comparison is therefore inapposite.[7] XOOM will not seek to introduce this evidence if CRA is precluded from testifying regarding its proposed margin comparators. But if CRA's proposed margins are not excluded (though they should be), then XOOM must be allowed to offer relevant and reliable rebuttal testimony from Mr. Coleman—including the DJIA analysis.

---

[7] Only one of Plaintiff's cases even addresses that issue. In *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984), the Second Circuit affirmed exclusion of an "apples-to-oranges" comparison an expert made based on "a number of assumptions and assertions made by [the expert] that were so unrealistic and contradictory as to suggest bad faith," *id.* Plaintiff also cites *Twelve Sixty LLC v. Extreme Music Libr. Ltd.*, No. 17 Civ. 1479 (PAC), 2020 WL 2749708, at **8–9 (S.D.N.Y. May 26, 2020), but that case did not address comparators at all. Instead, it found certain opinions amounted to inappropriate "contract interpretation," and then noted (in dicta) that the expert's methodology left it unable to test reliability. *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) is likewise inapposite. That case evaluates the reliability of causation opinions and, notably, denies as moot plaintiff's motion to exclude defendant's rebuttal causation opinions after excluding the affirmative causation opinions of plaintiff's experts.

**C.** **Deposition Testimony: Rule 32 prohibits use of Mr. Coleman's deposition testimony.**

Although Plaintiff seeks to exclude some of Mr. Coleman's expert testimony, she also asks the Court to rule *in limine* that she be allowed "to affirmatively present the numerous party admissions he made during his deposition." Pl. Mem. 18. In support of that request, Plaintiff contends that two hearsay exceptions apply. But the Court need not reach those exceptions at all because—regardless of whether Mr. Coleman's so-called "admissions" are hearsay—his deposition testimony is not admissible as a procedural matter under Rule 32, which governs the use of deposition testimony at a hearing or trial. *See* Fed. R. Civ. P. 32.

Plaintiff's request must be denied under Rule 32 due to the "unremarkable proposition that a party cannot introduce the deposition testimony of a witness (other than for impeachment purposes) who will, in fact, be present and giving live testimony at trial." *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008) (citing *Niver v. Travelers Indemn. Co. of Ill.*, 430 F. Supp. 2d 852, 866 (N.D. Iowa 2006)). Indeed, "it is the fact that a witness will actually be present at trial that renders him or her 'available,'" and thus precludes the use of their deposition testimony at trial. *Id.* That is precisely why other courts presented with this same question have correctly concluded that "if the witnesses in question are made available as has been agreed for examination [] in [a party's] case in chief, the Court will not allow deposition testimony in lieu of live testimony," *Young & Assocs. Pub. Rels. v. Delta Air Lines*, 216 F.R.D. 521, 524 (D. Utah 2003); *see also Salsman v. Witt*, 466 F.2d 76, 79 (10th Cir. 1972) (emphasizing "the long-established principle that testimony by deposition is less desirable than oral testimony and should ordinarily be used as a substitute only if the witness be unavailable to testify in person") (citing *Napier v. Bossard*, 102 F.2d 467 (2d Cir. 1939) ("The deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand." Indeed, the rule

itself suggests "the importance of presenting the testimony of witnesses orally in open court."))).[8]

Plaintiff's request is substantively deficient as well because she misrepresents Mr. Coleman's testimony. None of it constitutes an "admission" as Plaintiff suggests:

| Plaintiff's Misleading "Summary" | Substantive Deficiency(ies) of "Admission" |
|---|---|
| Conceded that ESCO customers in New York were overcharged by $1.4 billion[9] between 2014 and 2016 compared to what they would have paid if they had used utility service instead. | Mr. Coleman did not "concede" anything, but merely acknowledged that the DPS Staff said as much in their brief. Ex. A-3, Coleman Dep. 18:6–16.<br><br>The DPS Staff Brief is inadmissible hearsay. *Cf.* Fed. R. Evid. 803(8)(A)(iii) (excepting "factual findings from a legally authorized investigation," not the arguments in a staff brief).<br><br>Inadmissible per XOOM's MIL Nos. 8, 12. |
| Agreed that XOOM's customers would not be able to identify and quantify XOOM's actual supply costs without access to the company's internal data. | Mr. Coleman did not agree with that suggestion, instead clarifying that he "would agree customers would not know what the precise numbers were." Ex. A-3, Coleman Dep. 32:7–8. |
| Admitted that he compiled XOOM's supply costs from the company's rate-setting workbooks and found "no discrepancies" in Plaintiff's expert calculations.<br><br>Agreed that Plaintiff's expert model "was based on taking all the data that XOOM had provided for what it said were its total costs." | Mr. Coleman was referring to CRA's Model One, which has now been abandoned, in the referenced testimony. *See id.* at 36:24.<br><br>Mr. Coleman made clear that he did not agree and that the Total Cost data was only "one component of the total costs for the company." *Id.* at 34:14–18. |
| Admitted that the figures from XOOM's rate-setting workbooks were the company's "estimated and actual supply costs." | Mr. Coleman did not "admit" anything, but rather accepted counsel's hypothetical that assumed "the factfinder. . . agreed that the estimated and actual supply cost should be the rate that CRA determined was an overcharge. . ." *Id.* at 38:4–11. |
| Conceded he could not identify any advantage ESCOs provided consumers when compared to utilities. | Mr. Coleman answered counsel's question about "any advantage to the utility that *you've ever analyzed*," by stating "Well, I said I couldn't identify any one in particular," *id.* at 42:5–11, a reference to |

---

[8] Plaintiff separately moved for an *in limine* ruling that she can introduce the deposition testimony of lay witnesses. *See* Pl. MIL No. 9. XOOM hereby incorporates by reference all the arguments and authority made in its concurrently filed opposition to Plaintiff's MIL No. 9.

[9] In addition to the substantive misrepresentations discussed above, the number also contains a typo. *See* Ex. A-3, Coleman Dep. 18:10 ("'almost 1.2 billion…'" (quoting New York Department of Public Service brief)).

| | |
|---|---|
| | an earlier answer about whether he knew "of any ESCO that ever consistently provided customers lower rates than the utility, *id.* at 40:16-20. Inadmissible per XOOM's MIL No. 8. |
| Asserted that XOOM's contract allowed basing rates on non-supply costs. | Mr. Coleman readily admitted he was "not giving a legal opinion in this case as to the meaning of [the contract] language." *Id.* 56:10-13. "It is well-settled that expert testimony must be excluded where it 'states a legal conclusion.'" Pl. Mem. 11 (quoting *United States v. Duncan*, 42 F. 3d 97, 101 (2d Cir. 1994)). |
| Conceded that XOOM set rates using factors that are not supply costs. | Mr. Coleman stated only that he "believe[d XOOM witnesses] testified that they *considered* actual and estimated supply costs along with other factors which are not actual and estimated supply costs." Ex. A-3, Coleman Dep. 55:14–17. "[A]n expert witness may not offer testimony which merely rehashes the testimony of percipient witnesses." Pl. Mem. 11 (quoting *LaSalle Bank Nat. Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012)). |
| Admitted that XOOM did not use a formula to set variable rates. | Mr. Coleman admitted nothing of XOOM's process, but stated only that he did not "see any formulae that identified how [rate-setting factors] were incorporated." Ex. A-3, Coleman Dep. 55:18–24. |
| Agreed that XOOM used "pricing strategies" to set rates before that language was included in the company's contracts. | "[A]n expert witness may not offer testimony which merely rehashes the testimony of percipient witnesses." Pl. Mem. 11 (quoting *LaSalle*, 2012 WL 466785, at *7). |
| Acknowledged that the NYPSC found that for customers like Ms. Mirkin, there was no advantage from switching from their utility to an ESCO like XOOM. | Inadmissible per XOOM's MIL No. 12. |
| Conceded he could not compare XOOM's margins to those of other ESCOs. | Mr. Coleman stated only that he did not do that comparison and was not given the data to do it—not that he "could not" make the comparison. *See* Ex. A-3, Coleman Dep. 86:1–11. |
| Agreed that there was "no way of quantifying what XOOM's prior period adjustments were in a given month." | Mr. Coleman stated only that, at the time, he "didn't see any data that would allow [him] to quantify [what prior period adjustments were in a given month." *Id.* at 95:23–96:4. |

18

For all these reasons, Plaintiff's contention that Mr. Coleman's so-called admissions from his deposition should be admissible in her case-in-chief is both procedurally and substantively deficient. Plaintiff's request should be denied.

## V. CONCLUSION & PRAYER

Accordingly, the Court should deny Plaintiff's Motion *in Limine* to Exclude the Testimony of David Coleman in full. Mr. Coleman's opinions and testimony are relevant and admissible under the Rules, and his deposition testimony is inadmissible.

Dated: June 10, 2024

MCDOWELL HETHERINGTON LLP

*/s/ Michael D. Matthews, Jr*
Michael D. Matthews, Jr.
Diane S. Wizig (admitted *pro hac vice*)
David L. Villarreal (admitted *pro hac vice*)
Netra Sreeprakash
Justin R. Chapa (*pro hac* forthcoming)
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
david.villarreal@mhllp.com
netra.sreeprakash@mhllp.com
justin.chapa@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the 10th day of June, 2024 via CM/ECF on all counsel of record.

/s/*Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.