# EXHIBIT A-6

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF NEW YORK

 3     SUSANNA MIRKIN and BORIS MIRKIN,

 4     Individually and on Behalf of All Others

 5     Similarly Situated,

 6           Plaintiffs,

 7        vs.                      No. 18 Civ. 2949(ARR) (RER)

 8     XOOM ENERGY, LLC and XOOM ENERGY

 9     NEW YORK, LLC,

10           Defendants.

11     --------------------------------x

12

13

14               VIDEOTAPED DEPOSITION OF

15                   SEABRON ADAMSON

16              Tuesday, November 8, 2022

17                      10:06 a.m.

18                       Veritext

19                   101 Arch Street

20             Boston, Massachusetts 02110

21

22

23

24              Laurie K. Langer, RPR
```

Page 1

**Page 106**

1  analysis a little bit. You don't believe that the
2  correlation analysis in Mr. Coleman's initial report or
3  his rebuttal report is a relevant measure of whether or
4  not XOOM's rates were based on its actual and estimated
5  supply costs. Is that fair to say?
6      A. Yeah, it's an insufficient metric.
7      Q. Okay.
8      A. That's what I characterized it.
9      Q. And you described earlier your opinion that even
10 if supply costs and rates were perfectly correlated,
11 that would still, in your view, be insufficient to show
12 that XOOM's rates were based on its actual and estimated
13 supply costs; right?
14     A. Right. And we used the example.
15     Q. Got it. Aside from disagreeing with Mr. Coleman
16 that correlation is some relevant measure, you don't
17 think that his correlation analysis contains any
18 mathematical errors; right?
19     A. I haven't redone his correlation analysis.
20     Q. Have you done your own correlation analysis of
21 XOOM's rates and costs?
22     A. I mean, as we said, our methodology doesn't rely
23 on correlation. So the Method 1 here and 2 and
24 everything doesn't look at that.

**Page 107**

1      Q. Right. But my question is different. Have you
2  done a correlation analysis of --
3      A. No.
4      Q. -- XOOM's rate?
5      A. No. Not -- nothing like - no. I mean, obviously
6  we, you know, you can look at the graphs and stuff, but
7  I haven't calculated correlation coefficients or
8  anything like what he did.
9      Q. You don't disagree that the rates and costs are
10 positively correlated as stated in his report?
11     A. I'm trusting his analysis that he finds non zero
12 correlation coefficients.
13     Q. As far as you know he did the math correctly?
14     A. As far as I know. Again, I haven't checked his
15 math, but he seems to know his math.
16     Q. Okay. Got it. Do you intend to check it later
17 and offer a new opinion about that?
18     A. If in looking through it we were to identify
19 specific issues that relied upon it, I mean, I
20 haven't -- I didn't focus on that because I didn't find
21 it to be an appropriate or sufficient metric, so it
22 didn't, from my perspective, I just sort of assumed it
23 was correct. It's just not really answering the
24 question. If I found that there was some potential

**Page 108**

1  issue I, maybe I would run it. But I haven't -- I don't
2  have any intentions sitting here today to do so.
3      Q. Got it. And the initial report, which is
4  Exhibit 3, was produced on October 31st; right?
5      A. Yes. Something like that.
6      Q. I'm sorry. It was amended on October 31st.
7      A. Yeah.
8      Q. It was originally produced --
9      A. Earlier than that.
10     Q. -- earlier.
11     A. I don't remember the date. Sorry.
12     Q. That's okay. My point being just, you've had a
13 chance to look at it, you just don't think it's relevant
14 to do a correlation analysis?
15     A. That's the main driver, yes.
16     Q. Okay. As to your overcharge calculations as
17 you've characterized them in Model 1 and Model 2,
18 what -- what specialized knowledge or skill did you use
19 to render opinions on what you call overcharges?
20     A. Well, experience in the electricity industry and
21 the gas industry. Economics, finance. And then what I
22 would consider kind of just data analytics of
23 assembling, assembling models, including damages models.
24     Q. Got it. The math -- the data analytics may have

**Page 109**

1  been time consuming; right? But the math itself is
2  pretty straightforward; right?
3      A. Yes.
4      Q. You've got addition, multiplication, and
5  subtraction; right?
6      A. Broadly, yes.
7      Q. Okay. There wasn't any additional scientific
8  method --
9      A. No.
10     Q. -- or technical analysis involved?
11     A. We did not -- it did not require a -- it
12 did -- that model did not require a very complicated
13 mathematical model.
14     Q. Okay. How long, Mr. Adamson, have you been
15 testifying as an expert witness?
16     A. From the very first time that I did it? Because
17 it certainly hasn't been continuous. I think the first
18 case I ever testified in was a Massachusetts regulatory
19 case on behalf of the Massachusetts Attorney General's
20 Office 20 something years ago.
21     Q. Okay. And the last time that we met you told me
22 about half your work was expert witness work, is
23 that -- do you recall telling me that or is that
24 currently accurate?

```
 1  historical numbers; correct?
 2      I mean, I interpreted his as being a summary of
 3  historical data.
 4      Q.  I'm not sure, why are you referring to Yahoo?
 5      A.  In Footnote 28.
 6      Q.  I see.  From finance.yahoo.com?
 7      A.  Yahoo.com is the website.
 8      Q.  Yep.
 9      A.  So I -- I interpreted this and, as a, a chart of
10  historical data for these other companies.
11      Q.  Right.  But the --
12      A.  I mean, that's how I interpreted it.  I hope I'm
13  right.
14      Q.  Yeah, you're right.
15      The gross -- the reported gross margins for these
16  companies that are part of the Dow Jones Industrial
17  Average; right?
18          MR. WITTELS:  Objection.
19      A.  That's what I took this data to be, as reported
20  historical data, yes.
21      Q.  Okay.  And my question is which of these gross
22  margins, if any, do you believe are unreasonable?
23          MR. WITTELS:  Objection.
24      A.  I didn't -- I haven't expressed any opinion on
                                                    Page 122
```

```
 1  that.  I haven't looked at any of these companies and I
 2  did -- this is -- they would have to account for what
 3  those businesses are and what, like, contracts they
 4  have, or sign.  I mean, these are -- I guess, Chevron is
 5  at least an energy company.  I mean, most of these are
 6  software companies, or J&J, or Salesforce.  I mean,
 7  they're completely different businesses.  I don't -- I'm
 8  not quite sure I understand the relevance, but.  I never
 9  expressed any opinion about these data, which I assume
10  he has historical data.
11      Q.  And I guess is your answer it depends on the
12  business and the contracts whether or not a margin is
13  reasonable?
14      A.  To what extent the -- if there is to be a margin
15  is the margin charged under a contract would have to
16  refer to the contract.  I take these to be gross margins
17  reported for generally very large corporations which are
18  mixtures of businesses, contracts, in entirely different
19  business.
20      So, for example, Amgen, which I believe is a
21  biotech company, without knowing a huge amount about it.
22  I mean, that's a very different industry with huge R&D
23  costs.  Clearly the, the margins for an R&D oriented
24  company are going to be very different than for an ESCO.
                                                    Page 123
```

```
 1      Q.  And I guess that's sort of what I'm getting at, I
 2  think.  I think maybe we're saying the same thing.
 3      You're not offering an opinion that no company
 4  should charge more than a 50 percent gross margin ever?
 5      A.  Right.
 6      Q.  You're not offering that sort of opinion; right?
 7          MR. WITTELS:  Wait.  Objection.  You made a
 8  statement, now you have a question.  Objection to the
 9  form.
10      I don't know if you can answer that.
11      You made a statement.
12      A.  It's -- is your question -- say -- say your
13  question again, please.
14      Q.  You're not offering an opinion that it is per se
15  unreasonable, no matter the industry, for a company to
16  charge more than a 50 percent gross margin?
17          MR. WITTELS:  Objection.
18      A.  I have not -- I have not expressed that opinion,
19  no.
20      Q.  And you're not -- and level aside, you're not
21  expressing any opinion that, no matter what, it is
22  always in all circumstances unreasonable for any company
23  to charge a gross margin of a particular number; right?
24          MR. WITTELS:  Objection.
                                                    Page 124
```

```
 1      A.  I -- I have not offered that opinion.  That
 2  doesn't make much sense to me.
 3      Q.  Right.  It would depend on the industry for one;
 4  right?
 5      A.  For one thing, yeah.
 6      Q.  Okay.  And it would depend on contract terms or
 7  representations to customers?
 8      A.  It could, yes.
 9      Q.  It could depend on other things as well; right?
10          MR. WITTELS:  Objection.
11      A.  Sure.  The market timing, various things.  I
12  mean, everything I've said in this has been in relation
13  to these specific contracts.
14      Q.  Got it.
15      A.  And I don't -- as far as I know companies like
16  Amgen don't have these contracts, so comparison seems a
17  little off.  I just don't what it -- I don't know
18  exactly what it proves, but I don't disagree with his
19  data.
20      Q.  Fair enough.  ==The contract doesn't say anything
21  about capping margin; right?==
22      A.  ==It doesn't use -- it doesn't use the word
23  "margin" at all.==
24      Q.  Right.  Okay.  So whether a -- well, let's see.
                                                    Page 125
```

Page 138

1  their retail business.
2     Q. Okay. Well, I guess --
3     A. For example, a bunch of the Texas companies have
4  retail supply businesses. We did a little bit on that,
5  but not a major thing. But a bunch of the Texas
6  companies had retail supply businesses that also had
7  substantial other businesses.
8     Q. I think I understand what you're saying. And you
9  didn't work for the retail side of their businesses, you
10 worked for the other side of their businesses?
11    A. Or sometimes we would be hired on some kind of
12 corporate strategy type engagement, which might be
13 pretty broad.
14    Q. Got it. Okay. I thank you for your time and
15 your patience with me.
16       MR. MATTHEWS: I'll pass the witness.
17    A. Thank you.
18    Q. Yes, sir.
19
20          EXAMINATION
21
22 BY MR. WITTELS:
23    Q. Mr. Adamson, I just really have one question for
24 you. You were asked by counsel for XOOM about whether

Page 139

1  the company was able to make any profits on its fixed
2  rate customers; do you remember that question?
3     A. Yeah. Not in exact wording, but I remember the
4  question.
5     Q. Yeah. And did you ask me to, whether you could
6  go back and review your report when we had a break?
7     A. Yeah, well -- yes, we were discussing the report.
8     Q. And did you reread paragraph 57?
9     A. Yes.
10    Q. And does that answer the question of whether XOOM
11 made money and was profitable on its fixed rate
12 customers?
13       MR. MATTHEWS: Objection. Leading.
14    A. Well, I just -- it just reminded me there was
15 a -- I had said that there was not a specific P&L, this
16 was a reference in the report to deposition testimony
17 from a XOOM witness about the profitability of this.
18    Q. And what did your report find and state?
19    A. I don't remember exactly how he worded it. I
20 think there had been a, in the deposition there was a
21 question about, it was around, I don't have the
22 transcript in front of me, of course, of the deposition,
23 but it was something around the line of were -- were a
24 fixed rate -- were fixed rate customers profitable for

Page 140

1  XOOM or some broad question.
2     Q. And the answer was?
3     A. I believe he said yes, they were, they were both
4  profitable. Both fixed rate and variable rate were
5  profitable.
6     Q. Okay. I have no further questions at this time.
7  Thanks.
8        MR. MATTHEWS: Thanks very much.
9     A. Thank you.
10       VIDEOGRAPHER: The time is 2:39, we are off
11 the record.
12       COURT REPORTER: And, Mr. Matthews, your
13 order?
14       MR. MATTHEWS: My order is an expedited
15 transcript, just, I don't need any print copies.
16 Electronic only. PDF exhibits.
17       COURT REPORTER: Expedite by Friday?
18       MR. MATTHEWS: Yes.
19       (Whereupon, the deposition concluded at
20 approximately 2:39 p.m.)

Page 141

              CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss.

    I, Laurie Langer, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

    I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

    In witness whereof, I have hereunto set my hand and seal this 11th day of November, 2022.

                    _____
                    NOTARY PUBLIC
                    Commission Expires
                    7/27/2023

36 (Pages 138 - 141)