**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SUSANNA MIRKIN,<br>Individually and on Behalf of All Others<br>Similarly Situated,<br><br>               Plaintiffs,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY<br>NEW YORK, LLC,<br><br>               Defendants. | No. 18 Civ. 2949 (ARR) (RER) |

<u>**XOOM'S MEMORANDUM OF LAW IN OPPOSITION**</u>
<u>**TO PLAINTIFF'S MOTIONS *IN LIMINE***</u>

### TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ......................................................................................................................... 4

    I.    Plaintiff's MIL No. 1: Plaintiff cannot shift her evidentiary burdens to XOOM. .. 4

        A.    The Court's Summary Judgment Order did not address XOOM's trial burden. ...................................................................................................... 5

        B.    The Court did not rule that XOOM's contract is a cost-plus contract, and that would not shift the trial burden onto XOOM anyhow. .......................... 8

        C.    No other doctrine allows the Court to shift the trial burden onto XOOM either. ............................................................................................... 9

    II.    Plaintiff's MIL No. 2: The Court should deny Plaintiff's motion to preclude evidence of XOOM's "financial documents." ...................................................... 11

        A.    The financial documents are offered as evidence of XOOM's actual supply costs, are central to liability and damages, and cannot prejudice Plaintiff. . 11

            1.    Whether XOOM considered the financial documents while setting variable rates is immaterial to a relevance determination. ..................... 11

            2.    The evidence shows that XOOM indeed considered actual supply costs in setting variable rates. .......................................................... 14

            3.    The specificity of the actual supply cost evidence is a question of weight, not admissibility. ......................................................................... 15

            4.    Plaintiff's conclusory assertion of prejudice is without merit. ............. 16

        B.    The financial documents evidencing actual supply costs are not cumulative. ........................................................................................ 16

            1.    XOOM's actual and estimated supply costs cannot be conflated. .......... 16

            2.    XOOM is entitled to present PDFs of its rate-setting workbooks and PDFs showing actual costs at trial. ........................................................ 19

        C.    The "financial documents" and actual supply cost evidence were timely disclosed. .......................................................................................... 21

    III.    Plaintiff's MIL No. 3: Plaintiff's motion to preclude XOOM from presenting evidence concerning the nuances of its rate-setting decisions should be denied. . 23

        A.    XOOM's position has been consistent and the evidence that Plaintiff seeks to exclude is not contradictory. ................................................................... 23

        B.    The evidence plaintiff seeks to exclude was properly disclosed, so discovery sanctions under Rule 37 are inapplicable. ................................................... 26

i

IV.     Plaintiff's MIL No. 4: Plaintiff's motion to preclude evidence or argument
        suggesting that different products in different markets could be subject to
        different margins should be denied.................................................................... 28

V.      Plaintiff's MIL No. 5: Plaintiff's motion to prescribe the precise language XOOM
        can use to describe the rate-setting process should be denied. ............................ 34

VI.     Plaintiff's MIL No. 6: The contract's market-based compensation language is
        unquestionably relevant, and the jury should be instructed on it.......................... 37

VII.    Plaintiff's MIL No. 7: Class certification does not exempt Plaintiff from her
        burdens at trial...................................................................................................... 40

VIII.   Plaintiff's MIL No. 8: Plaintiff's request to exclude cumulative testimony is
        abstract and premature, and it should be denied. .................................................. 44

IX.     Plaintiff's MIL No. 9: Plaintiff cannot read deposition transcripts at trial for live
        witnesses. .............................................................................................................. 47

X.      Plaintiff's MIL No. 10: Plaintiff's expert should not testify twice....................... 53

XI.     Plaintiff's MIL No. 11: Plaintiff's motion to strike XOOM's defenses should be
        denied as untimely and because XOOM is entitled to raise each one. ................. 57

XII.    Plaintiff's MIL No. 12: Plaintiff's motion seeking to preclude XOOM from
        offering evidence or argument relating mitigation should be denied. .................. 64

XIII.   Plaintiff's MIL No. 13: The Court should reject Plaintiff's punitive-damages
        instruction. ............................................................................................................ 66

XIV.    Plaintiff's MIL No. 14: The Court should deny Plaintiff's motion to exclude
        evidence or argument regarding her pleaded "market supply cost." .................... 74

XV.     Plaintiff's MIL No. 15: The Court should deny Plaintiff's motion to exclude
        XOOM's rebuttal evidence concerning margins and grant both sides' motions to
        exclude evidence concerning ESCO margins. ....................................................... 77

XVI.    Plaintiff's MIL No. 16: Plaintiff's motion *in limine* seeking to preclude XOOM
        from introducing evidence of her prior ESCO lawsuit is meritless. ..................... 80

XVII.   Plaintiff's MIL No. 17: XOOM is permitted to impeach Plaintiff's expert with
        his prior testimony should the need arise on cross-examination. ......................... 82

XVIII.  Plaintiff's MIL No. 18: The Court should deny Plaintiff's motion to preclude
        XOOM from introducing evidence regarding Plaintiff's motivations.................. 86

CONCLUSION.................................................................................................................. 88

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                        **Page(s)**

*24/7 Recs., Inc. v. Sony Music Ent.*,
   566 F. Supp. 2d 305 (S.D.N.Y. 2008)..................................................................................26

*Ackerman v. Coca-Cola Co.*,
   No. 09 CV 395(DLI)(RML), 2013 WL 7044866 (E.D.N.Y. July 18, 2013).........................72

*Adams v. United States*,
   No. 03–0049–E–BLW, 2009 WL 2032430 (D. Idaho July 7, 2009)......................................49

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.*,
   748 F.3d 110 (2d Cir. 2014)..................................................................................................74

*Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*,
   No. 18-CV-170 (KMK), 2019 WL 4413052 (S.D.N.Y. Sept. 16, 2019)..........................69, 70

*Allgeier v. United States*,
   909 F.2d 869 (6th Cir. 1990) ..........................................................................................48, 52

*Allred v. Cap. Area Soccer League, Inc.*,
   669 S.E.2d 777 (N.C. Ct. App. 2008) ..................................................................................60

*Altruis Grp., LLC v. ProSight Specialty Mgmt. Co., Inc.*,
   No. 1:21-CV-10757-MKV, 2023 WL 4784233 (S.D.N.Y. July 26, 2023) .......................44, 78

*Andrews v. Metro N. Commuter R. Co.*,
   882 F.2d 705 (2d Cir. 1989)..................................................................................................75

*Barnes v. Long Island R.R.*,
   205 F.3d 1321 (2d Cir. 2000)..........................................................................................81, 87

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,
   129 F. Supp. 2d 578 (W.D.N.Y. 2000), *aff'd*, 229 F.3d 1135 (2d Cir. 2000) ........................58

*Bell v. Prefix, Inc.*,
   No. 05-74311, 2009 WL 3614350 (E.D. Mich. Nov. 2, 2009)...............................................65

*Belvin v. Electchester Mgmt., LLC*,
   635 F. Supp. 3d 190 (E.D.N.Y. 2022) .............................................................................44, 78

*Bemis v. Edwards*,
   45 F.3d 1369 (9th Cir. 1995) ...............................................................................................83

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979).................................................................................................82

*Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*,
86 S.E. 1025 (N.C. 1915) ........................................................................... *passim*

*Bobby Floars Toyota, Inc. v. Smith*,
269 S.E.2d 320 (N.C. Ct. App. 1980) ......................................................... 62

*Bockweg v. Anderson*,
117 F.R.D. 563 (M.D.N.C. 1987) ............................................................... 82

*Borden v. 400 E. 55th St. Assocs.*,
24 N.Y.3d 382 (2014) ................................................................................. 70

*Boyd v. Tchrs. Ins. & Annuity Ass'n of Am.*,
807 F. App'x 254 (4th Cir. 2020) ............................................................... 18

*Bracken v. MH Pillars Inc.*,
290 F. Supp. 3d 258 (S.D.N.Y. 2017) ........................................................ 71

*Brazos River Auth. v. GE Ionics, Inc.*,
469 F.3d 416 (5th Cir. 2006) ..................................................................... 51

*Corbin v. Langdon*,
208 S.E.2d 251 (N.C. Ct. App. 1974) ......................................................... 61

*Corsello v. Verizon N.Y., Inc.*,
18 N.Y.3d 777 (2012) ................................................................................. 69

*Daiichi Sankyo Co. v. Mylan Pharms. Inc.*,
No. 2:06–CV–03462 (WJM)(MF), 2009 WL 5842052 (D.N.J. Mar. 20, 2009) ................... 56

*Dhyne v. Meiners Thriftway, Inc.*,
184 F.3d 983 (8th Cir. 1999) ............................................................... 47, 48

*Disability Advocs., Inc. v. Paterson*,
No. 03 Civ. 3209 (NGG) (MDG), 2009 WL 1312112 (E.D.N.Y. May 8, 2009) .................. 32

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
No. 17CV4576GHWBCM, 2023 WL 2870484 (S.D.N.Y. Apr. 10, 2023) ......................... 31

*Duracell Inc. v. Glob. Imports, Inc.*,
No. 17-MC-185 (KNF), 2018 WL 5619983 (S.D.N.Y. Aug. 16, 2018) ......................... 31

*EEOC v. Laroy Thomas, Inc.*,
No. 5:05CV183, 2007 WL 9724343 (E.D. Tex. Oct. 3, 2007) ............................... 48

*Encarnacion v. Olivo*,
No. 921CV986MADTWD, 2024 WL 896362 (N.D.N.Y. Mar. 1, 2024) ......................... 44

iv

*Equal Emp. Opportunity Comm'n v. Tex. Roadhouse, Inc.*,
  215 F. Supp. 3d 140 (D. Mass. 2016) ...................................................................16

*Erazo v. SCM Grp. N. Am.*,
  No. 16 Civ. 2386 (RRM) (RER), 2019 WL 1044365 (E.D.N.Y. Mar. 5, 2019) ...................26

*Feinwachs v. Minn. Hosp. Ass'n*,
  No. 11-cv-0008, 2019 WL 4298085 (D. Minn. Sept. 11, 2019).........................................48

*Fenstermacher v. Phila. Nat'l Bank*,
  493 F.2d 333 (3d Cir. 1974)........................................................................................47

*Fetner v. Rocky Mount Marble & Granite Works*,
  111 S.E.2d 324 (N.C. 1959)........................................................................................61

*Fields v. BNSF Ry. Co.*,
  No. CIV-16-213-KEW, 2021 WL 7966593 (E.D. Okla. Sept. 29, 2021)...............................65

*Fin. Servs. of Raleigh, Inc. v. Barefoot*,
  594 S.E.2d 37 (N.C. Ct. App. 2004) ..........................................................................61

*In re Five Oaks Recreational Ass'n, Inc.*,
  724 S.E.2d 98 (N.C. Ct. App. 2012) ..........................................................................60

*Forrest Const. Co., LLC v. Laughlin*,
  337 S.W.3d 211 (Tenn. Ct. App. 2009) .........................................................................8

*Fulford v. Jenkins*,
  672 S.E.2d 759 (N.C. Ct. App. 2009) ..........................................................................39

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) ...............................................................................40, 59

*In re Gen. Motors LLC Ignition Switch Litig.*,
  No. 14-MD-2543 (JMF), 2016 WL 4493863 (S.D.N.Y. Aug. 24, 2016)...............................53

*In re: Gen. Motors LLC Ignition Switch Litig.*,
  No. 14-CV-8176, 2015 WL 7455569 (S.D.N.Y. Nov. 23, 2015)........................................84

*Global Fin. Corp. v. Triarc Corp.*,
  93 N.Y.2d 525 (1999) .................................................................................................63

*Gonzalez Prod. Sys. v. Martinrea Int'l, Inc.*,
  310 F.R.D. 341 (E.D. Mich. 2015) ..........................................................................48, 51

*Gordon & Co. v. Ross*,
  63 F. Supp. 2d 405 (S.D.N.Y. 1999).............................................................................63

*Green v. Harshaw*,
   121 S.E. 456 (N.C. 1924)................................................................................................61

*Greenspan v. Allstate Ins. Co.*,
   937 F. Supp. 288 (S.D.N.Y. 1996)..........................................................................69, 71

*Guzman v. Harris*,
   No. 16-CV-3499 (GBD) (RLE), 2017 WL 4386369 (S.D.N.Y. Sept. 29, 2017) ...................71

*In re Hampton*,
   407 B.R. 443 (B.A.P. 10th Cir. 2009) ...........................................................................31

*Hart v. RCI Hosp. Holdings, Inc.*,
   90 F. Supp. 3d 250 (S.D.N.Y. 2015)..............................................................................86

*In re Hernandez*,
   860 F.3d 591 (8th Cir. 2017) .........................................................................................16

*Hershkowitz v. Think Tech Labs, LLC*,
   651 F. App'x 15 (2d Cir. 2016) ......................................................................................31

*Hickory Sec. Ltd. v. Republic of Argentina*,
   493 F. App'x 156 (2d Cir. 2012) ...................................................................................43

*Hosbrook v. Ethicon, Inc.*,
   No. 20 Civ. 88, 2021 WL 4452289 (S.D. Ohio Sept. 29, 2021)....................................35

*Howell v. Waters*,
   347 S.E.2d 65 (N.C. Ct. App. 1986) ..............................................................................62

*In re Initial Pub. Offerings Sec. Litig. ("IPO")*,
   471 F.3d 24 (2d Cir. 2006)........................................................................................40, 59

*Intellivision v. Microsoft Corp.*,
   484 F. App'x 616 (2d Cir. 2012) ...................................................................................74

*Interclaim Hldgs. Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*,
   No. 00 C 7620, 2004 WL 725287 (N.D. Ill. Apr. 1, 2004).....................................67

*Internet E., Inc. v. Duro Commc'ns*,
   146 N.C. App. 401, 553 S.E.2d 84 (2001)......................................................................18

*Intersal, Inc. v. Hamilton*,
   373 N.C. 89 (2019) ...................................................................................... *passim*

*Irish v. Tropical Emerald LLC*,
    No. 18-CV-82-PKC-SJB, 2021 WL 5899048 (E.D.N.Y. Dec. 14, 2021), *aff'd in relevant part*, No. 18-CV-82 (PKC) (SJB), 2022 WL 2716182 (E.D.N.Y. July 13, 2022) ................................................................................................26

*Jackson v. Chevron Chem. Co.*,
    679 F.2d 463 (5th Cir. 1982) .....................................................................47

*Jin v. Shanghai Original, Inc.*,
    990 F.3d 251 (2d Cir. 2021) .................................................................40, 46

*Johnson v. Sprint Sols., Inc.*,
    No. 3:08-CV-00054, 2008 WL 2949253 (W.D.N.C. July 29, 2008), *aff'd*, 357 F. App'x 561 (4th Cir. 2009) ...................................................................61

*King v. New York City Emps. Ret. Sys.*,
    212 F. Supp. 3d 371 (E.D.N.Y. 2016) .........................................................58

*Kolb v. Suffolk County*,
    109 F.R.D. 125 (E.D.N.Y. 1985) ...........................................................47, 51

*Little v. Rose*,
    285 N.C. 724, 208 S.E.2d 666 (1974) .........................................................64

*Liu v. Little Saigon Cuisine Inc.*,
    No. 18CV2181RPKVMS, 2021 WL 4487839 (E.D.N.Y. Sept. 30, 2021) ............74

*Lorme v. Delta Air Lines, Inc.*,
    251 F. App'x 691 (2d Cir. 2007) ................................................................27

*LunarEye, Inc. v. Independent Witness, Inc.*,
    No. 9:05-CV-188, 2007 WL 9724756 (E.D. Tex. Feb. 1, 2007) .......................53

*United States ex rel. Lutz v. Berkeley Heartlab, Inc.*,
    No. 9:14-230-RMG, 2017 WL 6015157 (D.S.C. Dec. 1, 2017) .......................51

*M. Carbine Restoration, Ltd. v. Sutherlin*,
    544 So. 2d 455 (La. Ct. App.) .....................................................................8

*MaGee v. Paul Revere Life Ins. Co.*,
    954 F. Supp. 582 (E.D.N.Y. 1997) .............................................................69

*Martinez v. Agway Energy Servs.*,
    88 F.4th 401 (2d Cir. 2023) .......................................................................77

*Masters v. UHS of Del., Inc.*,
    No. 4:06CV1850-DJS, 2008 WL 11391123 (E.D. Mo. Oct. 15, 2008) ...............25

*Mastri v. Wilson,*
    No. 08-CV-01762, 2009 WL 10692482 (M.D. Pa. Aug. 28, 2009) ........................................21

*Matthews v. Davis,*
    664 S.E.2d 16 (N.C. App. 2008) ........................................42

*Mazloum v. D.C. Metro. Police Dep't,*
    248 F.R.D. 725 (D.D.C. 2008) ........................................47, 49

*Mazzei v. Money Store,*
    829 F.3d 260 (2d Cir. 2016) ........................................40, 46

*McK Enters., LLC v. Levi,*
    219 N.C. App. 647, 722 S.E.2d 798 (2012) ........................................8

*Medtronic, Inc. v. Mirowski Fam. Ventures, LLC,*
    571 U.S. 191 (2014) ........................................7

*Micron Tech., Inc v. Rambus Inc.,*
    No. 00-792 (SLR), 2007 WL 9771144 (D. Del. Aug. 29, 2007) ........................................50

*Mirkin v. XOOM Energy, LLC,*
    931 F.3d 173 (2d Cir. 2019) ........................................58

*Mohammed v. Holder,*
    No. 07-CV-02697-MSK-BNB, 2013 WL 4949282 (D. Colo. Sept. 13, 2013) ........................................44

*Mohegan Lake Motors, Inc. v. Maoli,*
    No. 16-CV-6717 (NSR), 2023 WL 1070247 (S.D.N.Y. Jan. 27, 2023) ........................................34

*Nall v. Estate of Powell,*
    99 A.D.3d 411 (1st Dep't 2012) ........................................63

*Napier v. Bossard,*
    102 F.2d 467 (2d Cir. 1939) ........................................47

*New York Univ. v. Continental Ins. Co.,*
    87 N.Y.2d 308 (1995) ........................................67, 68

*Newman v. RCN Telecom Servs.,*
    238 F.R.D. 57 (S.D.N.Y. 2006) ........................................72

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    259 F.3d 154 (3d Cir. 2001) ........................................45, 46, 59

*Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,*
    *LLP,* 322 F.3d 147 (2d Cir. 2003) ........................................74

*Olutosin v. Gunsett*,
   No. 14-CV-00685 (NSR), 2019 WL 5616889 (S.D.N.Y. Oct. 31, 2019) ..............................44

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
   585 F. Supp. 3d 540 (S.D.N.Y. 2022), *aff'd*, 66 F.4th 365 (2d Cir. 2023) ............................63

*Pierson v. Ford Motor Co.*,
   No. C 06-6503 PJH, 2008 WL 7084522 (N.D. Cal. Aug. 1, 2008) .........................................83

*Portfolio Recovery Assocs., LLC v. King*,
   14 N.Y.3d 410 (2010) .............................................................................................................62

*Prolitec Inc. v. ScentAir Techs., LLC.*,
   No. CV 20-984-WCB, 2024 WL 341342 (D. Del. Jan. 30, 2024) .........................................75

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   934 F.3d 619 (D.C. Cir. 2019) .............................................................................21, 35, 45, 59

*Raymond v. Marks*,
   116 F.3d 466 (2d Cir. 1997).......................................................................................................7

*Reilly v. Natwest Mkts. Grp.*,
   181 F.3d 253 (2d Cir. 1999).....................................................................................................26

*Rich v. Associated Brands Inc.*,
   559 F. App'x 67 (2d Cir. 2014) ...............................................................................................75

*Richards v. Direct Energy Services, LLC*,
   246 F. Supp. 3d 538 (D. Conn. 2017), *aff'd*, 915 F.3d 88 (2d Cir. 2019) ..............................82

*Richards v. Direct Energy Servs.*,
   915 F.3d 88 (2d Cir. 2019)............................................................................................ *passim*

*Rigsbee v. City & County of Honolulu*,
   No. 17-00532 HG-RT, 2019 WL 1089636 (D. Haw. Mar. 7, 2019) .......................................51

*Ruiz v. Walmart Inc.*,
   No. CV 20-01129-RAO, 2021 WL 5759043 (C.D. Cal. Oct. 28, 2021) .................................21

*S&H Farm Supply, Inc. v. Bad Boy, Inc.*,
   No. 18-03413-CV-S-BP, 2020 WL 8373428 (W.D. Mo. Sept. 4, 2020) ................................48

*Salsman v. Witt*,
   466 F.2d 76 (10th Cir. 1972) ...................................................................................................47

*Santa's Best Craft, LLC v. Janning*,
   No. 02 C 9529, 2003 WL 21504522 (N.D. Ill. June 30, 2003) ..............................................53

*Save Our Wetlands, Inc. (SOWL) v. Rush*,
   424 F. Supp. 354 (E.D. La. 1976) ...................................................................62

*Schmalz v. Sovereign Bancorp, Inc.*,
   868 F. Supp. 2d 438 (E.D. Pa. 2012) .............................................................30

*SciGrip v. Osae*,
   838 S.E.2d 334 (N.C. 2020) ...........................................................................66

*Scordill v. Louisville Ladder Grp., LLC*,
   No. CIV.A. 02-2565, 2004 WL 307475 (E.D. La. Feb. 17, 2004) .......................83

*Sevugan v. Direct Energy Servs.*,
   931 F.3d 610 (7th Cir. 2019) .....................................................................28, 77

*Shady Grove Orthopedic Assocs. v. Allstate Ins Co.*,
   559 U.S. 393 (2010).......................................................................................70

*Sheltry v. Unum Life Ins. Co. of Am.*,
   247 F. Supp. 2d 169 (D. Conn. 2003) .............................................................58

*Sierra Club v. E.P.A.*,
   353 F.3d 976 (D.C. Cir. 2004) ........................................................................35

*Simon v. Philip Morris, Inc.*,
   124 F. Supp. 2d 46 (E.D.N.Y. 2000) ...............................................................67

*Sioux Steel Co. v. Prairie Land Mill Wright Servs.*,
   No. 16 Civ. 2212, 2022 WL 17082541 (N.D. Ill. Nov. 18, 2022).......................35

*Strum v. Exxon Co.*,
   15 F.3d 327 (4th Cir. 1994) ...........................................................................67

*Synergy Hematology-Oncology Med. Assocs. v. Abbott Labs.*,
   No. 222CV01560SPGJEM, 2023 WL 4761550 (C.D. Cal. June 6, 2023)............26

*Ticheli v. Travelers Ins. Co.*,
   No. 1:14-CV-00172, 2014 WL 12587066 (N.D.N.Y. Dec. 23, 2014) ..................68

*Tomaino v. O'Brien*,
   315 F. App'x 359 (2d Cir. 2009) .....................................................................81

*Toussie v. Allstate Ins. Co.*,
   No. 15-CV-5235 (ARR)(PK), 2016 WL 6537670 (E.D.N.Y. Nov. 3, 2016)
   (Ross, J.)......................................................................................................69

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021).......................................................................................60

x

*Troitino v. Goodman*,
    35 S.E.2d 277 (N.C. 1945)..................................................................6, 42

*TVT Recs. v. Island Def Jam Music Grp.*,
    250 F. Supp. 2d 341 (S.D.N.Y. 2003)..................................................34

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016).................................................... *passim*

*U.S. Bank Trust, v. Jones*,
    330 F. Supp. 3d 530, 539 (D. Me. 2018) ......................................20, 21

*United Realty Advisors, LP v. Verschleiser*,
    No. 14-CV-5903 (JGK), 2019 WL 5285043 (S.D.N.Y. Oct. 3, 2019)..................57

*United States v. Bard*,
    73 F.4th 464 (7th Cir. 2023) ..............................................................55

*United States v. Dawson*,
    434 F.3d 956 (7th Cir. 2006) ..............................................................84

*United States v. Foley*,
    735 F.2d 45 (2d Cir. 1984)..................................................................36

*United States v. GAF Corp.*,
    928 F.2d 1253 (2d Cir. 1991)..............................................................75

*United States v. IBM Corp.*,
    90 F.R.D. 377 (S.D.N.Y. 1981) ..........................................................49

*United States v. Johnson*,
    No. 19 CR 405, 2024 WL 1486760 (N.D. Ill. Apr. 5, 2024)....................55

*United States v. McCombs*,
    30 F.3d 310 (2d Cir. 1994)....................................................................7

*United States v. Salzano*,
    2024 WL 866885 (D.N.J. Feb. 26, 2024) ............................................55

*United States v. Sanchez-Rodriguez*,
    161 F.3d 556 (9th Cir. 1998) ..............................................................35

*United States v. Terry*,
    702 F.2d 299 (2d Cir. 1983)..........................................................83, 84

*United States v. Zakhari*,
    No. 3:19-cr-208, 2021 WL 4139146 (W.D. Ky. Sept. 10, 2021) ............55

*Walker v. Firestone Tire & Rubber Co.*,
412 F.2d 60 (2d Cir. 1969)..................................................................82

*Young & Assocs. Pub. Relations, LLC v. Delta Air Lines, Inc.*,
216 F.R.D. 2003.....................................................................48, 49

**Statutes**

New York Gen. Bus. Law § 349.......................................................... *passim*

New York Gen. Bus. Law § 349-d ..................................................66, 71

**Other Authorities**

*Contract*, Black's Law Dictionary (11th ed. 2019)..................................8

New York CPLR § 202........................................................................62, 63

New York CPLR § 901.............................................................................70

Fed. R. Civ. P. 12....................................................................................62

Fed. R. Civ. P. 23............................................................................ *passim*

Fed. R. Civ. P. 26....................................................................................26

Fed. R. Civ. P. 32..................................................................47, 49, 51, 52

Fed. R. Civ. P. 30....................................................................................51

Fed. R. Civ. P. 37..................................................................23, 26, 44

Fed. R. Evid. 401............................................................................. *passim*

Fed. R. Evid. 403............................................................................. *passim*

Fed. R. Evid. 608 ...................................................................................84

Fed. R. Evid. 611....................................................................................48

Fed. R. Evid. 613 ...................................................................................84

Fed. R. Evid. 801..................................................................47, 49, 50, 51

Fed. R. Evid. 1001 .................................................................................20

## PRELIMINARY STATEMENT

XOOM's Motion to Decertify forced Plaintiff to finally reckon with her lack of admissible proof on two of the three components the Court held must determine XOOM's rates: (1) actual supply costs and (2) a reasonable and proportionate margin. Although Plaintiff still refuses to acknowledge those evidentiary deficiencies explicitly, she has launched a multi-front effort for the past three months that she apparently hopes will allow her to avoid them altogether.

First, a few weeks after XOOM served its decertification motion—and just three days before the parties were due to exchange expert motions in March—Plaintiff suddenly insisted she would amend the damage models from her experts at Charles River Associates (CRA) that sustained her case through summary judgment and won her class certification. But rather than supplement or amend CRA's timely disclosures made eighteen months prior, Plaintiff served an entirely new and untimely report from CRA that fully "replaces" its predecessors and discloses for the first time never-before disclosed damage models. XOOM addresses why this aspect of Plaintiff's strategy to salvage her case fails in its pending motions to exclude CRA's reports.

Plaintiff's second strategy initially appeared in her decertification response and continues in her MIL No. 1. To try to mitigate the increasingly certain risk that her evidentiary shortcomings will doom her claim, Plaintiff incorrectly argues that XOOM's burden as a summary-judgment movant applies at trial. Specifically, Plaintiff contends she does not need to present evidence of XOOM's actual supply costs or an appropriate margin because the burden to do so belongs to XOOM. That approach flies in the face of the universal principle that a claimant has the burden of proof to show she is entitled to recovery. Like CRA's New Report, and for all the reasons explained in XOOM's decertification reply, Plaintiff's strategy should be rejected.

Now, Plaintiff's Motions *in Limine* push her strategy several steps further away from any

applicable standards. Not only does XOOM have an evidentiary burden to establish its actual supply costs at trial to **disprove** her overcharge claim, Plaintiff says, but her MIL No. 2 seeks to heighten the burden to one of "clear evidence" and then prohibit XOOM from introducing any evidence to meet that burden. That exceptional request is meritless. The financial documents and related testimony at issue are plainly relevant to central issues in this case—the rates XOOM should have charged and how XOOM set rates—and thus cannot possibly prejudice Plaintiff. They were also properly disclosed in discovery, and the record belies Plaintiff's claim to the contrary.

But wait, there's more! Assuming the Court adopts her burden-shifting argument and then precludes XOOM from introducing evidence to meet its unprecedented burden, Plaintiff asks that the Court go ahead and instruct the jury that XOOM breached the contract. *See* Doc. 222, Pl. MIL Mem. 9 ("If XOOM cannot meet the burden of establishing that its fluctuating margins were 'determined solely by' permissible supply costs, the jury should be instructed that permissible supply costs were not incorporated into XOOM's variable rate margins."). In other words, Plaintiff not only wants to be free of her evidentiary burden, she wants XOOM to be prevented from defending itself—and then wants the jury instructed to find that 'yes' XOOM breached.

And if that were not enough, Plaintiff's MIL No. 13 asks that the jury then be allowed to **punish** XOOM for these presumed contract breaches that XOOM is not allowed to defend itself from. That is correct: Plaintiff asks that the jury be instructed on an unpleaded request for punitive damages pursuant to her "simple breach of contract claim." That unpleaded request is barred by federal procedural law, the contract, and the governing substantive state law.

To try to distract from her novel and extreme positions, Plaintiff's final strategy is to accuse XOOM of equivalent conduct. Plaintiff's Preliminary Statement and first three *limines* inaccurately frame XOOM's pretrial filings as "seek[ing] to disrupt the trial by confusing the

issues and ambushing Plaintiff with entirely new factual theories," like a "secret margin." Frankly that is nonsense. XOOM's legal positions, evidence, and witness testimony have been consistent for the past six years. XOOM has no intention of contradicting any of its witnesses' testimony about its rate-setting process. Rather, as its witnesses testified uniformly, XOOM's rate-setting ***process*** has largely remained the same throughout the class period while each rate-setting ***decision*** varied by product and its relevant supply costs, including prior period adjustments. Plaintiff's suggestion that XOOM's arguments, which have appeared in every filing to date, and its evidence that was admittedly produced in discovery are somehow new reveals her desperation to cover up her own evidentiary shortcomings—as does her feigned shock at XOOM's reasonable estimate that 35 days of testimony will be necessary to address the thousands of rate-setting decisions made during monthly meetings over the 11-year period at issue. Nothing about XOOM's defense is "new"—much less "fanciful," "outlandish," "curious," "highly implausible," "fantastical," "myth," "illogical," "improbable," "highly dubious," or "specious" as Plaintiff says.

As such, and as XOOM explains more fully below, Plaintiff's Motions *in Limine* are not mere requests for pretrial rulings on evidentiary issues. Rather, they are just one more step (and hopefully the last) in her strategy to avoid her evidentiary burden and prevent XOOM from mounting any defense. Plaintiff's motions should be denied in full.

<u>**ARGUMENT**</u>

**I.      Plaintiff's MIL No. 1: Plaintiff cannot shift her evidentiary burdens to XOOM.**

Plaintiff's case survived dismissal on a promise that she would be able to show "what XOOM's prices should have been" using anticipated "discovery of XOOM's ***actual costs*** and profits." Doc. 42, Am. Compl. ¶ 58 (emphasis added). XOOM produced that discovery, and Plaintiff's experts had it available in forming their opinions. The Court then denied XOOM's motion for summary judgment and granted class certification based on Plaintiff's arguments that her expert evidence accounted for all the supply costs XOOM considered in rate-setting.

Tellingly, Plaintiff rolled out her burden-shifting theories and accused XOOM of "using secret, undocumented supply costs in an equally secret calculation" only ***after*** it became clear that her models were untenable. Pl. MIL Mem. 19. But the demise of Plaintiff's expert evidence just means she has no evidence at all for essential elements of her overcharge claim. It is not a reason to impose a presumption of breach and make XOOM disprove it. Nor does it mean XOOM failed to provide discovery. The burden to show what XOOM's rates should have been is still Plaintiff's, as she implicitly and necessarily acknowledged by serving a new expert report with brand-new damage models. Indeed, the parties' arguments and the Court's analysis on summary judgment would have been markedly different if XOOM actually had the evidentiary burden Plaintiff now says it does.

Plaintiff's MIL No. 1 offers no reason to conclude otherwise. For one thing, it is mostly a beside-the-point rendition of Plaintiff's case and likely trial themes, heavy on attorney argument and largely unmoored from the merits of her burden-shifting theory. Of its nearly 20 pages, thirteen are devoted to "introduction" and "relevant background" sections that mischaracterize the materials XOOM produced in discovery and rehash issues from class certification, summary judgment, and the parties' briefing on XOOM's Motion to Decertify and motions to exclude

CRA's expert reports. Barely six pages of "argument" address Plaintiff's burden-shifting gambit, which Plaintiff contends is required based on two alleged summary judgment rulings. Plaintiff raised the same arguments in her Opposition to XOOM's Motion to Decertify, and XOOM addressed them in its Reply in Support of that Motion, *see* Doc. 212 7–10. XOOM incorporates those arguments here and addresses each of the two supposed rulings in turn.

    A.  <u>The Court's Summary Judgment Order did not address XOOM's trial burden.</u>

First, Plaintiff wrongly contends that the Court expressly held (and therefore the law-of-the-case doctrine demands) that XOOM must shoulder what otherwise would always be Plaintiff's burden to "'show that its rates were determined by its actual and estimated supply costs'" and also to "'explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric.'" Pl. MIL Mem. 20 (quoting SJ Order 15). But as the Court knows, it held no such thing. The Court's Order shows that the language quoted by Plaintiff arose in the context of a discussion of ***XOOM's burden as the movant for summary judgment*** and simply applied summary-judgment principles to deny XOOM's motion:

> However, I find that XOOM has failed to demonstrate that there is no genuine dispute of material fact as to whether it breached the contract. XOOM's arguments and evidence certainly show that it considered its supply costs when calculating the Mirkins' monthly rates. And if all XOOM had to do under the contract was consider and incorporate its supply costs into the final rate, it would likely prevail. But under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs. XOOM has not done so.
>
> First, XOOM has failed to adequately explain why the fluctuations in plaintiffs' variable rate did not directly correspond to XOOM's internal COGS metric. As shown in the following

Doc. 151, SJ Order 15.

Like any defendant moving for summary judgment, XOOM could have prevailed in one of two ways: it could either show that it was entitled to judgment as a matter of law or it could dispel

the existence of material fact questions. In the excerpt Plaintiff relies on, the Court held that XOOM did not show as a matter of law that its rates were determined by its actual and estimated supply costs. Two pages later, the Court also concluded that Plaintiff "presented evidence sufficient to demonstrate the existence of a question of fact as to whether XOOM set the Mirkins' monthly variable rate in compliance with the contract." *Id.* at 17. Neither of these rulings says anything about the parties' respective burdens ***at trial***, let alone purports to be a binding decision of law holding that XOOM must affirmatively prove the three issues Plaintiff insists it must. At trial, of course, a plaintiff has the burden on each element of her claim.

Here, that fundamental legal principle requires Plaintiff to show that XOOM breached its contract by charging her more than what the contract allowed. That claim is governed by North Carolina law. Plaintiff does not deny that North Carolina law governs the substance of her claim, or that North Carolina requires her to prove that "the amount charged by a defendant was in excess" of the amount she should have been charged. *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86 S.E. 1025, 1026 (N.C. 1915); *Troitino v. Goodman*, 35 S.E.2d 277, 282 (N.C. 1945) (measuring contract damages as "the pecuniary difference between [an injured party's] position upon breach of the contract and what it would have been, had the contract been performed"). The "amount" of damages is critical to a North Carolina contract claim. *See Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09 (N.C. 2019) (noting that "the amount of damages resulting to plaintiff" is an essential element of a contract claim).

Plaintiff admits that XOOM has actual supply costs but contends there is no evidence XOOM ***used*** them when setting variable rates. That is not true. But even if it were, and Plaintiff proved it to be so, that would not be the end. To succeed on her overcharge claim, Plaintiff cannot merely show that ***how*** XOOM set rates was improper; instead, she must prove ***the amount XOOM***

***should have charged***. Her contract claim rises and falls with proof of that amount. If she cannot prove the ***amount*** of each alleged overcharge—which (under the Court's construction) requires evidence of XOOM's actual supply costs—she cannot establish breach, much less damages. *Blalock*, 86 S.E. at 1026; *Intersal*, 373 N.C. at 109. She has to show what the rates should have been if the actual supply costs ***were*** used to determine every rate. *Id.*

Plaintiff mischaracterizes this legal reality as an effort to make her prove the amount of actual costs that XOOM ***in fact*** used to set its rates, which is one of XOOM's defenses. Not true. Plaintiff need not prove how XOOM permissibly incorporated its actual supply costs into the variable rates. To prove an overcharge, however, she must show what at least one rate should have been per the contract. And, showing what the rates ***should have been*** requires addressing what XOOM's actual supply costs ***were***, as one of the three permissible rate components. If Plaintiff contends that XOOM's actual supply costs were the same as the estimates in XOOM's rate-setting workbooks—contrary to the "ample" testimony and many documents showing otherwise—she is free to try to convince the jury. But because she knows that is an impossible task, and because she understands she has no other way to address XOOM's actual supply costs, she tries to deflect her burden of proof on actual costs at trial onto XOOM.[1] The Court should not allow her to do so.

---

[1] Plaintiff contends that the Court should not apply North Carolina substantive law to the burden question, but instead should apply New York procedural law here. It is axiomatic, however, that "the burden of proof is a ***substantive*** aspect of a claim." *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) (emphasis added, quotation marks and citations omitted); *see United States v. McCombs*, 30 F.3d 310, 323–24 (2d Cir. 1994) ("Presumptions and other matters related to the burden of proof are considered matters of substantive law, governed by the law of the jurisdiction whose substantive law applies to the merits of the question in issue."). As such, Plaintiff's burden of proof is governed by North Carolina law.

And even if Plaintiff's resort to New York law had merit (it does not), it would not matter. Like North Carolina (and all states), New York places the burden of proof for a contract claim on the plaintiff. *See, e.g.*, *Raymond v. Marks*, 116 F.3d 466 (2d Cir. 1997).

B. <u>The Court did not rule that XOOM's contract is a cost-plus contract, and that would not shift the trial burden onto XOOM anyhow.</u>

Plaintiff next attempts to recast the contract as a "cost-plus" contract—another theory she raised recently—because she believes that will shift the burden onto XOOM to prove its actual costs. She is wrong on several levels. As an initial matter, Plaintiff is incorrect to source her cost-plus theory to the Court's Summary Judgment Order. Nowhere in that Order did the Court "determine[] that XOOM's contract is a cost-plus contract." Pl. MIL Mem. 21. The quotes Plaintiff provides do not say that, and the term "cost-plus" does not appear in any order of this Court.

But more fundamentally, XOOM's contract does not fall within the "cost-plus" category. Such contracts are used primarily in the construction context and, unlike here, specify the "plus" amount. *See, e.g.*, *McK Enters., LLC v. Levi*, 219 N.C. App. 647, 722 S.E.2d 798 (2012) ("contract price was listed as '[c]ost plus 15%'"); *Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019) (A "cost-plus contract" is "[a] contract in which payment is based on a fixed fee or a percentage added to the actual cost incurred."). The construction cases Plaintiff cites (at 21 & n.7) were issued under the laws of not North Carolina or even New York, but Louisiana, Tennessee, Delaware, and Nebraska. And most importantly, there is nothing unique about the burden of proving breach on a cost-plus contract under the law of any state. Rather, the cases Plaintiff relies on simply apply the familiar rule that a ***plaintiff*** bears the burden of proof on all elements of a contract claim—no matter the type of contract. *See M. Carbine Restoration, Ltd. v. Sutherlin*, 544 So. 2d 455, 458 (La. Ct. App.) ("Once the existence of a cost-plus contract has been established, the contractor [plaintiff] also has a duty to [establish its costs]" to show the amount contractually owed.); *Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 223 (Tenn. Ct. App. 2009) (same).

C.  No other doctrine allows the Court to shift the trial burden onto XOOM either.

Plaintiff also relies on various other doctrines that supposedly require shifting burdens onto XOOM. Plaintiff conclusorily argues that XOOM has superior access to information about how it incorporated its actual supply costs into rates. But after years of discovery, XOOM has no better access to relevant evidence than Plaintiff. XOOM produced ample documentary evidence of its actual supply costs to Plaintiff, but she would rather ignore it because it is individualized and undermines her claims. Indeed, after trying to shift the burden to prove actual costs onto XOOM in this motion, Plaintiff's MIL No. 2 argues that XOOM is not allowed to introduce any of that evidence. Her heads-I-win-tails-you-lose argument should be rejected out of hand.

Plaintiff also briefly asserts that burden-shifting is necessary because otherwise "XOOM would have Plaintiff prove a negative—that fluctuations in XOOM's rates were **not** caused by undocumented supply costs incorporated into an undisclosed but fixed margin." Pl. MIL Mem. 25. As described more fully in response to Plaintiff's MIL No. 2, *see* Part II *infra*, XOOM has not made that argument; it contends only that Plaintiff must bear her burden to show what XOOM's rates should have been as part of establishing breach and damages.

And finally, burden shifting is not warranted based on Plaintiff's unsupported and false accusations that XOOM failed to provide complete discovery or because Plaintiff considers certain things to be implausible based on a misconstruction of her burden of proof. *See id.* at 25–27. XOOM fully and timely disclosed its evidence and legal theories. *See* Parts II, III *infra*. And asking a plaintiff pursuing an overcharge claim to prove the existence and amount of the overcharge is hardly an "illogical defense." *Id.* at 7. But whether XOOM presents a case with an "unusual fact pattern," *id.* at 26, is for the jury to decide, and certainly does not justify shifting Plaintiff's evidentiary burdens to XOOM.

\*   \*   \*   \*   \*

9

Plaintiff's MIL No. 1 raises issues that the Court will necessarily decide in ruling on XOOM's Motion to Decertify and Motions to Exclude Plaintiff's Expert Disclosures. As in her briefing opposing those motions, Plaintiff's burden-shifting theory in her MIL No. 1 is based on a fundamental misunderstanding of the difference between a summary judgment burden and a trial burden. XOOM respectfully asks the Court to reject it, grant XOOM's expert motions, grant XOOM's certification motion, and (if it is reached at all) deny Plaintiff's MIL No. 1.

II.     **Plaintiff's MIL No. 2: The Court should deny Plaintiff's motion to preclude evidence of XOOM's "financial documents."**

Plaintiff seeks "to preclude XOOM from offering financial documents that are not ***clear evidence*** of supply costs feeding directly into XOOM's margins or rates or are merely cumulative." Pl. MIL Mem. 32 (emphasis added). As a threshold matter, Plaintiff's attempted importation of a "clear evidence" standard is unsupported, unexplained, and thus can be rejected out of hand.

Her request fails for at least three additional independent reasons. First, the financial documents Plaintiff seeks to exclude are offered as proof of XOOM's actual supply costs. That evidence is relevant to the central issues in this case—the rates XOOM should have charged—and thus cannot be prejudicial. Second, the evidence of actual supply costs is not cumulative, nor could the Court make such a determination at this stage. And third, XOOM's contemporaneous evidence of its actual supply costs was properly disclosed in discovery.

A.   <u>The financial documents are offered as evidence of XOOM's actual supply costs, are central to liability and damages, and cannot prejudice Plaintiff.</u>

1.   *Whether XOOM considered the financial documents while setting variable rates is immaterial to a relevance determination.*

Perhaps the most fundamental of Plaintiff's incorrect arguments in MIL No. 2 is one that also underpins MIL No. 1—i.e., the idea that Plaintiff can make a submissible case without establishing what XOOM's rates ***should have been***. Plaintiff cannot make even a *prima facie* overcharge claim without addressing XOOM's actual supply costs, regardless of whether they were "us[ed] . . . to calculate New York variable rates." That determination using XOOM's actual supply costs is necessary to adjudicate both liability and damages. It is unquestionably relevant, and Plaintiff's motion should be denied on that basis alone.

As discussed in Part I *supra*, North Carolina law places the burden of proving the amount of the overcharge squarely on Plaintiff. *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86

S.E. 1025, 1026 (N.C. 1915) (plaintiff must prove that "the amount charged by a defendant was in excess" of the amount she should have been charged). The ***amount of the overcharge*** is an element of a *prima facie* contract claim for damages. *See Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09 (N.C. 2019) (listing "the amount of damages resulting to plaintiff" among the "necessary allegations for a breach-of-contract claim" and holding that "fail[ure] to allege an amount of damages" doomed contract claim). Thus, to calculate any alleged overcharge in this case, the jury will need to know both (1) the rate XOOM charged and, (2) if there was a breach, the rate XOOM should have charged under the contract. If Plaintiff cannot prove the difference between the rate XOOM charged and the rate XOOM should have charged, she cannot prove an overcharge claim.

As to the rates XOOM charged (factor 1), there is no dispute that those rates are documented in XOOM's rate-setting workbooks and in the class charge data. So the question for the jury will be: ***what was the rate XOOM should have charged*** (factor 2)? To give an answer, the jury must be presented with evidence to determine the following three rate-setting components:



As XOOM's decertification motion explains, there is no common evidence that Plaintiff can present from which the jury could determine XOOM's actual supply costs (component 2) or an appropriate margin (component 3). Doc. 197, Def. Decert. Mem. 12–22. So, Plaintiff's (incorrect) assertion that XOOM never actually based its rates on the actual supply costs misses the point.

No matter whether XOOM considered the actual supply costs every month in setting rates, the finder of fact must consider them to adjudicate Plaintiff's claim about what the rates **should have been**. That evidence includes the "ample testimonial evidence" the Court recognized at summary judgment and which XOOM will present at trial—and the abundant documentary evidence of actual supply costs on XOOM's Exhibit List that Plaintiff seeks to exclude. XOOM must be permitted to introduce it all.

Plaintiff's strategy for dealing with XOOM's actual supply costs has long been to pretend they did not exist. But they do exist. So now, she tries to erase them by excluding all actual supply cost evidence. Her motion fails for a variety of reasons, but principally because of her presumption that the rate XOOM should have charged **need not be proven at all**. That is wrong. It is incompatible with the Court's contract construction and the North Carolina law already discussed, *see, e.g.,* Doc. 151, SJ Order 19; *Blalock*, 86 S.E. at 1026; *Intersal*, 373 N.C. at 108–09.

Plaintiff's request to exclude all evidence of actual supply costs is also incompatible with XOOM's fundamental constitutional rights. Even if the burden of proof for liability and damages were somehow flipped so that XOOM had to prove the absence of an overcharge,[2] actual supply cost evidence would be relevant to XOOM's defense. XOOM would have the right to prove that its rates were based not just on the **estimated** supply costs in its rate-setting workbooks, but also on the **actual** supply costs in the very evidence Plaintiff seeks to exclude. XOOM would also have the right to prove that Plaintiff's damage model(s) minimize(s) the supply costs and improperly augment(s) class damages. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (class action parties have all the rights that "they could have asserted in an individual action").

---

[2] For the reasons discussed in opposing Plaintiff's MIL No. 1 above, *see* Part I *supra*, Plaintiff alone bears the burden at trial.

The bottom line is that, whichever party bears the burden of proof (and it is clear that Plaintiff does), the jury cannot find an overcharge (or the absence of one) unless it first decides the rate XOOM **should have charged**. XOOM's evidence of its actual supply costs exists in abundance and the jury cannot resolve Plaintiff's overcharge claim without considering it.

2.    *The evidence shows that XOOM indeed considered actual supply costs in setting variable rates.*

Plaintiff's premise that XOOM did not consider its actual supply costs in rate-setting is not just immaterial to the relevance inquiry; it is factually wrong. The Court already recognized the "ample testimonial evidence supporting the general proposition that prior period adjustments were included in the margin and therefore responsible for rate fluctuations." SJ Order 16. XOOM also has pointed to documentary evidence of it in droves. *See, e.g.,* Doc. 198, Loehde Decl. Exs. B-6– 20 (showing that XOOM's Senior Director of Pricing and Structure requested and regularly received analysis of the delta between actual and estimated supply costs in New York, and the variances between estimated supply costs and actual supply costs were considered when XOOM set rates for upcoming months). And all of this documentary evidence of actual supply costs was produced well before the "ample testimonial evidence" was provided in depositions. That Plaintiff did not focus on it earlier does not make it "previously undisclosed."

Because Plaintiff cannot argue this evidence is irrelevant, she seeks to invent a new "clear evidence" standard to replace relevance—asking the Court to "preclude XOOM from introducing financial documents that are not clear evidence of supply costs feeding directly into XOOM's margins or rates." Pl. MIL Mem. 32. Put differently, Plaintiff contends that if a document on its face does not "specifically show supply costs 'determining' XOOM's margins," or does not show a "linkage between supposed supply costs and XOOM's margins or rates," then it should be excluded. *Id.* at 32, 28. That proposition is not supported by any legal citation or logical

explanation. There is no rule requiring a specific showing or "linkage" within a document for it to be relevant and admissible. These were ordinary business records made in real-time. They were not created with an eye towards litigation, so they cannot reasonably be expected to tell a comprehensive, self-contained narrative about the role that actual supply costs played in the rate-setting process. XOOM's witnesses will provide the narrative, as the "ample testimonial evidence" already in the record shows. SJ Order 16; *see, e.g.*, Ex. A-7, Loehde Decl. ¶¶ 23–24. And Plaintiff is free to cross examine them about that narrative and the documents.

> 3.   *The specificity of the actual supply cost evidence is a question of weight, not admissibility.*

Similarly, Plaintiff complains that some of the financial documents showing actual supply costs "do not even specifically tie" the actual supply costs to New York utility zones. While some of XOOM's actual-cost data did not pertain to New York *only*, there is no dispute that it *all pertained to New York*. Take, for example, the June 2013 Consolidated Financial Statement, which shows higher actual supply costs, including PPAs, for both power and gas across XOOM states:



DX 1382 at XOOM_MIRKIN_064027. Although the COGS and PPA breakdowns do not mention New York specifically, elsewhere, that same document notes a "variance . . . attributed to the NYISO capacity cost of approximately $175K . . . ." *Id.* at XOOM_MIRKIN_064021.

Such documents are plainly relevant. The fact that some supply cost evidence was not specific to New York might affect the **weight** the jury gives it, but it does not render the evidence **irrelevant**. *See In re Hernandez*, 860 F.3d 591, 600 (8th Cir. 2017) (that evidence is generalized not specific "may go to the weight the evidence is due, but it does not render the testimony irrelevant"); *Equal Emp. Opportunity Comm'n v. Tex. Roadhouse, Inc.*, 215 F. Supp. 3d 140, 155 (D. Mass. 2016) ("Any concerns raised by overbroad [] data go to weight, not admissibility.").

### 4. Plaintiff's conclusory assertion of prejudice is without merit.

Finally, Plaintiff's assertion that the financial documents containing evidence of XOOM's actual supply costs would unfairly prejudice her is not only conclusory, but baseless. Evidence of the actual supply costs that XOOM used or should have used in determining its variable rates is undeniably relevant under the contract. Enforcing the contract as written cannot be said to be unfair, even if the result does not redound to Plaintiff's benefit.

### B. The financial documents evidencing actual supply costs are not cumulative.

#### 1. XOOM's actual and estimated supply costs cannot be conflated.

Plaintiff tries to sidestep the contract's three-component rate-setting requirement by merging actual supply costs with estimated supply costs, as though they were identical. Neither the facts nor the law permits such treatment.

Plaintiff's contention that XOOM's rate-setting workbooks were "the most comprehensive, accurate, and reliable evidence of XOOM's supply costs[,]" Pl. MIL Mem. 27, is inaccurate. As Plaintiff knows, and as her experts at CRA have admitted,[3] the rate-setting workbooks reflected

---

[3] Plaintiff claims that XOOM's testifying expert David Coleman conceded that the supply cost number that Plaintiff's experts at CRA used in their damage analysis (at the time, the "Total Cost" values from XOOM's rate-setting workbooks fed into Models One and Two) was comprehensive of all supply costs. But as Plaintiff's experts at CRA admit, *see* Ex. A-1, CRA New Rep. 8, the opposite is true. Mr. Coleman said expressly that CRA's analysis, which was based on

16

*estimated* supply costs but did not (and could not) reflect ***actual*** supply costs. *See* Ex. A-1, CRA New Rep. 8 ("[A]ctual costs are not reflected in XOOM's rate setting work-books"). That is because the rate-setting workbooks were used only to set rates ***prospectively***, for a ***coming*** month. *Id.*; Ex. A-2, Loehde Dep. 59:11–60:2, 65:24–66:10 (testifying that the workbooks' cost calculations were XOOM's "best estimate" of various costs it would incur in the upcoming month); Ex. A-3, Park Dep. 152:12–15 ("For variable products" the costs shown in the rate-setting workbook are "an educated guess based before the market on what your cost would be for that variable month"). Thus, rate-setting workbooks indisputably contained only estimated supply costs. *See* Ex. A-3, Park Dep. 150:10–18 ("[Y]ou don't have any certainty that your costs will actually be what you think they are at the time you set [variable] rates.").

Because actual supply costs for the coming month had not yet been accrued, let alone accounted for, concurrent actual supply costs were not delineated in the rate-setting workbooks. By their nature XOOM's actual supply costs could only be "captured" later. *See* Ex. A-4, Loehde 30(b)(6) Dep. 284:12–18 (explaining how "actual costs" are monitored "as they come in" and subsequently incorporated in XOOM's budgeting process). Thus, the rate-setting workbooks are not, and could never have been, evidence of actual supply costs.

Plaintiff nonetheless suggests that XOOM's "Total Cost" figures showing estimated supply costs in the rate-setting workbooks were so accurate that the jury need not consider actual supply costs separately. Plaintiff forgets that it was only because XOOM tracked its *actual* supply costs that it was able to monitor and ensure the accuracy of its *estimated* supply costs. Certainly, the goal for estimated supply costs was to capture the actual supply costs, but they were not identical,

---

the rate-setting workbooks alone, did "not reflect all of [XOOM']s actual or estimated supply costs . . . ." Ex. A-5, Coleman Dep. 35:19–36:1.

and Plaintiff has not suggested that they were. Thus, estimated supply costs cannot serve as a wholesale substitute for actual supply costs—especially in the face of overwhelming documentary evidence of divergences. It is precisely because the two concepts were different that the contract mentions both: each is a separate rate-setting component.

Plaintiff's concession that "[e]ven if these documents were relevant . . . , they do not show *consistently* higher than anticipated supply costs" (emphasis added) is telling. The relevance of XOOM's actual-cost evidence does not turn on whether the actual supply costs were "consistently higher than" the estimated supply costs. Whether they were higher or lower in any given month for any given product in any zone, they were admittedly ***different*** from the estimated costs, and so the jury must be allowed to consider them to determine what XOOM's rates should have been.

The danger of excluding XOOM's evidence of actual supply costs cannot be overstated. Under the circumstances, exclusion of that evidence would allow Plaintiff to unilaterally erase portions of the very contractual provision she seeks to enforce—an impermissible result. *See Internet E., Inc. v. Duro Commc'ns*, 146 N.C. App. 401, 405, 553 S.E.2d 84, 87 (2001) ("Where the terms of a contractual agreement are clear and unambiguous, the courts cannot rewrite the plain meaning of the contract."); *Boyd v. Tchrs. Ins. & Annuity Ass'n of Am.*, 807 F. App'x 254, 255 (4th Cir. 2020) ("[U]nder North Carolina law, . . . the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract . . . ." (quotation marks and citation omitted)).

Plaintiff also tries to invent a legal basis for conflating XOOM's actual and estimated supply costs, arguing the Court held on summary judgment that XOOM's rates must "equal the COGS figures in its rate-setting workbooks plus a fixed margin." Pl. MIL Mem. 27. There is no such language in the Court's summary judgment decision (or any other Court order). In fact, the

summary judgment order expressly contradicts that claim. *See* SJ Order 14–15 (identifying the issue as whether the rates were "determined by its *actual* and anticipated supply costs" (emphasis added)); *see also id.* 4 ("It is important to clarify that the Total Cost or COGS number may not represent XOOM's 'actual and estimated supply costs,' as that term is used in the contract, because the parties dispute whether all supply cost components were included in the Total Cost.").

Accordingly, XOOM's actual supply costs are both factually and legally separate from its estimated supply costs. They cannot be deleted from the contract or this litigation—no matter how much Plaintiff wishes they were not a permissible rate-setting component.

> 2.    *XOOM is entitled to present PDFs of its rate-setting workbooks and PDFs showing actual costs at trial.*

Plaintiff also makes the unusual request to have an entire file type excluded at trial. She argues that "PDF prints from the Excel versions of XOOM's workbooks are inadmissible because they are cumulative of the workbooks pursuant to Rule 403" and "the Excel workbooks are the complete documents and are thus the best evidence of XOOM's costs and rates . . . ." Pl. MIL Mem. 31. She is wrong. The contemporaneous printing of select portions of an Excel file is itself probative: it shows what sheets (of multiple tabs in each rate-setting worksheet or other financial document) were key to the rate-setting analysis. The rate-setting worksheets consisted of extremely complex, unwieldy data sets and analyses, and while those complexities were an important part of the pricing process that produced the rate-setting worksheets, only certain components were analyzed and considering in the rate-setting meetings themselves.[4]

---

[4] Likewise, much of XOOM's actual cost-data is contained in PDFs. *See, e.g.,* DX 840 (email attaching May 2013 Consolidated Financial Statements PDF showing an "unfavorable variance" partially "attributed to the NYISO capacity cost of approximately $250K"). Insofar as Plaintiff's motion concerning PDFs is yet another unreasonable attempt to exclude XOOM's actual supply costs, *see* Pl. MIL Mem. 32 (broadly seeking exclusion of "financial documents that are not clear evidence of supply costs…"), it should be swiftly denied.

Plaintiff provides just two examples of the offending "PDFs." One is an Excel file. DX 52.[5] The other, DX 53, is a standalone PDF that was created in July 2013. Plaintiff has not certified that DX 53 contains information that is identical to any rate-setting worksheet on the parties' joint exhibit list. She appears to have just assumed, without analysis, that that is the case. But her unjustified assumption is not a sufficient basis to deprive XOOM of its right to present evidence in its defense at trial. In any event, even if identical information is available in Excel format in a rate-setting worksheet, that would not make the PDF, which was last modified eleven years ago, any less probative or cumulative. The PDF is a different document with different characteristics. Indeed, the fact that only one section was printed to PDF is itself probative.

Tellingly, Plaintiff cites not a single case in support of her "No PDFs" rule. One need only look at the text of the applicable rule to understand why. Federal Rule of Evidence 1001(d) states: "For electronically stored information, *'original' means any printout—or other output readable by sight*—if it accurately reflects the information." Fed. R. Evid. 1001(d) (emphasis added). Undeniably, then, the standalone 2013 PDF is independently admissible as an original document. *See U.S. Bank Trust, v. Jones*, 330 F. Supp. 3d 530, 539 (D. Me. 2018) ("As a computer printout of a database, Plaintiff's Exhibit 8 is an original, not a copy."). And "[e]ven if [the] Exhibit [] is somehow considered a copy, it meets the requirements of a 'duplicate' of the original writing,"

---

[5] This is not the only mistake made in MIL No. 2. Plaintiff also mistakenly assumes that two documents that are on XOOM's exhibit list *because they were cited in her original expert report*, DX 3, DX 11, constituted actual-cost evidence that is duplicative of XOOM's rate-setting workbooks. Although Plaintiff has now abandoned her original expert report, the documents remain relevant because her expert's assertions live on at least as impeachment material, as explained further below in opposition to Plaintiff's MIL No. 17. The only other document in Plaintiff's "Shaping Curves and Hedges" category, DX 781, also is not actual-cost evidence as Plaintiff presumed, but rather, estimated-cost evidence. It is not cumulative of the rate-setting workbooks because it includes a cover email explaining one process by which some of XOOM's complicated estimated-cost data was derived.

and therefore is "'admissible to the same extent as the original' because there is no genuine question about the authenticity of the original." *Id.* (citations omitted).

Moreover, at the very least, Plaintiff's request is premature. Decisions as to whether evidence is cumulative are "better left to be decided at trial." *Mastri v. Wilson*, No. 08-CV-01762, 2009 WL 10692482, at *2 (M.D. Pa. Aug. 28, 2009) (summary denial); *Ruiz v. Walmart Inc.*, No. CV 20-01129-RAO, 2021 WL 5759043, at *1 (C.D. Cal. Oct. 28, 2021) (denying motion *in limine* to exclude purportedly "needlessly cumulative testimony" because the court was "unable to conclude at th[at] time that their testimony w[ould] be needlessly cumulative at trial").

C. The "financial documents" and actual supply cost evidence were timely disclosed.

XOOM's actual supply cost data is not illusory, nor was it ever missing or concealed. It was timely produced in discovery. *See, e.g.,* Ex. A-7, Loehde Decl. ¶ 18 (listing hundreds of actual-supply-cost documents produced in the litigation, including at least one document showing variances between actual and estimated supply costs for all but three months between November 1, 2012 and January 1, 2020). Nonetheless, Plaintiff disingenuously claims that "XOOM never disclosed this highly dubious story during discovery." Pl. MIL Mem. 29 n.11.

Plaintiff's story could not be further from the truth. As the Court knows, XOOM's witnesses and legal arguments repeatedly explained that actual supply costs, including prior period adjustments, were a key consideration in rate-setting. The Court's summary judgment and class-certification orders confirm as much. *See* SJ Order 4–5, 6, 16; Doc. 152, Class Order 4, 12. Plaintiff's failure to account for the actual supply costs thus cannot be attributed to anything but her own miscalculation, or to strategic choices she made after recognizing that the actual supply cost evidence is too individualized for a class trial. But Plaintiff's litigation choices cannot justify excluding relevant evidence critical to XOOM's defense. *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (noting importance of "preserv[ing]

the defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense" in class action). If Plaintiff will not grapple with this evidence to address actual costs in her case-in-chief, that is her choice. But if the Court does not then enter a directed verdict in XOOM's favor, XOOM must be able to do so in its defense.

*     *     *

For these reasons, Plaintiff's motion to "preclude XOOM from introducing financial documents that are not clear evidence of supply costs feeding directly into XOOM's margins or rates or are merely cumulative" should be denied.

III.    **Plaintiff's MIL No. 3: Plaintiff's motion to preclude XOOM from presenting evidence concerning the nuances of its rate-setting decisions should be denied.**

Plaintiff's MIL No. 3 is based on the false notion that XOOM's consistent rate-setting ***process*** means that each rate-setting ***decision*** over the course of more than 11 years was free of nuance. Not so. As XOOM has long argued (and Plaintiff has recognized) the rate-setting process was not formulaic, but varied month to month, regionally, and by product. Nonetheless, Plaintiff makes the extraordinary suggestion that XOOM's testimonial and documentary evidence of that variation—which was timely disclosed and has been relied on in all XOOM's dispositive briefing to date—would somehow be contradictory and a discovery violation sanctionable under Rule 37. Plaintiff's motion (just like her MIL Nos. 1, 2, 4 and 5) is just an attempt to exclude evidence of XOOM's actual supply costs and their role in the rate-setting process. Plaintiff's effort to muzzle XOOM and exclude relevant, probative, truthful, timely-disclosed evidence merits swift denial.

A.    XOOM's position has been consistent and the evidence that Plaintiff seeks to exclude is not contradictory.

As a threshold matter, the "contradiction" on which Plaintiff's motion is based does not exist. XOOM did consistently use rate-setting workbooks and meetings in the rate-setting process, and supply costs always were the foundation of the rates. But that is where the consistency ends. XOOM has always maintained that actual supply costs, which were not separately itemized in the rate-setting worksheets, factored into every rate. *See* Part II, *supra*. And partly because those actual supply costs were not reflected in the rate-setting worksheets, XOOM's rate-setting ***decisions*** have never been uniform.

The very description of XOOM's rate-setting process that Plaintiff cites reveals that, in practice, each rate-setting decision could not have been "uniform" as Plaintiff claims:

> XOOM's standard variable rates were always determined by (1) starting with supply cost estimates made in rate-setting workbooks, (2) ***deciding whether*** prior period adjustments should be made to account for variations between previous

supply cost estimates and the costs XOOM actually incurred, and (3) adding a margin that incorporated prior period adjustments, balancing costs, other costs to supply energy to the customer, and XOOM's profit.

Doc. 134, Def. Class Resp. 12. It is no surprise then that Plaintiff has repeatedly acknowledged XOOM's rate-setting process was not formulaic. Ex. A-1, CRA New Rep. 7; Pl. MIL Mem. 9; Doc. 231, Pl. Coleman Mem. 8. Indeed, Plaintiff's concession that there were variations in rate-setting decisions is noted in the summary judgment order. SJ Order 5 ("the Mirkins acknowledge that XOOM made rate adjustments based on unanticipated cost overruns").

Plaintiff nonetheless says that XOOM's position that there were variations in its rate-setting decisions somehow is new and contradicts its prior explanations. That is false. XOOM's position has never changed: the rate-setting *process* was consistent in certain respects while each rate-setting *decision* varied, as XOOM has repeatedly explained.

XOOM's position has been consistent. *See, e.g.,* Ex. A-6, XOOM's Supp. Objs. and Resps. to Plaintiff's RFAs Nos. 31–36 (objecting in ***December 2021*** to each request for admission to the extent that it suggested information "was considered on a uniform basis every month"). As XOOM has long explained, its "fact-intensive process produced rates that decidedly were *not* uniform because the margin incorporated varying costs each month, including prior period adjustments." Doc. 170-4, Def. 23(f) Reply 8; *see also, e.g.,* Ex. A-2, Loehde Dep. 217:2-5 ("We reduced prices more slowly than would otherwise be seen by individual month costs, in an effort to account for costs that occurred in a prior period."); *id.* at 251:6–22 ("Prior period adjustments flowed into our actual costs and actual results. . . . So not directly connected to a rate setting workbook or a scorecard."); 155:5 – 156:3 (discussing August 2013 email to pricing team about budget showing six months of actuals); *id.* at 257:5–10 ("[A]ctual and estimated supply costs is the bedrock foundation of everything we did. And monitoring that closely and ***adjusting for any variance***,

whether positive or negative, was always a key part of everything that we did." (emphasis added));

Ex. A-3, Park Dep. 180:23–181:8 ("Those margins are also how you – many cases accommodate

prior period adjustment collection. So if the costs were higher, th[e]n you know that you have to –

you can't go back and change your cost in the rate – rate-setting meeting historically. So you may

have to adjust your margins to accommodate for your prior period cost estimate.").

The incorporation of XOOM's varying actual supply costs thus does not paint a "new

picture" as Plaintiff disingenuously claims. XOOM's position about the complexities and

variations in its rate-setting process has been clear and consistent—so much so that the Court

acknowledged at summary judgment that "the process by which XOOM set rates . . . was not so

simple." SJ Order 3–4. The Court also acknowledged XOOM's argument (which Plaintiff says is

new) "that the Total Cost or COGS number does not constitute its 'actual and estimated supply

costs' because some of its supply costs—such as prior period adjustments are incorporated in the

margin." *Id.* 16. And the Court observed that "XOOM presents ample testimonial evidence

supporting the general proposition that prior period adjustments were included in the margin and

therefore responsible for rate fluctuations." *Id.* Plaintiff is just wrong to state that "[a]t no point

did XOOM or its witnesses claim or detail" a process by which "additional supply costs" beyond

those in the rate-setting workbooks were included in XOOM's margin. Pl. MIL Mem. 36.

Plaintiff's failure to identify any inconsistency in XOOM's position by itself warrants

denial of the motion. *See Masters v. UHS of Del., Inc.*, No. 4:06CV1850-DJS, 2008 WL 11391123,

at *2 (E.D. Mo. Oct. 15, 2008) (denying "motion to exclude evidence that contradicts the financial

information previously produced by defendant" because "the Court [wa]s not persuaded that

defendant's expert ha[d] relied on any contradictory information that should be excluded").

And in any event, Plaintiff is also wrong on the law. Any inconsistencies in XOOM's position would be appropriate fodder for cross-examination and impeachment, not a basis for exclusion. *See, e.g., Synergy Hematology-Oncology Med. Assocs. v. Abbott Labs.*, No. 222CV01560SPGJEM, 2023 WL 4761550, at *2 (C.D. Cal. June 6, 2023) (rejecting argument that a witness's prior "testimony should bind [defendant] against providing contradictory testimony" because "any ambiguities in his testimony should be addressed on cross-examination, not by motion *in limine*").

B.   The evidence plaintiff seeks to exclude was properly disclosed, so discovery sanctions under Rule 37 are inapplicable.

For the reasons discussed above, Plaintiff's contention that XOOM's evidence was not properly disclosed is factually wrong. XOOM's actual supply cost evidence and XOOM's explanations of their incorporation in the rate-setting process were timely disclosed in discovery and various briefs. *See* Part II, *supra*. Plaintiff is thus off-base to cite case law involving discovery sanctions under Rules 26 and 37. *Cf. Reilly v. Natwest Mkts. Grp.*, 181 F.3d 253, 268 (2d Cir. 1999) (affirming order precluding testimony from witnesses who were not produced for depositions where testimony would contradict 30(b)(6) witness testimony on specified subjects); *24/7 Recs., Inc. v. Sony Music Ent.*, 566 F. Supp. 2d 305, 318 (S.D.N.Y. 2008) (precluding new damage theory asserted for the first time "in the joint pre-trial order, long after the close of discovery"); *Irish v. Tropical Emerald LLC*, No. 18-CV-82-PKC-SJB, 2021 WL 5899048, at *1, *5 (E.D.N.Y. Dec. 14, 2021) (precluding evidence of new facts alleged after the close of discovery), *aff'd in relevant part*, No. 18-CV-82 (PKC) (SJB), 2022 WL 2716182 (E.D.N.Y. July 13, 2022); *Erazo v. SCM Grp. N. Am.*, No. 16 Civ. 2386 (RRM) (RER), 2019 WL 1044365, at *17 (E.D.N.Y. Mar. 5, 2019) (prohibiting "entirely new theories" after the close of discovery). She is also wrong to suggest that preclusion of the evidence would be automatic under Rule 37(c) even

if a violation were found. Rather, "the district court may impose other appropriate sanctions as an alternative to preclusion." *Lorme v. Delta Air Lines, Inc.*, 251 F. App'x 691, 692 (2d Cir. 2007). Of course, there was no violation here.

*     *     *

Plaintiff's MIL No. 3 has neither factual nor legal support. XOOM has long pointed out the difficulties in proceeding with a trial that involved thousands of rate-setting decisions. But only now does Plaintiff acknowledge that the nuances of XOOM's decisions "mak[e] the trial unmanageable." That is a reason for decertification, not a basis for excluding probative evidence. The Court accordingly should deny MIL No. 3.

IV.     **Plaintiff's MIL No. 4: Plaintiff's motion to preclude evidence or argument suggesting that different products in different markets could be subject to different margins should be denied.**

Plaintiff's MIL No. 4 seeks to preclude any evidence or argument that XOOM was entitled to charge different margins for different products in different zones.[6] Like the others before it, MIL No. 4 is based on the false premise that the Court's summary judgment and class certification orders somehow preclude XOOM's argument. And here again, Plaintiff is wrong.

XOOM is a private commercial entity that sold different products in different parts of New York. Plaintiff says that no matter what product XOOM was selling (gas or electricity, clean or standard, residential or commercial) and no matter where XOOM was selling it (New York City or Niagara, the Hamptons or the Catskills), XOOM had to use one monolithic margin over its actual and estimated supply costs. This rule is not found in the Court's prior orders or the plain terms of the contract. It is Plaintiff's invention. And it is undermined by the law and the facts.

Under the Court's contract construction, the margin added to XOOM's actual and estimated supply costs had to be reasonable and proportionate to its supply costs. Doc. 151, SJ Order 12–13. The Court also noted that the contract's provision that "market-based compensation is included in the price noted above" "could "refer[] to XOOM's compensation" and still be "entirely compatible with the proportionate-margin construction . . . ." *Id.* at 13.

Moreover, regardless of whether the "market-based compensation" applies to the margin, a "reasonable" margin must still be consistent with the particular market. *See Sevugan v. Direct Energy Servs.*, 931 F.3d 610, 617 (7th Cir. 2019) (finding that plaintiff failed to allege that "adder" was "unreasonabl[e]" because he did not "allege Direct Energy's adder was greater than that

---

[6] Insofar as Plaintiff suggests that XOOM intends to argue that it could charge different margins for the same product and zone in different ***months***, she is wrong. XOOM acknowledges that the Court's proportionate-margin construction precludes that argument. XOOM will hold that argument for the appropriate time on appeal.

charged by other market participants"); *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019) (noting, in finding "no evidence" that the ESCO's variable rate "was any higher than its competitors' rates," that "if a price is commercially reasonable it must be compared to the range of other prices in the market" (quotation marks and citation omitted)).

The products included in the class varied by commodity (electricity or gas), customer type (commercial or residential), utility zone (seven zones for electricity and eight for gas), and for electricity, renewable attributes (standard or green). There is no dispute that XOOM's documented estimated supply costs varied with each of these 44 rates in every month.

Yet, Plaintiff asks the Court to treat the margins for gas and electricity—two very different products with very different costs bases and different degrees of volatility—as though they were the same. Ex. A-7, Loehde Decl. ¶ 11 (explaining why power market is more volatile); Ex. A-8, Coleman Rep. 22. (detailing differences in cost bases for gas versus electricity). Plaintiff would also ask the jury to assume that the market for green electricity—for which customers are often willing to pay a premium—is the same as the market for standard electricity. Ex. A-7, Loehde Decl. ¶ 32. And Plaintiff would ask the jury to presume, without any supporting evidence, that the variable-rate market in New York City ("one of the most volatile and expensive gas markets in the country") is the same as that near Niagara Falls (where hydropower is readily available), *id.* ¶ 14; the same in Brooklyn as in Buffalo. But as the electric and natural gas utility maps below illustrate, the state is not a homogenous market for either commodity:





As discussed in XOOM's response to Plaintiff's MIL No. 1, Plaintiff bears the burden of establishing the rate that XOOM ***should have charged*** to present a submissible overcharge case. North Carolina law requires it. *See* Part I, *supra*. Indeed, as a general matter, the party seeking payment bears the burden of establishing that the rate they say should apply is the correct one. *See, e.g., Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 458 (E.D. Pa. 2012) ("[T]he

reasonableness of the interest rate is generally a question of fact that requires the presentation of evidence." (citing cases)); *In re Hampton*, 407 B.R. 443 (B.A.P. 10th Cir. 2009) ("The Creditors offered no evidence of what a reasonable rate of return would have been, leaving the court without any frame of reference to determine if Debtor had overestimated the potential rate of return."). *Cf. Hershkowitz v. Think Tech Labs, LLC*, 651 F. App'x 15, 19 (2d Cir. 2016) (remanding for determination of "reasonable value of services rendered" where there was in fact an "evidentiary basis upon which to determine the reasonable value" of plaintiff's services).

Even on a motion for attorneys' fees, where the factfinder (i.e., the court) has experience and knowledge concerning prevailing rates, some evidence is required to show a proffered rate is reasonable. *See, e.g., DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17CV4576GHWBCM, 2023 WL 2870484, at *4 (S.D.N.Y. Apr. 10, 2023) ("In the absence of any evidence concerning the reasonable hourly rates for the timekeepers whose work is at issue, the Court has no choice but to rely on decisional law, the rates awarded in prior cases, and the court's own familiarity with the rates prevailing in the district." (quotation marks and citations omitted)); *Duracell Inc. v. Glob. Imports, Inc.*, No. 17-MC-185 P1 (KNF), 2018 WL 5619983, at *8 (S.D.N.Y. Aug. 16, 2018) (finding suggested hourly rates unreasonable because no evidence supported them), *report and recommendation adopted*, No. 17-MC-185, 2019 WL 549064 (S.D.N.Y. Feb. 12, 2019). As discussed in XOOM's decertification and expert briefing, Plaintiff has no such evidence.

Yet, Plaintiff asks the Court to bar evidence and argument about variations of what might constitute an appropriate margin on 44 different rates. And she asks the Court to do so in the absence of any evidence to suggest the margins should be identical. No such evidence exists.

Plaintiff's argument is that the contract's uniform pricing language prohibits XOOM's

defense. Because the contract language was identical, Plaintiff says, the margins should be.[7] But applying that logic to a situation familiar to the lawyers and the Court reveals its fallacy. A lawyer in Manhattan and a lawyer in Poughkeepsie might each agree to charge a "reasonable" rate—but that does not mean that what is a reasonable hourly rate in Manhattan would be a reasonable rate in Poughkeepsie. Why, then, should the rates for energy products (that too, for two entirely different commodities, and, for electricity, clean and standard options) be identical just because the broad contract language that governs their sale is? This is a question that **Plaintiff** bears the burden of answering. But she cannot. Plaintiff's failure of evidence, however, is not a basis to exclude XOOM's argument or evidence on the subject.

The only evidence Plaintiff has presented on margin shows that energy product margins vary by product and by zone. Plaintiff's Model Two used XOOM's fixed-rate products' margin averages as a benchmark—and they largely varied by product and zone:

| | NYSEG | RGE | ConED_zoneHI | ConED_zoneJ | NGrid_NM | CenHud | OR |
|---|---|---|---|---|---|---|---|
| **Electric Res** | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| **Electric Com** | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

| | CenHud | ConED | NFG | NGrid_Keyspan | NGrid_NM | OR | RGE |
|---|---|---|---|---|---|---|---|
| **Gas Res** | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| **Gas Com** | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

Calculation derived from DXI 06, Ex. 5 (average of all percentages listed in each column, with numbers rounded to nearest hundredth). Plaintiff therefore cannot now reasonably suggest that margins should not vary with product and zone.

---

[7] In the only case Plaintiff cites in MIL No. 4, *Disability Advocs., Inc. v. Paterson*, No. 03 Civ. 3209 (NGG) (MDG), 2009 WL 1312112, at *2 (E.D.N.Y. May 8, 2009), the Court granted a motion not to revisit its prior *Daubert* and summary judgment decision. That case has no bearing here because XOOM is not seeking to challenge the Court's prior summary judgment rulings at this stage. The Court simply has not previously expressly ruled on the issue raised in MIL No. 4.

Finally, almost as a throwaway, Plaintiff asserts without explanation that "even if the Court were to find [the evidence and argument she seeks to exclude] minimally probative with respect to green energy, this evidence would nevertheless create inevitable confusion and waste valuable trial time, rendering it inadmissible under Rule 403." Pl. MIL Mem. 38. The only prejudice Plaintiff could possibly envision is that it would reduce her damages—but any such "prejudice" would hardly be "unfair" under the circumstances. Fed. R. Evid. 403.

For the foregoing reasons, Plaintiff's MIL No. 4 to preclude evidence or argument suggesting that XOOM was entitled to charge different margins for different products in different zones should be denied.

**V.      Plaintiff's MIL No. 5: Plaintiff's motion to prescribe the precise language XOOM can use to describe the rate-setting process should be denied.**

Plaintiff begins MIL No. 5 with the acknowledgement that XOOM is not at this stage challenging the Court's contract construction. Nonetheless, she asserts that "XOOM continues to misleadingly argue that its rate-setting complied with the contract because it '*considered*' its supply costs when setting rates or because supply costs '*affected*' XOOM's ultimate rates." Pl. MIL Mem. 38. Plaintiff asks the Court to "preclude any suggestion that XOOM adequately performed the contract when it subjectively 'considered' its supply costs or because those costs 'affected' XOOM's ultimate rates." *Id.* This motion is another attempt to preclude XOOM's legitimate defense, and it should be denied for at least six reasons.

First, the relief that Plaintiff seeks is not suited to a motion *in limine*. *See Mohegan Lake Motors, Inc. v. Maoli*, No. 16-CV-6717 (NSR), 2023 WL 1070247, at *5 (S.D.N.Y. Jan. 27, 2023) (holding that "the purpose of a motion in limine is to enable the Court to rule on disputes over the admissibility of discrete items of evidence, not to request clarification" regarding "a party's claim"); *TVT Recs. v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 344–45 (S.D.N.Y. 2003) (denying "impermissible" motions *in limine* that "would effectively serve as a form of advance trial of substantive portions of the case, or indeed as a substitute for the trial itself"). Insofar as the motion seeks clarification concerning the Court's summary judgment rulings, the issue is more appropriately addressed in the jury instructions, not through exclusion of evidence.

Second, Plaintiff's argument is internally inconsistent. Plaintiff argues that "[a]ny subjective consideration of supply costs is irrelevant" but also (in the very same sentence) insists that it is "proof of XOOM's breach." Pl. MIL Mem. 39. Of course, it is impossible for evidence to be irrelevant and probative at the same time. Plaintiff's inconsistencies show that her motivation for excluding XOOM's actual supply cost evidence is simply that it is damaging to her case.

Third, the evidence is very relevant. Trial will involve not just determination of what XOOM's rates should have been, but also the determination of how XOOM set those rates. Even if XOOM only "considered" actual and estimated supply costs, but the jury ultimately determined it did not "base" its rates on them, that would not render the evidence of what XOOM did during rate-setting meetings irrelevant. The Court has already ruled that the process by which XOOM set rates is "central" to this case, Doc. 151, SJ Order 3, so truthful testimony concerning that process cannot properly be excluded on grounds of relevance.[8]

Fourth, even if "considering," "affecting," and "basing" had divergent meanings,[9] each is decidedly probative of the others. XOOM's *consideration* of actual supply costs in setting rates and the fact that actual supply costs *affected* the rates is evidence that XOOM's rates were *based on* XOOM's actual supply costs. That is so even if the meanings of those terms and phrases do not precisely align. The jury cannot conclude whether supply costs "determined" XOOM's rates without first hearing that they were "considered." *See* SJ Order 15. Indeed, it is precisely because XOOM's evidence of the role supply costs played in rate-setting tends to prove that those supply costs determined XOOM's rates that Plaintiff seeks its exclusion. But XOOM's right to present probative evidence in its defense cannot be so impaired, and certainly not on the basis of semantics. *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (noting importance of "preserv[ing] the defendants' Seventh Amendment and due process rights

---

[8] Because this evidence is relevant, the cases Plaintiff cites where courts excluded evidence contradicting the Court's construction of the claim, are inapplicable. *Cf. Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, No. 16 Civ. 2212, 2022 WL 17082541, at *3 (N.D. Ill. Nov. 18, 2022), *Hosbrook v. Ethicon, Inc.*, No. 20 Civ. 88, 2021 WL 4452289, at *8 (S.D. Ohio Sept. 29, 2021)

[9] In fact, "considering" and "based on" share the same meaning, and therefore the distinction Plaintiff attempts to draw is fiction. *See, e.g.*, *United States v. Sanchez-Rodriguez*, 161 F.3d 556, 560 (9th Cir. 1998) (whether a factor is a "basis" turns on whether the factor is a "consideration") (quotation marks and citation omitted); *Sierra Club v. E.P.A.*, 353 F.3d 976, 990 (D.C. Cir. 2004) ("risk-based" meant defendant had to "consider [risks]")

to contest every element of liability and to present every colorable defense" in class action).

Fifth, Plaintiff's motion is an improper attempt to substitute her own *subjective* view of what XOOM's argument means in place of the jury's decisions regarding what the comprehensive documentary and testimonial evidence shows. But the Court cannot invade the fact-finding province of the jury. *See United States v. Foley*, 735 F.2d 45, 46 (2d Cir. 1984) ("Of course, a district judge may not usurp the jury's fact-finding functions . . . ."). Although Plaintiff might believe that XOOM's "consideration" of actual and estimated supply costs in rate-setting does not equate to rates being set *based on* actual and estimated supply costs, the jury need not believe that. A reasonable juror could conclude that if XOOM considered actual and estimated supply costs and added a margin, then XOOM based its rate on actual and estimated supply costs with a margin. If Plaintiff thinks splitting hairs over the meaning of the words "consider" and "based on" and "affect" is effective, she can present those arguments to the jury. But her own *subjective* and unsupported conclusion that "considering" and "affected" mean something entirely different from "based on" cannot deprive XOOM of its right to have the factfinder consider probative evidence and certainly is not a reason to exclude entire categories of evidence before trial.

Sixth and finally, because the evidence Plaintiff seeks to exclude is "central" to the case, and Plaintiff fails to substantiate her assertion of prejudice or other harm, her conclusive Rule 403 objection must fail. *See* Fed. R. Evid. 403 (providing that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

For these reasons, Plaintiff's MIL No. 5, which seeks to prescribe the terms in which XOOM's rate-setting process is described to exclude XOOM's evidence of actual supply costs, should be categorically denied.

## VI.      Plaintiff's MIL No. 6: The contract's market-based compensation language is unquestionably relevant, and the jury should be instructed on it.

XOOM proposes instructing the jury that the contract "state[s] that XOOM would provide certain services to its customer 'for the purposes of (i) acquiring the supplies necessary to meet' the customer's needs for electricity or natural gas, 'and (ii) arranging, contracting for and administering transportation and related services' needed to deliver electricity or natural gas to the customer's premises." Doc. 210-9, Def. Jury Instructions 2. "These services were 'provided on an arm's length basis and market-based compensation [was] included in the price' the customer agreed to pay for electricity or natural gas sold under their contract with XOOM." *Id.* XOOM further proposes the jury must "include 'market-based compensation' in the price each Class Member paid for electricity or natural gas, either by including that compensation as a component of the costs or margin [the jury] use[s] to determine the rate the contract required." *Id.* at 11.

This instruction should not be controversial; it relies on the contracts' express language. Plaintiff disagrees, wrongly claiming that "the Court specifically rejected XOOM's agency provision argument" and that "the Court's contract construction forecloses XOOM's claim." Doc. 210-13, Pl. Jury Mem. 4. Plaintiff now attempts to bolster that same objection through her MIL No. 6, claiming that an express term of the contracts that refers to pricing is somehow irrelevant and will confuse jury. She is wrong on all counts.

The Court did not decide the meaning of the market-based compensation term on summary judgment; it expressly declined to do so. In fact, the Court noted that "the meaning of the compensation term in the agency provision is unclear" and noted at least two plausible readings. Doc. 151, SJ Order 13. First, that "'market-based compensation' refers to compensation owed to the electricity supplier and LDU for their role in the procurement and delivery of electricity, which would be included 'in the price noted above' *as a supply cost*." *Id.* (emphasis added). But "if the

compensation term refers to XOOM's compensation," then that would be "compatible with the proportionate-margin construction, which allows a margin so long as it is not untethered to the actual and estimated supply costs." *Id.*

XOOM's proposed jury instructions are consistent with both interpretations—and concern unquestionably relevant portions of the contract on which to instruct the jury.

The first of the Court's interpretations means that "market-based compensation" is included "'in the price noted above' as a supply cost." SJ Order 13. The "price noted above" says that the customer's "monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." *Id.* at 2–3. In other words, under the Court's first construction, market-based compensation may be included in the monthly variable rate as an "actual and estimated supply cost," which includes "prior period adjustments[.]" *See id.* at 2–3, 13. This is exactly why XOOM's instructions state the jury may "include 'market-based compensation' in the price . . . by including that compensation as a component of the costs[.]" Def. Jury Instructions 11. One of the principal jobs of the jury will be to determine XOOM's actual and estimated supply costs for every one of the 5,800+ rates at issue. They can only do so if they are instructed on the correct composition of those costs. Plaintiff's MIL No. 6 would have the jury ignore this component entirely. That cannot be allowed. XOOM's instruction is relevant to its rate-setting under the Court's contract construction, is consistent with that construction, and can only help the jury determine whether the rates were set in accordance with the contracts.

The same is true of the court's second proposed construction that supposes "the compensation term refers to XOOM's compensation" that could be included in the "margin so long as it is not untethered to the actual and estimated supply costs." SJ Order 13. Under this

alternative construction, XOOM's "market-based compensation" may be included in the margin if it is tethered to the actual and estimated supply costs. *See id.* Again, this is exactly why XOOM's proposed instruction states the jury may "include 'market-based compensation' in the price each Class Member paid for electricity or natural gas . . . by including that compensation as a component of the . . . margin you use to determine the rate the contract required." Def. Jury Instructions 11. Under this alternative construction, the market-based compensation term remains highly relevant to XOOM's rate-setting under the Court's contract construction.

The truth is that Plaintiff has objected to XOOM's proposed jury instruction and filed MIL No. 6 because she would prefer that the contracts' market-based compensation term not exist because it underscores that individualized determinations are required for each rate. But the contract "must be interpreted as a whole, and individual provisions within a contract must be interpreted within the context of the entire contract." *Fulford v. Jenkins*, 672 S.E.2d 759, 763 (N.C. Ct. App. 2009). So Plaintiff cannot, on the one hand, claim that XOOM breached the "pricing term" of the contracts while, on the other hand, claim that XOOM cannot give proper context to that pricing term by referencing an express provision of the contracts that permits XOOM to include "market-based compensation . . . in the price noted above."[10]

For these reasons, Plaintiff's MIL to exclude any reference to an express pricing term of the contracts at issue should be denied.

---

[10] As a practical matter, it is entirely unclear how Plaintiff seeks to avoid any reference to an express term of the contracts. Will she ask the Court to redact a material term of the very contracts she seeks to enforce? Because contracts must be interpreted as a whole, that is plainly improper. *See Fulford*, 672 S.E.2d at 763.

**VII.     Plaintiff's MIL No. 7: Class certification does not exempt Plaintiff from her burdens at trial.**

In a further attempt to litigate issues more appropriately (and already) addressed elsewhere, Plaintiff's MIL No. 7 demands that the Court "exclude from trial any evidence or argument that would have the jury either (1) reevaluate the Court's Rule 23 findings, or (2) try this case as a series of minitrials." Pl. MIL Mem. 43. The parties have thoroughly argued these issues in their Trial Memoranda and Jury Instruction Memoranda, as well as their briefing on XOOM's Motion to Decertify. Plaintiff nonetheless raises the same arguments *in limine*. They have not improved with repetition.

To begin, Plaintiff invites the Court to err by seeking a blanket ruling that makes the Class Order sacrosanct. Second Circuit precedent unequivocally prohibits such a result. Courts and parties must remain vigilant in ensuring that Rule 23's requirements are met during trial and through final judgment. *See, e.g.*, *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261 (2d Cir. 2021) ("A district court is required to monitor class proceedings and 'reassess [its] class rulings as the case develops.'"); *id.* at 262 (the obligation to "ensure that a certified class satisfies Rule 23" continues "throughout the litigation"); *Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016) (holding that the party advocating for continued certification "retain[s] the burden to demonstrate that the[] [Rule 23] requirements [a]re satisfied.").

To the extent that developments pretrial ***or at trial*** show that class certification is inappropriate, the Court has an affirmative duty to act on those developments regardless of its prior Rule 23 findings. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *see also Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004) ("The jury or factfinder can be given free hand [at a class trial] to find all of the facts required to render a verdict on the

merits, and if its finding on any fact differs from a finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment.").

Plaintiff misunderstands not only the law, but also what XOOM intends to do at trial. Nowhere in XOOM's pretrial filings does XOOM ask the Court to provide the jury with questions that require it to pass judgment on the Court's Rule 23 findings. XOOM does ask for an instruction stating that "it does not follow from the fact [that there is a class] that if one Class Member is entitled to recover, they all are entitled to recover," and that "XOOM is entitled to fair consideration as to each Class Member." *See* Doc. 210-13, Pl. Jury Mem. 6–7. But contrary to Plaintiff's interpretation, this is not an "Instruct[ion] to Decertify the Class," *id.* at 6; rather, it is an instruction necessitated by Supreme Court precedent mandating that class trials and jury verdicts be designed to avoid including uninjured class members in any damage awards and to not vitiate defenses that defendants could raise in individual actions. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, J. concurring) ("[I]f there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand."). It is not improper to ask for instructions or verdict forms that correctly apply the law and minimize the risk of protracted litigation via successive appeals and trials. To the contrary, such an instruction is necessary to guard against error.

Plaintiff's real objection is that she would rather not have to prove what XOOM should have charged her and the class, which necessarily requires findings for "different products, customer classes, and utility zones." Pl. MIL Mem. 44. And so she concocts an argument that because the Court ruled that XOOM's "pricing term was the same" for all Class Members, she does not have to prove that each individual Class Member was overcharged or by how much. *Id.* (citing Class Order 15–16).

But as with so many of Plaintiff's *limine* arguments, the Court never made such a ruling. On summary judgment, for example, the Court specifically acknowledged that the contract does **not** cap XOOM's margins at "a fixed, specific percentage" and allows some element of market-based compensation. SJ. Order 13–14. And in its Class Order, the Court's typicality analysis found only that XOOM's "form contract contained ***identical language*** for electric and natural gas customers" and that Plaintiff's overcharge claims for those customers "arise from the same rate-setting ***process***." Class Order 16 (emphasis added). This ruling about the ***process*** XOOM uses to set rates in no way implies—let alone holds as a matter of law—that the ***prices*** XOOM charged (or should have charged) were uniform for all customers, products, and utility zones.

Nor does XOOM challenge the Court's conclusion that it used a similar process to set variable rates throughout the class period. It does, however, demand that Plaintiff meet her burden to show that XOOM's rates were too high. The "amount of damages" Plaintiff suffered is an essential element of a contract claim under North Carolina law. *Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09 (N.C. 2019). And the appropriate measure of damages on Plaintiff's breach of contract claim is the difference between the amount that she and the class were charged and the amount that they should have been charged. *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86 S.E. 1025, 1026 (N.C. 1915); *see also Troitino v. Goodman*, 35 S.E.2d 277, 282 (N.C. 1945) (contract damages are "the pecuniary difference between [an injured party's] position upon breach of the contract and what it would have been, had the contract been performed"). North Carolina law places "the burden of proving [her] losses with reasonable certainty" on Plaintiff, as "[t]he party claiming these damages[.]" *Matthews v. Davis*, 664 S.E.2d 16, 20 (N.C. App. 2008).

To prove an overcharge, Plaintiff must establish what XOOM **should have** charged for each product, month, and utility zone. That necessarily requires jury findings on pricing— quintessential questions of fact, not law. Without such findings, an aggregate damages award would "violate the Rules Enabling Act" and "result in inflated damage figures that do not accurately reflect the number of plaintiffs actually injured and bear little or no relationship to the amount of economic harm actually caused by defendants." *Hickory Sec. Ltd. v. Republic of Argentina*, 493 F. App'x 156, 159 (2d Cir. 2012) (cleaned up).

\*     \*     \*     \*     \*     \*

The propriety of class treatment **always** remains at issue under Rule 23. In arguing that Plaintiff must show class-wide breach and damages, XOOM does not "propos[e]" to "task the jury with determining questions of law," or have the "jury effectively reassess or disregard the Court's Rule 23 findings." Pl. MIL Mem. 43, 47. XOOM simply asks Plaintiff to meet the evidentiary burdens she necessarily took on when she obtained certification of the class definition and theory she put forward. Plaintiff's MIL No. 7 should be denied

VIII.     **Plaintiff's MIL No. 8: Plaintiff's request to exclude cumulative testimony is abstract and premature, and it should be denied.**

Plaintiff asks this Court to exclude unspecified exhibits and testimony as cumulative under Rule 403. Plaintiff's failure to offer "specific exhibits or evidence [she] seeks to exclude" amounts to an abstract motion *in limine* that should be summarily denied. *See Altruis Grp., LLC v. ProSight Specialty Mgmt. Co., Inc.*, No. 1:21-CV-10757-MKV, 2023 WL 4784233, at *6 (S.D.N.Y. July 26, 2023); *Belvin v. Electchester Mgmt., LLC*, 635 F. Supp. 3d 190, 204 (E.D.N.Y. 2022) (denying motion *in limine* where the court was "asked to rule on abstract and generalized hypotheticals rather than specific language, phrases or evidence"). Indeed, because of their typically unspecified nature, "[m]otions *in limine* . . . premised upon Rule[] 403 . . . are not particularly amenable to pre-trial determination." *Mohammed v. Holder*, No. 07-CV-02697-MSK-BNB, 2013 WL 4949282, at *3 (D. Colo. Sept. 13, 2013). This is particularly true as to Rule 403 motions based on cumulative testimony, which should be reserved for trial "where the cumulative nature of any or all . . . testimony [and exhibits] can be properly assessed in context." *Olutosin v. Gunsett*, No. 14-CV-00685 (NSR), 2019 WL 5616889, at *8 (S.D.N.Y. Oct. 31, 2019); *Encarnacion v. Olivo*, No. 921CV986MADTWD, 2024 WL 896362, at *1 (N.D.N.Y. Mar. 1, 2024) ("Courts considering motions *in limine* may reserve decision until trial so that the motion is placed in the appropriate factual context.").

As discussed in XOOM's responses to Plaintiff's MIL Nos. 2–5, *see* Parts II-V *supra*, what Plaintiff really wants is for the Court to prevent XOOM from presenting its defense. First, Plaintiff complains that "XOOM's newly concocted defense" that "additional costs" are contained "in its variable rates margins . . . should be precluded under Rule 37[.]" *See id.* As discussed, however, neither XOOM's defense nor the documents in support of it are new. *See* Parts II-V *supra*. Indeed, both the Court's Summary Judgment and Class Certification Orders address the very defense that

Plaintiff now claims is "new." *See* Doc. 151, SJ Order 16; Doc. 152, Class Order 13. The only thing about it that is new is Plaintiff's acknowledgement that it means there will necessarily be thousands of mini-trials on XOOM's rate-setting decisions. The hundreds of such examples that XOOM pointed to in its Motion to Decertify all rely on documents produced in discovery long ago. *See* Doc. 197, Def. Decert. Mem. 21-29.

Recognizing as much, Plaintiff complains that XOOM will turn the trial "into a mire of thousands of monthly rate-setting decisions" by "present[ing] a parade of witnesses to testify regarding individual rate-setting decisions" that have supposedly been "barred by the Court's contract construction." *See id.* The Court did not bar XOOM from presenting its defense. Nor could it. Rather, the Court correctly envisioned XOOM presenting its evidence of prior period adjustments at the class trial: "If the contract allowed XOOM to incorporate prior period adjustments and other supply costs into the margin, and they in fact did so consistent with the contract, the class will fail together." Class Order 13. There have been over 5,800 rates set for over 130 months during the class period. *See* Def. Decert. Mem. 7. Thus, XOOM will have to present testimonial and documentary evidence showing how actual supply costs including prior period adjustments factored into each one of those rates. *See id.* XOOM has a Seventh Amendment and Due Process right to present its defense as to each individual rate-setting decision in order to show how each class member's claim fails. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (noting "defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense"); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191–92 (3d Cir. 2001) ("[A]ctual injury cannot be presumed, and defendants have the right to raise individual defenses against each class member.").

While XOOM can and will present its defenses to each of the 5,800+ rates, it is Plaintiff who retains the burden to prove the class claim with common evidence through a workable trial plan. *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021) ("[D]istrict courts must ensure that a certified class satisfies Rule 23 throughout the litigation . . . and possess the authority to alter or decertify the class if that is no longer the case[.]"); *Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016) ("Mazzei retained the burden to demonstrate that these requirements were satisfied."). This Motion *in Limine* shows that she cannot. It should be no surprise that a case about those thousands of different rates set at hundreds of monthly rate-setting meetings over the course of more than a decade will necessitate a complex trial. Because Plaintiff has no answer (common or otherwise) to the individualized evidence stemming from 5,800+ rates set over the more than 11-year class period that she chose to certify, she instead seeks to preclude XOOM from showing how that individualized evidence defeats the class claims. Plaintiff's proposal to simplify trial by preemptively gagging XOOM is inappropriate and speaks to her realization that individualized issues will overwhelm common questions at trial. *See Newton*, 259 F.3d at 191–92.

For these reasons, Plaintiff's attempt to prevent XOOM from presenting its defense through an abstract motion *in limine* should be rejected.

IX.     **Plaintiff's MIL No. 9: Plaintiff cannot read deposition transcripts at trial for live witnesses.**

Plaintiff asks the Court to preemptively bless her use at trial of stenographic transcripts from the depositions of six current or former XOOM employees plus XOOM's expert witness, *even if* those witnesses appear for live testimony. The Court should reject Plaintiff's proposal. As Learned Hand long ago put it: "The deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand." *Napier v. Bossard*, 102 F.2d 467, 469 (2d Cir. 1939); *see also Salsman v. Witt*, 466 F.2d 76, 79 (10th Cir. 1972) (recognizing "long-established principle that testimony by deposition is less desirable than oral testimony and should ordinarily be used as a substitute only if the witness be unavailable to testify in person"). Consistent with that view, courts routinely preclude parties from "introduc[ing] the deposition testimony of a witness (other than for impeachment purposes) who will, in fact, be present and giving live testimony at trial." *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008) (citing *Niver v. Travelers Indem. Co.*, 430 F. Supp. 2d 852, 866 (N.D. Iowa 2006)).

As a court in this district has held, that practice remains *even if* the Rules "provide a separate basis to admit the depositions." *Kolb v. Suffolk County*, 109 F.R.D. 125, 127–28 (E.D.N.Y. 1985) (precluding party from using deposition testimony for eight party-opponent employees who would appear at trial, even though Rule of Evidence 801(d)(2)(D) made the deposition testimony admissible). That is because a "deposition contains no information that [a witness's] live testimony could not supply." *Jackson v. Chevron Chem. Co.*, 679 F.2d 463, 466 (5th Cir. 1982) (affirming district court's exclusion of deposition testimony for live witness, "even if [it] was properly admissible under Rule 32(a)(2)"); *see also Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 990 (8th Cir. 1999) (same, party wanted to "read [a live witness's] deposition testimony into evidence during her case in chief," as Plaintiff proposes to do here); *Fenstermacher*

*v. Phila. Nat'l Bank*, 493 F.2d 333, 337–38 (3d Cir. 1974) (same; collecting cases from other circuits). That the Rules say deposition testimony "'may' be used 'for any purpose'" when certain conditions are met ***does not*** mean that "they may be used *at any time* or *in any manner* as a party sees fit." *Gonzalez Prod. Sys. v. Martinrea Int'l, Inc.*, 310 F.R.D. 341, 344 (E.D. Mich. 2015) (emphasis in original).

Plaintiff cannot carry her burden to overcome the strong preference for live testimony by simply showing that some portion of the transcripts may be otherwise admissible under the Rules of Evidence. *See, e.g.*, *Allgeier v. United States*, 909 F.2d 869, 876 (6th Cir. 1990) (burden is on the deposition proponent). Trial efficiency, judicial economy, and jury confusion must still be considered—and under Rules of Evidence 403, 611, and others—those factors all weigh strongly against the approach to trial testimony Plaintiff urges here. *See, e.g.*, *Feinwachs v. Minn. Hosp. Ass'n*, No. 11-cv-0008, 2019 WL 4298085, at *11 (D. Minn. Sept. 11, 2019) (reasoning that just such an approach would "very likely be disjointed and confusing for a jury" and "also increases the risk of undue delay, wasted time, and cumulative evidence"). As one district court summarized:

> [I]t is more efficient and less confusing for the jury if all of the testimony of live witnesses is presented during their testimony in court. It is also more beneficial for the jury to personally observe the witnesses' testimony. Any questions asked during the deposition can be asked and answered in the jury's presence. For these reasons, and in light of the authorities cited above, the parties may not use depositions as substantive evidence if the witness in question testifies at trial.

*S&H Farm Supply, Inc. v. Bad Boy, Inc.*, No. 18-03413-CV-S-BP, 2020 WL 8373428, at * n.2 (W.D. Mo. Sept. 4, 2020) (citing, *inter alia*, *Crimm v. Mo. Pac. R. Co.*, 750 F.2d 703, 709 (8th Cir. 1983)); *see also EEOC v. Laroy Thomas, Inc.*, No. 5:05CV183, 2007 WL 9724343, at *2 (E.D. Tex. Oct. 3, 2007) (following *Dhyne*); *Young & Assocs. Pub. Relations, LLC v. Delta Air Lines, Inc.*, 216 F.R.D. 2003) (refusing to "allow deposition testimony in lieu of live testimony"

for witnesses who would appear at trial, "[i]n line with the universal preference for live testimony").

Plaintiff puts forward four arguments she says justify departing from the preference for live testimony. None do. First, Plaintiff contends that the deposition transcripts can be used at trial because "the seven deponents reside . . . outside of the 100-mile radius" discussed in Rule of Civil Procedure 32(a)(3)(B). Pl. MIL Mem. 49. But it does not matter if a witness resides more than 100 miles from the Court *before* trial; courts determine witness availability *at* trial. *See, e.g.*, *United States v. IBM Corp.*, 90 F.R.D. 377, 383 (S.D.N.Y. 1981) ("[T]he the time at which the deponent's location should be examined should extend beyond the time of offering to include any point during presentation of proponent's case when a trial subpoena could have been served."). A witness's pre-trial location has no bearing on whether their deposition transcript should be read at trial *while the witness is on the stand*. *See, e.g.*, *Young*, 216 F.R.D. at 524; *see also Adams v. United States*, No. 03–0049–E–BLW, 2009 WL 2032430, at *2 (D. Idaho July 7, 2009) (denying request similar to Plaintiff's for witness who "reside[d] more than 100 miles from the courthouse" because the witness would be present at trial); *Mazloum*, 248 F.R.D. at 727 ("Simply put, it is the fact that a witness will actually be present at the trial that renders him or her 'available,' and thus outside the scope of Rule 32(a)(4)(B)[.]"). Of course, if any witness ultimately is unable to attend trial, XOOM would not oppose use of their deposition testimony if it is otherwise admissible.

Second, Plaintiff argues that she should be permitted to read transcripts to live witnesses because Rule 32 "permits a party's use of a deposition 'for any . . . purpose permitted by the Federal Rules of Evidence," and Plaintiff asserts (although she does not show) that some portions of the transcripts are admissible as admissions of a party opponent under Rule 801. *See* Pl. MIL. Mem. 50–51. As an initial matter, Plaintiff's approach necessarily asks the Court to waste

significant time determining whether myriad individual out-of-court statements qualify as non-hearsay for witnesses **who will be in court**. As the authorities above reflect, that the Rules may make deposition testimony **admissible** does not *ipso facto* make them **appropriate** trial evidence. That is especially true when a party intends to raise witness credibility at trial. *See, e.g.*, *Micron Tech., Inc v. Rambus Inc.*, No. 00-792 (SLR), 2007 WL 9771144, at *2 (D. Del. Aug. 29, 2007) ("Courts have consistently recognized . . . that live testimony is preferable to deposition testimony, particularly when a witness's credibility has been challenged." (collecting cases)). Plaintiff plainly intends to try to impugn the credibility of XOOM and its witnesses—indeed, other of Plaintiff's MILs are replete with false accusations that XOOM hid information and that its witnesses gave "implausible" testimony during discovery. *See, e.g.*, Pl. MIL No. 1.

Plaintiff is incorrect, moreover, to portray the depositions as automatic non-hearsay party admissions under Rule 801(d)(2) because the depositions were cited by XOOM in court filings, given by current or former XOOM employees, or reviewed by XOOM's expert. Among other things, several of the witnesses for whom Plaintiff intends to introduce testimony **were not** XOOM employees at the time of the relevant depositions. The Rules render non-hearsay only statements that were made by a "party's agent or employee on a matter within the scope of that relationship **and while it existed**." Fed. R. Evid. 801(d)(2)(D) (emphasis added). Nor do the Rules provide that any statement given at an employee's deposition qualifies as their **employer's** admission simply because the employer made the employee available for testimony; the party itself must have specifically "authorized" the witness "to make a statement on the subject." Fed. R. Evid. 801(d)(2)(C). And although some courts have considered non-hearsay certain **data or investigative reports** given to expert witnesses or high-ranking officers who then acted on that information, *see* Pl. MIL Mem. 51, Plaintiff cites no cases that support her proposition that **deposition transcripts**

become party admissions in wholesale whenever a party provides them to its expert witnesses to aid in the development of their opinions. The party must "manifest[] that it adopted or believed to be true" the specific statements proffered as party admissions. *See* Fed. R. Evid. 801(d)(2)(B). Plaintiff's Rule 801 arguments thus are both insufficient and meritless. *See Kolb*, 109 F.R.D. at 128 ("Rule [801] is rarely applied to allow admission of whole depositions of witnesses who could easily appear at trial on a party's direct case.").

That leaves Plaintiff's final two arguments that (1) she can at least use the transcript of XOOM's Rule 30(b)(6) corporate-representative deposition under Rule 32(a)(3), and (2) "exceptional circumstances" justify allowing the deposition testimony under Rule 32(a)(4)(E). *See* Pl. MIL Mem. 51-52. As to the former argument, Plaintiff still does not grapple with the authorities holding that it is not enough for her to merely point to a Rule of Civil Procedure or Evidence that ***could*** permit use of deposition testimony. Corporate representative testimony is no exception. *Gonzalez Production*, 310 F.R.D. at 344. "[T]hough Federal Rule of Civil Procedure [32(a)(3)] '***permits*** a party to introduce the deposition of an adversary as part of his substantive proof regardless of the adversary's availability to testify at trial,' district courts are reluctant to allow the reading into evidence of the rule 30(b)(6) deposition if the witness is available to testify at trial." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006) (citation omitted). Plaintiff fails to explain why the live testimony of XOOM's corporate representative must be supplemented by recitations from his deposition transcript, let alone how the Court could efficiently "ensure that all levels of hearsay are satisfied" and that each statement "is actually admissible" "***before***" it is read. *Gonzalez Production*, 310 F.R.D. at 344 (emphasis added); *see also Rigsbee v. City & County of Honolulu*, No. 17-00532 HG-RT, 2019 WL 1089636, at *2 (D. Haw. Mar. 7, 2019) (excluding deposition testimony for corporate representatives who would provide live testimony).

And as to her last contention, Plaintiff identifies no circumstances that could possibly pass as exceptional under the "stringent standard" of Rule 32(a)(4)(E). *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, No. 9:14-230-RMG, 2017 WL 6015157, at *2 (D.S.C. Dec. 1, 2017). Courts define "exceptional circumstances" by reference to "companion provisions" in Rule 32(a)(3) and find them to "authorize use of a deposition in lieu of live testimony only" in situations akin to "when the witness is shown to be unavailable or unable to testify because he is dead; at a great distance; aged, ill, infirm, or imprisoned; or unprocurable through a subpoena." *Allgeier*, 909 F.2d at 876. Plaintiff passingly argues that exceptional circumstances exist because XOOM had notice of Plaintiff's plans and the opportunity to object (which it did), and because Plaintiff believes her proposal will save time and expense at trial (How that could possibly be so, Plaintiff does not explain). These are patently ***un***exceptional circumstances that the Court should disregard.

*     *     *     *     *

Plaintiff provides no reason—much less an exceptional one—to allow her to read from deposition transcripts while examining live witnesses during her case in chief or how such an approach would promote an efficient trial or conserve judicial and party resources. Her approach almost certainly would have the opposite results. Plaintiff's MIL No. 9 should be denied

**X.      Plaintiff's MIL No. 10: Plaintiff's expert should not testify twice.**

In her MIL No. 10, Plaintiff asks the Court to preemptively bless her proposed strategy of having her expert witness testify on two different occasions during her case in chief. Plaintiff contends that her expert should be allowed to first testify about "New York's wholesale and retail energy markets and relevant regulatory activity," and then again about "his opinions relating to XOOM's rate-setting" and damages.[11] In between this proposed testimony, Plaintiff intends to "establish[] specific facts regarding her involvement and XOOM's rate-setting practices." Pl. MIL Mem. 53.

The Court should reject Plaintiff's approach to expert testimony. In general, federal courts allow witnesses to testify only once, even where witnesses may be called "by *both* parties." *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4493863, at *2 n.3 (S.D.N.Y. Aug. 24, 2016) (emphasis in original). That is because successive rounds of testimony by the same witness tends to be both inconvenient for the witness, "as well as a waste of lawyers, witnesses and jurors' time." *LunarEye, Inc. v. Independent Witness, Inc.*, No. 9:05-CV-188, 2007 WL 9724756, at *2 (E.D. Tex. Feb. 1, 2007); *Santa's Best Craft, LLC v. Janning*, No. 02 C 9529, 2003 WL 21504522, at *4 (N.D. Ill. June 30, 2003) (finding transfer of venue would be more convenient for third-party witnesses because they would only "have to testify once").

Plaintiff proffers no substantive reason for allowing her expert to testify twice during her case in chief. Plaintiff's case would not be aided by having her expert explain—before Plaintiff's own testimony—the "functioning of New York's deregulated energy market, the role of ESCOs within that market, and the regulatory and legislative responses to ESCOs' role in that market over

---

[11] XOOM separately has moved to exclude these opinions in their entirety, potentially mooting Plaintiff's proposed witness-recall strategy. XOOM did not move to exclude a general background discussion about the New York energy market, but it has moved in its MIL No. 12 to prohibit Plaintiff's expert from discussing certain regulatory orders and proceedings.

time." Pl. MIL Mem. 53. Plaintiff asserts that such matters are "largely uncontested," *id.*, but that contention is belied by XOOM's other motions and filings objecting to Plaintiff's expert opining on various aspects of those exact topics. Plaintiff's participation in the market as an energy consumer needs no expert explanation; indeed, members of the jury almost certainly know from their day-to-day experience about procuring electricity in a deregulated market. Plaintiff's proposed approach also glosses over real and significant practical issues arising from bifurcating testimony, such as the fact that there is no bright line between discussion about energy deregulation in New York, ESCO rate setting, and subsequent "relevant regulatory activity." It is also not clear how to appropriately cabin the scope of cross examination given the breadth of such topics.

Plaintiff's proposed background education is ultimately also irrelevant to the circumstances in which Plaintiff learned of XOOM and its variable-rate electricity plans, as well as Plaintiff's decision to contract with XOOM and the amounts she paid under her electricity plan—the actual factual issues critical to her breach of contract claim. Plaintiff's expert cannot plausibly speak to Plaintiff's "involvement" with XOOM. Those are lay factual issues within the ken of Plaintiff and the jury. Nor can Plaintiff possibly have any personal (and therefore admissible) knowledge about "XOOM's rate-setting practices." *Id.* Plaintiff articulates no reason in her MIL No. 10 for concluding that she cannot credibly testify to the jury about such matters without prior expert testimony on the background and evolution of the New York energy market. Nor could she credibly; specialized, expert testimony about such extraneous, "foundational" matters would not aid the jury in analyzing whether XOOM breached its contract with Plaintiff. Pl. MIL Mem. 53. Plaintiff is uniquely situated to give testimony on the circumstances that led her to contract with XOOM, as well as the facts that ultimately led her to disengage XOOM as an electricity provider. A seminar on the basics of deregulated electricity and class actions—like that proposed by

Plaintiffs—has no bearing on those issues and therefore need not precede Plaintiff's testimony. And regardless, any basic background education about deregulation that Plaintiff believes is necessary to understand her testimony can appropriately be presented to the jury in summary form during her counsel's opening argument.

Plaintiff's cases—all in the context of criminal trials—are inapposite and do not support departing from the standard practice of one-time witness testimony. The cursory discussion in *Salzano* explains that the court permitted the Government's expert to testify twice because the parties "***reciprocally consent[ed]***" to that outcome as part of an agreement that also allowed "all experts" from both sides "to be present in the courtroom during others' testimony" in what would have been a violation of the Rule. *United States v. Salzano*, No. 22cr690 (EP), 2024 WL 866885, at *19 (D.N.J. Feb. 26, 2024) (emphasis added). The expert witness in *Zakhari* testified twice because he was also the "lead investigator" in the case and thus permitted to serve as an expert and fact witness; under longstanding federal procedural practice, the bifurcated testimony mitigated the risk of jury confusion about the "'two-headed nature of [his] testimony.'" *United States v. Zakhari*, No. 3:19-cr-208, 2021 WL 4139146, at *7–8 (W.D. Ky. Sept. 10, 2021) (citation omitted); *see also United States v. Bard*, 73 F.4th 464, 477 (7th Cir. 2023) ("It is routine for a law enforcement officer to act as a dual-role witness, offering both law and expert testimony. But [courts] have recognized that there are 'inherent dangers' with this practice," such that courts have "advised the district judge to first 'encourage the government to present the expert and lay testimony separately.'" (citation omitted)). And finally, the *Johnson* court ***tentatively*** allowed a law enforcement officer to testify twice in a case concerning different alleged criminal conduct in ***two different time periods***; even then, the court made the Government's ability to recall the witness contingent on the second set of criminal counts proceeding to trial. *See United States v. Johnson*,

No. 19 CR 405, 2024 WL 1486760, at *1 (N.D. Ill. Apr. 5, 2024) ("Officer Sack may testify twice . . . *but only if* evidence related to those latter counts . . . is otherwise admissible.").

Here, XOOM does not consent to the recall of Plaintiff's expert. Plaintiff's expert is not a law enforcement officer, and his testimony does not address different conduct spanning different periods of time with some of it to perhaps never be considered by the jury. Plaintiff herself had no personal knowledge of XOOM's rate-setting practices, so her proposed primer on New York energy markets and their history is not a necessary predicate to understanding Plaintiff's lay testimony about matters within her personal knowledge, such as her decision to purchase electricity from XOOM and what XOOM charged her. That Plaintiff initially proposed to present testimony from two expert witnesses does not make it appropriate to have one expert testify twice. Plaintiff's MIL No. 10 should be denied. *See, e.g.*, *Daiichi Sankyo Co. v. Mylan Pharms. Inc.*, No. 2:06–CV–03462 (WJM)(MF), 2009 WL 5842052, at *1 (D.N.J. Mar. 20, 2009) (explaining that "no witness shall appear more than once absent leave of Court upon a showing of genuine surprise").

XI.     **Plaintiff's MIL No. 11: Plaintiff's motion to strike XOOM's defenses should be denied as untimely and because XOOM is entitled to raise each one.**

Plaintiff proclaims that district courts "'should'" grant motions *in limine* seeking to preclude affirmative defenses. The Court should not even entertain Plaintiff's motion.

As courts routinely recognize, Plaintiff's request is nothing but "an improper attempt at summary judgment or a motion for judgment on the pleadings that seeks to strike various affirmative defenses[.]" *United Realty Advisors, LP v. Verschleiser*, No. 14-CV-5903 (JGK), 2019 WL 5285043, at *1 (S.D.N.Y. Oct. 3, 2019). This is "not [the] proper purpose[] of a motion *in limine*." *See id.* Indeed, if Plaintiff wanted to preclude XOOM's affirmative defenses, she should have done so within the time to move for judgment on the pleadings or at summary judgment. *See id.* ("The motion is an effort to avoid the time limits for making pleading motions or motions for summary judgment, which has long since passed."). She did not, so her time for challenging XOOM's pleaded defenses has long passed.

And even if the Court were to entertain Plaintiff's motion, it should be denied outright as abstract. Plaintiff "does not specify any evidence that [she] seeks to preclude and does not explain how granting the motion would change the evidence at trial in any way." *Id*. Indeed, each of her summary requests points to either no evidence at all or the supposed absence of evidence; she does not consider how any one of the defenses she moves to strike may apply to her or Class Members' claims. Especially considering Plaintiff's ever-evolving claims and case theories, it is apparent that XOOM's defenses may apply to facts adduced at trial.[12]

In fact, one of XOOM's principal reasons to maintain many of its defenses is simply to protect against Plaintiff's ever-changing theories. For example, Plaintiff represented to this Court

---

[12] The examples shown here are by no means an exhaustive list nor are they meant to show every circumstance where a defense may apply.

and to the Second Circuit that she was not challenging the dismissal of her implied covenant claim, which was then affirmed on appeal. *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 174 n.1 (2d Cir. 2019) ("The dismissal of the implied covenant and unjust enrichment claims is not challenged on appeal. Accordingly, we affirm the District Court's dismissal of those claims."). Despite that dismissal and affirmance nearly five years ago, she now seeks an implied covenant jury instruction. *See* Doc. 210-13, Pl. Jury Mem. 8. Plaintiff should be judicially estopped from raising a contrary position now. *Sheltry v. Unum Life Ins. Co. of Am.*, 247 F. Supp. 2d 169, 175 (D. Conn. 2003) ("A party invoking judicial estoppel must show that (1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner."). But if Plaintiff can somehow resurrect her long-since dismissed implied covenant claim, then it is not outside the realm of possibilities that Plaintiff will attempt to resurrect her long-since dismissed unjust enrichment claim. That would force XOOM, in turn, to rely on its unclean hands, laches, and adequate remedy at law defenses—so XOOM did not exclude them from the list of affirmative defenses in the Joint Pretrial Order and risk waiver.

By way of another example, Plaintiff's MIL No. 13 indicates that she plans to insert a never-pleaded New York General Business Law Section 349 tort claim at this late stage. She should not be allowed to for all the reasons discussed in XOOM's response, *see* Part XIII *infra*. But she can hardly claim that proximate cause is irrelevant to her position. GBL Section 349 claims require proof of proximate cause; thus, XOOM is similarly forced to keep open its ability to rely on this defense too. *See King v. New York City Emps. Ret. Sys.*, 212 F. Supp. 3d 371, 406-07 (E.D.N.Y. 2016) (holding that GBL Section 349 claim contains element of "causation," which "requires that the act complained of be the proximate cause of the harm alleged"); *Bath Petroleum*

*Storage, Inc. v. Mkt. Hub Partners, L.P.*, 129 F. Supp. 2d 578, 597 (W.D.N.Y. 2000), *aff'd*, 229 F.3d 1135 (2d Cir. 2000) (holding claims under GBL Section 349 "require proximate causation").

Plaintiff also ignores the possibility that many of XOOM's defenses may apply to some—but not all—of the class she currently represents. Plaintiff would have the Court believe that since a class has been certified (and summary judgment denied) she no longer has any burden to prove anything. Indeed, Plaintiff argues that "XOOM should be precluded from challenging certification at trial[.]" But the Court's Rule 23 determination is "made only for purposes of class certification and is not binding on the trier of facts," i.e., the jury. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *see also Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004) ("The jury or factfinder can be given free hand [at a class trial] to find all of the facts required to render a verdict on the merits, and if its finding on any fact differs from a finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment."). Thus, the jury is not bound by the Court's Rule 23 determination, and XOOM has a Seventh Amendment and due process right to present its defenses as to each class member's claim. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (noting "defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense"); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191–92 (3d Cir. 2001) ("[A]ctual injury cannot be presumed, and defendants have the right to raise individual defenses against each class member.").

XOOM likewise has a right to present its defense as to each individual rate-setting decision to show how each class member's claim fails. *See id.* XOOM explained one such defense in its Motion to Exclude Plaintiff's Untimely Expert Disclosures, where XOOM explained that the class was undercharged on numerous occasions. *See* Doc. 229-1, Def. Mem. 25–26. Any person who

was undercharged lacks standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("[A] plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."). XOOM has the right to argue each class member lacks standing because they were undercharged or for any other reason. *See id.* at 431 ("Every class member must have Article III standing in order to recover individual damages.").

Plaintiff also summarily claims that neither her nor the Class's claims are subject to XOOM's defenses for assumption of the risk and voluntary payment.[13] Not so. The contracts state that the "monthly *variable* rate" is "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." It further states that XOOM's services would be "provided on an arm's length basis and market-based compensation is included in the price noted above." Plaintiff and the class knew these terms when they entered the contracts, knew the rate would be variable, i.e., it would fluctuate, and knew that the rate would be based on estimated and *actual* costs. This includes actual costs such as prior period adjustments that take into account costs that were higher than those anticipated when they were estimated. *See* Doc. 212, Def. Decert. Reply 14-15. Thus, there is more than a colorable argument that Plaintiff and the class assumed the risk and voluntarily paid the amounts due with such knowledge. *Allred v. Cap. Area Soccer League, Inc.*, 669 S.E.2d 777, 781 (N.C. Ct. App.

---

[13] To the extent Plaintiff is permitted to raise evidence that certain customers were "re-rated" using the utility rate in the relevant market, XOOM would be permitted to raise the defense that such an agreement to pay a different amount than charged was an accord and satisfaction. *In re Five Oaks Recreational Ass'n, Inc.*, 724 S.E.2d 98, 102 (N.C. Ct. App. 2012) ("An accord and satisfaction is compounded of the two elements enumerated in the term. 'An "accord" is an agreement whereby one of the parties undertakes to give or perform, and the other to accept, in satisfaction of a claim, liquidated or in dispute, and arising either from contract or tort, something other than or different from what he is, or considers himself, entitled to; and a "satisfaction" is the execution, or performance, of such an agreement.'").

2008) ("The two elements of the common law defense of assumption of risk are: (1) actual or constructive knowledge of the risk, and (2) consent by the plaintiff to assume that risk."); *Johnson v. Sprint Sols., Inc.*, No. 3:08-CV-00054, 2008 WL 2949253, at *2 (W.D.N.C. July 29, 2008), *aff'd*, 357 F. App'x 561 (4th Cir. 2009) ("The North Carolina court system continues to recognize that 'voluntary payment of money by a person who has full knowledge of all the facts cannot be recovered.'").

In addition, the Court found and Plaintiff maintains the "relevant contract provision" is vague and the Court likewise found that the "meaning" of the market-based compensation provision "is unclear." This means that parol evidence may be necessary. *See Corbin v. Langdon*, 208 S.E.2d 251, 253-54 (N.C. Ct. App. 1974) ("Plaintiff first argues that the court failed to consider 'parol evidence which is admissible as completing and defining a vague contract.' We do not argue with the principles of law espoused by plaintiff."); *Green v. Harshaw*, 121 S.E. 456, 461 (N.C. 1924) (approving jury instruction stating that "parol evidence may be competent to explain a contract . . . where it is vague").

Plaintiff also claims there is no evidence of a release or waiver by any of the class members. But Plaintiff's counsel knows that is not true. They settled the claims of James Wynn, a class member, with XOOM in November 2021. This means that there is at least one class member who both signed a release and waived any claims against XOOM relating to their electricity or natural gas services. *See Fin. Servs. of Raleigh, Inc. v. Barefoot*, 594 S.E.2d 37, 41 (N.C. Ct. App. 2004) ("A release is a private agreement amongst parties which gives up or abandons a claim or right to the person against whom the claim exists or the right is to be enforced or exercised."); *Fetner v. Rocky Mount Marble & Granite Works*, 111 S.E.2d 324, 328 (N.C. 1959) ("The essential elements of a waiver are: (1) the existence, at the time of the alleged waiver, of a right, advantage or benefit;

(2) the knowledge, actual or constructive, of the existence thereof; and (3) an intention to relinquish such right, advantage or benefit."). If Plaintiff's counsel decided to seek to void this agreement and seek class relief instead, they may claim that the release was entered into by mistake, in which case XOOM's defense of mistake may apply. *Howell v. Waters*, 347 S.E.2d 65, 69 (N.C. Ct. App. 1986) ("The formation of a binding contract may be affected by a mistake."). But since the release—a binding contract—was executed back in November 2021, Mr. Wynn has ratified it and can no longer escape the release. *Bobby Floars Toyota, Inc. v. Smith*, 269 S.E.2d 320, 322 (N.C. Ct. App. 1980) ("And it is no more than just and reasonable that if he silently acquiesces in his deed and makes no effort to express his dissatisfaction with his act,  he should, after the lapse of a reasonable time, dependent upon circumstances, be considered as fully ratifying it.").

In short, it is unclear how the claims of Plaintiff and the class may shape up at trial given Plaintiff's willingness to change theories and ignore the individual circumstances of class members.[14] XOOM's affirmative defenses therefore should not be dismissed or excluded.

Finally, Plaintiff claims that New York's statute of limitations governs all class claims such that XOOM's limitations affirmative defense could not apply. Plaintiff is missing several important steps in her analysis that show class members' claims may be barred by limitations, which XOOM has a right to raise at trial. "[W]hen the injury of a nonresident plaintiff is purely economic, the cause of action accrues where the plaintiff resides and sustains the economic impact of the loss, . . . rather than where the defendant committed the wrongful act." *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 569 (S.D.N.Y. 2022), *aff'd*, 66 F.4th

---

[14] Plaintiff also claims that XOOM is precluded from arguing failure to exhaust administrative remedies. That is not true. XOOM has the right to re-urge its grounds for the motion to dismiss at trial. *Save Our Wetlands, Inc. (SOWL) v. Rush*, 424 F. Supp. 354, 357 (E.D. La. 1976) ("Therefore, the motion to dismiss under Rule 12(b)(6) must be denied, reserving to the defendants the right to reurge same at trial as provided under Rule 12(h)(2).").

365 (2d Cir. 2023). In other words, New York courts look to the state where the plaintiff resided to determine where the cause of action accrued. *See Nall v. Estate of Powell*, 99 A.D.3d 411, 412 (1st Dep't 2012) ("The complaint is untimely under the four-year California statute of limitations governing contract actions (*see* CPLR 202). Plaintiff Nall is a California resident, and the economic impact of her claimed injury was sustained in that state (*see Global Fin. Corp. v. Triarc Corp.,* 93 N.Y.2d 525 (1999) )."); *Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999) ("When an injury is purely economic, the place of injury for purposes of the borrowing statute is where the economic impact of defendant's conduct is felt, which is usually the plaintiff's place of residence.").

Thus, Plaintiff, like the lower court in her cited authority, "should have applied CPLR § 202 to [the class] claims to determine whether they were timely brought[.]" *Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 416 (2010) ("'[A]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued.' Therefore, '[w]hen a nonresident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued.'") (citing, *inter alia*, C.P.L.R. § 202).

Here, while the class is made up of persons who were charged a variable rate for supply service to an address in New York, Plaintiff can hardly claim to know with certainty that all class members **resided** in New York at the time they were charged. Thus, their claims may have accrued in a different state and be subject to a different statute of limitations. XOOM therefore reserves the right to challenge whether each class member's claim is barred by limitations.

For all these reasons, XOOM should not be precluded from relying on any of its defenses.

XII.     **Plaintiff's MIL No. 12: Plaintiff's motion seeking to preclude XOOM from offering evidence or argument relating mitigation should be denied.**

Plaintiff moves to preclude XOOM from submitting any evidence or argument concerning her or any class member's failure to mitigate damages. Her motion is without merit.

Plaintiff acknowledges that, under North Carolina law, "a plaintiff or a party who is injured by a breach of contract has the duty to minimize his loss where he can do so, rather than accept as much loss as he can and seek to recover for it." *Little v. Rose*, 285 N.C. 724, 730, 208 S.E.2d 666, 670 (1974) (cited by Plaintiff, *see* Pl. MIL Mem. 62). Yet, before the parties have even presented their evidence, Plaintiff seeks to strip XOOM of its right to present evidence or argument regarding any class member's failure to mitigate damages. Plaintiff's request would inappropriately deprive XOOM of its due process right to present defenses, individualized and classwide, without justification. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (noting that in a class trial, "damages or some affirmative defenses peculiar to some individual class members" may "have to be tried separately").

Although Plaintiff canceled her electricity supply contract with XOOM after only six months of service, not all class members acted with similar haste. Rather, the record shows that numerous class members paid or have been paying XOOM's variable rates for years. *See, e.g.,* PX65 XOOM_MIRKIN 074171, XOOM Enrollment Nos. 3775942 (commercial electricity customer of more than ten years), 3889731 (same for nearly ten years), and 3826550 (same). Whether Plaintiff or any other class member could have avoided any further alleged harm due to XOOM's rates by switching to a different ESCO or the incumbent utility is a question of fact that the jury should decide following trial. It is not a question of law that the Court can resolve in the jury's place on a motion *in limine*.

Plaintiff's argument that class members were under no duty to mitigate because they were "without access to XOOM's internal and non-public information regarding its supply costs," Pl. MIL Mem. 63, is similarly without merit. If Plaintiff prevails on her overcharge claim, then a class member (including Plaintiff) could have been on reasonable notice they were being overcharged without knowing the details of XOOM's supply costs. This is particularly true in light of CRA's New Report that Plaintiff recently produced. Methods A and B purport to measure overcharges against the corresponding utility's rates. Those utility rates were publicly available, which means that any class member could have determined in short order whether their rates were higher than, or 5% higher than, the utilities' rates. Moreover, Plaintiff's argument also does not apply at all to class members who remained XOOM variable-rate customers following receipt of the administrator's notice. For all these reasons, XOOM is entitled to present its mitigation defense.

Plaintiff cites no case granting a motion to exclude evidence concerning an affirmative defense of mitigation-of-damages, and for good reason: courts overwhelmingly ***deny*** such relief. *See, e.g., Fields v. BNSF Ry. Co.*, No. CIV-16-213-KEW, 2021 WL 7966593, at *1 (E.D. Okla. Sept. 29, 2021) (denying plaintiff's motion *in limine* to preclude defendant from introducing evidence that Plaintiff failed to mitigate damages because "[a]t this stage of the proceedings, it is impossible for this Court to rule on this issue in a vacuum without the benefit of considering the evidence on mitigation of damages"); *Bell v. Prefix, Inc.*, No. 05-74311, 2009 WL 3614350, at *2 (E.D. Mich. Nov. 2, 2009) (noting that "a motion *in limine* was not a proper vehicle in which to challenge mitigation," and denying motion *in limine* to strike that affirmative defense).

Accordingly, Plaintiff's MIL No. 12 on XOOM'S mitigation defense should be denied.

XIII.    **Plaintiff's MIL No. 13: The Court should reject Plaintiff's punitive-damages instruction.**

In her MIL No. 13, Plaintiff persists in her pursuit of punitive damages—a meritless theory of recovery revealed for the first time in her pretrial materials.[15] Plaintiff acknowledges that North Carolina law generally bars the recovery of punitive damages on breach of contract claims except in rare circumstances where the plaintiff pleads and proves "the commission of an identifiable tort" separate from the conduct that constitutes the alleged breach. *SciGrip v. Osae*, 838 S.E.2d 334, 348–49 (N.C. 2020). XOOM already has briefed in its Trial Memorandum and its own MIL No. 13 why Plaintiff's punitive-damages claim fails under North Carolina law. *See* Doc. 210, Pretrial Order 11–18; Doc. 227, Def. MIL Mem. at 41–45.[16] Undeterred, but perhaps sensing the infirmity of her position, Plaintiff now insists that she can pursue punitive damages if the Court splits her breach-of-contract claim into separate liability and damages questions and applies New York General Business Law Sections 349 and 349-d to the latter. But the GBL cannot salvage Plaintiff's procedurally improper and substantively meritless quest for punitive damages.

To begin, such claims are not properly before the Court. As XOOM repeatedly has pointed out, Plaintiff has ***never*** pleaded or pursued GBL claims or any other theories of recovery based on deceptive advertising or punitive damages under the law of any state. She cannot assert such a theory for the first time in her pretrial materials. Indeed, Plaintiff justified class certification by arguing that she raises only a "straightforward breach of contract claim" based on a form contract,

---

[15] Not even Plaintiff's initial jury instructions or verdict form served on XOOM included this request. Plaintiff apparently thought of it at the very last minute.

[16] XOOM incorporates those arguments here, which are substantially the same reasons that Plaintiff's punitive-damages theory fails under New York law. Among other things, both North Carolina and New York law require that Plaintiff have pleaded an independent tort and qualifying conduct by XOOM in order to obtain punitive damages on a breach of contract claim, and deceptive-advertising theories necessarily implicate issues that are improper to consider (and virtually impossible to resolve) in a class-action setting.

which would not implicate individualized issues like those inherent in tort and statutory claims based on allegedly deceptive advertising. *See* Doc. 132, Pl. Class Cert. Mem. 1 n.3. Plaintiff should be held to her prior representations that this is a pure breach of contract case—including her contemporaneous representations in other MILs that this case "concerns a simple breach of contact claim." Pl. MIL Mem. 47

Plaintiff continues to completely ignore her pleading deficiencies and instead confusingly asserts that "while the breach of contract claim is governed by North Carolina law, whether the action 'constitutes or is accompanied by' an independent tort is governed by New York law." Doc. 233, Pl. MIL Mem. 64 n.29. That is wrong[17] but ultimately irrelevant because North Carolina and New York use similar approaches to the availability of punitive damages for breach of contract claims. *See Strum v. Exxon Co.*, 15 F.3d 327, 331 (4th Cir. 1994) (summarizing limited exception for pursuing punitive damages in contract cases under North Carolina law); *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 315–16 (1995) (identifying "the pleading elements required to state a claim for punitive damages" in connection with breach of contract claims in New York (citation omitted)). In addition to specifically pleading the elements of an "identifiable tort," the

---

[17] Plaintiff cites cases supporting the unremarkable proposition that choice-of-law principles can result in the application of different states' laws to contract and tort claims in the same case. *See* Pl. MIL Mem. 64 n.29. But Plaintiff offers no explanation for why that rule applies here. Plaintiff has not pleaded any tort claims, so it cannot.

Plaintiff's request to apply different state laws to different aspects of the same claim invokes the doctrine of "depecage," but that doctrine is also inapplicable. It applies only to tort claims and then only when different state laws would have materially different effect. *See, e.g., Simon v. Philip Morris, Inc.*, 124 F. Supp. 2d 46, 75–76 (E.D.N.Y. 2000) (under depecage, different substantive issues ***in a tort case*** may be resolved under laws of different states where the choices influencing decisions differ." (emphasis added)). Courts specifically reject attempts—like Plaintiff's—to invoke depecage to apply different state law to punitive damages on a breach of contract claim. *See, e.g., Interclaim Hldgs. Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*, No. 00 C 7620, 2004 WL 725287, at **14–15 (N.D. Ill. Apr. 1, 2004) (refusing to apply different state law "to the so-called 'tort portion' of the breach of contract claim").

allegations supporting the tort must show that the conduct was "egregious" and akin to "gross" and "morally reprehensible conduct" involving "such wanton dishonesty as to imply a criminal indifference to civil obligations." *Id.* (cleaned up).

Plaintiff's operative complaint falls far short of alleging that XOOM engaged in such conduct, let alone that XOOM violated any "duty of reasonable care distinct from its contractual obligations" or engaged in alleged "tortious conduct separate and apart from its failure to fulfill its contractual obligations." *Id.* It instead alleges only that XOOM breached its contracts by setting variable rates based on factors other than actual and estimated supply costs. Doc. 42, Am. Compl. ¶¶ 76–81. Plaintiff acknowledges as much in her MIL No. 13 by focusing on her breach of contract allegations while conspicuously failing to cite any allegations that plead the elements of a GBL claim based on deceptive advertising. Nor can Plaintiff meet her burden to plead an independent tort with the conclusory statements in her MIL No. 13 that XOOM engaged in "willful and wanton" acts by allegedly violating a regulatory order that issued *years* after Plaintiff was a XOOM customer, did not make any findings specifically as to XOOM, and does not appear in Plaintiff's Complaint.[18] Plaintiff's Complaint plainly shows that she "is merely seeking to enforce [her] bargain," such that "a tort claim will not lie." *Id.* at 768 (collecting cases); *Ticheli v. Travelers Ins. Co.*, No. 1:14-CV-00172, 2014 WL 12587066, at *4 (N.D.N.Y. Dec. 23, 2014) (striking punitive-damages demand on breach of contract claim where plaintiff failed to allege the breach of duties "distinct from [the defendant's] contractual obligations").

The Court need go no further to prohibit Plaintiff from injecting tort- and punitive-damages theories into this breach of contract case. New York federal courts (like those in North Carolina)

---

[18] Notably, the language quoted by Plaintiff, *see* Pl. MIL Mem. 67, is not a finding by a regulatory body in the cited order. *See* Doc. 147-16. It is mere argument made in a brief submitted in the underlying proceedings, which was not adopted in the final order.

have refused to allow plaintiffs to seek punitive damages on breach of contract claims even where—unlike here—plaintiffs originally pled GBL and tort claims. *See MaGee v. Paul Revere Life Ins. Co.*, 954 F. Supp. 582, 588 (E.D.N.Y. 1997) (striking punitive-damages claim after dismissal of GBL and tort claims because plaintiff no longer had the predicate "independent tort necessary to support [such] a claim"); *see also Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*, No. 18-CV-170 (KMK), 2019 WL 4413052, at *8 (S.D.N.Y. Sept. 16, 2019) (holding that plaintiff was not eligible for punitive damages on breach of contract claim after dismissal of GBL Section 349 claim; also ruling that complaint's "conclusory statements" about fraudulent inducement did not allege the requisite "'high degree of moral turpitude' or 'wanton dishonesty'"); *Toussie v. Allstate Ins. Co.*, No. 15-CV-5235 (ARR)(PK), 2016 WL 6537670, at *3 (E.D.N.Y. Nov. 3, 2016) (Ross, J.) ("The first element requires pleading commission of an independent tort, such as fraud. Without such an allegation, plaintiffs' relief for a claim of denial of a valid insurance claim in New York is limited to breach of contract claims." (citation omitted)); *Greenspan v. Allstate Ins. Co.*, 937 F. Supp. 288, 295 (S.D.N.Y. 1996) (striking punitive-damages demand because "[p]laintiffs have no remaining tort claims" and could not rely on alleged breach of the implied covenant to meet the independent tort requirement).

XOOM would be severely prejudiced if the Court were to allow Plaintiff to present her unpleaded GBL-based punitive damage theory for the first time in front of a jury. *See* Fed. R. Evid. 403. As an initial matter, Plaintiff could not have asserted a GBL claim when she sued because it would have been barred by the applicable three-year statute of limitations. *See, e.g.*, *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 788–90 (2012). The parties also have not conducted discovery on any deceptive-advertising theories—because Plaintiff never hinted that she was pursuing one—

and XOOM was deprived of the opportunity to move for summary judgment on them. *See* Fed. R. Evid. 403.

But more fundamentally, New York law barred Plaintiff from pursuing punitive damages (or statutory treble-damages penalties like those in the GBL) at the time she filed suit in state court if she wished to pursue a class action. Section 901(b) of the New York Civil Practice & Law Rules ("CPLR") expressly prohibits class actions to "recover a penalty, or a minimum measure of recovery created or imposed by statute" unless that statute also "specifically authorizes the recovery thereof in a class action." That statutory bar applies to consumer class actions under GBL Section 349 unless putative class plaintiffs waive their right to recover such remedies and elect to "confin[e] the class recovery to actual damages." N.Y. CPLR Supp. Prac. Comment. C901:11; *Borden v. 400 E. 55th St. Assocs.*, 24 N.Y.3d 382, 394 (2014) ("Where a statute imposes a nonmandatory penalty, plaintiffs may waive the penalty in order to bring the claim as a class action—such as was the case for consumer fraud actions brought under section 349(h).").

Because the United States Supreme Court has held that CPLR § 901(b) does not apply to class actions in federal court, *Shady Grove Orthopedic Assocs. v. Allstate Ins Co.*, 559 U.S. 393 (2010), XOOM would not have removed this diversity case to federal court had Plaintiff indicated that she sought punitive damages or other penalties. It instead would have moved to dismiss this case under CPLR § 901(b). The Court should not permit Plaintiff to now proceed on theories of recovery that were not available to Plaintiff at the time she filed suit, the waiver of which was both a precondition of Plaintiff's ability to bring a class action and an inducement to XOOM's removal to federal court. Plaintiff offers no justification for waiting ***over six years*** to seek damages beyond those that she would have been limited to in state court—again, without ever pleading a predicate tort theory of recovery.

Nor does Plaintiff provide any credible reason for ignoring the punitive-damages waiver in XOOM's contracts, which is indistinguishable from those "routinely upheld by courts." *Airport Mart*, 2019 WL 4413052, at *8 (collecting cases enforcing punitive-damages waivers in form contracts like XOOM's). Plaintiff cursorily argues that the waiver provision cannot apply "when the basis for the punitive damages is GBL §§ 349 and 349-d." None of her cited authorities actually say that, and among other errors, Plaintiff conflates the waiver of remedies for a contract claim (which she **has** asserted) with the waiver of remedies for direct GBL claims (which she **has not**). "The basis" for Plaintiff's eleventh-hour punitive-damages claim is not the GBL, but her breach of contract claim. Plaintiff cites no authority for vitiating otherwise valid punitive-damages waivers for breach of contract claims simply because a plaintiff contends on the eve of trial for the first time that the breach also could constitute an (unpleaded) claim under the GBL.

Of course, this analysis assumes that punitive damages are available under the GBL and eligible for waiver in the first place. New York courts are split on whether the GBL authorizes punitive damages given the lack of textual support for such remedies. *Guzman v. Harris*, No. 16-CV-3499 (GBD) (RLE), 2017 WL 4386369, at *2–3 (S.D.N.Y. Sept. 29, 2017) ("Traditional punitive damages are not provided for within the text of the GBL."; GBL's capped treble-damages provision as a "limited punitive damages provision"); *Greenspan*, 937 F. Supp. at 295 n.2 ("Even if plaintiffs replead their section 349 claims, the statute does not authorize an award of punitive damages."); *see also Bracken v. MH Pillars Inc.*, 290 F. Supp. 3d 258, 267–68 (S.D.N.Y. 2017) (discussing split). Even then, the courts recognizing punitive damages under the GBL tend to cite the statute's treble damages provision—not an actual statutory recognition of punitive damages—the application of which the statute vests solely with a court (not a jury). *See Guzman*, 2017 WL

4386369, at **2–3. It therefore is doubtful the GBL even affords a punitive damages remedy in the form Plaintiff seeks and, even if so, whether a jury is allowed to assess such penalties.

Plaintiff characterizes her proposed deceptive-advertising theory as one based on alleged "misleading" "marketing and advertising." Pl. MIL Mem. 64 n.29. That theory is particularly inappropriate at this juncture unless Plaintiff intends to abandon her class-based approach to this case. Other than the breached contract language itself, Plaintiff has never identified any advertising or marketing materials that were deceptive, "and class certification is not appropriate where the 'plaintiffs do not point to any specific advertisement or public pronouncement by the [defendants] . . . which was undoubtedly seen by all class members.'" *Newman v. RCN Telecom Servs.*, 238 F.R.D. 57, 77 (S.D.N.Y. 2006). Moreover, although "materiality and reliance under GBL § 349" can in some instances be "determined based on the objective 'reasonable consumer' standard, loss causation must be addressed individually." *Ackerman v. Coca-Cola Co.*, No. 09 CV 395(DLI)(RML), 2013 WL 7044866, at *19 (E.D.N.Y. July 18, 2013) (citation omitted). That is because, among other things, "consumers' 'purchase decisions, and, a fortiori, the particular price paid . . . may be based on a variety of factors," making it impossible to determine damages on a classwide basis. *Id.* at *20. As a result, New York federal courts considering "allegations of misleading product labeling or marketing" like those advanced for the first time in Plaintiff's pretrial filings have declined to give them class treatment. *Id.* The Court should not allow Plaintiff to seek class punitive damages for her breach of contract claim via a GBL-based theory that itself would not survive class certification. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) ("Class certification is a procedural device that cannot 'giv[e] plaintiffs and defendants different rights . . . than they could have asserted in an individual action.'").

\*     \*     \*

Plaintiff's belated request for punitive damages fails for several independent reasons. Plaintiff has not pleaded a punitive-damages request; the underlying contracts contain an unambiguous punitive-damages waiver; Plaintiff's operative complaint lacks any independent tort claims as to which XOOM allegedly acted with criminal indifference; Plaintiff's proposed GBL-based theory would have been time-barred and statutorily prohibited at filing; and deceptive-practices theories present individualized issues incompatible with a class-based approach to damages. Accordingly, the Court should deny Plaintiff's MIL No. 13, grant XOOM's MIL No. 13, and prohibit Plaintiff from seeking punitive damages for the first time at trial.

XIV.     **Plaintiff's MIL No. 14: The Court should deny Plaintiff's motion to exclude evidence or argument regarding her pleaded "market supply cost."**

Plaintiff's MIL No. 14 seeks to preclude XOOM from introducing evidence or argument concerning Plaintiff's own theory of the case in her ***operative*** **complaint**—a theory she used to survive dismissal and that was devised by her testifying experts at CRA. While XOOM does not currently anticipate introducing any such evidence or argument in its case in chief, it has reserved the right to do so in rebuttal. The law is clear that XOOM indeed has such a right.

As a preliminary matter, allegations in the operative complaint are "judicial admissions" by which Plaintiff is "bound throughout the course of the proceeding." *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (cleaned up). Thus, "Plaintiff's operative complaint is admissible against h[er]," *Liu v. Little Saigon Cuisine Inc.*, No. 18CV2181RPKVMS, 2021 WL 4487839, at *3 (E.D.N.Y. Sept. 30, 2021), and Plaintiff's MIL No. 14 should be denied for that reason alone.

Moreover, having relied on that "Market Supply Cost" calculation to survive XOOM's motion to dismiss on appeal to the Second Circuit, Plaintiff is also judicially estopped from disavowing it. *See Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619–20 (2d Cir. 2012) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)); *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (litigant cannot "deliberately chang[e] positions according to the exigencies of the moment" (quoting *New Hampshire*, 532 U.S. at 743)).

Plaintiff suggests that she could avoid the consequences of her operative allegations simply by amending her complaint on the eve of trial. *See* Doc. 233, p. 68 n. 33. That suggestion is meritless. *See Rich v. Associated Brands Inc.*, 559 F. App'x 67, 70 (2d Cir. 2014) ("[T]o the extent Rich argues that amendment would have wiped the slate clean on contradictory statements in earlier pleadings, he is incorrect.") XOOM has the right at trial to showcase discrepancies between a superseded pleading and the operative pleading. *See Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) ("The district court erred in refusing to permit the original complaint to be received in evidence" because "amendment of a pleading does not make it any the less an admission of the party."); *Prolitec Inc. v. ScentAir Techs., LLC.*, No. CV 20-984-WCB, 2024 WL 341342, at *2 (D. Del. Jan. 30, 2024) (noting "statements made in pleadings—even superseded pleadings— . . . can serve as an evidentiary admission, even if . . . withdrawn in a subsequent pleading" (citing cases)). Thus, Plaintiff's proposed amendment of the complaint to remove the "Market Supply Cost" from the complaint would be futile. *See United States v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991) ("A party . . . cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." (quotation marks and citation omitted)).

Nor is there any merit to Plaintiff's conclusory argument that her alleged Market Supply Cost is somehow irrelevant to her claim against XOOM. For example, Plaintiff deemed it appropriate to include "[a] substantial margin of 1.3¢ per kWh sold to cover retailer fixed costs," which, for "Plaintiffs' billing cycles . . . represent[ed] an average 13.67% markup (margin) over XOOM's actual costs." Am. Compl. ¶ 55. The fact that Plaintiff (and her experts at CRA) thought it reasonable to include a 13.67% margin over its estimate of supply costs when those same experts

now suggest that XOOM's margin should not exceed 5% or 7% over costs is very relevant to one of the central issues in this case.[19] Plaintiff's belated realization that her operative complaint's concessions regarding margin are inconsistent with her latest theory of the case does not make her concessions any less probative. They may not favor her, but her own admissions cannot possibly prejudice her *unfairly*.

Accordingly, Plaintiff's MIL No. 14 should be denied in its entirety.

---

[19] XOOM has separately moved to exclude those new opinions as untimely, prejudicial, and ultimately futile. *See* Doc. 229.

XV.  **Plaintiff's MIL No. 15: The Court should deny Plaintiff's motion to exclude XOOM's rebuttal evidence concerning margins and grant both sides' motions to exclude evidence concerning ESCO margins.**

Plaintiff's MIL No. 15, which asks the Court to preclude XOOM from presenting evidence concerning the margins of (1) other ESCOs, and (2) other companies generally, should be denied.

As a preliminary matter, Plaintiff's motion turns on whether Plaintiff is allowed to present any evidence at all concerning a reasonable margin. XOOM has explained in detail in its *Daubert* motion and motions *in limine* why Plaintiff has no relevant evidence of what a reasonable variable-rate margin is. If she does not present any evidence concerning a margin, a direct verdict should be granted and XOOM will not introduce any evidence concerning any other companies' margins.

As to the first issue (other ESCOs' margins), Plaintiff's request is a fatal admission that she has no evidence concerning the variable-rate margins for a competitor of XOOM (i.e., another ESCO). But as XOOM explained more fully in its Motion to Exclude Plaintiff's Timely Expert Disclosures, Doc. 215, the Second Circuit has repeatedly held that such evidence is necessary to determine what a "reasonable" variable-rate margin would be in the market. *Compare* Doc. 233, Pl. MIL Mem. 70 ("Evidence of other ESCOs' margins or the margins of other companies has no bearing on those key issues."), *with Martinez v. Agway Energy Servs.*, 88 F.4th 401, 416 (2d Cir. 2023) (considering how ESCO's variable rates compared "to rates offered by other ESCOs in territories where Agway operated, for each quarter from 2014 to 2019"); *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019) (rejecting contention that variable rate was "too high" where there was "no evidence that it was any higher than its competitors' rates"); *Sevugan v. Direct Energy Servs.*, 931 F.3d 610, 616–17 (7th Cir. 2019) ("Without any information about valid market comparators, such as other alternative retail energy suppliers, Sevugan's breach of contract claim is speculative and implausible."). As Plaintiff knows, XOOM has no intention of offering the

margins of other ESCOs at trial either. Thus, Plaintiff's MIL No. 15 is not a proper motion *in limine*, but a case-ending concession that the record contains no relevant evidence on margin.

As to the second issue (margins of other companies), Plaintiff seeks to exclude testimony from XOOM's testifying expert David Coleman regarding his rebuttal opinion on a reasonable margin. In this regard, Plaintiff's MIL No. 15 is duplicative of her motion to exclude Mr. Coleman and should be denied on that basis alone.

Outside of Mr. Coleman's opinions, Plaintiff does not identify any evidence—documentary or testimonial—that concerns other companies' margins. For that reason, too, her motion should be denied. *See Altruis Grp., LLC v. ProSight Specialty Mgmt. Co., Inc.*, No. 1:21-CV-10757-MKV, 2023 WL 4784233, at *6 (S.D.N.Y. July 26, 2023) (denying motion *in limine* for failure to "particularize the specific exhibits or evidence [plaintiff] seeks to exclude"); *Belvin v. Electchester Mgmt., LLC*, 635 F. Supp. 3d 190, 204 (E.D.N.Y. 2022) (denying motion *in limine* based "on abstract and generalized hypotheticals rather than specific language, phrases or evidence").

Substantively, Plaintiff's request to exclude this testimony and evidence fares no better. Again, Mr. Coleman offered the evidence and testimony at issue in rebuttal to CRA's claim that XOOM's margins should have been capped by its corresponding fixed-rate margins in the same month (i.e., CRA's Model Two). *See* Doc. 232-03, Coleman Reb. Rep. 12 (analyzing gross margins for 26 Dow Jones Industrial Average companies because "it is instructive to assess whether CRA's judgment of whether what constitutes a 'reasonable' margin is consistent with commercial experience"). Plaintiff has seemingly abandoned Model Two. But if any of CRA's models (whether the original Model Two with its corresponding-fixed-rate-margin-cap or the new Methods A, B, and C) are presented at trial, then XOOM should be allowed to counter that

evidence with its expert's analysis showing that Plaintiff's expert's analysis is willfully blind to margin and profitability trends in a competitive commercial market.

Plaintiff's argument that such evidence is irrelevant because it concerns other contracts only shows how deficient the foundations of her own expert models are. *See* Pl. MIL Mem. 70 (admitting that "[w]hat other companies may have charged for different products or services, governed by ***different contractual commitments***, is ***patently irrelevant***" (emphasis added)). Neither the New York PSC order that became effective only ***prospectively*** beginning ***April 2021*** nor XOOM's fixed-rate margins, whether individually, added together and averaged, or compared with Plaintiff's undisclosed calculation of supply costs, involves the contract language at issue in this case, and therefore, none of those margins is an adequate substitute for a reasonable variable-rate margin.

As discussed, there is one point of agreement between the parties: XOOM agrees with Plaintiff's assertion that ESCO margins should be excluded. Plaintiff believes that is so because they are irrelevant. Not so. They would have been relevant but, because no such evidence has ever been disclosed, there is nothing to introduce at trial. As a result, that requested relief should be reduced to a binding order. *See* Pl. MIL Mem. 19–20, Doc. 227, Def. MIL No. 7 (asking the Court to preclude Plaintiff from offering evidence or argument relating to "rates set and charged by other ESCOs;" "margins achieved by other ESCOs;" and "how XOOM's rates, costs, or margins compared to those of other ESCOs").

XVI.    **Plaintiff's MIL No. 16: Plaintiff's motion *in limine* seeking to preclude XOOM from introducing evidence of her prior ESCO lawsuit is meritless.**

Plaintiff asks this Court to exclude any references to her prior lawsuit against Viridian and settlement of that lawsuit because it supposedly has no probative value and would prejudice her. She is wrong. Her prior lawsuit and settlement of that similar action is probative of her expectations about ESCO pricing and her motivations for bringing this case.

Indeed, it is Plaintiff—not XOOM—who wants to put her expectations at issue through her dismissed implied covenant claim and an unexplained and unpleaded New York General Business Law Section 349 claim that she has recently said is a basis for a punitive damages instruction. *See* Doc. 210-8, Pl. Jury Instructions 12 ("In considering what constitutes bad faith, you should consider a number of factors, including the expectations of the parties and the purposes for which the contract was made."); Pl. MIL No. 13. For the reasons discussed in XOOM's MILs Nos. 1 and 13 (and in its response to Plaintiff's MIL No. 13 above), Plaintiff should be precluded from offering any argument or evidence in support of these dismissed and unpleaded claims— including any evidence about Plaintiff's or Class Members' expectations. But there is no doubt that both claims involve consideration of reasonable expectations. *See* Pl. MIL Mem. 66 (citing *Orlander v. Staples, Inc.*, 802 F.3d 289, 301 (2d Cir. 2015) ("Accordingly, Plaintiff has sufficiently alleged a 'materially misleading' practice [under GBL 349], one that could lead a reasonable consumer to expect *much* more service than Staples has provided."). *See Cole v. Wells Fargo Bank, N.A.*, No. 1:15-CV-00039-MR, 2016 WL 737943, at *7 (W.D.N.C. Feb. 23, 2016). "'Courts have equated the covenant of good faith and fair dealing with an obligation to exercise . . . discretion reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'"). Thus, if Plaintiff is allowed to pursue those claims in any respect, then XOOM is allowed to challenge their elements including

her expectations. She cannot have it both ways. If Plaintiff agrees to XOOM's MIL Nos. 1 and 13 and withdraws her MIL No. 13, XOOM will agree not to use the Viridian lawsuit to probe Plaintiff's reasonable expectations.

But there are other probative purposes for introducing evidence about the Viridian lawsuit here. *Barnes v. Long Island R.R.*, 205 F.3d 1321 (2d Cir. 2000) ("Evidence of a party's prior litigation, including testimony and statements made in the course of a former case, may be admitted so long as it is relevant and probative of an issue in the present case-and particularly if the evidence is inconsistent with the party's current position."). For example, the facts that Plaintiff waited *five years* to initiate this lawsuit, and that she sued the ESCO that sold her electricity *after* XOOM did *before she sued XOOM* are relevant: they tend to show that she did not believe XOOM's variable rates breached her contract when she switched to Viridian for more ESCO supply service—and that she only brought a breach claim against XOOM later because of her success in the Viridian case. So, the jury could infer from this prior similar lawsuit, and the timing of it in relation to her timing here, that Plaintiff's allegations here are not credible. *See Tomaino v. O'Brien*, 315 F. App'x 359, 361 (2d Cir. 2009) ("The jury might, however, have reasonably inferred from the five previous occasions on which he had made strikingly similar claims, that his testimony in support of a sixth such suit was not credible.").

For these reasons, MIL No. 16 should be denied in full.

**XVII.**     **Plaintiff's MIL No. 17: XOOM is permitted to impeach Plaintiff's expert with his prior testimony should the need arise on cross-examination.**

Plaintiff asks the Court to preemptively exclude any evidence or argument about the District of Connecticut's and the Second Circuit's criticisms of her expert Seabron Adamson's similar testimony in *Richards v. Direct Energy Services, LLC*, 246 F. Supp. 3d 538, 553 (D. Conn. 2017), *aff'd*, 915 F.3d 88 (2d Cir. 2019). While XOOM certainly believes that *Richards* is relevant to its legal positions (including its pending *Daubert* motions), XOOM has never stated any intention of offering the *Richards* opinions as evidence or argument for the jury. That is precisely why neither the district court's opinion, the Second Circuit's opinion, nor Mr. Adamson's prior testimony appears on XOOM's Trial Exhibit List.

But Plaintiff's MIL No. 17 is most notable for what it fails to address. Plaintiff does not broach what permissible uses of Mr. Adamson's prior testimony and the courts' criticisms of that prior testimony *do* exist. The answer: impeachment purposes.

Indeed, Plaintiff wholly fails to address the relevant question of whether XOOM is permitted to impeach Mr. Adamson with his prior testimony. The answer is, of course, 'yes.' XOOM is clearly permitted to impeach Mr. Adamson with his prior testimony because "prohibiting cross-examination of an expert concerning his biases, fees, and related matters would normally be reversible error." *Bockweg v. Anderson*, 117 F.R.D. 563, 566 (M.D.N.C. 1987) (citing *Walker v. Firestone Tire & Rubber Co.*, 412 F.2d 60 (2d Cir. 1969)); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 308 (2d Cir. 1979) (noting "expert may be cross examined concerning falsity of testimony in earlier unrelated trial" (citing *Walker*, 412 F.2d at 60)). In *Walker*, the Second Circuit held "there is nothing improper in asking questions relating to extrinsic matters in the hope of undermining the witness' credibility" and that "in excluding the questions [the] attorney sought to ask [the expert] concerning . . . prior testimony, the trial court prohibited proper

impeachment of the plaintiff's key witness," which constituted reversible error. *See id.* at 63–64. Even Plaintiff's cited authority recognizes as much. *See Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) ("[A]n inconsistent statement by a testifying witness can be used to impeach that witness's credibility[.]"); *Pierson v. Ford Motor Co.*, No. C 06-6503 PJH, 2008 WL 7084522, at *5 (N.D. Cal. Aug. 1, 2008) ("Ford may of course use Cantor's prior recorded testimony for impeachment purposes should his testimony in this trial be different than his previous testimony."). Thus, XOOM should not be precluded *in limine* from impeaching Mr. Adamson should his testimony at trial be inconsistent with his testimony in prior matters. For example, if Mr. Adamson testified (again) that XOOM is not permitted a margin, then XOOM can point to his testimony in *Richards* that an ESCO was permitted to add "'an appropriate margin to cover . . . legitimate costs[.]" *Richards*, 915 F.3d at 96. And if Mr. Adamson maintains at trial that there are no risks to supplying electricity to variable rate customers (like he seems to imply in his reports), then XOOM can point back to his testimony acknowledging a "'margin'" is "'appropriate . . . to cover the . . . risks of supplying Variable Rate customers.'" *See id.*

Plaintiff also points to a legion of out-of-circuit authority for the proposition that Mr. Adamson cannot be impeached with his prior exclusions by different courts. This misses the mark for two reasons. First, Mr. Adamson was not excluded in the *Richards* case. But more importantly, this is far from a settled question despite Plaintiff's string cite. Courts regularly hold that "[u]se of the previous exclusion of an expert's testimony is permissible to impeach the credibility and credentials of the expert." *Scordill v. Louisville Ladder Grp., LLC*, No. CIV.A. 02-2565, 2004 WL 307475, at *12 (E.D. La. Feb. 17, 2004). Indeed, the Second Circuit has permitted the impeachment of experts "regarding prior occasions when his testimony in other cases had been criticized by the court as unworthy of belief." *United States v. Terry*, 702 F.2d 299, 316 (2d Cir.

1983). In *Terry*, "[p]roof that a judge of the District of Columbia Superior Court before whom Gerstman had testified as an expert had found that Gerstman had 'guessed under oath' was probative of the weight to be accorded to his testimony." *Id.* (citing Fed. R. Evid. 608(b), 613(a)); *see also United States v. Dawson*, 434 F.3d 956, 958 (7th Cir. 2006) ("[L]awyer in this case [was permitted] to ask the witnesses whether they had lied in two previous suppression hearings. And there is nothing to suggest that the 'inquiry' could not have extended to asking the witness whether a judge, say, had ever found him not to be a credible witness."). Thus, XOOM should not be precluded from impeaching Mr. Adamson with the district court's criticism of his fixed-rate-margin benchmark or the Second Circuit's criticism that his testimony as to the "legal meaning" of the *Richards* contract "would be irrelevant" should the need arise. *See Richards*, 915 F.3d at 98.

Nor is there any merit to Plaintiff's complaint that this potentially probative evidence should be excluded under Rule 403 because it would "require a substantial investment of time just to explain the basic underlying facts of *Richards*" or another case. As the Second Circuit's citations to Federal Rules of Evidence 608 and 613 make clear, impeachment with prior testimony is generally limited to questions and extrinsic evidence generally may not be introduced. *See Terry*, 702 F.2d at 316 (citing Fed. R. Evid. 608(b), 613(a)). Thus, any impeachment that becomes necessary because of any inconsistent statements by Mr. Adamson will be limited to questioning and will not involve the introduction of extrinsic evidence that may take "substantial" time. In any case, Rule 403 determinations as to impeachment evidence are best reserved for trial. *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-8176, 2015 WL 7455569, at *2 (S.D.N.Y. Nov. 23, 2015) ("The Court will therefore follow the approach of the *Hodge* Court and reserve ruling until the issue is ripe at trial — at which point relevance and Rule 403 determinations may be more

easily made — on whether New GM may introduce evidence of collateral source evidence for impeachment or rebuttal.").

For these reasons, XOOM should not be precluded from impeaching Mr. Adamson with his prior testimony and the District of Connecticut's or the Second Circuit's criticism of his testimony in *Richards* should it become necessary for impeachment or credibility purposes on cross-examination.

XVIII.    **Plaintiff's MIL No. 18: The Court should deny Plaintiff's motion to preclude XOOM from introducing evidence regarding Plaintiff's motivations.**

Plaintiff's MIL No. 18 is really two requests. The first, regarding her counsel's motivations, has no basis in fact, and the second, regarding her own motivations, has no basis in law. Both should be denied.

As to the first, Plaintiff's purported concern that XOOM intends to ask questions about her attorneys' motivations for filing this lawsuit is without foundation. Consistent with the parties' stipulation that they "will not argue, adduce testimony, or otherwise introduce evidence regarding potential attorneys' fees resulting from this action," Doc. 210, Joint Pretrial Order 24, XOOM does not intend to ask questions or present argument regarding Plaintiff's attorneys' motivations. The case law Plaintiff cites—all of which concerns the irrelevance of attorneys' motivations and fee arrangements—thus is entirely irrelevant. *See, e.g., Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 272 (S.D.N.Y. 2015) (granting motion to "preclude commentary or arguments generally as to lawyer-driven lawsuits").

As to the second, however, Plaintiff's request to prevent XOOM from eliciting testimony concerning her own motivations, can be summarily denied. Again, Plaintiff cites no case law to support this request. That is because Plaintiff's motivation in initiating this action cannot be neatly separated from issues that are relevant to this case, including whether XOOM's margins were reasonable.[20] The fact that Plaintiff was sufficiently satisfied with variable rates to immediately go on to purchase electricity at a variable rate from a different ESCO after she ended her contract with XOOM is relevant to the reasonableness of each margin XOOM charged her. *See* Part XVI, *infra* (explaining why the Viridian lawsuit is relevant and probative).

---

[20] Of course, as XOOM's decertification motion and its MIL No. 1 explain, Plaintiff has no evidence at all of a reasonable margin.

Likewise, the fact that Plaintiff waited **five years** to initiate this lawsuit, and that she sued the ESCO that sold her electricity **after** XOOM did **before she sued XOOM** is relevant: it shows that she was not so unsatisfied with XOOM's variable rates as she would otherwise have the jury believe. *See, e.g., Barnes v. Long Island R.R.*, 205 F.3d 1321 (2d Cir. 2000) (finding that "evidence of a party's prior litigation . . . may be admitted so long as it is relevant and probative of an issue in the present case—and particularly if the evidence is inconsistent with the party's current position"). The motivations and responses of the sole class representative must be pertinent to this case if it is going to involve **reasonableness** of the margin that XOOM charged. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (class-action parties have the rights that "they could have asserted in an individual action" (quotation marks omitted)). Plaintiff's MIL regarding her own motivations accordingly should be denied.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Plaintiff's Motions *in Limine*.

Dated: June 10, 2024

MCDOWELL HETHERINGTON LLP

*/s/ Michael D. Matthews, Jr*
Michael D. Matthews, Jr.
Diane S. Wizig (admitted *pro hac vice*)
David L. Villarreal (admitted *pro hac vice*)
Netra Sreeprakash
Justin R. Chapa (*pro hac* forthcoming)
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
david.villarreal@mhllp.com
netra.sreeprakash@mhllp.com
justin.chapa@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and
XOOM Energy New York, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on the 10th day of June, 2024, via email on all counsel of record.

<u>/s/*Michael D. Matthews, Jr.*</u>
Michael D. Matthews, Jr.