# EXHIBIT A-1



# Amended Expert Report of Seabron Adamson

---

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated**

**v.**

**XOOM ENERGY, LLC, and XOOM ENERGY NEW YORK, LLC**

**No: 18 Civ. 2949 (ARR) (JAM)**

**May 10, 2024**

## Table of Contents

1.    Introduction ................................................................................. 2

2.    XOOM and the Sales Agreement ...........................................11

3.    Calculation of Damages ...........................................................26

# 1.  Introduction

1. This is the Amended Expert Report ("Amended Report") of Seabron Adamson on behalf of Susanna Mirkin ("Plaintiff") and the Class of XOOM customers certified by the court on August 31, 2023 ("Class"). This Amended Report replaces the original report I submitted on October 3, 2022, with Derya Eryilmaz, Ph.D. ("Original Report").[1]

2. I was asked by counsel for Plaintiff and the Class ("Class Counsel") to prepare this Amended Report to reflect XOOM Energy's disclosure of new information and new legal developments on key issues in this case, and to update the damage calculations accordingly. These new events occurred after the Original Report was submitted. First, I understand from Class Counsel that before certifying the Class, in August 2023 the court issued a summary judgment opinion that clarified the meaning of the pricing term that XOOM had to follow when calculating monthly variable rates for Plaintiff and the Class. Second, I understand from Class Counsel that in December 2023 the Court of Appeals for the Second Circuit made clear that the pricing term did not give XOOM discretion to use any subjective process or factors to set monthly variable rates. Third, I understand that in March 2024, XOOM Energy produced new data files which contain previously unproduced customer and rate data for approximately three additional years during the period covered by the litigation and also included new and changed data for previous periods. These changes affect my analysis and the calculation of damages. They are discussed later in this Amended Report.

## 1.1   PARTIES TO THE DISPUTE

3. Plaintiff Susanna Mirkin is a resident of Brooklyn, New York.[2]  XOOM Energy, LLC and XOOM Energy New York, LLC (together "XOOM" or "XOOM Energy")

---

[1]     Dr. Eryilmaz is no longer with CRA and hence was not available to participate in the preparation of this Amended Report.

[2]     *Susanna Mirkin and Boris Mirkin, individually and on behalf of all others similarly situated v. XOOM Energy, LLC and XOOM Energy New York LLC*, First Amended Class Action Complaint, August 21, 2019 (hereafter "Amended Complaint").

are retail suppliers of electricity and natural gas to residential and commercial customers in the state of New York.[3]

4.  I understand from the Amended Class Action Complaint and discovery materials in *Mirkin v. XOOM Energy, LLC*, No. 18 Civ. 2949 (AER) (JAM) that Mrs. Mirkin was a retail customer of XOOM Energy in New York, enrolled in XOOM's "SimpleFlex" electricity plan. When Mrs. Mirkin enrolled, this XOOM plan provided an initial "teaser" rate of 8.99 cents per kilowatt-hour followed by rates which changed monthly, *i.e.*, a variable rate.[4]

5.  Mrs. Mirkin purchased electricity from XOOM pursuant to an Electricity Sales Agreement ("SA" or "Sales Agreement"). The SA defined the pricing mechanism for variable price electricity sold under the SimpleFlex plan after an initial teaser period.[5]

6.  I understand that the central issue in the lawsuit is whether the energy rates charged by XOOM to its variable rate customers such as Mrs. Mirkin complied with the pricing term in XOOM's Sales Agreements for electricity and natural gas used by XOOM prior to February 11, 2016. This pricing term required XOOM to charge customers rates "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs."[6] I also understand that after the Original Report was submitted, the courts clarified that under this pricing term XOOM did not have rate-setting discretion and was only permitted to charge a single margin over its supply costs that was a fixed percentage of those costs. XOOM's fixed margin also had to be reasonable.

---

[3]  Amended Complaint, page 4.

[4]  Amended Complaint, page 15.

[5]  XOOM SimpleFlex Variable Price Product in Electricity Sales Agreement, Residential Service – New York, Exhibit 1 to the Amended Complaint (hereafter "Exhibit 1 to Amended Complaint").

[6]  Exhibit 1 to Amended Complaint.

7.  It is my understanding that XOOM first began supplying electricity and gas to New York customers in or around January 2013.[7] I also understand that the Class of customers in this class action are all residential and small commercial variable rate customers in New York who were enrolled in any of XOOM's variable rate electricity and gas plans under these same pricing terms in the Electricity and Gas Sales Agreements used by XOOM prior to February 11, 2016. I performed my analysis using the data that XOOM produced in discovery which is understood to be the Class data encompassing this Class definition.

## 1.2   PURPOSE OF EXPERT REPORT

8.  I have been asked by counsel for the Plaintiff to address the following specific issues:

- To provide an explanation of variable rate pricing of utility services by energy service companies (*i.e.*, ESCOs), such as XOOM in New York, and the changing regulatory and policy landscape for these services.

- To explain the variable rate pricing by XOOM in the applicable Electricity and Gas Sales Agreements.

- To explain how XOOM set its rates and compare its rate-setting to the method in its Sales Agreements.

- To develop a damages model that quantifies XOOM's overcharges to the Class if it is determined that XOOM did not set its rates as required by its Sales Agreements.

9.  My opinions and damages model were developed by relying on (i) my expertise and experience in the energy industry and (ii) the data and documents produced by XOOM in discovery, as well as the deposition testimony of XOOM employees. The list of data, documents, and depositions I considered is set forth in Exhibit 1.

---

[7]   Data provided by XOOM in discovery starts in March 2013. Therefore, Class damages calculations span the period beginning in March 2013 and ending in January 2024. If I am provided additional data, damages calculations can be updated to the latest available date.

4

## 1.3   QUALIFICATIONS AND ROLE

10. This section provides a short synopsis of my qualifications.

11. I am a Vice President in the energy practice at CRA. I also lead the global energy disputes and regulatory segment of CRA's energy practice. I have more than 25 years of consulting and expert experience in the analysis of the electric power, natural gas, and related energy industries in the United States, Canada, the European Union, Latin America, Asia, and in other regions. I have been engaged to consult on market design, transmission, commercial, and regulatory issues in many jurisdictions, including the United States and Canada. This has included substantial work in New York. I have also served as an analyst in the gas and power sector for a major alternative investment firm.

12. Specifically relevant to the current dispute, I have advised electricity and gas retail companies on regulatory and commercial issues in the United States, Canada, and the United Kingdom and have substantial experience with ESCOs and how the energy industry has evolved in deregulated as well as regulated markets. I follow the regulatory, economic, and transactional developments in the U.S. energy industry from a range of sources, including discussions with clients and other industry experts.

13. In addition to my work at CRA, I teach a class on renewable energy project finance (MBA and Master's level) at the Carroll School of Management at Boston College. I am the co-author (with S. Raikar) of the textbook *Renewable Energy Finance: Theory and Practice*, published by the Academic Press (Elsevier) in 2020. I have previously taught classes on energy finance and risk management at the A.B. Freeman School of Business at Tulane University in New Orleans and have served on the advisory board of the Tulane Energy Institute. I am also a co-founder and was previously the chief financial officer of Quantum Diamond Technologies Inc., a technology company in the Boston area.

14. I have testified in or consulted on a number of disputes in the electric and gas utility sector.

15. I received B.S. and M.S. degrees in Physics and Applied Physics, respectively, from Georgia Tech and an S.M. degree in Technology and Policy (with an

energy focus) from M.I.T. in 1992. In 2007, I received an M.A. degree in Economics from Boston University. I have published several articles regarding energy economics and finance in academic publications.

16. In addition to authoring this expert report, I performed the data analysis and development of the quantitative damages model discussed herein. This work included synthesizing the substantial number of spreadsheets and other data produced by XOOM Energy and designing and developing the damages model which is presented here.

17. My *curriculum vitae*, including a list of all publications authored in the previous 10 years and all cases in which I testified as an expert at trial or by deposition in the previous 4 years, is attached as Exhibit 2.

**1.4   SUMMARY OF EXPERT OPINIONS**

18. I have reached the following expert opinions with respect to the issues raised above:

(a) XOOM is an ESCO, which provides electric and gas utility services to retail customers (*i.e.*, residential and commercial customers) in New York, including the Plaintiff. ESCOs only provide electric or gas supply to retail customers and do not generate, transmit, or distribute the energy they sell.

(b) XOOM supplied electricity and natural gas to the Plaintiff and the Class of customers who enrolled in XOOM's variable rate plans under the SA's original contract language used prior to February 11, 2016.[8] From my review of the data XOOM provided, the number of customer accounts included in the Class totals 129,537: 81,441 for electric service, and 48,096 for gas service.

---

[8]     As noted above, XOOM changed its Sales Agreement contract language on February 11, 2016. The pricing term used prior to February 11, 2016 was changed from "Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs" (Exhibit 1 to Amended Complaint) to "Your rate is based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies" (XOOM_INIT_000162).

6

(c) I understand that both the Plaintiff and the Class of XOOM variable rate customers who enrolled prior to February 11, 2016 were all subject to the same pricing terms set forth in similar Sales Agreements. These agreements provide that XOOM would supply energy under a "variable rate" plan with pricing based on XOOM's "actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs."[9] My detailed review of XOOM's rate-setting workbooks and other materials, however, shows that XOOM set its rates much higher than and inconsistently with the company's "Total Cost" reported in its rate-setting workbooks.

(d) Moreover, although XOOM's SAs state that the company's "actual and estimated supply costs" might include "prior period adjustments, inventory and balancing costs," I could not identify any documentation or substantiation in the data that XOOM provided in discovery that it used prior period adjustments or balancing costs in calculating XOOM's margin or variable rates. As for its inventory costs, the company only calculated these costs for its variable rate gas customers, but not its electric customers. Most critically, XOOM did not provide any documented methodology for calculating these supposed prior period adjustments or balancing costs as part of the rate setting process for its variable rate customers.

(e) I understand that XOOM has claimed that its variable rate margins fluctuated based on supposed "actual" supply costs that were allegedly incorporated into those margins. I could not identify any substantiation in the data or documents that XOOM provided in discovery that XOOM included or used actual supply costs as part of a rate setting formula. I understand that the court's August 14, 2023 opinion on summary judgment states that "[a]ccording to XOOM's Director of Product Management Ryan Park, there was no set formula for incorporating" actual costs, and further quotes Park as testifying that there was "certainly a human element in terms of" XOOM's claimed practice of "factoring" actual supply costs into

---

[9]     Exhibit 1 to Amended Complaint.

XOOM's margins.[10]  I also note that XOOM's own Rule 30(b)(6) testimony shows that the estimated supply costs in XOOM's rate-setting workbooks and other materials were highly accurate.[11] Thus the differences between "actual" and "estimated" supply costs on average over time may not have been material from a business perspective. This likely explains why "actual" costs are not reflected in XOOM's rate-setting workbooks.

(f) My review of the deposition testimonies of multiple XOOM personnel involved in the setting of rates charged to Plaintiff and the Class further reveals that XOOM set its rates based on factors nowhere mentioned in its SAs, such as hitting margin goals, utility prices, other ESCOs' prices, attrition rates, the prior month's rate, and other factors unrelated to XOOM's actual or estimated supply costs for variable rate customers in New York.[12] These XOOM personnel concede that the foregoing factors are not actual or estimated supply costs.[13]

(g) Further, XOOM did not use any established formula to set its variable rates "based on" its supply costs as I understand how the court has now defined the term "based on."  XOOM instead set variable rates "based on" the *ad hoc* views of various employees from its Pricing and Product groups who

---

[10]  *Mirkin v. XOOM Energy*, Opinion & Order Denying XOOM Energy's Motion for Summary Judgment, August 14, 2023, page 16, n.8 (hereafter "Summary Judgment Order").

[11]  30(b)(6) Tr. at 126:17–127:1, 288:25–289:8. See also XOOM internal email communications at XOOM_MIRKIN_018249, XOOM_MIRKIN_020038 and XOOM_MIRKIN_018031.

[12]  Deposition Transcript of Andrew Coppola, dated May 11, 2022 (hereafter "Coppola Tr.") at 37:11–38:4, 38:18–39:19, 50:8–51:6, 81:18–24, 82:14–83:6, 84:6–85:7, 98:11–18, 107:6–108:1, 125:4–17, 162:4–14, 168:22–169:3, 175:7–24, 233:17–234:9, 237:22–238:16, 238:21–239:3, 259:9–18; Deposition Transcript of Troy Chidester, dated June 24, 2022 (hereafter "Chidester Tr.") at 64:24–65:7, 68:17–24, 69:7–17, 99:8–14; Deposition Transcript of Ryan Park, dated July 22, 2022 (hereafter "Park Tr.") at 33:10–24, 36:17–37:3, 44:5–45:11; 53:11–54:12, 98:10–15, 99:20–100:22; Deposition Transcript of Jason Loehde, dated July 27, 2022 (hereafter "Loehde Tr.") at 219:5–22; Deposition Transcript of XOOM Energy, LLC and XOOM Energy New York, LLC, dated July 28, 2022 (hereafter "XOOM 30(b)(6) Tr.") at 83:10–23, 91:5–92:8, 264:6–18.

[13]  *Id.*

met to set XOOM's prices for New York and for other states.[14] The variable rates that XOOM selected yielded unreasonably high and fluctuating margins for XOOM substantially in excess of the supply costs that XOOM itself calculated. The rates charged to Mrs. Mirkin and XOOM's other variable rate customers thus appear to have been used simply to increase XOOM's profits, cross-subsidize other customer classes (*e.g.*, fixed-rate customers),[15] and offset losses from other states. Within a service territory, all customers of the same type face similar supply market conditions, including energy costs.

(h) ESCOs such as XOOM typically have substantially more information on energy costs than their customers. Recognizing the potential for customer abuse, New York (in December 2019)[16] and Connecticut (in October 2015)[17] banned the sale of energy under variable rate plans like the one XOOM sold the Plaintiff and the Class. In April 2024, in a 34-4 vote the Massachusetts Senate approved Senate Bill No. 2738, which would ban ESCOs from serving Massachusetts residential customers as of January 1, 2025.[18] On May 8, 2024, the Governor of Maryland signed a retail energy

---

[14]  Loehde Tr. at 60:3–61:19, 63:23–64:5; Park Tr. at 44:5–44:14, 197:19–198:25; Coppola Tr. at 88:10–14.  *See also* XOOM_MIRKIN_065172 (Ryan Park telling his colleagues that he was "given guidance that if we have to squeeze a market, we should squeeze New York power," without any evidence that this was in response to increasing supply costs for New York electricity customers).

[15]  Cross-subsidization is a situation in which profits from one activity are used to pay for another activity that is making less money. *See* https://dictionary.cambridge.org/us/dictionary/english/cross-subsidization.

[16]  "Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process," December 12, 2019 (hereafter "December 2019 Order"), https://dps.ny.gov/system/files/documents/2022/11/in-the-matter-of-eligibility-criteria-for-energy-service-companies-order-adopting-changes-to-the-retail-access-market-and-establishing-further-process-issued-december-12-2019.-case-15-m-0127-et.-al.pdf.

[17]  Consumer Protection Legislation and Rights Against Third Party Electricity Suppliers, https://portal.ct.gov/heatinghelp/knowledge-base/articles/consumer-protection-legislation-and-rights-against-third-party-electricity-suppliers?language=en_US.

[18]  Mass. Senate Advances Bill That Would Eliminate Retail Electricity Market, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/mass-senate-advances-bill-that-would-eliminate-retail-electricity-market-81374336.

market reform bill that prohibits ESCOs from charging variable rates that "exceed the trailing 12–month average of the electric company's standard offer service rate in the electric company's service territory[.]"[19]

(i)  I have calculated the overcharge damages to the Class under three different methods. Each method calculates damages based on the difference between the rate charged by XOOM and its own reported supply costs plus a fixed margin. The variation in overcharge damages is related to the different fixed margins used: (i) In Method A, I applied a fixed margin of 7.33% based on the average difference between XOOM's reported supply costs and the corresponding utility default rate; (ii) In Method B, I applied a fixed margin of 5% based on the margin restrictions New York regulators placed on ESCO fixed rate products sold in New York; and (iii) in Method C, I applied a 21.2% fixed margin derived from the average margin XOOM charged to its fixed rate customers. This last method does not account for New York's margin limits on fixed rate products. Damages under each method have been calculated by month, customer type (residential or commercial), and utility region in New York.

(j)  As discussed below, Methods A, B, and C reflect my opinion regarding a reasonable fixed margin for XOOM to charge. Specifically, considering what I understand to be the constraints on XOOM's rate-setting under the SA that were announced after the Original Report, in my opinion Method A represents the best comparator margin to use for setting a variable rate in accordance with the SA.

(k)  It is also important to note that my analyses relied upon the data requested and produced by XOOM in discovery. I assumed the data produced by XOOM in discovery is accurate and validated by XOOM. It is not in my scope to validate the data provided in discovery, including the accuracy of the costs reported.

---

[19]   Energy Choice Matters, "Maryland Gov. Signs Retail Market Reform Bill," http://www.energychoicematters.com/stories/20240507z.html

(l)  Total damages for the Class (electric and gas) are $96,010,225 using Method A, $100,648,611 using Method B, and $68,826,139 using Method C. My damage calculation methodologies and results are described in more detail in Section 3.

## 1.5   COMPENSATION

19. CRA is currently compensated at a rate of $700 per hour for my time. Earlier in this engagement this was $650/hour. All other CRA staff supporting this engagement are billed at their standard hourly rates.

## 2.   XOOM and the Sales Agreement

20. Prior to the restructuring of the electricity and natural gas utility sector in New York, regulated utilities served customers. These regulated companies, in simple terms, owned and operated the utility systems for electricity and natural gas in New York, and recovered the costs of supplying electricity and gas from regulated rates charged to their customers. Generally, New York's electric and gas sector regulator, the New York Public Service Commission ("NYPSC") "set rates to allow the utilities sufficient revenues to recover prudently incurred costs and to provide a fair return on investment."[20] In the late 1990s, the electric and gas industries were restructured and competition was introduced. This included the creation of a complex wholesale market for electricity, in which generators competed to sell power (a wholesale gas market already existed). New York also allowed competition at the retail level, so that individual customers (for example, a homeowner or small business) could arrange for supply from an energy service company or "ESCO" that would supply electricity or gas to the customer, buying the power or gas from the relevant wholesale market.[21]

21. At the physical level, an ESCO customer still takes electricity or gas from the local utility, which delivers the gas via a pipe or electric power line just as it

---

[20]    NYPSC, Cases 94-E-0952 et al., Matter of Competitive Opportunities Regarding Electric Service, Opinion 96-12, page 35 (hereafter "1996 Order").

[21]    How to Shop for Utility Services, https://dps.ny.gov/how-shop-utility-services#:~:text=Low%20Income%20Participant-,Retail%20Competition,Energy%20Services%20Company%20(ESCO).

always has. The local utility remains responsible for all the physical operation and maintenance of the local electric and gas distribution system. The role of the ESCO is that of a middleman, which purchases power or gas in the wholesale market, but which is still delivered to the customer by the utility. It was envisioned that for customers that chose to go with a competing supplier, ESCOs would compete to serve retail customers and help lower prices and/or create other economic benefits.[22] "Saving customers money was a crucial policy goal articulated by the [NYPSC] when the retail access market was initially opened."[23]

22. Customers who did not choose to go with an ESCO would still be served by the local utility. The local utility was required to offer customers a utility rate that passed through the costs of procuring the power or gas in the wholesale market, plus the related costs of fulfilling this function. The utility is also responsible for billing the customer, whether it serves the customer directly or the customer chooses to be served by an ESCO.

23. XOOM is an ESCO. As noted above, ESCOs do not produce, transmit, or distribute electricity or gas to retail consumers, but instead merely arrange supply from the wholesale energy market and act in this "middleman" role. The utility does almost everything else.

24. I understand that the Plaintiff enrolled in XOOM's SimpleFlex variable rate electricity supply plan in March 2013 and began receiving her energy supply from XOOM in May 2013. As is common in these plans, there was an initial fixed teaser rate, but I understand that the initial rate was fixed only for one month, May 2013. After this period, the Plaintiff was billed using XOOM's "variable rate."[24]

---

[22]     1996 Order at pages 25–27.

[23]     December 2019 Order at page 40.

[24]     Amended Complaint, page 15.

## 2.1   PRICING UNDER THE SALES AGREEMENT

25. In the SA, XOOM states that pricing under its "XOOM SimpleFlex Variable Price Product" will be as follows:

> *Your rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable. Your monthly variable rate is based on **XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs.** You are responsible for all charges assessed and billed by your local utility for all applicable utility charges, which are not included in your rate.*[25]

26. I understand that this same language was used not just in the SA provided to the Plaintiff but also to other residential and commercial and electricity and gas customers of XOOM Energy (including those customers supplied "clean energy"). I understand this language was also used in the SA for customers who converted from fixed rate plans to variable rate plans and was also provided to customers who were acquired by XOOM from another ESCO, Planet Energy.[26]

27. I further understand that in February 2016, XOOM changed the contract language in the SA provided to New York customers who enrolled with XOOM in a variable rate product. The new pricing term allowed XOOM to price energy "based upon a number of factors, which may include or be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices (including but not limited to capacity related costs, fluctuations in energy supply and demand, and weather patterns) and XOOM's pricing strategies."[27]

---

[25]   Exhibit 1 to Amended Complaint. Bold emphasis added.

[26]   ECF No. 103 at 1 (motion to compel data about customers XOOM acquired from Planet Energy who were transitioned to a XOOM variable rate plan); Feb. 3, 2022 Hr'g Tr. at 10:10–23 (Judge Reyes granting motion to compel). I further understand that XOOM set variable rates for former Planet Energy customers in the same manner as all other variable rate customers, as the RSWs do not identify different rates for former Planet Energy customers.

[27]   XOOM_INIT_000162 Electricity Sales Agreement, Residential Service – New York (hereafter "February 2016 Sales Agreement").

28. Despite the change in the contract language in February 2016, I understand that XOOM did not change its methodology for setting rates at that time and never differentiated between customers of one version of the SA versus the other when setting rates for its New York variable rate customers.[28] This suggests that XOOM always used "XOOM's pricing strategies" when setting rates prior to February 11, 2016, even though this "factor" is not an actual or estimated "supply cost" includable under its pre-February 2016 SAs. And as described above, XOOM's pricing personnel also used other criteria not included in its Sales Agreements when setting the company's rates for customers governed by the pre-February 2016 SAs.[29]

## 2.2  "VARIABLE RATE" ESCO PRICING HAS COME UNDER INCREASED SCRUTINY

29. The pricing mechanism in XOOM's SAs has obvious shortcomings. It is impossible for retail customers to know XOOM's "actual or estimated supply costs," and the rate to be paid is not known to the customer until they are presented with their bill.

30. In economic terms, the relationship between an ESCO, like XOOM Energy, and a retail customer may be characterized as an *information asymmetry*, in which one party to the transaction (XOOM) has better information than the other (customers such as the Plaintiff). With substantial asymmetry of information, it is widely recognized that small consumers can find it difficult to make efficient choices and avoid being exploited by companies like XOOM.[30]

31. In December 2016, the NYPSC, determined that "the retail markets serving mass-market [residential and small commercial] customers are not providing

---

[28]   XOOM 30(b)(6) Tr. at 20:5–10, 31:9–32:7, 132:12–136:8; Coppola Tr. at 277:16–278:1.

[29]   Coppola Tr. at 37:11–38:4, 38:18–39:19, 50:8–51:6, 81:18–24, 82:14–83:6, 84:6–85:7, 98:11–18, 107:6–108:1, 125:4–17, 162:4–14, 168:22–169:3, 175:7–24, 233:17–234:9, 237:22–238:16, 238:21–239:3, 259:9–18; Chidester Tr. at 64:24–65:7, 68:17–24, 69:7–17, 99:8–14; Park Tr. at 33:10–24, 36:17–37:3, 44:5–45:11; 53:11–54:12, 98:10–15, 99:20–100:22; Loehde Tr. at 219:5–22; XOOM 30(b)(6) Tr. at 83:10–23, 91:5–92:8, 264:6–18.

[30]   Tirole, J. (1988). *The Theory of Industrial Organization*. The MIT Press Massachusetts Institute of Technology Cambridge, MA. Chapter 4.6.1.

sufficient competition or innovation to properly serve consumers."[31] The 2016 Notice stated that the NYPSC "had specific concerns about reports of customer abuses in the retail access market, including 'overcharging,' as well as the lack of innovation with respect to energy efficiency and energy management services."[32]

32. After an extensive set of hearings and further investigation, the NYPSC went even further in its December 2019 Order. In this order, the NYPSC stated:

> The record establishes that many of the concerns raised by the non-ESCO parties about the current operation of the retail access market are warranted. **The Commission shares those concerns, particularly regarding the lack of easily accessible and comprehensible product and pricing information and, the number of complaints alleging that bad-acting ESCOs were misleading and exploiting customers.** Thus, we conclude that significant changes to provisions governing retail access are needed to provide adequate protections for New York customers. If market participants are unwilling, or unable, to provide material benefits to customers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended.[33]

33. The NYPSC made additional findings regarding the variable rate offerings of ESCOs such as XOOM Energy, stating:

> [A]fter the extensive process associated with this track, neither ESCOs nor any other party have shown, to any meaningful degree of certainty, that ESCO charges above utility rates were generally – or in any specific instances – justified.[34]

34. The NYPSC also concluded that variable rate plans such as XOOM's offered no demonstrable benefit to customers over utility service, and stated:

> [V]ariable-rate, commodity-only service is obtainable from the utility, most often at a lower price than from an ESCO and without any termination fee. We find that there is no demonstrated

---

[31]    NYPSC, Cases 15-M-0127 et al., "Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits," issued December 2, 2016 (hereafter "2016 Notice"), quoted in December 2019 Order.

[32]    December 2019 Order at page 3.

[33]    December 2019 Order at page 12. Bold and italics emphasis added.

[34]    December 2019 Order at page 30.  Italics emphasis added.

> *customer benefit to allowing ESCOs to offer this service to mass-market customers.*[35]

35. I also note that the NYPSC concluded that variable-rate service at premium to the default utility service was not needed:

> *[T]here is no need for the ESCOs to provide variable-rate service to customers at a premium to the default utility commodity cost because that service is readily available from the utilities at a just and reasonable rate.*[36]

36. The NYPSC concluded that the ESCOs offered so little value to retail customers and that their informational and customer abuse issues were so significant that variable rate products (such as those offered by XOOM) should be explicitly banned. Under the December 2019 Order, new variable rate plans could exist only if they offered guaranteed savings to customers, which the SA did not.[37] The NYPSC ordered:

> *Because customers receive no value when they pay a premium for variable-rate commodity-only service from ESCOs, ESCOs will be prohibited from offering variable-rate, commodity-only service except where the offering includes guaranteed savings.*[38]

37. As discussed above, variable rate pricing, such as that contained in the SA, has also been banned in two other states: Connecticut and Maryland, and a ban appears likely in Massachusetts. A 2020 analysis by the Connecticut Office of Consumer Counsel on continuing variable rate contracts concluded that these contracts created significant overcharges for ratepayers.[39]

38. The NYPSC also investigated fixed rate pricing by ESCOs. The NYPSC stated:

> *[T]he record in this case establishes that customers who choose fixed-rate ESCO products frequently pay a significant premium for*

---

[35]   December 2019 Order at page 37. Italics emphasis added.

[36]   December 2019 Order at page 38. Italics emphasis added.

[37]   There was also a carveout for plans offering green energy. *Id.* at page 23.  The effective date of this rule was later extended to April 16, 2021.

[38]   December 2019 Order at page 39. Italics emphasis added.

[39]   Connecticut Office of the Consumer Counsel, "OCC Fact Sheet: Electric Supplier Market, Legacy Variable Rate Analysis," March 5, 2020.

*the product. Fixed-rate products cannot provide meaningful benefits to customers unless they are reasonably priced.*[40]

39. The NYSPC further found that although then-fixed rate practices were typically not providing meaningful benefits to customers, that:

> *[t]he information in the record suggests that most ESCOs could continue to offer fixed-rate products if a reasonable price cap were adopted.*[41]

40. The NYPSC went on to state that "because a typical risk premium in financial markets ranges between 3.5% to 5.5% . . . a reasonable price premium associated with fixed-rate ESCO products would be 5%."[42] Thus, fixed rate products offered by ESCOs in New York were "limited to a price no greater than the trailing 12-month average [variable] utility supply rate plus a premium of no more than 5%."[43]

41. Thus, I note that while the NYPSC specifically banned variable-rate pricing such as that in the SAs, it also capped the rates that could be charged under fixed rate plans for customer protection reasons to what it considered a reasonable price premium or margin of 5% on top of the utility supply rate. In fact, while in the December 2019 order the NYPSC did not find record evidence to support its staff's claim that "the majority" of ESCOs were charging margins of "more than 20%" on fixed rate offerings, the NYPSC shared the view that ESCO fixed rate margins were not "just and reasonable."[44,45]

---

[40] December 2019 Order at page 64. Italics emphasis added.

[41] December 2019 Order at page 67. Italics emphasis added.

[42] December 2019 Order at page 67. Offering a longer-term fixed rate product requires some commercial party to bear this risk, which is not free. This is common in both energy commodity markets (like electricity and gas) and financial products (such as loans and mortgages) as some party must be compensated to take that price risk. I understand that NYPSC set the 5% reasonable fixed rate margin cap based on analogous risk premia for financial products, where similarly a commercial party was absorbing the fixed rate risk.

[43] December 2019 Order at page 67.

[44] December 2019 Order at page 67.

[45] I also understand that in February 2024 that the staff of the NYPSC issued a "Notice of Apparent Violation" to XOOM with respect to its retail offers to customers following the December 2019 order's April 2021 effective date. This notice contains alleged violations by XOOM with respect to electric and gas customers being

42. These regulatory developments provide objective criteria an analysis of ESCO pricing in New York, which in turn informs my opinion about the reasonableness of any proposed margin that may be applied in this case following my understanding of the courts' guidance about the contractual constraints on prices set under the Sales Agreements.

## 2.3    XOOM'S PRICING DOES NOT CONFORM WITH THE REQUIREMENTS OF ITS SALES AGREEMENTS

43. I understand a core issue in the current litigation is whether XOOM's variable rates were set in accordance with the terms of the Sales Agreements. To help analyze this issue, I reviewed the materials produced in discovery with respect to XOOM's pricing.

44. I also understand that the Plaintiff requested all costs from XOOM in discovery, including all the components of XOOM's actual and estimated supply costs.[46] I was informed by Class Counsel that in response to the discovery demands, XOOM produced documents and data that quantify its actual or estimated supply costs, including all rate-setting workbooks and other relevant documents that were retrieved by a broad list of search terms.

---

supplied non-compliant retail energy products. Specifically, the NYPSC alleges that despite continuing to sell gas in New York, "XOOM Energy was never issued eligibility to market or serve a gas product to mass market customers following the December 2019 Order, therefore it appears to be in violation of the Order." Department of Public Service, Notice of Apparent Violation at 4, January 8, 2024, https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7BE0DA F48C-0000-C750-906F-99E900C8889E%7D. As for electricity, the NYPSC alleges that notwithstanding the requirement that XOOM guarantee savings, XOOM allegedly "continue[s] to serve customers on non-compliant variable rate month-to-month electric non-renewable contracts," by which "XOOM Energy has apparently violated the December 2019 Order." *Id.* at page 3. The NYPSC's notice concludes by stating that "[d]espite the plain language of the December 2019 Order, it appears that XOOM Energy continues to serve mass-market customers on legacy agreements following the expiration of their current monthly term instead of transitioning these customers to compliant products after the April 16, 2021, effective date of the December 2019 Order." *Id.* at page 4.

[46]    *See* Responses to Plaintiffs' First Requests for the Production of Documents to All Defendants, dated December 24, 2019, at 21–26 (Requests 38, 41–47).

45. XOOM originally produced several data sets regarding its costs and rates in the form of a large number of Microsoft Excel files.[47] These included: (i) customer meter data; (ii) rate-setting workbooks; (iii) margin analysis reports; and (iv) an aggregated utility price workbook.

46. In early March 2024 XOOM produced additional information, including customer consumption data by type (electric and gas, residential and commercial), region, etc.[48] This new information covered not only the additional period since 2021 but included customer consumption and other data going back to 2013. XOOM also produced additional rate-setting workbooks for the more recent periods.

47. The new XOOM data produced in early March 2024 contains different data (and significantly larger consumption by XOOM variable rate customers of electricity and gas). This includes not only the new, more recent data but also shows significantly larger volumes in previous periods back to 2013. I understand that this recent (March 2024) customer consumption data has superseded the previous customer data, so it forms the basis of my current analysis.

48. Using these workbooks, I (and a team working under my direction) compiled electric and gas datasets for both residential and commercial customer classes to conduct my analyses. The compiled datasets span from March 2013 to January 2024.

49. The XOOM customer data includes each customer's enrollment number, start and end dates of variable rate coverage, monthly rate and usage, utility service territory, and product type that was offered to a given customer.[49]

---

[47]   I understand that the data produced by XOOM in compliance with Judge Reyes's Order granting Plaintiffs' January 2022 motion to compel documents and data of fixed-to-variable rate customers and former Planet Energy customers (ECF No. 105) is the Class data and I used that Class data to calculate damages. Email from Diane Wizig dated April 8, 2022, Subject: Mirkin v. XOOM - Supplemental Production.

[48]   XOOM_MIRKIN_074171-74180.

[49]   The full list of product types includes Basic Plan, BizChoice, BizChoice Prevailing, BizSimpleClean, Prevailing BizChoice, Prevailing Rate, Resi Basic Plan, Resi

19

50. XOOM produced in discovery a large number of rate-setting workbooks ("RSWs") that include details on the rate XOOM charged and various cost elements by month, customer type (*e.g.*, residential or commercial), product type, and utility service territory within New York.

51. The electric RSWs include a build-up of costs that adds up to a "Total Cost" value, differentiated again by month, customer type, product type, and utility region.[50] This "Total Cost" sums New York Independent System Operator ("NYISO") costs for electric supply, including energy, shaping, ancillary services, capacity, renewable energy certificate ("REC") costs, losses, and retail collateral. The electric RSWs also provide the proposed rate to charge and contain line items for XOOM's margins.

52. XOOM also produced RSWs for gas supply.[51] These build up to a "Total Cost," which includes the gas futures commodity price ("NYMEX"), basis, fixed and variable storage costs, fixed and variable pipeline costs, and other fees. Proposed gas rates and XOOM-calculated margins are also provided in the gas RSWs.

53. It is important to note that these rate-setting workbooks were produced separately for every month throughout the analysis period. For XOOM's gas and electric plans, I received rate-setting workbooks from March 2013 to

---

Prevailing Rate, SMB Basic Plan, SimpleClean, and SimpleFlex. All introductory, promotional product types are excluded from analysis. I understand that XOOM has suggested that so-called "green" electricity customers under its SimpleClean and BizClean variable rate plans are willing to pay a premium for their electricity supply. My analysis includes these customers because (1) I understand they were subject to the same pricing term under the SA as XOOM's other variable rate customers; and (2) the "green" electricity customers are receiving the exact same "brown" electricity as other customers, but XOOM is making minor additional payments to purchase renewable energy credits, which are reflected in the RSWs as supply costs. XOOM's reported additional costs for the green products from the rate-setting workbooks appear to be very small – on the order of a few percent in additional costs. The energy sold under these "green plans" is also a miniscule portion of energy sold in comparison to conventional "brown" energy. Furthermore, it is also worth noting that XOOM's SimpleClean and BizClean customers comprise a tiny percentage of the Class, 0.1% of the account numbers reflected in XOOM's data that consumed only 0.1% of the total electricity XOOM sold to the Class.

[50]    For example, see XOOM_INIT_001838.

[51]    For example, see XOOM_INIT_001700.

January 2024. As a result, my damage analysis is calculated between the period of March 2013 to January 2024. It is my understanding that these RSWs were subject to change by XOOM and some may have been non-final.[52] From the information provided in these workbooks, I was unable to determine the final RSW in each and every case, as a limited number of months included multiple RSWs. I used the best available information presented in these workbooks and consolidated them to obtain datasets for analysis.

54. There is no evidence, in the RSWs or elsewhere, of any calculations used by XOOM that build up to the monthly variable rates charged to Plaintiff and the Class. The RSWs do contain elements that build up to what XOOM calls "Total Cost," but this is generally well below the rate charged. Class Counsel has advised me that XOOM claims this "Total Cost" buildup reflects XOOM's "estimated" costs referred to in the SA's pricing provision, and that XOOM alleges "actual" supply costs are factored into the RSWs' margin figure and thereby explain the fluctuating margins XOOM obtained via its variable rates. I have seen no evidence in the discovery materials of any systematic calculations of XOOM's "actual" supply costs for its New York customers (including prior period adjustments, inventory (for gas only), or balancing costs), no evidence that XOOM had a method for using actual costs to calculate its varying margins, and no evidence that XOOM maintained a fixed margin and then added a determinable amount of "actual" supply costs to that margin.

55. Another data source I rely upon is the cumulative margin analysis produced by XOOM.[53] This margin analysis contains the full record of XOOM's monthly rates and margin percentages by customer type, product type, and utility service territory from December 2012 to February 2018.

---

[52]    XOOM 30(b)(6) Tr. at 86:13–21, 248:17–24, 286:11–18.

[53]    XOOM_MIRKIN_028684.

56. Lastly, XOOM produced its aggregated workbook of historical gas and electric utility prices by customer type.[54] This data source reports utility prices starting from April 2009 and ending in November 2019.

## 2.4   XOOM'S RATES CHARGED TO CUSTOMERS WERE NOT "BASED ON" ITS SUPPLY COSTS

57. The analysis of XOOM's many pricing and margin files provides insight into XOOM's pricing practices with respect to its variable rate customers. First, I note that overall XOOM's "Total Costs" are substantially lower than the rate charged to the Class of customers.

58. Second, I note that the rate charged is not based on XOOM's supply costs as there is no buildup of costs to the rates charged. There is no evidence in the RSWs that XOOM based the rates charged on any specific calculation of estimated or actual supply costs or components of supply costs such as inventory costs (for gas only), prior period adjustments, or balancing costs (*i.e.*, the referenced cost factors in the Sales Agreements).

59. The RSWs that XOOM created show that the rates charged are not based on any observable calculations. I understand from the deposition testimony that the margin used by XOOM was not a build-up of costs under the Sales Agreement, but instead was the by-product of the rate XOOM chose to charge and its own documented supply cost calculations.[55] With these set rates, a gross margin on a per unit basis was then determined by a backward calculation of the rate subtracted by the "Total Cost."

60. This observation is confirmed by the deposition testimony of Ryan Park, the former Director of Product Management for XOOM's Supply Team, who confirmed that in XOOM's rate-setting meetings, no specific formula was used to determine the rates. Supply costs were the starting point for the rates, but the discussion around the "final piece" was included in a so-called "margin," which was not a fixed number or calculated directly, but which instead was

---

[54]    XOOM_MIRKIN_032622.

[55]    Park Tr. at 44:5–45:11.

based on elements not related to XOOM's supply costs, such as XOOM's profit goals, utility rates, competitive intelligence, and attrition.[56]

61. I have seen no evidence in the rate-setting workbooks that XOOM calculated variable rates based on prior period adjustments, or that XOOM used prior period adjustments in any formula or systematic method for calculating its rates. These adjustments do not appear in the RSWs I reviewed. Anecdotally, XOOM claims it considered prior period losses in setting rates, although these may not have even been from New York customers and hence cannot have reflected the actual supply costs of those customers. For example, Jason Loehde, Senior Director of Pricing and Structure at XOOM, testified that while XOOM did not suffer losses in the New York market in 2014, it nonetheless raised rates for New York variable rate customers, such as the Plaintiff, to make up for corporate losses in the Pennsylvania/Maryland mid-Atlantic markets.[57] In this way, XOOM apparently used unspecified prior period adjustments to increase rates for New York customers whose prior period rates had not led to XOOM losses. The RSWs for this period, however, do not contain any calculations showing how, whether, or which supposed prior period adjustments were tabulated as XOOM's supply costs.

62. I understand that XOOM has claimed that its actual costs may have differed from the estimated costs used in the RSWs. Since these estimates were subject to error, I understand XOOM's argument to be that the RSWs could not fully reflect XOOM's actual costs that it was entitled to base variable rates on.

63. With respect to this claim, I note that XOOM witnesses testified that the rate-setting workbooks were very accurate. Andrew Coppola, XOOM's former Senior Vice President of Energy Supply, testified that the RSWs were at "99 percent certainty" of the company's costs.[58]  XOOM's 30(b)(6) witness similarly testified that there was "a very high level of accuracy across all" of XOOM's RSWs, that the RSWs were "highly accurate" "over time," and the RSWs in

---

[56]     *Id.*

[57]     Loehde Tr. at 219:5–22, 249:2–250:11.

[58]     Coppola Tr. 282:3–20.

"New York and other states" were "extremely reliable."[59] It therefore seems highly doubtful that differences between "estimated" and "actual" costs could be so large and so frequent as to require such large and varying variable rate margins month over month, year over year as compared to XOOM's fixed rate customers. I have not seen any evidence where such impacts are quantified or justified.

64. I also note that while some error is inherent in every forecast, errors can go both ways. Sometimes XOOM may have underestimated its supply costs, and sometimes overestimated them. It would be extraordinary if such a forecast of supply costs systematically underestimated supply costs and that such errors were both substantial and continued year over year. This unlikely scenario was contradicted by the testimony of XOOM witnesses described previously.

65. It is also noteworthy that my analysis of the margin reports demonstrates that XOOM charged higher margins to its variable rate customers than to its fixed rate customers. XOOM's Product Portfolio Manager Troy Chidester testified that it was generally true that variable rate products would have higher margins than fixed rate products in New York.[60] This was shown to be true during 2013 through 2023, as can be seen in Section 3 below.[61]

66. XOOM's pricing personnel and its internal documents acknowledged that variable rate customers created lower risks to XOOM than fixed rate customers, as XOOM had flexibility to adjust the rates of variable rate customers in response to changes in costs but it did not have that same ability

---

[59]   30(b)(6) Tr. at 126:17–127:1, 288:25-289:8.

[60]   Deposition Transcript of Troy Chidester, dated June 24, 2022 (hereafter "Chidester Tr.") at 133:6–134:19, 137:18–138:2.

[61]   This disparity occurred despite the fact that fixed rate products are riskier than variable rate products for XOOM, as XOOM has no ability with fixed rate products to increase rates for its current fixed rate customers if costs increase (or if customer energy usage increases beyond that anticipated), but it did have some flexibility under the SA to increase rates when costs increased for variable rate customers. Park Tr. at 60:5–22; Coppola Tr. at 167:22–168:14, 191:25–192:19; Loehde Tr. at 215:12–21.

with respect to its fixed rate customers.[62] Yet the company still charged variable rate customers substantially higher margins on average than the margins used for fixed rate customers. XOOM also used variable rate customers to cross-subsidize its fixed rate customers.[63]

67. Both variable rate customers and fixed rate customers were profitable for XOOM.[64]

68. Importantly, I understand that XOOM's rate setting methods did not change, even after XOOM implemented new contract language after February 11, 2016 that allowed XOOM to consider its "pricing strategies" when setting rates.[65] This suggests that instead of following the contractual terms in the pre-February 2016 Sales Agreements, which required that its prices be set based on its "actual and estimated supply costs," XOOM applied its own "pricing strategies" even before the contract changed, and charged Plaintiff and the Class rates I understand to be inconsistent with their Supply Agreements. The deposition testimony is clear that "pricing strategies" were used to set Class variable rates, including by focusing on hitting company target margins.[66]

69. My analysis shows that XOOM's margins for variable rate customers appear arbitrarily high and significantly higher than margins charged to comparable fixed rate customers, despite the fact that XOOM took on greater risks for fixed rate customers since XOOM had no ability to reset existing fixed rate

---

[62]   Loehde Tr. at 221:13–23; Deposition transcript of Thomas Ulry, dated May 12, 2022 (hereafter "Ulry Tr.") at 86:4–88:9. *See also* XOOM_MIRKIN_016476 ("In a side by side comparison, fixed products have no means for claw backs making them riskier / less valuable"; "Having a large fixed book restricts our ability to claw back costs").

[63]   XOOM_MIRKIN_015251 (Ryan Park acknowledging that XOOM "subsidize[s] the lower fixed rate margins with higher variable rate margins").

[64]   Coppola Tr. at 198:4-8.

[65]   XOOM 30(b)(6) Tr. at 20:5–10, 31:9–32:7, 132:12–136:8; Coppola Tr. at 277:16–278:1.

[66]   Ulry Tr. at 44:3–47:12; Coppola Tr. at 81:18-24, 82:14–83:6, 84:6–85:7, 97:22–98:14, 233:17–234:9, 237:22–238:16; Park Tr. at 36:17–37:3, 98:10–15; XOOM 30(b)(6) Tr. at 133:7–135:15, 264:6–18.

customers' rates during the fixed rate period.[67]  As set forth below, on average XOOM charged an average fixed rate margin of 21.2%, whereas XOOM charged a revenue-weighted variable rate margin of 63.0%. The simple average of XOOM's variable rate margins is 68.0%. I have seen no evidence that XOOM attempted to build up or justify the higher margins it charged to variable rate customers over fixed rate customers.

### 3.  Calculation of Damages

70. I have calculated damages based on XOOM's documented "supply costs" presented in the data and documents that XOOM produced in discovery plus a margin. I understand that the court has determined that the SAs are in effect "cost-plus" contracts and that no subjective elements can be used to determine the resulting rate. I therefore understand that XOOM can use its variable rates to recover its supply costs plus a single, fixed margin, but that the margin must be proportionate.[68] I also understand that the court has determined that any margin charged must be a reasonable one.[69]

71. I therefore understand that, based on the court's determinations, damages for pricing inconsistent with the SAs for any given monthly variable rate charged to any member of the Class is the difference between the monthly variable rate XOOM charged and a rate derived by applying a fixed, reasonable margin to XOOM's monthly supply costs, multiplied by relevant consumption in that month.

72. I understand that XOOM claims it recovered its "actual" supply costs within its variable rate margin.  I have not seen any evidence that these supposed "actual" supply costs were ever systematically broken down, documented, or calculated in a way that could be used determine how, if at all, "actual" supply costs flowed into the margin XOOM obtained on top of the "estimated" supply

---

[67]     Coppola Tr. at 180:1–181:13.

[68]     Summary Judgment Order at pages 12-14.

[69]     Summary Judgement Order at pages 12–13; *Mirkin v. XOOM Energy*, Opinion & Order Certifying the Class of XOOM Energy New York Customers, August 31, 2023, page 3.

costs in XOOM's rate-setting workbooks.  I was not able to identify any baseline margin(s) which XOOM supposedly increased with additional alleged actual supply cost adders because, to my knowledge, XOOM itself did not build up its margins in this way numerically (or otherwise). None of XOOM's alleged actual supply costs items (such as prior period adjustments) appear to have been broken down by XOOM in a way that relates to monthly variable rate calculations.[70] I also understand that XOOM conceded to the court that it played merely a middleman role,[71] and that at least one XOOM witness testified that any margin on variable rates sales reflected XOOM gross profits.[72]

73. In the remainder of this section of my Amended Report, I provide three alternate damage calculations. All of these, as described above, are based on the difference between the variable rate charged by XOOM and XOOM's own reported monthly variable rate supply costs (*e.g.*, Total Costs from the rate-setting workbooks) plus a fixed margin. This rate difference is then multiplied by the corresponding quantity of variable-rate consumption in that month (*e.g.*, gas or electric, by supply region, etc.). The difference in damages amounts between the three methods depends on the margin applied to the reported supply costs and nothing else. In each case, I use aggregate consumption by month, product, and region from the updated XOOM data received in early March 2024.[73] This data, as previously described, includes not only data for additional months not available to me on the Original Report but also includes additional volumes in months going back to 2013.

---

[70]   For example, I have seen XOOM financial reporting spreadsheets (for example XOOM_Mirkin_029940 and XOOM_Mirkin_032603) that apparently show aggregated differences between estimated and actual supply costs, but this is not even broken down by state, much less by customer class. Hence, I do not see any way in which these costs could be attributed specifically to categories of New York customers.

[71]   In *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177 (2d Cir. 2019) the court noted that "XOOM concedes that it operates as a commodity broker or middleman and does not generate or deliver electricity."

[72]   Coppola Tr. 143:5–7 ("Q: And gross margin means XOOM's gross profits for that period? A: Yes.").

[73]   If needed, I can perform this same calculation for any individual Class Member's monthly rate(s).  By using XOOM's data, I can account for variations by utility zone, month, and XOOM supply costs.

74. Below I discuss three methods for determining a margin that could be viewed, in my experience, as reasonable. In Method A, I used a margin based on the average difference between XOOM's direct supply costs and the utility rate charged for the same product at the same time. This margin was on average 7.33%.  Method A reflects the NYPSC's determination that it is not reasonable for ESCO customers to pay more for the exact same commodity that is also sold by their existing utility. This method is also consistent with the nature of the supply costs faced by both ESCOs and utilities. Method B is similar in that it incorporates the NYPSC's determination regarding reasonable ESCO rates. Method B uses the 5% margin the NYPSC selected as reasonable for fixed rate products.  While the 5% figure applies to a different product (fixed as opposed to variable rates), that premium was applied to a product that poses a greater financial risk to the ESCO than the variable rates at issue here.  The NYPSC's 5% premium restriction was also applied to ESCO products sold in the same New York market in which XOOM operates. In Method C, I based the margin for variable rate products on the average margin XOOM itself chose to charge for corresponding fixed rate products.

75. As I noted previously, I understand that the courts have now provided guidance on what margins XOOM could charge under the SAs. I will therefore discuss how the various damages methods reflect these constraints on XOOM's margins.

76. In my opinion, as I discuss in more detail below, the 7.33% margin in Method A is the preferred margin for calculating damages.

77. Accounting for those developments, I understand any margin to be charged by XOOM on top of its supply costs must (i) be supported by documented supply costs since any other approach would necessarily amount to subjective rate-setting, and (ii) must be reasonable measured against the constraints the courts have determined are imposed by the Sales Agreement's pricing term. Accordingly, in my opinion and applying the SA's governing terms as construed by the courts, the best comparators for determining a reasonable, fixed margin in this context are the margins approved as reasonable by regulators in the relevant market.

28

### 3.1   METHOD A – MARGIN SET BY REFERENCE TO AVERAGE UTILITY RATE

78. As I described above, the NYPSC has been especially critical of ESCOs' variable-rate pricing practices. I understand that in December 2019 (effective April 2021) the NYPSC banned all variable-rate offers to customers by ESCOs unless the rate offered a guaranteed savings to the customer over the corresponding rates that would have been charged by the utility for the same service, or the ESCO offered a complaint green energy product.[74]

79. As the NYPSC noted, there is no benefit to customers buying variable rate service from an ESCO at a higher rate than the utility default service rate. The customer is getting the same product, delivered in the same way, with no physical difference. Like XOOM, the utility must procure energy, capacity, ancillary services, renewable energy credits (RECs), etc. to provide service. I also understand that the utility passes through its non-supply costs of procuring these elements (staff, hardware and software systems, and overhead) in its default service rates.[75] As ConEd's "How to Read Your Bill" website notes, "[w]e buy the energy you use in the competitive, wholesale supply market" and "pass our costs on to you, without making a profit—what we pay, you pay."[76] Therefore, as I understand the NYPSC's logic, customers paying more are merely being exploited due to their comparative lack of information. This logic is also consistent with my economic analysis of the situation—that in the

---

[74]   I understand that the NYPSC's rules for compliant green energy products are not at issue here.

[75]   In New York, I understand all utilities regulated by the NYPSC recover their administrative and overhead costs to procure electricity or gas via the "Merchant Function Charge" incorporated into the utility's supply rate.  As an energy price aggregation website notes, this charge "goes towards the employees that buy the energy, their offices, etc." https://www.nyenergyratings.com/resources/understanding-your-coned-bill.  NYSEG, a New York utility describes the Merchant Function Charge as "[r]eflect[ing] the administrative costs of obtaining electricity supply."  NYSEG Electric Rates Summary – Effective May 1, 2022, https://www.nyseg.com/documents/40132/5899296/NYSEG%2BElectric%2BRate%2BSummary%2BMay%2B2022%2BNPRB211.pdf/692e2ee9-e221-913a-b020-94c522e5a43a?version=1.0&t=1654867260084.

[76]   https://www.coned.com/en/accounts-billing/your-bill/how-to-read-your-bill.

absence of imperfect information customers would not choose to pay more for the same product.

80. For months up to November 2019, XOOM provided in discovery data an aggregated view of the corresponding utility rates for New York variable products (electric or gas, region and month). Various rate-setting workbooks also included a view of the corresponding utility rate, but this was not included in each workbook.[77] I compared XOOM's supply costs (as reflected in the reported "Total Cost" data in the rate-setting workbooks) with the corresponding utility default service rates and found that on average XOOM's supply costs were 7.33% lower than the utility rates.[78]

81. In Method A, I use the 7.33% figure as the allowed margin applied to XOOM's documented supply costs. In my opinion, this method is most consistent with the constraints on XOOM's pricing behavior required by the courts. There are several reasons for this.

82. First, Method A reflects the NYPSC's independent determination regarding a reasonable (e.g., non-exploitative) rate for the same product sold by XOOM in the same New York market.  The NYPSC found that "because energy services are essential to customers' health and wellbeing, the additional cost to customers must not outweigh the purported benefits to them[,]" and that "there is no demonstrated customer benefit to allowing ESCOs to offer [non-guaranteed variable rates] to mass-market customers."[79]  Method A reflects this logic.

83. Second, Method A applies a margin that is objectively derived. In limiting ESCOs' variable rate offerings to only those that guaranteed savings compared to the utility, the NYPSC required that ESCO variable rate margins be determined objectively based on the ESCO's ability to achieve efficiencies over the corresponding utility rate. Through the guaranteed savings requirement, NYPSC implemented constraints on ESCO variable rate margins that directly

---

[77]     XOOM_MIRKIN_032622 and Rate-Setting Workbooks.

[78]     Details concerning this analysis are shown in Exhibit 3.

[79]     December 2019 Order at page 37.

tied them to the utility rate charged, so that an ESCO can charge a margin in its variable rates only to the extent that the resulting ESCO variable rate is less than or equal to the utility rate.

84. Here, I understand that courts have that found there are constraints that govern XOOM's rate setting under the SA—variable rates set without subjective discretion and based solely on supply costs plus a reasonable, proportionate margin. The utility rate margin constraint implemented by NYPSC is an appropriate analogue to these SA requirements. It implements a single, proportional margin, which is objectively determined, and linked to ESCO supply costs since utilities and ESCOs buy energy in the same wholesale markets to supply their customers.

85. Here, on average, XOOM's documented supply costs were 7.33% lower than the corresponding utility rate. This 7.33% margin is thus "based on" XOOM's supply costs insofar as the ultimate rate is determined by reference to documented supply costs as compared to the utility's cost-based rate. The utility's rates are also an appropriate benchmark. The utility purchases the electricity or gas in the same wholesale market as XOOM and faces the same categories of wholesale costs in supplying customers. Method A's 7.33% margin is thus objective and does not reflect XOOM's subjective discretion.

86. Third, I understand from Class Counsel that the court concluded that vague pricing terms (like the silent margin term here) should be construed against the party that "had the best opportunity to protect its interests."[80] Considering the NYPSC's independent finding that it is not reasonable for ESCO customers to pay higher variable commodity rates than those charged by the utility, Method A's 7.33% margin protects customers' interests (prevents them from paying unreasonable rates) while also allowing XOOM a proportionate margin above its documented supply costs.

87. Fourth, as also noted in the Original Report (page 23), XOOM itself used the utility rate when it needed to refund customers for overcharges claimed directly by individual customers or the NYPSC. XOOM's Compliance Officer Patricia

---

[80] Summary Judgment Order at 12.

Kulesa testified that when XOOM refunds customers in instances when the NYPSC finds that there were problems during the customer enrollment process or when XOOM's internal investigation finds that there was wrongdoing or "something broke" on XOOM's end, XOOM re-rates the customer using the utility rate in the utility market where the customer was located.[81]

88. Fifth, the Original Report (page 23) also observed that the NYPSC has extensively used the applicable utility rate as the basis of comparison for ESCO variable rates, even while accounting for when alleged ESCO "value-added products or services" were bundled with the commodity.[82]

89. Method A in my opinion thus represents the best context for determining an appropriate margin under the SA. It incorporates the independent judgment of the relevant regulator on the price of the same product XOOM sold to the Class and reflects the economic situation of energy consumers who could buy the same products from the utility. Method A is based on objective criteria that do not afford XOOM margin-setting discretion, protects consumers' interests in the face of a silent margin term, and there is record evidence that XOOM looked to a similar process when it needed to re-rate customers.

90. The total damage amount for electric customers using Method A is $64,150,964. The corresponding damage amount for gas customers is $31,859,261. These amounts do not include interest or other adjustments. Damages by year for each customer segment are provided below in Figure 1. Full details of the calculations are provided in Exhibit 4.

---

[81]    Deposition Transcript of Patricia Kulesa, dated June 29, 2022 (hereafter "Kulesa Tr.") at 90:10–24, 100:4–11, 137:25–138:12, 179:17–180:4.

[82]    December 2019 Order at page 8.

**Figure 1. Method A Damages from 2013-2024 by Customer Segment**

| Method A | Electric Residential | Electric Commercial | Gas Residential | Gas Commercial | Total |
|---|---|---|---|---|---|
| **2013** | $862,360 | $588,158 | $496,261 | $251,873 | $2,330,934 |
| **2014** | $4,259,848 | $3,131,391 | $2,247,900 | $989,012 | $11,086,621 |
| **2015** | $3,680,797 | $2,749,865 | $2,337,437 | $1,024,935 | $10,074,054 |
| **2016** | $3,735,865 | $2,705,654 | $1,789,438 | $974,238 | $9,432,720 |
| **2017** | $3,860,528 | $3,073,542 | $2,342,144 | $1,442,162 | $10,961,068 |
| **2018** | $4,300,723 | $4,515,396 | $2,828,793 | $1,664,602 | $13,563,120 |
| **2019** | $3,944,182 | $3,595,446 | $2,047,752 | $1,181,036 | $10,957,478 |
| **2020** | $2,369,242 | $2,385,512 | $1,451,330 | $891,653 | $7,283,035 |
| **2021** | $2,161,222 | $2,719,508 | $1,454,970 | $920,923 | $7,468,231 |
| **2022** | $2,857,816 | $3,122,426 | $1,425,672 | $923,159 | $8,581,444 |
| **2023** | $1,645,443 | $1,886,038 | $1,483,263 | $1,106,045 | $6,304,315 |
| **2024** | - | - | $322,609 | $262,055 | $591,653 |
| **All Years** | $33,678,027 | $30,472,937 | $20,227,569 | $11,631,692 | **$96,010,225** |

91. As shown in Table 1 below, in each year XOOM's data shows that it charged variable-rate customers margins that were much higher than a 7.33% margin based on the average difference between XOOM's documented supply costs and the utility rates.  Again, on average XOOM charged a revenue-weighted variable rate margin of 63.0%. The simple average of XOOM's variable rate margins is 68.0%.

33

**Table 1: Comparison of XOOM Variable Margins From March 2013 to January 2024**

**Electric Margin Percentages**

| | Residential | | Commercial | |
|---|---|---|---|---|
| | SimpleFlex Variable Plan | Method A | BizChoice Variable Plan | Method A |
| 2013 | 30% | 7.33% | 29% | 7.33% |
| 2014 | 47% | 7.33% | 50% | 7.33% |
| 2015 | 66% | 7.33% | 66% | 7.33% |
| 2016 | 82% | 7.33% | 79% | 7.33% |
| 2017 | 83% | 7.33% | 79% | 7.33% |
| 2018 | 93% | 7.33% | 99% | 7.33% |
| 2019 | 121% | 7.33% | 116% | 7.33% |
| 2020 | 92% | 7.33% | 95% | 7.33% |
| 2021 | 72% | 7.33% | 75% | 7.33% |
| 2022 | 73% | 7.33% | 74% | 7.33% |
| 2023 | 57% | 7.33% | 58% | 7.33% |
| 2024 | No Data | 7.33% | No Data | 7.33% |

**Gas Margin Percentages**

| | Residential | | Commercial | |
|---|---|---|---|---|
| | SimpleFlex Variable Plan | Method A | BizChoice Variable Plan | Method A |
| 2013 | 37% | 7.33% | 39% | 7.33% |
| 2014 | 33% | 7.33% | 37% | 7.33% |
| 2015 | 59% | 7.33% | 61% | 7.33% |
| 2016 | 58% | 7.33% | 60% | 7.33% |
| 2017 | 72% | 7.33% | 72% | 7.33% |
| 2018 | 74% | 7.33% | 74% | 7.33% |
| 2019 | 73% | 7.33% | 73% | 7.33% |
| 2020 | 62% | 7.33% | 62% | 7.33% |
| 2021 | 50% | 7.33% | 49% | 7.33% |
| 2022 | 40% | 7.33% | 41% | 7.33% |
| 2023 | 85% | 7.33% | 94% | 7.33% |
| 2024 | 140% | 7.33% | 194% | 7.33% |

## 3.2   METHOD B – 5% MARGIN BASED ON NYPSC REQUIREMENT

92. The fixed-rate margins used in the Original Report were selected by XOOM itself at its own discretion. I therefore understand that they do not reflect all

contractual rate-setting constraints that were later identified by the courts to follow from the Sales Agreement's pricing term.

93. As I noted previously, the fixed-rate margins charged by ESCOs like XOOM have been determined to be unreasonable by the NYPSC, which found that these products did not offer benefits to customers unless they were reasonably priced. The NYPSC, after its investigation, adopted a 5% cap over the corresponding average variable utility supply rate on fixed-rates as reasonable given the characteristics of New York's retail supply market.[83] As noted above, the NYPSC determined that a 5% "price premium" over the average utility rate was based on a "typical risk premium in financial markets" and was appropriate because an ESCO bears greater financial risk with fixed rate products as compared to variable rate products.[84]

94. In Method B, I apply a 5% margin cap adopted by the NYPSC as the basis for calculating damages, for both electric and gas. All other aspects of the damage calculations are unchanged from Method A. This method shares many similarities with Method A, and as set forth below there are several reasons why it is consistent with my understanding of the courts' guidance regarding the SA.

95. First, the 5% premium has been determined by the NYPSC (an independent third party with expertise in XOOM's market) to be a "just and reasonable" proportionate risk premium for a New York ESCO product.[85] I understand that the court's ruling at summary judgment required XOOM's margin to be both proportionate and reasonable.[86] In reaching its conclusion regarding the 5% figure, the NYPSC invoked its "statutory mandate to ensure that all customers receive safe and reliable gas and electric service at just and reasonable rates," and weighed "the costs versus the benefits of fixed-rate products offered by

---

[83]     December 2019 Order at page 67.

[84]     December 2019 Order at page 67.

[85]     December 2019 Order at page 67.

[86]     Summary Judgment Order at pages 12-14.

ESCOs."[87] The NYPSC found that the "trailing 12-month average [variable] utility supply rate offers a meaningful baseline against which to judge the reasonableness of the price of ESCO fixed-rate products" and then permitted 5% margin on top of that average "because a typical risk premium in financial markets ranges between 3.5% to 5.5%."[88]

96. Second, while XOOM's variable rates under the SA did not provide the "price insurance" afforded by fixed rates—a term used to describe fixed rates by XOOM's sister company Direct Energy,[89] a 5% margin was independently and objectively-determined by the regulator of XOOM's market to be a margin that "most" ESCOs could sustain on a product that is riskier than the variable rate products XOOM sold to the Class.[90] A 5% margin is thus based on objective criteria used to determine a reasonable margin that is not based on XOOM's margin-setting discretion.

97. Third, like with Method A, Method B protects consumers' interests in the face of a silent margin term.

98. Fourth, the 5% margin utilized in Method B provides an independent cross-check with which to assess Method A.

99. Method B thus represents a viable alternative context for determining an appropriate margin under the SA. Method B shares many of the same attributes as Method A. It looks to the regulator's independent pricing judgment on an ESCO product in XOOM's market and is based on objective criteria, not XOOM's discretion. Method B also protects consumers' interests, serves as a benchmark for Method A, and was found by the NYPSC to be a sustainable margin for ESCOs. Though the 5% premium was established for fixed rate products, those products are riskier for ESCOs. The 5% margin is consistent with my understanding of the court's requirement for a single "proportionate"

---

[87]    December 2019 Order at page 66 ("[I]f the cost incurred is significantly more than the value of the benefit achieved, then the Commission cannot permit ESCOs to offer such products.").

[88]    December 2019 Order at page 67.

[89]    December 2019 Order at page 61.

[90]    December 2019 Order at page 67.

margin that "is not untethered to [XOOM's] actual and estimated supply costs."[91]

100.    The total damage amount for electric customers using Method B was $67,105,477. The corresponding damage amount for gas customers was $33,543,134. These amounts do not include interest or other adjustments. Damages by year for each customer segment are provided below in Figure 2. Full details of the calculations are provided in Exhibit 5.

**Figure 2. Method B Damages from 2013-2024 by Customer Segment**

| Method B | Electric Residential | Electric Commercial | Gas Residential | Gas Commercial | Total |
|---|---|---|---|---|---|
| 2013 | $953,478 | $676,134 | $533,591 | $269,173 | $2,432,376 |
| 2014 | $4,551,692 | $3,380,159 | $2,440,265 | $1,066,551 | $11,438,667 |
| 2015 | $3,863,480 | $2,906,373 | $2,448,868 | $1,070,767 | $10,289,488 |
| 2016 | $3,871,831 | $2,819,726 | $1,889,653 | $1,025,933 | $9,607,143 |
| 2017 | $3,998,730 | $3,185,084 | $2,454,187 | $1,509,119 | $11,147,120 |
| 2018 | $4,443,544 | $4,640,792 | $2,941,017 | $1,732,183 | $13,757,536 |
| 2019 | $4,042,178 | $3,691,508 | $2,135,480 | $1,233,249 | $11,102,414 |
| 2020 | $2,493,655 | $2,485,669 | $1,514,849 | $931,249 | $7,425,423 |
| 2021 | $2,276,387 | $2,839,802 | $1,537,273 | $977,905 | $7,631,367 |
| 2022 | $2,985,581 | $3,262,629 | $1,530,467 | $996,379 | $8,775,057 |
| 2023 | $1,740,941 | $1,996,102 | $1,553,409 | $1,154,557 | $6,445,009 |
| 2024 | - | - | $331,212 | $265,799 | $597,011 |
| **All Years** | $35,221,498 | $31,883,979 | $21,310,271 | $12,232,863 | **$100,648,611** |

### 3.3    METHOD C – MARGIN BASED ON XOOM'S FIXED RATE MARGIN

101.    In Method C, I apply an average 21.2% margin that XOOM used for its fixed rate customers in New York.[92] This is analogous to "Method 2" in the Original Report (pages 23–25), but I have modified it slightly to use a single average XOOM fixed rate margin (for both gas and electric customers). I understand from Class Counsel that this change is needed to align this method with the

---

91      Summary Judgment Order at 13.

92      Details concerning the calculation of this figure are shown in Exhibit 6.

court's ruling at summary judgment that the SA's pricing term permits only a single proportionate margin.[93]

102.    Unlike Methods A and B above, this method was developed in October 2022, before the courts offered further guidance. At that time, I understood that the parties had differing views on the SA pricing term. I understand the court later determined the pricing term was "vague" because it "is not clear what effect the phrase ["based on"] has on the legal operation" of the contractual requirement that XOOM's variable rates be "based on" its supply costs.[94] As the court recognized, the parties had put forth different interpretations, with XOOM claiming that "the contract does not otherwise restrict XOOM's discretion to layer additional sums on top of the supply costs—so long as the margin does not vastly exceed supply costs."[95]

103.    As was noted in the Original Report, XOOM "impos[ed] an unreasonably high margin on its variable rate customers as compared to its fixed rate customers."[96] Given the vagueness of the SA pricing term, on which the courts were at that time yet to give any guidance, the Original Report used commercial reasonableness as the constraint on XOOM's pricing behavior. In my opinion, it was unreasonable for XOOM to charge a higher margin on variable rate products, which had lower risks, than it did for corresponding fixed rate products, which had higher risks. This concept of commercial reasonableness led to Method 2 in the Original Report, which in simple terms assumed that XOOM could charge margins on variable rate products no higher than those on fixed rate products, which XOOM itself had chosen.

104.    Now I understand that the courts have provided guidance on the pricing terms in the SAs, and that this provides new context not available at the time of the Original Report. I understand this Amended Report is needed to account for three developments: XOOM's March 2024 data production, the court's August

---

[93]    Summary Judgment Order at 13.

[94]    Summary Judgment Order at 10.

[95]    Summary Judgment Order at 10.

[96]    Original Report at 24.

2023 ruling construing the SA's pricing term, and the December 2023 statement by the Court of Appeals for the Second Circuit that the pricing term did not give XOOM discretion to use any subjective process or factors to set monthly variable rates.[97] Taken together I understand the courts' guidance to require a margin that is fixed as a percentage, reasonable in context, and set using objective factors (because I understand XOOM does not have pricing discretion).

105.    Because Method C is ultimately based on XOOM's subjective decision-making regarding the margin for its fixed-rate products, it reflects fewer of the pricing constraints incorporated into Methods A and B. Nonetheless, this method provides a ceiling in terms of a maximum commercially reasonable margin, especially in a scenario where XOOM is allowed to have had some price-setting discretion, but still faced a requirement to act reasonably and in good faith using any allowed discretion in setting rates, as discussed below.

106.    I understand that this court's summary judgment decision recognized that even if the SAs "unambiguously did not require rates to be tied to procurement costs" discretion granted by a contract must be exercised in good faith, reasonably, and with proper motive.[98] I also understand from Class Counsel that the Court of Appeals for the Second Circuit recently made clear that ESCOs do not "have carte blanche to charge their customers any rate they wish, so long as they reserve rate-setting discretion in their contracts."[99] Finally, I understand that ESCOs "must exercise their rate-setting discretion in 'good faith.'"[100]

107.    From a commercial and economic perspective, it would be unreasonable for XOOM to charge a higher margin on lower-risk variable rate products than the margin it charged for corresponding, higher-risk fixed rate products. Charging higher margins on lower risk variable rate products would allow XOOM to

---

[97]    Martinez v. Agway Energy Servs., LLC, 88 F.4th 401, 411 (2d Cir. 2023)

[98]    Summary Judgment Order at 14.

[99]    Martinez v. Agway at page 416.

[100]    *Id.*

overcharge variable rate customers. Method C recognizes this concept and thus is consistent with my understanding of these constraints on XOOM's pricing behavior imposed by the decisions of the courts.

108.     As shown in Table 2 below, in each year XOOM's own data shows that it charged its variable-rate customers substantially higher margins than it charged fixed-rate customers, even though variable-rate supply risks to XOOM were lower.

**Table 2: Comparison of XOOM Electric Variable and Fixed Rate Margins from March 2013 to January 2024[101]**

**Electric Margin Percentages**

|  | Residential | | Commercial | |
| --- | --- | --- | --- | --- |
|  | SimpleFlex Variable Plan | SureLock Fixed Plan | BizChoice Variable Plan | BizLock Fixed Plan |
| 2013 | 30% | 17% | 29% | 16% |
| 2014 | 47% | 17% | 50% | 17% |
| 2015 | 66% | 27% | 66% | 24% |
| 2016 | 82% | 26% | 79% | 24% |
| 2017 | 83% | 27% | 79% | 25% |
| 2018 | 93% | 27% | 99% | 27% |
| 2019 | 121% | 26% | 116% | 24% |
| 2020 | 92% | 20% | 95% | 20% |
| 2021 | 72% | 15% | 75% | 17% |
| 2022 | 73% | 15% | 74% | 12% |
| 2023 | 57% | 15% | 58% | 15% |
| 2024 | No Data | 28% | No Data | 22% |

**Gas Margin Percentages**

|  | Residential | | Commercial | |
| --- | --- | --- | --- | --- |
|  | SimpleFlex Variable Plan | SureLock Fixed Plan | BizChoice Variable Plan | BizLock Fixed Plan |
| 2013 | 37% | 26% | 39% | 25% |
| 2014 | 33% | 24% | 37% | 24% |
| 2015 | 59% | 29% | 61% | 30% |
| 2016 | 58% | 26% | 60% | 26% |
| 2017 | 72% | 25% | 72% | 23% |
| 2018 | 74% | 33% | 74% | 31% |
| 2019 | 73% | 27% | 73% | 23% |
| 2020 | 62% | 21% | 62% | 20% |
| 2021 | 50% | 11% | 49% | 11% |
| 2022 | 40% | -10% | 41% | -10% |
| 2023 | 85% | No Data | 94% | No Data |
| 2024 | 140% | No Data | 194% | No Data |

---

[101]     This table shows an annual average of reported monthly margins.

109.    I view the average 21.2% fixed rate margin as the absolute maximum of what could be considered an economically reasonable margin for variable-rate customers, given the higher risks associated with fixed-rate customers as the prices cannot be changed for these customers as market conditions change.

110.    The total damage amount for electric customers using Method C is $46,684,164. The corresponding damage amount for gas customers is $22,141,975. These amounts do not include interest or other adjustments. Damages by year for each customer segment are provided below in Figure 3. Full details of the calculations are provided in Exhibit 7.

**Figure 3**. **Method C Damages from 2013-2024 by Customer Segment**

| Method C | Electric Residential | Electric Commercial | Gas Residential | Gas Commercial | Total |
|---|---|---|---|---|---|
| 2013 | $341,847 | $115,313 | $294,999 | $148,669 | $900,827 |
| 2014 | $2,526,725 | $1,678,964 | $1,189,645 | $545,562 | $5,940,895 |
| 2015 | $2,602,231 | $1,819,251 | $1,672,516 | $751,197 | $6,845,195 |
| 2016 | $2,923,790 | $2,024,347 | $1,209,321 | $673,823 | $6,831,280 |
| 2017 | $3,035,101 | $2,407,342 | $1,672,949 | $1,042,252 | $8,157,644 |
| 2018 | $3,448,253 | $3,766,930 | $2,159,106 | $1,264,971 | $10,639,260 |
| 2019 | $3,358,886 | $3,021,706 | $1,524,097 | $869,256 | $8,773,946 |
| 2020 | $1,630,188 | $1,791,552 | $1,090,479 | $664,624 | $5,176,843 |
| 2021 | $1,484,373 | $2,001,034 | $996,333 | $604,392 | $5,086,131 |
| 2022 | $2,109,416 | $2,291,893 | $848,114 | $519,635 | $5,769,058 |
| 2023 | $1,075,070 | $1,229,954 | $1,069,289 | $819,827 | $4,194,140 |
| 2024 | - | - | $271,225 | $239,694 | $510,919 |
| **All Years** | $24,535,879 | $22,148,285 | $13,998,073 | $8,143,902 | **$68,826,139** |

111.    Given that the margin applied in Method C represents the maximum reasonable margin that XOOM could have applied in my opinion, the damage amount under Method C represents an outcome where XOOM is given the greatest leeway to charge a margin on top of its supply costs, increasing the rates paid by XOOM customers.

### 3.4   SUMMARY OF DAMAGE ESTIMATES

112.    As discussed above, under Method A (7.33% average margin to match utility rates), total damages are $96,010,225. Under Method B (5% margin based on NYPSC regulation) total damages are $100,648,611. Under Method

C (using XOOM's own 21.2% average fixed-rate margin) total damages are $68,826,139.[102,103]

113.    I reserve the right to change or modify this report if I am subsequently provided with additional data or information.

Seabron Adamson

_____

---

[102]    Damages to the Plaintiff under the three methods range from $16 to $69, as calculated in Exhibit 8.

[103]    I note that I have not received data concerning fixed price plans for gas customers from July 2022 onward, nor data concerning prices or margins for variable price plans for electric customers beyond November 2023. To the extent a finding in Plaintiff's favor encompasses billing periods beyond these periods, the damages analysis in this Amended Report will need to be updated. Finally, as noted in the Original Report, if a different margin is determined to be appropriate (e.g., 10%), I would easily be able to update my calculations to reflect a different margin assumption.