# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated

Plaintiff,

v.

XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,

Defendants.

Case No.: 18 Civ. 2949 (ARR) (JAM)

---

## PLAINTIFF SUSANNA MIRKIN AND THE CERTIFIED CLASS'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE*

---

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Ethan D. Roman
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com
edr@wittelslaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NEW YORK 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

**SCHLAM STONE & DOLAN LLP**
Richard Dolan
Bradley D. Simon
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Dated:   June 10, 2024

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT........................................................................................1

ARGUMENT ..............................................................................................................3

I.    THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS RELEVANT TO MULTIPLE TRIAL ISSUES AND IS ENCOMPASSED IN PLAINTIFF'S BREACH OF CONTRACT COUNT .................................................. 3

II.    THE COURT SHOULD REJECT XOOM'S ATTEMPT TO USE AN *IN LIMINE* MOTION TO OVERTURN THE COURT'S "PROPORTIONATE-MARGIN" CONTRACT CONSTRUCTION ......................... 7

III.    THE COURT HAS ALREADY RULED THAT DETERMINING A REASONABLE VARIABLE RATE MARGIN IS AN ISSUE FOR TRIAL ........... 13

IV.    XOOM'S MARGINS FOR ITS RISKIER FIXED RATE PRODUCTS ARE RELEVANT TO DETERMINING A REASONABLE VARIABLE RATE MARGIN ................................................................................................ 17

V.    EVIDENCE OF A REASONABLE MARGIN IS ADMISSIBLE UNDER THE COURT'S PROPORTIONATE-MARGIN CONTRACT CONSTRUCTION ........................................................................................ 22

    A.    The Jury Should Be Allowed to Consider All Three of Plaintiff's Reasonable Margin Benchmarks and XOOM's Complaints About the Court's Decision to Allow an Amended Expert Report Are Meritless .................. 23

    B.    The Court Has Already Approved Using XOOM's Average Fixed Rate Margin as a Class-Wide Benchmark; That XOOM's Fluctuating Variable Rate Margins Were Occasionally Lower Changes Nothing .................... 30

    C.    XOOM's Recycled Claim That Its Own Fixed Rate Margins Are "Irrelevant and Prejudicial" Fails for the Same Reasons That XOOM's MIL No. 4 Fails........................................................................................... 32

VI.    XOOM HAS ADMITTED THAT ITS FIXED RATE MARGINS WERE PROFITABLE AND THAT EVIDENCE IS RELEVANT TO DETERMINING A REASONABLE VARIABLE RATE MARGIN ....................... 33

VII.    EVIDENCE THAT XOOM CONSIDERED COMPETITORS' RATES WHEN SETTING ITS VARIABLE RATES IS RELEVANT TO KEY TRIAL ISSUES REGARDING HOW XOOM SET RATES AND IS ADMISSIBLE ................................................................................................ 35

VIII.    GIVEN THE COURT'S CONTRACT CONSTRUCTION AT SUMMARY JUDGMENT, UTILITY RATES ARE RELEVANT TO DETERMINING A REASONABLE "PROPORTIONATE" VARIABLE RATE MARGIN ................................................................................................ 37

i

IX.     XOOM ADMITTED THAT IN PERFORMING THE CONTRACT IT
        USED PRICING STRATEGIES TO SET VARIABLE RATES AND
        THAT A LATER CONTRACT AMENDMENT TO MEMORIALIZE
        THIS PRACTICE WAS "JUST SIMPLY PROVIDING MORE
        ACCURATE LANGUAGE" ......................................................................... 42

X.      PLAINTIFF'S EXPERT SHOULD BE PERMITTED TO TESTIFY
        REGARDING THE TECHNICAL MEANING OF CONTRACT
        TERMS AND THE DISCONNECT BETWEEN XOOM'S PRICING
        STRATEGIES AND THE REQUIRED RATE SETTING
        CALCULATIONS ..................................................................................... 46

XI.     XOOM HAS DESIGNATED A WITNESS FROM ITS PARENT
        COMPANY NRG ENERGY TO TESTIFY AT TRIAL ABOUT
        HOW XOOM SET VARIABLE RATES, AND NRG-RELATED
        DOCUMENTS ARE GERMANE TO QUESTIONS REGARDING
        XOOM'S RATE SETTING AND MARGINS .............................................. 48

XII.    THE SIX REGULATORY AND LEGISLATIVE EXHIBITS
        CHAILENGED IN XOOM's MIL NO. 12 ARE ADMISSIBLE ............................... 51

        A.      Each of the Exhibits Are Independently Relevant, Rely on One
                Another, and Together They Provide Critical Context for Several
                Key Trial Issues ......................................................................... 51

        B.      XOOM's Ten Irrelevance Claims Fail ....................................... 57

        C.      XOOM's Vague Unfair Prejudice Claims Lack Merit ............ 62

        D.      The Challenged Exhibits Are Admissible as Public Records ................. 64

        E.      The Challenged Documents Are Not Improper Expert Evidence .......... 74

XIII.   THE CLASS SHOULD BE ALLOWED TO RECOVER PUNITIVE
        DAMAGES FOR XOOM's TORTIOUS CONDUCT ................................................. 75

XIV.    ALLOWING PLAINTIFF TO USE XOOM WITNESSES'
        DEPOSITION TRANSCRIPTS IN HER CASE-IN-CHIEF WILL
        SAVE VALUABLE TRIAL TIME ............................................................. 79

XV.     XOOM'S HYPOTHETICAL DOES NOT JUSTIFY GIVING IT A
        BLANKET LICENSE TO PERFORM UNSPECIFIED TRADE-SECRET
        REDACTIONS ON UNNAMED DOCUMENTS ................................................ 81

CONCLUSION ....................................................................................................... 82

# TABLE OF AUTHORITIES

## Cases

*Ariza v. City of New York*,
139 F.3d 132 (2d Cir. 1998) ............................................. 69

*Babcock v. Jackson*,
12 N.Y.2d 473 (1963) ..................................................... 76

*Banks v. Yokemick*,
144 F. Supp. 2d 272 (S.D.N.Y. 2001) .............................. 81

*BioSignia, Inc. v. Life Line Screening of Am., Ltd.*,
No. 12 Civ. 1129, 2014 WL 2968139 (M.D.N.C. July 1, 2014) ............................................. 13

*Booker v. Washington Mut. Bank, F.A.*,
No. 06. Civ. 274, 2007 WL 475330 (M.D.N.C. Feb. 9, 2007) ............................................. 76

*Borchardt v. United States*,
133 F.R.D. 547 (E.D. Wis. 1991) .................................... 79

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000) ........................................ 71, 73

*Britt-Wagner v. D&B Enterprises of Florence, LLC*,
No. 22 Civ. 4, 2022 WL 2651847 (E.D.N.C. July 8, 2022) .................................................. 76

*California v. Southland Royalty Co.*,
436 U.S. 519 (1978) ........................................................ 44

*Chapman v. ChoiceCare Long Island Term Disability Plan*,
288 F.3d 506 (2d Cir. 2002) ............................................ 29

*Chapman v. San Francisco Newspaper Agency*,
No. 01 Civ. 2305, 2002 WL 31119944 (N.D. Cal. Sept. 20, 2002) ......................................... 68

*City Grill Hosp. Grp, Inc. v. Nationwide Mut. Ins. Co.*,
No. 12 Civ. 610, 2014 WL 1429552 (E.D.N.C. Apr. 14, 2014) ........................................... 3, 5

*City of New York v. Pullman Inc.*,
662 F.2d 910 (2d Cir. 1981) ............................................ 70

*Claridge v. N. Am. Power & Gas, LLC*,
No. 15 Civ. 1261, 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) ........................................ 5, 77

*Congregation Yetev Lev D'Satmar, Inc. v. Engie Power & Gas, LLC*,
683 F. Supp. 3d 238 (E.D.N.Y. 2023) .............................. 40

*Cross Sound Cable Co. v. Long Island Lighting Co.*,
No. 21 Civ. 2771, 2022 WL 16789978 (E.D.N.Y. Sept. 13, 2022)........................................ 44

*Deltacom, Inc. v. Budget Telecom, Inc.*,
No. 10 Civ. 38, 2011 WL 2036676 (E.D.N.C. May 22, 2011)................................................ 76

*Desrosiers v. Flight Int'l of Fla. Inc.*,
156 F.3d 952 (9th Cir. 1998) ................................................................................................. 74

*Eastman Kodak Co. v. Agfa-Gevaert N.V.*,
560 F. Supp. 2d 227 (W.D.N.Y. 2008).............................................................................. 79, 81

*Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*,
961 F.2d 1052 (2d Cir. 1992) .................................................................................................. 4

*Gentile v. Cnty. of Suffolk*,
926 F.2d 142 (2d Cir. 1991) ............................................................................................. 64, 66

*Great Am. Emu Co. v. E.J. McKernan Co.*,
509 F. Supp. 3d 528 (E.D.N.C. 2020) .................................................................................... 76

*Harris v. Provident Life & Accident Ins. Co.*,
310 F.3d 73 (2d Cir. 2002) ...................................................................................................... 4

*Harte v. Ocwen Fin. Corp.*,
No. 13 Civ. 5410, 2018 WL 1830811 (E.D.N.Y. 2018)................................................... 64, 65

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v.
Matthew Bender & Co., Inc.*,
37 N.Y.3d 169 (2021).............................................................................................................. 78

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
681 F. Supp. 2d 141 (D. Conn. 2009)..................................................................................... 71

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ................................................................................................... 32

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019)................................................................................................ 32

*In re the Bear Stearns Cos., Inc. Sec.*,
No. 08 MDL 1963, 2016 WL 4098385 (S.D.N.Y. July 25, 2016) .......................................... 71

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) .................................................................................................... 5

*In re Vitamin C Antitrust Litig.*,
No. 05 Civ. 453, 2012 WL 4511308 (E.D.N.Y. Oct. 1, 2012) ............................................... 68

*Iverson v. Surber*,
   800 F. App'x 50 (2d Cir. 2020) ................................................................... 2

*Koch v. Acker, Merrall & Condit Co.*,
   18 N.Y.3d 940 (2012) ................................................................................ 77

*Kolb v. Suffolk Cty.*,
   109 F.R.D. 125 (E.D.N.Y. 1985) ............................................................... 81

*Lane v. Scarborough*,
   200 S.E.2d 622 (N.C. 1973) ................................................................. 11, 12

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
   108 F.3d 1531 (2d Cir. 1997) ................................................................... 76

*Martinez v. Agway Energy Servs., LLC*,
   88 F.4th 401 (2d Cir. 2023) ............................................................... *passim*

*Melville v. HOP Energy, LLC*,
   No. 21 Civ. 10406 (KMK), 2023 WL 2648775 (S.D.N.Y. Mar. 27, 2023) ............................... 6

*Melville v. HOP Energy, LLC*,
   No. 21 Civ. 10406, 2023 WL 2648775 (S.D.N.Y. Mar. 27, 2023) ..................................... 6, 16

*Mirkin v. Viridian Energy, Inc.*,
   No. 15 Civ. 1057, 2016 WL 3661106 (D. Conn. July 5, 2016) ................................... 78

*Mirkin v. XOOM Energy, LLC*,
   931 F.3d 173 (2d Cir. 2019) ................................................................. 16, 35

*Naphcare, Inc. v. Guilford Cnty.*,
   2008 WL 4371770 (M.D.N.C. Sept. 18, 2008) ................................................. 9

*Nat'l Energy Marketers Ass'n v. New York State Pub. Serv. Comm'n*,
   126 N.E.3d 1041 (N.Y. 2019) ................................................................. 65, 73

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
   392 F.3d 520 (2d Cir. 2004) ................................................................... 3

*Peat, Inc. v. Vanguard Rsch., Inc.*,
   378 F.3d 1154 (11th Cir. 2004) ............................................................... 32

*Pelman v. McDonald's Corp.*,
   396 F.3d 508 (2d Cir. 2005) ................................................................. 77

*Powell v. Nat'l Bd. of Med. Exam'rs*,
   364 F.3d 79 (2d Cir. 2004) ................................................................... 76

v

*Recycling Equip., Inc. v. E Recycling Sys.*,
    2014 WL 6977766 (W.D.N.C. Dec. 9, 2014) ........................................................ 8

*Recycling Equip., Inc. v. E Recycling Sys., LLC*,
    No. 14 Civ. 56, 2014 WL 6977766 (W.D.N.C. Dec. 9, 2014) ................................ 12

*Rezapour v. Earthlog Equity Grp., Inc.*,
    No. 12 Civ. 105, 2013 WL 3326026 (W.D.N.C. July 1, 2013) ....................... 4, 8, 12

*Richards v. Direct Energy Servs.*,
    915 F.3d 88 (2d Cir. 2019) .................................................................................. *passim*

*Ridout v. KEP Morrisville Realty LLC*,
    No. 08 Civ. 453, 2010 WL 4828140 (E.D.N.C. Nov. 19, 2010) ........................... 11

*Root v. Allstate Ins. Co.*,
    158 S.E.2d 829 (N.C. 1968) ................................................................................... 9

*RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*,
    No. 18 Civ. 6449, 2023 WL 2403258 (E.D.N.Y. Mar. 7, 2023) ................... 64, 65, 71

*SCM Corp. v. Xerox Corp.*,
    76 F.R.D. 214 (D. Conn. 1977) .......................................................................... 80

*Sevugan v. Direct Energy Servs., LLC*,
    931 F.3d 610 (7th Cir. 2019) .............................................................................. 41

*Shelton v. Duke Univ. Health Sys.*,
    633 S.E.2d 113 (N.C. Ct. App. 2006) ................................................................. 11

*Stanley v. Direct Energy Servs., LLC*,
    466 F. Supp. 3d 415 (S.D.N.Y. 2020) ................................................................ 78

*Toussie v. Allstate Ins. Co.*,
    No. 15 Civ. 3235, 2016 WL 6537670 (E.D.N.Y. Nov. 3, 2016) ........................... 77

*Travel Ctr. of Fairfield Cnty., Inc. v. Royal Cruise Line Ltd.*,
    154 F. Supp. 2d 281 (D. Conn. 2001) .................................................................. 4

*Tray-Wrap, Inc. v. Six L's Packing Co.*,
    984 F.2d 65 (2d Cir. 1993) ................................................................................. 13

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ...................................................................................... 32, 61

*U.S. v. Dantzler*,
    771 F.3d 137 (2d Cir. 2014) ............................................................................... 29

*Ultra Innovations, Inc. v. Food Lion, Inc.*,
    502 S.E.2d 685 (N.C. Ct. App. 1998) ................................................. 13

*United States v. Am. Tel. & Tel. Co.*,
    498 F. Supp. 353 (D.D.C. 1980) ................................................. 69, 70

*United States v. Mohamed*,
    No. 18 Cr. 603, 2023 WL 319569 (E.D.N.Y. Jan. 19, 2023) ................................................. 2

*United States v. Ray*,
    585 F. Supp. 3d 445 (S.D.N.Y. 2022) ................................................. 2

*United States v. White*,
    692 F.3d 235 (2d Cir. 2012) ................................................. 2

*Walker v. Sheldon*,
    179 N.E.2d 497 (N.Y. 1961) ................................................. 77

*Weyerhaeuser Co. v. Godwin Bldg. Supply Co., Inc.*,
    253 S.E.3d 625 (N.C. App. 1979) ................................................. 3

## Statutes

N.Y. G.B.L. § 349 ................................................. 58, 76, 77, 78

N.Y. P.B.S. § 5(b)(1) ................................................. 65

N.Y. P.B.S. § 66(2) ................................................. 65

## Rules

Fed. R. Civ. P. 23 ................................................. 30, 32

Fed. R. Civ. P. 26 ................................................. 75

Fed. R. Civ. P. 30 ................................................. 42, 43, 80

Fed. R. Civ. P. 32 ................................................. 80, 81

Fed. R. Civ. P. 39 ................................................. 13

Fed. R. Civ. P. 54 ................................................. 76

Fed. R. Evid. 401 ................................................. 2, 52, 57

Fed. R. Evid. 403 ................................................. 2

Fed. R. Evid. 407 ................................................. 45

Fed. R. Evid. 803 ................................................. *passim*

**<u>Treatises</u>**

23 Williston on Contracts § 63:22 (4th ed. 2018).........................................................................15

5 Corbin on Contracts § 24.3 .........................................................................................................10

## PRELIMINARY STATEMENT

The Court has established a clear framework for trying this case. At summary judgment and class certification the Court outlined the two key issues to be resolved by the jury at trial. The jury will need to (1) resolve the questions raised by XOOM's implausible claim that the variable rate margins evident from its rate-setting workbooks somehow contain undisclosed and undocumented supply cost calculations; and (2) determine the reasonable fixed margin that should be added to the supply cost figures in those workbooks.

Once these issues are decided, calculating the contract rate becomes a matter of basic math. As the Court observed at class certification, "XOOM does not dispute that the algorithm itself is faulty—any measure of damages in this case would undoubtedly be based on the rate, cost, and margin." Class Order at 14. Nevertheless, with a looming trial and record evidence that it added over $100,000,000 in unauthorized markups to consumers' monthly utility bills, XOOM's 15 motions *in limine* pull out all stops in an effort to upend the Court's roadmap for trial.

For example, XOOM essentially asks that the Court reverse its central rulings at both summary judgment and class certification, including the Court's determination that any margin added to the COGS figures in XOOM's rate-setting workbooks must be "proportional," "reasonable," and set "in good faith." *See* XOOM MIL Nos. 1–3. As a backstop, XOOM asks that these prior rulings simply be disregarded or that Plaintiff be blocked from offering any proof on the central issues the Court has set for trial. *See* XOOM MIL Nos. 3–10, 12. XOOM's strategy includes barring Plaintiff from offering exemplar margins (and the building blocks for those exemplars), banning mention of any limits on XOOM's margins, and precluding the damning evidence showing that XOOM used "pricing strategies" and competitor pricing to set variable rates when the Court has construed XOOM's contract to require a straightforward cost-plus calculation that does not permit subjective rate-setting considerations. *See* XOOM MIL Nos. 3–9. That the

1

Court itself has previously relied on much of this same evidence is not enough to deter XOOM from seeking its preclusion.

The supposed legal basis for XOOM's motions is largely that Plaintiff's key evidence is irrelevant under Rule 401 or insufficiently probative under Rule 403.  But XOOM's 15 motions never even address the standards applicable under those rules, including that XOOM must show why the specific evidence or argument it seeks to exclude does not meet Rule 401's basic test of having "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401; *see also United States v. Ray*, 585 F. Supp. 3d 445, 459 (S.D.N.Y. 2022) ("Rule 401 imposes a 'relatively low bar' of relevance.").  As long as the evidence (or argument) meets that test as to even one issue at trial, it is presumptively admissible.  *See United States v. Mohamed*, No. 18 Cr. 603, 2023 WL 319569, at *1 (E.D.N.Y. Jan. 19, 2023) (Ross, J.) ("[R]elevant evidence is admissible 'unless an exception applies.'" (quoting *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012))).  Like so many of XOOM's other arguments, its Rule 401 claims are too abstract to work.

Similarly, XOOM's Rule 403 complaints do not withstand even the lightest scrutiny. "Under Federal Rule of Evidence 403, the trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  Prejudice under this rule means 'unfair' rather than 'harmful.'" *Iverson v. Surber*, 800 F. App'x 50, 52 (2d Cir. 2020) (cleaned up).  While the evidence XOOM seeks to preclude is unmistakably damning to XOOM, it is not unfair.  As set forth below, each of XOOM's 15 motions is fatally flawed and reflective of an overly disruptive strategy.  The Court should swiftly reject XOOM's efforts to make this case untriable and deny all of its *in limine* motions.

**ARGUMENT**

**I.   THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS RELEVANT TO MULTIPLE TRIAL ISSUES AND IS ENCOMPASSED IN PLAINTIFF'S BREACH OF CONTRACT COUNT**
*(Responding to Defs.' MIL No. 1, Defs.' Br. at 1–5)*

All contracts governed under North Carolina law contain the implied covenant of good faith and fair dealing.  *Weyerhaeuser Co. v. Godwin Bldg. Supply Co., Inc.*, 253 S.E.3d 625, 627–28 (N.C. App. 1979); *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).  Notwithstanding this clear law, XOOM's MIL No. 1 broadly asks that the Court "prohibit Plaintiff from offering evidence or argument that XOOM breached any implied contract term, including the implied covenant of good faith and fair dealing."  ECF 227, Mem. of Law in Supp. of XOOM's Motions *In Limine* ("Defs.' Br.") at 1.[1]

XOOM offers two grounds for its expansive preclusion motion.  Both fail.  First, XOOM claims that evidence of its bad faith is inadmissible because Plaintiff's stand-alone implied covenant cause of action was dismissed as duplicative and not challenged on appeal.  *Id.*  This assumes a separate cause of action is required before a jury can find breach of the implied covenant.  Not so.  Even when a court dismisses a stand-alone implied covenant claim, a plaintiff "may still present evidence, argue to the jury, and present jury instructions on [the] theory of breach of the covenant."  *City Grill Hosp. Grp, Inc. v. Nationwide Mut. Ins. Co.*, No. 12 Civ. 610, 2014 WL 1429552, at *5 (E.D.N.C. Apr. 14, 2014) (stand-alone claim dismissed as duplicative but finding plaintiff "may present evidence regarding the alleged breach of the covenant and argue to the jury that [the defendant] breached the contract by breaching the implied covenant"); *see also* ECF 24,

---

[1] Because New York law is the same, it makes no difference whether North Carolina law or New York law governs the question of whether Plaintiff should be barred from presenting evidence or argument regarding the implied covenant of good faith.  *See, e.g., Nat'l Mkt. Share, Inc.*, 392 F.3d at 525 (New York law implies a duty of good faith and fair dealing into every express contract.).

3

Opinion and Order Granting Motion to Dismiss ("MTD Order") at 15–16 (dismissing stand-alone implied covenant claim as duplicative); *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) ("[P]arties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." (citing *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir. 1992))).

As the Court recognized in its dismissal ruling, "courts interpreting North Carolina law have held that the claims are analyzed together" and "courts in North Carolina generally hold that this claim rises and falls with a claim for breach of contract." MTD Order at 15 (quoting *Rezapour v. Earthlog Equity Grp., Inc.*, No. 12 Civ. 105, 2013 WL 3326026, at *4 (W.D.N.C. July 1, 2013) for the proposition that "[w]here the claim for breach of good faith is 'part and parcel' of a similar claim for breach of an express term of the contract claim, that claim will rise and fall with the other breach of contract claim."). *Rezapour* is clear. When a plaintiff's "allegations" are found to be "duplicative," the plaintiff is "still entitled to assert theories of breach of good faith in support of its claims for breach of contract." *Id.* at 4. The rule applies here.

XOOM also claims Plaintiff is estopped because the Court's dismissal of the stand-alone claim was not challenged on appeal. Defs.' Br. at 1–3. Yet XOOM's own brief quotes Plaintiff's statement to the Second Circuit that "the district court dismissed the implied covenant claim as duplicative of the contract claim" and that ruling was not appealed. *Id.* at 2. XOOM's claim of surprise is thus both implausible and unreasonable.[2]

---

[2] XOOM's sole cited case applies Connecticut law and is therefore inapposite. *See Travel Ctr. of Fairfield Cnty., Inc. v. Royal Cruise Line Ltd.*, 154 F. Supp. 2d 281 (D. Conn. 2001). Moreover, the *Travel Ctr.* defendant was never notified of the implied covenant claim despite the plaintiff "being given four opportunities to refine the allegations in its complaint." *Id.* at 289. The *Travel Ctr.* court also contrasted that case with another case where the "the plaintiff had brought his breach of covenant claim as the second count in a two-count complaint." *Id.* That is what happened here. Not only was XOOM given notice when Plaintiff pled a stand-alone count, the Court made clear to XOOM that the implied covenant claim "rises and falls" with the express breach claim. MTD Order at 15.

Second, XOOM claims it is too late for Plaintiff to amend her complaint and assert a stand-alone implied covenant claim. Defs.' Br. at 3–5. Again, no such claim is required. XOOM's amendment arguments and suggestion that this allows XOOM to "add years of delay to these already protracted proceedings," *see id.* at 4–5, are thus irrelevant.[3]

At trial, the parties will dispute whether XOOM expressly breached the pricing term in its form contract. The Court construed that contract to require that XOOM's rates be "determined solely by" the supply costs documented in XOOM's rate-setting workbooks, plus a fixed reasonable margin. MSJ Order at 12–14; *see also* Class Order at 3, 14 (same). As the Court has already recognized, "the process by which XOOM set rates is [thus] of central importance." MSJ Order at 3. The facts surrounding that process bear equally on the question of whether XOOM set rates in breach of the covenant of good faith and fair dealing or whether its rate-setting process breached the contract's express pricing term. The dismissal of Plaintiff's stand-alone covenant claim as duplicative does not relieve XOOM of its obligation to act in good faith. *City Grill*, 2014 WL 1429552, at *5; *Harris*, 961 F.3d at 80.

Moreover, the Court effectively incorporated the covenant as an express contract term when it construed XOOM's contract to allow only an objectively "reasonable" fixed margin set in "good faith." *See* MSJ Order at 12–14; Class Order at 3, 14. Accordingly, answers to the questions concerning XOOM's margin will be shaped by the implied covenant of good faith and fair dealing.

---

[3] XOOM's suggestion (*id.* at 5) that the Court's certification order did not encompass implied covenant theories is also off base. Again, the claims rise and fall together and are certified as such. *See Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261, 2016 WL 7009062, at *7 (S.D.N.Y. Nov. 30, 2016) (noting the Second Circuit's finding that "[q]uestions of whether a defendant acted in good faith under [a form] contract" are "deemed 'common to all class members'") (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013))); *see also id.* (certifying contract and implied covenant claims "directed to the text of [an ESCO's] uniform Sales Agreement that was distributed to all members of the proposed class" because "[c]ommon issues susceptible to generalized proof substantially predominate over individualized issues, if any").

For example, XOOM has made the odd claim that its fluctuating variable rate margins contain entirely undocumented, but allegedly permissible, supply costs that justify those excessive margins.  MSJ Order at 15–16.  Plaintiff is entitled to argue that XOOM's complete failure to "show its math" related to this unorthodox practice both makes it unreasonable on its face and proves that XOOM breached its duty of good faith and fair dealing under its cost-plus contract.

Likewise, the question of what constitutes a "reasonable" and "good faith" margin over the supply cost figures documented in XOOM's rate-setting workbooks implicates XOOM's obligation to act in good faith.  When XOOM argues for rich margins based on its historical practices, Plaintiff will marshal evidence to show that those margins were unreasonable.  Plaintiff should similarly be allowed to argue that this same evidence is proof that XOOM's margins were not set in good faith.  For example, both XOOM's CEO and the Director of Pricing and Structuring admitted that XOOM would raise New York margins "so we could lower them elsewhere."  MSJ Order at 18.  This was because, as XOOM's Senior Vice President of Energy Supply and Pricing put it, "if we have to squeeze a market, we should squeeze New York power."  ECF 141-12.  Similarly, in 2014, XOOM personnel were told that XOOM's "new mindset" should be to set New York prices with the aim of "protecting margins," and "follow the competitor pricing pack (probably on the higher end)."  PX24 at 1.[4]  As other courts have recognized, even if the jury concludes that XOOM did not breach the contract's express language, the jury could still find that "nevertheless, Defendant violated a 'duty of good faith' that it owed to less-informed consumers in providing something as universally necessary as utility services."  *Melville v. HOP Energy, LLC*, No. 21 Civ. 10406 (KMK), 2023 WL 2648775, at *9 (S.D.N.Y. Mar. 27, 2023).

---

[4] "PX" refers to Plaintiff's exhibits submitted to the Court via flash drive.  "JX" refers to the parties' joint exhibits.

Finally, even if XOOM's motion had merit (it does not), XOOM's request is presented entirely in abstract terms and does not point the Court to any specific exhibit or line of questioning it seeks to preclude, nor does XOOM provide any specificity about which factual arguments it wants excluded.  In not distinguishing between permissible evidence and argument versus allegedly improper evidence and argument, XOOM seeks a ruling in a vacuum.  This will cause needless line-drawing disputes.  XOOM's unfocused motion thus must also be denied for lack of specificity.  In the (unlikely) event XOOM can show a principled basis for precluding some particular argument at trial regarding the duty of good faith and fair dealing, the Court should rule on specific objections on an item-by-item basis rather than address them in the abstract.

In sum, XOOM's unspecific motion should be denied because XOOM's customers are entitled to argue that XOOM did not discharge its contractual obligations in good faith, or at minimum, because of the motion's lack of specificity.

## II. THE COURT SHOULD REJECT XOOM'S ATTEMPT TO USE AN *IN LIMINE* MOTION TO OVERTURN THE COURT'S "PROPORTIONATE-MARGIN" CONTRACT CONSTRUCTION
*(Responding to Defs.' MIL No. 2, Defs.' Br. at 6–7)*

XOOM's second MIL simply seeks to reverse the contract construction the Court performed at summary judgment.  In construing the contract, the Court clearly and unmistakably ruled that XOOM was allowed to charge only a fixed and reasonable margin over the COGS figures documented in its rate-setting workbooks.  MSJ Order at 12–14.  The Court dubbed this the "proportionate-margin construction." *Id.* at 13.  XOOM now looks to undo that ruling by barring Plaintiff from offering evidence or argument concerning what that margin figure should be, brazenly claiming that a single, reasonable margin would be impermissibly "suppl[ying] an unwritten term in the Class Members' contracts that would cap margins at a certain level." Defs.' Br. at 6.  XOOM's motion disregards the fact that the Court expressly rejected this ***exact*** same

defense argument at summary judgment when it outlined and dispatched XOOM's claim "that jurors cannot 'invent absent contract terms' to require a specific margin in an ESCO contract that does not explicitly set a cap." MSJ Order at 13–14.

In a thinly veiled effort to obscure the fact that the Court has already ruled on this issue, XOOM claims to base its arguments on two cases Plaintiff cited in a pre-motion letter. Defs.' Br. at 6. According to XOOM, those two cases supersede the Court's express findings and somehow operate to bar Court and the jury from reading XOOM's contract to require a fixed, reasonable margin. *Id.* XOOM is incorrect.

On the first case (*Recycling Equipment*), XOOM suggests the Court's proportionate-margin construction was wrong because *Recycling Equipment* "deals with the implied covenant" and Plaintiff's implied covenant claim was dismissed. Defs.' Br. at 6. XOOM's argument is not serious. Both this Court and the Second Circuit have made clear (twice in the latter's case) that ESCOs' variable rate-setting is cabined by the duty of good faith and fair dealing—even when (unlike here) the ESCO's contract expressly affords it rate-setting "discretion." *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 416 (2d Cir. 2023) (observing that "[a]s we have held before, energy services companies must exercise their rate-setting discretion in 'good faith'" (citing *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019))); *see also* MSJ Order at 14 (citing *Richards*, 915 F.3d at 99 and observing that "contractual silence does not allow unbounded discretion").

As discussed in Plaintiff's response to XOOM's MIL No. 1, that Plaintiff's stand-alone implied covenant claim was dismissed as duplicative does not change this. *See Rezapour*, 2013 WL 3326026, at *4 ("Since[] Plaintiffs' allegations of breach of the duty of good faith and fair dealing center on alleged breaches of express contract terms, these claims rise and fall with the

underlying claims for breach of contract.  Therefore, Plaintiffs' allegations are duplicative of Plaintiffs' allegations of breach of contract elsewhere in the complaint and will be dismissed as a freestanding claim for relief.  Plaintiffs are still entitled to assert theories of breach of good faith in support of its claims for breach of contract.").

Moreover, at summary judgment, the Court expressly rejected XOOM's claim "that it could charge any markup it wanted . . . ."  MSJ Order at 16.  True, XOOM's pricing term is "silent as to an appropriate margin," but the Court has already held that "where a contract is silent as to the margin," only a reasonable margin—set "in good faith"—is allowed.  *Id.* at 13–14 (citations omitted).  That is the law of the case and XOOM cannot use the pretext of the Court's dismissal of the stand-alone implied covenant claim to assail the Court's proportionate-margin construction.

Next, XOOM turns to the *Naphcare* case and suggests that because the Court found the pricing term "vague" but not "ambiguous," North Carolina law prohibits the Court's proportionate-margin construction.  Defs.' Br. at 6.  Specifically, XOOM claims that to supply a missing term, the factfinder must conclude that the underlying contract is both (1) ambiguous and (2) the term was "inadvertently omitted."  *Id.*  XOOM is incorrect in its reading of both the Court's rulings and the relevant doctrines on missing contract terms.

The Court has already ruled that the jury would decide whether XOOM charged a reasonable fixed margin authorized by the contract.  *See* MSJ Order at 13–14 ("the margin would have to remain proportionate" and be set "in good faith"); Class Order at 13–14 (describing that a "central issue" for the jury is whether XOOM charged a margin "in violation of the contract").  In other words, it is up to the jury to determine the numerical margin that represents a reasonable margin set in good faith.  *See Root v. Allstate Ins.* Co., 158 S.E.2d 829, 837 (N.C. 1968) ("[I]f the

writing itself leaves it doubtful or uncertain as to what the agreement was . . . what was meant is for the jury under proper instructions from the Court.").

Nevertheless, XOOM claims that because the Court ruled the contract was vague but not ambiguous, MSJ Order at 10 (citing 5 Corbin on Contracts § 24.3), there is no way the "missing" term can be supplied, and no party can introduce evidence of what margin XOOM should have charged. Defs.' Br. at 6–7. If that were so, then there would be no basis on which to include any margin in calculating a XOOM variable rate "determined solely by" XOOM's "supply costs" set forth in XOOM's rate-setting workbooks. MSJ Order at 14. Class Members' damages would then be the difference between XOOM's COGS figures and the amount they were billed.

But the dispositive fact is that the Court already analyzed and ***expressly rejected*** the exact claim XOOM recycles here. Specifically, after construing XOOM's contract to require "the monthly variable rates to be determined by XOOM's actual and estimated supply costs—and only those costs," the Court noted that "XOOM objects to this construction on several grounds." MSJ Order at 12. The Court found XOOM's grounds "all unavailing." *Id.* Relevant here, XOOM's fourth ground was that "any interpretation capping the margin would impose an additional term not contained in the contract." *Id.* at 13. The Court even outlined XOOM's legal argument on this point: "Citing *Richards v. Direct Energy Services*, XOOM argues that jurors cannot 'invent absent contract terms' to require a specific margin in an ESCO contract that does not explicitly set a cap." *Id.* at 13–14.

The Court then made two express findings that defeat XOOM's arguments on this motion. First, the Court found that "[t]he contention that *Richards* forecloses any limitation on a margin where a contract is silent as to the margin requires an overreading of inapposite dicta contained in a footnote." *Id.* at 14. Second, the Court made clear that "*Richards* in fact confirms that

10

contractual silence does not allow unbounded discretion, because discretion granted by a contract must be 'exercise[d] . . . in good faith." *Id.* (quoting *Richards*, 915 F.3d at 99).

Looking to sidestep these findings, XOOM paints an inaccurate picture of the case law on missing contract terms and claims that neither the Court nor the jury can determine what the margin should have been.  Defs.' Br. at 6–7.  Specifically, XOOM wrongly contends that a missing contract term can only be supplied after a finding that (1) the contract is ambiguous, and (2) the missing term was inadvertently omitted.  Defs.' Br. at 6.  XOOM is wrong on both counts.

First, ambiguity is not required to invoke the doctrine of implication of unexpressed terms. The foundational North Carolina case is *Lane v. Scarborough*, 200 S.E.2d 622 (N.C. 1973).  *Lane* states that "if it can be plainly seen from all the provisions of the instrument taken together that the obligation in question was within the contemplation of the parties when making their contract or is necessary to carry their intention into effect, the law will imply the obligation and enforce it." *Id.* at 625.  Notably, the *Lane* court did not first make a finding of ambiguity.

XOOM cites *Shelton v. Duke Univ. Health Sys.*, 633 S.E.2d 113 (N.C. Ct. App. 2006) for the proposition that the doctrine does not apply to unambiguous contracts.  XOOM misreads that case as well.  True, the *Shelton* court found "the contested language is free from ambiguity," but it then ***applied*** the doctrine of unexpressed terms to hold that a missing term was "necessarily implied in the contract signed by plaintiff." *Id.* at 124–25.  Similarly, in *Ridout v. KEP Morrisville Realty LLC*, No. 08 Civ. 453, 2010 WL 4828140, at *6–7 (E.D.N.C. Nov. 19, 2010), *aff'd*, 461 F. App'x 255, the district court applied the doctrine, and the Fourth Circuit affirmed—even though there was no allegation of ambiguity or mistake.[5]  XOOM is thus incorrect to claim that the Court's

---

[5] The court in *Ridout* ultimately declined to imply a missing term, but only because the term sought to be implied was inconsistent with party intent.  *See id.* at *6–7 ("Nonetheless, the court is unable to see that these provisions, taken together with the purpose and subject matter of the Contract, impose an implicit

*(Footnote continued on next page)*

"proportionate-margin construction" is undone by its "vagueness" finding (as opposed to an ambiguity finding). MSJ Order at 13.

Second, XOOM is wrong that inadvertence must be found before supplying the missing reasonable, fixed margin term. *Lane* does not describe inadvertence as a prerequisite. Rather, *Lane* merely notes that the "***policy*** of the law is to supply in contracts what is presumed to have been inadvertently omitted or to have been deemed perfectly obvious by the parties . . . ." 200 S.E.2d at 625 (emphasis added). That the doctrine's policy motivation is to correct "presumed" inadvertent omissions does not mean that a court must find inadvertence before applying the doctrine. Indeed, that a necessary term was omitted from a performed contract is itself evidence of inadvertence. Neither XOOM nor Class Counsel have been able to cite any case where a court applying North Carolina law required a finding of inadvertence before applying the doctrine.[6]

There are also other doctrines that can be used to supply missing terms. For example, "[t]he duty of good faith provides the missing terms of the agreement that necessarily flow from the parties' intentions, thus allowing enforcement of the contract." *Recycling Equip., Inc. v. E Recycling Sys., LLC*, No. 14 Civ. 56, 2014 WL 6977766, at *5 (W.D.N.C. Dec. 9, 2014); *see also Rezapour*, 2013 WL 3326026, at *4 ("This understanding conforms to the central purpose of the implied duty of good faith, which is to allow enforcement of a vague or incomplete agreement that the ratifying parties intended to be binding, but that lacks certain terms essential to proper contract formation. In these cases, the duty of good faith provides the missing terms of the agreement that

---

obligation on [plaintiff] . . . ."). Again, the *Ridout* contract's lack of ambiguity did not bar the doctrine of implication of unexpressed terms. *See id.* at *7 ("Here, Defendant KEP does not argue that the Contract is ambiguous nor does it make any allegations of fraud or mistake.").

[6] XOOM appears to claim that its omission of any reference to margin in the contact it drafted ***was not*** inadvertent. Defs.' Br. at 6. If this is true, then XOOM *intentionally* omitted a provision entitling it to charge a margin and under XOOM's own logic it should not be allowed any margin over its rate-setting workbooks' COGS figures.

necessarily flow from the parties' intentions, thus allowing enforcement of the contract." (citations omitted)); *BioSignia, Inc. v. Life Line Screening of Am., Ltd.*, No. 12 Civ. 1129, 2014 WL 2968139, at \*4 (M.D.N.C. July 1, 2014) (same) (citing *Ultra Innovations, Inc. v. Food Lion, Inc.*, 502 S.E.2d 685, 687 (N.C. Ct. App. 1998)).   None of these cases mentions XOOM's supposed threshold (1) ambiguity or (2) inadvertence findings.   In fact, these cases specifically note the doctrine applies to "*vague* or incomplete agreement[s] that the ratifying parties intended to be binding." *Rezapour*, 2013 WL 3326026, at \*4 (emphasis added).   There is thus ample authority supporting the Court's summary judgment holding that the duty of good faith limits XOOM's margin.   MSJ Order at 14.

The Court set a cap on XOOM's variable rate margin—it must be proportionate, reasonable, and set in good faith—and left the jury to do the work of applying that standard to the evidence.   *Id.* at 12–14; *see also* Class Order at 3, 14 (same).   XOOM cannot use two cases Plaintiff cited in a pre-motion letter to undo the Court's ruling at summary judgment, especially since those cases undermine XOOM's claims.   XOOM's motion should be denied *in toto*.[7]

## III. THE COURT HAS ALREADY RULED THAT DETERMINING A REASONABLE VARIABLE RATE MARGIN IS AN ISSUE FOR TRIAL
*(Responding to Defs.' MIL No. 3, Defs.' Br. at 8–9)*

Under the Court's proportionate-margin construction, any margin XOOM may claim over the COGS figures in its rate-setting workbooks must be "reasonable."   MSJ Order at 12–13; *see also* Class Order at 3, 14 (reiterating that any margin must be "reasonable.").   A question at the

---

[7] XOOM also claims that "*the Court*" must determine XOOM's reasonable variable rate margin.   Def's Br. at 6 (emphasis in original).   XOOM is incorrect, as the Court has already assigned that determination to the jury.   MSJ Order at 13–14; Class Order at 13–14.   The issue is purely factual and arises in a case seeking only monetary damages rather than equitable relief.   Under Rule 39(a)(1), submitting this question to the Court requires a stipulation.   *Tray-Wrap, Inc. v. Six L's Packing Co.*, 984 F.2d 65, 68 (2d Cir. 1993).   Unless and until a stipulation is executed, the question of a reasonable margin is for the jury.

center of this case is thus "whether XOOM added a permissible markup above its cost calculation." MSJ Order at 17.

XOOM does not dispute this, but nonetheless asks the Court to "prohibit Plaintiff from offering evidence or argument that XOOM's variable rates or variable-rate margins were unreasonable." Defs.' Br. at 8. XOOM offers two familiar grounds in support, but repackaging the same argument in slightly different terms does nothing to improve its substance.

First, XOOM repeats that any inquiry into its margins' reasonableness is not allowed because the Court dismissed Plaintiff's stand-alone good faith and fair dealing count. *Id.* Second, XOOM claims the variable rates or margins charged by other ESCOs are "the only metric by which commercial reasonableness may be judged," which means Plaintiff's other evidence of reasonable margins should be excluded. XOOM says it wins by default because Plaintiff does not rely on other ESCOs' margins. *Id.* at 8–9.

Neither of XOOM's arguments hold water. XOOM's first argument—that absent a stand-alone implied covenant claim XOOM can charge whatever margin it wants—runs headlong into the Court's summary judgment ruling, which expressly rejected XOOM's claim "that it could charge any markup it wanted . . . ." MSJ Order at 16. That is the law of the case. Indeed, and as already noted above, in *Richards* and *Martinez* the Second Circuit has twice made clear that even in scenarios where an ESCO enjoys rate-setting discretion (unlike XOOM here), that discretion must be exercised in good faith.

XOOM's second argument—that only other ESCOs' margins can serve as benchmarks for reasonable margins—ignores the fact that unlike certain other ESCOs' contracts, XOOM's customer contract does not allow rate-setting discretion. XOOM's "reasonable" margin must be determined by reference to objective criteria, not XOOM's or any other ESCO's discretionary

pricing decisions.  Looking to the margins of ESCOs with rate-setting discretion is the antithesis of a suitable benchmark and is just another attempt to reverse the Court's proportionate-margin construction.

For example, in *Richards* the ESCO's customer contract "unambiguously did not require rates to be tied to procurement costs" and instead expressly allowed the ESCO to set rates at its "discretion" based upon "business and market conditions."  MSJ Order at 14.  Nevertheless, XOOM cites the fact that the *Richards* ESCO generally charged a 75% markup over its procurement costs.  Defs.' Br. at 8.  XOOM claims that when the Second Circuit looked to other ESCO rates in that case it somehow implicitly made a rule that other ESCO margins are the only benchmarks for a reasonable margin under ***this*** contract.   Defs.' Br. at 8.  Not so.

In *Richards*, the Second Circuit did not confront the question of what proportionate margin was reasonable for the *Richards* ESCO, much less any other ESCO.  By contrast, in *Richards*, the question was whether "even though" the ESCO's pricing term "gave [it] discretion in setting the variable rate" based upon "business and market conditions," was the ESCO's variable rate nonetheless "too high," as the *Richards* plaintiff had claimed.  915 F.3d at 99.  To answer that question, the Second Circuit looked in part to other ESCO rates because those rates were reflective of the type of "business ***considerations***" (such as "reaching a target profit margin") that the *Richards* ESCO was contractually allowed to consider when setting variable rates in its "discretion."  *Id.* (emphasis added).  As the Second Circuit noted, the *Richards* plaintiff "received exactly what he bargained for" and "there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract."  *Id.* (quoting 23 Williston on Contracts § 63:22 (4th ed. 2018)); *id.* at n.5 ("While there might be some pricing considerations

that would fall outside the 'business and market conditions' that [the ESCO] was explicitly authorized to consider," plaintiff's proffered reading that tied rates to costs was too restrictive).

Indeed, a fair reading of *Richards* highlights that because XOOM's contract does not permit rate-setting discretion, using the margins of ESCOs like the one in *Richards* that have contractually permitted "discretion" would improperly import other ESCOs' price-setting discretion into a contract where none is permitted.

Further, and as noted in Plaintiff's MIL No. 15, wading through "other ESCOs' margins (governed by different contracts) will mire this case in mini-trials focused on what other ESCOs were permitted to charge under ***their*** contracts."  ECF 233 at 70 (emphasis in original).  In fact, in *Richards* the Second Circuit made clear that if customers wanted more restrictive pricing terms, they could have signed up with the ESCOs that offer such terms.  915 F.3d at 99, n.7.  That is exactly what happened here.

As the Second Circuit observed in *Martinez*, this case presents the opposite scenario from *Richards*.  *Martinez*, 88 F.4th at 411; *see also Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 178 (2d Cir. 2019) (the "relevant contractual provisions" in *Richards* and this case "are critically different").  XOOM's contract does not allow any price-setting discretion whatsoever.  *Id.*  Courts have even contrasted the contracts at issue here and in *Richards* as "goalposts" which other contracts may fall nearer to or farther from based upon their language.  *Melville v. HOP Energy, LLC*, No. 21 Civ. 10406, 2023 WL 2648775, at *6 (S.D.N.Y. Mar. 27, 2023).  XOOM should not be permitted to sidestep its contract by looking to the margins allowed under other contracts.[8]

---

[8] XOOM's invocation of the UCC does not change this, as the cited provision only applies "when the price term is left open."  U.C.C. § 2-305 cmt. 1.  That is not the case here.

This Court and the Second Circuit have already made clear that nothing about XOOM's rate calculations can be subjective—they must be grounded in objectively demonstrable calculations. This is why Plaintiff offers three separate benchmarks for the jury to use in determining what that reasonable margin should be: (A) 7.33%, based on the average difference between XOOM's documented supply costs and the corresponding utility default rate; (B) 5%, based on the margin restrictions New York regulators have placed on ESCOs' fixed rate products; and (C) 21.2%, derived from the average margin XOOM charged its fixed rate customers. ECF 234-5, Amended Expert Report of Seabron Adamson, dated May 10, 2024 ("Am. Expert Report") at 10. These benchmark margins are consistent with the Court's contract construction at summary judgment, and they are reasonable—with the first being the most reasonable because it aligns most closely with the Court's contract construction. *Id.* at 28–34. These margins should also be presented to the jury. XOOM's efforts to avoid the Court's contract construction by relying on other ESCOs' margins should thus be rejected.[9]

## IV.  XOOM'S MARGINS FOR ITS RISKIER FIXED RATE PRODUCTS ARE RELEVANT TO DETERMINING A REASONABLE VARIABLE RATE MARGIN
*(Responding to Defs.' MIL No. 4, Defs.' Br. at 10–12)*

The Court's "proportionate-margin" construction at summary judgment requires that XOOM's variable rates be calculated by applying a fixed, reasonable margin to the supply cost tabulations in its rate-setting workbooks. MSJ Order at 12–14. In the Court's class certification ruling issued just two weeks later, the Court evaluated Plaintiff's proposal to use XOOM's contemporaneous fixed rate margins as a proxy for a reasonable variable rate margin. Class Order at 9, 14. After noting that this "model assumes that XOOM was allowed to charge its variable rate

---

[9] It is also worth noting that in MIL No. 7 XOOM reverses course entirely and asks that Plaintiff "be precluded" from "offering any evidence or argument relating" to "margins achieved by other ESCOs." Defs.' Br. at 20.

customers the same margin it charged its fixed-rate customers, an approximately 19% markup," *id.* at 9, the Court found the model "entirely consistent with plaintiff's theory" of breach, *id.* at 14.

Following the Court's contract construction at summary judgment, Plaintiff's expert amended his report to conform it to the Court's rulings about the legal operation of XOOM's contract and to incorporate XOOM's production of roughly three years of additional Class charging data. ECF 234-5, Am. Expert Report at 2. Relevant to the instant motion, for Plaintiff's model based on XOOM's fixed rate margins, Plaintiff's expert adjusted the input he used as a marker for calculating a "reasonable" XOOM variable rate margin. *Id.* at 37. Specifically, in the pre-summary judgment version of this model, Plaintiff's expert compared each month's fluctuating variable rate margin to that same month's corresponding fluctuating fixed rate margin. *Id.* In the amended report, instead of using the corresponding XOOM fixed rate margin for each month, Plaintiff's expert used a "proportionate" margin that was equal to XOOM's average fixed rate margin of 21.2% (calculated from XOOM's updated data production). *Id.* at 10, 37. Like the original model, the updated model was presented as the upper limit for a reasonable (and now proportionate) XOOM margin. *Id.* at 37–41.

As the expert explained, this change was "needed to align this method with the Court's ruling at summary judgment that the [contract's] pricing term permits only a single proportionate margin." *Id.* at 37–38. Notably, a comparable measurement of XOOM's variable rate margins shows an average margin of 68.0%, even though fixed rate products were financially riskier for XOOM and still profitable. *Id.* at 24–26; *see also* McInturff Declaration Ex. A, Deposition Transcript of Andrew Coppola, dated May 11, 2022 ("Coppola Tr.") at 200:24–201:8 (XOOM's former Senior Vice President of Energy Supply and Pricing testifying that "margins for all of our

products" provide a "satisfactory return for XOOM over that period of time").[10]  In Plaintiff's expert's opinion, "[f]rom a commercial and economic perspective, it would be unreasonable for XOOM to charge a higher margin on lower-risk variable rate products," with XOOM's average fixed rate margin "provid[ing] a ceiling in terms of a maximum commercially reasonable margin." *Id.* at 39–40; *see also* ECF 226-4, Deposition of Seabron Adamson, dated November 8, 2022 ("Adamson Tr.") 98:13–23 (testifying that it would be unreasonable for XOOM to charge a higher margin for variable rates than for fixed rates).  XOOM's fixed rate margins are thus clearly relevant to the critical trial question of establishing a reasonable and fixed XOOM margin.

Despite this, XOOM asks that the Court "prohibit Plaintiff from offering evidence or argument of XOOM's fixed rates or fixed-rate margins."  Defs.' Br. at 10.  XOOM offers five flawed arguments to support its meritless request.

***First***, even though Plaintiff's expert uses XOOM's average fixed rate margin as a benchmark for the highest possible reasonable margin, and even though the Court already found at class certification that using XOOM's average fixed rate margin was "entirely consistent with plaintiff's theory" of breach (Class Order at 14), XOOM claims its fixed rate margins are "simply irrelevant" because "Plaintiff was never a fixed-rate customer."  Defs.' Br. at 10.  That is beside the point.  "[W]hether XOOM added a permissible markup above its cost calculation" is one of the key questions in this case.  MSJ Order at 17.  The markup XOOM added to its fixed rate cost calculation is clearly relevant to the question of a reasonable markup above XOOM's cost calculation on its lower risk variable rate product.  As XOOM's CEO testified, "you don't assume the same risk in a variable [rate contract] because you get the chance to reprice every month."

---

[10] Accompanying this memorandum is the Declaration of J. Burkett McInturff dated June 10, 2024. References in this memorandum to "Ex." refer to the McInturff Declaration exhibits.

ECF 141-21, Deposition of former CEO Thomas Ulry at 86:4–87:7; PX9 at 3 (XOOM internal document explaining that "fixed products" are "riskier / less valuable").  Indeed, XOOM's own margin figures show that over an eleven-year period it only experienced negative margins on its fixed rate products.  Am. Expert Report at 40 (Table 2).

**Second**, XOOM recycles its failed argument that *Richards* prohibits the Court's proportionate margin construction because that construction would impose a "specific limitation" on XOOM's variable rate margin.  Defs.' Br. at 10 (citing Defs.' MIL Nos. 1, 2).  As discussed above, the Court has already expressly rejected this reading of *Richards*.  *See* pp. 14–16 supra. Indeed, even the *Richards* snippet XOOM uses for its "specific limitation" claim shows that XOOM is stretching *Richards* past the breaking point: "While there might be some pricing considerations that would fall outside the 'business and market conditions' that [the ESCO] was explicitly authorized to consider, nothing in that phrase suggests the specific limitation that Richards now argues for."  915 F.3d at 99, n.6.

**Third**, XOOM wrongly suggests its fixed rate margins are irrelevant because they fluctuated over time.  Defs.' Br. at 10–11.  XOOM's own data shows that month after month and year after year it levied variable rate margins that were on average **three times** those of its riskier fixed rate products.  *See* Am. Expert Report at 25–26 (average fixed rate margin of 21.2% compared to 68% average variable rate margin); *see also id.* at 40 (Table 2 comparing XOOM's fixed and variable rate margins on an annualized basis).  Again, it is not reasonable for XOOM to recoup higher margins on less risky products that were sold as being priced "based on" XOOM's supply costs.  *Id.* at 14, 37–40.

That XOOM's fixed rate margins fluctuated is irrelevant.  As noted by Plaintiff's expert, those fluctuating margins were the result of XOOM's subjective decision-making and thus

reflected *fewer* constraints than XOOM's contract imposed its variable rate price setting. *Id.* at 39. It is simply unreasonable to charge a higher markup on a product governed by *stricter* pricing constraints, especially when those constraints arise in a form contract that must be construed against the drafter. MSJ Order at 12.

Once XOOM's subjective fixed rate margin decisions are translated (by way of averaging) to conform to the Court's proportionate-margin construction, it is plainly relevant for Plaintiff's expert to opine (as he had done prior to the Court's rulings at summary judgment and class certification) that XOOM "imposed an unreasonably high margin on its variable rate customers as compared to its fixed rate customers." *Id.* at 38 (quoting Original Report at 24, cleaned up).

**Fourth**, XOOM introduces a non sequitur when it claims it would be improper for the Court to require XOOM to "consider its fixed-rate margins when it was setting its variable rates." Defs.' Br. at 11. XOOM was not contractually permitted to "consider" anything, as XOOM's contract affords it no rate-setting discretion when calculating variable rates. MSJ Order at 10, 14; *Martinez*, 88 F.4th at 411. Moreover, neither Plaintiff nor the Court has ever suggested that XOOM had to set variable rates "based on" its fixed rate margins. Defs.' Br. at 11. Again, Plaintiff's expert used XOOM's average fixed rate margin simply as an upper limit on any margin's reasonableness.

**Fifth**, and similarly off base, is XOOM's claim that the Court should preclude Plaintiff's evidence of fixed rate margins because those margins were not governed by the same pricing term. Defs.' Br. at 11. This is simply a repackaged version of XOOM's first argument that its fixed rate margins are not relevant because Plaintiff was not a fixed rate customer. XOOM's fifth argument thus fails for the same reasons.

XOOM's average fixed rate margin will properly inform the jury's consideration about what constitutes a reasonable "proportionate margin" on its less risky variable rate product that must be priced under more constraints than its fixed rate product.

## V. EVIDENCE OF A REASONABLE MARGIN IS ADMISSIBLE UNDER THE COURT'S PROPORTIONATE-MARGIN CONTRACT CONSTRUCTION
*(Responding to Defs.' MIL No. 5, Defs.' Br. at 13–16)*

The Court has established a clear framework for trying this case.  At summary judgment and class certification the Court outlined the two key issues to be resolved by the jury at trial.  The second issue requires that the factfinder determine the reasonable fixed margin that XOOM was allowed to add to the COGS figures documented in its rate-setting workbooks.  MSJ Order at 12–13; Class Order at 3, 14.

Ever since the Court established the framework for trial, XOOM has looked to upend it.  XOOM's MIL No. 5 is another facet of this strategy.  XOOM claims "[t]he Court should prohibit Plaintiff from offering evidence or argument of any proposed 'exemplar margin.'"  Defs.' Br. at 13.  In other words, XOOM wants to bar Plaintiff from offering any evidence or argument regarding one of the two main issues to be decided at trial.   XOOM's request is a backstop for XOOM's MIL Nos. 2 to 4—which collectively seek reversal of the Court's "proportionate-margin construction" and relief from the contractual requirement that variable rates be calculated by applying a fixed reasonable margin to XOOM's documented COGS.  Determining a reasonable margin is one of the two jobs for the jury at trial and XOOM's efforts to obstruct this work should be rejected.

Specifically, XOOM's motion asks in broad strokes that Plaintiff be barred from offering evidence or argument of a reasonable margin. *Id.* at 13–14.  XOOM also asks that Plaintiff not be

allowed to offer the average margin XOOM charged on its riskier fixed rate products.  *Id.* at 14–

16.  XOOM provides three reasons to support these two requests.  All three are easily rebutted.

> **A.  The Jury Should Be Allowed to Consider All Three of Plaintiff's Reasonable Margin Benchmarks and XOOM's Complaints About the Court's Decision to Allow an Amended Expert Report Are Meritless**

>> 1.  Plaintiff's Three Exemplar Margins Are Supported by Sound Principles and Follow the Court's Contract Construction

XOOM first claims that Plaintiff does not offer "any commercial standard or other principle

that would cap XOOM's variable rate margins at any such exemplar."  Defs.' Br. at 13.  XOOM's

claim is demonstrably false.  Plaintiff offers three benchmarks for a reasonable margin.

As the Court noted at class certification, one of Plaintiff's damages models "assumes that

XOOM was allowed to charge its variable rate customers the same margin it charged its fixed-rate

customers, an approximately 19% markup."  Class Order at 9.  Plaintiff's original expert report

made clear that "the margin on variable rate contracts should not be higher than the margin on the

corresponding fixed rates contracts on average."  ECF 138-3 ("Original Expert Rep.") at 25; *id.*

¶ 23 (XOOM "substantially overcharged its customers by imposing an unreasonably high margin

on its variable rate customers as compared to its fixed rate customers.").  As Plaintiff's expert

Seabron Adamson made clear at his deposition, when asked "are you going to offer an opinion

that it is not fair for XOOM to seek a higher margin on variable rates conceptually than it does

on fixed rates," Mr. Adamson responded "[i]n this context, yes."  ECF 226-4, Adamson Tr. 98:13–

23.

After the Court granted Plaintiff leave to amend her expert report, *see* April 15, 2024

Electronic Order, Mr. Adamson's amended report reiterated that "[f]rom a commercial and

economic perspective, it would be unreasonable for XOOM to charge a higher margin on lower-

risk variable rate products," and that XOOM's average fixed rate margin "provides a ceiling in

terms of a maximum commercially reasonable margin." Am. Expert Report at 39–40; *see also id.* at 41 ("I view the average 21.2% fixed rate margin as the absolute maximum of what could be considered an economically reasonable margin for variable-rate customers, given the higher risks associated with fixed-rate customers as the prices cannot be changed for these customers as market conditions change.").

As discussed in Plaintiff's response to XOOM's MIL No. 4 above, Plaintiff's expert also conformed his calculations to the Court's summary judgment contract construction and calculated that XOOM's average fixed rate margin, after incorporating the additional three years of charging data XOOM recently produced, was 21.2%. *Id.* at 38–39. This calculation is labeled "Method C" in Mr. Adamson's amended report. *Id.* at 37.

Yet that is not all. At trial, Plaintiff intends to propose two additional reasonable margins, both of which were born out of events that transpired after Plaintiff's original expert report was submitted. *See* ECF 187 (Plaintiff's application to amend and supplement her expert report outlining the three "events that transpired *after* expert discovery closed" prompting the amendment request (emphasis in original)). Specifically, after both this Court's "proportionate-margin construction" and the Second Circuit pronouncement making clear that XOOM's pricing term did not provide discretion to use any subjective processes or factors to set monthly variable rates (*id.* at 1), Plaintiff's expert looked for "objective criteria an[d] analysis of ESCO pricing in New York" to inform his "opinion about the reasonableness of any proposed margin that may be applied in this case" along with the "courts' guidance about the contractual constraints" governing XOOM's rate setting. *Id.* at 18; *see also id.* at 28 (outlining price setting constraints imposed by the courts' reading of XOOM's contract). The search for objective criteria and analysis led Plaintiff's expert

24

to the New York Public Service Commission's ("NYPSC") independent pronouncements about the reasonableness of both variable and fixed rates charged by New York ESCOs. *Id.* at 28.

With respect to variable rates, the NYPSC (an independent third party with expertise in ESCOs operations) found that "there is no demonstrated customer benefit to allowing ESCOs" to charge higher variable rates than the utility. *Id.* at 30 (citing ECF 138-10, Cases 15-M-0127, et al., *Ord. Adopting Changes to the Retail Access Energy Market and Establishing Further Process*, (Dec. 12, 2019) ("2019 Reset Order") at 37). This is because "energy services are essential to customers' health and wellbeing," and thus any "additional cost to customers must not outweigh the purported benefits to them." *Id.*

As a result of these findings, the NYPSC restructured the rules governing ESCO variable rate pricing and mandated that ESCOs guarantee that their variable rates be lower than the utility's variable rates. *Id.* When Plaintiff's expert compared the COGS figures in XOOM's rate-setting workbooks to the contemporaneous utility rates, he found that, "on average, XOOM's documented supply costs were 7.33% lower than the corresponding utility rate." *Id.* at 31. Again, XOOM's supply <u>costs</u> were ***lower*** than the utilities' ultimate <u>rates</u>. *Id.*[11]

The 7.33% "margin" derived from the delta between those two figures thus "reflects the NYPSC's independent determination regarding a reasonable (e.g., non-exploitative) rate for the same product sold by XOOM in the same New York market." Am. Expert Report at 30. The 7.33% figure is also "objectively derived" and does not reflect any subjective XOOM price-setting discretion. *Id.* As Plaintiff's expert noted, "[i]n limiting ESCOs' variable rate offerings to only

---

[11] The utility buys supply "in the same wholesale market as XOOM and faces the same categories of wholesale costs in supplying customers." *Id.* Moreover, as XOOM concedes, "utilities' overhead costs are baked into their rates." Defs' Br. at 35. In other words, utility rates reflect the utilities' supply costs and an adder to cover the utilities' overhead costs.

those that guaranteed savings compared to the utility, the NYPSC required that ESCO variable rate margins be determined objectively based on the ESCO's ability to achieve efficiencies over the corresponding utility rate." *Id.* "The utility rate margin constraint implemented by NYPSC" is also "an appropriate analogue" to the Court's finding that XOOM's variable rates must be "determined solely by" XOOM's "supply costs" (MSJ Order at 14). *Id.* at 31. This is because the NYPSC's constraint is "linked to ESCO supply costs since utilities and ESCOs buy energy in the same wholesale markets to supply their customers." *Id.* The 7.33% adder is thus "'based on' XOOM's supply costs insofar as the ultimate rate is determined by reference to documented supply costs as compared to the utility's cost-based rate." *Id.*

The 7.33% figure also accords with the Court's determination that vague pricing terms like XOOM's silent margin term here should be construed against the party that "'had the best opportunity to protect its interests.'" *Id.* (quoting MSJ Order at 12). "Considering the NYPSC's independent finding that it is not reasonable for ESCO customers to pay higher variable commodity rates than those charged by the utility, [a] 7.33% margin protects customers' interests (prevents them from paying unreasonable rates) while also allowing XOOM a proportionate margin above its documented supply costs." *Id.*

Using the average difference between XOOM's documented COGS and utility rate to derive a reasonable margin is also consistent with practice in XOOM's New York market. For example, as noted in the expert's original report, the NYPSC has extensively used the applicable utility rate as a basis for comparison for ESCO variable rates. ECF 217-1, Original Expert Rep. at 23. XOOM itself also uses the utility rate when it refunds customers for overcharges either claimed directly by the customers or the NYPSC. *Id.* XOOM's former Compliance Officer Patricia Kulesa testified that when XOOM refunds customers in instances when the NYPSC found problems

during the customer enrollment process or when XOOM internally found wrongdoing or "something broke" on XOOM's end, XOOM would re-rate the customer using the relevant utility rate.  Ex. B, Deposition Transcript of Patricia Kulesa, dated June 29, 2022, 90:10–24, 100:4–11, 137:25–138:12, 179:17–180:4.

For these and other reasons outlined in the expert's amended report, Plaintiff's expert will offer the 7.33% margin derived from the utility rate as "the preferred" reasonable margin to be applied to the COGS figures in XOOM's rate-setting workbooks.  Am. Expert Report at 28.  This proposed margin is referred to in the expert's amended report as "Method A."  *Id.*

As a second alternative, Plaintiff will offer as "Method B" the 5% margin cap the NYPSC mandated for all fixed rate ESCO products.  *Id.* at 34–37.  Specifically, the NYPSC found a 5% premium to be "just and reasonable" for a product that is riskier for ESCOs than the variable rate products at issue here.  *Id.* at 35–36.  "In reaching its conclusion regarding the 5% figure, the NYPSC invoked its 'statutory mandate to ensure that all customers receive safe and reliable gas and electric service at just and reasonable rates,' and weighed 'the costs versus the benefits of fixed-rate products offered by ESCOs.'"  *Id.* at 35–36 (quoting 2019 Reset Order at 66).

Moreover, the NYPSC found that ESCOs could sustain this margin and still offer those riskier fixed rate products.  *Id.* at 36.  Accordingly, it would be perfectly reasonable for the jury to find that a 5% markup—a figure determined by an independent third party with expertise in XOOM's market—represented a reasonable markup above XOOM's documented COGS figures.

Considering Plaintiff's expert's proposed Methods A, B, and C, XOOM is wrong to claim in its motion that "Plaintiff and her experts all specifically declined to opine that it would be unreasonable for XOOM's margins to exceed a specific percentage at all."  XOOM highlights

selective misquotes of deposition transcripts from Plaintiff and her experts, but the truth is not hard to see.[12]  XOOM's cases are similarly not on point.[13]

 2. XOOM Disregards the Fact That the Court Expressly Authorized an Amended Expert Report and XOOM Has Waived Any Right to Reopen Discovery

XOOM is wrong when it claims that Plaintiff's amended expert report was "untimely" and that "XOOM was not allowed to take discovery on the new exemplars." Defs.' Br. at 13, n.10. Again, the amended report was expressly requested in ECF 187 and expressly authorized in the Court's April 15, 2024 Electronic Order.  In fact, the Court approved an amended and supplemented report *after* Plaintiff was forced to make an application to do so, despite offering

---

[12] For example, XOOM wrongly claims that Mr. Adamson refused to opine as to a reasonable variable rate margin, but XOOM's cited testimony concerns an entirely different topic.  In the cited testimony, XOOM's lawyer—who had just admitted he and Mr. Adamson were "talking past each other"—jumbled the concepts of "an appropriate margin for *an* ESCO" (irrespective of the governing contract) and XOOM's *profitability*. *Id.* at 71:7–72:17 (emphasis added).  In discussing these topics, Mr. Adamson did not decline to offer an opinion about a reasonable variable rate margin under *this* contract.  XOOM's lawyer even admitted during this irrelevant colloquy that he was not asking about XOOM's contract.  *Id.* at 72:14–16.  Mr. Adamson's testimony, contrary to what XOOM excised in Defs.' Br. at 13, was that he would not be able to give a "cutoff point" for margin that was *profitable* for XOOM because he did not have access to XOOM's internal profitability metrics.  *Id.* at 72:5–7.  XOOM likewise twists two snippets of Dr. Eryilmaz's testimony beyond recognition.  The cited testimony simply states that XOOM's supply costs, once converted into a rate, should be "very close to" the variable rates it charged New York consumers, and leaves the "specific percentage" to the jury.  ECF 226-5 at 38:18–42:12.  Moreover, Dr. Eryilmaz's role in the original report was to "conduct the quantitative analysis" and not to "analyze the . . . contract."  Ex. C, Deposition Transcript of Derya Eryilmaz, Ph.D., dated November 15, 2022 at 12:4–16.  With respect to Ms. Mirkin, it is no surprise that a lay witness (not an energy economist) would have no opinion when asked by XOOM's lawyers to opine on "a reasonable *profit* margin for XOOM to charge."  ECF 226-3 at 79:4–7 (emphasis added).

[13] In *Peaseley v. Virginia Iron, Coal & Coke Co.*, 194 S.E.2d 133, 147 (N.C. 1973), the plaintiff relied on a witness who "g[a]ve a mere guess or opinion, unsupported by facts, as to the amount of damages."  That is clearly not the case here.  In *Martinez*, 88 F.4th at 414 the expert's opinion about a reasonable margin was "legally insufficient" because the contract's "express terms" gave the ESCO "discretion" to set rates by considering its "costs, expenses, and margins," including the cost of an additional home warranty product provided with its energy plans.  The Second Circuit further made clear in *Martinez* that whether an ESCO's contract specifically allows for rate-setting discretion is a "dispositive question" and that XOOM's contract here does not provide for any discretion whatsoever.  *Id.* at 411.  Like *Martinez*, *Richards* allowed the ESCO to set rates using its "discretion."  As this Court has already recognized, the Second Circuit found that a contract that expressly gave the ESCO "'discretion' to set a variable energy rate 'based upon business and market conditions' unambiguously did not require rates to be tied to procurement costs."  MSJ Order at 14 (quoting *Richards*, 915 F. 3d at 97–98).

XOOM the opportunity to depose Mr. Adamson a second time after Plaintiff served his amended report.  ECF 187.  In that application, Plaintiff explained that the amendment was needed to conform Plaintiff's expert's opinion to the Court's summary judgment construction of XOOM's contract, the Second Circuit's intervening findings in *Martinez*, and XOOM's production of substantial new data.  *Id.* at 1.

XOOM's response to the application was to claim that the requested amendment would be a "blank-check overhaul of Plaintiff's expert opinions [that] would severely prejudice XOOM and cause significant delay."  *Id.* at 3–5.  XOOM rejected Plaintiff's invitation to depose Plaintiff's expert a second time.  *Id.* at 3–4.  On this record, XOOM's untimeliness objection is frivolous.  Further, that XOOM chose to abandon further discovery and instead try its chances at barring a revised report is on XOOM, not Plaintiff.

Accordingly, XOOM's "intentional relinquishment and abandonment of a known right or privilege"—here, forgoing the opportunity to take discovery on the amended report—constitutes waiver.  *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 510 (2d Cir. 2002).  The question of waiver "focuse[s] on strategic, deliberate decisions that litigants consciously make."  *U.S. v. Dantzler*, 771 F.3d 137, 146 n.5 (2d Cir. 2014).  By deliberately deciding to try block Plaintiff's amended expert report instead of seeking further discovery about that report, XOOM has waived its right to further depose Plaintiff's expert.  Indeed, if XOOM's real purpose was to obtain further information and discovery on Plaintiff's amended report, it would have accepted Plaintiff's offer to do so.  The Court should therefore reject XOOM's claim that it "was not allowed to take discovery on the new exemplars."  Defs.' Br. at 13, n.10.

**B. The Court Has Already Approved Using XOOM's Average Fixed Rate Margin as a Class-Wide Benchmark; That XOOM's Fluctuating Variable Rate Margins Were Occasionally Lower Changes Nothing**

Even though the Court has already found that a damages model using XOOM's average fixed rate margin as an exemplar margin "would apply to each class member" at trial, Class Order at 14–15, XOOM incorrectly claims this average is "inadmissible" to challenge any particular monthly *variable* rate margin when XOOM's contemporaneous *fixed* rate margin happened to be higher than the average fixed rate. Defs.' Br. at 14–15. In other words, XOOM yet again disregards the Court's proportionate-margin construction.

It is worth noting at the outset that by faulting Plaintiff for not using XOOM's contemporaneous corresponding fixed rate margin, XOOM argues *for* Plaintiff's original model that used those contemporaneous margins, which XOOM has repeatedly claimed is *not* aligned with the Court's proportionate-margin construction. *See, e.g.,* ECF 107 at 13; *see also* ECF 234-5, Am. Expert Report at 37 (Plaintiff's revised fixed-rate damages calculations aligning them with the Court's summary judgment contract construction).

More importantly, the Court has already determined—in the appropriate Rule 23 assessment and not on a motion *in limine*—that in a trial centered on any particular month's variable rate, it would be fair for Plaintiff to offer XOOM's average fixed rate margin as a proposed "reasonable" margin. *See* Class Order at 14 (finding the average fixed rate margin model "entirely consistent with plaintiff's theory"). This is also why XOOM gains no ground when it cites six monthly rates where its variable rate margins were higher than its fixed rate margins. Defs.' Br. at 15. At a trial looking at each of those months, the jury would have to do exactly what it will have to do at the upcoming class action trial covering all Class period months: (1) settle the issues raised by XOOM's odd claim that it incorporated permissible supply costs into the variable rate

30

margins evident from its rate-setting workbooks; and (2) determine the reasonable fixed margin that XOOM was permitted to add to the COGS figures in XOOM's rate setting workbooks.

That XOOM's fluctuating fixed rate margins occasionally exceeded its fluctuating variable rate margins does not change the fact that over a 10+ year period XOOM on average charged a 21.2% margin on its riskier fixed rate products. Am. Expert Report at 37–41. It also does not change the fact that on average XOOM's variable rate margins were three times the 21.2% figure (*id.* at 26), or that XOOM's CEO testified that "you don't assume the same risk in a variable [rate contract] because you get the chance to reprice every month." ECF 141-21, Deposition of former CEO Thomas Ulry at 86:4–87:7; PX9 at 3 (XOOM internal document explaining that "fixed products" are "riskier / less valuable"). Indeed, "pushing" variable products was "a better investment for the company" on a risk-reward basis. PX9 at 3. This evidence is germane to the jury's determination of the reasonable margin that applies to *all* class rates, even in the relatively few months where XOOM's fixed rate margins were higher than its variable rate margins.

XOOM's cited cases are thus easily distinguished,[14] and its criticisms of Plaintiff's expert's calculations fail.[15]

### C.  XOOM's Recycled Claim That Its Own Fixed Rate Margins Are "Irrelevant and Prejudicial" Fails for the Same Reasons That XOOM's MIL No. 4 Fails

XOOM recycles its argument from MIL No. 4 that evidence of XOOM's fixed rate margins is inadmissible because it is "irrelevant and prejudicial."  *Id.* at 16.  This claim fails for the same reasons set forth in Plaintiff's opposition to MIL No. 4.  Again, XOOM's average fixed rate margin

---

[14] In *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 460 (2016), the Supreme Court made clear that "[t]he fairness and utility of statistical methods in contexts other than those presented here will depend on facts and circumstances particular to those cases."  The "context" of *Tyson Foods* was entirely different.  There, hourly workers claiming uncompensated time offered statistical evidence to establish the amount of time spent donning and doffing protective equipment.  *Id.* at 446.  Here, by contrast, Plaintiff will offer XOOM's average fixed rate margin as evidence to help the jury determine the "reasonable" variable rate margin.  This is akin to establishing a reasonable ***rate of pay*** for the workers in *Tyson Foods*, not a measurement of how long it took those workers to don and doff protective gear "even though differences in the composition of that gear may have meant that, in fact, employees took different amounts of time to don and doff."  *Id.*  In *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019), the class could not be certified because individual hearings were needed for the defendant to challenge whether certain shippers were ***impacted*** by an alleged antitrust conspiracy when those shippers were "of different sizes," shipped "different products in different geographic markets, with different transportation options," and had "different degrees of leverage" to avoid the alleged price increases.  No individualized concerns arise when determining a reasonable fixed margin here.  XOOM cites *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 193 (3d Cir. 2020) for the far-fetched proposition that class certification is inappropriate when an "average hypothetical price" would be applied to "individual class members."  Defs.' Br. at 16.  That case does not bear XOOM's weight.  There, the district court was faulted for not engaging in "a rigorous analysis" of whether direct purchasers could use average prices to show injury from an alleged antitrust conspiracy "in a market characterized by individual negotiations and a discounted-brand competition strategy."  957 F.3d at 192–93.  Here, XOOM's challenges to the Court's rigorous analysis at class certification have already been rejected by the Second Circuit.  ECF 174, Order Denying Defs.' Rule 23(f) Pet.  In *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154 (11th Cir. 2004), the Eleventh Circuit overturned the lower court's decision to admit a compilation purporting to list the plaintiff's trade secrets because that compilation was prepared at the request of the plaintiff's counsel after the litigation began.  Using XOOM's average margin applied to a riskier product is simply not analogous.

[15] XOOM's claim that the damages model in Plaintiff's original report calculated XOOM's average fixed rate margins "only through early 2018," Defs.' Br. at 14 n.11, is demonstrably incorrect.  First, the cited exhibit clearly lists the fixed rate margins through mid-2021.  Plaintiff's amended expert report also incorporates all available data to average XOOM's fixed rate margins throughout the Class period.  *See* Am. Expert Report at 37–39.  XOOM's clumsy (or worse) analysis merely highlights the need for expert testimony to present this information to the jury in a digestible and rigorous manner.

will help the jury set a reasonable "proportionate margin" on XOOM's less risky variable rate product that must be priced under more constraints than applied to its fixed rate product.

In sum, the Court should not allow XOOM to disregard the Court's framework for adjudicating this matter and Plaintiff should be allowed to offer margin exemplars that suggest a reasonable, proportionate variable rate margin.

## VI. XOOM HAS ADMITTED THAT ITS FIXED RATE MARGINS WERE PROFITABLE AND THAT EVIDENCE IS RELEVANT TO DETERMINING A REASONABLE VARIABLE RATE MARGIN
*(Responding to Defs.' MIL No. 6, Defs.' Br. at 17–18)*

XOOM's own testimony and internal documents regarding the profitability of its fixed rate products will help the jury establish a "reasonable" variable rate margin set in "good faith." *See* MSJ Order at 12–14; Class Order at 3, 14. XOOM claims that "the contract admittedly allowed XOOM to achieve a ***profit*** on its variable rates." Defs.' Br. at 23 (emphasis added). Plaintiff disagrees, but to temper XOOM's claim that its excessive variable rate margins were justified because of any business need to achieve a profit, the jury should know that XOOM's much lower fixed rate margins were profitable.

For example, Plaintiff will introduce an admission from Andrew Coppola, XOOM's former Senior Vice President of Energy Supply and Pricing, that "[b]oth [variable and fixed rate] products were profitable." ECF 137-22, Coppola Tr. at 198:4–8. Plaintiff further intends to present Coppola's admission that "margins for all of our products" provide a "satisfactory return for XOOM over that period of time." Ex. A, Coppola Tr. at 200:24–201:8. Using this evidence, Plaintiff will argue that XOOM's average fixed rate margin (21.2%) was generally profitable, especially over time.

Nevertheless, XOOM claims that Plaintiff should be precluded from offering evidence or argument regarding profitability.  Defs.' Br. at 17–18.  In support, XOOM offers five improper and inaccurate claims.

First, XOOM claims Plaintiff has no evidence.  *Id.* at 17.  The evidence cited above disproves this.  It is in fact XOOM that has no evidence to rebut Mr. Coppola's admissions.

Second, XOOM makes the irrelevant claim that Plaintiff's expert cannot refer to this admission because he "could not determine whether XOOM made a net profit on particular products or customers" and the expert's supply cost-based damages models "ignored many of the variables necessary to perform [a profitability] calculation."  *Id.*  These supposed shortcomings have nothing to do with the above-cited evidence.  They also defy logic.  No discovery suggests that XOOM, a for-profit company, had any incentive to offer a product that was unprofitable, especially for so many years.  XOOM offered fixed rate products in New York beginning in 2013 and continued to offer those products through 2022 (for natural gas) and 2024 (electricity).  Am. Expert Report at 40.

Third, XOOM makes the fantastical (and wholly unsupported) claim that due to "the nature of averages," its average fixed rate margin was only profitable half the time and that "assuming" XOOM's fixed rate margins were profitable, that was "only" when XOOM's fixed rate margin exceeded its average margin.  Defs.' Br. at 17.  That is simply not how profits work.

Fourth, XOOM makes the same error as MIL No. 5 in claiming that the fixed rate damages model from Plaintiff's original expert report cut off its analysis in 2018.  *Id.* at 18.

Fifth, XOOM falsely claims there is no evidence that a profitable fixed rate margin would also be profitable if applied to XOOM's variable-rate products.  *Id.*  Not so.  As the Second Circuit noted, "XOOM concedes that it operates as a commodity broker or middleman."  *Mirkin v. XOOM*

34

*Energy*, LLC, 931 F.3d 173, 177 (2d Cir. 2019).  As a middleman XOOM does not incur greater expenses on its variable rate products as compared to its fixed rate products.  The opposite is true. XOOM's internal documents show that fixed rate products posed a greater financial risk to XOOM than variable rate products.  *See, e.g.,* PX9 at 3 (XOOM internal document explaining that "fixed products" are "riskier / less valuable.").  As already noted, over an eleven-year period, the only time XOOM experienced negative margins was on its fixed rate products.  Am. Expert Report at 40 (Table 2).

Plaintiff should be allowed to introduce evidence showing that (1) XOOM's fixed rate products were profitable, and (2) it would be reasonable for the jury to adopt XOOM's average 21.2% fixed rate margin as a reasonable contract margin.

## VII. EVIDENCE THAT XOOM CONSIDERED COMPETITORS' RATES WHEN SETTING ITS VARIABLE RATES IS RELEVANT TO KEY TRIAL ISSUES REGARDING HOW XOOM SET RATES AND IS ADMISSIBLE
*(Responding to Defs.' MIL No. 7, Defs.' Br. at 19–20)*

Plaintiff's exhibit list includes documents and testimony showing that XOOM improperly used competitor pricing to set variable rates.  This plainly violates XOOM's contractual obligation to charge only variable rates that were "determined solely by" XOOM's "supply costs."  MSJ Order at 14.  The evidence showing that XOOM used competitor rates in determining Class Member rates includes an email from XOOM Director of Pricing and Structuring Jason Loehde that asked "[w]hat are three things that get considered in our monthly rate setting process?"  PX11 at 1.  His answer did not mention XOOM's supply costs, but did list "prices of our competitors," "competitive trends," and "target margins."  *Id.*   XOOM's former SVP of Energy Supply and Pricing Andrew Coppola similarly admitted that XOOM considered "[a]ttrition, sales growth, regulatory changes, [and] competitors" when setting rates.  ECF 138-22, Coppola Tr. at 50:8–51:2, 84:20–85:7; *see also id.* at 107:6–108:1 (admitting that even though competitors' prices are not

supply costs, XOOM used them to set variable rates); *id.* at 237:22–239:3 (margin targets, current and trending sales activity and utility rates, customer attrition, historical market pricing, and competitors' offers used to set variable rates).[16]

Key XOOM employees were also told that XOOM's "mindset" should be to set prices with the aim of "protecting margins," and "follow the competitor pricing pack (probably on the higher end)" in New York markets.  PX24 at 1.  In short, this and other record evidence proves that XOOM set rates in a way that is directly contrary to the methodology required by its customer contract, including by preparing and directing its employees to use various ***non-supply cost reports*** (such as reports regarding attrition, sales, and competitor rates) during rate-setting meetings. ECF 138-17, Loehde Tr. 48:17–25.

Faced with this compelling evidence of XOOM's ***breach***, XOOM asks to exclude any reference to the competitor pricing "that XOOM tracked" as irrelevant to calculating ***damages***. Defs.' Br. at 19.  That is strawman argument, and the Court should not allow XOOM to use it to exclude critical evidence of XOOM's breach by exposing "the process by which XOOM set rates." MSJ Order at 3.  The Court itself has already found that process "of central importance." *Id.*  As XOOM ultimately concedes, "the only triable issue is whether XOOM's variable rates were based on its 'actual and estimated supply costs' including a proportionate margin."  Defs.' Br. at 20. Evidence that XOOM used competitor pricing to set rates is clearly relevant to that issue and XOOM's motion should be denied in full.[17]

---

[16] Both the above-cited email and deposition testimony were referenced in the Court's summary judgment finding that "the record indicates that XOOM considered several factors besides supply costs when setting its monthly rates."  MSJ Order at 18.

[17] XOOM also makes the frivolous claim that Plaintiff's amended expert report is "untimely," Defs.' Br. at 19 n.13, ignoring that the amended report was expressly requested (ECF 187) and expressly authorized in the Court's April 15, 2024 Electronic Order.

**VIII.  GIVEN THE COURT'S CONTRACT CONSTRUCTION AT SUMMARY JUDGMENT, UTILITY RATES ARE RELEVANT TO DETERMINING A REASONABLE "PROPORTIONATE" VARIABLE RATE MARGIN**
*(Responding to Defs.' MIL No. 8, Defs.' Br. at 21–24)*

As noted on pp. 25–27 above, two of Plaintiff's proposed "reasonable" proportionate margins reference the applicable utility rate. ***First***, Plaintiff will propose a margin of 7.33%, which is the average of how much ***lower*** XOOM's documented supply costs were than the corresponding utility rate. Am. Expert Report at 10. This margin is Plaintiff's expert's preferred margin because it adheres most closely to the constraints imposed by the Court's contract construction. *Id.* at 28.

Specifically, the 7.33% margin is keyed to the NYPSC's finding that it is not reasonable for ESCO customers to pay more for the exact same commodity that is also sold by their existing utility. *Id.* at 30. The 7.33% margin allows XOOM to charge a rate above the COGS figures in its workbooks by the extent to which XOOM was able to purchase supply for less than what the utility ultimately charged. *Id.* at 30. A margin based on this average delta has the benefit of being objectively derived and does not depend on XOOM's or another ESCO's price-setting discretion. *Id.* at 30–31. The 7.33% figure also relies on an independent third-party's finding of a reasonable rate for the same product sold by XOOM in the same New York market. *Id.* That independent third-party (the NYPSC) also has deep expertise in the relevant market, which expertise was informed by a comprehensive record developed through a detailed investigation for the very purpose of assessing, *inter alia*, New York ESCOs' variable rates.[18] As the Second Circuit observed in *Martinez*, the NYPSC's ban on variable rates came after it engaged in "a multi-year process to re-evaluate the market." 88 F.4th at 416.

---

[18] *See* 2019 Reset Order at 2 ("In designing and implementing these changes, the Commission relies on its extensive experience regarding the retail energy market. The Commission is also guided by the considerable record in the instant proceedings, which parties were invited to develop for the purpose of further illuminating the current state of the Retail Energy Market.")

Determining XOOM's margin based on the average 7.33% delta also accords with the Court's ruling that vague pricing terms like the silent margin term here should be construed against the party that "'had the best opportunity to protect its interests.'" *Id.* at 31 (quoting MSJ Order at 12). A 7.33% margin protects customers' interests by preventing them from consistently paying variable rates the NYPSC has determined are unreasonable while also allowing XOOM a proportionate margin over its supply costs. *Id.* at 29, 31. In addition, XOOM used the utility rate when it needed to issue refunds, and the NYPSC has extensively used the utility rate as a benchmark for ESCO variable rates. *Id.* at 31–32.

As a second proposed reasonable margin (and as a cross-check for the preferred margin), Plaintiff will propose a 5% margin based on the NYPSC's adoption of a 5% cap for ESCO fixed rate products. The NYPSC determined that capping fixed rates at 5% over the corresponding average variable utility supply rate was a reasonable "price premium" for ESCOs to charge for this product. *Id.* at 35 (quoting 2019 Reset Order at 67). The NYPSC arrived at the 5% figure by looking to the "typical risk premium in financial markets" and determined that adding a premium for fixed rate plans was called for because ESCOs bear greater financial risk in offering fixed rates as compared to variable rates. *Id.*

The 5% figure also adheres closely to the pricing constraints imposed by XOOM's contract. For example, this figure has been determined to be a "just and reasonable" fixed risk premium for a New York ESCO product following the cost-benefit analysis of an independent third-party with expertise in XOOM's market. *Id.* (quoting 2019 Reset Order at 67). The fixed 5% figure was also found to be a margin that "most" ESCOs could sustain on a product that poses greater financial risk than the variable rate products at issue here. *Id.* at 36 (quoting 2019 Reset Order at 67). The 5% figure is thus also based on objective criteria and not XOOM's or another

ESCOs' price-setting discretion.  *Id.*  Finally, the 5% figure protects customers' interests vis-à-vis a counterparty with superior bargaining power and provides an independent cross check for assessing the expert's preferred 7.33% margin.

Despite the clear merits of these proposed margins, XOOM's motion seeks to bar Plaintiff from presenting them.  To do so, XOOM again resorts to strawman arguments.  XOOM offers four.  ***First***, XOOM claims that all references to utility rates should be excluded because Plaintiff does ***not*** propose to measure damages based on the delta between XOOM's rates and the utility's rate.  Defs.' Br. at 21.  That the utility's rate is merely a component of Plaintiff's expert's framework for assessing a reasonable margin does not make it irrelevant.[19]

***Second***, XOOM claims that nothing about utility rates can be presented because the contract does not mention them.  Defs.' Br. at 22.  XOOM misses the mark.  Again, utility rates are being used in connection with two of Plaintiff's proposals for a reasonable XOOM margin.  However, the contract is silent as to the margin.  XOOM, as the drafter of the form contract, should not get to benefit from its vague drafting.

***Third***, XOOM cites three cases where the ESCO's contract expressly allowed it to set variable rates at its "discretion," and claims that the Second Circuit has "unequivocally" held that utility rates are "irrelevant as a matter of law."  *Id.* at 22–23.  XOOM's caselaw analysis is flawed and XOOM ignores the Second Circuit's clear-cut observation that "courts in this Circuit evaluate claims arising from energy services agreements on a case-by-case basis" and that the first

---

[19] This is also why it is misleading for XOOM to selectively cite Dr. Eryilmaz's testimony and claim that she conceded that utility rates are broadly "irrelevant" here.  Defs.' Br. at 21.  To the contrary, Dr. Eryilmaz made clear that the utility rates were irrelevant to the much narrower question of whether XOOM derived its rates from its own "actual and estimated supply costs."  ECF 226-5, Eryilmaz Dep. 73:10–75:12.  Dr. Eryilmaz also made clear that in the original expert report the utility's rate was used as a "cross-check" for a hypothetical XOOM rate that was actually "based on" XOOM's "actual and estimated supply costs."  *Id.* Dr. Eryilmaz certainly did not testify that utility rates are irrelevant to the question of what reasonable, fixed margin XOOM could charge under its contract, which is how they are being used here.

"dispositive question[]" is "whether an agreement entitled the energy services provider to use discretion in setting its rates." *Martinez*, 88 F.4th at 410 (citing *Congregation Yetev Lev D'Satmar, Inc. v. Engie Power & Gas, LLC*, 683 F. Supp. 3d 238, 245 (E.D.N.Y. 2023) ("Subsequent cases in this Circuit with alleged breaches of ESCO contracts have turned on how—if at all—a contract describes how an ESCO will determine its variable rate.")).

Here, both this Court and the Second Circuit have recognized that XOOM's contract does not afford it any rate-setting discretion whatsoever.  Nevertheless, XOOM wrongly claims *Richards* bars any reference to rates other than XOOM's "private competitors" when considering the question of a reasonable proportionate margin for XOOM to charge under ***this*** contract.  Defs.' Br. at 22.  As discussed in response to XOOM's MIL No. 3, using the margins of ESCOs like the one in *Richards*—that had "discretion" to set rates based on "business and market conditions"— simply imports other ESCOs' price-setting discretion into a contract where none is allowed.  For this very reason, Plaintiff's MIL No. 15 seeks to exclude reference to evidence of other ESCOs' margins.  *See* Pl.'s Br. at 69–71 (noting that such evidence would require serial analysis of what other ESCOs were entitled to charge pursuant to their contracts and allow XOOM to mask its own discretionary pricing strategies by reference to the discretionary pricing of other ESCOs that did not face the same contractual constraints as XOOM).

XOOM also erroneously claims that using the utility rate for any purpose in an ESCO litigation would turn ESCOs' rates into regulated rates.  *Id.*  Again, Plaintiff does not claim that any XOOM rate that exceeds the utility's is *per se* a breach (*i.e.*, a rate that is not "determined solely by" the supply costs documented in XOOM's rate-setting workbooks, plus a fixed reasonable margin).  MSJ Order at 12–14; *see also* Class Order at 3, 14 (same).  Instead, two of

Plaintiff's expert's proposed models consider the utility rate as a point of reference for a proposed reasonable margin.

Moreover, the Second Circuit's criticism of using utility rates as a "comparator" in *Richards* was made after the plaintiff there claimed that charging more than the utility was proof the ESCO abused its "discretion" to set variable rates based upon "business and market conditions." 915 F.3d at 99. Requiring an ESCO to match or beat the utility rate in that scenario would rewrite the ESCO's contract and undermine the "point of electricity deregulation." *Id.* Plaintiff here does not seek anything of the sort. She seeks the opposite—to enforce the parties' private contractual arrangement, including the contractual constraints on XOOM's rate-setting.

XOOM's reliance on *Martinez* fails for similar reasons. There, measuring damages by reference to the utility rate was inappropriate "in light of the Agreement's express terms" which were that the ESCO had "discretion" to consider its "costs, expenses and margins" when setting its rates. 88 F.4th at 415. The *Martinez* contract further "specified that '[s]avings are NOT guaranteed' and made no representations that its prices would always be lower than those of the incumbent utilities, for example." *Id. Martinez* does not support XOOM's broad claim that no fact about utility rates can be used in this case.

In *Sevugan v. Direct Energy Servs., LLC*, the utility rate was not a proper comparator when the ESCO's contract stated that rates would be based on "generally prevailing ***market*** prices for electricity" in the customer's geographical region "plus an adder, determined solely by [the ESCO] in its ***discretion***." 931 F.3d 610, 613 (7th Cir. 2019) (emphasis added). None of XOOM's three cases suggest that Plaintiff here should be barred from using utility rates as a building block for a proposed reasonable margin.

*Fourth*, and finally, XOOM claims that utility rates have "no bearing at all on any of the three rate-setting components the Court said must determine XOOM's rates" and are otherwise prejudicial. Defs.' Br. at 23. This is largely a restatement of XOOM's other arguments, except that XOOM also claims that utility rates are "facially irrelevant" to determining a reasonable proportionate margin because utility rates are pass throughs of the utility's supply costs (incurred in the same market where XOOM purchases energy) and the utility's supply-related overhead. *Id.* XOOM is simply incorrect. For the multiple reasons outlined above that support the two proposed "reasonable" proportionate margins, references to utility rates are relevant and will help the jury set a reasonable margin for XOOM's variable rates.

## IX.   XOOM ADMITTED THAT IN <u>PERFORMING</u> THE CONTRACT IT USED PRICING STRATEGIES TO SET VARIABLE RATES AND THAT A LATER CONTRACT AMENDMENT TO MEMORIALIZE THIS PRACTICE WAS "JUST SIMPLY PROVIDING MORE ACCURATE LANGUAGE"
*(Responding to Defs.' MIL No. 9, Defs.' Br. at 25–27)*

XOOM's MIL No. 9 seeks to walk back damning admissions by XOOM witnesses— including binding testimony from XOOM's Rule 30(b)(6) designee—that XOOM used "pricing strategies" to set New York variable rates even though it was contractually barred from doing so. As the Court has already recognized, "the process by which XOOM set rates is of central importance." MSJ Order at 3. This evidence provides a clear window into that process and shows that XOOM ignored its contractual rate-setting obligations.

As the Court recognized at summary judgement, XOOM's 30(b)(6) admission was spurred by a discussion of "XOOM's 2016 amendment to its form Electricity Sales Agreement." *Id.* at 18. "The amended contract states that the variable rate would be 'based upon a number of factors, which may include but not be limited to, the fluctuation of wholesale commodity costs or other components of wholesale prices . . . *and XOOM's pricing strategies*.'" *Id.* (emphasis in original).

As the Court also recognized, "[i]n the Rule 30(b)(6) deposition of XOOM, Loehde explained that XOOM's rate-setting process did not change between 2013 and 2016, and so 'the updated [contract] language is just simply providing more accurate language to our customers. . . .' And Coppola confirmed that in 2013 XOOM customer rates were 'based in part' on XOOM's pricing strategies." *Id.* at 18–19; *see also id.* at 19 ("XOOM's witnesses have asserted that XOOM's pricing process remained constant from 2013 to 2016.").

XOOM also did not claim at summary judgment that this contract amendment was irrelevant. Instead, XOOM claimed it has always been allowed to use pricing strategies to set rates. In fact, XOOM claimed at summary judgment that the contract governing Class Member rates "cannot be reasonably construed to prohibit ***all*** pricing strategies, because several strategies are expressly disclosed—including the one that XOOM employed when it set rates that were *based on* its supply costs." ECF 149, MSJ Reply at 17 (emphasis in original); *see also id.* at 16. XOOM even claimed that "***it does not matter*** what strategies, formulas, or directives it used" to set Class rates. *Id.* at 17 (emphasis added).

The Court well understood XOOM's position. XOOM's predicament is that the Court disagreed: "XOOM responds by arguing that the use of pricing strategies was permissible under the contract. . . . But, as explained, the contract as construed according to North Carolina law required XOOM's rates to be determined by its actual and estimated supply costs." *Id.* at 19.

After failing to convince the Court that its contract allowed XOOM to use pricing strategies to set Class rates, XOOM now seeks a wholesale exclusion of the amended contract that revealed this longstanding use of "pricing strategies." Defs.' Br. at 25–27. Looking to tie up any loose ends, XOOM also seeks the exclusion of any related "deposition designations and live testimony." *Id.* at 25. XOOM offers three failed arguments to try to exclude this key evidence.

43

First, XOOM incorrectly claims "[t]he Court excluded these other contracts [*i.e.*, the 2016 amendment] from the class definition precisely because their pricing terms are different from the Plaintiff's contract that is at the center of this dispute."  Defs.' Br. at 25.  XOOM knows this is untrue, as shown by its failure to cite any part of the Class Order where the "Court excluded" these other contracts.  *Id.*  This is because the Court did no such thing.  Plaintiff never looked to include customers with different variable rate pricing terms in the Class because those customers' rates were governed by different pricing formulas.

Second, XOOM argues that "the pricing terms that applied to other products . . . or were implemented in later time periods" have "no bearing" on the issues to be decided at trial.  *Id.*  Of course, this evidence is plainly relevant as proof of XOOM's breach, a subject XOOM never addresses.  As shown above, at summary judgment the Court, XOOM, and Plaintiff all disagreed with the position XOOM now takes.  Further, what is key about XOOM's "pricing strategies" admission is what it says about "the process by which XOOM set rates" under ***this*** contract.  MSJ Order at 3.[20]

---

[20] Grasping at straws, XOOM cites a dissent from a 1978 Supreme Court case, *California v. Southland Royalty Co.*, 436 U.S. 519 (1978).  A dissent is not the law.  Moreover, *Southland* was not about a contract, but rather the Federal Power Commission's actions pursuant to the Natural Gas Act of 1938.  *Id.* at 524.  The footnoted dicta XOOM quotes has nothing to do with the majority opinion or dissent's counterargument.  *Cross Sound Cable Co. v. Long Island Lighting Co.*, No. 21 Civ. 2771, 2022 WL 16789978 (E.D.N.Y. Sept. 13, 2022) is also inapposite.  That case involves a ruling on a motion to compel discovery in a dispute over the triggering of a contract's force majeure clause.  To avoid reduced payment for lack of performance, the *Cross Sound* plaintiff claimed force majeure but the defendant disagreed.  *Id.* at 1.  Thereafter, the plaintiff sought discovery relating to the defendant's "response to, and analysis of, other force majeure events."  *Id.* at *1–2.  The *Cross Sound* court, exercising its "broad latitude" to "manage the discovery process," concluded those analyses were irrelevant because whether force majeure had occurred turned on how "the parties themselves defined the contours of force majeure in their agreement."  *Id.* at *2.  Here, when it comes to pricing strategies the "contours" of the parties' agreement were settled at summary judgment.  Following summary judgement, there is no dispute that "pricing strategies" could not be used to set variable rates.  That XOOM did so is a matter of its conduct and proof of breach, not the contours of the parties' agreement.

Third, XOOM claims this evidence is barred under Fed. R. Evid. 407, "which precludes use of a subsequent contract as evidence that a prior version was breached or misapplied." Defs.' Br. at 26–27. Rule 407 only applies where "measures are taken that would have made an earlier injury or harm less likely to occur," and then only excludes evidence of negligence, culpable conduct, products defects, and the need for consumer warnings. XOOM again misses the point. The evidence that XOOM used pricing strategies to set Class rates is XOOM's multiple admissions that it did so—not the 2016 contract's existence.[21] Further, and again, XOOM has consistently argued that it was allowed to set rates based on pricing strategies under ***this*** contract. *See, e.g.,* MSJ Order at 18–19. Only now, after XOOM lost on its contract interpretation at summary judgment, does XOOM recast its 2016 contract as some sort of remedial measure. It is simply too late for XOOM to change tack regarding its "pricing strategies" admissions.

Finally, even if the 2016 contract were a subsequent remedial measure (it is not), it is admissible "for another purpose, such as impeachment." Fed. R. Evid. 407. Once XOOM's witnesses testify that rates were set "based on" XOOM's "actual and estimated supply costs," XOOM's use of "pricing strategies" will be admitted for impeachment purposes.[22]

---

[21] XOOM's subsequent remedial measures cases are thus inapposite.

[22] XOOM's MIL also seeks the exclusion of fixed rate contracts. *See* Defs.' Br. at 25. XOOM's fixed rate contracts will be used to explain the differences between the two types of plans, especially how (unlike with variable rates) a fixed rate customer is shown the rate in advance. These contracts will also be used to show that after the fixed rate term ends XOOM automatically defaults fixed rate customers onto variable rate plans. This conduct also aligns with XOOM's admissions (discussed in Plaintiff's opposition to XOOM's MIL No. 5) that XOOM was "pushing" variable rates onto customers as "a better investment for the company" on a risk-reward basis. PX9 at 3. These contracts are clearly relevant and XOOM's motion attacks them on no other grounds than relevancy.

**X.   PLAINTIFF'S EXPERT SHOULD BE PERMITTED TO TESTIFY REGARDING THE TECHNICAL MEANING OF CONTRACT TERMS AND THE DISCONNECT BETWEEN XOOM'S PRICING STRATEGIES AND THE REQUIRED RATE SETTING CALCULATIONS**
*(Responding to Defs.' MIL No. 10, Defs.' Br. at 28)*

XOOM's MIL No. 10 seeks to preclude expert testimony about "the meaning of any terms in Plaintiff's contract."  Defs.' Br. at 28.  XOOM again presents its request in exceedingly general and abstract terms, leaving it unclear which testimony XOOM looks to preclude.  This alone warrants denying XOOM's motion.

The Court has already construed XOOM's contract and Plaintiff does not intend to offer expert testimony that is inconsistent with that construction.  Indeed, at deposition Plaintiff's expert repeatedly clarified that he was ***not*** offering a legal construction of XOOM's contract.  Ex. D, Adamson Tr. 11:1–8 ("I'm providing my understanding of what [the contract] says and in the context of the [] electricity and gas markets. . . .  Obviously, I'm not offering a legal opinion on the language."); *id.* at 11:12–21; *id.* at 37:7–9.

To the extent XOOM's motion asserts that any testimony regarding (1) any contract term or (2) whether any conduct was consistent with the Court's contract construction is testimony regarding the legal operation of XOOM's contract, that claim clearly defies logic, as it would bar any expert testimony regarding contract performance.  Plaintiff will present expert testimony on contract terms, specifically the custom and usage of highly technical words in the contract's pricing term such as "supply costs," "prior period adjustments," and "balancing costs."  Terms such as "'supply costs' are very specific technical terms in the industry."  ECF 133-1, Eryilmaz Tr. at 34:22–35:12.  Though XOOM's expert Mr. Coleman testified that he believed the average consumer would understand the meaning of terms such as "prior period adjustments," "inventory," and "balancing costs," the sole basis for this opinion was his "more than two decades of experience

working in the electric and natural gas industries, and understanding how those terms are commonly used in the energy industry." Ex. E, Deposition Transcript of David Coleman, dated Nov. 16, 2022, 27:16–29:12. This underscores the need for expert testimony at trial regarding these technical industry terms, without which the jury will lack full context to determine disputed issues in the case, such as XOOM's claimed (but undocumented) practice of including supply costs in margin rather than in the COGS figures in its rate-setting workbooks.

Likewise, expert testimony is needed to unpack and explain the difference between what the evidence shows regarding "how" XOOM set variable rates (and how XOOM's variable rate margin was simply a product of the rate XOOM chose) compared to how XOOM was required to set rates under the contract. Similarly, an expert will be required to help the jury assess XOOM's implausible claim about how its variable rate margins secretly contain supply costs. Expert testimony is also needed to help the jury determine XOOM's reasonable fixed margin.

None of this is "testimony regarding the meaning of the contract's terms" as XOOM claims, Defs.' Br. at 28, but rather testimony about how XOOM actually set its rates and how that conduct mapped onto what the Court has said the contract requires. These are key questions for trial and are a proper subject for expert testimony.

Finally, Plaintiff is concerned that XOOM may be trying to use this unspecific motion to bar the numerous admissions XOOM's own expert made during his deposition—admissions that contradict XOOM's more recent attempts to justify its variable rates.[23] This would be improper. For all of the foregoing reasons, XOOM's motion should be denied.

---

[23] As explained in Plaintiff's motion to exclude Mr. Coleman's testimony, even if he is not permitted to testify, his admissions are nonetheless admissible because he was an agent of XOOM or was authorized to speak on XOOM's behalf at his deposition and/or when he was included on XOOM's trial witness list. ECF 231 at 18–19.

XI.  **XOOM HAS DESIGNATED A WITNESS FROM ITS PARENT COMPANY NRG ENERGY TO TESTIFY AT TRIAL ABOUT HOW XOOM SET VARIABLE RATES, AND NRG-RELATED DOCUMENTS ARE GERMANE TO QUESTIONS REGARDING XOOM'S RATE SETTING AND MARGINS**
*(Responding to Defs.' MIL No. 11, Defs.' Br. at 29)*

XOOM's MIL No. 11 seeks to broadly exclude any evidence or argument regarding any non-party affiliated with XOOM.  Defs.' Br. at 29.  XOOM's wide-reaching request specifically references NRG Energy, Inc. ("NRG"), which is a publicly traded company with its stock listed on the New York Stock exchange.  PX41 at 2.  NRG acquired XOOM in 2018 through its acquisition of XOOM Energy Global Holdings LLC ("Global Holdings")—the only other non-party entity mentioned in XOOM's motion.  Defs.' Br. at 29.  Global Holdings is XOOM's "sole member and manager."  *Id.*  XOOM cites PX41, which is NRG's February 8, 2024 SEC Form 10-K ("10-K Form") and claims that anything about these entities' "size, revenue, or profitability" is irrelevant and thus even referencing these entities (or any other non-party XOOM affiliate) should be banned.  As outlined below, XOOM's motion is a diversion that disregards its own proffered testimony in the hopes of blocking damning facts about XOOM's rate-setting process.

While XOOM claims that NRG is entirely irrelevant, XOOM intends to have an NRG employee testify at trial about several aspects of XOOM's rate-setting process, including "adjustments made in connection with supply-cost inputs in the rate-setting worksheets that continue to be used to set rates for all XOOM products," and "the various supply costs that XOOM incurred and considered."  ECF 210-2 at 5 (XOOM's witness list and description of testimony for NRG employee Leonard Gardner).  XOOM therefore opened the door to this evidence and is thus off base to broadly argue that "Plaintiff should be precluded from offering evidence regarding or referring to NRG, Global Holdings, or any other [unspecified] non-party organization affiliated

48

with XOOM . . . ."  Defs' Br. at 29.  NRG (acting as "sole member and manager" of XOOM, Global Holdings) took part in variable rate setting and will be sending an employee testify at trial. Evidence or argument regarding NRG and Global Holdings is therefore clearly germane.[24]

XOOM's motion also looks to limit Plaintiff's use of "the February 8, 2024 SEC Form 10-K for NRG, PX41" because it supposedly relates to NRG's "size, revenue, or profitability."  That claim is a smokescreen.  NRG's 10-K Form is on Plaintiff's exhibit list because it includes a paragraph describing the NYPSC's January 8, 2024 Notice of Apparent Violation ("2024 NYPSC NOAV") that reveals that after April 2021 XOOM was not even licensed to sell the vast majority of energy it sold the Class over the past three years, which NRG notes could "negatively impact the retail business in New York."  PX41 at 159.

The 2024 NYPSC NOAV states in turn that on January 21, 2021, XOOM was "grant[ed] eligibility to serve *only* a renewable [electricity] product to mass market customers in New York State . . . and *no other products* that it may have served to mass market customers in the past." PX40 at 2 (emphasis added); *see also id.* at 4 (XOOM was "eligible to *only* provide a renewable electric product to mass market customers after April 16, 2021." (emphasis added)).[25]  In other words, while XOOM sold a tiny percentage of Class Members a "green" product after April 2021, the overwhelming amount of its post-April 2021 sales to Class Members were completely *unauthorized*.  *See* Am. Expert Report at 20 n.49 (noting that XOOM's "green" variable rate sales

---

[24] XOOM's request is also presented in overly general and abstract terms.  In failing to distinguish between permissible evidence and argument versus allegedly improper evidence and argument XOOM seeks a ruling in a vacuum.  This will produce needless line-drawing disputes.  If the Court finds any merit to XOOM's argument despite our foregoing response, the Court should rule on specific objections at trial on an item-by-item basis rather than address them in the abstract.

[25] "Mass market customers" is defined in the 2019 Reset Order as "residential and small commercial customers."  2019 Reset Order at 2.  The Class certified in this matter includes "residential or small commercial customers" charged variable rates under XOOM's contract.  Class Order at 18

49

"comprise a tiny percentage of the Class, 0.1% of the account numbers reflected in XOOM's data that consumed only 0.1% of the total electricity XOOM sold to the Class"); *see also id.* at 31–32 (Figure 1 showing more than $16 million in 2022 to 2024 damages and Table 1 showing 2022 average annual variable rate margins ranging from 40% to 194%).

The 2024 NYPSC NOAV indicates that 6,357 XOOM electric customers continued to be served on variable electric "non-renewable contracts," and that XOOM "continued to serve more than approximately 9,000 mass market gas customers" despite its ineligibility to offer any gas products whatsoever in New York.  PX40 at 3–4 ("XOOM Energy was never issued eligibility to market or serve a gas product to mass market customers following the December 2019 Order. . . ."). Astoundingly, this conduct occurred during the Class period even ***after*** XOOM had already been sued in this case and after the NYPSC "strengthen[d] protections for residential and small commercial customers" by "adopting limitations on the types of products that may be offered to mass-market customers by energy services companies . . . to ensure that those customers are receiving value from the retail energy market."  2019 Reset Order at 1–2.

XOOM's complete disregard of NYPSC pricing regulations is relevant to several questions regarding the "central" issue of "the process by which XOOM set rates . . . ."  MSJ Order at 3. First, XOOM's utter disregard of regulations established to protect New York ESCO customers from excessive energy rates ***during the Class period*** speaks to XOOM's bad faith in setting rates. It also makes less likely XOOM's implausible claim that that it built up its variable rate margins with wholly undocumented and uncalculated permissible supply costs, rather than simply including those supposedly additional "supply costs" in the COGS figures in its rate-setting workbooks.

Similarly, a central question at trial will be whether XOOM followed the contractual constraints on its rate-setting conduct and this evidence from the NYPSC is proof of XOOM's disregard of the constraints on its practices toward Class Members.  Again, XOOM was not licensed to sell *any* natural gas to mass market customers in New York after April 2021 and it was *only* permitted to sell qualifying renewable electricity, but it contracted over 6,000 times to sell non-renewable electricity.  This evidence also adds important context to the reams of additional evidence showing that XOOM took advantage of Class Members in violation of the implied covenant of good faith and fair dealing, including that XOOM's historically rich variable rate margins charged to Class members violated regulatory constraints on its rate-setting.  XOOM's motion should be denied.

## XII.   THE SIX REGULATORY AND LEGISLATIVE EXHIBITS CHALLENGED IN XOOM'S MIL NO. 12 ARE ADMISSIBLE
*(Responding to Defs.' MIL No. 12, Defs.' Br. at 30–40)*

### A.  Each of the Exhibits Are Independently Relevant, Rely on One Another, and Together They Provide Critical Context for Several Key Trial Issues

The following six Plaintiff exhibits are challenged in XOOM's MIL No. 12:

(1) **PX35** – NYPSC, Cases 94-E-0952 et al., *Matter of Competitive Opportunities Regarding Electric Service, Opinion 96-12* ("1996 NYPSC Order").

(2) **PX36** – GBL 349-d, Sponsors Mem., 2009 A.B. 1558 ("2009 349-d Sponsors Memo")

(3) **PX37** – NYPSC, Cases 15-M-0127 et al., Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits," issued December 2, 2016 ("2016 NYPSC Notice")

(4) **PX38** – Cases 15-M-0127, et al., *Dep't of Pub. Serv. Staff Redacted Initial Br.*, (Mar. 30, 2018) ("2018 NYPSC Staff Brief")

(5) **PX39** – The 2019 Reset Order

(6) **PX40** – The 2024 NYPSC NOAV

51

These documents undoubtedly make consequential facts more probable than without them. Rule 401.  For example, two of Plaintiff's expert's proposed reasonable margins (the 7.33% figure derived from Method A and the 5.0% figure derived from Method B) are built by referencing the NYPSC's reasonableness determinations regarding ESCO rates.  These methods also rely on the substantial record and independent expertise that produced those findings, most critically the 2019 Reset Order, which as discussed above contains key factual findings from investigations into New York ESCO rates.

As Plaintiff's expert (an energy economist) observed in his report, "[t]hese regulatory developments provide objective criteria an[d] analysis of ESCO pricing in New York, which in turn informs my opinion about the reasonableness of any proposed margin that may be applied in this case following my understanding of the courts' guidance about the contractual constraints on prices set under the [XOOM's contract]."  Am. Expert Report at 18; *see also id.* Ex. A (documents the expert considered include the 1996 NYPSC Order, the 2016 NYPSC Notice, and the 2019 Reset Order).  This is why, for example, the expert's discussion of his preferred 7.33% XOOM margin (Method A) repeatedly references and relies on the factual findings from the 2019 Reset Order.  Am. Expert Report at 28–33.  These references include the NYPSC's grounds for banning ESCO variable rates that exceed the utility rate as well as its ultimate findings about the reasonableness of ESCO variable rates in New York.  *Id.* at 28–33; *see also id.* at 15–16 (chronicling the NYPSC's findings in the 2019 Reset Order, including its conclusion that "[t]here is no need for the ESCOs to provide variable-rate service to customers at a premium to the default utility commodity cost because that service is readily available from the utilities at a just and reasonable rate").

52

Further, as discussed above, the expert's Methods A and B also look to the NYPSC's expertise, independence, and the extensive record supporting the 2019 Reset Order. The 2019 Reset Order, the 2016 NYPSC Notice, and 2018 NYPSC Staff Brief all help to show the scope of this expertise, independence, and record, including, as the Second Circuit recognized in *Martinez*, that the NYPSC's ban on variable rates came after it engaged in "a multi-year process to re-evaluate the market." 88 F.4th at 416 (citing the 2016 NYPSC Notice and quoting the NYPSC's finding that "the New York retail energy market was 'not providing sufficient competition or innovation to properly serve consumers,' and that '[c]ommodity price differentiation has not worked'"); *see also* Am. Expert Report at 15 (quoting the 2019 Reset Order's findings that "after the extensive process associated with this track, neither ESCOs nor any other party have shown, to any meaningful degree of certainty, that ESCO charges above utility rates were generally – or in any specific instances – justified"); *id.* at 12 (citing the 1996 NYPSC Order).

The 2019 NYPSC Order also provides important context related to the New York ESCO market, including that variable energy rates like XOOM's are "[t]he most commonly offered ESCO product." 2019 Reset Order at 11. The 2019 Reset Order in turn quotes and relies on the 2016 NYPSC Notice and the 2018 NYPSC Staff Brief, and arises from and relies on the 1996 NYPSC Order.[26]

Indeed, XOOM will argue at trial that its historically high margins serve as a measure of reasonableness. The timeline of NYPSC and legislative developments adds important context for the jury's assessment of XOOM's claim. Specifically, an independent third party with deep

---

[26] *See* 2019 Reset Order at 3 ("During the last 30 years, the Commission has witnessed significant, and in some instances unexpected, changes in the Retail Energy Market. Ultimately, the Commission reached the conclusion that this market had not evolved as originally intended and, more importantly, was not providing sufficient energy-related benefits for customers.").

expertise in the New York ESCO market has repeatedly criticized the discretionary rate-setting that produced XOOM's margins. That fact clearly bears on the jury's determination of a reasonable margin here. For example, as discussed in the Court's summary judgment ruling (MSJ Order at 6) and extensively in the Amended Expert Report (at 15–18), the 2019 Reset Order bans the exact variable rates XOOM charged the Class specifically because they are unreasonable. The jury should be told that the NYPSC has found "there is no demonstrated customer benefit to allowing ESCOs to offer [ESCO variable rates] to mass market customers." Am. Expert Report at 15-16 (quoting 2019 Reset Order).

Similarly, in 2018, and just weeks before this case was filed, NYPSC staff announced the factual finding that over a 3-year period, 2014 through 2016, roughly two million New York residential and small business customers paid ESCOs like XOOM over $1.3 billion more than they would have paid their utilities *for the exact same energy*. 2018 NYPSC Staff Brief at 2. NYPSC staff found that such massive overcharging was caused by the "the lack of transparency to customers on ESCO prices" which "allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than" they would have paid the utility. *Id.* at 41; *see also id.* at 68 (observing that New York ESCOs have "take[n] advantage of the mass market customers' lack of knowledge and understanding of . . . the electric and gas commodity markets"). The NYPSC staff also found that the vague and undefined pricing terms in ESCO contracts were "obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market," thus "resulting in the fattening of ESCOs' retained earnings." *Id.* at 87.

These findings can and should be considered by the jury when it determines a XOOM margin that is objectively reasonable, proportionate, and set in good faith. The findings likewise

will inform the jury's evaluation of both XOOM's implausible claim that it secretly incorporated undocumented supply cost calculations into the variable rate margins evident from its rate-setting workbooks, and whether that alleged process represented good faith performance of the contract. The regulatory environment in which XOOM's conduct occurred is crucial to the jury's adjudication of the reasonableness of that conduct.

Moreover, these public documents provide relevant evidence as to XOOM's defenses of its conduct, including the various permutations of its caveat emptor defense that the customer's inaction somehow excuses XOOM's disregard of its contractual obligations.  In addition, if Plaintiff's MIL No. 15 is not granted, XOOM will use other ESCOs' margins to justify its own margins.  The evidence in these six exhibits of ESCOs' longstanding price gouging is relevant to the jury's evaluation of XOOM's proposed, high-margin benchmarks.  That evidence is included, for example, in the 2009 349-d Sponsors Memo, which found that deregulation had produced an ESCO "business model" that "is based on taking unfair advantage of consumers" and subjecting them to "onerous contracts" and "short-term 'teaser' rates followed by skyrocketing variable prices." at 3–4.  Similarly, nearly a decade later, the NYPSC Staff found that "ESCOs have deliberately obfuscated prices and resisted market reforms" resulting in massive overcharges. 2018 NYPSC Staff Brief at 1.  "These overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market."  *Id*. at 87.

The 2018 NYPSC Staff Brief also makes clear that "as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers."  2018 NYPSC Staff Brief at 41–42.  "For variable rate products this is due, in large

part, to the fact that ESCOs often offer 'teaser rates' to start, and after expiration of the teaser rate, the rate is changed to what is called a 'market rate' that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated . . . ." *Id.*; *see also id.* at 86 ("ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and 'market based rate' mechanisms that customers are charged after the teaser rate expires."). The NYPSC Staff's comments apply with particular force to XOOM's contract, especially given the bizarre explanation XOOM proposes to offer at trial to explain how it supposedly complied with the contract.

And as noted in Plaintiff's opposition to XOOM's MIL No. 11, the 2024 NYPSC NOAV speaks volumes about the reasonableness of XOOM's conduct here. XOOM's decisions to (1) sell unlicensed energy products to Class Members, and (2) set rates for Class Members in violation of the regulatory constraints imposed by the 2019 Reset Order, are relevant to the jury's assessment of key issues in this case, such as XOOM's implausible claim that it secretly built up its variable rate margins with a wholly undocumented supply cost calculation. In other words, the fact that XOOM sold unlicensed energy products at impermissibly high rates to Class Members is evidence that it did not set Class members' rates in compliance with the contract.

Finally, the 1996 NYPSC Order—cited in the Amended Expert Report—will serve as both background on how utility variable rates are set ("to recover prudently incurred costs and to provide a fair return on investment"), as well as explain deregulation's purpose. Am. Expert Report at 11–12; *see also* 1996 NYPSC Order at 28 ("Market forces overall are expected to produce, over time, rates that will be lower than they would be under a regulated environment.").

56

The 1996 NYPSC Order will thus be part of Plaintiff's expert's background testimony meant to educate the jury on New York's wholesale and retail energy markets, the role of ESCOs within those markets, and the regulatory and legislative responses to ESCOs' conduct over time.  *See* ECF 233 at 52–53 (Plaintiff's MIL No. 10).  The jury should know, just as the Court noted in the background section of its summary judgment ruling, that "[i]n 1996, New York deregulated its energy markets with the goal of fostering competition and lowering rates for consumers."  MSJ Order at 2.  This "allowed the proliferation of ESCOs like XOOM," which "are essentially middlemen" that "purchase energy from producers on the wholesale market and sell it to consumers."  *Id.*  All of these facts, and the documents containing them, are relevant.

### B.  XOOM's Ten Irrelevance Claims Fail

Despite these six exhibits' clear relevance, XOOM broadly claims these "documents, and any related testimony or argument are entirely irrelevant."  Defs.' Br. at 30.  XOOM then adopts a scattershot approach, lodging ***ten*** relevancy challenges that are all easily dispatched.

***First***, XOOM formalistically claims that these six documents are irrelevant because they "were not incorporated in" XOOM's contract and are thus "not relevant to" those contracts or XOOM's ultimate rates.  Defs.' Br. at 31.  Rule 401's test for relevant evidence is not so narrow.  XOOM also mixes non sequiturs with demonstrably false claims: "None of the documents discuss contract interpretation, variable-rate margins, how variable rates should be set, or what margins are reasonable for an ESCO to include in its rates."  *Id.*  The Court has already interpreted XOOM's contract and explained "how variable rates should be set."  And as explained above, these six documents ***do*** bear on variable rate margins and their reasonableness, as well as other important trial issues like XOOM's credibility and its defenses, important background on New York's deregulated energy market, and the effect vague contract terms like XOOM's have on consumers.

**Second**, XOOM claims any reference to the 2009 349-d Sponsors Memo is irrelevant because Plaintiff does not plead a stand-alone cause of action under GBL § 349-d, or suggest that XOOM violated it in any way.  Defs.' Br. at 30, 34.   Again, the test for relevant documents is not that narrow.  The factual findings from the 2009 349-d Sponsors Memo tend to make Plaintiff's key claims more probable.

**Third**, XOOM claims the 1996 NYPSC Order was not "incorporated into [Plaintiff's] contract" and that Plaintiff has not suggested XOOM failed to comply with the deregulation order.  Defs' Br. at 30.  As discussed above, the 1996 NYPSC Order is independently relevant and is central for understanding other relevant documents and important trial issues.

**Fourth**, XOOM claims Dr. Eryilmaz admitted that the NYPSC did not sign off on XOOM's contract or that the NYPSC "specifically considered this lawsuit in reaching the decision with the [2019 Reset Order].  Defs' Br. at 31.  Those are strawman arguments.[27]

**Fifth**, XOOM claims the four exhibits that post-date 2013—the 2016 NYPSC Notice, the 2018 NYPSC Staff Brief, the 2019 Reset Order, and the 2024 NYPSC NOAV—are all irrelevant merely because they are dated after the Class period had already started in January 2013 and Plaintiff was no longer a customer.  Defs.' Br. at 32.  XOOM's formalism is meritless.  These documents have independent relevance to an assessment of the objective reasonableness of XOOM's margins, an inquiry that does not turn on **when** XOOM's conduct occurred or **when** these documents' findings were made.  Further, the Class period continues until "the date of judgment" (Class Order at 18) and XOOM admits that its pricing process has been the same

---

[27] In addition, and again, Dr. Eryilmaz's role in the original report was to "conduct the quantitative analysis" and not to "analyze the . . . contract."  Ex. C, Deposition Transcript of Derya Eryilmaz, Ph.D., dated November 15, 2022 at 12:4–16.  She is no longer employed at Charles River Associates (the firm of Plaintiff's energy economist Mr. Adamson) and was not available to participate in the quantitative analysis executed in the Amended Expert Report.  Am. Expert Report at 2.  For the amended report, that work was done by Mr. Adamson himself.  *Id.* at 6.

throughout.  *See, e.g.,* Plaintiff's MIL No. 3; *see also* ECF 134, XOOM's Class Opp'n at 12 (admitting that "without exception" its variable rates were "always determined" via the same process).

XOOM claims *Martinez* supports its timeline argument but that is simply not true. XOOM's reliance on *Martinez* here again ignores the Second Circuit's observation ***in Martinez itself*** that courts in this Circuit take a "case-by-case" approach to evaluating ESCO breach of contract claims.  88 F.4th at 410.  A fair reading of the *Martinez* pages cited by XOOM shows that the Second Circuit never made the point XOOM argues in its brief.  In *Martinez*, the plaintiff tried to use 2019 Reset Order's ban of non-guaranteed variable rates to construe the contract term "competitive," even though that term was agreed upon three years before the 2019 Reset Order. *Id.* at 417, n.12.  By contrast, trial in this case will concern XOOM's compliance with its contract— which the Court has already interpreted—throughout the Class period, including questions of XOOM's reasonableness and good faith which are governed by objective standards.

*Martinez* makes this distinction clear.  Specifically, the *Martinez* plaintiff advanced two theories of breach, with the second theory relevant to this MIL.   The first theory, as discussed above in response to XOOM MIL Nos. 5 and 8, was that the ESCO breached its pricing term's promise to set rates at its "discretion" based on its consideration of its "costs, expenses and margins," including the cost of an additional home warranty product.  88 F.4th at 415.  The *Martinez* plaintiff's second theory was that the ESCO breached a contractual promise that its rates would be "competitive."  *Id.* at 415–17.  The Second Circuit disagreed, finding that the "broad," "general," and "undefined" term "competitive" was limited by the contract's "significantly more specific" pricing term, which expressly listed the "factors that [the ESCO] may consider when exercising its rate-setting discretion."  *Id.* at 415.

59

Then, the Second Circuit added three levels of dicta: (1) that the undefined term "competitive" was too indefinite to be enforceable; (2) that the ESCO's "competitors" were not identified in the contract; and (3) that there was record evidence that the *Martinez* ESCO's rates ***were*** competitive with other ESCOs.  *Id.*  Finally, as a fourth degree of dicta, in a footnote, the Second Circuit stated that the fact that the 2019 Reset Order "reflects a public policy judgment that ESCOs . . . must compete against—and guarantee savings over—default utilities" was not relevant to the *Martinez* plaintiff's "competitive" breach claim because the "competitive" term was agreed upon three years before the 2019 Reset Order ***and*** Agway was expressly exempted from the 2019 Reset Order's guaranteed savings requirement because the PSC found (in the 2019 Reset Order itself) that "the specific, credible evidence [that the *Martinez* ESCO] submitted regarding the energy-related value of [its home warranty product]" warranted an exemption.  *Id.* at 417, n.12.

XOOM latches on to this footnote and claims "[f]or exactly that reason, none of the" post-2013 exhibits (the 2016 NYPSC Notice, the 2018 NYPSC Staff Brief, the 2019 Reset Order, and the 2024 NYPSC NOAV) "are relevant to Plaintiff's claim."  Defs.' Br. at 32.  XOOM stretches this *Martinez* dicta well past the breaking point.  Again, questions of XOOM's reasonableness and good faith are governed by objective standards. The developments in the New York regulatory environment—and the events and findings that prompted those developments— provide context for applying those objective standards.  That this context emerged throughout the Class period does not make it less illuminating or somehow unfair to XOOM.  There is thus no

reasonable way to analogize Plaintiff's proposed uses of the four post-2013 exhibits to the question addressed in dicta in *Martinez*.[28]

**Sixth**, XOOM recycles its claim from its MIL No. 8 that "[t]he question of whether an ESCO charged appropriate variable rates can be answered only by looking to the variable rates that *other ESCOs charged*." Defs.' Br. at 33 (emphasis in original). That claim fails for the same reasons discussed in Plaintiff's opposition to MIL No. 8.

**Seventh**, XOOM makes the odd claim that the 2019 Reset Order is irrelevant because it supposedly touches only on "***rates*** (not margins)." Defs.' Br. at 34–35. XOOM's argument ignores the uncontested algorithm at the heart of its cost-plus contract.

**Eighth**, XOOM recycles its claim that fixed rate margins are not relevant to variable rate margins and adds the claim that the PSC's fixed rate 5% cap over average variable utility rates is irrelevant to the question of XOOM's margin. Defs.' Br. at 34–35. XOOM's recycled objection to comparing its average fixed rate margins to its much higher variable rate margins is rebutted in Plaintiff's response to XOOM MIL No. 4. XOOM forgets that at class certification, the Court found that comparing these two margins was "entirely consistent with plaintiff's theory" of breach. Class Order at 14.

XOOM's new claim that the 5% figure cannot be applied to XOOM's costs (as opposed to a rate) ignores the fact that the NYPSC determined the 5% figure was a "just and reasonable" "price premium" for riskier fixed rate products and that the 5% figure was derived from the "typical risk premium in financial markets." 2019 Reset Order at 67. This was explained in Plaintiff's response to XOOM's MIL No. 8 and nothing about the PSC's logic suggests that 5% would not

---

[28] XOOM's citation to *Tyson Foods* is also inapposite for the same reasons stated in Plaintiff's opposition to XOOM's MIL No. 5.

be an acceptable adder to XOOM's costs here.  If anything, because of variable rates' lower risk, the figure could well be lower than 5%.

XOOM is similarly wrong to suggest the 2018 NYPSC Staff Brief's criticism of ESCO fixed rate premiums of "20 to 30 percent" helps its relevancy argument here.  Defs.' Br. at 35 (quoting 2018 NYPSC Staff Brief at 88).  Aside from demonstrating the usefulness of these independent findings by parties with deep expertise in XOOM's New York market, XOOM's analysis of the 2018 NYPSC Staff Brief is off base.  That document makes clear that 20% markups are excessive, "do not provide the customer material 'value,'" and that a premium "in the five to six percent range" was sustainable for this riskier ESCO product.  2018 NYPSC Staff Brief at 88. Further, and as noted in Plaintiff's expert's report (at 17), while the 2019 Reset Order did not find record evidence that "the majority" of New York ESCOs were charging such margins on fixed rate offerings, the 2019 Reset Order did make clear that such margins were not "just and reasonable."  2019 Reset Order at 67.   2018 NYPSC Staff Brief

*Ninth*, XOOM recycles its complaints about references to utility rates and then directs them at the 2019 Reset Order.  Defs.' Br. at 35.  XOOM's criticisms fail for the same reasons XOOM's MIL No. 8 fails.

*Tenth*, XOOM claims the documents related to the 2019 Reset Order (the 2016 NYPSC Notice, the 2018 NYPSC Staff Brief, and the 2024 NYPSC NOAV) are all irrelevant because they are merely connected to the 2019 Reset Order.  Defs.' Br. at 36.  As discussed above, those documents all have independent relevance and together shed important light on several central trial issues.

### C.  XOOM's Vague Unfair Prejudice Claims Lack Merit

XOOM first broadly claims these documents "can only prejudice XOOM by wrongly suggesting that XOOM was a specific focus [of those relevant marketplace findings and

developments] or that XOOM did something improper in the past." Defs.' Br. at 30. XOOM also claims the documents will cause the jury to "improperly apply the *prospective* changes the PSC made to the private energy market beginning in *2021* to hold XOOM liable to the class *retroactively* all the back to 2013." *Id.* at 32 (emphasis in original). Neither of XOOM's generalized prejudice claims are convincing. Evidence of the regulatory environment in which XOOM operates will not cloud the jury's judgment—it will inform it.

Moreover, that these facts hurt XOOM's defenses does not make them unfair, especially since XOOM does not even try explaining how a limiting instruction would not suffice. XOOM is also wrong to raise timeline issues, again failing to demonstrate why a limiting instruction would be futile. As already noted, that a regulatory finding bearing on the reasonableness of some aspect of XOOM's conduct happened later does not make the finding less relevant to the jury's consideration of the objective reasonableness of XOOM's margin.

Next, XOOM lodges two specific attacks, but both are easily dispatched. First, XOOM claims the jurors will be confused if they hear that the 2019 Reset Order imposed a 5% cap on fixed rates over the prior year's utility rates. Defs.' Br. at 36. Other than conclusory claims of "juror confusion," XOOM offers no justification for essentially excluding one of Plaintiff's three proposed reasonable margins. Nor does XOOM explain how its concerns cannot be addressed by a limiting instruction.

Second, XOOM claims that introducing the 2024 NYPSC NOAV would taint the jury with "unproven allegations about XOOM's compliance with regulations that are not part of the contracts at issue here." Defs.' Br. at 37. Not so. The short answer is that XOOM was never free to brush aside the NYPSC's orders or regulations, or the NYPSC's determination that after April 2021 XOOM was not authorized to sell natural gas or non-renewable electricity to New Yorkers,

including Class Members.  Its breezy dismissal of the NYPSC's order as "unproven allegations" speaks volumes about XOOM's conduct.  *Id.*  XOOM's own data produced in this litigation shows that despite not being allowed, XOOM made those unauthorized sales to Class Members, and lots of them.  This is a bad fact for XOOM, but it is not unfair.  And as discussed above, the 2024 PSC NOAV has probative value on multiple key issues.

### D.  The Challenged Exhibits Are Admissible as Public Records

The six regulatory and legislative documents are admissible as public records under Rule 803(8).[29]  "Admissibility of evidence covered under Rule 803(8) 'is generally favored' and presumed."  *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, No. 18 Civ. 6449, 2023 WL 2403258, at *11 (E.D.N.Y. Mar. 7, 2023) (quoting *Harte v. Ocwen Fin. Corp.*, No. 13 Civ. 5410, 2018 WL 1830811, at *18 (E.D.N.Y. 2018)).   The Second Circuit has described Rule 803(8)'s lenient standard as follows:

> Indeed, prevailing law on this issue indicates that admissibility of evidence of this sort is generally favored.  *See* Rule 803(8)(C) of the Fed. R. Evid.  Reports such as those issued by the [Temporary Commission of Investigation of the State of New York] are presumed to be "admissible in the first instance," *Masemer v. Delmarva Power and Light Co.*, 723 F.Supp. 1019, 1021 (D. Del. 1989), and the "party opposing the introduction of a report bears the burden of coming forward with enough 'negative factors' to persuade a court that a report should not be admitted." *Id.*, citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167, 109 S.Ct. 439, 448, 102 L.Ed.2d 445 (1988). This presumption of admissibility extends not merely to factual determinations in the narrow sense, but also to conclusions or opinions that are based upon a factual investigation.

*Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991).  Similarly, the advisory committee's note to Rule 803(8) indicates that the public record exception "assumes admissibility in the first instance . . . ."  Fed. R. Evid. 803(8) advisory committee's note.

---

[29] To the extent XOOM contends the challenged documents are inadmissible hearsay and the Court agrees with XOOM's contentions, Plaintiff respectfully requests the opportunity to call as witnesses the individuals responsible for preparing the documents to mitigate any hearsay concerns

Under Rule 803(8), public records are not inadmissible hearsay if they contain (1) factual findings (2) from legally authorized investigations.  Fed. R. Evid. 803(8)(A)(iii).  "Once the party seeking admission has met the minimum requirements and shows that the evidence contains factual findings and was made based on an investigation made pursuant to legal authority, the burden shifts to the opposing party to demonstrate a lack of trustworthiness."  *RVC Floor Decor*, 2023 WL 2403258, at *11 (quoting *Harte*, 2018 WL 1830811, at *18); *see also* Fed. R. Evid. 803(8)(B).  As set forth below, both prongs of the Rule 803(a) test are met.  The six exhibits arise from legally authorized investigations and contain factual findings.  XOOM also fails to rebut the presumption of admissibility of these public records.

1.  The Challenged Documents Are the Results of "Legally Authorized Investigations"

It is indisputable that the NYPSC is legally authorized to investigate ESCOs.  *See* N.Y. P.B.S. § 5(b)(1) (granting the NYPSC jurisdiction and supervision over the "sale or distribution of gas (natural or manufactured or mixture of both) and electricity for light, heat or power"); *id.* § 66(2) (granting the NYPSC authority to "investigate the methods employed by such persons, corporations and municipalities in manufacturing, distributing and supplying gas or electricity for light, heat or power and in transmitting the same . . . .").[30]  Because the NYPSC's investigations

---

[30] XOOM unpersuasively argues in a footnote that the NYPSC was not legally authorized to investigate ESCOs' margins.  Defs.' Br. at 38 n.15.  This argument is expressly refuted by the enabling statute, which authorizes the NYPSC to "[e]xamine all persons, corporations and municipalities under its supervision and keep informed as to the methods, practices, regulations and property employed by them in the transaction of their business" including to determine whether the "rates, charges or classifications or the acts or regulations of any such person, corporation or municipality are unjust, unreasonable, unjustly discriminatory or unduly preferential or in anywise in violation of any provision of law.").  Indeed, the New York Court of Appeals has conclusively established the NYPSC's authority regarding ESCOs' margins. *See Nat'l Energy Marketers Ass'n v. New York State Pub. Serv. Comm'n*, 126 N.E.3d 1041, 1048 (N.Y. 2019) ("[U]nder its authority to regulate utilities' transportation of ESCOs' gas and electricity, the PSC may condition access to utility infrastructure upon ESCOs' compliance with a price cap on gas or electricity. . . .  [T]he PSC has always had the additional duty of preventing 'extortionate competition' and 'oppressive or discriminating charges.'"); *see also id.* at 1049 ("Article 4 [of the New York Public Services

65

(*Footnote continued on next page*)

are legally authorized, its factual findings from those investigations are therefore subject to the public records exception to the rule against hearsay.

2.   All of the Challenged Documents Contain "Factual Findings"

The term "factual findings" as used in Rule 803(8)(A)(iii) is broadly construed.  *See Gentile*, 926 F.2d at 148 (general principle favoring application of Rule 803(8) "extends not merely to factual determinations in the narrow sense, but also to conclusions or opinions that are based upon a factual investigation.").  Indeed, Supreme Court precedent has long established that the "factual findings" requirement in the public records exception is flexible:

> Rather than requiring that we draw some inevitably arbitrary line between the various shades of fact/opinion that invariably will be present in investigatory reports, we believe the Rule instructs us—as its plain language states—to admit "reports ... setting forth ... factual findings."  The Rule's limitations and safeguards lie elsewhere: First, the requirement that reports contain factual findings bars the admission of statements not based on factual investigation.  Second, the trustworthiness provision requires the court to make a determination as to whether the report, or any portion thereof, is sufficiently trustworthy to be admitted . . . .  We see no reason to strain to reach an interpretation of Rule 803(8)(C) that is contrary to the liberal thrust of the Federal Rules.

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988).  All of the challenged documents contain "factual findings," as described by *Beech Aircraft Corp*.

**First**, PX35, the 1996 NYPSC Order, provides a summary of factual findings and the positions of parties following "an investigation of issues related to the future regulatory regime for the provision of electric service in light of competitive opportunities . . . ."  PX35, at 2.  Those findings are clearly within Rule 803(8)'s scope.

---

law] provides direct support for the PSC's authority to regulate utilities' infrastructure and thus condition ESCO's [*sic*] access to that infrastructure on compliance with a price cap.").  The Court of Appeals expressly found the NYPSC did not exceed its authority in the 2019 Reset Order.  *Id.* at 1050.

66

***Second***, PX37, the 2016 NYPSC Notice, describes that "[a]fter considerable experience with the offering of retail service to mass market customers by ESCOs, the Commission has determined that the retail markets serving mass-market customers are not providing sufficient competition or innovation to properly serve consumers." PX37, at 3. This and the other public factual findings were made by the NYPSC only after its extensive investigations into the ESCO marketplace. *See* PX37, at 1, 3 nn.2–3 (citing the NYPSC's factual findings from Case 12-M-0476, Case 15-M-0127, and Case 98-M-1343).

***Third***, PX38, the 2018 NYPSC Staff Brief, describes that eight years earlier "in 2010, in response to many high bill complaints from ESCO customers, Department Staff began to investigate and evaluate the prices that ESCOs were charging." PX38, at 9. "Among the most significant of Staff's findings was the large premiums charged for commodity services by ESCOs compared to the utilities with no readily apparent energy-related value-added attributes." *Id.* The 2018 NYPSC Staff Brief undeniably contains the "Staff's findings" based on its investigations.

***Fourth***, PX39, the 2019 Reset Order, notes that it was issued "after lengthy investigation" and describes the NYPSC's factual findings and conclusions based on that "lengthy investigation." PX39 at 2.

***Fifth***, PX40, the 2024 NYPSC NOAV, specifically recounts the date and scope of XOOM's November 16, 2020 application to serve New York customers following the 2019 Reset Order, including that on January 21, 2021 XOOM was granted "eligibility to serve only a renewable [electricity] product to mass market customers in New York State" but "no other products that it may have served to mass market customers in the past." PX40, at 2. The 2024 NYPSC NOAV then indicates its factual finding based on its 2023 "annual renewable energy audit" that XOOM supplied "5,859 MWh of load . . . with a non-compliant voluntary renewable

product." *Id.* at 3.   XOOM argues this document falls outside the scope of the public records exception because it discusses future investigations of XOOM's sales practices.  Defs.' Br. at 39. That the NYPSC indicates further scrutiny of XOOM is warranted based on its overt disregard of the NYPSC's narrow authorization of its product mix does nothing to refute the fact that this public record contains the NYPSC's factual findings from XOOM's 2020 application through the NYPSC's 2023 audit investigation.

**Sixth**, PX36, the 2009 349-d Sponsors Memo, is admissible pursuant to Rule 803(8)(A)(i) because it "sets out the office's activities."  Here, the Sponsors Memo sets out the office's activities because it describes the purpose, summary, and legislative history of the bill it passed, which is precisely the activity of the New York legislature.  *See In re Vitamin C Antitrust Litig.*, No. 05 Civ. 453, 2012 WL 4511308, at *2 (E.D.N.Y. Oct. 1, 2012) ("Nonetheless, since the Ministry Statements do pertain to the activities of the Ministry . . . concerning the regulation of vitamin C production, the Court will assume that the requirements of Rule 803(8)(A)(i) are satisfied."); *see also Chapman v. San Francisco Newspaper Agency*, No. 01 Civ. 2305, 2002 WL 31119944, at *2 (N.D. Cal. Sept. 20, 2002) (finding document to be a public record under Rule 803(8)(i) because it was "a record of the activity that the [agency] carries out . . . .").  Because the legislature is a public office whose activity is legislating, records regarding such legislation are public records.

Accordingly, all six challenged exhibits meet the requirements of Rule 803(8)(A).

### 3.   XOOM is Wrong to Argue that the Challenged Documents Do Not Meet the Requirements of Rule 803(8)(A)

XOOM next presents three unpersuasive arguments against the application of the public records exception: (1) certain of the documents include descriptions of prospective agency activity; (2) the documents contain a mix of factual findings and other conclusions; and (3) some of the findings are non-final.  Defs.' Br. at 37–39.  All three arguments fail.

First, the hearsay exception applies regardless of whether the documents indicate prospective agency activity. XOOM bases its argument on two inapposite cases. XOOM first cites *Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir. 1998) for the proposition that reports about future departmental behavior are not covered by Rule 803(8). But that is a careless reading of *Ariza*. The report in *Ariza* did not satisfy Rule 803(8) because it was not factual in nature. Instead, "[i]t was a summary of the attitudes and beliefs of a small group of officers, and was therefore evidence only of those officers' attitudes and beliefs." *Id.* That is why the report did not meet the public records exception—not because of its recommendations for prospective agency action. *Id.* The six exhibits XOOM challenges here all contain factual findings, not selected individual opinions. That some of the challenged documents contain forward-looking recommendations does not place them outside the purview of the public records exception.

XOOM's citation to *United States v. Am. Tel. & Tel. Co.*, 498 F. Supp. 353 (D.D.C. 1980) fares even worse. That opinion predated and is inconsistent with the Supreme Court's articulation of Rule 803(8)'s flexible standard, making it bad law. *Compare Am. Tel. & Tel. Co.*, 498 F. Supp. at 360–61 (requiring courts to "examine" the "subject matter of the paragraphs designated within each docket to determine which of these constitute findings of facts or conclusions drawn from such findings, on the one hand, and which are more fully oriented towards future conduct or policy, on the other"), *with Beech Aircraft Corp.*, 488 U.S. at 169 ("Rather than requiring that we draw some inevitably arbitrary line between the various shades of fact/opinion that invariably will be present in investigatory reports, we believe the Rule instructs us—as its plain language states—to admit "reports ... setting forth ... factual findings."), *and id.* at 170 ("We hold, therefore, that portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual

investigation and satisfies the Rule's trustworthiness requirement, ***it should be admissible along with other portions of the report.***" (emphasis added)).  Moreover, *Am. Tel. & Tel. Co.* ultimately held "that the findings of anticompetitive, unfair, or unreasonable rates and practices reached by the FCC as a result of facts found by that agency in the course of its investigations are admissible under Rule 803(8)(C)." *Am. Tel. & Tel. Co.*, 498 F. Supp. at 366.  The public records exception applies even if the challenged documents contain prospective recommendations.

XOOM's second argument—that reports containing a mix of factual findings and opinions are not covered by the exception—is also foreclosed by *Beech Aircraft Corp.*  Indeed, XOOM's only support for that argument comes from *Am. Tel. & Tel. Co.*, which predated *Beech Aircraft Corp.*'s binding articulation of the applicable standards.

Third, XOOM challenges PX40, the 2024 NYPSC NOAV, as a non-final report based on *City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981), which held that a non-final report could fall outside the public records exception's purview.  As described above, the 2024 NYPSC NOAV is not a preliminary report.  Rather, it contains findings based on the NYPSC's records regarding XOOM's application to serve New York customers under the 2019 Reset Order and the NYPSC's 2023 audit of XOOM—in other words, factual findings from an investigation. That the factual findings from its audit spurred the need for additional investigation of XOOM's practices does not alter the finality of the NYPSC's findings set forth in that the 2024 NYPSC NOAV.[31]

---

[31] To the extent the Court is concerned that the jury could consider PX40 for an improper purpose, such concern could be easily mitigated by a limiting instruction that the jury should consider PX40 only for its conclusions based on the NYPSC's records regarding XOOM's application to serve New York customers under the 2019 PSC Order and the NYPCS's 2023 audit of XOOM.

Moreover, even if the entire document were considered non-final, courts in the Second Circuit recognize that non-final reports still qualify as public records if they have sufficient indicia of trustworthiness.  *See, e.g.*, *In re the Bear Stearns Cos., Inc. Sec.*, No. 08 MDL 1963, 2016 WL 4098385, at *4 n.4 (S.D.N.Y. July 25, 2016) (distinguishing *Pullman* because the report in *Pullman* "constituted only a review of proposals"); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 155 (D. Conn. 2009) ("Not only is the report at issue in *Pullman* distinguishable from the [relevant report], but the Court's consideration [in *Pullman*] of Rule 803(8)(C) included factors in addition to the lack of finality that weighed against admission under the hearsay exception.").  Here, the 2024 NYPSC NOAV is being offered because of its factual findings and falls within the public records exception.

XOOM thus fails to offer a persuasive reason why any of the challenged documents fall outside the purview of the public records exception.

### 4.   XOOM Fails to Carry Its Burden to Show the Challenged Documents Are Not Trustworthy

Having established that all six challenged documents meet Rule 803(8)(A)'s requirements, the burden shifts to XOOM to prove why those public records are untrustworthy.  Fed. R. Evid. 803(8)(B); *RVC Floor Decor*, 2023 WL 2403258, at *11.  "When evaluating the trustworthiness of a factual report, [courts] look to (a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems."  *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) (citing advisory committee's note to Rule 803(8)).  While these factors are not exhaustive, XOOM's motion tellingly does not mention this standard or address any of these factors.[32]  The

---

[32] XOOM has the burden of proof on the issue of trustworthiness.  Because it did not mention the applicable standard or the factors considered under that standard, it has failed to carry its burden.  XOOM should not

(*Footnote continued on next page*)

public records exception "assumes admissibility in the first instance" unless "**sufficient negative factors** are present." *Id.* (emphasis in original).  The trustworthiness factors here decidedly cut in favor of admissibility.

The first factor—timeliness—weighs in favor of trustworthiness because the investigations and subsequent reports were prompt.  XOOM has not contested the timeliness of the investigations or reports.

The second factor—special skills or experience of the official—likewise weighs in favor of trustworthiness.  The NYPSC is made up of civil servants with special skills and experience in the relevant topics.  XOOM has not contested the NYPSC's special skills or experience.

The third factor—whether a hearing was held—"is not determinative by itself."  *Id.* Hearings specifically relevant to the subsequent documents were conducted in advance of PX35 (the 1996 NYPSC Order), PX39 (the 2019 Reset Order), and PX38 (the 2018 NYPSC Staff Brief). Debate was conducted before PX36 (the 2009 349-d Sponsors Memo).  Hearings were held on the relevant topics, but not specifically in relation to the subsequent reports contained in PX37 (the 2016 NYPSC Notice).  XOOM has not raised the issue of hearings, but this prong clearly favors admissibility of the challenged documents.

The fourth factor—possible motivation problems—also favors trustworthiness.  This factor stems from a concern about "possible bias when reports are prepared with a view to possible litigation." *Beech Aircraft Corp.*, 488 U.S. at 167 n.11.  There has been no suggestion that these reports are biased or prepared with a view to possible litigation.

---

be permitted to first attempt to meet its *prima facie* burden in its reply.  In any event, the factors strongly weigh in favor of each of the challenged documents.

XOOM does not present any evidence or argument that the relevant factors cut against trustworthiness.[33]  Indeed, all the factors articulated by the Second Circuit in *Bridgeway* strongly weigh in favor of trustworthiness.  XOOM argues that PX38 (the 2018 NYPSC Staff Brief) is not trustworthy because its statement that "the majority of ESCOs charge a premium of more than 20%" was "overstated" according to PX39 (the 2019 Reset Order).  However, XOOM's selective quotation omits the very next clause of the same sentence, in which the 2019 Reset Order makes clear that on that very point, the NYPSC "share[s] Staff's ultimate concern."  PX39 at 67.  In any event, XOOM's point does not go to trustworthiness, but rather establishes that if the evidence is admitted, XOOM still has "the ultimate safeguard—the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions."  *Beech Aircraft Corp.*, 488 U.S. at 168.

XOOM also challenges the trustworthiness of PX39 (the 2019 Reset Order) for making findings about applicable rates outside the NYPSC's authorized scope.  However, that challenge was fully litigated and the New York Court of Appeals already held "the PSC did not exceed its authority under the Public Service Law . . . in issuing the Reset Order."  *Nat'l Energy Marketers Ass'n*, 126 N.E.3d at 1050.

Accordingly, the challenged documents are all subject to the public records exception, and XOOM fails to carry its burden to establish that the records lack trustworthiness.[34]

---

[33] XOOM's contention that the NYPSC needs first-hand knowledge to issue trustworthy reports is meritless.  First, such a rule would essentially swallow the hearsay exception as most investigative reports rely on evidence other than personal knowledge of the investigators.  Second, XOOM cites no in-Circuit precedent for this purported theory.

[34] XOOM challenges the admissibility of the complete documents, and as such, Plaintiff responds in kind.  To the extent the Court thinks portions of the challenged documents should be excluded, Plaintiff respectfully requests an opportunity to admit portions of the documents.  While Plaintiff contends the documents are admissible in whole, if the Court disagrees, Plaintiff respectfully requests (1) the documents be admitted in their entireties with an appropriate limiting instruction; (2) that the issue be determined at

*(Footnote continued on next page)*

### E.  The Challenged Documents Are Not Improper Expert Evidence

XOOM claims the challenged documents fail under *Daubert* and are untimely.  Defs.' Br. at 39–40.  XOOM's arguments are red herrings.  First, the challenged documents are not expert reports.  They include both facts and opinions, but are predominately factual.  That those factual documents also contain opinions does not make them expert opinion evidence.  Indeed, the Supreme Court has already ruled that "portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." *Beech Aircraft Corp.*, 488 U.S. at 170; *see also id.* at 169 ("A broad approach to admissibility under Rule 803(8)(C), as we have outlined it, is also consistent with the Federal Rules' general approach of relaxing the traditional barriers to 'opinion' testimony.  Rules 702–705 permit experts to testify in the form of an opinion, and without any exclusion of opinions on 'ultimate issues.'  And Rule 701 permits even a lay witness to testify in the form of opinions or inferences drawn from her observations when testimony in that form will be helpful to the trier of fact.  We see no reason to strain to reach an interpretation of Rule 803(8)(C) that is contrary to the liberal thrust of the Federal Rules.").

Even XOOM's cited cases recognize this point.  *See, e.g.*, *Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 962 (9th Cir. 1998) ("In the *Beech Aircraft* decision, the Supreme Court was quick to point out that one of the main 'safeguards' of Rule 803(8)(C) is the trustworthiness provision that requires the district court to make a determination as to whether the report, or any portion thereof, is sufficiently trustworthy to be admitted.  In other words, the district court's

---

trial based on what specific portions are discussed during testimony; or (3) an opportunity to present to the Court excerpted or redacted versions of the documents.

'gatekeeper' role is not abrogated simply because the evidence falls under Rule 803(8)(C).") (cleaned up).  Put differently, the "gatekeeper" function is upheld by the "trustworthiness" test of Rule 803(8) rather than *Daubert*.[35]

XOOM's last argument that the documents are untimely expert reports lacks merit.  First, the documents are not expert reports subject to the expert disclosures set by the Court's schedule.  They are public records.  Second, XOOM was already aware of the documents because they were issued publicly by the NYPSC.  One of the challenged documents was specifically addressed to XOOM.  Third, even if the documents were untimely disclosed, there is no prejudice as no trial date has been set, meaning XOOM has ample time to coordinate a response to the information contained in those documents.  Indeed, XOOM cites Rule 26(a)(2), but even if the Court were to construe the exhibits as expert testimony, Rule 26(a)(2)(D)(i) requires that such testimony be disclosed only 90 days in advance of trial.  Again, no trial date has been set here.  XOOM's argument that the challenged documents are untimely expert disclosures is thus simply incorrect.

In sum, the challenged exhibits are clearly relevant, not unfairly prejudicial, and admissible.  XOOM's MIL No. 12 should be denied.

## XIII.   THE CLASS SHOULD BE ALLOWED TO RECOVER PUNITIVE DAMAGES FOR XOOM'S TORTIOUS CONDUCT
*(Responding to Defs.' MIL No. 13, Defs.' Br. at 41–44)*

As explained in Plaintiff's MIL No. 13, under North Carolina law, the Class is entitled to punitive damages because XOOM's conduct constitutes an independent tortious act accompanied by an element of aggravation.  ECF 233 at 63–64.  As also explained, the tortious act is governed

---

[35] To the extent the Court disagrees and thinks the documents are subject to *Daubert*, Plaintiff respectfully requests an opportunity to fully brief this issue, rather than burden the Court here with a complete *Daubert* analysis for each of the six challenged documents in response to a few throw-away sentences at the end of Defendants' MIL No. 12.

by New York law.  *Id.* at 64 n.29.   XOOM's violation of GBL § 349, which is a tort, was accompanied by an element of aggravation—willful and wanton disregard for government oversight and the public's well-being.

XOOM first argues that Plaintiff "has not pleaded or pursued a theory of recovery based on punitive damages." Defs.' Br. at 41.  But this is not required.  "Under Rule 54(c) of the Federal Rules of Civil Procedure, a court can grant any relief to which a prevailing party is entitled, whether or not that relief was expressly sought in the complaint."  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004).  Moreover, the complaint includes the request to "[g]rant all such other relief as the Court deems appropriate."  ECF 42, Am. Compl. at 26.

As explained in Plaintiff's MIL No. 13, while the breach of contract claim is governed by North Carolina law, whether the action "constitutes or is accompanied by" an independent tort is governed by New York law.  *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997) ("It is possible that, under New York's choice of law rules, the law of different jurisdictions can apply to the tort claims and the contract claims in a given suit."); *Babcock v. Jackson*, 12 N.Y.2d 473, 484 (1963) (applicable law can vary for different aspects of a case and "it is more than likely that it is the law of the place of the tort which will be controlling . . . .").

All of XOOM's case citations applying North Carolina law are inapposite for this reason.[36] XOOM's cases are further not on point because each barred punitive damages for breach of

---

[36] *Britt-Wagner v. D&B Enterprises of Florence, LLC*, No. 22 Civ. 4, 2022 WL 2651847, at *2 (E.D.N.C. July 8, 2022); *Great Am. Emu Co. v. E.J. McKernan Co.*, 509 F. Supp. 3d 528, 543 n.3 (E.D.N.C. 2020); *Booker v. Washington Mut. Bank, F.A.*, No. 06. Civ. 274, 2007 WL 475330, at *6 (M.D.N.C. Feb. 9, 2007); *Deltacom, Inc. v. Budget Telecom, Inc.*, No. 10 Civ. 38, 2011 WL 2036676, at *8 (E.D.N.C. May 22, 2011).

contract only after adjudicating and dismissing independent tort claims.   Here, no such adjudication of the independent tort under GBL §349 has occurred.[37]

Similarly, because New York law applies, XOOM's argument that North Carolina does not recognize a tort of "deceptive advertising" (Defs.' Br. at 42–43) is irrelevant, because New York expressly prohibits "deceptive acts or practices."  GBL § 349(a).  In fact, GBL § 349-d(3) specifically prohibits ESCOs' deceptive acts or practices.[38]

XOOM cites this Court's decision in *Toussie v. Allstate Ins. Co.*, No. 15 Civ. 3235, 2016 WL 6537670, at *3 (E.D.N.Y. Nov. 3, 2016), to argue that Plaintiff's complaint must plead the independent tort that provides the basis for punitive damages as a stand-alone cause of action.  Not so.  The complaint need only contain sufficient allegations regarding the tort.  *See Walker v. Sheldon*, 179 N.E.2d 497, 500 (N.Y. 1961) ("[T]he **allegations** of the complaint before us, if proved, would justify such an award [of punitive damages]." (emphasis added)).  Similarly, in *Toussie*, this Court focused on the relevant allegations: "Plaintiffs do not allege any tortious conduct separate from the alleged bad faith denial of their claim."  2016 WL 6537670, at *8.

Here, the operative complaint includes sufficient allegations to form the basis of GBL § 349 and 349-d(3) claims, which require that "(1) the defendant's conduct was consumer-oriented; (2) the defendant's act or practice was deceptive or misleading in a material

---

[37] XOOM claims with no supporting case law that it will be "substantially prejudiced" because there was no discovery on punitive damages.  XOOM was the master of its own fate in fashioning its discovery demands.  In any event, XOOM also fails to explain what discovery would be needed that has not already been produced.  *See* Defs.' Br. at 41.

[38] XOOM's discussion about North Carolina's Unfair and Deceptive Trade Practices Act, Defs.' Br. at 43–44, is thus irrelevant.  Moreover, GBL § 349 claims do not require reliance, *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940 (2012), nor are they subject to a heightened pleading standard, *Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).  Indeed, GBL § 349 class claims are routinely certified.  *See, e.g.*, *Price v. L'Oreal USA, Inc.*, No. 17 Civ. 614, 2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018).  GBL § 349 class claims against ESCOs arising out of claims made in their form contracts are no different.  *See Claridge v. N. Am. Power & Gas, LLC*, No. 15 Civ. 1261, 2016 WL 7009062, at *6 (S.D.N.Y. Nov. 30, 2016) (certifying class).

way; and (3) the plaintiff suffered an injury as a result of the deception." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 176 (2021).

First, there can be no dispute that XOOM's conduct was consumer-oriented. Similarly, the deceptive act is XOOM's false claim in the pricing term of its customer contract about how it would set the variable rates charged to those customers. Such claims have been repeatedly found to state claims under GBL §§ 349 and 349-d(3). *See, e.g.*, *Mirkin v. Viridian Energy, Inc.*, No. 15 Civ. 1057, 2016 WL 3661106, at *6 (D. Conn. July 5, 2016) (collecting cases and finding ESCO contract's claim "that the variable rate 'may fluctuate from month-to-month based on wholesale market conditions' also constitutes a misleading statement" in violation of GBL §§ 349 and 349-d(3)); *see also Stanley v. Direct Energy Servs.*, LLC, 466 F. Supp. 3d 415, 434 (S.D.N.Y. 2020) (same, sustaining GBL §§ 349 and 349-d(3) claims based on pricing representation in ESCO form contract).

That XOOM's actions were materially misleading is also alleged. ECF 42, Am. Compl. ¶¶ 59, 62 ("[C]onsumers do not receive a price based on the [pricing term]. . . . Instead, consumers are charged rates that are substantially higher and untethered to the supply costs."). The complaint likewise pleads injury that Plaintiff and the Class suffered as a result of XOOM's deception. *Id.* ¶¶ 63–64 ("XOOM's conduct caused injury to Plaintiffs because under the XOOM customer contract, their rate should have been based on XOOM's supply costs, which it was not."). These allegations sufficiently allege GBL §§ 349 and 349-d(3) claims. *See, e.g., Stanley*, 466 F. Supp. 3d at 434.

Further, the complaint pleads the element of aggravation required for punitive damages for a breach of contract, including XOOM's disregard of applicable regulations and its wanton and willful disregard for consumer well-being. *Id.* ¶ 62 ("[A]s uncovered by the PSC's staff regarding

78

the industry as a whole, XOOM's rates are not based on Defendants' supply costs.  They are based on Defendants' greed and the lack of adequate price transparency in the ESCO market.  As such, XOOM's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.").   Because XOOM's conduct constitutes an independent tortious act accompanied by an element of aggravation, Plaintiff and the Class should be allowed to pursue punitive damages and the jury should be instructed on them.  XOOM's motion should be denied.

## XIV.   ALLOWING PLAINTIFF TO USE XOOM WITNESSES' DEPOSITION TRANSCRIPTS IN HER CASE-IN-CHIEF WILL SAVE VALUABLE TRIAL TIME
*(Responding to Defs.' MIL No. 14, Defs.' Br. at 45–46)*

Plaintiff's MIL No. 9 details why Plaintiff should be allowed to read admissions contained in deposition transcripts of former and current XOOM employees into the record as part of her case-in-chief.  ECF 233 at 48–51.  Those employees include Thomas L. Ulry, Andrew Coppola, Troy Chidester, Ryan Park, Patricia Kulesa, and Jason Loehde (both his individual and 30(b)(6) capacities), as well as XOOM's expert David Coleman.[39]  *Id.*

"[T]he deposition excerpts are not offered to the exclusion of live testimony but as a supplement to live testimony in order to shorten the trial time."  *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 560 F. Supp. 2d 227, 312 (W.D.N.Y. 2008) (overruling objection to designation of available witness' deposition testimony).  Indeed, courts routinely allow the designation of deposition testimony "due to cost considerations" or "a desire not to waste trial time."  *Id.* at 312; *see also Borchardt v. United States*, 133 F.R.D. 547, 548 (E.D. Wis. 1991) (permitting deposition designations in lieu of live testimony in view of court's "prefer[ence] to use the most cost-effective method of providing the facts to the fact-finder whenever possible"); *SCM*

---

[39] The admissibility of Mr. Coleman's deposition testimony is further discussed in Plaintiff's separately filed motion *in limine* to exclude his expert testimony.  *See* ECF 231.

*Corp. v. Xerox Corp.*, 76 F.R.D. 214, 216 (D. Conn. 1977) (permitting deposition designations and noting that the trial length can serve as an 'exceptional circumstance' justifying such use).

Saving the jurors' and the Court's time is of particular salience here considering XOOM's strategic claim that it needs *35 days* of Court time for its case-in-chief.  ECF 210 at 5.[40]  Using deposition transcripts in Plaintiff's case-in-chief will save time and make the trial more efficient and manageable.  Further, although not raised by XOOM, nearly all the witnesses for whom Plaintiff seeks to read deposition testimony into the record will also be called by XOOM in its case-in-chief, negating any concerns that those witnesses will be unable to provide live testimony. Reasons of efficiency and manageability clearly favor Plaintiff's proposal.

Nevertheless, XOOM's MIL No. 14 is essentially a pre-emptive opposition to Plaintiff's MIL No. 9.  For the reasons set forth in Plaintiff's MIL No. 9 XOOM's motion should be denied.[41] Indeed, XOOM's sole argument is that the transcripts "may be read for an available witness only if the deponent was a XOOM 'officer, director, managing agent, or designee under Rule 30(b)(6)' at the time they were deposed."  Defs.' Br. at 45 (citing Fed. R. Civ. P. 32(a)(3)).  This is incorrect—there are other reasons why courts allow use of deposition transcripts at trial, many of which we discussed in Plaintiff's MIL No. 9 and we will not repeat here.  *See* ECF 233 at 48–51.

For example, Rule 32(a)(4)(e) permits the use of a deposition, whether of a party or non-party, "for any purpose" if the Court finds on "motion and notice, that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance

---

[40] XOOM's unreasonable request for 35 days of trial is addressed in Plaintiff's MIL No. 8, ECF 233 at 47–48, and XOOM's overarching strategy to make this case untriable is further addressed in Plaintiff's MIL Nos. 1–4 and 14–17.

[41] XOOM concedes that deposition testimony for witnesses that ultimately prove unavailable and Jason Loehde's Rule 30(b)(6) testimony may be read at trial pursuant to Rule 32.

of live testimony in open court—to permit the deposition to be used." Here, all these criteria have been met.

Further, XOOM "[c]learly . . . had notice that deposition testimony was to be used, because the Pre–Trial Order expressly provided for designation, counter-designation and objections to designated deposition testimony. Thus, there was both application and notice." *Eastman Kodak Co.*, 560 F. Supp. at 311.[42]

## XV.   XOOM'S HYPOTHETICAL DOES NOT JUSTIFY GIVING IT A BLANKET LICENSE TO PERFORM UNSPECIFIED TRADE-SECRET REDACTIONS ON UNNAMED DOCUMENTS
*(Responding to Defs.' MIL No. 15, Defs.' Br. at 47)*

XOOM's MIL No. 15 seeks to redact any supposed "trade-secret information" in the parties' trial exhibits to the extent that information is at some point excluded as a result of a XOOM MIL. Defs.' Br. at 47. This request is wholly speculative, fails to establish that any of the parties' proposed exhibits include legitimate trade secrets, and is thus fatally imprecise. To the extent XOOM has actual concerns about trade secrets, once *in limine* motions are decided, XOOM should identify the specific information it seeks to withhold from specific documents and Plaintiff should be provided the opportunity to respond to those particularized requests. XOOM's request to have the Court issue a premature and blanket rule based on a hypothetical scenario is not a proper use of Court resources.

XOOM's cited cases are also in accord. In each, the court addressed a specific document or small number of documents, meaning the courts were able to determine if the document(s) at

---

[42] XOOM's cases are also easily distinguished. In both *Banks v. Yokemick*, 144 F. Supp. 2d 272, 288 (S.D.N.Y. 2001), and *Kolb v. Suffolk Cty.*, 109 F.R.D. 125, 126 (E.D.N.Y. 1985), the courts assessed the conditions for using deposition testimony under Rule 32 and found them unmet. Here, at minimum, the condition relating to other exceptional circumstances is met.

issue contained legitimate trade secrets, often following *in camera* review.[43]  XOOM provides no reason why the Court should take a different course, and tellingly points to no specific alleged trade secrets.  XOOM's motion should be denied.

## CONCLUSION

For the reasons stated herein, Plaintiff requests that the Court deny Defendants' motions *in limine*.

Dated: June 10, 2024

**WITTELS MCINTURFF PALIKOVIC**

 /s/ J. Burkett McInturff
J. Burkett McInturff
Ethan D. Roman
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com
edr@wittelslaw.com

*Class Counsel for Plaintiff and the Class*

Richard Dolan
Bradley D. Simon
**SCHLAM STONE & DOLAN LLP**
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

---

[43] *In re Elec. Arts, Inc.*, 298 Fed. App'x 568, 569 (9th Cir. 2008); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, No. 05 Civ. 302, 2007 WL 1074933, at *1–2 (D. Vt. Apr. 6, 2007) (establishing procedure for "small number" of documents with potential trade secrets following *in camera* review); *Everlight Elecs. Co., Ltd. v. Nichia Corp.*, No. 12 Civ. 11758, 2016 WL 278812 (E.D. Mich. Jan. 22, 2016) (approximately 20 documents were properly sealed).  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 603 (1978), is inapposite, as that case was decided on the Presidential Recordings Act's procedure to determine whether President Nixon's Oval Office recordings could be distributed publicly for commercial purposes.

Andrey Belenky
**KHEYFITS BELENKY LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

*Co-Counsel for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 10, 2024, the foregoing was served via email on all counsel of record.

By:     <u>/s/ J. Burkett McInturff     </u>
           J. Burkett McInturff