UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SUSANNA MIRKIN, Individually and on Behalf of All
Others Similarly Situated,

                *Plaintiffs,*

   -against-

XOOM ENERGY, LLC, and XOOM ENERGY NEW
YORK, LLC,

                *Defendants.*

18-CV-2949 (ARR) (JAM)

<u>NOT FOR ELECTRONIC
OR PRINT PUBLICATION</u>

**OPINION & ORDER**

---

ROSS, United States District Judge:

      Plaintiff, Susanna Mirkin, a former residential electricity customer of defendants XOOM

Energy, LLC, and XOOM Energy New York, LLC (collectively, "XOOM"), alleges that she and

other similarly situated customers were charged exorbitant energy rates in breach of the pricing

terms contained in a contract for variable-rate energy service. In August 2023, I denied XOOM's

motion for summary judgment on her breach of contract claim[1] and granted her motion to certify

the case as a class action. Op. & Order, ECF No. 151 ("Summ. J. Op."); Op. & Order, ECF No.

152 ("Class Cert. Op."). After an unsuccessful Rule 23(f) petition to the Second Circuit, *see* ECF

Nos. 166, 174, XOOM filed the instant motion to decertify the class. For the following reasons,

the motion is denied.

---

[1] Plaintiff originally sued alongside her husband, Boris Mirkin, but I granted summary judgment
as to his claim and dismissed him from the case. Op. & Order 19–21, ECF No. 151 ("Summ. J.
Op.").

## BACKGROUND[2]

### I.    Factual Background

XOOM is an independent energy service company that purchases energy from producers on the wholesale market and sells it to consumers as an alternative to local utilities. *See* Summ. J. Op. 1–2. During the period relevant to this lawsuit, XOOM sold both electricity and natural gas service at either a variable or fixed rate. *See* Class Cert. Op. 2. In the spring of 2013, Mirkin contracted with XOOM to receive residential electricity service at a variable monthly rate. *See id.* The contract specifically provided that the charged "rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable." Decl. of Steven L. Wittels in Opp'n to Mot. Summ. J., Ex. 1 ("Enrollment Email & Contract"), at 4, ECF No. 147-2. That "monthly variable rate," per the contract, would be "***based on XOOM's actual and estimated supply costs*** which may include but not be limited to prior period adjustments, inventory and balancing costs." *Id.* (emphasis added). Between 2013 and 2016, XOOM used a standard agreement containing the "actual and estimated supply costs" language for New York residential and small business variable-rate customers receiving both electricity and natural gas service. *See* Class Cert. Op. 2.

After XOOM began providing plaintiff with electricity, the variable rate increased and fluctuated significantly. *See* Summ. J. Op. 3. Mirkin cancelled her service with XOOM after six months. *See id.* In this action, she alleges that XOOM did not set its monthly variable rates based on its actual and estimated supply costs, but rather allowed impermissible factors such as revenue goals and competitor pricing to influence the rates. *See id.* at 3, 5–6.

---

[2] The facts of this case are detailed in my prior opinion denying XOOM's motion for summary judgment, familiarity with which is assumed. I recount the facts necessary to resolve the present motion, drawing in large part on the factual record developed at summary judgment.

Although the parties contest many aspects about the process by which XOOM set its rates, there is no dispute that XOOM used spreadsheets to estimate and calculate certain costs of procuring electricity; these costs were aggregated in "rate-setting workbooks." *See id.* at 3–6, 14–19. These workbooks, produced during discovery, list the sum of projected cost components as the "Total Cost." *See id.* at 4; *see also* Class Cert. Op. 3. XOOM's pricing team proposed a variable rate after determining the Total Cost, and a team of XOOM's decisionmakers eventually finalized rates at rate-setting meetings. *See* Summ. J. Op. 4. The difference between the Total Cost and the final rate comprised the margin. *See id.* XOOM contends that the margin also included certain supply cost components, such as prior period adjustments,[3] whereas plaintiff argues that there is no evidence that the margin included such costs. *See id.* at 4–5. In other words, plaintiff maintains that the Total Cost represents XOOM's actual and estimated supply costs; XOOM, on the other hand, maintains that certain supply cost components were included in the margin, and that the Total Cost is therefore not synonymous with actual and estimated supply costs. *See* Class Cert. Op. 3–4.

## II.   Procedural Background

In the spring of 2023, plaintiff moved to certify a proposed class and XOOM moved for summary judgment. Mot. Certify Class, ECF No. 131; Mot. Summ. J., ECF No. 145. On August 14, 2023, I denied summary judgment on Ms. Mirkin's breach of contract claim. Summ. J. Op. 8–19. I began by construing the contract to mean that XOOM was required to determine its monthly variable rates using only its actual and estimated supply costs, subject to a reasonable and proportionate margin. *Id.* at 12–13. I then identified several genuine fact disputes that would need

---

[3] "Prior period adjustments" refers to the practice of raising rates in future months to recover unanticipated costs over time. Mem. Supp. Mot. Summ. J. 21, ECF No. 146-1.

to be resolved by a jury. Although the central dispute was whether XOOM indeed considered factors beyond its actual and estimated supply costs in setting variable rates, *id.* at 14–19, smaller sub-issues included whether the Total Cost reflected XOOM's actual and estimated supply costs (or whether some supply costs were also captured in the margin), *id.* at 16, and whether the margin itself was reasonable and proportionate, *id.* at 13–14.

Two weeks later, I certified plaintiff's proposed class. Class Cert. Op. 7–19. I found that commonality and predominance were satisfied because the claims of the proposed class depended on the common contention that XOOM breached its form contract, and because damages could be calculated with a common formula. *Id.* at 8–15. Specifically, I found that damages could be calculated with plaintiff's experts' proposed damages model,[4] which calculates damages by looking at the difference between the variable rates on the one hand and XOOM's actual and estimated supply costs (reflected in the Total Cost) plus a reasonable and proportionate margin on the other hand.[5] *Id.* at 9; *see* Decl. of Steven L. Wittels in Supp. Mot. Certify Class, Ex. 3 ("Pl.'s Expert Report"), ¶¶ 73, 76, ECF No. 138-3. XOOM had urged that plaintiff could not satisfy commonality or predominance because she offered no common evidence capable of proving breach and damages; it argued that because, in its view, the Total Cost was not synonymous with actual and estimated supply costs, plaintiff could not supply that necessary data point. *See* Class Cert. Op. 9–10, 12. I noted that this argument depended on one of the central summary judgment

---

[4] Plaintiff proposed two damages models; I found that only the second model, which assumes that XOOM was permitted to charge a margin on top of its actual and estimated supply costs, was consistent with plaintiff's theory of liability. *See* Class Cert. Op. 14. This opinion therefore discusses only that second model.

[5] The model assumes that an approximately 19% margin would have been reasonable—the same margin that XOOM charged its fixed-rate customers. Pl.'s Expert Report ¶ 73, 76. Plaintiff's experts noted, however, that if the "factfinder determines that a different margin was appropriate," the calculations could be easily updated. *Id.* ¶ 73 n.51.

issues—whether the Total Cost is equal to XOOM's actual and estimated supply costs. *Id.* at 9–10. I concluded that this issue was "common to all class members" and that a factfinder could decide the issue at trial. *Id.* at 13. I further noted that XOOM did not argue that plaintiff's damages model itself was faulty; rather, XOOM disputed whether plaintiff could supply the necessary inputs for the model, namely actual and estimated the supply costs and margin—which, again, I determined were issues for the factfinder to resolve. *Id.* at 13–14; Summ. J. Op. 13–14, 16–17. I therefore deemed plaintiff's damages model consistent with her theory of liability under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and concluded that damages were capable of measurement on a class-wide basis. Class Cert. Op. 14–15. Finally, I rejected XOOM's argument that plaintiff was atypical because she received only electric service, noting that the form contracts for electric and natural gas customers were identical and that XOOM did not claim to have used a different rate-setting process for electric and natural gas customers.[6] *Id.* at 15–16.

XOOM filed a Rule 23(f) petition with the Second Circuit, arguing that an appeal was warranted because commonality, predominance, and typicality were not met. *See* Decl. of Michael D. Matthews, Jr. in Support Mot. Stay, Ex. C, at 14–21, ECF No. 169-3. The Second Circuit denied the petition in December 2023, concluding that an immediate appeal was not warranted. Mandate, ECF No. 174. Shortly thereafter XOOM stated its intent to file a motion for decertification, *see* ECF Nos. 178, 180, and the motion was fully briefed as of May 10, 2024, *see* Mem. Supp. Mot. Decertify ("Mem. Supp."), ECF No. 197; Mem. Opp'n Mot. Decertify ("Pl.'s Opp'n"), ECF No. 200; Reply Supp. Mot. Decertify ("Reply"), ECF No. 212. Also on May 10,

---

[6] I also found that the proposed class was ascertainable and sufficiently numerous; that plaintiff and her counsel would fairly and adequately protect the class; and that a class action was superior to other available methods in this case. *Id.* at 7–8, 16–18. Because XOOM's motion to decertify the class does not rest on any of these grounds, I do not recount my reasoning on those issues in detail here.

plaintiff amended her expert report with updated damages calculations. *See* Mot. in Limine to Exclude Pl.'s Untimely Expert Disclosures ("Second Mot. Exclude"), Ex. A-3, ¶ 2, ECF No. 229-5; Mem. Supp. Second Mot. Exclude 7, ECF No. 229-1. The parties are separately briefing, among other evidentiary issues, the admissibility of both plaintiff's original expert report, which contains the damages model that I considered in my class certification opinion, and plaintiff's amended expert report. *See* Mot. in Limine to Exclude Pl.'s Timely Expert Disclosures ("First Mot. Exclude"), ECF No. 214; Second Mot. Exclude. Those motions will not be fully briefed until the end of July. *See* Docket Order Dated June 4, 2024.

## LEGAL STANDARD

An order granting class certification is "inherently tentative" and "subject to revision." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 & n.11 (1978). At any point before the entry of final judgment, "a district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met." *Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (quotation omitted). These requirements include:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The class must also be ascertainable, or capable of definition "by objective criteria," *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d Cir. 2017), and must satisfy at least one of the provisions of Rule 23(b), such as Rule 23(b)(3), which permits class certification if (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Under *Comcast*, at the class

certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case." 569 U.S. at 35 (quotation marks omitted).

A district court has an "affirmative 'duty'" to "monitor[] its class decisions in light of the evidentiary development of the case.'" *Mazzei*, 829 F.3d at 266 (quoting *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983)). The Second Circuit has accordingly held that a district court can "*sua sponte* decertify a class if it finds the class no longer meets the requirements of Rule 23," even if there is no "significant intervening event" between certification and decertification. *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021). The circuit court made clear in *Jin*, however, that it was not addressing—and has not addressed—whether a defendant must show something like a "significant intervening event" when the defendant *moves* for decertification. *Id.* at 262 n.18. District courts in this circuit, as well as other courts, have held that such a showing is required. *See id.* at 262 ns. 17, 18 (citing *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011); *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 832 (8th Cir. 2016); *Brown v. Wal-Mart Store, Inc.*, No. 09-CV-3339, 2018 WL 1993434, at*2 (N.D. Cal. Apr. 27, 2018); *see also Med. Soc'y of N.Y. v. UnitedHealth Group Inc.*, No. 16-CV-5265, 2021 WL 4263717, at *1 & n.1 (S.D.N.Y. Sept. 20, 2021) (requiring such a showing on a motion to decertify after *Jin*).

When there has been no significant change between the order certifying the class and the motion to decertify, and when the Court of Appeals has already refused the movant's request for interlocutory review under Rule 23(f), courts often view the motion to decertify with disfavor: The movant is essentially seeking "relief from a district court that has already been denied by a court of appeals." *In re Mercedes-Benz Tele Aid Cont. Litig.*, 267 F.R.D. 113, 135 (D.N.J. 2010), *opinion modified on other grounds on reconsideration*, No. 07-CV-2720, 2010 WL 2976496 (D.N.J. July 22, 2010). If, however, a court proceeds to the merits of the decertification analysis, the burden of

proof shifts to the plaintiff to demonstrate that Rule 23's requirements are still satisfied. *See Abdi v. McAleenan*, 405 F. Supp. 3d 467, 474 (W.D.N.Y. 2019).

## DISCUSSION

### I.   XOOM has identified no significant intervening event or compelling reason to revisit class certification.

XOOM insists that it is not asking me to revisit any aspect of my class certification opinion, but rather "to address an issue the Class Order specifically did not decide: the inadmissibility of [plaintiff's damages model] and the inaccuracy of its inputs." Reply 4. Although this statement is technically true, it is misleading. I have not yet addressed the admissibility of plaintiff's damages model because the parties have not yet briefed their motion to exclude that model; indeed, XOOM did not file its motion to exclude that model until this decertification motion was fully briefed. *See* ECF Nos. 212 (XOOM's May 10, 2024 reply in support of decertification), 214 (XOOM's May 20, 2024 motion to exclude plaintiff's original expert report). I have not addressed the accuracy of the damages model's inputs, meanwhile, because I have determined that two of those inputs are fact questions for the jury. As explained above, the model calculates damages by comparing the variable rates that XOOM charged with what it *should* have charged; it calculates the latter by looking at XOOM's actual and estimated supply costs (reflected in the Total Cost), plus a reasonable and proportionate margin (using XOOM's fixed-rate margin as a placeholder). Pl.'s Expert Report ¶¶ 73, 76. And as explained in my summary judgment opinion, a jury will decide (1) whether the Total Cost listed in XOOM's rate-setting workbooks reflects XOOM's actual and estimated supply costs and (2) what a reasonable and proportionate margin would have been. Summ. J. Op. 13–14, 16–17. By urging me to address the "accuracy" of these to-be-determined inputs, XOOM is asking me to resolve questions that I have expressly reserved for the jury.

XOOM also seems to argue that I should engage in the decertification analysis because I will inevitably strike plaintiff's damages model, and this exclusion will constitute a significant intervening event or compelling reason warranting decertification. *See* Reply 3 & n.1; Mem. Supp. 9. This argument flips the notion of a threshold inquiry on its head and is again premature, given that the parties have not yet finished briefing their motions in limine. The fact that XOOM has previewed here some of its arguments in support of its motion to exclude plaintiff's expert report does not mean that I can skip to deciding its partially briefed motion to exclude. *Cf. Cruz v. Zucker,* 195 F. Supp. 3d 554, 569 (S.D.N.Y. 2016) (noting that a district court need not consider whether evidence is admissible under the Federal Rules of Evidence for the purposes of class certification), *modified on other grounds on reconsideration*, 218 F. Supp. 3d 246 (S.D.N.Y. 2016). At the time that XOOM filed its motion for decertification, nothing had changed since my opinion certifying the class. The mere possibility that I might eventually strike plaintiff's expert report in the future does not constitute a significant intervening event, nor is it a compelling reason to revisit class certification. And if XOOM's arguments for excluding plaintiff's damages model are the same as those previewed here—that the model's still-to-be-determined "inputs," both of which I have identified as jury questions, are inaccurate or unreliable—that mere possibility is slight indeed.

Finally, XOOM cites the Second Circuit's decision in *Jin* for the proposition that no significant intervening event is necessary for a district court to decertify a class. Mem. Supp. 8. This citation is incomplete, because it omits *Jin*'s caveat that the opinion concerns only *sua sponte* decertification and not *motions* for decertification. 990 F.3d at 262 & n.18. The Second Circuit has not addressed whether a defendant must meet the significant intervening event threshold when moving for decertification, and I agree with other district and circuit courts that have held that such a showing is necessary. Otherwise, "if a defendant can require a court to revisit certification

decisions without any showing whatsoever and place the onus on the plaintiff to once again prove certification, '[the defendant's] incentives will be skewed'" because it will have no reason not to burden the plaintiff by bringing successive motions for decertification. *Day*, 827 F.3d at 832 (quoting 3 William B. Rubenstein, *Newberg on Class Actions* § 7:39 (5th ed. 2013)). That said, even if XOOM is correct and there is no such threshold requirement, decertification is not warranted for the reasons explained below.

## II.   XOOM's arguments for decertification hinge on fact questions teed up for trial.

Because nothing has changed since my order certifying the class, I incorporate that opinion's reasoning in its entirety and address only XOOM's new arguments against class certification. *See generally* Class Cert. Op. XOOM's primary argument is that decertification is required because plaintiff's damages model does not currently provide inputs for actual and estimated supply costs or a reasonable and proportionate margin, and therefore will not permit the jury to determine those variables. *See* Mem. Supp. 12–22. Again, XOOM puts the cart before the horse.

### A.   Plaintiff bears the burden of proving that she was overcharged.

As an initial matter, the parties dispute whose burden it is to prove that plaintiff was overcharged—her theory of liability, with which her damages model must be consistent. *See Comcast*, 569 U.S. at 35. XOOM urges that under North Carolina law, this is plaintiff's burden, Mem. Supp. 11–12; plaintiff, on the other hand, argues that under New York law, XOOM bears the burden because it has superior access to evidence, Pl.'s Opp'n 20–21. XOOM is correct that "matters related to the burden of proof are considered matters of substantive law, governed by the law of the jurisdiction whose substantive law applies to the merits of the question in issue." *United States v. McCombs*, 30 F.3d 310, 323–24 (2d Cir. 1994). I have already determined that North

Carolina's substantive law applies to the merits of this case. *See* Summ. J. Op. 3, 8. Under North Carolina law, "[t]he burden [i]s upon the plaintiff to show that the amount charged by defendant was in excess of the rate" permitted by the contract. *Blalock Hardware Co. v. Seaboard Air Line Ry. Co.*, 86 S.E. 1025, 1026 (N.C. 1915).

Plaintiff relies on *Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir. 1987), but that case merely noted that "[t]he question of burden of proof . . . is regarded *by New York law* as a question of procedure to which the law of the forum applies." *Id.* at 552. The relevant inquiry under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), is whether *federal law* regards the question of burden of proof as procedural or substantive. *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 143–44 (2d Cir. 2013) ("[R]ules that are considered 'procedural' under *state law* may still apply in federal diversity suits if those rules are considered 'substantive' under *federal law* pursuant to *Erie*."). And, as stated, "matters related to the burden of proof" are considered substantive under federal law. *McCombs*, 30 F.3d at 323–24. The fact that New York law may regard the issue of burden of proof as procedural is therefore irrelevant to this case. That said, it is premature to conclude that plaintiff cannot satisfy her burden under North Carolina law.

### B.  Whether plaintiff can satisfy her burden depends on disputed questions of fact.

In my opinion denying summary judgment on plaintiff's breach of contract claim, I explained that a jury will need to decide (1) whether the Total Cost listed in XOOM's rate-setting workbooks reflects XOOM's actual and estimated supply costs and (2) what would constitute a reasonable and proportionate margin. Summ. J. Op. 13–14, 16–17. Whether plaintiff's model is ultimately consistent with her theory of liability depends on the answers to these questions.

1. *A jury will decide whether the Total Cost equals XOOM's actual and estimated supply costs.*

Plaintiff's model calculates damages by comparing what XOOM charged to its actual and estimated supply costs—reflected in the Total Cost figure in XOOM's rate-setting workbooks—plus a reasonable and proportionate margin. Pl.'s Expert Report ¶¶ 73, 76. If a jury decides that the Total Cost figure is synonymous with XOOM's actual and estimated supply costs then plaintiff can easily provide the input for XOOM's actual and estimated supply costs by supplying the Total Cost numbers in XOOM's rate-setting workbooks, which were produced during discovery. *See* Decl. of Steven L. Wittels in Supp. Mot. Certify Class ¶ 41, ECF No. 138. In that scenario, there will be no need for the sort of individualized analysis that XOOM insists is inevitable. *See* Mem. Supp. 23–29. If, on the other hand, a jury concludes that XOOM incorporated some actual or estimated supply costs in the margin, and that the Total Cost figure is therefore *not* reflective of XOOM's actual and estimated supply costs, then XOOM will likely be correct that plaintiff cannot provide common evidence of its actual and estimated supply costs, given that in two rounds of briefing on class certification plaintiff has not suggested another method of measuring these costs other than the Total Cost figure. Moreover, if the Total Cost figure does not actually represent XOOM's supply costs, then plaintiff's model cannot accurately measure the extent to which XOOM overcharged class members and will no longer be "consistent with [plaintiff's] liability case." *Comcast*, 569 U.S. at 35.

This all hinges on the jury's assessment of *whether* the Total Cost figure equals XOOM's actual and estimated supply costs. As I explained in my summary judgment opinion, the jury will make this determination based on testimonial and documentary evidence. Summ. J. Op. 16–17. Until the jury makes that determination, there is no reason to think that plaintiff's model is necessarily inconsistent with her theory of liability. And plaintiff is correct that nothing in *Comcast*

requires "the model itself to supply a disputed input—much less an input the Court already highlighted as one of the central summary judgment issues." Pl.'s Opp'n 26 (quotation omitted); *see Comcast*, 569 U.S. at 35.

> ### 2. *A jury can determine a reasonable and proportionate margin.*

XOOM contends that plaintiff's model is inconsistent with her theory of liability because it does not include a proportionate margin but instead assumes that XOOM should have charged its variable-rate customers the same margin that it charged its fixed-rate customers. Mem. Supp. 13–14. It further objects that plaintiff has no evidence to help the jury assess whether the margin was reasonable. *Id.* at 14–21. Both arguments are unpersuasive.

As XOOM recognizes, my summary judgment opinion left it to a jury to decide whether XOOM charged a permissible margin. Summ. J. Op. 13–14 (rejecting XOOM's argument that jurors would be "invent[ing] absent contract terms," and noting that "contractual silence does not allow unbounded discretion"); Mem. Supp. 6 ("The Court left open what an appropriate margin would be as well as the legal and evidentiary bases by which a permissible margin could be determined by a factfinder."). The fact that the model does not currently provide a precise reasonable and proportionate margin is therefore to be expected, given the issues teed up for trial. Contrary to XOOM's suggestion, plaintiff's model does not assume that variable-rate margins should be the same as XOOM's fixed-rate margins, *see* Mem. Supp. 13; rather, plaintiff's experts were clear that the fixed-rate margin is a placeholder that can be "easily . . . update[d]" to accommodate any margin the jury deems appropriate. Pl.'s Expert Report ¶ 73 & n. 51.

Indeed, the fixed-rate margin is evidence that can help the jury assess whether XOOM charged a reasonable margin. Plaintiff's expert has indicated that he will opine that the margin XOOM sought on fixed rates marked the upper boundary of what it should have sought on variable

rates. *See* Decl. of J. Burkett McInturff in Opp'n to Mot. Decertify, Ex. A (Dep. Seabron Adamson), at 98:15–23, ECF No. 201-1 (Q: "[A]re you going to offer an opinion that it is not fair for XOOM to seek a higher margin on variable rates conceptually than it does on fixed rates?" A: "In this context, yes."); Pl.'s Expert Report ¶ 76 ("[T]he margin on variable rate contracts should not be higher than the margin on the corresponding fixed rate contracts on average."). Plaintiff also intends to offer evidence of a lower bound of a reasonable margin by pointing to the New York Public Service Commission's 2019 assessment that "a reasonable price premium associated with fixed-rate [energy service company] products would be 5%."[7] Pl.'s Opp'n 28. The jury will be able to determine a reasonable and proportionate margin by "select[ing] a rate between the range presented."[8] *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 983 (Fed. Cir. 2021).

*Richards v. Direct Energy Services, LLC*, 915 F.3d 88 (2d Cir. 2019), does not require a different result. Contrary to XOOM's suggestion, that case did not hold that a plaintiff such as Mirkin *must* provide evidence of competitor energy service companies' rates for the jury to be able to ascertain a reasonable margin; rather, it suggested only that such evidence would have been probative of whether the defendant energy company acted in good faith—an issue that is not before me in this case. *Id.* at 97–99. As I have already held, it is overreading *Richards* to interpret it to "foreclose[] any limitation on a margin where a contract is silent as to the margin." Summ. J. Op. 14. It is likewise overreading *Richards* to understand it to require a plaintiff to offer evidence of

---

[7] The admissibility of this assessment will be determined after the parties have finished briefing their separate motions in limine. *See* Mem. Supp. Motion in Limine 30–39, ECF No. 227; *Cruz*, 195 F. Supp. 3d at 569.

[8] XOOM also argues that "plaintiff's failure to offer evidence of an appropriate margin is fatal . . . to her typicality as a class representative." Mem. Supp. 29. Because I reject the premise that plaintiff has failed to offer such evidence, I deem this argument similarly unavailing.

competitors' rates to assist the jury in determining whether a margin was reasonable. Although such evidence might be helpful, it is hardly mandatory.

Nor does *Martinez v. Agway Energy Services, LLC*, 88 F.4th 401 (2d Cir. 2023), require that the jury be provided with evidence of competitors' rates. *See* Reply 21. There, the defendant presented evidence comparing its variable rates to those offered by other energy service companies, but the court nowhere suggested that such evidence was necessary to help the jury assess whether the defendant charged a reasonable margin—rather, it relied on this and other evidence to conclude that the plaintiff failed to raise a triable issue of fact as to whether the defendant energy service company made an enforceable promise as to the competitiveness of its rates. *Id.* at 416.

XOOM further relies on *Martinez* to suggest that plaintiff's experts' opinions about the reasonableness of XOOM's margins are inadmissible. Reply 20. But in *Martinez*, the plaintiff's expert calculated overcharge "based on his subjective and unsupported view of what a 'reasonable margin' would have been," *id.* at 414—whereas here, as noted, plaintiff's experts have made clear that the overcharge model can accommodate a jury's assessment of what a reasonable margin would have been and have opined only that the fixed-rate margin should mark the upper boundary of a reasonable margin. Moreover, *Martinez* does not stand for the proposition that an expert's opinion regarding a reasonable margin is inadmissible as a matter of law; rather, the Second Circuit merely held that the district court did not "manifestly err[]" or abuse its discretion in excluding the expert's report. *Id.* Indeed, *Martinez* reviewed a district court's decision on summary judgment, not class certification, and as noted, a district court "need not consider whether evidence is admissible under the Federal Rules of Evidence for the purposes of class certification." *Cruz*, 195 F. Supp. 3d at 569.

15

Finally, XOOM cites *Martinez* for the proposition that the New York Public Service Commission's findings are inadmissible as a matter of law, Reply 21—but again, XOOM overreads the case. In *Martinez*, the Second Circuit did not deem the Commission's findings inadmissible, but rather held that the findings did not prove that the defendant energy company was required to guarantee savings against public utilities. 88 F.4th at 417 n.12. *Martinez* does not speak to whether a jury might refer to the Commission's findings as a lower bound in determining a reasonable and proportionate margin.

I accordingly conclude again that plaintiff's theory of liability raises issues of breach and damages common to the class that can be proven with common evidence and which predominate over individualized issues, and that plaintiff's proposed damages model is consistent with her theory of liability.[9] As at the class certification stage, "XOOM does not dispute that the algorithm itself is faulty" but rather challenges "the accuracy of the inputs, namely the supply cost and margin." Class Cert. Op. 14. It may well be the case that plaintiff is unable to prove those inputs at trial; if so, the model will no longer be capable of accurately measuring damages on a class-wide basis. The possibility that XOOM will prevail on key fact disputes in the future, however, does not warrant decertification today.

---

[9] Because I conclude that plaintiff's model is consistent with her theory of liability, I need not consider whether she can prevail on an alternate theory of breach, such as one that does not involve any overcharge. *See* Mem. Supp. 30–31. To the extent that XOOM suggests that plaintiff is categorically barred from recovering nominal damages, however, XOOM is mistaken. Under North Carolina law, "[i]n a suit for damages for breach of contract, proof of the breach would entitle the plaintiff to nominal damages at least." *Bryan Builders Supply v. Midyette*, 162 S.E.2d 507, 511–12 (N.C. 1968) (quotation omitted). The Second Circuit's decision in *Fox v. Board of Trustees of State University of New York*, 42 F.3d 135 (2d Cir. 1994), is not to the contrary: That case did not involve a claim for breach of contract, and there, the complaint made no mention of seeking damages *at all*. *Id.* at 137, 141–42. *Fox*'s reasoning was specific to the fact that the plaintiffs there sought only injunctive and declaratory relief and attempted to avoid mootness by invoking nominal damages. *See id.* Here, in contrast, plaintiff expressly seeks damages. Amended Compl. 26, ECF No. 42.

**CONCLUSION**

For the foregoing reasons, XOOM's motion to decertify the class is DENIED.

SO ORDERED.

_____
/s/
Allyne R. Ross
United States District Judge

Dated:          June 20, 2024
                Brooklyn, New York