**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSANNA MIRKIN,<br>Individually and on Behalf of All Others<br>Similarly Situated,<br><br>                Plaintiffs,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY<br>NEW YORK, LLC,<br><br>                Defendants. | No. 18 Civ. 2949 (ARR) (RER) |

## XOOM'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTIONS *IN LIMINE*

## TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

Argument ..................................................................................................................... 3

I.      XOOM'S MIL No. 1: Plaintiff's attempt to resurrect her abandoned implied covenant claim is contrary to the Court's Decertification Order and barred by multiple non-discretionary doctrines. ............................................................ 3

II.      XOOM's MIL No. 2: The Court should prohibit Plaintiff from offering evidence or argument that an implied or unwritten rate or margin cap exists in the contract. .. 11

III.      XOOM's MIL No. 3: The Court should prohibit Plaintiff from offering evidence or argument that XOOM's variable rates or variable-rate margins were unreasonable. ................................................................................................... 17

     A.      Plaintiff does not have a live claim based on XOOM's obligation to include "reasonable" margins in its variable rates. ......................................... 17

     B.      The "reasonable" limitation on XOOM's variable-rate margins is admittedly objective. ...................................................................................... 18

IV.      XOOM's MIL No. 4: XOOM's fixed rates and fixed-rate margins are not relevant evidence of appropriate variable-rate margins. ............................................. 22

V.      XOOM's MIL No. 5: Plaintiff's exemplar margins are irrelevant, prejudicial, and untimely ....................................................................................................... 26

VI.      XOOM's MIL No. 6: Plaintiff's response confirms that the Court should prohibit her from offering evidence or argument regarding profitability of any rate or margin. ............................................................................................... 28

VII.      XOOM's MIL No. 7: Plaintiff offers no valid reason to allow evidence or argument relating to the rates and margins of other ESCOs. ....................................... 33

VIII.      XOOM's MIL No. 8: Evidence and argument regarding regulated utility rates, costs, and margins is inadmissible and should be excluded from trial. ...................... 37

IX.      XOOM's MIL No. 9: The Court should prohibit evidence and argument regarding contracts that are not included in the Class definition. ............................... 44

X.      XOOM's MIL No. 10: Plaintiff's proposed expert testimony on the contracts' meaning must be excluded. .......................................................................... 48

XI.      XOOM's MIL No. 11: Plaintiff does not contest that the revenue, profitability, or size of NRG or any other non-party affiliate are irrelevant. .................................. 52

XII.      XOOM's MIL No. 12: The Court should prohibit evidence and argument related to regulatory and legislative proceedings, including the 2019 Reset Order. .............. 56

     A.      Rule 403: The regulatory and legislative documents are highly prejudicial. . 56

B.    Rules 401 & 402: The regulatory and legislative history documents are all irrelevant. .................................................................................. 59

  1.    *The implied covenant is not grounds for relevance in this case.* ......... 59

  2.    *The regulatory and legislative documents are irrelevant for other reasons too.* ......................................................................... 60

    a.    Most of the documents are irrelevant as a matter of law because they post-date when Plaintiff and the Class contracted with XOOM. ....................................................................... 60

    b.    The regulatory and legislative history documents are not probative of a commercially reasonable variable-rate margin, even if that were at issue. ........................................................ 63

      i.    The documents are irrelevant because they do not speak to XOOM, its variable-rate margins, or variable-rate margins at all. ...................................................... 63

      ii.   The documents are irrelevant because they do not speak to the appropriate standard for objective reasonableness. .................................................... 68

C.    Rule 803: Plaintiff's response confirms the regulatory and legislative documents are hearsay without any applicable exception. ............................ 68

D.    Rule 702: Plaintiff concedes the documents are not expert opinion evidence. ......................................................................... 73

XIII.   XOOM's MIL No. 13: Plaintiff cannot seek punitive damages under any law. ........ 74

XIV.    XOOM's MIL No. 14: Plaintiff's request to introduce deposition testimony of witnesses who will be at trial is misguided and should be denied. ........................... 81

XV.     XOOM's MIL No. 15: The parties agree that XOOM should be permitted to identify proposed redactions to trial exhibits after *in limine* motions are resolved. ............... 85

Conclusion ..................................................................................... 86

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*3A Composites USA, Inc. v. United Indus., Inc.*,
  No. 5:16-CV-5017, 2017 WL 5991968 (W.D. Ark. Sept. 18, 2017) .....................................55

*Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*,
  No. 18-CV-170 (KMK), 2019 WL 4413052 (S.D.N.Y. Sept. 16, 2019)...............................75

*Allgeier v. United States*,
  909 F.2d 869 (6th Cir. 1990) ..........................................................................................82, 84

*Ariza v. City of New York*,
  139 F.3d 132 (2d Cir. 1998)...................................................................................35, 69, 71

*Barry v. Trustees of Int'l Ass'n Full-Time Salaried Officers & Emps. of Outside
  Loc. Unions & Dist. Counsel's (Iron Workers) Pension Plan*,
  467 F. Supp. 2d 91 (D.D.C. 2006) ...................................................................................70

*Beatty v. PruittHealth, Inc.*,
  2022 WL 3681918, at *9 (M.D.N.C. Aug. 25, 2022).............................................................9

*Beech Aircraft Corp. v. Rainey*,
  488 U.S. 153 (1988)..........................................................................................................69

*BioSignia, Inc. v. Life Line Screening of Am., Ltd.*,
  No. 1:12CV1129, 2014 WL 2968139 (M.D.N.C. July 1, 2014) ...........................................14

*Boland, Inc. v. Rolf C. Hagen (USA) Corp.*,
  685 F. Supp. 2d 1094 (E.D. Cal. 2010)...............................................................................15

*Borden v. 400 E. 55th St. Assocs.*,
  24 N.Y.3d 382 (2014) .......................................................................................................78

*Bracken v. USAA Gen. Indem. Co.*,
  No. 3:19-cv-00825-YY, 2019 WL 6037661 (D. Or. Nov. 14, 2019) .....................................5

*Brazos River Auth. v. GE Ionics, Inc.*,
  469 F.3d 416 (5th Cir. 2006) ............................................................................................83

*Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*,
  868 F. Supp. 33 (E.D.N.Y. 1994) ......................................................................................49

*Bridgeway Corp. v. Citibank*,
  201 F.3d 134 (2d Cir. 2000)...............................................................................................71

*Chapman v. San Francisco Newspaper Agency*,
  No. C 01-02305 CRB, 2002 WL 31119944 (N.D. Cal. Sept. 20, 2002) ...............................70

*Choi v. Tower Rsch. Cap. LLC*,
  2 F.4th 10 (2d Cir. 2021) .................................................................................50

*Christie's Inc. v. SWCA, Inc.*,
  22 Misc. 3d 380 (Sup. Ct. N.Y. Cty. 2008) ......................................................20

*Cioffe v. Morris*,
  676 F.2d 539 (11th Cir. 1982) ...............................................................77, 78, 79

*City Grill Hospitality Grp. v. Nationwide Mut. Ins. Co.*,
  2014 WL 1429552 (E.D.N.C. Apr. 14, 2014)...................................................5, 6

*City of New York v. Pullman Inc.*,
  662 F.2d 910 (2d Cir. 1981)..............................................................................71, 73

*Cole v. Wells Fargo Bank, N.A.*,
  No. 15-CV-39 (MR), 2016 WL 737943 (W.D.N.C. Feb. 23, 2016) .....................17

*Corsello v. Verizon N.Y., Inc.*,
  18 N.Y.3d 777 (2012) ........................................................................................78

*Crimm v. Mo. Pac. R. Co.*,
  750 F.2d 703 (8th Cir. 1983) .............................................................................82

*Cross Sound Cable Co., LLC v. Long Island Lighting Co.*,
  No. 21-2771 (KAM) (ARL), 2022 WL 16789978 (E.D.N.Y. Sept. 13, 2022)......45

*Darmer v. State Farm Fire & Cas. Co.*,
  No. CV 17-4309, 2022 WL 741039 (D. Minn. Mar. 11, 2022)..............................53

*Dhyne v. Meiners Thriftway, Inc.*,
  184 F.3d 983 (8th Cir. 1999) .........................................................................81, 82

*Dominion Res. SVC, Inc. v. Alstom Power, Inc.*,
  No. 3:16-CV-544, 2018 WL 3752878 (D. Conn. Aug. 8, 2018)...........................49

*EEOC v. Laroy Thomas, Inc.*,
  No. 5:05CV183, 2007 WL 9724343 (E.D. Tex. Oct. 3, 2007)..............................82

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  681 F. Supp. 2d 141 (D. Conn. 2009).................................................................71

*Feinwachs v. Minn. Hosp. Ass'n*,
  No. 11-cv-0008, 2019 WL 4298085 (D. Minn. Sept. 11, 2019)............................82

*Fenstermacher v. Phila. Nat'l Bank*,
  493 F.2d 333 (3d Cir. 1974)...............................................................................82

*Food Lion, LLC v. Dean Foods Co.*,
   No. 2:07-CV-188, 2017 WL 11681192 (E.D. Tenn. Feb. 17, 2017) ......................................54

*Gentile v. Cnty. of Suffolk*,
   926 F.2d 142 (2d Cir. 1991)...........................................................................................69, 71

*Gonzalez Prod. Sys. v. Martinrea Int'l, Inc.*,
   310 F.R.D. 341 (E.D. Mich. 2015) ...............................................................................82, 83

*Greenspan v. Allstate Ins. Co.*,
   937 F. Supp. 288 (S.D.N.Y. 1996).......................................................................................76

*Hamlen v. Gateway Energy Services*,
   No. 16 CV 3526 (VB), 2017 WL 892399 (S.D.N.Y. Mar. 6, 2017) ...................................4, 6

*Hart v. BHH, LLC*,
   No. 15CV4804, 2018 WL 3471813 (S.D.N.Y. July 19, 2018)..............................................50

*Harte v. Ocwen Fin. Corp.*,
   No. 13-CV-5410, 2018 WL 1830811 (E.D.N.Y. Feb. 8, 2018), *report and
   recommendation adopted*, No. 13CV5410MKBRER, 2018 WL 1559766
   (E.D.N.Y. Mar. 30, 2018) ..............................................................................................69, 71

*Hodgin v. Brighton*,
   196 N.C.App. 126, 674 S.E.2d 444 (N.C. 2009) ...................................................................12

*Holland Loader Co. v. FLSmidth A/S*,
   313 F. Supp. 3d 447 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019)..................19, 20

*Honda Motor Corporation v. Oberg*,
   512 U.S. 415 (1994).............................................................................................................54

*Interclaim Hldgs. Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*,
   No. 00 C 7620, 2004 WL 725287 (N.D. Ill. Apr. 1, 2004)...................................................74

*Jackson v. Chevron Chem. Co.*,
   679 F.2d 463 (5th Cir. 1982) ...............................................................................................81

*Jensen v. Cablevision Sys. Corp.*,
   372 F. Supp. 3d 95 (E.D.N.Y. 2019) ....................................................................................50

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
   No. 16CV1318GBDBCM, 2021 WL 4810266 (S.D.N.Y. Sept. 30, 2021)............................50

*Jones v. Jasper Wyman & Son*,
   No. 1:20-CV-00383-JAW, 2022 WL 16854267 (D. Me. Nov. 10, 2022)..............................54

*Kolb v. Suffolk County*,
  109 F.R.D. 125 (E.D.N.Y. 1985) .................................................................................81

*Lane v. Scarborough*,
  200 S.E.2d 622 (N.C. 1973) ................................................................................12, 13

*Lexington Furniture Indus. v. Bob Timberlake Collection, Inc.*,
  No. 08 CVS 02407, 2009 WL 2901618 (N.C. Super. Feb. 9, 2009) ....................................20

*United States ex rel. Lutz v. Berkeley Heartlab, Inc.*,
  No. 9:14-230-RMG, 2017 WL 6015157 (D.S.C. Dec. 1, 2017)............................................83

*MacDonald, Sommer & Frates v. Yolo Cnty.*,
  477 U.S. 340 (1986).......................................................................................................62

*MaGee v. Paul Revere Life Ins. Co.*,
  954 F. Supp. 582 (E.D.N.Y. 1997) .................................................................................75

*Martinez v. Agway Energy Services*,
  88 F.4th 401 (2d Cir. 2023) ................................................................................... *passim*

*Marx & Co., Inc. v. Diners' Club, Inc.*,
  550 F.2d 505 (2d Cir. 1977).........................................................................................49

*Masemer v. Delmarva Power & Light Co.*,
  723 F. Supp. 1019 (D. Del. 1989)................................................................................70

*Mazloum v. D.C. Metro. Police Dep't.*,
  248 F.R.D. 725 (D.D.C. 2008) .....................................................................................81

*McCune v. Graco Children's Prod., Inc.*,
  No. 5:09-CV-107, 2011 WL 13217898 (E.D. Tex. Aug. 8, 2011) .......................................55

*McDonald v. Bank of N.Y. Mellon Tr. Co.*,
  816 S.E.2d 861, 864-65 (N.C. Ct. App. 2018)........................................................................10

*MCI Constructors, Inc. v. Greensboro, City of*,
  125 F. App'x 471, 477 (4th Cir. 2005)..............................................................................19

*Melville v. HOP Energy, LLC*,
  No. 21 Civ. 10406 (KMK), 2023 WL 2648775 (S.D.N.Y. Mar. 27, 2023) .........................4, 6

*Milau Assocs. v. North Ave. Dev. Corp.*,
  42 N.Y.2d 482 (1977) ....................................................................................................21

*Miller v. Michael Weinig AG*,
  No. CV-20-47-BU-BMM, 2023 WL 3098328 (D. Mont. Apr. 26, 2023)................................55

*Misano di Navigazione, SpA v. United States*,
968 F.2d 273 (2d Cir. 1992)......................................................................20

*In re Namenda Indirect Purchaser Antitrust Litig.*,
338 F.R.D. 527 (S.D.N.Y. 2021) .............................................................60

*Napier v. Bossard*,
102 F.2d 467 (2d Cir. 1939).....................................................................81

*Navigators Ins. Co. v. Goyard, Inc.*,
608 F. Supp. 3d 44 (S.D.N.Y. 2022).......................................................48

*Neuman v. Pike*,
591 F.2d 191 (2d Cir. 1979).....................................................................15

*New York Univ. v. Cont'l Ins. Co.*,
87 N.Y.2d 308 (1995) .........................................................................74, 75

*Newell v. Wisconsin Teamsters Joint Council No. 39*,
2007 WL 2874938 (E.D. Wis. Sept. 28, 2007).......................................77

*In re Nieves*,
648 F.3d 232 (4th Cir. 2011) ...................................................................18

*Niver v. Travelers Indem. Co.*,
430 F. Supp. 2d 852 (N.D. Iowa 2006)....................................................81

*Pastor v. State Farm Mut. Auto. Ins. Co*,
487 F.3d 1042 (7th Cir. 2007) ...........................................................44, 46

*Pearce v. E.F. Hutton Grp., Inc.*,
653 F. Supp. 810 (D.D.C. 1987)..............................................................69

*Pearlman v. Cablevision Sys. Corp.*,
No. 10-CV-4992(JS)(GRB), 2015 WL 8481879 (E.D.N.Y. Dec. 8, 2015)............................49

*Pearlman v. Cablevision Sys. Corp.*,
No. 10-CV-4992(JS)(GRB), 2015 WL 9462104 (E.D.N.Y. Dec. 28, 2015)..........................49

*Peat, Inc. v. Vanguard Rsch., Inc.*,
378 F.3d 1154 (11th Cir. 2004) ...............................................................24

*In re Perrigo Co. PLC Sec. Litig.*,
No. 19CV70 (DLC), 2021 WL 3773461 (S.D.N.Y. Aug. 24, 2021)........................50

*Petrone v. Werner Enterprises, Inc.*,
No. 8:11CV401, 2017 WL 2021251 (D. Neb. May 11, 2017) ................................55

*Pyett v. Pennsylvania Bldg. Co.*,
  498 F.3d 88 (2d Cir. 2007), *rev'd and remanded on other grounds sub nom.*
  *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009) ................................................. 62

*Recycling Equip., Inc. v. E Recycling Sys.*,
  No. 5:14-CV-00056, 2014 WL 6977766 (W.D.N.C. Dec. 9, 2014) ...................................... 14

*In re ResCap Liquidating Tr. Litig.*,
  428 F. Supp. 3d 53 (D. Minn. 2019) ........................................................... 19

*ResCap Liquidating Tr. v. Primary Res. Mortgage, Inc.*,
  59 F.4th 905 (8th Cir. 2023) ................................................................. 19

*Reynolds v. Univ. of Pennsylvania*,
  483 F. App'x 726 (3d Cir. 2012) ............................................................. 46

*Rezapour v. Earthlog Equity Grp.*,
  No. 12 Civ. 105, 2013 WL 3326026 (W.D.N.C. July 1, 2013) ...................................... 5, 6, 14

*Rhee v. SHVMS, LLC*,
  No. 21-CV-4283 (LJL), 2024 WL 2943696 (S.D.N.Y. June 10, 2024) ................................. 33

*Richards v. Direct Energy Services*,
  246 F. Supp. 3d 538 (D. Conn. 2017), *aff'd*, 915 F.3d 88 (2d Cir. 2019) ....................... 22

*Richards v. Direct Energy Services*,
  915 F.3d 88 (2d Cir. 2019) ........................................................... *passim*

*Ridout v. KEP Morrisville Realty, LLC*,
  461 F. App'x 255 (4th Cir. 2012) ............................................................. 12

*Ridout v. KEP Morrisville Realty LLC*,
  No. 08 Civ. 453, 2010 WL 4828140 (E.D.N.C. Nov. 19, 2010) *aff'd*, 461 F.
  App'x 255 (4th Cir. 2012) .................................................................... 12

*Rigsbee v. City & County of Honolulu*,
  No. 17-00532 HG-RT, 2019 WL 1089636 (D. Haw. Mar. 7, 2019) ..................................... 83

*RJ's Int'l Trading, LLC v. Crown Castle S. LLC*,
  No. 20-25162-CIV, 2021 WL 6135137 (S.D. Fla. Dec. 2, 2021) .................................... 55

*Root v. Allstate Ins. Co.*,
  158 S.E.2d 829 (N.C. 1968) ................................................................... 15

*S&H Farm Supply, Inc. v. Bad Boy, Inc.*,
  No. 18-03413-CV-S-BP, 2020 WL 8373428 (W.D. Mo. Sept. 4, 2020) ................................ 82

*In re Seagate Tech. LLC Litig.*,
No. 16-CV-00523-JCS, 2019 WL 282369 (N.D. Cal. Jan. 22, 2019) ................................... 62

*Sec. & Exch. Comm'n v. Gruss*,
245 F. Supp. 3d 527 (S.D.N.Y. 2017) .................................................................................... 49

*Servidone Const. Corp. v. St. Paul Fire & Marine Ins. Co.*,
No. 91-CV-0943, 1992 WL 75064 (N.D.N.Y. Apr. 3, 1992) ................................................. 45

*Sevugan v. Direct Energy Services*,
931 F.3d 610 (7th Cir. 2019) ......................................................................................... *passim*

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ............................................................................................... 61, 67, 79

*Shelton v. Duke Univ. Health Sys.*,
633 S.E.2d 113 (N.C. Ct. App. 2006) .................................................................. 13, 14, 15, 17

*Sigmon for Hindin v. Goldman Sachs Mortg. Co.*,
No. 1:12-CV-3367 (ALC), 2018 WL 1517189 (S.D.N.Y. Mar. 26, 2018),
*aff'd*, 800 F. App'x 25 (2d Cir. 2020) .................................................................................. 49

*Simon v. Philip Morris, Inc.*,
124 F. Supp. 2d 46 (E.D.N.Y. 2000) ...................................................................................... 74

*SLSJ, LLC v. Kleban*,
277 F. Supp. 3d 258 (D. Conn. 2017) ..................................................................................... 49

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ................................................................................................................ 54

*Stonebrae, L.P. v. Toll Bros.*,
No. C–08–0221 EMC, 2010 WL 114010 (N.D. Cal. Jan. 7, 2010) ....................................... 19

*Strum v. Exxon Co.*,
15 F.3d 327 (4th Cir. 1994) .................................................................................................... 74

*In re the Bear Stearns Cos., Inc. Sec.*,
No. 08 MDL 1963, 2016 WL 4098385 (S.D.N.Y. July 25, 2016) .......................................... 71

*Ticheli v. Travelers Ins. Co.*,
No. 1:14-CV-00172, 2014 WL 12587066 (N.D.N.Y. Dec. 23, 2014) .................................... 75

*Toole v. McClintock*,
999 F.2d 1430 (11th Cir. 1993) .............................................................................................. 72

*Toussie v. Allstate Ins. Co.*,
No. 15-CV-5235 (ARR)(PK), 2016 WL 6537670 (E.D.N.Y. Nov. 3, 2016) ......................... 76

*Travel Ctr. of Fairfield Cnty., Inc. v. Royal Cruise Line Ltd.*,
    154 F. Supp. 2d 281 (D. Conn. 2001) ........................................................................7

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ............................................................................ *passim*

*U.S. v. Duncan*,
    42 F.3d 97 (2d Cir. 1994) ........................................................................49

*United Air Lines, Inc. v. Austin Travel Corp.*,
    867 F.2d 737 (2d Cir. 1989) ........................................................................73

*United Food Grp., LLC v. Cargill, Inc.*,
    No. CV 11-7752 SS, 2015 WL 13868984 (C.D. Cal. June 8, 2015) ....................71

*United States v. Am. Tel. & Tel. Co.*,
    498 F. Supp. 353 (D.D.C. 1980) ........................................................68, 72

*In re Vitamin C Antitrust Litig.*,
    No. 05-CV-0453, 2012 WL 4511308 (E.D.N.Y. Oct. 1, 2012) ........................70

*Wilder v. World of Boxing LLC*,
    310 F. Supp. 3d 426 (S.D.N.Y. 2018) ........................................................19

*Williams v. Metro. Life Ins. Co.*,
    367 F. Supp. 2d 844 (M.D.N.C. 2005) ........................................................19

*Yonaty v. Amerada Hess Corp.*,
    No. 304CV605FJSDEP, 2005 WL 1460411 (N.D.N.Y. June 20, 2005) ........20, 42

*Young & Assocs. Pub. Relations, LLC v. Delta Air Lines, Inc.*,
    216 F.R.D. 2003 ........................................................................82

**Statutes**

28 U.S.C. § 2072(b) ........................................................................61

N.C. Gen. Stat. § 25-1-201 ........................................................................19

U.C.C. § 1-201(b)(20) ........................................................................19

New York Gen. Bus. Law § 349 ........................................................................78

**Rules of Procedure and Evidence**

CPLR § 901(b) ........................................................................78, 79

Fed. R. Civ. P. 15 ........................................................................10

Fed. R. Civ. P. 16 ...................................................................................................... 10

Fed. R. Civ. P. 23 ............................................................................................... 24, 77

Fed. R. Civ. P. 26 ................................................................................................. 2, 43

Fed. R. Civ. P. 30 ...................................................................................................... 83

Fed. R. Civ. P. 32 ............................................................................................... 81, 83

Fed. R. Civ. P. 37 ............................................................................................... 36, 43

Fed. R. Civ. P. 54 ...................................................................................................... 77

Fed. R. Evid. 401 ............................................................................................... *passim*

Fed. R. Evid. 402 ............................................................................................... *passim*

Fed. R. Evid. 403 ............................................................................................... *passim*

Fed. R. Evid. 407 ............................................................................. 44, 45, 46, 47

Fed. R. Evid. 611 ...................................................................................................... 82

Fed. R. Evid. 702 ............................................................................................... 26, 73

Fed. R. Evid. 801 ............................................................................................... 68, 81

Fed. R. Evid. 803 ............................................................................................... *passim*

<u>**Preliminary Statement**</u>

By Plaintiff's design, this case has been limited to a single overcharge claim premised on the express language of her contract's pricing provision since the Second Circuit's mandate issued in 2019. Yet, despite three years of discovery and the limited scope of her claim, Plaintiff did not procure competent, classwide evidence to prove that alleged overcharge.

"Actual supply costs" and "estimated supply costs" are at the heart of this case, and abundant evidence of each is in the record. Plaintiff and her experts do not contend that evidence of "actual supply costs" does not exist, or that it is merged into the estimated supply costs titled "Total Costs" in XOOM's rate-setting workbooks. Rather, everyone acknowledges that the two categories of costs are ***not*** equal, and that they differ in shifting manners each month.[1] Plaintiff and her experts did not take actual supply costs into account simply because they were not neatly packaged in XOOM's rate-setting workbooks. It was easier for them to ignore that data.

To mitigate her evidentiary failings, Plaintiff's pretrial strategy has been to ask for new rules, claims, and expert opinions in an attempt to: flip the burden to prove her claim onto XOOM (the Court correctly ruled she cannot in its Decertification Order); prevent XOOM from presenting its own evidence of actual supply costs in its defense, *see* Pl. MIL No. 2; and present entirely new evidence and theories of her case that are barred, including the implied covenant of good faith and fair dealing, punitive damages, an unpleaded tort claim (maybe under North Carolina deceptive advertising law or maybe under New York GBL Section 349), and new untimely expert reports with entirely new methodologies to, in the expert's own words, "replace[]" the original deficient one.

---

[1] *See, e.g.,* Doc. 233, Pl. MIL Mem. 3 (acknowledging that the witness testimony and XOOM's internal documents show there are "variations" when comparing "XOOM's monthly COGS estimates from its workbooks to XOOM's actual supply costs.").

Plaintiff's response to XOOM's *in limine* motions builds on the strategy she began using in her decertification response and continued in her own *in limine* motions. She incorrectly argues that: XOOM seeks to alter the Court's summary judgment rulings; documents (including regulatory ones issued years after Plaintiff contracted with XOOM) that plainly are misleading and unfairly prejudicial should be admitted—although other courts, including sister courts in this Circuit, other appellate courts, and the Second Circuit itself, have deemed them irrelevant; and her new "replace[ment]" expert report filed after the Joint Pretrial Order and eighteen months after the discovery cutoff is merely a "timely" supplement.[2] Worse still, just one business day ago, Plaintiff filed an expert "Declaration" in response to XOOM's motion to exclude that is really just another untimely expert report: a ***35-page supplement*** to the already untimely ***42-page replacement report***.

XOOM's motions to exclude Plaintiff's experts explain why CRA's four reports should be excluded in their entirety.[3] And Plaintiff's other arguments—which are all part of her strategy to erode her evidentiary burden—are unavailing for the reasons discussed in XOOM's prior briefing and below. The Court should grant XOOM's Motions *in Limine* in full.

---

[2] The Court's April 15 order simply directed Plaintiff to supplement her report by Rule 26(e)(2)'s deadline of the Joint Pretrial Order. As XOOM's expert briefing more fully explains, CRA's New Report far exceeds the bounds of a Rule 26(e)(2) supplement, so it is untimely.

[3] XOOM would have preferred that the motions to exclude be fully briefed before the *in limine* motions, but Plaintiff's procedural maneuvering and untimely new expert reports preclude that logical sequence. Nonetheless, as the Court's recent Decertification Order acknowledges, the motions to exclude Plaintiff's expert opinions are a threshold matter affecting the scope of the case and trial. Decert Order 8–9. Accordingly, XOOM respectfully suggests that those motions should be resolved before the Court addresses the parties' motions *in limine*.

<u>**ARGUMENT**</u>

I.    **XOOM'S MIL No. 1: Plaintiff's attempt to resurrect her abandoned implied covenant claim is contrary to the Court's Decertification Order and barred by multiple non-discretionary doctrines.**

XOOM's MIL No. 1 asked the Court to prohibit Plaintiff from presenting evidence or argument that "XOOM breached any implied contract term including the implied covenant of good faith and fair dealing."[4] In response, Plaintiff advocated only for the implied covenant of good faith and fair dealing, implicitly conceding that no other implied contract term is at issue. Plaintiff's arguments in support of her implied covenant claim fail because that claim was dismissed at the pleading stage, she did not re-plead it in her Amended Complaint (instead deleting the allegations supporting it), and it was explicitly abandoned on appeal. Thus, as the Court correctly held in its Decertification Order, whether XOOM "acted in good faith" is "an issue that is not before [the Court] in this case." Doc. 246, Decert. Order 14.

That recent holding (which post-dates both XOOM's MIL and Plaintiff's response) should be the end of the inquiry. The implied covenant of good faith is not before the Court, so evidence and argument on it should be excluded from trial. But because Plaintiff has not yet withdrawn her opposition to XOOM's MIL No. 1, XOOM still replies here in an abundance of caution.

XOOM's MIL No. 1 detailed Plaintiff's strategic abandonment of her implied covenant claim here and at the Second Circuit. Her response avoids addressing that procedural history. She does not try to explain how her decision to deliberately remove all references to good faith, bad faith, consumer expectations, and rate-setting discretion from her allegations could square with

---

[4] Plaintiff claims that XOOM's motion suffered from a "lack of specificity." Pl. MIL Resp. 7. That simply is not true. XOOM specifically sought the exclusion of a defined category of evidence and argument, quoted above. XOOM also cited Plaintiff's proposed jury instructions on the implied covenant as an example of what must be excluded at trial. *See* Doc. 227, Def. MIL Mem. 4.

her new assertion that those matters are at issue—because they cannot. They are irreconcilable. She also fails to address the statements her counsel made to the Second Circuit abandoning the claim, along with the corresponding doctrines of judicial estoppel, the mandate rule, and law-of-the-case. Each bars any attempt to resurrect the implied covenant claim.

Plaintiff's failure to address those issues—especially that the implied covenant claim remains unpleaded—is fatal to her position, as her own cases recognize. *Cf. Melville v. HOP Energy, LLC*, No. 21 Civ. 10406 (KMK), 2023 WL 2648775, at *9 (S.D.N.Y. Mar. 27, 2023) (allowing pleaded implied covenant claim that was wholly "distinct" from express contract claim based on allegations of acting "in bad faith or with improper motive" (cleaned)); *Hamlen v. Gateway Energy Services*, No. 16 CV 3526 (VB), 2017 WL 892399, *5 (S.D.N.Y. Mar. 6, 2017) (explaining that a viable implied-breach claim, in addition to being pleaded, "must allege facts of defendant's bad faith or improper motive").

Nonetheless, Plaintiff now contends that an implied covenant claim somehow survives despite both her pleading amendment in this Court and subsequent disavowals to the Second Circuit. In support, she points to this Court's Summary Judgment and Class Certification Orders, as well as a line of cases that allowed implied covenant theories to proceed in very different contexts. The Court can summarily reject Plaintiff's position, as it did in the Decertification Order.

With respect to the Court's orders, nothing in them supports Plaintiff's assertion that the Court converted the ***implied*** covenant into "an ***express*** contract term when it construed XOOM's contract to allow only an objectively 'reasonable' fixed margin set in 'good faith.'" Pl. MIL Resp. 5 (emphasis added). Given Plaintiff's abandonment before the Second Circuit, judicial estoppel and the mandate rule bar revival of the implied covenant claim. And in any event, the Court could not rewrite the contract's ***express*** terms to include new or different ***implied*** terms because the

4

implied covenant "cannot be used to contradict the express terms of a contract." *Rezapour v. Earthlog Equity Grp.*, No. 12 Civ. 105, 2013 WL 3326026, at *4 (W.D.N.C. July 1, 2013). The term "good faith" does not appear at all in the Class Order. It shows up just once in the Summary Judgment Order, within a quote from Williston on Contracts that was immediately followed by the Court's "find[ing] that the contract required the variation in variable rates to be determined ***solely by*** XOOM's actual and estimated supply costs." Doc. 151, SJ Order 14 (emphasis added). Neither the Class Order nor the Summary Judgment Order supports the idea that the Court preemptively blessed Plaintiff's then-unstated attempt to have the jury assess XOOM's subjective "good faith" in deciding the sole issue raised by her express-breach claim: whether "XOOM charged variable rates . . . that were not based on '[its] actual and estimated supply costs.'" Doc. 43, FAC ¶ 79. XOOM's intent is irrelevant to that issue; its variable rates either complied with the contract's express terms, or they did not. *Cf. Bracken v. USAA Gen. Indem. Co.*, No. 3:19-cv-00825-YY, 2019 WL 6037661, at *6 (D. Or. Nov. 14, 2019) ("[A] claim for breach of the covenant of good faith and fair dealing does not 'otherwise provide a remedy for an [allegedly] unpleasantly motivated act that is expressly permitted by the contract.'" (citation omitted)).[5] That is what Plaintiff's counsel told the Second Circuit, and it remains true now.

Plaintiff next says she can reinject good faith and reasonableness here based on inapposite cases. For example, she relies on *City Grill*, in which a court allowed jury instructions for an implied breach theory even though it had previously dismissed the implied covenant claim as involving "the ***same*** factual allegations" as the pleaded express breach claim. *See City Grill*

---

[5] Putting aside that Plaintiff has long argued XOOM has no rate-setting discretion, her citation to *Richards* and *Martinez* for the proposition that an ESCO must exercise that discretion in good faith misses the point. *See* Pl. MIL Resp. 8. These cases involved pleaded implied covenant claims. In fact, Mr. Richards asserted only an implied covenant claim (not one for express breach).

*Hospitality Grp. v. Nationwide Mut. Ins. Co.*, 2014 WL 1429552, at *5 (E.D.N.C. Apr. 14, 2014) (emphasis added). Thus, *City Grill* concerned an implied covenant claim that was entirely duplicative of (and subsumed within) the plaintiff's express-breach claim. *See id.* Here, on the other hand, Plaintiff intentionally deleted all references to her implied-breach theory and then succeeded on her express breach claim before the Second Circuit in part by arguing it was ***not*** duplicative in distinguishing her (pleaded) express claim from her (de-pleaded and renounced) implied claim. *See* Doc. 227, Def. MIL Mem. 2. She could have argued to the Second Circuit that the implied covenant claim was distinct and should not have been dismissed as duplicative. Or she could have conceded that it was duplicative of her express breach claim and therefore did not need to be revived. But instead she chose a third path. She purposely deleted all bad faith allegations to argue that the express breach claim was simpler and distinct so that it might survive, which it did. Through those pleading choices and the Second Circuit's mandate, the implied covenant claim remains distinct and dismissed.

Plaintiff also cites cases that allowed implied breach theories to proceed past the pleading stage as either direct claims or as part of an express breach claim. But the complaints in those cases contained explicit allegations that the ESCOs' rate-setting was infected with bad faith or improper motive. *See, e.g.*, *Melville*, 2023 WL 2648775, at *9; *Hamlen*, 2017 WL 892399, at *5; *Rezapour*, 2013 WL 3326026, at *4 (dismissing implied breach claim that "center[ed] on alleged breaches of express contract terms" but allowing plaintiff to continue "assert[ing] theories of breach of good faith in support of its claims for breach of contract" that alleged numerous "bad faith actions"). This is not such a case. Again, Plaintiff deliberately removed all references to bad faith from her Amended Complaint and then expressly abandoned those same allegations on appeal.

Moreover, none of Plaintiff's cases had a procedural history remotely like hers, where: this Court dismissed both the express contract claim and the implied covenant claim; Plaintiff amended her complaint to remove all allegations of consumer expectations and XOOM's good (or bad) faith, *see* Doc. 27-1, Pl. Redline FAC; Plaintiff appealed this Court's dismissal of her express contract claim only; Plaintiff told the Second Circuit that she "decided not to challenge the implied covenant claim"; and the Second Circuit issued an opinion and mandate that expressly "affirm[ed] the dismissal of" Plaintiff's implied covenant claim because "[t]he dismissal of that claim [was] not challenged on appeal." *See* Doc. 227, Def. MIL Mem. 2–3.[6] That unique procedural history means three non-discretionary doctrines (judicial estoppel, the mandate rule, and law-of-the-case) preclude Plaintiff from pursuing her implied covenant claim—procedural bars not at issue in any of her cited cases.[7]

Thus, Plaintiff has not had a live implied covenant claim since 2019. When given the opportunity at the Second Circuit to characterize at least part of her case as based on good faith or fair dealing, Plaintiff declined. She instead portrayed her claim as "a simple breach of contract case" based on XOOM's "contract requir[ing] that [its] energy rates be based on [its] supply costs." Ex. 8,[8] OA Tr. 2:10–12. Asked if that was indeed the "only basis" for her claim or if other theories

---

[6] Contrary to Plaintiff's assertion, this case is on all fours with *Travel Ctr. of Fairfield Cnty., Inc. v. Royal Cruise Line Ltd.*, 154 F. Supp. 2d 281 (D. Conn. 2001). There, as here, Plaintiff amended her complaint to ***not*** assert an implied covenant claim. Plaintiff's suggestion that her original complaint's "stand-alone count" for breach of the implied covenant somehow put XOOM on notice of its forthcoming return years later is confusing at best. Plaintiff omitted the stand-alone claim from her live pleading, expressly abandoned it on appeal, and proceeded on an amended complaint that intentionally ***does not mention*** bad faith, consumer expectations, or reasonable rates. *See* MIL No. 1. Neither XOOM nor the Court could have divined that she would try to resurrect it five years later—and the mandate rule (among other doctrines) precludes it.

[7] Plaintiff's strategic choices throughout this case are the reason that XOOM's position on the implied covenant claim, although it might seem unusual, is nonetheless correct.

[8] Exhibits 1 through 7 are annexed to Doc. 216, Matthews Declaration. Exhibits 8 through 14 are annexed to the accompanying Reply Matthews Declaration.

supported her claim, Plaintiff stood firm: "No, Your Honor. That is the **only** basis." *Id.* at 2:13–17 (emphasis added). Plaintiff also distinguished her express contract claim from precedent addressing contracts that provided "leeway" to set rates based on "business and market conditions," saying that this case "is the opposite" because XOOM "has bound its costs, its . . . rates to its supply costs." *Id.* at 4:18–5:2.

Plaintiff now tries to avoid the consequences of her years' long express-breach-only strategy—a strategy that saved the express-breach claim on appeal and won her class certification—by requesting that she be allowed to argue to the jury that XOOM's "margins were unreasonable" and "were not set in good faith." Pl. MIL Resp. 6. Those issues are distinct from the express-breach issue of whether XOOM charged rates based on actual and estimated supply costs. Plaintiff could have earlier (i.e., pre-mandate) tried to pursue a non-duplicative implied covenant claim on those issues—a claim that while XOOM may have complied with the express contract term, it breached the implied covenant because its "margins were unreasonable" and "were not set in good faith." She chose not to. Again, Plaintiff convinced the Second Circuit to reverse this Court's dismissal order in part by arguing that liability on her express-breach claim "***does not require a showing of bad faith.***" Ex. 2, Pl. 2d Cir. Reply Br. 7–8 (emphasis added).

That is far from the position that Plaintiff takes now. Plaintiff asks to give the jury the option of imposing liability based on "evidence of bad faith" and consideration of XOOM's "good faith." She makes the same point throughout her contributions to the Joint Pretrial Order, perhaps nowhere as clearly as her proposed jury instructions, which set forth an implied-breach theory replete with the kind of references to bad faith, consumer expectations, and reasonableness she previously excised from her complaint:

> In addition to the express terms of a contract, the law provides that every contract contains an implied covenant of good faith and fair dealing. This means

> that it is understood that each party to the contract must act in good faith and deal fairly with the other party.
>
> To act in good faith and deal fairly, a party must act in a way that is honest and faithful to the agreed purposes of the contract and *consistent with the parties' reasonable expectations*. A contracting party *must not act in bad faith, dishonestly, or with improper motive* to diminish the right of the other party to receive the benefits or reasonable expectations of the contract.
>
> There are many forms of conduct that might constitute a violation of good faith and fair dealing, but each case is fact-specific. For you to find that there has been a breach of the implied covenant of good faith and fair dealing in this case, the *Plaintiff must prove to you that the Defendants: (1) acted in bad faith*, which can be inferred from evidence *that XOOM's conduct was arbitrary or contrary to reasonable expectations*, and (2) that conduct denied the Class the benefit of the bargain of XOOM's contract.
>
> In considering what constitutes *bad faith*, you should consider a number of factors, including the *expectations of the parties* and the purposes for which the contract was made. You should also consider the level of sophistication between the parties and whether the parties had unequal bargaining power.
>
> Plaintiff and the Class claim that XOOM breached the implied covenant of good faith and fair dealing. Defendants deny this.

Doc. 210-8, Joint Pretrial Order Ex. 8 at 12 (emphasis added); *see also id.* at 3 (providing similar explanation about implied-contract claim).

This is the very implied-breach theory that Plaintiff previously removed from her live pleading and then renounced at the Second Circuit. It is distinct from—not duplicative of—her express-breach claim that considers whether XOOM based its rates on supply costs. Plaintiff thus asks the Court to allow her a separate (dismissed, de-pleaded, and abandoned) theory of recovery to give her a second bite at the apple should her express-breach claim fail. Plaintiff admits as much by arguing that her implied covenant claim should be presented to the jury as an alternative theory of breach, contending that "even if [it] concludes that XOOM did not breach the contract's express language, [it] could still find" XOOM liable on an implied-breach claim. Pl. MIL Resp. 6. The law forecloses that fallback approach too. *See, e.g.*, *Beatty v. PruittHealth, Inc.*, 2022 WL 3681918, at

*9 (M.D.N.C. Aug. 25, 2022) ("'A defendant cannot breach a covenant of good faith and fair dealing when a claimant fails to establish the defendant breached the underlying contract.'" (quoting *McDonald v. Bank of N.Y. Mellon Tr. Co.*, 816 S.E.2d 861, 864–65 (N.C. Ct. App. 2018))).[9]

As the Court held in its Decertification Order, Plaintiff's unpleaded and abandoned implied covenant claim has no place at trial. The Court dismissed it and the Second Circuit affirmed based on Plaintiff's decision to abandon the claim, and her counsel's affirmative representation that the express contract claim she did appeal would not implicate consumer expectations or bad faith. Plaintiff then proceeded on a pleading that does not mention bad faith, consumer expectations, or reasonableness and, accordingly, the parties did not conduct discovery based on those theories. Nor is her proposed implied-breach claim duplicative of the narrower express-breach claim pleaded in the Amended Complaint. So, it does not come within the ambit of cases allowing dismissed-but-duplicative implied-breach theories to proceed as part of express-breach claims or to be raised at trial. XOOM respectfully asks the Court to grant its MIL No. 1.

---

[9] Because Plaintiff's implied covenant theory is not duplicative of the express-breach theory alleged in her Amended Complaint, Plaintiff would necessarily have to amend her complaint again to proceed on an implied covenant claim. Neither Rule 15 nor Rule 16 (nor any other Rule) would allow it in the face of such prejudice to XOOM.

**II.      XOOM's MIL No. 2: The Court should prohibit Plaintiff from offering evidence or argument that an implied or unwritten rate or margin cap exists in the contract.**

XOOM's MIL No. 2 showed that Plaintiff has no basis to ask the jury to supply an unwritten rate or margin cap because (a) Plaintiff deliberately abandoned any claim based on the implied covenant of good faith and fair dealing, *see supra,* Part I, and (b) the doctrine of implication of unexpressed terms does not apply. Plaintiff's response—like much of her pretrial briefing—recasts XOOM's argument as trying to upend the Court's proportionate-margin construction and escape the "reasonable" and "proportionate" limitations on its margins.

That accusation is not true. Reasonableness is in every contract by virtue of the implied covenant. But the implied covenant is not at issue here, so reasonableness is not either. *See supra,* Part I, *infra*, Part III.

XOOM understands it is bound by the Court's contract construction, which is law of the case.[10] With respect to a "reasonable" margin requirement, when XOOM moved for summary judgment, Plaintiff's lead position through CRA's Original Report was that the contract did not permit any margin at all. Thus, XOOM argued that interpretation failed because there was no question the contract allowed XOOM to include at least a reasonable margin. To survive that argument, Plaintiff conceded in her summary judgment response that a reasonable margin was allowed. The Court therefore assumed the parties agreed that the contract permitted a reasonable margin. *See* SJ Order 12. The "proportionate" limitation, on the other hand, comes from the Court's adopting Plaintiff's proposed reading of the express language to mean that XOOM's variable rates had to be determined solely by its actual and estimated supply costs.

But whether "reasonable" and "proportionate" margin requirements are in the contract is a

---

[10] XOOM has respectfully reserved its right to challenge the Summary Judgment Order and the Court's contract construction at the appropriate time: on appeal.

very different issue than whether Plaintiff has a live and submissible claim that XOOM breached them. For the reasons XOOM explained in its MIL Nos. 1–3, and its replies here, Plaintiff abandoned the claim from which the reasonableness requirement derives: the implied covenant of good faith and fair dealing. As a result, she has a live claim based on the "proportionate" limitation coming from the contract's express terms, but she does not have one based on the "reasonable" limitation coming from the implied covenant.

Plaintiff's response on the doctrine of implication of unexpressed terms is equally unavailing. Specifically, she claims that (1) the doctrine does not require an ambiguity in the contract's express terms; (2) the doctrine does not require inadvertent omission of the terms sought to be implied; (3) there are "other" theories that would allow the injection of unexpressed terms—though the only one Plaintiff identifies is the implied covenant; and (4) the jury has the power to infer any unexpressed terms. None of these positions is correct.

*First*, Plaintiff's contention that the doctrine of implication of unexpressed terms can apply here despite the Court's ruling that the contract is not ambiguous relies on *Lane v. Scarborough*, 200 S.E.2d 622 (N.C. 1973).[11] That case is entirely inapposite. In *Lane*, the court concluded that two spouses who agreed to "dispose of all classes and kinds of property . . . as though free and unmarried" and "released the right to administer upon the estate of the other" had implicitly "release[d] his or her share in the estate of the other." *Id.* at 625. That decision was based on the

_____

[11] Curiously, Plaintiff also cites a case that expressly found the implication-of-unexpressed-terms theory did not apply. *See Ridout v. KEP Morrisville Realty LLC*, No. 08 Civ. 453, 2010 WL 4828140, at **5–7 (E.D.N.C. Nov. 19, 2010) *aff'd*, 461 F. App'x 255. In affirming the district court's decision, the Fourth Circuit (much like the district court itself) explained that the implication of unexpressed terms is not appropriate "when the language of a contract 'is plain and unambiguous,'" because "'the construction of the agreement is a matter of law; and the court may not ignore or delete any of its provisions, nor insert words into it, but must construe the contract as written.'" *Ridout v. KEP Morrisville Realty, LLC*, 461 F. App'x 255, 256 (4th Cir. 2012) (quoting *Hodgin v. Brighton*, 196 N.C.App. 126, 674 S.E.2d 444, 446 (N.C. 2009)).

court's finding that "the specific terms of the contract" would have been "totally inconsistent" with a conclusion that contract did not contain the implied term, and its conclusion that the title of the document "connote[d] not only complete and permanent cessation of marital relations, but a full and final settlement of all property rights of every kind and character"—in other words, the express terms suggested that the implied term would have been included had the parties thought about it. *Id.* Here, not including a specific margin or rate cap is ***not*** "totally inconsistent" with "specific terms of the contract," and there is no express contractual language suggesting that any party, let alone both parties, envisioned the kind of cap that Plaintiff seeks to impose.[12]

*Second*, Plaintiff says that inadvertent omission is not a prerequisite for implication of unexpressed terms. She again points to *Lane*, claiming that decision "does not describe inadvertence as a prerequisite," but instead "notes that the '***policy*** of the law is to supply in contracts what is presumed to have been inadvertently omitted or to have been deemed perfectly obvious by the parties,'" Pl. MIL Resp. 12 (emphasis by Plaintiff). But plainly, *Lane* supplied a term only because the parties inadvertently omitted it—suggesting that inadvertence ***is*** required. Plaintiff also misreads *Shelton v. Duke Univ. Health Sys.*, 633 S.E.2d 113, 115–16 (N.C. Ct. App. 2006) to suggest that "a missing" term was read into an unambiguous contract. To the contrary, that decision rejected Plaintiff's argument that it should "infer[] a '***reasonable rate***' as the contract price for the services rendered." The contract at issue provided that plaintiff would pay the

---

[12] Plaintiff also makes the peculiar argument that if an unambiguous contract precludes adding a "missing" term, then "there would be no basis on which to include any margin" in the variable rates. But again, the "reasonable margin" comes from the parties' agreement on what the contract allowed and the implied covenant. It does not depend on the express contractual language. For this same reason, Plaintiff's argument that if "XOOM intentionally omitted a provision entitling it to charge a margin [then] under XOOM's own logic it should not be allowed any margin over its rate-setting workbooks' COGS figures" is unavailing.

hospital-defendant's "regular rates,"[13] and that language was "sufficiently definite" to put an end to Plaintiff's breach of contract claim. *Shelton* thus supports only XOOM's position.

In sum, XOOM's and Plaintiff's cases show that courts applying North Carolina law find implied terms only where there was inadvertent omission or ambiguity, and Plaintiff has not cited any case in which a court found that inadvertence was unnecessary before finding an implied term. That makes sense—allowing courts to read new terms into a contract where their omission was not inadvertent would turn fundamental contract principles on their head.

*Third*, Plaintiff argues that "other doctrines [] can be used to supply missing terms," and then returns only to her de-pleaded implied covenant theory, though this time she calls it "the duty of good faith," as though using different language to describe it makes it different. It does not. The two are identical, regardless of the terms used to describe them. *See, e.g., Recycling Equip., Inc. v. E Recycling Sys.*, No. 5:14-CV-00056, 2014 WL 6977766, at *5 (W.D.N.C. Dec. 9, 2014) (using "duty of good faith and fair dealing" and "implied covenant of good faith and fair dealing" to describe the same implied obligation); *Rezapour v. Earthlog Equity Grp.*, No. 5:12CV105-RLV, 2013 WL 3326026, at *4 (W.D.N.C. July 1, 2013) (same); *BioSignia, Inc. v. Life Line Screening of Am., Ltd.*, No. 1:12CV1129, 2014 WL 2968139, at *4 (M.D.N.C. July 1, 2014) (same). And as explained in MIL No. 1 and *supra,* Part I, the implied covenant cannot save her express contract claim because she abandoned it long ago.

*Fourth and finally*, contrary to Plaintiff's contention, the Court did not rule that the jury can invent an absent contract term here. The Court at summary judgment rejected XOOM's

---

[13] *Shelton* did hold that the "rates of services contained in the 'charge master' were necessarily implied in the contract" through the "regular rates" language and noted that "there is no allegation that the rates contained in the 'charge master' were not sufficiently definite." *Id.* at 125. Here, in contrast, Plaintiff asks the *jury* to imply a decidedly indefinite term that was not even referenced in the express contract. She cites no support for that position, and none exists.

argument that *Richards v. Direct Energy Services*, 915 F.3d 88 (2d Cir. 2019), holds that a cap cannot be imposed where an ESCO contract does not explicitly set one. But the Court did not rule that the jury has the power to invent a term not included in XOOM's unambiguous contract. And as explained, the jury does not have that power. *See, e.g., Shelton*, 633 S.E.2d at 113 (finding the doctrine did not apply to a contract "free from ambiguity"); *see also* Doc. 151, SJ Order 10 ("[T]he contract does not contain an ambiguity that must be interpreted by the jury."); *id.* at 13 (acknowledging that the contract is unambiguous and also "silent as to an appropriate margin").

Nor has the Court ruled on whether—despite Plaintiff's abandonment of the implied covenant claim—a margin cap can be read into Plaintiff's contract that is silent on the matter. Securing such a ruling is the purpose of this motion. And Plaintiff cites not a single case in which a court applying North Carolina law delegated the duty of supplying a purportedly missing term to the jury, much less one that, like a "reasonable" margin, is not "'definite and certain *or capable of being made so*,'" *Shelton*, 633 S.E.2d at 116 (emphasis in original, citation omitted).[14] That is

---

[14] The only case Plaintiff cites on the subject is one concerning the admissibility of ***parol*** evidence, which is not at issue here. *See Root v. Allstate Ins. Co.*, 158 S.E.2d 829, 837 (N.C. 1968) ("*[I]f it appear that the entire agreement was not reduced to writing,* or if the writing itself leaves it doubtful or uncertain as to what the agreement was, *parol evidence is competent, not to contradict, but to show and make certain what was the real agreement of the parties, and, in such a case*, what was meant is for the jury under proper instructions from the Court." (emphasis added to portions of the excerpt Plaintiff omitted, *see* Pl. MIL Resp. 9–10)). That a jury is permitted to consider extrinsic evidence where a contract is only oral or ambiguous does not mean that a jury can supply an unexpressed term in a written and unambiguous contract. Such an outcome would be contrary to not only North Carolina law, but also contract law generally. *See, e.g., Neuman v. Pike*, 591 F.2d 191, 194–95 (2d Cir. 1979) ("[A] ***court*** should not redraft the agreement that they executed, nor should it add a term which the parties have not expressed because it may deem it reasonable. A promise by the defendant should be implied only if ***the court*** may rightfully assume that the parties would have included it in their written agreement had their attention been called to it."); *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1105 (E.D. Cal. 2010) ("Absent an express term, it is first necessary to determine whether the intention of the parties as to duration can be implied from the nature of the contract and the circumstances surrounding it. For written contracts, this determination is a question of law for the court." (cleaned up)).

precisely why the good faith and reasonableness are ***implied*** in every contract. They are not read in as express terms as Plaintiff suggests.

For all the foregoing reasons, the Court should prohibit any evidence or argument that would permit the jury to supply an unexpressed term, including a margin or rate cap.

**III.        XOOM's MIL No. 3: The Court should prohibit Plaintiff from offering evidence or argument that XOOM's variable rates or variable-rate margins were unreasonable.**

XOOM's MIL No. 1 asks the Court to preclude Plaintiff from presenting evidence or argument concerning any purported breach of the implied covenant of good faith and fair dealing. Given the Court's recent ruling that good faith is not before it, that motion should be summarily granted. MIL No. 2 then asks the Court to preclude Plaintiff from arguing for any other kind of unexpressed rate cap, through the doctrine of implication of unexpressed terms or otherwise.

XOOM ties MIL Nos. 1 and 2 together through its MIL No. 3 by explaining that, because there is no submissible jury issue on the "reasonable" margin limitation, any evidence or argument that XOOM breached such a requirement should be excluded. But even if the Court rejects either MIL No. 1 or MIL No. 2 (it should not) and allows Plaintiff to proceed on the "reasonable" margin limitation at trial, Plaintiff should at a minimum be bound by her concession that only the objective standard, *i.e.*, commercial reasonableness, is at issue.

A.   Plaintiff does not have a live claim based on XOOM's obligation to include "reasonable" margins in its variable rates.

XOOM argued on summary judgment that the contract allowed it to include at least a reasonable margin in Plaintiff's rates—and Plaintiff conceded as much in her summary judgment response. A "reasonable" limitation on margin does not appear in the contract, but the Summary Judgment Order recited the principle that "contracts contain an implied 'obligation to exercise discretion ***reasonably*** and with proper motive'" *Id.* (quoting *Cole v. Wells Fargo Bank, N.A.*, No. 15-CV-39 (MR), 2016 WL 737943, at *7 (W.D.N.C. Feb. 23, 2016). The Court also noted that "contractual silence does not allow unbounded discretion, because discretion granted by a contract must be exercised in good faith." Doc. 151, SJ Order 14 (quoting *Richards v. Direct Energy Services*, 915 F.3d 88, 99 (2d Cir. 2019) (emphasis added)).

But as the Court recently concluded, Plaintiff abandoned her implied-covenant claim and associated allegations, so good faith "is not before [the Court] in this case." Decert. Order 14; XOOM's MIL No. 1; *supra,* Part I. As such, Plaintiff has no claim based on the implied covenant, and she has no relevant basis on which she can argue or present evidence that XOOM's variable-rate margins were not reasonable.[15] Any purported evidence of a "reasonable" margin, which Plaintiff admits she would use to suggest a margin cap, should therefore be excluded as irrelevant, prejudicial, and misleading.

## B. The "reasonable" limitation on XOOM's variable-rate margins is admittedly objective.

Even if Plaintiff is somehow allowed to proceed on an unpleaded and abandoned claim that XOOM's margins were not reasonable, then that reasonableness requirement must be an objective, not subjective, one (as Plaintiff admits[16]). In other words, it must be based on commercial reasonableness, not on consumer expectations, honesty, or bad faith. *See supra*, Part I (explaining that Plaintiff deleted such allegations from her Amended Complaint to strategically narrow the express breach theory); *see also* Doc. 27-1, Pl. Redline FAC.

The American legal system (including North Carolina and New York law) distinguishes between the subjective and objective aspects of good faith and fair dealing. Reasonableness falls within the implied covenant through its objective component as commercial reasonableness, while the subjective component looks to issues of good faith and "honesty in fact." *See In re Nieves*, 648 F.3d 232, 239–40 (4th Cir. 2011) ("Good faith" [] contains both subjective ('honesty in fact') and objective ('observance of ***reasonable commercial standards***') components. . . . Under the

---

[15] Nor can the "reasonable" margin limitation be the product of the doctrine of implication of unexpressed terms or any other doctrine of which the parties are aware. *See supra,* Part II.

[16] *See, e.g.*, Pl. MIL Resp. 59 ("[T]rial in this case will concern XOOM's compliance with its contract . . . including questions of XOOM's reasonableness and good faith which are governed by objective standards."); *id*. at 60 ("Again, questions of XOOM's reasonableness and good faith are governed by objective standards.").

objective prong, a party acts without good faith by failing to abide by ***routine business practices***.")[17]; *In re ResCap Liquidating Tr. Litig.*, 428 F. Supp. 3d 53, 112–13 (D. Minn. 2019) ("[T]he subjective good-faith standard used for the implied covenant of good faith rests on policy concerns that are markedly different than the policy concerns underlying the objective good-faith standard used in evaluating the reasonableness" of certain actions, with the subjective standard addressing issues like "dishonest" or "malicious" conduct."),[18] *aff'd sub nom. ResCap Liquidating Tr. v. Primary Res. Mortgage, Inc.*, 59 F.4th 905 (8th Cir. 2023), *with Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 470–72 (S.D.N.Y. 2018) (distinguishing subjective from objective good faith in context of "commercially reasonable efforts" clauses), *aff'd*, 769 F. App'x 40 (2d Cir. 2019).

Thus, should the Court conclude that, even in the absence of an implied covenant claim, there is a triable issue on whether XOOM charged reasonable margins, then that reasonableness standard is cabined to objective, commercial reasonableness. *See Stonebrae, L.P. v. Toll Bros.*, No. C–08–0221 EMC, 2010 WL 114010, at *4 (N.D. Cal. Jan. 7, 2010) (explaining that "the objective test applied" to a contractual provision that left "factors of commercial value or financial concern" to the allegedly breaching party (quotation marks and citation omitted)); *MCI Constructors, Inc.*

---

[17] Although the Fourth Circuit was not analyzing North Carolina law in that case, it was relying on a U.C.C. provision virtually identical to North Carolina's. *Compare* U.C.C. § 1-201(b)(20), (defining "good faith" as "honesty in belief," "faithfulness to one's duty or obligation," and "observance of reasonable commercial standards of fair dealing in a given trade or business")), *with* N.C. Gen. Stat. § 25-1-201 (defining "Good faith" as "honesty in fact and the observance of ***reasonable commercial*** standards of fair dealing").

[18] *In re ResCap* applied Minnesota law, but there are no material differences between the approaches used in North Carolina or New York. Under both states' laws, plaintiffs must show that an allegedly breaching party acted "malevolently" or with some other heightened state of mind to prove bad faith. *See, e.g.*, *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 451 (S.D.N.Y. 2018); *Williams v. Metro. Life Ins. Co.*, 367 F. Supp. 2d 844, 851 (M.D.N.C. 2005) (analyzing implied-breach claim by reference to "willful, oppressive, or malicious conduct").

*v. Greensboro*, City of, 125 F. App'x 471, 477 (4th Cir. 2005) ("[T]he general rule in North Carolina, where a contract confers on one party a discretionary power affecting the rights of the other party, is that such a contract is not illusory so long as its interpretation is exercised in an objectively reasonable manner based upon good faith and fair play."); *Holland Loader*, 313 F. Supp. at 471–72 ("A good faith standard has been held to apply when a contractual provision leaves implementation decisions to the discretion of the promisor," and "[o]n the other hand, where provisions do not grant authority to the promisor to exercise his or her judgment, courts have found an objective or 'reasonableness' standard to be applicable.").[19]

This distinction is material because an inquiry into commercial reasonableness requires comparisons with similarly situated peers. *See Richards*, 915 F.3d at 99 ("To determine if a price is commercially reasonable it must be compared to the range of other prices in the market." (cleaned up)); *Lexington Furniture Indus. v. Bob Timberlake Collection, Inc.*, No. 08 CVS 02407, 2009 WL 2901618, at *7 (N.C. Super. Feb. 9, 2009) ("To raise an issue of commercial reasonableness, a party must first introduce evidence as to the applicable industry standard."); *Yonaty v. Amerada Hess Corp.*, No. 304CV605FJSDEP, 2005 WL 1460411, at *5 (N.D.N.Y. June 20, 2005) (noting that a "commercially reasonable price . . . is not the same as a fair market price

---

[19] The cases *Holland Loader* cites involve satisfaction clauses, which expressly require one party to make a determination regarding, *e.g.*, a "commercial value," and not a contract provision like the one here, which is silent as to how margin will be determined. *See Misano di Navigazione, SpA v. United States*, 968 F.2d 273, 275 (2d Cir. 1992) ("Courts have observed that satisfaction clauses should fall into two categories of review: (1) those that call for satisfaction as to 'commercial value or quality, operative fitness, or mechanical utility,' which are interpreted under a reasonableness standard, and (2) those that require the consideration of a 'multiplicity of factors' and involve 'fancy, taste, or judgment,' which should be analyzed under a good faith standard."); *Christie's Inc. v. SWCA, Inc.*, 22 Misc. 3d 380, 383–84 (Sup. Ct. N.Y. Cty. 2008) ("Under so-called 'satisfaction clauses,' where one party is granted a certain level of discretion to exercise a contract right to its satisfaction, courts must determine whether the parties intended that party to be reasonably satisfied, that is[,] subject to the objective standard, or merely honestly, albeit unreasonably, satisfied, that is[,] subject to a subjective standard.").

or the lower price available" and finding that plaintiff who produced no evidence of, *inter alia*, "the pricing practices of other franchisees" could not show existence of genuine issue of fact with respect to bad faith claim) (quotation marks and citation omitted)); *see also Ashokan Water Services*, 11 Misc. 3d at 691 ("'[U]nless the parties have contractually bound themselves to a higher standard of performance, reasonable care and competence owed generally by practitioners *in the particular trade or profession* defines the limits of an injured party's justifiable demands.'" (quoting *Milau Assocs. v. North Ave. Dev. Corp.,* 42 N.Y.2d 482, 486 (1977)); *Sevugan v. Direct Energy Services*, 931 F.3d 610, 616 (7th Cir. 2019) ("[The utility's] price is not a market price at all; it is a regulated price. Neither [energy wholesale supplier] nor [utility] participate[s] in the general market for electricity, and thus they are not proper comparators with [ESCO] to gauge market price.").

*   *   *

In sum, Plaintiff should be precluded from presenting evidence or argument that XOOM did not charge "reasonable" margins because she does not have a claim through which she can enforce that implied contractual requirement. And even if Plaintiff can sue based on that implied term, she should be prohibited from presenting evidence or argument that does not meet a "commercially reasonable" standard. Without this restriction, Plaintiff's evidence and argument will confuse and mislead the jury and unfairly prejudice XOOM. *See* Fed. R. Evid. 401; Fed. R. Evid. 402; Fed. R. Evid. 403.

**IV.**     **XOOM's MIL No. 4: XOOM's fixed rates and fixed-rate margins are not relevant evidence of appropriate variable-rate margins.**

Plaintiff has never offered a legitimate reason why XOOM's fluctuating estimates of its fixed-rate margins (ranging from -27% up to 59%) are relevant to the "reasonable" and "proportionate" margins required under the Court's contract construction. That is because none exists. XOOM's fixed-rate products are (as Plaintiff admits) subject to different pricing terms and considerations than XOOM's variable-rate products. And as Plaintiff's expert explained: "I mean, to me the rates have to be set *for the contract*." Ex. 9, Adamson Dep. 99:6–18. Here, the variable-rate contract imposes no requirement that XOOM "have the same profit margin for each product the company sold," so fixed rates and fixed-rate margins are not relevant to any triable issue. *Richards v. Direct Energy Services*, 246 F. Supp. 3d 538, 552 (D. Conn. 2017) (district court analyzing Mr. Adamson's use of fixed-rate margins as a benchmark for a commercially reasonable variable-rate margin), *aff'd*, 915 F.3d 88 (2d Cir. 2019).

Plaintiff recognizes this problem, so she does not even try to argue that XOOM's fixed-rate margins are relevant to the contract's pricing term or her express-breach claim. Instead, Plaintiff's response argues only that CRA's untimely Method C (which purports to average XOOM's fixed-rate margin estimates on all New York products during the class period) is relevant to the implied covenant of good faith and fair dealing and the resulting determination of "reasonable" variable-rate margins.[20] But that argument pre-dates the Court's recent holding that the source of the "reasonable" limitation, i.e. "good faith" in rate-setting imposed by the implied covenant, is an "issue that is not before [the Court] in this case." Doc. 246, Decert. Order 14; *see* Parts I, II, III *supra*. Plaintiff's arguments for admissibility are therefore moot and can all be

---

[20] Plaintiff's choice to argue relevance only as to the average estimated fixed-rate *margins* in Method C is an implicit concession that evidence of XOOM's fixed *rates* is inadmissible.

rejected out-of-hand.[21]

As to the "proportionate" limitation on variable-rate margins under the Court's contract construction, it comes from the contract's express pricing language that variable rates would be based on XOOM's "actual and estimated supply costs." XOOM's compliance with that express contractual rate-setting obligation (unlike the implied covenant) is unquestionably at issue in this case. But again, Plaintiff does not (because she cannot) contend that evidence of XOOM's fixed-rate margin estimates might help the jury assess whether XOOM complied with the contract's express language.[22] In fact, it is undisputed that XOOM's fluctuating fixed-rate margins would violate the proportionate-margin construction. *See* Pl. MIL Resp. 18. Those margin estimates fluctuated significantly across products, commodities, and time—ranging from -27% up to 59% during the now more than 11-year class period. *See* Doc. 216-4, CRA Model Two at 4 (-27% SureLock Margin for NGrid_NM in December 2020; 59% SureLock Margin for NFG in October 2016).

Plaintiff's only response on this point is to (wrongly) claim that Method C's average of XOOM's fixed-rate margin estimates does not fluctuate—which, she says, means it can be relevant

---

[21] Even if the Court determines there is a submissible jury issue on reasonableness, Plaintiff's relevance arguments for CRA's average fixed-rate exemplar in its untimely Method C would still fail. Method C is inadmissible for all the reasons explained in XOOM's MIL Nos. 4 and 5, XOOM's Motion to Exclude Plaintiff's Untimely Expert Disclosures, and its forthcoming reply in support of its Motions to Exclude Plaintiff's Expert Disclosures. Rather than repeat those arguments addressing Method C here, XOOM incorporates that briefing by reference in full.

[22] The Court's Decertification Order also acknowledged the non-controversial proposition that XOOM's fluctuating fixed-rate margin estimates are not probative of a ***proportionate*** variable-rate margin. Specifically, the Decertification Order noted that, subject to XOOM's Motions in *Limine* and pending Motions to exclude CRA's Reports, evidence of fixed-rate margins might "help the jury assess whether XOOM charged a reasonable margin[,]" while saying nothing of a proportionate one. Decert. Order 13. And for the reasons discussed in these Motions in *Limine* and in XOOM's Motions to Exclude CRA's Reports, its fixed-rate margin estimates and CRA's Method C are not admissible evidence of a reasonable margin either.

to whether the variable-rate margins were "unreasonably high" in comparison. Pl. MIL Resp. 21 (quoting CRA New Rep. 38). In other words, Plaintiff again tethers her claim of Method C's relevance to the "reasonable" limitation that is not at issue for the reasons discussed, and her argument fails on those grounds alone.

And in any event, Plaintiff's premise that averaging fixed-rate margin estimates renders them proportionate and relevant is flawed three times over. First, the average still leaves Plaintiff with irrelevant evidence of a fluctuating margin, not a proportionate one; the average has fluctuated every month during the 11-year class period and will necessarily continue to change each month when XOOM sets new fixed rates. Second, neither XOOM's fixed rates nor its fixed-rate margin estimates have any relationship at all to XOOM's variable-rate supply costs.[23] Thus, there is no trick of arithmetic that can "translate[]" disproportionate fixed-rate margin estimates into evidence relevant to a margin that must "remain proportionate, but not equal to the supply costs over time," Doc. 151, SJ Order 13. *See Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004) (prohibiting summary evidence of data that would be inadmissible if introduced directly). Method C's average is no exception. And third, for the reasons explained in XOOM's MIL No. 5, a placeholder average is not appropriate class evidence because XOOM's fixed-rate margin estimates necessarily exceeded their average approximately half the time. They are thus irrelevant to a large portion of the class members' claims. *See* Doc. 227, Def. MIL Mem. 14–16 (citing, *e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (representative evidence is admissible only if the same evidence "could have been used to establish liability in an individual action" brought by each class member under the Rules Enabling Act, the Constitution, and Rule 23)).

---

[23] *See* Part VI, *infra*, discussing the different costs, pricing considerations, and risk profiles between fixed-rate and variable-rate products.

Finally, Plaintiff does not address Rule 403 at all, offering no reason why the relevance she ascribes to Method C is not "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed. R. Evid. 403. Nor could she. Even XOOM's preliminary review of Method C in the twenty days after it was served revealed it is highly unreliable and misleading:

> For Method C, Plaintiff uses undisclosed calculations to create the "fixed margin" inputs she used to determine XOOM's average fixed rates. These inputs are substantially different than the margin figures reported in XOOM's workbooks, and CRA does not disclose the algorithms, inputs, or logic used to create these figures.

Doc. 229-1, Def. Mem. Exclude CRA New Rep. 28–29 (citing Coleman Decl. ¶ 10(c)).

For all these reasons, Plaintiff should be precluded from offering evidence or argument regarding XOOM's fixed rates and the components of those rates (including CRA's Method C) because it is irrelevant, prejudicial, and misleading. *See* Fed. R. Evid. 401; Fed. R. Evid. 402; Fed. R. Evid. 403.

## V.     XOOM's MIL No. 5: Plaintiff's exemplar margins are irrelevant, prejudicial, and untimely.

XOOM's MIL No. 5 established that evidence or argument about any exemplar margin, including the 19% exemplar margin Plaintiff previously relied on, is inadmissible. Plaintiff's response does not defend the 19% exemplar derived from CRA's Original Report.[24] Nor does it point to any other exemplar margins that were timely disclosed. Rather, consistent with her other pretrial briefing, Plaintiff advocates for admission of only the three new exemplar margins (named Methods A, B, and C) that were untimely disclosed in CRA's New Report served after the Joint Pretrial Order was filed.

Plaintiff's strategy renders the issues in XOOM's MIL No. 5 and its pending Motion to Exclude Plaintiff's Untimely Expert Disclosures entirely duplicative. Both motions are now centered on the same issue: whether CRA's New Report, including the three new exemplar margins as well as the new algorithm they feed into, can be used at trial. As XOOM explained in its motion to exclude CRA's New Report, it must be excluded as untimely and because Plaintiff cannot meet her burden to show "it is more likely than not" that CRA's new methods satisfy any of Rule 702's requirements. *See* Doc. 229-1, Def. Mem. Exclude CRA New Rep. And XOOM's forthcoming reply will likewise address the overlapping arguments Plaintiff made in response to XOOM's MIL No. 5 and her combined response to XOOM's motions to exclude CRA's Reports.[25]

---

[24] Contrary to Plaintiff's assertion, *see* Pl. MIL Resp. 32 n. 15, XOOM never claimed Model Two cut off a damage analysis in 2018. Rather, XOOM correctly pointed out that the 19% average fixed-rate margin CRA mentioned in the Original Report—but which was ***not*** Model Two's margin input—was computed using an arbitrary data set ending in 2018. That is still true.

[25] XOOM received Plaintiff's combined response just one business day prior to its deadline to file this reply. Based on a preliminary review of that response, however, it appears Plaintiff lifted many arguments from her response to XOOM's MIL No. 5—further underscoring that Plaintiff's strategy means the two motions are now seeking the same relief.

To streamline the issues for the Court and the parties, and to avoid any further duplicative briefing, XOOM incorporates all materials filed (and soon to-be-filed) in support of its Motions to Exclude Plaintiff's Expert Disclosures as if fully set forth herein in support of its MIL No. 5. *See* Docs. 214–17, Def. Mot. Exclude CRA Orig. Rep.; Doc. 229, Def. Mot. Exclude CRA New Rep.

**VI.      XOOM's MIL No. 6: Plaintiff's response confirms that the Court should prohibit her from offering evidence or argument regarding profitability of any rate or margin.**

Plaintiff and her experts admittedly do not know what profit, if any, XOOM made on fixed or variable products. *See, e.g.,* Ex. 9, Adamson Dep. 101:20-23 (admitting he did not know "if XOOM actually made a net profit"). So plainly, they should not be permitted to tell a jury otherwise—or to make the kind of unsubstantiated claims about XOOM 'reaping outrageous profits' that have littered Plaintiff's briefs. That prohibition should not be controversial.

Likewise, because Plaintiff lacks evidence of XOOM's profit on any product (fixed or variable), she should be prohibited from offering evidence or argument that any particular margin would be profitable. If Plaintiff does not know what margin yielded a profit—and she does not—it means she is not entitled to speculate about it or ask the jury to.

In response, however, Plaintiff makes her oft-repeated (but false) claim that XOOM witnesses admitted the fixed-rate margins were always profitable to argue she should be able to rely on that testimony to encourage the jury "to adopt XOOM's average 21.2% fixed rate margin as a reasonable contract margin."[26] Plaintiff's position not only mischaracterizes the witness testimony, but misunderstands the differences between fixed-rate and variable-rate products. As described in XOOM's MIL No. 4 and *supra,* Part IV, those products are not the same and cannot be compared apples-to-apples as even her experts have acknowledged. Nor may Plaintiff substitute her failure to obtain evidence that could support a reasonable and profitable ***variable*** margin by pointing to XOOM's ***fixed*** margins. *See* Def. MIL No. 4; *supra,* Part IV.

Plaintiff says XOOM misleads the Court—that "XOOM falsely claims there is no evidence that a profitable fixed rate margin would also be profitable if applied to XOOM's variable-rate

---

[26] The proposed exemplar margin Plaintiff cites in her response comes from her experts' untimely Method C, which appears in CRA's New Report only.

products." Pl. MIL Resp. 34. But XOOM's assertion is true: there is **no** such evidence. Otherwise, Plaintiff would have pointed to it, rather than just quoting the Second Circuit's description of XOOM as a "commodity broker or middle man" and then summarily (and incorrectly) stating without any citation that XOOM's costs on variable-rate and fixed-rate products are the same. *Id.* 35.

Again, Plaintiff does not have evidence about whether XOOM's New York fixed-rate products—by themselves—were profitable. The testimony reveals that (at most) XOOM's witnesses testified that its variable-rate and fixed-rate products were profitable **in general** and that their margins provided a profitable return **over time**. But XOOM's witnesses were clear that margins do not equal profit, and that an examination of XOOM's profit and loss statements would be necessary to determine net profits on any product (a task Plaintiff and her experts refused to undertake):

> Q.   So from a margin perspective, the variable-rate customers were more profitable to XOOM than the fixed-rate customers, right?
>
> A.   Well, this is referring to margin not profitability. Those are different. . . . Again, variable-rate margins are not actual margins. They are margins that you're setting prior to knowing your cost. So part of those margins include risk premium . . . . Because you don't have any certainty that your costs . . . will actually be what you think they are at the time you set the rates. So you'd have to look at like a P&L statement to really know profitability of those customers.

Ex. 10, Park Dep. 150:3-20. But this is far from evidence of profitability as to any fixed-rate product (of which there were many), much less that any fixed-rate product was profitable in every month during the class period. Plaintiff's experts' analysis dispels any notion that XOOM's fixed rates were always profitable. In fact, it shows that XOOM's fixed-rate margins (again, not profits)

were negative seven times during the class period. Plaintiff's contention that XOOM's fixed rates were profitable in the face of this evidence is confounding.

Indeed, Plaintiff cannot determine whether the variable-rate or fixed-rate products were profitable on their own—let alone when compared to each other—without knowing XOOM's profits and losses. As former XOOM employee Ryan Park explained, Plaintiff is "referring to margin not profitability" and they "are different." *Id*. at 150:3-20. Rather, "you'd have to look at . . . a P&L [(profit and loss)] statement to really know profitability of [XOOM's] customers." *Id.* Plaintiff declined to do so and cannot overcome that evidentiary shortfall now.

But even if there was evidence about whether XOOM's New York fixed-rate products were profitable, there is still no evidence to suggest that the pricing and margins of fixed-rate products should be used as a stand-in for the commercially reasonable margin XOOM should have charged on its very different variable-rate products. As XOOM's Director of Pricing and Structure at the relevant time, Jason Loehde, testified: "Fundamentally, a variable rate product is different than a fixed product because of a different product term, different costs," and other factors. Ex. 11, Loehde Dep. 118:15–23. Indeed, rates for fixed products were for known customers for a specific term (usually 12 months or higher) whereas variable-rate customers could cancel at any time under their month-to-month agreements. Ex. 12, Loehde Decl. ¶¶ 30–31. Thus, with "fixed-rate products you know your supply cost with greater certainty because you're purchasing it because the customer is under contract." Ex. 10, Park Dep. 80:5–81:15. If the customer has a "12-month contract," "you buy 12 months of energy." *Id.* Whereas with variable-rate products "the rate is not set in advance" and is based on ***estimated*** "forward-looking information from one months or two months forward[.]" Ex. 11, Loehde Dep. 53:9–16. Further, under the variable-rate contract terms, XOOM bore the risks inherent in a month-to-month contract: variable-rate customers were free to

leave XOOM at any time without penalty. That uncertainty does not exist under fixed-rate contracts that are for a certain term. And for the customer, the flexibility of being able to switch back to the utility or another ESCO, as Plaintiff did, itself carries value. These are two reasons why private market participants in various industries, such as cellular phone and rental car companies, charge less when a customer commits to a longer term. There is no evidence to suggest the margin that might earn XOOM a profit over the course of a twelve-month fixed-rate term might also turn a profit on a variable-rate customer who left after three months. To the contrary, the products are inherently different, have different supply costs, and cannot be compared.

Perhaps recognizing as much, Plaintiff tries to justify her comparison by making the unsupported argument that "XOOM does not incur greater expenses on its variable rate products as compared to its fixed rate products" and that "fixed rate products posed a greater financial risk to XOOM than variable rate products." She is wrong. As XOOM's witnesses explained, "[t]here was more volatility . . . in a variable rate price than there was in a fixed price. That's not reflective of the margin. That's reflective of costs." Ex. 13, Coppola Dep. 89:10-17; *see also* Ex. 11, Loehde Dep. 160:13-161:5. Because "variable rate product[s] . . . set[] rate[s] fort the future for energy that hasn't yet [been] consumed that you're not buying yet[,] and only for one month[,]" there is "more variability, more risk." Ex. 10, Park Dep. 80:5-81:15. This is generally referred to as a "risk premium" and is part of the reason why variable-rate margins were larger than fixed-rate margins. Actual supply costs that are not known until after the rate is set can "very easily can evaporate that margin." *Id.* Again, with a "fixed rate, you have greater certainty that those costs . . . are truer. There's still some risk, but not nearly as much risk." *Id.* Because fixed and variable rates are sold in "two different product offerings with different terms" they have "completely different cost profiles and the margins could be different, higher or lower, depending on the time frames in

question." Ex. 11, Loehde Dep. 221:24–222:9.

The evidence bears this out. As XOOM explained, in Model Two from CRA'S Original Report, XOOM's fixed-rate margins were frequently both higher (up to 59%) and lower (into the negative range) than an arbitrary average of those figures. *See* MIL No. 6; *supra,* Part IV. While Plaintiff has now abandoned and "replace[d]" CRA's Original Report and its Model Two, CRA's New Report likewise relies on an arbitrary 21.2% average fixed-rate margin when XOOM's actual fixed-rate margins were higher and lower than that arbitrary average over time. That is unsurprising given how averages are computed. Plaintiff calls this evidence "fantastical and []wholly unsupported[.]" But Plaintiff's hyperbole does not mean she can deny this mathematical fact or even attempt to refute it. Indeed, she does not try.

For these reasons, the Court should prohibit Plaintiff from offering evidence or argument that XOOM's fixed rates were always profitable or that an average fixed-rate margin is evidence of a profitable variable-rate margin. Such evidence and argument are irrelevant, prejudicial, misleading, and must be excluded. *See* Fed. R. Evid. 401; Fed. R. Evid. 402; Fed. R. Evid. 403.

**VII.    XOOM's MIL No. 7: Plaintiff offers no valid reason to allow evidence or argument relating to the rates and margins of other ESCOs.**

In its MIL No. 7, XOOM explained why (1) Plaintiff should not be permitted to introduce undisclosed evidence of other ESCOs' costs or margins at trial, and (2) the evidence of other ESCOs' rates in the record is not probative because it pertains only to XOOM's rate-setting for fixed and introductory rates, not variable rates.

On the first point, Plaintiff does not dispute that she should be prohibited from using any undisclosed evidence regarding other ESCOs' **costs** or **margins**. That concession should result in an order summarily granting XOOM's MIL No. 7 to the extent it seeks to exclude the margins and costs of other ESCOs—because no such evidence has been produced and none is included in the Joint Pretrial Order.[27] *See, e.g., Rhee v. SHVMS, LLC*, No. 21-CV-4283 (LJL), 2024 WL 2943696, at *3 (S.D.N.Y. June 10, 2024) (granting defendant's unopposed motion *in limine*).[28]

Plaintiff's response to XOOM's second point that ESCO **rates** should be excluded is premised on a falsehood: her representation that she has evidence that XOOM considered other ESCOs' rates in setting Class Members' variable rates. *Cf.* Ex. 11, Loehde Dep. 77:11–13 ("Q. Did you look at competitive intelligence for variable rate customers? A. **We did not.**"). In fact, the evidence uniformly shows that, insofar as XOOM considered other ESCOs' rates, it did so only in connection with setting fixed and introductory rates. *See id.* at 77:19-22 (Q. So how would you determine if your variable rate product offerings were competitive with competitors or the utilities?

---

[27] If the Court determines that a reasonable margin is a triable issue, then the controlling commercial reasonableness standard renders Plaintiff's admission that she has no evidence of other ESCOs' margins a case-ending concession. *See* Parts I, II, III, *supra.* It should result in decertification and a directed verdict for XOOM. *See* Part I, *supra*; Part XII, *infra*.

[28] XOOM's MIL No. 7 can be summarily granted as to ESCO margins on two other grounds as well. First, Plaintiff's MIL No. 15 likewise sought to exclude the same evidence, so the parties agree on this point. Second, ESCO margins are relevant only to an implied covenant claim, which Plaintiff is barred from pursuing here. *See* Parts I and III, *supra*.

A. We did not typically look at that."); *id.* at 82:14–83:18 ("We're typically not looking at what the competitor rates are in setting the variable rate. Competitor rates are more used for the purposes of new customers in terms of fixed rates or introductory rates to the variable product."); Ex. 10, Park Dep. 107:16–25 (Q. . . . [S]o XOOM's basically considering the prices of its top competitors when it sets those own rates [*sic*], right? A. For new customer rates, where you're competing with those rates, yes. For existing customers, who are our customers, it's not applicable."); *id.* at 110:11–14 ("[T]he competitor rates and utility prices were really more considerations towards new customer products.").

XOOM witnesses also explained *why* XOOM did not look at competitor rates in setting its own variable rates: "Because we don't have an apples to apples number to refer to." *Id.* at 107:25–108:2. That is because those contemporaneous variable rates were unavailable and unknown: "The variable rates from [XOOM's] competitors are typically not published or published on a lag." Ex. 11, Loehde Dep. 77:13–15; *id.* at 79:2–12 (Q. How would you know whether or not XOOM's *variable rates* were being set higher than XOOM's competitors? A. *We didn't know* – because we didn't typically gather variable rate information on our competitors because it was typically *never available* or *never available in a timely fashion* for most of our nonutility competitors." (emphasis added)).

Thus, there is no genuine dispute that the limited data in the record showing other ESCOs' rates was used by XOOM to set only fixed and introductory rates. XOOM's witnesses uniformly testified they never looked at other ESCOs' rates when setting Class Members' variable rates.

The documents that Plaintiff cites in support of her assertion do not suggest otherwise. Jason Loehde drafted the PX11 internal presentation and, as he explained, that document pertained to rate-setting "for different products," including for the purpose of "attract[ing] new customers to

XOOM Energy through either an ***introductory*** rate product or a ***fixed*** rate product." Ex. 11, Loehde Dep. 256:16–257:23. The deposition excerpts that Plaintiff cites from Messrs. Loehde and Coppola are likewise irrelevant. They discuss rate-setting in general, not ***variable***-rate setting.[29] Each of the cited excerpts discusses XOOM's ***general*** rate-setting practices, for various types of rates it set each month—fixed, introductory, and variable. None supports Plaintiff's false claim that XOOM reviewed ESCO prices in setting the variable rates at issue in this case—because it did not.

Similarly, the discussion of "competitor pricing" in PX24 that Plaintiff highlights pertains to "gain[ing] ***new*** customers," including "fixed"-rate customers. *See* PX24 1 ("So, we have 18 markets where the utility is not the focus in pricing and the rest, we are really concerned with comparisons to the utility ***to gain new customers***. It also sounds like we are being encouraged to protect and actually move up margins on ***fixed*** products . . . ."). In other words, PX24, like all of Plaintiff's citations, confirms XOOM's position, not hers: XOOM referenced competitor pricing in setting rates only for new customers through fixed-rate or introductory offers.

Given their indisputable irrelevance, there can be no doubt that the prejudice to XOOM outweighs any probative value in the documents reflecting ESCO rates. Allowing Plaintiff to introduce evidence of other ESCOs' limited, stale, and therefore non-representative rates for low

---

[29] *See* Ex. 13, Coppola Dep. at 50:8–17 ("Price setting occurred you know, two weeks during the month. And so we met several times for particular products and markets to go ahead and formally price those . . . ."); *id.* at 84:12–16 (responding to the very general question "So when XOOM was pricing products, one factor it considered was competitive intelligence?"); *id.* at 107:6–14 (Q. . . . You said before that XOOM did make pricing decisions based on what its competitors, including utilities, were pricing in – in New York markets, right?" A. No. No. XOOM did not exclusively make pricing decisions based on competitors."); *id.* at 237:8–238:1 (Q. And that's referring to the price setting meetings? A. It's probably a combination of both, just product and pricing getting prepared for the price setting meetings and then also participating in a price setting meeting. Q. Under the header Questions and Strategies that are considered, examples – . . . . this is referring to questions and strategies when rate setting, right? A. Yes, sir."); Ex. 11, Loehde Dep. 48:17–25 (confirming what he "looked at" "in [his] rate setting meetings" generally).

introductory (i.e. "teaser") or fixed-rate products will only lead to juror confusion. Fed. R. Evid. 403.

For the foregoing reasons and the reasons stated in XOOM's MIL No. 7, under Federal Rule of Civil Procedure 37 and Federal Rules of Evidence 401, 402 and 403, the Court should enter an order precluding Plaintiff from offering any evidence or argument relating to:

- rates set or charged by other ESCOs;

- costs incurred by other ESCOs;

- margins achieved by other ESCOs; or

- how XOOM's rates, costs, or margins compared to those of other ESCOs.

**VIII.**      **XOOM's MIL No. 8: Evidence and argument regarding regulated utility rates, costs, and margins is inadmissible and should be excluded from trial.**

Plaintiff's response to MIL No. 8 only underscores XOOM's point: regulated utility rate data is both irrelevant and prejudicial.

XOOM's MIL No. 8 explained that information concerning the rates charged by regulated utilities, as well as their underlying costs and margins, are irrelevant as a matter of law. Indeed, controlling and persuasive authorities have deemed utility rates irrelevant to whether ESCO variable rates are commercially reasonable. That is why Plaintiff's expert agreed under oath that utility rates have no bearing on Plaintiff's rates and were "irrelevant for this contract."

And even assuming some marginal relevance of utility data (there is none), evidence regarding a profit-neutral utility would unfairly prejudice XOOM. XOOM's contract disclaimed savings and did not promise competitiveness with the utility. But Plaintiff's proposed use of the utility rate as a benchmark for reasonableness would suggest the contrary to the jury: that XOOM was required to tether its variable rates to the utility's. Further, as discussed in Part XII, if Plaintiff is also allowed to misleadingly suggest that the PSC endorsed such a utility benchmark as a basis for imposing retroactive liability, the prejudice to XOOM will only be compounded.

As a preliminary matter, Plaintiff's relevance arguments can be easily disposed of because they are premised on two incorrect assumptions. First, she assumes that CRA's New Report and two of the new damage methodologies that accompany it will be presented to the jury. *See* Pl. MIL Resp. 37–39. But XOOM has moved to exclude CRA's New Report in its entirety. *See* Doc. 229. Thus, if the Court grants that motion, it can likewise grant XOOM's MIL No. 8 and exclude the utility-rate evidence on which it relies. Second, her relevance arguments assume that there is a submissible jury issue on a "reasonable" margin. But, again, she is wrong. If the Court grants

XOOM's MIL Nos. 1, 2, 3, or 4 because a "reasonable" margin is not a submissible jury issue (it is not), then Plaintiff's claims of relevance can be rejected out of hand for this reason as well.

But even if those related motions are all denied—they should not be—Plaintiff's efforts to introduce irrelevant utility rate data are still fatally flawed and the data must be excluded.

Plaintiff's lead argument on relevance is that her experts use the regulated rates as "a component of [their] framework for assessing a reasonable margin" under two of their untimely damage models. Pl. MIL Resp. 39. But the fact that Plaintiff's experts belatedly decided to base two of their new models on utility rates does not magically transform that irrelevant data into probative evidence. As a matter of law, utility rates are not probative of an objectively "reasonable" ESCO variable-rate margin. *See Richards v. Direct Energy Services*, 915 F.3d 88, 99 (2d Cir. 2019) (rejecting utility rates as "the proper comparator" for ESCO variable rates because "the entire point of electricity deregulation was to allow the market, rather than [the regulator], to determine rates"); *Sevugan v. Direct Energy Services*, 931 F.3d 610, 616–17 (7th Cir. 2019) (holding that utilities "are not proper comparators with [the ESCO defendant] to gauge market price"); *see also Martinez v. Agway Energy Services*, 88 F.4th 401, 414–15, 417 (2d Cir. 2023) (affirming district court's rejection of expert's report that contended "that the proper comparison for [ESCO's] variable rate is solely the rates of the incumbent utilities" and concluding plaintiff "has not established a breach of contract . . . by showing that [ESCO] failed to charge rates comparable to those charged by the incumbent local utilities, rather than other ESCOs"). Nothing in *Richards*, *Martinez*, or *Sevugan* suggests that it was the rate-setting discretion in those ESCO contracts that made the utility an improper comparator. Rather, each court found the utility was the wrong comparator because those rates are regulated while the ESCOs' contracts did not promise savings or competitiveness with regulated rates. The same is true of XOOM's contract

here: it disclaimed savings and did not promise competitiveness. The PSC's decision to prospectively re-regulate limits on ESCO pricing starting in 2021 through the Reset Order only highlights that no such utility comparison was required (or should be imposed) in the years before those limitations went into effect. *See infra*, Part XII.

Indeed, Plaintiff's own experts recognized that utility rates are not relevant to her contract's pricing term. *See* Ex. 5, Eryilmaz Dep. 73:10–23 (acknowledging that "the utility's rate . . . is irrelevant for this contract"). Plaintiff argues that her experts' testimony about the irrelevance of utility rates was based on their understanding that the contract did not allow XOOM any margin at all. But her experts also originally presented a model ***with a margin***, Model Two, which was the basis for the Court's Class Order. And that model, although it allowed a margin, was not tied to utility rates. *See* Ex. 4, Adamson Dep. 68:19–69:9 ("And you're not offering a damage model that compares XOOM's variable rate charged to what customers would have been charged by the utility during the same time period? . . . A. No."). Clearly, while discovery was ongoing, Plaintiff's experts thought that utility rates were irrelevant to XOOM's margins under the contract. That their theories have evolved (or revolved) after the close of discovery does not make her experts' original, candid admissions any less conclusive or damning.

Plaintiff's argument that "XOOM, as the drafter of the form contract, should not get to benefit from its vague drafting" is likewise without merit. The Court already construed the contract—adopting the proportionate-margin construction that Plaintiff advocated for on summary judgment. *See* Doc. 151, SJ Order. Even if Plaintiff is permitted to argue that XOOM's margins were unreasonable,[30] then she can do so only with probative evidence. The Second and Seventh

---

[30] Her abandonment of the implied covenant and the lack of any other basis for such a requirement means she should not. *See* Parts I, II, III, *supra.*

Circuits have already ruled that such probative evidence does not include regulated utility rates. Plaintiff is wrong to urge the Court to disregard those precedents.

Plaintiff appears to suggest that if the Court were to follow *Richards, Martinez,* and *Sevugan* with respect to what is a relevant comparator for a reasonable rate or margin, it would effectively vest XOOM with the same rate-setting discretion that the ESCOs in those appellate cases had by virtue of their different contract terms. To support that argument, she claims—without citation—that this Court "recognized that XOOM's contract does not afford it any rate-setting discretion whatsoever." Pl. MIL Resp. 40. That claim is patently false; the Court's contract construction necessarily recognizes the opposite. If XOOM's variable-rate margin must be "reasonable" (which Plaintiff insists on) it is ***because*** the Court found that "contractual silence does not allow ***unbounded*** discretion." *See* SJ Order 14 (emphasis added). In other words, if there is a "reasonableness" limit on XOOM's margin, it is because XOOM has ***discretion*** that simply is not ***unbounded***, not because XOOM did not have any discretion at all. Thus, Plaintiff's emphasis on "discretion" as a distinguishing feature completely misses the mark.

Moreover, the Court's requirement that XOOM's rates be "determined by its actual and estimated supply costs," SJ Order 19, by itself ensures that XOOM's contract will not be treated like the contracts in *Richards*, *Martinez*, or *Sevugan*. XOOM does not seek to change the Court's contract construction through this MIL or otherwise. Rather, it seeks to ensure that the jury makes any determination as to the margin component based only on relevant evidence.

Nor can Plaintiff's premise for rejecting *Richards, Martinez,* and *Sevugan*—that margins from other ESCOs governed by different contracts can have no bearing on the reasonableness of XOOM's margins—be reconciled with her argument that she should be permitted to present evidence of heavily regulated, cost-neutral utility rates. Indeed, her argument runs afoul of

*Richards*' admonition that "hold[ing] private electricity suppliers liable for departing from the Standard Service Rates, [] would in effect make those [regulator]-approved rates binding on private electricity suppliers," when "the entire point of electricity deregulation was to allow the market, rather than [the state public utilities regulator], to determine rates." *Richards*, 915 F.3d at 99. Plaintiff remarkably concedes that "[r]equiring an ESCO to match or beat the utility rate in th[e] scenario" presented in *Richards* "would rewrite the ESCO's contract and undermine the 'point of electricity deregulation." Pl. MIL Resp. 41. But she fails to appreciate that the same is true here: requiring XOOM to "key[]" its rates from 2013 onward "to the NYPSC's finding [effective 2021] that it is not reasonable for ESCO customers to pay more for the exact same commodity that is also sold by their existing utility" indubitably would "undermine the point of electricity deregulation." Like the *Richards* contract, nothing in Plaintiff's contract supports retroactive re-regulation.

The Court recognized in its Decertification Order that Plaintiff wants to use utility rates as a "lower bound in determining a reasonable and proportionate margin." Respectfully, Plaintiff's proposal cannot be squared with the controlling holding in *Richards* and the persuasive authority of *Sevugan* (citing *Richards*) that the rates of heavily regulated, profit-neutral utilities cannot reasonably serve as comparators for a private ESCO's variable-rate margins in a deregulated market. *See Sevugan*, 931 F.3d at 616 and n.3 ("The Second Circuit recently considered whether a public utility is a proper comparator" and "the Second Circuit's reasoning in *Richards* stands unrebutted that a public utility is not a relevant comparator in these circumstances."); *id.* at 616 ("[The utility's] price is not a market price at all; it is a regulated price. [The utility does not] participate in the general market for electricity, and thus [it is not a] proper comparator[] with [the ESCO] to gauge market price.").

Because reasonableness in this context can mean only commercial reasonableness, *see supra,* Part III, any comparator must be one that operates in the open market. *See Richards*, 915 F.3d 99 ("To determine if a price is commercially reasonable it must be compared to the range of other prices in the market." (citation and quotation marks omitted)); *see also id.* (noting that "good faith" means "adher[ing] to 'reasonable commercial standards of fair dealing in the trade'"); *Richards*, 246 F. Supp. at 559 ("[T]he plaintiff must produce some evidence of improper motive, discriminatory pricing, or the pricing practices of other franchisees" (quoting *Yonaty v. Amerada Hess Corp.*, No. 304CV605FJSDEP, 2005 WL 1460411, at *5 (N.D.N.Y. June 20, 2005) (noting that a "commercially reasonable price . . . is not the same as a fair market price or the lower price available" and finding that plaintiff who produced no evidence of, *inter alia*, "the pricing practices of other franchisees" could not show existence of genuine issue of fact with respect to bad faith claim (quotation marks and citation omitted))), *aff'd*, 915 F.3d at 88.

Plaintiff also contends that she should be allowed to introduce irrelevant utility-rate evidence because she "does not claim that any XOOM rate that exceeds the utility's is *per se* a breach." Pl. MIL Resp. 40. That is neither here nor there. Under the prevailing case law, utility rates simply are not probative. They do not suddenly become probative when presented alongside other irrelevant evidence (like the average of XOOM's various fixed-rate margins in Method C). And even if Plaintiff's regulated-utility-based evidence were presented alongside XOOM's fixed-rate margins, the prejudice inherent in the introduction of utility-rate data (including Methods A and B, which purport to be "keyed to" rates approved by a state regulator) would remain.

Again, even if the utility rates and the damage models that rely on them had any relevance (they do not), the risk of jury confusion and prejudice to XOOM requires that they be excluded. Fed. R. Evid. 403. Plaintiff does not dispute that New York's regulated utilities must be profit-

neutral by law, or that the contract allowed XOOM a profit on its variable rates. Comparisons of XOOM's rates with the profit-neutral utility rates (which bear the authority of government approval) would inevitably confuse the jury and unfairly prejudice XOOM.

For the reasons stated here and in MIL No. 8, in accordance with *Richards, Martinez,* and *Sevugan*, as well as Federal Rules of Civil Procedure 26 and 37 and Federal Rules of Evidence 401, 402, and 403, the Court should exclude all evidence of utility rates, including:

- rates set and charged by regulated utilities;

- costs incurred by regulated utilities;

- margins achieved by regulated utilities; and

- how XOOM's rates, costs, or margins compared to those of regulated utilities.

IX.      **XOOM's MIL No. 9: The Court should prohibit evidence and argument regarding contracts that are not included in the Class definition.**

Plaintiff's response confirms that the Court should prohibit evidence and argument about contracts that are not at issue (including the 2016 Variable Contract Amendment and fixed-rate contracts) because they are irrelevant, unfairly prejudicial, and the 2016 Variable Contract Amendment is inadmissible under Rule 407.

The only reason Plaintiff wants to use the 2016 Variable Contract Amendment, which a XOOM witness called "more accurate language," is to argue that the revision is a "damning admission" that XOOM breached the earlier version of the contract. Not true. No XOOM witness said the original language was "not accurate." Rather, the 2016 Variable Contract Amendment is a textbook example of a revised contract that should be excluded under Rule 407, as the Seventh Circuit discussed with the revised version of a State Farm contract:

> The subsequent version of the clause, . . . which State Farm describes as a clarification, Pastor deems a confession that her interpretation of the original clause is correct. Obviously it is not a confession. And to use at a trial a revision in a contract to argue the meaning of the original version would violate Rule 407 of the Federal Rules of Evidence[.]"

*See Pastor v. State Farm Mut. Auto. Ins. Co*, 487 F.3d 1042, 1045 (7th Cir. 2007). The reasons Plaintiff offers for admitting the 2016 Variable Contract Amendment lack merit and cannot overcome Rule 407 and the significant risk of prejudice to XOOM under Rule 403.

First, Plaintiff asserts that the 2016 Variable Contract Amendment is fair game and was not excluded from the Class because she never asked to *include* it. That is a distinction without a difference. The 2016 Variable Contract Amendment (and the fixed-rate contracts) were excluded because Plaintiff proposed a class definition that did not include them, and the Court accepted that definition. *See* Doc. 152, Class Order 18–19. These other contracts indisputably have different terms, are not in the Class, and are irrelevant to whether XOOM breached the pricing term at issue.

Second, Plaintiff wrongly argues that the 2016 Variable Contract Amendment is relevant to show how XOOM priced under her earlier contract—and says XOOM failed to previously argue the amendment was irrelevant. Again, that is not true. XOOM has always argued the 2016 Variable Contract Amendment was irrelevant. For example, in response to Plaintiff's interrogatories about the reasons for the revision, XOOM objected "on the grounds that the request seeks information that is not relevant to any party's claims or defense," and because it "would be inadmissible under Federal Rule of Evidence 407." Ex. 14, Def. Int. No. 23 Resp., Sep. 30, 2020. XOOM likewise argued in its class opposition that "the 2016 version [of the contract] is not the contract for any class member and is thus irrelevant." Doc. 134, Def. Class Resp. 7 n.5. XOOM has consistently and correctly maintained that position.

Courts agree with XOOM, holding that other contracts have no bearing on whether a relevant contract was breached. *See Cross Sound Cable Co., LLC v. Long Island Lighting Co.*, No. 21-2771 (KAM) (ARL), 2022 WL 16789978, at *2 (E.D.N.Y. Sept. 13, 2022) ("clauses in other agreements [are] not relevant to the issues presented in this action"); *see also Servidone Const. Corp. v. St. Paul Fire & Marine Ins. Co.*, No. 91-CV-0943, 1992 WL 75064, at *7 (N.D.N.Y. Apr. 3, 1992) ("[T]he existence and terms of these other agreements are not relevant[.]"). Indeed, Plaintiff does not cite a single case holding that other contracts are relevant to breach of the contract at issue.[31]

Next, Plaintiff claims that the 2016 Variable Contract Amendment cannot be excluded as a subsequent remedial measure under Rule 407 because of its supposed relevance as an admission that XOOM used "pricing strategies" to set Class Members' rates, "not the 2016 contract's

---

[31] Rather than cite her own authority, Plaintiff attempts to distinguish XOOM's. But just because the underlying dispute involved a different kind of commercial dispute does not mean the courts' legal analyses have no bearing on this case.

existence." Plaintiff's concession that the 2016 Variable Contract Amendment is not itself evidence of the use of pricing strategies should end this dispute. Rule 407 and XOOM's case law forecloses Plaintiff's claim that the 2016 Variable Contract Amendment can be used as any sort of admission.[32] *See Pastor*, 487 F.3d at 1045. If Plaintiff still wants to ask XOOM witnesses whether "XOOM's pricing strategies" were considered when setting Class Members' rates, she does not need the 2016 Contract Amendment to simply ask them:

> Q.  Did XOOM consider its pricing strategies when
>     setting Class Members' variable rates?

Her counsel did just that in multiple depositions of XOOM's witnesses.

No matter, Plaintiff says, because she can still use the 2016 Variable Contract Amendment as evidence of impeachment if XOOM witnesses testify that variable rates were based on its actual and estimated supply costs. That argument is wrong for at least three reasons. First, the revised contract would not be impeachment evidence in Plaintiff's scenario. Every XOOM witness who testified that the company considered "pricing strategies" also uniformly testified that it set variable rates "based on actual and estimated supply costs." Moreover, it is not clear why basing rates on actual and estimated supply costs is *not* a pricing strategy. Second, if a witness testifies at trial that XOOM did *not* consider pricing strategies, the appropriate avenue for Plaintiff to try to impeach them is with any inconsistent deposition testimony—not the 2016 Variable Contract Amendment. Third, Plaintiff is prohibited from opening the door for her own impeachment purposes. *See Reynolds*, 483 F. App'x at 733 ("Rule 407's impeachment exception must not be

---

[32] Plaintiff claims that Mr. Loehde's deposition testimony is a "damning admission." Not so. Mr. Loehde simply explained the 2016 Variable Contract Amendment was to clarify the contractual language. But "[t]hat is one of the grounds that evidence of subsequent corrective action may *not* be used to establish." *Pastor*, 487 F.3d at 1045; *see also Reynolds v. Univ. of Pennsylvania*, 483 F. App'x 726, 732 (3d Cir. 2012) ("Likewise in our case, admitting the Town Hall meeting and website revisions would discourage those in Penn's situation from clarifying contractual obligations and thus would perpetuate confusion.").

used as subterfuge to prove negligence or culpability of the defendant."). "[A] court must interpret the impeachment exception to Rule 407 circumspectly because any evidence of subsequent remedial measures might be thought to contradict and so in a sense impeach [a party's] testimony[.]" *Id.* (citations and internal quotation marks omitted). XOOM will not refer to or allude to the 2016 Contract Amendment at trial, and any statement by XOOM's witnesses that its rates were based on actual and estimated supply costs does not open the door to the 2016 Contract Amendment. *Id.* ("Reynolds's counsel attempted to create an opportunity for impeachment by asking questions that Katalan could not answer without reference to the clarifications on the website that were taken as subsequent remedial measures[.]"). Plaintiff's request to circumvent Rule 407 can be summarily rejected. *See id.* ("Penn did not open the issue, . . . so Reynolds's counsel should not have been allowed to create an impeachment opportunity and then impeach Katalan using the subsequent remedial measures.").

As for the fixed-rate contract, PX63, Plaintiff tellingly relegates her discussion of it to a footnote. *See* Pl. MIL Resp. 45 n. 22. She says it is relevant to show the differences between the fixed and variable plans and how a fixed-rate contract rolls over into a variable-rate contract. But the roll-over process and the relative benefits of the products is not at issue. The only relevant issue is whether XOOM's variable rates were based on its estimated and actual supply costs. Thus, the fixed-rate contract has no probative value at all and should be excluded from evidence. *See* Fed. R. Evid. 401, 402.

For these reasons and those explained in its opening motion, Plaintiff should be precluded from offering into evidence—whether through exhibits or testimony—any contract other than those that contain "the same pricing term" as Plaintiff's contract, Class Order 7–8, including but not limited to PX4 and PX63. See Fed. R. Evid. 401, 402, 403, 407.

X.      **XOOM's MIL No. 10: Plaintiff's proposed expert testimony on the contracts' meaning must be excluded.**

XOOM moved *in limine* to exclude expert testimony regarding the contract's terms and meaning based on the non-controversial rule that legal interpretation is a judicial function, not an expert one. Plaintiff's response nominally claims her experts are not offering legal interpretation, but her description of that testimony in the Joint Pretrial Order and her response show otherwise.

Plaintiff principally argues that her experts are "***not*** offering a legal construction of XOOM's contract," only the meaning of "highly technical words" in the class contracts. Pl. MIL Resp. 46. The Second Circuit rejected this same approach by Mr. Adamson when it held that his "testimony" as to "factors the variable rate *should* reflect" "add[ed] nothing to [the plaintiff's] breach of contract claim," as here. *Richards v. Direct Energy Services, LLC*, 915 F.3d 88, 98 (2d Cir. 2019). It did not matter that Mr. Adamson attempted to frame his testimony as that of an economist: "'I'm not the expert on, you know, legal meaning of business and market conditions. But as an economist, you know, I do have an opinion professionally[.]'" *See id.* (citing expert's testimony). Plaintiff's attempts to offer legal interpretation under the guise of explanation of "technical" terms should be rejected here too. *See id.*; *see also Navigators Ins. Co. v. Goyard, Inc.*, 608 F. Supp. 3d 44, 48–49 (S.D.N.Y. 2022) ("The obvious barrier to admissibility that Navigators faces is that Comegys's report is essentially a legal analysis of the Policy.").

Plaintiff also claims that her expert "does not intend to offer expert testimony that is inconsistent with" the Court's contract construction—as if that would render expert legal interpretation permissible. It does not. Whether Plaintiff's expert offers legal interpretations that are consistent with the Court's contract construction is irrelevant. Experts are not permitted to offer legal interpretation of the contracts ***at all***. *See Richards*, 915 F.3d at 98 ("And the experts' interpretation of the Evergreen clause would be irrelevant *even if they had opined on its legal*

*meaning* because the construction of unambiguous contract terms is strictly a judicial function." (citation and internal quotation marks omitted)); *Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*, 868 F. Supp. 33, 36 (E.D.N.Y. 1994) ("[A]n expert is prohibited from offering his opinion as to the legal obligations of parties under a contract[.]" (citing *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508 (2d Cir. 1977)).[33]

Next, Plaintiff claims she needs an expert "to unpack and explain the difference between . . . 'how' XOOM set variable rates . . . compared to how XOOM was required to set rates under the contract." She further claims that an expert is "needed to help the jury determine XOOM's reasonable fixed margin." But this again is just a repackaged version of inadmissible testimony about the "factors [XOOM's] variable rate *should* reflect." *Richards*, 915 F.3d at 98; *see also Sec. & Exch. Comm'n v. Gruss*, 245 F. Supp. 3d 527, 594 (S.D.N.Y. 2017) ("Dr. Bergin's opinion that the interfund transfers did not violate the Operating Documents is a legal conclusion and is excluded." (citing *U.S. v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994)); *Pearlman v. Cablevision Sys. Corp.*, No. 10-CV-4992(JS)(GRB), 2015 WL 9462104, at *11 (E.D.N.Y. Dec. 28, 2015) ("By . . . expressly stating that Cablevision did not satisfy Paragraph Four's 'threshold requirements,' Gerbrandt is interpreting the subject contract[.]"); *Dominion Res. SVC, Inc. v. Alstom Power, Inc.*, No. 3:16-CV-544, 2018 WL 3752878, at *10 (D. Conn. Aug. 8, 2018) ("In the context of contract

---

[33] *See also Sigmon for Hindin v. Goldman Sachs Mortg. Co.*, No. 1:12-CV-3367 (ALC), 2018 WL 1517189, at *4 n.4 (S.D.N.Y. Mar. 26, 2018), *aff'd*, 800 F. App'x 25 (2d Cir. 2020) ("[I]t is well-settled that contract interpretation is not a proper subject of expert testimony."); *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 289 (D. Conn. 2017) ("Regarding Macey's legal discussion of the 'Sun Realty LLC Operating Agreement,' contract interpretation is a matter of law for the Court."); *Pearlman v. Cablevision Sys. Corp.*, No. 10-CV-4992(JS)(GRB), 2015 WL 8481879, at *8 (E.D.N.Y. Dec. 8, 2015) ("The Second Circuit held that the district court erred in permitting the expert witness to provide his opinion with respect to the parties' legal obligations pursuant to the contract." (citing *Marx*, 550 F.2d at 508)).

claims, courts have held that an expert may not testify as to the parties' obligations under the contract or whether the contract was breached.").

Plaintiff also claims that her expert is needed "to help the jury assess XOOM's implausible claim about how its variable rate margins secretly contain supply costs." But Plaintiff's own description of Mr. Adamson's anticipated testimony shows he simply intends to "parrot[] plaintiff'[s] arguments." *See Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021); *In re Perrigo Co. PLC Sec. Litig.*, No. 19CV70 (DLC), 2021 WL 3773461, at *3 (S.D.N.Y. Aug. 24, 2021) ("[A]n expert may not simply parrot for a jury a party's legal arguments."). Besides, Mr. Adamson's repeated statement that there is no evidence of actual costs being incorporated into the margin is nothing more than an (incorrect) conclusion that he has drawn based on his review of other witness testimony, and it is not helpful to the jury. *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16CV1318GBDBCM, 2021 WL 4810266, at *15 (S.D.N.Y. Sept. 30, 2021) ("The rule against expert testimony which states a legal conclusion is particularly important where the opinion is not based on personal knowledge, but instead on [the expert's] review of documents and depositions produced by the parties.") (internal quotation marks and citations omitted). The jury can review the evidence itself and make the determination without his help. *Hart v. BHH, LLC*, No. 15CV4804, 2018 WL 3471813, at *6 (S.D.N.Y. July 19, 2018) (holding it is "inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's story") (internal marks omitted); *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 116 (E.D.N.Y. 2019) ("[A]n expert may not use his or her report to construct a factual narrative based upon record evidence.").

Finally, Plaintiff states "concern" that XOOM is using its MIL No. 10 to bar Mr. Coleman's so-called admissions. *See* Pl. MIL Resp. 47. It is not. Rather, XOOM has detailed the many reasons why that deposition testimony is inadmissible in its own MIL No. 14 briefing, Response to Plaintiff's Motion to Exclude Mr. Coleman, and Response to Plaintiff's MIL No. 9.

For these reasons, Plaintiff's proposed expert testimony on the contract's meaning should be prohibited because it is nothing more than contract interpretation under the guise of expert opinion. It is inadmissible as a matter of law. XOOM's MIL No. 10 should be granted.

**XI.      XOOM's MIL No. 11: Plaintiff does not contest that the revenue, profitability, or size of NRG or any other non-party affiliate are irrelevant.**

XOOM's MIL No. 11 should have been uncontested. Plaintiff's response does not dispute that the revenues, profitability, and size of XOOM's parent company and corporate affiliates—the topics subject to XOOM's MIL No. 11—are irrelevant in this case. So there is no question that evidence and argument on those topics should be excluded.

Plaintiff, however, argues that XOOM broadly "opened the door" to presentation of otherwise irrelevant evidence about NRG and its non-party affiliates' revenue, profitability and size by designating Leonard Gardner, an NRG employee with knowledge of XOOM's rate setting, to testify about that relevant topic—XOOM's rate setting—not NRG's size or finances. Nothing about Mr. Gardner's testimony will put NRG's (or any other non-party affiliate's) financial condition or status at issue. XOOM described his anticipated testimony as follows:

> Leonard Gardner has been overseeing pricing for XOOM products, and approving the final rates, since NRG's acquisition in 2018, first as Senior Director of Portfolio Management at NRG and then as Vice President of Offer Pricing and Revenue Management. Mr. Gardner will testify during XOOM's case-in-chief about the transition following NRG's acquisition, including with respect to adjustments made in connection with supply-cost inputs in the rate-setting worksheets that continue to be used to set rates for all XOOM products.
>
> Mr. Gardner also will testify about the rate-setting process following NRG's acquisition, including preparation for the meetings, the composition and format of rate-setting meetings, and the fact that rate-setting for XOOM products still begins with estimated supply costs and ends with the addition of a margin that is based on XOOM's actual supply costs, including prior period adjustments and balancing costs. Mr. Gardner will further testify regarding the various supply costs that XOOM incurred and considered, including how such costs differed between electricity and gas, clean and standard products, various zones, and across time; and he will explain why it could take XOOM a month or more to learn what its actual costs were for any given period, zone, or product. Finally, subject to XOOM's *in limine* motions, Mr. Gardner will explain why margins between fixed- and variable-rate products typically are very different, why margins for green products differ from those for standard products, and why the utility's regulated rates are not an appropriate comparator for XOOM's competitive variable rates.

Doc. 210, Pretrial Order 5. The fact that Mr. Gardner will testify about ***XOOM's*** rate-setting while an NRG employee does not put NRG's profit, overall revenue, or size into play.

Plaintiff also suggests that XOOM is seeking to preclude evidence concerning whether or how NRG's acquisition affected XOOM's rate-setting and background information concerning any witness's employment or employment history. That is not true. XOOM seeks only to preclude evidence concerning non-party affiliates that is irrelevant and prejudicial. *See Darmer v. State Farm Fire & Cas. Co.*, No. CV 17-4309 (JRT/LIB), 2022 WL 741039, at *3 (D. Minn. Mar. 11, 2022) (granting motions *in limine* "as to evidence or statements about State Farm's corporate structure, profitability, and financial condition" while permitting plaintiff to "inquir[e] about the relevant job title and responsibilities of State Farm employees who will be witnesses at trial"). There can be no serious dispute that such evidence should be precluded.

The remainder of Plaintiff's argument focuses on a regulatory note in an NRG Form 10-K and is more appropriately the subject of XOOM's MIL No. 12, which XOOM incorporates here (along with its supporting reply, *see* Part XII *infra*) by reference. Specifically, Plaintiff states that the NRG Form 10-K is on her exhibit list not because of the financial information it contains (which is the subject of XOOM's MIL No. 11), but "because it includes a paragraph describing the NYPSC's January 8, 2024 Notice of Apparent Violation." Pl. MIL Resp. 49.

That does not provide a reason to admit the document, but it does provide four more reasons to exclude it: duplication, irrelevance, prejudice, and hearsay. First, Plaintiff says she wants to use the 10-K for the exact same purpose as the 2024 Notice, which is itself included on Plaintiff's Exhibit List; it should therefore be excluded as duplicative and unnecessarily cumulative. *See* Fed. R. Evid. 403. Second, the Form 10-K's supposed value is not probative because, as discussed *infra* Part XII, the 2024 Notice does not bear on Plaintiff's or any Class Members' contracts—since

Plaintiff and every impacted Class Member enrolled before the Reset Order. The 2024 Notice therefore cannot serve as class evidence, so its reference cannot justify admission of the Form 10-K either. *See id*. Third, it is severely and unfairly prejudicial to XOOM, and fourth, it is hearsay not subject to any applicable exception. *See id.*

In fact, the Form 10-K's admittedly duplicative information means it should be excluded regardless of the Court's ruling on the admissibility of the 2024 Notice. If the Court excludes the 2024 Notice, then the 10-K should be excluded on the same grounds; and if the Court admits the 2024 Notice into evidence, then the 10-K will be cumulative for Plaintiff's alleged purpose and, especially given the prejudice inherent in the additional irrelevant financial information it contains, should be excluded.

Plaintiff also emphasizes that NRG is a publicly traded company, as though that signifies that any information about it should be fair game at trial. But the fact that NRG is publicly traded does not make its revenue, profit, or size relevant to the issues here. *See* Fed. R. Evid. 401. The fact that NRG is publicly traded does, however, increase the risk of prejudice to XOOM from jurors' believing that the defendant has "deep pockets" that would allow it to weather a substantial damage award. *See* Fed. R. Evid. 403; *see Jones v. Jasper Wyman & Son*, No. 1:20-CV-00383-JAW, 2022 WL 16854267, at *3 (D. Me. Nov. 10, 2022) ("[T]he danger is that such evidence provides 'an open-ended basis for inflating awards when the defendant is wealthy'" (citing, *inter alia*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 427-28 (2003)); *Food Lion, LLC v. Dean Foods Co.*, No. 2:07-CV-188, 2017 WL 11681192, at *1 (E.D. Tenn. Feb. 17, 2017) ("Presentation of evidence of defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." (citing *Honda Motor Corporation v. Oberg*, 512 U.S. 415, 432 (1994)).

For these reasons, Plaintiff should be precluded from offering evidence or argument regarding NRG's and Global Holdings' size, revenue, or profitability—a proposition she does not even oppose. Such information is irrelevant. *See* Fed. R. Evid. 401; *see also, e.g., Miller v. Michael Weinig AG*, No. CV-20-47-BU-BMM, 2023 WL 3098328, at *2 (D. Mont. Apr. 26, 2023) (excluding evidence of defendant's corporate ownership on relevance ground); *RJ's Int'l Trading, LLC v. Crown Castle S. LLC*, No. 20-25162-CIV, 2021 WL 6135137, at *4 (S.D. Fla. Dec. 2, 2021) (excluding evidence of defendant's "parent company . . . and any other related entities' size, financial status, and business" on relevance ground); *3A Composites USA, Inc. v. United Indus., Inc.*, No. 5:16-CV-5017, 2017 WL 5991968, at *2 (W.D. Ark. Sept. 18, 2017) (excluding evidence regarding parties' relative sizes and ownership); *McCune v. Graco Children's Prod., Inc.*, No. 5:09-CV-107, 2011 WL 13217898, at *13 (E.D. Tex. Aug. 8, 2011) (granting motion *in limine* "with respect to Defendant's size, its parent corporation's size and Defendant's relationship or interactions with its corporate parent"); *Petrone v. Werner Enterprises, Inc.*, No. 8:11CV401, 2017 WL 2021251, at *5 (D. Neb. May 11, 2017) (granting motion *in limine* to prohibit reference to defendant's SEC Form 10-K). And even if it had any probative value, that value would be substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

**XII.**     **XOOM's MIL No. 12: The Court should prohibit evidence and argument related to regulatory and legislative proceedings, including the 2019 Reset Order.**

XOOM's MIL No. 12 established that the regulatory and legislative documents are irrelevant, prejudicial, and inadmissible hearsay. As to relevance and prejudice, Plaintiff's response wrongly assumes she has a live implied covenant claim. She does not. *See supra*, Parts I, III. Plaintiff's arguments under Rules 401 and 403, all of which speak to the documents' supposed probative value of "reasonableness" or of "good faith" are thus immaterial and can be rejected out of hand. Plaintiff's attempt to portray the documents as Public Records under Rule 803(8)'s hearsay exception fares no better. The documents should all be excluded.

A.   Rule 403: The regulatory and legislative documents are highly prejudicial.

Plaintiff's response shows that her purpose is to use these regulatory and legislative documents to suggest that New York regulators already determined XOOM engaged in improper behavior (they did not), in hopes that the jury will conclude XOOM probably breached here (it did not). Her proposed prejudicial use of these irrelevant records cannot be allowed.

If this case proceeds to a jury, that jury will have to answer whether XOOM set its variable rates based on its actual and estimated supply costs. It will have to answer that question of contract compliance as to Plaintiff for the six months she was a customer in 2013. And if it answers in the affirmative as to Plaintiff, then it will have to do so for the class—i.e., for the 6,000+ variable rates XOOM set in New York between January 2013 and the time of trial.

Based on the Court's construction, this question of XOOM's compliance with the contract's express pricing term focuses on XOOM's supply costs and a proportionate margin. The regulatory and legislative documents that Plaintiff seeks to introduce, on the other hand, have nothing to do with XOOM's supply costs or a proportionate margin. Instead, Plaintiff candidly seeks to admit them to darken the jury's view of those two relevant issues with extraneous

information about the regulator's critical reviews of ESCO industry marketing and pricing **generally** to wrongly suggest that New York lawmakers determined **XOOM** engaged in improper behavior.

Plaintiff would then use the regulator's review of the ESCO industry generally and the PSC's prospective changes to the market to suggest that the jury should make those same changes retroactive to punish XOOM specifically where New York regulators did not. Although the regulators made no observations (much less findings) about XOOM's contracts or pricing practices before the Reset Order went into effect in 2021, Plaintiff would use their prospective changes to suggest that the jury should do it here. In effect, Plaintiff wants the jury to graft the regulator's judgment about what to do with the market going forward onto the narrow question of XOOM's compliance with the contract's express pricing term years earlier, starting in 2013.

Of course, none of the documents Plaintiff seeks to introduce discuss, much less find, that XOOM's variable rates were not based on its supply costs, or that XOOM's variable-rate margins were inappropriate. But Plaintiff wants to use them and their industry critiques to suggest that the jury should make those findings in its verdict form here. She admits that is the whole point. If Plaintiff's wish is granted, however, it will run afoul of Rule 403 by confusing and misleading the jury. The prejudice to XOOM of admitting those documents cannot be overstated.

In fact, Plaintiff's response confirms that it is **because** the documents will unfairly prejudice XOOM and mislead the jury that she wants to present them. In Plaintiff's words:

| Document | Plaintiff's Description of the Prejudice |
|---|---|
| 1996 Opinion (PX35) | The PSC's 1996 Opinion "will . . . explain deregulation's purpose," which she describes as the hope that "'[m]arket forces overall [would] produce, over time, rates that w[ould] be **lower than they would be under a regulated** |

| | |
|---|---|
| | *environment.*'"[34] |
| 2009 Sponsoring Memorandum (PX36) | The post-deregulation "ESCO 'business model' . . . 'is based on taking **unfair advantage** of consumers' and subjecting them to '**onerous** contracts' and 'short-term "teaser" rates followed by **skyrocketing** variable prices.'" |
| 2016 Notice (PX37) | "[T]he 2016 NYPSC Notice, describes that '[a]fter considerable experience with the offering of retail service to mass market customers by ESCOs, the Commission has determined that the retail markets serving mass-market customers **are not providing sufficient competition or innovation** to **properly** serve consumers." |
| 2018 Initial Staff Brief (PX38) | "'ESCOs have **deliberately obfuscated** prices and **resisted** market **reforms'** . . . ." <br><br> The PSC Staff complained of "'**lack of transparency** and **greed** in the market . . . .'" <br><br> "'ESCOs **take advantage** of the mass market customers' **lack of knowledge and understanding** of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires.'" |
| 2019 Reset Order (PX39) | ESCOs allegedly sought "'to prevent, or at least limit, the transparency of the market,' thus 'resulting in the **fattening** of ESCOs' retained earnings.'" |
| 2024 Notice (PX40) | The PSC's 2024 Notice "indicates its factual finding based on its **2023** 'annual renewable energy audit' that XOOM supplied '5,859 MWh of load . . . with a **non-compliant** voluntary renewable |

---

[34] Plaintiff's goal with this document is not to provide "background testimony," as she claims, but rather to suggest that XOOM's rates were unreasonable insofar as they exceeded utility rates. But, again, whether any margin was reasonable or not is a fact that can be determined by comparison with such evidence as the margins of other ESCOs in the deregulated market. *See Richards v. Direct Energy Services, LLC*, 915 F.3d 88, 99 (2d Cir. 2019); *Sevugan v. Direct Energy Services*, 931 F.3d 610, 616–17 (7th Cir. 2019). And insofar as Plaintiff claims that she relies on the 1996 Opinion for evidence of XOOM's role in the energy market—such as the fact that XOOM purchased energy from producers and then sold it to consumers—that information can be elicited from any number of witnesses; the 1996 Opinion does not need to be admitted for that background information to be presented. Thus, any probative value the 1996 Opinion may have is far outweighed by the risk of serious, unfair prejudice to XOOM. Fed. R. Evid. 403.

| | product." |
| --- | --- |
| | The 2024 Notice "indicates further ***scrutiny of XOOM is warranted*** based on its ***overt disregard*** of the NYPSC's narrow authorization of its product mix . . . ."[35] |

Again, insofar as the documents discuss ESCOs generally (and not XOOM specifically), they are not probative of whether XOOM complied with the contract's pricing term. They are also highly inflammatory. Particularly because they would be presented with the imprimatur of a state regulatory entity, their prejudicial effect cannot be overstated. As Plaintiff's response shows, it is precisely for that improper purpose that Plaintiff seeks to introduce them. But because the documents are not relevant to her own claim, or indeed any class member's claim, the prejudicial effect outweighs any possible probative value under Federal Rule of Evidence 403.

In short, given the extreme prejudice to XOOM that Plaintiff intends to create with these regulatory and legislative documents, they should be excluded regardless of any relevance (they have none, as discussed below). Fed. R. Evid. 403.

B. Rules 401 & 402: The regulatory and legislative history documents are all irrelevant.

1. *The implied covenant is not grounds for relevance in this case.*

Plaintiff's relevance arguments in support of PX35-40 rely exclusively on the documents' alleged probative value to address XOOM's good faith and a reasonable margin. But again, Plaintiff has no live implied covenant claim, so neither good faith nor a reasonable margin is a submissible jury issue. *See supra*, Parts I, III; Doc. 210-14, Def. Jury Mem. 7. Thus, Plaintiff's

---

[35] Plaintiff acknowledges how severely prejudicial the 2024 Notice is in suggesting that the Court might cabin the prejudice through a limiting instruction. But given that the 2024 Notice is undeniably irrelevant to Plaintiff's own 2013 claim—or the claim of any class member charged before 2021 (the overwhelming majority of the class)—it has no probative value that could justify its presentation at trial, especially where, as here, the prejudice from a preliminary finding by a government agency of noncompliance with a regulatory order (not the contract at issue) would indelibly and improperly prejudice the jury against XOOM.

various assertions that the documents are relevant necessarily fail at the outset, and the Court need not reach the particulars of her relevance arguments. In an abundance of caution, however, XOOM still addresses the additional reasons why the documents are irrelevant in Part XII.B.2, below.

   2. *The regulatory and legislative documents are irrelevant for other reasons too*.

   a. <u>Most of the documents are irrelevant as a matter of law because they post-date when Plaintiff and the Class contracted with XOOM</u>**.**

The 2016 Notice, the 2018 Initial Brief, the 2019 Reset Order, and the 2024 Notice, PX37–PX40, post-date the January 2013 start of the class period and Plaintiff's 2013 stint as a XOOM customer by years. The Reset Order's effective date also post-dates every class member's enrollment. Therefore, as the Second Circuit held, they are irrelevant as a matter of law.[36]

Plaintiff's response indicates that she thinks class certification renders any evidence relevant to a single Class Member relevant as to all. Not so. Only evidence that "could have been used to establish liability in an individual action" can be used in a class action. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016); *see also, e.g., In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 550 (S.D.N.Y. 2021) ("[E]vidence is common if any class member can use it to prove its claim against the defendants, whereas individual evidence is only applicable to that specific member, and is irrelevant to the claims of the other class members.").

As the Second Circuit recently confirmed, neither Plaintiff nor any class member could have used the 2019 Reset Order (effective prospectively in 2021) in support of an individual claim. *Martinez v. Agway Energy Services*, 88 F.4th 401, 417 n.12 (2d Cir. 2023) (holding that the 2019 Reset Order does not "bear on [plaintiff's] claims" because it was issued "more than three years

---

[36] Plaintiff claims without authority that "[t]he regulatory environment in which XOOM's conduct occurred is crucial to the jury's adjudication of the reasonableness of that conduct." But even that cannot explain her desire to introduce evidence of a regulatory regime that was put into place eight years after she was a customer.

after [plaintiff] contracted with [defendant].").[37] It is undisputed that XOOM stopped enrolling new customers in New York prior to the Reset Order's effective date. The Reset Order is therefore irrelevant to the class because its implementation post-dates when any class member "contracted with [XOOM]." *Martinez*, 88 F.4th at 417 n.12. Plaintiff cannot use that same evidence in this case just because a class was certified. *See, e.g., Tyson Foods*, 577 U.S. at 458 ("Class certification is a procedural device that cannot 'giv[e] plaintiffs and defendants different rights . . . than they could have asserted in an individual action.'" (citation omitted)); *see also Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) ("A class action . . . leaves the parties' legal rights and duties intact and the rules of decision unchanged."); 28 U.S.C. § 2072(b) (the Federal Rules "shall not abridge, enlarge or modify any substantive right").

*Martinez*'s statement on timing is a binding pronouncement that the Reset Order has no probative value where, as here, every plaintiff contracted with XOOM before it issued. It is also a general pronouncement that, as a matter of law, prospective regulatory documents post-dating the start of the parties' relationship cannot be evidence that bears on their relationship—especially where, as here, the issue is contractual performance before the regulatory change.

Even still, Plaintiff claims without support that *Martinez*'s definitive ruling on timing was either cabined to the particular contract language or was "fourth degree [] dicta." Neither is true. The Second Circuit's discussion of the Reset Order on which XOOM relies does not focus on the terms of the contract but on its ***timing***. *See id.* ("[S]uch a public policy did not prevail until . . .

---

[37] Respectfully, the Decertification Order's statement that "the Second Circuit did not deem the Commission's findings inadmissible" in *Martinez* overlooks the holding of inadmissibility due to timing. That pronouncement of inadmissibility in *Martinez* is binding and determinative on the question of relevance. There can be no rule or policy announced in the Reset Order that could "bear on [Plaintiff's] claims . . . for [the] simple reason[]" that any "such [] public policy did not prevail until the Commission announced its new ESCO rules in 2019—more than [five] years after [plaintiff] contracted with [XOOM]." 88 F.4th at 417 n.12.

more than three years after [plaintiff] contracted with [defendant].").  And, because it addressed a substantive argument raised by the plaintiff, it was "not dicta" and binds this Court. *Pyett v. Penn. Bldg. Co.*, 498 F.3d 88, 93 (2d Cir. 2007), *rev'd and remanded on other grounds sub nom. 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009); *see, e.g.*, *MacDonald, Sommer & Frates v. Yolo Cnty.*, 477 U.S. 340, 346 n.4 (1986) ("[S]ince the Superior Court did not rest its holding on only one of its two stated reasons, it is appropriate to treat them as alternative bases of decision.").

Plaintiff's next tactic to avoid *Martinez*'s timing limitation is to repeatedly describe the standard applicable to XOOM's contract as an "objective" one, as though that label (or its repetition) renders *Martinez* inapplicable.  Specifically, she argues that "[t]he developments in the New York regulatory environment—and the events and findings that prompted those developments—provide context for applying those objective standards."  Again, she misses the point. What was standard in 2013 when Plaintiff contracted with XOOM is not relevant to what was standard in 2022 precisely because the Reset Order went into effect in April 2021. The Reset Order therefore cannot serve as evidence of what was standard for Plaintiff or almost all of the class who were customers only in earlier years. *See In re Seagate Tech. LLC Litig.*, No. 16-CV-00523-JCS, 2019 WL 282369, at *7 (N.D. Cal. Jan. 22, 2019) ("[C]orrespondence that [defendant] received or produced internally *later in the class period* does not show knowledge relevant to class members who purchased drives *before the date* of such correspondence.").  The Reset Order cannot be presented as evidence in this case.

Finally, Plaintiff suggests that because XOOM witnesses testified that the rate-setting process has been consistent over time, it does not matter that her regulatory "evidence" post-dates the class period. That is incorrect principally because it conflates XOOM's rate-setting process with the regulatory structure surrounding it. Whether XOOM's rate-setting process changed over

the years is irrelevant to the issue of whether regulatory standards that became effective prospectively in April 2021 may be applied to a claim that arose in 2013 or any time before April 2021. They cannot, so they must be excluded. *See, Martinez*, 88 F.4th at 417 n.12; *Tyson Foods*, 577 U.S. at 458 ("Class certification . . . cannot 'giv[e] plaintiffs and defendants different rights . . . than they could have asserted in an individual action.'" (citation omitted)).

            b.   <u>The regulatory and legislative history documents are not probative of a commercially reasonable variable-rate margin, even if that were at issue.</u>

It is not only their timing, but also the documents' content that renders them irrelevant. The documents at issue were not incorporated in, and are thus not relevant to, Plaintiff's and the class members' contracts. Plaintiff does not credibly suggest otherwise.[38]

Plaintiff's claim of relevance fails for additional factual and legal reasons as well. Factually, in the context of this case, the documents cannot be relevant because they do not speak to XOOM, its supply costs, its rate-setting process, or the variable rates or variable-rate margins of other ESCOs. And legally, the Second Circuit has held that "commercial reasonableness" (if it is at issue at all, *see* Part III *supra*) should be determined by comparison to what other ESCOs charged, not the comparison explored in these documents—i.e., a comparison to regulated utility rates.

            i.     **The documents are irrelevant because they do not speak to XOOM, its variable-rate margins, or variable-rate margins at all**.

Plaintiff argues that many of these documents are relevant on the facts of this case simply because her experts cite them and two of their new damage models rely on them. *See* Pl. MIL

---

[38] Plaintiff asserts in conclusory fashion that the documents "bear . . . on the effect vague contract terms like XOOM's have on consumers," but that fails on multiple levels. First, as Plaintiff argued to the Second Circuit and to secure class certification, consumer expectations are not at issue. Ex. 1, Plaintiff-Appellant's Opening Br. 5, 26, 27, 28; Ex. 2, Plaintiff-Appellant's Reply App. Br. 8, 12, 25–27; Doc. 132, Pl. Class Mem. 1 n.3. But even if they were, statements that are not about XOOM, the contract, or variable rates in 2013 could not aid the jury.

Resp. 52. But XOOM moved to exclude CRA's New Report, *see* Doc. 229, so the regulatory and legislative history documents can similarly be excluded as irrelevant without further inquiry if CRA's New Report is excluded. *See* PX35, PX37, PX38 PX39; Pl. MIL Resp. 52–53 (noting her "expert considered . . . the 1996 NYPSC Order, the 2016 NYPSC Notice, and the 2019 Reset Order" and claiming the "2018 NYPSC Staff Brief" also "help[s] to show the scope of th[e NYPSC's] expertise").[39]

And even if CRA's New Report is not excluded (it should be), the regulatory and legislative documents would still be irrelevant. Plaintiff sums up her relevance argument as follows:

> [A]n independent third party with deep expertise in the New York ESCO market [i.e., the PSC] has repeatedly criticized the discretionary rate-setting that produced XOOM's margins. That fact clearly bears on the jury's determination of a reasonable margin here.

Pl. MIL Resp. 53–54. Plaintiff's assertion is incorrect on multiple levels. First, neither the Reset Order nor any other document preceding it "criticized" XOOM or its margins. Those documents say nothing about XOOM *at all*. *See* Ex. 5, Eryilmaz Dep. 95:22-97:20 (conceding that the PSC did not address XOOM specifically). Second, as *Martinez* held, any hindsight statements the PSC made about the ESCO industry with a view towards prospective rule-making has no bearing on the question Plaintiff claims is at issue: whether margins XOOM charged years earlier were "reasonable."[40] The timing rule enunciated in *Martinez* is the result of the PSC's choice to make the Reset Order prospective. Allowing the jury to use it retroactively would be akin to the

---

[39] This is yet another example of the prejudice Plaintiff created with CRA's New Report: forcing XOOM to brief these *limines* before the intertwined expert issues are resolved.

[40] Plaintiff misleadingly suggests that the PSC concluded that the 20–30% premiums over the utility price that the PSC Staff had cataloged "were not 'just and reasonable,'" but that is not true. The Reset Order made no such retrospective finding. Instead, the Reset Order explained that it would ***prospectively*** ensure that "any premium charged for a ***fixed-rate*** product [will] be just and reasonable" by adopting a "reasonable price cap . . . ." PX39 at 67. The Reset Order is not relevant to variable rate-setting or any claims that arose before its April 2021 effective date. It therefore cannot serve as evidence for Plaintiff or the Class.

"untenable outcome" the Second Circuit forewarned of: "turning courts into rate-setting agencies treading on the Commission's mandate. *Martinez*, 88 F.4th at 4.

Again, XOOM could not have predicted in 2013 (or any other time before the Reset Order issued in 2019) that the PSC would set a 5%-over-annualized-utility-rate cap on **fixed-rate** products beginning in April 2021, or that a jury would later be allowed to apply that prospective fixed-rate cap to its variable-rate margins retroactively. How, then, could PSC documents issued in 2016, 2018, 2019, or 2024 bear on what was reasonable for Plaintiff, who contracted with XOOM in 2013 for just six months, or any Class Member who contracted before 2021? The answer simply is that they cannot.

Moreover, much of what Plaintiff points to in the Reset Order as supposedly relevant is irrelevant *per se* because it concerns how ESCO rates compare to utility rates, the propriety of ESCOs' fixed (not variable) rates, or both. For example, Plaintiff contends that the Reset Order's cap on ESCOs' fixed rates set at 5% over utility rates is somehow evidence that the jury should adopt a 5% margin over costs for XOOM's variable rates. Even outside of the timing issues, Plaintiff's relevance argument would require the Court to assume, without any support at all, that: (1) a **premium** over **utility rates** is relevant to an **ESCO's margin** over its **supply costs**; and (2) a **price** cap on **fixed rates** is relevant to a **margin** cap on **variable rates**.

Those assumptions are flawed because, as Plaintiff's experts expressly recognized, they equate qualitatively different variables. Plaintiff's expert testified in no uncertain terms that utility rates are **not** relevant to XOOM's variable rates here:

> [Q]   Okay. But you're not offering an opinion in this case that under the sales agreement, that XOOM was not permitted to charge more than the utility, right?

> [A]   No. I mean, XOOM – I mean our basis was the actual
>        and estimated supply cost, whatever it should be
>        charging.
>
> [Q]   And the utility's rate is irrelevant to that
>        consideration, right?
>
> [A]   **It is irrelevant for this contract.**

Ex. 5, Eryilmaz Dep. 73:10–23 (objections excluded); Ex. 4, Adamson Dep. 68:19–69:8 ("And

you're not offering a damage model that compares XOOM's variable rate charged to what

customers would have been charged by the utility during the same time period? . . . A. No."). And

as to differences between fixed- and variable-rate products, Plaintiff's expert recognized the

differences between those products' margins, stating: "Fixed rate pricing, I think we can all agree,

the actual outturn margins could be quite different." *Id*. at 73:3–4. Plaintiff retains her burden of

proof, *see* Decert. Order 10–11; she must prove that a fixed-rate margin is equivalent to a variable-

rate margin. She has not met, and cannot meet, that burden. The Reset Order's 5% limit over "the

trailing 12-month average utility supply rate" for fixed-rate products thus is not relevant here.

Plaintiff also makes a handful of relevance arguments with respect to other documents, all

of which fail. As to the Sponsoring Memorandum, PX36, Plaintiff says it is probative because it

shows that the ESCO "business model . . . is based on taking unfair advantage of consumers" under

"onerous contracts" and "short-term 'teaser' rates followed by skyrocketing variable prices." Pl.

MIL Resp. 55. But none of those things are at issue. Plaintiff has no claim based on unfair business

practices, XOOM's business model, or her introductory rate. And such general criticism of ESCOs

generally has no bearing on XOOM's compliance with the contract or on what a reasonable margin

is. It is, in short, irrelevant.

Plaintiff says the PSC's 1996 Opinion, "will serve as both background on how utility

variable rates are set ('to recover prudently incurred costs and to provide a fair return on

investment'), as well as explain deregulation's purpose," which, according to Plaintiff was the hope that "[m]arket forces overall [would] produce, over time, rates that w[ould] be lower than they would be under a regulated environment." Pl. MIL Resp. 56. But Plaintiff does not suggest that the aspirations underlying deregulation in 1996 were codified in any rule or regulation that XOOM should have been following during the class period. That the PSC may have hoped that deregulation would result in lower energy rates for consumers does not make it more or less likely that XOOM complied with the contract's pricing provision.

As to the 2024 Notice, Plaintiff says it goes to "the reasonableness of XOOM's conduct here," without explanation. That is because it has nothing to do with her narrow contract claim. The 2024 Notice pertains to XOOM's compliance with the Reset Order after it became effective in *April 2021*. But again, conduct that could only have been improper by standards set years after Plaintiff and the Class Members contracted with XOOM and years after the class period began cannot serve as common evidence. Nor can it serve as relevant evidence for any individual class member because it is not relevant to any issue here. Even if the disputed allegations in the 2024 Notice are eventually proven, that would bear only on whether XOOM complied with the Reset Order. Whether XOOM complied with the Reset Order, however, is not probative of the single issue to be decided in this case: whether XOOM complied with the contract's pricing term requiring variable rates to be set based on its actual and estimated supply costs. Thus, the 2024 Notice is not probative of Plaintiff's claim or the claims of any Class Members. *Tyson*, 577 U.S. at 455 ("classwide" evidence means "each class member could have relied on [it] to establish liability if he or she had brought an individual action").

In sum, Plaintiff pretends that evidence that is irrelevant to her is somehow relevant here by virtue of class certification alone. That is plainly prohibited by Supreme Court precedent. *See,*

*e.g., Shady Grove*, 559 U.S. at 408. Because the legislative and regulatory documents are all irrelevant, they should be excluded from evidence at any trial.

### ii.     The documents are irrelevant because they do not speak to the appropriate standard for objective reasonableness.

For the reasons discussed in XOOM's opening motion and *supra*, in Parts III and VIII, the jury's determination of a commercially "reasonable" margin (if that is even at issue) cannot be determined by utility rates discussed in the regulatory and legislative documents, but rather, must be determined by reference to the margins that other industry participants achieved. *See supra*, Part III. Plaintiff's response boils down to an unfounded warning that giving *Richards, Martinez,* and *Sevugan* any weight at all will erase the difference between those contracts and XOOM's. Not so. XOOM remains bound by the Court's contract construction, and XOOM's MIL No. 12 does not seek to change that. XOOM seeks only to preserve its right to have the jury determine a commercially reasonable (if that is at issue) and proportionate margin using **competent** evidence. Under the case law, which goes beyond *Richards, Martinez,* and *Sevugan*, the utility rates explored in the legislative and regulatory documents do not meet that standard. The fact that Plaintiff did not procure competent evidence of the margins of other ESCOs is not a reason to ignore this overwhelming consensus on how to determine a commercially reasonable rate; it is a reason to decertify the class and enter a directed verdict for XOOM.

### C.  Rule 803: Plaintiff's response confirms the regulatory and legislative documents are hearsay without any applicable exception.

Plaintiff's response also confirms that the documents are hearsay and no exception applies. She does not deny that each is a statement made outside of the trial "to prove the truth of the matter asserted," Fed. R. Evid. 801(c). And for the reasons explained in XOOM's opening papers, her assertion that the documents "are admissible as public records under Rule 803(8)" is wrong.

Notably missing from the several pages Plaintiff devotes to her Rule 803(8) discussion is

any case suggesting that a prospective rulemaking proceeding constitutes an "investigation" that would fall within the hearsay exception of Rule 803(8)(A)(iii), because none exists. *Cf. United States v. Am. Tel. & Tel. Co.*, 498 F. Supp. 353, 360 n.19 (D.D.C. 1980) (distinguishing rulemaking "from a proceeding that is clearly adjudicatory—that is, an investigation into disputed past acts with a view to determining whether those acts meet certain legal standards, with any prospective element being incidental—which certainly could yield 803(8)(C) findings"); *Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 814 (D.D.C. 1987) (finding that draft report that aimed "to evaluate the Justice Department's actions . . . does not have factual findings within the meaning of rule 803(8)(C)" because it involved neither "an adjudicatory proceeding nor even . . . an investigation whose stated purpose was the resolution of some factual dispute"). Plaintiff asserts that *Beech Aircraft* changed the rule on this subject, but that case involved an ordinary factual investigation of an accident, not a rulemaking proceeding. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 157 (1988) (considering admissibility of opinions in "investigative report" about an accident prepared under Judge Advocate General's authority). As such, it did not change the admissibility of a document relating to forward-looking rulemaking. *See Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir. 1998) ("Before the court can presume trustworthiness, it must determine that the report contains factual findings based on a factual investigation.") (citing *Beech,* 488 U.S. at 169).

The other cases that Plaintiff cites are equally inapposite. In *Gentile* and *Harte*, the report that was deemed to fall within the public-records exception was the product of a retrospective or contemporaneous factual investigation that aimed to produce retrospective factual findings—not prospective rulemaking. *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 144, 148 (2d Cir. 1991) (considering admissibility of "selected portions of a report by a state investigatory commission relating to past misconduct of the County Police Department and the District Attorney's Office");

*Harte v. Ocwen Fin. Corp.,* No. 13-CV-5410, 2018 WL 1830811, at *19 (E.D.N.Y. Feb. 8, 2018) (report issued under the auspices of a regulatory agency and "contain[ing] extensive factual findings" from multiple "investigations" fell within the public-records exception), *report and recommendation adopted,* No. 13CV5410MKBRER, 2018 WL 1559766 (E.D.N.Y. Mar. 30, 2018); *see also Masemer v. Delmarva Power & Light Co.*, 723 F. Supp. 1019, 1020–21 (D. Del. 1989) (finding "OSHA reports" containing "factual findings which are the result of an investigation" admissible (quotation marks and citation omitted)).[41] Here, in contrast, the proceeding that produced the documents at issue were not factual investigations aimed at producing retrospective factual findings. Instead, they were prospective rulemaking proceedings.

There can be no doubt that the documents at issue are the product of prospective rulemaking. Plaintiff has conceded as much. *See, e.g.,* Pl. MIL Resp. 66 ("PX35, the 1996 NYPSC Order, provides a summary of factual findings and the positions of parties following 'an investigation of issues related to the future regulatory regime . . .'"). And indeed, it is indisputable. *See* PX36 (sponsoring memorandum for GBL § 349-d);[42] PX37 at 3–4 ("Among the measures to

---

[41] In *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, the Court did not even reach the issue of whether Rule 803(8) applies because the documents at issue were irrelevant. *See* No. 18-CV-6449 (JS)(ARL), 2023 WL 2403258, at *11 (E.D.N.Y. Mar. 7, 2023) ("While the USPTO is an agency of the United States . . . that falls squarely withing the 'public offices or agencies' requirement of Rule 803(8), even *if* the Action Letters fall within the public documents exception to hearsay, they remain subject to the rules of relevance articulated in Rules 401, 402, and 403. To that end, the Court rules that Plaintiff is precluded from introducing the Action Letters on the ground that they are irrelevant. . . ." (emphasis added)).

[42] Plaintiff asserts in conclusory fashion that the Sponsoring Memorandum is "admissible pursuant to Rule 803(8)(A)(i) because it 'sets out the office's activities.'" Her cases do not support her position. The first *assumed*, but *did not decide*, that work product might be admissible under 803(8)(A)(i), because the Court ultimately concluded that the work was "not trustworthy." *In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 2012 WL 4511308, at **2–3 (E.D.N.Y. Oct. 1, 2012). The second reached the unremarkable conclusion that a "delivery confirmation is a record of the activity that the USPS carries out . . . ." *Chapman v. San Francisco Newspaper Agency*, No. C 01-02305 CRB, 2002 WL 31119944, at *2 (N.D. Cal. Sept. 20, 2002). Thus, neither case suggests

be considered are: . . . whether the regulatory regime, rules and Uniform Business Practices (UBP) applicable to ESCOs need to be modified . . . ; and [] whether new ESCO rules and products can be developed . . . ."); PX38 at 1 ("The overarching question . . . is whether ESCOs should be prohibited, in whole or in part, from serving mass market customers, and how the Commission should regulate the ESCOs and their product offerings."); PX39 at 1 ("In this Order, the Commission strengthens protections for residential and small commercial customers (mass-market customers) in the retail energy market."). The "presumption of admissibility" that extends to investigative "reports" "such as those" discussed in *Gentile* and *Harte*, therefore does not extend to the documents at issue here. *Gentile*, 926 F.2d at 144; *see also Ariza*, 139 F.3d at 134 (excluding report that "made generalized recommendations regarding future departmental behavior" because it "was not intended to[] set forth factual findings based on a factual investigation").

As for the 2024 Notice, PX40, it cannot fall under the "Public Records" hearsay exception for the reasons XOOM explained: it does not contain "factual findings" at all. Rather, it contains only preliminary, speculative statements subject to revision or alteration.[43] *See City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) (finding "an interim report subject to revision and review . . . did not satisfy the express requirement of the Rule that the proffered evidence must constitute the 'findings' of an agency or official");[44] *United Food Grp., LLC v. Cargill, Inc.*, No.

---

that the Sponsoring Memorandum should be admissible. Indeed, "[t]o the contrary, a number of cases . . . have declined to admit Congressional reports under Rule 803(8)(C)." *Barry v. Trustees of Int'l Ass'n Full-Time Salaried Officers & Emps. of Outside Loc. Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91, 98 (D.D.C. 2006) (listing cases).

[43] For that reason, the 2024 Notice, along with the 2016 Notice and 2018 Initial Brief, also are untrustworthy. *See* Pl. MIL Resp. 71–72 (explaining that whether the report is a product of a "hearing" is one of the factors to be considered in assessing trustworthiness (citing *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000)).

[44] Plaintiff attempts to distinguish *Pullman*, but the cases she cites each dealt with a "final" report. *See In re the Bear Stearns Cos., Inc. Sec.*, No. 08 MDL 1963, 2016 WL 4098385, at *4 n.4

CV 11-7752 SS, 2015 WL 13868984, at *8 (C.D. Cal. June 8, 2015) (finding documents concerning ongoing investigation inadmissible under Rule 803(8) (citing cases)); *Toole v. McClintock*, 999 F.2d 1430, 1434-35 (11th Cir. 1993) ("Rule 803 makes no exception for tentative or interim reports subject to revision and review."). Plaintiff responds by arguing, without any support, that the "record contains the NYPSC's factual findings from XOOM's 2020 application through the NYPSC's 2023 audit investigation." Plaintiff misleadingly omits the very first line of the body of the Notice, which states that "[t]he New York Department of Public Service," i.e., the PSC *staff*, not the PSC itself, "notifies XOOM . . . of its *apparent* non-compliance with regulatory requirements." PX40 at 1 (emphasis added). The Notice by its very terms is tentative. The Notice expressly requests a response because it is part of a *process* that has not yet resulted in findings. *Id.* Further underscoring its preliminary nature, the Notice explains that, even if the Staff find that XOOM's "reply to this N[otice] is insufficient," they may only seek an Order to Show Cause from the Commission. *Id.* Plaintiff's suggestion that this tentative Notice from the PSC's staff of a potential noncompliance issue contains the PSC's "factual findings" with respect to XOOM's practices is thus totally off-base. And regardless, any minimal probative value (even putting aside the impossibility of using evidence relevant to only a few class members as classwide evidence, *see* Part [[XII(A)(2)(a)]], *supra,* is far outweighed by the prejudice discussed above.

In short, because the documents involve prospective rulemaking proceedings, controlling precedent instructs that they are not admissible under Rule 803(8)'s public-records exception.

The PSC documents are also unreliable, and thus do not fall within the exception, for the

---

(S.D.N.Y. July 25, 2016) (report was prepared by "the entity tasked with fact gathering and investigation" and "[i]ts conclusions were final"); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 180 (D. Conn. 2009) (finding report "final" in part because it "was based on a fact-finding investigation in which the [] defendants participated and had the opportunity (which they apparently exercised) to defend themselves").

reasons stated in XOOM's opening papers:

(1) The 5%-above-the-utility cap that the PSC imposed on fixed rates in the 2019 Reset Order (and which is the lynchpin of Plaintiff's efforts to introduce the regulatory documents) was not a factual finding, but rather, only a prediction (based on a third-party's assessment of risk, not the government's analysis of profitability) that "most ESCOs *could* continue to offer fixed-rate products" at such a rate. PX39 at 67–68 (emphasis added); *see Am. Tel.*, 498 F. Supp. at 363 (holding that statements that "contain . . . predictions of future events" did not qualify "as 'factual findings'" under Rule 803(8)).

(2) Neither the 2019 Reset Order nor the 2018 Initial Brief can be deemed reliable with respect to prevailing ESCO prices and premiums because the Reset Order expressly ***declined*** to make a factual finding with respect to the 2018 Initial Brief's statement that "the majority of ESCOs charge a premium of more than 20%," and the 2019 Reset Order described those figures as "overstated based upon record evidence."[45] *See Pullman*, 662 F.2d at 914 (holding that report did not satisfy Rule 803 requirement that evidence "constitute the 'findings' of an agency or official"; noting that the court "attach[ed] substantial significance to the fact that the report expressly declined to state a conclusion on the most significant safety question").

(3) The Reset Order is not "trustworthy" because it does not assess reasonable commercial behavior during the relevant time period. *See, e.g.*, *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 743 (2d Cir. 1989) (affirming district court's exclusion of government reports about industry as "untrustworthy because they do not reflect real concerns of the business world").

Plaintiff has offered no credible response to any of these arguments, so the documents are inadmissible under the public records exception for the additional reason that they are unreliable.

D. Rule 702: Plaintiff concedes the documents are not expert opinion evidence.

Plaintiff concedes that she does not intend to use the regulatory and legislative documents as expert opinion evidence, so XOOM will not repeat its arguments on that point.

\* \* \*

---

[45] Plaintiff argues that the PSC's saying it shared the Staff's "concern" proves that the factual record was well developed. Not true. Whether the PSC and its Staff shared the same "concern" is irrelevant to whether the factual record before the PSC and its Staff regarding ESCO rates was properly developed. The PSC's rejection of those findings as unsupported by the record shows that the PSC itself thought the record was not sufficiently developed. *See* PX39 at 67.

For the foregoing reasons, Plaintiff should be precluded from offering Exhibits PX35–PX40 at trial. They are irrelevant, prejudicial, misleading, and hearsay not subject to any exception. Plaintiff should further be precluded from offering any other evidence or making statements related to proceedings before the New York PSC (or any other regulatory body), including briefs, orders, and other documents filed in such proceedings.

## XIII.    XOOM's MIL No. 13: Plaintiff cannot seek punitive damages under any law.

XOOM's Trial Memorandum and its MIL No. 13 explain why Plaintiff cannot seek punitive damages under North Carolina law, and Plaintiff's pivot to New York law is addressed in response to Plaintiff's MIL No. 13. *See* Doc. 210, Pretrial Order 11–18; Doc. 227, Def. MIL Mem. at 41–45; Doc. 242, Def. MIL Resp. 66–73. XOOM incorporates its arguments from that briefing and focuses here on the specific arguments Plaintiff raised in response to XOOM's MIL No. 13.

In her response, Plaintiff sticks with her new *limine* position that New York law supplies the predicate tort for her punitive damages request. That is wrong[46] but ultimately irrelevant because (1) the Court held in the Decertification Order that North Carolina governs here, Doc. 246, at 10–11, and (2) North Carolina and New York use similar approaches to the availability of punitive damages for breach of contract claims. *Compare Strum v. Exxon Co.*, 15 F.3d 327, 331 (4th Cir. 1994), *with New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 315–16 (1995). XOOM's earlier briefing explains why punitive damages are not available under North Carolina law. But

---

[46] Plaintiff's request to apply different state laws to different aspects of the same claim invokes the doctrine of "depecage," but that doctrine is also inapplicable. It applies only to tort claims and then only when different state laws would have materially different effect. *See, e.g.*, *Simon v. Philip Morris, Inc.*, 124 F. Supp. 2d 46, 75–76 (E.D.N.Y. 2000) (under depecage, different substantive issues ***in a tort case*** may be resolved under laws of different states where the choices influencing decisions differ." (emphasis added)). Courts specifically reject attempts—like Plaintiff's—to invoke depecage to apply different state law to punitive damages on a breach of contract claim. *See, e.g., Interclaim Hldgs. Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*, No. 00 C 7620, 2004 WL 725287, at **14–15 (N.D. Ill. Apr. 1, 2004) (refusing to apply different state law "to the so-called 'tort portion' of the breach of contract claim").

even assuming *arguendo* that New York law applied, Plaintiff would still have to specifically plead the elements of an "identifiable tort" and allegations showing that the conduct was "egregious" and akin to "gross" and "morally reprehensible conduct" involving "such wanton dishonesty as to imply a criminal indifference to civil obligations." *NYU*, 87 N.Y.2d at 315–16 (cleaned up). She has never done so.

Plaintiff's operative complaint falls far short of alleging that XOOM engaged in such conduct, let alone that XOOM violated any "duty of reasonable care distinct from its contractual obligations" or engaged in alleged "tortious conduct separate and apart from its failure to fulfill its contractual obligations." *Id.* The Amended Complaint instead alleges only that XOOM breached its contracts by setting variable rates based on factors other than actual and estimated supply costs. Doc. 42, FAC ¶¶ 76–81. Nor can Plaintiff meet her burden to plead that ***XOOM*** engaged in aggravated conduct by pointing to a conclusory allegation in her Amended Complaint of industry-wide "actual malice" and "wanton and willful disregard." Pl. MIL Resp. 78–79. Those allegations are about statements in a regulatory staff brief discussing "adequate price transparency" from ESCOs—made years after Plaintiff was a XOOM customer—that was a generalized observation about ***the ESCO industry as a whole***, not XOOM specifically. Pl. MIL Resp. 78–79. Plaintiff's Amended Complaint plainly shows that she "is merely seeking to enforce [her] bargain," such that "a tort claim will not lie." *NYU*, 87 N.Y.2d at 16; *Ticheli v. Travelers Ins. Co.*, No. 1:14-CV-00172, 2014 WL 12587066, at *4 (N.D.N.Y. Dec. 23, 2014) (striking punitive-damages demand on breach of contract claim where plaintiff failed to allege the breach of duties "distinct from [the defendant's] contractual obligations"). Indeed, even her *limine* motions state that "the trial concerns a simple breach of contract claim." Doc. 233, Pl. MIL Mem. 47.

The Court need go no further to prohibit Plaintiff from injecting tort- and punitive-damages theories into this breach of contract case. New York federal courts (like those in North Carolina) have refused to allow plaintiffs to seek punitive damages on breach of contract claims even where—unlike here—plaintiffs pleaded GBL and tort claims. *See MaGee v. Paul Revere Life Ins. Co.*, 954 F. Supp. 582, 588 (E.D.N.Y. 1997) (striking punitive-damages claim after dismissal of GBL and tort claims because plaintiff no longer had the predicate "independent tort necessary to support [such] a claim"); *see also Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*, No. 18-CV-170 (KMK), 2019 WL 4413052, at *8 (S.D.N.Y. Sept. 16, 2019) (holding that plaintiff was not eligible for punitive damages on breach of contract claim after dismissal of GBL Section 349 claim; also ruling that complaint's "conclusory statements" about fraudulent inducement did not allege the requisite "'high degree of moral turpitude' or 'wanton dishonesty'"); *Toussie v. Allstate Ins. Co.*, No. 15-CV-5235 (ARR)(PK), 2016 WL 6537670, at *3 (E.D.N.Y. Nov. 3, 2016) (Ross, J.) ("The first element requires pleading commission of an independent tort, such as fraud. Without such an allegation, plaintiffs' relief for a claim of denial of a valid insurance claim in New York is limited to breach of contract claims." (citation omitted)); *Greenspan v. Allstate Ins. Co.*, 937 F. Supp. 288, 295 (S.D.N.Y. 1996) (striking punitive-damages demand because "[p]laintiffs have no remaining tort claims" and could not rely on alleged breach of the implied covenant to meet the independent tort requirement).

Plaintiff brushes off these cases (and those under North Carolina law) as "not on point because each barred punitive damages for breach of contract only after adjudicating and dismissing independent tort claims," and "[h]ere, no such adjudication of the independent tort under GBL § 349 has occurred." Pl. MIL Resp. at 76–77. But that is precisely the point. If a plaintiff cannot pursue punitive damages under contract claims despite having ***actually pleaded*** predicate torts,

then Plaintiff cannot possibly seek punitive damages here when it is undisputed that she has **never** pleaded or pursued tort claims in this case. Indeed, punitive damages did not appear even in the first set of proposed jury instructions and verdict form that Plaintiff served on XOOM in March 2024, and her GBL theory appeared for the first time in her own *limine* motion in May. *Cf.* Doc. 210-8, Pl. Jury Instructions 13 (citing North Carolina deceptive advertising law, not New York's GBL Section 349).

In other words, Plaintiff makes the remarkable request that the Court put her in a better position than plaintiffs who pleaded tort claims—because she kept her tort claim secret until the eve of trial. She has repeatedly said that this is a straightforward breach of contract case, both here and at the Second Circuit. It would be highly prejudicial to suddenly reward Plaintiff with the potential benefits of a tort claim when she avoided the burdens of sustaining that claim through discovery, dispositive motion practice, and under Rule 23 by failing to plead or disclose it.

Plaintiff attempts to excuse her pleading deficiencies based on Federal Rule of Civil Procedure 54(c)'s language that allows courts to "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Plaintiff also seems to believe that her generic prayer for "all such other relief as the Court deems appropriate" extends to punitive damages. Pl. MIL Resp. 76. That is not the law.

Rule 54(c) affords litigants the opportunity to pursue punitive damage claims "absent an explicit demand" **only** when the complaint "contain[s] allegations sufficient to inform the defendant that punitive damages are on the table." *Newell v. Wisconsin Teamsters Joint Council No. 39*, 2007 WL 2874938, at *4 (E.D. Wis. Sept. 28, 2007) (exhaustively synthesizing case law). Otherwise, only "unpled issues which are tried with either the express or implied consent of the parties are to be treated as if they were raised in the pleadings." *Cioffe v. Morris*, 676 F.2d 539,

541 (11th Cir. 1982). Plaintiff's "boilerplate request" for general relief will not do; nor does it matter that Plaintiff now invokes "a statute that may authorize recovery of punitive damages." *Newell*, 2007 WL 2874938, at *4. That is because allowing untimely and unpleaded punitive damages demands "will almost invariably" prejudice defendants, "[e]ven at the earliest stages of a case," by depriving them of the opportunity to develop their "litigation posture" in response to the possibility of such awards, among other things. *Id.*

XOOM does not consent to Plaintiff's last-minute request for punitive damages, and it would be severely prejudiced if the Court were to allow Plaintiff to present her unpleaded GBL-based punitives theory for the first time in front of a jury. *See* Fed. R. Evid. 403. For one thing, Plaintiff (a customer in 2013) could not have asserted a GBL claim when she sued in 2018 because it would have been barred by the applicable three-year statute of limitations. *See, e.g.*, *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 788–90 (2012). The parties also have not conducted discovery on any deceptive-advertising theories—because Plaintiff never hinted that she was pursuing one— and XOOM was deprived of the opportunity to move for summary judgment on them. *See* Fed. R. Evid. 403; *Cioffe*, 676 F.2d at 542 (explaining that prejudice exists when a defendant "had no notice of the new issue, if the defendant could have offered additional evidence in defense, or if the defendant in some other way was denied a fair opportunity to defend).[47]

But more fundamentally, New York law barred Plaintiff from pursuing punitive damages (or statutory treble-damages penalties like those in the GBL) at the time she filed suit in state court if she wished to pursue her class allegations. Section 901(b) of the New York Civil Practice &

---

[47] Plaintiff wrongly argues that XOOM—as "the master of its own fate"—cannot be prejudiced because it could have conducted discovery on undisclosed punitive damages theories. Pl. MIL Resp. 77 n.37. But Plaintiff offers no explanation of how XOOM should have known to do so given her lone breach of contract claim and the complete absence of any request for punitive damages in her Amended Complaint.

Law Rules ("CPLR") expressly prohibits class actions to "recover a penalty, or a minimum measure of recovery created or imposed by statute" unless that statute also "specifically authorizes the recovery thereof in a class action." That statutory bar applies to consumer class actions under GBL Section 349 unless putative class plaintiffs waive their right to recover such remedies and elect to "confin[e] the class recovery to actual damages." N.Y. CPLR Supp. Prac. Comment. C901:11; *Borden v. 400 E. 55th St. Assocs.*, 24 N.Y.3d 382, 394 (2014) ("Where a statute imposes a nonmandatory penalty, plaintiffs may waive the penalty in order to bring the claim as a class action—such as was the case for consumer fraud actions brought under section 349(h).").

Because the United States Supreme Court has held that CPLR Section 901(b) does not apply to class actions in federal court, *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), XOOM would not have removed this diversity case to federal court had Plaintiff indicated that she sought punitive damages or other statutory remedies. It instead would have moved to dismiss this case under CPLR Section 901(b). The Court should not permit Plaintiff to now proceed on theories of recovery that were not available to Plaintiff at the time she filed suit, the waiver of which was both a precondition of Plaintiff's ability to bring a class action and an inducement to XOOM's removal to federal court. Plaintiff offers no justification for waiting ***over six years*** to seek damages beyond those that she would have been limited to in state court—again, without ever pleading a predicate tort theory of recovery. *Cioffe*, 676 F.2d at 542.

\*   \*   \*

Plaintiff's belated request for punitive damages fails for the various independent reasons explored in the briefing on this issue. Plaintiff has not pleaded a punitive-damages request; the

underlying contracts contain an unambiguous punitive-damages waiver[48]; Plaintiff's operative complaint lacks any independent tort claims as to which XOOM allegedly acted with criminal indifference; Plaintiff's proposed GBL-based theory would have been time-barred and statutorily prohibited at filing; and deceptive-practices theories present individualized issues incompatible with class certification. Accordingly, the Court should grant XOOM's MIL No. 13, deny Plaintiff's MIL No. 13, and prohibit Plaintiff from seeking punitive damages at trial.

---

[48] Plaintiff does not address the applicability of the contract's punitive-damages waiver in her Response, but she does so nominally in her own MIL No. 13.

**XIV.      XOOM's MIL No. 14: Plaintiff's request to introduce deposition testimony of witnesses who will be at trial is misguided and should be denied.**

Plaintiff contends that she "should be allowed to read admissions contained in deposition transcripts of former and current XOOM employees into the record as part of her case in chief." Pl. MIL Resp. 79. Plaintiff moved on this issue in her MIL No. 9, and her Response to XOOM's MIL No. 14 repeats her arguments from that motion. XOOM therefore incorporates the arguments raised in its Opposition to Plaintiff's MIL No. 9, and provides a summary argument here that responds to specific points raised in Plaintiff's response.

As Learned Hand long ago put it: "The deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand." *Napier v. Bossard*, 102 F.2d 467, 469 (2d Cir. 1939). Consistent with that view, courts routinely preclude parties from "introduc[ing] the deposition testimony of a witness (other than for impeachment purposes) who will, in fact, be present and giving live testimony at trial." *Mazloum v. D.C. Metro. Police Dep't.*, 248 F.R.D. 725, 727 (D.D.C. 2008) (citing *Niver v. Travelers Indem. Co.*, 430 F. Supp. 2d 852, 866 (N.D. Iowa 2006)).

That practice remains ***even if*** the Rules "provide a separate basis to admit the depositions." *Kolb v. Suffolk County*, 109 F.R.D. 125, 127–28 (E.D.N.Y. 1985) (precluding party from using deposition testimony for eight party-opponent employees who would appear at trial, even though Rule of Evidence 801(d)(2)(D) made the deposition testimony admissible). That is because a "deposition contains no information that [a witness's] live testimony could not supply." *Jackson v. Chevron Chem. Co.*, 679 F.2d 463, 466 (5th Cir. 1982) (affirming district court's exclusion of deposition testimony for live witness, "even if [it] was properly admissible under Rule 32(a)(2)"); *see also Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 990 (8th Cir. 1999) (same, party wanted to "read [a live witness's] deposition testimony into evidence during her case in chief," as Plaintiff

proposes to do here); *Fenstermacher v. Phila. Nat'l Bank*, 493 F.2d 333, 337–38 (3d Cir. 1974) (same; collecting cases from Sixth, Ninth, and D.C. Circuits).

Plaintiff cannot carry her burden to overcome the strong preference for live testimony by simply showing that some portion of the transcripts may be admissible under the Rules of Evidence or Civil Procedure. *See Allgeier v. United States*, 909 F.2d 869, 876 (6th Cir. 1990) (burden is on the deposition proponent). That the Rules say deposition testimony "'may' be used 'for any purpose'" when certain conditions are met ***does not*** mean that "they may be used *at any time* or *in any manner* as a party sees fit." *Gonzalez Prod. Sys. v. Martinrea Int'l, Inc.*, 310 F.R.D. 341, 344 (E.D. Mich. 2015). Trial efficiency, judicial economy, and jury confusion must still be considered—and under Rules of Evidence 403, 611, and others—those factors weigh against the approach to trial testimony Plaintiff urges here. *See, e.g.*, *Feinwachs v. Minn. Hosp. Ass'n*, No. 11-cv-0008 (WMW/SER), 2019 WL 4298085, at *11 (D. Minn. Sept. 11, 2019) (reasoning that just such an approach would "very likely be disjointed and confusing for a jury" and "also increases the risk of undue delay, wasted time, and cumulative evidence").

As one district court summarized:

> [I]t is more efficient and less confusing for the jury if all of the testimony of live witnesses is presented during their testimony in court. It is also more beneficial for the jury to personally observe the witnesses' testimony. Any questions asked during the deposition can be asked and answered in the jury's presence. For these reasons, and in light of the authorities cited above, the parties may not use depositions as substantive evidence if the witness in question testifies at trial.

*S&H Farm Supply, Inc. v. Bad Boy, Inc.*, No. 18-03413-CV-S-BP, 2020 WL 8373428, at * n.2 (W.D. Mo. Sept. 4, 2020) (citing, *inter alia*, *Crimm v. Mo. Pac. R. Co.*, 750 F.2d 703, 709 (8th Cir. 1983)); *see also EEOC v. Laroy Thomas, Inc.*, No. 5:05CV183, 2007 WL 9724343, at *2 (E.D. Tex. Oct. 3, 2007) (following *Dhyne*); *Young & Assocs. Pub. Relations, LLC v. Delta Air Lines, Inc.*, 216 F.R.D. 2003) (refusing to "allow deposition testimony in lieu of live testimony"

for witnesses who would appear at trial, "[i]n line with the universal preference for live testimony").

Plaintiff's response briefly argues that she (1) can at least use the transcript of XOOM's Rule 30(b)(6) corporate-representative deposition,[49] and that (2) "exceptional circumstances" justify allowing the deposition testimony under Rule 32(a)(4)(E). *See* Pl. MIL Resp. 79–81. As to the former argument, "though Federal Rule of Civil Procedure [32(a)(3)] '***permits*** a party to introduce the deposition of an adversary as part of his substantive proof regardless of the adversary's availability to testify at trial,' district courts are reluctant to allow the reading into evidence of the Rule 30(b)(6) deposition if the witness is available to testify at trial." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006) (citation omitted). Plaintiff fails to explain why the live testimony of XOOM's corporate representative must be supplemented by recitations from his deposition transcript, let alone how the Court could efficiently "ensure that all levels of hearsay are satisfied" and that each statement "is actually admissible" "***before***" it is read. *Gonzalez Prod. Sys.*, 310 F.R.D. at 344 (emphasis added) (barring use at trial of deposition transcript for corporate representative who would give live testimony); *see also Rigsbee v. City & County of Honolulu*, No. 17-00532 HG-RT, 2019 WL 1089636, at *2 (D. Haw. Mar. 7, 2019) (same).

As to the latter contention, Plaintiff identifies no circumstances that could possibly pass as exceptional under the "stringent standard" of Rule 32(a)(4)(E). *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, No. 9:14-230-RMG, 2017 WL 6015157, at *2 (D.S.C. Dec. 1, 2017). Courts define "exceptional circumstances" by reference to "companion provisions" in Rule

---

[49] Contrary to the Plaintiff's argument, *see* Pl. MIL Resp. 80 n.41, XOOM did not concede that Plaintiff may read at trial the deposition transcript of its corporate representative.

32(a)(3) and find them to "authorize use of a deposition in lieu of live testimony only" in situations akin to "when the witness is shown to be unavailable or unable to testify because he is dead; at a great distance; aged, ill, infirm, or imprisoned; or unprocurable through a subpoena." *Allgeier*, 909 F.2d at 876. Plaintiff passingly argues that exceptional circumstances exist because XOOM had notice of Plaintiff's plans and the opportunity to object, and because Plaintiff believes her proposal will save time and expense at trial (How that could possibly be, Plaintiff does not explain). These are patently ***un***exceptional circumstances that the Court should disregard.

*        *        *

Plaintiff provides no compelling reason to allow her to read from deposition transcripts while examining live witnesses during her case in chief, nor does she explain how such an approach would promote an efficient trial or conserve judicial and party resources. Her approach almost certainly would have the opposite results. The Court should deny Plaintiff's MIL No. 9 and grant XOOM's MIL No. 14.

**XV.**   **XOOM's MIL No. 15: The parties agree that XOOM should be permitted to identify proposed redactions to trial exhibits after *in limine* motions are resolved.**

The voluminous exhibits in the parties' Joint Exhibit List, Plaintiff's Exhibit List, and XOOM's Exhibit List contain numerous trade secrets and other confidential information regarding, among other things, irrelevant products, rates, and markets. XOOM therefore asked the Court in its MIL No. 15 for the opportunity to redact any category of information that is excluded as irrelevant pursuant to XOOM's motions *in limine*. Plaintiff's only response is to assert that XOOM's requests are not particularized. But that is because it is impossible to tell what documents will need to be redacted until the *in limine* motions are decided. Indeed, Plaintiff herself proposes that "once *in limine* motions are decided, XOOM should identify the specific information it seeks to withhold from specific documents[.]" XOOM agrees.

Thus, given the parties' apparent consent, the Court should grant XOOM leave to propose redactions in line with its *in limine* rulings once they are all resolved. Plaintiff can then raise any issues with those redactions to XOOM and, if not agreed, to the Court

<u>**CONCLUSION**</u>

For the reasons set forth above and in XOOM's opening memorandum of law, the Court should grant XOOM's Motions *in Limine* and preclude Plaintiff from offering evidence of, argument regarding, or otherwise referring to the matters discussed above.

Dated: July 1, 2024                     MCDOWELL HETHERINGTON LLP

*/s/ Michael D. Matthews, Jr*
Michael D. Matthews, Jr.
Diane S. Wizig (admitted *pro hac vice*)
David L. Villarreal (admitted *pro hac vice*)
Netra Sreeprakash
Justin R. Chapa (*pro hac* forthcoming)
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
david.villarreal@mhllp.com
netra.sreeprakash@mhllp.com
justin.chapa@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and*
*XOOM Energy New York, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on the 1st day of July, 2024, via email on all counsel of record.

<u>/s/*Michael D. Matthews, Jr.*</u>
Michael D. Matthews, Jr.
