# EXHIBIT 9

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF NEW YORK
 3     SUSANNA MIRKIN and BORIS MIRKIN,
 4     Individually and on Behalf of All Others
 5     Similarly Situated,
 6           Plaintiffs,
 7        vs.                      No. 18 Civ. 2949(ARR) (RER)
 8     XOOM ENERGY, LLC and XOOM ENERGY
 9     NEW YORK, LLC,
10           Defendants.
11     --------------------------------x
12
13
14               VIDEOTAPED DEPOSITION OF
15                   SEABRON ADAMSON
16              Tuesday, November 8, 2022
17                     10:06 a.m.
18                      Veritext
19                  101 Arch Street
20            Boston, Massachusetts 02110
21
22
23
24             Laurie K. Langer, RPR
```

Page 1

```
 1    A.  Well, in a sense, yes, because the, you
 2  know -- well, first off, the fix rate is used as, you
 3  know, a way of coming up with a reasonable margin that,
 4  based on what XOOM itself set rates on.  You know, it's
 5  not -- it's based on the information available.
 6       So one question then comes to, you know, are, is
 7  there some reason that, that XOOM would need to charge a
 8  higher rate on fixed rate customers?  If so I don't
 9  really see what it is.
10       MR. WITTELS:  Variable.
11    A.  Sorry.  On variable rate customers.  I am -- we
12  don't have any information to, to delve into that.
13    Q.  I'm asking conceptually.  And it's okay if you
14  are not offering this opinion.  I'm not saying you
15  should or you shouldn't be.  I just want to know in this
16  case are you going to offer an opinion that it is not
17  fair for XOOM to seek a higher margin on variable rates
18  conceptually than it does on fixed rates?
19    A.  In this context, yes.  Because there is no XOOM
20  provided despite all of the information about how those
21  methods were set of how these margins came up.  How
22  these -- how the variable rate margins were determined
23  and that's a reasonable proxy, yes.
24    Q.  Are you offering that opinion more broadly, that
                                                      Page 98
```

```
 1  in all circumstances -- and I'm asking this, to give you
 2  some prospective on why I'm asking, because you've done
 3  it in two cases now that I know of, set the fixed rate
 4  margin as a benchmark.
 5    A.  Uh-huh.
 6    Q.  So are you going to offer the opinion that in the
 7  ESCO world --
 8    A.  Uh-huh.
 9    Q.  -- it is not appropriate for an ESCO to seek a
10  higher margin for variable rates than it does for fixed
11  rates?
12       MR. WITTELS:  Objection.
13    A.  I mean, to me the rates have to be set for the
14  contract.  The -- the use of fixed rates seemed
15  appropriate for coming up with the reasonable proxy
16  given that, you know, the, the risks associated with the
17  variable rates in general would be similar or probably
18  lower.  If you say that there are other fixed costs it's
19  hard to see why they are different.  We never saw
20  anything in this case saying, demonstrating why there
21  would be a difference between the two.  If someone could
22  present, you know, compelling economic evidence that
23  says, "by God, I can prove to you that the costs of
24  variable rate is completely different than fixed rate"
                                                      Page 99
```

```
 1  that might be a thing.  But we -- we haven't seen that
 2  here.  It was asked, but we haven't seen it.
 3    Q.  Who asked?
 4    A.  Well, the discovery request asked for costs and
 5  pricing methodologies and stuff.
 6    Q.  Paragraph 75.  It says -- this is towards the
 7  bottom, I suppose it's the last sentence.
 8       "It appears that XOOM was able to operate and
 9  make a reasonable profit selling fixed rate contracts
10  with substantially lower margins than variable
11  contracts, and yet arbitrarily imposed much higher
12  margins on their variable rate customers?"
13       Do you see that?
14    A.  Yes.
15    Q.  Where does it appear that XOOM was able to
16  operate and make a reasonable profit selling fixed rate
17  contracts with substantially lower margins?
18    A.  Well, the margins you can kind of see in the
19  table, the average margins over years.  As I say, it
20  appears that they chose to offer those fixed rate
21  margins over a considerable period of time.
22    Q.  Uh-huh.
23    A.  So they would have had -- XOOM would have had the
24  opportunity to offer if it was saying, "oh, my God,
                                                     Page 100
```

```
 1  we're losing tons of money on all of our variable
 2  customers -- I mean, our fixed rate plans that could
 3  have been adjusted."
 4       But we don't -- as I mentioned before we don't
 5  have contract by contract P & Ls, for example.
 6    Q.  Right.  So I think we're saying the same thing.
 7  Your table 1 reflects gross margin for fixed rate
 8  customers; right?
 9    A.  Yes.
10    Q.  Okay.
11    A.  I think so, yes.
12    Q.  But you don't know whether --
13       VIDEOGRAPHER:  I'm sorry.  I didn't hear
14  that.  You're hitting the microphone.
15    A.  Oh, I'm sorry.
16       VIDEOGRAPHER:  Bring it up a little higher.
17    A.  How is that?  Is that better?
18       VIDEOGRAPHER:  Great.  Thank you.
19    A.  Okay.  Thank you.  Sorry.
20    Q.  That's okay.  But you don't know if XOOM actually
21  made a net profit on those same customers?
22    A.  No, we don't have -- we don't have customer
23  segment level profit and loss data.
24    Q.  Okay.  In the -- circling back to the Richards
                                                     Page 101
```

```
 1  their retail business.
 2    Q. Okay.  Well, I guess --
 3    A. For example, a bunch of the Texas companies have
 4  retail supply businesses.  We did a little bit on that,
 5  but not a major thing.  But a bunch of the Texas
 6  companies had retail supply businesses that also had
 7  substantial other businesses.
 8    Q. I think I understand what you're saying.  And you
 9  didn't work for the retail side of their businesses, you
10  worked for the other side of their businesses?
11    A. Or sometimes we would be hired on some kind of
12  corporate strategy type engagement, which might be
13  pretty broad.
14    Q. Got it.  Okay.  I thank you for your time and
15  your patience with me.
16        MR. MATTHEWS:  I'll pass the witness.
17    A. Thank you.
18    Q. Yes, sir.
19
20              EXAMINATION
21
22  BY MR. WITTELS:
23    Q. Mr. Adamson, I just really have one question for
24  you.  You were asked by counsel for XOOM about whether
                                                  Page 138
```

```
 1  the company was able to make any profits on its fixed
 2  rate customers; do you remember that question?
 3    A. Yeah.  Not in exact wording, but I remember the
 4  question.
 5    Q. Yeah.  And did you ask me to, whether you could
 6  go back and review your report when we had a break?
 7    A. Yeah, well -- yes, we were discussing the report.
 8    Q. And did you reread paragraph 57?
 9    A. Yes.
10    Q. And does that answer the question of whether XOOM
11  made money and was profitable on its fixed rate
12  customers?
13        MR. MATTHEWS:  Objection.  Leading.
14    A. Well, I just -- it just reminded me there was
15  a -- I had said that there was not a specific P&L, this
16  was a reference in the report to deposition testimony
17  from a XOOM witness about the profitability of this.
18    Q. And what did your report find and state?
19    A. I don't remember exactly how he worded it.  I
20  think there had been a, in the deposition there was a
21  question about, it was around, I don't have the
22  transcript in front of me, of course, of the deposition,
23  but it was something around the line of were -- were a
24  fixed rate -- were fixed rate customers profitable for
                                                  Page 139
```

```
 1  XOOM or some broad question.
 2    Q. And the answer was?
 3    A. I believe he said yes, they were, they were both
 4  profitable.  Both fixed rate and variable rate were
 5  profitable.
 6    Q. Okay.  I have no further questions at this time.
 7  Thanks.
 8        MR. MATTHEWS:  Thanks very much.
 9    A. Thank you.
10        VIDEOGRAPHER:  The time is 2:39, we are off
11  the record.
12        COURT REPORTER:  And, Mr. Matthews, your
13  order?
14        MR. MATTHEWS:  My order is an expedited
15  transcript, just, I don't need any print copies.
16  Electronic only.  PDF exhibits.
17        COURT REPORTER:  Expedite by Friday?
18        MR. MATTHEWS:  Yes.
19        (Whereupon, the deposition concluded at
20  approximately 2:39 p.m.)
21
22
23
24
                                                  Page 140
```

```
 1              CERTIFICATE
 2
 3  COMMONWEALTH OF MASSACHUSETTS
 4  SUFFOLK, ss.
 5
 6    I, Laurie Langer, Registered Professional Reporter
    and Notary Public in and for the Commonwealth of
 7  Massachusetts, do hereby certify that the witness whose
    deposition is hereinbefore set forth, was duly sworn by
 8  me and that such deposition is a true record of the
    testimony given by the witness.
 9
10    I further certify that I am neither related to or
11  employed by any of the parties in or counsel to this
    action, nor am I financially interested in the outcome
12  of this action.
13
      In witness whereof, I have hereunto set my hand and
14  seal this 11th day of November, 2022.
15
16
17
18  NOTARY PUBLIC
    Commission Expires
19  7/27/2023
20
21
22
23
24
                                                  Page 141
```