# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN, Individually and on
Behalf of All Others Similarly Situated

                  Plaintiff,

                  v.

XOOM ENERGY, LLC and XOOM
ENERGY NEW YORK, LLC,

                  Defendants.

Case No.: 18 Civ. 2949 (ARR) (JAM)

---

**PLAINTIFF'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO XOOM'S
TWO MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT DISCLOSURES**

---

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NEW YORK 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

**SCHLAM STONE & DOLAN LLP**
Richard Dolan
Bradley D. Simon
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Dated:  June 28, 2024

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................................ 1

**FACTUAL AND PROCEDURAL BACKGROUND** .................................................... 2

I.     PLAINTIFF PROMPTLY AND TIMELY MOVED TO SERVE AN AMENDED AND SUPPLEMENTED EXPERT REPORT, WHICH THE COURT THEN AUTHORIZED ............................................................................................................ 2

II.    IN OCTOBER 2022, PLAINTIFF'S EXPERT OFFERED ALTERNATIVE MODELS THAT COULD EXPRESSLY BE UPDATED ONCE THE COURT WEIGHED IN ON THE LEGAL OPERATION OF XOOM'S VAGUE CONTRACT ...................................................................................................... 6

    A.    Model Two Is a Proportionate Margin Model and Plaintiff's Expert Made Clear Both in His Original Report and Deposition that the Margin Input in His Report Would Need to Be Supplied by the Judge or Jury .................... 6

    B.    In Later Briefing, XOOM Agreed that Plaintiff's Expert Could Not Make the Legal Determination of an Appropriate Margin and Attacked the Report on Different Grounds ...................................................... 8

III.   IN AUGUST 2023, THE COURT CONSTRUED XOOM'S CONTRACT AT SUMMARY JUDGMENT AND AUTHORIZED A COST-PLUS DAMAGES "ALGORITHM" AT CLASS CERTIFICATION, AFTER WHICH THE SECOND CIRCUIT WEIGHED IN ON XOOM'S CONTRACT AND XOOM FINALLY UPDATED ITS DATA PRODUCTION ................................. 10

IV.   IN AN EFFORT TO LABEL THE REPORT UNTIMELY, XOOM PAINTS A DEMONSTRABLY FALSE PICTURE OF THE RECORD AND IGNORES THE COURT'S AUTHORIZATION OF THE AMENDED REPORT ................................................................................................ 13

    A.    Contrary to XOOM's Claim, the Pre-Discovery 1.3¢ per kWh Adder Used to Support the Complaint Was Not a Proportionate Margin ......................... 13

    B.    Models One and Two Were Created in Response to Discovery Showing that Despite Promising a Rate "Based on" XOOM's "Supply Costs" XOOM Had No Formula for Its Rates and Instead Relied on Discretionary "Pricing Strategies" ...................................................... 15

    C.    None of XOOM's Attacks on Model Two at Summary Judgment and Class Certification Concerned Its Supposed Inconsistency with a Proportionate-Margin Construction ...................................................... 18

    D.    The Court Adopted Its Proportionate-Margin Construction and Expressly Found that Model Two Is "Entirely Consistent" with Plaintiff's Liability Theory ...................................................... 18

i

E.     Although XOOM Never Previously Claimed a Mismatch Between Model Two and the Court's Proportionate-Margin Construction, After Losing Its Rule 23(f) Appeal XOOM Looks at Model Two's Calculations and Claims a Disconnect ........................................................ 19

F.     Replacing Model Two's Placeholder Calculations Does Not Reveal a Fundamental Incompatibility with the Court's Proportionate-Margin Construction ........................................................................ 20

G.     XOOM Incorrectly Claims that the Amended Report's Methods A, B, and C Represent "Brand New Models" that Are "Untimely and Must Be Excluded" ...... 23

**ARGUMENT** ........................................................................................................ **26**

I.     THE COURT EXPRESSLY AUTHORIZED THE AMENDED REPORT SO IT IS NOT "UNTIMELY" OR OTHERWISE IMPROPER ...................................... 26

A.     Under Rule 26(a)(2)(D), the Amended Report Was Served "In the Sequence that the Court Orders" and Was Expressly Authorized as a Rule 23(e) Supplement ........................................................................ 26

B.     XOOM's Other Attacks on the Amended Report Are Similarly Meritless ............ 29

II.    THE AMENDED REPORT USES THE SAME SOUND DAMAGES METHODOLOGY AS THE ORIGINAL REPORT AND IS ADMISSIBLE ................. 38

III.   XOOM'S FIRST EXCLUSION MOTION IS MOOT AND IS BASED ON ARGUMENTS THE COURT ALREADY REJECTED AT DECERTIFICATION ................................................................................ 52

A.     XOOM's Claim That Model Two's Calculations Were Never Updated Is Demonstrably False and the Court Made Clear in Its Decertification Denial that XOOM's Complaints about Supply Cost Inputs Raise Jury Issues ........................................................................................ 53

B.     The Court Has Already Evaluated and Rejected XOOM's Claim that *Martinez* Requires the Original Report's Exclusion .................................. 54

C.     The Rule 702 Arguments XOOM Advances Regarding Model Two Are Easily Rebutted, Mostly Because the Court Has Already Done so at Decertification ........................................................................ 55

D.     XOOM's Unsupported Catchall Argument to Exclude the Remainder of Plaintiff's Expert's Original Report Should Be Rejected ..................................... 57

**CONCLUSION** ........................................................................................................ **60**

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Adelphia Recovery Trust v. Goldman, Sachs & Co.*,
  748 F.3d 110 (2d Cir. 2014) ................................................................. 31

*Alan L. Frank Law Assocs., P.C. v. OOO Rm Invest*,
  No. 17 Civ. 1338 (NGG) (ARL), 2021 WL 1906468 (E.D.N.Y. May 12, 2021) ............. 40, 60

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ........................................................... *passim*

*Anthem, Inc. v. Express Scripts, Inc.*,
  660 F. Supp. 3d 169 (S.D.N.Y. 2023) ................................................... 27

*AU New Haven, LLC v. YKK Corp.*,
  No. 15 Civ. 3411 (GHW) (SN), 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) ..................... 59

*Bayer Healthcare LLC v. Baxalta Inc.*,
  989 F.3d 964 (Fed. Cir. 2021) ........................................................... 24, 36

*Canales v. United States*,
  No. 19 Civ. 834 (EK) (RLM), 2021 WL 5830765 (E.D.N.Y. Dec. 8, 2021) ........................ 29

*Chapman v. ChoiceCare Long Island Term Disability Plan*,
  288 F.3d 506 (2d Cir. 2002) ........................................................... 37

*Citizens Bank of Maryland v. Strumpf*,
  516 U.S. 16 (1995) ......................................................................... 47

*City of Almaty, Kazakhstan v. Ablyazov*,
  No. 15 Civ. 5345 (AJN), 2021 WL 5154110 (S.D.N.Y. Nov. 5, 2021) ................................ 58

*Coene v. 3M Co.*,
  303 F.R.D. 32 (W.D.N.Y. 2014) ......................................................... 29

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ................................................................. 39, 40, 41

*DeRosa v. Nat'l Envelope Corp.*,
  595 F.2d 99 (2d Cir. 2010) ........................................................... 30

*Deutsch v. Novartis Pharms. Corp.*,
  768 F. Supp. 2d 420 (E.D.N.Y. 2011) ................................................... 41

*Durham v. SMI Indus. Corp.*,
  882 F.2d 881 (4th Cir. 1989) ........................................................... 47

*Est. of Jackson by Jackson v. Cnty. of Suffolk*,
    No. 12 Civ. 1455, 2019 WL 1676000 (E.D.N.Y. Apr. 17, 2019)............................................ 29

*Guardino v. Alutiiq Diversified Servs., LLC*,
    457 F. Supp. 3d 158 (N.D.N.Y. 2020) ............................................................................ 39, 40

*Hamza v. Saks Fifth Ave., Inc.*,
    07 Civ. 5974 (FPS), 2011 WL 6187078 (S.D.N.Y. Dec. 5, 2011) .......................................... 60

*Harewood v. APL Ltd.*,
    No. 14 Civ. 1668 (ARR) (VMS), 2015 WL 12591648 (E.D.N.Y. Aug. 24, 2015)................. 31

*Hickory Sec. Ltd. v. Republic of Argentina*,
    493 F. App'x 156 (2d Cir. 2012) ........................................................................................ 48

*Hines v. BMG Rts. Mgmt. (US) LLC*,
    No. 20 Civ. 3535 (JPO), 2023 WL 6214264 (S.D.N.Y. Sept. 25, 2023)........................... 29, 38

*In re Battery Kings Mfr. Co., Inc.*,
    83 S.E.2d 490 (N.C. 1954).................................................................................................. 47

*In re Lehman Bros. Holdings Inc.*,
    404 B.R. 752 (Bankr. S.D.N.Y. 2009)................................................................................ 47

*In re Mirena IUD Prod. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................................................................... 39

*Int'l Bus. Machines Corp. v. BGC Partners, Inc.*,
    No. 10 Civ. 128 (PAC), 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ................................ 60

*Intellivision v. Microsoft Corp.*,
    484 F. App'x 616 (2d Cir. 2012) (summary order) ............................................................ 31

*Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*,
    645 F. Supp. 3d 95 (E.D.N.Y. 2022) ...................................................................... *passim*

*Jedrejcic v. Croatian Olympic Comm.*,
    190 F.R.D. 60 (E.D.N.Y. 1999)........................................................................................ 30

*Katt v. City of N.Y.*,
    151 F. Supp. 2d 313 (S.D.N.Y. 2001) ............................................................................... 60

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)........................................................................................................... 39

*Lewis v. FMC Corp.*,
    786 F. Supp. 2d 690 (W.D.N.Y. 2011) ......................................................................... 29, 38

*Lidle v. Cirrus Design Corp.*,
  No. 08 Civ. 1253 BSJ/HBP, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) ........................... 29

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
  97 F. Supp. 3d 485 (S.D.N.Y. 2015) ................................................................ 58, 59

*Makinen v. City of New York*,
  53 F. Supp. 3d 676, 697 (S.D.N.Y. 2014) ............................................................ 41

*Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*,
  156 F.3d 131 (2d Cir. 1998) ........................................................................ 47

*Mannoia v. Farrow*,
  476 F.3d 453 (7th Cir. 2007) .................................................................. 29, 38

*New Hampshire v. Maine*,
  532 U.S. 732 (2001) ................................................................................ 31

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
  2020 WL 13547723 (S.D.N.Y, Mar. 20, 2020) .................................................. 45, 48

*Resolution Trust Corp. v. Gregor*,
  872 F. Supp. 1140 (E.D.N.Y. 1994) ................................................................ 30

*Seijas v. Republic of Argentina*,
  606 F.3d 53 (2d Cir. 2010) ........................................................................ 48

*Sharpe v. United States*,
  230 F.R.D. 452 (E.D. Va. 2005) ................................................................. 29, 38

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*,
  118 F.3d 955 (2d Cir. 1997) ...................................................................... 29

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  749 F. Supp. 2d 130 (S.D.N.Y. 2010) .............................................................. 54

*Tewksbury v. Dowling*,
  169 F. Supp. 2d 103 (E.D.N.Y. 2001) .............................................................. 54

*Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*,
  2016 WL 958640 (S.D.N.Y. Mar. 8, 2016) .......................................................... 47

*Troitino v. Goodman*,
  225 N.C. 406 (1945) ................................................................................ 48

*U.S. v. Dantzler*,
  771 F.3d 137 (2d Cir. 2014) ...................................................................... 37

*United States v. Mack*,
   No. 13 Cr. 54, 2014 WL 7404763, at *2 (D. Conn. Nov. 7, 2014) .......................................... 41

*Vazquez v. City of New York*,
   No. 10 Civ. 6277 (JMF), 2014 WL 4388497 (S.D.N.Y. Sept. 5, 2014) ................................... 60

*Westinghouse Credit Corp. v. D'Urso*,
   278 F.3d 138 (2d Cir. 2002) ....................................................................................... 47

## <u>Rules</u>

Fed. R. Civ. P. 23 ............................................................................................. 6, 26

Fed. R. Civ. P. 26 ............................................................................................. *passim*

Fed. R. Civ. P. 37 ............................................................................................. 36, 38

Fed. R. Evid. 702 ............................................................................................. *passim*

## INTRODUCTION

This combined opposition brief responds to XOOM's two separate motions to exclude Plaintiff's expert's testimony.  XOOM's briefs span 55 pages yet they rest on a handful of specious claims.  These include XOOM's main premise that "there has been a mismatch between Plaintiff's legal theory and her expert's opinions since their original report was served in October 2022."  XOOM made this exact argument at decertification, which the Court expressly rejected in its June 20, 2024 ruling reaffirming class certification.  Left without a foundation, most of XOOM's remaining admissibility arguments cannot stand on their own.

Another of XOOM's core claims is that Plaintiff's amended expert report "completely abandons" the original report's opinions and "algorithms" in an effort to "remedy" the mismatch Plaintiff belatedly saw once she realized XOOM's "decertification arguments are correct and insurmountable."  But XOOM's decertification arguments were rejected, and the supposed changes are either not differences at all or were raised in Plaintiff's application to serve an amended report.  For example, XOOM's primary attack on the amended report is that it uses a new "algorithm."  As Plaintiff's expert explains, however, the different "algorithm" XOOM critiques is simply a different way of expressing the exact same thing.

The other "differences" XOOM highlights stem from this Court's contract construction in August 2023 and the Second Circuit's guidance in December 2023, neither of which was available when the initial report was submitted in October 2022.  In seeking leave to submit an amended report, Plaintiff cited that change in circumstances which justified serving an amended report.  In XOOM's 55 pages of briefing, it never seriously addresses that reality.

Next, XOOM falsely claims that the amended report was "untimely."  Yet XOOM's 30-page motion to exclude this allegedly "untimely" report does not once mention the Court's April 15, 2024 Order granting Plaintiff's application to serve an amended report.  Again, XOOM

just ignores the facts.  Similarly, the Court's April 15 authorization of the amended report moots XOOM's separate motion to exclude the "timely" original report.  XOOM admits that motion is premised on the false claim that the amended report is "undeniably late" and "will be excluded."

As a fallback, XOOM claims prejudice from the amended report because it was somehow prevented from taking additional expert discovery.  The record disproves that claim as well. XOOM rejected plaintiff's offer to reopen discovery and instead placed all its chips on a bet that the Court would not authorize an amended report.  XOOM's waiver of its right to reopen discovery stems from its own tactical decision, and the Court should not grant XOOM a do-over.

Finally, XOOM peppers its two briefs with a host of garden-variety criticisms of Plaintiff's expert and claims this hair-splitting is fatal.  Yet XOOM's cavils go to weight, not admissibility. Plaintiff's theory of damages is unchanged and XOOM should save its critiques for trial.  Both of XOOM's motions should be denied in full.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   PLAINTIFF PROMPTLY AND TIMELY MOVED TO SERVE AN AMENDED AND SUPPLEMENTED EXPERT REPORT, WHICH THE COURT THEN AUTHORIZED

On April 1, 2024, Plaintiff submitted a pre-motion application to serve an amended and supplemented expert report.  ECF 187.  The application was clear that "the amendment results from events that transpired *after* expert discovery closed."  *Id.* at 1 (emphasis in original).  The application then listed the three recent events the amended report would account for: "(1) XOOM's March 1[, 2024] production of three years of key data, (2) Judge Ross's August 2023 construction (for the first time) of the contract term at the center of this breach of contract case, and (3) the Second Circuit's December 2023 pronouncement that XOOM's contract affords no price-setting

discretion." *Id.* All of these transpired after the October 3, 2022 Original Report was issued.[1] The application was clear that "[t]hese developments all necessarily affect Plaintiff's expert's analysis," and "[o]nly now (a month after XOOM's substantial data production) is Plaintiff's expert fully able to conform his report to account for these post-discovery events." *Id.*

XOOM strongly opposed Plaintiff's application, claiming it was "a belated, blank-check overhaul" that "would severely prejudice XOOM and cause significant delay." *Id.* at 5. XOOM claimed the amendment was "meant to cure XOOM's leading argument for decertification: her damage models are inconsistent with Judge Ross's contract construction." *Id.* at 4. XOOM further argued "[t]hat is a reason to grant XOOM's Motion to Decertify—not a reason to allow amended opinions." *Id.* XOOM asked that Plaintiff's request to serve an amended and supplemented expert report "be summarily denied." *Id.* at 7.

On April 15, 2024, the Court overruled XOOM's objections and expressly permitted Plaintiff to serve an amended and supplemented expert report. The Court's Order stated that it had "reviewed the parties' letters concerning plaintiff's anticipated supplemental expert report and associated deadlines, and has determined that a conference is not necessary." *Id.* The Court set May 10, 2024 as the deadline for the parties to file the Joint Pretrial Order and also ordered that "any supplementation or amendment of information included in plaintiff's expert report must also be disclosed by May 10, 2024." *Id.* (citing Rule 26(e)(2)).

As it does now, prior to the Court's April 15 Order, XOOM complained about the timing of this amended report (the "Amended Report"). But as noted in Plaintiff's April 1 letter, serving an amended report prior to XOOM's voluminous March 1 data production was simply not feasible: after the Court construed XOOM's contract at summary judgment and then granted class

---

[1] The "Original Report" is the October 3, 2022, Expert Report of Derya Eryilmaz and Seabron Adamson, ECF 147-3.

certification two weeks later, XOOM immediately sought to delay this case by seeking a Rule 23(f) interlocutory appeal of the Court's class certification order, filing a related stay motion, and then a decertification motion once its appeal was denied.  ECF 187 at 1.

In fact, during this same period, Plaintiff was pressing XOOM to supplement its data production.  Specifically, on September 1, 2023, the day after the Court certified the Class, Class Counsel asked XOOM to update its production, with follow up requests on September 11, 18, 21, and 22 followed by a motion to compel production of this data on September 29.  ECF 157.   On October 3, XOOM responded to this motion and said: "Let's supplement efficiently—one time and closer to trial."  ECF 158.  XOOM offered to provide a supplemental data production *five* months later by March 1.  *Id.* at 1.  XOOM justified the lengthy wait because "trial cannot proceed at least until the months-long class notice plan Plaintiff proposed is completed," and waiting would "balance[] trial preparation needs with the burdens of serial productions."  *Id.*  On October 11, 2023, the parties agreed that XOOM would make a single data production "by no later than March 1, 2024."  ECF 159.[2]  On this record, XOOM has no grounds to complain that the an amended report was submitted after XOOM produced the data needed for that amendment.

Moreover, between the parties' October 11 agreement and the actual March 1 production date, the parties engaged in the extensive work occasioned by XOOM's efforts to grind this case to a halt.  On October 17, Judge Reyes held a conference on XOOM's stay motion (Oct. 17, 2023, Minute Entry), and the parties spent November 2023 briefing that motion, which briefing was completed on December 4, 2023 (ECF 163, 165–173).  The next day, the Second Circuit denied XOOM's request for an interlocutory appeal of the Court's class certification order.  ECF 174.  Class notice was then finalized and issued, and the notice period ended in late February.  ECF 182.

---

[2] XOOM would only agree to produce updated data covering up to January 1, 2024.  *Id.*

On January 11, 2024, the parties wrote Judge Marutollo[3] regarding their disagreement as to the timing of pre-trial preparation, with XOOM taking the position that "no pretrial order deadline exists because the case is not yet proceeding to trial, as no trial date has been set and substantive [undisclosed] motion practice remains outstanding." *See* ECF 177.  At the ensuing January 19 telephonic conference, defense counsel admitted that though "not detailed" in the parties' January 11 letter, XOOM intended to file two motions: a motion to strike Plaintiff's expert and a decertification motion—which, again, was coming just one month after XOOM had lost its appeal of the exact same class certification Order.  ECF 179, Jan. 19 Hr'g Tr.

At that same conference Judge Marutollo also set the deadline for the joint pre-trial order and scheduled a March 21 settlement conference.  January 19, 2024 Electronic Order.  The parties thereafter began the resource-intensive work of simultaneously briefing XOOM's decertification motion, readying the pre-trial order, and preparing for the March 21 settlement conference.  ECF 181.  On March 1, XOOM finally produced updated Class data, which Plaintiff's expert analyzed for use at the March 21 settlement conference.  ECF 184.

Then, on March 26, Plaintiff informed XOOM of her intention to serve the Amended Report—a mere five days after the unsuccessful mediation.  After XOOM objected, Plaintiff submitted her application to serve an amended and supplemented expert report on April 1.  ECF 187.  As Plaintiff's application made clear, Plaintiff sought to serve a single amended expert report, as "the alternative of submitting successive updated reports to account for Judge Ross's contract construction (August), the Second Circuit's ruling (December) and the data production (March) makes no sense for the parties or the Court."  *Id.* at 1.  "Notably, efficiency was XOOM's grounds for withholding the data production until March 1."  *Id.*  On April 15, 2024, the Court

---

[3] On November 9, 2023, this case was reassigned from then-Magistrate Judge Reyes (who had overseen it since 2018) to Magistrate Judge Marutollo.  Nov. 9, 2023, Electronic Entry.

expressly authorized Plaintiff to serve an amended report by May 10.  The Amended Expert Report of Seabron Adamson dated May 10, 2024 was timely served.  *See* ECF 229-5.[4]

## II.   IN OCTOBER 2022, PLAINTIFF'S EXPERT OFFERED ALTERNATIVE MODELS THAT COULD EXPRESSLY BE UPDATED ONCE THE COURT WEIGHED IN ON THE LEGAL OPERATION OF XOOM'S VAGUE CONTRACT

XOOM falsely claims the Amended Report is "untimely."  ECF 229, Mem. of Law in Supp. of XOOM's Mot. to Exclude Pl.'s Untimely Expert Disclosures ("Defs.' 2nd Br.").  XOOM appreciates that the record does not support its claim, so it instead paints a complicated—and highly inaccurate—factual background.  Defs.' 2nd Br. at 2–7.  The record shows the simple truth.

### A.   Model Two Is a Proportionate Margin Model and Plaintiff's Expert Made Clear Both in His Original Report and Deposition that the Margin Input in His Report Would Need to Be Supplied by the Judge or Jury

XOOM contracted with Class Members to charge variable rates "based on" XOOM's "actual and estimated supply costs."  As the Court found, the term "based on" is "vague because it is not clear what effect the phrase has on the legal operation of the contract."  MSJ Order at 10.

However, discovery (including expert discovery) had been completed more than seven months earlier in November 2022.  ECF 115-1.  That discovery showed—and XOOM admitted— that it set New York variable rates based on its "pricing strategies," which in turn yielded excessive and fluctuating margins over the supply cost tabulations documented in XOOM's rate-setting workbooks.  *See, e.g.*, Original Report ¶ 52 (the "rate-setting workbooks that XOOM created show that the rates charged are not based on any observable calculations, but rather are arbitrarily selected by XOOM personnel during XOOM's rate-setting meetings.").  Plaintiff's expert analyzed these pricing practices and the resulting rates and found no meaningful relationship to XOOM's documented supply costs.  *Id.* ¶¶ 23(e)–(f).

---

[4] Dr. Eryilmaz, who contributed to the Original Report, is no longer employed by Charles River Associates and therefore did not participate in the preparation of the Amended Report.

Nevertheless, because XOOM's contract was unclear, the October 2022 Original Report offered two theories of damages. "Model One" measured the delta between XOOM's rates and its documented total supply costs in its rate-setting workbooks. *Id.* ¶ 64.[5] Model One was based on a reading of XOOM's contract that did not permit a margin over supply costs. *Id.* ¶ 73. Alternatively, "if the Court or a jury were to find otherwise," Plaintiff's expert offered an "alternative model [that] allows XOOM a margin." *Id.* The alternative is "Model Two." *Id.*

To demonstrate that "XOOM's margins on fixed rate contracts were generally substantially smaller than the corresponding variable rate contracts" Plaintiff's expert prepared Table 1 in the Original Report which contrasted XOOM's annual average variable and fixed rate margins over a six-year period. *Id.* ¶ 75. Using these averages, the Original Report proposed Model Two, which makes clear that "[b]y allowing XOOM a margin equivalent to its fixed rate margins – averaging approximately 19% – our damage model anticipates a potential argument by XOOM that it was permitted to include a margin." *Id.* ¶ 76. The expert continued that "[g]iven these facts, the margin on variable rate contracts should not be higher than the margin on the corresponding fixed rate contracts **on average**," and that "XOOM has no legitimate explanation for why it would charge" variable rate customers much higher margins (including multiple years of "double" those margins) than fixed rate customers. *Id.* (emphasis added).

As the Court has now twice found, Model Two is a proportionate-margin model. *See* ECF 246, Decert. Denial Order, at 12 ("Plaintiff's model calculates damages by comparing what XOOM charged to its actual and estimated supply costs—reflected in the Total Cost figure in

---

[5] These methods for calculating damages are referred to in the Original Report as "Method 1" and "Method 2," but for the Court's convenience this brief uses the "Model" nomenclature used in XOOM's briefing.

XOOM's rate-setting workbooks—plus a reasonable and proportionate margin.") (citing Original Report ¶¶ 73, 76); *see also id.* at 4 (same, citing Class Order at 9); *id.* at 13–14 (same).

While Model Two used a placeholder to calculate damages using "XOOM's self-reported margins on fixed rate contracts for the same product by region and month as provided" in XOOM's own materials, the Original Report made clear that "[i]f the Court or factfinder determines that a different margin was appropriate here (e.g., 10%), Model Two's calculations could be "easily" updated "to reflect a different margin assumption." *Id.* ¶ 73. "Contrary to XOOM's suggestion, plaintiff's model does not assume that variable-rate margins should be the same as XOOM's fixed-rate margins," rather, "plaintiff's experts were clear that the fixed-rate margin is a placeholder that can be easily updated to accommodate any margin the jury deems appropriate." Decert. Denial Order at 13 (citing Original Report ¶ 73 & n. 51) (cleaned up)).

When XOOM took Mr. Adamson's deposition, it heard the same story. ECF 226-4, Transcript of Deposition of Seabron Adamson, dated November 8, 2022 ("Adamson Tr."). During his deposition, Mr. Adamson again reiterated that whether and to what extent XOOM's contract permits a margin is a question of law the judge or jury "has to opine on." *Id.* at 32:3–6; *see also id.* at 94:17:21 ("[A]s we saw in the report, if the Court were to find [the contract] should be interpreted to mean having a margin, we produced the second model," but that is "for the Court, in my mind, to determine."). If the Court did find that a margin was permitted, and consistent with the Original Report, Plaintiff's expert testified that it would be commercially unreasonable for XOOM to charge a higher margin for variable rates than for fixed rates. *Id.* at 98:13–23.

**B.   In Later Briefing, XOOM Agreed that Plaintiff's Expert Could Not Make the Legal Determination of an Appropriate Margin and Attacked the Report on Different Grounds**

On December 16, 2022, Plaintiff moved for class certification, again noting that under Model Two, "Mr. Adamson can readily update this model" to account for different margins and

can "generate damages for each Class Member using the same data and without individualized inquiries, including updating the second model" to account for a different margin.  ECF 132 at 22. On December 23, 2022, XOOM filed its pre-motion application for its summary judgment motion, acknowledging that Plaintiff's expert "cannot offer an opinion on contract interpretation." ECF 118 at 3.  On February 3, 2023, XOOM opposed class certification, arguing that Plaintiff's model "does not match their liability theory, attacking Model Two for allegedly "ignor[ing] the fundamental differences between fixed-rate and variable-rate products" and claiming that allowing XOOM any margin was a concession that XOOM's rates only need be correlated with its supply costs.  ECF 139, XOOM's Class Cert. Opp'n ("Class Opp'n"), at 26.  None of XOOM's attacks on Model Two had anything to do with a proportionate-margin theory.

On March 8, 2023, XOOM moved for summary judgment, and labeled Plaintiff's two damages models the "no-margin" model (Model One) and the "capped-margin" model (Model Two), claiming the latter model "has no foundation in the Contract," that the Second Circuit's opinion in *Richards* barred this model because "jurors are constrained by law, and not permitted to invent absent contract terms out of thin air," and because "the phrase 'based on XOOM's actual and estimated supply costs' cannot be reasonably construed to cap XOOM's variable-rate margins at any level[.]"  ECF 145-1, Defs.' MSJ Br. ("MSJ Br.") at 3, 9, 18.

Instead, XOOM's proposed contract construction was that "so long as supply costs are the 'foundation' and the 'fundamental part'" of the variable rate, "***how*** rates were set is irrelevant," though XOOM conceded that a rate 10 times its supply costs would be excessive.  ECF 149, Defs.' MSJ Reply Br. at 6–7, 19 ("MSJ Reply") (emphasis in original); *see also id.* at 16 ("the Contract cannot be reasonably construed to prohibit ***all*** pricing strategies, because several strategies are expressly disclosed—including the one that XOOM employed when it set rates that were *based on*

9

its supply costs.") (emphasis in original).  XOOM even claimed that "*it does not matter* what strategies, formulas, or directives it used" to set Class rates.  *Id.* at 17 (emphasis added).  XOOM also pointed to a completely unrelated section of its contract that it had not relied on to justify its rates in *five years* of prior litigation, claiming that a section called "Agency" allowed it to add a potpourri of additional and unspecified markups to its supply costs.  MSJ Br. at 3, 9, 18.

In response, Plaintiff's April 14, 2023, opposition brief argued that XOOM's agreement to charge variable rates "based on" its supply costs was "ambiguous." 147, Pl.'s MSJ Opp'n ("MSJ Opp'n") at 28–32.  To discern the contract's meaning, Plaintiff offered two alternative constructions.  *Id.* at 33.  Under the first reading, XOOM's variable rates should be virtually equal to or at minimum very close to XOOM's supply costs.  Under the second reading, XOOM's rates should be "set in direct proportion to XOOM's supply costs."  *Id.*

## III.   IN AUGUST 2023, THE COURT CONSTRUED XOOM'S CONTRACT AT SUMMARY JUDGMENT AND AUTHORIZED A COST-PLUS DAMAGES "ALGORITHM" AT CLASS CERTIFICATION, AFTER WHICH THE SECOND CIRCUIT WEIGHED IN ON XOOM'S CONTRACT AND XOOM FINALLY UPDATED ITS DATA PRODUCTION

At summary judgment the Court found the term "based on" to be "vague" (not ambiguous) and found the latter of Plaintiff's readings to be the most compelling.  MSJ Order at 9–15.  The Court dubbed this the "proportionate-margin construction."  *Id.* at 13.  The Court's summary judgment ruling also determined that any proportionate margin must be objectively "reasonable" and set in "good faith."  *Id.* at 12–14; *see also* Class Order at 3, 14.  In the Court's class certification Order issued just two weeks later, the Court rejected XOOM's criticism that Model Two "arbitrarily incorporates the margin charged on XOOM's fixed rate product," found that it was a proportionate-margin model, and that XOOM did not argue that the damages model itself was faulty, because "any measure of damages in this case would undoubtedly be based on the rate,

cost, and margin." Class Order at 13–15. Finally, the Court noted that XOOM disputed whether Plaintiff could supply the necessary inputs for Model Two ("namely the supply costs and margin"), but that those were issues for trial. *Id.* at 14; *see also* Decert. Denial Order at 5 ("XOOM did not argue that plaintiff's damages model itself was faulty; rather, XOOM disputed whether plaintiff could supply the necessary inputs for the model, namely actual and estimated the supply costs and margin—which, again, I determined were issues for the factfinder to resolve.") (citing Class Order at 13–14 and MSJ Order at 13–14, 16–17).

These rulings articulated specific constraints on XOOM's rate-setting practices and identified the specific model-related issues the jury would resolve. These rulings plainly required Plaintiff to update her expert's analysis to conform it to the Court's contract construction, just as Plaintiff and her expert had anticipated would be necessary if such a construction were adopted by the Court. This is why, as discussed above, on September 1, 2023, the day after the Court certified the Class, Class Counsel began pressing XOOM for an updated data production. ECF 157.[6] As also noted above, on October 11, 2023, the parties agreed XOOM would update the data "by no later than March 1, 2024" (ECF 159) and then turned to XOOM's class certification appeal and related stay motion.

Then, in the middle of briefing those motions, in December 2023, the Second Circuit made a key pronouncement about ESCO contracts. Specifically, the Second Circuit made clear that a "dispositive question" in ESCO contract cases is whether the ESCO has rate-setting discretion. *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 410–11 (2d Cir. 2023). The Second Circuit then observed that XOOM's contract here did not give it any discretion whatsoever to use any

---

[6] The Court need not take Plaintiff at her word, as XOOM even filed Class Counsel's September 1 email requesting this data on the docket (ECF 158-5 at 19), as well as Class Counsel's follow up emails of September 11 (at 12), 18 (at 9), 21 (at 9), and 22 (at 5).

subjective process or factors to set monthly variable rates. *Id.* This too affected Plaintiff's expert's analysis.

Finally, on March 1, 2024, XOOM provided the long-awaited data update. All of these developments transpired after the Original Report was finalized in October 2022. In fact, the only events that took place between March 1 and Plaintiff's April 1 application to serve an amended expert report, were XOOM's March 1 service of its failed decertification motion (ECF 194), and the parties' preparation for the March 21 settlement conference. Indeed, on February 9, 2024, XOOM wrote to Judge Marutollo and requested that he adjourn the March 21 settlement conference because of the "limited time between the March 1 production date and the current schedule make it infeasible to comply with the Court's settlement protocol or engage in meaningful settlement discussions." ECF 181. Judge Marutollo denied this request, although the parties were given until March 19 to submit their *ex parte* settlement letters to the Court. Feb. 9, 2024, Electronic Order.

Plaintiff then sought XOOM's consent to serve her amended report, but XOOM refused and forced Plaintiff to make an application. ECF 187. XOOM vigorously objected and took an all-or-nothing approach, insisting that Plaintiff be barred from serving an amended report. *Id.* The Court disagreed and the Amended Report was timely served as directed.

Now, regretting its unsuccessful hardline approach, XOOM seeks a do-over. XOOM's motion to exclude the Amended Report pretends that the report was never authorized (and thus should be excluded). Based on this fiction, XOOM paints a false picture of six years of litigation in support of its same arguments for why Plaintiff should not be given leave to amend. In other words, XOOM is asking that the Court reconsider and reverse its April 15, 2024 authorization of an amended report. As an alternative, XOOM claims it has found sufficient flaws in the report to

warrant the discovery Plaintiff previously offered but XOOM rejected.  As set forth below, each of XOOM's claims about the record prior to the Amended Report are demonstrably false, its criticisms of the Amended Report are hollow, and its right to take additional discovery was waived months ago.

## IV.   IN AN EFFORT TO LABEL THE REPORT UNTIMELY, XOOM PAINTS A DEMONSTRABLY FALSE PICTURE OF THE RECORD AND IGNORES THE COURT'S AUTHORIZATION OF THE AMENDED REPORT

### A. Contrary to XOOM's Claim, the Pre-Discovery 1.3¢ per kWh Adder Used to Support the Complaint Was Not a Proportionate Margin
*(Responding to Defs.' 2nd Br. Point II.A at 2–3)*

From the start of this case, Plaintiff has consistently claimed that XOOM breached its promise to charge variable rates "based on" its supply costs.  *See, e.g.*, ECF 42, First. Am. Compl. ("FAC") ¶ 45 ("the rates XOOM charged Plaintiffs were not commensurate with XOOM's supply costs"), ¶ 56 ("XOOM's rate was consistently and substantially higher than the rate based on Defendants' supply costs"), ¶ 59 (XOOM breached the 2013 Contract because "consumers do not receive a price based on [] XOOM's actual and estimated supply costs"), ¶ 63 (variable rate "should have been based on XOOM's supply costs, which it was not").

Because XOOM's actual supply costs are not public, at the pleading stage Plaintiff engaged her expert Mr. Adamson to determine XOOM's supply costs under the (ultimately correct) assumption that XOOM, like both the utilities and other ESCOs, purchased energy supply on New York's wholesale energy markets.  This resulted in the pre-discovery proxy for XOOM's supply costs called the "Market Supply Cost."  *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 175–76 (2d Cir. 2019); FAC ¶ 54.  To illustrate the disconnect between XOOM's supply costs and its variable rates, the Market Supply Cost figure included a "substantial margin of 1.3¢ per kWh sold to cover retailer fixed costs."  *Id.* ¶ 55.  Plaintiff afforded XOOM this additional margin even though New York Public Service Commission's ("NYPSC") staff had already found that these fixed adders do

"not justify the significant overcharges levied on New York consumers." FAC ¶ 38. As an alternative proxy for the Market Supply Cost, Plaintiff also pointed to the local utility rate as a benchmark "indicator of XOOM's supply costs" to show that XOOM's rates were not "based on" its supply costs. FAC ¶¶ 60–61.

Seizing on this 1.3¢ per kWh figure, XOOM's brief begins its false "Factual & Procedural Background" with the patently untrue claim that because Plaintiff's expert used a "static 1.3¢ per kWh" margin for the six billing cycles analyzed in the Complaint, this was proof that Plaintiff's experts had already adopted "the proportionate margin theory when they developed the damage model attached to her Original Complaint." Defs.' 2nd Br. at 2–3; *see also id.* at 12 ("Plaintiff's Original Complaint disclosed her (and CRA's) case theory built around a static and proportionate margin" and claiming "[a]s a matter of judicial estoppel," Plaintiff cannot "argue that the proportionate-margin construction was not her theory all along"); *id.* at 13 (claiming Plaintiff "did not need to wait for a summary judgment opinion").

Yet a "static 1.3¢ per kWh" margin is not proportionate—by definition, it is fixed, as the word "static" clearly conveys. *See* ECF 42-3 (monthly Market Supply Cost calculations showing total monthly costs ranging from 8.30¢ to 12.03¢ per kWh with static 1.3¢ per kWh margin). As XOOM has recognized since the Court's contract construction at summary judgment, a proportionate margin has to be expressed in terms of a ***percentage*** of XOOM's supply costs. A "static 1.3¢ per kWh" charge is not a percentage. XOOM concedes that it understands this figure was developed "at the pleading stage without the benefit of XOOM's cost information" or discovery. Defs. 2nd Br at 2. Nonetheless, XOOM incorrectly claims that using a "static 1.3¢ per kWh" charge against fluctuating supply costs is somehow evidence that "the proportionate-margin construction was" Plaintiff's "theory all along" and thus her expert is somehow estopped from

14

revising his report to account for the Court's construction of XOOM's contract at summary judgment. *Id.* at 12.

For good measure, XOOM includes a throwaway claim that Plaintiff abandoned this theory and her expert thereafter "specifically refused to allow XOOM a proportionate margin." *Id.* at 4. To the contrary, the transcript of Mr. Adamson's deposition shows that the expert made clear that when it came to the question of a margin, the Court's or the jury's input was first required.[7]

**B.    Models One and Two Were Created in Response to Discovery Showing that Despite Promising a Rate "Based on" XOOM's "Supply Costs" XOOM Had No Formula for Its Rates and Instead Relied on Discretionary "Pricing Strategies"**
*(Responding to Defs.' 2nd Br. Point II.B at 3–4)*

XOOM admits that it employed a consistent rate-setting process, whereby it held monthly rate-setting meetings for "up to 20 markets and 1,000 different products," and to "provide relevant information in a way that would apply to all the products at a single meeting, XOOM's pricing team" created monthly rate-setting workbooks. Class Opp'n at 9–10. These workbooks contained XOOM's internal supply cost calculations, which XOOM disregarded.

XOOM did not have a rate-setting formula, or any formula at all showing how its rates were "based on" its supply costs. *See* ECF 147-20, Dep. Tr. of Jason Loehde, dated July 27, 2022 ("Loehde Tr.") 61:11–19 ("There was no specific formula [for rate setting]."); ECF 147-21, Dep. Tr. of Andrew Coppola, dated May 11, 2022 ("Coppola Tr.") 88:10–14 (no formula used to set rates). Instead, XOOM held "a discussion over how best we are positioning our rates on our products." Ex. 147-20, Loehde Tr. 61:11–19; ECF 147-21, Dep. Tr. of Ryan Park, dated July 22,

---

[7] XOOM also makes the curious claim (Defs.' 2nd Br. at 3-4, n.2) that had Plaintiff's expert continued to use an undisclosed "static" margin over XOOM's documented supply costs as well as the additional supposed undocumented supply costs XOOM is trying to credit to the ledger "XOOM is confident the results would show that Plaintiff and the class were not overcharged." It is telling that XOOM does not share its calculations.

2022 ("Park Tr.") 32:10–19 (the rate-setting process was "[a] presentation of information and a discussion").

The record also lacks any instruction or requirement from XOOM management that variable rates be based on supply costs. Quite the opposite: the Director of Product Management for XOOM's Supply Team Ryan Park and SVP of Energy Supply and Pricing Andrew Coppola were instructed to "***protect[] margins***" and that XOOM should "follow the competitor pricing pack (probably on the higher end)" in New York. ECF 147-23 at XOOM_MIRKIN_065820 (emphasis added). In fact, consistent with XOOM's middleman role, XOOM executives considered "margin" and "profit" to mean the same thing. *See* ECF 147-23, Coppola Tr. 143:5–7 ("Q: And gross margin means XOOM's gross profits for that period? A: Yes.").

Thus, as noted by the Court at summary judgment, "[s]everal pieces of evidence suggest that XOOM relied on pricing strategies or other considerations to determine the monthly variable rate in the New York market." MSJ Order at 17. "First, it appears that XOOM's rate-setting decisionmakers were primarily concerned with meeting revenue goals, and that rates were set accordingly." *Id.* (collecting record evidence). "Second, the record indicates that XOOM considered several factors besides supply costs when setting its monthly rates." *Id.* at 18 (collecting additional record evidence). Third, in 2016 XOOM amended its contract to state that its variable rates would be "based upon a number of factors" including "XOOM's pricing strategies." *Id.* "In the Rule 30(b)(6) deposition of XOOM, Loehde explained that XOOM's rate-setting process did not change between 2013 and 2016, and so 'the updated language is just

simply providing more accurate language to our customers.'" *Id.* "And Coppola confirmed that in 2013 XOOM customer rates were 'based in part' on XOOM's pricing strategies." *Id.*[8]

Although XOOM's contract is silent as to a margin, Model Two was developed "if the Court or a jury were to find" that XOOM could assess a margin. Original Report ¶ 73. As stated in the Original Report itself, even after affording XOOM a margin, its breach was clear because "XOOM added a margin to its variable customers' rates which is unrelated to its costs." *Id.* ¶ 74. In terms of how Model Two works, it is a proportionate-margin model. *See* Decert. Denial Order at 12 ("Plaintiff's model calculates damages by comparing what XOOM charged to its actual and estimated supply costs—reflected in the Total Cost figure in XOOM's rate-setting workbooks— plus a reasonable and proportionate margin.") (citing Original Report ¶¶ 73, 76); *see also id.* at 4 (same, citing Class Order at 9); *id.* at 13–14 (same).

The Original Report also made clear that Model Two could be "easily" updated "to reflect a different margin assumption" if "the Court or the factfinder determines that a different margin was appropriate here (e.g. 10%)." Original Report ¶ 73 & n.51. "Contrary to XOOM's suggestion, plaintiff's model does not assume that variable-rate margins should be the same as XOOM's fixed-rate margins;" rather, "plaintiff's experts were clear that the fixed-rate margin is a placeholder that can be easily updated to accommodate any margin the jury deems appropriate." Decert. Denial Order at 13 (citing Original Report ¶ 73 & n.51) (cleaned up)).

---

[8] Indeed, that XOOM's contract concealed XOOM's actual practices was part of an unsettling industry trend. For example, the NYPSC's staff found that the vague pricing terms in ESCO contracts represent "obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market," thus "resulting in the fattening of ESCOs' retained earnings." ECF 147-17, 2018 NYPSC Staff Brief at 87; *see also id.* at 86 ("ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and 'market based rate' mechanisms that customers are charged after the teaser rate expires."); *id.* at 41–42 ("the contract signed by the customer does not provide information on how that 'market rate' is calculated . . . .").

**C.    None of XOOM's Attacks on Model Two at Summary Judgment and Class Certification Concerned Its Supposed Inconsistency with a Proportionate-Margin Construction**
*(Responding to Defs.' 2nd Br. Point II.C at 4–5)*

At summary judgment and class certification XOOM argued that because its contract requires that variable rates be "based on" XOOM's supply costs, it can (i) assess whatever markup it wants, (ii) change the size of the markup whenever it wants, and (iii) explain its markup however it wants.  Given this position, XOOM assailed Model Two, but not because its calculations were supposedly inconsistent with a proportionate-margin construction.  XOOM's briefing here cites snippets from its filings on those motions, but even a cursory reading of XOOM's cited pages shows that its defense at that time claimed that its contract allowed discretionary pricing.  *See* Class Opp'n at 25–27 (attacking Model Two and claiming it agreed with XOOM's position); MSJ Br. at 22–26 (admitting that Plaintiff' expert "made no attempt to offer a legal interpretation of the Contract" and claiming that Model Two "rests on nothing at all."); MSJ Reply at 10–11 ("[T]he Mirkins' experts rightfully admit they are not offering a legal interpretation of the Contract at all."); ECF 149-1, Defs.' Resp. to Pl.'s L.R. 56.1 Statement ¶¶ 99–100, 110, 112 (claiming XOOM's contract is unambiguous).

**D.    The Court Adopted Its Proportionate-Margin Construction and Expressly Found that Model Two Is "Entirely Consistent" with Plaintiff's Liability Theory**
*(Responding to Defs.' 2nd Br. Point II.D at 5)*

XOOM next claims Plaintiff was "incorrect" to argue that Model Two "reflects" a proportionate-margin construction.  Defs.' 2nd Br. at 5.  The Court expressly disagreed.  Specifically, at class certification, the Court found this model "assumes that XOOM was allowed to charge its variable rate customers the same margin it charged its fixed-rate customers, an approximately 19% markup."  Class Order at 9.  The Court also noted that XOOM criticized Model Two for "arbitrarily" using XOOM's fixed rate margin.  *Id.* at 14 (citing Class Opp'n at 26).

The Court rejected XOOM's misalignment claim, finding that "the second model is entirely consistent with plaintiff's theory." *Id.* at 14. "Whether plaintiff's second model, which calculates damages based on rate, cost, and margin, is accurate depends on the accuracy of the inputs, namely the supply cost and margin." *Id.* "But XOOM does not dispute that the algorithm itself is faulty—any measure of damages in this case would undoubtedly be based on the rate, cost, and margin," and "Plaintiff has therefore proposed a damages model consistent with her theory of liability." *Id.*

### E. Although XOOM Never Previously Claimed a Mismatch Between Model Two and the Court's Proportionate-Margin Construction, After Losing Its Rule 23(f) Appeal XOOM Looks at Model Two's Calculations and Claims a Disconnect
*(Responding to Defs.' 2nd Br. Points II.E–F at 5–6)*

XOOM immediately appealed the Court's class certification Order, largely repackaging arguments it had already made.  ECF 153-1, Defs.' 23(f) Pet.  Yet now, with two lengthy and unanalyzed string cites, XOOM falsely claims that that "[s]ince the Class Order, XOOM has repeatedly argued that Model Two cannot measure damages under the proportionate-margin interpretation of the contract" and that "Plaintiff's refusal to acknowledge Model Two's flaws has kept this case moving toward trial."  Defs.' 2nd Br. at 6.

XOOM's cited but unanalyzed filings tell a markedly different story.  For example, XOOM's Rule 23(f) appeal readily admits that in Model Two Plaintiff's expert "used an average of XOOM's fixed-rate margins *as a placeholder* until the [factfinder] decides what the class members' margin should have been." *Id.* at 17 (emphasis added).  Likewise, when XOOM moved for a stay, XOOM said Model Two was a "damage model that includes a single *illustrative* margin: the *average* of what her expert calculated XOOM's *fluctuating* fixed-rate residential electricity margins to be."  ECF 167, Defs.' Stay Memo at 11 (emphasis in original).

Similarly, at the January 19 conference XOOM never claimed a disconnect between a proportionate-margin liability theory and Model Two.  Instead, XOOM recycled its false claim

that Plaintiff's expert should be excluded because he "can't provide an opinion on what a reasonable and proportionate margin is" because he did not give an opinion "more broadly about in the industry what a reasonable and proportionate [margin] is."  ECF 179, Jan. 19 Hr'g Tr. 6:7–17.  For XOOM's decertification motion, defense counsel cited two arguments: "[f]irst is the one I just described, which is that there's no evidence of what a reasonable and proportionate margin is," because "[t]he experts have said that they can't provide that."  *Id.* at 6:20-23. "The second is that there's no common proof about how the actual supply costs including prior period adjustments, which are two factors the Court has said go into the rate."  *Id.* at 6:24–7:2

It was not until more than two months after the Second Circuit denied XOOM's Rule 23(f) appeal—and nearly six months after the Court's summary judgment order—that XOOM began claiming there was some sort of mismatch between Model Two and the Court's proportionate-margin construction.  In its February 6, 2024 letter to the Court, XOOM claimed for the first time that the expert's use of XOOM's contemporaneous fixed rate margins as a placeholder was inconsistent with Plaintiff's liability theory, and that this somehow required decertification.  ECF 108 at 3.  Yet as detailed below, XOOM's complaints about placeholder calculations do not reveal a mismatch between ***theories*** of liability and damages.

**F.    Replacing Model Two's Placeholder Calculations Does Not Reveal a Fundamental Incompatibility with the Court's Proportionate-Margin Construction**
*(Further Responding to Defs.' 2nd Br. Points II.E–G at 5–6)*

XOOM faults Model Two's ***calculations*** (not the model itself) because the October 2022 Original Report—written nearly a year ***before*** the Court's proportionate-margin construction—measured damages by using XOOM's corresponding (rather than average) contemporaneous fixed rate margins.   XOOM's argument is not only meritless, but it was also available at class

certification.  Moreover, XOOM's complaint assumes the Court had forgotten about its summary judgment order when, two weeks later, it granted class certification.  That is not plausible.

Model Two is not mismatched with Plaintiff's liability theory or the Court's proportionate-margin construction.  As the Court has now twice ruled, XOOM's criticism raises a trial issue, not an aspect of the model's logic (incorporating a reasonable margin over XOOM's supply costs) that the Court specifically evaluated and authorized at class certification.  Class Order at 14; *see also* Decert. Denial Order at 5 (citing Class Order at 13–14 and MSJ Order at 13–14, 16–17).

XOOM next claims that "after seeing XOOM's decertification motion in March, Plaintiff realized that her short-term tactical victories would ultimately lead to defeat" and that "the only question was how long Plaintiff would delay admitting it."  Defs.' 2nd Br. at 6.  "The answer: until it was too late."  *Id.* at 7.  XOOM's hyperbole is again disproven by the record.

First, XOOM did not serve its decertification motion until March 1, 2024—the same day XOOM updated its Class data production.  ECF 197.  Second, XOOM again ignores the fact that the Amended Report was expressly authorized by the Court on April 15, 2024.  Third, the Court has twice rejected XOOM's misalignment claim.

Fourth, XOOM is simply incorrect that removing Model Two's placeholder following the Court's contract construction at summary judgment suggests that Plaintiff's ***theories*** of damages and liability were ever misaligned.  From the outset, the Original Report made clear that Model Two "allows XOOM a margin over Total Cost that equates to the fixed rate margin applied to its fixed rate customers."  Original Report ¶ 73 (emphasis added).  XOOM latches on to the fact that the report's next sentence states "[t]o ***calculate*** the damages" the experts used the "self-reported margins on fixed rate contract by region and month," but that same sentence makes clear that  those calculations are a placeholder and that "[i]f the Court or factfinder determines that a different

margin was appropriate here (e.g., 10%) we would easily be able to update our calculations to reflect a different margin assumption." *Id.*; *see also* Decert. Denial Order at 8 (Model Two calculates damages "by looking at XOOM's actual and estimated supply costs (reflected in the Total Cost), plus a reasonable and proportionate margin (using XOOM's fixed-rate margin as a placeholder).") (citing Original Report ¶¶ 73, 76).

Model Two's theory is unchanged and its arithmetic can easily be updated to incorporate the margin determined at trial, which the Court's certification order recognized by finding Plaintiff's second model "entirely consistent with plaintiff's theory" and noting that "[c]alculations need not be exact . . . ." Class Order at 14 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)); *see also* Decert. Denial Order at 13 ("plaintiff's experts were clear that the fixed-rate margin is a placeholder that can be easily updated to accommodate any margin the jury deems appropriate.") citing Original Report ¶ 73 & n. 51) (cleaned up)).

Finally, even if re-tooling Model Two's math to replace a placeholder margin could be considered a flaw (it cannot), it is well settled that "'[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. . . . The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (cleaned up).[9]

---

[9] *See also Cruz v. Kumho Tire Co.*, No. 10 Civ. 219, 2015 WL 2193796, at *5 (N.D.N.Y. May 11, 2015) (same); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17 Civ. 4576 (DEH) (BCM), 2024 WL 1115944, at *6 (S.D.N.Y. Mar. 14, 2024) ("If there are flaws in an expert's reasoning, only flaws large enough such that the expert lacks good grounds for his or her conclusions should lead to a court excluding evidence." (cleaned up)).

**G.**   **XOOM Incorrectly Claims that the Amended Report's Methods A, B, and C Represent "Brand New Models" that Are "Untimely and Must Be Excluded"**
*(Responding to Defs.' 2ⁿᵈ Br. Points II.F–G at 6–7)*

Once again ignoring that the Court had authorized the May 10, 2024 service of an Amended Report, XOOM first wrongly claims that the amendment was "untimely." Defs.' 2ⁿᵈ Br. at 7. To support this claim, XOOM carefully omits from its 2ⁿᵈ Brief any mention whatsoever of the Court's April 15, 2024, express authorization of an amended report.

Despite attacking the Amended Report as "untimely," XOOM's sole mention of the Court's April 15 Order is in its *1ˢᵗ Brief*, but there, the Order is overtly misquoted and mischaracterized. Defs.' 1ˢᵗ Br. at 8–9. XOOM claims that under the Court's April 15, 2024 "express order setting a deadline for supplementation, Plaintiff was allowed to 'supplement Model Two's calculations to account for' the customer data XOOM produced earlier this year." *Id.* at 8–9. (citing ECF 187 at 4 n.4). Troublingly, the phrase XOOM quotes is nowhere found in ECF 187 or the Court's April 15 Electronic Order. In fact, XOOM's reference to footnote 4 of that letter is to XOOM's own position, which the Court rejected.

XOOM's overt misrepresentations in its 1ˢᵗ Brief continued: "XOOM told Plaintiff and the Court that it would not oppose such a supplement, and XOOM fully expected CRA to update Model Two using that data given that Plaintiff's decertification response relied on Model Two." *Id.* at. 9. This is also not true: again, the April 1 application carefully set forth the events Plaintiff's expert needed to account for (ECF 187 at 1), and XOOM vigorously objected to Plaintiff's proposed supplement, calling it a "belated, blank-check overhaul" (*id.* at 5). XOOM did the opposite of telling "Plaintiff and the Court that it would not oppose such a supplement." Defs.' 1ˢᵗ Br. at 9. There was nothing "untimely" about the Amended Report.

Methods A, B, and C are also not "brand new" models that use "new algorithms" that were "fed different data" using "undisclosed formulas." Defs' 2nd Br. at 7. Like XOOM's other efforts to convey facts, XOOM's description of Methods A, B, and C are wildly inaccurate. First, they are not "brand new" models. They simply replace Model Two's margin input with cost-based margin inputs that use the figures 7.33%, 5.0%, and 21.2%, respectively. Amended Report ¶ 18(i); *see also* Ex. A, Declaration of Seabron Adamson dated June 28, 2024 ("Adamson Decl."), ¶¶ 4–12. As the Court has recognized, "[t]he jury will be able to determine a reasonable and proportionate margin by selecting a rate between the range presented." Decert. Denial Order at 14 (quoting *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 983 (Fed. Cir. 2021)) (cleaned up).

Second, Methods A–C do not use "new algorithms." XOOM's jargon aside, the new methods simply remove XOOM's contemporaneous fixed rate placeholder margins and conform the math to the proportionate margin model articulated in paragraphs 73 and 76 of the Original Report, just as Plaintiff said would be done. ECF 187 at 1; Adamson Decl. ¶ 12. XOOM's rate-setting workbooks and Model Two calculated XOOM's margin as a function of XOOM's <u>rate</u>. Adamson Decl. ¶¶ 7, 10. Model Two and the court's proportionate-margin construction requires a percentage adder be added to XOOM's <u>costs</u>. Original Report ¶¶ 73, 76; Adamson Decl. ¶¶ 5, 12. That requires calculating XOOM's margin as a function of XOOM's <u>costs</u>, which is what the Amended Report does. Adamson Decl. ¶¶ 11–12. That change, however, is merely a matter of expression that is "essentially the same as the difference between Fahrenheit and Celsius – these are two different ways of expressing the same thing." *Id.* ¶ 6.

Methods A, B, and C were also not "fed different data." XOOM produced additional data on March 1, 2024. *Id.* ¶ 19. Finally, the methods do not use undisclosed formulas. The formulas

are set forth in the Amended Report and were recognized by XOOM in its motion.  Defs.' 2nd Br. at 1; Adamson Decl. ¶¶ 11, 15–17.

XOOM next recycles its claim that the Amended Report introduces "three new margin caps" that contradict "the Original Report" and Plaintiff's expert testimony.  Defs' 2nd Br. at 7. This is also not true.  Method C uses the exact same "margin cap" of XOOM's average fixed rate margins that the Court identified and approved of at class certification.  *See* Class Order at 9 (noting that Model Two "assumes that XOOM was allowed to charge its variable rate customers the same margin it charged its fixed-rate customers, an approximately 19% markup.").  The reasons the margin figure changed is because XOOM produced new data and the margin is now expressed in terms of cost.  Amended Report ¶¶ 73, 108–109; Adamson Decl. ¶ 11–12, 19.

Methods A and B use additional reference points for proposed reasonable margins, but those reference points do not represent a different ***theory*** of damages.  Amended Report ¶ 73 ("The difference in damages amounts between the three methods depends on the margin applied to the reported supply costs and nothing else.").  They are simply different reasonable proportionate margin calculations using different percentages for the margin.  *Id.*  As thoroughly explained in Plaintiff's opposition to XOOM's Eighth motion *in limine* (ECF 244 at 37–42), these margin inputs do not "contradict" any prior expert testimony.[10]

---

[10] XOOM reiterates its false claim of contradiction, *see* Defs.' 2nd Br. at 9, to argue that the Amended Report is "a brand-new report that fully abandons CRA's previous opinions."  Under the "Original Report's logic" the utility rate was not "irrelevant for this contract."  *Id.* at 9 (selectively citing Dr. Eryilmaz's deposition testimony).  Dr. Eryilmaz made clear that the utility rates were irrelevant to the much narrower question of whether XOOM derived its rates from its own "actual and estimated supply costs."  ECF 226-5, Eryilmaz Dep. 73:10–75:12.  Dr. Eryilmaz also made clear that in the original expert report the utility's rate was used as a "cross-check" for a hypothetical XOOM rate that was actually "based on" XOOM's "actual and estimated supply costs."  *Id.*  Dr. Eryilmaz certainly did not testify that utility rates are irrelevant to the question of what reasonable, fixed margin XOOM could charge, which is how they are being used in the Amended Report.  Likewise, the Amended Report is not "offering a damage model that compares XOOM's variable rate charged to what customers would have been charged by the utility during the same time period."  Defs.' 2nd Br. at 9 (quoting Adamson Tr. at 68:1–69:9).  XOOM's MIL No. 8 made this exact same

*(Footnote continued on next page)*

Finally, XOOM claims the Amended Report "does not solve Model Two's problems; rather, it exacerbates those problems and introduces new ones." Defs.' 2nd Br at 7. That is, again, plainly incorrect. As explained both above, Model Two never had "problems" and Methods A–C merely update its accepted damages methodology following a straightforward and expressly authorized update to account for developments that occurred after the expert discovery closed.

## ARGUMENT

### I. THE COURT EXPRESSLY AUTHORIZED THE AMENDED REPORT SO IT IS NOT "UNTIMELY" OR OTHERWISE IMPROPER
*(Responding to Defs.' 2nd Br. Point III.A at 8–21)*

#### A. Under Rule 26(a)(2)(D), the Amended Report Was Served "In the Sequence that the Court Orders" and Was Expressly Authorized as a Rule 23(e) Supplement

XOOM's claim that Amended Report was untimely fails for a simple reason: the Court's April 15 Order expressly authorized its service. Under Rule 26(a)(2)(D), expert disclosures occur "at the times and in the sequence that the court orders." That is exactly what happened here. Moreover, as outlined above, Plaintiff was transparent with both XOOM and the Court as to why an amended report was both necessary and appropriate. ECF 187 at 1–4. After XOOM refused to consent to Plaintiff's service of an amended report, Plaintiff submitted a detailed and contested application to serve it. *Id.* at 1–7. That application explained that "the amendment results from events that transpired *after* expert discovery closed," which were "Judge Ross's summary judgment and class certification decisions, intervening Second Circuit authority, and substantial new data." *Id.* at 1–3.

---

claim that Plaintiff refuted when she made clear that using the utility's rate as *a component* of Plaintiff's expert's framework for assessing a reasonable margin does not make it the same as a damages model that simply compares the two rates. ECF 244 at 39.

The Amended Report was thus not only expressly authorized under Rule 26(a)(2)(D), it was also *required* by Rule 26(e), which imposes upon parties "a duty to supplement or correct the[ir Rule 26(a)] disclosure" if (A) "the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing" **or** (B) "as ordered by the court."   Both of these criteria were met before the Amended Report was served.

First, the Court *ordered* "any supplementation or amendment of information included in plaintiff's expert report" by May 10, 2024.  April 15, 2024, Electronic Order (citing Rule 26(e)(2)).

Second, the Court authorized amendment after Plaintiff expressly sought leave to serve an amended report under Rule 26(e)'s "'duty to supplement' before the pretrial disclosure deadlines." ECF 187 at 1 (citing Rule 26(e)).   In fact, considering that expert discovery had closed in November 2022, Plaintiff's application relied on, and hewed closely to, the case law in this Circuit addressing similar circumstances.  *Id.* at 3.  This case law demonstrates that courts routinely permit amendment under Rule 26(e) in highly analogous scenarios.  *See, e.g.*, *Anthem, Inc. v. Express Scripts, Inc.*, 660 F. Supp. 3d 169, 184–86 (S.D.N.Y. 2023) (permitting amended expert report in light of the "Court's conclusions of law as to the contract at issue in this case" in a post-discovery ruling); *see also* ECF 187 at 3 n.3 (collecting authorities).

 In fact, Plaintiff's application analyzed the factors courts consider when confronted with requests to serve amended expert reports under Rule 26(e) after expert discovery has closed, even when "expert discovery was lengthy and [a] case has been pending for a long period of time." ECF 187 at 3 (quoting *Anthem*, 660 F. Supp. 3d at 185).  Plaintiff outlined the relevant factors "including (1) the justification for the disclosure's timing; (2) the evidence's importance;

27

(3) prejudice to the opposing party; and (4) the possibility of a continuance." *Id.* Plaintiff's application then demonstrated how "all factors weigh in Plaintiff's favor." *Id.*

XOOM objected to amendment on the same grounds it advances here: it claimed that the requested amendment was more than a Rule 26(e) supplement and would instead be a "belated, blank-check overhaul of Plaintiff's expert opinions [that] would severely prejudice XOOM and cause significant delay." *Id.* at 4–7. XOOM also argued that the Court's contract construction at summary judgment and the Second Circuit's ruling in *Martinez* were "nothing new," countering Plaintiff's claim that amendment was necessary because these key developments occurred ***after*** the close of expert discovery. *Compare id.* at 4 *with* Defs.' 2nd Br. at 10–12.

Likewise, XOOM cited the same out-of-context snippets from Plaintiff's post-certification efforts to explain that Model Two was consistent with Plaintiff's liability theory. *Compare* ECF 187 at 5–7 *with* Defs.' 2nd Br. at 10–12. That Plaintiff's expert later sought to update his testimony after the courts focused the parameters of the margin-related issues is not an admission of a prior disconnect between breach and damages theories.

Then, having considered the parties' positions, the Court "determined that a conference is not necessary" and issued an Order permitting Plaintiff to serve "any supplementation or amendment of information included in plaintiff's expert report" by May 10, 2024. Plaintiff did just that, serving the Amended Report on May 10, 2024. ECF 229-5.

XOOM now asks that the Court reconsider its April 15 Order by pretending it never happened and calling the Amended Report "untimely." Tellingly, XOOM's motion to exclude these supposedly "untimely expert disclosures" never once mentions that April 15 ruling. Worse, in its 1st Brief, XOOM brazenly claims that the Court only "allowed [Plaintiff] to 'supplement Model Two's calculations to account for' the customer data XOOM produced earlier this year."

Defs.' 1st Br. at 8–9.  But the Court made no such distinction when it granted Plaintiff's express and detailed request to serve an amended report.   What XOOM (mis)quotes in its 1st Brief is its **own** argument in favor of such a narrowing.  *See id.* (citing XOOM's objection to Plaintiff's application).

XOOM's disregard of the Court's express order defeats its entire untimeliness argument and renders all of its cited case law beside the point.  Indeed—and tellingly—not only do **none** of the cases XOOM cites over more than a dozen pages of briefing involve an express grant of leave to file an expert report,[11] but many involve the exact opposite—a court's denial of requests for leave to file new reports.[12]  XOOM's mislabeled reconsideration motion should thus be denied.

## B. XOOM's Other Attacks on the Amended Report Are Similarly Meritless

### 1. Rebranding a Reconsideration Request as Judicial Estoppel Changes Nothing

Doubling down on its reconsideration request, XOOM claims that Plaintiff is somehow retroactively judicially estopped from having served her expert's Amended Report.  Defs.' 2nd Br.

---

[11] *See Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253 BSJ/HBP, 2009 WL 4907201, at *4 (S.D.N.Y. Dec. 18, 2009) (report untimely where "nothing in the schedule permitted it"); *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011) (new report untimely where it was submitted without permission and well past the expert disclosure deadline); *Coene v. 3M Co.*, 303 F.R.D. 32, 43 (W.D.N.Y. 2014) (new report submitted months after court deadline for expert disclosures untimely); *Est. of Jackson by Jackson v. Cnty. of Suffolk*, No. 2:12 Civ. 1455, 2019 WL 1676000, at *2 (E.D.N.Y. Apr. 17, 2019) (same); *Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 106 (E.D.N.Y. 2022) (excluding portions of rebuttal report drafted by an undisclosed expert offering new opinions); *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 960 (2d Cir. 1997) (affirming preclusion of expert where "expert was unable to meet a discovery deadline imposed by" the magistrate judge); *Mannoia v. Farrow*, 476 F.3d 453, 456 (7th Cir. 2007) (affirming exclusion of report where party failed to comply with court deadline and never sought relief).

[12] *See Canales v. United States*, No. 19 Civ. 834 (EK) (RLM), 2021 WL 5830765, at *2 (E.D.N.Y. Dec. 8, 2021) (affirming denial of motion for leave to supplement record with additional reports); *Hines v. BMG Rts. Mgmt. (US) LLC*, No. 20 Civ. 3535 (JPO), 2023 WL 6214264, at *3 (S.D.N.Y. Sept. 25, 2023) (excluding expert materials appended to summary judgment opposition because they "were submitted after the close of expert discovery" and court had previously denied a request to extend expert discovery and reconsideration motion regarding same); *Sharpe v. United States*, 230 F.R.D. 452, 462 (E.D. Va. 2005) (denying motion to amend/supplement made six weeks before trial and after expert discovery closed).

at 11–12.  XOOM is simply wrong.  Plaintiff's timely application to serve the Amended Report was consistent with both the text of Rule 26(e) and the case law.  Further, the docket snippets XOOM cites to support its judicial estoppel claim show a consistent position.  Again, there is nothing inconsistent with Plaintiff's expert's seeking leave to update his testimony once the courts clarified the constraints on XOOM's rate-setting.

Typically, judicial estoppel applies if: "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."  *DeRosa v. Nat'l Envelope Corp.*, 595 F.2d 99, 103 (2d Cir. 2010).  "Judicial estoppel is a rarely used doctrine and exists to protect the court, not a party, from a party's chicanery."  *Resolution Trust Corp. v. Gregor*, 872 F. Supp. 1140, 1153 (E.D.N.Y. 1994) (Ross, J.).  XOOM fails to show any of judicial estoppel's three prerequisites.

As explained above, the theories of breach and damages have remained consistent across the Original and Amended Reports.  Further, as the Court has previously noted, when circumstances in a case change, that does not render positions reflecting those changed circumstances "inconsistent" with those that came before.  *See Jedrejcic v. Croatian Olympic Comm.*, 190 F.R.D. 60, 66 n.6 (E.D.N.Y. 1999) (Ross, J.).

Nor did this Court's and the Second Circuit's refusal to indefinitely delay this case while entertaining XOOM's serial attacks on class certification somehow result in them adopting a contrary position that Plaintiff never took.  Finally, Plaintiff gained no unfair advantage in, as XOOM puts it, "propell[ing] this case forward to trial."  Defs.' 2nd Br. at 12.  This Court's case law rejects XOOM's exact claim:  "While it is true that denying defendants' motion would allow this case to proceed to a trial on the merits, the mere continuation of litigation does not represent

an unfair advantage for the purposes of judicial estoppel.  To hold otherwise would render the

unfair advantage factor meaningless, easily satisfied in every single case." *Harewood v. APL Ltd.*,

No. 14 Civ. 1668, 2015 WL 12591648, at *5 (E.D.N.Y. Aug. 24, 2015) (Ross, J.).[13]

> 2.  Methods A, B, and C Incorporate the Courts' Newly Announced Guidance Regarding
> XOOM's Rate-Setting Constraints

XOOM next claims Methods A, B, and C could have and should have been in the Original

Report. Defs.' 2nd Br. at 13–14.  Not so.  Again, Plaintiff's expert made clear from the outset that

he needed guidance on whether XOOM's vague contract even permitted a margin.  Once the Court

gave guidance that a "reasonable" margin was permitted and once the Second Circuit made clear

that XOOM's contract prohibited the use of subjective process or factors to set monthly variable

rates (including the size of XOOM's "reasonable" proportionate margin), Plaintiff's expert

"learn[ed] that in some material respect [his report was] incomplete." Rule 26(e)(1)(1).  He then

updated his report to include Methods A and B and to conform Method C (the former Model Two)

to those post-discovery rulings.  Amended Report ¶¶ 2, 18(i)–(j) ,70–77.

**Method C:**  Again, this is Model Two from the Original Report.  Adamson Decl. ¶ 38.

The only difference is that Method C incorporates XOOM's March 1 expanded data production

and exchanges the Original Report's placeholder margins that XOOM had calculated as a function

of rate with a proportionate margin calculated as a function of XOOM's costs.  *Id*.  The Amended

Report also makes clear that Method C "is ultimately based on XOOM's subjective

---

[13] XOOM's cases are easily distinguished.  In *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012), the plaintiffs contended from case filing to just before summary judgment that they owned patent applications as principals of the corporate defendant, but then claimed they owned the patents in their individual capacity.  In *New Hampshire v. Maine*, 532 U.S. 732, 751–53 (2001), New Hampshire tried to change a position about a river boundary it had sought in separate litigation 30 years earlier.  The party judicially estopped in *Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110, 117–19 (2d Cir. 2014) was attempting to redo a bankruptcy plan after not objecting to it for over four years.

decision-making regarding the margin for its fixed-rate products," and thus "reflects fewer of the pricing constraints incorporated into Methods A and B."  Amended Report ¶ 105.  Nonetheless, Plaintiff's expert believes Method C "provides a ceiling in terms of a maximum commercially reasonable margin, especially in a scenario where XOOM is allowed to have had some price-setting discretion, but still faced a requirement to act reasonably and in good faith using any allowed discretion in setting rates."  *Id.*  In fact, the Amended Report's next paragraph makes clear that Method C is still germane because of the Court's and the Second Circuit's post-discovery pronouncements that even when an ESCO's contract give it unfettered rate-setting discretion, that discretion must be exercised "in good faith."  *Id.* ¶ 106.  Indeed, as this Court has already recognized, "the fixed-rate margin is evidence that can help the jury assess whether XOOM charged a reasonable margin" and "Plaintiff's expert has indicated that he will opine that the margin XOOM sought on fixed rates marked the upper boundary of what it should have sought on variable rates."  Decert. Denial Order at 13–14 (citing Plaintiff's expert's deposition testimony).[14]

**Method A:**  After both this Court's determination that XOOM's pricing term required a "reasonable" margin and the Second Circuit's pronouncement making clear that XOOM's pricing term did not provide discretion to use any subjective processes or factors to set monthly variable rates (Amended Report ¶ 2), Plaintiff's expert looked for "objective criteria an[d] analysis of ESCO pricing in New York" to inform his "opinion about the reasonableness of any proposed margin that may be applied in this case," which he took into account along with the "courts' guidance about the contractual constraints" governing XOOM's rate setting.  *Id.* ¶ 42; *see also id.* ¶ 77 (outlining price setting constraints from the Courts' ruling).  This led him to conclude that

---

[14] XOOM gets it wrong when it represents that Method C uses "the rates charged by utilities in some portions of the class period long before expert discovery closed."  Defs.' 2nd Br. at 14, n. 12 (citing Amended Report ¶ 74, which says no such thing).

"the best comparators for determining a reasonable, fixed margin in this context are the margins approved as reasonable by regulators in the relevant market." *Id.* ¶ 77.

With respect to variable rates, the NYPSC (an independent third party with expertise in ESCOs' operations) found that "there is no demonstrated customer benefit to allowing ESCOs" to charge higher variable rates than the utility. *Id.* ¶ 82 (citing ECF 138-10, Cases 15-M-0127, et al., *Ord. Adopting Changes to the Retail Access Energy Market and Establishing Further Process*, (Dec. 12, 2019) ("2019 Reset Order") at 37). This is because "energy services are essential to customers' health and wellbeing," and thus any "additional cost to customers must not outweigh the purported benefits to them." *Id.*

As a result of these findings, the NYPSC restructured the rules governing ESCO variable rate pricing and mandated that ESCOs guarantee that their variable rates be lower than the utility's variable rates. *Id.* ¶ 83. When Plaintiff's expert compared the Total Cost figures in XOOM's rate-setting workbooks to the contemporaneous utility rates, he found that, "on average, XOOM's documented supply costs were 7.33% lower than the corresponding utility rate." *Id.* ¶ 85. Again, XOOM's supply <u>costs</u> were ***lower*** than the utilities' ultimate <u>rates</u>. *Id.*[15]

The 7.33% "margin" used in Method A is derived from the delta between those two figures and thus "reflects the NYPSC's independent determination regarding a reasonable (*e.g.*, non-exploitative) rate for the same product sold by XOOM in the same New York market." *Id.* ¶ 82. The 7.33% figure is also "objectively derived" to exclude any impermissible subjective price-setting discretion. *Id.* ¶ 83. As Plaintiff's expert noted, "[i]n limiting ESCOs' variable rate

---

[15] The utility buys supply "in the same wholesale market as XOOM and faces the same categories of wholesale costs in supplying customers." *Id.* Moreover, as XOOM concedes, "utilities' overhead costs are baked into their rates." Defs.' MIL Br. at 35. In other words, utility rates reflect the utilities' supply costs and an adder to cover the utilities' overhead costs.

offerings to only those that guaranteed savings compared to the utility, the NYPSC required that ESCO variable rate margins be determined objectively based on the ESCO's ability to achieve efficiencies over the corresponding utility rate." *Id.* "The utility rate margin constraint implemented by NYPSC" is also "an appropriate analogue" to the Court's finding that XOOM's variable rates must be "determined solely by" XOOM's "supply costs" (MSJ Order at 14). *Id.* ¶ 84. This is because the NYPSC's constraint is "linked to ESCO supply costs since utilities and ESCOs buy energy in the same wholesale markets to supply their customers." *Id.* The 7.33% margin is thus "'based on' XOOM's supply costs insofar as the ultimate rate is determined by reference to documented supply costs as compared to the utility's cost-based rate." *Id.* ¶ 85.

The 7.33% figure also accords with the Court's determination that vague pricing terms like XOOM's silent margin term here should be construed against the party that "'had the best opportunity to protect its interests.'" *Id.* ¶ 86. (quoting MSJ Order at 12). "Considering the NYPSC's independent finding that it is not reasonable for ESCO customers to pay higher variable commodity rates than those charged by the utility, [a] 7.33% margin protects customers' interests (prevents them from paying unreasonable rates) while also allowing XOOM a proportionate margin above its documented supply costs." *Id.*

Using the average difference between XOOM's documented Total Costs and the utility rate to derive a reasonable margin is also consistent with practice in XOOM's New York market. For example, as noted in the expert's original report, the NYPSC has extensively used the applicable utility rate as a basis for comparison for ESCO variable rates. Original Report ¶ 69; *see also* Amended Report ¶ 88 (citing Original Report). XOOM itself also uses the utility rate when it refunds customers for overcharges either claimed directly by the customers or the NYPSC. Amended Report ¶ 87 (citing Original Report). XOOM's former Compliance Officer Patricia

Kulesa testified that when XOOM refunds customers in instances when the NYPSC found problems during the customer enrollment process or when XOOM internally found wrongdoing or "something broke" on XOOM's end, XOOM would re-rate the customer using the relevant utility rate. *Id.* (same).

Finally, other than the size of the margin input, Method A is not analytically different from Method C (or Method Two from the Original Report) because the "difference in damages amounts between the three methods depends on the margin applied to the reported supply costs and nothing else." *Id.* ¶ 73. For these and other reasons outlined in the Amended Report, Plaintiff's expert will offer as Method A the 7.33% margin derived from the utility rate as "the preferred" reasonable margin to be applied to the Total Cost figures in XOOM's rate-setting workbooks. *Id.* ¶ 74.

**Method B:** Plaintiff's Expert will also offer as "Method B" the 5% margin cap the NYPSC mandated for all fixed rate ESCO products. *Id.* ¶¶ 92–100. Specifically, the NYPSC found a 5% premium to be "just and reasonable" for a product that is riskier for ESCOs than the variable rate products at issue here. *Id.* ¶ 95. "In reaching its conclusion regarding the 5% figure, the NYPSC invoked its 'statutory mandate to ensure that all customers receive safe and reliable gas and electric service at just and reasonable rates,' and weighed 'the costs versus the benefits of fixed-rate products offered by ESCOs.'" *Id.* (quoting 2019 Reset Order at 66).

Moreover, the NYPSC found that ESCOs could sustain this margin and still offer those riskier fixed rate products. *Id.* ¶ 96. Like Method A, the 5% figure used by Method B also protects consumers' interests in the face of a silent margin term. *Id.* ¶ 97. Finally, "Method B provides an independent crosscheck with which to assess Method A." *Id.* ¶ 98. As the Court has already noted, Plaintiff intends to offer this "evidence [as] a lower bound of reasonable margin," which is consistent with the Court's finding that "[t]he jury will be able to determine a reasonable and

proportionate margin by selecting a rate between the range presented."  Decert. Denial Order at 14 (quoting *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 983 (Fed. Cir. 2021)) (cleaned up).

The above descriptions of Methods A–C show why XOOM is wrong to claim that Plaintiff "abandon[ed] Model Two" and thus "acknowledged the disconnect."  Defs.' Br. at 14.  Methods A–C *are* Model Two with new margin inputs and there never was a disconnect.  This is also why XOOM is wrong when it tries to leverage its contract's vagueness to claim that Plaintiff's expert should have presented these models in 2022 *before* both this Court and the Second Circuit provided the guidance that drove them.  Defs.' 2nd Br. at 13–14.

3.  XOOM's Rule 37 Arguments Fail Because Methods A, B, and C Incorporate the Courts' Newly Announced Constraints Governing XOOM's Rate-Setting

XOOM lodges a three-pronged Rule 37 attack on the Amended Report.  All three elements fail.  ***First***, XOOM claims the Amended Expert Report lacked substantial justification (Defs.' 2nd Br. at 15–16), but this argument fails for the same reason as XOOM's untimeliness argument— the Court's April 15, 2024 Order authorized the Amended Report.  Moreover, the Court's Decertification Denial Order makes clear that Plaintiff's original Model Two did "accommodate a proportionate margin input" and Plaintiff's "initial theory [was not] incorrect" as XOOM claims.  Defs.' 2nd Br. at 16; Decert. Denial Order at 4–5, 12–14.

***Second***, XOOM claims both future and past prejudice from the Amended Report.  As to XOOM's claim of future prejudice that "now XOOM will have to ask for permission to seek discovery" which will "more than double the expense of expert discovery," XOOM will be spared any future expense because it rejected Plaintiff's invitation to take discovery and instead placed all its chips on its failed decertification motion.  ECF 187 at 3–4.  That XOOM chose to abandon further discovery and instead try its luck at barring an amended report is on XOOM, not Plaintiff.

36

Accordingly, XOOM's "intentional relinquishment and abandonment of a known right or privilege"—here, forgoing the opportunity to take discovery on the Amended Report—constitutes waiver. *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 510 (2d Cir. 2002). The question of waiver "focuse[s] on strategic, deliberate decisions that litigants consciously make." *U.S. v. Dantzler*, 771 F.3d 137, 146 n.5 (2d Cir. 2014). By deliberately deciding to try to block service of an amended expert report and denying Plaintiff's invitation to take further discovery about that report, XOOM has waived its right to further discovery. Indeed, if XOOM's real purpose was to obtain further information about Plaintiff's Amended Report, it would have accepted Plaintiff's offer to do so.

XOOM's claim of past prejudice is also hollow. XOOM claims it built its defense on Model Two, but that model has not changed. It has only been updated. As the Court made clear at decertification, "plaintiff's experts were clear that the fixed-rate margin is a placeholder that can be 'easily . . . update[d]' to accommodate any margin the jury deems appropriate." Decert. Denial Order at 13 (quoting Original Report ¶ 73 & n. 51); *see also id.* (finding "unpersuasive" XOOM's claim that Model Two is inconsistent with Plaintiff's liability theory).

Moreover, XOOM's prejudice arguments (Defs.' 2nd Br. at 16–18) are taken almost verbatim from XOOM's failed opposition to Plaintiff's application to serve the Amended Report. *See* ECF 187 at 5 ("XOOM has poured hundreds of hours (and hundreds of thousands of dollars) into preparing for trial on the current record since a Pretrial Order deadline was set at Plaintiff's insistence over XOOM's request to resolve its decertification and expert motions first."); *see also id.* at 7 ("The prejudice to XOOM if Plaintiff's request is somehow granted would be enormous."). The Court should not reconsider its rejection of those arguments here.

Third, based on the flawed premise that the Amended Report was "untimely," XOOM asks that it be excluded.  Defs.' 2nd Br at 18–21.  XOOM again ignores the fact that on April 15, 2024, Plaintiff's request to serve an amended report was granted and XOOM chose not to seek a continuance.  Any supposed prejudice to XOOM is now self-inflicted.[16, 17]  In sum, XOOM advances no compelling attacks on the timeliness and propriety of the Amended Report.

## II.  THE AMENDED REPORT USES THE SAME SOUND DAMAGES METHODOLOGY AS THE ORIGINAL REPORT AND IS ADMISSIBLE
*(Responding to Defs.' 2nd Br. Point III.B at 21–30)*

XOOM next claims that the Amended Report should be excluded under Rule 702 because it allegedly "mirrors" the report that was excluded in *Martinez* and because XOOM has "exposed fatal flaws."  Defs.' Br. at 21.  XOOM is doubly wrong.

---

[16] XOOM's argument for Rule 37 sanctions (Defs.' 2nd Br. at 18–21) is thus irrelevant.  Even if that were not the case, as described in the parties' April 1, 2024, Joint Letter on this very topic, the appropriate remedy to any XOOM prejudice would be a continuance so it could re-depose Mr. Adamson.  ECF 187 at 4.  Nonetheless, XOOM barged ahead, requested that Plaintiff's application to serve an amended report be "summarily deni[ed]," (*id.* at 1) and did not even seek a continuance ***after*** the Court granted Plaintiff's application or after Plaintiff's Amended Report was served on May 10, 2024.

[17] XOOM even makes the patently false claim that Plaintiff refused to "honor her commitment" to serve the report by April 19 and that this "forced" XOOM "to prepare this motion in a mere twenty days."  Defs.' 2nd Br. at 21.  XOOM ignores the fact that the Court set May 10 as the deadline to serve the Amended Report.  *See* April 15, 2024 Electronic Order ("[A]ny supplementation or amendment of information included in plaintiff's expert report must also be disclosed by May 10, 2024.").  And XOOM's case support is inapposite.  *See, e.g.*, *Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 106 (E.D.N.Y. 2022) (admitting report but excluding affirmative opinions offered for the first time on rebuttal); *Hines v. BMG Rts. Mgmt. (US) LLC*, No. 20 Civ. 3535, 2023 WL 6214264, at *3 (S.D.N.Y. Sept. 25, 2023) (excluding report as untimely after plaintiff requested leave to file untimely expert report, was denied leave, and then filed it anyway); *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 706 (W.D.N.Y. 2011) (excluding expert declaration submitted for the first time in opposition to summary judgment motion that "bottomed upon speculation and guesswork"); *Mannoia v. Farrow*, 476 F.3d 453, 456 (7th Cir. 2007) (excluding report submitted for the first time in opposition to summary judgment motion for party's failure to update initial disclosures regarding individuals with discoverable information); *Sharpe v. United States*, 230 F.R.D. 452, 457 (E.D. Va. 2005) (excluding reports on completeness grounds for failing to comply with requirements regarding the contents of an expert's report).  XOOM then tries to distinguish Plaintiff's examples of expert reports being admitted after the close of discovery by claiming those cases involved less time between the close of discovery and the new reports than here.  Defs.' 2nd Br. at 20.  That argument fails for all the reasons discussed at pp. 4–6.

1.  <u>Legal Standard Under Rule 702</u>

Rule 702 permits expert opinion testimony if (i) the expert's specialized knowledge will help the jury understand the evidence or determine a fact issue; (ii) the testimony is based on sufficient facts or data; (iii) the testimony is based on reliable principles and methods; and (iv) the expert reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.

First, "[i]n reviewing the admissibility of expert testimony, courts must determine whether the expert is qualified to testify.  'Qualification may be based on a broad range of knowledge, skills, and training.'"  *Guardino v. Alutiiq Diversified Servs., LLC*, 457 F. Supp. 3d 158, 161 (N.D.N.Y. 2020) (quoting *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016)).  "'Courts within the Second Circuit have liberally construed expert qualification requirements.'"  *Id.* (quoting *Mirena*, 169 F. Supp. 3d at 412).[18]

Second, the court must determine whether the expert testimony is reliable.  Although Rule 702 and *Daubert* itself "set forth specific criteria for [a court's] consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  "[T]he gatekeeping inquiry must be tied to the facts of a particular case."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotation marks omitted).  "'In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how

---

[18] The Second Circuit employs a "relatively low bar to demonstrate qualifications" of an expert.  *Jakobovits*, 645 F. Supp. 3d at 107.  XOOM has not contested Mr. Adamson's qualifications, nor could it, as Mr. Adamson has substantial education and more than 25 years of experience as an energy economist.  *See* Amended Report ¶¶ 10–17 & Ex. 2.

the expert applies the facts and methods to the case at hand.'" *Guardino*, 457 F. Supp. 3d at 162 (quoting *Amorgianos*, 303 F.3d at 267).

In particular, courts "must be mindful of circumstances in which 'there is simply too great an analytical gap between the data and the opinion proffered.'" *Jakobovits*, 645 F. Supp. 3d at 104 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).   However, courts should "distinguish these circumstances from those where there is '[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method,' in light of 'the liberal admissibility standards of the federal rules' and the fact that our adversary system will also serve as a check on 'debatable[ ] expert testimony.'" *Id.*   (quoting *Amorgianos*, 303 F.3d at 267).   Indeed, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not necessarily render an opinion inadmissible; rather, the court should admit the evidence unless the flaw is large enough that the expert lacks good grounds for his or her conclusions."   *Alan L. Frank Law Assocs., P.C. v. OOO Rm Invest*, No. 17 Civ. 1338 (NGG) (ARL), 2021 WL 1906468, at *6 (E.D.N.Y. May 12, 2021) (internal quotations omitted) (quoting *Amorgianos*, 303 F.3d at 266).

"Finally, '[a]fter determining that a witness is qualified to testify as an expert as to a particular matter and that the opinion is reliable, Rule 702 requires the district court to determine whether the expert's testimony will help the trier of fact.'" *Guardino*, 457 F. Supp. 3d at 163 (quoting *Mirena*, 169 F. Supp. 3d at 413).   This "helpfulness" requirement "goes primarily to relevance," *i.e.*, "'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Daubert*, 509 U.S. at 591 (quoting *U.S. v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).

"As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'" *Guardino*, 457 F. Supp. 3d at 161 (quoting Fed. R. Evid. 702

advisory committee's note); *see also U.S. v. Mack*, No. 13 Cr. 54, 2014 WL 7404763, at *2 (D. Conn. Nov. 7, 2014) ("The Second Circuit has instructed that the *Daubert* standard does not change the liberal admissibility standards of the federal rules, and that the proper tool for challenging reliable, albeit debatable, expert testimony is still the adversary system.") (internal quotation marks omitted) (quoting *Amorgianos*, 303 F.3d at 267 ); *Makinen v. City of New York*, 53 F. Supp. 3d 676, 697 (S.D.N.Y. 2014) (the Federal Rules "favor admissibility" of expert testimony). "[W]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, arguments regarding the strength of the textual support for an opinion may go to the weight, not the admissibility of the expert's testimony." *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011) (internal quotation marks omitted) (quoting *Amorgianos*, 303 F.3d at 267).

2. XOOM's Overreading of *Martinez* Exposes No Flaws in Plaintiff's Expert's Opinion

XOOM claims that Plaintiff's expert's "opinions and methods" regarding both Methods A–C and Model Two "mirror" those of the expert in *Martinez*, and because the expert in that case was excluded the Court should do the same here. Defs.' 2nd Br. at 22. XOOM's argument merely recycles the exact same argument the Court rejected at decertification. "*Martinez* does not stand for the proposition that an expert's opinion regarding a reasonable margin is inadmissible as a matter of law; rather, the Second Circuit merely held that the district court did not 'manifestly err[]' or abuse its discretion in excluding the expert's report." Decert. Denial Order at 15 (quoting *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 414 (2d Cir. 2023)).

XOOM asks the Court to compare the Amended Report with the expert opinions offered in *Martinez*. Defs.' 2nd Br. at 22–24. No need. The underlying ESCO contracts in the two cases are fundamentally different. In fact, to claim similarity XOOM makes an unfair comparison of two wildly different pricing terms: XOOM claims "[i]n *Martinez*, as here, the contract allowed the ESCO to set rates that included a margin above costs." Defs.' 2nd Br. at 22. That is an

41

unsupportable analogy that actively ignores the Second Circuit's observation *in Martinez itself* that whether an ESCO's contract specifically allows for rate-setting discretion is a "dispositive question," and that XOOM's contract here ***does not*** provide for any discretion whatsoever whereas the *Martinez* ESCO's contract expressly did.  88 F.4th at 411.  This "critical" difference is what led to the *Martinez* expert's exclusion.  *Id.*

In *Martinez*, the contract expressly gave the ESCO "discretion" to set rates by considering its "costs, expenses, and margins," including the cost of an additional home warranty product provided with its energy plans.  *Id.* at 413.  The *Martinez* expert tried to offer proof that the ESCO exercised its price-setting discretion in bad faith when it calculated its rates by including "an exorbitant charge for" the home warranty.  *Id.* at 413.  First, the expert calculated the purported "value" of the home warranty and compared it to the warranty's "cost."  *Id.* at 413–14.  The expert then subtracted the warranty's "value" from his underlying "overcharge calculations," which had compared the ESCO's rates to the utility's rates based on the expert's "subjective and unsupported view of what a 'reasonable margin' would have been."  *Id.* at 414.  The district court excluded the expert's report because it found the expert had failed to justify comparing the ESCO's rates to the utility's rates to calculate the baseline overcharge.  *Id.*  In affirming, the Second Circuit ruled that "in light of the Agreement's express terms" (which afforded the ESCO "discretion" to set rates by considering its "costs, expenses and margins") it was not "manifestly erroneous" for the district court to exclude the expert's report.  *Id.* at 414–15.  These facts simply do not present a scenario that is analogous to the instant matter.

Here, XOOM does not have rate-setting discretion.  XOOM is not entitled to "consider" anything but supply costs in setting Class rates.  Moreover, the Court has already ruled that the jury will be able to determine a reasonable and proportionate margin by selecting one between the

42

range presented, and Plaintiff's expert here has "made clear that the overcharge model can accommodate a jury's assessment of what a reasonable margin would have been . . . ." Decert. Denial Order at 13, 15.  There is nothing about the *Martinez* court's decision to exclude the plaintiff's expert that can be fairly analogized to this case.

XOOM next claims the Amended Report "commits the same errors" as the expert in *Martinez* because it does not offer "affirmative opinions as to an industry standard to cap margins at a particular level."  Defs.' 2nd Br. at 24.  XOOM made (and lost) this exact same argument at decertification.  ECF 212, Decert. Reply at 18.   Specifically, the Court found that such evidence "is hardly mandatory" and that *Martinez* does not "require that the jury be provided with evidence of competitors' rates."  Decert. Denial Order at 15.[19]

Finally, XOOM cites footnote 12 in *Martinez* and recycles its decertification argument that the NYPSC's findings are irrelevant.  Defs.' 2nd Br. at 24.  Yet "*Martinez* does not speak to whether a jury might refer to the Commission's findings as a lower bound in determining a reasonable and proportionate margin."  Decert. Denial Order at 16.  In short, *Martinez* does not even suggest exclusion, much less compel it as XOOM wrongly claims.

3.   None of XOOM's Perceived "Flaws" in the Amended Report Warrant Exclusion

XOOM claims the Amended Report contains ***eleven*** fatal flaws.  None have merit.

***First***, XOOM claims the Amended Report uses a "previously undisclosed algorithm" that differs from the one used in Model Two.  Defs.' 2nd Br. at 25; *see also id.* at 1.  XOOM also claims this "new" algorithm is defective.  *Id.*  XOOM is wrong on both points.

As a threshold matter, the Court's August 31, 2023 Class Order first raised the issue of a match between an "algorithm" that could calculate classwide damages and Plaintiff's theory of

---

[19] XOOM also advances this same failed attack on the Original Report.  Defs.' 1st Br. at 13–14.

breach.   Specifically, in determining whether Plaintiff's proposed damages methodology was consistent with her classwide theory of liability, the Court rejected XOOM's claim that it was improper for Model Two to "incorporate[] the margin charged on XOOM's fixed rate product." Class Order at 14.  The Court made clear that Model Two was "entirely consistent with plaintiff's theory" because "any measure of damages in this case would undoubtedly be based on the rate, cost, and margin." *Id.*  The Court used the word "algorithm" when it observed that XOOM "d[id] not dispute" that an "algorithm" based on rate, cost, and margin was consistent with Plaintiff's liability theory.  *Id.*  The Court then found that "Plaintiff has therefore proposed a damages model consistent with her theory of liability."  *Id.*

Based only on the term "algorithm" (used once in the Class Order), XOOM constructs an entire admissibility attack.  Defs.' 2nd Br. at 25.  XOOM now claims that any new mathematical ***expression*** of damages "based on rate, cost, and margin" constitutes a "previously undisclosed algorithm."  *Id.*  XOOM's claim is both inaccurate and improperly formalistic.  The Class Order was correctly concerned with the underlying "methodology" for identifying damages and whether that methodology matched Plaintiff's liability theory.  Class Order at 14.  Calculating the appropriate XOOM rate in this case is straightforward and requires only cost and margin inputs. *Id.*  The size and scope of the inputs are hotly contested, but the rate-setting formula is not.  *Id.*; *see also* Decert. Denial Order at 11–16 (explaining how XOOM's concerns with Plaintiff's proposals to measure those inputs are "disputed questions of fact" and concluding "again" that "plaintiff's proposed damages model is consistent with her theory of liability").

Nothing supports XOOM's claim that simply expressing the combination of cost, rate, and margin in a way that differs from Model Two somehow constitutes a "previously undisclosed algorithm."  Defs.' 2nd Br. at 25.  The truth is that there is nothing "new" about the "algorithm"

used in the Amended Report other than the margin inputs.  Adamson Decl. ¶¶ 5–12.  The different

formulas XOOM presents in its brief are not substantively different.  *Id*.  The "undeniable algebraic

facts" XOOM stresses are "essentially the same as the difference between Fahrenheit and Celsius

– these are two different ways of expressing the same thing."   Adamson Decl. ¶ 6.

In fact, XOOM has already made—and the Court has already rejected—this exact same

argument (using words instead of algebra).   In its Decertification Denial Order, the Court outlined

XOOM's argument that Model Two "assumed that XOOM should have charged its variable

rate-customers the same margin that it charged its fixed-rate customers."  Decert. Denial Order at

13.   The Court then correctly rejected XOOM's premise because "[c]ontrary to XOOM's

suggestion, plaintiff's model does not assume that variable-rate margins should be the same as

XOOM's fixed-rate margins"; rather, "plaintiff's experts were clear that the fixed-rate margin is a

placeholder that can be easily updated to accommodate any margin the jury deems appropriate."

Decert. Denial Order at 13 (citing Original Report ¶ 73 & n. 51) (cleaned up)).  That the Amended

Report now simply replaces the placeholder (price-based) fixed rate margins used in Model Two

with the (cost-based) proposed reasonable margins outlined in Methods A–C does not constitute a

new damages theory or a "previously undisclosed algorithm."  Defs.' 2nd Br. at 25.

Clearly, this is no basis to exclude the Amended Report on grounds of reliability or

unhelpfulness.  Moreover, XOOM's complaint about the Amended Report's use of a cost-based

margin is at best a complaint about the damages model's input and assumptions that goes to the

methods' probative value, not its admissibility.  *See Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,

2020 WL 13547723, at *44 (S.D.N.Y, Mar. 20, 2020) ("But probing weaknesses in the model's

assumptions in favor of alternative inputs is appropriate grist for cross-examination and for

[defendant's] experts' rebuttal testimony, not for exclusion.").  Indeed, at class certification the

Court dismissed XOOM's same argument that using XOOM's fixed rate margins was "arbitrar[y]" as a criticism of an "input[]" and not the methodology.  Class Order at 14; *see also* Decert. Denial Order at 16 (same).  The Cort should do the same here.

**Second**, XOOM is wrong that the Amended Report's calculations are "defective."  Defs.' 2nd Br. at 25.  What XOOM suggests is some sort of mathematical defect is in fact XOOM's legal argument that in the very few instances where XOOM's contract rate is lower than its actual rate, XOOM should be given credit for an "undercharge."  The case law is not in accord.

On page 26 of its 2nd brief and ¶ 11 of the Coleman Declaration, XOOM contends that the Amended Report's damages calculations are wrong because they don't count "undercharges" as an offset against any damages otherwise due.  For the reasons explained below, there is no legal or factual basis for XOOM's claim that it is entitled to an offset or credit against Plaintiff's recoverable damages for any such "undercharges."

The Class is entitled to recover damages resulting from XOOM's breach of contract, measured by the difference between what XOOM charged and the amount it was contractually permitted to charge.  In calculating damages, XOOM is not entitled to a credit for any supposed undercharges: in those instances, there was no breach and thus no damages.

Even according to XOOM, all that happened is that on occasion XOOM charged less than the contract permitted.  If so, that was XOOM's own decision which it was free to make.  In demanding an offset, XOOM never contends that the Class had any input into the rates XOOM was charging or any knowledge about whether XOOM's rates were above or below the maximum the contract permitted.  In other words, XOOM's argument essentially seeks an offset based on XOOM's independent and voluntary decision to (on very rare occasions) charge less than it might otherwise have been permitted to do.

In making its argument, XOOM ignores entirely the well-developed law defining when a defendant may claim an offset against otherwise recoverable contract damages based on its own voluntary decision-making.  As the Supreme Court has explained, the common law doctrine of setoff allows entities to apply their mutual debts against each other, thus "avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see also Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1998) (same, applying New York law).  "In setoff, the debts may arise from different transactions, . . . but they must be mutual . . . . '[D]ebts are mutual when they are due to and from the same persons in the same capacity.'" *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002) (citations omitted).  For purposes of setoff, "a debt arises when all transactions necessary for liability have occurred, regardless of whether the claim was contingent when the petition was filed." *In re Lehman Bros. Holdings Inc*., 404 B.R. 752, 759 (Bankr. S.D.N.Y. 2009). That right to setoff is widely recognized at common law both in New York[20] and North Carolina.[21]

XOOM has no right of setoff here because even it does not claim there are any "mutual debts" owing between the Class and XOOM.  When the Class paid XOOM for energy at the rates charged by XOOM, they did not incur a debt to XOOM for any "undercharge."  Nothing in the

---

[20] Section 151 of the New York Debtor and Creditor Law ("DCL") now codifies New York's equitable and common law right to setoff.  *See Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, 2016 WL 958640, at *2–3 (S.D.N.Y. Mar. 8, 2016) (discussing section 151 of the DCL and its broad applicability).

[21] *See Durham v. SMI Indus. Corp.,* 882 F.2d 881, 883 (4th Cir. 1989) (the law of North Carolina has long recognized the common law right of setoff); *In re Battery Kings Mfr. Co., Inc.,* 83 S.E.2d 490, 492 (N.C. 1954) (North Carolina law permits setoff of debts where there is "mutuality of parties and of claims"); *see generally In re Britten,* 83 B.R. 914, 918 (Bankr. E.D.N.C. 1988) (summarizing North Carolina law of setoff).  Because the law of New York and North Carolina is the same, the Court need not address any issue under the contract's choice of law clause.

contract granted XOOM any right to increase its charges to the Class years after its bills were rendered and fully paid, as it is now attempting to do.[22]

Further, XOOM wrongly miscasts this issue as a methodological flaw, when in reality, XOOM's argument goes to the inputs used rather than the underlying algorithm of Mr. Adamson's analysis. If the Court agreed with XOOM, Mr. Adamson could simply replace the inputs for the alleged undercharges, thus fully taking those into account in determining appropriate damages. Whether or not XOOM is entitled to its claimed offsets, the same underlying algorithm determines damages, just with adjusted inputs. Consequently, XOOM's flawed critique goes to weight not to admissibility. *Phoenix Light SF*, 2020 WL 13547723 at *44.[23]

***Third***, XOOM claims that instead of using XOOM's "Total Costs" as the input for XOOM's supply costs, the Amended Report now uses supposedly impermissible aggregate figures

---

[22] XOOM tries to manufacture another defect when it claims that "undisclosed changes in CRA's underlying math" have shifted the expression of XOOM's margins. Defs.' 2nd Br. at 26, n. 16. XOOM similarly claims that "[w]ith a 21.2% margin input, Model Two says [Plaintiff] was *undercharged*, while Method C says she was *overcharged* at that same margin input." *Id.* at 26. These differences are attributable to XOOM's swapping price-based margins for cost-based margins. XOOM's math is the equivalent of XOOM saying that 25-degree weather is ideal for short sleeves but not disclosing if it is measuring in Celsius or Fahrenheit. *See* Adamson Decl. ¶ 6.

[23] XOOM's 1st Brief cites two cases for its undercharge argument. Both are inapposite because they concern damages issues not present here and they do not directly address the issue of setoff. *See Troitino v. Goodman*, 225 N.C. 406, 413 (1945) (for delivery of damaged goods, the measure of recovery is the difference between the fair market value of the goods as delivered and the fair market value of the goods as promised). In *Seijas v. Republic of Argentina (Seijas I)*, 606 F.3d 53 (2d Cir. 2010), the district court "estimat[ed] gross damages" without "using appropriate procedures to ensure that the awards roughly reflect the aggregate amount owed to each class member" while stating on the record that its estimates "were likely inflated" because "plaintiffs were unlikely to recover." *Id.* at 58–59. Essentially, the Second Circuit rejected the district court's determination that the damages calculation was unimportant given the low likelihood of recovery. That is completely distinct from the circumstances here. Indeed, *Seijas II* clarified the low bar that damages awards are unlawful only if they "bear[ ] little or no relationship to the amount of economic harm actually caused by defendants." *Hickory Sec. Ltd. v. Republic of Argentina (Seijas II)*, 493 F. App'x 156, 159 (2d Cir. 2012). Moreover, the issue in *Seijas II* was that the damages calculation included non-Class Members. *Id.* at 160–61. Here, there is no dispute that the damages model only includes Class Members, and there is also no genuine dispute that the damages bear a relationship to the economic harm caused by XOOM.

called "Variable Plan Costs." Defs.' 2nd Br. at 26. XOOM also claims that "CRA does not disclose the formula used to perform that aggregation." XOOM's claim should be rejected. The "Variable Plan Costs" come directly from XOOM's rate-setting workbooks. Adamson Decl. ¶ 21. They are not calculated; they are copied from XOOM's own data. *Id.* ¶ 22. Moreover, XOOM's complaint is about the model's input, which does not speak to its admissibility.

*Fourth*, XOOM challenges another input when it claims the Amended Report does not "fully explain" the products included in aggregate calculations but "at least some products in the class were excluded because CRA did not want to bother with the math." Defs.' 2nd Br. at 27. XOOM claims this is a change from the Original Report. *Id.* XOOM is incorrect. The Amended Report considered usage of all the customers in the Class and followed the same methodology in each of the expert's reports. Adamson Decl. ¶¶ 24–26. These reports calculated damages based on the rate and cost data of XOOM's two most popular plans for which full data was available: SimpleFlex for residential customers and BizChoice for commercial customers. *Id.* ¶ 26  The use of these rates is reliable because (1) XOOM's usage data specifically refers to these two plans in the produced workbooks, (2) XOOM failed to produce rate and cost data for many of its plans, and (3) the price and cost data for the plans that XOOM did provide appears to match those of SimpleFlex and BizChoice. *Id.* ¶¶ 26–36.[24]

*Fifth*, XOOM claims Method A's 7.33% figure based on the average difference between XOOM's supply costs and the utility's rate is flawed because it "omit[s] data about the utility rates charged in the vast subset of the class period." Defs.' 2nd Br. at 27. XOOM's criticism of this

---

[24] To the extent XOOM refers to "green plans," the energy sold under these plans is a miniscule portion of energy sold in comparison to conventional "brown" energy. Furthermore, it is also worth noting that XOOM's SimpleClean and BizClean customers comprise a tiny percentage of the Class, 0.1% of the account numbers reflected in XOOM's data that consumed only 0.1% of the total electricity XOOM sold to the Class. Amended Report ¶ 49 n.49.

input (not methodology) is not compelling.   The Amended Report relies on the data produced by XOOM that appears to have been gathered contemporaneously by XOOM.  Adamson Decl. ¶ 51. The gaps XOOM complains about are its own making, presumably the result of its own business judgment.  *Id.*  Demanding that Plaintiff collect utility rates is also expensive and inefficient as it could potentially spur satellite litigation over which collected rate reflects the accurate utility rate. *Id.*   Using XOOM's own utility rate compilations eliminates these potential disputes.  *Id.*  In addition, that XOOM collected and produced only partial utility data does not mean the average is unreliable or incorrect.  *Id.*  Tellingly, neither XOOM nor its expert suggests how the 7.33% figure would change if XOOM's data was complete.  *Id.*

**Sixth,** for Method C, XOOM claims Plaintiff's experts used "undisclosed calculations" to "create" the fixed margin inputs used to derive the 21.2% Method C margin.  Defs.' 2nd Br. at 28– 29.  XOOM also claims "[t]hese inputs are substantially different than the margin figures reported in XOOM's workbooks, and CRA does not disclose the algorithms, inputs, or logic used to create these figures."  *Id.*  This is the same complaint XOOM has about the Amended Report's use of a cost-based expression of margin.  Adamson Decl. ¶¶ 11–12, 58–62.  It fails for the same reason. Contrary to XOOM's claims, the Amended Report sets forth the formulas.  *Id.* ¶¶ 14–17.

**Seventh,** XOOM ignores the Court's contract construction when it claims "all the methods" do not incorporate "fixed costs, overhead and profit."  Defs.' 2nd Br. at 29.  That throwaway argument is dispatched by the contract XOOM drafted.

**Eighth,** XOOM recycles one of the arguments in its MIL No. 12 when it claims that the inputs in Methods A and B that are derived from the 2019 Reset Order are unfair to XOOM because the NYPSC's reasonableness findings were issued during the Class Period.  *Id.* at 29.  That argument fails for the same reason it fails in XOOM's MIL No. 12.  *See* ECF 237, Pls.' Opp'n to

Defs.' MILs, at 58–61 (explaining that the NYPSC's findings are relevant to the assessment of the objective reasonableness of XOOM's margins).  Further, the Court has refused to foreclose the possibility of the jury "refer[ing] to the Commission's findings as a lower bound in determining a reasonable and proportionate margin."  Decert. Denial Order at 16.  Finally, XOOM's quibble is with a model input, not the underlying damages methodology.

**Ninth**, XOOM again claims that using the utility rate as an input for Method A is contradictory.  Defs.' 2nd Br. at 29.  This input criticism goes to the model's weight and XOOM's factual claims of contradiction are incorrect for the reasons discussed in footnote 10, *supra*.  XOOM is also wrong to claim Method B's 5% figure uses the utility rate.  *Id.*  It uses the NYPSC's assessment of a reasonable return in exchange for taking on more financial risk than XOOM bore here.  Amended Report ¶¶ 92–100.

**Tenth,** XOOM recycles its arguments in its MIL No. 4 that just because it once charged a fixed rate margin of 59%, using XOOM's average margin of 21.2% is improper.  Defs.' 2nd Br. at 29.   This too is a criticism of an input improperly repackaged as a critique of the methodology itself.  XOOM's criticism is also meritless.  As discussed in Plaintiff's response to that motion, XOOM's own data shows that month after month and year after year it levied variable rate margins that were on average **three times** those of its riskier fixed rate products.  *See* Amended Report ¶ 69 (average fixed rate margin of 21.2% compared to 68% average variable rate margin); *see also id.* ¶ 108 (Table 2 comparing XOOM's fixed and variable rate margins on an annualized basis).  That XOOM's fixed rate margins fluctuated is irrelevant.  As noted by Plaintiff's expert, those fluctuating margins were the result of XOOM's subjective decision-making and thus reflected **fewer** constraints than XOOM's contract imposed on its variable rate price setting.  *Id.* ¶ 105.  It is simply unreasonable to charge a higher markup on a product governed by **stricter** pricing

constraints, especially when those constraints arise in a form contract that must be construed against the drafter.  MSJ Order at 12.  Once XOOM's subjective fixed rate margin decisions are translated (by way of averaging) to conform them to the proportionate-margin construction they are not "out-of-step."  Defs.' 2nd Br. at 30.

*Eleventh,* XOOM closes its 2nd Brief by claiming to have identified a problem with the fact that the class usage changed after it provided additional usage data on March 1, 2024.  Defs.' 2nd Br. at 30.  XOOM claims "the numbers seem to include usage for products that CRA declined to include in its supply cost calculations and, because CRA did not show their math, the usage numbers cannot be validated."  *Id.*  This is incorrect.  CRA considered the usage of all the Class Members, which was taken directly from XOOM's production.  Adamson Decl. ¶¶ 24–25.  Any changes are due to additional and updated figures in XOOM's March 1, 2024 production.  *Id.* ¶ 19.  CRA did not "decline" to include the supply costs calculations.  Rather, XOOM failed to provide rate and cost information for many of its plans and CRA had to use the rate and cost information of XOOM's most popular plans to compute damages.  Adamson Decl. ¶ 26.

## III.   XOOM'S FIRST EXCLUSION MOTION IS MOOT AND IS BASED ON ARGUMENTS THE COURT ALREADY REJECTED AT DECERTIFICATION
*(Responding to Defs.' 1st Br. Point IV.A–D at 8–25)*

XOOM ostensibly made its first motion to exclude because it was so confident the Amended Report is "undeniably late" that Plaintiff will be left with only the Original Report.  Defs.' 1st Br. at 2.  The true purpose of that wasteful motion, however, was to fill out the decertification arguments it had finished briefing just ten days prior.  *Compare* ECF 212, Defs.' May 10 Decertification Reply ("Decert. Reply") *with* ECF 215, Defs.' 1st Br.

There are thus two independent reasons why the Court can wholly disregard XOOM's motion to exclude the Original Report.  First, and as discussed above, the Amended Report was

not untimely. That report replaced the Original Report so XOOM's attacks on the Original Report are now moot. Second, the Court has already rejected XOOM's core exclusion arguments. When XOOM filed its decertification motion it "put[] the cart before the horse" and proceeded with a motion that previewed "some of its arguments in support of its motion to exclude plaintiff's expert report" in an effort to have the Court "skip to deciding its partially briefed motion to exclude." Decert. Denial Order at 9. Unfortunately for XOOM, the Court evaluated XOOM's arguments and found them to be claims of "inaccur[acy]" or "unreliab[ility]" of "the model's still-to-be-determined 'inputs,' both of which [the Court had already] identified as jury questions." *Id.* at 9. The Court then observed, however, that these arguments rendered the possibility of excluding Plaintiff's damages model "slight indeed" and proceeded to address (and refute) them. *Id.* As set forth below, because XOOM's 1st Brief simply repeats the arguments it unsuccessfully made at decertification, its first motion to exclude (ECF 214) is almost entirely a dead letter.

A. **XOOM's Claim That Model Two's Calculations Were Never Updated Is Demonstrably False and the Court Made Clear in Its Decertification Denial that XOOM's Complaints about Supply Cost Inputs Raise Jury Issues**
   *(Responding to Defs.' 1st Br. Point IV.A at 8–9)*

XOOM first claims that that "Plaintiff's failure to supplement Model Two's calculations renders it inadmissible as common proof for the certified class." Defs.' 1st Br. at 8. There are at least two reasons why this claim is meritless. First, as discussed on pp. 31–32 above, Method C in the Amended Report *is* Model Two and its calculations *were* supplemented. XOOM thus misfires when it claims these "calculations were not updated at all" because Plaintiff "finally recognized its fatal deficiencies." Defs.' 1st Br. at 9. Second, XOOM uses this concocted deficiency to claim that Model Two is "hopelessly incomplete" because it fails to provide common proof of XOOM's supply costs. *Id.* Again, XOOM's claim is not a serious one, but that lack of rigor does not prevent it from also running headlong into the Court's ruling at decertification that

XOOM's "challenges" to the "accuracy" of the "supply cost" input in Plaintiff's damages model are issues for the jury to decide at trial.  Decert. Denial Order at 16.

### B. The Court Has Already Evaluated and Rejected XOOM's Claim that *Martinez* Requires the Original Report's Exclusion
*(Responding to Defs.' 1st Br. Point IV.B at 9–14)*

XOOM next overreads *Martinez* and makes two claims the Court dispatched at decertification.  First, XOOM claims (without citation) that the expert's opinion in *Martinez* was excluded because he "left it to the jury to decide what margin was actually appropriate."  Defs. 1st Br. at 12.  The Court has already found XOOM's argument "unpersuasive," and specifically ruled that "[a] jury can determine a reasonable and proportionate margin."  Decert. Denial Order at 13.

Second, XOOM cites *Martinez* (and *Richards*) and claims that Plaintiff's expert's "failure to compare XOOM's rates or margins to those of other ESCOs renders their overcharge opinions irrelevant, inadmissible under Rule 702, and legally insufficient."  Defs.' 1st Br. at 14 (cleaned up).  XOOM made this exact same argument at decertification (Decert. Reply at 18), which as discussed on pp. 41–43 above the Court expressly rejected.   Decert. Denial Order at 14–15.[25]

---

[25] XOOM also claims that it is "remarkable" that another expert from the same global economic consulting firm criticized a different opinion offered in a different case that involved a markedly different contract. Defs. 1st Br. at 13.  Plaintiff disagrees and believes that XOOM's comparison does not shed light on any disputed issues.  Moreover, any differences in opinions go to the weight the jury will give Plaintiff's expert's opinion here, even if offered by the *same* expert.  *See Tewksbury v. Dowling*, 169 F. Supp. 2d 103, 112 (E.D.N.Y. 2001) ("It is clear, however, that any discrepancies and inconsistencies in Dr. Stastny's testimony are matters to be considered by the jury in assessing his credibility"); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 749 F. Supp. 2d 130, 132 (S.D.N.Y. 2010) ("To the extent that Defendants argue that the opinions of [two experts] are unreliable because they are inconsistent with their deposition testimony, previous declarations, or previous writings, these critiques speak, at most, to credibility.  As a court in this district recently explained, questions of credibility generally do not render an expert's testimony inadmissible.  Issues of credibility, such as those alleged here, are best explored through vigorous cross-examination." (cleaned up)).

**C. The Rule 702 Arguments XOOM Advances Regarding Model Two Are Easily Rebutted, Mostly Because the Court Has Already Done so at Decertification**
*(Responding to Defs.' 1st Br. Point IV.C at 15–24)*

1. The Original Report's Opinions About Breach and Damages Are Admissible

XOOM claims "Model Two is irrelevant and unhelpful" on questions of both (1) breach and (2) damages. Defs.' 1st Br. at 15. With respect to breach, XOOM attacks Model **One**. *See id.* (opinions based on a "misinterpretation that the contract allows no margin are irrelevant"). XOOM's brief is not merely careless. Instead, XOOM lumps together the Original Report's opinions about XOOM's rate setting process (citing Original Report ¶¶ 38–59) with Model One (*id.* ¶¶ 62–72) and claims that the Original Report's conclusions about XOOM's rate-setting process assume the contract does not permit a margin (*i.e.*, Model One). XOOM's sleight of hand is both unhelpful and unconvincing. Plaintiff's expert is an energy economist with decades of relevant experience (Original Report ¶¶ 16–22); his analysis of XOOM's rate-setting process is based on XOOM's own documents and testimony (*id.* ¶¶ 38–59) and the Court has already found that "the process by which XOOM set rates is of central importance." MSJ Order at 3. Clearly his opinions about XOOM's rate-setting process will help the jury understand the evidence and determine a fact at issue. *See Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 108 (E.D.N.Y. 2022) ("Under the Federal Rules of Evidence, the basic approach to opinions is to admit them when helpful to the trier of fact." (cleaned up)).

Second, regarding damages, XOOM claims Model Two "cannot function without numerical inputs for an appropriate margin, and Mr. Adamson admits he cannot help the jury decide what those inputs should be." Defs.' 1st Br. at 16–17. XOOM made this exact argument in its decertification motion (ECF 197, Defs.' Brief in Supp. of Mot. to Decertify ("Defs.' Decert. Br.") 14–16, 19–21), which the Court acknowledged and rejected. Decert. Denial Order at 13–16;

*see also id.* at 13–14 (describing two of Mr. Adamson's proposed inputs).  XOOM's argument is "unpersuasive" for the same reasons already articulated by the Court.  *Id.* at 13.[26]

     2.  XOOM's Recycled Facts and Data Complaints Were Expressly Rejected at <u>Decertification or Have Already Been Refuted</u>

XOOM next claims that Model Two is not based on sufficient facts or data.  XOOM's five supporting arguments were either rejected by the Court at decertification, were recycled in its 2nd Brief and have been refuted above or are facially incorrect.  Defs.' 1st Br. at 17–24.

***First***, XOOM simply repeats its claim that model two fails to provide a "reasonable" margin input.  *Id.* at 17–18.  As just discussed, the Court disposed of that argument at decertification.  Decert. Denial Order at 13–16.

***Second***, XOOM claims Model Two is inconsistent with the Court's proportionate-margin construction because it uses XOOM's contemporaneous fixed rate margin as a placeholder.  *Id.* at 17–20.  As previously noted, the Court rejected this claim at decertification: "Contrary to XOOM's suggestion, plaintiff's model does not assume that variable-rate margins should be the same as XOOM's fixed-rate margins"; rather, "plaintiff's experts were clear that the fixed-rate margin is a placeholder that can be easily updated to accommodate any margin the jury deems appropriate." Decert. Denial Order at 13 (citing Original Report ¶ 73 & n. 51) (cleaned up)).  XOOM is likewise wrong to claim that Plaintiff "did not supplement Model Two with a new data point," (Defs.' 1st Br. at 19), because as discussed on p. 31–32 above, Model Two ***was*** supplemented as Method C.

***Third***, XOOM falsely claims that "Model Two does not have any input for supply costs." *Id.* at 20.  XOOM's claim is both incorrect and misleading.  XOOM's claim is incorrect because

---

[26] XOOM adds nothing when it cites *Jakobovits*, 645 F. Supp. 3d at 109.  In XOOM's cited portion of that case, this Court excluded as unhelpful an opinion stating that cost of insurance rate increases merely "discriminated," when "discrimination is how insurance works" and the "the key issue in the case" was whether the discrimination was "unfair."

as discussed on pp. 45–46 above, the distinction XOOM draws between the price-based placeholder inputs of Model Two and the cost-based methodology of the model itself is a distinction without a difference.  XOOM's claim is misleading because it repackages a complaint about how a calculation is expressed as a potential issue about the model's methodology.

*Fourth*, XOOM claims Model Two lacks "reliable methods and applications" because XOOM wrongly believes it has a right to recoup undercharges.  As discussed on pp. 46–48 above, XOOM is incorrect and XOOM's criticism goes to weight, not admissibility.  *Id.* at 20–22.

*Fifth*, XOOM again gripes about the price-based placeholder inputs of Model Two and the cost-based methodology of the model itself and claims that these are also indicia of unreliable methods and applications.  *Id.* at 21–23.  Instead, and as discussed in the Court's Orders, the placeholder is appropriate to allow the jury to determine the appropriate margin.

### D. XOOM's Unsupported Catchall Argument to Exclude the Remainder of Plaintiff's Expert's Original Report Should Be Rejected
(*Responding to Defs.' 1st Br. Point IV.D at 24–25*)

At the end of its 1st Brief, XOOM includes the catchall argument that "[m]ost of CRA's other opinions" in both the Original and Rebuttal Reports "are inadmissible under Rule 702." Defs.' 1st Br. at 24.  In support of this sweeping claim, XOOM offers four bullet points and cites zero authorities.  *Id.* at 24–25.  XOOM's bullets offer three boilerplate critiques seeking to exclude a host of testimony: the challenged statements **(1)** "merely describe the contents of evidence that the jury is fully capable of assessing for itself" (citing summaries of expert opinions outlined in Original Report ¶¶ 23(c)–(f); Rebuttal Report 2(a)); **(2)** "are irrelevant to any disputed issue" (citing more opinion summaries in Original Report ¶ 23(g)); or **(3)** "attempt[] to interpret the contract or offer legal opinions about legal, legislative, or regulatory proceedings" (citing Rebuttal Report 2(d)–(f)).  Defs.' Br. at 24–25.  XOOM also asserts in conclusory fashion that that the

challenged statements do not relate to "matters on which CRA can claim expertise." *Id.* at 25. Notwithstanding the perfunctory nature of XOOM's arguments, each is refuted below.

As a general matter, XOOM's arguments miss the forest for the trees. XOOM attacks lines of reasoning leading to the expert's opinions. Inclusion of such reasoning in a report is not only permissible, it also is required. *See Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."); *R.C. Olmstead, Inc. v. CU Interfact, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ("An expert opinion must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation."). The challenged paragraphs provide, for example, industry background and address key facts about XOOM's rates and its rate-setting, all of which are relevant to the methods applied and conclusions reached.

In any event, each one of XOOM's scattershot arguments should be rejected because they are uniformly meritless. ***First***, XOOM argues that paragraphs 23(c)–(f) of the Original Report and paragraph 2(a) of the Rebuttal Report "merely describe the contents of evidence that the jury is fully capable of assessing for itself." Defs.' 1st Br. at 24–25. It is well settled that even "[w]hile a juror may be able to understand each individual source" cited in an expert report, the expert nonetheless may "synthesize[] this material and pull[] together common themes in reaching his conclusions." *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015); *see also City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345 (AJN), 2021 WL 5154110, at *16 (S.D.N.Y. Nov. 5, 2021) ("Even if a perceptive and persistent juror could sort through the documents and track the funds themselves, the Court nevertheless concludes that such expert testimony is admissible so long as it synthesizes or summarizes data in a manner that streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary

confusion." (cleaned up)).  Here, the challenged paragraphs recite key facts supporting Plaintiff's expert's opinions regarding XOOM's rates and rate-setting process, *see* Original Report ¶¶ 23(c)–(f)—or rebut XOOM's expert's analysis of XOOM's rates, *see* Rebuttal Report ¶ 2(a).  These are highly relevant, *see supra* at 55 (citing MSJ Order at 3 ("[T]he process by which XOOM set rates is of central importance . . . .")), and are proper subjects of expert testimony.  *See Louis Vuitton*, 97 F. Supp. 3d at 504; *AU New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411 (GHW) (SN), 2019 WL 1254763, at *8 (S.D.N.Y. Mar. 19, 2019) ("[A] party is free to—and should—attack the [opposing] expert's testimony with . . . rebuttal reports.").

**Second**, XOOM objects to paragraph 23(g) of the Original Report, which explains that New York banned the variable rate plans XOOM sold here.  According to XOOM, this paragraph is "irrelevant to any disputed issue" because it "describ[es] legal, legislative, or regulatory proceedings, which do not govern any issue in this case."  Defs.' 1st Br. at 24.  This is yet another attempt by XOOM to hide from the jury the clearly relevant history of New York's ESCO regulations, which is also the subject of XOOM's MIL No. 12.  *See* ECF 222 at 30.  For the reasons explained in Plaintiff's opposition to that motion, this information is admissible.  ECF 244 at 52.

**Third**, XOOM claims paragraphs 2(d)–(f) of the Rebuttal Report "attempt[] to interpret the contract or offer legal opinions about legal, legislative, or regulatory proceedings."  Defs.' 1st Br. at 25.  The challenged paragraphs do no such thing.  In fact, those paragraphs respond to XOOM's expert's attempts to interpret XOOM's contract and divine the NYPSC's motives.  XOOM should not be allowed to attack Plaintiff's expert based on the deficiencies in its own report.

**Finally**, XOOM asserts that the challenged statements do not relate to "matters on which CRA can claim expertise."  Defs.' 1st Br. at 25.  But the fact that each link in a chain of reasoning does not individually require complex calculations or specialized knowledge does not mean those

portions are improper.  To the contrary, courts routinely permit expert testimony "that takes the ultimate form of basic arithmetic when the expert used specialized knowledge" in developing the reasoning.  *Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*, No. 17 Civ. 1338 (NGG) (ARL), 2021 WL 1906468, at *10 (E.D.N.Y. May 12, 2021); *see also Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775437, at *7 (S.D.N.Y. Apr. 25, 2013) (expert "did not mechanically perform rote calculations, but rather based his analysis on . . . qualitative determinations" that relied on specialized knowledge); *Hamza v. Saks Fifth Ave., Inc.*, 07 Civ. 5974 (FPS), 2011 WL 6187078, at *2 (S.D.N.Y. Dec. 5, 2011) (expert "employed his specialized knowledge . . . to organize and utilize each piece of this earnings 'puzzle' into a final calculation at which fact-finders would not be able to arrive themselves if each piece of information were presented to them individually").

Further, "it is settled in this Circuit that expert testimony is helpful even where the jury might have general knowledge of the subject at issue, so long as such knowledge may be incomplete or inaccurate given the particular facts and circumstances relevant to the particular case for which expert testimony is offered."  *Vazquez v. City of New York*, No. 10 Civ. 6277 (JMF), 2014 WL 4388497, at *13 (S.D.N.Y. Sept. 5, 2014) (quoting *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 358 (S.D.N.Y. 2001)).  Plaintiff's expert has decades of experience and a high degree of expertise in XOOM's industry.  *See* Original Report ¶¶ 16–22 (summarizing qualifications).  His testimony will be not only helpful but essential to the jury in discharging its factfinding role.

## CONCLUSION

For the reasons stated herein, Plaintiff requests that the Court deny both of Defendants' motions to exclude.

Dated: June 28, 2024

**WITTELS MCINTURFF PALIKOVIC**

 /s/ J. Burkett McInturff
J. Burkett McInturff
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com

*Class Counsel for Plaintiff and the Class*

Richard Dolan
Bradley D. Simon
**SCHLAM STONE & DOLAN LLP**
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Andrey Belenky
**KHEYFITS BELENKY LLP**
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

*Co-Counsel for Plaintiff and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 28, 2024, the foregoing was served via ECF on all counsel of

record.

By:   <u>/s/ J. Burkett McInturff     </u>
            J. Burkett McInturff