# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

SUSANNA MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                                  Plaintiff,

          v.

XOOM ENERGY, LLC, AND
XOOM ENERGY NEW YORK, LLC,

                                  Defendant.

---

Case No: 1:18-cv-02949-ARR-JAM

**DECLARATION OF SEABRON ADAMSON**

I, Seabron Adamson, declare as follows:

1.      My qualifications are set forth in the Amended Report[1] and I am not restating them here.

2.      I have been asked by Class Counsel to provide responses to certain statements made by Mr. Coleman in support of XOOM's Motion to Exclude my Amended Report, which XOOM entitled "Motion to Exclude Plaintiff's Untimely Expert Disclosures."  (ECF No. 229-11) ("Coleman Declaration").  I have also been asked to respond to certain statements made by XOOM in the same motion (ECF No. 229-1) ("Second Motion to Exclude") and in XOOM's earlier Motion to Exclude my Original Report, which XOOM entitled "Motion to Exclude Plaintiff's Timely Expert Disclosures."  (ECF No. 215) ("First Motion to Exclude").

3.      At the outset it is necessary to address the role of Exhibits in the Amended

---

[1] In this declaration I use the terms "Original Report" and "Amended Report," to refer to the same documents as did Mr. Coleman in his May 30, 2024, declaration.

Report:

- Exhibit 3 sets forth the underlying data and calculations I used to determine the average 7.33% difference between XOOM's supply costs (as reflected in the reported "Total Cost" data in XOOM's rate-setting workbooks) with the corresponding utility default service rates;

- Exhibit 4 sets forth the underlying data and damages calculations using Method A's 7.33% margin;

- Exhibit 5 sets forth the underlying data and damages calculations using Method B's 5.00% margin;

- Exhibit 6 sets forth the underlying data and calculations I used to determine XOOM's average fixed-rate plan margin from the data XOOM provided;

- Exhibit 7 sets forth the underlying data and damages calculations using Method C's 21.2% margin.

4.      Mr. Coleman's declaration states that the "Amended Expert Report contains three approaches to calculating overcharges.  All three of these approaches, Methods A, B, and C, are completely new and novel analytical approaches.  There are no calculations represented in the CRA Original Report that even remotely resemble these approaches."  Coleman Decl. ¶ 3.  I disagree with this statement.  The analytical framework in the Original Report and the Amended Report are the same: damages are determined as the amount charged to XOOM's customers minus the amount customers would have been charged had XOOM been allowed a given margin.

5.      I understand from Class Counsel, the court's June 20, 2024, Order Denying XOOM's Decertification Motion (ECF No. 246) ("Decertification Denial Order") recognized that Model Two in the Original Report "does not currently provide a precise reasonable and

proportionate margin is therefore to be expected, given the issues teed up for trial."
Decertification Denial Order at 13.  I also understand the court acknowledged "plaintiff's experts
were clear that the fixed-rate margin is a placeholder that can be "easily . . . update[d]" to
accommodate any margin the jury deems appropriate. Pl.'s Expert Report ¶ 73 & n. 51." *Id.*
The difference in the Amended Report is that it was revised to incorporate the three proposed
proportionate margins I intend to present at trial now that the meaning of XOOM's pricing term
has been settled.  As I noted in the second paragraph of Amended Report itself, prior to the
court's August 2023 Summary Judgment Order and the December 2023 ruling from the Cout of
Appeals the constraints on what kind of a proportionate margin could be charged were not
known to me. I understand from Class Counsel that the Summary Judgment Order requires
XOOM's margin be proportionate to the supply costs in XOOM's rate-setting workbooks
(RSWs).  Summary Judgment Order at pages 12-14.  This is a "cost-based" margin where an
adder is layered on top of XOOM's supply costs, whereas both XOOM and the placeholder fixed
margins used in the Original Report calculated margin by reference to XOOM's ultimate rate,
this is a "price-based" margin.

6.    A "cost-based" margin and "price-based" margin are calculated using the same
two variables, pulled directly from XOOM's RSWs: price and cost. The difference between a
"cost-based" margin and "price-based" margin is essentially the same as the difference between
Fahrenheit and Celsius – these are two different ways of expressing the same thing.  A price-
based margin calculates the difference between the rate XOOM ultimately charged and XOOM's
supply costs as percentage of price, whereas the cost-based margin calculates the difference
between the rate XOOM charged and XOOM's supply costs as a percentage of cost.  I
understand from Class Counsel that the Court's summary judgment adopted the use of a cost-

based margin as the input for damages calculations.

7.      Before the court's August 2023 ruling, which I understand from Class Counsel clarified how the Electricity Sales Agreement's ("SA" or "Sales Agreement") pricing term worked, as a placeholder I followed XOOM's method for expressing its variable rate margins, which is a price-based margin, calculated as follows:

$$Margin_{Price} = \frac{Price - Cost}{Price}$$

8.      Using this formula, I calculated the allowable margin of the variable-rate plans to be the margin on the corresponding (market and time) fixed-rate plans, derived from XOOM's own data.

9.      I understand from Class Counsel that the court's August 2023 ruling agreed with the Original Report's proposal to use a cost-based margin (or the markup on top of cost) defined as:

$$Margin_{Cost} = \frac{Price - Cost}{Cost}$$

10.     My understanding is that XOOM characterized the "price-based" math underlying Model Two from the Original Report as follows:

> **Model Two:**
>
> [variable rate]*[usage]*([variable margin]-[fixed margin])

This equation can be rewritten as:

$$Rate_{Var} \times Usage \times (Margin_{Var} - Margin_{Fixed})$$

Factoring Usage (meaning taking Usage outside of the parenthesis), results in the following formula:

$$Usage\big(Rate_{Var} \times (Margin_{Var} - Margin_{Fixed})\big)$$

Now, substituting price-based margin formula for variable margin (price-based):

$$Usage\left(Rate_{Var} \times \left(\frac{Rate_{Var} - Cost_{Var}}{Rate_{Var}} - Margin_{Fixed}\right)\right)$$

This can be simplified as follows:

$$Usage(Rate_{Var} - Cost_{Var} - Rate_{Var} \times Margin_{Fixed})$$

In other words, the analytical framework for calculating damages in the Original Report was Rate minus cost minus allowable margin input.

11.     Further, I understand that XOOM characterizes Methods A, B, and C from the Amended Report as follows:

```
                    Methods A, B, C:

([variable rate]*[usage])-([usage]*[variable cost]*(1+[margin input])
```

This can be rewritten as follows:

$$(Rate_{Var} \times Usage) - (Usage \times Cost_{Var} \times (1 + Margin\ Input))$$

Factoring Usage, the equation becomes:

$$Usage\ (Rate_{Var} - Cost_{Var} - Cost_{Var} \times Margin\ Input)$$

12.     As these equations show, the analytical framework in the Original Report and the Amended Report are the same: damages are determined as the amount charged to XOOM's customers minus an amount XOOM would have been allowed to charge its customers given an allowed margin.  The difference in the Amended Report is that it now removes the placeholder contemporaneous "price-based" margins and consistent with the court's August 2023 ruling and replaces it with a margin that is proportionate to cost (not rate), i.e., a margin that is a cost-based margin, as I understand from Class Counsel the Court's construction of the SA's pricing term requires.

13.     Mr. Coleman further states: "In Method C, CRA calculates a margin for fixed rate

products for each utility in each month and then averages all of the values to arrive at <u>one single value</u> equal to 21.23%.  It is unclear where these figures came from or how they were calculated as they are presented as values with no supporting calculations."  Coleman Decl. ¶ 3.  I agree that I arrived at one single value of 21.23%.

14.     I disagree with Mr. Colman's statement that "it is unclear where these figures came from and how they were calculated as they are presented as values with no supporting calculations."  *Id.*  The data I used to calculate the 21.23% figure came directly from XOOM's own data produced to Plaintiff and made available to me.  Below are two examples of XOOM's own rate-setting workbooks (RSWs).  I also note the formula disclosed in the Amended Report used to compute the cost-based margin.

15.     The first example comes from December 2020 NYSEG Electric, based on November 2020 RSW (XOOM_MIRKIN_009181).  In the below screenshot, the relevant information is highlighted in yellow.



Specifically, for each of the four fixed plans (SureLock 12, SureLock24, BizLock 12, and

BizLock24), I considered the following information, i.e., the effective date, cost, and rate.  In Exhibit 6 to the Amended Report, I provided the formula used to calculate the cost-based margin:

> **[D]**
> [1] - [3930] Cost and Pricing data from RSW; Cost-based margin calculated as (Price / Cost) - 1

The data in the above RSW has all the information required to calculate the cost-based margin according to the above formula as follows:

**Cost-based Fixed Margin Calculation for Dec-2020 Rates in NYSEG (Electric)**



And these cost-based margins are reflected in Exhibit 6 as follows:

  16. The second example comes from October 19 ConED Zone J (electric), based on September 2019 RSW (XOOM_INIT_002044):



Applying the above-mentioned cost-based margin formula, the margins for those plans in

October 2019 were:



And this information is set forth in Exhibit 6:



17.    The same calculation was performed for each fixed-rate plan, for each month, and

for each market and the resulting 3,930 different cost-based margins were listed in Exhibit 6.

The final 21.23% figure is the average of all these individual cost-based margins, as stated in

Amended Report Exhibit 6:

| [3931] | Average Margin >> | 21.2% |

**Notes and Sources**

**[D]**
[1] - [3930] Cost and Pricing data from RSW; Cost-based margin calculated as (Price / Cost) - 1
[3931]   = Average ([D])

18.     Mr. Coleman next states: "None of the three Methods described in CRA's Amended Report reproduce or update the same overcharge calculations that were presented in its Original Report."  Coleman Decl. ¶ 4.  As discussed in ¶¶ 4-11 above, this is not the case.  Mr. Coleman claims there are no analogues to Methods A and B in the Original Report, and he compares only Method C in the Amended Report to Model Two in the Original Report and states: "However, when we compare the calculations performed in each month, the allowable margin clearly differs."  *Id*.  The difference Mr. Colman identifies is because, as discussed, the Amended Report simply conforms the calculations of the appropriate XOOM rate to what I understand from Class Counsel is the court's August 2023 interpretation of the SA's pricing term, which requires a cost-based margin and that the rate be affected only by changes to the supply cost figures in XOOM's RSWs.  Instead of using the placeholder margin inputs from the Original Report, I calculated a single margin figure and applied it to all markets and months, which, as I understand from Class Counsel, is what the court's interpretation of XOOM's contract at summary judgment resolved.

19.     I have also been advised that XOOM is claiming that the Amended Report made changes to the pre-2018 data that XOOM supposedly had produced before the Original Report. These changes were made by XOOM.  When XOOM produced additional data in March 2024, it made changes to the data that it had produced in 2022.  Two tables below summarize the changes to the two sets of data: (1) available to me when preparing the Original Report ("Old Data") and (2) available to me after March 1, 2024, which is the data I relied on to prepare the Amended

Report ("New Data"):

Electric Usage Data Comparison



Gas Usage Data Comparison:

As can be seen from the tables above, substantial usage and customers were added to the New Data and some of the additions were in the periods for which XOOM had previously produced the data.

20.     In paragraph five of his declaration Mr. Coleman states: "The overcharge calculations provided by CRA in the workpapers for its Amended Report show only the final step in its calculations, are often presented as values only without supporting formulae, and are insufficiently detailed to allow for expert critique."  Coleman Decl. ¶ 5.  Mr. Coleman then writes that he "was unable to determine whether the preceding, but unshown calculations were performed accurately."  This contention is without merit as explained in ¶¶ 15-17 above.  The formula for performing the calculations that Mr. Coleman supposedly could not verify was provided in Exhibit 6.  The inputs to the formula came from XOOM's own RSWs (and appropriately organized in helper tabs in Exhibit 6).[2]

21.     In the same paragraph of his declaration, Mr. Coleman writes that Amended Report Exhibit 6 "reports, as values only, what it labels as 'Variable Plan Costs', for 'Electric Res', 'Electric Com', 'Gas Res', and 'Gas Com' customer groups.  CRA does not identify the source of these costs, what products they encompass, or how the "Variable Plan Cost" is calculated."  Coleman Decl. ¶ 5.  As already stated in ¶¶15-17 above, the calculations for the cost-based margin for XOOM's fixed plans for each respective commodity and customer type in each respective market used price and cost data directly from XOOM's RSWs. This is demonstrated in the two examples below:

_____

[2] "Helper tabs" are the tabs in the Excel Exhibits that provide the underlying data for damages calculations carried out in the first tab.



XOOM_INIT_001971

Amended Report, Exhibit 4.



XOOM_INIT_001645

22.     Contrary to Mr. Coleman statement, the Variable Plan Costs are not "calculated," but rather *copied* from XOOM's own data.  Amended Report ¶ 73.

23.     Mr. Coleman also writes: "In my review of the Rate Setting Workbooks, I noted a wide variety of product names for variable rate products.  CRA has not indicated which products it considered when calculating its 'Variable Plan Costs.'  Because it is unclear what products CRA included in its 'Variable Plan Costs', it is possible that the usage CRA reports may include products which it did not consider in its "Variable Plan Cost" calculation."  Coleman Decl. ¶ 5.

24.     In the Amended Report, I included the usage for the class as provided by XOOM.[3] I have provided an illustrative portion of XOOM's usage data spreadsheet below.



XOOM_MIRKIN 074180.

25.     This shows usage for a specific customer purchasing natural gas from XOOM within the RG&E service territory from September 2015 through February 2017. The above screenshot is only a subset of usage data for one customer. XOOM provided usage data for over 120,000 customers.  I aggregated data provided by XOOM to determine total usage for each

---

[3] Usage figures were provided by XOOM on a customer-by-customer basis.

commodity, customer class, market, and month. See: XOOM_MIRKIN_074171 through XOOM_MIRKIN_074180.

26.     When calculating damages, I applied the rate and cost data of the most popular plans for which the rate and cost data were available in XOOM's production: SimpleFlex and BizChoice.  Specifically, for each relevant month, market, and commodity for all residential usage, I applied XOOM's SimpleFlex rate and cost data.  For each relevant month, market, and commodity for all commercial usage, I applied XOOM's BizChoice rate and cost data.  This methodology was followed in each of my reports: initial, rebuttal, and amended and is explained below.

27.     I understand that Class Counsel requested from XOOM all relevant price and cost data for each commodity, market, month, and customer type for customers in the class. XOOM appears to have produced no rate and cost data for many of the "Product_Types" in the usage data, such as those that included the words "Basic" and "Prevailing" in the product name.

28.     The Excel workbooks XOOM shared, which included updated usage data, were specifically titled "BizChoice," "SimpleFlex," "Fixed to Variable Basic," "BizClean," and "SimpleClean."[4]

---

[4] I understand from Class Counsel that these documents were directly shared by XOOM. See, for example: XOOM_MIRKIN 074171_NY_BIZCHOICE_ELECTRIC_COMMERCIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN 074172_NY_BIZCHOICE_GAS_COMMERCIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN 074173_NY_BIZCLEAN_ELECTRIC_COMMERCIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN 074174_NY_FIXED_TO_VAR_BASIC_ELECTRIC_COMMERCIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN 074175_NY_FIXED_TO_VAR_BASIC_ELECTRIC_RESIDENTIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN 074176_NY_FIXED_TO_VAR_BASIC_GAS_COMMERCIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN 074177_NY_FIXED_TO_VAR_BASIC_GAS_RESIDENTIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN

29.     Based on a survey of the data, I found the prices charged customers for each "Product_Type" as listed in the usage data were equal to the prevailing "SimpleFlex" or "BizChoice" rate in that given month for the relevant commodity, customer type, and market as presented in the RSWs. Based on this fact, I allocated usage for each respective commodity, customer type, market, and month to the relevant price and cost data as provided in the RSWs when calculating my damages figure. I provide a few examples of this below.

30.     XOOM itself shared usage data by labeling the documents "SimpleFlex" and "BizChoice." Reviewing the usage data, one can compare the rate XOOM appeared to charge customers for different plans, or product types, in a given month. For example, if one filters the data provided in XOOM_MIRKIN 074179, which was shared by XOOM as "XOOM_MIRKIN 074179_NY_SIMPLEFLEX_ELECTRIC_RESIDENTIAL_CONFIDENTIAL.XLSX," to include only data for electric usage in the ConEdison Zone J service territory, one will see the rate for SimpleFlex (J) and Resi Prevailing Rate (J) is the same: 0.1299.

| E | F | H | J | K | L | M | O | P |
|---|---|---|---|---|---|---|---|---|
| Commodity so | Name of utility that distributes XOOM | ZONE_C | XOOM rate by mon | BILLING_MON | YE | Monthly amount of commodi | Product_Type | TYPE_OF_SA |
| E | ConEdison - Electric | J | 0.1299000000 | June | 2021 | 15 | SimpleFlex (J) | RES |
| E | ConEdison - Electric | J | 0.1299000000 | June | 2021 | 16 | Resi Prevailing Rate (J) | RES |

XOOM_MIRKIN 074179, Tab: "XOOM"

31.     This is the same June 2021 rate shown in the RSW provided by XOOM for ConEd Zone J. Note, this RSW does not provide prices and costs for a product name called "Resi Prevailing Rate."

---

074178_NY_SIMPLECLEAN_ELECTRIC_RESIDENTIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN 074179_NY_SIMPLEFLEX_ELECTRIC_RESIDENTIAL_CONFIDENTIAL.XLSX; XOOM_MIRKIN 074180_NY_SIMPLEFLEX_GAS_RESIDENTIAL_CONFIDENTIAL.XLSX..



XOOM_MIRKIN_009211

32.     As another example, if one filters the data provided in XOOM_MIRKIN 074172, which was shared by XOOM as "XOOM_MIRKIN 074172_NY_BIZCHOICE_GAS_COMMERCIAL_CONFIDENTIAL.XLSX," to include only data for gas usage in the ConEdison region IN August 2019, one will see the rate for "BizChoice" and "Prevailing BizChoice" is the same: 0.999.



XOOM_MIRKIN_074172, Tab: "Planet Energy"

33.     Again, this is the same rate shown, when converted from $/th to $/Dth (i.e. multiplying by 10), in the RSW for gas in the ConEdison region in August 2019. Similar to the example above, the RSW does not provide prices and costs for a product called "Prevailing BizChoice."



XOOM_INIT_001771

34.     I notice the same situation when reviewing the usage data for the Fixed to

Variable customers. Evaluating XOOM_MIRKIN_074176, the workbook shared by XOOM

labelled

"XOOM_MIRKIN_074176_NY_FIXED_TO_VAR_BASIC_GAS_COMMERCIAL_CONFID

ENTIAL.XLSX," if one filters data to include February 2019 usage data in National Fuel – NY,

customers under the "SMB Basic Plan" and "BizChoice 12" plan have the same rate of 0.745.



| E | F | H | J | K | L | M | O |
|---|---|---|---|---|---|---|---|
| Commodity so | Name of utility that distributes XOOM | ZONE_C | XOOM rate by mon | BILLING_MONT | YE | Monthly amount of commodit | Product Type |
| G | National Fuel - NY | | 0.7450000000000 | February | 2019 | 2 0 | SMB Basic Plan |
| G | National Fuel - NY | | 0.7450000000000 | February | 2019 | 16 9 | BizChoice 12 |

XOOM_MIRKIN_074176, Tab: "XOOM"

35.     Reviewing the RSW for February 2019 for gas plans in the National Fuel – NY

(NFG-NY) market, the RSW shows the rate for the BizChoice plan is 0.745. Again, this RSW

does not provide prices and costs for a product called "SMB Basic Plan."



XOOM_INIT_001739

36.     Given (i) XOOM provided usage data and specifically delineated the data as "SimpleFlex" and "BizChoice" in the Excel workbooks they shared, (ii) XOOM did not provide price and cost data for many "Product_Types" as shown in the usage data, and (iii) the price data for different "Product_Types" appear to match the prevailing "SimpleFlex" and "BizChoice" rates in the RSWs, I determined it was reasonable to apply rate and cost data for the SimpleFlex plan for each respective month, market, and commodity for all residential usage and BizChoice for each respective month, market, and commodity for all commercial usage when calculating my damage figures. SimpleFlex and BizChoice are the most popular plans for which the rate and cost data were available in XOOM's production.

37.     For XOOM's so-called green plans – the plans that have the word "Clean" in their names, as mentioned in the Amended Report, "I understand that XOOM has suggested that so-called "green" electricity customers under its SimpleClean and BizClean variable rate plans are willing to pay a premium for their electricity supply.  My analysis includes these customers because (1) I understand they were subject to the same pricing term under the SA as XOOM's

other variable rate customers; and (2) the 'green' electricity customers are receiving the exact same "brown" electricity as other customers, but XOOM is making minor additional payments to purchase renewable energy credits, which are reflected in the RSWs as supply costs. XOOM's reported additional costs for the green products from the rate-setting workbooks appear to be very small – on the order of a few percent in additional costs."  Amended Report n. 49.  Below are two examples demonstrating that the costs associated with the "green" electricity plan are ██████████████████████████████████.



April 2023 RSW for NIMO Electric (XOOM_MIRKIN_074259).



July 2021 RSW for ConEd Zone J Electric (XOOM_MIRKIN_074268).

Costs associated with "green" plans are just a few percent greater than the SimpleFlex and BizChoice proxies used to calculate damages.  Considering that the usage for those plans is less

than 0.1% of the total usage, the effect on damages is just a few hundredths of a percent of the total damages number for each Method and is therefore negligible.

38.     Mr. Coleman's declaration further states: "Model 2 cannot be consistent with the Court's determination that XOOM's variable rates must vary solely on the basis of supply costs. CRA's current Method C appears to be an attempt to modify Model 2 in such a way that it can be compliant with the Court's interpretation.  However, it simply represents a new and different calculation and is unworkable for all the reasons discussed elsewhere in this declaration." Coleman Decl. ¶ 6.  As explained in ¶¶ 4-11 above, Model Two and Methods A, B, and C use the same analytical framework for calculating damages.  As to Method C, the three things that changed, as compared to Model Two, were: (1) additional and updated data from XOOM; (2) the margin in Method C is cost-based (as opposed to the placeholder price-based margin in the Original Report) and (3) the margin is now the same across all markets and months in the Class Period.  I am still calculating the difference between what XOOM charged its customers and what XOOM would have charged its customers based on a given allowed margin.

39.     In the remainder of paragraph 6 of his declaration, Mr. Coleman explains the differences between Model Two and Method C concluding with "It appears that CRA has altered its methodology in Model 2 in an attempt to make it compliant with the court's interpretation. In doing so, CRA has simply developed a new and novel approach, Method C, that is not an update or supplement to Model 2."  I disagree with Mr. Coleman's characterization of Method C being "a new and novel approach" and "not an updated or supplement to Model 2."  As discussed above, Method C is an update to Model Two that conforms to what I understand from Class Counsel to be the courts' guidance regarding the SA and accounts for the new data produced by XOOM.

40.     In paragraph 7 of his Declaration, Mr. Coleman criticizes the Amended Report because "actual supply costs" that are mentioned in the pricing term are not considered in damages calculations.  Specifically, Mr. Coleman states: "All three Methods are unworkable because they rely exclusively on figures derived from XOOM's estimated supply cost inputs to its rate-setting workbooks, while the Court has ruled that XOOM's variable rates must vary solely on the basis of XOOM's estimated and actual supply costs. None of CRA's Methods incorporate actual supply costs. I have also been unable to determine or verify how CRA calculated its aggregated estimated supply cost inputs because it does not disclose that calculation."  Again, XOOM's aggregated estimated supply costs were taken directly from XOOM's RSWs.  Turning to the substance of Mr. Coleman's criticism, i.e., not considering the "actual" costs when computing damages, I offered opinions on that point in the Amended Report.  Specifically, I stated:

> 54. There is no evidence, in the RSWs or elsewhere, of any calculations used by XOOM that build up to the monthly variable rates charged to Plaintiff and the Class. The RSWs do contain elements that build up to what XOOM calls "Total Cost," but this is generally well below the rate charged. Class Counsel has advised me that XOOM claims this "Total Cost" buildup reflects XOOM's "estimated" costs referred to in the SA's pricing provision, and that XOOM alleges "actual" supply costs are factored into the RSWs' margin figure and thereby explain the fluctuating margins XOOM obtained via its variable rates. I have seen no evidence in the discovery materials of any systematic calculations of XOOM's "actual" supply costs for its New York customers (including prior period adjustments, inventory (for gas only), or balancing costs), no evidence that XOOM had a method for using actual costs to calculate its varying margins, and no evidence that XOOM maintained a fixed margin and then added a determinable amount of "actual" supply costs to that margin.
>
> . . .
>
> 63. With respect to this claim, I note that XOOM witnesses testified that the rate-setting workbooks were very accurate. Andrew Coppola, XOOM's former Senior Vice President of Energy Supply,

testified that the RSWs were at "99 percent certainty" of the company's costs.[58] XOOM's 30(b)(6) witness similarly testified that there was "a very high level of accuracy across all" of XOOM's RSWs, that the RSWs were "highly accurate" "over time," and the RSWs in "New York and other states" were "extremely reliable."[59] It therefore seems highly doubtful that differences between "estimated" and "actual" costs could be so large and so frequent as to require such large and varying variable rate margins month over month, year over year as compared to XOOM's fixed rate customers. I have not seen any evidence where such impacts are quantified or justified.

. . .

72. I understand that XOOM claims it recovered its "actual" supply costs within its variable rate margin. I have not seen any evidence that these supposed "actual" supply costs were ever systematically broken down, documented, or calculated in a way that could be used determine how, if at all, "actual" supply costs flowed into the margin XOOM obtained on top of the "estimated" supply costs in XOOM's rate-setting workbooks. I was not able to identify any baseline margin(s) which XOOM supposedly increased with additional alleged actual supply cost adders because, to my knowledge, XOOM itself did not build up its margins in this way numerically (or otherwise). None of XOOM's alleged actual supply costs items (such as prior period adjustments) appear to have been broken down by XOOM in a way that relates to monthly variable rate calculations.

Amended Report ¶¶ 54, 63, and 72. I also note that Mr. Coleman in his rebuttal to my Original Report did not offer any calculations using the actual costs and demonstrating that they produced any significant departure from the damages calculations.

41.     In paragraph 8 of his declaration, Mr. Coleman states that "All three of CRA's proposed overcharge calculations are unworkable and unstable because they all rely on future data that could not have been known by XOOM or any other market participant at the time of service." Mr. Coleman then addresses each of the cost-based margins used in Methods A, B, and C and concludes that these three figures used as margin inputs to those methods "are inherently unstable and unreliable." Coleman Decl. ¶ 8. I was advised by Class Counsel that the court's guidance regarding the SA's pricing term requires "a margin that is fixed as a percentage,

reasonable in context, and set using objective factors (because I understand XOOM does not have pricing discretion)."  Amended Report ¶ 104.  Accordingly in the Amended Report I undertook the search for "objective criteria" that could be used in damages calculations.  This search for objective criteria and analysis led me to the New York Public Service Commission's ("NYPSC") independent pronouncements about the reasonableness of both variable and fixed rates charged by New York ESCOs:

> Method A reflects the NYPSC's determination that it is not reasonable for ESCO customers to pay more for the exact same commodity that is also sold by their existing utility. This method is also consistent with the nature of the supply costs faced by both ESCOs and utilities. Method B is similar in that it incorporates the NYPSC's determination regarding reasonable ESCO rates. Method B uses the 5% margin the NYPSC selected as reasonable for fixed rate products. While the 5% figure applies to a different product (fixed as opposed to variable rates), that premium was applied to a product that poses a greater financial risk to the ESCO than the variable rates at issue here. The NYPSC's 5% premium restriction was also applied to ESCO products sold in the same New York market in which XOOM operates.

*Id.* ¶ 74.

42.     The NYPSC's findings have independent relevance to an assessment of the objective reasonableness of XOOM's margins.  As to Method C, because that method "is ultimately based on XOOM's subjective decision-making regarding the margin for its fixed-rate products, it reflects fewer of the pricing constraints incorporated into Methods A and B."  *Id.* ¶ 105.  "Nonetheless, this method provides a ceiling in terms of a maximum commercially reasonable margin, especially in a scenario where XOOM is allowed to have had some price-setting discretion, but still faced a requirement to act reasonably and in good faith using any allowed discretion in setting rates[.]" *Id.*

43.     I understand from Class Counsel that the question of what is an objectively reasonable margin benchmark for the jury to hold XOOM to does not turn on when XOOM's

conduct occurred or when the NYPSC's findings were made.  My understanding from Class Counsel is that the factfinder may look at the available information, even if that information became available after XOOM's rate-setting decisions took place and determine the "reasonable" markup on top of XOOM's cost that XOOM was allowed to charge, as long as the determination is based on objective criteria, which it is in Methods A and B, and less so in Method C (because that method relies on underlying figures XOOM set based on its own discretion).

44.     I also note that the 5% margin referenced in the December 2019 NYPSC Order could have been known by XOOM before December 2019 because NYPSC referenced "a typical risk premium in financial markets" relying on historical data.

45.     In paragraph 9 of his declaration Mr. Coleman states that "CRA materially misapplies the 5% margin used in Method B versus how that same figure is described in the NY PSC's Reset Order."  He further writes that in the Reset Order "5% figure represents an allowable price premium above the utility rate that ESCOs can charge for fixed rate products. . . . Instead, CRA adopts the figure of 5%, but re-interprets it as the maximum allowable margin above XOOM's estimated supply costs, rather than the maximum allowable price premium over the prevailing utility rate."  He continues that "CRA has determined that the utility rate has historically reflected a price premium of 7.33% above XOOM's estimated supply costs.  By CRA's own calculations, the 5% allowable margin [CRA] uses in Method B would require XOOM to price its variable rate product below the prevailing utility rate, on average.  That is not commercially reasonable."

46.     I disagree with Mr. Coleman's analysis that it would not be "commercially reasonable" for XOOM to charge a lower rate than the utility.  Mr. Coleman does not dispute my determination that "the utility rate has historically reflected a price premium of 7.33% above

XOOM's estimated supply costs." Coleman Declaration ¶ 9.  In my opinion, it is commercially reasonable for XOOM to charge lower rates than the utility in an effort to compete with the utility to provide the same product.  Competition was the largest selling point of deregulation. Amended Report ¶ 21.

47.     I further disagree with Mr. Coleman's criticism of the 5% figure.  I did not "materially misrepresent[]" what the NYPSC's 5% figure means.  Coleman Declaration ¶ 9.  Mr. Coleman's opinion that the 5% figure cannot be applied to XOOM's costs (as opposed to a rate) seems to intentionally disregard the fact that the NYPSC determined the 5% figure was a "just and reasonable" "price premium" for (fixed-rate) products, which are products that pose a greater financial risk to ESCOs than the variable rate product XOOM sold here.  December 2019 Order at 67.  This is all explained in the Amended Report:

> While the 5% figure applies to a different product (fixed as opposed to variable rates), that premium was applied to a product that poses a greater financial risk to the ESCO than the variable rates at issue here.

Amended Report ¶ 74.  *See also* ¶¶ 92-100 for a more detailed discussion.

48.     In paragraph 10 of his declaration, Mr. Coleman states: "None of the new proposed methodologies represent reasonable or appropriate measures for overcharges."  He then criticizes Methods A, B, and C separately.

49.     In paragraph 10.a, Mr. Coleman offers three criticisms of Method A.  First, he states: "In Method A, the comparison between the regulated utility rate and the unregulated XOOM variable price is inappropriate and misleading.  There are valid reasons why ESCOs' unregulated retail prices may differ from the regulated utility Price-to-Compare.  ESCOs and LDCs (utilities) may acquire supply from the same wholesale markets, but their costs and risks of doing so may differ.  For example, adjustments and reconciliations included in utility rates

may distort comparisons to contemporaneous wholesale market conditions and ESCO prices."
Coleman Decl. ¶ 10.a.  I disagree with Mr. Coleman for several reasons.  First, both ESCOs' and
the utilities rates may have adjustments and reconciliations.  Amended Report ¶ 79.  Second, to
the extent adjustments and reconciliations are based on supply costs (as the utilities' are) those
adjustments smooth over time minimizing any differences.  Third, as discussed in the Amended
Report, the utilities' rates represent a pass-through of supply costs plus the utility's costs of
procuring energy.  *Id.*

50.     Mr. Coleman then states: "Further, XOOM's variable price offered customers
more price stability than the utility rate."  Coleman Decl. ¶ 10.a.  I was provided no data that
supports this claim and Mr. Coleman points to none.  But even if Mr. Coleman did point to some
time period when XOOM's variable rates were "more stable" than the corresponding utility
rates, the supposed "stability" of much *higher* rates for the exact same product is not a logical
justification for charging customers more.  This is especially true since unlike fixed rates,
variable rates offer no cap on upward rate fluctuations.

51.     Mr. Coleman also states: "In addition, CRA omits utility default service rates for
a large subset of the class period."  Coleman Decl. ¶ 10.a.  Mr. Coleman then catalogues the
percentage of "omitted" utilities data and writes that it is "unclear" how "7.33% figure CRA
calculates and uses in Method A" would "change had all relevant data been included."  *Id.*  The
utility rates were produced to Plaintiff by XOOM and appear to have been gathered
contemporaneously by XOOM.  So whatever gaps Mr. Coleman complains about are a result of
XOOM's own business judgment or incomplete collection and production.  Collecting utility
rates for each month in the Class Period is also not cost effective and could potentially spur
additional disagreement over which collected rate reflects the accurate utility rate.  Using

XOOM's own utility rate compilations eliminates these potential issues.  Moreover, that XOOM produced only partial utilities rate data does not make this calculation of an average unreliable or incorrect.  Tellingly, Mr. Coleman does not suggest how the 7.33% figure would change if the data was complete.

52.     In paragraph 10.b, Mr. Coleman restates his criticism of Method B's 5% figure. Mr. Coleman states that the Amended Report "materially mischaracterizes how the NY PSC describes and utilizes the 5% figure, its allowable margin in Method B is essentially arbitrary . . . By using the 5% figure in way utterly inconsistent with the NY PSC's intent, CRA has further divorced it from any supporting logic or merit"  This criticism is addressed in ¶¶ 44-47 above.

53.     Mr. Coleman further states "Even had CRA utilized the 5% figure as intended by the NY PSC, it would be an inappropriate benchmark margin to use in this case, as it would tie XOOM's variable rates to factors other than its estimated and actual supply costs."  I disagree with Mr. Coleman because once the 5% markup figure is set, it is consistently applied across the supply costs as a constant markup to arrive at the rate XOOM was allowed to charge under the Sales Agreement.  I understand from Class Counsel that even if the 5% figure is not derived from XOOM's supply costs, the use of this 5% figure is not prohibited by the Court's construction of the SA's pricing term.

54.     In paragraph 10.c of his declaration Mr. Coleman criticizes Method C, which is based on XOOM's average fixed-rate margin, which he characterizes as an "inappropriate and unreasonable benchmark."  Coleman Decl. ¶ 10.c.  The first reason he offers for this criticism is that "business conditions change over time.  It would be unreasonable for XOOM to ignore changing business conditions when setting their variable rates, and it would be unreasonable for a customer to assume that XOOM would do so."  *Id.*  Mr. Coleman's claims ignore the fact that

at all relevant times I understand XOOM's contract was the same and that XOOM was contractually bound to charge a rate that was "determined solely by" XOOM's supply costs per the Court's ruling at summary judgment.  Summary Judgment Order at page 14.  To the extent changing business conditions affect the supply costs, such changes would be reflected in the variable rates that XOOM was entitled to charge.

55.     Second, Mr. Coleman repeats his claim that imposing a reasonable fixed margin based on the average of XOOM's historical margins would unfairly require XOOM to know the future.  This argument is addressed in ¶ 41 above.

56.     Third, Mr. Coleman claims that "variable rate and fixed rate products are different products with different risk characteristics" and that it "would be unreasonable for XOOM to use the margin it charges on fixed rate products to set variable rates."  Coleman Decl. ¶ 10.c.  Mr. Coleman is only partially correct.  It is well understood that variable and fixed rate products have "different risk characteristics," but because (as XOOM itself recognizes) fixed rate products pose greater risk to the ESCO.  *See* Amended Report ¶ 66 (citing XOOM's witnesses admitting that they understand this fact); ¶¶ 92-101.  From a commercial reasonableness perspective any reasonable and proportionate XOOM variable rate margin should be lower than its average fixed rate margins.  *See id.*

57.     Turning now to certain statements made by XOOM in its motions.  In the Rebuttal Report, I calculated Plaintiff's individual damages under Model Two, in Exhibit 7.

| | | | | | | | (2) Xoom * Usage * Excess Margin |
|---|---|---|---|---|---|---|---|
| | | | Xoomrates Interval Data $/kWh | Usage kWh | SimpleFlex Margin (%) | SureLock Margin (%) | |
| year | month | date | ConED_zoneJ | ConED_zoneJ | ConED_zoneJ | ConED_zoneJ | ConED_zoneJ |
| 2013 | 6 | 6/1/2013 | 0.1290 | 370 | 16% | 13% | 2 |
| 2013 | 7 | 7/1/2013 | 0.1440 | 710 | 18% | 11% | 8 |
| 2013 | 8 | 8/1/2013 | 0.1490 | 800 | 18% | 11% | 9 |
| 2013 | 9 | 9/1/2013 | 0.1399 | 500 | 27% | 16% | 8 |
| 2013 | 10 | 10/1/2013 | 0.1490 | 280 | 21% | 12% | 4 |
| 2013 | 11 | 11/1/2013 | 0.1299 | 230 | 30% | 11% | 6 |

Rebuttal Report, Exhibit 7.  The fixed-rate margin (which in the Original and Rebuttal Reports were not constant) was between 11% and 16%.

58.     In its First Motion to Exclude, XOOM argues that "If Model Two's fixed-rate margin data is replaced with a reasonable 22% margin, its calculations would show that [Plaintiff] was *undercharged* overall."  First Motion to Exclude at 21.  XOOM's provided justification for its 22% figure in footnote 19 of its First Motion to Exclude states: "CRA acknowledges that 'the margin that the Mirkins were charged during the period when they were XOOM customers was approximately 22%.' *See* CRA Rebuttal ¶ 31; *see also* Pls.' Rule 56.1 Counterstatement 43 (admitting the same).  Plaintiff offers no evidence that a gross margin of 22% is excessive or unreasonable by any standard, or even that a 22% margin would cover XOOM's actual costs and yield a profit."  I disagree with XOOM.

59.     Paragraph 31 of my Rebuttal Report specifically states:

31. Under Damages Method 2 (overcharges as a result of excess margins over the fixed rate margins), the Mirkins were overcharged by approximately $36. Our analysis shows that the margin that the Mirkins were charged during the period when they were XOOM customers was approximately 22%, while the fixed rate margin was only 12% during that same period. In other words, the Mirkins were assessed with margins that were nearly double those charged to fixed rate customers during the same period. Further, it should be noted that as we

Rebuttal Report ¶ 31 (emphasis added).  XOOM appears to misconstrue this statement to imply that a 22% price-based margin is reasonable for variable rate customers when, in fact, I was noting the 22% price-based margin they were charging variable rate customers was almost double what they were charging fixed rate customers.  Further, XOOM confuses the difference between the placeholder price-based margin used in Model Two and cost-based margin used in Method C.  Consider a hypothetical when price was $200 and cost was $100.  In the Second Motion to Exclude, XOOM attempted to undermine Method C by arguing that Model Two works differently with the same input.  Second Motion to Exclude at 26.  But, again, the input is not the same because Model Two uses the price-based margin and Method C uses cost-based margin.

60.     XOOM deploys the same argument—failing to appreciate the difference between the price-based margin and cost-based margin—when it compares the variable rate cost-based margin of 68% in the Amended Report with lower number for the variable rate price-based margin in the Original Report.  Second Motion to Exclude at page 26, n. 17.  In footnote 17 of the Second Motion to Exclude, XOOM states "Or at least, that's what CRA says XOOM's average variable-rate margin is.  See Ex. A-3, CRA New Rep. ¶ 69.  In its last report, CRA reported average margins that were much lower.  See Ex. A-2, CRA Orig. Rep. ¶ 75.  CRA does not explain why these figures changed so drastically, nor has XOOM had the ability to check, but it is obviously the result of undisclosed changes in CRA's underlying math."

61.     Consider an illustrative hypothetical: an ESCO's supply costs are $100 and it charges the rate $200.  In this hypothetical, the price-based margin is 50%, whereas a cost-based margin is 100%.  The price-based margin is calculated as follows:

$$Margin_{Price} = \frac{Price - Cost}{Price} = \frac{200 - 100}{200} = 50\%$$

Using the same numbers, the cost-based margin is calculated as follows:

$$Margin_{Cost} = \frac{Price - Cost}{Cost} = \frac{200 - 100}{100} = 100\%$$

62.    Turning to what was actually stated in the reports:  In the Amended Report I stated:

> 69. My analysis shows that XOOM's margins for variable rate customers appear arbitrarily high and significantly higher than margins charged to comparable fixed rate customers, despite the fact that XOOM took on greater risks for fixed rate customers since XOOM had no ability to reset existing fixed rate

> customers' rates during the fixed rate period.[67]  As set forth below, on average XOOM charged an average fixed rate margin of 21.2%, whereas XOOM charged a revenue-weighted variable rate margin of 63.0%. The simple average of XOOM's variable rate margins is 68.0%. I have seen no evidence that XOOM attempted to build up or justify the higher margins it charged to variable rate customers over fixed rate customers.

Amended Report ¶ 69.

In the Original Report, I stated:

> 75. As can be seen in Table 1 below, XOOM's margins on fixed rate contracts were generally substantially smaller than the corresponding variable rate contracts. This was confirmed by XOOM documents and witnesses.[52] This occurred despite the fact that, as XOOM witness Loehde noted, fixed rate contracts carry greater risks to XOOM since the price cannot be adjusted once it has been fixed.[53] It appears that XOOM was able to operate and make a reasonable profit selling fixed rate contracts with substantially lower margins than variable contracts, and yet arbitrarily imposed much higher margins on their variable rate customers.

**Table 1: Comparison of XOOM variable and fixed rate margins from March 2013 to February 2018**

Electric Margin Percentages

| Year | Residential | | Commercial | |
| --- | --- | --- | --- | --- |
| | SimpleFlex Variable Plan | SureLock Fixed Plan | BizChoice Variable Plan | BizLock Fixed Plan |
| 2013 | 18% | 15% | 16% | 13% |
| 2014 | 32% | 16% | 32% | 16% |
| 2015 | 39% | 22% | 38% | 20% |
| 2016 | 44% | 19% | 43% | 18% |
| 2017 | 35% | 19% | 42% | 17% |
| 2018 | 19% | 19% | 29% | 16% |

Gas Margin Percentages

| Year | Residential | | Commercial | |
| --- | --- | --- | --- | --- |
| | SimpleFlex Variable Plan | SureLock Fixed Plan | BizChoice Variable Plan | BizLock Fixed Plan |
| 2013 | 23% | 19% | 25% | 19% |
| 2014 | 23% | 20% | 25% | 19% |
| 2015 | 35% | 23% | 36% | 23% |
| 2016 | 34% | 20% | 35% | 21% |
| 2017 | 33% | 20% | 37% | 19% |
| 2018 | 31% | 23% | 33% | 22% |

*Note: Table shows annual average of reported monthly margins.*

Original Report ¶ 75.  Again, I used price-based margins in the Original Report as a placeholder. In the Amended Report I used cost-based margins.  This explains the change in values XOOM labels "drastic."  As explained above, all the rate and cost data, the only data required to calculate both price-based and cost-based margins came from XOOM and is easily verifiable by XOOM and its expert. Regardless of whether one compares the price-based or cost-based margins between variable and fixed plans, the fundamental point is that XOOM charged much higher margins to variable rate customers than fixed rate customers.  From an economic perspective, variable rate customers are necessarily less risky than fixed rate customers.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 28, 2024
         Boston, MA

_____
                  Seabron Adamson