## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated

Plaintiff,

v.

XOOM ENERGY, LLC and XOOM ENERGY NEW YORK, LLC,

Defendants.

Case No.: 18 Civ. 2949 (ARR) (JAM)

---

## PLAINTIFF SUSANNA MIRKIN AND THE CERTIFIED CLASS'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE*

---

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Ethan D. Roman
Steven L. Wittels
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
edr@wittelslaw.com
jbm@wittelslaw.com
slw@wittelslaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NEW YORK 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

**SCHLAM STONE & DOLAN LLP**
Richard Dolan
Bradley D. Simon
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Dated:   July 1, 2024

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 4

I.   PLAINTIFF'S MIL NO. 1:  XOOM BEARS THE BURDEN OF PROVING ITS IMPLAUSIBLE DEFENSE ................................................................. 4

II.  PLAINTIFF'S MIL NO. 2:  THE COURT SHOULD EXCLUDE XOOM'S IRRELEVANT FINANCIAL DOCUMENTS ............................................... 4

    A.  Plaintiff Will Prove XOOM's Rates Were Not Determined Solely by Actual and Estimated Supply Costs ................................................. 6

    B.  Defendants Assert a Theory of Relevance Expressly Rejected by the Court ............................................................................................ 8

    C.  XOOM Is Not Able to Justify the Admission of Its Proffered Exhibits ............. 9

III. PLAINTIFF'S MIL NO. 3:  XOOM SHOULD BE PRECLUDED FROM CONTRADICTING ITS BINDING RULE 30(B)(6) TESTIMONY THAT ITS RATE-SETTING PROCESS WAS CONSISTENT AND INTRODUCING EVIDENCE IT FAILED TO PRODUCE IN DISCOVERY ................................... 12

    A.  XOOM's New Position Is Inconsistent with Prior Testimony and XOOM's Effort to Show Otherwise Is Mere Semantics ................................... 13

    B.  Rule 37 Preclusion Is the Appropriate Remedy for XOOM's Failure to Disclose .................................................................................. 15

IV.  PLAINTIFF'S MIL NO. 4:  XOOM COULD NOT CHARGE VARYING MARGINS ................................................................................................ 16

V.   PLAINTIFF'S MIL NO. 5:  XOOM SHOULD NOT BE PERMITTED TO INTRODUCE EVIDENCE OR ARGUMENT OF ITS SUBJECTIVE CONSIDERATIONS OF SUPPLY COSTS ............................................... 22

VI.  PLAINTIFF'S MIL NO. 6:  THE COURT SHOULD EXCLUDE EVIDENCE AND ARGUMENT REGARDING MARKET-BASED COMPENSATION AND THE CONTRACT'S AGENCY PROVISION ................................... 25

VII. PLAINTIFF'S MIL NO. 7:  THE COURT SHOULD REJECT XOOM'S EXPRESS ATTEMPT TO RELITIGATE RULE 23 ISSUES OF LAW BEFORE THE JURY ............................................................................... 28

    A.  XOOM Must Charge a Fixed and Reasonable Margin ...................................... 29

B.    Evidence and Argument About Certification Is Not Relevant to the Jury ......... 31

C.    Plaintiff Will Establish Class-Wide Liability and Damages ............................. 31

D.    The Jury Does Not Need to Make an Individual Finding for Each Class Member ...................................................................................................................... 32

VIII.    PLAINTIFF'S MIL NO. 8:  XOOM SHOULD NOT BE ABLE TO PRESENT THOUSANDS OF MINI-TRIALS ........................................................ 33

IX.    PLAINTIFF'S MIL NO. 9:  PLAINTIFF SHOULD BE PERMITTED TO USE XOOM WITNESSES' DEPOSITION TRANSCRIPTS AND OTHER ADMISSIONS IN HER CASE-IN-CHIEF .................................................. 36

X.    PLAINTIFF'S MIL NO. 10:  PLAINTIFF'S EXPERT SHOULD BE PERMITTED TO TESTIFY TWICE ........................................................................... 39

XI.    PLAINTIFF'S MIL NO. 11:  XOOM SHOULD BE PRECLUDED FROM OFFERING EVIDENCE REGARDING ITS AFFIRMATIVE DEFENSES BECAUSE THEY FAIL AS A MATTER OF LAW ................................................. 41

A.    Plaintiff's MIL Is Proper and Timely Because the Court Can Preclude Affirmative Defenses *In Limine* .......................................................................... 42

B.    XOOM's Affirmative Defenses Lack Legal and Evidentiary Support .............. 44

XII.    PLAINTIFF'S MIL NO. 12:  XOOM SHOULD BE BARRED FROM OFFERING EVIDENCE ABOUT MITIGATION .................................................... 48

XIII.    PLAINTIFF'S MIL NO. 13:  THE JURY SHOULD BE INSTRUCTED ON PUNITIVE DAMAGES ...................................................................................... 50

A.    There Are No Pleading Deficiencies in the Complaint ...................................... 51

B.    Punitive Damages Are Available Because the Breach "Constitutes" a Tort ................................................................................................................... 51

C.    XOOM Applies the Wrong Law to the Relevant Questions .............................. 53

D.    CPLR § 901(b) Has No Impact on the Dispute .................................................. 55

E.    Punitive Damages Are Available Under GBL § 349 and 349-d ....................... 56

XIV.    PLAINTIFF'S MIL NO. 14:  THE COURT SHOULD EXCLUDE EVIDENCE REGARDING PLAINTIFF'S PRE-DISCOVERY MARKET SUPPLY COST ESTIMATES .................................................................................. 56

XV.    PLAINTIFF'S MIL NO. 15:  THE COURT SHOULD EXCLUDE EVIDENCE OF OTHER COMPANIES' MARGINS ............................................. 58

XVI.    PLAINTIFF'S MIL NO. 16:  PLAINTIFF'S INVOLVEMENT IN
        LITIGATION AGAINST VIRIDIAN ENERGY IS IRRELEVANT ...................... 60

XVII.   PLAINTIFF'S MIL NO. 17:  PLAINTIFF'S EXPERT'S REPORT IN
        *RICHARDS V. DIRECT ENERGY* IS IRRELEVANT ............................................. 62

XVIII.  PLAINTIFF'S MIL NO. 18:  THE COURT SHOULD EXCLUDE
        EVIDENCE REGARDING PLAINTIFF'S MOTIVATIONS ................................ 65

**CONCLUSION** ........................................................................................................................ **68**

## **TABLE OF AUTHORITIES**

**Cases**

*A.I.A. Holdings, S.A. v. Lehman Bros.*,
   No. 97 Civ. 4978 (LMM) (HBP), 2002 WL 1041356 (S.D.N.Y. May 23, 2002) ................... 13

*Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*,
   No. 18 Civ. 170 (KMK), 2019 WL 4413052 (S.D.N.Y. Sept. 16, 2019) ................................ 53

*Angelopoulos v. Keystone Orthopedic Specialists, S.C.*,
   No. 12 Civ. 5836, 2017 U.S. Dist. LEXIS 76361 (N.D. Ill. May 19, 2017) ........................... 42

*Bermudez v. City of New York*,
   No. 15 Civ. 3240 (KAM) (RLM), 2019 WL 136633 (E.D.N.Y. Jan. 8, 2019) ........................ 9

*Blank v. Sullivan & Cromwell*,
   418 F. Supp. 1 (S.D.N.Y. 1975) ........................................................................................... 65

*Bueno v. LR Credit 18, LLC*,
   269 F. Supp. 3d 16 (E.D.N.Y. 2017) ................................................................................... 55

*Chavis v. S. Life Ins. Co.*,
   347 S.E.2d 425 (N.C. 1986).................................................................................................. 27

*CitiMortgage, Inc. v. Ramirez*,
   192 A.D.3d 70 (3d Dep't 2020)............................................................................................. 47

*Creative Consumer Concepts, Inc. v. Kreisler*,
   563 F.3d 1070 (10th Cir. 2009) ........................................................................................... 36

*Design Strategy, Inc. v. Davis*,
   469 F.3d 284 (2d Cir. 2006) ................................................................................................ 16

*Doe v. Lima*,
   No. 14 Civ. 2953 (PAE), 2020 WL 4731418 (S.D.N.Y. Aug. 14, 2020) ............................... 24

*Dowling v. United States*,
   493 U.S. 342 (1990)............................................................................................................. 24

*Dyber v. Quality King Distribs., Inc.*,
   No. 06 Civ. 735 (LDW) (AKT), 2006 WL 8424100 (E.D.N.Y. Dec. 12, 2006)..................... 65

*Eastman Kodak Co. v. Agfa-Gevaert N.V.*,
   560 F. Supp. 2d 227 (W.D.N.Y. 2008) ........................................................................... 36, 38

*Ford Motor Credit Co. v. Hairston*,
   06 Civ. 04, 2006 WL 2850615 (W.D. Va. Oct. 2, 2006)...................................................... 49

iv

*Fournier v. Erickson*,
   242 F. Supp. 2d 318 (S.D.N.Y. 2003) .................................................................... *passim*

*Fulford v. Jenkins*,
   672 S.E.2d 759 (N.C. Ct. App. 2009) ........................................................................ 27

*Glob. Fin. Corp. v. Triarc Corp.*,
   93 N.Y.2d 525 (1999) ................................................................................................ 46

*Goldberger Co., LLC v. Uneeda Doll Co., Ltd.*,
   No. 16 Civ. 4630 (AJP), 2017 WL 3098110 (S.D.N.Y. July 21, 2017) .................... 13

*Greenspan v. Allstate Ins. Co.*,
   937 F. Supp. 288 (S.D.N.Y. 1996) ............................................................................ 53

*Hickory Sec. Ltd. v. Republic of Argentina*,
   493 F. App'x 156 (2d Cir. 2012) ............................................................................... 32

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*,
   37 N.Y.3d 169 (2021) ................................................................................................ 52

*Holloway v. Wachovia Bank & Tr. Co.*,
   339 N.C. 338 (1994) .................................................................................................. 50

*Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*,
   No. 06 Civ. 4262, 2009 WL 10679721 (E.D. La. Aug. 4, 2009) ............................. 37

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
   934 F.3d 619 (D.C. Cir. 2019) .................................................................................. 35

*INS v. Phinpathya*,
   464 U.S. 183 (1984) ................................................................................................... 40

*Johnson v. Holder*,
   564 F.3d 95 (2d Cir. 2009) ........................................................................................ 28

*Koch v. Acker, Merrall & Condit Co.*,
   18 N.Y.3d 940 (2012) ................................................................................................ 52

*Koch v. Greenberg*,
   14 F. Supp. 3d 247 (S.D.N.Y. 2014) ........................................................................ 55

*L-3 Commc'ns Corp. v. OSI Sys., Inc.*,
   No. 02 Civ. 9144 (PAC), 2006 WL 988143 (S.D.N.Y. Apr. 13, 2006) ................... 13

*Little v. Rose*,
   208 S.E.2d 666 (N.C. 1974) ...................................................................................... 49

v

*Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*,
   No. 18 Civ. 4476 (LJL) (JW), 2023 WL 8804257 (S.D.N.Y. Dec. 20, 2023) ........................ 13

*MaGee v. Paul Revere Life Ins. Co.*,
   954 F. Supp. 582 (E.D.N.Y. 1997) ............................................................................ 53

*Martinez v. Agway Energy Servs., LLC*,
   88 F.4th 401 (2d Cir. 2023) ............................................................................... 16, 58

*Matter of Part 60 Put-Back Litig.*,
   36 N.Y.3d 342 (2020) ............................................................................................. 53

*Melville v. HOP Energy, LLC*,
   No. 21 Civ. 10406, 2023 WL 2648775 (S.D.N.Y. Mar. 27, 2023) .......................... 53

*Mirkin v. Viridian Energy, Inc.*,
   No. 15 Civ. 1057, 2016 WL 3661106 (D. Conn. July 5, 2016).............................. 52

*New York Univ. v. Cont'l Ins. Co.*,
   87 N.Y.2d 308 (1995) ............................................................................................. 53

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) .................................................................................. 35

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
   585 F. Supp. 3d 540 (S.D.N.Y. 2022) .................................................................... 46

*Plunk v. Hobbs*,
   No. 5:08 Civ. 203, 2010 WL 3927041 (E.D. Ark. Oct. 5, 2010) ............................ 37

*Powell v. Nat'l Bd. of Med. Exam'rs*,
   364 F.3d 79 (2d Cir. 2004) ..................................................................................... 51

*Republic of Turkey v. Christie's Inc.*,
   527 F. Supp. 3d 518 (S.D.N.Y. 2021) ................................................................. 7, 34

*Robinson v. De Niro*,
   No. 19 Civ. 9156 (LJL), 2023 WL 7004926 (S.D.N.Y. Oct. 24, 2023) ................... 44

*Rosales v. Barr*,
   839 F. App'x 592 (2d Cir. 2020) ............................................................................ 40

*Sabre v. First Dominion Capital, LLC*,
   No. 01 Civ. 2145 (BSJ) (HBP), 2001 WL 1590544 (S.D.N.Y. Dec. 12, 2001) ...... 13

*Seife v. U.S. Food & Drug Admin.*,
   43 F.4th 231 (2d Cir. 2022) ................................................................................... 54

*Senior by Senior v. Eihab Hum. Servs., Inc.*,
    No. 15 Civ. 1009 (ENV) (PK), 2023 WL 7134076 (E.D.N.Y. Apr. 19, 2023) ......................... 8

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................................... 55

*Shore v. Farmer*,
    522 S.E.2d 73 (N.C. 1999) ................................................................................ 50, 51, 54

*Snapp v. United Transp. Union*,
    889 F.3d 1088 (9th Cir. 2018) ........................................................................................ 12

*Stanley v. Direct Energy Servs., LLC*,
    466 F. Supp. 3d 415 (S.D.N.Y. 2020) .............................................................................. 52

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ............................................................................................. 52

*Synergy Hematology-Oncology Med. Assocs. Inc. v. Abbott Labs., Inc.*,
    No. 22 Civ. 1560, 2023 WL 4761550 (C.D. Cal. June 6, 2023) ............................................ 12

*Tomaino v. O'Brien*,
    315 F. App'x 359 (2d Cir. 2009) .................................................................................... 61

*Toussie v. Allstate Ins. Co.*,
    No. 15 Civ. 5235 (ARR) (PK), 2016 WL 6537670 (E.D.N.Y. Nov. 3, 2016) ......................... 53

*Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*,
    No. 01 Civ. 16 (AGS) (HB), 2002 WL 1835439 (S.D.N.Y. Aug. 8, 2002) ........................... 13

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................................................... 32

*United States v. Bailey*,
    444 U.S. 394 (1980) ................................................................................................... 42

*United States v. Bailey*,
    973 F.3d 548 (6th Cir. 2020) ........................................................................................ 40

*United States v. Baldwin*,
    No. 20 Cr. 270, 2021 WL 4521205 (S.D. Ind. Oct. 4, 2021) ......................................... 42, 43

*United States v. Gabinskaya*,
    829 F.3d 127 (2d Cir. 2016) .......................................................................................... 7

*United States v. Ghailani*,
    761 F. Supp. 2d 114 (S.D.N.Y. 2011) ........................................................................ 63, 64

*United States v. Hale*,
    422 U.S. 171 (1975) ...................................................................................... 63

*United States v. Holmes*,
    44 F.3d 1150 (2d Cir. 1995) ............................................................................. 7

*United States v. Jackson*,
    598 F.3d 340 (7th Cir. 2010) ........................................................................... 42

*United States v. Kraeger*,
    711 F.2d 6 (2d Cir. 1983) ............................................................................... 24

*United States v. LeFevour*,
    798 F.2d 977 (7th Cir. 1986) ............................................................................ 8

*United States v. Mejia-Velez*,
    855 F. Supp. 607 (E.D.N.Y. 1994) ................................................................. 63

*United States v. Perez*,
    86 F.3d 735 (7th Cir. 1996) ............................................................................ 43

*United States v. Sahakian*,
    453 F.3d 905 (7th Cir. 2006) ........................................................................... 42

*United States v. Scully*,
    No. 14 Cr. 208 (ADS), 2015 WL 5826493 (E.D.N.Y. Oct. 6, 2015) ...................... 42

*United States v. Sorensen*,
    73 F.4th 488 (7th Cir. 2023) ...................................................................... 42, 43

*United States v. Tokash*,
    282 F.3d 962 (7th Cir. 2002) ........................................................................... 42

*United States v. Vickers*,
    708 F. App'x 732 (2d Cir. 2017) ...................................................................... 23

*United States v. Weber*,
    843 F. App'x 364 (2d Cir. 2021) ...................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................................... 31

*Woolfolk v. Baldofsky*,
    No. 19 Civ. 3815 (WFK) (ST), 2022 WL 2600132 (E.D.N.Y. July 8, 2022) ............ 9

**Statutes**

N.Y.G.B.L. § 349 ............................................................................................ *passim*

N.Y.G.B.L. § 349-d ........................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12 ........................................................................................... 42

Fed. R. Civ. P. 23 ........................................................................................... *passim*

Fed. R. Civ. P. 26 ........................................................................................... 15

Fed. R. Civ. P. 30 ........................................................................................... 12, 38

Fed. R. Civ. P. 32 ........................................................................................... 36, 37, 38

Fed. R. Civ. P. 37 ........................................................................................... 13, 15, 33, 43

Fed. R. Civ. P. 54 ........................................................................................... 50

Fed. R. Evid. 102 ........................................................................................... 37

Fed. R. Evid. 106 ........................................................................................... 59

Fed. R. Evid. 401 ........................................................................................... *passim*

Fed. R. Evid. 402 ........................................................................................... *passim*

Fed. R. Evid. 403 ........................................................................................... *passim*

Fed. R. Evid. 404 ........................................................................................... 61

Fed. R. Evid. 602 ........................................................................................... 59

Fed. R. Evid. 608 ........................................................................................... 62, 64

Fed. R. Evid. 611 ........................................................................................... 38, 40

Fed. R. Evid. 613 ........................................................................................... 63

Fed. R. Evid. 703 ........................................................................................... 59

Fed. R. Evid. 801 ........................................................................................... 36, 37, 38

Fed. R. Evid. 802 ........................................................................................... 38, 59

Fed. R. Evid. 1002 ........................................................................................... 59

## PRELIMINARY STATEMENT

Plaintiff's MILs seek to ensure that the trial is efficient, focused on relevant issues and record evidence, and consistent with the Court's rulings of law.  XOOM's opposition and its own MILs are premised on a diametrically different reading of the Court's prior rulings, and if accepted, would confuse the issues and mire the Court and the jury in months of needless testimony.  To wit, if XOOM's arguments were accepted, the trial would:  (1) have the jury determine settled questions of law; (2) have the jury hear evidence not produced during discovery; and (3) introduce irrelevant evidence in an attempt to conceal its liability from the jury.  All three are plainly impermissible.

*First*, XOOM consistently seeks to present already settled issues of law to the jury.  For example, XOOM repeatedly tries to introduce its own discretion into the rate-setting process, including by claiming it was permitted to charge different margins in different markets (MIL No. 4), using the Agency provision as a basis for inflating its rate as it chooses (MIL No. 6), and arguing it could charge different Class Members different margins (MIL No. 7).  But both this Court and the Second Circuit have already held that XOOM had ***no discretion*** in setting its rates.

In addition, XOOM seeks to have the jury re-interpret the meaning of "based on" as used in the pricing term of the contract.  XOOM argues that mere "consideration" of supply costs in setting rates was sufficient to comply with the contract.  *See, e.g.*, MIL No. 5 (seeking preclusion of evidence and argument that XOOM complied with the contract by merely considering costs).  But the Court was clear that "XOOM must show that its rates were determined by its actual and estimated supply costs" and that XOOM had to do more than merely "consider and incorporate its supply costs into the final rate[.]"  MSJ Order at 15.  Nevertheless, XOOM insists that "[a]lthough Plaintiff might believe that XOOM's 'consideration' of actual and estimated supply costs in rate-setting does not equate to rates being set based on actual and estimated supply costs, the jury need not believe that. A reasonable juror could conclude that if XOOM considered actual and

1

estimated supply costs and added a margin, then XOOM based its rate on actual and estimated supply costs with a margin." Defs.' Br. at 16. To put the point bluntly: it does not matter what the jury "believes" the phrase "based on" means, since that is a question of contract interpretation that the Court has already resolved. Similarly, XOOM seeks to have the jury construe the meaning of the Agency provision (MIL No. 6). But the Court already construed the contract, and XOOM cannot ask the jury to re-assess issues of law already determined by the Court.

*Second*, XOOM repeatedly attempts to raise previously undisclosed factual theories at trial. For example, XOOM now claims that its supply cost calculations do not contain all of its supply costs and that its margins are really a hodgepodge of a margin plus alleged additional and unspecified "supply costs." However, when Plaintiff issued discovery requests and pursued deposition testimony regarding XOOM's rate-setting process, XOOM never disclosed (i) how costs were allegedly incorporated into its margins or (ii) what its supposed resulting margin was. Nevertheless, XOOM intends to introduce evidence that was not disclosed in discovery in support of this attorney-invented post-hoc justification for its rate-setting process. This is impermissible. *See* MIL No. 3 (precluding XOOM from introducing new evidence of XOOM's rate-setting process); MIL No. 8 (precluding XOOM from introducing new evidence of differing rate-setting decisions in thousands of mini-trials). Similarly, XOOM reaffirms its intention of offering evidence and argument of facts not in the record in support of its affirmative defenses (MIL No. 11), including its mitigation defense (MIL No. 12). It should not be permitted to do so.

*Third*, XOOM attempts to offer irrelevant evidence in order to confuse the issues before the jury. For example, it intends to offer thousands of financial documents that have minimal or no probative value to the issues the jury must resolve. *See* MIL No. 2. It also seeks to offer evidence of Plaintiff's pre-discovery estimates of XOOM's costs (MIL No. 14), evidence of the

margins of companies in different industries (MIL No. 15), evidence of Plaintiff's involvement in unrelated litigation (MIL No. 16) and personal motivations in bringing suit (MIL No. 18), and evidence of Plaintiff's Expert's report and testimony in an unrelated proceeding (MIL No. 17). This is just an attempt to kick up dust. These facts have nothing to do with the issues the jury must determine and are instead intended to confuse the jury and complicate the trial.

XOOM's diversionary goals are also apparent in XOOM's opposition to Plaintiff's common-sense measures to make trial more efficient. For example, Plaintiff intends to read XOOM's admissions from depositions into the record during her case-in-chief (MIL No. 9) and have her expert testify twice in order to streamline issues (MIL No. 10). XOOM can point to no prejudice occasioned by these proposals and instead opposes them precisely because they would aid the jury's comprehension and make the trial manageable. Likewise, XOOM's claim that it will need 35 trial days and over 2,700 exhibits in order to individually examine over 5,000 rate-setting decisions strongly suggests that XOOM's aim is not to facilitate a merits determination but to mystify the issues and overwhelm the jury. *See* MIL No. 8 (seeking preclusion of needlessly cumulative testimony).

By contrast, in Plaintiff's effort to streamline the issues and litigate this case consistent with the Court's Orders, Plaintiff has withdrawn her MIL No. 1 because, after filing the MIL, the Court ruled in the Decertification Denial Order that "[w]hether plaintiff can satisfy her burden depends on disputed questions of fact." Decert. Denial Order at 11. This leaves the burden issue to be determined later, when the factual issues come into better focus.

While Plaintiff has conformed her evidence and argument to the Court's Orders, Defendant has not. In addition to proceeding as if the Court's Class Certification and Summary Judgment Orders did not exist, *see, e.g.* XOOM's MIL No. 3 (arguing that Plaintiff cannot offer evidence of

3

the reasonableness of XOOM's margins),  XOOM has now also failed to take account of the Court's Decertification Denial Order, which definitely made clear that (i) XOOM could not consider non-supply costs in setting rates, (ii) the jury will determine what a reasonable margin would have been, and (iii) Plaintiff's claim is typical because XOOM used the same rate-setting process for all Class Members.  Accordingly, in light of these rulings, XOOM should have withdrawn at least its MIL No. 2 (asserting the contract did not limit XOOM's margins); No. 3 (contending that Plaintiff cannot introduce evidence as to the reasonableness of XOOM's margins); No. 4 (arguing that Plaintiff cannot point to XOOM's fixed-rate margins as a benchmark of reasonableness); No. 5 (asserting Plaintiff cannot propose an exemplar margin); No. 8 (seeking to preclude evidence of utility rates as benchmarks for the reasonableness of margins); and No. 12 (precluding reference to the NYPSC Reset Order as a benchmark for a reasonable margin).  XOOM's failure to accept the reality of the Court's Orders is telling and occasions needless work for the parties and the Court.

In the interest of an efficient and fair trial, the Court should grant Plaintiff's MILs.

## ARGUMENT

### I.  PLAINTIFF'S MIL NO. 1:  XOOM BEARS THE BURDEN OF PROVING ITS IMPLAUSIBLE DEFENSE
*(Responding to Defs.' Opp'n at 4–10)*

For the reasons discussed in Plaintiff's letter submitted concurrently with this Reply Brief, Plaintiff is withdrawing this MIL while reserving her rights to pursue this issue at a later point in this litigation.

### II.  PLAINTIFF'S MIL NO. 2:   THE COURT SHOULD EXCLUDE XOOM'S IRRELEVANT FINANCIAL DOCUMENTS
*(Responding to Defs.' Opp'n at 11–22)*

XOOM's rate-setting workbooks establish XOOM's liability and damages.  Because it knows its own records and testimony doom its case, XOOM wants to offer over 1,500 other

financial documents that are supposedly relevant to its "consideration" theory, which is based on a contract interpretation the Court expressly rejected. Specifically, XOOM contends that the financial documents are relevant because "the variances between estimated supply costs and actual supply costs were considered when XOOM set rates for upcoming months." Defs.' Br. at 14. However, the issue is not whether actual supply costs were "considered," but whether rates were "determined solely by" actual and estimated costs. Indeed, the Court expressly rejected the "consideration" theory XOOM now seeks to revive for the jury. MSJ Order at 15 ("XOOM's arguments and evidence certainly show that it considered its supply costs when calculating the Mirkins' monthly rates. And if all XOOM had to do under the contract was consider and incorporate its supply costs into the final rate, it would likely prevail. But under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs. XOOM has not done so."). Tellingly, XOOM never once in opposition argues that the proffered evidence tends to prove that XOOM determined rates solely by actual and estimated costs, instead arguing only that the evidence is probative of the fact that XOOM *considered* actual costs. But that is not the issue before the jury. XOOM's defense therefore relies on the nonsensical proposition that its "Total Cost" was not its total cost, and instead some of its supply costs were factored into its margins in setting rates. However, Plaintiff will show that the Total Cost listed in the rate-setting workbooks comprised the only costs used to determine

customers' rates.  Accordingly, the Court should exclude the financial documents described in MIL

No. 2[1] under Rules 401, 402, and 403.[2]

A.    **Plaintiff Will Prove XOOM's Rates Were Not Determined Solely by Actual and Estimated Supply Costs**

Defendants claim that Plaintiff attempts to disregard "actual costs" in proving her case.  To the contrary, as proof of breach, Plaintiff will offer evidence of the Total Cost figure in XOOM's rate-setting workbooks in addition to testimonial and record evidence that XOOM itself treated the Total Cost figure as extremely accurate and equated its "actual costs" with the Total Cost figure with occasional (and rare) *de minimis* adjustments.[3]  Indeed, XOOM witnesses and its employees have testified that the workbooks contain XOOM's rate-setting calculations and that the workbooks' Total Cost figures had a "very high level of accuracy" and were "extremely reliable." ECF 224-1, Ex. A to Roman Declaration, XOOM 30(b)(6) Tr. 126:16–127:1 (noting that there were no "systemic errors" in the workbooks); *id.* at 288:25–289:8 ("I think the rate setting workbooks are extremely reliable.  We had a process to keep costs and inputs as up to date as possible."); *see also* ECF 146-15, Coppola Tr. 281:14–282:1 (the workbooks are up to date and contain "the latest snapshot of everything that we can know about those costs up till that moment");

---

[1] This motion specifically addresses the parties' joint exhibits JX4 and JX1031–1152, and XOOM's exhibits DX1–45, DX47–51, DX53–343, DX 345–425, DX428, DX431–33, DX435–80, DX482–599, DX601–754, DX756–823, DX831–62, DX864–81, DX883–974, DX976–1368, DX1371–77, DX1376–1426, DX1458, DX1461–64, and DX1470–73.  *See* ECF 210-6–7.

[2] Defendant misleadingly argues that Plaintiff "seeks to invent a new 'clear evidence' standard to replace relevance."  Defs.' Br. at 14.  Plaintiff does no such thing.  Instead, because XOOM is the proponent of the proffered evidence, it must establish relevance, which it fails to do because there is no clear linkage between the proffered evidence and the issues to be tried.  To the extent there is no clear connection between the evidence and the issues before the jury, the probative value of such evidence is diminished for purposes of Rule 403 balancing.  And to the extent there may be some speculative connection between the financial documents and the issues before the jury, that speculation is not sufficient for purposes of Rule 401.  *See, e.g.*, *Fournier v. Erickson*, 242 F. Supp. 2d 318, 328 (S.D.N.Y. 2003) ("The Court concludes that these documents are not relevant . . . because any inferences regarding sales or profits from such general marketing plans would be too speculative to merit any probative weight.").

[3] At times these *de minimis* adjustments were in Plaintiff's favor, other times in XOOM's favor.

*id.* at 282:3–20 (the supply costs in the workbooks are compiled with "99 percent certainty"). All of that evidence, and more, was detailed in Plaintiff's initial motion papers.

Absent proof that these additional 1,500 financial documents were used in setting XOOM's rates—and there is none—these documents are not relevant, and if admitted, would likely only confuse the jury.

XOOM also argues that the Court should take a wait-and-see approach to determine whether the proffered evidence is cumulative. XOOM is wrong for at least three reasons. First, the evidence is not merely cumulative. To the extent it is not duplicative or cumulative of the rate-setting workbooks, it is irrelevant because it does not tend to prove or disprove whether XOOM's rates were determined solely by its supply costs. Second, courts commonly exclude cumulative evidence on a motion *in limine*. *See, e.g.*, *United States v. Gabinskaya*, 829 F.3d 127, 134 (2d Cir. 2016) (affirming district court's exclusion of evidence that "could easily have confused the jury and wasted time by diverting attention from the [relevant] evidence[.]"); *United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995) ("Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence."); *Republic of Turkey v. Christie's Inc.*, 527 F. Supp. 3d 518, 524–25 (S.D.N.Y. 2021) (excluding evidence on a motion *in limine* "because it is cumulative and would result in numerous trials within the trial"). Third, XOOM is essentially forcing the Court's hand on this issue by requesting 35 trial days for its case-in-chief. The determination of whether to exclude these financial documents is intertwined with the determination of trial length. To the extent the Court agrees with Plaintiff and provides XOOM with a more reasonable amount of time at trial, XOOM will not be able to introduce more than 1,500 financial documents at trial. It is up to the Court to determine the reasonable scope of this case, and Defendants' theory that it needs 35 trial days and over 1,500 financial documents in

addition to its rate-setting workbooks to make its defense is absurd.  *See United States v. LeFevour*, 798 F.2d 977, 980 (7th Cir. 1986) ("[T]he district judge was entitled to conclude that its probative value would be clearly outweighed by its effect in confusing the jury by extending an already very long trial.").

### B.      Defendants Assert a Theory of Relevance Expressly Rejected by the Court

At summary judgment, XOOM had argued that its "consideration" of costs was sufficient under the contract.  The Court expressly rejected that contract interpretation.  MSJ Order at 15 ("[I]f all XOOM had to do under the contract was ***consider*** and incorporate its supply costs into the final rate, it would likely prevail.  But under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs.  XOOM has not done so." (emphasis added)).   Indeed, while XOOM's consideration of supply costs is not sufficient to comply with the contract, XOOM's consideration of non-supply costs in setting rates is sufficient to show breach.  *See* Decert. Denial Order at 4 ("[T]he central dispute [is] whether XOOM indeed considered factors beyond its actual and estimated supply costs in setting variable rates[.]").   Evidence proffered in support of a rejected legal theory—here, XOOM's "consideration" construction of the contract—is, by definition, irrelevant and inadmissible.

In response to the fact that the proffered documents show no link to rate-setting, XOOM argues that "[t]here is no rule requiring a specific showing or 'linkage' within a document for it to be relevant and admissible."  Defs.' Br. at 15.  Rules 401 and 403 are clear.  To be relevant, evidence must be "of consequence in determining the action" under Rule 401 and its probative value must not be substantially outweighed by the danger of confusion and unfair prejudice under Rule 403.  XOOM's 1,500 pages of financial documents fail both tests.  *See Senior by Senior v. Eihab Hum. Servs., Inc.*, No. 15 Civ. 1009 (ENV) (PK), 2023 WL 7134076, at *1 (E.D.N.Y. Apr. 19, 2023) (excluding evidence under Rule 403 that "has little probative value for the issue central

to this case"); *see also Fournier*, 242 F. Supp. 2d at 328 ("[A]ny portions exhibiting some arguable minimal probative value would be outweighed by the otherwise clearly irrelevant content that risks a waste of time and jury distraction[.]").[4]  Because XOOM cannot prevail merely by showing it considered certain costs in setting rates, and because XOOM has not shown that the proffered documents are relevant to the question of whether it incorporated supply costs not subsumed within its Total Costs into its rates, XOOM has failed to offer any viable theory of relevance for these financial documents.

### C.    XOOM Is Not Able to Justify the Admission of Its Proffered Exhibits

"The proponent of the evidence bears the burden to demonstrate its admissibility." *Woolfolk v. Baldofsky*, No. 19 Civ. 3815 (WFK) (ST), 2022 WL 2600132, at *2 (E.D.N.Y. July 8, 2022).  This is true even when the opponent of evidence brings a motion *in limine*.  *See, e.g.*, *Bermudez v. City of New York*, No. 15 Civ. 3240 (KAM) (RLM), 2019 WL 136633, at *7 (E.D.N.Y. Jan. 8, 2019) (granting defendant's motion *in limine* where "plaintiff has also not satisfied his burdens under Rules 402 or 403").  XOOM, as the proponent of the financial documents relevant to this MIL, has the burden to prove their relevance.  Tellingly, XOOM has not endeavored to discuss the five categories of documents Plaintiff seeks to exclude, instead taking a broad and vague approach in asserting that all of the financial documents are relevant because they include financial information.  That is not sufficient to carry XOOM's burden to show the challenged documents are relevant and Plaintiff's motion should be granted on that basis alone.  In any event, as shown below, the five categories of documents should be excluded because they are not relevant

---

[4] XOOM peculiarly asserts that Plaintiff has not shown prejudice from admission of these documents. However, as discussed thoroughly in the opening brief and herein, the unfair prejudice of these documents is clear from the fact that they are cumulative, waste time, mislead the jury, and confuse the issues because XOOM's stated purpose for admitting these documents is to show that it complied with the contract by "considering" costs in setting rates—a legal theory the Court expressly rejected.

to XOOM's defense and XOOM's sole proffered theory of relevance (*i.e.*, XOOM's "consideration" of actual costs) only offers support for a legal theory the Court already rejected.[5]

    **(1) Financial Reports.**  The financial reports are far too broad to have any probative value for XOOM's defense.  This is true for at least two reasons.  First, the reports are not specific to New York, and second, the reports in no way show how actual costs were factored into XOOM's margin or how XOOM's rates were determined solely by its costs.  *See Fournier*, 242 F. Supp. 2d at 328 (excluding documents under Rule 401 because "[t]hey contain few specific details and no specific references to" the issues relevant in that case and "would be too speculative to merit any probative weight").  In other words, connecting these financial reports to XOOM's rate-setting for New York customers requires complete speculation, not a coherent pattern of inferences.  And again, XOOM misunderstands the nature of Rule 403 balancing.  The weight of the evidence—*i.e.*, the probative value—is directly compared to unfair prejudice.  XOOM essentially concedes the overbreadth of these reports, dooming their admission under Rule 403.

    **(2) Scorecards.**  While the scorecards occasionally (not universally) show prior period adjustments, they do not show (1) how prior period adjustments were used during the rate-setting process, or (2) how prior period adjustments were incorporated into XOOM's margins.  And like the financial reports, they are overbroad because they include regions other than New York.  These documents do nothing other than show that XOOM occasionally recorded prior period adjustments.  They do not show any

---

[5] Underlying all of these categories of documents is the specter of unfair prejudice through confusion of the issues, misleading the jury, and waste of time.  XOOM intends to spend 35 trial days going through these documents.

connection between prior period adjustments and rates or margins, making them irrelevant.  And to the extent they have any minimal relevance, such relevance is substantially outweighed by unfair prejudice.

**(3) Shaping Curves and Hedges.**  While these documents show certain costs XOOM incurred, those costs already flow into the Total Costs calculation.  Therefore, the evidence is entirely cumulative.  XOOM never rebuts this point.  These documents should be excluded on that basis alone.

**(4) Margin Estimates.**  Like the financial reports and scorecards, these documents are not specific to New York.  In addition, while they show preliminary financial results, they do not show or extrapolate supply costs into a rate-setting calculation.  In other words, while showing certain costs, there is no indication that these documents have any relationship to rate-setting.  As articulated by XOOM, they are only relevant to XOOM's "consideration" theory, not to the actual issue before the jury of whether rates were "determined solely by" costs or whether XOOM incorporated supply costs into its margins.

**(5) PDF Versions of Workbooks.**  XOOM offers two theories of why these documents should be admitted.  Both fail.  First, XOOM claims that the fact that they were printed is itself relevant.  But it is not clear how the mere printing of a portion of an otherwise admissible document could show that rates were determined solely by costs.  And to the extent there is any minimal probative value to the fact that portions of documents were printed, that fact can be adduced as testimony.  Second, XOOM says Plaintiff did not sufficiently prove that they are duplicative of the Excel versions of the workbooks.

But this is a bizarre argument.[6]  In practically the same breath, XOOM asserts they are relevant because personnel printed them directly from the rate-setting workbooks, conceding that they necessarily contain duplicative information.  XOOM also misses the mark because as the proponent of evidence, it bears the burden to prove admissibility, including that the documents are not needlessly cumulative and that they comply with the best evidence rule.  It is not Plaintiff's burden to prove admissibility for Defendants' proffered exhibits.

Accordingly, XOOM has not met its burden of showing that the financial documents described herein are relevant under Rule 401 or survive the Rule 403 balancing test.

## III. PLAINTIFF'S MIL NO. 3:  XOOM SHOULD BE PRECLUDED FROM CONTRADICTING ITS BINDING RULE 30(b)(6) TESTIMONY THAT ITS RATE-SETTING PROCESS WAS CONSISTENT AND INTRODUCING EVIDENCE IT FAILED TO PRODUCE IN DISCOVERY
*(Responding to Defs.' Opp'n at 23–27)*

XOOM's response to Plaintiff's MIL No. 3 follows a familiar formula: when faced with inconvenient evidence, XOOM opts for misdirection.[7]  XOOM has long taken the position that its rate-setting process was consistent, *see* Br. at 33–34, and the Court frequently noted that undisputed fact.  *See* Decert. Denial Order at 2; *see also id.* at 5 ("XOOM did not claim to have used a different rate-setting process for electric and natural gas customers.").  Now, however, XOOM seeks to offer evidence, never produced in discovery, that is intended to contradict its

---

[6] For one thing, this argument essentially refutes XOOM's argument that the PDFs satisfy the best evidence rule.  XOOM argues that it is not sufficiently clear that the PDFs are exact copies of the workbooks, and if that is the case, XOOM has not met its burden to show that the PDFs comply with Rule 1002 and they should be excluded on that basis alone.

[7] XOOM's response here echoes its larger trial strategy.  Faced with proof that rates based on XOOM's costs do not yield fixed and reasonable margins, XOOM claims that some costs are actually hidden in the margin instead of being itemized in the costs.  Here, faced with admissions that the rate-setting process was uniform, XOOM claims the procedural variation is hidden in the rate-setting "decision," not the "process."

binding Rule 30(b)(6) testimony and the position it has taken throughout the litigation.  This is not permitted.[8]  The position XOOM has long taken, including in its Rule 30(b)(6) testimony, is binding and, in addition, XOOM is precluded by Rule 37 from offering an entirely new evidentiary basis for its defense at this stage in the litigation.

### A.   XOOM's New Position Is Inconsistent with Prior Testimony and XOOM's Effort to Show Otherwise Is Mere Semantics

XOOM's consistent admissions regarding uniformity in its rate-setting process stand in the way of two of its trial goals: (1) to argue that the Class should be decertified because of an alleged lack of uniformity in the rate-setting process; and (2) to convince the jury that a secret formula it implemented in setting its margins renders those margins contractually permissible.  Thus, XOOM now tries to argue that its rate-setting process differed each time a new rate was set.  To do so, XOOM employs a semantic obfuscation: namely, the claim that while its rate-setting "***process***" was indeed consistent, its rate-setting "***decisions***" were not.  If, by changing the focus to its rate-setting "decisions" XOOM just means that it did not charge the exact same rate each month, that is an undisputed proposition.  (Indeed, that there were variations in XOOM's rate-setting

---

[8] XOOM's claim that it is not bound by its 30(b)(6) testimony relies on a single case from the Central District of California.  *See* Defs.' Br. at 26 (citing *Synergy Hematology-Oncology Med. Assocs. Inc. v. Abbott Labs., Inc.*, No. 22 Civ. 1560, 2023 WL 4761550, at *1 (C.D. Cal. June 6, 2023)).  Contrary to XOOM's spin, that case recognized the governing rule that "a corporation 'generally cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative.'"  *Id.* (quoting *Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018)).  Moreover, XOOM does nothing to explain why the Court should not follow the example of the other district courts from within the Second Circuit, which consistently find that a corporate representative's testimony binds a corporation.  *See, e.g.*, *Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, No. 18 Civ. 4476 (LJL) (JW), 2023 WL 8804257, at *4 (S.D.N.Y. Dec. 20, 2023); *Goldberger Co., LLC v. Uneeda Doll Co., Ltd.*, No. 16 Civ. 4630 (AJP), 2017 WL 3098110, at *8 (S.D.N.Y. July 21, 2017); *L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No. 02 Civ. 9144 (PAC), 2006 WL 988143, at *9 n.14 (S.D.N.Y. Apr. 13, 2006); *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, No. 01 Civ. 16 (AGS) (HB), 2002 WL 1835439, at *2 (S.D.N.Y. Aug. 8, 2002); *A.I.A. Holdings, S.A. v. Lehman Bros.*, No. 97 Civ. 4978 (LMM) (HBP), 2002 WL 1041356, at *2 (S.D.N.Y. May 23, 2002); *Sabre v. First Dominion Capital, LLC*, No. 01 Civ. 2145 (BSJ) (HBP), 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001).

"decisions" forms part of Plaintiff's case.)  But if instead XOOM means that the rate-setting process leading to each rate was different, then XOOM's claim that its "position has never changed," Defs.' Br. at 24, is patently false.  Indeed, XOOM itself cannot even maintain the charade, collapsing the supposed distinction at the heart of its argument within the first three sentences of its opposition.  *Compare id.* at 23 (first sentence describing "XOOM's consistent rate-setting process" and contrasting it with the "rate-setting decision"), *with id.* (third sentence describing that "the rate-setting process was not formulaic, but varied month to month, regionally, and by product").  Nevertheless, because of the alleged lack of uniformity, XOOM now claims it needs 35 trial days and over 2,700 exhibits to go over each and every rate-setting meeting.

Given the absolute clarity of the record regarding XOOM's own characterization of its "process," the Court found as an undisputed fact that "XOOM calculated the sum of various cost components listed in rate-setting workbooks to reach a number labeled Total Costs, or COGS; analysts then added a margin on top of COGS; and finally, the preliminary rate calculations were presented at a pricing meeting where a team of decisionmakers would set a final rate."  MSJ Order at 15.  The Court made similar findings in its Decertification Order.  Decert. Denial Order at 2.  XOOM's new theory is also belied by its responses to clear discovery requests[9] and deposition

---

[9] *See* Reply Ex. A (Plaintiff's First Set of Requests for Production, Request No. 9, seeking "All strategies, methods, formulas or models related to your energy rates"; Request No. 46, seeking "All documents concerning any operating costs that affect or concern the rates charged to XOOM's customers"; Request No. 47, seeking "All documents concerning any other costs that affect or concern the rates charged to XOOM's customers."); Reply Ex. B (Plaintiff's Second Set of Requests for Production, Request Nos. 116–118, 123, seeking documents pertaining to XOOM's margins); Reply Ex. C (Plaintiff's Third Set of Requests for Production, Request No. 124, seeking "All transcriptions, recordings, minutes, or notes taken at XOOM's rate-setting meetings pertaining to XOOM's New York Customers.").  Indeed, in Plaintiff's Second Set of Interrogatories, Plaintiff expressly directed XOOM to describe "the criteria used, considered, or discussed by Defendants' employees when setting monthly variable rates for XOOM's New York customers," yet in response, apart from boilerplate objections, XOOM only said that "XOOM's pricing team would set monthly variable prices for New York variable rate customers in accordance with the terms and conditions articulated in XOOM's contracts at pricing team meetings before the start of each month's billing cycle."  Reply Ex. D (XOOM's Responses and Objections to Plaintiff's Interrogatory No. 22).

(*Footnote continued on next page*)

questions[10] about its rate-setting process and margins.  During discovery, XOOM never disclosed (1) any imagined process or formula by which XOOM incorporated secret supply costs into its margin; (2) what the secret supply costs were and where they supposedly came from; (3) who performed that secret math; (4) why that secret math was not documented anywhere; (5) which specific supply costs not contained in the rate-setting workbooks were used in those secret equations; or most importantly, (6) what its resulting secret margin actually was—critical questions at the heart of XOOM's new defense.  XOOM had the obligation and the opportunity to produce records substantiating or otherwise explaining these supposed facts, but never did so.  Instead XOOM described a uniform rate-setting process that did not mention this secret math or secret margin.  XOOM's transparent effort to back out of its repeated admissions is based on flimsy semantic subtleties that XOOM itself fails to heed and should be rejected.

**B.** **Rule 37 Preclusion Is the Appropriate Remedy for XOOM's Failure to Disclose**

Rule 37(c)(1) is clear that a party who fails to provide information as required by Rule 26(a) or (e) is not allowed to use that information at trial unless the failure to disclose was substantially justified or harmless.  XOOM does not—and cannot— show either.

Instead, XOOM claims it provided sufficient discovery because one of its witnesses testified that XOOM generally accounted for "costs that occurred in a prior period" and those prior period adjustments "flowed into our actual costs and actual results."  Defs.' Br. at 24.  But XOOM fails to provide the context of that quote.  Mr. Loehde was specifically asked if prior period adjustments would be "folded into the margin."  *See* Reply Ex. F, Loehde Tr. 251:6–22.  He

---

XOOM never mentioned or described any process by which costs were secretly added into its margins.

[10] *See* Reply Ex. E, XOOM 30(b)(6) Tr. at 91:5–92:8 (specifically asking XOOM's corporate representative about factors incorporated into margins, with XOOM's corporate representative not mentioning prior period adjustments or any other uniform process by which costs were to be added into the margin).

disclaimed "fold[ing] [prior period adjustments] into the margin," instead saying that prior period adjustments were documented as "actual costs and actual results." *Id.* XOOM's witnesses also explained that the Total Cost figure in in XOOM's rate-setting workbooks was "highly accurate," to at least the level of 99%. XOOM's new claim—that supposed secret costs, dismissed as immaterial by XOOM's witnesses, were actually hidden in its margin—is therefore a belated attorney invention without any basis in the record.

Moreover, XOOM's contention about its witnesses' answers misses the point. It is undisputed that no deponent or document produced in discovery disclosed XOOM's secret but allegedly fixed and reasonable margin, and that no witness or document described the secret math on which XOOM now relies to argue against breach. Mere mention of prior period adjustments does not satisfy XOOM's discovery obligations, especially when ***all*** of the critical questions regarding XOOM's new factual defense would have been thoroughly probed in discovery if XOOM had raised its new factual theory then. *See supra* at 14–15. And because XOOM offers no justification for its failure to disclose facts relevant to its defense then or even to answer the obvious questions about it now, the Court should preclude XOOM from contradicting its repeated admissions during discovery and in prior motions. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006).

## IV. PLAINTIFF'S MIL NO. 4:  XOOM COULD NOT CHARGE VARYING MARGINS
*(Responding to Defs.' Opp'n at 28–33)*

The Court ruled that XOOM's margin must be fixed and reasonable. Consistent with its post-summary judgment litigation strategy, XOOM seeks to have the jury disregard that ruling. XOOM agrees that under the Court's construction, its margin must have been reasonable, but it contends that it was allowed to charge varying margins for different products and different utility zones. But that makes no sense. Because all of the products and utility zones were subject to the

same contractual constraints as to pricing and resulted from the same rate-setting process, and because the Court rejected the claim that customers who purchased different products should be treated differently, there is no basis to conclude that XOOM could charge varying margins.

In effect, this argument is a repackaging of XOOM's argument that the contract gives it rate-setting discretion, which this Court and the Second Circuit have expressly rejected.  *See* MSJ Order at 14 ("I find that the contract required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs."); *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) ("[T]he relevant agreement did not describe the monthly variable rate as being set according to [XOOM's] discretion.").  The Court should reject XOOM's attempt to relitigate the Court's conclusions of law in front of the jury.

Indeed, the Court rejected XOOM's very argument at class certification, holding that Plaintiff's electricity claims are typical of the Class, for both electricity and gas customers.  Class Order at 15–16 ("Though XOOM's natural gas supply costs necessarily differ from its electricity supply costs, there is no question that the form contract contained identical language for electric and natural gas customers.  And XOOM does not claim that it used a different rate-setting process for its electric and natural gas customers.  Because the electric and natural gas customer claims arise from the same rate-setting process and will rely on similar legal arguments to prove liability, I have no doubt that the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." (citations omitted)).  The Court recently reaffirmed this holding.  Decert. Denial Order at 5 ("I rejected XOOM's argument that plaintiff was atypical because she received only electric service, noting that the form contracts for electric and natural gas customers were identical and that XOOM did not claim to have used a different rate-setting process for electric and natural gas customers.").

17

In contrast to XOOM's claims that the Court ought to "treat the margins for gas and electricity" differently, the Court has consistently referred to XOOM's reasonable and fixed "margin" in the singular because the basis for charging a margin arose from the same contractual pricing term requiring the "variable rate" (which included the margin) to be "determined . . . using only its actual and estimated supply costs." *See* Decert. Denial Order at 3 ("XOOM was required to determine its monthly variable rates using only its actual and estimated supply costs, subject to a reasonable and proportionate margin."); *see also id.* at 4 (identifying as an issue for the jury "whether the margin itself was reasonable and proportionate"); *id.* ("I found that damages could be calculated with plaintiff's experts' proposed damages model, which calculates damages by looking at the difference between the variable rates on the one hand and XOOM's actual and estimated supply costs (reflected in the Total Cost) plus a reasonable and proportionate margin on the other hand." (footnotes omitted)).

In support of its effort to disregard the Court's conclusions, XOOM makes five arguments: (1) differing volatility across zones and products allows it to charge different margins; (2) consumers in different markets have different expectations of rates, so XOOM can charge different margins; (3) the market-based compensation provision of the contract allows for different margins among products and zones; (4) Plaintiff produced no evidence that the margins should be the same across products and zones; and (5) consumers have different expectations for green energy, so XOOM can charge a higher margin. Yet on their face, all of these supposed differences are irrelevant because they do not concern XOOM's costs, which is the only input that can change rates per the Court's construction. MSJ Order at 14 ("I find that the contract required the variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs"). Instead, all of these arguments assume that XOOM had the discretion to incorporate in its final

18

variable rate whatever factors it deemed appropriate.  That argument is ruled out by the repeated holdings from this Court and the Second Circuit that XOOM had no such rate-setting discretion—not in the costs, not in its margin, and not in the final rates charged to customers.  Even though the dispositive fact is that XOOM never had the rate-setting discretion on which all of its arguments are premised, Plaintiff addresses XOOM's meritless arguments on their own terms below.

**First**, XOOM argues that differing volatilities of different markets give it rate-setting discretion.  The volatility inherent in different products or different utility zones has absolutely no bearing on XOOM's margin under the contract, which requires XOOM's rates to vary solely based on its costs.  Because XOOM's costs are expressly factored into the rate calculation, XOOM bears no risk from volatility and cannot use volatility as an end-run around the Court's Orders to give it pricing discretion.  In other words, all the risk from volatility is transferred to variable rate consumers, so volatility provides no basis for differing margins.  Because XOOM bears no additional risk across zones or products, and because XOOM is not permitted to consider volatility in setting its rates under the contract, there is no basis for concluding that identical contract language means different things for different zones and products.

**Second**, XOOM argues that different markets have different expectations of rates and so XOOM has rate-setting discretion.  But that is essentially a repackaging of the first argument.  Consumers have different expectations of rates because costs are different in different markets.  And for variable-rate products, those costs are passed through to consumers.  XOOM gives the example that attorneys charge different rates in different locations.  However, an attorney in New York City charges higher rates than rural attorneys because their costs are higher.  But in the variable rate energy context, all differences in costs are passed through to the consumer, so there is no basis to charge different margins in different markets.  A more accurate analogy is that a client

19

from New York City would not expect to pay higher rates than a client from Buffalo would pay for the same attorney.  And most importantly, the willingness for consumers to pay more cannot override the actual contractual language.  The contract required the variation in rates to be determined solely by XOOM's costs.  The contract did not allow varying consumer expectations to factor into XOOM's rate-setting process at its discretion.

**Third**, XOOM argues the "Agency" provision in the contract provides it with discretion to charge different margins in different markets.  As discussed more fully in MIL No. 6, the Court has already rejected XOOM's argument in the MSJ Order.  Briefly, the "market-based compensation" term as used in the Agency provision is not an additional rate component.  The Court found that term "unclear" but noted that "[e]ven if the compensation term refers to XOOM's compensation, that meaning would be entirely compatible with the proportionate-margin construction."  MSJ Order at 13.  In other words, there is no permissible construction of that term that would impact the Court's interpretation of the contract.  XOOM cannot use an inapplicable and unclear contract term to grant it the rate-setting discretion this Court and the Second Circuit already found it lacks.

**Fourth**, XOOM claims that Plaintiff has not provided any evidence that XOOM's margin should be fixed.  This is another example of XOOM's consistent pattern of confusing factual matters for the jury and legal matters for the Court.  The Court already construed the contract as a matter of law in the MSJ Order.  XOOM cannot ask the jury to reinterpret the contract.  Similarly, XOOM's peculiar claim that Plaintiff bears the burden of proving why margins should be the same across different markets is unavailing.  Defs.' Br. at 32.  The Court and the Second Circuit already

decided XOOM does not have rate-setting discretion and therefore could not use its non-existent discretion to set varying margins.[11]

***Fifth***, XOOM claims that green energy customers are willing to pay more than non-green energy customers so XOOM should be able to charge a higher margin.  But the hypothetical amount a customer would have been willing to pay does not determine the rate XOOM was permitted to charge—the contract does.  Indeed, XOOM does not—and cannot—respond to Plaintiff's point that green energy customers got the exact same "brown energy" as its other customers, paired with renewable energy credits, with the costs of those renewable energy credits already passed through to customers and incorporated into XOOM's Total Cost figures.  In other words, to the extent green energy customers are willing to pay more because green energy costs more, that additional cost is already passed through to the customers.  And to the extent green energy customers' willingness to pay more has any impact on the rate (it does not), it would be because those customers expect the energy to cost more, not because they expect the ESCO to impose a larger margin for that product.  There is therefore no basis for green energy customers with the exact same pricing term to be subject to a different margin than non-green energy customers.  And again, because the contract did not allow XOOM to consider consumer expectations in setting its rates, it cannot claim such expectations grant it pricing discretion.

Accordingly, XOOM offers no reason why it should be able to charge different margins in different markets.  The Court construed the contract and that construction applies to all Class Members alike because they all had the same operative pricing language.  The Court should grant

---

[11] While XOOM now contends that it could charge different margins for different markets, it never once throughout this litigation revealed the proportionate and reasonable margins it contends it charged.  The only margins it provided in discovery have been varying and unreasonable.  It should not be able to invent new margins for the first time at trial.

Plaintiff's MIL to prohibit XOOM from trying to relitigate the Court's (and the Second Circuit's) conclusions of law in front of the jury.

## V.   PLAINTIFF'S MIL NO. 5:   XOOM SHOULD NOT BE PERMITTED TO INTRODUCE EVIDENCE OR ARGUMENT OF ITS SUBJECTIVE CONSIDERATIONS OF SUPPLY COSTS
*(Responding to Defs.' Opp'n at 34–36)*

At summary judgment, XOOM argued the contract only required it to "consider" costs. But the Court rejected that argument, finding that XOOM's rates must be determined solely by its supply costs, plus a fixed and reasonable margin.  Now XOOM wants the jury to disregard the Court's conclusion of law.  Ironically, XOOM's opposition shows why this MIL should be granted. The Court clearly and unambiguously held that mere consideration of costs is not sufficient to comply with the contract.  MSJ Order at 15 ("XOOM's arguments and evidence certainly show that it ***considered*** its supply costs when calculating the Mirkins' monthly rates.  And if all XOOM had to do under the contract was ***consider*** and incorporate its supply costs into the final rate, it would likely prevail.  But under the controlling reading of the agreement, XOOM must show that its rates were determined by its actual and estimated supply costs. XOOM has not done so.") emphases added)).

Notwithstanding the clear finding that mere consideration of supply costs is insufficient to prove compliance with the contract, XOOM now contends in its opposition that:

> Although Plaintiff might believe that XOOM's "consideration" of actual and estimated supply costs in rate-setting does not equate to rates being set based on actual and estimated supply costs, the jury need not believe that. A reasonable juror could conclude that if XOOM considered actual and estimated supply costs and added a margin, then XOOM based its rate on actual and estimated supply costs with a margin.

Defs.' Br. at 36.  This is in direct contradiction to the Court's Order.  Indeed, XOOM has it backwards.  While its consideration of supply costs is not sufficient to show compliance with its contract, consideration of non-supply costs in the rate-setting process is sufficient to show breach.

*See* Decert. Denial Order at 4 ("[T]he central dispute whether XOOM indeed considered factors beyond its actual and estimated supply costs in setting variable rates[.]").

In support of its claim that it can ask the jury to reverse the Court's contract construction, XOOM makes six arguments:  (1) Plaintiff's MIL is insufficiently definite; (2) Plaintiff's MIL is internally inconsistent; (3) evidence of XOOM's subjective considerations is relevant; (4) "considered" and "based on" have the same meaning; (5) the jury can interpret the contract how it likes; and (6) Plaintiff fails to meet her burden to exclude the evidence.  All are meritless.

XOOM first argues that the MIL is not appropriate because it does not refer to discrete evidence or because it seeks a clarification of the Court's summary judgment ruling.  Neither is true.  XOOM conveniently omits that Plaintiff provides 12 discrete examples following the MSJ Order where XOOM makes its improper argument to disregard the Court's construction of the contract.  Br. at 40–41.  And as noted, XOOM's opposition itself provides further grounds for the relief sought.  XOOM is not even hiding the fact that it is trying to get the jury to disregard the Court's conclusion of law.  And rather than a request for the Court to clarify its summary judgment ruling, Plaintiff's MIL is better construed as a request for the Court to ensure XOOM complies with it, given XOOM's repeated insistence that it can construe the contract in defiance of the Court's ruling.  XOOM cannot relitigate contract construction in front of the jury.

XOOM's second argument is that the MIL is internally inconsistent because it claims that evidence of XOOM's mere consideration of costs is both irrelevant to XOOM's claim of compliance with the contract and probative to Plaintiff's claim that XOOM did not comply with the contract.  Similarly, XOOM's third argument is that evidence of cost consideration is relevant. However, XOOM misunderstands that the probative value of evidence turns on the purpose for which it is offered.  *See, e.g.*, *United States v. Vickers*, 708 F. App'x 732, 737 (2d Cir. 2017)

(affirming Rule 403 determination where the court "carefully considered the testimony and the purpose for which it was offered").  When offered to prove that XOOM complied with the contract, evidence of consideration of supply costs is irrelevant because XOOM's obligation to set rates based on costs is not satisfied by its mere consideration of costs.  On the other hand, evidence that XOOM considered non-supply costs in setting rates is probative of Plaintiff's claim that XOOM did not comply with the contract.  *See* Decert. Denial Order at 4 (noting that the "central issue" is whether XOOM "considered" non-supply costs in setting rates).  In other words, evidence of mere consideration of supply costs is not relevant if offered only to prove compliance with XOOM's rejected contract construction, but consideration of non-supply costs is relevant to show breach of the contract as construed by the Court.  This MIL does not seek, as XOOM claims, to exclude truthful testimony about the rate-setting process.  Rather, it seeks to prohibit evidence and argument that mere "consideration" of supply costs was sufficient to comply with the contract.

XOOM's fourth and fifth arguments are that the terms "considered" and "based on" are synonyms so the jury can use its own judgment to determine what they mean, and that evidence of XOOM "considering" costs is probative regardless of contract construction.  Here, XOOM says the quiet part out loud, asserting that the jury can find that XOOM complied with the contract merely by considering costs, since the jury can construe those words however it wants.  According to XOOM, "[t]hat is so even if the meanings of those terms and phrases do not precisely align." Defs.' Br. at 35.  This is exactly what the Court said XOOM cannot do.  MSJ Order at 15.  XOOM is invading the province of the Court to determine issues of law by asking the jury to construe the contract for itself.  Courts should exclude evidence that "is likely to confuse a jury on the distinction between questions of law, which are for the court to decide, and questions of fact, which are for the jury." *United States v. Weber*, 843 F. App'x 364, 366 (2d Cir. 2021) (quoting *United*

24

*States v. Kraeger*, 711 F.2d 6, 7 (2d Cir. 1983) (per curiam)).   Because XOOM indicates its intention to ask the jury to rule on a question of law—the proper construction of the contract—Plaintiff requests that the Court exclude all evidence and argument that merely considering costs is sufficient to comply with the contract.

XOOM's sixth argument is that Plaintiff's Rule 403 allegations are conclusory.   Quite the opposite is true, and as the proponent of the disputed evidence and argument, XOOM bears the burden to establish that it is admissible under Rule 403.   *Doe v. Lima*, No. 14 Civ. 2953 (PAE), 2020 WL 4731418, at *4 (S.D.N.Y. Aug. 14, 2020) (excluding evidence and noting that the proponent of the evidence had the burden of demonstrating its relevance) (citing *Dowling v. United States*, 493 U.S. 342, 351 n.2 (1990)).   The Rule 403 balancing factors are clear here.   XOOM intends to argue that it complied with the contract merely because it considered costs.   That is not probative because the Court has indicated that mere consideration is not sufficient to comply with that contract.   And that argument is unfairly prejudicial because it risks misleading the jury into thinking it can disregard the Court's express contract construction.

Accordingly, the Court should grant Plaintiff's MIL and preclude XOOM from offering evidence or argument that it complied with the contract because it "considered" costs.   And the Court should instruct the jury that while merely "considering" supply costs is not sufficient to comply with the contract, considering non-supply costs in setting rates is sufficient to show breach.

## VI.   PLAINTIFF'S MIL NO. 6:  THE COURT SHOULD EXCLUDE EVIDENCE AND ARGUMENT REGARDING MARKET-BASED COMPENSATION AND THE CONTRACT'S AGENCY PROVISION
*(Responding to Defs.' Opp'n at 37–39)*

XOOM's attempt to shoehorn the contract's Agency provision into the jury instructions is yet another attempt to undermine the Court's prior ruling and confuse the jury about the straightforward implication of the Court's cost-plus pricing construction of the contract.   As

XOOM's opposition reveals, it wants to argue to the jury that its rates may include "market-based compensation"—*i.e.*, that XOOM was permitted under the contract to increase its rates using discretionary "market" factors rather than just its supply costs. The Court has already held that XOOM did not have such pricing discretion. Thus, the Court should grant Plaintiff's motion and preclude XOOM from arguing about the irrelevant Agency provision at trial.

At summary judgment, XOOM argued against the proportionate-margin construction by claiming that the "market-based compensation" provision gave it discretion in setting its margin. *See* Defs.' Br. in Support of Summary Judgment, ECF 145-1, at 14, 23. The Court rejected this argument and found that the Agency provision was entirely consistent with the proportionate-margin construction of the contract, even though it was "unclear." MSJ Order at 13. Specifically, the Court held that if the "market-based compensation" provision has any meaning, it was either referring to enumerated supply costs or the existence of the margin. *Id.* Either way, the contract still required that prices be determined solely by supply costs plus a fixed and reasonable margin. *Id.* In other words, the Court held that the Agency provision does not change the legal operation of the pricing term. *Id.* (holding the Agency provision is "entirely compatible with the proportionate-margin construction").

XOOM now argues that "market-based compensation" can be included as a supply cost under the Agency provision, which in turn enumerates two specific costs, one supply cost and one non-supply cost: (i) acquisition of energy supply, and (ii) utility costs. The first, "acquisition of energy supply," adds nothing. The second, utility costs, are charged directly to the consumer, ***by the utility***. *See* Reply Ex. G at 1 (customer invoice showing "Con Edison electricity charges" for the delivery fees enumerated in the Agency provision being billed directly by the utility to the

consumer); *see also id.* at 2 (listing the delivery charges from the utility to the consumer).[12] Construing the Agency provision as an elaboration of XOOM's supply costs does nothing to change the contract interpretation or the factual issues entailed in calculating its costs, which are clearly established through its rate-setting workbooks.  The "central dispute" is whether XOOM breached by "consider[ing] factors beyond its actual and estimated supply costs in setting variable rates," Decert. Denial Order at 4, and the Agency provision is not relevant to the jury's determination of that issue.

XOOM next argues that "market-based compensation" can be included in XOOM's margin at its discretion.  But this Court and the Second Circuit have already rejected XOOM's claim of discretion.   Instead, at summary judgment, the Court recognized that the "market-based compensation" term could simply refer to the fact that XOOM was allowed to charge a margin. That, too, has not been in dispute.

Moreover, XOOM's proposed reading of the Agency provision—which would benefit XOOM to the detriment of consumers—is also foreclosed by the same basic principles of contract interpretation that the Court applied at summary judgment.  As the Court held, "'[o]ne of the most fundamental principles of contract interpretation is that ambiguities are to be construed against the party who prepared the writing.'"  MSJ Order at 12 (quoting *Chavis v. S. Life Ins. Co.*, 347 S.E.2d 425, 427 (N.C. 1986)).  Where, as here, the meaning of a provision is "unclear" and there are multiple "plausible constructions of the legal effect of the contested contract phrase," the meaning must be construed against the drafter.  *Id.* at 12–13.  Thus, because the Agency provision must be

---

[12] XOOM did not purchase its energy supply from the utility.  To the extent XOOM incurred any additional cost from the utility, those costs were not for "supply" and, in any event, would have been known in advance (unlike prior period adjustments), and should have been accounted for in its Total Cost figures in the rate-setting workbooks.  XOOM has never claimed that estimated costs were hidden in the margin.  Because these costs are known in advance, they would have been captured by XOOM's estimated costs, and XOOM has not presented any evidence that this type of cost was allegedly incorporated into its margin.

construed against XOOM, the most appropriate plausible reading is that the provision merely reaffirms the contract's pricing term which promised rates determined solely by supply costs plus a fixed and reasonable margin.

XOOM's remaining arguments are meritless.  XOOM argues that "the contract 'must be interpreted as a whole, and individual provisions within a contract must be interpreted within the context of the entire contract,'" Defs.' Br. at 39 (quoting *Fulford v. Jenkins*, 672 S.E.2d 759, 763 (N.C. Ct. App. 2009)), and that the Agency provision is required to "give proper context to the pricing term." *Id.*  This is a red herring.  The jury is not being asked to interpret the pricing term of the contract; the Court has already done so as a matter of law. *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009).  Discussion of the Agency provision at trial would only confuse the jury, as XOOM improperly seeks to have the jury reconsider the Court's ruling on a point of law.

XOOM also suggests that as a "practical matter," reference to the Agency provision at trial cannot be precluded other than by redacting the term from the contract.  That too is nonsense. Plaintiff is not asking that the provision be redacted, but that XOOM be precluded from making argument or eliciting testimony about it—just as will be the case for the vast majority of contract terms that are irrelevant for purposes of trial.  That should not be difficult, seeing as no XOOM witness previously testified about the Agency provision, further underscoring its irrelevance.

Accordingly, the Court should grant Plaintiff's MIL No. 6 and preclude testimony or argument about the Agency provision under Rules 402 and 403.

## VII.   PLAINTIFF'S MIL NO. 7:  THE COURT SHOULD REJECT XOOM'S EXPRESS ATTEMPT TO RELITIGATE RULE 23 ISSUES OF LAW BEFORE THE JURY
*(Responding to Defs.' Opp'n at 40–43)*

XOOM is attempting to convert a jury trial into a seven-week evidentiary hearing on class certification.  After this Court's certification of the Class, the Second Circuit's rejection of

XOOM's Rule 23(f) petition, and this Court's denial of XOOM's motion for decertification, XOOM has lost on certification three times.  Still dissatisfied, XOOM now wants to ask the jury to make its own typicality and predominance conclusions of law.  Or worse, it seeks to instruct the jury as if the Class has already been decertified and asks the Court to treat this action as a series of thousands of individual actions.

XOOM's opposition makes four principal arguments:  (1) XOOM can charge differing margins to different Class members, so the trial must take account of each rate-setting decision; (2) because the Court can decertify a class at any time, evidence regarding certification is relevant to the jury; (3) Plaintiff has the burden to prove liability and damages individually for each rate-setting decision; and (4) the jury must determine whether each individual Class Member was damaged.  These arguments lack merit because they disregard the Court's Orders and seek to have the jury determine issues of law.

## A.   XOOM Must Charge a Fixed and Reasonable Margin

XOOM claims that the jury must consider liability separately for each product offered and utility zone serviced because it could charge different margins for each product and zone.  The Court found the opposite both in granting class certification and denying decertification.  In fact, XOOM refuses to accept three separate issues already decided by the Court.  *First*, the Court already ruled XOOM's margin must remain fixed.  Yet XOOM claims that "the Court specifically acknowledged that the contract does *not* cap XOOM's margins at 'a fixed, specific percentage' and allows some element of market-based compensation."[13]  Defs.' Br. at 42 (emphasis in original).  In fact, the Court held the opposite.  *See* MSJ Order at 14 ("I find that the contract required the

---

[13] The "market-based compensation" language does not allow XOOM to charge different margins in different markets.  This is more fully discussed in MIL Nos. 4 and 6.

variation in the variable rates to be determined solely by XOOM's actual and estimated supply costs."); *see also* Decert. Denial Order at 8 (leaving to the jury the issue of "what a reasonable and proportionate margin would have been" without leaving room for multiple, discretionary margins). For the reasons discussed more fully in MIL No. 4, the Court already decided that the contract required a fixed margin across markets as a matter of law.

*Second*, even though the Court has already twice ruled that Plaintiff's claims were typical of the Class, XOOM proposes to ask the jury to decide whether her claims were atypical because different Class Members were subject to different "rate-setting decisions," yielding different margins based on what product they received and in what utility zone. The Court already explained that while the *costs* may differ for different products, "there is no question that the form contract contained identical language." Class Order at 15–16. And "[b]ecause electric and natural gas customer claims arise from the same rate-setting process and will rely on similar legal arguments to prove liability," Ms. Mirkin's claims are typical of the Class. *Id.* at 16; *see also* Decert. Denial Order at 5 ("XOOM did not claim to have used a different rate-setting process for electric and natural gas customers."). And as for different utility zones, the Court dismissed XOOM's argument out of hand, noting that "XOOM does not seriously contest that plaintiff's claim is typical of other electricity customers." Class Order at 15. All Class Members were subject to the same pricing term and rate-setting process. Therefore, liability and damages can be determined in one stroke—all of which the Court has already decided.

*Third*, XOOM repeats the argument used in its opposition to MIL Nos. 4 and 6 that the Court's "ruling about the *process* XOOM uses to set rates in no way implies—let alone holds as a matter of law—that the *prices* XOOM charged (or should have charged) were uniform for all customers, products, and utility zones." Defs.' Br. at 42 (emphasis in original). As discussed more

fully in MIL Nos. 4 and 6, this argument is meritless.  Plaintiff has never contested that the ***prices***
XOOM charged can change across products and utility zones.  But that is because price is
comprised of two components:  costs and margin.  The costs will change across zones and products,
and those costs will be passed through to customers.  But the margin cannot change.  Because all
Class Members were subject to the same pricing language and the same rate-setting process, the
margin must remain fixed for all of them and "the variation in the variable rates" must be
"determined solely by XOOM's actual and estimated supply costs."  MSJ Order at 14.

### B.    Evidence and Argument About Certification Is Not Relevant to the Jury

In addition to XOOM's refusal to accept the Court's ruling on XOOM's fixed and
reasonable margin, XOOM feigns ignorance about what Plaintiff's motion seeks and misapplies
the case law.  For example, XOOM points out that the Court can decertify the Class during or after
trial and claims that Plaintiff seeks a blanket ruling that makes the Class Order "sacrosanct."  But
XOOM misses the crucial point.  While the Court has authority to decertify the Class after trial,
that is exclusively an issue for the Court, not the jury.  The jury's role is one of fact-finding, and
the only relevant issues for the jury at trial are the disputed facts about liability and damages.
Evidence and argument about Rule 23 factors is not relevant to either determination.

### C.    Plaintiff Will Establish Class-Wide Liability and Damages

Next, XOOM contends that "Plaintiff's real objection is that she would rather not have to
prove what XOOM should have charged her and the class."  Defs.' Br. at 41.  As discussed in MIL
Nos. 2–5, Plaintiff will prove XOOM's breach based on its own records and admissions.  Plaintiff
will offer different possible margins that comply with the contract's requirements, and as the
Court's Decertification Denial Order notes, the jury will decide which margin applies.  *See* Decert.
Denial Order at 8 ("[A] jury will decide . . . what a reasonable and proportionate margin would
have been.").  Plaintiff will also propose damages calculations for each proposed margin, allowing

the jury to award damages conforming to its determination of a reasonable margin. As the Court has repeatedly held, this is sufficient to meet Plaintiff's burden to establish liability and damages.

But XOOM demands mini-trials "to prove that each individual Class Member was overcharged [and] by how much." Defs.' Br. at 41. Rule 23 is designed to avoid the precise mini-trials XOOM seeks to conduct. Indeed, the Court already held that the determination of "how XOOM in fact set its rates" can be "made by the factfinder at trial 'in one stroke.'" Class Order at 152 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The Court should not let XOOM effectively decertify the Class be requiring the jury to make individual determinations for each Class Member.

### D. The Jury Does Not Need to Make an Individual Finding for Each Class Member

Lastly, XOOM argues that a concurrence from *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J. concurring), requires the jury to evaluate breach and damages for each Class Member individually.[14] But in *Tyson Foods* "it [was] undisputed that hundreds of class members suffered no injury." *Id.* at 463. That is not the case here, and XOOM overstates the effect of the *Tyson Foods* concurrence.[15] Because XOOM conceded that the rate-setting process was uniform for all Class Members, the jury can determine liability and damages in one stroke.

---

[14] Importantly, XOOM's cited portion of the *Tyson Foods* concurrence regarding uninjured class members is non-binding, as the Court expressly ***did not*** rule on the issue XOOM now claims is settled law: "In its petition for certiorari petitioner framed its second question presented as whether a class may be certified if it contains 'members who were not injured and have no legal right to any damages.' In its merits brief, however, petitioner reframes its argument. It now concedes that '[t]he fact that federal courts lack authority to compensate persons who cannot prove injury does not mean that a class action (or collective action) can never be certified in the absence of proof that all class members were injured.' In light of petitioner's abandonment of its argument from the petition, the Court need not, and does not, address it." *Tyson Foods*, 577 U.S at 460 (citations omitted).

[15] XOOM also cites *Hickory Sec. Ltd. v. Republic of Argentina*, 493 F. App'x 156, 159 (2d Cir. 2012), for the proposition that aggregate damages calculations that "bear little or no relationship" to the harm suffered by the Class are not permissible. However, that is not the case here because XOOM used the same

(*Footnote continued on next page*)

…

Because XOOM should not be permitted to relitigate class certification via the jury, the Court should preclude any argument or evidence as to (1) the typicality of the Class, (2) different margins in different zones or for different products, or (3) the need for mini-trials or individual determinations of liability or damages.[16]

## VIII.    PLAINTIFF'S MIL NO. 8:   XOOM SHOULD NOT BE ABLE TO PRESENT THOUSANDS OF MINI-TRIALS
### (Responding to Defs.' Opp'n at 44–46)

XOOM has made explicit in its filings, including in opposition to this MIL, that it intends to structure its defense as thousands of mini-trials going through each of the 5,800+ rate-setting decisions that occurred during the Class Period.  This trial strategy necessarily involves cumulative and irrelevant evidence that should be excluded pursuant to Rules 401–403.  XOOM makes three arguments in response:  (1) Plaintiff's MIL requesting preclusion of such cumulative testimony is too abstract; (2) decisions on cumulative evidence should be reserved for trial; and (3) preclusion of thousands of mini-trials violates XOOM's Seventh Amendment rights.  None carry the day.

First, XOOM contends that the MIL is too abstract because Plaintiff does not point to discrete evidence.  But the issues before the jury are (1) whether XOOM's rates were determined solely by its supply costs, and (2) whether XOOM charged a fixed and reasonable margin.  XOOM has consistently represented that the rate-setting process was uniform throughout the Class Period. *See* MIL No. 3.  The relevant evidence concerns the "actual and estimated supply costs" used by

---

rate-setting process and was bound by the same pricing language for all Class Members.  Plaintiff's damages calculation will precisely establish the amount the Class was harmed.  This goes well beyond the Second Circuit's requirement that "damages awards roughly reflect the aggregate amount owed to class members." *Id.* ("[D]amages need not usually be demonstrated with precision[.]").

[16] Despite XOOM's strawman argument, the Court's typicality finding does not require that all Class Members received the same price.  Prices can vary across markets when costs vary across markets.  But because prices must have varied solely by supply costs, both liability and damages can be determined in one stroke.

XOOM during that uniform rate-setting process to arrive at its rates, which as the Court has already found can be decided in one stroke.[17]  *See* Decert. Denial Order at 5 ("XOOM did not claim to have used a different rate-setting process for electric and natural gas customers.").  Indeed, as the Court explained:

> [O]ne of the central disputes of material fact is whether plaintiff's rate fluctuations were caused by permissible supply costs incorporated into the margin.  Specifically, I found that a reasonable jury could conclude that XOOM did not factor prior period adjustments into its margin or that XOOM's practice of adjusting the margin to cover cost overruns and meet revenue goals was not permitted under the contract. I need not delve too far into the merits and decide at this stage how XOOM in fact set its rates, because that decision may be made by the factfinder at trial in one stroke.

Class Order at 13 (cleaned up).  The Court stressed that this "central issue" can be resolved through evidence "related to the rate-setting ***process***."  *Id.* (emphasis added).  Because this dispute centers on the rate-setting process, "the outcome will be determined by common evidence, rather than evidence that differs between class members."  *Id.*  Following the Class Order, the Court came to the same conclusion in disposing of XOOM's decertification motion.  *See* Decert. Denial Order at 4 (the "central dispute" is "whether XOOM indeed considered factors beyond its actual and estimated supply costs in setting rates," with two sub-issues about "whether the Total Cost reflected XOOM's actual estimated supply costs (or whether some supply costs were also captured in the margin)" and "whether the margin itself was reasonable and proportionate").

Therefore, the evidence XOOM seeks to admit regarding thousands of rate-setting decisions is irrelevant to the questions before the jury.  XOOM's proposed trial strategy relies on categorically irrelevant material, focusing on individual rate-setting decisions rather than the

---

[17] For the reasons discussed in MIL No. 3, XOOM should not now be permitted to claim—contrary to its position through discovery, class certification, and summary judgment—that its rate-setting process is ***not*** uniform and consistent.  Evidence contrary to XOOM's position throughout this litigation should be excluded pursuant to Rule 37.

rate-setting process.  XOOM's trial strategy is nothing more than an attempt to nullify the Court's two certification rulings and the Second Circuit's denial of XOOM's Rule 23(f) petition.

XOOM's second argument is that the MIL is premature and that determinations on cumulative evidence should be reserved for trial.  But courts regularly exclude cumulative or irrelevant evidence on motions *in limine*.  *See Republic of Turkey v. Christie's Inc.*, 527 F. Supp. 3d 518, 524–25 (S.D.N.Y. 2021) (excluding evidence on a motion *in limine* "because it is cumulative and would result in numerous trials within the trial").

Lastly, XOOM argues that preventing it from presenting thousands of mini-trials violates its Seventh Amendment rights to contest liability and damages for every Class Member.  XOOM is effectively asking the Court to repeal Rule 23.  In support of this extreme argument, XOOM cites two inapposite cases affirming denials of class certification.[18]  In *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 934 F.3d 619 (D.C. Cir. 2019), the court denied certification because the plaintiff's own expert "measured negative damages for over 2,000 members of the proposed class."  *Id.* at 620.  In other words, the basis for denying class certification was that common issues did not predominate.  *Id.* at 625.  That is not the case here.  In *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001), the Court did not even mention the Seventh Amendment, instead affirming denial of class certification on predominance and typicality grounds.  *Id.* at 187.  Indeed, in *Newton*, which involved individual stock trades, the Court found that each trade would have to be evaluated individually, which is not the case here, where the jury can determine the issues in one stroke because rates were set uniformly.  Neither of XOOM's cited cases stand for the proposition that preventing a class action defendant from

---

[18] Tellingly, neither of these cases concern evidentiary issues at trial, instead turning on the Rule 23 factors.

conducting thousands of mini-trials after a court duly certified a class violates that defendant's Seventh Amendment rights.  XOOM has no support for the effective repeal of Rule 23 that it seeks.

Accordingly, XOOM should not be able to turn a relatively simple trial into a months-long series of thousands of mini-trials.

## IX.     PLAINTIFF'S MIL NO. 9:   PLAINTIFF SHOULD BE PERMITTED TO USE XOOM WITNESSES' DEPOSITION TRANSCRIPTS AND OTHER ADMISSIONS IN HER CASE-IN-CHIEF
*(Responding to Defs.' Opp'n at 47–52)*

Plaintiff requests the Court's permission to read XOOM's admissions in deposition testimony by XOOM's witnesses into the record during Plaintiff's case-in-chief.  This promotes efficiency by allowing discrete portions of the depositions to be heard by the jury rather than having the jury sit through extended questioning and answers by adverse witnesses.  It also causes no prejudice to Defendants.

"[I]t is permissible under Rule 801(d)(2) of the Federal Rules of Evidence to admit a deposition as a statement of a party-opponent.  Moreover, neither Rule 801(d)(2) nor Rule 32(a)(1) require a showing of unavailability for admissions of party-opponents.  Rule 32 allows a party to introduce as a part of his substantive proof, the deposition of his adversary, and it is quite immaterial that the adversary is available to testify at trial or has testified there."  *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1080 (10th Cir. 2009) (quotation omitted); *see also Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 560 F. Supp. 2d 227, 310 (W.D.N.Y. 2008), *aff'd*, 351 F. App'x 441 (Fed. Cir. 2009) ("Federal Rule of Civil Procedure 32(a)(1) permits a party's use of a deposition for any purpose permitted by the Federal Rules of Evidence.  This provision permits the substantive admission of depositions which fall within the ambit of Fed. R. Evid. 801(d)(2) irrespective of whether the deponent is available to testify at trial." (cleaned up)).

Accordingly, regardless of whether the witness appears at trial, Plaintiff can still admit portions of the deposition transcript pursuant to Rule 32(a)(1)(B).

XOOM opposes this request, claiming that: (1) deposition testimony is an inadequate substitute for trial testimony; (2) even if the testimony is admissible, the Court should still preclude it; (3) the witnesses will be available at trial; (4) the Court would need to conduct a hearsay analysis for each statement read into the record; and (5) no exceptional circumstances justify reading the deposition transcripts into the record. These arguments fail. And most tellingly, XOOM does not articulate any prejudice to this procedure, opposing it simply because it will streamline Plaintiff's presentation of evidence and make trial more efficient.[19] Because the deposition excerpts from the testimony of XOOM's own witnesses are admissions under Rule 801(d)(2), XOOM's various arguments to preclude Plaintiff from offering them in her case-in-chief are beside the point. Moreover, those objections are also meritless.

First, XOOM claims that deposition testimony is an inadequate substitute for live testimony. But nothing in Plaintiff's proposal prevents XOOM from examining its witnesses in its case-in-chief. Accordingly, XOOM would not face any prejudice because it could present its case-in-chief as it pleases. Plaintiff's proposal is designed to increase the efficiency of trial and streamline presentation of her case. For this reason, courts routinely admit deposition testimony in a party's case-in-chief. *See Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. 06 Civ. 4262, 2009 WL 10679721, at *1 (E.D. La. Aug. 4, 2009) (collecting cases where deposition testimony was admitted during a party's case-in-chief, even where the deponent was available). If XOOM prefers a different strategy for its case-in-chief, it is welcome to pursue that strategy.

---

[19] These arguments are also discussed in Plaintiff's Opposition to XOOM's MIL No. 14.

Second, XOOM claims that even if permissible, the Court should still reject Plaintiff's proposal. But XOOM's logic is contrary Rule 102's instruction that the Rules of Evidence are designed in part to "eliminate unjustifiable expense and delay," which is exactly what Plaintiff seeks to do. Indeed, "[t]he requirements of Rule 32(a) have been construed liberally in light of the twin goals of fairness and efficiency." *Plunk v. Hobbs*, No. 5:08 Civ. 203, 2010 WL 3927041, at *1 (E.D. Ark. Oct. 5, 2010) (quotation omitted). And there are no prudential reasons to reject Plaintiff's proposal here. Instead, XOOM seeks to waste the Court's and the jury's time with needlessly long examinations that could be eliminated or reduced by reading deposition testimony.

Third, XOOM contends that the witnesses will be available at trial, making Rule 32(a)(4)(B) inapplicable. The witnesses' distance from trial dispositively allows the deposition testimony to be read into the record if they are greater than 100 miles from the place of trial. *See* Rule 32(a)(4)(B). If those witnesses ultimately appear at trial during Plaintiff's case-in-chief, that deposition testimony may still be read into the record pursuant to Rule 32(a)(1)(B) and (a)(4)(E), which in turn permit this procedure pursuant to Rules 611 and 801.

Fourth, XOOM claims that the Court would need to conduct a hearsay analysis for each statement to be read into the record based on its contention that the deponents cannot be considered party opponents for purposes of Rule 801(d). However, for the reasons discussed in Plaintiff's brief, *see* Br. at 50–51, the statements are party opponent admissions, meaning they are categorically not hearsay. *See* Rule 801(d). The Rule 30(b)(6) testimony was given in a "representative capacity" and therefore independently meets the requirement of Rule 802(d)(2)(A). XOOM's other employees testified about "a matter within the scope of" their employment, satisfying Rule 802(d)(2)(D). XOOM contends that Rule 802(d)(2)(A) does not apply to former employees, but Troy Chidester, Patricia Kulesa, and Jason Loehde were current employees at the

time of their depositions, so the Rule plainly applies to them.  And pursuant to Rule 802(d)(2)(B), XOOM adopted the admissions of its former employees by providing those admissions to its expert and relying on them in court filings.  *See* Br. at 51.  Likewise, XOOM adopted its expert's testimony by relying on it in court filings.  *Id.*; *see also* Pl.'s *Daubert* Mot., ECF 231.

Fifth, XOOM contends no exceptional circumstances exist here.  But in the same breath, XOOM claims it needs 35 trial days for its case-in-chief alone.  XOOM's requested trial length is extraordinary and the Court should take measures to make the trial more efficient, as courts routinely do.  *See, e.g.*, *Eastman Kodak Co.*, 560 F. Supp. 2d at 312 (collecting cases where trial length or costs were sufficient exceptional circumstances under Rule 32(a)(4)(E)).

Accordingly, the Court should grant Plaintiff's proposal to read XOOM's admissions during depositions into the record during her case-in-chief.

## X.   PLAINTIFF'S MIL NO. 10:  PLAINTIFF'S EXPERT SHOULD BE PERMITTED TO TESTIFY TWICE
*(Responding to Defs.' Opp'n at 53–56)*

Plaintiff intends to have her expert explain the background and functioning of New York's deregulated energy market, the role of ESCOs within that market, and the regulatory and legislative responses to ESCOs' role in that market over time.  Following the testimony of other witnesses, Plaintiff intends to recall her expert to testify about matters relating to XOOM's breach of contract and damages.  XOOM opposes this proposal for three reasons, all of which lack merit and none of which demonstrate any prejudice to XOOM.

First, XOOM contends it would be difficult to contain the scope of the expert's first segment of testimony.  This argument does not present a genuine issue.  As an initial matter, the two segments of testimony are clearly demarcated: the first one does not focus on XOOM specifically and the second one does.  And while the scope of cross-examination should be limited

to the testimony offered during each respective segment, Plaintiff agrees that XOOM can cross-examine her expert at the conclusion of his second direct examination on *all* topics he covered during both segments.

Second, XOOM argues that the first proposed segment is irrelevant and that Plaintiff can testify to the circumstances of her decision to contract with XOOM.  While Plaintiff can adequately testify about her own circumstances, the jury must be able to understand the ESCO market and how ESCOs function.  The jury is likely unfamiliar with the role ESCOs play in the energy market and the services they provide.  For example, the jury may not be familiar with concepts like "supply" and "delivery" in connection with energy markets, or the relationship between ESCOs and utilities and their respective roles in the market.  As a matter of common sense, XOOM's contention that "members of the jury almost certainly know from their day-to-day experience about procuring electricity in a deregulated market" is highly doubtful.  *See* Defs.' Br. at 54.  Even the most sophisticated individuals unfamiliar with ESCOs would require background information to comprehend the issues relevant to this case.  Indeed, the NYPSC has espoused a "long-held concern" that there is a widespread "misunderstanding" of the ESCO market.  PX39 at 31. Therefore, background testimony on the market will certainly be useful to the jury to help provide context and avoid this widespread "misunderstanding," and assist the jury in understanding Plaintiff's and other witnesses' testimony.

Third, XOOM argues that any basic background can be provided by counsel during the opening statement.  *Id.* at 55.  But an opening statement is not evidence, and the Court will instruct the jury to rely on evidence, not attorney arguments.  *Rosales v. Barr*, 839 F. App'x 592, 596 (2d Cir. 2020) ("[T]he statements of counsel are not evidence." (citing *INS v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984))).

Lastly, XOOM attempts to distinguish Plaintiff's examples of courts allowing witnesses to testify twice during a party's case-in-chief and contends that the Court should follow the principle that witnesses generally testify only once.  But XOOM's attempts to distinguish fall flat because Plaintiff's cases clearly show that the decision regarding whether a witness should be permitted to testify twice is case-specific and that courts depart from the general practice of having each witness testify only once where warranted by the circumstances.  *See* Br. at 53.  Rule 611 gives the Court "reasonable control over the mode and order of examining witnesses and presenting evidence." And allowing a witness to testify more than once is within the Court's discretion.  *See United States v. Bailey*, 973 F.3d 548, 563–64 (6th Cir. 2020) (holding that the district court did not err when allowing a witness to testify three times).  Here, segmented testimony will allow the witness to cover two discrete subjects to aid in the jury's understanding and Plaintiff's presentation of the evidence. XOOM cites no real prejudice from having Plaintiff's expert testify twice, especially because XOOM will be permitted to cross-examine the witness both times (including being given *two* opportunities to cross-examine Plaintiff's expert on topics covered during his first segment of direct testimony).

Accordingly, the Court should allow Plaintiff's expert to testify twice during Plaintiff's case-in-chief.

**XI.   PLAINTIFF'S MIL NO. 11:   XOOM SHOULD BE PRECLUDED FROM OFFERING EVIDENCE REGARDING ITS AFFIRMATIVE DEFENSES BECAUSE THEY FAIL AS A MATTER OF LAW**
*(Responding to Defs.' Opp'n at 57–63)*

Plaintiff requests that the Court strike XOOM's affirmative defenses that are legally inapplicable or lack evidentiary support.  XOOM first argues against Plaintiff's MIL as a whole, claiming it is untimely and non-specific.  Then XOOM takes selected affirmative defenses and muses about how they may hypothetically come into play at trial—without any reference to

evidence in the record.  XOOM fails to justify including its affirmative defenses at trial because it cannot substantiate them with any record evidence or otherwise show they are legally tenable.[20]

### A.   Plaintiff's MIL Is Proper and Timely Because the Court Can Preclude Affirmative Defenses *In Limine*

XOOM first argues that this MIL is an improper and belated attempt at summary judgment on its affirmative defenses.  This argument fails because courts routinely preclude affirmative defenses *in limine*.  Indeed, precluding evidence and argument about defenses lacking legal or evidentiary support is rooted in Supreme Court precedent.  *See United States v. Bailey*, 444 U.S. 394, 416 (1980) ("If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense.").

Thus, "the Court may rule on whether or not an affirmative defense is available to a defendant in ruling on a motion *in limine*."  *Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, No. 12 Civ. 5836, 2017 U.S. Dist. LEXIS 76361, at *2 (N.D. Ill. May 19, 2017) (citing *United States v. Tokash*, 282 F.3d 962, 967 (7th Cir. 2002)).  "[A] district court may properly deny a defendant the opportunity to introduce evidence supporting an affirmative defense by granting a pre-trial motion *in limine*, so long as the facts proffered by the defendant to support the defense are insufficient as a matter of law to meet the minimum standard as to each of the elements of that defense."  *United States v. Baldwin*, No. 20 Cr. 270, 2021 WL 4521205, at *1 (S.D. Ind. Oct. 4,

---

[20] XOOM also argues that it should be able to argue Rule 23 factors to the jury and that it can put on its anticipated defense of thousands of mini-trials.  Both these arguments fail for the reasons discussed in MIL Nos. 7 & 8.  Indeed, class certification is a question for the Court not the jury.  And the defense is arguably waived (at least in terms of what can be offered to the jury) because "[n]owhere in XOOM's pretrial filings does XOOM ask the Court to provide the jury with questions that require it to pass judgment on the Court's Rule 23 findings."  Defs.' Br. at 41.

2021) (quoting *United States v. Sahakian*, 453 F.3d 905, 909 (7th Cir. 2006)).[21]  Tellingly, XOOM does not grapple with this precedent and instead simply ignores the cases cited in Plaintiff's MIL. *See* Br. at 54–55 (citing *United States v. Scully*, No. 14 Cr. 208 (ADS), 2015 WL 5826493, at *2 (E.D.N.Y. Oct. 6, 2015), *United States v. Sorensen*, 73 F.4th 488, 491 (7th Cir. 2023), *United States v. Jackson*, 598 F.3d 340, 349–50 (7th Cir. 2010)).

XOOM next argues that Plaintiff's MIL is insufficiently specific.  But this shifts the burden to Plaintiff.  Because XOOM listed its affirmative defenses in the Joint Pre-Trial Order, it must present sufficient evidence to support each element of each defense.  "The burden of establishing an affirmative defense rests with the defendant, and each of the elements of that defense must be supported by sufficient evidence to allow a reasonable jury to find the defense proved before an instruction on the defense can be given." *Baldwin*, 2021 WL 4521205, at *2 (citing *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996)).  Thus, a court "may, and often should, preclude a defendant from introducing evidence of a proposed defense where the defendant cannot establish all elements of that defense." *United States v. Sorensen*, 73 F.4th 488, 491 (7th Cir. 2023).

Notably, in response to this MIL, XOOM does not point at any evidence in the record in support of any of its affirmative defenses.  Nor can it.  Plaintiff propounded Request for Production No. 89 asking for "[a]ll documents which [Defendants] believe support any affirmative defense in this action."  Reply Ex. A.  In response, XOOM referred Plaintiff to a total of 8 pages of documents—the Enrollment Information, New Customer Enrollment Confirmation, and Electricity Sales Agreement—which are insufficient to support any of its affirmative defenses.[22]

---

[21] Moreover, the Court has the authority to strike defenses *sua sponte*, *see* Rule 12(f)(1), so it follows *a fortiori* that the Court could strike XOOM's affirmative defenses in response to Plaintiff's MIL.

[22] Given that XOOM failed to supplement its response to Request No. 89 with other documents supporting its affirmative defenses, it should be precluded from offering such evidence at trial pursuant to Rule 37.

43

Moreover, XOOM has not included any of the affirmative defenses in its proposed jury instructions or identified any witnesses who can testify to the facts supporting any of the defenses.  XOOM's attempts to salvage its affirmative defenses rely on hypotheticals, not actual evidence.  XOOM should not be allowed to introduce evidence or make arguments in support of those defenses.

### B.   XOOM's Affirmative Defenses Lack Legal and Evidentiary Support

XOOM next attempts to revitalize some—but not all—of the affirmative defenses it listed in the Joint Pre-Trial Order.[23]

***Equitable Defenses.***  XOOM argues that its equitable defenses should survive even though Plaintiff does not request any equitable relief.  XOOM points to Plaintiff's proposed instruction addressing XOOM's duty of good faith and fair dealing and argues that Plaintiff is attempting to "resurrect" a dismissed claim.[24]  Because of this, XOOM surmises, "it is not outside the realm of possibilities that Plaintiff will attempt to resurrect her long-since dismissed unjust enrichment claim," Defs.' Br. at 58, and such "resurrection" would entitle XOOM to present its equitable defenses and allow XOOM to claim Plaintiff is estopped from raising these points.

XOOM's entire argument on this point is speculation unmoored from the realities of this litigation.  Plaintiff has no ability or intent to "resurrect[]" its unjust enrichment claim at trial, nor has her proposed instruction "resurrected" the covenant claim.  Instead, Plaintiff is entitled to show (and always has been) that a breach of the implied covenant is a breach of the contract itself.  Plaintiff and the Class do not seek any equitable relief and, in fact, expressly withdrew requests

---

[23] Specifically, XOOM does not appear to contest the MIL with respect to its estoppel, ratification, and election of remedies defenses.  These defenses should be stricken.

[24] As explained in Plaintiff's opposition to XOOM's MIL No. 1, Plaintiff does not attempt to reassert the stand-alone good faith and fair dealings claim.  The covenant of good faith and fair dealing is implied in every North Carolina contract and is encompassed in the breach of contract claim.  *See* Pl.'s Opp. to Defs.' MILs, at 3–7.

for equitable relief.  *See* Joint Pre-Trial Order at 20 ("Plaintiff and the Class do not intend to seek injunctive or declaratory relief at trial.").   Accordingly, XOOM should be precluded from introducing evidence (as none exists in the record) or making arguments in support of equitable defenses.  *Robinson v. De Niro*, No. 19 Civ. 9156 (LJL), 2023 WL 7004926, at *4 (S.D.N.Y. Oct. 24, 2023) (granting motion *in limine* to preclude equitable defenses in action at law).[25]

*Proximate Cause.*  XOOM incorrectly argues that its proximate cause defense is applicable to the element of "causation" in a GBL § 349 claim.  First, proximate cause is not an appropriate defense to a breach of contract claim.  Second, with respect to whether XOOM's breach also constitutes a violation of GBL § 349 and 349-d, XOOM points to no evidence in the record supporting the proximate cause defense.  Therefore, there is no basis to allow it to remain.

*Standing.*  XOOM claims it has a viable standing defense because it speculates that some Class Members were not damaged.  Yet in response to this MIL, it did not produce evidence of a single such Class Member.  XOOM instead argues that the Class "was undercharged on numerous occasions," Defs.' Br. at 59, but even if that were true, a Class Member's standing turns only on whether that Member suffered an injury from XOOM's breach, not on whether there was an occasional "undercharge."  Moreover, the Court found that Class Members are entitled to nominal damages if they establish breach but cannot establish compensatory damages.  Accordingly, even supposed Class Members who were not overcharged (XOOM points to none) would have standing if XOOM breached its obligation with respect to its improper consideration of non-supply costs.

---

[25] Likewise, XOOM's argument that Plaintiff intends to "insert a never-pleaded New York General Business Law Section 349 tort claim at this late stage," Defs.' Br at 58, is also without merit.  Plaintiff does not intend to "insert" a GBL § 349 claim.  Plaintiff pleaded sufficient allegations and will adduce sufficient evidence to show that XOOM's breach of contract also "constituted" a violation of GBL § 349 and 349-d for purposes of punitive damages.  *See* MIL No. 13.  Plaintiff has never asserted a GBL § 349 claim and will not do so.

***Assumption of Risk and Voluntary Payment.***   XOOM's assumption of risk and voluntary payment defenses fail as a matter of law.   Specifically, the assumption of risk defense in the breach of contract context only applies where a breaching party's failure to perform was justified by the non-occurrence of a condition and Plaintiff assumed the risk of the non-occurrence of that condition.   *See* Br. at 57.   XOOM has made no such showing.   Similarly, the voluntary payment defense is only available when the payee knew all the relevant facts before making a voluntary payment.   *See* Br. at 58.  As discussed in connection with MIL No. 12, no customer had material information about XOOM's costs, and therefore the voluntary payment defense does not apply.   Conflating these defenses, XOOM suggests that the "actual cost" language in the agreement put the Class on notice that actual costs could be higher than the estimated costs and customers voluntarily and knowingly paid the amounts due.  Defs.' Br. at 60.  But that contract language is insufficient.   Class Members lacked actual knowledge of XOOM's costs.

***Accord and Satisfaction.***   XOOM argues that the accord and satisfaction defense applies to rerated customers.   This argument fails.   Rerating is not an accord, which requires an entirely separate contract to be accepted by the party harmed by the breach.   *See* Br. at 58.   There is no evidence of such accords here.

***Parol Evidence.***   XOOM claims it can present parol evidence because the Court found the Agency provision in the contract to be "unclear."   As explained above, contract interpretation is not an issue for the jury and was already resolved by the Court as a matter of law.   Because the jury will not be asked to construe the contract, parol evidence is irrelevant.

***Release and Waiver.***   XOOM claims that its release and waiver defenses are viable because one Class Member has settled individually with XOOM.   But XOOM failed to produce the settlement agreement and there is no evidence in the record supporting this claim.   There are also

no exhibits on its exhibit list supporting this claim.  Without sufficient evidence in the record, XOOM cannot first introduce this evidence at trial.  Similarly, XOOM claims that its mistake defense could be relevant if Plaintiff contests the validity of this Class Member's release, but XOOM has presented no evidence in support of that claim.

**Statute of Limitations.**  XOOM argues that an unspecified shorter statute of limitations may apply to some of its New York customers if they resided outside of New York at the time of the breach.  In support of its statute of limitations defense, XOOM cites cases for the proposition that a cause of action accrues where the plaintiff resides but ignores the caution in those cases that this is just a "general"[26] rule to be applied in the "usual[]"[27] circumstances.  Those cases do not address the unusual context here, of a (supposed) non-resident receiving gas or electricity at their residence in New York.  Moreover, XOOM provides no evidence of its supposition that some Class Members reside outside the state.  On the contrary, the fact that all Class Members received electricity or gas in New York is *prima facie* evidence that they reside in the state.  But XOOM neither sought nor produced evidence of Class Members residing outside New York or pointed to a single Class Member who it claims resides outside of New York.  It should not be able to present such evidence for the first time at trial.  Because it would be precluded from first offering such evidence at trial, its defense is not viable and should be stricken.[28]

---

[26] *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 569 (S.D.N.Y. 2022), *aff'd Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365 (2d Cir. 2023).

[27] *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999).

[28] In addition, it is not clear that trial is the proper place to adjudicate the issue of which statute of limitations applies.  "Generally, determinations as to statutes of limitations – including which statute applies and whether any toll interrupts the running of the applicable statute – constitute questions of law, although a factual question may exist regarding the proper calculation under the circumstances." *CitiMortgage, Inc. v. Ramirez*, 192 A.D.3d 70, 72–73 (3d Dep't 2020).  The determination of which statute of limitations applies to which Class Member should be made by the Court, and XOOM waived this argument by failing to raise it at summary judgment or on the motion to dismiss.  To the extent this determination requires factual development, XOOM failed to produce relevant facts, failed to request relevant facts, and failed to request

47

(*Footnote continued on next page*)

***Failure to Exhaust Administrative Remedies.***   XOOM claims, without any factual support, that it can bring its failure to exhaust administrative remedies defense based on the same "grounds for the motion to dismiss." Defs.' Br. at 62.  It presents no evidence in support of this defense and no reason why the jury should consider it.  And the Court already expressly rejected this argument.  *See* MTD Order at 7 ("I find that the dispute-resolution clause of the agreement does not impose a mandatory exhaustion requirement upon XOOM's customers.").

***Claims of Individual Class Members.***  XOOM claims its affirmative defenses broadly may be available to rebut the claims of individual Class Members, but it has not produced any evidence supporting such an individualized application of its defenses and it is too late for it to first introduce such evidence now.  And the Court has explained in both the Class Order and the Decertification Order that the issues at trial can be decided in one stroke.

Accordingly, the Court should grant Plaintiff's MIL No. 11 and preclude XOOM from offering evidence of its inapplicable affirmative defenses.

## XII.   PLAINTIFF'S MIL NO. 12:  XOOM SHOULD BE BARRED FROM OFFERING EVIDENCE ABOUT MITIGATION
*(Responding to Defs.' Opp'n at 64–65)*

Class Members were not obligated to mitigate damages because XOOM concealed its breach, and a party is only obligated to mitigate damages when the nonbreaching party "knew or should have known" of the breach.  XOOM does not dispute this statement of law.  Instead, it contends that its customers should have mitigated damages because they "knew or should have known" of the breach, while simultaneously contending there was no breach to know about.  XOOM's position is inconsistent with the record and legally untenable.

---

an evidentiary hearing on this issue before the Court.

First, as the Court noted in its Motion to Dismiss Order, XOOM's customers could not have possibly known of the breach because they had no basis for predicting XOOM's actual or estimated costs.  *See* MTD Order at 11 ("Customers—at least those without any background in the electricity market or the numerous factors that may determine the costs of an individual electricity provider—would have no basis for predicting XOOM's actual or estimated costs. As a result, customers have no mechanism for comparing their actual rates to the costs of the utility, since the agreement provides them with limited information about the factors used to determine XOOM's costs.").  Indeed, information about XOOM's costs was produced to Plaintiff's counsel under the protective order and is not publicly available.  XOOM's claim that Class Members should have been aware of the breach because utility rates are publicly available and Plaintiff's expert damages models according to Methods A and B "purport to measure overcharges against the corresponding utility's rates," Defs.' Br. at 65, also fails.  As the Court found, XOOM's supply costs are a necessary input for setting the variable rate and determining whether there was an overcharge, even if reference to a utility's rate is a proper measure of a permissible margin.  Decert. Denial Order at 8 (listing the two inputs of the proper variable rate as "XOOM's actual and estimated supply costs" plus "a reasonable and proportionate margin").  Without knowing XOOM's supply costs it would be impossible for any Class Member or even an expert to ascertain the breach.  And without knowing—or even having the ability to know—XOOM's supply costs, the duty to mitigate did not arise for any Class Members.

Moreover, XOOM represented to its customers what it would charge, and customers were entitled to rely on those representations.  *See Little v. Rose*, 208 S.E.2d 666, 670 (N.C. 1974).  Indeed, XOOM fails to counter the obvious principle that it would be "absurd to extend the principle of mitigation of damages to make the non-breaching party responsible for preempting all

damages by requiring them to police the other party's performance at every step in order to detect a breach at the earliest possible moment."  Br. at 62–63 (quoting *Ford Motor Credit Co. v. Hairston*, 06 Civ. 04, 2006 WL 2850615, at *4 (W.D. Va. Oct. 2, 2006)).  Thus, and given the proprietary nature of XOOM's costs, the mitigation of damages defense is not merely a factual impossibility, it is a legal impossibility.

Most tellingly, XOOM takes an internally inconsistent position that dooms its opposition. It contends simultaneously that XOOM did not breach its contract and that its customers should have already terminated their contractual relationship because of its breach.  XOOM cannot have it both ways.  If even XOOM still believes it did not breach its contract, there is no reason XOOM's customers should be under a duty to have already terminated their contractual relationship with XOOM.  In other words, XOOM's position is that a reasonable jury would conclude that XOOM did not breach its contract, but a reasonable consumer should have already concluded that XOOM did breach its contract and should have taken steps to terminate their contractual relationship with XOOM.  This position is untenable.

XOOM should be precluded from introducing evidence or making arguments in support of its mitigation-of-damages defense.

## XIII.    PLAINTIFF'S MIL NO. 13:   THE JURY SHOULD BE INSTRUCTED ON PUNITIVE DAMAGES
*(Responding to Defs.' Opp'n at 66–73)*

The Court should instruct the jury on punitive damages because XOOM's conduct constitutes an aggravated tortious act.   XOOM's arguments to the contrary rely on a misunderstanding of choice-of-law rules and a misapplication of the relevant law.

"When the breach of contract also constitutes or is accompanied by an identifiable tortious act, the tort committed may be grounds for recovery of punitive damages" if "the tortious conduct

[is] accompanied by or partake[s] of some element of aggravation." *Shore v. Farmer*, 522 S.E.2d 73, 76 (N.C. 1999). In its opposition, XOOM makes five mistakes: (1) XOOM incorrectly argues that the claim is barred by alleged pleading deficiencies; (2) XOOM fails to recognize the disjunctive nature of the test such that punitive damages are available if the breach is accompanied by an identifiable tortious act *or* constitutes a tortious act; (3) XOOM fails to apply the correct law; (4) XOOM improperly contends that CPLR § 901(b) precludes punitive damages here; and (5) XOOM incorrectly claims punitive damages are not available under GBL § 349 and 349-d.

## A.    There Are No Pleading Deficiencies in the Complaint

XOOM contends that punitive damages are unavailable because Plaintiff did not specifically plead them. However, under North Carolina law, "a plaintiff need not specially plead punitive damages as a prerequisite to recovering them at trial." *Holloway v. Wachovia Bank & Tr. Co.*, 339 N.C. 338, 347 (1994). Moreover, "[u]nder Rule 54(c) of the Federal Rules of Civil Procedure, a court can grant any relief to which a prevailing party is entitled, whether or not that relief was expressly sought in the complaint." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004). In any event, the operative Complaint includes the request to "[g]rant all such other relief as the Court deems appropriate." ECF 42, First Am. Class Action Compl. ("FAC") at 26. XOOM's claim of surprise about the punitive damages claim is belied by its own Answer, which specifically asserts as an affirmative defense that "any award of punitive damages against Defendants that is not based on the substantive limitations and principles set forth in [the relevant case law] would violate Defendants' rights." *See* ECF 44, Defs.' Fourteenth Aff. Defense. Accordingly, the Complaint has sufficient allegations to warrant a punitive damages instruction.

## B.    Punitive Damages Are Available Because the Breach "Constitutes" a Tort

XOOM contends that GBL § 349 and 349-d cannot support a punitive damages instruction because Plaintiff never pleaded those claims and argues that such a claim would not be viable

because the case was filed after the statute of limitations elapsed for those claims.  Again, XOOM misses the mark.  The test under North Carolina law is not, as XOOM contends, whether the breach was accompanied by an independent tort, but whether the breach "constitutes *or* is accompanied by an identifiable tortious act."  *Shore*, 522 S.E.2d at 76 (emphasis added).  Thus, Plaintiff can establish entitlement to punitive damages by showing that the breach "constitutes" a tort.[29]

A jury's finding for Plaintiff on the contract claim necessarily requires that the jury found all the elements of GBL § 349 and 349-d to have been satisfied.  GBL § 349 and 349-d require that "(1) the defendant's conduct was consumer-oriented; (2) the defendant's act or practice was deceptive or misleading in a material way; and (3) the plaintiff suffered an injury as a result of the deception."  *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 176 (2021).  Those elements are expressly pleaded in Plaintiff's operative Complaint[30] and necessarily entailed by a jury's finding of breach.

A jury can only find for Plaintiff and the Class on the breach of contract claim if it finds that XOOM engaged in consumer-oriented activity (by charging consumers for electricity), in a materially deceptive and misleading way (because it secretly did not comply with its own pricing term),[31] and the Class suffered damages.  That is sufficient to prove a violation of GBL § 349 and

---

[29] Because XOOM's breach "constituted" a tortious act, it is irrelevant that the statute of limitations allegedly lapsed on the GBL § 349 and 349-d claims before Plaintiff brought suit.  Timeliness has no bearing on whether the conduct meets the elements of the tort.

[30] *See, e.g.*, FAC ¶ 1 (noting that the case is about consumer-oriented activity); *id.* ¶ 5 ("Defendants' conduct injures New York consumers and is unlawful."); *id.* ¶ 28 ("[T]he ESCO Consumers Bill of Rights, codified as G.B.L. Section 349-d, in 2010 sought to end the exact type of deceptive conduct Plaintiffs challenge here."); *id.* ¶ 80 ("Plaintiffs and the Class were damaged as a result because they were billed, and they paid energy rates that were substantially higher than they would have been had XOOM based its rates [on] the criteria set for in XOOM's customer contract.").

[31] XOOM argues that the GBL § 349 and 349-d theory fails because Plaintiff cannot show that the misleading representations in the contract were seen by all Class Members.  But proof of reliance is not required under the statute.  *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012) ("Justifiable reliance by the plaintiff is not an element of [GBL § 349].").  This misleading representations were in the

(*Footnote continued on next page*)

349-d.  Because a jury's finding of breach necessarily means it found all the elements of GBL § 349 and 349-d, the breach "constitutes" tortious activity.

Such tortious activity is aggravated because it was "based on Defendants' greed and the lack of adequate price transparency in the ESCO market.  As such, XOOM's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being." FAC ¶ 62.  Tellingly, XOOM never contested that its actions entailed a sufficient level of aggravation.  Indeed, Plaintiff will show that XOOM flouted orders by the PSC and price gouged customers "in providing something as universally necessary as utility services."  *Melville v. HOP Energy, LLC*, No. 21 Civ. 10406 (KMK), 2023 WL 2648775, at *9 (S.D.N.Y. Mar. 27, 2023).  The jury can conclude that this disregard for over 100,000 customers for something as universally necessary as utility services and in defiance of regulatory requirements is sufficiently aggravated to warrant punitive damages.

### C.    XOOM Applies the Wrong Law to the Relevant Questions

It is undisputed that North Carolina contract law applies.  And XOOM does not appear to dispute that under New York's choice-of-law rules, New York tort law applies.[32]  However, XOOM repeatedly applies the wrong law in the wrong context on its mistaken contention that North Carolina and New York law would require the same outcome.

---

contracts (which had a recissionary period), and thus all Class Members were exposed to the misleading representations.  And XOOM's claim that courts do not certify classes based on GBL § 349 claims lacks merit.  *See, e.g.*, *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 75 (2d Cir. 2015) (affirming district court's class certification of GBL § 349 claim.).  Indeed, GBL § 349 and 349-d claims are regularly sustained on this theory.  *See, e.g.*, *Mirkin v. Viridian Energy, Inc.*, No. 15 Civ. 1057, 2016 WL 3661106, at *6 (D. Conn. July 5, 2016) (collecting cases and finding ESCO contract's claim "that the variable rate 'may fluctuate from month-to-month based on wholesale market conditions' also constitutes a misleading statement" in violation of GBL §§ 349 and 349-d(3)); *see also Stanley v. Direct Energy Servs.*, LLC, 466 F. Supp. 3d 415, 434 (S.D.N.Y. 2020) (same, sustaining GBL §§ 349 and 349-d(3) claims based on pricing representation in ESCO form contract).

[32] XOOM contests that it is ever appropriate to apply New York tort law but does not specifically contest that New York's choice-of-law rules for tort law would require application of New York law.

For example, XOOM cites four cases in which punitive damages were disallowed where there were no independent tort claims.[33]   However, all of those cases applied New York contract law, under which punitive damages are only available where "defendant's conduct [is] actionable as an independent tort." *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 360 (2020) (cleaned up).   Specifically, punitive damages are only available under New York contract law where the tort is "apart from and independent of promises made" in the contract.  *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995); *see also id.* at 320 (punitive damages are available for a breach of contract only where there is a tort "independent of the contract").   But under North Carolina law, the test is whether the breach "constitutes **or** is accompanied by an identifiable tortious act."  *Shore*, 522 S.E.2d at 76 (emphasis added).

In other words, North Carolina law applies a disjunctive test, allowing for punitive damages where the breach "constitutes" a tort, whether or not there is an accompanying independent tortious act.   New York law only allows punitive damages where there is an accompanying independent tort.   XOOM's cited cases and legal theories are inapplicable because they apply New York **contract** law and uncontroversially hold that punitive damages are unavailable in the absence of an accompanying independent tort.   North Carolina contract law applies a materially different test.

XOOM then makes the mistake in the reverse direction applying North Carolina law to GBL § 349 and 349-d.   XOOM contends that any punitive damages available under GBL § 349 and 349-d are precluded by the punitive damages waiver in the contract.   But under GBL § 349-d, punitive damages waivers are ineffective.   XOOM strangely contends that North Carolina contract

---

[33] *See MaGee v. Paul Revere Life Ins. Co.*, 954 F. Supp. 582, 588 (E.D.N.Y. 1997); *Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*, No. 18 Civ. 170 (KMK), 2019 WL 4413052, at *8 (S.D.N.Y. Sept. 16, 2019); *Toussie v. Allstate Ins. Co.*, No. 15 Civ. 5235 (ARR) (PK), 2016 WL 6537670, at *3 (E.D.N.Y. Nov. 3, 2016); *Greenspan v. Allstate Ins. Co.*, 937 F. Supp. 288, 295 (S.D.N.Y. 1996).

law controls the remedies available by New York statute.  Under GBL § 349 and 349-d, the statute itself supplies the appropriate remedy.  This is not a question of contract interpretation; it is a question of statutory interpretation.  To the extent a statute is invoked, it must be read in its entirety, including for its remedies, which in this case, are expressly prescribed in GBL § 349 and 349-d.  XOOM's purported contract waiver precludes recovery of anything other than actual damages, which is expressly prohibited by the relevant statute here.  *See* GBL § 349-d(8) ("Any waiver by a buyer of energy services of the provisions of this section shall be deemed void and unenforceable by the ESCO as contrary to public policy."); *see also Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 241 (2d Cir. 2022) (when determining meaning of a statute, the court "must read the statute in its entirety"); *id.* at 240 (court must consider "the broader context of the statute as a whole").

Therefore, XOOM's theory that punitive damages are foreclosed by the lack of an independent tort is foreclosed by North Carolina contract law.  XOOM's argument that punitive damages are waived for violation of GBL § 349 and 349-d is foreclosed by the statutory tort itself.

### D.    CPLR § 901(b) Has No Impact on the Dispute

XOOM claims that CPLR § 901(b) prohibits punitive damages in this context.  That position was expressly rejected by the Supreme Court.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 411 (2010) (because Rule 23 is procedural, it displaces CPLR § 901(b), meaning it is inapplicable in federal class actions).  Recognizing this, XOOM makes the argument that it would not have removed the case to federal court had it known it would be subject to punitive damages.  This argument amounts to a concession that XOOM made a mistake when it removed the case—but that XOOM regrets its choice of forum has no bearing on the availability of punitive damages.

### E.    Punitive Damages Are Available Under GBL § 349 and 349-d

Lastly, XOOM claims punitive damages are unavailable under GBL § 349 and 349-d. However, courts have widely come to the opposite conclusion.  *See, e.g.*, *Bueno v. LR Credit 18, LLC*, 269 F. Supp. 3d 16, 21 (E.D.N.Y. 2017) (collecting cases for the proposition that there is "no precise limit" on the amount of punitive damages recoverable from GBL § 349); *Koch v. Greenberg*, 14 F. Supp. 3d 247, 278–79 (S.D.N.Y. 2014) ("[W]hile the $1,000–per-violation cap of the GBL claims' exemplary provision provides a comparative measure, it is clear that in New York the GBL's treble damages provision does not proscribe an additional award of punitive damages.").  Accordingly, the jury is authorized to award punitive damages if it finds XOOM's breach constituted a violation of GBL § 349 or 349-d.

While the ultimate recovery of punitive damages will be up to the jury, Plaintiff has shown she is entitled to a punitive damages instruction.

## XIV.   PLAINTIFF'S MIL NO. 14:   THE COURT SHOULD EXCLUDE EVIDENCE REGARDING PLAINTIFF'S PRE-DISCOVERY MARKET SUPPLY COST ESTIMATES
*(Responding to Defs.' Opp'n at 74–76)*

Plaintiff seeks to preclude reference to ***pre-discovery estimates*** of XOOM's supply costs, which were referred to as "Market Supply Costs" in Plaintiff's Complaint.  Those estimates were used to show that XOOM's rates did not correspond to changes in market prices, and thus that XOOM's rates could not have been "based on" its supply costs.  Exclusion of this information makes sense—the pre-discovery estimates will have no bearing on the jury's resolution of Plaintiff's claim because trial will focus on XOOM's rate-setting workbooks, which were produced in discovery and which contain actual evidence of XOOM's supply costs.  XOOM opposes this common-sense motion but fails to show any relevance to its intended line of questioning.

First, XOOM argues that the Complaint is a judicial admission.  But the Complaint's admissibility is beside the point—evidence regarding the Market Supply Cost should be excluded because it is irrelevant, regardless of whether it is otherwise admissible.  Next, XOOM argues that Plaintiff is judicially estopped from "disavowing" the calculations.  *Id.*  The Complaint expressly noted that those calculations were preliminary and subject to revision upon receiving discovery, and thus nothing is being "disavowed."  But in any event, estoppel does not apply because Plaintiff's theory of the case is not "contrary" to the theory in her Complaint.  Plaintiff has consistently argued that XOOM breached its contract charging rates not based on its supply costs. The only difference is that Plaintiff now has XOOM's own documents that prove XOOM's breach, rather than relying on pre-discovery estimates.  Rather than disavowing the estimate in the Complaint, Plaintiff merely notes that the estimate is no longer relevant because discovery has revealed XOOM's true costs, eliminating the need for the pre-discovery estimates.

In fact, XOOM's only argument regarding the relevance of the Market Supply Cost calculations is buried at the end of its opposition.  XOOM apparently wishes to use the Market Supply Cost calculations to argue that Plaintiff "conce[ded]" that XOOM is entitled to a margin. Defs.' Br. at 76.  But this argument addresses a non-issue.  In fact, Plaintiff's expert will present evidence at trial specifically addressing what a reasonable margin would be.

XOOM misleadingly argues that the Complaint endorses a 13.67% margin, but that is not true.  The Complaint includes that margin to show that even a very large margin does not account for XOOM's pricing.  Indeed, the Complaint refers to the 13.67% margin as a "substantial margin" and an "already generous" margin.  FAC ¶¶ 54 n.27, 55.  The 13.67% percent margin included in the Complaint's estimates is therefore completely consistent with Plaintiff's theory of the case. Accordingly, the Market Supply Cost calculations are both unnecessary and irrelevant and should

be excluded under Rules 401 and 402, or at minimum excluded under Rule 403 because any probative value is substantially outweighed by unfair prejudice, confusion of the issues, and the potential to mislead and waste time.

## XV. PLAINTIFF'S MIL NO. 15:  THE COURT SHOULD EXCLUDE EVIDENCE OF OTHER COMPANIES' MARGINS
*(Responding to Defs.' Opp'n at 77–79)*

Plaintiff seeks to exclude evidence regarding the margins of (1) other ESCOs and (2) other non-ESCO companies because such margins have no relevance to the determination of a reasonable margin under XOOM's operative contract.  XOOM's opposition meanders through restatements of its various arguments before confirming that "XOOM agrees with Plaintiff's assertion that ESCO margins should be excluded."  Defs.' Br. at 79.  Thus, the parties agree regarding point one and the Court should preclude XOOM from entering evidence regarding the margins of other ESCOs.  XOOM disagrees, however, that evidence of the margins of other non-ESCO companies should be excluded.  Its arguments on this point should be rejected.

First, XOOM argues that Plaintiff's motion is duplicative of its *Daubert* motion seeking to exclude the testimony of David Coleman because Mr. Coleman opines on other companies' margins.  But Plaintiff's motion is not limited solely to Mr. Coleman's anticipated testimony.  Thus, even if the Court excludes Mr. Coleman's testimony, as it should, the Court should still grant Plaintiff's motion to prevent XOOM from attempting to elicit the same testimony from other witnesses.  Contrary to XOOM's claims, other companies' margins are plainly irrelevant and should be excluded whether they are elicited through Mr. Coleman or any other XOOM witness.

Second, XOOM fails to meaningfully address Plaintiff's relevancy argument.  Instead, XOOM focuses on why it thinks other evidence relied on by Plaintiff's expert, such as the NYPSC Reset Order or XOOM's own fixed rate margins, is irrelevant.  XOOM merely makes the

conclusory assertion that XOOM should be permitted to "counter" Plaintiff's expert's anticipated testimony regarding an appropriate margin under XOOM's contract with "its expert's analysis showing that Plaintiff's expert's analysis is willfully blind to margin and profitability trends in a competitive commercial market." Defs.' Br. at 78–79. But XOOM makes no effort to explain how its expert's analysis of the supposed margins of 26 of the largest companies in the world has anything to do with the margin XOOM is permitted to charge under the relevant pricing term.

Given that XOOM has already conceded the inapplicability of the margins of other ESCOs, it strains credulity to then claim that the margins of non-ESCOs are somehow relevant. *Cf.* Decert. Denial Order at 14–15 ("It is likewise overreading *Richards* to understand it to require a plaintiff to offer evidence of competitors' rates to assist the jury in determining whether a margin was reasonable."); *see also id.* at 15 ("Nor does *Martinez v. Agway Energy Services*, LLC, 88 F.4th 401 (2d Cir. 2023), require that the jury be provided with evidence of competitors' rates. There, the defendant presented evidence comparing its variable rates to those offered by other energy service companies, but the court nowhere suggested that such evidence was necessary to help the jury assess whether the defendant charged a reasonable margin[.]" (internal citation omitted)). The margin of a company like Walmart—to take just one example from Mr. Coleman's analysis—is not only irrelevant, but also highly prejudicial to Plaintiff. Indeed, XOOM utterly fails to meet the stringent requirement in Rule 703 that the probative value of the facts underlying an expert's opinion must substantially outweigh unfair prejudice. Discussion of the margins of companies in other industries will require evidence as to typical margins in each industry to educate the jury that different industries have different margins based on the business realities of those industries. Thus,

and as set forth in Plaintiff's opening brief, the Court should grant Plaintiff's motion to exclude the challenged testimony under Rules 106, 401, 402, 403, 602, 802,[34] and/or 1002.

## XVI.   PLAINTIFF'S MIL NO. 16:   PLAINTIFF'S INVOLVEMENT IN LITIGATION AGAINST VIRIDIAN ENERGY IS IRRELEVANT
*(Responding to Defs.' Opp'n at 80–81)*

Plaintiff was the class representative in an action against Viridian Energy.  That has absolutely no bearing on the issues relevant to this action.  Yet XOOM intends to question Plaintiff on her participation in that wholly separate litigation, involving a different defendant and a different contract with a different pricing term.  XOOM offers two theories of relevance: (1) the prior lawsuit somehow sheds light on Plaintiff's expectations of what a reasonable margin would have been, and her expectations regarding the margin are relevant to punitive damages and the covenant of good faith and fair dealing, and (2) the lawsuit impugns Plaintiff's credibility.  These theories of relevance fail because they are not probative of whether XOOM set its rates in a contractually permissible manner.

First, XOOM argues that the timing of the lawsuit suggests that the Plaintiff did not think XOOM's rates were unreasonable.  This theory makes no sense.  Plaintiff sued XOOM within the applicable limitations period.  The fact that she sued Viridian before XOOM does not bear on whether she thought XOOM's margins were reasonable, especially because she did not know

---

[34] XOOM never responds to Plaintiff's contention that evidence of other companies' margins is inadmissible hearsay pursuant to Rule 802.  Indeed, it has no response because no entity on XOOM's witness list has personal knowledge of those margins, *see* Rule 602, and therefore no fact witness could testify to those margins.  Instead, XOOM would be relying on out-of-court statements for the truth of the matter asserted.  And under Rule 703, other companies' margins could only be disclosed to the jury if their probative value substantially outweighs their prejudicial effect.  XOOM, as the proponent of this evidence has not made that showing.  Indeed, the probative value is minimal because the margin of one company in a different industry is not probative of the reasonableness of a margin for a different company in a different industry.  And the prejudicial effect is substantial because a jury could wrongly conclude that XOOM should emulate the margins of other companies without adequate consideration of the factors unique to XOOM's contract and industry.

XOOM's margins.  This line of questioning would also inevitably wade into privileged content about Plaintiff's communications with her attorneys regarding legal strategy.

Using this failed logic, XOOM attempts to connect Plaintiff's participation in *Viridian* to her punitive damages claim and the implied covenant of good faith and fair dealing.  Both theories are meritless.  The punitive damages claim hinges on the fact that XOOM's violations of GBL § 349 and 349-d are coextensive with its breach of contract.  There is no additional evidence that would be needed to prove (or disprove) violation of GBL § 349 and 349-d than what will be adduced with respect to Plaintiff's breach of contract claim.  That the covenant of good faith and fair dealing is implied in all contracts construed under North Carolina law likewise does not change the equation.  The *Viridian* litigation has absolutely no bearing on whether XOOM acted in bad faith in setting its margins.[35]  Plaintiff's subjective opinion of reasonableness is not relevant to the issue of whether XOOM's rates were determined solely by its supply costs.

And even if Plaintiff's expectations regarding XOOM's margins were relevant, the *Viridian* litigation is not probative of her expectations.  This is especially true because Plaintiff did not know XOOM's costs or margins when she was XOOM's customer.  XOOM intends only to hypothesize about what the fact of the *Viridian* litigation implies in terms of Plaintiff's expectations and the reasonableness of XOOM's margins.  This is far too speculative to be probative.  *See Fournier v. Erickson*, 242 F. Supp. 2d 318, 328 (S.D.N.Y. 2003) (excluding evidence under Rule 401 that "would be too speculative to merit any probative weight").

---

[35] Plaintiff's expectations are also irrelevant to XOOM's costs.  XOOM's variable rates must have been XOOM's supply costs plus a reasonable and fixed margin.  But because XOOM asserts no connection between Plaintiff's expectations and XOOM's costs, the only way Plaintiff's expectations could be relevant is with respect to whether the margins XOOM charged were reasonable.  Since Plaintiff never knew XOOM's margins, her expectations have no bearing on the issues for trial.

Second, XOOM argues that the prior litigation is relevant to Plaintiff's credibility because it will show that that she only brought a breach claim against XOOM because of her success in the *Viridian* case.  This is plainly an attempt to offer improper propensity evidence.  The real theory is that XOOM wants to paint Plaintiff as overly litigious.  This is the exact type of propensity evidence Rule 404 precludes.[36]

Therefore, XOOM has not met its burden to prove that the *Viridian* litigation passes muster under Rule 401.  But even if it did, XOOM's theory of relevance is tenuous at best and Plaintiff's credibility is not a central issue to this case.  Pursuant to Rule 403, any extremely limited probative value this evidence might have is substantially outweighed by unfair prejudice, including the likelihood that the jury would use improper propensity reasoning about Plaintiff's prior litigation, harassment, confusion of the issues, and waste of time.  The Court should exclude all reference to the *Viridian* litigation.

## XVII.   PLAINTIFF'S MIL NO. 17:  PLAINTIFF'S EXPERT'S REPORT IN *RICHARDS v. DIRECT ENERGY* IS IRRELEVANT
*(Responding to Defs.' Opp'n at 82–85)*

Plaintiff's expert, Seabron Adamson, provided an expert report and was deposed in *Richards v. Direct Energy Services*.  His work in that case involved a contract that expressly authorized "discretion" to set rates based on "business and market conditions."  As such, the factors that ESCO evaluated in setting rates were significantly different than here, and correspondingly, Mr. Adamson's opinions about the appropriate rate and margin were different than here.  XOOM

---

[36] XOOM cites *Tomaino v. O'Brien*, 315 F. App'x 359, 361 (2d Cir. 2009), for the proposition that evidence of prior lawsuits can be admitted to impugn credibility.  However, that case dealt with the issue of animus, and involved five past lawsuits in which the plaintiff accused police officers of "act[ing] with personal animus towards him."  *Id.*  Credibility was therefore a central issue in the case, and because animus involves a subjective determination, the jury in *Tomaino* was required to weigh the plaintiff's perception of animus.  Here, the issues are objective.  There is no need for the jury to weigh the Plaintiff's credibility with respect to her judgment of the character of others, and Plaintiff's credibility is not central to this case.

indicated that it does not intend to offer any substantive evidence regarding Mr. Adamson's prior work, instead only reserving its right to impeach him based upon his testimony (without offering any exhibits into evidence).  Nonetheless, such impeachment is not permitted.  XOOM posits that it can (1) impeach Mr. Adamson with other courts' description of his report, and (2) impeach Mr. Adamson with his prior testimony.  XOOM is wrong on both counts because the judicial discussions of his work do not target his character for truthfulness and his prior statements are not inconsistent with his current report and anticipated testimony.[37]

First, the Rules do not allow for impeachment based on out-of-court statements of a third party.  XOOM cites cases allowing impeachment based on findings that an expert "lied" and "guessed" under oath in prior cases, which are relevant under Rule 608(a).  Defs.' Br. at 83.  But those cases have no bearing on criticisms other than those that go directly to honesty.  The relevant inquiry here is under Rule 613, not Rule 608(a), because none of the statements in question go directly to Mr. Adamson's honesty.  XOOM fails to rebut the consistent line of cases establishing that out-of-court statements by someone other than the witness cannot be used to impeach that witness pursuant to Rule 613.  *See* Br. at 75.

Second, XOOM indicates its intent to impeach Mr. Adamson with his prior testimony in *Richards*.  This is not permitted under Rule 613 because the statements XOOM intends to elicit are not inconsistent.  "A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness.  As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent."  *United States v. Hale*, 422 U.S. 171, 176

---

[37] XOOM's efforts to impeach Plaintiff's expert rely on its consistent misreading of *Richards*.  *See* Decert. Denial Order at 14–15 ("[XOOM] is likewise overreading *Richards* to understand it to require a plaintiff to offer evidence of competitors' rates to assist the jury in determining whether a margin was reasonable.").  Indeed, because the pricing term in *Richards* expressly authorized discretion in setting rates, the relevant issues were different than here.

(1975).  "First, the court must determine whether the proffered statement in fact is inconsistent with the testimony sought to be impeached.  The test is whether there is any variance between the statement and the testimony that has a reasonable bearing on credibility." *United States v. Ghailani*, 761 F. Supp. 2d 114, 117–18 (S.D.N.Y. 2011) (cleaned up).  "Where inconsistency is not demonstrated, the putative impeachment evidence must be rejected."  *United States v. Mejia-Velez*, 855 F. Supp. 607, 616 (E.D.N.Y. 1994).

XOOM has not shown that its intended impeachment involves inconsistent statements.  For example, XOOM indicated its intention to impeach Mr. Adamson if he testifies that XOOM is not permitted a margin with his statement from *Richards* that the ESCO there could charge a margin.  But XOOM's hypothetical is baseless:  Mr. Adamson will testify about what a reasonable margin should be, not that XOOM was precluded from applying one.  These positions are not inconsistent at all, especially because the contract in *Richards* had an express provision about the margin and no such provision exists here.  The same logic applies to XOOM's intended impeachment about the risks of supplying variable rate customers.  Mr. Adamson's testimony concerned the risks associated with supplying energy pursuant to a ***different*** contract.  The risks depend on the operative pricing term and other circumstances specific to an individual ESCO, and therefore, there is nothing inconsistent with having different views about the risks faced by different ESCOs bound by different contracts.  And XOOM, as the proponent of this purported impeachment evidence, has not met its burden of showing that any "variance between the [prior] statement and the [anticipated] testimony . . . has a reasonable bearing on credibility."  *See Ghailani*, 761 F. Supp. 2d at 117–18.

Moreover, the illustration of why these statements are not inconsistent is precisely why this line of impeachment questioning should be excluded under Rule 403.  To evaluate the impact of

these statements on Mr. Adamson's credibility, the jury will need to fully understand the operative contract in *Richards*. That will waste time, confuse the issues, and force a mini-trial over the permissible factors to be considered in setting rates pursuant to the contract used in *Richards*. The Court should not authorize such a waste of time for impeachment evidence that, if entered, has very little probative value on credibility.

Accordingly, XOOM has failed to meet its burden as the proponent of the impeachment evidence to prove that (1) the prior judicial statements bear on Mr. Adamson's character for truthfulness pursuant to Rule 608; (2) his relevant prior statements are indeed inconsistent; (3) any variance in his prior statements bears on his credibility; and (4) this line of impeachment inquiry survives the Rule 403 balancing test. Therefore, this line of impeachment evidence should be prohibited.

## XVIII.   PLAINTIFF'S MIL NO. 18:   THE COURT SHOULD EXCLUDE EVIDENCE REGARDING PLAINTIFF'S MOTIVATIONS
*(Responding to Defs.' Opp'n at 86–87)*

Plaintiff's MIL No. 18 seeks to exclude evidence and argument concerning Plaintiff's and counsel's motivations in bringing this suit. XOOM agrees it will not adduce any evidence or argument about counsel's motivations in bringing this suit. However, it contends that it may introduce evidence and argument as to Plaintiff's motivations and suggests that Plaintiff's motivations are somehow relevant to the reasonableness of XOOM's margins. But Plaintiff never knew XOOM's margins, and there is no probative value in prying into her personal decisions, which shed no light on the issues relevant to the jury.

XOOM bizarrely argues that Plaintiff cites no case law in support of the position that her motivations for bringing this action are irrelevant. That is false. *See* Br. at 77 (citing *Dyber v. Quality King Distribs., Inc.*, No. 06 Civ. 735 (LDW) (AKT), 2006 WL 8424100, at *2 (E.D.N.Y.

Dec. 12, 2006), for the proposition that "[a]s federal courts have repeatedly held, it is difficult to see how an inquiry into the circumstances surrounding the instigation of the action could affect the substance of the claim").  Indeed, *Dyber* makes clear that "courts have held that a plaintiff's motive in bringing an action, even at the discovery phase, is irrelevant." *Dyber*, 2006 WL 8424100, at *2.  Other courts in this Circuit have also noted that a "ruling that the motive of plaintiff in bringing the action is irrelevant is consistent with well-settled law." *Blank v. Sullivan & Cromwell*, 418 F. Supp. 1, 4 (S.D.N.Y. 1975).

XOOM has no persuasive theory of relevance, but to the extent there is any limited probative value, it is far outweighed by unfair prejudice under Rule 403.  Specifically, XOOM raises the following facts as relevant to the reasonableness of XOOM's margin:  (1) Plaintiff left XOOM for another ESCO; (2)  Plaintiff waited five years to initiate suit; (3) Plaintiff sued Viridian before she sued XOOM; and (4)  Plaintiff's subjective feelings about the rates she received.  None of these facts are relevant to the reasonableness of XOOM's margins.  Plaintiff never knew XOOM's margins (and could not have known them because she did not know XOOM's costs).  XOOM essentially contends that her actions are reflective of her views on the reasonableness of XOOM's margins even though she did not know what those margins were.  And there is zero evidence in the record that XOOM even considered Plaintiff's subjective feelings when setting rates.  XOOM's individual theories of relevance cannot withstand scrutiny.

First, XOOM contends that the fact that Plaintiff left XOOM for another ESCO somehow is probative of her satisfaction with XOOM's rates.  Beyond the fact that Plaintiff's leaving XOOM, if anything, is evidence that she was *dissatisfied* with XOOM's rates, it still has no bearing on the margins because she did not know what they were when she left XOOM.  Without knowing XOOM's margins, there is no probative value to the fact that she left XOOM for another ESCO.

66

Second, given that Plaintiff brought the suit within the limitations period, the timing of her lawsuit cannot have any bearing on the issues at play.  XOOM's argument to the contrary is essentially an attempt to get in its laches defense.  But for the reasons described in MIL No. 11, that defense is inapplicable.  And the theory of relevance here is beyond tenuous.  As long as Plaintiff brought the suit within the limitations period, the question of how long she waited to file suit after terminating her relationship with XOOM is entirely irrelevant.  XOOM fails to articulate the probative value of the amount of time between Plaintiff's decision to leave XOOM and bring suit.  Instead, XOOM hopes the jury will speculate about what this fact means, rather than make any logical inferences.  Moreover, this line of questioning will likely wade into privileged considerations of legal strategy discussed with her counsel.

Third, that Plaintiff brought suit against Viridian before XOOM has absolutely no bearing on the reasonableness of XOOM's margins.  Again, this fact is an attempt to introduce improper propensity evidence or an invitation to the jury to speculate about Plaintiff's intentions.  In addition to lacking a coherent theory of relevance, questions about the order in which she filed suit will likewise wade into privileged conversations.

Fourth, whether Plaintiff was dissatisfied with the rate she received has no bearing on the reasonableness of the margins because she did not know what XOOM's margins were.  Reasonableness in this context is inherently objective, and Plaintiff's personal beliefs (which would be unfounded because she did not know XOOM's margins) are irrelevant.  Because Plaintiff did not (and could not) know XOOM's margins, her decision to leave XOOM cannot be tied to her views on XOOM's margins, just as her views on margins bear no connection to the objective reasonableness of XOOM's margins.

Therefore, whatever minimal probative value XOOM's attack on Plaintiff's motives might have, it is far outweighed by risk of unfair prejudice including confusing the issues, wasting time, and harassing the Plaintiff.  This evidence should be rejected under Rules 401–403.

## **CONCLUSION**

For the reasons stated herein, Plaintiff requests the Court grant Plaintiff's motions *in limine*.

Dated: July 1, 2024

**WITTELS MCINTURFF PALIKOVIC**

 /s/ J. Burkett McInturff
J. Burkett McInturff
Ethan D. Roman
Steven L. Wittels
305 BROADWAY 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com
edr@wittelslaw.com
slw@wittelslaw.com

*Class Counsel for Plaintiff and the Class*

Richard Dolan
Bradley D. Simon
**SCHLAM STONE & DOLAN LLP**
26 BROADWAY
NEW YORK, NEW YORK 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
rdolan@schlamstone.com
bsimon@schlamstone.com

Andrey Belenky
**KHEYFITS BELENKY LLP**
1140 AVENUE OF THE AMERICAS, 9TH FLOOR
NEW YORK, NY 10036
Telephone: (212) 203-5399
Facsimile: (212) 203-6445
abelenky@kblit.com

*Co-Counsel for Plaintiff and the Class*

68

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2024, the foregoing was served via email on all counsel of record.

By:   <u>/s/ J. Burkett McInturff     </u>
        J. Burkett McInturff