**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SUSANNA MIRKIN,<br>Individually and on Behalf of All Others<br>Similarly Situated,<br><br>              Plaintiffs,<br><br>v.<br><br>XOOM ENERGY, LLC and XOOM ENERGY<br>NEW YORK, LLC,<br><br>              Defendants. | No. 18 Civ. 2949 (ARR) (JAM) |

**XOOM'S COMBINED REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT REPORTS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

I.      Because Plaintiff and CRA now admit that "Total Cost" is *not* equal to XOOM's .......... "actual and estimated supply costs," CRA's models must all be excluded...................... 3

II.     CRA's Original Report should be excluded as moot and for failure to satisfy Rule 702. ...................................................................................................................... 9

      A.    Model Two is irrelevant because it admittedly does not include a proportionate margin. ........................................................................................................... 9

      B.    Model Two is inadmissible because it cannot constitute classwide evidence. ........ 10

      C.    CRA's Original Report contains no opinion on a reasonable margin. ..................... 11

      D.    Model Two's methodological errors are independent grounds for exclusion. ......... 12

            1.    CRA's failure to account for undercharges renders Model Two unreliable. . 12

            2.    Model Two is not capable of showing damages proportionate to XOOM's costs because its calculations derive only from XOOM's rates. ................... 13

      E.    CRA's other opinions in the Original Report and Rebuttal Report are inadmissible. ....................................................................................................... 13

III.    CRA's New Report should be excluded as untimely. .................................................... 14

      A.    CRA's New Report is not a timely supplement but an entirely new set of opinions........................................................................................................... 14

            1.    CRA's New Report was more than a year and a half too late under Rule 26(a) ..................................................................................................... 14

            2.    CRA's New Report is not an amendment or supplement, but a replacement. ...................................................................................... 17

      B.    Rule 37 sanctions must be imposed because Plaintiff effectively concedes she cannot show that the New Report's timing was substantially justified or harmless. .............................................................................................. 20

1.   The three "developments" that Plaintiff claims permit her to serve a replacement report nineteen months too late are not "substantial justification." ........................................................................................... 21

2.   Plaintiff has not shown that the belated expert disclosures are harmless. ... 22

3.   Under the circumstances, exclusion is the only appropriate sanction. ........ 24

4.   At a minimum, XOOM must be allowed to conduct discovery on CRA's New Report and prepare a rebuttal report at Plaintiff's expense...... 27

IV.   Alternatively, CRA's New Report should be excluded under Rule 702. ....................... 28

A.   Plaintiff has no evidence of an appropriate reasonable margin. .............................. 29

1.   CRA's models are inadmissible because a "reasonable" margin is not at issue................................................................................................... 29

2.   Even if a "reasonable" margin is a triable issue, CRA's New Report does not offer admissible evidence of commercially reasonable margin. ... 30

a.   Method C: An arbitrary average of XOOM's fixed-rate margin estimates is not evidence of a reasonable variable-rate margin. ......... 33

b.   Methods A and B: The utility-based margin caps are also irrelevant to a commercial reasonableness standard. .......................... 35

B.   CRA's new algorithms, like its original models, do not measure the overcharge. .. 35

C.   Methods A, B, and C do not use XOOM's reported supply costs. .......................... 36

D.   Methods A, B, and C are all based on insufficient facts and data............................ 37

1.   Methods A and B should be excluded as unreliable. .................................... 37

2.   Method C should be excluded as unreliable. ................................................ 39

V.   CRA's unauthorized 35-page rebuttal declaration should also be stricken.................... 39

CONCLUSION.................................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*3M Innovative Properties v. Avery-Dennison Corp.*,
    No. 01-1781, 2005 WL 6019652 (D. Minn. Oct. 21, 2005) ...................................22

*Am. Fam. Mut. Ins. Co. SI v. Electrolux Home Prod.*,
    No. 20-CV-1455, 2024 WL 1715590 (E.D. Wis. Apr. 22, 2024)...........................40

*Amari v. C.R. England, Inc.*,
    No. 1:07-CV-1616-WTL-TAB, 2010 WL 2943686 (S.D. Ind. July 21, 2010) .....................28

*Anthem, Inc. v. Express Scripts, Inc.*,
    660 F. Supp. 3d 169 (S.D.N.Y. 2023).......................................................................25

*In re AppHarvest*,
    684 F. Supp. 3d 201 (S.D.N.Y. 2023)........................................................................6

*Ashokan Water Servs. v. New Start*, 11 Misc. 3d 686, 691 (Civ. Ct., Kings Cty.
    2006.........................................................................................................................31

*Blake v. Securitas Sec. Servs.*,
    292 F.R.D. 15 (D.D.C. 2013)...................................................................................41

*Brecher v. Republic of Argentina*,
    806 F.3d 22 (2d Cir. 2015)......................................................................................13

*Burger v. Excel Contractors, Inc.*,
    No. 2:12-CR-01634-APG-CW, 2013 WL 5781724 (D. Nev. Oct. 25, 2013) .........................16

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F.Supp.2d 269 (S.D.N.Y.2011)........................................................................25

*Chapman v. ChoiceCare Long Island Term Disability Plan*,
    288 F.3d 506 (2d Cir. 2002)....................................................................................27

*Chart v. Town of Parma*,
    No. 10-CV-6179P, 2014 WL 4923166 (W.D.N.Y. Sept. 30, 2014).......................22

*Cochran v. Brinkmann Corp.*,
    No. 1:08-CV-1790-WSD, 2009 WL 4823858 (N.D. Ga. Dec. 9, 2009), *aff'd*
    *sub nom. Cochran v. The Brinkmann Corp.*, 381 F. App'x 968 (11th Cir.
    2010) .......................................................................................................................16

*Coco Rico, LLC v. Universal Ins. Co.*,
    No. CV 21-1390 (MEL), 2023 WL 3735108 (D.P.R. May 30, 2023)....................25

i

*Coene v. 3M Co.*,
    303 F.R.D. 32 (W.D.N.Y. 2014)................................................................14, 20, 24

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)...........................................................................................3, 9, 13

*Congregation Yetev Lev D'Satmar, Inc. v. Engie Power & Gas, LLC*,
    683 F. Supp. 3d 238 (E.D.N.Y. 2023) ...................................................................35

*Cummings v. Standard Reg. Co.*,
    265 F.3d 56 (1st Cir. 2001)....................................................................................19

*Ebewo v. Martinez*,
    309 F. Supp. 2d 600 (S.D.N.Y. 2004).............................................................. *passim*

*EEOC v. Freeman*,
    961 F. Supp. 2d 783 (D. Md. 2013), *aff'd sub nom. E.E.O.C. v. Freeman*, 778
    F.3d 463 (4th Cir. 2015) .......................................................................................16

*Engler v. MTD Prod.*,
    304 F.R.D. 349 (N.D.N.Y. 2015)....................................................................17, 41

*Est. of Jackson by Jackson v. Cnty. of Suffolk*,
    No. 2:12-CV-1455, 2019 WL 1676000 (E.D.N.Y. Apr. 17, 2019) (Ross, J.) ............16, 17, 20

*Hickory Sec. Ltd. v. Republic of Argentina*,
    493 F. App'x 156 (2d Cir. 2012) ..........................................................................13

*Hines v. BMG Rts. Mgmt. (US)*,
    -- F. Supp. 3d --, 2023 WL 6214264 (S.D.N.Y. 2023)..............................23, 25, 26

*Hines v. BMG Rts. Mgmt. (US)*,
    No. 20-CV-3535 (JPO), 2024 WL 113498 (S.D.N.Y. Jan. 10, 2024) .....................40

*Hoffman v. Constr. Protective Servs.*,
    541 F.3d 1175 (9th Cir. 2008), *as amended* (Sept. 16, 2008)...........................25, 28

*Holland Loader Co. v. FLSmidth A/S*,
    313 F. Supp. 3d 447 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019)......................31

*Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*,
    645 F. Supp. 3d 95 (E.D.N.Y. 2022) (Ross, J.) .........................................10, 21, 26

*Jung v. Neschis*,
    No. 01 Civ. 6993(RMB)(THK), 2007 WL 5256966 (S.D.N.Y. Oct. 23, 2007).....................17

*Kelly v. Beliv LLC*,
    No. 21-CV-8134 (LJL), 2024 WL 1076217 (S.D.N.Y. Mar. 12, 2024)...........................27, 28

*Lampe Berger USA. v. Scentier, Inc.*,
   No. CIV. A. 04-354-C-M2, 2008 WL 3386716 (M.D. La. Aug. 8, 2008) ..............................17

*Lewis v. FMC Corp.*,
   786 F. Supp. 2d 690 (W.D.N.Y. 2011) ...........................................................................17, 26

*Lexington Furniture Indus. v. Bob Timberlake Collection, Inc.*,
   No. 08 CVS 02407, 2009 WL 2901618 (N.C. Super. Feb. 9, 2009) ......................................31

*Lidle v. Cirrus Design Corp.*,
   No. 08 Civ. 1253, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009)...........................................17

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................................................................................19

*Mannoia v. Farrow*,
   476 F.3d 453 (7th Cir. 2007) .................................................................................................26

*Martinez v. Agway Energy Servs.*,
   88 F.4th 401 (2d Cir. 2023) ......................................................................................30, 32, 35

*Milau Assocs. v. North Ave. Dev. Corp.*,
   42 N.Y.2d 482 (1977) ............................................................................................................31

*Morritt v. Stryker Corp.*,
   No. 07-CV-2319 RRM RER, 2011 WL 3876960 (E.D.N.Y. Sept. 1, 2011)
   ............................................................................................................................24, 25, 27, 40

*In re Nieves*,
   648 F.3d 232 (4th Cir. 2011) .................................................................................................31

*Nuwer v. FSA US, LLC*,
   No. 20-60432-CIV, 2023 WL 4364029 (S.D. Fla. June 9, 2023)..........................................18

*Oracle Am., Inc. v. Google Inc.*,
   No. C 10-03561 WHA, 2016 WL 1743154 (N.D. Cal. May 2, 2016)....................................39

*Pagliaro v. Stevens Transp.*,
   No. 10 Civ. 268 (RLE), 2011 WL 2671567 (S.D.N.Y. July 6, 2011) ....................................26

*Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*,
   No. 3:16-CV-00024-CHB, 2022 WL 15722630 (W.D. Ky. May 24, 2022)...................18, 19

*Point Prods. A.G. v. Sony Music Entm't*,
   93–CV–4001 (NRB), 2004 U.S. Dist. LEXIS 2676, 2004 WL 345551
   (S.D.N.Y. Feb. 20, 2004).......................................................................................................27

*Puricelli v. Argentina*,
797 F.3d 213 (2d Cir. 2015).................................................................................13

*Richards v. Direct Energy Servs.*,
246 F. Supp. 3d 538 (D. Conn. 2017), *aff'd*, 915 F.3d 88 (2d Cir. 2019) ..................31, 33, 35

*Ritchie Risk-Linked Strategies Trading (Ireland) v. Coventry First*,
280 F.R.D. 147 (S.D.N.Y. 2012) ..................................................................21, 23, 39

*Rodgers v. Beechcraft Corp.*,
759 F. App'x 646 (10th Cir. 2018) .......................................................................40

*Salgado by Salgado v. Gen. Motors Corp.*,
150 F.3d 735 (7th Cir. 1998) ..........................................................................15, 26

*Seijas v. Republic of Argentina (Seijas I)*,
606 F.3d 53 (2d Cir. 2010)................................................................................12

*Sevugan v. Direct Energy Servs.*,
931 F.3d 610 (7th Cir. 2019) .............................................................................32

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
559 U.S. 393 (2010).........................................................................................13

*Sharpe v. U.S.*,
230 F.R.D. 452 (E.D. Va. 2005) ..........................................................................26

*Shelter Mut. Ins. Co. v. Culbertson's Ltd.*,
No. Civ. A. 97–1609, 1999 WL 135297 (E.D. La.1999)........................................................17

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*,
73 F.3d 546 (5th Cir. 1996) ...............................................................................16

*Sitts v. Dairy Farmers of Am.*,
No. 2:16-CV-00287, 2020 WL 3467993 (D. Vt. June 24, 2020) ............................................19

*State Farm Fire & Cas. Co. v. Omega Flex, Inc.*,
No. 3:20-CV-00648 (SVN), 2023 WL 2666676 (D. Conn. Mar. 28, 2023)....................................40

*Stratton v. Thompson/Ctr. Arms, Inc.*,
608 F. Supp. 3d 1079 (D. Utah 2022).....................................................................18

*Torres v. Dematteo Salvage Co.*,
No. 14 Civ. 774 (ADS) (AKT), 2016 WL 845326 (E.D.N.Y. Mar. 2, 2016)...................................26

*Troitino v. Goodman*,
35 S.E.2d 277 (N.C. 1945)...................................................................10, 12, 13, 36

iv

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................................................. 11

*United States v. Bacaner*,
    No. 8:21-CV-391-VMC-SPF, 2022 WL 824245 (M.D. Fla. Mar. 18, 2022) ......................... 28

*United States v. Dantzler*,
    771 F.3d 137 (2d Cir. 2014) ........................................................................................ 27

*Valassis Commc'ns v. News Corp.*,
    No. 17 Civ. 7378 (PKC), 2020 WL 1982963 (S.D.N.Y. Apr. 24, 2020) .............................. 26

*Vanguard Dealer Servs. v. Bottom Line Driven, LLC*,
    No. 3:21-CV-00659 (JAM), 2024 WL 98420 (D. Conn. Jan. 8, 2024) ................................. 18

*White v. BNSF Ry. Co.*,
    726 F. App'x 603 (9th Cir. 2018) ................................................................................... 9

*Whole Woman's Health All. v. Hill*,
    No. 118CV01904SEBMJD, 2020 WL 7129727 (S.D. Ind. Dec. 3, 2020) ............................ 18

**Statutes**

28 U.S.C. § 2072(b) ............................................................................................................ 13

N.C. Gen. Stat. § 25-1-201 .................................................................................................. 31

U.C.C. § 1-201(b)(20) ......................................................................................................... 31

**Other Authorities**

Fed. R. Civ. P. 16 ......................................................................................................... 15, 20

Fed. R. Civ. P. 23(f) ............................................................................................................ 22

Fed. R. Civ. P. 26 ........................................................................................................ *passim*

Fed. R. Civ. P. 37 ........................................................................................................ *passim*

Fed. R. Evid. 401 ............................................................................................................... 14

Fed. R. Evid. 402 ............................................................................................................... 14

Fed. R. Evid. 403 ............................................................................................................... 14

Fed. R. Evid. 702 ........................................................................................................ *passim*

<u>**PRELIMINARY STATEMENT**</u>

CRA's models are inconsistent with Plaintiff's legal theory. When it comes to Model Two, Plaintiff now insists that is because the Court's contract construction on summary judgment was new and unexpected. But that is not true. The Court adopted ***Plaintiff's*** legal theory, construing "'based on' to mean ***directly proportional*** to XOOM's supply costs such that XOOM could charge a reasonable, and ***consistent***, margin." Doc. 147, Pl. SJ Resp. 9. Plaintiff also claimed on summary judgment that CRA's Model Two "reflects this reasonable interpretation." *Id.*

That was not true at the time and still is not true today. As CRA's New Report admits, Model Two never included the single "directly proportional" margin for which Plaintiff expressly advocated (and which she told the Court and Second Circuit was included in Model Two); rather, Model Two always used thousands of fluctuating fixed-rate margins. That fact is undisputed. Nor have CRA's models ever accounted for XOOM's "actual and estimated supply costs" (or anything equal to them) as the Court was previously told; rather, as Plaintiff and CRA now acknowledge, "Total Cost" reflects ***only*** XOOM's estimated costs, not its "actual ***and*** estimated supply costs." In other words, that fact is now undisputed too.

Plaintiff's (mis)representations about Model Two and its inputs were not without consequence: The Court denied summary judgment and certified a class a year ago by relying on them. Yet, now, Plaintiff tries to turn the effect into a cause, arguing that the Court's adoption of her own contract construction was a drastic change warranting an entirely new expert report, with entirely different opinions, models, and methodologies, and which she served more than ***nine*** months after the Court's orders and over ***a year-and-a-half*** after the discovery cut-off. That falsehood is just an attempt to conceal the many deficiencies in CRA's models and opinions—deficiencies that require exclusion of the two reports under Federal Rule of Civil Procedure 37 and

Federal Rule of Evidence 702. As a result, this case is unsuitable for class treatment and for trial.

CRA's Original Report and New Report are irremediably deficient for other reasons as well. First, Plaintiff says that XOOM's motion to exclude the Original Report is "moot" because CRA "replaced" it with the New Report. That concession warrants excluding the Original Report in full. The Original Report is also inadmissible because Model Two: (1) does not include a proportionate margin, as Plaintiff now admits; (2) cannot be class evidence because it omits data for a significant portion of the class period; and (3) is based on insufficient and irrelevant data because it does not use a commercially reasonable margin and it conceals undercharges.

CRA's New (replacement) Report fares no better. Far from a supplement required by Rule 26(e) and the Court's April text order, the New Report contains entirely new and different opinions, methodologies, and calculations. Plaintiff's extraordinarily belated attempt to change CRA's damage calculations and underlying theories can and should be rejected out of hand under the Federal Rules. But even if the Court were to allow Plaintiff's unprecedented attempt to shoehorn a totally new replacement report into this case on the cusp of trial, which it should not, XOOM must be allowed to take discovery on it and supply its own expert rebuttal. Even XOOM's limited analysis of the New Report shows that it should be excluded on its merits. Not only does the New Report, like its predecessor, lack any evidence of XOOM's actual supply costs, but it also: (1) lacks any input for a commercially reasonable margin; (2) ignores undercharges in supplying a purported overcharge model; (3) uses an undisclosed formula to create a new estimated costs input that can only be deemed unreliable; and (4) is based on insufficient data.

XOOM's motions to exclude CRA's opinions and models should be granted in full. And because Plaintiff has no common proof of an overcharge without them, the Court should then decertify the class.

<u>**ARGUMENT**</u>

I.   **Because Plaintiff and CRA now admit that "Total Cost" is *not* equal to XOOM's "actual and estimated supply costs," CRA's models must all be excluded.**

The Decertification Order correctly recognized that "if the Total Cost figure [in XOOM's rate-setting workbooks] does not ***actually represent*** XOOM's supply costs, then plaintiff's model cannot accurately measure the extent to which XOOM overcharged class members" and will be unable to satisfy *Comcast*. Decert. Order 12 (emphasis added). Moreover, "Total Cost" can only "represent XOOM's supply costs" if "the Total Cost figure is ***synonymous*** with XOOM's actual and estimated supply costs." *Id.* (emphasis added). Thus, the Court held, whether "Total Cost" is a viable input into CRA's damage models "hinges on the jury's assessment of *whether* the Total Cost figure ***equals*** XOOM's actual and estimated supply costs." *Id.* (partial emphasis added).[1]

But Plaintiff and CRA no longer believe they are equal. Plaintiff's recent briefs and CRA's New Report repeatedly admit they are ***not*** equal, so there is no longer any fact dispute on the meaning of "Total Cost." Indeed, there is no longer any question for a jury to assess on that topic.

The jury will not hear argument or evidence at trial that the Total Cost figure "actually represents" XOOM's actual and estimated supply costs. That is because Plaintiff and CRA both now admit that the Total Cost figure in XOOM's rate-setting workbooks represents only its estimated supply costs for the upcoming month, while actual supply costs were separately documented in various financial records that were also produced in discovery. And although the parties continue to dispute whether and how XOOM incorporated its actual supply costs into rates, it is now undisputed that those actual supply costs do exist, were separately documented, and deviate from XOOM's supply cost estimates in differing amounts—sometimes to a great extent.

---

[1] *See also id.* ("A jury will decide whether the Total Costs ***equals*** XOOM's actual and estimated supply costs (emphasis added)).

To be clear, the Court's determination that a fact issue existed on the constitution of "Total Cost" was not unfounded when made at summary judgment and on class certification. Plaintiff and CRA suggested as much based on CRA's misunderstanding of the evidence. Specifically, CRA's Original Report and its Model Two were premised on a mistaken assumption that "Total Cost" encompassed XOOM's actual and estimated supply costs:

> (h) We have calculated the overcharge damages to the Class under two different methods: (i) overcharges based on XOOM's own calculations of its actual and estimated supply costs – labeled by XOOM in its data as "Total Cost"; and (ii) overcharges based on applying the same margin that XOOM used for its fixed rate customers rather than the excessive margins that XOOM charged to variable rate customers. Damages have been calculated by month, customer type (residential or commercial), and utility region in New York.

Ex. 1, CRA Rep. ¶ 23; *see id.* ¶ 52 ("XOOM simply calculated and reported its actual costs of supplying electricity and gas as a sum total called 'Total Cost.'").

Plaintiff seized on CRA's misunderstanding in her summary judgment and class certification briefing. Indeed, Plaintiff escaped summary judgment and prevailed on class certification due in large part to her repeated (mis)representations to the Court that "Total Cost" captured all XOOM's supply costs—both actual and estimated. *See* Doc. 132, Pl. Class Mem. 1 (claiming XOOM "produc[ed] data detailing its total actual supply costs—which Plaintiffs' energy economists analyzed and tallied")[2]; Doc. 147, Pl. SJ Resp. 2 ("Discovery shows that the costs

---

[2] *See also id.* at 5 ("Plaintiffs' experts adjusted their overcharge formula in the event the factfinder were to determine that the applicable contract allows XOOM to charge a profit margin above its actual costs"); *id.* at 21 (claiming Model One used XOOM's "actual reported supply costs, as required by the 2013 Contract"); *id.* at 33 ("XOOM produced their actual supply costs in discovery, and Plaintiffs' energy experts calculated and analyzed their supply costs.").

embodied by this term of art [actual and estimated supply costs] were captured in XOOM's internal records in a calculation that XOOM labeled "Total Cost" and was maintained for each of its monthly energy rates.")[3]. But, as Plaintiff and CRA now admit, CRA was mistaken—and it was never true that Total Costs were the same as "actual and estimated supply costs."

After reviewing XOOM's decertification evidence and trial exhibits documenting the differences between actual and estimated supply costs (all of which were produced in discovery before class certification and summary judgment), CRA and Plaintiff were forced to pivot. Contrary to representations made in the now-replaced Original Report, CRA's New Report explicitly acknowledges the "***differences*** between 'actual' and 'estimated supply costs,'" and forthrightly admits that "'actual' costs ***are not reflected*** in XOOM's rate-setting workbooks:"

> XOOM's margins.[10]  I also note that XOOM's own Rule 30(b)(6) testimony shows that the estimated supply costs in XOOM's rate-setting workbooks and other materials were highly accurate.[11] Thus the <mark>differences between "actual" and "estimated" supply costs</mark> on average over time may not have been material from a business perspective. This likely explains why <mark>"actual" costs are not reflected in XOOM's rate-setting workbooks</mark>.

CRA New Rep. ¶ 18(e). CRA tries to temper the consequence of that admission—i.e., that its damage models do not account for actual costs—by focusing on the entirely separate issue of whether (and how) actual costs impacted rates overall. *See, e.g. id.* (theorizing that differences between actual and estimated costs "on average over time ***may not*** have been material from a

---

[3] *See also id.* at 4 ("Both documents and testimonial evidence show that XOOM never 'based' consumers' variable rates on its own 'true' reported 'supply costs.'"); *id.* at 37 ("Both of Plaintiffs' methods incorporate XOOM's internal reported supply cost metric.").

business perspective." (emphasis added)).[4] In other words, CRA acknowledges that Total Costs are different from "actual and estimated supply costs," but argues that the degree or significance of the difference is unclear. Yet CRA's admission that there was *any* difference necessarily eliminates a fact question about whether they were the same. Because "the Total Cost figure is [] *not* reflective of XOOM's actual and estimated supply costs," Plaintiff is left unable "to provide common evidence of [XOOM's] actual and estimated supply costs," and CRA's damage models are "necessarily inconsistent with her theory of liability." Decert. Order 12.

Plaintiff's concessions are in accord with CRA's. As a threshold matter, Plaintiff's consolidated response does not even address XOOM's arguments that CRA's models should be excluded under Rule 702 because the "Total Cost" input does not reflect the "actual and estimated supply costs" referenced in the contract. XOOM's motions to exclude CRA's opinions—both old and new—should be granted based on that concession-by-silence alone. *See, e.g., In re AppHarvest*, 684 F. Supp. 3d 201, 255 (S.D.N.Y. 2023) ("Plaintiff do[es] not oppose this argument

---

[4] *See also id.* at ¶ 54 ("I also note that while some error is inherent in every forecast, errors can go both ways. Sometimes XOOM may have underestimated its supply costs, and sometimes overestimated them."); *id.* at ¶ 72 ("I have not seen any evidence that these supposed 'actual' supply costs were ever systematically broken down, documented, or calculated in a way that could be used determine how, if at all, 'actual' supply costs flowed into the margin XOOM obtained on top of the 'estimated' supply costs in XOOM's rate-setting workbooks."); *id.* at n. 70: ("For example, I have seen XOOM financial reporting spreadsheets (for example XOOM_Mirkin_029940 and XOOM_Mirkin_032603) that apparently show aggregated differences between estimated and actual supply costs, but this is not even broken down by state, much less by customer class. Hence, I do not see any way in which these costs could be attributed specifically to categories of New York customers."). Of course, CRA's unfamiliarity with a method by which XOOM's documented actual supply costs and prior period adjustments could be attributed to specific rates does not mean the task is impossible. Plaintiff could have engaged another expert (e.g., an accountant) to provide that methodology, and CRA could have relied on their opinions and incorporated them into the damage models. Plaintiff instead chose to ignore XOOM's documented actual supply costs. And when she could no longer do so, she tried to flip the burden onto XOOM to prove its actual costs. The Decertification Order rightly rejected that attempt and, under the established standard, CRA's models necessarily fail.

. . . . Plaintiff's 'silence concedes the point.'" (collecting authorities)).

However, the Court need not rely exclusively on Plaintiff's silence to conclude she now admits that the Total Cost figure does not equal XOOM's actual and estimated supply costs. In addition to the concessions within the New Report itself, CRA's testimony accompanying her response readily admits as much too. Mr. Adamson forthrightly acknowledges that the models do "not consider[] the 'actual' costs when computing damages." *See* Doc. 245, Adamson Decl. ¶ 40.[5] Moreover, Plaintiff, just like CRA, has rightly acknowledged for months in her pretrial submissions that "Total Cost" represents only estimated supply costs, which do ***not*** equal the "estimated and actual supply costs" referenced in the contract:

> The record evidence confirms this, as ***internal documents comparing XOOM's monthly COGS estimates from its workbooks to XOOM's actual supply costs*** show minuscule ***variations***. See, e.g., JX1083 ("less than a -0.041% ***variance***" between actual and estimated COGS); JX1073 ("less than -0.03%"); JX1075 ("less than 0.10%").

Doc. 233, Pl. MIL Mem. 3 (emphasis added); *see also* Doc. 204, Decert. Resp. 35 ("XOOM has not shown any proof of a ***material*** difference between the workbooks' highly accurate[6] cost estimates and XOOM's actual costs" (emphasis added)).

As is evident from these quotations, Plaintiff (like CRA) attempts to minimize the significance of the admitted differences by focusing instead on the separate question of whether

---

[5] *See also id.* (admitting that only "XOOM's aggregated ***estimated*** supply costs were taken directly from XOOM's RSWs." (emphasis added)); *id.* (criticizing XOOM's failure to "offer any calculations using the actual costs," despite XOOM not having any burden to do so).

[6] Plaintiff's citation to testimony regarding the accuracy of the Total Cost estimates to argue those estimates were "highly accurate" indicators of ***actual*** supply costs is misleading and misguided. *See, e.g.* Doc. 222, Pl. MIL Mem. 3; Doc. 200, Pl. Decert. Resp. 35. The cited testimony all discusses the workbooks' Total Cost input as an accurate representation of XOOM's ***estimated*** supply costs, i.e. "'everything that we can know about those costs up till that moment.'" Pl. MIL Mem. 35 (quoting testimony of Mr. Coppola). Plaintiff's counsel never asked a single XOOM witness whether the Total Cost estimates always aligned with XOOM's actual supply costs that were not known until weeks or months later—because they knew the answer was 'no.'

they account for fluctuations in the variable rates. But no amount of misdirection can transform the parties' live dispute over what impact those differences had on rates into a live jury issue over "*whether* the Total Cost figure equals XOOM's actual and estimated supply costs." Decert. Order 12. The now-undisputed fact is that those figures are not equal or synonymous with one another, and no fact issue exists. CRA's models must be excluded and the class must be decertified. *Id.*

And in any event, there is overwhelming documentary evidence that the variance between the estimated supply costs labeled "Total Cost" in XOOM's workbooks and the actual supply costs documented elsewhere differed over time and was often significant. For example, XOOM experienced a 2.027% variance between its estimated supply costs and actual supply costs for gas for January 2013, while the February variance was more than ***eight times*** higher at 17.375%:

| | Monthly Actual (with PPA) | |
|---|---|---|
| | 1/31/2013 | 2/28/2013 |
| Gross Revenue Gas Estimate | $ 9,101,490 | $ 8,030,956 |
| PPA | 753,828 | 969,891 |
| COGS Gas Estimate | $ 6,644,211 | $ 5,810,359 |
| PPA | 134,705 | 1,009,550 |

Doc. 197, Def. Decert. Mem. 26. Thus, Plaintiff's three cherry-picked examples showing slight negative variations between Total Cost estimates and XOOM's actual supply costs are not only irrelevant (as they still show the two types of costs were not equal), but they are also the exception.[7]

---

[7] *See, e.g.,* DX 785 (***12.1%*** lower than estimated COGS for gas in January 2013); *id.* (***6%*** higher than estimated COGS for electricity in January 2013); DX 795 (***28.1%*** higher than estimated COGS for gas in March 2013); DX 1381 (***60.6%*** higher than estimated COGS for gas in May 2013); DX 1382 (***25.1%*** higher than estimated COGS for gas in June 2013); *id.* (***7.2%*** higher than estimated COGs for electricity in June 2013); DX 813 (***20.7%*** higher than estimated COGS for gas in August 2013); DX 1403 (***14.1%*** higher than estimated COGS for gas in October 2015); JX 1145 (***9.1%*** higher than estimated COGS for gas in July 2016); JX 1107 (***9%*** higher than estimated COGS for gas in September 2016); JX 1147 (***9.2%*** higher than estimated COGS

Accordingly, CRA's and Plaintiff's admissions that "Total Cost" does **not** equal XOOM's "actual and estimated supply costs" is fatal to every model and opinion CRA has offered in the Original Report and New Report. Any previously existing jury issue as to "whether the Total Cost equals XOOM's actual and estimated supply costs," Decert. Order 12, is obsolete because the jury will not be told those two figures are equal. And as a result, none of CRA's models can satisfy *Comcast* and the models must all be excluded under Rule 702.

## II.    CRA's Original Report should be excluded as moot and for failure to satisfy Rule 702.

Plaintiff says because "the [New] report replaced the Original Report[,] XOOM's attacks on the Original Report are now moot." The Original Report can be excluded on that concession alone. *See White v. BNSF Ry. Co.*, 726 F. App'x 603, 604 (9th Cir. 2018) (affirming exclusion of initial expert report where plaintiff "offer[ed] to submit a replacement report," because "[t]his admitted deficiency [by plaintiff] was an appropriate ground to exclude the expert").

And even if the merits of CRA's Original Report are reached, Plaintiff's response only confirms it should be excluded for the reasons XOOM identified: (A) Model Two admittedly is not designed to include a proportionate margin; (B) Model Two cannot prove class damages because it omits a significant portion of the class; (C) the Original Report contains no opinions or evidence about an appropriate margin; (D) Model Two is plagued by methodological errors; and (E) the remaining opinions in the Original Report will not be helpful to the finder of fact.

### A.    Model Two is irrelevant because it admittedly does not include a proportionate margin.

The Court ruled that Plaintiff must prove any overcharge using a "proportionate" margin,

---

for gas in October 2016); DX 1421 (**22.4%** higher than estimated COGS for gas in June 2017); DX 1422 (**25.2%** higher than estimated COGS for gas in July 2017); DX 1226 (**12.3%** higher than estimated COGS for gas in August 2017); JX 1110 (**10%** higher than estimated COGS for gas in September 2017); JX 1118 (**9.8%** higher than estimated COGS for gas in March 2018); DX 1318 (**20.6%** higher than estimated COGS for gas in May 2018).

SJ Order 13, but Model Two's margin inputs are admittedly not proportional to costs. Rather, the *thousands* of inputs **vary** with the fluctuating estimated margins for an arbitrary subset of XOOM's fixed-rate products. The model thus is not built to accommodate one proportionate margin.[8]

Plaintiff and CRA make no attempt to defend Model Two's non-proportionate inputs. Instead, they try to minimize the problem by calling the thousands of fluctuating margins a replaceable data point. That is a mischaracterization. Model Two does not have a single margin input but **thousands** of them. The model was constructed assuming the inputs would not be consistent or proportionate, despite Plaintiff's contentions. *See* Ex. 8,[9] CRA New Report 37–38 (acknowledging Model Two's margin inputs did not "align . . . with the court's ruling at summary judgment"). It is thus undisputed that Model Two is not designed to include sufficient data to measure overcharges under the contract. *See Troitino v. Goodman*, 35 S.E.2d 277, 282 (N.C. 1945). That is one of the reasons (though not the only one) that Plaintiff has now abandoned it, and it should be excluded. *See Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 108 (E.D.N.Y. 2022) (Ross, J.) (excluding expert's opinion because it "would be confusing, irrelevant, and [would] not assist the jury" with the question presented).

B.   Model Two is inadmissible because it cannot constitute classwide evidence.

Plaintiff concedes that CRA did not update Model Two's calculations with the charge data XOOM produced by agreement on March 1, 2024. As a result, Model Two indisputably does not attempt to show damages for the approximately 40,000 class members who were not included in

---

[8] The Decertification Order, like the SJ Order, assumed that Model Two contained a single margin input of 19%, but that was not the case. 19% was the average of the thousands of individual fixed-rate margin estimates that Plaintiff's counsel included in Model Two. CRA admits this.

[9] References to Exs. 1 through 15 are to the Matthews Declaration in support of excluding the Original Report, Doc. 216. References to Exs. A-1 through A-8 are to the Matthews Declaration in support of excluding the New Report, Doc. 229. Ex. C is the accompanying Wizig Declaration.

Model Two or for class members who paid variable rates after July 2021. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (class action plaintiffs cannot rely on evidence that would not establish liability in individual actions filed by each class member).

Plaintiff says that Model Two need not be updated because Method C *is* Model Two, and Method C includes the updated data. But even putting aside the untimeliness (and other problems) of Method C, Model Two and Method C are not the same. They include not just different "replaceable data points" for the margin as Plaintiff calls them, but different math and methodologies. The fact that CRA saw fit to create an entirely new "Method" to "replace" Model Two is itself proof they are not the same. Model Two must be excluded.

C.  CRA's Original Report contains no opinion on a reasonable margin.

Plaintiff says the jury must determine a "reasonable" margin input to measure overcharges. If that is correct[10], then CRA's Original Report must be excluded because it did not contain any evidence that would assist the jury in determining that amount.

The Original Report mentions the term "reasonable" only once in discussing margin, and then only to state in conclusory fashion that "XOOM still substantially overcharged its customers by imposing an unreasonably high margin on its variable rate customers as opposed to its fixed rate customers." Ex. 1, CRA Rep. ¶ 73. That comment is unhelpful and unreliable because it does not suggest what a reasonable margin would be.

And while Plaintiff repeatedly argues that the thousands of inputs in Model Two could be replaced with a "reasonable" margin, CRA's failure to present any opinion on a reasonable margin in the Original Report means Model Two cannot serve as a damage model for Plaintiff or the class.

---

[10] For the reasons discussed in XOOM's MIL No. 3, associated Reply, and *infra*, Part IV(A), a reasonable margin is not a submissible jury issue.

The Original Report and Model Two are therefore irrelevant, unhelpful, and inadmissible.

D.  <u>Model Two's methodological errors are independent grounds for exclusion.</u>

1.  *CRA's failure to account for undercharges renders Model Two unreliable.*

As XOOM explained, CRA's models improperly ignore undercharges. *See* Fed. R. Evid. 702(c), (d) (requiring the proponent of expert testimony to demonstrate that (c) "the testimony is the product of reliable principles and methods," and "(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case"). Plaintiff does not deny that Model Two ignores the months in which Plaintiff saved money and incorrectly reports she was overcharged by $6. *See* Ex. 8 (showing Model Two's final output for Plaintiff's individual damages if Model Two's margin inputs are modified to allow a 22% margin). Because CRA's Models ignore the contractual undercharges, they fail to accurately capture the amount of class members' alleged *over*charges. The failure to account for undercharges also puts some class members in a situation significantly better than they would have occupied if XOOM's rates had fulfilled the proportionate-margin construction at the margins Plaintiff uses—i.e., their charges do not take into account times when XOOM's variable-rate margins were less than its fixed-rate margins. *Troitino*, 35 S.E.2d 277, 282 (N.C. 1945) (parties "not entitled to be enriched by" contract damages). What's more, this flaw will result in damage calculations that impermissibly subject XOOM to liability far greater than it would face in individual actions, fatally undermining a verdict based on Model Two's algorithm. *See Seijas v. Republic of Argentina (Seijas I)*, 606 F.3d 53, 58–59 (2d Cir. 2010) (vacating class judgment relying on expert's aggregate damage estimates without estimating damages for each violation, and without "using appropriate procedures to ensure that the damages awards roughly reflect the aggregate amount owed to [individual] class members"); *Hickory Sec. Ltd. v. Republic of Argentina*, 493 F. App'x 156, 161 (2d Cir. 2012) (same); *Puricelli v.*

*Argentina*, 797 F.3d 213, 219 (2d Cir. 2015) (same); *Brecher v. Republic of Argentina*, 806 F.3d 22, 27 (2d Cir. 2015) (same).[11]

      2.   *Model Two is not capable of showing damages proportionate to XOOM's **costs** because its calculations derive only from XOOM's **rates**.*

Plaintiff's response confirms that CRA's original models are incapable of modelling rates that vary according to XOOM's costs because they purport to calculate XOOM's margins as a percentage of its variable **rates**, not a percentage above **costs**. *See* Ex. 7 (individual Model Two calculations omit a cost input); Ex. 3 (same for the class). As XOOM explained, Model Two's margin calculation means that a 22% margin would be equal to $.030778/kWh in September and $.028578/kWh in November. In other words, while Model Two's margins are proportionate to XOOM's **rates** over time, they are ***not*** "proportionate . . . **to the supply costs** over time," as the Court ruled they must be. SJ Order 13 (emphasis added); *see* Ex. 7 (omitting costs from Model Two's calculations of Plaintiff's individual damages); Ex. 3 (same for the class-wide calculations). This undisputed disconnect between the legal principles and the damage model requires exclusion. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to" the plaintiff's class theory); Fed. R. Evid. 702(c), (d). Model Two must be excluded on these grounds too.

E.   <u>CRA's other opinions in the Original Report and Rebuttal Report are inadmissible.</u>

Finally, Plaintiff's half-hearted attempt to save CRA's other statements and opinions are easily rejected. For the reasons described in XOOM's motion and its related MILs Nos.

---

[11] Plaintiff argues that the facts of these cases and *Troitino* were different, but that does not affect the applicability of their rulings. Under North Carolina law, a plaintiff should not be enriched by contract damages, and the same is true for each member of the class. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) ("A class action . . . leaves the parties' legal rights and duties intact and the rules of decision unchanged."); 28 U.S.C. § 2072(b) (the Federal Rules "shall not abridge, enlarge or modify any substantive right").

10 and 12, CRA's opinions at ¶¶ 23(c)–(g), (i) in the Original Report and ¶¶ 2(a), (d)–(f) in the Rebuttal Report should be excluded under Rules 401, 402, 403, and 702.

## III.   CRA's New Report should be excluded as untimely.

Plaintiff does not seriously dispute that CRA's New Report "may be properly characterized as" containing "new opinion[s]," and thus is not merely a supplement as contemplated by Rule 26(e). *Coene v. 3M Co.*, 303 F.R.D. 32, 43 (W.D.N.Y. 2014). Rather, Plaintiff claims the Court's April text order citing Rule 26(e) somehow gave her carte-blanche to produce an entirely new report that she had not yet even described to the Court. She is wrong. Because CRA's New Report replaces its Original Report with new (and contradictory) opinions, it is "untimely under Rule 26(a)(2)(D)." *Id.* And because the New Report is untimely, Plaintiff can avoid Rule 37(c)(1) sanctions only by proving that her untimeliness is "substantially justified" or "harmless." *Id.* She has not even attempted to make such showings and, indeed, she cannot. Accordingly, the New Report and its associated new opinions and methodologies should be excluded in their entirety.

A.   <u>CRA's New Report is not a timely supplement but an entirely new set of opinions.</u>

1.   *CRA's New Report was more than a year and a half too late under Rule 26(a).*

It is undisputed that the deadline for Plaintiff's expert disclosures "accompanied by a written report" containing, among other things, "a complete statement of all opinions [CRA] will express and the basis and reasons for them" and "the facts or data" CRA considered in forming those opinions was October 3, 2022. *See* Fed. R. Civ. P. 26(a)(2)(B). Yet, it is similarly undisputed that the New Report was not served until May 10, 2024—***nineteen months*** after her deadline.

Plaintiff's response contends that CRA's New Report is timely because the Court already permitted it via an April text order. But that is not the case. The text order stated:

ORDER re: [187] Motion for Discovery Conference; [203] Motion for Extension of Time to File Joint Pretrial Order: The court has reviewed the parties' letters

concerning plaintiff's anticipated **supplemental** expert report and associated deadlines, and has determined that a conference is not necessary. The deadline for the parties to file the Joint Pretrial Order is extended to May 10, 2024; **any supplementation or amendment of information included in plaintiff's expert report must also be disclosed** by May 10, 2024. **See Fed. R. Civ. P. 26(e)(2)**. All motions in limine, including any motion to exclude portions of or the entirety of plaintiff's expert report(s), shall be filed on or before May 20, 2024. Ordered by Judge Allyne R. Ross on 4/15/2024. (MK)

Apr. 15, 2024 Text Order (emphasis added). In other words, the text order merely reiterated Rule

26(e)(2), which already gave Plaintiff the right (and obligation) to update "information included

in" the Original Report:

> *Expert Witness.* For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's **duty to supplement** extends both to **information included in the report** and to information given during the expert's deposition. Any additions or changes to **this information** must be disclosed **by the time the party's pretrial disclosures** under Rule 26(a)(3) **are due**.

Fed. R. Evid. 26(e)(2) (emphasis added).

Plaintiff's position that the Court's text order—which, again, tracks the language of Rule

26(e)(2)—endowed her with special rights to "replace" all her expert opinions more than nineteen

months past the deadline is thus a fiction. Neither the Court's text order nor Rule 26 permits the

wholesale alteration of substantive aspects of an expert report out-of-time.[12] *Salgado by Salgado*

*v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("Disclosures must not be used as a

means to extend a discovery deadline. . . . The 'incentive for total disclosure' is the threat that

expert testimony not disclosed in accordance with the rule can be excluded pursuant to Rule

37(c)(1)."). And the nature of supplementation permitted by Rule 26(e)(2) is very limited:

> Rule 26(a) clearly require[s] that the initial disclosures be complete and detailed. The purpose of rebuttal and supplementary disclosures is just that—to rebut and to supplement. These disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information."

---

[12] Plaintiff has not denied she lacks "good cause" to modify the schedule under Rule 16(b).

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996). Accordingly, Rule 26(e) permits new disclosures only when "the information relied upon by the expert was previously unavailable to him." *Est. of Jackson by Jackson v. Cnty. of Suffolk*, No. 2:12-CV-1455, 2019 WL 1676000, at *2 (E.D.N.Y. Apr. 17, 2019) (Ross, J.)[13]; *see also, e.g., EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013) ("Despite being titled 'supplemental' reports, [the] latest filings do not qualify as supplements under Federal Rule of Civil Procedure 26(e), but are instead poorly disguised attempts to counter Defendant's arguments with new expert analyses. Except under limited circumstances not here present, expert disclosures are fixed targets, and not ones movable at will."), *aff'd sub nom. E.E.O.C. v. Freeman*, 778 F.3d 463 (4th Cir. 2015).

Indeed, by reference to Rule 26(e), the Court did not "expressly [or implicitly] permit Plaintiff to serve" the New Report, as Plaintiff boldly claims. Doc. 258, Pl. Resp. 3. *See Cochran v. Brinkmann Corp.*, No. 1:08-CV-1790-WSD, 2009 WL 4823858, at *7 (N.D. Ga. Dec. 9, 2009) ("Rule 26 does not bestow upon litigants unfettered freedom to rely on supplements produced after a court-imposed deadline. Rule 26 imposes a ***duty*** on Plaintiffs; it grants them ***no right*** to produce information in a belated fashion." (cleaned up, emphasis added)), *aff'd sub nom. Cochran v. The Brinkmann Corp.*, 381 F. App'x 968 (11th Cir. 2010); *Burger v. Excel Contractors, Inc.*, No. 2:12-CR-01634-APG-CW, 2013 WL 5781724, at *3 (D. Nev. Oct. 25, 2013) ("Rule 26(e) creates a ***duty*** to supplement, ***not a right***. Supplementation under Rule 26(e) does not create a loophole for a party to revise an initial report to its advantage. Rather, 'supplementation under the Rules means

---

[13] Plaintiff's suggestion that the Court's text order allowed her to replace CRA's opinions regardless of whether they could "be fairly considered a supplement under Rule 26(e)," ignores the Rule's plain text and the Court's consideration of this same issue is *Jackson*. As explained in that case, an expert report is "not a supplemental disclosure under Rule 26(e) [but is] untimely" where, as here, it "'reflects additional information based on further research that [the expert] conducted after [his] deposition.'" *Id.* (alterations in original).

correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." (cleaned up, emphasis added)).

Rule 26(e) "does not grant a license" to serve a new report simply because Plaintiff now "wants to bolster" CRA's deficient opinions with new methods she could have disclosed by the original deadline. *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011) (cleaned up).[14] In truth, if Rule 26(e) "permit[ted] a party to supplement an expert report at any time it wishes," as Plaintiff suggests, it would "wreak havoc on docket control and amount to unlimited expert opinion preparation." *Est. of Jackson*, 2019 WL 1676000, at *2 (Ross, J.) (cleaned up).

### 2. *CRA's New Report is not an amendment or supplement, but a replacement.*

The New Report presents entirely new and different opinions, fully abandoning CRA's previous opinions and models.[15] CRA candidly titles those new methodologies "Methods," but

---

[14] *See also, e.g., Engler v. MTD Prod., Inc.*, 304 F.R.D. 349, 356 (N.D.N.Y. 2015) ("'[C]ommon sense suggests (and numerous decisions confirm) that an expert report that discloses new opinions is in no way a mere supplement to a prior report.'") (citation omitted); *Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) (Rule 26(e) "is not . . . a vehicle to permit a party to serve a deficient opening report and then remedy the deficiency through the expedient of a 'supplemental' report."); *Lampe Berger USA, Inc. v. Scentier, Inc.*, No. CIV. A. 04-354-C-M2, 2008 WL 3386716, at *2 n.3 (M.D. La. Aug. 8, 2008) ("Courts have [] made it clear that supplemental expert reports cannot be used to 'fix' problems in initial reports." (citing cases)); *Shelter Mut. Ins. Co. v. Culbertson's Ltd.*, No. Civ. A. 97–1609, 1999 WL 135297, at *4 (E.D. La.1999) (issues not included in initial report cannot be considered "supplementary").

[15] An entirely new **replacement** report from an **existing** expert appears to be so unusual that it is unparalleled. In fact, Plaintiff has not cited any case in any court in which a party served a "replacement" report from an existing expert—as opposed to a replacement report from a new expert. *Cf. Jung v. Neschis*, No. 01 Civ. 6993(RMB)(THK), 2007 WL 5256966 (S.D.N.Y. Oct. 23, 2007) (allowing plaintiffs to submit new report from new expert to replace original expert who, due to "circumstances that [we]re at least partly beyond [plaintiffs'] control," was unavailable).

Moreover, when replacement experts are allowed, their reports are typically limited to the opinions in the original reports, and some courts even require the new report to wholesale adopt the opinions of the prior report. *See, e.g., Vanguard Dealer Servs. v. Bottom Line Driven, LLC*, No. 3:21-CV-00659 (JAM), 2024 WL 98420, at *8 (D. Conn. Jan. 8, 2024) (precluding replacement expert testimony because it "violate[d] the restriction that the Court placed on Vanguard's replacement of its expert"); *Nuwer v. FSA US, LLC*, No. 20-60432-CIV, 2023 WL 4364029, at *2

Plaintiff nonetheless argues they are mere "inputs" for its disavowed Model Two. Plaintiff even tries to justify her completely new and different damages methodologies by offering new expert "opinions" about a commercially reasonable margin that, in some instances, ***directly contradict*** sworn testimony CRA provided in this case. *See* Ex. A-3, CRA New Rep. ¶ 1 ("This Amended Report ***replaces*** the [Original Report]") (emphasis added); Ex. B, Coleman Decl. ¶¶ 3–4, 6.

Plaintiff acknowledges that CRA's Methods A, B, and C employ a different formula than Model Two. Model Two's margins were a function of the rate, while Methods A, B, and C's margins are a function of cost. But Plaintiff disingenuously claims that the two different algorithms are just different ways of expressing the same thing, "the same as the difference between Fahrenheit and Celsius." That is not true because Model Two does not use just a different input than the new methods. Instead, it uses an entirely different algorithm. That is a qualitative difference with a very real practical effect, and it means that the new "Methods" are not the kind of supplements or amendments that Rule 26(e)(2) permits. *See, e.g., Whole Woman's Health All. v. Hill*, No. 118CV01904SEBMJD, 2020 WL 7129727, at *3 (S.D. Ind. Dec. 3, 2020) ("Instead of correcting the report to reflect the accurate data, Dr. Studnicki substituted a different comparison between [] data [sets]. This moves past simply correcting an error and is instead an attempt to offer

---

(S.D. Fla. June 9, 2023) (permitting expert substitution with the restriction that "the new expert report may not provide an opinion that is contrary to or inconsistent with the original expert's opinion" and further be "substantially similar to those presented by the original expert"); *Stratton v. Thompson/Ctr. Arms, Inc.*, 608 F. Supp. 3d 1079, 1088 (D. Utah 2022) (limiting substitute expert's opinions because "allow[ing] a replacement expert to use entirely new methods which the original expert did not . . . would frustrate the rationale behind allowing a replacement expert and provide a windfall to [the proponent]"); *Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*, No. 3:16-CV-00024-CHB, 2022 WL 15722630, at *5 (W.D. Ky. May 24, 2022) ("Courts elsewhere have permitted new experts to essentially adopt the opinions of an expert that becomes unavailable to testify at trial." (collecting cases)).

a new opinion or analysis under the guise of a supplemental label." (cleaned up)).[16]

That the New Report represents a striking about-face is further evidenced by the fact that, whereas the Original Report offered **zero** opinions as to a reasonable margin, the New Report purports to offer **three**. *Compare* CRA Rep. (not specifying any reasonable margin), *with* Ex. A-3, CRA New Rep. ¶ 74 ("Below I discuss three methods for determining a margin that could be viewed, in my experience, as reasonable."), *id.* ¶ 105 ("Method C . . . provides a **ceiling** in terms of a maximum commercially reasonable margin . . . ." (emphasis added)), *and id.* ¶ 107 ("From a commercial and economic perspective, it would be **unreasonable** for XOOM to charge a **higher margin** on lower-risk variable rate products **than the margin it charged for corresponding, higher-risk fixed rate products**." (emphasis added))). And, as Plaintiff concedes, whereas CRA opined under the Original Report's logic that the regulated utility's rate "is irrelevant for this contract,"[17] CRA's New Report relies on those very same utility rates to generate a margin input for Method A—which it now touts as "the best comparator." *Id.* at ¶ 18(j). The New Report does so based not on the availability of new information, but because CRA admittedly went on a "search

---

[16] *See also id.* ("Experts may supplement their reports 'to correct mistakes and oversights, not to include new examples and illustrations that could have been included in an original expert report.'" (cleaned up)); c*f. Sitts v. Dairy Farmers of Am., Inc.*, No. 2:16-CV-00287, 2020 WL 3467993, at *9 (D. Vt. June 24, 2020) (holding that a "computer code problem is akin to a mistake in arithmetic that can be corrected (unlike the mistake of using an unreliable methodology)" (quotation marks and citation omitted); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 657 (S.D.N.Y. 2007) ("[M]istakes in arithmetic can be corrected (unlike the mistake of using an unreliable methodology) . . . ."); *Cummings v. Standard Reg. Co.*, 265 F.3d 56, 65 (1st Cir. 2001) (affirming district court's decision to permit expert's testimony that included a "computational error" because, while it "raise[d] some red flags concerning the reliability of the predicted . . . damages," the "mistake was not only revealed to the jury, but was duly corrected while he was still on the stand," which meant that Plaintiff "would have to concede[] that [the expert's] report contained errors, allowing the jury room to discredit his testimony accordingly").

[17] Ex. A-4, Eryilmaz Dep. 74:8–75:12; *see also* Ex. A-1, Adamson Dep. 68:19–69:9 ("And you're not offering a damage model that compares XOOM's variable rate charged to what customers would have been charged by the utility during the same time period? . . . A. No.").

for objective criteria" for a commercially reasonable margin at Plaintiff's direction after XOOM pointed out that the Original Report contained no such opinions in its decertification motion. Doc. 237, Pl. MIL Resp. 24. Of course, the 2019 Reset Order was available to CRA when the Original Report was served in 2022; indeed, the Original Report cites the Reset Order at length. As such, the PSC's pronouncements indisputably were not "previously unknown or unavailable," *Jackson*, 2019 WL 1676000, at *2, as required for the New Report qualify as a Rule 26(e) supplement.

In sum, the New Report is "properly characterized as [] new opinion[s] and is therefore untimely under Rule 26(a)(2)(D)." *Coene*, 303 F.R.D. at 43. Plaintiff's cavalier assertion that she can "replace" CRA's Original Report with entirely new methodologies, calculations, and opinions without substantial justification under the guise of a "supplement" contravenes Rules 16, 26, and 37, as well as the substantial case law construing the Rules in this Circuit and throughout the country. The fact that Plaintiff cites not a single case supporting her position with respect to Rule 26(e)(2) supplements says it all: CRA's New Report that purports to be a replacement is unprecedented and highly improper, and the Court should exclude it from evidence.

### B. Rule 37 sanctions must be imposed because Plaintiff effectively concedes she cannot show that the New Report's timing was substantially justified or harmless.

Plaintiff's sole argument against imposition of Rule 37 sanctions is that the Court's April text order gave her experts a do-over. As discussed, however, that premise is fatally flawed. Thus, Plaintiff's failure to even attempt to show that her May 2024 service of CRA's New Report due in October 2022 was either "substantially justified or harmless" requires exclusion under Rule 37(c)(1). *See Jakobovits*, 645 F. Supp. at 106 (Ross, J.) (excluding expert opinions because they were not timely disclosed).

1. *The three "developments" that Plaintiff claims permit her to serve a replacement report nineteen months too late are not "substantial justification."*

As XOOM predicted, Plaintiff cites three "developments" she claims entitled her to serve a replacement expert report nineteen months too late. But that reliance is found only in her background section, not in her argument or in any sort of response to XOOM's arguments. She has thus effectively conceded that no substantial justification exists. So, for the same reasons XOOM explained, there can be no doubt that those circumstances are not "substantial justification" (or any justification at all) for her untimely disclosure of CRA's New Report.

*First*, Plaintiff's reliance on XOOM's agreed March production of recent rate-setting workbooks and charge data is a red herring. XOOM expressly told Plaintiff and the Court it would consent to her experts' updating Model Two to include that data. Doc. 187, Joint Ltr. on Am. Rep. 4 n. 4. And more fundamentally, as discussed in Part II(B), *supra*, Plaintiff never actually supplemented Model Two with the updated data. The idea that the March production justified her brand-new models and opinions at the end of May thus is wrong twice over.

*Second*, Plaintiff's citation of the Court's supposed "clarif[ication of] the meaning of the pricing term" in its summary judgment order is another false flag. The Court's "pricing term" construction was Plaintiff's all along. She asked the Court to rule that any margin XOOM could charge be ***"proportional"*** and ***"consistent,"*** and she represented that Model Two did just that:

> As a second option, the jury could conclude that . . . a reasonable consumer would understand "based on" to mean ***directly proportional*** to XOOM's supply costs such that XOOM could charge a reasonable, ***and consistent***, margin. ***Plaintiffs' second model reflects this reasonable interpretation.***

Doc. 147, Pl. SJ. Resp. 9. Plaintiff continued to recognize as much in the parties' Rule 23(f) briefing, and in her filings in this Court as late as February 2024. *See* Doc. 229-1, Def. Mem. 12 and n.10 (collecting citations and quotations). Plaintiff's and CRA's feigned surprise just a few weeks later, in March 2024, should therefore be rejected out of hand. It can (indeed, must) be

rejected based on judicial estoppel as well. Although Plaintiff says her position has not changed, the record plainly shows otherwise. And finally, Plaintiff does not even address XOOM's point that, even if the Summary Judgment Order could justify supplementation (it cannot), Rule 26(e)'s requirement that it be "timely" was not met because she waited seven months after the order to raise the prospect of the New Report and then withheld it until the last minutes of May 10.[18]

*Third*, Plaintiff has not shown, and cannot show, that the Second Circuit's opinion in a different case (*Martinez*) changed anything at all. Plaintiff does not even counter the obvious point that *Martinez* could not have pronounced anything new about this case because it merely quotes the Circuit's opinion issued in 2019.

In short, XOOM showed Plaintiff's belated disclosure of CRA's New Report with fundamentally different opinions and methodologies so far out of time was unjustified, *See* Def. Mem. 10–16,[19] and Plaintiff does not seriously try to meet her burden to show otherwise.

### 2. *Plaintiff has not shown that the belated expert disclosures are harmless.*

Plaintiff does not try to show that her belated disclosures are harmless either. Indeed, she cannot because where, as here, "the disclosing party [seeks] to offer a new theory out of time when the responding party has demonstrated that the disclosing party's initial theory is incorrect," there

---

[18] Plaintiff knew her timing would deprive XOOM of the opportunity to tailor its share of Joint Pretrial Order material to her New Report—indeed, Plaintiff filed the Joint Pretrial Order on the parties' behalf before she served her New Report.

[19] *See also 3M Innovative Properties Co. v. Avery-Dennison Corp.*, No. 01-1781 (JRT/FLN), 2005 WL 6019652, at *1 (D. Minn. Oct. 21, 2005) (affirming order striking portions of "a new supplemental expert report" that "included [] previously-undisclosed" materials where Court did not "adopt[] a construction that was not anticipated" and "there [wa]s no reason why [the proponent] could not have included this material in its previous . . . report"); *Chart v. Town of Parma*, No. 10-CV-6179P, 2014 WL 4923166, at *26 (W.D.N.Y. Sept. 30, 2014) ("[C]ourts should not permit untimely disclosure of new opinions to fill gaps in expert proof, particularly where those gaps are revealed through the opposing party's [dispositive] motion. I easily conclude that the failure to produce the untimely disclosed opinions during the discovery period and prior to the filing of dispositive motions was not substantially justified." (citations omitted)).

*cannot be* substantial justification. *Hines v. BMG Rts. Mgmt. (US)*, -- F. Supp. 3d --, 2023 WL 6214264, at *3 (S.D.N.Y. 2023).

XOOM has already been severely prejudiced in the four months since Plaintiff revealed her plans to serve the New Report. *See Ritchie Risk-Linked Strategies Trading (Ireland) v. Coventry First*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) ("Harmlessness means an absence of prejudice."). As described in its opening brief : (i) XOOM built its defense around a damage model that Plaintiff has now abandoned, (ii) XOOM had to file two different motions to exclude Plaintiff's expert evidence, (iii) XOOM had to file motions *in limine* without knowing what Plaintiff's new models would look like, (iv) XOOM was required to submit trial exhibits, witness lists, proposed jury instructions, and other Pretrial Order components without having any idea that Plaintiff would thereafter serve entirely ***new*** expert opinions and methodologies thereafter—not to mention that XOOM had no idea what those new opinions and methodologies would be, and (v) XOOM has not yet even had the benefit of discovery with respect to the New Report.

The Court's Decertification Order highlighted additional prejudice as well. Decertification and XOOM's (single) *Daubert* motion were not briefed in a logical order (rendering decertification "premature") entirely as a result of **Plaintiff's** insistence that decertification, *Daubert* motions, and pretrial disclosures occur simultaneously, and **Plaintiff's** choice to announce her intention to "supplement" her expert report three weeks after XOOM filed its decertification motion, and just three days before the parties' *Daubert* motions were due. If not for Plaintiff's procedural hijinks, XOOM's decertification and *Daubert* motions would have been briefed contemporaneously, and the Court could have considered both together on their merits. Instead, Plaintiff's maneuvering reordered deadlines to the point that it appeared to the Court that XOOM's decertification motion put the cart before the horse.

But that is not all. If the New Report is not excluded at this stage, the harm to XOOM will continue to be compounded. Among other prejudice, XOOM will be forced to re-depose CRA, prepare new expert rebuttal opinions, and engage in new dispositive briefing based on the experts' live opinions. Plaintiff has not denied, and cannot deny, that, had she timely disclosed the New Report and Methods A, B, and C, XOOM would have served a single expert rebuttal report, taken one round of expert depositions, and addressed the models' defects in a single round of briefing. *See, e.g., Coene*, 303 F.R.D. at 44 (late disclosure not harmless where non-disclosing party's expert disclosure had already been made and both parties' experts had been deposed); *Morritt v. Stryker Corp.*, No. 07-CV-2319 RRM RER, 2011 WL 3876960, at *7 (E.D.N.Y. Sept. 1, 2011) ("[T]he prejudice to defendants of admitting [the belated] testimony would be 'severe, as discovery would have to be reopened' to permit additional expert reports and depositions." (citation omitted)).

As XOOM explained in its opening motion, this degree of prejudice means CRA's New Report is not harmless as a matter of law. *See* Def. Mem. 16–18.

3.   *Under the circumstances, exclusion is the only appropriate sanction.*

XOOM established that Plaintiff's failure to justify her nineteen-month delay in producing the New Report and the tremendous prejudice to XOOM require exclusion under Rule 37. *See* Def. Mem. 10–18.[20] Plaintiff's principal response is to rely on her misunderstanding that the Court

---

[20] *See also Hoffman v. Constr. Protective Servs.*, 541 F.3d 1175, 1179–80 (9th Cir. 2008), *as amended* (Sept. 16, 2008) (affirming preclusion of "undisclosed evidence of damages" where "Plaintiffs' failure to disclose was not substantially justified" and not harmless because it would require reopening discovery "rather than simply set a trial date"); *Hines*, 2023 WL 6214264 at *3 ("The purpose of [Rule 37(c)(1)] is to 'prevent the practice of 'sandbagging' an opposing party with new evidence.'" (quoting *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)); *Coco Rico, LLC v. Universal Ins. Co.*, No. CV 21-1390 (MEL), 2023 WL 3735108, at *2 (D.P.R. May 30, 2023) ("[A]n amended report should be essentially supplemental and a party may not rely on Rule 26 as a way to remedy a deficient expert report or as a means of getting in, in effect, a brand new report." (cleaned up)).

permitted her to serve a wholesale replacement report. As discussed in Part III(A)(i), *supra*, that is not the case—the Court's text order, like Rule 26(e)(2), references Plaintiff's **obligation** to disclose any routine supplement or amendments to the information contained in a timely expert disclosure.

Plaintiff also relies on *Anthem, Inc. v. Express Scripts, Inc.*, 660 F. Supp. 3d 169, 184–86 (S.D.N.Y. 2023). As XOOM explained, that case is easily distinguished. In *Anthem*, "the Court issued [an] Opinion[ that] foreclosed [plaintiff]'s prior damages theories." *Id.* Here, in contrast, the Court issued the Summary Judgment Order that explicitly adopted Plaintiff's proposed construction. *See* Part III.A, *supra.* And in *Anthem*, the "request [to amend the expert disclosure] was made approximately **one month** after" the Court's opinion issued. *Anthem*, 660 F. Supp. 3d at 184–86.[21] Here, on the other hand, Plaintiff insisted in multiple filings that Model Two was entirely consistent with the Order for more than seven months after it issued. Thus, excluding CRA's new methodologies and opinions that could have been filed on time is not a drastic remedy; it is the only appropriate sanction. *See, e.g., Morritt*, 2011 WL 3876960, at *5 ("[C]ourts will not admit supplemental expert evidence following the close of discovery when it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report, as doing so would eviscerate the purpose of the expert disclosure rules." (quoting *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F.Supp.2d 269, 279 (S.D.N.Y.2011)). In fact, courts routinely exclude opinions far less untimely than the New Report. *See, e.g., Jakobovits*, 645 F. Supp. 3d at 106 (excluding expert opinions served just **thirty days** after disclosure deadline based on prejudice

---

[21] The remaining cases Plaintiff cited in requesting leave to amend, and which she incorporates by reference in her response, also involved similarly short delays. *See Torres v. Dematteo Salvage Co. Inc*., No. 14 Civ. 774 (ADS) (AKT), 2016 WL 845326 (E.D.N.Y. Mar. 2, 2016) (granting motion to allow new expert **one month** after deadline); *Valassis Commc'ns, Inc. v. News Corp.*, No. 17 Civ. 7378 (PKC), 2020 WL 1982963 (S.D.N.Y. Apr. 24, 2020) (granting motion filed **mere weeks** later); *Pagliaro v. Stevens Transp., Inc.*, No. 10 Civ. 268 (RLE), 2011 WL 2671567 (S.D.N.Y. July 6, 2011) (request made **two months** after discovery closed).

to opposing party).[22] Plaintiff's inability to cite a single case that allowed expert opinions disclosed more than a year—much less more than nineteen months—after the discovery deadline shows her request is so improper as to be unprecedented.

Nor has Plaintiff ever cited a case in which a lead plaintiff was permitted to so substantially alter the opinions and models on which she successfully sought and maintained class certification and defeated summary judgment. While the Court may be hesitant to impose on the class the consequences of Plaintiff's counsel's failure to "comply with the usual constraints placed by the district court on the parties to ensure the efficient management of litigation . . ., the fact that the client is affected by the delicts of counsel is not a justification for excusing counsel's conduct or for mitigating the operation of the rule." *Salgado*, 150 F.3d at 743 ("Counsel failed to submit the expert witness reports in a timely fashion. . . . The district court [] acted well within its discretion when it imposed the sanction of excluding the testimony of the expert witnesses."). The fact that the evidence Plaintiff disclosed nineteen months too late is critical to her claim (and that of the class) is not a reason to deny XOOM's motion; it is reason to grant it. *See, e.g., Kelly v. Beliv LLC*, No. 21-CV-8134 (LJL), 2024 WL 1076217, at *8 (S.D.N.Y. Mar. 12, 2024) ("A party's late filing of an expert report that is critical to a party's case 'only serves to underscore the inexcusable quality of its delayed submission.' . . . Plaintiff's failure to develop evidence to substantiate his claims, and then properly disclose that evidence in advance of the expert disclosure deadline, is inexcusable."); *Morritt*, 2011 WL 3876960, at *7 ("[T]his Court agrees with its sister court that

---

[22] *See also Hines*, 2023 WL 6214264 at *3 (excluding untimely expert materials offered in opposition to summary judgment **four months** after the deadline); *Lewis*, 786 F. Supp. 2d at 705 (granting motion to preclude plaintiff's use of new expert opinions offered **eight months** after service of timely supplemental report); *Mannoia v. Farrow*, 476 F.3d 453, 456–57 (7th Cir. 2007) (affirming district court's exclusion of expert testimony disclosed only **one month** following discovery deadline); *Sharpe v. U.S.*, 230 F.R.D. 452, 462–63 (E.D. Va. 2005) (denying motion to use out-of-time expert disclosure made **five weeks** after initial report).

the great importance of this testimony 'only serves to underscore the inexcusable quality of its delayed submission.'" (quoting *Point Prods. A.G. v. Sony Music Entm't*, 93–CV–4001 (NRB), 2004 U.S. Dist. LEXIS 2676, at **37–38, 2004 WL 345551 (S.D.N.Y. Feb. 20, 2004)).

The extraordinary delay involved here—and the corresponding prejudice to XOOM— leaves exclusion of CRA's New Report as the only appropriate sanction under the circumstances.

> ### 4. *At a minimum, XOOM must be allowed to conduct discovery on CRA's New Report and prepare a rebuttal report at Plaintiff's expense.*

If the Court does not strike the New Report (and it should), at a minimum, XOOM must be allowed to conduct discovery on it and present rebuttal expert opinions at Plaintiff's expense.

Plaintiff, however, makes the outlandish argument that XOOM somehow waived any right to discovery by moving to strike the report as untimely. Not surprisingly, she cites no case where out-of-time expert disclosures were allowed without additional discovery. And the two cases she does cite not only involved the question of waiver in unrelated circumstances—but they also found no waiver. *See Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 510–11 (2d Cir. 2002); *United States v. Dantzler*, 771 F.3d 137, 146 (2d Cir. 2014).

If the New Report's opinions and models are to be presented at trial despite being so egregiously untimely, XOOM must be allowed to take discovery on them, submit an expert rebuttal, and make a fully developed *Daubert* motion. Courts uniformly recognize the necessity of such measures in the face of a belated new expert report. *See, e.g., Kelly*, 2024 WL 1076217, at *8 ("If the Court did not strike the [untimely expert opinions], . . . Defendant would suffer significant prejudice . . . to designate a rebuttal witness, develop rebuttal evidence, defend and take depositions, and then engage in additional motion practice, all at considerable expense." (cleaned up)); *Hoffman*, 541 F.3d at 1180 (recognizing harm from untimely disclosure because "[l]ater disclosure of damages would have most likely required the court to create a new briefing schedule

and perhaps re-open discovery, rather than simply set a trial date."); *United States v. Bacaner*, No. 8:21-CV-391-VMC-SPF, 2022 WL 824245, at *4 (M.D. Fla. Mar. 18, 2022) ("Allowing an amended or supplemental report at this juncture would require the [opposing party] to review the new report, depose Dr. Buffington, and potentially locate its own rebuttal expert witness, all of which would stall and delay this case."); *Amari v. C.R. England, Inc.*, No. 1:07-CV-1616-WTL-TAB, 2010 WL 2943686, at *3 (S.D. Ind. July 21, 2010) ("Permitting [new expert] report would substantially increase the pretrial burden facing Defendants, who would need to depose [the expert] and revamp their trial strategy. . . .").

Further, under Rule 37, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure" to "obey an order to provide or permit discovery" in this situation. Fed. R. Civ. P. 37(b)(2)(A), (C).

## IV.      Alternatively, CRA's New Report should be excluded under Rule 702.

In the 20 days between Plaintiff's service of the New Report and the deadline for XOOM's motion to strike it, XOOM identified numerous flaws in the new models and opinions.

As a threshold problem, that abbreviated review showed CRA did not adequately explain its calculations, preventing further evaluation and critique. *See* Ex. B, Coleman Decl. ¶ 5. Plaintiff's response is that, where CRA did not show its work, that was because it used XOOM's data. But that does not explain the missing calculations Mr. Coleman identified.

The deficiencies in the New Report are only underscored by CRA's improper rebuttal declaration, *see* Part V, *infra*, which includes 35 pages of extraneous evidence that attempt to plug the New Report's analytical gaps. While the rebuttal uses a few examples where CRA says the data was simply lifted from XOOM's documents, there are many more that are not so easily explained. Take, for example, this discrepancy in the June 2022 costs for ConEdison Zone J, in which CRA's

New Report says COGS were only 75% of what XOOM's records say they were:

**CRA's** Exhibit:

$0.07472

| 6 | | | | Variable Plan Costs | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 | year | month | date | NYSEG | RGE | ConED_zon | ConED_zon | NGrid_NN | CenHud | OR |
| 119 | 2022 | 6 | Jun-22 | $0.07535 | $0.07825 | $0.07421 | $0.07472 | $0.07835 | $0.07515 | $0.07306 |

**XOOM's** File:

$0.09916

| | Zone_E | | Zone_G | | Zone_J | | | | Contract Usage | | COGS $/MWh | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Market | Product Code | Product Name | Product Ty | Class | Effective Start Da | # of Mon | Previous | Curre | Previous | Curre | Adder | GRT |
| ConEd NYC (J) | CEJERVEF01 | 30% Renewable | Variable | Residential | Jun-22 | 1 | 377 | 492 | 98.59 | 99.16 | 0.7000 | 0.0042 |
| ConEd NYC (J) | CEJERVE036 | 3 Year Simpleflex | Variable | Residential | Jun-22 | 1 | 377 | 492 | 98.59 | 99.16 | | 0.0042 |
| ConEd NYC (J) | CEJERVE001 | Simpleflex | Variable | Residential | Jun-22 | 1 | 377 | 492 | 98.59 | 99.16 | | 0.0042 |
| ConEd NYC (J) | CEJERVEJ01 | SimpleClean 50% | Variable | Residential | Jun-22 | 1 | 377 | 492 | 98.59 | 99.16 | 0.7000 | 0.0042 |
| ConEd NYC (J) | CEJERVEJNY | SimpleClean (NY Compliant) | Variable | Residential | Jun-22 | 1 | 377 | 492 | 98.59 | 99.16 | 0.7000 | 0.0042 |
| ConEd NYC (J) | CEJERIFJNY | SimpleClean Intro (NY Compliant) | Variable | Residential | Jun-22 | 3 | 1,720 | 1,692 | 98.59 | 99.16 | 0.7000 | 0.0039 |

*See* Ex. C (containing twelve examples of such discrepancies identified even without an exhaustive analysis). CRA's figures thus clearly were not simply taken from XOOM's data, and, even after 35 pages of rebuttal, they still have not shown how these figures were derived. These discrepancies provide an independent basis to exclude the New Report and its models as unreliable.[23]

Moreover, CRA's new models are inadmissible for the simple reason that they cannot show an overcharge consistent with Plaintiff's theory.

A. Plaintiff has no evidence of an appropriate reasonable margin.

1. *CRA's models are inadmissible because a "reasonable" margin is not at issue.*

First, as discussed in XOOM's MIL Nos. 1, 2, and 3, Plaintiff cannot enforce a "reasonable" margin requirement because she irrevocably abandoned her implied covenant claim, and no other doctrine could supply an unexpressed reasonable-margin requirement in the unambiguous

---

[23] The twelve examples attached to this brief are just samples meant to highlight for the Court the types of discrepancies XOOM has been able to identify in this short time without the benefit of discovery. These unexplained discrepancies further underscore that, if the Court departs from every applicable precedent to permit Plaintiff to submit an untimely new replacement report and three totally new models at this late stage, then XOOM should be entitled to take the discovery it was denied, to serve its own amended expert report in response, and to file a *Daubert* motion with respect to the New Report after that discovery process is complete.

contract. For that reason alone, CRA's damage models, which purport to allow the jury to supply a "reasonable" margin to calculate damages, is irrelevant and therefore inadmissible.

2. *Even if a "reasonable" margin is a triable issue, CRA's New Report does not offer admissible evidence of commercially reasonable margin.*

But to the extent that a "reasonable" margin is a triable issue, any such requirement must be one of **commercial** reasonableness. *See* Docs. 227 and 254, XOOM MIL No. 3 and Reply. Because CRA's New Report does not supply any margin inputs that bear on that standard, the opinions and models therein are irrelevant and should be excluded under binding precedent.

As XOOM's opening motions explained, CRA's models must be excluded for the same reasons the district court excluded the expert in *Martinez* (and the Second Circuit affirmed): they offer overcharge models with margin assumptions that are based on "unreliable methodology and insufficient data," including "[the expert's] subjective views on the reasonableness of margins." *Martinez v. Agway Energy Servs.*, 88 F.4th 401, 414 (2d Cir. 2023).

Here, just as in *Martinez*, there is no dispute that an objective standard applies to the ESCOs' variable-rate margins under their respective contracts. In *Martinez*, objective reasonableness was at issue by virtue of the plaintiff's claim that the ESCO did not charge a "competitive" and "market-based" rate as promised in the contract. *Id.* at 409; *see also id.* at 414 (criticizing the expert's subjective opinions). And here, the parties agree that any triable issue of reasonableness is "governed by objective standards." Doc. 237, Pl. MIL Resp. 59. What "objective" reasonableness means practically is that the reasonableness standard is one of **commercial** reasonableness. *See In re Nieves*, 648 F.3d 232, 239–40 (4th Cir. 2011) ("Good faith" [] contains both subjective ('honesty in fact') and objective ('observance of **reasonable commercial standards**') components. . . . Under the objective prong, a party acts without good

faith by failing to abide by **routine business practices**.");[24] *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 470–72 (S.D.N.Y. 2018) (distinguishing subjective from objective good faith in context of "commercially reasonable efforts" clauses), *aff'd*, 769 F. App'x 40 (2d Cir. 2019).

In North Carolina, as elsewhere, an inquiry into commercial reasonableness requires comparisons with similarly situated peers. *See Lexington Furniture Indus. v. Bob Timberlake Collection, Inc.*, No. 08 CVS 02407, 2009 WL 2901618, at *7 (N.C. Super. Feb. 9, 2009) ("To raise an issue of commercial reasonableness, a party must first introduce evidence as to the applicable industry standard."); *see also Ashokan Water Servs. v. New Start*, 11 Misc. 3d 686, 691 (Civ. Ct. Kings Cty. 2006 ("'[U]nless the parties have contractually bound themselves to a higher standard of performance, reasonable care and competence owed generally by practitioners **in the particular trade or profession** defines the limits of an injured party's justifiable demands.'" (quoting *Milau Assocs. v. North Ave. Dev. Corp.,* 42 N.Y.2d 482, 486 (1977)); *Richards*, 915 F.3d at 99 ("To determine if a price is commercially reasonable it must be compared to the range of other prices in the market." (cleaned up)); *Sevugan v. Direct Energy Servs.*, 931 F.3d 610, 616 (7th Cir. 2019) ("[The utility's] price is not a market price at all; it is a regulated price. Neither [energy wholesale supplier] nor [utility] participate[s] in the general market for electricity, and thus they are not proper comparators with [ESCO] to gauge market price.").

But CRA admitted that they declined—and still decline in the New Report—to compare XOOM's rates or margins to those of other ESCOs:

---

[24] Although the Fourth Circuit was not analyzing North Carolina law in that case, it was relying on a U.C.C. provision virtually identical to North Carolina's. *Compare* U.C.C. § 1-201(b)(20), (defining "good faith" as "honesty in belief," "faithfulness to one's duty or obligation," and "observance of reasonable commercial standards of fair dealing in a given trade or business")), *with* N.C. Gen. Stat. § 25-1-201 (defining "[g]ood faith" as "honesty in fact and the observance of **reasonable commercial** standards of fair dealing").

```
Q.   Did you do any analysis of what other ESCOs charged
     in New York during that same time period?

A.   No.

Q.   Okay. So you don't know how XOOM's rates compared
     to other ESCOs rates?

A.   For purposes of this we never made a comparison.

Q.   And you don't know if XOOM's rates were outside the
     range of what ESCOs were charging during that time
     period?

A.   No, we didn't look at that. It didn't seem very
     relevant.
```

Ex. 10, Adamson Dep. 64:21–65:7. CRA's failure to consider XOOM's margins in their commercial context renders their overcharge opinions irrelevant, "inadmissible under [Rule 702]," and "legally insufficient . . . to raise a triable issue of fact" as to Plaintiff's allegations of overcharges and unreasonable margins. *Martinez*, 88 F.4th at 414.

The margins proposed in CRA's new methods (like Model Two) fail for additional reasons too. First, they give no consideration to XOOM's fixed costs, overhead, or profit, despite Plaintiff's repeated concessions that XOOM should be able to account for those factors. Second, the margins are all based on future data that was unknowable until years after the start of the class period—underscoring that CRA's proposed margins are all *un*reasonable. Specifically, neither the average of differences between XOOM's costs and some random cross-section of utility rates from between 2013 and 2023 (Method A), nor the PSC's 2019 rate limits effective April 2021 (Method B), nor the average of XOOM's projected margins for its fixed-rate products over an arbitrary 131-month period (Method C) could have been foreseen in prior years—including in 2013 when XOOM set Plaintiff's rates. How, then, could XOOM have violated a commercial reasonableness (or any other) standard by not predicting those future margins and setting its variable rates according to

them?

### a. Method C: An arbitrary average of XOOM's fixed-rate margin estimates is not evidence of a reasonable variable-rate margin.

Plaintiff relies heavily on CRA's testimony that it was unreasonable to charge more for variable-rate margins than for fixed-rate margins, but that assertion is both irrelevant to Method C and unsupported. Indeed, Mr. Adamson's testimony was in the context of defending Model Two which, again, used *fluctuating* contemporaneous fixed-rate margins—not an average over an 11-year period like Method C does. Moreover, it is *undermined* by CRA's testimony that in their view, "the rates have to be set *for the contract*." Ex. 9, Adamson Dep. 99:6–18. XOOM's fixed-rate and variable-rate contracts were different, so by CRA's own logic, fixed-rate margins should not be relevant to variable-rate margins. Moreover, here, as the district court held in *Richards,* the variable-rate contract imposes no requirement that XOOM "have the same profit margin for each product the company sold," and therefore, fixed rates and fixed-rate margins decidedly are not relevant to any triable issue. *Richards v. Direct Energy Servs.*, 246 F. Supp. 3d 538, 552 (D. Conn. 2017) (district court analyzing Mr. Adamson's use of fixed-rate margins as a benchmark for a commercially reasonable variable-rate margin), *aff'd*, 915 F.3d 88 (2d Cir. 2019).

Neither CRA nor Plaintiff offers any justification for why XOOM's fluctuating estimates of its fixed-rate margins (ranging from -27% up to 59%) are relevant to a "reasonable" and "proportionate" margin. Nor can they: fixed rates are not appropriate comparators.

The uniform (and unrebutted) testimony shows they were subject to different costs and risks and had different value, both to XOOM and to customers. Rates for fixed products were for known customers for a specific term (usually 12 months or higher) whereas variable-rate customers could cancel at any time under their month-to-month agreements. Doc. 195, Loehde Decl. ¶¶ 30–31; Doc. 229-11, Coleman Decl. ¶ 10(c) ("[V]ariable rate and fixed rate products are

different products with different risk characteristics. It would be unreasonable for XOOM to use the margin it charges on fixed rate products to set variable rates."). Thus, with "fixed-rate products you know your supply cost with greater certainty because you're purchasing it because the customer is under contract." Ex. 10, Park Dep. 80:5–81:15. If the customer has a "12-month contract," "you buy 12 months of energy." *Id.* Whereas with variable-rate products "the rate is not set in advance" and is based on ***estimated*** "forward-looking information from one month or two months forward[.]" Doc. 226-6, Loehde Dep. 53:9–16. Under variable-rate contracts, XOOM bore the risks inherent in a month-to-month contract: variable-rate customers were free to leave XOOM at any time without penalty. That uncertainty does not exist under fixed-rate contracts that are for a set term. There is no evidence to suggest the margin that might earn XOOM a profit over the course of a twelve-month fixed-rate term might also turn a profit on a variable-rate customer who left after three months. And for the customer, the flexibility of being able to switch back to the utility or another ESCO, as Plaintiff herself did, itself carries value. These are two reasons why private market participants in various industries, such as cellular phone and rental car companies, charge less when a customer commits to a longer term.

And certainly, CRA's conclusory statements that XOOM should not have charged a higher margin for variable-rate products than for fixed-rate products does not make it more or less likely that a given margin was ***commercially*** reasonable. CRA presents no analysis of whether other ESCOs charge a higher margin for fixed-rate products than for variable-rate products—because CRA's Seabron Adamson knows that such analysis would show the opposite. *See, e.g., Richards*, 915 F.3d 109 n. 2 (noting that the ESCO's target fixed-rate margin was lower than its target variable-rate margin); *Congregation Yetev Lev D'Satmar, Inc. v. Engie Power & Gas, LLC*, 683 F. Supp. 3d 238, 251 (E.D.N.Y. 2023) (ESCO alleged to make "substantially higher profits on

its variable rate customers than its fixed rate customers"). Method C's fixed-rate average margin should be excluded as irrelevant and unreliable.

### b. Methods A and B: The utility-based margin caps are also irrelevant to a commercial reasonableness standard.

Methods A and B, which are both tethered to *utility* rates, are decidedly irrelevant to a commercial reasonableness standard. *See* Def. MIL Nos. 8 and 12 (explaining why utility-rate data and the New York Public Service Commission's Reset Order should be excluded from evidence); *see also Martinez*, 88 F.4th at 414 (finding that expert's "proffered comparisons between [the ESCO's] prices and those of the default utilities [were] legally insufficient" to show what the rates should have been). Plaintiff concedes, as she must, that the Reset Order on which Methods A and B are based were issued years after the class period commenced, and that the Second Circuit has held that the Reset Order's 2019 pronouncements concerning rates that became effective in April 2021 are irrelevant to contracts formed before that date. *See Martinez*, 88 F.4th a 417 n.12. Plaintiff's only response is to summarily contend that, despite that timing problem, the PSC's "findings are relevant to the assessment of the objective reasonableness of XOOM's margins." Pl. Resp. 51. That argument contravenes case law establishing both that an objective reasonableness standard is one of commercial reasonableness, and that utility rates cannot serve as evidence under a commercial reasonableness standard. *See* Part IV(A)(2), *supra*.

B. <u>CRA's new algorithms, like its original models, do not measure the overcharge.</u>

Plaintiff does not deny that, any time a Class Member was undercharged in a given month, CRA's new methods return a zero value instead of a negative value. This means that, with Method B's 5% margin, the aggregate calculation is off by $75,000; with Method C's 21.2% margin, CRA's new algorithm overstates aggregate damages by nearly $900,000; and with XOOM's average variable-rate margin of 68%, the algorithm overstates damages by ***nearly $40 million***. See Ex. B,

Coleman Decl. ¶ 11. Plaintiff also does not deny that a 21.2% margin under Model Two would show she was undercharged, whereas the same margin under Method C would show she was overcharged. Plaintiff's only response is to argue that XOOM is not entitled to a set-off, citing federal and New York cases. Plaintiff misses the point. The doctrine of set-off need not play any role in the analysis. To prove breach of contract on her overcharge claim, Plaintiff must show the *amount* she was *over*charged. If XOOM overcharged her in certain months but undercharged her overall, she would have no overcharge claim at all. *See Troitino,* 35 S.E.2d at 282 (overcharge damages measured as "the pecuniary difference between" the charges incurred and the charges that would have been incurred if the rates included a proportionate margin). But Plaintiff's models erase every undercharge and take account of only the individualized overcharges. They therefore fail to calculate the overall overcharge for each class member.

Because Models A, B, and C are not capable of reliably showing classwide damages, they should be excluded. *See* Fed. R. Evid. 702(c)–(d).

C.   Methods A, B, and C do not use XOOM's reported supply costs.

Plaintiff also does not deny that CRA now uses what it calls "Variable Plan Costs" in lieu of the Total Cost figures that Model Two used. This new "Costs" input is even worse than Model Two's input[25] because it combines the Total [estimated] Costs for multiple energy products without specifying the formula CRA used to come up with that number. *See* Ex. B, Coleman Decl. ¶ 7.

Plaintiff admits that CRA used only "the rate and cost data of XOOM's two most popular plans," which, she acknowledges, omits clean electricity rates and costs—even though the certified class encompasses customers on "clean" electricity rates. The apples-to-oranges comparison of

---

[25] As discussed in Part I, *supra*, Total Cost is not an appropriate input for any model because, as CRA and Plaintiff now admit, it reflects only estimated supply costs, not actual supply costs. It therefore does *not* equal the "actual and estimated supply costs" referenced in the contract.

standard to clean margins underscores the unreliability of her experts' methods (and, at minimum, warrants carving clean electricity customers out of the class definition).

Because Plaintiff cannot show that CRA's New Report is "based on sufficient facts or data," "the product of reliable principles and methods," or "a reliable application of the principles and methods to the facts of the case," the new models should be excluded. Fed. R. Evid. 702(a)–(d).

D.   Methods A, B, and C are all based on insufficient facts and data.

Further, Plaintiff's response confirms what XOOM's limited review of CRA's new Methods A, B, and C indicated: each is based on insufficient facts and data.

1.   *Methods A and B should be excluded as unreliable.*

Method A assumes that XOOM's rates should have included "a 7.33% margin based on the average difference between XOOM's documented supply costs and the utility rates." Ex. A-3, CRA New Rep. ¶ 91. But Plaintiff admits that Method A is founded on an incomplete data set, omitting data about utility rates in vast swathes of the class period. *See* Pl. Resp. 49–50; *see also* Ex. B, Coleman Decl. ¶ 10(a) ("CRA omits utility default service rate data for *24%* of residential electric rates, *26%* of commercial electric rates, *35%* of residential gas rates, and *36%* of commercial gas rates."). She attempts to justify her incomplete model by claiming that any holes in the data are attributable to holes in XOOM's production, but the relevant utility rates were published and publicly available. Plaintiff's and CRA's failure to analyze that data to support her own theory therefore cannot be attributed to XOOM.

Plaintiff also tries to shirk her burden by accusing XOOM of not "suggest[ing] how the 7.33% figure would change if XOOM's data was complete." Pl. Resp., Ex. A ¶ 51. But Plaintiff, not XOOM, indisputably bears the burden under Rule 702 to establish the reliability and sufficiency of CRA's models and opinions. She also fails to explain why XOOM and its expert

should have undertaken such a task in the 20 days they had between Plaintiff's belated production of the New Report and XOOM's deadline to file this motion without the benefit of CRA's underlying calculations or any discovery on the New Report at all.

Method B is premised on the PSC's purported "select[ion]" of 5% as a margin that would be "reasonable for fixed rate products." Ex. A-3, CRA New Rep. ¶ 74. However, as discussed, Plaintiff does not and cannot deny that the Reset Order, which became effective *prospectively* in April 2021, more than eight years into the class period, is not relevant to either rates or margins in 2013, when Plaintiff contracted with XOOM. *See* Part IV(A)(2)(b), *supra*.[26]

Moreover, the Reset Order did not address ESCO margins at all—it concerned the fixed *rates* ESCOs charged in relation to utility rates. For these reasons, and the reasons discussed in XOOM's MIL No. 12 and associated Reply, Docs. 227 and 254, Method B should be excluded as irrelevant and unreliable.

Finally, CRA's own candid admissions that utility rates are not an appropriate basis for comparison are damning proof that Models A and B are unreliable. *See* Ex. A-3, Eryilmaz Dep. 74:8–75:12 (testifying utility rates are "irrelevant for this contract"); Ex. A-1, Adamson Dep. 68:19–69:9 ("And you're not offering a damage model that compares XOOM's variable rate charged to what customers would have been charged by the utility during the same time period? . . . A. No.").

---

[26] Plaintiff vaguely suggests that because the Court stated in the Decertification Order that "*Martinez* does not speak to whether a jury might refer to the Commission's findings as a lower bound in determining a reasonable and proportionate margin," *Martinez*'s relevance determination no longer carries any force. Respectfully, the *Martinez* ruling on relevance based on *timing*— which this Court did not address in the Decertification Order—is directly on point and controls. In addition to being irrelevant to Plaintiff's claim, it is also irrelevant to the class because every Class Member contracted with XOOM before the Reset Order went into effect.

2.   *Method C should be excluded as unreliable.*

For Method C, CRA used undisclosed calculations to create the "fixed margin" inputs she says come from XOOM's data. CRA's failure to show its work at this late stage of the case warrants exclusion. *See Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743154, at *8 (N.D. Cal. May 2, 2016) (where expert relied "on a constructed data set that she failed to include in her paper or to provide upon request," "depriv[ing]" defendant "of any opportunity to vet the underlying premises of [the] econometric analysis," there was "serious doubt" as to the reliability of the model" that warranted precluding reliance on that model "for any purpose").

\*      \*      \*

Because even an abridged review shows that the New Report would not be admissible even if it had been timely, it should be excluded pursuant to Rule 702.

**V.   CRA's unauthorized 35-page rebuttal declaration should also be stricken.**

Plaintiff, trying to argue that the belated New Report is proper, submits an even more belated report in the form of a new 35-page declaration from CRA. The declaration is improper for at least two reasons, and the Court should strike it out of hand.

*First*, as expert evidence produced twenty months after discovery closed, the declaration, like the New Report itself, is woefully untimely. *See* Part III, *supra*; *see also* Fed. R. Civ. P. 26(e)(2); Fed. R. Civ. P. 37(c)(1); *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 663 (10th Cir. 2018) (affirming exclusion of expert affidavit submitted in response to *Daubert* motion because "[]it did not simply emphasize or highlight previous opinions," which itself would not have been "proper supplementation under Rule 26(e) "but instead attempted to add new opinions" and the party "d[id] not adequately explain why [expert] could not have made these arguments or included these materials in his original report"); *Am. Fam. Mut. Ins. Co. SI v. Electrolux Home Prod.*, No.

20-CV-1455, 2024 WL 1715590, at *7 (E.D. Wis. Apr. 22, 2024) ("disregard[ing]" expert

declaration submitted in opposition to *Daubert* motion insofar as it went "beyond his report,"

noting that "a party does not comply with Rule 26(a)(2)(B) if it is necessary cobble together a

report, deposition testimony, and declarations to try to discern an expert's opinions and the basis

and reasons for them" and "an expert cannot supplement his report through an affidavit submitted

in response to a Daubert motion").[27] And, as with the New Report, the appropriate sanction for its

untimeliness is exclusion. *See* Fed. R. Civ. P. 37.

 *Second,* the declaration is not even a proper rebuttal because it does not respond to original

opinions by XOOM's expert. Rather, it merely attempts to fill in holes and shore up the New

Report, which is not a proper subject for rebuttal. *See, e.g., Hines*, 2024 WL 113498, at *3 ("[T]he

supplemental Bennett materials expand on [subjects that the] original report already referenced . .

. , and 'an expert's rebuttal statement is not an opportunity for a correction or fill[ing] in the gaps

of the party's case-in-chief, particularly where those gaps are revealed through the opposing party's

[subsequent] motion.'") (quoting *Engler v. MTD Prods.*, 304 F.R.D. 349, 356 (N.D.N.Y. 2015));

*see also, e.g.*, *Blake v. Securitas Sec. Servs.*, 292 F.R.D. 15, 18–19 (D.D.C. 2013) ("Because

[Plaintiff's expert's] report cannot be considered a rebuttal report, Plaintiff's belated disclosure is

not permitted under Fed. R. Civ. P. 26(a)(2)(D)(ii). Instead, [the] report must be considered an

---

[27] *See also Morritt*, 2011 WL 3876960, at *5, *8 (excluding untimely expert declaration that proposed "for the first time, two alternative" theories of the case, and granting summary judgment because exclusion meant plaintiffs could not "make out a prima facie case"); *Hines v. BMG Rts. Mgmt. (US)*, No. 20-CV-3535 (JPO), 2024 WL 113498, at *3 (S.D.N.Y. Jan. 10, 2024) ("[T]he relevant court order made clear that Plaintiff's expert disclosures were due September 1, 2022 and that the expert discovery deadline was October 21, 2022—deadlines that passed months before [the] supplemental materials were filed. . . . Once again, [Plaintiff] has missed the relevant deadline."); *State Farm Fire & Cas. Co. v. Omega Flex, Inc.*, No. 3:20-CV-00648 (SVN), 2023 WL 2666676, at *4 (D. Conn. Mar. 28, 2023) (granting motion to preclude consideration of affidavit material that "contain[ed] expert opinions that were not previously disclosed").

untimely and improperly disclosed initial expert report in violation of Rule 26(a)(2), subjecting Plaintiff to sanctions under Rule 37(c)(1)." (quotation marks and citations omitted)).

Thus, in addition to striking CRA's New Report, the Court should strike CRA's rebuttal declaration attached to Plaintiff's combined response.

## CONCLUSION

For the foregoing reasons, the Court should strike CRA's timely reports and testimony in their entirety as irrelevant and unreliable under Rule 702 and *Daubert*, including:

- Any opinions about breach, the requirements of the class members' contracts, the consistency of XOOM's conduct with regard to the contracts, or overcharges, including but not limited to those disclosed in paragraphs 23(c)–(h), 23(j), 38–79 of CRA's Report and paragraphs 2(b)–(f), 4–32 of CRA's Rebuttal Report;

- The damage models described in paragraphs 60–79 of CRA's Report, paragraphs 29–32 of CRA's Rebuttal Report, and the associated calculations or workpapers;

- The other opinions disclosed in paragraphs 28–79 of CRA's Report and paragraphs 2(a) and 4–7 of CRA's Rebuttal Report; and

- Any other opinions, apart from rebuttal opinions disclosed in CRA's Rebuttal Report, not disclosed in CRA's Report.

The Court should also strike the entirety of CRA's New Report, including the models and opinions therein, as untimely or, in the alternative, as irrelevant and unreliable. Further, because Plaintiff does not have sufficient evidence to present a *prima facie* overcharge case, the Court should *sua sponte* decertify the class and entertain dismissal of the case in full.

Dated: July 26, 2024                    MCDOWELL HETHERINGTON LLP

                                        */s/ Michael D. Matthews, Jr*
                                        Michael D. Matthews, Jr.
                                        Diane S. Wizig (admitted *pro hac vice*)
                                        David L. Villarreal (admitted *pro hac vice*)
                                        Netra Sreeprakash
                                        Justin R. Chapa (*pro hac* forthcoming)

MᶜDᴏᴡᴇʟʟ Hᴇᴛʜᴇʀɪɴɢᴛᴏɴ LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
david.villarreal@mhllp.com
netra.sreeprakash@mhllp.com
justin.chapa@mhllp.com

*Attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on the 26th day of July, 2024, via email on all counsel of record.

/s/*Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.