**Wittels McInturff Palikovic**

August 9, 2024

<u>Via ECF</u>
The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *Mirkin v. XOOM Energy, LLC, et al.*, No. 18 Civ. 2949 (ARR) (JAM)

Dear Judge Ross:

On behalf of Plaintiff and the Class, we hereby submit this letter-motion pursuant to Local Civil Rule 7.1(d) and ask that the Court strike or ignore the two newly-raised arguments in XOOM's reply in support of its motions to exclude Plaintiff's expert report. ECF 262, XOOM's Reply. Alternatively, if the Court considers XOOM's new arguments, Plaintiff asks the Court to accept this letter as our response.[1] If the Court believes it would be helpful, Plaintiff welcomes an in-person conference to address the matters discussed below.

## I. Relevant Background and Summary of XOOM's Two New *Daubert* Attacks

XOOM's motions to exclude Plaintiff's expert were filed after its decertification motion. Yet XOOM's decertification motion was based on its preliminary *Daubert* arguments and "[t]he mere possibility that [the Court] might eventually strike plaintiff's expert report in the future." ECF 246, Decert. Denial Order at 9. In denying the motion, the Court reiterated that its August 2023 summary judgment and class certification rulings determined that the jury would resolve any disputes about how XOOM set rates and whether rate fluctuations were caused by permissible supply costs added to XOOM's margins. *Id.* at 10–12. The Court also made clear that the possibility of excluding Plaintiff's expert based on a pre-trial critique of Plaintiff's position on the appropriate margin and what counts as a supply cost under the contract was "slight indeed." *Id.*

Disappointed, XOOM now pivots and its Reply advances two brand new *Daubert* attacks.

***First***, XOOM claims the Decertification Denial Order somehow now requires *sua sponte* decertification and dismissal of this case in full. XOOM's Reply at 1, 3–9, 41. XOOM's claim is based on the false premise that the Decertification Denial Order changed the Court's August 2023 rulings and substantially revised the Court's view of the jury's role. Not so. As the Court has said

---

[1] When a party raises new arguments or evidence on reply, courts strike or ignore the new material. *See Wolters Kluwer Fin. Servs. Inc. v. Scivantage*, No. 07 Civ. 2352 (HB), 2007 WL 1098714, at *1 (S.D.N.Y. Apr. 12, 2007); *see also Rios v. MicMac Recs., Inc.*, No. 22 Civ. 2008 (AT), 2023 WL 2495958, at *2 (S.D.N.Y. Mar. 14, 2023) (ignoring new argument); *Kaye v. N.Y.C. Health & Hosps. Corp.*, No. 18 Civ. 12137 (JPC), 2020 WL 7237901, at *10 n.8 (S.D.N.Y. Dec. 9, 2020) (same). Alternatively, courts consider the non-movant's response. *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010).

over and over again, how XOOM set rates and whether that process breached the contract are questions for the jury. Nothing in the Decertification Denial Order suggests the Court changed its mind, and indeed, that Order repeatedly cites directly to the Court's Summary Judgment Opinion. *See, e.g.*, Decert. Denial Order at 8, 11, 12.

***Second***, XOOM claims there are twelve discrepancies in the 10,000+ data points that Plaintiff's expert transcribed and used to calculate damages. XOOM had these calculations before briefing began and it impermissibly waited to present this argument until its reply. "[I]t is established beyond peradventure that it is improper to sandbag one's opponent by raising new matter in reply." *Wolters Kluwer*, 2007 WL 1098714, at *1 (quotation omitted). Further, XOOM's complaints go to the model's weight, not its admissibility. Finally, the minor issues XOOM flags are either not issues at all or will be corrected once XOOM makes its final data production in advance of trial.[2]

## II. <u>XOOM's Two New *Daubert* Attacks Are Meritless</u>

### A. The Decertification Denial Order Does Not Upend the Court's Prior Rulings

The Decertification Denial Order changed nothing about the August 2023 class certification and summary judgment rulings. Indeed, like those earlier rulings, the Order first recounts that "there is no dispute" that XOOM's rate-setting workbooks contain aggregations of XOOM's "projected" supply costs (the "Total Cost") and that this contemporaneous calculation was used to set monthly rates. *Id.* at 3. The workbooks also contain XOOM's final rate, and the delta between "Total Cost" and the rate show XOOM's margin. *Id.* Those margins "fluctuated significantly." *Id.* at 2.

When the Court determined that XOOM's customer contract does not permit fluctuating margins (ECF 151, MSJ Order at 13), XOOM was caught off guard. Its longstanding position had been—and discovery showed—that XOOM believed "it could charge any markup it wanted under the contract so long as supply costs were the starting point of its rate calculation." *Id.* at 16. The Court's contract construction left XOOM with only a fallback claim that its fluctuating margins were driven by undisclosed and uncalculated supply costs. *Id.* at 4–5, 16–17; *see also* Decert. Denial Order at 3 (same). XOOM's claim is premised on the idea that once those secret additional supply costs are identified, a true, fixed margin emerges.

XOOM's problem is that none of its documents support its fallback position. Indeed, no document discloses or even describes XOOM's "true" (but secret) margin. XOOM instead claims that Plaintiff loses (both on Rule 23 and the merits) because she cannot isolate the phantom supply cost calculations XOOM now claims drive its margins. The workbooks ***do***, however, have detailed supply cost calculations—the Total Cost figure. XOOM thus faces the uphill battle of explaining why it exhaustively documented only an alleged subset of supply cost calculations while leaving no trace of the other alleged set of calculations.

Faced with XOOM's implausible explanation of its fluctuating margins, the Court made clear at class certification that the jury could make any one of three distinct findings: (1) XOOM was not permitted to incorporate supply costs into its margins; or (2) even if it was, it did not in fact do so;

---

[2] XOOM's current data production ends in January 2024.

or (3) even if it did so, the margin adjustments unfolded in a way that violated the contract. ECF 152, Class Order at 13 (citing MSJ Order at 17). Under either scenario, the Court ruled that questions of whether "rate fluctuations were caused by permissible supply costs incorporated into the margin," and "how XOOM in fact set its rates" are jury questions. *Id.* at 13.

The Decertification Denial Order does not change this rubric one bit. It first makes clear that the question of what counts as "supply costs" under the contract is for the jury. Decert. Denial Order at 8. Then, it incorporates the class certification "opinion's reasoning in its entirety" and again rejects XOOM's claim that Plaintiff's model is deficient. *Id.* at 10. Finally, it repeats that the jury will determine the supply cost input "based on testimonial and documentary evidence." *Id.* at 12 (citing MSJ Order at 16–17). The Orders are consistent as to which issues the jury will decide.

XOOM's reply is premised on its view that the Decertification Denial Order upended the Court's prior rulings and now requires that the jury find that the workbooks' Total Cost figure represents a perfect *accounting* of the undocumented supply costs XOOM claims drive its fluctuating margins. There is no dispute that the only supply costs XOOM documented when setting its rates and margins are those set forth in its workbooks—*i.e.*, the starting point for Plaintiff's damages model. XOOM's new claim that the jury must find that its workbooks also reflect *undocumented* calculations is a "tails I win, heads you lose" argument that fails for at least three reasons.

First, XOOM's new argument is a rehash of its claim that Plaintiff's model lacks a supply cost input because it does not tabulate the "actual costs" XOOM supposedly incorporated into the workbooks' margin figures. As the Court has repeatedly held, that is a question for the jury.

Second, like its failed decertification motion, XOOM seeks to exclude Plaintiff's expert based on a future event. This time it's the jury's finding that XOOM calculated rates in a way that no XOOM document supports. XOOM's claim about its margins clearly requires the jury's credibility assessment. XOOM's claim will run headlong into its admission that it used "pricing strategies" to set rates and that rates drove margins—not vice versa. XOOM's dilemma is that its contract barred such a process, not that its workbooks are somehow deficient.

Third, XOOM's new argument is based on fiction. XOOM claims that at summary judgment and class certification Plaintiff tricked the Court into thinking Total Cost reflected a flawless accounting of XOOM's supply costs, including the phantom costs allegedly in XOOM's margins. XOOM claims it has now caught Plaintiff admitting that the jury cannot find Total Cost synonymous with the contract language "actual and estimated supply costs." XOOM could have made that argument before, yet it comes only after XOOM's decertification loss.

XOOM also overlooks the fact that the Court recognized in both the MSJ Order and the Decertification Denial Order that the workbooks' Total Cost figure represents XOOM's "projected costs" (MSJ Order at 4–5) and "projected cost components," (Decert. Denial Order at 3). If the Court were fooled about what Total Cost tabulates, it would not have expressly recognized that Total Cost represents XOOM's (highly accurate) supply cost projections.

Further, the MSJ Order and Class Order never required that the jury find that the Total Cost figure represents a perfect accounting of every last XOOM supply cost. Perfection to the last penny is

not the standard, and if it were, the Court would have said so then. Instead, XOOM twists the Decertification Denial Order and wrongly claims the jury must find as a matter of fact that Total Cost accounts for all XOOM supply costs (both actual and estimated). But that is not what the Court has asked the jury to do. The Court asked the jury to determine how XOOM set rates and whether that process breached the contract, with due regard for the jury's ability to reject implausible claims about undocumented calculations.

### B. XOOM's New Nitpicks at the Expert's Damages Calculations Were Available on XOOM's Opening Papers, Are Incorrect, or Have No Meaningful Impact

XOOM produced more than 1,000 excel workbooks with more than 10,000 data points related to XOOM's rates, costs, and margins. Plaintiff's expert transcribed and analyzed these data points to provide the Amended Report's damages calculations. For the first time on reply, XOOM presents *twelve* supposed data transcription discrepancies and claims that "CRA's figures thus clearly were not simply taken from XOOM's data," and Plaintiff "still" has "not shown how these figures were derived." XOOM's Reply at 29.

These critiques were available to XOOM on its opening papers. *See Kantor v. Air Atl. Med., P.C.*, No. 19 Civ. 3597 (EK), 2023 WL 2329800, at *6 (E.D.N.Y. Mar. 2, 2023) ("[A] party may not attempt to cure deficiencies in its moving papers by including new evidence in its reply to opposition papers."). XOOM's hair splitting also goes to weight, not admissibility.

Finally, XOOM's complaints are unconvincing. For example, XOOM's first "discrepancy" is of XOOM's own making. XOOM's analysis uses the workbook's "COGS" figure, not the Total Cost (which incorporates Gross Receipts Tax ("GRT")). ECF 262-1, Wizig Decl. ¶ 2. Once GRT is added, the correct Total Cost, as presented in the Amended Report, is shown.

Similarly, for another "discrepancy" XOOM claims the relevant margin should be 42.84% or 33.91%, as these are the figures in XOOM_INIT_001953. *Id.* ¶ 8. But that is not the only relevant workbook. XOOM_INIT_001957 has a third plan with a margin of 86.66%. The average of 42.84%, 33.91%, and 86.66% for the three plans equals 54.47%, as shown in the Amended Report.

It is true, that there are a few copyist errors among the more than 10,000 transcriptions Plaintiff's expert performed. Plaintiff's expert has corrected those minor errors and reports that his damages estimates have changed by -0.125%, -0.115%, and -0.295% for Methods A–C respectively. As previously noted, these minor transcription errors will be corrected once XOOM makes its final data production in advance of trial.

As always, we appreciate the Court's consideration and attention to this matter.

									Respectfully submitted,

									/s/ J. Burkett McInturff
									    J. Burkett McInturff

cc: *All counsel of record (via ECF)*