## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN and BORIS MIRKIN,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiffs,

v.

XOOM ENERGY, LLC and XOOM ENERGY
NEW YORK, LLC,

                    Defendants.

No. 18 Civ. 2949 (ARR) (JAM)

### DECLARATION OF MICHAEL D. MATTHEWS, JR. IN OPPOSITION TO PLAINTIFF'S MEMORANDUM OF LAW ON CONTINUED CLASS TREATMENT

Michael D. Matthews, Jr., under penalty of perjury, declares as follows:

I am a partner of the law firm McDowell Hetherington LLP, attorneys for Defendants XOOM Energy, LLC and XOOM Energy New York, LLC. I submit this Declaration in opposition to Plaintiff's memorandum of law as to whether or not classwide proceedings remain viable.

1.      Annexed hereto as **Exhibit 1** is a true and correct copy of an email I received from Plaintiff's counsel on March 26, 2024 with an attached "Proposed Revised Pretrial Schedule Draft." It was through that attachment that XOOM first learned of Plaintiff's intent to submit a new expert report.

2.      Annexed hereto as **Exhibit 2** is a true and correct copy of an email that XOOM's counsel sent to Plaintiff's counsel on March 26, 2024 following the parties' discussions regarding Plaintiff's "proposed supplemental report [that] would not only update the existing damage model to account for new data but also would include a new methodology and opinions not previously disclosed . . . ."

3.      Annexed hereto as **<u>Exhibit 3</u>** is a true and correct copy of relevant excerpts from the November 8, 2022, deposition of Seabron Adamson.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 1, 2024.

_____

Michael D. Matthews, Jr., Esq.

# EXHIBIT 1

| | |
|---|---|
| **From:** | Ethan Roman |
| **To:** | Diane Wizig; Matt Matthews; Netra Sreeprakash |
| **Cc:** | Burkett McInturff; Steven Wittels; Andrey Belenky |
| **Subject:** | Mirkin v. XOOM - 3.26 Meet & Confer |
| **Date:** | Tuesday, March 26, 2024 9:04:13 AM |
| **Attachments:** | image001.png |
| | Mirkin v. Xoom - Proposed Revised Pretrial Schedule Draft 3.26.24.docx |

Diane & Matt –

On today's meet and confer, we would like to discuss a revised schedule.

For Defendants' decertification motion, we are jammed up and would like one extra week to respond, moving the deadline to April 5.  We are amenable to the same extension for Defendants' reply, moving that deadline to April 26.

For the pretrial schedule, analyzing Defendants' March 1 data production and preparing for last week's settlement conference took substantially more work than anticipated.  We therefore would like to request that the Court extend the deadline to file the pretrial order to July 26.  Both parties and the Court would benefit from building in that additional time to crystalize the parties' disputes and ensure there is enough time to complete everything required for the pretrial order.  A proposed revised schedule for the parties to complete the various pretrial tasks is attached with the July 26 date in mind.

We can use the following dial-in for today's call:
Dial-in Number: (267) 930-4000;
Participant Access: 094-032-726

Best,
Ethan

**Ethan D. Roman**

WMP | Senior Associate
305 Broadway, 7th Floor | New York, NY 10007
Phone: 914 775 8862 x106



**Mirkin et al v. XOOM Energy, LLC et al (EDNY 1:18-cv-02949-ARR-JAM)
Pretrial Schedule**

| Date | Activity |
|------|----------|
| ~~March 29~~April 5, 2024 | **Both Parties**<br>• Objections to witnesses<br>• Objections to deposition designations<br>• Deposition cross-designations<br>• Objections to exhibits<br>• Rebuttal exhibit list<br>• ~~Motions in limine (including motions to strike and *Daubert* motions)~~<br><br>**Plaintiff**<br>• Response to Decertification Motion<br><br>**Defendants**<br>• Redline to jury instructions<br>• Response to jurisdiction statement |
| April 19~~5~~, 2024 | **Both Parties**<br>• Motions in limine (excluding expert-related motions)<br><br>**Plaintiff**<br>• Serve updated expert report~~Trial Memorandum for parties to evaluate disagreements regarding governing law~~ |
| April 26, 2024 | **Both Parties**<br>• Objections to deposition cross-designations<br>• Objections to rebuttal exhibit list<br><br>**Defendants**<br>• Decertification Reply<br>• File Decertification Motion |
| ~~April 12~~May 17, 2024 | **Both Parties**<br>• Responses to motions in limine (~~including~~ excluding expert-related motions ~~to strike and *Daubert* motions~~)<br>• Objections to deposition cross-designations<br>• Objections to rebuttal exhibit list |
| May 24, 2024 | **Both Parties**<br>• Deadline for any further expert depositions |
| June 7, 2024 | **Both Parties**<br>• Replies on MILs |

1

**Formatted:** Font: Bold, Underline

**Formatted:** Line spacing: single, Bulleted + Level: 1 + Aligned at: 0" + Indent at: 0.25"

**Formatted:** Font: (Default) Aptos, 11 pt, Bold, Underline, Font color: Auto

**Formatted:** Font: Bold, Underline

**Formatted:** List Paragraph, Line spacing: At least 11.55 pt, Bulleted + Level: 1 + Aligned at: 0" + Indent at: 0.25"

**Formatted:** Font:

**Formatted:** Font: Not Bold, No underline

**Formatted:** Font: (Default) Calibri, 12 pt, Not Bold, No underline, Font color: Custom Color(RGB(33,33,33))

**Formatted:** Font: Not Bold, No underline

**Formatted:** List Paragraph, Line spacing: At least 11.55 pt, Bulleted + Level: 1 + Aligned at: 0" + Indent at: 0.25"

**Formatted:** Font: Not Bold, No underline

**Formatted:** List Paragraph, Line spacing: At least 11.55 pt, Bulleted + Level: 1 + Aligned at: 0" + Indent at: 0.25"

| Date | Activity |
|---|---|
| June 14, 2024 | **Both Parties**<br>• *Daubert* and other expert-related MILs |
| June 28, 2024 | **Both Parties**<br>• Trial memorandum for parties to evaluate disagreements regarding governing law |
| July 3, 2024 | **Both Parties**<br>• Opposition to *Daubert* and other expert-related MILs |
| ~~April 17~~July 12, 2024 | **Plaintiff**<br>• Draft of the Pretrial Order |
| ~~April 19, 2024~~ | ~~**Defendants**~~<br>• ~~Decertification Reply~~<br>• ~~File Decertification Motion~~ |
| ~~April 22~~July 19, 2024 | **Defendants**<br>• Revisions/additions to the Pretrial Order |
| ~~April 24~~July 23, 2024 | ~~**Defendants**~~ **Both Parties** (For filing with the Pretrial Order):<br>• Revisions to trial memorandum<br>• Statement of damages claimed or other relief sought (if any) |
| ~~April~~July 26, 2024 | **Plaintiff**<br>• File the Pretrial Order<br><br>**Both Parties**<br>• Submit copies of respective exhibits to Court per Individual Rules<br>• Replies on *Daubert* and expert-related motions in limine ~~(including motions to strike and *Daubert* motions)~~<br>• File motions in limine (including motions to strike and *Daubert* motions) |

2

# EXHIBIT 2

| From: | Diane Wizig |
|---|---|
| To: | Ethan Roman; Matt Matthews; Netra Sreeprakash |
| Cc: | Burkett McInturff; Steven Wittels; Andrey Belenky |
| Subject: | Re: Mirkin v. XOOM - 3.26 Meet & Confer |
| Date: | Tuesday, March 26, 2024 2:41:35 PM |
| Attachments: | image001.png |
| | [MH 3.26] Mirkin v. Xoom - Pretrial Schedule - Final.docx |

Ethan and Burkett,

Attached is a new draft schedule that gives you the requested courtesy extensions of an extra week for decertification briefing and a few additional weeks on the pretrial order deadlines. As discussed, however, we can't agree to your proposed supplemental expert report because it would not only update the existing damage model to account for new data but also would include a new methodology and opinions not previously disclosed, which would seriously prejudice XOOM at this late stage.

If this schedule looks acceptable to you, please put together a letter to the court for our review that seeks only the two extensions that need court approval: decertification briefing and the pretrial order. Or if you want to have a call to discuss, we are available to talk at 4 ET using the call-in number from earlier.

Thanks,

**Diane S. Wizig**
Partner
**McDowell Hetherington LLP**
P: 713-333-5889   F: 713-337-8850

**CONFIDENTIALITY NOTICE**
The information in this e-mail may be confidential and/or privileged. This e-mail is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this e-mail and its attachments, if any, or the information contained herein is prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and delete this e-mail from your system.

**From:** Ethan Roman <edr@wittelslaw.com>
**Date:** Tuesday, March 26, 2024 at 9:04 AM
**To:** Diane Wizig <diane.wizig@mhllp.com>, Matt Matthews <matt.matthews@mhllp.com>, Netra Sreeprakash <netra.sreeprakash@mhllp.com>
**Cc:** Burkett McInturff <jbm@wittelslaw.com>, Steven Wittels <slw@wittelslaw.com>, Andrey Belenky <abelenky@kblit.com>
**Subject:** Mirkin v. XOOM - 3.26 Meet & Confer

Diane & Matt –

On today's meet and confer, we would like to discuss a revised schedule.

For Defendants' decertification motion, we are jammed up and would like one extra week to respond, moving the deadline to April 5. We are amenable to the same extension for Defendants' reply, moving that deadline to April 26.

For the pretrial schedule, analyzing Defendants' March 1 data production and preparing for last week's settlement conference took substantially more work than anticipated. We therefore would like to request that the Court extend the deadline to file the pretrial order to July 26. Both parties and the Court would benefit from building in that additional time to crystalize the parties' disputes and ensure there is enough time to complete everything required for the pretrial order. A proposed revised schedule for the parties to complete the various pretrial tasks is attached with the July 26 date in mind.

We can use the following dial-in for today's call:
Dial-in Number: (267) 930-4000;
Participant Access: 094-032-726

Best,
Ethan

**Ethan D. Roman**

WMP | Senior Associate
305 Broadway, 7th Floor | New York, NY 10007
Phone: 914 775 8862 x106



# EXHIBIT 3

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NEW YORK

3     SUSANNA MIRKIN and BORIS MIRKIN,

4     Individually and on Behalf of All Others

5     Similarly Situated,

6          Plaintiffs,

7        vs.                    No. 18 Civ. 2949(ARR) (RER)

8     XOOM ENERGY, LLC and XOOM ENERGY

9     NEW YORK, LLC,

10         Defendants.

11    -------------------------------x

12

13

14              VIDEOTAPED DEPOSITION OF

15               SEABRON ADAMSON

16            Tuesday, November 8, 2022

17                 10:06 a.m.

18                  Veritext

19               101 Arch Street

20          Boston, Massachusetts 02110

21

22

23

24             Laurie K. Langer, RPR

                                          Page 1

1  Q. And so I'm not at this point even arguing with
2  you about it. I just want to understand it.
3  A. Uh-huh.
4  Q. You've said that under Model 1 --
5  A. Right.
6  Q. -- anything above, --
7  A. Uh-huh.
8  Q. -- anything charged by XOOM above the supply
9  costs reported in the rate setting workbook is a damage;
10 right?
11 A. Yes.
12 Q. And that -- under that model --
13 A. Uh-huh.
14 Q. -- for those customers who were charged variable
15 rates by XOOM over the relative time period, XOOM would
16 lose money --
17    MR. WITTELS: Objection.
18 Q. -- for those customers in that contract language?
19    MR. WITTELS: Asked and answered.
20 Objection.
21 A. Possibly. I don't think that's the question in
22 front of us. As I said, I mean, the question is
23 consistency with the contractual language.
24 Q. Right.

Page 86

1  this information back that we made the calculation on
2  around their costs.
3  Q. Let me see if I can go at it a different way.
4  Model 1 in your opinion accurately measures the
5  damages --
6  A. Uh-huh.
7  Q. -- flowing from what you believe is XOOM's
8  failure to set variable rates consistent with the
9  contract language?
10 A. Yes.
11 Q. And let's see. Paragraph 72 to your report.
12 A. Just give me one second to flip to the page.
13    MR. WITTELS: 72?
14 A. Uh-huh. Okay.
15 Q. Calculates the difference between XOOM's reported
16 supply costs and the rate that the regulated utility
17 charged; correct?
18 A. No. I don't think you said that right.
19 Q. Okay. What -- what does that calculate in
20 paragraph 72?
21 A. Well, the second sentence talks about XOOM's
22 total costs and the thing we just discussed; right?
23    As we -- as I indicate here we also did a, you
24 know, just a kind of a crosscheck calculation to see if

Page 88

1  A. You said -- as you said yourself, they provided
2  their supply costs. What's the difference with supply
3  costs?
4  Q. I -- I don't know why this is difficult. Like,
5  the calculation isn't even difficult. I'm bad at math
6  and I can do this one. It's anything above the reported
7  supply cost is a damage under Model 1; --
8  A. Yes.
9  Q. -- correct?
10 A. Yes.
11 Q. Even if anything above that reported supply cost
12 included certain fixed costs, that if they weren't
13 reported in the rate setting workbooks it is a damage
14 under Model 1?
15    MR. WITTELS: Objection.
16 A. That is how the calculus -- that's how the
17 calculations go through, because that's how XOOM
18 reported its total costs, yes.
19 Q. And that is because your reading of the contract
20 is that XOOM can charge no more than the reported total
21 costs?
22 A. Since we went through this morning, it depends on
23 how you read supply costs. I read supply costs as, you
24 know, costs directly related to supply. XOOM reported

Page 87

1  it's in the same, you know, in the same order of
2  magnitude and just crosschecked it again to what XOOM
3  had reported the applicable utility rates to be. You
4  know, they're generally similar. So if you were to take
5  the deltas, not against XOOM's total cost but against
6  the utility rates, then you get 49 million, not 55
7  million.
8  Q. How is that different from what I asked?
9  A. You said, as I remember, this compares the, the
10 total cost to the -- I'm not exactly sure what you said,
11 but I think it had some consistency with that. If you
12 want to read it back.
13 Q. It's okay. The first sentence of 72 --
14 A. Uh-huh.
15 Q. -- calculates the difference between XOOM's
16 reported supply costs --
17 A. Uh-huh.
18 Q. -- and the rate that the utility charged?
19 A. Yes.
20 Q. Okay. And the utility in New York is required to
21 be profit neutral; right?
22 A. Well, you -- the utilities in New York are
23 actually investor owned, most of them are investor owned
24 utilities, so they're not, they are not nonprofit

Page 89

23 (Pages 86 - 89)

1  rate that is consistent with the costs plus an
2  appropriate margin, but in this case your opinion that,
3  is that based on actual and estimated supply costs does
4  not allow for recovery of an appropriate margin?
5      A. Okay. Well, I mean, obviously those are two very
6  different wordings. Right? I mean, here we have a
7  very -- in this particular case, with the Mirkins, we
8  have this specific contractual language around supply
9  costs, which as I remember wasn't -- that actual and
10 estimated supply costs and the examples of direct supply
11 costs were not in that contractual language; correct?
12 As you just read out.
13     Here we have this very specific contractual
14 language which, you know, as I said, my first, my first
15 reading of that is, you know, what it says, "specific
16 actual and estimated supply costs."
17     So, you know, as we saw in the report, if the
18 Court were to find that that phrase should be
19 interpreted to mean having a margin, we, we produced the
20 second model with a margin. But, you know, that's
21 really kind of for the Court, in my mind, to determine.
22 You know, my first read is supply costs are pretty
23 narrowly defined as supply costs. It doesn't include
24 marketing costs, for example, that you mentioned. So,

Page 94

1  you know, that's why Model 1 went with, went with supply
2  costs.
3      Q. Okay. In the contract language here, one of the
4  reasons that you have opined --
5      A. Uh-huh.
6      Q. -- that XOOM has constrained its --
7      A. Uh-huh.
8      Q. -- supply costs is that the contract language
9  doesn't reference margin; right?
10     A. Uh-huh.
11     Q. But the Richards --
12         MR. WITTELS: You have to say -- you have to
13 say, "yes." You can't say, "uh-huh."
14     A. I'm sorry. I think, yes.
15     Q. But the Richards contract language, based on
16 business and market conditions, didn't reference margin
17 either; right?
18     A. No. But it also doesn't have the specific
19 construction here.
20     Q. Okay. Are -- are you now prepared to provide
21 contract interpretation?
22     A. No. But I'm just saying it doesn't have the same
23 word. I mean, it doesn't -- it doesn't work the same
24 way.

Page 95

1      Q. Okay.
2      A. I don't mean construction in a legal sense, I
3  mean just the wording is different; right? I mean, the
4  pricing provisions are different.
5      Q. The words are not exactly the same, I will agree
6  with you on that.
7      A. Well, and in my mind the economic meaning of the
8  words is not the same. Clearly the words are not the
9  same. It's not the same words on the page on the left
10 and the right. But to me, I mean, I -- I interpret the
11 meaning of those to be somewhat different.
12     Q. I can tell.
13     A. Uh-huh.
14     Q. But neither one referenced margin or profit;
15 right?
16     A. No.
17     Q. Okay. All right. Model 2.
18     A. Okay.
19     Q. Let's look at where that begins.
20     A. Page 23.
21     Q. So Model 2 in plain terms is like Model 1 except
22 that you also factored in the margin that XOOM charged
23 its fixed rate customers; right?
24     A. Yeah, in broad terms, yes.

Page 96

1      Q. Okay. And that's essentially the damage model
2  used in the Richards case; right?
3          MR. WITTELS: Objection.
4      A. I don't exactly remember how that one, that one
5  worked. That was maybe, like, seven or eight years ago.
6  But I'm -- so I'll -- I won't say I remember
7  specifically how the model worked there.
8      Q. Okay. You -- are you offering the opinion that
9  it's inappropriate for XOOM to seek a higher margin for
10 variable rates than it does for fixed rates?
11     A. That that -- the -- you know, with the assumption
12 of the margin, so, I mean, everything we're predicated
13 here is on the assumption of the applicability of the
14 margin under this specific contract. I -- we need a
15 reasonable margin to charge.
16     We used the fixed rate margin as, you know,
17 indicative of a rate that, a margin that XOOM itself had
18 charged in the same months, in the same periods, blah,
19 blah, blah, all being equal, and as, as an indicator of
20 what a reasonable margin might be.
21     Q. Okay. And are you offering an opinion in this
22 case that it would be unreasonable for XOOM to target a
23 higher margin on its variable rates than it does on its
24 fixed rates?

Page 97

25 (Pages 94 - 97)

1   their retail business.
2       Q.  Okay.  Well, I guess --
3       A.  For example, a bunch of the Texas companies have
4   retail supply businesses.  We did a little bit on that,
5   but not a major thing.  But a bunch of the Texas
6   companies had retail supply businesses that also had
7   substantial other businesses.
8       Q.  I think I understand what you're saying.  And you
9   didn't work for the retail side of their businesses, you
10  worked for the other side of their businesses?
11      A.  Or sometimes we would be hired on some kind of
12  corporate strategy type engagement, which might be
13  pretty broad.
14      Q.  Got it.  Okay.  I thank you for your time and
15  your patience with me.
16      MR. MATTHEWS:  I'll pass the witness.
17      A.  Thank you.
18      Q.  Yes, sir.
19
20              EXAMINATION
21
22  BY MR. WITTELS:
23      Q.  Mr. Adamson, I just really have one question for
24  you.  You were asked by counsel for XOOM about whether

Page 138

1   XOOM or some broad question.
2       Q.  And the answer was?
3       A.  I believe he said yes, they were, they were both
4   profitable.  Both fixed rate and variable rate were
5   profitable.
6       Q.  Okay.  I have no further questions at this time.
7   Thanks.
8       MR. MATTHEWS:  Thanks very much.
9       A.  Thank you.
10      VIDEOGRAPHER:  The time is 2:39, we are off
11  the record.
12      COURT REPORTER:  And, Mr. Matthews, your
13  order?
14      MR. MATTHEWS:  My order is an expedited
15  transcript, just, I don't need any print copies.
16  Electronic only.  PDF exhibits.
17      COURT REPORTER:  Expedite by Friday?
18      MR. MATTHEWS:  Yes.
19      (Whereupon, the deposition concluded at
20  approximately 2:39 p.m.)
21
22
23
24

Page 140

1   the company was able to make any profits on its fixed
2   rate customers; do you remember that question?
3       A.  Yeah.  Not in exact wording, but I remember the
4   question.
5       Q.  Yeah.  And did you ask me to, whether you could
6   go back and review your report when we had a break?
7       A.  Yeah, well -- yes, we were discussing the report.
8       Q.  And did you reread paragraph 57?
9       A.  Yes.
10      Q.  And does that answer the question of whether XOOM
11  made money and was profitable on its fixed rate
12  customers?
13      MR. MATTHEWS:  Objection.  Leading.
14      A.  Well, I just -- it just reminded me there was
15  a -- I had said that there was not a specific P&L, this
16  was a reference in the report to deposition testimony
17  from a XOOM witness about the profitability of this.
18      Q.  And what did your report find and state?
19      A.  I don't remember exactly how he worded it.  I
20  think there had been a, in the deposition there was a
21  question about, it was around, I don't have the
22  transcript in front of me, of course, of the deposition,
23  but it was something around the line of were -- were a
24  fixed rate -- were fixed rate customers profitable for

Page 139

1                   CERTIFICATE
2
3   COMMONWEALTH OF MASSACHUSETTS
4   SUFFOLK, ss.
5
6       I, Laurie Langer, Registered Professional Reporter
    and Notary Public in and for the Commonwealth of
7   Massachusetts, do hereby certify that the witness whose
    deposition is hereinbefore set forth, was duly sworn by
8   me and that such deposition is a true record of the
    testimony given by the witness.
9
10      I further certify that I am neither related to or
11  employed by any of the parties in or counsel to this
    action, nor am I financially interested in the outcome
12  of this action.
13
        In witness whereof, I have hereunto set my hand and
14  seal this 11th day of November, 2022.
15
16
17
18      NOTARY PUBLIC
        Commission Expires
19      7/27/2023
20
21
22
23
24

Page 141