UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SUSANNA MIRKIN, Individually and on Behalf of All Others Similarly Situated,

                    *Plaintiffs*,

  -against-

XOOM ENERGY, LLC, and XOOM ENERGY NEW YORK, LLC,

                    *Defendants*.

18-CV-2949 (ARR) (JAM)

**OPINION & ORDER**

ROSS, United States District Judge:

Susanna Mirkin ("plaintiff"), a former residential electricity customer of defendants XOOM Energy, LLC and XOOM Energy New York, LLC (collectively "XOOM"), is the lead plaintiff in the present class action, which alleges that she and other similarly situated customers of XOOM were charged exorbitant energy rates in breach of the pricing terms contained in their contracts with XOOM. Before me now is plaintiff's motion to exclude various aspects of the testimony of XOOM's expert witness, David Coleman ("Mr. Coleman"). *See* Pl.'s Mem. Supp. Mot. in Lim. to Exclude Testimony of David Coleman ("Pl. Br."), ECF No. 231. Pursuant to Fed. R. Civ. P. 26(a)(2)(B), Mr. Coleman has produced an expert report, *see* Coleman Report, ECF No. 145-5, and a rebuttal report to plaintiff's expert witness, *see* Coleman Rebuttal Report, ECF No. 145-6.

For the reasons set forth below, I GRANT in part and DENY in part plaintiff's motion to exclude Mr. Coleman's reports and testimony.[1]

---

[1] I do not presently decide whether plaintiff may use Mr. Coleman's deposition testimony as part of her case-in-chief. As plaintiff acknowledges, the parties' arguments are more fully briefed in

1

## BACKGROUND

XOOM is an independent energy service company ("ESCO") that purchases energy from producers on the wholesale market and sells that energy to consumers as an alternative to local utilities. *See* Op. & Order at 1–2 ("Summ. J. Op."), ECF No. 151. During the period relevant to this lawsuit, XOOM sold both electricity and natural gas service at either a variable or a fixed monthly rate.[2] *See* Op. & Order ("Class Cert. Op.") at 2, ECF No. 152. In the spring of 2013, Mirkin contracted with XOOM to purchase residential electricity service under one of its variable rate plans. *See id*. According to the contract, the "monthly variable rate" would be "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." Decl. of Steven L. Wittels in Opp'n to Mot. Summ. J., Ex. 1 ("Enrollment Email & Contract") at 4, ECF No. 147-2. Between 2013 and 2016, XOOM used a standard contract that contained identical language to Mirkin's contract for its New York residential and small business variable-rate customers who purchased its electricity or natural gas services. *See* Class Cert. Op. at 2.

As I have previously explained, XOOM's contracts required the variations in its prices "to be determined by XOOM's actual and estimated supply costs—and only those costs." Summ. J. Op. at 12. XOOM's prices were permitted to add a margin on top of XOOM's costs, but those margins "would have to remain [reasonable and] proportionate" to those costs. *Id*. at 13.

---

the parties' other *in limine* motions. *See* Pl.'s Rep. Supp. Mot. in Lim. to Exclude Testimony of David Coleman at 11, ECF No. 250.

[2] As self-evident from the naming conventions of those products, the variable-rate plans charged a kilowatt-hour (kWh) rate set by XOOM that fluctuated each month, whereas the fixed-rate plans set a single rate over the contract term which did not vary each month. *See* Op. Denying Decert. at 13–14.

At issue now are Mr. Coleman's expert report and expert rebuttal report, both of which were produced prior to my summary judgment and class certification rulings. Because plaintiff has raised numerous challenges to particular aspects of Mr. Coleman's reports, the details of those reports are discussed further below.

## LEGAL STANDARDS

For a proposed expert's testimony to be admissible under Fed. R. Evid. 702, the expert's testimony must "rest[] on a reliable foundation" and be "relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). The analysis "must focus on the principles and methodology employed by the expert," rather than the district court's "belief as to the correctness of those conclusions." *Id*. at 266. Nonetheless, "conclusions and methodology are not entirely distinct from one another," and a district court may exclude "opinion evidence that is connected to existing data only by the ipse dixit of the expert" or that has "too great an analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"The court must also conclude that the proposed testimony will assist the trier of fact." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016). Thus, expert testimony must "concern[] matters that the average juror is not capable of understanding on his or her

3

own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). Moreover, the expert cannot "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999). Thus, an expert may not "provide legal opinions, legal inclusions, or interpret legal terms." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (internal quotation marks omitted). Nor may the expert "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." *Scott*, 315 F.R.D. at 48 (internal quotation marks omitted).

Finally, even expert testimony that satisfies Rule 702 may be excluded if the court finds that "the probative value of the evidence is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than lay witnesses." *Daubert*, 509 U.S. at 595.

## DISCUSSION

### I. The Cost to Price Correlation Analysis

Mr. Coleman's report is principally devoted to an analysis of the "correlation between changes in XOOM's [variable-rate prices] and its supply costs," Coleman Report at 13, *i.e.*, whether XOOM's prices decreased (or increased) when its costs decreased (or increased). Statisticians "often measure the strength of a relationship between two variables by calculating the correlation coefficient," a value that falls between -1 and +1. Coleman Report at 39. A positive value indicates that the two variables "tend to move in the same direction," while

4

"negative values indicate that variations in two variables tend to move in opposite directions." *Id*. According to Mr. Coleman's analysis, XOOM's prices "and XOOM's supply costs," as reflected in its rate-setting workbooks, bore "a positively correlated relationship," which indicates that XOOM's prices and costs rose and fell together. *Id*. at 14–15.

Plaintiff does not contest the accuracy or reliability of the methodology, principles, and calculations underlying Mr. Coleman's correlation analysis, nor does the record reveal any deficiencies that merit exclusion. Instead, plaintiff argues that the evidence is of minimal relevance and overly prejudicial, because Mr. Coleman's correlation analysis "does not address whether XOOM's rates were 'determined solely by' XOOM's 'supply costs—and only those costs.'" Pl. Br. at 13 (quoting Summ. J. Op. at 12, 14). In response, XOOM contends that the correlation analysis "addresses some contractual rate-setting components" and is therefore "plainly probative of . . . whether XOOM's variable rates were . . . based on its supply costs." Def.'s Mem. Opp. Mot. in Lim. to Exclude Testimony of David Coleman at 7–8 ("Def. Br."), ECF No. 240.

Plaintiff has the better of the argument. Expert testimony is relevant where it "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Bustamante v. KIND, LLC*, 100 F.4th 419, 430 (2d Cir. 2024) (quoting *Daubert*, 509 U.S. at 587). As explained below, Mr. Coleman's correlation analysis bears only minimal probative value to a fact of consequence, and is instead probative of a fact that is facially similar but ultimately immaterial to XOOM's liability. The risk that the jury will confuse those issues and give undue weight to Mr. Coleman's correlation analysis is significant, and I therefore exclude that opinion under Fed. R. Evid. 403.

As I have explained, XOOM's decisionmakers "clearly considered supply costs when setting [its prices]." Summ. J. Op. at 15. To set its monthly prices, XOOM first "calculated the sum of various cost components . . . to reach" an estimated total cost in its rate setting workbooks, and "then added a margin on top of [total cost]," and reach a final price based on those calculations. *Id*.

Mr. Coleman's cost-price correlation analysis proves "at most that XOOM incorporated its internal cost calculation into [its] rates." Summ. J. Op. at 17. That much is self-evident from XOOM's price-setting process. XOOM's prices were formed by adding only two components together (cost plus margin), and therefore its prices would naturally bear a high degree of correlation with its costs. *Id*. at 15 (describing XOOM's rate setting process). As my interpretation of XOOM's contract makes clear, XOOM cannot escape liability simply because its costs and prices generally moved in the same direction. *Id*. at 16 (noting that XOOM could not charge any markup it wanted). Mr. Coleman's correlation analysis may support that proposition, as it suggests that XOOM generally did not totally offset changes to costs with changes to its margins or increase prices in the face of decreasing costs. Summ. J. Op. at 17. However, the key question at issue in this matter is a different one, namely whether XOOM's added margins on top of costs (and thereby its prices), remained reasonable and proportionate to its costs. *Id*. (noting that Mr. Coleman's cost-price correlation "does not tell us whether XOOM added a permissible markup above its cost[s]" such that XOOM's prices and margins remained proportionate to its costs).

To illustrate that distinction, imagine that XOOM always charged a price that was 10¢ greater than its costs. In that hypothetical situation, XOOM's costs and prices would have been perfectly correlated—a 1¢ cost increase would always lead to a corresponding 1¢ price increase.

6

However, that perfect correlation would not demonstrate that those prices were permissible under the contract terms. In a month where XOOM's cost was 5¢ and its price 15¢, a jury might well find that the resulting 200% markup over cost was unreasonable. By contrast, in a month where XOOM's cost was 20¢ and its price 30¢, a jury might conclude that the resulting 33% markup over cost was permissible. Thus, as the above example shows, even a perfect correlation between cost and price may have almost no bearing on the question the jury will be tasked with deciding—whether XOOM's prices were reasonable and proportionate to its costs.

Mr. Coleman's correlation analysis may have some limited probative value on that question, but Mr. Coleman's reports provide no basis by which to evaluate that probative value. Mr. Coleman's correlation analysis, which was built on the assumption that XOOM's contracts required only that XOOM's costs rose and fell with its costs, attempted to prove that XOOM complied with *that* interpretation of the contract. *See* Coleman Report at 12–13. However, I have rejected that reading of the contract, *see* Summ. J. Op. at 14, and neither Mr. Coleman's reports nor XOOM's briefs explain the applicability of his correlation analysis to the questions at issue under the governing interpretation of the contract. Thus, even assuming that Mr. Coleman's analysis bears some minimal probative value on the reasonableness of XOOM's margins as compared to its costs, XOOM has failed to meet its burden of establishing that any such value is substantially outweighed by the likelihood that it will "confus[e] the issues" or "mislead[] the jury." Fed. R. Evid. 403. I therefore exclude Mr. Coleman's correlation analysis.

## II.    The "No Margin Cap" Opinion

In his expert reports, Mr. Coleman further opines that XOOM "was not required to cap its rates or gross margin," Coleman Report at 28, because no "contractual or regulatory requirement establish[ed] an allowable level for such margin," Coleman Rebuttal Report at 11. Elsewhere in

7

his opinion, Mr. Coleman opines that plaintiff's expert's opinion as to XOOM's reasonable margins is "arbitrary" and does not account for XOOM's need to recover its non-supply costs, such as marketing, advertising, and administrative expenses. Coleman Report at 29. I agree with plaintiff that Mr. Coleman's "no margin cap" opinions are largely inadmissible. Pl. Br. at 15.

I have repeatedly held that XOOM's contracts required it to charge margins and prices that were reasonable and proportionate to its costs. *See* Summ. J. Op. at 13–14; Op. & Order at 3 ("Op. Denying Decert."), ECF No. 246 (noting that XOOM's contracts required it "to determine its monthly variable rates using only its actual and supply costs, subject to a reasonable and proportionate margin"). Mr. Coleman's opinions that the contracts imposed *no* margin or price cap directly contradict my rulings and are therefore irrelevant. Indeed, Mr. Coleman's attempts to interpret the contracts would remain inadmissible even if I had not definitively interpreted XOOM's contracts, as it is well settled that an expert may not testify as to what obligations are imposed by a contract. *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509 (2d Cir. 1977); *see also Levinson v. Westport Nat'l Bank*, No. 09-CV-269, 2013 WL 3280013, at *4 (D. Conn. June 27, 2013) ("[A]n expert may not interpret a contract for the jury, nor may an expert testify about the meaning of legal terms." (citations omitted)).

For similar reasons, I also exclude Mr. Coleman's opinion that New York's regulators did not limit the prices or margins of ESCOs such as XOOM. The report merely recites passages of a 2005 regulation that (1) required energy providers providing a special introductory rate to new customers to "conspicuously disclose" that any savings were not guaranteed beyond the period in which the special rate applied and (2) allowed prices to be set by "competitive market forces." Coleman Report at 30. Mr. Coleman then opines that New York regulators "wanted to ensure that . . . customers understood that there was no guarantee" of savings and "consciously designed

8

retail access plans . . . in a manner that places responsibility on retail customers to evaluate . . . supply options in the marketplace." *Id*. Those opinions are plainly not a permissible subject for expert testimony.

The cited regulations state that New York did not, until recently, impose caps on ESCO prices. Mr. Coleman's interpretive gloss on the regulations is merely to restate their plain text—that they did not impose a price cap—and does nothing but waste valuable trial time. *See Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 252 (S.D.N.Y. 2013) ("Simply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702."). Nor is he permitted to present an opinion designed "solely for the purpose of constructing a factual narrative based on record evidence." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005.); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (finding that expert testimony on the regulatory history of a diabetes drug was merely narrative and the expert's "simple inferences drawn from uncomplicated facts" served "only to buttress the plaintiffs' theory of the case").

Mr. Coleman's opinions on what New York regulators "wanted" or "consciously designed" are inadmissible for another reason, apart from the fact that they merely restate the regulations. As a general rule, "[i]nferences about the intent or motive of parties or others lie outside of the bounds of expert testimony." *In re Rezulin Prods.*, 309 F. Supp. 2d at 547. Likewise, an expert may not testify regarding the "intent, motives or states of mind of corporations, regulatory agencies and others." *Id*. at 546. Mr. Coleman therefore cannot testify as to the subjective intent or desires of New York's regulators.

Nonetheless, Mr. Coleman's testimony regarding XOOM's appropriate "reasonable margin" is not wholly inadmissible. As a rebuttal expert, Mr. Coleman's "role is to undermine

9

the soundness of the plaintiffs' experts' conclusions." *Scott*, 315 F.R.D. at 47 (admitting rebuttal expert opinions and charts that "display[ed] variances in the [plaintiffs'] data that were not discussed by the plaintiffs' experts"). I therefore admit Mr. Coleman's opinions insofar as they respond to the *particular* reasonable margins chosen by plaintiff or her expert, on the grounds that plaintiff's selection of those margins is "arbitrary" and that plaintiff did not analyze whether such margins "would be adequate for XOOM to cover its non-commodity costs." Coleman Report at 28–29. Plaintiff offers no argument that those opinions are unreliable or unhelpful, nor do I see any reason to exclude such evidence.

In sum, I exclude Mr. Coleman's opinions that XOOM's contracts and New York's regulations did not impose any limitation on XOOM's prices and margins. However, I admit his opinions to the extent that they challenge the reasonable margins advanced by plaintiff or her expert.

### III. Opinions on the Differences Between Market Structures and Supply Costs for Gas and Electricity

The Coleman Report contains several pages describing the differences between the differences in the electricity and natural gas markets and opines that the "sources and components of 'estimated and actual supply costs' for each are material [and] different." Coleman Report at 23. Unlike the supply of electricity, which relies on "an independently managed grid and market" run through a centralized non-profit entity for delivery to customers, retailers must "arrange for natural gas supply through bilateral contracts." *Id*. at 22.

Plaintiff objects that the above opinion is "unhelpful and irrelevant" because XOOM's form contracts for electricity and natural gas service contained identical language requiring XOOM to set prices "based on its estimated and actual supply costs." Pl. Br. at 15. Plaintiff's argument is without merit. Although XOOM's electric and gas contracts set the same pricing

10

formula, requiring XOOM to consider only its supply costs in setting its prices, XOOM's "natural gas supply costs necessarily differ from its electricity supply costs." Class Cert. Op. at 15. For a jury to determine whether or not XOOM's rates were based on its supply costs, the jury must necessarily ascertain what those supply costs *were*. An explanation of how and why those costs differed between the two forms of energy products is therefore relevant and admissible.

## IV.   Gross Margin Comparisons

In his rebuttal report, Mr. Coleman compares XOOM's margins on its fixed-rate and variable-rate products with the company-wide "gross margins" earned by 26 of the 30 companies listed in the Dow Jones Industrial Average ("DJIA").[3] Coleman Rebuttal Report at 12–14. Under his calculations, XOOM's "electric fixed rate margins were lower than 25 of the 26 DJIA companies" and its "natural gas fixed rate gross margins were lower than the gross margins charged by 24 of the 26 DJIA companies." *Id*. at 13. From that analysis, Mr. Coleman opines that plaintiff's position that XOOM's variable rate margins should have been limited by its fixed rate margins is "[in]consistent with commercial experience," as it "ignores the commercial reality that many other companies rightly charge higher gross margins." *Id*. at 12, 14.

As a preliminary matter, XOOM contends that Mr. Coleman need not justify the reliability of his comparison to the DJIA companies because that analysis is offered in rebuttal and "not . . . as Mr. Coleman's opinion of a valid comparator in its own right." Def. Br. at 15. That argument is frivolous. Although a rebuttal expert has "no burden to produce models or methods of their own," a rebuttal expert must still meet *Daubert*'s threshold standards "regarding

---

[3] The DJIA "is a stock market index composed of 30 large businesses spanning a wide range of industries. Mr. Coleman excluded the remaining four companies, "American Express, Goldman Sachs, JP Morgan Chase, and Travelers," from his analysis because they are "predominantly financial companies that do not report a close analogue to the cost of goods sold." Coleman Rebuttal Report at 12 n.27.

11

the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott*, 315 F.R.D. at 44 (quotation marks omitted) (collecting cases).

An expert opinion should be excluded if it is "in essence an apples and oranges comparison" or if "there is simply too great an analytical gap between the data and the opinion offered." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (internal quotation marks omitted). Mr. Coleman provides no explanation for how the margins realized by companies in the DJIA have any comparative value in determining the reasonableness of XOOM's margins. The DJIA is "a stock market index" used to track the performance of stocks, Coleman Rebuttal Report at 12, and the record contains no indication that companies are selected for inclusion in the DJIA based on their margins, that the DJIA companies earn margins that are representative of other companies, or that financial analysts or industry experts use the DJIA companies as a margin benchmark.

Even assuming that one or more of those propositions were true, the DJIA companies are household names that rank among the largest businesses in the United States. As much as XOOM might like to imagine otherwise, the DJIA companies are dissimilar from XOOM on that basis alone. Moreover, apart from Chevron, none of the companies are even in the same sector (energy) as XOOM, much less the same industry. *See id*. at 13. In addition, XOOM, unlike the vast majority of the DJIA companies, is a mere retailer for the products that it sells. For example, the DJIA includes Coca-Cola, Nike, Microsoft, Merck, and Disney. *See id*. Mr. Coleman offers no basis for his opinion that the margins realized from the production *and* sale of products like soda, clothing, software, pharmaceuticals, and entertainment have any relationship to XOOM's margins selling (but not producing) energy. *See New York v. Deutsche Telekom AG*, 419 F. Supp. 3d 783, 788 (S.D.N.Y. 2019) (declining to consider evidence of mergers in foreign markets in

12

part because it would "likely yield only an apples-to-oranges comparison"). Nor does Mr. Coleman explain why the DJIA companies are any more comparable to XOOM than any other business in America.

Indeed, Mr. Coleman's reports and deposition contain no explanation for why he selected the DJIA companies for his margin comparison, other than that the data for twenty-six of those companies was available because they "report" it. *Id*. at 12. However, the mere availability of data plainly does not justify using that data as the basis for his analysis. *See Joiner*, 522 U.S. at 146 (Where an expert's testimony is "connected to existing data only by the *ipse dixit* of the expert[, a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Without further explanation, Mr. Coleman's analysis of the DJIA companies' margins bears no practical relevance to the question of whether XOOM's margins were reasonable. *See Carmichael v. City of New York*, 34 F. Supp. 3d 252, 266 (E.D.N.Y. 2014) (holding that racial composition of missing persons in the United States as a whole was not "an appropriate benchmark for the demographic composition of missing persons in New York City" where expert did not offer reasons that justified the comparison). Mr. Coleman's gross margin analysis is therefore inadmissible, as "the data relied upon by the expert is materially different from the data relevant to the facts of the case." *Astra Aktiebolag v. Andrx Pharms., Inc*., 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002) (internal quotation marks omitted), *aff'd sub nom. In re Omeprazole Pat. Litig.*, 84 F. App'x 76 (Fed. Cir. 2003).[4]

---

[4] I note that, even if the Gross Margin analysis does have some minimal level of probative value, it is substantially outweighed by the danger of "confusing the issues" and "misleading the jury." Fed. R. Evid. 403. Mr. Coleman's apparent inability to explain the applicability of the various DJIA companies' margins to XOOM's margins "would leave the factfinder to guess at the answers" to that question. *Bustamante*, 100 F.4th at 430 (internal quotation marks omitted); *See also Starter Corp. v. Converse, Inc*., 170 F.3d 286, 297 (2d Cir. 1999) (holding "that the district court did not abuse its discretion" in excluding a survey from evidence because "the probative

**V.      Mitigation Testimony**

Finally, plaintiff seeks to preclude Mr. Coleman's report and testimony regarding mitigation of damages by XOOM's customers, who Mr. Coleman opines "could have avoided any alleged harm" by switching to a different energy provider.[5] Coleman Report at 31. Mr. Coleman advances two grounds for that opinion. First, XOOM's customers were not "required" to contract with XOOM and could purchase energy from another supplier. Because XOOM's customers "affirmatively" chose XOOM over the default utility, "[t]hey are then responsible for monitoring their future purchase" and "ha[d] the opportunity to shop for better rates." *Id*. Second, XOOM did not require its customers to pay a cancellation fee or penalty. *Id*.

I agree with plaintiff that Mr. Coleman's mitigation opinions are unhelpful and should therefore be excluded.[6] An expert may not provide testimony "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001). The jury does not need to hear Mr. Coleman opine that XOOM's customers could buy energy from other sources. Likewise, the absence of a termination or penalty fee is self-evident from the absence of such fees in XOOM's contracts. Finally, reasonable jurors will undoubtedly understand the obvious concept that different sellers charge different prices and that consumers can seek out a lower price if one is available. *See Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 292 (S.D.N.Y. 2013) ("[T]he mere fact that a fire causes increasing damage the longer it burns is an obvious statement, and a lay person is entirely capable of reaching this conclusion without the help of an expert.").

---

value of the survey [was] so slight that it was easily outweighed, under a Rule 403 analysis, by the danger of confusion of the issues").

[5] Notably, the Coleman Report does not state that cheaper rates were in fact available elsewhere.
[6] I therefore do not address plaintiff's argument that XOOM's mitigation defense fails as a matter of law because the customers lacked sufficient information about XOOM's supply costs to have known that XOOM was in breach of its contracts' pricing provisions.

Mr. Coleman stretches these simple concepts further and opines that, by "affirmatively cho[osing]" XOOM, plaintiffs took on "the responsibility for monitoring their future purchases." Coleman Report at 31. However, Mr. Coleman offers no basis for that opinion. *See Cospelich v. Hurst Boiler & Welding Co., Inc.*, No. 08-CV-46, 2009 WL 8599064, at *2 (S.D. Miss. July 7, 2009) (excluding testimony where the rebuttal expert failed to employ a reliable methodology or illustrate how his experience informed his analysis). Even if there was any evidence or methodology underlying that opinion, which there is not, whether plaintiffs in fact had such a "responsibility" is not the proper subject of expert testimony. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (noting that expert testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it"); *Scott*, 315 F.R.D. at 48 (noting that an expert may not "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence").

## CONCLUSION

For the reasons set forth above, I GRANT in part and DENY in part plaintiff's motion to exclude Mr. Coleman's expert report and testimony. I therefore exclude Mr. Coleman's report and testimony on the following subjects:

1. Mr. Coleman's correlation analysis;

2. Mr. Coleman's opinions that XOOM's contracts and New York's regulations did not, until recently, impose any cap on XOOM's margins and prices;

3. Mr. Coleman's comparison of XOOM's margins to those of the DJIA companies; and

4. Mr. Coleman's opinions regarding mitigation of damages.