# Wittels McInturff Palikovic

April 23, 2025

**Via ECF**
The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re:    _Mirkin, et al. v. XOOM Energy, LLC, et al._, No. 18 Civ. 2949 (RPK) (JAM)**

Dear Judge Kovner,

We write on behalf of Plaintiff and the Class pursuant to Your Honor's Rule IV.C.4 to request that the newly raised argument in XOOM's Reply in Support of its Second Submission Regarding Trial Exhibits (ECF 297, the "Reply") be stricken, or in the alternative, that Plaintiff be given leave to file a sur-reply. A sur-reply is warranted in response to XOOM's new merits argument that is both factually and legally incorrect and is XOOM's latest effort to change its defense on the eve of trial. If the Court wishes, this letter can also serve as Plaintiff's sur-reply.

By way of brief background, prior to summary judgment XOOM thought it had rate-setting discretion and could charge rates that merely correlated with the documented supply costs in its rate-setting workbooks ("RSWs"). Reply at 3 (citing ECF 145-1 ("Summ. J. Mot.") at 15–18). There was no question that the RSWs' supply cost figures reflected XOOM's "actual and estimated supply costs." This was XOOM's theory of the case that drove discovery:

> Not one person testified that XOOM ever set variable rates—in any month— without using the detailed supply cost information in its monthly [RSWs]. Every witness said those supply costs were always the starting point, the primary consideration, and the main component of XOOM's variable rates. No document . . . suggests that XOOM ever did anything but methodically consider its supply costs and then set a rate that was based on them. And a correlation analysis by XOOM's expert shows that contrary to the complaint's allegations, Susanna's variable rate ***always*** rose and fell with XOOM's supply costs.

Summ. J. Mot. at 2 (emphasis in original); *see also id.* at 7 (same, calculating margin using "supply costs" from RSWs); *id.* at 8 ("XOOM's rates are based on detailed supply cost data in monthly rate-setting workbooks," showing image of RSW, and admitting that this "spreadsheet-based model" was what "XOOM used to set rates based on its actual and estimated supply costs"); *id.* at 18–20 (equating RSW figures with "actual and estimated supply costs").

Judge Ross's summary judgment ruling flatly rejected XOOM's correlation defense. The Court construed XOOM's contract as a cost-plus contract whereby XOOM could only apply a fixed and reasonable margin over the RSWs' documented supply costs. ECF 151, Op. & Order Den. Summ. J. ("MSJ Order") at 12. The Court called this the "proportionate-margin construction." *Id.* at 13. It

The Honorable Rachel P. Kovner                                                    Page 2 of 4

allowed only a "reasonable" fixed margin over the RSWs' supply costs figures. *Id.* at 12–13. The Court then relied on the RSWs to find that XOOM's margins were not fixed. *Id.* at 15–16.

Because XOOM had claimed in connection with its correlation theory that an undocumented "secondary component" called "prior period adjustments" that contained both supply and non-supply costs was tucked into XOOM's margins, Summ. J. Mot. at 19–20, the Court found that "whether permissible supply costs incorporated in the margin determined the monthly change in markup [over the RSWs' supply cost figures] is a disputed material fact." MSJ Order at 17. Thus, the jury needs to evaluate whether those totally undocumented and secret but alleged "supply costs" could be fed into the cost-plus calculation, and if so whether XOOM actually did this (or whether XOOM's undocumented claims were not credible). MSJ Order at 15–19. At class certification, Judge Ross provided at least three different ways the jury could reject XOOM's claim about tucking supply costs into the RSWs' margin figures. ECF 152, Op. & Order Granting Class Cert. ("Class Order") at 13 (citing MSJ Order at 17). Judge Ross recently reiterated that "one of the key issues to be decided at trial is whether, and to what extent, XOOM's prices reflected supply costs beyond those included in the estimated 'Total Cost' values set forth in XOOM's rate-setting workbooks." ECF 276 at 9 (citing Class Order at 4). That same order then directed XOOM to explain how its 1,474 exhibits will "impact the supply cost figures XOOM plans to present at trial." *Id.* As the Court can now see, XOOM does not plan to present any "supply cost figures" at trial.

Instead, XOOM argues on Reply that Judge Ross quietly decided in June 2024 that the jury would *not* select a reasonable margin for the cost-plus formula. The Reply's first paragraph fashions that argument from Judge Ross's treatment of XOOM's citation to *Richards v. Direct Energy* in its motion to decertify the Class. Reply at 1. Judge Ross wrote that *Richards* "did not hold that a plaintiff such as Mirkin *must* provide evidence of competitor [ESCOs'] rates for the jury to be able to ascertain a reasonable margin; rather, it suggested only that such evidence would have been probative of whether the defendant energy company acted in good faith—an issue that is not before me in this case." ECF 246, Op. & Order Den. Decert. Mot. ("Decert. Denial Order") at 14 (*citing Richards*, 915 F.3d 88, 97–99 (2d Cir. 2019)) (emphasis in original). The Reply excises the phrase "an issue not before me in this case" and claims that the "reasonableness" of XOOM's margin is "not before [the Court] in this case."

That is not a fair reading of the Court's Order. The contract at issue in *Richards* expressly gave the ESCO rate-setting discretion. Courts have contrasted *Richards* and the instant action as the "goalposts" between which ESCO contracts "may fall nearer to or farther from" when it comes to discretion. *Melville v. HOP Energy, LLC*, 2023 WL 2648775, at *6 (S.D.N.Y. Mar. 27, 2023); *see also Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 410 (2d Cir. 2023) (same). Here, there is *no* rate-setting discretion. In *Richards* the contract allowed variable rates to be set "at [the ESCO's] discretion" and stated that rates "may be higher or lower each month based upon business and market conditions." *Richards*, 915 F.3d 88, 97 (2d Cir. 2019). Even though the ESCO had "discretion" it "was obliged to 'exercise that discretion in good faith.'" *Id.* at 99. The *Richards* plaintiff alleged breach of the duty of good faith and fair dealing, but the Second Circuit read the "business and market conditions" contract language to require "evidence that [the ESCO's rates were] higher than its competitors' rates." *Id.* Because that evidence was lacking, there was insufficient proof of bad faith. *Id.* That is "the issue" Judge Ross wrote was "not before me in this case." Further, the "not before me in this case" statement appeared under the heading "A jury can determine a reasonable and proportionate margin." Decert. Denial Order at 13–15. To borrow a

maxim of statutory interpretation, courts do not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). If Judge Ross intended to abandon her prior rulings, she would not have done it by distinguishing a case addressing a different point.

Moreover, even if XOOM were correct that its bad faith is not at issue (it is), XOOM's argument fails because it conflates good faith with reasonableness. Good faith "is governed by a subjective, rather than an objective standard." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989). Reasonableness is determined by an objective standard. As the Second Circuit explained: "[A]n act or belief is 'reasonable' when it is '[f]air, proper, or moderate under the circumstances.' . . . That is an objective standard, unconcerned with the actor's motivations or the sincerity of her beliefs. Accordingly, one may hold a belief or undertake an act in good faith, even if that belief or act is objectively unreasonable. That distinction is not a novel one; courts and legislatures routinely distinguish between good faith and reasonableness in a broad array of contexts." *Ziparo v. CSX Transp., Inc.*, 15 F.4th 153, 158–59 (2d Cir. 2021) (citations omitted).

At bottom, the Reply is another example of XOOM disavowing the case it built during discovery and used at summary judgment. No XOOM witness testified that XOOM set rates on a cost-plus basis using unrecorded calculations to tuck secret supply costs into a secret fixed margin. We urge the Court to read XOOM's summary judgment and class certification submissions. ECF 134, 145-1, 149. They do not attack the RSWs as unreliable for the "supply cost" input or argue that the jury cannot select a reasonable fixed margin. Instead, XOOM admitted that a "human element" was used to set rates. MSJ Order at 16 n.8; *see also id.* at 19 (because XOOM admitted it used "pricing strategies" to set rates, there is a factual question on whether rates were "based on other considerations, such as pricing strategies driven by margin goals"). Now, XOOM claims it used a cost-plus formula, adding secret costs to those documented in the RSWs using an equally secret formula. From that premise, XOOM claims that Plaintiff loses because XOOM's cost-plus calculations are not written down and the reasonableness of the margins it applied in billing New Yorkers is magically no longer part of this case—despite all the prior rulings saying the opposite.[1]

XOOM tries to bolster that argument by saying that the cost figures in its RSWs were only estimates because XOOM was not charged for actual supply costs until some weeks after it had to send the utility its monthly rates. During discovery, XOOM told a different story—the RSWs' costs figures were highly accurate, constantly updated, and completely reliable. Even now, XOOM never says what, if any, difference there was between the supply costs documented in the RSWs and its actual supply costs, or even whether in aggregate that difference was positive or negative. It is all just a secret and Plaintiff loses because she is not in on the secret. Claiming secret undocumented costs and secret unwritten formulas is just XOOM's latest (and incredible) attempt to shoehorn discretion into a cost-plus contract. In due course, the jury will have the opportunity to evaluate the probative value of that far-fetched account.

Finally, Class Counsel found it helpful and efficient to have the opportunity to address issues orally with the Court at the March 26, 2025 conference. We would therefore welcome the opportunity to appear in person after the Court has had time to review the outstanding motions to address whatever questions the Court may have to further narrow and focus the issues.

---

[1] XOOM has only raised this issue at times when Plaintiff could not respond. XOOM first raised it in its reply in support of XOOM's MILs. ECF 254 at 3, 18, 22. XOOM next referred to this during the March 26, 2025 Pretrial Conference. *See* Ex. A at 8:23–9:17. Now, XOOM raises this issue in its Reply.

The Honorable Rachel P. Kovner                                                    Page 4 of 4

Thank you for the Court's consideration of this request.

Respectfully Submitted

/s/ Ethan D. Roman
    Ethan D. Roman

*Class Counsel for Plaintiff and the Class*

cc: All Counsel of Record (*via ECF*)