# Exhibit 2

```
                       STATE OF NEW YORK
                  PUBLIC SERVICE COMMISSION

                         At a session of the Public Service
                         Commission held in the City of
                         Albany on September 18, 2025
```

COMMISSIONERS PRESENT:

Rory M. Christian, Chair
James S. Alesi
David J. Valesky
John B. Maggiore
Uchenna S. Bright
Denise M. Sheehan
Radina R. Valova


CASE 25-M-0516 – Proceeding on Motion of the Commission to Seek Consequences Against Gateway Energy Services Corporation for Violations of the Uniform Business Practices.

CASE 25-E-0517 - Proceeding on Motion of the Commission to Seek Consequences Against Energy Plus Holdings LLC for Violations of the Uniform Business Practices.

CASE 25-G-0518 - Proceeding on Motion of the Commission to Seek Consequences Against Energy Plus Natural Gas, LLC for Violations of the Uniform Business Practices.

CASE 25-M-0519 - Proceeding on Motion of the Commission to Seek Consequences against Direct Energy Services, LLC, et al. for Violations of the Uniform Business Practices.

CASE 25-M-0520 - Proceeding on Motion of the Commission to Seek Consequences Against Green Mountain Energy Company for Violations of the Uniform Business Practices.

CASE 25-M-0521 - Proceeding on Motion of the Commission to Seek Consequences Against Reliant Energy Northeast LLC for Violations of the Uniform Business Practices.

CASE 25-E-0516 <u>et al</u>.


CASE 25-M-0522 - Proceeding on Motion of the Commission to Seek Consequences Against Stream Energy New York LLC for Violations of the Uniform Business Practices.

CASE 25-M-0523 - Proceeding on Motion of the Commission to Seek Consequences Against XOOM Energy New York LLC for Violations of the Uniform Business Practices.

CASE 25-M-0524 - Proceeding on Motion of the Commission to Seek Consequences Against NRG Business Marketing, LLC for Violations of the Uniform Business Practices.


ORDER INSTITUTING PROCEEDING
AND TO SHOW CAUSE

(Issued and Effective September 23, 2025)


BY THE COMMISSION:

<u>INTRODUCTION</u>

In this Order, the Commission renders a preliminary conclusion that Department of Public Service staff (Staff) has identified sufficiently credible evidence to support the issuance of an Order to Show Cause (OTSC) regarding (1) Direct Energy Services, LLC's (Direct), Energy Plus Holdings LLC's (EPH), Energy Plus Natural Gas, LLC's (EPNG), Gateway Energy Service Corporation's (Gateway), Green Mountain Energy Company's (Green Mountain), Reliant Energy Northeast LLC's d/b/a NRG Home, NRG Business and NRG Retail Solutions' (Reliant), Stream Energy New York, LLC's (Stream), and XOOM Energy New York LLC's (XOOM) apparent failure to comply with the Uniform Business Practices (UBP) and a December 12, 2019 Commission Order Adopting Changes to the Retail Access Energy Market and Establishing Further

CASE 25-E-0516 et al.

Process[1] (Reset Order); (2) Green Mountain's apparent failure to comply with a July 15, 2022 Order Regarding Energy Service Company Waivers (Green Gas Transition Order); and (3) NRG Business Marketing, LLC f/k/a Direct Energy Business Marketing, LLC's (NBM) apparent failure to comply with the UBP.[2]  Direct, EPH, EPNG, Gateway, Green Mountain, Reliant, Stream, and XOOM are collectively referred to as the NOAV Entities.  The NOAV Entities and NBM are collectively referred to as the NRG Entities.

Today's Order does not constitute final findings of fact or conclusions of law.  We now provide the NRG Entities with the opportunity to respond to Staff's contentions.  The NRG Entities are ordered to show cause within 30 days why their eligibility to act as Energy Services Companies (ESCOs) in New

---

[1]  Case 15-M-0127 et al., In the Matter of Eligibility Criteria for Energy Service Companies, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process (issued December 12, 2019).

[2]  In addition to the instant case, this omnibus order likewise applies to the following cases: 25-M-0516 (In the Matter to Seek Consequences Against Gateway Energy Services Corporation for Violations of the Uniform Business Practices); 25-E-0517 (In the Matter to Seek Consequences Against Energy Plus Holdings LLC for Violations of the Uniform Business Practices); 25-G-0518 (In the Matter to Seek Consequences Against Energy Plus Natural Gas, LLC for Violations of the Uniform Business Practices); 25-M-0520 (In the Matter to Seek Consequences Against Green Mountain Energy Company for Violations of the Uniform Business Practices); 25-M-0521 (In the Matter to Seek Consequences Against Reliant Energy Northeast LLC for Violations of the Uniform Business Practices); 25-M-0522 (In the Matter to Seek Consequences Against Stream Energy New York LLC for Violations of the Uniform Business Practices); 25-M-0523 (In the Matter to Seek Consequences Against XOOM Energy New York LLC for Violations of the Uniform Business Practices); and 25-M-0524 (In the Matter to Seek Consequences Against NRG Business Marketing, LLC for Violations of the Uniform Business Practices).

CASE 25-E-0516 <u>et</u> <u>al</u>.

York State should not be revoked or, alternatively, why other consequences as set forth in the UBP should not be imposed.

BACKGROUND

a. <u>The UBP</u>

In 1999, the Commission adopted the UBP.  The UBP sets forth various conditions for ESCOs to begin accessing, and to continue accessing, utility distribution systems for the purpose of selling energy services to customers.  The Commission has adopted revisions to the UBP on multiple subsequent occasions aimed at enhancing these procedures.  The most recent UBP update went into effect on October 27, 2024.

As relevant to this proceeding, UBP §2.B.1.a outlines eligibility requirements for ESCOs, including information that ESCOs must submit in a Retail Access Eligibility Application Form (RAAF).  Among other things, the RAAF requires ESCOs to identify the category or categories of commodity products that they intend to provide to customers.[3]

The Commission has authority to enforce the requirements of the UBP by imposing consequences on ESCOs that fail to abide by the UBP's terms and conditions.[4]  An ESCO may be subject to the consequences listed in UBP §2.D.6.b for multiple reasons, including, but not limited to, providing "false or misleading information in the application package" (UBP §2.D.5.a), "failure to comply with required customer protections" (UBP §2.D.5.c), "failure to comply with applicable ... reporting requirements" (UBP §2.D.5.d), "failure to comply with the UBP terms and conditions, including discontinuance requirements" (UBP §2.D.5.f), and "failure to comply with the

---

[3]  UBP §2.B.1.A.ii.

[4]  UBP §2.D.6.A.1.b.

4

CASE 25-E-0516 <u>et</u> <u>al</u>.

Commission's Environmental Disclosure requirements or failure to comply with other Commission Orders, Rules or Regulations" (UBP §2.D.5.i).  In addition, pursuant to UBP §2.B.3, "[a]n ESCO that knowingly makes false statements in its application package is subject to denial or revocation of eligibility."

       b. <u>The Commission Issued the Low-Income Order</u>

On December 16, 2016, the Commission issued an Order Adopting a Prohibition on Service to Low-Income Customers by Energy Service Companies (Low-Income Order).  In that order, the Commission stated that bill comparison data revealed that retail customers, and particularly low-income customers, were often charged higher prices for electric and gas service purchased through an ESCO rather than a utility.[5]  Although subsidies through assistance programs were intended to make low-income customers' bills more affordable, the Commission observed that expensive ESCO service can offset the value of those subsidies, thus resulting in higher bills for low-income customers.[6]

Based on this information, the Low-Income Order prohibited ESCOs from serving customers participating in utility low-income assistance programs.  Specifically, the Commission instructed utilities to reject new ESCO enrollments for low-income individuals, and instructed ESCOs to de-enroll low-income accounts "at the expiration of the existing agreement," or at "the end of the current billing period[]" for month-to-month contracts.[7]  The Low Income Order further required that utilities

---

[5]  Case 12-M-0476, <u>Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State</u>, Low-Income Order (issued December 16, 2016), p. 6.

[6]  Id., p. 25.

[7]  Id., pp. 20-21.

CASE 25-E-0516 et al.

provide updated lists of ineligible accounts to ESCOs on a "rolling basis," but "no less than once every month."[8]

Regarding ESCO customers who become low-income after the prohibition, the Commission instructed utilities enrolling new customers in their low-income programs to place blocks on those customers' accounts, and to inform ESCOs serving low-income customers that those ESCOs can no longer serve those low-income accounts.[9]  Upon receiving that utility communication, ESCOs were required to de-enroll accounts at the end of existing agreements, or at the end of the current billing period for month-to-month contracts.[10]

c. The Commission Issued the Reset Order

On December 12, 2019, the Commission continued "strengthen[ing] protections for residential and small commercial customers ... in the retail energy market" by issuing the Reset Order.[11]  That order established a new paradigm for ESCO business practices and reined in undesirable ESCO conduct by adopting limitations on the types of products ESCOs were permitted to offer to residential and small commercial, known as mass market, customers to ensure those offerings provided value to customers.

For instance, to ensure mass market customers received value from the retail energy market, the Reset Order instituted a prohibition on non-energy-related value-added products and services.  The Commission observed that these products, which

---

[8]  Id., pp. 22-23, 27.

[9]  Id., p. 22.

[10]  The Commission stated that ESCOs "shall [] de-enroll the identified accounts at the expiration of the existing agreement.  With respect to customers on month-to-month contracts, the expiration of the agreement is at the end of the current billing period." Id., p. 22.

[11]  Reset Order, p. 1.

CASE 25-E-0516 <u>et</u> <u>al</u>.

often take the form of gift cards or "swag" to induce customers to sign contracts with ESCOs, frequently have a market value that is significantly less than the price the customer pays for that item or service and do not further the State's energy goals.  The Commission, therefore, determined that those products do not provide any energy-related benefit to mass market customers.[12]

The Reset Order also instituted stricter eligibility requirements to ensure that ESCOs complied with regulations, rules, and the overarching policy goals of New York State.  That order specified that:

> ESCOs shall enroll new residential or small non-residential customers (mass market customers) or renew existing mass market customers for gas and/or electric service only if at least one of the conditions is met: (1) enrollment includes a guaranteed savings over the utility price, as reconciled on an annual basis; (2) enrollment is for a fixed-rate commodity product that is priced at no more than 5% greater than the trailing 12-month average utility supply rate; (3) enrollment is for a renewably sourced electric commodity product that (a) has a renewable mix that is at least 50% greater than the ESCO's current Renewable Energy Standard (RES) obligation, (b) the ESCO complies with the RES location and delivery requirements when procuring Renewable Energy Credits (RECs) or entering into bilateral contracts for renewable commodity supply, and (3) there is transparency of information disclosures provided to the customers with respect to pricing commodity sourcing.[13]

The Reset Order further required that all ESCOs offering renewable products identify the percentage of renewable energy supplied in their contracts and then retire Renewable Energy Certificates (RECs) to match corresponding loads in the

---

[12] Id., p. 43.

[13] Id., p. 108.

CASE 25-E-0516 et al.

New York Generation Attributes Tracking System (NYGATS) and in their Environmental Disclosure Program (EDP) subaccount.[14]  This process, which Staff verifies, ensures that New York State mass market customers who choose to support renewable energy receive the contractually obligated loads upon which an ESCO's ability to serve them is conditioned.  In addition, Ordering Clause 6 of the Reset Order instructed ESCOs "who are currently operating in New York that intend to continue to renew contracts with customers in New York and/or enroll new customers in New York following the effective date of Ordering Clause No. 1 ... to file an application in accordance with the body of [the] Order no later than 30 calendar days following the date the revisions to the [UBP] become effective."[15]

Several ESCOs subsequently sought extensions of the implementation of the Reset Order, which the Commission granted.[16]  Some ESCOs also filed requests for rehearing that the Commission denied in a September 18, 2020 Order on Rehearing, Reconsideration and Providing Clarification (Clarification Order).[17]  Following these actions, portions of the Reset Order relevant here took effect on April 16, 2021.

---

[14] The EDP sets the parameters for a REC to be classified as compliant.  Staff contends that only RECs retired in an ESCO's EDP subaccount comply with the Reset Order.  Any other method(s) of retirement potentially subject an ESCO to a Notice of Apparent Violation (NOAV).

[15] Reset Order, pp. 109-11.

[16] Case 15-M-0127 et al., supra, Notice Granting Extension Requests (issued January 22, 2020); Notice Granting Extension Requests (issued April 7, 2020); Notice Granting Extension Requests (issued July 14, 2020); and Notice Granting Extension Requests (issued February 4, 2021).

[17] Case 15-M-0127 et al., supra, Order on Rehearing, Reconsideration and Providing Clarification (issued September 18, 2020).

CASE 25-E-0516 <u>et</u> <u>al</u>.

      d. <u>The NRG Entities Participated in the Revised Eligibility</u>
         <u>Process or Affirmed that They Did Not Intend to Continue</u>
         <u>to Serve Mass Market Customers</u>

During the revised eligibility application process following the Reset Order, all participating ESCOs were required to submit a new application package to Staff for review that included copies of all customer contracts for each compliant product offering the ESCOs wished to market.[18]  As part of that process, Staff granted eligibility for the NOAV Entities to serve New York customers on certain products.  Specifically, Direct received eligibility to serve a variable rate guaranteed savings product for electric-only service in Consolidated Edison Company of New York, Inc.'s (Con Edison) utility service territory, a renewable energy product, and a fixed-rate product with a cap to gas and electric mass market customers.  EPH, Gateway, Green Mountain, Reliant, Stream, and XOOM all received eligibility to serve a renewable energy product to electric mass market customers.  These entities were to serve mass market customers on products that complied with the Reset Order, not to offer products they may have served to mass market customers in the past.

EPNG filed an application to serve a gas product to customers on November 16, 2020.  Ultimately, rather than continue to serve mass market customers, EPNG submitted an attestation stating that the company was withdrawing its application, pursuant to the Reset Order.  EPNG affirmed that "it does not presently intend to continue to renew contracts with customers in New York and/or enroll customers in New York following the April 16, 2021 effective date of the September 18, 2020 Order or as extended," and acknowledged that if "at some future time ... [EPNG chose to] renew contracts with customers

_____

[18] Reset Order, p. 109.

CASE 25-E-0516 <u>et</u> <u>al</u>.

in New York and/or enroll customers in New York, that it must apply to the Department for the privilege to do so."[19]

Similarly, NBM submitted an attestation regarding its eligibility to serve mass market customers. In that attestation, dated June 11, 2020 (but filed June 17, 2020), NBM represented that it "[had] not submitted, and [did] not intend to submit, updated eligibility applications for the purpose of obtaining/retaining eligibility to serve mass-market customers," and further affirmed that it did not intend to market to or enroll new mass market customers after September 9, 2020.[20]

e. The Commission Issued Orders Limiting and Ultimately Prohibiting ESCOs From Offering "Green Gas" Products

So-called "green gas" or renewable gas products generally consist of natural gas commodity service bundled with carbon offsets or RECs. While the Reset Order permitted ESCOs to offer a renewable electric product, that order did not permit ESCOS to offer a renewable gas product.

After the Commission issued the Reset Order, some ESCOs sought to continue offering "green gas" products to mass market customers. In the Clarification Order, the Commission stated that the Reset Order did not exempt "green gas" products from the default guaranteed savings rule.[21] The Commission observed that the ESCOs had provided "virtually no evidence" related to "green gas" products and stated that the record did not include any proof of the benefits of "green gas" products

---

[19] Matter 19-02972, <u>In the Matter of Revised ESCO Applications in Compliance with Commission Order in Case 15-M-0127 et al. Issued and Effective December 19, 2019</u>, Attestation Letter, Filing No. 553 (submitted February 9, 2021).

[20] Matter 19-02972, <u>supra</u>, Attestation Letter, Filing No. 35 (submitted June 18, 2020).

[21] Clarification Order, p. 39.

10

CASE 25-E-0516 et al.

for mass market customers that would justify an exception to the guaranteed savings requirement.[22]

In response, Green Mountain and several other ESCOs filed petitions seeking an exemption from the guaranteed savings rule for a "green gas" product as a value-added, energy-related product.  In an order issued January 25, 2021 (Limited Waiver Order), the Commission directed that details for a "green gas" product be further developed and analyzed in so-called Track II proceedings.[23]  The Commission denied the petitioner ESCOs' proposals but authorized a one-year limited waiver to permit "ESCOs currently selling natural gas bundled with either a carbon offset component or a REC purchase component ... to continue to market such eligible bundles to customers already purchasing them."[24]  In order to qualify for the waiver, ESCOs that wished to continue offering a "green gas" product were required to submit: (1) proof that their "green gas" product was offered prior to September 18, 2020; and (2) a standard sales agreement for that product during the waiver period.[25]

After the Commission issued the Limited Waiver Order, nine ESCOs, including Green Mountain, filed the required documentation.  Staff subsequently permitted these ESCOs to provide existing mass market customers with a "green gas" product for one year from the effective date of the Limited Waiver Order (i.e., until January 25, 2022).

---

[22] Id.

[23] Case 15-M-0127 et al., supra, Order Addressing ESCO Petitions Requesting Authorization to Provide Additional Products and Services (issued January 25, 2021).

[24] Limited Waiver Order, p. 18.

[25] Id., pp. 18-19.

11

CASE 25-E-0516 et al.

Following multiple extensions of the waiver period,[26] on July 15, 2022, the Commission issued the Green Gas Transition Order, denying the petitioning "green gas" ESCOs' request to extend the waiver period, and directing those ESCOs to, "within 120 days of the effective date of this Order, transfer residential customers served on a 'green gas' product pursuant to a waiver to either: (1) a product that complies with the [Reset Order and Limited Waiver Order]; or (2) full utility service."[27]  The Commission further ordered that these transfers occur "upon expiration of the current contract term with the customers and on customers' regularly scheduled meter reading dates."[28]

In addition, during the Track II proceedings, a group of ESCOs, including Green Mountain, filed a petition (Petition), dated July 5, 2022, seeking authorization to offer three types of "green gas" products to customers without any price restrictions.[29]  On January 19, 2023, the Commission denied the Petition in an Order Denying Exemption from Guaranteed Savings Rule (Exemption Denial Order).[30]  In that order, the Commission

---

[26] Upon the expiration of the waiver period on January 25, 2022, the Commission extended the waiver period for 120 days, or until May 24, 2022, and again until July 24, 2022.  See Case 15-M-0127 et al., supra, Waiver Letter – Green Mountain Energy Company (filed January 25, 2022); Second Waiver Letter – Green Mountain Energy Company (filed May 24, 2022).

[27] Green Gas Transition Order, p. 19.

[28] Id., p. 19.

[29] Several ESCOs filed the Petition, including most of the NRG Entities, as well as several other NRG affiliates not named in this order.  The entities associated with NRG that joined in the Petition included: Direct; EPH; EPNG; Gateway; Green Mountain; Reliant; Stream; XOOM; NBM; Direct Energy Business, LLC; and Independence Energy Group LLC d/b/a Cirro Energy.

[30] Case 15-M-0127 et al., supra, Order Denying Exemption from Guaranteed Savings Rule (issued January 19, 2023).

CASE 25-E-0516 <u>et</u> <u>al</u>.

summarized Green Mountain's claims that the company could purportedly provide energy-related, value-added products to assist in meeting the State's climate goals, as well as Green Mountain's assertion that the Commission should adopt the Petition to avoid disrupting service to existing customers who purchased "green gas" products.[31]  However, the Commission determined that, among other things, the petitioners had failed to demonstrate that their proposed "green gas" products were bona fide energy-related value-added products, and had also failed to adequately address the costs associated with these products (particularly the premium charged to customers).[32]  In rejecting the Petition, the Commission further noted its responsibility to balance customer choice with the statutory commitment to ensure just and reasonable rates.[33]

In sum, the Green Gas Transition Order mandated that ESCOs who had served "green gas" customers during the waiver period transition those customers to a compliant product or to full utility service no later than November 12, 2022 (<u>i.e.</u>, 120 days from the effective date of that order), while the Exemption Denial Order denied certain ESCOs' Petition that the Commission approve those companies' requests to offer three different types of "green gas" products to mass market customers without any price restrictions.

## LEGAL AUTHORITY

The Commission has broad "authority to condition ESCO's eligibility to access utility [distribution systems] on such terms and conditions that the [Commission] determines to be

---

[31] Exemption Denial Order, pp. 11-12.

[32] Id., pp. 19-20, 24.

[33] Id., p. 25.

CASE 25-E-0516 <u>et</u> <u>al</u>.

just and reasonable."[34]  Consistent with this authority, the Commission's orders and the UBP set forth various eligibility conditions for ESCOs to begin accessing, and to continue accessing, utility distribution systems for the purpose of selling energy services to customers.  The Commission has authority to enforce these conditions by imposing consequences on ESCOs that fail to abide by the terms of the UBP.[35]

THE DEPARTMENT'S INVESTIGATION AND FINDINGS

In 2023, Staff initiated an investigation into the NOAV Entities' contracts after a routine voluntary energy review following the close of the 2022 Clean Energy Standard compliance year on June 30, 2023, revealed multiple concerns regarding the NOAV Entities' business practices.  Following its initial investigation, Staff issued an NOAV to each of the NOAV Entities on January 8, 2024, alleging violations of the Reset Order and the UBP.  Since that time, Staff has identified additional apparent violations of the UBP as well as other Commission Orders.  Accordingly, Staff now contends that:

1) The NOAV Entities apparently failed to transition customers to compliant contracts in violation of the Reset Order;

2) Green Mountain apparently failed to transition "green gas" customers to utility service or enroll customers on compliant contracts in violation of the Reset Order and the Green Gas Transition Order;

---

[34] <u>Matter of National Energy Marketers Assn. v. New York State Pub. Serv. Comm.</u>, 33 N.Y.3d 336, 343, 351 (2019); see generally UBP §2.d.6.a.1.b.

[35] UBP §2.D.6.a.1.b.

CASE 25-E-0516 <u>et al</u>.

3) Certain NOAV Entities apparently failed to comply with REC locational and delivery requirements in violation of the Reset Order and UBP §2.D.5.i;

4) Multiple NOAV Entities apparently failed to comply with the prohibition on non-energy-related value-added products and services in violation of the Reset Order;

5) The NOAV Entities apparently failed to de-enroll low-income customers in violation of the Low-Income Order and UBP §§2.D.5.c and 2.D.5.f; and

6) NBM apparently failed to disclose that it is currently serving mass market customers in violation of UBP §§2.B.1.a.ii, 2.D.5.a, and 2.D.5.d.

The following summary is based on Staff's investigation to date; it does not constitute final findings or conclusions by the Commission, and the NRG Entities will have an opportunity to respond to the contentions.

a. <u>The NOAV Entities Apparently Failed to Transition Customers to Compliant Contracts in Violation of the Reset Order</u>

As discussed below, Staff contends that the NOAV Entities have apparently failed to resolve the allegations put forth in the NOAVs and continue to serve customers on non-compliant products, in violation of the Reset Order.

i. <u>Background and NOAV Allegations</u>

Consistent with the Commission's Reset Order, ESCOs were required to serve customers enrolled on renewing contracts, including those enrolled on month-to-month or fixed-term contracts that shifted to month-to-month contracts at the expiration of the contract term, on compliant products upon renewal or expiration of those agreements.[36]  With respect to customers' month-to-month contracts, the expiration of the

_____

[36] Reset Order, p. 108.

CASE 25-E-0516 et al.

agreement is at the end of the current billing period.[37]  Thus, the Commission required that ESCOs either return any customers served on renewing contracts to utility service or enroll those customers on a compliant product upon the expiration of the billing period following the effective date of the new product restrictions, which was April 16, 2021.

During Staff's renewable energy review for the 2022 calendar year, Staff identified inconsistencies between the NOAV Entities' self-reported renewable load data compared to the load data tracked in NYGATS.  Since the majority of the NOAV Entities only had eligibility to serve mass market customers on a renewable electric product, Staff expected to see much higher renewable load reported for each of the entities.  Given these aberrations, Staff reviewed migration data and requested copies of active customer contracts for closer review.  An inspection of these contracts showed that many customers of the NOAV Entities had apparently (and improperly) continued to be served on contracts executed prior to the date the Reset Order took effect.  Accordingly, on January 8, 2024, Staff issued NOAVs to the eight NOAV Entities.  The allegations in those NOAVs are detailed below.

1. Direct

In the Direct NOAV, Staff contended that Direct had 583 MWh of voluntary renewable load associated with compliant renewable products and 4,850 MWh of voluntary non-compliant renewable load in 2022.  Direct identified 4,254 customers that remained on fixed-term contracts and 36,940 customers that remained on allegedly non-compliant month-to-month contracts

---

[37] Low-Income Order, p. 21; see also Nat'l Energy Marketers Ass'n v. New York State Pub. Serv. Comm'n, 167 A.D.3d 88, 98 (3d Dept. 2018) (upholding the Commission's implementation of the prohibition on ESCO service to low-income customers).

16

CASE 25-E-0516 et al.

(i.e., legacy customer contracts executed prior to April 16, 2021). This prompted Staff to further investigate the number of mass market customers served on compliant products versus those who continued to be served on non-compliant legacy products that continued on a fixed term or month-to-month variable product following the effective date of the Reset Order.

Staff only granted Direct eligibility to serve a guaranteed savings product in Con Edison's territory, but Staff determined that the company did not serve any customers on this product from April 16, 2021, through September 30, 2023. This indicated to Staff that the majority of Direct's customers were served on non-compliant month-to-month contracts following the effective date of the Reset Order.

The Direct NOAV further contended that, based on migration report data the utilities provided to Staff, Direct had continued to serve gas to over 13,000 mass market gas customers across every utility in New York State, even though the company was only eligible to serve a renewable electric product after April 16, 2021.

2. EPH

In the EPH NOAV, Staff contended that EPH reported 3,401 MWh of compliant voluntary renewable load, but 15,597 MWh of load associated with a non-compliant voluntary renewable product, despite the company only having eligibility to offer renewable electric products post-April 16, 2021. This discrepancy prompted Staff to investigate further.

Staff requested a copy of an active 2022 customer contract. In response, EPH submitted a renewal contract from December 30, 2020, for a 100 percent renewable month-to-month contract with an effective date of February 23, 2021. The language in the contract specified that EPH would purchase RECs produced by wind power generation facilities located in the

17

CASE 25-E-0516 et al.

United States to match 100 percent of electricity usage.[38]  As
this was a month-to-month contract that should have transitioned
to a EDP-complaint product after the effective date of the Reset
Order, Staff requested confirmation that associated RECs were
included in the EDP-compliant load data that EPH self-reported.
EPH responded that "[t]hose customers are included in the non-
compliant load," which indicated to Staff that EPH continued to
serve customers on non-compliant electric products after April
16, 2021.

### 3. EPNG

As detailed above, on February 9, 2021, EPNG submitted
an attestation on the Department's Document Matter Management
(DMM) system that it did not intend to continue to renew or
enroll new mass market customers in New York following the
effective date of the Reset Order on April 16, 2021.  However,
as detailed in the EPNG NOAV, Staff reviewed EPNG's gas
migration reports and discovered that the company had apparently
continued to serve over 1,300 mass market gas customers across
the service territories of Con Edison, The Brooklyn Union Gas
Company d/b/a National Grid NY (KEDNY), National Fuel Gas
Distribution Corporation (National Fuel), New York State
Electric & Gas Corporation (NYSEG), and Orange and Rockland
Utilities, Inc. (O&R).

In connection with its investigation, Staff also
requested and reviewed EPNG sales agreements.  Staff found no
evidence that EPNG had any fixed-term contracts prior to the

---

[38] The Commission prohibited ESCOs from purchasing RECs from
national sources following the effective date of the Reset
Order.  See Clarification Order, p. 10 (noting the
"prohibition on nationally sourced renewable attributes"); p.
49 (observing that "[e]ligible RECs are unique products that
are not comparable to products marketed as nationally sourced
RECs.").  See also Section d, infra.

CASE 25-E-0516 <u>et</u> <u>al</u>.

effective date of the Reset Order that could account for the number of mass market gas customers that the company apparently served in 2022.  Therefore, Staff contended that EPNG failed to return mass market gas customers to their respective utilities at the end of the monthly term of their contracts.

4. <u>Gateway</u>

In the Gateway NOAV, Staff alleged that Gateway did not file a response to Staff's annual voluntary REC review for the 2022 compliance year, even though the company received eligibility to only offer a renewable variable rate product after April 16, 2021.

After additional Staff investigation, Gateway informed Staff that the company had 8,751 residential and small commercial customers, all of whom were served on month-to-month contracts.  After Staff requested a copy of an active 2022 customer contract, Gateway stated that it "had no new acquisition customers post 4/16/2021 and therefore no customers who signed up for the 50% renewable product."  Gateway also confirmed that it did not retire any RECs associated with any voluntary renewable Gateway customers contracts in 2022 and indicated that it had never offered renewable products.  Gateway provided an active customer contract from April 5, 2021, who was served on a fixed-rate, 12-month electric plan with no renewable energy component.

Staff also examined gas migration reports and discovered that Gateway apparently continued to provide gas service to over 14,000 residential and small commercial customers.  However, because Gateway is only eligible to offer a renewable electric product, the company is prohibited from serving gas customers.  This data indicated to Staff that Gateway continued to serve mass market customers on legacy contracts following the expiration of their billing term.

19

CASE 25-E-0516 et al.

### 5. Green Mountain

In response to Staff's annual voluntary REC review for calendar year 2022, Green Mountain self-reported that 132,507 MWh of load was served on a voluntary compliant renewable product, while 229,530 MWh of load was served on a non-compliant voluntary renewable product.  In subsequent correspondence with Staff, Green Mountain reported that it had 43,013 legacy customers on month-to-month variable rate renewable electric contracts and 839 legacy customers on month-to-month fixed rate contracts.  Staff contended that, by continuing to provide service to customers on non-compliant contracts, Green Mountain apparently violated the Reset Order.

Staff also alleged in the Green Mountain NOAV that Green Mountain continued to serve gas to over 2,500 mass market customers in Con Edison and KEDNY's service territories, despite lacking eligibility to serve gas after the effective date of the Reset Order.  These allegations are further discussed in The Department's Investigation and Findings, Section b, infra, regarding Green Mountain's apparently improper "green gas" product offerings.

### 6. Reliant

In response to Staff's voluntary renewable energy review for 2022, Reliant reported that it had served 3,194 MWh of load on a voluntary compliant renewable product and 5,615 MWh of load on a non-compliant voluntary renewable product.  Reliant later reported that it had 12,498 customers on month-to-month legacy contracts and four customers on fixed-rate legacy products.  Staff alleged that Reliant's continued use of non-compliant products apparently violated the Reset Order.

Staff also reviewed utility migration reports and discovered that Reliant apparently continued to serve gas products to over 3,800 mass market customers in the service

20

CASE 25-E-0516 <u>et</u> <u>al</u>.

territory of Niagara Mohawk Power Corporation d/b/a National Grid (NMPC), despite only being eligible to serve a renewable electric product after April 16, 2021.  This also apparently violated the Reset Order.

7. <u>Stream</u>

In connection with Staff's voluntary renewable energy review for 2022, Staff reviewed data indicating that Stream's New York load was apparently 44,231 MWh.  However, Stream's self-reported renewable data indicated that only 1,893 MWh of that load was served on a voluntary compliant renewable product in 2022, which is the only product the company was authorized to offer after the effective date of the Reset Order.  The large difference between the total load and the compliant load prompted additional questions from Staff, as it appeared that much of Stream's load originated from non-compliant products.

Stream subsequently represented to Staff that, of the 4,551 customers who began ESCO service prior to April 21, 2021, 4,530 continued to be served on a variable month-to-month non-renewable product as of December 31, 2022.  This statement indicated to Staff that Stream was not complying with the Reset Order because Stream was only permitted to serve renewable products following the contract "reset" that occurred on April 16, 2021.

In addition, Stream's gas migration reports suggested to Staff that Stream continued to serve gas to over 2,500 mass market customers in the Con Edison, KEDNY, NPMC, NYSEG, and Rochester Gas and Electric Corporation (RG&E) service territories, even though Stream was never granted eligibility to serve gas to mass market customers after April 16, 2021. Accordingly, the Stream NOAV alleged that Stream failed to comply with the Reset Order by improperly continuing its mass market gas service.

21

CASE 25-E-0516 et al.

8. XOOM

XOOM provided self-reported load data in response to Staff's 2022 voluntary renewable energy review. The company reported that 123,856 MWh of load was served on a compliant voluntary renewable product during that calendar year, but 5,859 MWh of load was served on a non-compliant voluntary renewable product. In subsequent correspondence with Staff, XOOM indicated that 6,357 customers continued to be served on non-compliant variable month-to-month contracts executed prior to April 21, 2023. This information suggested to Staff that XOOM had apparently violated the Reset Order by serving customers on non-compliant products during 2022.

Staff's review of utility gas migration reports also revealed that XOOM apparently continued to serve approximately 9,000 mass market gas customers in the service territories of Central Hudson Gas & Electric Corporation (Central Hudson), Con Edison, Keyspan Gas East Corporation d/b/a National Grid (KEDLI), KEDNY, National Fuel, NMPC, NYSEG, O&R, and RG&E, even though XOOM was only granted eligibility to provide a renewable electric product to mass market customers after April 16, 2021. Staff never permitted XOOM to market or serve a gas product to mass market customers after that date. Staff therefore contended that XOOM's apparent failure to enroll customers on a compliant product or return customers to utility service constituted a violation of the Reset Order.

ii. The NOAV Entities' Response to the NOAVs

In the NOAV Entities' omnibus response to the NOAVs, dated February 13, 2024 (Response to the NOAVs), the NOAV Entities claimed that: (1) the NOAV Entities and other ESCOs sought clarification on the contract renewal issue and the Commission confirmed in the Clarification Order that the Reset Order only applied to "prospective" contracts; (2) the NOAV

22

CASE 25-E-0516 et al.

Entities disclosed their customer agreements and the products they offered to Staff, and Staff approved these submissions as in compliance with both the UBP and Commission Orders; (3) the NOAV Entities justifiably relied on the Commission's and Staff's actions, and adopting Staff's interpretation in the NOAVs would raise concerns under the State Administrative Procedures Act, the Good Faith Reliance Doctrine, and constitutional doctrines including ex post facto enforcement; (4) Staff's interpretation of the Reset Order conflicts with the language of the NOAV Entities' continuous service agreements, and is also incompatible with the UBP and the New York General Business Law (GBL), which contemplates such continuous service agreements; and (5) Staff's position would result in an impermissible regulatory taking.  The NOAV Entities argued that Staff should therefore withdraw the NOAVs and close these matters.

In particular, the NOAV Entities asserted that the Commission intended that the Reset Order "not impact any existing customer agreements," largely based on the Clarification Order's directive that the Reset Order "only applies to prospective contracts."[39]  The NOAV Entities further claimed that automatic renewal of a contract's initial term is simply continuation of a contract, not a new contract, and that the NOAV Entities are essentially exempt from Commission regulation of existing customer contracts because the companies' "automatic renewal provisions do not create new contracts."[40] The NOAV Entities contend that they need not follow Commission directives impacting continuing contracts because their "contract language clearly states the parties' intention that

---

[39] Matter 23-02403 et al., In the Matter of Notice of Apparent Violation Against Direct Energy Services LLC, Response to NOAVs, pp. 6-7 (quoting Clarification Order, pp. 48-49).

[40] Id., p. 13.

23

CASE 25-E-0516 <u>et</u> <u>al</u>.

'the' contract automatically continues unless there is a clear action from either party to cancel the contract."[41]  As the legacy contracts at issue are purportedly "an extension or continuation of the term in the contracts entered into prior to the [effective date of the Reset Order]," the NOAV Entities claim that Staff's interpretation would infringe on the parties' rights under the original contracts.[42]

Although the NOAV Entities responded to Staff's NOAVs, by today's Order, the Commission now directs those entities to respond to each of Staff's allegations in a submission to the Commission for potential Commission action.[43]

### iii. The NOAV Entities Apparently Continue to Serve Mass Market Customers on Non-Compliant Products

The NOAV Entities have long been aware of the Commission's "reset" requirement for ESCOs serving mass market customers after April 16, 2021, including through the Reset Order, the Clarification Order, and the NOAVs that Staff issued in January 2024.  However, based on the initial results of Staff's renewable energy review for calendar year 2024, as well as recent gas migration data Staff received from the utilities, it appears that the NOAV Entities have continued to improperly serve legacy mass market electric and gas customers on non-compliant products.

---

[41] Id.

[42] Id., p. 15.

[43] In response to the NOAVs, the NOAV Entities avoid directly engaging with Commission practice regarding billing and contract terms.  We note that the Commission previously ordered – and the Appellate Division Third Department subsequently affirmed – that the expiration of a customer's month-to-month agreement is at the end of the current billing period.  Low-Income Order, p. 21; Nat'l Energy Marketers Ass'n v New York State Pub. Serv. Comm'n, 167 A.D.3d 88, 98 (3d Dept. 2018).

24

CASE 25-E-0516 et al.

Staff contends that the NOAV Entities have apparently admitted that they continue to serve mass market electric customers on prohibited legacy products. For example:

- In its response to Staff's 2024 voluntary renewable review, dated June 26, 2025, Direct admitted to serving 47 MWh of voluntary renewable load associated with non-compliant products predating April 16, 2021, during 2024.[44]

- In its response to Staff's 2024 voluntary renewable review, dated June 26, 2025, EPH admitted to serving 11,724 MWh of voluntary renewable load associated with non-compliant products predating April 16, 2021, during 2024.[45] In a follow-up response, dated July 18, 2025, EPH admitted that 7,820 customers remained on variable month-to-month legacy contracts.[46]

- In a follow-up response to Staff's 2024 voluntary renewable review, dated August 22, 2025, Gateway admitted that 6,471 electric customers remained on non-complaint legacy agreements.

- In its response to Staff's 2024 voluntary renewable review, dated June 26, 2025, Green Mountain admitted to serving 152,956 MWh of voluntary renewable load

---

[44] Matter 22-00900, In the Matter of Renewable Energy Audits, DES 2024 Voluntary Renewable Audit Response, Filing No. 326 (submitted June 26, 2025).

[45] Matter 22-00900, supra, EPH 2024 Voluntary Renewable Audit Response, Filing No. 327 (submitted June 26, 2025). Staff further notes that these non-compliant renewable products apparently made up the vast majority of EPH's voluntary renewable load in 2024, as EPH reported that only 2,217 MWh of voluntary renewable load was associated with customers served on compliant voluntary renewable products.

[46] Matter 22-00900, supra, EPH 2024 Voluntary Renewable Audit Follow-up Response, Filing No. 339 (submitted July 18, 2025).

CASE 25-E-0516 et al.

associated with non-compliant products predating April 16, 2021, during 2024.[47]  In a follow-up response, dated July 18, 2025, Green Mountain admitted that 26,816 customers remained on legacy products, with 26,815 customers on variable month-to-month contracts and one customer on a fixed term contract.[48]

- In its response to Staff's 2024 voluntary renewable review, dated June 26, 2025, Reliant admitted to serving 3,917 MWh of voluntary renewable load associated with non-compliant products predating April 16, 2021, during 2024.[49]  In a follow-up response, dated July 18, 2025, Reliant admitted that 9,054 customers remained on variable month-to-month legacy contracts.[50]

- In a follow-up response to Staff's 2024 voluntary renewable review, dated July 18, 2025, Stream admitted that, during 2024, it had served 0 mass market customers on a renewable product (the only product Stream is currently eligible to offer), and 525 mass market customers on legacy products.[51]

- In its response to Staff's 2024 voluntary renewable review, dated June 26, 2025, XOOM admitted to serving 505 MWh of voluntary renewable load associated with non-

---

[47] Matter 22-00900, supra, GME 2024 Voluntary Renewable Audit Response, Filing No. 331 (submitted June 26, 2025).

[48] Matter 22-00900, supra, GME 2024 Voluntary Renewable Audit Follow-up Response, Filing No. 342 (submitted July 18, 2025).

[49] Matter 22-00900, supra, REN 2024 Voluntary Renewable Audit Response, Filing No. 328 (submitted June 26, 2025).

[50] Matter 22-00900, supra, REN 2024 Voluntary Renewable Audit Follow-up Response, Filing No. 340 (submitted July 18, 2025).

[51] Matter 22-00900, supra, Stream 2024 Voluntary Renewable Audit Follow-up Response, Filing No. 341 (submitted July 18, 2025).

CASE 25-E-0516 <u>et al</u>.

compliant products predating April 16, 2021, during 2024.[52]

In addition, Staff's review of utility gas migration data from 2025 indicates that Direct, Gateway, Green Mountain, Stream, and XOOM have apparently continued to serve mass market gas customers, even though these companies did not have eligibility to offer gas products after April 16, 2021.

Based on the information the NOAV Entities provided in response to Staff's 2024 renewable energy review of electric mass market customers, as well as Staff's review of recent migration data for gas mass market customers, Staff contends that the NOAV Entities' apparent violations of the Reset Order are ongoing and continuous.

b. <u>Green Mountain Apparently Failed to Transition "Green Gas" Customers to Utility Service or Enroll Customers on Compliant Contracts in Violation of the Reset Order and the Green Gas Transition Order</u>

After the NOAV Entities submitted their Response to the NOAVs, Staff identified additional potential violations of Commission Orders including, but not limited to, the Green Gas Transition Order. Upon further investigation, Staff alleges that Green Mountain apparently failed to transition its "green gas" customers to utility service or enroll those customers on compliant products following the effective date of the Green Gas Transition Order, which was November 12, 2022. Green Mountain's failure to take this action also apparently constitutes another violation of the Reset Order, which only permitted ESCOs to offer certain compliant products on a going-forward basis. "Green gas" products – which Staff asserts Green Mountain continues to provide – are not among the limited products that

---

[52] Matter 22-00900, <u>supra</u>, XOOM 2024 Voluntary Renewable Audit Response, Filing No. 330 (submitted June 26, 2025).

CASE 25-E-0516 et al.

Staff permitted Green Mountain to offer after the effective date of the Reset Order.

As stated in Background, Section d, supra, Green Mountain only received eligibility to serve renewable products to electric mass market customers during the revised eligibility process. Staff, therefore, did not permit Green Mountain to continue to serve any gas customers following the effective date of the Reset Order. The Clarification Order found that the Reset Order did not exempt "green gas" products from the default guaranteed savings rule, while the Green Gas Transition Order affirmed that ESCO customers could no longer be served on "green gas" products. Therefore, at the conclusion of the one-year limited waiver period, and consistent with Ordering Clause No. 2 of the Green Gas Transition Order, Green Mountain was required to transfer any "green gas" customers to a product that complied with the Reset Order (i.e., to the fixed and variable rate renewable electric products Staff approved the company to serve during the revised eligibility process), or drop those customers back to utility service within 120 days of the effective date of the Green Gas Transition Order (November 12, 2022).

Additionally, in a letter to the Secretary filed March 15, 2021, Green Mountain sought a waiver of the Reset Order to market a "green gas" product (natural gas bundled with carbon offsets) that the company asserted it "[had] been offering in the market prior to September 2020."[53] In that filing, Green Mountain included a redacted copy of an enrollment form, reflecting that a customer had been enrolled on a month-to-month variable rate "green gas" product in Con Edison's service

---

[53] Matter 14-02554, In the Matter of Compliance with Annual, Triennial, and Third Party Marketer/Vendor Listing, Filing No. 6374 (submitted March 15, 2021).

28

CASE 25-E-0516 <u>et</u> <u>al</u>.

territory in March 2020.[54]  Green Mountain therefore apparently admitted that it served customers on "green gas" products prior to the effective date of the Reset Order.

Staff now contends that Green Mountain apparently continued serving its legacy gas customers rather than transition them to compliant products following the effective dates of both the Reset Order (for gas customers generally) and the Green Gas Transition Order (for "green gas" customers).  As stated in the Green Mountain NOAV, Staff determined that Green Mountain had apparently continued to serve gas to over 2,500 mass market customers in Con Edison and KEDNY's service territories, despite lacking eligibility to serve gas at all after April 16, 2021.

Recently, Staff requested that Green Mountain produce "ALL currently active gas customer sales agreements" by August 19, 2025.  On that day, rather than provide "ALL" active contracts, as Staff had requested, Green Mountain submitted a single sample variable rate month-to-month natural gas contract for a "Carbon Conscious plan."  Green Mountain describes that plan as "offsetting the estimated carbon dioxide ($CO_2$) emissions associated with the stated percentage of [a customer's] natural gas usage by purchasing carbon offsets under one or more third-party carbon offset standards."

Staff contends that this contract is for "natural gas bundled with ... a carbon offset component"[55] – a product offering that was the subject of the limited waiver in the Limited Waiver Order, and whose continued use in the New York retail market the Commission later prohibited in the Green Gas

---

[54] Matter 14-02554, <u>supra</u>, Filing No. 6374 (submitted March 15, 2021), Exhibit I.

[55] Limited Waiver Order, p. 18.

29

CASE 25-E-0516 <u>et</u> <u>al</u>.

Transition Order.[56]  In addition, because Green Mountain only provided Staff with a copy of one "green gas" contract in response to Staff's request for all active contracts, it appears that Green Mountain's natural gas offering only consists of "green gas" products that the Commission has explicitly rejected.  Green Mountain submitted a follow-up response to Staff on August 22, 2025, and acknowledged that 2,077 customers are currently being served on its "Carbon Conscious" green gas plan.  This impermissible product offering therefore apparently violates both the Reset Order and the Green Gas Transition Order.

c. <u>Certain NOAV Entities Apparently Failed to Comply with REC Locational and Delivery Requirements in Violation of the Reset Order and UBP §2.D.5.i</u>

Staff contends that permissible REC purchases are limited to those that can be tracked and retired in NYGATS and in ESCOs' EDP subaccounts.  However, it appears that multiple NOAV Entities contracted to provide their customers with renewable products but apparently failed to adhere to the REC and EDP locational and delivery requirements outlined in the Reset Order.

In addition, ESCOs such as the NOAV Entities may be subject to the consequences listed in UBP §2.D.6.b, including revocation of eligibility, for, among other things, "failure to comply with the Commission's Environmental Disclosure requirements or failure to comply with other Commission Orders, Rules or Regulations" under UBP §2.D.5.i.  Staff contends that the NOAV Entities apparently continued to serve legacy customers on non-EDP-compliant products after April 16, 2021, contrary to UBP §2.D.5.i and the Reset Order.

---

[56] Green Gas Transition Order, p. 19.

30

CASE 25-E-0516 et al.

By way of background, in the Reset Order, the Commission observed that Staff cannot always track RECs associated with energy sources that originate from outside the New York Independent System Operator, Inc. (NYISO) market, which are sometimes referred to as "nationally sourced RECs."[57]  Given these concerns, the Commission articulated its commitment to ensuring that customers in New York State only pay a premium for renewable energy that directly benefits the State.

Therefore, the Commission determined that "ESCO purchases of RECs from outside the NYISO market will not advance the clean energy goals adopted by [the] State," and any national REC purchases would "not be permitted to continue."[58]  The Reset Order also mandated that "all voluntary renewable electricity purchases made by ESCOs will be subject to the same locational and delivery requirements as Tier-1-eligible REC purchases."[59] While that order permitted ESCOs to offer certain products that are less than 100 percent renewable,[60] it required ESCOs with renewable product offerings to identify the portion of renewable energy advertised for each product and ensure that renewable load complied with REC locational and delivery requirements. The Commission further instructed ESCOs to "ensure that all

---

[57] See Reset Order, p. 79 (observing that "it is difficult or impossible for New York regulators and customers to evaluate whether, and to what extent, the purchase of RECs from Texas and other states actually results in increased generation of renewable energy.").

[58] Id.

[59] Id.

[60] Id., p. 75.  Staff contends that, for a product to be considered "renewable," its associated RECs must be able to be tracked and retired in NYGATS.

31

CASE 25-E-0516 et al.

transactions are recorded in NYGATS and properly associated with their account."[61]

Staff alleges that, with the exception of EPNG, all NOAV Entities apparently failed to adhere to these requirements because they continued to purchase nationally sourced RECs to satisfy their renewable load obligations.[62]  For example, during the revised eligibility process, Staff only approved EPH to serve a renewable (EDP-compliant) energy product to electric mass market customers.  As referenced in The Department's Investigation and Findings, Section A.i.2, supra, Staff requested that EPH provide a copy of an active customer contract in connection with its 2022 voluntary renewable energy review.  In response, EPH provided a month-to-month renewal contract from December 30, 2020.  That contract stated that EPH would purchase RECs produced by wind power sourced from within the United States to meet 100 percent of electricity usage - and therefore not from locations that can be tracked in NYGATS.  EPH confirmed that customers served on this product were included in its non-EDP-compliant load.  Therefore, Staff contends that EPH improperly continued to serve customers on an electric product generated from national sources, rather than from EDP-compliant sources, as required by the Reset Order.

In sum, Staff alleges that multiple NOAV Entities improperly procured RECs from national sources and failed to retire compliant RECs that can be tracked in NYGATS, which constitutes a violation of the Reset Order.  Staff further contends that this failure constitutes an apparent "failure to

---

[61] Id., p. 80.

[62] Staff's predicate allegations concerning the NOAV Entities' authorized products offerings are set out in section (d) in the Background discussion, above.  Staff contends that after April 16, 2021, the NOAV Entities were obligated to source renewable electric products from EDP-compliant products.

32

CASE 25-E-0516 <u>et al</u>.

comply with the Commission's Environmental Disclosure requirements or failure to comply with other Commission Orders, Rules or Regulations" under UBP §2.D.5.i.  With the exception of EPNG, all the NOAV Entities are directed to respond to Staff's contention.

d. <u>Multiple NOAV Entities Apparently Failed to Comply with the Prohibition on Non-Energy-Related Value-Added Products and Services in Violation of the Reset Order</u>

The Reset Order determined that "[v]alue-added products and services that have no energy-related benefit and/or that are offered as a one-time promotion do not further the energy policy goals of the State and, therefore, provide no value in the context of the retail energy market."[63]  In adopting that order, the Commission observed that promotional items such as gift cards are often used to induce customers to sign a contract with an ESCO, but the market value of such items is often significantly less than the price the customer pays over the length of the ESCO contract term.[64]  Thus, the Commission ordered that, "because these promotional items typically do not provide any energy-related benefit to customers, ESCOs are prohibited from offering them to prospective customers as inducements to sign a contract."[65]

Although the Commission's prohibition of non-energy-related value-added products and services has been in place for more than four years, Staff now alleges that at least two of the NOAV Entities – Green Mountain and XOOM – have improperly offered promotional items to customers within the last year.  In addition, Staff contends that potential EPH or EPNG customers

---

[63] Reset Order, p. 43.

[64] Id.

[65] Id., pp. 43-44.

CASE 25-E-0516 <u>et al</u>.

could be induced to sign up with rewards advertised on their shared website.

        i.    <u>Green Mountain</u>

Staff contends that Green Mountain improperly distributed gift cards to prospective customers in 2024 and 2025 as an incentive to enroll on ESCO service. Specifically, Staff received multiple complaints detailing Green Mountain solicitations in New York City that apparently indicate that the company's sales representatives engaged in improper solicitation.

In one case (QRS Case 513291), a consumer alleged that a Green Mountain representative approached the consumer's daughter in a grocery store in Manhattan in December 2024 and requested to see a copy of a Con Edison bill in exchange for a gift card. The consumer sent his daughter a picture of their Con Edison bill, and the consumer was apparently enrolled with Green Mountain via proxy of his daughter. The contract is dated December 20, 2024, and lists a sales agent. The consumer subsequently sought to rescind enrollment with Green Mountain. Green Mountain's response, dated January 31, 2025, indicates that the company processed the rescission request and agreed not to start the consumer's electric service. Green Mountain further admitted that the consumer's "description of the sales interaction is not in line with Green Mountain Energy's Code of Conduct and his complaint was forwarded to our internal Sales Quality team for further investigation." The company further represented that it "has strict policies and procedures that all sales agents must follow," and that "[t]he agent involved has received coaching on this matter and appropriate action has been taken to prevent future occurrences."

Despite Green Mountain's assurances that it was taking corrective action, on June 16, 2025, another consumer filed a

34

CASE 25-E-0516 <u>et</u> <u>al</u>.

complaint with Staff (QRS Case 543782), alleging that a Green Mountain salesperson had approached his wife in a Best Buy in Brooklyn and convinced her to sign up for ESCO service with a $5 gift card.  The consumer claimed that his wife was not accurately informed about Green Mountain's service, and the consumer requested that the contract be rescinded.  The contract is dated June 14, 2025, and lists a different sales agent than QRS Case 513291.

Staff contends that Green Mountain engaged in prohibited solicitation by offering gift cards as incentives to enroll customers on its products.  Notably, while Green Mountain claimed in January 2025 that it had addressed its sales representative's admittedly improper actions and acted "to prevent future occurrences," an entirely different Green Mountain salesperson apparently attempted to sign up customers by offering gift cards only a few months later.  These incidents suggest that Green Mountain is apparently improperly instructing or failing to instruct its personnel on the requirements of the Reset Order.  Thus, Staff alleges that Green Mountain has apparently violated the Reset Order's prohibition on non-energy-related value-added products and services.

ii.  <u>XOOM</u>

Staff contends that XOOM has improperly offered non-energy-related value-added incentives by advertising and enrolling New York customers in its "XOOM Xtras" rewards program.  This program apparently promotes the use of rewards points to earn gift cards and other rewards.  Staff considers these rewards points to be inducements to encourage customers to enroll and remain on XOOM service.

Staff first became aware of XOOM's apparently improper offerings through QRS Case 517883.  In that case, a customer informed Staff on February 13, 2025, that XOOM "has a reward

35

CASE 25-E-0516 et al.

program and you earn points for gift cards."  The customer sought $25 in rewards purportedly earned through a XOOM account before discontinuing XOOM energy service.  In a letter to the Department's Office of Consumer Services, dated February 17, 2025, XOOM acknowledged that the customer was enrolled in its XOOM Xtras rewards program.  XOOM stated in its response to the complaint that this program "provides Xtra members the opportunity to participate in fun activities, such as auctions, sweepstakes, trivia, polling, and so much more!  Rewards are awarded as KOIYN that can be redeemed for sweepstake entries, auctions, and money saving goods & services."  XOOM informed Staff that the company had advised the customer that, "while his KOIYN balance was worth $14.16, as a gesture of goodwill XOOM Energy would provide him a $25 gift card link" to resolve the complaint, which the customer had accepted.

The rewards program referenced in the customer's complaint prompted further Staff investigation.  Staff reviewed the XOOM Xtras website (https://xoomxtras.com/), which details the rewards that customers can apparently redeem with KOIYN.[66] As of August 19, 2025, that website apparently references multiple non-energy-related value-added items, from "local deals, from your favorite restaurants to retail shops," to "hotel bookings and vacation packages," to "insurance savings." XOOM informs customers that they can redeem KOIYN for gift cards at retail stores "like L.L. Bean, Macy's, Nike, Bass Pro Shops, and more!" and can also use KOIYN to obtain "top, name brand merchandise items from electronics to home goods and beyond." It appears that XOOM customers can earn KOIYN through online games, by making monthly payments as a XOOM customer, and by enrolling in autopay.  Notably, the bottom of the XOOM Xtras

---

[66] Referenced portions of the XOOM Xtras website are included in Exhibit A.

36

CASE 25-E-0516 <u>et al</u>.

home page specifically associates "XOOM Energy New York, LLC" with the rewards program.

Staff contends that XOOM appears to be using non-energy-related promotional items that customers can redeem through its XOOM Xtras program to incentivize customers to join and remain on ESCO service.  Staff also notes that the complainant in QRS Case 517883 apparently enrolled on XOOM service beginning on March 18, 2023, which is nearly two years after the Reset Order's prohibition on non-energy-related value-added products went into effect.

Furthermore, XOOM's reliance on incentives forbidden by the Reset Order in order to resolve complaints filed with the Department suggests an overall lack of familiarity with New York's established marketing requirements.  It appears to Staff that XOOM improperly sought to remedy a problem with a prohibited solution by offering to resolve a complaint with a gift card.  The Reset Order forbade ESCOs from offering "[v]alue-added products and services that have no energy-related benefit" - such as gift cards and savings at retail stores, restaurants, hotels, and insurance – because these items "provide no value in the context of the retail energy market."[67] It is Staff's position that XOOM's rewards program does not offer any value-added, energy-related benefits, and thus appears to violate the Reset Order.

iii. <u>EPH and EPNG</u>

Staff alleges that the Energy Plus company website for both EPH and EPHG (https://www.energypluscompany.com/) contains representations about improper value-added, non-energy-related rewards that could induce prospective customers in New York to

---

[67] Reset Order, p. 43.

37

CASE 25-E-0516 et al.

initiate service with one or both companies.  This website, therefore, appears to violate the Reset Order.

Staff observes that, as of August 19, 2025, the "Our Services" page of the joint EPH and EPNG website (https://www.energypluscompany.com/services/services.php) states that Energy Plus offers "some nice rewards" in connection with energy service.[68]  That page also advertises "[m]iles/points awards typically earned after at least 2 months of service," without any limitation on redeeming these rewards based on a customer's service territory.  While this webpage mentions New York customers, it does not indicate that these "[m]iles/points" rewards are unavailable in New York.  The website only advises New York customers that they can call a phone number to obtain historical non-promotional price information.  Additionally, a link on the "Our Services" page invites prospective customers to "start earning rewards!" and directs to an "Enroll Today" page (https://www.energypluscompany.com/care/enroll_today.php).  That portion of the website discloses that Energy Plus is now part of the NRG family of companies, but states that potential customers can still – apparently without any details or caveats - "[c]hoose from plans with rewards," and that customers can visit PickNRG.com to sign up.

Staff is concerned that the joint EPH and EPNG website lacks any limiting conditions for New York customers. Prospective customers in New York could be encouraged to enroll through references to rewards such as "[m]iles/points" that these companies appear to offer to all customers.  Even if a prospective EPH or EPNG customer in New York was ultimately unable to enroll with an ESCO through PickNRG.com that did not offer non-energy-related, value-added rewards, these prospective

---

[68] Screenshots of Energy Plus website pages referenced in this paragraph can be found in Exhibit B.

CASE 25-E-0516 <u>et</u> <u>al</u>.

customers could be induced by the inclusion of enticing language and references to "[m]iles/points" on the Energy Plus website. Thus, Staff contends that, at a minimum, several NOAV Entities including, but not limited to, EPH and EPNG, have apparently failed to police their websites to ensure compliance with the Reset Order.[69]

e. <u>The NOAV Entities Apparently Failed to De-Enroll Low-Income Customers in Violation of the Low-Income Order and UBP §§2.D.5.c and 2.D.5.f</u>

Staff's investigation recently revealed that the NOAV Entities apparently failed to de-enroll customers participating in their respective utilities' low-income programs, which is a violation of the Low-Income Order. Among other things, that order required utilities to place a block on low-income accounts to prevent those customers from being enrolled on ESCO service, required utilities to communicate updates to ESCOs regarding low-income program enrollment or de-enrollment, and required ESCOs to de-enroll low-income accounts, "provided that existing contracts will continue until their expiration" (<u>i.e.</u>, until the end of the current billing period for those customers on month-to-month contracts).[70]

---

[69] This apparent failure to maintain compliant websites can also be seen on a Stream website Staff accessed on August 19, 2025 (https://www.mystream.com/en/egift-card), describing that company's gift card offerings. See Exhibit C. Although that website discloses that a "$50 eGift Card for New Georgia, Northeast and Midwest Energy Customers," to be redeemed at retailers such as Amazon and Target, may not be "available for all rate classes, customer types, or in all areas," Staff observes that a prospective New York customer could be enticed by an offer for new "Northeast" customers (especially since that website notes that Stream is licensed in New York). Finally, Staff observes that this promotion conspicuously ran for one month starting on April 16, 2021, which is precisely the date the Reset Order took effect.

[70] Low-Income Order, pp. 21, 26-28.

CASE 25-E-0516 et al.

In addition, ESCOs may be subject to the consequences listed in UBP §2.D.6.b, including possible revocation of eligibility, for "failure to comply with required customer protections" (UBP §2.D.5.c) and "failure to comply with the UBP terms and conditions, including discontinuance requirements" (UBP §2.D.5.f).  Staff contends that the NOAV Entities have failed to ensure that low-income customers are adequately protected by failing to de-enroll or "discontinue" service to low-income customers, contrary to the Low-Income Order.

Staff requested data from New York utilities reflecting low-income program enrollment as of December 31, 2022, December 31, 2023, and December 31, 2024.[71]  Staff also sought a breakdown of low-income customers enrolled in regular ESCO service and those enrolled as part of a Community Choice Aggregation (CCA) program.  Based on the information Staff received, Staff now contends that thousands of low-income customers statewide have been improperly served by the NOAV Entities over the prior three years.  Specifically, Staff alleges that, collectively, between both regular ESCO service and CCA ESCO service, the NOAV Entities improperly served a total of 2856 low-income customers statewide as of the end of 2022, 3,354 as of the end of 2023, and 4,042 as of the end of 2024.  These enrollment figures indicate that the number of low-income customers has apparently increased over time, suggesting that this problem may be escalating.

By way of background, CCA programs are based on an opt-out membership model in which - based on a tripartite contract between and among a municipality, a CCA administrator, and an ESCO - all residents of a locality are placed in an aggregated cohort of energy customers unless a resident takes an

---

[71] Staff requested this data from Central Hudson, Con Edison, KEDLI, KEDNY, National Fuel, NMPC, NYSEG, O&R, and RG&E.

CASE 25-E-0516 <u>et</u> <u>al</u>.

affirmative action to leave the cohort (<u>i.e.</u>, opt-out).[72]  The Commission has expressed the need for robust community outreach and education to ensure informed consent and transparency in municipalities participating in CCA programs, and has implemented increasingly enhanced CCA program rules.[73]  As all residents in participating municipalities are enrolled in CCA programs by default if those residents do not opt-out, any enrollments should be conducted with heightened scrutiny to ensure that customers – and particularly low-income customers - do not improperly receive CCA ESCO service.

Information that the utilities provided to Staff has also highlighted additional problems and concerns with low-income CCA service.  That data suggests that certain municipalities appear to have a significant number of low-income customers enrolled on CCA ESCO service with Direct, which is the only NOAV Entity that offers CCA service.  For instance, based on the terms and timing of CCA contracts, Staff contends that Direct is only providing CCA service to customers to one municipality located within Con Edison's service territory - the City of Yonkers.  Therefore, all of Con Edison's low-income customers receiving CCA service through Direct consist of Yonkers customers.

---

[72] See generally Case 14-M-0224, <u>Proceeding on Motion of the Commission to Enable Community Choice Aggregation Programs</u>, Order Authorizing Framework for Community Choice Aggregation Opt-Out Program (issued April 21, 2016) (providing the framework for CCA programs).

[73] See generally Case 14-M-0224, <u>supra</u>, Order Modifying Outreach and Education Requirements and Directing Program Evaluation (issued November 19, 2024) (strengthening outreach and education requirements for CCA programs); see also Case 14-M-0224, <u>supra</u>, CCA Rules December 2024 (filed December 12, 2024) (reflecting the latest update to CCA rules).

CASE 25-E-0516 et al.

It further appears that low-income enrollments are directly correlated with the start of Yonkers CCA contracts, with contract terms running from December 1, 2023, to November 30, 2024, and from December 1, 2024, to November 30, 2025. Con Edison reported that Direct did not serve any low-income CCA customers in Yonkers as of the end of 2022, but served more than 800 low-income CCA customers in Yonkers by the end of 2024. As with regular ESCO service, this data indicates to Staff that this low-income customer enrollment problem may be escalating and may be particularly problematic in municipalities participating in CCA programs.

Pursuant to the Low-Income Order, utilities were required to provide updated lists of ineligible low-income accounts to ESCOs "no less than once every month."[74] Utilities must also inform ESCOs about customers who, for instance, become low-income after enrolling on ESCO service. ESCOs are then required to de-enroll those accounts at the end of those customers' billing periods.[75] Any delay on the part of the utilities to update their low-income lists or other data issues, such as belated verification of enrollment in the Home Energy Assistance Program for low-income individuals, would still not account for the thousands of customers who remained on ESCO service through the NOAV Entities as of the end of the last three calendar years. Indeed, utility data that Staff received in August 2025 indicates that at least 600 low-income customers have continued to receive ESCO service from some of the NOAV Entities in at least three consecutive years. ESCOs such as the NOAV Entities are ultimately responsible for de-enrolling low-income customers and ensuring compliance with Commission rules

---

[74] Low-Income Order, pp. 22-23, 27.

[75] Id., p. 22.

CASE 25-E-0516 et al.

and regulations.  Staff therefore contends that the NOAV Entities apparently violated the Low-Income Order, UBP §2.D.5.c, and UBP §2.D.5.f by failing to monitor and de-enroll their low-income customers.

f. NBM Apparently Failed to Disclose That It Is Currently Serving Mass Market Customers in Violation of UBP §§2.B.1.a.ii, 2.D.5.a, and 2.D.5.d

Finally, Staff contends that another NRG entity not named in the original NOAVs, NBM, is apparently serving mass market gas customers despite (1) lacking eligibility to offer products to mass market customers and (2) attesting to only serving industrial and large commercial customers.  Staff alleges that this failure to disclose that it is currently serving mass market customers constitutes an apparent violation of UBP §2.B.1.a.ii, which requires ESCOs to accurately identify the category or categories of commodity products they intend to provide to customers.

Additionally, ESCOs may be subject to the consequences listed in UBP §2.D.6.b, including revocation of eligibility, for having "false or misleading information in the application package" (UBP §2.D.5.a), as well as for "failure to comply with applicable ... reporting requirements (UBP §2.D.5.d).  It appears that, by including false information in its RAAF submissions and failing to disclose the existence of its mass market customers, NBM apparently violated UBP §§2.D.5.a and 2.D.5.d.

As stated in Background, Section d, supra, on June 17, 2020, NBM attested that it "[had] not submitted, and [did] not intend to submit" updated eligibility applications to serve mass market customers and stated that it did not intend to market to

43

CASE 25-E-0516 et al.

or enroll new mass market customers after September 9, 2020.[76] NBM's RAAF and triennial filings in DMM Matter 14-02554 dating back to 2015 consistently represented that company did not serve residential customers.[77] NBM also did not check a box in its RAAFs and triennial filings indicating that it ever sought eligibility to offer products to "Residential and Small Non-Residential (the Mass Market)" customers. In its most recent triennial filing, submitted on May 2, 2025, NBM only indicates that it is currently serving natural gas in "Industrial and Large [Commercial and Industrial]" markets.[78]

Despite these representations, recent migration data that Staff received from utilities between May 2025 and July 2025 (depending on the service territory) indicates that NBM is apparently serving several thousand mass market gas customers across multiple service territories statewide, including nearly 4,900 residential customers in Con Edison's service territory alone. NBM never informed Staff that it was serving these mass market customers or sought eligibility to do so, but apparently served these customers even after the Reset Order took effect. Accordingly, Staff contends that NBM apparently failed to

---

[76] Matter 19-02972, supra, Attestation Letter, Filing No. 35 (submitted June 18, 2020).

[77] See, e.g., Matter 14-02554, supra, Filing No. 6516 (submitted May 2, 2025); Filing No. 5669 (submitted January 26, 2024); Filing No. 4954 (submitted January 25, 2023); Filing No. 4722 (submitted May 4, 2022); Filing No. 3638 (filed January 14, 2021); Filing No. 3084 (submitted January 29, 2020); Filing No. 2627 (submitted May 16, 2019); Filing No. 1667 (submitted January 31, 2018); Filing No. 1114 (submitted February 1, 2017); Filing No. 783 (submitted May 16, 2016); and Filing No. 260 (submitted February 13, 2015). Some of these filings were submitted under NBM's previous name, Direct Energy Business Marketing, LLC.

[78] Matter 14-02554, supra, Filing No. 6516 (submitted May 2, 2025).

44

CASE 25-E-0516 <u>et</u> <u>al</u>.

provide accurate information in its RAAF and triennial filings, in violation of UBP §2.B.1.a.ii.

DISCUSSION AND CONCLUSION

Every ESCO in New York must comply with the UBP and all applicable Commission orders including, without limitation, the Reset Order, to maintain eligibility to operate in New York. Staff alleges that one or more of the NRG Entities have apparently failed to comply with the terms of the UBP, the Reset Order, the Green Gas Transition Order, and the Low-Income Order.

The Commission notes that the presentation of Staff's allegations herein does not reflect a final determination of facts or legal conclusions. However, at this initial stage of the proceeding, the Commission finds that the Department's investigation has identified sufficient credible information to support Staff's contention that:

1) The NOAV Entities apparently failed to transition customers to compliant contracts in violation of the Reset Order;

2) Green Mountain apparently failed to transition "green gas" customers to utility service or enroll customers on compliant contracts in violation of the Reset Order and the Green Gas Transition Order;

3) Certain NOAV Entities apparently failed to comply with REC locational and delivery requirements in violation of the Reset Order and UBP §2.D.5.i;

4) Multiple NOAV Entities apparently failed to comply with the prohibition on non-energy-related value-added products and services in violation of the Reset Order;

5) The NOAV Entities apparently failed to de-enroll low-income customers in violation of the Low-Income Order and UBP §§2.D.5.c and 2.D.5.f; and

45

CASE 25-E-0516 <u>et</u> <u>al</u>.

6) NBM apparently failed to disclose that it is currently serving mass market customers in violation of UBP §§2.B.1.a.ii, 2.D.5.a, and 2.D.5.d.

Staff contends that the NRG Entities' apparent violations were not isolated events but rather encompass numerous instances of non-compliance that extend across the Companies' business practices that may reflect a pervasive disregard for the UBP, the Reset Order, the Green Gas Transition Order, and the Low-Income Order.  Based on the information identified by Staff, and for the reasons discussed in this Order, the Commission therefore orders the NRG Entities to show cause why, based upon the allegations and contentions described herein, their eligibility to provide services as ESCOs in New York should not be revoked.  The NRG Entities should further show cause why other consequences should not be imposed.

<u>The Commission orders</u>:

1.  A proceeding is instituted, and the NRG Entities are ordered to show cause within 30 days of the date of this Order why the Commission should not revoke their eligibility to operate as Energy Services Companies in the State of New York, or impose other consequences, as described in UBP §2.D.6, or other potential remedies including, but not limited to, prospective debarment, refunds or re-rates to customers who may have been impacted, and/or installation of independent third party monitors (at ESCO expense) to police and report unauthorized conduct.

2.  In the Secretary's sole discretion, the deadlines set forth in this Order may be extended.  Any request for an extension must be in writing, must include a justification for the extension, and must be filed at least three days prior to the affected deadline.

46

CASE 25-E-0516 <u>et</u> <u>al</u>.

3.  These proceedings are continued.


By the Commission,



(SIGNED)                          MICHELLE L. PHILLIPS
                                       Secretary

47

Exhibit A

CASE 25-E-0516 <u>et</u> <u>al</u>.



# XOOM Xtras is fast, fun & free

XOOM Xtras rewards you with **Koiyn (points)** for managing your XOOM Energy account, submitting testimonials, playing games and more. You can redeem your Koiyn for gift cards, merchandise, social good, and more.

Deals & Discounts    Earn    Redeem



**Local Deals**
Browse a wide variety of local deals, from your favorite restaurants to retail shops.



**Hotel Deals**
Before you book that well-deserved trip, save more on hotel bookings and vacation packages.



**Insurance Savings**
Make sure your life is secured with these wallet-happy savings on insurance.

1

CASE 25-E-0516 *et al*.

Deals & Discounts    **Earn**    Redeem



**Games**
Play, have fun earn bonus Koiyn for playing our online arcade games



**Monthly Deposits**
Each month you're a XOOM Energy customer you'll earn Koiyn



**Auto-pay enrollment**
Sign up for auto bill pay and you'll earn Koiyn

Deals & Discounts    Earn    **Redeem**



**Gift Cards**
Search thousands of popular gift cards like L.L. Bean, Macy's, Nike, Bass Pro Shops, and more!



**Merchandise**
Search top, name brand merchandise items from electronics to home goods and beyond.



**Social Good**
Pay it forward with your Koiyn. Gift life saving water or supplies through our partnership with Me to We.

2

CASE 25-E-0516 <u>et</u> <u>al</u>.



3

Exhibit B

CASE 25-E-0516 <u>et</u> <u>al</u>.

# ENERGY PLUS

Home          Our Services          Enroll          About Us

Our Services

## Our Services

**A unique approach to a standard service.** Energy Plus® is one of the only companies that offers valuable rewards to all of its customers just for paying their energy bills.

When you choose Energy Plus, you'll receive the same delivery service you've always had plus some nice rewards. You can earn rewards for your electricity service (through Energy Plus Holdings LLC) or your natural gas service (through Energy Plus Natural Gas LLC).

Choose Energy Plus and start earning rewards!

**We offer:**

✓ Sign-up bonus plus monthly ongoing rewards*

✓ Seamless switching

✓ Reliable service

✓ Fixed or variable pricing plans

*Many products feature 3 months of promotional pricing, followed by a variable price that changes monthly. Miles/points awards typically earned after at least 2 months of service; Cash Back awards available after every 12 months of service (check your product reward terms). Energy Plus prices may be higher than your utility's supply rate and savings are not implied nor guaranteed. You will still be responsible for your utility's delivery charges after switching. NY customers may call 1-866-964-5672 for historical non-promotional price information. Cancelling may take up to 2 billing cycles in some markets.

| Our Services | Customer Care | | Service Areas | |
|---|---|---|---|---|
| Home | | | | |
| Overview | Our Company | FAQs | Connecticut | New Jersey |
| | Customer Care | Utility Contacts | Illinois | New York |
| | | Privacy Rights & Requests | Massachusetts | Ohio |
| | | | Maryland | Pennsylvania |

1

CASE 25-E-0516 et al.



<u>Exhibit C</u>

CASE 25-E-0516 _et al_.



CASE 25-E-0516 _et_ _al_.

## Pick your perk!

eGift Cards available for: Amazon, Target, Walmart®, The Home Depot, Lowe's, Applebee's, Bass Pro Shops, The Container Store, CVS Pharmacy, Fanatics, Google Play, Home Goods, Hotels.com, Bed, Bath & Beyond, Marshalls, Overstock.com, Papa John's, Staples, TJ Maxx and more.**

**\*OFFER DETAILS**

**Valid Service Areas**
This electricity and natural gas service offer is valid for areas serviced by Stream.

**Eligibility**
Limited-time offer. Price and bonus offers are only for first-time, residential customers, so previous or existing customers are not eligible. Promotion not available to non-residential service accounts. Promotion is only available for residential customers who enroll in a fixed-price plan with a contract of 12 months or longer between April 16 - May 17, 2021. Electricity and natural gas promotion only available where applicable. Offer cannot be transferred or combined with other offers. Offer may change or be cancelled at any time. Offers are not available for all rate classes, customer types, or in all areas. Additional eligibility requirements, terms and conditions may apply.

**Please note:** Eligible customer(s) must have active eligible service account at reward fulfillment time. Active accounts are defined as those qualifying accounts that (i) are billing more then $0 and (ii) for which we have not received a request to discontinue service or change programs, and (iii) customers who are in good standing and do not have an overdue balance.

**Rewards Information**
Please refer to the terms and conditions of the eGift card brand you select.

**The merchants represented are not sponsors of the rewards or otherwise affiliated with Stream. The logos and other identifying marks attached are trademarks of and owned by each represented company and/or its affiliates. Please visit each company's website for additional terms and conditions.

eGift Cards administered by Whapos, LLC d/b/a Online-Rewards and sent via email to the email address associated with the customer's account. Stream is not responsible for lost, stolen, damaged, or undeliverable eGift Cards, including those that may be lost in transmission.

**For Texas Customers**
Customers in Texas will be awarded a $100 eGift Card after completing two consecutive months of active electricity service with Stream.

**For Northeast, Midwest and Georgia Customers**
Customers in Northeast, Midwest and Georgia markets will be awarded the $50 eGift Card after completing two consecutive months of active electricity or natural gas service with Stream.

Switching to a retail energy supplier is not mandatory and you have the option to remain with your utility.

**Applicable Fees**
None

**Shop Energy**
For Home
For Business
Stream Green

**My Account**
Log In
Pay My Bill
Renew Services

**Support**
Contact
FAQs

**About**
Blog
About Us



©2025 Stream Energy. All rights reserved. Stream's home energy services companies (both electric and gas) are duly licensed in TX, GA, PA, MD, NJ, NY, DC, IL, DE & OH. (TX — Stream SPE, Ltd., #10104, GA #GM-38, NJ #ESL-0109 & GSL-0120, PA #A-2010-2181867 & A-2012-2308991, MD #IR-2072 & IR-2742, NY #STRM, DC #EA11-11, IL #17-0033, DE #9137, OH #08-133G (5) and 17-1187 E (1)). Both Stream and Stream Energy are registered trade names duly licensed to various subsidiaries. All products, services and brand names used in connection with Stream's services are the property of their respective owners.

For information regarding Washington D.C.'s energy supply market, please visit the Washington D.C. Public Service Commission's web pages on Consumer Retail Choice and Consumer Suppliers' Offers.

Terms of Use. Privacy Rights and Request.