# Exhibit 3

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

                          At a session of the Public Service
                          Commission held in the City of
                          Albany on April 16, 2026

COMMISSIONERS PRESENT:

Rory M. Christian, Chair
James S. Alesi
David J. Valesky
John B. Maggiore
Uchenna S. Bright
Denise M. Sheehan
Radina R. Valova


CASE 25-M-0516 -  In the Matter to Seek Consequences Against
                  Gateway Energy Services Corporation for
                  Violations of the Uniform Business Practices.

CASE 25-E-0517 -  In the Matter to Seek Consequences Against
                  Energy Plus Holdings LLC for Violations of the
                  Uniform Business Practices.

CASE 25-G-0518 -  In the Matter to Seek Consequences Against
                  Energy Plus Natural Gas, LLC for Violations of
                  the Uniform Business Practices.

CASE 25-M-0519 -  In the Matter to Seek Consequences against
                  Direct Energy Services, LLC, et al. for
                  Violations of the Uniform Business Practices.

CASE 25-M-0520 -  In the Matter to Seek Consequences Against
                  Green Mountain Energy Company for Violations of
                  the Uniform Business Practices.

CASE 25-M-0521 -  In the Matter to Seek Consequences Against
                  Reliant Energy Northeast LLC for Violations of
                  the Uniform Business Practices.

CASE 25-M-0522 -  In the Matter to Seek Consequences Against
                  Stream Energy New York LLC for Violations of
                  the Uniform Business Practices.

CASE 25-M-0523 -  In the Matter to Seek Consequences Against XOOM
                  Energy New York LLC for Violations of the
                  Uniform Business Practices.

CASES 25-M-0516 et al.

CASE 25-M-0524 - In the Matter to Seek Consequences Against NRG
                 Business Marketing, LLC for Violations of the
                 Uniform Business Practices.


ORDER ADOPTING TERMS OF SETTLEMENT AGREEMENT

(Issued and Effective April 16, 2026)


BY THE COMMISSION:


INTRODUCTION

This Order adopts the terms and conditions of a settlement agreement (Settlement Agreement) executed by Direct Energy Services, LLC (Direct), Energy Plus Holdings LLC (EPH), Energy Plus Natural Gas, LLC (EPNG), Gateway Energy Service Corporation (Gateway), Green Mountain Energy Company (Green Mountain), Reliant Energy Northeast LLC d/b/a NRG Home, NRG Business and NRG Retail Solutions (Reliant), Stream Energy New York, LLC (Stream), XOOM Energy New York LLC (XOOM), and NRG Business Marketing, LLC f/k/a Direct Energy Business Marketing, LLC (NBM) (collectively, the Affiliated ESCOs) and the Department of Public Service's (Department or Department Staff) Office of Investigations and Enforcement.

The Settlement Agreement, attached hereto as Appendix 1, fully resolves all claims asserted in the omnibus Order to Show Cause (OTSC) issued by the Commission on September 23, 2025. Specifically, the Settlement Agreement resolves: (1) the Affiliated ESCOs' alleged failure to comply with the Commission's Uniform Business Practices (UBP); (2) Direct's, EPH's, EPNG's, Gateway's, Green Mountain's, Reliant's, Stream's, and XOOM's (collectively, the NOAV Entities) alleged failure to comply with a December 12, 2019 Commission Order Adopting Changes to the Retail Access Energy Market and Establishing

2

CASES 25-M-0516 et al.


Further Process[1] (Reset Order); (3) Green Mountain's alleged failure to comply with a July 15, 2022 Order Regarding Energy Service Company Waivers[2] (Green Gas Transition Order); and (4) the NOAV Entities' alleged failure to comply with a December 16, 2016 Order Adopting a Prohibition on Service to Low Income Customers by Energy Service Companies[3] (Low-Income Order).

Pursuant to the terms and conditions of the Settlement Agreement, the Affiliated ESCOs shall: (1) provide billing adjustments (Billing Adjustments) totaling $50 million ($50,000,000) to all former and current residential and small commercial customers who were allegedly not transitioned to contracts compliant with the Reset Order (Legacy Customers); (2) subject to obtaining affirmative customer consent, offer a fixed-price commodity electric and natural gas product approved by Department Staff as reflected and approved in Case 25-M-0519 (the Guaranteed Savings Product), providing a savings of fifteen percent compared to the Local Distribution Utility (LDU) price for a one-year term to all current and former Legacy Customers, or else drop current Legacy Customers back to their respective LDU; and (3) provide more than $900,000 to certain low-income customers who received service from the NOAV Entities and were retained as customers (the Low-Income Customers).

---

[1]  Cases 15-M-0127 et al., In the Matter of Eligibility Criteria for Energy Service Companies, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process (issued December 12, 2019).

[2]  Cases 15-M-0127 et al., In the Matter of Eligibility Criteria for Energy Service Companies, Order Regarding Energy Service Company Waivers (issued July 15, 2022).

[3]  Cases 12-M-0476 et al., Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State, Order Adopting a Prohibition on Service to Low-Income Customers by Energy Service Companies (issued December 16, 2016).

CASES 25-M-0516 <u>et</u> <u>al.</u>

## LEGAL BACKGROUND

In 1999, the Commission adopted the UBP.  The UBP established various eligibility conditions for Energy Service Companies (ESCOs), such as the Affiliated ESCOs, to access utility-owned distribution systems for the purpose of selling energy services to customers, which the Commission has authority to enforce.  The Commission has adopted revisions to the UBP on multiple subsequent occasions to enhance these procedures and customer protections.  The most recent UBP update went into effect in December 2025.

The Commission has also implemented reforms to the ESCO market through other Commission orders.  For instance, in recognition of the importance of ensuring affordability, particularly for low-income customers, on December 16, 2016, the Commission issued the Low-Income Order.  The Low-Income Order prohibited ESCOs from serving customers participating in utility low-income assistance programs.  Among other requirements, upon receiving information regarding low-income customer accounts, the Low-Income Order required ESCOs to de-enroll customers participating in low-income assistance programs at the end of existing agreements, or at the end of the current billing period for month-to-month contracts.[4]

On December 12, 2019, the Commission issued the Reset Order, which implemented additional requirements for ESCOs.  The Reset Order instituted enhanced eligibility requirements for ESCOs and changed the energy service products that ESCOs are authorized to offer in New York State.  Among other things, the Reset Order also required that all ESCOs offering renewable products identify the percentage of renewable energy supplied in their contracts and then retire Renewable Energy Certificates

---

[4]  <u>Id.</u>, p. 22.

4

CASES 25-M-0516 et al.

(RECs) to match corresponding loads in the New York Generation Attributes Tracking System and in their Environmental Disclosure Program subaccount.  The Reset Order also prohibited the use of non-energy-related value-added products and services.

Additionally, on July 15, 2022, the Commission issued the Green Gas Transition Order, directing certain petitioning ESCOs, including Green Mountain, to transfer residential customers served on a "green gas" product (pursuant to a previously issued "green gas" waiver) to either a product compliant with certain prior Commission orders or default LDU service within 120 days.[5]  The Commission further ordered that these transfers occur "upon expiration of the current contract term with the customers and on customers' regularly scheduled meter reading dates."[6]

FACTUAL AND PROCEDURAL BACKGROUND

On September 23, 2025, the Commission issued the omnibus OTSC, ordering the Affiliated ESCOs to show cause within 30 days why their eligibility to act as ESCOs in New York State should not be revoked or, alternatively, why other consequences as set forth in the Commission's UBP should not be imposed.  The omnibus OTSC alleged that:

1) The NOAV Entities apparently failed to transition customers to compliant contracts in violation of the Reset Order;

2) Green Mountain apparently failed to transition "green gas" customers to utility service or enroll customers on

---

[5]  Cases 15-M-0127 et al., In the Matter of Eligibility Criteria for Energy Service Companies, Order Regarding Energy Service Company Waivers (issued July 15, 2022).

[6]  Id., p. 19.

5

CASES 25-M-0516 et al.

compliant contracts in violation of the Reset Order and the Green Gas Transition Order;

3) Certain NOAV Entities apparently failed to comply with REC locational and delivery requirements in violation of the Reset Order and UBP §2.D.5.i;

4) Multiple NOAV Entities apparently failed to comply with the prohibition on non-energy-related value-added products and services in violation of the Reset Order;

5) The NOAV Entities apparently failed to de-enroll Low-Income Customers in violation of the Low-Income Order and UBP §§2.D.5.c and 2.D.5.f; and

6) NBM apparently failed to disclose that it is currently serving mass market customers in violation of UBP §§2.B.1.a.ii, 2.D.5.a, and 2.D.5.d.

As noted in the Settlement Agreement, the Affiliated ESCOs deny various aspects of the omnibus OTSC.

SUMMARY OF THE PROPOSED SETTLEMENT AGREEMENT

The Settlement Agreement would resolve all claims asserted in the omnibus OTSC against the Affiliated ESCOs. Pursuant to the terms and conditions of the Settlement Agreement, the Affiliated ESCOs and the Department agree as follows:

(a)   The Affiliated ESCOs shall provide Billing Adjustments totaling $50 million to all current and former Legacy Customers served on products that the Department contends expired, and should have been, but were not, transitioned to Reset Order products compliant with the Reset Order. The Billing Adjustments shall be distributed to Legacy Customers based on their overall energy usage from April

6

CASES 25-M-0516 et al.

16, 2021, (the effective date of relevant portions of the Reset Order) to the date of Commission approval of the Settlement Agreement, to the nearest one percent. Notices informing Legacy Customers of the settlement and accompanying Billing Adjustment checks shall be sent to Legacy Customers no later than 60 days after the date of any Commission approval of the Settlement Agreement.

(b)   Direct shall offer the Guaranteed Savings Product to all current and former Legacy Customers.  Subject to obtaining affirmative customer consent, the Guaranteed Savings Product would provide impacted customers with a 15% savings rate compared to the rate a customer would have paid their LDU for supply of electricity or natural gas for a single 12 month contract term.[7]

(c)   To the extent not already completed, the NOAV Entities shall provide payments to the Low-Income Customers for the period during which such customers inadvertently received ESCO service through one or more of the NOAV Entities, totaling approximately $919,396.  To the extent not already completed, the NOAV Entities shall return the Low-Income Customers to their LDU service no later than the conclusion of such customers' current billing cycle.

In sum, the Settlement Agreement compensates all Legacy Customers while ensuring that the Affiliated ESCOs either transition Legacy Customers to the Guaranteed Savings Product

---

[7]   The Guaranteed Saving Product shall not be available to natural gas Legacy Customers whose LDU is Corning Natural Gas Corporation, as Direct is not permitted to provide natural gas service in that service territory.

7

CASES 25-M-0516 <u>et</u> <u>al.</u>

(subject to obtaining affirmative consent) or return those customers to LDU service.  The Settlement Agreement further ensures that Low-Income Customers are fully compensated for being retained as customers of one or more of the NOAV Entities. The Settlement Agreement also instructs the Affiliated ESCOs to report to the Department regarding administration of the Billing Adjustments and Guaranteed Savings Product.  Finally, the Settlement Agreement instructs Direct to engage an independent third-party auditor at its own expense to monitor Direct's implementation of, and performance under, the Guaranteed Savings Product.  Through these terms and other requirements further detailed in the Settlement Agreement, and subject to Commission approval, the Affiliated ESCOs and the Department have fully and finally resolved all issues raised and claims made against the Affiliated ESCOs in the omnibus OTSC.

DISCUSSION AND CONCLUSION

In reviewing the Settlement Agreement, the Commission seeks to ensure that its terms are in the public interest.  An appropriate compromise should be consistent with the economic, consumer, environmental, social, safety, and legal policies of the Commission and the State.  An acceptable agreement should also produce results that are within the range of reasonable results that would have likely arisen from a Commission decision in a litigated proceeding.  An agreement should likewise endeavor to balance the interests of consumers, shareholders, and public safety, consistent with the applicable legal framework.[8]

---

[8]  These public interest inquiries are consistent with the considerations noted in, for example, Cases 90-M-0255 <u>et</u> <u>al.</u>, <u>Procedures for Settlements and Stipulation Agreements</u>, Opinion 92-2 (issued March 24, 1992).

CASES 25-M-0516 <u>et</u> <u>al.</u>

Here, the Commission finds that approval of the Settlement Agreement is in the public interest because the Affiliated ESCOs and the Department have identified and taken action to correct the alleged violations identified in the omnibus OTSC.  In the Settlement Agreement, the Affiliated ESCOs have agreed to provide $50 million in Billing Adjustments to Legacy Customers, offer a Guaranteed Savings Product that will save Legacy Customers who choose to enroll on that product 15% compared to their LDU rate for one year, and fully compensate Low-Income Customers for their enrollment on ESCO service with one or more of the NOAV Entities.  The Affiliated ESCOs will also report to Department Staff regarding the Billing Adjustments and Direct will engage an independent third-party auditor to review and identify any issues with administration of the Guaranteed Savings Product.  The Commission further observes that, in response to the omnibus OTSC, the Affiliated ESCOs voluntarily suspended certain marketing and enrollment activities and altered the language and disclosures on all relevant websites.  The Affiliated ESCOs have also represented that they will fully comply with Commission rules and regulations.

Second, the Commission finds that the Settlement Agreement is a fair compromise because the Affiliated ESCOs have agreed to concessions that will provide tangible value to impacted customers.  Notably, the Affiliated ESCOs have agreed to remit a substantial payment of $50 million to Legacy Customers.  In recognition of ongoing affordability policy objectives and concerns, the Guaranteed Savings Product will provide Legacy Customers with an opportunity to save 15% compared to the default LDU rate for one year.  Low-Income Customers will also receive payments to address their retention as customers of one or more of the NOAV Entities.  The

9

CASES 25-M-0516 <u>et</u> <u>al.</u>

Commission therefore determines that the Billing Adjustments, Guaranteed Savings Product offering, payment to Low-Income Customers, and other terms and conditions outlined in the Settlement Agreement are appropriate enforcement-related remedies and comport with the public interest.

Based on the unique and specific facts before us in this case, the Commission further concludes that the Settlement Agreement includes remedies that provide an equitable and fair compromise between the parties and is consistent with the economic, environmental, social, and regulatory compliance policies of the Commission.  The Commission finds that the Settlement Agreement's terms and conditions are within the range of reasonable outcomes that could be expected to be included in a litigated proceeding and benefits impacted former and current customers of the Affiliated ESCOs.  Therefore, consistent with the above discussion in this Order, the Commission hereby adopts and approves the Settlement Agreement.

<u>The Commission orders</u>:

1.  The terms of the Settlement Agreement, which is attached to this Order as Appendix 1, are adopted.

2.  In the Secretary's sole discretion, the deadlines set forth in this Order and accompanying Settlement Agreement may be extended.  Any request for an extension must be in writing, must include a justification for the extension, and must be filed at least three days prior to the affected deadline.

10

CASES 25-M-0516 <u>et</u> <u>al.</u>

3.  These proceedings are closed.


By the Commission,


(SIGNED)                        MICHELLE L. PHILLIPS
                                    Secretary

11

CASES 25-M-0516 <u>et</u> <u>al.</u>

<u>Appendix 1</u>

EXECUTION COPY

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is by and between the New York State Department of Public Service ("DPS" or "DPS Staff") and the Affiliated ESCOs[1] (each individually a "Signatory Party" and collectively, the "Signatory Parties"). This Agreement resolves all pending alleged violations arising out of the New York State Public Service Commission's ("Commission") Order Instituting Proceeding and to Show Cause, issued and effective September 23, 2025 ("OSC"), in Case 25-M-0516, et al.[2]

## RECITALS

WHEREAS, on December 12, 2019, the Commission issued an Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("Reset Order") in Case 15-M-0127, et al., In the Matter of Eligibility Criteria for Energy Service Companies, which instituted enhanced eligibility requirements for Energy Service Companies ("ESCOs") and changed the energy service products that ESCOs are authorized to offer in New York.[3]

WHEREAS, the Commission's Uniform Business Practices ("UBP") established various eligibility conditions for ESCOs to access utility-owned distribution systems for the purpose of selling energy services to customers, which the Commission has authority to enforce;

WHEREAS, the Affiliated ESCOs are ESCOs that are currently authorized to operate and offer electric and/or natural gas services to customers in New York;

---

[1] The "Affiliated ESCOs" are Gateway Energy Services Corp. ("Gateway"), Energy Plus Holdings LLC ("EPH"), Energy Plus Natural Gas LLC ("EPNG"), Direct Energy Services, LLC ("Direct Energy"), Green Mountain Energy Company ("Green Mountain"), Reliant Energy Northeast LLC ("Reliant"), Stream Energy New York, LLC ("Stream"), XOOM Energy New York, LLC ("XOOM"), and NRG Business Marketing LLC ("NBM"). The "NOAV Entities" are the Affiliated ESCOs, excluding NBM.

[2] The full list of cases (the "Cases") is Case 25-M-0516 (Proceeding on Motion of the Commission to Seek Consequences Against Gateway Energy Services Corporation for Violations of the Uniform Business Practices), 25-E-0517 (Proceeding on Motion of the Commission to Seek Consequences Against Energy Plus Holdings LLC for Violations of the Uniform Business Practices), 25-G-0518 (Proceeding on Motion of the Commission to Seek Consequences Against Energy Plus Natural Gas, LLC for Violations of the Uniform Business Practices), 25-M-0519 (Proceeding on Motion of the Commission to Seek Consequences against Direct Energy Services, LLC, et al. for Violations of the Uniform Business Practices), 25-M-0520 (Proceeding on Motion of the Commission to Seek Consequences Against Green Mountain Energy Company for Violations of the Uniform Business Practices), 25-M-0521 (Proceeding on Motion of the Commission to Seek Consequences Against Reliant Energy Northeast LLC for Violations of the Uniform Business Practices), 25-M-0522 (Proceeding on Motion of the Commission to Seek Consequences Against Stream Energy New York LLC for Violations of the Uniform Business Practices), 25-M-0523 (Proceeding on Motion of the Commission to Seek Consequences Against XOOM Energy New York LLC for Violations of the Uniform Business Practices), and 25-M-0524 (Proceeding on Motion of the Commission to Seek Consequences Against NRG Business Marketing, LLC for Violations of the Uniform Business Practices).

[3] On September 18, 2020, the Commission issued an order on rehearing, affirming the terms of the Reset Order. See Case 15-M-0127, In the Matter of Eligibility Criteria for Energy Service Companies, Order on Rehearing, Reconsideration, and Providing Clarification (relevant portions effective April 16, 2021).

**WHEREAS**, in 2023, DPS Staff and the DPS Office of Investigations and Enforcement ("OIE") initiated an investigation into the NOAV Entities' contracts after a routine voluntary renewable energy review following the close of the 2022 Clean Energy Standard compliance year on June 30, 2023, revealed multiple alleged concerns regarding the NOAV Entities' business practices;

**WHEREAS**, following its initial investigation, DPS Staff issued a Notice of Apparent Violation to each of the NOAV Entities on January 8, 2024, alleging violations of the Reset Order and the UBP (the "NOAVs"). After that time, DPS Staff and DPS OIE identified additional alleged violations of the UBP as well as other Commission Orders. The full list of alleged violations is detailed in the OSC and are summarized as follows:

1.  Alleged Failure to Transition Customers to Contracts Compliant with the Reset Order: The NOAV Entities allegedly improperly continued to serve certain customers on auto-renewing contracts executed prior to the date the relevant portions of the Reset Order took effect on April 16, 2021.

2.  Alleged Failure to Transition "Green Gas" Customers: Green Mountain allegedly failed to transition its "green gas" customers to compliant contracts or utility service, in violation of the Reset Order and the July 15, 2022, Order Regarding Energy Service Company Waivers in Case 15-M-0127.

3.  Alleged Failure to Comply with REC Locational and Delivery Requirements: All NOAV Entities except EPNG allegedly improperly procured Renewable Energy Credits ("RECs") from national sources and failed to retire compliant RECs that can be tracked in the New York Generation Attributes Tracking System, allegedly in violation of the Reset Order and the UBP.

4.  Alleged Offering of Non-Energy-Related Value-Added Products and Services: Green Mountain allegedly offered gift cards as an inducement to enroll into Green Mountain's services; XOOM allegedly improperly offered non-energy-related value-added incentives by advertising to and enrolling New York customers in its "XOOM Xtras" rewards program; the EPH and EPNG website allegedly contained representations about non-energy-related rewards that could induce prospective customers in New York to initiate services; and the Stream website allegedly offered gift card inducements for new enrollments. The OSC alleged that these offerings violated the Reset Order.

5.  Alleged Failure to De-Enroll Low-Income Customers: The NOAV Entities allegedly improperly served certain low-income customers statewide, in violation of the Order Adopting a Prohibition on Service to Low Income Customers by Energy Service Companies in Case 12-M-0476 and the UBP.

6.  Alleged Failure to Disclose Service to Mass Market Customers: NBM allegedly provided false or misleading statements in applications provided to DPS Staff and failed to update disclosures timely as required, in violation of the UBP.

WHEREAS, DPS OIE concluded that reasonable cause and a factual basis existed to initiate an enforcement proceeding under the New York State Public Service Law against the Affiliated ESCOs regarding the above alleged violations;

WHEREAS, on September 23, 2025, the Commission issued the OSC;

WHEREAS, the OSC alleged various apparent deficiencies by the Affiliated ESCOs and directed the Affiliated ESCOs to show cause why the Commission should not revoke the Affiliated ESCOs' eligibility to operate as ESCOs in the State of New York, or impose other consequences;

WHEREAS, the Affiliated ESCOs deny various aspects of the alleged violations;

WHEREAS, the Signatory Parties have been engaged in settlement discussions;

WHEREAS, the Signatory Parties agree that, after the issuance of the OSC, the Affiliated ESCOs demonstrated a proactive and cooperative approach to the alleged violations by, *inter alia*, (i) voluntarily suspending certain marketing and enrollment activities, and (ii) altering the language and disclosures on certain of the Affiliated ESCOs' websites;

WHEREAS, the Affiliated ESCOs represent that to the best of their knowledge and belief, all residential and small commercial customers enrolled on new contracts that began on or after the date the relevant portions of the Reset Order took effect on April 16, 2021, are or were served on products approved by the Reset Order;

WHEREAS, the Signatory Parties further agree that this Agreement resolves all of the alleged violations relating to the Affiliated ESCOs' alleged failure to comply with the Reset Order, the UBP, and other Commission Orders referenced in the OSC.

NOW, THEREFORE, in consideration of the mutual covenants, promises, agreements, and representations set forth herein, the receipt and sufficiency of which are hereby agreed to and acknowledged, the Signatory Parties, intending to be bound, agree as follows:

1.  **Definitions**

    a.    Definitions. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Recitals. The following terms have the meanings set forth below:

        (i)    "Effective Date" means the date on which the Commission issues a written order approving this Agreement without modification or with only such modifications as are accepted by the Affiliated ESCOs in writing.

        (ii)    "Utility Price" means the rate a customer would have paid their Local Distribution Utility ("LDU") for supply of natural gas or electricity.

3

(iii) "Guaranteed Savings Product" means the fixed-price commodity product approved by DPS Staff as reflected and approved at Case 25-M-0519, *Proceeding on Motion of the Commission to Seek Consequences against Direct Energy Services, LLC, et al. for Violations of the Uniform Business Practices*.

(iv) "Legacy Customers" has the meaning set forth in Settlement Consideration – Billing Adjustments.

(v) "Commission Approval" means an order of the Commission approving this Agreement.

(vi) "Claims Administrator" means a qualified third-party claims administrator engaged by the Affiliated ESCOs to administer any or all of the procedures set forth in Sections 2.a. and 2.b. of this Agreement and the Appendices hereto.

(vii) "Settled Matters" means all issues, concerns, claims, and actions raised and/or asserted, or that could properly have been raised and/or asserted by DPS or the Commission, in connection with or as a result of the Affiliated ESCOs' alleged failure to comply with the Reset Order, the UBP, and other Commission Orders, as referenced in the NOAVs and the OSC.

(viii) "Low-Income Customers" has the meaning set forth in Settlement Consideration – Low-Income Customers.

    b.    Interpretation. Unless the context otherwise requires, (i) "including" means "including without limitation," (ii) references to "days" mean calendar days and to "Business Days" mean days other than Saturdays, Sundays, and State-recognized holidays, and (iii) headings are for convenience only and do not affect interpretation.

    2.    **Settlement Consideration**

    a.    Billing Adjustments:

(i) The Affiliated ESCOs shall provide a payment totaling $50 million ($50,000,000) by way of billing adjustments (the "Billing Adjustments") to all of the Affiliated ESCOs' current and former residential and small commercial customers who were held over on legacy contracts that DPS Staff contends expired and should have been, but were not, transitioned to Reset Order-compliant products, as contended in sub-section "a" of the OSC's discussion of the Department's Investigations and Findings (the "Legacy Customers"). The Billing Adjustments shall be distributed to Legacy Customers based on their overall energy usage from April 16, 2021 (the effective date of the Reset Order) to the date of Commission Approval of this Agreement, to the nearest 1%. The

4

operational procedures for the Billing Adjustments, including notice requirements, check mailing, address verification, DPS reporting, skip-tracing, and remittance of unclaimed funds, are set forth in Part I of Appendix D.

(ii)     The Billing Adjustments shall not be reduced by any refunds, payments, rebates, or rewards previously redeemed by any Legacy Customer.

(iii)    The Billing Adjustments shall constitute complete and exclusive restitution for the Settled Matters with respect to all Legacy Customers. Neither DPS nor the Commission shall seek, require, or support any additional customer-specific restitution or redress for the Settled Matters.

b.     Guaranteed Savings Product for Legacy Customers:

(i)     Subject to obtaining affirmative consent, Direct Energy shall offer the Guaranteed Savings Product to all Legacy Customers. The Guaranteed Savings Product provides a fifteen percent (15%) savings rate (the "Guaranteed Savings Percentage") compared to the Utility Price for a single twelve (12) month contract term. Direct Energy shall offer this product to both natural gas and electric Legacy Customers; provided, however, that the Guaranteed Savings Product shall not be available to natural gas Legacy Customers whose LDU is Corning Natural Gas Corporation, as Direct Energy is not permitted to provide natural gas service in that service territory.

(ii)    The operational procedures for the Guaranteed Savings Product, including enrollment, true-up calculations, reporting, and auditor requirements, are set forth in Part II of Appendix D.

c.     Low-Income Customers:

(i)     The Signatory Parties acknowledge that certain low-income customers who received ESCO service from the NOAV Entities ("Low-Income Customers") were inadvertently retained as customers.

(ii)    To the extent not already completed, the NOAV Entities shall provide full billing adjustments to the Low-Income Customers for the period during which such customers inadvertently received ESCO service through one or more of the NOAV Entities, totaling approximately $919,396.

5

(iii)    To the extent not already completed, the NOAV Entities shall return the Low-Income Customers to local utility service no later than the conclusion of such customers' current billing cycle.

3.    **Release From Actions**

a.    Resolution and Release of Settled Matters: This Agreement fully and finally resolves and releases all issues, concerns, claims, and actions raised and/or asserted, or that could properly have been raised and/or asserted by DPS or the Commission, in connection with or as a result of the Settled Matters. Subject to compliance with this Agreement, the Affiliated ESCOs' ESCO eligibility in New York shall not be suspended, revoked, or restricted on account of the Settled Matters, and no additional eligibility conditions shall be imposed based on the Settled Matters. DPS Staff shall not recommend, seek, or support ancillary licensing, registration, or eligibility consequences for the Affiliated ESCOs in New York arising from the Settled Matters.

b.    Non-Settled Matters: This Agreement does not resolve or address any issues, concerns, claims, or actions outside the scope of the NOAVs and the OSC.

c.    Waiver: DPS and the Commission fully and finally waive and relinquish any right to seek penalties or any other remedy at law or equity from the Affiliated ESCOs (collectively or individually), or their directors, officers, employees, attorneys, agents, shareholders, or affiliates, arising out of or related to the Settled Matters. The releases and waivers herein extend to the Commission, DPS, DPS OIE, and their Commissioners, officers, directors, employees, agents, and representatives, solely in their official capacities.

d.    Prohibition on Actions: Neither DPS nor the Commission will institute or cause to be instituted against the Affiliated ESCOs (collectively or individually), or their directors, officers, employees, agents, shareholders, or affiliates, any action under the Public Service Law, or under any other statute, regulation, or Commission order, directly or indirectly related to the Settled Matters.

e.    Non-Tolling. The Commission and DPS agree that, with respect to the Settled Matters, applicable limitation periods are not tolled and no further investigative or enforcement action will be initiated or supported by DPS or the Commission based on the same facts, transactions, or occurrences.

f.    No Third-Party Actions: The Commission and DPS will not entertain a request by another person or entity seeking penalties or other administrative remedies against the Affiliated ESCOs (collectively or individually) that is directly or indirectly related to the Settled Matters.

g.    No Admission of Liability: This Agreement represents a compromise and settlement of disputed claims. Nothing contained in this Agreement shall be construed as an admission by the Affiliated ESCOs of any liability or wrongdoing. The Affiliated ESCOs specifically deny various aspects of the allegations and claims resolved by this Agreement.

6

h.    No Discretionary Referrals. DPS will not initiate discretionary referrals based on the Settled Matters and will respond to any inquiries consistent with the non-admission and non-precedential provisions herein.

i.    Voluntary Settlement: This Agreement has been entered into voluntarily by the Signatory Parties. The Signatory Parties have determined the Agreement constitutes a fair and reasonable resolution of all outstanding issues relating to the Cases and avoids litigation. No representations, inducements, promises, or agreements have been made by any party, or anyone acting on behalf of any party, that are not contained within this Agreement. This Agreement is a settlement of potential penalties stated in the OSC and should not be construed as an assessment of a fine or penalty. Furthermore, this Agreement does not necessarily represent the position that any one of the Signatory Parties would have adopted had this matter been fully litigated. This Agreement is entered into without prejudice to the positions the Signatory Parties may have taken in the absence of the Agreement or may take if the Commission does not approve this Agreement.

j.    No Limitation on Authority: Nothing in this Agreement shall be construed to limit, impair, or restrict the Commission's authority to promulgate, amend, or repeal regulations, rules, orders, guidance, or policies of general applicability on a prospective basis.

## 4.    Tax Treatment

The Signatory Parties make no representation regarding the tax treatment of any payments hereunder. The Affiliated ESCOs shall have no obligation for any tax reporting or withholding with respect to the Billing Adjustments or true-up payments beyond what is expressly required by applicable law, and customers shall be solely responsible for any tax consequences.

## 5.    Term; Stay; Approval

a.    Term. This Agreement becomes effective on the Effective Date and remains in effect until all obligations have been fully performed, including completion of all true-ups, reporting, and recordkeeping obligations.

b.    Stay of Proceedings. Upon execution of this Agreement by the Signatory Parties, if necessary, DPS Staff agrees to support the Affiliated ESCOs' request for a stay of proceedings pending the Commission action contemplated by Section 7. If the Commission rejects this Agreement, the stay shall terminate thirty (30) days from the Commission's rejection, and all parties shall have their rights and defenses preserved as set forth herein.

c.    Effect of Approval. Upon Commission Approval, the OSC and each of the Cases shall be deemed resolved and closed with prejudice, and any pending show cause directives or proposed consequences predicated on the Settled Matters shall be deemed resolved.

## 6.    Authorization

The execution, delivery and performance of this Agreement by each Signatory Party hereto is within its corporate or statutory powers, as appropriate, has been duly authorized by all

7

necessary corporate or statutory action, and does not and will not: (i) require any governing or governmental consent or approval except for the Commission Approval required for this Agreement to become effective; (ii) contravene its organizational documents or enabling legislation; or (iii) violate applicable law.

### 7.    Effectiveness of the Agreement

a.    Commission Review and Approval. This Agreement is subject to ratification or approval by the Commission and will have no effect in the absence thereof. DPS Staff shall take reasonable steps to obtain Commission approval of this Agreement as soon as practicable following execution of this Agreement. If the Commission does not approve this Agreement in its entirety, without modification or with only such modifications as are accepted by the Affiliated ESCOs in writing, the Affiliated ESCOs may withdraw their acceptance of this Agreement by serving written notice on the Commission, the stay provided for in Section 5.b. shall terminate thirty (30) days thereafter, and the Affiliated ESCOs shall be free to pursue their position without prejudice. If the Commission approves this Agreement or modifies it in a manner acceptable to the Affiliated ESCOs in writing, the parties intend that this Agreement thereafter be implemented in accordance with its terms. The Commission order approving this Agreement is enforceable under the Public Service Law to ensure the Affiliated ESCOs' material compliance with its terms herein.

b.    Scheduling. The Signatory Parties recommend that the Commission authorize the Commission Secretary, in the Secretary's sole discretion, to extend any deadlines set forth in this Agreement.

### 8.    Confidentiality; FOIL Handling; Data Protection

a.    Confidential Treatment. The Affiliated ESCOs may designate business, trade secret, customer, or security-sensitive information as confidential at the time of submission. DPS Staff shall handle such information consistent with applicable confidentiality procedures, statutes, and regulations. DPS Staff shall provide at least ten (10) Business Days' advance written notice of any intended disclosure to allow the Affiliated ESCOs to seek protective relief, unless a shorter period is required by law, in which case DPS shall provide the maximum practicable notice.

b.    Auditor Work. All auditor workpapers, interim findings, communications, and reports shall be designated and treated as confidential information under applicable New York law, including, without limitation, Public Officers Law §§ 87(2)(d), 87(2)(f), and 89(5), to the maximum extent permitted by law. DPS Staff shall provide prompt notice to the Affiliated ESCOs of any Freedom of Information Law request related to auditor work and assert applicable exemptions.

### 9.    No Third-Party Beneficiaries; No Collateral Estoppel

a.    No Third-Party Beneficiaries. This Agreement is solely for the benefit of the Signatory Parties. No person or entity not a Signatory Party shall be deemed a third-party beneficiary or have any rights hereunder. No customer shall have any right to enforce this Agreement, which is intended solely to allocate responsibilities between the Signatory Parties.

8

b. **No Collateral Estoppel**. This Agreement, the negotiations leading hereto, the Guaranteed Savings Product true-up results, and any auditor reports shall not constitute or be construed as an admission of liability. Negotiations shall be inadmissible in any proceeding for any purpose other than to enforce this Agreement, consistent with applicable law (including principles analogous to N.Y. Civil Practice Law and Rules § 4547).

**10.    Reservation of Rights**

Except as expressly released herein with respect to the Settled Matters, each Signatory Party reserves all rights, claims, and defenses in any other matter.

**11.    Material Breach; Meet and Confer; Notice and Cure**

a. **Material Breach**. A 'material breach' is a substantial, uncured failure to perform an essential obligation that defeats a principal purpose of this Agreement.

b. **Meet and Confer; Notice and Cure**. In the event of an alleged breach of this Agreement, the non-breaching party shall meet and confer with the allegedly breaching party to attempt to resolve the matter. If such meet and confer effort does not resolve the alleged breach, the non-breaching party shall provide written notice to the allegedly breaching party describing the alleged breach in reasonable detail. The allegedly breaching party shall have thirty (30) days to cure the breach, or if the breach is not reasonably curable within thirty (30) days, such longer period as is mutually agreed by the Signatory Parties (not to exceed ninety (90) days), provided the allegedly breaching party commences and diligently pursues cure efforts during such period. If the Signatory Parties are unable to resolve the alleged breach through the foregoing meet and confer and cure process, then any Signatory Party may pursue all available legal and equitable remedies.

c. **Resolution of Interpretation**. In the event of any disagreement over the interpretation of this Agreement or implementation of the provisions of this Agreement which cannot be resolved informally among the Signatory Parties, such disagreement shall be resolved in the following manner: (i) the Signatory Parties shall promptly convene a conference and in good faith attempt to resolve any such disagreement and/or request the assistance of DPS's Office of Hearings and Alternative Dispute Resolution for mediation or other appropriate process; and (ii) if any such disagreement cannot be resolved by the Signatory Parties or alternative process, any Signatory Party may seek other remedies available by law.

**12.    Governing Law; Venue; Jurisdiction**

a. **Governing Law**. This Agreement and the rights and obligations of the Parties shall be governed by and construed in accordance with the laws of the State of New York without regard to the principles of conflicts of laws thereof.

b. **Venue and Jurisdiction**. Venue for any lawsuit related to this Agreement shall lie exclusively in courts in the State of New York. Subject to available subject matter jurisdictional defenses, the Signatory Parties hereby consent to jurisdiction in any such court solely for purposes of any such lawsuit.

### 13.    Force Majeure

Neither Signatory Party shall be liable for delays or failures in performance (other than payment obligations) due to events beyond its reasonable control, including, but not limited to, natural disasters, pandemics, acts of war or terrorism, widespread utility or market system failures, or governmental actions that delay or prevent compliance. The affected party shall provide prompt notice and use commercially reasonable efforts to mitigate and resume performance of its obligations under this Agreement to the extent commercially feasible.

### 14.    Notice

All notices under this Agreement shall be in writing and delivered by nationally recognized overnight courier, certified mail, or by confirmed email to the addresses designated by each Signatory Party below, and shall be deemed given upon submission to the courier, mailing, or, for email, upon confirmation of transmission during Business Hours.

To DPS:

Alison E. Wrynn, Esq.
Senior Attorney
New York State Department of Public Service
3 Empire State Plaza
Albany, NY 12223
Email: Alison.Wrynn@dps.ny.gov

To the Affiliated ESCOs:

Peter J. Tomasco, Esq.
Assistant General Counsel
NRG Energy, Inc.
Legal Department
2929 Arch St., Suite 1902
Philadelphia, PA 19104
Email: Peter.Tomasco@nrg.com

*With a copy, which shall not constitute notice, to:*

C. Neil Gray, Esq.
Duane Morris LLP
335 Madison Avenue
New York, NY 10017
Email: CNGray@duanemorris.com

### 15.    Assignment; Successors; Structural Changes

This Agreement shall be binding upon and inure to the benefit of the Signatory Parties and their respective successors and permitted assigns. Except as provided in this paragraph, the Affiliated ESCOs shall not assign this Agreement without the prior written consent of DPS. Such

consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, no consent shall be required for assignments to a successor by merger, consolidation, or sale of substantially all assets, provided that the successor assumes this Agreement and remains eligible as an ESCO to the extent necessary to fulfill the obligations hereunder. Until the later of (i) the date on which the DPS representative identified in Section 14 confirms delivery of the Comptroller Check to the State Comptroller or (ii) the date on which the auditor for the Guaranteed Savings Product issues its final report, the Affiliated ESCOs shall notify DPS Staff of any changes in the corporate structure of any Affiliated ESCO, or any business that any Affiliated ESCO directly or indirectly controls or in which any Affiliated ESCO holds an ownership interest, that may affect compliance obligations arising under this Agreement. Notification to DPS Staff as required by this Agreement shall not preclude or substitute for any notifications or approvals that may be required under the UBP.

16.    **Integration; Amendment; Severability; Waiver**

a.    **Entire Agreement**. This Agreement constitutes the entire agreement among the Signatory Parties regarding the Settled Matters and supersedes all prior or contemporaneous understandings relating thereto.

b.    **Amendment**. Any amendment must be in writing and signed by the Signatory Parties.

c.    **Severability**. If any provision is held invalid, the remaining provisions shall remain in full force, and the Signatory Parties shall negotiate in good faith a valid substitute provision that most closely effectuates the original intent.

d.    **Waiver**. No waiver shall be effective unless in writing and signed by the waiving Signatory Party. No waiver of any breach constitutes a waiver of any other or subsequent breach.

17.    **Attorneys' Fees; Costs**

Each Signatory Party will bear its own costs and attorneys' fees incurred in connection with the Cases, the OSC, and this Agreement.

18.    **Counterparts; Electronic Signatures**

This Agreement may be executed in counterparts, each of which is deemed an original, and all of which constitute one and the same instrument. Electronic signatures and PDF copies are deemed originals for all purposes.

**IN WITNESS WHEREOF**, each of the Signatory Parties hereto has executed this Agreement as of the day and year written below.

*[Signature pages follow.]*

11

**STATE OF NEW YORK DEPARTMENT OF PUBLIC SERVICE**

By: _____          Date: 4/1/26

Title: Senior Attorney

**DIRECT ENERGY SERVICES, LLC**

By: _____          Date: 4/1/26

Title: EVP, General Counsel

**ENERGY PLUS HOLDINGS LLC**

By: _____          Date: 4/1/26

Title: EVP, General Counsel

**ENERGY PLUS NATURAL GAS LLC**

By: _____          Date: 4/1/26

Title: EVP, General Counsel

**GATEWAY ENERGY SERVICES CORP.**

By: _____          Date: 4/1/26

Title: EVP, General Counsel

12

**GREEN MOUNTAIN ENERGY COMPANY**

By: _____    Date: 4/1/26

Title: EVP, General Counsel

**NRG BUSINESS MARKETING LLC**

By: _____    Date: 4/1/26

Title: EVP, General Counsel

**RELIANT ENERGY NORTHEAST LLC**

By: _____    Date: 4/1/26

Title: EVP, General Counsel

**STREAM ENERGY NEW YORK, LLC**

By: _____    Date: 4/1/26

Title: EVP, General Counsel

**XOOM ENERGY NEW YORK, LLC**

By: _____    Date: 4/1/26

Title: EVP, General Counsel

13

## Appendix A[4]

### Notice to Current Legacy Customers for the Billing Adjustment

[Date]

Re: Notice of Settlement Agreement with the New York State Department of Public Service

Dear [Affiliated ESCO Name] Customer:

[Affiliated ESCO Name], the energy services company (ESCO) that supplies your electric and/or natural gas, recently settled claims asserted by the New York State Department of Public Service (DPS) relating to product offerings, among other alleged violations. [Affiliated ESCO Name] did not admit fault as part of the settlement and no court has made any finding of liability. As a [Affiliated ESCO Name] customer, you are eligible for a billing adjustment in the amount of [Total Payment] as part of the settlement. A check for that amount is enclosed. THE CHECK WILL BE VOID IF YOU DO NOT CASH OR DEPOSIT IT WITHIN 60 DAYS.

In addition, as part of the settlement, [Affiliated ESCO Name] can no longer serve you on your current electric and/or natural gas product. However, in recognition of ongoing energy affordability concerns, the settlement provides you with the opportunity to enroll on an electric and/or natural gas supply product with a guaranteed 15% savings rate compared to the utility supply price. This product [either: (1) is offered by [Affiliated ESCO Name's] affiliated company, Direct Energy Services, LLC; or (2) is also offered by Direct Energy]. You can affirmatively consent to enroll on this product by visiting [unique link to be provided], reviewing the terms and conditions available there, and submitting your enrollment information to Direct Energy.[5]

The enrollment period for this offer ends 30 days from the date of this letter. If you don't take action to enroll on this offer, we will take steps to switch your energy supply account to your local utility's default supply service. There is no fee for this switch and there will be no interruption to your service. Please note that the switching process can take 1-2 billing cycles to take effect.

The 15% guaranteed savings product is only available for a 12-month period and will not continue or renew. At the expiration of the 12-month period, you can choose to enroll on another energy supply product with Direct Energy or another ESCO. Should you take no action by the end of the 12-month period, you will be returned to your local utility's supply service. You may choose to have your local utility or another ESCO supply your electricity and/or natural gas

---

[4] The Affiliated ESCOs will prepare corresponding notices that do not include the Guaranteed Savings Product offer for Corning Natural Gas Corporation customers.

[5] To enroll in this product, you must be receiving energy service at an eligible New York service location served by Direct Energy. Customers who have relocated outside of New York, for example, are not eligible.

14

instead at any time during this 12-month period. You can terminate your service at any time, with no termination fee, by contacting us or switching to a different supplier.

We thank you for being our customer. If you have any questions or concerns relating to this notice you may contact us at [Contact Information]. You may also contact DPS at [Contact Information].

Sincerely,
[NAME OF AFFILIATED ESCO]

15

Notice to **Former** Legacy Customers for the Billing Adjustment

[Date]

Re: Notice of Settlement Agreement with the New York State Department of Public Service

Dear [Affiliated ESCO Name] Customer:

[Affiliated ESCO Name], the energy services company (ESCO) that previously supplied your electric and/or natural gas, recently settled claims asserted by the New York State Department of Public Service (DPS) relating to product offerings, among other alleged violations. [Affiliated ESCO Name] did not admit fault as part of the settlement and no court has made any finding of liability. As a former [Affiliated ESCO Name] customer, you are eligible for a billing adjustment in the amount of [Total Payment] as part of the settlement. A check for that amount is enclosed. Cashing the check does not mean that your service with [Affiliated ESCO Name] will resume. THE CHECK WILL BE VOID IF YOU DO NOT CASH OR DEPOSIT IT WITHIN 60 DAYS.

In addition, in recognition of ongoing energy affordability concerns, the settlement provides you with the opportunity to enroll on an electric and/or natural gas supply product with a guaranteed 15% savings rate compared to the utility supply price. This product [either: (1) is offered by [Affiliated ESCO Name's] affiliated company, Direct Energy Services, LLC; or (2) is also offered by Direct Energy]. You can affirmatively consent to enroll on this product by visiting [unique link to be provided], reviewing the terms and conditions available there, and submitting your enrollment information to Direct Energy.[6] The enrollment period for this offer ends 30 days from the date of this letter. The 15% guaranteed savings product is only available for a 12-month period and will not continue or renew. At the expiration of the 12-month period, you can choose to enroll on another energy supply product with Direct Energy or another ESCO. Should you take no action by the end of the 12-month period, you will be returned to your local utility's supply service. You may choose to have your local utility or another ESCO supply your electricity and/or natural gas instead at any time during this 12-month period. You can terminate your service at any time, with no termination fee, by contacting us or switching to a different supplier.

If you have any questions or concerns relating to this notice you may contact us at [Contact Information]. You may also contact DPS at [Contact Information].

Sincerely,
[NAME OF AFFILIATED ESCO]

---

[6] To enroll in this product, you must be receiving energy service at an eligible New York service location served by Direct Energy. Customers who have relocated outside of New York, for example, are not eligible.

16

## Appendix B

As further detailed in Appendix D, the Affiliated ESCOs shall file a report with DPS Staff in Case 25-M-0519, *Proceeding on Motion of the Commission to Seek Consequences against Direct Energy Services, LLC, et al. for Violations of the Uniform Business Practices* (the "DPS Report"). The DPS Report shall each include, at a minimum, the following information:

1.  The total number of Legacy Customers to whom a check containing a Legacy Customer's respective Billing Adjustment (an "Adjustment Check") was issued;

2.  The Billing Adjustment amount that each Legacy Customer received through his, her, or its respective Adjustment Check;

3.  The number and total monetary amount of Adjustment Checks issued to Legacy Customers;

4.  The number and total monetary amount of Adjustment Checks cashed by Legacy Customers;

5.  The number and total monetary amount of Adjustment Checks returned to the Affiliated ESCOs by the United States Postal Service as undeliverable;

6.  The number and total monetary amount of Adjustment Checks cancelled by the Affiliated ESCOs, including the reason for each cancellation;

7.  The number and total monetary amount of outstanding Adjustment Checks; and

8.  The names, telephone numbers, and last known addresses of all Legacy Customers whose Adjustment Checks remain uncashed.

17

## Appendix C

See attachment.

Summary Sheet

| | |
|---|---|
| Total Number Customers Served on Electric GSP between [reporting period] | |
| Total Number Customers Served on Natural Gas GSP between [reporting period] | |
| Total Dollar Amount of Refunds Issued to Electric Customers between [reporting period] | |
| Total Dollar Amount of Refunds Issued to Natural Gas Customers between [reporting period] | |

Electric GSP

| Account Number | Utility Service Territory (use dropdown list) | Months Served Since GSP Enrollment | Early Termination Date (if Applicable) | Total Utility Supply Amount Between [reporting period] | Total ESCO Supply Amount Between [reporting period] | Amount Difference | Refund Issued Between [reporting period] (use dropdown list) | Refund Amount Provided by ESCO | Date Refund Issued | Savings Percentage |
|---|---|---|---|---|---|---|---|---|---|---|
| | ConEd | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Natural Gas GSP

| Account Number | Utility Service Territory (use dropdown list) | Months Served Since GSP Enrollment | Early Termination Date (if Applicable) | Total Utility Supply Amount Between [reporting period] | Total ESCO Supply Amount Between [reporting period] | Amount Difference | Refund Issued During [reporting period] (use dropdown list) | Refund Amount Provided by ESCO | Date Refund Issued | Savings Percentage |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |

<u>Appendix D</u>

The following operational procedures shall govern the implementation of the Billing Adjustments and the Guaranteed Savings Product for Legacy Customers pursuant to Sections 2.a. and 2.b. of this Agreement.

Notwithstanding any provision of this Agreement or the Appendices hereto to the contrary, the Affiliated ESCOs may, in their sole election and at their own cost, engage a Claims Administrator to perform any or all of the procedures set forth in this Appendix D on behalf of the Affiliated ESCOs. The engagement of a Claims Administrator shall not relieve the Affiliated ESCOs of their obligations under this Agreement, and all references to the Affiliated ESCOs performing any act or obligation in this Appendix D shall be deemed to include performance by a Claims Administrator acting on behalf of the Affiliated ESCOs.

**Part I: Training**

1.　The Affiliated ESCOs shall ensure that their customer service representatives are fully trained to handle inquiries regarding the Billing Adjustments and the Guaranteed Savings Product offering.

**Part II: Billing Adjustment Procedures**

1.　Notice. The Affiliated ESCOs shall send notice ("<u>Notice</u>") of the settlement to Legacy Customers, substantially in the form of the sample settlement notices attached as Appendix A. Such notices shall, as applicable: (i) inform each Legacy Customer that DPS and the Affiliated ESCOs have reached a settlement; (ii) include details on the Billing Adjustments to be provided and the Guaranteed Savings Product that will be made available, as applicable; and (iii) enclose the Adjustment Check. To accommodate operational limits on switching capacity, these notices may be staggered in tranches; provided, however, that all such communications shall be sent no later than sixty (60) days after the date of Commission Approval. The settlement notices shall vary based on: (i) the Affiliated ESCO issuing the notice; (ii) whether the recipient is a current or former customer; (iii) whether the recipient is currently a customer of Direct Energy; and (iv) whether the recipient's LDU is Corning Natural Gas Corporation.

2.　Skip Tracing for Undeliverable Notices. If a Notice is returned as undeliverable, the Affiliated ESCOs shall: (i) void the Adjustment Check; and (ii) conduct skip tracing using a commercially available skip-tracing service for the sole purpose of obtaining a mailable address with a reasonable degree of confidence. For successful hits, the Affiliated ESCOs shall re-mail the Notice and re-issue the Adjustment Check to the Legacy Customer at the updated address. Direct Energy shall take steps to ensure that the Guaranteed Savings Product offer remains open and available for enrollment for at least thirty (30) days from the date of each re-mailed Notice.

19

3.   Check Mailing and Void Dates. Each Adjustment Check shall become void sixty (60) days after its issuance date. A Legacy Customer may request a replacement check within thirty (30) days following the void date of such customer's Adjustment Check. Within forty-five (45) days after the last void date of the final batch of Adjustment Checks, the Affiliated ESCOs shall file a DPS Report containing the information set forth in Appendix B.

4.   Confirmation to DPS Staff. Upon issuance of all Adjustment Checks, the Affiliated ESCOs shall provide written confirmation to DPS Staff ("Confirmation"). The Confirmation shall include: (i) the number of Legacy Customers issued an Adjustment Check; and (ii) the Billing Adjustment amount allocated to each such Legacy Customer.

5.   Remittance of Unclaimed Funds. Within thirty (30) days after filing the DPS Report, the Affiliated ESCOs shall remit the total unclaimed amount of the Billing Adjustments by check (the "Comptroller Check") to the State Comptroller for distribution in accordance with N.Y. Aband. Prop. Law § 400. The Affiliated ESCOs shall notify the DPS representative identified in Section 14 upon remitting the Comptroller Check. Upon delivery of the Comptroller Check to the State Comptroller, as confirmed by such DPS representative, the Affiliated ESCOs' unclaimed property obligations with respect to the Adjustment Checks shall be fully satisfied, and the Affiliated ESCOs shall have no further liability with respect to such funds.

6.   Cooperation with DPS Staff. To the extent DPS Staff seeks information relating to Billing Adjustments not otherwise contained in the Confirmation or the DPS Report, the Affiliated ESCOs shall cooperate with DPS Staff to provide such additional information. The Affiliated ESCOs shall respond to DPS Staff as soon as practicable.

**Part III: Guaranteed Savings Product Procedures**

1.   Enrollment Communications. Direct Energy shall, via the settlement Notices substantially in the form included in Appendix A, inform each eligible Legacy Customer that Direct Energy has agreed to offer the Guaranteed Savings Product pursuant to this Agreement. Such communication shall provide Legacy Customers with an opportunity to affirmatively consent to enroll in the Guaranteed Savings Product in accordance with the process set forth in Appendix A. To accommodate operational limits on switching capacity, Direct Energy may stagger transmission of these communications in tranches; provided, however, that all such communications shall be sent no later than sixty (60) days after the date of Commission Approval.

2.   Enrollment Procedures. Direct Energy shall fully comply with all DPS requirements during enrollments, including but not limited to the UBP.

20

3. Offer Availability Period. Except as provided in Section 2.b.i. of the Agreement, the offer shall remain available to all Legacy Customers across all Affiliated ESCO brands for thirty (30) days from the date such Legacy Customer's communication is sent.

4. Offer Restrictions. The offer is only available to eligible Legacy Customers. The Affiliated ESCOs shall not solicit customers other than eligible Legacy Customers to enroll on the Guaranteed Savings Product. The Affiliated ESCOs shall limit any promotion or marketing of the Guaranteed Savings Product designed to solicit customer enrollment to the information set forth in Appendix A. Any such promotional materials shall clearly state that the Guaranteed Savings Product is only available to eligible Legacy Customers.

5. Non-Consenting Customers. For any Legacy Customer who does not provide affirmative consent to enroll on the Guaranteed Savings Product, the respective Affiliated ESCO shall submit a drop request to the respective LDU as soon as practicable in accordance with the Electronic Data Interchange ("EDI") specifications of such LDU and the UBP process to switch customers to utility service. The Signatory Parties acknowledge that, in the normal course of business, the switching process may take multiple billing cycles once a switch is requested and involves coordination with the customer's LDU to effectuate the switch. Accordingly, any usual or customary delays outside the Affiliated ESCOs' control, and any delays attributable to compliance with the UBP in coordination with LDUs, shall not be held against the Affiliated ESCOs or deemed noncompliance with this Agreement. Setting aside any of the delays referenced in this Paragraph 5, the Affiliated ESCOs represent that all Legacy Customers that do not affirmatively consent to enroll on the Guaranteed Savings Product within the deadlines set forth in this Agreement will be dropped back to LDU service.

6. True-Up Calculations and Refunds. Within thirty (30) days after the end of each calendar quarter, or within thirty (30) days after termination, Direct Energy shall complete the savings calculation and issue any true-up credit to Legacy Customers currently or previously enrolled in the Guaranteed Savings Product. Direct Energy shall file quarterly reports in Case 25-M-0519, *Proceeding on Motion of the Commission to Seek Consequences against Direct Energy Services, LLC, et al. for Violations of the Uniform Business Practices*, with data reflecting these savings calculations for each of the prior three (3) months in the format set forth in Appendix C. If a customer did not achieve the Guaranteed Savings Percentage, Direct Energy shall provide the refund amount to the LDU for credit to the customer's account. If the refund amount cannot be processed through the LDU, Direct Energy shall mail a physical check to the customer's last known address. If a customer is no longer receiving Direct Energy service, Direct Energy shall issue a physical check to the customer's last known address. No enrollment, processing, or other fees shall be charged to Legacy Customers in connection with true-ups or refunds, and no early termination fee shall apply to Legacy Customers enrolled in the Guaranteed Savings Product.

21

7.  End of Term. At the end of the one-year term for any Legacy Customer enrolled in the Guaranteed Savings Product offered in connection with this Agreement, Direct Energy may seek such customer's affirmative consent to enroll in another compliant, DPS-approved product. If Direct Energy does not obtain such affirmative consent, it shall submit a drop request to the respective LDU as soon as practicable in accordance with the EDI specifications of such LDU and the UBP process to switch customers to utility service.

8.  Third-Party Auditor. Within sixty (60) days after the date of Commission Approval, Direct Energy shall, at its own expense, engage a qualified, independent third-party auditor to monitor its implementation of, and performance under, the Guaranteed Savings Product. The auditor shall be mutually agreed upon by DPS Staff and Direct Energy and shall agree to a reasonable cost cap for its services. The auditor shall verify that Legacy Customers who affirmatively consent to receive the Guaranteed Savings Product receive the Guaranteed Savings Percentage relative to the applicable Utility Price in all material respects, and that all true-up calculations and payments are accurately and timely processed. The auditor shall provide a summary report of its findings to DPS and Direct Energy on a semi-annual basis and shall complete all reporting within ninety (90) days after the end of the last customer's Guaranteed Savings Product term, unless DPS and Direct Energy mutually agree otherwise. Prior to issuing any report identifying material deficiencies, the auditor shall provide DPS and Direct Energy with a draft report and a twenty (20) Business Day opportunity for Direct Energy to respond and propose a remedial plan to cure any identified material deficiencies within forty-five (45) Business Days, subject to approval by DPS Staff. Notwithstanding the foregoing, the auditor's findings shall not limit or preclude DPS from initiating any investigation or enforcement proceeding should the auditor identify any material deficiencies regarding Direct Energy's implementation of, or performance under, the Guaranteed Savings Product that Direct Energy fails to timely address in accordance with this provision. The auditor and its work shall be subject to security and confidentiality obligations with respect to confidential customer, LDU, and Direct Energy information that are at least as robust as those set forth in the Commission's form Data Security Agreement in effect at the time of the auditor's engagement.

22