# EXHIBIT 2

Finite Utility Consulting, LLC v. Tawa, Inc., Not Reported in Fed. Supp. (2025)

2025 WL 490483

2025 WL 490483
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division,
Houston Division.

FINITE UTILITY
CONSULTING, LLC, Plaintiff,
v.
TAWA, INC. (Retail), a/k/a Tawa, Inc.;
Tawa Supermarket, Inc.; Tawa Retail Group,
Inc., a/k/a Welcome California Market, Inc.;
Welcome Services, Inc.; Walong Marketing,
Inc., a/k/a Walong Corporation, Defendants.

Civil Action No. 4:23-cv-00432
|
Signed February 13, 2025

**Attorneys and Law Firms**

Joshua L. Hedrick, Spencer Fane LLP, Dallas, TX, Rebecca Lynne Gibson, Spencer Fane LLP, Houston, TX, for Plaintiff.

Jo Ann Michelle Mazoch, Nikki Leigh Morris, Joshua C Thomas, Baker & Hostetler LLP, Houston, TX, Bailey A. Bridges, for Defendants. Tawa Inc. (Retail).

**MEMORANDUM, ORDER, AND RECOMMENDATION**

Yvonne Y. Ho, United States Magistrate Judge

**\*1** This opinion addresses three motions pending in the suit by Plaintiff Finite Utility Consulting, LLC ("Finite") against Defendants Tawa, Inc., Tawa Supermarket, Inc., Tawa Retail Group, Inc., Tawa Services, Inc., Welcome Market, Inc., Welcome Services, Inc., and Walong Marketing, Inc. (collectively, "Tawa") over lost commissions and other compensation under energy broker agreements.[1] Tawa filed two motions to exclude Finite's expert testimony, one concerning a retained expert, German Ibanez, Dkt. 79, and the other targeting rebuttal testimony from a non-retained expert, Thomas Lee, Dkt. 84. Tawa also filed a motion for summary judgment challenging all claims. Dkt. 81.

After carefully considering the motions, Finite's responses, Dkt. 106, 107, 111, Tawa's replies, Dkt. 109, 110, 115, Finite's sur-reply, Dkt. 117, the record, and the applicable law, the Court concludes that Tawa's motion to exclude Ibanez's damages opinions (Dkt. 79) and its motion to exclude Lee's rebuttal testimony (Dkt. 84) should be and are hereby granted.[2] It is further recommended that Tawa's motion for summary judgment (Dkt. 81) be granted in its entirety, as Finite fails to raise a genuine issue of material fact on damages for its claims.

**Background**

**A. The dispute**

This case involves claims by Finite, an energy broker organized and based in Texas, against Tawa, a group of California companies that own or operate supermarkets in many states. *See generally* Dkt. 23; *see also* Dkt. 28 at 1-2; Dkt. 32 at 3. As an energy broker, Finite earns commissions when it procures electrical and gas supply contracts for clients like Tawa. *See* Dkt. 23 at 7-8. Tawa authorized Finite as its energy broker for certain store locations. *See id.* at 9-10. In particular, Tawa signed multiple Client Representation Agreements ("CRA") with Finite. Dkt. 83-2, 83-3, 83-4, 83-5, 83-6. One specified a location in Quincy, Massachusetts, Dkt. 83-2, another specified all Southern California locations, Dkt. 83-6, and three others specified no location, Dkt. 83-3, 83-4, 83-5. All but the Massachusetts CRA state that Tawa had retained Finite "as sole and exclusive consultant" to assist Tawa with obtaining price quotes and evaluating competing offers. *See, e.g.*, Dkt. 83-3 at 2.

**\*2** Tawa authorized Finite to obtain energy pricing starting in December 2019. Dkt. 81-2 at 3 (Declaration of Christina Chang). Finite provided price quotes to Tawa between December 2019 and October 2020, for one store in Massachusetts, one in Maryland, three in New Jersey, and many in California. *See id.* at 3-4. Tawa accepted Finite's proposed pricing and executed an electricity supply agreement with Constellation New Energy for a 99 Ranch Market location in Quincy, Massachusetts. *See id.* Finite received a commission from Constellation on this contract. *See* Dkt. 23 at 18 & n.4. Tawa did not execute energy supply contracts based on Finite's price quotes for any other locations. *See* Dkt. 81-2 at 4.

Between December 2019 and April 2021, Tawa executed or extended numerous electricity supply contracts, with 12- to

Case 1:18-cv-02949-RPK-JAM    Document 303-2    Filed 08/14/26    Page 3 of 18 PageID #: 14913

Finite Utility Consulting, LLC v. Tawa, Inc., Not Reported in Fed. Supp. (2025)

2025 WL 490483

36-month terms, for stores in Maryland, Massachusetts, New Jersey, and California. *See id.* at 5. During the same period, Tawa executed 24-month gas supply contracts for three stores in New Jersey. *See id.* On April 20, 2021, Tawa terminated the CRAs and revoked Finite's authority to represent Tawa's energy initiatives. Dkt. 81-15 (Adrienne Lee email to Thomas Lee).

### B. Finite's suit

Finite sued Tawa in Texas state court, asserting claims for breach of contract, promissory estoppel, tortious interference with its broker agreements with energy suppliers, and quantum meruit. *See* Dkt. 1-3 at 20-23. After the suit was removed to this Court, Dkt. 1, Finite filed an amended complaint that reasserted the same claims, Dkt. 23 at 19-23.

According to Finite's live complaint, Tawa violated its promise to use Finite as its "sole and exclusive" energy broker, as stated in the CRAs, either by negotiating gas and electricity supply contracts directly with energy suppliers or by using other energy brokers to procure those contracts for various Tawa supermarket stores. *See* Dkt. 23 at 19-21. Finite further asserts that Tawa wrongfully interfered with Finite's broker agreements with energy suppliers that would have paid Finite a commission for procuring Tawa's business. *See id.* at 21-22. Tawa filed a motion to dismiss Finite's claims, Dkt. 24, which the Court granted only as to the quantum meruit claim. Dkt. 29.

Defendant Tawa Retail Group, Inc., also known as Welcome California Market ("WCM"), counterclaimed for breach of contract, promissory estoppel, negligent misrepresentation, and unjust enrichment. Dkt. 33. Finite moved to dismiss WCM's counterclaim, which WCM repleaded. Dkt. 35, 45. Finite's amended motion to dismiss, which this Court converted into a motion for summary judgment, remains pending. Dkt. 48, 78, 91.

### C. German Ibanez's opinions

**\*3** As the basis for its damages, Finite asserts that it is owed lost commissions related to Tawa's supermarket locations in specific states. Finite retained an expert, German Ibanez, to substantiate those lost commissions.

Ibanez has bachelor's and master's degrees in business administration and a certificate in sustainability energy. Dkt. 79-1 at 24. He has experience as a project development executive in the domestic and international energy industries. *Id.* at 24-25. He worked as an energy broker for five years and provided services to an energy broker for 15 years. *See* Dkt. 107-1 at 3.

In his amended report, Ibanez opined that Tawa's alleged breach of the CRAs caused Finite to lose the following commissions:

### Lost Commissions Summary

| Utility | 2020 | 2021 | 2022 | Sub-total |
|---|---|---|---|---|
| **Gas** | $44,869.00 | $50,849.15 | $49,440.00 | $145,158.15 |
| **Electricity** | $646,416.97 | $783,308.09 | $937,240.34 | $2,366,965.40 |
| **Total** | **$691,285.97** | **$834,157.24** | **$986,680.34** | **$2,512,123.55** |

Dkt. 107-1 at 7. Ibanez arrived at these totals by taking Tawa's gas and electricity usage in four states—California, Maryland, New Jersey, and Texas—from 2020 through 2022 and multiplying them by a commission rate:

**Lost Commissions Summary by State**

*See* Dkt. 107-1 at 11; *see also* Dkt. 111-3 (Tawa's utility usage data). The figures reflect that Ibanez used a commission rate of $0.01 per kilowatt-hour (kWh) for electricity and $0.50 per dekatherm (DTh) for gas. *See* Dkt. 107-1 at 11; Dkt. 79-2 at 4. The sole source of Ibanez's chosen commission rate is Finite's broker agreement with Direct Energy, Dkt. 79-3 at 17, 27, 32, which states that Direct Energy will pay Finite "up to $0.010 per kWh for electricity services contracts" and "up to $.50 per DTh for natural gas services contracts" as commission, Dkt. 80-1 at 5 ¶ 3.1.

2025 WL 490483

### D. Thomas Lee's testimony

Thomas Lee is Finite's Vice President and main employee. *See* Dkt. 84-1 at 4-5. Tawa deposed Lee on January 9, 2024. *See* Dkt. 106-1 at 2; Dkt. 81-3 (Lee's deposition; summary judgment exhibit). In its subsequent disclosures, Finite listed Lee as a non-retained expert with knowledge of Finite's business model, the utility broker and consultant industry, and utility markets. Dkt. 84-2 at 4 (January 29, 2024 disclosures); *see also* Dkt. 39 (deadlines for expert designations). The disclosure also stated that Lee's testimony might relate to Finite's work for Tawa, Finite's agreements with energy suppliers, and "other matters generally raised in this lawsuit." *See* Dkt. 84-2 at 4-5.

Tawa responded with its expert witness designations. Dkt. 84-3 (April 2, 2024).[3] Tawa's designation included energy consultant Udit Patel, whose disclosed opinions included views on Finite's CRAs with Tawa, industry practice on the exclusivity of broker relationships, conditions necessary for energy brokers to earn a commission, and customary industry ranges for commission rates. *See id.* at 4-12 (designation); *id.* at 16-46 (Patel's expert report). Finite then provided a rebuttal report from its damages expert, Ibanez. Dkt. 79-2; Dkt. 84 at 3 (April 30, 2024 disclosure of Ibanez report).

On May 23, 2024, fifty-one days after Tawa had designated its expert witnesses, Finite served an "amended expert disclosure." Dkt. 84-1. The disclosure offers entirely new opinions from Thomas Lee that explicitly rejoin and rebut the opinions of Tawa's expert, Udit Patel:

> **\*4** (1) the alleged industry practices, customs, and standards discussed by Defendants' expert witness Udit Patel; (2) why the commission ranges discussed by Defendants' expert witness Udit Patel do not align with what Finite would have likely earned for Defendants' site; (3) broker licensure and operations in various states; (4) the difference in the volume of usage and other factors between Defendants and Mr. Patel's clients and how that affects likely commission rates; (5) the difference between Finite's business model and practices and those of Mr. Patel's company, and how that affects likely commission rates; (6) how common or uncommon certain occurrences discussed by Mr. Patel are in Finite's line of work; and (7) how utility broker companies differ in their clients, line of business, and commission rates, such that Mr. Patel's opinions and observations based on his own work are not universally applicable.

Dkt. 84-1 at 5; *compare* Dkt. 84-2 at 4-5.

Finite deposed Tawa's expert Patel on June 6, 2024. Dkt. 106-2. Discovery closed the next day, June 7, 2024. *See* Dkt. 68.

### E. The motions addressed in this opinion

One week after discovery closed, Tawa filed a motion for summary judgment on Finite's claims and two motions seeking to exclude Ibanez's and Lee's opinions. *See* Dkt. 79, 81, 84. Finite responded to those motions, Dkt. 106, 107, 111, Tawa replied, Dkt. 109, 110, 115, and Finite filed a sur-reply on the summary-judgment issues, Dkt. 117. These motions are ripe for resolution.

## Analysis

### I. Tawa's motion to exclude Ibanez's opinions

Tawa's motion to exclude the opinions of Finite's damages expert, German Ibanez, attacks multiple aspects of his opinions.[4] Dkt. 79. Notably, however, Ibanez submitted an amended expert report, Dkt. 107-1, that moots several of Tawa's arguments. The amended report reflects that Finite has withdrawn its claims concerning Tawa locations in Nevada, Oregon, Virginia, and Washington. Dkt. 107-1 at 3, 12-13. Only claims for California, Maryland, New Jersey, and Texas remain. *Id.* In addition, Ibanez's updated damages model incorporates Tawa's actual utility usage data for all the sites, thereby superseding his previous calculations premised on the square footage of Tawa's sites and other usage estimates. *Id.*

Ibanez's amended report further shows that Finite has abandoned its claims for lost compensation in regulated natural gas or electricity markets, Dkt. 107-1 at 5-6, while recognizing that the damages model may include some regulated natural gas damages in California's varied markets. *See* Dkt. 111 at 9. Also removed from Ibanez's amended report are most of the sites for which Tawa did not sign a new energy supply contract or an extension or renewal during the relevant timeframe (December 19, 2019, to April 20, 2021). *See* Dkt. 107-1 at 3, 12-13.

### A. Standard governing admissibility of expert testimony

Under Rule 702 of the Federal Rules of Evidence, a witness who is qualified as an expert

by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

**\*5** Fed. R. Evid. 702. The proponent of the expert's testimony must show, by a preponderance of the evidence, that these requirements are met. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

"The object of Rule 702 is to protect juries from unreliable and irrelevant expert testimony." *In re Taxotere Prods. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022). To fulfill its gatekeeping function, the district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). This evaluation applies to all types of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). District courts enjoy "broad discretion" when performing their gate-keeping role of determining whether expert opinions are admissible. *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013).

"To establish reliability under *Daubert*, an expert bears the burden of furnishing 'some objective, independent validation of [his] methodology.' " *Texokan Operating, Inc. v. Hess Corp.*, 89 F. Supp. 3d 903, 909 (S.D. Tex. 2015) (quoting *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013)). On the one hand, "[t]he *Daubert* [inquiry] should not supplant trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

On the other hand, courts should not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *Kumho Tire*, 526 U.S. at 157; *see Ellis v. U.S.*, 673 F.3d 367, 373 (5th Cir. 2012). Expert opinions that are fundamentally unsupported provide no assistance to the jury and should be excluded. *Texokan*, 89 F. Supp. 3d at 909 (citing *Guile v. U.S.*, 422 F.3d 221, 227 (5th Cir. 2005)).

### B. Overview of Ibanez's damages opinions

Finite retained Ibanez to substantiate its damages consisting of lost commissions on utility contracts that Tawa signed with suppliers after allegedly cutting Finite out of deals, either when Tawa dealt directly with utility suppliers or when it worked with other energy brokers. *See* Dkt. 23 at 1-3, 16-17, 20. Ibanez has 25 years of experience developing power plants in domestic and international markets. Dkt. 107-1 at 3. For 15 years, he worked for Texas Energy Options, an energy broker, where he reconciled the broker's monthly commission statements to check for missing commission fees and provided back-office support. *See* Dkt. 107-1 at 3; 79-3 at 14, 11.

#### 1. The commission rate

To calculate Finite's lost commissions, Ibanez chose a commission rate that Finite would have earned on electricity or natural gas supply contracts and multiplied that rate by the amount of electricity or gas that Tawa used at its facilities in California, Maryland, New Jersey, and Texas. *See* Dkt. 107-1 at 6-7, 11 (Ibanez's amended report); *see also* Dkt. 79-2 at 4-5 (Ibanez's rebuttal report utilizing the same commission rate). To derive that commission rate, Ibanez relied on Finite's broker agreement with Direct Energy, one utility supplier with whom Finite worked. *See* Dkt. 79-2 at 4. The Direct Energy agreement specified a commission range of "up to $.01 per kWh for electricity services contracts and/or ... up to $.050 per DTh for natural gas services contracts." Dkt. 80-1 at 5 ¶ 3.3. Despite this language that contemplates commissions of less than the maximum figures, Ibanez took the maximum figures—$.01 for electricity and $.050 for gas—and used those to determine Finite's lost commissions for every contract with every single supplier from whom Tawa procured the disputed utility contracts.

**\*6** Ibanez had no other basis for choosing the commission rate. He did not consider other documents, his own experience, past broker fees earned by Finite, broker fees

Finite Utility Consulting, LLC v. Tawa, Inc., Not Reported in Fed. Supp. (2025)

2025 WL 490483

Case 1:18-cv-02949-RPK-JAM    Document 303-2    Filed 08/14/26    Page 6 of 18 PageID #: 14916

earned by Ibanez himself, information from other utility suppliers, information from other brokers, information from the market, energy industry standards, or any independent calculations or analysis. *See* Dkt. 79-3 at 27-28, 32-33, 42 (Ibanez deposition). Even for locations where Finite had provided utility pricing to Tawa, Ibanez did not attempt to determine what portion of the price accounts for the broker fee. *Id.* at 28.

Ibanez acknowledged that a commission rate would have to be negotiated, within the range permitted in the broker agreement, based on the market rate for energy, the price a supplier is willing to offer, and the price a customer is willing to pay. *See id.* at 17; Dkt. 79-2 at 5 (agreeing that "a commission rate is negotiated between the Supplier and the energy broker"). But he considered none of those factors when pulling the maximum rate from a single broker agreement. Dkt. 79-3 at 20-22. Instead, Ibanez declared that "[b]ecause the rates were in the contract, they are market rates." Dkt. 79-2 at 5; Dkt. 79-3 at 32 ("I have the opinion that if it's listed in the contract, it's a market rate.").

In his rebuttal report, Ibanez offered several justifications for utilizing the maximum commission rate stated in the Direct Energy contract. First, Ibanez reasoned that "California has the highest prices for electricity and has complex rules and regulations" that justify energy brokers receiving "more commission for a deal in California than [a] deal in Texas." Dkt. 79-2 at 5. But he offered no data or evidence to support this conclusion or to show how much extra time Finite spent on this deal. *See id.* Nor did he explain why purported complexities in California's utility regime should affect the commission rates for utility contracts servicing locations in Maryland, New Jersey, and Texas.

Second, Ibanez stated that providing energy brokerage services for both electricity and gas is "more time-consuming" and less common than providing services for one utility. *See id.*; Dkt. 79-3 at 36. He identified no data supporting this assertion. Nor did Ibanez know how much time Finite had spent quoting electricity or gas prices. *See* Dkt. 79-3 at 38. Ibanez admittedly knew of no broker who charges a higher fee when providing both electricity and natural gas services. *See id.* Ibanez himself had only provided brokerage services for electricity and was "not an expert in gas." Dkt. 79-3 at 12, 38.

Third, Ibanez explained that "Direct Access" designation in California requires extra consulting services that could justify a higher commission rate. *See* Dkt. 79-2 at 5; Dkt. 79-3 at 38. According to Ibanez, Direct Access is a special designation that allows energy customers in California—a regulated market—to be billed like a customer in a deregulated state. *See* Dkt. 107-1 at 5. But Ibanez did not know whether Finite performed any work on Direct Access for Tawa. *See id.* at 39. Ibanez merely assumed that Finite had identified Tawa stores that were eligible for Direct Access, but he could not quantify that work. *See id.*

### 2. Three years of lost commissions

As another critical component of his damages opinions, Ibanez's model projected Finite's lost commissions over a three-year period, 2020-22, for Tawa's locations in all four states and for both utility types. *See* Dkt. 107-1 at 7. Ibanez based this three-year term on his "understand[ing] that Tawa and Finite discussed three-year contracts frequently." *See id.* He also based the three-year figure on a spreadsheet that Finite provided. *See* Dkt. 79-3 at 16, 44. Yet Ibanez acknowledged that Tawa and Finite "discussed 12-month contracts frequently" and "also discussed 18-month contracts"; he simply "wasn't given that information" to prepare his report. *See* Dkt. 79-3 at 44, 60. Ibanez also did not analyze whether most of the price quotes were for three-year contracts or for shorter durations. *See id.*

### C. German Ibanez is qualified.

**\*7** As its first challenge, Tawa argues that Ibanez's "extremely limited experience" as an energy broker makes him unqualified to opine on Finite's lost commission rate. *See* Dkt. 79 at 10-11. Finite counters that Ibanez's direct, relevant experience makes him qualified, and that Tawa's arguments about the extent of his expertise go to the weight of his testimony, rather than its admissibility. *See* Dkt. 111 at 10-12.

"Experience alone can provide a sufficient foundation for expert testimony." *Van Winkle v. Rogers*, 82 F.4th 370, 379 (5th Cir. 2023) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendment). "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Id.* (citing *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)). Courts do not demand that an expert "have specific experience and training matched precisely to the circumstances at issue." *EEOC v. Mod. Grp., Ltd.*, 725 F. Supp. 3d 644, 663-64 (E.D. Tex. 2024) (collecting cases holding that Rule 702 should be applied liberally).

2025 WL 490483

Importantly, Tawa does not dispute that Ibanez had "direct experience as an energy broker." *See* Dkt. 111 at 10; 115 at 6. Instead, it argues that Finite "overstates Mr. Ibanez's 'direct experience.' " Dkt. 115 at 6 (quoting Dkt. 111 at 10). For instance, Tawa contends that Ibanez was not a full-time broker for the five-year period referenced in his resume. *Id.* (citing Dkt. 79-1 at 24 (Ibanez's CV)). Tawa further argues that Ibanez worked directly on only three brokerage transactions for two clients, two of which were residential and only one of which was commercial. *Id.* (citing Dkt. 79-3 at 7-9 (Ibanez deposition)). Tawa asserts that Ibanez's limited experience renders him unqualified to opine on commissions for a "large commercial client with dozens of supermarkets across the country." Dkt. 79 at 10. In addition, Tawa downplays Ibanez's services for Texas Energy as mere "back office" work. *See* Dkt. 115 at 6 (citing Dkt. 79-3 at 11, 13-14 (Ibanez deposition)).

Ibanez admits that his energy brokerage clients had a different demand profile than Tawa. *See* Dkt. 79-3 at 7. But a demand profile is about "how the customer uses the electricity throughout the day, the month, and the year." *Id.*; Dkt. 79 at 10 n.2. Whether his client's demand profile was comparable to Tawa's does not necessarily undermine his experience with the commission rates involved. *See* Dkt. 79-3 at 7-9 (Ibanez deposition).

Several decisions provide helpful benchmarks for evaluating an expert's qualifications. In *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, the defendant challenged the plaintiff's expert, a fire cause investigator, for his lack of direct experience with wind turbine generators—the source of the fire underlying the case. *See* 662 F. Supp. 2d 623, 664-65 (S.D. Tex. 2009). The expert had conducted fire investigations involving welding and hot work, though not on wind turbine generators specifically. *Id.* at 664. Nevertheless, this Court found that the expert's "experience and expertise qualif[ied] him to testify about fire prevention procedures for hot work on different objects or structures." *Id.* at 665.

In *Modern Group*, the plaintiff challenged a medical expert's qualification to testify about the interaction between methadone and Xanax for treating opioid addition because the expert had limited experience with patients taking both. *See* 725 F. Supp. 3d at 662-63. The expert was a physician who specialized in addiction medicine and opioid stewardship. *See id.* at 663. Although the expert was not authorized to prescribe methadone to treat addiction, he was authorized

to prescribe it for pain treatment. *Id.* He also had daily experience prescribing opioids. *Id.* The court found the expert to be qualified based on his work history and education, rejecting the notion that his experience and training must dovetail precisely with the circumstances in the case. *Id.* at 663-64 (collecting cases).

**\*8** At the other end of the spectrum, the Fifth Circuit's opinion in *Van Winkle v. Rogers* affirmed the exclusion of an expert who lacked sufficient expertise on the key liability issues. *See* 82 F.4th 370, 379-80 (5th Cir. 2023). The expert had extensive experience in the trucking business, but he had no expertise on the specific issues of tire failure, tire retreading processes, and tire manufacturing defects. *Id.* at 380. The Fifth Circuit found that the district court did not abuse its discretion by limiting the expert's testimony to his knowledge of the trucking industry. *Id.*

Like the experts in *Suzlon* and *Modern Group*, and unlike the expert in *Van Winkle*, Ibanez has experience and expertise with the subject of his opinions, namely energy brokerage and related brokerage fees. His years of "back office" work for an energy broker are relevant because they included "reviewing and reconciling the commission rates and amounts from eight different electricity providers on a monthly basis." Dkt. 79-2 at 6; *see also* Dkt. 79-3 at 11 (Ibanez performed "commission work" at Texas Energy Options). This process included determining whether commission fees were missing. *See* Dkt. 79-3 at 14 (Ibanez deposition); Dkt. 79-2 at 6 (rebuttal report). That experience is relevant to assessing energy broker commission fees.

Tawa's attacks on Ibanez's qualifications are unavailing. Ibanez is qualified as an expert on broker fees because of his experience in the "particular field" and on the "given subject." *See Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 782 (N.D. Tex. 2013) (quoting *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009)). Tawa tries to distinguish Ibanez's relatively short career in energy brokerage from a damages expert's 25-year career in *Sinclair Oil. See* Dkt. 115 at 7 (citing *Sinclair Oil Corp. v. Heights Energy Corp.*, 2007 WL 9718223, at \*5 (N.D. Tex. Nov. 13, 2007)). But so long as an expert has relevant experience to opine on a subject, the magnitude of the expert's experience and credentials go to the weight of the expert's testimony, not its admissibility. *See Huss*, 571 F.3d at 452 ("Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."); *see also, e.g., Rushing v. Kan. City S. Ry.*, 185 F.3d 496, 507 (5th Cir. 1999)

2025 WL 490483

(allowing an expert to offer opinions "[a]s long as some reasonable indication of qualifications is adduced .... After that, qualifications become an issue for the trier of fact rather than the court in its gate-keeping capacity"), *superseded by statute on other grounds, as recognized in* Mathis, 302 F.3d at 459 n.16. Ibanez's possession of relevant experience renders him qualified to proffer expert testimony on Finite's lost commissions.

**D. Ibanez's damages model is inadmissible.**

Tawa mounts numerous challenges to the reliability of Ibanez's damages opinions. Most of them attack Ibanez's use of the maximum commission rate in the Direct Energy contract and his reliance on a three-year period for Finite's lost commissions. Because those challenges are well-taken, the Court declines to address Tawa's other contentions.

1. The commission rate underlying Ibanez's damages model is unreliable and speculative.

Tawa argues that Ibanez's choice of the maximum commission rate in the Direct Energy brokerage agreement is unsupported by the broker agreement's terms and industry practices. *See* Dkt. 79 at 13-21. As Tawa notes, Ibanez admitted that the commission rate that Finite would have received, had Tawa signed supply contracts through Finite's brokerage services, would have been negotiated between the energy supplier and energy broker based on the specifics of a particular transaction, *i.e.*, the market rate for energy, what the supplier was willing to offer, and what the customer was willing to pay. *See* Dkt. 79-3 at 16-17, 34 (Ibanez deposition); Dkt. 79-2 at 5 (rebuttal report). Yet, according to Tawa, Ibanez considered none of those factors when selecting the appropriate commission rate for his damages model. *See* Dkt. 79 at 13-14 (citing Dkt. 79-3 at 20-22). According to Tawa, Ibanez's reliance on the maximum rate in the Direct Energy agreement, without considering Finite's commissions in other deals, industry standards, or even Ibanez's own energy brokerage experience, is inadmissible *ipse dixit. See* Dkt. 79 at 14-15 (citing Dkt. 79-3 at 32-33, 42); Dkt. 115 at 8-9.

 **\*9**  Finite responds that the maximum rates Ibanez used to calculate damages are not "baseless" because he based them on Finite's broker agreement with Direct Energy, and he therefore thinks they are market rates. *See* Dkt. 111 at 15. Finite points to examples of commissions it received on deals for other clients, including for Tawa's Quincy, Massachusetts location, as support for Ibanez's choice of broker fee. *See* Dkt. 111 at 16 (citing Dkt. 107-6 at 5 (Finite's answers to interrogatories)).

As Tawa asserts, and the Court agrees, Finite has not satisfied its burden to prove that Ibanez's chosen commission rate, which he used to calculate all of Finite's lost commissions, is reliable. The unreliability of that threshold rate renders all of Ibanez's damages opinions inadmissible.

Ibanez's own testimony acknowledges the proper method for determining the commission rate that Finite would have earned on the Tawa contracts. According to Ibanez, the rate for procuring any utility contract would be negotiated within a contractually specified range, and it would vary depending on the market rate for energy, the price that the supplier is willing to offer, and the price the customer is willing to pay. Dkt. 79-3 at 17.

Yet Ibanez did not take any of those factors into account determining Finite's lost commissions. Instead, Ibanez cited Finite's agreement with Direct Energy, which specifies a range of potential broker fees, with no figure listed as the minimum, and a maximum figure of "up to $.01 per kWh" for electricity and "up to $.050 per DTh" for gas. *See* Dkt. 79-3 at 27-28 (Ibanez's deposition); Dkt. 80-1 at 5 ¶ 3.1 (Direct Energy contract). Ibanez lifted those maximum rates and used them as a proxy for Finite's lost commission rate on every contract with every provider from whom Tawa procured utility services in four different states. *See* Dkt. 107-1 at 11-13.

Ibanez's insistence that the figures he lifted from the Direct Energy contract is "*a* market rate," Dkt. 79-3 at 32, does not make it a reliable indicator of what rate Finite *actually would have earned* absent Tawa's alleged failure to utilize Finite's brokerage services. As Tawa observes, Ibanez's figures do not even reflect what Finite earned on the Direct Energy contract.[5] *See* Dkt. 79 at 13 (arguing that the agreement "does not set" Finite's rate) (emphasis removed). Because the contract provides a range of possible commission rates, it contemplates instances where Finite could be paid less than the maximum rate. *See* Dkt. 79-3 at 30 (Ibanez admitting that the commission could be anywhere between zero and the maximum rate). Yet Ibanez did not consider what commission Finite received under that contract, much less from any other utility provider. Quite the opposite: Ibanez declared "I wasn't swayed about what Finite was going to get or not going to

get." Dkt. 79-3 at 32; *see also id.* at 42 (admitting he did not know if his lost commission damage model reflects the commissions that Finite actually lost). Ibanez's admissions show that he neither analyzed nor offered reliable opinions on Finite's actual damages.

In addition, Ibanez offers no data or analysis justifying his reliance on a single contract as the going rate for energy brokerage services, generally, nor for the providers from whom Tawa acquired utility services.[6] *Cf. Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1167 (10th Cir. 2000) (affirming exclusion of an expert's market value opinion that "strayed too far from the available sales data" for $CO_2$, including prices actually received from sales). Finite's assertion that it cannot know "with absolute certainty the 'actual' commission rate," Dkt. 111 at 17, does not give its expert license to cherry-pick a number without providing a reliable basis for selecting it.

**\*10**  Tawa is correct that Ibanez performed no meaningful evaluation or analysis to arrive at his chosen broker fee. *See* Dkt. 79 at 14-17. He did not base the broker fee on scientific, technical, or special knowledge, nor on any industry principles. *See* Dkt. 79-3 at 42 (Ibanez deposition); Dkt. 79 at 16-17. Ibanez conceded that he applied no particular methodology—not even the factors he acknowledged were relevant, Dkt. 79-3 at 17—and relied on no other documents, data, or even his own energy brokerage experience to choose the broker fee, *see id.* at 32, 42.

Ibanez's approach of selecting a single, theoretical rate without evaluating the going market rates for energy brokerage services, generally, makes his opinion inadmissible. *Cf. Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 349 (5th Cir. 2020) (per curiam) (affirming exclusion of expert's opinion that simply took another source's sales projections, without meaningfully evaluating them, and extrapolated lost-profits figures); *Texokan Operating*, 89 F. Supp. at 911 (excluding expert who used plaintiff's financial figures "without conducting any independent evaluation"). Put another way, Ibanez's arbitrary selection of a maximum commission rate from a single broker agreement, without analyzing general market conditions or actual rates paid for similar brokerage services, merits "such little weight that the jury should not be permitted to receive that opinion." *Diabetes Ctrs. of Am., Inc. v. Healthpia Am., Inc.*, 2008 WL 375505, at \*2 (S.D. Tex. Feb. 11, 2008) (quotation omitted) (expert's wholesale reliance on plaintiff's projections, without conducting "independent research into whether the projected

figures ... were valid, or even reasonable" rendered his opinion speculative and inadmissible).

Ibanez's proffered justifications for using the maximum commission rate only magnify the foregoing deficiencies. First, as Tawa notes, *see* Dkt. 79 at 17-18, Ibanez provides nothing beyond a bare assertion that California's market complexity would justify a higher broker fee for the "greater work involved." *See* Dkt. 79-2 at 5. Indeed, when asked whether this complexity would result in Finite's receipt of the maximum commission rate, Ibanez admitted "I don't have enough information to say true or false on that." Dkt. 79-3 at 58. This testimony exposes Ibanez's speculation.

Second, Ibanez similarly offered no facts or data supporting his view that helping Tawa with Direct Access would justify a higher commission rate. *See* Dkt. 79-2 at 5. Ibanez did not even know whether Finite performed any Direct Access work on Tawa's behalf, *see* Dkt. 79-3 at 38-39—a deficiency that Tawa highlights, *see* Dkt. 79 at 19. This makes Ibanez's assumption that Finite performed such work wholly speculative.

Third, Ibanez makes an unsupported assertion that not many brokers handle both electricity and gas, and that this combined service merits a higher fee. *See* Dkt. 79-2 at 36-38; *see also* Dkt. 79-2 at 5 ("Providing energy broker and consulting services for both electricity and gas is more time-consuming."). The lack of any supporting facts or data is reason enough to deem his position unreliable. But Tawa aptly notes that a broker who procured contracts for both commodities would already be entitled to separate commissions for gas and utility services. *See* Dkt. 79 at 20; Dkt. 115 at 11. Indeed, that is reflected in the Direct Energy agreement that Ibanez cites. This makes even more problematic Ibanez's lack of explanation for increasing the relevant fee, when the commission structure already accounts for any extra work by specifying separate electricity and gas brokerage fees.

**\*11**  Even if the Court were to accept Ibanez's conclusory opinions, his explanations are disconnected from many undisputed facts. Where there is too great an analytical gap between the data and the opinion proffered, the court should exclude the expert testimony as *ipse dixit. See Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Those gaps are glaringly apparent here.

2025 WL 490483

For instance, Tawa is correct that a higher commission rate for California—even if it were somehow justified in that jurisdiction—cannot support the same commission rate in other states. *See* Dkt. 79 at 17-18; Dkt. 115 at 9-10. Yet Ibanez arbitrarily used the same fee multiplier for Maryland, New Jersey, and Texas locations. *Compare* Dkt. 107-1 at 11-13 (damages charts), *with* Dkt. 79-3 at 36 (Ibanez conceding that "Texas probably would be on the lower end ... as compared to other states," but declining to use a lower broker fee for Texas because "I wanted to use a consistent rate").

Similarly, Ibanez's notion that dual electricity and gas consulting warrants a higher rate cannot apply if Finite did not provide dual services. But Ibanez applied the same rate even when Finite's services were limited to a single commodity. *See* Dkt. 107-1 at 11-13 (damages chart); *see also* Dkt. 79-3 at 36 (Ibanez assumed without knowing or investigating that "Finite provided both electricity and gas pricing for all those locations"). Ibanez's failure to bridge the gap between the data and his opinions makes his opinions illogical and unreliable. *See Burleson*, 393 F.3d at 587.

Finite cannot salvage Ibanez's unreliable choice of commission rate by citing documents and information that Ibanez never considered. By his own admission, Ibanez's sole source for the commission rate was the maximum rate in the Direct Energy contract. *See* Dkt. 79-3 at 27-28. Finite's references to other information that Ibanez "*might* have used"—but did not consider— "smack of post hoc rationalization." *Jacked Up*, 807 F. App'x at 349 (rejecting reliance on information not utilized by the expert).

Specifically, Finite cites examples of other commissions it has received to show that the rates Ibanez used were within that range.[7] *See* Dkt. 107-6 at 5 (Finite's interrogatory answer with commission rate chart, showing Constellation electricity commissions ranging from $0.0025 to $0.01597 per kWh, and a gas commission of $1.63 per DTh); Dkt. 63-5 at 19-20 (Thomas Lee deposition, stating a Direct Energy commission rate of $0.65 for Tawa's Quincy, Massachusetts store). But Ibanez explicitly disclaimed reliance on "any actual broker fees that Finite has ever received to come up with" his chosen fees. *See* Dkt. 79-3 at 27 (addressing the fee for electricity); *id.* at 28 ("Q: You didn't rely on any broker fees for gas that Finite has ever received to come up with that broker fee, right? A: Correct.").

As Ibanez said, "I liked the maximum amount of the contract .... Because it was the maximum amount on the contract." Dkt. 79-3 at 32; *see also id.* at 42 (Ibanez agreeing that he chose the highest potential broker fee because he thought that is what Finite deserves). This is classic inadmissible *ipse dixit*. The commission rate forming the lynchpin of Ibanez's calculations is baseless and unreliable, which renders his damages opinions inadmissible.

2. The three-year contract assumption in the damages model is arbitrary and baseless.

**\*12** In addition to challenging Ibanez's selected commission rate, Tawa also disputes the reliability of Ibanez's use of three-year contract terms when calculating Finite's damages. According to Tawa, Ibanez performed no analysis to determine what contract terms might have been negotiated, nor did he consider that Tawa's actual utility supply contracts during the relevant period varied in duration from 12 to 36 months. *See* Dkt. 79 at 24. Finite justifies the three-year term by asserting that Finite most frequently recommended a term of three years or longer during the period at issue. *See* Dkt. 111 at 26.

Finite cannot dismiss this debate as a "mere difference of opinion." *See* Dkt. 111 at 26. Expert testimony that lacks an adequate basis for opining about the duration of a party's damages is inadmissible. *See 360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, 2016 WL 6075566, at \*4 (W.D. Tex. Apr. 22, 2016) (excluding expert opinion that projected lost profits over a 5-year period, for lack of sufficient explanation).

Ibanez's basis for his three-year projection rests on a declaration by Finite's employee, Thomas Lee, that he often discussed three-year or longer terms with clients. *See* Dkt. 107-5 at 2 (Lee's declaration in summary-judgment record, cited in Dkt. 111 at 26). The fact that Lee *discussed* three-year terms "fail[s] to provide a coherent rationale" for assuming that all contracts would endure for three-year terms because Finite has not shown that it *executed* three-year contracts for the relevant locations. *See 360 Mortg. Grp.*, 2016 WL 6075566, at \*4.

At best, Finite can show that Tawa entered into "*some* three-year contracts" during the relevant period. *See* Dkt. 111 at 26 (emphasis added) (citing Dkt. 89 at 5 (Christina Chang's declaration, listing Tawa's signed supply contracts by location and term)). But of the 32 stores for which Tawa signed supply contracts, fewer than half had three-year terms, and none of

those were in Maryland, New Jersey, or Texas. *See* Dkt. 79-5 at 5 (Chang's declaration). And Ibanez admitted that Finite's lost commissions depend on the length of the contracts that Tawa actually signed. *See* Dkt. 79-3 at 44. Yet Ibanez was not provided that information. *See id.* (Ibanez testifying that "I wasn't given that information to adjust by site ...."). Finite therefore cannot rely on Tawa's actual supply contracts to shore up any part of Ibanez's opinions. *See Jacked Up*, 807 F. App'x at 349 (rejecting "post hoc rationalization"). Ibanez's across-the-board, three-year assumption lacked supporting data and, hence, is unreliable. For this additional reason, Ibanez's damages opinions are excluded.

## II. Motion to exclude amended disclosure of Lee's testimony

Tawa also seeks to exclude specific testimony by Finite's non-retained expert, Thomas Lee, for lack of timely disclosure.[8] Dkt. 84. Finite's original disclosures identified Lee as a non-retained expert, but the disputed testimony concerns certain topics that appear, for the first time, in Finite's amended expert disclosures that were served more than 30 days after receiving Tawa's expert disclosures. *Compare* Dkt. 84-3 (Tawa's April 2, 2024 expert disclosures), *with* Dkt. 84-1 at 5 (Lee's opinions in Finite's May 23, 2024 amended disclosures). The parties debate whether Lee's new opinions are timely and, if not, what the consequences should be.

### A. Legal standard: untimely disclosure of expert testimony

 **\*13** Rule 26 of the Federal Rules of Civil Procedure requires a party to disclose "the identity of any witness it may use at trial to present" expert testimony. Fed. R. Civ. P. 26(a)(2)(A). Parties also "must supplement these disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). "[E]vidence ... intended solely to contradict or rebut evidence on the same subject matter identified by another party" must be designated "within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii).

Under Rule 37, a party who fails to make timely disclosure "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In addition to or in lieu of excluding the witness's testimony, the district court may impose sanctions such as awarding costs and attorneys' fees to the other party. *See In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 372 (5th Cir. 2016) (citing Fed. R. Civ. P. 37(c)(1)(A)-(C)).

### B. Finite's amended disclosure is not merely supplemental.

Tawa argues that Finite's amended disclosure of Lee's testimony constituted a rebuttal designation under Rule 26(a), making it subject to a 30-day disclosure deadline and therefore untimely. *See* Dkt. 84 at 3-4; Dkt. 110 at 1-2 (both citing Fed. R. Civ. P. 26(a)(2)(D)(ii)). Finite counters that its amended disclosure of Lee's testimony was timely because it was merely supplemental. *See* Dkt. 106 at 12-14.

"The purpose of rebuttal and supplementary disclosures is just that—to rebut and to supplement. These disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996). Supplementing an expert report or disclosure is permissible only for the narrow purpose of correcting inaccuracies or filling the interstices of an incomplete report based on previously unavailable information. *See Diaz v. Con-Way Truckload, Inc.*, 279 F.R.D. 412, 421 (S.D. Tex. 2012) (collecting federal cases). Supplementation does not provide an end-run around the deadlines for designating experts and producing expert reports. *See Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998); *Charter Sch. Sols. v. GuideOne Mut. Ins. Co.*, 2019 WL 5258055, at \*2 (W.D. Tex. June 28, 2019) (supplemental reports do not "provide a back-door means for parties to extend" expert deadlines). As one court has summarized:

> When a supplemental report is comprised of new, previously undisclosed opinions, it is not truly a supplement and must be filed within the deadline for expert opinions set by the court. Similarly, when a report contains entirely new opinions or addresses subject matter outside the scope of [the initial] designation and [the] initial report, it is not a supplement. Rather, it is an untimely designation.

*Eagle Railcar Servs.-Roscoe, Inc. v. NGL Crude Logistics, LLC*, 2018 WL 2317696, at \*7 (N.D. Tex. May 22, 2018) (quotations and citations omitted).

Finite's original disclosure mentioned Lee's knowledge of "Finite's business model, the utility broker and consultant business in general, and utility markets in California, Texas, and other states" and said he "may give testimony related to that knowledge and experience." Dkt. 84-2 at 4. It also disclosed Lee's testimony on "Finite's operations, business model, and agreements with Defendants"; "Finite's

Finite Utility Consulting, LLC v. Tawa, Inc., Not Reported in Fed. Supp. (2025)
2025 WL 490483

Case 1:18-cv-02949-RPK-JAM    Document 303-2    Filed 08/14/26    Page 12 of 18 PageID #: 14922

communications with Defendants and work that Finite performed for Defendants"; and "Finite's agreements, work, and communications with electricity and natural gas suppliers that are relevant to this case." *Id.* To this, Finite added that Lee "may also give testimony about other matters generally raised in this lawsuit." *Id.* at 4-5.

 **\*14**  Finite's characterization of Lee's amended disclosure as a supplement does not pass the straight face test, at least for nearly all of Lee's disclosed opinions. Only one topic —"(3) broker licensure and operations in various states," Dkt. 84-1 at 5—is related enough to the original disclosures to characterize it as a supplement. The remaining six are brand new topics found nowhere in the original disclosure. All six explicitly target and challenge the opinions of Tawa's expert, Udit Patel, *by name*:

> (1) the alleged industry practices, customs, and standards discussed by Defendants' expert witness Udit Patel;
>
> (2) why the commission ranges discussed by Defendants' expert witness Udit Patel do not align with what Finite would have likely earned for Defendants' sites;
>
> ...
>
> (4) the difference in the volume of usage and other factors between Defendants and Mr. Patel's clients and how that affects likely commission rates;
>
> (5) the difference between Finite's business model and practices and those of Mr. Patel's company, and how that affects likely commission rates;
>
> (6) how common or uncommon certain occurrences discussed by Mr. Patel are in Finite's line of work; and
>
> (7) how utility broker companies differ in their clients, line of business, and commission rates, such that Mr. Patel's opinions and observations based on his own work are not universally applicable.

Dkt. 84-1 at 5.

Finite itself describes Lee's testimony as "vitally important" to "*counter*"—*i.e.* to rebut—"many of Mr. Patel's opinions ...." *See* Dkt. 106 at 15 (emphasis added). The amended disclosures are new opinions, offered to rebut Tawa's expert Patel's opinions and not merely to supplement Finite's initial disclosure. *Cf. In re Complaint of C.F. Bean*, 841 F.3d at 371-72 (finding a second expert report not supplementary, and therefore untimely, when it included

new opinions not disclosed in the initial report); *Eagle Railcar*, 2018 WL 2317696, at *7 (expert disclosure was not supplemental because it identified new opinions on damages and affirmative defenses). Finite's amended disclosure therefore is untimely with respect to Lee's six proposed topics (numbers (1), (2), and (4) through (7)) that rebut Patel's opinions.

### C. Finite's untimely disclosure warrants excluding Lee's rebuttal opinions.

1. The untimely disclosure is not substantially justified.

Tawa argues that Finite offers no justification for the seven-week gap between Tawa's April 2, 2024 disclosure of Patel's expert report, *see* Dkt. 84-3 at 3, and Finite's May 23, 2024 disclosure of Lee's new rebuttal opinions. *See* Dkt. 84 at 4; Dkt. 110 at 3-4; Dkt. 106-1 at 2; Dkt. 106 at 14-15. Finite argues that it reasonably believed the disclosure was supplemental and therefore timely. *See* Dkt. 106 at 13-14.

Substantial justification for a failure to make a required disclosure is "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure [obligation]." *Olivarez v. GEO Grp., Inc.*, 844 F.3d 200, 205 (5th Cir. 2016) (applying this standard to Rule 26(g)(3) analysis but citing cases applying it to Rule 37); *see also Eagle Railcar*, 2018 WL 2317696, at *8 & n.10 (same standard applies to Rules 26(g)(3) and 37(c)(1)). Finite's explanations fall well short of that threshold. In fact, the only case law cited by Finite emphasizes that an expert report containing new, previously undisclosed opinions is *not* supplemental, but must instead be filed within the deadlines specified by the court. *See Eagle Railcar*, 2018 WL 2317696, at *7 (holding that a new expert report with new opinions was "not supplemental"). That principle applies with equal force to Lee's entirely new opinions that appeared, for the first time, in Finite's amended disclosure.

 **\*15**  The amended disclosure was so obviously a new rebuttal designation that Finite lacked "a reasonable basis both in law and fact" for failing to timely disclose the information. *See Olivarez*, 844 F.3d at 205 (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). It appears that Finite's counsel simply failed to discuss Patel's report with Lee for seven weeks, even though work on the amended disclosure began in mid-April. *See* Dkt. 106-1 at 2 (counsel

Finite Utility Consulting, LLC v. Tawa, Inc., Not Reported in Fed. Supp. (2025)

2025 WL 490483

asserting that she "did not determine the specifics of Mr. Lee's planned testimony regarding Mr. Patel's expert report until May 22, 2024" when "discussing the report with Mr. Lee"). There is no justification—let alone a substantial one—for the untimely disclosure.

2. The appropriate sanction is to exclude Lee's new opinions.

Because the untimely disclosure is wholly unjustified, Finite must show that its tardiness is harmless. *See Eagle Railcar,* 2018 WL 2317696, at *9. For this inquiry, courts assess: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *See In re Complaint of C.F. Bean,* 841 F.3d at 369 (citing *Geiserman v. MacDonald,* 893 F.2d 787, 791 (5th Cir. 1990)). These factors are evaluated holistically rather than mechanically counting the number of factors that favor each side. *See EEOC v. Serv. Temps, Inc.,* 2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009), *aff'd,* 679 F.3d 323 (5th Cir. 2012). Taken together, these factors weigh against permitting Lee's rebuttal testimony.

a. *Finite offers little explanation for the untimely designation.*

Finite's explanation for its untimely disclosure reprises its unavailing substantial justification argument, *see supra* Part II.C.1., and adds that it did not act in bad faith. *See* Dkt. 106 at 15. But even a good faith mistake does not excuse Finite's seven-week lag between its receipt of Patel's expert report and Finite's subsequent amended disclosure with Lee's rebuttal opinions. *See, e.g., Geiserman,* 893 F.2d at 791 (finding a "scheduling mistake ... is not the type of satisfactory explanation for which relief may be granted"). This factor favors excluding Lee's tardy rebuttal opinions.

b. *Lee's testimony is important to Finite's case.*

Tawa does not dispute that Lee's testimony is important to Finite's case. Instead, it contends that Lee's purported importance undermines Finite's excuse for not timely amending the disclosure. *See* Dkt. 84 at 5; Dkt. 110 at 4-5. But the Fifth Circuit has criticized that view because it stands the inquiry "on its head." *Betzel v. State Farm Lloyds,* 480 F.3d 704, 707 (5th Cir. 2007). As *Betzel* explains, the more

important the witness, the more this factor favors allowing his late disclosure. *See id.*

Finite, for its part, contends that Lee's testimony is essential to counter Patel's opinions about the energy brokerage business, and that its retained damages expert, German Ibanez, has not worked extensively enough as a broker to fully rebut Patel. *See* Dkt. 106 at 15-16. Although Lee is not a designated damages expert, *see* Dkt. 84-1 at 1-6, Finite maintains that Lee's testimony is important to rebut Tawa's stance on other issues in the case, including industry standards and common practices in the energy brokerage business. *See id.* at 5; Dkt. 106 at 16. This is enough to show that Lee's rebuttal opinions have some importance to Finite's case, although that alone cannot justify permitting Finite to present the opinions at trial. *See Betzel,* 480 F.3d at 708 (importance of witness's testimony "cannot *singularly* override the enforcement of ... scheduling orders") (citing *Barrett v. Atl. Richfield Co.,* 95 F.3d 375, 381 (5th Cir. 1996)).

c. *The untimely disclosure prejudices Tawa.*

**\*16** Tawa argues that the untimely amended disclosure (on May 23, 2024) is prejudicial because it occurred only two weeks before the discovery deadline (on June 7, 2024), and three weeks before the joint pretrial conference, as originally scheduled. Dkt. 84 at 5. Finite notes that Tawa, at that juncture, still had two weeks to re-depose Lee, and four months before the scheduled trial date, but neither asked for an extension nor asked to depose him again. Dkt. 106 at 18. Tawa counters that the two-week window was already consumed with two expert depositions (June 4, 6), deposition preparation (June 5), and a discovery hearing (May 28)—not to mention preparing motions to file by the June 14, 2024 deadline. Dkt. 110 at 5; *see also* Dkt. 84 at 5.

Ironically, one of the case commitments that Tawa cites resulted from an extension requested by Tawa itself. *See* Dkt. 64; Dkt. 67 (resetting May 16, 2024 hearing to May 28). It is also apparent that the parties have not been shy about requesting extensions of various deadlines. *See, e.g.,* Dkt. 4-5, 11-12, 22, 30-31, 36-39, 40-44, 46-47, 49, 59-60, 64, 67-68, 94-98, 102-03.

Nonetheless, courts "often find late expert designations prejudicial where the delay interferes with the opposing party's opportunity to depose the expert." *Gamboa v. Centrifugal Casting Mach. Co.,* 2015 WL 6835359, at *3

(S.D. Tex. Nov. 6, 2015) (citing *Geiserman*, 893 F.2d at 791-92). In *Reliance Insurance Co. v. Louisiana Land and Exploration Co.*, the plaintiff sought to supplement an expert report ten days after the deadline for expert reports had passed. *See* 110 F.3d 253, 257 (5th Cir. 1997). Based on the initial disclosure and the deposition, the defendant had decided not to counter the plaintiff's expert testimony with its own expert report. *Id.* The defendant opposed the plaintiff's motion to supplement the report because the discovery cut-off date was three weeks away, and the newly disclosed opinions might cause them to designate an engineering expert of their own. *Id.* Applying the *Geiserman* factors, the Fifth Circuit affirmed the district court's denial of the request to supplement the expert report, because to "allow plaintiff to add more material now and create essentially a new report would prejudice the defendants, who would then have to get an expert to address these last-minute conclusions, and thus disrupt the trial date in this case." *Id.* at 257-58.

Similarly, here, Finite's amended disclosure proffers a new set of expert opinions that Tawa would need to explore in another deposition of a witness it already deposed. *See id.* Tawa's potential burden and expense of trial preparation is compounded by the "summary fashion" in which Lee's opinions were disclosed. *See* Dkt. 110 at 5; *see* Dkt. 84-1 at 4-6. Moreover, "the Court does not find [Tawa's] failure to seek discovery from [Finite] to be dispositive or persuasive." *Lucero v. Federated Mut. Ins. Co.*, 2023 WL 2287240, at *10 (N.D. Tex. Feb. 10, 2023), *adopted sub nom. Lucero v. Caterpillar Inc.*, 2023 WL 2290780 (N.D. Tex. Feb. 28, 2023). "To accept [Finite's] argument that inadequate, untimely, and last-minute disclosures are harmless whenever the opposing party has the opportunity to later depose the expert defeats the purpose of the rule and turns it on its head by shifting the burden to the opposing party to discover the expert's opinions and the bases for those opinions and allowing conclusion-only expert disclosures and reports such as [Lee's] to be gap-filled via deposition." *See State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, 2019 WL 1436659, at *25 (N.D. Tex. Mar. 31, 2019), *reconsidered in part on other grounds*, 2023 WL 8606773 (N.D. Tex. Dec. 12, 2023). Because Tawa is prejudiced by Finite's untimely disclosure, this factor favors excluding Lee's rebuttal testimony.

d. *A continuance would not serve as an adequate deterrent.*

**\*17**  Tawa protests that the case has already been continued too many times and that no further continuances are warranted. *See* Dkt. 110 at 6. Finite notes that Tawa deposed Lee originally before either expert deadline, so even if Finite had complied with the disclosure deadline, Tawa would have had to conduct a second deposition anyway. *See* Dkt. 106 at 21-22.

Finite's contention misses the point. If Finite's disclosure had been timely, Tawa would have had an additional three weeks to respond, when the discovery and motions deadlines would have been five and six weeks away, respectively. That would have provided Tawa ample opportunity to probe Lee's opinions and respond to their substance, including by utilizing such further information in Tawa's dispositive motions. The untimeliness of Finite's disclosure threw a wrench into the discovery and motions process.

Although a continuance would give Tawa more time to review and respond to the late disclosures, including perhaps to re-depose Lee, such a measure "would neither punish [Finite] for [its] conduct nor deter similar behavior in the future." *See Harmon v. Ga. Gulf Lake Charles L.L.C.*, 476 F. App'x 31, 37 (5th Cir. 2012) (per curiam) (quoting *Sierra Club*, 73 F.3d at 573). Nor should Finite reap the benefit of the Court's subsequent decision to delay docket call and trial solely to provide sufficient runway for resolving the parties' many pending motions. *See* Dkt. 124 (pushing docket call from January to May 2, 2025). On balance, the interests in deterrence, the prejudice to Tawa, and Finite's lack of justification for its tardy disclosures outweigh Finite's interests in permitting Lee to offer his rebuttal opinions. Accordingly, Lee's rebuttal opinions are excluded.

### III. Tawa's motion for summary judgment

**A. Summary judgment standard**

Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material if the issue it addresses "could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379-80 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)).

Finite Utility Consulting, LLC v. Tawa, Inc., Not Reported in Fed. Supp. (2025)

2025 WL 490483

When resolving a motion for summary judgment, courts must view the facts and any reasonable inferences "in the light most favorable to the nonmoving party." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (quotation omitted). "[T]he court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party ...." *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 584 (5th Cir. 2001). In addition, courts must credit all reasonable inferences from the evidence, without "weigh[ing] evidence or mak[ing] credibility findings." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022). But "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023) (quoting *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003)).

### B. Finite has failed to raise a fact issue on damages, which negates its claims.

**\*18** The exclusion of Finite's damages expert, German Ibanez, is material to Tawa's motion for summary judgment. In fact, Tawa's lead contentions attack Ibanez's opinions, identifying the same flaws in his choice of broker fee and his use of a three-year assumption for the damages period that the undersigned has already concluded make Ibanez's damages calculation unreliable and inadmissible. *See* Dkt. 81 at 8-17, 22-23; *see supra* Part I.D.

As explained below, Finite lacks sufficient evidence supporting its lost commissions, which defeats its claims. The Court therefore finds it unnecessary to address Tawa's alternative grounds for summary judgment.

Regardless of what law applies, proof of damages is indispensable to Finite's recovery, whether for breach of contract,[9] promissory estoppel,[10] or tortious interference.[11] As for the standard for proving damages, Tawa cites California, New Jersey, and Texas law. *See* Dkt. 81 at 15 & n.3. Finite cites only Texas law. But neither party claims that the laws of those states conflict on these issues. The Court therefore applies Texas law, as the law of the forum state. *See Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002); *see also, e.g., Hagan v. Mazda Motor Co. of Am., Inc.*, 690 F. App'x 242, 243-44 (5th Cir. 2017) (per curiam) (failure to raise conflicts-of-law waived the issue).

Finite's alleged lost commissions are a form of lost profits. *See, e.g., Quick Change Artist, LLC v. Accessories*, 2017 WL 563340, at \*4 (Tex. App.—Dallas Feb. 13, 2017, no pet.) (characterizing as lost profits "commissions Iris would have received on sales to its customers but for the breach of contract"), *abrogated on other grounds by Nath v. Tex. Children's Hosp.*, 576 S.W.3d 707, 709 (Tex. 2019). "Recovery for lost profits does not require that the loss be susceptible of exact calculation." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). Under Texas law, the factfinder has broad discretion to award reasonable damages within the range of evidence presented at trial. *See Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

**\*19** Nevertheless, to obtain recovery, lost profits must be supported by competent evidence and proved with reasonable certainty. *See Szczepanik v. First S. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam). The threshold is context- and fact-specific. *See Holt Atherton*, 835 S.W.2d at 84. But a party must do more than merely show that it suffered *some* lost profits. *See Szczepanik*, 883 S.W.2d at 649. At a minimum, "opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 779 (5th Cir. 2017) (citing *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 206-07 (Tex. App.—Fort Worth 2004, pet. denied)). As a further requirement, lost profits must be "predicated on one complete calculation." *See Holt Atherton*, 835 S.W.2d at 85 (collecting cases); *accord Szczepanik*, 883 S.W.2d at 649.

According to Tawa, the exclusion of Ibanez's opinions leaves Finite without competent evidence substantiating its lost commissions. *See* Dkt. 81 at 17; Dkt. 109 at 8. Finite, however, asserts that it has "alternative bases" for its damages. *See* Dkt. 107 at 14. These alleged bases are: (1) Finite's commission rates on deals with other customers; and (2) the opinion of Tawa's expert, Udit Patel, on the range of "industry standard" commissions. *See id.*

Specifically, Finite cites various commission rates it received on energy deals with Constellation and Green Mountain Energy[12] for non-Tawa customers during the relevant timeframe. *See* Dkt. 107-6 at 4-5. On five electricity supply contracts with Constellation in Texas, New York, and New Jersey, Finite earned between $0.0025 and $0.01597 per kWh. *See id.* at 5. Finite identified only a single gas supply

Case 1:18-cv-02949-RPK-JAM   Document 303-2   Filed 08/14/26   Page 16 of 18 PageID #: 14926

Finite Utility Consulting, LLC v. Tawa, Inc., Not Reported in Fed. Supp. (2025)

2025 WL 490483

contract—with Constellation, and in New Jersey—for which Finite was paid $1.63 per DTh in commissions. *See id.* Finite then invokes the opinion of Tawa's expert, Patel, indicating that "industry standard practice" provides "commissions of $0.001 to $0.0035 per kwh for electricity" and "$0.10 to $0.35 per Dth" for gas acquired by large commercial clients like Tawa. *See* Dkt. 107 at 14 (citing Dkt. 89-21 at 13). According to Finite, this evidence is enough to raise a fact issue on damages even if Ibanez's calculation is inadmissible. *See id.*

Tawa is correct that Finite cannot simply present a wide range of possible commissions—from $.001 per kWh to more than *six times* that figure, predicated on Finite's prior commissions, or $.001 and $.10 to 3.5 times that amount for electricity and gas, respectively, based on Patel's opinions—and ask the jury to pick a number within those ranges.[13] This is because Finite has proffered no objective facts, figures, or data necessary to inform what figure within those ranges should apply.

**\*20** As noted earlier, Finite's own expert conceded that a utility company would negotiate the specific commission for a particular supply contract, and the ultimate rate would depend on market rates for energy and other factors. *See* Dkt. 79-3 at 17; Dkt. 79-2 at 5. Yet Finite presents no evidence indicating that the utility contracts procured for other customers are sufficiently comparable to the contracts for which Finite seeks lost commissions.

There is no indication that Finite's prior customers were commercial entities with a usage profile similar to Tawa's —a deficiency that Tawa notes. *See* Dkt. 109 at 10 (citing Dkt. 107-6 at 5). Moreover, Tawa's supply contracts are either with different utility suppliers or for different states, or both, than the two suppliers that Finite cites.[14] *Compare* Dkt. 107-6 at 5 (Finite identifying Constellation and Green Mountain Energy for electricity in Texas, New Jersey, and New York, and Constellation for gas in New Jersey), *with* Dkt. 89 at 5 (Tawa's utility contracts with Constellation (Massachusetts, for electricity); Talen Energy (Maryland and New Jersey, for electricity); Indra Energy (New Jersey for gas); 3 Phases Renewables, Inc. (Northern California, electricity); and Direct Energy (Southern California, electricity)). Without competent evidence that Finite's prior deals are sufficiently similar to Tawa's utility contracts so as to provide an appropriate benchmark for the commission rate that Finite would have been paid for procuring Tawa's energy supply contracts, Finite cannot substantiate its lost commissions with reasonable certainty. *See, e.g.*, *Holmes v. Jetall Cos.*, 2016 WL 3662645, at \*5 (Tex. App.—Houston [1st Dist.] 2016, pet.

denied) (rejecting as legally insufficient an expert's opinion about expected profit on the construction of townhomes, including because there was no evidence showing that other townhomes used as comparators were sold under similar market conditions and were similar enough to the subject properties); *Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC,* 403 S.W.3d 547, 556 & n.5 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (insufficient evidence of lost profits where no evidence showed that the profit margin under one alleged contract was "sufficiently similar" to two other contracts, or that the plaintiff "would earn the same profit margin on all three of them").

Also problematic is Finite's failure to proffer "one complete calculation" of damages. *See Holt Atherton,* 835 S.W.2d at 85 (holding that legally insufficient evidence supported lost profits, when the plaintiffs testified to "pieces of several different methods of calculating lost profits" but provided no evidence "supporting one complete calculation"); *Szczepanik,* 883 S.W.2d at 650 (no evidence of lost profits damages when there was "nothing in the record that relates the total amount of profits [plaintiff] expected to make"). The exclusion of Ibanez's opinions leaves Finite without anything resembling a single calculation of its lost commissions.[15] Instead, it offers not one, but two wide commission ranges— whether based on Patel's opinions or Finite's prior contracts —without sufficient facts to determine what the actual commission rate should be. This approach impermissibly invites the jury to speculate about the proper quantum of lost commissions. Finite's alternative bases for damages are insufficient to support recovery. *See, e.g.*, *Holt Atherton,* 835 S.W.2d at 84-86; *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 860 (Tex. 2017) ("largely speculative" evidence cannot establish lost profits damages "with reasonable certainty") (citing *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)).

**\*21** Finite offers no damages theory other than its lost commissions that lack sufficient evidentiary support. Accordingly, Finite cannot raise a genuine issue of material fact on the damages element of its breach of contract, promissory estoppel,[16] and tortious interference claims. This Court should grant summary judgment on all of Finite's claims.

## Order and Recommendation

For the foregoing reasons, it is **ORDERED** that (1) Tawa's motion to exclude the report of Finite's expert German Ibanez (Dkt. 79); and (2) Tawa's motion to exclude the new rebuttal testimony of Finite's non-retained expert Thomas Lee (Dkt. 84) are both **GRANTED.**

It is further recommended that Tawa's motion for summary judgment (Dkt. 81) be **GRANTED.**

**The parties have fourteen days from service of this Report and Recommendation to file written objections. 28**

U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). **Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.** *Ortiz v. City of San Antonio Fire Dep't*, **806 F.3d 822, 825 (5th Cir. 2015).**

**All Citations**

Not Reported in Fed. Supp., 2025 WL 490483

Footnotes

1       Finite's pending motion for summary judgment (Dkt. 48, 91) on a counterclaim brought by one defendant entity will be addressed in a separate opinion.

2       Motions to exclude expert testimony are non-dispositive matters, such that a magistrate judge's order resolving them is reversible only if "clearly erroneous or contrary to law," 28 U.S.C. § 636(b)(1)(A). *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 346 n.2 (5th Cir. 2020) (per curiam); *Tsao v. Ferring Pharm., Inc.*, 2018 WL 3589082, at *2 (S.D. Tex. June 13, 2018) (affirming magistrate judge's order excluding expert opinions under the deferential standard for non-dispositive matters); *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 569 (S.D. Tex. 2003) (noting prior affirmance of magistrate judge's *Daubert* order excluding experts was "not clearly erroneous or contrary to law").

3       By agreement, Tawa's deadline to designate experts was extended to April 2, 2024. *See* Dkt. 84-3 at 2 & n.1; Dkt. 39 (amended scheduling order).

4       As a procedural challenge, Finite argues that Tawa's motion to exclude Ibanez should be stricken for failure to confer. *See* Dkt. 111 at 8. But even if the Court were to strike the motion, it would still permit Tawa to file a proper version that includes a certificate of conference. Because the motion to exclude is fully briefed, the Court declines to delay these proceedings and denies the request to strike Tawa's motion.

5       Indeed, Finite's own interrogatory responses reflect that Direct Energy did not pay a penny in commissions to Finite during the relevant timeframe. *See* Dkt. 107-6 at 5 (identifying Direct Energy as an entity for whom Finite provided "pro bono work" and was paid $0).

6       The illogic of Ibanez's reasoning is apparent when extended to determining the market value of a home. Ibanez's approach is akin to equating the *asking* price for a single house with the market value of a similar home, regardless of whether the listed house ultimately *sold* for less than its asking price, and regardless of what other comparable houses sold for in the same area.

7       If anything, the wide variation in Finite's actual commission rates paid by other electricity suppliers—ranging from 25% to 160% of Ibanez's chosen rate of $.01, *compare* Dkt. 107-6 at 5, *with* Dkt. 80-1 at 5 ¶ 3.1—underscores that Ibanez's selection is arbitrary and unreliable.

8       For the same reasons noted above, the Court denies Finite's request to strike Tawa's motion despite Tawa's failure to confer before filing it. Dkt. 106 at 24; *see supra* n.4.

9       *See, e.g.*, *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (breach of contract under Texas law requires proof of "damages sustained by the plaintiff as a result of the breach"); *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011) (same under California law); *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016) (same under New Jersey law).

2025 WL 490483

10    *See, e.g.*, *MetroplexCore, LLC v. Parsons Transp., Inc.*, 743 F.3d 964, 977 (5th Cir. 2014) (elements of promissory estoppel in Texas include "substantial reliance by the promisee to his detriment"); *US Ecology, Inc. v. California*, 28 Cal. Rptr. 3d 894, 905 (Cal. Ct. App. 2005) (California promissory estoppel law requires that "the party asserting [it] must be injured by his reliance"); *Toll Bros., Inc., et al. v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 944 A.2d 1, 19 (N.J. 2008) (New Jersey law; promissory estoppel requires proof of "definite and substantial detriment").

11    *See, e.g.*, *Ancor Holdings, L.P. v. Landon Cap. Partners, L.L.C.*, 114 F.4th 382, 398 (5th Cir. 2024) (citing *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017)) (elements of tortious interference in Texas include "actual damage or loss"); *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 670 (Cal. 2020) (elements of tortious interference in California include "resulting damage"); *MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996) (same, New Jersey law).

12    Finite's chart also includes two pro bono deals that Finite negotiated, one with Direct Energy and another with GME. *See* Dkt. 107-6 at 5.

13    Tawa also notes that Finite could have built a damages model based on actual (alleged) lost commissions on Tawa deals, but it chose not to do so. *See* Dkt. 109 at 8; *see also* Dkt. 81 at 16. In response, Finite contends that "neither side has a way of determining [actual fees] with absolute certainty," and that Finite "has no records of whether it included commission in the pricing offers sent to [Tawa] or ... what that commission rate was." *See* Dkt. 107 at 12-13. Tawa counters that Finite's lack of certainty about fees is precisely why summary judgment is appropriate. *See* Dkt. 109 at 8. It further contends that Lee's declaration, stating he was unsure whether Finite's commission was included in price quotes presented to Tawa, contradicts Lee's deposition testimony, confirming that price quotes typically included commissions. *See id.* at 8-9 (*comparing* Dkt. 107-5 at 2 (Lee declaration), *with* Dkt. 89-1 at 19 (Lee deposition)).

      Ultimately, this debate is immaterial because Finite does not rely on the inclusion or exclusion of commission amounts from price quotes as a basis for its damages. If anything, Finite's complaints about the difficulty and uncertainty surrounding its damages calculation, *see* Dkt. 107 at 12-13, reinforces that merely offering a range of possible fees to the jury falls well short of supporting recovery.

14    Finite asserts that it earned unspecified commissions from Direct Energy in Texas, citing Lee's deposition. Dkt. 107 at 13 (citing Dkt. 107-7 at 15). This is unsupported because Lee could not recall the energy supplier with whom he placed a larger client in Texas. *See* Dkt. 107-7 at 15.

15    As Tawa observes, Finite has designated no other expert to opine on damages. *See* Dkt. 109 at 10-11; Dkt. 84-2 at 4-5 (designation of Lee does not include damages).

16    Notably, Texas law does not permit recovery of lost profits on a promissory estoppel claim. *See Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 734 (Tex. 1981) (such damages are "not measured by the profits that such party's reliance led him to expect, but instead are limited to the amount necessary to compensate that party for a loss already suffered"). But both parties have assumed that Finite's sole damages for promissory estoppel consist of lost commissions. Given their position, Finite's insufficient evidence substantiating its lost commissions also forecloses its promissory estoppel claim.

---

**End of Document**                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.